No. 23-2097

---

**In The United States Court Of Appeals
For The Fourth Circuit**

**LULA WILLIAMS,**
*Plaintiff-Appellee*

**v.**

**MATT MARTORELLO,**
*Defendant-Appellant,*

On Appeal From The United States District Court
For The Eastern District Of Virginia (Robert E. Payne)
(3:17-cv-00461-REP)

---

**JOINT APPENDIX
VOLUME II**

---

Matthew William Wessler
Gupta Wessler PLLC
1900 L Street NW, Suite 312
Washington, D.C. 20036
Telephone: (202) 888-1741
E-mail : matt@guptawessler.com

*Counsel for Appellee*

Steven D. Gordon
Holland & Knight LLP
800 17th Street, N.W., Suite 1100
Washington, D.C. 20006
Telephone: (202) 955-3000
E-mail: steven.gordon@hklaw.com

*Counsel for Appellant*

December 6, 2023

Krisi Cahoon Kelly
Andrew Joseph Guzzo
Kelly Guzzo, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
Telephone: (703) 424-7576
E-mail:  kkelly@kellyguzzo.com
E-mail:  aguzzo@kellyguzzo.com

*Counsel for Appellee*

VOLUME II

TABLE OF CONTENTS

| No. | Document Description | Page No. |
|---|---|---|
| 10 | Exhibits #7 to #56 to plaintiffs' memorandum in support of their motion for partial summary judgment | JA460-JA937 |
| 11 | Exhibit #3 to plaintiffs' memorandum in support of their motion *in limine* | JA938-JA949 |

# Exhibit 7

---

**Message**

---

| | |
|---|---|
| **From**: | Ashish Rane [ashish.rane@aranca.com] |
| **Sent**: | 1/12/2017 12:40:08 PM |
| **To**: | Matt Martorello [matt@liontllc.com]; Zayra Emanuelli [zayra@liontllc.com] |
| **CC**: | manish.goyal@aranca.com; 'Jitendra Pabrekar, CFA' [jitendra.pabrekar@aranca.com]; pooja.gala@aranca.com |
| **Subject**: | RE: Bellicose Capital Valuation |

Hi Matt,

Thank you for the email. Any expected economic benefits (including the future revenues) that could be earned from the way of having this contract in place would be captured under goodwill. While I agree the tribe's relationship is certainly valuable, we also need to factor in the abundance of supply and/or the relative ease of replacing these tribes. As such, we will value them by aggregating the total costs incurred (would be incurred) to get a similar contract.

I will discuss and elaborate on this during our call if needed.

Thanks,

**Ashish Rane**

**Manager| Valuations Advisory|Aranca**

**LinkedIn Profile**

---

**From:** Matt Martorello [mailto:matt@liontllc.com]
**Sent:** Wednesday, January 11, 2017 3:30 AM
**To:** Zayra Emanuelli; Ashish Rane
**Cc:** manish.goyal@aranca.com; Jitendra Pabrekar, CFA; pooja.gala@aranca.com
**Subject:** RE: Bellicose Capital Valuation

To comment on this:

1.   We had an internal discussion regarding the proportion of value of (existing) customers that would be captured in our hot assets calculation. Since both essentially capture the value from existing customer contracts, would it be fair to say that their values would be the same? Please let us know your thoughts on this. If you believe there is incremental value attached to these above and beyond the cashflows analyzed in our Hot asset calculations, please discuss your underlying rationale.

The Hot Assets are is earned revenue up to this moment, but not yet received. The additional contract value will be the future revenues that will be earned by way of having the contract in place (given the high probability of the business relationship remaining for at least some material timeframe). The former is done and recorded, while the latter is almost like option value. If I wanted to get a new contract, I'd probably call a broker who would introduce me to tribes and charge me a few hundred K (we sent how much we paid for the initial relationship intro in a prior email). Then there would be additional costs for legal and compliance and investment, if we were to get a new contract into place as well.

---

**From:** Zayra Emanuelli
**Sent:** Wednesday, January 4, 2017 11:00 AM
**To:** Ashish Rane <ashish.rane@aranca.com>; Matt Martorello <matt@liontllc.com>
**Cc:** manish.goyal@aranca.com; Jitendra Pabrekar, CFA <jitendra.pabrekar@aranca.com>; pooja.gala@aranca.com
**Subject:** RE: Bellicose Capital Valuation

JA461

MARTORELLO_008958

Hi Ashish,

Please refer to my comments below.

Best regards,
Zayra

**Liont, LLC**

**Zayra Emanuelli**
Mobile: 787-426-5344
Email: **zayra@liontllc.com**

875 Carretera 693, Suite 202, Dorado, PR 00646
**http://www.LiontLLC.com**

This electronic mail, including any attachments, is confidential and intended solely for the use of the individual to whom it is addressed.  Use or distribution by any unintended recipient is prohibited. Please notify the sender immediately if you have received this email by error and delete this email and all attachments from your system.

---

**From:** Ashish Rane [mailto:ashish.rane@aranca.com]
**Sent:** Wednesday, January 4, 2017 8:11 AM
**To:** Zayra Emanuelli <zayra@liontllc.com>; Matt Martorello <matt@liontllc.com>
**Cc:** manish.goyal@aranca.com; Jitendra Pabrekar, CFA <jitendra.pabrekar@aranca.com>; pooja.gala@aranca.com
**Subject:** Bellicose Capital Valuation

Good morning Zayra and Matt,

Thank you for sharing the consolidated financials for Bellicose VI. We have incorporated the same in our analysis.

1.   I had one query on analyzing the file shared yesterday. Deloitte's report mentions the total value of the group at $17.1 million. Further, previous emails refer to $7.7 million as the value to be distributed among intangibles, implying a $9.4 million net asset value of the group's tangible assets. However, based on the current consolidated financials shared, we arrived at a net asset value of $7.5 million (attached), leaving an unaccounted $1.9 million of net asset value/tangible assets. Could you please help me bridge the gap or correct my understanding with regards to the numbers?.
ZE – See attached spreadsheet, where I reconciled the 2012 valuation's numbers to the tax returns. I noted some differences but they were below $100K. Keep in mind that Deloitte's report did DCF for SPVI and ICA, therefore, you will not be able to tie that value to these entities NAV.  I hope the attached reconciliation is helpful, but let me know if you have further questions.

2.   We also await the consolidated financials (including Bellicose for June 30, 2015).
ZE – noted. Will be provided.

3.   We had an internal discussion regarding the proportion of value of (existing) customers that would be captured in our hot assets calculation. Since both essentially capture the value from existing customer contracts, would it be fair to say that their values would be the same? Please let us know your thoughts on this. If you believe there is incremental value attached to these above and beyond the cashflows analyzed in our Hot asset calculations, please discuss your underlying rationale.
ZE – In my mind, the customer contracts will be the value attributed to the contracts, net of the hot assets. For me, the customer contracts are the contracts in place with the tribes, while the hot assets are basically the revenue that have not yet been collected from outstanding loans. Therefore, I do believe there is an incremental

JA462

MARTORELLO_008959

value in top of the hot asset numbers. Remember that the hot assets only include the outstanding balance as of each of the transaction events (i.e. 12/31/2012 and 6/30/2015), assuming no reinvestment of collected amounts. On the other hand, for calculating the value of customer contracts, I think we definitely need to take into account the re-deployment of collected amounts into new loans.

For purposes of the 2012 valuation, I think Deloitte assumed that revenues would stop on Feb 2014, so there was only an increment in revenues during 2013. Likewise, for June 2015, we made the assumption that the loan portfolio would commence an unwinding process beginning in Jan 2017. So, for both dates, Dec 31, 2012 and June 30, 2015, I think most of the value attributable to the customer contracts will in fact be hot assets, but there should definitely be some additional value that is related to loans that were not outstanding as of each of those days, but that were subsequently originated (for 2012 – originated after Dec 31, 2012; for June 2015 – originated on or after July 1, 2015 through Dec 31, 2016).  Let me know if you agree.

Based on the inputs shared, we should be able to share preliminary numbers for 2012 this week and the 2015 numbers on receipt of the consolidated financials.

Thanks,

**Ashish Rane**

Manager| Valuations Advisory|**Aranca**

**LinkedIn Profile**

---

**From:** Zayra Emanuelli [mailto:zayra@liontllc.com]
**Sent:** Wednesday, January 04, 2017 2:46 AM
**To:** Ashish Rane; Matt Martorello
**Cc:** manish.goyal@aranca.com; Jitendra Pabrekar, CFA; pooja.gala@aranca.com
**Subject:** RE: Bellicose Capital Valuation

Hi Ashish,

Attached please find Bellicose VI's consolidated financials as of 12/31/2012 and 12/31/2013, and for the years then ended.

Best regards,
Zayra

**Liont, LLC** 

**Zayra Emanuelli**
Mobile: 787-426-5344
Email: **zayra@liontllc.com**

875 Carretera 693, Suite 202, Dorado, PR 00646
**http://www.LiontLLC.com**

This electronic mail, including any attachments, is confidential and intended solely for the use of the individual to whom it is addressed.  Use or distribution by any unintended recipient is prohibited. Please notify the sender immediately if you have received this email by error and delete this email and all attachments from your system.

---

**From:** Ashish Rane [mailto:ashish.rane@aranca.com]
**Sent:** Monday, January 2, 2017 12:26 PM

CONFIDENTIAL                                                 MARTORELLO_008960

**To:** Zayra Emanuelli <zayra@liontllc.com>; Matt Martorello <matt@liontllc.com>
**Cc:** manish.goyal@aranca.com; Jitendra Pabrekar, CFA <jitendra.pabrekar@aranca.com>; pooja.gala@aranca.com
**Subject:** Bellicose Capital Valuation

Hi Zayra and Matt,

Thanks for the files you sent last week. We have reviewed the calculations for the June 2015 Hot Asset valuation and are comfortable with the assumptions used therein. With respect to the Dec 2012 Hot Assets calculations, I think the best approach would be use to apply the 2015 Hot Asset – Loan portfolio ratio and then discount the Hot Asset balance to reflect the increased risk or bad debt risk/non-collection. With that said, if you have any other documentation with respect to the 2012 Hot Asset valuation, please feel free to send across for us to fortify our analysis.

We were analyzing the consolidated balance sheet for Kairos Holdings you sent on Saturday (attached). Could you please confirm if the consolidation incorporate Bellicose Capital?
For example, there are line items such as 'Investments in Bellicose Capital' and 'Due to SPVI', highlighted in the file, which should be in the eliminations.
Further, Bellicose Capital had certain fixed assets as of June 30, 2015, a proportion of which should be allocated to Kairos, based on its shareholding. These do not appear in the consolidated financials shared currently.

If possible, could you please share a consolidated balance sheet for the entities concerned – we believe adding Bellicose to the current file, and adjusting for eliminations, should be sufficient.

Please let me know your thoughts and/or if you have any questions.

Thanks,

**Ashish Rane**

**Manager| Valuations Advisory|Aranca**

**LinkedIn Profile**

---

**From:** Zayra Emanuelli [mailto:zayra@liontllc.com]
**Sent:** Saturday, December 31, 2016 12:33 AM
**To:** Ashish Rane; Matt Martorello
**Cc:** manish.goyal@aranca.com; 'Jitendra Pabrekar, CFA'
**Subject:** RE: Bellicose Capital Valuation

Hi Ashish,

Attached are the consolidated financials for Kairos Holdings, LLC at 6/30/2015 and for the period then ended. In terms of the 2012 consolidated financials, you can take a look at the tax return provided for BVI for such year, as it has a consolidating schedule as one of its annexes. We will provide the complete file once available (along with December 2013 and June 2015).

Best regards,
Zayra

**Liont, LLC**

**Zayra Emanuelli**
Mobile: 787-426-5344
Email: zayra@liontllc.com

CONFIDENTIAL

875 Carretera 693, Suite 202, Dorado, PR 00646
http://www.LiontLLC.com

This electronic mail, including any attachments, is confidential and intended solely for the use of the individual to whom it is addressed. Use or distribution by any unintended recipient is prohibited. Please notify the sender immediately if you have received this email by error and delete this email and all attachments from your system.

---

**From:** Ashish Rane [mailto:ashish.rane@aranca.com]
**Sent:** Friday, December 30, 2016 6:32 AM
**To:** Zayra Emanuelli <zayra@liontllc.com>; Matt Martorello <matt@liontllc.com>
**Cc:** manish.goyal@aranca.com; 'Jitendra Pabrekar, CFA' <jitendra.pabrekar@aranca.com>
**Subject:** RE: Bellicose Capital Valuation

Hi Zayra & Matt,

Thank you the responses and your time yesterday. We have received the revised files prepared by Luis and will use that analysis to the extent we can to support the assumptions and drivers. I will wait for the remaining financials and any supporting documentation for the 2012 Hot Assets calculation. We will also apply the Hot Assets to Loan ratio (2015) mechanics and other methodologies to calculate the Hot assets number for 2012 and share our analysis with supporting assumptions.

Please let me know if you have any questions.

Have a good weekend and Happy New Year!

Thanks,

**Ashish Rane**

**Manager| Valuations Advisory|Aranca**

**LinkedIn Profile**

---

**From:** Zayra Emanuelli [mailto:zayra@liontllc.com]
**Sent:** Thursday, December 29, 2016 7:30 PM
**To:** Ashish Rane; Matt Martorello
**Cc:** manish.goyal@aranca.com; 'Jitendra Pabrekar, CFA'; pooja.gala@aranca.com
**Subject:** RE: Bellicose Capital Valuation

Ashish,

Below you'll find the answers provided by our financial analyst with respect to your questions about the hot assets calculations. I'm awaiting for Matt to confirm his availability for today's call. Will confirm in a bit. Will continue sending the requested information during the day.

1.  *We noted that a monthly repayment rate of around 20% has been assumed for the June 2015 calculations.*
    a.  *What is the basis for this assumption?*  The 20% average is based on assumption that the outstanding portfolio as of June 2015 will behave similar to historical cash flows for outstanding loans in the past.
    b.  *Is this based on actual churn observed in the portfolio?* Yes. The rate is calculated using the monthly weighted average rate of portfolio of outstanding loans cash flows data from February 1, 2014 to October 1, 2014 (segregated by new customer and returning customers).

JA465

                                                     MARTORELLO_008962

2. *Further, service revenue proportion of 8-13% has been assumed in the hot assets calculation. Please provide the rationale for these assumptions. Are these assumptions inclusive of interest (service fee) and penalties?* The service revenue proportion of July and Aug are based on monthly actuals, and then, Sept through Dec is the average of the previous actuals calculated. Service revenue is the RRTL service fee (based on RRTL Income), so it includes service revenue, returns, charge -offs and expenses.

3. *We saw that the ratio of service fee earned from DCTF and RRTL to the loan portfolio (assumed at $23 million) varied between 1-13% in 2014. What causes the variation?* The variation was mainly caused by the accounting impact of bad debt, consulting expenses and  marketing expenses. The accounting is cash based so few months were impacted by the swings in those expenses.

As to your other request regarding the portfolio details, we don't think that the schedule you sent us will provide accurate information. The portfolios grow and stop growing and unwind.  Sometimes they have periodic changes due to seasonality.

Best regards,
Zayra

**Liont, LLC**

**Zayra Emanuelli**
Mobile: 787-426-5344
Email: **zayra@liontllc.com**

875 Carretera 693, Suite 202, Dorado, PR 00646
**http://www.LiontLLC.com**

This electronic mail, including any attachments, is confidential and intended solely for the use of the individual to whom it is addressed.  Use or distribution by any unintended recipient is prohibited. Please notify the sender immediately if you have received this email by error and delete this email and all attachments from your system.

---

**From:** Ashish Rane [mailto:ashish.rane@aranca.com]
**Sent:** Thursday, December 29, 2016 8:25 AM
**To:** Matt Martorello <matt@liontllc.com>; Zayra Emanuelli <zayra@liontllc.com>
**Cc:** manish.goyal@aranca.com; 'Jitendra Pabrekar, CFA' <jitendra.pabrekar@aranca.com>; pooja.gala@aranca.com
**Subject:** RE: Bellicose Capital Valuation

Hi Matt and Zayra,

Thank you for your responses. I think we are comfortable with respect to factors driving the workforce value. However, we still need your help to formulate the value proposition for Hot Assets. We have certainly reviewed your calculation, but need additional data support to defend the assumptions used in the analysis. We have also conducted some market research on our end but given the unique nature of the business and the expected cash flow stream, we believe it's best if we could demonstrate a historical relationship to the Unwinding rate, RRTL Income rate and risk assumptions. I realize we may not be able to analyze the month-on-month churn of the loan portfolio, but iIf we could qualitatively discuss or address the questions below, we might be able to better support our analysis.

1. We noted that a monthly repayment rate of around 20% has been assumed for the June 2015 calculations.
    a. What is the basis for this assumption?
    b. Is this based on actual churn observed in the portfolio?
2. Further, service revenue proportion of 8-13% has been assumed in the hot assets calculation. Please provide the rationale for these assumptions. Are these assumptions inclusive of interest (service fee) and penalties?
3. We saw that the ratio of service fee earned from DCTF and RRTL to the loan portfolio (assumed at $23 million) varied between 1-13% in 2014. What causes the variation?

JA466

CONFIDENTIAL

MARTORELLO_008963

4. Hot assets calculation for January 2016 as well as the most recent period (Dec 2016) including the lowest level of detail available.

Apologies for the short notice, but could we please have a brief (15-20 mins) call today to discuss the Hot assets calculations this morning anytime between 10.30 am EST and 12pm EST? I can share the dial in.

In addition, we still need the following items:

1. Consolidated Balance sheet of the group (Bellicose) as of Dec 31, 2012 and 2013
2. Consolidated Balance sheet for Kairos Holdings LLC (group) as of June 30, 2015 (and Jan 2016 for the Jan valuation).
3. We have the balance sheet for Liont as of July 12, 2015. Though the valuation date of June 30, 2015 is close to this date, it would be good to have Liont's Balance sheet as of June 30, 2015.
4. Though not significant, please explain the nature of artworks of $195,153 appearing in Kairos' Balance sheet as of June 30, 2015.

Please let me know if you have any questions.

Thanks,

**Ashish Rane**

Manager| Valuations Advisory|**Aranca**

**LinkedIn Profile**

---

**From:** Matt Martorello [mailto:matt@liontllc.com]
**Sent:** Wednesday, December 28, 2016 9:14 PM
**To:** Zayra Emanuelli; Ashish Rane
**Cc:** manish.goyal@aranca.com; Jitendra Pabrekar, CFA; pooja.gala@aranca.com
**Subject:** RE: Bellicose Capital Valuation

A couple quick comments:
1) I was no longer President of Bellicose effective sometime in 2015. Instead, I acted as President of Liont (working instead on my US businesses)
2) So Bellicose/SPVI was always without me, my comp would fall under Liont when it comes to valuing Workforce in Place
3) ICA's $9.6mm due required SP to get paid from Island Breeze. However, Island Breeze declared bankruptcy in 2014. SP is still trying to sue a 3rd party to recover any amount of money, but it is also being countersued for filing liens against assets. We never got a single payment, and the 3rd party never made a penny. Since 2014, it's always been improbable that we get to collect anything. We were very close to writing off the $9.6mm, but will wait for the lawsuits to conclude. If I were to sell the $9.6mm obligation, they'd have to be comfortable with SP recovering money that might not actually get paid to ICA. The recovered cash (if any) could be SP's and not owed to ICA. In best case, I think SP might recover $1.5mm. I think that's a 30% chance, and it will cost another $250k in legal bills to find out. However, that may not go to ICA, that might be SP cash/assets being recovered.

---

**From:** Zayra Emanuelli
**Sent:** Wednesday, December 28, 2016 11:15 AM
**To:** Ashish Rane <ashish.rane@aranca.com>; Matt Martorello <matt@liontllc.com>
**Cc:** manish.goyal@aranca.com; Jitendra Pabrekar, CFA <jitendra.pabrekar@aranca.com>; pooja.gala@aranca.com
**Subject:** RE: Bellicose Capital Valuation

Hi Ashish,

JA467

MARTORELLO_008964

See my comments in your email below.

Best regards,
Zayra



**Liont, LLC**

**Zayra Emanuelli**
Mobile: 787-426-5344
Email: **zayra@liontllc.com**

875 Carretera 693, Suite 202, Dorado, PR 00646
**http://www.LiontLLC.com**

This electronic mail, including any attachments, is confidential and intended solely for the use of the individual to whom it is addressed.  Use or distribution by any unintended recipient is prohibited. Please notify the sender immediately if you have received this email by error and delete this email and all attachments from your system.

**From:** Ashish Rane [mailto:ashish.rane@aranca.com]
**Sent:** Wednesday, December 28, 2016 8:47 AM
**To:** Zayra Emanuelli <zayra@liontllc.com>; Matt Martorello <matt@liontllc.com>
**Cc:** manish.goyal@aranca.com; Jitendra Pabrekar, CFA <jitendra.pabrekar@aranca.com>; pooja.gala@aranca.com
**Subject:** FW: Bellicose Capital Valuation

Hi Zayra and Matt,

Thank you for your responses. While we wait for the Hot asset inputs, could you please provide your insights on the following:

1.    Matt mentioned earlier that Liont charged an annual fee of $2 million from your US entities on a collective basis. Could you please help me understand how much of this is attributable to our subject entities (those under Kairos – Bellicose, ICA etc.)
    ZE – This is not related to these entities, only to Liont, LLC. Liont serves as the manager of a couple of US entities in which Matt is either the sole owner or majority owner. This $2MM fee Matt made reference to is being charged to the following entities: Green Key Techonologies, LLC; Jet Capital, LLC, and Balance Credit, LLC (a/k/a SunUp Financial, LLC).

2.    We believe the above will be inclusive of Matt's remuneration for June 2015 and Jan 2016 (since Matt was on Liont's payroll). Please confirm.
    ZE - As explained, this management fee is related to the US operations. Everything under Kairos and Bellicose is considered Puerto Rico's operations, and therefore covered by Liont's compensation/wages to Matt. It should be noted that Matt's salary (in Liont) is a safe-harbour amount established by PR law. Otherwise, Matt's compensation would be much higher than that (probably around the management fee charged to the US entities).

3.    The ICA forecasts mention that the agreement between ICA and SP is expected to continue till April 2017. What is the probability of the contract getting renewed? Does the business face any challenges as a going-concern?
    ZE - Zero probability of the contract being renewed, and a very low probability of getting paid for the $9.6MM due under the contract. By way of summary, this agreement is dependable/related to the Lease Agreement entered into by SourcePoint, LLC and Island Breeze I. Basically, the amounts payable under the Development Agreement between SourcePoint, LLC and ICA were due on a quarterly basis throughout the duration of the Lease Agreement between Island BreezeI and SP (i.e. 6 years), unless and until the lease was rightfully terminated by SP or IBI (in which case, SP had no further obligation to pay the fees to ICA under the Development Agreement (i.e. the $9.6MM). Such lease

JA468

was terminated in 2014. There are some ongoing legal claims which could result in a partial recovery of the amount due, but certainly the development agreement is not active.

There are no other operations in place by ICA as of today.

Thanks,

**Ashish Rane**

Manager| Valuations Advisory|**Aranca**

**LinkedIn Profile**

**From:** Zayra Emanuelli [mailto:zayra@liontllc.com]
**Sent:** Wednesday, December 28, 2016 1:51 AM
**To:** Ashish Rane; Matt Martorello
**Cc:** manish.goyal@aranca.com; Jitendra Pabrekar, CFA; pooja.gala@aranca.com
**Subject:** RE: Bellicose Capital Valuation

Hi Ashish,

Below please find the response to most of your queries below. The rest will follow:

2.  Employees –

    a.       Matt is not mentioned in the employee list as of June 30, 2015 and January 2016. Please clarify.
         **ZE - At this time, Matt was an employee of Liont, LLC. Matt sent some communications over the weekend regarding the workforce in Liont. We will send the relevant information between today and tomorrow.**

    b.       What would be the approximate starting efficiency of the employees? Also, please indicate the average time to reach full productivity. Employee-wise details for this request, if readily available, would be more helpful.
         **ZE – Matt to comment on this one.**

    c.       Please confirm that the salaries mentioned in the file Payroll Summary are monthly.
         **ZE – confirmed. For those employees that are "Salaried" the monthly compensation is showed in column F (under Rate). However, for employees categorized as hourly, the monthly compensation is showed under column J (column F shows the hourly rate for these employees). Let me know if you have further questions.**

    d.       What would be the average annual working hours for the employees contracted on an hourly basis? We have currently considered 8 hours*5 days*52 weeks=2080 for our calculations.
         **ZE – The hourly employees work 86.6 hours per month. So, they will work for 1,039.92 hours a year.**

    e.       Column J of the file Payroll Summary has certain values calculated for some of the employees, but the column is not labeled. Please indicate the nature of these values.
         **ZE – Explained in C above.**

    f.       An email also mentioned that certain benefits information was listed in the second tab of the file Payroll Summary. The file shared with us has only one tab. Please clarify if this relates to the numbers in Column J.
         **ZE – see file attached.**

Liont, LLC   

**Zayra Emanuelli**
Mobile: 787-426-5344

JA469

Email: **zayra@liontllc.com**

**875 Carretera 693, Suite 202, Dorado, PR 00646**
**http://www.LiontLLC.com**

This electronic mail, including any attachments, is confidential and intended solely for the use of the individual to whom it is addressed.  Use or distribution by any unintended recipient is prohibited. Please notify the sender immediately if you have received this email by error and delete this email and all attachments from your system.

**From:** Ashish Rane [mailto:ashish.rane@aranca.com]
**Sent:** Tuesday, December 27, 2016 1:06 PM
**To:** Zayra Emanuelli <zayra@liontllc.com>; Matt Martorello <matt@liontllc.com>
**Cc:** manish.goyal@aranca.com; Jitendra Pabrekar, CFA <jitendra.pabrekar@aranca.com>; pooja.gala@aranca.com
**Subject:** Bellicose Capital Valuation

Hi Zayra and Matt,

Thanks again for providing the documents. We have made progress with respect to the identification and valuation methodologies for the intangible assets but have some queries that need clarification. Could you could help me out with the following document requests and questions?

**Information request**
1. Hot assets calculation for January 2016 as well as the most recent period (Dec 2016).
2. Consolidated Balance sheet of the group (Bellicose) as of Dec 31, 2012 and 2013
3. Consolidated Balance sheet for Kairos Holdings LLC (group) as of June 30, 2015.
4. ICA forecasts as of June 30, 2015. (ICA was not part of the June 2015 valuation)
5. We have the balance sheet for Liont as of July 12, 2015. Though the valuation date of June 30, 2015 is close to this date, it would be good to have Liont's Balance sheet as of June 30, 2015.

**Hot Assets Calculations:**
1. We noted that a monthly repayment rate of around 20% has been assumed for the June 2015 calculations.
    a. What is the basis for this assumption?
    b. Is this based on actual churn observed in the portfolio?
2. Further, service revenue proportion of 8-13% has been assumed in the hot assets calculation. Please provide the rationale for these assumptions. Are these assumptions inclusive of interest (service fee) and penalties?
3. We saw that the ratio of service fee earned from DCTF and RRTL to the loan portfolio (assumed at $23 million) varied between 1-13% in 2014. What causes the variation?
4. We wanted to analyze the month-on-month churn of the loan portfolio along with the service fee earned on it. for this, request you to share loan portfolio details in the format attached with this mail to the extent available.

**Queries**
1. Though not significant, please explain the nature of artworks of $195,153 appearing in Kairos' Balance sheet as of June 30, 2015.
2. Employees –
    a.     Matt is not mentioned in the employee list as of June 30, 2015 and January 2016. Please clarify.
    b.     What would be the approximate starting efficiency of the employees? Also, please indicate the average time to reach full productivity. Employee-wise details for this request, if readily available, would be more helpful.
    c.     Please confirm that the salaries mentioned in the file Payroll Summary are monthly.
    d.     What would be the average annual working hours for the employees contracted on an hourly basis? We have currently considered 8 hours*5 days*52 weeks=2080 for our calculations.

JA470

e.       Column J of the file Payroll Summary has certain values calculated for some of the employees, but the column is not labeled. Please indicate the nature of these values.

f.        An email also mentioned that certain benefits information was listed in the second tab of the file Payroll Summary. The file shared with us has only one tab. Please clarify if this relates to the numbers in Column J.

Happy to talk through the requests/queries above over a quick call at your convenience.

Please let me know if you have any questions.

Thanks,

**Ashish Rane**

Manager| Valuations Advisory|**Aranca**

**LinkedIn Profile**

---

**From:** Matt Martorello [mailto:matt@liontllc.com]
**Sent:** Monday, December 26, 2016 11:00 PM
**To:** Ashish Rane; Zayra Emanuelli
**Cc:** manish.goyal@aranca.com; 'Jitendra Pabrekar, CFA'; pooja.gala@aranca.com
**Subject:** RE: Bellicose Capital Valuation

Hi Ashish,

I wanted to alert you that we have significant value to the Liont Management team, as measured how we discussed… (comp + O/H * forward years of service).

Please keep in mind that my comp is not market value.  We are adjusting based on an economist recommendation for public comp studies, but that is for arm's length fee in a different transaction.  We may need a different method for this business, since it's not the same industry as those public companies.

We will need to have this contribution to the hybrid valued as well.

---

**From:** Ashish Rane [mailto:ashish.rane@aranca.com]
**Sent:** Thursday, December 22, 2016 7:33 AM
**To:** Matt Martorello <matt@liontllc.com>; Zayra Emanuelli <zayra@liontllc.com>
**Cc:** manish.goyal@aranca.com; 'Jitendra Pabrekar, CFA' <jitendra.pabrekar@aranca.com>; pooja.gala@aranca.com
**Subject:** RE: Bellicose Capital Valuation

Hi Matt,

Please find the attached document that enlists the questions I will briefly go over during our call today.

Please let me know if you have any questions.

Thanks,

**Ashish Rane**

Manager| Valuations Advisory|**Aranca**

**LinkedIn Profile**

JA471

                                                                    MARTORELLO_008968

**From:** Matt Martorello [mailto:matt@liontllc.com]
**Sent:** Wednesday, December 21, 2016 6:49 PM
**To:** Ashish Rane; Zayra Emanuelli
**Cc:** manish.goyal@aranca.com; Jitendra Pabrekar, CFA; pooja.gala@aranca.com
**Subject:** RE: Bellicose Capital Valuation

Great, how does 8am ET work?

---

**From:** Ashish Rane [mailto:ashish.rane@aranca.com]
**Sent:** Wednesday, December 21, 2016 7:59 AM
**To:** Matt Martorello <matt@liontllc.com>
**Cc:** manish.goyal@aranca.com; Jitendra Pabrekar, CFA <jitendra.pabrekar@aranca.com>; pooja.gala@aranca.com
**Subject:** Bellicose Capital Valuation

Good morning Matt,

My name is Ashish and I am a Manager within Aranca's Valuation and Advisory Services. I will be assisting Manish with the valuation of Bellicose Capital. Manish has briefed me on your interactions with him and has also shared the related documents. While my team has already started working on the assignment, there are a few questions I would like to discuss with you.

Could you please let me know you availability for a call tomorrow morning? I will then send an invite with the call in details.

Please let me know if you have any questions.

Thanks and regards,

**Ashish Rane**

**Manager| Valuations Advisory|Aranca**

**LinkedIn Profile**



**Please think of the environment before printing this email.**

This communication and any attached files may contain privileged and confidential information, and is intended solely for the use of the addressee(s). If you received this communication in error, please notify the sender by reply e-mail and then destroy the message, all attachments and any copies. Furthermore, you are not to copy, disclose, or distribute this e-mail or its contents to any other person and any such actions are unlawful. Internet communications cannot be guaranteed to be timely, secure, error or virus-free. The sender does not accept liability for any errors or omissions. Any views expressed in this message are those of the individual sender, except where the sender specifically states them to be the views of Aranca.

**Aranca is an ISO 27001:2013 certified company.**

CONFIDENTIAL

# Exhibit 8

## Darcie Pace

| | |
|---|---|
| **From:** | mattm@bellicosevi.com |
| **Sent:** | Friday, August 26, 2011 7:32 AM |
| **To:** | Flint Richardson |
| **Cc:** | Scott Merritt; Robert Rosette |
| **Subject:** | Re: Question on Docs |

I'd agree with that for sure. If she's already been around these documents several times then we will see what she can do. She's on vacation until the 2nd though. I don't think we'll make the 9/15 and 10/1 dates we targeted.  With the back and forth that will e required, I'd be happy to have things wrapped up for 11/1 if we can move efficiently.

Ryan Bloom will be reaching out to Rob to conduct their diligence on the tribe. That should happen today.

On Aug 26, 2011, at 7:24 AM, Flint Richardson <flint@wsedge.biz> wrote:

> Matt – to the extent that you already have counsel on board that is fine.  Claudia (and Christina who works with her) have completed a few large scale deals which is helpful.  Wheeler is ok, personally I think his agreements are the least complex and I don't believe that he may have built in the same level of protection for his clients.
>
> Rob – thoughts here?
>
> **Flint Richardson | CPA** | Chandler | AZ| 85225 |
> office 480.889.4888 | fax 480.889.8997 | flint@wsedge.biz |
>
> **<IMAGE003.JPG>**
>
> **********************************************************************************
> ********************************************************************
> ********

This e-mail message may contain legally privileged and/or confidential information. If you are not the intended recipient(s), or the employee or agent responsible for delivery of this message to the intended recipient(s), you are hereby notified that any dissemination, distribution or copying of this e-mail message is strictly prohibited. If you have received this message in error, please immediately notify the sender and delete this e-mail message from your computer.

CONFIDENTIAL                                                      ROSETTE_REVISED_052496

JA474

**IRS CIRCULAR 230 DISCLOSURE**:  To ensure compliance with Treasury Department regulations, we inform you that any U.S. federal tax advice contained in this correspondence (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties that may be imposed under the U.S. Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

**From:** mattm@bellicosevi.com [mailto:mattm@bellicosevi.com]
**Sent:** Friday, August 26, 2011 2:20 AM
**To:** Flint Richardson
**Cc:** Scott Merritt; Rob Rosette
**Subject:** Re: Question on Docs

Does her structure differ somehow? I'm curious how she will be more value added than the other 3 lawyers we've engaged now. Also, how is Wheeler Neff?

On Aug 26, 2011, at 3:23 AM, "Flint Richardson" <flint@wsedge.biz> wrote:

> Matt – sorry for the delay on getting back to you.  I was sick this afternoon so ended up leaving the office at around 4 and slept/threw up until about 8:30.  Please give Rob a call tomorrow at 480-242-9810 as I will be in transit to MI all morning and he is the expert on agreement type questions.  Following are some initial responses on your questions (the ones that I can answer).          Further, upon further reflection we would in fact recommend that you engage Claudia Callaway in order to assist you with the agreements.  She has a superb structure that we have just completed the review on and we believe that utilizing her on this will expedite us getting this deal done.
>
>
> A) If Wells Fargo is subpoenaed, what information is given (names of signors) which exposes whoever is a signor on behalf of Servicer.  Can this be hedged? YES, IF YOU WANT THE TRIBE TO BE THE EXCLUSIVE SIGNER ON THE ACCOUNT.
>
> B) For the USVI, Bellicose can have nothing to do with "Loan Originations", it can only provide the Analytics and such, and I think the Tribe has to be the originator anyway, correct? YES, CORRECT – CORNERSTONE OF THE SOVEREIGN MODEL. In fact, the Loan Management Software would have to be with the Tribe, and not with Bellicose.  This creates a problem where it says "Servicer, shall determine whether such applicants are eligible for Loans from Consumer Lender based on Consumer Lender's credit granting standards duly adopted from time to time by Consumer Lender and applied by Servicer".  Bellicose wants to provide the IP, but Consumer Lender should be the one making the final decision and originating the loans on Tribal Land.  If I'm not mistaking, that applies to support the Tribal Jurisdiction as well?  Similarly, Bellicose can't be as stated in provision 6 specifically.  The USVI will require better separation that the Tribe is the originator and Bellicose is simply a consultant/Manager.  THE TRIBE ESTABLISHES THE LENDING CRITERIA, AND IS THE LENDER BELLICOSE IS JUST CARRYING OUT THE TRIBE'S DIRECTION.  WE CAN CHANGE THE LANGUAGE HOWEVER YOU WOULD LIKE.

2

C) If possible, we'd like the Tribe to be on all vendor documents so any subpoena given to any vendor points to the Tribe.  This does, however, create an issue of protecting the information.  TRIBE SHOULD BE ON ALL VENDOR DOCUMENTS WEB-SITE, ACH AGREEMENTS ETC – WE AGREE.  INFORMATION IS IN THE POSSESSION OF THE SERVICER.


Can you elaborate on this: So the Tribal Lending entity has a Tribal Management Company, which is going to be the Bellicose customer – NO, YOUR ENTITY WOULD BE THE SERVICER FOR THE LENDING OPERATION.  THE LLC MANAGERS ARE MANAGERS OF THE LLC ENTITY ON BEHALF OF THE TRIBE BUT ARENT INVOLVED IN THE BUSINESS.

Does it mean that Bellicose is the Manager of the Tribal LLC?  Similarly, in what capacity is Bellicose's name on the operating account of the Tribe?  NO REPRESENTATIVES FROM THE TRIBE ARE THE LLC'S "MANAGERS".  THE SERVICER, BELLCIOSE OPERATES THE BUSINESS COMPLETELTY.




**Flint Richardson** | **CPA** | Chandler | AZ| 85225 |
office 480.889.4888 | fax 480.889.8997 | flint@wsedge.biz |


**<IMAGE003.JPG>**


* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

This e-mail message may contain legally privileged and/or confidential information. If you are not the intended recipient(s), or the employee or agent responsible for delivery of this message to the intended recipient(s), you are hereby notified that any dissemination, distribution or copying of this e-mail message is strictly prohibited. If you have received this message in error, please immediately notify the sender and delete this e-mail message from your computer.


**IRS CIRCULAR 230 DISCLOSURE**:  To ensure compliance with Treasury Department regulations, we inform you that any U.S. federal tax advice contained in this correspondence (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties that may be imposed under the U.S. Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

CONFIDENTIAL                                                    ROSETTE_REVISED_052408
JA476

**From:** mattm@bellicosevi.com [mailto:mattm@bellicosevi.com]
**Sent:** Thursday, August 25, 2011 11:59 AM
**To:** Flint Richardson; 'Scott Merritt'; Rob Rosette
**Subject:** RE: Question on Docs

This is helpful thanks.  Can you hop on a call real quick with me and walk through this, I'd have to call you though, cell doesn't work down here:

The Servicing Agreement says that it is between Consumer Lender and XYZ Company, another "wholly-owned, unincorporated entity of the _____, created under Tribal law".  I've seen these models before, and I'm not sure which way to go is the best.   My concern/questions surround:

A) If Wells Fargo is subpoenaed, what information is given (names of signors) which exposes whoever is a signor on behalf of Servicer.  Can this be hedged?

B) For the USVI, Bellicose can have nothing to do with "Loan Originations", it can only provide the Analytics and such, and I think the Tribe has to be the originator anyway, correct?  In fact, the Loan Management Software would have to be with the Tribe, and not with Bellicose.  This creates a problem where it says "Servicer, shall determine whether such applicants are eligible for Loans from Consumer Lender based on Consumer Lender's credit granting standards duly adopted from time to time by Consumer Lender and applied by Servicer".  Bellicose wants to provide the IP, but Consumer Lender should be the one making the final decision and originating the loans on Tribal Land.  If I'm not mistaking, that applies to support the Tribal Jurisdiction as well?  Similarly, Bellicose can't be as stated in provision 6 specifically.  The USVI will require better separation that the Tribe is the originator and Bellicose is simply a consultant/Manager.

C) If possible, we'd like the Tribe to be on all vendor documents so any subpoena given to any vendor points to the Tribe.  This does, however, create an issue of protecting the information.

Can you elaborate on this: So the Tribal Lending entity has a Tribal Management Company, which is going to be the Bellicose customer – NO, YOUR ENTITY WOULD BE THE SERVICER FOR THE LENDING OPERATION.  THE LLC MANAGERS ARE MANAGERS OF THE LLC ENTITY ON BEHALF OF THE TRIBE BUT ARENT INVOLVED IN THE BUSINESS.

Does it mean that Bellicose is the Manager of the Tribal LLC?  Similarly, in what capacity is Bellicose's name on the operating account of the Tribe?

**Regards,**

4

**Matt Martorello**

Mobile: 773-209-7720

Email: MattM@BellicoseVI.com

<image005.jpg>

---

**From:** Flint Richardson [mailto:flint@wsedge.biz]
**Sent:** Thursday, August 25, 2011 2:40 PM
**To:** mattm@bellicosevi.com; 'Scott Merritt'; Rob Rosette
**Subject:** RE: Question on Docs


Matt – see attached document with you initial questions from August 23 along with responses which are underlined.  Following are responses to your email below:


So the Tribal Lending entity has a Tribal Management Company, which is going to be the Bellicose customer – NO, YOUR ENTITY WOULD BE THE SERVICER FOR THE LENDING OPERATION.  THE LLC MANAGERS ARE MANAGERS OF THE LLC ENTITY ON BEHALF OF THE TRIBE BUT ARENT INVOLVED IN THE BUSINESS.


Do we want to service the Tribal Management Company or do we want to service the Tribe directly?  YOU WILL BE THE SERVICER FOR THE UNIQUE LLC THAT IS ESTABLISHED – FOR INSTANCE, YOUR SERVICING AGREEMENT WOULD BE FOR RED ROCK LENDING, LLC (WHICH IS THE TRIBALLY ESTABLISHED ENTITY FOR LENDING)


What's the advantage of the Tribal Lender having the Tribal Service Entity?  Trying to get these docs done and still not certain what the structure looks like in this regard.  PLEASE CALL ME IF YOU HAVE QUESTIONS RELATED TO ANY OF OUR RESPONSES.


Thanks Matt.

5

Flint Richardson | **CPA** | Chandler | AZ| 85225 |
office 480.889.4888 | fax 480.889.8997 | [flint@wsedge.biz](mailto:flint@wsedge.biz) |

**<IMAGE006.JPG>**

*****************************************************************
*****************************************************************
*********************************

This e-mail message may contain legally privileged and/or confidential information. If you are not
the intended recipient(s), or the employee or agent responsible for delivery of this message to the
intended recipient(s), you are hereby notified that any dissemination, distribution or copying of this
e-mail message is strictly prohibited. If you have received this message in error, please
immediately notify the sender and delete this e-mail message from your computer.

**IRS CIRCULAR 230 DISCLOSURE**:  To ensure compliance with Treasury Department regulations,
we inform you that any U.S. federal tax advice contained in this correspondence (including any
attachments) is not intended or written to be used, and cannot be used, for the purpose of (i)
avoiding penalties that may be imposed under the U.S. Internal Revenue Code or (ii) promoting,
marketing or recommending to another party any transaction or matter addressed herein.

---

**From:** [mattm@bellicosevi.com](mailto:mattm@bellicosevi.com) [mailto:mattm@bellicosevi.com]
**Sent:** Thursday, August 25, 2011 11:24 AM
**To:** [flint@wsedge.biz](mailto:flint@wsedge.biz); Scott Merritt ([smerritt@answersetc.com](mailto:smerritt@answersetc.com)); Rob Rosette
([rosette@rosettelaw.com](mailto:rosette@rosettelaw.com))
**Subject:** Question on Docs

So the Tribal Lending entity has a Tribal Management Company, which is going to be the
Bellicose customer.  Do we want to service the Tribal Management Company or do we
want to service the Tribe directly?  What's the advantage of the Tribal Lender having the
Tribal Service Entity?  Trying to get these docs done and still not certain what the
structure looks like in this regard.

**Regards,**

**Matt Martorello**

Mobile: 773-209-7720

CONFIDENTIAL                                                    ROSETTE_REVISED_052501

JA479

# Exhibit 9

| From: | Rob Rosette </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=4EA335FB493D4964B92B0395C04F0C63-ROB ROSETTE> |
|---|---|
| To: | Nicole St. Germain |
| CC: | 'flint@whetstoneedge.biz' |
| Sent: | 8/24/2011 5:29:25 AM |
| Subject: | Fw: Next Steps |

---

# Redacted

---

**From**: Flint Richardson [mailto:flint@wsedge.biz]
**Sent**: Tuesday, August 23, 2011 10:28 PM
**To**: mattm@bellicosevi.com <mattm@bellicosevi.com>; Scott Merritt <smerritt@answersetc.com>; Karrie Wichtman
**Cc**: Rob Rosette
**Subject**: Re: Next Steps

Matt - a lot of content in your emails. We will pull together responses for you and respond tomorrow thoroughly. I have copied Karrie Wichtman who is General Counsel for LVD.

Sent via BlackBerry by AT&T

---

**From:** "mattm@bellicosevi.com" <mattm@bellicosevi.com>
**Date:** Wed, 24 Aug 2011 05:08:43 +0000
**To:** Flint Richardson<flint@wsedge.biz>; 'Scott Merritt'<smerritt@answersetc.com>
**Cc:** Rob Rosette<rosette@rosettelaw.com>
**Subject:** RE: Next Steps

What I meant by the first comment was that the Costa Rican lender/entity is selling assets to the Tribe, so vendors may require notification (LMS, leads, underwriting, debt buyers, call center, ACH provider, bank)?  All vendors and their contracts should be pointing to the Tribe, except where needed (Flint mentioned the bank account below, will that be Bellicose or Iron Fence with the Revolver on the Wells account?)

I forgot to ask for a list of "logistical tasks" that will be required come Oct 1 (i.e. point DNS over to Tribal Server, move emails to Tribal server, and phone or fax #s on ACH agreement/consumer bank statements that go to Tribe rather than call center, fax, marketing website hosting moved, etc)

Also along the lines of the contracts, what makes us comfortable with recourse in the event that the Tribe were getting into underwriting or leads strategies, call customers of one Tribal portfolio to steal them for a different one, etc and these things resulting in a diminished return to Bellicose in exchange for its services?   I understand the underwriting and other strategies to be Bellicose's methods and ideas, but the Tribe's decision on how to operate and underwrite.  Bellicose provides for the Tribe, but only for the Tribe as related to Bellicose's servicing agreement.

Finally, when Bellicose suggests new ideas and changes to the operations, how does implementation work? As the Tribe is making the decision on how to operate, after taking Bellicose advice?

**Regards,**

**Matt Martorello**
Mobile: 773-209-7720
Email: MattM@BellicoseVI.com

 BELLICOSE VI

---

**From:** Flint Richardson [mailto:flint@wsedge.biz]

JA481

CONFIDENTIAL                                                                       ROS002-0000693

**Sent:** Tuesday, August 23, 2011 7:54 PM
**To:** mattm@bellicosevi.com; 'Scott Merritt'
**Cc:** Rob Rosette
**Subject:** RE: Next Steps

Some of the items to discuss were surrounding control:

All vendor docs will be assigned from Costa Rica entity to tribe – not sure what this means?

Tribe will need to get ready with bank account at wells and intercept ACH – <u>tribe has relationship with wells. Servicer will need to be signer on account.</u>

Option agreements to buy back pool, website etc at the end or if something should happen, etc – <u>yes, option agreement, or can structure it so that debt is repaid with the assignment of the assets.</u>

Reporting to tribe, detail of calc of 2% of net rev – <u>we think the calculations should be something as follows: Gross Fees + ACH Recoveries – Returned Checks – ACH Returns = Total multiplied by 2%.</u>

current debt obligation is being transferred over as well so a doc there too. – <u>purchase of A/R with corresponding debt?</u>

**Flint Richardson | CPA | Chandler | AZ| 85225 |**
office 480.889.4888 | fax 480.889.8997 | flint@wsedge.biz |



\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

This e-mail message may contain legally privileged and/or confidential information. If you are not the intended recipient(s), or the employee or agent responsible for delivery of this message to the intended recipient(s), you are hereby notified that any dissemination, distribution or copying of this e-mail message is strictly prohibited. If you have received this message in error, please immediately notify the sender and delete this e-mail message from your computer.

**IRS CIRCULAR 230 DISCLOSURE**:  To ensure compliance with Treasury Department regulations, we inform you that any U.S. federal tax advice contained in this correspondence (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties that may be imposed under the U.S. Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

**From:** mattm@bellicosevi.com [mailto:mattm@bellicosevi.com]
**Sent:** Tuesday, August 23, 2011 4:38 PM
**To:** Scott Merritt
**Cc:** flint@wsedge.biz; Rob Rosette
**Subject:** Re: Next Steps

I think I have a travel day, but we will see. I will try you between trips.

Some of the items to discuss were surrounding control, all vendor docs will be assigned from Costa Rica entity to tribe, tribe will need to get ready with bank account at wells and intercept ACH, option agreements to buy back pool, website etc at the end or if something should happen, etc.  Reporting to tribe, detail of calc of 2% of net rev, current debt obligation is being transferred over as well so a doc there too.

JA482

On Aug 23, 2011, at 6:34 PM, "Scott Merritt" <smerritt@answersetc.com> wrote:

I was just about to say the same thing.

Matt – we didn't touch base today. How's your day looking tomorrow? I have morning calls, but afternoon is wide open. Let me know.

Thanks,
**Scott Merritt** | **Managing Partner** | Vancouver | WA| 98682 |
office 800-275-1418 x136| fax 817.595.8819 | smerritt@tribeloans.com |
<image001.jpg>

---

**From:** Flint Richardson [mailto:flint@wsedge.biz]
**Sent:** Tuesday, August 23, 2011 4:33 PM
**To:** mattm@bellicosevi.com
**Cc:** Rob Rosette; Scott Merritt
**Subject:** Re: Next Steps

You can name it !!

Sent via BlackBerry by AT&T

---

**From:** "mattm@bellicosevi.com" <mattm@bellicosevi.com>
**Date:** Tue, 23 Aug 2011 23:21:27 +0000
**To:** Flint Richardson<flint@wsedge.biz>
**Cc:** Rob Rosette<rosette@rosettelaw.com>; smerritt@answersetc.com<smerritt@answersetc.com>
**Subject:** Re: Next Steps

Is there an entity name for the tribal LLC?  Obviously an LLC that will only be tied solely to us, with a unique name that doesn't expose our relations if another lender tribe entity had problems.

Thanks

On Aug 22, 2011, at 9:36 AM, "Flint Richardson" <flint@wsedge.biz> wrote:

Sounds good Matt.  We look forward to it.  In the meantime not sure if you and Scott have talked through technology or the operating account structure but we should work on that as well soon.

Flint

**Flint Richardson** | **CPA** | Chandler | AZ| 85225 |
office 480.889.4888 | fax 480.889.8997 | flint@wsedge.biz |

**<image002.jpg>**

*************************************************************************************************************
This e-mail message may contain legally privileged and/or confidential information. If you are not the intended recipient(s), or the employee or agent responsible for delivery of this message to the intended recipient(s), you are hereby notified that any dissemination, distribution or copying of this e-mail message is strictly prohibited. If you have received this message in error, please immediately notify the sender and delete this e-mail message from your computer.

JA483

CONFIDENTIAL

IRS CIRCULAR 230 DISCLOSURE:  To ensure compliance with Treasury Department regulations, we inform you that any U.S. federal tax advice contained in this correspondence (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties that may be imposed under the U.S. Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

---

**From:** Matt Martorello [mailto:mattm@bellicosevi.com]
**Sent:** Monday, August 22, 2011 7:21 AM
**To:** Flint Richardson; Rob Rosette; smerritt@answersetc.com
**Subject:** RE: Next Steps

I agree.  I'd like to get the legal documents all completed and ready for signatures ASAP.  Then on that week in Sept, we can execute the agreements with an Oct 1 launch date.

---

**From:** Flint Richardson [flint@wsedge.biz]
**Sent:** Monday, August 22, 2011 8:50 AM
**To:** Matt Martorello; Rob Rosette; smerritt@answersetc.com
**Cc:** mmartorello@apriorisolutions.com
**Subject:** RE: Next Steps

That would be possible Matt.  However, I believe that we should have agreements finalized and have the meeting coincide with the execution of documents.  Since you have outside legal counsel in Delaware and Michigan I believe that we should work with them in order to get a full set of documents that will be acceptable hammered out as soon as possible.  To the extent that your counsel desires to review the lending ordinance, regulatory framework and tribal limited liability ordinance we can work with them so that they are comfortable that all of structural components of the deal are in fact in place with appropriate resolutions.

Let me know what you think about this approach.

Flint


**Flint Richardson** | **CPA** | Chandler | AZ| 85225 |
office 480.889.4888 | fax 480.889.8997 | flint@wsedge.biz |

# <image003.jpg>

*********************************************************************************************************
This e-mail message may contain legally privileged and/or confidential information. If you are not the intended recipient(s), or the employee or agent responsible for delivery of this message to the intended recipient(s), you are hereby notified that any dissemination, distribution or copying of this e-mail message is strictly prohibited. If you have received this message in error, please immediately notify the sender and delete this e-mail message from your computer.

IRS CIRCULAR 230 DISCLOSURE:  To ensure compliance with Treasury Department regulations, we inform you that any U.S. federal tax advice contained in this correspondence (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties that may be imposed under the U.S. Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

---

**From:** Matt Martorello [mailto:mattm@bellicosevi.com]
**Sent:** Monday, August 22, 2011 6:46 AM
**To:** Matt Martorello; Rob Rosette; 'flint@wsedge.biz'; 'smerritt@answersetc.com'
**Cc:** 'mmartorello@apriorisolutions.com'
**Subject:** RE: Next Steps

Can we schedule a day on the week of  9/12 - 9/16 to meet the Tribe in the UP?

---

**From:** Matt Martorello

JA484

ROS002-0000696

**Sent:** Saturday, August 20, 2011 8:40 AM
**To:** Rob Rosette; 'flint@wsedge.biz'; 'smerritt@answersetc.com'
**Cc:** 'mmartorello@apriorisolutions.com'
**Subject:** RE: Next Steps

OK, maybe we can coordinate a UP trip to all get together when we do a site meet and greet with the Tribe.  Preferably before the very rough winters up there begin.

Thanks and enjoy the weekend.

---

**From:** Rob Rosette [rosette@rosettelaw.com]
**Sent:** Saturday, August 20, 2011 8:21 AM
**To:** Matt Martorello; 'flint@wsedge.biz'; 'smerritt@answersetc.com'
**Cc:** 'mmartorello@apriorisolutions.com'
**Subject:** Re: Next Steps

Hi Matt. I'm in the U.P. We are quite far away from each other, but otherwise I would have loved to meet you!

**From:** Matt Martorello [mailto:mattm@bellicosevi.com]
**Sent:** Saturday, August 20, 2011 06:17 AM
**To:** flint@wsedge.biz <flint@wsedge.biz>; Scott Merritt <smerritt@answersetc.com>
**Cc:** mmartorello@apriorisolutions.com <mmartorello@apriorisolutions.com>; Rob Rosette
**Subject:** RE: Next Steps

Rob?  I'll be staying at the Campus Inn in Ann Arbor tonight and to the race in Brooklyn tomorrow.  Are you anywhere nearby?

---

**From:** Flint Richardson [flint@wsedge.biz]
**Sent:** Saturday, August 20, 2011 7:48 AM
**To:** Matt Martorello; Scott Merritt
**Cc:** mmartorello@apriorisolutions.com; Rob Rosette
**Subject:** Re: Next Steps

Rob is in Michigan as well - perhaps you gents could meet if you are in proximity?

Sent via BlackBerry by AT&T

---

**From:** Matt Martorello <mattm@bellicosevi.com>
**Date:** Sat, 20 Aug 2011 11:47:08 +0000
**To:** Scott Merritt<smerritt@answersetc.com>
**Cc:** mmartorello@apriorisolutions.com<mmartorello@apriorisolutions.com>;
flint@wsedge.biz<flint@wsedge.biz>; rosette@rosettelaw.com<rosette@rosettelaw.com>
**Subject:** Re: Next Steps

Sounds great. I'll be up in Michigan this weekend for the NASCAR race and back on island Wed night.  I do have

JA485

additional questions to clarify some other details when I started reading docs again a few days ago. Maybe we can keep moving forward with docs to complete things ASAP and have a call Thursday morning to go over status and additional questions?

On Aug 20, 2011, at 12:35 AM, "Scott Merritt" <smerritt@answersetc.com> wrote:

Matt,

Good to hear from you; glad to hear you're making headway on your tax situation. We can appreciate how critical that component is to your model.

The good news is the tribe is ready, and we'd be glad to arrange a visit at your convenience. They are ready to go live today.

We can drill down to a much more granular level regarding the origination from the tribe on our next call - we've only provided a high-level outline in our documentation, so we can certainly clarify the process.

Additionally, we can discuss the banking and assignment issues when we talk.

I believe Flint may be traveling Monday/Tuesday, but should be able to accommodate most days/times. Let us know what works best for you.

Have a good weekend - I'm sure that's fairly easy to do, considering your location. Flint and I might have to travel down your way for official business at some point!

Best,

-Scott

_____

**From**: Matt Martorello <mmartorello@apriorisolutions.com>
**To**: Flint Richardson <flint@wsedge.biz>
**Cc**: Scott Merritt; Rob Rosette <rosette@rosettelaw.com>
**Sent**: Fri Aug 19 20:01:04 2011
**Subject**: Re: Next Steps
Hey Flint, how's it coming along? I plan to get my tax opinion letter back on Tuesday, and I told them I wanted to have all of this completed within 2 weeks.

-Is the tribe ready to go live?
-I wanted to talk about the detail of origination occurring at the tribe
-I'd love to make a visit to their facility in the near future as well.
-wanted to discuss operating bank account activity
-do you have assignment contracts
-it sounds like we may transfer this over and then launch a new one, and run returning only on the current one after #2 gets going

Anyway, maybe we can discuss next week. I plan to take a crack at merging these myself too and then we can compare notes.

Let's get this thing going. Looking forward to it, have a great weekend guys.

JA486

CONFIDENTIAL

Thanks,
Matt


On Aug 9, 2011, at 5:59 PM, "Flint Richardson" <flint@wsedge.biz> wrote:

Hey Matt –

Just wanted to circle back with you to ensure that you had received the servicing agreement that I had sent to you yesterday.   Also – I wanted to see if it made sense to schedule another call to discuss the service agreement or work with someone with your company to merge this with the RAPE agreement?  I would recommend that having your counsel (whichever attorney you want to use in-house or external) may help us expedite this process.

Let us know what we can do to help.

Flint


**Flint Richardson | CPA** | Chandler | AZ| 85225 |
office 480.889.4888 | fax 480.889.8997 | flint@wsedge.biz |

**<image003.jpg>**

*********************************************************************************************************************
This e-mail message may contain legally privileged and/or confidential information. If you are not the intended recipient(s), or the employee or agent responsible for delivery of this message to the intended recipient(s), you are hereby notified that any dissemination, distribution or copying of this e-mail message is strictly prohibited. If you have received this message in error, please immediately notify the sender and delete this e-mail message from your computer.

**IRS CIRCULAR 230 DISCLOSURE**:  To ensure compliance with Treasury Department regulations, we inform you that any U.S. federal tax advice contained in this correspondence (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties that may be imposed under the U.S. Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.


The message does not contain any threats
AVG for MS Exchange Server (9.0.901 - 271.1.1/3845)
<image002.jpg>
<image003.jpg>
<AVG certification.txt>


JA487

# Exhibit 10

**From:**  Flint Richardson <flint@wsedge.biz>
**To:**  mmartorello@apriorisolutions.com; weddlej@gtlaw.com; smerritt@answersetc.com; Rob Rosette; Karrie Wichtman; Van Hoffman; will.londo@lvdtribal.com; Nicole St. Germain; craig.mansfield@lvdcasino.com; shelly.allen@lvdtribal.com
**Sent:**  10/8/2011 10:19:01 PM
**Subject:**  Bellicose VI Relationship
**Attachments:**  Belicose Items to Complete 10 08 2011.docx

**Good Afternoon Everyone:**

I wanted to provide a status update with respect to the pending transaction with Bellicose VI (Matt Martorello).  As everyone is aware LVD has already established Red Rock Tribal Lending LLC and Will has secured already secured the EIN for this entity.  Based on our discussions with Matt he has informed us that he has engaged Jennifer Weddle with Greenburg Traurig to represent him from a legal standpoint on the transaction.  This is great news as Jennifer and her firm are very familiar with LVD and the Tribe's laws and structure.  This significantly minimizes the start –up time that another attorney would take to get up to speed.

Matt has also informed us that he has received funding for another Servicing arrangement that will launch at the same time as Red Rock Tribal Lending.   The additional entity will be called Castle Tribal Finance LLC.

My understanding is that Matt will be forwarding a draft of his agreements to Jennifer in the coming week and that we are planning on executing agreements at LVD on Tuesday, October 25, 2011 with a launch date of on or around November 1, 2011.  In anticipation of such as tight time-frame I have put together a preliminary task list with some tentative assignments for each of the tasks.  Matt will be responsible for the tactical items on behalf of his company.  Also, on page two of the accompanying document is a contact listing for all of the parties that will likely be working on accomplishing this transaction.  **Should anyone have any additional items that need to be added please feel free to include those and re-circulate to this working group.**

Please don't hesitate to contact me should you wish to discuss any of the items.

**Flint Richardson | CPA** | Chandler | AZ| 85225 |
office 480.889.4888 | fax 480.889.8997 | **flint@wsedge.biz** |



\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
This e-mail message may contain legally privileged and/or confidential information. If you are not the intended recipient(s), or the employee or agent responsible for delivery of this message to the intended recipient(s), you are hereby notified that any dissemination, distribution or copying of this e-mail message is strictly prohibited. If you have received this message in error, please immediately notify the sender and delete this e-mail message from your computer.

**IRS CIRCULAR 230 DISCLOSURE:**  To ensure compliance with Treasury Department regulations, we inform you that any U.S. federal tax advice contained in this correspondence (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties that may be imposed under the U.S. Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

JA489

# Bellicose VI
## Items to Complete

| Task | Responsibility |
|------|----------------|
| 1. Tribal Council resolution establishing Castle Tribal Finance, LLC as a division of the LVD SLS | Karrie Wichtman |
| 2. New EIN for Castle Tribal Finance LLC | Will Londo |
| 3. New bank accounts – for Red Rock Tribal Lending LLC and Castle Tribal Finance, LLC: <br> a. Operating Account <br> b. Lobby/Litigation Account | Matt Moratello <br> Will Londo <br> Van Hoffman |
| 4. Signature cards | Matt Moratello <br> Will Londo |
| 5. Creation/identification of vendor entities that will be party to agreements with SLS | Matt Moratello <br> Jennifer Waddel |
| 6. License applications for new vendor entities | Matt Moratello <br> Jennifer Waddel <br> Karrie Wichtman |
| 7. Servicing Agreements authorizing resolution | Jennifer Waddel <br> Karrie Wichtman |
| 8. Promissory Note & authorizing resolution | Jennifer Waddel <br> Karrie Wichtman |
| 9. Security Agreement & authorizing resolution | Jennifer Waddel <br> Karrie Wichtman |
| 10. Account Control Agreement & authorizing resolution | Jennifer Waddel <br> Karrie Wichtman |
| 11. ACH Application / Merchant Agreement & authorizing resolution | Matt Moratello <br> Scott Merritt <br> Karrie Wichtman |
| 12. New Consumer Loan Agreement | Jennifer Waddel <br> Scott Shehan (GT) |
| 13. | |
| 14. | |
| 15. | |
| 16. | |
| 17. | |

JA490

CONFIDENTIAL

ROS002-0000065

# Bellicose VI
# Items to Complete

### Working Party List

| | | |
|---|---|---|
| Matt Martorello<br>mattm@bellicosevi.com<br>773-209-7720<br>Principal | Scott Merritt<br>smerritt@answersetc.com<br>503-939-9126<br>Answers / technical | Flint Richardson<br>flint@wsedge.biz<br>480-889-4888<br>TLM / accounting |
| | | |
| Jennifer Weddel<br>weddlej@gtlaw.com<br>303-572-6565<br>Bellicose legal counsel | Karrie Wichtman<br>kwichtman@rosettelaw.com<br>480-242-6959<br>LVD General Counsel | Will Londo<br>Will.londo@lvdtribal.com<br>906-358-4577 ext 153<br>Tribal Controller |
| | | |
| Nicole St. Germain<br>nstgermain@rosettelaw.com<br>480-241-5871<br>TLM Legal Counsel | Rob Rosette<br>rosette@rosettelaw.com<br>480-242-9810<br>TLM / structure | Van Hoffman<br>vhoffman@gmail.com<br>602-680-8437<br>Tribal CFO |
| | | |

JA491

CONFIDENTIAL

ROS002-0000066

# Exhibit 11

| | |
|---|---|
| **From:** | mattm@bellicosevi.com |
| **To:** | Karrie Wichtman |
| **Subject:** | RE: TLM |
| **Date:** | Friday, July 13, 2012 8:08:36 AM |

---

Great!  We'll figure a way I'm sure.  Thanks Karrie

Regards,

Matt Martorello
Mobile: 773-209-7720
Email: MattM@BellicoseVI.com

**This email and any files transmitted with it are confidential and contain privileged or copyright information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

-----Original Message-----
From: Karrie Wichtman [mailto:kwichtman@rosettelaw.com]
Sent: Friday, July 13, 2012 8:26 AM
To: mattm@bellicosevi.com
Subject: Re: TLM

Matt,

I agree that a 3x multiplier is way too large. I think Rob will be more reasonable. I'll have some suggested amendments to remove the TLM component from the Servicing Agreement as a profit sharer by Monday.

Karrie

Sent from my iPhone

On Jul 13, 2012, at 4:01 AM, "mattm@bellicosevi.com" <mattm@bellicosevi.com> wrote:

> Sounds like they want a huge multiple for a buy out. 3x annual (1.3mm) to me is insane when the CFPB could wipe Think and PGL off the planet in the next 2 months.  While that risk is out there, I'd say it is not worth it. Now if that risk settles, then I'd still try to negotiate to 1 times and then would need to triple the size after, in order to make up for it.
>
> Now i said to Scott "how much for me to buy it", sort of as a matter of curiosity.  FYI... Maybe it's different for the tribe to buy it.
>
> I also mentioned that TLM shouldn't be profit sharing like an owner. That really is an issue to me and I think it puts my capital lent at risk.  I said that if TNP becomes 1%, and their is a 1% broker fee as a servicing expense, that is a potential solution.  He said he agrees it's a problem, but that after talking to Flint that the 1% TNP might be a problem too (though the net $ effect is no change to anyone so I don't understand).  No other suggestion was made, but I'm all ears and I think it is very important we remove TLM as a "profit sharing 50% of retained earnings broker", because it sounds like "50% owner". This negates the entire tribal owned component that makes me as financer/Servicer feel like we are safe.
>
> Now also realize I do control the market on what 3x is.  I am the only party with an "out" if I wanted to exit because I don't like the TLM component's added risk.  I can call the debt due and end the venture.  That would make

JA493

3x a very very small number for the tribe to buy out.
>
> However, I don't want to do that and I don't want to assert myself to TLM in that manner either. But the fact is, as the financer, if the way the TLM component is structured isn't up to par and creates major risk to the borrowed capital, then it needs to change or: nobody wins, I put my capital in major jeopardy, and the tribe puts the operation in jeopardy.
>
> I will keep talking on the TLM not getting "Tribal Net Profits" point and try to get that resolved first and foremost. Maybe Karrie you might need to call Flint and can just say that Matt is very concerned about TLM sharing the "profits" and so are you and see if tribe and TLM can come up with any alternative.
>
> As for the buyout, we can save that for 2nd item.  At some point I think I am going to have to say to TLM that they need come to a fair price for the tribe to buy them out or else the structure just doesn't work for me anymore. I'm not sure we want to do that, but we can discuss this side of TLM next week.
>
> However, I'd love to get the 1st issue of "profits" resolved ASAP, before digging into the TLM fee issue.
>
>
>

CONFIDENTIAL

# Exhibit 12

| | |
|---|---|
| **From:** | mattm@bellicosevi.com |
| **To:** | Karrie Wichtman |
| **Subject:** | RE: CFPB and Tribes |
| **Date:** | Tuesday, June 19, 2012 9:11:50 AM |
| **Attachments:** | image001.jpg |
| | image002.png |

That's really great news.  I'd love to switch the portfolios over to self-financed entities when they are ready!  Right around the end of the Alpha line of credit in 36 months should be perfect timing.

I wish I could come up with an answer quickly on the NAFCC/NALA stuff, but I have to think about it. I'm not that familiar with it and its goals vs. OLA or the costs.  I think the costs were extremely high vs. OLA for NALA.  I have to review their website at some point here and see what they are about.

The one thing I don't want is the TLM relationship to be a sour point for the Tribe's attitude about the SPVI relationship ("if it were a different Servicer, we wouldn't have to pay TLM any more").  Just let me know how I can help!


**Regards,**

**Matt Martorello**
Mobile: 773-209-7720
Email: MattM@BellicoseVI.com



\*\*This email and any files transmitted with it are confidential and contain privileged or copyright information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.\*\*

**From:** Karrie Wichtman [mailto:kwichtman@rosettelaw.com]
**Sent:** Monday, June 18, 2012 2:14 PM
**To:** mattm@bellicosevi.com
**Subject:** RE: CFPB and Tribes

Matt,

No apologies necessary.  I appreciate your comprehensive responses and the fact that you took the time to do so.  I will discuss your concerns re: anonymity and the NAFCC/NALA involvement with Shelly and Craig.  We do plan to attend the Denver event of the two organizations this week, however, rest assured that proprietary information will not be shared regarding the LVD tribal entities or SPVI.  I also cannot see any competitor weakening the SPVI and LVD relationship, they are quite happy with the services provided by SPVI and are looking forward to a long business relationship.  I am not sure that the Tribe, itself, has the means to support the involvement with NAFCC/NALA, thus the request to access lobby/litigation reserve funds to allow for their continued involvement.  Given, SPVI's stance on participation, is this even an option?

Overall, sounds like our weaknesses are covered or at least being addressed. I did not mean to convey that the Tribe was not happy with the current percentage received and I am glad that the current pay structure has been found legally sound, at least in one circuit. I hope you did not take it that way – it was just an area, if I were a regulator, I would attack. Your explanation regarding the risk associated with your investment paints a clearer picture as to the defensibility of the model. That is what I was hoping for. With regard to LVD receiving more profits, I believe that they will be in a position to make such an investment, if they so desire in the near future (18-24 months), given the return on investments that have closed this year and the capital gains that they will likely see from those as well as the re-investment in their own facility which will change almost the entire face of the gaming floor this summer. It would be great to see them graduate to the lender level. As far as TLM, the agreements had no termination date and ceased only when the relationship ceased between the vendors, investors and the Tribe. Furthermore, the "consulting fee" was to be received for any investment, indirect or indirect, of "Bona Fide Investors" to the Tribe's Lending business for which TLM made some sort of introduction between the vendor/investor and the Tribe. This includes "any and all assignees, associates, affiliates, partners, agents, employees or any other entity or person that benefits through its contact or communication." I am a little unclear about how far this reaches – I know the intent is as far as any investor making any investment in the Tribe's lending businesses, however, in the case where we find ourselves with RRTL and Alpha, TLM has had no involvement with the due diligence or anything else associated with this potential additional funding source – but because of the SPVI introduction and the potential argument that Alpha has an "associate" relationship with SPVI – the consulting fee will be expected by TLM when that funding falls into place. I also think the agreement was to include any servicer regardless of introduction through its non-circumvent clause. And no, the consulting agreement does not have a cap regarding the amount of Tribal Net Profits it may receive. I fear that even in the scenario of opening a new portfolio, because of the TLM introduction of SPVI to the Tribe, they would argue that they get the fee from that too. I, however, believe that the Tribe making its own investment is entirely different, regardless of the use of the same Servicer, and will be arguing that TLM is entitled to no such fee if that were to come to fruition. I am aware that TLM has approached some of its clients with a buy-out opportunity, I am certain it will be offered to LVD as well, I just hope that it is a fair proposal, that the Tribe sees the advantages of doing such, and that they have the means to make it happen.

Thank you for the opportunity to speak candidly and for the honesty in your responses. Personally, I think it is your willingness to have discussions like these that set you apart from other Servicers and greatly contributes to your success!

Sincerely,

**Karrie S. Wichtman, Attorney**
**Rosette, LLP**
**Attorneys at Law**
Michigan Office
25344 Red Arrow Hwy, Suite B
Mattawan, MI 49071
269.283.5005 – Office

480.242.6959 - Cell

517.913.6443 — Fax

kwichtman@rosettelaw.com

www.rosettelaw.com

CONFIDENTIAL COMMUNICATION: THIS MESSAGE IS A CONFIDENTIAL ATTORNEY COMMUNICATION
ONLY FOR USE BY THE INTENDED RECIPIENT.  ANY INADVERTENT RECEIPT SHALL NOT CONSTITUTE A
WAIVER OF ATTORNEY-CLIENT OR WORK PRODUCT PROTECTION.  IF RECEIVED IN ERROR, PLEASE
NOTIFY KARRIE S. WICHTMAN IMMEDIATELY AND DELETE THIS MESSAGE.  THANK YOU FOR YOUR
COOPERATION.

**From:** mattm@bellicosevi.com [mailto:mattm@bellicosevi.com]
**Sent:** Monday, June 18, 2012 10:53 AM
**To:** Karrie Wichtman
**Subject:** RE: CFPB and Tribes

Thanks Karrie, sorry for the delay... my thoughts are below (sorry so lengthy)

**Regards,**

**Matt Martorello**
Mobile: 773-209-7720
Email: MattM@BellicoseVI.com



**This email and any files transmitted with it are confidential and contain privileged or copyright information. You must not present this message to
another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the
information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately,
and delete this email from your system.**

**From:** Karrie Wichtman [mailto:kwichtman@rosettelaw.com]
**Sent:** Friday, June 15, 2012 5:54 PM
**To:** mattm@bellicosevi.com
**Subject:** RE: CFPB and Tribes

Matt,

As far as I know we have not received anything.  I will inquire with the Chairman, his Executive
Secretary, Shelly and Craig to see if something was received.  Jennifer gave me the heads up about
these letters about a month ago and I did inform the Tribe that we might be getting one.  As far as
the NAFCC/NALA, I understand your concern about calling unnecessary attention to ourselves,
however, the advocacy work that is being done by the NAFCC and being in the know through our
participation gives us an advantage of not being surprised when issues arise such as the recent
legislation proposed by Senator Merkley.  Are you saying that you would rather Shelly and I not go
out to Denver next week to attend the merger meeting scheduled between the NAFCC/NALA?  I
guess I am more afraid about not being involved and allowing someone else to dictate to us what

best practices are or will be, as well as ensure that the folks making the decisions are the Tribal entities and not someone else.*[Matt Martorello]* This sounds like a deeper more fundamental interest for tribes to ensure the right groundwork is being laid for a budding new industry.  We at SPVI seem to favor letting the other players bear the brunt and defend aggressively (which thankfully guys like Tucker have done a great job at standing strong) giving us the free look at how to avoid expensive legal trouble.  We have the same perspective for our offshore lenders and even our state licensed lender.  In fact, at OLA we very rarely go and have found reporters crashing events there to try to get intel.  We much prefer to operate through trusted 3rd parties for these events and stay off the radar.  We are also concerned that the Tribe will be working closely with other large competing Servicer's to SPVI now, which could lead to a competitive disadvantage for SPVI if the Tribe decides that it does not want the exclusive anymore, or if a competitor to SPVI weakens the enthusiasm of LVD having the relationship with SPVI as it is.  So as we finance the build of a stronger tribal lending business and we are betting on the long-term year 3 profitability, we don't want to lose out on the returns associated with such intellectual and financial investment.

As far as the ability of the CFPB being able to investigate Tribes, it is my understanding that the CFPB's authority is regulatory in nature and derived from the Dodd-Frank bill in which Tribes are treated as States over which the CFPB has no regulatory control.  I am not certain, however, about the FTC's reach. *[Matt Martorello]* This is wonderful, sounds like the FTC is the only potential issue here.  I know Tucker is challenging the authority of the FTC right now for the first time ever by a Tribe.  So we'll learn soon on how that pans out.  SPVI is working on a new loan product/consumer loan agreement and working with the software system to make it work.  This will address each concern the FTC had with Tucker so that they can never have such concerns with SPVI clients.  We are planning to have that wrapped up in the next 3 or 4 weeks.

We have a fight coming and I understand you wanting to lay low, but we can't escape it forever.  I am not saying I want to waive a banner and say "look at us" but our model is one of the best there is, we have made every effort to ensure tribal control, and are tweaking things almost constantly, it seems, to allow for more tribal control.  While some may attack the role of the Servicer, your role is integral to our success – you have the know-how and the funding sources to ensure that the business is fruitful for the Tribe.  You asked me a little while ago, if there is anything that I would change about our current model or if I were a regulator how I would attack it.  Personally, I see  only a few issues – on the regulatory side, the Tribal Regulatory Authority that is, it needs to have a designated employee, even if only part time, to ensure that licensing is done correctly and tracked and that audits of lending practices are performed.  We are certainly in compliance with the law at present, but internally the Tribe's need to embrace this as a new position intended to strengthen the model and protect the Tribe and consumers.*[Matt Martorello]* I don't foresee any more licenses being required in the near term.  I guess it depends on what the TRA decides it wants to do on this compliance stuff.  Annual review?  If so, I'd imagine just requiring somebody's attention for 2 - 3 weeks a year to get through that process.   The second piece is the profit to the Servicer, we have to be prepared to show that the percentage of net profit that the Servicer is receiving is defensible compared to what the Tribe is receiving.  In the casino management context there is a certain percentage cap per regulations at 30%, or maybe 40% I believe, that a manager is legally allowed to receive in order to ensure that the benefit of the business is to the Tribe and not the Manager.  That being said, the fact that in our current arrangement the Servicer pays all operating expenses and

then throwing in the Lobby/Litigation account and potential expenses there, and the minimum guaranteed payment to the Tribe, certainly takes a bite out of any net profit realized by the Servicer, but what does that calculation truly look like in our situation?  I think that is where we will  be attacked and it is the weakest link in the model.  *[Matt Martorello]*  This was tested in Colorado with Tucker at 1% and the Supreme Court of Colorado upheld it with flying colors, and no justification was even necessary for them to do so.  There was a specific comment you see in the decision about it that was very supportive.  I'd imagine that casino fee discussion might come up in a lot of circles over the next year or so.  The thing is, this industry is nothing like the casino industry.  The casino industry has a calculated definable "edge" in which you make money and it's a cash business vs. having everything out on the street in loans that you may never get back (operational risk of massive losses which is common, ACH/Bank risk of closure, regulator risk of lawsuit and ending industry before you reach your period of profitability, etc.).  In payday lending, more lenders fail and LOSE their entire investment than there are lenders that succeed.  Even despite the bank/ach/regulatory risk!  Folks jump into this business thinking the profits are so large, but they don't know what they are doing.  It is so very sensitive to underwriting and marketing and operations, that one little tweak the wrong way and you are losing massive dollars before you even know you have a problem on your hands (this is because you lend money today, and you don't know how it did for another month or two… meanwhile, you've been putting out all of your funds under a model before you've realized the model is flawed and losing 50% of cash put in each month).  Majority of lenders fail.  Those that don't fail are facing diminishing profits, increased competition, restrictions in marketing efforts from Google, and now the legal bills are several times as costly as they used to be thanks to increased regulation.  All the while, the "end" is always around each corner with the FTC and CFPB and the banks/ACH providers getting heavily influenced to stop serving lenders.  In fact, if we don't have a Wells Fargo replacement done, Iron Fence would likely lose $4,000,000 come July 1.  If we lost our ACH provider and had no replacement, Iron Fence would lose even more than that.  The risk in this industry is massive and takes many forms.  In a casino in know I'm only giving back 97% of every dollar played in Blackjack and I know I can't have all of my money frozen (like losing my bank/ACH), I can't have the FTC come in and file suit for likely more assets than I have, etc. etc.  Also, I don't have options in the casino model where in Lending I can operate via offshore, state COL, state-by-state, etc.

RRTL for example has paid TNP of about $80k I think, maybe $100k…  Iron Fence has loaned RRTL over $5,000,000 and SPVI has lost over $2,000,000 to date on servicing RRTL by eating the expenses with no revenue.  If the FTC shut RRTL down today, we would be in trouble.  This will continue this way for about 18 months where RRTL will have SPVI on the losing end and TNP will have been over $400k.  This is why SPVI gets compensated on the back-end (which unlike the casino business there may never be a back end) in years 3 and 4 when it will break-even.  SPVI is guaranteeing TNP in an industry where majority of entrants fail and hoping to get to profitability in year 4.

Another consideration is that unlike the Casino model, there are alternatives.  Offshore lending means no FTC involvement and legal costs associated with that fight, no CFPB issues, and no recurring legal expenses with dealing with BBB inquiries and AG letters (today is arguably the best model to raise capital for).  Choice of law state licensed lending is also still a viable alternative, as is state-by-state licensed lenders like the $1bn company cashnetusa.com does very well, and is a public company.  But so long as these other options are out there the Servicing Fees will won't ever reach

anything close to the casino model.

The biggest proponent I know of, but is a very private study, was done by a Servicer that I am close friends with.  Their entity had Ernst & Young come in and do an economic study on what the right fee relative to industry risk was, and this was done 3 years ago.  Today the cost of leads have increased about 70%, and the regulatory/legal risk has reached all new levels.  E&Y came out deciding that the lender was entitled to a bond yield of equivalent risk, and the result was converted into a low single digits % of revenue.  So this is how the Servicer built their contract and bills the Lending entity, and this study is required to provide to the IRS (the most diligent of all in terms of fair pricing) with confidence that the model in which the Servicer charges the lender is fair.

Now all of that said, I get the feeling the Tribes may want more money.  They may feel it's not that hard, that they could do it on their own, etc.  That they are getting more involved now with CFPB/FTC attacks.  However, the level of sophistication behind the scenes built into the IP that SPVI uses, which makes SPVI clients succeed while majority of lenders fail, is massive.  Going at it alone is an exercise in how much money do you want to lose before you make it up the learning curve high enough to know how to do it right.  That takes a lot of analytics to get there and the faster the better.

Today, I am VERY interested in going to Tribes that can self-finance, and I would offer something equating to about 25% of the Net Profit in such a deal.  I would do this with every Tribe I could get.  The reason that number is not 51% is because I'm better off operating with other models/lenders, or lending myself as a choice of law or state licensed lender even if it is the Tribe's money, the time and effort it takes to manage portfolios is a limited skill set.  I would say the minimum investment would be $3,000,000.  I would love to do something like this with LVD on a 3rd portfolio that is capitalized by the Tribe itself.  Obviously with RRTL/DCTF the risk is all Iron Fence, but this model allows the Tribe to fund it, the Tribe to take the financial risk, and the Tribe to enjoy higher benefits.  They would earn more than any tribe out there, but they would be responsible for to fund their own venture.  Maybe we should do a 3rd portfolio in something similar to this model if LVD has the funds.

One comment pertaining to the interest of assessing market value… Servicers are not all apples to apples.  You might think one Servicer's model is cheaper than another, but their practices will yield 1/2 the revenue as ours, per dollar invested (Think Finance for example).  Or they charge a flat $100 fee per originated loan and they mark up their leads by 50% to minimize the profitability of the lender BEFORE they do a split that looks larger on the surface (also like Think Finance).

Lastly, the TLM piece is problematic for a whole host of reasons, and while I do not have any doubt that for bringing the regulatory structure and the Servicers to the table there should be a  fee paid to TLM and notwithstanding their recent timely and effective resolution to the Wells Fargo issue and leading us to USB, 50% of the Tribe's profits has always been a bit excessive in my opinion.  However, that is the agreement entered into by the Tribe, and incorporated into our agreement, and ultimately the Tribe has benefitted greatly from the introduction and the entry into the on-line lending industry.  However, if there was a way to pay for the value received by TLM as a result of the introduction and structural documents provided and part amicably with TLM, I would hope that the Tribe would pursue it.*[Matt Martorello]* I understand this completely.  Is there a duration to the

TLM relationship?  Or is there a cap on the maximum amount they get from TNP?  Most importantly, does LVD have to pay them on EVERY relationship they get into, even if TLM doesn't make the intro to the Servicer?

Those are my thoughts…☺

Sincerely,

**Karrie S. Wichtman, Attorney**
**Rosette, LLP**
**Attorneys at Law**
Michigan Office
25344 Red Arrow Hwy, Suite B
Mattawan, MI 49071
269.283.5005 – Office
480.242.6959 - Cell
517.913.6443 – Fax
kwichtman@rosettelaw.com
www.rosettelaw.com

CONFIDENTIAL COMMUNICATION: THIS MESSAGE IS A CONFIDENTIAL ATTORNEY COMMUNICATION ONLY FOR USE BY THE INTENDED RECIPIENT.  ANY INADVERTENT RECEIPT SHALL NOT CONSTITUTE A WAIVER OF ATTORNEY-CLIENT OR WORK PRODUCT PROTECTION.  IF RECEIVED IN ERROR, PLEASE NOTIFY KARRIE S. WICHTMAN IMMEDIATELY AND DELETE THIS MESSAGE.  THANK YOU FOR YOUR COOPERATION.

---

**From:** mattm@bellicosevi.com [mailto:mattm@bellicosevi.com]
**Sent:** Friday, June 15, 2012 3:48 PM
**To:** Karrie Wichtman
**Subject:** CFPB and Tribes

I heard many tribes received investigation letters from the CFPB on Wednesday, did you hear anything about this?  I'm kind of an advocate right now for LVD to be laying low and under the radar while we let everyone else sort things out over the very rocky next 6 months.  I think the NALA/NAFCC stuff has a great purpose for a voice, but I think it's best done at an anonymous level via 3rd parties like yourself who have client-attorney privilege.  Being super active, I think makes it easier to put up a target for FTC/CFPB to figure out who to send investigations to.  Just wondering what your thoughts are on this, because admittedly I know little to nothing about the organizations or the ability for the CFPB to investigate at all (or the FTC for that matter).

**Regards,**

**Matt Martorello**
Mobile: 773-209-7720
Email: MattM@BellicoseVI.com



**This email and any files transmitted with it are confidential and contain privileged or copyright information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

# Exhibit 13

# Tribal Loan Management, LLC

565 W. Chandler Blvd., Suite 212
Chandler, Arizona 85225

August 1, 2012

Alan Shively, Chairman
Lac Vieux Desert Band of Lake Superior Chippewa Indians
P.O. Box 249
Watersmeet, Michigan 49969

Re:   **Tribal Loan Management, LLC Side-Letter Agreement**

Dear Chairman Shively:

This letter (the "Letter Agreement") is intended to memorialize the agreement between Tribal Loan Management, LLC, an Arizona limited liability company ("TLM") and the Lac Vieux Desert Band of Lake Superior Chippewa Indians (the "Tribe"), a federally recognized Indian tribe (each individually, a "Party" and collectively, the "Parties") with whom any agreement, contract, understanding, letter of intent, stipulation, or any other rule or bylaw of the Tribe or its subsidiaries of any kind whatsoever, whether oral or written, express or implied (as applicable, an "Agreement"), which was or which might have been attempted or consummated in fact between the TLM and the Tribe.

The Parties have agreed as follows:

1.     The TLM Invoice dated August 1, 2012 ("TLM Invoice") in the amount of $960,000, when fully paid in accordance with the terms thereof, shall fully satisfy any and all obligations, duties, requirements to act or refrain from acting, omissions, or any other performance of the Parties under, related to, or with any possible connection to, an Agreement.   For the avoidance of doubt, it is understood that, subject to the execution of this Letter Agreement,  pursuant to the terms specified in the Invoice attached as Exhibit A, any Agreement directly affecting the Tribe shall be deemed null and void including any revenue or profit sharing arrangements, agency relationships, duties to negotiate documents, requirements for access to or restrictions from certain locations, and, except as set forth herein, requirements to arbitrate certain disputes, non-disclosure, or confidentiality requirements, as well as any other provision, requirement, duty to act or refrain from acting, that might arise from or be in any way related to, an Agreement.

The Parties shall preserve the confidentiality of all material information related to this Letter Agreement or any Agreement that may have been or will be disclosed (the "Confidential Information"), and shall not publish, disclose, or otherwise divulge such Confidential Information without the prior written consent of the other Parties, except to officers, directors, agents, or employees on a confidential and need-to-know basis. In the case of any breach of this confidentiality provision, the breaching Party

Tribe        TLM

JA505

CONFIDENTIAL

August 1, 2012
Page 2 of 3

agrees to pay the other non-breaching Parties the sum of Two Hundred Thousand Dollars ($200,000.00) as liquidated and stipulated damages.

Confidential Information does not include information that: (a) was or is in the public domain prior to the date of disclosure; (b) was or is lawfully received by a Party from a third party without obligation of confidentiality; (c) was or is already known by or in the possession of a Party; or (d) is required to be disclosed under applicable law or by a governmental or court order, decree, regulation or rule, provided that written notice is provided to the other Party as far in advance as possible prior to disclosure. The Parties acknowledge that irreparable damage may incur if there is a breach of this section. Accordingly, if a Party or any of its respective agents or representatives breaches or threatens to breach any of the provisions of this section, then the affected Party will be entitled to all the rights and remedies available to it, including an equitable relief restraining any potential breach of the provisions of this section.

2. The Parties, individually and on behalf of themselves, their assigns, and successors, and each of them, covenants not to sue and fully indemnifies, releases, discharges, and holds harmless each other and their parents, subsidiaries, affiliates, and successors-in-interest, whether as they may have existed in the past, may currently exist, or as they may be created in the future, as well as its and their owners, agents, attorneys, insurers, representatives, assigns, and successors, whether as they may have existed in the past, may currently exist, or as they may be created in the future (hereinafter collectively referred to as "Releasees") with respect to and from any and all claims, demands, rights, liens, agreements, contracts, covenants, actions, suits, causes of action, obligations, debts, costs, expenses, attorneys' fees, damages, judgments, orders and liabilities of whatever kind or nature in law, equity or otherwise, whether now known or unknown, suspected or unsuspected, and whether or not concealed or hidden, which the Parties now own or hold or has at any time owned or held against said Releasees, arising out of or in any way connected with this Letter Agreement or any Agreement.

5. Because the Tribe intends to provide Tribal lending services to consumer borrowers, the Tribe shall indemnify, defend, and hold harmless TLM, its shareholders, directors, officers, attorneys, employees and agents, and its and their successors and assigns from and against any and all claims, demands, losses, costs, expenses, obligations, liabilities, damages, recoveries and deficiencies, including interest, penalties, reasonable attorneys' fees and costs that TLM may incur or suffer which arise, result from, or relate to the Tribe's (a) a breach of any of its representations and covenants set forth in this Agreement or (b) a breach of this Agreement by the Tribe or (c) the Tribe's intended lending services to consumer borrowers or (d) the Tribe's or the Tribe's partner's or contracted vendor's business practices and/or advertising practices. The Tribe will pay any and all costs, damages and reasonable attorneys' fees and reasonable expert witness fees incurred by or awarded against TLM, its shareholders, directors, officers, attorneys, employees and agents, and all expenses incurred by TLM in connection with or arising from any such claim, suit, or proceeding.

6. If any dispute arises under this Letter Agreement, the Parties agree to first try to resolve the dispute with the help of a mutually agreed upon mediator. Any costs and fees other than attorneys' fees associated with the mediation shall be shared equally by the Parties. If it proves impossible to arrive at a mutually satisfactory solution through mediation, the Parties agree to submit the dispute to binding arbitration in the following location: Marquette, Michigan. The Parties agree that the binding arbitration will be conducted by a single arbitrator under the rules of the American Arbitration Association. Judgment upon the award rendered by the arbitrator may be entered in the Lac Vieux Desert Tribal Court and in any Michigan State court. The Tribe consents to a waiver of its sovereign immunity for the limited purposes of resolving any dispute between the Parties arising under this Letter Agreement through

Tribe _____   TLM _____

JA506

ROS002-0001920

August 1, 2012
Page 3 of 3

arbitration as set forth herein and for the entering of any judgment awarded by the arbitrator. The Tribe consents to the forum and venue(s) as set forth herein.

7. Each Party hereto is an independent contractor and nothing contained herein shall be construed to create a partnership, joint venture or agency relationship between the Tribe and TLM, and neither Party shall be authorized to bind the other in any way. This Letter Agreement is between the Tribe and TLM, and is not for the benefit of any third party, whether directly or indirectly.

8. The failure of any Party to exercise in any respect any right provided for herein will not be deemed a waiver of any further rights hereunder.

9. If any provision of this Letter Agreement is held to be invalid or unenforceable for any reason, such provision shall be conformed to prevailing law rather than voided, if possible, in order to achieve the intent of the parties and, in any event, the remaining provisions of this Letter Agreement shall remain in full force and effect and shall be binding upon the Parties hereto.

10. This Letter Agreement and the Attachment referred to in this Letter Agreement represent the complete and exclusive statement of the mutual understanding of the Parties and supersede and cancel all previous agreements, written and oral agreements, communications and other understandings specifically relating to the Tribe's consumer financial services businesses and the subject matter of this Letter Agreement. Except as otherwise provided herein, all modifications or amendments to this Letter Agreement must be in a writing signed by both Parties, except as otherwise provided herein.

11. The Parties warrant and agree that, by completing and executing this Letter Agreement, legal rights, duties and obligations are created. By signing, each of the Parties independently acknowledges, warrants, and agrees that the Parties have been advised to seek and obtain independent legal counsel as to all matters contained in the Letter Agreement prior to signing same, that each Party has had adequate time and sufficient opportunity to review this Letter Agreement with its own legal counsel and that each Party has obtained such advice or has chosen to proceed without same. For the avoidance of doubt, the Tribe Tribe warrants and represents that it was encouraged to seek independent legal counsel review of this Letter Agreement and affirmatively decided to forgo such review.

12. This Letter Agreement may be signed by TLM and the Tribe in counterparts, and facsimile signatures shall have the same force and effect as an original signature. The Tribe shall attach a copy of a Tribal Council Resolution (Exhibit B) approving both this Letter Agreement and the Invoice.

If this letter accurately reflects the terms of the agreement between TLM and the Tribe please sign where indicated below.

Sincerely,

~~Flint Richardson, Member~~ Rob Rosette
Tribal Lending Management, LLC

Lac Vieux Desert Band of Lake Superior Chippewa Indians

By: _____
Alan Shively, Chairman

Tribe        TLM

JA507

CONFIDENTIAL                                                                 ROS002-0001921

# Exhibit 14

# INVOICE



**DATE:** August 1, 2012
Invoice: LVD-082012

**FOR:** Consulting Services Rendered

**BILL TO:** Lac Vieux Desert Band of
Chippewa Indians
Attention: Tribal Chairman
P.O. Box 249
Watersmeet, MI 49969

| DESCRIPTION | AMOUNT |
|---|---|
| Total amount owed for professional services from June 2011 through July 2012. Services included the development of all Tribal Consumer financial services laws and associated regulatory framework for review and consideration by the Tribal client. Services also include the review, evaluation and comment on all agreements from a financial and legal standpoint with corresponding recommendations for potential changes for consideration to the Tribal client. | $ 960,000.00 |
| Amount due September 20, 2012 | 40,000.00 |
| **Balance Forward** | $ 920,000.00 |
| ($40,000 each month for September 2012 through August 2014, each payment due on the 20th of each month - 24 consecutive monthly payments.) | |

**Payment to be Remitted Via:**
**Bank:** Mutual of Omaha
**Account Name:** Tribal Loan Management, LLC
**Account:** Redacted
**Routing:** Redacted

JA509

ROS002-0001918

Exhibit 15

**AMENDED & RESTATED SERVICING AGREEMENT**

**BETWEEN**

**RED ROCK TRIBAL LENDING, LLC**

**AND**

**SOURCEPOINT VI, LLC**

**JULY 31, 2012, with retroactive effect to OCTOBER 25, 2011**

JA511

CONFIDENTIAL                                                          MARTORELLO_003474

# TABLE OF CONTENTS

1.    Recitals.....................................................................................................1
2.    Definitions.................................................................................................3
3.    Covenants..................................................................................................5
4.    Business and Affairs in Connection with Enterprise. ...............................9
5.    Liens and Debt. .......................................................................................16
6.    Servicer Fee Reimbursement, Disbursement, and Capital Contribution. ...........................17
7.    General Provisions. .................................................................................18
8.    Warranties. ..............................................................................................22
9.    Grounds for Termination. ........................................................................23
10.   Conclusion Of the Servicing Term ..........................................................25
11.   Consents and Approvals...........................................................................25
12.   Disclosures. .............................................................................................26
13.   No Present Lien Lease or Joint Venture ...................................................26
14.   Enterprise's Limited Waiver of Sovereign Immunity...............................26
15.   Time is of the Essence .............................................................................28
16.   Tribal Assets ............................................................................................28
17.   Governing Law ........................................................................................28
18.   Dispute Resolution...................................................................................28
19.   Performance During Disputes ..................................................................31
20.   Confidential Information...........................................................................32
21.   Execution .................................................................................................32
22.   Enterprise Name.......................................................................................32
23.   Intent to Negotiate New Agreement .........................................................32
24.   Entire Agreement .....................................................................................33
25.   Additional Actions ...................................................................................33
26.   Representation...........................................................................................33

**Schedule 1.0 – Tribal Laws**

**Schedule 18.2.1 - List of Pre-Approved Arbitrators**

*i*

CONFIDENTIAL

MARTORELLO_003475

*ii*

CONFIDENTIAL                                                    MARTORELLO_003476

## AMENDED AND RESTATED SERVICING AGREEMENT

**THIS AMENDED AND RESTATED SERVICING AGREEMENT** ("Agreement") is made and entered into as of this 31st day of July 2012, and hereby amends and restates, in its entirety, the October 25, 2011 Servicing Agreement entered into by and between RED ROCK TRIBAL LENDING, LLC ("Enterprise"), an economic development arm and instrumentality of, and a limited liability company wholly owned by the LAC VIEUX DESERT BAND OF LAKE SUPERIOR CHIPPEWA INDIANS ("Tribe"), a federally-recognized Indian Tribe and sole member of the Enterprise, and BELLICOSE VI, INC., a U.S. Virgin Islands corporation with offices in the U.S. Virgin Islands to reflect the April 15, 2012 assignment of rights and interest in the October 25, 2011 Agreement from BELLICOSE VI, INC. to SOURCEPOINT VI, LLC, a U.S. Virgin Islands limited liability company, and BELLICOSE VI, INC. subsidiary, with offices in the U.S. Virgin Islands ("Servicer"), to incorporate amendments agreed to by and between the Enterprise and the Servicer effective May 15, 2012, and to make such amendments both the Enterprise and the Servicer agree more accurately reflect the operation of the Enterprise and the role of the Servicer. This Agreement and the terms provided for herein shall be retroactively effective to October 25, 2011. Each of Enterprise and Servicer may be referenced hereinafter individually as a "Party" or together, as the "Parties."

1.  **Recitals.**

    1.1    The Tribe is a federally-recognized Indian tribe. The Tribe possesses sovereign governmental authority pursuant to the Tribe's inherent and recognized powers of self-government.

    1.2    The Tribe has established Enterprise, a limited liability company wholly owned by and formed under the laws of the Tribe, as an economic development arm and instrumentality of the Tribe.

    1.2.1    The purpose of Enterprise is to promote the self-sufficiency of the Tribe and to address the socio-economic needs of the Tribe, its members, its families, and its community by building capital within the tribal community. This capital will subsequently be dispersed to the Tribe through the Enterprise, and used at the Tribe's discretion for the benefit of its members and the community through tribal initiatives and tribal governmental programs. The increase of such capital, as well as the initiatives and programs funded by it, will guarantee that the Tribe can continue to care for itself, its members, and its community by promoting greater self-determination, political and social autonomy.

    1.2.2    The Enterprise, pursuant to its Governing Documents, has the exclusive right to develop and operate the Tribe's financial services business that will provide small-denomination short-term financial services and other related goods and services to consumers through its internet call-center and field representative operations and has been directed and authorized to take any and all action as is deemed necessary or desirable in connection with such business and services, including but not limited to the authority to act as the exclusive agent to enter into and to exercise the rights and perform the obligation of Enterprise under this Agreement.

1

CONFIDENTIAL

**1.2.3**  The Tribe, through Enterprise, is engaged in internet-based unsecured lending, as hereinafter defined, and provision of financial services.  It is the Tribe's hope that Enterprise's endeavors will improve the economic conditions of its members; enable the Tribe to better serve the social, economic, educational and health needs of the Tribe, its members, and its community; increase Tribal revenues; enhance the Tribe's economic self-sufficiency and self-determination; and provide positive, long-term social, environmental and economic benefits.

**1.3**  Enterprise is seeking managerial, technical and financial experience and expertise for the development and operation of the new Unsecured Lending Business, as defined below.  The Servicer is a company located in the U.S. Virgin Islands which provides management and consulting services to companies engaged in the Unsecured Lending Business and is willing and able to provide such assistance, experience, expertise and instruction to the Enterprise.

**1.4**  The Enterprise, through a contractual relationship, desires to retain and engage the Servicer as its independent contractor to consult to, develop, manage, and provide operational guidelines regarding the Unsecured Lending Business and any expansion thereof during the term of this Agreement and conforming with the provisions of this Agreement.  In addition to providing investment and capital management services, management, operations and marketing consulting, Servicer also provides analytic services to its roster of clients, including risk assessment and management. The parties believe that Servicer possesses the necessary experience and skill to effectively analyze portfolio composition, trends in performance and predictive measures of potential new customers to the Enterprise to increase the profitability and overall risk profile of the Enterprise.

**1.5**  The Enterprise and the Servicer entered into such a contractual relationship on October 25, 2011.  The Enterprise and the Servicer desire to amend and restate, in its entirety, the October 25, 2011 Servicing Agreement to reflect the April 15, 2012 assignment of rights and interest in the October 25, 2011 Servicing Agreement to SOURCEPOINT VI, LLC, a U.S. Virgin Islands limited liability company, and Bellicose VI, Inc. subsidiary, with offices in the U.S. Virgin Islands, to incorporate amendments agreed to by and between the Enterprise and the Servicer effective May 15, 2012, and to make such amendments both the Enterprise and the Servicer agree more accurately reflect the operation of the Enterprise and the role of the Servicer.

**1.6**  Each Party represents and warrants that the individuals executing this Agreement, as set forth in the signature blocks below, are fully and properly authorized under controlling law to enter into this Agreement on behalf of their respective organizations; and that the respective organizations have duly approved and ratified the terms of this Agreement.

**1.7**  In addition to the representations and warranties made in Section 12.1 herein, each Party represents and warrants that the individuals executing this Agreement, Enterprise management and Servicer management, do not have criminal records involving any financial crimes or crimes of dishonesty that might trigger any concern from any regulatory body with respect to their involvement in a consumer financial services business.

**1.8**  The Servicer further represents and warrants that it, along with all other members of the management as well as employees having any responsibility for the business of the

2

CONFIDENTIAL

Enterprise, meets the eligibility requirements for licensing pursuant to the Tribe's Consumer Financial Services Regulatory Code. Proper licensing is a requirement for entering into this Agreement and the Transaction Documents.

**2.** **Definitions**. Unless otherwise specified in this Agreement, as they are used in this Agreement, the terms listed below shall have the meaning assigned to them in this Section:

**2.1** **Affiliate**. "Affiliate" means as to Servicer or Enterprise, any corporation, partnership, limited liability company, joint venture, trust, department or agency or individual controlled by, under common control with, or which controls, directly or indirectly Servicer or Enterprise. "Control" means (i) ownership, control, or power to vote twenty five percent (25%) or more of the outstanding shares of any class of voting securities, directly or indirectly or acting through one (1) or more persons, (ii) control in any manner over the election of a majority of the directors, trustees, or general partners (or individuals exercising similar functions), or (iii) the power to exercise, directly or indirectly, a controlling influence over management or policies.

**2.2** **Authorized Debt**. "Authorized Debt" shall have the meaning given to it in Section 5.2.

**2.3** **Commencement Date**. "Commencement Date" shall be the Effective Date.

**2.4** **Commercial Finance Provider**. "Commercial Finance Provider" shall mean any entity that provides credit to Enterprise for the making of Consumer Loan Transactions.

**2.5** **Consumer Loan Transaction**. "Consumer Loan Transaction" means any form of consumer financial services transaction provided by a financial services provider to a consumer or other person that is unsecured or secured by way of ACH agreements.

**2.6** **Effective Date**. The "Effective Date" shall mean October 25, 2011.

**2.7** **Enterprise**. The "Enterprise" is the instrumentality and commercial subdivision of the Tribe formed to engage in (a) the Unsecured Lending Business; and (b) any other lawful commercial activity allowed upon approval of the Tribe as sole member of the Enterprise pursuant to Enterprise's Governing Documents. The Enterprise shall not include any commercial enterprise conducted by the Tribe or any other instrumentality of the Tribe other than as set forth immediately above in this Section 1.2. Enterprise shall have the sole proprietary interest in and responsibility for the conduct of all activities conducted by Enterprise, subject to the rights and responsibilities of the Servicer under this Agreement.

**2.8** **Enterprise Employees**. "Enterprise Employees" shall mean a generic reference to those employees who are employed by Enterprise.

**2.9** **Fiscal Year**. "Fiscal Year" shall mean each twelve (12) month period, or portion thereof, ending on December 31 of each year, or on such other date as may be adopted by Enterprise in the future as the ending date of its fiscal year.

**2.10** **Governing Documents**. "Governing Document" shall mean Enterprise's Articles of Organization and Operating Agreement, if any.

3

CONFIDENTIAL

MARTORELLO_003479

**2.11    Governmental Action**. "Governmental Action" shall mean any resolution, ordinance, statute, regulation, order or decision regardless of how constituted having the force of law or legal authorization of the Tribe or any instrumentality or agency of the Tribe.

**2.12    Gross Revenues**. "Gross Revenues" shall mean all revenues of any nature derived directly or indirectly from the operation of Enterprise (including the gross revenues of all Subsidiaries) on a consolidated basis.

**2.13    Legal Requirements**. "Legal Requirements" shall mean singularly and collectively all applicable laws including without limitation all applicable tribal and federal law.

**2.14    Net Revenues**. "Net Revenues" for the purpose of this Agreement shall mean Gross Revenues of the Enterprise less all Servicing Expenses.

**2.15    New Transaction**. "New Transaction" means a Consumer Loan Transaction with a new customer.

**2.16    Operations Manager**. "Operations Manager" shall mean the person employed by Enterprise, if any, to direct the day-to-day operations of Enterprise and to coordinate with the Servicer as defined above as well as any other entities providing services to the Enterprise.

**2.17    Primary Bank Account**. "Primary Bank Account" shall have the meaning given to it in Section 4.4.

**2.18    Refinancing Transaction**.    "Refinancing Transaction" means a Consumer Loan Transaction that extends or refinances, in whole or in part, an outstanding Consumer Loan.

**2.19    Regulatory and Litigation Reserve Fund**. "Regulatory and Litigation Reserve Fund" shall mean that fund established pursuant to Section 4.5 of this Agreement and shall be considered a Servicing Expense of Enterprise.

**2.20    Repeat Transaction**. "Repeat Transaction" means a Consumer Loan Transaction with an existing customer that is not a Refinancing Transaction.

**2.21    Servicing Budget**.    "Servicing Budget" shall have the meaning given to it in Section 4.5.

**2.22    Servicing Expenses**. "Servicing Expenses" shall mean the expenses of the operation of Enterprise, incurred pursuant to the Servicing Budget, including but not limited to the following: (1) the payment of salaries, wages, and benefit programs for all employees of Enterprise subject to the approval described in Section 4.3; (2) supplies for Enterprise; (3) utilities; (4) repairs and maintenance of any facility used by Enterprise for the conduct of its business; (5) interest expense on Authorized Debt of Enterprise; (6) insurance and bonding; (7) advertising and marketing; (8) professional fees; (9) reasonable travel expenses for officers and employees of Enterprise, Servicer or its affiliates to inspect and oversee Enterprise; (10) the Regulatory and Litigation Reserve fund expense; (11) security costs; (12) underwriting expenses; (13) bad debt expenses and (14) legal or professional fees incurred for lobbying or litigation that is not adequately covered by the Regulatory and Litigation fund.. Any expenses not referenced or

*4*

CONFIDENTIAL

MARTORELLO_003480

provided for in this Section that are added as Servicing Expenses after approval of this Agreement and the Servicing Budget in effect at the time must first be approved in writing by the Servicer and the Enterprise as provided for in this Agreement. Each of the above listed expenses is subject to the annual budgetary process and its resolution processes at Section 4.5 of this Agreement.

 **2.23**  <u>**Unsecured Lending Business**</u>.  "Unsecured Lending Business" means the activities of a financial services provider in providing Consumer Loan Transactions and other related financial services to consumers or other persons.

 **2.24**  <u>**Tribal Council**</u>. "Tribal Council" means the governing body of the Lac Vieux Desert Band of Lake Superior Chippewa Indians.

 **2.25**  <u>**Tribal Net Profits**</u>. "Tribal Net Profits" is calculated by adding the sum of Gross Revenues plus bad debt recoveries minus the sum of charge backs and bad debt charge-offs and multiplying the sum of this amount by two (2) percent calculated on a monthly basis all calculated on a cash basis.

 **2.26**  <u>**Tribal Representatives**</u>. "Tribal Representatives" shall mean the person or persons designated by the Enterprise, to serve as its liaisons to the Servicer, and who shall be responsible for assisting in the implementation of tribal policies as such policies relate to Enterprise and the Unsecured Lending Business. The Enterprise may remove and replace the Tribal Representatives in its sole and absolute discretion. The Tribal Representatives shall have the right to attend as an observer all meetings of Enterprise regarding management of Enterprise and shall have access to all documents and records of Enterprise. The salary, wages and benefits of the Tribal Representative(s) are a Servicing Expense of the Enterprise. The Tribal Representatives serve hereunder on behalf and for the benefit of the Enterprise and for purposes of decision-making are no way a substitute for the Tribe itself as sole member of the Enterprise.

**3.**  <u>**Covenants**</u>. In consideration of the mutual covenants contained in this Agreement, the Parties agree and covenant as follows:

 **3.1**  <u>**Engagement of Servicer**</u>. The Enterprise hereby retains and engages Servicer as its independent contractor for the purposes of providing those business management, consulting and professional services to Enterprise pursuant to the terms of this Agreement and advising the Operations Manager of the Enterprise and the Tribal Representatives. Servicer shall have the authority and responsibility over all communication and interaction whatsoever between Enterprise and each service provider, lender and other agents of Enterprise (for purposes of this Agreement, the service provider, lender and other agents of Enterprise or its subsidiaries shall be referred to as "Authorized Agents"). Nothing contained herein grants or is intended to grant Servicer a titled interest to or in Enterprise. The Servicer hereby accepts such retention and engagement as an independent contractor. Enterprise acknowledges that the services contemplated by this Agreement shall be provided by the Servicer from its offices in the U.S. Virgin Islands. Enterprise also acknowledges that the fees to be paid to Servicer as defined in Section 3.5.1 herein, are in fact performance-based fees, and are based solely on the profitability of the Enterprise following commencement of this Agreement. Enterprise also acknowledges that any tax or earnings statements to be issued to Servicer as a result of any payments made pursuant

5

CONFIDENTIAL

to this Agreement shall be filed with the Virgin Islands Bureau of Internal Revenue and not with the Internal Revenue Service as the Servicer is subject to the administration of tax laws by the Virgin Islands Bureau of Internal Revenue and not the Internal Revenue Service.

**3.2     Term**. The term of this Agreement shall begin on the Effective Date of this Agreement and continue until December 31, 2018 ("Term"). The Term shall automatically renew for an additional period of two (2) years unless either Party hereto provides written notice to the other Party at least one hundred twenty (120) days, but no greater than one (1) year, prior to the end of the Term.

**3.3     Restrictions on Competition.**

**3.3.1**   In consideration for Servicer providing its expertise to the Enterprise, the Enterprise agrees that so long as this Agreement is in effect neither it nor any Affiliate shall, directly or indirectly, either on its own or through any agent, joint venture, subsidiary or independent contractor, engage in the Unsecured Lending Business anywhere in the world except through the Enterprise without engaging the Servicer to provide the management and consulting services contemplated by this Agreement. The exclusivity provisions contained in this Paragraph 3.3.1. shall apply so long as Servicer achieves performance targets described herein. Performance targets are equal to Tribal Net Profits generated by the Enterprise on a monthly basis. The exclusivity provision shall remain in effect to the extent that the Tribal Net Profits as listed in Table 3.3.1 for a particular monthly amount is not achieved but the difference between the required amount and the actual amount are recouped (on a cumulative basis) in any three (3) consecutive month period of time (on a cumulative basis for the two SourcePoint V.I.-managed Tribal-lending entities contemplated at this time, including Red Rock Tribal Lending, LLC and Duck Creek Tribal Financial, LLC, formerly known as North Country Financial, LLC):

**Table 3.3.1 Tribal Net Profit**

6

CONFIDENTIAL

| Month | Tribe Net Profit |
|-------|------------------|
| 3 | 42,000 |
| 4 | 45,000 |
| 5 | 50,000 |
| 6 | 55,000 |
| 7 | 50,000 |
| 8 | 65,000 |
| 9 | 75,000 |
| 10 | 80,000 |
| 11 | 90,000 |
| 12 | 100,000 |
| 13 | 110,000 |
| 14 | 120,000 |
| 15 | 130,000 |
| 16 | 145,000 |
| 17 | 160,000 |
| 18 | 175,000 |
| 19 | 190,000 |
| 20 | 200,000 |

The Enterprise acknowledges that the Unsecured Lending Business can be conducted throughout the world (both as to the location of the consumers as well as operations) and that the worldwide restriction is appropriate. Nothing herein shall be taken to restrict the Enterprise, the Tribe, or its Affiliates from engaging in businesses that provide services, which in themselves do not compete with the Unsecured Lending Business. The Enterprise further agrees that it shall not solicit for employment or hire any employees of Servicer. In no event shall failure to meet the thresholds contained in this Section be considered a breach of this Agreement. Rather, they are significant only to the application or not of the non-compete provisions of this Section. The Parties agree that having two or more entities in the payday lending space or otherwise engaged in the Unsecured Lending Business, including Duck Creek Tribal Financial, LLC, formerly known as North Country Financial, LLC and Enterprise, is not a violation of this section restricting competition so long as any such entity is serviced by Servicer and/or its successors or assigns.

**3.3.2** The Enterprise has carefully read and considered the provisions of this Section and, having done so, agrees that the covenants set forth in this Section are fair and reasonable and are reasonably required to protect the legitimate business interests of the Servicer and the Enterprise including, but not limited to, protection of trade secrets, the Servicer's investment in its Confidential Information (as hereinafter defined), and the Servicer's goodwill and relationships with its clients and vendors. The Enterprise agrees that the covenants set forth in this Section do not unreasonably impair the ability of the Enterprise to conduct any unrelated business. The Parties hereto agree that if a court of competent jurisdiction holds any of the covenants set forth in this Section unenforceable, the court shall substitute an enforceable covenant that preserves, to the maximum lawful extent, the scope, duration and all other aspects of the covenant deemed unenforceable, and that the covenant substituted by the

7

CONFIDENTIAL

JA520

MARTORELLO_003483

court shall be immediately enforceable against the Enterprise. The foregoing shall not be deemed to affect the right of the parties hereto to appeal any decision by a court concerning this Agreement.

**3.4** **Servicer's Compliance With Law.; Licenses**. The Servicer covenants that it will at all times comply with all Legal Requirements and any licenses issued under any of the foregoing. If applicable, the Tribe shall not unreasonably withhold, withdraw, qualify or condition such licenses. Enterprise, through the Tribal Representatives will ensure that Servicer is made fully aware of and has acquired all applicable tribal licenses prior to commencement of Enterprise business activities.

**3.5** **Servicing Fee.**

**3.5.1** The Parties hereto have agreed that the success of the business is based in large part upon the services provided to the Enterprise by the Servicer. As a result, Enterprise has agreed to a performance-based fee equal to cash basis revenue remaining after payment of Tribal Net Profits, Servicer advances, and all Servicing Expenses . The Servicing Fees shall be paid monthly, with the Servicer having the ability to sweep Enterprise bank account amounts into the Servicer's bank accounts, on or before the fifteenth (15th) day of the ensuing month. The Enterprise acknowledges and agrees that the Servicer is not responsible for the performance or activities of any of the lenders or servicing companies that may be doing business with the Enterprise, nor any minimum revenue from the Unsecured Lending Business. However, Servicer has agreed that that the minimum amount per month which shall be paid to the Enterprise shall be twenty thousand dollars ($20,000).

**3.5.2** Payment of the Servicing Fee shall be subject to and reduced by the obligations of the Servicer to make the payments specified in Sections 3.5.1 and 4.6hereof.

**3.5.3** The Enterprise acknowledges and agrees that Servicer, subject to Legal Requirements and the limitations of Section 4.1.1, shall have the right to enter into agreements with servicing companies or lenders providing goods or services to the Enterprise, and Servicer may be separately compensated under such agreements.

**3.6** **No Preexisting Contracts**. The Enterprise covenants that there are no valid preexisting contractual impediments to the entry by the Enterprise into this Agreement. Further, the Enterprise agrees to indemnify Servicer and hold harmless its Affiliates for any loss, cost, judgment, settlement or other compromise related to any claim arising out of or related to any alleged pre-existing contractual relationship. Servicer shall be limited to recovery of such indemnification from the assets of Enterprise and shall have no right to indemnification from other assets of the Tribe or any of Tribe's other Affiliates.

**3.7** **Agreement Scope**. The Enterprise is entering into this Agreement with Servicer in order to avail itself of the expertise of Servicer in developing a profitable Unsecured Lending Business. In recognition of the Servicer's expertise, the scope of this Servicing Agreement covers all aspects of the management of the Unsecured Lending Business, however oversight of the day to day operations of the Enterprise and management of the Enterprise's employees shall be vested in the Operations Manager and/or the Tribal Representatives.

*8*

**3.8    Certain Activities of Enterprise**. The Enterprise covenants that adequate high speed internet access, and sufficient remote access for the Enterprise to all hardware and software which it is responsible to acquire and install shall be at all times available to Enterprise and Servicer to conduct the Unsecured Lending Business contemplated by this Agreement. Any physical facilities located within the Tribe's jurisdiction shall be maintained in a secure manner to protect sensitive consumer financial information potentially contained therein, including but not limited to protection by the latest security encryption technology for privacy protection which shall also be provided by the Servicer, as approved by the Servicer. Servicer shall have the sole discretion to request upgrades or additions to and to approve the security/encryption technology used in connection with the Unsecured Lending Business which shall be treated as Servicing Expense of the business. If such a request is made following the Tribe's annual approval of a Servicing Budget that does not contain such upgrades or additions, Servicer shall seek approval of the Tribe pursuant to its Governing Documents, approval of which will not be unreasonably withheld, prior to incurring such additional servicing expenses.

**4.    Business and Affairs in Connection with Enterprise.**

**4.1    Servicer's Authority and Responsibility**. It is the Parties' intentions that Servicer shall provide such management, consulting and analytical services as it deems necessary to assist the Enterprise in undertaking the Unsecured Lending Business contemplated herein.

**4.1.1**    The Servicer is hereby granted the necessary power and authority to act in order to fulfill its responsibilities under this Agreement, including the execution and delivery of any and all agreements necessary or appropriate to effectuate the terms hereof subject to the limitations of the Section 4.1.1 herein. It should be noted, however, that Servicer has no authority to engage in origination activities, execute loan documentation, or approve the issuance of loans to third parties. Final determination as to whether to lend to a consumer rests with the Enterprise.

**4.1.2**    Servicer shall, unless otherwise agreed to herein, require express written consent from the Tribe as sole member of the Enterprise to do any of the following: (1) to borrow, pledge, assign, convey, encumber, grant security interest in, guaranty, or otherwise restrict the assets of the Enterprise; (2) to sell or otherwise dispose of all or substantially all of the assets of the Enterprise; (3) to waive the sovereign immunity of the Enterprise.

**4.2    Duties of the Servicer**. In providing services to Enterprise, the Servicer's duties may include, without limitation, the following:

**4.2.1    Operations**. Consistent with the Servicing Budget, the Servicer shall develop and recommend to the Enterprise and to the Operations Manager and Tribal Representatives, reasonable measures for the orderly administration and management of Enterprise in the areas of financial reporting, financing, regulatory compliance, marketing, human resources, development of third party servicer relationships, collections and risk assessment, including:

**(a)**    Screening of and selecting service providers and lenders, and negotiating agreements with such service providers and lenders on behalf of the Enterprise on

CONFIDENTIAL

JA522

MARTORELLO_003485

such terms and conditions as Servicer may reasonably determine to be appropriate, including but not limited to potentially securing a funding agreement between Alpha Credit Resources, LLC and the Enterprise, whereby Alpha Credit Resources, LLC may serve as Commercial Finance Provider for the Unsecured Lending Business;

(b)     Development and promotion of sound and positive business relationships on behalf of Enterprise with the designated service providers and lenders, including, but not limited to, the enforcement or termination of agreements with such service providers and lenders;

(c)     Preparation of suggested practices and recommendations to the Tribal Representative of such suggested practices governing the operations of the Enterprise to provide that such operations are conducted in a manner that is consistent with the best interests of Enterprise and generally accepted industry standards;

(d)     Preparation of regulatory and compliance standards and practices and recommendations to the Enterprise of such standards and practices to be adopted by the Enterprise provide that such operations are conducted in a manner consistent with the best interests of Enterprise and generally accepted industry standards;

(e)     Preparation of training and education standards and recommendations to the Enterprise of such suggested practices to be adopted by the designated service providers and lenders to provide that such designated service providers and lenders are conducting business with the Enterprise in a manner that is consistent with the best interests of Enterprise and generally accepted industry standards;

(f)     Preparation of standards for financial reporting and accounting and recommendations to the Enterprise of such best practices to be adopted by the designated service providers and lenders of the Enterprise provide that such designated service providers and lenders are conducting business in a manner that is consistent with the best interests of Enterprise and generally accepted accounting standards presented on a cash basis;

(g)     Preparation of standards and screening and review of and making recommendations to the Enterprise regarding the website contents, marketing and consumer relations practices of designated service providers and lenders to provide that such designated service providers and lenders are conducting business in a manner that is consistent with the best interests of Enterprise and generally accepted industry standards;

(h)     Monitor and supervision of and reporting to the Enterprise regarding the designated service providers and lenders to provide that such designated service providers and lenders are conducting business in a manner that is consistent with the standards, best practices, policies and requirements established by the Enterprise;

(i)     Servicer will be responsible for providing pre-qualified leads to Enterprise and providing the necessary credit-modeling data and risk assessment strategies by which the Enterprise may evaluate to whether or not to extend funds to an individual borrower based on criteria that has been established by the Enterprise. The criteria used to extend funds to

10

CONFIDENTIAL
MARTORELLO_003486

individual borrowers will remain within the sole and absolute discretion of the Enterprise and the Enterprise shall execute all necessary loan documentation;

   **(j)**  Servicer may also be responsible for training and monitoring employees of the Enterprise that operate the Enterprise's call center; and

   **(k)**  Sale and transfer of Enterprise's right of collection of collateral on any Loan Transactions that become in default prior to settlement. Servicer shall sell Loan Transactions in default at prevailing market rates, to a third-party debt collector, with the third-party debt collector to effect the collection of the debt. This third-party debt buyer may be Capture Financial LLC or such other third-party debt as may be determined to be appropriate by the Parties.

   **4.2.2** <u>**Contracts in Enterprise's Name**</u>. Contracts for the operations of Enterprise shall be entered into in the name of Enterprise and shall be executed by the Enterprise. In no event shall Servicer be empowered to waive the sovereign immunity of the Enterprise or the Tribe in any contract, including but not limited to any contract for the operations of the Enterprise or for the supply of goods and services. No contracts for the supply of goods or services to Enterprise shall be entered into with parties affiliated with the Servicer or its officers or directors unless the affiliation is disclosed to and approved by Enterprise, which approval shall not be unreasonably withheld subject to the limitations of Section 4.1.1 herein. Servicer shall deliver all contracts executed by it on behalf of Enterprise to Enterprise on a monthly basis. The Servicer acknowledges that Enterprise and the Tribe retain exclusive sovereign control over the Enterprise's and the Tribe's immunity, respectively. If Servicer determines that a limited waiver of Enterprise's Tribal sovereign immunity is necessary and desirable for inclusion in any contract on behalf of the Enterprise, Servicer shall summarize the need for such waiver and the underlying contract for the Enterprise to seek approval of the Tribal Representative(s) and the Tribe as sole member of the Enterprise. Only after the matter has been forwarded for review to the Tribe's legal counsel, presented to the Tribal Council by the Tribal Representative(s), and authorized by Tribal Council resolution, shall the Servicer be authorized to execute the contract on behalf of the Enterprise.

   **4.2.3** <u>**Consumer Loan Transaction Covenants and Agreements**</u>. The Servicer shall assist the Enterprise with the compilation and provision of information and reports (financial and otherwise) as may be reasonably requested by the Tribe as sole member of the Enterprise in connection with the business of Enterprise or as required under Authorized Debt of Enterprise as defined in Section 5.2 herein, including any reports required to comply with the covenants and agreements contained therein. The Servicer shall promptly advise the Enterprise in the event that the Servicer becomes aware of any matter that may cause a default by Enterprise under any documents evidencing any indebtedness or obligation of Enterprise.

 **4.3** <u>**Employees.**</u>

   **4.3.1** <u>**Servicer's Responsibility**</u>. Subject to the Servicing Budget, Legal Requirements and the terms of this Agreement, Servicer shall have the exclusive responsibility for identifying and recommending third-party service providers needed for the business of the Unsecured Lending Business and shall assist the Operations Manager, at his or her request, in

*11*

the selection, hiring, training, control and discharge of employees performing regular services for Enterprise in connection with the maintenance, operation, and management of the Unsecured Lending Business. Enterprise shall not engage any third-party service providers needed for the business of the Unsecured Lending Business without the benefit of Servicer's prior advice and approval, for which approval shall not be unreasonably withheld.

      **4.3.2**   **Enterprise Employees**. Subject to the Servicing Budget, Servicer shall assist the Operations Manager and/or Tribal Representatives in directing the hiring and management of sufficient employees to effectively staff the Unsecured Lending Business, if any.

      **4.3.3**   **Tribal Representative(s)**. Tribal Representative(s) shall have the full access to inspect all aspects of Enterprise, including the daily operations of Enterprise, and to verify daily Gross Revenues and all income of Enterprise. The Servicer or a designee otherwise appointed by the Servicer may accompany the Tribal Representative(s) upon any inspection.

      **4.3.4**   **Indian and Other Preference, Wages, and Training**. The Servicer shall, during the term of this Agreement, be required to give preference in recruiting, training and recommending employment to Native Americans in any job category of the Enterprise, in accordance with any employment preference laws or policy now existing or later adopted by the Tribe.

    **4.4**   **Enterprise Bank Accounts**. The Servicer shall select a bank or banks for the establishment of (i) a primary bank account by Enterprise into which all funds generated by the Unsecured Lending Business will be transferred and deposited (the "Primary Bank Account") and (ii) any other bank accounts by Enterprise subject to the Deposit Account Control Agreement as the Servicer deems necessary or appropriate to conduct the Unsecured Lending Business consistent with this Agreement, e.g., an account to hold the Regulatory and Litigation Reserve Fund (as defined below). Unless otherwise mutually agreed in writing by the Enterprise and Servicer, the Servicer shall have sole signatory and transfer authority over such bank accounts. Servicer shall have sole authority to sweep monies from such bank accounts for distributions made to the Enterprise consistent with Sections 3.5.1 and 6.4. In addition to the foregoing, Servicer shall further have the sole authority to instruct and direct any ACH providers that Enterprise may engage to assist it in operating the Unsecured Lending Business, to the extent provided by this Agreement. The right to consent to change any bank account into which the funds generated by the Unsecured Lending Business will be transferred and deposited by any such ACH providers rests mutually with Enterprise and Servicer. The signed authorization of both Servicer and Enterprise shall be required for any change to any bank account into which the funds generated by the Unsecured Lending Business will be transferred and deposited by any such ACH providers. This section shall not apply in the event of a default; in the event of a default, the Security Agreement will allow Iron Fence Investments, Inc. to override this section.

    **4.5**   **Servicing Budget and Business Plan**. Servicer shall provide to the Tribal Representatives an initial Servicing Budget and Business Plan ("Servicing Budget") for the review and consent of the Enterprise, which consent shall not be unreasonably withheld or delayed. Servicer shall, not less than ninety (90) days prior to the commencement of each full or partial year, submit to the Tribal Representative(s), for approval by the Enterprise and the Tribe

*12*

JA525

MARTORELLO_003488

as sole member of the Enterprise, a proposed Servicing Budget for the ensuing full or partial year, as the case may be. The Servicing Budget shall include a Regulatory and Litigation Reserve Fund and such other reserves as are deemed necessary for the conduct of the Unsecured Lending Business.

The Enterprise's and Tribe's approval of the Servicing Budget shall not be unreasonably withheld or delayed. Servicer shall meet with the Tribal Representative(s) to discuss the proposed Servicing Budget, and if requested, with the Tribe as sole member of the Enterprise. The Enterprise's and the Tribe's as sole member of the Enterprise approval shall be deemed given unless a specific written objection thereto is delivered by it to Servicer within sixty (60) days after Servicer and the Tribal Representative and/or the Tribe as sole member of the Enterprise have met to discuss the proposed Servicing Budget. If the Tribal Representative for any reason declines to meet with Servicer to discuss a proposed Servicing Budget, the Servicer shall meet with the Tribe as sole member of the Enterprise. The Enterprise and the Tribe as sole member of the Enterprise shall review the Servicing Budget on a line-by-line basis. To be effective, any notice which disapproves a proposed Servicing Budget must contain specific objections to individual Budget line items.

If the proposed Servicing Budget contains disputed budget item(s), the Enterprise and Servicer agree to cooperate with each other in good faith to resolve the disputed or objectionable proposed item(s). In the event the Enterprise and Servicer are not able to reach mutual agreement concerning any disputed or objectionable item(s) within a period of sixty (60) days after the date the Enterprise provides written notice of its objection to Servicer, either Party shall be entitled to submit the dispute to arbitration in accordance with Section 18. If the Enterprise and Servicer are unable to resolve the disputed or objectionable item(s) prior to the commencement of the applicable year, the undisputed portions of the proposed Servicing Budget shall be deemed to be adopted and approved and the corresponding line item(s) contained in the Servicing Budget for the preceding year shall be adjusted as set forth herein and shall be substituted in lieu of the disputed item(s) in the proposed Servicing Budget. Those line items which are in dispute shall be determined as follows:

Pending resolution of any disputes over the Servicing Budget, each line item shall be determined by increasing the preceding year's actual expense for the corresponding line items by an amount determined by Servicer which does not exceed the Consumer Price Index for All Urban Consumers published by the Bureau of Labor Statistics of the United States Department of Labor, U.S. City Average, all items (1982-1984=100) for the year prior to the year with respect to which the adjustment to the line item(s) is being calculated or any successor or replacement index thereto. The resulting Servicing Budget obtained in accordance with the preceding sentence shall be deemed to be the Servicing Budget in effect until such time as the Enterprise and Servicer have resolved the disputed items.

Servicer may, subject to approval by the Enterprise if such a change requires reallocation of more than fifteen percent (15%) of the particular line items being affected, revise the Servicing Budget from time to time, as necessary, to reflect any unpredicted significant changes, variables or events or to include significant, additional, unanticipated items of expense. Servicer may, after notice to the Tribal Representatives, reallocate part or all of the amounts budgeted with respect to any line item to another line item and to make such other modifications to the

*13*

CONFIDENTIAL

JA526

MARTORELLO_003489

Servicing Budget as Servicer deems necessary when such reallocation is fifteen percent (15%) or less than for the line items being affected. The Enterprise acknowledges that the Servicing Budget is intended only to be a reasonable estimate of Enterprise revenue and expenses for the ensuing year. Servicer shall not be deemed to have made any guaranty, warranty or representation whatsoever in connection with the Servicing Budget, however Servicer shall act in good faith when projecting, proposing and presenting an Servicing Budget to the Enterprise for its approval.

**4.6    Regulatory and Litigation Matters.** If any claim or legal action, except an action to impose taxes as contained in 7.5.1 of the Agreement, is brought against the Enterprise, the Tribe, the Servicer, Enterprise or any employee of the Servicer having responsibilities related to the Enterprise or of Enterprise, or official or employee of the Tribe by any person arising out of the operation of Enterprise or against the Servicer, its parent or Affiliates, employees, directors, managers or members arising out of Servicer's provision of services to the Unsecured Lending Business of Enterprise or performance hereunder or the execution of this Agreement or any other related agreement by Enterprise and Servicer, Enterprise, or the Servicer, as appropriate, shall defend such action. Any cost of such litigation, including any judgment rendered in an action arising out of the operation of Enterprise and the cost of any legal action brought by the Enterprise or Servicer against any third party, shall constitute a Servicing Expense. The only exception to the foregoing shall be that each Party will be responsible for its own acts if same are proven to constitute fraud or willful or wanton misconduct. Nothing in this Section shall be construed to waive, in whole or in part, the Tribe's or Enterprise's sovereign immunity, except as contemplated in the limited waiver of sovereign immunity contained in Section 14 herein.

The Enterprise and Servicer shall establish and maintain a separate and segregated joint signature bank account ("Regulatory and Litigation Reserve Fund") that shall contain a balance of not less than, but no more than, Fifty Thousand Dollars ($50,000). The Regulatory and Litigation Reserve Fund shall be funded with one dollar ($1.00) for every New Transaction and ($.50) for every Repeat Transaction and Refinancing Transaction, as those terms are defined herein. The exclusive purpose of the Regulatory and Litigation Reserve Fund is to provide funding for Enterprise of the costs of any litigation, defense, responses to regulatory inquiries, litigation and other similar expenses arising out of the business of Enterprise. If any claim or legal action is brought against the Tribe, Servicer, Enterprise, or any Affiliate or any employee or director thereof, or any official of the Tribe by any person arising out of the operation of Enterprise, Enterprise, in collaboration and coordination with the Servicer, shall defend such action with monies in the joint signature account described herein as Servicer and Enterprise may agree. Any cost of such regulatory action or litigation, including any judgment rendered in an action arising out of the operation of Enterprise and the cost of any legal action brought by Servicer or Enterprise against any third party, shall be paid by the Regulatory and Litigation Reserve Fund to the extent funds are at the time of payment available therein or if funds are not at the time of such payment then available the amount paid in excess of available funds shall constitute an Servicing Expense. In the event Servicer expends any monies from the Regulatory and Litigation Reserve Fund, the Regulatory and Litigation Reserve Fund shall be replenished in the same manner of initial funding described in the first sentence of this paragraph beginning the first day of the first month following such an expenditure and continue until the Regulatory and Litigation Reserve Fund is again fully funded at $50,000.

*14*

CONFIDENTIAL

JA527

MARTORELLO_003490

To the extent Enterprise maintains or acquires any insurance policy that might cover the cost of defense of any action or any liability resulting from an action against the Enterprise or operation of the Unsecured Lending Business, Enterprise shall name Servicer as an additional insured under any such insurance policy. To the extent there is any such insurance coverage available, Servicer shall seek to use such insurance monies before use of Regulatory and Litigation Reserve Fund monies in defense of any claim or legal action brought against the Tribe, Servicer, Enterprise, or any Affiliate or any employee or director thereof, or any official of the Tribe by any person arising out of the operation of Enterprise, in collaboration and coordination with the Servicer. If, in Servicer's sole discretion, it is not practicable to expend insurance monies before Regulatory and Litigation Reserve Fund monies, Servicer shall seek to replenish any spent Regulatory and Litigation Reserve Fund monies with reimbursement under any applicable insurance policy. To the extent the Regulatory and Litigation Reserve Fund is insufficient to cover the costs of defense of any action or liability, Servicer shall advance monies that it deems necessary and appropriate to defend against such action or liability. Servicer shall be able to be reimbursed with distributions from the Regulatory and Litigation Reserve Fund as it might later be replenished in the manner described in this Paragraph 4.6.

**4.7**    **No Servicer Wages or Salaries**. Neither the Servicer nor any of Servicer's employees, officers, directors or principals shall be compensated by wages from or contract payments by Enterprise for their efforts or for any work which they perform under this Agreement other than the Servicing Fee paid to Servicer under Section 6.2.

**4.8**    **Internal Control Systems**. The Servicer shall recommend and assist the Operations Manager and Tribal Representatives in implementing accounting standards applicable to the unsecured consumer lending industry.

**4.9**    **Daily Deposits to Bank Account**. The Servicer shall collect all gross revenues and other proceeds connected with or arising from the operation of Enterprise and all other activities of Enterprise and deposit proceeds daily into a bank account established under Section 4.4 consistent with Paragraph 3.5.1 herein, except as to any restrictions on cash deposits imposed by the local bank.

**4.10**    **No Cash Disbursements**. The Servicer shall not make any cash disbursements from the bank accounts or on hand cash except for the disbursements from any petty cash fund of Enterprise maintained in accordance with the Servicing Budget. Any and all other payments or disbursements by the Servicer shall be made by check or wire transfer drawn against a bank account.

**4.11**    **Transfers Between Accounts**. The Servicer has the authority to transfer funds among the bank accounts of Enterprise unless otherwise provided by the Servicing Budget, in order to pay Servicing Expenses, pay the Servicing Fee, or to pay a debt service and any other payments provided for in Section 6 or elsewhere in this Agreement.

**4.12**    **Accounting and Books of Account.**

**4.12.1** **Statements**. The Servicer shall prepare and provide to Enterprise servicing statements on a monthly, quarterly, and annual basis, which shall include:

*15*

JA528

MARTORELLO_003491

comparative statements of all revenues after the first full year of operation, statements of all other amounts collected and received, and all deductions and disbursements made there from in connection with Enterprise. The monthly and quarterly servicing reports shall be delivered by the twenty-first (21st) day of the following month, with the annual servicing report delivered within ninety (90) days of the year-end and shall be in form satisfactory to meet all requirements under any Authorized Debt as defined in Section 5.2. The Enterprise shall include as an Servicing Expense the annual compilation of the books and records of Enterprise and any Subsidiaries as Enterprise deems necessary by a certified public accounting firm selected by the Enterprise subject to the reasonable consent of Servicer, which consent shall not be unreasonably withheld. Such reviews may be used by the Servicer for reporting purposes under applicable laws, if required. The reviewers shall have access to all books and records, all cash management procedure manuals, all internal control manuals, and all other records, documents, papers and persons of Enterprise or employed by Enterprise or Servicer as the reviewers shall deem necessary. For each review performed, the reviewers shall provide Servicer with a letter noting any control weaknesses or other items which it believes should be brought to the attention of the Servicer, and shall permit Servicer to respond to the letter with changes to the operations of Enterprise deemed appropriate by the Servicer which address any concerns expressed in the draft letter within thirty (30) days. The Enterprise warrants that it shall retain in the strictest confidence the information provided by Enterprise, and shall include in any reports concerning Servicer's financial affairs only such portions of information supplied by Enterprise as is required by statute to be provided.

> **4.12.2 Accounting Standards**. Servicer shall maintain the books and records reflecting the operations of Enterprise in accordance with the accounting practices of Servicer on a cash basis consistently applied and shall adopt and follow a fiscal year end of December 31. The accounting records reflecting detailed day-to-day transactions of Enterprise's operations shall be kept by Servicer and made available to the Tribal Representative(s) upon request. The accounting systems and procedures shall, at a minimum (i) include an adequate system of internal accounting controls; (ii) permit the preparation of financial statements on a cash basis; (iii) permit the calculation and payment of the Servicing Fee; (iv) provide for the allocation of servicing expenses or overhead expenses among Enterprise and any other user of shared facilities and services; and (vi) provide for disbursements to Enterprise

> **4.13 Enterprise Servicing Standards**. Servicer shall operate Enterprise in accordance with servicing standards mutually agreed upon by the Servicer and the Enterprise, which standards shall be consistent with the servicing standards of the industry generally.

## 5. Liens and Debt.

> **5.1 Liens**. The Enterprise specifically represents and warrants to the Servicer that during the term of this Agreement Enterprise shall not act in any way whatsoever, either directly or indirectly, to cause any Party to become an encumbrance or lienholder of any facility utilized by Enterprise or any tangible or intangible personal property assets of Enterprise, other than, as to the tangible or intangible personal property assets of Enterprise only, a creditor of Enterprise, or the Servicer, provided the Servicer is a creditor or is guaranteeing the amounts due under Authorized Debt, or to allow any Party to obtain any interest in this Agreement without the prior written consent of the Servicer.

*16*

CONFIDENTIAL

MARTORELLO_003492

**5.2    Authorized Debt.** "Authorized Debt" shall mean debt incurred by Enterprise to operate the Unsecured Lending Business, including from one or more Commercial Finance Providers, and any extensions or renewals of such debt.

**6.    Servicer Fee Reimbursement, Disbursement, and Capital Contribution.**

**6.1    Disbursements at the Commencement of the Term.**  On the Effective Date, Servicer shall pay from its own account, and not the account of Enterprise, to Enterprise as directed by Enterprise the sum of five thousand and No/100 Dollars ($5,000.00) to reimburse the Enterprise for due diligence-related costs.

**6.2    Servicing Fee.** Servicer is authorized by Enterprise to pay itself its Servicing Fee in accordance with the terms of Section 3.5.1 hereof.

**6.3    Disbursements.** All revenues received by Enterprise in connection with the Unsecured Lending Business shall be deposited into the Primary Bank Account. These revenues shall, in turn, be disbursed by Servicer, for and on behalf of Enterprise, from the Primary Bank Account to pay, to the extent available, Servicing Expenses.

**6.4    Payment of Fees and Tribal Disbursement.** No later than fifteen (15) days or such other time period as provided in this Agreement after the end of each calendar month of operations, the Servicer shall calculate and report to the Enterprise the Gross Revenuesfor the preceding month and shall disburse the funds in the Primary Bank Account (or otherwise set aside reserves out of such funds as permitted by this Agreement) to the extent due and payable in the following order of priority unless otherwise agreed by the Parties with regard to Servicer Advances:

      **6.4.1**    To the Enterprise, 100% of Tribal Net Profits; ;

      **6.4.2**    To Servicer, an amount sufficient to reimburse Servicer for any amounts advanced to the Enterprise by Servicer if such amounts exceed ten thousand dollars ($10,000.00) and remain unpaid at month end;

      **6.4.3**    To all service providers, including Servicer, all Servicing Expenses, including allocations to reserves as provided in the Servicing Budget, including any additional monies owed to Servicer, to the extent the same have not been paid during the course of the preceding calendar month;

      **6.4.4**    To any creditor of the Enterprise, an amount sufficient to repay any principal or interest outstanding under any Authorized Debt extended by such creditor but only to the extent then required to be paid; and

      **6.4.5**    To the Servicer, the Servicing Fee in the manner directed by the Servicer (which shall be paid monthly pursuant to Section 3.5.1 hereof).

17

JA530

MARTORELLO_003493

## 7. General Provisions.

**7.1    Notice.** All notices and other communications hereunder shall be in writing, and shall be deemed to have been duly given (a) upon hand delivery thereof, (b) upon facsimile and written confirmation of transmission, (c) upon receipt of any overnight deliveries, or (d) on the third (3rd) business day after mailing United States registered or certified mail, return receipt requested, postage prepaid, addressed to each Party at the following addresses:

**If to Enterprise:**          Red Rock Tribal Lending, LLC
                               P.O. Box 704
                               Watersmeet, MI 49969

                               Lac Vieux Desert Band of Lake Superior Chippewa Indians,
                               As sole member of Red Rock Tribal Lending, LLC
                               Attn: General Counsel
                               P.O. Box 249
                               Watersmeet, Michigan 49969


**If to Servicer:**           SourcePoint VI, LLC.
                              5322 Yacht Haven Grande, Box 7
                              St. Thomas, VI  00802


**7.2    Authorization.** The Enterprise and Servicer represent and warrant to each other that they each have full power and authority to execute this Agreement and to be bound by and perform the terms hereof.  The Enterprise further warrants that it has complied with all applicable tribal laws and procedures necessary to effectuate its obligations herein, including but not limited to any requisite Tribal approvals.  Upon request, each Party shall furnish the other evidence of the authority represented in this Paragraph 7.2.

**7.3    Relationship.** Servicer and Enterprise or the Tribe as sole member of the Enterprise shall not be construed as joint-venturers or partners of each other by reason of this Agreement and none shall have the power to bind or obligate the other except as set forth in this Agreement.

**7.4    Servicer's Contractual Authority in the Performance of this Agreement.** Subject to the provisions of Section 4.2.2, and applicable law, Servicer is authorized to negotiate, and perform for the account of Enterprise any contracts deemed necessary or appropriate by Servicer and executed by the Enterprise to perform Enterprise's obligations under this Agreement and any other agreement or other instrument reasonable necessary or appropriate in the conduct of the Unsecured Lending Business or authorized herein.

**7.5    Further Actions.** Enterprise and Servicer agree to execute all contracts, agreements and documents and to take all actions necessary to comply with the provisions of this Agreement and the intent hereof.

*18*

JA531

MARTORELLO_003494

**7.5.1 Taxes.** If any state or any local government attempts to impose any possessory interest tax upon any Party to this Agreement or upon any facility utilized by Enterprise, in the name of the appropriate Party or parties in interest, will, upon the request of either Party, resist such attempt through legal action. The costs of such action and the compensation of legal counsel shall be an Servicing Expense of Enterprise. Any such tax shall constitute an Servicing Expense of Enterprise. This Section shall in no manner be construed to imply that any Party to this Agreement or Enterprise, or Authorized Agents are liable for any such tax, or that any state or federal tax on the Servicer's income is to be considered an expense of Enterprise or Authorized Agents.

**7.5.2 Tribal Taxes.** The Enterprise agrees that neither it nor any agent, agency, affiliate or representative of the Enterprise will impose any taxes, fees, assessments, or other charges of any nature whatsoever on payments of any debt service to Servicer, or to any Authorized Agents, or to any lender furnishing financing for any facility utilized by or for Enterprise, or on Enterprise or the revenues therefrom, or on any Servicing Fee as described in Section 3.5 of this Agreement; provided, however, Enterprise may assess a tax upon Servicer or an Authorized Agent in the nature of a business license and occupation tax or other tax assessed against Servicer or an Authorized Agent by any state, but only to the extent that same is a dollar for dollar set off against the state tax. The Enterprise further agrees that neither it nor any agent, agency, affiliate or representative of the Enterprise will impose any taxes, fees, assessments or other charges of any nature whatsoever on the salaries or benefits, or dividends paid to, any of the Servicer's stockholders, officers, directors, or employees or any of the stockholders, officers, directors, or employees of Enterprise, or any of the Subsidiaries of Enterprise or Servicer, or any of the Authorized Agents. The Enterprise further agrees that the amount of any tax, fee, assessment or other charge of any nature whatsoever that may subsequently be imposed contrary to this Section 7.5.2 shall be added to the Servicing Fee to which the Servicer is entitled under this Agreement. Servicer retains the right, in its sole discretion, to terminate this Agreement and all accompanying agreements if it reasonably determines that any statute or regulation of the Tribe renders operation of Enterprise uncompetitive. Should the Servicer terminate this Agreement pursuant to this Section, the Servicer shall retain the right to repayment of money lent to Enterprise on a limited recourse basis, limited exclusive to the assets of the Enterprise and to no other assets of the Tribe or any other arm or affiliate of the Tribe. Except as otherwise provided herein, if any taxes, fees or assessments are levied by the Tribe on Enterprise, Servicer, or any Authorized Agent, such taxes and assessments shall be abated for the term of this Agreement. Nothing herein shall limit the Tribe's ability to tax its members or businesses operating within the regulatory jurisdiction of the Tribe.

**7.5.3 Situs of the Contracts.** This Agreement, as well as all contracts entered into between Enterprise and any person or any entity providing services to Enterprise or to the Servicer on behalf of Enterprise, shall be deemed entered into at the Tribal Administration Office of the Tribe in Watersmeet, Michigan, and shall be subject to all Legal Requirements of the Tribe and federal law, except as otherwise expressly provided herein.

**7.5.4 Enforcement.** Authorized Agents are agreed to be intended third party beneficiaries of this Section 7.5 and shall have the right to enforce same to the extent of any breach thereof as same applies to such Authorized Agent.

*19*

JA532

MARTORELLO_003495

**7.6    Defense.** Except for disputes between Enterprise and Servicer, Servicer shall bring and/or defend and/or settle any claim or legal action brought against Servicer or Enterprise and/or the Tribe, individually, jointly or severally in connection with the operation of Enterprise. Servicer and Enterprise shall consult and agree on who Enterprise shall retain as legal counsel, accountants and such other professionals, consultants and specialists to defend and/or settle any such claim or cause of action, and such professionals shall be under the supervision of Servicer, subject to the approval of the Enterprise. In all claims or legal actions bringing claims against Enterprise and/or the Tribe involving questions of jurisdiction, tribal sovereignty or sovereign immunity issues, the Servicer shall consult with Enterprise and the Tribe concerning the presentation and defense of such actions and the Tribe and Enterprise shall provide any information necessary to assist in the Servicer's and Enterprise's defense of any such claims or legal actions. All liabilities, reasonable costs, and expenses, including attorneys' fees and disbursements, incurred in defending and/or settling any such claim or legal action which are not covered by insurance shall be paid from the Regulatory and Litigation Reserve Fund to be established by Enterprise and the Servicer pursuant to Section 6.3, or otherwise as an Servicing Expense. Nothing contained herein is a grant to the Servicer of the right to waive tribal sovereign immunity of the Tribe or of Enterprise.

**7.7    Tribal Laws.** The Enterprise represents that attached hereto as Schedule 1.0 is a complete copy of each and every law of the Tribe or otherwise that may pertain to the transactions and activities contemplated to be conducted pursuant to this Agreement and the agreements between Enterprise and each designated service provider and lender of the Subsidiaries and between Enterprise and such Subsidiaries; and furthermore, that except as provided in such laws set forth in Schedule 1.0, there are no laws, requirements or restrictions that are reasonably known to the Parties as of the effective date of this Agreement that could apply to such transactions and activities, including but limited to laws, requirements or restrictions related to civil or criminal usury.    Any passage by the Tribe of any law or requirement that, in Servicer's discretion, is determined to have a material negative impact on the financial benefits of this Agreement may be regarded as a breach of this Agreement by Enterprise, and actionable by Servicer under the dispute resolution provisions herein.

**7.8    Waivers.** No failure or delay by Servicer or Enterprise to insist upon the strict performance of any covenant, agreement, term or condition of this Agreement, or to exercise any right or remedy consequent upon the breach thereof, shall constitute a waiver of any such breach or any subsequent breach of such covenant, agreement, term or condition. No covenant, agreement, term, or condition of this Agreement and no breach thereof shall be waived, altered or modified except by written instrument. No waiver of any breach shall affect or alter this Agreement, but each and every covenant, agreement, term and condition of this Agreement shall continue in full force and effect with respect to any other then existing or subsequent breach thereof.

**7.9    Captions.** The captions for each Section are intended for convenience only.

**7.10    Severability.** If any of the terms and provisions hereof shall be held invalid or unenforceable, such invalidity or unenforceability shall not affect any of the other terms or provisions hereof. If, however, any material part of a Party's rights under this Agreement shall be declared invalid or unenforceable (specifically including Servicer's right to receive its Servicing

*20*

CONFIDENTIAL

Fees) the Party whose rights have been declared invalid or unenforceable shall have the option to terminate this Agreement upon thirty (30) days written notice to the other Party, without liability on the part of the terminating Party.

**7.11** **Interest**. Any amount payable to Servicer or Enterprise by the other which has not been paid as provided herein shall accrue interest as may be agreed upon by the parties.

**7.12** **Reimbursement**. The performance by Servicer of its responsibilities under this Agreement are conditioned upon Enterprise generating sufficient funds from borrowings and operations to enable Servicer on a timely basis to perform its obligations hereunder. Notwithstanding the foregoing, Servicer shall, according to the terms of this Agreement may, at its option if not so required, advance funds or contribute property, on behalf of Enterprise, subject to the prior approval of the Enterprise, to satisfy obligations of Enterprise in connection with Enterprise and this Agreement. Servicer shall keep appropriate records to document all reimbursable expenses paid by Servicer, which records shall be made available for inspection by Enterprise through the Tribal Representative(s) or its agents upon request and supplied to the Tribe as sole member of the Enterprise on a monthly basis. Enterprise agrees to reimburse Servicer with interest from future Net Revenues of Enterprise for money paid or property contributed by Servicer to satisfy obligations of Enterprise in connection with this Agreement. Interest shall be calculated at the rate set forth in Section 7.11, or if no rate was agreed upon at six percent (6%) per annum, from the date the Servicer advances monies to the date reimbursement is made. The Servicer's sole source of such reimbursement shall be from the assets of Enterprise.

**7.13** **Travel and Out-of-Pocket Expenses**. Subject to the Servicing Budget, all travel and out-of-pocket expenses of Enterprise or Servicer or employees of Enterprise reasonably incurred in the performance of their duties shall be an Servicing Expense.

**7.14** **Third-Party Beneficiary**. This Agreement is exclusively for the benefit of the parties hereto and it may not be enforced by any Party other than the parties to this Agreement and shall not give rise to liability to any third party other than the authorized successors and assigns of the parties hereto.

**7.15** **Survival of Covenants**. Any covenant, term or provision of this Agreement which, in order to be effective, must survive the termination or expiration of this Agreement, shall survive any such termination or expiration for a period of one (1) year following the termination or expiration of this Agreement.

**7.16** **Survival of Remedy**. Subsequent to any termination of this Agreement, the dispute resolution provisions of this Agreement, including but not limited to the waiver of the Enterprise's sovereign immunity, shall remain available to the Parties with respect to disputes arising out of or relating to this Agreement prior or subsequent for a period of one (1) year after the termination date.

**7.17** **Periods of Time**. Whenever any determination is to be made or action is to be taken on a date specified in this Agreement, if such date shall fall on a Saturday, Sunday or any

21

CONFIDENTIAL

JA534

MARTORELLO_003497

holiday observed by the Tribe, then in such event, said date shall be extended to the next day which is not a Saturday, Sunday or Tribal holiday.

**7.18**   **Preparation of Agreement**. This Agreement shall not be construed more strongly against either Party regardless of who is responsible for its preparation.

**7.19**   **Exhibits**. All exhibits and schedules attached hereto are incorporated herein by reference and made a part hereof as if fully rewritten or reproduced herein.

**7.20**   **Successors, Assigns, and Subcontracting**. The benefits and obligations of this Agreement shall inure to and be binding upon the parties hereto and their respective successors and assigns. Enterprise's (subject to the limitations of its Governing Documents) prior written consent shall be required for Servicer to assign or subcontract any of its rights, interests or obligations as Servicer hereunder to any successor or assign, except to any parent, subsidiary or affiliate of Servicer. The Enterprise shall, with the prior written consent of the Servicer, which consent shall not be unreasonably withheld, have the right to assign this Agreement and the assets of Enterprise to an instrumentality of the Tribe, including an entity wholly owned by the Tribe organized to conduct the business of Enterprise for the Tribe that assumes all obligations herein. Any assignment by the Enterprise shall not prejudice the rights of the Servicer under this Agreement. No assignment authorized hereunder shall be effective until all necessary government approvals, if any, have been obtained.

**7.21**   **Modification**. Any change to or modification of this Agreement must be in writing signed by all parties hereto.

## 8.   **Warranties.**

**8.1**   **Warranties**. The Servicer and Enterprise each warrant and represent that they shall not act in any way whatsoever, directly or indirectly, to cause this Agreement to be amended, modified, canceled, or terminated, except pursuant to Section 7.22. The Servicer and Enterprise warrant and represent that they shall take all actions necessary to ensure that this Agreement shall remain in full force and effect at all times.

**8.2**   **Interference in Tribal Affairs**. The Servicer agrees not to interfere in or attempt to influence the internal affairs or government decisions of Tribal government by offering cash incentives, by making written or oral threats to the personal or financial status of any person, or by any other action, specifically including actions in the normal course of business of the Servicer that only affect the activities of Enterprise, except for contact with Enterprise, authorized Enterprise employees, or the Tribe as contemplated in this Agreement. For the purposes of this Section 8.2, if any such undue interference in Tribal affairs is alleged by the Enterprise in writing and through arbitration it is found that the Servicer has unduly interfered with the internal affairs of the Tribal government and has not taken sufficient action to cure and prevent such interference, that finding of interference shall be grounds for termination of the Agreement.

**8.3**   **No Political Interference with Operations**. The Enterprise agrees that it shall not, through the Tribe's elected government officials or tribal employees, interfere with the day-to-day operations of Servicer or of the Subsidiaries.

22

CONFIDENTIAL

**8.4** **Prohibition of Payments to Members of Tribal Government.** The Servicer represents and warrants that no payments have been or will be made to any member of the Tribal government, any Tribal official, any relative of a member of Tribal government or Tribal official, or any Tribal government employee for the purpose of obtaining any special privilege, gain, advantage or consideration. Any payment received by a Tribal Representative or Operations Manager in the performance of his or her duties as they relate to the business of the Enterprise shall not constitute a prohibited payment.

**8.5** **Prohibition of Financial Interest in Enterprise.** No member of the Tribal government or relative of a member of the Tribal government shall have a direct or indirect financial interest in Enterprise greater than the interest of any other member of the Tribe, nor shall any such person have any direct or indirect financial interest in the Servicer, its parents, subsidiaries or affiliates. For purposes of this Section direct or indirect financial interest refers to ownership interest or right to receive Tribal Net Profits as defined by this Agreement. The individual who serves in the capacity of Tribal Representative, or other individuals employed by the Enterprise as Operations Manager or in some other capacity shall not be deemed to have a direct or indirect financial interest in the Enterprise as is prohibited by this Section.

**8.6** **Definitions.** As used in this Section 8, the term "member of the Tribal government" means the Tribal Representatives or any member of the Tribal Council, or other tribal elected official, or any independent board or body created to oversee any aspect of Enterprise or its business and any Tribal Court official; the term "relative" means an individual residing in the same household who is related as a spouse, father, mother, son or daughter.

**9.** **Grounds for Termination.**

**9.1** **Voluntary Termination and Termination for Cause.** This Agreement may be terminated as set forth in this Agreement.

**9.2** **Voluntary Termination.** This Agreement may be terminated upon the mutual written consent and approval of the Parties. This Agreement may also be terminated voluntarily solely by Servicer upon one hundred and eighty (180) days written notice to the other Party pursuant to the notice provisions of Section 7.1 herein. The Enterprise may terminate this agreement upon one hundred and eighty (180) days written notice following the period in which any Authorized Debt is outstanding in which any Bellicose VI or SourcePoint VI guaranty remains outstanding.

**9.3** **Termination for Cause.** Any of the parties may terminate this Agreement if any of the Parties commits or allows to be committed any material breach of this Agreement. A material breach of this Agreement shall include, but not be limited to, a failure of either Party to perform any monetary obligation within five (5) days of when due, or any nonmonetary material duty or obligation on its part for any twenty (20) consecutive days after notice. A Party may not terminate this Agreement on grounds of material breach unless it has provided written notice to the other parties of its intention to declare a default and to terminate this Agreement and the defaulting Party thereafter fails to cure or take steps to substantially cure the default within

*23*

CONFIDENTIAL

ninety (90) days following receipt of such notice. The discontinuance or correction of a material breach shall constitute a cure thereof.

In the event of any termination for cause, regardless of fault, the Parties shall retain all money previously paid to them pursuant to Section 6 of this Agreement and shall receive all amounts currently owed to them under this Agreement.

An election to pursue damages or other equitable remedies while this Agreement remains in effect pursuant to the provisions of Section 9.6 or 9.7 shall not preclude the injured Party from providing notice of termination pursuant to this Section 9.3. Neither shall termination preclude a suit for damages.

**9.4    Involuntary Termination Due to Changes in Legal Requirements**. It is the understanding and intention of the parties that the establishment and operation of Enterprise conforms to and complies with all Legal Requirements. If during the term of this Agreement, Enterprise, or any material aspect of the business conducted by Enterprise, becomes prohibited by operation of federal law or determined by final judgment of a court of competent jurisdiction, after all appeals thereof, to be unlawful under applicable law, the obligations of the parties hereto shall cease, and this Agreement shall be of no further force and effect; provided that (i) the Servicer shall have the rights in Section 4.4 of this Agreement; (ii) the Servicer and the Enterprise shall retain all money previously paid to them pursuant to Section 6 of this Agreement; (iii) funds of Enterprise in any account shall be paid and distributed as provided in Section 6 of this Agreement, provided any Authorized Debt shall be paid in full; (iv) any money lent by or guaranteed by the Servicer or its affiliates to Servicer shall be repaid to the Servicer to the extent provided in a written agreement entered in connection therewith, with recovery of monetary payments or damages limited in recourse to Enterprise assets and any such payments or damages shall be made only after payment in full of any and all amounts under any Authorized Debt; and (v) the Enterprise, directly or indirectly, shall retain its interest in the title to all Enterprise assets, fixtures, supplies and equipment subject to any requirements of financing arrangements. Nothing contained in this Section 9.4 shall be read to preclude either or both parties from contesting any actions which could lead to the involuntary cessation of business by Enterprise.

**9.5    Consequences of Servicer's Breach**. In the event of the termination of this Agreement by Enterprise for cause under Section 9.3, the Servicer shall not, prospectively from the date of termination, except as provided in Section 9.3, have the right to its Servicing Fee from Enterprise, but such termination shall not affect the Servicer's rights relating to reimbursement for any amounts it has loaned Enterprise under this Agreement through the date of termination or other agreements entered pursuant hereto. Any Net Revenues accruing through the date of termination shall be distributed in accordance with Section 6 of this Agreement.

**9.6    Consequences of Enterprise's Breach**. In the event of termination of this Agreement by the Servicer for cause under Section 9.3, the Servicer shall not be required to perform any further services under this Agreement and Enterprise shall indemnify and hold the Servicer harmless against all liabilities of any nature whatsoever relating to Enterprise, but only insofar as these liabilities result from acts within the control of Enterprise or its agents or created by the termination of this Agreement, and also with the source for such indemnification limited

*24*

CONFIDENTIAL

MARTORELLO_003500

to the assets or future earnings of Enterprise and without recourse to other assets of the Tribe. The parties acknowledge and agree that termination of this Agreement may not be a sufficient or appropriate remedy for breach by Enterprise, and further agree that pursuant to the other provisions of this Agreement, the Servicer shall, upon breach of this Agreement by Enterprise, have the right to pursue such remedies (in addition to termination) at law or equity as it determines are best able to compensate it for such breach, including, without limitation monetary compensation, except that the source for such compensation shall be limited to the assets or future earnings of Enterprise without recourse to other assets of the Tribe, specifically the Servicing Fee pursuant to Section 6 for a term equal to the then remaining term of this Agreement at the amount specified in Section 6 provided any such payments or damages shall be subordinate to the payment of the amounts due under any Authorized Debt. Enterprise specifically acknowledges and agrees that there will be irreparable harm to the Servicer and that damages will be difficult to determine if Enterprise commits any breach, and Enterprise therefore further acknowledges that an injunction and/or other equitable relief is an appropriate remedy for any such breach. In such event, the Servicer shall have the right to its Servicing Fee accruing through the date of termination as provided in Section 6 of this Agreement, the repayment of unpaid principal and interest and other amounts due under any loans from it to Enterprise, provided any such payments or damages shall be subordinate to the payment of the amounts due under any Authorized Debt as defined in Section 5.2.

**10.** **Conclusion Of the Servicing Term**. Upon the conclusion of the Term of this Agreement, or the termination of this Agreement under other of its provisions, in addition to other rights under this Agreement, the Servicer shall have the following rights:

**10.1** **Transition**. If termination occurs at any time other than upon the conclusion of its Term, Servicer shall be entitled to a reasonable period of not less than thirty (30) days to transition services for which it has been retained to provide to Enterprise to the Tribe or its designee. Any property or equipment of Servicer that may be located at any location of the Tribe or Enterprise shall be returned to Servicer. Any property or equipment of Enterprise that may be located at any location of the Tribe or Enterprise shall be returned to Enterprise.

**10.2** **Undistributed Net Revenues and Remaining Regulatory and Litigation Reserve Fund Monies**. If Enterprise has accrued Net Revenues which have not been distributed under Section 6 of this Agreement, the Servicer shall receive that Servicing Fee equal to that Fee it would have received had the distribution occurred during the Term of the Servicing Agreement. Any monies remaining in the Regulatory and Litigation Reserve Fund twelve (12) months after the conclusion of the management term shall be distributed fifty-fifty to the Servicer and Enterprise in accord with the proportion the Parties contributed those monies to the Regulatory and Litigation Reserve Fund.

**11.** **Consents and Approvals.**

**11.1** **Enterprise**. Where approval or consent or other action of Enterprise is required, such approval shall mean the written approval of the Enterprise subject to its Governing Documents. Should the Governing Documents require the Tribe as sole member of the Enterprise to act, such action should be evidenced by a duly enacted resolution or properly

*25*

CONFIDENTIAL

JA538

MARTORELLO_003501

recorded motion at a meeting of the Tribal Council thereof. Any such approval, consent or action shall not be unreasonably withheld or delayed.

**11.2    Servicer**. Where approval or consent or other action of the Servicer is required, such approval shall mean the written approval of the Operations Manager. Any such approval, consent or other action shall not be unreasonably withheld or delayed.

## 12.    Disclosures.

**12.1    Warranties. The Servicer warrants and represents as follows**: (i) no person or entity has any beneficial ownership interest in the Servicer other than as set forth herein; (ii) no officer, director or owner of 5% or more of the stock of the Servicer has been arrested, indicted for, convicted of, or pleaded nolo contendere to any felony or any offense related to business of payday loans or the payday loan industry in general, or had any association with individuals or entities known to be connected with organized crime; and (iii) no offices or director of the Servicer, has been arrested, indicted for, convicted of, or pleaded nolo contendere to any felony or any offense described in subsection (ii) above, or had any association with individuals or entities known to be connected with organized crime.

**12.2    Disclosure Amendments**. The Servicer agrees that whenever there is any material change in the information disclosed pursuant to this Section 12 it shall notify the Enterprise in writing pursuant to Section 7.1. All of the warranties and agreements contained in this Section 12 shall apply to any person or entity that would be listed in this Section 12 as a result of such changes.

**12.3    Breach of Servicer Warranties and Agreements**. The material breach of any warranty or agreement of the Servicer contained in this Section 12 shall be grounds for immediate termination of this Agreement; provided that if a breach of the warranty contained in clause (ii) of Section 12.2 is discovered, and such breach was not disclosed but all officers and directors of the Servicer sign sworn affidavits that they had no knowledge of such breach, then the Servicer shall have thirty (30) days after notice from Enterprise to terminate the interest of the offending person or entity and, if such termination takes place, this Agreement shall remain in full force and effect.

**13.    No Present Lien Lease or Joint Venture**. The parties agree and expressly warrant that neither the Servicing Agreement nor any exhibit thereto is a mortgage or lease and, consequently, does not convey any present interest whatsoever in Enterprise or its assets, nor any proprietary interest in Enterprise itself. The parties further agree and acknowledge that it is not their intent, and that this Agreement shall not be construed, to create a joint venture between Enterprise and the Servicer; rather, the Servicer shall be deemed to be an independent contractor for all purposes hereunder.

**14.    Enterprise's Limited Waiver of Sovereign Immunity**. Subject to the provisions hereof, Enterprise, to the extent that Enterprise can avail itself to the sovereign immunity of the Tribe, the Enterprise hereby clearly, expressly and irrevocably grants to Servicer and its respective successors and assigns hereunder a clear, express and unequivocal waiver of tribal sovereign immunity, to the extent limited herein, from suits, actions or arbitration or mediation proceedings

*26*

CONFIDENTIAL

MARTORELLO_003502

and consents to suits, actions or arbitration or mediation proceedings arising under this Agreement, all in accordance with the terms and limitations herein. Enterprise hereby makes this limited waiver of sovereign immunity as follows:

**14.1** For the purpose of allowing the Servicer to take any and all actions necessary to enforce the provisions of this Agreement pursuant to the alternative dispute resolution procedures set forth in Section 18, including mediation, arbitration, and judicial enforcement proceedings which seek injunctive or declaratory relief and/or damages (as limited in Paragraph 16), specific performance or other legal and equitable remedies in the court or courts authorized by this Agreement and to effect enforcement of any remedy granted herein. This waiver of sovereign immunity also applies to any attempt by a later tribal government to revoke the Enterprise's waiver of sovereign immunity or consents herein. The Enterprise waives its sovereign immunity, if applicable, from a judgment or order (including any appellate judgment or order) and post judgment proceedings supplemental thereto consistent with the terms and provisions hereof, which is final because either the time for appeal thereof has expired or the judgment or an order issued by a court having final appellate jurisdiction over the matter.

**14.2** Subject to this Section 14, pursuant to its limited waiver, Enterprise expressly waives its immunity from suit and consents to be hailed into mediation or arbitration as provided in Section 18 and/or to be sued in any of the following: the Lac Vieux Desert Band of Lake Superior Chippewa Tribal Court, Michigan state courts, and the United States District Court for the Western District of Michigan and appellate courts therefrom for all three (3) jurisdictions for any claims by the Servicer arising out of this Agreement. As to any claims by the Servicer or its successors or assigns arising under this Agreement, Enterprise waives its rights to claim it is a tribal entity and/or is operating as a subordinate part of the tribal government entitling as a defense to legal action by the Servicer or its successors or assigns in accord with this Paragraph 14.2.

**14.3** Enterprise agrees that it shall not plead or raise as a defense to any action brought by the Servicer or its successors or assigns any right or claim of right to the requirement of exhaustion of tribal court remedies, as the parties have expressly agreed, subject to 14.2 above. The Enterprise waives its rights to have any dispute, controversy, suit, action or proceeding, if any, heard in any tribal court or other tribunal or forum, council or adjudicative body of the whether or not such forum now exists or is hereafter created. The Enterprise hereby expressly waives any requirement which may exist for exhaustion of any remedies available in any tribal forum prior to the commencement of any dispute, controversy, suit, action proceeding in any state or federal court even if any such tribal forum would have concurrent jurisdiction over any such dispute, controversy, suit, action or proceeding but for such waiver, and any application of the abstention doctrine and any other law or interpretation thereof that might otherwise require, as a matter of law or comity, that resolution of any claim, controversy or dispute be heard first in a tribal forum.

**14.4** The limited waiver of sovereign immunity granted here does not include any waiver, either express or implied, to any third party.

**14.5** The Enterprise covenants and agrees that the clear, express and unequivocal limited waiver of sovereign immunity and other waivers contained herein are irrevocable and

27

CONFIDENTIAL

JA540

MARTORELLO_003503

agrees not to revoke or limit, in whole or in part, such waiver of sovereign immunity or other waivers contained herein or in any way attempt to revoke or limit, in whole or in part, such waiver of sovereign immunity or other waivers, as the case may be.  In the event that the Enterprise (i) revokes, limits, or attempts to revoke or limit the waivers granted herein, (ii) takes any action that is inconsistent with the waivers granted herein, or (iii) fails to submit to the jurisdiction of the tribal, state or federal courts or arbitration tribunals as provided herein, the parties expressly recognize and agree that there remains no adequate remedy at law available to the Parties and that they will be injured.  In any such event, Enterprise hereby agrees that the Servicer may seek immediate judicial injunctive relief as provided herein.

       **14.6**    The limited waiver of sovereign immunity of Enterprise as provided for in this Section shall expire at the conclusion of the longer of (i) one (1) year after the termination or expiration of this Agreement, or (ii) at the conclusion of any mediation, arbitration or litigation matter with respect to this Agreement pending at the termination or expiration of this Agreement, including the conclusion of any potential appeals available from such proceedings.

**15.**    <u>Time is of the Essence</u>. Time is of the essence in the performance of this Agreement.

**16.**    <u>Tribal Assets</u>. The Servicer understands and agrees that notwithstanding anything to the contrary herein, the obligations of the Enterprise hereunder are unsecured obligations and no recourse may be made against any assets of the Tribe, and recourse may only be made against the revenues and personal property of Enterprise after entry of a judgment in a court of competent jurisdiction as provided by the applicable law and the provisions of this Agreement related to an arbitration and provided that obligations due under any Authorized Debt have been paid in full or payment of the judgment is approved by the Lender under any Authorized Debt.

**17.**    <u>Governing Law</u>.  The interpretation, validity and performance of this Agreement shall be governed by the laws of the Tribe and of the State of Michigan, without regard to the conflicts of law rules of such Tribe or State.  If any of the terms and provisions of this Agreement shall be held invalid or unenforceable for any reason, such invalidity or unenforceability shall not affect any of the other terms or provisions hereof, all such other terms and provisions to be valid and enforceable to the fullest extent permitted by law.

**18.**    <u>Dispute Resolution</u>. All disputes, controversies or claims between the Parties arising out of or relating to this Agreement, including without limitation any dispute, controversy or claim between the Parties regarding the rights, duties, adequacy of performance, breach, or liabilities of a Party under any provision of this Agreement or the validity or enforceability of this Agreement ("Dispute"), shall be resolved by binding arbitration conducted in accordance with the provisions of this Section ("Arbitration Proceedings") and per the limited waiver of tribal sovereign immunity contained in Section 14 above.  If a Party ("Complaining Party") concludes that the other Party ("Responding Party") has failed to comply with, or is proposing to take action which is inconsistent or will breach any term or condition of this Agreement, and the Parties informal efforts to resolve the Dispute as set forth in Paragraph 18.1 below have been unsuccessful, the Complaining Party may give written notice to the Responding Party ("Notice of Dispute"), which specifies: (a) the nature of the Dispute; (b) the corrective action which must be taken to remove, or, where appropriate, to commence removal of, the Dispute, if the Dispute is susceptible to cure ("Corrective Action"); (c) a reasonable time limit within which the Corrective

*28*

CONFIDENTIAL

Action must be taken ("Time Limit"); and (d) the amount of damages or losses asserted to have arisen from the Dispute. Except in the case of emergencies, no Arbitration Proceedings on a Dispute may be commenced by a Party unless prior Notice of Dispute and opportunity to take Corrective Action have been given as provided in this Subsection. If, within the Time Limit, the Responding Party fails in the reasonable judgment of the Complaining Party to take substantial steps to make the Corrective Action provided for in the Notice of Dispute then, with respect to the Dispute, either Party may initiate Arbitration Proceedings under Paragraph 18.2 with respect to the asserted Dispute. Each of the Parties hereby agrees that this arbitration provision is valid and enforceable and therefore waives any defense or assertion to the contrary.

**18.1    Negotiations/Mediation.** Before Arbitration Proceedings are commenced, the Parties shall use their best efforts to settle the Dispute by negotiating with each other in good faith and, recognizing their mutual interests, attempting to reach a just and equitable solution satisfactory to both Parties. Should the Parties' good faith efforts to resolve a Dispute be unsuccessful, the Parties agree that prior to resorting to judicial or arbitral avenues of relief, they may engage a mutually-acceptable mediator to assist them in resolving the Dispute. If the Parties do not reach a solution within a period of thirty (30) days from the date on which the Dispute was first asserted in writing, then the provisions in Paragraph 18.2 below shall apply.

**18.2    Binding Arbitration.** Subject to the requirements and limitations of Paragraph 18.1, either Party shall have the right to have the Dispute decided by Arbitration Proceedings in the manner provided in this Paragraph 18.2.

**18.2.1 Notice of Intent.** A Party intending to demand arbitration shall first serve written notice of that intent ("Notice of Intent to Arbitrate") on the other Party and shall promptly thereafter file the Notice of Intent to Arbitrate with any arbitration organization of its choosing in accordance with the that arbitration organization's rules and pay the required fees. A Notice of Intent to Arbitrate shall specify: (a) the matters to be submitted to arbitration; (b) the nature of the relief to be sought in the arbitration; and (c) the name of the "Pre-Approved Arbitrator" desired to be selected by the Party. The Parties have established a list of pre-approved, mutually acceptable arbitrators, "Pre-Approved Arbitrators," whom either Party may identify as the decider for any Dispute under any arbitration organization's rules. The list of Pre-Approved Arbitrators is contained at Schedule 18.2.1 hereto..

**18.2.2 Response.** Within ten (10) days after the service of a Notice of Intent to Arbitrate, the other Party shall serve a written response ("Response") specifying (a) any additional matters it intends to submit to arbitration relating to the Dispute, and (b) the nature of any relief it intends to seek in the arbitration. The responding Party shall promptly thereafter file the Response with the arbitration organization that received the Notice of Intent and pay any required fees. In the event that the Pre-Approved Arbitrator identified by the Party initiating a Notice of Intent to Arbitrate is unavailable to serve for whatever reason, the responding Party shall in its Response identify an alternate Pre-Approved Arbitrator from Schedule 18.2.1 to hear the Dispute. The Parties shall alternate identification of Pre-Approved Arbitrators no longer than each ten (10) days until a Pre-Approved Arbitrator who is able to serve in the timeframes provided in this Agreement is identified.

*29*

CONFIDENTIAL

**18.2.3** **Arbitrators**. The Pre-Approved Arbitrators identified from Schedule 18.2.1 shall be the "Decider Arbitrator." Any Arbitration Proceedings shall take place exclusively before the single Decider Arbitrator. Any Decider Arbitrator shall be competent and professionally experienced in the matter being arbitrated. The Parties further agree that no arbitrator shall be an officer, agent, employee, stockholder or contractor of any Party or its affiliates, and nor shall any arbitrator be a member or descendent or spouse of a member or descendent of the Tribe. If no Pre-Approved Arbitrator can serve then the Decider Arbitrator to be appointed shall be selected by the arbitration organization that received the Notice of Intent. All arbitrators, no matter how designated or appointed, shall act as neutral arbitrators. All decisions, awards, orders and other rulings of the arbitrators, relief awarded, or other substantive or procedural matters ("Decisions") shall be made by only the duly-appointed Decider Arbitrator, shall be in writing signed by the Decider Arbitrator, and shall include the findings of fact and conclusions of law on which the Decision is based.

**18.2.4** **Conduct of Arbitration**. After the Notice of Intent to Arbitrate has been delivered, arbitration shall be considered commenced as to all matters properly submitted under the foregoing provisions, and shall thereafter be prosecuted with diligence in accordance with the following provisions, unless the Parties agree otherwise. The Decider Arbitrator shall apply the governing law specified in Section 17, and shall follow such rules of discovery and evidence as the United States District Court for the State of Michigan would apply. Within sixty (60) days of commencement of the arbitration actions, and after receiving evidence and hearing witnesses, if any, the Decider Arbitrator shall render his or her award, accompanied by findings of fact and a statement of reasons for the decision.

**18.2.5** **Standard of Review**. All Decisions rendered by the Decider Arbitrator shall be determined in light of the nature of the Dispute, the circumstances surrounding the Dispute, applicable Laws, and the rights and interests of the Parties, so as to do substantial justice to the Parties. No order in Arbitration Proceedings may terminate this Agreement except upon (a) a determination that the Dispute on which the order is based constitutes a major and material default under this Agreement, or (b) upon a determination of repeated defaults sufficient to indicate callous indifference to a Party's obligations under this Agreement; provided that in no event shall this Agreement be subject to termination for breach of a term or conditions the breach of which the Parties have agreed shall not be the basis for termination of this Agreement.

**18.2.6** **Place of Arbitration**. All hearings and other proceedings in the arbitration shall be held at Marquette, Michigan, unless otherwise designated by the Parties.

**18.2.7** **Relief Available**. With respect to the matters submitted to Arbitration Proceedings, the Decider Arbitrator shall have authority to:

**(a)** issue appropriate Interlocutory Orders to mitigate damage or prevent irreparable injury to a Party; and

**(b)** render a final decision which:

*30*

CONFIDENTIAL

(i)    determines or declares the rights, duties, adequacy of performance, breach or liabilities of a Party under the Agreement;

(ii)    orders a Party to specifically perform its obligations under the Agreement;

(iii)    awards appropriate injunctive, declaratory or compensatory monetary relief for the benefit of a Party; and/or

(iv)    contains such further relief and provisions as the arbitrators have jurisdiction and authority to grant.

The Decider Arbitrator shall not have jurisdiction or authority to assess special, consequential or punitive damages against either Party. Except as inconsistent with the provisions of this Section 18, the arbitration shall be conducted in accord with the Commercial Rules of the American Arbitration Association then in effect.

**18.2.8 Decision Binding; Enforcement**. The Decision of the Decider Arbitrator shall become a "Final Decision" at the time rendered. All Final Decisions shall be conclusive and binding on the Parties with respect to the matters decided, and shall be complied with by the Parties. A Party may enter a Final Decision and institute Judicial Proceedings for the sole purpose of enforcing a Final Decision in any tribunal specific in Section 14 above. In such Judicial Proceedings, neither Party, without consent of the other Party, shall be entitled to contend that the Final Decision should be vacated, modified or corrected and the Parties hereby expressly waive all other rights and remedies that might otherwise be available in the Judicial Proceeding.

**18.2.9 Costs of Arbitration**. All costs of arbitration, including the fees and expenses of the Decider Arbitrator, shall initially be borne equally by the Parties, but ultimate responsibility for such costs shall be determined by the Decider Arbitrator in the course of his or her decision and/or award according to the extent to which each Party prevailed on the issues subject to the arbitration. Each Party shall bear the costs and expenses for the presentation of its case, including the fees of its attorneys and experts.

**18.2.10 Survival of Remedy**. Subsequent to any expiration or termination of this Agreement, this Section shall remain available to the Parties with respect to Disputes arising out of or relating to this Agreement, whether such Dispute arose prior or subsequent to the expiration or termination of the Agreement, for the longer of (i) one (1) year, or (ii) the conclusion of any proceedings timely initiated pursuant to this Section 18, including the conclusion of any appeals allowed by proceedings hereunder.

**19.    Performance During Disputes**. It is mutually agreed that during any kind of controversy, claim, disagreement or dispute, including a dispute as to the validity of this Agreement or to terminate the Agreement for cause, Servicer shall remain in Enterprise as Servicer; and Enterprise and Servicer shall continue their performance of the provisions of this Agreement and its exhibits, subject to the maintenance of any licenses required to perform such duties. Servicer shall be entitled to seek injunctive relief from such court or other competent authority as contemplated by Section 14 of this Agreement to maintain the status quo in the event

*31*

CONFIDENTIAL

JA544

MARTORELLO_003507

of a threatened eviction during any dispute, controversy, claim or disagreement arising out of this Agreement.

**20.    Confidential Information.** Each of the Parties agree that any information received concerning any other Party during the performance of this Agreement, regarding a Party's organization, financial matters, marketing plans, or other information of a proprietary nature (the "Confidential Information"), will be treated by all Parties in full confidence and except as required to allow Servicer or Enterprise to perform their respective covenants and obligations hereunder, or in response to legal process or appropriate and necessary inquiry, and will not be revealed to any other persons, firms or organizations; provided, however, that a Party may disclose such information to such of its officers, employees or agents who need to know the information for purposes of performing services to such Party for purposes related to this Agreement and who agree to keep such information confidential and to be bound by this Section to the same extent as if they were signatories to and bound by this Agreement. The provisions of Sections 3.3.2 and 3.3.3 shall apply to the enforcement of this Section. The provisions of this Section shall survive the termination of this Agreement.  Confidential Information shall include all information, data, knowledge, and know-how (in whatever form and however communicated) relating to the Enterprise, or to its businesses, operations, properties, products, strategies, plans, markets, or financial positions, that is delivered or disclosed by Servicer, or any Servicer representative, or any of its officers, directors, partners, employees, agents, affiliates, or shareholders, to Enterprise in writing, electronically, verbally, or through visual means, or which Enterprise learns or obtains aurally, through observation or through analyses, interpretations, compilations, studies, or evaluations of such information, data, knowledge, or know-how regardless of whether or not any such information is marked or designated "confidential."

The obligations not to use or disclose the Confidential Information shall not apply to Confidential Information which (a) has been made previously available to the public by Enterprise or the Tribe as sole member of Enterprise or Servicer or Servicer's affiliates or becomes generally available to the public, unless the Confidential Information being made available to the public results in a breach of this Agreement; (b) prior to disclosure to Enterprise or Servicer or Servicer's affiliates, was already rightfully in any such person's possession; or (c) is obtained by Enterprise or Servicer or Servicer's affiliates from a third party who is lawfully in possession of such Information, and not in violation of any contractual, legal or fiduciary obligation to Enterprise or the Tribe as sole member of Enterprise or Servicer or Servicer's affiliates, with respect to such Confidential Information and who does not require Enterprise or Servicer or Servicer's affiliates to refrain from disclosing such Confidential Information to others.

**21.    Execution.** This Agreement is being executed in three (3) counterparts. Each of the three originals is equally valid and binding upon the parties.

**22.    Enterprise Name.** Enterprise shall be operated under the business name of Red Rock Tribal Lending, LLC, and such trade names as both the Servicer and Enterprise and the Tribe as sole member of Enterprise shall agree.

**23.    Intent to Negotiate New Agreement.** On or before one hundred twenty (120) days before the end of the Term of this Agreement, Enterprise shall give Servicer notice of its intent

*32*

CONFIDENTIAL

regarding their willingness to enter into negotiations for a new Servicing Agreement to be effective upon the conclusion of this Agreement. If Enterprise and Servicer are unable to agree to the terms of a new agreement or if Enterprise decide not to enter into negotiations for a new agreement, then Enterprise and Servicer shall agree upon a transition plan within thirty (30) days' notice from Enterprise of its intention not to negotiate a new Servicing Agreement which plan shall be sufficient to allow Enterprise to operate Enterprise and provide for the orderly transition of the management of Enterprise.

**24.** **Entire Agreement**. This Agreement, including the Exhibits referred to herein and any document executed by the Parties simultaneously herewith, constitutes the entire understanding and agreement of the Parties hereto and supersedes all other prior agreements and understandings, written or oral, between the Parties.

**25.** **Additional Actions**. Each of the Parties agrees to execute, deliver and, if necessary, record any and all additional instruments, certifications, amendments, modifications and other documents as may be reasonably required by another Party in order to effectuate, complete, perfect, continue or preserve the respective rights, obligations, liens and interests of the parties hereto to the fullest extent permitted by law; provided, that any such additional instrument, certification, amendment, modification or other document shall not materially change the respective rights, remedies or obligations of Enterprise or the Servicer under this Agreement or any other agreement or document related hereto. Each of the parties further agrees to review and consider the tax benefits that arise from the operation of Enterprise pursuant to the terms of this Agreement and to allocate such tax benefits among the parties in order to promote the respective interests of the parties hereto to the fullest extent permitted by law.

**26.** **Representation**. The Tribe and Enterprise have been represented by Rosette, LLP in connection with the negotiation of this Agreement, and Servicer has been represented by Greenberg Traurig LLP. Each Party has had its attorneys fully explain and counsel it in connection with the rights and obligations imposed upon such Party under this Agreement and the agreements and other documents contemplated to be executed in connection with the Unsecured Lending Business. Each Party has a complete understanding of such rights and obligations and is entering into the Agreement notwithstanding any covenants or restrictions set forth herein that may impose obligations on the parties.

**[remainder of page intentionally left blank]**

*33*

JA546

CONFIDENTIAL

MARTORELLO_003509

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement on the day and year first above written.

RED ROCK TRIBAL LENDING, LLC

By: _____

Name: Craig Mansfield

Title:  Co-Manager

By: _____

Name: Michelle Allen

Title: Co-Manager

SOURCEPOINT VI, LLC

By _____

Name: Matt Martorello

Title: President

*1*

JA547

MARTORELLO_003510

**Schedule 1.0**

2

JA548

CONFIDENTIAL

MARTORELLO_003511

**Schedule 18.2.1 - List of Pre-Approved Arbitrators**

List of Pre-Approved Arbitrators from Indian Country

Robert Anderson

John Bickerman

Robert Clinton

Matthew L.M. Fletcher

JoAnn Cook-Gasco

B.J. Jones

Stacey Leeds

Carrie Newton Lyons

John Petoskey

Michael Petoskey

Frank Pommerscheim

Wenona Singel

Jill Tompkins

Kevin Washburn

Robert A. Williams

*3*

CONFIDENTIAL

Exhibit 16

**LULA WILLIAMS, ET AL. vs BIG PICTURE LOANS, LLC, ET AL.**
**Matthew Martorello on 08/30/2018**

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF VIRGINIA
 2                    RICHMOND DIVISION

 3   LULA WILLIAMS, et al., on    *
     behalf of themselves and all *
 4   other similarly situated     *
     individuals,                 *
 5           Plaintiff,           *
                                  *
 6   VS.                          *  Civil Action No.
                                  *  3:17-cv-461 (REP)
 7   BIG PICTURE LOANS, LLC,      *
     et al.,                      *
 8           Defendants.          *

 9
     ****************************************************
10
               ORAL AND VIDEOTAPED DEPOSITION OF
11                  MATTHEW MARTORELLO
                     AUGUST 30, 2018
12
     ****************************************************
13

14              DEPOSITION of MATTHEW MARTORELLO,

15   produced as a witness at the instance of the

16   Plaintiffs, and duly sworn, was taken in the

17   above-styled and numbered cause on the 30th day of

18   August, 2018, from 10:09 a.m. to 2:44 p.m., before

19   Christy R. Sievert, CSR, RPR, in and for the State

20   of Texas, reported by machine shorthand, at the

21   offices of Kellett & Bartholow, PLLC, 11300 North

22   Central Expressway, Suite 301, Dallas, Texas 75243,

23   pursuant to the Texas Rules of Civil Procedure and

24   the provisions stated on the record or attached

25   hereto.
```

www.huseby.com        Huseby, Inc.  Regional Centers        800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

JA551

USCA4 Appeal: 23-2097    Doc: 11-2    Filed: 12/06/2023    Pg: 96 of 493
Case 3:17-cv-00461-REP   Document 1166-16   Filed 04/21/23   Page 3 of 6 PageID# 48199

```
 1                    A P P E A R A N C E S

 2

 3    FOR THE PLAINTIFFS:

 4       MS. KRISTI C. KELLY
         MR. ANDREW J. GUZZO
 5       Kelly & Crandall, PLC
         3925 Chain Bridge Road, Suite 202
 6       Fairfax, Virginia  22030
         Phone:     703-424-7570
 7       E-mail:    kkelly@kellyandcrandall.com
                    aguzzo@kellyandcrandall.com
 8

 9    COUNSEL FOR MATTHEW MARTORELLO:

10

         MR. RICHARD L. SCHEFF
11       Montgomery, McCracken, Walker & Rhoads, LLP
         123 South Broad Street
12       Philadelphia, Pennsylvania  19109
         Phone:     215-772-7502
13       E-mail:    rscheff@mmwr.com

14

      ALSO PRESENT:
15
         GUS PHILLIPS, Videographer
16       WILL RAINE, Videographer

17

18

19

20

21

22

23

24

25
```

**www.huseby.com**          **Huseby, Inc.  Regional Centers**          **800-333-2082**
**Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco**

JA552

1  question is whether or not this is a final.  I do

2  see other signatures on it.  I suspect it is, but I

3  just don't know if his signature is on this one.

4  That's all.

5      A.   Under the assumption that it's final, yeah,

6  it's -- it looks like the document.

7  BY MS. KELLY:

8      Q.   And was this servicing agreement ever

9  amended during the time that you were a president of

10  SourcePoint VI?

11              MR. SCHEFF:  Object to the form.  I

12  think it misstates the testimony.

13              Answer the question.

14      A.   This -- I don't recall any amendments to

15  this document at any time.

16  BY MS. KELLY:

17      Q.   Okay.

18      A.   Sorry.  Just got a small technicality

19  there.

20      Q.   How -- how long was this servicing

21  agreement in effect?

22      A.   Well, I guess -- I mean, there's two dates

23  on here.  So whichever one you would consider the

24  start date through somewhere in late 2015 or early

25  2016, somewhere in. . .

**LULA WILLIAMS, ET AL. vs BIG PICTURE LOANS, LLC, ET AL.**
**Matthew Martorello on 08/30/2018**                              Page 152

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF VIRGINIA
 2                     RICHMOND DIVISION

 3   LULA WILLIAMS, et al., on    *
     behalf of themselves and all *
 4   other similarly situated     *
     individuals,                 *
 5          Plaintiff,            *
                                  *
 6   VS.                          *  Civil Action No.
                                  *  3:17-cv-461 (REP)
 7   BIG PICTURE LOANS, LLC,      *
     et al.,                      *
 8          Defendants.           *

 9              REPORTER'S CERTIFICATION
             DEPOSITION OF MATTHEW MARTORELLO
10                  AUGUST 30, 2018

11              I, CHRISTY R. SIEVERT, CSR, RPR, in

12   and for the State of Texas, hereby certify to the

13   following:

14              That the witness, MATTHEW MARTORELLO, was

15   duly sworn by the officer and that the transcript of

16   the oral deposition is a true record of the

17   testimony given by the witness;

18              I further certify that the signature of

19   the deponent was requested by the deponent or a

20   party and is to be returned within 30 days from date

21   of receipt of the transcript.  If returned, the

22   attached Changes and Signature Page contains any

23   changes and the reasons therefor;

24              I further certify that I am neither

25   counsel for, related to, nor employed by any of the
```

www.huseby.com        Huseby, Inc.  Regional Centers        800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

JA554

USCA4 Appeal: 23-2097    Doc: 11-2    Filed: 12/06/2023    Pg: 99 of 493
Case 3:17-cv-00461-REP   Document 1166-16   Filed 04/21/23   Page 6 of 6 PageID# 48202

1    parties or attorneys in the action in which this

2    proceeding was taken, and further that I am not

3    financially or otherwise interested in the outcome

4    of the action.

5              Subscribed and sworn to on this the 1st

6    day of September, 2018.

7

8

9

10             CHRISTY R. SIEVERT, CSR, RPR
               Expiration Date:  12/31/2018

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

www.huseby.com          **Huseby, Inc.  Regional Centers**          800-333-2082
**Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco**

JA555

# Exhibit 17

# AMENDED AND RESTATED
## OPERATING AGREEMENT
### OF
## BELLICOSE CAPITAL, LLC
A Delaware Limited Liability Company

THIS AMENDED AND RESTATED **OPERATING AGREEMENT (this "Agreement") is made and** entered into as of July 1, 2014, by and among the Members whose signatures appear on Schedule A, as may be amended from time to time, which shall be, and remain after subsequent amendment, part and parcel of this Agreement.

Whereas, the Members of the Company entered into an Operating Agreement dated January 1, 2014 (the **"Original Agreement")**, and subsequently entered into an Amended and Restated Operating Agreement made **effective retroactive to January 1, 2014 ("Amended Agreement")** in order to clarify certain errors and ambiguities contained in the Original Agreement;

Whereas the Company now wishes to further amend and restate the Amended Agreement; and

Whereas, this Agreement is intended to govern the relationships among the Company, its Manager and its Members.

In consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties, intending to be legally bound, agree as follows:

## SECTION I
## ORGANIZATION & FORMATION

A.    Formation. The Company has been organized as a Delaware limited liability company under and pursuant to the Delaware Limited Liability Company Act **(the "Act")** by the filing of Articles of Organization **("Articles") with the** State of Delaware Division of Corporations, on October 9, 2013, as required by the Act.

B.    Name. **The name of the Company shall be "Bellicose Capital, LLC". Upon proper notice and filing** with the State of Delaware Division of Corporations, the Company may conduct its business under one or more assumed names.

C.    Purpose. The purpose of the Company is to operate any lawful business permitted by the law of the State of Delaware or any other State, Territory or Commonwealth in which it is registered to do business. The Company shall have all the powers necessary or convenient to affect any purpose for which it is formed, including all powers granted by the Act. The Company is authorized to apply for any and all tax exemptions and other benefits for which it may be eligible, including without limitation, benefits provided by the Department of Economic Development and Commerce of the Commonwealth of Puerto Rico.

D.    Duration. The Company shall continue in existence perpetually, beginning on the date of filing of the Articles, unless terminated by law or dissolved and terminated pursuant to this Agreement.

E.    No Partnership.  The Members intend that the Company not be a partnership (including, without limitation, a limited partnership) or joint venture, that no Member be a partner or joint venturer for any purposes other than federal, state and territorial tax purposes, and this Agreement may not be construed to suggest otherwise.

JA557

MARTORELLO_000299

F.   <u>Registered Office, Resident Agent and Place of Business</u>. The registered office and principal place of business of the Company shall be at **203 Galeria De Artes y Ciencias I, Dorado, Puerto Rico** or such other place or places as the Manager may hereafter determine. The Resident Agent of the Company for service of process in Delaware shall be Incorporating Services, Ltd., 3500 South Dupont Highway, Dover, DE 19901.

**SECTION II**
**MEMBERS, MEMBERSHIP INTEREST & CLASSES**

A.   <u>Definitions</u>.

(i) **"Act" shall mean the** Delaware Limited Liability Company Act, Title 6 of the Delaware Code, as in effect in the State of Delaware and as amended from time to time. Reference to any section of the Act shall be deemed to refer to a similar provision in any amendment to the Act. To the extent the Company redomiciles, it may be required to amend and restate this Agreement in accordance with the laws of its new domicile.

(ii) "Additional Member" shall mean any Member admitted, to the Company after the date of this Agreement as provided for in Section II D.

(iii) "Capital Account" shall mean the account maintained for each Member described in Section III of the Agreement.

(iv) "Capital Contribution" shall mean, with respect to any Member, the total amount of contributions by all the Members or any class of Members or any one Member, as the case may be (or the predecessor holders of the interests of such Members), to the capital of the Company in cash, property, or services for an interest in the Company, valued at fair market value without deduction of selling, organization, or other expenses; and shall include all such contributions to the capital of the Company whenever made.

(v) **"Class" or "Classes":** Membership Interests may include voting interest, economic interest and equity interest, and may be divided into separate Classes in the sole discretion of the Manager, which Classes and Membership Interests shall have such rights and preferences as the Manager shall determine, including (without limitation) different fee, expense and allocation structures and different voting privileges. The Manager shall cause separate and distinct records to be kept with respect to Company Property associated with each Class. Certain classes of the Company shall entitle a Member to participate only in the future profits, losses and/or appreciation of the Company Property allocated to a particular Class of Membership Interest. The designation of Class and rights of any Member, shall be designated by the Manager, and shall either be described herein in this Agreement, or made pursuant to an ancillary agreement among the Company and the proposed Member.  All Classes of Membership Interest shall be shown on <u>Schedule A</u>, attached hereto and made a part hereof, as amended from time to time.

(vi) **"Company Property" or "Property"** each shall mean the real property and any other assets or property (tangible or intangible, personalty or real, choate or inchoate, fixed or contingent) of the Company, including all earnings and proceeds which may arise therefrom from time to time.

(vii) **"Economic Interest" shall mean a Member's** share of the **Classes'** future net profits and net losses specifically associated with a particular Class pursuant to this Agreement. Economic Interests shall be non-voting interests. It is the intention of the parties hereto that all Economic Interests shall be deemed to be **"profits interests" of the Company in accordance with Rev. Proc. 93**-27 and 2001-43 and that the Economic Interest holders are only entitled to participate in the future net profits and or net losses of the Company accruing after each Member's date of execution of this Agreement and are not entitled to participate in profits or losses related to the sale of assets or equity.

2

JA558

CONFIDENTIAL

MARTORELLO_000300

(vii) **"Equity Interest" shall mean a Member's** share of the value upon a sale or liquidation of the Company, its subsidiaries, or the asset(s) specifically associated with a particular Class of Equity Interest and set forth in section II C below.

(viii) "Initial Capital Contribution" shall mean, with respect to any Member, the initial contribution by such Member to the capital of the Company as set forth on Schedule A hereto.

(ix) "Internal Revenue Code" shall mean the Internal Revenue Code of 1986, as amended from time to time, or any corresponding provision or provisions of succeeding laws. The term "Internal Revenue Code" shall be abbreviated as "IRC" or "Code".

(x) "Member" **shall mean each of the persons or entities holding a Membership Interest in the** Company and each of the persons or entities who may hereafter become a Member holding a Membership Interest. Members' rights to participate in the management and affairs of the Company, to share in the profits, gains or losses of the Company, to share in the value upon sale or liquidation of the asset(s) associated with a particular Class of Membership Interest, or to vote at meetings of the Members shall be determined pursuant to this Agreement, or to any ancillary agreements between the Member and the Company executed contemporaneously with this Agreement, or to any resolutions of the Members executed in connection with the issuance of a new class of interests.

(xi) "Membership Interest" **shall mean a Member's** voting interest, economic interest and/or equity interest in a particular Class, including the right to vote associated with such Membership Interest, if any, and such other rights and privileges that the Member may enjoy by being such a Member.

B.     Members.  The Members are set forth on Schedule A hereto, and shall include any other person hereafter admitted to the Company as a Member **as provided in this Agreement.  The term "Members" shall** not include any person who has ceased to be a member of the Company.

C.     Classes.  The following Classes have been designated by the Manager as of the Effective Date of this Agreement:

(i)     Class A Membership Interest.  Class A Membership Interest shall be the membership interest in the Company not otherwise designated to any other Class of Membership Interest.

(a) Class A Voting Interest: Class A Voting Interest shall be the only Class of Membership entitled to vote on any and all matters presented to the Company for Member approval. Class A Voting Interest shall not include an Economic Interest or an Equity Interest.

(b) Class A Economic Interest: **Class A Economic Interest shall be a Class A Member's economic interest in the Company's** future net profits and net losses pursuant to this Operating Agreement and the Act, as more particularly set forth in Schedule A to this Operating Agreement as the same may be amended from time to time by the Class A Members holding Class A Voting Interest, but shall not include any right to participate in the management or affairs of the Company, including the right to vote on, consent to or otherwise participate in any decision of the Class A Members holding Class A Voting Interest, nor shall it include an Equity Interest.

(c) Class A Equity Interest:  Class A Equity Interest shall be entitled to the value of the Company upon sale or liquidation, the gain or losses from the sale of some or all of the companies assets, and the sharing in liabilities pursuant to this Operating Agreement and the Act, as more particularly set forth in Schedule A to this Operating Agreement as the same may be amended from time to time by the Manager, but shall not include any right to participate in the management or affairs of the Company, including the right to

3

JA559

MARTORELLO_000301

vote on, consent to or otherwise participate in any decision of the Class A Members holding Class A Voting Interest, nor shall it include an Economic Interest.

(ii)    <u>Class B Membership Interest</u>. Class B Membership Interest shall be the membership interest in the Company based solely upon the value and profitability of the subsidiary entity, **SourcePoint VI, LLC**. <u>No other</u> net profits, net losses, or distributions or value upon sale or liquidation attributable to the Company or any of its other subsidiaries shall be payable, under any circumstances, to the Class B Membership Interest holders, as are set forth in <u>Schedule A</u> to this Agreement as the same may be amended from time to time by the Manager. Class B Membership Interest <u>shall not include,</u> under any circumstances, any right to participate in the management or affairs of the Company, including the right to vote on, consent to or otherwise participate in any decision of the Company; the right to vote on any matter presented to the Class A Members holding Class A Voting Interest; or any decision whatsoever regarding the Class B Membership Interest or the subsidiary entity: SourcePoint VI, LLC.

(a) <u>Class B Economic Interest</u>: Class B Economic Interests shall only be entitled to the net profits and net losses derived solely from the wholly owned subsidiary of the Company, SourcePoint VI, LLC, from the applicable issue date set forth on Schedule A. Class B Economic Interest shall not include any right to participate in the management or affairs of the Company, including the right to vote on, consent to or otherwise participate in any decision of the Class A Members holding Class A Voting Interest, nor shall it include an Equity Interest.

(b) <u>Class B Equity Interest</u>. Class B Equity Interest shall be entitled to the value of the Class B Membership Interest only, which shall be based solely upon the value of the subsidiary entity, SourcePoint VI, LLC and/or some or all of its assets and liabilities, upon sale or liquidation, but shall not include any right to participate in the management or affairs of the Company, including the right to vote on, consent to or otherwise participate in any decision of the Class A Members holding Class A Voting Interest, nor shall it include an Economic Interest.

(iii)    <u>Class C Membership Interest</u>. Class C Membership Interest shall be the membership interest in the Company based solely upon the value and profitability of the subsidiary entity, **Green Key Technologies, LLC**. <u>No other</u> net profits, net losses, or distributions or value upon sale or liquidation attributable to the Company or any of its other subsidiaries shall be payable, under any circumstances, to the Class C Membership Interest holders, as are set forth in <u>Schedule A</u> to this Agreement as the same may be amended from time to time by the Manager. Class C Membership Interest <u>shall not include,</u> under any circumstances, any right to participate in the management or affairs of the Company, including the right to vote on, consent to or otherwise participate in any decision of the Company; the right to vote on any matter presented to the Class A Members holding Class A Voting Interest; or any decision whatsoever regarding the Class C Membership Interest or the subsidiary entity: Green Key Technologies, LLC.

(a) <u>Class C Economic Interest</u>: Class C Economic Interests shall only be entitled to the net profits and net losses derived solely from the wholly owned subsidiary of the Company, Green Key Technologies, LLC, from the applicable issue date set forth on Schedule A. Class C Economic Interest shall not include any right to participate in the management or affairs of the Company, including the right to vote on, consent to or otherwise participate in any decision of the Class A Members holding Class A Voting Interest, nor shall it include an Equity Interest.

(b) <u>Class C Equity Interest</u>. Class C Equity Interest shall be entitled to the value of the Class C Membership Interest only, which shall be based solely upon the value of the subsidiary entity, Green Key Technologies, LLC and/or some or all of its assets and liabilities, upon sale or liquidation, but shall not include any right to participate in the management or affairs of the Company, including the right to vote on, consent to or otherwise participate in any decision of the Class A Members holding Class A Voting Interest, nor shall it include an Economic Interest.

4

JA560

MARTORELLO_000302

D.    <u>Representations and Warranties of the Members</u>.  As of the date on which any person becomes a Member, such person severally (and not jointly) hereby represents and warrants, as to itself and no other Member, to, and covenants with, the Company and each of the other Members that: (i) such person understands that the offer and sale or other transfer of the Membership Interest to such person have not been registered under the Securities Act or the securities laws of any state or territory, and further understands that such Membership Interest has not been approved or disapproved by the Securities and Exchange Commission or any other federal or state agency; (ii) such person understands that there are substantial restrictions on the transfer of the Membership Interests, including without limitation, that Membership Interests may not be transferred except as permitted by this Section II; (iii) such person has carefully reviewed and understands this Agreement in its entirety; (iv) the Manager has not made and hereby makes no warranties or representations to such person other than those set forth in this Agreement.

E.    <u>Membership Interests; Additional Membership Interests</u>. Ownership of the Company shall be divided into and represented by Membership Interests.  The Class and types of Membership Interests of the Members are set forth on <u>Schedule A</u>.  The Manager is expressly authorized to provide for the issuance from time to time of additional Membership Interests for such consideration, and with rights, privileges, preferences, qualifications, limitations and restrictions as shall be stated and expressed in the resolution or resolutions adopted by the Manager providing for the issuance of additional Membership Interests and as may be permitted by the Act.  The Manager shall reflect the issuance of any additional Membership Interest and, if applicable, the admission of a new Member, pursuant to an amendment to <u>Schedule A</u>, which such amendment shall not be required to be executed by any other Member.

F.    <u>Transfer of Membership Interests</u>.  Subject to the limitations of transferability set forth herein in this Agreement, Members may transfer any or all of their Membership Interest to any person or persons, at any time and from time to time.  Subject to the provisions of this Section, Members may assign their Membership Interest in the Company in whole or in part. The assignment of a Membership Interest does not itself entitle the assignee to participate in the management and affairs of the Company or to become a Member. Such assignee is entitled only to receive the distributions of cash and other property and the allocations of income, gains, losses, deductions, credits or similar items to which its assignor would have been entitled to, and such assignee shall only become an assignee of a Membership Interest and not a substituted Member. An assignee of Membership Interest shall be admitted as a substitute Member and shall be entitled to all the rights and powers of the assignor only if the Manager consents in writing. If admitted, the substitute Member, has to the extent assigned, all of the rights and powers, and is subject to all of the restrictions and liabilities of the Members.

H.    <u>Right of First Refusal</u>.  Before any Membership Interest (**"Interest"**) held by any Member is sold or otherwise transferred (including, but not limited to transfer by gift, operation of law, or pursuant to Section II H below) the Company shall have an uncontested and irrevocable right of first refusal to purchase the Interest on the following terms and conditions:

    (i)    **The selling Member shall deliver to the Company a written notice stating: (a) the Member's** bona fide intention to sell or otherwise transfer such Interest; (b) the name of the proposed purchaser or other **transferee ("Proposed Transferee"); (c) the percent of Interest to be transferred to each Proposed Transferee;** (d) the bona fide cash price or other consideration to be exchanged for the **Interest ("Offered Price"); and (e)** the terms and conditions of the proposed transfer.

    (ii)    At any time within forty-five (45) days after receipt of this notice, the Company may, by written notice to the selling Member, elect to purchase all, or any part of the Interest at Fair Market Value (as defined in Section J below) or at the Offered Price, whichever price is lower.

    (iii)    The right of first refusal shall not terminate upon any transfer of Interest.

5

JA561

MARTORELLO_000303

(iv)     The right of first refusal shall be freely assignable by the Company at any time and in its sole discretion.

(v)     Any transfer done without adherence to this Section II F shall be void.

I.     <u>Mandatory Repurchase</u>.  The Manager, in his sole and absolute discretion, may require a Member to sell all **or a portion of the Interest of such Member, on not less than fourteen (14) days' notice (a "Mandatory Repurchase").  Such Mandatory Repurchase shall become effective on the date (the "Repurchase Date")** specified in such notice.  A Member who is so required to sell its Interest pursuant to this Section shall receive the Fair Market Value of the Interest, computed as of the date on which such Mandatory Repurchase shall become effective (a Member whose Interest is repurchased pursuant to this Section is referred to herein as a **"Repurchased Member").**

J.     <u>Payments in Connection with Mandatory Repurchase</u>.

(i)     Within 30 days after a Repurchase Date there shall be paid or distributed to a Repurchased Member an amount in cash, or, in the discretion of the Manager, in securities selected by the Manager, or, in the discretion of the Manager, partly in cash and partly in securities selected by the Manager, equal in value to not less than 90% of the estimated Fair Market Value of the Interest being repurchased. Within 30 days after the Manager has determined the Fair Market Value of the Interest being redeemed or repurchased as of such date, the Company shall pay to the Repurchased Member in cash, or, in the discretion of the Manager, in securities selected by the Manager, or, in the discretion of the Manager, partly in cash and partly in securities selected by the Manager, the amount of the excess, if any, of the Fair Market Value of the redeemed or repurchased Interest over the amount so paid.

a.     **"Fair Market Value" shall mean the value of the Interest, as applicable, as determined by Manager using reasonable valuation criteria, all in the Manager's sole discretion.**

b.     **The Company's assets will be valued from time to time in the discretion of the Manager.  In those cases where an exchange-based pricing mechanism is unavailable, the Manager or Manager's** representative will develop an assessment of Fair Market Value, which will be reviewed and approved by the Manager whose consent shall not be unreasonably withheld.  In the absence of bad faith, such determination, as approved by the Manager, shall be conclusive.  Fair Market Value shall reflect any declared but unpaid distributions with respect to the Interest.

(ii)     If, in the discretion of the Manager, the assets of the Company are committed in such a manner as not to reasonably permit immediate withdrawal of such assets, then, on the applicable Repurchase Date (the "Repurchase Effective Date"), the Manager may adopt a deferred payment system in accordance with the following:

a.     The Manager will attempt to liquidate, as of the earliest date on or after the Repurchase Effective Date upon which the Company is permitted to do so or on which market conditions make same feasible, from the Company's investments, such portion thereof as is allocable to the Interest of the Repurchased Member;

b.     Within 30 days following the Repurchase Effective Date, the Repurchased Member will be entitled to receive an amount equal to the Repurchased Member's percentage of all cash and the fair market value of all liquid securities held directly by the Company with respect to any applicable Interest; provided, however, that any such amount shall be subject to the provisions of this Section;

JA562

CONFIDENTIAL

MARTORELLO_000304

c.      The balance due to the Repurchased Member shall be paid from time to time, within 30 days after the Company receives the proceeds from the liquidation of the previously illiquid portion of the Company's investments, but only to the extent that such proceeds plus the Repurchased Member's percentage of cash and the fair market value of liquid securities held by the Company with respect to any applicable Membership exceed such Member's percentage of the Company's liabilities and any amount retained pursuant to this Section with respect to any applicable Membership; provided, however, that in any event, at least 80% of the amount due a Repurchased Member shall be paid within one year following the Redemption Effective Date; and

d.      The Fair Market Value of the Interest attributable to a Repurchased Member shall be subject to an adjustment equal to a credit or charge for the Repurchased Member's percentage of the increase or decrease in the net asset value of the Company's investments with respect to any applicable Interest from the Redemption Effective Date through the date on which final payment of such Repurchased Member's percentage is made.

K.      <u>Involuntary Transfers</u>.  In the event of an Involuntary Transfer of any Interest to any person, the transferee (which term, as used herein, shall include any and all transferees and subsequent transferees of the initial transferee) shall take and hold such Interest subject to this Agreement and to all the obligations and restrictions upon the transferor, and shall observe and comply with this Agreement and with such obligations and restrictions.  As used in this Section II, **the term "Involuntary Transfer" shall mean any transaction,** proceeding or action by or in which a Member or other person is involuntarily deprived or divested of any right, title or interest in or to any Interest (including without limitation, a seizure under levy of attachment or execution, transfer to a trustee in bankruptcy or receiver or other officer or agency pursuant to a statute pertaining to escheat **or abandoned property, a Member's death or the appointment of a guardian with respect** to a Member).

L.      <u>Admission of New Members</u>.  No person shall be admitted as a Member of the Company unless: (i) the Manager shall have consented in writing to the admission of such person as a new Member; (ii) the person has executed and delivered all documents reasonably deemed appropriate by the Manager to reflect such **person's admission as a Member, and its agreement to be bound by this Agreement; and (iii) such person** has paid all expenses connected with its admission.


**SECTION III**
**CAPITAL ACCOUNT**

A.      <u>Capital Account</u>.  **A capital account ("Capital Account") shall be maintained for** the Members, and any additional Members in accordance with the provisions of this Section and subject to any ancillary agreements entered into between the Company and the Members.

(i)      Increases in Capital Account.  The Capital Account of the Members shall be increased by:

a.  The fair market value of the Members' **initial capital contri**bution and any additional capital contributions by the Members to the Company.  If any property, other than cash, is contributed to or distributed by the Company, the adjustments to Capital Accounts required by Treasury Regulation Section 1.704-1(b)(2)(iv)(d), (e), (f) and (g) and Section 1.704-1(b)(4)(i) shall be made.

b.      The Members' **share of the increase in the tax basis of Company property, if any,** arising out of the recapture of any tax credit.

c.      Allocations to the Members of profit.

7

JA563

CONFIDENTIAL

MARTORELLO_000305

d.     **The Members' share of** Company income or gain (including income and gain exempt from income taxation) as provided under this Agreement, or otherwise by Regulation Section 1.704-1(b)(2)(iv).

e.     **The Members' share of t**he amount of Company liabilities that are assumed by the Members.

(ii)     Decreases in Capital Account.  The Capital Account of the Members shall be decreased by:

a.     **The Members' share of t**he amount of money distributed to the Members of the Company pursuant to any provision of this Agreement.

b.     **The Members' share of t**he fair market value of property distributed to the Members by the Company (net liabilities secured by such distributed property that such Members are considered to assume or take subject to Code Section 752).

c.     Allocations to the Members of losses.

d.     Allocations to the Members of deductions, expenses, Nonrecourse Deductions and net losses allocated to it pursuant to this Agreement, and the Members' **share of Company expenditures which** are neither deductible nor properly chargeable to Capital Accounts under Code Section 705(a)(2)(B) or are treated as such expenditures under Treasury Regulation Section 1.704-1**(b)(2)(iv)(i). "Nonrecourse Deductions"** shall have the meaning set forth in Treasury Regulation Section 1.704-2.

e.     **The Members' share of t**he amount of any liabilities of the Members that are assumed by the Company.

# SECTION IV
## ALLOCATIONS AND DISTRIBUTIONS

A.     <u>Allocations</u>.

(i)     Allocations shall be made at such times as the Manager shall deem, in his sole discretion, to the Members listed and described on <u>Schedule A</u> attached hereto in accordance with the terms and rights of their interests.  Except as may be expressly provided otherwise in this Section IV or agreed to among the parties, and subject to the provisions of Sections 704(b) and 704(c) of the Code, the net income, net loss, or gains of the Company for each year of the Company shall be allocated to the Members, in accordance with the rights attributable to their respective interests.

(ii)     Net profits, net losses, or any other items allocable to any period shall be determined by the Manager, in his discretion, using any permissible method under Code Section 706 and the related Treasury Regulations and in accordance with the rights attributable to their respective interests.

(iii)     Acknowledgement.  The Members are aware of the income and other tax consequences of the allocations in or referred to by this Section IV and hereby agree to be bound by the provisions of this Section IV in reporting the share of items of Company income, gain, loss, deduction and expense for tax purposes.

(iv)     Determination by Manager of Certain Matters.  All matters not expressly provided for by the terms of this Agreement concerning the manner in which capital accounts and allocations are computed shall be determined in good faith by the Manager, in his reasonable discretion, whose determination shall be final and conclusive as to all the Members.  In the event the Manager determines that it is prudent to modify the manner in which capital accounts or any allocations under this Agreement are computed in order to comply with Section 704(b) of the Code and Treasury Regulations thereunder, the Manager shall make such

JA564

CONFIDENTIAL

MARTORELLO_000306

modification. In the event that unanticipated events might otherwise cause this Agreement not to comply with such law, the Manager, consistent with the prior sentence, shall make such modifications as he deems reasonable.

B.    <u>Allocations for Tax Purposes</u>. Except as otherwise provided in and after giving effect to Section IV A, as of the end of each fiscal year, items of Company income, gain, loss, deduction and expense, shall be allocated among the Members pursuant to this Section IV B and as otherwise agreed to in writing by the parties for federal income tax purposes. In accordance with Code Section 704(c) and the related Treasury Regulations, income, gain, loss and deduction with respect to any property contributed to the capital of the Company, solely for tax purposes, will be allocated among the Members so as to take account of any variation between the adjusted basis to the Company of the property for federal income tax purposes and the initial Book Value of the property. If the Book Value of any Company asset is adjusted under clause "b." of the definition of Book Value, subsequent allocations of income, gain, loss and deduction with respect to that asset will take account of any variation between the adjusted basis of the asset for federal income tax purposes and its Book Value in the same manner as under Code Section 704(c) and the related Treasury Regulations. Any elections or other decisions relating to allocations under this Section IV B will be made in any manner that the Manager determines reasonably reflects the purpose and intention of this Agreement. The allocations in or referred to by this Section IV B are solely for federal, state, territorial and local income tax purposes and shall not affect, or in any way be taken into account in computing, any Member's capital account or share of net profit or net loss or other items described in this Agreement.

C.    <u>Acknowledgement</u>. The Members are aware of the income and other tax consequences of the allocations in or referred to by this Section IV and hereby agree to be bound by the provisions of this Section IV in reporting their shares of items of Company income, gain, loss, deduction and expense for tax purposes.

D.    <u>Certain Tax Related Definitions</u>. For the purposes of this Agreement, unless the context otherwise requires:

(i)    "Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in such Member's capital account as of the end of the relevant fiscal year or other period, after giving effect to the following adjustments.

a.    Credit to such capital account any amounts which such Member is obligated to restore or is deemed to be obligated to restore pursuant to the penultimate sentence of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5);

b.    Debit to such capital account the item described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6); and

c.    Credit and debit to such capital account, in the sole and absolute discretion of the Manager, any other items required or permitted under Section 704(b) of the Code and Treasury Regulations thereunder.

(ii)    "Book Value" means with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

a.    the initial Book Value of any asset contributed by a Member to the Company shall be the asset's gross fair market value at the time of the contribution;

b.    the Book Value of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Manager in his reasonable judgment:

9

JA565

CONFIDENTIAL

MARTORELLO_000307

1.      if any adjustment is necessary or appropriate to reflect the relative economic interests of the Members in the Company as of (x) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a *de minims* capital contribution, or (y) the distribution by the Company to a Member of more than a *de minims* amount of Company property as consideration for an interest in the Company;

2.      As of the liquidation of the Company within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g); and

3.      Whenever else allowed under Treasury Regulations Section 1.704-1(b)(2)(iv)(f) or Proposed Treasury Regulations Section 1.704-1(b)(2)(iv)(s).

c.      The Book Value of any Company asset distributed to any Member will be the gross fair market value of the asset on the date of distribution; and

d.      The Book Value of Company assets will be increased or decreased to reflect any adjustment to the adjusted basis of the assets under Code Section 734(b) or 743(b), but only to the extent that the adjustment is taken into account in determining capital accounts under Treasury Regulations Section 1.704-1(b)(2)(iv)(m), provided that Book Values will not be adjusted hereunder to the extent that the Manager **determines that an adjustment under clause "b." is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment under this clause "d."**

e.      After the Book Value of any asset has been adjusted under this Section IV F(ii) above, Book Value will be adjusted by the depreciation taken into account with respect to the asset for purposes of computing net profit and net loss.

(iii)      **"Treasury Regulations" means the Income Tax** Regulations promulgated under the Internal Revenue Code, as such regulations may be amended from time to time (including corresponding provisions of successor regulations).

E.      <u>Distributions</u>.

(i)      The Manager, in his sole and absolute discretion, may at any time cause the Company to distribute to Members in accordance with their respective Interest any cash available for distribution with respect to each Interest. The Manager shall reserve the right to make distributions to certain Classes of Interests and not to others, as well as certain Members and not to others.

(ii)      The Manager, in his sole and absolute discretion, may use the capital accounts of any Member and any class or type of Membership Interest for purposes that it deems appropriate, including funding or investing in companies related or unrelated to the Company subsidiary associated with a particular type of Membership Interest, and no interest or other benefits shall accrue to the Member whose capital account is so used.

(iii)      Distributions made pursuant to this Section IV E will be calculated separately for each Interest and will be distributed to the Members participating in that Interest based on their respective Interest, as applicable.

(iv)      The Members agree to be bound by all the provisions of this Section IV in reporting their share of Company income and loss for income tax purposes.

F.      <u>Distributions upon Liquidation of the Company</u>.

10

JA566

MARTORELLO_000308

(i)      At the termination of the Company and after the Company has satisfied or provided for the **satisfaction of all the Company's debts and other obligations, the Company's assets will be distributed to the** Members and any dissociated members whose interests have not been previously redeemed first, in discharge of their respective capital interests; and then, in proportion to the respective Membership Interest, as applicable. Assets will be distributed only to Members holding Equity Interests in the Company, unless so determined by the Manager in his sole and absolute discretion.

(ii)      If the Company lacks sufficient assets to make the distributions described in the foregoing paragraph, the Company will make distributions in proportion to the amount of the respective capital interest of the Members and any dissociated members whose interests have not been previously redeemed, and all in accordance with each **Member's respective Membership Interest**.

## SECTION V
## MANAGEMENT OF THE COMPANY

A.      The business and affairs of the Company shall be managed by or under the direction of the Manager, who may exercise all powers of the Company and do all such lawful acts and things as are not by statute, the Articles, or by this Agreement directed or required to be exercised and done by the Members having a right to vote.  The Manager of the Company shall be: <u>MBM Services, LLC</u>.

B.      Without prejudice to such general powers, but subject to the same limitations, it is hereby expressly declared that the Manager shall have the following powers:

(i)      to conduct, manage and control the business and affairs of the Company and to make such rules and regulations therefor not inconsistent with the law, the Articles or this Agreement, as the Manager shall deem to be appropriate;

(ii)      to appoint and remove at his pleasure the Officers (if any), agents and employees of the Company, prescribe their duties and fix their compensation;

(iii)      to appoint boards or committees in accordance with Section K of this Article.

(iv)      to borrow money and incur indebtedness for the purposes of the Company, and to cause to **be executed and delivered therefor, in the Company's name, promissory notes, bonds, debentures, deeds of** trust, mortgages, pledges, hypothecations, or other evidences of debt and securities therefor;

(v)      to amend this Agreement, with the consent of the Members holding 51% of the Class A Voting Interests;

(vi)      to make all other arrangements and do all things which are necessary or convenient to the conduct, promotion or attainment of business, purposes or activities of the Company.

C.      The Manager shall hold office until his successor is elected and qualified, or his earlier death, dissolution, resignation or removal.

D.      A vacancy in the Manager shall be deemed to exist in case of the death, dissolution, resignation or removal of a Manager, if the authorized number of Managers is increased, or if the Members fail, at any meeting of Members at which any Manager or Managers are to be elected by those Members with Class A Voting Interest, to elect the full authorized number of Managers to be voted for at such meeting.  Unless the Members shall have elected a Manager to fill a vacancy, vacancies may be filed by (i) a majority of the Managers then in office, whether or not less than a quorum, or by a sole remaining Manager, or (ii) failing the election of a Manager pursuant to clause (i), by the Members with Class A Voting Interest.

JA567

CONFIDENTIAL

MARTORELLO_000309

E.       Any Manager may be removed, with or without cause, by the vote of Members holding not less than a majority of Class A Voting Interests represented and voting at a duly held meeting at which a quorum is present (which Members voting affirmatively also constitute at least a majority of the required quorum), or, in lieu of a meeting, by way of written consent of Members holding fifty-one percent (51%) of the Class A Voting Interests.

F.       No Manager shall receive any compensation for serving as a Manager, except that (i) a Manager shall receive such compensation as is otherwise determined by the Members holding Class A Voting Interest, and (ii) a Manager shall be reimbursed for reasonable and necessary expenses.

G.       Except as expressly set forth in this Agreement or required by law, no Manager shall be personally liable for any debt, obligation or liability of the Company, whether arising in contract, tort or otherwise, solely by reason of being a Manager of the Company.

H.       <u>Compensation and Fees</u>.

         (i)      No Member shall be paid any fee or other compensation whatsoever for services as a Manager or otherwise, whether ordinary or extraordinary, foreseen or unforeseen, rendered to or for the benefit of the Company, except as otherwise provided in this Section.

         (ii)     The Manager shall be paid such compensation for his services as shall be set forth by the majority holders Class A Voting Interest.

I.       <u>Certain Related Party Transactions Permitted</u>.  The Company may (i) employ or retain a Member or a person directly or indirectly related to or affiliated with an Member to render or perform a service on behalf of the Company, and/or (ii) contract to purchase property from a Member or a person directly or indirectly related to or affiliated with a Member, provided that the charges made for services rendered and materials furnished by such Member, person or persons must be reasonable and competitive with those charged by others in the same line of business and not so related.

J.       <u>No Resignation</u>.   Except pursuant to an authorized transfer of its entire Membership Interest in accordance with this Agreement, no Member shall have the right to resign from the Company as a Member prior to the dissolution and winding up of the Company without the prior written consent of the Manager. Any Member which purports to resign from the Company in violation of the foregoing provision or which has ceased for any reason to be a Member shall be liable to the Company and the other Members for any damages sustained by reason of such resignation or cessation.

K.       <u>Boards and Committees</u>. The Manager may appoint individuals to serve on boards or committees to **assist the Manager in overseeing certain aspects of the Company's operations, including but not limited to appointing a board to oversee the Company's** legal and regulatory compliance. The manner of functioning of said boards and committees will be as set forth by the Manager in a separate written resolution.

L.       <u>Indemnity</u>. Neither the Manager nor any of **the Company's officers, directors, partners, employee**s, agents, affiliates, successors or assigns shall be liable to the Company or the Members for any loss or damage incurred by reason of any act performed or omitted in connection with the activities of the Company or in dealing with third parties on behalf of the Company, unless such act or omission was taken or omitted by such Manager or such other persons as noted above, in bad faith, and such act or omission constitutes fraud, gross negligence or willful breach of fiduciary duty.

The Company, its receiver or its trustee, shall indemnify and save harmless the Manager and its officers, directors, partners, employees, agents, Affiliates, successors and assigns, including any guarantors of Company

JA568

CONFIDENTIAL

MARTORELLO_000310

obligations (each of the foregoing being a "Covered Person"), from any claim, liability, loss, judgment or damage incurred by them by reason of any act performed or omitted to be performed in connection with the activities of the Company or in dealing with third parties on behalf of the Company, including costs and attorneys' fees (which attorneys' fees may be paid as incurred) and any amounts expended in the settlement of any claims of liability, loss or damage provided that the act or omission of the Covered Person is not found by a final, non-appealable ruling of a court of competent jurisdiction to have resulted from an act or omission of the Covered Person taken in bad faith and that constitutes fraud, gross negligence or willful breach of fiduciary duty by the Covered Person.  The Company shall advance all sums required to indemnify and hold each Covered Person harmless as provided herein from the initiation of any claim against such Covered Persons, subject to acknowledgment in writing by such Covered Person of the obligation to reimburse the Company in the event that, following the entry of a final, non-appealable judgment, it is determined that the Company was not obligated to indemnify such Person pursuant to this Agreement.  All judgments against the Company and a Covered Person, wherein the Covered Person is entitled to indemnification, must first be satisfied from Company assets before the Covered Person shall be responsible for such obligations.  The Company shall not pay for any insurance covering liability of a Covered Person for actions or omissions for which indemnification is not permitted hereunder; provided, that nothing contained herein shall preclude the Company from purchasing and paying for such types of insurance, including extended coverage liability and casualty and worker's compensation, as would be customary for any person owning comparable property and engaged in a similar business or from naming the Manager and any Covered Person as additional insured parties thereunder. The provisions of this Section shall survive the termination of the Company.

## SECTION VI
## MEETING OF MEMBERS

A.     Meetings and Voting.  Notwithstanding anything to the contrary herein, only Members owning Class A Voting Interests in the Company, which confer voting rights, shall be entitled to vote with regards to any issue concerning the Company. Neither an assignee nor transferee may vote any Class A Voting Interest unless such assignee or transferee is admitted as a Member with voting rights.  Furthermore, Members who only hold Economic Interests or Equity Interests in the Company shall not be entitled to vote on any issues concerning the Company.

B.     Special Meetings.  Special meetings of the Members may be called at any time by the Manager and shall be called at the written request of the holders of a majority of the Class A Voting Interest then outstanding and entitled to vote thereat. The meeting may be dispensed with if all Members who would have been entitled to vote on such action if such meeting was held consent in writing to the action to be taken.

C.     Place of Meetings.  All meetings of the Members shall be held in the Commonwealth of Puerto Rico at the principal office of the Company, or at such other places as shall be designated in the notices or waivers of notice of such meetings and may be held telephonically.

D.     Notice of Meetings.

       (i)     Except as otherwise provided by statute, written notice of each meeting of the Members, stating the time when and the place where it is to be held, shall be served either personally, by mail, or by email or other electronic communication,, not less than ten (10) or more than fifty (50) days before the meeting, upon each Member of record entitled to vote at such meeting, or the Member's designated agent, and to any other member to whom the giving of notice may be required by law.  Notice of a meeting shall also state the purpose or purposes for which the meeting is called, and shall indicate that it is being issued by, or at the direction of, the person or persons calling the meeting. If mailed, such notice shall be directed to each such Member entitled to vote at the Member's address as it appears on the records of the Members of the Company, unless he or she has previously notified the Manager of the Company in writing that notices intended for the Member to be

13

JA569

CONFIDENTIAL

MARTORELLO_000311

mailed to the **Member's agent and/or some other address, in which case, it shall be mailed to the person and** address designated in such request.

(ii)     Notice of any meeting need not be given to any person who may become a Member of record after the mailing of such notice and prior to the meeting, or to any Member who attends such meeting in person or by proxy, or to any Member who, in person or by proxy, submits a signed waiver of notice either before or after such meeting. Holders of non-voting Classes of Membership Interest shall only be permitted to attend Member meetings if they receive advance written permission of the Manager, which permission the Manager may withhold in his sole discretion.

(iii)     Whenever the vote of the Members at a meeting thereof is required or permitted to be taken in connection with any Company action, by any Section of this Agreement, the meeting and vote of the Members may be dispensed with, if all other Members who would have been entitled to vote upon the action if such meeting were held, shall consent in writing to such Company action being taken.

(iv)     Whenever any notice is required to be given under the provisions of this Section, or under the provisions of the Articles, a waiver thereof in writing, signed by the person or persons entitled to said notice, whether before or after the time stated in said notice, shall be deemed equivalent thereto.

E.     <u>Quorum</u>.  Except as otherwise provided herein, or by the applicable provisions of the Delaware Code, or in the Articles, at all meetings of the Members of the Company, the presence at the commencement of such meetings in person or by proxy of any number of Members holding of record a majority of the total number of the Class A Voting Interests of the Company then issued and outstanding and entitled to vote shall be necessary and sufficient to constitute a quorum for the transaction of any business.  The withdrawal of any Member holding Class A Voting Interests after the commencement of a meeting shall have no effect on the existence of a quorum after a quorum has been established at such meeting.

F.     <u>Voting</u>.

(i)     Except as otherwise provided by the Articles, any Company action to be taken by vote of the Members shall be authorized by a majority of votes cast at a meeting of Members at which a quorum is present by the holders of Class A Voting Interest.

(ii)     Each Member entitled to vote or to express consent or dissent without a meeting, may do so by proxy; provided, however, that the instrument authorizing such proxy to act shall have been executed in writing by the Member or the Member's attorney in fact thereunto duly authorized in writing.  No proxy shall be valid after expiration of eleven (11) months from the date of its execution, unless the person executing same directs in said proxy that it shall continue in force for a longer period of time.  Such instrument shall be exhibited to the Manager at the meeting and shall be filed with the records of the Company.

(iii)     Class A Voting Interest registered in the name of another entity, if entitled to be voted, may be voted by the President (or the equivalent) of said entity or a proxy appointed by the President of such other entity, unless some other person has been appointed to vote such shares pursuant to a by-law or a resolution of the board of directors (or the equivalent) of such other entity, in which case such person may vote such Class A Voting Interest. Any fiduciary may vote Class A Voting Interest registered in the name of such entity as such fiduciary, either in person or by proxy.

(iv)     Any resolution in writing, signed by all the Class A Voting Interest, shall be and constitute action by such members to the effect therein expressed, with the same force and effect as if the same had been duly passed by fifty-one percent (51%) of the Class A Voting Interests at a duly called meeting of members of such resolution.

14

JA570

CONFIDENTIAL

MARTORELLO_000312

# SECTION VII
## EXCULPATION OF LIABILITY; INDEMNIFICATION

A.    <u>Liability of Members to the Company and One Another</u>.  No Member shall be liable for the debts, liabilities, contracts, or any other obligation of the Company, except to the extent expressly provided herein or under Delaware law, or as expressly provided otherwise.  No Member shall be liable for the debts or liabilities of any other Member.  With respect to the Company and its business and the enterprise established by this Agreement, no Member shall be liable, responsible or accountable in damages or otherwise to the Company or any other Member for any act performed by it (i) within the scope of the authority conferred on it by this Agreement and in good faith; (ii) based on the good faith opinion of legal counsel or other appropriate expert; or (iii) otherwise made in good faith.

B.    <u>Indemnification</u>.

(i)    Except as otherwise provided in this Section, the Company shall indemnify the Member and may indemnify any employee or agent of the Company who was or is a party or is threatened to be made a party to a threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, or investigative, and whether formal or informal, other than an action by or in the right of the Company, by reason of the fact that such person is or was an Member, employee or agent of the Company, against expenses, including attorneys**' fees, judgments, penalties, fines and amounts paid in settlement actually and reasonably** incurred by such person in connection with the action, suit or proceeding, if the person acted in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner that such person reasonably believed to be in the best interests of the Company and with respect to a criminal action or proceeding, if such person had no reasonable cause to believe such **person's conduct was** unlawful.

(ii)    To the extent that any Member, employee or agent of the Company has been successful on the merits or otherwise in defense of an action, suit or proceeding or in defense of any claim, issue or other matter in the action, suit or proceeding, such person shall be indemnified against actual and reasonable **expenses, including attorneys' fees, incurred by such person in connection with the action, suit or proceeding** and any action, suit or proceeding brought to enforce the mandatory indemnification provided herein.

(iii)    Any indemnification permitted under this Section, unless ordered by a court, shall be made by the Company only as authorized in the specific case upon a determination that the indemnification is proper under the circumstances because the person to be indemnified has met the applicable standard of conduct and upon an evaluation of the reasonableness of expenses and amounts paid in settlement. This determination and evaluation shall be made by a majority vote of the Members who are not parties or threatened to be made parties to the action, suit or proceeding. Notwithstanding the foregoing to the contrary, no indemnification shall be provided to any manager, employee or agent of the Company for or in connection with the receipt of a financial benefit to which such person is not entitled, voting for or assenting to a distribution to the Members in violation of this Agreement or the Act, or a knowing violation of law.

# SECTION VIII
## DISSOLUTION AND LIQUIDATION

A.    <u>Dissolution</u>. The Company shall dissolve and its affairs shall be wound up on the first to occur of the following:

(i)    The written consent of the Members holding at least fifty-one percent of the Class A Voting Interests;

JA571

CONFIDENTIAL

MARTORELLO_000313

(ii)    The entry of a decree of judicial dissolution of the Company under Section 1801(4) of the Act or a judicial determination under Section 1805(5) of the Act.

(iii)    The sale of all or substantially all of the assets of the Company.

The death, insanity, retirement, resignation, expulsion, bankruptcy, or dissolution of any Member, or the occurrence of any other event that terminates the continued membership of a Member in the Company, shall not cause a dissolution of the Company.

B.    <u>Liquidation</u>.  On dissolution of the Company, the Manager shall act as liquidator.  The liquidator shall proceed diligently to wind up the affairs of the Company and make final distributions as provided herein and in the Act.  The costs of liquidation shall be borne as a Company expense.  Until final distribution, the liquidator shall continue to manage the Company with all of the power and authority of the Manager.

## SECTION IX
## CONFIDENTIALITY; NON-DISCLOSURE; NON-SOLICITATION; AND NON-COMPETE

Each Member of the Company shall be required to execute, prior to the issuance of any interest in the Company, a separate confidentiality, non-disclosure, non-solicitation and non-compete agreement.

## SECTION X
## BOOKS AND RECORDS

A.    <u>Access to Books and Records</u>.  Upon the written request stating the reason for such request of any holder of Class B or Class C Membership Interest for purposes reasonably related to the interest of that person as a Member, the Manager shall permit said Member the right, upon reasonable notice for the purposes reasonably related to the interest of the person as a Member, to (i) inspect during normal business hours any of the Company records maintained by the Company that were created on or after the date said Member acquired his/her Membership Interest; and (ii) obtain from the Manager, promptly after their becoming available, a copy of the Company's federal, state, and local income tax or information returns for each Fiscal Year.

B.    <u>No Access to Information</u>.  Notwithstanding any right of access to the books and records of the Company that may be applicable, under no circumstances shall any books or records be deemed to include any books and records concerning the information deemed to be covered by the agreements executed pursuant to Section IX, and all non-voting Classes and Interests hereby irrevocably waive any access whatsoever to any of said information.  All non-voting Classes and Interests hereby covenant and agree that it is unreasonable and otherwise improper under all circumstances to demand access to said information.

## SECTION XI
## MISCELLANEOUS PROVISIONS

A.    <u>Section Headings</u>.  The Section headings and numbers contained in this Agreement have been inserted only as a matter of convenience and for reference, and in no way shall be construed to define, limit or describe the scope or intent of any provision of this Agreement.

B.    <u>Severability</u>.  The invalidity or unenforceability of any particular provision of this Agreement shall not affect the other provisions hereof, and this Agreement shall be construed in all respects as if such invalid or unenforceable provisions were omitted.

16

JA572

CONFIDENTIAL

MARTORELLO_000314

C.    Amendment.  This Agreement may be amended or revoked at any time, in writing, with the consent of the Manager or a vote of the Members holding fifty-one percent (51%) of the outstanding Class A Voting Interests. No change or modification to this Agreement shall be valid unless in writing and signed by the Manager or the Members entitled to vote.

D.    Binding Effect. Subject to the provisions of this Agreement relating to transferability, this Agreement will be binding upon and shall inure to the benefit of the parties, and their respective distributees, heirs, successors and assigns.

E.    Governing Law.  Regardless of the place where this Agreement may be executed by the Member, the rights and obligations of the Member, and any claims and disputes relating thereto, shall be subject to, governed by, construed and enforced in accordance with the laws of the State of Delaware.

F.    Power of Attorney.  Each Member hereby appoints the Manager to exercise the rights set forth in this Section XI F, acting individually, as the true and lawful representative of such Member and attorney-in-fact, in such Member's name, place and stead, to:

    (i)    Complete or correct, on behalf of such Member, all documents to be executed by such Member in connection with such Member's subscription for an Interest, including, without limitation, filling in or amending amounts, dates, and other pertinent information.

    (ii)    Make, execute, sign, acknowledge, swear to, and file: (i) any and all instruments, certificates, and other documents which may be deemed necessary or desirable to effect the winding-up and termination of the Company; (ii) any business certificate, fictitious name certificate, amendment thereto, or other instrument, agreement, or document of any kind necessary or desirable to accomplish the business, purpose and objectives of the Company, or required by any applicable federal, state, territorial, tribal or local law; (iii) any counterpart of this Agreement to be entered into pursuant to this Agreement and any amendment to which such Member is a signatory; (iv) any amendments to this Agreement; (v) all certificates and other instruments conforming with this Agreement that are necessary or appropriate to qualify, continue and terminate the Company as a foreign limited liability company in all such jurisdictions in which the Company may conduct its business; (vi) any and all certificates, documents, and other instruments necessary or desirable for purposes of applying to and complying with the Puerto Rico Department of Economic Development and Commerce tax incentives program; (vii) all other filings with agencies of the federal government, of any state, territorial, tribal or local government, or of any other jurisdictions, which the Manager considers necessary or desirable to carry out the purposes of this Agreement and the business of the Company.

    (iii)    This power of attorney granted pursuant to this Section XI F is a special power of attorney coupled with an interest and is irrevocable and shall survive the death, disability, or cessation of the existence as a legal entity of a Member; and shall survive the delivery of an assignment by a Member of the whole or any portion of its interest in the Company, except that, when the assignee thereof has been approved by the Manger for admission to the Company as a Member, the power of attorney shall survive the delivery of such assignment for the sole purpose of enabling the Manger to execute, acknowledge, and file any instrument necessary to effect such substitution.

G.    Waiver of Certain Rights.  All holders of non-voting Classes of Membership Interest irrevocably waive any right they may have to maintain any action for dissolution of the Company or for partition of the property of the Company.

H.    Arbitration.

    (i)    Any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled by arbitration administered by the American Arbitration Association in accordance with its

17

JA573

                                          MARTORELLO_000315

Commercial Arbitration Rules, and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. The prevailing party shall recover its costs and expenses of arbitration and the collection of the award, including its reasonable attorney fees.

(ii)     Solely upon agreement of the parties, the parties may dispense with administration by the American Arbitration Association and agree to self-administer any dispute or, alternatively, agree to have the dispute administered by any other agreed upon organization/tribunal and pursuant to any other agreed upon rules.

(iii)     Any self-administered arbitration shall be conducted in English before an arbitrator chosen by the parties and who shall reside in the Commonwealth of Puerto Rico.  Any certified mediator in Puerto Rico shall be deemed to have the minimum qualifications to arbitrate the dispute.  The parties shall split the **arbitrator's fees, including any required** prepayment deposit.  The arbitration shall be governed by the **Commercial Rules of the American Arbitration Association ("AAA") including the Fast Track/Expedited** Procedures except as modified herein.  Within 10 days of the written notice and a demand for arbitration, the parties shall provide to each other the names of 3 persons residing in Puerto Rico, who would be acceptable as arbitrators.  If the parties agree on any person, that person shall be chosen as the arbitrator.  If the agreed upon person declines to act as the arbitrator for any reason, the parties shall have 5 days to submit alternate names. If the parties are unable to agree on an arbitrator within 25 days of the written notice and demand for arbitration, either party may proceed with AAA administered arbitration pursuant to clause (a) above.  If an arbitrator is agreed upon, the final arbitration hearing shall commence within 120 days of the arbitrator being chosen. The arbitrator shall hold an initial hearing, which may be held telephonically, and shall enter a scheduling order. The parties may, but are not required, to mediate the case prior to the final hearing.  The parties may modify these rules to the extent there is agreement by the parties to do so.  The decision of the arbitrator shall be final and binding.  Judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.

I.     <u>Entire Agreement</u>.   This Agreement, including Schedules, supersedes all previous Operating Agreements entered into by the Company.

[SIGNATURES TO FOLLOW ON SCHEDULE A]

18

JA574

CONFIDENTIAL

MARTORELLO_000316

SCHEDULE A
OF
THE AMENDED AND RESTATED OPERATING AGREEMENT
OF
BELLICOSE CAPITAL, LLC

MEMBER LISTING/INTEREST/PERCENTAGE INTEREST

| Interest | Voting Interest | Date Issued | Economic Interest | Date Issued | Equity Interest | Date Issued |
|---|---|---|---|---|---|---|
| **Class A Membership Interest: Member:** | | | | | | |
| Alpha Tau Capital, LLC | 1,000 Units (100%) | 1/1/2014 | 700 Units (70%) | 1/1/2014 | 1,000 Units (100%) | 1/1/2014 |
| MBM Services, LLC | 0 Units (0%) | | 300 Units (30%) | | 0 Units (0%) | |
| **Class B Membership Interest: Member:** | | | | | | |
| Alpha Tau Capital, LLC | N/A | | 600 Units (60.0%) | 1/1/2014 | 855 Units (85.5%) | 1/1/2014 |
| MBM Services, LLC | N/A | | 255 Units (25.5%) | 1/1/2014 | 0 Units (0%) | |
| Justin Martorello | N/A | | 100 Units (10.0%) | 1/1/2014 | 100 Units (10.0%) | 1/1/2014 |
| Brian McFadden | N/A | | 15 Units (1.5%) | 7/1/2014 | 15 Units (1.5%) | 7/1/2014 |
| James Dowd | N/A | | 15 Units (1.5%) | 7/1/2014 | 15 Units (1.5%) | 7/1/2014 |
| Simon Liang | N/A | | 15 Units (1.5%) | 7/1/2014 | 15 Units (1.5%) | 7/1/2014 |
| **Class C Membership Interest: Member:** | | | | | | |
| Alpha Tau Capital, LLC | N/A | | 800 Units (80%) | 1/1/2014 | 800 Units (80%) | 1/1/2014 |
| Justin Martorello | N/A | | 200 Units (20%) | 1/1/2014 | 200 Units (20%) | 1/1/2014 |

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement on and as of the date first above written.

ACCEPTED AND AGREED:

By: _____
Name: Alpha Tau Capital
By the President of its Manager, Matt Martorello
Title:  Class A, B & C Member

By: _____
Name: MBM Services, LLC
By its President, Matt Martorello
Title: Class A & B Member

By: _____
Name: Justin Martorello
Title:  Class B & C Member

By: _____
Name: Brian McFadden
Title: Class B Member

19

JA575

CONFIDENTIAL

MARTORELLO_000317

By: _____        By: _____
Name: James Dowd                           Name: Simon Liang
Title:  Class B Member                     Title: Class B Member

JA576

CONFIDENTIAL                                                    MARTORELLO_000318

**SCHEDULE A**
**OF**
**THE AMENDED AND RESTATED OPERATING AGREEMENT**
**OF**
**BELLICOSE CAPITAL, LLC**

**MEMBER LISTING/INTEREST/PERCENTAGE INTEREST**

| Interest | Voting Interest | Date Issued | Economic Interest | Date Issued | Equity Interest | Date Issued |
|---|---|---|---|---|---|---|
| Class A Membership Interest: Member: | | | | | | |
| Alpha Tau Capital, LLC | 1,000 Units (100%) | 1/1/2014 | 700 Units (70%) | 1/1/2014 | 1,000 Units (100%) | 1/1/2014 |
| MBM Services, LLC | 0 Units (0%) | | 300 Units (30%) | 1/1/2014 | 0 Units (0%) | |
| Class B Membership Interest: Member: | | | | | | |
| Alpha Tau Capital, LLC | N/A | | 600 Units (60.0%) | 1/1/2014 | 855 Units (85.5%) | 1/1/2014 |
| MBM Services, LLC | N/A | | 255 Units (25.5%) | 1/1/2014 | 0 Units (0%) | |
| Justin Martorello | N/A | | 100 Units (10.0%) | 1/1/2014 | 100 Units (10.0%) | 1/1/2014 |
| Brian McFadden | N/A | | 15 Units (1.5%) | 7/1/2014 | 15 Units (1.5%) | 7/1/2014 |
| James Dowd | N/A | | 15 Units (1.5%) | 7/1/2014 | 15 Units (1.5%) | 7/1/2014 |
| Simon Liang | N/A | | 15 Units (1.5%) | 7/1/2014 | 15 Units (1.5%) | 7/1/2014 |
| Class C Membership Interest: Member: | | | | | | |
| Alpha Tau Capital, LLC | N/A | | 800 Units (80%) | 1/1/2014 | 800 Units (80%) | 1/1/2014 |
| Justin Martorello | N/A | | 200 Units (20%) | 1/1/2014 | 200 Units (20%) | 1/1/2014 |

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement on and as of the date first above written.

ACCEPTED AND AGREED:

By: _____
Name: Alpha Tau Capital
By the President of its Manager, Matt Martorello
Title:  Class A, B & C Member

By: _____
Name: MBM Services, LLC
By its President, Matt Martorello
Title: Class A & B Member

By: _____
Name: Justin Martorello
Title:  Class B & C Member

By: _____
Name: Brian McFadden
Title: Class B Member

19

JA577

CONFIDENTIAL

MARTORELLO_000319

**SCHEDULE A**
**OF**
**THE AMENDED AND RESTATED OPERATING AGREEMENT**
**OF**
**BELLICOSE CAPITAL, LLC**

## MEMBER LISTING/INTEREST/PERCENTAGE INTEREST

| Interest | Voting Interest | Date Issued | Economic Interest | Date Issued | Equity Interest | Date Issued |
|---|---|---|---|---|---|---|
| Class A Membership Interest: Member: | | | | | | |
| Alpha Tau Capital, LLC | 1,000 Units (100%) | 1/1/2014 | 700 Units (70%) | 1/1/2014 | 1,000 Units (100%) | 1/1/2014 |
| MBM Services, LLC | 0 Units (0%) | | 300 Units (30%) | 1/1/2014 | 0 Units (0%) | |
| Class B Membership Interest: Member: | | | | | | |
| Alpha Tau Capital, LLC | N/A | | 600 Units (60.0%) | 1/1/2014 | 855 Units (85.5%) | 1/1/2014 |
| MBM Services, LLC | N/A | | 255 Units (25.5%) | 1/1/2014 | 0 Units (0%) | |
| Justin Martorello | N/A | | 100 Units (10.0%) | 1/1/2014 | 100 Units (10.0%) | 1/1/2014 |
| Brian McFadden | N/A | | 15 Units (1.5%) | 7/1/2014 | 15 Units (1.5%) | 7/1/2014 |
| James Dowd | N/A | | 15 Units (1.5%) | 7/1/2014 | 15 Units (1.5%) | 7/1/2014 |
| Simon Liang | N/A | | 15 Units (1.5%) | 7/1/2014 | 15 Units (1.5%) | 7/1/2014 |
| Class C Membership Interest: Member: | | | | | | |
| Alpha Tau Capital, LLC | N/A | | 800 Units (80%) | 1/1/2014 | 800 Units (80%) | 1/1/2014 |
| Justin Martorello | N/A | | 200 Units (20%) | 1/1/2014 | 200 Units (20%) | 1/1/2014 |

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement on and as of the date first above written.

ACCEPTED AND AGREED:

By: _____
Name: Alpha Tau Capital
By the President of its Manager, Matt Martorello
Title: Class A, B & C Member

By: _____
Name: MBM Services, LLC
By its President, Matt Martorello
Title: Class A & B Member

By: _____
Name: Justin Martorello
Title: Class B & C Member

By: _____
Name: Brian McFadden
Title: Class B Member

19

JA578

By: _____
Name: James Dowd
Title:  Class B Member

By: _____
Name: Simon Liang
Title: Class B Member

JA579

CONFIDENTIAL

MARTORELLO_000321

SCHEDULE A
OF
THE AMENDED AND RESTATED OPERATING AGREEMENT
OF
BELLICOSE CAPITAL, LLC

MEMBER LISTING/INTEREST/PERCENTAGE INTEREST

| Interest | Voting Interest | Date Issued | Economic Interest | Date Issued | Equity Interest | Date Issued |
|---|---|---|---|---|---|---|
| **Class A Membership Interest:** Member: | | | | | | |
| Alpha Tau Capital, LLC | 1,000 Units (100%) | 1/1/2014 | 700 Units (70%) | 1/1/2014 | 1,000 Units (100%) | 1/1/2014 |
| MBM Services, LLC | 0 Units (0%) | | 300 Units (30%) | | 0 Units (0%) | |
| | | | | | | |
| **Class B Membership Interest:** Member: | | | | | | |
| Alpha Tau Capital, LLC | N/A | | 600 Units (60.0%) | 1/1/2014 | 855 Units (85.5%) | 1/1/2014 |
| MBM Services, LLC | N/A | | 255 Units (25.5%) | 1/1/2014 | 0 Units (0%) | |
| Justin Martorello | N/A | | 100 Units (10.0%) | 1/1/2014 | 100 Units (10.0%) | 1/1/2014 |
| Brian McFadden | N/A | | 15 Units (1.5%) | 7/1/2014 | 15 Units (1.5%) | 7/1/2014 |
| James Dowd | N/A | | 15 Units (1.5%) | 7/1/2014 | 15 Units (1.5%) | 7/1/2014 |
| Simon Liang | N/A | | 15 Units (1.5%) | 7/1/2014 | 15 Units (1.5%) | 7/1/2014 |
| | | | | | | |
| **Class C Membership Interest:** Member: | | | | | | |
| Alpha Tau Capital, LLC | N/A | | 800 Units (80%) | 1/1/2014 | 800 Units (80%) | 1/1/2014 |
| Justin Martorello | N/A | | 200 Units (20%) | 1/1/2014 | 200 Units (20%) | 1/1/2014 |

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement on and as of the date first above written.

ACCEPTED AND AGREED:


By: _____
Name: Alpha Tau Capital
By the President of its Manager, Matt Martorello
Title:  Class A, B & C Member


By: _____
Name: Justin Martorello
Title:  Class B & C Member


By: _____
Name: MBM Services, LLC
By its President, Matt Martorello
Title: Class A & B Member


By: _____
Name: Brian McFadden
Title: Class B Member

19

JA580

CONFIDENTIAL

MARTORELLO_000322

By: _____
Name: James Dowd
Title: Class B Member

By: _____
Name: Simon Liang
Title: Class B Member

JA581

CONFIDENTIAL

MARTORELLO_000323

USCA4 Appeal: 23-2097   Doc: 11-2   Filed: 12/06/2023   Pg: 126 of 493

# Exhibit 18

Message

**From**: John Evans [john.evans@csb.co.ck]
**Sent**: 8/8/2013 6:06:05 PM
**To**: Matt Martorello [mattm@bellicosevi.com]
**Subject**: RE: Valuation Method

Thank you Matt,

Appreciate the documents you have sent through,

These should be more than adequate however I'll let you know if I have any questions,

Kind Regards
John

**John Evans** | Operations Manager, Capital Security Bank Limited

| | | | |
|---|---|---|---|
| Phone | (+682) 22505 | Centerpoint | |
| Fax | (+682) 22506 | Main Road, Avarua | |
| Skype | john-csb | PO Box 906 | |
| Email | john.evans@csb.co.ck | Rarotonga, Cook Islands | |
| Web | www.capitalsecuritybank.com | |  |
| US Free Fax | (+1) 800 863 0056 | | |

**"Important Note – CSB's USD correspondent will be changing as of the 30th June 2013. Click here for our new details."**

This communication (including any files or text attached to it) is confidential and may also be privileged. It is intended only for the recipient(s) named above. If you are not an intended recipient, you must not read, copy, use or disclose this communication to any other person. Please also notify us immediately by telephoning (+682) 22505, or replying to this communication, and then delete all copies of it from your system.

**From:** Matt Martorello [mailto:mattm@bellicosevi.com]
**Sent:** Thursday, 8 August 2013 5:50 a.m.
**To:** John Evans
**Subject:** FW: Valuation Method

This might help as well.

**From:** Argyros, John (VG - British Virgin Islands) [mailto:jargyros@DELOITTE.com]
**Sent:** Friday, March 8, 2013 10:18 AM
**To:** Matt Martorello; Simon Liang
**Cc:** White, Richard (VG - Road-Town); Hyndman, Michele (VG - British Virgin Islands); Kondrateva, Tatyana (VG - British Virgin Islands)
**Subject:** RE: Valuation Method

Good morning Matt,

Please find attached our final Valuation Report with AOI and ICA names corrected.

I hope that you have a good day and please let me know should you require further assistance from us in this regard.

Many thanks,

CONFIDENTIAL PURSUANT TO
PARTIES' PROTECTIVE ORDER

John Argyros
Manager
Financial Advisory Services
Deloitte & Touche

**British Virgin Islands**
Wickham's Cay 1, PO Box 3083, Road Town, Tortola
VG1110 | British Virgin Islands
Tel: + 1 (284) 494 2868 Ext. 2015 | Fax: + 1 (284) 494 7889 | Mobile: +1 (284) 346 2015

**U.S. Virgin Islands**
9100 Port of Sale Mall, Suite #13
St. Thomas |US Virgin Islands | 00802-3602
Tel: + 1 (340) 715 2868 | Fax: + 1 (340) 776 7889

jargyros@deloitte.com | www.deloitte.com

---

**From:** Matt Martorello [mailto:mattm@bellicosevi.com]
**Sent:** 05 March 2013 15:15
**To:** Argyros, John (VG - British Virgin Islands); Simon Liang
**Cc:** White, Richard (VG - Road-Town); Hyndman, Michele (VG - British Virgin Islands); Kondrateva, Tatyana (VG - British Virgin Islands)
**Subject:** RE: Valuation Method

Looks good. Only need to get AOI and ICA names corrected in the final version.

**Regards,**

**Matt Martorello**
Mobile: 773-209-7720
Email: MattM@BellicoseVI.com

**BELLICOSE VI**

**This email and any files transmitted with it are confidential and contain privileged or copyright information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

---

**From:** Argyros, John (VG - British Virgin Islands) [mailto:jargyros@DELOITTE.com]
**Sent:** Tuesday, March 05, 2013 11:54 AM
**To:** Matt Martorello; Simon Liang
**Cc:** White, Richard (VG - Road-Town); Hyndman, Michele (VG - British Virgin Islands); Kondrateva, Tatyana (VG - British Virgin Islands)
**Subject:** RE: Valuation Method

Good morning Matt,

Thank you for your e-mail.

Please find attached our Valuation report version 2. Please will you review the report and if you are happy with it then we shall send you our final version.

CONFIDENTIAL PURSUANT TO
PARTIES' PROTECTIVE ORDER

JA584
MARTORELLO_038980

Many thanks and have a great day,

**John Argyros**
Manager
Financial Advisory Services
Deloitte & Touche

**British Virgin Islands**
Wickham's Cay 1, PO Box 3083, Road Town, Tortola
VG1110 | British Virgin Islands
Tel: + 1 (284) 494 2868 Ext. 2015 | Fax: + 1 (284) 494 7889 | Mobile: +1 (284) 346 2015

**U.S. Virgin Islands**
9100 Port of Sale Mall, Suite #13
St. Thomas |US Virgin Islands | 00802-3602
Tel: + 1 (340) 715 2868 | Fax: + 1 (340) 776 7889

jargyros@deloitte.com | www.deloitte.com

---

**From:** Matt Martorello [mailto:mattm@bellicosevi.com]
**Sent:** 04 March 2013 17:58
**To:** Simon Liang; Argyros, John (VG - British Virgin Islands)
**Cc:** White, Richard (VG - Road-Town); Hyndman, Michele (VG - British Virgin Islands); Kondrateva, Tatyana (VG - British Virgin Islands)
**Subject:** RE: Valuation Method

Hi John, I just want to make sure you guys are on track and communicating with Michele on the valuation.

**Regards,**

**Matt Martorello**
Mobile: 773-209-7720
Email: MattM@BellicoseVI.com



**This email and any files transmitted with it are confidential and contain privileged or copyright information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

---

**From:** Simon Liang
**Sent:** Wednesday, February 27, 2013 4:56 PM
**To:** Argyros, John (VG - British Virgin Islands); Matt Martorello
**Cc:** White, Richard (VG - Road-Town); Rebecca Martorello
**Subject:** RE: Valuation Method

John, please see my answers below. Thank you.

Regards,

Simon Liang
Office: 340-715-1807
Mobile: 773-677-6962

---

CONFIDENTIAL PURSUANT TO
PARTIES' PROTECTIVE ORDER

Email: SL@BellicoseVI.com



**This email and any files transmitted with it are confidential and contain privileged or copyright information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

---

**From:** Argyros, John (VG - British Virgin Islands) [mailto:jargyros@DELOITTE.com]
**Sent:** Wednesday, February 27, 2013 2:18 PM
**To:** SL@bellicosevi.com; mattm@bellicosevi.com
**Cc:** White, Richard (VG - Road-Town); rh@bellicosevi.com
**Subject:** RE: Valuation Method

Good afternoon Simon,

After reviewing and updating our valuation model please could you assist me with the following:

1) Per inspection of the Balance Sheet of Bellicose VI there is no longer an investment in Bellicose Management ("BM"). There is now an investments in "GMK". Has BM changed its name to "GMK" and is this the acronym for Green Key Marketings, LLC? I realise that the GMK does not provide an exact acronym for Green Key Marketings but I am assuming that this is perhaps a typo.*[Simon Liang]* BellicoseVI Management, LLC was changed to BC Brokerage, LLC. None of them is on BVI balance sheet because they didn't have any business activities in 2012. The previously recorded capital contribution was the payment of legal services and we believe it should be expensed by BVI. Green Key Markets, LLC is a different entity and not related to BVM.
2) Per inspection of the Balance Sheet of Source Point VI ("SP") I have noticed that there is a "Notes Receivable – LVD". Could you please let me know the full name of "LVD"?*[Simon Liang]* Lac Vieux Desert Band of Lake Superior Chippewa Indians borrowed $200K from SPVI on 12/27/12.
3) IFI has a loan receivable from "TFB VI, LLC" – Could you please clarify whether this is the full name of this entity or is the TFB an acronym? IFI also has notes payable to "TJA", "TPA" and "CPS". Could you please clarify the full names for these acronyms?*[Simon Liang]* Yes, TFB VI, LLC is the full name of the entity and it is owned by 7X. The three debt investors are: Timothy P. Arenberg, Terrence J. Arenberg and Columbia Pipe & Supply, Co.
4) Per inspection of the Income Statement of SP I have noticed that there does not appear to be any rent/payroll expenses for the period to 31 December 2012. Is there perhaps a reason for this omission and based on your response are these expenses still forecast to occur in 2013 and 2014?*[Simon Liang]* We plan to allocate part of BVI rent and payroll expenses to SPVI and that is why they are shown on the pro forma, but are not shown in SPVI 2012 income statement.

Thank you for your assistance with the above Simon and I hope that you have a good day,

**John Argyros**
Manager
Financial Advisory Services
Deloitte & Touche

**British Virgin Islands**
Wickham's Cay 1, PO Box 3083, Road Town, Tortola
VG1110 | British Virgin Islands
Tel: + 1 (284) 494 2868 Ext. 2015 | Fax: + 1 (284) 494 7889 | Mobile: +1 (284) 346 2015

**U.S. Virgin Islands**
9100 Port of Sale Mall, Suite #13
St. Thomas |US Virgin Islands | 00802-3602
Tel: + 1 (340) 715 2868 | Fax: + 1 (340) 776 7889

CONFIDENTIAL PURSUANT TO
PARTIES' PROTECTIVE ORDER

jargyros@deloitte.com | www.deloitte.com

---

**From:** Argyros, John (VG - British Virgin Islands)
**Sent:** 26 February 2013 17:43
**To:** 'SL@bellicosevi.com'; mattm@bellicosevi.com
**Cc:** White, Richard (VG - Road-Town); rh@bellicosevi.com
**Subject:** RE: Valuation Method

Thank you Simon, I shall be in touch soon with our draft report for your final review.

Many thanks and have a good evening,

**John Argyros**
Manager
Financial Advisory Services
Deloitte & Touche

**British Virgin Islands**
Wickham's Cay 1, PO Box 3083, Road Town, Tortola
VG1110 | British Virgin Islands
Tel: + 1 (284) 494 2868 Ext. 2015 | Fax: + 1 (284) 494 7889 | Mobile: +1 (284) 346 2015

**U.S. Virgin Islands**
9100 Port of Sale Mall, Suite #13
St. Thomas |US Virgin Islands | 00802-3602
Tel: + 1 (340) 715 2868 | Fax: + 1 (340) 776 7889

jargyros@deloitte.com | www.deloitte.com

---

**From:** SL@bellicosevi.com [mailto:SL@bellicosevi.com]
**Sent:** 26 February 2013 10:36
**To:** Argyros, John (VG - British Virgin Islands); mattm@bellicosevi.com
**Cc:** White, Richard (VG - Road-Town); rh@bellicosevi.com
**Subject:** RE: Valuation Method

John,

BVI and its subsidiaries' 2012 financials are attached. Depreciation and amortization will be recorded according to tax return calculation. Please let us know if you have any questions. Thank you.

Regards,

Simon Liang
Office: 340-715-1807
Mobile: 773-677-6962
Email: SL@BellicoseVI.com


BELLICOSE VI

CONFIDENTIAL PURSUANT TO
PARTIES' PROTECTIVE ORDER

**This email and any files transmitted with it are confidential and contain privileged or copyright information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

**From:** Argyros, John (VG - British Virgin Islands) [mailto:jargyros@DELOITTE.com]
**Sent:** Wednesday, February 06, 2013 11:39 AM
**To:** mattm@bellicosevi.com
**Cc:** White, Richard (VG - Road-Town); rh@bellicosevi.com; SL@bellicosevi.com
**Subject:** RE: Valuation Method

Hi Matt,

To make payment by wire transfer, please use the following details:

Instructions to:
Wachovia Bank, New York
Swift Code: PNBPUS3NNYC ABA Code: 026005092

For initial credit to:
FirstCaribbean International Bank (Cayman) Limited, British Virgin Islands
Swift Code: FCIBVGVG
Account Number 2000192005393

And Onward Credit To:
Deloitte & Touche, British Virgin Islands
Account Number 215266893

Many thanks,

**John Argyros**
Manager
Financial Advisory Services
Deloitte & Touche

**British Virgin Islands**
Wickham's Cay 1, PO Box 3083, Road Town, Tortola
VG1110 | British Virgin Islands
Tel: + 1 (284) 494 2868 Ext. 2015 | Fax: + 1 (284) 494 7889 | Mobile: +1 (284) 346 2015

**U.S. Virgin Islands**
9100 Port of Sale Mall, Suite #13
St. Thomas |US Virgin Islands | 00802-3602
Tel: + 1 (340) 715 2868 | Fax: + 1 (340) 776 7889

jargyros@deloitte.com | www.deloitte.com

**From:** mattm@bellicosevi.com [mailto:mattm@bellicosevi.com]
**Sent:** 06 February 2013 11:22
**To:** Argyros, John (VG - British Virgin Islands)
**Cc:** White, Richard (VG - Road-Town); rh@bellicosevi.com; SL@bellicosevi.com
**Subject:** RE: Valuation Method

CONFIDENTIAL PURSUANT TO
PARTIES' PROTECTIVE ORDER

Could be the case. Please send me wire info to make payment.

**Regards,**

**Matt Martorello**
Mobile: 773-209-7720
Email: MattM@BellicoseVI.com



**This email and any files transmitted with it are confidential and contain privileged or copyright information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

**From:** Argyros, John (VG - British Virgin Islands) [mailto:jargyros@DELOITTE.com]
**Sent:** Wednesday, February 06, 2013 11:14 AM
**To:** mattm@bellicosevi.com
**Cc:** White, Richard (VG - Road-Town)
**Subject:** RE: Valuation Method

Good morning Matt,

I hope that you are well.

I just wanted to follow up on our invoice number 2369 attached. I believe per our debtors department that this amount is outstanding. Would you perhaps be able to look into this on our behalf?

Furthermore, I have attached our final invoice for the valuation performed.

I look forward to hearing from you soon and I await receipt of the final numbers for our use in the valuation.

Many thanks and have a good day,

**John Argyros**
Manager
Financial Advisory Services
Deloitte & Touche

**British Virgin Islands**
Wickham's Cay 1, PO Box 3083, Road Town, Tortola
VG1110 | British Virgin Islands
Tel: + 1 (284) 494 2868 Ext. 2015 | Fax: + 1 (284) 494 7889 | Mobile: +1 (284) 346 2015

**U.S. Virgin Islands**
9100 Port of Sale Mall, Suite #13
St. Thomas |US Virgin Islands | 00802-3602
Tel: + 1 (340) 715 2868 | Fax: + 1 (340) 776 7889

jargyros@deloitte.com | www.deloitte.com

**From:** SL@bellicosevi.com [mailto:SL@bellicosevi.com]
**Sent:** 31 January 2013 19:28
**To:** Argyros, John (VG - British Virgin Islands)

CONFIDENTIAL PURSUANT TO
PARTIES' PROTECTIVE ORDER

IA589
MARTORELLO_038985

**Cc:** mattm@bellicosevi.com; White, Richard (VG - Road-Town)
**Subject:** Re: Valuation Method

We will send them to you as soon as BVI's ready.


Regards,

Simon Liang
Mobile: 773-677-6962
Office: 340-715-1807
Email: SL@BellicoseVI.com


On Jan 31, 2013, at 7:26 PM, "SL@bellicosevi.com" <SL@bellicosevi.com> wrote:

> Hi John,
>
> Financials for most of BVI subsidiaries are done. BVI financials will be available in middle of February. We will send them all to you as soon as poss
>
>
> Regards,
>
> Simon Liang
> Mobile: 773-677-6962
> Office: 340-715-1807
> Email: SL@BellicoseVI.com
>
>
> On Jan 30, 2013, at 3:18 PM, "Argyros, John (VG - British Virgin Islands)" <jargyros@DELOITTE.com> wrote:
>
>> Good afternoon Matt and Simon,
>>
>> I hope that you are both well.
>>
>> I just wanted to follow up on our e-mail below. We need the 12/31 financials to finalize our valuation report. Do you perhaps know when these may be completed and ready for us to utilize in our report?
>>
>> Many thanks,
>>
>> **John Argyros**
>> Manager
>> Financial Advisory Services
>> Deloitte & Touche
>>
>> **British Virgin Islands**
>> Wickham's Cay 1, PO Box 3083, Road Town, Tortola
>> VG1110 | British Virgin Islands
>> Tel: + 1 (284) 494 2868 Ext. 2015 | Fax: + 1 (284) 494 7889 | Mobile: +1 (284) 346 2015
>>
>> **U.S. Virgin Islands**

CONFIDENTIAL PURSUANT TO
PARTIES' PROTECTIVE ORDER

9100 Port of Sale Mall, Suite #13
St. Thomas |US Virgin Islands | 00802-3602
Tel: + 1 (340) 715 2868 | Fax: + 1 (340) 776 7889

jargyros@deloitte.com | www.deloitte.com

---

**From:** White, Richard (VG - Road-Town)
**Sent:** 11 January 2013 17:11
**To:** mattm@bellicosevi.com; Argyros, John (VG - British Virgin Islands)
**Cc:** SL@bellicosevi.com
**Subject:** RE: Valuation Method

Thanks Matt

**Richard White**
Director
Deloitte & Touche
Telephone: +1 (284) 494 2868 ext: 2012 | Cell: +1 (284) 346 2012
www.deloitte.com

---

**From:** mattm@bellicosevi.com [mailto:mattm@bellicosevi.com]
**Sent:** Friday, January 11, 2013 5:09 PM
**To:** Argyros, John (VG - British Virgin Islands)
**Cc:** White, Richard (VG - Road-Town); SL@bellicosevi.com
**Subject:** RE: Valuation Method

Only a few comments:

-Page i - last sentence of objectives should read, "In order to change the classification of the Bellicose parent company from "C" corporation to LLC."
-Page 7 - please remove strengths listed: "Compliant to an extent" and "State gov unlikely to enforce criminal liability…"
-Page 10 - fee paid to Jennifer Gallaway for legal services
-Page 11 - WMS is due to terminate in the 1st quarter of 2013
-Page 13 - Salaries and prof fees are paid to… BVI employs a financial analyst that time is allocated to as used. O/H is allocated as well, and professional fees is legal. My time is also allocated to salaries.

We will get you 12/31 financials when they are done for you to finalize the report, thanks.

**Regards,**

**Matt Martorello**
Mobile: 773-209-7720
Email: MattM@BellicoseVI.com

**This email and any files transmitted with it are confidential and contain privileged or copyright information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

IA591
MARTORELLO_038987

**From:** Argyros, John (VG - British Virgin Islands) [mailto:jargyros@DELOITTE.com]
**Sent:** Wednesday, January 09, 2013 12:49 PM
**To:** mattm@bellicosevi.com
**Cc:** White, Richard (VG - Road-Town); SL@bellicosevi.com
**Subject:** RE: Valuation Method

Good afternoon Matt,

I hope that you are well.

Please find attached our first draft valuation report. Please review the report and feel free to ask either Richard or I any questions which you may have.

In order for us to finalise the report we shall need:

1) The Statement of Financial Position of all entities as at 31 December 2012;
2) The Statement of Comprehensive Income for SP from October – December 2012. We have the figures per your updated Pro forma statement sent to us, however, I am not sure as to whether these are final or not.
3) The Statement of Comprehensive Income for ICA for the year ended 31 December 2012. Our report has utilised budgeted figures and not the actual results.

I hope that you have a good day and I look forward to hearing from you soon,

**John Argyros**
Manager
Financial Advisory Services
Deloitte & Touche

**British Virgin Islands**
Wickham's Cay 1, PO Box 3083, Road Town, Tortola
VG1110 | British Virgin Islands
Tel: + 1 (284) 494 2868 Ext. 2015 | Fax: + 1 (284) 494 7889 | Mobile: +1 (284) 346 2015

**U.S. Virgin Islands**
9100 Port of Sale Mall, Suite #13
St. Thomas |US Virgin Islands | 00802-3602
Tel: + 1 (340) 715 2868 | Fax: + 1 (340) 776 7889

jargyros@deloitte.com | www.deloitte.com

---

**From:** Argyros, John (VG - British Virgin Islands)
**Sent:** 22 December 2012 08:43
**To:** 'mattm@bellicosevi.com'
**Cc:** White, Richard (VG - Road-Town); SL@bellicosevi.com
**Subject:** RE: Valuation Method

Hi Matt,

Thank you for sending us this information. It is certainly a fascinating forecast and we look forward to gaining further insights into the model once we have received it.

CONFIDENTIAL PURSUANT TO
PARTIES' PROTECTIVE ORDER

Have a good weekend and speak soon,

**John Argyros**
Manager
Financial Advisory Services
Deloitte & Touche

**British Virgin Islands**
Wickham's Cay 1, PO Box 3083, Road Town, Tortola
VG1110 | British Virgin Islands
Tel: + 1 (284) 494 2868 Ext. 2015 | Fax: + 1 (284) 494 7889 | Mobile: +1 (284) 346 2015

**U.S. Virgin Islands**
9100 Port of Sale Mall, Suite #13
St. Thomas |US Virgin Islands | 00802-3602
Tel: + 1 (340) 715 2868 | Fax: + 1 (340) 776 7889

jargyros@deloitte.com | www.deloitte.com

---

**From:** mattm@bellicosevi.com [mailto:mattm@bellicosevi.com]
**Sent:** 21 December 2012 20:28
**To:** Argyros, John (VG - British Virgin Islands)
**Cc:** White, Richard (VG - Road-Town); SL@bellicosevi.com
**Subject:** RE: Valuation Method

Sorry for the delay, but figuring out how to price all of these risks into our forecasts is pretty interesting. I can say that b/w the having 1 Tribal client thing and having high risk of losing their bank account and/or their ACH provider, the pro-forma won't exist for longer than 30 - 36 months which is about where I'd expect to lose one or the other and terminate business.

In reality, I certainly hope that we can find new business models to venture into and new clients. Maybe traditional banks will one day be willing to service the industry again too. I certainly can't say any of that is anywhere in process or even close at this time, so I won't be accounting for that in these models.

Lead costs have doubled in 3 years, I'll continue that trend and we will assume on the capacity that we have today.

Revenue generated per loan will become lower as we expect the industry to become more competitive as well of the 30 - 36 months we'll have in the business as it is.

Hoping to have this to you very soon.

**Regards,**

**Matt Martorello**
Mobile: 773-209-7720
Email: MattM@BellicoseVI.com

CONFIDENTIAL PURSUANT TO
PARTIES' PROTECTIVE ORDER

**This email and any files transmitted with it are confidential and contain privileged or copyright information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

**From:** mattm@bellicosevi.com
**Sent:** Monday, December 10, 2012 8:59 AM
**To:** Argyros, John (VG - British Virgin Islands) (jargyros@DELOITTE.com)
**Cc:** White, Richard (VG - Road-Town) (ricwhite@deloitte.com); 'SL@bellicosevi.com'
**Subject:** Valuation Method
**Importance:** High

Hey guys, I have some urgent questions for you on valuation.

-What would you value the old US internet poker websites at the point in time when you knew Washington was pushing to ban them from the US altogether? And did?
-What would you value a business that's competitors are being sought out by several state governments and the federal government challenging the legality (i.e. the Tribal Gaming model before a favorable federal law was created)? These businesses were entitled to 90% of the revenue as their fee for services, and they were sued by the state every time. They ended up getting lucky and getting a federal law passed, but their revenue was cut to 30% max, and for only a period of 7 years max.
-What would you value medicinal marijuana stores that are not yet legal and could get shut down any day?
-What would you value STATE LICENSED stores in the state of Ohio, at the moment that a bill is in congress to cap rates at 36%, resulting ALL stores closing down? This just happened last year and it's the perfect analogy to the position our client is in today.
-What would you value a drug cartel at? (i.e. a business that is illegal, yet very profitable)?

This industry is going to be living in the grey area of its legality for another year or two. State governments will continue to sue the Tribes and me saying their state laws apply. Tribes will continue to say their laws apply.

The FTC right now is suing a competitor (FTC vs. AMG Services and Scott Tucker, which you can Google) and are alleging 3 or 4 violations of consumer lending laws. Our client arguably employs similar practices and the FTC has begun investigations of several Tribal lenders like our client, and their service providers. If Tucker/AMG loses, the FTC is seeking RESTITUTION OF ALL REVENUE EVER EARNED BY THE COMPANY. Not profit, REVENUE! You've seen this last year by the other industry regulator who we expect our audit from in Q1 next year, the CFPB. They settled for $250mm with Capital One for ALL REVENUE ever earned off a product that the CFPB did not like. They did the same to American Express and another large bank. Our industry is on the list. This concept of restitution makes this business one of the only in the world where there is no LIMITED LIABILITY to equity holders. As restitution from the government means I personally would have to give every $ I have to my name, period. I don't just lose my investment.

Class action lawsuits follow and are already following Tucker's case with the FTC. Also see Martin Butch Webb/Western Sky and look that up.

There is no business with such risk to it as this you, you will simply not find any business out there that can measure up on risk. That's why the proper discount rate I would apply would be 300%.
-There are NO public companies doing what we do, and there will never be

JA 594
MARTORELLO_038990

-Major funds want nothing to do with the equity side of what we are doing for the major liability reasons stated above

-In fact, major banks WILL NOT service our Tribal clients, as they want nothing to do with the business. Wells Fargo closed our accounts on us just 4 months ago! The risk of losing a bank, means that we lose access to ALL of the cash that is out in loans, and we lose everything.

-Identical risk to the ACH servicers between the borrower and the bank. We lose them (there are 2 in the US that are willing to service the business) and they are small players, then we lose all of the principal that is on the street and all of our money.

-We only have ONE CLIENT, and if you read their contract, they can cancel with 180 days' notice and we have no revenue. Think about the large fees that we earn from them, what's to keep them from canceling our service? This is a major point and I think you need to look closely at that agreement and the pricing and termination.

-Our client is a Tribe, and we could never sue them. They could "nationalize" the debt and investment that we've made in them and we would never see those funds again. This happened recently where Wells Fargo lent $30mm to a Tribal entity, then the Tribal council simply nationalized those assets and told Wells they can't sue them and the money is there's. This is not a traditional client we have, and again, we only have 1 client! If I were on their end, as I represent about 80% of their expenses, I'd be looking for a way to operate alone and TERMINATE my agreement.

-300% returns is annualized what equity players will make if they can avoid all of these issues. Despite 300% returns, there still isn't a public company, there still isn't a major institutional player rolling these up when sellers like me would sell at 1.5x EBITDA and a traditional valuation would put the business at 10 times that?

-Debt holders don't have any of these risks. If the Restitution penalty is applied, then debt holders get all of what they are due before the government does. And we have DOZENS of individuals, one company, and one hedge fund who've invested between 30 - 36% APR. Again, that's if NO restitution risk.

-More equity risk you don't see in any business you'll pull COE from: Several states make it a FELONY crime to make loans over a certain rate or without a license. I had a 20 Page document done for me to understand the risk that I have as an equity owner for **aiding and abetting felony crime** in states like GA and you will see the conclusion. It says something like... "yes it is possible the state will come after you for helping the tribe lend against their laws and charge YOU for aiding and abetting as a felony crime in their state (in some instances penalty could be jail time), but we don't think it's going to happen." That's an equity risk, how do you price that into the equation?

-The Merkely Bill is in congress seeks to outright BAN Tribal and offshore lending. This is soon to be voted on, could end the industry in a matter of MONTHS. This is not the first bill to be proposed, and dozens of states have already passed similar legislation. We lose states off the map every month.

-Obama campaigned to cap payday rates at 36%. The CFPB has the power to effectively regulate out this industry and they are pushing to.

-Bottom line is, this business will simply not exist in 2 to 3 years anything like it does right now. If it does exist, it will be so extremely low profitability and we may not be able to keep up to remain profitable.

-We have received dozens of letters from State AGs saying we need to be licensed and sending Cease and Desist orders. Those battles will go to court.

I can put you on the phone with former FTC Directors, who are industry experts and our legal counsel that can tell you about the real risk of this business from the regulatory side ALONE. Now, I don't want you to think that we are doing anything wrong, we certainly are NOT. We use some of the biggest law firms in the country and they CERTAINLY would not be willing to service us and advise us if we were. However, we are

CONFIDENTIAL PURSUANT TO
PARTIES' PROTECTIVE ORDER

living in a grey area that is being highly challenged right now. Greenberg Traurig is the one that did the Aiding and Abetting piece from me, and despite the fact that they feel a State could threaten me with jail time and charge me with a felony, they are still comfortable that I am not doing anything wrong/illegal and so they will defend me on it. GT Law is one of the biggest firms in the US.

So the only way that I would value a business with what I know is as a multiple of EBITDA. Because I think that I'd be thrilled to see 1.5 years left as the business is. I would buy a business at somewhere between 1x and 1.5x EBITDA because I could be shut down after that, or WORSE take all of the liability to have to pay restitution for latent liability that the business I bought did in prior years. I almost wouldn't do it for even 1x but I would probably roll the dice. NO VC OR FUND would do that! Hence, the Cane Bay deal dying after they did full diligence.

I'd argue a multiple of EBITDA is appropriate.

If you want to stick to DCF, then let me know if you want to either:

A) build this all into a discount rate (300% is about the long-term average ROE and so the risk is already priced really, and despite 300% many will never enter the business b/c it puts all your CURRENT assets at risk due to the restitution penalty risk, so perhaps the right cost of equity is higher than that)... or
B) Do you want me to adjust the revenues based on the PROBABILITY of legislation passing at given times in the future, creating contingent reserves for lawsuits and battles, reducing revenue etc. etc. which will MASSIVELY change what we originally provided. As I give the probability of this industry lasting AND ME STILL HAVING MY 1 SINGLE CLIENT PAYING ME SUCH HUGE FEES, about a 20% chance to still be the same situation in 18 - 24 months' time from now.

Very unorthodox. Also, very important as this is a big deal to determine the merger from C-corp to LLC that we are doing.

Give me a call if any questions.


Regards,

**Matt Martorello**
Mobile: 773-209-7720
Email: MattM@BellicoseVI.com


**This email and any files transmitted with it are confidential and contain privileged or copyright information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

Deloitte refers to one or more of Deloitte Touche Tohmatsu Limited, a UK private company limited by guarantee, and its network of member firms, each of which is a legally separate and independent entity. Please see **www.deloitte.com/about** for a detailed description of the legal structure of Deloitte Touche Tohmatsu Limited and its member firms.

Deloitte refers to one or more of Deloitte Touche Tohmatsu Limited, a UK private company limited by guarantee, and its network of member firms, each of which is a legally separate and

JA596
MARTORELLO_038992

independent entity. Please see **www.deloitte.com/about** for a detailed description of the legal structure of Deloitte Touche Tohmatsu Limited and its member firms.

Deloitte refers to one or more of Deloitte Touche Tohmatsu Limited, a UK private company limited by guarantee, and its network of member firms, each of which is a legally separate and independent entity. Please see **www.deloitte.com/about** for a detailed description of the legal structure of Deloitte Touche Tohmatsu Limited and its member firms.

Deloitte refers to one or more of Deloitte Touche Tohmatsu Limited, a UK private company limited by guarantee, and its network of member firms, each of which is a legally separate and independent entity. Please see **www.deloitte.com/about** for a detailed description of the legal structure of Deloitte Touche Tohmatsu Limited and its member firms.

Deloitte refers to one or more of Deloitte Touche Tohmatsu Limited, a UK private company limited by guarantee, and its network of member firms, each of which is a legally separate and independent entity. Please see **www.deloitte.com/about** for a detailed description of the legal structure of Deloitte Touche Tohmatsu Limited and its member firms.

Deloitte refers to one or more of Deloitte Touche Tohmatsu Limited, a UK private company limited by guarantee, and its network of member firms, each of which is a legally separate and independent entity. Please see **www.deloitte.com/about** for a detailed description of the legal structure of Deloitte Touche Tohmatsu Limited and its member firms.

Deloitte refers to one or more of Deloitte Touche Tohmatsu Limited, a UK private company limited by guarantee, and its network of member firms, each of which is a legally separate and independent entity. Please see **www.deloitte.com/about** for a detailed description of the legal structure of Deloitte Touche Tohmatsu Limited and its member firms.

**This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

CONFIDENTIAL PURSUANT TO
PARTIES' PROTECTIVE ORDER

IA 597
MARTORELLO_038993

# Exhibit 19

## Darcie Pace

| | |
|---|---|
| **From:** | Matt Martorello <mattm@bellicosevi.com> |
| **Sent:** | Tuesday, April 16, 2013 10:10 PM |
| **To:** | Robert Rosette |
| **Subject:** | Fwd: Significant Ruling in Colorado Western Sky Case |
| **Attachments:** | Order Granting Plaintiffs' Motion for Summary Judgment.pdf |

Let's zero in asap on minimizing my risk for being individually liable like CO just successfully did to Butch webb.   The Mou issue to me means that when the CFPB and LVD do interact,  we know intel will be given to state AGs. I don't want my company on anything that goes to the CFPB. This may mean DCTF needs to be able to do a lot more on is own, including its compliance program

-------- Original message --------
From: weddlej@gtlaw.com
Date: 04/16/2013 7:13 PM (GMT-04:00)
To: weddlej@gtlaw.com
Subject: Significant Ruling in Colorado Western Sky Case

This order just in.  I have only very briefly skimmed it, but it is a big loss for Western Sky.  A Denver District Court judge granted summary judgment in favor of the Colorado Attorney General against Butch Webb's entities, unpersuaded by Webb's arguments that his status as an individual tribal member conferred any immunity against state enforcement actions.  The order also contains some very negative rulings on individual liability for corporate actions in violation of state law that require much closer consideration for those currently supporting sovereign lending activities.  We will provide that analysis as soon as possible.

Note too that an appeal of this order is a certainty and that the appeal process here in Colorado could easily take another two years.  Webb has been ordered to pay restitution and the State's attorneys' fees in connection with more than 4,000 Colorado loans.  The parties are to recommend a special master in the coming weeks to help the court determine the scope of restitution to be made.  I would expect Webb to seek a stay of this order pending the appeal process.  Whether that stay is granted, who knows.  It is very likely that the Colorado Attorney General will herald this case as a significant victory and encourage other state regulators to employ it in their own efforts to pursue violations of state law.  We will be prepared to provide outreach and education to state AGs.

We will read this more closely tonight and be available to discuss in detail in the coming days.  In the meantime, I would encourage tribal lenders not to panic.  This is an isolated district court ruling that will certainly be appealed.  And we all know that the nature of Western Sky's business and arguments is much different than that of sovereign lenders operating as arms of tribes.  There are many ways to distinguish this case if its rulings survive the appellate process.  But we can all expect that this decision will be cited – a lot – by state and federal investigators in the months ahead.

Best and more soon,

**Jennifer H. Weddle**
Shareholder, Co-Chair, American Indian Law Practice Group
Greenberg Traurig, LLP | 1200 17th Street, Suite 2400 | Denver, Colorado 80202
Tel 303.572.6565 | Fax 720.904.7665
weddlej@gtlaw.com | www.gtlaw.com

ALBANY · AMSTERDAM · ATLANTA · AUSTIN · BOSTON · CHICAGO · DALLAS · DELAWARE · DENVER · FORT LAUDERDALE · HOUSTON · LAS VEGAS · LONDON* · LOS ANGELES · MEXICO CITY+ · MIAMI · NEW JERSEY · NEW YORK · ORANGE COUNTY · ORLANDO · PALM BEACH COUNTY · PHILADELPHIA · PHOENIX · SACRAMENTO · SAN FRANCISCO · SHANGHAI · SILICON VALLEY · TALLAHASSEE · TAMPA · TEL AVIV^ · TYSONS

CONFIDENTIAL                                                                                      ROSETTE_REVISED_045697

JA599

CORNER · WARSAW- · WASHINGTON, D.C. · WHITE PLAINS
*OPERATES AS GREENBERG TRAURIG MAHER LLP ·OPERATES AS GREENBERG TRAURIG, S.C. ^A BRANCH OF GREENBERG TRAURIG, P.A., FLORIDA, USA –OPERATES AS GREENBERG TRAURIG GRZESIAK SP.K.
**STRATEGIC ALLIANCE WITH AN INDEPENDENT LAW FIRM**
MILAN · ROME

---

If you are not an intended recipient of confidential and privileged information in this email, please delete it, notify us immediately at postmaster@gtlaw.com, and do not use or disseminate such information. Pursuant to IRS Circular 230, any tax advice in this email may not be used to avoid tax penalties or to promote, market or recommend any matter herein.

**This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

CONFIDENTIAL                                                        ROSETTE_REVISED_048408
JA600

| DISTRICT COURT, DENVER COUNTY, STATE OF COLORADO<br>City and County Building<br>1437 Bannock, Denver, CO 80202 | DATE FILED: April 15, 2013<br><br>▲ COURT USE ONLY ▲ |
|---|---|
| **Plaintiffs:** STATE OF COLORADO ex rel. JOHN W. SUTHERS, ATTORNEY GENERAL FOR THE STATE OF COLORADO, AND LAURA UDIS, ADMINISTER UNIFORM CONSUMER CREDIT CODE<br><br>v.<br><br>**Defendants:** WESTERN SKY FINANCIAL, LLC, AND MARTIN A. WEBB | Case Number: 11 CV 638<br><br>Courtroom: 259 |
| **ORDER** ||

**THIS MATTER** is before the Court on Plaintiffs the State of Colorado ex rel. John W. Suthers, Attorney General for the State of Colorado, and Laura Udis, Administer, Uniform Consumer Credit Code's (the "State") Motion for Partial Summary Judgment – Second Claim for Relief, filed December 27, 2012. Defendants Western Sky Financial, LLC ("Western Sky"), and Martin A. Webb ("Webb") (collectively "Defendants") filed their Response on January 31, 2013. The State filed its Reply on March 8, 2013. The Court has reviewed the Motion, the pleadings in support and opposition, the case file, and the relevant authority, and, being fully informed, finds and orders as follows:

## BACKGROUND

This dispute arises over allegedly illegal, usurious, and unlicensed loans, issued over the Internet, in Colorado to Colorado consumers. The State alleges that Western Sky, a South Dakota limited liability company, has conducted business, through the Internet, to make loans to Colorado consumers in amounts ranging from $400 to $2,600 with annual percentage interest

rates ("APR") of approximately 140% to 300%.  Webb is the sole manager and owner of Western Sky.  Further, Webb is an enrolled member of the Cheyenne River Sioux (the "Tribe") and resides on the Cheyenne River Indian Reservation (the "Reservation") in South Dakota.

In 2010, Western Sky made more than 200 such loans to Colorado consumers.  Following an investigation, the State determined that Western Sky was making "unlicensed supervised loans" and imposing excessive finance charges.  After Western Sky failed to comply with a demand that it cease and desist from making further loans, the State filed suit against Defendants seeking injunctive relief and damages.

### UNDISPUTED FACTS

1. Western Sky is a South Dakota company.  Webb is Western Sky's sole manager, sole executive officer, and sole owner.  Webb directs, controls, manages, participates in, supervises, is responsible for, and authorizes Western Sky's activities.

2. Western Sky is principally engaged in the business of making small, short-term personal loans to consumers.

3. Via the Internet and television advertising, Western sky offers and enters into loans with Colorado consumers.

4. According to its website, Western Sky offers personal loans of up to $2,600.00.

5. Also according to its website and a loan agreement with a Colorado consumer the loans have APRs from 140% to over 300%.  The loan agreement with the Colorado consumer reflects a loan for $400.00 with over 330% APR.  *See* Exhibits 1 and 2 to the affidavit of Jodie Robertson. (Robertson Aff., attached to the State's Motion as Exhibit 2).

6. Colorado Consumers apply for loans directly through Western Sky's Website.

7. Western Sky electronically deposits the loans' proceeds into the consumers' bank accounts.

8. Pursuant to the loan agreements, consumers authorize Western Sky to withdraw funds electronically from the consumers' bank accounts.

2

ROSETTE_REVISED_048509
JA602

USCA4 Appeal: 23-2087    Doc: 11-2    Filed: 12/06/2023    Pg: 147 of 493

9. In 2010 alone, Western Sky made over 200 loans to Colorado consumers.

10. Western Sky is not, and at no relevant time was, licensed as a supervised lender in Colorado authorized to make supervised loans pursuant to Colorado's Uniform Consumer Credit Code, C.R.S. § 5-1-101, *et seq*. (the "Code").

11. In November 2010, Administrator Udis (the "Administrator") demanded that Western Sky cease making any new loans. The Administrator also demanded that Western Sky make refunds to consumers of all of its loans' improper and excess finance charges.

12. Western Sky did not comply with the Administrator's demands.

## STANDARD OF REVIEW

Summary judgment is appropriate when, based on the pleadings, no genuine issue as to any material fact exists and the moving party is entitled to judgment as a matter of law. C.R.C.P. 56(c); *Cotter Corp. v. American Empire Surplus Lines Ins. Co.*, 90 P.3d 814, 819 (Colo. 2004). The purpose of summary judgment is to permit the parties to pierce the formal allegations of the pleadings and save the time and expense associated with trial when, as a matter of law, one party could not prevail. *Peterson v. Halsted*, 829 P.2d 373, 375 (Colo. 1992). The nonmoving party must receive the benefit of all favorable inferences that may be reasonably drawn from the undisputed facts, and all doubts are resolved against the moving party. *Clementi v. Nationwide Mut. Fire Ins. Co.*, 16 P.3d 223, 225-26 (Colo. 2000).

A party may move for summary judgment on an issue it would not bear the burden of proof upon at trial. *Casey v. Christie Lodge Owners Ass'n, Inc.*, 923 P.2d 365, 366 (Colo. App. 1996). In such an instance, the burden is on the moving party to establish the "nonexistence of a genuine issue of material fact." *Civil Serv. Comm'n v. Pinder*, 812 P.2d 645, 649 (Colo. 1991) (*citing Continental Airlines, Inc. v. Keenan*, 731 P.2d 708, 712 (Colo. 1987)). This burden may be satisfied by "demonstrating that there is an absence of evidence in the record to support the

3

nonmoving party's case." *Id*. "An affirmative showing of specific facts, un-contradicted by any counter affidavits, leaves a trial court with no alternative but to conclude that no genuine issue of material fact exists." *Civil Serv. Comm'n*, 812 P.2d at 649 (*citing Terrell v. Walter E. Heller & Co.*, 439 P.2d 989, 991 (Colo. 1968)).

## ANALYSIS

The State requests that this Court enter summary judgment regarding Defendants' liability on its second claim for relief, "Refunds to Consumers – Code Unlicensed Lender." Specifically, the State contends that Defendants made and collected supervised loans without a supervised lender's license, in violation of § 5-2-301 the Code, and therefore, Defendants are subject to penalty under the Code.

The Code prohibits a person from making or collecting supervised loans without a supervised lender's license, providing that:

> (1) Unless a person . . . has first obtained a license from the administrator authorizing him or her to make supervised loans, he or she shall not engage in the business of:
>
> (a) Making supervised loans or undertaking direct collection of payments from or enforcement of rights against consumers arising from supervised loans he or she has previously made.

Code § 5-2-301(1)(a). Where a creditor has violated the Code regarding the authority to make supervised loans contained in Code § 5-2-301:

> the consumer is not obligated to pay the finance charge and has a right to recover from the person violating this code . . . a penalty in an amount to be determined by the court not in excess of three times the amount of the finance charge . . . .

Code § 5-5-201(1). Further, Code § 5-6-114 authorizes the State to seek these amounts on the consumers' behalves and provides that the Administrator may "bring an action against a creditor

4

for making or collecting charges in excess of those permitted by this code" and, if "an excess charge has been made, the court shall order the respondent to refund to the consumer the amount of the excess charge and to pay a penalty to the consumer as provided in [§] 5-5-201."

Code § 5-1-301(47) defines a "supervised" loan as a consumer loan with an APR in excess of 12%. In turn, a consumer loan is a loan in which: (1) the consumer is a person other than an organization; (2) the principal does not exceed $75,000; (3) a loan finance charge is made; and (4) the debt is incurred primarily for personal, family, or household purposes. *See* Code § 5-1-301(15)(a).

Here, the undisputable facts before the Court confirm that Western Sky makes and collects unlicensed supervised loans to Colorado citizens, thereby subjecting Defendants to liability under the Code.[1] However, Defendants assert that the State's Motion fails because: (1) Mr. Webb is a Native American who conducts business within the boundaries of the Reservation, and therefore, Webb and his company, Western Sky, are subject to tribal immunity and federal preemption, not subject to state jurisdiction and control; and, (2) in its Motion, the State improperly "relies heavily on the non-binding stipulation [of fact] in an unrelated federal court case [*FTC v. Payday Financial, LLC*, Case No. 11 CV 03017 (D.S.D. May 18, 2012) (the "South Dakota Case")]."

**I. Defendants' contention that the State's Motion fails because it improperly relies on the Non-Binding Stipulation in the South Dakota Case is not persuasive.**

Defendants assert that the State improperly relied on the stipulation from the South Dakota Case. Specifically, Defendants maintain that the State's contentions, based on the

---

[1] While Defendants deny certain of Plaintiff's allegation with respect to Defendants making and collecting supervised loans without a license, their denials are simply not supported by the record before the Court.

5

ROSETTE_REVISED_048503
JA605

stipulation, that Western Sky: (a) "makes withdrawals from the consumer's bank account'" (b) "initiates collection procedures if the consumer foes not pay the loan;" and, (c) "collected illegal and unlicensed supervised loans," are clearly disputed and contradicted by the record before the Court. Therefore, Defendants assert that summary judgment is not appropriate.

However, in its Motion, the State contends that the facts are "taken principally from the Complaint's allegations that [D]efendants admit in their Answer." While the aforementioned facts, as alleged by the State derive from the stipulation in the South Dakota Case, other salient facts come from Defendants' own documents, their discovery responses, sworn affidavits, and deposition testimony. Further, as discussed in greater detail below, the disputed facts referenced above with respect to Defendants' withdrawal and collection procedures are not material to resolving the present issue before the Court – whether Defendants are liable under the Code – as there is ample undisputed evidence before the Court to establish that Defendants have engaged in unlicensed supervised loans and are not entitled to tribal immunity or federal preemption with respect to their business activities.

## II. Defendants are not entitled to Tribal Immunity or Federal Preemption.

Turning next to Defendants' contention that they are entitled to tribal immunity because they are conducting business on the Reservation, the Court concludes that Defendants' argument is without merit. This Court addressed this very argument in its Order dated, April 17, 2012, denying Defendants' Motion to Dismiss, rejecting Defendants' assertion that the State is attempting to reach into and regulate on-reservation activity. Defendants' recycling of this same argument here is equally unpersuasive.

CONFIDENTIAL

ROSETTE_REVISED_048504

JA606

Specifically, in the April 17, 2012 Order, this Court found *State ex rel. Suthers v. Cash Advance & Preferred Cash Loans*, 205 P.3d 389 (Colo. App. 2008) ("*Cash Advance I*") instructive on this issue, where, in a near identical factual scenario to this action, the State attempted to investigate a tribal entities alleged usurious internet loan making to Colorado consumers in violation of Colorado's Consumer Credit Code and Consumer Protection Act. *Id.* at 394, *aff'd sub nom. Cash Advance & Preferred Cash Loans v. State*, 242 P.3d 1099 (Colo. 2010).

In *Cash Advance I*, the Court of Appeals determined that business conducted via the internet, which is identical to the type of business conducted by Western Sky here, was sufficient to confer jurisdiction to the State and demonstrated that the business activity constituted off-reservation activity. *See Cash Advance I*, 205 P.3d at 400. Observing that violations of Colorado's Consumer Credit Code and Consumer Protection Act would have significant off-reservation effects that would require the State's intervention, the Court of Appeals held that the State had jurisdiction to "investigate, criminally prosecute, seek declaratory and injunctive relief, and pursue civil remedies for conduct occurring within its borders." *See id.* at 403.

Nevertheless, Defendants maintain that the application of the five-factor test, set forth in *Cash Advance I*, as applied to their business activities here, establish that Western Sky's lending activities occur within the boundaries of the Reservation, thereby preventing the State's enforcement efforts in accordance with tribal immunity. The Court does not agree.

In *Cash Advance I*, the Court of Appeals provided the following factors for courts to consider when determining whether lending activity took place off-reservation: (1) where the contract was entered into; (2) where the contract was negotiated; (3) where performance will

7

ROSETTE_REVISED_048505
JA607

USCA4 Appeal: 23-2097 Doc: 11-2 Filed: 12/06/2023 Pg: 152 of 493

occur; (4) where the subject matter of the contract is located; and, (5) where the parties reside. 205 P.3d at 400. However, in *Cash Advance I* the Court of Appeals did not rely on those factors. Rather, as set forth above, the Court of Appeals employed a long-arm analysis, to conclude that "[b]usiness conducted over the Internet that would confer jurisdiction on a state court also demonstrates that the business activity constitutes off-reservation activity." *Id.* Further, an application of the *Cash Advance I* factors to the uncontroverted facts presented here leads this Court to no contrary conclusion that Defendants' lending activities occur off-reservation.

Similarly, Defendants' contention that Webb is individually protected by tribal immunity as a member of the Tribe is in vain. Again, the Court addressed this very contention in its April 17, 2012 Order, denying Defendants' Motion to Dismiss. Webb, as an enrolled member of the Tribe, is not individually entitled to immunity, nor does his membership in the Tribe confer such immunity upon Western Sky. *See Puyallup Tribe, Inc. v. Dep't of Game*, 433 U.S. 165, 171,72 (1977) (holding that the "doctrine of sovereign immunity . . . does not immunize individual members of [a] tribe.").

Defendants also contend that the State has no regulatory authority of Webb because Webb conducts business through a legally recognized business entity, and the State has alleged no facts sufficient to pierce the corporate veil with respect to Webb. Conversely, the State maintains that Webb's individual liability is not dependent on any "piercing the corporate veil" or "alter ego" theory. Rather, the State contends that Webb's liability flows from the long and well-established principle that those responsible for corporate wrongdoing are personally liable for the corporation's wrongful acts.

8

In support of its contention, the State directs the Court to several cases from other persuasive jurisdictions. First, in *F.T.C. v. Amy Travel Serv., Inc.*, 875 F.2d 564 (7th Cir. 1989), the Seventh Circuit affirmed a judgment holding individual shareholder and officer defendants liable for consumer restitution and other remedies to the same extent as their businesses. *Id.* at 566, 573-74. In doing so, the Seventh Circuit held that where the individuals participated in the businesses' unlawful acts, "or had authority to control them," the individuals were personally liable. *Id.* at 573. Similarly, in *Texas v. Am. Blastfax, Inc.*, 164 F.Supp.2d 892, 899 (W.D. Tex. 2001), in a state regulatory action brought under the federal Telephone Consumer Protection Act, the court held the individual officers, directors, and shareholders jointly and severally liable with the defendant corporation for monetary judgment and injunctive relief. There, the federal court rejected the defendants' proposition that individual liability for corporate acts required piercing the corporate veil, holding that those who "participate in or authorize the commission of a wrongful act, even if the wrongful act is done on behalf of the corporation, . . . may be personally liable . . . [T]o hold otherwise would allow the individual defendants to simply dissolve the [corporation], set-up a new shell corporation, and repeat their conduct." *Id.* at 897-898.

The State provided the Court with countless other examples of courts holding individual defendants liable for a business's violations under similar circumstances without requiring that the plaintiff pierce the corporate veil. *See, e.g.*, *U.S. v. Pollution Abatement Serv., Inc.*, 763 F.2d 16, 23-25 (2nd Cir. 7985); *McCown v. Heidler*, 527 F.2d 204 (10th Cir. 1975); *Mead v. Johnson & Co. v. Baby's Formula Serv., Inc.*, 402 F.2d 19, 23 (5th Cir. 1968); *Wash v. Ralph Williams' N.W. Chrysler Plymouth, Inc.*, 553 P.2d 423, 439 (Wash. 1979).

9

ROSETTE_REVISED_048507

JA609

This principle is equally established in Colorado. In *Snowden v. Taggart*, 17 P.2d 305 (Colo. 1932) the Colorado Supreme Court held that an officer of a corporation involved with the commission of the corporation's wrongdoing is personally liable, providing:

> This principle is absolutely without exception, and is founded upon the soundest legal analogies, and the wisest public policy. To permit an agent of a corporation, in carrying on its business, to inflict wrong and injuries upon others, and then shield himself from liability behind his vicarious character, would often both sanction and encourage the perpetration of flagrant and wanton injuries by agents of insolvent and irresponsible corporations.

*Id*. at 307 (internal quotations omitted).

This principle was reiterated in *Sanford v. Kobey Bros. Constr. Corp.*, 689 P.2d 724 (Colo. App. 1984), where the Court of Appeals reversed a trial court's entry of judgment in favor of an individual defendant because the facts presented did not permit the plaintiffs to pierce the corporate veil. In reaching its conclusion, the Court of Appeals provided that:

> Neither the doctrine of *respondeat superior* nor the fiction of corporate existence bars imposition of individual liability for individual acts of negligence, even when the individual is acting in a representative capacity . . . Rather, a servant may be held personally liable for his individual acts . . ., as so may an officer, director, or agent of a corporation for his or her tortious acts, regardless of the fact that the master or corporation also may be vicariously liable.

*Id*. at 725-26.

Here, it is uncontroverted that Webb is the sole manager, executive director, owner, and principal of Western Sky. It is further undisputed that Webb directs, controls, manages, participates in, supervises, is responsible for, and authorizes Western Sky's activities. Finally, the record before the Court confirms that Webb has general responsibility and final decision making authority for *all* of Western Sky's business operations. Accordingly, because Webb has

10

ROSETTE_REVISED_046508
JA610

the exclusive authority to control the actions of Western Sky, he may also be held individually liable for Western Sky's violations of the Code.

To the extent that Defendants contend that "Indian businesses operating on a reservation are not subject to state jurisdiction and control" and are thus preempted by federal law, the Court is not persuaded.

Again, this very contention was rejected by this Court in its April 17, 2012 Order denying Defendants' Motion to Dismiss. As discussed above, the record before the Court confirms that Defendants' conduct does not involve the regulation of Indian affairs on an Indian reservation. Further, as discussed in the Court's April 17, 2012 Order, the Court finds the federal court's determination in *State ex rel. Suthers v. Western Sky, LLC*, 845 F.Supp.2d 1178, 1182 (D. Colo. 2011), regarding Defendants' preemption argument particularly instructive:

> Defendants argue that Congress has completely preempted the regulation of Indian affairs on a reservation. However, even if that were so, it begs the question of whether the conduct of which [the State] complain[s] involved regulation of Indian affairs on a reservation. I find and conclude that it did not. [The State] allege[s], and defendants do not dispute, that defendants were operating via the Internet . . . . The borrowers do not go to the reservation in South Dakota to apply for, negotiate or enter into loans. They apply for loans in Colorado by accessing defendants' website. They repay the loans and pay the financing charges from Colorado; Western Sky is authorized to withdraw the funds electronically from their bank accounts. The impact of the allegedly excessive charges was felt in Colorado. Defendants have not denied that they were doing business in Colorado for jurisdictional purposes, nor does it appear that they could. *See* [*Cash Advance I*, 205 P.3d at 400]. "Business conducted over the Internet that would confer jurisdiction on a state court also demonstrates that the business activity constitutes off-reservation activity." [*Id.*]

11

Moreover, notwithstanding the above, it is well settled that tribes are subject to state law when engaged in off-reservation activity. *See, e.g., Nevada v. Hicks*, 533 U.S. 353 (2001); *Mescalero Apache Tribe v. Jones*, 411 U.S. 145 (1973); *Organized Vill. Of Kake v. Egan*, 369 U.S. 60, 62-63, 75-76 (1962).

C.R.S. § 5-1-201(1) provides that the Code "applies to consumer credit transactions made in this state." The Code further provides that a consumer credit transaction is made in this state if:

> (b) A consumer who is a resident of this state enters into a transaction with a creditor who has solicited or advertised in this state by any means, including but not limited to mail, brochure, telephone, print, radio, television, internet, or any other electronic means.

Code § 5-1-201(1)(b).

Here, it is undisputed that Defendants operate a website and engage in television advertising in this state, thereby soliciting and advertising their lending business in Colorado. It is further, undisputed that Defendants have entered into loan agreements with Colorado residents.

Accordingly, because Defendants' business activities are conducted off-reservation and because Defendants solicit and advertise their business in Colorado and have, in fact, entered into loan agreements with Colorado citizens, Defendants are not entitled to tribal immunity or federal preemption. Rather, based on the undisputed facts before the Court, the Court concludes that Defendants are subject to the Code's previsions and are thereby liable for any violation thereof. Specifically, because Western Sky is not, and has never been, licensed as a supervised lender, and because unlicensed lenders are not authorized to charge a finance charge on

12

ROSETTE_REVISED_048519

supervised loans, Defendants' liability for restitution to consumers of all finance charges, including penalties, on all unlicensed loans made or collected with respect to Colorado citizens, is established as a matter of law.

### III. The State is entitled to Attorney's Fees incurred in Replying to Defendants' Tribal Immunity and Preemption Arguments in their Response.

The State requests that this Court grant its request for Attorney's fees pursuant to C.R.S. § 13-17-101, *et seq.*, for fees incurred in replying to Defendants' tribal immunity and federal preemption arguments, raised in their Response. C.R.S. § 13-17-102 provides, in pertinent part, that a court may award reasonable attorney fees against a party who brings an action "that lacks substantial justification." *See* C.R.S. § 13-17-102(2). Under this statute, the term "lacks substantial justification" means substantially frivolous, substantially groundless, or substantially vexatious. C.R.S. § 13-17-102(4).

Here, as discussed above, the crux of Defendants' argument is that they are entitled to tribal immunity and federal preemption because their business activities are conducted on the Reservation. This very argument has been raised twice previously by these Defendants, and was rejected in each instance. Defendants first raised this argument in *Suthers*, 845 F.Supp.2d at 1182, where the federal court determined that "[D]efendants' repeated argument that [this] case involves regulation of Indian Affairs on an Indian Reservation" so lacked an "objectively reasonable basis" as to entitle the State to its costs and attorney's fees. *Id*. Defendants raised this same argument in the present litigation in their Motion to Dismiss. This argument was again rejected by this Court in its April 17, 2012 Order, denying Defendants' Motion to Dismiss. In their Response to the State's Motion for Summary Judgment, Defendants now raise this same argument for a third time, seemingly undeterred by the federal court's ruling in *Suthers*, as well

13

JA613

as this Court's prior ruling here. While Defendants purportedly provide additional facts concerning the details of their loan making process in support of their tribal immunity and preemption arguments, a review of the additional information provided by Defendants leads the Court to no contrary conclusion. Rather, these additional materials confirm what this Court, along with the *Suthers* court, already determined – that Defendants' actions in offering and entering into loans with Colorado consumers, via the Internet, does not constitute on-reservation business activity.

Defendants' continued assertions that they are entitled to tribal immunity and federal preemption, which have been repeatedly rejected by this Court and the Federal Courts, evince stubbornly litigious and substantially vexatious defense of this action and warrant and assessment of attorney's fees. *Mitchell v. Ryder*, 104 P.3d 316, 320-21 (Colo. App. 2004). Where, as the Court has found here, an attorney or party has brought or defended an action, or any part thereof, which lacked substantial justification, the Court shall assess attorney's fees. C.R.S. § 13-17-102(4). Any such award is properly entered in favor of the State and against Defendants and their counsel, jointly and severally. C.R.S. § 13-17-102(3).

Accordingly, because Defendants tribal immunity and federal preemption arguments lack substantial justification, the State is entitled to recover its attorney's fees expended in replying to Defendants Response insofar as the State can establish the reasonable fees incurred in addressing Defendants' tribal immunity and preemption arguments.

## CONCLUSION

WHEREFORE, in light of the reasoning stated above, the State's Motion for Partial Summary Judgment – Second Claim for Relief is hereby GRANTED. It is further ordered that,

CONFIDENTIAL                                     ROSETTE_REVISED_046512

JA614

in light of the voluminous unlicensed loans extended by Defendants in violation of the Code, estimated at over 4,000, the State's request that a special master be appointed to determine the number of, and extent to which, consumers have been adversely affected by Defendants' unlawful activity in this matter is GRANTED. The Parties shall submit a joint list of three potential Special Masters, not later than 14 days from the date of entry of this Order, and the Court will select one from that list. If the parties cannot agree on a list of potential Special Masters, the Court will appoint someone of the Court's choosing. Further, in accordance with the Court's findings herein, the State shall file an Affidavit of Attorney's fees incurred in replying to Defendants' tribal immunity and federal preemption arguments in their Response, not later than 14 days from the date of entry of this Order.

   **DONE** this 15th day of April, 2012.

                                        BY THE COURT:

                                        _____
                                        MICHAEL A. MARTINEZ
                                        District Court Judge

CONFIDENTIAL                                ROSETTE_REVISED_046513

JA615

# Exhibit 20




STATE OF CONNECTICUT
**DEPARTMENT OF BANKING**
260 CONSTITUTION PLAZA – HARTFORD, CT 06103-1800

May 7, 2013

President
Castle Payday.com
PO Box 704
Watersmeet, MI 49969

Dear Sir or Madam:

Enclosed is correspondence received from Ms. Sarah Criscio regarding a payday loan allegedly obtained from Castle Payday.com.

According to Section 37-4 of the Connecticut General Statutes, "no person and no firm or corporation or agent thereof shall, as guarantor or otherwise, directly or indirectly, loan money to any person and, directly or indirectly, charge, demand, accept or make any agreement to receive therefore interest <u>at a rate greater than twelve per cent per annum</u>."

The received correspondence indicates an APR in excess of the usury statutes in this State. Based on Section 37-4, it would appear that the loan allegedly made to Ms. Criscio is in clear violation of Connecticut's usury statute.

Furthermore, Section 37-8 of the Connecticut General Statutes provides "no action shall be brought to recover principal or interest, or any part therefore, on any loan prohibited by Section 37-4 or upon any cause arising from the negotiation of such loan." In other words, since the loans are in violation of Connecticut's usury statute, you would be precluded from collecting principal or interest from Ms. Criscio.

In view of the above, this department is requiring Castle Payday.com and any affiliated companies to cease any and all payday lending activity and cease collection efforts related to any payday loans in Connecticut. Failure to cease payday lending and any related collection activity may result in an enforcement action against Castle Payday.com including imposition of civil penalties up to $100,000.00 per violation and a possible criminal referral.

Please respond in writing to this Department within three weeks from the date of this letter with your position regarding the above.

Very truly yours,

Michael Lentini
Examiner

Case: 54167
Enclosure

TEL: (860) 240-8299 ● FAX: (860) 240-8178
Website: http://www.ct.gov/dob
*An Affirmative Action/Equal Opportunity Employer*

CONFIDENTIAL

JA617

# Exhibit 21

| | |
|---|---|
| **From:** | Matt Martorello |
| **To:** | Karrie Wichtman |
| **Subject:** | FW: DRAFT COMPLAINT |
| **Date:** | Monday, August 12, 2013 8:36:49 PM |
| **Attachments:** | 2013 08 11 Complaint for Declaratory and Injunctive Relief.doc |

Let's discuss in the morning.  Are you free?

---

**From:** Rob Rosette [mailto:rosette@rosettelaw.com]
**Sent:** Monday, August 12, 2013 1:40 PM
**To:** Matt Martorello
**Cc:** Karrie Wichtman; Saba Bazzazieh; jim.williams@lvdtribal.com; Gkway (gkway@lvdtribal.com);
John McGeshick (jcmcgeshick@gmail.com)
**Subject:** FW: DRAFT COMPLAINT

Matt,

Please see the draft Complaint that our law firm drafted for LVD's consideration.   As you know, I
believe strongly that if we do nothing we may forever lose the tribal online lending opportunity.   In
my opinion, it's impossible to unwind or undo what the State of New York (in collaboration with
federal agencies) have started without a legitimate piece of litigation being filed.   We need to move
swiftly to file something this week, but not later than next week.   Please call us to discuss at your
earliest convenience.

Sincerely,

Robert A. Rosette
Rosette, LLP
Attorneys at Law
565 W. Chandler Blvd., Suite 212
Chandler, Arizona 85225
Tel (480) 889-8990
Fax (480) 889-8997
Cell (480) 242-9810
www.rosettelaw.com

CONFIDENTIAL COMMUNICATION: THIS MESSAGE IS A CONFIDENTIAL ATTORNEY
COMMUNICATION ONLY FOR USE BY THE INTENDED RECIPIENT.  ANY INADVERTENT RECEIPT
SHALL NOT CONSTITUTE A WAIVER OF ATTORNEY-CLIENT OR WORK PRODUCT PROTECTION.
IF RECEIVED IN ERROR, PLEASE NOTIFY THE SENDER IMMEDIATELY AND DELETE THIS
MESSAGE.

---

**From:** Saba Bazzazieh
**Sent:** Sunday, August 11, 2013 8:44 PM
**To:** Eric Lau (eric.lau@macfarlanegp.com); Gehres, Ed (EGehres@PattonBoggs.com); Martin Wong
(mwong@thinkfinance.com); ECKMANR@pepperlaw.com

CONFIDENTIAL

JA619

**Cc:** Mark Curry (mcurry@solpartnerspr.com); Rob Rosette; Barry Brandon
**Subject:** DRAFT COMPLAINT

Team –

Please find attached for your review and input a ***working draft*** of the Complaint for Declaratory and Injunctive Relief against the State of New York, the New York State Department of Financial Services and NY officials.  You will observe that we took a "kitchen sink" approach to the Complaint and included all constitutional and tort law causes of action that we believed were available to us.  We can, of course, add to or subtract from the current list of claims.

Per our discussions on Friday, I have included a placeholder for Ed's group to provide the cause of action related to discrimination.  Other items highlighted in yellow will need to be confirmed.

We are finalizing the related Motion for Temporary Restraining Order, which we expect to have circulated by this evening or tomorrow morning, at the latest.

We look forward to receiving your input and incorporation of edits.

Regards,

Saba Bazzazieh
Rosette, LLP
Attorneys at Law
565 W. Chandler Blvd., Suite 212
Chandler, AZ 85225
Mobile: (480) 240-0238
Office: (480) 889-8990
Fax:  (480) 889-8997
sbazzazieh@rosettelaw.com
www.rosettelaw.com

CONFIDENTIAL COMMUNICATION: THIS MESSAGE IS A CONFIDENTIAL ATTORNEY COMMUNICATION ONLY FOR USE BY THE INTENDED RECIPIENT.  ANY INADVERTENT RECEIPT SHALL NOT CONSTITUTE A WAIVER OF ATTORNEY-CLIENT OR WORK PRODUCT PROTECTION.  IF RECEIVED IN ERROR, PLEASE NOTIFY SENDER IMMEDIATELY AND DELETE THIS MESSAGE.  THANK YOU FOR YOUR COOPERATION.

**This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

1   Robert A. Rosette (*pro hac vice*)
2   Saba Bazzazieh (*pro hac vice*)
    ROSETTE, LLP
3   565 W. Chandler Blvd., Suite 212
    Chandler, AZ 85225
4   Telephone: (480) 889-8990
    Facsimile: (480) 889-8998
5
6   *Attorneys for Plaintiffs*

7   [ADDITIONAL LEGAL COUNSEL]

    ### IN THE UNITED STATES DISTRICT COURT
8
    ### FOR THE SOUTHERN DISTRICT OF NEW YORK
9

10  **THE OTOE-MISSOURIA TRIBE,** a
11  federally-recognized Indian Tribe; **GREAT**
    **PLAINS LENDING, LLC,** a wholly-owned      **COMPLAINT FOR DECLARATORY AND**
12  tribal limited liability company;             **INJUNCTIVE RELIEF**
    **AMERICAN WEB LOAN, INC.,** a wholly-
13  owned tribal corporation, and **OTOE-**
    **MISSOURIA CONSUMER FINANCE**
14  **SERVICES REGULATORY**
    **COMMISSION,** a tribal regulatory agency;
15  **LAC VIEUX DESERT BAND OF LAKE**
16  **SUPERIOR CHIPPEWA INDIANS,** a
    federally-recognized Indian Tribe; **RED**
17  **ROCK TRIBAL LENDING, LLC,** a
18  wholly-owned tribal limited liability
    company; **DUCK CREEK TRIBAL**
19  **FINANCE**, a wholly-owned tribal limited
    liability company; **LAC VIEUX DESERT**
20  **TRIBAL FINANCIAL SERVICES**
21  **REGULATORY AUTHORITY,** a tribal
    regulatory agency; **HABEMATOLEL**
22  **POMO OF UPPER LAKE,** a federally-
    recognized Indian Tribe; **GOLDEN**
23  **VALLEY LENDING, LLC,** a wholly-
    owned tribal limited liability company;; and
24  **HABEMATOLEL POMO OF UPPER**
    **LAKE REGULATORY COMMISSION**
25

26

27

28
                COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

CONFIDENTIAL                                                    JA621

1                              Plaintiffs,

2        vs.

3 **STATE OF NEW YORK; NEW YORK**
**STATE DEPARTMENT OF FINANCIAL**
4 **SERVICES; ANDREW M. CUOMO, in**
**his official capacity as Governor of the**
5 **State of New York; BENJAMIN M.**
**LAWSKY, in his official capacity as**
6 **Superintendent of the New York State**
**Department of Financial Services,**

7                         Defendants.

8

9                            **INTRODUCTION**

10        This Complaint seeks declaratory and injunctive relief from the State of New York, Governor

11 Andrew Cuomo, in his official capacity, the New York State Department of Financial Services, and

12 Benjamin M. Lawsky, in his official capacity as the Superintendent of the New York State Department

13 of Financial Services (collectively, "Defendants"). Plaintiffs consist of three (3) federally-recognized

14 Indian the Otoe-Missouria Tribe, the Lac Vieux Desert Band of Lake Superior Chippewa Indians, and

15 the Habematolel Pomo of Upper Lake ("Tribal Government Plaintiffs") - their wholly owned corporate

16 entities Great Plains Lending, LLC, American Web Loan, Inc., Red Rock Tribal Lending, LLC, Duck

17 Creek Tribal Finance, LLC, and Golden Valley Lending, LLC (collectively, "Tribal Corporate

18 Defendants"), as well as their respective regulatory agencies established pursuant to tribal law and

19 charged with the responsibility and oversight over the activities of the Tribal Corporate Defendants. As

20 detailed herein, Defendants, by and through their coordinated, deliberate and illegal actions, seek to

21 proceed in an extra-territorial manner, in violation of the United States Constitution, in an effort to

22 regulate and pursue enforcement actions against sovereign Indian nations. In doing so, the Defendants

23 have intentionally and negligently interfered with the Plaintiffs' contracts with their customers, financial

24 institutions and third party vendors, resulting in imminent and irreparable harm. Defendants have also

25 negligently and intentionally interfered with Plaintiffs' prospective economic advantage with their

26

27

28                              2

customers, financial institutions and third party vendors, also resulting in imminent and irreparable harm. Accordingly, Plaintiffs seek an injunction restraining and enjoining Defendants from: (a) pursuing any and all state regulatory and enforcement actions against all Plaintiffs for lack of jurisdiction pursuant to federal law; (b) pursuing any and all state regulatory and enforcement actions over financial institutions, payment processors, and financial services associations for the purpose of requesting that these entities cease processing legal transactions on behalf of the Tribal Corporate Plaintiffs, or in an attempt to otherwise stifle, reduce, or interrupt the Plaintiffs' lawful business operations; and (c) issuing, publishing and/or disseminating in any manner whatsoever, any and all statements regarding any and all Plaintiffs, their lawful business operations or the incorrect and injurious claim that its business activities are illegal in the State of New York or anywhere else in the United States. Additionally, Plaintiffs seek a declaratory judgment from the Court recognizing that (a) Plaintiffs are sovereign Indian nations, and, as such, New York state law is wholly inapplicable to them and that all Defendants lack jurisdiction to pursue any regulatory or enforcement actions against Plaintiffs, financial institutions, or third party processors in relation thereto; and (b) the financial services of the Tribal Corporate Plaintiffs are legal pursuant to tribal law, consistent with stringent industry best practices, and in conformance with federal consumer protection laws.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over Plaintiffs' claims arising under the laws of the United States pursuant to 28 U.S.C. § 1331 because Plaintiffs raise a federal question requiring this Court's adjudication. The Court also has jurisdiction pursuant to 28 U.S.C. § 1343 for the applicable causes of action alleged herein.

2.      The Court has jurisdiction over the remaining causes of actions in this Complaint on the basis of supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

3.      The Court has jurisdiction over actions brought by federally recognized Indian tribes pursuant to 28 U.S.C. § 1362 for claims arising under the laws of the United States.

3

CONFIDENTIAL

4.      This Court may grant the injunctive and declaratory relief sought pursuant to 28 U.S.C. §§ 2201-02.

5.      Venue is proper pursuant to 28 U.S.C. § 1391(e), because Defendants are officials and agencies of the State of New York acting in their official capacities and residing in this district, and because a substantial part of the events giving rise to the Plaintiffs' claims occurred in this district.  28 U.S.C. § 1391(b)(2).

### **PARTIES**

6.      Plaintiff Otoe-Missouria Tribe of Indians ("Otoe-Missouria") is a federally-recognized Indian tribe with its tribal government offices located in Red Rock, Oklahoma.

7.      Plaintiff Great Plains Lending, LLC ("Great Plains") is a limited liability company wholly-owned and operated and formed under the laws of the Otoe-Missouria, with its principal place of business in Edmond, Oklahoma.  Great Plains is engaged in online small dollar lending pursuant to tribal law and subject to tribal regulation.  Great Plains voluntarily complies with all applicable federal consumer protection laws.

8.      Plaintiff American Web Loan, Inc. ("AWL") is a corporation wholly-owned and operated and formed under the laws of the Otoe-Missouria, with its principal place of business in Red Rock, Oklahoma.  AWL is engaged in online small dollar lending pursuant to tribal law and subject to tribal regulation.  AWL voluntarily complies with all applicable federal consumer protection laws.

9.      The Otoe-Missouria Consumer Finance Services Regulatory Commission is a regulatory agency formed pursuant to Tribal law and functioning as a governmental arm and instrumentality of the Otoe-Missouria, with its principal place of governmental business located in Red Rock, Oklahoma and is tasked with regulating all consumer financial services provided by both Great Plains and AWL

10.     Plaintiff Lac View Desert Band of Lake Superior Chippewa Indians ("LVD") is a federally-recognized Indian tribe with its tribal governmental offices located in Watersmeet, Michigan.

11.     Plaintiff, Red Rock Lending, LLC ("Red Rock") is a limited liability company wholly-

4

CONFIDENTIAL

JA624

owned and operated and formed under the laws of LVD, with its principal place of business in Watersmeet, Michigan. Red Rock is engaged in online small dollar lending pursuant to tribal law and subject to tribal regulation. Red Rock voluntarily complies with all applicable federal consumer protection laws.

12.     Plaintiff, Duck Creek Financial ("Duck Creek") is a limited liability company wholly-owned and operated and formed under the laws of LVD, with its principal place of business in Watersmeet, Michigan. Red Rock is engaged in online small dollar lending pursuant to tribal law and subject to tribal regulation. Red Rock voluntarily complies with all applicable federal consumer protection laws.

13.     Plaintiff Lac Vieux Desert Tribal Financial Services Regulatory Authority  is a regulatory agency formed pursuant to tribal law and functioning as a governmental arm and instrumentality of LVD, with its principal place of governmental business located in Watersmeet, Michigan and is tasked with regulating all consumer financial services provided by both Red Rock and Duck Creek.

14.     Plaintiff Habematolel Pomo of Upper Lake ("Upper Lake") is a federally-recognized Indian tribe whose tribal government offices are located in Upper Lake, California.

15.     Plaintiff Golden Valley Lending, LLC ("Golden Valley") is a limited liability company wholly-owned and operated and formed under the laws of Upper Lake, with its principal place of business in Upper Lake, California. Golden Valley is engaged in online small dollar lending pursuant to tribal law and subject to tribal regulation. Golden Valley voluntarily complies with all applicable federal consumer protection laws.

16.     Plaintiff Habematolel Pomo of Upper Lake Regulatory Commission, is a regulatory agency formed pursuant to Tribal law and functioning as a governmental arm and instrumentality of Upper Lake, with its principal place of governmental business located in Upper Lake, California and is tasked with regulating all consumer financial services provided by Golden Valley.

17.     Defendant State of New York is a state organized and maintained pursuant to the New

5

York Constitution. Its principal office is located at the State Capitol Building, Albany, New York 12224.

18.    Defendant New York State Department of Financial Services is an executive branch agency of the State of New York, whose principal place of business is located at 1 State Street, Manhattan, New York.

19.    Defendant Andrew M. Cuomo, sued in his official capacity, is the Governor of the State of New York, whose principal place of business is located at the State Capitol Building, Albany, New York.

20.    Defendant Benjamin M. Lawsky, sued in his official capacity, is the Superintendent of the New York Department of Financial Services, whose principal place of business is located at 1 State Street, Manhattan, New York.

## **FACTUAL ALLEGATIONS**

21.    As federally-recognized Indian tribes, pursuant to well-established federal law and policy, the three Plaintiff tribes possess inherent sovereignty with the right to enact their own laws and be governed by them.

22.    The Tribal Corporate Plaintiffs were created pursuant to tribal laws and are wholly owned, operated and controlled by the respective Tribal Government Plaintiffs.  Each are operated for the benefit of the tribal governments and the tribes' membership to strengthen the tribes' economic development, benefit, and self-sufficiency.

23.    The Tribal Corporate Plaintiffs are responsibly and lawfully engaged in consumer finance, operating within the tribes' territories and jurisdictional boundaries.

24.    There is long-standing federal policy and precedent recognizing the inherent sovereignty of American Indian tribes.

25.    In exercising the Tribe's sovereignty    that is, the power to establish laws and be governed by them    the Tribal Government Plaintiffs endeavored to enact respective tribal regulatory laws which expressly govern the tribes' and the Tribal Corporate Plaintiffs' consumer finance activities.

6

JA626

26.     On or around August 5, 2013, Defendant Lawsky, the Superintendent of Defendant New York State Department of Financial Services ("Defendant Department"), issued a letter to 35 companies, including Tribal Corporate Plaintiffs, demanding they "CEASE AND DESIST [from] offering and originating illegal payday loans in New York." (*See* Cease and Desist letter from Defendant Lawsky, dated August 5, 2013, a true and correct copy of which is attached hereto as Exhibit A.)

27.     In its letter, Defendant Department demanded that Tribal Corporate Plaintiffs confirm in writing within 14 days of the date of its letter that they would "no longer solicit or make illegal payday loans in New York, and outline the steps taken to cease offering these loans to New York consumers. "Should your company . . . fail to comply with this directive by August [], 2013, the Department will take appropriate action to protect New York consumers." (Id.)

28.     On or around August 5, 2013, Defendant Lawsky also issued letters to 117 financial institutions which stated that Defendant Department was conducting an investigation into "illegal online payday lending," named the Tribal Corporate Plaintiffs as five of 35 lending entities that "solicit and provide illegal payday loans to consumers in New York," and stated that the Tribal Corporate Plaintiffs charge fees resulting in "interest rates far in excess of the legal limit." (*See* Letter from Defendant Lawsky to financial institutions, dated August 5, 2013, a true and correct copy of which is attached hereto as Exhibit B.)

29.     In this letter, the Defendant Department stated that "[t]o address [Tribal Corporate Defendants'] unlawful activity, Defendant Department today sent letters to 35 payday lenders directing them to cease and desist offering to lend and lending monies at usurious rates in New York," and stated that it would "aggressively pursue appropriate enforcement against payday lenders that refuse to cease and desist from their illegal activity in New York." (Id.)

30.     The letter further provides: "Illegal payday loans made over the Internet are made possible in New York by credits and debits that must pass through the Automated Clearing House ("ACH") network. The current ACH network appears to allow illegal loans to flow through New York

7

without sufficient mechanisms to prevent or block these debits or credits as they occur." (Id.)

31.    According to the letter, "[Receiving Depository Financial Institutions] would be a great asset in preventing their customers from being victimized by these illegal loans if they were aware of questionable activity before such debits were made.  As such, changes to the ACH network may be necessary. . . .  [A]ccess to the ACH system is the foot in the door that online payday lenders need to prey on vulnerable New Yorkers.  And banks have proven to be   even if unintentionally   an essential cog in the vicious machinery that these purveyors of predatory loans use to make an end-run around New York law." (Id.)

32.    Also, in the letter, Defendant Lawsky and Defendant Department request that the financial institutions cooperate with them to create procedures which would "choke off ACH access to the 35 illegal lenders" identified by Defendant Department.  The letter further states that it is in the banks' long-term interest "to take appropriate action to help ensure that it is not serving as a pipeline for illegal conduct." (Id.)

33.    Defendant Department also asked banks to provide information about their current procedures to stop "illegal payday loans from entering into New York through the ACH network" as well as any changes that would be necessary to stop such loans.  It writes: "Through a cooperative effort with the banking industry, we can work together to stamp out these pernicious, illegal payday loans in New York." (Id.)

34.    On or around August 5, 2013, Defendant Department sent a similar letter to NACHA, a nonprofit association of financial institutions which administers the ACH network, which was largely similar to the letter it sent to the banks.  In this letter, Defendant Department requests that NACHA "choke off ACH access" to the "illegal lenders" identified by Defendant Department.  (*See* letter from Defendant Lawsky to NACHA, a true and correct copy of which is attached hereto as Exhibit C.)

35.    Also on or around August 5, 2013, Defendant Department sent a letter titled "Letter to All Debt Collectors Operating in the State of New York," informing them that Defendant Department of the

8

issuance of letters to 35 payday loan companies "directing them to cease and desist offering and making usurious payday loans in New York." (See letter from Defendant Lawsky to Debt Collectors, dated August 5, 2013, attached hereto as Exhibit D.)

36.    This letter again references the Tribal Corporate Plaintiffs, stated that "these companies have charged New York consumers for payday loans with interest rates many times the legal limit," and cited various state laws for the proposition that Tribal Corporate Plaintiffs were involved in "criminal usury." (Id.)

36.    The letter also stated that Defendant Department would "aggressively enforce the law against any person or entity attempting to collect debts on illegal payday loans made to New York consumers" on behalf of 35 lending entities, including Tribal Corporate Plaintiffs. (Id.)

37.    Several Tribal Corporate Plaintiffs have received correspondence from InterceptEFT, a payment processing company, specifically stating that as a result of Defendant Department's August 5, 2013 Cease and Desist letters, the lending entity was to "immediately cease submitting any transactions involving NY residents to InterceptEFT for processing." (See Letter from InterceptEFT to Tribal Corporate Plaintiffs, a true and correct copy of which is attached hereto as Exhibit E.)

38.    In addition, the letter from InterceptEFT states that "in conjunction with our processing banks," in 18 states and the District of Columbia, "as of August 15, 2013, no further credit/advance transactions will be processed by InterceptEFT," and that "as of September 15, 2013, no further debit/payment transactions will be processed by InterceptEFT. Please make alternative payment arrangements for your customers after September 15, 2013. Transactions will be monitored to ensure compliance with noncompliance resulting in immediate termination." (Id.) Subsequently, InterceptEFT issued additional correspondence with altered its original timeline and informs Tribal Corporate Plaintiffs that their contractual relationship will be terminated August 30.

39.    Upon information and believe, subsequent to receipt of the letter from the Defendant Department, NACHA sent a letter to its member banks and TPPPs, citing to the Defendant Department

9

letter and its specific list of illegal companies.  In doing so, NACHA states that "purported authorizations to pay illegal loans are unenforceable under applicable state law and do not constitute valid authorizations under the NACHA rules."  (*See* Letter from NACHA to [INSERT] s, a true and correct copy of which is attached hereto as Exhibit F.)

40.     The NACHA letter further states:  "In light of the allegations of [Defendant Department], it is imperative that you immediately review your origination activity for the [Tribal Corporate Plaintiffs] and terminate any origination that would otherwise violate the NACHA rules."  (Id.)

41.     This letter further requests that the payment processors and financial institutes advise, no later than August 23:  "(a) whether you have determined to terminate origination for the [Tribal Corporate Plaintiffs], (b) if so, the date that such termination will be effective, and (c) if not the basis for your determination that continued origination for such [Trial Corporate Plaintiffs] is permissible and appropriate."  (Id.)

42.     Upon information and belief, Defendant Department, improperly and without legal basis, sent the aforementioned correspondence to exert pressure on banks and third party processors in order to subvert tribal sovereignty and assert control over third parties to injure the Tribal Corporate Plaintiffs' ability to engage in lawful consumer finance operations, and the Plaintiffs' sovereign rights to engage in economic development and self-determination.

43.     Upon information and belief, Defendant Department is aware of or should have been aware of the sovereign status of the Tribal Corporate Plaintiffs based upon correspondence submitted to Defendant Department prior to the issuance of its cease and desist letters, which informed them of this information.

40.     Plaintiffs have suffered harm and continue to suffer harm as a direct consequence of the Defendants' actions.

41.  As a direct and foreseeable consequence of Defendants' actions, current financial institutions and TPPPs have, through written correspondence and otherwise, expressed unwillingness to continue

10

business relations with the Tribal Corporate Plaintiffs.

42.     As a direct and foreseeable consequence of Defendants' actions, Tribal Corporate Defendants' business operations have been jeopardized, and, in turn, so has a source of revenue that is critical to the survival of the Tribal Government Plaintiffs and its citizens.

43.     As a direct and foreseeable consequence of Defendants' actions, the ability of the Tribal Government Plaintiffs to engage in lawful self-determination and self-governance for the benefit of its people and betterment of its community has been endangered.

44.   As a direct and foreseeable consequence of Defendants' actions, the sovereign right of the Tribal Government Plaintiffs to enact their own laws and govern themselves by such laws as been threatened and undermined.  Indeed, as a result of the extra-territorial actions of the Defendants, the ability of the Plaintiff tribal regulatory agencies to fulfill their legal responsibilities of overseeing and regulating the activities of the Tribal Corporate Plaintiffs  to ensure compliance with tribal and federal law has been undermined.

## FIRST CAUSE OF ACTION
**(42 U.S.C. § 1983 – Infringement of a Federally Protected Right As to All Defendants and Violations of the United States Constitution – Due Process Clause of the Fourteenth Amendment; Indian Commerce Clause)**

45.     Plaintiffs incorporate by reference paragraphs 1 through 44 above as if fully rewritten herein.

46.     Tribal Corporate Plaintiffs are deemed "persons" for purposes of 42 U.S.C. § 1983 and are economic business entities organized by and wholly owned by federally-recognized Indian tribes and are entitled to recognition of their sovereign status.

47.     Defendants, collectively and individually through the actions of Defendant Department and Defendant Lawsky, infringed on Plaintiffs' protected Constitutional rights, both as a matter of the Indian Commerce Clause (Article I, Section 8, Clause 3), which expressly reserves the ability to regulate Indian Commerce to the federal government and not the states, and the Fourteenth Amendment, which

11

CONFIDENTIAL

JA631

requires that Defendants afford Tribal Corporate Plaintiffs due process of law.

48.     Defendants individually and collectively infringed on Plaintiffs' recognized and protected right to sovereignty and self-determination by attempting to subvert Plaintiffs' Constitutional right to engage in lawful economic activity without due process of law to unlawfully and tortuously interfere with the Tribal Corporate Plaintiffs' businesses through illegal and inapplicable regulatory efforts.

49.     Defendant State, Defendant Cuomo, Defendant Department and Defendant Lawsky failed to engage Tribal Government Plaintiffs and Tribal Regulatory Plaintiffs on a government-to-government basis to learn of Plaintiffs' lawful business activities and infringed on Plaintiffs' protected rights afforded to all federally recognized tribes.  Due process requires recognition of Plaintiffs' sovereign status and the applicability of Tribal law to tribal Corporate Plaintiffs' lawful business activities.

50.     Defendant Department's and Defendant Lawsky's actions to intentionally mislead banks, TPPPs and the general public violated Plaintiffs' rights of sovereignty and such actions are attributable to all Defendants because such actions occurred under the color of law.

51.     Plaintiffs' have been damaged by Defendants' unlawful actions occurring under the color of law based on the interruptions caused to Tribal Corporate Plaintiffs' lawful business activities and the continued threat of unlawful regulatory oversight by Defendants.

**SECOND CAUSE OF ACTION**
**(Violation of the United States Constitution - Dormant Commerce Clause – Effect of Discrimination As to All Defendants)**

52.     Plaintiffs re-allege the above paragraphs and incorporate those paragraphs herein as if set forth in full.

53.     The Dormant Commerce Clause of the United States Constitution requires that State action imposing a burden on interstate commerce which, in effect, discriminates out of state actors participating in commerce, be stricken unless it is necessary to achieve a legitimate, non-protectionist state interest.

54.      Defendants' actions have the effect of discriminating against Tribal Corporate Plaintiffs

12

CONFIDENTIAL

JA632

specifically, and against the valid and applicable Tribal law and regulation governing the Tribal Corporate Plaintiffs' business activities.

55.     Defendants' action are not necessary to achieve a legitimate, non-protectionist state interest as the action discriminates against regulated economic development activities, pursuant to tribal law and consistent with federal law, and Defendants' actions cannot be shown to serve a legitimate, non-protectionist interest.

56.     Plaintiffs have been damaged by Defendants' actions in that Tribal Corporate Plaintiffs' business relationships are being harmed and Plaintiff Tribes and Plaintiff Tribal Regulators have not been given the sovereign recognition to which they are entitled.

## THIRD CAUSE OF ACTION
**(Violation of the Dormant Commerce Clause – Pled in the Alternative – Facially Neutral Effect of Discrimination as to all Defendants)**

57.     Plaintiffs re-allege the above paragraphs and incorporate those paragraphs herein as if set forth in full.

58.     The Dormant Commerce Clause of the United States Constitution requires that State action that imposes a burden on interstate commerce that, if is neutral on its face, the Court must balance interests, and must strike the State law or action unless the burden on interstate commerce is clearly excessive in relation to local benefits.

59.     Defendants' actions a burden on interstate commerce, and on the Plaintiffs' specifically that clearly exceeds any perceived local benefits.  Fundamental tenets of sovereignty of Indian nations as recognized pursuant to well-established federal law and policy - and inherent rights and authority of Indian nations to engage in self-governance and self-determination, clearly outweigh the local benefits Defendants seek to gain for New York residents by pressuring banks and TPPPs by publishing inflammatory and threatening correspondence to Tribal Corporate Plaintiffs' business relations.

60.     Plaintiffs have been damaged by Defendants' actions in that Tribal Corporate Plaintiffs'

13

CONFIDENTIAL

JA633

business relationships are being harmed and Plaintiff Tribes and Plaintiff Tribal Regulators have not been given the sovereign recognition to which they are entitled.

**FOURTH CAUSE OF ACTION**
**(Violations of the Dodd-Frank Wall Street Reform and Consumer Protection Act (12 U.S.C. §**
**5301 – 5641) for Failure to Recognize Plaintiff Tribal Regulators as to all Defendants)**

61.     Plaintiffs re-allege the above paragraphs and incorporate those paragraphs herein as if set forth in full.

62.     Pursuant to the Dodd-Frank Wall Street Reform and Consumer Protection Act (12 U.S.C. § 5301   5641) ("Dodd-Frank Act"), federally recognized tribes, including Tribal Government Plaintiffs, are defined  as States purposes of consumer protection laws and the financial services contemplated herein.

63.     Plaintiff Tribal Regulators are on equal footing with federal and state regulators, and the Dodd-Frank Act requires regulatory agencies seeking to engage in review or institute action against any tribal entity providing consumer financial services, including Tribal Corporate Plaintiffs, to engage on a regulator-to-regulator basis with Plaintiff Tribal Regulators.

64.     Defendants have intentionally and improperly refused to properly engage in such a relationship with Plaintiff Tribal Regulators in violation of federal law.

65.     Plaintiffs have been damaged by Defendants' intentional and improper actions as Tribal Government Plaintiffs and Plaintiff Tribal Regulators have not been afforded the sovereign recognition to which they are entitled, and as mandated pursuant to federal law.

**FIFTH CAUSE OF ACTION**
**(Executive and Express Federal Preemption as to all Defendants)**

66.     Plaintiffs re-allege the above paragraphs and incorporate those paragraphs herein as if set forth in full.

67.     Defendants are each State agencies and actors tasked pursuant to New York State

14

CONFIDENTIAL

Constitutional and statutory law to regulate individuals and entities acting within the State of New York.

68.     Tribal Government Plaintiffs are federally recognized tribes entitled to State recognition of their sovereignty that share a government-to-government relationship with the United States.

69.     Tribal Regulator Plaintiffs are governmental arms of Tribal Governmental Plaintiffs entitled to interact with regulatory agencies wishing to assert jurisdiction over Tribal Corporate Plaintiffs on a regulator-to-regulator basis pursuant to the Dodd-Frank Act.

70.     Tribal Corporate Plaintiffs are lawfully engaged in lending pursuant to applicable Tribal law adopted by Tribal Government Plaintiffs and enforced by Tribal Regulator Plaintiffs, and such Tribal law and regulation governing Indian Commerce are recognized and entitled to recognition pursuant to the Indian Commerce Clause and United States Supreme Court jurisprudence recognizing tribal sovereignty and each tribe's inherent right to enact its own laws and engage in economic development.

71.     The Federal government's express intent to leave matters of Indian commerce solely within the purview of Federal government oversight dictates that Defendants lack regulatory jurisdiction over Tribal Corporate Plaintiffs' legitimate business operations.  Federal law and policy thus preempt the laws of the State of New York.

72.     Defendants' have wrongfully attempted to assert regulatory control over Tribal Corporate Plaintiffs' legitimate business activity in contravention of Federal law and policy and tribal laws.

73.     Plaintiffs have been damaged by Defendants' unlawful attempts to assert regulatory control.  Defendants have failed to recognize the sovereignty and law-making authority of Tribal Government Plaintiffs and Tribal Regulators Plaintiffs, and unlawfully infringed upon their rights of sovereignty. Tribal Corporate Plaintiffs have been damaged by Defendants' attempts to cease its legal and legitimate business operations in the State of New York.

<mark>SIXTH CAUSE OF ACTION</mark>
<mark>(Unlawful disparate treatment of state-chartered banks and Tribal Corporate Plaintiffslicensed by Plaintiff Tribal Regulators as to all Defendants) [PATTON BOGGS TO INCORPORATE]</mark>

15

CONFIDENTIAL

JA635

74.    Plaintiffs re-allege the above paragraphs and incorporate those paragraphs herein as if set forth in full.

### SEVENTH CAUSE OF ACTION
**(Tortious Interference with Contract with Banks and Third Party Processors as to all Defendants)**

75.    Plaintiffs re-allege the above paragraphs and incorporate those paragraphs herein as if set forth in full.

76.    Tribal Corporate Plaintiffs have existing contractual relationships with numerous banks and third party payment processors ("TPPPs") that utilize a variety of banks to facilitate access to the ACH network and to process payments to allow Tribal Corporate Plaintiffs to engage in business. [INSERT] contracts with InterceptEFT to serve this function..

77.    Defendants were aware of the existence of such agreements between Tribal Corporate Plaintiffs and TPPPs and banks.

78.    In the August 5, 2013 Letters, Defendant Lawsky characterized Tribal Corporate Plaintiffs operations as "illegal online payday lending," repeatedly stated that such operations were unlawful, and requested that the banks and NACHA (and thereby all of NACHA's members, including banks and TPPPs) "work with [the Department] to choke off ACH access" to several lenders, including Tribal Corporate Plaintiffs.

79.    Upon information and belief, through such correspondence, Defendants successfully pressured banks and TPPPs, including InterceptEFT, to breach their existing agreements with Tribal Corporate Plaintiffs, terminating their existing agreements, closing their accounts, and refusing to continue to provide access to the ACH network pursuant to contractual obligations.

80.    Defendant's actions were intentionally calculated to cause damage to Tribal Corporate Plaintiffs and were performed with the intentional purpose of causing harm to Tribal Corporate Plaintiffs without sound legal basis,  justifiable cause, or due process of law.

81.    Tribal Corporate Plaintiffs have suffered damages as a result of Defendant's interference with their business contracts to the extent that Tribal Corporate Plaintiffs are losing contractual

16

CONFIDENTIAL

JA636

relationships, business contacts, and the ability to functionally engage in already-originated loans that were legally contracted.

### EIGHT CAUSE OF ACTION
**(Tortious Interference with Contracts with Consumers as to all Defendants)**

82.     Plaintiffs re-allege the above paragraphs and incorporate those paragraphs herein as if set forth in full.

83.     Tribal Corporate Plaintiffs entered into contracts with various banks and third payment party processors whereby banks agreed, for a fee, to process payments and transactions, transfer funds, and grant each Tribal Corporate Plaintiffs' access to the ACH network.

84.     Tribal Corporate Plaintiffs sought to contract with those banks and TPPPs, and the banks intended to continue to conduct their payment processing and financial services pursuant to their agreements with Tribal Corporate Plaintiffs.

85.     Defendant Department and Defendant Lawsky were  aware of the existence of such agreements between Plaintiffs and the banks and TPPPs.

86.     In his August 5, 2013 Letters, Defendant Lawsky characterized Tribal Corporate Plaintiffs' operations as "illegal online payday lending," repeatedly stated that such operations were unlawful, and requested that the banks and NACHA "work with [Defendant Department] to choke off ACH access" to several lenders, including Tribal Corporate Plaintiffs.

87.     Through such correspondence, Defendant Lawsky and Defendant Department knowingly, intentionally and improperly procured a breach of banks' and TPPPs' existing agreements with Tribal Corporate Plaintiffs by cancelling their accounts and refusing to continue to provide financial services pursuant to their agreements with Lending Plaintiffs.

88.     Plaintiffs entered into short-term consumer loan agreements with several consumers whereby consumers borrowed an amount of money and agreed to pay it back with interest.

89.     There was a reasonable probability that Plaintiffs would have received future economic

17

CONFIDENTIAL

JA637

benefits if their agreements with the consumers would have been allowed to continue uninterrupted.

90.     Defendant Lawsky and Defendant Department were aware of the existence of the agreements between Tribal Corporate Plaintiffs and the banks, as well as the agreements between Tribal Corporate Plaintiffs and the short-term loan consumers.

91.     Defendant Lawsky and Defendant Department intentionally interfered with these prospective relationships by sending correspondence (a) incorrectly characterizing Plaintiffs' business operations as "illegal online payday lending"; (b) requesting banks and NACHA to "choke off ACH access" to Plaintiffs"; and (c) stating that banks "have proven to be . . . an essential cog in the vicious machinery that these purveyors of predatory loans use to make an end-run around New York law."

92.     Department Lawsky's and Defendant Department's actions caused damage to Tribal Corporate Plaintiffs without right or justifiable cause.

93.     Tribal Corporate Plaintiffs have suffered damages as a result of Defendant Lawsky and Defendant Department's  interference with the contracts currently in place with their existing consumers and the economic benefits that Tribal Corporate Plaintiffs had reasonably expected to receive.

## NINTH CAUSE OF ACTION
**(Negligent Interference with Prospective Economic Advantage for Relations with Banks and Third Party Payment Processors as to all Defendants)**

94.     Plaintiffs re-allege the above paragraphs and incorporate those paragraphs herein as if set forth in full.

95.     Tribal Corporate Plaintiffs entered into contracts with various banks and TPPPs whereby banks agreed, for a fee, to process payments and transactions, transfer funds, and grant each Tribal Court Plaintiffs' access to the ACH network.

96.     Tribal Corporate Plaintiffs sought to contract with those banks and TPPPs, and the banks intended to continue to conduct their payment processing and financial services pursuant to their agreements with Tribal Corporate Plaintiffs.

97.     Defendant Department and Defendant Lawsky were aware of the existence of such

18

agreements between Plaintiffs and the banks and the TPPPs.

98.     In his August 5, 2013 Letters, Defendant Lawsky characterized Lending Plaintiffs' operations as "illegal online payday lending," repeatedly stated that such operations were unlawful, and requested that the banks and NACHA "work with [Defendant Department] to choke off ACH access" to several lenders, including Tribal Corporate Plaintiffs.

99.     Through such correspondence, Defendant Lawsky and Defendant Department negligently and improperly procured a breach of banks' and TPPPs' existing agreements with Tribal Corporate Plaintiffs by cancelling Tribal Corporate Plaintiffs' accounts and refusing to continue to provide financial services pursuant to their agreements with Tribal Corporate Plaintiffs.

100.    There was a reasonable probability that Tribal Corporate Plaintiffs would have received future economic benefits if their agreements with banks and TPPPs and would have continued their lawful business activity uninterrupted by unlawful State action by the Defendants.

101.    Defendant Lawsky and Defendant Department was aware of the existence of the agreements between Tribal Corporate Plaintiffs and the banks and TPPPs.

102.    Defendant Lawsky and Defendant Department negligently and improperly interfered with these prospective relationships by sending correspondence (a) incorrectly characterizing Lending Plaintiffs' business operations as "illegal online payday lending"; (b) requesting banks and NACHA to "choke off ACH access" to Plaintiffs"; and (c) stating that banks "have proven to be . . . an essential cog in the vicious machinery that these purveyors of predatory loans use to make an end-run around New York law."

103.    Department Lawsky's and Defendant Department's actions caused damage to Tribal Corporate Plaintiffs without right or justifiable cause.

104.    Tribal Corporate Plaintiffs have suffered and continue to suffer damages as a result of Defendant Lawsky and Defendant Department's interference with their various business contracts.

19

CONFIDENTIAL

### TENTH CAUSE OF ACTION
**(Negligent Interference with Prospective Economic Advantage for Continued Customer Relations as to all Defendants)**

105.    Plaintiffs re-allege the above paragraphs and incorporate those paragraphs herein as if set forth in full.

106.    Tribal Corporate Plaintiffs entered into contracts with various banks and TPPPs whereby banks and the third party vendors agreed, for a fee, to process payments and transactions, transfer funds, and grant each Plaintiff access to the ACH network.

107.    There was a reasonable probability that Tribal Corporate Plaintiffs would have received future economic benefits if their relationships with the banks and TPPPs would have been allowed to continue uninterrupted.

108.    Tribal Corporate Plaintiffs entered into short-term consumer loan agreements with several consumers whereby consumers borrowed an amount of money and agreed to pay it back with interest.

109.    There was a reasonable probability that Tribal Corporate Plaintiffs would have received future economic benefits if their agreements with the consumers would have been allowed to continue uninterrupted.

110.    Defendant Lawsky and Defendant Department were aware of the existence of the agreements between Tribal Corporate Plaintiffs and the banks and TPPPs, as well as the agreements between Tribal Corporate Plaintiffs and the short-term loan consumers.

111.    Defendant Lawsky and Defendant Department negligently and improperly interfered with these prospective relationships by sending correspondence (a) incorrectly characterizing Plaintiffs' business operations as "illegal online payday lending"; (b) requesting banks and NACHA to "choke off ACH access" to Plaintiffs"; and (c) stating that banks "have proven to be . . . an essential cog in the vicious machinery that these purveyors of predatory loans use to make an end-run around New York law."

112.    Department Lawsky's and Defendant Department's actions caused damage and continue to cause damage to the Tribal Corporate Plaintiffs without right or justifiable cause.

20

CONFIDENTIAL

JA640

113.    Tribal Corporate Plaintiffs have suffered damages as a result of Defendant Lawsky and Defendant Department's interference with their short term loan customers.

### ELEVENTH CAUSE OF ACTION
### (False Light as to All Defendants)

114.    Plaintiffs re-allege the above paragraphs and incorporate those paragraphs herein as if set forth in full.

115.    The letters issued by Defendant Department and Defendant Lawsky to multiple parties repeatedly and erroneously characterized Tribal Corporate Plaintiffs as "illegal lenders" that act in a predatory and scheming manner to "prey on vulnerable New Yorkers."

116.   As entities wholly owned and operated by Indian nations, which are properly regulated and act legally pursuant to tribal and federal law, Tribal Corporate Plaintiffs, in no way, act illegally by making its services available to the residents of any state, including the state of New York.

117.   A reasonable person    similar situated in the sovereign position of the Tribal Corporate Plaintiffs and the Tribal Government Plaintiffs    would find the untruthful statements of the Defendants to be highly offensive.

118.   Defendants had knowledge of or acted in reckless disregard as to the falsity of its characterizations of the Tribal Corporate Plaintiffs as "illegal lenders" as Defendants' previously received correspondences from the Tribal Corporate Plaintiffs elaborating on the legality of their operations and the structure of their companies as wholly owned and regulated by Indian nations.

### TWELFTH CAUSE OF ACTION
### (Injurious Falsehood as to All Defendants)

119.   Plaintiffs re-allege the above paragraphs and incorporate those paragraphs herein as if set forth in full.

120.   The false and misleading allegations contained in the letters issued by the Defendant Department and Defendant Lawsky were specifically intended to damage and did, in fact, damage the property and pecuniary interests of the Tribal Corporate Plaintiffs, in turn, the Tribal Governmental

21

CONFIDENTIAL

JA641

Plaintiffs.

121.    The publicity of the Defendant Departments' letters and the thousands of banks and payment processors to which the letters were sent, would certainly lead a reasonable person to anticipate that damage would be imposed upon the Plaintiffs in relation thereto.

122.  Plaintiffs have suffered and continue to suffer damages as a result of Defendant Lawsky and Defendant Department's actions through negative impacts on their contractual relationships with banks, TPPPs and consumers directly.

123.  Such negative impact has resulted in actual and direct pecuniary loss.

### THIRTEENTH CAUSE OF ACTION
### (Trade Libel as to All Defendants)

124.  Plaintiffs re-allege the above paragraphs and incorporate those paragraphs herein as if set forth in full.

125.  In disseminating its letters, Defendant Department and Defendant Lawsky did so knowing that it was publishing false and derogatory material as to Tribal Corporate Plaintiffs and its business operations.

126.  The content of Defendant Department and Defendant Lawsky's letters to the Tribal Corporate Plaintiffs, NACHA and banks clearly demonstrated that the publication of the letters was calculated to prevent others from doing business with the Tribal Corporate Plaintiffs.

### FOURTEENTH CAUSE OF ACTION
### (Injunctive relief as to all Defendants)

127.    Plaintiffs re-allege the above paragraphs and incorporate those paragraphs herein as if set forth in full.

128.    Tribal Corporate Plaintiffs have already suffered and will continue to suffer immediate and irreparable harm as a result of the statements published by Defendant Lawsky and Defendant Department in the August 5, 2013 Letters.

22

JA642

129.     Upon information and belief, Defendant Lawsky and Defendant Department sent this correspondence to exert pressure on banks and TPPPs in an attempt to assert control over third parties and injure the Plaintiffs' ability to engage in lawful consumer finance operations.

130.     Plaintiffs will be irreparably harmed if Defendants are permitted to continue publishing libelous statements about their lending businesses and contacting banks and financial services associations requesting their assistance in attempting to shut down Lending Plaintiffs' lawful operations. In addition, the filing of regulatory actions against Tribal Corporate Plaintiffs could also cause harm to their economic and managerial interests.

131.     Upon information and belief, without an injunction, Defendants will continue their smear campaign against Tribal Corporate Plaintiffs' operations, damaging their reputation and business operations and exposing them to public scorn.  Defendants would also be able to continue to request information from banks and financial services associations, seeking their assistance in an attempt to shut down Lending Plaintiffs' lending businesses, and pursue regulatory action against Lending Plaintiffs.

132.     There is no adequate legal remedy to compensate the Tribal Corporate Plaintiffs for Defendants' actions.

133.     Defendants have no legal basis for its claims that they have the ability to pursue or enforce any regulatory actions against Tribal Corporate Plaintiffs.  Accordingly, Tribal Corporate Plaintiffs have a substantial likelihood of success on the merits.

### FIFTEENTH CAUSE OF ACTION
### (Declaratory relief)

127.     Plaintiffs re-allege the above paragraphs and incorporate those paragraphs herein as if set forth in full.

128.     An actual controversy has arisen and now exists between Plaintiffs and Defendants concerning their respective rights and duties.

129.     Defendants, having cited to various New York state statutes and regulations in their Letters, contend that Tribal Corporate Plaintiffs lending activities are illegal according to New York

23

CONFIDENTIAL

JA643

state law, and, as a result, that Plaintiff Tribes and Plaintiff Tribal Regulators lack jurisdiction to adequately regulate Tribal business and Tribal Corporate Plaintiffs

130.    Plaintiffs' legal authority Tribal Corporate Plaintiffs' lawful business activities in New York are lawful because they are lawful pursuant to applicable federal and tribal law, that New York state law does not apply to their operations, and that Defendants lack jurisdiction to pursue any regulatory actions against Plaintiffs.

131.    Pursuant to 28 U.S.C. §§ 2201 and 2202, a judicial determination of the respective rights of the parties with respect to the legality of Tribal Corporate Plaintiffs' financial activities is necessary and appropriate under the circumstances.

132.    Plaintiffs have no equally plain, speedy, or adequate remedy to prevent Defendants' actions other than seeking declaratory relief.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests an Order of this Court granting the following equitable relief:

133.    An injunction restraining and enjoining Defendants from pursuing any and all state regulatory and enforcement actions against all Plaintiffs for lack of jurisdiction pursuant to federal law;

134.    An injunction restraining and enjoining Defendants from pursuing any and all state regulatory and enforcement actions over financial institutions, payment processors, and financial services associations for the purpose of requesting that these entities cease processing legal transactions on behalf of the Tribal Corporate Plaintiffs, or in an attempt to otherwise stifle, reduce, or interrupt the Plaintiffs' lawful business operations;

135.  An injunction restraining and enjoining Defendants from issuing, publishing and/or disseminating in any manner whatsoever, any and all statements regarding Plaintiffs, their lawful business operations or the incorrect and injurious claim that its business activities are illegal in the State of New York or anywhere else in the United States.

24

CONFIDENTIAL

JA644

136.   A declaratory order from the Court recognizing that Plaintiffs are sovereign Indian nations, and, as such, New York state law is wholly inapplicable to them and their wholly owned tribal entities, and, accordingly Defendants lack jurisdiction to pursue any regulatory or enforcement actions against Plaintiffs, financial institutions, or third party processors in relation thereto;

136.   A declaratory order from the Court stating that the financial services of the Tribal Corporate Plaintiffs are legal pursuant to tribal law, consistent with stringent industry best practices, and in conformance with federal consumer protection laws.

137.   Damages on Plaintiffs' causes of action pursuant to proof;

138.   An order awarding Plaintiff its costs, expenses, and reasonable attorneys' fees as provided by law;

139.   Such other costs as the Court may deem equitable and just; and

140.   Such additional relief as the Court may conclude is equitable and appropriate.

Dated:  August _____, 2013

RESPECTFULLY SUBMITTED,

ROSETTE, LLP

_____
Robert A. Rosette (*pro hac vice*)
Saba Bazzazieh (*pro hac vice*)
ROSETTE, LLP
565 W. Chandler Blvd., Suite 212
Chandler, AZ 85225
Telephone: (480) 889-8990
Facsimile: (480) 889-8998

Attorneys for Plaintiff

[ADDITIONAL LEGAL COUNSEL]

25

CONFIDENTIAL

JA645

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

CONFIDENTIAL

Exhibit 22

**From:** Matt Martorello
**To:** Karrie Wichtman
**Subject:** RE: LEGAL RESPONSE REQUIRED - NY AG Letter Cease & Desist Letter
**Date:** Friday, August 9, 2013 9:25:19 AM

I agree, but I think it's better for Think Finance to have the fight. They have a dozen banks and 5 ACH providers and they are all over the state AGs, CFPB, and FTC radars. LVD is not and for LVD this will result in: A) a countersuit from NY, FTC investigation, a CFPB CID, and potentially other states piling on. How much is too much before your 1 bank/processor folds on you?

LVD's house is not completely in order yet. Time is our most important commodity right now. We don't have to be a plantiff, it will happen anyways with Think and Mark Curry. RRTL/DCTF are too young for this right now. We haven't even discussed a budget for it, but I'd have to multiply it by 5 because of all of the other lawsuits and investigations that are just coming to come immediately after we stand up. Which I'm certain I could not finance.

We're better to let Otoe and Think/Curry who have $700mm in loans on the street go to war and we focus on sustaining and strengthening right now. We're simply undercapitalized, the bench isn't deep enough, and we're not backed into a corner like they are. The better option is to stay low and get stronger, not to go to war any sooner than we have to and we certainly don't have to yet.

If the FTC were here already and the CFPB, I'd have a different opinion. It will be impossible for a cease fire next week with NY if that NAFSA full page ad runs, no point in even meeting at that stage. We open the doors and I really think we'll be overwhelmed with counter attacks from all sides, and it will be game over really quick. We don't make enough $ to finance all of the battles that are to come. Rick Gerber is meeting with the FDIC next week in person. He may for the 1st time feel that FDIC pressure and we'll see how he reacts. We certainly should do nothing before that meeting happens as well as the NY face to face meeting. We should have the OLA accreditation audit in September and have that completed as well before we step out into the light too.

Too young, too small, too poor and not enough depth in the bench with ACH/Banks. This is a Think Finance and Mark Curry battle right now, we make 0 impact by signing onto it and yet we enjoy all of the benefits if we delay and gather our strength.

They are clearly coordinating and they're going to counter and come at us from all sides. Maybe they won't, but that's all they'd need to do to shut down the business at LVD b/c we simply would not be able to afford to stay in business anymore. It's that easy for them to win against us. Think/Otoe are 20 times the size.

**From:** Karrie Wichtman [mailto:kwichtman@rosettelaw.com]
**Sent:** Friday, August 9, 2013 12:21 AM
**To:** Matt Martorello
**Subject:** Re: LEGAL RESPONSE REQUIRED - NY AG Letter Cease & Desist Letter

CT. And just so you know the Tribe is ready to fight - and surprisingly enough me along with my usually even keeled conservative nature believes that they are right. It's time to deal with

ROSETTE_REVISED_043135
JA648

these questions/issues head on through a concerted effort based upon Sovereignty that can't be ignored. And one that we initiate so that we are proactive and not reactive like we have been all week. I have no delusions of grandeur -it will be an uphill battle but neither LVD nor any of the 570 plus federally recognized tribes in this country has ever shied away from a fight-- and they certainly have not been able to maintain the sovereignty that they have left by laying SUPER low! Where's your tommy gun!

Bottom line is we need your help. I know you are being counseled otherwise and I certainly respect that advice and the person it is coming from - however, what do we achieve by laying low waiting for the next bomb to drop - hoping that it doesn't blow us up? The way iI see it the risk is the same. In addition, LVD is still interested in sitting down with the NY regulators next week- perhaps we can avoid participation if that is successful but i am not going to hold my breath. I see the talks as an opportunity however for the most part the harm is already done. Also, nothing will be filed unless and until fully vetted with the Tribe and you.  A commitment to proceed with exploration of the lawsuit Rob proposed which likely won't be filed until after those discussions next week is a sound decision.

Talk to you in the morning.

Karrie

Sent from my iPhone

On Aug 8, 2013, at 10:50 PM, "Matt Martorello" <mattm@bellicosevi.com> wrote:

> CT or ET?
>
> ---
>
> **From:** Karrie Wichtman [mailto:kwichtman@rosettelaw.com]
> **Sent:** Thursday, August 8, 2013 11:50 PM
> **To:** Matt Martorello
> **Subject:** Re: LEGAL RESPONSE REQUIRED - NY AG Letter Cease & Desist Letter
>
> Sounds good. 8:00 am?
>
> Sent from my iPhone
>
> On Aug 8, 2013, at 10:48 PM, "Matt Martorello" <mattm@bellicosevi.com> wrote:
>
>> Ok, first thing tomorrow?
>>
>> ---
>>
>> **From:** Karrie Wichtman [mailto:kwichtman@rosettelaw.com]
>> **Sent:** Thursday, August 8, 2013 11:48 PM
>> **To:** Matt Martorello
>> **Subject:** Re: LEGAL RESPONSE REQUIRED - NY AG Letter Cease & Desist Letter
>>
>> Given your concerns, before is preferable.

Sent from my iPhone

On Aug 8, 2013, at 10:43 PM, "Matt Martorello"
<mattm@bellicosevi.com> wrote:

> Agree, do you want to do that before I reply to Rob's email?
> Bottom line is, we have 1 bank and we have ½ of an ACH
> provider. If we spook either b/c we stand up right now, then
> LVD is in default, and Alpha credit takes the entire business
> OVERNIGHT. Game over, everyone loses their jobs and LVD
> loses the income. We can't risk that.
>
> I'm seeing it now today, Tucker's banks have been with him
> for a decade and he has 20 times the money with them!
> Several backed out this week and they are extremely
> worried. All it takes is the FTC investigation (with or w/o
> merit).

> **From:** Karrie Wichtman
> [mailto:kwichtman@rosettelaw.com]
> **Sent:** Thursday, August 8, 2013 11:40 PM
> **To:** Matt Martorello
> **Subject:** Re: LEGAL RESPONSE REQUIRED - NY AG Letter
> Cease & Desist Letter

> Ok, you and I need to have a conversation soon please.

> Sent from my iPhone

> On Aug 8, 2013, at 10:26 PM, "Matt Martorello"
> <mattm@bellicosevi.com> wrote:

>> I don't think we should before the
>> conversations face-to-face with them next
>> week. I think we need to stay SUPER low and
>> out of trouble right now. I'll elaborate in my
>> reply to Rob.

>> **From:** Karrie Wichtman
>> [mailto:kwichtman@rosettelaw.com]
>> **Sent:** Thursday, August 8, 2013 10:57 PM
>> **To:** jasong@duckcreektf.com
>> **Cc:** Justin Martorello; Matt Martorello; Brian
>> McFadden; Daniel Gravel; Craig Mansfield;
>> giizhigookway
>> **Subject:** Re: LEGAL RESPONSE REQUIRED - NY

CONFIDENTIAL

AG Letter Cease & Desist Letter

So have we decided if we will be ceasing
and desisting?

Sent from my iPhone

On Aug 8, 2013, at 9:25 AM,
"jasong@duckcreektf.com"
<jasong@duckcreektf.com> wrote:

> Here is a Cease & Desist Order
> we received from State of NY
>
> Thanks,
> Jason
>
> <NY AG Letter - Cease &
> Desist Order.pdf>

**This email and any files transmitted with
it are confidential and may contain
privileged or copyrighted information. You
must not present this message to another
party without gaining permission from the
sender. If you are not the intended recipient
you must not copy, distribute or use this
email or the information contained in it for
any purpose other than to notify us. If you
have received this message in error, please
notify the sender immediately, and delete
this email from your system.**

**This email and any files transmitted with it are
confidential and may contain privileged or copyrighted
information. You must not present this message to
another party without gaining permission from the
sender. If you are not the intended recipient you must not
copy, distribute or use this email or the information
contained in it for any purpose other than to notify us. If
you have received this message in error, please notify the
sender immediately, and delete this email from your
system.**

**This email and any files transmitted with it are confidential and
may contain privileged or copyrighted information. You must not
present this message to another party without gaining permission
from the sender. If you are not the intended recipient you must not
copy, distribute or use this email or the information contained in it for
any purpose other than to notify us. If you have received this message
in error, please notify the sender immediately, and delete this email
from your system.**

**This email and any files transmitted with it are confidential and may contain

# Exhibit 23

**Leigh Wink**

| | |
|---|---|
| **From:** | gkway@duckcreektf.com |
| **Sent:** | Thursday, October 03, 2013 3:21 PM |
| **To:** | Karrie Wichtman; Matt Martorello; Chairman James Williams; Craig Mansfield |
| **Cc:** | Justin Martorello; Daniel Gravel; weddlej@gtlaw.com; Saba Bazzazieh; Robert Rosette; Cheryl McGeshick; Eli Edwards; gkway@lvdtribal.com; Henry Smith; Joette Pete-Baldwin (joette.pete@lvdtribal.com); John McGeshick,  Jr.; Susan McGeshick (susan.mcgeshick@lvdcasino.com); Tyrone McGeshick (tyrone.mcgeshick@lvdcasino.com) |
| **Subject:** | RE: Notice to Cease Servicing Origination of New Loans to NY consumers |
| **Attachments:** | Moratorium on NY Customers.pdf |

Here you go.

*giizhigookway*
*CEO/Co-Manager*
*Duck Creek Tribal Financial*
*P.O. Box 704*
*Watersmeet, MI  49969*
*906.358.2008-Office*
*906.358.2010-Fax*
*906.366.7041-Cell*
*gkway@duckcreektf.com*


-------- Original Message --------
Subject: RE: Notice to Cease Servicing Origination of New Loans to NY
consumers
From: Karrie Wichtman <kwichtman@rosettelaw.com>
Date: Thu, October 03, 2013 1:55 pm
To: Matt Martorello <mattm@bellicosevi.com>, Chairman James Williams
<jim.williams@lvdtribal.com>, "gkway@duckcreektf.com"
<gkway@duckcreektf.com>, Craig Mansfield <craigm@duckcreektf.com>
Cc: Justin Martorello <JustinM@BellicoseVI.com>, Daniel Gravel
<DanielG@bellicosevi.com>, "weddlej@gtlaw.com" <weddlej@gtlaw.com>, Saba
Bazzazieh <sbazzazieh@rosettelaw.com>, Rob Rosette
<rosette@rosettelaw.com>, Cheryl McGeshick
<cheryl.mcgeshick@lvdtribal.com>, Eli Edwards
<eli.edwards@lvdtribal.com>, "gkway@lvdtribal.com"
<gkway@lvdtribal.com>, Henry Smith <henry.smith@lvdtribal.com>, "Joette
Pete-Baldwin (joette.pete@lvdtribal.com)" <joette.pete@lvdtribal.com>,
"John McGeshick, Jr." <johnjr@lvdtribal.com>, "Susan McGeshick
(susan.mcgeshick@lvdcasino.com)" <susan.mcgeshick@lvdcasino.com>,
"Tyrone McGeshick (tyrone.mcgeshick@lvdcasino.com)"
<tyrone.mcgeshick@lvdcasino.com>

All,

Please find attached approval documents for the consideration of the Co-
Managers of RRTL and DCTF (the "TLEs") issuing a moratorium on consumer
loans in the State of New York and the winding down of the business currently
existing in the State of New York, immediately, until further notice, which I

1

CONFIDENTIAL

JA653

understand only constitutes five percent (5%) of the current business of RRTL and DCTF,  will have little to no effect in Tribal Net Profits.

Matt and SPVI Team:

In response to your response, thank you for the clarification of the meaning of your email of yesterday.  While I disagree with your statement Judge Sullivan's 9/30 Order "right now today [] represents a basis for New York authorities to initiate enforcement proceedings" and that New York law has been modified in any way in relationship to the operation of the businesses, I do agree that it makes good business sense for the TLEs to take action as provided for in the attached moratorium approval documents.  Nevertheless, and as indicated yesterday, that is a decision for the TLE to make, not me or SPVI, considering we have not yet received "a final judgment of a court of competent jurisdiction, after all appeals thereof" that changes any of the Legal Requirements under which the TLEs, collectively, operate.

Sincerely,

**Karrie S. Wichtman, Partner**
**Rosette, LLP**
**Attorneys at Law**
Michigan Office
25344 Red Arrow Hwy, Suite B
Mattawan, MI 49071
269.283.5005 – Office
480.242.6959 - Cell
517.913.6443 – Fax
kwichtman@rosettelaw.com
www.rosettelaw.com

CONFIDENTIAL COMMUNICATION: THIS MESSAGE IS A CONFIDENTIAL ATTORNEY COMMUNICATION ONLY FOR USE BY THE INTENDED RECIPIENT.  ANY INADVERTENT RECEIPT SHALL NOT CONSTITUTE A WAIVER OF ATTORNEY-CLIENT OR WORK PRODUCT PROTECTION.  IF RECEIVED IN ERROR, PLEASE NOTIFY KARRIE S. WICHTMAN IMMEDIATELY AND DELETE THIS MESSAGE.  THANK YOU FOR YOUR COOPERATION.

---

**From:** Matt Martorello [mailto:mattm@bellicosevi.com]
**Sent:** Thursday, October 3, 2013 9:55 AM
**To:** Karrie Wichtman; Chairman James Williams; gkway@duckcreektf.com; Craig Mansfield
**Cc:** Justin Martorello; Daniel Gravel; weddlej@gtlaw.com; Saba Bazzazieh; Rob Rosette; Cheryl McGeshick; Eli Edwards; gkway@lvdtribal.com; Henry Smith; Joette Pete-Baldwin (joette.pete@lvdtribal.com); John McGeshick, Jr.; Susan McGeshick (susan.mcgeshick@lvdcasino.com); Tyrone McGeshick (tyrone.mcgeshick@lvdcasino.com)
**Subject:** RE: Notice to Cease Servicing Origination of New Loans to NY consumers

Yes, Karrie, thank you for that clarification.  It is our intention to recommend that the Enterprise refrain, immediately, and until further notice, from making new loans in the State of New York and that current loans be wound down until paid in

CONFIDENTIAL

full or some other disposition of the debt to the Enterprise has been reached.  But we also mean to say that whether or not the Enterprise accepts our recommendation, SPVI cannot continue to provide services with respect to any new loans in New York.  While Judge Sullivan's order may be appealed, and hopefully overturned, right now today it represents a basis for New York authorities to initiate enforcement proceedings.  Whatever valid defenses the Tribe and the Enterprise might have to such actions, SPVI does not have such sovereign protections and we feel we have to comply with what a New York court says New York law is.  Although Judge Sullivan's order isn't clear on a number of points, it is clear that New York's non-discriminatory anti-usury laws apply, and SPVI does not intend to willfully and wantonly disregard that ruling because we could face liability from New York for doing so.

---

**From:** Karrie Wichtman [mailto:kwichtman@rosettelaw.com]
**Sent:** Wednesday, October 2, 2013 4:39 PM
**To:** Matt Martorello; Chairman James Williams; gkway@duckcreektf.com; Craig Mansfield
**Cc:** Justin Martorello; Daniel Gravel; weddlej@gtlaw.com; Saba Bazzazieh; Rob Rosette; Cheryl McGeshick; Eli Edwards; gkway@lvdtribal.com; Henry Smith; Joette Pete-Baldwin (joette.pete@lvdtribal.com); John McGeshick, Jr.; Susan McGeshick (susan.mcgeshick@lvdcasino.com); Tyrone McGeshick (tyrone.mcgeshick@lvdcasino.com)
**Subject:** RE: Notice to Cease Servicing Origination of New Loans to NY consumers

Matt and SPVI Team,

Please advise as to the intent of your email as it is my understanding that your email and the citation to Section 9.4 of the Servicing Agreement is effectively a declaration of breach or dispute being asserted in writing in accordance with Section 18.1 of the Servicing Agreement, considering that that provision cited calls for cessation of the obligations of the parties to one another under the Agreement and states that the "Agreement shall be of no further force and effect".  Claiming such a breach under 9.4 necessarily requires that such material change in law be based upon "a final judgment of a court of competent jurisdiction, after all appeals thereof".  The Order of the Court denying the Plaintiff's Preliminary Injunction is certainly not such an order as it is not a final judgment of a court,  appealable and while no such appeals have yet been file we have 30 days from yesterday's date to do so.  Transmitting such a notice declaring a breach, if that is the intent here, is unwarranted and unsupported by the facts at hand. It matters not how Judge Sullivan's order will be regarded by overzealous regulatory agencies but rather that such an order IS NOT, in fact, a final order of the Court on the merits changing a material aspect of the Legal Requirements governing the agreement of the parties.  Furthermore the provision does not appear to allow for the singling out of a particular state, in this case NY, to wind down business- which is the cause for my confusion – and leads me to believe that it is not your intent at all to make such a declaration of breach.

CONFIDENTIAL

Indeed, your email, the concerns expressed, and the recommendations therein seem to fall more in line with Section 4.2 in that as the Servicer you have been contracted to advise the Enterprise regarding the "orderly administration and management of Enterprise in the areas of financial reporting, financing, regulatory compliance, marketing, human resources, development of third party servicer relationships, collections and risk assessment". Among other provisions included in Section 4.2 , your observations, and recommendation to the Enterprise not to lend to and wind down business involving residents in the State of New York surely fits within Section 4.2.1 (a) whereby the "Servicer will be responsible for providing pre-qualified leads to Enterprise and providing the necessary credit-modeling data and risk assessment strategies by which the Enterprise may evaluate to whether or not to extend funds to an individual borrower based on criteria that has been established by the Enterprise." Note that the Agreement, in that same section, however, makes quite clear that "The criteria used to extend funds to individual borrowers will remain within the sole and absolute discretion of the Enterprise and the Enterprise shall execute all necessary loan documentation". Therefore, in the spirit of clarification of your earlier email, would you agree that a better way to approach this matter may be for the Servicer as provided for in Section 4.2.1 (a) to make a recommendation to the Enterprise that in light of recent enforcement actions taken by the State of NY Department of Financial Services, the pending litigation and the recent preliminary Order of the Court, that the Enterprise refrain, immediately, and until further notice, from making new loans in the State of New York and that current loans be wound down until paid in full or some other disposition of the debt to the Enterprise has been reached?

I look forward to your response so that I may advise my client.

Regards,



**Karrie S. Wichtman, Partner**
**Rosette, LLP**
**Attorneys at Law**
Michigan Office
25344 Red Arrow Hwy, Suite B
Mattawan, MI 49071
269.283.5005 – Office
480.242.6959 - Cell
517.913.6443 – Fax
kwichtman@rosettelaw.com
www.rosettelaw.com

CONFIDENTIAL COMMUNICATION: THIS MESSAGE IS A CONFIDENTIAL ATTORNEY COMMUNICATION ONLY FOR USE BY THE INTENDED RECIPIENT. ANY INADVERTENT RECEIPT SHALL NOT CONSTITUTE A WAIVER OF ATTORNEY-

CONFIDENTIAL

CLIENT OR WORK PRODUCT PROTECTION.  IF RECEIVED IN ERROR, PLEASE NOTIFY KARRIE S. WICHTMAN IMMEDIATELY AND DELETE THIS MESSAGE.  THANK YOU FOR YOUR COOPERATION.

**From:** Matt Martorello [mailto:mattm@bellicosevi.com]
**Sent:** Wednesday, October 2, 2013 2:50 PM
**To:** Chairman James Williams; gkway@duckcreektf.com; Craig Mansfield
**Cc:** Karrie Wichtman; Justin Martorello; Daniel Gravel
**Subject:** Notice to Cease Servicing Origination of New Loans to NY consumers

Dear Mr. Chairman and Team:

Due to Judge Sullivan's ruling, we believe we have an involuntary termination event under the Servicing Agreement as it relates to loans made in the State of New York.  As you know, the Servicing Agreement provides:

Involuntary Termination Due to Changes in Legal Requirements
It is the understanding and intention of the parties that the establishment and operation of Enterprise conforms to and complies with all Legal Requirements. If during the term of this Agreement, Enterprise, or any material aspect of the business conducted by Enterprise, becomes prohibited by operation of federal law or determined by final judgment of a court of competent jurisdiction, after all appeals thereof, to be unlawful under applicable law, the obligations of the parties hereto shall cease, and this Agreement shall be of no further force and effect; provided that (i) the Servicer shall have the rights in Section 4.4 of this Agreement; (ii) the Servicer and the Enterprise shall retain all money previously paid to them pursuant to Section 6 of this Agreement; (iii) funds of Enterprise in any account shall be paid and distributed as provided in Section 6 of this Agreement, provided any Authorized Debt shall be paid in full; (iv) any money lent by or guaranteed by the Servicer or its affiliates to Servicer shall be repaid to the Servicer to the extent provided in a written agreement entered in connection therewith, with recovery of monetary payments or damages limited in recourse to Enterprise assets and any such payments or damages shall be made only after payment in full of any and all amounts under any Authorized Debt; and (v) the Enterprise, directly or indirectly, shall retain its interest in the title to all Enterprise assets, fixtures, supplies and equipment subject to any requirements of financing arrangements. Nothing contained in this Section 9.4 shall be read to preclude either or both parties from contesting any actions which could lead to the involuntary cessation of business by Enterprise.

While we understand that an appeal of Judge Sullivan's order is imminent, our concern is that Judge Sullivan's order finding that tribal enterprises are subject to New York's anti-usury laws will be regarded as sufficiently final by the State of New York such that it will precipitate their potential investigation and potential prosecution of us personally and our companies if we continue to provide New York-related services at this time.

We might be able to resume servicing New York loans at some point in the future, but for now, Judge Sullivan's Order presents a significant potential liability for us

CONFIDENTIAL

JA657

and we do not believe that we should service any new New York loans.  We are willing to wind down our New York services and see existing loans through to their completion, but we simply cannot flaunt the clear ruling from Judge Sullivan's order, however legally incorrect it might be.

This action applies both to services performed for the Red Rock Tribal Lending, LLC and Duck Creek Tribal Financial, LLC portfolios.

**Regards,**

**Matt Martorello**
Mobile:  773-209-7720
Email:  mm@BellicoseVI.com

**This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**
**This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

CONFIDENTIAL

JA658



# Duck Creek Tribal Financial, LLC

## DBA as Peppercash.com

E23967 Choate Road, P.O. Box 704, Watersmeet, Michigan 49969
Telephone: 906-358-2008    Facsimile: 906-358-4785

---

October 2, 2013

Pursuant to Article 3, Section 3.1 of Duck Creek Tribal Financial, LLC's ("Company") Operating Agreement, which is a wholly owned and operated tribal lending entity of, and created under the law of, the Lac Vieux Desert Band of Lake Superior Chippewa Indians (the "Tribe"), the Co-Managers are vested with the power and authority to do and perform all actions as may be necessary or appropriate to the conduct of the Company's business.

WHEREAS, On or about August 5, 2013, the sister Company of the Tribe, Red Rock Tribal Lending, LLC, ("RRTL") received cease and desist letters from the New York Department of Financial Services (DFS) falsely asserting that the Tribe's lending entities were in violation of New York civil and criminal laws, and threatening enforcement action related thereto; and

WHEREAS,  On or about August 5, 2013, DFS sent similar notices to hundreds of financial institutions and an electronic payment association comprised of payment processors which named the Tribe's lending entities and specifically and instructed these institutions to cease doing business with them; and

WHEREAS, on August 21, 2013, the Tribe, the Lac Vieux Desert Tribal Financial Services Regulatory Authority ("TFSRA"), and RRTL filed a lawsuit against the State of New York, specifically the DFS with regard to the Department of Financial Services complete disregard for the sovereign authority of the Lac Vieux Desert Band of Lake Superior Chippewa Indians' economic development efforts and sovereign status captioned The Otoe-Missouria Tribe of Indians et al v. New York State Department of Financial Services et al, Case No. 1:13-cv-05930-RJS (the "Lawsuit"); and

WHEREAS, shortly after the filing of the Lawsuit, the Tribe, the TFSRA and RRTL filed a Motion for Preliminary Injunction to enjoin DFS from taking any further enforcement action that would further harm the business of the Company; and

WHEREAS, on September 30, 2013, the Court issued an Order Denying Injunctive Relief as request, to which the Tribe, the TFSRA, and RRTL will appeal; and

WHEREAS, after performing a risk assessment in accordance with Section 4.2 of the agreement between the Company and SourcePointVI, LLC, the Company's contracted consultant and advisor on matters concerning the "orderly administration and management of Enterprise in the areas of financial reporting, financing, regulatory compliance, marketing, human resources, development of third party

CONFIDENTIAL

JA659

servicer relationships, collections and risk assessment" (the "Servicer") weighing regulatory enforcement concerns, the progress of the pending litigation, and the financial risk associated with continuing to make loans to New York residents, and knowledge that similarly situated companies have curtailed their business in the State of New York, the Servicer has recommended to the Company that it immediately cease making loans to consumers in the State of New York until further notice, and that current loans between the Company and consumers in the State of New York be wound down;

WHEREAS, after careful review and consideration by the Co-Managers of the recommendations of the Servicer regarding the cessation of making loans to New York consumers immediately, and until further notice, and the winding down of current loans between the Company and New York consumers to mitigate any potential financial loss to the Company, although there has been no material change to the Legal Requirements of the business of the Company as defined in the agreement between the Company and the Servicer, the Co-Managers believe that said recommendation is in the best interest of interest of the Company.

NOW THEREFORE BE IT RESOLVED THAT, the Co-Managers hereby institute a moratorium effective immediately, and until further notice, on the processing and origination of new loans to consumers located in the State of New York, and further directs that all current loans between the Company and consumers in the State of New York will continue to be serviced pursuant to Tribal law, the Company's practices and the Servicer's contractual obligations and be wound down until paid in full or some other disposition of the debt to the Company has been reached.

giizhigookway, Co-Manager

Craig Mansfield, Co-Manager



# RED ROCK TRIBAL LENDING, LLC

A wholly independently owned and operated entity of by the Lac Vieux Desert Band of Lake Superior Chippewa Indians

P.O. Box 704  ∞  Watersmeet, Michigan 49969   ∞   906-358-2008 (Phone)  ∞   906-358-4785 (Fax)

October 2, 2013

Pursuant to Article 3, Section 3.1 of the Red Rock Tribal Lending, LLC's ("Company") Operating Agreement, which is a wholly owned and operated tribal lending entity of, and created under the law of, the Lac Vieux Desert Band of Lake Superior Chippewa Indians (the "Tribe"), the Co-Managers are vested with the power and authority to do and perform all actions as may be necessary or appropriate to the conduct of the Company's business.

WHEREAS, On or about August 5, 2013, the Company received cease and desist letters from the New York Department of Financial Services (DFS) falsely asserting that the Tribe's lending entities were in violation of New York civil and criminal laws, and threatening enforcement action related thereto; and

WHEREAS,  On or about August 5, 2013, DFS sent similar notices to hundreds of financial institutions and an electronic payment association comprised of payment processors which named the Tribe's lending entities and specifically and instructed these institutions to cease doing business with them; and

WHEREAS, on August 21, 2013, the Tribe, the Lac Vieux Desert Tribal Financial Services Regulatory Authority ("TFSRA"), and the Company filed a lawsuit against the State of New York, specifically the DFS with regard to the Department of Financial Services complete disregard for the sovereign authority of the Lac Vieux Desert Band of Lake Superior Chippewa Indians' economic development efforts and sovereign status captioned *The Otoe-Missouria Tribe of Indians et al v. New York State Department of Financial Services et al, Case No. 1:13-cv-05930-RJS* (the "Lawsuit"); and

WHEREAS, shortly after the filing of the Lawsuit, the Tribe, the TFSRA and the Company file a Motion for Preliminary Injunction to enjoin DFS from taking any further enforcement action that would further harm the business of the Company; and

WHEREAS, on September 30, 2013, the Court issued an Order Denying Injunctive Relief as request, to which the Tribe, the TFSRA, and the Company will appeal; and

WHEREAS, after performing a risk assessment in accordance with Section 4.2 of the contract between SourcePointVI, LLC, the Company's contracted consultant and advisor on matters concerning the "orderly administration and management of Enterprise in the areas of financial reporting, financing, regulatory compliance, marketing, human resources, development

CONFIDENTIAL

JA661

of third party servicer relationships, collections and risk assessment" (the "Servicer") weighing regulatory enforcement concerns, the progress of the pending litigation matter, and the financial risk associated with continuing to make loans to New York residents, and knowledge that similarly situated companies have curtailed their business in the State of New York, the Servicer has recommended to the Company that it immediately cease making loans to consumers in the State of New York until further notice, and that current loans between the Company and consumers in the State of New York be wound down;

WHEREAS, after careful review and consideration by the Co-Managers of the recommendations of the Servicer regarding the cessation of making loans to New York consumers immediately, and until further notice, and the winding down of current loans between the Company and New York consumers to mitigate any potential financial loss to the Company, although there has been no material change to the Legal Requirements of the business of the Company as defined in the agreement between the Company and the Servicer, the Co-Managers believe that said recommendation is in the best interest of interest of the Company.

NOW THEREFORE BE IT RESOLVED THAT, the Co-Managers hereby institute a moratorium effective immediately, and until further notice, on the processing and origination of new loans to consumers located in the State of New York, and further directs that all current loans between the Company and consumers in the State of New York will continue to be serviced pursuant to Tribal law, the Company's practices and the Servicer's contractual obligations and be wound down until paid in full or some other disposition of the debt to the Company has been reached.


giizhigookway, Co-Manager                    Craig Mansfield, Co-Manager

CONFIDENTIAL                                                    JA662

# Exhibit 24

## Darcie Pace

**From:** Matt Martorello <mattm@bellicosevi.com>
**Sent:** Monday, October 14, 2013 10:45 AM
**To:** Robert Rosette
**Subject:** LVD to take ownership of Bellicose VI

**Importance:** High

Hi Rob,

Do you have time to talk about the items below this morning?

- Assign today LVD 51% of Bellicose via <u>Equity only</u> membership interest tied to the SPVI subsidiary only
- Assign today LVD 51% of 7X Services, LLC equity for class tied to:
    - Iron Fence
    - Obsidian Armor
    - WMS (WMS terminates the existing option agreement)
    - In 2014 only, Bellicose VI, LLC (STX offices)
- In 2014, the Bellicose Equity will be shifted to SPVI directly (as we move from VIs to Puerto Rico)
- Specific to Bellicose/SPVI Equity:
    - LVD will own 51% equity, but 0% profits interest until month 49
    - BlueTech will own 49% equity, but 100% profits interest until month 49
    - Current Manager will be locked in for 48 months at which point will be 100% LVD owned equity and managed
    - In month 49, Profits will be 80% LVD and 20% BlueTech for 10 years, after which it is 100% profits to LVD.  With appropriate protections for assignments or other IP use, to be fair to BlueTech
    - LVD cannot compete to cut BlueTech out of income stream
    - Appropriate waivers to keep everything fair
    - All structured to provide all entities sovereign immunity
- On 7X Services LLC equity
    - Less complex since IFI and OAF will only survive 36 months and then be completed.
    - All structured to provide all entities sovereign immunity

**Regards,**

**Matt Martorello**
Mobile: 773-209-7720
Email: mm@BellicoseVI.com



\*\*This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.\*\*

CONFIDENTIAL                                                                ROSETTE_REVISED_048536
JA664

Exhibit 25

## Joette Pete-Baldwin

| | |
|---|---|
| **From:** | Matt Martorello <mattm@bellicosevi.com> |
| **Sent:** | Monday, October 14, 2013 4:14 PM |
| **To:** | Karrie Wichtman; Chairman James Williams; Cheryl McGeshick; Eli Edwards; gkway@lvdtribal.com; Henry Smith; Joette Pete-Baldwin (joette.pete@lvdtribal.com); John McGeshick, Jr.; Susan McGeshick (susan.mcgeshick@lvdcasino.com); Tyrone McGeshick (tyrone.mcgeshick@lvdcasino.com) |
| **Cc:** | Craig Mansfield (craig.mansfield@lvdcasino.com); Justin Martorello |
| **Subject:** | SPVI Equity Transfer to LVD |

Good afternoon,

Below is the beginning of a concept I have to facilitate a transition to LVD of MY businesses. The abrupt termination of RRTL/DCTF, as it is written in the existing servicing agreements, is an oversimplified end that we have for some time been meaning to revisit. I think it is time to move forward on the proper legacy plan for how our companies come together. I believe Rob and Karrie can provide some highlights, but I do believe the items below should be able to get us to a term sheet with the goal of FINAL documents delivered on 10/30/13. The documents will not be as daunting as the list below appears, for tax structuring reasons, it is a little more complicated than it appears.

- Assign today to LVD - 51% of Bellicose VI, LLC Equity only membership interest tied to the SPVI subsidiary only (i.e. SPVI is a wholly owned sub of Bellicose, as it must be for tax reasons. Therefore, LVD's equity share for the subsidiary would be at the Bellicose parent company level):
  - LVD will own 51% equity, but 0% profits interest until month 49 when it becomes 100% equity and 80% profits
  - BlueTech will own 49% equity, but 100% profits interest until month 49 when it becomes 0% equity and 20% profits
  - Current Manager (myself) will be locked in as the decision maker for 48 months, at which point they will hire a new Manager to replace me
  - In month 49, Profits will be 80% LVD and 20% BlueTech for 10 years, after which it is 100% profits to LVD.
- Assign today to LVD - 51% of 7X Services, LLC Equity only for a membership class tied to:
  - Iron Fence Investments, LLC
  - Obsidian Armor Fund, LLC (note this will be dissolved before the 48 month mark)
  - WMS (where both WMS and SPVI terminate the existing option agreements)
  - On January 1st, due to my forthcoming 2014 restructuring, Bellicose VI, LLC will be transferred 100% to 7X Services, LLC and LVD's Equity will be shifted to DIRECTLY to SPVI (as we move from the VIs to Puerto Rico)
- Other:
  - Appropriate waivers of SI to protect the Assignors and Managers
  - Structured to ensure the integrity of sovereign immunity
  - It is possible the currently Delaware and Virgin Islands LLCs, may need to be migrated to be LVD LLCs (perhaps AFTER the closing in the interest of time)
  - Castle stops NEW customer loans beginning on January 31, 2014 and only does VIP loans thereafter (same as DCTF today)
  - Tribe uses its own capital to launch a new portfolio in Q1 2014, in which SPVI generates the same fees from the TLE, but LVD gets to keep 75% of the profits interest on the SPVI side for servicing the portfolio, until that 48th month. Adjusts the same thereafter. (This is required for tax purposes)
  - Proper indemnities to the Assignors and Managers
  - No strings attached, no requirements, no liability to LVD by Assignors or Managers on the new LVD portfolio, RRTL, DCTF, or on anything that may happen after month 48. Best efforts basis.

1

JA666

**This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

JA667

# Exhibit 26

| | |
|---|---|
| **From:** | Matt Martorello |
| **To:** | Karrie Wichtman |
| **Subject:** | Re: Payday US Offer Deactivation Notice |
| **Date:** | Tuesday, October 29, 2013 4:28:04 PM |

Not directly, but like my email said all the marketing entities are just about closing up shop, rates on things have skyrocketed, capture just cut us down by 200k a month in buying debt, most of the servicers like spvi have literally gone out of business. It's impossible to buy any volume, debt providers are asking what would happen to everything if the ruling in NY were upheld (certain death and all vendors including spvi, banks, ACH processors, bureaus etc would all obviously shut down if it were considered off reservation activity), and the class actions against banks and personal threats of enforcement against individuals by regulators all has everyone spooked. No joke, several of the biggest servicers have shut down. Though I bet they come back if things end well.

Desperately hoping that Rule 19 works and a favorable outcome on the appeal!


-------- Original message --------
From: Karrie Wichtman <kwichtman@rosettelaw.com>
Date: 10/29/2013 2:40 PM (GMT-07:00)
To: Matt Martorello <mattm@bellicosevi.com>
Subject: Re: Payday US Offer Deactivation Notice


Is this one our vendor companies?

Sent from my iPhone

On Oct 29, 2013, at 3:24 PM, "Matt Martorello" <mattm@bellicosevi.com> wrote:



-------- Original message --------
From: Sam Lepore <snlepore@yahoo.com>
Date: 10/29/2013 11:54 AM (GMT-07:00)
To: Matt Martorello <mattm@bellicosevi.com>
Subject: Fw: Payday US Offer Deactivation Notice


Hey Matt-

Issues in the US with Payday? You seeing this?



Thanks,

**Sam Lepore**
Cell: 856.297.6827
Email: sam@samlepore.com
www.samlepore.com


CONFIDENTIAL

JA669

facebook.com/SouthJerseyRealEstateTrends
twitter.com/samlepore



----- Forwarded Message -----
**From:** Leadnomics <partner-platform@leadnomics.com>
**To:** snlepore@yahoo.com
**Sent:** Tuesday, October 29, 2013 1:47 PM
**Subject:** Payday US Offer Deactivation Notice

October 29th, 2013

As most of you are
aware, the current
regulatory climate in
the US has resulted in
significantly less lead
buying in the US
Payday Market.
Unfortunately, this has
impacted our ability to
provide our publishers
with a compelling offer.
Therefore, after careful
deliberation, we have
decided to suspend
lead generation
activities within the US
Payday market,
**effective Friday,
November 1.**

We will continue to
focus on offers that
perform better for you
including Payday UK,
Auto Insurance, and
our newest vertical,
Health Insurance.

Your account manager
is available to answer
any questions you
might have. We thank
you for your trust and

CONFIDENTIAL

JA670

patronage in the past, and look forward to working with you again in the future.

**Our All-new Payday UK Offer**

# CashAdvancer UK

We are very pleased to announce our re-entry into the UK payday market with our premier offer, **CashAdvancer UK**. Our team has been working tirelessly to create and optimize this offer to ensure high conversion rates and EPCs, and we've already been seeing great results.

CashAdvancer UK is completely mobile optimized and features a brand-new form design. Reach out to your account manager to get set up to run this today.

As always, we are here when you need us.

Sincerely,

*The Leadnomics Partner Platform Team*

_____

Visit Us Online | Like Us on Facebook | Follow Us on

CONFIDENTIAL

JA671

Twitter | Check Out Our Blog

Copyright © 2013. All Rights Reserved.

**Forward this email**

This email was sent to snlepore@yahoo.com by partner-platform@leadnomics.com |
Update Profile/Email Address | Instant removal with SafeUnsubscribe™ | Privacy Policy.

Leadnomics | 2929 Arch St | Philadelphia | PA | 19104

**This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

**This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

Exhibit 27

**Darcie Pace**

| | |
|---|---|
| **From:** | Matt Martorello <mattm@bellicosevi.com> |
| **Sent:** | Tuesday, December 31, 2013 12:06 AM |
| **To:** | Nicole St. Germain; Karrie Wichtman; Justin Martorello |
| **Cc:** | Daniel Gravel; Robert Rosette |
| **Subject:** | RE: Memo Regarding Structure of Possible Acquisition of SPVI |

Sorry one more thing on Management.  If it is something where one person controls the entity, let's make certain they have immunity (if it were Justin for example) of course as well.

---

**From:** Matt Martorello
**Sent:** Tuesday, December 31, 2013 1:00 AM
**To:** Nicole St. Germain; 'Karrie Wichtman'; Justin Martorello
**Cc:** Daniel Gravel; 'Rob Rosette'
**Subject:** FW: Memo Regarding Structure of Possible Acquisition of SPVI

Very preliminary review (I skimmed it).

A) Great work guys, very informative here
B) I'm not sure the proposal was exactly accurate, but close enough to analyze the issues
C) Seems like after your proposed changes, the 51% equity bit is left as the only question mark.  I think this could easily be increased to whatever the benchmark of confidence is, since equity and profits interest differ.  What equity ownership % hits the benchmark (60/40?).  Or is it more like 100% or 51%, and in between is no man's land (a lot of page 13 #3 seems to state 100% is the only certainty).  I don't think 100% is out of reach, some caveats could simply be made.
D) On the proposed changes:
    a.  Revenue – 10% certainly isn't going to work from a business standpoint (i.e. I might as well be a state licensed lender, as a comp.)  The deal could be an outstanding deal and 1st of its kind, but we need to have it make sense.
        i.  I think this stems partly from point 2 on page 13, which I believe inaccurately only looks at a 4 year time period.  In reality, the economics certainly support economic development as in 4 years, it's spinning off a major amount of cash flows.  That's economic development.  Not even a casino makes money in the first several years.
        ii.  Also partly from Page 14 part 5 – which is more of the same really.  Looks at years 1 – 4 only.  Even during that time, money does in fact inure to the benefit of the tribe via the TLE.  It would be explained to exist because it is exactly what it is.  The tribe would like to buy in some capacity the intel of SPVI so it could get more money in the long-term.  The terms of such a deal result as proposed.  This is the same way casino developers get Management fees (though for 7 years, not 4 years and at a lower rate).  If regulations didn't prevent it, I might develop a casino for you and say, "I don't want 7 years and 30%, I want less years and a higher %".  What I think you'd tell a court that would challenge the immunity is that if the deal were not done, well then: A) the tribe didn't know: A) if SPVI would be around in 10 days given the industry, B) Execute its termination provision in accordance with the SA, or C) hike rates as risk has gone through the roof with detractors now seeking out SPVI's of the world for major attacks.  Plus, it could save money over the course of the next 10 years of the relationship with SPVI by entering this deal, rather than keeping the status quo.  This is same as how I might consider buying a LMS for example.  I can pay the licensing fee, or I can pay way more money today to buy it from them and I am upside down on that investment for 4 years, but after year 4, I'm making 10 times

CONFIDENTIAL                                        ROSETTE_REVISED_052217
JA674

more money than I would have been had I elected to be licensing still today.  For all of these reasons, I don't see the revenue as an issue.

  b.  Management – If this issue isn't worked out in some very particular way, the deal just won't get done.  Hoping you have some ideas around this.  All the investors (institutional, personal, and myself) won't allow the deal to occur without being 100% certain adequate Management resources are in control.  This seems the 1st major hurdle to accomplish.

All that said, I kind of thought we'd settled on status quo after talking about this for about 18 months and nowhere to go.  However, I think there is a way this works.  Clock is ticking before I end up in a Cash Call type attack though, at which point, I think the deal is about dead.

Hopefully yours,
Matt

---

**From:** Nicole St. Germain [mailto:NStGermain@rosettelaw.com]
**Sent:** Monday, December 30, 2013 7:06 PM
**To:** Chairman James Williams; Joette Pete-Baldwin; Susan McGeshick; Giizhigookway; Cheryl McGeshick; Eli Edwards; Tyrone McGeshick; john.mcgeshickjr@lvdtribal.com; Henry Smith
**Cc:** Karrie Wichtman; Matt Martorello; Justin Martorello; Daniel Gravel
**Subject:** Memo Regarding Structure of Possible Acquisition of SPVI

Honorable Tribal Council,

Please find attached a memorandum analyzing the proposed transaction between the Tribe and Source Point for the formation of a new LLC formed under Tribal law that would act as RRTL's and DCTF's servicer.  As you will see, the threshold issue is whether formation of a new entity that is co-owned by the Tribe and Source Point and subject to the proposed profit, management and voting controls is sufficient to pass muster with the "arm of the tribe" test to extend the Tribe's sovereign immunity from suit to the new LLC.

We are ready to discuss these issues at your convenience.

Thank you,

Nicole M. St. Germain, Associate

**Rosette, LLP**
**Attorneys at Law**
193 Blue Ravine Road - Suite 255
Folsom, CA 95630
916.353.1084 – Office
916.353.1085 – Fax
480.241.5871 – Cell



NStGermain@rosettelaw.com
www.rosettelaw.com

CONFIDENTIAL COMMUNICATION: THIS MESSAGE IS A CONFIDENTIAL ATTORNEY COMMUNICATION ONLY FOR USE BY THE INTENDED RECIPIENT.  ANY INADVERTENT RECEIPT SHALL NOT CONSTITUTE A WAIVER OF ATTORNEY-CLIENT OR WORK PRODUCT PROTECTION.  IF RECEIVED IN ERROR, PLEASE NOTIFY THE SENDER IMMEDIATELY AND DELETE THIS MESSAGE.

CONFIDENTIAL                    ROSETTE_REVISED_052918
JA675

# Exhibit 28

**Darcie Pace**

| | |
|---|---|
| **From:** | Karrie Wichtman |
| **Sent:** | Tuesday, July 22, 2014 9:21 AM |
| **To:** | Daniel Gravel; Matt Martorello; gkway@duckcreektf.com; Jim Williams Jr. |
| **Cc:** | Justin Martorello; Brian McFadden; James Dowd |
| **Subject:** | RE: Rebrand from "Payday" |

I think it imperative that all vendor contracts under the new branding include Gkway and Chairman Williams in all discussions, or at a minimum Gkway.  This will strengthen the sovereign model as well as assist the CEO and Co-Managers with developing a new level of intimacy with the operation of the business that will be needed if it is expected that the "New Deal" will also be born out of this rebrand.

Just my thoughts...

Sincerely,



**Karrie S. Wichtman, Partner**
**Rosette, LLP**
**Attorneys at Law**
Michigan Office
25344 Red Arrow Hwy, Suite B
Mattawan, MI 49071
269.283.5005 – Office
480.242.6959 - Cell
517.913.6443 – Fax
kwichtman@rosettelaw.com
www.rosettelaw.com

CONFIDENTIAL COMMUNICATION: THIS MESSAGE IS A CONFIDENTIAL ATTORNEY COMMUNICATION ONLY FOR USE BY THE INTENDED RECIPIENT.  ANY INADVERTENT RECEIPT SHALL NOT CONSTITUTE A WAIVER OF ATTORNEY-CLIENT OR WORK PRODUCT PROTECTION.  IF RECEIVED IN ERROR, PLEASE NOTIFY KARRIE S. WICHTMAN IMMEDIATELY AND DELETE THIS MESSAGE.  THANK YOU FOR YOUR COOPERATION.

**From:** Daniel Gravel [mailto:DanielG@bellicosevi.com]
**Sent:** Tuesday, July 22, 2014 9:13 AM
**To:** Matt Martorello; Karrie Wichtman; gkway@duckcreektf.com; Jim Williams Jr.
**Cc:** Justin Martorello; Brian McFadden; James Dowd
**Subject:** RE: Rebrand from "Payday"

Karrie:

Here is the initial list of items we will be working on for Chorus:

1. Consulting agreement review/assignment
2. Revise loan agreement and all customer facing docs and scripts
3. New vendor contracts
4. Review/revise internal policy/procedure docs, such as Recommendation Form, for new entity.

CONFIDENTIAL

JA677

    5.   Website/branding

There are many vendor contracts, so I will start requesting new ones immediately.

Thanks,

**Dan Gravel**
**General Counsel**
Email: danielg@bellicosecapital.com
Office: 787-520-6053
Mobile: 781-910-9642



CONFIDENTIAL COMMUNICATION: The information contained in this email is intended for the individual or entity above. This email is protected by the Electronic Communications Privacy Act, 18 U.S.C. Sections 2510-2521 and may be legally protected by the attorney/client privilege and/or work product doctrine. If you are not the intended recipient, please do not read, copy, use, forward or disclose this communication to others; also, please notify the sender by replying to this message, and then delete this message from your system.

**From:** Matt Martorello
**Sent:** Monday, July 21, 2014 3:02 PM
**To:** Karrie Wichtman; gkway@duckcreektf.com; Jim Williams Jr.
**Cc:** Daniel Gravel; Justin Martorello
**Subject:** RE: Rebrand from "Payday"

Dan is working on this task list. Sounds like Assignment will be easiest and doesn't protect from any hidden risk that you'd want to limit on pass through from RRTL to new entity.

If I can get this 17mb file down to a better size to email you guys on the work and imaging done for ChorusLoans, I think you'd absolutely love the new design.  Domain names in this space are very very rare and hard to come by, then trying to get a TM to protect it from competition is another issue, so SPVI did a lot of work created Chorus which I think you'll enjoy when I can send this to you.

**From:** Karrie Wichtman [mailto:kwichtman@rosettelaw.com]
**Sent:** Friday, July 18, 2014 9:47 AM
**To:** Matt Martorello; gkway@duckcreektf.com; Jim Williams Jr.
**Cc:** Daniel Gravel; Justin Martorello
**Subject:** RE: Rebrand from "Payday"

What exactly will be done on your end so that efforts are not being duplicated?



**Karrie S. Wichtman, Partner**
**Rosette, LLP**
**Attorneys at Law**
Michigan Office
25344 Red Arrow Hwy, Suite B
Mattawan, MI 49071
269.283.5005 – Office
480.242.6959 - Cell
517.913.6443 – Fax
kwichtman@rosettelaw.com

CONFIDENTIAL

JA678

www.rosettelaw.com

CONFIDENTIAL COMMUNICATION: THIS MESSAGE IS A CONFIDENTIAL ATTORNEY COMMUNICATION ONLY FOR USE BY THE INTENDED RECIPIENT.  ANY INADVERTENT RECEIPT SHALL NOT CONSTITUTE A WAIVER OF ATTORNEY-CLIENT OR WORK PRODUCT PROTECTION.  IF RECEIVED IN ERROR, PLEASE NOTIFY KARRIE S. WICHTMAN IMMEDIATELY AND DELETE THIS MESSAGE.  THANK YOU FOR YOUR COOPERATION.

**From:** Matt Martorello [mailto:mattm@bellicosevi.com]
**Sent:** Friday, July 18, 2014 9:36 AM
**To:** gkway@duckcreektf.com; Jim Williams Jr.
**Cc:** Karrie Wichtman; Daniel Gravel; Justin Martorello
**Subject:** RE: Rebrand from "Payday"

Great, we'll start getting ready on our end.  Thanks!

**From:** gkway@duckcreektf.com [mailto:gkway@duckcreektf.com]
**Sent:** Friday, July 18, 2014 9:35 AM
**To:** Matt Martorello; Jim Williams Jr.
**Cc:** 'Karrie Wichtman'; Daniel Gravel; Justin Martorello
**Subject:** RE: Rebrand from "Payday"

I certainly do agree and yes I would be happy to present this to the Council.

*giizhigookway*
*CEO/Co-Manager*
*Duck Creek Tribal Financial*
*P.O. Box 704*
*Watersmeet, MI  49969*
*906.358.2008-Office*
*906.358.2010-Fax*
*906.366.7041-Cell*
*gkway@duckcreektf.com*


-------- Original Message --------
Subject: RE: Rebrand from "Payday"
From: Matt Martorello <mattm@bellicosevi.com>
Date: Fri, July 18, 2014 6:30 am
To: "gkway@duckcreektf.com" <gkway@duckcreektf.com>, Jim Williams Jr. <jim.williams@lvdtribal.com>
Cc: 'Karrie Wichtman' <kwichtman@rosettelaw.com>, Daniel Gravel <DanielG@bellicosevi.com>, Justin Martorello <JustinM@BellicoseVI.com>

Gkway, as CEO for RRTL, do you feel comfortable representing RRTL to council on this?  And assuming you agree LVD should move away from "Payday", do you feel comfortable leading the charge in getting this rebrand done?  I think we need to make sure we have someone who can "own the process" to get it over the finish line.

Looking forward to your thoughts

**From:** Matt Martorello
**Sent:** Friday, July 18, 2014 9:26 AM

CONFIDENTIAL

JA679

**To:** gkway@duckcreektf.com; Jim Williams Jr.
**Cc:** 'Karrie Wichtman'; Daniel Gravel; Justin Martorello
**Subject:** Rebrand from "Payday"
**Importance:** High

Hi guys,

We've been mentioning for a very long time now, CastlePayday needs a rebrand.  Rather than tie it to other things that may take 6 months to complete, it's time to get it done.  RRTL has been blacklisted and rolled through the mud in the press.  Also, "Payday" is not an accurate description and is virtually about to be outlawed by the CFPB (likely a no renewal and cool off periods are coming in August).  I think it's time to get away from the word "Payday" and the black mark of RRTL before the rules come out and things get hotter.  I know for sure, many banks have turned down RRTL because it says Payday in the title, even if it is not a payday lender.

I suggest forming ASAP a new LLC with a new domain/brand, for purposes of transferring all contracts, assets, bank accounts, liabilities, etc. over to the new entities when ready.   We will gladly facilitate the work, but need the entity formed and approval to begin doing so as step 1.  It will take some time (months), after the new entity and approval by Tribal council is provided so the sooner we can get moving away from "Payday" and the poor image of RRTL the better.


**Regards,**

**Matt Martorello**
Mobile: 773-209-7720
Email: mm@BellicoseVI.com



**This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

**This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

**This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in

CONFIDENTIAL

JA680

Exhibit 29

| | |
|---|---|
| **From:** | Matt Martorello |
| **To:** | Karrie Wichtman; Justin Martorello |
| **Subject:** | RE: 2014 08 22 TC Resolution 2014_____ Approving Chorus Loans_final.docx |
| **Date:** | Monday, August 25, 2014 11:27:30 AM |
| **Attachments:** | BigPicture_DesignsR03_20130923.pdf |
| | Big Picture Brand Pyramid.pdf |

Ok, sorry for the run around here Karrie... Chorus has been sold.  Attached is another really great brand with just as much energy, money and time spent into developing.  Assuming LVD buys SPVI, BigPictureLoans.com would be an excellent domain.  If LVD doesn't buy SPVI, then FirstNationLoans.com is the domain we can provide (which we haven't yet gotten around to build out/design).

-----Original Message-----
From: Karrie Wichtman [mailto:kwichtman@rosettelaw.com]
Sent: Monday, August 25, 2014 11:58 AM
To: Matt Martorello; Justin Martorello
Subject: 2014 08 22 TC Resolution 2014_____ Approving Chorus Loans_final.docx


**This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

ROSETTE_REVISED_043437

JA682

**PHENOMENON®**

BELLICOSE  \  2013.09.23

# Big Picture Site Designs

Confidential ©2013 **PHENOMENON**



CONFIDENTIAL

ROSETTE_REVISED 043439

JA684



CONFIDENTIAL

ROSETTE_REVISED 043440

JA685



CONFIDENTIAL

ROSETTE_REVISED 043441

JA686



CONFIDENTIAL

ROSETTE_REVISED 043442

JA687

BIG PICTURE LOANS

HOME    APPLY NOW    CUSTOMER LOGIN    REQUIREMENTS    FAQ    CONTACT

### Apply Now and get an answer in minutes!

It only takes a few moments to apply; it's simple, quick & completely confidential. Fill out the information below and submit your application to find out if you're approved.

## Customer Information

| First Name | | Last Name |
| --- | --- | --- |
| John | | Doe |

| Street Address | | Apartment # |
| --- | --- | --- |
| 12345 Some St | | 123 |

| City | | Zip Code ▲ |
| --- | --- | --- |

| State ▲ | | Length at Address |
| --- | --- | --- |
| Select | | Year(s)    Month(s) |

| Cell Phone | | Home Phone |
| --- | --- | --- |

| E-Mail | | E-Mail Confirm |
| --- | --- | --- |

| SSN | | SSN Confirm |
| --- | --- | --- |

Date of Birth

Driver's License or State ID #    |    ID State: Select

Do you rent or own your home?
○ Rent    ○ Own

## Financial Information

| Employer Name | | Income Type |
| --- | --- | --- |
| | | Select |

| Employer Phone | | Length at Employer |
| --- | --- | --- |
| | | Year(s)    Month(s) |

| How often do you receive income? | | How do you receive income? |
| --- | --- | --- |
| Select | | Select |

| How are you paid when your pay date falls on a non-business day? | | What was the take home amount of your last check?* |
| --- | --- | --- |
| Select | | |

* Alimony, child support and/or separate maintenance income need not be revealed if you do not wish to have it considered as a basis for repaying this obligation

## Bank Information

ABA or Bank Routing Number
Bank Account Number
Check Number

| Account Type | | How long have you had this account? |
| --- | --- | --- |
| Select | | Year(s)    Month(s) |

| ABA Number | | Account Number |
| --- | --- | --- |

| Bank Name | | Bank Phone |
| --- | --- | --- |

## Debit Card (optional)

Set up a debit card profile today, and you may qualify for instant funding on future loans.

Debit Card Number

Expiration Date
MM    YYYY

## Disclosure

**CONSENT TO ELECTRONIC COMMUNICATIONS:**

You must consent to transact business with **Red Rock Tribal Lending, LLC d/b/a BalanceCredit.com** through electronic communications in order for us to process your loan request. The following terms and conditions govern electronic communications in connection with your loan request, Loan Agreement (if approved) and any communications regarding your account with us (the "Consent").

By electronically signing this Consent, you are confirming that you have agreed to the terms and conditions of the Consent and that you have downloaded or printed a copy of this Consent for your records.

You agree that:

• Any disclosure, notice, record or other type of information that is provided to you in connection with your transaction with us, including but not limited to, the Loan Agreement, this Consent, the Truth in Lending disclosures set forth in the Loan Agreement, change-in-terms notice, fee and transaction information, statements, delayed disbursement letters, notices of adverse action, and transaction information (collectively "Communications"), may be sent to you

Click Here
☐ By clicking here you consent to Electronic Delivery as detailed above and you acknowledge that your computer satisfies the hardware and software requirements within the disclosure and you can access PDF files.

Click Here
☐ By clicking here you verify the information given in connection with this loan application is true and accurate to be the best of your knowledge, and you give us consent to obtain information about you from a consumer reporting agency or other sources as detailed in the disclosures. You also acknowledge that you have read and agree to our **Privacy Policy**.

Click Here
☐ I agree that if CastlePayday.com is unable to approve my loan application, I would like it to help me find a lender who will fund my loan.

**SUBMIT FOR CASH**

JA688

# BIG PICTURE LOANS

| HOME | APPLY NOW | CUSTOMER LOGIN | REQUIREMENTS | FAQ | CONTACT |

## APPLY NOW!

Glad to see you're back!
Sign in to get started!

| me@example.com | ex. 123111222 |
| Your Email Address | Your SSN |

**NEXT STEP**

**Safe, Secure and Simple!**
Call us now, at 1-888-945-2727

Home  |  Apply Now  |  Customer Login  |  Requirements  |  Rates  |  FAQ
Educational Resources  |  Contact Us  |  Privacy Policy  |  Terms of Website Use

BigPictureLoans.com  |  ©2013  |  All Rights Reserved  |  1.888.945.2727

First time BigPictureLoans.com customers typically qualify for a loan of $200 to $1,000. Red Rock Tribal Lending, LLC (D.B.A. BigPictureLoans.com) is a tribal enterprise wholly owned and operated by the Lac Vieux Desert Band of Lake Superior Chippewa Indians, a federally recognized American Indian tribe and sovereign government. Applicable tribal and federal law shall govern any agreement entered into as a result of your loan application. BigPictureLoans.com's contents do not signify a solicitation or offer for loans in all areas. Areas of operation may change with or without notice. Services mentioned on this website may or may not be available in your particular area. Each communication or transaction conducted via BigPictureLoans.com will be deemed to have occurred in BigPictureLoans.com's Lac Vieux Desert Band of Lake Superior Chippewa Indians offices, regardless of the location where you accessed or viewed this website. All content existing and/or submitted to and in association with this website will be considered BigPictureLoans.com's copyrighted property. All communications with the company are deemed confidential. Any unauthorized reproduction, distribution, or disclosure is prohibited without the company's express written consent.

**Consumer Notice:**
Big Picture loans should be used for short-term financial needs only, not as a long-term financial solution. Individuals with credit difficulties should seek credit counseling.

CONFIDENTIAL

ROSETTE_REVISED 043444

JA689

# BIG PICTURE LOANS

| HOME | APPLY NOW | CUSTOMER LOGIN | REQUIREMENTS | FAQ | CONTACT |

## APPLY NOW!

**You have questions?**
Here is some information that may provide the answers!

# REQUIREMENTS

## Apply online in under a few minutes!

- You must have steady income of at least $700.00 per month.
- You must be able to show a verifiable source of income.
- You must have an open bank account in good standing.
- You must be reachable by phone.
- You must be at least 18 years old and a US citizen.

## How the process works

1. Review the terms of website use and privacy policy.
2. Fill out the application using our secure website and submit.
3. Electronically sign your loan documents.
4. Print out your loan documents and retain for your files.
5. A customer service representative may call to verify your information and employment.
6. If you loan is approved, Castle Payday will deposit the loan proceeds into your bank account or mail you a check the next business day, depending on your funding selection.

Home | Apply Now | Customer Login | Requirements | Rates | FAQ                          BigPictureLoans.com | ©2013 | All Rights Reserved | 1.888.945.2727
Educational Resources | Contact Us | Privacy Policy | Terms of Website Use

First time BigPictureLoans.com customers typically qualify for a loan of $200 to $1,000. Red Rock Tribal Lending, LLC (D.B.A. BigPictureLoans.com) is a tribal enterprise wholly owned and operated by the Lac Vieux Desert Band of Lake Superior Chippewa Indians, a federally recognized American Indian tribe and sovereign government. Applicable tribal and federal law shall govern any agreement entered into as a result of your loan application. BigPictureLoans.com's contents do not signify a solicitation or offer for loans in all areas. Areas of operation may change with or without notice. Services mentioned on this website may or may not be available in your particular area. Each communication or transaction conducted via BigPictureLoans.com will be deemed to have occurred in BigPictureLoans.com's Lac Vieux Desert Band of Lake Superior Chippewa Indians offices, regardless of the location where you accessed or viewed this website. All content existing and/or submitted to and in association with this website will be considered BigPictureLoans.com's copyrighted property. All communications with the company are deemed confidential. Any unauthorized reproduction, distribution, or disclosure is prohibited without the company's express written consent.

**Consumer Notice:**
Big Picture loans should be used for short-term financial needs only, not as a long-term financial solution. Individuals with credit difficulties should seek credit counseling.

CONFIDENTIAL                                                                                                    ROSETTE_REVISED 043445

**BIG PICTURE LOANS**

| HOME | APPLY NOW | CUSTOMER LOGIN | REQUIREMENTS | FAQ | CONTACT |

**APPLY NOW!**

**You have questions?**
Here is some information that may provide the answers!

# FAQ

**Q: How much can I borrow from Big Picture?**
A: The amount you can borrow is contingent upon your income level and various underwriting criteria.

**Q: How quickly will I receive my loan from Big Picture?**
A: If all the pertinent information is received by 8:00 p.m. EST and can be verified, you will generally receive your money the next business day.

**Q: Will someone from Big Picture contact me after I've submitted my loan application?**
A: If you have applied between 9:00 a.m. and 8:00 p.m. EST on business days (Monday-Friday, except for holidays) and included all necessary information, you should expect to hear from us within 15 minutes. Otherwise you will hear from us within one business day. We will call or email you for missing information.

**Q: How will I know if I'm approved for a loan?**
A: The amount you can borrow is contingent upon your income level and various underwriting criteria.

**Q: Once paid off, when can I apply for another loan?**
A: You can apply for a new loan any time after your current loan is paid off. We may ask you to prove your previous loan has been paid in full, unless the previous loan was paid more than three business days prior to applying for a new loan.

**Q: What is required to obtain a Big Picture loan?**
A: Qualifying is easy. You merely need to meet the following minimum requirements:

Currently receive regular income of at least $700/month
Be at least 18 years of age and a U.S. resident
Have an active bank account in good standing

Even bankruptcy, bounced checks, charge-offs and other credit problems won't prevent you from receiving a loan from Castle Payday. Other requirements may apply. Castle Payday loans are not available in all states. States serviced by Castle Payday may change from time to time with or without notice.

**Q: Does Big Picture's status as a tribal entity have any effect on my loan?**
A: The Lac Vieux Desert Band of Lake Superior Chippewa Indians is a federally recognized American Indian tribe with governmental headquarters in Watersmeet, Michigan. Castle is an economic arm of the tribe, created by the Lac Vieux Desert Band of Lake Superior Chippewa Indians' tribal council, which operates under tribal law for the tribe's benefit. As such, Castle is an entity with tribal sovereign immunity from lawsuits. The tribe, through its economic-development arm doing business as Castle, is dedicated to serving its customers efficiently and effectively. For any customer disputes that may arise, the tribe established the Tribal Dispute Resolution Procedure. For more information on the Tribal Dispute Resolution Procedure, please refer to your loan documents or contact Castle.

**Q: Do either the laws of my state of residence or where I am applying for a loan govern my loan agreement?**
A: No. Your loan agreement will be governed by and construed in accordance with the laws of the Lac Vieux Desert Band of Lake Superior Chippewa Indians, and to the extent applicable, the laws of the United States. The laws of your state of residence or the state where you enter into a transaction with CastlePayday will not apply to any agreement you enter into with us. Indian tribes are sovereign and are not obligated to adhere to state law absent congressional authorization.

Home  |  Apply Now  |  Customer Login  |  Requirements  |  Rates  |  FAQ
Educational Resources  |  Contact Us  |  Privacy Policy  |  Terms of Website Use

BigPictureLoans.com  |  ©2013  |  All Rights Reserved  |  1.888.945.2727

First time BigPictureLoans.com customers typically qualify for a loan of $200 to $1,000. Red Rock Tribal Lending, LLC (D.B.A. BigPictureLoans.com) is a tribal enterprise wholly owned and operated by the Lac Vieux Desert Band of Lake Superior Chippewa Indians, a federally recognized American Indian tribe and sovereign government. Applicable tribal and federal law shall govern any agreement entered into as a result of your loan application. BigPictureLoans.com's contents do not signify a solicitation or offer for loans in all areas. Areas of operation may change with or without notice. Services mentioned on this website may or may not be available in your particular area. Each communication or transaction conducted via BigPictureLoans.com will be deemed to have occurred in BigPictureLoans.com's Lac Vieux Desert Band of Lake Superior Chippewa Indians offices, regardless of the location where you accessed or viewed this website. All content existing and/or submitted to and in association with this website will be considered BigPictureLoans.com's copyrighted property. All communications with the company are deemed confidential. Any unauthorized reproduction, distribution, or disclosure is prohibited without the company's express written consent.

**Consumer Notice:**
Big Picture loans should be used for short-term financial needs only, not as a long-term financial solution. Individuals with credit difficulties should seek credit counseling.

JA691

# BIG PICTURE LOANS

| HOME | APPLY NOW | CUSTOMER LOGIN | REQUIREMENTS | FAQ | CONTACT |

**APPLY NOW!**

Reach out!
Feel free to contact us any time!

## CONTACT US

**Customer Service**
Phone: 1-888-945-2727
Fax: 1-866-269-3526

**For Questions, Comments or Complaints:**
Email: support@BigPictureLoans.com

**Hours of Operation:**
Mon-Thu, 8 a.m. to 8 p.m. EST
Fri, 8 a.m. to 6 p.m. EST
Sat-Sun, 9 a.m. to 6 p.m. EST

**Mailing Address:**
CastlePayday.com
Attn: Customer Support
PO Box 704
Watersmeet, MI 49969

Home | Apply Now | Customer Login | Requirements | Rates | FAQ          BigPictureLoans.com | ©2013 | All Rights Reserved | 1.888.945.2727
Educational Resources | Contact Us | Privacy Policy | Terms of Website Use

First time BigPictureLoans.com customers typically qualify for a loan of $200 to $1,000. Red Rock Tribal Lending, LLC (D.B.A. BigPictureLoans.com) is a tribal enterprise wholly owned and operated by the Lac Vieux Desert Band of Lake Superior Chippewa Indians, a federally recognized American Indian tribe and sovereign government. Applicable tribal and federal law shall govern any agreement entered into as a result of your loan application. BigPictureLoans.com's contents do not signify a solicitation or offer for loans in all areas. Areas of operation may change with or without notice. Services mentioned on this website may or may not be available in your particular area. Each communication or transaction conducted via BigPictureLoans.com will be deemed to have occurred in BigPictureLoans.com's Lac Vieux Desert Band of Lake Superior Chippewa Indians offices, regardless of the location where you accessed or viewed this website. All content existing and/or submitted to and in association with this website will be considered BigPictureLoans.com's copyrighted property. All communications with the company are deemed confidential. Any unauthorized reproduction, distribution, or disclosure is prohibited without the company's express written consent.

**Consumer Notice:**
Big Picture loans should be used for short-term financial needs only, not as a long-term financial solution. Individuals with credit difficulties should seek credit counseling.

CONFIDENTIAL                                                                                                ROSETTE_REVISED 043447



**BIG PICTURE LOANS**

| HOME | APPLY NOW | CUSTOMER LOGIN | REQUIREMENTS | FAQ | CONTACT |

## APPLY NOW!

### New Customer Pricing Terms

**AMOUNT YOU WANT TO BORROW:** **$400**

$200 —————●————— $1000

| ANNUAL PERCENTAGE RATE* | BORROWING | $400 | + 1ST FINANCE CHARGE | |
| 888 % | | TOTAL TO PREPAY LOAN IN FULL ON OR BEFORE YOUR 1ST DUE DATE. | **$540.00** |

## Payment Schedule for selected Loan Amount

| Payment | Principle Balance | Fee Balance | Total Due | Amount to Payoff |
|---------|-------------------|-------------|-----------|------------------|
| 1 | $400.00 | $140.00 | $140.00 | $540.00 |
| 2 | $400.00 | $140.00 | $140.00 | $540.00 |
| 3 | $400.00 | $140.00 | $140.00 | $540.00 |
| 4 | $400.00 | $140.00 | $140.00 | $540.00 |
| 5 | $400.00 | $140.00 | $140.00 | $540.00 |
| 6 | $400.00 | $140.00 | $165.00 | $540.00 |
| 7 | $375.00 | $131.25 | $156.25 | $506.25 |
| 8 | $350.00 | $122.50 | $147.50 | $472.50 |
| 9 | $325.00 | $113.75 | $138.75 | $438.75 |
| 10 | $300.00 | $105.00 | $130.00 | $405.00 |
| 11 | $275.00 | $96.25 | $121.25 | $371.25 |
| 12 | $250.00 | $87.50 | $112.50 | $337.50 |
| 13 | $225.00 | $78.75 | $103.75 | $303.75 |
| 14 | $200.00 | $70.00 | $95.00 | $270.00 |
| 15 | $175.00 | $61.25 | $86.25 | $236.25 |
| 16 | $150.00 | $52.50 | $77.50 | $202.50 |
| 17 | $125.00 | $43.75 | $68.75 | $168.75 |
| 18 | $100.00 | $35.00 | $60.00 | $135.00 |
| 19 | $75.00 | $26.25 | $51.25 | $101.25 |
| 20 | $50.00 | $17.50 | $42.50 | $67.50 |
| 21 | $25.00 | $8.75 | $33.75 | $33.75 |

* Your APR may vary based on when your first pay date is scheduled. The APR calculation above is based on payments being made every 14 days.
APRs and payment amounts may vary based on loan term. Complete disclosures of APR, fees & other payment terms are contained in your loan agreement.

Home | Apply Now | Customer Login | Requirements | Rates | FAQ
Educational Resources | Contact Us | Privacy Policy | Terms of Website Use

BigPictureLoans.com | ©2013 | All Rights Reserved | 1.888.945.2727

First time BigPictureLoans.com customers typically qualify for a loan of $200 to $1,000. Red Rock Tribal Lending, LLC (D.B.A. BigPictureLoans.com) is a tribal enterprise wholly owned and operated by the Lac Vieux Desert Band of Lake Superior Chippewa Indians, a federally recognized American Indian tribe and sovereign government. Applicable tribal and federal law shall govern any agreement entered into as a result of your loan application. BigPictureLoans.com's contents do not signify a solicitation or offer for loans in all areas. Areas of operation may change with or without notice. Services mentioned on this website may or may not be available in your particular area. Each communication or transaction conducted via BigPictureLoans.com will be deemed to have occurred in BigPictureLoans.com's Lac Vieux Desert Band of Lake Superior Chippewa Indians offices, regardless of the location where you accessed or viewed this website. All content existing and/or submitted to and in association with this website will be considered BigPictureLoans.com's copyrighted property. All communications with the company are deemed confidential. Any unauthorized reproduction, distribution, or disclosure is prohibited without the company's express written consent.

Consumer Notice:
Big Picture loans should be used for short-term financial needs only, not as a long-term financial solution. Individuals with credit difficulties should seek credit counseling.

CONFIDENTIAL

ROSETTE_REVISED 043448

JA693

# BIG PICTURE LOANS

| HOME | APPLY NOW | CUSTOMER LOGIN | REQUIREMENTS | FAQ | CONTACT |

## APPLY NOW!

**Big Picture Loans**
Educational Resources

| BUDGETING | CREDIT | MONEY MANAGEMENT | IDENTITY THEFT | LIFE CHANGES |



### Learn About Finance

Congratulations on taking this important step to a brighter financial future. This website has over forty videos to help you improve your personal finances. These free tools help you become debt free, use your money wisely, plan for the future, and build wealth. The topics range from budgeting, money management and credit. We also include a section on critical life changing events, and how they can affect you financially. These videos demonstrate our dedication to personal financial literacy and providing a debt-free life for Americans. Simply click any of the topics to begin your video education series.

00:08 | 00:57

### Watch More Budgeting Videos:

> **Budgeting Made Easy**

> **Managing Debt**

> **The Budget**

> **Credit Tips to Live By**

> **Student Loan Strategies**

 **MyMoney.gov** - the Federal Government's website dedicated to helping Americans understand more about their money - how to save it, invest it, and manage it to meet their personal goals.

 **5 Tips: Improving your credit score** - Board of Governors of the Federal Reserve System. (FederalReserve.gov)

 **Consumer Protection** - Your everyday guide to help you prevent identity theft, understand credit and be a smart shopper. (USA.gov)

**Free Credit Report** - This is the official site to obtain a free credit report (AnnualCreditReport.com)

| Home | Apply Now | Customer Login | Requirements | Rates | FAQ            BigPictureLoans.com | ©2013 | All Rights Reserved | 1.888.945.2727
| Educational Resources | Contact Us | Privacy Policy | Terms of Website Use

First time BigPictureLoans.com customers typically qualify for a loan of $200 to $1,000. Red Rock Tribal Lending, LLC (D.B.A. BigPictureLoans.com) is a tribal enterprise wholly owned and operated by the Lac Vieux Desert Band of Lake Superior Chippewa Indians, a federally recognized American Indian tribe and sovereign government. Applicable tribal and federal law shall govern any agreement entered into as a result of your loan application. BigPictureLoans.com's contents do not signify a solicitation or offer for loans in all areas. Areas of operation may change with or without notice. Services mentioned on this website may or may not be available in your particular area. Each communication or transaction conducted via BigPictureLoans.com will be deemed to have occurred in BigPictureLoans.com's Lac Vieux Desert Band of Lake Superior Chippewa Indians offices, regardless of the location where you accessed or viewed this website. All content existing and/or submitted to and in association with this website will be considered BigPictureLoans.com's copyrighted property. All communications with the company are deemed confidential. Any unauthorized reproduction, distribution, or disclosure is prohibited without the company's express written consent.

Consumer Notice:
Big Picture loans should be used for short-term financial needs only, not as a long-term financial solution. Individuals with credit difficulties should seek credit counseling.

CONFIDENTIAL                                                                                                    ROSETTE_REVISED 043449

**APPLY NOW!**

Big Picture Loans
Privacy Policy

## PRIVACY POLICY
### Red Rock Tribal Lending, LLC dba Big Picture Loans

Rev. July 2013

| FACTS | What does Red Rock Tribal Lending, LLC do with your personal information? |
|---|---|
| Why? | Financial companies choose how they share your personal information. Federal law gives consumers the right to limit some but not all sharing. Federal law also requires lenders to tell you how they collect, share, and protect your personal information. Please read this notice carefully to understand what we do. |
| What? | The types of personal information we collect and share depend on the product or service you have with us. This information can include:<br><br>Social Security number and income<br>Account balances and payment history<br>Credit history and credit scores |
| How? | All financial companies need to share customers' personal information to run their everyday business. In the section below, we list the reasons financial companies can share their customers' personal information; the reasons Red Rock Tribal Lending, LLC chooses to share; and whether you can limit this sharing. |

| Reasons we can share your personal information | Does Red Rock Tribal Lending share? | Can you limit this sharing? |
|---|---|---|
| **For our everyday business purposes-** such as to process your transactions, maintain your account(s), respond to court orders and legal investigations, or report to credit bureaus | YES | NO |
| **For our marketing purposes-** to offer our products and services to you | YES | NO |
| **For joint marketing with other financial companies** | NO | We Don't Share |
| **For our affiliates' everyday business purposes-** information about your transactions and experiences | NO | NO |
| **For our affiliates' everyday business purposes -** information about your creditworthiness | NO | We Don't Share |
| **For nonaffiliates to market to you** | NO | We Don't Share |

| To limit our sharing | Call 1-888-945-2727<br>Visit us online: www.BigPictureLoans.com or<br>Contact us via email: support@BigPictureLoans.com<br><br>**Please note:**<br>If you are a new customer, we can begin sharing your information as soon as the same day that you apply for a loan. When you are no longer our customer, we continue to share your information as described in this notice.<br><br>However, you can contact us at any time to limit our sharing. |
|---|---|
| Questions? | Call 1-888-945-2727or go to www.BigPictureLoans.com |

| What we do | |
|---|---|
| How does Red Rock Tribal Lending, LLC protect my personal information? | To protect your personal information from unauthorized access and use, we use security measures that comply with federal law. These measures include computer safeguards and secured files and buildings. |
| How does Red Rock Tribal Lending, LLC collect my personal information? | We collect your personal information, for example, when you<br><br>Apply for a loan<br>Give us your income information<br>Provide employment information<br>Provide account information<br>Give us your contact information<br><br>We also collect your personal information from others, such as credit bureaus, affiliates, or other companies. |
| Why can't I limit all sharing? | Federal law gives you the right to limit only<br><br>Sharing for affiliates' everyday business purposes - information about your creditworthiness<br>Affiliates from using your information to market to you<br>Sharing for nonaffiliates to market to you |
| What happens when I limit sharing for an account I hold jointly with someone else? | Your choices will apply to everyone on your account. |

| Definitions | |
|---|---|
| Affiliates | Financial and nonfinancial companies related by common ownership or control.<br><br>Duck Creek Tribal Financial, LLC |
| Nonaffiliates | Financial and nonfinancial companies not related by common ownership or control.<br><br>Nonaffiliates we share with can include service providers, direct mail, data processor, advertisers, direct marketing companies for application resell and other purposes. |
| Joint Marketing | A formal agreement between nonaffiliated financial companies that together market financial products or services to you.<br><br>Our joint marketing partners include financial institutions, credit card companies, partners that promote our products, pre-paid debit card providers and other lending companies. |

**Short Message Services ("SMS")**
By submitting your information at the Website, you agree to receive mobile marketing including, but not limited to, text-message based marketing, from us and our third party advertisers and marketers. Notwithstanding that your mobile telephone number may be listed on state and/or federal do-not-call registries, we retain the right to contact you via text-message based marketing in accordance with applicable federal law. In addition, by registering and/or using the Website, you agree that such act constitutes an inquiry and/or application for purposes of the Amended Telemarketing Sales Rule (16 CFR 310 et seq.), as amended from time to time (the "Rule"). Notwithstanding that your telephone number may be listed at the Federal Trade Commission's Do-Not-Call List, we retain the right to contact you via telemarketing in accordance with the Rule.

**SMS Help Resources**
By submitting your information at the Website, you agree to receive mobile marketing including, but not limited to, text-message

**Short Message Services ("SMS")**
For help or additional information regarding our SMS courtesy text services please email us at Support@BigPictureLoans.com or reply "HELP" anytime from your mobile device to the message you receive.

**SMS Opt-out Information and Notice**
You may opt-out of receiving communications from us and our third-party partners by not submitting your information. During registration and/or when you submit personally identifiable information to us at the Website, you have opted-in to request that we share your personal information (other than your Sensitive Information) with third parties to receive marketing communications. When contacted by any of these companies or third parties, you should notify them directly of your choices regarding their use and sharing of your information. As noted, we use personal information to provide promotional offers by SMS to our Website users. We may maintain separate SMS lists for different purposes. If SMS recipients wish to end their SMS subscription from a particular list, they need to reply "STOP" to the SMS message they received. Additionally, you may opt-out from receiving any additional SMS communications regarding the Website, by sending your request in writing via email to OptOut@BigPictureLoans.com.

Home  |  Apply Now  |  Customer Login  |  Requirements  |  Rates  |  FAQ
Educational Resources  |  Contact Us  |  Privacy Policy  |  Terms of Website Use

BigPictureLoans.com   |   ©2012   |   All Rights Reserved   |   1.888.940.2727

First time BigPictureLoans.com customers typically qualify for a loan of $200 to $1,000. Red Rock Tribal Lending, LLC (D.B.A. BigPictureLoans.com) is a tribal enterprise wholly owned and operated by the Lac Vieux Desert Band of Lake Superior Chippewa Indians, a federally recognized American Indian tribe and sovereign government. Applicable tribal and federal law shall govern any agreement entered into as a result of your loan application. BigPictureLoans.com's contracts are not subject to a solicitation or offer for loans in all areas. Areas of operation may change with or without notice. Services mentioned on this website may or may not be available in your particular area. Each communication or transaction conducted via BigPictureLoans.com will be deemed to have occurred in BigPictureLoans.com's Lac Vieux Desert Band of Lake Superior Chippewa Indians offices, regardless of the location where you accessed or viewed this website. All content existing and/or submitted to and in association with this website will be considered BigPictureLoans.com's copyrighted property. All communications with the company are deemed confidential. Any unauthorized reproduction, distribution, or disclosure is prohibited without the company's express written consent.

Consumer Notice:
Big Picture loans should be used for short-term financial needs only, not as a long-term financial solution. Individuals with credit difficulties should seek credit counseling.

JA695

HOME    APPLY NOW    CUSTOMER LOGIN    REQUIREMENTS    FAQ    CONTACT

**JOHN DOE, you have been Approved for a loan. Please choose your Loan amount below.**

AMOUNT YOU WANT TO BORROW:    **$800**

FIRST PAYMENT AMOUNT:  **$200**    * FULL PAY OFF AMOUNT:  **$1000**

* If loan paid to Bil on or before the first payment due date

For additional information on payments please review the
Truth-In-Lending Disclosure of the Loan Agreement.

RESET LOAN AMOUNT

**Your Big Picture Loan**

| | |
|---|---|
| Original Date | 09/14/2013 |
| Effective Date | 09/11/2013 |
| First Payment Due Date | 09/20/2013 |

QUESTIONS?
Call us at 1.888.945.2727

## Consent to Electronic Communications

You must consent to transact business with Red Rock Tribal Lending, LLC d/b/a BigPictureLoans.com through electronic communications in order for us to process your loan request. The following terms and conditions govern electronic communications in connection with your loan request, the Loan Agreement (if approved) and any communications regarding your account with us (the "Consent").

By electronically signing this Consent, you are confirming that you have agreed to the terms and conditions of the Consent and that you have downloaded or printed a copy of this Consent for your records.

You agree that:

- Any disclosure, notice, record or other type of information that is provided to you in connection with your transaction with us, including but not limited to the Loan Agreement, this Consent, the Truth in Lending disclosures set forth in the Loan Agreement, change-in-terms notices, fee and transaction information, statements, delayed disbursement letters, notices of adverse action, and transaction information (collectively, "Communications"), may be sent to you electronically by posting the information at our website, www.CastlePayday.com, or by sending it to you by email from us or any vendor/servicer contracted through us at any time.

Click Here

☑ I acknowledge and agree to the Consent to Electronic Communication

## Loan Agreement

**CONSUMER INSTALLMENT LOAN AGREEMENT**

Application Date: September 11, 2013
Effective Date : September 11, 2013 (you may get funds prior to this date)
QA – Red Rock Tribal Lending, LLC DBA BigPictureLoans
PO Box 704
Watersmeet, MI 49969
Phone: 8889452727
Email address: legal@CastlePayday.com

Loan No.: 59443854
Final Maturity Date: September 9, 2015
Borrower Name: Test1238 Test
Borrower Address : 123 Test St
Address: City, CO 12345
Phone: 1112223333
Cell Phone: 1112223333
Email address: test1238@test.com

IMPORTANT NOTICE: This Loan Agreement (hereinafter, the "Agreement") is governed by the laws of the Lac Vieux Desert Band of Lake Superior Chippewa
Indians.

Click Here

☐ I acknowledge and agree to the Loan Agreement, including but not limited to the Governing Law and Forum Selection, Waiver of Jury Duty and Tribal Dispute Resolution Procedure provisions and I acknowledge and agree to the Privacy Policy.

Click Here

☐ I agree that Castlepayday.com, may contact me in any manner (including text messages or auto-dialed calls) at any telephone number provided on my credit applicaiton, including my cell phone number or any other mobile device, to provide me reminders, notices and information on special sales offers.

## Funding Options

Please review and select one of these funding options:

☐ **Electronic Credit (as soon as next business day)** - I choose to receive my loan proceeds by ACH credit to my bank account. By choosing this funding options I also agree to the ACH Authorizations set forth in the Loan Agreement.

☐ **Paper Check (up to 7 to 10 days)** - I choose to receive my loan proceeds by check, delivered by the United States Postal Service. By choosing this funding option, I acknowledge that I must make my scheduled loan payments by mailing a certified check or money order to Red Rock Tribal Lending, LLC (D/B/A BigPictureLoans.com), P.O. Box 704, Watersmeet, MI 49969. BigPictureLoans.com must receive my check or money order on or before the scheduled installment due date. **I am also aware that if I choose to have my loan funded by check, it may take up to 7 to 10 days to arrive. Interest will begin accruing on the date the check is issued.**

GET MY CASH

First time BigPictureLoans.com customers typically qualify for a loan of $200 to $1,000. Red Rock Tribal Lending, LLC (D.B.A. BigPictureLoans.com) is a tribal enterprise wholly owned and operated by the Lac Vieux Desert Band of Lake Superior Chippewa Indians, a federally recognized American Indian tribe and sovereign government. Applicable tribal and federal law shall govern any agreement entered into as a result of your loan application. BigPictureLoans.com controls its contents do not signify a solicitation or offer for loans in all areas. Areas of operation may change with or without notice. Services mentioned on this website may or may not be available in your particular area. Each communication or transaction conducted via BigPictureLoans.com will be deemed to have occurred on BigPictureLoans.com's Las Vieux Desert Band of Lake Superior Chippewa Indians offices, regardless of the location where you accessed or viewed this website. All content existing and/or submitted to and in association with this website will be considered BigPictureLoans.com's copyrighted property. All communications with the company are deemed confidential. Any unauthorized reproduction, distribution, or disclosure is prohibited without the company's express written consent.

**Consumer Notice:**
Big Picture loans should be used for short-term financial needs only, not as a long-term financial solution. Individuals with credit difficulties should seek credit counseling.

JA696

USCA4 Appeal: 23-2097   Doc: 11-2   Filed: 12/06/2023   Pg: 241 of 493

# BIG PICTURE LOANS

APPLY NOW!

Big Picture Loans
Website Terms of Use (TOU)

## TERMS OF WEBSITE USE
(Revised 2.26.2015)

PLEASE CAREFULLY REVIEW THESE TERMS OF WEBSITE USE BEFORE USING THIS SITE. BigPicture REQUIRES THAT ALL VISITORS TO OUR WEBSITE (the "Site") ADHERE TO THE FOLLOWING TERMS OF WEBSITE USE. BY ACCESSING THIS SITE YOU AGREE TO AND ACCEPT THE TERMS AND CONDITIONS CONTAINED HEREIN. IF YOU DO NOT AGREE TO THESE TERMS AND CONDITIONS YOU SHOULD IMMEDIATELY CEASE USING THE SITE.

### Information Provided on Website

### Site Security

### Privacy Policy

### Linking

### Disclaimers of Warranties

### Limitations of Liabilities

### Indemnity

### Tribal Dispute Resolution Procedure

### No Waiver of Sovereign Immunity

### Agreement to Pursue All Disputes Through the Tribal Dispute Resolution Procedure and Waiver of Jury Trial

### Agreement to Not to Bring, Join or Participate in Class Actions

### Minors

### Content Submitted or Made Available for Inclusion on the Site

### Conduct of Site Visitors

### Dealings with Advertisers

### Notices

### International Use

### Miscellaneous

### Contact

If you have any questions or concerns regarding the site, please contact us by email at Legal@BigPictureLoans.com or by phone at (888) 849-2727.

JA697

## BIG PICTURE LOANS

| HOME | APPLY NOW | CUSTOMER LOGIN | REQUIREMENTS | FAQ | CONTACT |

### Again, we woud like to congratulate you!
### Your application is complete pending verification.

**What's Next...**

Your money will be deposited into your bank account as soon as we verify your information - usually in just a day!

**Remember:**

You'll receive an email reminder prior to each payment due date. If you selected ACH, your payment will automatically be deducted from your bank account on the due date.

**Money Saving Reminders**

When your budget allows, you can save by:

    Paying off your loan early. The sooner you pay, the more you'll save.

    Paying extra on your due date. This will reduce your future payments and save future finance charges.

**Debit Card Verification**

We are unable to validate the devit card you submitted with your application. By having a debit card on file, you may qualify for instant funding in the future. **Set up a debit card profile.**

**PRINT DOCUMENTS**

### QUESTIONS/ Call (888) 945-2727 or email support@BigPictureLoans.com

---

### PRIVACY POLICY
#### Red Rock Tribal Lending, LLC dba Big Picture Loans

Rev. July 2013

| FACTS | What does Red Rock Tribal Lending, LLC do with your personal information? |
|---|---|
| Why? | Financial companies choose how they share your personal information. Federal law gives consumers the right to limit some but not all sharing. Federal law also requires lenders to tell you how they collect, share, and protect your personal information. Please read this notice carefully to understand what we do. |
| What? | The types of personal information we collect and share depend on the product or service you have with us. This information can include:<br><br>Social Security number and income<br>Account balances and payment history<br>Credit history and credit scores |
| How? | All financial companies need to share customers' personal information to run their everyday business. In the section below, we list the reasons financial companies can share their customers' personal information; the reasons Red Rock Tribal Lending, LLC chooses to share; and whether you can limit this sharing. |

---

Home | Apply Now | Customer Login | Requirements | Rates | FAQ
Educational Resources | Contact Us | Privacy Policy | Terms of Website Use

BigPictureLoans.com | ©2013 | All Rights Reserved | 1.888.945.2727

First time BigPictureLoans.com customers typically qualify for a loan of $200 to $1,000. Red Rock Tribal Lending, LLC (D.B.A. BigPictureLoans.com) is a tribal enterprise wholly owned and operated by the Lac Vieux Desert Band of Lake Superior Chippewa Indians, a federally recognized American Indian tribe and sovereign government. Applicable tribal and federal law shall govern any agreement entered into as a result of your loan application. BigPictureLoans.com's contents do not signify a solicitation or offer for loans in all areas. Areas of operation may change with or without notice. Services mentioned on this website may or may not be available in your particular area. Each communication or transaction conducted via BigPictureLoans.com will be deemed to have occurred in BigPictureLoans.com's Lac Vieux Desert Band of Lake Superior Chippewa Indians offices, regardless of the location where you accessed or viewed this website. All content existing and/or submitted to and in association with this website will be considered BigPictureLoans.com's copyrighted property. All communications with the company are deemed confidential. Any unauthorized reproduction, distribution, or disclosure is prohibited without the company's express written consent.

**Consumer Notice:**

Big Picture loans should be used for short-term financial needs only, not as a long-term financial solution. Individuals with credit difficulties should seek credit counseling.

# BIG PICTURE LOANS

| HOME | APPLY NOW | CUSTOMER LOGIN | REQUIREMENTS | FAQ | CONTACT |

| | Customer Name: | John Doe | Customer Name: | John Doe |
|---|---|---|---|---|
| | | | **TO PAY IN FULL** | |
| | Application #: | 59443854 | Loan Amount: | $800.00 |
| | Application Date: | 9/11/2013 | Finance Charge: | $200.00 |
| | Next Payment Date: | 9/20/2013 | Pay Off Balance: | Pending |

**Your application is currently pending, please review, sign your documents, or contact us if you have any questions.**

\* The pay off balance is valid until the next payment date.

**PREVIEW AND SIGN DOCUMENTS**

**If you have any questions please contact us at: (888) 945-2727**

Home | Apply Now | Customer Login | Requirements | Rates | FAQ
Educational Resources | Contact Us | Privacy Policy | Terms of Website Use

BigPictureLoans.com | ©2013 | All Rights Reserved | 1.888.945.2727

First time BigPictureLoans.com customers typically qualify for a loan of $200 to $1,000. Red Rock Tribal Lending, LLC (D.B.A. BigPictureLoans.com) is a tribal enterprise wholly owned and operated by the Lac Vieux Desert Band of Lake Superior Chippewa Indians, a federally recognized American Indian tribe and sovereign government. Applicable tribal and federal law shall govern any agreement entered into as a result of your loan application. BigPictureLoans.com's contents do not signify a solicitation or offer for loans in all areas. Areas of operation may change with or without notice. Services mentioned on this website may or may not be available in your particular area. Each communication or transaction conducted via BigPictureLoans.com will be deemed to have occurred in BigPictureLoans.com's Lac Vieux Desert Band of Lake Superior Chippewa Indians offices, regardless of the location where you accessed or viewed this website. All content existing and/or submitted to and in association with this website will be considered BigPictureLoans.com's copyrighted property. All communications with the company are deemed confidential. Any unauthorized reproduction, distribution, or disclosure is prohibited without the company's express written consent.

**Consumer Notice:**
Big Picture loans should be used for short-term financial needs only, not as a long-term financial solution. Individuals with credit difficulties should seek credit counseling.

CONFIDENTIAL

ROSETTE_REVISED 043454



| HOME | APPLY NOW | CUSTOMER LOGIN | REQUIREMENTS | FAQ | CONTACT |

## APPLY NOW!

## LOAN APPLICATION RESULTS

### Unfortunately we are unable to approve your loan application.

We're sorry but we are unable to approve your loan application.  We
hope to help you see The Big Picture in the future, so feel free to try
again at a later date.



Home   |   Apply Now   |   Customer Login   |   Requirements   |   Rates   |   FAQ                    BigPictureLoans.com   |   ©2013   |   All Rights Reserved   |   1.888.945.2727
Educational Resources   |   Contact Us   |   Privacy Policy   |   Terms of Website Use

First time BigPictureLoans.com customers typically qualify for a loan of $200 to $1,000. Red Rock Tribal Lending, LLC (D.B.A. BigPictureLoans.com) is a tribal enterprise wholly owned and operated
by the Lac Vieux Desert Band of Lake Superior Chippewa Indians, a federally recognized American Indian tribe and sovereign government. Applicable tribal and federal law shall govern any
agreement entered into as a result of your loan application. BigPictureLoans.com's contents do not signify a solicitation or offer for loans in all areas. Areas of operation may change with or without
notice. Services mentioned on this website may or may not be available in your particular area. Each communication or transaction conducted via BigPictureLoans.com will be deemed to have
occurred in BigPictureLoans.com's Lac Vieux Desert Band of Lake Superior Chippewa Indians offices, regardless of the location where you accessed or viewed this website. All content existing and/or
submitted to and in association with this website will be considered BigPictureLoans.com's copyrighted property. All communications with the company are deemed confidential. Any unauthorized
reproduction, distribution, or disclosure is prohibited without the company's express written consent.

**Consumer Notice:**
Big Picture loans should be used for short-term financial needs only, not as a long-term financial solution. Individuals with credit difficulties should seek credit counseling.

CONFIDENTIAL                                                                                                                                    ROSETTE_REVISED 043465

JA700

# THANKS!

**PHENOMENON**®

CONFIDENTIAL

JA701

USCA4 Appeal: 23-2097    Doc: 11-2        Filed: 12/06/2023    Pg: 246 of 493



# Exhibit 30

| | |
|---|---|
| **From:** | Matt Martorello |
| **To:** | Karrie Wichtman; Justin Martorello |
| **Subject:** | RE: 2014 08 22 TC Resolution 2014____ Approving Chorus Loans_final.docx |
| **Date:** | Monday, August 25, 2014 12:52:23 PM |

BigPictureLoans.com

-----Original Message-----
From: Karrie Wichtman [mailto:kwichtman@rosettelaw.com]
Sent: Monday, August 25, 2014 3:48 PM
To: Matt Martorello; Justin Martorello
Subject: RE: 2014 08 22 TC Resolution 2014____ Approving Chorus Loans_final.docx

Which one do you want me to use?  Let's talk about that today so I can modify the docs accordingly.

Karrie S. Wichtman, Partner
Rosette, LLP
Attorneys at Law
Michigan Office
25344 Red Arrow Hwy, Suite B
Mattawan, MI 49071
269.283.5005 - Office
480.242.6959 - Cell
517.913.6443 - Fax
kwichtman@rosettelaw.com
www.rosettelaw.com

CONFIDENTIAL COMMUNICATION: THIS MESSAGE IS A CONFIDENTIAL ATTORNEY
COMMUNICATION ONLY FOR USE BY THE INTENDED RECIPIENT.  ANY INADVERTENT RECEIPT
SHALL NOT CONSTITUTE A WAIVER OF ATTORNEY-CLIENT OR WORK PRODUCT PROTECTION.  IF
RECEIVED IN ERROR, PLEASE NOTIFY KARRIE S. WICHTMAN IMMEDIATELY AND DELETE THIS
MESSAGE.  THANK YOU FOR YOUR COOPERATION.

-----Original Message-----
From: Matt Martorello [mailto:mattm@bellicosevi.com]
Sent: Monday, August 25, 2014 2:26 PM
To: Karrie Wichtman; Justin Martorello
Subject: RE: 2014 08 22 TC Resolution 2014____ Approving Chorus Loans_final.docx

Ok, sorry for the run around here Karrie... Chorus has been sold.  Attached is another really great brand with just as
much energy, money and time spent into developing.  Assuming LVD buys SPVI, BigPictureLoans.com would be
an excellent domain.  If LVD doesn't buy SPVI, then FirstNationLoans.com is the domain we can provide (which
we haven't yet gotten around to build out/design).

-----Original Message-----
From: Karrie Wichtman [mailto:kwichtman@rosettelaw.com]
Sent: Monday, August 25, 2014 11:58 AM
To: Matt Martorello; Justin Martorello
Subject: 2014 08 22 TC Resolution 2014____ Approving Chorus Loans_final.docx


**This email and any files transmitted with it are confidential and may contain privileged or copyrighted
information. You must not present this message to another party without gaining permission from the sender. If you
are not the intended recipient you must not copy, distribute or use this email or the information contained in it for

CONFIDENTIAL

JA704

any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

**This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

CONFIDENTIAL

# Exhibit 31

# Lac Vieux Desert Band Of Lake Superior Chippewa Tribal Government

### P.O. Box 249, Pow Wow Trail • Watersmeet, Michigan 49969
### Phone: 906-358-4577 • Fax: 906-358-4785

**Executive Officers:**
James Williams, Jr., Tribal Chairman
Joette Pete-Baldwin, Tribal Vice-Chairwoman
Susan M. McGeshick, Treasurer
Michelle Hazen, Tribal Secretary



**Council Members:**
Eli Edwards
Cheryl McGeshick
John McGeshick, Jr.
Tyrone McGeshick
Henry Smith

## RESOLUTION # T2014 - _0606_

## APPROVING THE CREATION OF THE WHOLLY OWNED AND OPERATED TRIBAL LENDING ENTITY – BIG PICTURE LOANS, LLC

**WHEREAS**, the Lac Vieux Desert Band of Lake Superior Chippewa Indians ("Tribe") is a federally recognized Indian Tribe organized pursuant to Section 16 of the Indian Reorganization Act of June 18, 1934, 48 Stat, 984, 25 U.S.C. §476; and,

**WHEREAS**, the Tribal Council ("Council") of the Tribe is empowered pursuant to Article IV, Section 1(f), of the Tribe's Constitution to "manage the economic affairs, enterprises, property, both real and personal, and other interest of the [Tribe]"; and,

**WHEREAS,** The Council is authorized pursuant to Article IV, Section 1(b) of the Tribal Constitution to enact resolutions or ordinances; and

**WHEREAS**, The Council in its effort to diversify the economy of the Tribe's Reservation in order to improve the Tribe's economic self- sufficiency did create, pursuant to tribal law, an independent tribally chartered entity, to transact business in the form of tribally-owned lending enterprises known as Red Rock Tribal Lending, LLC and Duck Creek Tribal Financial, LLC ("the Companies"), of which the Tribe is sole Member, pursuant to Resolution 2011-041 and Resolution 2011-050 and Resolution 2011-058, respectively; and,

**WHEREAS,** James Williams, Jr. and Michelle Hazen, aka giizhigookway and Michelle Allen, are appointed were appointed as Co-Managers of the Companies pursuant to the Companies' Operating Agreement; and,

**WHEREAS,** the Council in accordance with its strategic economic development efforts wishes to create an additional independent tribally chartered entity, that may ultimately consolidate the business of the Companies, to transact business in the form of one (1) tribally-owned lending enterprise; and,

**WHEREAS,** on August _24th_, 2014, pursuant to Council Resolution T2014-_068_, the Council enacted the Lac Vieux Desert Business Entities Ordinance; and,

JA707

CONFIDENTIAL

LVD-DEF00002562

**WHEREAS**, the Council has been presented with Articles of Organization and an Operating Agreement for the tribally chartered business entity to be known as Big Picture Loans, LLC ("Big Picture"), of which the Tribe is named as the sole member; and,

**WHEREAS**, the Council believes it to be in the best interest of the Tribe to create such an entity which, as a wholly owned and operated instrumentality of the Tribe, shall be possessed of all of the privileges of the Tribe, including but not limited to the sovereign immunity of the Tribe which shall not be waived unless authorized by the Council in accordance with the terms of the Operating Agreement; and,

**WHEREAS**, the Council, in furtherance of the business of Big Picture, and therefore in furtherance of the business enterprises of the tribe, consistent with the Companies, finds that all information and records of Big Picture are confidential and deemed Tribal Records as provided for in the Tribal Constitution and may not be disclosed except as provided for in accordance applicable Tribal or federal law or contract providing for access to such information and records; and,

**WHEREAS**, the Council, in furtherance of business of the Big Picture, and therefore in furtherance of the business enterprises of the Tribe, believes that it is in the best interest of the Tribe to appoint Michelle Hazen and Chairman James Williams, Jr. as Co-Managers of Big Picture who will be possessed of all power and authority, consistent with the attached Articles of Organization and Operating Agreement, to conduct the business of the Company; and,

**WHEREAS**, the Council, in furtherance of the business of Big Picture, specifically indemnify and defend the Co-Managers Williams and Hazen, and all of their successors, against all liabilities, losses, and costs (including attorneys' fees) incurred or suffered by either Co-Manager in connection with the business of Big Picture subject to the limitations set forth in the Operating Agreement;

**THEREFORE BE IT RESOLVED**, that the Council hereby adopts the Articles of Organization and Operating Agreement of the wholly owned and operated tribally chartered business entity to be known as Big Picture Loans, LLC ("Big Picture") of which the Lac Vieux Desert Band of Lake Superior Chippewa Indians shall be now and forever, the sole member; and

**BE IT FURTHER RESOLVED**, that the Council hereby declares that Big Picture, as a wholly owned and operated instrumentality of the Tribe, shall be possessed of all of the privileges of the Tribe, including but not limited to the sovereign immunity of the Tribe which shall not be waived unless authorized by the Council in accordance with the terms of the Operating Agreement; and,

**BE IT FURTHER RESOLVED**, that the Council, hereby declares that all information and records of Big Picture are confidential and deemed Tribal Records as provided for in the Tribal Constitution and may not be disclosed except as provided for in accordance applicable Tribal or federal law or contract providing for access to such information and records; and,

**BE IT FURTHER RESOLVED**, that the Council, acting on behalf of the Tribe as sole member of Big Picture, hereby appoints Chairman James Williams, Jr. and Michelle Hazen who are possessed of all

JA708

CONFIDENTIAL

LVD-DEF00002563

power and authority, consistent with the attached Articles of Organization and Operating Agreement, to conduct the business of Big Picture; and,

**BE IT FURTHER RESOLVED,** that the Council, hereby approves authorizes and directs Co-Managers to take the necessary steps to conduct the business of Big Picture including but not limited to the registration of the business necessary to receive a tax identification number and the opening of bank accounts at one or more financial institutions of their choosing, including Chippewa Valley Bank, as well as the execution and delivery of any and all documents, including but not limited to signature cards for each account, necessary to conduct the business of Big Picture; and

**BE IT FURTHER RESOLVED,** that the Council, acting on behalf of the Tribe as sole member of Big Picture, hereby indemnifies and shall defend Co-Managers Williams an Hazen, and all of their successors, against all liabilities, losses, and costs (including attorneys' fees) incurred or suffered by the Manager in connection with the business of Big Picture subject to the limitations set forth in the Operating Agreement.

## CERTIFICATION

I, the undersigned, as Chairman of the Lac Vieux Desert Band of Lake Superior Chippewa Indians, a tribal government operating under a Constitution adopted pursuant to Section 16 of the Indian Reorganization Act 25 U.S.C. 476 and, more specifically, 25 U.S.C. 1300(h), do hereby certify that the Tribal Council of the Band is composed of nine (9) members, of whom eight (8), constituting a quorum, were present at a meeting duly called, noticed, convened and held on the 26th day of August 2014 and that the foregoing resolution was duly adopted at said meeting by an affirmative vote of seven (5) members, zero (0) against, and zero (0) abstaining, and that the said resolution has not been rescinded or amended in any way.

_Michelle Hazen_
Michelle Hazen – Secretary

_James Williams, Jr._
James Williams, Jr., Tribal Chairman

CONFIDENTIAL

# Exhibit 32

## Darcie Pace

| | |
|---|---|
| **From:** | Matt Martorello <mattm@bellicosevi.com> |
| **Sent:** | Tuesday, August 26, 2014 12:42 AM |
| **To:** | 'Chairman James Williams'; gkway@duckcreektf.com |
| **Cc:** | Nicole St. Germain; Karrie Wichtman; Robert Rosette; Justin Martorello |
| **Subject:** | Model for Tribal Council Review |
| **Attachments:** | Sale Model.xlsx |

| | |
|---|---|
| **Importance:** | High |

Great speaking with you today Mr. Chairman,

In an effort to put this on an extremely rapid pace, I wanted to get information to you immediately for disclosure at tomorrow morning's meeting with counsel. This model (attached) will help everyone very clearly see how the deal works, for which SPVI is seeking a firm buyer commitment for its business in very short order.

The model varies on some minor moving parts yet to be determined (like interest rate). However, **this is what you should focus on, cash to Tribal government by year:**

| Tribal Income by Year | | |
|---|---|---|
| Year 1 | $ | 1,265,693 |
| Year 2 | $ | 1,265,693 |
| Year 3 | $ | 1,265,693 |
| Year 4 | $ | 1,265,693 |
| Year 5 | $ | 1,265,693 |
| **Annually after PIF** | **$** | **58,086,901.20** |

**NOTE THE GREEN PART**... It says **$58,086,901.20**... This is how much money LVD is forecasted to make EACH YEAR, after the business is paid for in full ("PIF"). Let's just get from here to there and not get caught up in too many details. Let's set up the business for long term success, and feel very good about what we've accomplished in this deal for LVD and the precedent we set for Indian Country in similar/future deals that will inevitably follow. Then, let's also feel good about the very many great things this money will do in the years ahead both directly and by way of investment, within Indian Country and in whatever other avenues LVD should choose to pursue.

This is very real, and in fact like Rob said, if the note isn't paid back after Year 7 the business is yours anyways. Every month I'm going to want to see you hit the #s, I'm going to want to make sure that you have the $20mm+ financers still in place, and that you are hitting all of the metrics that drive this spreadsheet. All because the better that you do after you buy the company, the sooner we get payment on our note! The objective of current ownership of SPVI/Bellicose after the deal, is to avoid "misuse" or "bad boy acts" of any kind, and really to make sure that we get paid on the note (sooner is always better than later) and we move quickly to transition the business into very capable hands.

I won't get too winded on the details of the spreadsheet. It's simply the metrics we've proven to drive revenue on the $20mm portfolio. That, along with consolidated financials between the entities and the waterfall at the bottom. Forecasts are always forecasts, but with the 7 year hard stop, in any scenario, you're owning this business on day 1 and you are free and clear at the end of the term.

To be fair to LVD, I have to stress the urgency on our end a little further. The concept is that we're looking to sell our business with $0 down Seller Financing, no obligation on TNP used to pay for it, a very nice profit distribution along the way, and a huge windfall of distributions after the business is paid for. Many would love to be a buyer of such a

CONFIDENTIAL                                                    ROSETTE_REVISED_049541
JA711

business, and SPVI/BVI are looking to move very quickly on such an exit.   I didn't bring this up on the call because I didn't want you to feel I was being pushy, and rather than putting the business on the "auction block" to the highest bidder, we're coming exclusively to LVD out of respect for our relationship and wanting to secure a brighter future for the Tribe.  But it is important that LVD knows that time is of the essence for SPVI/BVI in getting a sale done.  I just ask that if LVD is interested or not interested, we move as quickly as SPVI/BVI needs to so that we're not inadvertently disadvantaged.

Looking forward to hearing details on the deal's reception by council tomorrow.

**Regards,**

**Matt Martorello**
Mobile: 773-209-7720
Email: mm@BellicoseVI.com



**This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

CONFIDENTIAL                                                          ROSETTE_REVISED_048542

JA712

**Forecasted Gross Revenue**

| | | | **Sale and Note Economics** |
|---|---|---|---|
| Outstanding A/R Balance | $ | 20,000,000.00 | Multiple (Months) |
| Average Fee per $100 (60/40) | | 31% | Sale Price |
| Cleared rate per ACH | | 91% | Interest Rate |
| ACH attempts per loan/month | | 2.1665 | Monthly Int Payment |
| *Gross Revenue projection per month* | *$* | *12,223,393.00* | |
| | | | 5 years Paid on Note |

| **Waterfall** | **Month 1** | | **Month 2** | | **Month 3** | |
|---|---|---|---|---|---|---|
| Gross Revenue | $ | 12,223,393.00 | $ | 12,223,393.00 | $ | 12,223,393.00 |
| Bad Debt Expense (30%) | $ | 3,667,017.90 | $ | 3,667,017.90 | $ | 3,667,017.90 |
| Marketing Expense | $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 |
| Underwriting/ACH Expense | $ | 250,000.00 | $ | 250,000.00 | $ | 250,000.00 |
| Call Center Expense | $ | 180,000.00 | $ | 180,000.00 | $ | 180,000.00 |
| Legal Fees | $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 |
| VPCS | $ | 8,800.00 | $ | 8,800.00 | $ | 8,800.00 |
| Accounting, CC and banking Fees | $ | 20,000.00 | $ | 20,000.00 | $ | 20,000.00 |
| IT Expense | $ | 5,000.00 | $ | 5,000.00 | $ | 5,000.00 |
| Interest Expense (ACR and IFI) | $ | 500,000.00 | $ | 500,000.00 | $ | 500,000.00 |
| Licensing | $ | 12,000.00 | $ | 12,000.00 | $ | 12,000.00 |
| Postage and Misc Expense | $ | 350,000.00 | $ | 350,000.00 | $ | 350,000.00 |
| Payroll Expense | $ | 200,000.00 | $ | 200,000.00 | $ | 200,000.00 |
| LMS and Systems | $ | 75,000.00 | $ | 75,000.00 | $ | 75,000.00 |
| NAFSA/OLA | $ | 15,000.00 | $ | 15,000.00 | $ | 15,000.00 |
| Expenses | $ | 5,382,817.90 | $ | 5,382,817.90 | $ | 5,382,817.90 |
| Tribal Ownership Distribution | $ | 342,255.00 | $ | 342,255.00 | | 342,255.00 |
| Interest Payment on Sale Note | $ | - | $ | - | $ | - |
| Funding to replenish AR Outstanding | $ | - | $ | - | $ | - |
| Funding to pay down Sale Note | $ | 6,498,320.10 | $ | 6,498,320.10 | | 6,498,320.10 |

ROSETTE_REVISED_048543

JA713

| | | |
|---|---|---|
| s | | |
| | 32 | |
| $ | 391,148,576.00 | |
| | 0% | |
| $ | - | |
| $ | 385,792,145.71 | |

| Tribal Income by Year | | |
|---|---|---|
| Year 1 | $ | 4,107,060.05 |
| Year 2 | $ | 4,107,060.05 |
| Year 3 | $ | 4,107,060.05 |
| Year 4 | $ | 6,160,590.07 |
| Year 5 | $ | 6,160,590.07 |
| **Annually after PIF** | **$** | **58,086,901.20** |

| | Month 4 | | Month 5 | | Month 6 | | Month 7 | | Month 8 |
|---|---|---|---|---|---|---|---|---|---|
| $ | 12,223,393.00 | $ | 12,223,393.00 | $ | 12,223,393.00 | $ | 12,223,393.00 | $ | 12,223,393.00 |
| | | | | | | | | | |
| $ | 3,667,017.90 | $ | 3,667,017.90 | $ | 3,667,017.90 | $ | 3,667,017.90 | $ | 3,667,017.90 |
| $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 |
| $ | 250,000.00 | $ | 250,000.00 | $ | 250,000.00 | $ | 250,000.00 | $ | 250,000.00 |
| $ | 180,000.00 | $ | 180,000.00 | $ | 180,000.00 | $ | 180,000.00 | $ | 180,000.00 |
| $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 |
| $ | 8,800.00 | $ | 8,800.00 | $ | 8,800.00 | $ | 8,800.00 | $ | 8,800.00 |
| $ | 20,000.00 | $ | 20,000.00 | $ | 20,000.00 | $ | 20,000.00 | $ | 20,000.00 |
| $ | 5,000.00 | $ | 5,000.00 | $ | 5,000.00 | $ | 5,000.00 | $ | 5,000.00 |
| $ | 500,000.00 | $ | 500,000.00 | $ | 500,000.00 | $ | 500,000.00 | $ | 500,000.00 |
| $ | 12,000.00 | $ | 12,000.00 | $ | 12,000.00 | $ | 12,000.00 | $ | 12,000.00 |
| $ | 350,000.00 | $ | 350,000.00 | $ | 350,000.00 | $ | 350,000.00 | $ | 350,000.00 |
| $ | 200,000.00 | $ | 200,000.00 | $ | 200,000.00 | $ | 200,000.00 | $ | 200,000.00 |
| $ | 75,000.00 | $ | 75,000.00 | $ | 75,000.00 | $ | 75,000.00 | $ | 75,000.00 |
| $ | 15,000.00 | $ | 15,000.00 | $ | 15,000.00 | $ | 15,000.00 | $ | 15,000.00 |
| $ | 5,382,817.90 | $ | 5,382,817.90 | $ | 5,382,817.90 | $ | 5,382,817.90 | $ | 5,382,817.90 |
| $ | 342,255.00 | $ | 342,255.00 | $ | 342,255.00 | $ | 342,255.00 | $ | 342,255.00 |
| $ | - | $ | - | $ | - | $ | - | $ | - |
| $ | - | $ | - | $ | - | $ | - | $ | - |
| $ | 6,498,320.10 | $ | 6,498,320.10 | $ | 6,498,320.10 | $ | 6,498,320.10 | $ | 6,498,320.10 |

| Tier down by year "Funding to replenish AR" | | |
|---|---|---|
| Year 1 | 0% | $    - |
| Year 2 | 0% | $    - |
| Year 3 | 0% | $    - |
| Year 4 | 0% | $    - |
| Year 5 | 0% | $    - |

| Month 9 | Month 10 | Month 11 | Month 12 | Month 13 |
|---|---|---|---|---|
| $ 12,223,393.00 | $ 12,223,393.00 | $ 12,223,393.00 | $ 12,223,393.00 | $ 12,223,393.00 |
| $ 3,667,017.90 | $ 3,667,017.90 | $ 3,667,017.90 | $ 3,667,017.90 | $ 3,667,017.90 |
| $ 50,000.00 | $ 50,000.00 | $ 50,000.00 | $ 50,000.00 | $ 50,000.00 |
| $ 250,000.00 | $ 250,000.00 | $ 250,000.00 | $ 250,000.00 | $ 250,000.00 |
| $ 180,000.00 | $ 180,000.00 | $ 180,000.00 | $ 180,000.00 | $ 180,000.00 |
| $ 50,000.00 | $ 50,000.00 | $ 50,000.00 | $ 50,000.00 | $ 50,000.00 |
| $ 8,800.00 | $ 8,800.00 | $ 8,800.00 | $ 8,800.00 | $ 8,800.00 |
| $ 20,000.00 | $ 20,000.00 | $ 20,000.00 | $ 20,000.00 | $ 20,000.00 |
| $ 5,000.00 | $ 5,000.00 | $ 5,000.00 | $ 5,000.00 | $ 5,000.00 |
| $ 500,000.00 | $ 500,000.00 | $ 500,000.00 | $ 500,000.00 | $ 500,000.00 |
| $ 12,000.00 | $ 12,000.00 | $ 12,000.00 | $ 12,000.00 | $ 12,000.00 |
| $ 350,000.00 | $ 350,000.00 | $ 350,000.00 | $ 350,000.00 | $ 350,000.00 |
| $ 200,000.00 | $ 200,000.00 | $ 200,000.00 | $ 200,000.00 | $ 200,000.00 |
| $ 75,000.00 | $ 75,000.00 | $ 75,000.00 | $ 75,000.00 | $ 75,000.00 |
| $ 15,000.00 | $ 15,000.00 | $ 15,000.00 | $ 15,000.00 | $ 15,000.00 |
| $ 5,382,817.90 | $ 5,382,817.90 | $ 5,382,817.90 | $ 5,382,817.90 | $ 5,382,817.90 |
| $ 342,255.00 | $ 342,255.00 | $ 342,255.00 | $ 342,255.00 | $ 342,255.00 |
| $    - | $    - | $    - | $    - | $    - |
| $    - | $    - | $    - | $    - | $    - |
| $ 6,498,320.10 | $ 6,498,320.10 | $ 6,498,320.10 | $ 6,498,320.10 | $ 6,498,320.10 |

ROSETTE_REVISED_048545

| | Month 14 | | Month 15 | | Month 16 | | Month 17 | | Month 18 |
|---|---|---|---|---|---|---|---|---|---|
| $ | 12,223,393.00 | $ | 12,223,393.00 | $ | 12,223,393.00 | $ | 12,223,393.00 | $ | 12,223,393.00 |
| | | | | | | | | | |
| $ | 3,667,017.90 | $ | 3,667,017.90 | $ | 3,667,017.90 | $ | 3,667,017.90 | $ | 3,667,017.90 |
| $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 |
| $ | 250,000.00 | $ | 250,000.00 | $ | 250,000.00 | $ | 250,000.00 | $ | 250,000.00 |
| $ | 180,000.00 | $ | 180,000.00 | $ | 180,000.00 | $ | 180,000.00 | $ | 180,000.00 |
| $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 |
| $ | 8,800.00 | $ | 8,800.00 | $ | 8,800.00 | $ | 8,800.00 | $ | 8,800.00 |
| $ | 20,000.00 | $ | 20,000.00 | $ | 20,000.00 | $ | 20,000.00 | $ | 20,000.00 |
| $ | 5,000.00 | $ | 5,000.00 | $ | 5,000.00 | $ | 5,000.00 | $ | 5,000.00 |
| $ | 500,000.00 | $ | 500,000.00 | $ | 500,000.00 | $ | 500,000.00 | $ | 500,000.00 |
| $ | 12,000.00 | $ | 12,000.00 | $ | 12,000.00 | $ | 12,000.00 | $ | 12,000.00 |
| $ | 350,000.00 | $ | 350,000.00 | $ | 350,000.00 | $ | 350,000.00 | $ | 350,000.00 |
| $ | 200,000.00 | $ | 200,000.00 | $ | 200,000.00 | $ | 200,000.00 | $ | 200,000.00 |
| $ | 75,000.00 | $ | 75,000.00 | $ | 75,000.00 | $ | 75,000.00 | $ | 75,000.00 |
| $ | 15,000.00 | $ | 15,000.00 | $ | 15,000.00 | $ | 15,000.00 | $ | 15,000.00 |
| $ | 5,382,817.90 | $ | 5,382,817.90 | $ | 5,382,817.90 | $ | 5,382,817.90 | $ | 5,382,817.90 |
| $ | 342,255.00 | $ | 342,255.00 | $ | 342,255.00 | $ | 342,255.00 | $ | 342,255.00 |
| $ | - | $ | - | $ | - | $ | - | $ | - |
| $ | - | $ | - | $ | - | $ | - | $ | - |
| $ | 6,498,320.10 | $ | 6,498,320.10 | $ | 6,498,320.10 | $ | 6,498,320.10 | $ | 6,498,320.10 |

ROSETTE_REVISED_048546

JA716

| Month 19 | | Month 20 | | Month 21 | | Month 22 | | Month 23 | |
|---|---:|---|---:|---|---:|---|---:|---|---:|
| $ | 12,223,393.00 | $ | 12,223,393.00 | $ | 12,223,393.00 | $ | 12,223,393.00 | $ | 12,223,393.00 |
| | | | | | | | | | |
| $ | 3,667,017.90 | $ | 3,667,017.90 | $ | 3,667,017.90 | $ | 3,667,017.90 | $ | 3,667,017.90 |
| $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 |
| $ | 250,000.00 | $ | 250,000.00 | $ | 250,000.00 | $ | 250,000.00 | $ | 250,000.00 |
| $ | 180,000.00 | $ | 180,000.00 | $ | 180,000.00 | $ | 180,000.00 | $ | 180,000.00 |
| $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 |
| $ | 8,800.00 | $ | 8,800.00 | $ | 8,800.00 | $ | 8,800.00 | $ | 8,800.00 |
| $ | 20,000.00 | $ | 20,000.00 | $ | 20,000.00 | $ | 20,000.00 | $ | 20,000.00 |
| $ | 5,000.00 | $ | 5,000.00 | $ | 5,000.00 | $ | 5,000.00 | $ | 5,000.00 |
| $ | 500,000.00 | $ | 500,000.00 | $ | 500,000.00 | $ | 500,000.00 | $ | 500,000.00 |
| $ | 12,000.00 | $ | 12,000.00 | $ | 12,000.00 | $ | 12,000.00 | $ | 12,000.00 |
| $ | 350,000.00 | $ | 350,000.00 | $ | 350,000.00 | $ | 350,000.00 | $ | 350,000.00 |
| $ | 200,000.00 | $ | 200,000.00 | $ | 200,000.00 | $ | 200,000.00 | $ | 200,000.00 |
| $ | 75,000.00 | $ | 75,000.00 | $ | 75,000.00 | $ | 75,000.00 | $ | 75,000.00 |
| $ | 15,000.00 | $ | 15,000.00 | $ | 15,000.00 | $ | 15,000.00 | $ | 15,000.00 |
| $ | 5,382,817.90 | $ | 5,382,817.90 | $ | 5,382,817.90 | $ | 5,382,817.90 | $ | 5,382,817.90 |
| $ | 342,255.00 | $ | 342,255.00 | $ | 342,255.00 | $ | 342,255.00 | $ | 342,255.00 |
| $ | - | $ | - | $ | - | $ | - | $ | - |
| $ | - | $ | - | $ | - | $ | - | $ | - |
| $ | 6,498,320.10 | $ | 6,498,320.10 | $ | 6,498,320.10 | $ | 6,498,320.10 | $ | 6,498,320.10 |

| Month 24 | Month 25 | Month 26 | Month 27 | Month 28 |
|---|---|---|---|---|
| $ 12,223,393.00 | $ 12,223,393.00 | $ 12,223,393.00 | $ 12,223,393.00 | $ 12,223,393.00 |
| $ 3,667,017.90 | $ 3,667,017.90 | $ 3,667,017.90 | $ 3,667,017.90 | $ 3,667,017.90 |
| $ 50,000.00 | $ 50,000.00 | $ 50,000.00 | $ 50,000.00 | $ 50,000.00 |
| $ 250,000.00 | $ 250,000.00 | $ 250,000.00 | $ 250,000.00 | $ 250,000.00 |
| $ 180,000.00 | $ 180,000.00 | $ 180,000.00 | $ 180,000.00 | $ 180,000.00 |
| $ 50,000.00 | $ 50,000.00 | $ 50,000.00 | $ 50,000.00 | $ 50,000.00 |
| $ 8,800.00 | $ 8,800.00 | $ 8,800.00 | $ 8,800.00 | $ 8,800.00 |
| $ 20,000.00 | $ 20,000.00 | $ 20,000.00 | $ 20,000.00 | $ 20,000.00 |
| $ 5,000.00 | $ 5,000.00 | $ 5,000.00 | $ 5,000.00 | $ 5,000.00 |
| $ 500,000.00 | $ 500,000.00 | $ 500,000.00 | $ 500,000.00 | $ 500,000.00 |
| $ 12,000.00 | $ 12,000.00 | $ 12,000.00 | $ 12,000.00 | $ 12,000.00 |
| $ 350,000.00 | $ 350,000.00 | $ 350,000.00 | $ 350,000.00 | $ 350,000.00 |
| $ 200,000.00 | $ 200,000.00 | $ 200,000.00 | $ 200,000.00 | $ 200,000.00 |
| $ 75,000.00 | $ 75,000.00 | $ 75,000.00 | $ 75,000.00 | $ 75,000.00 |
| $ 15,000.00 | $ 15,000.00 | $ 15,000.00 | $ 15,000.00 | $ 15,000.00 |
| $ 5,382,817.90 | $ 5,382,817.90 | $ 5,382,817.90 | $ 5,382,817.90 | $ 5,382,817.90 |
| $ 342,255.00 | $ 342,255.00 | $ 342,255.00 | $ 342,255.00 | $ 342,255.00 |
| $ - | $ - | $ - | $ - | $ - |
| $ - | $ - | $ - | $ - | $ - |
| $ 6,498,320.10 | $ 6,498,320.10 | $ 6,498,320.10 | $ 6,498,320.10 | $ 6,498,320.10 |

CONFIDENTIAL

| | Month 29 | | Month 30 | | Month 31 | | Month 32 | | Month 33 |
|---|---|---|---|---|---|---|---|---|---|
| $ | 12,223,393.00 | $ | 12,223,393.00 | $ | 12,223,393.00 | $ | 12,223,393.00 | $ | 12,223,393.00 |
| | | | | | | | | | |
| $ | 3,667,017.90 | $ | 3,667,017.90 | $ | 3,667,017.90 | $ | 3,667,017.90 | $ | 3,667,017.90 |
| $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 |
| $ | 250,000.00 | $ | 250,000.00 | $ | 250,000.00 | $ | 250,000.00 | $ | 250,000.00 |
| $ | 180,000.00 | $ | 180,000.00 | $ | 180,000.00 | $ | 180,000.00 | $ | 180,000.00 |
| $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 |
| $ | 8,800.00 | $ | 8,800.00 | $ | 8,800.00 | $ | 8,800.00 | $ | 8,800.00 |
| $ | 20,000.00 | $ | 20,000.00 | $ | 20,000.00 | $ | 20,000.00 | $ | 20,000.00 |
| $ | 5,000.00 | $ | 5,000.00 | $ | 5,000.00 | $ | 5,000.00 | $ | 5,000.00 |
| $ | 500,000.00 | $ | 500,000.00 | $ | 500,000.00 | $ | 500,000.00 | $ | 500,000.00 |
| $ | 12,000.00 | $ | 12,000.00 | $ | 12,000.00 | $ | 12,000.00 | $ | 12,000.00 |
| $ | 350,000.00 | $ | 350,000.00 | $ | 350,000.00 | $ | 350,000.00 | $ | 350,000.00 |
| $ | 200,000.00 | $ | 200,000.00 | $ | 200,000.00 | $ | 200,000.00 | $ | 200,000.00 |
| $ | 75,000.00 | $ | 75,000.00 | $ | 75,000.00 | $ | 75,000.00 | $ | 75,000.00 |
| $ | 15,000.00 | $ | 15,000.00 | $ | 15,000.00 | $ | 15,000.00 | $ | 15,000.00 |
| $ | 5,382,817.90 | $ | 5,382,817.90 | $ | 5,382,817.90 | $ | 5,382,817.90 | $ | 5,382,817.90 |
| $ | 342,255.00 | $ | 342,255.00 | $ | 342,255.00 | $ | 342,255.00 | $ | 342,255.00 |
| $ | - | $ | - | $ | - | $ | - | $ | - |
| $ | - | $ | - | $ | - | $ | - | $ | - |
| $ | 6,498,320.10 | $ | 6,498,320.10 | $ | 6,498,320.10 | $ | 6,498,320.10 | $ | 6,498,320.10 |

| | Month 34 | | Month 35 | | Month 36 | | Month 37 | | Month 38 |
|---|---|---|---|---|---|---|---|---|---|
| $ | 12,223,393.00 | $ | 12,223,393.00 | $ | 12,223,393.00 | $ | 12,223,393.00 | $ | 12,223,393.00 |
| | | | | | | | | | |
| $ | 3,667,017.90 | $ | 3,667,017.90 | $ | 3,667,017.90 | $ | 3,667,017.90 | $ | 3,667,017.90 |
| $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 |
| $ | 250,000.00 | $ | 250,000.00 | $ | 250,000.00 | $ | 250,000.00 | $ | 250,000.00 |
| $ | 180,000.00 | $ | 180,000.00 | $ | 180,000.00 | $ | 180,000.00 | $ | 180,000.00 |
| $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 |
| $ | 8,800.00 | $ | 8,800.00 | $ | 8,800.00 | $ | 8,800.00 | $ | 8,800.00 |
| $ | 20,000.00 | $ | 20,000.00 | $ | 20,000.00 | $ | 20,000.00 | $ | 20,000.00 |
| $ | 5,000.00 | $ | 5,000.00 | $ | 5,000.00 | $ | 5,000.00 | $ | 5,000.00 |
| $ | 500,000.00 | $ | 500,000.00 | $ | 500,000.00 | $ | 500,000.00 | $ | 500,000.00 |
| $ | 12,000.00 | $ | 12,000.00 | $ | 12,000.00 | $ | 12,000.00 | $ | 12,000.00 |
| $ | 350,000.00 | $ | 350,000.00 | $ | 350,000.00 | $ | 350,000.00 | $ | 350,000.00 |
| $ | 200,000.00 | $ | 200,000.00 | $ | 200,000.00 | $ | 200,000.00 | $ | 200,000.00 |
| $ | 75,000.00 | $ | 75,000.00 | $ | 75,000.00 | $ | 75,000.00 | $ | 75,000.00 |
| $ | 15,000.00 | $ | 15,000.00 | $ | 15,000.00 | $ | 15,000.00 | $ | 15,000.00 |
| $ | 5,382,817.90 | $ | 5,382,817.90 | $ | 5,382,817.90 | $ | 5,382,817.90 | $ | 5,382,817.90 |
| $ | 342,255.00 | $ | 342,255.00 | $ | 342,255.00 | $ | 513,382.51 | $ | 513,382.51 |
| $ | - | $ | - | $ | - | $ | - | $ | - |
| $ | - | $ | - | $ | - | $ | - | $ | - |
| $ | 6,498,320.10 | $ | 6,498,320.10 | $ | 6,498,320.10 | $ | 6,327,192.59 | $ | 6,327,192.59 |

| | Month 39 | | Month 40 | | Month 41 | | Month 42 | | Month 43 |
|---|---|---|---|---|---|---|---|---|---|
| $ | 12,223,393.00 | $ | 12,223,393.00 | $ | 12,223,393.00 | $ | 12,223,393.00 | $ | 12,223,393.00 |
| $ | 3,667,017.90 | $ | 3,667,017.90 | $ | 3,667,017.90 | $ | 3,667,017.90 | $ | 3,667,017.90 |
| $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 |
| $ | 250,000.00 | $ | 250,000.00 | $ | 250,000.00 | $ | 250,000.00 | $ | 250,000.00 |
| $ | 180,000.00 | $ | 180,000.00 | $ | 180,000.00 | $ | 180,000.00 | $ | 180,000.00 |
| $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 |
| $ | 8,800.00 | $ | 8,800.00 | $ | 8,800.00 | $ | 8,800.00 | $ | 8,800.00 |
| $ | 20,000.00 | $ | 20,000.00 | $ | 20,000.00 | $ | 20,000.00 | $ | 20,000.00 |
| $ | 5,000.00 | $ | 5,000.00 | $ | 5,000.00 | $ | 5,000.00 | $ | 5,000.00 |
| $ | 500,000.00 | $ | 500,000.00 | $ | 500,000.00 | $ | 500,000.00 | $ | 500,000.00 |
| $ | 12,000.00 | $ | 12,000.00 | $ | 12,000.00 | $ | 12,000.00 | $ | 12,000.00 |
| $ | 350,000.00 | $ | 350,000.00 | $ | 350,000.00 | $ | 350,000.00 | $ | 350,000.00 |
| $ | 200,000.00 | $ | 200,000.00 | $ | 200,000.00 | $ | 200,000.00 | $ | 200,000.00 |
| $ | 75,000.00 | $ | 75,000.00 | $ | 75,000.00 | $ | 75,000.00 | $ | 75,000.00 |
| $ | 15,000.00 | $ | 15,000.00 | $ | 15,000.00 | $ | 15,000.00 | $ | 15,000.00 |
| $ | 5,382,817.90 | $ | 5,382,817.90 | $ | 5,382,817.90 | $ | 5,382,817.90 | $ | 5,382,817.90 |
| $ | 513,382.51 | $ | 513,382.51 | $ | 513,382.51 | $ | 513,382.51 | $ | 513,382.51 |
| $ | - | $ | - | $ | - | $ | - | $ | - |
| $ | - | $ | - | $ | - | $ | - | $ | - |
| $ | 6,327,192.59 | $ | 6,327,192.59 | $ | 6,327,192.59 | $ | 6,327,192.59 | $ | 6,327,192.59 |

ROSETTE_REVISED_048551

| | Month 44 | | Month 45 | | Month 46 | | Month 47 | | Month 48 |
|---|---|---|---|---|---|---|---|---|---|
| $ | 12,223,393.00 | $ | 12,223,393.00 | $ | 12,223,393.00 | $ | 12,223,393.00 | $ | 12,223,393.00 |
| | | | | | | | | | |
| $ | 3,667,017.90 | $ | 3,667,017.90 | $ | 3,667,017.90 | $ | 3,667,017.90 | $ | 3,667,017.90 |
| $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 |
| $ | 250,000.00 | $ | 250,000.00 | $ | 250,000.00 | $ | 250,000.00 | $ | 250,000.00 |
| $ | 180,000.00 | $ | 180,000.00 | $ | 180,000.00 | $ | 180,000.00 | $ | 180,000.00 |
| $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 |
| $ | 8,800.00 | $ | 8,800.00 | $ | 8,800.00 | $ | 8,800.00 | $ | 8,800.00 |
| $ | 20,000.00 | $ | 20,000.00 | $ | 20,000.00 | $ | 20,000.00 | $ | 20,000.00 |
| $ | 5,000.00 | $ | 5,000.00 | $ | 5,000.00 | $ | 5,000.00 | $ | 5,000.00 |
| $ | 500,000.00 | $ | 500,000.00 | $ | 500,000.00 | $ | 500,000.00 | $ | 500,000.00 |
| $ | 12,000.00 | $ | 12,000.00 | $ | 12,000.00 | $ | 12,000.00 | $ | 12,000.00 |
| $ | 350,000.00 | $ | 350,000.00 | $ | 350,000.00 | $ | 350,000.00 | $ | 350,000.00 |
| $ | 200,000.00 | $ | 200,000.00 | $ | 200,000.00 | $ | 200,000.00 | $ | 200,000.00 |
| $ | 75,000.00 | $ | 75,000.00 | $ | 75,000.00 | $ | 75,000.00 | $ | 75,000.00 |
| $ | 15,000.00 | $ | 15,000.00 | $ | 15,000.00 | $ | 15,000.00 | $ | 15,000.00 |
| $ | 5,382,817.90 | $ | 5,382,817.90 | $ | 5,382,817.90 | $ | 5,382,817.90 | $ | 5,382,817.90 |
| $ | 513,382.51 | $ | 513,382.51 | $ | 513,382.51 | $ | 513,382.51 | $ | 513,382.51 |
| $ | - | $ | - | $ | - | $ | - | $ | - |
| $ | - | $ | - | $ | - | $ | - | $ | - |
| $ | 6,327,192.59 | $ | 6,327,192.59 | $ | 6,327,192.59 | $ | 6,327,192.59 | $ | 6,327,192.59 |

| | Month 49 | | Month 50 | | Month 51 | | Month 52 | | Month 53 |
|---|---|---|---|---|---|---|---|---|---|
| $ | 12,223,393.00 | $ | 12,223,393.00 | $ | 12,223,393.00 | $ | 12,223,393.00 | $ | 12,223,393.00 |
| | | | | | | | | | |
| $ | 3,667,017.90 | $ | 3,667,017.90 | $ | 3,667,017.90 | $ | 3,667,017.90 | $ | 3,667,017.90 |
| $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 |
| $ | 250,000.00 | $ | 250,000.00 | $ | 250,000.00 | $ | 250,000.00 | $ | 250,000.00 |
| $ | 180,000.00 | $ | 180,000.00 | $ | 180,000.00 | $ | 180,000.00 | $ | 180,000.00 |
| $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 |
| $ | 8,800.00 | $ | 8,800.00 | $ | 8,800.00 | $ | 8,800.00 | $ | 8,800.00 |
| $ | 20,000.00 | $ | 20,000.00 | $ | 20,000.00 | $ | 20,000.00 | $ | 20,000.00 |
| $ | 5,000.00 | $ | 5,000.00 | $ | 5,000.00 | $ | 5,000.00 | $ | 5,000.00 |
| $ | 500,000.00 | $ | 500,000.00 | $ | 500,000.00 | $ | 500,000.00 | $ | 500,000.00 |
| $ | 12,000.00 | $ | 12,000.00 | $ | 12,000.00 | $ | 12,000.00 | $ | 12,000.00 |
| $ | 350,000.00 | $ | 350,000.00 | $ | 350,000.00 | $ | 350,000.00 | $ | 350,000.00 |
| $ | 200,000.00 | $ | 200,000.00 | $ | 200,000.00 | $ | 200,000.00 | $ | 200,000.00 |
| $ | 75,000.00 | $ | 75,000.00 | $ | 75,000.00 | $ | 75,000.00 | $ | 75,000.00 |
| $ | 15,000.00 | $ | 15,000.00 | $ | 15,000.00 | $ | 15,000.00 | $ | 15,000.00 |
| $ | 5,382,817.90 | $ | 5,382,817.90 | $ | 5,382,817.90 | $ | 5,382,817.90 | $ | 5,382,817.90 |
| $ | 513,382.51 | $ | 513,382.51 | $ | 513,382.51 | $ | 513,382.51 | $ | 513,382.51 |
| $ | - | $ | - | $ | - | $ | - | $ | - |
| $ | - | $ | - | $ | - | $ | - | $ | - |
| $ | 6,327,192.59 | $ | 6,327,192.59 | $ | 6,327,192.59 | $ | 6,327,192.59 | $ | 6,327,192.59 |

| | Month 54 | | Month 55 | | Month 56 | | Month 57 | | Month 58 |
|---|---|---|---|---|---|---|---|---|---|
| $ | 12,223,393.00 | $ | 12,223,393.00 | $ | 12,223,393.00 | $ | 12,223,393.00 | $ | 12,223,393.00 |
| | | | | | | | | | |
| $ | 3,667,017.90 | $ | 3,667,017.90 | $ | 3,667,017.90 | $ | 3,667,017.90 | $ | 3,667,017.90 |
| $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 |
| $ | 250,000.00 | $ | 250,000.00 | $ | 250,000.00 | $ | 250,000.00 | $ | 250,000.00 |
| $ | 180,000.00 | $ | 180,000.00 | $ | 180,000.00 | $ | 180,000.00 | $ | 180,000.00 |
| $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 |
| $ | 8,800.00 | $ | 8,800.00 | $ | 8,800.00 | $ | 8,800.00 | $ | 8,800.00 |
| $ | 20,000.00 | $ | 20,000.00 | $ | 20,000.00 | $ | 20,000.00 | $ | 20,000.00 |
| $ | 5,000.00 | $ | 5,000.00 | $ | 5,000.00 | $ | 5,000.00 | $ | 5,000.00 |
| $ | 500,000.00 | $ | 500,000.00 | $ | 500,000.00 | $ | 500,000.00 | $ | 500,000.00 |
| $ | 12,000.00 | $ | 12,000.00 | $ | 12,000.00 | $ | 12,000.00 | $ | 12,000.00 |
| $ | 350,000.00 | $ | 350,000.00 | $ | 350,000.00 | $ | 350,000.00 | $ | 350,000.00 |
| $ | 200,000.00 | $ | 200,000.00 | $ | 200,000.00 | $ | 200,000.00 | $ | 200,000.00 |
| $ | 75,000.00 | $ | 75,000.00 | $ | 75,000.00 | $ | 75,000.00 | $ | 75,000.00 |
| $ | 15,000.00 | $ | 15,000.00 | $ | 15,000.00 | $ | 15,000.00 | $ | 15,000.00 |
| $ | 5,382,817.90 | $ | 5,382,817.90 | $ | 5,382,817.90 | $ | 5,382,817.90 | $ | 5,382,817.90 |
| $ | 513,382.51 | $ | 513,382.51 | $ | 513,382.51 | $ | 513,382.51 | $ | 513,382.51 |
| $ | - | $ | - | $ | - | $ | - | $ | - |
| $ | - | $ | - | $ | - | $ | - | $ | - |
| $ | 6,327,192.59 | $ | 6,327,192.59 | $ | 6,327,192.59 | $ | 6,327,192.59 | $ | 6,327,192.59 |

| | Month 59 | | Month 60 | | Month 61+ |
|---|---|---|---|---|---|
| $ | 12,223,393.00 | $ | 12,223,393.00 | $ | 12,223,393.00 |
| | | | | | |
| $ | 3,667,017.90 | $ | 3,667,017.90 | $ | 3,667,017.90 |
| $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 |
| $ | 250,000.00 | $ | 250,000.00 | $ | 250,000.00 |
| $ | 180,000.00 | $ | 180,000.00 | $ | 180,000.00 |
| $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 |
| $ | 8,800.00 | $ | 8,800.00 | $ | 8,800.00 |
| $ | 20,000.00 | $ | 20,000.00 | $ | 20,000.00 |
| $ | 5,000.00 | $ | 5,000.00 | $ | 5,000.00 |
| $ | 500,000.00 | $ | 500,000.00 | $ | 500,000.00 |
| $ | 12,000.00 | $ | 12,000.00 | $ | 12,000.00 |
| $ | 350,000.00 | $ | 350,000.00 | $ | 350,000.00 |
| $ | 200,000.00 | $ | 200,000.00 | $ | 200,000.00 |
| $ | 75,000.00 | $ | 75,000.00 | $ | 75,000.00 |
| $ | 15,000.00 | $ | 15,000.00 | $ | 15,000.00 |
| $ | 5,382,817.90 | $ | 5,382,817.90 | $ | 5,382,817.90 |
| $ | 513,382.51 | $ | 513,382.51 | $ | 4,840,575.10 |
| $ | - | $ | - | $ | - |
| $ | - | $ | - | $ | 2,000,000.00 |
| $ | 6,327,192.59 | $ | 6,327,192.59 | $ | - |

CONFIDENTIAL

ROSETTE_REVISED_049555

JA725

# Exhibit 33

## Darcie Pace

**From:**      Matt Martorello <mattm@bellicosevi.com>
**Sent:**      Monday, August 25, 2014 11:36 AM
**To:**        Robert Rosette
**Subject:**   FYI


So here is what I'm thinking (for now).  If we can't reach terms with LVD to buy SPVI, then SPVI will be sold to another Tribe (likely Middletown).  If we do reach terms, then some of my team will likely proceed with MTR in a new entity, to help them stand up a business.

So I'm sort of on hold (and MTR) until we know if LVD is going to be able to come to terms on SPVI or not.


**Regards,**


**Matt Martorello**
Mobile: 773-209-7720
Email: mm@BellicoseVI.com



**This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

CONFIDENTIAL                                                 ROSETTE_REVISED_048529

JA727

# Exhibit 34

JA728

| | |
|---|---|
| **From:** | Matt Martorello |
| **To:** | Karrie Wichtman |
| **Subject:** | RE: DM Recommendation |
| **Date:** | Tuesday, August 26, 2014 8:18:51 PM |
| **Attachments:** | image001.png |

At this stage, I was told council only approved evolving the term sheet into something that would be reviewed later to ask questions about, and if approved, then it'd be binding.  I didn't hear anything back from the Chairman to my email, nor did I get any sense of excitement from anyone, which is really perplexing.  It makes me wonder if some folks think they can operate without spvi or want to learn more to complete the puzzle and reverse engineer.

There are a lot of legal details to go through yet on the deal. Especially in a seller financing.  The tribe will have to be comfortable with full waivers for misuse, bad acts, etc.  (Rob said they would, but he is not LVD).

Plus, the seller will have to keep a final say so in business decisions to protect the business from being destroyed by the new owner before paid.  The business needs to be treated very delicately and protected if it is to survive.  Risk and reward carefully measured.  No need to reinvent the wheel or shake things up, just need to keep it alive and then use the earnings from it to take risks with and do other things.

In any event, many extreme protections will be necessary to make sure the sale price occurs, and that IP is not misused (I.e. Escrow for example is common).  These sort of things are mandatory in such a deal format, and I don't have any certainty that they're going to be agreed to or not right now.  My goal is to keep the business alive through Note repayment.

In fact, every vendor but me has a waiver but SPVI.  If LVD were to snoop, and then not do the deal after learning everything about us, and the details and IP, I'd have zero recourse today when they use it to start their own servicing business.  Tribal leaders will need to understand all of these things, then maybe they understand why we have to protect the business and IP.

The Servicer is a Servicer, so the IP it builds is its own, and for the use of its clients (multiple) which it services, or has serviced from even the pre-LVD days.  If it weren't SPVI IP, we'd have some real problems, and I guess any clients would have to deal with previous lenders claiming the same thing today.  The concept of IP sale in and of itself was evident of IP ownership.

Similarly, the Tribe will need to be comfortable that key officers and myself will continue to exist in the industry. With Middletown and possibly another Tribe, or even as a state licensed lender.

We later evolved to recommendations and sharing a bit to be helpful, but certain items and code will never even be shared with most of my current employees, because nobody else in the subprime industry does it, and it is too valuable to put at risk as one leak would destroy the business.  Even talking about DM is a very bad idea, as small a thing as it is, due to competition and the value and power of what we've created.  Just knowing "DM is good" makes people want to study it and spend years figuring it out.

That said, even in due diligence, some information will be extremely limited and some IP held in escrow after closing until satisfaction of the note.  It can't get out to the world.

CONFIDENTIAL

JA729

As for Management I don't know what that looks like yet post transaction.  I've discussed staying on as Manager of LLC or maybe not even whatsoever.  I'd love to just turn over the keys and be hands off. However, I very much need to make sure the business can sustain.

All of this would be entirely different if we were talking about a cash purchase deal, but the nature of the transaction has to permeate throughout the documents and details.  I do hope a deal is imminent.  However, I have no idea how council is thinking or will think. I don't know if they will see the nature of the transaction requires such a level of care or not.

Admittedly, I am very paranoid, but I think I have many good reasons to be.  I just would prefer to take one step at a time (yet need to move as quickly as possible).

Sent via the Samsung GALAXY S® 5, an AT&T 4G LTE smartphone

-------- Original message --------
From: Karrie Wichtman
Date:08/26/2014 10:35 PM (GMT-04:00)
To: Matt Martorello
Subject: RE: DM Recommendation

Matt,

I am at a total loss with regard to your response.

I wasn't recommending that SPVI disclose its secret sauce but only that SPVI be willing to explain to the Co-Managers what exactly they are approving.  For example, do Jimmer and Shelly even know what "DM" means because I don't.  Perhaps I got overzealous with the questions but I have Tribal leaders in my ear eager to learn the business and excited about the restructure.  Your statements with regard to the "should an acquisition occur" and "would be relevant questions for the eyes of Management and those in the acquiring company on a need to know basis as well" have me in a tailspin.  How confident are you that the acquisition will happen because my client is very excited about it as demonstrated by their willingness through formal Tribal Council action to move forward today?  Also, if the Tribe is buying SPVI aren't these questions relevant due diligence so that they know what they are buying and after acquisition who determines who needs to know would be the Tribe not Management.  I guess I would like to know who Management is?  Here's the other thing that I don't understand about your response.  Wasn't the DM – which I have figured out to mean Direct Mail -created for RRTL?  I can't locate any provision in the Servicing that says that IP produced for the Company is SPVI IP.  In fact, it is my opinion that RRTL owns the IP - so you can imagine why it is hard for me to understand why the Co-Managers would not be able to ask questions about documents attached to the approval as support for the basis of the recommendation.

I am not trying to be a bull in a China shop, I am just trying to understand your response?

Sincerely,


Karrie S. Wichtman, Partner

CONFIDENTIAL

JA730

ROSETTE, LLP

Michigan Office

Attorneys at Law

25344 Red Arrow Highway

Mattawan, Michigan 49071

269.283.5005 Office

517.913.6443 Facsimile

480.242.6959 Cell

kwichtman@rosettelaw.com

rosettelaw.com

CONFIDENTIAL COMMUNICATION: THIS MESSAGE IS A CONFIDENTIAL ATTORNEY COMMUNICATION ONLY FOR USE BY THE INTENDED RECIPIENT.  ANY INADVERTENT RECEIPT SHALL NOT CONSTITUTE A WAIVER OF ATTORNEY-CLIENT OR WORK PRODUCT PROTECTION.  IF RECEIVED IN ERROR, PLEASE NOTIFY KARRIE S. WICHTMAN IMMEDIATELY AND DELETE THIS MESSAGE.  THANK YOU FOR YOUR COOPERATION.

**From:** Matt Martorello [mailto:mattm@bellicosevi.com]
**Sent:** Tuesday, August 26, 2014 9:34 PM
**To:** Karrie Wichtman; 'gkway@duckcreektf.com'; Daniel Gravel; Chairman James Williams
**Cc:** jennifers@duckcreektf.com; Justin Martorello; James Dowd; Brian McFadden; Ivelisse Morales; Tanya Gibbs; Rob Rosette
**Subject:** RE: DM Recommendation

We respectfully opt to continue to keep any details of SPVI IP (including DM) explicitly for internal eyes only, both for the protection of our business and maintaining the integrity of an acquisition of the SPVI business.  Should an acquisition actually transpire, obviously these would be relevant questions for the eyes of Management and those in the acquiring company on a need to know basis as well (I.e. Certain IP, even in small doses, should at all times be aggressively protected when the result is such a massive competitive advantage, like the process of even just utilizing DM itself which SPVI owns and created).

Sent via the Samsung GALAXY S® 5, an AT&T 4G LTE smartphone

-------- Original message --------
From: Karrie Wichtman
Date:08/26/2014 8:33 PM (GMT-04:00)
To: "'gkway@duckcreektf.com'" , Daniel Gravel , Chairman James Williams
Cc: jennifers@duckcreektf.com, Matt Martorello , Justin Martorello , James Dowd , Brian McFadden , Ivelisse Morales , Tanya Gibbs
Subject: RE: DM Recommendation

Good Evening Shelly,

The campaign being recommended is largely similar to the one approved several months ago. While the modeling and selection criteria seems to vary for this campaign, the look and feel is largely the same.  I assume that the email from Blake Sims was included as an FYI and from a compliance perspective is largely being disregarded because Mr. Sims pointed to CA law but nothing necessarily in federal law that requires Red Rock to comply with CA law or register the campaign with the Commissioner of Business Oversight.  Also, based on the MNE case and the fact that the enforcement authority of these laws and regs by the Commissioner is non-existent when a true TLE is concerned.  This line of reasoning would be consistent throughout the states regardless of the regulatory laws of those states.  Are those assumptions correct, Dan?  I do wonder though as to the purpose of calling out the exemption that can be given by the Commissioner of Business Oversight in CA, when to the best of my knowledge no such exemption has been granted.  What am I missing?

With regard to the other documents, while not needed for approval for the campaign to move forward, due to the desire to learn and the pending restructure it is my recommendation that you set up a conference call with SPVI to determine for each document (as applicable):

1.  Who created the document/concept?  Vendor/Individual/Both
2.  Who created the models and the criteria for the models re: where the campaign should be launched? Vendor/Individual/Both
3.  How will the data be tracked and compiled to measure success?
4.  Who will track the data and compile it?
5.  How will such data be reported to the Company and by whom?

It is never too soon to learn who is doing what, where, why, how and when it will be done with regard to every aspect of the business.

Sincerely,


Karrie S. Wichtman, Partner
ROSETTE, LLP
Michigan Office
Attorneys at Law
25344 Red Arrow Highway
Mattawan, Michigan 49071
269.283.5005 Office
517.913.6443 Facsimile
480.242.6959 Cell
kwichtman@rosettelaw.com
rosettelaw.com

CONFIDENTIAL COMMUNICATION: THIS MESSAGE IS A CONFIDENTIAL ATTORNEY COMMUNICATION ONLY FOR USE BY THE INTENDED RECIPIENT.  ANY INADVERTENT RECEIPT SHALL NOT CONSTITUTE A WAIVER OF ATTORNEY-CLIENT OR WORK PRODUCT PROTECTION.  IF RECEIVED IN ERROR, PLEASE NOTIFY KARRIE S. WICHTMAN IMMEDIATELY AND DELETE THIS MESSAGE.  THANK YOU FOR YOUR

COOPERATION.

**From:** gkway@duckcreektf.com [mailto:gkway@duckcreektf.com]
**Sent:** Tuesday, August 26, 2014 7:49 PM
**To:** Daniel Gravel; Chairman James Williams
**Cc:** Karrie Wichtman; jennifers@duckcreektf.com; Matt Martorello; Justin Martorello; James Dowd;
Brian McFadden; Ivelisse Morales
**Subject:** RE: DM Recommendation

Karrie, Jennifer and Chairman

Do you have any concerns with this campaign?  I know  SP is anxious to get this campaign
going.  Please let me know so that I can sign the approval form.

Thanks.

Shelly

> --------- Original Message ---------
> Subject: DM Recommendation
> From: "Daniel Gravel" <DanielG@bellicosevi.com>
> Date: 8/26/14 4:07 pm
> To: "Gkway - DCTF (gkway@duckcreektf.com)" <gkway@duckcreektf.com>,
> "Chairman James Williams" <jim.williams@lvdtribal.com>
> Cc: "Karrie Wichtman" <kwichtman@rosettelaw.com>, "jennifers@duckcreektf.com"
> <jennifers@duckcreektf.com>, "Matt Martorello" <mattm@bellicosevi.com>, "Justin
> Martorello" <JustinM@BellicoseVI.com>, "James Dowd"
> <jamesd@bellicosecapital.com>, "Brian McFadden" <BrianM@bellicosevi.com>,
> "Ivelisse Morales" <ivelissem@bellicosecapital.com>
>
> Shelly and Chairman Williams:
>
> Please see attached recommendation for a direct mail campaign, DM, and supporting
> documentation.
>
> Let us know if you want to discuss.
>
> Thanks,
>
> **Dan Gravel**
> **General Counsel**
> Email: danielg@bellicosecapital.com
> Office: 787-520-6053
> Mobile: 781-910-9642
>
> 
>
> CONFIDENTIAL COMMUNICATION: The information contained in this email is intended for the individual or entity

JA733

# Exhibit 35

**From:** Matt Martorello
**To:** Karrie Wichtman; Tanya Gibbs
**Subject:** RE: AG letters
**Date:** Friday, October 10, 2014 10:51:28 AM
**Attachments:** image001.png
image002.png
image003.png
image004.png

I can't urge any stronger that LVD not proceed even if otoe does.  SPVI won't be willing to testify, or do anything as the result of another filing will certainly end in a slew of attacks on me, SPVI and my team.  I take the result now as a win and I can't be a part of anything further by any stretch of the imagination.

-------- Original message --------
From: Karrie Wichtman <kwichtman@rosettelaw.com>
Date:10/10/2014 12:40 PM (GMT-04:00)
To: Matt Martorello <mattm@bellicosevi.com>, Tanya Gibbs <TGibbs@rosettelaw.com>
Cc:
Subject: RE: AG letters

There is a tentative meeting schedule in DC to discuss litigation strategy (the pros and cons of moving forward or not) sometime next week.  Once there is a tentative plan, you will be the first to know.  If you have input please share it so I can forward it on to Saba as she will be present at the meeting.  Obviously, whatever is being recommended will ultimately need to be approved by the Tribal Councils of both Tribes so there will be follow up meetings on that front as well.

Sincerely,

Karrie S. Wichtman, Partner
ROSETTE, LLP
Michigan Office
Attorneys at Law
25344 Red Arrow Highway
Mattawan, Michigan 49071
269.283.5005 Office
517.913.6443 Facsimile
480.242.6959 Cell
kwichtman@rosettelaw.com
rosettelaw.com

CONFIDENTIAL COMMUNICATION: THIS MESSAGE IS A CONFIDENTIAL ATTORNEY COMMUNICATION ONLY FOR USE BY THE INTENDED RECIPIENT.  ANY INADVERTENT RECEIPT SHALL NOT CONSTITUTE A WAIVER OF ATTORNEY-CLIENT OR WORK PRODUCT PROTECTION.  IF RECEIVED IN ERROR, PLEASE NOTIFY KARRIE S. WICHTMAN IMMEDIATELY AND DELETE THIS MESSAGE.  THANK YOU FOR YOUR COOPERATION.

**From:** Matt Martorello [mailto:mattm@bellicosevi.com]
**Sent:** Friday, October 10, 2014 12:10 PM
**To:** Karrie Wichtman; Tanya Gibbs
**Subject:** RE: AG letters

Sounds great!  I think we could do well to take the communications with those folks to the next level.  Certainly won't hurt, and I'm sure it will leave an impact with those folks to one degree or another.

What's the latest on NY?  Is it over?

**From:** Karrie Wichtman [mailto:kwichtman@rosettelaw.com]
**Sent:** Friday, October 10, 2014 12:06 PM
**To:** Matt Martorello; Tanya Gibbs
**Subject:** RE: AG letters

I am happy to begin to focus my efforts in this area.  I would like to get Shelly and the Chairman on board as well.  I will plan to discuss it with them the next time I go to LVD.

Sincerely,

Karrie S. Wichtman, Partner
ROSETTE, LLP
Michigan Office
Attorneys at Law

25344 Red Arrow Highway
Mattawan, Michigan 49071
269.283.5005 Office
517.913.6443 Facsimile
480.242.6959 Cell
kwichtman@rosettelaw.com
rosettelaw.com

CONFIDENTIAL COMMUNICATION: THIS MESSAGE IS A CONFIDENTIAL ATTORNEY COMMUNICATION ONLY FOR USE BY THE INTENDED RECIPIENT.  ANY INADVERTENT RECEIPT SHALL NOT CONSTITUTE A WAIVER OF ATTORNEY-CLIENT OR WORK PRODUCT PROTECTION.  IF RECEIVED IN ERROR, PLEASE NOTIFY KARRIE S. WICHTMAN IMMEDIATELY AND DELETE THIS MESSAGE.  THANK YOU FOR YOUR COOPERATION.

---

**From:** Matt Martorello [mailto:mattm@bellicosevi.com]
**Sent:** Friday, October 10, 2014 11:57 AM
**To:** Karrie Wichtman; Tanya Gibbs
**Subject:** RE: AG letters

Thanks!  What do you think about LVD taking its own direct approach to communicate and visit with Banking Commissions, rather than solely lumping in with NAFSA?  Seems like we have much more control of timing, message, and effort this way.

I know other Tribes have MOUs in a few states.  I'm guessing NAFSA wasn't out getting MOUs for just those few, but  I feel like we need to give LVD that same direct effort to really move furthest in fastest for the good fight.  And Karrie is just the person to do it!

---

**From:** Karrie Wichtman [mailto:kwichtman@rosettelaw.com]
**Sent:** Friday, October 10, 2014 11:53 AM
**To:** Matt Martorello; Tanya Gibbs
**Subject:** RE: AG letters

Hi Matt,

After the letters are sent it has been my experience that we have received very few responses.  I can recall one from Arkansas which you received a copy of in the past.  One from Maryland, I believe, where they thanked us for our letter and closed the matter.  And a similar letter from Florida.  Other than that we typically don't receive a response.  As far as the consultative push, I agree and will get you a report from Alex Lozada in our office regarding the outreach being coordinated on behalf of NAFSA and our clients with State AGs and other DFS type regulators so that we can better consider where we can harness these efforts.  I know off hand that it has been NM, SD, AZ, VT, CA, and MI but there may be more than that.

Sincerely,

Karrie S. Wichtman, Partner
ROSETTE, LLP
Michigan Office
Attorneys at Law
25344 Red Arrow Highway
Mattawan, Michigan 49071
269.283.5005 Office
517.913.6443 Facsimile
480.242.6959 Cell
kwichtman@rosettelaw.com
rosettelaw.com

CONFIDENTIAL COMMUNICATION: THIS MESSAGE IS A CONFIDENTIAL ATTORNEY COMMUNICATION ONLY FOR USE BY THE INTENDED RECIPIENT.  ANY INADVERTENT RECEIPT SHALL NOT CONSTITUTE A WAIVER OF ATTORNEY-CLIENT OR WORK PRODUCT PROTECTION.  IF RECEIVED IN ERROR, PLEASE NOTIFY KARRIE S. WICHTMAN IMMEDIATELY AND DELETE THIS MESSAGE.  THANK YOU FOR YOUR COOPERATION.

---

**From:** Matt Martorello [mailto:mattm@bellicosevi.com]
**Sent:** Friday, October 10, 2014 11:47 AM
**To:** Tanya Gibbs
**Cc:** Karrie Wichtman
**Subject:** FW: AG letters

Hi Tanya, I am curious what level of response have these been met with from LVD and even more so, if any subsequent replies were received from the States.  It seems that the authors of these letters are a big part of the bigger push on federal regulators, and that candid educational communications (even if they end in disagreement) would be a very valuable tact to educating these states about sovereign rights.  I'm wondering if we can ask LVD to take a more consultative approach state by state to try to get to MOUs and other agreements.

CONFIDENTIAL

JA736

Anyway, some of these letters demand replies and other commentary, which I believe is always provided.  Have we ever received a response after that?  I'd like to see the message in those replies after they get ours.  Have we ever received any or do they get our reply and then go silent thereafter?

---

**From:** Brian McFadden
**Sent:** Friday, October 10, 2014 10:47 AM
**To:** Matt Martorello
**Subject:** FW: AG letters

This is not all of them, but most.

---

**From:** Spring Holtz [mailto:sholtz@rosettelaw.com]
**Sent:** Friday, October 10, 2014 10:40 AM
**To:** Brian McFadden
**Cc:** Tanya Gibbs
**Subject:** RE: AG letters

Attached are the AG Letter I found that we had on file.  I am send Tanya a list of the ones I could not find to see if she can locate them. Also, there are 2 on the list without names, only a date.



**Spring Holtz, Administrative Assistant**
**Rosette, LLP**
**Attorneys at Law**

Michigan Office
25344 Red Arrow Hwy., Ste. B
Mattawan, MI  49071
269.283.5005 – Office
517-913-6443 – Fax
sholtz@rosettelaw.com
www.rosettelaw.com

CONFIDENTIAL COMMUNICATION: THIS MESSAGE IS A CONFIDENTIAL ATTORNEY COMMUNICATION ONLY FOR USE BY THE INTENDED RECIPIENT.  ANY INADVERTENT RECEIPT SHALL NOT CONSTITUTE A WAIVER OF ATTORNEY-CLIENT OR WORK PRODUCT PROTECTION.  IF RECEIVED IN ERROR, PLEASE NOTIFY SPRING HOLTZ  IMMEDIATELY AND DELETE THIS MESSAGE.  THANK YOU FOR YOUR COOPERATION.

---

**From:** Brian McFadden [mailto:BrianM@bellicosevi.com]
**Sent:** Thursday, October 09, 2014 2:49 PM
**To:** Tanya Gibbs
**Cc:** Spring Holtz
**Subject:** RE: AG letters

I only need the 18 outlined below for now.

| Date received | PPC/CPD | App# | Name | Issue | Current Status | |
|---|---|---|---|---|---|---|
| 3/12/2014 | CPD | 59653230 | Antoinette Jenkins | AG Letter | Legal Letter sent via USPS | CT |
| 4/1/2014 | CPD | 59945036 | Cherie Madore | AG letter | Legal Letter sent via USPS | CO |
| 5/12/2014 | CPD | 59947207 | Jennifer Westburg | AG letter | Legal Letter sent via USPS | OR |
| 5/7/2014 | CPD | 59619771 | Joseph Beck | AG letter | Legal Letter sent via USPS | AZ |
| 11/13/2013 | CPD | 59636813 | Juanito Vargas | AG letter | Legal Letter sent via USPS | NJ |
| 4/21/2014 | CPD | 57164175 | Kathleen Pfeiffer | AG letter | Legal Letter sent via USPS | MA |
| 1/21/2014 | CPD | 59584728 | Linda Lazier | AG letter | Legal Letter sent via USPS | NJ |

CONFIDENTIAL

JA737

| 12/24/2013 | CPD | 59740851 | Luther Sullivan | AG letter | | Legal Letter sent via USPS | CT |
| 11/13/2013 | CPD | N/A | N/A | AG letter | | Legal Letter sent via USPS | MA |
| 12/27/2013 | CPD | N/A | N/A | AG letter | | Legal Letter sent via USPS | MA |
| 12/27/2013 | CPD | 57161159 | Notawyah Smith | ag letter | | Legal Letter sent via USPS | CT |
| 9/2/2014 | CPD | 57221524 | Pamela Zuckerman | District Attorney letter | | Legal Letter sent via USPS | MA |
| 7/28/2014 | CPD | 59812149 | Richard Prokop | ag letter | | Legal Letter sent via USPS | PA |
| 10/15/2013 | PPC | 588676 | Stephanie Swesey | AG letter | | Legal Letter sent via USPS | AZ |
| 1/29/2014 | CPD | 60002676 | Steve Lewis | AG letter | | Legal Response created | NC |
| 6/19/2014 | PPC | 503855 | Teresa Mayes | AG letter | | Legal Letter sent via USPS | CT |
| 6/19/2014 | CPD | 59782840 | Teresa Mayes | AG letter | | Legal Letter sent via USPS | ct |
| 2/25/2014 | CPD | 59999576 | Tonya Feimster | AG letter | | Legal Letter sent via USPS | NC |

---

**From:** Brian McFadden
**Sent:** Thursday, October 09, 2014 2:36 PM
**To:** 'Tanya Gibbs'
**Cc:** Spring Holtz
**Subject:** RE: AG letters

Yes I can get her access, but I am going to be updating the process and pulling out of Hyper Office to a new and better system.

If I gave you a list of the AG letters I need would that be easier? It should cut the number down by about 1/2

---

**From:** Tanya Gibbs [mailto:TGibbs@rosettelaw.com]
**Sent:** Thursday, October 09, 2014 1:19 PM
**To:** Brian McFadden
**Cc:** Spring Holtz
**Subject:** RE: AG letters

Ok. This might take a few days, just FYI...there are a lot of them. Also, is it possible to get Spring access to Hyperoffice? I'd like her to keep me on track in responding to these things.

Spring, please locate the files and scan the AG letters to Brian and copy me on it.

Thanks!

**Tanya M. Gibbs, Attorney**
**Rosette, LLP**
**Attorneys at Law**
Michigan Office
25344 Red Arrow Hwy, Suite B
Mattawan, MI 49071
269.283.5005 – Office
480.204.8009 - Cell
517.913.6443 – Fax
tgibbs@rosettelaw.com
www.rosettelaw.com

CONFIDENTIAL COMMUNICATION: THIS MESSAGE IS A CONFIDENTIAL ATTORNEY COMMUNICATION ONLY FOR USE BY THE INTENDED RECIPIENT. ANY INADVERTENT RECEIPT SHALL NOT CONSTITUTE A WAIVER OF ATTORNEY-CLIENT OR WORK PRODUCT PROTECTION. IF RECEIVED IN ERROR, PLEASE NOTIFY TANYA M. GIBBS IMMEDIATELY AND DELETE THIS MESSAGE. THANK YOU FOR YOUR COOPERATION.

---

**From:** Brian McFadden [mailto:BrianM@bellicosevi.com]

CONFIDENTIAL

JA738

**Sent:** Thursday, October 9, 2014 1:17 PM
**To:** Tanya Gibbs
**Cc:** Spring Holtz
**Subject:** RE: AG letters

All I need is the letters from the AGs.

---

**From:** Tanya Gibbs [mailto:TGibbs@rosettelaw.com]
**Sent:** Thursday, October 09, 2014 1:16 PM
**To:** Brian McFadden
**Cc:** Spring Holtz
**Subject:** RE: AG letters

Ok. I'll be having our secretary find the files, scan and email them to you. I've copied her here. Do you need just the letters from the AG or would you like our responses too?

**Tanya M. Gibbs, Attorney**
**Rosette, LLP**
**Attorneys at Law**
Michigan Office
25344 Red Arrow Hwy, Suite B
Mattawan, MI 49071
269.283.5005 – Office
480.204.8009 – Cell
517.913.6443 – Fax
tgibbs@rosettelaw.com
www.rosettelaw.com

CONFIDENTIAL COMMUNICATION: THIS MESSAGE IS A CONFIDENTIAL ATTORNEY COMMUNICATION ONLY FOR USE BY THE INTENDED RECIPIENT.  ANY INADVERTENT RECEIPT SHALL NOT CONSTITUTE A WAIVER OF ATTORNEY-CLIENT OR WORK PRODUCT PROTECTION.  IF RECEIVED IN ERROR, PLEASE NOTIFY TANYA M. GIBBS IMMEDIATELY AND DELETE THIS MESSAGE.  THANK YOU FOR YOUR COOPERATION.

---

**From:** Brian McFadden [mailto:BrianM@bellicosevi.com]
**Sent:** Thursday, October 9, 2014 1:10 PM
**To:** Tanya Gibbs
**Subject:** RE: AG letters

Last oct.

---

**From:** Tanya Gibbs [mailto:TGibbs@rosettelaw.com]
**Sent:** Thursday, October 09, 2014 12:11 PM
**To:** Brian McFadden
**Subject:** RE: AG letters

We should have files with them. Do you need them from January 2014 or from last last October 2013?

**Tanya M. Gibbs, Attorney**
**Rosette, LLP**
**Attorneys at Law**
Michigan Office
25344 Red Arrow Hwy, Suite B
Mattawan, MI 49071
269.283.5005 – Office
480.204.8009 - Cell
517.913.6443 – Fax
tgibbs@rosettelaw.com
www.rosettelaw.com

CONFIDENTIAL COMMUNICATION: THIS MESSAGE IS A CONFIDENTIAL ATTORNEY COMMUNICATION ONLY FOR USE BY THE INTENDED RECIPIENT.  ANY INADVERTENT RECEIPT SHALL NOT CONSTITUTE A WAIVER OF ATTORNEY-CLIENT OR WORK PRODUCT PROTECTION.  IF RECEIVED IN ERROR, PLEASE NOTIFY TANYA M. GIBBS IMMEDIATELY AND DELETE THIS MESSAGE.  THANK YOU FOR YOUR COOPERATION.

---

**From:** Brian McFadden [mailto:BrianM@bellicosevi.com]
**Sent:** Thursday, October 9, 2014 12:06 PM
**To:** Tanya Gibbs

**Subject:** AG letters

Tanya,

Do you have copies of all the AG letters received by CPD and PPC in the last year? I need to get a copy of them. I'm working on a new solution that is much better than the Hyper Office system that we use now.

Thanks,

**Brian McFadden**
875 Carretera 693, Suite 203 | Dorado, PR 00646
Mobile: 616-405-4578
Email: BrianM@BellicoseCapital.com



**This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

**This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

**This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

**This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

**This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

**This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

**This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

**This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

**This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

# Exhibit 36

| | |
|---|---|
| **From:** | Karrie Wichtman |
| **To:** | Matt Martorello |
| **Cc:** | Justin Martorello; "gkway@lvdtribal.com"; Jimmer; Saba Bazzazieh; Robert Rosette |
| **Subject:** | RE: WSJ Press |
| **Date:** | Tuesday, November 04, 2014 10:25:20 AM |
| **Attachments:** | image001.jpg |

Matt,

Below is the statement that was released to the press last Friday. Unfortunately, as you can see from the WSJ article much of the tribal sovereignty language was not used. What is released and what is reported are often two different things. I agree that statements in the opinion are strong and that we are on the best footing that we have ever been. The matter was not ever litigated on the merits. The bottom line is that many don't really understand what happened from a procedural stand point and no amount of message crafting could get them there. The statement issued by my firm indicates all of the reasons that this case was a victory and even that needed to be tempered in order for us to gain the support of Indian law scholars and others to begin to more appropriately fight the public policy debate. To attempt to run a story that hailed victory for the Tribes when they were actually dismissing the lawsuit would have gotten us a significant amount of bad press and so the option was to … go quietly into the night and restructure based on what we know from the opinion in order to build an even stronger case for future litigation. Attempts were made after the release to remove the pay day language through explaining the products offered to which the WSJ refused. As for the NY DFS spokesperson, I would not expect anything less – and the Court's ruling clarifies nothing at all with regard to NY regulatory authority. I will be sure to loop you in on any future discussions planned for response to the article. Your perspective is welcome and needed.

# Statement: Tribal Chairmen Update on E-Commerce Litigation with New York

*Appeals Court Opinion a Significant Recognition of Native American Sovereign Rights; Considerable Resources Required Prevent Continuing Further*

NEW YORK, NY (October 31, 2014) – John Shotton, Tribal Council Chairman of the Otoe-Missouria Tribe of Indians, and James Williams Jr., Tribal Council Chairman of the Lac Vieux Desert Band of Lake Superior Chippewa Indians, co-plaintiffs in the case Otoe-Missouria Tribe et al v. New York State Department of Financial Services et al (No. 13-cv-5930), made the following joint statement:

"The recent ruling by the Second Circuit of the United States Court of Appeals in our litigation filed last year against the state of New York was a pivotal recognition of sovereign rights for our Tribes and all Indian Nations. The court's opinion recognized and affirmed the important Tribal interests at play, the legitimacy of our Tribal businesses, and the need to balance the interests of two sovereigns. However, the case has consumed considerable resources, and while our Tribes will remain resilient despite the State of New York's targeted attack, after careful consideration the Otoe-Missouria Tribe and the Lac Vieux Desert Band of Lake Superior Chippewa have decided to dismiss the litigation.

CONFIDENTIAL

JA742

"While we hoped when we first pursued this action that we would be able to quickly undo the damage caused and avoid a prolonged and material interruption to our businesses, the fact of the matter is the state's unjust interference in the businesses of the Tribes have caused irreparable harm that further legal proceedings would simply be unable to remedy.

"E-commerce remains an essential tool for Native American tribes, many of whom reside on remote reservations that limit opportunities for economic development. Vital social programs provided by tribes, including health care, elder care, education, nutrition assistance, housing, and more, are dependent on the revenues of our tribally-owned businesses. E-commerce represents the future for Indian country, and we intend to continue to operate in all areas where we determine it is in the interests of our businesses as authorized and regulated by Tribal law, consistent with federal consumer protection laws and the expressed goals of the federal government regarding promotion of tribal economic development. We will also continue to seek the support of relevant federal agencies to assist us in ensuring the longevity of our businesses, thereby fulfilling the federal government's trust responsibility to the Tribes.

"We strongly believe the actions of the state of New York do not comport with long established legal precedent and federal law regarding Native Americans' sovereign rights, and in the importance of continuing to ensure those rights remain preserved. We are pleased that the U.S. Court of Appeals recognized and reaffirmed the importance the significant interests of Indian Country in economic development and the novel issues presented when Tribes engage in e-commerce."

###

**Media Contact:** Brian Bartlett
brianbartlett@rational360.com
(202) 236-2144

Sincerely,

Karrie S. Wichtman, Partner
ROSETTE, LLP
Michigan Office
Attorneys at Law
25344 Red Arrow Highway
Mattawan, Michigan 49071
269.283.5005 Office
517.913.6443 Facsimile
480.242.6959 Cell
kwichtman@rosettelaw.com
rosettelaw.com

CONFIDENTIAL COMMUNICATION: THIS MESSAGE IS A CONFIDENTIAL ATTORNEY COMMUNICATION

ONLY FOR USE BY THE INTENDED RECIPIENT.  ANY INADVERTENT RECEIPT SHALL NOT CONSTITUTE A WAIVER OF ATTORNEY-CLIENT OR WORK PRODUCT PROTECTION.  IF RECEIVED IN ERROR, PLEASE NOTIFY KARRIE S. WICHTMAN IMMEDIATELY AND DELETE THIS MESSAGE.  THANK YOU FOR YOUR COOPERATION.

---

**From:** Matt Martorello [mailto:mattm@bellicosevi.com]
**Sent:** Tuesday, November 4, 2014 10:06 AM
**To:** Karrie Wichtman
**Cc:** Justin Martorello; 'gkway@lvdtribal.com'; Jimmer
**Subject:** WSJ Press

Certainly not the splash for public it could've been, this more likely works against the industry than for it.  There were so many comments by the panel that outright demonstrate the legality of tribal lending that could've been touted as victorious, but NY gets to win on that front with their comment below about appeals court.  It needed to be said, b/c the credit bureaus and banks will never read the case, they'll just read what's below… "it was a baseless attempt to overturn what the court had already decided in NY's favor"…  I wouldn't call this message properly handled by the professional PR team at all.  I think if I'm a banker, I read this as worse, when in fact those that read and know all the commentary that was not highlighted in the message (like us) know it was actually a rather victorious decision in many respects.  The rest of the world needed to keep the businesses alive don't get the hear that:

## Wall Street Journal: Tribes Drop Payday-Loan Suit Against New York State

Two Indian tribes with online lending operations on Friday said they are dropping a lawsuit filed against New York state, abandoning an effort to block the state from restricting their businesses.

New York's top banking regulator, Benjamin Lawsky , last year urged banks in his state to stop processing payments for lenders that violate the state's cap on interest rates.

The Oklahoma-based Otoe Missouria Tribe and Michigan-based Lac Vieux Desert Band of Lake Superior Chippewa Indians responded with a federal lawsuit against the state, arguing New York's campaign against payday lenders was trampling on their rights as sovereign tribes.

The tribes said their operations are located on reservation land and not subject to oversight by any state. But the tribes suffered a setback in October when a federal appeals court denied a temporary injunction that would have barred New York from restricting tribal lending while their case was litigated.

In a joint written statement Friday, the tribes said the case had "consumed considerable resources" over the past year.

"While we hoped when we first pursued this action that we would be able to quickly undo the damage caused and avoid a prolonged and material interruption to our businesses, the fact of the matter is the state's unjust interference in the businesses of the tribes have caused irreparable harm that further legal proceedings would simply be unable to

CONFIDENTIAL

remedy," the tribes' chairmen, John Shotton and James Williams Jr. , said.

"We are pleased they intend to drop their baseless litigation after the appeals court ruled that New York has the clear power to enforce its laws," said Matt Anderson, a spokesman for Mr. Lawsky.

Tribes say they have turned to lending as a way to foster economic development and alleviate poverty. But online lending by tribes have faced opposition from officials in states such as New York that have laws banning or limiting payday loans.


**Regards,**

**Matt Martorello**
Mobile: 773-209-7720
Email: mm@BellicoseVI.com



**This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.****

CONFIDENTIAL

# Exhibit 37

| From: | Matt Martorello |
|---|---|
| To: | Karrie Wichtman |
| Cc: | Jimmer; gkway@duckcreektf.com; Daniel Gravel; Justin Martorello |
| Subject: | Docs |
| Date: | Monday, September 15, 2014 6:09:40 AM |
| Attachments: | image001.jpg |

We're very close on tax considerations on our side now having found an appropriate expert on important subject matter.  That said:

After further discussions, the Bellicose Companies will be sold only "as is", with existing Management in place and the company remaining substantially the same.  Of course a purchase, merger and dissolution are required for a Tribal buyer, and so the name will/jurisdiction of the LLC will change.

What this really means, however, is that rather than the companies becoming part of a TLE (servicer and TLE in one) it needs to remain an independent cutting edge "FinTech" company which specializes in analytics, modeling, technology and management consulting.   It also needs to be run in the same format it is today.  This is a vital component to the cultural side, as any shifting of jobs/departments, relocation, firing/hiring, or change in leadership/direct reports, etc will trigger a signal to people (the Companies most vital asset).  We can't risk a mass exodus, concerns, fear, etc. associated with the deal.  No matter how big or small the effort is, signal is sent to the staff.

i.e. moving the St. Croix QA office to Atlanta after a new owner comes in, signals everyone to quit and go find stable jobs as they don't feel comfortable or certain with the plans from the top for their livelihoods.  Hiring in Atlanta or NC must also be done with ultimate care for the cultural/people impact, as that indicates (right or wrong, as I've seen before) that they are "digging their own graves" by hiring and training only to replace themselves.  Also, the PR effect of hiring on (existing or new) very talented/vested career professionals who will understand they risk being labeled by peers as working for some "illegal" lender is a major handicap on the organization, as opposed to working for a cutting edge tech/analytics shop that is more protected from the biased media.

That said, **the Management Agreement of a Manager Managed LLC** is vital
The **Servicing Agreement** is as well

Do you have a Management Agreement you can send over as a draft in order to speed things along?  I've asked Nicole and am waiting for:  Merger Agreement, Note, Security Agreements too.  I'm sure some provisions will find their way as well into a Servicing Agreement so maybe someone can send them as well?

**Regards,**

**Matt Martorello**
Mobile: 773-209-7720
Email: mm@BellicoseVI.com

ROSETTE_REVISED 049179

JA747

**This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

CONFIDENTIAL

# Exhibit 38

| | |
|---|---|
| **From:** | Matt Martorello |
| **To:** | Tanya Gibbs; Karrie Wichtman |
| **Cc:** | Michelle Hazen; Justin Martorello; Brian McFadden |
| **Subject:** | RE: Attached Image |
| **Date:** | Thursday, September 3, 2015 7:30:36 AM |
| **Attachments:** | image001.png |
| | image002.jpg |

Agreed, and appreciated as always.  I think you're suggesting changes to the Term Sheet, I'm simply relaying information on why they won't allow those changes, and what is their justification for why.

I'm wondering if you can send me that term sheet from the case by the way?  Like to see who provided that financing.

**From:** Tanya Gibbs [mailto:tgibbs@rosettelaw.com]
**Sent:** Thursday, September 3, 2015 10:22 AM
**To:** Matt Martorello <mattm@bellicosevi.com>; Karrie Wichtman <kwichtman@rosettelaw.com>
**Cc:** Michelle Hazen <shellyh@duckcreektf.com>; Justin Martorello <justinm@bellicosecapital.com>; Brian McFadden <brianm@bellicosecapital.com>
**Subject:** RE: Attached Image

I don't disagree with anything you are saying Matt and I understand the lender's concerns and the reasons why certain things are in the term sheet.  The provisions I pointed out are things that are already in place within RRTL and don't pose any problems. But it's my job to point these things out to everyone so everyone is aware and can make informed decisions.

**Tanya M. Gibbs, Attorney** 
**Rosette, LLP**
**Attorneys at Law**
Michigan Office
25344 Red Arrow Hwy.
Mattawan, MI 49071
269.283.5005 – Office
480.204.8009 - Cell
517.913.6443 – Fax
tgibbs@rosettelaw.com
www.rosettelaw.com

CONFIDENTIAL COMMUNICATION: THIS MESSAGE IS A CONFIDENTIAL ATTORNEY COMMUNICATION ONLY FOR USE BY THE INTENDED RECIPIENT.  ANY INADVERTENT RECEIPT SHALL NOT CONSTITUTE A WAIVER OF ATTORNEY-CLIENT OR WORK PRODUCT PROTECTION.  IF RECEIVED IN ERROR, PLEASE NOTIFY TANYA M. GIBBS IMMEDIATELY AND DELETE THIS MESSAGE.  THANK YOU FOR YOUR COOPERATION.

**From:** Matt Martorello [mailto:mattm@bellicosevi.com]
**Sent:** Thursday, September 3, 2015 10:15 AM
**To:** Tanya Gibbs <tgibbs@rosettelaw.com>; Karrie Wichtman <kwichtman@rosettelaw.com>
**Cc:** Michelle Hazen <shellyh@duckcreektf.com>; Justin Martorello <justinm@bellicosecapital.com>;
Brian McFadden <brianm@bellicosecapital.com>
**Subject:** RE: Attached Image

I hear you on that, but Optics of the Nay-sayers be damned.  The argument that TLE is rent a tribe
b/c of those factors I think we all agree is absurd.  If you give in to them, the terrorists have already
won.

To quote this Lender, "The only way this loan is really ever going to go into default is if the Tribe get
sideways with SPVI".  A perfect non-tribal example of a Servicer requirement is Webbank or Three
Rivers Bank (Lenders) with Prosper, Lending Club, AvantCredit and OnDeck's of the world
(Servicers).  Lending Club has $10BN on the street, Webbank has the Utah license and is the lender.
That $10BN in debt capital from 3rd parties is 100% required to have Prosper or Lending Club as the
Servicer for Webbank.

Fact is, the Servicer comfort is the only way this Lender will be involved, and there are 3 other big
Servicers/Tribes deeply in bed in this same context with them (and deeper in some respects).  Seeing
it from their perspective, if the Borrower was to cut SPVI out of the picture, then you simply cannot
perform as a business.   That'd be like Webbank trying to lend without any personnel with
experience and knowledge in very intricate subject matter, which Prosper provides.  This lender very
explicitly will not lend to RRTL unless SPVI always remains servicer (and we get them comfortable
with post sale via the Eventide Note).  That was an unsolicited comment from them to me AFTER I
removed the statement about Servicer entirely from the term sheet and sent it back to them!  After
which, I told them a sale may be pending and we should talk about if/how they'd be comfortable in
that context.

They also won't lend if you're lending in states that get them in trouble or are too high risk of their
collateral or them getting sued (I wouldn't lend to you if you're lending to PA either right?  Heck,
even Sequoia is now getting sued in VT).  Also, they won't lend if you're not reporting to Microbilt for
their internal reporting purposes to their investors.

It's take it or leave it, given the weakness such an argument against it represents, I think the decision
is clear.

There are also state lenders who have agreed to the exact same 3 constraints with this Lender (and 3
other Tribes).  Including one deal they did for $75mm:  http://www.prnewswire.com/news-
releases/argon-secures-75000000-in-growth-capital-300085418.html (Argon is servicer to
Webbank).

For the redline… This isn't a binding term sheet, and it says this "will be" a full recourse obligation.  I
don't think it will be limited to the collateral since they will require RRTL corporate guarantee
(unsecured) and potentially other factors.  Since it's not binding and refers to a future agreement, I'd

suggest just executing and moving it along to Alpha for ROFR.

---

**From:** Tanya Gibbs [mailto:tgibbs@rosettelaw.com]
**Sent:** Thursday, September 3, 2015 9:10 AM
**To:** Matt Martorello <mattm@bellicosevi.com>; Karrie Wichtman <kwichtman@rosettelaw.com>
**Cc:** Michelle Hazen <shellyh@duckcreektf.com>; Justin Martorello <justinm@bellicosecapital.com>;
Brian McFadden <brianm@bellicosecapital.com>
**Subject:** RE: Attached Image

Overall I have no issues with this, however there are a couple of things that are concerning because of the current class action litigation pending in Vermont, *Gingras & Givens v. Rosette, et al.*

In that case, the plaintiffs somehow got a hold of the initial term sheet between the tribe and the lender. Their argument is that the TLE is a "rent a tribe" in part, because the term sheet requires the TLE to establish certain relationships with a servicer and various vendors.

In this term sheet, RRTL is required to use Microbilt, required to use a certain servicer, and the lender gets to determine which states RRTL can lend in.

Practically speaking, these things are not issues because RRTL already uses Microbilt (among others), is already engaged with SPVI as servicer (to be AT), and the states where we lend is probably similar to what the Lender is going to suggest. I highlighted those sections in the doc so you can find them easily. I'm just wondering whether we need to put these things in writing.

I also believe that it is highly unlikely that any potential plaintiff could get their hands on this document, but I'm wondering whether that is a risk we are willing to take given the recent case in Vermont.

Also, in the first paragraph of the terms, it talks about a full recourse obligation, which I redlined to limit it to the collateral for this loan. We will of course define the collateral and how it will work with the SPVs in the actual transaction documents, but we thought it important to make sure that it is limited.

**Tanya M. Gibbs, Attorney** 
**Rosette, LLP**
**Attorneys at Law**
Michigan Office
25344 Red Arrow Hwy.

CONFIDENTIAL

Mattawan, MI 49071

269.283.5005 – Office

480.204.8009 - Cell

517.913.6443 – Fax

tgibbs@rosettelaw.com

www.rosettelaw.com

CONFIDENTIAL COMMUNICATION: THIS MESSAGE IS A CONFIDENTIAL ATTORNEY COMMUNICATION ONLY FOR USE BY THE INTENDED RECIPIENT.  ANY INADVERTENT RECEIPT SHALL NOT CONSTITUTE A WAIVER OF ATTORNEY-CLIENT OR WORK PRODUCT PROTECTION.  IF RECEIVED IN ERROR, PLEASE NOTIFY TANYA M. GIBBS IMMEDIATELY AND DELETE THIS MESSAGE.  THANK YOU FOR YOUR COOPERATION.

**From:** Matt Martorello [mailto:mattm@bellicosevi.com]
**Sent:** Thursday, September 3, 2015 8:14 AM
**To:** Karrie Wichtman <kwichtman@rosettelaw.com>
**Cc:** Michelle Hazen <shellyh@duckcreektf.com>; Tanya Gibbs <tgibbs@rosettelaw.com>; Justin Martorello <justinm@bellicosecapital.com>; Brian McFadden <brianm@bellicosecapital.com>
**Subject:** RE: Attached Image

Not sure why they did that, but here are the rest of the pages where it was left off.  Looks like he moved the bold print and signature at the end to the first 2 page letter, then added Shelly as signatory.

**From:** Karrie Wichtman [mailto:kwichtman@rosettelaw.com]
**Sent:** Wednesday, September 2, 2015 11:41 PM
**To:** Matt Martorello <mattm@bellicosevi.com>
**Cc:** Michelle Hazen <shellyh@duckcreektf.com>; Tanya Gibbs <tgibbs@rosettelaw.com>; Justin Martorello <justinm@bellicosecapital.com>; Brian McFadden <brianm@bellicosecapital.com>
**Subject:** Re: Attached Image

The document says page 5 of 7. Seems like there are pages that are missing.

Can you send the rest of the pages with the actual terms?

Sent from my iPhone

On Sep 2, 2015, at 8:27 PM, Matt Martorello <mattm@bellicosevi.com> wrote:

> For Shelly signature.
>
>
> Begin forwarded message:
>
>> **From:** "Bob Farrell" <bfarrell@princetonalternativefunding.com>
>> **To:** "Matt Martorello" <mattm@bellicosevi.com>
>> **Cc:** "Brian McFadden" <brianm@bellicosecapital.com>

**Subject: FW: Attached Image**

Matt,

Please have Shelly Hazen counter sign attached term sheet signature page and return.  If she's not the correct signatory, (saw it red lined) please add preferred name.

Thanks

Bob

**From:** Mindi Vavra [mailto:mindi.0305@gmail.com]
**Sent:** Wednesday, September 02, 2015 6:12 PM
**To:** Bob Farrell
**Subject:** Fwd: Attached Image

**Hi. Attached are the signature pages for Red Rock term sheet**

**Bob Farrell**
President



100 Canal Pointe Blvd | Suite 208 | Princeton  NJ 08540

tel (800) 261-7660 Ext. 4822 | mobile (609) 731-4513

website | email

This email may contain confidential and/or private information.If you received this email in error delete and notify sender.

---------- Forwarded message ----------
From: **REDCO** <redco@gwtc.net>
Date: 2015-09-02 17:49 GMT-05:00
Subject: Attached Image
To: mindi <mindi.0305@gmail.com>

--
**Mindi Vavra**
General Manager
Rosebud Lending
Direct Line 605-856-8411
Cell 605-319-9434
Fax 605-856-8403

ROSETTE_REVISED_048898

JA754

# Exhibit 39

| | |
|---|---|
| **From:** | Matt Martorello |
| **To:** | Karrie Wichtman; John L. Williams |
| **Cc:** | Justin Martorello; Tanya Gibbs; Brian McFadden |
| **Subject:** | RE: AT BPL SA |
| **Date:** | Thursday, January 14, 2016 3:34:16 PM |

The Lenders care about the person who runs the business of AT.  If the Transaction Docs are clear that the position in question and under scrutiny to the lenders is President and CEO (Brian), then I think we're OK.  As far as I know, the Manager's don't really do anything...  I defer to John on what the TD's say if that jives, and what the authority is of BMF vs the Managers, but if Managers are really only involved per the OA to get feedback from the CEO/President then seems OK.  If they do more than that, or if the TD's say the position of concern are the Managers then we'd have some cleaning up to do.

---

**From:** Karrie Wichtman [mailto:kwichtman@rosettelaw.com]
**Sent:** Thursday, January 14, 2016 5:47 PM
**To:** John L. Williams <JWilliams@cwlaw.com>
**Cc:** Justin Martorello <justinm@bellicosecapital.com>; Tanya Gibbs <tgibbs@rosettelaw.com>; Matt Martorello <mattm@bellicosecapital.com>; Brian McFadden <BrianM@bellicosevi.com>
**Subject:** Re: AT BPL SA

I'll take a look. I haven't looked at the AT docs in a while. I seem to remember Brian was appointed at Matt's direction as President but the Co Mrg were still Shelly and the Chairman. This was understood and fine when AT was created I don't really understand the issue. Collateral is protected under the agreements not positions or people. What has changed?

Sent from my iPhone

On Jan 14, 2016, at 4:12 PM, John L. Williams <JWilliams@cwlaw.com> wrote:

> Karrie,
>
> The Operating Agreement puts all the power in the hands of the Manager.  The office of President is not mentioned from what I can see.  Shouldn't Brian, as President, be the Manager of that sub?  If so, that's not the way the resolution is written.  Let me know what you think.  John.
>
> **John L. Williams**
> Partner
> <image001.png>
> CONNER & WINTERS, LLP
> Attorneys & Counselors at Law
> 4000 One Williams Center
> Tulsa, OK 74172-0148
> P 918.586.8990
> F 918.586.8674
> jwilliams@cwlaw.com
> www.cwlaw.com

CONFIDENTIAL

JA756

This message and any attachments may contain information that is highly confidential, privileged, and exempt from disclosure.  Any recipient other than the intended recipient is advised that any dissemination, distribution, copying, or other use of this message is strictly prohibited.

If you have received this message in error, please notify the sender immediately.

**From:** Karrie Wichtman [mailto:kwichtman@rosettelaw.com]
**Sent:** Thursday, January 14, 2016 3:08 PM
**To:** Justin Martorello
**Cc:** Tanya Gibbs; John L. Williams; Matt Martorello; Brian McFadden
**Subject:** Re: AT BPL SA

I think that depends on the structure. Let's look into what the actual operating agreement says before we go changing things around now.

Sent from my iPhone

On Jan 14, 2016, at 1:33 PM, Justin Martorello <justinm@bellicosecapital.com> wrote:

> CEO is the highest ranking officer, above President.
>
> ---
>
> **From:** Tanya Gibbs [mailto:tgibbs@rosettelaw.com]
> **Sent:** Thursday, January 14, 2016 12:32 PM
> **To:** Justin Martorello <justinm@bellicosecapital.com>; Karrie Wichtman <kwichtman@rosettelaw.com>; John L. Williams <JWilliams@cwlaw.com>
> **Cc:** Matt Martorello <mattm@bellicosecapital.com>; Brian McFadden <BrianM@bellicosevi.com>
> **Subject:** RE: AT BPL SA
>
> I don't see a problem with that.  But what's the real difference? And to your earlier question, yes I think we are all set with the servicing agreement.
>
> **Tanya M. Gibbs, Attorney**<image001.png>
> **Rosette, LLP**
> **Attorneys at Law**
> Michigan Office
> 25344 Red Arrow Hwy.
> Mattawan, MI 49071
> 269.283.5005 – Office
> 480.204.8009 - Cell
> 517.913.6443 – Fax
> tgibbs@rosettelaw.com
> www.rosettelaw.com
>
> CONFIDENTIAL COMMUNICATION: THIS MESSAGE IS A CONFIDENTIAL ATTORNEY COMMUNICATION ONLY FOR USE BY THE INTENDED RECIPIENT.  ANY INADVERTENT RECEIPT SHALL NOT CONSTITUTE A

WAIVER OF ATTORNEY-CLIENT OR WORK PRODUCT PROTECTION.  IF
RECEIVED IN ERROR, PLEASE NOTIFY TANYA M. GIBBS IMMEDIATELY AND
DELETE THIS MESSAGE.  THANK YOU FOR YOUR COOPERATION.

---

**From:** Justin Martorello [mailto:justinm@bellicosecapital.com]
**Sent:** Thursday, January 14, 2016 1:20 PM
**To:** Tanya Gibbs <tgibbs@rosettelaw.com>; Karrie Wichtman
<kwichtman@rosettelaw.com>; John L. Williams <JWilliams@cwlaw.com>
**Cc:** Matt Martorello <mattm@bellicosecapital.com>; Brian McFadden
<BrianM@bellicosevi.com>
**Subject:** RE: AT BPL SA

This reminds me, Brian needs to be the CEO of AT.

---

**From:** Tanya Gibbs [mailto:tgibbs@rosettelaw.com]
**Sent:** Thursday, January 14, 2016 12:13 PM
**To:** Justin Martorello <justinm@bellicosecapital.com>; Karrie Wichtman
<kwichtman@rosettelaw.com>; John L. Williams <JWilliams@cwlaw.com>
**Cc:** Matt Martorello <mattm@bellicosecapital.com>; Brian McFadden
<BrianM@bellicosevi.com>
**Subject:** RE: AT BPL SA

It is.  TC gets to appoint at first and certainly has the ability to remove.
The operating agreements limit removal as follows:

The Manager may be removed as Manager by a majority vote of the
Member, by majority vote of the Tribal Council acting as
sole member of Tribal Economic Development Holdings, LLC if it is
found that the Manager has committed an act constituting willful
misconduct, fraud, or gross negligence.

But this really only applies to the Co-Managers (Jimmer and Shelly) and
arguably Brian as President because he was specifically designated as such
in the AT Creation Resolution.  But TC doesn't have any right to remove
any other employee of AT for any reason.  Brian, as President, has the
authority to hire and fire on AT's side of things.

And if TC tried to remove somebody, your still covered by the Parental
Guaranty.

**Tanya M. Gibbs, Attorney**<image001.png>
**Rosette, LLP**
**Attorneys at Law**
Michigan Office
25344 Red Arrow Hwy.
Mattawan, MI 49071

CONFIDENTIAL

JA758

269.283.5005 – Office
480.204.8009 - Cell
517.913.6443 – Fax
tgibbs@rosettelaw.com
www.rosettelaw.com

CONFIDENTIAL COMMUNICATION: THIS MESSAGE IS A CONFIDENTIAL
ATTORNEY COMMUNICATION ONLY FOR USE BY THE INTENDED
RECIPIENT.  ANY INADVERTENT RECEIPT SHALL NOT CONSTITUTE A
WAIVER OF ATTORNEY-CLIENT OR WORK PRODUCT PROTECTION.  IF
RECEIVED IN ERROR, PLEASE NOTIFY TANYA M. GIBBS IMMEDIATELY AND
DELETE THIS MESSAGE.  THANK YOU FOR YOUR COOPERATION.

**From:** Justin Martorello [mailto:justinm@bellicosecapital.com]
**Sent:** Thursday, January 14, 2016 1:07 PM
**To:** Tanya Gibbs <tgibbs@rosettelaw.com>; Karrie Wichtman
<kwichtman@rosettelaw.com>; John L. Williams <JWilliams@cwlaw.com>
**Cc:** Matt Martorello <mattm@bellicosecapital.com>; Brian McFadden
<BrianM@bellicosevi.com>
**Subject:** RE: AT BPL SA

I thought everything was structured such that the TC was purposely
removed from the businesses.  Why not TEDs co-managers?

Do we all consider the AT BPL SA complete?

**From:** Tanya Gibbs [mailto:tgibbs@rosettelaw.com]
**Sent:** Thursday, January 14, 2016 12:05 PM
**To:** Justin Martorello <justinm@bellicosecapital.com>; Karrie Wichtman
<kwichtman@rosettelaw.com>; John L. Williams <JWilliams@cwlaw.com>
**Cc:** Matt Martorello <mattm@bellicosecapital.com>; Brian McFadden
<BrianM@bellicosevi.com>
**Subject:** RE: AT BPL SA

It is the Tribal Council acting as Member of TED (member of AT).  But
either way par. 5 of the Parental Guaranty says:

The Tribe, Borrower or any Subsidiary shall not terminate or replace any
manager, director or officer of Borrower or the respective Subsidiary or
modify delegations of authority without the prior written consent of
Lender, which shall not be unreasonably withheld, conditioned or
delayed.

**Tanya M. Gibbs, Attorney**<image001.png>
**Rosette, LLP**

CONFIDENTIAL

JA759

**Attorneys at Law**
Michigan Office
25344 Red Arrow Hwy.
Mattawan, MI 49071
269.283.5005 – Office
480.204.8009 - Cell
517.913.6443 – Fax
tgibbs@rosettelaw.com
www.rosettelaw.com

CONFIDENTIAL COMMUNICATION: THIS MESSAGE IS A CONFIDENTIAL
ATTORNEY COMMUNICATION ONLY FOR USE BY THE INTENDED
RECIPIENT.  ANY INADVERTENT RECEIPT SHALL NOT CONSTITUTE A
WAIVER OF ATTORNEY-CLIENT OR WORK PRODUCT PROTECTION.  IF
RECEIVED IN ERROR, PLEASE NOTIFY TANYA M. GIBBS IMMEDIATELY AND
DELETE THIS MESSAGE.  THANK YOU FOR YOUR COOPERATION.

---

**From:** Justin Martorello [mailto:justinm@bellisecapital.com]
**Sent:** Thursday, January 14, 2016 12:58 PM
**To:** Karrie Wichtman <kwichtman@rosettelaw.com>; John L. Williams
<JWilliams@cwlaw.com>
**Cc:** Tanya Gibbs <tgibbs@rosettelaw.com>; Matt Martorello
<mattm@bellisecapital.com>; Brian McFadden
<BrianM@bellisevi.com>
**Subject:** RE: AT BPL SA

TC or TED's co-managers?

---

**From:** Karrie Wichtman [mailto:kwichtman@rosettelaw.com]
**Sent:** Thursday, January 14, 2016 8:42 AM
**To:** John L. Williams <JWilliams@cwlaw.com>
**Cc:** Justin Martorello <justinm@bellisecapital.com>; Tanya Gibbs
<tgibbs@rosettelaw.com>; Matt Martorello
<mattm@bellisecapital.com>; Brian McFadden
<BrianM@bellisevi.com>
**Subject:** Re: AT BPL SA

Sounds good to me.

In answer to the questions directed at Tanya and I- the Capital "T"
transaction docs account for this. The TC replaces but with lender
consent. If an AT license frivolous witch hunt ensues it's a default and
opens the Tribe up to potential liability through the parental guarantee.
However, if licensed folks at AT violate tribal law or other applicable
consumer protection laws or commit a crime that disqualified them from

CONFIDENTIAL

JA760

holding a license, insulating AT employees cannot and should not be absolute.

Karrie

Sent from my iPhone

On Jan 14, 2016, at 9:21 AM, John L. Williams <JWilliams@cwlaw.com> wrote:

> We just date it whatever date we close.  Easy on that one.  I
> will make the change to the last doc Karrie sent.

John L. Williams
Partner
<image002.png>
CONNER & WINTERS, LLP
Attorneys & Counselors at Law
4000 One Williams Center
Tulsa, OK 74172-0148
P 918.586.8990
F 918.586.8674
jwilliams@cwlaw.com
www.cwlaw.com

This message and any attachments may contain information that is highly confidential, privileged, and exempt from disclosure.  Any recipient other than the intended recipient is advised that any dissemination, distribution, copying, or other use of this message is strictly prohibited.

If you have received this message in error, please notify the sender immediately.

**From:** Justin Martorello [mailto:justinm@bellicosecapital.com]
**Sent:** Tuesday, January 12, 2016 4:20 PM
**To:** Karrie Wichtman; John L. Williams; Tanya Gibbs
**Cc:** Matt Martorello; Brian McFadden
**Subject:** RE: AT BPL SA

Thank you Karrie.

Karrie and Tanya:
Question about TFSRA licensing…  Let's say that there's a coop within LVD to oust AT managers, and so the TFSRA revokes licenses for Brian and/or managers.
- Who would be responsible for making replacements?
- Will AT be required to approve?
- Basically, how do we protect the "licensed" managers of AT?

CONFIDENTIAL

JA761

John:

We wanted to remove ("M") Merger to eliminate reference to previously existing non-tribal entities. How do we provide for an effective date here that does not come before the Merger date?

---

**From:** Karrie Wichtman [mailto:kwichtman@rosettelaw.com]
**Sent:** Tuesday, January 12, 2016 3:48 PM
**To:** Justin Martorello <justinm@bellicosecapital.com>; John L. Williams (JWilliams@cwlaw.com) <JWilliams@cwlaw.com>; Tanya Gibbs <tgibbs@rosettelaw.com>
**Cc:** Matt Martorello <mattm@bellicosecapital.com>; Brian McFadden <BrianM@bellicosevi.com>
**Subject:** RE: AT BPL SA

Responses to comments and questions.

Karrie S. Wichtman, Partner
ROSETTE, LLP
Michigan Office
Attorneys at Law
25344 Red Arrow Highway
Mattawan, Michigan 49071
269.283.5005 Office
517.913.6443 Facsimile
480.242.6959 Cell
kwichtman@rosettelaw.com
rosettelaw.com

CONFIDENTIAL COMMUNICATION: THIS MESSAGE IS A CONFIDENTIAL ATTORNEY COMMUNICATION ONLY FOR USE BY THE INTENDED RECIPIENT. ANY INADVERTENT RECEIPT SHALL NOT CONSTITUTE A WAIVER OF ATTORNEY-CLIENT OR WORK PRODUCT PROTECTION. IF RECEIVED IN ERROR, PLEASE NOTIFY KARRIE S. WICHTMAN IMMEDIATELY AND DELETE THIS MESSAGE. THANK YOU FOR YOUR COOPERATION.

---

**From:** Justin Martorello [mailto:justinm@bellicosecapital.com]
**Sent:** Wednesday, January 6, 2016 10:15 PM
**To:** John L. Williams (JWilliams@cwlaw.com)

<JWilliams@cwlaw.com>; Karrie Wichtman
<kwichtman@rosettelaw.com>; Tanya Gibbs
<tgibbs@rosettelaw.com>
**Cc:** Matt Martorello <mattm@bellicosecapital.com>; Brian
McFadden <BrianM@bellicosevi.com>
**Subject:** AT BPL SA

Minimal comments and questions from MM.  See attached.


Regards,

**Justin Martorello**
Phone: 773.263.1554
Email: JustinM@BellicoseCapital.com
<image003.png>

**This email and any files transmitted with it are
confidential and may contain privileged or copyrighted
information. You must not present this message to
another party without gaining permission from the
sender. If you are not the intended recipient you must not
copy, distribute or use this email or the information
contained in it for any purpose other than to notify us. If
you have received this message in error, please notify the
sender immediately, and delete this email from your
system.**
**This email and any files transmitted with it are
confidential and may contain privileged or copyrighted
information. You must not present this message to
another party without gaining permission from the
sender. If you are not the intended recipient you must not
copy, distribute or use this email or the information
contained in it for any purpose other than to notify us. If
you have received this message in error, please notify the
sender immediately, and delete this email from your
system.**
**This email and any files transmitted with it are confidential and
may contain privileged or copyrighted information. You must not
present this message to another party without gaining permission
from the sender. If you are not the intended recipient you must not
copy, distribute or use this email or the information contained in it for
any purpose other than to notify us. If you have received this message
in error, please notify the sender immediately, and delete this email
from your system.**
**This email and any files transmitted with it are confidential and
may contain privileged or copyrighted information. You must not
present this message to another party without gaining permission
from the sender. If you are not the intended recipient you must not

CONFIDENTIAL

copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

**This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

**This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

**This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

CONFIDENTIAL

JA764

# Exhibit 40

**To:** Karrie Wichtman[kwichtman@rosettelaw.com]; John L. Williams[JWilliams@cwlaw.com]; Tanya Gibbs[tgibbs@rosettelaw.com]

Case 3:17-cv-00461-REP   Document 1166-40   Filed 04/21/23   Page 2 of 11 PageID# 48413

**Cc:** Brian McFadden[BrianM@bellicosevi.com]; Matt Martorello[mattm@bellicosevi.com]
**From:** Justin Martorello
**Sent:** Tue 1/19/2016 1:44:07 AM
**Subject:** RE: 2016 01 15 Ascension Tech Manger Delegation  of Authority (draft).doc
2016 01 15 Ascension Tech Manger Delegation  of Authority (draft) doc (t....doc


Updated redlines, subject to review with JW, BMF and MM.

**From:** Karrie Wichtman [mailto:kwichtman@rosettelaw.com]
**Sent:** Monday, January 18, 2016 7:08 PM
**To:** John L. Williams <JWilliams@cwlaw.com>; Tanya Gibbs <tgibbs@rosettelaw.com>
**Cc:** Justin Martorello <justinm@bellicosecapital.com>; Brian McFadden <BrianM@bellicosevi.com>; Matt Martorello <mattm@bellicosevi.com>
**Subject:** RE: 2016 01 15 Ascension Tech Manger Delegation of Authority (draft).doc


Our edits.

Karrie S. Wichtman, Partner
ROSETTE, LLP
Michigan Office
Attorneys at Law
25344 Red Arrow Highway
Mattawan, Michigan 49071
269.283.5005 Office
517.913.6443 Facsimile
480.242.6959 Cell
kwichtman@rosettelaw.com
rosettelaw.com


CONFIDENTIAL COMMUNICATION: THIS MESSAGE IS A CONFIDENTIAL ATTORNEY COMMUNICATION ONLY FOR USE BY THE INTENDED RECIPIENT.  ANY INADVERTENT RECEIPT SHALL NOT CONSTITUTE A WAIVER OF ATTORNEY-CLIENT OR WORK PRODUCT PROTECTION.  IF RECEIVED IN ERROR, PLEASE NOTIFY KARRIE S. WICHTMAN IMMEDIATELY AND DELETE THIS MESSAGE.  THANK YOU FOR YOUR COOPERATION.

**From:** John L. Williams [mailto:JWilliams@cwlaw.com]
**Sent:** Saturday, January 16, 2016 1:02 PM
**To:** Karrie Wichtman <kwichtman@rosettelaw.com>; Tanya Gibbs <tgibbs@rosettelaw.com>
**Cc:** Justin Martorello <justinm@bellicosecapital.com>; Brian McFadden <BrianM@bellicosevi.com>; Matt Martorello <mattm@bellicosevi.com>
**Subject:** 2016 01 15 Ascension Tech Manger Delegation of Authority (draft).doc

Karrie and Tanya,

As we discussed on our call Thursday, attached is a proposed Delegation of Authority to address the concerns Justin brought up and still keep the protections you guys were trying to structure.  John.


**John L. Williams**
Partner

CW **CONNER & WINTERS**

**CONNER & WINTERS, LLP**
Attorneys & Counselors at Law
4000 One Williams Center
Tulsa, OK 74172-0148
P 918.586.8990

JA766

CW_00001

jwilliams@cwlaw.com
www.cwlaw.com

This message and any attachments may contain information that is highly confidential, privileged, and exempt from disclosure.  Any recipient other than the intended recipient is advised that any dissemination, distribution, copying, or other use of this message is strictly prohibited.

If you have received this message in error, please notify the sender immediately.


**This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

CW_00002

# ASCENSION TECHNOLOGIES, LLC
## Delegation of Authority Policy

Ascension Technologies, LLC Co-Managers
Effective January ___, 2016

1. GENERAL PURPOSE

   1.1. Objective.  The Ascension Technologies, LLC ("Ascension") Co-Managers establish this Delegation of Authority Policy (the "Policy") to establish those powers granted to the President and those specifically reserved for determination by the Co-Managers.

   1.2. Matters Reserved For the Co-Managers.  The matters specifically reserved for the Co-Managers under this Policy include:

      a) approval of Ascension contracts that create an obligation for Ascension over $100,000 in a calendar year, as described in Co-Manager Meeting Minutes dated February 18, 2015;

      b) appointment and succession of the President of Ascension; and
      c) approval of adoption of any new major employee benefit plans and programs and approval of any major amendment of an existing major employee benefit plan or program (e.g., Pension Plan and Savings Plan) which might significantly alter the scope, nature or degree of benefits as presented by the President or otherwise accounted for in the Operating or Servicing Budget.

   1.3. Matters Reserved for the Member.  The matters specifically reserved for the Member pursuant to Ascension's Operating Agreement include:

      a) approval of any agreement to borrow, pledge, assign, convey, encumber, grant security interest in, guaranty, or otherwise restrict the assets of Ascension;
      b) approval of any sale or other disposal of all or substantially all of the assets of Ascension; and
      c) approval of any waiver of sovereign immunity of Ascension.

   1.4. Matters Delegated to the President.  The Co-Managers expressly grant to the President:

      a) approval of Ascension strategic direction, goals and targets
      b) authority to execute documents on behalf of Ascension, subject to the limitations contained in Sections 1.2(a) and 1.3 herein;

JA768

CW_00003

c) authority to open and maintain bank accounts and to interface with any lockbox service providers in the ordinary course of business of Ascension; provided however Co-Managers are informed of the locations and account numbers for any bank accounts opened pursuant to this delegation;

d) authority to adopt, terminate, or change employee benefit plans or programs, except major additions or changes to major employee benefit plans or programs as set forth in Section 1.2(d) above;

e) authority to further delegate his or her authority to subordinates; and

f) authority regarding all matters necessary for the day to day management of Ascension and the implementation of corporate objectives that are not specifically reserved to the Co-Managers set forth in Section 1.2 or Member set forth in Section 1.3.

1.5. Reporting by the President to the Co-Managers

a) As part of the framework established by this Policy, the President is required to report regularly to the Co-Managers concerning the authority exercised and matters which come, or may come within, the scope of matters reserved for the Co-Managers or Member.

2. EXPENDITURE APPROVAL POLICY

The President has the authority to make expenditures in a manner consistent with the approved annual operating budget of Ascension, as limited by Section 1.2(a) hereing.

3. COMMUNICATIONS ON BEHALF OF ASCENSION

3.1. Verbal communications. All verbal communications with media, regulatory bodies, or other entities which may have a material effect on Ascension, are limited to the President, or a person directly delegated by the President to speak on behalf of Ascension or pursuant to Ascension's written and duly adopted communications policy. Any such inquiries as well as how they were handled shall be reported to the Co-Managers within a reasonable time of the inquiry.

3.2. Written communications. Any written communication with media, regulatory bodies, or other entities which may have a material effect on Ascension, must to be approved by the President, or a person directly delegated by the President, prior to release. The President, or the President's delegee, must circulate any proposed press release to news media to the Co-Managers prior to release. .

4. CHANGES
Changes in this Policy require the unanimous approval of the Co-Managers and President.

JA769
CW_00004

Approved this _____ day of January, 2016, by:

**CO-MANAGER, ASCENSION
TECHNOLOGIES, LLC**

By: _____

Name: Michelle Hazen
Title: Co-Manager

**CO-MANAGER, ASCENSION
TECHNOLOGIES, LLC**

By: _____

Name: James Williams, Jr.
Title: Co-Manager

Accepted by:

**PRESIDENT, ASCENSION TECHNOLOGIES,
LLC**

By_____
Name: Brian McFadden
Title: President

JA770

CW_00005

**To:** Karrie Wichtman[kwichtman@rosettelaw.com]; John L. Williams[JWilliams@cwlaw.com]; Tanya Gibbs[tgibbs@rosettelaw.com]; Matt Martorello[mattm@bellicosevi.com]; Justin Martorello[justinm@bellicosecapital.com]; Simon Liang[SimonL@bellicosevi.com]

**From:** Brian McFadden
**Sent:** Mon 1/25/2016 7:38:11 PM
**Subject:** RE: Docs

[2016 01 22 BPL Ascension Servicing Agreement-signed.pdf](#)
[2016 01 22 Delegation of Authority _Ascension (002)-signed.pdf](#)

---

**From:** Karrie Wichtman [mailto:kwichtman@rosettelaw.com]
**Sent:** Friday, January 22, 2016 7:45 PM
**To:** John L. Williams <JWilliams@cwlaw.com>; Tanya Gibbs <tgibbs@rosettelaw.com>; Matt Martorello <mattm@bellicosevi.com>; Justin Martorello <justinm@bellicosecapital.com>; Brian McFadden <BrianM@bellicosevi.com>; Simon Liang <SimonL@bellicosevi.com>
**Subject:** Docs

Here is some signed stuff.

Karrie S. Wichtman, Partner
ROSETTE, LLP
Michigan Office
Attorneys at Law
25344 Red Arrow Highway
Mattawan, Michigan 49071
269.283.5005 Office
517.913.6443 Facsimile
480.242.6959 Cell
kwichtman@rosettelaw.com
rosettelaw.com

CONFIDENTIAL COMMUNICATION: THIS MESSAGE IS A CONFIDENTIAL ATTORNEY COMMUNICATION ONLY FOR USE BY THE INTENDED RECIPIENT. ANY INADVERTENT RECEIPT SHALL NOT CONSTITUTE A WAIVER OF ATTORNEY-CLIENT OR WORK PRODUCT PROTECTION. IF RECEIVED IN ERROR, PLEASE NOTIFY KARRIE S. WICHTMAN IMMEDIATELY AND DELETE THIS MESSAGE. THANK YOU FOR YOUR COOPERATION.

**This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

CW_00006

## ASCENSION TECHNOLOGIES, LLC
### Delegation of Authority Policy

Ascension Technologies, LLC Co-Managers
Effective January _22_, 2016

1. GENERAL PURPOSE

   1.1. Objective.  The Ascension Technologies, LLC ("Ascension") Co-Managers establish this Delegation of Authority Policy (the "Policy") to establish those powers granted to the President and those specifically reserved for determination by the Co-Managers.

   1.2. Matters Reserved For the Co-Managers.  The matters specifically reserved for the Co-Managers under this Policy include:

      a)  approval of Ascension contracts that create an obligation for Ascension over $100,000 in a calendar year, as described in Co-Manager Meeting Minutes dated February 18, 2015;

      b)  appointment and succession of the President of Ascension; and

      c)  approval of adoption of any new major employee benefit plans and programs and approval of any major amendment of an existing major employee benefit plan or program (e.g., Pension Plan and Savings Plan) which might significantly alter the scope, nature or degree of benefits as presented by the President or otherwise accounted for in the Operating or Servicing Budget.

   1.3. Matters Reserved for the Member.  The matters specifically reserved for the Tribal Council as Member of Tribal Economic Development Holdings, LLC pursuant to Ascension's Operating Agreement include:

      a)  approval of any agreement to borrow, pledge, assign, convey, encumber, grant security interest in, guaranty, or otherwise restrict the assets of Ascension;

      b)  approval of any sale or other disposal of all or substantially all of the assets of Ascension; and

      c)  approval of any waiver of sovereign immunity of Ascension.

CW_00007

1.4. **Matters Delegated to the President.** The Co-Managers expressly grant to the President:

    a) approval of Ascension strategic direction, goals and targets which shall be communicated to Co-Managers in accordance with Section 1.5 but no less frequently than quarterly.

    b) authority to execute documents on behalf of Ascension, subject to the limitations contained in Sections 1.2(a) and 1.3 herein;

    c) authority to open and maintain bank accounts and to interface with any lockbox service providers in the ordinary course of business of Ascension; provided however Co-Managers are informed of the locations and account numbers for any bank accounts opened pursuant to this delegation;

    d) authority to adopt, terminate, or change employee benefit plans or programs, except major additions or changes to major employee benefit plans or programs as set forth in Section 1.2(d) above; and

    e) authority regarding all matters necessary for the day to day management of Ascension, including delegation to subordinates, and the implementation of corporate objectives that are not specifically reserved to the Co-Managers set forth in Section 1.2 or Member set forth in Section 1.3.

1.5. **Reporting by the President to the Co-Managers.** As part of the framework established by this Policy, the President is required to report regularly to the Co-Managers concerning the authority exercised and matters which come, or may come within, the scope of matters reserved for the Co-Managers or Member.

2. **EXPENDITURE APPROVAL POLICY**

The President has the authority to make expenditures in a manner consistent with the approved annual operating budget of Ascension, as limited by Section 1.2(a) herein.

3. **COMMUNICATIONS ON BEHALF OF ASCENSION**

3.1. **Verbal communications.** All verbal communications with media, regulatory bodies, or other entities which may have a material effect on Ascension, are limited to the President, or a person directly delegated by the President to speak on behalf of Ascension or pursuant to Ascension's written and duly adopted communications policy. Any such inquiries as well as how they were handled shall be reported to the Co-Managers within a reasonable time of the inquiry.

3.2. **Written communications.** Any written communication with media, regulatory bodies, or other entities which may have a material effect on Ascension, must to be

Ascension Technologies, LLC Delegation of Authority Policy—approved January 22, 2016

2

CW_00008

approved by the President, or a person directly delegated by the President, prior to release. The President, or the President's delegee, must circulate any proposed press release to news media to the Co-Managers prior to release.

4. CHANGES

Changes in this Policy require the unanimous approval of the Co-Managers and President.

5. PREVIOUS POLICIES

Unless incorporated by reference herein, this Policy represents the complete authority of the President adopted by the Co-Managers.

Approved this **22** day of January, 2016, by:

CO-MANAGER, ASCENSION TECHNOLOGIES, LLC

By: _Michelle Hazen_

Name: Michelle Hazen
Title: Co-Manager

CO-MANAGER, ASCENSION TECHNOLOGIES, LLC

By: _____

Name: James Williams, Jr.
Title: Co-Manager

JA774

CW_00009

Accepted by:

**PRESIDENT, ASCENSION TECHNOLOGIES, LLC**

By _____

Name: Brian McFadden
Title: President

CW_00010

Exhibit 41

| | |
|---|---|
| **From:** | Karrie Wichtman |
| **To:** | Justin Martorello; Tanya Gibbs; John L. Williams; Matt Martorello; Brian McFadden |
| **Subject:** | RE: Ascension Manager Issue |
| **Date:** | Thursday, January 14, 2016 3:56:01 PM |

The Tribal Council does not get to make the decision regarding his employment nor determine his salary other than through the budgeting process.  Because daily operations, including hiring and firing rests with the Co-Managers having the Co-Managers between Brian and the Tribal Council ensures that Tribal Council can't get a wild hair up their hiny and pass a resolution or motion to fire him because they do not have the authority to act in that capacity as Member.

Karrie S. Wichtman, Partner
ROSETTE, LLP
Michigan Office
Attorneys at Law
25344 Red Arrow Highway
Mattawan, Michigan 49071
269.283.5005 Office
517.913.6443 Facsimile
480.242.6959 Cell
kwichtman@rosettelaw.com
rosettelaw.com

CONFIDENTIAL COMMUNICATION: THIS MESSAGE IS A CONFIDENTIAL ATTORNEY COMMUNICATION ONLY FOR USE BY THE INTENDED RECIPIENT.  ANY INADVERTENT RECEIPT SHALL NOT CONSTITUTE A WAIVER OF ATTORNEY-CLIENT OR WORK PRODUCT PROTECTION.  IF RECEIVED IN ERROR, PLEASE NOTIFY KARRIE S. WICHTMAN IMMEDIATELY AND DELETE THIS MESSAGE.  THANK YOU FOR YOUR COOPERATION.

**From:** Justin Martorello [mailto:justinm@bellicosecapital.com]
**Sent:** Thursday, January 14, 2016 6:51 PM
**To:** Karrie Wichtman <kwichtman@rosettelaw.com>; Tanya Gibbs <tgibbs@rosettelaw.com>; John L. Williams <JWilliams@cwlaw.com>; Matt Martorello <mattm@bellicosevi.com>; Brian McFadden <BrianM@bellicosevi.com>
**Subject:** RE: Ascension Manager Issue

Looks like we're just over the one year mark from that conversation date.  Can you please remind me how having the co-managers as manager insulates brian?

**From:** Karrie Wichtman [mailto:kwichtman@rosettelaw.com]
**Sent:** Thursday, January 14, 2016 5:31 PM
**To:** Tanya Gibbs <tgibbs@rosettelaw.com>; Karrie Wichtman <kwichtman@rosettelaw.com>; John L. Williams <JWilliams@cwlaw.com>; Justin Martorello <justinm@bellicosecapital.com>; Matt Martorello <mattm@bellicosevi.com>; Brian McFadden <BrianM@bellicosevi.com>
**Subject:** Ascension Manager Issue

CONFIDENTIAL

JA777

All,

Please see the discussion below regarding Ascension creation had on February 4, 2016.  Matt's thoughts were in blue, my responses were in red, and his replies are in green.  We had contemplated at that time that the Co-Managers would be named as Shelly and the Chairman in order to further insulate Brian as a tribal employee.  Brian would then have his duties defined by his position description, his contract and certain delegations of authority by the Co-Managers which incidentally have already been made regarding Brian's ability to sign contracts (attached).  I think we are in a good place now and see know reason to change.  I hope you all agree.

Look forward to your thoughts.

Karrie

---

**From:** Matt Martorello <mattm@bellicosevi.com>
**Sent:** Wednesday, February 4, 2015 6:39 AM
**To:** Karrie Wichtman; Justin Martorello
**Cc:** Tanya Gibbs
**Subject:** RE: DCTF Restructure Visual Aid

See below... One more conversation piece on fundamentals….  assuming you have the Tribal Acquisition Company (TAC) as a sub of BP Holdings (BPH), BPH will take out the Note/loan and do an intercompany funds transfer to TAC to fund the acquisition.  TAC merges with Bellicose with TAC as the surviving entity.  TAC assigns assets to BPH and/or Ascension Tech as appropriate through an Assignment Agreement.  After the assignment, TAC dissolves under tribal law so that BPH never has a direct nexus with DE and the tribal entity that does is immediately dissolved.

Just thinking through this last night some more, you may want to have the name of the Holding Company different from the TLE.  Reason is, if there is ever a lawsuit (say against TSE in Puerto Rico) it will get confusing since the holding company could get sucked into that suit from an outsider thinking it is the TLE.  Maybe like LVD Development Holdings, or LVD Financial Services Holding Company would be best.  See below.

---

**From:** Karrie Wichtman [mailto:kwichtman@rosettelaw.com]
**Sent:** Wednesday, February 4, 2015 1:52 AM
**To:** Matt Martorello; Justin Martorello
**Cc:** Tanya Gibbs
**Subject:** RE: DCTF Restructure Visual Aid

See responses below.  New version attached.

CONFIDENTIAL

JA778

Sincerely,


Karrie S. Wichtman, Partner
ROSETTE, LLP
Michigan Office
Attorneys at Law
25344 Red Arrow Highway
Mattawan, Michigan 49071
269.283.5005 Office
517.913.6443 Facsimile
480.242.6959 Cell
kwichtman@rosettelaw.com
rosettelaw.com


CONFIDENTIAL COMMUNICATION: THIS MESSAGE IS A CONFIDENTIAL ATTORNEY COMMUNICATION
ONLY FOR USE BY THE INTENDED RECIPIENT.  ANY INADVERTENT RECEIPT SHALL NOT CONSTITUTE A
WAIVER OF ATTORNEY-CLIENT OR WORK PRODUCT PROTECTION.  IF RECEIVED IN ERROR, PLEASE
NOTIFY KARRIE S. WICHTMAN IMMEDIATELY AND DELETE THIS MESSAGE.  THANK YOU FOR YOUR
COOPERATION.

---

**From:** Matt Martorello [mailto:mattm@bellicosevi.com]
**Sent:** Wednesday, February 4, 2015 12:13 AM
**To:** Karrie Wichtman; Justin Martorello
**Subject:** RE: DCTF Restructure Visual Aid

- I think you wanted to have a Tribal Acquisition Company which would be the Buyer, then
  transfer assets and dissolve?  Something about shedding Delaware law post acquisition.
  That entity I think is still needed. Additional comments on this above, maybe it's outside the
  family of entities, but the Note is being designed to be with Holdings…
- TSE:
- What does "HQ" mean?  Is that just the registered agent address or is there a physical office
  and people there as well? Yes, TSE headquarters is Watersmeet, physical address would be
  same as BPL but satellites would operate as you stated in PR and US VI.  I don't anticipate
  this being staffed in Watersmeet.
- Don't forget another satellite office in St. Croix  Got it
- I think the Managers can be the Co-Managers, but I'm not yet certain.  At least for now they
  certainly can be? Co Managers insulate model for TSE Brian named as President.  Should
  remain the same.  Docs revised to indemnify all – see attached.
- There are no contracted employees, but maybe not important.  Could certainly happen. I am
  confused here.  What are the employment contracts that Chelsea sent over?  I thought that
  we would certainly have executive level management folks that would be contracted.
  Certainly not all but some.  You're right.  I was just saying I don't think there are any
  "contractors" as employees, they're all real "employees"… who are under contract.  I'm

CONFIDENTIAL

JA779

saying they're 100% "regular employees", but given the locations it's possible contracted employees are in the future.

- o What did you mean by training program and employee loyalty built in? Modified language. If the TSE is going to survive after the sale sunsets or is complete – it cannot operate in a vacuum – it's a tribal business and the Tribe needs to know what is happening and be learning about the operation of the TSE through building relationships with TSE employees. Upper level management and tribal leadership should become aware of all aspects of operation of the TSE. This has been a discussion point in all of our conversations. You can do whatever you want to. It's a matter for me of just protecting the collateral so I think 2 things make me comfortable with flexibility, A) provisions in the Note trigger default if things start going to crap (i.e. the collateral value tanking), and B) there'd never be a new government's intent to purposely tank the collateral thanks to the bad boy acts waiver and a "cooling off period" post default... That said, I believe the best way for LVD to handle their purchase will be with as little red tape as possible. Any business is very hard and often frustrating for nerds when the folks at the top don't understand the business and try to push the company direction. I don't think that's the intent though. I believe the TSE execs will be able to communicate things to the Co-Managers in layman's terms so they can understand how things work and can handle the communications to Tribal council. I think that's very beneficial. Like I said, I care about the collateral just like any lender. But as long as I'm covered, I'd really like LVD to do anything that they want... however, I would also like to make sure this works for them too. The TSE is all about the people, so I would make sure their lives are good and they're happy and there's no question it will work.
- o AT will service RRTL and DCTF upon close. Then facilitates the launch of BPL, LLC. Got it.
- • DCTF/RRTL = Is there an advantage or disadvantage to having TLEs as subs of BPL, LLC instead of BPL Holdings, LLC? I guess an advantage would be easier to absorb the assets when the rebranding is good to go. Changed it.

---

**From:** Karrie Wichtman [mailto:kwichtman@rosettelaw.com]
**Sent:** Wednesday, February 4, 2015 12:42 AM
**To:** Matt Martorello; Justin Martorello
**Subject:** DCTF Restructure Visual Aid

Evening guys,

Tribal Council meeting postponed until tomorrow which gave me a little more time to prep. I decided to create a visual aid to assist with my presentation tomorrow. Please take a look and let me know if I have something wrong.

Thanks so much.

Sincerely,


Karrie S. Wichtman, Partner
ROSETTE, LLP

CONFIDENTIAL

JA780

Case 3:17-cv-00461-REP   Document 1166-41   Filed 04/21/23   Page 6 of 6 PageID# 48428

Michigan Office
Attorneys at Law
25344 Red Arrow Highway
Mattawan, Michigan 49071
269.283.5005 Office
517.913.6443 Facsimile
480.242.6959 Cell
kwichtman@rosettelaw.com
rosettelaw.com

CONFIDENTIAL COMMUNICATION: THIS MESSAGE IS A CONFIDENTIAL ATTORNEY COMMUNICATION
ONLY FOR USE BY THE INTENDED RECIPIENT.  ANY INADVERTENT RECEIPT SHALL NOT CONSTITUTE A
WAIVER OF ATTORNEY-CLIENT OR WORK PRODUCT PROTECTION.  IF RECEIVED IN ERROR, PLEASE
NOTIFY KARRIE S. WICHTMAN IMMEDIATELY AND DELETE THIS MESSAGE.  THANK YOU FOR YOUR
COOPERATION.


**This email and any files transmitted with it are confidential and may contain privileged or
copyrighted information. You must not present this message to another party without gaining
permission from the sender. If you are not the intended recipient you must not copy, distribute
or use this email or the information contained in it for any purpose other than to notify us. If
you have received this message in error, please notify the sender immediately, and delete this
email from your system.**
**This email and any files transmitted with it are confidential and may contain privileged or
copyrighted information. You must not present this message to another party without gaining
permission from the sender. If you are not the intended recipient you must not copy,
distribute or use this email or the information contained in it for any purpose other than to
notify us. If you have received this message in error, please notify the sender immediately, and
delete this email from your system.**
**This email and any files transmitted with it are confidential and may contain privileged or
copyrighted information. You must not present this message to another party without gaining
permission from the sender. If you are not the intended recipient you must not copy, distribute
or use this email or the information contained in it for any purpose other than to notify us. If
you have received this message in error, please notify the sender immediately, and delete this
email from your system.**

CONFIDENTIAL

# Exhibit 42

**AGREEMENT AND PLAN OF MERGER**

among

**LVD TRIBAL ACQUISITION COMPANY, LLC**

and

**BELLICOSE CAPITAL, LLC**

and

**EVENTIDE CREDIT ACQUISITIONS, LLC**

JA783

CONFIDENTIAL

MARTORELLO_000096

# AGREEMENT AND PLAN OF MERGER

This Agreement and Plan of Merger (this "Agreement"), executed on September 14, 2015 but effective as of date of Close (the "Effective Date") is entered into among, LVD TRIBAL ACQUISITION COMPANY, LLC ("Acquiror") an entity wholly owned and operated by the Lac Vieux Desert Band of Lake Superior Chippewa Indians, a federally recognized Indian tribe (the "Tribe"), Bellicose Capital, LLC, a Delaware limited liability company ("Company"), and Eventide Credit Acquisitions, LLC, in its capacity as seller and member of the Company ("Seller").

## ARTICLE I
## RECITALS

1.1   The United States Congress has recognized and enacted legislation such as the Native American Business Development, Trade Promotion and Tourism Act (25 U.S.C. §§ 4301 et seq.) and other legislation which recognizes the federal policy and Congressional intent "to promote economic self-sufficiency and political self-determination for Indian tribes and members of Indian tribes" through offering services from Indian Country.

1.2   The Tribe is interested in expanding its e-commerce business interests in order to serve the much needed economic interests of the Tribe.

1.3   Historically, the Tribe has suffered from a lack of significant economic activity, however, with the advent of e-commerce activities occurring within the Tribe's jurisdiction and pursuant to Tribal law, including but not limited to the Tribal Consumer Financial Services Regulatory Code, the Tribe, through its wholly-owned corporate entities, has been able to engage in e-commerce in a meaningful way that enables Acquiror, or another successor Tribal entity, to achieve profits distributable to the Tribe that will be utilized for the benefit of the Tribe. Acquiror believes that the purchase of Company will help advance these efforts further.

1.4   Company has been engaged in servicing the loan portfolios of Red Rock Tribal Lending, LLC and Duck Creek Tribal Financial, LLC and intends to service the loan portfolio of Big Picture Loans, LLC, all wholly owned and operated arms and instrumentalities of the Tribe, and the valuation of such services has been used among other components such as goodwill to base the sales price, and the Tribe wishes to acquire Company.

JA784

CONFIDENTIAL

MARTORELLO_000097

1.5    On the Effective Date, the parties intend that Company be merged with and into Acquiror, with Acquiror surviving that merger on the terms and subject to the conditions set forth herein (the "Merger").

1.6    At Close, the Company shall provide Acquiror, in accordance with Delaware corporate and limited liability company law ("DCL"), a written consent of its member approving this Agreement, the Merger and the transactions contemplated hereby in accordance with the DCL;

NOW, THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants, and agreements set forth herein, and subject to the terms and conditions set forth herein, Seller, Company, and Acquiror agree as follows:

## ARTICLE II
## MERGER

2.1    The Merger. On the terms and subject to the conditions set forth in this Agreement, and in accordance with the DCL, at the time established in Section 2.2 on the Effective Date  provided that each of the conditions precedent have been satisfied, (a) the Company will merge with and into Acquiror, and (b) the separate corporate existence of Company will cease and Acquiror will continue its corporate existence under Tribal law as the surviving company (the "Surviving Company") in the Merger (collectively "Close").

2.2    Effective Time. Subject to the provisions of this Agreement, prior to Close, the Company and Acquiror shall cause a certificate of merger (the "Certificate of Merger") to be executed and filed with the Secretary of State of the State of Delaware in accordance with the relevant provisions of the DCL, to be filed at least seven (7) business days before closing, with the effective date of the Merger to be the Effective Time on the Effective Date, and shall make all other filings or recordings required under the DCL. The Merger shall become effective at such time as the Certificate of Merger has been duly filed with the Secretary of State of the State of Delaware or at such later date or time as may be agreed by Company and Acquiror in writing and specified in the Certificate of Merger in accordance with the DCL (the effective time of the Merger being hereinafter referred to as the "Effective Time") or as required by DCL.

2.3    Effects of the Merger. The Merger shall have the effects set forth herein and in the applicable provisions of the DCL. Without limiting the generality of the foregoing, and subject thereto, from and after the Effective Time, all property, rights, privileges, immunities, powers, franchises, licenses and authority of Company and Acquiror shall vest in the

JA785

CONFIDENTIAL

MARTORELLO_000098

Surviving Company with the exception that any tax credits or refunds from operations prior to January 1, 2016 shall remain the property and under the control of Seller, and all debts, liabilities, obligations, restrictions and duties of each of Company and Acquiror shall become the debts, liabilities, obligations, restrictions and duties of the Surviving Company. Acquiror or a successor entity of Acquiror specifically agrees to honor and assume the obligations evidenced by those certain promissory notes owed by Bellicose listed on Exhibit A (an updated Exhibit A shall be provided immediately before Close). This Agreement does not modify or terminate any of those notes.

2.4 Certificate of Existence; Operating Agreement. At the Effective Time, (a) the certificate of incorporation of Acquiror as in effect immediately prior to the Effective Time shall be the certificate of organization of the Surviving Company until thereafter amended in accordance with the terms thereof or as provided by applicable law, and (b) the operating agreement of Acquiror as in effect immediately prior to the Effective Time shall be the operating agreement of the Surviving Company until thereafter amended in accordance with the terms thereof, the certificate of existence of the Surviving Company or as provided by applicable Tribal law.

2.5 Directors and Officers. The directors and officers of Acquiror, in each case, immediately prior to the Effective Time shall, from and after the Effective Time, be the directors and officers, respectively, of the Surviving Company until their successors have been duly elected or appointed and qualified or until their earlier death, resignation or removal in accordance with the certificate of existence and operating agreement of the Surviving Company.

2.6 Effect of Merger. Provided the Merger has occurred, at the Effective Time, as a result of the Merger and without any action on the part of Acquiror, Company or any equity owner:

(a) Cancellation of Company Equity. Units, interests and/or equity of the Company (collectively, "Equity") that are owned by Acquiror or Company shall automatically be cancelled and retired and shall cease to exist, and, except for the consideration set forth below, no further consideration shall be delivered in exchange therefor.

(b) Conversion of Equity. All Equity of Company not cancelled pursuant to Section 2.6(a) that is issued and outstanding immediately prior to the Effective Time shall be cancelled and will cease to exist, and each holder of Equity of Company will cease to have any rights with respect thereto, except the right to receive the Merger Consideration (as hereinafter defined) in accordance with Section 2.7 hereof.

JA786

CONFIDENTIAL

MARTORELLO_000099

(c)   Continuation of Acquiror.  All issued and outstanding equity of Acquiror at the Effective Time shall remain unchanged and Acquiror shall be the Surviving Company.

(d)   Clarification on Company Assets.  To verify those certain intellectual property and general intangible assets of Company (collectively, "IP") acquired by Acquiror through the Merger, the list of IP owned by Company is attached as Exhibit B.  All Company information now or that may be discovered on equipment of any kind or in any written materials shall be immediately provided to Acquiror and deleted or destroyed by the holder so that holder retains no copies of Company information.  Seller shall make a good faith effort to identify, transfer and/or destroy all Company information that may inadvertently be in its possession after the closing within two (2) month of the closing.  Acquiror shall make a good faith effort to identify, transfer and/or destroy all non-Company information that may inadvertently be in its possession after the closing within two (2) months of the closing, and Acquiror agrees to allow Seller limited access to remove any non-Company information for two (2) months from the Effective Date.  During those two (2) months Seller shall take all commercially reasonable steps to remove any non-Company information from Acquiror servers and locations, and after two (2) months, Acquiror may destroy any remaining information found.  All parties agree to hold such information strictly confidential.  Seller may retain such information as required to prepare required tax returns and any retention requirement of applicable taxing jurisdiction.

2.7   Consideration.  The amount of merger consideration to be paid to the Seller shall be an amount equal to three hundred million dollars $300,000,000 (the "Acquisition Amount").   Such consideration has been arranged by Acquiror's parent organization through a Secured Promissory Note and associated Loan and Security Agreement (collectively, the "Merger Consideration").

2.8   No Bad Acts.  As of the execution date of this Agreement, each party agrees that it shall not take any actions that are materially adverse to the rights of any other party, including, without limitation, any change in the organizational structure, ownership or assets, business, management, contracts or otherwise, except that the conditions precedent to Close set forth in Section 3.2 are specifically excluded and shall not be considered a "bad act." Specifically, Acquiror agrees that the provisions of the Parental Guarantee and Sovereign Immunity Waiver are hereby incorporated into this Agreement as of the execution date.

## ARTICLE III
## CLOSING, DELIVERIES & ADJUSTMENTS

Agreement and Plan of Merger
5

JA787

MARTORELLO_000100

3.1    The closing will take place on upon satisfaction of each of the conditions precedent set forth in Section 3.2, but in any event not earlier than January 6, 2016, but not later than February 15, 2016 (unless otherwise agreed to in writing by all parties), but effective on the Effective Date.

3.2    Conditions Precedent to closing. All of the following conditions precedent shall be met or waived in writing by each party prior to Close:

(a)    Company has provided Acquiror with the Certificate of Formation of the Company, certified as of a recent date and current under Delaware law by the Secretary of State of Delaware;

(b)    Company has provided Acquiror with certificates of the Secretary of State of Delaware as to the good standing of the Company as of a recent date under Delaware law of the Company;

(c)    The execution of all Transaction Documents and any associated agreements by all parties thereto;

(d)    The provision by Acquiror to Seller of a legal opinion satisfactory to Seller in similar substance as that provided to Senior Lenders regarding the legality of the Business and the enforceability of the Transaction Documents;

(e)    Acquiror has provided Seller evidence of the termination of operations and the dissolution of Duck Creek Tribal Financial, LLC in accordance with Tribal law and on terms satisfactory to and acceptable to Seller;

(f)    Acquiror has provided Seller with evidence of the merger of Red Rock Tribal Lending, LLC into Big Picture Loans, LLC or the assignment of all assets of Red Rock Tribal Lending, LLC to Big Picture, LLC and the dissolution of Red Rock Tribal Lending, LLC in accordance with Tribal law and on terms satisfactory to and  acceptable to Seller;

(g)    Any required approvals of any Senior Lenders;

(h)    Mutual approval of an operating budget for 2016;

(i) Lockbox and deposit account control agreements as described in Section 4.16 of the Loan and Security Agreement;

JA788

CONFIDENTIAL

MARTORELLO_000101

(j)   An executed Servicing Agreement between Ascension Technologies, LLC and Subsidiaries making consumer loans satisfactory to and on terms acceptable to Seller;

(k)   The Tribe shall provide a legal opinion that the Tribal Financial Services Regulatory Code ("Code") (1) allows for protections of the Collateral and perfection of the security interest under the Loan Agreement and other Transaction Documents acceptable to the Lender; and (2) clarifies that Lender shall not be a regulated entity under the Code

(l)   Undated assignments in blank or other appropriate transfer documents, each in form and substance satisfactory to Lender, to be held in escrow by Lender, for (1) domain names and (2) vendor agreements agreed to by the Parties shall be placed in escrow for the benefit and security of the Lender; and

(m)   Undated merger agreement, in form and substance satisfactory to Lender, to be held in escrow by Lender, in which Ascension Technologies, LLC would be merged into an entity of Lender's choice upon an event of default.

(n)   Company has provided to Acquiror Exhibits A and B, as defined herein, and information reasonably related thereto.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF COMPANY

4.1   Company represents and warrants as of immediately before the Effective Time to Acquiror as follows:

(a)   Organization and Good Standing. Company is an entity duly formed with limited liability under the applicable laws of Delaware, validly existing and in good standing under the applicable laws of Delaware and has full power, authority and the legal right to own its properties and conduct its business, and to execute, deliver and perform its obligations under this Agreement.

(b)   Organizational Documents. Company is in compliance with its organizational documents.

(c)   Due Authorization; Enforceability. Company has the full power and authority to execute and deliver this Agreement and to perform all obligations hereunder. The execution, delivery and performance of this Agreement by Company has been duly authorized by all necessary corporate actions on its part and does not and will not contravene any provision of its organizational documents. This Agreement has

Agreement and Plan of Merger
7

JA789

CONFIDENTIAL

been duly executed and delivered by Company and constitutes the legal, valid and binding obligation of Company, enforceable against Company in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, reorganization, insolvency, moratorium and/or other similar laws and general equitable principles.

(d)   No Conflict. The execution, delivery and performance by Company of this Agreement and the transactions contemplated hereby does not violate, conflict with or result in a breach or default under the organizational documents of Company or any subsidiary or any other regulation applicable to Company or any subsidiary or any agreement or other document to which Company or any subsidiary is a party or by which it or any of its property is bound.

(e)   No Proceeding. To the knowledge of Seller, there is no litigation, administrative proceeding, enforcement action, or investigation before any court, tribunal or governmental body presently pending or threatened against Seller that has not been disclosed to Acquiror.

(f)   No Outstanding Liabilities.   There are no outstanding liabilities of the Company, including tax liability that exist other than those disclosed in Exhibit A.

(g)   No Outstanding Guarantees. All guarantees related to the Company, or its members, have been released.

4.2   Capitalization.   There are no: (a) outstanding securities convertible or exchangeable into equity of Company; (b) options, warrants, calls, subscriptions or other rights, agreements or commitments obligating Company to issue, transfer or sell any equity; or (c) voting trusts or other agreements, or understandings to which Company is a party or by which Company is bound with respect to the voting, transfer or other disposition of units, other than the Company's Operating Agreement.

4.3   No Conflict; Required Filings and Consents. Neither the execution and delivery of this Agreement by Seller or Company, nor the consummation by Seller or Company of the transactions contemplated hereby, nor compliance by Seller or Company with any of the provisions hereof, will (a) conflict with or result in a breach of any provisions of the certificate of formation of Company or Company's Operating Agreement, (b) constitute or result in the breach of any term, condition or provision of, or constitute a default under, or give rise to any right of termination, cancellation or acceleration with respect to, or result in the creation or imposition of any lien upon any property or assets of Company pursuant to any note, bond,

Agreement and Plan of Merger<br>8

JA790

MARTORELLO_000103

mortgage, indenture, license, agreement, lease or other instrument or obligation to which Company is a party or by which Company or any of Company's properties or assets may be subject, and that would, in any such event, have a material adverse effect on Company; or (c) violate any order or law applicable to the Company or its properties or assets.

## ARTICLE V
## REPRESENTATIONS, WARRANTIES AND COVENANTS OF THE SELLER

Seller represents and warrants as of immediately before the Effective Time to Acquiror as follows:

5.1    Authority, Validity and Effect. Seller is a business entity duly formed, validly existing, and in good standing under the applicable laws of its respective jurisdiction. Seller has all requisite power and authority to execute and deliver this Agreement and all agreements and documents contemplated hereby to be executed and delivered by it, and to consummate the transactions contemplated hereby and thereby. The execution and delivery of this Agreement and such other agreements and documents and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary corporate, limited liability company or other action on the part of Seller as the only member of Company and no other action is needed. This Agreement has been duly and validly executed and delivered by Seller and constitutes the legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, except as limited by the general enforceability exceptions in Section 4.1 above.

5.2    Capitalization. There are no: (a) outstanding securities convertible or exchangeable into units of the Company; (b) options, warrants, calls, subscriptions, or other rights, agreements, or commitments obligating Company to issue, transfer, or sell any units; or (c) voting trusts or other agreements, or understandings to which the Company is a party or by which Company is bound with respect to the voting, transfer, or other disposition of units, other than Company's Operating Agreement.

5.3    Promissory Notes Assumed.   The promissory notes owed by Company described in Exhibit A are true and correct descriptions thereof as of the date of the execution of this Agreement.

5.4    No Conflict; Required Filings and Consents. Neither the execution and delivery of this Agreement by Seller or Company, nor the consummation by Seller or Company of the transactions contemplated hereby, nor compliance by Seller or Company with any of the provisions hereof, will (a) conflict with or result in a breach of any provisions of the certificate

JA791

CONFIDENTIAL                                                                    MARTORELLO_000104

of formation of Seller or the Seller's Operating Agreement, (b) constitute or result in the breach of any term, condition or provision of, or constitute a default under, or give rise to any right of termination, cancellation or acceleration with respect to, or result in the creation or imposition of any lien upon any property or assets of Seller pursuant to any note, bond, mortgage, indenture, license, agreement, lease or other instrument or obligation to which Seller is a party or by which Seller or any of Seller's properties or assets may be subject, and that would, in any such event, have a material adverse effect on Seller; or (c) violate any order or law applicable to the Seller or its properties or assets.

5.5   Title. Seller (a) is the only record and beneficial owner of the equity being sold; (b) has full power, right, and authority, and any approval required by law to make and enter into this Agreement and to sell, assign, transfer, and deliver the units to Acquiror; and (c) has good and valid title to the units free and clear of all liens, other than liens arising under Company's Operating Agreement. Upon the consummation of the transactions contemplated by this Agreement in accordance with the terms hereof, at the closing, Acquiror will acquire valid title to the units of Seller free and clear of all liens, other than liens created by Acquiror and pursuant to Company's Operating Agreement.

5.6 No Lawsuits.  Seller is unaware of any litigation or other governmental action of any type of pending against Seller, the Company, or any beneficial owner of the Company that has not been disclosed.

5.7. Access to IP.  At the closing, Seller will provide Acquiror with immediate secured access to all electronic data and IP of Company, and Aquiror will have the sole and exclusive right to access the IP of Company.

## ARTICLE VI
## REPRESENTATIONS AND WARRANTIES OF ACQUIROR

Acquiror represents and warrants to the  Seller on the date of execution of this Agreement and on the Effective Date as follows:

6.1   Organization and Standing. Acquiror is a limited liability company, duly organized, validly existing, and in good standing under Tribal law.

6.2   Authority, Validity and Effect. Acquiror has the requisite power and authority to execute and deliver this Agreement and the Transaction Documents to be executed and delivered by it, and to consummate the transactions contemplated hereby and thereby without obtaining any additional approvals (whether internal or third-party). The execution and

JA792

CONFIDENTIAL                                                   MARTORELLO_000105

delivery of this Agreement and such other Transaction Documents and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary action on the part of Acquiror. This Agreement has been duly and validly executed and delivered by Acquiror  and constitutes the legal, valid, and binding obligation of Acquiror, enforceable against Acquiror in accordance with its terms, except as limited by Article VIII herein.  This Agreement, the Secured Promissory Note, the Loan and  Security Agreement, the Parental Guarantee and Sovereign Immunity Waiver Agreement and any and all other documents, amendments or renewals executed and delivered in connection with any of the foregoing, are collectively hereinafter referred to as the "Transaction Documents."

6.3    No Conflict; Required Consents. Neither the execution and delivery of this Agreement by Acquiror, nor the consummation by Acquiror of the transactions contemplated hereby, nor compliance by Acquiror with any of the provisions hereof, will (a) conflict with or result in a breach of any provisions of the articles or certificate of existence or operating agreement or equivalent organizational documents of Acquiror; (b) constitute or result in the breach of any term, condition or provision of, or constitute a default under, or give rise to any right of termination, cancellation, or acceleration with respect to, or result in the creation or imposition of any lien upon any property or assets of Acquiror pursuant to any note, bond, mortgage, indenture, license, agreement, lease, or other instrument or obligation to which Acquiror is a party or by which Acquiror or any of Acquiror's properties or assets may be subject, and that would, in any such event, have a material adverse effect on Acquiror; or (c) violate any order or law applicable to Acquiror or any of its properties or assets.

6.4    Independent Due Diligence. In connection with its investment decision, Acquiror and/or its representatives have inspected and conducted such reasonable independent review, investigation, and analysis of the Company.

## ARTICLE VII
### MISCELLANEOUS AND GENERAL

7.1    Successors and Assigns. This Agreement is binding upon and inures to the benefit of the parties hereto and their respective successors and permitted assigns consisting of TED and its Subsidiaries, but is not assignable by any party without the prior written consent of the other parties hereto.

7.2    Third Party Beneficiaries. Each party hereto intends that this Agreement does not benefit or create any right or cause of action in or on behalf of any person other than the parties hereto.

JA793

CONFIDENTIAL                                                            MARTORELLO_000106

7.3   Further Assurances. The parties shall execute such further instruments and take such further actions as may reasonably be necessary to carry out the intent of this Agreement. Each party hereto shall cooperate affirmatively with the other parties, to the extent reasonably requested by such other parties, to enforce rights and obligations herein provided.

7.4   Notices. Any notice or other communication provided for herein or given hereunder to a party hereto must be in writing, and (a) sent by facsimile transmission; (b) electronic mail, (c) delivered in person, (d) mailed by first-class registered or certified mail, postage prepaid, or (e) sent by Federal Express or other overnight courier of national reputation. Each such notice or communication will be effective (i) if given by facsimile, when the successful sending of such facsimile is electronically confirmed, (ii) if given by electronic mail, when electronic evidence of receipt is received, or (iii) if given by any other means specified in the first sentence of this Section 7.4, upon delivery or refusal of delivery.

> To Seller at:
> 875 Carretera 693
> Suite 202
> Dorado, PR 00646
>
> To Acquiror at:
> P.O. Box 704
> Watersmeet, MI 49969
>
> With copy to counsel:
>
> Rosette, LLP
> 25344 Red Arrow Highway, Suite B
> Mattawan, MI 49071.

7.5   Complete Agreement. This Agreement and exhibits hereto and thereto and the other documents delivered by the parties in connection herewith contain the complete agreement between the parties hereto with respect to the transactions contemplated hereby and thereby and supersede all prior agreements and understandings between the parties hereto with respect thereto.

7.6   Captions. The captions contained in this Agreement are for convenience of reference only and do not form a part of this Agreement.

7.7   Amendment. This Agreement may be amended or modified only by an instrument in writing duly executed by the parties.

Agreement and Plan of Merger
12

JA794

MARTORELLO_000107

7.8   Severability. Any term or provision of this Agreement that is invalid or unenforceable in any jurisdiction will, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining terms and provisions of this Agreement or affecting the validity or enforceability of any of the terms or provisions of this Agreement in any other jurisdiction, subject to the limitations in Article VIII.

7.9   Survival. The releases, representations, warranties, covenants, and agreements of the Seller, the Company, and Acquiror contained in this Agreement (including the exhibits attached hereto) will survive the closing.

7.10  Release. The parties permanently release each other and each of their trustees, officers, directors, shareholders and members from, and irrevocably covenant to not commence any proceeding of any kind against any other party for, any and all claims, known and unknown, associated with past agreements entered into by the parties between the parties that occurred before closing except any claim associated with the provisions of the Transaction Documents.

7.11  Execution. Document may be executed in multiple counterparts, all of which taken together shall constitute one and the same instrument. Delivery by any party of an executed counterpart of a signature page to this Agreement by telecopier, facsimile or portable document format (pdf) shall be effective as delivery of a manually executed counterpart hereof.

7.12  Definitions.  All capitalized terms used but not defined herein will have the respective meanings set forth in the Loan and Security Agreement, or if not defined therein, in the applicable other Transaction Document.

JA795

CONFIDENTIAL                                          MARTORELLO_000108

# ARTICLE VIII
## TRIBAL WAIVERS OF SOVEREIGN IMMUNITY, DISPUTES AND REMEDIES

8.1   Limited Waiver Of Sovereign Immunity.

(a)   Retention of Sovereign Immunity.  By executing this Agreement, Acquiror does not waive, limit or modify its sovereign immunity, except as expressly provided in this Article VIII.

(b)   Scope of Waiver.  Subject to the provisions of this Article VIII, Acquiror hereby expressly and irrevocably grants to Seller, a limited waiver of its sovereign immunity from suit and consents to process and suit in accordance with this Section.  These waivers apply to actions in which Seller alleges a default or breach by Acquiror of one or more of the specific obligations or duties expressly assumed by Acquiror under the terms of this Agreement and the Transaction Documents.   These waivers expressly include Seller's or an affiliate's ability to pursue in litigation:

(i)   specific performance or other specific action, or discontinuance of some action, by Acquiror to bring Acquiror into full compliance with its duties and obligations hereunder; or

(ii)   money damages for noncompliance with the terms and provisions of this Agreement; or

(iii)   Acquiror does not consent to a waiver of its sovereign immunity from suit except for the limited purposes as set forth in this Article VIII and as follows: (A) the dispute shall be brought by and limited to Seller and no other party or entity; (B) the dispute shall be limited to causes of action arising under this Agreement and the Transaction Documents pursuant to Section 8.5 and (C) to enforce any Arbitration Decision (as defined herein) or court order compelling arbitration pursuant to Section 8.5; and (D) any such award or damages resulting from the dispute shall be limited to the assets and revenues of Acquiror and no other assets of the Tribe.

(c)   Express Waiver.  Acquiror hereby expressly and irrevocably waives:

(i)   its rights to have any dispute, controversy, suit, action or proceeding arising under this Agreement heard in any forum other than the ones set forth in Section 8.2 whether or not such forum now exists or is hereafter created including, without limitation, any Tribal court or other tribunal, forum, council or adjudicative body of the Tribe (each a "Tribal Forum");

(ii)   any claim or right which it may possess to the exercise of jurisdiction by, any Tribal Forum, including, without limitation, any determination that any Tribal Forum has jurisdiction over any such dispute, controversy, suit, action or

Agreement and Plan of Merger
14

JA796

MARTORELLO_000109

proceeding or jurisdiction to determine the scope of such Tribal Forum's jurisdiction, and Seller does not consent to the jurisdiction of any Tribal Forum;

(iii)    any requirement which may exist for exhaustion of any remedies available in any Tribal Forum prior to the commencement of any dispute, controversy, suit, action or proceeding in any state or federal court even if any such Tribal Forum would have concurrent jurisdiction over any such dispute, controversy, suit, action or proceeding but for such waiver;

(iv)    its sovereign immunity as to an action by Seller in the United States District Court for the Western District of Michigan or any State of Michigan Circuit Court, and in the federal or state courts having appellate jurisdiction thereover, seeking injunctive and/or declaratory relief and/or money damages against Acquiror based solely upon an attempt by Acquiror to revoke its waiver of its sovereign immunity or other waivers granted under this Article VIII and solely to compel participation in arbitration proceedings pursuant to Section 8.5 and enforce an arbitration decision;

(v)    its sovereign immunity from a judgment or order (including any appellate judgment or order) and post judgment proceedings supplemental thereto consistent with the terms and provisions of this Article VIII, which is final because either the time for appeal thereof has expired or the judgment or the order is issued by a court having final appellate jurisdiction over the matter; and

(vi)    its sovereign immunity from the assertion or enforcement of any claim in any Tribal Forum (it being understood that this provision does not detract from or diminish any other waiver of the Acquiror in this Article VIII).

8.2    <u>Consent to Jurisdiction</u>.  Acquiror consents to the jurisdiction of and to accept and be bound by any order or judgment of the United States District Court for the Western District of Michigan or any State of Michigan Circuit Court, and any federal or state court having appellate jurisdiction thereover for enforcement of an Arbitration Decision (as defined herein) consistent with the terms and provisions of this Article VIII.  It is the express intent of the parties that their first recourse for dispute resolution shall be to attempt to amicably resolve any issue, and second to the federal and state courts specified herein.

8.3    <u>Enforcement Authorization of Governmental Authorities</u>.  Without in any way limiting the generality of the foregoing, Acquiror expressly authorizes any governmental authorities who have the right and duty under applicable law to take any action authorized or ordered by any court, including, without limitation, to take such action as entering Acquiror's property, to give effect to any judgment or order entered, subject to this Article VIII.

8.4    <u>Governing Law</u>.  This Agreement, and any disputes or controversies arising hereunder, shall be governed by and construed according to the laws of the State of Delaware.

8.5    <u>Dispute Resolution</u>.  In the event that either Party to this Agreement believes that

Agreement and Plan of Merger
15

JA797

CONFIDENTIAL

MARTORELLO_000110

the other Party has failed to comply with any requirement of this Agreement or a Transaction Document, or in the event of any dispute hereunder, including, but not limited to, a dispute over the proper interpretation of the terms and conditions of this Agreement, the following procedures shall be invoked:

(a) <u>Discussions between the Parties</u>. The goal of the Parties shall be to first resolve all disputes amicably and voluntarily whenever possible. A Party asserting noncompliance or seeking an interpretation of this Agreement first shall serve written notice on the other Party. The notice shall identify the specific Agreement provisions alleged to have been violated or that is in dispute and shall specify in detail the asserting Party's contention and any factual basis for the claim. Senior representatives of both Parties shall meet in person or by phone or other electronic medium within two (2) days of receipt of notice in an effort to resolve the dispute. A failure to meet shall be considered a failure to resolve the dispute and shall invoke Section (b) below.

(b) <u>Binding Arbitration</u>. After failure to resolve such disputes within two (2) days of notice, either Party may refer a dispute arising under this Agreement to arbitration with the American Arbitration Association (the "<u>AAA</u>"). If the dispute centers around an action of a Party, such action shall be postponed or discontinued during the pendency of the arbitration, provided that the lack of action shall not have a negative impact to the economic value of a Party. The Parties shall endeavor to mutually select one arbitrator from a list of qualified arbitrators, one of whom must have a minimum of five (5) years federal Indian law experience, one of whom must have a minimum of five (5) years of experience in financial or banking law, and one to be chosen by the other two and to be provided by the AAA. If the Parties cannot agree on arbitrators within three (3) Business Days, then the arbitrator shall be named by the AAA provided that they have the requisite experience. All hearings and other proceedings for such arbitration shall be held in Marquette, Michigan unless otherwise agreed to by the Parties in writing. The expenses of arbitration charged by the AAA shall be borne equally by the Parties, and each side shall bear its own other costs except that the winning Party may petition the arbitrators to award all or a portion of its expenses incurred in the dispute based on the facts of the dispute. The arbitrator shall determine whether the dispute is arbitrable and shall apply the substantive laws of the State of Delaware as well as the Commercial Arbitration Rules. The arbitrator shall issue a final and binding decision (the "<u>Arbitration Decision</u>") in which the remedies available through arbitration are limited to enforcement of the provisions of this Agreement and any associated equitable or monetary relief. The Arbitration Decision may be enforced as set forth in Section 8.5 (d) below.

(c) <u>Good Faith</u>. The Party asserting breach or seeking an interpretation of this Agreement under this Section 8.5 shall be deemed to have certified that to the best of such Party's knowledge, information and belief formed after reasonable inquiry, the claim of noncompliance or the request for interpretation of this Agreement is warranted and made in good faith and not for any improper purpose, such as to harass or to cause unnecessary delay or the needless incurring of the cost of resolving the dispute. If the dispute is found to have been initiated in violation of this Section 8.5, then the arbitrator, upon request or upon his or her own initiative, may impose upon the violating Party an appropriate sanction, which may include an award to

JA798

CONFIDENTIAL

MARTORELLO_000111

the other Party of its reasonable expenses incurred in having to participate in the arbitration.(d) Enforcement of Arbitration Decision. Notwithstanding any provision of law, either Party to the Agreement may bring an action against the other pursuant to the provisions of this Article VIII solely for the enforcement of the Arbitration Decision. The Parties agree that the Arbitration Decision shall be final, conclusive and binding on the Parties with respect to the matters decided, and shall be complied with by the Parties. In such judicial proceedings, neither Party, without the prior written consent of the other Party, shall be entitled to contend that such arbitration award should be vacated, modified or corrected, and the Parties hereby expressly waive all other rights and remedies that might otherwise be available in such judicial proceeding.

(e) Fast-track Injunctive Relief. Either Party may bring an original action in a court of competent jurisdiction pursuant to this Article VIII to prevent actions by the other Party which could have a Material Adverse Effect if taken. Such injunctive relief may only be taken to maintain the status quo during the Dispute Resolution process set forth in this Section 8.5.

8.6  Attorneys Fees. Except as ordered by an Arbitration Decision or a court of competent jurisdiction for enforcement proceedings, all Parties shall bear their own costs, except that the prevailing party shall be reimbursed all reasonable attorneys' fees, in connection with any dispute resolution or enforcement proceedings authorized under this Agreement. Anything in this Agreement to the contrary notwithstanding, the parties expressly agree that this provision shall survive the termination, for any reason, or expiration of this Agreement and any additional agreement contemplated herein.

8.7  Service of Process. Acquiror and Seller hereby consent to any and all process which may be served in any such suit, action or proceeding, (a) by mailing a copy thereof by registered or certified mail, postage prepaid, return receipt requested, to the party's address shown in this Agreement or as notified to Seller and (b) by serving the same upon Acquiror in any other manner otherwise permitted by law, and agrees that such service shall in every respect be deemed effective service upon Acquiror.

8.8  **JURY WAIVER. ACQUIROR AND SELLER EACH HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY, AND AFTER AN OPPORTUNITY TO CONSULT WITH LEGAL COUNSEL, (A) TO THE FULLEST EXTENT ALLOWED BY THE STATE OF DELAWARE, WAIVE ANY AND ALL RIGHTS TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING IN CONNECTION WITH THIS AGREEMENT, THE OBLIGATIONS, ALL MATTERS CONTEMPLATED HEREBY AND DOCUMENTS EXECUTED IN CONNECTION HEREWITH AND (B) AGREE NOT TO SEEK TO CONSOLIDATE ANY SUCH ACTION WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE, OR HAS NOT BEEN, WAIVED. ACQUIROR CERTIFIES THAT NEITHER SELLER NOR ANY OF ITS REPRESENTATIVES, AGENTS OR COUNSEL HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SELLER WOULD NOT IN THE EVENT OF ANY SUCH PROCEEDING SEEK TO ENFORCE THIS WAIVER OF RIGHT TO TRIAL BY JURY.**

8.9  Irrevocable Waiver. Acquiror covenants and agrees it possess the requisite

JA799

CONFIDENTIAL

MARTORELLO_000112

authority from the governing body of the Tribe to give this limited waiver of sovereign immunity and other waivers contained in this Article VIII and that it is irrevocable for one (1) year after termination of all Transaction Documents, or in the Event of Default, for a period not to exceed twelve (12) months after transfer of the Collateral, or for any non-compete period as defined in the Transaction Documents, or for any period required to enforce any rights under this Agreement when such enforcement action is initiated within one year of the termination of all the Transaction Documents, whichever is longer.  Acquiror agrees not to revoke or limit, in whole or in part, the limited waivers of sovereign immunity or other waivers contained in this Article VIII.  Acquiror hereby consents to the entry of appropriate injunctive relief, consistent with the terms and conditions of this Agreement.


# ARTICLE  IX
## INDEMNIFICATION


9.1    Each party shall indemnify and hold harmless (the "Indemnifying Party") the other party, and its respective affiliates, members, managers, officers, directors, trustees, agents and employees (collectively "Indemnified Parties") from and against any claim, loss, cost, liability, damage or expense (including, without limitation, reasonable attorneys' fees and costs of suits) that arise out of or relate to any breach by the Indemnifying Party of its express representations, warranties, covenants or other responsibilities set forth in this Agreement, provided however, the Indemnifying Party shall not be liable to any Indemnified Party for the foregoing to the extent any claims, loss, cost, liability, damage or expense (including, without limitation, reasonable attorneys' fees and costs) arise from any the Indemnified Party's gross negligence or willful misconduct, as determined pursuant to the dispute resolution procedures set forth in the Transaction Documents.


[signature pages to follow]


Agreement and Plan of Merger
18

JA800

CONFIDENTIAL

MARTORELLO_000113

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the Effective Date.

**ACQUIROR:**

**LVD TRIBAL ACQUISITION COMPANY, LLC**

By: _Michelle Hazen_
Name: Michelle Hazen
Title: Co-Manager

**COMPANY:**

**BELLICOSE CAPITAL, LLC**

By: _Brian McFadden_
Name: Brian McFadden
Title: President

**SELLER:**

**EVENTIDE CREDIT ACQUISITIONS, LLC**

By: _____
Name: Matt Martorello
Title:  President, Liont, LLC, Manager

JA801

CONFIDENTIAL                                                                                  MARTORELLO_000114

# EXHIBIT A

### Notes Assumed

| Note Holder | Amount | Execution Date |
|---|---|---|
| Columbia Pipe & Supply Co. | 2,000,000.00 | 12/10/2012 |
| Timothy P. Arenberg | 700,000.00 | 12/10/2012 |
| Terrance J. Arenberg | 900,000.00 | 12/10/2012 |
| DTA Trinity Wealth Transfer Trust | 300,000.00 | 9/25/2013 |
| Columbia Pipe & Supply Co. | 4,000,000.00 | 11/21/2013 |
| Timothy P. Arenberg | 700,000.00 | 11/21/2013 |
| Terrance J. Arenberg | 750,000.00 | 11/21/2013 |
| DTA | 150,000.00 | 11/21/2013 |
| DMA | 150,000.00 | 11/21/2013 |
| Columbia Pipe & Supply Co. | 2,000,000.00 | 8/16/2014 |
| Timothy P. Arenberg | 400,000.00 | 12/10/2014 |
| Terrance J. Arenberg | 400,000.00 | 12/10/2014 |
| Jeremy Davis | 2,500,000.00 | 12/16/2014 |

JA802

CONFIDENTIAL

MARTORELLO_000115

**EXHIBIT B**

Intellectual Property
Assets of Company

Seller hereby transfers to Buyer the following Intellectual Property Assets of the Company at Close:

 (1) All Company records in either paper or electronic format;

 (2) All data contained on Company's servers or individual computer except as set forth in Section 2.6(d);

 (3) All templates, training manuals, and other information created for the benefit of Company;

 (4) All copyrighted or patented materials or processes created by Company or Company's employees;

 (5) Any Company computer codes and computer models developed by or on behalf of Company or by Company employees;

 (6) All rights to licenses or other use rights owned or controlled by Company with third-party vendors; and

 (7) All trade secrets developed by or on behalf of Company or by Company employees.

JA803

CONFIDENTIAL

MARTORELLO_000116

# Exhibit 43

# ASCENSION TECHNOLOGIES, LLC
## Delegation of Authority Policy

Ascension Technologies, LLC Co-Managers
Effective January _22_, 2016

## 1. GENERAL PURPOSE

1.1. **Objective.** The Ascension Technologies, LLC ("Ascension") Co-Managers establish this Delegation of Authority Policy (the "Policy") to establish those powers granted to the President and those specifically reserved for determination by the Co-Managers.

1.2. **Matters Reserved For the Co-Managers.** The matters specifically reserved for the Co-Managers under this Policy include:

    a) approval of Ascension contracts that create an obligation for Ascension over $100,000 in a calendar year, as described in Co-Manager Meeting Minutes dated February 18, 2015;

    b) appointment and succession of the President of Ascension; and

    c) approval of adoption of any new major employee benefit plans and programs and approval of any major amendment of an existing major employee benefit plan or program (e.g., Pension Plan and Savings Plan) which might significantly alter the scope, nature or degree of benefits as presented by the President or otherwise accounted for in the Operating or Servicing Budget.

1.3. **Matters Reserved for the Member.** The matters specifically reserved for the Tribal Council as Member of Tribal Economic Development Holdings, LLC pursuant to Ascension's Operating Agreement include:

    a) approval of any agreement to borrow, pledge, assign, convey, encumber, grant security interest in, guaranty, or otherwise restrict the assets of Ascension;

    b) approval of any sale or other disposal of all or substantially all of the assets of Ascension; and

    c) approval of any waiver of sovereign immunity of Ascension.

JA805

CONFIDENTIAL

LVD-DEF00002881

1.4. **Matters Delegated to the President.** The Co-Managers expressly grant to the President:

    a) approval of Ascension strategic direction, goals and targets which shall be communicated to Co-Managers in accordance with Section 1.5 but no less frequently than quarterly.

    b) authority to execute documents on behalf of Ascension, subject to the limitations contained in Sections 1.2(a) and 1.3 herein;

    c) authority to open and maintain bank accounts and to interface with any lockbox service providers in the ordinary course of business of Ascension; provided however Co-Managers are informed of the locations and account numbers for any bank accounts opened pursuant to this delegation;

    d) authority to adopt, terminate, or change employee benefit plans or programs, except major additions or changes to major employee benefit plans or programs as set forth in Section 1.2(d) above; and

    e) authority regarding all matters necessary for the day to day management of Ascension, including delegation to subordinates, and the implementation of corporate objectives that are not specifically reserved to the Co-Managers set forth in Section 1.2 or Member set forth in Section 1.3.

1.5. **Reporting by the President to the Co-Managers.** As part of the framework established by this Policy, the President is required to report regularly to the Co-Managers concerning the authority exercised and matters which come, or may come within, the scope of matters reserved for the Co-Managers or Member.

2. **EXPENDITURE APPROVAL POLICY**

The President has the authority to make expenditures in a manner consistent with the approved annual operating budget of Ascension, as limited by Section 1.2(a) herein.

3. **COMMUNICATIONS ON BEHALF OF ASCENSION**

3.1. **Verbal communications.** All verbal communications with media, regulatory bodies, or other entities which may have a material effect on Ascension, are limited to the President, or a person directly delegated by the President to speak on behalf of Ascension or pursuant to Ascension's written and duly adopted communications policy. Any such inquiries as well as how they were handled shall be reported to the Co-Managers within a reasonable time of the inquiry.

3.2. **Written communications.** Any written communication with media, regulatory bodies, or other entities which may have a material effect on Ascension, must to be

Ascension Technologies, LLC Delegation of Authority Policy—approved January 22, 2016

2

CONFIDENTIAL

approved by the President, or a person directly delegated by the President, prior to release. The President, or the President's delegee, must circulate any proposed press release to news media to the Co-Managers prior to release.

4. CHANGES

Changes in this Policy require the unanimous approval of the Co-Managers and President.

5. PREVIOUS POLICIES

Unless incorporated by reference herein, this Policy represents the complete authority of the President adopted by the Co-Managers.

Approved this _22_ day of January, 2016, by:

CO-MANAGER, ASCENSION
TECHNOLOGIES, LLC

By: _Michelle Hazen_

Name: Michelle Hazen
Title: Co-Manager

CO-MANAGER, ASCENSION
TECHNOLOGIES, LLC

By: _____

Name: James Williams, Jr.
Title: Co-Manager

JA807

CONFIDENTIAL                                                     LVD-DEF00002883

Accepted by:

PRESIDENT, ASCENSION TECHNOLOGIES,
LLC

By _____

Name: Brian McFadden
Title: President

Ascension Technologies, LLC Delegation of Authority Policy—approved January 22, 2016

4

CONFIDENTIAL

LVD-DEF00002884

# Exhibit 44

# INTRATRIBAL

# SERVICING AGREEMENT

# BETWEEN

# BIG PICTURE LOANS, LLC

# AND

# ASCENSION TECHNOLOGIES, LLC

February 16, 2016

CONFIDENTIAL

JA810

LVD-DEF00002335

# TABLE OF CONTENTS

1.   Recitals. .......................................................................................................... 1
2.   Definitions ...................................................................................................... 1
3.   Covenants ........................................................................................................ 2
4.   Business and Affairs in Connection with Enterprise. ...................................... 4
5.   Liens ............................................................................................................... 7
6.   General Provisions. ......................................................................................... 7
7.   Grounds for Termination. ............................................................................... 9
8.   Consents and Approvals ................................................................................ 10
9.   Disclosures. .................................................................................................. 10
10.  Intratribal Dispute Resolution ...................................................................... 10
11.  Time is of the Essence ................................................................................... 10
12.  Governing Law .............................................................................................. 10
13.  Performance During Disputes ....................................................................... 10
14.  Confidential Information ............................................................................... 10
15.  Entire Agreement .......................................................................................... 11
16.  Additional Actions ........................................................................................ 11

*i*

JA811

CONFIDENTIAL

LVD-DEF00002336

## INTRATRIBAL SERVICING AGREEMENT

**THIS INTRATRIBAL SERVICING AGREEMENT** (this "Agreement") is made and entered into as of February 16, 2016 (the "Effective Date") by and between BIG PICTURE LOANS, LLC ("Enterprise") and its Subsidiaries, and a limited liability company and wholly owned subsidiary of Tribal Economic Development Holdings, LLC ("TED"), a wholly owned and operated economic arm and instrumentality of the LAC VIEUX DESERT BAND OF LAKE SUPERIOR CHIPPEWA INDIANS (the "Tribe"), a federally-recognized Indian Tribe, and ASCENSION TECHNOLOGIES, LLC, a limited liability company and wholly owned subsidiary of TED ("Servicer"). Each of Enterprise and Servicer may be referenced hereinafter individually as a "Party" or together, as the "Parties."

1.    **Recitals.**

   1.1    The Tribe is a federally-recognized Indian tribe. The Tribe possesses sovereign governmental authority pursuant to the Tribe's inherent and recognized powers of self-government.

   1.2    The Tribe has established Enterprise and Servicer as limited liability companies wholly owned by TED and formed under the laws of the Tribe, as economic development arms and instrumentalities of the Tribe whose purpose is to promote the self-sufficiency of the Tribe and to address the socio-economic needs of the Tribe, its members, its families, and its community by building capital within the tribal community. The Tribe, through Enterprise, is engaged in small loan transaction business.  It is the Tribe's hope that Enterprise's endeavors will improve the economic conditions of its members; enable the Tribe to better serve the social, economic, educational and health needs of the Tribe, its members, and its community; increase Tribal revenues; enhance the Tribe's economic self-sufficiency and self-determination; and provide positive, long-term social, environmental and economic benefits. Enterprise wishes to use its Affiliate, Servicer, to provide managerial, technical and financial experience and expertise for the continued development and operation of its Small Loan Transaction Business, as defined below.

   1.5    The Servicer represents and warrants that it, along with all other members of the management having any responsibility for the servicing of the business of the Enterprise, meets the eligibility requirements for licensing pursuant to the Tribal Consumer Financial Services Regulatory Code ("Code").  Proper licensing pursuant to the Code is a requirement for entering into this Agreement.

2.    **Definitions**. Unless otherwise specified in this Agreement, as they are used in this Agreement, the terms listed below shall have the meaning assigned to them in this Section:

   2.1    **Affiliate**. "Affiliate" means as to Servicer or Enterprise, any corporation, partnership, limited liability company, joint venture, trust, department or agency controlled by, under common control with, or which controls, directly or indirectly Servicer or Enterprise. "Control" means (i) ownership, control, or power to vote twenty five percent (25%) or more of the outstanding shares of any class of voting securities, directly or indirectly or acting through one (1) or more persons, (ii) control in any manner over the election of a majority of the directors, trustees or general partners (or individuals exercising similar functions), or (iii) the power to exercise, directly or indirectly, a controlling influence over management or policies.

*1*

JA812

CONFIDENTIAL

LVD-DEF00002337

**2.2** **Authorized Debt**. "Authorized Debt" shall mean debt incurred by Enterprise, a Subsidiary, or TED to operate the Small Loan Transaction Business or in the past acquisition of other entities, including from one or more Commercial Finance Providers, and any extensions or renewals of such debt.

**2.3** **Chief Executive Officer.** "Chief Executive Officer" or "CEO" shall mean the person employed by Enterprise to direct the day-to-day operations of Enterprise and to coordinate with the Servicer as defined above as well as any other entities providing services to the Enterprise.

**2.4** **Commercial Finance Provider.** "Commercial Finance Provider" shall mean any entity that provides credit to Enterprise, its Subsidiaries, or TED or any TED subsidiaries.

**2.5** **Consumer Loan Transaction.** "Consumer Loan Transaction" means any form of consumer financial services transaction provided by a financial services licensee allowable under the Code.

**2.6** **Enterprise**. The "Enterprise" is the instrumentality and commercial subdivision of the Tribe held by the Tribe's holding company, TED, formed to engage in the Small Loan Transaction Business.

**2.7** **Legal Requirements**. "Legal Requirements" shall mean singularly and collectively all applicable laws including without limitation all Tribal and federal laws and regulations, as amended and in effect from time to time.

**2.8** **Operating Budget.** "Operating Budget" shall consist of categorically budgeted expenses necessary to operate the Small Loan Transaction Business.

**2.9** **Servicing Budget**. "Servicing Budget" shall consist of categorically budgeted expenses necessary to carry out its responsibilities under this Agreement.

**2.10** **Servicing Fee**. "Servicing Fee" shall have that meaning given to it in Section 3.4.

**2.11** **Small Loan Transaction Business**. "Small Loan Transaction Business" means the activities of a financial services provider in providing Consumer Loan Transactions pursuant to Section 2.5 of the Code.

**2.12** **Subsidiary**. "Subsidiary" shall mean any entity formed and wholly-owned by Enterprise.

**2.13** **TED**. "TED" means the Tribal entity known as Tribal Economic Development Holding, LLC, the parent entity of Enterprise and Servicer.

**3.** **Covenants**. In consideration of the mutual covenants contained in this Agreement, the Parties agree and covenant as follows:

**3.1** **Engagement of Servicer**. The Enterprise hereby retains and engages Servicer as its independent contractor for itself and its Subsidiaries for the purposes of providing those business management, consulting and professional services to Enterprise pursuant to the terms of

CONFIDENTIAL

JA813

LVD-DEF00002338

this Agreement and advising the CEO of the Enterprise. Servicer shall have the authority and responsibility to manage communication and interaction between Enterprise and each vendor, Commercial Finance Provider and other agents of Enterprise. Nothing contained herein grants or is intended to grant Servicer a titled interest to or in Enterprise. The Servicer hereby accepts such retention and engagement as an independent contractor. Enterprise acknowledges that most of the services contemplated by this Agreement shall be provided by the Servicer from its office locations.

    **3.2**    __Term__. The term of this Agreement shall begin on the Effective Date of this Agreement and continue until ten (10) years from the Effective Date ("Term"). The Term shall automatically renew for an additional period of two (2) years unless either Party hereto provides written notice to the other Party at least one hundred twenty (120) days, but no greater than one (1) year, prior to the end of the Term.

    **3.3**    __Servicer's Compliance With Law; Licenses__. The Servicer covenants that it will at all times comply with all Legal Requirements and maintain any required licenses issued under any of the foregoing.

    **3.4**    __Servicing Fee__. Enterprise agrees to pay Servicer the following fee (the "Servicing Fee"), calculated on a monthly basis, the sum of the following:

        **3.4.1**    Manpower charges. Servicer will charge (i) 110% of the hourly salary costs which shall be based on the historical labor-only costs charged in providing the services under this Agreement by the previous servicer, and (ii) pay 100% of all associated payroll taxes and other employment expenses for Servicer's employees. Servicer agrees to keep staffing levels to those typical in the marketplace and to follow the Servicing Budget.

        **3.4.2**  Internal Expenses. Those internal costs, including expenses to Affiliates and the Tribe, travel expenses, supplies, etc. capped by the Servicing Budget.

        **3.4.3**    Non-affiliated Overhead Expenses. The non-affiliated, third-party costs associated with overhead expenses (such as phone, rental space, non-affiliated vendors etc.) incurred by Servicer in the course of providing service under this Agreement shall be allocated (i) 100% to Enterprise as Enterprise is the sole beneficiary of the expense, and (ii) for expenses where the Enterprise is not the sole beneficiary, to Enterprise by a mutually agreed upon methodology that ensures a fair distribution of costs and follows generally accepted accounting principles (GAAP).

        **3.4.4**    Enterprise/Servicer Retention Incentive Plan. In an effort to retain employees hired by Servicer after the Effective Date of this Agreement, Servicer will set up a bonus plan that may be no more than 150% of employee wages and approved in the annual Servicing Budget.

    **3.5**    __No Preexisting Contracts__. The Enterprise covenants that there are no valid preexisting contractual impediments to the entry by the Enterprise into this Agreement.

    **3.6**    __Engagement of Vendors.__ During the term of this Agreement, Enterprise covenants that it will not engage any vendor needed for the Small Loan Transaction Business

3

CONFIDENTIAL

without the benefit of satisfactory completion of Servicer's due diligence and recommendation to engage vendor.

**4.** **Business and Affairs in Connection with Enterprise**.

    **4.1** **Servicer's Authority and Responsibility**. It is the Parties' intentions that Servicer shall provide management, consulting and analytical services to assist the Enterprise and its Subsidiaries in operating its Small Loan Transaction Business. In this role, Servicer is hereby granted the necessary power and authority to act in order to fulfill its responsibilities under this Agreement. However, the execution of agreements necessary or appropriate to effectuate the terms of this Agreement will be entered into by the Enterprise when such agreements are in the name of the Enterprise. Servicer has no authority to engage in origination activities, execute loan documentation, or approve the issuance of loans to consumers. Final determination as to whether to lend to a consumer rests with Enterprise and its Subsidiaries. Servicer shall owe a fiduciary duty to the Enterprise and its Subsidiaries.

    **4.2** **Duties of the Servicer**. In providing services to Enterprise and its Subsidiaries, the Servicer's duties include, without limitation, the following:

        **4.2.1** **Operations**. Consistent with the Servicing Budget, the Servicer shall develop and recommend to the Enterprise and its Subsidiaries reasonable measures for the orderly administration and management of Enterprise in the areas of financial reporting, financing, regulatory compliance, marketing, human resources, development of vendor relationships, collections and risk assessment, and shall implement such recommendations, including:

        **(a)** Screening of and selecting vendors and Commercial Finance Providers, and negotiating agreements with such vendors and Commercial Finance Providers on behalf of the Enterprise on such terms and conditions as Servicer may reasonably determine to be appropriate;

        **(b)** Development and promotion of sound and positive business relationships on behalf of Enterprise with the designated vendors and Commercial Finance Providers, including, but not limited to, the enforcement or termination of agreements with such vendors and Commercial Finance Providers;

        **(c)** Identification of vendors needed for the Small Loan Transaction Business;

        **(d)** Preparation of suggested practices and recommendations of suggested practices governing the operations of the Enterprise and its Subsidiaries to provide that operations are conducted in a manner that is consistent with the best interests of Enterprise and its Subsidiaries and generally accepted industry standards;

        **(e)** Preparation of regulatory and compliance standards and practices and recommendations to the Enterprise and its Subsidiaries of such standards and practices to be adopted by the Enterprise and its Subsidiaries provided that such operations are conducted in a manner consistent with the best interests of Enterprise and its Subsidiaries and generally accepted industry standards;

*4*

CONFIDENTIAL

      **(f)**    Preparation of training and education standards and recommendations to the Enterprise and its Subsidiaries of suggested practices to be adopted by the designated vendors to provide that such designated vendors are conducting business with the Enterprise in a manner that is consistent with the best interests of Enterprise and its Subsidiaries and generally accepted industry standards;

      **(g)**    Assistance to the CEO, at his or her request, in the selection, hiring, training, control and discharge of employees performing regular services for Enterprise and its Subsidiaries in connection with the maintenance, operation, and management of the Small Loan Transaction Business;

      **(h)**    Preparation of standards for financial reporting and accounting and recommendations to the Enterprise and its Subsidiaries of best practices to be adopted by the designated vendors and Commercial Finance Providers of the Enterprise and its Subsidiaries to provide that such designated vendors and Commercial Finance Providers are conducting business in a manner that is consistent with the best interests of Enterprise and its Subsidiaries and generally accepted accounting standards presented on a cash basis;

      **(i)**    Preparation of standards and screening and review of and making recommendations to the Enterprise and its Subsidiaries regarding the website contents, marketing and consumer relations practices and designated vendors to provide that such designated vendors are conducting business in a manner that is consistent with the best interests of Enterprise and its Subsidiaries and generally accepted industry standards;

      **(j)**    Monitoring and supervision of and reporting to the Enterprise and its Subsidiaries regarding the designated vendors to provide that such designated vendors are conducting business in a manner that is consistent with the standards, best practices, policies and requirements established by the Enterprise and its Subsidiaries;

      **(k)**    Coordinating pre-qualified leads to Enterprise and its Subsidiaries and providing the necessary credit-modeling data and risk assessment strategies by which the Enterprise and its Subsidiaries may evaluate whether or not to extend funds to an individual borrower based on criteria that has been established by the Enterprise and its Subsidiaries. The criteria used to extend funds to individual borrowers will remain within the sole and absolute discretion of the Enterprise and/or its Subsidiaries and the Enterprise and/or its Subsidiaries shall execute all necessary loan documentation;

      **(l)**    May be responsible for certain training and monitoring employees of the Enterprise and its Subsidiaries that operate the Enterprise's call center on behalf of itself and its Subsidiaries; and

      **(m)**    Coordinating sale of Consumer Loan Transactions in default at prevailing market rates, to third-party debt collector vendors of the Enterprise.

      **4.2.2**   **Consumer Loan Transaction Covenants and Agreements**. The Servicer shall assist the Enterprise and its Subsidiaries with the compilation and provision of information and reports (financial and otherwise) as may be reasonably requested by the CEO of the Enterprise and its Subsidiaries in connection with the business of Enterprise and its Subsidiaries or as

JA816

CONFIDENTIAL

LVD-DEF00002341

required under Authorized Debt of Enterprise, including any reports required to comply with the covenants and agreements contained therein. The Servicer shall promptly advise the Enterprise in the event that the Servicer becomes aware of any matter that may cause a default by Enterprise or a Subsidiary under any documents evidencing any indebtedness or obligation of Enterprise or a Subsidiary.

**4.3**    **Employees.**   Indian and Other Preference, Wages, and Training.  The Servicer shall, during the term of this Agreement, be required to give preference in recruiting, training and recommending employment to Native Americans in any job category of the Enterprise, in accordance with any employment preference laws of the Tribe now existing or later and the "near reservation" exception to Title VII of the Civil Rights Act of 1964, as applicable.

**4.4**    **Enterprise Bank Accounts**. In coordinating services to the Enterprise and its Subsidiaries, the Servicer shall follow any deposit account control or lockbox agreements established by the Enterprise and/or its Subsidiaries and mutually agreed to by the Commercial Finance Providers of Enterprise or its Subsidiaries.

**4.5**    **Operating Budget and Servicing Budget**.

    **4.5.1**    **Operating Budget.**   Ninety (90) days prior to years end, Servicer shall provide to Enterprise an Operating Budget for the review and consent of Enterprise which meets all requirements under any agreement for Authorized Debt for an affiliated transaction.

    **4.5.2**    **Servicing Budget**.   Ninety (90) days prior to year end, Servicer shall provide to Enterprise a Servicing Budget for the review and consent of Enterprise which meets all requirements under any agreement for Authorized Debt for an affiliated transaction.

**4.6**    **Internal Control Systems**. The Servicer shall recommend and assist the Enterprise and its Subsidiaries in implementing accounting standards applicable to the Small Loan Transaction Business.

**4.7**    **Daily Deposits to Bank Account**. The Servicer shall insure that gross revenues and other proceeds connected with or arising from the operation of Enterprise and its Subsidiaries are deposited daily into Enterprise and/or Subsidiary bank accounts pursuant to any applicable lockbox agreement and deposit account control agreements in effect under Section 4.4 except as to any restrictions on cash deposits imposed by the local bank.

**4.8**    **No Cash Disbursements**. The Servicer shall not have any authority to make any cash disbursements from the bank accounts or on hand cash.

**4.9**    **Accounting and Books of Account.**

    **4.9.1**    **Statements**. The Servicer shall prepare and provide to TED and Enterprise and/or its Subsidiaries servicing statements on a monthly, quarterly, and annual basis, which shall include: comparative statements of all revenues after the first full year of operation, statements of all other amounts collected and received, and all deductions and disbursements made there from in connection with Enterprise. The monthly and quarterly servicing reports shall be delivered by the twenty-first (21st) day of the following month, with the annual servicing report delivered

6

JA817

within ninety (90) days of the year-end and shall be in form satisfactory to meet all requirements under any Authorized Debt. In preparing such servicing reports, Servicer shall have access to all books and records, all cash management procedure manuals, all internal control manuals, and all other records, documents, papers and persons of Enterprise and its Subsidiaries or employed by Enterprise and its Subsidiaries that Servicer deems necessary. For each servicing review performed, Servicer shall provide the Enterprise and any appropriate Subsidiary with a letter noting any control weaknesses or other items which it believes should be brought to the attention of the Enterprise.

    **4.9.2**   **Accounting Standards**. Servicer shall maintain the books and records reflecting the operations of TED, Enterprise and its Subsidiaries (as related to the Small Loan Transaction Business) in accordance with accounting practices as required by the Enterprise or any requirement imposed by Authorized Debt. The accounting systems and procedures shall, at a minimum (i) include an adequate system of internal accounting controls; (ii) permit the preparation of financial statements on a cash basis; (iii) permit the calculation and payment of the Servicing Fee; and (iv) provide for funds flow pursuant to any agreement for Authorized Debt.

**5.**     **Liens**. As required by any agreements for Authorized Debt, neither Enterprise nor Servicer shall act in any way whatsoever, either directly or indirectly, to cause any Party to become an encumbrance or lienholder of any tangible or intangible personal property assets of Enterprise and its Subsidiaries.

**6.**     **General Provisions.**

    **6.1**   **Notice**. All notices and other communications hereunder shall be in writing, and shall be deemed to have been duly given (a) upon hand delivery thereof, (b) upon facsimile and written confirmation of transmission, (c) upon receipt of any overnight deliveries, or (d) on the third (3rd) business day after mailing United States registered or certified mail, return receipt requested, postage prepaid, addressed to each Party at the following addresses:

**If to Enterprise and/ or a Subsidiary**:

                    Big Picture Loans, LLC
                    P.O. Box 704
                    Watersmeet, MI  49969

                    with a copy to:

                    Rosette, LLP

                    25344 Red Arrow Hwy.
                    Mattawan, Michigan 49071

**If to Servicer:**            Ascension Technologies, LLC
                    P.O. Box 704
                    Watersmeet, MI  49969

JA818

CONFIDENTIAL
LVD-DEF00002343

with a copy to:

Attn: President

954 Ponce de Leon Avenue
[ Redacted ] Plaza Suite 601
San Juan, PR 00908

**6.2    Authorization.** The Enterprise and Servicer represent and warrant to each other that they each have full power and authority to execute this Agreement and to be bound by and perform the terms hereof. The Enterprise further warrants that it has complied with all applicable Tribal laws and procedures necessary to effectuate its obligations herein, including but not limited to any requisite Tribal approvals. Upon request, each Party shall furnish the other evidence of the authority represented in this Section 6.2.

**6.3    Further Actions.** Enterprise and Servicer agree to execute all contracts, agreements and documents and to take all actions necessary to comply with the provisions of this Agreement and the intent hereof.

**6.3.1    Situs of the Contracts.** This Agreement, as well as all contracts entered into between Enterprise and any person or any entity providing services to Enterprise or to the Servicer on behalf of Enterprise, shall be deemed entered into at the Big Picture Loans, LLC Office in Watersmeet, Michigan, and shall be subject to all Legal Requirements of the Tribe and applicable federal law, except as otherwise expressly provided herein.

**6.4    Tribal Laws.** The Servicer shall stay apprised of Tribal Law and assist Enterprise in meeting all requirements of Tribal Law as well as other Legal Requirements.

**6.5    Waivers.** No failure or delay by Servicer or Enterprise to insist upon the strict performance of any covenant, agreement, term or condition of this Agreement, or to exercise any right or remedy consequent upon the breach thereof, shall constitute a waiver of any such breach or any subsequent breach of such covenant, agreement, term or condition. No covenant, agreement, term, or condition of this Agreement and no breach thereof shall be waived, altered or modified except by written instrument. No waiver of any breach shall affect or alter this Agreement, but each and every covenant, agreement, term and condition of this Agreement shall continue in full force and effect with respect to any other then existing or subsequent breach thereof.

**6.6    Captions.** The captions for each Section are intended for convenience only.

**6.7    Severability.** If any of the terms and provisions hereof shall be held invalid or unenforceable, such invalidity or unenforceability shall not affect any of the other terms or provisions hereof. If, however, any material part of a Party's rights under this Agreement shall be declared invalid or unenforceable (specifically including Servicer's right to receive its Servicing Fees) the Party whose rights have been declared invalid or unenforceable shall have the option to terminate this Agreement upon thirty (30) days written notice to the other Party, without liability on the part of the terminating Party.

JA819

CONFIDENTIAL

LVD-DEF00002344

**6.8    Survival of Covenants**. Any covenant, term or provision of this Agreement which, in order to be effective, must survive the termination or expiration of this Agreement, shall survive any such termination or expiration for a period of one (1) year following the termination or expiration of this Agreement.

**6.9    Survival of Remedy**. Subsequent to any termination of this Agreement, the dispute resolution provisions of this Agreement shall remain available to the Parties with respect to disputes arising out of or relating to this Agreement prior or subsequent for a period of one (1) year after the termination date.

**6.10    Periods of Time**. Whenever any determination is to be made or action is to be taken on a date specified in this Agreement, if such date shall fall on a Saturday, Sunday or any holiday observed by the Tribe, then in such event, said date shall be extended to the next day which is not a Saturday, Sunday or Tribal holiday.

**6.11    Modification**. Any change to or modification of this Agreement must be in writing signed by all parties hereto.

## 7.    **Grounds for Termination**.

**7.1    Voluntary Termination**. This Agreement may be terminated upon the mutual written consent and approval of the Parties.

**7.2    Termination for Cause**. Either of the parties may terminate this Agreement if the other Party commits or allows to be committed any material breach of this Agreement. A material breach of this Agreement shall include, but not be limited to, a failure of either Party to perform any monetary obligation within five (5) days of when due, or any nonmonetary material duty or obligation on its part for any twenty (20) consecutive days after notice. A Party may not terminate this Agreement on grounds of material breach unless it has provided written notice to the other Party of its intention to declare a default and to terminate this Agreement and the defaulting Party thereafter fails to cure or take steps to substantially cure the default within ninety (90) days following receipt of such notice. The discontinuance or correction of a material breach shall constitute a cure thereof.

**7.3    Consequences of Enterprise's Breach**. In the event of termination of this Agreement by the Servicer for cause under Section 7.2, the Servicer shall not be required to perform any further services under this Agreement and Enterprise shall indemnify and hold the Servicer harmless against all liabilities of any nature whatsoever relating to Enterprise, but only insofar as these liabilities result from acts within the control of Enterprise or its agents or created by the termination of this Agreement, and also with the source for such indemnification limited to the assets or future earnings of Enterprise and without recourse to other assets of the Tribe.

9

CONFIDENTIAL

JA820

LVD-DEF00002345

8.    **Consents and Approvals**. As Subsidiaries of TED, each party has secured the necessary approvals to enter into this Agreement under their formation documents and the corporate structure.

9.    **Disclosures.**

    9.1    **Warranties**. The Servicer warrants and represents as follows: (i) no officer, director of the Servicer has been arrested, indicted for, convicted of, or pleaded nolo contendere to any felony or any offense related to the business of consumer lending or the Small Loan Transaction industry in general, or had any association with individuals or entities known to be connected with organized crime; and (ii) no officer or director of the Servicer, has or had any association with individuals or entities known to be connected with organized crime.

    9.2    **Disclosure Amendments**. The Servicer agrees that whenever there is any material change in the information disclosed pursuant to this Section 9 it shall notify the Enterprise in writing pursuant to Section 6.1.

10.    **Intratribal Dispute Resolution**. Both Parties shall attempt to resolve any dispute by mutual agreement between the Parties.

11.    **Time is of the Essence**. Time is of the essence in the performance of this Agreement.

12.    **Governing Law**. The interpretation, validity and performance of this Agreement shall be governed by the laws of the Tribe and in the absence of Tribal law, the laws of the State of Michigan, without regard to the conflicts of law rules of such Tribe or State. If any of the terms and provisions of this Agreement shall be held invalid or unenforceable for any reason, such invalidity or unenforceability shall not affect any of the other terms or provisions hereof, all such other terms and provisions to be valid and enforceable to the fullest extent permitted by law.

13.    **Performance During Disputes**. It is mutually agreed that during any kind of controversy, claim, disagreement or dispute, including a dispute as to the validity of this Agreement or to terminate the Agreement for cause, Servicer shall continue its performance of the provisions of this Agreement, subject to the maintenance of any licenses required to perform such duties.

14.    **Confidential Information**. Each of the Parties agree that any information received concerning any other Party during the performance of this Agreement, regarding a Party's organization, financial matters, marketing plans, or other information of a proprietary nature (the "Confidential Information"), will be treated by all Parties in full confidence and except as required to allow Servicer or Enterprise and its Subsidiaries to perform their respective covenants and obligations hereunder, or in response to legal process or appropriate and necessary inquiry, and will not be revealed to any other persons, firms or organizations; provided, however, that a Party may disclose such information to such of its officers, employees or agents who need to know the information for purposes of performing services to such Party for purposes related to this Agreement and who agree to keep such information confidential and to be bound by this Section to the same extent as if they were signatories to and bound by this Agreement. The provisions of this Section shall survive the termination of this Agreement.  Confidential Information shall include all information, data, knowledge, and know-how (in whatever form and however communicated) relating to the Enterprise and its Subsidiaries, or to its businesses, operations,

*10*

JA821

CONFIDENTIAL                                                    LVD-DEF00002346

properties, products, strategies, plans, markets, or financial positions, that is delivered or disclosed by Servicer, or any Servicer representative, or any of its officers, directors, partners, employees, agents, affiliates, to Enterprise and its Subsidiaries in writing, electronically, verbally, or through visual means, or which Enterprise and its Subsidiaries learns or obtains aurally, through observation or through analyses, interpretations, compilations, studies, or evaluations of such information, data, knowledge, or know-how regardless of whether or not any such information is marked or designated "confidential."

The obligations not to use or disclose the Confidential Information shall not apply to Confidential Information which (a) has been made previously available to the public by Enterprise, a Subsidiary, TED, Servicer or the Tribe or becomes generally available to the public, unless the Confidential Information being made available to the public results in a breach of this Agreement; (b) prior to disclosure to a Party, the information was already rightfully in any such person's possession; or (c) is obtained by a Party from a third party who is lawfully in possession of such Information, and not in violation of any contractual, legal or fiduciary obligation to any Party with respect to such Confidential Information.

**15.** **Entire Agreement**. This Agreement constitutes the entire understanding and agreement of the Parties hereto and supersedes all other prior agreements and understandings, written or oral, between the Parties.

**16.** **Additional Actions**. Each of the Parties agrees to execute, deliver and, if necessary, record any and all additional instruments, certifications, amendments, modifications and other documents as may be reasonably required by another Party in order to effectuate, complete, perfect, continue or preserve the respective rights, obligations, liens and interests of the parties hereto to the fullest extent permitted by law; provided, that any such additional instrument, certification, amendment, modification or other document shall not materially change the respective rights, remedies or obligations of Enterprise and its Subsidiaries or the Servicer under this Agreement or any other agreement or document related hereto.

**[remainder of page intentionally left blank]**

*11*

CONFIDENTIAL

JA822

LVD-DEF00002347

**IN WITNESS WHEREOF**, the parties hereto have duly executed this Agreement as of the Effective Date.

BIG PICTURE LOANS, LLC

By: _Michelle Hazen_

Name: Michelle Hazen
Title: CEO

ASCENSION TECHNOLOGIES, LLC

By _Brian McFadden_

Name: Brian McFadden
Title: President

*Signature Page to Servicing Agreement*

JA823

CONFIDENTIAL

LVD-DEF00002348

Exhibit 45

## LOAN AND SECURITY AGREEMENT

This LOAN AND SECURITY AGREEMENT (this "Agreement"), executed on September 14 , 2015 to become effective as of Close as defined in the Merger Agreement the Effective Date, by and between Tribal Economic Development Holdings, LLC, (together with its Subsidiaries as defined herein, successors and assigns, the "Borrower"), a wholly-owned holding company of the Lac Vieux Desert Band of Lake Superior Chippewa Indians, a federally recognized Indian tribe (the "Tribe"), and Eventide Credit Acquisitions, LLC, a Delaware limited liability company (together with its successors or assigns, the "Lender"). All capitalized terms that are not otherwise defined herein shall have the meanings ascribed to them in the Transaction Documents (as hereinafter defined).

This Agreement is made and delivered by Borrower in connection with the acquisition through merger of Bellicose Capital, LLC, a Delaware limited liability company (the "Company") by Borrower's subsidiary, LVD Tribal Acquisition Company, LLC, pursuant to that certain Agreement and Plan of Merger, executed on September 14 , 2015 but effective as of the Effective Date of the Merger Agreement among, Borrower, Bellicose Capital, LLC, and Eventide Credit Acquisitions, LLC (the "Merger Agreement"). Borrower and Lender may each be referred to as "Party" and collectively as "Parties."

## 1. THE LOAN

1.1    Loan.  Subject to the terms and conditions of this Agreement, Lender hereby agrees to loan to or for the benefit of Borrower a principal amount equal to the Acquisition Amount as defined in the Merger Agreement to fund the purchase price for Company (the "Loan").  Should the Merger Agreement be canceled due to the failure to meet the conditions precedent in the Merger Agreement, this Agreement and the Note shall terminate.  The Loan shall be evidenced by that certain Promissory Note, dated as of the date hereof (the "Note") given by Borrower to the order of Lender, in the face amount of the Acquisition Amount.  This Agreement, the Note, the Merger Agreement, the Servicing Agreement, lockbox agreements, any deposit account control agreements, the Parental Guarantee and Sovereign Immunity Waiver Agreement and any and all other documents, amendments or renewals executed and delivered and/or held in escrow in connection with any of the foregoing, including any guaranties of any obligation of Borrower are collectively hereinafter referred to as the "Transaction Documents."

1.2    Interest.  Interest respecting the outstanding principal balance of the Loan will be charged to Borrower from time to time outstanding at the rate specified in the Note in accordance with the terms of the Note or as otherwise set forth in this Agreement.  Interest on the Loan will be based on the actual number of days elapsed in a given calendar month and an assumed 360-day year.

1.3    Payments.  Payments shall be set forth in the Note.

1.4    Conduct of Business.  Borrower, through Borrower's Subsidiaries, is (and throughout the term of the Loan shall be) engaged  in the business related to consumer lending for the Tribe (the "Business"), and Borrower's Subsidiaries shall not conduct any business activities unrelated to the Business while any Obligations (as hereinafter defined) are outstanding.

JA825

MARTORELLO_000067

## 2.    GRANT OF SECURITY INTEREST

2.1    Grant of Security Interest.  In consideration of Lender's extending credit and other financial accommodations to or for the benefit of Borrower, Borrower and its Subsidiaries hereby grant to Lender a security interest in, a lien on and pledge and assignment of the Collateral (as hereinafter defined), including, without limitation, all claims against third parties arising out of or related to the Collateral.  The security interest granted by this Agreement is given to and shall be held by Lender as security for the payment and performance of all Obligations, including, without limitation, all amounts outstanding pursuant to the Note.  Borrower and Subsidiaries hereby authorized the filing of by Lender of any financing statement in any applicable jurisdiction, and such financing statement may describe the collateral as "all assets" or a similar description.

2.2    Definitions.  As used herein, the following definitions shall have the following meanings:

(a)    "Business Day"" shall mean any day other than a Saturday, Sunday or day that is or shall be a federal holiday or a day on which banking institutions are required or authorized to close.

(b)    "Collateral" shall mean all of Borrower's and any Subsidiary's present and future right, title and interest in, to and under the following described property whether (unless otherwise defined herein, each capitalized term used herein shall have the meaning given to it in the UCC) whether directly owned by Borrower or owned by a Subsidiary:

      (i)    all now existing and hereafter acquired or arising Accounts, Goods, General Intangibles, Payment Intangibles, Financial Assets, Deposit Accounts (including, without limitation, the Collateral Account), Chattel Paper (including, without limitation, Electronic Chattel Paper), Documents, Instruments, Software, Investment Property, Letters of Credit, Letter-of-Credit Rights, Commercial Tort Claims, money, Equipment, Inventory, Fixtures, and Supporting Obligations, together with all products of and Accessions to any of the foregoing and all Proceeds of any of the foregoing (including without limitation all insurance policies and proceeds thereof), and those agreements held in escrow for benefit of Lender in an Event of Default providing for the potential merger of Ascension Technologies, LLC; the control of certain intellectual property interests (specifically including website domain names); and certain vendor agreements;

      (ii)    to the extent, if any, not included in clause (i) above, each and every other item of personal property and fixtures, whether now existing or hereafter arising or acquired, including, without limitation, all software use licenses, contracts and agreements, and all collateral for the payment or performance of any contract or agreement, together with all products and Proceeds (including all insurance policies and proceeds) of any accessions to any of the foregoing; and

      (iii)    all present and future business records and information relating to any of the foregoing, including computer tapes and other storage media containing the same and computer programs and software (including without limitation, source code, object code and related manuals and documentation and all licenses to use such

JA826

CONFIDENTIAL

MARTORELLO_000068

software) for accessing and manipulating such information, provided Borrower and its Subsidiaries may retain copies of the same business records and information as required by applicable law.

All such information shall be subject to Section 5.17 of this Agreement.

(c) "Collateral Account" shall mean any account(s) of Borrower or a Subsidiary (including banking, ACH processing, reserve or other accounts in which Borrower or a Subsidiary may have an economic interest) through which Borrower or the Subsidiary conducts its Business and maintains a deposit account control agreements and lockbox agreements to protect the interests of Lender unless otherwise waived by Lender.

(d) "Consumer" shall have the meaning given under the Code.

(e) "Consumer Loan" shall mean a "Small Loan Transaction" as defined in the Tribal Consumer Financial Services Regulatory Code.

(f) "Financial Assets" shall mean any security for an obligation of a person or a share participation or other interest in a person or in property or an enterprise of a person which is, or is of a type, dealt in or traded on financial markets, or which is recognized in any area which it is issued or dealt in as a medium for investment, or any property that is held by a securities intermediary for another person in Investment Property if the securities intermediary has expressly agreed with the other person that the property is to be treated as a financial asset.

(g) "Investment Property" means a security, whether certificated or uncertificated, security entitlement, securities account, contract, or commodity account.

(h) "Material Adverse Effect" shall mean, with respect to Borrower, any event, occurrence, development, fact, condition or change that individually or in the aggregate is or would be reasonably likely to be materially adverse to the operations or financial performance of Borrower or any of Borrower's Subsidiaries.

(i) "Obligation(s)" shall mean, without limitation, all loans, advances, indebtedness, notes, liabilities and amounts, liquidated or unliquidated, owing by Borrower to Lender at any time, of each and every kind, nature and description, whether arising under this Agreement or otherwise, and whether secured or unsecured, direct or indirect (that is, whether the same are due directly by Borrower to Lender; or are due indirectly by Borrower to Lender as endorser, guarantor or other surety, or as borrower of obligations due third persons which have been endorsed or assigned to Lender, or otherwise), absolute or contingent, due or to become due, now existing or hereafter arising or contracted, including, without limitation, payment when due of all amounts outstanding respecting any of the Transaction Documents. Said term shall also include all interest and other charges chargeable to Borrower or due from Borrower to Lender from time to time and all fees, costs and expenses referred to in this Agreement.

(j) "Person" or "party" shall mean individuals, partnerships, corporations, limited liability companies and all other entities.

-3-

CONFIDENTIAL

JA827

MARTORELLO_000069

(k)    "Senior Debt" shall mean (1) the debt owed to Alpha Credit Resources, LLC, a Delaware limited liability company by Borrower or a Subsidiary; (2) those notes owed and acquired through the merger of Bellicose Capital, LLC into LVD Tribal Acquisition Company, LLC ("TAC"), and subsequently assigned by TAC to Borrower as set forth in Exhibit A of the Merger Agreement; (3) the successor in interest to the line of credit provided by Source Point VI, LLC originally held by Red Rock Lending, LLC and transferred to Big Picture Loans, LLC and reaffirmed;  (4) the successor in interest to the line of credit provided by Source Point VI, LLC and Big Picture Loans, LLC as reaffirmed;  and (5) such other debt as agreed to in writing by Lender pursuant to the Transaction documents.

(l)    "Senior Lender" shall mean any party providing Senior Debt, and collectively, "Senior Lenders."

(m)    "Subsidiary" shall mean Big Picture Loans, LLC, Ascension Technologies, LLC, LVD Tribal Acquisition Company, LLC and any other entity created as allowed under the Transaction Documents (collectively referred to as the "Subsidiaries")

(n)    "UCC" shall mean the Uniform Commercial Code in effect in the State of Delaware from time to time.

(o)    "Tribal" shall mean of or relating to the Tribe.

All other capitalized terms used in this Agreement shall have the meanings accorded to them in the UCC, and if not defined therein, the Merger Agreement or other applicable Transaction Document, or otherwise they shall have the word's or term's normal and customary use within the industry.  Definitions referenced or used herein are for interpretation of this Agreement and the Transaction Documents only.

2.3    Ordinary Course of Business.  Lender hereby authorizes and permits Borrower through the lockbox(es) established by mutual agreement and under the deposit account control agreements (unless other waived by Lender) to receive from its Subsidiaries the proceeds of the Collateral at Borrower's own cost and expense, and also liability, if any, subject to Borrower's and the Subsidiaries' obligations under this Agreement and the Note; provided however, that following an Event of Default or at  maturity, the Lender may terminate all or any part of the authority and permission granted to Borrower and/or any Subsidiary with reference to the Collateral.  Subject to the Senior Debt requirements, all proceeds of and collections of Collateral shall be retained by the lockbox agent and used for purposes of satisfying Section 1.2 of the Note and making disbursements thereunder.  Borrower and its Subsidiaries acknowledge and agree that the lockbox agent must direct all funds available from each Subsidiary and the Borrower to follow the cash waterfall established by Section 1.2 of the Note.  From and after an Event of Default which has not been waived by Lender, all proceeds of and collections of the Collateral shall be held in trust by Borrower and/or any Subsidiary for the benefit of Lender and shall not be commingled with any other funds or deposited in any bank account of Borrower or a Subsidiary other than a Collateral Account; and, from and after an Event of Default which has not been waived by Lender, Borrower and each Subsidiary agrees to deliver to Lender on the dates of receipt thereof by Borrower and/or its Subsidiaries, duly endorsed to Lender or to bearer, or assigned to Lender, as

CONFIDENTIAL

JA828

MARTORELLO_000070

may be appropriate, all proceeds of the Collateral in the identical form received by Borrower and/or any Subsidiary.

2.4     Records.  Borrower and/or each Subsidiary shall deliver to Lender from time to time promptly at its request all invoices, original documents of title, contracts, chattel paper, instruments and any other writings relating thereto, and other evidence of performance of contracts, or evidence of the rendering of services of Borrower, or Subsidiary; and Borrower and/ or each Subsidiary will deliver to Lender promptly at Lender's request from time to time additional copies of any or all of such papers or writings, and such other information with respect to any of the Collateral and such schedules of accounts and such other writings as Lender may in its sole discretion deem to be necessary or effectual to evidence any loan or Consumer Loan hereunder or Lender's security interest in the Collateral.

2.5     Legends.  Borrower or Subsidiary shall promptly make, stamp or record such entries or legends on Borrower's or that Subsidiary's books and records or on any of the Collateral (including, without limitation, chattel paper or electronic chattel paper) as Lender shall request from time to time, to indicate and disclose that Lender has a security interest in such Collateral.  Such books and records may be maintained in electronic form (provided that any Consumer Loan shall be evidenced by electronic records which at all times comply with the requirements of all applicable federal and Tribal laws) and the entries or legends indicating or disclosing Lender's security interest shall be made electronically on any such electronic records.

## 3.     REPRESENTATIONS AND WARRANTIES

Borrower and each Subsidiary represent and warrant to Lender that the following are, and after giving effect to the transactions contemplated by this Agreement and the other Transaction Documents will be, true, correct and complete:

3.1     Organization and Qualification.  Borrower and Borrower's Subsidiaries are each duly formed and existing limited liability companies under Tribal law and are wholly-owned subsidiaries of Borrower, and therefore the Tribe.  Borrower and Borrower's Subsidiaries are in good standing under Tribal law and each has the power to own its property and conduct its business as now conducted and as currently proposed to be conducted.

3.2     Subsidiaries.  Borrower shall not during the term of this Agreement create additional subsidiaries without the written consent of Lender, but may terminate and dissolve at will any subsidiary that has terminated operations provided that such termination may not create a Material Adverse Effect.

3.3     Corporate Records.  Borrower's and Borrower's Subsidiaries' articles of organization have been duly filed and their articles of organization and operating agreement are in proper order.  All outstanding equity issued by Borrower and Borrower's Subsidiaries was and is properly issued and all books and records of Borrower and each Subsidiary, including but not limited to its minute books, operating agreement, and books of account, are accurate and up to date and will be so maintained.

3.4     Title to Properties; Absence of Liens.  Borrower and each Subsidiary has good and clear record and marketable title to all of its properties and assets, and all of its properties and assets,

JA829

CONFIDENTIAL

MARTORELLO_000071

including the Collateral (as defined herein) to the extent owned by Borrower or a Subsidiary, are free and clear of all mortgages, liens, pledges, charges, encumbrances and setoffs, other than the Senior Debt and other security interests outstanding as of the Effective Date ("Permitted Liens").

3.5    Places of Business.  Borrower's principal place of business and chief executive office are located within Tribal jurisdiction at N5384 U.S. Hwy. 45, P. O. Box 704, Watersmeet, Michigan, 49969, and Borrower shall, during the term of this Agreement, keep Lender currently and accurately informed in writing of each of its and its Subsidiaries other places of business, and shall not change the location of any such principal place of business or open or close, move or change any existing or new place of business without giving Lender at least thirty (30) days prior written notice thereof unless otherwise waived by the Lender.

3.6    Valid Obligations.  The execution, delivery and performance of the Transaction Documents have been duly authorized by all necessary action and the Transaction Documents represent the legal, valid and binding obligation of Borrower and its Subsidiaries and are fully enforceable according to their terms, except as limited by (a) bankruptcy, insolvency, reorganization, receivership, moratorium and other laws affecting creditors' rights and (b) the exercise of judicial discretion and the application of principles of equity, good faith, fair dealing, reasonableness, conscionability and materiality (regardless of whether the applicable agreements are considered in a proceeding in equity or at law).

3.7    Conflicts.  There is no provision in Borrower's or any Subsidiary's organizational documents, if any, or in any indenture, contract or agreement to which Borrower or a Subsidiary is a party which prohibits, limits or restricts the execution, delivery or performance of Borrower's or a Subsidiaries obligations under the Transaction Documents other than those associated with the Senior Debt and 5.2 (c) of the Operating Agreement of the Borrower, as it exists on the Effective Date.

3.8    Approvals.  The execution, delivery and performance of the Transaction Documents have been duly authorized and approved by the Tribe, as member of the Borrower, do not and will not require any additional approval of or filing with any Tribal or governmental agency or authority or any other Person.

3.9    Litigation.  At the time of execution of this document, there are no actions, suits or proceedings pending or, to the knowledge of Borrower, threatened against Borrower or the Subsidiaries which would be reasonably expected to cause a Material Adverse Effect.

3.10    Title to Collateral.  As of the Effective Date and subject to Section 6.4, Borrower is the lawful owner of its assets constituting the Collateral, and the Collateral and each item thereof is free of all restrictions, liens, encumbrances or other rights, title or interests, credits, defenses, recoupments, set-offs or counterclaims whatsoever, other than the security interest granted to Lender hereby and the Permitted Liens.  Borrower has full power and authority to grant to Lender a security interest in the Collateral, and neither Borrower nor any of Borrower's Subsidiaries have transferred, assigned, sold, pledged, encumbered, subjected to lien or granted any security interest in, and will not transfer, assign, sell, pledge, encumber, subject to lien or grant any security interest in any of the Collateral (or any of Borrower's or its Subsidiaries' right, title or interest therein), to any person other than Lender or the holder of a Permitted Lien.  The Collateral is valid and genuine

-6-

in all respects. Except as to claims by a Senior Lender, Borrower and each Subsidiary will warrant and defend Lender's right to and interest in the Collateral against all claims and demands of all persons whatsoever.

3.11    Third Parties. Lender shall not be deemed to have assumed any liability or responsibility to Borrower, a Subsidiary or any third person for the correctness, validity or genuineness of any instruments or documents that may be released or endorsed to Borrower or a Subsidiary by Lender (which shall automatically be deemed to be without recourse to Lender in any event) or for the existence, character, quantity, quality, condition, value or delivery of any goods purporting to be represented by any such documents; and Lender, by accepting such security interest in the Collateral owned by Borrower or a Subsidiary, or by releasing any Collateral to Borrower or Subsidiary, shall not be deemed to have assumed any obligation or liability to any Consumer or to any other third party, and Borrower and each Subsidiary agree to indemnify and defend Lender and hold Lender harmless in respect to any claim or proceeding arising out of any matter referred to in this paragraph.

3.12    Taxes. Borrower and each Subsidiary has filed, or will file, all applicable and required Federal, Tribal, state and other tax returns (except for such returns for which current and valid extensions have been filed), and all taxes, assessments and other governmental charges due from Borrower or a Subsidiary have been fully paid. Borrower and each Subsidiary have established on their books reserves adequate for the payment of all applicable and required Federal, Tribal, state and other tax liabilities (if any).

3.13    Use of Proceeds. Funds received under this Agreement may only be used for the acquisition of Bellicose Capital, LLC by TAC, and Borrower and/or its Subsidiaries shall receive good and valuable consideration in connection with such acquisition.

3.14    Compliance with Law. As of the Effective Date, Borrower and each Subsidiary are in compliance with all applicable laws.

3.15    Disclosure. This Agreement (together with all exhibits and schedules hereto), the other Transaction Documents and the other agreements, certificates and other documents furnished to Lender by or on behalf of Borrower and each Subsidiary related to effectuating the Transaction Documents do not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained herein or therein, in the light of the circumstances under which they were made, not misleading. There is no fact known to Borrower or a Subsidiary which has not been disclosed to Lender in writing which could reasonably be expected to have a Material Adverse Effect.

## 4.    AFFIRMATIVE COVENANTS

4.1    Payments and Performance. Borrower and each Subsidiary will duly and punctually pay and perform all Obligations on its part to be done or performed under this Agreement.

4.2    Books and Records; Inspection. Borrower and each Subsidiary will at all times keep proper books of account in which full, true and correct entries will be made of its transactions in accordance with its standard practices, consistently applied. Borrower and each Subsidiary will at all reasonable times, and on reasonable advance notice, make its books, records, and accounting

JA831

CONFIDENTIAL

MARTORELLO_000073

practices and procedures available in its offices for a field inspection and examination by Lender and/or Lender's representatives and will permit inspection of the Collateral and all of its properties by Lender and/or Lender's representatives (a "Field Inspection"). Lender may, at its option and expense, require a Field Inspection not more than one (1) time in any calendar quarter, unless an Event of Default shall occur which has not been waived by Lender, in which case Lender shall be permitted to require a Field Inspection as frequently as Lender deems reasonably necessary. In the event that an infraction is found, all reasonable costs and expenses incurred by Lender in connection with any Field Inspection shall be borne by Borrower, otherwise such costs shall be borne by Lender. Borrower and/ or any Subsidiary will from time to time furnish Lender with such information and statements as Lender may request in its sole discretion with respect to the Obligations or Lender's security interest in the Collateral, and Borrower shall have a commercially reasonable time period to produce such information and statements. Borrower shall, during the term of this Agreement, keep Lender currently and accurately informed in writing of each location where Borrower's or a Subsidiary's records relating to its accounts and contract rights are kept, and shall not remove such records to another jurisdiction without giving Lender at least thirty (30) days prior written notice thereof.

4.3    Financial Information. Borrower and each Subsidiary will furnish to Lender:

(a)    real-time, read-only, online access to information concerning sums on deposit (including credits and debits) to any Collateral Account or other pertinent accounts and other information contained in technology used to monitor the Collateral;

(b)    as soon as available to Borrower and each Subsidiary, but in any event within thirty (30) days after the close of each calendar month, a full and complete signed copy of financial statements, which shall include a balance sheet of Borrower and each Subsidiary, as at the end of such month, and statement of profit and loss of Borrower and each Subsidiary reflecting the results of its operations during such month and shall be prepared by Borrower and each Subsidiary and certified by a senior officer of Borrower or each Subsidiary as appropriate having primary responsibility for the preparation of such financial statements as to correctness in accordance with Borrower's standard practices, consistently applied, subject to year-end adjustments;

(c)    as soon as available to Borrower or a Subsidiary, but in any event within thirty (30) days after the close of each calendar quarter, a full and complete signed copy of financial statements, which shall include a balance sheet of Borrower and each Subsidiary, as at the end of such quarter, and statement of profit and loss of Borrower and each Subsidiary reflecting the results of its operations during such quarter and shall be prepared by Borrower or the respective Subsidiary and certified by a senior officer of Borrower or the respective Subsidiary having primary responsibility for the preparation of such financial statements as to correctness in accordance with Borrower's standard practices, consistently applied, subject to year-end adjustments ; and

(d)    promptly, from time to time, such other financial data and information about Borrower or a Subsidiary, including a Subsidiary's Consumer Loans, if applicable, and the performance thereof, as Lender may reasonably request.

JA832

CONFIDENTIAL

MARTORELLO_000074

All information submitted pursuant to this Section 4.3 shall be certified as true, accurate, and complete in all material respects by Borrower or the respective Subsidiary.

4.4     Financial & Operational Performance.   Borrower and its Subsidiaries shall only use the Collateral for the benefit of TED and its Subsidiaries and to meet their fiduciary obligations to Lender under this Agreement.   Borrower and/or its Subsidiaries shall maintain a range of the cumulative loan portfolio (all Consumer Loans on Borrower's or a Subsidiary's balance sheet current up to sixty (60) days past due) of a minimum portfolio size of fifteen million dollars ($15,000,000) to a maximum portfolio size in any given month equal to 1.1 times the previous month's portfolio size.   All funds in excess of those required for (a) balancing requirements of Senior Lenders and (b) the monthly maximum portfolio size, shall be applied to Note payments. As long as Borrower and Subsidiaries meet their fiduciary obligations to maximize Note payments during the term of the Note, Lender agrees that Subsidiaries may do Business such that Note payments may be affected while portfolio size is within the above mentioned range.   Regardless of portfolio size, any additional debt may only be entered into as allowed under this Agreement.

4.5     Conduct of Business.   Borrower and each Subsidiary will maintain its articles of organization and existence in good standing and materially comply with all laws and regulations of the Tribe and of any other governmental authority which may be applicable to it or to the Business.   Each lending Subsidiary will maintain servicing agreements with the servicing Subsidiary in a form substantially the same as that in place at the execution of this agreement and not make any changes that would cause a Material Adverse Effect under this Agreement.

4.6     Contact with Accountant.   Borrower and each Subsidiary hereby authorizes Lender to directly contact and communicate with any accountant employed by Borrower or the respective Subsidiary in connection with the review and/or maintenance of Borrower's or the respective Subsidiary's books and records or preparation of any financial reports delivered by or at the request of Borrower or a Subsidiary to Lender.   To the extent any accountant is so employed, Borrower or the respective Subsidiary shall provide Lender with full contact information for such accountant or any other accountant which may be employed by Borrower or the respective Subsidiary to replace such accountant.

4.7     Taxes.   Borrower and each Subsidiary will promptly pay all applicable real and personal property taxes, assessments and charges and all franchise, income, unemployment, old age benefits, withholding, sales and other taxes assessed against it or payable by it before delinquent; provided that this covenant shall not apply to any tax assessment or charge which is being contested in good faith or any outstanding tax liability of Lender or its subsidiaries incurred prior to the Effective Date.   Lender may, at its option, from time to time, discharge any taxes resulting in a lien or encumbrance on the Collateral, or other charges resulting in liens or encumbrances on any of the Collateral, and Borrower will pay to Lender on demand or Lender in its sole discretion may charge to Borrower all amounts so paid or incurred by it.

4.8     Indemnity.   Borrower and each Subsidiary shall protect, defend (by counsel selected by Lender and reasonably acceptable to Borrower), indemnify and hold harmless Lender and Lender's officers, directors, partners, shareholders, members, employees, attorneys, successors and permitted assigns and any successors to Lender's interest in the Loan, their officers, directors, partners, shareholders, employees, attorneys,   successors and permitted assigns (collectively, the

-9-

JA833

MARTORELLO_000075

"Indemnitees") from and against all liabilities (including sums paid in settlement of claims), losses, costs, obligations, demands, suits, liens, damages, fines (including any sums ordered to be paid or expended by Indemnitees by any governmental entity as a fine), penalties or damages arising as a direct or indirect result of any of the following with respect to Borrower's, any Subsidiary's: (a) fraud, (b) intentional material misrepresentation, (c) failure to pay applicable taxes, (d) misapplication of funds (including any sums on deposit from time to time in the Collateral Account), (e) failure to apply funds to pay the Obligations following an Event of Default pursuant to Section 6, (f) additional financing incurred or guaranteed by Borrower or any Subsidiary in violation of the terms of the Transaction Documents, (g) transfer of substantially all of Borrower's or Subsidiary's assets without consent of Lender, (h) gross negligence, (i) willful misconduct, and (j) court costs and attorneys' fees. In addition, Borrower and each Subsidiary shall indemnify and hold harmless the Indemnitees from and against any liabilities or costs incurred by any Indemnitee under the deposit account control agreement between the Parties.

4.9    <u>Insurance</u>. Borrower and each Subsidiary will maintain (or cause to be maintained) in force insurance on its properties against risks customarily insured against by companies engaged in businesses similar to that of Borrower or the respective Subsidiary containing such terms and written by such companies reasonably standard in the industry, with Lender to be named as the loss payee.

4.10    <u>Notification of Default</u>. Within five (5) days of becoming aware of the existence of any condition or event which constitutes an Event of Default, or any condition or event which would upon notice or lapse of time, or both, constitute an Event of Default, Borrower and/ or a Subsidiary shall give Lender written notice thereof specifying the nature and duration thereof and the action being or proposed to be taken with respect thereto.

4.11    <u>Notification of Litigation</u>. Borrower will promptly notify Lender in writing of any litigation or of any investigative or enforcement actions initiated by a governmental agency or authority against it or any Subsidiary which would or is reasonably be expected to have a Material Adverse Effect, and which would cause the potential liability of Borrower and/ or a Subsidiary under such litigation, when aggregated with all other active litigation against Borrower or any Subsidiary, to exceed twenty-five thousand dollars (US$25,000.00), <u>unless</u> the potential liability of Borrower under such litigation is covered by a policy of insurance acceptable to Lender, Lender has been named as an additional insured or additional loss payee and has received reasonably acceptable endorsements from such insurer(s) to such effect, and Lender has been provided evidence satisfactory to Lender that such insurance coverage is in full force and effect. The Parties agree this Section does not apply to correspondence or inquiries received in the ordinary course of business from various state agencies or departments. Without limiting the foregoing, within two (2) days of Borrower or any Subsidiary obtaining knowledge of the existence thereof, Borrower or Subsidiary shall notify Lender of any applicable investigative or enforcement action, and shall immediately forward to Lender, on receipt thereof by Borrower or any Subsidiary, a copy of any written communication or correspondence concerning the foregoing.

4.12    <u>Compliance</u>. Borrower and each Subsidiary shall comply with all applicable requirements of governmental authorities having jurisdiction over Borrower and each Subsidiary, including, without limitation, those relating to money laundering and terrorism, in each case as amended from time to time, and the rules and regulations promulgated thereunder.

-10-

JA834

MARTORELLO_000076

4.13    Organizational Documents.  Borrower and each Subsidiary shall comply in all respects with Borrower's or the respective Subsidiary's articles of organization and Borrower's or the respective Subsidiary's operating agreement.

4.14    Location of Collateral.  Borrower and each Subsidiary shall, during the term of this Agreement, keep Lender currently and accurately informed in writing of each location where Borrower's and each Subsidiary's records relating to its accounts and contract rights, including Consumer Loans, respectively, are kept, and shall not remove such records or any of them to another location without giving Lender at least thirty (30) days prior written notice thereof.  The Borrower and Subsidiaries have agreed to pre-signed assignments of all vendor agreements and associated obligations in favor of the Lender and held in escrow for Lender, and for any future vendor agreements shall provide pre-signed assignments to be held in escrow upon the execution of any new vendor agreements.  Further, the Borrower and certain Subsidiaries, have agreed to pre-signed merger agreements to be held in escrow by the Lender.

4.15    Notification of Material Adverse Effect.  Borrower and/or a Subsidiary will immediately notify Lender of any Material Adverse Effect.

4.16    Deposit Account Control Agreements/Lockbox.

(a)      Unless waived in writing by Lender or as otherwise limited pursuant to Section 6.4, the Borrower and each Subsidiary will enter into (1) a deposit account control agreement (or maintain existing deposit account control agreements) for any bank account(s) in which the Subsidiary conducts its business in a form mutually agreeable with Lender and agrees to enter into other banking arrangements only if a mutual agreeable deposit account control agreement is in place and (2) enter into a lockbox agreement in a form mutually agreeable with Lender and third-party provider for the lending Subsidiaries.

(b)      In the event the lockbox agreement is terminated or fails for any reason, the Collateral Account(s) shall be governed by the existing deposit account control agreement(s) to ensure the continued operation of the Business and satisfaction of obligations under the Transaction Documents.  Unless mutually agreed by the Parties, upon the termination or failure of the lockbox agreement required by (a)(ii), a new lockbox agreement will be entered into by Borrower and each Subsidiary in a form mutually agreeable with the Lender and third-party provider for the Subsidiaries

4.17    Costs & Expenses.  The Borrower and each Subsidiary will maintain a fiduciary duty to the Lender to keep costs and expenses (including any capital expenses or other investments) associated with operations within industry standards and that all transactions with affiliates shall occur at no more than arms-length, market rates, and Borrower will not allow any movement of assets or liabilities between affiliates (such movement shall not include payment of affiliates for services rendered under contracts for services) unless approved by Lender.  Any excessive salary or bonus payments must be accounted for the Tribe's distribution under the cash waterfall in the Note or other Tribal equity.  For the term of the Note, neither Borrower nor any Subsidiary shall make any charitable donations or any investments in excess of an aggregate of $5,000 per year for all entities unless approved by Lender.

JA835

CONFIDENTIAL

MARTORELLO_000077

4.18   Title to Acquired Collateral.   As to Collateral that Borrower (directly or through its Subsidiaries) acquires, Borrower or Subsidiary shall be the lawful owner of its assets constituting the Collateral.  The Collateral and each item thereof will be and shall continue to be free of all restrictions, liens, encumbrances or other rights, title or interests, credits, defenses, recoupments, set-offs or counterclaims whatsoever, other than the security interest granted to Lender hereby and the Permitted Liens.  Borrower and Subsidiaries have full power and authority to grant to Lender a security interest in the Collateral as it is acquired, and neither Borrower nor any of Borrower's Subsidiaries will transfer, assign, sell, pledge, encumber, subject to lien or grant any security interest in any of the Collateral (or any of Borrower's or its Subsidiaries' right, title or interest therein), to any person other than Lender or the holder of a Permitted Lien.  The Collateral will be valid and genuine in all respects.  Except for claims by Senior Debt, Borrower and each Subsidiary will warrant and defend Lender's right to and interest in the Collateral acquired against all claims and demands of all persons whatsoever.

4.19   Licensing and Tribal Law.  Borrower and each Subsidiary shall maintain all licenses and other authorizations required for Borrower or the respective Subsidiary to operate its business.  No Tribal law, regulatory code or other Tribal action exists that could potentially prohibit or interfere with the perfection of the security interest granted under this and the other Transaction Documents except for Section 8.7 of the Code which could potentially interfere with the perfection of the security interest by allowing the seizure of the property owned by a Person or other entity with a license issued by the Tribal Financial Services Regulatory Authority if such property was used in violation of the Code, and Appendix 1 of the Code, which governs secured transactions within the Tribe's jurisdiction.  In the event of any such seizure on behalf of the Tribe or other adverse action, the Borrower and, if applicable, Subsidiary shall use all good faith efforts to ensure that all obligations to Lender are met and all Lender's rights may be fully exercised (including the right to perfect Lender's security interest during the due process required under the Code) under the Transaction Documents.

## 5.   NEGATIVE COVENANTS

5.1   Limitations on Indebtedness.  Other than the Senior Debt, Borrower and each Subsidiary shall not, without the prior written consent of Lender in each instance, issue any evidence of indebtedness or create, assume, guarantee, become contingently liable for, or suffer to exist indebtedness in addition to Permitted Liens.  Neither Borrower nor any Subsidiary will incur additional indebtedness nor take any action that could negatively affect payment under the Note or dilute or burden the equity of Borrower without the express written approval of Lender.

5.2   Sale of Interest.  There shall not be any sale or transfer of ownership of any interest, whether direct or indirect, in Borrower or in any Subsidiary without Lender's prior written consent, unless Lender is paid in full for all Obligations under the Transaction Documents in accordance with the provisions of this Agreement.

5.3   Loans or Advances.  Borrow and each Subsidiary shall not make any loans or advances to any individual, firm or corporation, including without limitation it officers and employees; provided that Borrower or the respective Subsidiary may make advances to its employees in the ordinary course of business which expenses are reimbursable by Borrower or the respective Subsidiary.

-12-

CONFIDENTIAL

JA836

MARTORELLO_000078

5.4     Investments.  Borrower and each Subsidiary shall not make investments in any individual, trust, entity or Tribal or governmental body.  Borrower and each Subsidiary will not purchase or otherwise invest in or hold securities, real estate or other non-operating assets or purchase all or substantially all the assets of any entity other than in connection with an acquisition approved by Lender in writing.

5.5     Merger and Restructuring.  Borrower and each Subsidiary will not dissolve, merge or consolidate or be merged or consolidated with or into any other entity, unless prior to or concurrently therewith Lender is paid in full for all Obligations under the Transaction Documents except as set forth in Section 3.2 of the Merger Agreement.

5.6     Capital Expenditures.  Borrower and each Subsidiary shall not, directly or indirectly, make or commit to make capital expenditures by lease, purchase, or otherwise, except in the ordinary course of business for the purpose of replacing machinery, equipment or other personal property necessary for operating the Business unless pursuant to Section 1.2(b)(4)(b) of the Note.

5.7     Sale of Assets.  Borrower and each Subsidiary shall not sell, lease or otherwise dispose of any of its assets including the Collateral, except the sale of bad debt  in the ordinary course of business, unless prior to or concurrently therewith Lender is paid in full for all Obligations under the Transaction Documents pursuant to any internal restructuring of Borrower's operations and Subsidiaries' but only to the extent that all of the total assets and any liabilities owed to the Lender remain within the new structure and do not create a Material Adverse Effect, and Borrower provides Lender with prior written notice of such restructuring.

5.8     Restriction on Liens.  Borrower and each Subsidiary shall not grant any security interest in, or mortgage of, its respective properties or assets including the Collateral, other than Permitted Liens or such liens as are in favor of Lender.  Any granted in breach of this provision shall be considered void.  Reserve accounts required by non-affiliated, third party vendors do not constitute a "lien" under this Agreement.

5.9     Other Business.  Borrower and each Subsidiary shall not engage in any business other than the Business.

5.10    Change of Name.  Borrower and each Subsidiary shall not change its legal name or the jurisdiction of its organization, without giving Lender at least thirty (30) days' prior written notice thereof.

5.11    Payment Processors.  No Subsidiary shall enter into or modify or permit the modification of any payment processor agreements (such as ACH, RCC or debit card), and all such agreements must require that all transactions must settle to the Collateral Account(s).  In the event of a termination of a payment processor agreement the respective Subsidiary shall replace the terminated payment processor agreement with a new payment processor agreement as soon as reasonably practicable after such termination in a form substantially similar to the prior processor's agreement.  Provided, however, the Subsidiary's failure to replace the terminated payment processor agreement shall not be deemed an Event of Default so long as adequate payment processing relationships exist that allows for the Business to operate in a commercially reasonable manner.  Borrower shall provide Lender a prompt update in the event of any ACH provider

-13-

CONFIDENTIAL                                                     MARTORELLO_000079

changes or additions by Borrower or a Subsidiary. The payment processor agreements shall contain a provision irrevocably instructing that the payment processor to direct all payments to a lockbox established pursuant to Section 4.16.

5.12   Servicing Agreement.   Neither Borrower nor any Subsidiary shall amend, modify, or terminate the Servicing Agreement between that Subsidiary and Ascension Technologies, LLC during the term of the Loan without the prior written consent of Lender in each instance, which consent shall not be unreasonably withheld, conditioned, or delayed.  To insure quality servicing of the loan portfolio included in the Collateral, neither Borrower nor any of its Subsidiaries will offer services to any other lender without prior written consent from Lender.

5.13   Business Policies.  Neither the Borrower nor any Subsidiary shall make any internal policy decisions which could dilute the value of the Collateral unless such changes are made to mitigate a Material Adverse Effect.

5.14   Management.   Neither the Borrower nor any Subsidiary shall terminate or replace any manager, director or officer of Borrower or the respective Subsidiary or modify delegations of authority without the prior written consent of Lender, which shall not be unreasonably withheld, conditioned or delayed.

5.15   Organizational Documents.  Borrower and each Subsidiary shall not dissolve or modify, alter, amend, or restate in any way its articles of organization or operating agreement without the prior written consent of Lender in each instance, which consent shall not be unreasonably withheld, conditioned, or delayed, unless such modification, alteration, amendment or restatement is clerical, administrative, ministerial, or *de minimis* in nature, including any change in permitted management thereunder.

5.16   Tribal Law.  There will be no changes to Tribal law or regulations that would materially adversely impact Borrower's or a Subsidiary's performance under the Transaction Documents, unless such changes are caused by applicable requirements outside the Tribe's sovereign authority.

5.17   Confidentiality.  The provisions of Section 9 of the Parental Guarantee and Sovereign Immunity Waiver shall apply *mutatis mutandis* to this Agreement.

## 6.   DEFAULT

6.1   Default.  An "Event of Default" shall mean the occurrence of one or more of any of the following events:

(a)     (1) failure to make any payment of principal or interest within three (3) days of the due date, whether at maturity, by acceleration or otherwise under the Note, or, (2) any material breach or default by Borrower or a Subsidiary of an affirmative covenant hereof not substantially cured within ten (10) days, (3) any material breach or default by Borrower or a Subsidiary of a negative covenant hereof, or (4) any breach or default under any agreements regarding the Senior Debt not substantially cured within the time frame allowed under the applicable agreement, provided, however, no Event of Default shall have occurred under (1) and (4) if the failure to make payment is a result of the termination or

-14-

JA838

MARTORELLO_000080

failure of the lockbox agreement or responsibility of the Lender under any deposit account control agreement; or

(b)    default of any other liability, obligation or undertaking of Tribe, Borrower or a Subsidiary, including under the Transaction Documents or any material breach of the Transaction Documents or any documents evidencing Borrower's and any Subsidiary's guarantee of indebtedness, or of the Tribe as guarantor under the Parental Guarantee or later-added guarantors or other surety for the Loan, which failure continues after ten (10) days' written notice thereof (provided that if such default is not reasonably susceptible of cure within said ten (10) days, and Borrower or the respective Subsidiary commences a cure of such default within said ten (10) day period, and thereafter diligently pursues such cure, then Borrower or the respective Subsidiary shall have an additional period of ten (10) days in which to effect such cure prior to an Event of Default arising hereunder); or

(c)    if any statement, representation or warranty heretofore, now or hereafter made by Borrower or any Subsidiary in connection with this Agreement or in any supporting financial statement of Borrower or any Subsidiary shall be determined to have been intentionally false in any material respect when made; or

(d)    the liquidation, termination or dissolution of Borrower or a Subsidiary, or the merger or consolidation of Borrower or a Subsidiary into another entity that is not otherwise permitted hereby, or stops processing loans or servicing loans for ninety (90) days of any one hundred twenty (120) day period  or the appointment of a receiver for its property; or

(e)    the institution by or against the Borrower or any Subsidiary of any insolvency proceedings, whether under the United States Bankruptcy Code 11 USC §101 *et seq.* or any other law, in which Borrower or any Subsidiary is alleged to be insolvent or unable to pay its debts as they mature, or the making by Borrower or any Subsidiary of an assignment for the benefit of creditors or the granting by Borrower or any Subsidiary of a trust mortgage for the benefit of creditors and, if such proceeding is instituted against Borrower or any Subsidiary, such proceeding shall not have been dismissed in sixty (60) days; or

(f)    the service upon Lender of a writ in which Lender is named as trustee of Borrower or of any Subsidiary; or

(g)    the decision of the Tribal Financial Services Regulatory Authority to seize control of any of the Collateral; or

(h)    the imposition of any non-appealable fee, fine or order of restitution or reparations by any regulatory authority having requisite jurisdiction upon Borrower or any Subsidiary which exceeds a cumulative amount of one hundred thousand dollars ($100,000) during the term of the Note; or

(i)    a final, non-appealable judgment or judgments for the payment of money enforceable against Borrower or any Subsidiary shall be rendered in excess of twenty-five thousand dollars (US$25,000.00) against Borrower or any Subsidiary, and any such judgment shall remain unsatisfied and in effect for any period of thirty (30) consecutive days without a

JA839

CONFIDENTIAL

MARTORELLO_000081

stay of execution unless such non-payment would have no Material Adverse Effect on the Business as mutually agreed by the Parties; or

(j)    the occurrence of any Material Adverse Effect; or

(k)    any levy, lien (including mechanics lien) other the Permitted Liens, seizure, attachment, execution or similar process shall be issued or levied on any material portion of the property of Borrower or any Subsidiary, and such lien or levy shall not be removed within sixty (60) days.

6.2    <u>Windup.</u>

(a)    If an Event of Default under Section 6.1(e) shall have occurred, all Obligations shall become immediately due and payable without notice or demand. If any other Event of Default shall have occurred which, to the extent capable, has not been waived by Lender, at the election of Lender, all Obligations shall become immediately due and payable without notice or demand.

(b)    Lender is hereby authorized, at its election, after an Event of Default shall have occurred which has not been waived by Lender, without any further demand or notice except to such extent as notice may be required by applicable law, to take possession and/or sell or otherwise dispose of all or any of the Collateral at a public or private sale and the exercise of any rights under agreements held in escrow; and Lender may also exercise any and all other rights and remedies of a secured party under the UCC or which are otherwise accorded to it in equity or at law, all as Lender may determine, and such exercise of rights in compliance with the requirements of law will not be considered adversely to affect the commercial reasonableness of any sale or other disposition of the Collateral. If notice of a sale or other action by Lender is required by applicable law, unless the Collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, Borrower agrees that ten (10) days' written notice to Borrower, or the shortest period of written notice permitted by such law, whichever is smaller, shall be sufficient notice; and that to the extent permitted by law, Lender, its officers, attorneys and agents may bid and become purchasers at any such sale, if public, and may purchase at any private sale any of the Collateral that is of a type customarily sold on a recognized market or which is the subject of widely distributed standard price quotations. Any sale (public or private) shall be without warranty and free from any right of redemption, which Borrower and all Subsidiaries shall waive and release after default upon Lender's request therefor, and may be free of any warranties as to the Collateral if Lender shall so decide. No purchaser at any sale (public or private) shall be responsible for the application of the purchase money. The net proceeds of sale shall belong to Lender. Upon demand by Lender, Borrower and all Subsidiaries shall assemble the Collateral and make it available to Lender at a place designated by Lender which is reasonably convenient to Lender and Borrower. Borrower and each Subsidiary hereby acknowledges that Lender has extended credit and other financial accommodations to Borrower upon reliance of Borrower's and its Subsidiaries' granting Lender the rights and remedies contained in this Agreement including without limitation the right to take immediate possession of the Collateral upon the occurrence of an Event of Default which has not been waived by Lender and Borrower

-16-

JA840

MARTORELLO_000082

and each Subsidiary hereby acknowledges that Lender is entitled to such equitable and injunctive relief to enforce any of its rights and remedies hereunder and Borrower and each Subsidiary hereby waives any defense to such equitable or injunctive relief based upon any allegation of the absence of irreparable harm to Lender.

(c) No Lender shall be required to marshal any present or future security for (including but not limited to this Agreement and the Collateral subject to the security interest created hereby), or guarantees of, the Obligations or any of them, or to resort to such security or guarantees in any particular order; and all of its rights hereunder and in respect of such securities and guarantees shall be cumulative and in addition to all other rights, however existing or arising. To the extent that it lawfully may, Borrower and each Subsidiary hereby agrees that it will not invoke any law relating to the marshalling of Collateral which might cause delay in or impede the enforcement of Lender's rights under this Agreement or under any other instrument evidencing any of the Obligations or under which any of the Obligations is outstanding or by which any of the Obligations is secured or guaranteed, and to the extent that it lawfully may do so, Borrower and each Subsidiary hereby irrevocably waives the benefits of all such laws. Except as otherwise provided in subsection (e), Lender shall have no duty as to the collection or protection of the Collateral or any income thereon, nor as to the preservation of rights against prior parties, nor as to the preservation of any rights pertaining thereto beyond the safe custody thereof.

(d) Borrower and its Subsidiaries will accelerate all payments pursuant to Section 6.2(a), or other mutually agreeable methodology, and in good faith pursue winding up the business of the Borrower and its Subsidiaries in a manner that maximizes the value to Lender. In the event of windup, the payment methodology shall follow that of Section 1.2 of the Note provided that outstanding Consumer Loan principal returned shall at that point be included in Gross Revenues.

(e) The Borrower and Subsidiaries will effectuate assignments of all vendor and other agreements and associated obligations, whether held in escrow or otherwise, as directed by the Lender within three (3) Business Days of the occurrence of any event described in subsections 6.2 (a)-(d).

    (i) Borrower and Subsidiaries will prepare assignments of vendor agreements as described in Section 4.14 or will effectuate any pre-signed assignments held in escrow.

    (ii) In the event of assignment under (e)(i), Lender agrees to assume the obligations of said vendor agreements and satisfy the remaining unassigned obligations to other vendors related to the Business through the date of the Event of Default unless otherwise agreed by the Lender.

(f) In the event of assignment of Consumer Loans after an Event of Default, so long as it is commercially feasible, Lender, its successors or assigns agrees to:

    (i) Provide Borrower with information related to Consumer Loans that were entered into prior to the Event of Default within five (5) Business Days of a request by

JA841

CONFIDENTIAL

MARTORELLO_000083

Borrower or Borrower's designee related to a consumer initiated complaint or an inquiry from a regulatory agency. Such information shall include executed loan agreement(s), payment history and account notes;

(ii)  Provide, as soon as is reasonably practicable, Borrower with a database including information related Consumer Loans that were entered into prior to the Event of Default such as: full name, date of birth, state of residency, origination date(s), and customer ID;

(iii) Provide, as soon as is reasonable practicable, Borrower with access to or a copy of any database maintained for the purpose of tracking Consumer complaints or inquiries that occurred prior to the Event of Default; and

(iv)  notify the Tribal Financial Services Regulatory Authority of the assignment of Collateral and provide contact information for the holder of the Collateral; and

(v)   notify Consumers of the assignment of the Consumer Loan.

(g)  Access to Consumer Loan information provided for in subsection (i)-(iii) shall survive the termination of this Agreement for a period not to exceed twelve (12) months after dissolution of the Subsidiary that formerly held the Consumer Loans or the transfer of the Collateral.

6.3   Power of Attorney.  Subject to 6.4, Borrower and each Subsidiary hereby irrevocably constitutes and appoints Lender as Borrower's and/ or each Subsidiary's true and lawful attorney, with full power of substitution, at the sole cost and expense of Borrower but for the sole benefit of Lender, upon the occurrence of an Event of Default which has not been waived by Lender, to convert the Collateral into cash, including, without limitation, completing the manufacture or processing of work in process, and the sale (either public or private) of all or any portion or portions of the Collateral (subject to the notice and other terms provided in Section 6.2, above); to solely enforce collection of the Collateral either in its own name or in the name of Borrower or any Subsidiary beyond 90 days after the transfer of collateral, including, without limitation, executing releases or waivers, compromising or settling with any Consumers and prosecuting, defending, compromising or releasing any action relating to the Collateral; to receive, open and dispose of all mail addressed to Borrower or any Subsidiary and to take therefrom any remittances or proceeds of Collateral in which Lender has a security interest; to notify applicable postal authorities to change the address for delivery of mail addressed to Borrower or any Subsidiary to such address as Lender shall designate; to endorse the name of Borrower or any Subsidiary in favor of Lender upon any and all checks, drafts, money orders, notes, acceptances or other instruments of the same or different nature; to sign and endorse the name of Borrower or any Subsidiary on and to receive as secured party any of the Collateral, any invoices, freight or express receipts, or bills of lading, storage receipts, warehouse receipts, or other documents of title of the same or different nature relating to the Collateral; to act on behalf of Borrower or any Subsidiary under any vendor or servicing contract beyond 90 days after the transfer of collateral to sign the name of Borrower or any Subsidiary on verification of the Collateral beyond 90 days after the transfer of collateral; and to sign, if necessary, and file or record on behalf of Borrower or any Subsidiary any financing or other statement in order to perfect or protect Lender's security interest.  Unless otherwise provided

-18-

CONFIDENTIAL

JA842

MARTORELLO_000084

in this Agreement, Lender shall not be obliged to do any of the acts or exercise any of the powers hereinabove authorized, but if Lender elects to do any such act or exercise any such power, it shall not be accountable for more than it actually receives as a result of such exercise of power, and it shall not be entitled to collect more than an amount equal to the then outstanding Obligations, and any sums received in excess of the then-outstanding Obligations shall be returned to Borrower unless otherwise provided in this Agreement, and it shall not be responsible to Borrower or to any other party except in the event that Lender has been determined, with finality, by an Arbitration Decision (as hereafter defined), that Lender has committed gross negligence or willful misconduct. All powers conferred upon Lender by this Agreement, being coupled with an interest, shall be, once triggered, irrevocable so long as any Obligation of Borrower or any surety to Lender shall remain unpaid or Lender is obligated under this Agreement to extend any credit to Borrower. The Lender shall retain the power of attorney during the pendency of any dispute resolution process. This power of attorney shall not grant Lender with the right or ability to waive the sovereign immunity of the Tribe, Borrower or any Subsidiary.

6.4     Subordination.    The repayment of the Loan and Lender's rights hereunder shall be subordinate to the rights of the Senior Lender.

6.5     Nonexclusive Remedies.    All of Lender's rights and remedies not only under the provisions of this Agreement but also any other Transaction Document shall be cumulative and not alternative or exclusive, and may be exercised by Lender at such time or times and in such order of preference as Lender in its sole discretion may determine.

6.6     Force Majeure.    In the event of an act of God or other natural disaster which makes the carrying out of this Agreement impossible, or if a Party's performance hereunder is rendered illegal or materially adversely affected by reason of changes in applicable federal law  applicable to Borrower's Business or to either Party, or if a Party is advised in writing by a federal governmental authority having or asserting jurisdiction over such Party, in an enforcement action or otherwise, that the performance of its obligations under this Agreement is or may be unlawful, then the Party unable to perform, or whose performance has been rendered illegal or who has been so advised by a federal governmental authority, may terminate this Agreement by giving written notice at least ninety (90) calendar days in advance of termination to the other Party, unless such changes in federal law or communication from a federal governmental authority require earlier termination, in which case termination shall be effective upon such earlier required date.

## 7.     MISCELLANEOUS

7.1     Waivers.    Borrower and each Subsidiary waives notice of intent to accelerate, notice of acceleration, notice of nonpayment, demand, presentment, protest or notice of protest of the Obligations, and all other notices, consents to any renewals or extensions of time of payment thereof, and generally waives any and all suretyship defenses and defenses in the nature thereof.

7.2     Severability.    If any provision of this Agreement or portion of such provision or the application thereof to any person or circumstance shall to any extent be held invalid of this Agreement (or the remainder of such provision) and the application thereof to other persons or circumstance shall not be affected thereby.

JA843

CONFIDENTIAL

MARTORELLO_000085

7.3    Set-Off.  Subject to Lender's limitations pursuant to Section 6.4, Borrower and each Subsidiary hereby grants to Lender a continuing lien and security interest in any and all deposits or other sums at any time credited by or due from Lender to Borrower and any cash, securities, instruments or other property of Borrower or any Subsidiary in the possession of Lender or subject to the lockbox agreement as required Section 4.16 whether for safekeeping or otherwise, or in transit to or from Lender as security for the full and punctual payment and performance of all of the liabilities and obligations of Borrower to Lender and such deposits and other sums may be applied or set off against such liabilities and obligations of Borrower to Lender as are then due and unpaid, whether or not demand has been made and whether or not other collateral is then available to Lender.

7.4    Indemnification.  Borrower and each Subsidiary shall protect, defend (by counsel selected by Lender and reasonably acceptable to Borrower), indemnify and hold harmless Lender and Lender's officers, directors, partners, members, employees, attorneys, successors and permitted assigns and any successors to Lender's interest in the Loan, their officers, directors, partners, shareholders, employees, attorneys, successors and permitted assigns (collectively, the "Indemnitees") from and against all liabilities (including sums paid in settlement of claims), claims brought or threatened against Lender (as well as from reasonable attorneys' fees and expenses in connection therewith), losses, costs, obligations, demands, suits, liens, damages, fines (including any sums ordered to be paid or expended by Indemnitees by any governmental entity as a fine, penalty or damages) arising as a direct or indirect result of (a) Borrower's or a Subsidiary's Event of Default arising under Section 6.1  of this Agreement, (b) as a result of any investigation or enforcement action initiated by any governmental entity into Borrower's and/ or a Subsidiary's business.  The indemnification provided by this Section 7.4 shall survive payment of the Obligations, any termination of this Agreement, and/or release or discharge executed by Lender in favor of Borrower for a period of four (4) years or twelve (12) months beyond the resolution of any case initiated within the four (4) year period or in the Event of Default for a period not to exceed twelve (12) months after the transfer of Collateral.

7.5    Costs and Expenses.  Borrower and/ or Subsidiary shall pay to Lender any and all reasonable costs and expenses (including, without limitation, reasonable attorneys' fees, and disbursements, court costs, litigation and other expenses) incurred or paid by Lender in establishing, maintaining, protecting or enforcing any of Lender's rights or the Obligations, including, without limitation, any and all such costs and expenses incurred or paid by Lender in defending Lender's security interest in, title or right to the Collateral or in collecting or attempting to collect or enforcing or attempting to enforce payment of the Obligations.

7.6    Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall be an original, but all of which shall constitute but one agreement.  Delivery by any Party of an executed counterpart of a signature page to this Agreement by telecopier, facsimile or portable document format (pdf) shall be effective as delivery of a manually executed counterpart hereof.

7.7    Complete Agreement.  This Agreement and the other Transaction Documents constitute the entire agreement and understanding between and among the Parties hereto relating to the subject matter hereof, and supersedes, all prior proposals, negotiations, agreements and understandings among the parties hereto with respect to such subject matter.

JA844

CONFIDENTIAL

MARTORELLO_000086

7.8    Binding Effect of Agreement.  This Agreement shall be binding upon and inure to the benefit of the respective heirs, executors, administrators, legal representatives, successors and permitted assigns of the parties hereto, and shall remain in full force and effect (and Lender shall be entitled to rely thereon) until all commitments of Lender hereunder are terminated and all Obligations hereunder are fully paid.  Lender may transfer and assign this Agreement and deliver the Collateral to the assignee, who shall thereupon have all of the rights and liabilities of Lender; and such assigning Lender shall then be relieved and discharged of any responsibility or liability with respect to this Agreement, and the Collateral.  Lender shall provide at least sixty (60) days advance written notice to the Borrower of such an intent to assign.  Borrower and each Subsidiary may not assign or transfer any of its rights or obligations under this Agreement.  Except as expressly provided herein or in the other Transaction Documents, nothing, expressed or implied, is intended to confer upon any party, other than the parties hereto, any rights, remedies, obligations or liabilities under or by reason of this Agreement or the other Transaction Documents.

7.9    Further Assurances.  During the pendency of the merger and after the merger is complete, the Borrower and each Subsidiary will from time to time execute and deliver to Lender, and take or cause to be taken, all such other or further action as Lender may reasonably request in order to effect and confirm or vest more securely in Lender all rights contemplated by this Agreement and the other Transaction Documents or to vest more fully in or assure to Lender the security interest in the Collateral granted to Lender by this Agreement or to comply with applicable Delaware or federal law and to facilitate the collection of the Collateral (including, without limitation, the endorsement of promissory notes and instruments and notifications to obligors on the Collateral).  To the extent permitted by applicable Delaware, Tribal, or federal law, Borrower and each Subsidiary authorizes Lender to file financing statements, continuation statements or amendments, and any such financing statements, continuation statements or amendments may be signed by Lender on behalf of Borrower, if necessary, and may be filed at any time in any jurisdiction.  Lender may at any time and from time to time file financing statements, continuation statements, debentures, mortgage, and any other documents allowed under the laws of the Tribe or any other applicable jurisdiction, and amendments thereto which contain any information required by the laws of the Tribe or any other applicable jurisdiction for the sufficiency or filing office acceptance of any financing statement, continuation statement or amendment, including whether Borrower or the respective Subsidiary is an organization, the type of organization and any organization identification number issued to Borrower or Subsidiary.  Borrower and each Subsidiary agree to furnish any such information to Lender promptly upon request.  In addition, Borrower and each Subsidiary shall at any time and from time to time take such steps as Lender may reasonably request for Lender (a) to obtain an acknowledgement, in form and substance reasonably satisfactory to Lender, of any bailee having possession of any of the Collateral that the bailee holds such Collateral for Lender, (b) to obtain possession and control of any Collateral comprised of deposit accounts, electronic chattel paper, letter of credit rights or investment property, with any agreements establishing control to be in form and substance satisfactory to Lender, and (c) otherwise to insure the continued perfection and priority of Lender's security interest in any of the Collateral and the preservation of its rights therein.  As limited by Section 6.3 herein, Borrower and each Subsidiary hereby constitutes Lender its attorney-in-fact to execute, if necessary, and will file all filings required or so requested for the foregoing purposes, all acts of such attorney being hereby ratified and confirmed; and such power, being coupled with an interest, shall be irrevocable until this Agreement terminates in accordance with its terms, all Obligations are paid in full and

JA845

CONFIDENTIAL

MARTORELLO_000087

the Collateral is released. Lender shall deliver to Borrower a copy, on receipt by Lender from the applicable filing jurisdiction, of any such financing statements.

7.10    Amendments and Waivers. This Agreement may not be amended, or the obligations of the parties hereto modified, except in a writing executed by all of the parties. No delay or omission on the part of Lender in exercising any right hereunder shall operate as a waiver of such right or any other right, and waiver on any one or more occasions shall not be construed as a bar to or waiver of any right or remedy of Lender on any future occasion.

7.11    Terms of Agreement. This Agreement shall continue in full force and effect so long as any Obligations or obligation of Borrower to Lender shall be outstanding, or Lender shall have any obligation to extend any financial accommodation hereunder, and shall not be so construed as to limit or otherwise derogate from any of the rights or remedies of Lender or any of the liabilities, obligations or undertakings of Borrower or any Subsidiary under the Transaction Documents, nor shall any contemporaneous or subsequent agreement between Borrower and Lender be construed to limit or otherwise derogate from any of the rights or remedies of Lender or any of the liabilities, obligations or undertakings of Borrower hereunder, unless such other agreement specifically refers to this Agreement and expressly so provides.

7.12    Notices. Any notice under or pursuant to this Agreement shall be a signed writing or other authenticated record. Any such notice shall be deemed duly received and effective (a) if delivered in hand or by telecopier to, or received by, any officer or agent of Borrower or Lender, upon such delivery or receipt, or (b) if sent by overnight courier, on the next business day after being so sent, (c) if sent via electronic medium and reply or other proof of receipt is available, or (d) if mailed by registered or certified mail, return receipt requested, postage prepaid, and properly addressed to Borrower or Lender, two (2) business days after being so mailed. A party's proper address is that set forth for such party in this Agreement or such address as that party may from time to time hereafter designate by notice to the other party.

> To Lender at:
>
> 875 Carretera 693
> Suite 202
> Dorado, PR 00646
>
> To Borrower and Subsidiaries at:
>
> P.O. Box 704
> Watersmeet, MI 49969
>
> With copy to counsel:
>
> Rosette, LLP
> 25344 Red Arrow Highway, Suite B
> Mattawan, MI 49071.

JA846

CONFIDENTIAL

MARTORELLO_000088

7.13    Reproductions.  This Agreement and all documents which have been or may be hereinafter furnished by one Party to the other Party may be reproduced by either Party by any photographic, photostatic, microfilm, xerographic or similar process, and any such reproduction shall be admissible in evidence as the original itself in any judicial or administrative proceeding allowable pursuant to Section 8.5 herein (whether or not the original is in existence and whether or not such reproduction was made in the regular course of business).

7.14    No Partnership.  Nothing contained in this Agreement or the other Transaction Documents shall be deemed to create an equity investment in Borrower or any Subsidiary on the part of Lender or a partnership between Lender and Borrower or any Subsidiary, it being the intent of the parties hereto that only the relationship of lender and borrower shall exist with respect to the Loan.  Borrower and each Subsidiary agree that they shall report this transaction for income tax purposes, and file all applicable and related tax returns, in a manner consistent with the form of this transaction as a loan.

7.15    Lender Is Not In Control; Lender-Creditor Relationship.

(a)    None of the covenants or other provisions contained in this Agreement or any of the other Transaction Documents shall, or shall be deemed to, give Lender the right or power to exercise control over the day to day affairs or management of Borrower or any Subsidiary, the power of Lender being limited to the right to exercise the remedies provided for in this Agreement and the other Transaction Documents.

(b)    The relationship between Lender, on the one hand, and Borrower and any Subsidiary, on the other hand, is solely that of creditor and debtor.  Lender shall not have (or be deemed to have) any fiduciary relationship or duty to any of Borrower or any Subsidiary, arising out of or in connection with, and there is no agency or joint venture relationship between Lender, on the one hand, and Borrower, a Subsidiary, on the other hand, by virtue of, the Transaction Documents.

7.16    Certification.  The individual(s) signing this Agreement on behalf of each Party, by affixing a signature(s) hereon, hereby certify(ies) for the benefit of the receiving Party, that all information submitted to the receiving Party in connection with this Agreement is true and correct in all material respects on and as of the Effective Date.

7.17    Publicity.  Except as may be required by applicable law, none of the parties hereto shall issue a publicity release or announcement or otherwise make any public disclosure concerning this Agreement or the transactions contemplated hereby, without prior approval by the other parties hereto.  If any announcement is required by applicable law to be made by any party hereto, prior to making such announcement such party will deliver a draft of such announcement to the other parties and shall give the other parties an opportunity to comment thereon.  Notwithstanding the foregoing, Lender may disclose a general description of transactions arising under the Transaction Documents for advertising, marketing or other similar purposes upon notice to Borrower and Subsidiaries.

8.    **TRIBAL WAIVERS OF SOVEREIGN IMMUNITY, DISPUTES AND REMEDIES**

8.1    Limited Waiver Of Sovereign Immunity.

-23-

JA847

MARTORELLO_000089

(a)  <u>Retention of Sovereign Immunity</u>.  By executing this Agreement, neither Borrower nor any Subsidiary waives, limits or modifies its sovereign immunity, except as expressly provided in this Section 8.

(b)  <u>Scope of Waiver</u>.  Subject to the provisions of this Section 8, Borrower and each Subsidiary each hereby expressly and irrevocably grants to Lender, a limited waiver of its sovereign immunity from suit and consents to process and suit in accordance with this Section.  These waivers apply to actions in which Lender alleges a default or breach by Borrower or a Subsidiary of one or more of the specific obligations or duties expressly assumed by Borrower or a Subsidiary under the terms of this Agreement and the Transaction Documents.  These waivers expressly include Lender's or an affiliate's ability to pursue in litigation:

   (i)    specific performance or other specific action, or discontinuance of some action, by Borrower or Subsidiary to bring Borrower or Subsidiary into full compliance with its duties and obligations hereunder; or

   (ii)   money damages for noncompliance with the terms and provisions of this Agreement; or

   (iii)  Borrower and Subsidiaries do not consent to a waiver of their sovereign immunity from suit except for the limited purposes as set forth in this Section 8 and as follows: (A) the dispute shall be brought by and limited to Lender and no other party or entity; (B) the dispute shall be limited to causes of action arising under this Agreement and the Transaction Documents pursuant to Section 8.5 and (C) to enforce any Arbitration Decision (as defined herein) or court order compelling arbitration pursuant to Section 8.5; and (D) any such award or damages resulting from the dispute shall be limited  to the assets and revenues of Borrower and Subsidiaries and no other assets of the Tribe.

(c)  <u>Express Waiver</u>.  Borrower and each Subsidiary hereby expressly and irrevocably waives:

   (i)    its rights to have any dispute, controversy, suit, action or proceeding arising under this Agreement heard in any forum other than the ones set forth in Section 8.2 whether or not such forum now exists or is hereafter created including, without limitation, any Tribal court or other tribunal, forum, council or adjudicative body of the Tribe (each a "<u>Tribal Forum</u>");

   (ii)   any claim or right which it may possess to the exercise of jurisdiction by, any Tribal Forum, including, without limitation, any determination that any Tribal Forum has jurisdiction over any such dispute, controversy, suit, action or proceeding or jurisdiction to determine the scope of such Tribal Forum's jurisdiction, and Lender does not consent to the jurisdiction of any Tribal Forum;

   (iii)  any requirement which may exist for exhaustion of any remedies available in any Tribal Forum prior to the commencement of any dispute, controversy, suit, action or proceeding in any state or federal court even if any such Tribal Forum would

-24-

JA848

CONFIDENTIAL

MARTORELLO_000090

have concurrent jurisdiction over any such dispute, controversy, suit, action or proceeding but for such waiver;

(iv)     its sovereign immunity as to an action by Lender in the United States District Court for the Western District of Michigan or any State of Michigan Circuit Court, and in the federal or state courts having appellate jurisdiction thereover, seeking injunctive and/or declaratory relief and/or money damages against Borrower or Subsidiary based solely upon an attempt by Borrower or Subsidiary to revoke its waiver of its sovereign immunity or other waivers granted under this Section 8 and solely to compel participation in arbitration proceedings pursuant to Section 8.5 and enforce an arbitration decision;

(v)      its sovereign immunity from a judgment or order (including any appellate judgment or order) and post judgment proceedings supplemental thereto consistent with the terms and provisions of this Section 8, which is final because either the time for appeal thereof has expired or the judgment or the order is issued by a court having final appellate jurisdiction over the matter; and

(vi)     its sovereign immunity from the assertion or enforcement of any claim in any Tribal Forum (it being understood that this provision does not detract from or diminish any other waiver of the Borrower or Subsidiary in this Section 8).

8.2    Consent to Jurisdiction.  Borrower and each Subsidiary consents to the jurisdiction of and to accept and be bound by any order or judgment of the United States District Court for the Western District of Michigan or any State of Michigan Circuit Court, and any federal or state court having appellate jurisdiction thereover for enforcement of an Arbitration Decision (as defined herein) consistent with the terms and provisions of this Section 8.  It is the express intent of the parties that their first recourse for dispute resolution shall be to attempt to amicably resolve any issue, and second to the federal and state courts specified herein.

8.3    Enforcement Authorization of Governmental Authorities.  Without in any way limiting the generality of the foregoing, Borrower and each Subsidiary expressly authorize any governmental authorities who have the right and duty under applicable law to take any action authorized or ordered by any court, including, without limitation, to take such action as entering Borrower's or Subsidiary's property, to give effect to any judgment or order entered, subject to this Section 8.

8.4    Governing Law.  This Agreement, and any disputes or controversies arising hereunder, shall be governed by and construed according to the laws of the State of Delaware.

8.5    Dispute Resolution.  In the event that either Party to this Agreement believes that the other Party has failed to comply with any requirement of this Agreement or a Transaction Document, or in the event of any dispute hereunder, including, but not limited to, a dispute over the proper interpretation of the terms and conditions of this Agreement, the following procedures shall be invoked:

(a)      Discussions between the Parties.  The goal of the Parties shall be to first resolve all disputes amicably and voluntarily whenever possible.  A Party asserting noncompliance or seeking

JA849

CONFIDENTIAL

MARTORELLO_000091

an interpretation of this Agreement first shall serve written notice on the other Party. The notice shall identify the specific Agreement provisions alleged to have been violated or that is in dispute and shall specify in detail the asserting Party's contention and any factual basis for the claim. Senior representatives of both Parties shall meet in person or by phone or other electronic medium within two (2) days of receipt of notice in an effort to resolve the dispute. A failure to meet shall be considered a failure to resolve the dispute and shall invoke Section (b) below.

(b)     <u>Binding Arbitration</u>. After failure to resolve such disputes within two (2) days of notice, either Party may refer a dispute arising under this Agreement to arbitration with the American Arbitration Association (the "<u>AAA</u>"). If the dispute centers around an action of a Party, such action shall be postponed or discontinued during the pendency of the arbitration, provided that the lack of action shall not have a negative impact to the economic value of a Party. The Parties shall endeavor to mutually select one arbitrator from a list of qualified arbitrators, one of whom must have a minimum of five (5) years federal Indian law experience, one of whom must have a minimum of five (5) years experience in financial or banking law, and one to be chosen by the other two and to be provided by the AAA. If the Parties cannot agree on arbitrators within three (3) Business Days, then the arbitrator shall be named by the AAA provided that they have the requisite experience. All hearings and other proceedings for such arbitration shall be held in Marquette, Michigan unless otherwise agreed to by the Parties in writing. The expenses of arbitration charged by the AAA shall be borne equally by the Parties, and each side shall bear its own other costs except that the winning Party may petition the arbitrators to award all or a portion of its expenses incurred in the dispute based on the facts of the dispute. The arbitrator shall determine whether the dispute is arbitrable and shall apply the substantive laws of the State of Delaware as well as the Commercial Arbitration Rules. The arbitrator shall issue a final and binding decision (the "<u>Arbitration Decision</u>") in which the remedies available through arbitration are limited to enforcement of the provisions of this Agreement and any associated equitable or monetary relief. The Arbitration Decision may be enforced as set forth in Section 8.5 (d) below.

(c)     <u>Good Faith</u>. The Party asserting breach or seeking an interpretation of this Agreement under this Section 8.5 shall be deemed to have certified that to the best of such Party's knowledge, information and belief formed after reasonable inquiry, the claim of noncompliance or the request for interpretation of this Agreement is warranted and made in good faith and not for any improper purpose, such as to harass or to cause unnecessary delay or the needless incurring of the cost of resolving the dispute. If the dispute is found to have been initiated in violation of this Section 8.5, then the arbitrator, upon request or upon his or her own initiative, may impose upon the violating Party an appropriate sanction, which may include an award to the other Party of its reasonable expenses incurred in having to participate in the arbitration.

(d)     <u>Enforcement of Arbitration Decision</u>. Notwithstanding any provision of law, either Party to the Agreement may bring an action against the other pursuant to the provisions of this Section 8 solely for the enforcement of the Arbitration Decision. The Parties agree that the Arbitration Decision shall be final, conclusive and binding on the Parties with respect to the matters decided, and shall be complied with by the Parties. In such judicial

-26-

JA850

MARTORELLO_000092

proceedings, neither Party, without the prior written consent of the other Party, shall be entitled to contend that such arbitration award should be vacated, modified or corrected, and the Parties hereby expressly waive all other rights and remedies that might otherwise be available in such judicial proceeding.

(e)  Fast-track Injunctive Relief. Either Party may bring an original action in a court of competent jurisdiction pursuant to this Section 8 to prevent actions by the other Party which could have a Material Adverse Effect if taken. Such injunctive relief may only be taken to maintain the status quo during the Dispute Resolution process set forth in this Section 8.5.

8.6  Attorneys Fees. Except as ordered by an Arbitration Decision or a court of competent jurisdiction for enforcement proceedings, all Parties shall bear their own costs, except that the prevailing party shall be reimbursed all reasonable attorneys' fees, in connection with any dispute resolution or enforcement proceedings authorized under this Agreement. Anything in this Agreement to the contrary notwithstanding, the parties expressly agree that this provision shall survive the termination, for any reason, or expiration of this Agreement and any additional agreement contemplated herein.

8.7  Service of Process. Borrower and Lender hereby consent to any and all process which may be served in any such suit, action or proceeding, (i) by mailing a copy thereof by registered or certified mail, postage prepaid, return receipt requested, to the party's address shown in this Agreement or as notified to Lender and (ii) by serving the same upon Borrower in any other manner otherwise permitted by law, and agrees that such service shall in every respect be deemed effective service upon Borrower.

8.8  **JURY WAIVER. BORROWER AND LENDER EACH HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY, AND AFTER AN OPPORTUNITY TO CONSULT WITH LEGAL COUNSEL, (A) TO THE FULLEST EXTENT ALLOWED BY THE LAWS OF THE STATE OF DELAWARE, WAIVE ANY AND ALL RIGHTS TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING IN CONNECTION WITH THIS AGREEMENT, THE OBLIGATIONS, ALL MATTERS CONTEMPLATED HEREBY AND DOCUMENTS EXECUTED IN CONNECTION HEREWITH AND (B) AGREE NOT TO SEEK TO CONSOLIDATE ANY SUCH ACTION WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE, OR HAS NOT BEEN, WAIVED. BORROWER CERTIFIES THAT NEITHER LENDER NOR ANY OF ITS REPRESENTATIVES, AGENTS OR COUNSEL HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT LENDER WOULD NOT IN THE EVENT OF ANY SUCH PROCEEDING SEEK TO ENFORCE THIS WAIVER OF RIGHT TO TRIAL BY JURY.**

8.9  Irrevocable Waiver. Borrower and each Subsidiary covenants and agrees that each possess the requisite authority from the governing body of the Tribe to give this limited waiver of sovereign immunity and other waivers contained in this Section 8 and that each are irrevocable for one (1) year after termination of all Transaction Documents, or in the Event of Default, for a period not to exceed twelve (12) months after transfer of the Collateral, or for any non-compete period or indemnity period as defined in the Transaction Documents, or for that period of time required to resolve any disputes initiated within the times set forth previously,   whichever is longer. The Borrower and each Subsidiary each agrees not to revoke or limit, in whole or in part, the limited

-27-

JA851

MARTORELLO_000093

waivers of sovereign immunity or other waivers contained in this Section 8.  Borrower and each Subsidiary each hereby consents to the entry of appropriate injunctive relief, consistent with the terms and conditions of this Agreement.

[NO FURTHER TEXT ON THIS PAGE]

JA852

CONFIDENTIAL

MARTORELLO_000094

**IN WITNESS WHEREOF,** the undersigned have executed this Loan and Security Agreement as of the date first above written.

**SELLER:**

**Eventide Credit Acquisitions, LLC**

By: _____

Name: _____

Its: _____

**BORROWER:**

**Tribal Economic Development Holdings, LLC**

By: _____

Name: Michelle Hazen_____

Its: Co-Manager_____

**SUBSIDIARY:**

**Big Picture Loans, LLC**

By: _____

Name: Michelle Hazen_____

Its: Co-Manager and CEO_____

**SUBSIDIARY:**

**Ascension Technolgies, LLC**

By: _____

Name: Brian McFadden

Its: President

Signature Page

CONFIDENTIAL

USCA4 Appeal: 23-2097    Doc: 11-2    Filed: 12/06/2023    Pg: 398 of 493

# Exhibit 46

_____, 2016

## SECURED PROMISSORY NOTE

FOR VALUE RECEIVED, Tribal Economic Development Holdings, LLC (hereinafter "Borrower") an entity wholly owned and operated by the Lac Vieux Desert Band of Lake Superior Chippewa Indians, a federally recognized Indian tribe ("Tribe") and formed pursuant to the laws of the Tribe, unconditionally promises to pay, in the aggregate, to Eventide Credit Acquisitions, LLC, a Delaware limited liability company (hereinafter "Lender"), without any counterclaim, setoff, or deduction whatsoever, Borrower's Obligation (as defined below), provided Borrower shall pay at such other place as Lender may designate to Borrower in writing from time to time, the principal sum equal to the Acquisition Amount ("Note Amount"), together with as is from time to time outstanding and unpaid, from the date of the advance of the principal evidenced hereby, at an interest rate of 1.8% per annum or such other minimum interest rate required under United States tax regulations (the total of which is the "Borrower's Obligation"). All principal and interest shall be paid in lawful money of the United States of America which shall at the time of payment be legal tender in payment of all debts and dues, public and private.

This Secured Promissory Note is made and delivered by Borrower in connection with the acquisition through merger of Bellicose Capital, LLC, a Delaware limited liability company (the "Company") by Borrower's subsidiary, LVD Tribal Acquisition Company, LLC, pursuant to that certain Agreement and Plan of Merger, executed on September 14 , 2015 and effective as of even date herewith among, Borrower, Bellicose Capital, LLC, Eventide Credit Acquisitions, LLC ("ECA") (the "Merger Agreement") and effective as set forth therein. Borrower and Lender may each be referred to as "Party" and collectively as "Parties."

## ARTICLE I - TERMS AND CONDITIONS

1.1   Definitions.  The following terms shall have the meanings as follows and any other capitalized terms used but not defined herein shall have the respective meanings set forth in the Loan and Security Agreement, or if not defined therein, other applicable Transaction Document.

a.   "Bad Debt" shall mean Consumer Loans more than sixty (60) days past due.

b.   "Gross Revenues" shall mean all revenues of any nature derived directly or indirectly from the operation of Borrower and the Subsidiaries plus any bad debt recovery of Borrower or Subsidiaries minus the sum of charge backs and bad debt charge offs.

c.   "Loan and Security Agreement" shall mean that certain Loan and Security Agreement executed by Borrower for the benefit of Lender in the amount of Borrower's Obligations, dated as of the date hereof.

JA855

CONFIDENTIAL

MARTORELLO_000128

d.      "Merger Agreement" shall mean that meaning set forth in the second introductory paragraph of this Agreement.

e.      "Net Cash Available" shall mean as calculated in Section 1.2.

f.      "Prudent Operator" means the standard of care equal to that degree of diligence, skill, prudence and foresight, which is reasonably and ordinarily exercised by experienced market participants engaged in the same line of business under the same or similar circumstances, and the actions resulting from such standard of care being in compliance with the applicable laws and the Transaction Documents.

g.      "Transaction Documents" shall mean this Note, the Loan and Security Agreement, the Parental Guarantee and Sovereign Immunity Waiver and such other agreements, documents, and instruments, together with any and all renewals, modifications, amendments, restatements, consolidations, substitutions, replacements, and extensions and modifications thereof.   All of the terms and provisions of the Transaction Documents are incorporated herein by reference.

1.2      Payment of Principal and Interest. Interest shall be computed hereunder based on a three hundred sixty (360) day year and paid for the actual number of days elapsed for any whole or partial month in which interest is being calculated. Principal and accrued and unpaid interest on this Note shall be payable monthly on the 15th day of the calendar month (each a "Payment Date"), with the amount of each payment equal to the amount of Net Cash Available (as hereinafter defined), if any, beginning on the last day of each calendar month preceding the Payment Date (each a "Calculation Date"). On each Payment Date, Borrower shall pay to Lender an amount equal to the Net Cash Available which payment shall be first applied to Lender's costs associated with an Event of Default (if any) permitted under the terms of the Transaction Documents, then to a reduction of the principal balance of this Note, and then to unpaid interest.  If any Payment Date is not a Business Day, such payment shall be due and payable on the Business Day immediately prior to such Payment Date. As used herein, "Net Cash Available" shall be an amount calculated as follows:

(a)      Gross Revenues deposited in Borrower's and Subsidiaries' accounts.

(b)      Minus the following:

1.      A monthly distribution to the Tribe equal to two percent (2%) of the Gross Revenues until such time as fifty percent (50%) of the Note Amount has been repaid at which time the percentage shall increase from two percent (2%) to four (4%) ("Monthly Distribution"), except that in an Event of Default, the distribution under this provision shall be reduced to zero.

2.      In addition to the Monthly Distribution, a one-time reinvestment amount equal to 1.3 million dollars ($1,300,000), and a monthly reinvestment amount thereafter of two percent (2%) of Gross Revenues shall be paid to the Tribe which shall be reinvested by the Tribe in growing the loan portfolio which shall stay in equity within

JA856

CONFIDENTIAL

MARTORELLO_000129

Borrower or a Subsidiary conducting lending until the termination of this Agreement except that in an Event of Default, the reinvestment amount under this provision shall be reduced to zero.

3.    All interest accrued and scheduled principal payments on any Senior Debt per the terms of the respective debt instrument, and any debt balancing requirements.

4.    Expenses:
    (a)    Ordinary and necessary business expenses that would be reasonably accrued by a Prudent Operator incurred by Borrower or a Subsidiary relative to the operation of the Business incurred from vendors with no affiliation to the Tribe or any Tribal member provided that all work output provided by non-affiliated entities shall not exceed the market price and market service level under which a Prudent Operator would acquire such services.

    (b)    Ordinary and necessary business expenses that would be reasonably accrued by a Prudent Operator relative to operation of the Business incurred by Borrower or a Subsidiary or charged by a vendor affiliated with the Tribe, any Tribal entity or any Tribal member capped by the historical labor costs charged to Borrower or a Subsidiary by previous service providers (calculated by examining the labor costs for the same calendar month in the previous year) plus an annual escalator of five percent (5%), or if a further increase is required for expansion activities, then pursuant to a budget approved by Lender. Borrower agrees that any transaction between it or any Subsidiary and an affiliated entity of the Tribe or Tribal member shall not exceed reasonable market rates. Borrower agrees that it and each Subsidiary shall have a fiduciary duty to the Lender to ensure that neither Borrower nor any Subsidiary or affiliates shall undermine the Parties' intent to maximize the cash flows directed to retire the Note as soon as possible . Notwithstanding the forgoing, nothing in this provision shall limit the reasonable expansion of the Business of the Borrower or any Subsidiary (which the Parties agree does not cause a Material Adverse Effect on the Business) and is a natural evolution of the Business based on industry climate and norms. To ensure that any such expansion does not affect payments under this Note, such expansion shall follow a budget approved by the Lender.

5.    Non-deductible expenses (to be deducted from the Tribal distribution or reinvestment portion at Borrower's choice) include:

    (a)    any tax, fine or other fee including licensing charged by the Tribe except as reasonably required for licensure or regulatory oversight by the Tribal Financial Services Regulatory Authority (the "Authority") or fines or fees assessed against Borrower or a Subsidiary by the Authority except for fines levied against a Subsidiary for the actions of a non-affiliated vendor capped at twenty-five thousand dollars ($25,000) per year;

CONFIDENTIAL

JA857

MARTORELLO_000130

(b)     any award of attorneys fees under the Dispute Resolution provisions of any Transaction Document; and

(c)     any ordinary and necessary expenses not agreed to in Section 4 above and in excess of an aggregate of twenty-five thousand dollars ($25,000)per year , unless otherwise agreed by the Parties, shall be a non-deductible expense.

It shall be considered an Event of Default under the Transaction Documents, if the non-deductible expenses exceed the Tribal distribution or accumulated reinvestment portion.

6.     Reserves allowed to maintain portfolio size as set for in Section 4.4 of the Loan Agreement and Security Agreement, except that in an Event of Default, the amount reserved under this provision shall be reduced to zero.

(c)     Each payment above shall be accompanied by a schedule showing how such payment was calculated. The Lender shall have the right to inspect Borrower's and any Subsidiary's books and records to determine and/or verify the payments due under this Note during regular business hours and upon reasonable notice to Borrower or the respective Subsidiary.

(d)     There shall be a true-up payment to Lender on the first 15th following the date of Close, reflecting the payment that would have been due to any Lender's subsidiary under the Servicing Agreement with Lender's affiliate acquired by Borrower for services provided up to and including the date of Close.

1.3     Term. The term of this Note is seven (7) years from execution.  At the expiration of the term, the remaining balance is forgiven.

1.4     Prepayment. This Note may be prepaid at any time in whole or in part with no prepayment penalty.

1.5     Security. This indebtedness evidenced by this Note, the Transaction Documents, and the obligations created thereby are secured by the Collateral.

1.6     Event of Default. An "Event of Default" shall be deemed to exist upon the occurrences of any item listed in Section 6.1 of the Loan and Security Agreement. Upon the occurrence of an Event of Default, the indebtedness evidenced hereby, including all sums advanced or accrued hereunder or under any other Transaction Document, and all unpaid interest accrued thereon shall, at the option of Lender, at once become due and payable and may be collected forthwith. The remedies of Lender in this Note or in the other Transaction Documents shall be cumulative and concurrent, and may be pursued singly, successively, or together, at Lender's discretion as limited by Section 2.3. In the event this Note, or any part hereof, is collected by or through an attorney-at-law, Borrower agrees to pay all reasonable costs of collection, including, but not limited to, reasonable attorneys' fees.

JA858

CONFIDENTIAL                                                    MARTORELLO_000131

## ARTICLE II - GENERAL CONDITIONS

2.1    No Waiver; Amendment. No failure to accelerate the debt evidenced hereby after an Event of Default, acceptance of a partial or past due payment, or indulgences granted from time to time shall be construed (i) as a novation of this Note or as a reinstatement of the indebtedness evidenced hereby or as a waiver of such right of acceleration or of the right of Lender thereafter to insist upon strict compliance with the terms of this Note, or (ii) to prevent the exercise of such right of acceleration or any other right granted hereunder.  No extension of the time for the payment of this Note or any installment due hereunder, made by agreement with any person now or hereafter liable for the payment of this Note, shall operate to release, discharge, modify, change, or affect the original liability of Borrower and its Subsidiaries under this Note, either in whole or in part, unless Lender agrees otherwise in writing except as provided in Section 1.3. This Note may only be amended by an agreement in writing signed by the Party against whom enforcement of any waiver, change, modification, or discharge is sought.

2.2    Waivers. Presentment for payment, demand, protest and notice of demand, protest, and nonpayment, notice of intent to accelerate maturity, notice of acceleration of maturity, and all other notices are hereby waived by Borrower.

2.3 Limited Waiver Of Sovereign Immunity. Section 8 of the Loan and Security Agreement is incorporated by reference herein *mutatis mutandis*.

2.4    Unconditional Payment. Subject to and as limited by Section 1.2 and 1.3, Borrower is and shall be obligated to pay principal, interest, and any and all other amounts which become payable hereunder or under the other Transaction Documents absolutely and unconditionally and without any abatement, postponement, diminution, or deduction and without any reduction for counterclaim or setoff.

2.5    Further Assurances. Borrower and any Subsidiary shall execute and acknowledge (or cause to be executed and acknowledged) and deliver to Lender all reasonable documents and take all reasonable actions, reasonably required by Lender from time to time to confirm the rights created under this Note and the other Transaction Documents, to protect its rights in the Collateral.  Provided, however, that no such further actions, assurances, and confirmations shall increase, modify, or change Borrower's or any Subsidiary's obligations under this Note or under the other Transaction Documents.

2.6    Miscellaneous. The terms and provisions hereof shall be binding upon and inure to the benefit of Borrower, its Subsidiaries and Lender and their respective permitted successors and assigns. Assignment of any rights and obligations of this Note may only be assigned with the prior written consent of the Parties, not to be unreasonably withheld. As used herein, the terms "Borrower," "Subsidiary" and "Lender" shall be deemed to include their respective permitted successors and assigns. All personal pronouns used herein, whether used in the masculine, feminine or neuter gender, shall include all other genders; the singular shall include the plural and vice versa. Titles of articles and sections are for convenience only and in no way define, limit, amplify, or describe the scope or intent of any provisions hereof. Time is of the essence with respect to all provisions of this Note and the other Transaction Documents. This

JA859

CONFIDENTIAL

MARTORELLO_000132

Note and the other Transaction Documents contain the entire agreement between the Parties hereto relating to the subject matter hereof and thereof, and all prior agreements relative hereto and thereto which are not contained herein or therein are terminated. If any provision under this Note or the application thereof to any entity, person, or circumstance shall be invalid, illegal, or unenforceable to any extent, the remainder of this Note and the application of the provisions hereof to other entities, persons or circumstances shall not be affected thereby and shall be enforced to the fullest extent permitted by law.

2.7   NO ORAL AGREEMENTS. THIS WRITTEN AGREEMENT IS THE FINAL EXPRESSION OF THE AGREEMENT BETWEEN BORROWER AND LENDER AND MAY NOT BE CONTRADICTED BY EVIDENCE OR ANY PRIOR OR CONTEMPORANEOUS ORAL AGREEMENT BETWEEN BORROWER AND LENDER. BORROWER AND LENDER HEREBY AFFIRM THAT THERE IS NO UNWRITTEN ORAL CREDIT AGREEMENT BETWEEN BORROWER AND LENDER WITH RESPECT TO THE SUBJECT MATTER OF THIS WRITTEN AGREEMENT.

2.8   Payments & Notice. Payments will be made through mutually agreeable electronic arrangements.  Any written Notices shall be sent to the Parties at the address set forth in Section 7.12 of the Loan and Security Agreement.

2.9   Counterparts. This Note may be executed in multiple counterparts.  Delivery by any party of an executed counterpart of a signature page to this Note by telecopier, facsimile or portable document format (pdf) shall be effective as delivery of a manually executed counterpart hereof.

[signature page follows]

JA860

CONFIDENTIAL

MARTORELLO_000133

IN WITNESS WHEREOF, the undersigned, intending to be legally bound hereby, have duly executed this Note to be effective as of the day and year first written above.

**TRIBAL ECONOMIC DEVELOPMENT HOLDINGS, LLC**

By: _Michelle Hazen_

Name: Michelle Hazen

Title: Co-Manager

**BIG PICTURE LOANS, LLC**

By: _Michelle Hazen_

Name: Michelle Hazen

Title: Co-Manager, Board of Directors

**ASCENSION TECHNOLOGIES, LLC**

By: _Brian McFadden_

Name: Brian McFadden

Title: President

JA861

CONFIDENTIAL                                                                                 MARTORELLO_000134

# Exhibit 48

# Operating Agreement

## OF

## Breakwater Holding LLC

### A Limited Liability Company

The name of the Company is **Breakwater Holding LLC** referred to in this Operating Agreement as the "Company". The Company was duly incorporated under the laws of Cook Islands as a Limited Liability Company on November 1, 2010.

1.     The registered office of the Company is Asiaciti Trust Pacific Ltd. Level 2, BCI House, Rarotonga, Cook Islands

2.     The Company is incorporated for the purpose of carrying on business as an investment company and any other business that it's Managers may choose to pursue as authorized by the provisions of the Act.

3.     The Company's resident agent is Asiaciti Trust Pacific Ltd. whose office is located at Level 2, BCI House, Rarotonga, Cook Islands.

## ARTICLE I
## DEFINITIONS

When used in this Agreement, the following terms shall have the meanings set forth below (all terms used in this Agreement that are not defined in this Article I shall have the meanings set forth elsewhere in this Agreement):

1.1     "Affiliate" shall mean any individual, partnership, corporation, trust or other entity or association, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with the Member. The term "control," as used in the immediately preceding sentence, means, with respect to a corporation or limited liability company the right to exercise, directly or indirectly, more than fifty percent (50%) of the voting right attributable to the controlled corporation or limited liability company, and, with respect to any individual, partnership, trust, other entity or association, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the controlled entity.

1.2     "Agreement" shall mean this Operating Agreement, as originally executed and as amended from time to time.

1.3     "Articles" shall mean the Articles of Organization for the Company originally filed on November 1, 2010, with the Office of the Registrar of Limited Liability Companies and as amended from time to time.

Page 1

CONFIDENTIAL PURSUANT TO
PARTIES' PROTECTIVE ORDER

JA863

Liont_29434

1.4    "Bankruptcy" shall mean:  (a) the filing of an application by a Member for, or his or her consent to, the appointment of a trustee, receiver, or custodian of his or her other assets; (b) the entry of an order for relief with respect to a Member in proceedings under the United States Bankruptcy Code, as amended or superseded from time to time, or the applicable bankruptcy law of any other jurisdiction in which a Member is subject to voluntary or involuntary bankruptcy proceedings; (c) the making by a Member of a general assignment for the benefit of creditors; (d) the entry of an order, judgment, or decree by any court of competent jurisdiction appointing a trustee, receiver, or custodian of the assets of a Member unless the proceedings and the person appointed are dismissed within ninety (90) days; or (e) the failure by a Member generally to pay his or her debts as the debts become due within the meaning of Section 303 (h)(1) of the United States Bankruptcy Code, as determined by the Bankruptcy Court, or the admission in writing of his or her inability to pay his or her debts as they become due.

1.5    "Capital Account" shall mean with respect to any Member the capital account which the Company establishes and maintains for such Member pursuant to Section 3.3.

1.6    "Capital Contribution" shall mean the total value of cash and fair market value of property (including promissory notes or other obligation to contribute cash or property) contributed and/or services rendered or to be rendered to the Company by Members.

1.7    "Code" shall mean the Internal Revenue Code of 1986, as amended from time to time, the provisions of succeeding law, and to the extent applicable, the Regulations.

1.8    "Company" shall mean Breakwater Holding LLC, a Limited Liability Company.

1.9    "Company Minimum Gain" shall have the meaning ascribed to the term "Partnership Minimum Gain" in the Regulations Section 1.704-2(d).

1.10    "Dissolution Event" shall mean with respect to any Member one or more of the following: the death, insanity, withdrawal, resignation, expulsion, Bankruptcy, dissolution or occurrence of any other event which terminate the continued Membership of any Member unless the other Members consent to continue the business of the Company pursuant to Section 8.1.

1.11    "Distributable Cash" shall mean the amount of cash which the Manager deems available for distribution, taking into account all Company debts, liabilities, and obligations of the Company then due and amounts which the Manager deems necessary to place into reserves for customary and usual claims with respect to the Company's business, and amounts which the Manager deems necessary for company business and objectives.

1.12    "Economic Interest" shall mean a Member's or Economic Interest Owner's share of one or more of the Company's Net Profits, Net Losses, and distributions of the Company's assets pursuant to this Agreement and the Act, but shall not include any other rights of a Member, including, without limitations, the right to vote or participate in the management, or except as provided in the Act, any right to information concerning the business and affairs of Company.

Page 2

CONFIDENTIAL PURSUANT TO
PARTIES' PROTECTIVE ORDER

JA864
Liont_29435

1.13    "Economic Interest Owner" shall mean the owner of an Economic Interest who is not a Member.

1.14    "Fiscal Year" shall mean the Company's fiscal year, which shall be determined by the Members.

1.15    "Majority Interest" shall mean one or more Percentage Interests of Members which taken together exceed fifty percent (50%) of the aggregate of all Percentage Interests.

1.16    "Member" shall mean each Person who (a) is an initial signatory to this Agreement, has been admitted to the Company as a Member in accordance with the Articles or this Agreement or is an assignee who has become a Member in accordance with Article VII and (b) has not resigned, withdrawn, been expelled or, if other than an individual, dissolved.

1.17    "Member Nonrecourse Debt" shall have the meaning ascribed to the term "Partner Nonrecourse Debt" in Regulations Section 1.704-2(b)(4).

1.18    "Member Nonrecourse Deductions" shall mean items of Company Net Losses, deductions, or Code Section 705(a)(2)(b) expenditures which are attributable to Member Nonrecourse Debt.

1.19    "Membership Interest" shall mean a Member's entire interest in the Company including the Member's Economic Interest, the right to vote on or participate in the management, and the right to receive information concerning the business and affairs, of the Company.

1.20    "Net Profits" and "Net Losses" shall mean the income, gain, loss, deductions, and credits of the Company in the aggregate or separately stated, as appropriate, determined in accordance with generally accepted accounting principles employed under the method of accounting at the close of each fiscal year on the Company's information tax return filed for federal income tax purposes.

1.21    "Nonrecourse Liability" shall have the meaning set forth in Regulations Section 1.752-1(a)(2).

1.22    "Percentage Interest" shall mean the percentage of a Member set forth opposite the name of such Member under the column "Member's Percentage Interest" in Exhibit A hereto, as such percentage may be adjusted from time to time pursuant to the terms of this Agreement.  Percentage Interests shall be determined annually, unless otherwise provided herein, in accordance with the relative proportions of the Capital Accounts of the Members, effective as of the first day of the Company's Fiscal Year but with all distributions under this Agreement to be deemed to have occurred on such day immediately prior to determination of the Percentage Interest of a Member.

1.23    "Person" shall mean an individual, general partnership, limited partnership, Limited Liability Company, corporation, trust, estate, real estate investment trust, association or any other entity.

1.24    "Regulations" shall, unless the context clearly indicates otherwise, mean the regulations currently in force as final or temporary that have been issued by the U.S. Department of Treasury pursuant to its authority under the Code.

Page 3

CONFIDENTIAL PURSUANT TO
PARTIES' PROTECTIVE ORDER

JA865
Liont_29436

## ARTICLE II
## MANAGEMENT BY MANAGER

2.1   <u>Designation of Manager</u>

     A.   <u>Single Manager.</u>  The Company will be managed by a Manager.  The first Manager shall be ATP Directors Limited who will serve until either removal by the Members or resignation.

     B.   <u>Removal</u>.  The Members may remove the Manager, without having to possess, state, or prove cause, by

        (i)    a vote of Members holding 75% percent of  the voting power of all Membership interests excluding any voting power held by the Manager whose removal is sought.  The vote must be taken at a properly scheduled meeting of the Members, and a Manager whose removal is sought may not vote, or

        (ii)    written consent of Members holding 75% percent of the voting power of all Membership interests, excluding any voting power held by the Manager whose removal is sought.

            The removal of Manager without stating or proving cause does not bar a later claim that the Manager engaged in misconduct while a Manager.

     C.   <u>Resignation</u>.  The Manager may resign by giving thirty days written notice to all Members.  The resignation takes effect thirty days after the date the Manager gives notice to all Members, or at such other date, earlier or later, as may be agreed between the Members and the Manager.

     D.   <u>Replacement of Manager</u>.  The Members will elect a replacement Manager at a properly scheduled meeting of the Members or by the written consent of Members.   The vote of Members holding 75% of the voting power of all membership interests is necessary to elect a replacement Manager.  In the case of the removal of a Manager under Section 2.1B, the same meeting that votes removal may also elect a replacement Manager.  The replacement Manager must have a professional qualification or experience appropriate to the business of the Company.  Once elected, the replacement Manager will have all of the powers and duties of the initial Manager.

2.2   <u>Authority of the Manager</u>

     A.   <u>Manager's Operational Authority</u>.  The Manager has sole authority to manage the Company and is authorised to make any contracts, enter into any transactions, and make and obtain any commitments on behalf of the Company to conduct or further the Company's business.  This provision does not alter nor waive any duty that the Manager may have to the

Page 4

CONFIDENTIAL PURSUANT TO
PARTIES' PROTECTIVE ORDER

JA866
Liont_29437

Company concerning the Manager's exercise of management authority.

B.   <u>Matters Reserved to the Members</u>.  The Manager has no authority to take any of the following actions, unless first authorized by all Members holding the voting power of the Membership interests, pursuant to a resolution passed at a properly convened meeting of the Members or by written consent of such Members:

(i)   amending these Articles;

(ii)   adopting or amending the operating agreement;

(iii)   admitting new Members;

(iv)   approving transfer of a Members complete interest;

(v)   permitting redemption of a Members interest;

(vi)   delegating management responsibility or authority;

(vii)   approving Members conflict of interest transactions;

(viii)   selling or otherwise disposing of the assets or business undertaking of the Company;

(ix)   merger;

(x)   avoiding dissolution of the Company following the dissociation of a Member.

2.3   Unless otherwise provided in the operating agreement, a Member who is a Manager of the Company must own at all times during the existence of the Company:

A.   an aggregate interest of not less than 1% of the income, gain, loss, deduction, or credit of the company; and

B.   an aggregate interest of not less than 1% in the aggregate of the paid up capital and reserves of the Company.

2.4   <u>Nonliability of Manager for Acts or Omissions in Official Capacity:</u>

To the full extent permitted by law, the Manager is released from liability for damages and other monetary relief.  This release protects a Manager who is also a Member from being required by a court to purchase the Membership interest of another Member who successfully contends that the Manager - Member has committed actionable oppressive acts.  No amendment or repeal of this Article affects any liability or alleged liability of the Manager for any acts, omissions, or conduct that occurred prior to the amendment or repeal.

Page 5

CONFIDENTIAL PURSUANT TO
PARTIES' PROTECTIVE ORDER

JA867
Liont_29438

2.5    <u>No Authority of Members</u>:

Except as authorised by the Manager, no Member has the authority to make any contracts, enter into any transactions, or make any commitments on behalf of the Company.

2.6    <u>Votes by Members</u>.  Any affirmative act by a Member, called for under the Act or the terms of this Agreement, including but not limited to any vote, consent, or approval by such Member shall be disregarded and of no force and effect if such action is the product of duress, coercion, or compulsion by any court or agency having or asserting jurisdiction over the Company, the Manager or any Member.

**ARTICLE III**
**CAPITAL CONTRIBUTIONS**

3.1    <u>Initial Capital Contributions</u>.  Each Member shall contribute such amount as is set forth on Exhibit A as his or her initial Capital Contribution, which Exhibit A shall be revised to reflect any additional contributions contributed in accordance with Section 3.2.

3.2    <u>Additional Capital Contributions</u>.    The Members shall contribute additional capital to the Company in such amounts and at such times as the Members holding a Majority Interest shall determine.  The Members shall contribute such additional capital in proportion to their respective Percentage Interests.  Each Member shall have fourteen (14) days from the date notice is given to contribute his or her share of the additional capital to the Company.  Each Member shall receive a credit to his or her Capital Account in the amount of any additional capital which he or she contributes to the Company.

3.3    <u>Capital Accounts</u>.    The Company shall establish an individual Capital Account for each Member.  The Company shall determine and maintain each Capital Account in accordance with Regulations Section 1.704-1(b)(2)(iv).  If a Member transfers all or a part of his or her Membership Interest in accordance with this Agreement, such Member's Capital Account attributable to the transferred Membership Interest shall carry over to the new owner of such Membership Interest pursuant to Regulations Section 1.704-1(b)(2)(iv)(1).

3.4    <u>No Interest</u>.    No Member shall be entitled to receive any interest on his or her Capital Contributions.

3.5    <u>Failure to Make Contributions</u>.    If a Member does not timely contribute capital when required, that Member shall be in default under this Agreement.  In such event, the non-defaulting Members shall send the defaulting Member written notice of such default, giving him or her fourteen (14) days from the date such notice is given to contribute the entire amount of his or her required capital contribution.  If the defaulting Member does not contribute his or her required capital to the Company within said fourteen (14)-day period, the Manager or those non-defaulting Members who hold a majority of the Percentage Interests held by all non-defaulting Members may elect any one or more of the following remedies:

Page 6

CONFIDENTIAL PURSUANT TO
PARTIES' PROTECTIVE ORDER

JA868
Liont_29439

A.    The non-defaulting Members may advance funds to the Company to cover those amounts which the defaulting Member fails to contribute. Amounts which a non-defaulting Member so advances on behalf of the defaulting Member shall become a loan due and owing from the defaulting Member to such non-defaulting Member and bear interest at the rate of ten percent (10%) per annum, payable monthly. All cash distributions otherwise distributable to the defaulting Member under this Agreement shall instead be paid to the non-defaulting Members making such advances until such advances and interest thereon are paid in full. In any event, any such advances shall be evidenced by a promissory note and be due and payable by the defaulting Member one (1) year from the date that such advance was made. Any amounts repaid shall first be applied to interest and thereafter to principal. Effective upon a Member becoming a defaulting Member, each Member grants to the non-defaulting Members who advance funds under this Section 3.5A a security interest in his or her Economic Interest to secure his or her obligation to repay such advances and agrees to execute and deliver a promissory note as described herein together with a security agreement and such UCC-1 financing statements and assignments of certificates of Membership (or other documents of transfer) as such non-defaulting Members may reasonably request.

B.    The Percentage Interests shall be adjusted, in which event each Member's Percentage Interest shall be a fraction, the numerator of which represents the amount of such Member's Capital Account and the denominator of which represents the sum of all Members' Capital Accounts.

C.    The non-defaulting Members who hold a majority of the Percentage Interests held by all non-defaulting Members may dissolve the Company, in which event the Company shall be wound-up, liquidated and terminated pursuant to Articles VIII and IX.

D.    The Company or the non-defaulting Members may purchase the defaulting Member's entire Membership Interest in accordance with the same terms and conditions as those set forth in Article VIII except that the purchase price shall be an amount equal to eighty percent (80%) of the purchase price determined in accordance with Article VII.

E.    The defaulting Members shall have no right to receive any distributions from the Company until the non-defaulting Members have first received distributions in an amount equal to the additional capital contributed by each non-defaulting Member to the Company plus a cumulative, non-compounded return thereon at the rate of ten percent (10%) per annum.

F.    The defaulting Member shall lose his or her voting and approval rights under the Act, the Articles and this Agreement until such time as the defaulting Member cures the default.

G.    The defaulting Member shall lose his or her ability to actively participate in the management and operations of the Company until such time as the defaulting Member cures the default.

H.    If the defaulting Member does not make a required contribution of property or services, the Company may require the defaulting Member to contribute cash equal to that portion of the fair market value of the contribution that has not been made. This remedy is in addition to, and not in lieu of any other rights, including the right to specific performance, the remedies listed above in this Section 3.5, or any other rights of the Company or its Members under applicable law.

Page 7

CONFIDENTIAL PURSUANT TO
PARTIES' PROTECTIVE ORDER

JA869

Liont_29440

Each Member acknowledges and agrees that the remedies described in this Section 3.5 bear a reasonable relationship to the damages which the Members estimate may be suffered by the Company and the non-defaulting Members by reason of the failure of the defaulting Member to make an additional Capital Contribution and the election of any or all of the above described remedies is not unreasonable under the circumstances existing as of the date hereof.

The election of the Manager or non-defaulting Members, as applicable, to pursue any remedy provided in this Section 3.5 shall not be a waiver or limitation of the right to pursue an additional or different remedy available hereunder or of law or equity with respect to any subsequent default.

## ARTICLE IV
## PROHIBITION ON ISSUE OF BEARER SHARES

4.1     The Company is not permitted to issue any shares to bearer nor issue any share warrants to bearer.  All shares issued by the Company must be entered in the register of Members.

## ARTICLE V
## SHARE CAPITAL

5.1     Contribution of Share Capital

Each Member shall contribute to the Company by way of cash or other consideration acceptable to the Company, the share capital payable on the share or shares allotted to them.  No share in the Company shall be issued until the person subscribing for such share has paid the consideration due in respect of that share.

5.2     Variation of Rights

If at any time the share capital is divided into different classes of shares, the rights attached to any class of share shall not be varied without the written approval of all the Members holding such class of share.  The issue of additional shares of any class of share issued with preferred or other special rights shall constitute a variation of the rights of such class of share.

5.3     Registration of Members and Issue of Share Certificate

No person shall become a Member of the Company until that persons name and address is entered as a Member in the register of Members in accordance with the provisions of the Act. Every person whose name is entered as a Member in the register of Members shall be entitled to receive a share certificate under the seal of the Company in accordance with the provisions of the Act.

Page 8

CONFIDENTIAL PURSUANT TO
PARTIES' PROTECTIVE ORDER

JA870
Liont_29441

# ARTICLE VI
## ALLOCATIONS OF NET PROFITS AND NET LOSSES AND DISTRIBUTIONS

6.1    Allocations of Net Profit and Net Loss.

A.    Net Loss.    Net Loss shall be allocated to the Members in proportion to their Percentage Interests.        Notwithstanding the previous sentence, loss allocations to a Member shall be made only to the extent that such loss allocations will not create a deficit Capital Account balance for that Member in excess of an amount, if any, equal to such Member's share of Company Minimum Gain that would be realized on a foreclosure of the Company's property.  Any loss not allocated to a Member because of the foregoing provision shall be allocated to the other Members (to the extent the other Members are not limited in respect of the allocation of losses under this Section 6.1).  Any loss reallocated under this Section 6.1A shall be taken into account in computing subsequent allocations of income and losses pursuant to this Article VI, so that the net amount of any item so allocated and the income, gain and losses allocated to each Member pursuant to this Article VI, to the extent possible, shall be equal to the net amount that would have been allocated to each such Member pursuant to this Article VI if no reallocation of losses had occurred under this Section 6.1A.

B.    Net Profit.        Net Profit shall be allocated to the Members in proportion to their Percentage Interests.

6.2    A.    Minimum Gain Chargeback.    Notwithstanding Section 6.1, if there is a net decrease in Company Minimum Gain during any Fiscal Year, each Member shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, in subsequent fiscal years) in an amount equal to the portion of such Member's share of the net decrease in Company Minimum Gain that is allocable to the disposition of Company property subject to a Nonrecourse Liability, which share of such net decrease shall be determined in accordance with Regulations Section 1.704-2(g)(2).  Allocations pursuant to this Section 6.2A shall be made in proportion to the amounts required to be allocated to each Member under this Section 6.2A.  The items to be so allocated shall be determined in accordance with Regulations Section 1.704-2(f).  This Section 6.2A is intended to comply with the minimum gain chargeback requirement contained in Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

B.    Chargeback of Minimum Gain Attributable to Member Nonrecourse Debt. Notwithstanding Section 6.1 of this Agreement, if there is a net decrease in Company Minimum Gain attributable to a Member Nonrecourse Debt, during any Fiscal Year, each Member who has a share of the Company Minimum Gain attributable to such Member Nonrecourse Debt (which share shall be determined in accordance with Regulations Section 1.704-2(i)(5)) shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, in subsequent Fiscal Years) in an amount equal to that portion of such Member's share of the net decrease in Company Minimum Gain attributable to such Member Nonrecourse Debt that is allocable to the disposition of Company property subject to such Member Nonrecourse Debt (which share of such net decrease shall be determined in accordance with Regulations Section 1.704-2(i)(4)).  This Section 6.2B is intended to comply with the minimum gain chargeback requirement contained in Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

Page 9

CONFIDENTIAL PURSUANT TO
PARTIES' PROTECTIVE ORDER

JA871
Liont_29442

C.  Nonrecourse Deductions.   Notwithstanding Section 6.1, any nonrecourse deductions (as defined Regulations Section 1.704-2(b)(1) for any Fiscal Year or other period shall be specially allocated to the Members in proportion to their Percentage Interests.

D.  Member Nonrecourse Deductions.      Notwithstanding Section 6.1, those items of Company loss, deduction, or Code Section 705(a)(2)(B) expenditures which are attributable to Member Nonrecourse Debt for any Fiscal Year or other period shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such items are attributable in accordance with Regulations Section 1.704-2(i).

E.  Qualified Income Offset.      Notwithstanding Section 6.1, if a Member unexpectedly receives any adjustments, allocations, or distributions described in Regulations Section 1.704-1(b)(2)(ii)(d)(4),(5) or (6), or any other event creates a deficit balance in such Member's Capital Account in excess of such Member's share of Company Minimum Gain, items of Company income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate such excess deficient balance as quickly as possible.  Any special allocations of items of income and gain pursuant to this Section 6.2E shall be taken into account in computing subsequent allocations of income and gain pursuant to this Article VI so that the net amount of any item so allocated and the income, gain, and losses allocated to each Member pursuant to this Article VI to the extent possible, shall be equal to the net amount that would have been allocated to each such Member pursuant to the provisions of this Section 6.2E if such unexpected adjustments, allocations, or distributions had not occurred.

6.3    Code Section 704(c) Allocations.    Notwithstanding any other provision in this Article VI, in accordance with Code Section 704(c) and the Regulations promulgated thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its fair market value on the date of contribution.  Allocations pursuant to this Section 6.3 are solely for purposes of federal, state and local taxes.  As such, they shall not affect or in any way be taken into account in computing a Member's Capital Account or share of profits, losses, or other items of distributions pursuant to any provision of this Agreement.

6.4    Allocation of Net Profits and Losses and Distributions in Respect of a Transferred Interest.   If any Membership Interest is transferred, or is increased or decreased by reason of the admission of a new Member or otherwise, during any Fiscal year of the Company, each item of income, gain, loss, deduction, or credit of the Company for such Fiscal Year shall be assigned pro rata to each day in the particular period of such fiscal year to which such item is attributable (i.e., the day on or during which it is accrued or otherwise incurred) and the amount of each such item so assigned to any such day shall be allocated to the Member based upon his or her respective Membership Interest at the close of such day.

However, for the purpose of accounting convenience and simplicity, the Company shall treat a transfer of, or an increase or decrease in, a Membership Interest which occurs at any time during a semi-monthly period (commencing with the semi-monthly period including the date hereof) as having been consummated on the last day of such semi-monthly period, (i.e., sales and dispositions

Page 10

CONFIDENTIAL PURSUANT TO
PARTIES' PROTECTIVE ORDER

made during the first fifteen (15) days of any month will be deemed to have been made on the 15th day of the month).

Notwithstanding any provision above to the contrary, gain or loss of the Company realized in connection with a sale or other disposition of any of the assets of the Company shall be allocated solely to the parties owning Membership Interests as of the date such sale or other disposition occurs.

6.5    Distribution of Assets by the Company.    Subject to applicable law and any limitations contained elsewhere in this Agreement, the Members may elect from time to time to distribute Distributable Cash to the Members, which distributions shall be in the following order of priority:

A.    To the Members in proportion to their unreturned Capital Contributions until each Member has recovered his or her Capital Contributions; and

B.    To the Members in proportion to their Percentage Interests.

All such distributions shall be made only to the Persons who, according to the books and records of the Company, are the holders of record of the Economic Interests in respect of which such distributions are made on the actual dates of distribution. Neither the Company nor any officer shall incur any liability for making distributions in accordance with this Section 6.5.

6.6    Form of Distribution.    A Member, regardless of the nature of the Member's Capital Contribution, has no right to demand and receive any distribution from the Company in any form other than money. No Member may be compelled to accept from the Company a distribution of any asset in kind in lieu of a proportionate distribution of money being made to other Members. Except upon dissolution and the winding up of the Company, no Member may be compelled to accept a distribution of any asset in kind.

6.7    Restriction on Distributions.

A.    No distribution shall be made if, after giving effect to the distribution:

(i)    The Company would not be able to pay its debts as they become due in the usual course of business.

(ii)    The Company's total assets would be less than the sum of its total liabilities plus, unless this Agreement provides otherwise, the amount that would be needed, if the Company were to be dissolved at the time of the distribution, to satisfy the preferential rights of other Members, if any, upon dissolution that are superior to the rights of the Member receiving the distribution.

B.    The Members may base a determination that a distribution is not prohibited on any of the following:

(i)    Financial statements prepared on the basis of accounting practices and principles that are reasonable in the circumstances.

Page 11

CONFIDENTIAL PURSUANT TO
PARTIES' PROTECTIVE ORDER

JA873
Liont_29444

USCA4 Appeal: 23-2097 Doc: 11-2 Filed: 12/06/2023 Pg: 418 of 493

    (ii)    A fair valuation.

    (iii)    Any other method that is reasonable in the circumstances.

Except as otherwise provided in the Act, the effect of a distribution is measured as of the date the distribution is authorized if the payment occurs within 120 days after the date of authorization, or the date payment is made if it occurs more than 120 days of the date of authorization.

6.8    <u>Return of Distributions</u>.    Except for distributions made in violation of the Act or this Agreement, no Member or Economic Interest Owner shall be obligated to return any distribution to the Company or pay the amount of any distribution for the account of the Company by a Member or Economic Interest Owner or paid by a Member or Economic Interest Owner for the account of the Company or to a creditor of the Company shall be added to the account or accounts from which it was subtracted when it was distributed to the Member or Economic Interest Owner.

6.9    <u>Obligations of Members to Report Allocations</u>.    The Members are aware of the income tax consequences of the allocations made by this Article VI and hereby agree to be bound by the provisions of this Article VI in reporting their shares of Company income and loss for income tax purposes.

**ARTICLE VII**
**TRANSFER AND ASSIGNMENT OF INTERESTS**

7.1    <u>Transfer and Assignment of Interests</u>.    No Member shall be entitled to transfer, assign, convey, sell, encumber or in any way alienate all or any part of his or her Membership Interest except with the prior written consent of all of the other Members and the Manager, which consent may be given or withheld, conditioned or delayed (as allowed by this Agreement or the Act), as the other Members may determine in their sole discretion. Transfers in violation of this Article VII shall only be effective to the extent set forth in Section 7.7. After the consummation of any transfer of any part of a Membership Interest, the Membership Interest so transferred shall continue to be subject to the terms and provisions of this Agreement and any further transfers shall be required to comply with all the terms and provisions of this Agreement.

7.2    <u>Further Restrictions on Transfer of Interests</u>.    In addition to other restrictions found in this Agreement, no Member shall transfer, assign, convey, sell, encumber or in any way alienate all or any part of his or her Membership Interest: (i) without compliance with this Article VII, and (ii) if the Membership Interest to be transferred, assigned, sold or exchanged, when added to the total of all other Membership Interests sold or exchanged in the preceding twelve (12) consecutive months prior thereto, would cause the termination of the Company under the Code, as determined by the Manager.

7.3    <u>Substitution of Members</u>.    A transferee of a Membership Interest shall have the right to become a substitute Member only if (i) the requirement of Sections 7.1 and 7.2 relating to unanimous consent of Members, securities and tax requirement hereof are met, (ii) such transferee executes an instrument satisfactory to the Members accepting and adopting the terms and provisions of this Agreement, and (iii) such transferee pays any reasonable expenses in connection with his or her

Page 12

CONFIDENTIAL PURSUANT TO
PARTIES' PROTECTIVE ORDER

Llont_29445

admission as a new Member. The admission of substitute Member shall not result in the release of the Member who assigned the Membership Interest from liability that such Member may have to the Company.

7.4   Family and Affiliate Transfers.   The Economic Interest of any Member may be transferred subject to compliance with Section 7.2, and without the prior written consent of all Members and Manager as required by Section 7.1, upon consent of the Members, which shall not be unreasonably withheld, by the Member (i) by inter vivos gift or by testamentary transfer to any spouse, parent, sibling, in-law, child or grandchild of the Member, or to a trust for the benefit of the Member or such spouse, parent, sibling, in-law, child or grandchild of the Member, or (ii) to any affiliate of the Member; it being agreed that in executing this Agreement, each Member has consented to such transfers.

7.5   Effective Date of Permitted Transfers.   Any permitted transfer of all or any portion of a Membership Interest shall be effective following the date upon which the requirement of Sections 7.1, 7.2 and 7.3 have been met. Any transferee of a Membership Interest shall take subject to the restrictions on transfer imposed by this Agreement.

7.6   Rights of Legal Representatives.   If a Member who is an individual dies or is adjudged by a court of competent jurisdiction to be incompetent to manage the Member's personal property, the Member's executor, administrator, guardian, conservator, or other legal representative may exercise all of the Member's rights for the purpose of settling the Member's estate or administering the Member's property, including any power the Member has under the Articles or this Agreement to give an assignee the right to become a Member. If a Member is a corporation, trust, or other entity and is dissolved or terminated, the powers of that Member may be exercised by his or her legal representative or successor.

7.7   No Effect to Transfers in Violation of Agreement.   Upon any transfer of a Membership Interest in violation of this Article VII, the transferee shall have no right to vote or participate in the management of the business, property and affairs of the Company or to exercise any rights of a Member. Such transferee shall only be entitled to become an Economic Interest Owner and thereafter shall only receive the share of the Company's Net Profits, Net Losses and distributions of the Company's assets to which the transferor of such Economic Interest would otherwise be entitled. Notwithstanding the immediately preceding sentences, if, in the determination of the Members, a transfer in violation of this Article VII would cause the termination of the Company under the Code, in the sole discretion of the Members and the Manager, the transfer shall be null and void and the purported transferee shall not become either a Member or an Economic Interest Owner.

Upon and contemporaneously with any involuntary transfer, assignment, conveyance or sale (whether arising out of an attempted charge upon that Member's Economic Interest by judicial process, a foreclosure by a creditor of the Member or otherwise) of a Member's Economic Interest which does not at the same time transfer the balance of the rights associated with the Membership Interest transferred by the Member (including, without limitation, the rights of the Member to vote or participate in the management of the business, property and affairs of the Company), the Company at its option, by majority vote of the Members, shall purchase from the Member, and the Member shall sell to the Company for a purchase price of $100, all remaining rights and interests retained by the

Page 13

JA875
Liont_29446

Member that immediately before the transfer, assignment, conveyance or sale were associated with the transferred Economic Interest. Such purchase and sale shall not, however, result in the release of the Member from any liability to the Company as a Member.

Each Member acknowledges and agrees that the right of the Company to purchase such remaining rights and interests from a Member who transfers a Membership Interest in violation of this Article VII is not unreasonable under the circumstances existing as of the date hereof.

7.8    Right of First Refusal.    Each time a Member proposes to transfer, assign, convey, sell, encumber or in any way alienate all or any part of his or her Membership Interest (or required by operation of law or other involuntary transfer to do so) other than pursuant to Section 7.4, such Member shall first offer such Membership Interest to the Company and the non-transferring Members in accordance with the following provisions:

A.    Such Member shall deliver a written notice to the Company and the other Members stating (i) such Member's bona fide intention to transfer such Membership Interest, (ii) the name and address of the proposed transferee, (iii) the Membership Interest to be transferred, and (iv) the purchase price in terms of payment for which the Member proposes to transfer such Membership Interest.

B.    Within thirty (30) days after receipt of the notice described in Section 7.8A, each non-transferring Member shall notify the selling Member in writing of his or her desire to purchase a portion of the Membership Interest being so transferred. The failure of any Member to submit a notice within the applicable period shall constitute an election on the part of the Member not to purchase any of the Membership Interest which may be so transferred. Each Member so electing to purchase shall be entitled to purchase a portion of such Membership Interest in the same proportion that the Percentage Interest of such Member bears to the aggregate of the Percentage Interests of all of the Members electing to so purchase the Membership Interest being transferred, and the Company may purchase any remaining share of such Membership Interest.

C.    Within ninety (90) days after receipt of the notice described in Section 7.8A the Company and the Members electing to purchase such Membership Interest shall have the first right to purchase or obtain such Membership Interest upon the price and terms of payment designated in such notice. If such notice provides for the payment of non-cash consideration, the Company and such purchasing Members each may elect to pay the consideration in cash equal to the good faith estimate of the present fair market value of the non-cash consideration offered as determined by the officers of the Company.

D.    If the Company or the other Members elect not to purchase or obtain all of the Membership Interest designated in such notice, then the transferring Member may transfer the Membership Interest described in the notice to the proposed transferee, providing such transfer (i) is completed within thirty (30) days after the expiration of the Company's and the other Members' right to purchase such Membership Interest, (ii) is made on terms not less than those specified in the notice provided for under Section 7.8A and the proper consent of the Members and appropriate securities and tax requirements are met. If such Membership Interest is not so transferred, the transferring Member must give notice in accordance with this Section prior to any other or

Page 14

CONFIDENTIAL PURSUANT TO
PARTIES' PROTECTIVE ORDER

JA876
Liont_29447

subsequent transfer of such Membership Interest.

## ARTICLE VIII
## DISSOLUTION

8.1    Dissolution Upon the Occurrence of Specified Events

The occurrence of any of the following events or conditions will cause the Company to dissolve automatically:

A.    when the period fixed for the duration of the Company shall expire;

B.    by the unanimous written agreement of all Members of the Company;

C.    subject to any contrary provisions in these Articles, upon the redemption, repurchase or cancellation of all the shares of any Member of the Company;

D.    upon the transfer of any share or other interest in the Company in contravention of these Articles;

E.    upon the dissociation of a Member through death, retirement, resignation, expulsion, bankruptcy, or dissolution or occurrence of any other event which terminates the continued Membership of any Member in the Company.  Except for prior amendment to this article, no act by the Company or its Members can avoid that dissolution.

8.2    Dissolution and Dissolution Avoidance Following the Dissociation of a Member

A.    <u>Dissociation Defined</u>.  "Dissociation of a Member" or "dissociation" occurs when the Company has notice or knowledge of an event as specified in Articles 8 or 9 that has terminated a Member's continued Membership in the Company.

B.    <u>Means of Avoiding Dissolution Following Member Dissociation</u>.

(i)    To avoid dissolution under Article 8.1, the Company must have at least two remaining Members.  If a dissociation leaves the Company with only one remaining Member, that Member may admit an additional Member.

(ii)    In addition dissolution is avoided upon the dissociation of a Member if the business of the Company is continued by the consent of all the remaining Members within 90 days following the occurrence of any such event or pursuant to a right to do so specified in these Articles or the operating agreement.  The consent may be by vote at a properly called meeting of Members or in writing.

Page 15

CONFIDENTIAL PURSUANT TO
PARTIES' PROTECTIVE ORDER

JA877
Liont_29448

## ARTICLE IX
## LIQUIDATION

9.1    Liquidation

Upon dissolution of the Company pursuant to Article 8.01 the Manager - Member, if any, shall be appointed the liquidator of the Company and in the event that the Manager is not a Member, a majority of the remaining Members shall appoint a liquidator of the Company.

## ARTICLE X
## ACCOUNTING, RECORDS, REPORTING BY MEMBERS

10.1    Books and Records.    The books and records of the Company shall be kept, and the financial position and the results of its operations recorded, in accordance with the accounting methods followed for federal income tax purposes. The books and records of the Company shall reflect all the Company transactions and shall be appropriate and adequate for the Company business. The Company shall maintain at its principal office all of the following:

A.    A current list of the full name and last known business or residence address of each Member and Economic Interest Owner set forth in alphabetical order, together with the Capital Contributions, Capital Account and Percentage Interest of each Member and Economic Interest Owner;

B.    A copy of the Articles and any and all amendments thereto together with executed copies of any powers of attorney pursuant to which the Articles or any amendments thereto have been executed;

C.    Copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the six most recent taxable years;

D.    A copy of this Agreement and any and all amendments thereto together with executed copies of any powers of attorney pursuant to which this Agreement or any amendments thereto have been executed;

E.    Copies of the financial statements of the Company, if any, for the six most recent Fiscal Years; and

F.    The Company's books and records as they relate to the internal affairs of the Company for at least the current and past four Fiscal Years.

10.2    Bank Accounts.    The Company shall maintain the funds of the Company in one or more separate bank accounts in the name of the Company, and shall not permit the funds of the Company to be commingled in any fashion with the funds of any other Person.

Page 16

CONFIDENTIAL PURSUANT TO
PARTIES' PROTECTIVE ORDER

JA878
Liont_29449

10.3    Accounting Decisions and Reliance on Others.    All decisions as to accounting matters, except as otherwise specifically set forth herein, shall be made by the Members. The Members may rely upon the advice of their accountants as to whether such decisions are in accordance with accounting methods followed for federal income tax purposes.

## ARTICLE XI
## INDEMNIFICATION AND INSURANCE

11.1    Indemnification of Agents.    The Company shall indemnify any Person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding by reason of the fact that he or she is or was a Member, officer, employee or agent, he or she is or was serving at the request of the Company as a Manager, director, officer, employee or other agent of another limited liability company, corporation, partnership, joint venture, trust or other enterprise (all such persons being referred to hereinafter as an "agent"), to the fullest extent permitted by applicable law in effect on the date hereof and to such greater extent as applicable law may hereafter from time to time permit. The Members shall be authorized, on behalf of the Company, to enter into indemnity agreements from time to time with any Person entitled to be indemnified by the Company hereunder, upon such terms and conditions as the Members deem appropriate in their business judgment.

11.2    Insurance.    The Company shall have the power to purchase and maintain insurance on behalf of any Person who is or was an agent of the Company against any liability asserted against such Person and incurred by such Person in any such capacity, or arising out of such Person's status as an agent, whether or not the Company would have the power to indemnify such Person against such liability under the provisions of this Agreement or under applicable law.

## ARTICLE XII
## MISCELLANEOUS

12.1    Complete Agreement.    This Agreement and the Articles constitute the complete and exclusive statement of agreement among the Members with respect to the subject matter herein and therein and replace and supersede all prior written and oral agreements or statements by and among the Members or any of them. No representation, statement, condition or warranty not contained in this Agreement or the Articles will be binding on the Members or have any force or effect whatsoever. To the extent that any provision of the Articles conflict with any provision of this Agreement, the Articles shall control.

12.2    Binding Effect.    Subject to the provisions of this Agreement relating to transferability, this Agreement shall be binding upon and inure to the benefit of the Members, and their respective successors and assigns.

12.3    Parties in Interest.    Except as expressly provided in the Act, nothing in this Agreement shall confer any rights or remedies under or by reason of this Agreement on any Persons other than the Members and their respective successors and assigns nor shall anything in this Agreement relieve or discharge the obligation or liability of any third Person to any party to this Agreement, nor shall any provision give any third Person any right of subrogation or action over or against any party to this Agreement.

Page 17

CONFIDENTIAL PURSUANT TO
PARTIES' PROTECTIVE ORDER

JA879
Liont_29450

12.4    Pronouns; Statutory References.    All pronouns and all variations thereof shall be deemed to refer to the masculine, feminine, or neuter, singular or plural, as the context in which they are used may require.  Any reference to the Code, the Regulations, the Act, or other statutes or law will include all amendments, modifications, or replacements of the specific sections and provisions concerned.

12.5    Headings.    All headings herein are inserted only for convenience and ease of reference and are not to be considered in the construction or interpretation of any provision of this Agreement.

12.6    Interpretation.    In the event any claim is made by any Member relating to any conflict, omission or ambiguity in this Agreement, no presumption or burden of proof or persuasion shall be implied by virtue of the fact that this Agreement was prepared by or at the request of a particular Member or his her counsel.

12.7    References to this Agreement.    Numbered or lettered articles, sections and subsections herein contained refer to articles, sections and subsections of this Agreement unless otherwise expressly stated.

12.8    Exhibits.    All Exhibits attached to this Agreement are incorporated and shall be treated as if set forth herein.

12.9    Severability.    If any provision of this Agreement or the application of such provision to any Person or circumstance shall be held invalid, the remainder of this Agreement or the application of such provision to persons or circumstances other than those to which it is held invalid shall not be affected thereby.

12.10    Additional Documents and Acts.    Each Member agrees to execute and deliver such additional documents and instruments and to perform such additional acts as may be necessary or appropriate to effectuate, carry out and perform all of the terms, provisions, and conditions of this Agreement and the transactions contemplated hereby.

12.11    Notices.    Any notice to be given or to be served upon the Company or any party hereto in connection with this Agreement must be in writing (which may include facsimile) and shall be deemed to have been given and received when delivered to the address specified by the party to receive the notice.  Such notices shall be given to a Member at the address specified in Exhibit A hereto.  Any party may, at any time by giving five (5) days prior written notice to the other parties, designate any other address in substitution of the foregoing address to which such notice will be given.

12.12    Amendments.    All amendments to this Agreement shall be in writing and signed by all the Members with the written consent of the Manager.

12.13    Reliance on Authority of Person Signing Agreement.    If a Member is not a natural Person, neither the Company nor any Member will (a) be required to determine the authority of

Page 18

CONFIDENTIAL PURSUANT TO
PARTIES' PROTECTIVE ORDER

JA880
Liont_29451

the individual signing this Agreement to make any commitment or undertaking on behalf of such entity or to determine any fact or circumstances bearing upon the existence of the authority of such individual or (b) be responsible for the application or distribution of proceeds paid or credited to individual signing this Agreement on behalf of such entity.

12.14  <u>No Interest in Company Property:  Waiver of Action for Partition</u>.    No Member or Economic Interest Owner shall have any interest in specific property of the Company.  Without limiting the foregoing, each Member and Economic Interest Owner irrevocably waives during the term of the Company any right that he or she may have to maintain any action for partition with respect to the property of the Company.

12.15  <u>Multiple Counterparts</u>.    This Agreement may be executed in two or more counterparts, each of which shall be deemed original, but all of which shall constitute one and the same instrument.

12.16  <u>Attorney Fees</u>.    In the event that any dispute between the Company and the Members or among the Members should result in litigation or arbitration, the prevailing party in such dispute shall be entitled to recover from the other party all reasonable fees, costs and expenses of enforcing any right of the prevailing party, including without limitation, reasonable attorney's fees and expenses.

12.17   <u>Time is of the Essence</u>.    All dates and times in this Agreement are of the essence.

12.18  <u>Remedies Cumulative</u>.    The remedies under this Agreement are cumulative and shall not exclude any other remedies to which any person may be lawfully entitled.

MEMBER:
M. Martorello Irrevocable Trust
Guardian Trust, Trustee

_____
ATP Secretaries by its duly authorized signatory

_____
ATP Secretaries by its duly authorized signatory


MANAGER:
A.T.P. Directors Limited
By Its Duly Authorized Officer

_____
For and on behalf of the Company

Page 19

CONFIDENTIAL PURSUANT TO
PARTIES' PROTECTIVE ORDER

JA881
Liont_29452

## EXHIBIT "A"

## CAPITAL CONTRIBUTION OF MEMBERS AND ADDRESSES OF MEMBERS

## BREAKWATER HOLDING LLC

| Member's Name & Address | Member's Capital Contribution | Member's Percentage Interest |
|---|---|---|
| M. Martorello Irrevocable Trust 355 E. Ohio Street, Unit 4909 Chicago, Illinois 60611 | $100 | 100 % |

Page 20

CONFIDENTIAL PURSUANT TO
PARTIES' PROTECTIVE ORDER

JA882
Llont_29453

# Exhibit 49

**Fill in this information to identify the case:**

Debtor name    **Eventide Credit Acquisitions, LLC**

United States Bankruptcy Court for the:    NORTHERN DISTRICT OF TEXAS

Case number (if known)    **20-40349-11**

☐ Check if this is an amended filing

# Official Form 207
## Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy    04/19

The debtor must answer every question. If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and case number (if known).

**Part 1:**    Income

1. **Gross revenue from business**

   ☐ None.

   | Identify the beginning and ending dates of the debtor's fiscal year, which may be a calendar year | Sources of revenue<br>Check all that apply | Gross revenue<br>(before deductions and exclusions) |
   |---|---|---|
   | **From the beginning of the fiscal year to filing date:**<br>From **1/01/2020** to **Filing Date** | ■ Operating a business<br>☐ Other _____ | **$0.00** |
   | **For prior year:**<br>From **1/01/2019** to **12/31/2019** | ■ Operating a business<br>☐ Other _____ | **$128,301.29** |
   | **For year before that:**<br>From **1/01/2018** to **12/31/2018** | ■ Operating a business<br>☐ Other _____ | **$338,984.48** |

2. **Non-business revenue**
   Include revenue regardless of whether that revenue is taxable. *Non-business income* may include interest, dividends, money collected from lawsuits, and royalties. List each source and the gross revenue for each separately. Do not include revenue listed in line 1.

   ■ None.

   | Description of sources of revenue | Gross revenue from each source<br>(before deductions and exclusions) |
   |---|---|
   | | |

**Part 2:**    List Certain Transfers Made Before Filing for Bankruptcy

3. **Certain payments or transfers to creditors within 90 days before filing this case**
   List payments or transfers--including expense reimbursements--to any creditor, other than regular employee compensation, within 90 days before filing this case unless the aggregate value of all property transferred to that creditor is less than $6,825. (This amount may be adjusted on 4/01/22 and every 3 years after that with respect to cases filed on or after the date of adjustment.)

   ☐ None.

   | Creditor's Name and Address | Dates | Total amount of value | Reasons for payment or transfer<br>*Check all that apply* |
   |---|---|---|---|

| Debtor | **Eventide Credit Acquisitions, LLC** | Case number (if known) | 20-40349-11 |
|---|---|---|---|

| Creditor's Name and Address | Dates | Total amount of value | Reasons for payment or transfer<br>*Check all that apply* |
|---|---|---|---|
| 3.1. **American Arbitration Association**<br>9 Greenway Plaza #1275<br>Houston, TX 77046 | 12/18/2019 | $14,000.00 | ☐ Secured debt<br>☐ Unsecured loan repayments<br>☐ Suppliers or vendors<br>■ Services<br>☐ Other___ |
| 3.2. **Bowman & Brooke LLP**<br>5830 Granite Pkwy #1000<br>Plano, TX 75024 | 01/08/2020<br>$6,540.00<br>01/17/2020<br>$6,240.00 | $12,780.00 | ☐ Secured debt<br>☐ Unsecured loan repayments<br>☐ Suppliers or vendors<br>■ Services<br>☐ Other___ |
| 3.3. **Holland & Knight LLP**<br>200 Crescent Ct #1600<br>Dallas, TX 75201 | 12/2/2019 | $33,328.83 | ☐ Secured debt<br>☐ Unsecured loan repayments<br>☐ Suppliers or vendors<br>■ Services<br>☐ Other___ |
| 3.4. **The MCS Group, Inc.**<br>1601 Market St., Suite 800<br>Philadelphia, PA 19103 | 12/04/2019<br>$21,024.36<br>12/25/2019<br>$15,745.32<br>01/06/2020<br>$32,560.38 | $69,330.06 | ☐ Secured debt<br>☐ Unsecured loan repayments<br>☐ Suppliers or vendors<br>■ Services<br>☐ Other___ |
| 3.5. **Spotts Fain, P.C.**<br>411 East Franklin St., Suite 600<br>Richmond, VA 23219 | 12/3/2019<br>$83,608.97<br>1/13/2020  $ 3,172.00<br>1/13/2020  $ 960.00<br>1/17/2020<br>$21,496.00 | $109,236.97 | ☐ Secured debt<br>☐ Unsecured loan repayments<br>☐ Suppliers or vendors<br>■ Services<br>☐ Other___ |
| 3.6. **Pepper Hamilton**<br>3000 Two Logan Square<br>Philadelphia, PA 19103 | 12/03/2019<br>$549.50<br>01/17/2020<br>$8,409.00 | $8,958.50 | ☐ Secured debt<br>☐ Unsecured loan repayments<br>☐ Suppliers or vendors<br>■ Services<br>☐ Other___ |
| 3.7. **Van Ness Feldman LLP**<br>1050 Thomas Jefferson St NW<br>Washington, DC 20007 | 1/17/2020<br>$43,968.60 | $43,968.60 | ☐ Secured debt<br>☐ Unsecured loan repayments<br>☐ Suppliers or vendors<br>■ Services<br>☐ Other___ |
| 3.8. **Greer Walker LLP**<br>227 W. Trade Street<br>Suite 110<br>Charlotte, NC 28202 | 1/6/2020<br>$15,472.00 | $15,472.00 | ☐ Secured debt<br>☐ Unsecured loan repayments<br>☐ Suppliers or vendors<br>☐ Services<br>☐ Other___ |

| Debtor | **Eventide Credit Acquisitions, LLC** | Case number *(if known)* | **20-40349-11** |
|---|---|---|---|

| | Creditor's Name and Address | Dates | Total amount of value | Reasons for payment or transfer *Check all that apply* |
|---|---|---|---|---|
| 3.9. | **Shraiberg, London & Page P.A.**<br>**2385 NW Executive Center Dr**<br>**Suite 300**<br>**Boca Raton, FL 33431** | 12/3/2019<br>$7,880 | $7,888.00 | ☐ Secured debt<br>☐ Unsecured loan repayments<br>☐ Suppliers or vendors<br>☐ Services<br>☐ Other___ |

**4. Payments or other transfers of property made within 1 year before filing this case that benefited any insider**

List payments or transfers, including expense reimbursements, made within 1 year before filing this case on debts owed to an insider or guaranteed or cosigned by an insider unless the aggregate value of all property transferred to or for the benefit of the insider is less than $6,825. (This amount may be adjusted on 4/01/22 and every 3 years after that with respect to cases filed on or after the date of adjustment.) Do not include any payments listed in line 3. *Insiders* include officers, directors, and anyone in control of a corporate debtor and their relatives; general partners of a partnership debtor and their relatives; affiliates of the debtor and insiders of such affiliates; and any managing agent of the debtor. 11 U.S.C. § 101(31).

☐ None.

| | Insider's name and address<br>Relationship to debtor | Dates | Total amount of value | Reasons for payment or transfer |
|---|---|---|---|---|
| 4.1. | **See attached SOFA 4/13/30**<br>**Payments to Insiders** | | | |

**5. Repossessions, foreclosures, and returns**

List all property of the debtor that was obtained by a creditor within 1 year before filing this case, including property repossessed by a creditor, sold at a foreclosure sale, transferred by a deed in lieu of foreclosure, or returned to the seller. Do not include property listed in line 6.

■ None

| Creditor's name and address | Describe of the Property | Date | Value of property |
|---|---|---|---|

**6. Setoffs**

List any creditor, including a bank or financial institution, that within 90 days before filing this case set off or otherwise took anything from an account of the debtor without permission or refused to make a payment at the debtor's direction from an account of the debtor because the debtor owed a debt.

■ None

| Creditor's name and address | Description of the action creditor took | Date action was taken | Amount |
|---|---|---|---|

| **Part 3:** | Legal Actions or Assignments |
|---|---|

**7. Legal actions, administrative proceedings, court actions, executions, attachments, or governmental audits**

List the legal actions, proceedings, investigations, arbitrations, mediations, and audits by federal or state agencies in which the debtor was involved in any capacity—within 1 year before filing this case.

☐ None.

| Case title<br>Case number | Nature of case | Court or agency's name and address | Status of case |
|---|---|---|---|
| 7.1. **Williams et al. v. Big Picture Loans, LLC et al.**<br>3:17-cv-00461 | 28:1331 Fed. Question: Racketeering (RICO) Act | **US Dist. Court for E. Dist. of Virginia**<br>**701 East Broad Street**<br>**Richmond, VA 23219** | ■ Pending<br>☐ On appeal<br>☐ Concluded |
| 7.2. **Galloway et al. v. Big Picture Loans, LLC et al.**<br>3:18-cv-00406 | 18:1961 Racketeering (RICO) Act | **US Dist. Court, E. Dist. of Virginia**<br>**701 E Broad St**<br>**Richmond, VA 23219** | ■ Pending<br>☐ On appeal<br>☐ Concluded |

Software Copyright (c) 1996-2020 Best Case, LLC - www.bestcase.com Best Case Bankruptcy

JA886

## Breakwater Holding, LLC

| Bank Account Number | Date | Description | Payment |
|---|---|---|---|
| Bank of America (4326) | 2/23/2018 | Distribution | $(2,086,000.00) |
| Bank of America (4326) | 3/22/2018 | Distribution | $(2,086,000.00) |
| Tolleson Private Bank BUS CK **6536 | 4/20/2018 | Distribution | $(1,907,200.00) |
| Tolleson Private Bank BUS CK **6536 | 6/14/2018 | Distribution | $ (178,800.00) |
| Tolleson Private Bank BUS CK **6536 | 6/28/2018 | Distribution | $(1,192,000.00) |
| Tolleson Private Bank BUS CK **6536 | 7/31/2018 | Distribution | $ (745,000.00) |
| Tolleson Private Bank BUS CK **6536 | 11/8/2018 | Distribution | $ (298,000.00) |
| Tolleson Private Bank BUS CK **6536 | 11/15/2018 | Distribution | $ (59,600.00) |
| Tolleson Private Bank BUS CK **6536 | 11/27/2018 | Distribution | $ (596,000.00) |
| Tolleson Private Bank BUS CK **6536 | 1/14/2019 | Distribution | $ (274,160.00) |
| Tolleson Private Bank BUS CK **6536 | 8/30/2019 | Distribution | $ (175,123.00) |

## Brian McFadden

| Bank Account Number | Date | Description | Payment |
|---|---|---|---|
| Bank of America (4326) | 2/16/2018 | Distribution | $ (70,000.00) |
| Bank of America (4326) | 3/21/2018 | Distribution | $ (70,000.00) |
| Bank of America (4326) | 4/20/2018 | Distribution | $ (64,000.00) |
| Bank of America (4326) | 6/14/2018 | Distribution | $ (6,000.00) |
| Bank of America (4326) | 7/17/2018 | Distribution | $ (40,000.00) |
| Bank of America (4326) | 7/31/2018 | Distribution | $ (25,000.00) |
| Bank of America (4326) | 11/8/2018 | Distribution | $ (10,000.00) |
| Bank of America (4326) | 1/14/2019 | Distribution | $ (22,000.00) |
| Bank of America (4326) | 1/23/2019 | Distribution | $ (9,200.00) |

## Gallant Capital, LLC

| Bank Account Number | Date | Description | Payment |
|---|---|---|---|
| Bank of America (4326) | 2/16/2018 | Distribution | $ (892,500.00) |
| Bank of America (4326) | 3/21/2018 | Distribution | $ (892,500.00) |
| Tolleson Private Bank BUS CK **6536 | 4/20/2018 | Distribution | $ (816,000.00) |
| Bank of America (4326) | 6/14/2018 | Distribution | $ (76,500.00) |
| Tolleson Private Bank BUS CK **6536 | 7/9/2018 | Distribution | $ (510,000.00) |
| Tolleson Private Bank BUS CK **6536 | 7/31/2018 | Distribution | $ (318,750.00) |
| Tolleson Private Bank BUS CK **6536 | 11/8/2018 | Distribution | $ (127,500.00) |
| Tolleson Private Bank BUS CK **6536 | 11/15/2018 | Distribution | $ (25,500.00) |
| Tolleson Private Bank BUS CK **6536 | 11/27/2018 | Distribution | $ (255,000.00) |
| Tolleson Private Bank BUS CK **6536 | 1/14/2019 | Distribution | $ (117,300.00) |

JA887

## James Dowd

| Bank Account Number | Date | Description | Payment |
|---|---|---|---|
| Bank of America (4326) | 2/16/2018 | Distribution | $ (52,500.00) |
| Bank of America (4326) | 3/21/2018 | Distribution | $ (52,500.00) |
| Bank of America (4326) | 4/20/2018 | Distribution | $ (48,000.00) |
| Bank of America (4326) | 6/14/2018 | Distribution | $ (4,500.00) |
| Bank of America (4326) | 7/17/2018 | Distribution | $ (30,000.00) |
| Bank of America (4326) | 7/31/2018 | Distribution | $ (18,750.00) |
| Bank of America (4326) | 11/8/2018 | Distribution | $ (7,500.00) |
| Bank of America (4326) | 1/14/2019 | Distribution | $ (16,500.00) |
| Bank of America (4326) | 1/22/2019 | Distribution | $ (6,900.00) |

## Justin Martorello

| Bank Account Number | Date | Description | Payment |
|---|---|---|---|
| Bank of America (4326) | 2/16/2018 | Distribution | $ (346,500.00) |
| Bank of America (4326) | 3/21/2018 | Distribution | $ (346,500.00) |
| Bank of America (4326) | 4/20/2018 | Distribution | $ (316,800.00) |
| Bank of America (4326) | 6/14/2018 | Distribution | $ (29,700.00) |
| Bank of America (4326) | 7/17/2018 | Distribution | $ (198,000.00) |
| Bank of America (4326) | 7/31/2018 | Distribution | $ (123,750.00) |
| Bank of America (4326) | 11/8/2018 | Distribution | $ (49,500.00) |
| Bank of America (4326) | 1/14/2019 | Distribution | $ (108,900.00) |
| Bank of America (4326) | 1/23/2019 | Distribution | $ (45,540.00) |

## Simon Liang

| Bank Account Number | Date | Description | Payment |
|---|---|---|---|
| Bank of America (4326) | 2/16/2018 | Distribution | $ (52,500.00) |
| Bank of America (4326) | 3/21/2018 | Distribution | $ (52,500.00) |
| Bank of America (4326) | 4/20/2018 | Distribution | $ (48,000.00) |
| Bank of America (4326) | 6/14/2018 | Distribution | $ (4,500.00) |
| Bank of America (4326) | 7/17/2018 | Distribution | $ (30,000.00) |
| Bank of America (4326) | 7/31/2018 | Distribution | $ (18,750.00) |
| Bank of America (4326) | 11/8/2018 | Distribution | $ (7,500.00) |
| Bank of America (4326) | 1/14/2019 | Distribution | $ (16,500.00) |
| Bank of America (4326) | 1/22/2019 | Distribution | $ (6,900.00) |

JA888

Debtor   **Eventide Credit Acquisitions, LLC**                          Case number *(if known)*   **20-40349-11**

| Case title<br>Case number | Nature of case | Court or agency's name and address | Status of case |
|---|---|---|---|
| 7.3. **Smith v. Martorello, et al**<br>3:18-cv01651 | **470 Civil (RICO) Racketeer/Corrupt Organization** | **US Dist. Court, Oregon**<br>1000 S.W. Third Ave.<br>Portland, OR 97204 | ■ Pending<br>☐ On appeal<br>☐ Concluded |
| 7.4. **Duggan v. Martorello, et al.**<br>1:18-cv-12277 | **18:1962 Racketeering (RICO) Act** | **US Dist. Court, Massachusetts**<br>1 Courthouse Way<br>Boston, MA 02210 | ■ Pending<br>☐ On appeal<br>☐ Concluded |
| 7.5. **Williams et al v. Microbilt Corporation et al**<br>3:19-cv-00085 | **15:1681 Fair Credit Reporting Act** | **US Dist. Court, E. Dist. of Virginia**<br>701 East Broad Street<br>Richmond, VA 23219 | ■ Pending<br>☐ On appeal<br>☐ Concluded |
| 7.6. **Galloway et al. v. Martorello et al**<br>3:19-cv-00314 | **18:1961 Racketeering (RICCO) Act** | **US Dist. Court, E. Dist. of Virginia**<br>701 East Broad Street<br>Richmond, VA 23219 | ☐ Pending<br>☐ On appeal<br>■ Concluded |
| 7.7. **Galloway et al. v. Williams et al**<br>3:19-cv-00470 | **18:1962 Racketeering (RICO) Act** | **US Dist. Court, E. Dist. of Virginia**<br>701 East Broad Street<br>Richmond, VA 23219 | ■ Pending<br>☐ On appeal<br>☐ Concluded |
| 7.8. **Eventide Credit Acquisitions, LLC v. Ascension Technologies, LLC, Big Picture Loans, LLC and Tribal Economic Development Holdings, LLC**<br>2:19-cv-00256 | **28:1332 Diversity-Other Contract** | **US Dist. Court  for W. Dist. of Michigan**<br>110 Michigan St NW #399<br>Grand Rapids, MI 49503 | ☐ Pending<br>☐ On appeal<br>■ Concluded |
| 7.9. **Matt Martorello, Liont LLC, and Eventide Credit Acquisitions, LLC  v. Lula Williams, on behalf of Williams, Gloria Turnage, on behalf of Turnage, George Hengle, on behalf of Hengle, Dowin Coffy, on behalf of Coffy & Marcella P Singh, on behalf of Singh, Tolleson Private Bank, as Objector**<br>3:19-MC-0002-S | **Civil Miscellaneous Case re Motion to Quash Case transferred to the United States District Court for the Eastern District of Virginia, with the underlying litigation, Williams v. Big Picture Loans, LLC, 3:17-cv-00461-REP (E.D. Va.).** | **US Dist. Court, N.D. Texas, Dallas Div.**<br>1100 Commerce St # 1452<br>Dallas, TX 75242 | ☐ Pending<br>☐ On appeal<br>■ Concluded |
| 7.10. **Eventide Credit Acquisitions, LLC v. Lac Vieux Desert Bank of Lake Superior Chippewa Indians, Tribal Economic Development Holdings, LLC, Big Picture Loans, LLC, Ascension Technologies, LLC and LVD Tribal Acquisition Company, LLC**<br>01-19-0004-5187 | **Breach of LSA, Note and Guaranty** | **American Arbitration Association** | ■ Pending<br>☐ On appeal<br>☐ Concluded |

JA889

| Debtor | **Eventide Credit Acquisitions, LLC** | Case number *(if known)* | **20-40349-11** |
|---|---|---|---|

**8. Assignments and receivership**
List any property in the hands of an assignee for the benefit of creditors during the 120 days before filing this case and any property in the hands of a receiver, custodian, or other court-appointed officer within 1 year before filing this case.

■ None

**9.** List all gifts or charitable contributions the debtor gave to a recipient within 2 years before filing this case unless the aggregate value of the gifts to that recipient is less than $1,000

■ None

| Recipient's name and address | Description of the gifts or contributions | Dates given | Value |
|---|---|---|---|

**10. All losses from fire, theft, or other casualty within 1 year before filing this case.**

■ None

| Description of the property lost and how the loss occurred | Amount of payments received for the loss<br><br>If you have received payments to cover the loss, for example, from insurance, government compensation, or tort liability, list the total received.<br><br>List unpaid claims on Official Form 106A/B *(Schedule A/B: Assets – Real and Personal Property).* | Dates of loss | Value of property lost |
|---|---|---|---|

**11. Payments related to bankruptcy**
List any payments of money or other transfers of property made by the debtor or person acting on behalf of the debtor within 1 year before the filing of this case to another person or entity, including attorneys, that the debtor consulted about debt consolidation or restructuring, seeking bankruptcy relief, or filing a bankruptcy case.

☐ None.

| Who was paid or who received the transfer?<br>Address | If not money, describe any property transferred | Dates | Total amount or value |
|---|---|---|---|
| 11.1.<br><br><br><br>**Loeb & Loeb LLP<br>10100 Santa Monica Blvd<br>Suite 2200<br>Los Angeles, CA 90067-4120**<br><br>Email or website address<br>**bgiven@loeb.com**<br><br>Who made the payment, if not debtor?<br>~~Bluetech~~ Irrevocable Trust | **$250,000 loan advanced on behalf of Debtor.** | **Five months that Loeb was retained prior to the Petition Date. Loeb is currently holding $50,000.00 in retainer (at date of filing).** | **$206,809.07** |

Software Copyright (c) 1996-2020 Best Case, LLC - www.bestcase.com                Best Case Bankruptcy

JA890

Debtor  **Eventide Credit Acquisitions, LLC**   Case number *(if known)* **20-40349-11**

| | Who was paid or who received the transfer? Address | If not money, describe any property transferred | Dates | Total amount or value |
|---|---|---|---|---|
| 11.2. | **Forshey & Prostok, LLP** **777 Main Street** **Suite 1290** **Arlington, TX 76012** | **$250,000 loan advanced on behalf of Debtor.** | **1/28/2020 - Paid from IOLTA account of Loeb & Loeb, on behalf of the Debtor.** | **$25,000.00** |
| | Email or website address **jprostok@forsheyprostok.com** | | | |
| | Who made the payment, if not debtor? **Bluetech Irrevocable Trust** | | | |
| 11.3. | **MACCO Restructuring Group, LLC** **The Pennzoil Building** **700 Milam Street, Suite 1300** **Houston, TX 77002** | **$250,000 loan advanced on behalf of Debtor.** | **1/28/2020 - Paid from IOLTA account of Loeb & Loeb, on behalf of the Debtor.** | **$40,000.00** |
| | Email or website address **www.maccorestructuringgroup.com** | | | |
| | Who made the payment, if not debtor? **Bluetech Irrevocable Trust** | | | |

12. **Self-settled trusts of which the debtor is a beneficiary**
List any payments or transfers of property made by the debtor or a person acting on behalf of the debtor within 10 years before the filing of this case to a self-settled trust or similar device.
Do not include transfers already listed on this statement.

■ None.

| Name of trust or device | Describe any property transferred | Dates transfers were made | Total amount or value |
|---|---|---|---|

13. **Transfers not already listed on this statement**
List any transfers of money or other property by sale, trade, or any other means made by the debtor or a person acting on behalf of the debtor within 2 years before the filing of this case to another person, other than property transferred in the ordinary course of business or financial affairs. Include both outright transfers and transfers made as security. Do not include gifts or transfers previously listed on this statement.

☐ None.

| | Who received transfer? Address | Description of property transferred or payments received or debts paid in exchange | Date transfer was made | Total amount or value |
|---|---|---|---|---|
| 13.1 . | **Breakwater Holdings, LLC** **Bermuda House, Tutakimoa Road** **Rarotonga, Cook Islands** | **See attached Exhibit SOFA 4/13/30** | | |
| | Relationship to debtor **Member** | | | |

Debtor    **Eventide Credit Acquisitions, LLC**    Case number *(if known)*    **20-40349-11**

| | Who received transfer?<br>Address | Description of property transferred or<br>payments received or debts paid in exchange | Date transfer<br>was made | Total amount or<br>value |
|---|---|---|---|---|
| 13.2<br>. | **Brian McFadden**<br>**3133 Indian Pont Road**<br>**Saugatuck, MI 49453** | See attached Exhibit SOFA 4/13/30 | | |
| | Relationship to debtor<br>**Member** | | | |
| 13.3<br>. | **Gallant Capital, LLC**<br>**1920 McKinney Avenue**<br>**7th Floor**<br>**Dallas, TX 75201** | See attached Exhibit SOFA 4/13/30 | | |
| | Relationship to debtor<br>**Member** | | | |
| 13.4<br>. | **James Dowd**<br>**2014 Calle Las Violetas**<br>**San Juan, PR 00915** | See attached Exhibit SOFA 4/13/30 | | |
| | Relationship to debtor<br>**Member** | | | |
| 13.5<br>. | **Justin Martorello**<br>**2019 Westbourne Park Dr.**<br>**Houston, TX 77007** | See attached Exhibit SOFA 4/13/30<br>Payments to Justin Martorello (deposited<br>into joint account with Gina Martorello) | | |
| | Relationship to debtor<br>**Member** | | | |
| 13.6<br>. | **Simon Liang**<br>**119 Gascony Dr.**<br>**Greenville, SC 29609** | See attached Exhibit SOFA 4/13/30 | | |
| | Relationship to debtor<br>**Member** | | | |

| **Part 7:** | Previous Locations |
|---|---|

**14. Previous addresses**
List all previous addresses used by the debtor within 3 years before filing this case and the dates the addresses were used.

■ Does not apply

| Address | Dates of occupancy<br>From-To |
|---|---|

| **Part 8:** | Health Care Bankruptcies |
|---|---|

**15. Health Care bankruptcies**
Is the debtor primarily engaged in offering services and facilities for:
- diagnosing or treating injury, deformity, or disease, or
- providing any surgical, psychiatric, drug treatment, or obstetric care?

■ No. Go to Part 9.
☐ Yes. Fill in the information below.

| Debtor | **Eventide Credit Acquisitions, LLC** | Case number *(if known)* | 20-40349-11 |
|---|---|---|---|

| Facility name and address | Nature of the business operation, including type of services the debtor provides | If debtor provides meals and housing, number of patients in debtor's care |
|---|---|---|
| | | |

---

**Part 9:  Personally Identifiable Information**

16. **Does the debtor collect and retain personally identifiable information of customers?**

   ☒ No.
   ☐ Yes. State the nature of the information collected and retained.

17. **Within 6 years before filing this case, have any employees of the debtor been participants in any ERISA, 401(k), 403(b), or other pension or profit-sharing plan made available by the debtor as an employee benefit?**

   ☒ No. Go to Part 10.
   ☐ Yes. Does the debtor serve as plan administrator?

---

**Part 10:  Certain Financial Accounts, Safe Deposit Boxes, and Storage Units**

18. **Closed financial accounts**
   Within 1 year before filing this case, were any financial accounts or instruments held in the debtor's name, or for the debtor's benefit, closed, sold, moved, or transferred?
   Include checking, savings, money market, or other financial accounts; certificates of deposit; and shares in banks, credit unions, brokerage houses, cooperatives, associations, and other financial institutions.

   ☒ None

| Financial Institution name and Address | Last 4 digits of account number | Type of account or instrument | Date account was closed, sold, moved, or transferred | Last balance before closing or transfer |
|---|---|---|---|---|
| | | | | |

19. **Safe deposit boxes**
   List any safe deposit box or other depository for securities, cash, or other valuables the debtor now has or did have within 1 year before filing this case.

   ☒ None

| Depository institution name and address | Names of anyone with access to it Address | Description of the contents | Do you still have it? |
|---|---|---|---|
| | | | |

20. **Off-premises storage**
   List any property kept in storage units or warehouses within 1 year before filing this case. Do not include facilities that are in a part of a building in which the debtor does business.

   ☒ None

| Facility name and address | Names of anyone with access to it | Description of the contents | Do you still have it? |
|---|---|---|---|
| | | | |

---

**Part 11:  Property the Debtor Holds or Controls That the Debtor Does Not Own**

21. **Property held for another**
   List any property that the debtor holds or controls that another entity owns. Include any property borrowed from, being stored for, or held in trust. Do not list leased or rented property.

   ☒ None

---

**Part 12:  Details About Environment Information**

For the purpose of Part 12, the following definitions apply:
   *Environmental law* means any statute or governmental regulation that concerns pollution, contamination, or hazardous material, regardless of the medium affected (air, land, water, or any other medium).

Software Copyright (c) 1996-2020 Best Case, LLC - www.bestcase.com    Best Case Bankruptcy

JA893

| Debtor | **Eventide Credit Acquisitions, LLC** | Case number *(if known)* | 20-40349-11 |
|---|---|---|---|

*Site* means any location, facility, or property, including disposal sites, that the debtor now owns, operates, or utilizes or that the debtor formerly owned, operated, or utilized.

*Hazardous material* means anything that an environmental law defines as hazardous or toxic, or describes as a pollutant, contaminant, or a similarly harmful substance.

**Report all notices, releases, and proceedings known, regardless of when they occurred.**

22. **Has the debtor been a party in any judicial or administrative proceeding under any environmental law? Include settlements and orders.**

■ No.
☐ Yes. Provide details below.

| Case title Case number | Court or agency name and address | Nature of the case | Status of case |
|---|---|---|---|

23. **Has any governmental unit otherwise notified the debtor that the debtor may be liable or potentially liable under or in violation of an environmental law?**

■ No.
☐ Yes. Provide details below.

| Site name and address | Governmental unit name and address | Environmental law, if known | Date of notice |
|---|---|---|---|

24. **Has the debtor notified any governmental unit of any release of hazardous material?**

■ No.
☐ Yes. Provide details below.

| Site name and address | Governmental unit name and address | Environmental law, if known | Date of notice |
|---|---|---|---|

**Part 13:   Details About the Debtor's Business or Connections to Any Business**

25. **Other businesses in which the debtor has or has had an interest**
List any business for which the debtor was an owner, partner, member, or otherwise a person in control within 6 years before filing this case. Include this information even if already listed in the Schedules.

■ None

| Business name address | Describe the nature of the business | Employer Identification number Do not include Social Security number or ITIN. Dates business existed |
|---|---|---|

26. **Books, records, and financial statements**
26a. List all accountants and bookkeepers who maintained the debtor's books and records within 2 years before filing this case.
☐ None

| Name and address | | Date of service From-To |
|---|---|---|
| 26a.1. | **Andersen and Starr Accounting Division of Andersen 5949 Sherry Lane, Suite 500 Dallas, TX 75225** | **2018 - Present** |
| 26a.2. | **Zayra Emanuelli Puerto Rico** | **Approximately January 1-June 30, 2018** |
| 26a.3. | **Talkington & Associates 295 Palmas Inn Way Ste 130 Pmb 354 Humacao, PR 791** | **2018** |

| Debtor | **Eventide Credit Acquisitions, LLC** | Case number *(if known)* | **20-40349-11** |
|---|---|---|---|

| Name and address | Date of service From-To |
|---|---|
| 26a.4.   **Melanie Hedrick (Andersen)**<br>**5949 Sherry Lane**<br>**Suite 500**<br>**Dallas, TX 75225** | **2018 - Present** |
| 26a.5.   **Peter Watson (Andersen)**<br>**5949 Sherry Lane**<br>**Suite 500**<br>**Dallas, TX 75225** | **2018 - Present** |
| 26a.6.   **Edwin Roberts (Andersen)**<br>**5949 Sherry Lane**<br>**Suite 500**<br>**Dallas, TX 75225** | **2018 - Present** |
| 26a.7.   **Carol Robles**<br>**Address Unknown** | **Approximately January 1-June 30, 2018** |

26b. List all firms or individuals who have audited, compiled, or reviewed debtor's books of account and records or prepared a financial statement within 2 years before filing this case.

☐ None

| Name and address | Date of service From-To |
|---|---|
| 26b.1.   **Andersen and Starr Accounting,**<br>**Division of Andersen**<br>**5949 Sherry Lane, Suite 500**<br>**Dallas, TX 75225** | **2018-Present** |

| Name and address | Date of service From-To |
|---|---|
| 26b.2.   **Talkington & Associates**<br>**295 Palmas Inn Way Ste 130 Pmb 354**<br>**Humacao, PR 791** | **2018** |

26c. List all firms or individuals who were in possession of the debtor's books of account and records when this case is filed.

☐ None

| Name and address | If any books of account and records are unavailable, explain why |
|---|---|
| 26c.1.   **Andersen**<br>**5949 Sherry Lane, Suite 500**<br>**Dallas, TX 75225** | |
| 26c.2.   **Talkington & Associates**<br>**295 Palmas Inn Way Ste 130 Pmb 354**<br>**Humacao, PR 791** | |
| 26c.3.   **Matt Martorello**<br>**3805 Greenbriar Dr**<br>**Dallas, TX 75225** | |

26d. List all financial institutions, creditors, and other parties, including mercantile and trade agencies, to whom the debtor issued a financial statement within 2 years before filing this case.

■ None

| Name and address |
|---|

JA895

| Debtor | **Eventide Credit Acquisitions, LLC** | Case number *(if known)* | **20-40349-11** |

**27. Inventories**

Have any inventories of the debtor's property been taken within 2 years before filing this case?

■ No
☐ Yes. Give the details about the two most recent inventories.

| Name of the person who supervised the taking of the inventory | Date of inventory | The dollar amount and basis (cost, market, or other basis) of each inventory |
|---|---|---|

**28. List the debtor's officers, directors, managing members, general partners, members in control, controlling shareholders, or other people in control of the debtor at the time of the filing of this case.**

| Name | Address | Position and nature of any interest | % of interest, if any |
|---|---|---|---|
| Breakwater Holdings, LLC | Bermuda House, Tutakimoa Road P.O. Box 822 Rarotonga, Cook Islands | Member | 59.6% |

| Name | Address | Position and nature of any interest | % of interest, if any |
|---|---|---|---|
| Matt Martorello | 3805 Greenbriar Dr Dallas, TX 75225 | President | |

| Name | Address | Position and nature of any interest | % of interest, if any |
|---|---|---|---|
| Drew McManigle | c/o MACCO Restructuring Group, LLC 700 Milam St., Suite 1300 Houston, TX 77002 | Manager | |

**29. Within 1 year before the filing of this case, did the debtor have officers, directors, managing members, general partners, members in control of the debtor, or shareholders in control of the debtor who no longer hold these positions?**

■ No
☐ Yes. Identify below.

**30. Payments, distributions, or withdrawals credited or given to insiders**

Within 1 year before filing this case, did the debtor provide an insider with value in any form, including salary, other compensation, draws, bonuses, loans, credits on loans, stock redemptions, and options exercised?

☐ No
■ Yes. Identify below.

| | Name and address of recipient | Amount of money or description and value of property | Dates | Reason for providing the value |
|---|---|---|---|---|
| 30.1. | **See attached Exhibit SOFA 4/13/30** | | | |
| | **Relationship to debtor** | | | |

**31. Within 6 years before filing this case, has the debtor been a member of any consolidated group for tax purposes?**

■ No
☐ Yes. Identify below.

| Name of the parent corporation | Employer Identification number of the parent corporation |
|---|---|

| Debtor | **Eventide Credit Acquisitions, LLC** | Case number *(if known)* **20-40349-11** |
|---|---|---|

32. **Within 6 years before filing this case, has the debtor as an employer been responsible for contributing to a pension fund?**

■ No
☐ Yes. Identify below.

| Name of the pension fund | Employer Identification number of the parent corporation |
|---|---|

---

**Part 14:   Signature and Declaration**

**WARNING** -- Bankruptcy fraud is a serious crime.  Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both.
18 U.S.C. §§ 152, 1341, 1519, and 3571.

I have examined the information in this *Statement of Financial Affairs* and any attachments and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on     **March 20, 2020**

| Signature of individual signing on behalf of the debtor | **Drew McManigle** Printed name |
|---|---|

Position or relationship to debtor   **Manager**

**Are additional pages to** *Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy* (Official Form 207) attached?
■ No
☐ Yes

JA897

# EVENTIDE CREDIT ACQUISTIONS, LLC

Michelle Hazen
Ascension Technologies, LLC
P.O. Box 703
Watersmeet, MI 49969

*Re: Consent to Ascension Technologies, LLC Atlanta Office Expansion*

Ms. Hazen:

Pursuant to Loan and Security Agreement dated October 7, 2015 and, more specifically, Section 4(b) of the related Promissory Note ("Note") dated January 26, 2016 by and between Eventide Credit Acquisitions, LLC ("Eventide") and Tribal Economic Development Holdings, LLC (together with its Subsidiaries, including Big Picture Loans, LLC and Ascension Technologies, LLC), Eventide must provide written consent and approval of a budget before Borrower or its Subsidiaries expand the Business in such a manner as to materially reduce payments under the Note.

Please let this letter serve as Eventide's formal written consent to Ascension Technologies, LLC's expansion and establishment of an office in Atlanta, Georgia pursuant to the attached organizational chart and budget.

Sincerely,

Matt Martorello
Eventide Credit Acquisitions, LLC

CONFIDENTIAL

Exhibit 51

**EVENTIDE CREDIT ACQUISITIONS, LLC**
875 Carretera 693, Suite 202
Dorado, Puerto Rico 00646

11/03/2016

Michelle Hazen
Big Picture Loans, LLC
P.O. Box 704
Watersmeet, MI 49969

*Re: Consent to Additional Indebtedness – Deborah M. Arenberg Living Trust*

Ms. Hazen:

Pursuant to Section 5.1 of the Loan and Security Agreement ("Agreement") dated October 7, 2015 by and between Eventide Credit Acquisitions, LLC ("Eventide") and Tribal Economic Development Holdings, LLC (together with its Subsidiaries Big Picture Loans, LLC ("BPL") and Ascension Technologies, LLC ("AT"), together ("TED"), Eventide must provide written consent before Borrower or any of its Subsidiaries issue any indebtedness in addition to the Permitted Liens.

Eventide has been informed that the Permitted Lien for Noteholder Deborah M. Arenberg Living Trust ("Noteholder") authorized pursuant to Section 3.4 of the Agreement has almost reached maturity. Eventide is also informed that the Noteholder wishes to reinvest in the Business of BPL in the amount of $276,148.16.

Please let this letter serve as Eventide's formal written consent to the Loan and Security Agreement and related Promissory Note for $276,148.16 by and between Big Picture Loans, LLC and Noteholder which shall constitute a Permitted Lien under the Agreement.

Sincerely,

Matt Martorello
Eventide Credit Acquisitions, LLC

JA900

CONFIDENTIAL

MARTORELLO_000020

# Exhibit 52

EVENTIDE CREDIT ACQUISITIONS, LLC
875 Carretera 693, Suite 202
Dorado, Puerto Rico 00646


11/3/2016


Michelle Hazen
Big Picture Loans, LLC
P.O. Box 704
Watersmeet, MI 49969

*Re: Consent to Additional Indebtedness - DTA Trinity Wealth Transfer Trust*

Ms. Hazen:

Pursuant to Section 5.1 of the Loan and Security Agreement ("Agreement") dated October 7, 2015 by and between Eventide Credit Acquisitions, LLC ("Eventide") and Tribal Economic Development Holdings, LLC (together with its Subsidiaries Big Picture Loans, LLC ("BPL") and Ascension Technologies, LLC ("AT"), together ("TED"), Eventide must provide written consent before Borrower or any of its Subsidiaries issue any indebtedness in addition to the Permitted Liens.

Eventide has been informed that the Permitted Lien for Noteholder DTA Trinity Wealth Transfer Trust ("Noteholder") authorized pursuant to Section 3.4 of the Agreement has almost reached maturity.  Eventide is also informed that the Noteholder wishes to reinvest in the Business of BPL in the amount of $720,593.16.

Please let this letter serve as Eventide's formal written consent to the Loan and Security Agreement and related Promissory Note for $720,593.16 by and between Big Picture Loans, LLC and Noteholder which shall constitute a Permitted Lien under the Agreement.


Sincerely,


Matt Martorello
Eventide Credit Acquisitions, LLC

CONFIDENTIAL                                                                MARTORELLO_000021

# Exhibit 53

**EVENTIDE CREDIT ACQUISITIONS, LLC**
875 Carretera 693, Suite 202
Dorado, Puerto Rico 00646

11/03/2016

Michelle Hazen
Big Picture Loans, LLC
P.O. Box 704
Watersmeet, MI 49969

    *Re: Consent to Additional Indebtedness – Terrance J. Arenberg*

Ms. Hazen:

    Pursuant to Section 5.1 of the Loan and Security Agreement ("Agreement") dated October 7, 2015 by and between Eventide Credit Acquisitions, LLC ("Eventide") and Tribal Economic Development Holdings, LLC (together with its Subsidiaries Big Picture Loans, LLC ("BPL") and Ascension Technologies, LLC ("AT"), together ("TED"), Eventide must provide written consent before Borrower or any of its Subsidiaries issue any indebtedness in addition to the Permitted Liens.

    Eventide has been informed that the Permitted Lien for Noteholder Terrance J. Arenberg ("Noteholder") authorized pursuant to Section 3.4 of the Agreement has almost reached maturity. Eventide is also informed that the Noteholder wishes to reinvest in the Business of BPL in the amount of $750,000.00.

    Please let this letter serve as Eventide's formal written consent to the Loan and Security Agreement and related Promissory Note for $750,000.00 by and between Big Picture Loans, LLC and Noteholder which shall constitute a Permitted Lien under the Agreement.

                  Sincerely,

                  Matt Martorello
                  Eventide Credit Acquisitions, LLC

JA904

CONFIDENTIAL

Exhibit 54

**EVENTIDE CREDIT ACQUISITIONS, LLC**
875 Carretera 693, Suite 202
Dorado, Puerto Rico 00646

11/03/2016

Michelle Hazen
Big Picture Loans, LLC
P.O. Box 704
Watersmeet, MI 49969

*Re: Consent to Additional Indebtedness – Timothy P. Arenberg*

Ms. Hazen:

Pursuant to Section 5.1 of the Loan and Security Agreement ("Agreement") dated October 7, 2015 by and between Eventide Credit Acquisitions, LLC ("Eventide") and Tribal Economic Development Holdings, LLC (together with its Subsidiaries Big Picture Loans, LLC ("BPL") and Ascension Technologies, LLC ("AT"), together ("TED"), Eventide must provide written consent before Borrower or any of its Subsidiaries issue any indebtedness in addition to the Permitted Liens.

Eventide has been informed that the Permitted Lien for Noteholder Timothy P. Arenberg ("Noteholder") authorized pursuant to Section 3.4 of the Agreement has almost reached maturity. Eventide is also informed that the Noteholder wishes to reinvest in the Business of BPL in the amount of $900,000.00.

Please let this letter serve as Eventide's formal written consent to the Loan and Security Agreement and related Promissory Note for $900,000.00 by and between Big Picture Loans, LLC and Noteholder which shall constitute a Permitted Lien under the Agreement.

Sincerely,

Matt Martorello
Eventide Credit Acquisitions, LLC

JA906

CONFIDENTIAL

MARTORELLO_000023

# Exhibit 55

## TRIBAL ECONOMIC DEVELOPMENT HOLDINGS, LLC

10/28/2016

Matt Martorello
Eventide Credit Acquisitions, LLC
875 Carretera 693, Suite 202,
Dorado, PR 00646

Re:     Lender Written Consent - Risk and Analytics Manager and Vice President of Marketing

Mr. Martorello:

Pursuant to that certain Loan and Security Agreement dated October 7, 2015 by and between Eventide Credit Acquisitions, LLC ("Eventide") by Tribal Economic Development Holdings, LLC ("TED") and its Subsidiaries including Big Picture Loans, LLC ("BPL") and Ascension Technologies, LLC ("AT"), and more specifically pursuant Section 1.2 (b)(4)(b) of associated Secured Promissory Note ("Note") dated January 26, 2016 issued to Eventide by TED (the "Borrower"). Eventide must provide written consent of a budget before Borrower or any of its Subsidiaries can expand (i) the Business in such a manner that could materially reduce payments under the Note; and (2) can incur labor expenses in an amount five percent (5%) greater than "the historical labor costs charged to Borrower [TED] or a Subsidiary by previous service providers."

On or about June 7, 2016, Eventide was informed of certain personnel costs associated with proposed organizational changes related to the expansion of the AT Atlanta office. Specifically, Eventide was advised that:

1.  AT has taken steps to hire a Risk and Analytics Manager who is scheduled to start in the AT Atlanta office on November 1, 2016.
2.  The negotiated starting salary of the Risk and Analytics Manager is $200,000.00, an amount that exceeds the amount to which Eventide had previously consented.
3.  As part of the "natural evolution of the Business" AT has also taken steps to hire a Vice President of Marketing who is also scheduled to start in the AT Atlanta office on November 1, 2016.
4.  The negotiated salary for the Vice President of Marketing is $185,000.00

Recognizing that written consent is required under the Loan and Security Agreement and associated Note, the purpose of this letter is document Eventide's written consent of the verbal consent given by Eventide on or about June 7, 2016 to the additional expenses associated with hiring the Risk and Analytics Manager and Vice President of Marketing at the AT Atlanta office as indicated herein. TED and its Subsidiaries represent and warrant that the proposed personnel changes will improve the operational efficiency of the Subsidiaries thus meeting TED's and its Subsidiaries' fiduciary obligation to maximize repayment under the Note.

Sincerely,

Michelle Hazen
Michelle Hazen
Tribal Economic Development Holdings, LLC

Agreed to and accepted:

Matt Martorello                                        **11/17/16**
Eventide Credit Acquisitions, LLC          Date

ECA Consent to Personnel Changes Announce June 7, 2016
Page 1 of 1

CONFIDENTIAL

JA908

LVD-DEF00015613

# Exhibit 56

DocuSign Envelope ID: C2A26E46-9ADE-4DEA-9A9B-3036C6E22A7A

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | | |
|---|---|---|
| LULA WILLIAMS, *et al. on behalf of themselves and all other similarly situated individuals,* | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Civil Action No. 3:17-cv-461 (REP) |
| | : | |
| BIG PICTURE LOANS, LLC, et al., | : | |
| | : | |
| Defendants. | | |

## <u>WRITTEN REPORT OF KARL J. EBERT</u>

I, Karl J. Ebert, submit the follow written report pursuant to Rule 26(a)(2) of the Federal Rules of Civil Procedure:

1.     I am a technology consultant and founder and owner of KJE Computer Solutions, Inc, which is an advanced technology software firm, that develops and markets an extensive suite of banking and e-commerce content as cloud based financial calculator tools for deployment with mortgages, finance, banking, real estate, education, credit union and wealth management. I have been retained by the Plaintiff's attorneys to provide technology consulting services with regard to electronic discovery, specifically the loan level data for the certified classes in this case. This declaration is submitted based upon my knowledge, experience, and information provided to me with regard to the electronic discovery issues in this litigation. A copy of my current resume is attached hereto as Exhibit 1.

2.     I am prepared to testify as necessary.

3.     I have authored various articles and posts on the websites below over the past ten years:

JA910

Website: https://www.dinkytown.net
Website: https://cucalc.org
Website: https://www.maprcalculator.com

4.      I have spent over 20 years working with large enterprise databases, programming queries on .csv files, like the loan level consumer data produced in this case. This has included an electronic loan approval system for a large financial Institution, E-Commerce architecture design, data warehouse development architect, relational database design, Internet, Intranet and Client/Server development.

5.      In this case, in addition to discussions with the Plaintiffs' attorneys, I have reviewed: the Stipulated Protective Order; the six .csv data files that were provided by TranDotCom on August 5, 2021; and the documents including the class notice and definitions available at https://www.bigpictureloansclassaction.com/.

6.      In this case, the Plaintiffs, Lula Williams, Gloria Turnage, George Hengle, Dowin Coffy, and Felix Gillison, Jr. filed a lawsuit in connection with consumer loans made by Castle Payday d/b/a Red Rock ("Red Rock") and Big Picture Loans ("Big Picture").

7.      The Court has certified the following classes:

(a) **Big Picture RICO Class**: All Virginia Consumers who entered into a loan agreement with Big Picture where a payment was made from June 22, 2013 to December 20, 2019.
>    (i) **Big Picture Usury Sub-class**: All Virginia consumers who paid any principal, interest, or fees on their loan with Big Picture from June 22, 2015, to December 20, 2019.
>    (ii) **Big Picture Unjust Enrichment Sub-class**: All Virginia consumers who paid any amount on their loan with Big Picture from June 22, 2014 to December 20, 2019.

(b) **Red Rock RICO Class**: All Virginia consumers who entered into a loan agreement with Red Rock where a payment was made from June 22, 2013 to December 20, 2019.
>    (i) **Red Rock Usury Sub-class**: All Virginia consumers who paid any principal, interest, or fees on their loan with Red Rock from June 22, 2015 to December 20, 2019.

JA911

(ii) **Red Rock Unjust Enrichment Sub-class**: All Virginia consumers who paid any amount on their loan with Red Rock from June 22, 2014, to December 20, 2019.

8.    There were four .csv files that pertained to Red Rock and Big Picture loans. The other two .csv files pertained to Pepper Cash loans, which is not part of the classes that the Court has certified.

9.    There were two .csv files for both Red Rock and Big Picture loans, which were divided by payment details and consumer loan origination details.

10.    Upon my review of the .csv files, I am making the assumption that "Merchant No. 26419" are loans originated in the name Red Rock and "Merchant No. 42475" are loans originated in the name Big Picture. I have also assumed that the "Loan State" is the state that the consumer resided in when the loan was originated.

11.    My opinions contained herein are based upon my review of the above-described documents, as well as upon my qualifications, training, and experience described above. I understand that further discovery may take place in this case and a record will be produced. I reserve the right to amend and update my opinions based upon additional information that may be provided to me, including any information that may rebut any assumptions I have made, or that may become known to me by other appropriate means in the future.

**OPINION 1:   Consumers in the Big Picture RICO Class paid $17,034,261.47 from June 22, 2013 to December 20, 2019.**

12.    Each of the data points necessary to establish the amount paid by consumers is contained in the .csv files, without referencing any additional materials or third-party sources.

13.    There are a total of 6544 consumers (9783 loans) in this class.

14.    Specifically, I used the following fields from the .csv files to make this finding:

Page **3** of 25

    a.  ApplNo

    b.  PmtDate

    c.  MerchantNo

    d.  CustID

    e.  PmtAmt

    f.  PrincipalPaid

    g.  InterestPaid

15.    I was also able to calculate the amount of principal and interest that were paid by the Big Picture RICO class. That amount is $12,287,519.50 in interest and $4,706,202.02 in principal.

16.    In order to reach this conclusion, I took the following steps:

    a.  Find all loans with a payment date in specified range with query as follows:

      [Loans RICO Class] = SELECT DISTINCT LoanPayment.ApplNo

      FROM LOANPAYMENT

      *WHERE* LOANPAYMENT.PmtDate >=#6/22/2013# And

      LOANPAYMENT.PmtDate<=#12/20/2019#

    b.  Find all consumers with a payment date in specified range with query as follows:

      SELECT  DISTINCT  LOAN.CustID

      FROM LOAN, [Loans RICO Class]

      where  [Loans RICO Class].ApplNo = LOAN.ApplNo

      and MerchantNo = '26475'

    c.  Count all loans in [Loans RICO Class] in LOAN table. With query as follows:

      SELECT Count(LoanPayment.ApplNo) AS LOANCOUNT

DocuSign Envelope ID: C2A6BF0840DF-4D6B-A9B3-B36C6E22A1F3

FROM [Loans RICO Class], LOAN

WHERE [loans RICO Class].ApplNo = LOAN.applNo

and LOAN.MerchantNo = '26475

d. Count all consumers in [Loan RICO Class] in LOAN table.  With query as follows:

SELECT Count(LOAN.CustID) AS CONSUMERCOUNT

FROM [Consumers RICO Class], LOAN

WHERE [Consumers RICO Class].CustID = LOAN.CustID

and LOAN.MerchantNo = '26475'

e. Total all payments, interest and interest with query as follows:

SELECT Sum(LOANPAYMENT.PmtAmt) as PAYMENTTOTAL,

sum(LOANPAYMENT.PrincipalPaid) as PRINCIPALTOTAL,

sum(LOANPAYMENT.InterestPaid) as INTERESTTOTAL

FROM [Loans RICO Class], LOANPAYMENT

WHERE [Loans RICO Class].ApplNo=LOANPAYMENT.applNo

AND LOANPAYMENT.MerchantNo = '26475 '

**OPINION 2:  Consumers in the Big Picture Usury Sub-Class paid $17,034,261.47 from June 22, 2015 to December 20, 2019.**

17. Each of the data points necessary to establish the amount paid by consumers is contained in the .csv files, without referencing any additional materials or third-party sources.

18. There are a total of 6544 consumers (9783 loans) in this class.

19. Specifically, I used the following fields from the .csv files to make this finding:

a. ApplNo

b. PmtDate

c. MerchantNo

d. CustID

e. PmtAmt

f. PrincipalPaid

g. InterestPaid

20.     I was also able to calculate the amount of principal and interest that were paid by the Big Picture usury sub-class. That amount is $12,287,519.50 in interest and $4,706,202.02 in principal.

21.     In order to reach this conclusion, I took the following steps:

a. Find all loans with a payment date in specified range with query as follows:

[Loans USURY SubClass] = SELECT DISTINCT LoanPayment.ApplNo

FROM LoanPayment

WHERE LoanPayment.PmtDate>=#6/22/2015# And

LoanPayment.PmtDate<=#12/20/2019#;

b. Find all consumers with a payment date in specified range with query as follows:

SELECT  DISTINCT  LOAN.CustID

FROM LOAN, [Loans USURY SubClass]

where  [Loans USURY SubClass].ApplNo = LOAN.ApplNo

and MerchantNo = '26475'

c. Count all loans in [Loans RICO Class] in LOAN table. With query as follows:

SELECT Count(LoanPayment.ApplNo) AS LOANCOUNT

FROM [Loans USURY SubClass], LOAN

WHERE [Loans USURY SubClass].ApplNo = LOAN.applNo

and LOAN.MerchantNo = '26475'

    d.   Count all consumers in [Loan USURY SubClass] in LOAN table.  With query as follows:

SELECT  DISTINCT  LOAN.CustID

FROM LOAN, [Loans USURY SubClass]

where  [Loans USURY SubClass].ApplNo = LOAN.ApplNo

and MerchantNo = '26475'

    e.   Total all payments, interest and interest with query as follows:

SELECT Sum(LOANPAYMENT.PmtAmt) as PAYMENTTOTAL,

sum(LOANPAYMENT.PrincipalPaid) as PRINCIPALTOTAL,

sum(LOANPAYMENT.InterestPaid) as INTERESTTOTAL

FROM [Loans USURY SubClass], LOANPAYMENT

WHERE [Loans USURY SubClass].ApplNo=LOANPAYMENT.applNo

AND LOANPAYMENT.MerchantNo = '26475 '


**OPINION 3: Consumers in the Big Picture Unjust Enrichment Sub-Class paid $17,034,261.47 from June 22, 2014 to December 20, 2019.**

22.    Each of the data points necessary to establish the amount paid by consumers is contained in the .csv files, without referencing any additional materials or third-party sources.

23.    There are a total of 6544 consumers (9783 loans) in this class.

24.    Specifically, I used the following fields from the .csv files to make this finding:

    a.   ApplNo

DocuSign Envelope ID: GA29E6B4-DADF-4DE9-A49B-3B36C6E22A77

   b.  PmtDate

   c.  MerchantNo

   d.  CustID

   e.  PmtAmt

   f.  PrincipalPaid

   g.  InterestPaid

25.     I was also able to calculate the amount of principal and interest that were paid by the Big Picture unjust enrichment sub-class. That amount is $12,287,519.50 in interest and $4,706,202.02 in principal.

26.     In order to reach this conclusion, I took the following steps:

   a.  Find all loans with a payment date in specified range with query as follows:

       [Loans USURY SubClass] = SELECT DISTINCT LoanPayment.ApplNo

       FROM LoanPayment

       WHERE (((LoanPayment.PmtDate)>=#6/22/2014# And

       (LoanPayment.PmtDate)<=#12/20/2019#));

   b.  Find all consumers with a payment date in specified range with query as follows:

       SELECT DISTINCT LOAN.CustID

       FROM LOAN, [Loans UNJUST Enrichment SubClass]

       where  [Loans UNJUST Enrichment SubClass].ApplNo = LOAN.ApplNo

       and MerchantNo = '26475'

   c.  Count all loans in [Loans RICO Class] in LOAN table. With query as follows:

       SELECT Count(LoanPayment.ApplNo) AS LOANCOUNT

       FROM [Loans UNJUST Enrichment SubClass], LOAN

WHERE [Loans UNJUST Enrichment SubClass].ApplNo = LOAN.applNo

and LOAN.MerchantNo = '26475'

   d.   Count all consumers in [Loan RICO Class] in LOAN table.  With query as follows:

SELECT  DISTINCT  LOAN.CustID

FROM LOAN, [Loans UNJUST Enrichment SubClass]

where  [Loans UNJUST Enrichment SubClass].ApplNo = LOAN.ApplNo

and MerchantNo = '26475'

   e.   Total all payments, interest and interest with query as follows:

SELECT Sum(LOANPAYMENT.PmtAmt) as PAYMENTTOTAL,

sum(LOANPAYMENT.PrincipalPaid) as PRINCIPALTOTAL,

sum(LOANPAYMENT.InterestPaid) as INTERESTTOTAL

FROM [Loans UNJUST Enrichment SubClass], LOANPAYMENT

WHERE                    [Loans                    UNJUST                    Enrichment

SubClass].ApplNo=LOANPAYMENT.applNo

AND LOANPAYMENT.MerchantNo = '26475 '


**OPINION 4:  Consumers in the Red Rock RICO Class paid $14,703,730.55 from June 22, 2013 to December 20, 2019.**

27.    Each of the data points necessary to establish the amount paid by consumers is contained in the .csv files, without referencing any additional materials or third-party sources.

28.    There are a total of 7774 consumers (or 10386 loans) in this class.

29.    Specifically, I used the following fields from the .csv files to make this finding:

   a.   ApplNo

USCA4 Appeal: 23-2097   Doc: 44-3   Filed: 12/06/2023   Pg: 463 of 493

    b.   PmtDate

    c.   MerchantNo

    d.   CustID

    e.   PmtAmt

    f.   PrincipalPaid

    g.   InterestPaid

30.    I was also able to calculate the amount of principal and interest that were paid by the Red Rock RICO class. That amount is $10,342,045.41 in interest and $4,283,421.94 in principal.

31.    In order to reach this conclusion, I took the following steps:

    a.   Find all loans with a payment date in specified range with query as follows:

[Loans RICO Class] = SELECT DISTINCT LoanPayment.ApplNo

FROM LOANPAYMENT

*WHERE* LOANPAYMENT.PmtDate >=#6/22/2013# And

LOANPAYMENT.PmtDate<=#12/20/2019#

    b.   Find all consumers with a payment date in specified range with query as follows:

SELECT  DISTINCT  LOAN.CustID

FROM LOAN, [Loans RICO Class]

where  [Loans RICO Class].ApplNo = LOAN.ApplNo

and MerchantNo = '26419'

    c.   Count all loans in [Loans RICO Class] in LOAN table. With query as follows:

SELECT Count(LoanPayment.ApplNo) AS LOANCOUNT

FROM [Loans RICO Class], LOAN

WHERE [loans RICO Class].ApplNo = LOAN.applNo

and LOAN.MerchantNo = '26419'

d.  Count all consumers in [Loan RICO Class] in LOAN table.  With query as follows:

SELECT Count(LOAN.CustID) AS CONSUMERCOUNT

FROM [Consumers RICO Class], LOAN

WHERE [Consumers RICO Class].CustID = LOAN.CustID

and LOAN.MerchantNo = '26419'

e.  Total all payments, interest and interest with query as follows:

SELECT Sum(LOANPAYMENT.PmtAmt) as PAYMENTTOTAL,

sum(LOANPAYMENT.PrincipalPaid) as PRINCIPALTOTAL,

sum(LOANPAYMENT.InterestPaid) as INTERESTTOTAL

FROM [Loans RICO Class], LOANPAYMENT

WHERE [Loans RICO Class].ApplNo=LOANPAYMENT.applNo

AND LOANPAYMENT.MerchantNo = '26419'

**OPINION 5:  Consumers in the Red Rock Usury Sub-Class paid  $6,385,340.48from June 22, 2015 to December 20, 2019.**

32.    Each of the data points necessary to establish the amount paid by consumers is contained in the .csv files, without referencing any additional materials or third-party sources.

33.    There are a total of 4265 consumers (5044 loans) in this class.

34.    Specifically, I used the following fields from the .csv files to make this finding:

a.  ApplNo

b.  PmtDate

   c.   MerchantNo

   d.   CustID

   e.   PmtAmt

   f.   PrincipalPaid

   g.   InterestPaid

35.   I was also able to calculate the amount of principal and interest that were paid by the Red Rock usury sub-class. That amount is $4,326,421.63 in interest and $ $2,005,143.88 in principal.

36.   In order to reach this conclusion, I took the following steps:

   a.   Find all loans with a payment date in specified range with query as follows:

   [Loans USURY SubClass] = SELECT DISTINCT LoanPayment.ApplNo

   FROM LoanPayment

   WHERE LoanPayment.PmtDate>=#6/22/2015# And

   LoanPayment.PmtDate<=#12/20/2019#;

   b.   Find all consumers with a payment date in specified range with query as follows:

   SELECT  DISTINCT  LOAN.CustID

   FROM LOAN, [Loans USURY SubClass]

   where  [Loans USURY SubClass].ApplNo = LOAN.ApplNo

   and MerchantNo = '26419'

   c.   Count all loans in [Loans USURY SubClass] in LOAN table. With query as follows:

   SELECT Count(LoanPayment.ApplNo) AS LOANCOUNT

   FROM [Loans USURY SubClass], LOAN

WHERE [Loans USURY SubClass].ApplNo = LOAN.applNo

and LOAN.MerchantNo = '26419'

d.  Count all consumers in [Loan USURY SubClass] in LOAN table.  With query as follows:

SELECT  DISTINCT  LOAN.CustID

FROM LOAN, [Loans USURY SubClass]

where  [Loans USURY SubClass].ApplNo = LOAN.ApplNo

and MerchantNo = '26419'

e.  Total all payments, interest and interest with query as follows:

SELECT Sum(LOANPAYMENT.PmtAmt) as PAYMENTTOTAL,

sum(LOANPAYMENT.PrincipalPaid) as PRINCIPALTOTAL,

sum(LOANPAYMENT.InterestPaid) as INTERESTTOTAL

FROM [Loans USURY SubClass], LOANPAYMENT

WHERE [Loans USURY SubClass].ApplNo=LOANPAYMENT.applNo

AND LOANPAYMENT.MerchantNo = '26419'

AND LoanPayment.PmtDate>=#6/22/2015# And

LoanPayment.PmtDate<=#12/20/2019#;

**OPINION 6:  Consumers  in  the  Red  Rock  Unjust  Enrichment  Sub-Class  paid $10,705,364.25 from June 22, 2014 to December 20, 2019.**

37.    Each of the data points necessary to establish the amount paid by consumers is contained in the .csv files, without referencing any additional materials or third-party sources.

38.    There are a total of 6056 consumers (7860 loans) in this class.

39.    Specifically, I used the following fields from the .csv files to make this finding:

DocuSign Envelope ID: 6A2A9F09-9ADE-4A32-AA85-9F36C6F22A1A

USCA4 Appeal: 22-2007  Doc: 44  Filed: 12/06/2023  Pg: 467 of 493

    a. ApplNo

    b. PmtDate

    c. MerchantNo

    d. CustID

    e. PmtAmt

    f. PrincipalPaid

    g. InterestPaid

40.    I was also able to calculate the amount of principal and interest that were paid by the Red Rock unjust enrichment sub-class. That amount is $7,406,745.00 in interest and $3,232,328.86 in principal.

41.    In order to reach this conclusion, I took the following steps:

    a. Find all loans with a payment date in specified range with query as follows:

    [Loans Unjust Enrichment] = SELECT DISTINCT LoanPayment.ApplNo

    FROM LoanPayment

    WHERE (((LoanPayment.PmtDate)>=#6/22/2014# And

    (LoanPayment.PmtDate)<=#12/20/2019#));

    b. Find all consumers with a payment date in specified range with query as follows:

    SELECT  DISTINCT  LOAN.CustID

    FROM LOAN, [Loans UNJUST Enrichment SubClass]

    where  [Loans UNJUST Enrichment SubClass].ApplNo = LOAN.ApplNo

    and MerchantNo = '26419'

JA923

c. Count all loans in [Loans Unjust Enrichment] in LOAN table. With query as follows:

SELECT Count(LoanPayment.ApplNo) AS LOANCOUNT

FROM [Loans UNJUST Enrichment SubClass], LOAN

WHERE [Loans UNJUST Enrichment SubClass].ApplNo = LOAN.applNo

and LOAN.MerchantNo = '26419'

d. Count all consumers in [Loan RICO Class] in LOAN table. With query as follows:

SELECT DISTINCT LOAN.CustID

FROM LOAN, [Loans UNJUST Enrichment SubClass]

where [Loans UNJUST Enrichment SubClass].ApplNo = LOAN.ApplNo

and MerchantNo = '26419'

e. Total all payments, interest and interest with query as follows:

SELECT Sum(LOANPAYMENT.PmtAmt) as PAYMENTTOTAL,

sum(LOANPAYMENT.PrincipalPaid) as PRINCIPALTOTAL,

sum(LOANPAYMENT.InterestPaid) as INTERESTTOTAL

FROM [Loans UNJUST Enrichment SubClass], LOANPAYMENT

WHERE [Loans UNJUST Enrichment

SubClass].ApplNo=LOANPAYMENT.applNo

AND LOANPAYMENT.MerchantNo = '26419'

AND LoanPayment.PmtDate>=#6/22/2014# And

LoanPayment.PmtDate<=#12/20/2019#;

**OPINION 7: The average APR for the consumer loans was 727.80%.**

42.    There is a field in the .csv files labelled "APR."

43.    I reviewed the loan APR's to create the following chart of various APRs based on class:

| Category | Merchant | Maximum % APR | Average % APR |
|---|---|---|---|
| Unjust Enrichment Sub Class | Big Picture | 3041.67 | 658.25 |
| Usury Sub Class | Big Picture | 3041.67 | 658.25 |
| RICO Class | Big Picture | 3041.67 | 658.25 |
| Unjust Enrichment Sub Class | Red Rock | 4258.33 | 716.27 |
| Usury Sub Class | Red Rock | 18250.00 | 753.86 |
| RICO Class | Red Rock | 18250.00 | 797.35 |

44.    Based on my review, the highest APR charged was 18,250% and the lowest APR charged was 34.8887%.

45.    I obtained the average APR by using the following query:

SELECT [RICO Class].Name AS Merchant,  [RICO Class].Maximum, [RICO Class].Mean, [RICO Class].TotalPaid, 'RICO Class' AS Category

FROM [RICO Class]

UNION

SELECT [UNJUST Enrichment].Name AS Merchant, [UNJUST Enrichment].Minimum, [UNJUST Enrichment].Maximum, [UNJUST Enrichment].Mean, [UNJUST Enrichment].TotalPaid, 'UNJUST Enrichment Sub Class' AS Category

FROM [UNJUST Enrichment]

JA925

UNION SELECT [USURY SubClass].Name AS Merchant, [USURY

SubClass].Minimum, [USURY SubClass].Maximum, [USURY SubClass].Mean,

[USURY SubClass].TotalPaid, 'USURY Sub Class' AS Category

FROM [USURY SubClass]

46.    In order to reach this conclusion, I took the following steps:

a.    Directly viewing the data in the LOAN table ordering by APR.

b.    There was 10 assumed data error for APRs not included in the results.  One APR
was reported as -1520.83% and nine at 0% out of a total of loans.

**OPINION 8:  Plaintiff Lula Williams had 2 loans for which she borrowed $1,200.00 and paid
back $1,930.**

47.    Each of the data points necessary to establish the amount paid by Lula Williams is
contained in the .csv files, without referencing any additional materials or third-party sources.

48.    She obtained 2 different loans with Red Rock/Big Picture.

49.    The following chart summarizes her loan and payment activity:

| PmtDate | PmtAmt | PrincipalPaid | InterestPaid |
|---------|--------|---------------|--------------|
| 8/3/2016 | $600.00 | $400.00 | $200.00 |
| 9/2/2016 | $400.00 | $0.00 | $400.00 |
| 10/3/2016 | $400.00 | $0.00 | $400.00 |
| 10/4/2016 | ($400.00) | $0.00 | ($400.00) |
| 10/4/2016 | $0.00 | $0.00 | $0.00 |
| 11/3/2016 | $400.00 | $0.00 | $400.00 |
| 11/7/2016 | ($400.00) | $0.00 | ($400.00) |
| 11/7/2016 | $0.00 | $0.00 | $0.00 |
| 12/2/2016 | $210.00 | $0.00 | $190.00 |
| 1/3/2017 | $210.00 | $0.00 | $210.00 |
| 2/3/2017 | $210.00 | $0.00 | $190.00 |
| 2/6/2017 | ($210.00) | $0.00 | ($190.00) |

| PmtDate | PmtAmt | PrincipalPaid | InterestPaid |
|---|---|---|---|
| 3/3/2017 | $210.00 | $0.00 | $190.00 |
| 4/3/2017 | $300.00 | $0.00 | $300.00 |
| 5/3/2017 | $300.00 | $200.00 | $100.00 |
| 5/4/2017 | ($300.00) | ($200.00) | ($100.00) |
| 5/4/2017 | $0.00 | $0.00 | $0.00 |

50.    Lula Williams borrowed a total of $1,200 and paid back $1,930. The range of APRs was from 793.478% to 1303.57%.

51.    In order to reach this conclusion, I took the following steps:

a.    Identified loans and loan information for '971812','915209' by the name associated in the LOAN table.  This was used to identify the APRs and Loan Amounts.

b.    Calculated total of payments with following query:

SELECT Sum(PmtAmt) AS TOTALPAID

FROM LOANPAYMENT

WHERE (((LOANPAYMENT.[applno]) In ('971812','915209')));

c.    Summary table of payments created with following query:

SELECT PmtDate, PmtAmt, PrincipalPaid, InterestPaid

FROM LOANPAYMENT

WHERE (((LOANPAYMENT.[applno]) In ('971812','915209')));

**OPINION 9:  Plaintiff Gloria Turnage had 2 loans for which she borrowed $525 and paid back $1,308.54.**

52.    Each of the data points necessary to establish the amount paid by Gloria Turnage is contained in the .csv files, without referencing any additional materials or third-party sources.

53.    She obtained 2 different loans with Red Rock/Big Picture.

DocuSign Envelope ID: 6A2ABF490AADE-4A12AA85-3F36C6F22A1A

54.     The following chart summarizes her loan and payment activity:

| PmtDate | PmtAmt | PrincipalPaid | InterestPaid |
|---------|--------|---------------|--------------|
| 3/31/2017 | $319.80 | $225.00 | $94.80 |
| 3/31/2017 | $319.80 | $225.00 | $94.80 |
| 4/18/2017 | $334.47 | $300.00 | $34.47 |
| 4/24/2017 | $334.47 | $300.00 | $34.47 |

55.     Gloria Turnage borrowed a total of $1,025 and paid back $1,308.54. The range of APRs was from 696.975% to 683.372%.

56.     In order to reach this conclusion, I took the following steps:

a.     Identified loans and loan information for 1598831, 1701953by the name associated in the LOAN table.  This was used to identify the APRs and Loan Amounts.

b.     Calculated total of payments with following query:

SELECT Sum(PmtAmt) AS TOTALPAID

FROM LOANPAYMENT

WHERE (((LOANPAYMENT.[applno]) In (1598831, 1701953)));

c.     Summary table of payments created with following query:

SELECT PmtDate, PmtAmt, PrincipalPaid, InterestPaid

FROM LOANPAYMENT

WHERE (((LOANPAYMENT.[applno]) In (1598831, 1701953)));

**OPINION 10: Plaintiff George Hengle had 10 loans for which he borrowed $8,200 and paid back $16,073.75.**

57.     Each of the data points necessary to establish the amount paid by George Hengle is contained in the .csv files, without referencing any additional materials or third-party sources.

58.     He obtained 10 different loans with Red Rock/Big Picture.

59.     The following chart summarizes his loan and payment activity:

| PmtDate | PmtAmt | PrincipalPaid | InterestPaid |
|---|---|---|---|
| 12/27/2013 | $1,080.00 | $800.00 | $280.00 |
| 1/24/2014 | $375.00 | $225.00 | $150.00 |
| 2/7/2014 | $468.75 | $375.00 | $93.75 |
| 3/7/2014 | $75.00 | $0.00 | $75.00 |
| 3/21/2014 | $75.00 | $0.00 | $75.00 |
| 4/4/2014 | $75.00 | $0.00 | $75.00 |
| 4/18/2014 | $375.00 | $300.00 | $75.00 |
| 7/25/2014 | $1,000.00 | $800.00 | $200.00 |
| 9/19/2014 | $800.00 | $550.00 | $250.00 |
| 10/3/2014 | $112.50 | $0.00 | $112.50 |
| 10/17/2014 | $112.50 | $0.00 | $112.50 |
| 10/31/2014 | $112.50 | $0.00 | $112.50 |
| 11/14/2014 | $112.50 | $0.00 | $112.50 |
| 11/28/2014 | $562.50 | $450.00 | $112.50 |
| 1/9/2015 | $250.00 | $0.00 | $250.00 |
| 1/23/2015 | $250.00 | $0.00 | $250.00 |
| 2/6/2015 | $250.00 | $0.00 | $250.00 |
| 2/20/2015 | $250.00 | $0.00 | $250.00 |
| 3/6/2015 | $250.00 | $0.00 | $250.00 |
| 3/20/2015 | $1,250.00 | $1,000.00 | $250.00 |
| 4/17/2015 | $1,250.00 | $1,000.00 | $250.00 |
| 5/15/2015 | $1,250.00 | $1,000.00 | $250.00 |
| 6/26/2015 | $250.00 | $0.00 | $250.00 |
| 7/10/2015 | $650.00 | $400.00 | $250.00 |
| 7/24/2015 | $150.00 | $0.00 | $150.00 |
| 8/7/2015 | $750.00 | $600.00 | $150.00 |
| 10/2/2015 | $175.00 | $0.00 | $175.00 |
| 10/16/2015 | $175.00 | $0.00 | $175.00 |
| 10/30/2015 | $175.00 | $0.00 | $175.00 |
| 11/13/2015 | $175.00 | $0.00 | $175.00 |
| 11/27/2015 | $175.00 | $0.00 | $175.00 |
| 12/11/2015 | $200.00 | $25.00 | $175.00 |
| 12/28/2015 | $193.75 | $25.00 | $168.75 |
| 1/8/2016 | $187.50 | $25.00 | $162.50 |

JA929

DocuSign Envelope ID: 642AB5069ADE-4A120AA85-3F36C6E22A1A

| PmtDate | PmtAmt | PrincipalPaid | InterestPaid |
|---|---|---|---|
| 1/22/2016 | $181.25 | $25.00 | $156.25 |
| 2/5/2016 | $175.00 | $25.00 | $150.00 |
| 3/4/2016 | $168.75 | $25.00 | $143.75 |
| 3/18/2016 | $162.50 | $25.00 | $137.50 |
| 4/1/2016 | $156.25 | $25.00 | $131.25 |
| 4/15/2016 | $150.00 | $25.00 | $125.00 |
| 4/29/2016 | $143.75 | $25.00 | $118.75 |
| 5/13/2016 | $137.50 | $25.00 | $112.50 |
| 5/27/2016 | $131.25 | $25.00 | $106.25 |
| 6/10/2016 | $125.00 | $25.00 | $100.00 |
| 6/24/2016 | $118.75 | $25.00 | $93.75 |
| 7/8/2016 | $112.50 | $25.00 | $87.50 |
| 7/22/2016 | $106.25 | $25.00 | $81.25 |
| 8/5/2016 | $100.00 | $25.00 | $75.00 |
| 8/19/2016 | $93.75 | $25.00 | $68.75 |
| 9/2/2016 | $87.50 | $25.00 | $62.50 |
| 9/16/2016 | $81.25 | $25.00 | $56.25 |
| 9/23/2016 | $250.00 | $200.00 | $50.00 |

60.     George Hengle borrowed a total of $8,200 and paid back $16,073.75. The range of APRs was from 325.893% to 1596.88%.

61.     In order to reach this conclusion, I took the following steps:

a.   Identified loans and loan information for '61448213','61912590','63212112','60914298','60123198','61741274','61801256','60685325','60003594','59832576' by the name associated in the LOAN table.  This was used to identify the APRs and Loan Amounts.

b.   Calculated total of payments with following query:

SELECT Sum(PmtAmt) AS TOTALPAID

FROM LOANPAYMENT

JA930

WHERE (((LOANPAYMENT.[applno]) In ('61448213','61912590','63212112','60914298','60123198','61741274','61801256','60685325','60003594','59832576')));

    c.  Summary table of payments created with following query:

SELECT PmtDate, PmtAmt, PrincipalPaid, InterestPaid

FROM LOANPAYMENT

WHERE (((LOANPAYMENT.[applno]) In ('61448213','61912590','63212112','60914298','60123198','61741274','61801256','60685325','60003594','59832576')));

**OPINION 11: Plaintiff Dowin Coffy had 2 loans for which he borrowed $1,800 and paid back $3,200.**

62.    Each of the data points necessary to establish the amount paid by Dowin Coffy is contained in the .csv files, without referencing any additional materials or third-party sources.

63.    He obtained 2 different loans with Red Rock/Big Picture.

64.    The following chart summarizes his loan and payment activity:

| PmtDate | PmtAmt | PrincipalPaid | InterestPaid |
|---|---|---|---|
| 12/31/2015 | $350.00 | $0.00 | $350.00 |
| 1/15/2016 | $350.00 | $0.00 | $350.00 |
| 1/29/2016 | $1,350.00 | $1,000.00 | $350.00 |
| 3/11/2016 | $200.00 | $0.00 | $200.00 |
| 3/25/2016 | $700.00 | $500.00 | $200.00 |
| 4/8/2016 | $75.00 | $0.00 | $75.00 |
| 4/22/2016 | $75.00 | $0.00 | $75.00 |
| 5/6/2016 | $75.00 | $0.00 | $75.00 |
| 5/10/2016 | ($75.00) | $0.00 | ($75.00) |
| 5/10/2016 | $0.00 | $0.00 | $0.00 |
| 5/20/2016 | $100.00 | $25.00 | $75.00 |

| PmtDate | PmtAmt | PrincipalPaid | InterestPaid |
|---------|--------|---------------|--------------|
| 6/3/2016 | $93.75 | $25.00 | $68.75 |
| 6/7/2016 | ($93.75) | ($25.00) | ($68.75) |
| 6/7/2016 | $0.00 | $0.00 | $0.00 |

65.     Dowin Coffy borrowed a total of $1,800 and paid back $3,200. The range of APRs was from 506.944% to 851.667%.

66.     In order to reach this conclusion, I took the following steps:

a.    Identified loans and loan information for '65365931', '64892052 by the name associated in the LOAN table.  This was used to identify the APRs and Loan Amounts.

b.    Calculated total of payments with following query:

SELECT Sum(PmtAmt) AS TOTALPAID

FROM LOANPAYMENT

WHERE (((LOANPAYMENT.[applno]) In ('65365931', '64892052')));

c.    Summary table of payments created with following query:

SELECT PmtDate, PmtAmt, PrincipalPaid, InterestPaid

FROM LOANPAYMENT

WHERE (((LOANPAYMENT.[applno]) In ('65365931', '64892052')));

**OPINION 12: Plaintiff Felix Gillison, Jr. had 2 loans for which he borrowed $1200 and paid back $3,206.25.**

67.     Each of the data points necessary to establish the amount paid by Felix Gillison, Jr. is contained in the .csv files, without referencing any additional materials or third-party sources.

68.     He obtained 2 different loans with Red Rock/Big Picture.

Page **23** of **25**

JA932

69.     The following chart summarizes his loan and payment activity:

| PmtDate | PmtAmt | PrincipalPaid | InterestPaid |
|---|---|---|---|
| 7/5/2013 | $100.00 | $0.00 | $100.00 |
| 7/19/2013 | $300.00 | $200.00 | $100.00 |
| 8/2/2013 | $250.00 | $200.00 | $50.00 |
| 8/30/2013 | $200.00 | $0.00 | $200.00 |
| 9/13/2013 | $200.00 | $0.00 | $200.00 |
| 9/27/2013 | $200.00 | $0.00 | $200.00 |
| 10/11/2013 | $300.00 | $100.00 | $200.00 |
| 10/25/2013 | $300.00 | $125.00 | $175.00 |
| 11/8/2013 | $168.75 | $25.00 | $143.75 |
| 11/22/2013 | $162.50 | $25.00 | $137.50 |
| 12/6/2013 | $156.25 | $25.00 | $131.25 |
| 12/20/2013 | $225.00 | $100.00 | $125.00 |
| 1/3/2014 | $200.00 | $100.00 | $100.00 |
| 1/17/2014 | $100.00 | $25.00 | $75.00 |
| 11/3/2014 | $343.75 | $275.00 | $68.75 |

70.     Felix Gillison, Jr. borrowed a total of $1,200 and paid back $3,206.25. The range of APRs was from 536.765% to 570.312%.

71.     In order to reach this conclusion, I took the following steps:

a.   Identified loans and loan information for 58655378, 59325491 by the name associated in the LOAN table.  This was used to identify the APRs and Loan Amounts.

b.   Calculated total of payments with following query:

SELECT Sum(PmtAmt) AS TOTALPAID

FROM LOANPAYMENT

WHERE (((LOANPAYMENT.[applno]) In (58655378, 59325491)));

c.   Summary table of payments created with following query:

SELECT PmtDate, PmtAmt, PrincipalPaid, InterestPaid

**Page 24 of 25**

JA933

FROM LOANPAYMENT

WHERE (((LOANPAYMENT.[applno]) In (58655378, 59325491)));

72. I am being paid in this case on an hourly basis. My hourly rate is $475 per hour. To date, I have spent 11.25 hours on this case and have invoiced the Plaintiffs $5,343.75 for my services.

73. Because discovery is continuing as the date of this report, I expect that I will continue to review documents and testimony related to the topics discussed in this report. Accordingly, I reserve the right to supplement my report based on materials not available at the time I prepared it, including any reports that other experts might submit.


I hereby certify that the foregoing statements made by me are true and correct based on the information available to me at this time. I reserve the right to amend and supplement this report as additional information and evidence is provided to me.

Signed this 14th day of April, 2023.

DocuSigned by:

_Karl Ebert_

BCDD886BBAA14D9...

Karl J. Ebert

# EXHIBIT 1

# Karl J. Ebert

1044 20th Ave SE
Minneapolis, MN 55414
(612) 623-0401

| | |
|---|---|
| **Education** | **University of Minnesota Carlson School of Management, MBA Dec. 1997** |

Emphasis        Marketing and Finance                Overall GPA      3.93

**University of Minnesota Carlson School of Management, B.S. in Business Dec. 1991**
Emphasis:        Management Information Systems        Overall GPA      3.59
Minor:            Computer Science                    MIS/CSCI        3.85

**Experience**      **KJE Computer Solutions, Inc.**                            **Minneapolis, MN**
**CEO**                                                          **1999- Present**
Developed and marketed extensive suite of banking and e-commerce content as cloud based financial calculator tools.  Development in Java, JavaScript, CSS and HTML5.  Financial calculators securely deployed in Mortgage, Finance, Banking, Realestate, Education, Credit Union, Wealth Management and numerous other financially related websites on behalf of thousands of e-commerce clients.  Continuous development and support expanded offerings into foreign languages and countries outside the United States, including Canada and Australia.

**Best Buy Co.**                                                  **Edina, MN**
**Project Manager - eCommerce**                                    **1998- 1999**
Project manager for eCommerce division.  Managed large scale 12 month project, was responsible for architecture, management and deployment of  "Configure to Order (CTO)" in-store kiosk for designing, ordering and shipping custom built name-brand computers directly to customers. Project was end-to-end including in-store kiosk order placement, integration with VMS accounting system, EDI transaction enabled for external vendors and web-enabled order tracking.  Project budget was $7 million, project team consisted of 32 partially dedicated and 11 full-time employees and contract programmers.

**Grant Thornton**                                                **St. Louis, MO**
**Project Manager - netSolutions**                                **1994-1998**
Project and business development manager for Internet Electronic Commerce practice area. Key business plan architect for large scale Internet, Intranet and E-commerce business initiatives. Project management has included: Electronic loan approval system for large financial Institution, E-Commerce architecture design, data warehouse development architect, relational database design, Internet, Intranet and Client/Server development.

**Cargill Inc.**                                                  **Minnetonka, MN**
**Programmer / Analyst**                                          **1992- 1994**
New Development (80%) and support of Client/Server applications, participating in all phases of development life cycle. Development included an order entry and inventory system for a large division, written in SQLWindows running under Windows 3.1.  Other projects included Foxpro PC inventory management system and a Salt Billing System. Responsible for supporting existing PC system for 15 locations in the Molasses Division.

**Susan Wehmann Model And Talent**                                **Minneapolis, MN**
**Programmer / Analyst**                                          **1992-1994**
Part-time position, converting and enhancing existing dBase III application to Foxpro for Windows 2.5. Responsible for gathering requirements, weekly progress updates, composing and programming application, and testing.  Network administration of Windows NT 4.0.

**Special**        **Work Experience and Education has included:**
**Skills**          Web, e-commerce workflow, Business management, Project management, Business development, Organizational systems data architecture, data analsys, relational database, object database, Responsive design, HTTP, HTTPS, HTML 5, CSS3, JavaScript, Java, JSP, SQL, Oracle, Perl, PHP, Python, GIT, MongoDB, Angular, Node.js, CDN, Cloud Deployment.

JA936

| **Certifications** | Sun Certified Java Programmer | |
| | Microsoft Certified Systems Engineer (MCSE) | |
| | Certified Centura Client/Server Developer | |
| | Certified PowerBuilder Developer | |

| **Honors** | University of Minnesota Presidential Scholarship | 1987 |
| | Peavey award, outstanding Freshmen Forensic member | 1988 |
| | Sumner award, outstanding Upper-class Forensic member | 1990,91 |
| | Mortar Board national Honors Society | 1991 |

| **Activities** | **Community Education Instructor** | **1994-1999** |
| | **University of Minnesota Forensics Team** | **1987-1991** |
| | **University of Minnesota Debate Team** | **1987-1988** |
| | **Historic Home Restoration** | **1994-present** |

# Exhibit 3

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | |
|---|---|
| LULA WILLIAMS, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civil Action No. 3:17-cv-461 (REP) |
| | ) |
| BIG PICTURE LOANS, LLC, *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**REVISED OBJECTIONS AND RESPONSES OF**
**DEFENDANT MATT MARTORELLO**
**TO PLAINTIFF GEORGE HENGLE'S SECOND SET OF INTERROGATORIES**

Defendant Matt Martorello ("Martorello"), by counsel, hereby provides revised

objections and responses to Plaintiff George Hengle's Second Set of Interrogatories to

Defendant Matt Martorello as set forth below.

**INTRODUCTORY STATEMENT REGARDING THE PARTIES' ONGOING**
**COLLECTIVE DISCOVERY EFFORTS**

Pursuant to ongoing discussions among counsel regarding the scope and parameters of

the collection, review, and production of information in discovery for this action, the parties

have agreed, as reflected in the Court's Order of January 23, 2019 (Dkt. 326), to work to

establish a formal ESI protocol in an effort to identify potential additional documents for review

and possible production in discovery for this case. Accordingly, it is possible that the ESI

protocol and further related efforts will result in the discovery and disclosure of additional

information responsive to these discovery requests.

1

involved.

> **RESPONSE:  Martorello believes that only Duck Creek Tribal Financial, Red Rock Tribal Lending, and Big Picture Loans performed loan collection functions.**

11.     Identify any amendments to the Servicing Agreement between Red Rock and SourcePoint dated July 31, 2012, and all documents related to those amendments.

> **RESPONSE:  Martorello directs Plaintiffs to the following servicing agreements between Red Rock and SourcePoint:  MM_003474; MM_003598; MM_004604; MM_009292; AND LVD-DEF00021406.**

12.     If you intend to rely on advice of counsel as a defense to any of the Plaintiffs' claims, identify: (1) the substance of any advice you received; (2) the attorney who provided it; (3) the date it was provided; and (4) any advice you received to the contrary.

> **RESPONSE:  Martorello does not intend to rely upon advice of counsel as a defense in this matter at this time.  However, if the Court orders that Martorello must waive privilege to assert his good faith defense, Martorello may then elect to assert an advice of counsel defense.**

13.     If you intend to assert subjective good faith as a defense to any of the Plaintiffs' claims, identify all advice you received from any attorney regarding the legality of the tribal business model and/or the LVD's lending operation.

> **RESPONSE:  Martorello does intend to assert good faith as a defense in this matter based, in part, on non-privileged information provided by attorneys Jennifer Weddle, Karrie Wichtman, Blake Sims, Rick Hackett, John Williams, Saba Bazzazieh, Tanya Gibbs, and Robert Rosette, as well as others at their respective law firms, as well as from additional non-attorney public sources, about the legality of the tribal business model and LVD's lending operations.  Martorello reserves the right to revise or supplement this response.  Martorello incorporates herein his response to the Plaintiffs' corresponding Document Request.**

14.   Please identify all individuals known to you or your attorney who are witnesses to the events or allegations described in Plaintiff's complaint or who has knowledge of any matter that is the subject of any defense you have raised to this lawsuit. For each person, please provide a brief summary of facts to which each person might or could testify.

**OBJECTION**:  **Martorello objects to this Interrogatory on the grounds that it is unduly burdensome and oppressive, and requires Martorello to undertake undue burden and expense in an unreasonable amount of time.**

**RESPONSE**:  **Subject to the foregoing objections, Martorello cannot summarize the facts which witnesses in this case "might or could" provide by way of their testimony. Various witnesses have been deposed or subpoenaed for depositions, and Martorello directs the Plaintiffs to the testimony of such witnesses as the source of information responsive to this Interrogatory.**

15.   State the factual basis of any and all affirmative defenses that you have asserted to the Complaint.

**RESPONSE**:  **Martorello responds as follows:  Plaintiffs have a fundamental misunderstanding of the facts of this case.  A proper understanding of the truth and facts behind this case informs and supports all of Martorello's affirmative defenses.**

**MARTORELLO, BELLICOSE AND  SOURCEPOINT NEVER LENT MONEY TO CONSUMERS DIRECTLY OR INDIRECTLY**

**Contrary to Plaintiffs' allegations and theories, Martorello has never lent money to Plaintiffs or any of the consumers in question.  Similarly, Bellicose Capital, LLC ("Bellicose") and SourcePoint VI, LLC ("SourcePoint"), two typical FinTech companies for which Martorello served as a President of its Manager, and in which Martorello had an indirect partial ownership interest, have never lent money to Plaintiffs or any of the consumers in question.  At all times relevant, SourcePoint and Bellicose were not in the business of lending money to consumers.  Rather, Bellicose Capital was built to be a family office providing economic development to the US Virgin Islands (and later Puerto Rico) under government decree, and would go on to own and operate a multitude of businesses including trading securities, having an interest in an entertainment cruise ship, slot machine leasing and artificial intelligence in voice recognition to enhance compliance in investment entities.  Here, Bellicose and SourcePoint had a contractual relationship to provide**

6

advisory services to a lender that has always been wholly-owned and operated by a sovereign Native American tribe: the Lac Vieux Desert Band of Lake Superior Chippewa Indians (the "Tribe"). The Tribe is a federally recognized Native American Tribe whose sovereignty is unquestionable, and an abundance of federal law and policy expressly encourage the exact type of relationship and self-regulatory venture entered into in this matter.

### THE TRIBE SOUGHT TO PARTNER WITH MARTORELLO TO PROVIDE AN ECONOMIC DEVELOPMENT OPPORTUNITY FOR THE TRIBE AND ITS MEMBERS

In 2011, from a clear desire for tribal self-determination and economic diversity, the Tribe sought out a vendor to assist them to build and grow their already operating online lending venture formed by LVD prior to Martorello's involvement or entering into a contractual relationship with Bellicose Capital. Accordingly, the Tribe, with experienced legal counsel and substantial investment, entered a lengthy six month negotiation process concluding with a typical contractual arrangement for rural tribal economic development, based on a congressionally-blessed NIGC draft template. Under such an arrangement, Bellicose would provide services to, and develop valuable intellectual property for, the Tribe's lending businesses. Before consummating the transaction, Martorello and his attorneys performed significant due-diligence on the Tribe's contemplated transactions and business efforts, as the Tribe and its business advisors and attorneys did with Martorello. As part of this due diligence, Martorello learned about the Tribe's sovereignty, various federal policy and acts of Congress such as the Native American Business Development Act, Dodd Frank's explicit recognition of tribes as regulatory agencies over loan transaction, the Indian Commerce Clause, IGRA, and various cases regarding the enforceability of tribal law, and LVD's ability to pass and implement its own laws which, in addition to applicable federal laws, would exclusively pertain to the exact transaction contemplated by the lending businesses. Martorello understood that state laws to the contrary were preempted by tribal law absent an explicit act of Congress otherwise. The agreements were executed in the presence of the LVD tribal council, attorneys from both sides, and LVD business advisors on tribal land during a scheduled meeting of council. The Tribe's General Counsel, Karrie Wichtman, was from then on engaged in ensuring strict adherence to the Servicing Agreement, and ensuring the broader legality of the business for the Tribe. Ms. Wichtman would also advise council and keep abreast of all matters and obtain all approvals and resolutions as needed.

### THE TRIBAL LENDING BUSINESS WAS LAWFUL, THE LOANS WERE GOVERNED BY TRIBAL LAW AND MARTORELLO DID NOT BELIEVE OTHERWISE AS EVIDENCED BY HIS FOCUS ON COMPLIANCE

At all times, Martorello believed and understood that the LVD lending business, as well as the support it was getting from Bellicose and SourcePoint, was lawful in all

respects.   The loans at issue in this case were issued by the tribal lending entities —
either Red Rock Tribal Lending, LLC or Big Picture Lending, LLC — both owned
and operated by the Tribe pursuant to the Tribe's laws and under the oversight of
the TFSRA.  The Tribe conspicuously and repeatedly disclosed to consumers that
they were contracting with a sovereign Native American lender, offering an
expensive form of credit pursuant to the Tribe's law.  Such conspicuous and
repeated disclosures provided consumers with the opportunity to research whether
the Tribe's products, together with the terms, were the correct option for them.
Additionally, these conspicuous disclosures permitted a consumer to investigate the
ability of the Tribe to offer those loans to them, and all facts relating to the legality
of the loans were clear and apparent from the face of the loan transaction.  Each
loan at issue in this case contained a valid and enforceable choice-of-law provision
that selected the laws of the jurisdiction in which the lender was located, the
jurisdiction where all loans were originated, the jurisdiction involved in
participating and directing all loan origination and servicing, the jurisdiction where
the website server is hosted, the jurisdiction where all approvals and decisions
regarding the operations were made, the headquarters of the operation and council,
and the jurisdiction back to which all net profits return for exclusive governmental
economic development purposes, and the jurisdiction involved in participating and
directing collection activity occurred:  the laws of the Tribe.  Each loan at issue in
this case contained a valid and enforceable forum selection clause that requires
Plaintiffs and others to engage in the Tribal Dispute Resolution procedure with the
TLEs before their regulator and, if unsuccessful, to press their dispute before the
Tribe's court system.

Martorello's belief in the lawfulness of the business of the tribal lending entities or
applicability of tribal law to the consumer loans was not impacted by legal actions
against Cash Call, Western Sky or Scott Tucker as Martorello understood that
those businesses and individuals were not true tribal government operations, not
licensed pursuant to a consumer tribal lending code, and not regulated by a tribal
regulatory authority as LVD.  Similarly, Operation Chokepoint ("OCP") did not
impact Martorello's belief as to the lawfulness of the LVD lending business as it was
widely understood that OCP was an abuse of governmental authority.  Martorello
believed that the CFPB under Director Cordray was simply an extension, in a sense,
of OCP.  This was confirmed by Acting CFPB Director Mick Mulvaney in the
opening statements of his new 5 year plan published 2/12/2018 in which he said:

> Indeed, this should be an ironclad promise for any federal agency;
> pushing the envelope in pursuit of other objectives ignores the will of
> the American people, as established in law by their representatives in
> Congress and the White House. Pushing the envelope also risks
> trampling upon the liberties of our citizens, _or interfering with the_
> _sovereignty or autonomy of the states or Indian tribes_. I have resolved
> that this will not happen at the Bureau.

Id. (emphasis added).  Shortly thereafter, CFPB dismissed its lawsuit against Upper Lake, another true tribal government lending operation most parallel to LVD's business.  Martorello's belief in the lawfulness of the LVD lending business was reinforced by Rick Gerber, CEO of Chippewa Valley Bank, the financial institution used by LVD, when he advised that the FDIC has told him that tribal lending businesses were not illegal.

Martorello was aware that third parties, including ACH processors and credit bureaus, conducted independent evaluations of the lawfulness of LVD's business as well, and he was informed by their repeated acceptance of lending business' permissible purpose, the applicability of tribal law and their interest for continued involvement in the LVD lending businesses.  Martorello was aware of certain State Attorney General communications, which specifically acknowledged TFSRA as the appropriate forum where disputes regarding these tribal loans would be heard, other Attorney Generals who filed amicus briefs in tribal lending cases, and several states with whom LVD entered into memoranda of understanding regarding their ability to operate within a particular state.  Martorello was aware of extensive LVD and CFPB government-to-government discussions, an effort to reach a memorandum of understanding, as LVD had done with numerous state Attorneys General, and LVD's registration of its businesses into the CFPB complaint portal. Martorello was aware that LVD and its attorneys would routinely visit Washington, D.C. to meet with lawmakers, as well as with other agencies of the federal government.

The Tribe's attorneys, who had intimate knowledge of the entire operations of the Tribe's lending business and relationships, routinely issued opinion letters - which Martorello received - to third-party vendors of the Tribe expressing its confidence in the Tribe's sovereign status, the legality of the Tribe's lending businesses (i.e. the inapplicability of state law explicitly), the businesses' ability to make loans to consumers containing choice of law clauses selecting the laws of the Tribe, and the Tribe's control over its lending businesses.  Ultimately, these representations and consultation with counsel provided Martorello with the assurances that the servicing relationship whereby Bellicose or SourcePoint would assist the Tribe's lending businesses was lawful in all respects.

In addition, Bellicose, at the direction of Martorello, spent nearly $1 million building a compliance management system ("CMS"), and hired attorneys and experts to help manage and provide guidance regarding compliance.  These systems, and those implemented by LVD, which designed and implemented its own compliance system, served to ensure that the TLEs, Bellicose, SourcePoint, and all vendors followed tribal and applicable federal laws.

JA944

**LVD FULLY CONTROLLED THE BUSINESS OF THE LENDING ENTITY AND THE SERVICES PROVIDED BY BELLICOSE AND SOURCEPOINT WERE TYPICAL OF THIRD PARTY CONSULTANTS HIRED BY TRIBES SEEKING ASSISTANCE WITH THEIR BUSINESSES CREATED TO PROVIDE ECONOMIC DEVELOPMENT TO TRIBES AND THEIR MEMBERS**

**Bellicose and SourcePoint provided typical contractual services and advice to LVD's lending business but the Tribe at all times retained full control over its businesses. Neither Bellicose, SourcePoint, nor Martorello exercised control over, made decisions for, or entered into contracts on behalf of LVD's lending business. Rather, all decision-making authority (other than those decisions reserved exclusively for Tribal Council) was vested in two co-managers selected by vote of the Tribal Council. Although Bellicose and SourcePoint would make recommendations to the co-managers, those co-managers routinely made decisions after consulting with the appropriate compliance personnel, legal counsel, and, where appropriate, the Tribe's Council. Indeed, numerous resolutions show that the Tribe's Council was involved in contract negotiations with vendors and numerous other aspects of the business.**

**Similarly, neither SourcePoint nor Bellicose had any control over the decision to lend to any consumer. Rather, the co-managers of the Tribe's business had full control over the loan origination decisions and had the final say on whether to originate any loan to a consumer. Martorello played no role in the decision to lend to any particular consumer. In fact, Martorello never interacted with any consumer who borrowed from the Tribe's businesses. Further, every concept recommended or developed by SourcePoint for consideration received approval from the Tribe prior to its implementation, despite which party might ultimately implement that recommendation. Numerous actions and decisions were taken and made by the Tribe's participants without any involvement or input from SourcePoint whatsoever, including but not limited to daily operations, personnel, compliance, lobbying, negotiating contracts with vendors, and communications with AGs or TFSRA.**

**Though the services and intellectual property that SourcePoint and Bellicose provided to the Tribe's businesses were extremely valuable, there were significant limitations to the servicing agreement. One such limitation was the Tribe's ability to voluntarily terminate the Servicing Agreement and walk away with the valuable intellectual property with just 180 days-notice. Accordingly, LVD could have terminated SourcePoint, retained the intellectual property, and then hired one of dozens of other service providers or taken over. In fact, the Tribe did terminate its vendor related to its title lending business. Additionally, the control retained by LVD included its right to have eliminated its budget for lending or decided in its sole discretion not to originate any loans, or to change its laws to prohibit the type of lending engaged in by its lending entities.**

**BELLICOSE, SOURCEPOINT AND MARTORELLO HAD NO ECONOMIC INTEREST IN ANY LOAN ORIGINATED BY LVD NOR DID THEY PARTICIPATE IN THE COLLECTION OF ANY LOAN; MARTORELLO'S INVOLVMENT IN THE OPERATIONS OF BELLICOSE AND SOURCEPOINT DIMINISHED OVER TIME**

For each loan at issue in this case, the tribal lending entities have always held a 100%, undivided share of the economic and legal ownership. At no point has Martorello, SourcePoint, or Bellicose ever held an economic, legal, or beneficial interest in any loan originated by the TLEs to Plaintiffs, or any other consumer. Nor were the fees earned by Bellicose and SourcePoint tied to any specific loan that was originated by the Tribe.

Neither Bellicose nor SourcePoint ever accepted, obtained, or retained any consumer loan payments.  Similarly, Martorello, Bellicose and/or SourcePoint were not responsible for, and did not participate in, the collection of loans originated by the Tribe's businesses.  Instead, the Tribe's businesses were responsible for collection of loans originated by the Tribe's businesses.  Martorello has never taken any action that encouraged or induced a Plaintiff or any other consumer to repay their loan to the Tribe's businesses.  And, Martorello's involvement in the servicing activities and business of Bellicose and SourcePoint varied widely over time, with many other employees and executives taking the lead on everything from specific projects to running SourcePoint and Bellicose. Martorello had very little involvement in the business of SourcePoint post-June 22, 2013, given his founding and development of multiple other start-up businesses during that time frame.  As Martorello's role and involvement with Bellicose and SourcePoint diminished over time, he was removed as a signatory to the RRTL bank account and early 2015, and Brian McFadden was appointed as President.  With the office relocation to Puerto Rico in January 2014, Martorello rarely would come to the offices of Bellicose and SourcePoint and he would not see Bellicose employees for months at a time.

**THE SALE OF BELLICOSE AND SOURCEPOINT WAS NOT A SHAM AND WAS NOT CONSUMATED TO AVOID ANY POTENTIAL LIABILTY ARISING FROM THE TRIBAL LENDING BUSINESSES**

As early as 2012, the Tribe began discussing a potential sale of Bellicose and SourcePoint to the Tribe.  Such a sale would enable the Tribe to bring previously outsourced services provided by Bellicose and SourcePoint in-house, thus ensuring the longevity and certainty of performance thereafter as desired by the tribal government.  These discussions evolved over a number of years.

During this time, the Tribe and its lawyers negotiated the terms of a potential sale with Martorello.  These negotiations were active, reciprocal, and ensured that all parties received what they believed to be fair value for their assets.  The Tribe's Chairman and its attorney Rob Rosette approached Martorello in mid-2014 with a

11

more urgent desire about wanting to buy the business. Martorello was aware of a similar transaction that was occurring with another tribe, and was worried that LVD might buy a competitor to Bellicose or SourcePoint or perhaps receive or solicit a better offer from another service provider and terminate the relationship. Fearful of losing the relationship with LVD, Martorello, on August 22, 2014, provided a Term Sheet for the sale of the businesses to the Tribe's counsel. Shortly thereafter, Martorello and his wife, for personal reasons, decided that they would be relocating to the mainland United States. Because the change of his residency would have significant tax implications, Martorello's effort to sell Bellicose and SourcePoint hastened. Towards that end, Martorello began restructuring of Bellicose to prepare to sell. GT Law would initially represent Bellicose in the sale transaction, but given John Williams' experience in a similar transaction, Conner and Winters would conclude the transaction. As an Act 22 beneficiary by decree of the Puerto Rico government in their effort for economic stimulation, the effective tax rate of a sale vs operating a business in the years ahead as a resident of the United States would equate to a significant material value, and thus incentivized Martorello to sell prior to relocation. In perspective, the ongoing operation from United States would amount to about 40% tax rate per year vs a sale being taxed at an effective 8% rate. Ultimately, in late-2015 a seller-financed structure was agreed upon for the sale of Bellicose, SourcePoint, and a number of subsidiaries, to the Tribe. The sale transaction closed on January 26, 2016, and the Tribe, via a subsidiary, became the owner of all of Bellicose's assets, liabilities, technical knowledge, and other valuable consideration.

In return, Eventide Credit Acquisitions, LLC ("Eventide"), was given a note which entitled Eventide to variable payments from the Tribe's lending business over a maximum period of seven years. After the expiry of the seven-year note, or payment-in-full of the note, the Tribe will have no further obligation to Eventide and is projected to earn in excess of $50 million annually (a nearly six-fold increase in government revenues since inception of the relationship) in profits exclusively for the LVD government and its economic development effort and having accomplished the stated goal of industry diversification away from gaming. Since the close of the sale transaction, Martorello has had no involvement in the operations or management of the tribal lending entity or any other business owned and operated by the Tribe, and through this litigation, Martorello has learned that there have been material changes and growth to the product, personnel and business interests of LVD of which Martorello had no knowledge.

In addition to the foregoing, Martorello incorporates herein by reference the arguments and facts set forth in his Motion to Dismiss the Plaintiffs' Complaint, as well as the arguments and facts set forth in his Motion Opposing Class Certification, as well as the evidence to be provided in his and others' upcoming depositions and discovery efforts in this matter.

*/s/ Jonathan P. Boughrum*
Jonathan P. Boughrum
ARMSTRONG TEASDALE LLP
1500 Market Street
East Tower, 12th Floor
Philadelphia, PA  19102
*Counsel for Matt Martorello*

## CERTIFICATE OF SERVICE

I hereby certify that on the 30th day of January, 2019, a copy of the foregoing was

sent  via electronic mail to all counsel of record.


*/s/ Jonathan P. Boughrum*
Jonathan P. Boughrum
ARMSTRONG TEASDALE LLP
1500 Market Street
East Tower, 12th Floor
Philadelphia, PA  19102
*Counsel for Matt Martorello*

14