No. 23-2097

---

In The United States Court Of Appeals
For The Fourth Circuit

**LULA WILLIAMS,**
*Plaintiff-Appellee*

**v.**

**MATT MARTORELLO,**
*Defendant-Appellant,*

On Appeal From The United States District Court
For The Eastern District Of Virginia (Robert E. Payne)
(3:17-cv-00461-REP)

---

**JOINT APPENDIX
VOLUME III**

---

Matthew William Wessler
Gupta Wessler PLLC
1900 L Street NW, Suite 312
Washington, D.C. 20036
Telephone: (202) 888-1741
E-mail : matt@guptawessler.com

Steven D. Gordon
Holland & Knight LLP
800 17th Street, N.W., Suite 1100
Washington, D.C. 20006
Telephone: (202) 955-3000
E-mail: steven.gordon@hklaw.com

*Counsel for Appellee*

*Counsel for Appellant*

December 6, 2023

Krisi Cahoon Kelly
Andrew Joseph Guzzo
Kelly Guzzo, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
Telephone: (703) 424-7576
E-mail:  kkelly@kellyguzzo.com
E-mail:  aguzzo@kellyguzzo.com

*Counsel for Appellee*

VOLUME III

TABLE OF CONTENTS

| | | |
|---|---|---|
| 12 | Exhibits #4 to #30 to plaintiffs' memorandum in support of their motion *in limine* | JA950-JA1161 |
| 13 | Plaintiffs' reply in support of their motion for partial summary judgment, and exhibits #1 - #5 | JA1162-JA1212 |
| 14 | Order regarding pending motions *in limine* | JA1213-JA1214 |
| 15 | Plaintiffs' statement of position in response to the Court's order of May 19, 2023, and exhibits #1 - #2 | JA1215-JA1384 |

# Exhibit 4

---

**Message**

| | |
|---|---|
| **From**: | John Evans [john.evans@csb.co.ck] |
| **Sent**: | 8/8/2013 6:06:05 PM |
| **To**: | Matt Martorello [mattm@bellicosevi.com] |
| **Subject**: | RE: Valuation Method |

Thank you Matt,

Appreciate the documents you have sent through,

These should be more than adequate however I'll let you know if I have any questions,

Kind Regards
John

**John Evans** | Operations Manager, Capital Security Bank Limited

| | | | |
|---|---|---|---|
| Phone | (+682) 22505 | Centerpoint | |
| Fax | (+682) 22506 | Main Road, Avarua | |
| Skype | john-csb | PO Box 906 | |
| Email | john.evans@csb.co.ck | Rarotonga, Cook Islands | |
| Web | www.capitalsecuritybank.com | | |
| US Free Fax | (+1) 800 863 0056 | | |



**"Important Note – CSB's USD correspondent will be changing as of the 30th June 2013. Click <u>here</u> for our new details."**

This communication (including any files or text attached to it) is confidential and may also be privileged. It is intended only for the recipient(s) named above. If you are not an intended recipient, you must not read, copy, use or disclose this communication to any other person. Please also notify us immediately by telephoning (+682) 22505, or replying to this communication, and then delete all copies of it from your system.

---

**From:** Matt Martorello [mailto:mattm@bellicosevi.com]
**Sent:** Thursday, 8 August 2013 5:50 a.m.
**To:** John Evans
**Subject:** FW: Valuation Method

This might help as well.

**From:** Argyros, John (VG - British Virgin Islands) [mailto:jargyros@DELOITTE.com]
**Sent:** Friday, March 8, 2013 10:18 AM
**To:** Matt Martorello; Simon Liang
**Cc:** White, Richard (VG - Road-Town); Hyndman, Michele (VG - British Virgin Islands); Kondrateva, Tatyana (VG - British Virgin Islands)
**Subject:** RE: Valuation Method

Good morning Matt,

Please find attached our final Valuation Report with AOI and ICA names corrected.

I hope that you have a good day and please let me know should you require further assistance from us in this regard.

Many thanks,

---

CONFIDENTIAL PURSUANT TO
PARTIES' PROTECTIVE ORDER

IA951
MARTORELLO_038979

**John Argyros**
Manager
Financial Advisory Services
Deloitte & Touche

**British Virgin Islands**
Wickham's Cay 1, PO Box 3083, Road Town, Tortola
VG1110 | British Virgin Islands
Tel: + 1 (284) 494 2868 Ext. 2015 | Fax: + 1 (284) 494 7889 | Mobile: +1 (284) 346 2015

**U.S. Virgin Islands**
9100 Port of Sale Mall, Suite #13
St. Thomas |US Virgin Islands | 00802-3602
Tel: + 1 (340) 715 2868 | Fax: + 1 (340) 776 7889

jargyros@deloitte.com | www.deloitte.com

---

**From:** Matt Martorello [mailto:mattm@bellicosevi.com]
**Sent:** 05 March 2013 15:15
**To:** Argyros, John (VG - British Virgin Islands); Simon Liang
**Cc:** White, Richard (VG - Road-Town); Hyndman, Michele (VG - British Virgin Islands); Kondrateva, Tatyana (VG - British Virgin Islands)
**Subject:** RE: Valuation Method

Looks good. Only need to get AOI and ICA names corrected in the final version.


**Regards,**

**Matt Martorello**
Mobile: 773-209-7720
Email: MattM@BellicoseVI.com

**BELLICOSE VI**

**This email and any files transmitted with it are confidential and contain privileged or copyright information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

---

**From:** Argyros, John (VG - British Virgin Islands) [mailto:jargyros@DELOITTE.com]
**Sent:** Tuesday, March 05, 2013 11:54 AM
**To:** Matt Martorello; Simon Liang
**Cc:** White, Richard (VG - Road-Town); Hyndman, Michele (VG - British Virgin Islands); Kondrateva, Tatyana (VG - British Virgin Islands)
**Subject:** RE: Valuation Method

Good morning Matt,

Thank you for your e-mail.

Please find attached our Valuation report version 2. Please will you review the report and if you are happy with it then we shall send you our final version.

Many thanks and have a great day,

**John Argyros**
Manager
Financial Advisory Services
Deloitte & Touche

**British Virgin Islands**
Wickham's Cay 1, PO Box 3083, Road Town, Tortola
VG1110 | British Virgin Islands
Tel: + 1 (284) 494 2868 Ext. 2015 | Fax: + 1 (284) 494 7889 | Mobile: +1 (284) 346 2015

**U.S. Virgin Islands**
9100 Port of Sale Mall, Suite #13
St. Thomas |US Virgin Islands | 00802-3602
Tel: + 1 (340) 715 2868 | Fax: + 1 (340) 776 7889

jargyros@deloitte.com | www.deloitte.com

---

**From:** Matt Martorello [mailto:mattm@bellicosevi.com]
**Sent:** 04 March 2013 17:58
**To:** Simon Liang; Argyros, John (VG - British Virgin Islands)
**Cc:** White, Richard (VG - Road-Town); Hyndman, Michele (VG - British Virgin Islands); Kondrateva, Tatyana (VG - British Virgin Islands)
**Subject:** RE: Valuation Method

Hi John, I just want to make sure you guys are on track and communicating with Michele on the valuation.

**Regards,**

**Matt Martorello**
Mobile: 773-209-7720
Email: MattM@BellicoseVI.com



**This email and any files transmitted with it are confidential and contain privileged or copyright information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

---

**From:** Simon Liang
**Sent:** Wednesday, February 27, 2013 4:56 PM
**To:** Argyros, John (VG - British Virgin Islands); Matt Martorello
**Cc:** White, Richard (VG - Road-Town); Rebecca Martorello
**Subject:** RE: Valuation Method

John, please see my answers below. Thank you.

Regards,

Simon Liang
Office: 340-715-1807
Mobile: 773-677-6962

CONFIDENTIAL PURSUANT TO
PARTIES' PROTECTIVE ORDER

Email: SL@BellicoseVI.com



**This email and any files transmitted with it are confidential and contain privileged or copyright information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

---

**From:** Argyros, John (VG - British Virgin Islands) [mailto:jargyros@DELOITTE.com]
**Sent:** Wednesday, February 27, 2013 2:18 PM
**To:** SL@bellicosevi.com; mattm@bellicosevi.com
**Cc:** White, Richard (VG - Road-Town); rh@bellicosevi.com
**Subject:** RE: Valuation Method

Good afternoon Simon,

After reviewing and updating our valuation model please could you assist me with the following:

1) Per inspection of the Balance Sheet of Bellicose VI there is no longer an investment in Bellicose Management ("BM"). There is now an investments in "GMK". Has BM changed its name to "GMK" and is this the acronym for Green Key Marketings, LLC? I realise that the GMK does not provide an exact acronym for Green Key Marketings but I am assuming that this is perhaps a typo.*[Simon Liang]* BellicoseVI Management, LLC was changed to BC Brokerage, LLC. None of them is on BVI balance sheet because they didn't have any business activities in 2012. The previously recorded capital contribution was the payment of legal services and we believe it should be expensed by BVI. Green Key Markets, LLC is a different entity and not related to BVM.

2) Per inspection of the Balance Sheet of Source Point VI ("SP") I have noticed that there is a "Notes Receivable – LVD". Could you please let me know the full name of "LVD"?*[Simon Liang]* Lac Vieux Desert Band of Lake Superior Chippewa Indians borrowed $200K from SPVI on 12/27/12.

3) IFI has a loan receivable from "TFB VI, LLC" – Could you please clarify whether this is the full name of this entity or is the TFB an acronym? IFI also has notes payable to "TJA", "TPA" and "CPS". Could you please clarify the full names for these acronyms?*[Simon Liang]* Yes, TFB VI, LLC is the full name of the entity and it is owned by 7X. The three debt investors are: Timothy P. Arenberg, Terrence J. Arenberg and Columbia Pipe & Supply, Co.

4) Per inspection of the Income Statement of SP I have noticed that there does not appear to be any rent/payroll expenses for the period to 31 December 2012. Is there perhaps a reason for this omission and based on your response are these expenses still forecast to occur in 2013 and 2014?*[Simon Liang]* We plan to allocate part of BVI rent and payroll expenses to SPVI and that is why they are shown on the pro forma, but are not shown in SPVI 2012 income statement.

Thank you for your assistance with the above Simon and I hope that you have a good day,

**John Argyros**
Manager
Financial Advisory Services
Deloitte & Touche

**British Virgin Islands**
Wickham's Cay 1, PO Box 3083, Road Town, Tortola
VG1110 | British Virgin Islands
Tel: + 1 (284) 494 2868 Ext. 2015 | Fax: + 1 (284) 494 7889 | Mobile: +1 (284) 346 2015

**U.S. Virgin Islands**
9100 Port of Sale Mall, Suite #13
St. Thomas |US Virgin Islands | 00802-3602
Tel: + 1 (340) 715 2868 | Fax: + 1 (340) 776 7889

jargyros@deloitte.com | www.deloitte.com

---

**From:** Argyros, John (VG - British Virgin Islands)
**Sent:** 26 February 2013 17:43
**To:** 'SL@bellicosevi.com'; mattm@bellicosevi.com
**Cc:** White, Richard (VG - Road-Town); rh@bellicosevi.com
**Subject:** RE: Valuation Method

Thank you Simon, I shall be in touch soon with our draft report for your final review.

Many thanks and have a good evening,

**John Argyros**
Manager
Financial Advisory Services
Deloitte & Touche

**British Virgin Islands**
Wickham's Cay 1, PO Box 3083, Road Town, Tortola
VG1110 | British Virgin Islands
Tel: + 1 (284) 494 2868 Ext. 2015 | Fax: + 1 (284) 494 7889 | Mobile: +1 (284) 346 2015

**U.S. Virgin Islands**
9100 Port of Sale Mall, Suite #13
St. Thomas |US Virgin Islands | 00802-3602
Tel: + 1 (340) 715 2868 | Fax: + 1 (340) 776 7889

jargyros@deloitte.com | www.deloitte.com

---

**From:** SL@bellicosevi.com [mailto:SL@bellicosevi.com]
**Sent:** 26 February 2013 10:36
**To:** Argyros, John (VG - British Virgin Islands); mattm@bellicosevi.com
**Cc:** White, Richard (VG - Road-Town); rh@bellicosevi.com
**Subject:** RE: Valuation Method

John,

BVI and its subsidiaries' 2012 financials are attached. Depreciation and amortization will be recorded according to tax return calculation. Please let us know if you have any questions. Thank you.

Regards,

Simon Liang
Office: 340-715-1807
Mobile: 773-677-6962
Email: SL@BellicoseVI.com


BELLICOSE VI

CONFIDENTIAL PURSUANT TO
PARTIES' PROTECTIVE ORDER

**This email and any files transmitted with it are confidential and contain privileged or copyright information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

**From:** Argyros, John (VG - British Virgin Islands) [mailto:jargyros@DELOITTE.com]
**Sent:** Wednesday, February 06, 2013 11:39 AM
**To:** mattm@bellicosevi.com
**Cc:** White, Richard (VG - Road-Town); rh@bellicosevi.com; SL@bellicosevi.com
**Subject:** RE: Valuation Method

Hi Matt,

To make payment by wire transfer, please use the following details:

Instructions to:
Wachovia Bank, New York
Swift Code: PNBPUS3NNYC ABA Code: 026005092

For initial credit to:
FirstCaribbean International Bank (Cayman) Limited, British Virgin Islands
Swift Code: FCIBVGVG
Account Number 2000192005393

And Onward Credit To:
Deloitte & Touche, British Virgin Islands
Account Number 215266893

Many thanks,

**John Argyros**
Manager
Financial Advisory Services
Deloitte & Touche

**British Virgin Islands**
Wickham's Cay 1, PO Box 3083, Road Town, Tortola
VG1110 | British Virgin Islands
Tel: + 1 (284) 494 2868 Ext. 2015 | Fax: + 1 (284) 494 7889 | Mobile: +1 (284) 346 2015

**U.S. Virgin Islands**
9100 Port of Sale Mall, Suite #13
St. Thomas |US Virgin Islands | 00802-3602
Tel: + 1 (340) 715 2868 | Fax: + 1 (340) 776 7889

jargyros@deloitte.com | www.deloitte.com

---

**From:** mattm@bellicosevi.com [mailto:mattm@bellicosevi.com]
**Sent:** 06 February 2013 11:22
**To:** Argyros, John (VG - British Virgin Islands)
**Cc:** White, Richard (VG - Road-Town); rh@bellicosevi.com; SL@bellicosevi.com
**Subject:** RE: Valuation Method

CONFIDENTIAL PURSUANT TO
PARTIES' PROTECTIVE ORDER

Could be the case. Please send me wire info to make payment.

**Regards,**

**Matt Martorello**
Mobile: 773-209-7720
Email: MattM@BellicoseVI.com



**This email and any files transmitted with it are confidential and contain privileged or copyright information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

---

**From:** Argyros, John (VG - British Virgin Islands) [mailto:jargyros@DELOITTE.com]
**Sent:** Wednesday, February 06, 2013 11:14 AM
**To:** mattm@bellicosevi.com
**Cc:** White, Richard (VG - Road-Town)
**Subject:** RE: Valuation Method

Good morning Matt,

I hope that you are well.

I just wanted to follow up on our invoice number 2369 attached. I believe per our debtors department that this amount is outstanding. Would you perhaps be able to look into this on our behalf?

Furthermore, I have attached our final invoice for the valuation performed.

I look forward to hearing from you soon and I await receipt of the final numbers for our use in the valuation.

Many thanks and have a good day,

**John Argyros**
Manager
Financial Advisory Services
Deloitte & Touche

**British Virgin Islands**
Wickham's Cay 1, PO Box 3083, Road Town, Tortola
VG1110 | British Virgin Islands
Tel: + 1 (284) 494 2868 Ext. 2015 | Fax: + 1 (284) 494 7889 | Mobile: +1 (284) 346 2015

**U.S. Virgin Islands**
9100 Port of Sale Mall, Suite #13
St. Thomas |US Virgin Islands | 00802-3602
Tel: + 1 (340) 715 2868 | Fax: + 1 (340) 776 7889

jargyros@deloitte.com | www.deloitte.com

---

**From:** SL@bellicosevi.com [mailto:SL@bellicosevi.com]
**Sent:** 31 January 2013 19:28
**To:** Argyros, John (VG - British Virgin Islands)

CONFIDENTIAL PURSUANT TO
PARTIES' PROTECTIVE ORDER

**Cc:** mattm@bellicosevi.com; White, Richard (VG - Road-Town)
**Subject:** Re: Valuation Method

We will send them to you as soon as BVI's ready.


Regards,

Simon Liang
Mobile: 773-677-6962
Office: 340-715-1807
Email: SL@BellicoseVI.com


On Jan 31, 2013, at 7:26 PM, "SL@bellicosevi.com" <SL@bellicosevi.com> wrote:

> Hi John,
>
> Financials for most of BVI subsidiaries are done. BVI financials will be available in middle of February. We will send them all to you as soon as poss
>
>
> Regards,
>
> Simon Liang
> Mobile: 773-677-6962
> Office: 340-715-1807
> Email: SL@BellicoseVI.com
>
>
> On Jan 30, 2013, at 3:18 PM, "Argyros, John (VG - British Virgin Islands)" <jargyros@DELOITTE.com> wrote:
>
> > Good afternoon Matt and Simon,
> >
> > I hope that you are both well.
> >
> > I just wanted to follow up on our e-mail below. We need the 12/31 financials to finalize our valuation report. Do you perhaps know when these may be completed and ready for us to utilize in our report?
> >
> > Many thanks,
> >
> > **John Argyros**
> > Manager
> > Financial Advisory Services
> > Deloitte & Touche
> >
> > **British Virgin Islands**
> > Wickham's Cay 1, PO Box 3083, Road Town, Tortola
> > VG1110 | British Virgin Islands
> > Tel: + 1 (284) 494 2868 Ext. 2015 | Fax: + 1 (284) 494 7889 | Mobile: +1 (284) 346 2015
> >
> > **U.S. Virgin Islands**

CONFIDENTIAL PURSUANT TO
PARTIES' PROTECTIVE ORDER

9100 Port of Sale Mall, Suite #13
St. Thomas |US Virgin Islands | 00802-3602
Tel: + 1 (340) 715 2868 | Fax: + 1 (340) 776 7889

jargyros@deloitte.com | www.deloitte.com

---

**From:** White, Richard (VG - Road-Town)
**Sent:** 11 January 2013 17:11
**To:** mattm@bellicosevi.com; Argyros, John (VG - British Virgin Islands)
**Cc:** SL@bellicosevi.com
**Subject:** RE: Valuation Method

Thanks Matt

**Richard White**
Director
Deloitte & Touche
Telephone: +1 (284) 494 2868 ext: 2012 | Cell: +1 (284) 346 2012
www.deloitte.com

---

**From:** mattm@bellicosevi.com [mailto:mattm@bellicosevi.com]
**Sent:** Friday, January 11, 2013 5:09 PM
**To:** Argyros, John (VG - British Virgin Islands)
**Cc:** White, Richard (VG - Road-Town); SL@bellicosevi.com
**Subject:** RE: Valuation Method

Only a few comments:

-Page i - last sentence of objectives should read, "In order to change the classification of the Bellicose parent company from "C" corporation to LLC."
-Page 7 - please remove strengths listed: "Compliant to an extent" and "State gov unlikely to enforce criminal liability..."
-Page 10 - fee paid to Jennifer Gallaway for legal services
-Page 11 - WMS is due to terminate in the 1st quarter of 2013
-Page 13 - Salaries and prof fees are paid to... BVI employs a financial analyst that time is allocated to as used. O/H is allocated as well, and professional fees is legal. My time is also allocated to salaries.

We will get you 12/31 financials when they are done for you to finalize the report, thanks.

**Regards,**

**Matt Martorello**
Mobile: 773-209-7720
Email: MattM@BellicoseVI.com

**This email and any files transmitted with it are confidential and contain privileged or copyright information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

**From:** Argyros, John (VG - British Virgin Islands) [mailto:jargyros@DELOITTE.com]
**Sent:** Wednesday, January 09, 2013 12:49 PM
**To:** mattm@bellicosevi.com
**Cc:** White, Richard (VG - Road-Town); SL@bellicosevi.com
**Subject:** RE: Valuation Method

Good afternoon Matt,

I hope that you are well.

Please find attached our first draft valuation report. Please review the report and feel free to ask either Richard or I any questions which you may have.

In order for us to finalise the report we shall need:

1) The Statement of Financial Position of all entities as at 31 December 2012;
2) The Statement of Comprehensive Income for SP from October – December 2012. We have the figures per your updated Pro forma statement sent to us, however, I am not sure as to whether these are final or not.
3) The Statement of Comprehensive Income for ICA for the year ended 31 December 2012. Our report has utilised budgeted figures and not the actual results.

I hope that you have a good day and I look forward to hearing from you soon,

**John Argyros**
Manager
Financial Advisory Services
Deloitte & Touche

**British Virgin Islands**
Wickham's Cay 1, PO Box 3083, Road Town, Tortola
VG1110 | British Virgin Islands
Tel: + 1 (284) 494 2868 Ext. 2015 | Fax: + 1 (284) 494 7889 | Mobile: +1 (284) 346 2015

**U.S. Virgin Islands**
9100 Port of Sale Mall, Suite #13
St. Thomas |US Virgin Islands | 00802-3602
Tel: + 1 (340) 715 2868 | Fax: + 1 (340) 776 7889

jargyros@deloitte.com | www.deloitte.com

---

**From:** Argyros, John (VG - British Virgin Islands)
**Sent:** 22 December 2012 08:43
**To:** 'mattm@bellicosevi.com'
**Cc:** White, Richard (VG - Road-Town); SL@bellicosevi.com
**Subject:** RE: Valuation Method

Hi Matt,

Thank you for sending us this information. It is certainly a fascinating forecast and we look forward to gaining further insights into the model once we have received it.

CONFIDENTIAL PURSUANT TO
PARTIES' PROTECTIVE ORDER

Have a good weekend and speak soon,

**John Argyros**
Manager
Financial Advisory Services
Deloitte & Touche

**British Virgin Islands**
Wickham's Cay 1, PO Box 3083, Road Town, Tortola
VG1110 | British Virgin Islands
Tel: + 1 (284) 494 2868 Ext. 2015 | Fax: + 1 (284) 494 7889 | Mobile: +1 (284) 346 2015

**U.S. Virgin Islands**
9100 Port of Sale Mall, Suite #13
St. Thomas |US Virgin Islands | 00802-3602
Tel: + 1 (340) 715 2868 | Fax: + 1 (340) 776 7889

jargyros@deloitte.com | www.deloitte.com

---

**From:** mattm@bellicosevi.com [mailto:mattm@bellicosevi.com]
**Sent:** 21 December 2012 20:28
**To:** Argyros, John (VG - British Virgin Islands)
**Cc:** White, Richard (VG - Road-Town); SL@bellicosevi.com
**Subject:** RE: Valuation Method

Sorry for the delay, but figuring out how to price all of these risks into our forecasts is pretty interesting. I can say that b/w the having 1 Tribal client thing and having high risk of losing their bank account and/or their ACH provider, the pro-forma won't exist for longer than 30 - 36 months which is about where I'd expect to lose one or the other and terminate business.

In reality, I certainly hope that we can find new business models to venture into and new clients. Maybe traditional banks will one day be willing to service the industry again too. I certainly can't say any of that is anywhere in process or even close at this time, so I won't be accounting for that in these models.

Lead costs have doubled in 3 years, I'll continue that trend and we will assume on the capacity that we have today.

Revenue generated per loan will become lower as we expect the industry to become more competitive as well of the 30 - 36 months we'll have in the business as it is.

Hoping to have this to you very soon.

**Regards,**

**Matt Martorello**
Mobile: 773-209-7720
Email: MattM@BellicoseVI.com

CONFIDENTIAL PURSUANT TO
PARTIES' PROTECTIVE ORDER

**This email and any files transmitted with it are confidential and contain privileged or copyright information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

**From:** mattm@bellicosevi.com
**Sent:** Monday, December 10, 2012 8:59 AM
**To:** Argyros, John (VG - British Virgin Islands) (jargyros@DELOITTE.com)
**Cc:** White, Richard (VG - Road-Town) (ricwhite@deloitte.com); 'SL@bellicosevi.com'
**Subject:** Valuation Method
**Importance:** High

Hey guys, I have some urgent questions for you on valuation.

-What would you value the old US internet poker websites at the point in time when you knew Washington was pushing to ban them from the US altogether? And did?
-What would you value a business that's competitors are being sought out by several state governments and the federal government challenging the legality (i.e. the Tribal Gaming model before a favorable federal law was created)? These businesses were entitled to 90% of the revenue as their fee for services, and they were sued by the state every time. They ended up getting lucky and getting a federal law passed, but their revenue was cut to 30% max, and for only a period of 7 years max.
-What would you value medicinal marijuana stores that are not yet legal and could get shut down any day?
-What would you value STATE LICENSED stores in the state of Ohio, at the moment that a bill is in congress to cap rates at 36%, resulting ALL stores closing down? This just happened last year and it's the perfect analogy to the position our client is in today.
-What would you value a drug cartel at? (i.e. a business that is illegal, yet very profitable)?

This industry is going to be living in the grey area of its legality for another year or two. State governments will continue to sue the Tribes and me saying their state laws apply. Tribes will continue to say their laws apply.

The FTC right now is suing a competitor (FTC vs. AMG Services and Scott Tucker, which you can Google) and are alleging 3 or 4 violations of consumer lending laws. Our client arguably employs similar practices and the FTC has begun investigations of several Tribal lenders like our client, and their service providers. If Tucker/AMG loses, the FTC is seeking RESTITUTION OF ALL REVENUE EVER EARNED BY THE COMPANY. Not profit, REVENUE! You've seen this last year by the other industry regulator who we expect our audit from in Q1 next year, the CFPB. They settled for $250mm with Capital One for ALL REVENUE ever earned off a product that the CFPB did not like. They did the same to American Express and another large bank. Our industry is on the list. This concept of restitution makes this business one of the only in the world where there is no LIMITED LIABILITY to equity holders. As restitution from the government means I personally would have to give every $ I have to my name, period. I don't just lose my investment.

Class action lawsuits follow and are already following Tucker's case with the FTC. Also see Martin Butch Webb/Western Sky and look that up.

There is no business with such risk to it as this you, you will simply not find any business out there that can measure up on risk. That's why the proper discount rate I would apply would be 300%.
-There are NO public companies doing what we do, and there will never be

CONFIDENTIAL PURSUANT TO
PARTIES' PROTECTIVE ORDER

-Major funds want nothing to do with the equity side of what we are doing for the major liability reasons stated above

-In fact, major banks WILL NOT service our Tribal clients, as they want nothing to do with the business. Wells Fargo closed our accounts on us just 4 months ago! The risk of losing a bank, means that we lose access to ALL of the cash that is out in loans, and we lose everything.

-Identical risk to the ACH servicers between the borrower and the bank. We lose them (there are 2 in the US that are willing to service the business) and they are small players, then we lose all of the principal that is on the street and all of our money.

-We only have ONE CLIENT, and if you read their contract, they can cancel with 180 days' notice and we have no revenue. Think about the large fees that we earn from them, what's to keep them from canceling our service? This is a major point and I think you need to look closely at that agreement and the pricing and termination.

-Our client is a Tribe, and we could never sue them. They could "nationalize" the debt and investment that we've made in them and we would never see those funds again. This happened recently where Wells Fargo lent $30mm to a Tribal entity, then the Tribal council simply nationalized those assets and told Wells they can't sue them and the money is there's. This is not a traditional client we have, and again, we only have 1 client! If I were on their end, as I represent about 80% of their expenses, I'd be looking for a way to operate alone and TERMINATE my agreement.

-300% returns is annualized what equity players will make if they can avoid all of these issues. Despite 300% returns, there still isn't a public company, there still isn't a major institutional player rolling these up when sellers like me would sell at 1.5x EBITDA and a traditional valuation would put the business at 10 times that?

-Debt holders don't have any of these risks. If the Restitution penalty is applied, then debt holders get all of what they are due before the government does. And we have DOZENS of individuals, one company, and one hedge fund who've invested between 30 - 36% APR. Again, that's if NO restitution risk.

-More equity risk you don't see in any business you'll pull COE from: Several states make it a FELONY crime to make loans over a certain rate or without a license. I had a 20 Page document done for me to understand the risk that I have as an equity owner for **aiding and abetting felony crime** in states like GA and you will see the conclusion. It says something like… "yes it is possible the state will come after you for helping the tribe lend against their laws and charge YOU for aiding and abetting as a felony crime in their state (in some instances penalty could be jail time), but we don't think it's going to happen." That's an equity risk, how do you price that into the equation?

-The Merkely Bill is in congress seeks to outright BAN Tribal and offshore lending. This is soon to be voted on, could end the industry in a matter of MONTHS. This is not the first bill to be proposed, and dozens of states have already passed similar legislation. We lose states off the map every month.

-Obama campaigned to cap payday rates at 36%. The CFPB has the power to effectively regulate out this industry and they are pushing to.

-Bottom line is, this business will simply not exist in 2 to 3 years anything like it does right now. If it does exist, it will be so extremely low profitability and we may not be able to keep up to remain profitable.

-We have received dozens of letters from State AGs saying we need to be licensed and sending Cease and Desist orders. Those battles will go to court.

I can put you on the phone with former FTC Directors, who are industry experts and our legal counsel that can tell you about the real risk of this business from the regulatory side ALONE. Now, I don't want you to think that we are doing anything wrong, we certainly are NOT. We use some of the biggest law firms in the country and they CERTAINLY would not be willing to service us and advise us if we were. However, we are

CONFIDENTIAL PURSUANT TO
PARTIES' PROTECTIVE ORDER

living in a grey area that is being highly challenged right now. Greenberg Traurig is the one that did the Aiding and Abetting piece from me, and despite the fact that they feel a State could threaten me with jail time and charge me with a felony, they are still comfortable that I am not doing anything wrong/illegal and so they will defend me on it. GT Law is one of the biggest firms in the US.

So the only way that I would value a business with what I know is as a multiple of EBITDA. Because I think that I'd be thrilled to see 1.5 years left as the business is. I would buy a business at somewhere between 1x and 1.5x EBITDA because I could be shut down after that, or WORSE take all of the liability to have to pay restitution for latent liability that the business I bought did in prior years. I almost wouldn't do it for even 1x but I would probably roll the dice. NO VC OR FUND would do that! Hence, the Cane Bay deal dying after they did full diligence.

I'd argue a multiple of EBITDA is appropriate.

If you want to stick to DCF, then let me know if you want to either:

A) build this all into a discount rate (300% is about the long-term average ROE and so the risk is already priced really, and despite 300% many will never enter the business b/c it puts all your CURRENT assets at risk due to the restitution penalty risk, so perhaps the right cost of equity is higher than that)... or
B) Do you want me to adjust the revenues based on the PROBABILITY of legislation passing at given times in the future, creating contingent reserves for lawsuits and battles, reducing revenue etc. etc. which will MASSIVELY change what we originally provided. As I give the probability of this industry lasting AND ME STILL HAVING MY 1 SINGLE CLIENT PAYING ME SUCH HUGE FEES, about a 20% chance to still be the same situation in 18 - 24 months' time from now.

Very unorthodox. Also, very important as this is a big deal to determine the merger from C-corp to LLC that we are doing.

Give me a call if any questions.


Regards,

**Matt Martorello**
Mobile: 773-209-7720
Email: MattM@BellicoseVI.com


**This email and any files transmitted with it are confidential and contain privileged or copyright information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

Deloitte refers to one or more of Deloitte Touche Tohmatsu Limited, a UK private company limited by guarantee, and its network of member firms, each of which is a legally separate and independent entity. Please see **www.deloitte.com/about** for a detailed description of the legal structure of Deloitte Touche Tohmatsu Limited and its member firms.

Deloitte refers to one or more of Deloitte Touche Tohmatsu Limited, a UK private company limited by guarantee, and its network of member firms, each of which is a legally separate and

USCA4 Appeal: 23-2097      Doc: 11-3      Filed: 12/06/2023      Pg: 19 of 438

independent entity. Please see **www.deloitte.com/about** for a detailed description of the legal
structure of Deloitte Touche Tohmatsu Limited and its member firms.

Deloitte refers to one or more of Deloitte Touche Tohmatsu Limited, a UK private company limited by guarantee, and its network of
member firms, each of which is a legally separate and independent entity. Please see **www.deloitte.com/about** for a detailed
description of the legal structure of Deloitte Touche Tohmatsu Limited and its member firms.

Deloitte refers to one or more of Deloitte Touche Tohmatsu Limited, a UK private company limited by guarantee, and its network of
member firms, each of which is a legally separate and independent entity. Please see **www.deloitte.com/about** for a detailed
description of the legal structure of Deloitte Touche Tohmatsu Limited and its member firms.

Deloitte refers to one or more of Deloitte Touche Tohmatsu Limited, a UK private company limited by guarantee, and its network of
member firms, each of which is a legally separate and independent entity. Please see **www.deloitte.com/about** for a detailed
description of the legal structure of Deloitte Touche Tohmatsu Limited and its member firms.

Deloitte refers to one or more of Deloitte Touche Tohmatsu Limited, a UK private company limited by guarantee, and its network of
member firms, each of which is a legally separate and independent entity. Please see **www.deloitte.com/about** for a detailed
description of the legal structure of Deloitte Touche Tohmatsu Limited and its member firms.

Deloitte refers to one or more of Deloitte Touche Tohmatsu Limited, a UK private company limited by guarantee, and its network of
member firms, each of which is a legally separate and independent entity. Please see **www.deloitte.com/about** for a detailed
description of the legal structure of Deloitte Touche Tohmatsu Limited and its member firms.

**This email and any files transmitted with it are confidential and may contain privileged or copyrighted information.
You must not present this message to another party without gaining permission from the sender. If you are not the
intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose
other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this
email from your system.**

IA965
MARTORELLO_038993

# Exhibit 5

MONTGOMERY, McCRACKEN, WALKER & RHOADS, LLP
**PRIVILEGED AND CONFIDENTIAL – Attorney Work Product**



**MEMORANDUM**

To:        File

From:     Montgomery McCracken Walker & Rhoads, LLP

Re:        Case Analysis – Virginia Litigation Overview, Defenses, and Indemnity

Date:      May 4, 2018

---

## I.    SUMMARY OF THE CLAIMS

### A.    The Parties to the Lawsuit

Plaintiffs Lula Williams, Gloria Turnage, George Hengle, Dowin Coffy, and Felix Gillison, Jr., are Virginia consumers who borrowed money on line from either Red Rock Lending, LLC ("RRTL") or Big Picture Loans ("BPL"). The defendants are BPL a lender owned and operated by the Lac Vieux Desert Band of Lake Superior Chippewa Indians ("LVD"), Ascension Technologies, a service provider owned ultimately by LVD, Matt Martorello, a former owner of Bellicose Capital, LLC and Sourcepoint VI, LLC (service providers who were retained by RRTL to provide services to it in the operation of its lending company), and four official of the LVD who serve on the Tribal Council.[1]

### B.  Summary of the Complaint and Plaintiffs' Theory of the Case

On June 22, 2017, five Plaintiffs – Lula Williams, Gloria Turnage, George Hengle, Dowin Coffy, and Felix Gillison, Jr. – filed a putative class action in the Eastern District of Virginia alleging claims arising out of loans they entered into with a sovereign lending entity owned and operated by the Lac Vieux Desert Band of Lake Superior Chippewa Indians ("LVD"). These Plaintiffs purport to represent a class of all Virginia consumers who borrowed money from LVD as described below. Contrary to the loan agreements signed by each Plaintiff, the Complaint does not acknowledge that they entered into an agreement with a sovereign Native American Lender (either RRTL or BPL). Instead, Plaintiffs have alleged that non-tribal members – including Matt Martorello (or businesses owned or controlled by him) – utilized and

---

[1] Recently, the US District Court for the Eastern District of Virginia dismissed the four officials from the case without prejudice and provided until April 5, 2018, for the Plaintiffs to file an Amended Complaint as to them. In essence, the Court found that the original Complaint did not contain enough factual detail to plausibly form the basis for claims against the officials.

-1-

ATTORNEY'S EYES ONLY

MONTGOMERY, MCCRACKEN, WALKER & RHOADS, LLP
**PRIVILEGED AND CONFIDENTIAL** – Attorney Work Product

controlled LVD's wholly owned lending entities in what is alleged to be a "rent-a-tribe" scheme in which LVD's sovereignty was "rented" by non-tribal members in order to make loans to residents of Virginia.  Plaintiffs allege that Martorello's servicing company – Bellicose Capital, LLC – controlled the lending process utilized by LVD's lending entities and retained most of the revenue made by those entities.  Plaintiffs make these allegations notwithstanding their acknowledgement that Martorello sold Bellicose Capital, LLC to LVD in 2016 in return for a Note from LVD.  Though not acknowledged in the Complaint, the Note from LVD is made payable to Eventide Credit Acquisitions – a company for which Martorello is the President of the company's manager, and for which Martorello has an indirect ownership interest.  In essence, Plaintiffs allege that the sale of Bellicose and Sourcepoint to a wholly owned entity controlled by LVD was a sham and that Martorello continues to control every aspect of the tribal lending entity.

Specifically, Plaintiffs contend that in both pre-sale and post-sale periods[2], non-tribal members Martorello and Bellicose Capital, LLC controlled all aspects of the lending business, including: marketing, underwriting, provision of loan capital, servicing of loans, and collection.  In return, the non-tribal entities received the majority of income from the businesses, and merely paid LVD a nominal fee in return for "renting" LVD's sovereignty for the purpose of making loans to Virginians.

From these core factual allegations, Plaintiffs' Complaint alleges four claims seeking class-wide relief on behalf of Virginia residents:  (1) a declaratory judgment action seeking to void the loans as against the laws and public policy of Virginia; (2) violations of the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c), for the participation in an enterprise through the collection of unlawful debts, (3) conspiracy to violate the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(d), for conspiring to conduct an enterprise through the collection of unlawful debts; (4) violations of Virginia's Usury law, Va. Code §§ 6.2-1501 *et seq.* for receipt of loan interest in excess of 12%;  and (5) unjust enrichment under Virginia law.

### C. **What the Plaintiffs Seek to Obtain from the Defendants**

In layman's terms, the Plaintiffs seek the following relief from the Defendants:

> 1. A Declaration that the loans made by RRTL and BPL to Virginia consumers are void.  If a loan is declared to be void, it is as if the loan never was made.  With respect to any loan on which any money, including principal, was still owed, the practical effect of a declaration that the loans are void is that no further payments would need to be made on the loans.

> 2. If the loans were found to be unlawful, then under the substantive or conspiracy racketeering claims, the Class of Virginia consumers would be entitled to treble damages.  In short, the total amount of the loans, including principal, interest, fees or any penalties, that had been collected could then be

---

[2] The sale of Bellicose and Sourcepoint closed on January 26, 2016.

-2-

4641378v1

ATTORNEY'S EYES ONLY

JA968

PCAM_00408

MONTGOMERY, MCCRACKEN, WALKER & RHOADS, LLP
**PRIVILEGED AND CONFIDENTIAL** – **Attorney Work Product**

trebled.  Such trebling of damages, however, is not automatic and requires an evidentiary showing by Plaintiffs sufficient to demonstrate that such a punitive recovery is appropriate.

3.  If the loans were found to be unlawful, then under the Virginia usury statute, the Class of Virginia consumers would be entitled to recover all monies they paid to RRTL or BPL in excess of the principal plus 12% interest, the maximum interest rate permitted under Virginia law.

4.  If a class of Virginia consumers was certified and the Class was successful at trial, or was able to settle the case, attorney's fees could be recovered as well as awards for the five individual plaintiffs for serving as Class representatives.  During settlement discussions, Plaintiffs' counsel has represented that attorneys fees can be approximated at 30% of the total recovery.  Plaintiffs' counsel has also stated that she expects each named Plaintiff would expect an individual settlement award of no more than $10,000.

The relief described above is the maximum that the Plaintiffs are seeking to recover from the defendants in the event that judgment was entered in their favor for the entirety of each of their claims.  The preceding does not set forth what is a likely recovery – only what is sought in the Complaint.

## II.    DEFENSES TO LIABILITY

To be clear, many allegations in the Complaint are simply false and the facts as we understand them do not substantiate the claims pled by the Plaintiffs.  Notwithstanding the false allegations within the Complaint, which the Court is required to accept as true for the purposes of a motion to dismiss, as described below Martorello possesses numerous factual and legal defenses in this case.

### A.  The loans are lawful as they contain a valid and enforceable choice of law provision.

The defenses to Plaintiffs' claims against Martorello begin with the Supreme Court of Virginia's holding in *Settlement Funding v. Von Neumann-Lillie*, 274 Va. 76, 645 S.E.2d 436 (2007), a case which is largely on all fours with the legal theories of the Plaintiffs' Complaint and that ostensibly requires dismissal of those claims.  In *Settlement Funding* the Supreme Court of Virginia was required to interpret and apply a loan contract between a Virginia resident and an out-of-state lender requiring payment of interest at rates which exceeded the maximum rate of interest permitted under Virginia law.  Specifically, the Supreme Court of Virginia was asked to "consider whether the circuit court erred in refusing to apply the law of the jurisdiction stipulated in the choice of law provision of a contract and its application of Virginia's usury law to the provisions of that contract." *Id.* at 77.  The Supreme Court held that the Circuit Court's ruling was in error, and enforced a choice of Utah law provision – a state with no maximum rate of

-3-

ATTORNEY'S EYES ONLY

JA969

PCAM_00409

MONTGOMERY, MCCRACKEN, WALKER & RHOADS, LLP
**PRIVILEGED AND CONFIDENTIAL – Attorney Work Product**

interest – to find that a Virginia consumer could be charged interest rates in a loan agreement at rates above those permissible under the laws of Virginia.[3]

Under the holding of *Settlement Funding*, the Supreme Court of Virginia has endorsed the position that Virginia consumers can legally enter into a loan agreement containing a choice of law provision providing for application of the laws of a state with a higher interest rate than set by the Virginia Legislature. Such loan agreements, in the context of a sister-state, are not void as against the public policy of Virginia and may be enforced against consumers, even where that choice of law provides no maximum rate of interest (as did the loan agreement at issue in the underlying case). Given the similarities between the facts of *Settlement Funding* – the only meaningful difference[4] between the loan agreement here being the reference to the laws of sovereign Native American tribes rather than the laws of Utah – we believe the Supreme Court of Virginia's holding governs this case. Proper application of this decision would deem the loans legal and should require dismissal of *all* of Plaintiffs claims founded upon the purported illegality of the loans – specifically the RICO claims, the Virginia usury claim, the declaratory judgment action, and the unjust enrichment claim.

**B. Individual RICO claims against Martorello are inappropriate as a matter of law.**

Beyond the proper application of the holding of *Settlement Funding*, Plaintiffs' claims under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 *et seq.* are subject to a number of unique defenses. First and foremost, Martorello is not alleged to have engaged in any activity which qualifies as "racketeering" as defined by 18 U.S.C. § 1961, or participated in the affairs of an enterprise through such acts. These are essential elements of any RICO claim. *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 371 (3d Cir. 2010) (A defendant violates Section 1962(c) only where he or she 'participate[s], directly or indirectly, in the conduct of the enterprise's affairs,' through predicate acts of racketeering). And, Plaintiffs will ultimately be required to demonstrate that they possess standing to pursue RICO claims against Martorello – a showing which requires each Plaintiff to demonstrate that they have suffered harm to their business or property as a result of Martorello's RICO violation. 18 U.S.C. § 1664(c); *Chisolm v. TransSouth Fin. Corp.*, 95 F.3d 331, 336 (4th Cir. 1996) (noting that RICO's standing provision requires that a RICO defendant's racketeering activity is both the but-for and proximate cause of a plaintiff's injury). The facts, as we understand them, do not support a conclusion that any injury to Plaintiffs were caused by an act of racketeering *by Martorello*, rather than the enterprise as a whole. Together with the proper application of *Settlement Funding*, this case law provides a strong basis for ultimate dismissal of claims under 18 U.S.C. §§ 1962(c) and (d).

---

[3] Licensed payday lenders in Virginia can actually legally charge borrowers interest rates higher than those charged by LVD's lending entities when compared on an APR basis.

[4] While Plaintiffs' counsel has repeatedly attempted to differentiate the holding of *Settlement Funding* through reference to a number of distinctions, none of those distinctions are present in the reasoning of the Supreme Court of Virginia. For example, Plaintiffs have referenced to the lender's *current* status as a Utah-registered industrial loan bank as a basis to differentiate and ignore the holding of *Settlement Funding*. But the each of the distinctions identified by Plaintiffs do not appear within the reasoning of the Supreme Court of Virginia's opinion. They are merely *post hoc* explanations from Plaintiffs attempting to avoid the result compelled by *Settlement Funding*.

-4-

JA970

ATTORNEY'S EYES ONLY                                                                PCAM_00410

MONTGOMERY, McCRACKEN, WALKER & RHOADS, LLP
**PRIVILEGED AND CONFIDENTIAL – Attorney Work Product**

### C. Martorello has not been unjustly enriched by any Plaintiff.

The unjust enrichment claim against Martorello should also ultimately fail. To state a claim for unjust enrichment under Virginia law, Plaintiffs must show that they conferred a benefit on the defendants, that the defendants knew of the benefit and should have expected to repay Plaintiffs, and that the defendants accepted or retained the benefit from Plaintiffs without paying for its value. *Schmidt v. Household Fin. Corp., II*, 661 S.E.2d 834, 838 (Va. 2008). First, *Settlement Funding* compels a holding that no party, including Martorello, has been *unjustly* enriched. Second, there will be no evidence that Martorello directly accepted or retained a benefit from Plaintiffs. Such a factual finding will be difficult to prove given the structure of the relationship between Martorello, Eventide, BPL, Ascension Technologies, and LVD. And, as in *Schmidt*, the mere allegation that a plaintiff paid sums on a loan which is otherwise illegal under Virginia law, does not state a claim for unjust enrichment. *Id.* As such, there are strong factual and legal defenses to the unjust enrichment claims by Plaintiffs.[5]

## III.   POTENTIAL LIABILITY OF A LENDER TO ECA

### A.   Liability of a lender under 1962(a)

Section 1962(a), makes it unlawful:

> for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity [...] to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce[...]

18 U.S.C. 1962(a). Section 1962(a) "was primarily directed at halting the investment of racketeering proceeds into legitimate businesses, including the practice of money laundering." *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1188 (3d Cir. 1993); *see also, generally,* Sean M. Douglass & Tyler Layne, Racketeer Influenced and Corrupt Organizations, 48 Am. Crim. L. Rev. 1075, 1094-95 (2011) (Subsection (a) "is clearly aimed at the classic Mafia investment case envisioned by Congress, where organized criminals gain control of an uncorrupted business by investing profits from gambling or other illegal activities.").

To establish a violation of section 1962(a), a plaintiff must prove: "(1) the defendant received income from a pattern of racketeering activity; [and] (2) [the defendant] invested that money in an enterprise..." *Lightning Lube*, 4 F.3d at 1188; *Ouaknine v. MacFarlane*, 897 F.2d

---

[5] This memorandum does not purport to provide a summary of the laws of the fifty states on unjust enrichment. Instead, the memorandum focuses solely on the claims presented in the Virginia lawsuit, and the Virginia law applicable to those claims. While the substantive law on unjust enrichment of other jurisdictions may be similar to Virginia, significant additional research would be needed to survey the laws, and defenses, applicable in the other forty-nine states.

4641378v1

JA971

ATTORNEY'S EYES ONLY                                                                PCAM_00411

MONTGOMERY, MCCRACKEN, WALKER & RHOADS, LLP
**PRIVILEGED AND CONFIDENTIAL – Attorney Work Product**

75, 82 (2d Cir. 1990) ("Under the plain language of this section, a violation of § 1962(a) consists of investing income derived from a pattern of racketeering activity to acquire an interest in, establish, or operate an enterprise.").

1.     Defendant Must Receive Income

'Income,' as used in section 1962(a), has been interpreted broadly in light of the remedial nature of RICO. *Ideal Steel Supply Corp. v. Anza*, 652 F.3d 310, 322 (2d Cir. 2011); *see also Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 497-498 (1985) (Congress' "expansive language" and "express admonition" require RICO to be read broadly). Given the disjunctive phrasing of this element, all funds received or saved as a result of racketeering activities are tainted for the purposes of reinvestment. *Ideal Steel*, 652 F.3d at 322. Moreover, "Section 1962(a) does not exact rigorous proof of the exact course of income derived from a pattern of racketeering activity into its ultimate "use or investment" and "[t]he key operative terms of the section, as specifically charged here, are expansive, not restrictive ones: "use or invest," "any part," "income ... or ... proceeds," "directly or indirectly," "establishment or operation." *United States v. Vogt*, 910 F.2d 1184, 1194 (4th Cir. 1990) (citations omitted). Thus, "*any* requirement that the tainted income must be specifically and directly traced in proof from its original illegal receipt to its ultimately proscribed "use or investment" by the defendant." *Id.* (emphasis added). Despite this broad definition, receipt of income has typically been interpreted to include only funds in the form of money. *See, e.g., Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1188 (3d Cir. 1993) (theft of 'trade secrets' did not constitute income for the purposes of a section 1962(a) claim, and was properly analyzed under section 1964(c)).

2.     Income must be derived from a pattern of racketeering

The income a defendant receives must result from a pattern of predicate racketeering acts, *and* the defendant must have participated in those acts as a principal. *Genty v. Resolution Trust Corp.*, 937 F.2d 899, 908 (3d Cir. 1991) (noting that to hold otherwise would be to impose liability on banks in receipt of illicit racketeering income from their customers, a result Congress clearly did not intend); *accord Brady v. Dairy Fresh Products Co.*, 974 F.2d 1149, 1152 (9th Cir. 1992) ("the clear language of this provision, the person who receives and invests the 'racketeering' income must have participated as a principal in the racketeering activities.") (citing *United States v. Wyatt*, 807 F.2d 1480, 1482 (9th Cir.), *cert. denied*, 484 U.S. 858 (1987)).

The receipt of income **must** be connected back to the RICO enterprise. *See, e.g., Chambers v. King Buick GMC, LLC*, No. CIV.A. DKC 13-2347, 2014 WL 4384316 (D. Md. Sept. 2, 2014) (Court held that consumer's allegations that, through use of illegal and fraudulent scheme to sell prior short-term rental vehicle to consumers without disclosures required by law, used car dealerships were able to retain money that was rightfully payable to her and class members, and reinvested and used those funds in their operations were insufficient to state plausible RICO claim provision prohibiting use or investment of income from pattern of racketeering activity in enterprise because consumer did not identify manner in which alleged enterprise received money, how dealerships used it, how much was invested, or contours of reinvestment.); *see also U.S. v. Gotti*, 457 F. Supp. 2d 403, 405-06 (S.D.N.Y. 2006) ("The statute

-6-

4641378v1

ATTORNEY'S EYES ONLY

JA972

PCAM_00412

MONTGOMERY, MCCRACKEN, WALKER & RHOADS, LLP
**PRIVILEGED AND CONFIDENTIAL** – Attorney Work Product

does not require evidence tracing the income or proceeds invested in the enterprise directly to the racketeering acts, so long as the evidence demonstrates a 'sufficient nexus' between the illicit money and the enterprise.") (quoting *United States v. Indelicato*, 865 F.2d 1370, 1384 (2d Cir.1989)).

3.     Defendant must invest or use the racketeering income in an enterprise

The crux of a Section 1962(a) claim is the investment of racketeering income by a defendant into an otherwise legitimate enterprise. *Lightning Lube*, 4 F.3d at 1188 ("This provision was primarily directed at halting the investment of racketeering proceeds into legitimate businesses, including the practice of money laundering."); *Kolar v. Preferred Real Estate Investments, Inc.*, 361 F. App'x 354, 368 n.6 (3d Cir. 2010) ("For claims asserted under § 1962(a), however, the 'essence of the violation' is the investment of racketeering proceeds in an enterprise."); *Grider v. Texas Oil & Gas Corp.*, 868 F.2d 1147, 1149 (10th Cir. 1989)) (emphasis in original) cert. denied, 493 U.S. 820 (1989) ("The statute does not state that it is unlawful to receive racketeering income; rather, as the italicized language underscores, the statute prohibits a person who has received such income from using or investing it in the proscribed manner."); *Abraham v. Singh*, 480 F.3d 351, 354 (5th Cir. 2007) (in the simplest terms, 1962(a) states that "a person who has received income from a pattern of racketeering activity cannot invest that income in an enterprise."); *Ammirato v. Duraclean Int'l, Inc.*, 687 F. Supp. 2d 210, 222 (E.D.N.Y. 2010) ("The basic purpose of section 1962(a) is to prevent racketeers from using their ill-gotten gains to operate, or purchase a controlling interest in, legitimate businesses."). As such, where a third party does not invest racketeering income or "ill-gotten gains" into an enterprise, there is no violation of Section 1962(a).

Mere investment into an enterprise is not enough, to face liability under Section 1962(a). Instead the funds invested must first be obtained through racketeering activity *and* that income must be invested into an enterprise. For this reason, we believe an investor utilizing its normal business funds, is unlikely to face liability under Section 1962(a) for investing those funds into ECA or otherwise loaning ECA funds.

**B.     Liability of a lender under 1962(c)**

A purely passive lender to a RICO enterprise is not likely to incur liability under RICO. As discussed, *supra.*, liability under Section 1962(c) requires that the plaintiff demonstrate that a defendant operated or managed an enterprise through a pattern of racketeering. Loaning money and providing financial support to an enterprise does not demonstrate control over the enterprise. *Berry v. Deutsche Bank Trust Co. Americas*, No. 07CIV.7634(WHP), 2008 WL 4694968, at *6 (S.D.N.Y. Oct. 21, 2008), *aff'd*, 378 F. App'x 110 (2d Cir. 2010) ("Lending money to an enterprise does not establish a role in 'directing the enterprise[']s affairs.'"). Providing banking services to an enterprise, even with knowledge of an enterprise's fraudulent activity, does not demonstrate control over the enterprise. *Indus. Bank of Latvia v. Baltic Fin. Corp.*, No. 93 CIV. 9032 (LLS), 1994 WL 286162, at *3 (S.D.N.Y. June 27, 1994) ("[P]rovid[ing] banking services [to an enterprise]—even with knowledge of the [enterprise's] fraud—is not enough to state a claim under § 1962(c).").

Recently, a federal court in Pennsylvania examined the liability of a lender to a purported illegal lending enterprise under Pennsylvania's RICO analogue using RICO case law. *Pa. v.*

-7-

ATTORNEY'S EYES ONLY

JA973

PCAM_00413

## MONTGOMERY, MCCRACKEN, WALKER & RHOADS, LLP
### PRIVILEGED AND CONFIDENTIAL – Attorney Work Product

*Think Fin., Inc.*, No. 14-CV-7139, 2018 WL 637656 (E.D. Pa. Jan. 31, 2018). There, just as with other cases, liability under Section 1962 (c) hinged on whether the lender 'operated or managed' the enterprise. The court there confirmed, "a defendant does not incur liability under [RICO] for merely funding an alleged unlawful enterprise." *Id.* at *9 (citing *Dongelewicz v. PNC Bank Nat'l. Ass'n.*, 104 F. App'x 811, 117-18 (3d Cir. 2004)). Utilizing this framework, the court dismissed claims against the funder where the allegations in the complaint alleged nothing more than investment. *Id.* However, the court refused to dismiss claims against the funder where the complaint alleged aspects of control over aspects of the lending enterprise. *Id.* The court drew similar distinctions when dealing with the RICO conspiracy allegations, noting that passive investors would not incur liability.

Given this case law, we believe it unlikely that passive investment in ECA could serve as the basis of RICO liability against an investor.

## IV. TED MAY BE RESPONSIBLE FOR INDEMNIFYING EVENTIDE IN THE EVENT OF A FINAL JUDGMENT AGAINST EVENTIDE.

In the event that there is ever a final money judgment against the Tribe, Eventide[6], or any related person or entity, there are circumstances under which that judgment must be indemnified by Tribal Economic Development Holdings, LLC ("TED")[7], an instrumentality and economic development arm organized as a business entity by the Tribe and pursuant to Tribal law. Under the Loan and Security Agreement ("LSA") TED is required to indemnify and repay all costs, fines, and judgments – including attorneys' fees and expenses – incurred as a result of a final judgment against Eventide, along with related persons and assigns. Specifically, section 7.4 of the LSA states:

> Borrow and each Subsidiary shall protect, defend (by counsel selected by Lender and reasonably acceptable to Borrower), indemnify and hold harmless Lender and Lender's officers, directors, partners, members employees, attorneys, successors and permitted assigns and any successors to Lender's interest in the Loan, their officers, directors, partners, shareholders, employees, attorneys, successors and permitted assigns (collectively, the "Indemnitees") from and against all liabilities (including sums paid in settlement of claims), claims brought or threatened against Lender (as well as from reasonable attorneys' fees and expenses in connection therewith), losses, costs, obligations, demands, suits, liens, damages, fines (including any sums ordered to be paid or expended by Indemnitees by any governmental entity as a fine, penalty or damages) arising as a direct or indirect result of (a) Borrower's or a Subsidiary's Event of Default arising under 6.1 of this Agreement, (b) as a result of any investigation or

---

[6] Eventide is not a defendant in this action and we have no information suggesting that it will be added as a defendant.

[7] TED is wholly owned by LVD and in turn, owns BPL.

-8-

4641378v1

ATTORNEY'S EYES ONLY

JA974

PCAM_00414

MONTGOMERY, McCRACKEN, WALKER & RHOADS, LLP
**PRIVILEGED AND CONFIDENTIAL – Attorney Work Product**

enforcement action initiated by any governmental entity into Borrower's and/or a Subsidiary's business. The indemnification provided by this Section 7.4 shall survive payment of the Obligations, any termination of this Agreement, and/or release or discharge executed by Lender in favor of Borrower for a period of four (4) years or twelve (12) months beyond the resolution of any case initiated within the four (4) year period or in the Event of Default for a period not to exceed twelve (12) months after the transfer of Collateral.

Section 6.1(i) of the LSA states that it is an event of default where:

> a final, non-appealable judgment or judgments for the payment of money enforceable against Borrower or any Subsidiary shall be rendered in excess of twenty-five thousand dollars (US$25,000.00) against Borrower or any Subsidiary, and any such judgment shall remain unsatisfied and in effect for any period of thirty (30) consecutive days without a stay of execution unless such non-payment would have no Material Adverse Effect on the Business as mutually agreed by the Parties

Where there is a final, non-appealable judgment against the lending business outstanding for 30 days, there is indemnification under Section 7.4(a) of the LSA. And, while liability under several of plaintiffs' legal theories are joint and several, Plaintiffs are ultimately only entitled to a single recovery. As such, this provision may effectively require the Tribe to both indemnify the lender – alongside the lender's officers, directors, partners, members, employees, and related individuals – but also immediately pay any judgment that arises out of litigation in which both the Borrower and Lender (or any other entity) are both sued. However, in situations where liability is apportioned by a Court, or the lending business is not sued, an effective method of indemnification by TED for losses and costs arising out of private civil actions may not exist.

## V.    **POSSIBLE OUTCOMES**

### A.    **Summary**

The vast majority of civil actions settle at some point during the litigation process. Any settlement involves, among other things, an assessment of litigation risk, possible defenses, factual strengths and weaknesses, legal issues, judicial forum and judicial officer, cost and business considerations. Settlements are accomplished even more frequently when the plaintiff's counsel fees are contingent on the outcome of the case, as is the situation here.

### B.    **Settlement Discussions To Date**

The model being used in settlement discussions is consistent with the settlement model used in similar cases brought by the same plaintiffs' counsel. The monetary settlement amount is determined by the payment by the defendant of a percentage of the interest, fees or penalties in excess of the principal amount of the loan plus 12% interest. We understand from LVD officials that for the period between June 22, 2013 and January 26, 2016, the total amount of interest

-9-

ATTORNEY'S EYES ONLY

JA975

PCAM_00415

collected by LVD's lending entity above 12% from Virginia residents equates to approximately $7,110,609.

In a similar case involving the online lender CashCall, the defendant settled for an amount representing 40% of the interest, fees or penalties paid by Virginia consumers in excess of the principal amount of the loan and 12% annual interest. The facts of CashCall are not nearly as strong as the facts of our case. Specifically, in CashCall, the nominal lender was a member of a Native American tribe, not a lending entity owned and operated by a tribe as an arm of the tribe. As such, the protection of sovereign immunity afforded to a tribe and entity operating as an arm of the tribe was not available. In contrast, BPL here is wholly owned by TED which, in turn, is wholly owned and operated by LVD. Based on our analysis of the facts, BPL is operated as an arm of the tribe and as a result, should be afforded sovereign immunity protections. We also continue to believe that the holding of *Settlement Funding*, as well as proper application of the relevant choice-of-law provisions within the loan agreement, should require application of the laws of LVD over the laws of the Commonwealth of Virginia. In addition, with the sale of Bellicose and Sourcepoint to a tribally owned entity and the creation of BPL and Ascension Technologies, Mr Martorello and Eventide became creditors of the tribal lending entity and had no involvement in the lending operation. These are significant favorable facts that make this case distinguishable from CashCall.

To settle, Mr Martorello has offered to pay 5% of the interest, fees or penalties paid by Virginia consumers in excess of the principal amount of the loan and 12% annual interest for loans originated by RRTL during the period of June 22, 2013 (the earliest date for statute of limitations purposes) until January 26, 2016 (the date of closing of the sale of Bellicose and Sourcepoint to LVD). While this offer is likely to be rejected, it's value, based on numbers provided by LVD is $355,530.45. Accordingly, even if the case settles for 20% of the interest, fees or penalties in excess of the principal amount of the loan plus 12% annual interest -- half the CashCall settlement percentage -- the value of the settlement would be $1,422,121.80.

Therefore, we believe the likely range of settlement is $355,530.45 to $1,422,121.80. Such figures do not include any contribution to a settlement by LVD.

## C.    Probable Range and Likelihood of Loss Absent a Settlement

In the event the case does not settle and there is an adverse verdict at a trial, it is impossible to estimate the jury verdict with any reasonable degree of certainly. As stated above, the total amount of annual interest above 12% paid by Virginia residents is known and may provide one potential measure of damages. Plaintiffs, however, are likely to seek the full amount of interest and principal paid by Virginia residents – an amount which is not known – should this case proceed to a verdict. And, certain of Plaintiffs' claims, such as RICO, provide for the potential of recovering double or trebled damages, costs, and attorneys' fees. The doubling or trebling of damages is not automatic after a finding of liability – the facts of each individual case dictate whether such additional recoveries are appropriate. While we do not believe the facts of this case, as we understand them support a finding of doubling or trebling of damages, we cannot accurately predict whether such penalties would be ultimately imposed by the Court given certain extra-legal factors discussed below.

-10-

ATTORNEY'S EYES ONLY

MONTGOMERY, MCCRACKEN, WALKER & RHOADS, LLP
**PRIVILEGED AND CONFIDENTIAL** – Attorney Work Product

While it is our belief that such additional liability would be inappropriate under the facts and law, certain extra-legal associated with this case make accurate predictions more difficult. First, the involvement of a sovereign Native American lender complicates potential resolutions of this case given their status as a sovereign with immunity from judgment. Additionally, we have found that the judge assigned to the case in the Eastern District of Virginia, Judge Payne, has proven to be unpredictable and has previously ignored case law which we believe is case determinative and requires dismissal of Plaintiffs' claims. While such errors of law are correctable at the appellate level – where we believe the Fourth Circuit will ultimately apply Virginia law properly – such an appeal would not be immediate.

Given this unpredictability from the District Court, we do not believe success at trial is likely regardless of the positive underlying and Virginia case law which counsels in favor of a verdict in favor of the defendants. In fact, we believe an unfavorable verdict at the trial court level is more likely than not. Despite this prediction, we continue to believe a favorable result at the appellate level may be likely. This prediction is founded upon our strong belief in the proper application of Virginia case law requiring dismissal of Plaintiffs' claims in full. Such purely legal arguments are particularly apt for determination at the appellate court level – no deference would be due to the trial court's improper legal determinations. As such, ultimate success on the merits is likely, albeit after an appeal.

-11-

4641378v1

JA977

ATTORNEY'S EYES ONLY                                                            PCAM_00417

Exhibit 6

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2             FOR THE EASTERN DISTRICT OF VIRGINIA
 3                      RICHMOND DIVISION
 4     Civil Action No. 17-CV-461
       _____
 5
       VIDEO DEPOSITION OF JENNIFER WEDDLE
 6     May 20, 2019
 7     _____

       LULA WILLIAMS, GLORIA TURNAGE,
 8     GEORGE HENGLE, DOWIN COFFY, and
       FELIX GILLISON, JR., on behalf of
 9     themselves and all individuals similarly
       situated,
10
       Plaintiffs,
11
       v.
12
       BIG PICTURE LOANS, LLC, MATT
13     MARTORELLO, ASCENSION
       TECHNOLOGIES, INC., DANIEL GRAVEL,
14     JAMES WILLIAMS, JR., GERTRUDE
       MCGESHICK, SUSAN MCGESHICK, and
15     GIIWEGIIZHIGOOKWAY MARTIN,
16     Defendants.
       _____
17
       APPEARANCES:
18
           KELLY GUZZO
19             By Kristi Kelly, Esq.
                  Andrew Guzzo, Esq.
20                3925 Chain Bridge Road
                  Suite 202
21                Fairfax, Virginia 22030
                  703.424.7572
22                kkelly@kellyguzzo.com
                  Appearing on behalf of Plaintiffs
23
24
25     Job No. CS3302797
```

USCA4 Appeal: 23-2097   Doc: 11-3   Filed: 12/06/2023   Pg: 34 of 438
Case 3:17-cv-00461-REP   Document 1174-6   Filed 04/24/23   Page 3 of 15 PageID# 48755

Page 2

```
 1     APPEARANCES (Continued):
 2         ROSETTE, LLP
               By Justin Gray, Esq.
 3                 44 Grandville Avenue SW
                   Suite 300
 4                 Grand Rapids, Michigan 49503
                   616.655.1601
 5                 jgray@rosettelaw.com
                   Appearing on behalf of Defendants
 6                 Big Picture Loans, LLC and
                   Ascension Technologies, Inc.
 7
           ARMSTRONG TEASDALE, LLP
 8             By Richard L. Scheff, Esq.
                   2005 Market Street
 9                 29th Floor
                   Philadelphia, Pennsylvania 19103
10                 267.780.2000
                   rlscheff@armstrongteasdale.com
11                     and
                   Michelle L. Alamo, Esq.
12                 4643 South Ulster Street
                   Suite 800
13                 Denver, Colorado 80237
                   720.200.0676
14                 malamo@armstrongteasdale.com
                   Appearing on behalf of Defendant
15                 Martorello
16         WHEELER TRIGG O'DONNELL, LLP
               By Carolyn J. Fairless, Esq.
17                 Bill Hauptman, Esq.
                   370 17th Street
18                 Suite 4500
                   Denver, Colorado 80202-5647
19                 303.244.1800
                   fairless@wtotrial.com
20                 hauptman@wtotrial.com
                   Appearing on behalf of the Deponent
21
           Also Present:
22                 Maryvonne Tompkins, Videographer
23
24
25
```

Page 194

1           MS. FAIRLESS:  And we just want to make

2      sure that the right decision makers are involved.

3           Q     (BY MR. SCHEFF)  Let me ask another

4      question, Ms. Weddle.  Paragraph 5 of Exhibit 27 says

5      that, In 2016, Mr. Martorello, on behalf of

6      Bellicose, informed Greenberg Traurig that Bellicose

7      had entered into an agreement and plan of merger?

8           A     Yes.

9           Q     So your declaration that you swore to in

10     January says that when Mr. Martorello called you in

11     January -- in 2016, concerning company files that

12     were to be transferred to the tribe or destroyed, he

13     was contacting you in his capacity of being related

14     to Bellicose?

15          A     That is correct.  Bellicose was our

16     client, and Mr. Martorello had been its previous

17     principal, so he contacted us to inform us that he

18     was no longer the principal of the client.

19          Q     Right.  And to tell you that he was

20     required to certify that all company files were to be

21     transferred to the tribe or destroyed?

22          A     That is correct.

23          Q     And did he say anything else to you in his

24     capacity as a representative or former representative

25     of Bellicose?

Page 195

 1            MS. FAIRLESS:  And again, if it's the same
 2    issue, then I would have the same objection and
 3    instruction not to answer.
 4            So with that caveat, if you can answer the
 5    question, you can go ahead and answer it.
 6        A    I can answer it factually yes, we talked
 7    about other things, but I cannot divulge what those
 8    things are without violating privilege.
 9        Q    (BY MR. SCHEFF)  All right.  Let's take a
10    short break.  Okay?
11            THE VIDEOGRAPHER:  The time is 2:15.  We
12    are going off the record.
13            (Recess taken.)
14            THE VIDEOGRAPHER:  The time is 2:27.  We
15    are back on the record.
16        Q    (BY MR. SCHEFF)  Ms. Weddle, did
17    Mr. Martorello ever direct you to destroy Bellicose
18    documents?
19        A    No, he did not.
20        Q    All right.  Did Greenberg Traurig in fact
21    destroy documents relating to its representation of
22    Bellicose and SourcePoint, to your knowledge?
23        A    I cannot speak to what Greenberg Traurig
24    did.  I'm not the custodian of records for Greenberg
25    Traurig.

Page 196

```
 1        Q     Did you?

 2        A     I did.

 3        Q     And as Paragraph 7 of your declaration,

 4   which is Exhibit 27, indicates, that was done at the

 5   direction of counsel for the tribe?

 6        A     That's correct.

 7        Q     And who did you speak to?

 8        A     Karrie Wichtman.

 9        Q     And was that convers- -- did that

10   conversation occur shortly after you spoke to

11   Mr. Martorello, as referenced in Paragraph 5 of your

12   declaration?

13        A     Yes, it did.

14        Q     Okay.  And what, if anything, did you do

15   to carry out Ms. Wichtman's direction?

16        A     I don't think I can answer that without

17   violating Rule 1.6.

18              MR. SCHEFF:  Justin?

19              MR. GRAY:  We believe that information

20   would be confidential related to representation, but

21   we'll allow her to answer if it is pertaining to my

22   client is your 1.6 claim.

23              THE DEPONENT:  It is.

24        A     So the conversation with Karrie was one of

25   congratulations that the tribe had taken this step
```

Page 197

```
 1    forward.  Our conversation was generally that the
 2    merger agreement required the transfer or destruction
 3    of preexisting Bellicose files.
 4              I asked her, first of all, whether the
 5    tribe wanted to continue to retain Greenberg Traurig
 6    to represent Bellicose or any entities into which
 7    they merged Bellicose.  Her answer to that was no,
 8    they would not be continuing Greenberg Traurig's
 9    services.
10              I offered to transfer our files to her and
11    the tribe, and she indicated that that was
12    unnecessary; that she believed anything in our files
13    was either something the tribe already had copies of
14    or were likely simply working files as between us
15    during the -- either in the negotiations of the
16    agreement or the various issues that had come up on
17    the years subsequent and would be duplicative of
18    materials already in Rosette Law and the tribe's
19    possession.  So encouraged us to simply delete and
20    recycle whatever papers we had.
21        Q    (BY MR. SCHEFF)  Okay.  And as a result of
22    that conversation with Ms. Wichtman, what, if
23    anything, did you do to comply with the tribe's
24    direction?
25        A    I removed the files from my laptop.  I
```

Page 198

1    shredded all of my working files that I had at the

2    time, and I informed both my colleagues and my

3    managing shareholder, David Palmer, for the Denver

4    office, that that had been the instruction.

5         Q    And do you know what, if anything,

6    Greenberg Traurig did after you had those

7    conversations?

8         A    I do not.

9         Q    Okay.  Okay.  Ms. Wichtman -- I'm sorry.

10   Ms. Weddle, I apologize.  Let me show you what I'm

11   going to have marked as Exhibit 28.

12              (Exhibit 28 marked.)

13              MR. SCHEFF:  Kristi, that is Martorello

14   038989.

15        Q    (BY MR. SCHEFF)  Would you take a look at

16   this, please?  You're not on this email.

17        A    I want to -- look at -- look at as much of

18   it as you choose.

19              MS. KELLY:  Was that a Rosette or a

20   Martorello document?

21              MR. SCHEFF:  It's a Martorello document.

22        A    I've read it.

23        Q    (BY MR. SCHEFF)  Okay.  Have you ever seen

24   this document before?

25        A    No, I have not.

Page 207

1    Mr. Martorello, that's outside of what I'm objecting

2    to.  I'm only objecting to legal advice given to

3    Bellicose and SourcePoint.

4              MR. SCHEFF:  So, Ms. Kelly, it's not my

5    understanding, from listening to Ms. Weddle testify

6    today, that she has stated that either she or

7    Greenberg Traurig represented Mr. Martorello

8    personally until sometime in 2018.  I may disagree

9    with that, but that's been her testimony.

10             To the extent that you are asking

11   Ms. Weddle to testify about protected communications

12   between Mr. Martorello, in his personal capacity, and

13   his counsel, either Ms. Weddle and/or Greenberg

14   Traurig, then I am objecting and directing her not to

15   answer.

16             As you know, we have filed a motion for

17   reconsideration of Judge Payne's order, and we

18   intend, if necessary -- I've explained this to your

19   partner, Mr. Guzzo -- to exercise our appellate

20   remedies, and until and unless we do that or -- and

21   there's a finding that is upheld on appeal that

22   Ms. Weddle represented or Greenberg Traurig

23   represented Mr. Martorello personally, I think the

24   objection that I am making is well-founded.

25             MS. KELLY:  Well, then, we're going to

Page 212

1    admitted to practice in those states would have been

2    involved.

3              I am certain that Georgia lawyers

4    participated in Bellicose matters over the years, but

5    I can't remember specific individuals as I sit here

6    today.

7              Later, other individuals participated,

8    including Marc Mukasey, who was in our New York

9    office until very recently, who was the former

10   Appellate Chief for the Southern District of New

11   York.  Greg Kehole, another former New York Southern

12   District AUSA.  Bill Silverman, another Southern

13   District of New York AUSA.  And I'm sure many others

14   that I'm not recalling off the top of my head.

15        Q    And what advice would Troy Eid have

16   provided to Bellicose or Mr. Martorello?

17              MR. SCHEFF:  Object to the form, and also

18   to the extent that it is calling for privileged

19   communications with Matt Martorello personally based

20   on the reasons that I've stated previously about the

21   fact that Judge Payne's rulings are subject to a

22   motion for reconsideration and that we intend to

23   exercise our appellate rights if need be.

24              MR. GRAY:  I'm going to object to that, as

25   well, to the extent it calls for legal advice given

Page 222

```
 1              MS. KELLY:  I'm sorry?

 2              MS. FAIRLESS:  That presents the same

 3      issue.

 4              MR. GRAY:  I'm going to make an objection

 5      that any legal advice that Ms. Weddle gave Bellicose

 6      or SourcePoint, or either of the Bellicoses or

 7      SourcePoint, related to those relationships has been

 8      acquired by my client pursuant to Delaware law

 9      controlling the acquisition, if that information

10      exists.

11         Q    (BY MS. KELLY)  Why did Mr. Martorello

12      engage you to look into acquiring a state-chartered

13      bank?

14              MR. SCHEFF:  I'm -- I'm sorry.  Why didn't

15      he?

16              MS. KELLY:  Why did he?

17              MS. FAIRLESS:  Is there an instruction --

18              MR. GRAY:  Is there any foundation --

19              MS. FAIRLESS:  -- under privilege?

20              MR. GRAY:  -- for any of that?  I don't

21      follow.  I don't know if Matt Martorello has ever

22      made that request.  I don't know if there would have

23      been legal advice related to such request.

24              MR. SCHEFF:  All right.

25              MS. KELLY:  She just -- Ms. Weddle just
```

USCA4 Appeal: 23-2087    Doc: 11-3    Filed: 12/06/2023    Pg: 43 of 438

Page 223

1    testified that one of the matters was looking into

2    whether Mr. Martorello was going to acquire a state-

3    chartered bank, and I'm asking why he retained her in

4    order to acquire a state-chartered bank.

5              MR. SCHEFF:  What -- what Ms. Weddle

6    testified to, I believe, is that she represented

7    Bellicose in a matter that related to the possible

8    acquisition of a state-chartered bank.

9              To the extent that that was individual

10   representation of Mr. Martorello, and I know

11   Ms. Weddle has said that's not, then I object and

12   direct Ms. Weddle not to answer.

13             MR. GRAY:  I'm going to make an objection.

14   If Ms. Weddle gave Bellicose or SourcePoint legal

15   advice related to that acquisition, I'm going to

16   instruct her not to answer.  If it was anecdotal or

17   otherwise, something other than legal advice, we'll

18   allow her to answer.

19        A    So, so I guess all I can --

20        Q    (BY MS. KELLY)  Go ahead.

21        A    I would just say that Bellicose retained

22   Greenberg Traurig to represent Bellicose in that

23   potential acquisition.  I was not personally involved

24   in that matter.

25        Q    Okay.  Did Bellicose retain Greenberg

USCA4 Appeal: 23-2097    Doc: 11-3    Filed: 12/06/2023    Pg: 44 of 438

Page 232

1    familiar with those corporate structuring issues.

2              I'm the Indian law and tribal sovereignty

3    member of the team, one of the members of the team on

4    that.  And so the corporate issues would have been

5    largely addressed with others.

6              I do recall having Mr. Martorello express

7    interest in selling Bellicose over a period of years.

8    I can't pinpoint specific dates of conversations, or

9    even tell you when the first conversation may have

10   been.

11       Q    (BY MS. KELLY)  Why did Mr. Martorello

12   want to sell Bellicose?  What is your understanding?

13            MR. SCHEFF:  Again, to the -- to the

14   extent that these communications were held with

15   Mr. Martorello in his individual personal

16   representation capacity, we claim there was such a

17   representation.  We understand that Greenberg Traurig

18   says there was not.  Then I would direct her not to

19   answer those questions as being protected by the

20   attorney-client privilege.

21            MR. GRAY:  To the extent that Ms. Weddle

22   gave legal advice to Bellicose or SourcePoint about

23   acquisitions over the course of several years, if

24   there was legal advice there, my clients acquired it,

25   there was acquisition under Delaware law, I'm

USCA4 Appeal: 23-2097    Doc: 11-3    Filed: 12/06/2023    Pg: 45 of 438

Case 3:17-cv-00461-REP   Document 1174-6   Filed 04/24/23   Page 14 of 15 PageID# 48766

```
 1   STATE OF COLORADO)

 2                    )   ss.     REPORTER'S CERTIFICATE

 3   COUNTY OF DENVER )

 4            I, Pamela J. Hansen, do hereby certify that

 5   I am a Registered Professional Reporter and Notary

 6   Public within the State of Colorado; that previous to

 7   the commencement of the examination, the deponent was

 8   duly sworn to testify to the truth.

 9            I further certify that this deposition was

10   taken in shorthand by me at the time and place herein

11   set forth, that it was thereafter reduced to

12   typewritten form, and that the foregoing constitutes

13   a true and correct transcript.

14            I further certify that I am not related to,

15   employed by, nor of counsel for any of the parties or

16   attorneys herein, nor otherwise interested in the

17   result of the within action.

18            In witness whereof, I have affixed my

19   signature this 22nd day of May, 2019.

20            My commission expires September 3, 2022.

21

22           _Pamela J. Hansen_____

23           Pamela J. Hansen, CRR, RPR, RMR
             216 - 16th Street, Suite 600
             Denver, Colorado  80202
24

25
```

JA991

Page 246

Veritext Legal Solutions

1

290 W. Mt. Pleasant Ave. - Suite 3200

2                  Livingston, New Jersey 07039

Toll Free: 800-227-8440   Fax: 973-629-1287

3

4

May 22, 2019

5

To: Carolyn J. Fairless

6

Case Name: Williams, Lula v. Big Picture Loans, Llc, Et Al

7

Veritext Reference Number: 3302797

8

Witness:  Jennifer  Weddle        Deposition Date:  5/20/2019

9

10   Dear Sir/Madam:

11   The deposition transcript taken in the above-referenced matter, with
     the reading and signing having not been expressly waived, has been

12   completed and is available for review and signature.  Please call our
     office to make arrangements for a convenient location to accomplish

13   this or if you prefer a certified transcript can be purchased, which

14   can be sent to you or the deponent directly.

15

16   If the jurat is not returned within thirty days of your receipt of

17   this letter, the reading and signing will be deemed waived.

18

19   Sincerely,

20

21   Production Department

22

23   Cc: Richard L. Scheff

24       Kristi Kelly

25       Justin Gray

# Exhibit 7

# AGREEMENT AND PLAN OF MERGER

among

## LVD TRIBAL ACQUISITION COMPANY, LLC

and

## BELLICOSE CAPITAL, LLC

and

## EVENTIDE CREDIT ACQUISITIONS, LLC

JA994

CONFIDENTIAL

MARTORELLO_000096

# AGREEMENT AND PLAN OF MERGER

This Agreement and Plan of Merger (this "Agreement"), executed on September 14, 2015 but effective as of date of Close (the "Effective Date") is entered into among, LVD TRIBAL ACQUISITION COMPANY, LLC ("Acquiror") an entity wholly owned and operated by the Lac Vieux Desert Band of Lake Superior Chippewa Indians, a federally recognized Indian tribe (the "Tribe"), Bellicose Capital, LLC, a Delaware limited liability company ("Company"), and Eventide Credit Acquisitions, LLC, in its capacity as seller and member of the Company ("Seller").

# ARTICLE I
# RECITALS

1.1    The United States Congress has recognized and enacted legislation such as the Native American Business Development, Trade Promotion and Tourism Act (25 U.S.C. §§ 4301 et seq.) and other legislation which recognizes the federal policy and Congressional intent "to promote economic self-sufficiency and political self-determination for Indian tribes and members of Indian tribes" through offering services from Indian Country.

1.2    The Tribe is interested in expanding its e-commerce business interests in order to serve the much needed economic interests of the Tribe.

1.3    Historically, the Tribe has suffered from a lack of significant economic activity, however, with the advent of e-commerce activities occurring within the Tribe's jurisdiction and pursuant to Tribal law, including but not limited to the Tribal Consumer Financial Services Regulatory Code, the Tribe, through its wholly-owned corporate entities, has been able to engage in e-commerce in a meaningful way that enables Acquiror, or another successor Tribal entity, to achieve profits distributable to the Tribe that will be utilized for the benefit of the Tribe. Acquiror believes that the purchase of Company will help advance these efforts further.

1.4    Company has been engaged in servicing the loan portfolios of Red Rock Tribal Lending, LLC and Duck Creek Tribal Financial, LLC and intends to service the loan portfolio of Big Picture Loans, LLC, all wholly owned and operated arms and instrumentalities of the Tribe, and the valuation of such services has been used among other components such as goodwill to base the sales price, and the Tribe wishes to acquire Company.

JA995

CONFIDENTIAL                                                                    MARTORELLO_000097

1.5   On the Effective Date, the parties intend that Company be merged with and into Acquiror, with Acquiror surviving that merger on the terms and subject to the conditions set forth herein (the "Merger").

1.6   At Close, the Company shall provide Acquiror, in accordance with Delaware corporate and limited liability company law ("DCL"), a written consent of its member approving this Agreement, the Merger and the transactions contemplated hereby in accordance with the DCL;

NOW, THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants, and agreements set forth herein, and subject to the terms and conditions set forth herein, Seller, Company, and Acquiror agree as follows:

## ARTICLE II
## MERGER

2.1   The Merger. On the terms and subject to the conditions set forth in this Agreement, and in accordance with the DCL, at the time established in Section 2.2 on the Effective Date  provided that each of the conditions precedent have been satisfied, (a) the Company will merge with and into Acquiror, and (b) the separate corporate existence of Company will cease and Acquiror will continue its corporate existence under Tribal law as the surviving company (the "Surviving Company") in the Merger (collectively "Close").

2.2   Effective Time. Subject to the provisions of this Agreement, prior to Close, the Company and Acquiror shall cause a certificate of merger (the "Certificate of Merger") to be executed and filed with the Secretary of State of the State of Delaware in accordance with the relevant provisions of the DCL, to be filed at least seven (7) business days before closing, with the effective date of the Merger to be the Effective Time on the Effective Date, and shall make all other filings or recordings required under the DCL. The Merger shall become effective at such time as the Certificate of Merger has been duly filed with the Secretary of State of the State of Delaware or at such later date or time as may be agreed by Company and Acquiror in writing and specified in the Certificate of Merger in accordance with the DCL (the effective time of the Merger being hereinafter referred to as the "Effective Time") or as required by DCL.

2.3   Effects of the Merger. The Merger shall have the effects set forth herein and in the applicable provisions of the DCL. Without limiting the generality of the foregoing, and subject thereto, from and after the Effective Time, all property, rights, privileges, immunities, powers, franchises, licenses and authority of Company and Acquiror shall vest in the

Agreement and Plan of Merger

3

JA996

MARTORELLO_000098

Surviving Company with the exception that any tax credits or refunds from operations prior to January 1, 2016 shall remain the property and under the control of Seller, and all debts, liabilities, obligations, restrictions and duties of each of Company and Acquiror shall become the debts, liabilities, obligations, restrictions and duties of the Surviving Company. Acquiror or a successor entity of Acquiror specifically agrees to honor and assume the obligations evidenced by those certain promissory notes owed by Bellicose listed on Exhibit A (an updated Exhibit A shall be provided immediately before Close). This Agreement does not modify or terminate any of those notes.

2.4    Certificate of Existence; Operating Agreement. At the Effective Time, (a) the certificate of incorporation of Acquiror as in effect immediately prior to the Effective Time shall be the certificate of organization of the Surviving Company until thereafter amended in accordance with the terms thereof or as provided by applicable law, and (b) the operating agreement of Acquiror as in effect immediately prior to the Effective Time shall be the operating agreement of the Surviving Company until thereafter amended in accordance with the terms thereof, the certificate of existence of the Surviving Company or as provided by applicable Tribal law.

2.5    Directors and Officers. The directors and officers of Acquiror, in each case, immediately prior to the Effective Time shall, from and after the Effective Time, be the directors and officers, respectively, of the Surviving Company until their successors have been duly elected or appointed and qualified or until their earlier death, resignation or removal in accordance with the certificate of existence and operating agreement of the Surviving Company.

2.6    Effect of Merger.  Provided the Merger has occurred, at the Effective Time, as a result of the Merger and without any action on the part of Acquiror, Company or any equity owner:

(a)    Cancellation of Company Equity. Units, interests and/or equity of the Company (collectively, "Equity") that are owned by Acquiror or Company shall automatically be cancelled and retired and shall cease to exist, and, except for the consideration set forth below, no further consideration shall be delivered in exchange therefor.

(b)    Conversion of Equity. All Equity of Company not cancelled pursuant to Section 2.6(a) that is issued and outstanding immediately prior to the Effective Time shall be cancelled and will cease to exist, and each holder of Equity of Company will cease to have any rights with respect thereto, except the right to receive the Merger Consideration (as hereinafter defined) in accordance with Section 2.7 hereof.

JA997

CONFIDENTIAL

MARTORELLO_000099

(c)   Continuation of Acquiror.  All issued and outstanding equity of Acquiror at the Effective Time shall remain unchanged and Acquiror shall be the Surviving Company.

(d)   Clarification on Company Assets.  To verify those certain intellectual property and general intangible assets of Company (collectively, "IP") acquired by Acquiror through the Merger, the list of IP owned by Company is attached as Exhibit B.  All Company information now or that may be discovered on equipment of any kind or in any written materials shall be immediately provided to Acquiror and deleted or destroyed by the holder so that holder retains no copies of Company information.  Seller shall make a good faith effort to identify, transfer and/or destroy all Company information that may inadvertently be in its possession after the closing within two (2) month of the closing.  Acquiror shall make a good faith effort to identify, transfer and/or destroy all non-Company information that may inadvertently be in its possession after the closing within two (2) months of the closing, and Acquiror agrees to allow Seller limited access to remove any non-Company information for two (2) months from the Effective Date.  During those two (2) months Seller shall take all commercially reasonable steps to remove any non-Company information from Acquiror servers and locations, and after two (2) months, Acquiror may destroy any remaining information found.  All parties agree to hold such information strictly confidential.  Seller may retain such information as required to prepare required tax returns and any retention requirement of applicable taxing jurisdiction.

2.7   Consideration.  The amount of merger consideration to be paid to the Seller shall be an amount equal to three hundred million dollars $300,000,000 (the "Acquisition Amount").   Such consideration has been arranged by Acquiror's parent organization through a Secured Promissory Note and associated Loan and Security Agreement (collectively, the "Merger Consideration").

2.8   No Bad Acts.  As of the execution date of this Agreement, each party agrees that it shall not take any actions that are materially adverse to the rights of any other party, including, without limitation, any change in the organizational structure, ownership or assets, business, management, contracts or otherwise, except that the conditions precedent to Close set forth in Section 3.2 are specifically excluded and shall not be considered a "bad act."  Specifically, Acquiror agrees that the provisions of the Parental Guarantee and Sovereign Immunity Waiver are hereby incorporated into this Agreement as of the execution date.

# ARTICLE III
## CLOSING, DELIVERIES & ADJUSTMENTS

Agreement and Plan of Merger
5

JA998

MARTORELLO_000100

3.1   The closing will take place on upon satisfaction of each of the conditions precedent set forth in Section 3.2, but in any event not earlier than January 6, 2016, but not later than February 15, 2016 (unless otherwise agreed to in writing by all parties), but effective on the Effective Date.

3.2   Conditions Precedent to closing. All of the following conditions precedent shall be met or waived in writing by each party prior to Close:

(a)   Company has provided Acquiror with the Certificate of Formation of the Company, certified as of a recent date and current under Delaware law by the Secretary of State of Delaware;

(b)   Company has provided Acquiror with certificates of the Secretary of State of Delaware as to the good standing of the Company as of a recent date under Delaware law of the Company;

(c)   The execution of all Transaction Documents and any associated agreements by all parties thereto;

(d)   The provision by Acquiror to Seller of a legal opinion satisfactory to Seller in similar substance as that provided to Senior Lenders regarding the legality of the Business and the enforceability of the Transaction Documents;

(e)   Acquiror has provided Seller evidence of the termination of operations and the dissolution of Duck Creek Tribal Financial, LLC in accordance with Tribal law and on terms satisfactory to and acceptable to Seller;

(f)   Acquiror has provided Seller with evidence of the merger of Red Rock Tribal Lending, LLC into Big Picture Loans, LLC or the assignment of all assets of Red Rock Tribal Lending, LLC to Big Picture, LLC and the dissolution of Red Rock Tribal Lending, LLC in accordance with Tribal law and on terms satisfactory to and  acceptable to Seller;

(g)   Any required approvals of any Senior Lenders;

(h)   Mutual approval of an operating budget for 2016;

(i) Lockbox and deposit account control agreements as described in Section 4.16 of the Loan and Security Agreement;

JA999

CONFIDENTIAL

MARTORELLO_000101

(j)   An executed Servicing Agreement between Ascension Technologies, LLC and Subsidiaries making consumer loans satisfactory to and on terms acceptable to Seller;

(k)   The Tribe shall provide a legal opinion that the Tribal Financial Services Regulatory Code ("Code") (1) allows for protections of the Collateral and perfection of the security interest under the Loan Agreement and other Transaction Documents acceptable to the Lender; and (2) clarifies that Lender shall not be a regulated entity under the Code

(l)   Undated assignments in blank or other appropriate transfer documents, each in form and substance satisfactory to Lender, to be held in escrow by Lender, for (1) domain names and (2) vendor agreements agreed to by the Parties shall be placed in escrow for the benefit and security of the Lender; and

(m)   Undated merger agreement, in form and substance satisfactory to Lender, to be held in escrow by Lender, in which Ascension Technologies, LLC would be merged into an entity of Lender's choice upon an event of default.

(n)   Company has provided to Acquiror Exhibits A and B, as defined herein, and information reasonably related thereto.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF COMPANY

4.1   Company represents and warrants as of immediately before the Effective Time to Acquiror as follows:

(a)   Organization and Good Standing. Company is an entity duly formed with limited liability under the applicable laws of Delaware, validly existing and in good standing under the applicable laws of Delaware and has full power, authority and the legal right to own its properties and conduct its business, and to execute, deliver and perform its obligations under this Agreement.

(b)   Organizational Documents. Company is in compliance with its organizational documents.

(c)   Due Authorization; Enforceability. Company has the full power and authority to execute and deliver this Agreement and to perform all obligations hereunder. The execution, delivery and performance of this Agreement by Company has been duly authorized by all necessary corporate actions on its part and does not and will not contravene any provision of its organizational documents. This Agreement has

Agreement and Plan of Merger
7

JA1000

CONFIDENTIAL                                                                      MARTORELLO_000102

been duly executed and delivered by Company and constitutes the legal, valid and binding obligation of Company, enforceable against Company in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, reorganization, insolvency, moratorium and/or other similar laws and general equitable principles.

(d)   No Conflict. The execution, delivery and performance by Company of this Agreement and the transactions contemplated hereby does not violate, conflict with or result in a breach or default under the organizational documents of Company or any subsidiary or any other regulation applicable to Company or any subsidiary or any agreement or other document to which Company or any subsidiary is a party or by which it or any of its property is bound.

(e)   No Proceeding. To the knowledge of Seller, there is no litigation, administrative proceeding, enforcement action, or investigation before any court, tribunal or governmental body presently pending or threatened against Seller that has not been disclosed to Acquiror.

(f)   No Outstanding Liabilities.   There are no outstanding liabilities of the Company, including tax liability that exist other than those disclosed in Exhibit A.

(g)   No Outstanding Guarantees. All guarantees related to the Company, or its members, have been released.

4.2   Capitalization.  There are no: (a) outstanding securities convertible or exchangeable into equity of Company; (b) options, warrants, calls, subscriptions or other rights, agreements or commitments obligating Company to issue, transfer or sell any equity; or (c) voting trusts or other agreements, or understandings to which Company is a party or by which Company is bound with respect to the voting, transfer or other disposition of units, other than the Company's Operating Agreement.

4.3   No Conflict; Required Filings and Consents. Neither the execution and delivery of this Agreement by Seller or Company, nor the consummation by Seller or Company of the transactions contemplated hereby, nor compliance by Seller or Company with any of the provisions hereof, will (a) conflict with or result in a breach of any provisions of the certificate of formation of Company or Company's Operating Agreement, (b) constitute or result in the breach of any term, condition or provision of, or constitute a default under, or give rise to any right of termination, cancellation or acceleration with respect to, or result in the creation or imposition of any lien upon any property or assets of Company pursuant to any note, bond,

Agreement and Plan of Merger<br>8

JA1001

CONFIDENTIAL

MARTORELLO_000103

mortgage, indenture, license, agreement, lease or other instrument or obligation to which Company is a party or by which Company or any of Company's properties or assets may be subject, and that would, in any such event, have a material adverse effect on Company; or (c) violate any order or law applicable to the Company or its properties or assets.

## ARTICLE V
## REPRESENTATIONS, WARRANTIES AND COVENANTS OF THE SELLER

Seller represents and warrants as of immediately before the Effective Time to Acquiror as follows:

5.1    Authority, Validity and Effect. Seller is a business entity duly formed, validly existing, and in good standing under the applicable laws of its respective jurisdiction. Seller has all requisite power and authority to execute and deliver this Agreement and all agreements and documents contemplated hereby to be executed and delivered by it, and to consummate the transactions contemplated hereby and thereby. The execution and delivery of this Agreement and such other agreements and documents and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary corporate, limited liability company or other action on the part of Seller as the only member of Company and no other action is needed. This Agreement has been duly and validly executed and delivered by Seller and constitutes the legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, except as limited by the general enforceability exceptions in Section 4.1 above.

5.2    Capitalization. There are no: (a) outstanding securities convertible or exchangeable into units of the Company; (b) options, warrants, calls, subscriptions, or other rights, agreements, or commitments obligating Company to issue, transfer, or sell any units; or (c) voting trusts or other agreements, or understandings to which the Company is a party or by which Company is bound with respect to the voting, transfer, or other disposition of units, other than Company's Operating Agreement.

5.3    Promissory Notes Assumed.   The promissory notes owed by Company described in Exhibit A are true and correct descriptions thereof as of the date of the execution of this Agreement.

5.4    No Conflict; Required Filings and Consents. Neither the execution and delivery of this Agreement by Seller or Company, nor the consummation by Seller or Company of the transactions contemplated hereby, nor compliance by Seller or Company with any of the provisions hereof, will (a) conflict with or result in a breach of any provisions of the certificate

JA1002

CONFIDENTIAL

MARTORELLO_000104

of formation of Seller or the Seller's Operating Agreement, (b) constitute or result in the breach of any term, condition or provision of, or constitute a default under, or give rise to any right of termination, cancellation or acceleration with respect to, or result in the creation or imposition of any lien upon any property or assets of Seller pursuant to any note, bond, mortgage, indenture, license, agreement, lease or other instrument or obligation to which Seller is a party or by which Seller or any of Seller's properties or assets may be subject, and that would, in any such event, have a material adverse effect on Seller; or (c) violate any order or law applicable to the Seller or its properties or assets.

5.5    Title. Seller (a) is the only record and beneficial owner of the equity being sold; (b) has full power, right, and authority, and any approval required by law to make and enter into this Agreement and to sell, assign, transfer, and deliver the units to Acquiror; and (c) has good and valid title to the units free and clear of all liens, other than liens arising under Company's Operating Agreement. Upon the consummation of the transactions contemplated by this Agreement in accordance with the terms hereof, at the closing, Acquiror will acquire valid title to the units of Seller free and clear of all liens, other than liens created by Acquiror and pursuant to Company's Operating Agreement.

5.6 No Lawsuits.  Seller is unaware of any litigation or other governmental action of any type of pending against Seller, the Company, or any beneficial owner of the Company that has not been disclosed.

5.7. Access to IP.  At the closing, Seller will provide Acquiror with immediate secured access to all electronic data and IP of Company, and Aquiror will have the sole and exclusive right to access the IP of Company.

## ARTICLE VI
## REPRESENTATIONS AND WARRANTIES OF ACQUIROR

Acquiror represents and warrants to the  Seller on the date of execution of this Agreement and on the Effective Date as follows:

6.1    Organization and Standing. Acquiror is a limited liability company, duly organized, validly existing, and in good standing under Tribal law.

6.2    Authority, Validity and Effect. Acquiror has the requisite power and authority to execute and deliver this Agreement and the Transaction Documents to be executed and delivered by it, and to consummate the transactions contemplated hereby and thereby without obtaining any additional approvals (whether internal or third-party). The execution and

JA1003

CONFIDENTIAL

MARTORELLO_000105

delivery of this Agreement and such other Transaction Documents and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary action on the part of Acquiror. This Agreement has been duly and validly executed and delivered by Acquiror  and constitutes the legal, valid, and binding obligation of Acquiror, enforceable against Acquiror in accordance with its terms, except as limited by Article VIII herein.  This Agreement, the Secured Promissory Note, the Loan and  Security Agreement, the Parental Guarantee and Sovereign Immunity Waiver Agreement and any and all other documents, amendments or renewals executed and delivered in connection with any of the foregoing, are collectively hereinafter referred to as the "Transaction Documents."

6.3   No Conflict; Required Consents. Neither the execution and  delivery of this Agreement by Acquiror, nor the consummation by Acquiror of the transactions contemplated hereby, nor compliance by Acquiror with any of the provisions hereof, will (a) conflict with or result in a breach of any provisions of the articles or certificate of existence or operating agreement or equivalent organizational documents of Acquiror; (b) constitute or result in the breach of any term, condition or provision of, or constitute a default under, or give rise to any right of termination, cancellation, or acceleration with respect to, or result in the creation or imposition of any lien upon any property or assets of Acquiror pursuant to any note, bond, mortgage, indenture, license, agreement, lease, or other instrument or obligation to which Acquiror is a party or by which Acquiror or any of Acquiror's properties or assets may be subject, and that would, in any such event, have a material adverse effect on Acquiror; or (c) violate any order or law applicable to Acquiror or any of its properties or assets.

6.4   Independent Due Diligence. In connection with its investment decision, Acquiror and/or its representatives have inspected and conducted such reasonable independent review, investigation, and analysis of the Company.

## ARTICLE VII
## MISCELLANEOUS AND GENERAL

7.1   Successors and Assigns. This Agreement is binding upon and inures to the benefit of the parties hereto and their respective successors and permitted assigns consisting of TED and its Subsidiaries, but is not assignable by any party without the prior written consent of the other parties hereto.

7.2   Third Party Beneficiaries. Each party hereto intends that this Agreement does not benefit or create any right or cause of action in or on behalf of any person other than the parties hereto.

JA1004

CONFIDENTIAL

MARTORELLO_000106

7.3    Further Assurances. The parties shall execute such further instruments and take such further actions as may reasonably be necessary to carry out the intent of this Agreement. Each party hereto shall cooperate affirmatively with the other parties, to the extent reasonably requested by such other parties, to enforce rights and obligations herein provided.

7.4    Notices. Any notice or other communication provided for herein or given hereunder to a party hereto must be in writing, and (a) sent by facsimile transmission; (b) electronic mail, (c) delivered in person, (d) mailed by first-class registered or certified mail, postage prepaid, or (e) sent by Federal Express or other overnight courier of national reputation. Each such notice or communication will be effective (i) if given by facsimile, when the successful sending of such facsimile is electronically confirmed, (ii) if given by electronic mail, when electronic evidence of receipt is received, or (iii) if given by any other means specified in the first sentence of this Section 7.4, upon delivery or refusal of delivery.

> To Seller at:
> 875 Carretera 693
> Suite 202
> Dorado, PR 00646
>
> To Acquiror at:
> P.O. Box 704
> Watersmeet, MI 49969
>
> With copy to counsel:
>
> Rosette, LLP
> 25344 Red Arrow Highway, Suite B
> Mattawan, MI 49071.

7.5    Complete Agreement. This Agreement and exhibits hereto and thereto and the other documents delivered by the parties in connection herewith contain the complete agreement between the parties hereto with respect to the transactions contemplated hereby and thereby and supersede all prior agreements and understandings between the parties hereto with respect thereto.

7.6    Captions. The captions contained in this Agreement are for convenience of reference only and do not form a part of this Agreement.

7.7    Amendment. This Agreement may be amended or modified only by an instrument in writing duly executed by the parties.

JA1005

CONFIDENTIAL

MARTORELLO_000107

7.8   Severability. Any term or provision of this Agreement that is invalid or unenforceable in any jurisdiction will, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining terms and provisions of this Agreement or affecting the validity or enforceability of any of the terms or provisions of this Agreement in any other jurisdiction, subject to the limitations in Article VIII.

7.9   Survival. The releases, representations, warranties, covenants, and agreements of the Seller, the Company, and Acquiror contained in this Agreement (including the exhibits attached hereto) will survive the closing.

7.10   Release. The parties permanently release each other and each of their trustees, officers, directors, shareholders and members from, and irrevocably covenant to not commence any proceeding of any kind against any other party for, any and all claims, known and unknown, associated with past agreements entered into by the parties between the parties that occurred before closing except any claim associated with the provisions of the Transaction Documents.

7.11   Execution.  Document may be executed in multiple counterparts, all of which taken together shall constitute one and the same instrument. Delivery by any party of an executed counterpart of a signature page to this Agreement by telecopier, facsimile or portable document format (pdf) shall be effective as delivery of a manually executed counterpart hereof.

7.12   Definitions.  All capitalized terms used but not defined herein will have the respective meanings set forth in the Loan and Security Agreement, or if not defined therein, in the applicable other Transaction Document.

Agreement and Plan of Merger
13

JA1006

CONFIDENTIAL

MARTORELLO_000108

## ARTICLE VIII
## TRIBAL WAIVERS OF SOVEREIGN IMMUNITY, DISPUTES AND REMEDIES

8.1    Limited Waiver Of Sovereign Immunity.

(a)    Retention of Sovereign Immunity.  By executing this Agreement, Acquiror does not waive, limit or modify its sovereign immunity, except as expressly provided in this Article VIII.

(b)    Scope of Waiver.  Subject to the provisions of this Article VIII, Acquiror hereby expressly and irrevocably grants to Seller, a limited waiver of its sovereign immunity from suit and consents to process and suit in accordance with this Section.  These waivers apply to actions in which Seller alleges a default or breach by Acquiror of one or more of the specific obligations or duties expressly assumed by Acquiror under the terms of this Agreement and the Transaction Documents.   These waivers expressly include Seller's or an affiliate's ability to pursue in litigation:

(i)    specific performance or other specific action, or discontinuance of some action, by Acquiror to bring Acquiror into full compliance with its duties and obligations hereunder; or

(ii)    money damages for noncompliance with the terms and provisions of this Agreement; or

(iii)    Acquiror does not consent to a waiver of its sovereign immunity from suit except for the limited purposes as set forth in this Article VIII and as follows: (A) the dispute shall be brought by and limited to Seller and no other party or entity; (B) the dispute shall be limited to causes of action arising under this Agreement and the Transaction Documents pursuant to Section 8.5 and (C) to enforce any Arbitration Decision (as defined herein) or court order compelling arbitration pursuant to Section 8.5; and (D) any such award or damages resulting from the dispute shall be limited to the assets and revenues of Acquiror and no other assets of the Tribe.

(c)    Express Waiver.  Acquiror hereby expressly and irrevocably waives:

(i)    its rights to have any dispute, controversy, suit, action or proceeding arising under this Agreement heard in any forum other than the ones set forth in Section 8.2 whether or not such forum now exists or is hereafter created including, without limitation, any Tribal court or other tribunal, forum, council or adjudicative body of the Tribe (each a "Tribal Forum");

(ii)    any claim or right which it may possess to the exercise of jurisdiction by, any Tribal Forum, including, without limitation, any determination that any Tribal Forum has jurisdiction over any such dispute, controversy, suit, action or

JA1007

CONFIDENTIAL

MARTORELLO_000109

proceeding or jurisdiction to determine the scope of such Tribal Forum's jurisdiction, and Seller does not consent to the jurisdiction of any Tribal Forum;

(iii)   any requirement which may exist for exhaustion of any remedies available in any Tribal Forum prior to the commencement of any dispute, controversy, suit, action or proceeding in any state or federal court even if any such Tribal Forum would have concurrent jurisdiction over any such dispute, controversy, suit, action or proceeding but for such waiver;

(iv)   its sovereign immunity as to an action by Seller in the United States District Court for the Western District of Michigan or any State of Michigan Circuit Court, and in the federal or state courts having appellate jurisdiction thereover, seeking injunctive and/or declaratory relief and/or money damages against Acquiror based solely upon an attempt by Acquiror to revoke its waiver of its sovereign immunity or other waivers granted under this Article VIII and solely to compel participation in arbitration proceedings pursuant to Section 8.5 and enforce an arbitration decision;

(v)   its sovereign immunity from a judgment or order (including any appellate judgment or order) and post judgment proceedings supplemental thereto consistent with the terms and provisions of this Article VIII, which is final because either the time for appeal thereof has expired or the judgment or the order is issued by a court having final appellate jurisdiction over the matter; and

(vi)   its sovereign immunity from the assertion or enforcement of any claim in any Tribal Forum (it being understood that this provision does not detract from or diminish any other waiver of the  Acquiror in this Article VIII).

8.2   <u>Consent to Jurisdiction</u>.  Acquiror consents to the jurisdiction of and to accept and be bound by any order or judgment of the United States District Court for the Western District of Michigan or any State of Michigan Circuit Court, and any federal or state court having appellate jurisdiction thereover for enforcement of an Arbitration Decision (as defined herein) consistent with the terms and provisions of this Article VIII.  It is the express intent of the parties that their first recourse for dispute resolution shall be to attempt to amicably resolve any issue, and second to the federal and state courts specified herein.

8.3   <u>Enforcement Authorization of Governmental Authorities</u>.  Without in any way limiting the generality of the foregoing, Acquiror expressly authorizes any governmental authorities who have the right and duty under applicable law to take any action authorized or ordered by any court, including, without limitation, to take such action as entering Acquiror's property, to give effect to any judgment or order entered, subject to this Article VIII.

8.4   <u>Governing Law</u>.  This Agreement, and any disputes or controversies arising hereunder, shall be governed by and construed according to the laws of the State of Delaware.

8.5   <u>Dispute Resolution</u>.  In the event that either Party to this Agreement believes that

Agreement and Plan of Merger<br>15

JA1008

CONFIDENTIAL

MARTORELLO_000110

the other Party has failed to comply with any requirement of this Agreement or a Transaction Document, or in the event of any dispute hereunder, including, but not limited to, a dispute over the proper interpretation of the terms and conditions of this Agreement, the following procedures shall be invoked:

(a) <u>Discussions between the Parties</u>. The goal of the Parties shall be to first resolve all disputes amicably and voluntarily whenever possible. A Party asserting noncompliance or seeking an interpretation of this Agreement first shall serve written notice on the other Party. The notice shall identify the specific Agreement provisions alleged to have been violated or that is in dispute and shall specify in detail the asserting Party's contention and any factual basis for the claim. Senior representatives of both Parties shall meet in person or by phone or other electronic medium within two (2) days of receipt of notice in an effort to resolve the dispute. A failure to meet shall be considered a failure to resolve the dispute and shall invoke Section (b) below.

(b) <u>Binding Arbitration</u>. After failure to resolve such disputes within two (2) days of notice, either Party may refer a dispute arising under this Agreement to arbitration with the American Arbitration Association (the "<u>AAA</u>"). If the dispute centers around an action of a Party, such action shall be postponed or discontinued during the pendency of the arbitration, provided that the lack of action shall not have a negative impact to the economic value of a Party. The Parties shall endeavor to mutually select one arbitrator from a list of qualified arbitrators, one of whom must have a minimum of five (5) years federal Indian law experience, one of whom must have a minimum of five (5) years of experience in financial or banking law, and one to be chosen by the other two and to be provided by the AAA. If the Parties cannot agree on arbitrators within three (3) Business Days, then the arbitrator shall be named by the AAA provided that they have the requisite experience. All hearings and other proceedings for such arbitration shall be held in Marquette, Michigan unless otherwise agreed to by the Parties in writing. The expenses of arbitration charged by the AAA shall be borne equally by the Parties, and each side shall bear its own other costs except that the winning Party may petition the arbitrators to award all or a portion of its expenses incurred in the dispute based on the facts of the dispute. The arbitrator shall determine whether the dispute is arbitrable and shall apply the substantive laws of the State of Delaware as well as the Commercial Arbitration Rules. The arbitrator shall issue a final and binding decision (the "<u>Arbitration Decision</u>") in which the remedies available through arbitration are limited to enforcement of the provisions of this Agreement and any associated equitable or monetary relief. The Arbitration Decision may be enforced as set forth in Section 8.5 (d) below.

(c) <u>Good Faith</u>. The Party asserting breach or seeking an interpretation of this Agreement under this Section 8.5 shall be deemed to have certified that to the best of such Party's knowledge, information and belief formed after reasonable inquiry, the claim of noncompliance or the request for interpretation of this Agreement is warranted and made in good faith and not for any improper purpose, such as to harass or to cause unnecessary delay or the needless incurring of the cost of resolving the dispute. If the dispute is found to have been initiated in violation of this Section 8.5, then the arbitrator, upon request or upon his or her own initiative, may impose upon the violating Party an appropriate sanction, which may include an award to

JA1009

CONFIDENTIAL

MARTORELLO_000111

the other Party of its reasonable expenses incurred in having to participate in the arbitration. (d) Enforcement of Arbitration Decision. Notwithstanding any provision of law, either Party to the Agreement may bring an action against the other pursuant to the provisions of this Article VIII solely for the enforcement of the Arbitration Decision. The Parties agree that the Arbitration Decision shall be final, conclusive and binding on the Parties with respect to the matters decided, and shall be complied with by the Parties. In such judicial proceedings, neither Party, without the prior written consent of the other Party, shall be entitled to contend that such arbitration award should be vacated, modified or corrected, and the Parties hereby expressly waive all other rights and remedies that might otherwise be available in such judicial proceeding.

(e) Fast-track Injunctive Relief. Either Party may bring an original action in a court of competent jurisdiction pursuant to this Article VIII to prevent actions by the other Party which could have a Material Adverse Effect if taken. Such injunctive relief may only be taken to maintain the status quo during the Dispute Resolution process set forth in this Section 8.5.

8.6    Attorneys Fees. Except as ordered by an Arbitration Decision or a court of competent jurisdiction for enforcement proceedings, all Parties shall bear their own costs, except that the prevailing party shall be reimbursed all reasonable attorneys' fees, in connection with any dispute resolution or enforcement proceedings authorized under this Agreement. Anything in this Agreement to the contrary notwithstanding, the parties expressly agree that this provision shall survive the termination, for any reason, or expiration of this Agreement and any additional agreement contemplated herein.

8.7    Service of Process. Acquiror and Seller hereby consent to any and all process which may be served in any such suit, action or proceeding, (a) by mailing a copy thereof by registered or certified mail, postage prepaid, return receipt requested, to the party's address shown in this Agreement or as notified to Seller and (b) by serving the same upon Acquiror in any other manner otherwise permitted by law, and agrees that such service shall in every respect be deemed effective service upon Acquiror.

8.8    **JURY WAIVER.  ACQUIROR AND SELLER EACH HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY, AND AFTER AN OPPORTUNITY TO CONSULT WITH LEGAL COUNSEL, (A) TO THE FULLEST EXTENT ALLOWED BY THE STATE OF DELAWARE, WAIVE ANY AND ALL RIGHTS TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING IN CONNECTION WITH THIS AGREEMENT, THE OBLIGATIONS, ALL MATTERS CONTEMPLATED HEREBY AND DOCUMENTS EXECUTED IN CONNECTION HEREWITH AND (B) AGREE NOT TO SEEK TO CONSOLIDATE ANY SUCH ACTION WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE, OR HAS NOT BEEN, WAIVED. ACQUIROR CERTIFIES THAT NEITHER SELLER NOR ANY OF ITS REPRESENTATIVES, AGENTS OR COUNSEL HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SELLER WOULD NOT IN THE EVENT OF ANY SUCH PROCEEDING SEEK TO ENFORCE THIS WAIVER OF RIGHT TO TRIAL BY JURY.**

8.9    Irrevocable Waiver. Acquiror covenants and agrees it possess the requisite

JA1010

MARTORELLO_000112

authority from the governing body of the Tribe to give this limited waiver of sovereign immunity and other waivers contained in this Article VIII and that it is irrevocable for one (1) year after termination of all Transaction Documents, or in the Event of Default, for a period not to exceed twelve (12) months after transfer of the Collateral, or for any non-compete period as defined in the Transaction Documents, or for any period required to enforce any rights under this Agreement when such enforcement action is initiated within one year of the termination of all the Transaction Documents, whichever is longer.  Acquiror agrees not to revoke or limit, in whole or in part, the limited waivers of sovereign immunity or other waivers contained in this Article VIII.  Acquiror hereby consents to the entry of appropriate injunctive relief, consistent with the terms and conditions of this Agreement.

## ARTICLE IX
## INDEMNIFICATION

9.1    Each party shall indemnify and hold harmless (the "Indemnifying Party") the other party, and its respective affiliates, members, managers, officers, directors, trustees, agents and employees (collectively "Indemnified Parties") from and against any claim, loss, cost, liability, damage or expense (including, without limitation, reasonable attorneys' fees and costs of suits) that arise out of or relate to any breach by the Indemnifying Party of its express representations, warranties, covenants or other responsibilities set forth in this Agreement, provided however, the Indemnifying Party shall not be liable to any Indemnified Party for the foregoing to the extent any claims, loss, cost, liability, damage or expense (including, without limitation, reasonable attorneys' fees and costs) arise from any the Indemnified Party's gross negligence or willful misconduct, as determined pursuant to the dispute resolution procedures set forth in the Transaction Documents.

[signature pages to follow]

JA1011

CONFIDENTIAL

MARTORELLO_000113

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the Effective Date.

**ACQUIROR:**

**LVD TRIBAL ACQUISITION COMPANY, LLC**

By: _Michelle Hazen_

Name: Michelle Hazen

Title: Co-Manager

**COMPANY:**

**BELLICOSE CAPITAL, LLC**

By: _Brian McFadden_

Name: Brian McFadden

Title: President

**SELLER:**

**EVENTIDE CREDIT ACQUISITIONS, LLC**

By: _____

Name: Matt Martorello

Title:  President, Liont, LLC, Manager

Agreement and Plan of Merger

19

CONFIDENTIAL

JA1012

MARTORELLO_000114

# EXHIBIT A

## Notes Assumed

| Note Holder | Amount | Execution Date |
|---|---|---|
| Columbia Pipe & Supply Co. | 2,000,000.00 | 12/10/2012 |
| Timothy P. Arenberg | 700,000.00 | 12/10/2012 |
| Terrance J. Arenberg | 900,000.00 | 12/10/2012 |
| DTA Trinity Wealth Transfer Trust | 300,000.00 | 9/25/2013 |
| Columbia Pipe & Supply Co. | 4,000,000.00 | 11/21/2013 |
| Timothy P. Arenberg | 700,000.00 | 11/21/2013 |
| Terrance J. Arenberg | 750,000.00 | 11/21/2013 |
| DTA | 150,000.00 | 11/21/2013 |
| DMA | 150,000.00 | 11/21/2013 |
| Columbia Pipe & Supply Co. | 2,000,000.00 | 8/16/2014 |
| Timothy P. Arenberg | 400,000.00 | 12/10/2014 |
| Terrance J. Arenberg | 400,000.00 | 12/10/2014 |
| Jeremy Davis | 2,500,000.00 | 12/16/2014 |

JA1013

CONFIDENTIAL

MARTORELLO_000115

**EXHIBIT B**

Intellectual Property
Assets of Company

Seller hereby transfers to Buyer the following Intellectual Property Assets of the Company at Close:

(1)     All Company records in either paper or electronic format;

(2)     All data contained on Company's servers or individual computer except as set forth in Section 2.6(d);

(3)     All templates, training manuals, and other information created for the benefit of Company;

(4)     All copyrighted or patented materials or processes created by Company or Company's employees;

(5)     Any Company computer codes and computer models developed by or on behalf of Company or by Company employees;

(6)     All rights to licenses or other use rights owned or controlled by Company with third-party vendors; and

(7)     All trade secrets developed by or on behalf of Company or by Company employees.

JA1014

CONFIDENTIAL

MARTORELLO_000116

Exhibit 8

| | |
|---|---|
| **Subject:** | RE: Williams v. Big Picture - Martorello's |
| **Date:** | Wednesday, October 18, 2017 at 6:56:28 PM Eastern Daylight Time |
| **From:** | Justin Gray |
| **To:** | Andrew Guzzo |
| **CC:** | Kristi Cahoon Kelly, Karrie Wichtman, Anthony, David N. |
| **Attachments:** | image004.png, image003.png |

No, that is incorrect.

When we searched, the only Martorello emails on the server were the pre-2014 travel confirmation emails. Any other emails surrendered by Martorello to my clients were deleted shortly after the time of the acquisition according to the requirements in the acquisition documents. Martorello never had an Ascension email account.

Any emails from any domain that McFadden, Laing, and Dowd possessed have been collected.

**Justin Gray, Attorney**
**Rosette, LLP**
**Attorneys at Law**
Michigan Office
25344 Red Arrow Hwy
Mattawan, MI 49071
Office: (269) 283-5005
jgray@rosettelaw.com
www.rosettelaw.com

*This message may contain privileged communication between attorney and client. It is intended*
*for use only by the original recipient. If you receive this message in error, please notify the sender,*
*then delete and disregard this message.*

---

**From:** Andrew Guzzo [mailto:aguzzo@kellyandcrandall.com]
**Sent:** Wednesday, October 18, 2017 6:39 PM
**To:** Justin Gray <jgray@rosettelaw.com>
**Cc:** Kristi Cahoon Kelly <kkelly@kellyandcrandall.com>; Karrie Wichtman <kwichtman@rosettelaw.com>; Anthony, David N. <David.Anthony@troutmansanders.com>
**Subject:** Re: Williams v. Big Picture - Martorello's

Justin,

Thanks for looking into this. I just want to make sure I understand you correctly. Are you saying that your client received no emails involving Martorello when the servers/company data were transferred from Bellicose?

Would this also be true for McFadden, Liang, Dowd and other employees? In other words, were the responsive documents identified for these individuals limited to their Ascension emails?

Thanks,

Andrew J. Guzzo, Esq.

Kelly & Crandall, PLC
Direct Dial: 703-424-7576
E-mail: aguzzo@kellyandcrandall.com
Fairfax Office: 3925 Chain Bridge Rd., Ste. 202, Fairfax, VA 22030
Honolulu Office:  500 Ala Moana Blvd., Ste. 400, Honolulu, HI 96813

Please do not read, copy or disseminate this communication unless you are the intended addressee. This e-mail communication contains confidential and/or privileged information intended only for the addressee.  If you have received this communication in error, please call me at 703-424-7570 or e-mail me immediately.  Thank you.

---

**From:** Justin Gray <jgray@rosettelaw.com>
**Date:** Wednesday, October 18, 2017 at 5:58 PM
**To:** Andrew Guzzo <aguzzo@kellyandcrandall.com>
**Cc:** Kristi Cahoon Kelly <kkelly@kellyandcrandall.com>, Karrie Wichtman <kwichtman@rosettelaw.com>, "david.anthony@troutmansanders.com" <David.Anthony@troutmansanders.com>
**Subject:** RE: Williams v. Big Picture - Martorello's

Andrew,

Sorry for the late response to your question below...to double check on whether or not our clients possessed any Matt Martorello emails, we got back in touch with our e-discovery team for a search specifically for Martorello emails.  The only emails our client possesses are his travel confirmations from pre-2014.

We have produced (or will as we revisit the documents based on the Court's order) all emails sent to our clients from Matt Martorello.

**Justin Gray, Attorney**
**Rosette, LLP**
**Attorneys at Law**
Michigan Office
25344 Red Arrow Hwy
Mattawan, MI 49071
Office: (269) 283-5005
jgray@rosettelaw.com
www.rosettelaw.com

*This message may contain privileged communication between attorney and client.  It is intended for use only by the original recipient.  If you receive this message in error, please notify the sender, then delete and disregard this message.*

---

**From:** Andrew Guzzo [mailto:aguzzo@kellyandcrandall.com]
**Sent:** Wednesday, October 18, 2017 2:53 PM
**To:** Justin Gray <jgray@rosettelaw.com>; Karrie Wichtman <kwichtman@rosettelaw.com>; Anthony, David N. <David.Anthony@troutmansanders.com>
**Cc:** Kristi Cahoon Kelly <kkelly@kellyandcrandall.com>
**Subject:** RE: Williams v. Big Picture - Martorello's

Justin and Karrie,

I just wanted to follow up on this. We really need an answer as soon as possible as we may need to include this issue in the brief we file on Monday.

Thanks,
Andrew

---

**From:** Andrew Guzzo
**Sent:** Tuesday, October 17, 2017 11:53 AM
**To:** Justin Gray <jgray@rosettelaw.com>; 'kwichtman@rosettelaw.com' <kwichtman@rosettelaw.com>; Anthony, David N. <David.Anthony@troutmansanders.com>
**Cc:** Kristi Cahoon Kelly <kkelly@kellyandcrandall.com>
**Subject:** Williams v. Big Picture - Martorello's

Justin and Karrie,

It was nice to meet you yesterday. In reviewing the various logs for our upcoming briefing, we noticed that Matt Martorello was not listed on the log identifying the custodians searched. It is our understanding that BPL took possession of Martorello's emails as part of the acquisition. Can you let us know whether you conducted a search for these emails or why BPL no longer has possession of them?

Thanks,

Andrew J. Guzzo, Esq.
Kelly & Crandall, PLC
Direct Dial: 703-424-7576
E-mail: aguzzo@kellyandcrandall.com
Fairfax Office: 3925 Chain Bridge Rd., Ste. 202, Fairfax, VA 22030
Honolulu Office:  500 Ala Moana Blvd., Ste. 400, Honolulu, HI 96813

Please do not read, copy or disseminate this communication unless you are the intended addressee. This email communications contains confidential and/or privilege information intended only for the addressee. If you have received this communication in error, please contact me immediately.

# Exhibit 9

USCA4 Appeal: 23-2052   Doc: 114-3   Filed: 12/05/2023   Pg: 74 of 438
Case 3:17-cv-00461-REP   Document 1174-9   Filed 04/24/23   Page 2 of 5 PageID# 48795
Case 1:18-mc-00225-RBJ-KLM   Document 17-1   Filed 01/24/19   USDC Colorado   Page 1 of 4

# Exhibit C

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:18-mc-00225-RBJ-KLM

JENNIFER WEDDLE,

        Movant,

v.

LULA WILLIAMS,
GLORIA TURNAGE,
GEORGE HENGLE,
DOWIN COFFY, and
MARCELLA P. SINGH,
on behalf of themselves and all others similarly situated,

        Respondents.

---

## DECLARATION OF JENNIFER WEDDLE

I, Jennifer Weddle, hereby state and declare the following.

1.     I am over twenty-one years of age, of sound mind, and competent to testify. Unless otherwise stated, I have personal knowledge of the facts stated in this declaration.

2.     I am a shareholder in the Denver office of Greenberg Traurig, LLP ("Greenberg Traurig") and the Co-Chair of Greenberg Traurig's nationwide American Indian Law Practice, a role I have held since I joined the firm in 2009.

3.     Between 2011 and 2015, Greenberg Traurig represented Bellicose Capital, LLC ("Bellicose"). At that time, Matt Martorello was a principal of Bellicose.  In the course of that representation, Greenberg Traurig created and acquired documents relating to that representation and had communications regarding Bellicose with Mr. Martorello and other persons and entities.

JA1021

4.      Mr. Martorello individually became a client of Greenberg Traurig only in 2018, when he retained Greenberg Traurig as counsel in *Cumming et al. v. Big Picture Loans, LLC et al.*, No. 5:18-cv-03476 (N.D. Cal.), a class-action lawsuit with allegations nearly identical to those that the issuers of the Subpoena assert in their Eastern District of Virginia litigation.  Prior to that time, Greenberg Traurig had not given Mr. Martorello legal advice in an individual capacity.

5.      In 2016, Mr. Martorello, on behalf of Bellicose, informed Greenberg Traurig that Bellicose had entered into an Agreement and Plan of Merger with the Lac Vieux Desert Band of Lake Superior Chippewa Indians ("the Tribe"), and that, as required by the merger contract, he was required to certify that all company files were to be transferred to the Tribe or destroyed.

6.      Greenberg Traurig did not represent Bellicose or any other entity or person in connection with the merger.

7.      Upon receipt of notice of the merger from Bellicose, I contacted counsel for the Tribe, as the acquirer, and inquired if the Tribe wished to retain Greenberg Traurig as counsel for Bellicose and if not, I requested to know the Tribe's instructions as to its files in Greenberg Traurig's custody.  The Tribe advised me that it would not engage Greenberg Traurig going forward and did not desire to review or transfer our files because they understood them to be working files and/or duplicative of documents they had already acquired as a result of the 2015 sale.  The Tribe directed that we delete the files in our possession consistent with the sale documents, with respect to which GT represented no party and was provided only after the transaction closed.

JA1022

Case 1:18-mc-00225-RBJ-KLM Document 17-1 Filed 01/24/19 USDC Colorado Page 4 of 4
Case 3:17-cv-00461-REP Document 1174-9 Filed 04/24/23 Page 5 of 5 PageID# 48798
USCA4 Appeal: 17-2086 Doc: 113 Filed: 12/06/22 Pg: 458

8.     Greenberg Traurig promptly complied with that direction, and all timekeepers who had worked on Bellicose matters deleted electronic files and disposed of hard-copy files by secure methods.

9.     I declare under penalty of perjury and under 28 U.S.C. § 1746 that the foregoing statements are true and correct.

Executed on this _24th_ day of January 2019.

Jennifer Weddle

Jennifer Weddle

3

JA1023

# Exhibit 10

**LULA WILLIAMS, ET AL. vs BIG PICTURE LOANS, LLC, ET AL.**
**Matthew Martorello on 02/25/2019**

```
 1            IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF VIRGINIA
 2                    RICHMOND DIVISION

 3    LULA WILLIAMS, et al., on     *
      behalf of themselves and all  *
 4    other similarly situated      *
      individuals,                  *
 5            Plaintiff,            *
                                    *
 6    VS.                          *   Civil Action No.
                                    *   3:17-cv-461 (REP)
 7    BIG PICTURE LOANS, LLC,       *
      et al.,                       *
 8            Defendants.          *

 9
      *****************************************************
10
             ORAL AND VIDEOTAPED DEPOSITION OF
11                  MATTHEW MARTORELLO
                    FEBRUARY 25, 2019
12
      *****************************************************
13

14            DEPOSITION of MATTHEW MARTORELLO,

15    produced as a witness at the instance of the

16    Plaintiffs, and duly sworn, was taken in the

17    above-styled and numbered cause on the 25th day of

18    February, 2019, from 10:33 a.m. to 5:56 p.m., before

19    Christy R. Sievert, CSR, RPR, in and for the State

20    of Texas, reported by machine shorthand, at the

21    offices of Regus Business Center, 100 Crescent

22    Court, 7th Floor, Dallas, Texas 75201, pursuant to

23    the Federal Rules of Civil Procedure and the

24    provisions stated on the record or attached hereto.

25
```

www.huseby.com          Huseby, Inc. Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

JA1025

**LULA WILLIAMS, ET AL. vs BIG PICTURE LOANS, LLC, ET AL.**
**Matthew Martorello on 02/25/2019**

```
 1                    A P P E A R A N C E S

 2

 3     FOR THE PLAINTIFFS:

 4        MR. LEONARD A. BENNETT
          (Appearing via teleconference)
 5        Consumer Litigation Associates
          763 J. Clyde Morris Boulevard, Suite 1-A
 6        Newport News, Virginia 23601
          Phone:      757-930-3660
 7        E-mail:     len@clalegal.com

 8        MR. ANDREW J. GUZZO
          (Appearing telephonically)
 9        Kelly & Crandall, PLC
          763 J Clyde Morris Boulevard, Suite 1A
10        Newport News, Virginia  23601
          Phone:      703-424-7576
11        E-mail:     aguzzo@kellyandcrandall.com

12        MS. E. MICHELLE DRAKE
          (Appearing telephonically)
13        Berger Montague
          43 SE Main Street, Suite 505
14        Minneapolis, Minnesota 55414
          Phone:      612-594-5933
15        E-mail:     emdrake@bm.net

16
       COUNSEL FOR MATTHEW MARTORELLO:
17
          MR. RICHARD L. SCHEFF
18        Armstrong Teasdale, LLP
          1500 Market Street, 12th Floor, East Tower
19        Philadelphia, Pennsylvania 19102
          Phone:      215-246-3478
20        E-mail:     rscheff@armstrongteasdale.com

21

22

23

24

25
```

www.huseby.com          Huseby, Inc. Regional Centers          800-333-2082  Page 2
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

JA1026

**LULA WILLIAMS, ET AL. vs BIG PICTURE LOANS, LLC, ET AL.**
**Matthew Martorello on 02/25/2019**

```
 1              Have you had a chance to refamiliarize
 2     yourself with this?
 3         A.   Oh, sorry.  Let me briefly take a quick
 4     look again.
 5              (Reviews document.)
 6              Okay.  Thank you.
 7         Q.   And first, whose idea was it to put this
 8     language in this merger agreement?
 9         A.   This provision was included in a -- sort of
10     like a template, the original template document that
11     came from a -- my understanding is that it came from
12     another transaction.
13         Q.   Okay.  Do you know what transaction?
14         A.   Yeah, I think it was related to Upper Lake.
15         Q.   What is Upper Lake?
16         A.   Upper Lake is a tribe in northern
17     California that had made an acquisition in some
18     similar capacity.
19              So this was the -- this was the template
20     document that was provided to me with the exception
21     being the very last sentence, which I was adamant
22     that I obviously needed to be able to retain
23     anything required for tax returns and anything that
24     would amount to that.
25         Q.   Have you ever heard of Golden Valley
```

www.huseby.com          Huseby, Inc. Regional Centers          800-333-2082  Page 149
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

JA1027

**LULA WILLIAMS, ET AL. vs BIG PICTURE LOANS, LLC, ET AL.**
**Matthew Martorello on 02/25/2019**

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF VIRGINIA
 2                    RICHMOND DIVISION

 3   LULA WILLIAMS, et al., on     *
     behalf of themselves and all  *
 4   other similarly situated      *
     individuals,                   *
 5              Plaintiff,          *
                                    *
 6   VS.                            *   Civil Action No.
                                    *   3:17-cv-461 (REP)
 7   BIG PICTURE LOANS, LLC,        *
     et al.,                        *
 8              Defendants.         *

 9

               REPORTER'S CERTIFICATION
10          DEPOSITION OF MATTHEW MARTORELLO
                  FEBRUARY 25, 2019
11

12              I, CHRISTY R. SIEVERT, CSR, RPR, in

13   and for the State of Texas, hereby certify to the

14   following:

15              That the witness, MATTHEW MARTORELLO, was

16   duly sworn by the officer and that the transcript of

17   the oral deposition is a true record of the

18   testimony given by the witness;

19              I further certify that the signature of

20   the deponent was requested by the deponent or a

21   party and is to be returned within 30 days from date

22   of receipt of the transcript.  If returned, the

23   attached Changes and Signature Page contains any

24   changes and the reasons therefor;

25              I further certify that I am neither
```

www.huseby.com          Huseby, Inc. Regional Centers          800-333-2082  Page 229
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

JA1028

**LULA WILLIAMS, ET AL. vs BIG PICTURE LOANS, LLC, ET AL.**
**Matthew Martorello on 02/25/2019**

```
 1    counsel for, related to, nor employed by any of the

 2    parties or attorneys in the action in which this

 3    proceeding was taken, and further that I am not

 4    financially or otherwise interested in the outcome

 5    of the action.

 6            Subscribed and sworn to on this the 4th

 7    day of March, 2019.

 8

 9

10            _____

11            CHRISTY R. SIEVERT, CSR, RPR
              Expiration Date:  4-30-2021
12            Huseby, Inc.
              7000 North Mopac Freeway
13            2nd Floor
              Austin, Texas  78731
14            (512) 687-0421 (tel)

15

16

17

18

19

20

21

22

23

24

25
```

www.huseby.com          **Huseby, Inc. Regional Centers**          800-333-2082  Page 230
**Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco**

JA1029

# Exhibit 11

# AGREEMENT AND PLAN OF MERGER

among

## CLEAR LAKE TAC S

and

## NAGUS ENTERPRISES, LLC

and

## LATINUM FUNDING, LLC

August 20 , 2014

**EXHIBIT**

**JoW 19**

JA1031

# AGREEMENT AND PLAN OF MERGER

This Agreement and Plan of Merger (this "Agreement"), dated as of August 26, 2014 is entered into among, Clear Lake TAC S, Inc., ("CLTAC-S") an entity wholly owned and operated by the Habematolel Pomo of Upper Lake ("Tribe"), Nagus Enterprises, LLC, a Delaware limited liability company ("Company"), and Latinum Funding, LLC, a Delaware limited liability company, in its capacity as seller and member of the Company ("Seller").

## ARTICLE I
## RECITALS

1.1     The United States Congress has recognized and enacted legislation such as the Native American Business Development, Trade Promotion and Tourism Act (25 U.S.C. §§ 4301 et seq.) and other legislation which recognizes the federal policy and Congressional intent "to promote economic self-sufficiency and political self-determination for Indian tribes and members of Indian tribes" through offering services from Indian Country.

1.2     CLTAC-S is interested in expanding its e-commerce business interests in order to serve the much needed economic interests of the Tribe.

1.3     Historically, the Tribe has suffered from a lack of significant economic activity, however, with the advent of e-commerce activities occurring within the Tribe's jurisdiction and pursuant to Tribal law, including but not limited to the Tribal Consumer Financial Services Regulatory Ordinance, the Tribe, through its wholly-owned corporate entities, has been able to engage in e-commerce in a meaningful way that enables CLTAC-S, or another successor Tribal entity, to achieve profits distributable to the Tribe that will be utilized for the benefit of the Tribe. CLTAC-S believes that the purchase of Company will help advance these efforts further.

1.4     The Company has been engaged in purchasing participation interest in the loan portfolio of Silver Cloud Financial, Inc. ("SCF") and has used its participation financials upon which to base its sales price; and the Tribe wishes to acquire Company.

1.5     The parties intend that the Company be merged with and into the CLTAC-S, with the CLTAC-S surviving that merger on the terms and subject to the conditions set forth herein (the "Merger").

1.6     At Closing, the Company shall provide CLTAC-S, in accordance with Section 228 of the Delaware General Corporation Law ("DGCL"), a written consent of its stockholders approving this Agreement, the Merger and the transactions contemplated hereby in accordance with Section 251 of the DGCL;

NOW, THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants, and agreements set forth herein, and subject to the terms and conditions set forth herein, the Seller, the Company, and CLTAC-S agree as follows:

## ARTICLE II
## MERGER

2.1     The Merger. On the terms and subject to the conditions set forth in this Agreement, and in accordance with the DGCL, at the Effective Time, (a) the Company will merge with and into the CLTAC-S, and (b) the separate corporate existence of the Company will cease and CLTAC-S will continue its corporate existence under Tribal law as the surviving corporation in the Merger (sometimes referred to herein as the "Surviving Corporation").

2.2     Effective Time. Subject to the provisions of this Agreement, at the Closing, the Company and CLTAC-S shall cause a certificate of merger (the "Certificate of Merger") to be executed, acknowledged and filed with the Secretary of State of the State of Delaware in accordance with the relevant provisions of the DGCL and shall make all other filings or recordings required under the DGCL. The Merger shall become effective at such time as the Certificate of Merger has been duly filed with the Secretary of State of the State of Delaware or at such later date or time as may be agreed by the Company and CLTAC-S in writing and specified in the Certificate of Merger in accordance with the DGCL (the effective time of the Merger being hereinafter referred to as the "Effective Time").

2.3     Effects of the Merger. The Merger shall have the effects set forth herein and in the applicable provisions of the DGCL. Without limiting the generality of the foregoing, and subject thereto, from and after the Effective Time, all property, rights, privileges, immunities, powers, franchises, licenses and authority of the Company and CLTAC-S shall vest in the Surviving Corporation, and all debts, liabilities, obligations, restrictions and duties of each of the Company and CLTAC-S shall become the debts, liabilities, obligations, restrictions and duties of the Surviving Corporation.

JA1033

2.4     Certificate of Incorporation; Bylaws. At the Effective Time, (a) the certificate of incorporation of CLTAC-S as in effect immediately prior to the Effective Time shall be the certificate of incorporation of the Surviving Corporation until thereafter amended in accordance with the terms thereof or as provided by applicable law, and (b) the bylaws of CLTAC-S as in effect immediately prior to the Effective Time shall be the bylaws of the Surviving Corporation until thereafter amended in accordance with the terms thereof, the certificate of incorporation of the Surviving Corporation or as provided by applicable law.

2.5     Directors and Officers. The directors and officers of CLTAC-S, in each case, immediately prior to the Effective Time shall, from and after the Effective Time, be the directors and officers, respectively, of the Surviving Corporation until their successors have been duly elected or appointed and qualified or until their earlier death, resignation or removal in accordance with the certificate of incorporation and bylaws of the Surviving Corporation.

2.6     Effect of Merger.  At the Effective Time, as a result of the Merger and without any action on the part of CLTAC-S, the Company or any equity owner:

(a)     Cancellation of Certain Company Equity. Units, interests, and/or equity (the "Equity") of the Company that are owned by CLTAC-S or the Company shall automatically be cancelled and retired and shall cease to exist, and no consideration shall be delivered in exchange therefore.

(b)     Conversion of Equity. All Equity of the Company not cancelled pursuant to Section 2.6(a) that is issued and outstanding immediately prior to the Effective Time shall be cancelled and will cease to exist, and each holder of Equity of the Company will cease to have any rights with respect thereto, except the right to receive the Merger Consideration in accordance with Section 2.7 hereof.

(c)     Continuation of CLTAC-S. All issued and outstanding equity of CLTAC-S at the Effective Time shall remain unchanged and CLTAC-S shall be the Surviving Corporation.

2.7     Consideration.  The aggregate amount of merger consideration to be paid the Seller shall be an amount equal to $24,112,215.33 ($22,316,435.86 principal and $1,795,779.47) payable pursuant to a Secured Promissory Note in the form as attached hereto as Exhibit A and the acceptance of an existing obligation and the issuance of a new note with a total obligation of $7.4 million dollars attached hereto as Exhibit A-1 (the "Merger Consideration").  The Seller agrees that the Secured Promissory Note shall be issued in the name of Seller, payable to a trustee designated by the Seller, which such trustee shall act as an

agent for the benefit of the Seller and the party to whom CLTAC-S makes payments under the Promissory Note.

2.8  Security Agreement. The Secured Promissory Note shall be secured by the Security Agreement attached hereto as Exhibit B.

## ARTICLE III
## CLOSING, DELIVERIES & ADJUSTMENTS

3.1    The Closing will take place simultaneously with the execution of the Transaction Documents (as defined in the Note).

3.2    Conditions Precedent to Closing. All of the following conditions precedent shall be met by Seller or waived in writing by CLTAC-S prior to Closing. Prior to Closing, Seller shall deliver to CLTAC-S the following items:

(a)    The Certificate of Organization of the Company, certified as of a recent date and current under Delaware law by the Secretary of State of Delaware;

(b)    Certificates of the Secretary of State of Delaware as to the good standing as of a recent date and current under Delaware law of the Company; and

3.3    Deliveries by CLTAC-S. At the Closing, CLTAC-S shall deliver, or cause to be delivered, to the Seller the following items:

(a)    Secured Promissory Note in the form attached as Exhibit A; and
(b)    The Security Agreement in the form attached as Exhibit B.
(c)    The Parental Acknowledgement attached hereto as Exhibit C.

3.4  Working Capital Adjustment.  The parties hereby acknowledge, covenant and agree that the "working capital" available to GVL will not be less than $2 million at the Effective Time of the Merger (the "Beginning Working Capital").  For purposes hereof, "working capital" means cash on hand at GVL less accounts payable on the balance sheet. The parties further acknowledge, covenant and agree to cause GVL to return the principal from loans participated by the Company as set forth on the Balance Sheet of the Company dated June 30, 2014 attached hereto as Exhibit "D" (the "Closing Balance Sheet") by the amount necessary to reduce the Working Capital of GVL to the Beginning Working Capital of GVL.  The parties finally acknowledge, covenant and agree that the Company will provide all of the cash of the Company (after giving effect to the payment by GVL of the

amount required to reduce the working capital of GVL to the Beginning Working Capital) immediately prior to the Effective Time of the Merger (the "Working Capital Adjustment").

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF COMPANY

4.1    Company represents and warrants as of immediately before the Effective Time to CLTAC-S as follows:

(a)    Organization and Good Standing. Company is an entity duly formed with limited liability under the applicable laws of Delaware, validly existing and in good standing under the applicable laws of Delaware and has full power, authority and the legal right to own its properties and conduct its business, and to execute, deliver and perform its obligations under this Agreement;

(b)    Due Qualification. Company is in compliance with its organizational documents;

(c)    Due Authorization; Enforceability. Company has the full power and authority to execute and deliver this Agreement and to perform all obligations hereunder. The execution, delivery and performance of this Agreement by Company has been duly authorized by all necessary corporate action on its part and does not and will not contravene any provision of its organizational documents. This Agreement has been duly executed and delivered by Company and constitutes the legal, valid and binding obligation of Company, enforceable against Company in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, reorganization, insolvency, moratorium and/or other similar laws and general equitable principles;

(d)    No Conflict. The execution, delivery and performance by Company of this Agreement and the transactions contemplated hereby does not violate, conflict with or result in a breach or default under the organizational documents of Company or any other regulation applicable to Company or any agreement or other document to which Company is a party or by which it or any of its property is bound.

(e)    No Proceeding. There is no litigation, administrative proceeding, enforcement action, or investigation before any court, tribunal or governmental body presently pending or, to the knowledge of Seller, threatened against Seller.

4.2    Capitalization. There are no: (x) outstanding securities convertible or exchangeable into equity of the Company; (y) options, warrants, calls, subscriptions, or other

JA1036

rights, agreements, or commitments obligating the Company to issue, transfer, or sell any equity; or (z) voting trusts or other agreements, or understandings to which the Company is a party or by which the Company is bound with respect to the voting, transfer, or other disposition of Units, other than the Company Operating Agreement.

4.3   No Conflict. Required Filings and Consents. Neither the execution and delivery of this Agreement by the Seller or the Company, nor the consummation by the Seller or the Company of the transactions contemplated hereby, nor compliance by the Seller or the Company with any of the provisions hereof, will (i) conflict with or result in a breach of any provisions of the certificate of formation of the Company or the Company Operating Agreement, (ii) constitute or result in the breach of any term, condition, or provision of, or constitute a default under, or give rise to any right of termination, cancellation, or acceleration with respect to, or result in the creation or imposition of any lien upon any property or assets of Company pursuant to any note, bond, mortgage, indenture, license, agreement, lease, or other instrument or obligation to which Company is a party or by which Company or any of Company's properties or assets may be subject, and that would, in any such event, have a material adverse effect on Company; or (iii) violate any order or law applicable to the Company or its properties or assets.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

Seller represents and warrants as of immediately before the Effective Time to CLTAC-S as follows:

5.1   Authority, Validity and Effect. Seller is a business entity duly formed, validly existing, and in good standing under the applicable laws of their respective jurisdictions. Seller has all requisite power and authority to execute and deliver this Agreement and all agreements and documents contemplated hereby to be executed and delivered by it, and to consummate the transactions contemplated hereby and thereby. The execution and delivery of this Agreement and such other agreements and documents and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary corporate or other action on the part of Seller as the only other members of Company and no other action is needed. This Agreement has been duly and validly executed and delivered by Seller and constitutes the legal, valid, and binding obligation of Seller, enforceable against Seller in accordance with its terms, except as limited by the general enforceability exceptions in paragraph 4.1 above.

5.2    Capitalization. There are no: (x) outstanding securities convertible or exchangeable into Units of the Company; (y) options, warrants, calls, subscriptions, or other rights, agreements, or commitments obligating the Company to issue, transfer, or sell any Units; or (z) voting trusts or other agreements, or understandings to which the Company is a party or by which the Company is bound with respect to the voting, transfer, or other disposition of Units, other than the Company Operating Agreement.

5.3    No Conflict. Required Filings and Consents. Neither the execution and delivery of this Agreement by the Seller or the Company, nor the consummation by the Seller or the Company of the transactions contemplated hereby, nor compliance by the Seller or the Company with any of the provisions hereof, will (i) conflict with or result in a breach of any provisions of the certificate of formation of the Seller or the Seller's Operating Agreement(s), (ii) constitute or result in the breach of any term, condition, or provision of, or constitute a default under, or give rise to any right of termination, cancellation, or acceleration with respect to, or result in the creation or imposition of any lien upon any property or assets of Seller pursuant to any note, bond, mortgage, indenture, license, agreement, lease, or other instrument or obligation to which Seller is a party or by which Seller or any of Seller's properties or assets may be subject, and that would, in any such event, have a material adverse effect on Seller; or (iii) violate any order or law applicable to the Seller or its properties or assets.

5.4    Title. Seller (a) is the only record and beneficial owners of the equity being sold; (b) has full power, right, and authority, and any approval required by law to make and enter into this Agreement and to sell, assign, transfer, and deliver the Units to CLTAC-S; and (c) has good and valid title to the Units free and clear of all liens, other than liens arising under the Company Operating Agreement or the note referenced in Section 2.7. Upon the consummation of the transactions contemplated by this Agreement in accordance with the terms hereof, at the Closing, CLTAC-S will acquire valid title to the Units of Seller free and clear of all liens, other than liens created by CLTAC-S and pursuant to the Company Operating Agreement.

5.5    Financials. . Seller represents and warrants that the profit and loss statements and balance sheets (both for 2013 year end and trailing 12 month financials) fairly, accurately, and completely reflect the financial performance and condition of the Company based on the accounting method the Company has consistently used and are subject to the Working Capital Adjustment outlined in Section 3.4.

5.6    Other representations and warranties.    Seller represents and warrants that Company has no outstanding tax, civil, criminal or regulatory investigations or liabilities or

outstanding obligations at the time of Closing, except for previously disclosed state regulatory inquiries that have not resulted in any enforcement action being taken. Seller shall be solely responsible for preparing and filing of Company's tax returns for all tax liability through the Effective Time.

5.7    Limitation on damages.    All damages associated with a breach of representations and warranties by Seller shall be limited to actual damages, along with reasonable attorney fees and expenses and will result in such damages being applied as a reduction in the total obligation under the Note, provided however, that if the breach of representations or warranties is caused by Seller's fraudulent misrepresentation, this provision shall not apply, or if by Seller's gross negligence, the actual damages may be supplemented by additional damages, including but not limited to consequential, special, punitive or any other additional damages, but such additional damages are limited to 10% of the Merger Consideration.

## ARTICLE VI
## REPRESENTATIONS AND WARRANTIES OF CLTAC-S

CLTAC-S represents and warrants to the Seller as follows:

6.1    Organization and Standing. CLTAC-S is a corporation, duly organized, validly existing, and in good standing under Tribal law.

6.2    Authority, Validity and Effect. CLTAC-S has the requisite power and authority to execute and deliver this Agreement and the Transaction Documents to be executed and delivered by it, and to consummate the transactions contemplated hereby and thereby without obtaining any additional approvals (whether internal or third-party). The execution and delivery of this Agreement and such other Transaction Documents and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary action on the part of CLTAC-S. This Agreement has been duly and validly executed and delivered by CLTAC-S and constitutes the legal, valid, and binding obligation of CLTAC-S, enforceable against CLTAC-S in accordance with its terms, except as limited by (a) Article VIII herein, and (b) the general enforceability exceptions in paragraph 4.1(c) above.

6.3    No Conflict; Required Consents. Neither the execution and delivery of this Agreement by CLTAC-S, nor the consummation by CLTAC-S of the transactions contemplated hereby, nor compliance by CLTAC-S with any of the provisions hereof, will (i) conflict with or result in a breach of any provisions of the articles or certificate of incorporation or bylaws or equivalent organizational documents of CLTAC-S; (ii) constitute

or result in the breach of any term, condition, or provision of, or constitute a default under, or give rise to any right of termination, cancellation, or acceleration with respect to, or result in the creation or imposition of any lien upon any property or assets of CLTAC-S pursuant to any note, bond, mortgage, indenture, license, agreement, lease, or other instrument or obligation to which CLTAC-S is a party or by which CLTAC-S or any of CLTAC-S's properties or assets may be subject, and that would, in any such event, have a material adverse effect on CLTAC-S; or (iii) violate any order or law applicable to CLTAC-S or any of its properties or assets.

6.4    Independent Due Diligence. In connection with its investment decision, CLTAC-S and/or its representatives have inspected and conducted such reasonable independent review, investigation, and analysis of the Company.

6.5    Limitation on damages.    All damages associated with a breach of representations and warranties by CLTAC-S shall be limited to actual damages, along with reasonable attorney fees and expenses and will result in such damages being applied as an increase in the total obligation under the Note, provided however, that if the breach of representations or warranties is caused by CLTAC-S' fraudulent misrepresentation, this provision shall not apply, or if by CLTAC-S' gross negligence, the actual damages may be supplemented by additional damages, including but not limited to consequential, special, punitive or any other additional damages, but such additional damages are limited to 10% of the Merger Consideration.

## ARTICLE VII
## MISCELLANEOUS AND GENERAL

7.1    Successors and Assigns. This Agreement is binding upon and inures to the benefit of the parties hereto and their respective successors and permitted assigns, but is not assignable by any party without the prior written consent of the other parties hereto.

7.2    Third Party Beneficiaries. Each party hereto intends that this Agreement does not benefit or create any right or cause of action in or on behalf of any person other than the parties hereto.

7.3    Further Assurances. The parties shall execute such further instruments and take such further actions as may reasonably be necessary to carry out the intent of this Agreement. Each party hereto shall cooperate affirmatively with the other parties, to the extent reasonably requested by such other parties, to enforce rights and obligations herein provided.

Nagus Merger Agreement
10

7.4     Notices. Any notice or other communication provided for herein or given hereunder to a party hereto must be in writing, and (a) sent by facsimile transmission; (b) electronic mail, (c) delivered in person, (d) mailed by first-class registered or certified mail, postage prepaid, or (e) sent by Federal Express or other overnight courier of national reputation. Each such notice or communication will be effective (i) if given by facsimile, when the successful sending of such facsimile is electronically confirmed, (ii) if given by electronic mail, when electronic evidence of receipt is received, or (iii) if given by any other means specified in the first sentence of this Section 7.4, upon delivery or refusal of delivery.

7.5     Complete Agreement. This Agreement and exhibits hereto and thereto and the other documents delivered by the parties in connection herewith contain the complete agreement between the parties hereto with respect to the transactions contemplated hereby and thereby and supersede all prior agreements and understandings between the parties hereto with respect thereto.

7.6     Captions. The captions contained in this Agreement are for convenience of reference only and do not form a part of this Agreement.

7.7     Amendment. This Agreement may be amended or modified only by an instrument in writing duly executed by the parties.

7.8     Severability. Any term or provision of this Agreement that is invalid or unenforceable in any jurisdiction will, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining terms and provisions of this Agreement or affecting the validity or enforceability of any of the terms or provisions of this Agreement in any other jurisdiction, subject to the limitations in Article VIII.

7.9     Survival. The representations, warranties, covenants, and agreements of the Seller, the Company, and CLTAC-S contained in this Agreement (including the exhibits attached hereto and the certificates delivered pursuant hereto) will survive the Closing.

7.10    Release.   The parties release each other and trustees, officers, directors, shareholders from and irrevocably covenants to not commence any proceeding of any kind against the other party for potential claims associated with past agreements entered into by the parties between the parties that occurred before Closing except any claim associated with the provisions of the Transaction Documents.

# ARTICLE VIII
## DISPUTE RESOLUTION

8.1     Dispute Resolution. In the event that either party to this Agreement believes that the other party has failed to comply with any requirement of this Agreement, or in the event of any dispute hereunder, including, but not limited to, a dispute over the proper interpretation of the terms and conditions of this Agreement, the following procedures shall be invoked:

(a)     Discussions between the Parties. The goal of the parties shall be to first resolve all disputes amicably and voluntarily whenever possible. A party asserting noncompliance or seeking an interpretation of this Agreement first shall serve written notice on the other parties. The notice shall identify the specific Agreement provisions alleged to have been violated or that is in dispute and shall specify in detail the asserting party's contention and any factual basis for the claim. Senior representatives of both parties shall meet within ten (10) days of receipt of notice in an effort to resolve the dispute.

(b)     Binding Arbitration. After failure to resolve such disputes within twenty (20) days of notice, either party may refer a dispute arising under this Agreement to arbitration with the American Arbitration Association (AAA). If the dispute centers around an action of a party, such action shall be postponed or discontinued during the pendency of the arbitration, provided that the lack of action shall not have a negative impact on the economic value of a party. The parties shall endeavor to mutually select three arbitrators from a list of qualified arbitrators to be provided by the AAA. If the parties cannot agree on arbitrators within three (3) business days, then the arbitrators shall be named by the AAA. All hearings and other proceedings for such arbitration shall be held in Sacramento, California, unless otherwise agreed to by the parties in writing. The expenses of arbitration charged by the AAA shall be borne equally by the parties, and each side shall bear its own other costs. The arbitrators shall apply the laws of the State of California as well as the Commercial Arbitration Rules. The arbitrators shall issue a final and binding decision (the "Arbitration Decision") in which the remedies available through arbitration are limited to enforcement of the provisions of this Agreement and any associated equitable or monetary relief. The Arbitration Decision may be enforced as set forth in Section 8.1(d) below.

(c)     Good Faith. The party asserting breach or seeking an interpretation of this Agreement under this Section 8.1 shall be deemed to have certified that to the best of such party's knowledge, information and belief formed after reasonable inquiry, the claim of noncompliance or the request for interpretation of this Agreement is warranted and made in good faith and not for any improper purpose, such as to harass or to cause unnecessary delay

or the needless incurring of the cost of resolving the dispute. If the dispute is found to have been initiated in violation of this Section 8.1, then the arbitrators, upon request or upon his or her own initiative, may impose upon the violating party an appropriate sanction, which may include an award to the other party of its reasonable expenses incurred in having to participate in the arbitration.

(d)     Enforcement of Arbitration Decision. Notwithstanding any provision of law, any party to the Agreement may bring an action against the other in the United Stated Federal District Court for the Northern District of California solely for the enforcement of the Arbitration Decision to which the parties irrevocably consent to the jurisdiction of such court. The parties agree that the Federal Arbitration Act shall apply to the enforcement of the Arbitration Decision. The parties agree that the Arbitration Decision shall be final, conclusive and binding on the parties with respect to the matters decided, and shall be complied with by the parties. In such judicial proceedings, neither party, without the prior written consent of the other party, shall be entitled to contend that such arbitration award should be vacated, modified or corrected, and the parties hereby expressly waive all other rights and remedies that might otherwise be available in such judicial proceeding. CLTAC-S waives any obligation to participate in or exhaust any Tribal court remedies. CLTAC-S agrees that it shall not initiate any action against Seller in any Tribal court or Tribal forum, and waives to the fullest extent permitted by law, any objection it may now or hereafter have to the laying of venue in the court referenced above, including any claim that the action has been brought in an inconvenient forum. Seller does not consent to Tribal court jurisdiction. If such federal court fails to find jurisdiction to enforce the Arbitration Decision, the parties may bring an action in the appropriate court in the State of California for the sole purposes of enforcing the Arbitration Decision and under the same terms and restrictions as federal court.

(e)     Limited Waiver of Tribal Sovereign Immunity. CLTAC-S does not waive its sovereign immunity except as expressly set forth below in this Section 8.1(e). This limited waiver is limited solely to CLTAC-S, and does not constitute a waiver of sovereign immunity by and shall not be deemed a waiver of the rights, privileges, and immunities of the Tribe or any other Tribal entity or subdivision, or extend to an action against the Tribe or any other Tribal entity or subdivision. The parties acknowledge that Tribe intends specifically to protect from suit real, personal and other property of the Tribe that is used in or associated with gaming operations of the Tribe and revenues of such gaming operations. CLTAC-S hereby waives its sovereign immunity from unconsented suit pursuant to the dispute resolution provisions of this Agreement. This limited waiver entered into by CLTAC-S is expressly limited to actions to (a) interpret the provisions of this Agreement, and (b) to enforce an Arbitration Decision including execution or collection of monetary damages subject to the limitations upon enforcement set forth in Section 8.1(f) of this Agreement. This limited

waiver of sovereign immunity extends only to actions brought by Seller, its successors and assigns (and not any other party) against CLTAC-S for claims of any kind arising under this Agreement. The limited waiver of sovereign immunity as provided for in this Section shall expire at the conclusion of the longer of (i) one (1) year after the termination or expiration of this Agreement, or (ii) at the conclusion of any mediation, arbitration or litigation matter with respect to this Agreement pending at the termination or expiration of this Agreement and upon collection of any and all judgments and awards.

(f) Limitation Upon Enforcement. Any amounts due and owing to Seller are hereby limited solely to CLTAC-S. In no instance shall any enforcement of any kind whatsoever be allowed against any other Tribal body, entity or subdivision that has, at some point over the course of this Agreement, received funds from Seller through operation of its Business.

## ARTICLE IX
## INDEMNIFICATION

9.1     Each party shall indemnify and hold harmless (the "Indemnifying Party") the other party, and its respective members, managers, officers, directors, trustees, agents and employees (collectively "Indemnified Parties") from and against any claims, loss, cost, liability, damage or expense (including, without limitation, reasonable attorneys' fees and costs of suits) that arise out of or relate to any breach by the Indemnifying Party of its express representations, warranties, covenants or other responsibilities set forth in this Agreement, provided however, the Indemnifying Party shall not be liable to any Indemnified Party for the foregoing to the extent any claims, loss, cost, liability, damage or expense (including, without limitation, reasonable attorneys' fees and costs) arise from any the Indemnified Party's gross negligence or willful misconduct, as determined pursuant to the dispute resolution procedures set forth in the Transaction Documents.

IN WITNESS WHEREOF, Company, CLTAC-S, and the Seller have executed this Agreement or caused this Agreement to be executed as of the day and year first above written.

[signature pages to follow]

JA1044

**CLEAR LAKE TAC S, INC.**

By: _____
Name: Sherry Treppa
Title: Chairperson, Board of Directors

JA1045

**NAGUS ENTERPRISES, LLC**

By: AG613, LLC, Manager

By: 60 Million Buffalo, L.L.C., Manager

By: _____
     Scott Asner, Authorized Signatory

**LATINUM FUNDING, LLC**

By: AG613, LLC, Manager

By: 60 Million Buffalo, L.L.C., Manager

By: _____
     Scott Asner, Authorized Signatory

JA1046

Exhibit 12

Page 1

UNITED STATES DISTRICT COURT
FOR THE
EASTERN DISTRICT OF VIRGINIA

LULA WILLIAMS, et al.,
   PLAINTIFF,
vs.                       Civil Action No.:
                              3:17-cv-461


BIG PICTURE LOANS, LLC, et al.,

   DEFENDANT.
--------------------------------
RENEE GALLOWAY, et al.,
   PLAINTIFF,
vs.                       Civil Action No.:
                              3:18-cv-406


BIG PICTURE LOANS, LLC, et al.,

   DEFENDANT.


   Videotaped deposition of JOHN WILLIAMS taken
pursuant to notice, was held virtually commencing
June 22, 2020, 10:16 a.m. CST, on the above date,
before Carla S. Kimbrough, Certified Shorthand
Reporter in the State of Oklahoma.


MAGNA LEGAL SERVICES
(866) 624-6221
www.MagnaLS.com



JA1048

Page 183

1    destroy or whatever, right?

2        A     Correct.

3        Q     And then you looked at the agreement, the

4    Clear Lake agreement, that we marked as an exhibit.

5    And you acknowledged that there was no such -- no

6    similar provision in that agreement, correct?

7        A     Via my scan of it, no.

8        Q     Okay.  And when you say your scan of it, I

9    mean you had a chance to read the whole, thing,

10   right?

11       A     Yes, I read it.

12       Q     You looked through the whole thing.

13       A     I read it.  I did not see one.

14       Q     Okay.  Now -- and give a moment because I

15   know there's going to be an objection so, but we

16   want -- we need to have it right for the record,

17   okay?  So just take a second.

18            Did Mr. Martorello advise you to put

19   paragraph 2.6D or provisions to that effect into

20   the merger agreement between Bellicose, Eventide,

21   Bellicose, and the tribe?

22            MR. GRAY:  I'm going to object to the

23   extent it calls for attorney/client privileged

24   information and advise you not to answer.

25       Q     (By Mr. Caddell)  And, Mr. Williams, are



JA1049

Page 184

1  you going to follow that advice with -- that I

2  guess was expressed by Mr. Gray?

3      A    Yes.

4      Q    Okay.  All right.

5           MR. WITSCH:  Mr. Caddell, just so the

6  record is clear to the extent that it calls for

7  information that Matt may have had individually and

8  just to maintain our position is clear, to the

9  extent that that is a privilege, it could be held

10  by Matt, you know, we would raise the same

11  objection.

12          MR. CADDELL:  Okay.  That's fine.

13     Q    (By Mr. Caddell)  Okay.  Now,

14  Mr. Williams, I'm done for the time being.

15  Mr. Witsch may have some more and -- but hopefully

16  it won't be too long and this will be over shortly

17  and you can enjoy the rest of your day.

18          THE WITNESS:  Okay.

19          MR. CADDELL:  Thank you for your time.  I

20  appreciate it, and I know it's been an imposition.

21  And thank you for your patience.

22          THE WITNESS:  Thank you.

23          MR. WITSCH:  Mr. Williams, I actually

24  don't think I need a break.  I only have a couple

25  of questions for you.



JA1050

Page 191

1                         CERTIFICATE

2       STATE OF OKLAHOMA   )

                            )   SS:

3                           )

4       COUNTY OF TULSA

5              I, Carla S. Kimbrough, do hereby certify

6       that on June 22, 2020, there came before me JOHN

7       WILLIAMS, who was duly sworn to testify the truth,

8       the whole truth, and nothing but the truth; and

9       that the foregoing pages constitute a full, true,

10      and correct transcript of the deposition of said

11      witness on the date as indicated.

12             I do further certify that I am not

13      counsel, attorney, or relative of either party, or

14      otherwise interested in the event of this suit.

15             IN WITNESS WHEREOF, I have hereunto set my

16      hand and affixed my seal at my office in Tulsa

17      County, Oklahoma, this 25th day of June, 2020.

18

19                   _Carla S. Kimbrough_

20                   Carla Sue Kimbrough, C.S.R.

                     Oklahoma Certified Shorthand Reporter

21                   Certificate No. 1237

22

23

24

25



JA1051

# Exhibit 13

# Delaware

## The First State

Page 1

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF MERGER, WHICH MERGES:

"BELLICOSE CAPITAL, LLC", A DELAWARE LIMITED LIABILITY COMPANY,

WITH AND INTO "LVD TRIBAL ACQUISITION COMPANY, LLC" UNDER THE NAME OF "LVD TRIBAL ACQUISITION COMPANY, LLC", A LIMITED LIABILITY COMPANY ORGANIZED AND EXISTING UNDER THE LAWS OF THE COUNTRY OF THREE AFFILIATED TRIBES OF THE FORT BERTHOLD INDIAN RESERVATION, AS RECEIVED AND FILED IN THIS OFFICE ON THE TWENTY-SIXTH DAY OF JANUARY, A.D. 2016, AT 7:46 O`CLOCK P.M.

AND I DO HEREBY FURTHER CERTIFY THAT THE EFFECTIVE DATE OF THE AFORESAID CERTIFICATE OF MERGER IS THE TWENTY-SIXTH DAY OF JANUARY, A.D. 2016 AT 11:59 O'CLOCK P.M.

Jeffrey W. Bullock, Secretary of State

5947786  8100M
SR# 20160415327

Authentication: 201739555
Date: 01-27-16

You may verify this certificate online at corp.delaware.gov/authver.shtml

JA1053

CONFIDENTIAL

MARTORELLO_000141

State of Delaware
Secretary of State
Division of Corporations
Delivered 07:46 PM 01/26/2016
FILED 07:46 PM 01/26/2016
SR 20160415327 - File Number 5412469

# STATE OF DELAWARE
## CERTIFICATE OF MERGER OF A
### DOMESTIC LIMITED LIABILITY COMPANY INTO
### A FOREIGN LIMITED LIABILITY COMPANY

Pursuant to Title 6, Section 18-209 of the Delaware Limited Liability Company Act.

**First:** The name of the surviving Limited Liability Company is LVD Tribal Acquisition Company, LLC        , a Foreign Limited Liability Company.

**Second:** The jurisdiction in which this Limited Liability Company was formed is Lac Vieux Desert Band of Lake Superior Chippewa Indians, a federally recognized Indian tribe. **Third:** The name of the Limited Liability Company being merged into the Limited Liability Company is _____
Bellicose Capital, LLC         , a Delaware Limited Liability Company.

**Fourth:** The agreement of merger or consolidation has been approved and executed by each of the business entities which is to merge or consolidate.

**Fifth:** The name of the surviving foreign Limited Liability Company is
LVD Tribal Acquisition Company, LLC                              .

**Sixth:** An agreement of merger or consolidation is on file at a place of business of the surviving foreign limited Liability Company and the address thereof is
N5384 U.S. Hwy 45, Suite 400 P.O. Box 704 Watersmeet, MI, 49969

**Seventh:** A copy of the agreement of merger or consolidation will be furnished by the surviving foreign limited liability company, on request and without cost, to any member of any domestic limited liability company or any person holding an interest in any other business entity which is to merge or consolidate.

**Eighth:** The surviving foreign Limited Liability Company agrees that it may be served with process in the State of Delaware in any action, suit or proceeding for the enforcement of any obligation of any domestic limited liability company which is to merge or consolidate, irrevocably appointing the Secretary of State as its agent to accept service of process in any such action, suit or proceeding and the address to which a copy of such process shall be mailed to by the Secretary of State is N5384 U.S. Hwy 45 Suite 400 P.O. Box 704 Watersmeet, MI, 49969 .

**Ninth:** The merger is to become effective January 26, 2016 at 11:59 pm.

JA1054

MARTORELLO_000142

IN WITNESS WHEREOF, said Limited Liability Company has caused this certificate to be signed by it's authorized person, this 26                          day of January                    , A.D., 2016        .

By: _____
Authorized Person

Name: _____
Print or type

JA1055

CONFIDENTIAL

MARTORELLO_000143

# Exhibit 14

**Shagun Chopra**

Senior Research Analyst | Valuation

Aranca | Floor 2, Wing-B, Supreme Business Park, Hiranandani Gardens, Powai, Mumbai 400 076. | Tel: +91.22.3937 9999 | www.aranca.com | https://www.linkedin.com/in/shagunchopra

This communication and any attached files may contain privileged and confidential information, and is intended solely for the use of the addressee(s). If you received this communication in error, please notify the sender by reply e-mail and then destroy the message, all attachments and any copies. Furthermore, you are not to copy, disclose, or distribute this e-mail or its contents to any other person and any such actions are unlawful. Internet communications cannot be guaranteed to be timely, secure, error or virus-free. The sender does not accept liability for any errors or omissions. Any views expressed in this message are those of the individual sender, except where the sender specifically states them to be the views of Aranca.

Aranca is an ISO 27001:2013 certified company.

---

**From:** Matt Martorello [mailto:matt@liontllc.com]
**Sent:** Saturday, December 05, 2015 4:05 AM
**To:** Shagun Chopra; Zayra Emanuelli
**Cc:** manish.goyal@aranca.com; 'Pooja Gala'; Luis Jimenez
**Subject:** RE: Bellicose Capital Valuation

My comments:

- Page 8 – SPVI is located in Puerto Rico, not USVI - Done
- Page 8 – change "which operate in the tribal payday lending industry" to "which provide services to lenders in the online tribal consumer lending industry" (Note, we are consultants to lenders, and the lenders are not "payday" but rather "online tribal consumer lenders". You use the term "payday" throughout the document, and though it is relevant and similar in many places, these are not payday lenders our clients) – Done. Have changed 'payday lending' references to 'consumer lending' while referring to Bellicose and related entities in other parts of the report. But, retained payday loan references when talking about the industry in general.
- Page 8 and Page 9 – change to "SPVI primarily provides outsourced marketing, underwriting and loan management consulting services for online tribal consumer lending businesses". - Done
- Page 9 – 1st bullet – CP wasn't "renamed" as DCTF but rather the 3rd party owner of CP sold the business to the Tribe, which bought CP under the Tribal LLC called DCTF. CP was originally owned by a Costa Rica citizen. Opex rights with CP terminated with that transaction, and BVI began servicing DCTF from scratch. So Opex was not actually related to BVI at all. In fact, you might want to cut out everything before DCTF formation and its partnership with BVI. Everything before that was not related to Bellicose, but more a private matter related to me. –Done. We prefer not to eliminate the reference to Opex, since it gives an overview of the services provided and inter-relationship of entities.
- Page 9 – part 2 – requires clarification. I want it to be clear that we do not have the right to distribute DCTF's "net income". But rather that SPVI has the right to reinvestment SPVI's earnings it makes from providing services to DCTF. So it is SPVI's net income that is used in the fashion you describe, it is not the Tribe's/DCTF net income that is used which is how it reads. Further, this is not a service provided to the Tribe. This is just services related to broker agreements with 3rd parties who lent money to SPVI. As it reads, the Tribe is paying SPVI to do this with its own Net Income, which is not accurate. – Done. Was based on Inputs provided at the time of the previous report, changed now.
- Please confirm that ICA pays BVI (not BC) for Management fee, per diagram on Page 10 – The diagram does indicate that ICA pays BVI, not BCap. Added one more label to make it more clear.
- Page 12 – I feel the risks of continuity of the business could be enhanced from the cases and lawsuits and the CFPB rule isn't mentioned at all here. – added a reference to CFPB. Since the cases/lawsuits have been mentioned in the 'Industry section', added a link to the 'Industry Section'.
- Page 17 – Note that Bay Mills v Michigan the supreme listed explicitly ways in which the State could shut down the casino. – Added. Similar efforts would be attempted by State governments to shut down tribal lenders (and are being attempted in fact). PA vs Elevate/Think Finance and Ken Reese is the most significant issue/risk to SPVI, that and the CFPB rule. – Included reference to lawsuit highlighting all allegations on the tribal entities on

JA1057

CONFIDENTIAL

MARTORELLO_005530

Pg 22. Also mentioned that the judgment in the said case is awaited. PA could bring the same claims against SPVI for sure. NY DFS have issues too. NY DFS named RRTL as illegal of 35 lenders in the Wall Street Journal I believe it was. RRTL sued NY DFS and lost... NY DFS went after Money Mutual/Montell Williams for helping service Tribal lenders and they could go after SPVI as well. . – Included information on Pg 12 under Risks section.

- It's also worth noting that RRTL has received threats from several state AGs demanding they stop lending or they will come after them. Helps support the 90/10 argument. – reference added in Company Risks section.
- Page 39 – You missed the stock EVNA.... It's gone from a $1BN market cap down to $220mm in the last 18 months! And it's not even tribal and they do $1Bn a year in Revenue and $100mm a year in earnings. – We had included and considered this stock, but when we removed casino companies from the exhibit list it advertently got deleted. Have revised the exhibits to ensure it is there now.

In general, nobody will argue with your valuation methods because these are very well founded fundamentally. The only area that could ever be debated would be the 90%/10% assumptions that this business will come to an end.

Therefore, I think it's vital that you input ALL of the support you can that says the CFPB rule will shut this business down, and how operation choke point is hurting everyone. I felt there were some elements missing. In fact, CFPB has already been challenged by a Tribal Servicer that received a CID. Perhaps it was Think Finance... CFPB won in court that they ARE applicable and allowed to server their CID on Think Finance and the Tribe. That case wasn't noted. FTC fought with Scott Tucker and Tribal Lender on if they are applicable to Tribal lending, the court decided FTC does have jurisdiction over tribes. Also, it's not accurate that federal law applies to Tribal businesses, It's not certain but Tribes think it is possible that federal law DOES apply. – Added Think Finance case reference and its implications along with relevant case-laws in the Industry section.

All of this contradicts your statements on Page 22, where you're saying "CFPB may have their hands tied with Tribal". If you want to support that CFPB rule or fines by CFPB may destroy SPVI and/or their clients, and 90/10 valuation assumption is logical, I think this section needs to be enhanced. Page 22 entire CFPB section is a problem and it is inaccurate. You are saying in the models that CFPB will end this business. However, in this provision you're listing all the reasons which CFPB doesn't have authority? I don't think what you're saying there is accurate either. – It is important to indicate both sides of the legal picture. That is why our report carries cases which support tribal sovereignty and those which indicate its weakening in the recent time. The ultimate conclusion being that is that there is a very real risk of the guidelines affecting tribal lending businesses. To make this further clear, I have made small changes in the Industry section. What also needs to be noted here is that we are focusing on the combined effect of CFPB and Operation Chokepoint to support the 90-10% probability, and Operation Chokepoint is the reason we can assume definite end points for the business.

I think it's important to note that the proposed rule as of June 30 by the CFPB, has been issued and what it reads since the rule has been posted. Added proposed rules on Page 23. Also note that the expected live date is in Q1 2017 as CFPB says in their releases (you can even site it), and that it will destroy 82% revenue decline to not JUST payday lenders, but to "consumer installment lenders" like our clients as well. Since they are not Payday, it should be noted the rule destroys Payday and Installment of similar APR and structure as well. The rule is available as proposed, and there is public record of it having been planned for 2017 Q1 effective date (at least it was thought to on June 30, 2015)... it should be in here since it's so important to the 90/10 thing. – We could not source CFPB timeline from an official source, but ENOVA's investor presentation and other online sources indicate the expected timeline of introduction. Our report includes a reference to the Q1 Jan timeline as well as the 82% decline in the Industry section.

If we were to assume there was no 90/10 termination of business, and we assumed we'd remain a going concern over the years, can you highlight for us what that valuation would have been? I think that puts us in a position where if we are ever audited or challenged about the 90/10, we can show what the valuation per DCF would have been. Which I don't think would have been terribly different and might even justify a higher CSRP than 35%. Don't forget, ALL of the debt will mature before 5 years comes around, and there is no way to know if they'll renew especially with all these CFPB and regulatory and legal fights happening around us. Don't think including DCF valuation based on going concern in the report is a good idea as it is contrary to our argument that the business is likely to cease in the next two years. With the current circumstances, extending projections beyond 2017 will be highly speculative too. However just to give you

JA1058

MARTORELLO_005531

an estimate, we ran a DCF analysis using high level assumptions based on historical track record such as revenue growth 15%, CoS 5% and Opex 14% and a perpetual growth rate of 4% under Gordon Growth Method. The value is well above 100million even with a CSRP of 50%. In our view, Bellicose should not be valued as a going concern unless CFPB or Operation Chokepoint timeline gets extended much beyond 2017.

We should:

1) Do everything we can to substantiate the 90/10 major effect on valuation – We have supported the 90-10 assumption in the Valuation section drawing references from the Industry section.
2) Map out if that weren't applied, what would've been the valuation so that we can see how big this effect was. – Please refer the DCF comment above.

Hope that helps support the valuation.

**From:** Shagun Chopra [mailto:shagun.chopra@aranca.com]
**Sent:** Friday, December 4, 2015 7:30 AM
**To:** Matt Martorello <matt@liontllc.com>; Zayra Emanuelli <zayra@liontllc.com>
**Cc:** manish.goyal@aranca.com; 'Pooja Gala' <pooja.gala@aranca.com>; Luis Jimenez <luis@liontllc.com>
**Subject:** RE: Bellicose Capital Valuation

Hi Matt,

Thank you for the confirmation. We have put together our analysis in the final valuation report. Please note that we have fixed a minor inconsistency in the model as a result of which the concluded equity value of the Company (on a consolidated basis) now stands at **$23.97 million**. The revised model as well as the draft valuation report are attached with this mail.
Please let me know if you have any comments on the draft report. If not, I'll send the certified copy of the report next week.

Thanks,
Shagun

*Classification: Confidential*

**Shagun Chopra**

**Senior Research Analyst | Valuation**

**Aranca** | Floor 2, Wing-B, Supreme Business Park, Hiranandani Gardens, Powai, Mumbai 400 076. | Tel: +91.22.3937 9999 | www.aranca.com | https://www.linkedin.com/in/shagunchopra

This communication and any attached files may contain privileged and confidential information, and is intended solely for the use of the addressee(s). If you received this communication in error, please notify the sender by reply e-mail and then destroy the message, all attachments and any copies. Furthermore, you are not to copy, disclose, or distribute this e-mail or its contents to any other person and any such actions are unlawful. Internet communications cannot be guaranteed to be timely, secure, error or virus-free. The sender does not accept liability for any errors or omissions. Any views expressed in this message are those of the individual sender, except where the sender specifically states them to be the views of Aranca.

Aranca is an ISO 27001:2013 certified company.

**From:** Matt Martorello [mailto:matt@liontllc.com]
**Sent:** Tuesday, December 01, 2015 12:25 AM
**To:** Shagun Chopra; Zayra Emanuelli
**Cc:** manish.goyal@aranca.com; 'Pooja Gala'; Luis Jimenez
**Subject:** RE: Bellicose Capital Valuation

JA1059

Exhibit 15

**From:** Lisa McGreevy </O=FIRST ORGANIZATION/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=41FF7D0D3CF143169CFDE14A6 4A42FB2-LMCGR>

**Sent:** Monday, April 18, 2016 6:12 PM

**To:** Matt Martorello <matt@liontllc.com>

**Subject:** RE: Project

████████████████████████████████████████████████████████████

Working on an answer

Lisa McGreevy
President & CEO
Online Lenders Alliance
202-669-1017
lmcgreevy@oladc.org

-----Original Message-----
From: Matt Martorello [mailto:matt@liontllc.com]
Sent: Monday, April 18, 2016 1:29 PM
To: Lisa McGreevy <lmcgreevy@oladc.org>
Subject: Project

Hi Lisa,

I have a project I needed someone to help me with.

I need a simple report written that justifies a position I have taken on the industry in a valuation study BDO did for me completed as of the state of the Tribal lending industry as of June 30, 2015... my position was that Servicing of Tribal Lending will be shut down from new loan originations and forced into orderly liquidation mode (at best) (I.e. No loan originations allowed, just collecting what's already out there) come January 1, 2017 as a result of two factors:

1) CFPB (new rule or otherwise)
2) Operation choke point (in this case that term includes AG lawsuits like VT/PA v Think, and C&D pressures against tribal clients)

I need all the bullet point support I can get, ideally with references to articles perhaps.  This helps me should the IRS ever ask one day why my valuations used for tax calculations from 6/30/15 included the assumption that on January 1, 2017 we flipped into orderly liquidation mode.

Again, this was viewed based on the state of the world on June 30, 2015.

Do you have anyone that can just bullet list items to support that position?  If so I'll send what I have done myself so far, just want to make sure it's a comprehensive as possible and in the files.

CONFIDENTIAL SUBJECT TO PROTECTIVE
ORDER DATED SEPT. 21, 2017

Exhibit 16

## Darcie Pace

| | |
|---|---|
| **From:** | Matt Martorello <mattm@bellicosevi.com> |
| **Sent:** | Tuesday, April 16, 2013 10:10 PM |
| **To:** | Robert Rosette |
| **Subject:** | Fwd: Significant Ruling in Colorado Western Sky Case |
| **Attachments:** | Order Granting Plaintiffs' Motion for Summary Judgment.pdf |

Let's zero in asap on minimizing my risk for being individually liable like CO just successfully did to Butch webb.   The Mou issue to me means that when the CFPB and LVD do interact,  we know intel will be given to state AGs. I don't want my company on anything that goes to the CFPB. This may mean DCTF needs to be able to do a lot more on is own, including its compliance program


-------- Original message --------
From: weddlej@gtlaw.com
Date: 04/16/2013 7:13 PM (GMT-04:00)
To: weddlej@gtlaw.com
Subject: Significant Ruling in Colorado Western Sky Case


This order just in.  I have only very briefly skimmed it, but it is a big loss for Western Sky.  A Denver District Court judge granted summary judgment in favor of the Colorado Attorney General against Butch Webb's entities, unpersuaded by Webb's arguments that his status as an individual tribal member conferred any immunity against state enforcement actions.  The order also contains some very negative rulings on individual liability for corporate actions in violation of state law that require much closer consideration for those currently supporting sovereign lending activities.  We will provide that analysis as soon as possible.

Note too that an appeal of this order is a certainty and that the appeal process here in Colorado could easily take another two years.  Webb has been ordered to pay restitution and the State's attorneys' fees in connection with more than 4,000 Colorado loans.  The parties are to recommend a special master in the coming weeks to help the court determine the scope of restitution to be made.  I would expect Webb to seek a stay of this order pending the appeal process.  Whether that stay is granted, who knows.  It is very likely that the Colorado Attorney General will herald this case as a significant victory and encourage other state regulators to employ it in their own efforts to pursue violations of state law.  We will be prepared to provide outreach and education to state AGs.

We will read this more closely tonight and be available to discuss in detail in the coming days.  In the meantime, I would encourage tribal lenders not to panic.  This is an isolated district court ruling that will certainly be appealed.  And we all know that the nature of Western Sky's business and arguments is much different than that of sovereign lenders operating as arms of tribes.  There are many ways to distinguish this case if its rulings survive the appellate process.  But we can all expect that this decision will be cited – a lot – by state and federal investigators in the months ahead.

Best and more soon,

**Jennifer H. Weddle**
Shareholder, Co-Chair, American Indian Law Practice Group
Greenberg Traurig, LLP | 1200 17th Street, Suite 2400 | Denver, Colorado 80202
Tel 303.572.6565 | Fax 720.904.7665
weddlej@gtlaw.com | www.gtlaw.com

ALBANY · AMSTERDAM · ATLANTA · AUSTIN · BOSTON · CHICAGO · DALLAS · DELAWARE · DENVER · FORT LAUDERDALE · HOUSTON · LAS VEGAS · LONDON* · LOS ANGELES · MEXICO CITY+ · MIAMI · NEW JERSEY · NEW YORK · ORANGE COUNTY · ORLANDO · PALM BEACH COUNTY · PHILADELPHIA · PHOENIX · SACRAMENTO · SAN FRANCISCO · SHANGHAI · SILICON VALLEY · TALLAHASSEE · TAMPA · TEL AVIV^ · TYSONS

CONFIDENTIAL                                        ROSETTE_REVISED_048497

JA1063

CORNER  ·  WARSAW·  ·  WASHINGTON, D.C.  ·  WHITE PLAINS
*OPERATES AS GREENBERG TRAURIG MAHER LLP  ◦OPERATES AS GREENBERG TRAURIG, S.C.  ^A BRANCH OF GREENBERG TRAURIG, P.A., FLORIDA, USA  ⁼OPERATES AS
GREENBERG TRAURIG GRZESIAK SP.K.
**STRATEGIC ALLIANCE WITH AN INDEPENDENT LAW FIRM**
MILAN  ·  ROME

If you are not an intended recipient of confidential and privileged information in this email, please delete it, notify us immediately at postmaster@gtlaw.com, and do not use or disseminate such information. Pursuant to IRS Circular 230, any tax advice in this email may not be used to avoid tax penalties or to promote, market or recommend any matter herein.

**This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

CONFIDENTIAL                                        ROSETTE_REVISED_048498

JA1064

| DISTRICT COURT, DENVER COUNTY, STATE OF COLORADO<br>City and County Building<br>1437 Bannock, Denver, CO 80202 | DATE FILED: April 15, 2013<br><br>▲ COURT USE ONLY ▲ |
|---|---|
| **Plaintiffs:** STATE OF COLORADO ex rel. JOHN W. SUTHERS, ATTORNEY GENERAL FOR THE STATE OF COLORADO, AND LAURA UDIS, ADMINISTER UNIFORM CONSUMER CREDIT CODE<br><br>v.<br><br>**Defendants:** WESTERN SKY FINANCIAL, LLC, AND MARTIN A. WEBB | Case Number: 11 CV 638<br><br>Courtroom: 259 |
| **ORDER** | |

**THIS MATTER** is before the Court on Plaintiffs the State of Colorado ex rel. John W. Suthers, Attorney General for the State of Colorado, and Laura Udis, Administer, Uniform Consumer Credit Code's (the "State") Motion for Partial Summary Judgment – Second Claim for Relief, filed December 27, 2012. Defendants Western Sky Financial, LLC ("Western Sky"), and Martin A. Webb ("Webb") (collectively "Defendants") filed their Response on January 31, 2013. The State filed its Reply on March 8, 2013. The Court has reviewed the Motion, the pleadings in support and opposition, the case file, and the relevant authority, and, being fully informed, finds and orders as follows:

## BACKGROUND

This dispute arises over allegedly illegal, usurious, and unlicensed loans, issued over the Internet, in Colorado to Colorado consumers. The State alleges that Western Sky, a South Dakota limited liability company, has conducted business, through the Internet, to make loans to Colorado consumers in amounts ranging from $400 to $2,600 with annual percentage interest

   ROSETTE_REVISED_048499

rates ("APR") of approximately 140% to 300%. Webb is the sole manager and owner of Western Sky. Further, Webb is an enrolled member of the Cheyenne River Sioux (the "Tribe") and resides on the Cheyenne River Indian Reservation (the "Reservation") in South Dakota.

In 2010, Western Sky made more than 200 such loans to Colorado consumers. Following an investigation, the State determined that Western Sky was making "unlicensed supervised loans" and imposing excessive finance charges. After Western Sky failed to comply with a demand that it cease and desist from making further loans, the State filed suit against Defendants seeking injunctive relief and damages.

## UNDISPUTED FACTS

1. Western Sky is a South Dakota company. Webb is Western Sky's sole manager, sole executive officer, and sole owner. Webb directs, controls, manages, participates in, supervises, is responsible for, and authorizes Western Sky's activities.

2. Western Sky is principally engaged in the business of making small, short-term personal loans to consumers.

3. Via the Internet and television advertising, Western sky offers and enters into loans with Colorado consumers.

4. According to its website, Western Sky offers personal loans of up to $2,600.00.

5. Also according to its website and a loan agreement with a Colorado consumer the loans have APRs from 140% to over 300%. The loan agreement with the Colorado consumer reflects a loan for $400.00 with over 330% APR. *See* Exhibits 1 and 2 to the affidavit of Jodie Robertson. (Robertson Aff., attached to the State's Motion as Exhibit 2).

6. Colorado Consumers apply for loans directly through Western Sky's Website.

7. Western Sky electronically deposits the loans' proceeds into the consumers' bank accounts.

8. Pursuant to the loan agreements, consumers authorize Western Sky to withdraw funds electronically from the consumers' bank accounts.

2

9. In 2010 alone, Western Sky made over 200 loans to Colorado consumers.

10. Western Sky is not, and at no relevant time was, licensed as a supervised lender in Colorado authorized to make supervised loans pursuant to Colorado's Uniform Consumer Credit Code, C.R.S. § 5-1-101, *et seq*. (the "Code").

11. In November 2010, Administrator Udis (the "Administrator") demanded that Western Sky cease making any new loans. The Administrator also demanded that Western Sky make refunds to consumers of all of its loans' improper and excess finance charges.

12. Western Sky did not comply with the Administrator's demands.

## STANDARD OF REVIEW

Summary judgment is appropriate when, based on the pleadings, no genuine issue as to any material fact exists and the moving party is entitled to judgment as a matter of law. C.R.C.P. 56(c); *Cotter Corp. v. American Empire Surplus Lines Ins. Co.*, 90 P.3d 814, 819 (Colo. 2004). The purpose of summary judgment is to permit the parties to pierce the formal allegations of the pleadings and save the time and expense associated with trial when, as a matter of law, one party could not prevail. *Peterson v. Halsted*, 829 P.2d 373, 375 (Colo. 1992). The nonmoving party must receive the benefit of all favorable inferences that may be reasonably drawn from the undisputed facts, and all doubts are resolved against the moving party. *Clementi v. Nationwide Mut. Fire Ins. Co.*, 16 P.3d 223, 225-26 (Colo. 2000).

A party may move for summary judgment on an issue it would not bear the burden of proof upon at trial. *Casey v. Christie Lodge Owners Ass'n, Inc.*, 923 P.2d 365, 366 (Colo. App. 1996). In such an instance, the burden is on the moving party to establish the "nonexistence of a genuine issue of material fact." *Civil Serv. Comm'n v. Pinder*, 812 P.2d 645, 649 (Colo. 1991) (*citing Continental Airlines, Inc. v. Keenan*, 731 P.2d 708, 712 (Colo. 1987)). This burden may be satisfied by "demonstrating that there is an absence of evidence in the record to support the

3

nonmoving party's case." *Id*. "An affirmative showing of specific facts, un-contradicted by any

counter affidavits, leaves a trial court with no alternative but to conclude that no genuine issue of

material fact exists." *Civil Serv. Comm'n*, 812 P.2d at 649 (*citing Terrell v. Walter E. Heller &

Co.*, 439 P.2d 989, 991 (Colo. 1968)).

## ANALYSIS

The State requests that this Court enter summary judgment regarding Defendants'

liability on its second claim for relief, "Refunds to Consumers – Code Unlicensed Lender."

Specifically, the State contends that Defendants made and collected supervised loans without a

supervised lender's license, in violation of § 5-2-301 the Code, and therefore, Defendants are

subject to penalty under the Code.

The Code prohibits a person from making or collecting supervised loans without a

supervised lender's license, providing that:

> (1) Unless a person . . . has first obtained a license from the
> administrator authorizing him or her to make supervised loans, he
> or she shall not engage in the business of:
>
> (a) Making supervised loans or undertaking direct collection of
> payments from or enforcement of rights against consumers arising
> from supervised loans he or she has previously made.

Code § 5-2-301(1)(a). Where a creditor has violated the Code regarding the authority to make

supervised loans contained in Code § 5-2-301:

> the consumer is not obligated to pay the finance charge and has a
> right to recover from the person violating this code . . . a penalty in
> an amount to be determined by the court not in excess of three
> times the amount of the finance charge . . . .

Code § 5-5-201(1). Further, Code § 5-6-114 authorizes the State to seek these amounts on the

consumers' behalves and provides that the Administrator may "bring an action against a creditor

CONFIDENTIAL

ROSETTE_REVISED_043802

USCA4 Appeal: 23-2097    Doc: 11-3    Filed: 12/06/2023    Pg: 123 of 438

for making or collecting charges in excess of those permitted by this code" and, if "an excess charge has been made, the court shall order the respondent to refund to the consumer the amount of the excess charge and to pay a penalty to the consumer as provided in [§] 5-5-201."

Code § 5-1-301(47) defines a "supervised" loan as a consumer loan with an APR in excess of 12%. In turn, a consumer loan is a loan in which: (1) the consumer is a person other than an organization; (2) the principal does not exceed $75,000; (3) a loan finance charge is made; and (4) the debt is incurred primarily for personal, family, or household purposes. *See* Code § 5-1-301(15)(a).

Here, the undisputable facts before the Court confirm that Western Sky makes and collects unlicensed supervised loans to Colorado citizens, thereby subjecting Defendants to liability under the Code.[1] However, Defendants assert that the State's Motion fails because: (1) Mr. Webb is a Native American who conducts business within the boundaries of the Reservation, and therefore, Webb and his company, Western Sky, are subject to tribal immunity and federal preemption, not subject to state jurisdiction and control; and, (2) in its Motion, the State improperly "relies heavily on the non-binding stipulation [of fact] in an unrelated federal court case [*FTC v. Payday Financial, LLC*, Case No. 11 CV 03017 (D.S.D. May 18, 2012) (the "South Dakota Case")]."

I.   **Defendants' contention that the State's Motion fails because it improperly relies on the Non-Binding Stipulation in the South Dakota Case is not persuasive.**

Defendants assert that the State improperly relied on the stipulation from the South Dakota Case. Specifically, Defendants maintain that the State's contentions, based on the

---

[1] While Defendants deny certain of Plaintiff's allegation with respect to Defendants making and collecting supervised loans without a license, their denials are simply not supported by the record before the Court.

CONFIDENTIAL

ROSETTE_REVISED_048509

JA1069

stipulation, that Western Sky: (a) "makes withdrawals from the consumer's bank account'" (b) "initiates collection procedures if the consumer foes not pay the loan;" and, (c) "collected illegal and unlicensed supervised loans," are clearly disputed and contradicted by the record before the Court. Therefore, Defendants assert that summary judgment is not appropriate.

However, in its Motion, the State contends that the facts are "taken principally from the Complaint's allegations that [D]efendants admit in their Answer." While the aforementioned facts, as alleged by the State derive from the stipulation in the South Dakota Case, other salient facts come from Defendants' own documents, their discovery responses, sworn affidavits, and deposition testimony. Further, as discussed in greater detail below, the disputed facts referenced above with respect to Defendants' withdrawal and collection procedures are not material to resolving the present issue before the Court – whether Defendants are liable under the Code – as there is ample undisputed evidence before the Court to establish that Defendants have engaged in unlicensed supervised loans and are not entitled to tribal immunity or federal preemption with respect to their business activities.

## II. Defendants are not entitled to Tribal Immunity or Federal Preemption.

Turning next to Defendants' contention that they are entitled to tribal immunity because they are conducting business on the Reservation, the Court concludes that Defendants' argument is without merit. This Court addressed this very argument in its Order dated, April 17, 2012, denying Defendants' Motion to Dismiss, rejecting Defendants' assertion that the State is attempting to reach into and regulate on-reservation activity. Defendants' recycling of this same argument here is equally unpersuasive.

6

ROSETTE_REVISED_048504

Specifically, in the April 17, 2012 Order, this Court found *State ex rel. Suthers v. Cash Advance & Preferred Cash Loans*, 205 P.3d 389 (Colo. App. 2008) ("*Cash Advance I*") instructive on this issue, where, in a near identical factual scenario to this action, the State attempted to investigate a tribal entities alleged usurious internet loan making to Colorado consumers in violation of Colorado's Consumer Credit Code and Consumer Protection Act. *Id.* at 394, *aff'd sub nom. Cash Advance & Preferred Cash Loans v. State*, 242 P.3d 1099 (Colo. 2010).

In *Cash Advance I*, the Court of Appeals determined that business conducted via the internet, which is identical to the type of business conducted by Western Sky here, was sufficient to confer jurisdiction to the State and demonstrated that the business activity constituted off-reservation activity. *See Cash Advance I*, 205 P.3d at 400. Observing that violations of Colorado's Consumer Credit Code and Consumer Protection Act would have significant off-reservation effects that would require the State's intervention, the Court of Appeals held that the State had jurisdiction to "investigate, criminally prosecute, seek declaratory and injunctive relief, and pursue civil remedies for conduct occurring within its borders." *See id.* at 403.

Nevertheless, Defendants maintain that the application of the five-factor test, set forth in *Cash Advance I*, as applied to their business activities here, establish that Western Sky's lending activities occur within the boundaries of the Reservation, thereby preventing the State's enforcement efforts in accordance with tribal immunity. The Court does not agree.

In *Cash Advance I*, the Court of Appeals provided the following factors for courts to consider when determining whether lending activity took place off-reservation: (1) where the contract was entered into; (2) where the contract was negotiated; (3) where performance will

7

occur; (4) where the subject matter of the contract is located; and, (5) where the parties reside. 205 P.3d at 400. However, in *Cash Advance I* the Court of Appeals did not rely on those factors. Rather, as set forth above, the Court of Appeals employed a long-arm analysis, to conclude that "[b]usiness conducted over the Internet that would confer jurisdiction on a state court also demonstrates that the business activity constitutes off-reservation activity." *Id*. Further, an application of the *Cash Advance I* factors to the uncontroverted facts presented here leads this Court to no contrary conclusion that Defendants' lending activities occur off-reservation.

Similarly, Defendants' contention that Webb is individually protected by tribal immunity as a member of the Tribe is in vain. Again, the Court addressed this very contention in its April 17, 2012 Order, denying Defendants' Motion to Dismiss. Webb, as an enrolled member of the Tribe, is not individually entitled to immunity, nor does his membership in the Tribe confer such immunity upon Western Sky. *See Puyallup Tribe, Inc. v. Dep't of Game*, 433 U.S. 165, 171,72 (1977) (holding that the "doctrine of sovereign immunity . . . does not immunize individual members of [a] tribe.").

Defendants also contend that the State has no regulatory authority of Webb because Webb conducts business through a legally recognized business entity, and the State has alleged no facts sufficient to pierce the corporate veil with respect to Webb. Conversely, the State maintains that Webb's individual liability is not dependent on any "piercing the corporate veil" or "alter ego" theory. Rather, the State contends that Webb's liability flows from the long and well-established principle that those responsible for corporate wrongdoing are personally liable for the corporation's wrongful acts.

CONFIDENTIAL
ROSETTE_REVISED_048506

JA1072

In support of its contention, the State directs the Court to several cases from other persuasive jurisdictions. First, in *F.T.C. v. Amy Travel Serv., Inc.*, 875 F.2d 564 (7th Cir. 1989), the Seventh Circuit affirmed a judgment holding individual shareholder and officer defendants liable for consumer restitution and other remedies to the same extent as their businesses. *Id.* at 566, 573-74. In doing so, the Seventh Circuit held that where the individuals participated in the businesses' unlawful acts, "or had authority to control them," the individuals were personally liable. *Id.* at 573. Similarly, in *Texas v. Am. Blastfax, Inc.*, 164 F.Supp.2d 892, 899 (W.D. Tex. 2001), in a state regulatory action brought under the federal Telephone Consumer Protection Act, the court held the individual officers, directors, and shareholders jointly and severally liable with the defendant corporation for monetary judgment and injunctive relief. There, the federal court rejected the defendants' proposition that individual liability for corporate acts required piercing the corporate veil, holding that those who "participate in or authorize the commission of a wrongful act, even if the wrongful act is done on behalf of the corporation, . . . may be personally liable . . . [T]o hold otherwise would allow the individual defendants to simply dissolve the [corporation], set-up a new shell corporation, and repeat their conduct." *Id.* at 897-898.

The State provided the Court with countless other examples of courts holding individual defendants liable for a business's violations under similar circumstances without requiring that the plaintiff pierce the corporate veil. *See, e.g., U.S. v. Pollution Abatement Serv., Inc.*, 763 F.2d 16, 23-25 (2nd Cir. 7985); *McCown v. Heidler*, 527 F.2d 204 (10th Cir. 1975); *Mead v. Johnson & Co. v. Baby's Formula Serv., Inc.*, 402 F.2d 19, 23 (5th Cir. 1968); *Wash v. Ralph Williams' N.W. Chrysler Plymouth, Inc.*, 553 P.2d 423, 439 (Wash. 1979).

CONFIDENTIAL                    ROSETTE_REVISED_043507

JA1073

This principle is equally established in Colorado. In *Snowden v. Taggart*, 17 P.2d 305 (Colo. 1932) the Colorado Supreme Court held that an officer of a corporation involved with the commission of the corporation's wrongdoing is personally liable, providing:

> This principle is absolutely without exception, and is founded upon the soundest legal analogies, and the wisest public policy. To permit an agent of a corporation, in carrying on its business, to inflict wrong and injuries upon others, and then shield himself from liability behind his vicarious character, would often both sanction and encourage the perpetration of flagrant and wanton injuries by agents of insolvent and irresponsible corporations.

*Id*. at 307 (internal quotations omitted).

This principle was reiterated in *Sanford v. Kobey Bros. Constr. Corp.*, 689 P.2d 724 (Colo. App. 1984), where the Court of Appeals reversed a trial court's entry of judgment in favor of an individual defendant because the facts presented did not permit the plaintiffs to pierce the corporate veil. In reaching its conclusion, the Court of Appeals provided that:

> Neither the doctrine of *respondeat superior* nor the fiction of corporate existence bars imposition of individual liability for individual acts of negligence, even when the individual is acting in a representative capacity . . . Rather, a servant may be held personally liable for his individual acts . . ., as so may an officer, director, or agent of a corporation for his or her tortious acts, regardless of the fact that the master or corporation also may be vicariously liable.

*Id*. at 725-26.

Here, it is uncontroverted that Webb is the sole manager, executive director, owner, and principal of Western Sky. It is further undisputed that Webb directs, controls, manages, participates in, supervises, is responsible for, and authorizes Western Sky's activities. Finally, the record before the Court confirms that Webb has general responsibility and final decision making authority for *all* of Western Sky's business operations. Accordingly, because Webb has

10

the exclusive authority to control the actions of Western Sky, he may also be held individually liable for Western Sky's violations of the Code.

To the extent that Defendants contend that "Indian businesses operating on a reservation are not subject to state jurisdiction and control" and are thus preempted by federal law, the Court is not persuaded.

Again, this very contention was rejected by this Court in its April 17, 2012 Order denying Defendants' Motion to Dismiss. As discussed above, the record before the Court confirms that Defendants' conduct does not involve the regulation of Indian affairs on an Indian reservation. Further, as discussed in the Court's April 17, 2012 Order, the Court finds the federal court's determination in *State ex rel. Suthers v. Western Sky, LLC*, 845 F.Supp.2d 1178, 1182 (D. Colo. 2011), regarding Defendants' preemption argument particularly instructive:

> Defendants argue that Congress has completely preempted the regulation of Indian affairs on a reservation. However, even if that were so, it begs the question of whether the conduct of which [the State] complain[s] involved regulation of Indian affairs on a reservation. I find and conclude that it did not. [The State] allege[s], and defendants do not dispute, that defendants were operating via the Internet . . . . The borrowers do not go to the reservation in South Dakota to apply for, negotiate or enter into loans. They apply for loans in Colorado by accessing defendants' website. They repay the loans and pay the financing charges from Colorado; Western Sky is authorized to withdraw the funds electronically from their bank accounts. The impact of the allegedly excessive charges was felt in Colorado. Defendants have not denied that they were doing business in Colorado for jurisdictional purposes, nor does it appear that they could. *See* [*Cash Advance I*, 205 P.3d at 400]. "Business conducted over the Internet that would confer jurisdiction on a state court also demonstrates that the business activity constitutes off-reservation activity." [*Id.*]

CONFIDENTIAL                                              ROSETTE_REVISED_043509

JA1075

Moreover, notwithstanding the above, it is well settled that tribes are subject to state law when engaged in off-reservation activity. *See, e.g., Nevada v. Hicks*, 533 U.S. 353 (2001); *Mescalero Apache Tribe v. Jones*, 411 U.S. 145 (1973); *Organized Vill. Of Kake v. Egan*, 369 U.S. 60, 62-63, 75-76 (1962).

C.R.S. § 5-1-201(1) provides that the Code "applies to consumer credit transactions made in this state." The Code further provides that a consumer credit transaction is made in this state if:

> (b) A consumer who is a resident of this state enters into a transaction with a creditor who has solicited or advertised in this state by any means, including but not limited to mail, brochure, telephone, print, radio, television, internet, or any other electronic means.

Code § 5-1-201(1)(b).

Here, it is undisputed that Defendants operate a website and engage in television advertising in this state, thereby soliciting and advertising their lending business in Colorado. It is further, undisputed that Defendants have entered into loan agreements with Colorado residents.

Accordingly, because Defendants' business activities are conducted off-reservation and because Defendants solicit and advertise their business in Colorado and have, in fact, entered into loan agreements with Colorado citizens, Defendants are not entitled to tribal immunity or federal preemption. Rather, based on the undisputed facts before the Court, the Court concludes that Defendants are subject to the Code's previsions and are thereby liable for any violation thereof. Specifically, because Western Sky is not, and has never been, licensed as a supervised lender, and because unlicensed lenders are not authorized to charge a finance charge on

12

ROSETTE_REVISED_048510

supervised loans, Defendants' liability for restitution to consumers of all finance charges, including penalties, on all unlicensed loans made or collected with respect to Colorado citizens, is established as a matter of law.

### III. The State is entitled to Attorney's Fees incurred in Replying to Defendants' Tribal Immunity and Preemption Arguments in their Response.

The State requests that this Court grant its request for Attorney's fees pursuant to C.R.S. § 13-17-101, *et seq.*, for fees incurred in replying to Defendants' tribal immunity and federal preemption arguments, raised in their Response. C.R.S. § 13-17-102 provides, in pertinent part, that a court may award reasonable attorney fees against a party who brings an action "that lacks substantial justification." *See* C.R.S. § 13-17-102(2). Under this statute, the term "lacks substantial justification" means substantially frivolous, substantially groundless, or substantially vexatious. C.R.S. § 13-17-102(4).

Here, as discussed above, the crux of Defendants' argument is that they are entitled to tribal immunity and federal preemption because their business activities are conducted on the Reservation. This very argument has been raised twice previously by these Defendants, and was rejected in each instance. Defendants first raised this argument in *Suthers*, 845 F.Supp.2d at 1182, where the federal court determined that "[D]efendants' repeated argument that [this] case involves regulation of Indian Affairs on an Indian Reservation" so lacked an "objectively reasonable basis" as to entitle the State to its costs and attorney's fees. *Id.* Defendants raised this same argument in the present litigation in their Motion to Dismiss. This argument was again rejected by this Court in its April 17, 2012 Order, denying Defendants' Motion to Dismiss. In their Response to the State's Motion for Summary Judgment, Defendants now raise this same argument for a third time, seemingly undeterred by the federal court's ruling in *Suthers*, as well

13

as this Court's prior ruling here. While Defendants purportedly provide additional facts concerning the details of their loan making process in support of their tribal immunity and preemption arguments, a review of the additional information provided by Defendants leads the Court to no contrary conclusion. Rather, these additional materials confirm what this Court, along with the *Suthers* court, already determined – that Defendants' actions in offering and entering into loans with Colorado consumers, via the Internet, does not constitute on-reservation business activity.

Defendants' continued assertions that they are entitled to tribal immunity and federal preemption, which have been repeatedly rejected by this Court and the Federal Courts, evince stubbornly litigious and substantially vexatious defense of this action and warrant and assessment of attorney's fees. *Mitchell v. Ryder*, 104 P.3d 316, 320-21 (Colo. App. 2004). Where, as the Court has found here, an attorney or party has brought or defended an action, or any part thereof, which lacked substantial justification, the Court shall assess attorney's fees. C.R.S. § 13-17-102(4). Any such award is properly entered in favor of the State and against Defendants and their counsel, jointly and severally. C.R.S. § 13-17-102(3).

Accordingly, because Defendants tribal immunity and federal preemption arguments lack substantial justification, the State is entitled to recover its attorney's fees expended in replying to Defendants Response insofar as the State can establish the reasonable fees incurred in addressing Defendants' tribal immunity and preemption arguments.

## CONCLUSION

WHERFORE, in light of the reasoning stated above, the State's Motion for Partial Summary Judgment – Second Claim for Relief is hereby GRANTED. It is further ordered that,

CONFIDENTIAL

ROSETTE_REVISED_04512

JA1078

in light of the voluminous unlicensed loans extended by Defendants in violation of the Code, estimated at over 4,000, the State's request that a special master be appointed to determine the number of, and extent to which, consumers have been adversely affected by Defendants' unlawful activity in this matter is GRANTED. The Parties shall submit a joint list of three potential Special Masters, not later than 14 days from the date of entry of this Order, and the Court will select one from that list. If the parties cannot agree on a list of potential Special Masters, the Court will appoint someone of the Court's choosing. Further, in accordance with the Court's findings herein, the State shall file an Affidavit of Attorney's fees incurred in replying to Defendants' tribal immunity and federal preemption arguments in their Response, not later than 14 days from the date of entry of this Order.

**DONE** this 15th day of April, 2012.

BY THE COURT:

_____
MICHAEL A. MARTINEZ
District Court Judge

15

ROSETTE_REVISED_048510
JA1079

Exhibit 17

**From:** Matt Martorello
**To:** Karrie Wichtman
**Subject:** RE: LEGAL RESPONSE REQUIRED - NY AG Letter Cease & Desist Letter
**Date:** Friday, August 9, 2013 9:25:19 AM

I agree, but I think it's better for Think Finance to have the fight.  They have a dozen banks and 5 ACH providers and they are all over the state AGs, CFPB, and FTC radars.  LVD is not and for LVD this will result in:  A) a countersuit from NY, FTC investigation, a CFPB CID, and potentially other states piling on.  How much is too much before your 1 bank/processor folds on you?

LVD's house is not completely in order yet.  Time is our most important commodity right now.  We don't have to be a plantiff, it will happen anyways with Think and Mark Curry. RRTL/DCTF are too young for this right now.  We haven't even discussed a budget for it, but I'd have to multiply it by 5 because of all of the other lawsuits and investigations that are just coming to come immediately after we stand up.  Which I'm certain I could not finance.

We're better to let Otoe and Think/Curry who have $700mm in loans on the street go to war and we focus on sustaining and strengthening right now.  We're simply undercapitalized, the bench isn't deep enough, and we're not backed into a corner like they are.  The better option is to stay low and get stronger, not to go to war any sooner than we have to and we certainly don't have to yet.

If the FTC were here already and the CFPB, I'd have a different opinion.   It will be impossible for a cease fire next week with NY if that NAFSA full page ad runs, no point in even meeting at that stage.  We open the doors and I really think we'll be overwhelmed with counter attacks from all sides, and it will be game over really quick.  We don't make enough $ to finance all of the battles that are to come.  Rick Gerber is meeting with the FDIC next week in person.  He may for the 1st time feel that FDIC pressure and we'll see how he reacts.  We certainly should do nothing before that meeting happens as well as the NY face to face meeting.  We should have the OLA accredidation audit in September and have that completed as well before we step out into the light too.

Too young, too small, too poor and not enough depth in the bench with ACH/Banks.  This is a Think Finance and Mark Curry battle right now, we make 0 impact by signing onto it and yet we enjoy all of the benefits if we delay and gather our strength.

They are clearly coordinating and they're going to counter and come at us from all sides.  Maybe they won't, but that's all they'd need to do to shut down the business at LVD b/c we simply would not be able to afford to stay in business anymore.   It's that easy for them to win against us.  Think/Otoe are 20 times the size.

**From:** Karrie Wichtman [mailto:kwichtman@rosettelaw.com]
**Sent:** Friday, August 9, 2013 12:21 AM
**To:** Matt Martorello
**Subject:** Re: LEGAL RESPONSE REQUIRED - NY AG Letter Cease & Desist Letter

CT. And just so you know the Tribe is ready to fight - and surprisingly enough me along with my usually even keeled conservative nature believes that they are right. It's time to deal with

these questions/issues head on through a concerted effort based upon Sovereignty that can't be ignored. And one that we initiate so that we are proactive and not reactive like we have been all week. I have no delusions of grandeur -it will be an uphill battle but neither LVD nor any of the 570 plus federally recognized tribes in this country has ever shied away from a fight-- and they certainly have not been able to maintain the sovereignty that they have left by laying SUPER low! Where's your tommy gun!

Bottom line is we need your help. I know you are being counseled otherwise and I certainly respect that advice and the person it is coming from - however, what do we achieve by laying low waiting for the next bomb to drop - hoping that it doesn't blow us up? The way iI see it the risk is the same. In addition, LVD is still interested in sitting down with the NY regulators next week- perhaps we can avoid participation if that is successful but i am not going to hold my breath. I see the talks as an opportunity however for the most part the harm is already done. Also, nothing will be filed unless and until fully vetted with the Tribe and you.  A commitment to proceed with exploration of the lawsuit Rob proposed which likely won't be filed until after those discussions next week is a sound decision.

Talk to you in the morning.

Karrie

Sent from my iPhone

On Aug 8, 2013, at 10:50 PM, "Matt Martorello" <mattm@bellicosevi.com> wrote:

> CT or ET?
>
> ---
>
> **From:** Karrie Wichtman [mailto:kwichtman@rosettelaw.com]
> **Sent:** Thursday, August 8, 2013 11:50 PM
> **To:** Matt Martorello
> **Subject:** Re: LEGAL RESPONSE REQUIRED - NY AG Letter Cease & Desist Letter
>
> Sounds good. 8:00 am?
>
> Sent from my iPhone
>
> On Aug 8, 2013, at 10:48 PM, "Matt Martorello" <mattm@bellicosevi.com> wrote:
>
>> Ok, first thing tomorrow?
>>
>> ---
>>
>> **From:** Karrie Wichtman [mailto:kwichtman@rosettelaw.com]
>> **Sent:** Thursday, August 8, 2013 11:48 PM
>> **To:** Matt Martorello
>> **Subject:** Re: LEGAL RESPONSE REQUIRED - NY AG Letter Cease & Desist Letter
>>
>> Given your concerns, before is preferable.

Sent from my iPhone

On Aug 8, 2013, at 10:43 PM, "Matt Martorello"
<mattm@bellicosevi.com> wrote:

> Agree, do you want to do that before I reply to Rob's email?
> Bottom line is, we have 1 bank and we have ½ of an ACH
> provider.  If we spook either b/c we stand up right now, then
> LVD is in default, and Alpha credit takes the entire business
> OVERNIGHT.  Game over, everyone loses their jobs and LVD
> loses the income.  We can't risk that.
>
> I'm seeing it now today, Tucker's banks have been with him
> for a decade and he has 20 times the money with them!
> Several backed out this week and they are extremely
> worried.  All it takes is the FTC investigation (with or w/o
> merit).

---

**From:** Karrie Wichtman
[mailto:kwichtman@rosettelaw.com]
**Sent:** Thursday, August 8, 2013 11:40 PM
**To:** Matt Martorello
**Subject:** Re: LEGAL RESPONSE REQUIRED - NY AG Letter
Cease & Desist Letter

Ok, you and I need to have a conversation soon please.

Sent from my iPhone

On Aug 8, 2013, at 10:26 PM, "Matt Martorello"
<mattm@bellicosevi.com> wrote:

> I don't think we should before the
> conversations face-to-face with them next
> week.  I think we need to stay SUPER low and
> out of trouble right now.  I'll elaborate in my
> reply to Rob.

---

**From:** Karrie Wichtman
[mailto:kwichtman@rosettelaw.com]
**Sent:** Thursday, August 8, 2013 10:57 PM
**To:** jasong@duckcreektf.com
**Cc:** Justin Martorello; Matt Martorello; Brian
McFadden; Daniel Gravel; Craig Mansfield;
giizhigookway
**Subject:** Re: LEGAL RESPONSE REQUIRED - NY

AG Letter Cease & Desist Letter

So have we decided if we will be ceasing and desisting?

Sent from my iPhone

On Aug 8, 2013, at 9:25 AM,
"jasong@duckcreektf.com"
<jasong@duckcreektf.com> wrote:

> Here is a Cease & Desist Order
> we received from State of NY
>
> Thanks,
> Jason
>
> <NY AG Letter - Cease &
> Desist Order.pdf>

**This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

**This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

**This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

**This email and any files transmitted with it are confidential and may contain

Exhibit 18

**Leigh Wink**

| | |
|---|---|
| **From:** | gkway@duckcreektf.com |
| **Sent:** | Thursday, October 03, 2013 3:21 PM |
| **To:** | Karrie Wichtman; Matt Martorello; Chairman James Williams; Craig Mansfield |
| **Cc:** | Justin Martorello; Daniel Gravel; weddlej@gtlaw.com; Saba Bazzazieh; Robert Rosette; Cheryl McGeshick; Eli Edwards; gkway@lvdtribal.com; Henry Smith; Joette Pete-Baldwin (joette.pete@lvdtribal.com); John McGeshick, Jr.; Susan McGeshick (susan.mcgeshick@lvdcasino.com); Tyrone McGeshick (tyrone.mcgeshick@lvdcasino.com) |
| **Subject:** | RE: Notice to Cease Servicing Origination of New Loans to NY consumers |
| **Attachments:** | Moratorium on NY Customers.pdf |

Here you go.

*giizhigookway*
*CEO/Co-Manager*
*Duck Creek Tribal Financial*
*P.O. Box 704*
*Watersmeet, MI  49969*
*906.358.2008-Office*
*906.358.2010-Fax*
*906.366.7041-Cell*
*gkway@duckcreektf.com*


-------- Original Message --------
Subject: RE: Notice to Cease Servicing Origination of New Loans to NY consumers
From: Karrie Wichtman <kwichtman@rosettelaw.com>
Date: Thu, October 03, 2013 1:55 pm
To: Matt Martorello <mattm@bellicosevi.com>, Chairman James Williams <jim.williams@lvdtribal.com>, "gkway@duckcreektf.com" <gkway@duckcreektf.com>, Craig Mansfield <craigm@duckcreektf.com>
Cc: Justin Martorello <JustinM@BellicoseVI.com>, Daniel Gravel <DanielG@bellicosevi.com>, "weddlej@gtlaw.com" <weddlej@gtlaw.com>, Saba Bazzazieh <sbazzazieh@rosettelaw.com>, Rob Rosette <rosette@rosettelaw.com>, Cheryl McGeshick <cheryl.mcgeshick@lvdtribal.com>, Eli Edwards <eli.edwards@lvdtribal.com>, "gkway@lvdtribal.com" <gkway@lvdtribal.com>, Henry Smith <henry.smith@lvdtribal.com>, "Joette Pete-Baldwin (joette.pete@lvdtribal.com)" <joette.pete@lvdtribal.com>, "John McGeshick, Jr." <johnjr@lvdtribal.com>, "Susan McGeshick (susan.mcgeshick@lvdcasino.com)" <susan.mcgeshick@lvdcasino.com>, "Tyrone McGeshick (tyrone.mcgeshick@lvdcasino.com)" <tyrone.mcgeshick@lvdcasino.com>

All,

Please find attached approval documents for the consideration of the Co-Managers of RRTL and DCTF (the "TLEs") issuing a moratorium on consumer loans in the State of New York and the winding down of the business currently existing in the State of New York, immediately, until further notice, which I

1

JA1086

understand only constitutes five percent (5%) of the current business of RRTL and DCTF, will have little to no effect in Tribal Net Profits.

Matt and SPVI Team:

In response to your response, thank you for the clarification of the meaning of your email of yesterday. While I disagree with your statement Judge Sullivan's 9/30 Order "right now today [] represents a basis for New York authorities to initiate enforcement proceedings" and that New York law has been modified in any way in relationship to the operation of the businesses, I do agree that it makes good business sense for the TLEs to take action as provided for in the attached moratorium approval documents. Nevertheless, and as indicated yesterday, that is a decision for the TLE to make, not me or SPVI, considering we have not yet received "a final judgment of a court of competent jurisdiction, after all appeals thereof" that changes any of the Legal Requirements under which the TLEs, collectively, operate.

Sincerely,

**Karrie S. Wichtman, Partner**
**Rosette, LLP**
**Attorneys at Law**
Michigan Office
25344 Red Arrow Hwy, Suite B
Mattawan, MI 49071
269.283.5005 – Office
480.242.6959 - Cell
517.913.6443 – Fax
kwichtman@rosettelaw.com
www.rosettelaw.com

CONFIDENTIAL COMMUNICATION: THIS MESSAGE IS A CONFIDENTIAL ATTORNEY COMMUNICATION ONLY FOR USE BY THE INTENDED RECIPIENT. ANY INADVERTENT RECEIPT SHALL NOT CONSTITUTE A WAIVER OF ATTORNEY-CLIENT OR WORK PRODUCT PROTECTION. IF RECEIVED IN ERROR, PLEASE NOTIFY KARRIE S. WICHTMAN IMMEDIATELY AND DELETE THIS MESSAGE. THANK YOU FOR YOUR COOPERATION.

---

**From:** Matt Martorello [mailto:mattm@bellicosevi.com]
**Sent:** Thursday, October 3, 2013 9:55 AM
**To:** Karrie Wichtman; Chairman James Williams; gkway@duckcreektf.com; Craig Mansfield
**Cc:** Justin Martorello; Daniel Gravel; weddlej@gtlaw.com; Saba Bazzazieh; Rob Rosette; Cheryl McGeshick; Eli Edwards; gkway@lvdtribal.com; Henry Smith; Joette Pete-Baldwin (joette.pete@lvdtribal.com); John McGeshick, Jr.; Susan McGeshick (susan.mcgeshick@lvdcasino.com); Tyrone McGeshick (tyrone.mcgeshick@lvdcasino.com)
**Subject:** RE: Notice to Cease Servicing Origination of New Loans to NY consumers

Yes, Karrie, thank you for that clarification. It is our intention to recommend that the Enterprise refrain, immediately, and until further notice, from making new loans in the State of New York and that current loans be wound down until paid in

full or some other disposition of the debt to the Enterprise has been reached.  But we also mean to say that whether or not the Enterprise accepts our recommendation, SPVI cannot continue to provide services with respect to any new loans in New York.  While Judge Sullivan's order may be appealed, and hopefully overturned, right now today it represents a basis for New York authorities to initiate enforcement proceedings.  Whatever valid defenses the Tribe and the Enterprise might have to such actions, SPVI does not have such sovereign protections and we feel we have to comply with what a New York court says New York law is.  Although Judge Sullivan's order isn't clear on a number of points, it is clear that New York's non-discriminatory anti-usury laws apply, and SPVI does not intend to willfully and wantonly disregard that ruling because we could face liability from New York for doing so.

---

**From:** Karrie Wichtman [mailto:kwichtman@rosettelaw.com]
**Sent:** Wednesday, October 2, 2013 4:39 PM
**To:** Matt Martorello; Chairman James Williams; gkway@duckcreektf.com; Craig Mansfield
**Cc:** Justin Martorello; Daniel Gravel; weddlej@gtlaw.com; Saba Bazzazieh; Rob Rosette; Cheryl McGeshick; Eli Edwards; gkway@lvdtribal.com; Henry Smith; Joette Pete-Baldwin (joette.pete@lvdtribal.com); John McGeshick, Jr.; Susan McGeshick (susan.mcgeshick@lvdcasino.com); Tyrone McGeshick (tyrone.mcgeshick@lvdcasino.com)
**Subject:** RE: Notice to Cease Servicing Origination of New Loans to NY consumers

Matt and SPVI Team,

Please advise as to the intent of your email as it is my understanding that your email and the citation to Section 9.4 of the Servicing Agreement is effectively a declaration of breach or dispute being asserted in writing in accordance with Section 18.1 of the Servicing Agreement, considering that that provision cited calls for cessation of the obligations of the parties to one another under the Agreement and states that the "Agreement shall be of no further force and effect".  Claiming such a breach under 9.4 necessarily requires that such material change in law be based upon "a final judgment of a court of competent jurisdiction, after all appeals thereof".  The Order of the Court denying the Plaintiff's Preliminary Injunction is certainly not such an order as it is not a final judgment of a court,  appealable and while no such appeals have yet been file we have 30 days from yesterday's date to do so.  Transmitting such a notice declaring a breach, if that is the intent here, is unwarranted and unsupported by the facts at hand. It matters not how Judge Sullivan's order will be regarded by overzealous regulatory agencies but rather that such an order IS NOT, in fact, a final order of the Court on the merits changing a material aspect of the Legal Requirements governing the agreement of the parties.  Furthermore the provision does not appear to allow for the singling out of a particular state, in this case NY, to wind down business- which is the cause for my confusion – and leads me to believe that it is not your intent at all to make such a declaration of breach.

CONFIDENTIAL

Indeed, your email, the concerns expressed, and the recommendations therein seem to fall more  in line with Section 4.2 in that as the Servicer you have been contracted to advise the Enterprise regarding the "orderly administration and management of Enterprise in the areas of financial reporting, financing, regulatory compliance, marketing, human resources, development of third party servicer relationships, collections and risk assessment".  Among other provisions included in Section 4.2 , your observations, and recommendation to the Enterprise not to lend to and wind down business involving residents in the State of New York surely fits within Section 4.2.1 (a) whereby the "Servicer will be responsible for providing pre-qualified leads to Enterprise and providing the necessary credit-modeling data and risk assessment strategies by which the Enterprise may evaluate to whether or not to extend funds to an individual borrower based on criteria that has been established by the Enterprise."  Note that the Agreement, in that same section, however, makes quite clear that "The criteria used to extend funds to individual borrowers will remain within the sole and absolute discretion of the Enterprise and the Enterprise shall execute all necessary loan documentation".  Therefore, in the spirit of clarification of your earlier email, would you agree that a better way to approach this matter may be for the Servicer as provided for in Section 4.2.1 (a) to make a recommendation to the Enterprise that in light of recent enforcement actions taken by the State of NY Department of Financial Services, the pending litigation and the recent preliminary Order of the Court, that the Enterprise refrain, immediately, and until further notice, from making new loans in the State of New York and that current loans be wound down until paid in full or some other disposition of the debt to the Enterprise has been reached?

I look forward to your response so that I may advise my client.

Regards,



**Karrie S. Wichtman, Partner**
**Rosette, LLP**
**Attorneys at Law**
Michigan Office
25344 Red Arrow Hwy, Suite B
Mattawan, MI 49071
269.283.5005 – Office
480.242.6959 - Cell
517.913.6443 – Fax
kwichtman@rosettelaw.com
www.rosettelaw.com

CONFIDENTIAL COMMUNICATION: THIS MESSAGE IS A CONFIDENTIAL ATTORNEY COMMUNICATION ONLY FOR USE BY THE INTENDED RECIPIENT.  ANY INADVERTENT RECEIPT SHALL NOT CONSTITUTE A WAIVER OF ATTORNEY-

CONFIDENTIAL

CLIENT OR WORK PRODUCT PROTECTION.  IF RECEIVED IN ERROR, PLEASE
NOTIFY KARRIE S. WICHTMAN IMMEDIATELY AND DELETE THIS
MESSAGE.  THANK YOU FOR YOUR COOPERATION.

**From:** Matt Martorello [mailto:mattm@bellicosevi.com]
**Sent:** Wednesday, October 2, 2013 2:50 PM
**To:** Chairman James Williams; gkway@duckcreektf.com; Craig Mansfield
**Cc:** Karrie Wichtman; Justin Martorello; Daniel Gravel
**Subject:** Notice to Cease Servicing Origination of New Loans to NY consumers

Dear Mr. Chairman and Team:

Due to Judge Sullivan's ruling, we believe we have an involuntary termination
event under the Servicing Agreement as it relates to loans made in the State of
New York.  As you know, the Servicing Agreement provides:

Involuntary Termination Due to Changes in Legal Requirements
It is the understanding and intention of the parties that the establishment and
operation of Enterprise conforms to and complies with all Legal Requirements. If
during the term of this Agreement, Enterprise, or any material aspect of the
business conducted by Enterprise, becomes prohibited by operation of federal law
or determined by final judgment of a court of competent jurisdiction, after all
appeals thereof, to be unlawful under applicable law, the obligations of the
parties hereto shall cease, and this Agreement shall be of no further force and
effect; provided that (i) the Servicer shall have the rights in Section 4.4 of this
Agreement;  (ii) the Servicer and the Enterprise shall retain all money previously
paid to them pursuant to Section 6 of this Agreement;  (iii) funds of Enterprise in
any account shall be paid and distributed as provided in Section 6 of this
Agreement, provided any Authorized Debt shall be paid in full;  (iv) any money
lent by or guaranteed by the Servicer or its affiliates to Servicer shall be repaid to
the Servicer to the extent provided in a written agreement entered in connection
therewith, with recovery of monetary payments or damages limited in recourse to
Enterprise assets and any such payments or damages shall be made only after
payment in full of any and all amounts under any Authorized Debt; and (v) the
Enterprise, directly or indirectly, shall retain its interest in the title to all
Enterprise assets, fixtures, supplies and equipment subject to any requirements
of financing arrangements. Nothing contained in this Section 9.4 shall be read to
preclude either or both parties from contesting any actions which could lead to
the involuntary cessation of business by Enterprise.

While we understand that an appeal of Judge Sullivan's order is imminent, our
concern is that Judge Sullivan's order finding that tribal enterprises are subject to
New York's anti-usury laws will be regarded as sufficiently final by the State of
New York such that it will precipitate their potential investigation and potential
prosecution of us personally and our companies if we continue to provide New
York-related services at this time.

We might be able to resume servicing New York loans at some point in the future,
but for now, Judge Sullivan's Order presents a significant potential liability for us

CONFIDENTIAL

JA1090

and we do not believe that we should service any new New York loans.  We are willing to wind down our New York services and see existing loans through to their completion, but we simply cannot flaunt the clear ruling from Judge Sullivan's order, however legally incorrect it might be.

This action applies both to services performed for the Red Rock Tribal Lending, LLC and Duck Creek Tribal Financial, LLC portfolios.

**Regards,**

**Matt Martorello**
Mobile: 773-209-7720
Email: mm@BellicoseVI.com

**This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**
**This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

CONFIDENTIAL

JA1091



# Duck Creek Tribal Financial, LLC

## DBA as Peppercash.com

E23967 Choate Road, P.O. Box 704, Watersmeet, Michigan 49969
Telephone: 906-358-2008    Facsimile: 906-358-4785

October 2, 2013

Pursuant to Article 3, Section 3.1 of Duck Creek Tribal Financial, LLC's ("Company") Operating Agreement, which is a wholly owned and operated tribal lending entity of, and created under the law of, the Lac Vieux Desert Band of Lake Superior Chippewa Indians (the "Tribe"), the Co-Managers are vested with the power and authority to do and perform all actions as may be necessary or appropriate to the conduct of the Company's business.

WHEREAS, On or about August 5, 2013, the sister Company of the Tribe, Red Rock Tribal Lending, LLC, ("RRTL") received cease and desist letters from the New York Department of Financial Services (DFS) falsely asserting that the Tribe's lending entities were in violation of New York civil and criminal laws, and threatening enforcement action related thereto; and

WHEREAS,  On or about August 5, 2013, DFS sent similar notices to hundreds of financial institutions and an electronic payment association comprised of payment processors which named the Tribe's lending entities and specifically and instructed these institutions to cease doing business with them; and

WHEREAS, on August 21, 2013, the Tribe, the Lac Vieux Desert Tribal Financial Services Regulatory Authority ("TFSRA"), and RRTL filed a lawsuit against the State of New York, specifically the DFS with regard to the Department of Financial Services complete disregard for the sovereign authority of the Lac Vieux Desert Band of Lake Superior Chippewa Indians' economic development efforts and sovereign status captioned The Otoe-Missouria Tribe of Indians et al v. New York State Department of Financial Services et al, Case No. 1:13-cv-05930-RJS (the "Lawsuit"); and

WHEREAS, shortly after the filing of the Lawsuit, the Tribe, the TFSRA and RRTL filed a Motion for Preliminary Injunction to enjoin DFS from taking any further enforcement action that would further harm the business of the Company; and

WHEREAS, on September 30, 2013, the Court issued an Order Denying Injunctive Relief as request, to which the Tribe, the TFSRA, and RRTL will appeal; and

WHEREAS, after performing a risk assessment in accordance with Section 4.2 of the agreement between the Company and SourcePointVI, LLC, the Company's contracted consultant and advisor on matters concerning the "orderly administration and management of Enterprise in the areas of financial reporting, financing, regulatory compliance, marketing, human resources, development of third party

CONFIDENTIAL

JA1092

servicer relationships, collections and risk assessment" (the "Servicer") weighing regulatory enforcement concerns, the progress of the pending litigation, and the financial risk associated with continuing to make loans to New York residents, and knowledge that similarly situated companies have curtailed their business in the State of New York, the Servicer has recommended to the Company that it immediately cease making loans to consumers in the State of New York until further notice, and that current loans between the Company and consumers in the State of New York be wound down;

WHEREAS, after careful review and consideration by the Co-Managers of the recommendations of the Servicer regarding the cessation of making loans to New York consumers immediately, and until further notice, and the winding down of current loans between the Company and New York consumers to mitigate any potential financial loss to the Company, although there has been no material change to the Legal Requirements of the business of the Company as defined in the agreement between the Company and the Servicer, the Co-Managers believe that said recommendation is in the best interest of interest of the Company.

NOW THEREFORE BE IT RESOLVED THAT, the Co-Managers hereby institute a moratorium effective immediately, and until further notice, on the processing and origination of new loans to consumers located in the State of New York, and further directs that all current loans between the Company and consumers in the State of New York will continue to be serviced pursuant to Tribal law, the Company's practices and the Servicer's contractual obligations and be wound down until paid in full or some other disposition of the debt to the Company has been reached.

giizhigookway, Co-Manager

Craig Mansfield, Co-Manager



# RED ROCK TRIBAL LENDING, LLC

A wholly independently owned and operated entity of by the Lac Vieux Desert Band of Lake Superior Chippewa Indians

P.O. Box 704 ∞ Watersmeet, Michigan 49969 ∞ 906-358-2008 (Phone) ∞ 906-358-4785 (Fax)

October 2, 2013

Pursuant to Article 3, Section 3.1 of the Red Rock Tribal Lending, LLC's ("Company") Operating Agreement, which is a wholly owned and operated tribal lending entity of, and created under the law of, the Lac Vieux Desert Band of Lake Superior Chippewa Indians (the "Tribe"), the Co-Managers are vested with the power and authority to do and perform all actions as may be necessary or appropriate to the conduct of the Company's business.

WHEREAS, On or about August 5, 2013, the Company received cease and desist letters from the New York Department of Financial Services (DFS) falsely asserting that the Tribe's lending entities were in violation of New York civil and criminal laws, and threatening enforcement action related thereto; and

WHEREAS, On or about August 5, 2013, DFS sent similar notices to hundreds of financial institutions and an electronic payment association comprised of payment processors which named the Tribe's lending entities and specifically and instructed these institutions to cease doing business with them; and

WHEREAS, on August 21, 2013, the Tribe, the Lac Vieux Desert Tribal Financial Services Regulatory Authority ("TFSRA"), and the Company filed a lawsuit against the State of New York, specifically the DFS with regard to the Department of Financial Services complete disregard for the sovereign authority of the Lac Vieux Desert Band of Lake Superior Chippewa Indians' economic development efforts and sovereign status captioned *The Otoe-Missouria Tribe of Indians et al v. New York State Department of Financial Services et al, Case No. 1:13-cv-05930-RJS* (the "Lawsuit"); and

WHEREAS, shortly after the filing of the Lawsuit, the Tribe, the TFSRA and the Company file a Motion for Preliminary Injunction to enjoin DFS from taking any further enforcement action that would further harm the business of the Company; and

WHEREAS, on September 30, 2013, the Court issued an Order Denying Injunctive Relief as request, to which the Tribe, the TFSRA, and the Company will appeal; and

WHEREAS, after performing a risk assessment in accordance with Section 4.2 of the contract between SourcePointVI, LLC, the Company's contracted consultant and advisor on matters concerning the "orderly administration and management of Enterprise in the areas of financial reporting, financing, regulatory compliance, marketing, human resources, development

CONFIDENTIAL

JA1094

of third party servicer relationships, collections and risk assessment" (the "Servicer") weighing regulatory enforcement concerns, the progress of the pending litigation matter, and the financial risk associated with continuing to make loans to New York residents, and knowledge that similarly situated companies have curtailed their business in the State of New York, the Servicer has recommended to the Company that it immediately cease making loans to consumers in the State of New York until further notice, and that current loans between the Company and consumers in the State of New York be wound down;

WHEREAS, after careful review and consideration by the Co-Managers of the recommendations of the Servicer regarding the cessation of making loans to New York consumers immediately, and until further notice, and the winding down of current loans between the Company and New York consumers to mitigate any potential financial loss to the Company, although there has been no material change to the Legal Requirements of the business of the Company as defined in the agreement between the Company and the Servicer, the Co-Managers believe that said recommendation is in the best interest of interest of the Company.

NOW THEREFORE BE IT RESOLVED THAT, the Co-Managers hereby institute a moratorium effective immediately, and until further notice, on the processing and origination of new loans to consumers located in the State of New York, and further directs that all current loans between the Company and consumers in the State of New York will continue to be serviced pursuant to Tribal law, the Company's practices and the Servicer's contractual obligations and be wound down until paid in full or some other disposition of the debt to the Company has been reached.


giizhigookway, Co-Manager                    Craig Mansfield, Co-Manager

# Exhibit 19

## Darcie Pace

| | |
|---|---|
| **From:** | Matt Martorello <mattm@bellicosevi.com> |
| **Sent:** | Monday, October 14, 2013 10:45 AM |
| **To:** | Robert Rosette |
| **Subject:** | LVD to take ownership of Bellicose VI |

**Importance:**    High

Hi Rob,

Do you have time to talk about the items below this morning?

- Assign today LVD 51% of Bellicose via <u>Equity only</u> membership interest tied to the SPVI subsidiary only
- Assign today LVD 51% of 7X Services, LLC equity for class tied to:
    - Iron Fence
    - Obsidian Armor
    - WMS (WMS terminates the existing option agreement)
    - In 2014 only, Bellicose VI, LLC (STX offices)
- In 2014, the Bellicose Equity will be shifted to SPVI directly (as we move from VIs to Puerto Rico)
- Specific to Bellicose/SPVI Equity:
    - LVD will own 51% equity, but 0% profits interest until month 49
    - BlueTech will own 49% equity, but 100% profits interest until month 49
    - Current Manager will be locked in for 48 months at which point will be 100% LVD owned equity and managed
    - In month 49, Profits will be 80% LVD and 20% BlueTech for 10 years, after which it is 100% profits to LVD.  With appropriate protections for assignments or other IP use, to be fair to BlueTech
    - LVD cannot compete to cut BlueTech out of income stream
    - Appropriate waivers to keep everything fair
    - All structured to provide all entities sovereign immunity
- On 7X Services LLC equity
    - Less complex since IFI and OAF will only survive 36 months and then be completed.
    - All structured to provide all entities sovereign immunity

**Regards,**

**Matt Martorello**
Mobile: 773-209-7720
Email: mm@BellicoseVI.com



\*\*This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.\*\*

CONFIDENTIAL                    ROSETTE_REVISED_048639

JA1097

# Exhibit 20

| | |
|---|---|
| **From:** | Matt Martorello |
| **To:** | Karrie Wichtman |
| **Subject:** | Re: Payday US Offer Deactivation Notice |
| **Date:** | Tuesday, October 29, 2013 4:28:04 PM |

Not directly,  but like my email said all the marketing entities are just about closing up shop, rates on things have skyrocketed, capture just cut us down by 200k a month in buying debt, most of the servicers like spvi have literally gone out of business.  It's impossible to buy any volume, debt providers are asking what would happen to everything if the ruling in NY were upheld (certain death and all vendors including spvi, banks, ACH processors, bureaus etc would all obviously shut down if it were considered off reservation activity), and the class actions against banks and personal threats of enforcement against individuals by regulators all has everyone spooked.  No joke, several of the biggest servicers have shut down.  Though I bet they come back if things end well.

Desperately hoping that Rule 19 works and a favorable outcome on the appeal!


-------- Original message --------
From: Karrie Wichtman <kwichtman@rosettelaw.com>
Date: 10/29/2013 2:40 PM (GMT-07:00)
To: Matt Martorello <mattm@bellicosevi.com>
Subject: Re: Payday US Offer Deactivation Notice


Is this one our vendor companies?

Sent from my iPhone

On Oct 29, 2013, at 3:24 PM, "Matt Martorello" <mattm@bellicosevi.com> wrote:




-------- Original message --------
From: Sam Lepore <snlepore@yahoo.com>
Date: 10/29/2013 11:54 AM (GMT-07:00)
To: Matt Martorello <mattm@bellicosevi.com>
Subject: Fw: Payday US Offer Deactivation Notice


Hey Matt-

Issues in the US with Payday?  You seeing this?



Thanks,

**Sam Lepore**
Cell: 856.297.6827
Email: sam@samlepore.com
www.samlepore.com

CONFIDENTIAL

JA1099

[facebook.com/SouthJerseyRealEstateTrends](facebook.com/SouthJerseyRealEstateTrends)
[twitter.com/samlepore](twitter.com/samlepore)



----- Forwarded Message -----
**From:** Leadnomics <[partner-platform@leadnomics.com](mailto:partner-platform@leadnomics.com)>
**To:** [snlepore@yahoo.com](mailto:snlepore@yahoo.com)
**Sent:** Tuesday, October 29, 2013 1:47 PM
**Subject:** Payday US Offer Deactivation Notice

October 29th, 2013

As most of you are aware, the current regulatory climate in the US has resulted in significantly less lead buying in the US Payday Market. Unfortunately, this has impacted our ability to provide our publishers with a compelling offer. Therefore, after careful deliberation, we have decided to suspend lead generation activities within the US Payday market, **effective Friday, November 1.**

We will continue to focus on offers that perform better for you including Payday UK, Auto Insurance, and our newest vertical, Health Insurance.

Your account manager is available to answer any questions you might have. We thank you for your trust and

CONFIDENTIAL

patronage in the past, and look forward to working with you again in the future.

**Our All-new Payday UK Offer**

# CashAdvancer UK

We are very pleased to announce our re-entry into the UK payday market with our premier offer, **CashAdvancer UK**. Our team has been working tirelessly to create and optimize this offer to ensure high conversion rates and EPCs, and we've already been seeing great results.

CashAdvancer UK is completely mobile optimized and features a brand-new form design. Reach out to your account manager to get set up to run this today.

As always, we are here when you need us.

Sincerely,

*The Leadnomics Partner Platform Team*

_____

Visit Us Online | Like Us on Facebook | Follow Us on

CONFIDENTIAL

JA1101

Twitter | Check Out Our Blog

Copyright © 2013. All Rights Reserved.

**Forward this email**

This email was sent to snlepore@yahoo.com by partner-platform@leadnomics.com |
Update Profile/Email Address | Instant removal with SafeUnsubscribe™ | Privacy Policy.

Leadnomics | 2929 Arch St | Philadelphia | PA | 19104

**This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

**This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

CONFIDENTIAL

# Exhibit 21

| From: | Matt Martorello |
| To: | Karrie Wichtman |
| Subject: | RE: LVD and legal bills |
| Date: | Friday, November 8, 2013 6:02:44 AM |

Between us, very candidly…

At this moment in time, I'm not about to even give Think the time of day.  I have very good reason to believe they conspire to harm me and they explicitly seek to put SPVI (me personally) out of business (and indirectly LVD).

RRTL  is down now about 55% from where it was in July and standing on thin ice with 1 TPPP Ach provider under constant attacks every day.  As you know, I was very adamant about LVD not belonging on the suit, as we are nothing but a warm body to take some blows on Think Finance's behalf.   Last thing I'm going to do after getting steamrolled on my recommendation to stay away (though I certainly was willing to pledge financial support if not a plaintiff as I told Curry) is to add insult to injury buying pledging capital towards the litigation.   Especially when it only goes to Think's pocket, an agency I am certain is out to harm us.

And considering:
   a)   where this puts us (i.e. SPVI is about to be discovered and will need extreme resources to defend itself against all kinds of aiding and abetting and "true lender" claims to come in Q1),
   b)   and the very significant possibility that should we even survive long enough to get there, I will have to defend myself even personally (in more than civil matters), with no ongoing business or revenue at all should the decision be made in the appeal that the activity is in fact OFF reservation (a certain end to the industry).  Or if LST folds I still have those battles to face now on account of the suit.

Think should be paying me about a $3mm legal reserve for my forthcoming legal bills from this action, which I would've not had to prepare for had LVD not joined as a Plaintiff.  These funds reserved, and the funds they are asking for need to go to back into your business given the shrinking capital providers and inability to access funding.  Not to the pockets of Think Finance.  They should also pay LVD $1mm if they want LVD to remain a Plaintiff on the case.  As there is a huge value added that everyone keeps ignoring, which is that LVD is a shield for Think Finance.

Curry is an innocent bystander in all of this by the way, and that is unfortunate.  I haven't shared any of the above with him or anyone outside the circle.

To be clear though, I'm not holding a grudge about it against LVD for putting me in this situation.  I believe their decision was not fully informed and was with a good heart for the best for what's right for their sovereignty, and I certainly hope for the most positive outcome and have tried to help in that regard where I could.  The time, the risk, and the blows to follow are way more compensation than we need to put forth here.  Think is now 30 times the size of RRTL.  This was their fight to finance, and they should be sending thank you emails every day for RRTL being listed as a plaintiff.

I advise them to go ask Sherry or one of the other NAFSA tribes to join as a Plaintiff instead as the

CONFIDENTIAL

JA1104

results would be far more fruitful.

Just being 100% up front on this with you and LVD.  I do seriously think LVD should tell Think they'll drop as a plaintiff unless Think pays them $1mm.  ☺

All that said ☺, this reply isn't' for Eric.  I guess you can just tell Eric that for several reasons, LVD is just not in a position at this time to contribute any further than we already are, and that we are in fact paying an equal and significant share of the Rosette bills today related to the matter.

---

**From:** Karrie Wichtman [mailto:kwichtman@rosettelaw.com]
**Sent:** Thursday, November 7, 2013 8:55 AM
**To:** Matt Martorello
**Subject:** Fwd: LVD and legal bills

See below. I said I would forward the message below to you from Eric Lau. Please let me know how you would like me to respond or if you would rather respond directly to Eric.

Sincerely,

Karrie

Sent from my iPhone

Begin forwarded message:

> **From:** Eric Lau <eric.lau@macfarlanegp.com>
> **Date:** November 5, 2013 at 11:16:31 AM CST
> **To:** Karrie Wichtman <kwichtman@rosettelaw.com>
> **Cc:** Saba Bazzazieh <sbazzazieh@rosettelaw.com>, Rob Rosette
> <rosette@rosettelaw.com>
> **Subject: RE: LVD and legal bills**
>
> No issue with forwarding.  Thank you.
>
> ---
> **From:** Karrie Wichtman [mailto:kwichtman@rosettelaw.com]
> **Sent:** Tuesday, November 05, 2013 11:06 AM
> **To:** Eric Lau
> **Cc:** Saba Bazzazieh; Rob Rosette
> **Subject:** Re: LVD and legal bills
>
> Good Morning Eric,
>
> Unless you have any objections, I will forward your email request to our SPVI Servicer to begin the discussion of an LVD contribution to the litigation expenses. I will keep you posted as to responses received and progress made.

CONFIDENTIAL

Sincerely,

Karrie

Sent from my iPhone

On Nov 5, 2013, at 11:52 AM, "Eric Lau" <eric.lau@macfarlanegp.com> wrote:

> Rob, Saba and Karrie,
>
> The Dechert bills are rolling in and they are significant.  Can LVD or its servicer provide any support?  Currently Otoe is pulling the weight in paying the bills for the lawsuit.
>
> Eric K. Lau
> General Counsel
> MacFarlane Group, Inc.
> PHONE/FAX: (913) 312-3320
> MOBILE: (816) 520-7421
> EMAIL: eric.lau@macfarlanegp.com
> ===========================================
> CONFIDENTIALITY NOTICE: This e-mail and any attachments are confidential and may also be privileged. If you are not the named recipient, please notify the sender immediately and delete the contents of this message without disclosing the contents to anyone, using them for any purpose, or storing or copying the information in any medium.

**This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

CONFIDENTIAL

# Exhibit 22

| | |
|---|---|
| **From:** | Matt Martorello |
| **To:** | Karrie Wichtman; Tanya Gibbs |
| **Subject:** | RE: AG letters |
| **Date:** | Friday, October 10, 2014 10:51:28 AM |
| **Attachments:** | image001.png |
| | image002.png |
| | image003.png |
| | image004.png |

I can't urge any stronger that LVD not proceed even if otoe does.  SPVI won't be willing to testify, or do anything as the result of another filing will certainly end in a slew of attacks on me, SPVI and my team.  I take the result now as a win and I can't be a part of anything further by any stretch of the imagination.

-------- Original message --------
From: Karrie Wichtman <kwichtman@rosettelaw.com>
Date:10/10/2014 12:40 PM (GMT-04:00)
To: Matt Martorello <mattm@bellicosevi.com>, Tanya Gibbs <TGibbs@rosettelaw.com>
Cc:
Subject: RE: AG letters

There is a tentative meeting schedule in DC to discuss litigation strategy (the pros and cons of moving forward or not) sometime next week.  Once there is a tentative plan, you will be the first to know.  If you have input please share it so I can forward it on to Saba as she will be present at the meeting.  Obviously, whatever is being recommended will ultimately need to be approved by the Tribal Councils of both Tribes so there will be follow up meetings on that front as well.

Sincerely,


Karrie S. Wichtman, Partner
ROSETTE, LLP
Michigan Office
Attorneys at Law
25344 Red Arrow Highway
Mattawan, Michigan 49071
269.283.5005 Office
517.913.6443 Facsimile
480.242.6959 Cell
kwichtman@rosettelaw.com
rosettelaw.com

CONFIDENTIAL COMMUNICATION: THIS MESSAGE IS A CONFIDENTIAL ATTORNEY COMMUNICATION ONLY FOR USE BY THE INTENDED RECIPIENT.  ANY INADVERTENT RECEIPT SHALL NOT CONSTITUTE A WAIVER OF ATTORNEY-CLIENT OR WORK PRODUCT PROTECTION.  IF RECEIVED IN ERROR, PLEASE NOTIFY KARRIE S. WICHTMAN IMMEDIATELY AND DELETE THIS MESSAGE.  THANK YOU FOR YOUR COOPERATION.

---

**From:** Matt Martorello [mailto:mattm@bellicosevi.com]
**Sent:** Friday, October 10, 2014 12:10 PM
**To:** Karrie Wichtman; Tanya Gibbs
**Subject:** RE: AG letters

Sounds great!  I think we could do well to take the communications with those folks to the next level.  Certainly won't hurt, and I'm sure it will leave an impact with those folks to one degree or another.

What's the latest on NY?  Is it over?

---

**From:** Karrie Wichtman [mailto:kwichtman@rosettelaw.com]
**Sent:** Friday, October 10, 2014 12:06 PM
**To:** Matt Martorello; Tanya Gibbs
**Subject:** RE: AG letters

I am happy to begin to focus my efforts in this area.  I would like to get Shelly and the Chairman on board as well.  I will plan to discuss it with them the next time I go to LVD.

Sincerely,


Karrie S. Wichtman, Partner
ROSETTE, LLP
Michigan Office
Attorneys at Law

CONFIDENTIAL

JA1108

25344 Red Arrow Highway
Mattawan, Michigan 49071
269.283.5005 Office
517.913.6443 Facsimile
480.242.6959 Cell
kwichtman@rosettelaw.com
rosettelaw.com

CONFIDENTIAL COMMUNICATION: THIS MESSAGE IS A CONFIDENTIAL ATTORNEY COMMUNICATION ONLY FOR USE BY THE INTENDED RECIPIENT.  ANY INADVERTENT RECEIPT SHALL NOT CONSTITUTE A WAIVER OF ATTORNEY-CLIENT OR WORK PRODUCT PROTECTION.  IF RECEIVED IN ERROR, PLEASE NOTIFY KARRIE S. WICHTMAN IMMEDIATELY AND DELETE THIS MESSAGE.  THANK YOU FOR YOUR COOPERATION.

---

**From:** Matt Martorello [mailto:mattm@bellicosevi.com]
**Sent:** Friday, October 10, 2014 11:57 AM
**To:** Karrie Wichtman; Tanya Gibbs
**Subject:** RE: AG letters

Thanks!  What do you think about LVD taking its own direct approach to communicate and visit with Banking Commissions, rather than solely lumping in with NAFSA?  Seems like we have much more control of timing, message, and effort this way.

I know other Tribes have MOUs in a few states.  I'm guessing NAFSA wasn't out getting MOUs for just those few, but  I feel like we need to give LVD that same direct effort to really move furthest in fastest for the good fight.  And Karrie is just the person to do it!

---

**From:** Karrie Wichtman [mailto:kwichtman@rosettelaw.com]
**Sent:** Friday, October 10, 2014 11:53 AM
**To:** Matt Martorello; Tanya Gibbs
**Subject:** RE: AG letters

Hi Matt,

After the letters are sent it has been my experience that we have received very few responses.  I can recall one from Arkansas which you received a copy of in the past.  One from Maryland, I believe, where they thanked us for our letter and closed the matter.  And a similar letter from Florida.  Other than that we typically don't receive a response.  As far as the consultative push, I agree and will get you a report from Alex Lozada in our office regarding the outreach being coordinated on behalf of NAFSA and our clients with State AGs and other DFS type regulators so that we can better consider where we can harness these efforts.  I know off hand that it has been NM, SD, AZ, VT, CA, and MI but there may be more than that.

Sincerely,

Karrie S. Wichtman, Partner
ROSETTE, LLP
Michigan Office
Attorneys at Law
25344 Red Arrow Highway
Mattawan, Michigan 49071
269.283.5005 Office
517.913.6443 Facsimile
480.242.6959 Cell
kwichtman@rosettelaw.com
rosettelaw.com

CONFIDENTIAL COMMUNICATION: THIS MESSAGE IS A CONFIDENTIAL ATTORNEY COMMUNICATION ONLY FOR USE BY THE INTENDED RECIPIENT.  ANY INADVERTENT RECEIPT SHALL NOT CONSTITUTE A WAIVER OF ATTORNEY-CLIENT OR WORK PRODUCT PROTECTION.  IF RECEIVED IN ERROR, PLEASE NOTIFY KARRIE S. WICHTMAN IMMEDIATELY AND DELETE THIS MESSAGE.  THANK YOU FOR YOUR COOPERATION.

---

**From:** Matt Martorello [mailto:mattm@bellicosevi.com]
**Sent:** Friday, October 10, 2014 11:47 AM
**To:** Tanya Gibbs
**Cc:** Karrie Wichtman
**Subject:** FW: AG letters

Hi Tanya, I am curious what level of response have these been met with from LVD and even more so, if any subsequent replies were received from the States.  It seems that the authors of these letters is a big part of the bigger push on federal regulators, and that candid educational communications (even if they end in disagreement) would be a very valuable tact to educating these states about sovereign rights.  I'm wondering if we can ask LVD to take a more consultative approach state by state to try to get to MOUs and other agreements.

CONFIDENTIAL

Anyway, some of these letters demand replies and other commentary, which I believe is always provided.  Have we ever received a response after that?  I'd like to see the message in those replies after they get ours.  Have we ever received any or do they get our reply and then go silent thereafter?

---

**From:** Brian McFadden
**Sent:** Friday, October 10, 2014 10:47 AM
**To:** Matt Martorello
**Subject:** FW: AG letters

This is not all of them, but most.

---

**From:** Spring Holtz [mailto:sholtz@rosettelaw.com]
**Sent:** Friday, October 10, 2014 10:40 AM
**To:** Brian McFadden
**Cc:** Tanya Gibbs
**Subject:** RE: AG letters

Attached are the AG Letter I found that we had on file.  I am send Tanya a list of the ones I could not find to see if she can locate them. Also, there are 2 on the list without names, only a date.



**Spring Holtz, Administrative Assistant**
**Rosette, LLP**
**Attorneys at Law**

Michigan Office
25344 Red Arrow Hwy., Ste. B
Mattawan, MI  49071
269.283.5005 – Office
517-913-6443 – Fax
sholtz@rosettelaw.com
www.rosettelaw.com

CONFIDENTIAL COMMUNICATION: THIS MESSAGE IS A CONFIDENTIAL ATTORNEY COMMUNICATION ONLY FOR USE BY THE INTENDED RECIPIENT.  ANY INADVERTENT RECEIPT SHALL NOT CONSTITUTE A WAIVER OF ATTORNEY-CLIENT OR WORK PRODUCT PROTECTION.  IF RECEIVED IN ERROR, PLEASE NOTIFY SPRING HOLTZ  IMMEDIATELY AND DELETE THIS MESSAGE.  THANK YOU FOR YOUR COOPERATION.

---

**From:** Brian McFadden [mailto:BrianM@bellicosevi.com]
**Sent:** Thursday, October 09, 2014 2:49 PM
**To:** Tanya Gibbs
**Cc:** Spring Holtz
**Subject:** RE: AG letters

I only need the 18 outlined below for now.

| Date received | PPC/CPD | App# | Name | Issue | Current Status | |
|---|---|---|---|---|---|---|
| 3/12/2014 | CPD | 59653230 | Antoinette Jenkins | AG Letter | Legal Letter sent via USPS | CT |
| 4/1/2014 | CPD | 59945036 | Cherie Madore | AG letter | Legal Letter sent via USPS | CO |
| 5/12/2014 | CPD | 59947207 | Jennifer Westburg | AG letter | Legal Letter sent via USPS | OR |
| 5/7/2014 | CPD | 59619771 | Joseph Beck | AG letter | Legal Letter sent via USPS | AZ |
| 11/13/2013 | CPD | 59636813 | Juanito Vargas | AG letter | Legal Letter sent via USPS | NJ |
| 4/21/2014 | CPD | 57164175 | Kathleen Pfeiffer | AG letter | Legal Letter sent via USPS | MA |
| 1/21/2014 | CPD | 59584728 | Linda Lazier | AG letter | Legal Letter sent via USPS | NJ |

CONFIDENTIAL

JA1110

| 12/24/2013 | CPD | 59740851 | Luther Sullivan | AG letter | | Legal Letter sent via USPS | CT |
| 11/13/2013 | CPD | N/A | N/A | AG letter | | Legal Letter sent via USPS | MA |
| 12/27/2013 | CPD | N/A | N/A | AG letter | | Legal Letter sent via USPS | MA |
| 12/27/2013 | CPD | 57161159 | Notawyah Smith | ag letter | | Legal Letter sent via USPS | CT |
| 9/2/2014 | CPD | 57221524 | Pamela Zuckerman | District Attorney letter | | Legal Letter sent via USPS | MA |
| 7/28/2014 | CPD | 59812149 | Richard Prokop | ag letter | | Legal Letter sent via USPS | PA |
| 10/15/2013 | PPC | 588676 | Stephanie Swesey | AG letter | | Legal Letter sent via USPS | AZ |
| 1/29/2014 | CPD | 60002676 | Steve Lewis | AG letter | | Legal Response created | NC |
| 6/19/2014 | PPC | 503855 | Teresa Mayes | AG letter | | Legal Letter sent via USPS | CT |
| 6/19/2014 | CPD | 59782840 | Teresa Mayes | AG letter | | Legal Letter sent via USPS | ct |
| 2/25/2014 | CPD | 59999576 | Tonya Feimster | AG letter | | Legal Letter sent via USPS | NC |

**From:** Brian McFadden
**Sent:** Thursday, October 09, 2014 2:36 PM
**To:** 'Tanya Gibbs'
**Cc:** Spring Holtz
**Subject:** RE: AG letters

Yes I can get her access, but I am going to be updating the process and pulling out of Hyper Office to a new and better system.

If I gave you a list of the AG letters I need would that be easier? It should cut the number down by about 1/2

**From:** Tanya Gibbs [mailto:TGibbs@rosettelaw.com]
**Sent:** Thursday, October 09, 2014 1:19 PM
**To:** Brian McFadden
**Cc:** Spring Holtz
**Subject:** RE: AG letters

Ok. This might take a few days, just FYI...there are a lot of them. Also, is it possible to get Spring access to Hyperoffice? I'd like her to keep me on track in responding to these things.

Spring, please locate the files and scan the AG letters to Brian and copy me on it.

Thanks!

**Tanya M. Gibbs, Attorney** 
**Rosette, LLP**
**Attorneys at Law**
Michigan Office
25344 Red Arrow Hwy, Suite B
Mattawan, MI 49071
269.283.5005 – Office
480.204.8009 - Cell
517.913.6443 – Fax
tgibbs@rosettelaw.com
www.rosettelaw.com

CONFIDENTIAL COMMUNICATION: THIS MESSAGE IS A CONFIDENTIAL ATTORNEY COMMUNICATION ONLY FOR USE BY THE INTENDED RECIPIENT.  ANY INADVERTENT RECEIPT SHALL NOT CONSTITUTE A WAIVER OF ATTORNEY-CLIENT OR WORK PRODUCT PROTECTION.  IF RECEIVED IN ERROR, PLEASE NOTIFY TANYA M. GIBBS IMMEDIATELY AND DELETE THIS MESSAGE.  THANK YOU FOR YOUR COOPERATION.

**From:** Brian McFadden [mailto:BrianM@bellicosevi.com]

CONFIDENTIAL

**Sent:** Thursday, October 9, 2014 1:17 PM
**To:** Tanya Gibbs
**Cc:** Spring Holtz
**Subject:** RE: AG letters

All I need is the letters from the AGs.

---

**From:** Tanya Gibbs [mailto:TGibbs@rosettelaw.com]
**Sent:** Thursday, October 09, 2014 1:16 PM
**To:** Brian McFadden
**Cc:** Spring Holtz
**Subject:** RE: AG letters

Ok. I'll be having our secretary find the files, scan and email them to you. I've copied her here. Do you need just the letters from the AG or would you like our responses too?

**Tanya M. Gibbs, Attorney**
**Rosette, LLP**
**Attorneys at Law**
Michigan Office
25344 Red Arrow Hwy, Suite B
Mattawan, MI 49071
269.283.5005 – Office
480.204.8009 – Cell
517.913.6443 – Fax
tgibbs@rosettelaw.com
www.rosettelaw.com

CONFIDENTIAL COMMUNICATION: THIS MESSAGE IS A CONFIDENTIAL ATTORNEY COMMUNICATION ONLY FOR USE BY THE INTENDED RECIPIENT.  ANY INADVERTENT RECEIPT SHALL NOT CONSTITUTE A WAIVER OF ATTORNEY-CLIENT OR WORK PRODUCT PROTECTION.  IF RECEIVED IN ERROR, PLEASE NOTIFY TANYA M. GIBBS IMMEDIATELY AND DELETE THIS MESSAGE.  THANK YOU FOR YOUR COOPERATION.

---

**From:** Brian McFadden [mailto:BrianM@bellicosevi.com]
**Sent:** Thursday, October 9, 2014 1:10 PM
**To:** Tanya Gibbs
**Subject:** RE: AG letters

Last oct.

---

**From:** Tanya Gibbs [mailto:TGibbs@rosettelaw.com]
**Sent:** Thursday, October 09, 2014 12:11 PM
**To:** Brian McFadden
**Subject:** RE: AG letters

We should have files with them. Do you need them from January 2014 or from last last October 2013?

**Tanya M. Gibbs, Attorney**
**Rosette, LLP**
**Attorneys at Law**
Michigan Office
25344 Red Arrow Hwy, Suite B
Mattawan, MI 49071
269.283.5005 – Office
480.204.8009 - Cell
517.913.6443 – Fax
tgibbs@rosettelaw.com
www.rosettelaw.com

CONFIDENTIAL COMMUNICATION: THIS MESSAGE IS A CONFIDENTIAL ATTORNEY COMMUNICATION ONLY FOR USE BY THE INTENDED RECIPIENT.  ANY INADVERTENT RECEIPT SHALL NOT CONSTITUTE A WAIVER OF ATTORNEY-CLIENT OR WORK PRODUCT PROTECTION.  IF RECEIVED IN ERROR, PLEASE NOTIFY TANYA M. GIBBS IMMEDIATELY AND DELETE THIS MESSAGE.  THANK YOU FOR YOUR COOPERATION.

---

**From:** Brian McFadden [mailto:BrianM@bellicosevi.com]
**Sent:** Thursday, October 9, 2014 12:06 PM
**To:** Tanya Gibbs

CONFIDENTIAL

JA1112

**Subject:** AG letters

Tanya,

Do you have copies of all the AG letters received by CPD and PPC in the last year? I need to get a copy of them. I'm working on a new solution that is much better than the Hyper Office system that we use now.

Thanks,

**Brian McFadden**
875 Carretera 693, Suite 203 | Dorado, PR 00646
Mobile: 616-405-4578
Email: BrianM@BellicoseCapital.com



**This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

**This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

**This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

**This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

**This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

**This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

**This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

**This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

**This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

# Exhibit 23

| From: | Karrie Wichtman |
|---|---|
| To: | Matt Martorello |
| Cc: | Justin Martorello; "gkway@lvdtribal.com"; Jimmer; Saba Bazzazieh; Robert Rosette |
| Subject: | RE: WSJ Press |
| Date: | Tuesday, November 04, 2014 10:25:20 AM |
| Attachments: | image001.jpg |

Matt,

Below is the statement that was released to the press last Friday.  Unfortunately, as you can see from the WSJ article much of the tribal sovereignty language was not used.  What is released and what is reported are often two different things.  I agree that statements in the opinion are strong and that we are on the best footing that we have ever been. The matter was not ever litigated on the merits.   The bottom line is that many don't really understand what happened from a procedural stand point and no amount of message crafting could get them there.  The statement issued by my firm indicates all of the reasons that this case was a victory and even that needed to be tempered in order for us to gain the support of Indian law scholars and others to begin to more appropriately fight the public policy debate.  To attempt to run a story that hailed victory for the Tribes when they were actually dismissing the lawsuit would have gotten us a significant amount of bad press and so the option was to … go quietly into the night and restructure based on what we know from the opinion in order to build an even stronger case for future litigation.  Attempts were made after the release to remove the pay day language through explaining the products offered to which the WSJ refused.  As for the NY DFS spokesperson, I would not expect anything less – and the Court's ruling clarifies nothing at all with regard to NY regulatory authority.  I will be sure to loop you in on any future discussions planned for response to the article.  Your perspective is welcome and needed.

# Statement: Tribal Chairmen Update on E-Commerce Litigation with New York

*Appeals Court Opinion a Significant Recognition of Native American Sovereign Rights; Considerable Resources Required Prevent Continuing Further*

NEW YORK, NY (October 31, 2014) – John Shotton, Tribal Council Chairman of the Otoe-Missouria Tribe of Indians, and James Williams Jr., Tribal Council Chairman of the Lac Vieux Desert Band of Lake Superior Chippewa Indians, co-plaintiffs in the case Otoe-Missouria Tribe et al v. New York State Department of Financial Services et al (No. 13-cv-5930), made the following joint statement:

"The recent ruling by the Second Circuit of the United States Court of Appeals in our litigation filed last year against the state of New York was a pivotal recognition of sovereign rights for our Tribes and all Indian Nations. The court's opinion recognized and affirmed the important Tribal interests at play, the legitimacy of our Tribal businesses, and the need to balance the interests of two sovereigns. However, the case has consumed considerable resources, and while our Tribes will remain resilient despite the State of New York's targeted attack, after careful consideration the Otoe-Missouria Tribe and the Lac Vieux Desert Band of Lake Superior Chippewa have decided to dismiss the litigation.

"While we hoped when we first pursued this action that we would be able to quickly undo the damage caused and avoid a prolonged and material interruption to our businesses, the fact of the matter is the state's unjust interference in the businesses of the Tribes have caused irreparable harm that further legal proceedings would simply be unable to remedy.

"E-commerce remains an essential tool for Native American tribes, many of whom reside on remote reservations that limit opportunities for economic development. Vital social programs provided by tribes, including health care, elder care, education, nutrition assistance, housing, and more, are dependent on the revenues of our tribally-owned businesses. E-commerce represents the future for Indian country, and we intend to continue to operate in all areas where we determine it is in the interests of our businesses as authorized and regulated by Tribal law, consistent with federal consumer protection laws and the expressed goals of the federal government regarding promotion of tribal economic development. We will also continue to seek the support of relevant federal agencies to assist us in ensuring the longevity of our businesses, thereby fulfilling the federal government's trust responsibility to the Tribes.

"We strongly believe the actions of the state of New York do not comport with long established legal precedent and federal law regarding Native Americans' sovereign rights, and in the importance of continuing to ensure those rights remain preserved. We are pleased that the U.S. Court of Appeals recognized and reaffirmed the importance the significant interests of Indian Country in economic development and the novel issues presented when Tribes engage in e-commerce."

###

**Media Contact:** Brian Bartlett
brianbartlett@rational360.com
(202) 236-2144


Sincerely,


Karrie S. Wichtman, Partner
ROSETTE, LLP
Michigan Office
Attorneys at Law
25344 Red Arrow Highway
Mattawan, Michigan 49071
269.283.5005 Office
517.913.6443 Facsimile
480.242.6959 Cell
kwichtman@rosettelaw.com
rosettelaw.com

CONFIDENTIAL COMMUNICATION: THIS MESSAGE IS A CONFIDENTIAL ATTORNEY COMMUNICATION

ONLY FOR USE BY THE INTENDED RECIPIENT.  ANY INADVERTENT RECEIPT SHALL NOT CONSTITUTE A WAIVER OF ATTORNEY-CLIENT OR WORK PRODUCT PROTECTION.  IF RECEIVED IN ERROR, PLEASE NOTIFY KARRIE S. WICHTMAN IMMEDIATELY AND DELETE THIS MESSAGE.  THANK YOU FOR YOUR COOPERATION.

---

**From:** Matt Martorello [mailto:mattm@bellicosevi.com]
**Sent:** Tuesday, November 4, 2014 10:06 AM
**To:** Karrie Wichtman
**Cc:** Justin Martorello; 'gkway@lvdtribal.com'; Jimmer
**Subject:** WSJ Press

Certainly not the splash for public it could've been, this more likely works against the industry than for it.  There were so many comments by the panel that outright demonstrate the legality of tribal lending that could've been touted as victorious, but NY gets to win on that front with their comment below about appeals court.  It needed to be said, b/c the credit bureaus and banks will never read the case, they'll just read what's below... "it was a baseless attempt to overturn what the court had already decided in NY's favor"...  I wouldn't call this message properly handled by the professional PR team at all.  I think if I'm a banker, I read this as worse, when in fact those that read and know all the commentary that was not highlighted in the message (like us) know it was actually a rather victorious decision in many respects.  The rest of the world needed to keep the businesses alive don't get the hear that:

## Wall Street Journal: Tribes Drop Payday-Loan Suit Against New York State

Two Indian tribes with online lending operations on Friday said they are dropping a lawsuit filed against New York state, abandoning an effort to block the state from restricting their businesses.

New York's top banking regulator, Benjamin Lawsky , last year urged banks in his state to stop processing payments for lenders that violate the state's cap on interest rates.

The Oklahoma-based Otoe Missouria Tribe and Michigan-based Lac Vieux Desert Band of Lake Superior Chippewa Indians responded with a federal lawsuit against the state, arguing New York's campaign against payday lenders was trampling on their rights as sovereign tribes.

The tribes said their operations are located on reservation land and not subject to oversight by any state. But the tribes suffered a setback in October when a federal appeals court denied a temporary injunction that would have barred New York from restricting tribal lending while their case was litigated.

In a joint written statement Friday, the tribes said the case had "consumed considerable resources" over the past year.

"While we hoped when we first pursued this action that we would be able to quickly undo the damage caused and avoid a prolonged and material interruption to our businesses, the fact of the matter is the state's unjust interference in the businesses of the tribes have caused irreparable harm that further legal proceedings would simply be unable to

CONFIDENTIAL

JA1117

remedy," the tribes' chairmen, John Shotton and James Williams Jr. , said.

"We are pleased they intend to drop their baseless litigation after the appeals court ruled that New York has the clear power to enforce its laws," said Matt Anderson, a spokesman for Mr. Lawsky.

Tribes say they have turned to lending as a way to foster economic development and alleviate poverty. But online lending by tribes have faced opposition from officials in states such as New York that have laws banning or limiting payday loans.

**Regards,**

**Matt Martorello**
Mobile: 773-209-7720
Email: mm@BellicoseVI.com



**This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

CONFIDENTIAL

# Exhibit 24

**To:**       manish.goyal@aranca.com[manish.goyal@aranca.com]
**From:**     Matt Martorello
**Sent:**     Wed 12/7/2016 2:22:14 PM
**Subject:**  RE: PR Hybrid

I'd like to supplement this to keep you up to speed... Do you have any experts on staff in this area who could be helpful to figuring out tax treatment on all of this in addition to the asset by asset valuations? Thinking about 2012, 3 ways this 7.7mm liquidation value could go.
1) Customer Contracts, if in reviewing the agreement I take the position that they owned all IP, not me. I've waffled on this one thinking back further... Tax treatment = Potentially Section 936 Operating Intangible, may or may not be subject to ATB election (all very material, could be 100% US sourced Ordinary Income instead of bifurcated to PR day count at 0%, and capital gains for US day count)

2) A series of IP, and to a lesser extent maybe the customer contract. if I owned the IP... Tax Treatment = asset by asset where maybe some is Operating Intangible again.

3) Goodwill, which sounds a lot like customer contract in this instance, but perhaps it is something more. Perhaps it is "potential" of the business... Tax treatment = based on where it's created, definition of created is still unclear

Based on what we know, we now have to decide which of the 3 were prevalent here, and that seems much more of an art form than a science.

Like to nail down the tax treatment of each while we continue reviewing classifications closely.


-------- Original message --------
From: Matt Martorello <matt@liontllc.com>
Date: 12/6/16 5:07 PM (GMT-04:00)
To: manish.goyal@aranca.com
Subject: FW: PR Hybrid

 Hi Manish, I recently did a deep dive to see what potential IP existed as part of the $7.7mm miscellaneous "liquidation value" and came up with a lot of clarity I think.  Let me know your opinion on IP ownership, GW, and $7.7mm being 100% customer contracts:

## 2012 Potential for Intangible Assets:

**About IP**:  The client/Tribe often argued with me that they view all of the IP and data as their property.  They strongly believed that SPVI was paid to create the IP for them, and to facilitate them in using it.  Early on, I agreed with their position, but in 2014 I argued opposite to that (as I wanted to sell the business, it felt pretty pertinent).  Now, reading the contracts, nothing is stated about IP, but it is very clear in Section 4.2 that SPVI is hired for the service of creating all of these business methods for the Tribe.  It appears pretty clear that the Tribe was correct, in that the IP created to service their business, was always their property.

As such, I am of the opinion that the only IP of any relevance was the contracts with the clients.  With that, I'm not sure there could have been any GW, since this was 1 contract/client business (1 tribe with 2 portfolios) and there was no public face at all to the business (i.e. no reputation value).  The value of the repeat customers/reputation, is really identified directly as these 2 servicing contracts.  Such that, putting the value on these servicing contracts and having GW, would sound redundant.  I think this is supported by the

JA1120

CONFIDENTIAL

MARTORELLO_011445

DT for some reason avoiding calling $7.7mm Goodwill. My inclination is that this all supports $7.7mm being classified entirely as "customer contracts".

**Summary of the Businesses:**

1) Bellicose

    a. (holding company) earns no income,

    b. Employer for 100% of the employees. Heavy majority of which worked solely on the SPVI contracts

2) SPVI (sub)

    a. Contracted with 3 clients to provide services to build/operate their businesses (2 of the same Native American Tribe).

    b. Provided managerial, technical and financial expertise for development of the clients' unsecured lending businesses.

    c. By separate contract, call center outsourcing services, project management and consulting services by marking up a contract SPVI had with LCI (call center in Philippines). LCI would charge about $5.60 an hour and we would bill clients at US rates of about $14.50 an hour (average was probably $120k every 2 weeks in billing of SPVI clients)

    d. It was estimated that the industry would be wiped out in Feb 2014 by the new CFPB, and/or operation chokepoint tactics.

        i. Accurately enough, the clients lost the ability to debit borrower bank accounts in January 2014 when their ACH provider was shut down with no warning as a direct result of Operation Choke Point. The clients were in default with their hedge fund, and very narrowly escaped massive disaster. One week later, the Tribes were able to get a new ACH provider. The clients made no loans for many months after out of fear banking would be fully cut off for good.

3) Iron Fence

    a. Lending entity, it borrows money from 3rd parties (and some from Bellicose too) and lends to the clients earning a 1% APR spread on the money if managed efficiently, which it often was not timed right to earn the spread.

    b. Maturity dates were 12/31/2018

4) ICA

    a. Provides consulting related to 2 deals, to affiliates:

JA1121

MARTORELLO_011446

    i.   One is to SourcePoint LLC (not to be confused with SPVI) for managing (consulting services) it's deal with a tribal casino in Oklahoma (Grand Lake Casino) where SP leased 230 slot machines to the tribe

    ii.   Other is to SP LLC for setting up an investment related to a casino boat venture

**To be considered as potential IP - by entity:**

A) SourcePoint VI, LLC:

    a.   Customer Contracts:

    i.   RRTL (LVD Tribe) and DCTF (LVD Tribe) were identical:

        1.   Termination Date – 12/31/18 (auto 2 year renewal, unless notified)

        2.   Assignable with consent of the Tribe

        3.   Payment to SPVI is performance based:

            a.   Tribe takes a distribution calculated as Sum of Gross Revenues plus Bad Debt Recovery, minus the sum of Charge Backs and Bad Debt Charge Off, and multiplying all of the foregoing by 2%. Remainder (if any) is SPVI's Servicing Fee.

            b.   SPVI promised a $20k/month minimum to the Tribe, several months SPVI earned nothing for revenues

        4.   RRTL cannot compete (given nature of the performance based servicing fee to SPVI)

    ii.   WMS – This business was being terminated immediately (Q1 2013), no valuation work was done by DT on this immaterial business relationship with SPVI

    b.   Hot Assets

    i.   Subject to careful review of Section 4.2 (unclear yet)

    c.   Company Books/Records?

    d.   Goodwill (Given the above… i.e. all of the value is the 2 customer contracts with just 1 party, I'm not sure this is possible to exist. There was no "reputation" value.)

B) Bellicose IP:

    a.   ALL employees were Bellicose employees (however, DT did NAV for BVI and therefore I'm not sure a valuation of the Management team is relevant)

    i.   Agreement existed b/w Bellicose and SPVI dated 1/1/13, but it was ignored (was supposed to be $80k/month).

JA1122

MARTORELLO_011447

    ii.   2014 we did $40k monthly fee and paid it from Jan 2014 and after

  b.   QA center over the outsourced call centers, located in St Croix (6 employees monitoring the outsourced call centers and training them better)

C)  Iron Fence Investments:

  a.   Relationship with OAF, LLC -  who provided debt to IFI, and in turn went to clients

  b.   Company Books/Records

D)  Tribe (listing this in case different interpretation is made for ownership of IP, based on read of the Servicing Agreement.  If there is, I can elaborate on below later):

  a.   U/W Methods – New Customers

  b.   U/W Methods – Returning Customers

  c.   Marketing Methods – New Customers

  d.   Marketing Methods – Returning Customers

  e.   Domain(s)?

  f.   Financial Forecasting, Budgets, Working Capital Management for Loan deployment of customers

  g.   SOPs to handle live customer leads and open loan accounts, at the call center level

  h.   Training Manuals for new employees

  i.   Collections Strategy for Bad Debt – Nothing unique, just a schedule of when to call folks post default and rules for how to address bad debt accounts and what is allowed for CSRs or Managers to settle with the customers

  j.   Vendor Relationships – All of these relationships can be obtained by just going to trade shows and visiting their booths, I don't believe there is anything material.  **All of these contracts at this time were between the 3rd party and SPVI, in order to protect SPVI, though reading the contract now I think I was supposed to ask their approval to have done that (i.e. subcontract for my services required their consent):**

    i.  Lead Providers

    ii.  Debt Buyers

    iii.  Underwriting data providers

    iv.  Outside call centers

JA1123

CONFIDENTIAL

MARTORELLO_011448

     v.   Loan Management Software

     b.   Compliance Management Manuals – Did not exist in 2012

---

**From:** Matt Martorello
**Sent:** Tuesday, December 6, 2016 2:03 PM
**To:** 'jbradley@buddlarner.com' <jbradley@buddlarner.com>
**Cc:** Zayra Emanuelli <zayra@liontllc.com>
**Subject:** PR Hybrid
**Importance:** High

Hi John,

I fear sending you the confusing opinion letter puts us several steps back to getting to some pressing issues. Here are the 2 most pressing issues, which I view as independent of the opinion letter:

This is about Goodwill created (or not created) in 2012, when I liquidated a C-Corp that I was sole shareholder of, and continued the basis (with adjusted basis) personally, through the disregarded entity Bellicose Capital, LLC (the entity later assigned into the Hybrid in 2015). Only the 2012 liquidation of C-corp is relevant for these questions:

1)  #1 priority to figure out:
    a.   Could GW have existed from a liquidation of a business to myself in 2012?
      i.   Is that even possible for me to pay for "reputation of the business" when all I am doing is taking out all of the assets?
     ii.   PMA lawyer said on the last call, he doesn't think we could have GW in 2012 but he had to research it.
    iii.   BDO said today they don't think I'd have GW from the 2012 transaction. BDO also seemed to think to the extent GW represents repetition of customers, that it'd be captured for me in the value of my 2 servicing contracts (I only have 2 long-term clients)
    b.   The valuation team is beginning their asset-by-asset valuation today for 2012. Do we tell them that the sum of IP valuations they are doing must total $7.7mm (with or w/o GW, per outcome above)?:
      i.   $7.7mm is the "liquidation value" per Deloitte 2012 FMV study (attached), not sure why they did not call it GW. The accounting firm, in 2013 and 2014 called it GW for amortization purposes but they say it doesn't matter. It was never impairment tested.
     ii.   BDO's valuation people said today, under any circumstance, NAV including intangibles and GW MUST total the 7.7mm liquidation value so the values equate exactly to the DCF values that Deloitte performed.

So the fundamental question is, did any of that $7.7mm "liquidation value" equate to GW in 2012?

I'm attaching the 2012 return and 2012 DT valuation.

Best,

JA1124

CONFIDENTIAL

MARTORELLO_011449



**Matt Martorello** / President
773-209-7720 / **Matt@LiontLLC.com**

**Liont, LLC**
875 Carretera 693, Suite 202, Dorado, PR 00646
**http://www.LiontLLC.com**

This electronic mail, including any attachments, is confidential and intended solely for the use of the individual to whom it is addressed.  Use or distribution by any unintended recipient is prohibited. Please notify the sender immediately if you have received this email by error and delete this email and all attachments from your system.

JA1125

CONFIDENTIAL                                                                    MARTORELLO_011450

USCA4 Appeal: 23-2097      Doc: 11-3      Filed: 12/06/2023      Pg: 180 of 438

# Exhibit 25

JA1126

Message

---

**From**:      Matt Martorello [matt@liontllc.com]
**Sent**:      8/26/2015 3:13:30 AM
**To**:        Simon Liang [Simon@liontllc.com]
**CC**:        Zayra Emanuelli [zayra@liontllc.com]
**Subject**:   RE: Forecasts for Valuation


ECA – ignored
ICA – Once we get financials through July, we can easily do the forecast but ICA has 2 deals:
  1) Tribe in OK which has been in great legal conflict for 8 or 9 months, so we'll have to decide how to view that as a going concern
  2) SourcePoint, LLC has a contract with ICA to pay them about $9mm, but it never made a payment and seems unlikely that it will.  ICA already earned that and paid it's taxes on the income.  So I'm not sure this would be relevant.  Have to discuss with BDO I think. Zayra do you have this contract on file somewhere?
      a. ICA doesn't get paid from PBG right now, but something we can fix after we get the structure in proper order.
SPVI – Simon, please send the schedule of debt maturity dates going forward.  We have to look at the likelihood of those to renew and build that in.  Zayra, let's do a 5 year model and if we need to trim it back later we certainly can.  We should talk more with BDO about how to value in the CFPB rule, and even the expiration of the contract between SPVI and the Tribal client which I think is over in 2018 (Zayra please look up that contract)?  Anyone have the Servicing Agreement?  I'm sure the Tribe would want better terms at renewal, so have to discuss how to price that in too.
BC – this is easy and dependent on SPVI model first
BVI – also easy and dependent on SPVI model first

Zayra, have a look at the Aranca July 2014 409a valuations.  They ended forecasts at 2 years because they saw that either Operation Chokepoint (bank accounts and ACH processing gets shut off) or CFPB rule would end the business.  This was supported by news articles mainly.  Did BDO say that if the debt is less than 50% likely to renew that we should assume it expires?  I guess I didn't hear them say the same about Operation Choke Point and CFPB risk?  Is that so?  If that's the case, this is a model that only exists until the point at which the CFPB rule is projected to go into effect.  Which we can look up.

SPVI is the first priority, maybe we need a call Friday with BDO to discuss questions above for how we should do our modeling.  SPVI let's assume is going to be 5 years, but it's all based on a few things:
  1) the client's business which is 100% funded by Debt and 0% equity.  So if the debt goes away, they are over and SPVI is over.  Some of the debt certainly will not renew and getting more debt from new parties we definitely cannot assume in the models.
  2) Operation Choke Point may result in losing bank/ACH
  3) Lawsuits by AGs and regulators against SPVI, myself, or the client (as the reports and cases filed to date against competitors supports) may end the business or seriously shrink the business
  4) The business loses states every few months, meaning there will not be growth even if it were a going concern, but rather it'd be shrinking (i.e. PA, CT, CO were all major losses in 2014)
  5) CFPB rule was proposed which if implemented ends the business.
So let's start with 5 year going concern and then shrink it by these factors above.

---

**From:** Simon Liang
**Sent:** Monday, August 24, 2015 5:21 PM
**To:** Matt Martorello <matt@liontllc.com>
**Cc:** Zayra Emanuelli <zayra@liontllc.com>
**Subject:** Re: Forecasts for Valuation

CONFIDENTIAL PURSUANT TO
PARTIES' PROTECTIVE ORDER

Matt,

I agree that ECA can be ignored. I'm working on BC and BVI financials. I will also send you IFI financials which should be consolidated with SPVI or BC for valuation purposes. Attached are BC, SPVI, ICA forecasts for 1/1/14 and 7/1/14 valuations. Please let us know how do you think and we can update them accordingly.

Zayra, is Juan able to do anything with ICA and KH?

---

**From:** Matt Martorello
**Sent:** Monday, August 24, 2015 2:33 PM
**To:** Simon Liang
**Cc:** Zayra Emanuelli
**Subject:** Forecasts for Valuation

Hi Simon,

For the restructuring valuations, the following entities will be valued as of 6/30/15:

1)  Kairos Holdings, LLC
a.  Bellicose Capital, LLC (also as of 7/31/15 for Gallant PR)
b.  SourcePoint VI, LLC (also as of 7/31/15 for Gallant PR)
c.  Bellicose VI, LLC (also as of 7/31/15 for Gallant PR)
d.  Indian Country Analytics, LLC
e.  Eventide Credit Acquisitions, LLC

-Eventide we can forget about.
-Obviously we'll need financials of the others done through 7/31/15 and make sure the Balance Sheets have been cleaned up to avoid any tax inaccuracies.
-Also, we need forecasts for SPVI, BVI, ICA.  Do you have something a template you can provide for those?  Maybe based on the forecasts we did for the 2014 409a study for BCap?  Along with the 2013 Deloitte forecasts done for Indian Country Analytics?

Best,



**Matt Martorello** / President
773-209-7720 / **Matt@LiontLLC.com**
**Liont, LLC**
875 Carretera 693, Suite 202, Dorado, PR 00646
**http://www.LiontLLC.com**

CONFIDENTIAL PURSUANT TO
PARTIES' PROTECTIVE ORDER

Liont_05388

# Exhibit 26

**To:**        Ashish Rane[ashish.rane@aranca.com]
**Cc:**        Zayra Emanuelli[zayra@liontllc.com]
**From:**      Matt Martorello
**Sent:**      Fri 3/10/2017 4:33:58 PM
**Subject:**   RE: DRAFT memorandum regarding timing of evolution of CFPB rule
Memo regarding Small Dollar Rule history; Final 03-10-2017.docx

That was fast, final version attached for your records and incorporation to study/content

---

**From:** Matt Martorello
**Sent:** Friday, March 10, 2017 12:13 PM
**To:** 'Ashish Rane' <ashish.rane@aranca.com>
**Cc:** Zayra Emanuelli <zayra@liontllc.com>
**Subject:** FW: DRAFT memorandum regarding timing of evolution of CFPB rule

Wanted to get you the draft, some very minor edits may be coming later today or next week, but I think you'll find this very convincing as to why we thought (and data supported) "end of days in 2015" followed by 2016 suspecting we were in fact a "going concern" and **even at a competitive advantage** come Q2 2016!

You'll notice that the rule went from shutting everyone down, to shutting down the storefront payday product (meaning that entire demand and market opens up to online install, as a massive competitive advantage!)

As for Chokepoint, you'll see the data showing the choking off of transactional volume (a lot of fear prevalent in the markets). Followed by a very strong recovery in 2nd Half of 2015 and on into 2016. You could imagine, this isn't only about the lenders and their volume, but a debt provider whose borrower puts out 100% of the borrowed funds and then suddenly cannot access banking to get that money back, would certainly be jumping on the sidelines in 2014/2015.

---

**From:** Hackett, Rick [mailto:rhackett@hudco.com]
**Sent:** Friday, March 10, 2017 11:25 AM
**To:** Matt Martorello <matt@liontllc.com>
**Cc:** Tim Ranney (tranney@clarityservices.com) <tranney@clarityservices.com>; Hackett, Rick <rhackett@hudco.com>
**Subject:** DRAFT memorandum regarding timing of evolution of CFPB rule

Dear Matt

I attach a DRAFT of the memo you requested.
Please let me know if it is acceptable and I will issue it in final.
Thanks
Rick


Richard P. Hackett
Partner, Admitted in Maine
Hudson Cook, LLP
Direct: (207) 541-9556 | Cell:  (207) 210-3409
22 Free Street | Suite 205 | Portland, ME 04101

CONFIDENTIAL                                      MARTORELLO_011671

**HUDSON COOK**

The information contained in this transmission may be privileged and may constitute attorney work product. Any unauthorized review, use, disclosure or distribution is prohibited.  If you are not the intended recipient, please contact Richard Hackett at rhackett@hudco.com or (207) 541-9556 and destroy all copies of the original message and any attachments.

CONFIDENTIAL

MARTORELLO_011672



**HUDSON COOK**

Hudson Cook, LLP • Attorneys at Law • www.hudco.com

22 Free Street | Suite 205 | Portland, ME 04101
Direct: 207-541-9556 • Cell: 207-210-3409

rhackett@hudco.com

## PRIVILEGED AND CONFIDENTIAL MEMORANDUM

| | |
|---|---|
| **To:** | Matt Martorello |
| **From:** | Rick Hackett |
| **Date:** | March 9, 2017 |
| **Subject:** | History of Federal Regulatory Intervention in Small Dollar Lending |

Matt,

### Context

You have asked us to reconstruct the history of developments in federal regulatory intervention in the small dollar lending market during the period 2015-2016. We have particularly focused in this memo on the public pronouncements and the known stakeholder interactions of the CFPB, which has now proposed a rule that will significantly impact small dollar installment lenders like your business, as well as other markets such as storefront payday lending and auto title lending. We also review briefly the information we have regarding the impact of Operation Chokepoint, an effort of the Department of Justice (DOJ) and the federal prudential banking regulators. As you requested, our primary focus is the change in outlook for your online installment lending servicing business between the end of Q2 2015 and the end of January 2016.

Although your companies are clients of Hudson Cook LLP, this memorandum is not intended to provide any legal advice or opinion. This work has been prepared in our capacity as business consultants to Clarity Services, and is intended to provide an accurate record of activities in which we participated in that capacity. In addition, given the sensitive nature of the work of the Small Dollar Round Table (described below), you have agreed to limit distribution of this memorandum to company officials, consultants, attorneys and advisors who have a need to access this information in support of the company's dealings with relevant government authorities, as well as to those authorities themselves.

### Summary Conclusions

Beginning in the late fall of 2013, Operation Chokepoint severely threatened online lenders, who were faced with the loss of critical access to the payments system. This resulted both from "back channel" pressure on depository institutions by bank examiners who "blacklisted" high rate lenders and from pubic attacks by DOJ in the *Four Oaks* case. We can observe the resulting negative effects in transaction flow of lender business that we have studied in our work with Clarity Services. However, by late 2015 that transaction flow appears to have recovered substantially, suggesting that the pressure on lender access to banking services had diminished by the end of 2015.

Of greater significance, the CFPB's publication of its Outline of Proposals for Payday, Auto Title and Similar Loans ( "SBREFA Outline") on March 26, 2015 sent shock waves through the affected industries. By mid-2015 available information about CFPB intentions suggested that single payment (payday) lenders would be put out of business completely and online lenders of all types would face insurmountable regulatory requirements to document

HC#
*Attorney-Client Communication*

Hudson Cook, LLP
*Confidential & Privileged*

CONFIDENTIAL

MARTORELLO_011673



**HUDSON COOK**

Hudson Cook, LLP • Attorneys at Law • www.hudco.com

consumer ability to repay (ATR). However, subsequent to the SBREFA hearing in April 2015, the CFPB engaged extensively with industry to obtain practical input into the process of refining its SBREFA Outline into a detailed rule. That input ultimately resulted, in June 2016, in a set of proposals that clearly favored online installment lenders who had the ability and history of using automated data inputs to underwrite loans, and clearly disfavored storefront single payment lenders, who utilize little or no underwriting. This memo reviews the history of public, but not published, interactions with the Bureau that led to a more optimistic view of online installment lender prospects by early 2016. We understand that you were privy to these developments indirectly, as a customer of Clarity Services. Clarity was an active and continuing participant in the regulatory interactions described below.

*Operation Chokepoint*

We have published detailed information about the effects of Operation Chokepoint on the online lending market, in our capacity as consultants to Clarity Services. In that capacity, we have access to de-identified versions of the Clarity production database. That database contains the history of hundreds of millions of loan applications and tens of millions of loan transactions of hundreds of small dollar lenders, mostly online. Our work is published at www.nonprime101.com.

Our first review of the results of Operation Chokepoint was published in February, 2015. See the link below.[1] Our data in 2015 showed a significant loss of business by online lenders correlating with the first reports of Operation Chokepoint activities. That loss affected online installment lenders most severely, because those lenders must rely on ACH access to consumer accounts to receive payments over an extended period of time. The mere threat of a future interruption of ACH access by the ODFI (the bank of account for the lender) would force curtailment of new loans. Since Chokepoint was completely opaque, taking the form of secret pressure by bank examiners on depositories, that was unpredictable as to timing, the threat to a longer term lender was impossible to quantify, but severe. This opacity and uncertainty necessarily affected the ability of lenders to obtain funding for ongoing operations from capital sources.

Our 2015 data showed the results on the market in Figure 1:

**FIGURE 1: COUNT OF LOANS BY TYPE BY QUARTER**

---

[1] **https://www.nonprime101.com/wp-content/uploads/2016/07/Regulatory-Intervention-Report-4-v2-3415.pdf**

JA1133

CONFIDENTIAL                                                                            MARTORELLO_011674

# HUDSON COOK

Hudson Cook, LLP • Attorneys at Law • www.hudco.com

## TRIBAL LENDERS



As you can see from Figure 1, Operation Chokepoint began in the fall of 2013 and severely impacted all tribal originated online loans, with the greatest impact on installment loans. At the time of our study in early 2015, there was no indication of recovery of online installment business.

We recently had occasion to conduct a new study of online lending volumes, this time tracking trends for a group of lenders who have been customers of Clarity for at least 3 years. Unlike the data shown above, this study includes both tribal lenders and state licensed online lenders. As shown in Figure 2, online lending has recovered significantly from the effects of Chokepoint, even though some lenders continue to report difficulties maintaining multiple banking relationships.

**Figure 2: Growth of Count of Online Loans Quarterly 2013-2016; Q1 2013 = 100**

JA1134

CONFIDENTIAL                                                                    MARTORELLO_011675

# HUDSON COOK

Hudson Cook, LLP • Attorneys at Law • www.hudco.com



As seen in Figure 2, our mix of tribal and state-licensed online installment lenders showed the severe business dip seen on our study of tribal lenders in 2013-2014. By Q2 2015, however, that retrenchment ended and began a sustained recovery, although it was not clear the recovery was continuous until the end of 2015. Our data also shows a reduction in online installment volume in 2016. Even in 2016, however, the market retained volume that is 400% of the levels of Q1 2014, the worst point in Choke Point. Our data suggests that reductions in 2016 volumes reflect tighter credit criteria and not reduced demand. We will publish a paper on this issue in April 2017.

The market data above reflects the state of public information about Operation Chokepoint by early 2016. DOJ did not file additional cases after *Four Oaks.* In additional, Congressional pressure was placed on DOJ and the prudential banking regulators by legislators who strongly opposed non-transparent attempts to harm lawful businesses through the secret supervisory process.

Thus, by January 2016, it was reasonable to conclude, and the market had concluded, that the threat presented by Operation Chokepoint had run its course – or was at least manageable.

### *CFPB Rulemaking*

From the publication of its first data study on storefront payday lending in April 2013, the CFPB had telegraphed that it was severely troubled by consumer use patterns in single-payment or payday loans. The publication of the SBREFA Outline in March 2015, however, was the first formal indication that the Bureau planned to regulate other liquidity products such as installment loans and title loans.

The approach of the SBREFA Outline was necessarily broad brush and non-specific. The SBREFA process requires providing just enough information to put small businesses on notice of the potential scope of a future rulemaking, in order to allow them to participate in a public hearing through "Small Entity Representatives" chosen by the CFPB.

JA1135

CONFIDENTIAL                                                                   MARTORELLO_011676



HUDSON
COOK

Hudson Cook, LLP • Attorneys at Law • www.hudco.com

The SBREFA outline was fairly specific, however, in its description of proposed underwriting requirements. It suggested that lenders would be required to compute consumer cash flows in order to demonstrate ATR for a loan. The lender would need to show computations demonstrating that the consumer's income was sufficient to pay existing legal obligations, costs of living, and the new loan payment, without being cash-flow negative in any pay period over the term of the loan. More significant for online lenders, the SBREFA Outline suggested that lenders would need to manually review proof of income, and proof of obligations such as residential leases and child support orders. Given the small dollar amounts involved, the outlined requirements involved costs that would outweigh the revenues from the loans involved.

Such was the state of play in June 2015.

As we now know, the CFPB significantly moderated the ATR approach in its actual proposed rule in June 2016. It authorized use of images of income documents and even use of databases built off of such images to verify income. It also authorized "screen scraping" of bank account information showing income. More important for the online installment industry, it clarified that proof of a consumer's existing obligations need only involve consumer-stated information (which can be collected easily in an online application) and verification of that information through automated data feeds, namely a major bureau credit report and a specialty credit report (the latter covering small dollar lending). Finally, information regarding a consumer's living expenses could be proxied by using publicly available datasets, such as those published by the Bureau of labor Statistics (BLS).

The ramifications for online installment lenders of the June 2016 evolution of CPFB thinking were strongly positive. Online installment lenders are already adept at utilizing automated data feeds for underwriting. In addition, commercially available products to combine those feeds with BLS proxies to produce a "regulatory ATR" analysis were announced shortly after the June rule proposal.[2] While it was likely that some current customers of online installment lenders could not pass a regulatory ATR test, it was also likely that most of the storefront payday customers would be denied that product as a result of the rule.[3] Those customers who were pushed out of the storefront payday market, however, would very likely qualify for the smaller payments of an installment loan.[4]

In short, the Bureau's ultimate proposal was workable for online installment lenders, in a way that the SBREFA Outline was not, and the rule proposal also promised to displace a large number of storefront payday customers into the online installment market.

We understand your ultimate question to be: was it reasonable to predict this outcome in January 2016? We believe a knowledgeable observer of the regulatory interaction at that time would say "yes."

*What Industry Insiders Knew Before June 2016*

Beginning as far back as 2011, when I served as Assistant Director of the CFPB responsible for the small dollar market, CFPB sought regular interaction with small dollar lender trade associations and major market participants. CFPB also regularly interacted with consumer advocate groups about small dollar lending, including Pew Research,

---

[2] See, for example, Clarity Services ClearAbility product.
[3] The storefront payday industry would almost certainly contract by over 80% under the rule, and perhaps disappear entirely except in large cities, given the significant overhead costs of the bricks and mortar channel.
See **https://www.nonprime101.com/wp-content/uploads/2017/02/report-9-updated.pdf**
[4] See **https://www.nonprime101.com/wp-content/uploads/2017/01/Report-8-Can-Storefront-Payday-Borrowers-Become-Installment-Loan-Borrowers-Web-1.23.pdf**

JA1136

CONFIDENTIAL                                                              MARTORELLO_011677



HUDSON COOK, LLP • Attorneys at Law • www.hudco.com

National Consumer Law Center, The Center for Responsible Lending, The National Council of La Raza and others. CFPB's purpose included informing the stakeholders of the results of ongoing research, receiving input on related research and policy arguments, and understanding business realities in the affected markets. CFPB's overarching purpose was to continue the availability of small dollar credit, but in a much safer and sustainable form than the market currently provided. CFPB also sought to promote dialogue between stakeholders, believing its job would be made easier and less controversial, to the extent that principles and approaches could be hammered out that were acceptable to both industry and consumer advocates.

In view of CFPB's approach, a group of online installment lenders as well as selected vendors to the industry (including Clarity Services), reached out to the consumer advocate groups identified above and invited them to participate in a series of round tables to discuss the impending rule. Encouraged by a non-partisan moderator hired to lead the group, many of the consumer advocates joined that effort.

The "Small Dollar Roundtable (SDR)," as it came to be known, began meeting in December 2014. By February 2015, it scheduled its first joint meeting with Bureau officials and rule writers. Some of the early concepts from that time period showed up in the SBREFA outline.

Soon after the April, 2015, SBREFA hearing, the CFPB reached out to the SDR for another meeting. Among other things, the Bureau sought industry ideas on how their ATR approach could be made workable in the real world of automated underwriting. By the fall of 2015, the SDR had met a half dozen times and had agreed on underwriting principles. Those presented to the CPFB in **October 2015**, included the following:

"The Small Dollar Roundtable supports the use of third party verification of income and expenses:

- The CFPB regulation should allow lenders to use non-paper based electronic information feeds to make underwriting decisions, to the extent that such information is from third party transaction or other business records, and not solely from self-certified consumer information.

- Permissible electronic sources should include commercial or governmental records maintained in the ordinary course, provided the lender reasonably believes they are reliable.

- Third party transaction information is permitted as long as it is generated from customer transactions.

The Small Dollar Roundtable supports the use of third party statistical proxies for calculating expenses, where no electronic feed of customer-specific information is available. As an example, BLS or census data for housing expense would be reasonable proxy where no mortgage exists, provided that the proxy is made specific to the consumer's residential location (e.g., census tract or Zip+4). Proxies may not be used for income verification."

The foregoing approaches all made their way into the June 2016 rule proposal.

While the CFPB provided no formal assurance that it would follow these suggestions in 2015, this writer felt it was likely that CFPB would be heavily influenced by the SDR's recommendation. The SDR's input

JA1137

CONFIDENTIAL                                                              MARTORELLO_011678



**HUDSON COOK**

Hudson Cook, LLP · Attorneys at Law · www.hudco.com

provided both (a) a workable way to achieve CFPB goals of low-cost in-depth underwriting (at high speeds), and (b) a solution that many consumer advocates thought was sufficient in reducing risks to consumers. Based on this logic, in 2015 Clarity Services accelerated its plans to build an automated ATR system based on the foregoing principles and shared those plans with its customers – as well as its optimism that the system approach would fit the rule proposal.

We understand that your company was one of the Clarity customers who was brought into the loop on these developments in late 2015.[5] If that is the case, then you had a reasonable basis in early 2016 to conclude that there was a good opportunity for business continuation under the impending CPFB rule proposal – indeed the rule might increase your business due to its unfavorable treatment of storefront payday lending.

---

[5] The SDR activities were necessarily confidential amongst the participants in 2015, although they were revealed in general terms in the CFPB's rule proposal. The details set forth herein are confidential, and you are not authorized to share them except as provided in the second paragraph of this memorandum.

HC#                                          7 of 7                                Hudson Cook, LLP
*Confidential & Privileged*

JA1138

CONFIDENTIAL                                                              MARTORELLO_011679

Exhibit 27

| | |
|---|---|
| **From:** | Matt Martorello |
| **To:** | Karrie Wichtman; John L. Williams |
| **Cc:** | Justin Martorello; Tanya Gibbs; Brian McFadden |
| **Subject:** | RE: AT BPL SA |
| **Date:** | Thursday, January 14, 2016 3:34:16 PM |

The Lenders care about the person who runs the business of AT.  If the Transaction Docs are clear that the position in question and under scrutiny to the lenders is President and CEO (Brian), then I think we're OK.  As far as I know, the Manager's don't really do anything...  I defer to John on what the TD's say if that jives, and what the authority is of BMF vs the Managers, but if Managers are really only involved per the OA to get feedback from the CEO/President then seems OK.  If they do more than that, or if the TD's say the position of concern are the Managers then we'd have some cleaning up to do.

---

**From:** Karrie Wichtman [mailto:kwichtman@rosettelaw.com]
**Sent:** Thursday, January 14, 2016 5:47 PM
**To:** John L. Williams <JWilliams@cwlaw.com>
**Cc:** Justin Martorello <justinm@bellicosecapital.com>; Tanya Gibbs <tgibbs@rosettelaw.com>; Matt Martorello <mattm@bellicosecapital.com>; Brian McFadden <BrianM@bellicosevi.com>
**Subject:** Re: AT BPL SA

I'll take a look. I haven't looked at the AT docs in a while. I seem to remember Brian was appointed at Matt's direction as President but the Co Mrg were still Shelly and the Chairman. This was understood and fine when AT was created I don't really understand the issue. Collateral is protected under the agreements not positions or people. What has changed?

Sent from my iPhone

On Jan 14, 2016, at 4:12 PM, John L. Williams <JWilliams@cwlaw.com> wrote:

> Karrie,
>
> The Operating Agreement puts all the power in the hands of the Manager.  The office of President is not mentioned from what I can see.  Shouldn't Brian, as President, be the Manager of that sub?  If so, that's not the way the resolution is written.  Let me know what you think.  John.
>
> John L. Williams
> Partner
> <image001.png>
> CONNER & WINTERS, LLP
> Attorneys & Counselors at Law
> 4000 One Williams Center
> Tulsa, OK 74172-0148
> P 918.586.8990
> F 918.586.8674
> jwilliams@cwlaw.com
> www.cwlaw.com

CONFIDENTIAL

JA1140

This message and any attachments may contain information that is highly confidential, privileged, and exempt from disclosure. Any recipient other than the intended recipient is advised that any dissemination, distribution, copying, or other use of this message is strictly prohibited.

If you have received this message in error, please notify the sender immediately.

**From:** Karrie Wichtman [mailto:kwichtman@rosettelaw.com]
**Sent:** Thursday, January 14, 2016 3:08 PM
**To:** Justin Martorello
**Cc:** Tanya Gibbs; John L. Williams; Matt Martorello; Brian McFadden
**Subject:** Re: AT BPL SA

I think that depends on the structure. Let's look into what the actual operating agreement says before we go changing things around now.

Sent from my iPhone

On Jan 14, 2016, at 1:33 PM, Justin Martorello <justinm@bellicosecapital.com> wrote:

> CEO is the highest ranking officer, above President.
>
> ---
>
> **From:** Tanya Gibbs [mailto:tgibbs@rosettelaw.com]
> **Sent:** Thursday, January 14, 2016 12:32 PM
> **To:** Justin Martorello <justinm@bellicosecapital.com>; Karrie Wichtman <kwichtman@rosettelaw.com>; John L. Williams <JWilliams@cwlaw.com>
> **Cc:** Matt Martorello <mattm@bellicosecapital.com>; Brian McFadden <BrianM@bellicosevi.com>
> **Subject:** RE: AT BPL SA
>
> I don't see a problem with that. But what's the real difference? And to your earlier question, yes I think we are all set with the servicing agreement.
>
>
> **Tanya M. Gibbs, Attorney**<image001.png>
> **Rosette, LLP**
> **Attorneys at Law**
> Michigan Office
> 25344 Red Arrow Hwy.
> Mattawan, MI 49071
> 269.283.5005 – Office
> 480.204.8009 - Cell
> 517.913.6443 – Fax
> tgibbs@rosettelaw.com
> www.rosettelaw.com
>
> CONFIDENTIAL COMMUNICATION: THIS MESSAGE IS A CONFIDENTIAL ATTORNEY COMMUNICATION ONLY FOR USE BY THE INTENDED RECIPIENT. ANY INADVERTENT RECEIPT SHALL NOT CONSTITUTE A

WAIVER OF ATTORNEY-CLIENT OR WORK PRODUCT PROTECTION.  IF
RECEIVED IN ERROR, PLEASE NOTIFY TANYA M. GIBBS IMMEDIATELY AND
DELETE THIS MESSAGE.  THANK YOU FOR YOUR COOPERATION.

**From:** Justin Martorello [mailto:justinm@bellicosecapital.com]
**Sent:** Thursday, January 14, 2016 1:20 PM
**To:** Tanya Gibbs <tgibbs@rosettelaw.com>; Karrie Wichtman
<kwichtman@rosettelaw.com>; John L. Williams <JWilliams@cwlaw.com>
**Cc:** Matt Martorello <mattm@bellicosecapital.com>; Brian McFadden
<BrianM@bellicosevi.com>
**Subject:** RE: AT BPL SA

This reminds me, Brian needs to be the CEO of AT.

**From:** Tanya Gibbs [mailto:tgibbs@rosettelaw.com]
**Sent:** Thursday, January 14, 2016 12:13 PM
**To:** Justin Martorello <justinm@bellicosecapital.com>; Karrie Wichtman
<kwichtman@rosettelaw.com>; John L. Williams <JWilliams@cwlaw.com>
**Cc:** Matt Martorello <mattm@bellicosecapital.com>; Brian McFadden
<BrianM@bellicosevi.com>
**Subject:** RE: AT BPL SA

It is.  TC gets to appoint at first and certainly has the ability to remove.
The operating agreements limit removal as follows:

The Manager may be removed as Manager by a majority vote of the
Member, by majority vote of the Tribal Council acting as sole
member of Tribal Economic Development Holdings, LLC if it is
found that the Manager has committed an act constituting willful
misconduct, fraud, or gross negligence.

But this really only applies to the Co-Managers (Jimmer and Shelly) and
arguably Brian as President because he was specifically designated as such
in the AT Creation Resolution.  But TC doesn't have any right to remove
any other employee of AT for any reason.  Brian, as President, has the
authority to hire and fire on AT's side of things.

And if TC tried to remove somebody, your still covered by the Parental
Guaranty.

**Tanya M. Gibbs, Attorney**<image001.png>
**Rosette, LLP**
**Attorneys at Law**
Michigan Office
25344 Red Arrow Hwy.
Mattawan, MI 49071

CONFIDENTIAL

JA1142

269.283.5005 – Office
480.204.8009 - Cell
517.913.6443 – Fax
tgibbs@rosettelaw.com
www.rosettelaw.com

CONFIDENTIAL COMMUNICATION: THIS MESSAGE IS A CONFIDENTIAL
ATTORNEY COMMUNICATION ONLY FOR USE BY THE INTENDED
RECIPIENT.  ANY INADVERTENT RECEIPT SHALL NOT CONSTITUTE A
WAIVER OF ATTORNEY-CLIENT OR WORK PRODUCT PROTECTION.  IF
RECEIVED IN ERROR, PLEASE NOTIFY TANYA M. GIBBS IMMEDIATELY AND
DELETE THIS MESSAGE.  THANK YOU FOR YOUR COOPERATION.

**From:** Justin Martorello [mailto:justinm@bellicosecapital.com]
**Sent:** Thursday, January 14, 2016 1:07 PM
**To:** Tanya Gibbs <tgibbs@rosettelaw.com>; Karrie Wichtman
<kwichtman@rosettelaw.com>; John L. Williams <JWilliams@cwlaw.com>
**Cc:** Matt Martorello <mattm@bellicosecapital.com>; Brian McFadden
<BrianM@bellicosevi.com>
**Subject:** RE: AT BPL SA

I thought everything was structured such that the TC was purposely
removed from the businesses.  Why not TEDs co-managers?

Do we all consider the AT BPL SA complete?

**From:** Tanya Gibbs [mailto:tgibbs@rosettelaw.com]
**Sent:** Thursday, January 14, 2016 12:05 PM
**To:** Justin Martorello <justinm@bellicosecapital.com>; Karrie Wichtman
<kwichtman@rosettelaw.com>; John L. Williams <JWilliams@cwlaw.com>
**Cc:** Matt Martorello <mattm@bellicosecapital.com>; Brian McFadden
<BrianM@bellicosevi.com>
**Subject:** RE: AT BPL SA

It is the Tribal Council acting as Member of TED (member of AT).  But
either way par. 5 of the Parental Guaranty says:

The Tribe, Borrower or any Subsidiary shall not terminate or replace any
manager, director or officer of Borrower or the respective Subsidiary or
modify delegations of authority without the prior written consent of
Lender, which shall not be unreasonably withheld, conditioned or
delayed.

**Tanya M. Gibbs, Attorney**<image001.png>
**Rosette, LLP**

CONFIDENTIAL

**Attorneys at Law**
Michigan Office
25344 Red Arrow Hwy.
Mattawan, MI 49071
269.283.5005 – Office
480.204.8009 - Cell
517.913.6443 – Fax
tgibbs@rosettelaw.com
www.rosettelaw.com

CONFIDENTIAL COMMUNICATION: THIS MESSAGE IS A CONFIDENTIAL
ATTORNEY COMMUNICATION ONLY FOR USE BY THE INTENDED
RECIPIENT.  ANY INADVERTENT RECEIPT SHALL NOT CONSTITUTE A
WAIVER OF ATTORNEY-CLIENT OR WORK PRODUCT PROTECTION.  IF
RECEIVED IN ERROR, PLEASE NOTIFY TANYA M. GIBBS IMMEDIATELY AND
DELETE THIS MESSAGE.  THANK YOU FOR YOUR COOPERATION.

---

**From:** Justin Martorello [mailto:justinm@bellicosecapital.com]
**Sent:** Thursday, January 14, 2016 12:58 PM
**To:** Karrie Wichtman <kwichtman@rosettelaw.com>; John L. Williams
<JWilliams@cwlaw.com>
**Cc:** Tanya Gibbs <tgibbs@rosettelaw.com>; Matt Martorello
<mattm@bellicosecapital.com>; Brian McFadden
<BrianM@bellicosevi.com>
**Subject:** RE: AT BPL SA

TC or TED's co-managers?

---

**From:** Karrie Wichtman [mailto:kwichtman@rosettelaw.com]
**Sent:** Thursday, January 14, 2016 8:42 AM
**To:** John L. Williams <JWilliams@cwlaw.com>
**Cc:** Justin Martorello <justinm@bellicosecapital.com>; Tanya Gibbs
<tgibbs@rosettelaw.com>; Matt Martorello
<mattm@bellicosecapital.com>; Brian McFadden
<BrianM@bellicosevi.com>
**Subject:** Re: AT BPL SA

Sounds good to me.

In answer to the questions directed at Tanya and I- the Capital "T"
transaction docs account for this. The TC replaces but with lender
consent. If an AT license frivolous witch hunt ensues it's a default and
opens the Tribe up to potential liability through the parental guarantee.
However, if licensed folks at AT violate tribal law or other applicable
consumer protection laws or commit a crime that disqualified them from

CONFIDENTIAL

JA1144

holding a license, insulating AT employees cannot and should not be absolute.

Karrie

Sent from my iPhone

On Jan 14, 2016, at 9:21 AM, John L. Williams <JWilliams@cwlaw.com> wrote:

> We just date it whatever date we close.  Easy on that one.  I will make the change to the last doc Karrie sent.

John L. Williams
Partner
<image002.png>
CONNER & WINTERS, LLP
Attorneys & Counselors at Law
4000 One Williams Center
Tulsa, OK 74172-0148
P 918.586.8990
F 918.586.8674
jwilliams@cwlaw.com
www.cwlaw.com

This message and any attachments may contain information that is highly confidential, privileged, and exempt from disclosure.  Any recipient other than the intended recipient is advised that any dissemination, distribution, copying, or other use of this message is strictly prohibited.

If you have received this message in error, please notify the sender immediately.

**From:** Justin Martorello [mailto:justinm@bellicosecapital.com]
**Sent:** Tuesday, January 12, 2016 4:20 PM
**To:** Karrie Wichtman; John L. Williams; Tanya Gibbs
**Cc:** Matt Martorello; Brian McFadden
**Subject:** RE: AT BPL SA

Thank you Karrie.

Karrie and Tanya:
Question about TFSRA licensing…  Let's say that there's a coop within LVD to oust AT managers, and so the TFSRA revokes licenses for Brian and/or managers.

- Who would be responsible for making replacements?
- Will AT be required to approve?
- Basically, how do we protect the "licensed" managers of AT?

CONFIDENTIAL

JA1145

John:

We wanted to remove ("M") Merger to eliminate reference to previously existing non-tribal entities.  How do we provide for an effective date here that does not come before the Merger date?

---

**From:** Karrie Wichtman [mailto:kwichtman@rosettelaw.com]
**Sent:** Tuesday, January 12, 2016 3:48 PM
**To:** Justin Martorello <justinm@bellicosecapital.com>; John L. Williams (JWilliams@cwlaw.com) <JWilliams@cwlaw.com>; Tanya Gibbs <tgibbs@rosettelaw.com>
**Cc:** Matt Martorello <mattm@bellicosecapital.com>; Brian McFadden <BrianM@bellicosevi.com>
**Subject:** RE: AT BPL SA

Responses to comments and questions.

Karrie S. Wichtman, Partner
ROSETTE, LLP
Michigan Office
Attorneys at Law
25344 Red Arrow Highway
Mattawan, Michigan 49071
269.283.5005 Office
517.913.6443 Facsimile
480.242.6959 Cell
kwichtman@rosettelaw.com
rosettelaw.com

CONFIDENTIAL COMMUNICATION: THIS MESSAGE IS A CONFIDENTIAL ATTORNEY COMMUNICATION ONLY FOR USE BY THE INTENDED RECIPIENT.  ANY INADVERTENT RECEIPT SHALL NOT CONSTITUTE A WAIVER OF ATTORNEY-CLIENT OR WORK PRODUCT PROTECTION.  IF RECEIVED IN ERROR, PLEASE NOTIFY KARRIE S. WICHTMAN IMMEDIATELY AND DELETE THIS MESSAGE.  THANK YOU FOR YOUR COOPERATION.

---

**From:** Justin Martorello [mailto:justinm@bellicosecapital.com]
**Sent:** Wednesday, January 6, 2016 10:15 PM
**To:** John L. Williams (JWilliams@cwlaw.com)

CONFIDENTIAL

<JWilliams@cwlaw.com>; Karrie Wichtman
<kwichtman@rosettelaw.com>; Tanya Gibbs
<tgibbs@rosettelaw.com>
**Cc:** Matt Martorello <mattm@bellicosecapital.com>; Brian
McFadden <BrianM@bellicosevi.com>
**Subject:** AT BPL SA

Minimal comments and questions from MM.  See attached.


Regards,

**Justin Martorello**
Phone: 773.263.1554
Email: JustinM@BellicoseCapital.com
<image003.png>

**This email and any files transmitted with it are
confidential and may contain privileged or copyrighted
information. You must not present this message to
another party without gaining permission from the
sender. If you are not the intended recipient you must not
copy, distribute or use this email or the information
contained in it for any purpose other than to notify us. If
you have received this message in error, please notify the
sender immediately, and delete this email from your
system.**
**This email and any files transmitted with it are
confidential and may contain privileged or copyrighted
information. You must not present this message to
another party without gaining permission from the
sender. If you are not the intended recipient you must not
copy, distribute or use this email or the information
contained in it for any purpose other than to notify us. If
you have received this message in error, please notify the
sender immediately, and delete this email from your
system.**

**This email and any files transmitted with it are confidential and
may contain privileged or copyrighted information. You must not
present this message to another party without gaining permission
from the sender. If you are not the intended recipient you must not
copy, distribute or use this email or the information contained in it for
any purpose other than to notify us. If you have received this message
in error, please notify the sender immediately, and delete this email
from your system.**
**This email and any files transmitted with it are confidential and
may contain privileged or copyrighted information. You must not
present this message to another party without gaining permission
from the sender. If you are not the intended recipient you must not

CONFIDENTIAL

JA1147

copy, distribute or use this email or the information contained in it for
any purpose other than to notify us. If you have received this message
in error, please notify the sender immediately, and delete this email
from your system.**

**This email and any files transmitted with it are confidential and
may contain privileged or copyrighted information. You must not
present this message to another party without gaining permission
from the sender. If you are not the intended recipient you must not
copy, distribute or use this email or the information contained in it for
any purpose other than to notify us. If you have received this message
in error, please notify the sender immediately, and delete this email
from your system.**

**This email and any files transmitted with it are confidential and
may contain privileged or copyrighted information. You must not
present this message to another party without gaining permission
from the sender. If you are not the intended recipient you must not
copy, distribute or use this email or the information contained in it for
any purpose other than to notify us. If you have received this message
in error, please notify the sender immediately, and delete this email
from your system.**

**This email and any files transmitted with it are confidential and may contain privileged or
copyrighted information. You must not present this message to another party without gaining
permission from the sender. If you are not the intended recipient you must not copy, distribute
or use this email or the information contained in it for any purpose other than to notify us. If
you have received this message in error, please notify the sender immediately, and delete this
email from your system.**

CONFIDENTIAL

# Exhibit 28

**Darcie Pace**

---

| | |
|---|---|
| **From:** | Matt Martorello <mattm@bellicosevi.com> |
| **Sent:** | Tuesday, December 31, 2013 12:06 AM |
| **To:** | Nicole St. Germain; Karrie Wichtman; Justin Martorello |
| **Cc:** | Daniel Gravel; Robert Rosette |
| **Subject:** | RE: Memo Regarding Structure of Possible Acquisition of SPVI |

Sorry one more thing on Management.  If it is something where one person controls the entity, let's make certain they have immunity (if it were Justin for example) of course as well.

---

**From:** Matt Martorello
**Sent:** Tuesday, December 31, 2013 1:00 AM
**To:** Nicole St. Germain; 'Karrie Wichtman'; Justin Martorello
**Cc:** Daniel Gravel; 'Rob Rosette'
**Subject:** FW: Memo Regarding Structure of Possible Acquisition of SPVI

Very preliminary review (I skimmed it).

A) Great work guys, very informative here
B) I'm not sure the proposal was exactly accurate, but close enough to analyze the issues
C) Seems like after your proposed changes, the 51% equity bit is left as the only question mark.  I think this could easily be increased to whatever the benchmark of confidence is, since equity and profits interest differ.  What equity ownership % hits the benchmark (60/40?).  Or is it more like 100% or 51%, and in between is no man's land (a lot of page 13 #3 seems to state 100% is the only certainty).  I don't think 100% is out of reach, some caveats could simply be made.
D) On the proposed changes:
    a. Revenue – 10% certainly isn't going to work from a business standpoint (i.e. I might as well be a state licensed lender, as a comp.)  The deal could be an outstanding deal and 1st of its kind, but we need to have it make sense.
        i.  I think this stems partly from point 2 on page 13, which I believe inaccurately only looks at a 4 year time period.  In reality, the economics certainly support economic development as in 4 years, it's spinning off a major amount of cash flows.  That's economic development.  Not even a casino makes money in the first several years.
        ii. Also partly from Page 14 part 5 – which is more of the same really.  Looks at years 1 – 4 only.  Even during that time, money does in fact inure to the benefit of the tribe via the TLE.  It would be explained to exist because it is exactly what it is.  The tribe would like to buy in some capacity the intel of SPVI so it could get more money in the long-term.  The terms of such a deal result as proposed.  This is the same way casino developers get Management fees (though for 7 years, not 4 years and at a lower rate).  If regulations didn't prevent it, I might develop a casino for you and say, "I don't want 7 years and 30%, I want less years and a higher %".  What I think you'd tell a court that would challenge the immunity is that if the deal were not done, well then: A) the tribe didn't know: A) if SPVI would be around in 10 days given the industry, B) Execute its termination provision in accordance with the SA, or C) hike rates as risk has gone through the roof with detractors now seeking out SPVI's of the world for major attacks.  Plus, it could save money over the course of the next 10 years of the relationship with SPVI by entering this deal, rather than keeping the status quo.  This is same as how I might consider buying a LMS for example.  I can pay the licensing fee, or I can pay way more money today to buy it from them and I am upside down on that investment for 4 years, but after year 4, I'm making 10 times

CONFIDENTIAL

ROSETTE_REVISED_052247

JA1150

more money than I would have been had I elected to be licensing still today.  For all of these reasons, I don't see the revenue as an issue.

b.  Management – If this issue isn't worked out in some very particular way, the deal just won't get done.  Hoping you have some ideas around this.  All the investors (institutional, personal, and myself) won't allow the deal to occur without being 100% certain adequate Management resources are in control.  This seems the 1st major hurdle to accomplish.

All that said, I kind of thought we'd settled on status quo after talking about this for about 18 months and nowhere to go.  However, I think there is a way this works.  Clock is ticking before I end up in a Cash Call type attack though, at which point, I think the deal is about dead.

Hopefully yours,
Matt

---

**From:** Nicole St. Germain [mailto:NStGermain@rosettelaw.com]
**Sent:** Monday, December 30, 2013 7:06 PM
**To:** Chairman James Williams; Joette Pete-Baldwin; Susan McGeshick; Giizhigookway; Cheryl McGeshick; Eli Edwards; Tyrone McGeshick; john.mcgeshickjr@lvdtribal.com; Henry Smith
**Cc:** Karrie Wichtman; Matt Martorello; Justin Martorello; Daniel Gravel
**Subject:** Memo Regarding Structure of Possible Acquisition of SPVI

Honorable Tribal Council,

Please find attached a memorandum analyzing the proposed transaction between the Tribe and Source Point for the formation of a new LLC formed under Tribal law that would act as RRTL's and DCTF's servicer.  As you will see, the threshold issue is whether formation of a new entity that is co-owned by the Tribe and Source Point and subject to the proposed profit, management and voting controls is sufficient to pass muster with the "arm of the tribe" test to extend the Tribe's sovereign immunity from suit to the new LLC.

We are ready to discuss these issues at your convenience.

Thank you,

Nicole M. St. Germain, Associate

**Rosette, LLP**
**Attorneys at Law**
193 Blue Ravine Road - Suite 255
Folsom, CA 95630
916.353.1084 – Office     
916.353.1085 – Fax
480.241.5871 – Cell

NStGermain@rosettelaw.com
www.rosettelaw.com

CONFIDENTIAL COMMUNICATION: THIS MESSAGE IS A CONFIDENTIAL ATTORNEY COMMUNICATION ONLY FOR USE BY THE INTENDED RECIPIENT.  ANY INADVERTENT RECEIPT SHALL NOT CONSTITUTE A WAIVER OF ATTORNEY-CLIENT OR WORK PRODUCT PROTECTION.  IF RECEIVED IN ERROR, PLEASE NOTIFY THE SENDER IMMEDIATELY AND DELETE THIS MESSAGE.

CONFIDENTIAL                                                 ROSETTE_REVISED_052248

JA1151

# Exhibit 29

## Darcie Pace

| | |
|---|---|
| **From:** | mattm@bellicosevi.com |
| **Sent:** | Friday, August 26, 2011 7:32 AM |
| **To:** | Flint Richardson |
| **Cc:** | Scott Merritt; Robert Rosette |
| **Subject:** | Re: Question on Docs |

I'd agree with that for sure. If she's already been around these documents several times then we will see what she can do. She's on vacation until the 2nd though. I don't think we'll make the 9/15 and 10/1 dates we targeted.  With the back and forth that will e required, I'd be happy to have things wrapped up for 11/1 if we can move efficiently.

Ryan Bloom will be reaching out to Rob to conduct their diligence on the tribe. That should happen today.


On Aug 26, 2011, at 7:24 AM, Flint Richardson <flint@wsedge.biz> wrote:

> Matt – to the extent that you already have counsel on board that is fine.  Claudia (and Christina who works with her) have completed a few large scale deals which is helpful.  Wheeler is ok, personally I think his agreements are the least complex and I don't believe that he may have built in the same level of protection for his clients.
>
>
> Rob – thoughts here?
>
>
>
> **Flint Richardson | CPA** | Chandler | AZ| 85225 |
> office 480.889.4888 | fax 480.889.8997 | flint@wsedge.biz |
>
>
> **<IMAGE003.JPG>**
>
>
> *********************************************************************************
> ******************************************************************
> *********
>
> This e-mail message may contain legally privileged and/or confidential information. If you are not the intended recipient(s), or the employee or agent responsible for delivery of this message to the intended recipient(s), you are hereby notified that any dissemination, distribution or copying of this e-mail message is strictly prohibited. If you have received this message in error, please immediately notify the sender and delete this e-mail message from your computer.

1

**IRS CIRCULAR 230 DISCLOSURE**:  To ensure compliance with Treasury Department regulations, we inform you that any U.S. federal tax advice contained in this correspondence (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties that may be imposed under the U.S. Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

**From:** mattm@bellicosevi.com [mailto:mattm@bellicosevi.com]
**Sent:** Friday, August 26, 2011 2:20 AM
**To:** Flint Richardson
**Cc:** Scott Merritt; Rob Rosette
**Subject:** Re: Question on Docs

Does her structure differ somehow? I'm curious how she will be more value added than the other 3 lawyers we've engaged now. Also, how is Wheeler Neff?

On Aug 26, 2011, at 3:23 AM, "Flint Richardson" <flint@wsedge.biz> wrote:

> Matt – sorry for the delay on getting back to you.  I was sick this afternoon so ended up leaving the office at around 4 and slept/threw up until about 8:30.  Please give Rob a call tomorrow at 480-242-9810 as I will be in transit to MI all morning and he is the expert on agreement type questions.  Following are some initial responses on your questions (the ones that I can answer).         Further, upon further reflection we would in fact recommend that you engage Claudia Callaway in order to assist you with the agreements.  She has a superb structure that we have just completed the review on and we believe that utilizing her on this will expedite us getting this deal done.
>
>
> A) If Wells Fargo is subpoenaed, what information is given (names of signors) which exposes whoever is a signor on behalf of Servicer.  Can this be hedged? YES, IF YOU WANT THE TRIBE TO BE THE EXCLUSIVE SIGNER ON THE ACCOUNT.
>
> B) For the USVI, Bellicose can have nothing to do with "Loan Originations", it can only provide the Analytics and such, and I think the Tribe has to be the originator anyway, correct? YES, CORRECT – CORNERSTONE OF THE SOVEREIGN MODEL. In fact, the Loan Management Software would have to be with the Tribe, and not with Bellicose.  This creates a problem where it says "Servicer, shall determine whether such applicants are eligible for Loans from Consumer Lender based on Consumer Lender's credit granting standards duly adopted from time to time by Consumer Lender and applied by Servicer".  Bellicose wants to provide the IP, but Consumer Lender should be the one making the final decision and originating the loans on Tribal Land.  If I'm not mistaking, that applies to support the Tribal Jurisdiction as well?  Similarly, Bellicose can't be as stated in provision 6 specifically.  The USVI will require better separation that the Tribe is the originator and Bellicose is simply a consultant/Manager.  THE TRIBE ESTABLISHES THE LENDING CRITERIA, AND IS THE LENDER BELLICOSE IS JUST CARRYING OUT THE TRIBE'S DIRECTION.  WE CAN CHANGE THE LANGUAGE HOWEVER YOU WOULD LIKE.

CONFIDENTIAL                                                          ROSETTE_REVISED_052497

JA1154

C) If possible, we'd like the Tribe to be on all vendor documents so any subpoena given to any vendor points to the Tribe.  This does, however, create an issue of protecting the information.  TRIBE SHOULD BE ON ALL VENDOR DOCUMENTS WEB-SITE, ACH AGREEMENTS ETC – WE AGREE.  INFORMATION IS IN THE POSSESSION OF THE SERVICER.

Can you elaborate on this: So the Tribal Lending entity has a Tribal Management Company, which is going to be the Bellicose customer – NO, YOUR ENTITY WOULD BE THE SERVICER FOR THE LENDING OPERATION.  THE LLC MANAGERS ARE MANAGERS OF THE LLC ENTITY ON BEHALF OF THE TRIBE BUT ARENT INVOLVED IN THE BUSINESS.

Does it mean that Bellicose is the Manager of the Tribal LLC?  Similarly, in what capacity is Bellicose's name on the operating account of the Tribe?  NO REPRESENTATIVES FROM THE TRIBE ARE THE LLC'S "MANAGERS".  THE SERVICER, BELLCIOSE OPERATES THE BUSINESS COMPLETELTY.

**Flint Richardson | CPA** | Chandler | AZ| 85225 |
office 480.889.4888 | fax 480.889.8997 | flint@wsedge.biz |

**<IMAGE003.JPG>**

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
* * * * * * * * * * * * * * * * * * * * * * * * * * *

This e-mail message may contain legally privileged and/or confidential information. If you are not the intended recipient(s), or the employee or agent responsible for delivery of this message to the intended recipient(s), you are hereby notified that any dissemination, distribution or copying of this e-mail message is strictly prohibited. If you have received this message in error, please immediately notify the sender and delete this e-mail message from your computer.

IRS CIRCULAR 230 DISCLOSURE:  To ensure compliance with Treasury Department regulations, we inform you that any U.S. federal tax advice contained in this correspondence (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties that may be imposed under the U.S. Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

CONFIDENTIAL                                    ROSETTE_REVISED_052498

JA1155

**From:** mattm@bellicosevi.com [mailto:mattm@bellicosevi.com]
**Sent:** Thursday, August 25, 2011 11:59 AM
**To:** Flint Richardson; 'Scott Merritt'; Rob Rosette
**Subject:** RE: Question on Docs

This is helpful thanks.  Can you hop on a call real quick with me and walk through this, I'd have to call you though, cell doesn't work down here:

The Servicing Agreement says that it is between Consumer Lender and XYZ Company, another "wholly-owned, unincorporated entity of the _____, created under Tribal law".  I've seen these models before, and I'm not sure which way to go is the best.   My concern/questions surround:

A) If Wells Fargo is subpoenaed, what information is given (names of signors) which exposes whoever is a signor on behalf of Servicer.  Can this be hedged?

B) For the USVI, Bellicose can have nothing to do with "Loan Originations", it can only provide the Analytics and such, and I think the Tribe has to be the originator anyway, correct?  In fact, the Loan Management Software would have to be with the Tribe, and not with Bellicose.  This creates a problem where it says "Servicer, shall determine whether such applicants are eligible for Loans from Consumer Lender based on Consumer Lender's credit granting standards duly adopted from time to time by Consumer Lender and applied by Servicer".  Bellicose wants to provide the IP, but Consumer Lender should be the one making the final decision and originating the loans on Tribal Land.  If I'm not mistaking, that applies to support the Tribal Jurisdiction as well?  Similarly, Bellicose can't be as stated in provision 6 specifically.  The USVI will require better separation that the Tribe is the originator and Bellicose is simply a consultant/Manager.

C) If possible, we'd like the Tribe to be on all vendor documents so any subpoena given to any vendor points to the Tribe.  This does, however, create an issue of protecting the information.

Can you elaborate on this: So the Tribal Lending entity has a Tribal Management Company, which is going to be the Bellicose customer – NO, YOUR ENTITY WOULD BE THE SERVICER FOR THE LENDING OPERATION.  THE LLC MANAGERS ARE MANAGERS OF THE LLC ENTITY ON BEHALF OF THE TRIBE BUT ARENT INVOLVED IN THE BUSINESS.

Does it mean that Bellicose is the Manager of the Tribal LLC?  Similarly, in what capacity is Bellicose's name on the operating account of the Tribe?

**Regards,**

4

**Matt Martorello**

Mobile: 773-209-7720

Email: MattM@BellicoseVI.com

<image005.jpg>

---

**From:** Flint Richardson [mailto:flint@wsedge.biz]
**Sent:** Thursday, August 25, 2011 2:40 PM
**To:** mattm@bellicosevi.com; 'Scott Merritt'; Rob Rosette
**Subject:** RE: Question on Docs


Matt – see attached document with you initial questions from August 23 along with responses which are underlined.  Following are responses to your email below:


So the Tribal Lending entity has a Tribal Management Company, which is going to be the Bellicose customer – NO, YOUR ENTITY WOULD BE THE SERVICER FOR THE LENDING OPERATION.  THE LLC MANAGERS ARE MANAGERS OF THE LLC ENTITY ON BEHALF OF THE TRIBE BUT ARENT INVOLVED IN THE BUSINESS.


Do we want to service the Tribal Management Company or do we want to service the Tribe directly?  YOU WILL BE THE SERVICER FOR THE UNIQUE LLC THAT IS ESTABLISHED – FOR INSTANCE, YOUR SERVICING AGREEMENT WOULD BE FOR RED ROCK LENDING, LLC (WHICH IS THE TRIBALLY ESTABLISHED ENTITY FOR LENDING)


What's the advantage of the Tribal Lender having the Tribal Service Entity?  Trying to get these docs done and still not certain what the structure looks like in this regard.  PLEASE CALL ME IF YOU HAVE QUESTIONS RELATED TO ANY OF OUR RESPONSES.


Thanks Matt.

CONFIDENTIAL

ROSETTE_REVISED_052509

JA1157

Flint Richardson | **CPA** | Chandler | AZ| 85225 |
office 480.889.4888 | fax 480.889.8997 | flint@wsedge.biz |


**<IMAGE006.JPG>**


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

This e-mail message may contain legally privileged and/or confidential information. If you are not
the intended recipient(s), or the employee or agent responsible for delivery of this message to the
intended recipient(s), you are hereby notified that any dissemination, distribution or copying of this
e-mail message is strictly prohibited. If you have received this message in error, please
immediately notify the sender and delete this e-mail message from your computer.


**IRS CIRCULAR 230 DISCLOSURE**:  To ensure compliance with Treasury Department regulations,
we inform you that any U.S. federal tax advice contained in this correspondence (including any
attachments) is not intended or written to be used, and cannot be used, for the purpose of (i)
avoiding penalties that may be imposed under the U.S. Internal Revenue Code or (ii) promoting,
marketing or recommending to another party any transaction or matter addressed herein.


---

**From:** mattm@bellicosevi.com [mailto:mattm@bellicosevi.com]
**Sent:** Thursday, August 25, 2011 11:24 AM
**To:** flint@wsedge.biz; Scott Merritt (smerritt@answersetc.com); Rob Rosette
(rosette@rosettelaw.com)
**Subject:** Question on Docs


So the Tribal Lending entity has a Tribal Management Company, which is going to be the
Bellicose customer.  Do we want to service the Tribal Management Company or do we
want to service the Tribe directly?  What's the advantage of the Tribal Lender having the
Tribal Service Entity?  Trying to get these docs done and still not certain what the
structure looks like in this regard.


**Regards,**


**Matt Martorello**

Mobile: 773-209-7720

6

Exhibit 30

## Joette Pete-Baldwin

| | |
|---|---|
| **From:** | Matt Martorello <mattm@bellicosevi.com> |
| **Sent:** | Monday, October 14, 2013 4:14 PM |
| **To:** | Karrie Wichtman; Chairman James Williams; Cheryl McGeshick; Eli Edwards; gkway@lvdtribal.com; Henry Smith; Joette Pete-Baldwin (joette.pete@lvdtribal.com); John McGeshick, Jr.; Susan McGeshick (susan.mcgeshick@lvdcasino.com); Tyrone McGeshick (tyrone.mcgeshick@lvdcasino.com) |
| **Cc:** | Craig Mansfield (craig.mansfield@lvdcasino.com); Justin Martorello |
| **Subject:** | SPVI Equity Transfer to LVD |

Good afternoon,

Below is the beginning of a concept I have to facilitate a transition to LVD of MY businesses. The abrupt termination of RRTL/DCTF, as it is written in the existing servicing agreements, is an oversimplified end that we have for some time been meaning to revisit. I think it is time to move forward on the proper legacy plan for how our companies come together. I believe Rob and Karrie can provide some highlights, but I do believe the items below should be able to get us to a term sheet with the goal of FINAL documents delivered on 10/30/13. The documents will not be as daunting as the list below appears, for tax structuring reasons, it is a little more complicated than it appears.

- Assign today to LVD - 51% of Bellicose VI, LLC <u>Equity only</u> membership interest tied to the SPVI subsidiary only (i.e. SPVI is a wholly owned sub of Bellicose, as it must be for tax reasons. Therefore, LVD's equity share for the subsidiary would be at the Bellicose parent company level):
  - LVD will own 51% equity, but 0% profits interest until month 49 when it becomes 100% equity and 80% profits
  - BlueTech will own 49% equity, but 100% profits interest until month 49 when it becomes 0% equity and 20% profits
  - Current Manager (myself) will be locked in as the decision maker for 48 months, at which point they will hire a new Manager to replace me
  - In month 49, Profits will be 80% LVD and 20% BlueTech for 10 years, after which it is 100% profits to LVD.
- Assign today to LVD - 51% of 7X Services, LLC <u>Equity only</u> for a membership class tied to:
  - Iron Fence Investments, LLC
  - Obsidian Armor Fund, LLC (note this will be dissolved before the 48 month mark)
  - WMS (where both WMS and SPVI terminate the existing option agreements)
  - On January 1st, due to my forthcoming 2014 restructuring, Bellicose VI, LLC will be transferred 100% to 7X Services, LLC and LVD's Equity will be shifted to DIRECTLY to SPVI (as we move from the VIs to Puerto Rico)
- Other:
  - Appropriate waivers of SI to protect the Assignors and Managers
  - Structured to ensure the integrity of sovereign immunity
  - It is possible the currently Delaware and Virgin Islands LLCs, may need to be migrated to be LVD LLCs (perhaps AFTER the closing in the interest of time)
  - Castle stops NEW customer loans beginning on January 31, 2014 and only does VIP loans thereafter (same as DCTF today)
  - Tribe uses its own capital to launch a new portfolio in Q1 2014, in which SPVI generates the same fees from the TLE, but LVD gets to keep 75% of the profits interest on the SPVI side for servicing the portfolio, until that 48th month. Adjusts the same thereafter. (This is required for tax purposes)
  - Proper indemnities to the Assignors and Managers
  - No strings attached, no requirements, no liability to LVD by Assignors or Managers on the new LVD portfolio, RRTL, DCTF, or on anything that may happen after month 48. Best efforts basis.

1

**This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

JA1161

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| LULA WILLIAMS, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:17-cv-461 (REP) |
| | ) | |
| BIG PICTURE LOANS, LLC, *et al.*, | ) | **REDACTED VERSION** |
| | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR**
**<u>MOTION FOR PARTIAL SUMMARY JUDGMENT</u>**

## INTRODUCTION

Martorello's opposition concedes nearly all of Plaintiffs' statement of material facts, which establish the existence of a usurious lending scheme that Martorello knew about, facilitated, and benefited from. Unable to refute these objective facts—most of which come from his own email— Martorello attempts to create a factual dispute over the level of the LVD's involvement, but such "facts" are immaterial to any issue in this motion. Regardless of whether LVD had meaningful involvement, no one can genuinely dispute the key issue raised in Plaintiffs' motion—that Martorello knew and facilitated a usurious lending scheme. That's what matters, and it was objectively established in Plaintiffs' opening brief.

Martorello also attempts to avoid summary judgment by mischaracterizing the governing law about RICO liability as requiring "knowledge that the loans were unlawful." ECF No. 1218 at 32. And because Martorello claims that certain attorneys told him the lending scheme was legal, he contends that there is a genuine dispute about whether he knew that the loans were unlawful. The Court should reject this argument because "knowledge of illegality" is neither an element nor a defense to a RICO claim based on the collection of unlawful debt. *Mao v. Glob. Tr. Mgmt., LLC*, 2022 WL 989012, at *9 (E.D. Va. Mar. 31, 2022). In other words, a person may be liable for a civil RICO claim "whether they knew the debt was unlawful or not." *Id.*

Martorello also <u>utterly disregarded</u> Plaintiffs' request for summary judgment that: (1) an enterprise existed; (2) the loans constituted unlawful debts under RICO; and (3) persons associated with the enterprise—not necessarily Martorello—participated in the affairs through the collection of unlawful debt. ECF No. 1166 at 36. Because Plaintiffs' evidence establishes each of these elements, summary judgment should be granted (in whole or in part) as to the § 1962(c) violation.

1

JA1163

<u>**THERE IS NO GENUINE DISPUTE OF MATERIAL FACTS**</u>

**I.    Martorello's response violated Local Rule 56.**

Martorello first responded to Plaintiffs' Motion on May 5, 2023. ECF No. 1206. This response, however, did not contain a list the material facts in dispute with citations supporting his alleged disputes as required by the Local and Federal Rules of Civil Procedure. Loc. Civ. R. 56(B); Fed. R. Civ. P. 56(c)(1)(A). Plaintiffs consented to a replacement brief to avoid unnecessary motions practice. ECF Nos. 1216-1218. But Martorello's replacement brief still violates the rules because it fails to make genuine and material challenges to

Plaintiffs' Statement of Undisputed Facts, which contained 146 paragraphs, each supported by a specific citation to the record and was limited to the fact necessary to determine this motion.  ECF No. 1166, at 5-26 ("Statement").

Even after Plaintiffs' facilitation of a replacement brief—Martorello offered only a limited set of disputes to the Statement, treating it like a Rule 8(b) general denial in an answer rather than a Rule 56 summary judgment response. *See generally* ECF No. 1218 at 15-21. There is almost no explanation supporting his "disputes." Instead, Martorello largely ignores the substance of each factual paragraph and only sporadically includes a record citation. Even then, most of the "disputes" are immaterial nits or semantics. Again, these nonspecific and unsupported denials violate the Local Rules. Loc. Civ. R. 56(B) (a summary judgment opposition "shall include a specifically captioned section listing all material facts as to which it is contended that there exists a genuine issue necessary to be litigated and citing the parts of the record relied on to support the facts alleged to be in dispute.") Martorello is not *pro se* but is represented by sophisticated defense counsel. His violation of this requirement—after two attempts—is inexcusable.

Rather than substantively respond to Plaintiffs' material facts (supported by record citations), Martorello instead offered a "Counterstatement of Undisputed Facts" (labeled "CUF" by Defendant). This CUF, however, does not correspond to any of the specific facts in the Plaintiffs' Statement and instead lays out Martorello's own overall case facts and narrative, raising countless issues that are not irrelevant to Plaintiffs' Motion.

"A summary judgment motion with such an extensive record requires the parties to adhere to Local Rule 56(B) with special care." *Wood v. Credit One Bank*, 277 F. Supp. 3d 821, 829 (E.D. Va. 2017). Yet here, Martorello did exactly as the *Wood* defendant. *Id.* ("Credit One instead scatters citations to the record throughout its memorandum, absent any reference to whether the facts are material or in dispute."). As in *Wood*, Martorello's failure to comply with the Local Rules makes it difficult for the Plaintiffs and the Court to consider whether any of Marterollo's CUF establish a material dispute. This conduct is "unfair to its adversary . . . and its conduct is adverse to the conservation of judicial resources, which are most efficiently deployed when the parties fulfill their adversarial functions in a rigorously organized, coherent fashion." *CertusView Techs., LLC v. S & N Locating Servs., LLC*, 2015 WL 4717256, at *5 (E.D. Va. Aug. 7, 2015). Because of this, the "Court could strike [Martorello's] 'disputes' altogether and consider all of [Plaintiffs'] facts undisputed. While extreme, such sanctions would not seem unwarranted given [Defendant's] failure to even attempt a proper correction of [his] failure." *Wood*, 277 F. Supp. 3d at 830 (internal citation omitted).

## II. Martorello Does Not Substantively Dispute Any Material Facts.

Beyond procedure, Martorello's response to the Statement is substantively anemic. Because Martorello could not genuinely challenge many facts, he largely attempts to manufacture a dispute by claiming that he disputes "the implication" of 49 of Plaintiffs' facts. *See* ECF No.

1218 (disputing the implication of ¶¶ 5, 6, 7, 8, 9, 10, 45, 46, 47, 48, 49, 50, 51, 55, 56, 57, 59, 60, 61, 62, 63, 64, 65, 66, 67, 70, 71, 72, 73, 74, 75, 76, 87, 88, 89, 90, 91, 92, 93, 94, 102, 103, 104, 105, 106, 129, 131, 132, 133). Yet Martorello's dispute regarding "the legal implications of the material fact does not mean that the fact itself is disputed, nor does it prevent the court from deciding the legal implications of the fact on a motion for summary judgment." *Scott v. Kelkris Assocs., Inc.*, 2012 WL 996578, at *3 (E.D. Cal. Mar. 23, 2012). The Court, of course, can read and understand this evidence for itself and determine its implications.

Similarly, even where Martorello claims a fact is "disputed," his response is either: (1) unsupported by evidence to the contrary (*Id.* at ¶¶ 1, 21, 83, 117, 131); (2) nits or semantics (¶¶ 12, 37, 38, 53, 58, 115, 120, 124, 128); or (3) directly contradicted by the Plaintiffs' evidence (¶¶ 23, 37, 38, 95, 96-98, 128). Again, these tactics do not create a *genuine* or *material* dispute. Instead, "a dispute is 'genuine' if 'a reasonable jury could return a verdict for the moving party.'" *Reid v. Dalco Nonwovens, LLC*, 2016 WL 427948, at *1 (W.D.N.C. Feb. 3, 2016) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). And a fact is "material" only "if it 'might affect the outcome of the suit under the governing law." *Reid,* 2016 WL 427948 at *1 (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)). Martorello's unsupported assertions and nitpicking of certain word choices does not create a genuine or material dispute.

While Martorello's failure to response to Plaintiffs' Statement under the Local Rules can be broken into the three categories outlined in the previous paragraph, Plaintiffs believe that it is important to highlight two of his "disputes." First, Martorello misleadingly attempts to dispute the Plaintiffs' facts about received from Red Rock's operations by Martorello and his trust. *See* ECF No. 1218 at ¶¶ 37-39. As support, Martorello cites to his own deposition testimony where he testified that he might not have *necessarily* received the money because, for example, it could have

stayed in a capital account at Bellicose. Ex. 1 at 106:25-107:12. Martorello further confirmed that

the allocation amount on the spreadsheet would have been reflected on his tax returns as the owner

of Bellicose—even if the money stayed at the corporate level in a capital account (as opposed to

Martorello's personal bank account). Ex. 1 at 107:2-23. Martorello's entitlement to the money and

ownership for tax purposes is receipt of the money under the plain meaning of the word. Thus,

Martorello's superficial distinction regarding actual receipt versus legal entitlement does not create

a genuine dispute of material fact. And to put this matter to rest, attached are Martorello's sworn

interrogatory responses, which indicated that he received ███████ from in salary and/or

distributions as of October 2, 2017. Ex. 2 at 3.

Second, Martorello also disputes that SourcePoint VI "was owned by Martorello." *See* ECF

No. 1218 at ¶ 32 (citing Martorello Ex. AAAAA at 105:17 – 106:6). The cited evidence, however,

is Martorello's deposition testimony where he admitted that "Me and/or some entity under [his]

trust collectively had 100 percent" interest in Bellicose VI and SourcePoint VI. *Id*. at 105:17-22.

Martorello's convoluted corporate structure does not create a genuine or material dispute of fact.

## III. Response to Martorello's Counterstatement of Undisputed Material Facts.

As explained above, the Court cannot fairly consider the Defendant's "CUF" because it

would require Court to guess which CUF fact corresponded to a numbered fact in Plaintiffs'

Statement. Even so, Martorello's statement of facts can be addressed in groups:

Paragraphs 1-7: None of these purported facts are material to Plaintiffs' motion.[1] Here,

Martorello attempts to establish that LVD had a genuine desire to enter the tribal lending industry

---

[1] In support of this section, Martorello cites to Exhibit D, which the same declaration by Michelle Hazen that this Court has already found to contain misrepresentations. *Williams*, 2020 WL 6784352, at *12. Martorello has indicated that Ms. Hazen will not be appearing trial (Dkt. 1238) and, thus, Plaintiffs object to the use of her declaration as it is inadmissible.

and insinuates that this genuine desire predated his first communication with Rob Rosette, who brokered the deal between Martorello and LVD. While Plaintiffs disagree with Martorello's characterizations, they are irrelevant to the pending motion.

Paragraphs 8-16: All these purported facts are immaterial to Plaintiffs' motion. Here, Martorello attempts to establish: (1) the LVD had a genuine interest in entering the tribal lending industry before its introduction to Martorello (*see* ¶¶ 8-11), and (2) that attorneys were involved to develop the relationship and structure of the enterprise (*see* ¶¶ 13-16). While Plaintiffs disagree with these characterizations, these facts are immaterial to the three issues on which Plaintiffs seek summary judgment.[2]

Paragraphs 17-23. None of these purported facts are material to Plaintiffs' motion. In this section, Martorello attempts to establish that: (1) the LVD had an office on the reservation where it originated the loans (¶ 17); (2) the Servicing Agreement delegated origination determinations to Red Rock (¶ 18); and (3) the LVD participated in certain decisions about the lending operations (¶¶ 19-23). None of these "facts" refute that Martorello knew of the overall objective of the conspiracy and facilitated the scheme. Put differently, Martorello cannot refute his knowledge and facilitation by simply pointing to the role of others.[3]

---

[2] Although these facts are irrelevant, Plaintiffs note that they are a variation of the false narrative already rejected by this Court after a two-day evidentiary hearing. *Williams v. Big Picture Loans, LLC*, 2020 WL 6784352, at *4 (E.D. Va. Nov. 18, 2020). For example, this Court has already found that Martorello's claim that LVD identified and approached him "were not true. In fact, the record shows that Martorello sought out a connection with the LVD so that he could get into the Tribal lending business." *Id.* The Court further added: "The testimony of Pete and Merritt, supported by the documentary record, demonstrate that this Court incorrectly found that there was a lending operation underway when the Tribe was put in touch with Martorello and that the Tribe had identified Martorello as a potential consultant." *Id.* at *5. Thus, while Plaintiffs dispute Martorello's characterizations, who approached who is irrelevant to Martorello's liability.

[3] Although these proffered facts are irrelevant to whether Martorello knew about and facilitated the scheme, Plaintiffs again note that this Court has already rejected these "facts." *Williams*, 2020

Paragraphs 24-42. None of these purported facts are material to Plaintiffs' motion. In this section, Martorello attempts to support his good faith reliance on the advice of counsel defense. While Plaintiffs disagree with many of Martorello's characterizations, they are immaterial to the three issues on which Plaintiffs seek summary judgment because, as explained below, Plaintiffs do not have to prove "knowledge of illegality," or whether Martorello "knew that debt was unlawful or not." *Mao*, 2022 WL 989012, at *9.

Paragraphs 43-62. None of these purported facts are material to Plaintiffs' motion. In this section, Martorello vaguely discusses the negotiations related to the sale to create the appearance that it was LVD—not Martorello—who had a sincere and strong interest in the Bellicose sale. Martorello's narrative in this section again misses the point. Plaintiffs' citation to contrary evidence on this point was not to show bad intention, but merely to demonstrate Martorello's knowledge and facilitation of the restructure, as well as its design to provide non-tribal members (including Martorello) with continued involvement in the enterprise.

But even if these purported facts were relevant (they aren't), the Court should disregard them because they are wrong. As detailed in their opening brief, the evidence shows that Martorello was the impetus behind the sale of Bellicose to the LVD and that he aggressively pursued the sale to insulate himself from legal liability. ECF No. 1166 at 13-19. In fact, he approached Rob Rosette, LVD's counsel, about the restructure on October 14, 2013—a mere two

---

WL 6784352, at *5-9. At this Court found, "at the time of the initial formation of Red Rock, Martorello understood that his company, Bellicose, would operate the lending business in which Red Rock was to be engaged completely and that the 'Tribe's managers are not involved in the business.'" *Id*. at *5. The Court also found that the Tribe's co-managers paid a "rather meaningless role" and that neither the Tribal Entities nor its employees established the underwriting criteria or made the decision to make the loans. *Id*. at *5-6. The Court also rejected the significance of the Servicing Agreement's delegation of authority over origination to Red Rock: the "record shows that the intellectual property kept by Martorello's company, Sourcepoint, and was not known by, or available to, the Tribal entities that nominally were making the loans at issue." *Id*.

7

weeks after the *Otoe-Missouria* decision. ECF. No. 1166-24. This email was clear that the sale must be "structured to provide all entities sovereign immunity." *Id.* (emphasis added).

The evidence further shows that—contrary to Martorello's claims—LVD was initially uninterested in the sale.[4] This is confirmed by the August 2014 email to Chairman Williams, where wrote explained that he had "to stress the urgency on [his] end" and "SPVI/BVI are looking to move very quickly on such an exit." ECF. No. 1166-32. "[R]ather than putting the business on the 'auction block' to the highest bidder," Martorello stated that he was coming "exclusively to LVD," but it was "important that LVD knows that time is of the essence for SPVI/BVI in getting a sale done." *Id.* Chairman Williams did not respond to Martorello's email that day, prompting Martorello to email Karrie Wichtman later that evening, complaining that he had not heard "anything back from the Chairman" in response to his email, nor did Martorello get "any sense of excitement from anyone[.]" Ex. 34 at Rosette_Revised_045272. The evidence showed that LVD's position changed after the Second Circuit affirmed *Otoe*. ECF. No. 1166-36 (email from Wichtman saying that the best path was to "go quietly into the night and restructure based on what we know from the opinion in order to build an even stronger case for future litigation.").[5]

---

[4] While Martorello asserts that Hazen and Wichtman asked Martorello to consider selling in 2012, there is no documentary evidence to support this self-serving testimony. In fact, there is ample evidence to the contrary, including documents showing that the LVD was looking for a "turn-key" product, Ex. 3 at JPB00383, and Vice Chairwoman Pete's testimony that the LVD was not looking to learn the business, Ex. 4 ¶ 6.

[5] There is also substantial evidence that contradicts Martorello's self-serving contention that the sale was for tax purposes. For example, when Mr. Martorello first emailed the LVD about the concept for the Bellicose Transaction—in 2014—Mr. Martorello stated that he would "likely have a massive negative tax consequence" associated with the sale, but he was nonetheless "ready to proceed with a potential sale of the companies/discussion." Ex. 5 at Rosette_Revised_052619. Based on this and other evidence, the Court has already rejected Martorello's alleged motivations for the Bellicose sale. *Williams*, 2020 WL 6784352, at *11.

But again, whether the LVD had a sincere and strong interest in the restructure is immaterial. Instead, Plaintiffs submitted the restructuring emails to show Martorello's significant knowledge, involvement, and facilitation of the usurious lending scheme, as well as his involvement in the restructure and what it was designed to accomplish.

Paragraphs 63-68: In these paragraphs, Martorello describes the lending enterprise as fully controlled by the LVD and its Tribal Council after the Bellicose sale. None of these facts matter because "[o]nce it is proven" that a person "was a member of the conspiracy," his "'membership in the conspiracy is presumed to continue until he withdraws from the conspiracy by affirmative action.'" *United States v. Cornell*, 780 F.3d 616, 632 (4th Cir. 2015) (quoting *United States v. Bennett*, 984 F.2d 597, 609 (4th Cir. 1993)); *see also United States v. DePriest*, 6 F.3d 1201, 1206 (7th Cir. 1993) (same). Because the evidence unquestionably shows that Martorello entered into the conspiracy, he continues to remain responsible for the actions of his co-conspirators.

Moreover, Martorello's statement of "facts" relies on mischaracterizations of the transactional documents and disregards the objective evidence about non-tribal members needing to remain in control of the business until repayment of the note. As the Fourth Circuit observed: "the record shows that Martorello planned to continue running the lending operations after the Tribe restructured" through the checks and balances in the transactional documents. *Williams v. Martorello*, 59 F.4th 68, 90 (4th Cir. 2023) (citing multiple emails authored by Martorello). The Fourth Circuit further concluded that "the record supports the conclusion that Martorello retained control over the business." *Id.* (citing an email authored by Martorello about replacing Brian McFadden as manager of Ascension). As Martorello himself explained prior to the restructure: "the [tribal] Manager[s] don't really do anything," and they "are really only involved per the [operating agreement] to get feedback from" the non-tribal president of Ascension. ECF No. 1166-

39. And, of course, Martorello did not genuinely dispute the documents showing his need to approve operational changes to the lending enterprise, such as his consent to allow new office space, the hiring of employees, and reinvestment in the business. *See* ECF Nos. 1166-50, 1166-51, 1166-52, 1166-53, 1166-54, 1166-55.

Paragraphs 69-75: None of these purported facts are material to Plaintiffs' motion for the reasons explained in the previous section. In this section, Martorello attempts to establish that he did not "control" the lending enterprise after the sale of Bellicose to the LVD or participate in any of the day-to-day operations. But again, none of these "facts" matter as they do not establish that Martorello withdrew from the conspiracy. Also, Plaintiffs need not establish that Martorello controlled or participated in the day-to-day operations of the lending operation to succeed on their § 1962(d) claim; only that he knew about and facilitated it. The undisputed evidence shows that: (1) Martorello designed the restructure to continue the usurious lending activities; (2) continued to profit from them; and (3) approved operational changes to the lending enterprise. *Id.* Pointing to his involvement in the day-to-day minutiae does not create a genuine dispute of material fact.

Paragraphs 76-78: Again, none of these purported facts are material to Plaintiffs' motion. Here, Martorello states that the LVD received significant benefits from the lending enterprise. Martorello also insinuates that LVD hired him to help build a business and that this business was worth almost $25 million in equity value in 2016.[6] While Plaintiffs disagree with Martorello's implications and characterizations of the lending enterprise, none of the facts in these paragraphs are material to the three issues on which Plaintiffs seek summary judgment.

## **ARGUMENT**

## I. **Martorello's federal preemption argument ignores decades of precedent from the Supreme Court, as well as the Fourth Circuit's binding decision in *Hengle*.**

---

[6] Plaintiffs object to Martorello's use of Cowhey's expert report and valuation for the same reasons explained in their briefing regarding their Motion to Exclude Cowhey. ECF Nos. 1183, 1232.

The foundations of the tribal lending model revolve around two distinct—but often blended—concepts. First, participants in the tribal lending industry have argued that making online loans constitutes "on the reservation" activity. *See, e.g., Hengle v. Treppa*, 19 F.4th 324, 348 (4th Cir. 2021). This was one of the cornerstones of the tribal lending model because if online lending were considered on-reservation activity, it would negate the general rule that "[a]bsent express federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to non-discriminatory state law otherwise applicable to all citizens of the State." *Id.* (quoting *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148–149 (1973)). Every court to consider this first issue has held that online lending activities "clearly constitute off-reservation conduct subject to nondiscriminatory state regulation." *Hengle*, 19 F.4th at 349 (gathering cases and quoting *Hengle v. Asner*, 433 F. Supp. 3d 825, 876 (E.D. Va. 2020)). Because "substantive state law applies to off-reservation conduct," tribal officers and their business partners may be sued for online loans that violate state laws. *Id.*

Even though online lending constitutes off-reservation conduct, the fight has not ended there. Instead, participants in the tribal lending industry have pushed a fallback argument—that generally applicable state law may be waived through choice-of-law provisions that elect tribal law to govern the loans. *Hengle*, 19 F.4th at 349. Courts have routinely rejected this argument, largely on two grounds. First, the tribal contracts and tribal codes—which were largely crafted by the same law firm (Rosette)—prospectively waive borrowers' rights and remedies. *See, e.g., Hengle*, 19 F.4th at 336-339 (examining the prospective waiver doctrine and its application to prior tribal lending contracts). And second, courts have applied generally applicable defenses to choice-of-law provisions, including whether enforcement of the choice-of-law provision would violate a state's public policy. *See Hengle*, 19 F.4th at 349-350; *see also W. Sky Fin., LLC v. State ex rel.*

11

JA1173

*Olens*, 300 Ga. 340, 347, (2016) (rejecting the defendants' argument that tribal choice-of-law provision prohibited the application of Georgia's usury laws).

As explained in Plaintiffs' opening brief, Plaintiffs are entitled to summary judgment on both issues. First, under the controlling precedent in *Hengle*, it cannot be genuinely disputed that the online loans at issue "clearly constitute off-reservation conduct subject to nondiscriminatory state regulation." *Hengle*, 19 F.4th at 349. It also cannot be disputed that the tribal choice-of-law provisions are unenforceable on two independent grounds: (1) the contracts and tribal code violate the prospective waiver doctrine as determined by this Court and the Fourth Circuit at the class certification stage; or (2) enforcement of the provisions would violate Virginia's compelling public policy against usurious lending as determined in *Hengle*.

Left with this reality, Martorello makes several frivolous arguments that contradict existing law. Out of caution, Plaintiffs will address each argument in turn.

### A.    Federal law prohibits the enforcement of the choice-of-law provision.

Martorello's overarching point is that Plaintiffs' motion "rests on the erroneous proposition that the Court should look to Virginia's choice of law jurisprudence to determine the applicable law." ECF No. 1218 at 21. Against this backdrop, Martorello makes several arguments that urge the Court to ignore the traditional conflicts of law framework that "[f]ederal courts, ***when exercising their diversity or pendent jurisdiction over state law claims***, must of course, apply the choice of law rules applicable in the forum state." *ITCO Corp. v. Michelin Tire Corp., Com. Div.*, 722 F.2d 42, 49 (4th Cir. 1983), *on reh'g*, 742 F.2d 170 (4th Cir. 1984) (emphasis added).

As a threshold matter, this argument fails because Plaintiffs moved for summary judgment on claims arising under federal law: RICO. Where, as here, "federal question jurisdiction is invoked," courts "generally apply federal common law principles to resolve choice of law

12

JA1174

disputes." *JAAAT Tech. Servs., LLC v. Tetra Tech Tesoro, Inc.*, 2017 WL 4003026, at *6 (E.D. Va. Sept. 11, 2017) (quoting *Nat'l Fair Hous. All, Inc. v. Prudential Ins. Co. of Am.*, 208 F. Supp. 2d 46, 62 (D.D.C. 2002)). As explained in Plaintiffs' opening brief, choice-of-law clauses are unenforceable *under federal law* if they are 'unreasonable under the circumstances.'" *Hunter v. NHcash.com, LLC*, 2017 WL 4052386, at *3 (E.D. Va. Sept. 12, 2017) (quoting *The Bremen v. Zapata Off–Shore Co.*, 407 U.S. 1, 9 (1972)).[7]

One *federal* exception to enforcement of a choice-of-law provision "is the so-called 'prospective waiver' doctrine, under which an agreement that prospectively waives 'a party's right to pursue statutory remedies' is unenforceable as a violation of public policy." *Hengle*, 19 F.4th at 334 (citation omitted). Applying this doctrine, this Court previously held that "[a]lthough there is no express renunciation of federal law, the net result of the loan contract is that the consumers have no meaningful way to vindicate their federal rights." *Williams v. Big Picture Loans, LLC*, 2021 WL 2930976, at *6 (E.D. Va. July 12, 2021). The Fourth Circuit affirmed this, holding that "the doctrine renders the class-action waiver unenforceable because the waiver itself, the Loan Agreement, and the Code provisions incorporated into the Loan Agreement make clear that the waiver does not permit the Borrowers to effectively vindicate their federal rights." *Williams v. Martorello*, 59 F.4th 68, 81 (4th Cir. 2023) (emphasis added). Because of this, tribal law cannot apply as a matter of federal law.[8]

---

[7] Those circumstances include if "(1) their formation was induced by fraud or overreaching; (2) the complaining party will for all practical purposes be deprived of his day in court because of the grave inconvenience or unfairness of the selected forum; (3) the fundamental unfairness of the chosen law may deprive the plaintiff of a remedy; or (4) their enforcement would contravene a strong public policy of the forum state." *Hunter*, 2017 WL 4052386, at *3 (citing *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 595 (1991); *The Bremen*, 407 U.S. at 12–13, 15, 18)).

[8] Martorello attempts to distinguish this Court and the Fourth Circuit's determination by claiming that it was limited to the choice of forum clause, not the choice of law clause. ECF No. 1218 at 30-31. Martorello also claims that the choice-of-law provision "in Plaintiffs' loan agreements does

13

**B.**    **The foundation of Martorello's argument rests on the test for conduct occurring on the reservation.**

Martorello's argument that tribal law applies must also be rejected because it revolves around a mischaracterization of federal law. *See* ECF No. 1218 at 19-20. According to Martorello, the Supreme Court has "consistently required courts to assess the applicability of state law through an interest-weighing analysis whenever it impacts on-reservation business activity." *Id*. at 22. In his view, this balancing test shows why Virginia law is preempted here. *Id*. at 22.

The Court should reject this argument because it relies on the wrong standard of law when the conduct at issue constitutes off-reservation activity. As the Second Circuit explained, the "breadth of a state's regulatory power depends upon two criteria—the location of the targeted conduct and the citizenship of the participants in that activity." *Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 769 F.3d 105, 113 (2d Cir. 2014). When the location of the targeted activity is "beyond the reservation boundaries," tribes and their members "must comply with "state laws as long as those laws are "non-discriminatory [and] ... otherwise applicable to all citizens of [that] State." *Id*. (quoting *Mescalero Apache*, 411 U.S. at 148–49).

By contrast, "once a state reaches across a reservation's borders its power diminishes and courts must weigh the interests of each sovereign—the tribes, the federal government, and the state—in the conduct targeted by the state's regulation." *Otoe-Missouria*, 769 F.3d at 113. As the Supreme Court explained, "[w]hen <u>on-reservation conduct involving only Indians is at issue</u>, state

---

not disavow federal law and, instead, specifically provides that is it governed by applicable federal law." *Id*. at 30. These arguments are frivolous. First, both this Court and the Fourth Circuit analyzed the whole contract (as well as the Tribal Code) when determining that it prospectively waived federal law. *See, e.g., Williams*, 59 F.4th at 81. And second, the Fourth Circuit also expressly rejected Martorello's reliance on the "applicable federal law" clause, explaining that "[s]uch a provision," the Fourth Circuit explained, "must be viewed in context to determine its actual meaning." *Id*. at 84 (citing *Hengle*, 19 F.4th at 341). This "context" was the repeated waivers and deprivations created by tribal law. *Id*. at 85.

14

law is generally inapplicable, for the State's regulatory interest is likely to be minimal and the federal interest in encouraging tribal self-government is at its strongest." *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 144 (1980) (emphasis added). "More difficult questions arise" where "a State asserts authority over the conduct of non-Indians engaging in activity on the reservation." *Id.*

Determining the appropriate test requires a court to identify "who a regulation targets and where the targeted activity takes place." *Otoe-Missouria*, 769 F.3d at 114. "Only then can" a court "either test for discriminatory laws," for off the reservation conduct "as in *Mescalero I*, or balance competing interest, as in *Bracker*." *Id.* Here, this analysis is easy: *Hengle* has conclusively determined that online lending activities "clearly constitute off-reservation conduct subject to nondiscriminatory state regulation." *Hengle*, 19 F.4th at 349. Accordingly, it is unnecessary to engage in the interest-weighing analysis from *Bracker*, which involved attempted state regulation of activities *on a reservation*.[9]

And even if interest-weighing analysis applies, it should not change the result as it cannot be genuinely disputed that Martorello, a non-tribal member, was the key architect of the lending operations, as well its primary beneficiary. In other words, "a tribe has no legitimate interest in selling an opportunity to evade state law." *Otoe-Missouria*, 769 F.3d at 114. And although Martorello characterizes the application of Virginia law as an affront to tribal sovereignty, it is the opposite. It is the tribe (and really, Martorello) who desires to infringe on one of fundamental components of Virginia's sovereignty: its ability to regulate and protect its residents within its

---

[9] Similarly, Martorello cites (ECF No. 1218 at 27) the Ninth Circuit's decision in *Hoopa Valley Tribe v. Nevins*, 881 F.2d 657, 659 (9th Cir. 1989), which noted that if "state law interferes with the purpose or operation of a federal policy regarding tribal interests, it is preempted." But that case involved attempted state taxation of timber harvested on the reservation, thereby implicating the "[f]ederal laws and policies" supporting "the harvest of timber <u>on tribal lands</u>." *Id.* at 559.

boundaries. Neither the LVD's sovereignty, nor its own poverty provides it with a free pass to operate "as payday lenders to reach far beyond their sovereignty and violate state consumer protection statutes with impunity." *Hengle v. Asner*, 433 F. Supp. 3d 825, 877 (E.D. Va. 2020).

### C. NABDA does not authorize tribes and their business partners to conduct business outside the reservation without conforming to state law.

Martorello also summarily contends that "the business relationships between companies affiliated with Martorello and the Tribe" further the goals of the Native American Business Development Act, Trade Promotion, and Tourism Act ("NABDA") and so "Virginia law is preempted to the extent it would undercut federal law, including NABDA." ECF No. 1218 at 28.

Although Martorello broadly cites the NABDA, he fails to point to any provision of the Act that preempts state usury laws. *Muscogee (Creek) Nation v. Henry*, 867 F. Supp. 2d 1197, 1214 (2010) (holding that NABDA did not preempt Oklahoma's tax statutes on non-tribe members who bought cigarettes), *aff'd sub nom. Muscogee (Creek) Nation v. Pruitt*, 669 F.3d 1159 (10th Cir. 2012). This is because NABDA "even when given the broadest reading to which [it is] fairly susceptible," does not provide any authorization or "discernable regulatory framework for the activity that is the subject" of this case. *Tulalip Tribes v. Washington,* 349 F. Supp. 3d 1046, 1055 (W.D. Wash. 2018) (citations and quotations omitted).

Indeed, after the passage of NABDA, the Supreme Court has expressly acknowledged that there are a "panoply of tools" available to "shutter, quickly and permanently" unlawful conduct involving tribes. *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 796 (2014). One example of those tools is a suit for "*injunctive* relief against individuals, including tribal officers, responsible for unlawful conduct." *Id*. (emphasis added) (citations omitted). Another example provided by the Supreme Court was denying "a license to Bay Mills for an off-reservation casino." *Id*. (citing Mich. Comp. Laws Ann. §§ 432.206–432.206a (West 2001)). And if the tribe "went ahead anyway," the

16

Supreme Court said that Michigan "could bring suit against tribal officials or employees (rather than the Tribe itself) seeking an injunction for, say, gaming without a license" in violation of Michigan's gaming laws. *Id.* (citing Mich. Comp. Laws Ann. § 432.220).

In sum, the "purpose of Congress is the ultimate touchstone in every preemption case." *Scott v. GMAC Mortg., LLC*, 2010 WL 3340518, at *3 (W.D. Va. 2010) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)). Without express preemptive language in a statute, courts have "long presumed that Congress does not cavalierly pre-empt state-law causes of action." *Id.* (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)). Here, there is no preemption clause in NABDA, nor is there any language in the statute remotely suggesting that Native American businesses may operate outside the reservation without complying with state law.[10]

### D. Virginia choice-of-law rules govern the choice-of-law rules for Plaintiffs' claims arising under state law.

Throughout this case, Martorello has argued that Virginia choice-of-law rules governed the enforceability of the choice of law provisions. *See, e.g.*, ECF No. 37 at 10-14 (Martorello's initial motion to dismiss arguing that the Virginia Supreme Court's decision in *Settlement Funding* required an application of tribal law). In his opposition, Martorello has now abandoned this position following the Fourth Circuit's decision in *Hengle*, which held that enforcement of the choice of law provisions would violate Virginia's public policy. Martorello should be judicially estopped from now taking a contrary position from his earlier submissions. *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001) (explaining that the doctrine of judicial estoppel prohibits "parties from deliberately changing positions according to the exigencies of the moment.") (*quoting United States v. McCaskey*, 9 F.3d 368, 378 (C.A. 5 1993)).

---

[10] Martorello further argues that the National Bank Act "supports application of federal law." Dkt. 1218 at 28-29. This two-paragraph argument is undeveloped and does not make any sense. And, of course, the National Bank Act does not cover the companies in this case.

If the Court considered Martorello's new position—that Virginia choice-of-law rules do not apply—it should be rejected as it is well settled that "[f]ederal courts, when exercising their diversity or pendent jurisdiction over state law claims, must of course, apply the choice of law rules applicable in the forum state." *Michelin Tire Corp.*, 722 F.2d at 49; *see also Harrell v. Colonial Holdings, Inc.*, 923 F. Supp. 2d 813, 821 (E.D. Va. 2013) (same). This well-established approach has been applied in tribal lending cases, and Martorello offers no reason to depart from the same. *See, e.g., MacDonald v. CashCall, Inc*, 2017 WL 1536427, at *8 (D.N.J. Apr. 28, 2017), *aff'd*, 883 F.3d 220 (3d Cir. 2018).

## II.    Martorello did not respond to Plaintiffs' request for summary judgment as to his affirmative defense that tribal immunity bars the cause of action.

Plaintiffs also moved for summary judgment on Martorello's third affirmative defense that a "cause of action based on lending by Native American tribal entities" is "barred by the operation of Tribal immunity." ECF No. 1166 at 31. Martorello did not acknowledge or provide any response to this request. Accordingly, summary judgment should be granted on this affirmative defense. *Akzo Nobel Coatings, Inc. v. Pearl Ave. USA, Ltd.*, 2010 WL 11564919, at *1, n. 1 (E.D. Va. Oct. 6, 2010) ("Pursuant to Fed. R. Civ. P. 56(e)(1), where an opposing party fails to respond to a motion for summary judgment, judgment should, if appropriate, be entered against that party."). Here, it is appropriate to enter summary judgment on this defense because it is a misstatement of the law as explained in Plaintiffs' opening brief.

## III.    Partial summary judgment should be granted on Plaintiffs' RICO conspiracy claim because mistake of law is not a defense.

As explained in Plaintiffs' opening brief, "to prove a RICO conspiracy, two things must be established: '(1) that two or more people agreed to commit a substantive RICO offense and (2) that the defendant knew of and agreed to the overall objective of the RICO offense.'" *Hengle*, 433

F. Supp. 3d at 898). In his opposition, Martorello offers a puzzling reason why he should be able to avoid liability on this claim. According to Martorello, "RICO requires knowledge that the loans were unlawful." ECF No. 1218 at 31. And because Martorello claims that there is a genuine dispute about whether he knew the loans were unlawful, summary judgment should be denied.

This theory should be rejected because "knowledge of illegality" is not an element of a RICO claim. *Mao*, 2022 WL 989012, at \*9. A person who engages in the forbidden conduct—conspiring to collect usurious debt—may be liable for a civil RICO claim "whether they knew the debt was unlawful or not." *Id*.

### A.   Martorello's theory defies the plain language of RICO.

Martorello's theory ignores the "common maxim, familiar to all minds, that ignorance of the law will not excuse any person, either civilly or criminally." *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 581 (2010) (quoting *Barlow v. United States*, 7 Pet. 404, 411, 8 L.Ed. 728 (1833)). "Our law is therefore no stranger to the possibility" that a person may be civilly liable "even if the actor lacked actual knowledge that her conducted violated the law." *Jerman*, 559 U.S. at 581.

For this reason, "when Congress has intended to provide a mistake-of-law defense to civil liability," it has "often done so [] explicitly." *Id*. at 582. For example, the Federal Trade Commission Act's administrative penalty provisions applies "only when a debt collector acts with 'actual knowledge or knowledge fairly implied on the basis of objective circumstances' that its action was 'prohibited by the FDCPA.'" *Id*. at 583-584 (quoting 15 U.S.C. §§ 45(m)(1)(A), (C)). By way of another example, Congress often triggers liability on "willful violations, a term more often understood in the civil context to excuse mistakes of law." *Id*. at 584 (internal quotations and citation omitted). Examples of this would include the Age Discrimination in Employment Act and

the Fair Credit Reporting Act. *Id.* at 584 (citing *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 125–126 (1985) as an example that "civil damages for "willful violations" of Age Discrimination in Employment Act of 1967 require a showing that the employer "knew or showed reckless disregard for the matter of whether its conduct was prohibited" (internal quotation marks omitted)); *Safeco Ins. Co. of America v. Burr*, 551 U.S. 47, 57 (2007) (same under FCRA)).

Indeed, "even in the criminal context," Congress' "reference to a 'knowing' or 'intentional' 'violation' or cognate terms has not necessarily implied a defense for legal errors." *Id.* at 585 (citing, *e.g.*, *Bryan v. United States*, 524 U.S. 184, 192 (1998) (" '[T]he knowledge requisite to knowing violation of a statute is factual knowledge as distinguished from knowledge of the law' ") (internal quotations and citation omitted); *United States v. International Minerals & Chem. Corp.*, 402 U.S. 558, 559 (1971) (holding that criminal liability for those who " 'knowingly violat[e]' " regulations governing transportation of corrosive chemicals did not require 'proof of [the defendant's] knowledge of the law'").

Contrary to these principles, Martorello asks the Court to adopt a categorical rule that a person may only be held liable for a RICO violation if the participant knew the conduct violated the law. ECF No. 1218 at 31-33. Rather than supporting his argument with the statutory text of RICO, Martorello selectively cites several sources out of context in support of his position, such as the Department of Justice's manual for federal prosecutors. ECF No. 1218 at 32 (citing *Criminal RICO*: 18 U.S.C. §§ 1961-1968, *A Manual for Federal Prosecutors*, p. 136 (6th rev. ed. 2016)). But "[a]s always, the starting point for any issue of statutory interpretation is the language of the statute itself." *D.B. v. Cardall*, 826 F.3d 721, 734 (4th Cir. 2016) (citations and internal quotations omitted). Where, as here, the "language at issue has a plain and unambiguous meaning with regard to the particular dispute, that meaning controls." *Id.* (internal quotations omitted).

20

JA1182

Here, the issue presented by Martorello's opposition is a simple question of statutory interpretation: does RICO require knowledge that loans were unlawful to impose civil liability? To answer this question, "the first task of the court" is "to look to the plain language of the statute." *Milbourne v. JRK Residential Am., LLC*, 92 F. Supp. 3d 425, 434 (E.D. Va. 2015). To determine "whether the language is plain," courts should consider "the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Newport News Shipbuilding & Dry Dock Co. v. Brown*, 376 F.3d 245, 248 (4th Cir. 2004); (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)). If the language is plain, "that language must ordinarily be regarded as conclusive." *Milbourne*, 92 F. Supp. 3d at 435 (quoting *Consumer Product Safety Comm'n et al. v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980)).

The relevant statutory text of RICO provides that it "shall be unlawful for any person to conspire to violate any provisions of subsection (a), (b), or (c)" of § 1962. 18 U.S.C. § 1962(d). In turn, § 1962(c) provides that "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). By their terms, neither of these provision require "knowing," "willful," or "intentional" violations; they simply requires a person to conduct or participate in the affairs of an enterprise engaged in the collection of unlawful debt or conspire with someone to do so. The same is true for the predicate act of collection of "unlawful debt," which is defined as a debt:

> (A) incurred or contracted in gambling activity which was in violation of the law of the United States, a State or political subdivision thereof, or which is unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury, and (B) which was incurred in connection with the business of gambling in violation of the law of the United States, a State or political subdivision thereof, or the business of lending money or

a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate[.]

18 U.S.C. § 1961(6). None of the language in this statutory definition, nor the requirements of RICO support Martorello's construction that a defendant must know his conduct was illegal.

The Supreme Court's decision in *United States v. Feola* illustrates this point. 420 U.S. 671 (1975). In that case, the Supreme Court considered whether the government needed to show that a defendant was "aware that his intended victims were undercover agents" to "successfully prosecute him for conspiring to assault federal agents" in violation of 18 U.S.C. § 371. *Id*. at 686-687. In rejecting the defendant's argument, the Supreme Court held that the statute offered "no textual support for the proposition that to be guilty of conspiracy a defendant in effect must have known that his conduct violated federal law." *Id*. at 687. Rather than reading such a requirement into the statute, the Supreme Court determined that there was "nothing on the face" of the statute "that would seem to require that those agreeing to the assault have a greater degree of knowledge." *Id*. Thus, it reasoned that a "natural reading of these words" confirmed that one could violate the statute "simply by engaging in the forbidden conduct." *Id*. The same is true for RICO.

And even if the text of the statute leaves room for doubt, the context and history of RICO provide more support for construing these provisions to exclude a mistake-of-law defense. As the Supreme Court has explained, "RICO is to be read broadly"—"not only" because of "Congress' self-consciously expansive language and overall approach," but also because of "its express admonition that RICO is to be 'liberally construed to effectuate its remedial purposes." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497 (1985) (citation omitted); *see also Clodfelter v. Republic of Sudan*, 720 F.3d 199, 211 (4th Cir. 2013) (explaining that remedial statutes "should be liberally construed and should be interpreted (when that is possible) in a manner tending to discourage attempted evasions by wrongdoers."). Given that the "elimination of loansharking was one of

Congress' principal aims in enacting the statute," *United States v. Biasucci*, 786 F.2d 504, 512 (2d Cir. 1986) (S.Rep. No. 617, 90th Cong., 2d Sess. 78–80; H.R.Rep. No. 1574, 90th Cong., 2d Sess. 5), it would be shocking that Congress intended to allow participants to avoid *civil liability* even if they lacked actual knowledge that their 800% APR loans violated the law.

For these reasons, this Court has rejected a virtually identical argument that "if Defendants did not know the debts were illegal," they could not be held liable under RICO. *Mao*, 2022 WL 989012, at \*9; *compare with* ECF No. 1218 at 33 (arguing that "Plaintiffs must prove that Martorello knew that the loans were unlawful and, with that knowledge, intentionally conspired with co-conspirators to collect them."). In doing so, this Court concluded that "knowledge of illegality" is not an element of a RICO claim and so a person may be liable for a civil RICO claim "whether they knew the debt was unlawful or not." *Id*. Multiple other cases have reached the same conclusion. *Brice v. Haynes Investments, LLC*, Case No. 18-cv-1200-WHO, Aug. 10, 2021 Final Pretrial Order (barring any evidence or argument about attorney communications because "a good faith defense" is not "relevant to any of the claims to be presented to the jury"). Thus, Martorello's lone defense to summary judgment should be rejected.

### B.     None of Martorello's cited authorities hold that RICO requires knowledge that the loans were unlawful.

Martorello's opposition ignores the plain language of the statute, as well as multiple decisions rejecting his theory. *See generally* ECF No. 1218 at 31-33. Consistent with this, Martorello never takes a position about what word or phrase in RICO makes willfulness or specific intent an element of the violation at issue. *Id*. Is it the definition of "unlawful debt"? Or is it in the element of §§ 1962(c)-(d)? Martorello's failure to tether his argument to the statutory language is telling. Rather than identify the statutory text, Martorello's brief cites three authorities in support

23

of his claim that Plaintiffs must prove Martorello had actual knowledge of the illegality of his conduct. ECF No. 1218 at 33.

First, Martorello cites two criminal cases from the Fourth Circuit, which stated: "to satisfy § 1962(d), the government must prove that an enterprise affecting interstate commerce existed; 'that each defendant **knowingly** and **intentionally** agreed with another person to conduct or participate in the affairs of the enterprise; and ... that each defendant knowingly and willfully agreed that he or some other member of the conspiracy would commit at least two racketeering acts.'" *See, e.g.*, *United States v. Mouzone*, 687 F.3d 207, 218 (4th Cir. 2012) (emphasis added). Without any support, Martorello suggests that the Fourth Circuit's inclusion of the words "knowingly and willfully" means that RICO liability requires a showing of knowingly unlawful conduct. ECF No. 1218 at 31-32. Neither of these words—even assuming they apply to a civil claim for collection of unlawful debt—impose the requirement posited by Martorello.

Instead, the term " 'knowingly' merely requires proof of knowledge of the facts that constitute the offense." *Bryan v. United States*, 524 U.S. 184, 193 (1998). Put differently, "the term 'knowingly' does not necessarily have any reference to a culpable state of mind or to knowledge of the law." *Id*. at 192. Instead, even when the term is used *in a statute*, "the knowledge requisite to knowing violation of a statute is factual knowledge as distinguished from knowledge of the law." *Id*.; s*ee also RSM, Inc. v. Herbert*, 466 F.3d 316, 320 (4th Cir. 2006) (" 'Knowingly' typically refers only to one's knowledge of the facts that make his conduct unlawful, not to one's knowledge of the law."). For example, "a charge that the defendant's possession of an unregistered machinegun was unlawful required proof 'that he knew the weapon he possessed had the characteristics that brought it within the statutory definition of a machinegun." *Id*. (quoting *Staples v. United States*, 511 U.S. 600, 602 (1994). If the person knew about the characteristics of the

machinegun, it is unnecessary "to prove that the defendant knew that his possession was unlawful." *Id*. The same is true here—it is Martorello's knowledge regarding the characteristics of the loans that matters, not whether lawyers told him that they were legal.

The "word 'willfully' is sometimes said to be a 'word of many meanings' whose construction is often dependent on the context in which it appears." *Id*. at 191. When willfulness is *not* a condition to civil liability, the "word often denotes an act which is intentional, or knowing, or voluntary, as distinguished from accidental." *Id*., n. 12; *see also RSM, Inc. v. Herbert*, 466 F.3d 316, 320 (4th Cir. 2006) (explaining that "[a]t its core," the term willfulness "describes conduct that results from an exercise of the will, distinguishing 'intentional, knowing, or voluntary' action from that which is 'accidental' or inadvertent."); *United States v. Blankenship*, 846 F.3d 663, 672 (4th Cir. 2017) (same); *United States v. McBride*, 908 F. Supp. 2d 1186, 1205 (D. Utah 2012) ("In civil contexts involving a requirement to report or disclose certain information to the IRS, willfulness has been defined as conduct which is voluntary, rather than accidental or unconscious."). By contrast, "where willfulness is a statutory condition of civil liability," it has generally covered "not only knowing violations of a standard, but reckless ones as well." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57 (2007).

The plain language of RICO does not condition liability on a person who "willfully" violates the statute. 18 U.S.C. § 1962(d); *compare with, e.g.*, 15 U.S.C. § 1962(n)(a). Thus, the Court should not interpret the Fourth Circuit's "bare use of the word 'willfully'" in *Mouzone* to "signal that the statute implies a requirement that the defendant act with knowledge that his conduct was prohibited by law." *Council on Am.-Islamic Rels. Action Network, Inc. v. Gaubatz*, 31 F. Supp. 3d 237, 265, n. 10 (D.D.C. 2014). This is all the more true because *Mouzone* was a

criminal case, rather than a civil action where "willful conduct is most often defined simply as that which is intentional, rather than inadvertent or accidental." *Id*.

Along with *Mouzone*, Martorello also selectively cites the Department of Justice's manual for federal prosecutors as support for his position that Plaintiffs must prove that Martorello had actual knowledge his conduct violated the law. ECF No. 1218 at 32 (citing Criminal RICO: 18 U.S.C. §§ 1961-1968, A Manual for Federal Prosecutors, p. 136 (6th rev. ed. 2016)). Yet this manual expressly acknowledges that: "Every court that has considered the issue has held that RICO does not require any mens rea or scienter element beyond what the predicate offenses require. ***Therefore, willfulness or other specific intent is not an element of a RICO offense***; however, if any of the predicate offenses require proof of willfulness or specific intent then such requirement must be met regarding that predicate offense." *Id*. at 331 (emphasis added). Despite this, the manual adds that "it is the policy of the Organized Crime and Gang Section to allege and prove at least that the RICO defendant acted knowingly or intentionally to eliminate any issue that the RICO defendant did not have the requisite criminal intent." *Id*. at 331-332. Once this policy is understood, it provides the context for the portion trumpeted by Martorello, which merely recites the internal policy to seek to prove a defendant knew the debt was unlawful.  *Id*. at 136.

Finally, Martorello also cites (ECF No. 1218 at 32-33) the Second Circuit's decision in *Grote*, which expressed "no view on whether willfulness or awareness of unlawfulness was required for" the criminal convictions of two individuals involved in a tribal lending scheme. *United States v. Grote*, 961 F.3d 105, 119 (2d Cir. 2020)). In *dicta*, however, the Second Circuit expressed concern with its prior holding in *Biasucci* and its potential to result in a conviction where "high interest rates can result from application of reasonable service fees to small debit balances," such as where a store owner mailed a "monthly bill that charged $15 fee where the customer's

unpaid balance was sufficiently small." *Id*. at 120-121.[11] The court added: "If RICO liability requires no proof of state of mind other than what is required to show that the loan is unenforceable" under state law, "this can produce criminal liability for racketeering for unexceptionable conduct" such as the store owner imposing the late fee. *Id*. at 121. The Second Circuit, however, declined to adopt a rule to address this issue because the defendants partook in "predatory lending practices" quite different from the hypothetical store owner. *Id*. at 120.

The Second Circuit's decision in *Grote* offers no help to Martorello. For starters, it never remotely suggests that RICO requires proof of actual knowledge that their conducted violated the law. Nor did it examine the plain language of the statute. It also did not overturn the Court's prior holding from *Biasucci*, which held that "RICO imposes no additional mens rea requirement beyond that found in the predicate crimes." *United States v. Biasucci*, 786 F.2d 504, 512 (2d Cir. 1986). The *Grote* court also did not canvass whether the hypothetical store owner could be civilly liable for the imposition of improper late charges.

### C.  Other than his erroneous mistake of law defense, Martorello did not oppose that he knew about and agreed to facilitate the scheme.

As explained in Plaintiffs' opening brief, a conspiracy claim under RICO "does not require that a defendant have a role in directing an enterprise." *Mouzone*, 687 F.3d at 218. Rather, in the Fourth Circuit, "simply agreeing to advance a RICO undertaking is sufficient." *Id*. "Once it has been shown that a conspiracy exists, the evidence need only establish *a slight connection* between the defendant and the conspiracy" to support a violation of § 1962(d). *See United States v. Brooks*, 957 F.2d 1138, 1147 (4th Cir. 1992) (emphasis added). A "slight connection" is satisfied by showing "knowledge of the essential nature of the plan." *United States v. Morrow*, 914 F.2d 608,

---

[11] It is unclear why this example troubled the Second Circuit as RICO's unlawful debt provision only applies to debt incurred in connection with "the business of lending money," not a store who imposes late charges on the failure to return goods. 15 U.S.C. § 1961(6).

612 (4th Cir. 1990). Put differently, once a defendant knows of the conspiracy, he "could, for example" be liable if it is proven "that the defendant agreed to facilitate a scheme by providing tools, equipment, cover, or space." *United States v. Zemlyansky*, 908 F.3d 1, 12, n.6 (2d Cir. 2018).

In his opposition, Martorello does not—and cannot—contest that he has far more than a slight connection to the usurious lending scheme. While the parties disagree on the level of meaningful involvement of the LVD, it does not matter to Martorello's liability as no one disputes that Martorello had a major connection to this longstanding scheme. Because Martorello concedes that he knew about and facilitated the usurious lending activities, partial summary judgment should be awarded to Plaintiffs as to each of the liability elements of their § 1962(d) conspiracy claim.

**IV.    Martorello did not respond to Plaintiffs' request for summary judgment that: (1) an enterprise existed; (2) the loans constituted unlawful debts; and (3) persons associated with the enterprise engaged in the collection of unlawful debt in violation of § 1962(c).**

Plaintiffs' opening brief sought partial summary judgment that a violation of § 1962(c) occurred. ECF No. 1166 at 36. More specifically, Plaintiffs sought summary judgment as to each of the core elements of § 1962(c) claim, *i.e.*, that (1) an enterprise existed; (2) the loans constituted unlawful debts under RICO; and (3) persons associated with the enterprise—not necessarily Martorello—participated in the affairs through the collection of unlawful debt. *Id.*

Granting summary judgment—in whole or in part—as to certain elements is a routine practice in federal courts. *See, e.g.*, *Wallace v. Love's Travel Stops & Country Stores*, 2022 WL 3021019, at *17 (E.D. Va. July 20, 2022) (granting summary judgment on the first element of plaintiffs' claim of negligence per se); *Gemalto Pte Ltd. v. Telecommunications Indus. Ass'n*, 2009 WL 464484, at *7 (E.D. Va. Feb. 24, 2009) (granting summary judgment on one element of plaintiff's negligence claim); *Dreher v. Experian Info. Sols., Inc.*, 71 F. Supp. 3d 572, 584 (E.D.

Va. 2014) (granting "partial summary judgment on the willfulness liability issue" of the plaintiffs' FCRA claims), *vacated on the grounds*, 856 F.3d 337 (4th Cir. 2017).

Partial summary judgment on each of these issues should be awarded because Martorello did not acknowledge or respond to Plaintiffs' request as to any of these elements. *Akzo Nobel Coatings*, 2010 WL 11564919, at *1, n. 1 ("where an opposing party fails to respond to a motion for summary judgment, judgment should, if appropriate, be entered against that party."). Instead, in a two-page section entitled "Plaintiffs have not demonstrated that Martorello 'directed' the affairs of the alleged RICO enterprise as required under § 1962(c)," Martorello contends that his participation "never rose to the level required to create RICO liability under *Reves*." ECF No. 1218 at 39. This misses the mark as it was never argued or asserted in Plaintiffs' opening brief that Martorello violated § 1962(c). *See generally* ECF No. 1166.

Because Plaintiffs' motion for partial summary judgment establishes all the elements of a substantive violation *by some members of the enterprise*, there is no need to prove that Martorello himself committed the substantive violation under the Supreme Court's decision in *Salinas v. United States*, 522 U.S. 52, 61 (1997). There, the jury acquitted the defendant "on the substantive count" under § 1962(c), but convicted him of conspiracy under § 1962(d). *Id.* at 62-63. The defendant challenged the conviction on the theory that the jury should have been "instructed that he must have committed or agreed to commit two predicate acts himself." *Id.* at 63. In other words, the defendant argued that the § 1962(d) conviction could be upheld only if he was also convicted of a substantive violation of § 1962(c).

The Supreme Court rejected held that the defendant's "interpretation of the conspiracy statute" was "wrong," and explained that there was "no requirement of some overt act or specific act in the statute" unlike "the general conspiracy provision applicable to federal crimes." *Id.* The

Supreme Court further added that "partners in the criminal plan must agree to pursue the same criminal objective and may divide up the work, yet each is responsible for the acts of the each other." *Id*. at 64. Put differently, a person "may conspire for the commission of a crime by a third person," and the "interplay between subsections (c) and (d) does not permit us to excuse from the reach of the conspiracy provision an actor who does not himself commit or agree to commit the two or more predicate acts requisite to the underlying offense." *Id*. at 64-65 (citation omitted).

With these principles in mind, the Supreme Court affirmed the conviction because even if the defendant "did not accept or agree to accept bribes" in violation of § 1962(c), there was still "ample evidence that he conspired to violate subsection (c)." *Id*. at 65. This evidence showed that the defendant's co-conspirator "committed at least two acts of racketeering activity when he accepted numerous bribes," and that the defendant "knew about and agreed to facilitate the scheme." *Id*. at 66 (emphasis added). Nothing more is required. And following *Salinas*, courts have repeatedly rejected arguments that a defendant must commit a substantive violation of RICO to be liable under RICO's conspiracy provision. *See, e.g.*, *Smith v. Berg*, 247 F.3d 532, 534 (3rd Cir. 2001); *United States v. Fernandez*, 388 F.3d 1199 (9th Cir. 2004) (same).

So too here. Even if Martorello did not participate in the management of the affairs, partial summary judgment may be awarded on the conspiracy claim that he knew about and facilitated the scheme. Similarly, the undisputable evidence also shows that (1) an enterprise existed; (2) the loans constituted unlawful debts under RICO; and (3) persons associated with the enterprise—not necessarily Martorello—participated in the affairs through the collection of unlawful debt. ECF No. 1166 at 36-39. Accordingly, partial summary judgment should be awarded as to each of these core elements of Plaintiffs' claim, thereby leaving a jury to determine: (1) whether Martorello also participated in the management; and (2) the proper amount of damages.

Respectfully submitted,

**PLAINTIFFS,** *on behalf of themselves and the classes as certified by the Court*

By*: /s/ Kristi C. Kelly*
              Counsel

Kristi Cahoon Kelly (VSB #72791)
Andrew Joseph Guzzo (VSB #82170)
KELLY GUZZO, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
Phone: 703-424-7572
Fax: 703-591-0167
Email: kkelly@kellyguzzo.com
Email: aguzzo@kellyguzzo.com

Leonard Anthony Bennett
Consumer Litigation Associates
763 J Clyde Morris Boulevard, Suite 1A
Newport News, VA 23601
Telephone: 757-930-3660
Facsimile: 757-930-3662
Email: lenbennett@clalegal.com
*Counsel for Plaintiffs*

JA1193

Exhibit 1

**RENEE GALLOWAY, ET AL. vs JUSTIN MARTORELLO, ET AL.**
**Matthew B. Martorello on 03/29/2023**

```
 1                 IN THE UNITED STATES DISTRICT COURT
                 FOR THE EASTERN DISTRICT OF VIRGINIA
 2                        RICHMOND DIVISION

 3

 4      _____

 5
        RENEE GALLOWAY, et al.
 6                   Plaintiffs,

 7      v                                   3:19-cv-314

 8      JUSTIN MARTORELLO, et al.,
                     Defendants.
 9
        _____
10

11

12           The video recorded deposition of MATTHEW B.

13      MARTORELLO, a witness in the above-entitled cause,

14      taken before Samantha Evans Robertson, Notary Public

15      in and for the Commonwealth of Virginia at Large, via

16      Zoom, on March 29, 2023, commencing at or about the

17      hour of 11:39 a.m.

18

19

20

21

22

23

24

25
```

USCA4 Appeal: 23-2087    Doc: 11-3    Filed: 12/06/2023    Pg: 250 of 438

```
 1   it was in February 2012.  I just don't know what -- at
 2   what point in time that happened.
 3        Q     Okay.  Do you -- do you recall ever owning
 4   more than 30 percent?
 5        A     Well, 100 percent until I didn't own 100
 6   percent, and then it was 30 percent.
 7        Q     Okay.  Understood.
 8              And so the final field in this column is
 9   identified as the net payment allocated to MM trust.
10              Do you see that?
11        A     Yeah.
12        Q     Okay.  So this field identifies the actual
13   net payment distributed to you and the trust
14   collectively; is that right?
15        A     No.
16        Q     Okay.  Explain to me why I'm not
17   interpreting that right.
18        A     Well, it has nothing to do with
19   distributions.  This is just a calculation of Row 11
20   times Row 12 to say what the economic benefit was of
21   that net payment calculation relative to that
22   aggregate percentage we went over on Row 12.
23              It doesn't -- it's not a distribution.
24   It's just a calculation of net benefit.
25        Q     Okay.  So the key on this column is the
```

**RENEE GALLOWAY, ET AL. vs JUSTIN MARTORELLO, ET AL.**
**Matthew B. Martorello on 03/29/2023**                        Page 107

```
 1    word allocate, right, as opposed to distribution?
 2              What -- if I understand you -- you
 3    correctly, you're telling me we didn't actually
 4    necessarily get this money, but it was a net economic
 5    benefit to us?  Did I understand that correctly?
 6        A    Right.
 7              MR. GIVEN:  Object to form.  You can
 8        answer.
 9              THE WITNESS:  Yeah.  It would be like --
10        yeah, like if you keep a capital account on a
11        balance sheet, it would be -- it would be
12        recorded there.
13
14    BY MR. GUZZO:
15        Q    Okay.  So --
16        A    But it doesn't actually go anywhere.
17    Yeah.
18        Q    And then -- so this would have been
19    reported on your taxes for the month of February 2012?
20        A    Yeah, in some form.  Not specifically,
21    maybe, this number or anything.  But yeah --
22        Q    Okay.
23        A    -- it's part of what's on my tax returns.
24        Q    Okay.  So I'm going to hopefully share
25    this with you.
```

USCA4 Appeal: 23-2087    Doc: 11-3    Document 1241-1    Filed 12/06/2023    Pg: 252 of 438
Case 3:17-cv-00461-REP    Document 1241-1    Filed 05/16/23    Page 5 of 5 PageID# 51950

**RENEE GALLOWAY, ET AL. vs JUSTIN MARTORELLO, ET AL.**
**Matthew B. Martorello on 03/29/2023**

Page 150

```
 1                 COURT REPORTER'S CERTIFICATE

 2

 3    COMMONWEALTH OF VIRGINIA:

 4    CITY OF NORFOLK:

 5

 6         I, Samantha Evans Robertson, Notary Public in and

 7    for the above county and state, do hereby certify that

 8    the foregoing testimony was taken before me at the

 9    time and place hereinbefore set forth; that the

10    witness was by me first duly sworn to testify to the

11    truth, the whole truth, and nothing but the truth;

12    that thereupon the foregoing testimony was later

13    reduced by computer transcription; and I certify that

14    this is a true and correct transcript of my

15    stenographic notes so taken to the best of my

16    ability.

17         I further certify that I am not of counsel to

18    either party, nor interested in the event of this

19    cause.

20

21    Given under my hand this 31st day of March, 2023.

22    My commission expires December 31, 2023.

23

24                          _____
                            Samantha Evans Robertson,
25                          Court Reporter
                            Notary Registration Number 7512786
```

# Exhibit 2

# Filed Under Seal

Exhibit 4

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

RENEE GALLOWAY, et al.,                     :
                                            :
                        Plaintiffs,         :
v.                                          :   Civil Action No. 3:18-cv-406-REP
                                            :
BIG PICTURE LOANS, LLC, et al.,             :
                                            :
                        Defendants.         :

## <u>DECLARATION OF JOETTE PETE</u>

I, Joette Pete, hereby make this Declaration under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1.     My name is Joette Pete. I am the former Vice Chairwoman of the Lac Vieux Desert Band of Lake Superior Chippewa Indians. I served in this capacity between 2010 and 2016. I am over the age of twenty-one and otherwise competent to testify as to the matters contained herein. I have personal knowledge of these matters contained herein based on my experience as Vice Chairwoman, as well as a tribal member of the Lac Vieux Desert Band of Lake Superior Chippewa Indians.

2.     In 2011, Tribal Council was approached by Matt Martorello with an opportunity to participate in a lending business. In the fall of 2011, Martorello visited our reservation to meet with Tribal Council to present the deal. During this presentation, Martorello explained that his company would run the business if LVD

1

JA1201

allowed him to claim that LVD law applied to the loans. Under the deal, LVD would receive 2% of the gross revenue from the loans.

3.    When Tribal Council initially agreed to the deal with Martorello, we understood that all aspects of the lending business would be handled by Martorello and that the Tribe would have no risk. It was understood that Martorello's company would handle everything, including underwriting, marketing, servicing, funding, and collection of the loans. Because Martorello was going to completely run the lending business, he received the most of the profits.

4.    For Martorello to be able to claim that LVD law applied to the consumer loans, the deal required that Red Rock "originate" the loans. But, this responsibility was immaterial because Red Rock would have no reason to reject a loan that satisfied Martorello's lending criteria because Martorello ran the business and bore all the risk. After the inception of the business, it was operated completely by Martorello until government regulators and litigation against competitors began. As these cases proceeded, efforts were made to create the appearance of the Tribe's involvement, but the Tribe had no substantive involvement.

5.    I have read the declaration of Michelle Hazen submitted in connection with the lawsuits against Big Picture, Ascension, and Matt Martorello. It is my understanding that it is inaccurate for Hazen to assert that "All of Red Rock's employees, computers, and records were on LVD's reservation lands at all times." I

JA1202

understand that Martorello operated Red Rock exclusively for a significant amount of time after its inception. I understand that some employees, computers, and records were located off the reservation.

6.    It is also inaccurate for Hazen to claim that Red Rock contracted with Bellicose VI "to learn the lending industry." That was never the goal when LVD formed Red Rock; nor did Martorello attempt to teach us anything about the business. Tribal Council and other members of the tribe did not have access to information regarding the business. Instead, the relationship with Martorello was presented as an opportunity to make money, with no risk of loss, in exchange for rubberstamping LVD's name on loans. And that is what occurred.

7.    Additionally, although business information was kept secret from Tribal Council, it was my understanding that the co-managers did not receive a salary or compensation for their roles as co-managers, at least for the first two years of the business. Instead, the co-managers were volunteers, who were involved for "optics" and to provide pro forma approval of recommendations provided by Bellicose. I believe both co-managers worked other full-time jobs, in addition to their service as tribal council members, at least until January 2014 after we started making structural changes due to lawsuits against the business model.

8.    Similarly, it is also inaccurate and misleading for Hazen to assert that "LVD had gained considerable experience and knowledge of the online lending

3

JA1203

industry" thereby prompting it to look for ways "to expand its online lending business to earn money for LVD." This is inaccurate because Martorello initiated and developed the concept to restructure after the district court ruled against Red Rock in its litigation against the New York Department of Financial Services.

9.      For example, less than three weeks after the district court's decision in Otoe-Missouria, I received the e-mail attached hereto as Exhibit 1 from Martorello. In this e-mail, Martorello detailed his "concept" to "facilitate a transition to LVD" of his "businesses." This e-mail was sent shortly after another e-mail from Martorello, where he detailed his fears that the Otoe-Missouria decision would "precipitate" a potential investigation and prosecution of him personally. Attached as Exhibit 2 is a true and accurate copy of that e-mail correspondence. This is the first time we were ever presented with the opportunity "to own" the business, but it would still be controlled by Martorello as proposed.

10.     In 2014-2016, LVD's Tribal Council did not look for ways to expand its business and did not gain considerable experience and knowledge of the industry. The restructure was driven by Martorello's desire to attempt to obtain sovereign immunity for his businesses. Other than receiving our monthly proceeds, Tribal Council had nominal involvement and little understanding about the operations of the business, and the Tribe was not in a position to run the business.

JA1204

11.     As part of the restructure, I have learned that Matt Martorello's emails were destroyed. I did not participate in the destruction of Martorello's emails. I do not know who performed this task, and to my knowledge, it was not presented to Tribal Council for approval. However, it does not surprise me that the e-mails were destroyed because a shredding company was also hired to destroy paper records related to the business. This had never been done in the past and was performed specifically to conceal the truth about the business.

12.     And unless they were deleted/destroyed, Tribal Council kept audio recordings of our monthly meetings. These audio recordings would be consistent with the statements herein and would show the lack of meaningful involvement of Tribal Council in the lending business.

I have reviewed this Declaration and declare under penalty of perjury that the foregoing statements are true to the best of my knowledge and belief.


Date: August 20, 2019

Joette Pete

JA1205

**Joette Pete-Baldwin**

| | |
|---|---|
| **From:** | Matt Martorello <mattm@bellicosevi.com> |
| **Sent:** | Monday, October 14, 2013 4:14 PM |
| **To:** | Karrie Wichtman; Chairman James Williams; Cheryl McGeshick; Eli Edwards; gkway@lvdtribal.com; Henry Smith; Joette Pete-Baldwin (joette.pete@lvdtribal.com); John McGeshick, Jr.; Susan McGeshick (susan.mcgeshick@lvdcasino.com); Tyrone McGeshick (tyrone.mcgeshick@lvdcasino.com) |
| **Cc:** | Craig Mansfield (craig.mansfield@lvdcasino.com); Justin Martorello |
| **Subject:** | SPVI Equity Transfer to LVD |

Good afternoon,

Below is the beginning of a concept I have to facilitate a transition to LVD of MY businesses.  The abrupt termination of RRTL/DCTF, as it is written in the existing servicing agreements, is an oversimplified end that we have for some time been meaning to revisit.  I think it is time to move forward on the proper legacy plan for how our companies come together.  I believe Rob and Karrie can provide some highlights, but I do believe the items below should be able to get us to a term sheet with the goal of FINAL documents delivered on 10/30/13.  The documents will not be as daunting as the list below appears, for tax structuring reasons, it is a little more complicated than it appears.

- Assign today to LVD - 51% of Bellicose VI, LLC <u>Equity only</u> membership interest tied to the SPVI subsidiary only (i.e. SPVI is a wholly owned sub of Bellicose, as it must be for tax reasons.  Therefore, LVD's equity share for the subsidiary would be at the Bellicose parent company level):
  - LVD will own 51% equity, but 0% profits interest until month 49 when it becomes 100% equity and 80% profits
  - BlueTech will own 49% equity, but 100% profits interest until month 49 when it becomes 0% equity and 20% profits
  - Current Manager (myself) will be locked in as the decision maker for 48 months, at which point they will hire a new Manager to replace me
  - In month 49, Profits will be 80% LVD and 20% BlueTech for 10 years, after which it is 100% profits to LVD.
- Assign today to LVD - 51% of 7X Services, LLC <u>Equity only</u> for a membership class tied to:
  - Iron Fence Investments, LLC
  - Obsidian Armor Fund, LLC (note this will be dissolved before the 48 month mark)
  - WMS (where both WMS and SPVI terminate the existing option agreements)
  - On January 1st, due to my forthcoming 2014 restructuring, Bellicose VI, LLC will be transferred 100% to 7X Services, LLC and LVD's Equity will be shifted to DIRECTLY to SPVI (as we move from the VIs to Puerto Rico)
- Other:
  - Appropriate waivers of SI to protect the Assignors and Managers
  - Structured to ensure the integrity of sovereign immunity
  - It is possible the currently Delaware and Virgin Islands LLCs, may need to be migrated to be LVD LLCs (perhaps AFTER the closing in the interest of time)
  - Castle stops NEW customer loans beginning on January 31, 2014 and only does VIP loans thereafter (same as DCTF today)
  - Tribe uses its own capital to launch a new portfolio in Q1 2014, in which SPVI generates the same fees from the TLE, but LVD gets to keep 75% of the profits interest on the SPVI side for servicing the portfolio, until that 48th month.  Adjusts the same thereafter. (This is required for tax purposes)
  - Proper indemnities to the Assignors and Managers
  - No strings attached, no requirements, no liability to LVD by Assignors or Managers on the new LVD portfolio, RRTL, DCTF, or on anything that may happen after month 48.  Best efforts basis.

JPB 00988

JA1206

## Joette Pete-Baldwin

| | |
|---|---|
| **From:** | Matt Martorello <mattm@bellicosevi.com> |
| **Sent:** | Wednesday, October 02, 2013 4:28 PM |
| **To:** | Karrie Wichtman; Chairman James Williams; gkway@duckcreektf.com; Craig Mansfield |
| **Cc:** | Justin Martorello; Daniel Gravel; weddlej@gtlaw.com; Saba Bazzazieh; Rob Rosette; Cheryl McGeshick; Eli Edwards; gkway@lvdtribal.com; Henry Smith; Joette Pete-Baldwin (joette.pete@lvdtribal.com); John McGeshick, Jr.; Susan McGeshick (susan.mcgeshick@lvdcasino.com); Tyrone McGeshick (tyrone.mcgeshick@lvdcasino.com) |
| **Subject:** | RE: Notice to Cease Servicing Origination of New Loans to NY consumers |

Thanks for the clarification on these points of distinction Karrie, we'll take a closer look at the details of the provisions and circle back shortly. Simply put in the meantime, we do recommend that RRTL and DCTF stop issuing new and returning customer loans in the State of NY at this time.

**From:** Karrie Wichtman [mailto:kwichtman@rosettelaw.com]
**Sent:** Wednesday, October 2, 2013 4:39 PM
**To:** Matt Martorello; Chairman James Williams; gkway@duckcreektf.com; Craig Mansfield
**Cc:** Justin Martorello; Daniel Gravel; weddlej@gtlaw.com; Saba Bazzazieh; Rob Rosette; Cheryl McGeshick; Eli Edwards; gkway@lvdtribal.com; Henry Smith; Joette Pete-Baldwin (joette.pete@lvdtribal.com); John McGeshick, Jr.; Susan McGeshick (susan.mcgeshick@lvdcasino.com); Tyrone McGeshick (tyrone.mcgeshick@lvdcasino.com)
**Subject:** RE: Notice to Cease Servicing Origination of New Loans to NY consumers

Matt and SPVI Team,

Please advise as to the intent of your email as it is my understanding that your email and the citation to Section 9.4 of the Servicing Agreement is effectively a declaration of breach or dispute being asserted in writing in accordance with Section 18.1 of the Servicing Agreement, considering that that provision cited calls for cessation of the obligations of the parties to one another under the Agreement and states that the "Agreement shall be of no further force and effect". Claiming such a breach under 9.4 necessarily requires that such material change in law be based upon "a final judgment of a court of competent jurisdiction, after all appeals thereof". The Order of the Court denying the Plaintiff's Preliminary Injunction is certainly not such an order as it is not a final judgment of a court, appealable and while no such appeals have yet been file we have 30 days from yesterday's date to do so. Transmitting such a notice declaring a breach, if that is the intent here, is unwarranted and unsupported by the facts at hand. It matters not how Judge Sullivan's order will be regarded by overzealous regulatory agencies but rather that such an order IS NOT, in fact, a final order of the Court on the merits changing a material aspect of the Legal Requirements governing the agreement of the parties. Furthermore the provision does not appear to allow for the singling out of a particular state, in this case NY, to wind down business- which is the cause for my confusion – and leads me to believe that it is not your intent at all to make such a declaration of breach.

Indeed, your email, the concerns expressed, and the recommendations therein seem to fall more in line with Section 4.2 in that as the Servicer you have been contracted to advise the Enterprise regarding the "orderly administration and management of Enterprise in the areas of financial reporting, financing, regulatory compliance, marketing, human resources, development of third party servicer relationships, collections and risk assessment". Among other provisions included in Section 4.2 , your observations, and recommendation to the Enterprise not to lend to and wind down business involving residents in the State of New York surely fits within Section 4.2.1 (a) whereby the "Servicer will be responsible for providing pre-qualified leads to Enterprise and providing the necessary credit-modeling data and risk assessment strategies by which the Enterprise may evaluate to whether or not to extend funds to an individual borrower based on criteria that has been established by the Enterprise." Note that the Agreement, in that same section, however,

1

JPB 00980
JA1207

makes quite clear that "The criteria used to extend funds to individual borrowers will remain within the sole and absolute discretion of the Enterprise and the Enterprise shall execute all necessary loan documentation". Therefore, in the spirit of clarification of your earlier email, would you agree that a better way to approach this matter may be for the Servicer as provided for in Section 4.2.1 (a) to make a recommendation to the Enterprise that in light of recent enforcement actions taken by the State of NY Department of Financial Services, the pending litigation and the recent preliminary Order of the Court, that the Enterprise refrain, immediately, and until further notice, from making new loans in the State of New York and that current loans be wound down until paid in full or some other disposition of the debt to the Enterprise has been reached?

I look forward to your response so that I may advise my client.

Regards,

**Karrie S. Wichtman, Partner**
**Rosette, LLP**
**Attorneys at Law**
Michigan Office
25344 Red Arrow Hwy, Suite B
Mattawan, MI 49071
269.283.5005 – Office
480.242.6959 - Cell
517.913.6443 – Fax
kwichtman@rosettelaw.com
www.rosettelaw.com

CONFIDENTIAL COMMUNICATION: THIS MESSAGE IS A CONFIDENTIAL ATTORNEY COMMUNICATION ONLY FOR USE BY THE INTENDED RECIPIENT. ANY INADVERTENT RECEIPT SHALL NOT CONSTITUTE A WAIVER OF ATTORNEY-CLIENT OR WORK PRODUCT PROTECTION. IF RECEIVED IN ERROR, PLEASE NOTIFY KARRIE S. WICHTMAN IMMEDIATELY AND DELETE THIS MESSAGE. THANK YOU FOR YOUR COOPERATION.

**From:** Matt Martorello [mailto:mattm@bellicosevi.com]
**Sent:** Wednesday, October 2, 2013 2:50 PM
**To:** Chairman James Williams; qkway@duckcreektf.com; Craig Mansfield
**Cc:** Karrie Wichtman; Justin Martorello; Daniel Gravel
**Subject:** Notice to Cease Servicing Origination of New Loans to NY consumers

Dear Mr. Chairman and Team:

Due to Judge Sullivan's ruling, we believe we have an involuntary termination event under the Servicing Agreement as it relates to loans made in the State of New York. As you know, the Servicing Agreement provides:

### Involuntary Termination Due to Changes in Legal Requirements

It is the understanding and intention of the parties that the establishment and operation of Enterprise conforms to and complies with all Legal Requirements. If during the term of this Agreement, Enterprise, or any material aspect of the business conducted by Enterprise, becomes prohibited by operation of federal law or determined by final judgment of a court of competent jurisdiction, after all appeals thereof, to be unlawful under applicable law, the obligations of the parties hereto shall cease, and this Agreement shall be of no further force and effect; provided that (i) the Servicer shall have the rights in Section 4.4 of this Agreement; (ii) the Servicer and the Enterprise shall retain all money previously paid to them pursuant to Section 6 of this Agreement; (iii) funds of Enterprise in any account shall be paid and distributed as

JPB 00981
JA1208

provided in Section 6 of this Agreement, provided any Authorized Debt shall be paid in full; (iv) any money lent by or guaranteed by the Servicer or its affiliates to Servicer shall be repaid to the Servicer to the extent provided in a written agreement entered in connection therewith, with recovery of monetary payments or damages limited in recourse to Enterprise assets and any such payments or damages shall be made only after payment in full of any and all amounts under any Authorized Debt; and (v) the Enterprise, directly or indirectly, shall retain its interest in the title to all Enterprise assets, fixtures, supplies and equipment subject to any requirements of financing arrangements. Nothing contained in this Section 9.4 shall be read to preclude either or both parties from contesting any actions which could lead to the involuntary cessation of business by Enterprise.

While we understand that an appeal of Judge Sullivan's order is imminent, our concern is that Judge Sullivan's order finding that tribal enterprises are subject to New York's anti-usury laws will be regarded as sufficiently final by the State of New York such that it will precipitate their potential investigation and potential prosecution of us personally and our companies if we continue to provide New York-related services at this time.

We might be able to resume servicing New York loans at some point in the future, but for now, Judge Sullivan's Order presents a significant potential liability for us and we do not believe that we should service any new New York loans. We are willing to wind down our New York services and see existing loans through to their completion, but we simply cannot flaunt the clear ruling from Judge Sullivan's order, however legally incorrect it might be.

This action applies both to services performed for the Red Rock Tribal Lending, LLC and Duck Creek Tribal Financial, LLC portfolios.

Regards,

Matt Martorello
Mobile: 773-209-7720
Email: mm@BellicoseVI.com



**This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**
**This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

JPB 00982
JA1209

Exhibit 5

**Darcie Pace**

| | |
|---|---|
| **From:** | Matt Martorello <mattm@bellicosevi.com> |
| **Sent:** | Monday, August 18, 2014 9:54 AM |
| **To:** | Nicole St. Germain |
| **Cc:** | Robert Rosette; Karrie Wichtman; Tanya Gibbs |
| **Subject:** | RE: Term Sheet Summaries and Draft LVD Term Sheet |

Hi guys,

Nicole and I spoke at length on Friday about this.  I likely have a massive negative tax consequence associated with this I'm trying to figure, but am ready to proceed with a potential sale of the companies/discussion.  What are next steps?

---

**From:** Nicole St. Germain [mailto:NStGermain@rosettelaw.com]
**Sent:** Thursday, August 14, 2014 9:32 PM
**To:** Matt Martorello
**Cc:** Rob Rosette; Karrie Wichtman; Tanya Gibbs
**Subject:** Term Sheet Summaries and Draft LVD Term Sheet

Matt,

Midway through putting summaries together we decided to try to meld these concepts with the existing term sheet you sent LVD.  I have attached all three for review.

One is an equity purchase model where the servicer was a party.  As you will see, many employees come over in the transaction, but key managerial staff stays with the parent.  The business is paid for through revenues over time, and there's an existing consulting agreement with the key managerial staff of the parent that allows for continued involvement, just on a lesser scale and with the significant revenues flowing back through the note to pay off the debt.  With this deal, the Tribe purchases everything and literally steps into the shoes of the servicer – and thus, theoretically has the option to continue to operate with the company's name/brand/assets.

The second was geared toward restructuring the cash flows of the portfolio to allow the Tribe to gain a higher equity share in the portfolio as the note is paid down.  The payment structure/waterfall provisions in the agreement ensure that the portfolio has sufficient capital to remain self-sustaining (note payments are at the bottom of the waterfall after TNP and operating expenses to ensure the portfolio continues to generate revenue).  The deal contemplates a purchase price that is a multiple of the portfolio's existing annual revenue stream and cuts off the sellers' ability to participate in A/R or any future revenues generated from consumer loans.  Existing servicing is already in-house, with Tribal employees with inter-tribal agreements with the lending company.

Finally, I've taken some pieces from these deals and combined them with existing terms from the term sheet you proposed.  I haven't been involved in the back and forth on this revived restructure, so if some of it is contrary to what's already been negotiated, it is my fault, and unintentional.  Similarly, if it's not aligned with how you want a deal structured, feel free to propose whatever you think works.  (I also have several placeholders for discussion between you and the Tribe depending on what the vision is here and what you want your role/placement/level of involvement to be in this restructured deal.)  They are simply suggestions based on the other deals I've worked on in the last several months.

A conversation would be the easiest way to work through these structures and ideas.  After you've had a chance to review, please let me know if you'd like to discuss any of these.  I will make myself available as needed to move this project along.

CONFIDENTIAL                                                    ROSETTE_REVISED_052619

JA1211

Thanks,


Nicole M. St. Germain
Rosette, LLP
Attorneys at Law
193 Blue Ravine Road – Suite 255
Folsom, California 95630
Office Number: (916) 353-1084
Fax Number: (916) 353-1085
Cell Number: (480) 241-5871
nstgermain@rosettelaw.com
www.rosettelaw.com

CONFIDENTIAL COMMUNICATION: THIS MESSAGE IS A CONFIDENTIAL ATTORNEY COMMUNICATION ONLY FOR USE BY THE INTENDED RECIPIENT.  ANY INADVERTENT RECEIPT SHALL NOT CONSTITUTE A WAIVER OF ATTORNEY-CLIENT OR WORK PRODUCT PROTECTION.  IF RECEIVED IN ERROR, PLEASE NOTIFY THE SENDER IMMEDIATELY AND DELETE THIS MESSAGE.  THANK YOU FOR YOUR COOPERATION.


**This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

CONFIDENTIAL                                                                 ROSETTE_REVISED_052629

JA1212



IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

Williams, et al.,
    Plaintiff

v.                              Case No. 3:17-cv-461

Big Picture Loans, et al.
    Defendant.

### ORDER

Having conferred with counsel during the conference call on May 18, 2023, it is hereby ORDERED that:

(1) On May 22, 2023 at noon, the parties shall identify (a) which of the motions in limine (ECF Nos. 1173 and 1185); (b) which of the motions relating to experts (ECF Nos. 1175, 1177, 1179, 1183, and 1187); and (c) which aspects of the partial summary judgement (ECF No. 1165) they wish to be heard orally; and they shall specify any other issue or topic on which they wish to be heard orally; and

(2) On May 22, 2023, the parties shall submit copies of any jury instructions given in similar cases to the RICO claims in this case; and

(3) On May 23, 2023, Matt Martorello ("Martorello") shall file a statement setting forth the factual basis of his proposed "good faith" defense. Therein, Martorello shall include: (a) a statement of what belief(s) he held; (b) the substantive advice

JA1213

that he was allegedly provided; (c) the date that advice was given; (d) the identity of the person who provided the advice; (e) whether the advice was written or oral; (f) all written advice upon which he allegedly relied; and (g) all documents in which he comments on or describes the advice; and

(4) On May 23, 2023, Plaintiffs shall file a statement explaining what is known about the alleged 20-page Greenberg Traurig legal memorandum mentioned in MEMORANDUM IN SUPPORT OF PLAINTIFFS' OMNIBUS MOTIONS IN LIMINE at 13 (ECF No. 1174), including the details respecting its destruction.

It is SO ORDERED.

/s/   _RЕ_

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: May _19_, 2023

2

JA1214

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

LULA WILLIAMS, *et al.*,                    )
                                            )
                        Plaintiffs,          )
                                            )
            v.                              )          Civil Action No. 3:17-cv-461 (REP)
                                            )
BIG PICTURE LOANS, LLC, *et al.*,           )
                                            )
                        Defendants.          )
                                            )

**PLAINTIFFS' STATEMENT OF POSITION IN RESPONSE TO**
**THE COURT'S ORDER DATED MAY 19, 2023**

Plaintiffs, by counsel, on behalf of themselves and the classes certified by this Court,

submit this Statement of Position as requested by the Court's Order dated May 19, 2023 (ECF No.

1247).

(1)      Plaintiffs would like oral argument on: (a) the motions in limine (ECF Nos. 1173

and 1185) that remain outstanding; (b) the expert motions (ECF Nos. 1175, 1177, 1179, 1181,

1183, 1187); and (c) Plaintiffs' motion for partial summary judgment[1] (ECF No. 1165). Plaintiffs

believe that the Plaintiffs' Motion in Limine No. 5 should be addressed first, as it will impact the

outcome of the motion for partial summary judgment and the motions relating to certain experts.

Other than these pending motions, Plaintiffs do not have any other issue or topic to be addressed

at this time. Plaintiffs request the earliest hearing date available on the Court's schedule.

(2)      Plaintiffs have been unable to identify any civil cases where jury instructions were

given in similar cases to the RICO claims in this case. As one circuit recently explained in

---

[1] While Andrew Guzzo is unavailable the week of May 29th, Plaintiffs will make themselves the
earliest date that the Court has available.

removing RICO from its model instructions, RICO "cases are so rarely tried that there is no recent set of instructions in this circuit the Committee viewed as sufficiently reliable to include in the revised Instructions."[2]

Although it did not involve collection of unlawful debt as the predicate act, Plaintiffs attach hereto one set of RICO instructions recently given in a civil RICO case tried in the Northern District of California. *See Planned Parenthood Federation of America, Inc., v. Center for Medical Progress*, Case No. 3:16-cv-236 (N.D. Cal. 2019) (attached as Ex. 1). Plaintiffs further attached instructions—drafted by Plaintiffs' counsel in this case—that were <u>submitted</u> in a similar tribal lending case involving RICO, usury, and unjust enrichment claims, but this case ultimately settled before the court ruled on those instructions. *See Brice v. Stinson*, Case No. 3:19-cv-01481-WHO (N.D. Cal.) (attached as Exhibit 2).[3]

Plaintiffs further attach the government's proposed instructions in the *Hallinan* case, which involved similar facts—other than the obvious difference that it was a criminal case. *United States v. Hallinan*, Case No. 2:16-cr-00130-ER (E.D. Pa.) (attached as Exhibit 3). Plaintiffs also attach the instructions from the similar *Tucker* case, which was also a criminal case. *United States v. Tucker*, Case No. 1:16-cr-91-PKC (S.D. NY.) (attached as Exhibit 4).

---

[2] Pattern Jury Instructions (Civil Cases), Committee on Civil Pattern Jury Instructions for Fifth Circuit (June 2020), available at: https://www.lb5.uscourts.gov/viewer/?/juryinstructions/Fifth/2020civil.pdf.

[3] Some of the instructions in *Brice* would not apply here, but Plaintiffs offer these instructions as to their proposed language relating to the collection of unlawful debt (as opposed to the racketeering language from *Planned Parenthood*).

Respectfully submitted,

**PLAINTIFFS,** *on behalf of themselves and the classes as certified by the Court*

By: _/s/ Kristi C. Kelly_____
          Counsel

Kristi Cahoon Kelly (VSB #72791)
Andrew Joseph Guzzo (VSB #82170)
KELLY GUZZO, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
Phone: 703-424-7572
Fax: 703-591-0167
Email: kkelly@kellyguzzo.com
Email: aguzzo@kellyguzzo.com

Leonard Anthony Bennett
Consumer Litigation Associates
763 J Clyde Morris Boulevard, Suite 1A
Newport News, VA 23601
Telephone: 757-930-3660
Facsimile: 757-930-3662
Email: lenbennett@clalegal.com
*Counsel for Plaintiffs*

JA1217

# Exhibit 1

USCA4 Appeal: 23-2097    Doc: 11-3    Filed: 12/06/2023    Pg: 273 of 438
Case 3:16-cv-00236-WHO Document 1005 Filed 12/11/23 Page 2 of 61 Page ID# 52080

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

PLANNED PARENTHOOD
FEDERATION OF AMERICA, INC., et al.,

Plaintiffs,

v.

CENTER FOR MEDICAL PROGRESS, et al.,

Defendants.

Case No. 16-cv-00236-WHO

**FINAL JURY INSTRUCTIONS**

TABLE OF CONTENTS

I.   INTRODUCTORY AND MISCELLANEOUS INSTRUCTIONS ........................................ 7

   1.   Duty of Jury - Instructions ................................................................ 7

   2.   Matters Not to be Decided by the Jury ............................................. 8

   3.   Burden of Proof – Preponderance of Evidence ................................ 9

   4.   Burden of Proof—Clear and Convincing Evidence ....................... 10

   5.   Two or More Parties – Different Legal Rights ............................... 11

   6.   What is Evidence ............................................................................ 12

   7.   What is Not Evidence ..................................................................... 13

   8.   Evidence for Limited Purpose ....................................................... 14

   9.   Direct and Circumstantial Evidence .............................................. 15

   10.  Ruling on Objections ..................................................................... 16

United States District Court
Northern District of California

11. Credibility of Witnesses .................................................................. 17

12. Witnesses Statements on the Law ..................................................... 18

13. Expert Opinions ............................................................................... 19

14. Charts and Summaries Not Received in Evidence ........................... 20

15. Charts and Summaries Received in Evidence ................................... 21

16. Stipulations of Fact ........................................................................... 22

17. Deposition In Lieu Of Live Testimony ............................................. 23

II. CLAIMS AND DEFENSES ........................................................................ 24

A. GENERAL INSTRUCTIONS ......................................................... 24

1. Liability of Corporations – Scope of Authority Not in Issue........... 24

2. Agent and Principal—Definition ..................................................... 25

3. Agent—Scope of Authority Defined ................................................ 26

4. Scope of Employment ...................................................................... 27

5. Ostensible Agent ............................................................................... 28

6. Agency - Corporate Parent and Subsidiary ...................................... 29

7. First Amendment .............................................................................. 30

8. Fifth Amendment and Adverse Inferences - Party........................... 31

9. Fifth Amendment and Adverse Inferences – Non-Party................... 32

10. Advice of Counsel Not a Defense .................................................... 33

11. Causation—Substantial Factor ......................................................... 34

B. TRESPASS CLAIMS ....................................................................... 35

1. Trespass—Essential Factual Elements—Daleiden, Lopez, BioMax, CMP—2014

Forum, MeDC, 2015 National Conference ....................................... 35

JA1220

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

2.    Trespass—Essential Factual Elements-Daleiden, Merritt, BioMax, CMP—PPRM Health Center ............................................................................................ 36

3.    Trespass—Essential Factual Elements-Daleiden, Merritt, BioMax, and CMP—PPGC/PPCFC Health Center ..................................................................... 37

C.    BREACH OF CONTRACT CLAIMS ................................................................. 38

1.    Breach of Contract—Introduction ................................................................ 38

2.    Breach of Contract—Construction of Contract as a Whole......................... 39

3.    Breach of Contract—Meaning of Ordinary Words...................................... 40

4.    Breach of Contract—Essential Factual Elements—PPFA Exhibitor Terms and Conditions – Breach Determined by the Court ...................................... 41

5.    Breach of Contract—Essential Factual Elements—PPFA Exhibitor Terms and Conditions – Breach Disputed............................................................... 42

6.    Breach of Contract—Essential Factual Elements—Breach of NAF Agreements ........ 43

7.    Breach of Contract—Essential Factual Elements—Breach of PPGC NDA................ 44

D.    FRAUD CLAIMS................................................................................................. 46

1.    Fraud—Introduction ..................................................................................... 46

2.    Fraud—Intentional Misrepresentation ......................................................... 47

3.    Fraud—False Promise ................................................................................... 51

4.    Fraud—Reliance ............................................................................................ 53

5.    Fraud—Reasonable Reliance ........................................................................ 54

6.    Fraud - Plaintiff's Negligence Not a Defense .............................................. 55

7.    Fraud—Misrepresentations Made to Persons Other Than the Plaintiff........ 56

E.    RICO.................................................................................................................... 57

1.    RICO—Introduction ..................................................................................... 57

JA1221

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

2.  RICO—Conducting Affairs of Association-in-Fact—Elements ................................. 58

3.  RICO—Enterprise ................................................................................................... 59

4.  RICO—Association with the Enterprise ................................................................... 60

5.  RICO—Conducting or Participating in the Enterprise ............................................. 61

6.  RICO—Pattern of Racketeering ............................................................................... 62

7.  RICO—"Racketeering Act" Defined ........................................................................ 63

8.  Violation of 18 U.S.C §1028(a)(1) .......................................................................... 64

9.  Violation of 18 U.S.C §1028(a)(2) .......................................................................... 65

10.  RICO—Racketeering Conspiracy—Conspiracy in General ..................................... 66

11.  RICO—Racketeering Conspiracy—Elements .......................................................... 68

12.  RICO—Causation .................................................................................................... 69

F.  RECORDING CLAIMS OVERVIEW ................................................................... 70

G.  CALIFORNIA RECORDING CLAIMS ................................................................. 73

1.  Violation of California Penal Code §632 ................................................................. 73

2.  Violation of California Penal Code §632 - Corporation as Plaintiff ......................... 74

3.  Violation of California Penal Code § 632 - § 633.5 affirmative defense ................... 75

4.  California Penal Code - § 632 - Confidential Subject Matter Not Required ............... 76

5.  California Penal Code - § 633.5 Defense - Reasonable Belief Independent of Recorded

Material ................................................................................................................... 77

H.  FLORIDA RECORDING CLAIMS ....................................................................... 78

1.  Violation of Section 934.03 of Title XLVII of the Florida Criminal Procedure Law .. 78

2.  Violation of Section 934.03 of Title XLVII of the Florida Criminal Procedure Law -

Corporation as Plaintiff .......................................................................................... 79

JA1222

United States District Court
Northern District of California

I.   MARYLAND RECORDING CLAIMS ................................................................ 80

1.   Violation of Section 10-402 of the Courts and Judicial Proceedings Article of the Maryland Annotated Code ................................................................ 80

2.   Violation of Section 10-402 of the Courts and Judicial Proceedings Article of the Maryland Annotated Code - Corporation as Plaintiff ........................................ 81

J.   FEDERAL RECORDING CLAIMS ................................................................ 82

1.   Violation of 18 U.S.C. §2511 ................................................................ 82

2.   Federal Recording - Mixed Purpose ................................................................ 84

3.   Federal Recording - Corporation as Plaintiff ................................................ 85

K.   CONSPIRACY ................................................................................................ 86

1.   Conspiracy—Essential Elements ................................................................ 86

2.   Conspiracy—Essential Elements ................................................................ 87

L.   DAMAGES ....................................................................................................... 88

1.   Damages - Generally ................................................................................... 88

2.   Damages – Mitigation ................................................................................. 89

3.   Damages—Tort Damages ............................................................................ 90

4.   Damages - Contract Damages ..................................................................... 91

5.   Damages—Overlapping Damages ............................................................... 92

6.   Arguments of Counsel Not Evidence of Damages ....................................... 93

7.   Attorney Fees and Court Costs .................................................................... 94

M.   PUNITIVE DAMAGES .................................................................................... 95

1.   Punitive Damages—Individual and Entity Defendants—Trial Not Bifurcated............ 95

2.   Punitive Damages for Violation of 934.03 of Title XLVII of the Florida Criminal Procedure Law ........................................................................... 97

III.    CLOSING INSTRUCTIONS ........................................................................... 99

    1.    Duty to Deliberate ........................................................................ 99

    2.    Evidence in Electronic Format .................................................... 101

    3.    Consideration of Evidence – Conduct of the Jury ....................... 102

    4.    Communication with Court .......................................................... 104

    5.    Return of Verdict ........................................................................ 105

United States District Court
Northern District of California

JA1224

USCA4 Appeal: 23-2097    Doc: 11-3    Filed: 12/06/2023    Pg: 279 of 438

# I.    INTRODUCTORY AND MISCELLANEOUS INSTRUCTIONS

## 1.    Duty of Jury - Instructions

Members of the Jury: Now that you have heard all of the evidence it is my duty to instruct you on the law that applies to this case.

A copy of these instructions will be sent to the jury room for you to consult during your deliberations.

It is your duty to find the facts from all the evidence in the case. To those facts you will apply the law as I give it to you.  You must follow the law as I give it to you whether you agree with it or not.  And you must not be influenced by any personal likes or dislikes, opinions, prejudices, or sympathy.  This includes personal beliefs about abortion.  Your verdict should be based on the law and facts and not whether you agree with one side or the other on abortion.  That means that you must decide the case solely on the evidence before you. You will recall that you took an oath to do so.

Please do not read into these instructions or anything that I may say or do or have said or done that I have an opinion regarding the evidence or what your verdict should be.

JA1225

## 2.    Matters Not to be Decided by the Jury

The claims and defenses in this case concern the strategies chosen and employed by the Defendants, and I limited the evidence accordingly.  I need to emphasize what this case is not about.  It is not about the truth of whether Plaintiffs profited from the sale of fetal tissue or otherwise violated the law in securing tissue for those programs.  It is not about whether any Plaintiff actually engaged in illegal conduct.  It is not about whether abortion is good or bad.  Those issues are a matter of dispute between the parties in the world outside this courtroom.  In this courtroom your job is to consider the evidence related to the claims and defenses in this case in accordance with the instructions that I give you.

United States District Court
Northern District of California

8

JA1226

### 3.     Burden of Proof – Preponderance of Evidence

When a party has the burden of proving any claim or affirmative defense by a preponderance of the evidence, it means you must be persuaded by the evidence that the claim or affirmative defense is more probably true than not true.

You should base your decision on all of the evidence, regardless of which party presented it.

United States District Court
Northern District of California

9

JA1227

### 4.    Burden of Proof—Clear and Convincing Evidence

When a party has the burden of proving any claim or defense by clear and convincing evidence, it means that the party must present evidence that leaves you with a firm belief or conviction that it is highly probable that the factual contentions of the claim or defense are true.

This is a higher standard of proof than proof by a preponderance of the evidence, but it does not require proof beyond a reasonable doubt.

JA1228

USCA4 Appeal: 23-2097    Doc: 11-3        Filed: 12/06/2023    Pg: 283 of 438
Case 3:1Case 3:01-cv-03461-EMD-3owhm DocDecmentFileentFiled05/22/23 Page1 Page 11 of 41405## 52090

### 5.  Two or More Parties – Different Legal Rights

You should decide the case as to each party separately. There are multiple Plaintiffs in this trial. You should decide the case of each Plaintiff separately as if it were a separate lawsuit.  Each Plaintiff is entitled to separate consideration of its own claims.  There are multiple Defendants in this trial. You should decide the case against each Defendant separately as if it were a separate lawsuit.  Each Defendant is entitled to separate consideration of his or her own defenses.

Unless otherwise stated, the instructions apply to all parties.

United States District Court
Northern District of California

JA1229

USCA4 Appeal: 23-2097    Doc: 11-3    Filed: 12/06/2023    Pg: 284 of 438
Case 3:12-cv-06461-WHO-Down-on-Document-Filed-05/22/23-Page-13-Page-06-Pages# 52091

**6.     What is Evidence**

The evidence you are to consider in deciding what the facts are consists of:

1. the sworn testimony of any witness;

2. the exhibits that are admitted into evidence;

3. any facts to which the lawyers have agreed; and

4. any facts that I may instruct you to accept as proved.

United States District Court
Northern District of California

JA1230

USCA4 Appeal: 23-2097   Doc: 11-3   Filed: 12/06/2023   Pg: 285 of 438
Case 3:1cvase04461cv-RED23DownmenDt252entFi16d05/22/231/Page14Page0f3Pagel5ID # 52092

### 7.     What is Not Evidence

In reaching your verdict, you may consider only the testimony and exhibits received into evidence. Certain things are not evidence, and you may not consider them in deciding what the facts are. I will list them for you:

(1) Arguments and statements by lawyers are not evidence. The lawyers are not witnesses. What they may say in their opening statements, closing arguments and at other times is intended to help you interpret the evidence, but it is not evidence. If the facts as you remember them differ from the way the lawyers have stated them, your memory of them controls.

(2) Questions and objections by lawyers are not evidence. Attorneys have a duty to their clients to object when they believe a question is improper under the rules of evidence. You should not be influenced by the objection or by the court's ruling on it.

(3) Testimony that is excluded or stricken, or that you are instructed to disregard, is not evidence and must not be considered. In addition some evidence may be received only for a limited purpose; when I instruct you to consider certain evidence only for a limited purpose, you must do so and you may not consider that evidence for any other purpose.

(4) Anything you may see or hear when the court was not in session is not evidence. You are to decide the case solely on the evidence received at the trial.

13

JA1231

USCA4 Appeal: 23-2097   Doc: 11-3   Filed: 12/06/2023   Pg: 286 of 438
Case 3:1cv3se04614CR4BD23DohuHenDDcB2nenFile0b057d2/231/Page15Pageg06Ragde5# 52093

### 8.    Evidence for Limited Purpose

Some evidence in this case has been admitted only for a limited purpose.

Where I instructed you that an item of evidence was admitted only for a limited purpose, you must consider it only for that limited purpose and not for any other purpose.

JA1232

USCA4 Appeal: 23-2097    Doc: 11-3    Filed: 12/06/2023    Pg: 287 of 438
Case 3:1Case 3:21-cv-cv-02023-Down-nDocument Doc52ment Filed 11605/22/23 11/Page 16 Page 06 Pages# 52094

### 9.    Direct and Circumstantial Evidence

Evidence may be direct or circumstantial. Direct evidence is direct proof of a fact, such as testimony by a witness about what that witness personally saw or heard or did. Circumstantial evidence is proof of one or more facts from which you could find another fact. You should consider both kinds of evidence. The law makes no distinction between the weight to be given to either direct or circumstantial evidence. It is for you to decide how much weight to give to any evidence.

JA1233

USCA4 Appeal: 23-2097   Doc: 11-3      Filed: 12/06/2023      Pg: 288 of 438
Case 3:1Case 3:16-cv-01023-hwih0enDDc5ment1FiledsC5722/23117PageP1PageI6Pages# 52095

### 10.    Ruling on Objections

There are rules of evidence that control what can be received into evidence. When a lawyer asks a question or offers an exhibit into evidence and a lawyer on the other side thinks that it is not permitted by the rules of evidence, that lawyer may object.  If I overruled the objection, the question was answered or the exhibit received.  If I sustained the objection, the question could not be answered, and the exhibit could not be received. Whenever I sustained an objection to a question, you must ignore the question and must not guess what the answer might have been.

Sometimes I ordered that evidence be stricken from the record and that you disregard or ignore that evidence. That means when you are deciding the case, you must not consider the stricken evidence for any purpose.

JA1234

### 11.    Credibility of Witnesses

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says, or part of it, or none of it.

In considering the testimony of any witness, you may take into account:

(1) the opportunity and ability of the witness to see or hear or know the things testified to;

(2) the witness's memory;

(3) the witness's manner while testifying;

(4) the witness's interest in the outcome of the case, if any;

(5) the witness's bias or prejudice, if any;

(6) whether other evidence contradicted the witness's testimony;

(7) the reasonableness of the witness's testimony in light of all the evidence; and

(8) any other factors that bear on believability.

Sometimes a witness may say something that is not consistent with something else he or she said. Sometimes different witnesses will give different versions of what happened. People often forget things or make mistakes in what they remember. Also, two people may see the same event but remember it differently. You may consider these differences, but do not decide that testimony is untrue just because it differs from other testimony.

However, if you decide that a witness has deliberately testified untruthfully about something important, you may choose not to believe anything that witness said. On the other hand, if you think the witness testified untruthfully about some things but told the truth about others, you may accept the part you think is true and ignore the rest.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify. What is important is how believable the witnesses were, and how much weight you think their testimony deserves.

JA1235

USCA4 Appeal: 23-2097   Doc: 11-3      Filed: 12/06/2023   Pg: 290 of 438
Case 3:1Case6361cv-R0J23DownHoenDouBuentFileb6057221231JPage19PageIB Pages# 52097

**12.      Witnesses Statements on the Law**

During the course of the trial, you have heard witnesses and others express views about

that the law is.  Your duty is to follow my instructions on the law, not what others may have said it

is, including statements in the 20/20 video.

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

JA1236

### 13.    Expert Opinions

You have heard testimony from David Cohen, Gregory Regan, Michael New, Paul Zimmer, and Jonathan Perkins who testified to opinions and the reasons for their opinions.  This opinion testimony is allowed, because of the education or experience of this witness.

Such opinion testimony should be judged like any other testimony.  You may accept it or reject it, and give it as much weight as you think it deserves, considering the witness's education and experience, the reasons given for the opinion, and all the other evidence in the case.

United States District Court
Northern District of California

19

USCA4 Appeal: 23-2097     Doc: 11-3        Filed: 12/06/2023     Pg: 292 of 438
Case 3:1Case63461-cv-D023Dommen DocumentFile06057e2c231/Page92 1Page08 Pages# 52099

**14.    Charts and Summaries Not Received in Evidence**

    Certain charts and summaries not admitted into evidence have been shown to you in order to help explain the contents of books, records, documents, or other evidence in the case.  Charts and summaries are only as good as the underlying evidence that supports them.  You should, therefore, give them only such weight as you think the underlying evidence deserves.

JA1238

USCA4 Appeal: 23-2097 Doc: 11-3 Filed: 12/06/2023 Pg: 293 of 438
Case 3:1Case6461cv-E023Down4nenDt252nenFiteb0057/22/231Page22Page051Page05# 52100

### 15. Charts and Summaries Received in Evidence

Certain charts and summaries have been admitted into evidence to illustrate information brought out in the trial. Charts and summaries are only as good as the testimony or other admitted evidence that supports them. You should, therefore, give them only such weight as you think the underlying evidence deserves.

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

JA1239

USCA4 Appeal: 23-2097    Doc: 11-3    Filed: 12/06/2023    Pg: 294 of 438

**16.    Stipulations of Fact**

The parties have agreed to certain facts I read to you during the course of the trial.  You must therefore treat these facts as having been proved.

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

22

### 17.    Deposition In Lieu Of Live Testimony

A deposition is the sworn testimony of a witness taken before trial. The witness is placed under oath to tell the truth and lawyers for each party may ask questions. The questions and answers are recorded.

The depositions of several witnesses and parties were taken in this action.  You should consider their video deposition testimony, presented to you in court in lieu of live testimony, insofar as possible, in the same way as if the witness had been present to testify.

Where deposition testimony is read from the transcript instead of presented by video, do not place any significance on the behavior or tone of voice of any person reading the questions or answers.

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

JA1241

USCA4 Appeal: 23-2097   Doc: 11-3   Filed: 12/06/2023   Pg: 296 of 438
Case 3:1Case6346-cv-EL023DocuhenenDocument11c605722e231/Page25-Page06-Pageid# 52103

II.     **CLAIMS AND DEFENSES**

     A.     **GENERAL INSTRUCTIONS**

          1.     **Liability of Corporations – Scope of Authority Not in Issue**

Under the law, a corporation is considered to be a person. It can only act through its employees, agents, directors, or officers. Therefore, a corporation (including a limited liability corporation) is responsible for the acts of its employees, agents, directors, and officers performed within the scope of authority.

All parties are equal before the law and a corporation is entitled to the same fair and conscientious consideration by you as any party.

24

JA1242

## 2.    Agent and Principal—Definition

An agent is a person who performs services for another person under an express or implied agreement and who is subject to the other's control or right to control the manner and means of performing the services. The other person is called a principal.

United States District Court
Northern District of California

JA1243

### 3. Agent—Scope of Authority Defined

An agent is acting within the scope of authority if the agent is engaged in the performance of duties which were expressly or impliedly assigned to the agent by the principal.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

USCA4 Appeal: 23-2097    Doc: 11-3    Filed: 12/06/2023    Pg: 299 of 438
Case 3:16-cv-00236-WHO Document 252 Filed 05/22/23 Page 28 of 57 Page ID# 52106

#### 4.  Scope of Employment

Defendants Center for Medical Progress and BioMax are corporations.  Corporations are responsible for the acts of their employees and agents within the scope of their employment or authorization.

Conduct is within the scope of employment or authorization if:

(a) It is reasonably related to the kinds of tasks that the employee or agent was employed to perform; or

(b) It is reasonably foreseeable in light of the employer's business or the agent's or employee's job responsibilities.

JA1245

USCA4 Appeal: 23-2097    Doc: 11-3       Filed: 12/06/2023    Pg: 300 of 438
Case 3:1Case:3:2461cvRe023DowhHoenDcuhent FilebEb05722r231lFaage:29 Page:03 PageID# 52107

### 5.      Ostensible Agent

A business entity is liable for the acts of an individual who is its ostensible agent, even if the ostensible agent was not an employee of the entity and even if the entity did not give the individual actual authority to act on its behalf.

To establish an individual is an ostensible agent of an entity, a Plaintiff must prove all of the following:

1.  That the entity intentionally or carelessly created the impression that the individual was the entity's employee or agent;

2.  That the Plaintiff reasonably believed that the individual was the entity's employee or agent; and

3.  That Plaintiff was harmed because it reasonably relied on its belief.

28

JA1246

USCA4 Appeal: 23-2097   Doc: 11-3   Filed: 12/06/2023   Pg: 301 of 438
Case 3:10-cv-06461-cr-023-Downum Document 252ent Filed 05/22/23-11 Page 30 Page 09 Page ID# 52108

### 6. Agency - Corporate Parent and Subsidiary

If a corporation owns another company, it is called a "parent corporation."  The company owned by the corporation is called a "subsidiary" of the parent corporation.

A subsidiary is the agent of its parent corporation if the parent goes beyond providing general policy and direction to its subsidiary and takes over the subsidiary's day-to-day operations in carrying out that policy.

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

29

JA1247

### 7.  First Amendment

The First Amendment is not a defense to the claims in this case for the jury to consider. Defendants' argument that they were citizen journalists was admissible as context for the Defendants' case, not as a legal defense.

JA1248

### 8.    Fifth Amendment and Adverse Inferences - Party

The Fifth Amendment of the United States Constitutional affords every person the right to decline to answer questions if he or she believes that the answers may tend to incriminate them. However, in civil cases, you are permitted, but not required, to draw the inference that the withheld information would have been unfavorable to the Defendant.

In this case, Defendant Troy Newman exercised his right under the Fifth Amendment not to incriminate himself and did not answer any substantive questions asked by Plaintiffs during his deposition. Accordingly, he did not testify in this trial. For claims based on California law, you may not consider that, or speculate about why, Newman invoked the Fifth Amendment and refused to answer. For claims based on federal law, and the laws of Florida, Maryland, and the District of Columbia, you may make an adverse inference from the fact Newman invoked the Fifth Amendment and refused to answer questions.

Any inference you may draw should be based upon all of the facts and circumstances in this case as you may find them.

JA1249

**9.      Fifth Amendment and Adverse Inferences – Non-Party**

If a witness who asserts the Fifth Amendment is associated closely enough with a Defendant, you may, but are not required to, draw an adverse inference against the Defendant. Whether a witness is sufficiently closely associated depends on the entire circumstances of his or her relationship with the Defendant.  For example, a witness who is a past or present employee, officer or agent of a party may be, but is not necessarily, sufficiently associated with that party to justify an adverse inference.  Likewise, a coconspirator may be sufficiently associated with a party to permit the drawing of an inference adverse to the party if the coconspirator refuses to testify.

In this case, non-parties Brianna Baxter and Annamarie Bettisworth Davin exercised their rights under the Fifth Amendment not to incriminate themselves in response to deposition questions and will not testify in this trial.

If you determine these non-parties are associated closely enough with a Defendant, you may, but are not required to, draw an adverse inference against the Defendant. For claims based on California law, you may not consider that, or speculate about why, Baxter or Davin invoked the Fifth Amendment and refused to answer. For claims based on federal law, and the laws of Florida, Maryland, and the District of Columbia, you may make an adverse inference from the fact that Baxter or Davin invoked the Fifth Amendment and refused to answer questions.

United States District Court
Northern District of California

32

### 10.     Advice of Counsel Not a Defense

During trial, you have heard that Defendants consulted lawyers when carrying out their activities against Plaintiffs.  Consulting with lawyers is not a defense to any of Plaintiffs' claims.  You may not speculate as to whether Defendants accurately described their plans to their lawyers, whether their lawyers told Defendants their conduct was lawful or not, and whether Defendants' lawyers provided correct advice.  You should base your verdict solely on the law I have given you and the evidence presented in this case, not on whether Defendants consulted with lawyers.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

JA1251

USCA4 Appeal: 23-2097   Doc: 11-3   Filed: 12/06/2023   Pg: 306 of 438
Case 3:1c-as:e06b46e1c-WeD23D-o7w/4nh0e-nD2D5o2cent-iFiteld0605/2122/233tht-Pfaaggee03435-faPgaegé0Id4#: 52113

**11. Causation—Substantial Factor**

Throughout these instructions, you will be asked to determine whether conduct is a "substantial factor" in causing harm.

A substantial factor in causing harm is a factor that a reasonable person would consider to have contributed to the harm. It must be more than a remote or trivial factor. It does not have to be the only cause of the harm.

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

34

JA1252

**B.     TRESPASS CLAIMS**

     **1.     Trespass—Essential Factual Elements—Daleiden, Lopez, BioMax, CMP—2014 Forum, MeDC, 2015 National Conference**

Plaintiff PPFA contends that Defendants Daleiden, Lopez, BioMax, and CMP trespassed at the 2014 Forum in Miami, Florida; at the 2015 MeDC Meeting in Orlando, Florida; and the 2015 National Conference in Washington, D.C.

I have already determined that these Defendants trespassed at each of these locations. Because I determined that these Defendants trespassed, the law assumes that PPFA has been harmed and PPFA is entitled to an award of nominal damages such as one dollar for each trespass.

PPFA is also entitled to actual damages for the trespasses if PPFA proves the following:

1.     That PPFA was actually harmed; and

2.     That a Defendant's entry was a substantial factor in causing PPFA's harm.

United States District Court
Northern District of California

35

JA1253

**2.    Trespass—Essential Factual Elements-Daleiden, Merritt, BioMax, CMP—PPRM Health Center**

Plaintiff PPRM claims that Daleiden, Merritt, BioMax, and CMP trespassed at the PPRM Stapleton Health Center in Colorado.  I have already determined that these Defendants trespassed at this location.  Because I determined that these Defendants trespassed, the law assumes that PPRM has been harmed.  PPRM does not seek damages from that trespass, but PPFA contends that it may recover damages for amounts PPFA spent as a result of the trespass at PPRM.

PPFA may be entitled to actual damages for the trespasses at PPRM, if PPFA proves the following:

1.    That PPRM was actually harmed; and

2.    That a Defendant's entry was a substantial factor in causing PPFA to incur costs for the trespass at PPRM.

A party who voluntarily reimburses the expenses of another may not be awarded those amounts as damages unless the party had an obligation to pay those expenses.

United States District Court
Northern District of California

36

JA1254

### 3.    Trespass—Essential Factual Elements-Daleiden, Merritt, BioMax, and CMP—PPGC/PPCFC Health Center

Plaintiff PPGC/PPCFC claims that Daleiden, Merritt, BioMax, and CMP trespassed at the PPGC/PPCFC Prevention Park Health Center in Texas.  I have already determined that these Defendants trespassed at this location.  Because I determined that these Defendants trespassed, the law assumes that PPGC/PPCFC has been harmed and PPGC/PPCFC is entitled to an award of nominal damages such as one dollar for each trespass.

PPGC/PPCFC is also entitled to actual damages for trespass if it proves the following:

1.    That PPGC/PPCFC was actually harmed; and

2.    That a Defendant's entry was a substantial factor in causing PPGC/PPCFC harm.

37

United States District Court
Northern District of California

C.     **BREACH OF CONTRACT CLAIMS**

1.     **Breach of Contract—Introduction**

I will now instruct you on the law you must apply to Plaintiffs' breach of contract claims. Plaintiffs have brought three different sets of breach of contract claims.

The first set of claims concerns claims for breach of the PPFA Exhibitor Terms and Conditions.  I have already found that Defendants Daleiden, BioMax, and CMP breached certain provisions in these agreements. Plaintiffs allege Defendants Daleiden, BioMax, and CMP breached additional provisions that I have not ruled on. Defendants deny that they breached these additional provisions.

The second set of claims concern claims for breach of the NAF Agreements.  I have already found that Defendants Daleiden, BioMax, CMP, Merritt, and Lopez breached various NAF Agreements.

The third set concern claim for beach of the PPGC NDA.  Defendants deny breaching the PPGC NDA.

JA1256

USCA4 Appeal: 23-2097   Doc: 11-3   Filed: 12/06/2023   Pg: 311 of 438

### 2. Breach of Contract—Construction of Contract as a Whole

In deciding what the words of a contract meant to the parties, you should consider the whole contract, not just isolated parts. You should use each part to help you interpret the others, so that all the parts make sense when taken together.

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

JA1257

USCA4 Appeal: 23-2097    Doc: 11-3       Filed: 12/06/2023    Pg: 312 of 438
Case 3:10-cv-03461-WHO Document 252 Filed 05/22/13 Page 41 of 60   Page ID# 52119

### 3.     Breach of Contract—Meaning of Ordinary Words

You should assume that the parties intended the words in their contract to have their usual and ordinary meaning unless you decide that the parties intended the words to have a special meaning.

United States District Court
Northern District of California

40

JA1258

#### 4. Breach of Contract—Essential Factual Elements—PPFA Exhibitor Terms and Conditions – Breach Determined by the Court

I will now discuss the first set of breach of contract claims involving the breach of the PPFA Exhibitor Terms and Conditions. These contracts relate to the following meetings: the 2014 North American Forum on Family Planning (the "2014 Forum Agreement"), the 2015 MeDC Conference (the "MeDC Agreement"), and the 2015 PPFA National Conference (the "2015 National Conference Agreement"). These contracts were entered into by PPFA, Daleiden, and BioMax, and CMP.

I will now explain to you the provisions of these agreements that I have already determined have been breached by Daleiden, BioMax, and CMP.

Educational Nature Promises

The 2014 Forum Agreement and the MeDC Agreement both contain provisions in which Daleiden, BioMax, and CMP promised that their conference exhibits would be "educational and informative, emphasizing information about products and services useful to the registrants' practice and beneficial to the interests of their clients and patients." Both of these agreements also require that exhibits be "of an educational nature."

Show Products Promises

The 2015 National Conference Agreement contains a provision in which Daleiden, BioMax, and CMP promised to "show only products manufactured or represented by their company in the regular course of business."

Because I determined that these Defendants breached these provisions, the law assumes that PPFA has been harmed and PPFA is entitled to an award of nominal damages such as one dollar for each breach.

PPFA is also entitled to actual damages for these breaches from these Defendants if PPFA proves the following:

1. That PPFA was harmed by the breach; and

2. That these Defendants' breach of contract was a substantial factor in causing it harm.

United States District Court
Northern District of California

41

JA1259

### 5. Breach of Contract—Essential Factual Elements—PPFA Exhibitor Terms and Conditions – Breach Disputed

The 2014 Forum Agreement, the 2015 MeDC Agreement, and the 2015 National Conference Agreement each contain the following provision:  the signatories promised that they would "comply with all applicable federal, state, and local laws and regulations in performance of its respective obligations pursuant to this Agreement, including, without limitation, laws related to fraud, abuse, privacy, discrimination, disabilities, samples, confidentiality, false claims and prohibition of kickbacks."

Plaintiffs contend that Defendants Daleiden, BioMax, and CMP breached these provisions in each of the contracts.  Daleiden, BioMax, and CMP deny that they breached the agreements in this manner.

To recover damages for breach of this provision in the PPFA Exhibitor Terms and Conditions from these Defendants concerning compliance with laws concerning fraud and privacy, PPFA must prove all of the following:

1. That these Defendants violated an applicable law concerning fraud or privacy, in performing their respective obligations under the contracts;

2. That PPFA was harmed by the violation; and

3. That Defendants' violation was a substantial factor in causing PPFA harm.

If you decide that these Defendants breached this provision in the contracts but also that PPFA was not harmed by the breach, PPFA is still entitled to an award of nominal damages, such as one dollar.

JA1260

**6.  Breach of Contract—Essential Factual Elements—Breach of NAF Agreements**

I will now discuss the second set of breach of contract claims, involving the breach of the NAF Agreements.  The Plaintiffs bringing these claims are PPFA and PPNorCal.  These claims are asserted against Defendants Daleiden, Lopez, Merritt, BioMax, and CMP.

I have determined that Plaintiffs are third-party beneficiaries of the 2014 NAF Agreement and Confidentiality Agreement and the 2015 NAF Agreement and Confidentiality Agreement.  I will refer to these agreements as the "NAF Agreements."

I have found that Defendants breached the NAF Agreements by misrepresenting their identities, recording private conversations, and disclosing confidential information.  Plaintiffs also claim that Defendants' breach of these contracts caused harm for which Defendants should pay.

To recover damages for breach of the NAF Agreements from a Defendant, a Plaintiff must prove all of the following:

1.  That a Plaintiff was harmed by Defendants breach of contract; and

2.  That the Defendant's breach of contract was a substantial factor in causing Plaintiff's harm.

If you decide that the Plaintiffs were not harmed by any breach of the NAF Agreements, Plaintiffs are still entitled to an award of nominal damages, such as one dollar.

United States District Court
Northern District of California

43

JA1261

### 7.    Breach of Contract—Essential Factual Elements—Breach of PPGC NDA

I will now discuss the third set of breach of contract claims involving the alleged breach of the PPGC non-disclosure agreement.  I will refer to this agreement as the "PPGC NDA."  The Plaintiff bringing this claim is PPGC.  This claim is brought against Defendants Daleiden, BioMax, and CMP.

Plaintiff PPGC claims that these Defendants breached the confidentiality provisions of the PPGC NDA.  The NDA contains the following language regarding confidentiality:

> Subject to the limitations set forth in Paragraph 2, all information disclosed by the Disclosing Party to the Recipient shall be deemed to be "Confidential Information."  In particular, "Confidential Information" shall be deemed to include (i) all written information of the Disclosing Party, and (ii) all oral information of the Disclosing Party, which in either case is identified at the time of disclosure as being of a confidential or proprietary nature or is reasonably understood by the Recipient to be confidential under the circumstances of the disclosure. . . .

The Court has already determined that the general language "all information disclosed" is modified by the next sentences, such that the NDA does not cover "all information disclosed," but only covers the information identified in (i) and (ii).  Confidentiality must be determined by objectively looking at the totality of the circumstances such as the context and location of the discussion.

PPGC claims that Defendants' breach of this contract caused harm to PPGC.  Defendants deny they breached the PPGC NDA or that any breach caused harm to PPGC.

To recover damages for breach of the PPGC NDA from a Defendant, PPGC must prove all of the following:

1. That PPGC and the Defendant entered into a contract;

2. That PPGC did all, or substantially all, of the significant things that the contract required it to do; and

3. That a Defendant (a) failed to do something that the contract required Defendant to do or (b) did something that the contract prohibited Defendant from doing;

4. That PPGC was harmed; and

5. That a Defendant's breach of contract was a substantial factor in causing PPGC harm.

JA1262

USCA4 Appeal: 23-2097    Doc: 11-3    Filed: 12/06/2023    Pg: 317 of 438
Case 3:1Case 3:16-cv-03629-Document DocumentFiled 05/22/23 Page 46 Page 45 of 105 Page ID# 52124

1          If you decide that the Defendants breached this contract but also that PPGC was not

2     harmed by the breach, PPGC is still entitled to an award of nominal damages, such as one dollar.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

JA1263

USCA4 Appeal: 23-2097   Doc: 11-3   Filed: 12/06/2023   Pg: 318 of 438

**D.      FRAUD CLAIMS**

**1.      Fraud—Introduction**

Plaintiffs PPFA, PPGC, PPCFC, and PPPSGV contend that they were defrauded by Defendants Daleiden, Merritt, Lopez, BioMax, and CMP.  In addition, Plaintiffs contend Defendants Rhomberg and Newman conspired with the other Defendants to commit fraud. Defendants deny that they defrauded Plaintiffs.

A Plaintiff may establish fraud in two different ways relevant to this case:  (1) Intentional Misrepresentation and (2) False Promise.  A Plaintiff need only establish one of these forms of fraud in order to prevail on a claim for fraud.  I will now instruct you on the elements of each of form of fraud.

JA1264

## 2.    Fraud—Intentional Misrepresentation

To establish a claim for intentional misrepresentation against a Defendant, a Plaintiff must prove all of the following:

1. That the Defendant represented to Plaintiff that a fact was true;

2. That the Defendant's representation was false;

3. That the Defendant knew that the representation was false when he made it, or that he made the representation recklessly and without regard for its truth;

4. That the Defendant intended that the Plaintiff rely on the representation;

5. That the Plaintiff reasonably relied on the Defendant's representation;

6. That the Plaintiff was harmed; and

7. That the Plaintiff's reliance on Defendant's representation was a substantial factor in causing its harm.

As to allegedly fraudulent statements made in Washington, D.C., Plaintiffs must prove each of these elements by clear and convincing evidence. As to allegedly fraudulent statements made in any location besides Washington, D.C., Plaintiffs must prove each of the elements by the preponderance of the evidence.

Plaintiffs contend that Defendants made three general categories of false statements of fact: (1) Defendants' use of fake names; (2) Defendants' provision of fake identifications; and (3) statements suggesting BioMax was a legitimate tissue procurement organization. Statements suggesting that BioMax was a legitimate tissue procurement organization include: (a) Defendants and others CMP personnel  portraying themselves as having relevant job tiles, such as "procurement technician," "CEO," and "Procurement Manager and Vice President of Operations," (b) representations that Defendants had education or relevant experience in the tissue procurement industry, (c) oral representations that BioMax actually engaged in tissue procurement, and (d) distributing brochures and business cards that stated or suggested that BioMax engaged in tissue procurement.

Plaintiffs contend that the following Defendants presented fake identifications to Plaintiffs' registration staff at conferences or desk staff at offices to gain entry into the following locations:

47

JA1265

- The Forum (October 11-13, 2014): Daleiden.

- MeDC (February 26-28, 2015): Daleiden.

- PPFA National Conference (March 18-20, 2015): Daleiden.

- PPGC (April 9, 2015): Daleiden and Merritt.

Plaintiffs contend that Defendants used fake names and misrepresented the nature of BioMax at the following locations to the following individuals:

- Association of Reproductive Healthcare Professionals ("ARHP") Conference (Colorado: September 19-21, 2013):

  - Merritt and BioMax in person to NAF representatives (Sandy Fulkerson and Jennifer Hart)

- Pre-NAF 2014 (November 2013 - April 2014)

  - Daleiden and BioMax's communications regarding registration.

  - BioMax's 2014 NAF registration.

- NAF 2014 (California: April 5-8, 2014):

  - Daleiden, Merritt, and BioMax's misrepresentations to NAF regarding registration, check-in, and NAF Confidentiality Agreement.

  - Daleiden, Merritt, and BioMax in person to Dr. Deborah Nucatola of PPFA.

- Nucatola Lunch (California: July 25, 2014):

  - Daleiden, Merritt, and BioMax in person to Dr. Deborah Nucatola of PPFA.

  - Defendants also made similar representations in emails to set up the lunch.

- Pre-Forum (August to September 2014)

  - Daleiden and BioMax's communications regarding registration, including to Vikky Graziani.

  - BioMax's 2014 Forum registration and Exhibitor Agreement.

- The Forum (Florida: October 11-13, 2014):

  - Daleiden, Lopez, and BioMax's misrepresentations to PPFA regarding registration and check-in.

  - Daleiden, Lopez, and BioMax in person to Dr. Deborah Nucatola of PPFA, Dr.

48

JA1266

USCA4 Appeal: 23-2097   Doc: 11-3   Filed: 12/06/2023   Pg: 321 of 438
Case 3:1 Case: 3:16-cv-0236-WHO Document Document Filed 05/22/23 Page 50 Page 49 Pages ID# 52128

Mary Gatter of PPPSGV, Dr. Savita Ginde of PPRM, and Karen Shea of PPFA.

- Gatter Lunch (California: February 6, 2015):
  - o Daleiden, Merritt, and BioMax in person to Dr. Mary Gatter and Laurel Felczer of PPPSGV.
  - o Defendants also made similar representations in emails to set up the lunch.
- Pre-MeDC (February 2015):
  - o Daleiden and BioMax's communications regarding registration, including to Vikky Graziani.
  - o BioMax's 2015 MeDC registration and Exhibitor Agreement.
- MeDC (Florida: February 26-28, 2015):
  - o Daleiden, Lopez, and BioMax's misrepresentations to PPFA regarding registration and check-in.
  - o Daleiden, Lopez, and BioMax in person to Vikky Graziani of PPFA, Kate Carlucci of PPFA, June Gupta of PPFA, Dr. Jennefer Russo of PPOSBC, Bonnie Smith of PPGC, Dr. Mary Gatter of PPPSGV, Dr. Deborah Nucatola of PPFA.
- Pre-PPFA National Conference (February 2015):
  - o Daleiden, Lopez, and BioMax's communications regarding registration.
  - o BioMax's 2015 PPFA National Conference registration and Exhibitor Agreement.
- PPFA National Conference (Washington, D.C.: March 18-20, 2015):
  - o Daleiden, Lopez, and BioMax's misrepresentations to PPFA regarding registration and check-in.
  - o Daleiden, Lopez, and BioMax in person to Jen Castle of PPFA, Kristin Flood of PPFA, Deborah VanDerhei of PPFA, Janet Fils-Amie of PPFA, Anne-Marie Grewer of PPFA, Dr. Carolyn Westhoff of PPFA, Tram Nguyen of PPCFC, Jackie Krugler of PPGC/PPCFC.
- Pre-PPRM Site Visit (October 2014-April 2015):
  - o Daleiden and BioMax's communications with Dr. Savita Ginde and J.R. Johnstone regarding BioMax.

49

JA1267

United States District Court
Northern District of California

- PPRM (Colorado: April 7, 2015):
    - Daleiden, Merritt, and BioMax in person to Dr. Savita Ginde, J.R. Johnstone, and other PPRM staff.
- Pre-PPGC Site Visit (March-April 2015):
    - Daleiden and BioMax's communications with Melissa Farrell and Tram Nguyen concerning BioMax.
    - BioMax's PPGC NDA.
- PPGC Site Visit (Texas: April 9, 2015):
    - Daleiden, Merritt, and BioMax's communications to registration desk staff.
    - Daleiden, Merritt, and BioMax in person to Melissa Farrell, Tram Nguyen, and other PPGC/PPCFC lab staff.
- Pre-NAF 2015 (March-April 2015):
    - Daleiden and BioMax's communications regarding registration.
    - BioMax's 2015 NAF registration.
- NAF 2015 (Maryland: April 18-21, 2015):
    - Daleiden, Merritt, Lopez, and BioMax's misrepresentations to NAF regarding registration, check-in, and NAF Confidentiality Agreement.
    - Daleiden, Merritt, and Lopez in person to Deborah VanDerHei of PPFA, Jen Castle of PPFA, Dr. Deborah Nucatola of PPFA, Tram Nguyen of PPCFC, Jackie Krugler of PPGC/PPCFC, Dr. Anne Schutt-Aine of PPCFC.

Defendants deny that they made any fraudulent misrepresentations.

JA1268

### 3. Fraud—False Promise

To establish a claim for false promise against a Defendant, a Plaintiff must prove all of the following:

1. That Defendant made a promise to Plaintiff;

2. That Defendant did not intend to perform this promise when he made it;

3. That Defendant intended that Plaintiff rely on this promise;

4. That Plaintiff reasonably relied on Defendant's promise;

5. That Defendant did not perform the promised act;

6. That Plaintiff was harmed; and

7. That Plaintiff's reliance on Defendant's promise was a substantial factor in causing its harm.

As to allegedly false promises made in Washington, D.C., Plaintiffs must prove each of these elements by clear and convincing evidence. As to allegedly false promises made in any location besides Washington, D.C., Plaintiffs must prove each of the elements by the preponderance of the evidence.

Plaintiffs allege that Defendants did not intend to perform the following promises:

1. Defendants Daleiden, BioMax, and CMP promised in the 2014 Forum Agreement that:

> a. BioMax's conference exhibits would be "educational and informative, emphasizing information about products and services useful to the registrants' practice and beneficial to the interests of their clients and patients."

> b. BioMax's exhibits would be "of an educational nature."

> c. They would "comply with all applicable federal, state, and local laws and regulations in performance of its respective obligations pursuant to this Agreement, including, without limitation, laws related to fraud, abuse, privacy, discrimination, disabilities, samples, confidentiality, false claims and prohibition of kickbacks."

2. Defendants Daleiden, BioMax, and CMP promised in the 2015 MeDC Agreement that:

> a. BioMax's conference exhibits would be "educational and informative, emphasizing information about products and services useful to the registrants'

51

JA1269

practice and beneficial to the interests of their clients and patients."

b. BioMax's exhibits would be "of an educational nature."

c. They would "comply with all applicable federal, state, and local laws and regulations in performance of its respective obligations pursuant to this Agreement, including, without limitation, laws related to fraud, abuse, privacy, discrimination, disabilities, samples, confidentiality, false claims and prohibition of kickbacks."

3. Defendants Daleiden, BioMax, and CMP promised in the 2015 National Conference Agreement that:

a. BioMax would "show only products manufactured or represented by their company in the regular course of business."

b. They would "comply with all applicable federal, state, and local laws and regulations in performance of its respective obligations pursuant to this Agreement, including, without limitation, laws related to fraud, abuse, privacy, discrimination, disabilities, samples, confidentiality, false claims and prohibition of kickbacks."

4. Defendants Daleiden, BioMax, and CMP promised in the PPGC NDA:

a. "Recipient shall maintain the Disclosing Party's Confidential Information strictly confidential, shall not use the Confidential Information for any purpose other than to evaluate, negotiate and consummate the Transaction and shall not disclose to any third party or use any Confidential Information for any other purpose following the date of disclosure of such Confidential Information."

Defendants deny they made any false promises.

JA1270

USCA4 Appeal: 23-2097   Doc: 11-3   Filed: 12/06/2023   Pg: 325 of 438
Case 3:12-cv-00461-REP23-Downl0enDocumentFiled605712/23.11Page 54 Page 63 Page 05# 52132

### 4. Fraud—Reliance

A Plaintiff relied on the Defendant's misrepresentation or false promise if:

1. The misrepresentation or false promise substantially influenced the Plaintiff to act; and

2. The Plaintiff would probably not have acted in the same way without the misrepresentation or false promise.

It is not necessary for a misrepresentation or false promise to be the only reason for the Plaintiff's conduct.

JA1271

USCA4 Appeal: 23-2097    Doc: 11-3    Filed: 12/06/2023    Pg: 326 of 438

### 5.    Fraud—Reasonable Reliance

In determining whether the Plaintiff's reliance on the representation or promise was reasonable, the Plaintiff must first prove that the matter was material. A matter is material if a reasonable person would find it important in determining his or her choice of action.

If you decide that the matter is material, you must then decide whether it was reasonable for the Plaintiff to rely on the representation or promise. In making this decision, take into consideration the Plaintiff's intelligence, knowledge, education, and experience.

However, it is not reasonable for anyone to rely on a representation or promise that is preposterous. It also is not reasonable for anyone to rely on a representation or promise if facts that are within its observation show that it is obviously false.

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

JA1272

USCA4 Appeal: 23-2097   Doc: 11-3      Filed: 12/06/2023   Pg: 327 of 438
Case 3:1Case 3:1cv-04461-WHO Document Filed 05/22/23 Page 56 Page 05 Page ID# 52134

### 6.   Fraud - Plaintiff's Negligence Not a Defense

When a Defendant makes a false statement or promise, the Plaintiff does not have any duty to investigate whether the Defendant was telling the truth to the Plaintiff.

In determining whether a Plaintiff's reliance on a Defendant's false representation was reasonable, you should not consider whether a hypothetical reasonable person would have conducted more investigation of the Defendant than the Plaintiff did. A Plaintiff's reliance on a Defendant's false representations is reasonable, unless the Defendants' misrepresentation would be so obviously false or preposterous to someone with the same information and intelligence as the Plaintiff that the Plaintiff would have needed to purposefully close his eyes to avoid discovering the truth.

JA1273

**7.     Fraud—Misrepresentations Made to Persons Other Than the Plaintiff**

Defendants are responsible for a representation that was not made directly to Plaintiffs if they made the representation to another person, intending or reasonably expecting that it would be repeated to Plaintiffs.  This instruction does not apply to alleged fraudulent conduct occurring in Florida.

JA1274

**E.      RICO**

     **1.      RICO—Introduction**

Plaintiffs PPFA, PPGC, PPCFC, PPOSBC, and PPPSGV claim that all Defendants are liable to them under the RICO statute.

I will now instruct you on the elements of Plaintiffs' RICO claim. As relevant here, there are two different ways to violate RICO: (1) conducting the affairs of an enterprise through a pattern of racketeering or (2) conspiring to do so. Plaintiffs allege both theories.

RICO refers to the Racketeer Influenced and Corrupt Organization Act. This does not mean, however, that RICO is limited to organized crime. When Congress enacted RICO, it wanted to reach persons who use legitimate and illegitimate enterprises to commit racketeering.

The word "racketeering" has certain implications in our society. Use of that term in this statute and in this courtroom should not be regarded as having anything to do with your determination of whether Plaintiffs have established the elements of the claim. The term is only a term used by Congress to describe the statute.

The RICO claim asserted by Plaintiffs in this case is a civil claim subject to the civil burden of proof of preponderance of the evidence.

JA1275

## 2.    RICO—Conducting Affairs of Association-in-Fact—Elements

Plaintiffs first allege that each of the Defendants conducted or participated in the conduct of the affairs of an enterprise through a pattern of racketeering activity.

Plaintiffs must prove each of the following elements by a preponderance of the evidence:

First, there was an ongoing enterprise with some sort of formal or informal framework for carrying out its objectives consisting of a group of persons associated together for a common purpose of engaging in a course of conduct;

Second, the Defendant was employed by or associated with the enterprise;

Third, the Defendant conducted or participated, directly or indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity. To conduct or participate means that the Defendant had to be involved in the operation or management of the enterprise; and

Fourth, the Defendants' conduct or participation in the enterprise was the cause of Plaintiffs' damages.

An enterprise need not be a formal entity such as a corporation and need not have a name, regular meetings, or established rules.

JA1276

USCA4 Appeal: 23-2097    Doc: 11-3    Filed: 12/06/2023    Pg: 331 of 438
Case 3:1Case03461cvR0023DowHnenDocument FileD05/22/231/Page960Page069Pag4e05# 52138

### 3.     RICO—Enterprise

An "enterprise" is a group of people who have associated together for a common purpose of engaging in a course of conduct over a period of time. This group of people, in addition to having a common purpose, must have an ongoing organization, either formal or informal. The personnel in the enterprise, however, may change and need not be associated with the enterprise for the entire period of its existence. The group does not have to be a legally recognized entity, such as a partnership or corporation. The group may be organized for a legitimate and lawful purpose, or it may be organized for an unlawful purpose. The name of the organization itself is not an element of the claim and does not have to be proved.

Plaintiffs must prove that the enterprise had at least the three following structural features: (1) a purpose, (2) relationships among those associated with the enterprise, and (3) longevity sufficient to permit these associates to pursue the enterprise's purpose.

It is not necessary that the enterprise have any particular or formal structure, but it must have sufficient organization that its members functioned and operated in a coordinated manner in order to carry out the alleged common purpose or purposes of the enterprise. Such a group need not have a hierarchal structure or a "chain of command"; decisions may be made on an ad hoc basis and by any number of methods. Members of the group need not have fixed roles; different members may perform different roles at different times. The group need not have a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies. While the group must or would function as a continuing unit and remain in existence long enough to pursue a course of conduct, you may nonetheless find that the enterprise element is satisfied by finding a group whose associates engage in spurts of activity punctuated by periods of inactivity.

59

JA1277

### 4.    RICO—Association with the Enterprise

With regard to the element that the Defendant must have been associated with or employed by the enterprise:

It is required that at some time during the relevant time period, the Defendant was employed by, or associated with, the enterprise. It is not required, however, that the Defendant have been employed by, or associated with, the enterprise for the entire time that the enterprise existed.

A person cannot be associated with, or employed by, an enterprise if he or she does not know of the enterprise's existence or the nature of its activities.  Thus, in order to prove this element, Plaintiffs must prove that the Defendant was connected to the enterprise in some meaningful way and that the Defendant knew of the existence of the enterprise and of the general nature of its activities.

With regard to the corporate Defendants, CMP and BioMax: A corporation is considered to know of all material facts for which its employee acquires knowledge of or receives notice of while acting within the scope of the employee's employment.

60

JA1278

USCA4 Appeal: 23-2097    Doc: 11-3    Filed: 12/06/2023    Pg: 333 of 438
Case 3:1Case 3:14-cv-00223-WHO Document 1252    Filed 05/22/23    Page 61 of 105    Page ID #: 52140

**5.      RICO—Conducting or Participating in the Enterprise**

        With regard to the element that the Defendant conducted or participated in the conduct of

the enterprise through that pattern of racketeering activity:

        To conduct or participate in the conduct of the enterprise means that the Defendant must

have played some part in the operation or management of the enterprise.  Plaintiffs are not

required to prove that the Defendant was a member of upper management.  An enterprise is

operated not only by those in upper management, but also those lower down in the enterprise who

act under the direction of upper management.  The Defendant need not have participated in, or

been aware of, all of the enterprise's activities; it is sufficient if he or she was involved in the

operation or management of some of the enterprise's activities.

61

JA1279

USCA4 Appeal: 23-2097    Doc: 11-3    Filed: 12/06/2023    Pg: 334 of 438
Case 3:1Case6:0461cv-REOW3Document 1252ent Filed0605712/2311/Page63 Page06 Pages# 52141

### 6. RICO—Pattern of Racketeering

A pattern of racketeering activity requires:

First, at least two separate acts of racketeering were committed, though two separate racketeering acts are not necessarily enough to establish a pattern of racketeering;

Second, the acts of racketeering had a relationship to each other which posed a threat of continued criminal activity; and

Third, the acts of racketeering embraced the same or similar purposes, results, participants, victims, or methods of commission, or were otherwise interrelated by distinguishing characteristics.

Sporadic, widely separated, or isolated criminal acts do not form a pattern of racketeering activity.

JA1280

USCA4 Appeal: 23-2097   Doc: 11-3   Filed: 12/06/2023   Pg: 335 of 438
Case 3:1cv061ase6461cvRE023Dowlt-HoenDDe2i2entiFi0l6b05722.23.117Pa2ge964Pag0e6Pgäg0fl5# 52142

JA1281

United States District Court
Northern District of California

### 7.   RICO—"Racketeering Act" Defined

The RICO statute defines a racketeering act to be any of a long list of specified crimes.

The pattern of racketeering Plaintiffs allege in this case consists of violations of the federal false identification statute.

As I mentioned in the previous instruction, a pattern of racketeering requires at least two acts of racketeering. The two contemplated racketeering acts may be of the same type, for example, two acts of producing a false identification; or, the two acts may be of different predicates, for example, one act of producing a false identification and one act of transferring a false identification. Regardless of whether it is two racketeering acts of the same type or two racketeering acts of two different types, in order to satisfy this element, you must unanimously conclude that, for at least two specific acts of racketeering, the Defendant in question either committed those particular predicate acts or conspired for someone to commit those particular predicate acts.

I will now instruct you on the definition of each of these racketeering activities that the Defendants are alleged to have committed.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

USCA4 Appeal: 23-2097   Doc: 11-3   Filed: 12/06/2023   Pg: 336 of 438
Case 3:1cv0461-cv0023DowHenDocimentFile05722/2317Page65Page064Page45# 52143

## 8. Violation of 18 U.S.C §1028(a)(1)

Plaintiffs also allege that Defendants committed the predicate act of violating 28 U.S.C. §1028(a)(1). To prove a violation of that statute, Plaintiffs must prove all of the following:

First, the Defendant knowingly produced, or caused to be produced, a false identification document;

Second, the Defendant produced the false identification document without lawful authority; and

Third, the false identification document was or appeared to be issued by or under authority of a State of the United States.

"Produce" includes to alter, authenticate, or assemble.

The phrase "false identification document" means a document of a type intended or commonly accepted for the purposes of identification of individuals that—

(A)  is not issued by or under the authority of a governmental entity or was issued under the authority of a governmental entity but was subsequently altered for purposes of deceit; and

(B)  appears to be issued by or under the authority of a State.

JA1282

USCA4 Appeal: 23-2097   Doc: 11-3   Filed: 12/06/2023   Pg: 337 of 438
Case 3:1 Case 3:21-cv-00223 Document 252 Filed 06/22/23 Page 66 Page 66 Pages D# 52144

**9.      Violation of 18 U.S.C §1028(a)(2)**

In addition, Plaintiffs allege that Defendants committed the predicate act of violating 28 U.S.C. §1028(a)(2).  To prove a violation of that statute, Plaintiffs must prove all of the following:

First, the Defendant knowingly transferred a false identification document;

Second, the Defendant knew that the false identification document was produced without lawful authority; and

Third, the false identification document was or appeared to be issued by or under authority of a State of the United States.

The phrase "false identification document" means a document of a type intended or commonly accepted for the purposes of identification of individuals that—

(A)  is not issued by or under the authority of a governmental entity or was issued under the authority of a governmental entity but was subsequently altered for purposes of deceit; and

(B)  appears to be issued by or under the authority of a State.

JA1283

USCA4 Appeal: 23-2097    Doc: 11-3    Filed: 12/06/2023    Pg: 338 of 438
Case 3:10-cv-00461-REC23-DoumenDocumentFiled05/22/231Page67Page66Pag#: 52145

### 10. RICO—Racketeering Conspiracy—Conspiracy in General

I said that Plaintiffs alleged two bases for its RICO claim. Plaintiffs' second basis alleges a conspiracy to violate RICO.  Plaintiffs allege that each of the Defendants knowingly and intentionally conspired with at least one other person to conduct or to participate in the conduct of the affairs of the enterprise in violation of RICO.

A conspiracy for purposes of RICO is a kind of criminal partnership—an agreement of two or more persons to commit one or more crimes. The crime of conspiracy is the agreement to do something unlawful; it does not matter whether the crime agreed upon was committed.

For a conspiracy to have existed, it is not necessary that the conspirators made a formal agreement or that they agreed on every detail of the conspiracy. An informal understanding is enough. It is not enough, however, that they simply met, discussed matters of common interest, acted in similar ways, or perhaps helped one another.

One becomes a member of a conspiracy by willfully participating in the unlawful plan with the intent to advance or further some object or purpose of the conspiracy, even if the person does not have full knowledge of all the details of the conspiracy. Furthermore, one who willfully joins an existing conspiracy is as responsible for it as the originators. On the other hand, one who has no knowledge of a conspiracy, but happens to act in a way which furthers some object or purpose of the conspiracy, does not thereby become a conspirator. Similarly, a person does not become a conspirator merely by associating with one or more persons who are conspirators, nor merely by knowing that a conspiracy exists.

A conspiracy may continue for a long period of time and may include the performance of many transactions. One may join a conspiracy after it is already in progress. It is not necessary that all members of the conspiracy join it at the same time, and one may become a member of a conspiracy without full knowledge of all the details of the unlawful scheme or the names, identities, or locations of all of the other members.

Events that occurred before a conspirator joined a conspiracy may be considered by you to prove the nature and scope of the conspiracy at the time the person joined.

It is no defense that a person's participation in a conspiracy was minor or for a short period

JA1284

USCA4 Appeal: 23-2097    Doc: 11-3    Filed: 12/06/2023    Pg: 339 of 438

1    of time.

United States District Court
Northern District of California

JA1285

USCA4 Appeal: 23-2097   Doc: 11-3   Filed: 12/06/2023   Pg: 340 of 438
Case 3:10-cv-03461-WHO   Document 2522   Filed 10/05/23   Page 69 of 105   Page ID # 52147

### 11.    RICO—Racketeering Conspiracy—Elements

Plaintiffs must prove each of the following elements of a conspiracy to violate RICO by a preponderance of the evidence:

First, the alleged enterprise was or would be established;

Second, the Defendant knowingly agreed that either the Defendant or another person would be associated with the enterprise; and

Third, the Defendant knowingly agreed that either the Defendant or another person would conduct or participate, directly or indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity.  For purposes of conspiracy, it is not necessary for Plaintiffs to prove that the Defendant actually committed a pattern of racketeering activity; rather, the element is satisfied if the Defendant agreed that a pattern of racketeering activity would be committed.

Plaintiffs must prove that the Defendant agreed to participate in the conspiracy with the knowledge and intent that at least one member of the racketeering conspiracy would intentionally commit, or cause, or aid and abet the commission of, two or more racketeering acts.  That one member could be one of the Defendants or another person.  You must agree on at least two acts of racketeering the Defendants understood would be committed.  But Plaintiffs are not required to prove that the Defendants personally committed, or agreed to personally commit, two or more racketeering acts.  Nor is there any requirement that the Defendant actually conspired to operate or manage the enterprise himself or herself.

Plaintiffs must prove that the Defendant joined the conspiracy knowing the conspiracy's purpose and intending to facilitate it. The Defendant must also have been aware of the essential nature and scope of the enterprise and intended to participate in it.

In your consideration of Plaintiffs' conspiracy claim, you should first determine whether the alleged conspiracy existed.  If you conclude that a conspiracy existed as alleged, you should then determine whether each Defendant knowingly became a member of that conspiracy.

68

JA1286

USCA4 Appeal: 23-2097    Doc: 11-3    Filed: 12/06/2023    Pg: 341 of 438
Case 3:1Case3046461cv-RED23DownDmenDocumentFile0605722/231/Page970Page069Pages# 52148

### 12.    RICO—Causation

If you find that the Defendant in question conducted or participated in the affairs of a racketeering enterprise through a pattern of racketeering, or conspired to do so, you must also determine whether each Plaintiff has proved by a preponderance of the evidence that the violation caused that Plaintiff an injury to its business or property before you may find for that Plaintiff. This requirement will be satisfied if the damages are caused by the predicate acts or if the damages are caused by the pattern of acts as a whole, or both. In either case, you must find that there was some direct relationship between the injury that Plaintiff has asserted and the alleged violation by the Defendant in question.

JA1287

## F.  RECORDING CLAIMS OVERVIEW

Certain Plaintiffs have brought claims against certain Defendants under the laws of California, Florida, and Maryland, and under Federal law, for secretly recording individuals whom Plaintiffs contend were their employees and contractors.  I will now provide you a summary of each recording for which you will be asked to determine whether the recording violated the law.

You should apply Federal law to every claim.  If a recording occurred in California, Florida, or Maryland, you should apply both the law of the state where the recording occurred and Federal law.  If the recording occurred outside of California, Florida, or Maryland, you should apply only Federal law.

### I.  CALIFORNIA (CALIFORNIA AND FEDERAL LAW):

**NAF Annual Meeting held in San Francisco, CA from April 5-8, 2014**

PPNorCal contends that Dr. Leslie Drummond-Hay was illegally recorded in the exhibitor hall by David Daleiden and Sandra Merritt.

PPFA contends that Dr. Deborah Nucatola was illegally recorded on two separate instances in the exhibitor hall: In the first encounter, by Sandra Merritt, and Brianna Baxter. In the second encounter, by David Daleiden, Sandra Merritt, and Brianna Baxter.

**Lunch in Los Angeles, CA on July 25, 2014**

PPFA contends that Dr. Deborah Nucatola was illegally recorded during lunch at Craft by both David Daleiden and Sandra Merritt.

**Lunch in Pasadena, CA on February 6, 2015**

PPPSGV contends that Dr. Mary Gatter and Laurel Felczer were illegally recorded during lunch at a/k/a Bistro by both David Daleiden and Sandra Merritt.

### II.  FLORIDA (FLORIDA AND FEDERAL LAW):

**National Medical Conference/North American Forum on Family Planning in Miami, FL from October 11-13, 2014.**

PPFA contends that Dr. Deborah Nucatola was illegally recorded on two separate occasions: One, during at an outdoor reception by both Adrian Lopez and David Daleiden. The other, during an indoor reception by both Adrian Lopez and David Daleiden.

70

JA1288

PPFA contends that Karen Shea was illegally recorded at an outdoor reception by both David Daleiden and Adrian Lopez.

PPCCC contends that Dr. Virginia Siegfried was illegally recorded at an outdoor reception by both David Daleiden and Adrian Lopez.

PPRM contends that Dr. Savita Ginde was illegally recorded inside the exhibitor hall by David Daleiden.

**PPFA's Medical Director's Council Annual Meeting in Orlando FL from February 26-28, 2015.**

PPFA contends that June Gupta was illegally recorded on two separate occasions at the conference: The first during a PPFA-hosted dinner by both David Daleiden and Adrian Lopez, and the second in the exhibitor hall by both David Daleiden and Adrian Lopez.

PPFA contends that Dr. Deborah Nucatola was illegally recorded on two instances: The first during an outdoor reception by both David Daleiden and Adrian Lopez, and the second inside the exhibitor hall by both David Daleiden and Adrian Lopez.

PPFA contends that Deborah VanDerhei was illegally recorded inside the exhibitor hall by both David Daleiden and Adrian Lopez.

PPPSGV contends that Dr. Mary Gatter was illegally recorded at an outdoor reception by both David Daleiden and Adrian Lopez.

PPOSBC contends that Dr. Jennifer Russo was illegally recorded during a PPFA-hosted dinner by David Daleiden and Adrian Lopez.

PPGC contends that Bonnie Smith was illegally recorded inside the exhibitor hall by David Daleiden.

PPPSW contends that Dr. Son Nguyen and Dr. Tom Moran were illegally recorded inside the exhibitor hall by David Daleiden and Adrian Lopez.

**III.    MARYLAND (MARYLAND AND FEDERAL LAW):**

**NAF Annual Meeting held in Baltimore, MD from April 18-21, 2015**

PPFA contends that Dr. Deborah Nucatola was illegally recorded in a meeting room by David Daleiden.

United States District Court
Northern District of California

71

JA1289

PPFA contends that Deborah VanDerhei and Jen Castle were illegally recorded in a refreshment area by David Daleiden and Sandra Merritt.

PPCFC contends that Tram Nguyen and Dr. Ann Schutt-Aine, and PPGC/PPCFC contends that Jackie Krugler, were illegally recorded on two occasions. The first was at a reception in the exhibitor hall by Adrian Lopez. The second was at another reception by David Daleiden.

**IV.     OTHER JURISDICTIONS (FEDERAL LAW):**

**PPFA National Conference in Washington, DC from March 18-20, 2015**

PPFA contends that Dr. Carolyn Westhoff was illegally recorded inside the exhibitor hall by David Daleiden and Adrian Lopez.

PPFA contends that Jen Castle was illegally recorded inside the exhibitor hall by David Daleiden and Adrian Lopez.

PPFA contends that Kristin Flood was illegally recorded inside an evening reception by David Daleiden and Adrian Lopez.

PPFA contends that Janet Fils-Aime and Anne-Marie Grewer were illegally recorded inside the exhibitor hall by David Daleiden and Adrian Lopez.

PPGC contends that Melaney Linton was illegally recorded inside the exhibitor hall by David Daleiden and Adrian Lopez.

**PPRM Stapleton Health Center Visit in Colorado on April 7, 2015**

PPRM contends that Dr. Savita Ginde and J.R. Johnstone were illegally recorded over a period of hours inside the PPRM health center by David Daleiden and Sandra Merritt.

**PPGC Prevention Park Health Center Visit in Texas on April 9, 2015**

PPGC contends that Melissa Farrell was illegally recorded over a period of 7 hours inside the PPGC health center by David Daleiden and Sandra Merritt.

PPGC contends that two receptionists were illegally recorded at the reception desk inside the PPGC health center by David Daleiden and Sandra Merritt.

JA1290

### G.    CALIFORNIA RECORDING CLAIMS

#### 1.    Violation of California Penal Code §632

Plaintiffs PPFA, PPPSGV, PPNorCal, and PPGC/PPCFC allege that Defendants Daleiden, Merritt, BioMax, and CMP violated Section 632 of the California Penal Code during meetings and/or conferences that occurred in California by recording confidential conversations. To prove a violation, Plaintiffs must show that a Defendant did all of the following:

1. That the Defendant intentionally recorded one of Plaintiffs' employees or contractors by using an electronic device;

2. That the person recorded had a reasonable expectation that the conversation was not being overheard or recorded; and

3. That the Defendant did not have the consent of all parties to the conversation to record it.

A conversation is confidential where the recorded party had a reasonable expectation that others are not listening-in to the conversation or recording it.

If you find a violation, I may award statutory damages. You must also determine whether the Plaintiff is entitled to actual damages. A Plaintiff is entitled to actual damages if the Plaintiff proves the following:

First, that Plaintiff was harmed by the recording; and

Second, that the Defendant's conduct was a substantial factor in causing Plaintiff's harm.

73

JA1291

USCA4 Appeal: 23-2097    Doc: 11-3    Filed: 12/06/2023    Pg: 346 of 438
Case 3:1cv-e00461-REO23Docuen DtocuentntFileb05/22.231/P1age 75Page006Pag 405# 52153

## 2.    Violation of California Penal Code §632 - Corporation as Plaintiff

A corporation may prove a violation of Section 632 if a Defendant recorded one of its employees or contractors in her capacity as a corporate employee or contractor.  An employee or contractor is recorded in her capacity as a corporate employee or contractor if the employee or contractor is recorded discussing internal matters of the corporation or if the Defendant targeted her for recording because she could disclose information about the corporation's internal matters.

JA1292

### 3.    Violation of California Penal Code § 632 - § 633.5 affirmative defense

Defendants assert that they were permitted to record Plaintiffs in California by California Penal Code section 633.5.

To establish an affirmative defense under section 633.5, a Defendant has the burden of proving all of the following:

(1)  That Defendant believed that the person being recorded committed or intended to commit a violent felony against a person;

(2)  That, based on information the Defendants had before Defendants conducted their first recording in California, the Defendant's belief that the person being recorded committed or intended to commit a violent felony against a person was reasonable; and

(3)  That Defendants' purpose for recording the communication was to obtain evidence that the person being recorded committed or intended to commit a violent felony against a person.

In determining whether a Defendant's belief was reasonable, you may not rely on information that the Defendant learned only after they began recording in California.

JA1293

USCA4 Appeal: 23-2097    Doc: 11-3    Filed: 12/06/2023    Pg: 348 of 438
Case 3:1Case 3461-cv-0023DowumenDocument Fileb05/22/23 Page 77 Page 06 Paige# 52155

**4.    California Penal Code - § 632 - Confidential Subject Matter Not Required**

In determining whether a person had a reasonable expectation of privacy in a conversation, it is not relevant whether the content of the communication is sensitive or confidential.

JA1294

United States District Court
Northern District of California

USCA4 Appeal: 23-2097    Doc: 11-3    Filed: 12/06/2023    Pg: 349 of 438
Case 3:1Case 3:21-cv-00023 Document 252 Filed 06/22/23 Page 78 of 107 PageID# 52156

### 5. California Penal Code - § 633.5 Defense - Reasonable Belief Independent of Recorded Material

In determining whether a Defendant had a reasonable belief the person being recorded committed or intended to commit a violent felony against a person, you may not consider the content of the recorded conversation itself.

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

JA1295

## H.    FLORIDA RECORDING CLAIMS

### 1.    Violation of Section 934.03 of Title XLVII of the Florida Criminal Procedure Law

Plaintiffs PPFA, PPRM, PPOSBC, PPPSGV, PPPSW, PPRM, PPCCC and PPGC/PPCFC allege that Defendants Daleiden, Lopez, BioMax, and CMP have violated a Florida statute known as Section 934.03 of Title XLVII (the Florida Criminal Procedure Law) during conferences that occurred in Florida.

To prove a violation, Plaintiffs must show that each Defendant did one of the following acts:

(1) intentionally recorded or procured any other person to record any private oral communication; or

(2) intentionally disclosed to any other person the contents of any recorded private oral communication, knowing or having reason to know that the contents were obtained through the recording of an oral communication in violation of the statute.

However, it is lawful to do any of the foregoing acts if all parties to the communication have given prior consent to the interception.

An oral communication means a communication uttered by a person who has a subjective expectation that the communication is not subject to interception under circumstances justifying such expectation, and whose expectation was objectively reasonable.

If you find a violation,  I may award statutory damages.  You must also determine whether the Plaintiff is entitled to actual damages.  A Plaintiff is entitled to actual damages if the Plaintiff proves the following:

First, that Plaintiff was harmed by the recording; and

Second, that the Defendant's conduct was a substantial factor in causing Plaintiff's harm.

JA1296

USCA4 Appeal: 23-2097   Doc: 11-3   Filed: 12/06/2023   Pg: 351 of 438
Case 3:1cCase04061c-RED23DoWnHenDDe5onent Fil6605722/2311/Pa2e980 Fage009RA405# 52158

**2. Violation of Section 934.03 of Title XLVII of the Florida Criminal Procedure Law - Corporation as Plaintiff**

A corporation may prove a violation of the Florida Criminal Procedure Law if a Defendant recorded one of its employees or contractors in her capacity as a corporate employee or contractor. An employee or contractor is recorded in her capacity as a corporate employee or contractor if the employee or contractor is recorded discussing internal matters of the corporation or if the Defendant targeted her for recording because she could disclose information about the corporation's internal matters.

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

JA1297

## I.  MARYLAND RECORDING CLAIMS

### 1.  Violation of Section 10-402 of the Courts and Judicial Proceedings Article of the Maryland Annotated Code

Plaintiffs PPFA and PPGC/PPCFC contend that Defendants Daleiden, Merritt, Lopez, BioMax, and CMP violated Section 10-402 of the Courts and Judicial Proceedings Article of the Maryland Annotated Code during conferences that occurred in Maryland.  To prove a violation, Plaintiffs must show that each Defendant did one of the following acts:

(1) intentionally recorded or procured any other person to record any private oral communication; or

(2) intentionally disclosed to any other person the contents of any recorded private oral communication, knowing or having reason to know that the contents were obtained through the recording of an oral communication in violation of the statute.

An oral communication means a communication made by a person who had the subjective belief that the conversation was private, and that subjective belief was objectively reasonable.

However, it is lawful to do any of the foregoing acts if all parties to the communication have given prior consent to the interception.

If you find a violation,  I may award statutory damages.  You must also determine whether the Plaintiff is entitled to actual damages,  A Plaintiff is entitled to actual damages if the Plaintiff proves the following:

First, that Plaintiff was harmed by the recording; and

Second, that the Defendant's conduct was a substantial factor in causing Plaintiff's harm.

USCA4 Appeal: 23-2097    Doc: 11-3    Filed: 12/06/2023    Pg: 353 of 438
Case 3:17-cv-00461-WHO   Document 252   Filed 05/22/23   Page 82 of 105   Page ID# 52160

**2.    Violation of Section 10-402 of the Courts and Judicial Proceedings Article of the Maryland Annotated Code - Corporation as Plaintiff**

A corporation may prove a violation of Maryland law if a Defendant recorded one of its employees or contractors in her capacity as a corporate employee or contractor. An employee or contractor is recorded in her capacity as a corporate employee or contractor if the employee or contractor is recorded discussing internal matters of the corporation or if the Defendant targeted her for recording because she could disclose information about the corporation's internal matters.

United States District Court
Northern District of California

81

JA1299

United States District Court
Northern District of California

### J.    FEDERAL RECORDING CLAIMS

#### 1.    Violation of 18 U.S.C. §2511

Plaintiffs PPFA, PPGC/PPCFC, PPNorCal, PPOSBC, PPPSGV, PPPSW, PPRM, and PPCCC allege that Defendants Daleiden, Merritt, Lopez, BioMax, and Center for Medical Progress violated 18 U.S.C. §2511, the federal law against unlawful recording. To prove that the Defendant violated this statute, Plaintiffs must prove that the Defendant did one of the following acts:

> (1) intentionally intercepted or procured any other person to intercept or endeavor to intercept, any private oral communication; or

> (2) intentionally disclosed, or endeavored to disclose, to any other person the contents of any private oral communication, knowing or having reason to know that the information was obtained through the interception of an oral communication in violation of this subsection; or

> (3) intentionally used, or endeavored to use, the contents of any private oral communication, knowing or having reason to know that the information was obtained through the interception of an oral communication in violation of this subsection.

An oral communication means a communication uttered by a person who has a subjective expectation that the communication is not subject to interception under circumstances justifying such expectation, and whose expectation was objectively reasonable.

To "intercept" an oral communication means to acquire the contents of that communication through the use of any electronic, mechanical, or other device.

However, a party to an intercepted communication who consents to the interception does not violate this statute unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State.  Here, Plaintiffs claim Defendants used the recordings to violate civil RICO.

If you find that one or more Defendant violated this statute, you must then determine whether the violation caused harm to each Plaintiff.

If you find a violation,  I may award statutory damages.  You must also determine whether

82

JA1300

the Plaintiff is entitled to actual damages.  A Plaintiff is entitled to actual damages if the Plaintiff proves the following:

      First, that Plaintiff was harmed by the recording; and

      Second, that the Defendant's conduct was a substantial factor in causing Plaintiff's harm.

United States District Court
Northern District of California

JA1301

USCA4 Appeal: 23-2097    Doc: 11-3        Filed: 12/06/2023    Pg: 356 of 438
Case 3:1 Case 06461 cv R023 Down Hen Document File 05/22/23 11/Page 85 Page 84 Pages # 52163

## 2.    Federal Recording - Mixed Purpose

A person may record for both a lawful purpose and an unlawful purpose at the same time. The existence of a lawful purpose does not negate the unlawful purpose.  If you find that a Defendant had both a lawful and unlawful purpose for recording, you should find the Defendant acted with an unlawful purpose in violation of the federal recording statute.

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

JA1302

USCA4 Appeal: 23-2097    Doc: 11-3    Filed: 12/06/2023    Pg: 357 of 438
Case 3:12-cv-06413-WHO Document 1252 Filed 05/22/23 Page 86 of 105    PageID# 52164

### 3. Federal Recording - Corporation as Plaintiff

A corporation may prove a violation of Federal law if a Defendant recorded one of its employees or contractors in her capacity as a corporate employee or contractor. An employee or contractor is recorded in her capacity as a corporate employee or contractor if the employee or contractor is recorded discussing internal matters of the corporation or if the Defendant targeted her for recording because she could disclose information about the corporation's internal matters.

United States District Court
Northern District of California

JA1303

### K.    CONSPIRACY

#### 1.    Conspiracy—Essential Elements

Plaintiffs claim that Defendants Daleiden, Lopez, Merritt, BioMax, Center for Medical Progress, Rhomberg, and Newman conspired to commit trespass, fraud and recording in violation of federal and state laws and that the conspiracy harmed one or more Plaintiffs.

A conspiracy is an agreement by two or more persons to commit a wrongful act. Such an agreement may be made orally or in writing or may be implied by the conduct of the parties.  If you find that one Defendant committed a wrongful act that harmed a Plaintiff, then you must determine whether other Defendants that did not commit the wrongful act are also responsible for the harm.

A Defendant is responsible if a Plaintiff proves both of the following:

1. That the Defendant was aware that another Defendant or person planned to commit a wrongful act; and

2. That the Defendant agreed with the other Defendant or person and intended that the wrongful act be committed.

Mere knowledge of a wrongful act without cooperation or an agreement to cooperate is insufficient to make a Defendant responsible for the harm.  A conspiracy may be inferred from circumstances, including the nature of the acts done, the relationships between the parties, and the interests of the alleged coconspirators. Plaintiff are not required to prove that each Defendant personally committed a wrongful act or that he or she knew all the details of the agreement or the identities of all the other participants.

JA1304

United States District Court
Northern District of California

USCA4 Appeal: 23-2097   Doc: 11-3   Filed: 12/06/2023   Pg: 359 of 438
Case 3:1Case 64b1-cv-03Down DocbDocement FileD0573a/23117Page 88 Page 87 of 405 # 52166

## 2. Conspiracy—Essential Elements

If you decide that a Defendant joined the conspiracy to commit fraud, trespass, or illegally record, then he or she is responsible for all acts done as part of the conspiracy, whether the acts occurred before or after he or she joined the conspiracy.

JA1305

## L.    DAMAGES

### 1.    Damages - Generally

It is the duty of the Court to instruct you about the measure of damages. By instructing you on damages, the Court does not mean to suggest for which party your verdict should be rendered.

If you find for a Plaintiff on one or more of its claims, you must determine that Plaintiff's damages. A Plaintiff has the burden of proving damages by a preponderance of the evidence. Damages means the amount of money that will reasonably and fairly compensate the Plaintiff for any injury you find was caused by the Defendant.

It is for you to determine what damages, if any, have been proved. Your award must be based upon evidence and not upon speculation, guesswork or conjecture.

JA1306

USCA4 Appeal: 23-2097     Doc: 11-3     Filed: 12/06/2023     Pg: 361 of 438
Case 3:1Case3:04b6461cvREl023DowumenDoc5121entFileobf05f22231Pag90Pagt089Pages# 52168

## 2.    Damages – Mitigation

Plaintiffs have a duty to use reasonable efforts to mitigate damages. To mitigate means to avoid or reduce damages.

The Defendants have the burden of proving by a preponderance of the evidence:

1. that a Plaintiff failed to use reasonable efforts to mitigate damages; and

2. the amount by which damages would have been mitigated.

JA1307

### 3.    Damages—Tort Damages

This instruction applies to Plaintiffs' fraud, trespass, California recording, Florida recording, Maryland recording, Federal recording, and RICO claims.

For each of these claims in which a Defendant has been found liable, either by me or by you, you must determine the damages for each Plaintiff that was caused by the conduct giving rise to liability.

Plaintiffs have the burden of proving damages. Damages means the amount of money that will reasonably and fairly compensate each Plaintiff for any injury you find was caused by the Defendants. It is for you to determine what damages, if any, have been proved. Your award must be based on evidence and not on speculation, guesswork, or conjecture.

The amount of damages must include an award for each category of harm that was caused by the Defendant's wrongful conduct, even if the particular harm could not have been anticipated. The Plaintiff does not have to prove the exact amount of damages that will provide reasonable compensation for the harm. However, you must not speculate or guess in awarding damages. You may award Plaintiffs damages to reimburse them for expenses that were directly caused by Defendants' acts. These expenses may include the costs of security for staff members after Plaintiffs became aware of Defendants' recordings, costs to investigate intrusions, and costs to implement access security measures to prevent intrusions in the future. Any damages based on money spent by Plaintiffs must have been  for expenses that were reasonably incurred in light of the Defendants' actions.

JA1308

### 4.    Damages - Contract Damages

This instruction applies to Plaintiffs' claims for Breach of the NAF Agreements, Breach of the PPFA Exhibitor Agreements, and Breach of the PPGC NDA.

For each of these claims in which a Defendant has been found liable, either by me or by you, you also must decide how much money will reasonably compensate the Plaintiff for the harm caused by the breach. This compensation is called "damages." The purpose of such damages is to put Plaintiff in as good a position as it would have been if the Defendant had performed as promised.  To recover damages for any harm, the Plaintiff must prove that when the contract was made, both parties knew or could reasonably have foreseen that the harm was likely to occur in the ordinary course of events as result of the breach of the contract.  The Plaintiff also must prove the amount of its damages according to the following instructions.  It does not have to prove the exact amount.

You may award Plaintiffs damages to reimburse them for expenses that were directly caused by Defendants' acts.  These expenses may include the costs of security for staff members after Plaintiffs became aware of Defendants' recordings, costs to investigate intrusions, and costs to implement access-security measures to prevent intrusions in the future.  Any damages based on money spent by Plaintiffs must have been for expenses that were reasonably incurred in light of Defendants' actions.

JA1309

**5.** **Damages—Overlapping Damages**

Plaintiffs seek damages under more than one cause of action. You will be asked to decide whether Defendants are liable to Plaintiffs under the following causes of action:

- Trespass

- Breach of PPFA Exhibitor Terms and Conditions

- Breach of NAF Agreements

- Breach of PPGC NDA

- Fraud

- RICO

- Recording (California law)

- Recording (Florida law)

- Recording (Maryland law)

- Recording (Federal law)

In the verdict form, you will be asked to determine the amount of damages, if any, you award to each Plaintiff for each cause of action. For each cause of action, enter the entire amount of damages in each category that each Plaintiff is entitled to under that cause of action, even if you awarded the same category of damage under a different cause of action. After you complete your deliberations, I will remove any duplicate damages from any final award to Plaintiffs.

JA1310

### 6.    Arguments of Counsel Not Evidence of Damages

The arguments of the attorneys are not evidence of damages. Your award must be based on your reasoned judgment applied to the testimony of the witnesses and the other evidence that has been admitted during trial.

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

JA1311

USCA4 Appeal: 23-2097   Doc: 11-3   Filed: 12/06/2023   Pg: 366 of 438

### 7. Attorney Fees and Court Costs

If you find for a Plaintiff or Plaintiffs, you must not take into account any consideration of attorney fees or court costs in deciding the amount of the Plaintiffs' damages. I will decide the matter of attorney fees and court costs, if any, later.

United States District Court
Northern District of California

94

JA1312

USCA4 Appeal: 23-2097   Doc: 11-3   Filed: 12/06/2023   Pg: 367 of 438
Case 3:12-cv-06461-RED23-Document D12-2 Filed 11/06/23 Page 96 Page 95 Page ID# 52174

## M.    PUNITIVE DAMAGES

### 1.    Punitive Damages—Individual and Entity Defendants—Trial Not Bifurcated

If you decide that a Defendant's fraud, trespass, or violation of the Maryland or federal recording statutes caused harm, you must also decide whether that conduct justifies an award of punitive damages based on this instruction.  (A separate instruction I will give governs the award of punitive damages for the Florida recording claim.)  The purposes of punitive damages are to punish a wrongdoer for the conduct that harmed the Plaintiff and to discourage similar conduct in the future.

You may award punitive damages against a Defendant who is a natural person, i.e. a human being, only if a Plaintiff proves by clear and convincing evidence that the Defendant engaged in that conduct with malice, oppression, or fraud.

You may award punitive damages against a Defendant that is a corporate entity only if a Plaintiff proves that the corporation acted with malice, oppression, or fraud. To do this, a Plaintiff must prove one of the following by clear and convincing evidence:

1. That the malice, oppression, or fraud was conduct of one or more officers, directors, or managing agents of the entity Defendant, who acted on behalf of the entity Defendant; or

2. That the conduct constituting malice, oppression, or fraud was authorized by one or more officers, directors, or managing agents of the entity Defendant; or

3.  That one or more officers, directors, or managing agents of the entity Defendant knew of the conduct constituting malice, oppression, or fraud and adopted or approved that conduct after it occurred.

"Malice" means that a Defendant acted with intent to cause injury or that a Defendant's conduct was despicable and was done with a willful and knowing disregard of the rights or safety of another.  A Defendant acts with knowing disregard when the Defendant is aware of the probable dangerous consequences of his conduct and deliberately fails to avoid those consequences.

"Oppression" means that a Defendant's conduct was despicable and subjected the Plaintiff to cruel and unjust hardship in knowing disregard of its rights.

JA1313

USCA4 Appeal: 23-2097  Doc: 11-3  Filed: 12/06/2023  Pg: 368 of 438
Case 3:10-cv-03461-WHO Document Document Filed 05/22/11 Page 97 Page 96 of 105 # 52175

1    "Despicable conduct" is conduct that is so vile, base, or contemptible that it would be

2    looked down on and despised by reasonable people.

3         "Fraud" means that a Defendant intentionally misrepresented or concealed a material fact

4    and did so intending to harm a Plaintiff.

5         An employee is a "managing agent" if he or she exercises substantial independent

6    authority and judgment in his or her corporate decision making such that his or her decisions

7    ultimately determine corporate policy.

8         There is no fixed formula for determining the amount of punitive damages, and you are not

9    required to award any punitive damages. If you decide to award punitive damages, you should

10   consider all of the following factors separately for each Defendant in determining the amount:

11        (a) How reprehensible was that Defendant's conduct? In deciding how reprehensible a

12   Defendant's conduct was, you may consider, among other factors:

13            1. Whether the conduct caused physical harm;

14            2. Whether the Defendant disregarded the health or safety of others;

15            3. Whether Plaintiff was financially weak or vulnerable and the Defendant knew

16            Plaintiff was financially weak or vulnerable and took advantage of it;

17            4. Whether the Defendant's conduct involved a pattern or practice; and

18            5. Whether the Defendant acted with trickery or deceit.

19        (b) Is there a reasonable relationship between the amount of punitive damages and

20   Plaintiff's harm?

21        (c) In view of that Defendant's financial condition, what amount is necessary to punish

22   him and discourage future wrongful conduct? You may not increase the punitive award

23   above an amount that is otherwise appropriate merely because a Defendant has substantial

24   financial resources.

25

26

27

28

United States District Court
Northern District of California

96

JA1314

USCA4 Appeal: 23-2097    Doc: 11-3    Filed: 12/06/2023    Pg: 369 of 438
Case 3:12-cv-06461-WHO-DMC  Document 165-3  Filed 12/11/23  Page 98 of 105  Page ID # 52176

**2.  Punitive Damages for Violation of 934.03 of Title XLVII of the Florida Criminal Procedure Law**

If you find that Defendants have violated Section 934.03 and award compensatory damages, you must also decide whether punitive damages are warranted as punishment to one or more of the Defendants and as a deterrent to others.

Punitive damages are warranted against Defendants if you find by clear and convincing evidence that the Defendant was guilty of intentional misconduct or gross negligence, which was a substantial cause of injury to the Plaintiffs.  Under those circumstances you may, in your discretion, award punitive damages against Defendants.  If clear and convincing evidence does not show such conduct by any Defendant, punitive damages are not warranted against that Defendant.

"Intentional misconduct" means that the Defendant had actual knowledge of the wrongfulness of his or her conduct and that there was a high probability of injury or damage to Plaintiffs and, despite that knowledge, he or she intentionally pursued that course of conduct, resulting in injury or damage. "Gross negligence" means that the Defendant's conduct was so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct.

"Clear and convincing evidence" differs from "preponderance of the evidence" in that it is more compelling and persuasive.  Clear and convincing evidence is evidence that is precise, explicit, lacking in confusion, and of such weight that it produces a firm belief or conviction, without hesitation, about the matter in issue.

If you decide that punitive damages that are warranted against one or more of the Defendants then you must decide the amount of punitive damages, if any, to be assessed as punishment against the Defendants and as a deterrent to others.  This amount would be in addition to the compensatory damages you have previously awarded.  In making this determination, you should consider the following:

(1).    the nature, extent and degree of misconduct and the related circumstances, including the following:

(A).    whether the wrongful conduct was motivated solely by unreasonable financial gain;

97

JA1315

(B).    whether the unreasonably dangerous nature of the conduct, together with the high likelihood of injury resulting from the conduct, was actually known by Defendants;

(C).    whether, at the time of Plaintiffs' damage, the Defendant had a specific intent to harm Plaintiffs and the conduct of Defendants did in fact harm Plaintiffs; and

(2).    the financial resources of Defendants.

However, you may not award an amount that would financially destroy Defendants.

You may in your discretion decline to assess punitive damages. You may assess punitive damages against one Defendant and not the others or against more than one Defendant. Punitive damages may be assessed against different Defendants in different amounts.

JA1316

### III.    CLOSING INSTRUCTIONS

#### 1.    Duty to Deliberate

Before you begin your deliberations, elect one member of the jury as your presiding juror. The presiding juror will preside over the deliberations and serve as the spokesperson for the jury in court.

You shall diligently strive to reach agreement with all of the other jurors if you can do so. Your verdict must be unanimous, as to each element of a claim or defense.  If more than one piece of evidence can support an element of a claim or defense, you do not need to unanimously agree on which piece of evidence satisfies the element of the claim or defense, as long as you unanimously agree that the element has been satisfied.

Each of you must decide the case for yourself, but you should do so only after you have considered all of the evidence, discussed it fully with the other jurors, and listened to their views.

It is important that you attempt to reach a unanimous verdict but, of course, only if each of you can do so after having made your own conscientious decision. Do not be unwilling to change your opinion if the discussion persuades you that you should. But do not come to a decision simply because other jurors think it is right, or change an honest belief about the weight and effect of the evidence simply to reach a verdict.

Please do not state your opinions too strongly at the beginning of your deliberations or immediately announce how you plan to vote as it may interfere with an open discussion. Keep an open mind so that you and your fellow jurors can easily share ideas about the case.

You should use your common sense and experience in deciding whether testimony is true and accurate. However, during your deliberations, do not make any statements or provide any information to other jurors based on any special training or unique personal experiences that you may have had related to matters involved in this case. What you may know or have learned through your training or experience is not a part of the evidence received in this case.

Sometimes jurors disagree or have questions about the evidence or about what the witnesses said in their testimony. If that happens, you may ask to have testimony read back to you or ask to see any exhibits admitted into evidence that have not already been provided to you. Also,

99

JA1317

1   jurors may need further explanation about the laws that apply to the case. If this happens during

2   your discussions, write down your questions and give them to the clerk or bailiff. I will talk with

3   the attorneys before I answer so it may take some time. You should continue your deliberations

4   while you wait for my answer. I will do my best to answer them. When you write me a note, do

5   not tell me how you voted on an issue.

6   While I know you would not do this, you must not base your decision on chance, such as a

7   flip of a coin. If you decide to award damages, you may not agree in advance to simply add up the

8   amounts each juror thinks is right and then, without further deliberations, make the average your

9   verdict.

10   You may take breaks, but do not discuss this case with anyone, including each other, until

11   all of you are back in the jury room.

United States District Court
Northern District of California

## 2. Evidence in Electronic Format

Those exhibits received in evidence that are capable of being displayed electronically will be provided to you in that form, and you will be able to view them in the jury room. A computer and accessory equipment will be available to you in the jury room.

A court technician will show you how to operate the computer and other equipment; how to locate and view the exhibits on the computer. You will also be provided with a paper list of all exhibits received in evidence. You may request a paper copy of any exhibit received in evidence by sending a note through my clerk, Ms. Davis. If you need additional equipment or supplies or if you have questions about how to operate the computer or other equipment, you may send a note to Ms. Davis, signed by your presiding juror or by one or more members of the jury. Do not refer to or discuss any exhibit you were attempting to view.

If a technical problem or question requires hands-on maintenance or instruction, a court technician may enter the jury room for the sole purpose of assuring that the only matter that is discussed is the technical problem. When the court technician or any nonjuror is in the jury room, the jury shall not deliberate. No juror may say anything to the court technician or any nonjuror other than to describe the technical problem or to seek information about operation of the equipment. Do not discuss any exhibit or any aspect of the case.

The sole purpose of providing the computer in the jury room is to enable jurors to view the exhibits received in evidence in this case. You may not use the computer for any other purpose. At my direction, technicians have taken steps to ensure that the computer does not permit access to the Internet or to any "outside" website, database, directory, game, or other material. Do not attempt to alter the computer to obtain access to such materials. If you discover that the computer provides or allows access to such materials, you must inform the court immediately and refrain from viewing such materials. Do not remove the computer or any electronic data from the jury room, and do not copy any such data.

JA1319

United States District Court
Northern District of California

### 3.    Consideration of Evidence – Conduct of the Jury

Because you must base your verdict only on the evidence received in the case and on these instructions, I remind you that you must not be exposed to any other information about the case or to the issues it involves. Except for discussing the case with your fellow jurors during your deliberations:

Do not communicate with anyone in any way and do not let anyone else communicate with you in any way about the merits of the case or anything to do with it. This includes discussing the case in person, in writing, by phone or electronic means, via email, via text messaging, or any internet chat room, blog, website or application, including but not limited to Facebook, YouTube, Twitter, Instagram, LinkedIn, Snapchat, or any other forms of social media. This applies to communicating with your family members, your employer, the media or press, and the people involved in the trial. If you are asked or approached in any way about your jury service or anything about this case, you must respond that you have been ordered not to discuss the matter and to report the contact to the court.

Do not read, watch, or listen to any news or media accounts or commentary about the case or anything to do with it; do not do any research, such as consulting dictionaries, searching the Internet, or using other reference materials; and do not make any investigation or in any other way try to learn about the case on your own. Do not visit or view any place discussed in this case, and do not use Internet programs or other devices to search for or view any place discussed during the trial. Also, do not do any research about this case, the law, or the people involved—including the parties, the witnesses or the lawyers—until you have been excused as jurors. If you happen to read or hear anything touching on this case in the media, turn away and report it to me as soon as possible.

These rules protect each party's right to have this case decided only on evidence that has been presented here in court. Witnesses here in court take an oath to tell the truth, and the accuracy of their testimony is tested through the trial process. If you do any research or investigation outside the courtroom, or gain any information through improper communications, then your

102

JA1320

USCA4 Appeal: 23-2097    Doc: 11-3    Filed: 12/06/2023    Pg: 375 of 438
Case 3:17-cv-00461-RED3DowitinenDo252iientFilbb05/22/231/22ge 104age1106Paig@05# 52182

verdict may be influenced by inaccurate, incomplete or misleading information that has not been tested by the trial process. Each of the parties is entitled to a fair trial by an impartial jury, and if you decide the case based on information not presented in court, you will have denied the parties a fair trial. Remember, you have taken an oath to follow the rules, and it is very important that you follow these rules.

A juror who violates these restrictions jeopardizes the fairness of these proceedings and a mistrial could result that would require the entire trial process to start over.  If any juror is exposed to any outside information, please notify the court immediately.

United States District Court
Northern District of California

JA1321

### 4. Communication with Court

If it becomes necessary during your deliberations to communicate with me, you may send a note through my Clerk, Ms. Davis, signed by any one or more of you. No member of the jury should ever attempt to communicate with me except by a signed writing. I will not communicate with any member of the jury on anything concerning the case except in writing or here in open court. If you send out a question, I will consult with the lawyers before answering it, which may take some time. You may continue your deliberations while waiting for the answer to any question. Remember that you are not to tell anyone—including the court—how the jury stands, whether in terms of vote count or otherwise, until after you have reached a unanimous verdict or have been discharged.

United States District Court
Northern District of California

JA1322

Case 3:17-cv-00461-WHO Document 252 Filed 05/22/23 Page 106 of 105 Page ID# 52184
USCA4 Appeal: 23-2097    Doc: 11-3    Filed: 12/06/2023    Pg: 377 of 438

### 5. Return of Verdict

A verdict form has been prepared for you. After you have reached unanimous agreement on a verdict, your presiding juror should complete the verdict form according to your deliberations, sign and date it, and advise Ms. Davis that you are ready to return to the courtroom.

JA1323

United States District Court
Northern District of California

# Exhibit 2

Anna C. Haac (pro hac vice)
**TYCKO & ZAVAREEI LLP**
1828 L Street, N.W., Suite 1000
Washington, DC 20036
Phone: 202-973-0900
Fax: 202-973-0950
Email: ahaac@tzlegal.com

*Attorneys for Plaintiffs and the Class*
*Additional Counsel on Signature Page*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KIMETRA BRICE, EARL BROWNE, and JILL NOVOROT,<br><br>    Plaintiffs,<br><br>v.<br><br>MIKE STINSON; LINDA STINSON; 7HBF NO. 2, LTD.; STARTUP CAPITAL VENTURES, L.P.; STEPHEN J. SHAPER,<br><br>    Defendants. | Case No.: 3:19-cv-01481-WHO |
| KIMETRA BRICE, EARL BROWNE, and JILL NOVOROT,<br><br>    Plaintiffs,<br><br>v.<br><br>HAYNES INVESTMENTS, LLC, and L. STEPHEN HAYNES,<br><br>    Defendants | Case No.: 3:18-cv-01200-WHO<br><br>**PLAINTIFFS' PROPOSED JURY INSTRUCTIONS**<br><br>Hon. William H. Orrick |

1    Plaintiffs, Kimetra Brice, Earl Browne and Jill Novorot, attached hereto as **EXHIBIT 1** their

2    Proposed Jury Instructions.

3

4    Dated: July 12, 2021                    By: _/s/  Anna C. Haac_

5                                            Anna C. Haac (pro hac vice)
                                             Mark A. Clifford (pro hac vice)
6                                            **TYCKO & ZAVAREEI LLP**
                                             1828 L Street, N.W., Suite 1000
7                                            Washington, DC 20036
                                             Phone: 202-973-0900
8                                            Fax: 202-973-0950
                                             Email: ahaac@tzlegal.com
9                                            Email: mclifford@tzlegal.com

10

11                                           Kristi C. Kelly, Esq. (pro hac vice)
                                             Andrew Guzzo, Esq. (pro hac vice)
12                                           **KELLY GUZZO, PLC**
                                             3925 Chain Bridge Road, Suite 202
13                                           Fairfax, VA 22030
                                             (703) 424-7572
14                                           (703) 591-0167 Facsimile
                                             Email: kkelly@kellyguzzo.com
15                                           Email: aguzzo@kellyguzzo.com

16
                                             Sabita Soneji (SBN 224262)
17                                           **TYCKO & ZAVAREEI LLP**
                                             1970 Broadway, Suite 1070
18                                           Oakland, CA 94612
                                             Telephone (510) 254-6808
19                                           Facsimile (510) 210-0571
                                             Email: ssoneji@tzlegal.com

20
                                             Craig C. Marchiando, Esq., (SBN 283829)
21                                           Leonard A. Bennett, Esq., (pro hac vice)
                                             Amy Leigh Austin (pro hac vice)
22                                           **CONSUMER LITIGATION ASSOCIATES, P.C.**
                                             763 J. Clyde Morris Blvd., Ste. 1-A
23                                           Newport News, VA 23601
                                             Telephone: (757) 930-3660
24                                           Facsimile: (757) 930-3662
                                             Email: lenbennett@clalegal.com
25                                           Email: craig@clalegal.com
                                             Email: amyaustin@clalegal.com
26
                                             *Attorneys for Plaintiffs and the Class*
27

28

**CERTIFICATE OF SERVICE**

The undersigned, Nicole Porzenheim, hereby certifies that on July 12, 2021, she caused a copy of the foregoing **PLAINTIFFS' PROPOSED JURY INSTRUCTIONS** to be served via electronic mail, upon the following counsel of record:

> Anna S. McLean
> Jacqueline Melissa Simonovich
> Michael Andrew Lundholm
> Sheppard Mullin Richter & Hampton LLP
> Four Embarcadero Center
> Seventeenth Floor
> San Francisco, CA 94111-4109
> (415) 434-9100
> Fax: (415) 434-3947
> Email: AMcLean@sheppardmullin.com
> Email: jsimonovich@sheppardmullin.com
> Email: mlundholm@sheppardmullin.com
>
> David Foster Herman
> Jonathan P. Boughrum
> Richard L. Scheff
> Michael Christopher Witsch
> Armstrong, Teasdale, LLP
> 2005 Market Street, 29th floor
> One Commerce Square
> Philadelphia, PA 19103
> 267-780-2015
> Email: dherman@armstrongteasdale.com
> Email: jboughrum@armstrongteasdale.com
> Email: rscheff@armstrongteasdale.com
> Email: mwitsch@armstrongteasdale.com

> */s/ Nicole Porzenheim*
> Nicole Porzenheim

# EXHIBIT 1

## I.    INTRODUCTORY AND MISCELLANEOUS INSTRUCTIONS

### 1.    Duty of Jury

Members of the Jury: Now that you have heard all of the evidence, it is my duty to instruct you on the law that applies to this case. A copy of these instructions will be sent to the jury room for you to consult during your deliberations.

It is your duty to find the facts from all the evidence in the case. To those facts, you will apply the law as I give it to you. You must follow the law as I give it to you whether you agree with it or not. And you must not be influenced by any personal likes or dislikes, opinion, prejudices, or sympathy. Your verdict should be based on the law and facts; and not whether you personally agree with one side or the other. That means that you must decide the case solely on the evidence before you. You will recall that you took an oath to do so.

Please do not read into these instructions or anything that I may say or do or have said or done that I have opinions regarding the evidence or what your verdict should be.

**Authorities**: Ninth Circuit's Model Civil Jury Instructions at § 1.2.

JA1329

## 2. Matters Not to be Decided by the Jury.

The claims and defenses in this case concern the strategies chosen and employed by the Parties, and I limited the evidence accordingly. I need to emphasize what this case is not about. It is not about whether the loans are good or bad for borrowers. It is not about whether they should be legal or illegal. It is not about whether class actions are good or bad. Those issues are matters for lawmakers and others in the world outside this courtroom. In this courtroom your job is to consider the evidence related to the claims and defenses in this case in accordance with the instructions that I give you.

**Authorities**: *Planned Parenthood Federation of America, Inc., v. Center for Medical Progress*, Case No. 3:16-cv-00236 (WHO) (N.D. Cal.), Final Jury Instructions (Dkt. 1006 at pgs. 8).

3.        **Burden of Proof—Preponderance of Evidence.**

In this civil case, the Plaintiffs have the burden of proving each essential element of their claim by a "preponderance of the evidence." To prove an element by a preponderance of the evidence simply means to prove that something is more likely than not. In other words, in light of the evidence and the law, do you believe that each element of Plaintiffs' claim is more likely true than not? If so, you should decide in favor of Plaintiffs. If not, or if the evidence is equally balanced, then Plaintiffs have not carried their burden of proof on that element. You do ***not*** need to find that it is highly probable or beyond a reasonable doubt that the factual contentions of the claims are true.

This same standard applies to any affirmative defense. This means that Defendants have the burden of proving each essential element of their affirmative defense by a "preponderance of the evidence." In other words, in light of the evidence and the law, do you believe that each element of Defendants' affirmative defense is more likely true than not?

**Authorities**: Ninth Circuit's Model Civil Jury Instructions at § 1.6.

4.     **Multiple Defendants – Different Legal Rights**

You should decide this case as to each Defendant separately. There are multiple Defendants in this trial. You should decide the case as to each Defendant as if it were a separate lawsuit. Each Defendant is entitled to separate consideration of the claims against them.

Unless otherwise stated, these instructions apply to all parties.

**Authorities**: Ninth Circuit's Model Civil Jury Instructions at § 1.8.

JA1332

**5.      What is Evidence.**

The evidence you are to consider in deciding what the facts are consists of:

i.      The sworn testimony of any witness (this includes live testimony, deposition testimony, or written testimony);

ii.      The exhibits that are admitted into evidence;

iii.      Any facts to which the lawyers have agreed; and

iv.      Any facts that I may instruct you to accept as proved.

**Authorities**: Ninth Circuit's Model Civil Jury Instructions at § 1.9.

JA1333

**6.      What is Not Evidence.**

In reaching your verdict, you may consider only the testimony and exhibits received into evidence. Certain things are not evidence, and you may not consider them in deciding what the facts are. Here is a list of them:

(i)      Arguments and statements by lawyers are not evidence. The lawyers are not witnesses. What they may say in their opening statements, closing arguments and at other times is intended to help you interpret the evidence, but it is not evidence. If the facts as you remember them differ from the ways the lawyers have stated them, your memory of them controls.

(ii)      Questions and objections by lawyers are not evidence. Attorneys have a duty to their clients to object when they believe a question is improper under the rules of evidence. You should not be influenced by the objection or by the court's ruling on it.

(iii)      Testimony that is excluded or stricken, or that you are instructed to disregard, is not evidence and must not be considered. In addition, some evidence may be received only for a limited purpose; when I instruct you to consider certain evidence only for a limited purpose, you must do so and you may not consider that evidence for any other purpose.

(iv)      Anything you may see or hear when the court was not in session is not evidence. You are to decide the case solely on the evidence received at trial.

**Authorities**: Ninth Circuit's Model Civil Jury Instructions at § 1.10.

JA1334

7.    **Evidence for Limited Purpose.**

Some evidence in this case may only be admitted for a limited purpose. When I instructed you that an item of evidence was admitted only for a limited purpose, you must consider it only for that limited purpose and not for any other purpose.

**Authorities**: Ninth Circuit's Model Civil Jury Instructions at § 1.11.

**8.      Direct or Circumstantial Evidence**

Evidence may be direct or circumstantial. Direct evidence is direct proof of a fact, such as testimony by a witness about what that witness personally saw or heard or did. Circumstantial evidence is proof of one or more facts from which you could find another fact. The law makes no distinction between the weight to be given to either direct or circumstantial evidence. It is for you to decide how much weight to give to any evidence.

I want to provide you with an example of circumstantial evidence. If you wake up in the morning and see that the sidewalk is wet, you may find from that circumstantial fact that it rained during the night. However, other evidence, such as a turned on garden hose, may provide a different explanation for the presence of water on the sidewalk. Therefore, before you decide that a fact has been proved by circumstantial evidence, you must consider all the evidence in the light of reason, experience and common sense.

**Authorities**: Ninth Circuit's Model Civil Jury Instructions at § 1.12.

9.        **Ruling on Objections.**

There are rules of evidence that control what can be received into evidence. When a lawyer asks a question or offers an exhibit into evidence and a lawyer on the other side thinks that it is not permitted by the rules of evidence, that lawyer may object. If I overruled the objection, the question was answered or the exhibit received. If I sustained the objection, the question could not be answered, and the exhibit could not be received. Whenever I sustained an objection to a question, you must ignore the question and must not guess what the answer might have been.

Sometimes I ordered that evidence be stricken from the record and that you disregard or ignore that evidence. That means when you are deciding the case, you must not consider the stricken evidence for any purpose.

**Authorities**: Ninth Circuit's Model Civil Jury Instructions at § 1.13.

### 10.    Credibility of Witnesses

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says, or part of it, or none of it. In considering the testimony of any witness, you may take into account:

(i)     the opportunity and ability of the witness to see or hear or know the things testified to;

(ii)    the witness's memory;

(iii)   the witness's manner while testifying;

(iv)    the witness's interest in the outcome of the case, if any;

(v)     the witness's bias or prejudice, if any;

(vi)    whether other evidence contradicted the witness's testimony;

(vii)   the reasonableness of the witness's testimony in light of all the evidence; and

(viii)  any other factors that bear on believability.

Sometimes a witness may say something that is not consistent with something else he or she said. Sometimes different witnesses will give different versions of what happened. People often forget things or make mistakes in what they remember. Also, two people may see the same event but remember it differently. You may consider these differences, but do not decide that testimony is untrue just because it differs from other testimony.

However, if you decide that a witness has deliberately testified untruthfully about something important, you may choose not to believe anything that witness said. On the other hand, if you think the witness testified untruthfully about some things but told the truth about others, you may accept the part you think is true and ignore the rest.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify. What is important is how believable the witnesses were, and how much weight you think their testimony deserves.

**Authorities**: Ninth Circuit's Model Civil Jury Instructions at § 1.14.

JA1338

**11.     Witnesses Statements on the Law**

During the course of the trial, you may hear witnesses and others express views about what the law is. Your duty is to follow my instructions on the law, not what others may have said it is.

**Authorities**: *Planned Parenthood Federation of America, Inc., v. Center for Medical Progress*, Case No. 3:16-cv-00236 (WHO) (N.D. Cal.), Final Jury Instructions (Dkt. 1006 at pgs. 18).

**12.      Advice of Counsel Not A Defense**

Consulting with lawyers is not a defense to any of Plaintiffs' claims. You may not speculate as to whether Defendants accurately described their plans to their lawyers, whether their lawyers told Defendants their conduct was lawful or not, and whether Defendants' lawyers provided correct advice. You should base your verdict solely on the law I have given you and the evidence presented in this case, not on whether Defendants consulted with lawyers.

**Authorities**: *Planned Parenthood Federation of America, Inc., v. Center for Medical Progress*, Case No. 3:16-cv-00236 (WHO) (N.D. Cal.), Final Jury Instructions (Dkt. 1006 at pgs. 33).

**13.    Expert Testimony**

You have heard testimony from Christopher Peterson who testified to opinions and the reasons for his opinions. This opinion testimony is allowed, because of the education or experience of this witness.

Such opinion testimony should be judged like any other testimony. You may accept it or reject it, and give it as much weight as you think it deserves, considering the witness's education and experience, the reasons given for the opinion, and all the other evidence in the case.

**Authorities**: Ninth Circuit's Model Civil Jury Instructions at § 2.13.

USCA4 Appeal: 23-2097    Doc: 11-3      Filed: 12/06/2023    Pg: 396 of 438

14.     **Stipulations of Fact**

The parties have agreed to certain facts I read to you during the course of trial. You must therefore treat these facts as having been proved.

**Authorities**: Ninth Circuit's Model Civil Jury Instructions at § 2.2.

**15.       Deposition in Lieu of Live Testimony**

A deposition is the sworn testimony of a witness taken before trial. The witness is placed under oath to tell the truth and lawyers for each party may ask questions. The questions and answers are recorded.

The depositions of several witnesses and parties were taken in this action. You should consider their video deposition testimony, presented to you in court in lieu of live testimony, insofar as possible, in the same way as if the witness had been present to testify.

Where deposition testimony is read from the transcript instead of presented by video, do not place any significance on the behavior or tone of voice of any person reading the questions or answers.

**Authorities**: Ninth Circuit's Model Civil Jury Instructions at § 2.4.

### 16.    Use of Interrogatories

Evidence was presented to you in the form of answers of one of the parties to written interrogatories submitted by the other side. These answers were given in writing and under oath before the trial in response to questions that were submitted under established court procedures. You should consider the answers, insofar as possible, in the same way as if they were made from the witness stand.

**Authorities**: Ninth Circuit's Model Civil Jury Instructions at § 2.11.

17.     **Charts and Summaries Not Received in Evidence**

Certain charts and summaries not admitted into evidence have been shown to you in order to help explain the contents of books, records, documents, or other evidence in the case. Charts and summaries are only as good as the underlying evidence that supports them. You should, therefore, give them only such weight as you think the underlying evidence deserves.


**Authorities**: Ninth Circuit's Model Civil Jury Instructions at § 2.14.

JA1345

**18.        Charts and Summaries Received In Evidence.**

Certain charts and summaries have been admitted into evidence to illustrate information brought out in the trial. Charts and summaries are only as good as the testimony or other admitted evidence that supports them. You should, therefore, give them only such weight as you think the underlying evidence deserves.

**Authorities**: Ninth Circuit's Model Civil Jury Instructions at § 2.15.

**19.    Class Action – Defined.**

A class action is a lawsuit that has been brought by one or more plaintiffs on behalf of a larger group of people who have similar legal claims. All of these people together are called a "class." Plaintiffs Kimetra Brice, Jill Novorot, and Earl Browne have brought this case as a class action.

In a class action, the claims of many individuals can be resolved at the same time instead of requiring each member to sue separately. Because of the large number of claims that are at issue in this case, not everyone in the class will testify. You may assume that the evidence at this trial applies to all class members unless I specifically tell you otherwise. All members of the class will be bound by the result of this trial.

In this case, the classes consist of the following:

All individuals who resided in California at the time he or she: (i) obtained a loan(s) from Great Plains Lending, or (ii) obtained a loan(s) from Plain Green prior to June 1, 2016.

**Authorities**: California Civil Jury Instructions (2021) at § 115.

JA1347

II.    **CLAIMS AND DEFENSES**

A.    **USURY CLAIMS**

1.    **Usury—Introduction**

Usury is the lending of money at an illegally high rate of interest. Usury laws differ from one state to another. In California, an unlicensed lender is prohibited from charging an annual percentage rate of more than ten percent (10%) on a consumer loan of less than $2,500.

I have previously ruled that California law applies to the loans made to the California borrowers in this case—even though Defendants, Think Finance, Plain Green, and Great Plains are physically located outside of California and have no offices in California. Further, California law applies to the loans even if the borrowers signed a contract agreeing that California law does not apply. California law also applies even if borrowers were willing to pay an interest rate higher than the enforceable rate of interest.

Authorities: Cal. Civ. Code § 1916-2;

JA1348

## 2.   Usury—Elements (Direct Liability)

Plaintiffs claim that Defendants are liable to Plaintiffs for violations of California's usury law. California law prohibits any person, company, association, or corporation from taking or receiving—directly or indirectly—money in any manner whatsoever at annual percentage rate greater than ten percent (10%) per year. To prove a Defendant violated this statute, Plaintiffs must prove the following elements by a preponderance of the evidence:

(1)  The Defendant, directly or indirectly, took or received money in any manner whatsoever;

(2)  From a loan of less than $2,500 that had an annual percentage rate greater than ten percent (10%) per year.

Whether a loan is usurious—i.e., whether the annual percentage rate was more than ten percent (10%) per year—is determined by the total amount of interest required to be paid between the date of execution and the date of maturity.

**Authorities**: *In re Dominguez*, 995 F.2d 883, 886 (9th Cir. 1993); Cal. Civ. Code § 1916-2; *Creative Ventures, LLC v. Jim Ward & Associates*, 195 Cal. App. 4th 1430, 1449 (Cal. App. 6th Dist. 2011).

### 3.    Usury—Civil Conspiracy (Alternative Theory of Liability).

Plaintiffs also claim that Defendants conspired to violate California's usury laws and that the conspiracy harmed Plaintiffs and the Class Members. Under conspiracy liability all who cooperate in another's wrong may be held liable.

A conspiracy is an agreement by two or more persons to commit a wrongful act. Such an agreement may be made orally or in writing or may be implied by the conduct of the parties.

A Defendant is responsible if Plaintiffs proved the following elements by a preponderance of the evidence:

(1)  The Defendant was aware that another person or persons planned to commit a wrongful act;

(2)  The Defendant agreed with the other person or persons and intended that the wrongful act be committed.

Mere knowledge of a wrongful act without cooperation or an agreement to cooperate is insufficient to make a Defendant responsible for the harm. A conspiracy may be inferred from circumstances, including the nature of the acts done, the relationships between the parties, and the interests of the alleged coconspirators. Plaintiffs are not required to prove that each Defendant personally committed a wrongful act or that he or she knew all the details of the agreement or the identities of all the other participants.

If you decide that a Defendant joined the conspiracy to violate California's usury laws, then he or she is responsible for all acts done as part of the conspiracy, whether the acts occurred before or after he or she joined the conspiracy.

**Authorities**: *Planned Parenthood Federation of America, Inc., v. Center for Medical Progress*, Case No. 3:16-cv-00236 (WHO) (N.D. Cal.), Final Jury Instructions (Dkt. 1006 at pgs. 86-87); *United States v. Umagat*, 998 F.2d 770, 772 (9th Cir. 1993).

4.    **Usury—Shareholder Liability for Authorization or Direction (Second Alternative Theory of Liability)**

Plaintiffs also claim that Defendants Linda Stinson, Mike Stinson, 7HBF, and Steven Shaper are liable for Think Finance's violations of California usury law because of Defendants' conduct as shareholders of Think Finance. Under California law, shareholders of a corporation (including a limited liability company) are liable for the corporation's misconduct if the shareholder specifically directed, authorized, or participated in the wrongful acts. A Defendant is liable if Plaintiffs proved the following elements by a preponderance of the evidence:

(1) A defendant was a shareholder;

(2) Think Finance took or received the interest money on a loan of less than $2,500 with an annual percentage rate greater than 10% per year; and

(3) The Defendant directed or authorized these acts.

When determining whether someone "directed" an act, you should apply the ordinary meaning of the word. The ordinary meaning of the word "direct" is "to regulate the activities or course of" or "to carry out the organizing, energizing, and supervising of" an act.

When determining whether someone "authorized" an act, you should also apply the ordinary meaning of the word. The ordinary meaning of the word "authorize" is "to endorse, empower, justify, or permit."

**Authorities**: *Wyatt v. Union Mortg. Co.*, 24 Cal. 3d 773, 785 (1979); *see also U.S. Small Bus. Admin. v. Alto Tech Ventures, LLC*, 2008 WL 5245903, at *15 (N.D. Cal. 2008); *Holistic Supplements, L.L.C. v. Stark*, 61 Cal. App. 5th 530, 544 (2021); Merriam Webster's.

**B.    UNJUST ENRICHMENT CLAIMS**

**1.    Unjust Enrichment—Introduction**

Plaintiffs claim that Defendants have been unjustly enriched by the money that Defendants received from Think Finance; and that this money should be provided to Plaintiffs and the Class Members. Plaintiffs and the Class Members are entitled to restitution from a Defendant if they prove that the Defendant knew or had reason to know that he or she received usurious amounts from Plaintiffs and the Class Members.

**Authorities**: California Civil Jury Instructions (2021) at § 375.

## 2. Unjust Enrichment—Elements

Plaintiffs claim that they and the Class Members are entitled to restitution from each of Defendants for their unjust enrichment under California law. Plaintiffs and the Class Members are entitled to restitution from a Defendant if Plaintiffs prove the following by a preponderance of the evidence:

(1)  Plaintiffs and Class Members conferred a benefit upon Defendant;

(2)  The Defendant received of a benefit; and

(3)  The Defendant unjustly retained the benefit at the expense of Plaintiffs and the Class Members.

A recipient of money who has reason to believe that the funds he or she receives were unlawfully obtained may be liable for restitution.

**Authorities**: California Civil Jury Instructions (2021) at § 375 (citing *Professional Tax Appeal v. Kennedy-Wilson Holdings, Inc.,* 29 Cal. App. 5th 230, 238-242 (2018)); *Welborne v. Ryman-Carroll Foundation*, 22 Cal. App. 5th 719, 725–726 (2018).

JA1353

3.        **Unjust Enrichment—Civil Conspiracy (Alternative Theory of Liability).**

Plaintiffs also claim that Defendants conspired to unjustly enrich themselves and others at the expense of Plaintiffs and the Class Members. As previously explained, under conspiracy liability all who cooperate in another's wrong may be held liable.

A conspiracy is an agreement by two or more persons to commit a wrongful act. Such an agreement may be made orally or in writing or may be implied by the conduct of the parties. If you find that one person (a person means an individual or an entity) committed a wrongful act that harmed Plaintiffs, then you must determine whether a Defendant that did not commit the wrongful act is also responsible for the harm.

A Defendant is responsible if Plaintiffs and the Class Members' harm if the following was proved by a preponderance of the evidence:

(1)  The Defendant was aware that another person or persons planned to commit a wrongful act;

(2)  The Defendant agreed with the other person or persons and intended that the wrongful act be committed.

Mere knowledge of a wrongful act is not enough to make a Defendant responsible for the harm. A conspiracy may be inferred from circumstances, including the nature of the acts done, the relationships between the parties, and the interests of the alleged coconspirators. Plaintiffs are not required to prove that the Defendant personally committed a wrongful act or that he or she knew all the details of the agreement or the identities of all the other participants.

If you decide that a Defendant joined the conspiracy, then he or she is responsible for all acts done as part of the conspiracy including any unjust amounts collected by co-conspirators, regardless of whether such acts were known to the Defendant.

**Authorities**: *Planned Parenthood Federation of America, Inc., v. Center for Medical Progress*, Case No. 3:16-cv-00236 (WHO) (N.D. Cal.), Final Jury Instructions (Dkt. 1006 at pgs. 86-87);n *United States v. Umagat*, 998 F.2d 770, 772 (9th Cir. 1993).

JA1354

4.      Unjust Enrichment—Shareholder Liability for Authorization or Direction (Alternative Theory of Liability)

Plaintiffs also claim that Defendants Linda and Mike Stinson, 7HBF, and Shaper are liable for Think Finance's unjust enrichment as the shareholders of Think Finance. As previously explained, shareholders of a corporation (including a limited liability company) are liable for the corporation's misconduct if the shareholder specifically directed, authorized, or participated in the wrongful acts. A Defendant is liable under this alternative theory of liability if Plaintiffs proved the following elements by a preponderance of the evidence::

(1)  A Defendant was a shareholder of Think Finance;

(2)  Think Finance took or received the interest; and

(3) The Defendant directed or authorized these acts.

When determining whether someone "directed" an act, you should apply the ordinary meaning of the word. The ordinary meaning of the word "direct" is "to regulate the activities or course of" or "to carry out the organizing, energizing, and supervising of" an act.

When determining whether someone "authorized" an act, you should also apply the ordinary meaning of the word. The ordinary meaning of the word "authorize" is "to endorse, empower, justify, or permit."

**Authorities**: *Wyatt v. Union Mortg. Co.*, 24 Cal. 3d 773, 785 (1979); *see also U.S. Small Bus. Admin. v. Alto Tech Ventures, LLC*, 2008 WL 5245903, at *15 (N.D. Cal. 2008); *Holistic Supplements, L.L.C. v. Stark*, 61 Cal. App. 5th 530, 544 (2021); Merriam Webster's.

C.      **RICO CLAIMS OVERVIEW**

1.      **RICO Claims Overview**

Plaintiffs claim that Defendants are liable to them under a federal statute entitled the Racketeer Influenced and Corrupt Organizations Act. It is often referred to by the acronym "RICO." Eliminating the making and collection of usurious loans was one of Congress' principal aims when enacting this statute.

RICO is not limited to organized crime. When Congress enacted RICO, it wanted to reach persons who use legitimate and illegitimate enterprises. As relevant here, there are four different ways to violate RICO: (1) investing in any enterprise; (2) acquiring or maintaining any interest in or control of any enterprise; (3) conducting or participating in the affairs of the enterprise; or (4) conspiring to do so.

Plaintiffs allege that Defendants violated RICO in each one of these four ways. You may find that a Defendant violated all, some, or none of RICO's prohibitions because each of these claims have some separate elements. Some of them also have one element, or more, in common. When assessing each of the RICO claims, you must consider the specific elements of the particular claim at issue.

**Authorities**: *Planned Parenthood Federation of America, Inc., v. Center for Medical Progress*, Case No. 3:16-cv-00236 (WHO) (N.D. Cal.), Final Jury Instructions (Dkt. 1006 at pg. 57).

JA1357

## 2.    RICO Claims Overview-Enterprise

The existence of an enterprise is an element of each of the four RICO claims Plaintiffs claim against Defendants. An "enterprise" is a group of people who have associated together for a common purpose of engaging in a course of conduct over a period of time. This requirement is not very demanding. RICO's net has broad coverage to trap even the smallest fish, even those peripherally involved with the enterprise.

This group of people, in addition to having a common purpose, must have an ongoing organization, either formal or informal. The personnel in the enterprise, however, may change and need not be associated with the enterprise for the entire period of its existence. The group does not have to be a legally recognized entity, such as a partnership or corporation. The group may be organized for a legitimate and lawful purpose, or it may be organized for an unlawful purpose. The name of the organization itself is not an element of the claim and does not have to be proved.

Plaintiffs must prove that the enterprise had at least the three following structural features: (1) a purpose, (2) relationships among those associated with the enterprise, and (3) longevity sufficient to permit these associates to pursue the enterprise's purpose.

It is not necessary that the enterprise have any particular or formal structure, but it must have sufficient organization that its members functioned and operated in a coordinated manner in order to carry out the alleged common purpose or purposes of the enterprise. Such a group need not have a hierarchal structure or a chain of command; decisions may be made on an ad hoc basis and by any number of methods. Members of the group need not have fixed roles; different members may perform different roles at different times. The group need not have a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies. While the group must or would function as a continuing unit and remain in existence long enough to pursue a course of conduct, you may nonetheless find that the enterprise element is satisfied by finding a group whose associates engage in spurts of activity punctuated by periods of inactivity.

Defendants in RICO actions must have had some knowledge of the nature of the enterprise to avoid an unjust association of the defendant[s] with the crimes of others, but the requirement of a

common purpose may be met so long as the defendants were each aware of the essential nature and scope of [the] enterprise and intended to participate in it.

This same definition of enterprise applies to each one of the RICO claims.

**Authorities**: *Planned Parenthood Federation of America, Inc., v. Center for Medical Progress*, Case No. 3:16-cv-00236 (WHO) (N.D. Cal.), Final Jury Instructions (Dkt. 1006 at pg. 59); *see also United States v. Christensen*, 828 F.3d 763 (9th Cir. 2015).

### 3.    RICO Claims Overview-Causation

Causation is an element of each of the four RICO claims Plaintiffs claim against each of Defendants. Here, Plaintiffs and the Class Members have asserted that they were injured by the alleged payment of interest at excessive rates. Proximate cause is satisfied if you find that Plaintiffs' damages were caused by the collection of unlawful debt.

The fact that Plaintiffs were also injured by other members of the enterprise's violations does not mean Plaintiffs' injuries were not also caused by a Defendant's role in the enterprise.

**Authorities**: *Planned Parenthood Federation of America, Inc., v. Center for Medical Progress*, Case No. 3:16-cv-00236 (WHO) (N.D. Cal.), Final Jury Instructions (Dkt. 1006 at pg. 69); *Brice v. Plain Green, LLC*, 372 F. Supp. 3d 955, 983, n. 24 (N.D. Cal. 2019)

**D.** **Section 1962(c) RICO Claims—Conducting the Affairs of an     Enterprise**

     **1.**     **Section 1962(c) RICO Claims —Conducting the Affairs of an Enterprise—Elements**

Plaintiffs allege that each of the Defendants conducted or participated in the conduct of the affairs of an enterprise through the collection of unlawful debt in violation of § 1962(c) of RICO. To hold a Defendant liable for this claim, Plaintiffs must prove each of the following elements by a preponderance of the evidence:

(1) There was an ongoing enterprise with some sort of formal or informal framework for carrying out its objectives consisting of a group of persons associated together for a common purpose of engaging in a course of conduct;

(2) The Defendant was associated with the enterprise;

(3) The Defendant conducted or participated, directly or indirectly, in the conduct of the affairs of the enterprise through the collection of unlawful debt. To conduct or participate means that the Defendant had to be involved in the operation or management of the enterprise

(4) The Defendant's conduct or participation in the enterprise was the cause of Plaintiffs' damages.

I have already explained to you the enterprise and causation elements. I will now explain to you what each of the remaining elements mean.

**Authorities**: *Planned Parenthood Federation of America, Inc., v. Center for Medical Progress*, Case No. 3:16-cv-00236 (WHO) (N.D. Cal.), Final Jury Instructions (Dkt. 1006 at pg. 58).

2. **SECTION 1962(c) RICO CLAIMS —Conducting the Affairs of an Enterprise—Association with the Enterprise**

With regard to the element that the Defendant must have been associated with or employed by the enterprise:

It is required that at some time during the relevant time period, the Defendant was employed by, or associated with, the enterprise. It is not required, however, that the Defendant have been employed by, or associated with, the enterprise for the entire time that the enterprise existed.

A person cannot be associated with, or employed by, an enterprise if he or she does not know of the enterprise's existence or the nature of its activities. Thus, in order to prove this element, Plaintiffs must prove that the Defendant was connected to the enterprise in some meaningful way and that the Defendant knew of the existence of the enterprise and of the general nature of its activities.

With regard to the corporate Defendants, 7HBF and Haynes Investments: A corporation is considered to know of all material facts for which its officers, employees, or agents acquire knowledge of or receives notice of while acting within the scope of the officers, employees, or agents' duties.

**Authorities**: *Planned Parenthood Federation of America, Inc., v. Center for Medical Progress*, Case No. 3:16-cv-00236 (WHO) (N.D. Cal.), Final Jury Instructions (Dkt. 1006 at pg. 60).

        **i.**      **Section 1962(c) RICO Claim—Conducting the Affairs of an Enterprise— Conducting or Participating in the Enterprise**

With regard to the element that the Defendant conducted or participated in the conduct of the enterprise through the collection of unlawful debt:

To conduct or participate in the conduct of the enterprise means that the Defendant must have played some part in the operation or management of the enterprise. Plaintiffs are not required to prove that the Defendant was a member of upper management. An enterprise is operated not only by those in upper management, but also those lower down in the enterprise who act under the direction of upper management. The Defendant need not have participated in, or been aware of, all of the enterprise's activities; it is sufficient if he or she was involved in the operation or management of some of the enterprise's activities.

**Authorities**: *Planned Parenthood Federation of America, Inc., v. Center for Medical Progress*, Case No. 3:16-cv-00236 (WHO) (N.D. Cal.), Final Jury Instructions (Dkt. 1006 at pg. 61).

3.    **SECTION 1962(c) RICO CLAIMS —Conducting the Affairs of an Enterprise—Collection of Unlawful Debt**

"Collection" of unlawful debt does not require a Defendant to personally, individually, or directly collect the underlying debt. Instead, the word collection means any act that would tend to induce another to repay on an unlawful debt. In determining whether this element has been satisfied, relevant questions include whether a Defendants was instrumental in setting up, and knowingly setting up, an enterprise that collected unlawful debts, thereby causing the collection to occur. In other words, you may find a person collected the unlawful debt if they directed or participated in the setup, management or operations of the enterprise, thereby causing a person to repay on the unlawful debts.

A debt is "unlawful debt" under RICO if:

(1)  The debt is unenforceable in whole or in part because of a state law relating to usury;

(2)  The debt was incurred in connection with the business of lending money; and

(3)  The usurious rate was at least twice the enforceable rate.

As I previously explained, California law applies to the loans made to the California borrowers in this case, including California's usury laws. A debt is unenforceable under California law if the interest rate charged on the loan exceeds 10% per year. Accordingly, the Plaintiffs' and Class Members' loans were "unlawful debt" if Plaintiffs proved by a preponderance of the evidence that:

(1)  The loans charged an annual percentage rate that exceeded 10%;

(2)  The debts were incurred in connection with the business of lending money; and

(3)  The rate charged by the terms of the loan exceeded 20%, *i.e.*, that it was two times greater than the enforceable rate.

**Authorities**: *Goldenstein v. Repossessors Inc.*, 815 F.3d 142, 148 (3d Cir. 2016); *United States v. Eufrasio,* 935 F.2d 553, 576 (3d Cir. 1991); *United States v. Pepe*, 747 F.2d 632, 661 n.48 (11th Cir. 1984).

JA1364

E.       SECTION 1962(a) RICO CLAIMS—Investing in an Enterprise—Elements

Plaintiffs allege that Defendants received income derived, directly or indirectly, from the collection of unlawful debt and used or invested the income in the establishment or operation of an enterprise in violation of § 1962(a) of RICO. To hold a Defendant liable for this claim, Plaintiffs must prove each of the following elements by a preponderance of the evidence:

(1) The Defendant received income derived, directly or indirectly, from the collection of unlawful debt;

(2) The Defendant used or invested the income to establish or operate an enterprise;

(3) There was an ongoing enterprise with some sort of formal or informal framework for carrying out its objectives consisting of a group of persons associated together for a common purpose of engaging in a course of conduct;

(4) The Defendant's use or investment of the income caused Plaintiffs' damages.

The same instructions provided above regarding what constitutes an "enterprise" and "unlawful debt" apply to this § 1962(a) claim.

The requirement that the Defendants "used or invested the income to establish or operate an enterprise" is satisfied if the Defendant either: (1) used or invested ill-gotten usurious income in a separate enterprise that injured Plaintiffs; or (2) used for itself or invested in itself its unlawful debt income, thus allowing Defendant to injure the plaintiff.

**Authorities**:   *In re Nat'l Prescription Opiate Litig.*, 452 F. Supp. 3d 745, 772–73 (N.D. Ohio 2020).

**F.      SECTION 1962(b) RICO CLAIMS—Acquiring or Maintaining an Interest in or Control of an Enterprise—Elements.**

Plaintiffs allege that Defendants received income derived, directly or indirectly, from the collection of unlawful debt and used or invested the income in the establishment or operation of an enterprise in violation of § 1962(b) of RICO. To hold a Defendant liable for this claim, Plaintiffs must prove each of the following elements by a preponderance of the evidence:

(1)  That through the unlawful collection of debt;

(2)  The Defendant acquired or maintained any interest in or control of any enterprise;

(3)  There was an ongoing enterprise with some sort of formal or informal framework for carrying out its objectives consisting of a group of persons associated together for a common purpose of engaging in a course of conduct;

(4)  The Defendant's interest in or control of the enterprise was the cause of Plaintiffs' damages.

I have previously explained to you the enterprise, unlawful debt, and causation elements. The predominant element of this section is the maintenance of an interest or control over the enterprise. Interest in or control over an enterprise is to be determined by the circumstances of each case and does not require formal control such as the holding of majority of stock or actual designation as an officer or director—though the presence or absence of both of these facts could be relevant to your determination.

**Authorities**: *Ikuno v. Yip*, 912 F.2d 306, 310 (9th Cir. 1990).

JA1366

G.      **SECTION 1962(d) RICO CLAIMS —Conspiracy to Violate RICO**

1.      **SECTION 1962(d) RICO CLAIMS —Unlawful Debt Conspiracy—Introduction**

Plaintiffs allege that Defendants were members of a conspiracy to violate RICO. Plaintiffs allege that each of the Defendants knowingly and intentionally conspired with at least one other person to violate RICO.

A conspiracy for purposes of RICO is a kind of partnership—an agreement of two or more persons to commit one or more violations. The act of conspiracy is the agreement to do something unlawful; it does not matter whether the act agreed upon was committed.

For a conspiracy to have existed, it is not necessary that the conspirators made a formal agreement or that they agreed on every detail of the conspiracy. An informal understanding is enough. It is not enough, however, that they simply met, discussed matters of common interest, acted in similar ways, or perhaps helped one another.

One becomes a member of a conspiracy by willfully participating in the unlawful plan with the intent to advance or further some object or purpose of the conspiracy, even if the person does not have full knowledge of all the details of the conspiracy. One who willfully joins an existing conspiracy is just as responsible for it as the people who originally formed the conspiracy. On the other hand, one who has no knowledge of a conspiracy, but happens to act in a way which furthers some object or purpose of the conspiracy, does not thereby become a conspirator. Similarly, a person does not become a conspirator merely by associating with one or more persons who are conspirators, nor merely by knowing that a conspiracy exists.

A conspiracy may continue for a long period of time and may include the performance of many transactions. One may join a conspiracy after it is already in progress. It is not necessary that all members of the conspiracy join it at the same time, and one may become a member of a conspiracy without full knowledge of all the details of the unlawful scheme or the names, identities, or locations of all of the other members.

JA1367

Events that occurred before a conspirator joined a conspiracy may be considered by you to prove the nature and scope of the conspiracy at the time the person joined.

It is no defense that a person's participation in a conspiracy was minor or for a short period of time.

**Authorities**: *Planned Parenthood Federation of America, Inc., v. Center for Medical Progress*, Case No. 3:16-cv-00236 (WHO) (N.D. Cal.), Final Jury Instructions (Dkt. 1006 at pg. 67).

2.       **SECTION 1962(d) RICO CLAIMS — Conspiracy to Violate RICO —**
**Elements**

Plaintiffs allege that Defendants were members of a conspiracy to violate RICO. To hold a Defendant liable for this claim, Plaintiffs must prove each of the following elements of a conspiracy to violate RICO by a preponderance of the evidence:

(1) The alleged enterprise was or would be established;

(2) the Defendant knowingly agreed that either the Defendant or another person would be associated with the enterprise; and

(3) One or more of the following:

(a)   The Defendant knowingly agreed that either the Defendant or another person would conduct or participate, directly or indirectly, in the conduct of the affairs of the enterprise through the collection of unlawful debt;

(b)   The Defendant knowingly agreed that either the Defendant or another person would receive income from the collection of unlawful debt and use or invest that income in the establishment or operation of an enterprise; OR

(c)   The Defendant knowingly agreed that either the Defendant or another person would acquire or maintain any interest in or control of any enterprise through the collection of unlawful debt.


It is not necessary for Plaintiffs to prove that the Defendant actually committed the collection of the unlawful debt; rather, the third element is satisfied if the Defendant agreed that the collection of unlawful debt would be committed. Plaintiffs must prove that the Defendant agreed to participate in the conspiracy with the knowledge and intent that at least one member of the conspiracy would intentionally commit, or cause, or aid and abet the collection of unlawful debt. That one member could be one of the Defendants or another person.

JA1369

Plaintiffs are not required to prove that the Defendant personally committed, or agreed to personally commit, the collection of unlawful debt. Nor is there any requirement that the Defendant actually conspired to operate or manage the enterprise himself or herself.

In your consideration of Plaintiffs' conspiracy claim, you should first determine whether the alleged conspiracy existed. If you conclude that a conspiracy existed as alleged, you should then determine whether each Defendant knowingly became a member of that conspiracy.

**Authorities**: *Planned Parenthood Federation of America, Inc., v. Center for Medical Progress*, Case No. 3:16-cv-00236 (WHO) (N.D. Cal.), Final Jury Instructions (Dkt. 1006 at pg. 68).

JA1370

**H.     Vicarious Liability Under RICO**

Plaintiffs also claim that Defendants are liable under RICO because they knowingly benefitted from another person's RICO violations. Imposing liability on knowing beneficiaries of an enterprise is also in accord with the primary purpose of RICO, which is to reach those who ultimately profit from the violations.

If you determine that a Defendant received any benefit by way of a RICO violation by another person (such as Think Finance, Plain Green, or Great Plains), you may find them liable as the beneficiaries of the unlawful conduct unless you find that they unknowingly received the benefits.

**Authorities**: *Brady v. Dairy Fresh Prod. Co.*, 974 F.2d 1149, 1155 (9th Cir. 1992); *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1398 (9th Cir. 1986).

JA1371

## III.   DAMAGES

### 1.   Damages—Generally

It is the duty of the Court to instruct you about the measure of damages. By instructing you on damages, the Court does not mean to suggest for which party your verdict should be rendered.

If you find for Plaintiffs and the Class Members on one or more of their claims, you must determine the Plaintiffs' and Class Members' damages. Plaintiffs have the burden of proving damages by a preponderance of the evidence. Damages means the amount of money that will reasonably and fairly compensate the Plaintiffs and Class Members for any injury you find was caused by the Defendant.

It is for you to determine what damages, if any, have been proved. Your award must be based upon evidence and not upon speculation, guesswork or conjecture.

**Authorities**: *Planned Parenthood Federation of America, Inc., v. Center for Medical Progress*, Case No. 3:16-cv-00236 (WHO) (N.D. Cal.), Final Jury Instructions (Dkt. 1006 at pg. 88).

## 2. Damages—Measure of Damages (Generally)

This instruction applies to Plaintiffs' usury and unjust enrichment claims. If you find that any of the Defendants are liable for these claims, you also must decide how much money will reasonably compensate the Plaintiffs and Class Members for the harm caused by these claims. This compensation is called "damages." The purpose of such damages is to put Plaintiffs and the Class Members in as good a position as it would have been if the loans had complied with California's laws.

In this case, the damages sought are the unlawful interest amounts paid on the loans. To recover these damages, you must determine whether there was proof that Plaintiffs and the Class Members paid unlawful interest, *i.e.*, interest at a rate greater than 10%. California law does not require a plaintiff to prove the amount of unlawful interest paid with mathematical precision; rather, they need only establish sufficient facts to support any intelligent estimate without speculation or conjecture.

If you determine that Plaintiffs and Class Members proved an intelligent estimate of the ***total*** amount of unlawful interest paid, you may award a ***total*** amount to Plaintiffs and the Class Members as summarized by the evidence presented. How to distribute those damages among the Plaintiffs and Class Members can be determined through a post-trial process so long as a Defendant's total liability has been determined.

**Authorities**:

3.      **Damages—Measure of Damages—Usury and Unjust Enrichment Claims**

Plaintiffs seek damages under two state law causes of action: usury and unjust enrichment. In the verdict form, you will be asked to determine the amount of damages, if any, you award to Plaintiffs and the Class Members.

For the usury claim, you may award: (1) the amount of unlawful interest, directly or indirectly, received by the Defendant if you find them liable; (2) the full amount of unlawful interest taken or received if you find that the Defendant was part of the conspiracy; or (3) the amount of unlawful interest taken or received by Think Finance if you find that the Stinson's, 7HBF, or Shaper directed or authorized Think Finance's usury violations.

For the unjust enrichment claim, you may award: (1) the amount of unlawful interest, directly or indirectly, received by a Defendant if you find them liable; (2) the full amount of unlawful interest taken or received if you find that a Defendant was part of the conspiracy; or (3) the amount of unlawful interest taken or received by Think Finance if you find that the Stinson's, 7HBF, or Shaper directed or authorized Think Finance's conduct.

### 4. Damages—Measure of Damages—RICO Claims

Plaintiffs also seek damages under RICO. The law holds members of a RICO enterprise jointly and severally liable for the acts of the other members of the enterprise. This means that Plaintiffs and the Class Members are not required to prove the specific portion of the unlawful amounts for which each Defendant is responsible.

If you find a Defendant violated RICO as to Plaintiffs and the Class Members, you may award Plaintiffs and the Class Members' any interest or fees paid on the loans. To do so, you must find that it was proven by a preponderance of the evidence that Plaintiffs and the Class Members paid interest and fees.

**Authorities**: *Oki Semiconductor Co. v. Wells Fargo Bank*, 298 F.3d 768, 775 (9th Cir.2002); *United States v. Philip Morris USA*, 316 F. Supp. 2d 19, 27 (D.D.C. 2004).

### 5. Damages—Overlapping Damages

Plaintiffs and the Class Members seek damages under six causes of action and multiple theories of liability. In the verdict form, you will be asked to determine the amount of damages, if any, to be awarded to Plaintiffs and Class Members for each cause of action. For each cause of action, enter the entire amount of damages that Plaintiffs and Class Members are entitled to under that cause of action, even if you awarded the same category of damages under a different cause of action. After you complete your deliberations, I will remove any duplicate damages from any final award to Plaintiffs.

JA1376

## IV.    CLOSING INSTRUCTIONS

### 1.    Duty to Deliberate

Before you begin your deliberations, elect one member of the jury as your presiding juror. The presiding juror will preside over the deliberations and serve as the spokesperson for the jury in court.

You shall diligently strive to reach agreement with all of the other jurors if you can do so. Your verdict must be unanimous, as to each element of a claim or defense. If more than one piece of evidence can support an element of a claim or defense, you do not need to unanimously agree on which piece of evidence satisfies the element of the claim or defense, as long as you unanimously agree that the element has been satisfied.

Each of you must decide the case for yourself, but you should do so only after you have considered all of the evidence, discussed it fully with the other jurors, and listened to their views. It is important that you attempt to reach a unanimous verdict but, of course, only if each of you can do so after having made your own conscientious decision. Do not be unwilling to change your opinion if the discussion persuades you that you should. But do not come to a decision simply because other jurors think it is right, or change an honest belief about the weight and effect of the evidence simply to reach a verdict.

Please do not state your opinions too strongly at the beginning of your deliberations or immediately announce how you plan to vote as it may interfere with an open discussion. Keep an open mind so that you and your fellow jurors can easily share ideas about the case.

You should use your common sense and experience in deciding whether testimony is true and accurate. However, during your deliberations, do not make any statements or provide any information to other jurors based on any special training or unique personal experiences that you may have had related to matters involved in this case. What you may know or have learned through your training or experience is not a part of the evidence received in this case.

Sometimes jurors disagree or have questions about the evidence or about what the witnesses said in their testimony. If that happens, you may ask to have testimony read back to you or ask to see any exhibits admitted into evidence that have not already been provided to you. Also,

JA1377

jurors may need further explanation about the laws that apply to the case. If this happens during your discussions, write down your questions and give them to the clerk or bailiff. I will talk with the attorneys before I answer so it may take some time. You should continue your deliberations while you wait for my answer. I will do my best to answer them. When you write me a note, do not tell me how you voted on an issue.

While I know you would not do this, you must not base your decision on chance, such as a flip of a coin. If you decide to award damages, you may not agree in advance to simply add up the amounts each juror thinks is right and then, without further deliberations, make the average your verdict.

You may take breaks, but do not discuss this case with anyone, including each other, until all of you are back in the jury room.

**Authorities**: *Planned Parenthood Federation of America, Inc., v. Center for Medical Progress*, Case No. 3:16-cv-00236 (WHO) (N.D. Cal.), Final Jury Instructions (Dkt. 1006 at pgs. 99-100).

2.        **Evidence in Electronic Format**

Those exhibits received in evidence that are capable of being displayed electronically will be provided to you in that form, and you will be able to view them in the jury room. A computer and accessory equipment will be available to you in the jury room.

A court technician will show you how to operate the computer and other equipment; how to locate and view the exhibits on the computer. You will also be provided with a paper list of all exhibits received in evidence. You may request a paper copy of any exhibit received in evidence by sending a note through my clerk, Ms. Davis. If you need additional equipment or supplies or if you have questions about how to operate the computer or other equipment, you may send a note to Ms. Davis, signed by your presiding juror or by one or more members of the jury. Do not refer to or discuss any exhibit you were attempting to view.

If a technical problem or question requires hands-on maintenance or instruction, a court technician may enter the jury room for the sole purpose of assuring that the only matter that is discussed is the technical problem. When the court technician or any nonjuror is in the jury room, the jury shall not deliberate. No juror may say anything to the court technician or any nonjuror other than to describe the technical problem or to seek information about operation of the equipment. Do not discuss any exhibit or any aspect of the case.

The sole purpose of providing the computer in the jury room is to enable jurors to view the exhibits received in evidence in this case. You may not use the computer for any other purpose. At my direction, technicians have taken steps to ensure that the computer does not permit access to the Internet or to any "outside" website, database, directory, game, or other material. Do not attempt to alter the computer to obtain access to such materials. If you discover that the computer provides or allows access to such materials, you must inform the court immediately and refrain from viewing such materials. Do not remove the computer or any electronic data from the jury room, and do not copy any such data.

**Authorities**: *Planned Parenthood Federation of America, Inc., v. Center for Medical Progress*, Case No. 3:16-cv-00236 (WHO) (N.D. Cal.), Final Jury Instructions (Dkt. 1006 at pg. 101).

**3.      Consideration of Evidence—Conduct of the Jury**

Because you must base your verdict only on the evidence received in the case and on these instructions, I remind you that you must not be exposed to any other information about the case or to the issues it involves. Except for discussing the case with your fellow jurors during your deliberations:

Do not communicate with anyone in any way and do not let anyone else communicate with you in any way about the merits of the case or anything to do with it. This includes discussing the case in person, in writing, by phone or electronic means, via email, via text messaging, or any internet chat room, blog, website or application, including but not limited to Facebook, YouTube, Twitter, Instagram, LinkedIn, Snapchat, or any other forms of social media. This applies to communicating with your family members, your employer, the media or press, and the people involved in the trial. If you are asked or approached in any way about your jury service or anything about this case, you must respond that you have been ordered not to discuss the matter and to report the contact to the court.

Do not read, watch, or listen to any news or media accounts or commentary about the case or anything to do with it; do not do any research, such as consulting dictionaries, searching the Internet, or using other reference materials; and do not make any investigation or in any other way try to learn about the case on your own. Do not visit or view any place discussed in this case, and do not use Internet programs or other devices to search for or view any place discussed during the trial. Also, do not do any research about this case, the law, or the people involved—including the parties, the witnesses or the lawyers—until you have been excused as jurors. If you happen to read or hear anything touching on this case in the media, turn away and report it to me as soon as possible.

JA1381

USCA4 Appeal: 23-2097      Doc: 11-3         Filed: 12/06/2023      Pg: 436 of 438

These rules protect each party's right to have this case decided only on evidence that has been presented here in court. Witnesses here in court take an oath to tell the truth, and the accuracy of their testimony is tested through the trial process. If you do any research or investigation outside the courtroom, or gain any information through improper communications, then your verdict may be influenced by inaccurate, incomplete or misleading information that has not been tested by the trial process. Each of the parties is entitled to a fair trial by an impartial jury, and if you decide the case based on information not presented in court, you will have denied the parties a fair trial. Remember, you have taken an oath to follow the rules, and it is very important that you follow these rules.

A juror who violates these restrictions jeopardizes the fairness of these proceedings and a mistrial could result that would require the entire trial process to start over. If any juror is exposed to any outside information, please notify the court immediately.

**Authorities**: *Planned Parenthood Federation of America, Inc., v. Center for Medical Progress*, Case No. 3:16-cv-00236 (WHO) (N.D. Cal.), Final Jury Instructions (Dkt. 1006 at pg. 103).

### 4.      Communication with Court

If it becomes necessary during your deliberations to communicate with me, you may send a note through my Clerk, Ms. Davis, signed by any one or more of you. No member of the jury should ever attempt to communicate with me except by a signed writing. I will not communicate with any member of the jury on anything concerning the case except in writing or here in open court. If you send out a question, I will consult with the lawyers before answering it, which may take some time. You may continue your deliberations while waiting for the answer to any question. Remember that you are not to tell anyone—including the court—how the jury stands, whether in terms of vote count or otherwise, until after you have reached a unanimous verdict or have been discharged.

**Authorities**: *Planned Parenthood Federation of America, Inc., v. Center for Medical Progress*, Case No. 3:16-cv-00236 (WHO) (N.D. Cal.), Final Jury Instructions (Dkt. 1006 at pg. 104).

JA1383

5.      **Return of Verdict**

A verdict form has been prepared for you. After you have reached unanimous agreement on a verdict, your presiding juror should complete the verdict form according to your deliberations, sign and date it, and advise Ms. Davis that you are ready to return to the courtroom.

**Authorities**: *Planned Parenthood Federation of America, Inc., v. Center for Medical Progress*, Case No. 3:16-cv-00236 (WHO) (N.D. Cal.), Final Jury Instructions (Dkt. 1006 at pg. 105).