No. 23-2097

---

**In The United States Court Of Appeals
For The Fourth Circuit**

**LULA WILLIAMS,**
*Plaintiff-Appellee*

**v.**

**MATT MARTORELLO,**
*Defendant-Appellant,*

On Appeal From The United States District Court
For The Eastern District Of Virginia (Robert E. Payne)
(3:17-cv-00461-REP)

---

**JOINT APPENDIX
VOLUME IV**

---

Matthew William Wessler
Gupta Wessler PLLC
1900 L Street NW, Suite 312
Washington, D.C. 20036
Telephone: (202) 888-1741
E-mail : matt@guptawessler.com

Steven D. Gordon
Holland & Knight LLP
800 17th Street, N.W., Suite 1100
Washington, D.C. 20006
Telephone: (202) 955-3000
E-mail: steven.gordon@hklaw.com

*Counsel for Appellee*

*Counsel for Appellant*

December 6, 2023

Krisi Cahoon Kelly
Andrew Joseph Guzzo
Kelly Guzzo, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
Telephone: (703) 424-7576
E-mail:  kkelly@kellyguzzo.com
E-mail:  aguzzo@kellyguzzo.com

*Counsel for Appellee*

VOLUME IV

TABLE OF CONTENTS

| 16 | Exhibits #3 - # 4 to plaintiffs' statement of position in response to the Court's order of May 19, 2023 | JA1385-JA1592 |
|---|---|---|
| 17 | Martorello's statement of position regarding good faith defense | JA1593-JA1611 |
| 18 | Plaintiffs' objection to Martorello's statement of position regarding good faith defense | JA1612-JA1686 |
| 19 | Exhibits #1 – #18 to plaintiffs' opposition to Martorello's motion for summary judgment | JA1687-JA1884 |

# Exhibit 3

# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA      :      **CRIMINAL NO. 16-130**

          **v.**      :

**CHARLES M. HALLINAN**      :
**WHEELER K. NEFF**

## <u>GOVERNMENT'S PROPOSED JURY INSTRUCTIONS</u>

The United States of America, by its attorneys, Zane David Memeger, United

States Attorney for the Eastern District of Pennsylvania, and Mark B. Dubnoff and James A.

Petkun, Assistant United States Attorneys for the district, respectfully submits the following

proposed jury instructions[1] pursuant to Federal Rule of Criminal Procedure 30 and requests

leave to file any supplemental instructions as may appear necessary and proper.

Respectfully submitted,

ZANE DAVID MEMEGER
United States Attorney

/s/ Mark B. Dubnoff
MARK B. DUBNOFF
JAMES A. PETKUN
Assistant United States Attorneys

Date: December 9, 2016

---

[1]      The government has noted deletions from model instructions by [brackets], and
additions by <u>underlining</u>.

# TABLE OF CONTENTS

**Instructions**                                                    **Page Number**

GOV'T'S REQUEST NO. 1 ............................................................................................ 1
  Role of Jury ............................................................................................................ 1

GOV'T'S REQUEST NO. 2 ............................................................................................ 3
  Evidence ................................................................................................................. 3

GOV'T'S REQUEST NO. 3 ............................................................................................ 6
  Direct and Circumstantial Evidence ...................................................................... 6

GOV'T'S REQUEST NO. 4 ............................................................................................ 8
  Credibility of Witnesses ........................................................................................ 8

GOV'T'S REQUEST NO. 5 .......................................................................................... 10
  Not All Evidence, Not All Witnesses Needed ...................................................... 10

GOV'T'S REQUEST NO. 6 .......................................................................................... 11
  Presumption of Innocence; Burden of Proof; Reasonable Doubt .......................... 11

GOV'T'S REQUEST NO. 7 .......................................................................................... 13
  Penalty Not To Be Considered ............................................................................. 13

GOV'T'S REQUEST NO. 8 .......................................................................................... 14
  Summary ~~Nature~~ of the Indictment .................................................................... 14

GOV'T'S REQUEST NO. 9 .......................................................................................... 15
  "On or About" ...................................................................................................... 15

GOV'T'S REQUEST NO. 10 ........................................................................................ 16
  Venue .................................................................................................................... 16

GOV'T'S REQUEST NO. 11 ........................................................................................ 17
  Separate Consideration - Multiple Defendants Charged with Different Offenses .................. 17

GOV'T'S REQUEST NO. 12 ........................................................................................ 18
  Indictment – Persons Not Charged ....................................................................... 18

GOV'T'S REQUEST NO. 13 ........................................................................................ 19
  Stipulated Testimony; Stipulation of Fact; Judicial Notice (F.R.E. 201) ................. 19

GOV'T'S REQUEST NO. 14 ........................................................................................ 20
  Audio/Video Recordings – Consensual .................................................................. 20

GOV'T'S REQUEST NO. 15 ........................................................................................ 21
  Audio/Video Recordings - Transcripts .................................................................. 21

GOV'T'S REQUEST NO. 16 ........................................................................................ 22
  Opinion Evidence (Expert Witnesses) .................................................................. 22

GOV'T'S REQUEST NO. 17 ........................................................................................ 23
  Summaries - Underlying Evidence Admitted ......................................................... 23

GOV'T'S REQUEST NO. 18 ........................................................................................ 24
  Summaries – Underlying Evidence Not Admitted (F.R.E. 1006) .......................... 24

i

GOV'T'S REQUEST NO. 19 ....................................................................................... 25
  Specific Investigation Techniques Not Required ..................................................... 25

GOV'T'S REQUEST NO. 20 ....................................................................................... 26
  Credibility of Witnesses – Law Enforcement Officer .............................................. 26

GOV'T'S REQUEST NO. 21 ....................................................................................... 27
  Defendant's Choice not to Testify or Present Evidence ........................................... 27

GOV'T'S REQUEST NO. 22 ....................................................................................... 28
  Defendant's Testimony ............................................................................................. 28

GOV'T'S REQUEST NO. 23 ....................................................................................... 29
  Defendant's Prior Bad Acts or Crimes (F.R.E. 404(b)) ........................................... 29

GOV'T'S REQUEST NO. 24 ....................................................................................... 31
  Consciousness of Guilt (Flight, Concealment, Use of an Alias, etc.)....................... 31

GOV'T'S REQUEST NO. 25 ....................................................................................... 32
  Defendant's Character Evidence ............................................................................... 32

GOV'T'S REQUEST NO. 26 ....................................................................................... 33
  Motive Explained ...................................................................................................... 33

GOV'T'S REQUEST NO. 27 ....................................................................................... 34
  Counts 1 and 2 – RICO Conspiracy - Elements of the Offense................................ 34

GOV'T'S REQUEST NO. 28 ....................................................................................... 39
  Counts 1 and 2 - RICO Conspiracy - Objectives of the Racketeering Conspiracy ................. 39

GOV'T'S REQUEST NO. 29 ....................................................................................... 40
  Counts 1 and 2 - RICO Conspiracy - "Enterprise" Defined Generally..................... 40

GOV'T'S REQUEST NO. 30 ....................................................................................... 42
  Counts 1 and 2 - RICO Conspiracy - "Enterprise" - Association in Fact Defined .................. 42

GOV'T'S REQUEST NO. 31 ....................................................................................... 44
  Counts 1 and 2 - RICO Conspiracy – "Engaged In, Or The Activities Of Which Affect,
  Interstate Commerce" - Defined ............................................................................... 44

GOV'T'S REQUEST NO. 32 ....................................................................................... 46
  Counts 1 and 2 - RICO Conspiracy – "Employed by or Associated With the Enterprise"-
  Defined....................................................................................................................... 46

GOV'T'S REQUEST NO. 33 ....................................................................................... 48
  Counts 1 and 2 - RICO Conspiracy - "Conduct or Participate in the Conduct of the Enterprise"
  - Defined .................................................................................................................... 48

GOV'T'S REQUEST NO. 34 ....................................................................................... 50
  Counts 1 and 2 - RICO Conspiracy – "Unlawful Debt" - Defined ........................... 50

GOV'T'S REQUEST NO. 35 ....................................................................................... 52
  Counts 1 and 2 - RICO Conspiracy – "Unlawful Debt" - Relevant Pennsylvania Laws .......... 52

GOV'T'S REQUEST NO. 36 ....................................................................................... 53
  Counts 1 and 2 - RICO Conspiracy – "Unlawful Debt" - Relevant Laws From Other States .. 53

GOV'T'S REQUEST NO. 37 .................................................................................................... 55
    COUNTS 1 and 2 – RICO Conspiracy – Ignorance of the Law is No Excuse........................ 55

GOV'T'S REQUEST NO. 38 .................................................................................................... 56
    COUNTS 1 and 2 – RICO Conspiracy – Knowledge of state laws not required ................... 56

GOV'T'S REQUEST NO. 39 .................................................................................................... 57
    Relevant Law Pertaining to Tribal Sovereign Immunity......................................................... 57

GOV'T'S REQUEST NO. 40 .................................................................................................... 58
    Counts 1 and 2 - RICO Conspiracy - Existence of an Agreement .......................................... 58

GOV'T'S REQUEST NO. 41 .................................................................................................... 60
    Counts 1 and 2 - RICO Conspiracy - Membership in the Agreement ...................................... 60

GOV'T'S REQUEST NO. 42 .................................................................................................... 61
    Counts 1 and 2 - RICO Conspiracy - Mental States ............................................................... 61

GOV'T'S REQUEST NO. 43 .................................................................................................... 62
    Counts 1 and 2 - RICO Conspiracy - Overt Acts .................................................................... 62

GOV'T'S REQUEST NO. 44 .................................................................................................... 63
    Counts 1 and 2 - RICO Conspiracy - Success Immaterial ...................................................... 63

GOV'T'S REQUEST NO. 45 .................................................................................................... 64
    Counts 1 and 2 - RICO Conspiracy - Charged Period and Duration ....................................... 64

GOV'T'S REQUEST NO. 46 .................................................................................................... 65
    Counts 1 and 2 - RICO Conspiracy - Acts and Statements of Co-Conspirators...................... 65

GOV'T'S REQUEST NO. 47 .................................................................................................... 66
    Counts 1 and 2 - RICO Conspiracy - Agreement to Commit a Racketeering Offense ........... 66

GOV'T'S REQUEST NO. 48 .................................................................................................... 69
    Count 3 - Conspiracy to Commit an Offense Against the United States - Elements of the
    Offense ...................................................................................................................................... 69

GOV'T'S REQUEST NO. 49 .................................................................................................... 72
    Counts 4 and 5 – Mail Fraud – Essential Elements ................................................................. 72

GOV'T'S REQUEST NO. 50 .................................................................................................... 73
    Counts 6-8 – Wire Fraud - Essential Elements ....................................................................... 73

GOV'T'S REQUEST NO. 51 .................................................................................................... 74
    Counts 4-8 – Mail and Wire Fraud – "Knowingly" - Defined................................................. 74

GOV'T'S REQUEST NO. 52 .................................................................................................... 75
    Counts 4-8 – Mail and Wire Fraud – "Scheme to Defraud or to Obtain Money or Property" -
    Defined...................................................................................................................................... 75

GOV'T'S REQUEST NO. 53 .................................................................................................... 78
    Counts 4-8 – Mail and Wire Fraud – Intent to Defraud - Defined .......................................... 78

GOV'T'S REQUEST NO. 54 .................................................................................................... 79
    Counts 4 and 5 – Mail Fraud – "Use of Mails" - Defined ...................................................... 79

GOV'T'S REQUEST NO. 55 .................................................................................................... 80

iii

    Counts 4 and 5 – Mail Fraud - Each Use of the Mails a Separate Offense ............................. 80

GOV'T'S REQUEST NO. 56 ........................................................................................ 81
    Counts 6-8 - Wire Fraud - "Transmits by means of wire, radio, or television communication in interstate commerce" - Defined .......................................................... 81

GOV'T'S REQUEST NO. 57 ........................................................................................ 83
    Counts 6-8 – Wire Fraud - Each Transmission by Wire Communication a Separate Offense. 83

GOV'T'S REQUEST NO. 58 ........................................................................................ 84
    Counts 9-17 – Money Laundering – the Indictment and the Statute ................................. 84

GOV'T'S REQUEST NO. 59 ........................................................................................ 85
    Counts 9-17 – Money Laundering – Essential Elements ............................................... 85

GOV'T'S REQUEST NO. 60 ........................................................................................ 86
    Counts 9-17 – Money Laundering – First Element – Transmittal or Transference of a Monetary Instrument or Funds to or from the United States .................................... 86

GOV'T'S REQUEST NO. 61 ........................................................................................ 88
    Counts 9-17 – Money Laundering – Second Element – Intent to Promote Specified Unlawful Activity ......................................................................................................... 88

GOV'T'S REQUEST NO. 62 ........................................................................................ 89
    Counts 4 through 17 - Accomplice Liability: Aiding and Abetting ................................. 89

GOV'T'S REQUEST NO. 63 ........................................................................................ 91
    Election of Foreperson; Unanimous Verdict; Do Not Consider Punishment; Duty to Deliberate; Communication with Court ................................................................... 91

GOV'T'S REQUEST NO. 64 ........................................................................................ 94
    Verdict Form .......................................................................................................... 94

JA1390

## GOV'T'S REQUEST NO. 1

### Role of Jury

Members of the jury, you have seen and heard all the evidence and the arguments of the lawyers. Now I will instruct you on the law.

You have two duties as a jury. Your first duty is to decide the facts from the evidence that you have heard and seen in court during this trial. That is your job and yours alone. I play no part in finding the facts. You should not take anything I may have said or done during the trial as indicating what I think of the evidence or what I think about what your verdict should be.

Your second duty is to apply the law that I give you to the facts. My role now is to explain to you the legal principles that must guide you in your decisions. You must apply my instructions carefully. Each of the instructions is important, and you must apply all of them. You must not substitute or follow your own notion or opinion about what the law is or ought to be. You must apply the law that I give to you, whether you agree with it or not.

Whatever your verdict, it will have to be unanimous. All of you will have to agree on it or there will be no verdict. In the jury room you will discuss the case among yourselves, but ultimately each of you will have to make up his or her own mind. This is a responsibility that each of you has and that you cannot avoid.

During your deliberations, you must not communicate with or provide any information to anyone by any means about this case. You may not use any electronic device or media, such as the telephone, a cell phone, smart phone, iPhone, Blackberry or computer, the Internet, any Internet service, any text or instant messaging service, any Internet chat room, blog, or website such as Facebook, Instagram, Snapchat, MySpace, LinkedIn, YouTube or Twitter, to

1

JA1391

communicate to anyone any information about this case or to conduct any research about this case until I accept your verdict. In other words, you cannot talk to anyone on the phone, correspond with anyone, or electronically communicate with anyone about this case. You can only discuss the case in the jury room with your fellow jurors during deliberations.

You may not use these electronic means to investigate or communicate about the case because it is important that you decide this case based solely on the evidence presented in this courtroom. You are only permitted to discuss the case with your fellow jurors during deliberations because they have seen and heard the same evidence you have. In our judicial system, it is important that you are not influenced by anything or anyone outside of this courtroom.

Perform these duties fairly and impartially. Do not allow sympathy, prejudice, fear, or public opinion to influence you. You should also not be influenced by any person's race, color, religion, national ancestry, or gender, sexual orientation, profession, occupation, celebrity, economic circumstances, or position in life or in the community.

_____

3rd Circuit Model Criminal Jury Instructions, No. 3.01 (2015) (modified).

2

## GOV'T'S REQUEST NO. 2

### Evidence

You must make your decision in this case based only on the evidence that you saw and heard in the courtroom. Do not let rumors, suspicions, or anything else that you may have seen or heard outside of court influence your decision in any way.

The evidence from which you are to find the facts consists of the following:

(1) The testimony of the witnesses;

(2) Documents and other things received as exhibits; and

(3) Any fact or testimony that was stipulated; that is, formally agreed to by the parties.

(4) Any facts that have been judicially noticed--that is, facts which I say you may accept as true even without other evidence.

The following are not evidence:

(1) The indictment;

(2) Statements and arguments of the lawyers for the parties in this case;

(3) Questions by the lawyers and questions that I might have asked;

(4) Objections by lawyers, including objections in which the lawyers stated facts;

(5) Any testimony I struck or told you to disregard; and

(6) Anything you may have seen or heard about this case outside the courtroom.

You should use your common sense in weighing the evidence. Consider it in light of your everyday experience with people and events, and give it whatever weight you believe it deserves. If your experience and common sense tells you that certain evidence reasonably leads to a conclusion, you may reach that conclusion.

JA1393

As I told you in my preliminary instructions, the rules of evidence control what can be received into evidence. During the trial the lawyers objected when they thought that evidence was offered that was not permitted by the rules of evidence. These objections simply meant that the lawyers were asking me to decide whether the evidence should be allowed under the rules.

You should not be influenced by the fact that an objection was made. You should also not be influenced by my rulings on objections or any sidebar conferences you may have overheard. When I overruled an objection, the question was answered or the exhibit was received as evidence, and you should treat that testimony or exhibit like any other. When I allowed evidence (testimony or exhibits) for a limited purpose only, I instructed you to consider that evidence only for that limited purpose and you must do that.

When I sustained an objection, the question was not answered or the exhibit was not received as evidence. You must disregard the question or the exhibit entirely. Do not think about or guess what the witness might have said in answer to the question; do not think about or guess what the exhibit might have shown. Sometimes a witness may have already answered before a lawyer objected or before I ruled on the objection. If that happened and if I sustained the objection, you must disregard the answer that was given.

Also, if I ordered that some testimony or other evidence be stricken or removed from the record, you must disregard that evidence. When you are deciding this case, you must not consider or be influenced in any way by the testimony or other evidence that I told you to disregard.

Although the lawyers may have called your attention to certain facts or factual conclusions that they thought were important, what the lawyers said is not evidence and is not

JA1394

binding on you. It is your own recollection and interpretation of the evidence that controls your

decision in this case. Also, do not assume from anything I may have done or said during the trial

that I have any opinion about any of the issues in this case or about what your verdict should be.

_____

3rd Circuit Model Criminal Jury Instructions, No. 3.02 (2015) (unmodified).

## GOV'T'S REQUEST NO. 3

**Direct and Circumstantial Evidence**

Two types of evidence may be used in this trial, "direct evidence" and "circumstantial (or indirect) evidence." You may use both types of evidence in reaching your verdict.

"Direct evidence" is simply evidence which, if believed, directly proves a fact. An example of "direct evidence" occurs when a witness testifies about something the witness knows from his or her own senses ─ something the witness has seen, touched, heard, or smelled.

"Circumstantial evidence" is evidence which, if believed, indirectly proves a fact. It is evidence that proves one or more facts from which you could reasonably find or infer the existence of some other fact or facts. A reasonable inference is simply a deduction or conclusion that reason, experience, and common sense lead you to make from the evidence. A reasonable inference is not a suspicion or a guess. It is a reasoned, logical decision to find that a disputed fact exists on the basis of another fact.

For example, if someone walked into the courtroom wearing a wet raincoat and carrying a wet umbrella, that would be circumstantial or indirect evidence from which you could reasonably find or conclude that it was raining. You would not have to find that it was raining, but you could.

Sometimes different inferences may be drawn from the same set of facts. The government may ask you to draw one inference, and the defense may ask you to draw another. You, and you alone, must decide what reasonable inferences you will draw based on all the evidence and your reason, experience and common sense.

JA1396

You should consider all the evidence that is presented in this trial, direct and circumstantial. The law makes no distinction between the weight that you should give to either direct or circumstantial evidence. It is for you to decide how much weight to give any evidence.

_____

3rd Circuit Model Criminal Jury Instructions, No. 3.03 (2015) (unmodified).

JA1397

USCA4 Appeal: 23-2097    Doc: 11-4    Filed: 12/06/2023    Pg: 17 of 503
Case 3:17-cr-00126-EN... Document 95...  Filed 12/09/18...  Page 15 of 100
Case 2:18-cr-00126-ER  Document 95  Filed 12/09/18  Page 15 of 100 PageID# 52259

## GOV'T'S REQUEST NO. 4

**Credibility of Witnesses**

As I stated in my preliminary instructions at the beginning of the trial, in deciding what the facts are you must decide what testimony you believe and what testimony you do not believe. You are the sole judges of the credibility of the witnesses. Credibility refers to whether a witness is worthy of belief: Was the witness truthful? Was the witness' testimony accurate? You may believe everything a witness says, or only part of it, or none of it.

You may decide whether to believe a witness based on his or her behavior and manner of testifying, the explanations the witness gave, and all the other evidence in the case, just as you would in any important matter where you are trying to decide if a person is truthful, straightforward, and accurate in his or her recollection. In deciding the question of credibility, remember to use your common sense, your good judgment, and your experience.

In deciding what to believe, you may consider a number of factors:

(1) The opportunity and ability of the witness to see or hear or know the things about which the witness testified;

(2) The quality of the witness' knowledge, understanding, and memory;

(3) The witness' appearance, behavior, and manner while testifying;

(4) Whether the witness has an interest in the outcome of the case or any motive, bias, or prejudice;

(5) Any relation the witness may have with a party in the case and any effect the verdict may have on the witness;

(6) Whether the witness said or wrote anything before trial that was different from the witness' testimony in court;

JA1398

(7) Whether the witness' testimony was consistent or inconsistent with other evidence that you believe; and

(8) Any other factors that bear on whether the witness should be believed.

Inconsistencies or discrepancies in a witness' testimony or between the testimony of different witnesses may or may not cause you to disbelieve a witness' testimony. Two or more persons witnessing an event may simply see or hear it differently. Mistaken recollection, like failure to recall, is a common human experience. In weighing the effect of an inconsistency, you should also consider whether it was about a matter of importance or an insignificant detail. You should also consider whether the inconsistency was innocent or intentional.

You are not required to accept testimony even if the testimony was not contradicted and the witness was not impeached. You may decide that the witness is not worthy of belief because of the witness' bearing and demeanor, or because of the inherent improbability of the testimony, or for other reasons that are sufficient to you.

After you make your own judgment about the believability of a witness, you can then attach to that witness' testimony the importance or weight that you think it deserves.

The weight of the evidence to prove a fact does not necessarily depend on the number of witnesses who testified or the quantity of evidence that was presented. What is more important than numbers or quantity is how believable the witnesses were, and how much weight you think their testimony deserves.

_____

3rd Circuit Model Criminal Jury Instructions, No. 3.04 (2015) (unmodified).

9

## GOV'T'S REQUEST NO. 5

**Not All Evidence, Not All Witnesses Needed**

Although the government is required to prove the defendant guilty beyond a

reasonable doubt, the government is not required to present all possible evidence related to the

case or to produce all possible witnesses who might have some knowledge about the facts of the

case. In addition, as I have explained, the defendant is not required to present any evidence or

produce any witnesses.

*(In this case, defendant (name) (presented evidence) (produced witnesses).*

*Defendant (name) is not required to present all possible evidence related to the case or to*

*produce all possible witnesses who might have some knowledge about the facts of the case.)*

_____

3rd Circuit Model Criminal Jury Instructions, No. 3.05 (2015) (unmodified).

10

JA1400

USCA4 Appeal: 23-2097    Doc: 11-4    Filed: 12/06/2023    Pg: 20 of 503
Case 3:17-cr-00190-REP Document 95 Filed 12/09/19 Page 10 of 100
Case 3:16-cr-00130-LRH Document 95 Filed 12/09/19 Page 10 of 100

## GOV'T'S REQUEST NO. 6

### Presumption of Innocence; Burden of Proof; Reasonable Doubt

The defendants, Charles M. Hallinan and Wheeler K. Neff, pleaded not guilty to the offenses charged. Every defendant is presumed to be innocent. He started the trial with a clean slate, with no evidence against him. The presumption of innocence stays with a defendant unless and until the government has presented evidence that overcomes that presumption by convincing you that the defendant is guilty of the offense charged beyond a reasonable doubt. The presumption of innocence requires that you find a defendant not guilty, unless you are satisfied that the government has proved guilt beyond a reasonable doubt.

The presumption of innocence means that a defendant has no burden or obligation to present any evidence at all or to prove that he is not guilty. The burden or obligation of proof is on the government to prove that a defendant is guilty and this burden stays with the government throughout the trial.

In order for you to find a defendant guilty of the offenses charged, the government must convince you that that defendant is guilty beyond a reasonable doubt. That means that the government must prove each and every element of the offense charged beyond a reasonable doubt. A defendant may not be convicted based on suspicion or conjecture, but only on evidence proving guilt beyond a reasonable doubt.

Proof beyond a reasonable doubt does not mean proof beyond all possible doubt or to a mathematical certainty. Possible doubts or doubts based on conjecture, speculation, or hunch are not reasonable doubts. A reasonable doubt is a fair doubt based on reason, logic, common sense, or experience. It is a doubt that an ordinary reasonable person has after carefully weighing all of the evidence, and is a doubt of the sort that would cause him or her to hesitate to

JA1401

act in matters of importance in his or her own life. It may arise from the evidence, or from the lack of evidence, or from the nature of the evidence.

If, having now heard all the evidence, you are convinced that the government proved each and every element of the offense charged beyond a reasonable doubt, you should return a verdict of guilty for that offense. However, if you have a reasonable doubt about one or more of the elements of the offense charged, then you must return a verdict of not guilty of that offense.

---

3rd Circuit Model Criminal Jury Instructions, No. 3.06 (2015) (unmodified).

JA1402

## GOV'T'S REQUEST NO. 7

**Penalty Not To Be Considered**

The punishment provided by law for the offense charged in the indictment is a

matter exclusively within the province of the Court and should never be considered by the jury in

any way in arriving at an impartial verdict as to the offense charged.

_____

1A O'Malley, Grenig & Lee, <u>Federal Jury Practice and Instructions</u>, § 20.01 (6th ed. 2010) (the
instruction set out is paragraph 6 of a longer instruction intended to be given as the jury retires);
<u>United States v. Austin</u>, 533 F.2d 879, 884-85 (3d Cir. 1976), <u>cert</u>. <u>denied</u>, 429 U.S. 1043 (1977).

JA1403

## GOV'T'S REQUEST NO. 8

**<u>Summary</u> <s>Nature</s> of the Indictment**

As you know, defendant Charles M. Hallinan and Wheeler K. Neff are charged in the indictment with violating federal law.   Specifically, <u>Counts 1 and 2 of the indictment each charge Charles M. Hallinan and Wheeler K. Neff with RICO conspiracy, that is, conspiracy to conduct or participate in the conduct of the affairs of an enterprise through the collection of unlawful debt.   Count 3 charges Hallinan and Neff with conspiracy to commit mail fraud, wire fraud, and money laundering.   Counts 4 and 5 each charge Hallinan and Neff with mail fraud and aiding and abetting mail fraud.   Counts 6 through 8 each charge Hallinan and Neff with wire fraud and aiding and abetting wire fraud.   Counts 9 through 17 each charge Hallinan with money laundering and aiding and abetting money laundering.</u>

As I explained at the beginning of trial, an indictment is just the formal way of specifying the exact crimes the defendant is accused of committing. An indictment is simply a description of the charges against a defendant. It is an accusation only. An indictment is not evidence of anything, and you should not give any weight to the fact that the defendant has been indicted in making your decision in this case.

_____

3rd Circuit Model Criminal Jury Instructions, No. 3.07 (2015) (modified as noted).

14

JA1404

## GOV'T'S REQUEST NO. 9

**"On or About"**

   You will note that the indictment charges that the offenses were committed "on or about" certain dates. The Government does not have to prove with certainty the exact dates of the alleged offenses. It is sufficient if the Government proves beyond a reasonable doubt that the offenses were committed on dates reasonably near the dates alleged.

---

3rd Circuit Model Criminal Jury Instructions, No. 3.08 (2015) (unmodified).

JA1405

## GOV'T'S REQUEST NO. 10

### Venue

The indictment alleges that some act in furtherance of the offense charged occurred here in the Eastern District of Pennsylvania. There is no requirement that all aspects of the offense charged, or the entire conspiracy take place here in the Eastern District of Pennsylvania. But for you to return a guilty verdict, the government must convince you that either the agreement, or one of the overt acts, took place here in the Eastern District of Pennsylvania.

Unlike all the elements that I have described, this fact only has to be proved by a preponderance of the evidence. This means the government only has to convince you that it is more likely than not that some part of the conspiracy took place here.

Remember that the government must prove all the elements I have described beyond a reasonable doubt.

_____

3rd Circuit Model Criminal Jury Instructions, No. 3.09 (2015) (unmodified).

JA1406

<div align="center">

**GOV'T'S REQUEST NO. 11**

</div>

**Separate Consideration - Multiple Defendants Charged with Different Offenses**

   The defendants, Charles M. Hallinan and Wheeler K. Neff, are charged with several offenses. <u>Hallinan is also charged with some offenses for which Neff is not charged.</u>  I will explain to you in more detail shortly which defendants are charged with which offenses. Before I do that, however, I want to emphasize several things.

   The number of offenses charged is not evidence of guilt, and this should not influence your decision in any way.   Also, in our system of justice, guilt or innocence is personal and individual.   You must separately consider the evidence against each defendant on each offense charged, and you must return a separate verdict for each defendant for each offense. For each defendant and each offense, you must decide whether the government has proved beyond a reasonable doubt that the particular defendant is guilty of the particular offense.

   Your decision on any one defendant or any one offense, whether guilty or not guilty, should not influence your decision on any of the other defendants or offenses.   Each offense and each defendant should be considered separately.

_____

3rd Circuit Model Criminal Jury Instructions, No. 3.14 (2015) (modified as noted).

<div align="center">

17

</div>

JA1407

## **GOV'T'S REQUEST NO. 12**

**Indictment – Persons Not Charged**

You are here to determine whether the government has proven the guilt of the defendants for the charges in the indictment beyond a reasonable doubt. You are not called upon to return a verdict as to the guilt or innocence of any other person or persons.

So, if the evidence in the case convinces you beyond a reasonable doubt of the guilt of a defendant for the crimes charged in the indictment, you should so find, even though you may believe that one or more other unindicted persons are also guilty. But if any reasonable doubt remains in your minds after impartial consideration of all the evidence in the case, it is your duty to find that defendant not guilty.

_____

1A O'Malley, Grenig, and Lee, Federal Jury Practice and Instructions, §12.11 (6th ed. 2010) (unmodified).

JA1408

## GOV'T'S REQUEST NO. 13

**Stipulated Testimony; Stipulation of Fact; Judicial Notice (F.R.E. 201)**

  The parties have agreed what (*name of witness*)'s testimony would be if called as a witness. You should consider that testimony in the same way as if it had been given here in court by the witness.

  The Government and the defendant(*s*) have agreed that *(set forth stipulated fact(s)) (is)(are)* true. You should therefore treat *(this fact)(these facts)* as having been proved. You are not required to do so, however, since you are the sole judge of the facts.

  I have taken judicial notice of certain facts. *(State the fact(s) that are being judicially noticed.)* I believe *(this fact is) (these facts are) (of such common knowledge) (can be so accurately and readily determined from (name accurate source))* that it cannot reasonably be disputed. You may accept this fact as proven, but are not required to do so. As with any fact the final decision whether or not to accept it is for you to make and you are not required to agree with me.

_____

3rd Circuit Model Criminal Jury Instructions, Nos. 4.01-4.03 (2015) (unmodified).

19

JA1409

USCA4 Appeal: 23-2097    Doc: 11-4    Filed: 12/06/2023    Pg: 29 of 503    PageID# 52271

## GOV'T'S REQUEST NO. 14

**Audio/Video Recordings – Consensual**

During the trial you heard audio recordings of conversations with defendant Charles M. Hallinan made without his knowledge. These recordings were made with the consent and agreement of either Adrian Rubin and Mark Kabbash, who were the other parties to the conversations.

The use of this procedure to gather evidence is lawful and the recordings may be used by either party.

_____

3rd Circuit Model Criminal Jury Instructions, No. 4.04 (2015) (unmodified).

JA1410

USCA4 Appeal: 23-2097    Doc: 11-4    Filed: 12/06/2023    Pg: 30 of 503
Case 3:17-cr-00126-EMC Document 95 Filed 12/09/19 Page 27 of 100
Case 1:18-cr-00126-EMC Document 95 Filed 12/09/19 Page 20 of 100    PageID# 52272

## GOV'T'S REQUEST NO. 15

**Audio/Video Recordings - Transcripts**

You have heard audio recordings that were received in evidence, and you were given written transcripts of the recordings.

Keep in mind that the transcripts are not evidence.   They were given to you only as a guide to help you follow what was being said.   The recordings themselves are the evidence. If you noticed any differences between what you heard on the recordings and what you read in the transcripts, you must rely on what you heard, not what you read.   And if you could not hear or understand certain parts of the recordings you must ignore the transcripts as far as those parts are concerned.

*(The transcripts name the speakers.   But remember, you must decide who you actually heard speaking in the recording.   The names on the transcript were used simply for your convenience.)*

———————————————————

3rd Circuit Model Criminal Jury Instructions, No. 4.06 (2015) (unmodified).

JA1411

USCA4 Appeal: 23-2097    Doc: 11-4    Filed: 12/06/2023    Pg: 31 of 503
Case 3:17-cr-00130-EMC   Document 95   Filed 12/09/16   Page 27 of 100
Case 2:18-cr-00130-EMC   Document 95   Filed 12/09/16   Page 27 of 100   PageID# 52273

## GOV'T'S REQUEST NO. 16

### Opinion Evidence (Expert Witnesses)

The rules of evidence ordinarily do not permit witnesses to state their own opinions about important questions in a trial, but there are exceptions to these rules.

In this case, you heard testimony from *(state of name of person who offered an opinion)*.   Because of *his/her/their* his knowledge, skill, experience, training, or education in the field of (*state the witness(es)'s field), (Mr.) (Ms.) (Dr.) (name) (was)(were)*, he was permitted to offer a*(n)* opinion*(s)* in that field and the reasons for *(that)(those)* at opinion.

The opinion*(s)* (*this/these*) witness*(es)* state*(d)* should receive whatever weight you think appropriate, given all the other evidence in the case. In weighing this opinion testimony you may consider the witness' qualifications, the reasons for the witness' opinions, and the reliability of the information supporting the witness' opinion, as well as the other factors discussed in these instructions for weighing the testimony of witnesses. You may disregard the opinion*(s)* entirely if you decide that *(Mr.)(Ms.)(Dr.)*'s opinion is not based on sufficient knowledge, skill, experience, training, or education. You may also disregard the opinion*(s)* if you conclude that the reasons given in support of the opinion*(s)* are not sound, or if you conclude that the opinion*(s) (is)(are)* not supported by the facts shown by the evidence, or if you think that the opinion*(s) (is)(are)* outweighed by other evidence.

_____

3rd Circuit Model Criminal Jury Instructions, No. 4.08 (2015) (unmodified).

JA1412

## GOV'T'S REQUEST NO. 17

### Summaries - Underlying Evidence Admitted

The government presented certain charts and summaries in order to help explain the facts disclosed by the *(describe the admitted evidence that provided the basis for the summaries; e.g., books, records, documents)* which were admitted as evidence in the case. The charts and summaries are not themselves evidence or proof of any facts. If the charts and summaries do not correctly reflect the evidence in the case, you should disregard them and determine the facts from the underlying evidence.

_____

3rd Circuit Model Criminal Jury Instructions, No. 4.10 (2015) (unmodified).

JA1413

USCA4 Appeal: 23-2097    Doc: 11-4    Filed: 12/06/2023    Pg: 33 of 503
Case 3:17-cr-00261-REP Document 95 Filed 12/09/19 Page 30 of 100
Case 2:18-cr-00036-ER Document 95 Filed 12/09/19 Page 29 of 100 PageID# 52275

## GOV'T'S REQUEST NO. 18

### Summaries – Underlying Evidence Not Admitted (F.R.E. 1006)

Certain *(charts)(summaries)* offered by the government were admitted as evidence.    You may use those *(charts)(summaries)* as evidence, even though the underlying documents and records have not been admitted into evidence.

*[(However, the (accuracy)(authenticity) of those (charts)(summaries) has been challenged.    You must decide how much weight, if any, you will give to them.    In making that decision, you should consider the testimony you heard about the way in which the (charts)(summaries) were prepared.)]*

_____

3rd Circuit Model Criminal Jury Instructions, No. 4.11 (2015) (unmodified).

24

**GOV'T'S REQUEST NO. 19**

**<u>Specific Investigation Techniques Not Required</u>**

      During the trial you heard testimony of witnesses and argument by counsel that the government did not use specific investigative techniques such as *(mention omitted techniques that have been addressed in testimony or argument; e.g., fingerprint analysis, DNA analysis, the use of recording devices)*. You may consider these facts in deciding whether the government has met its burden of proof, because as I told you, you should look to all of the evidence or lack of evidence in deciding whether the defendant is guilty. However, there is no legal requirement that the government use any of these specific investigative techniques or all possible techniques to prove its case. There is no requirement to *(mention omitted techniques; e.g., attempt to take fingerprints or offer fingerprint evidence, gather DNA evidence or offer DNA analysis, or use recording devices or offer recordings in evidence)*.

      Your concern, as I have said, is to determine whether or not the evidence admitted in this trial proves the defendant's guilt beyond a reasonable doubt.

———————————

3rd Circuit Model Criminal Jury Instructions, No. 4.14 (2015) (unmodified).

25

JA1415

### GOV'T'S REQUEST NO. 20

**Credibility of Witnesses – Law Enforcement Officer**

You have heard the testimony of law enforcement officers. The fact that a witness is employed as a law enforcement officer does not mean that his or her testimony necessarily deserves more or less consideration or greater or lesser weight than that of any other witness.

*[At the same time, it is quite legitimate for defense counsel to try to attack the believability of a law enforcement witness on the ground that (his)(her) testimony may be colored by a personal or professional interest in the outcome of the case.]*

You must decide, after reviewing all the evidence, whether you believe the testimony of the law enforcement witness and how much weight, if any, it deserves.

---

3rd Circuit Model Criminal Jury Instructions, No. 4.18 (2015) (unmodified).

26

JA1416

## GOV'T'S REQUEST NO. 21

**Defendant's Choice not to Testify or Present Evidence**

      Defendant *(name)* did not testify *(did not present evidence)* in this case. A defendant has an absolute constitutional right not to testify *(or to present any evidence).* The burden of proof remains with the prosecution throughout the entire trial and never shifts to a defendant. A defendant is never required to prove that he is innocent. You must not attach any significance to the fact that a defendant did not testify. You must not draw any adverse inference against a defendant because he did not take the witness stand. Do not consider, for any reason at all, the fact that a defendant did not testify. Do not discuss that fact during your deliberations or let it influence your decision in any way.

_____

3rd Circuit Model Criminal Jury Instructions, No. 4.27 (2015) (unmodified).

JA1417

USCA4 Appeal: 23-2097     Doc: 11-4       Filed: 12/06/2023     Pg: 37 of 503
Case 3:17-cr-00261-REP Document 1522-3 Filed 12/09/19 Page 30 of 101 PageID# 52279
Case 2:18-cr-00130-ER Document 95 Filed 12/09/18 Page 35 of 100

# GOV'T'S REQUEST NO. 22

**Defendant's Testimony**

       In a criminal case, a defendant has a constitutional right not to testify. However, if he chooses to testify, he is, of course, permitted to take the witness stand on his own behalf. In this case, defendant *(name)* testified. You should examine and evaluate his testimony just as you would the testimony of any witness.

_____

3rd Circuit Model Criminal Jury Instructions, No. 4.28 (2015) (unmodified).

JA1418

USCA4 Appeal: 23-2097    Doc: 11-4    Filed: 12/06/2023    Pg: 38 of 503
Case 3:17-cr-00126-JAG Document 95 Filed 12/09/19 Page 34 of 100
Case 3:18-cr-00126-JAG Document 95 Filed 12/09/19 Page 34 of 100 PageID# 52280

## GOV'T'S REQUEST NO. 23

**Defendant's Prior Bad Acts or Crimes (F.R.E. 404(b))**

You have heard testimony that the defendant *(summarize the other act evidence).*

This evidence of other act(s) was admitted only for (a) limited purpose(s).    You may consider this evidence only for the purpose of deciding whether the defendant *(describe the precise purpose or purposes for which the other act evidence was admitted: for example (Pick those of the following, or other reasons, that apply)),*

> *had the state of mind, knowledge, or intent necessary to commit the crime charged in the indictment;*
>
> *or*
>
> *had a motive or the opportunity to commit the acts charged in the indictment;*
>
> *or*
>
> *was preparing or planning to commit the acts charged in the indictment;*
>
> *or*
>
> *acted with a method of operation as evidenced by a unique pattern (describe);*
>
> *or*
>
> *did not commit the acts for which the defendant is on trial by accident or mistake.;*
>
> *or*
>
> *is the person who committed the crime charged in the indictment.   You may consider this evidence to help you decide (describe how the evidence will be used to prove identity -- e.g., whether the evidence that the defendant committed the burglary in which the gun that is the subject of this trial was stolen makes it more*

29

USCA4 Appeal: 23-2097    Doc: 11-4    Filed: 12/06/2023    Pg: 39 of 503

Case 3:17-cr-00261-GCM    Document 95    Filed 12/09/19    Page 35 of 100    Case 2:18-cr-00291-ER   Document 94-1   Filed 2/25/19   PageID# 52281

*likely that the defendant was the person who placed the gun in the trunk of the car).*

Do not consider this evidence for any other purpose.

Of course, it is for you to determine whether you believe this evidence and, if you do believe it, whether you accept it for the purpose offered.   You may give it such weight as you feel it deserves, but only for the limited purpose that I described to you.

The defendant(s) is/are not on trial for committing these other acts.   You may not consider the evidence of these other acts as a substitute for proof that the defendant(s) committed the crime(s) charged.   You may not consider this evidence as proof that the defendant(s) has/have a bad character or any propensity to commit crimes.   Specifically, you may not use this evidence to conclude that because a defendant may have committed the other act(s), (he)[(she)] must also have committed the act(s) charged in the indictment.

Remember that the defendants are on trial here only for (*state the charges*), not for these other acts.   Do not return a guilty verdict unless the government proves the crime(s) charged in the indictment beyond a reasonable doubt.

---

3rd Circuit Model Criminal Jury Instructions, No. 4.29 (2015) (modified as indicated).

30

USCA4 Appeal: 23-2097    Doc: 11-4        Filed: 12/06/2023    Pg: 40 of 503
Case 3:17-cr-00201-EMC   Document 95   Filed 12/09/18   Page 36 of 100
Case 2:16-cr-00201-ER   Document 95   Filed 12/09/18   Page 36 of 100

## GOV'T'S REQUEST NO. 24

**Consciousness of Guilt (Flight, Concealment, Use of an Alias, etc.)**

You have heard testimony that after the crimes [was] were supposed to have been committed, (*name of defendan*t) (*describe the conduct proven*) defendant Charles M. Hallinan took additional steps to conceal his actions in the Indiana Lawsuit, including by paying an attorney to make legal claims on behalf of Apex 1 Processing, Inc., in order to hinder or delay the investigation and prosecution of this case.

If you believe that defendant Hallinan engaged in efforts to conceal his actions in the Indiana lawsuit (*name of defendant*) *(describe the conduct proven)*, then you may consider this conduct, along with all the other evidence, in deciding whether the government has proved beyond a reasonable doubt that *(he)(she)* committed the crime charged.   This conduct may indicate that *(he)(she)* thought *(he)(she)* was guilty of the crime charged and was trying to avoid punishment.   On the other hand, sometimes an innocent person may *(describe the conduct proven)* for some other reason.   Whether or not this evidence causes you to find that the defendant was conscious of *(his)(her)* guilt of the crime charged, and whether that indicates that *(he)(she)* committed the crime charged, is entirely up to you as the sole judges of the facts.

——————————————

3rd Circuit Model Criminal Jury Instructions, No. 4.30 (2015) (modified as indicated).

31

JA1421

## GOV'T'S REQUEST NO. 25

**Defendant's Character Evidence**

You have heard *(reputation)(opinion)(reputation and opinion)* evidence about whether the defendant has a character trait for *(name trait, such as truthfulness, peacefulness, honesty, being a law-abiding citizen, etc.)*.

You should consider this character evidence together with and in the same way as all the other evidence in the case in deciding whether the government has proved the charge*(s)* beyond a reasonable doubt.

_____

3rd Circuit Model Criminal Jury Instructions, No. 4.39 (2015) (unmodified).

32

JA1422

<u>**GOV'T'S REQUEST NO. 26**</u>

<u>**Motive Explained**</u>

Motive is not an element of the offenses with which the defendants are charged. Proof of bad motive is not required to convict. Further, proof of bad motive alone does not establish that a defendant is guilty and proof of good motive alone does not establish that a defendant is not guilty. Evidence of a defendant's motive may, however, help you find a defendant's intent.

Intent and motive are different concepts. Motive is what prompts a person to act. Intent refers only to the state of mind with which the particular act is done.

Personal advancement and financial gain, for example, are motives for much of human conduct. However, these motives may prompt one person to intentionally do something perfectly acceptable while prompting another person to intentionally do an act that is a crime.

_____

3rd Circuit Model Criminal Jury Instructions, No. 5.04 (2015) (unmodified).

33

JA1423

USCA4 Appeal: 23-2097    Doc: 11-4       Filed: 12/06/2023     Pg: 43 of 503
Case 3:17-cv-00201-REP Document 95 Filed 12/09/18 Page 39 of 100
Case 2:16-cr-00130-EPD Document 95 Filed 12/09/18 Page 39 of 100 PageID# 52285

**GOV'T'S REQUEST NO. 27**

**Counts 1 and 2 – RICO Conspiracy - Elements of the Offense**

Count 1 of the indictment charges that from at least 2007 until at least early 2013, in the Eastern District of Pennsylvania, and elsewhere, defendants Charles M. Hallinan and Wheeler K. Neff agreed or conspired [with one or more other persons] together and with others to conduct or to participate in the conduct of the affairs of an enterprise, that is the Hallinan Payday Lending Organization, through the collection of unlawful debt, as I *(have explained) (will shortly explain)* to you.

Count 2 of the indictment charges that from at least November 2011 until at least March 2012, in the Eastern District of Pennsylvania, and elsewhere, defendants Charles M. Hallinan and Wheeler K. Neff agreed or conspired [with one or more other persons] together and with others to conduct or to participate in the conduct of the affairs of an enterprise, that is the Rubin Payday Lending Organization, through the collection of unlawful debt, as I *(have explained) (will shortly explain)* to you.

In order to convict a defendant of the racketeering conspiracy offenses charged in Counts 1 and 2, the government must prove that a defendant knowingly agreed that a conspirator, which may include the defendant himself, would commit a violation of 18 U.S.C. § 1962(c).

Section 1962(c) is a provision of a law that is commonly referred to as the "RICO" statute, which stands for Racketeering and Corrupt Organizations Act.   The relevant provision of the RICO statute provides as follows:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through . . .   the collection of unlawful debt.

JA1424

Section 1962(d) makes it unlawful for a person or persons to conspire to violate Section 1962(c).

It is a federal crime for two or more persons to agree or conspire to commit any offense against the United States, even if they never actually achieve their objective. A conspiracy is a kind of criminal partnership.

In order for you to find a defendant guilty of conspiracy to conduct or to participate in the conduct of an enterprise's affairs through the collection of unlawful debt, you must find that the government proved beyond a reasonable doubt each of the following three (3) elements:

First:   That two or more persons agreed to conduct or to participate, directly or indirectly, in the conduct of the affairs of an enterprise engaged in, or the activities of which affected, interstate commerce, through the collection of unlawful debt;

Second:   That the defendant was a party to or member of that agreement;

Third:   That the defendant joined the agreement or conspiracy knowing of its objective to conduct or participate, directly or indirectly, in the conduct of an enterprise's affairs through the collection of unlawful debt, and intending to join together with at least one other alleged conspirator to achieve that objective; that is, that the defendant and at least one other alleged conspirator shared a unity of purpose and the intent to achieve the objective of conducting or participating in the conduct of an enterprise's affairs through the collection of unlawful debt.

[The meanings of the elements "enterprise," "employed by or associated with," "conduct or participate, directly or indirectly, in the conduct of that enterprise's affairs," and "through a pattern of racketeering activity" are the same as I have just explained to you with respect to the RICO offense charged in Count (*no.*).   However, the RICO conspiracy charged in

JA1425

Count (*no.*) is a distinct offense from the RICO offense charged in Count (*no*). There are several important differences between these offenses.]

       <u>The government is not required to prove that the alleged enterprise was actually established, that the defendant was actually employed by or associated with the enterprise, that the enterprise was actually engaged in, or its activities actually affected, interstate or foreign commerce, or that the defendant actually collected an unlawful debt.</u>

       [One important difference is that, unlike the requirements to find (*name*) guilty of the RICO offense charged in Count (*No.*), in order to find (*name*) guilty of the RICO conspiracy charged in Count (*No.*) the government is not required to prove that the alleged enterprise actually existed, or that the enterprise actually engaged in or its activities actually affected interstate or foreign commerce. Rather, because an agreement to commit a RICO offense is the essence of a RICO conspiracy, the government need only prove that (*name*) joined the conspiracy and that if the object of the conspiracy was achieved, the enterprise would be established and the enterprise would be engaged in or its activities would affect interstate or foreign commerce.]

       [Similarly, unlike the requirements to find (*name*) guilty of the RICO offense, in order to find (*name*) guilty of the RICO conspiracy charged in Count (*No.*) the government is not required to prove that (*name*) was actually employed by or associated with the enterprise, or that (*name*) agreed to be employed by or to be associated with the enterprise. Nor does the RICO conspiracy charge require the government to prove that (*name*) personally participated in the operation or management of the enterprise, or agreed to personally participate in the operation or management of the enterprise. Rather, you may find (*name*) guilty of the RICO conspiracy offense if the evidence establishes that (*name*) knowingly agreed to facilitate or further a scheme

<div align="center">36</div>

<div align="right">JA1426</div>

which, if completed, would constitute a RICO violation involving at least one other conspirator who would be employed by or associated with the enterprise and who would participate in the operation or management of the enterprise.]

[Finally, in order to find (*name*) guilty of the RICO conspiracy charged in Count (*No.*) the government is not required to prove that (*name*) personally committed or agreed to personally commit any act of racketeering activity.]

Indeed, it is not necessary for you to find that the objective or purpose of the conspiracy was achieved at all. However, the evidence must establish that the defendant knowingly agreed to facilitate or further a scheme which, if completed, would include the collection of unlawful debt committed by at least one other conspirator.

In short, to find Charles Hallinan or Wheeler Neff guilty of <u>either</u> RICO conspiracy charged in Counts 1 and 2 of the indictment, you must find that the government proved beyond a reasonable doubt that the defendant joined in an agreement or conspiracy with another person or persons, knowing that the objective or purpose was to conduct or to participate, directly or indirectly, in the conduct of the affairs of an enterprise through the collection of unlawful debt, and intending to join with the other person or persons to achieve that objective.

*[If applicable: The indictment need not specify the predicate racketeering acts that (name) agreed would be committed by some member of the conspiracy in the conduct of the affairs of the enterprise. The indictment alleges that (name) agreed that multiple racketeering acts would be committed.   You are not limited to considering only the specific racketeering acts alleged in Count (No.) of the indictment (the RICO substantive count). Rather, you may also consider the evidence presented of other racketeering acts committed or agreed to be committed*

JA1427

*by any co-conspirator in furtherance of the enterprise's affairs, including racketeering acts for which (name) is not charged in Count (No.) (the RICO substantive count), to determine whether (name) agreed that at least one member of the conspiracy would commit two or more racketeering acts.*

*Moreover, in order to convict (name) of the RICO conspiracy offense, your Verdict must be unanimous as to which type or types of racketeering activity (name) agreed would be committed; for example, at least two acts of extortion, or robbery, or drug trafficking, or one of each, or any combination thereof. (Note use examples that apply)].*

_____

3rd Circuit Model Criminal Jury Instructions, 6.18.1962D (2013) (modified as noted).

38

## GOV'T'S REQUEST NO. 28

### Counts 1 and 2 - RICO Conspiracy - Objectives of the Racketeering Conspiracy

       As I instructed you earlier, the objective of the racketeering conspiracy charged in Counts 1 and 2 was to violate 18 U.S.C. § 1962(c) by participating in the affairs of the enterprise, directly or indirectly, through the collection of unlawful debt.

       I will now explain to you the meanings of the terms "enterprise," "associated with," "conduct or participate, directly or indirectly, in the conduct of that enterprise's affairs," and "through the collection of unlawful debt."

_____

Modeled on 3d Circuit Model Criminal Jury Instruction, No. 6.18.1962D, ¶ 4 (2013).

JA1429

## GOV'T'S REQUEST NO. 29

### Counts 1 and 2 - RICO Conspiracy - "Enterprise" Defined Generally

[The first element that the government must prove beyond a reasonable doubt for the offenses charged in Counts 1 and 2 is the existence of an "enterprise," as alleged in the indictment.]   An enterprise may be either (1) a legal entity, such as a corporation or partnership; or (2) a group of individuals associated in fact although not a legal entity. In this case, the enterprises alleged in <u>Counts 1 and 2 of</u> the indictment are <u>the Hallinan Payday Lending Organization and the Rubin Payday Lending Organization.   Each is alleged to be a group of individuals and entities associated in fact whose members and associates engaged in the collection of unlawful debt.</u>

The term enterprise includes both legitimate enterprises and also illegitimate or completely illegal enterprises.   Thus, the enterprise need not have a purpose other than the commission of or facilitating the collection of unlawful debt alleged in the indictment.

[One important difference is that, unlike the requirements to find a defendant guilty of the RICO offense charged in Count (*no.*),]

In order to find a defendant guilty of the RICO conspiracy charged in Counts 1 and 2, the government is not required to prove that the alleged enterprise actually existed, or that the enterprise actually engaged in or its activities actually affected interstate or foreign commerce. Rather, because an agreement to commit a RICO offense is the essence of a RICO conspiracy, the government need only prove that a defendant joined the conspiracy and that if the object of the conspiracy was achieved, the enterprise would be established and the enterprise would be engaged in or its activities would affect interstate or foreign commerce.

_____

JA1430

USCA4 Appeal: 23-2097   Doc: 11-4      Filed: 12/06/2023    Pg: 50 of 503
Case 3:17-cr-00126-HEH   Document 155-2   Filed 12/09/19   Page 47 of 101   PageID# 52292
Case 2:18-cr-00126-HEH   Document 95   Filed 12/09/19   Page 46 of 100

3rd Circuit Model Criminal Jury Instructions, No. 6.18.1962C-1 (2013); final paragraph taken from No. 6.18.1962D, ¶ 5 (2013) (both modified as noted).

## GOV'T'S REQUEST NO. 30

## Counts 1 and 2 - RICO Conspiracy - "Enterprise" - Association in Fact Defined

The indictment alleges that the enterprises in this case were [was a] groups of individuals and entities associated together in fact although not a legal entity. As I already told you, an enterprise need not be a formal business entity such as a corporation, but may be merely an informal association of individuals. A group or association of individuals can be an enterprise if they have associated together for a common purpose of engaging in a course of conduct. This is referred to as an "association in fact enterprise."

In order to find the existence of an "association in fact enterprise," you must find that the government proved beyond a reasonable doubt each of the following:

First: That the group had a purpose and longevity sufficient for the members of the group to pursue its purpose;

Second: That the group had an ongoing organization, formal or informal, with some sort of framework for carrying out its objectives;

Third: That there was a relationship among the members of the group and that the members of the group functioned as a continuing unit to achieve a common purpose; and

Fourth: That the enterprise existed separate and apart from the alleged collection of unlawful debt.

To find that the enterprise was an entity separate and apart from the alleged [pattern of racketeering activity] collection of unlawful debt, you must find that the government proved that the enterprise had an existence beyond what was necessary merely to commit the charged [racketeering activity] collection of unlawful debt.   However, the government does not have to prove that the enterprise had some function wholly unrelated to the collection of

JA1432

USCA4 Appeal: 23-2097    Doc: 11-4      Filed: 12/06/2023    Pg: 52 of 503
Case 3.17-cr-00201-LRN   Document 351   Filed 12/09/18   Page 48 of 100
Case 2:18-cr-00280-LRN   Document 95   Filed 12/09/18   Page 48 of 100   PageID# 52294

unlawful debt; the enterprise may be formed solely for the purpose of carrying out the collection of unlawful debt.   The existence of an association-in-fact enterprise is often proved by what it does.   Evidence that shows [a pattern of racketeering activity] the collection of unlawful debt may be considered in determining whether the government has proved the existence of an enterprise beyond a reasonable doubt, and proof of [a pattern of racketeering activity] the collection of unlawful debt may be sufficient for you to infer the existence of an association-in-fact enterprise.   Also, evidence showing the oversight or coordination of the collection of unlawful debt on an ongoing basis may be considered in determining whether the enterprise had a separate existence.

To prove an association-in-fact enterprise, the government need not prove that the group had a hierarchical structure or a chain of command; decisions may be made on an ad hoc basis and by any number of methods.   The government also need not prove that members of the group had fixed roles; different members may perform different roles at different times.   The government need not prove that the group was a business-like entity, or that it had a name, or regular meetings, or established rules and regulations, or the like.   An enterprise is also not limited to groups whose crimes are sophisticated, diverse, complex, or unique.

—————————————

3rd Circuit Model Criminal Jury Instructions, No. 6.18.1962C-2 (2013) (modified as noted).

JA1433

## GOV'T'S REQUEST NO. 31

### Counts 1 and 2 - RICO Conspiracy – "Engaged In, Or The Activities Of Which Affect, Interstate Commerce" - Defined

[The second element the government must prove beyond a reasonable doubt for the offense charged in Count (no.) is that the enterprise was engaged in interstate (or foreign) commerce, or that the enterprise's activities affected interstate (or foreign) commerce. This means the government must prove that the enterprise was involved in or affected in some way trade, or business, or travel between two or more states (between a state and a foreign country).]

An enterprise is engaged in interstate commerce when it is itself directly engaged in the production, distribution, or acquisition of services, money, goods, or other property in interstate commerce.

Alternatively, an enterprise's activities affected interstate commerce if its activities in any way interfered with, changed, or altered the movement or transportation or flow of goods, merchandise, money, or other property between or among two or more states. The government must prove that the enterprise's activities had some effect on commerce, no matter how minimal or slight. The government need not prove that a defendant knew that the enterprise would engage in, or that the enterprise's activities would affect, interstate commerce. The government also need not prove that a defendant intended to obstruct, delay or interfere with interstate commerce, or that the purpose of the alleged crime generally was to affect interstate commerce.

In addition, the government does not have to prove that the collection of unlawful debt itself affected interstate commerce. Rather, it is the enterprise and its activities considered

44

as a whole that must be shown to have that effect.   On the other hand, this effect on interstate

commerce may be established through the effect caused by the collection of unlawful debt.

_____

3rd Circuit Model Criminal Jury Instructions, No. 6.18.1962C-3 (2013); deletion based on fact
that this is a conspiracy charge.

## GOV'T'S REQUEST NO. 32

### Counts 1 and 2 - RICO Conspiracy – "Employed by or Associated With the Enterprise"- Defined

[The third element that the government must prove beyond a reasonable doubt for the offense charged in Count (no.) is that (name) was either "employed by" or "associated with" the enterprise.   The government need not prove both.]

[If you find that (name) was employed by the enterprise, that is enough to satisfy this element.]   You should give the phrase "employed by" its common, ordinary meaning.   For example, a person is employed by an enterprise when he or she is on the payroll of the enterprise, or performs services for the enterprise, or holds a position in the enterprise.

Alternatively, you may find that a defendant was "associated with" the enterprise, if you find that the government proved that he was aware of the general existence and nature of the enterprise, that it extended beyond his individual role, and with that awareness participated in, aided, or furthered the enterprise's activities.

It is not required that a defendant be employed by or associated with the enterprise for the entire time the enterprise existed. The government also is not required to prove that a defendant had a formal or managerial position in the enterprise, or participated in all the activities of the enterprise, or had full knowledge of all the activities of the enterprise, or knew about the participation of all the other members of the enterprise. [What the government must prove beyond a reasonable doubt is that at some time during the existence of the enterprise as alleged in the indictment, (name) was employed by or associated with the enterprise within the meaning of those terms as I have just explained.]

46

JA1436

To prove that a conspirator was either employed by or associated with an enterprise, the government must prove beyond a reasonable doubt that a defendant was connected to the enterprise in some meaningful way, and that a defendant knew of the existence of the enterprise and of the general nature of its activities.

_____

3rd Circuit Model Criminal Jury Instructions, No. 6.18.1962C-4 (2013); deletion based on fact that this is a conspiracy charge.

47

JA1437

## GOV'T'S REQUEST NO. 33

### Counts 1 and 2 - RICO Conspiracy - "Conduct or Participate in the Conduct of the Enterprise" - Defined

[Similarly, unlike the requirements to find (name) guilty of the RICO offense,] In order to find a defendant guilty of the RICO conspiracy charged in Counts 1 and 2, the government is not required to prove that the defendant [was actually employed by or associated with the enterprise, or that the defendant agreed to be employed by or to be associated with the enterprise. Nor does the RICO conspiracy charge require the government to prove that a defendant] personally participated in the operation or management of the enterprise, or agreed to personally participate in the operation or management of the enterprise. Rather, you may find a defendant guilty of the RICO conspiracy offense if the evidence establishes that that defendant knowingly agreed to facilitate or further a scheme which, if completed, would constitute a RICO violation involving at least one other conspirator who would be employed by or associated with the enterprise and who would participate in the operation or management of the enterprise.

[The fourth element that the government must prove beyond a reasonable doubt for the offense charged in Count (no.) is that (name) knowingly conducted the affairs of the enterprise or that (he) (she) knowingly participated, directly or indirectly, in the conduct of the affairs of the enterprise.   In order to prove this element, the government must prove a connection between (name) and the conduct of the affairs of the enterprise.   The government must prove that (name) took some part in the operation or management of the enterprise or that (he) (she) had some role in directing the enterprise's affairs.]

Evidence that a defendant held a managerial position within the enterprise or exerted control over the enterprise's operations is enough to prove this element, but is not

48

JA1438

USCA4 Appeal: 23-2097    Doc: 11-4    Filed: 12/06/2023    Pg: 58 of 503
Case 3:17-cr-00201-REP Document 1552-3 Filed 12/09/19 Page 58 of 100 PageID# 52300
Case 2:18-cr-00236-ER Document 95 Filed 12/09/19 Page 54 of 100

required. You may find that a defendant participated, directly or indirectly, in the conduct of the affairs of the enterprise if you find that he was a lower level participant who acted under the direction of upper management, knowingly furthering the aims of the enterprise by implementing management decisions or carrying out the instructions of those in control, or that a defendant knowingly performed acts, functions, or duties that were necessary to, or helpful in, the operation of the enterprise.

_____

3rd Circuit Model Criminal Jury Instructions, No. 6.18.1962C-5 (2013); first paragraph taken from No. 6.18.1962D, ¶ 6 (2013) (both modified as noted).

JA1439

## **GOV'T'S REQUEST NO. 34**

### **Counts 1 and 2 - RICO Conspiracy – "Unlawful Debt" - Defined**

The government is not required to prove that the defendant personally collected or agreed to personally collect any unlawful debt. Indeed, it is not necessary for you to find that the objective or purpose of the conspiracy was achieved at all. However, the evidence must establish that that defendant knowingly agreed to facilitate or further a scheme which, if completed, would include the collection of unlawful debt committed by at least one other conspirator.

[The fifth element that the government must prove beyond a reasonable doubt for the offense charged in Count (no.) is that (name) knowingly conducted the enterprise's affairs or knowingly participated, directly or indirectly, in the conduct of the enterprise's affairs "through the collection of unlawful debt."]

[To establish this element, the government must prove each of the following beyond a reasonable doubt:]

The term "unlawful debt," as used in these instructions, means a debt that (1) was [incurred or contracted in gambling activity in violation of federal, state or local law [,or which was] unenforceable in whole or in part under federal or state law because of the laws relating to usury, and (2) was incurred in connection with the business of [gambling in violation of federal, state, or local law, or the business of] lending money or anything of value at a rate that was usurious under federal or state law, where the rate was at least twice the legally enforceable rate.

_____

50

JA1440

3rd Circuit Model Criminal Jury Instructions, No. 6.18.1962C-9 (2013); first paragraph taken from No. 6.18.1962D, ¶ 7 (2013) (both modified as noted);

51

JA1441

## GOV'T'S REQUEST NO. 35

### Counts 1 and 2 - RICO Conspiracy – "Unlawful Debt" - Relevant Pennsylvania Laws

Usury is the lending of money at an illegally high rate of interest.   Usury laws can differ from one state to another, as can enforceable rates of interest.

In Pennsylvania, the enforceable rate of interest on consumer loans of up to $25,000 is six (6) percent per year for unlicensed lenders and approximately twenty-four (24) percent per year for lenders who are licensed with the Pennsylvania Department of Banking.[2]

Pennsylvania also has a law, which makes it a crime to charge a rate of interest higher than thirty-six (36) percent per year on most loans to individuals.[3]   The term "rate of interest" includes fees, charges, and any other costs associated with loans.[4]

These Pennsylvania laws on interest rate limits apply to all loans made to Pennsylvania borrowers, even if the lenders are physically located outside of Pennsylvania and have no offices in Pennsylvania, and even if the borrower signs a contract agreeing that Pennsylvania law does not apply and that the borrower is willing to pay an interest rate higher than the enforceable rate of interest.[5]   Therefore, if you believe the government has presented evidence demonstrating that the defendants agreed to collect debt from loans to borrowers living in Pennsylvania where the loans had interest rates that exceeded twice the enforceable rate of interest, you may consider such evidence as evidence that the defendants agreed to collect unenforceable debt.

---

[2] 41 P.S. § 201(a); 7 P.S. §§ 6203.A; 6213.E, 6217.1.; *Cash America Net of Nevada, LLC v. Commonwealth Dep't of Banking*, 607 Pa. 432, 437 (Pa. 2010).
[3] 18 P.S.A. § 4806.1(h).
[4] *Pennsylvania Dept. of Banking v. NCAS of Delaware, LLC*, 596 Pa. 638 (2008).
[5] *Cash America*, 607 Pa. at 451; *NCAS of Delaware, LLC, 596 Pa. at 649.*

**GOV'T'S REQUEST NO. 36**

**Counts 1 and 2 - RICO Conspiracy – "Unlawful Debt" - Relevant Laws From Other States**

Some states other than Pennsylvania also have interest rate limits on consumer loans that are either thirty-six percent per year or less.   These states include Connecticut Georgia, Maine, Maryland, Massachusetts, Montana, New Hampshire, New Jersey, New York, North Carolina, Ohio, Vermont, and West Virginia.   Washington, D.C., has an interest rate limit of 24 percent.[6]

If you believe the government has presented evidence demonstrating that the defendants agreed to collect debt from loans to borrowers living in any of those states where the loans had interest rates that exceeded twice the enforceable rates of interest in those states, you may consider such evidence as evidence that the defendants agreed to collect unenforceable debt.

Other states permitted some payday lending if the lenders obtained licenses from the states, and complied with regulations.[7]   If you believe the government has presented

---

[6]  Ariz. Rev. Stat. Ann. § 6-1263 (until July 1, 2010); Ark. Const. Art. 19, Section 13 (repealed in 2011); Conn. Gen. Stat. Ann. § 36a-563(a); Ga. Code Ann. § 16-17-1 *et seq.*; Me. Rev. Stat. Ann. tit. 9-A, §§1-201, *et al.*; Md. Code Ann., Com. Law § 12-306; Mass. Gen. Laws Ann. ch. 140, § 96; 209 Mass. Code Regs. 26.01(1); Mont. Code Ann. § 31-1-701 *et seq.*; N.H. Rev. Stat. Ann. § 399-A:17(I); N.J. Stat. Ann. 2c:21-19; N.J. Admin Code 3:24-1.3; N.Y. Penal Law § 190.40; N.C. Gen. Stat. Ann. § 53-176(a); Ohio Rev. Code Ann. § 1321.35 et seq.; Or. Rev. Stat. ch. 725A (enacted in 2010); Vt. Stat. Ann. tit. 9, § 41a(b)(1); W. Va. Code Ann. § 46A-4-107(2); 2007 District of Columbia Laws 17-42 (Act 17–115).

[7]  *See* Ala. Stat. §§ 5-18A-1 *et seq.* (setting up licensing scheme and limiting total charges to 17.5 percent of amount advanced); Alaska Stat. 06.50.010, *et seq.* (setting up licensing scheme and limiting fees on deferred deposit advances to approximately 15 percent of amount advanced); Cal. Civ. Code §§ 1789.30 *et seq.* (limiting fees for deferred deposit transactions to 15 percent of amount advanced); Colo. Stat. 5-3.101, *et seq.* (limiting size of payday loans and interest charged on them); Fla. Stat. § 560.404(6) (limiting fees charged by deferred presentment providers on currency or payment instrument); Haw. Stat. 480F-1, *et seq.* (limiting fees that check cashers can charge on deferred deposit checks); 815 ILCS §§ 122/1-1 *et seq.* (setting up a regulatory scheme for payday lending and limiting fees that can be charged on such loans); Ind. Stat. Ann. 24-4.5 –

evidence demonstrating that the defendants agreed to collect debt from loans to borrowers living in any of those states without complying with the laws of those states, you may consider such evidence as evidence that the defendants agreed to collect unenforceable debt.

---

7.101 (setting up licensing scheme limiting interest rate that can be charged on loans of up to $500); Iowa Stat. Ann. 533D.1, *et seq.* (setting up licensing scheme and limiting number of loans and fees that can be charged by licensees to approximately $15 per $100 loaned); Kan. Stat. Ann. § 16a-2-404 (requiring licenses for payday lenders and limiting rates they can charge to approximately $15 per $100 loaned); Ky. Stat. Ann. §§ 286.9-010, *et seq.* (setting up licensing scheme and limiting number of loans and fees that can be charged by licensees to approximately $15 per $100 loaned); La. Rev. Stat. §§ 9:3578:1, *et seq.* (setting maximum loan amount, requiring licenses, and limiting fees that can be charged on amount advanced); Mich. Stat. Ann. § 487.2121, *et seq.* (setting up licensing scheme and limiting fees that can be charged by licensees to no more than $15 per $100 loaned); Minn. Stat. 47.60 (limiting charges that can be assessed on consumer small loans); Miss Code. Ann. §§ 75-67-501 *et seq.* (limiting amount of short-term loans to $500 and limiting fees that can be charged on a delayed deposit check to either 20 percent or 21.95 percent, depending on amount advanced); Mo. Rev. Stat. § 408.505 (limiting amount and duration of short-term loans and interest rates and fees on such loans); Neb. Rev. Stat. §§ 45-901 *et seq.* (limiting amount and duration of short-term loans and limiting total service fees to 15 percent of initial loan amount); N.M. Stat. Ann. §§58-15-32 - 58-15-38 (limiting duration of short-term loans and limiting fees to 15.5 percent of initial loan amount, and linking amount of permissible loan to borrower's income); N.D. Cent. Code §§ 13-08-0101 *et seq.*(limiting duration and amount of permissible short-term consumer loans and limiting fees to 20 percent of initial loan amount); Okla. Stat. tit. §§ 3101 *et seq.* (limiting amount and duration of deferred deposit loans); 19 R.I. Gen. Laws §§ 19-14.2-1 *et seq.* (limiting duration of short-term loans and interest to approximately 36 percent per year); S.C. Code Ann. § 34-39-250 (limitation duration and amount of short-term loans); Tenn. Code Ann. §§ 45-17-101 *et seq.* (limiting duration and amount of short term loans and limiting service fees to approximately 15 percent of initial loan amount); Tex. Fin. Code Ann. §§ 342.251 *et seq.*, 342.601 *et seq.* (limiting amount and duration of extensions of credit and total charges, providing for maximum interest rates); Va. Code Ann. §§ §§ 6.2-1800 *et seq.* (limiting interest rate to 36 percent, and total service fee to 20 percent of loan proceeds); Wash. Rev. Code § 31.45.010, *et seq.*(setting up licensing scheme and imposing limits on duration and amount of consumer loans, number of loans that can be made to any borrower, and fees relative to amounts advanced); Wyo. Stat. Ann. § 40-14-363 (limiting finance charges that can be charged on post-dated checks and duration of loans).

## GOV'T'S REQUEST NO. 37

### COUNTS 1 and 2 – RICO Conspiracy – Ignorance of the Law is No Excuse

To convict a defendant of conspiracy to violate RICO, the government is not required to prove that a defendant knew that his acts were against the law.    Instead, a defendant must generally know the facts that make his conduct fit into the definition of the charged offense, even if the defendant did not know that those facts gave rise to a crime.    Ignorance of the law is no excuse. [8]

---

[8] *See Elonis v. United States*, -- U.S. --, 135 S. Ct. 2001, 2009 (2015).

55

## GOV'T'S REQUEST NO. 38

## COUNTS 1 and 2 – RICO Conspiracy – Knowledge of state laws not required

   To prove a defendant guilty of conspiracy to collect unlawful debt, the government is not required to prove that a defendant knew what the usury rates were in the states where the borrowers lived.[9]

   For example, in the case of a Pennsylvania borrower, the government does not need to prove that defendant Charles M. Hallinan or Wheeler K. Neff knew the that criminal usury rate was 36 percent, or that the enforceable rate of interest was 6 percent for unlicensed lenders.    Nor does the government have to prove that a defendant knew the usury laws or the enforceable rate of interest in any other state.

---

[9] *See United States v. Biasucci*, 786 F.2d 504, 512 (2d Cir. 1986).

JA1446

**GOV'T'S REQUEST NO. 39**

**COUNTS 1 and 2 – RICO CONSPIRACY -- Relevant Law Pertaining to Tribal Sovereign Immunity**

You have heard testimony and evidence regarding the concept of "tribal sovereign immunity." Tribal sovereign immunity is a legal rule that protects federally-recognized Indian tribes from being sued by states and that limits the means by which a state can enforce some of its laws against a federally-recognized tribe. Tribal sovereign immunity does not provide a tribe or its members with any rights to violate the laws of any sate. Nor does tribal sovereign immunity provide a tribe or its members with any immunity from criminal prosecution.[10]

Absent express federal law to the contrary, individual Indians going beyond reservation boundaries are generally subject to state laws otherwise applicable to all other citizens of that state.[11]

---

[10] *Michigan* v. *Bay Mills Indian Community*, 134 S. Ct. 2024, 2030, 2034-35 (2014); *Kiowa Tribe of Oklahoma v. Manufacturing Tech., Inc*., 523 U.S. 751, 755 (1998); *Colorado v. Western Sky Fin., L.L.C*., 845 F. Supp. 2d 1178, 1181 (D. Colo. 2011); *Consumer Fin. Protection Bureau v. CashCall, Inc.*, 15 Cv. 7522, 2016 WL 4820635 (C.D. Cal. Aug. 31, 2016).
[11] *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148-49 (1973).

57

JA1447

## GOV'T'S REQUEST NO. 40

**Counts 1 and 2 - RICO Conspiracy - Existence of an Agreement**

Now that I've explained the some of the terminology in the RICO statute, I'm going to repeat the three elements that the government has to prove beyond a reasonable doubt in order for you to find a defendant guilty of the RICO conspiracy charges in Counts 1 and 2 of the indictment:

First:    That two or more persons agreed to conduct or to participate, directly or indirectly, in the conduct of the affairs of an enterprise engaged in, or the activities of which affected, interstate commerce, through the collection of unlawful debt;

Second:    That the defendant was a party to or member of that agreement; and

Third:    That the defendant joined the agreement or conspiracy knowing of its objective to conduct or participate, directly or indirectly, in the conduct of an enterprise's affairs through the collection of unlawful debt, and intending to join together with at least one other alleged conspirator to achieve that objective; that is, that the defendant and at least one other alleged conspirator shared a unity of purpose and the intent to achieve the objective of conducting or participating in the conduct of an enterprise's affairs through the collection of unlawful debt.

I'm now going to explain what is meant by an agreement in this context.    The government must prove beyond a reasonable doubt that two or more persons knowingly and intentionally arrived at a mutual understanding or agreement, either spoken or unspoken, to work together to achieve the overall objective of the conspiracy, to conduct or to participate, directly or indirectly, in the conduct of the affairs of an enterprise through collection of unlawful debt.

58

JA1448

The government does not have to prove the existence of a formal or written agreement, or an express oral agreement spelling out the details of the understanding.   The government also does not have to prove that all the members of the conspiracy directly met, or discussed between themselves their unlawful objective, or agreed to all the details, or agreed to what the means were by which the objective would be accomplished.   The government is not even required to prove that all the people named in the indictment were, in fact, parties to the agreement, or that all members of the alleged conspiracy were named, or that all members of the conspiracy are even known.   What the government must prove beyond a reasonable doubt is that two or more persons in some way or manner arrived at some type of agreement, mutual understanding, or meeting of the minds to try to accomplish a common and unlawful objective.

You may consider both direct evidence and circumstantial evidence in deciding whether the government has proved beyond a reasonable doubt that an agreement or mutual understanding existed.   You may find the existence of a conspiracy based on reasonable inferences drawn from the actions and statements of the alleged members of the conspiracy, from the circumstances surrounding the scheme, and from evidence of related facts and circumstances which prove that the activities of the participants in a criminal venture could not have been carried out except as the result of a preconceived agreement, scheme, or understanding.

---

3rd Circuit Model Criminal Jury Instructions, 6.18.1962D (2013); 6.18.371C (2015) (modified as noted); .

USCA4 Appeal: 23-2097    Doc: 11-4      Filed: 12/06/2023    Pg: 69 of 503
Case 3:17-cr-00630-REN-Document 95 Filed 12/09/19 Page 65 of 100
Case 2:18-cr-00130-REN Document 950 Filed 12/09/19 Page 65 of 100 PageID# 52311

## GOV'T'S REQUEST NO. 41

### Counts 1 and 2 - RICO Conspiracy - Membership in the Agreement

If you find that a criminal agreement or conspiracy existed, then in order to find a defendant guilty of conspiracy you must also find that the government proved beyond a reasonable doubt that that defendant knowingly and intentionally joined that agreement or conspiracy during its existence. The government must prove that that defendant knew the goal or objective of the agreement or conspiracy and voluntarily joined it during its existence, intending to achieve the common goal or objective and to work together with the other alleged conspirators toward that goal or objective.

The government need not prove that a defendant knew everything about the conspiracy or that he knew everyone involved in it, or that he was a member from the beginning. The government also does not have to prove that a defendant played a major or substantial role in the conspiracy.

You may consider both direct evidence and circumstantial evidence in deciding whether a defendant joined the conspiracy, knew of its criminal objective, and intended to further the objective. Evidence which shows that a defendant only knew about the conspiracy, or only kept "bad company" by associating with members of the conspiracy, or was only present when it was discussed or when a crime was committed, is not sufficient to prove that that defendant was a member of the conspiracy even if that defendant approved of what was happening or did not object to it. Likewise, evidence showing that a defendant may have done something that happened to help a conspiracy does not necessarily prove that he joined the conspiracy. You may, however, consider this evidence, with all the other evidence, in deciding whether the government proved beyond a reasonable doubt that a defendant joined the conspiracy.

_____

3rd Circuit Model Criminal Jury Instructions, 6.18.371D (2015) (unmodified).

60

JA1450

USCA4 Appeal: 23-2097    Doc: 11-4      Filed: 12/06/2023    Pg: 70 of 503
Case 3.17-cr-00130-ER  Document 95  Filed 12/09/18  Page 66 of 100
Case 3:18-cr-00130-ER  Document 3  Filed 12/09/18  Page 66 of 100   PageID# 52312

## GOV'T'S REQUEST NO. 42

### Counts 1 and 2 - RICO Conspiracy - Mental States

In order to find a defendant guilty of conspiracy you must find that the government proved beyond a reasonable doubt that that defendant joined the conspiracy knowing of its objective and intending to help further or achieve that objective. That is, the government must prove: (1) that that defendant knew of the objective or goal of the conspiracy, (2) that that defendant joined the conspiracy intending to help further or achieve that goal or objective, and (3) that that defendant and at least one other alleged conspirator shared a unity of purpose toward that objective or goal.

You may consider both direct evidence and circumstantial evidence, including a defendant's words or conduct and other facts and circumstances, in deciding whether that defendant had the required knowledge and intent. For example, evidence that a defendant derived some benefit from the conspiracy or had some stake in the achievement of the conspiracy's objective might tend to show that that defendant had the required intent or purpose that the conspiracy's objective be achieved.

_____

3rd Circuit Model Criminal Jury Instructions, 6.18.371E (2015) (unmodified).

61

JA1451

## GOV'T'S REQUEST NO. 43

### Counts 1 and 2 - RICO Conspiracy - Overt Acts

Counts 1 and 2 of the indictment allege that in furtherance of the conspiracies, various overt acts were committed. To prove the crime of conspiracy to conduct or to participate, directly or indirectly, in the conduct of the affairs of an enterprise through the collection of unlawful debt, the government is not required to prove that any overt acts were performed. Under the law, the agreement to commit the offense is alone sufficient to prove a charge of conspiracy against a defendant, if you find that that defendant intentionally became a member of the conspiracy. Proof of the commission of overt acts is merely evidence from which you may infer the existence of the conspiracy.

_____

Salinas v. United States, 522 U.S. 52, 63 (1997); see also 3rd Circuit Model Criminal Jury Instructions, 6.18.1962D, Comment "No Overt Act Requirement" (2013)

JA1452

## GOV'T'S REQUEST NO. 44

**Counts 1 and 2 - RICO Conspiracy - Success Immaterial**

   The government is not required to prove that any of the members of the conspiracy were successful in achieving the objective of the conspiracy. You may find a defendant guilty of conspiracy if you find that the government proved beyond a reasonable doubt the elements I have explained, even if you find that the government did not prove that any of the conspirators actually committed any other offense against the United States. Conspiracy is a criminal offense separate from the offense that was the objective of the conspiracy; conspiracy is complete without the commission of that offense.

_____

3rd Circuit Model Criminal Jury Instructions, No. 6.18.371G (2015) (unmodified).

JA1453

USCA4 Appeal: 23-2097    Doc: 11-4    Filed: 12/06/2023    Pg: 73 of 503
Case 3.17-cr-00126-FL   Document 95   Filed 12/09/19   Page 65 of 130   PageID# 52315
Case 2:18-cr-00126-LRN   Document 95   Filed 12/09/19   Page 65 of 100

## GOV'T'S REQUEST NO. 45

### Counts 1 and 2 - RICO Conspiracy - Charged Period and Duration

Although Count 1 of the indictment charges that the conspiracy existed from at least 2007 until at least early 2013, and Count 2 of the indictment charges that the conspiracy existed from at least November 2011 until at least March 2012, it is not essential that the government prove that the conspiracy started or ended on or about those specific dates. It is sufficient if you find that in fact the charged conspiracy was formed and existed for some time within the period set forth in the indictment.[12]

A conspiracy ends when the objectives of the conspiracy have been achieved or when all members of the conspiracy have withdrawn from it. However, a conspiracy may be a continuing conspiracy and if it is, it lasts until there is some affirmative showing that it has ended or that all its members have withdrawn. A conspiracy may be a continuing one if the agreement includes an understanding that the conspiracy will continue over time. Also, a conspiracy may have a continuing purpose or objective and, therefore, may be a continuing conspiracy.[13]

---

[12]     See 1A O'Malley, Grenig, and Lee, Federal Jury Practice and Instructions, § 13.05 (6th ed. 2010).

[13]     3rd Circuit Model Criminal Jury Instructions, 6.18.371I (2015) (unmodified).

JA1454

USCA4 Appeal: 23-2097    Doc: 11-4    Filed: 12/06/2023    Pg: 74 of 503
Case 3:17-cr-00263-REP Document 11-4 Filed 12/09/16 Page 74 of 100 PageID# 52316
Case 3:16-cr-00001-ER Document 95 Filed 12/09/16 Page 70 of 100

## GOV'T'S REQUEST NO. 46

### Counts 1 and 2 - RICO Conspiracy - Acts and Statements of Co-Conspirators

Evidence has been admitted in this case that certain persons, who are alleged to be co-conspirators of the defendants, did or said certain things. The acts or statements of any member of a conspiracy are treated as the acts or statements of all the members of the conspiracy, if these acts or statements were performed or spoken during the existence of the conspiracy and to further the objectives of the conspiracy.

Therefore, you may consider as evidence against a defendant any acts done or statements made by any members of the conspiracy, during the existence of and to further the objectives of the conspiracy. You may consider these acts and statements even if they were done and made in a defendant's absence and without his knowledge. As with all the evidence presented in this case, it is for you to decide whether you believe this evidence and how much weight to give it.

Acts done or statements made by an alleged co-conspirator before a defendant joined the alleged conspiracy may also be considered by you as evidence against that defendant. However, acts done or statements made before the alleged conspiracy began or after it ended may only be considered by you as evidence against the person who performed that act or made that statement.

That concludes my instructions on conspiracy generally. I will now instruct you in the specifics of RICO conspiracy.

———————————————

3rd Circuit Model Criminal Jury Instructions, 6.18.371K (2015) (modified as noted).

65

JA1455

## GOV'T'S REQUEST NO. 47

### Counts 1 and 2 - RICO Conspiracy - Agreement to Commit a Racketeering Offense

As I previously stated, the agreement to commit a RICO offense is the essential aspect of the racketeering conspiracy offense.

The jury may find that a defendant has entered into the requisite agreement to violate the RICO statute when the government has proven beyond a reasonable doubt that the defendant agreed with at least one other co-conspirator that [at least two racketeering acts of the type or types of racketeering activity listed in the indictment, or] a collection of unlawful debt would be committed by a member of the conspiracy in the conduct of the affairs of the enterprise. The government is not required to prove that the defendant personally [committed two racketeering acts or a] collected an unlawful debt, or that he agreed to personally [commit two racketeering acts or a] collect an unlawful debt. Rather, it is sufficient if the government proves beyond a reasonable doubt that the defendant agreed to participate in the enterprise with the knowledge and intent that at least one member of the RICO conspiracy, who could be, but need not be, the defendant himself, would [commit at least two racketeering acts or a] collect an unlawful debt in the conduct of affairs of the enterprise.

Furthermore, to establish the requisite conspiratorial agreement, the government is not required to prove that each co-conspirator explicitly agreed with every other co-conspirator to violate section 1962(c), knew all his fellow conspirators, or was aware of all of the details of the conspiracy. Rather, it is only required that the defendant knew the general nature and common purpose of the conspiracy and that the conspiracy extended beyond his individual role.

Moreover, the elements of a RICO conspiracy, such as the conspiratorial agreement, the defendant's knowledge of it, and the defendant's participation in the conspiracy,

JA1456

may be inferred from circumstantial evidence. For example, when the evidence establishes that the defendant and at least one other conspirator collected unlawful debt in furtherance of the charged enterprise's affairs, you may infer the existence of the requisite agreement to commit a RICO offense. However, you must determine whether, based on the entirety of the evidence, the government has proven that the defendant entered into the required conspiratorial agreement.

Furthermore, it is not necessary that the government prove that a particular defendant was a member of the conspiracy from its beginning. Different persons may become members of the conspiracy at different times.

If you find that there is a conspiracy, you may consider the acts and statements of any other member of the conspiracy during and in the furtherance of the conspiracy as evidence against a defendant whom you have found to be a member of it. When persons enter into a conspiracy, they become agents for each other, so that the act or statement of one conspirator during the existence of, and in furtherance of, the conspiracy is considered the act or statement of all the other conspirators and is evidence against them all.

Moreover, a defendant may be convicted as a conspirator even though he or she plays a minor role in the conspiracy, provided that you find beyond a reasonable doubt that the conspiracy existed and that the defendant knowingly participated in the conspiracy with the intent to accomplish its objectives or assist other conspirators in accomplishing its objectives.

––––––––––––––––––––––––––

Seventh Circuit Pattern Jury Instructions (1999 ed.) (modified as noted); Eleventh Circuit Pattern Jury Instructions § 71.2 (2003 ed.); Salinas v. United States, 522 U.S. 52, 62-65 (1997); United States v. Lawson, 535 F.3d 434, 445 (6th Cir. 2008); United States v. Useni, 516 F.3d 634, 646 (7th Cir. 2008); United States v. Ashman, 979 F.2d 469, 492 (7th Cir. 1992); United States v. Crockett, 979 F.2d 1204, 1208-09 (7th Cir. 1992); United States v. Melton, 689 F.2d 679, 683 (7th Cir. 1982); United States v. Quinones, 511 F.3d 289, 316 (2d Cir. 2007); United States v. Browne, 505 F.3d 1229, 1265 (11th Cir. 2007); United States v. Smith, 413 F.3d 1253, 1272-73 (10th Cir. 2005); United States v. Saadey, 393 F.3d 669, 676 (6th Cir. 2005); United States v.

Pipkins, 378 F.3d  1281, 1288 (11th Cir. 2004); United States v. Lee, 374 F.3d 637, 646-47 (8th Cir. 2004); United States v. Harriston, 329 F.3d 779, 785 (11th Cir. 2003); United States v. Ciccone, 312 F.3d 535, 542 (2d Cir. 2002); United States v. Abbell, 271 F.3d 1286, 1299 (11th Cir. 2001); United States v. Nguyen, 255 F.3d 1335, 1341 (11th Cir. 2001); United States v. Zichettello, 208 F.3d 72, 100 (2d Cir. 2000); United States v. Posada-Rios, 158 F.3d 832, 857 (5th Cir. 1998); United States v. To, 144 F.3d 737, 744 (11th Cir. 1998); United States v. Starrett, 55 F.3d 1525, 1543-44 (11th Cir. 1995); United States v. Quintanilla, 2 F.3d 1469, 1484 (7th Cir. 1993); United States v. Eufrasio, 935 F.2d 553, 577 (3d Cir. 1991); United States v. Rastelli, 870 F.2d 822, 825 (2d Cir. 1989); United States v. Neapolitan, 791 F.2d 489, 498 (7th Cir. 1986); United States v. Elliot, 571 F.2d 880, 903-04 (5th Cir. 1978); United States v. Carlock, 806 F.2d 535, 547 (5th Cir.1986); United States v. Sutherland, 656 F.2d 1181, 1187 n.4 (5th Cir. 1981).

JA1458

## GOV'T'S REQUEST NO. 48

**Count 3 - Conspiracy to Commit an Offense Against the United States - Elements of the Offense**

Count 3 of the indictment charges that from at least July 2013 until at least April 2014, defendants Charles M. Hallinan and Wheeler K. Neff conspired and agreed with each other and other persons, known and unknown to the grand jury, to commit offenses against the United States, that is: (a) mail fraud, (b) wire fraud, and (c) money laundering.

It is a federal crime for two or more persons to agree or conspire to commit any offense against the United States, even if they never actually achieve their objective.   A conspiracy is a kind of criminal partnership.

In order for you to find a defendant guilty of conspiracy to commit mail fraud, wire fraud, and money laundering [an offense against the United States], you must find that the government proved beyond a reasonable doubt each of the following four (4) elements:

First:   That two or more persons agreed to commit mail fraud, wire fraud, or money laundering [an offense(s) against the United States], as charged in Count 3 of the indictment. I will explain the elements of the offense of these offenses to you shortly.;

Second:   That the defendant was a party to or member of that agreement;

Third:   That the defendant joined the agreement or conspiracy knowing of its objective to commit an offense against the United States and intending to join together with at least one other alleged conspirator to achieve that objective; that is, that the defendant and at least one other alleged conspirator shared a unity of purpose and the intent to achieve a common goal or objective, to commit an offense against the United States; and

69

JA1459

Fourth:    That at some time during the existence of the agreement or conspiracy, at least one of its members performed an overt act in order to further the objectives of the agreement.[14]

I have already explained to you the law of conspiracy, and those instructions apply to this offense as well, with the following difference.   As I have instructed you, the RICO conspiracies charged in Counts 1 and 2 do not require that the government prove that an overt act was committed.   However, the conspiracy to commit mail fraud, wire fraud, and money laundering charged in Count 3 does require that the government must prove beyond a reasonable doubt that during the existence of the conspiracy at least one member of the conspiracy performed at least one of the overt acts described in the indictment, for the purpose of furthering or helping to achieve the objectives of the conspiracy.

Count 3 of the indictment alleges certain overt acts.   The government does not have to prove that all of these acts were committed or that any of these acts were themselves illegal.   Also, the government does not have to prove that a defendant personally committed any of the overt acts.   The government must prove beyond a reasonable doubt that at least one member of the conspiracy committed at least one of the overt acts alleged in the indictment and committed it during the time that the conspiracy existed, for the purpose of furthering or helping to achieve the objectives of the conspiracy.   You must unanimously agree on the overt act that was committed.[15]

---

[14]    Up to this point, this instruction is taken from 3rd Circuit Model Criminal Jury Instructions, 6.18.371A (2015) (modified as noted).

[15]    This paragraph and the preceding paragraph are taken from 3rd Circuit Model Criminal Jury Instructions, 6.18.371F (2015) (modified as noted).

USCA4 Appeal: 23-2097   Doc: 11-4   Filed: 12/06/2023   Pg: 80 of 503
Case 3.17-cr-00630-ELH   Document 95   Filed 12/09/18   Page 73 of 100
Case 1:18-cr-00630-ELH   Document 95   Filed 12/09/18   Page 73 of 100 PageID# 52322

<u>Count 3 of</u> the indictment charges a conspiracy to commit [several] <u>three</u> federal crimes<u>, that is, mail fraud, wire fraud, and money laundering</u>. The government does not have to prove that the alleged conspirators agreed to commit all of these crimes. The government, however, must prove that they agreed to commit at least one of the object crimes, and you must unanimously agree on which crime. You cannot find a defendant guilty of conspiracy unless you unanimously agree that the same federal crimes were the objectives of the conspiracy. It is not enough if some of you agree that one of the charged crimes was the objective of the conspiracy and others agree that a different crime was the objective of the conspiracy.[16]

<u>Thus, the focus of Count 3 is whether the defendants agreed to commit mail fraud, wire fraud, and money laundering, not whether any mail fraud, wire fraud, or money laundering violations actually occurred. Counts 4 through 17 of the indictment charge actual mail fraud, wire fraud, and money laundering violations. I will now explain to you the elements of mail fraud, wire fraud, and money laundering. Those instructions also apply to the conspiracy charged in Count 3 in that the instructions define what the government alleges the defendants charged in the conspiracy were agreeing to do.</u>

[I will explain each of these elements in more detail.]

---

[16]   This paragraph is the last paragraph of 3rd Circuit Model Criminal Jury Instructions, 6.18.371C (2015) (modified as noted).

## GOV'T'S REQUEST NO. 49

### Counts 4 and 5 – Mail Fraud – Essential Elements

  Counts 4 and 5 of the indictment <u>each</u> charge Charles M. Hallinan and Wheeler K. Neff with mail fraud, which is a violation of federal law.

  In order to find a defendant guilty of this offense, you must find that the government proved each of the following three elements beyond a reasonable doubt:

  First: That the defendant knowingly devised a scheme to defraud or to obtain money or property by materially false or fraudulent pretenses, representations or promises, or willfully participated in such a scheme with knowledge of its fraudulent nature;

  Second: That the defendant acted with the intent to defraud; and

  Third: That in advancing, furthering, or carrying out the scheme, the defendant used the mails [or a private or commercial interstate carrier], or caused the mails [or a private or commercial interstate carrier] to be used.

_____

3rd Circuit Model Criminal Jury Instructions, No. 6.18.1341 (2015) (modified as noted).

72

JA1462

## GOV'T'S REQUEST NO. 50

### Counts 6-8 – Wire Fraud - Essential Elements

Counts 6-8 of the indictment <u>each</u> charge Charles M. Hallinan and Wheeler K. Neff with wire fraud, which is a violation of federal law.

In order to find a defendant guilty of this offense, you must find that the government proved each of the following three elements beyond a reasonable doubt:

First: That the defendant knowingly devised a scheme to defraud or to obtain money or property by materially false or fraudulent pretenses, representations or promises, or willfully participated in such a scheme with knowledge of its fraudulent nature;

Second: That the defendant acted with the intent to defraud; and

Third: That in advancing, furthering, or carrying out the scheme, the defendant transmitted any writing, signal, or sound by means of a wire, radio, or television communication in interstate commerce or caused the transmission of any writing, signal, or sound of some kind by means of a wire, radio, or television communication in interstate commerce.

<u>The offenses of mail fraud and wire fraud have certain elements in common. I will instruct you on these common elements first.</u>

_____

3rd Circuit Model Criminal Jury Instructions, No. 6.18.1343 (2015) (modified as noted).

JA1463

## GOV'T'S REQUEST NO. 51

### Counts 4-8 – Mail and Wire Fraud - "Knowingly" - Defined

      The offenses of mail and wire fraud charged in the indictment require that the government prove that a defendant acted "knowingly" with respect to certain elements of the offenses. This means that the government must prove beyond a reasonable doubt that that defendant was conscious and aware of the nature of his actions and of the surrounding facts and circumstances, as specified in the definition of the offense charged.

      In deciding whether a defendant acted "knowingly", you may consider evidence about what he said, what he did and failed to do, how he acted, and all the other facts and circumstances shown by the evidence that may prove what was in his mind at that time.

      The government is not required to prove that the defendant knew his acts were against the law.

_____

3rd Circuit Model Criminal Jury Instructions, No. 5.02 (2015) (unmodified).

74

JA1464

## GOV'T'S REQUEST NO. 52

### Counts 4-8 – Mail and Wire Fraud – "Scheme to Defraud or to Obtain Money or Property" - Defined

The first element that the government must prove beyond a reasonable doubt <u>for both mail fraud and wire fraud</u> is that the defendant knowingly devised or willfully participated in a scheme to defraud the victims named in the indictment, of money or property by materially false or fraudulent pretenses, representations or promises.

A "scheme" is merely a plan for accomplishing an object.

"Fraud" is a general term which embraces all the various means by which one person can gain an advantage over another by false representations, suppression of the truth, or deliberate disregard for the truth.

Thus, a "scheme to defraud" is any plan, device, or course of action to deprive another of money or property by means of false or fraudulent pretenses, representations or promises reasonably calculated to deceive persons of average prudence.

In this case, the indictment alleges that the scheme to defraud was carried out by making false or fraudulent statements, representations, claims, or documents. The representations which the government charges were made as part of the scheme to defraud are set forth in the indictment [(which I have already read to you)]. The government is not required to prove every misrepresentation charged in the indictment. It is sufficient if the government proves beyond a reasonable doubt that one or more of the alleged material misrepresentations were made in furtherance of the alleged scheme to defraud. However, you cannot convict the defendant unless all of you agree as to at least one of the material misrepresentations.

A statement, representation, claim or document is false if it is untrue when made and if the person making the statement, representation, claim or document or causing it to be made knew it was untrue at the time it was made.

75

JA1465

A representation or statement is fraudulent if it was falsely made with the intention to deceive.

In addition, deceitful statements of half-truths or the concealment of material facts or the expression of an opinion not honestly entertained may constitute false or fraudulent statements. The arrangement of the words, or the circumstances in which they are used, may convey the false and deceptive appearance.

The deception need not be premised upon spoken or written words alone. If there is deception, the manner in which it is accomplished is immaterial.

*[(The failure to disclose information may constitute a fraudulent representation if the defendant was under a legal, professional or contractual duty to make such a disclosure, the defendant actually knew such disclosure ought to be made, and the defendant failed to make such disclosure with the intent to defraud.)]*

The false or fraudulent representation must relate to a material fact or matter. A material fact is one which would reasonably be expected to be of concern to a reasonable and prudent person in relying upon the representation or statement in making a decision as whether to proceed with the sale of merchandise or services to the defendant.

This means that if you find that a particular statement of fact was false, you must determine whether that statement was one that a reasonable person might have considered important in making his or her decision. The same principle applies to fraudulent half-truths or omissions of material facts.

In order to establish a scheme to defraud, the government must also prove that the alleged scheme contemplated depriving another of money or property.

76

JA1466

However, the government is not required to prove that the defendant himself originated the scheme to defraud. Furthermore, it is not necessary that the government prove that the defendant actually realized any gain from the scheme or that any intended victim actually suffered any loss. In this case, it so happens that the government does contend that the proof establishes that the victims named in the indictment were defrauded and that the defendant profited. Although whether or not the scheme actually succeeded is really not the question, you may consider whether it succeeded in determining whether the scheme existed.

If you find that the government has proved beyond a reasonable doubt that the overall scheme to defraud charged in the indictment did exist and that the defendant knowingly devised or participated in the overall scheme charged in the indictment, you should then consider the second element.

_____

3rd Circuit Model Criminal Jury Instructions, No. 6.18.1341-1 (2015) (modified as noted).

77

USCA4 Appeal: 23-2097    Doc: 11-4    Filed: 12/06/2023    Pg: 87 of 503
Case 3.17-cr-00261-FL Document 95-1 Filed 12/09/19 Page 85 of 100
Case 2:18-cr-00286-EM Document 95 Filed 12/09/19 Page 80 of 100 PageID# 52329

## GOV'T'S REQUEST NO. 53

### Counts 4-8 – Mail and Wire Fraud – Intent to Defraud - Defined

The second element that the government must prove beyond a reasonable doubt for both mail fraud and wire fraud is that the defendant acted with the specific intent to defraud.

To act with an "intent to defraud" means to act knowingly and with the intention or the purpose to deceive or to cheat.

In considering whether the defendant acted with an intent to defraud, you may consider, among other things, whether he acted with a desire or purpose to bring about some gain or benefit to himself or someone else or with a desire or purpose to cause some loss to someone.

That concludes my instructions on the common elements of mail fraud and wire fraud. I will now instruct you on the different elements of each.

_____

3rd Circuit Model Criminal Jury Instructions, No. 6.18.1341-4 (2015) (unmodified).

78

JA1468

# GOV'T'S REQUEST NO. 54

## Counts 4 and 5 – Mail Fraud – "Use of Mails" - Defined

The third element that the government must prove beyond a reasonable doubt to prove a mail fraud violation is that in advancing, furthering, or carrying out the scheme, the defendant used the mails, or caused the mails to be used.

The government is not required to prove that the defendant himself actually mailed anything or that he even intended that the mails would be used to further, or to advance, or to carry out the scheme.

However, the government must prove beyond a reasonable doubt, that the mails were, in fact, used in some manner to further, or to advance, or to carry out the scheme to defraud. The government must also prove either that the defendant used the mails, or that he knew the use of the mails would follow in the ordinary course of business or events, or that he should reasonably have anticipated that the mails would be used.

It is not necessary that the item mailed was itself false or fraudulent or contained any false or fraudulent statement, representation, or promise, or contained any request for money or thing of value.

However, the government must prove beyond a reasonable doubt that the use of the mails in some way furthered, or advanced, or carried out the scheme.

_____

3rd Circuit Model Criminal Jury Instructions, No. 6.18.1341-5 (2015) (modified as noted).

79

JA1469

USCA4 Appeal: 23-2097    Doc: 11-4      Filed: 12/06/2023    Pg: 89 of 503
Case 3.17-cr-00201-ELH   Document 652-3   Filed 12/29/18   Page 86 of 101   PageID# 52331
Case 2:18-cr-00190-ELH   Document 95   Filed 12/09/18   Page 89 of 100

## GOV'T'S REQUEST NO. 55

### Counts 4 and 5 – Mail Fraud - Each Use of the Mails a Separate Offense

Each use of the mails to advance, or to further, or to carry out the scheme or plan may be a separate violation of the mail fraud statute.

———————————————————

3rd Circuit Model Criminal Jury Instructions, No. 6.18.1341-6 (2015) (unmodified).

JA1470

## GOV'T'S REQUEST NO. 56

### Counts 6-8 - Wire Fraud - "Transmits by means of wire, radio, or television communication in interstate commerce" - Defined

The third element that the government must prove beyond a reasonable doubt <u>to prove a wire fraud violation</u> is that in advancing, furthering, or carrying out the scheme, the defendant transmitted a writing, signal, or sound by means of a wire, radio, or television communication in interstate commerce or caused the transmission of a writing, signal, or sound of some kind by means of a wire, radio, or television communication in interstate commerce.

The phrase "transmits by means of wire, radio, or television communication in interstate commerce" means to send from one state to another by means of telephone or telegraph lines or by means of radio or television. The phrase includes a telephone conversation by a person in one state with a person in another state, or electronic signals sent from one state to another, such as by fax or financial wire. The use of the Internet to send a message, such as an e-mail, or to communicate with a web site may constitute a wire transmission in interstate commerce.

The government is not required to prove that the defendant actually used a wire communication in interstate commerce or that he even intended that anything be transmitted in interstate commerce by means of a wire, radio, or television communication to further, or to advance, or to carry out the scheme or plan to defraud <u>and to obtain</u> [scheme or plan for obtaining] money or property by means of false or fraudulent pretenses, representations, or promises.

However, the government must prove beyond a reasonable doubt that a transmission by a wire, radio, or television communication facility in interstate commerce was, in fact, used in some manner to further, or to advance, or to carry out the scheme to defraud. The government must also prove either that the defendant used wire, radio, or television

81

JA1471

communication in interstate commerce, or that he knew the use of the wire, radio, or television communication in interstate commerce would follow in the ordinary course of business or events, or that he should reasonably have anticipated that wire, radio, or television communication in interstate commerce would be used.

It is not necessary that the information transmitted by means of wire, radio, or television communication in interstate commerce itself was false or fraudulent or contained any false or fraudulent pretense, representation, or promise, or contained any request for money or thing of value.

However, the government must prove beyond a reasonable doubt that the use of the wire, radio, or television communication in interstate commerce furthered, or advanced, or carried out, in some way, the scheme.

---

3rd Circuit Model Criminal Jury Instructions, No. 6.18.1343-1 (2015) (modified as noted).

JA1472

USCA4 Appeal: 23-2097    Doc: 11-4      Filed: 12/06/2023    Pg: 92 of 503
Case 3:17-cr-00461-REP Document 15523 filed 12/09/19 page 85 of 101 PageID# 52334
Case 2:18-cr-00236-EH Document 95 Filed 12/09/18 Page 80 of 100

## GOV'T'S REQUEST NO. 57

### Counts 6-8 – Wire Fraud - Each Transmission by Wire Communication a Separate Offense

Each transmission by wire communication in interstate commerce to advance, or to further, or to carry out the scheme or plan may be a separate violation of the wire fraud statute.

_____

3rd Circuit Model Criminal Jury Instructions, No. 6.18.1343-2 (2015) (unmodified).

# GOV'T'S REQUEST NO. 58

## Counts 9-17 – Money Laundering – the Indictment and the Statute

[The defendant is] Each of Counts 9-17 charge defendant Charles M. Hallinan with unlawfully [transporting] transmitting and transferring funds or monetary instruments to or from the United States, in violation of Title 18, United States Code, section 1956(a)(2)(A). [The indictment reads as follows:]

[Read Indictment]

Section 1956(a)(2)(A) of Title 18, United States Code, provides:

> Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States-
>
> (A) with the intent to promote the carrying out of specified unlawful activity . . . (is guilty of a crime).

--------------------------

3-50A, Modern Federal Jury Instructions-Criminal, ¶ 50A.03, Instruction 50A-11 (Matthew Bender, 2016) (modified as noted).

JA1474

USCA4 Appeal: 23-2097      Doc: 11-4        Filed: 12/06/2023      Pg: 94 of 503
Case 3:17-cr-00261-REP   Document 95   Filed 12/09/16   Page 90 of 100
Case 3:16-cr-00130-REP   Document 95   Filed 12/09/16   Page 90 of 100   PageID# 52336

## GOV'T'S REQUEST NO. 59

### Counts 9-17 – Money Laundering – Essential Elements

In order to prove the crime of unlawful [transportation] <u>transmittal or transference</u> of funds or monetary instruments with the intent to promote the carrying on of specified unlawful activity in violation of section 1956(a)(2)(A), the government must establish beyond a reasonable doubt each of the following elements:

First, that the defendant [transported] <u>transmitted or transferred</u> a monetary instrument or funds from a place in the United States to or through a place outside the United States.

Second, that the defendant did so with the intent to promote the carrying on of specified unlawful activity.

_____

3-50A, <u>Modern Federal Jury Instructions-Criminal</u>, ¶ 50A.03, Instruction 50A-12 (Matthew Bender, 2016) (modified as noted).

JA1475

## GOV'T'S REQUEST NO. 60

**Counts 9-17 – Money Laundering – First Element – Transmittal or Transference of a Monetary Instrument or Funds to or from the United States**

The first element which the government must prove beyond a reasonable doubt is that the defendant [transported] transmitted or transferred a monetary instrument or funds from a place in the United States to or through a place outside the United States.

The term "monetary instrument" means coin or currency of the United States or of any other country, travelers' checks, personal checks, bank checks, money orders, investment securities in bearer form or otherwise in such form that title thereto passes upon delivery, and negotiable instruments in bearer form or otherwise in such form that title thereto passes upon delivery.

The term "funds" refers to money or negotiable paper which can be converted into currency.

["Transportation" is not a word which requires a definition; it is a word which has its ordinary, everyday meaning. The government need not prove that the defendant physically carried the funds or monetary instrument in order to prove that he is responsible for transporting it. All that is required is proof that the defendant caused the funds or monetary instrument to be transported.]

To "transport, transmit, or transfer" includes all means to carry, send, mail, ship, or move money. It includes any physical means of transferring or transporting funds, and also electronic transfer by wire or computer or other means.

To satisfy this element, the government must also prove that the funds or monetary instruments were [transported] transmitted or transferred from somewhere in the

86

JA1476

USCA4 Appeal: 23-2097    Doc: 11-4    Filed: 12/06/2023    Pg: 96 of 503
Case 3:17-cr-00291-REP   Document 515-2   Filed 12/09/19   Page 93 of 101   PageID# 52338
Case 2:18-cr-00130-EE   Document 95   Filed 12/09/19   Page 92 of 100

United States to or through someplace outside the United States.

_____

3-50A, <u>Modern Federal Jury Instructions-Criminal</u>, ¶ 50A.03, Instruction 50A-13 (Matthew Bender, 2016) (modified as noted). Underlined paragraph taken from Pattern Crim. Jury Instr. 11th Cir. OI 74.3 (2016).

JA1477

## GOV'T'S REQUEST NO. 61

### Counts 9-17 – Money Laundering – Second Element – Intent to Promote Specified Unlawful Activity

The second element which the government must prove beyond a reasonable doubt is that the defendant acted with intent to promote the carrying on of specified unlawful activity. [namely mail fraud and wire fraud.]   As a matter of law, the term "specified unlawful activity" includes a violation of the mail fraud statute and the wire fraud statute, as charged in this case.   I have previously explained the elements of mail fraud and wire fraud.

To act intentionally means to act deliberately and purposefully, not by mistake or accident, with the purpose of promoting, facilitating or assisting the carrying on of mail fraud and wire fraud. If you find that the defendant acted with the intention or deliberate purpose of promoting, facilitating, or assisting in the carrying on of mail fraud and wire fraud, then the second element is satisfied.

------------------------

3-50A, Modern Federal Jury Instructions-Criminal, ¶ 50A.03, Instruction 50A-14 (Matthew Bender, 2016) (modified as noted). The inserted language is the third paragraph of 3rd Circuit Model Criminal Jury Instructions, No. 6.18.1956-3 (2014).

88

JA1478

# GOV'T'S REQUEST NO. 62

## Counts 4 through 17 - Accomplice Liability: Aiding and Abetting

A person may be guilty of an offense because he personally committed the offense himself or because he aided and abetted another person in committing the offense. A person who has aided and abetted another person in committing an offense is often called an accomplice.   The person whom the accomplice aids and abets is known as the principal.

In this case, the government alleges that both defendants aided and abetted the principal in committing the [offenses as] mail and wire fraud charged in <u>Counts 4 through 8, and that defendant Charles M. Hallinan aided and abetted the principal in committing the money laundering charged in Counts 9-17 of</u> the indictment. In order to find a defendant guilty of these offenses because he aided and abetted the principal in committing these offenses, you must find that the government proved beyond a reasonable doubt each of following four (4) requirements:

First:   That the principal committed the offense charged by committing each of the elements of the offense charged, as I have explained those elements to you in these instructions.   The principal need not have been charged with or found guilty of the offense, however, as long as you find that the government proved beyond a reasonable doubt that he committed the offense.

Second:   That the defendant knew that the offense charged was going to be committed or was being committed by the principal, and

Third:   That the defendant knowingly did some act for the purpose of aiding, assisting, soliciting, facilitating, or encouraging the principal in committing the specific offense charged and with the intent that the principal commit that specific offense, and

Fourth:   That the defendant's acts did, in some way, aid, assist, facilitate, or encourage the principal to commit the offense.

In deciding whether the defendant had the required knowledge and intent to satisfy the third requirement for aiding and abetting, you may consider both direct and circumstantial evidence including the defendant's words and actions and the other facts and circumstances. However, evidence that the defendant merely associated with persons involved in a criminal venture or was merely present or was merely a knowing spectator during the commission of the offense is not enough for you to find him guilty as an aider and abetter. If the evidence shows that the defendant knew that the offense was being committed or was about to be committed, but does not also prove beyond a reasonable doubt that it was his intent and purpose to aid, assist, encourage, facilitate, or otherwise associate himself with the offense, you may not find the defendant guilty of the offenses as an aider and abettor. The government must prove beyond a reasonable doubt that the defendant in some way participated in the offense committed by the principal as something the defendant wished to bring about and to make succeed.

To show that the defendant performed an act in furtherance of the offense charged, to satisfy the fourth requirement, the government needs to show some affirmative participation by the defendant which at least encouraged the principal to commit the offense. That is, you must find that the defendant's act did, in some way, aid, assist, facilitate, or encourage the principal to commit the offense. The defendant's acts need not further aid, assist, facilitate, or encourage every part or phase or element of the offense charged; it is enough if the defendant's acts further aid, assist, facilitate, or encourage, only one or some parts or phases of the offense. Also, the defendant's acts need not themselves be against the law.

_____

3rd Circuit Model Criminal Jury Instructions, No. 7.02 (2014) (modified as noted).

JA1480

USCA4 Appeal: 23-2097   Doc: 11-4      Filed: 12/06/2023    Pg: 100 of 503
Case 3:17-cr-00126-EMC   Document 95   Filed 12/09/18   Page 90 of 100
Case 3:18-cr-00126-EMC   Document 95   Filed 12/09/18   Page 90 of 100   PageID# 52342

## GOV'T'S REQUEST NO. 63

**Election of Foreperson; Unanimous Verdict; Do Not Consider Punishment; Duty to Deliberate; Communication with Court**

That concludes my instructions explaining the law regarding the testimony and other evidence, and the offenses charged. Now let me explain some things about your deliberations in the jury room, and your possible verdicts.

First: The first thing that you should do in the jury room is choose someone to be your foreperson. This person will speak for the jury here in court. He or she will also preside over your discussions. However, the views and vote of the foreperson are entitled to no greater weight than those of any other juror.

Second: I want to remind you that your verdict, whether it is guilty or not guilty, must be unanimous. To find a defendant guilty of an offense, every one of you must agree that the government has overcome the presumption of innocence with evidence that proves each element of that offense beyond a reasonable doubt. To find a defendant not guilty, every one of you must agree that the government has failed to convince you beyond a reasonable doubt.

Third: If you decide that the government has proved a defendant guilty, then it will be my responsibility to decide what the appropriate punishment should be. You should never consider the possible punishment in reaching your verdict.

Fourth: As I have said before, your verdict must be based only on the evidence received in this case and the law I have given to you. You should not take anything I may have said or done during trial as indicating what I think of the evidence or what I think your verdict should be. What the verdict should be is the exclusive responsibility of the jury.

Fifth: Now that all the evidence is in, the arguments are completed, and once I have finished these instructions, you are free to talk about the case in the jury room. In fact, it is your duty to talk with each other about the evidence, and to make every reasonable effort you can

91

to reach unanimous agreement. Talk with each other, listen carefully and respectfully to each other's views, and keep an open mind as you listen to what your fellow jurors have to say. Do not hesitate to change your mind if you are convinced that other jurors are right and that your original position was wrong. But do not ever change your mind just because other jurors see things differently, or just to get the case over with. In the end, your vote must be exactly that--your own vote. It is important for you to reach unanimous agreement, but only if you can do so honestly and in good conscience. Listen carefully to what the other jurors have to say, and then decide for yourself if the government has proved the defendant guilty beyond a reasonable doubt.

No one will be allowed to hear your discussions in the jury room, and no record will be made of what you say. You should all feel free to speak your minds.

*(Remember, if you elected to take notes during the trial, your notes should be used only as memory aids. You should not give your notes greater weight than your independent recollection of the evidence. You should rely upon your own independent recollection of the evidence or lack of evidence and you should not be unduly influenced by the notes of other jurors. Notes are not entitled to any more weight than the memory or impression of each juror.)*

Sixth: Once you start deliberating, do not talk, communicate with, or provide any information about this case by any means to the court officials, or to me, or to anyone else except each other. During your deliberations, you may not use any electronic device or media, such as a telephone, cell phone, smart phone, iPhone, Blackberry or computer; the internet, any internet service, or any text or instant messaging service; or any internet chat room, blog, or website such as Facebook, Instagram, Snapchat, My Space, LinkedIn, YouTube or Twitter, to communicate to anyone any information about this case or to conduct any research about this case.

Seventh: If you have any questions or messages, your foreperson should write them down on a piece of paper, sign them, and then give them to the court official who will give

92

JA1482

them to me. I will first talk to the lawyers about what you have asked, and I will respond as soon as I can. In the meantime, if possible, continue with your deliberations on some other subject.

*(If you want to see any of the exhibits that were admitted in evidence, you may send me a message and, if I can legally do so, I will have those exhibits provided to you.)*

One more thing about messages. Do not ever write down or tell anyone how you or anyone else voted. That should stay secret until you have finished your deliberations. If you have occasion to communicate with the court while you are deliberating, do not disclose the number of jurors who have voted to convict or acquit on any offense*(s)*.

_____

3rd Circuit Model Criminal Jury Instructions, No. 3.16 (2015) (unmodified).

93

JA1483

**GOV'T'S REQUEST NO. 64**

**Verdict Form**

   A verdict form has been prepared that you should use to record your verdicts.

   Take this form with you to the jury room. When you have reached your unanimous verdict, the foreperson should write the verdict on the form, date and sign it, return it to the courtroom and give the form to my courtroom deputy to give to me. If you decide that the government has proved a defendant guilty of any or all of the offenses charged beyond a reasonable doubt, say so by having your foreperson mark the appropriate place on the form. If you decide that the government has not proved a defendant guilty of some or all of the offenses charged beyond a reasonable doubt, say so by having your foreperson mark the appropriate place on the form.

_____

3rd Circuit Model Criminal Jury Instructions, No. 3.17 (2015) (unmodified).

94

USCA4 Appeal: 23-2097 Doc: 11-4 Filed: 12/06/2023 Pg: 104 of 503
Case 3:17-cr-00131-REP Document 112-3 Filed 12/09/16 Page 100 of 100 PageID# 52346
Case 2:16-cr-00130-ER Document 95 Filed 12/09/16 Page 100 of 100

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served via

ECF's electronic filing system upon:


Edwin J. Jacobs, Jr
Jacobs and Barbone
1125 Pacific Avenue
Atlantic City, NJ 08401
*Counsel for Charles M. Hallinan*

Andrew K. Stutzman
Stradley Ronon Stevens & Young, LLP
2005 Market Street, Suite 2600
Philadelphia, PA 19103-7018
*Counsel for Charles M. Hallinan*

Dennis J. Cogan
2000 Market Street, Suite 2925
Philadelphia, PA 19103
*Counsel for Wheeler K. Neff*

Christopher D. Warren
1730 North Fifth Street
Suite 604
Philadelphia, PA    19122
*Counsel for Wheeler K. Neff*


/s/ Mark. B. Dubnoff
MARK B. DUBNOFF
JAMES A. PETKUN
Assistant United States Attorneys


Date: December 9, 2016

95

JA1485

# Exhibit 4

HAC8TUC1

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                           16 Cr. 91 (PKC)

5    SCOTT TUCKER and
     TIMOTHY MUIR,                          Trial
6
                   Defendants.
7
     ------------------------------x
8                                           New York, N.Y.
                                            October 12, 2017
9                                           10:15 a.m.

10

     Before:
11                    HON. P. KEVIN CASTEL

12                                          District Judge
                                              and a jury
13                         APPEARANCES

14   JOON H. KIM
          Acting United States Attorney for the
15        Southern District of New York
     BY:  NIKETH V. VELAMOOR
16        HAGAN C. SCOTTEN
          SAGAR K. RAVI
17        Assistant United States Attorneys

18   FREEMAN NOOTER & GINSBERG
          Attorneys for Defendant Tucker
19   BY:  LEE A. GINSBERG
          NADJIA LIMANI
20           -and-
     STAMPUR & ROTH
21   BY:  JAMES M. ROTH

22   BATH & EDMONDS, P.A.
          Attorneys for Defendant Muir
23   BY:  THOMAS J. BATH
             -and-
24   BEVERLY VAN NESS

25
```

JA1487

HacWtuc6                    Charge

 1 | cheated these people in their time of need.  They ran roughshod
 2 | over courts and regulators.  They were trying to enforce laws
 3 | that were in place to protect these people, and they tried to
 4 | cover it all up with lies.  This case really was about the lies
 5 | and greed of those two men.
 6 |          THE COURT:  All right.  Thank you, Mr. Velamoor.
 7 |          MR. VELAMOOR:  We'd ask you to find them guilty.
 8 |          THE COURT:  Thank you.
 9 |          Ladies and gentlemen, you can stand up and stretch.
10 |          Members of the jury, you have now heard all of the
11 | evidence in the case as well as the final arguments of the
12 | parties.  We have reached the point where you are about to
13 | undertake your final duties as jurors.  You have paid careful
14 | attention to the evidence.  I am confident that you will act
15 | together with fairness and impartiality to reach a just verdict
16 | in the case.
17 |          My duty is to instruct you as to the law, and it is
18 | your duty to accept these instructions of law and to apply them
19 | to the facts as you determine them.
20 |          On these legal matters, you must take the law as I
21 | give it to you.  If any attorney has stated a legal principle
22 | different from any that I state to you in my instructions, it
23 | is my instructions you must follow.  You must not substitute
24 | your own ideas of what the law is or ought to be.
25 |          You are not to infer from any of my questions or

USCA4 Appeal: 23-2097    Doc: 11-4    Filed: 12/06/2023    Pg: 198 of 503

1    rulings or anything else I have said during this trial that I

2    have any view as to the credibility of the witnesses or how you

3    should decide this case.

4            As members of the jury, you are the sole and exclusive

5    judges of the facts.  You pass upon the evidence.  You

6    determine the credibility of the witnesses.  You resolve such

7    conflicts as there may be in the testimony.  You draw whatever

8    reasonable inferences you decide to draw from the facts as you

9    have determined them.  You determine the weight of the

10   evidence.

11           It is the duty of the attorneys to object when the

12   other side offers testimony or other evidence that the attorney

13   believes is not properly admissible.  Therefore, you should

14   draw no inference from the fact that an attorney objected to

15   any evidence.  Nor should you draw any inference from the fact

16   that I sustained or overruled an objection.

17           From time to time, the lawyers and I had sidebar

18   conferences and other conferences out of your hearing.  These

19   conferences involved procedural and other matters, and none of

20   the matters relating to them should enter into your

21   deliberations.

22           Your verdict must be based solely upon the evidence

23   developed at trial, or the lack of evidence.  It would be

24   improper for you to consider any personal feelings you may have

25   about the defendants' race, religion, national origin, sex or

1   age.  The parties in this case are entitled to a trial free

2   from prejudice, and our judicial system cannot work unless you

3   reach your verdict through a fair and impartial consideration

4   of the testimony.

5           Similarly, under your oath as jurors, you are not to

6   be swayed by sympathy.  Once you let fear, prejudice, bias or

7   sympathy interfere with your thinking, there is a risk that you

8   will not arrive at a just verdict.  Your verdict must be based

9   exclusively upon the evidence, or the lack of evidence.

10          The fact that the prosecution is brought in the name

11  of the United States of America entitles the government to no

12  greater and no lesser consideration than accorded to any other

13  party to a litigation.  All parties, whether the government or

14  an individual, stand as equals under the law.

15          The two defendants in this case, Scott Tucker and

16  Timothy Muir, have separately entered pleas of not guilty to

17  the indictment.  As I told you before, the law presumes a

18  defendant to be innocent of all charges against him.  I

19  therefore instruct you that each defendant is to be presumed by

20  you to be innocent throughout your deliberations until such

21  time, if ever, that you, as a jury, are satisfied that the

22  government has proven its case beyond a reasonable doubt.

23          The presumption of innocence alone is sufficient to

24  require an acquittal of a defendant unless and until, after

25  careful and impartial consideration of all the evidence, you,

USCA4 Appeal: 23-2097    Doc: 11-4    Filed: 12/06/2023    Pg: 110 of 503
Case 3:10-cr-00461-REP Document 2024 at 305 Filed 06/21/2023 Page 1076 PageID# 52352265

 1    as jurors, are convinced unanimously of a defendant's guilt

 2    beyond a reasonable doubt.

 3         The question that naturally arises is: what is a

 4    reasonable doubt?  The words almost define themselves.  It is a

 5    doubt founded in reason and arising out of the evidence, or the

 6    lack of evidence.  It is a doubt that a reasonable person has

 7    after carefully weighing all the evidence.  Proof beyond a

 8    reasonable doubt, therefore, must be proof of such a convincing

 9    nature that a reasonable person would not hesitate to rely and

10    act upon it in matters of the most importance in his own or her

11    own personal affairs.

12         Reasonable doubt is a doubt that appeals to your

13    reason, your judgment, your experience, your common sense.  It

14    is not a caprice or whim; it is not speculation.  It is not an

15    excuse to avoid the performance of an unpleasant duty.  It is

16    not sympathy for a defendant.

17         The burden of proof here is upon the prosecution to

18    prove the guilt of each defendant beyond a reasonable doubt.

19    It must satisfy this burden as to each and every element of the

20    crimes charged.  The burden never shifts to a defendant.  The

21    law never imposes upon a defendant in a criminal case the

22    burden of calling any witnesses or producing any evidence.  The

23    fact that one party called more witnesses and introduced more

24    evidence does not mean that you should find in favor of that

25    party.  It is the quality of the evidence that matters.

1          If, after a fair and impartial consideration of all

2     the evidence, you can honestly say that you are not satisfied

3     of the guilt of a defendant -- that is, if you have such a

4     doubt as would cause you, as a prudent person, to hesitate

5     before acting in matters of importance to yourself -- then you

6     have a reasonable doubt.  In that circumstance, it is your duty

7     to return a not guilty verdict for that defendant.

8          On the other hand, if, after a fair and impartial

9     consideration of all the evidence, you can honestly say that

10    you are satisfied of the guilt of a defendant and that you do

11    not have a doubt that would prevent you from acting in

12    important matters in the personal affairs of your own life,

13    then you have no reasonable doubt.  Under that circumstance,

14    you should return a guilty verdict for that defendant on that

15    particular count.

16         The evidence in this case is the sworn testimony of

17    the witnesses, the exhibits received into evidence and any

18    stipulations made by the parties.  By contrast, and you've

19    heard me say this before, the questions of a lawyer are not

20    evidence.  It is the witness's answers that are evidence, not

21    the questions standing alone.

22         Testimony that has been stricken or excluded by me, or

23    I've sustained an objection, is not evidence and may not be

24    considered by you in rendering your verdict.  If I instruct you

25    that evidence is received for only a limited purpose -- in

USCA4 Appeal: 23-2097    Doc: 11-4    Filed: 12/06/2023    Pg: 112 of 503
Case 3:10-cr-00461-REP    Document 1284-4    Filed 06/21/2027    Page 117    PageID# 52354

1    other words, it may not be considered for the truth of its

2    content, only as it may bear on state of mind, and there are

3    other areas where I gave you limiting instructions -- then you

4    must consider it only for that limited purpose.

5          Arguments by lawyers are not evidence, because the

6    lawyers are not witnesses.  What the lawyers have said to you

7    in their openings and closings was intended to help you

8    understand the evidence.  As I said in the case of legal

9    principles, a similar thing is true with facts.  If any lawyer

10   has made a statement during the closing argument that is

11   different from your recollection of the evidence, it is your

12   recollection of the evidence that controls.  Of course, any

13   statements I have made during the trial also are not evidence.

14         To constitute evidence, exhibits first must be

15   admitted or received in evidence.  Exhibits marked for

16   identification but not admitted are not evidence, nor are

17   materials brought forth only to refresh a witness's

18   recollection.

19         It is for you alone to decide the weight, if any, to

20   be given to the testimony you have heard and the exhibits you

21   have seen.

22         Generally, there are two types of evidence that you

23   may consider in reaching your verdict.  One type is direct

24   evidence.  Direct evidence is when a witness testifies about

25   something he or she knows by virtue of his or her own senses --

USCA4 Appeal: 23-2097    Doc: 11-4    Filed: 12/06/2023    Pg: 113 of 503

1    something he or she has seen, felt, touched, smelled or heard.

2    The other type is circumstantial evidence, which is evidence

3    from which you may infer the existence of certain facts.  Let

4    me give you an example to help you understand the difference.

5        If you were outside this morning, standing in the

6    rain, getting wet and looking at that dark cloud pouring water

7    on you, you would have direct evidence that it was raining.

8    But now I want you to consider a very different situation.

9    Let's say you were in this courtroom, and let's say all the

10   windows were covered, and that when you came to court in the

11   morning, it was a bright, sunny day.  The windows are covered,

12   so you can't look out and see what's going on.  Now, imagine in

13   this hypothetical situation that the doors of the courtroom

14   opened up and one person walked in with a raincoat that was

15   visibly wet, and a few minutes later, someone else came in with

16   an umbrella that was wet, dripping wet.  On the combination of

17   those facts, it would be reasonable for you to infer that it

18   had been raining.

19       That is all there is to circumstantial evidence.  You

20   infer, on the basis of reason and experience and common sense,

21   from one established fact the existence or nonexistence of some

22   other fact.

23       Circumstantial evidence is of no less value than

24   direct evidence.  As a general rule, the law makes no

25   distinction between direct evidence and circumstantial

USCA4 Appeal: 23-2097    Doc: 11-4       Filed: 12/06/2023    Pg: 114 of 503    Total Pages:(114 of 503)
Case 3:17-cr-00046-REP Document 22524-1 Filed 05/22/2027 Page Page 107 of 94 PageID# 523569

1   evidence.  It simply requires that your verdict be based on all

2   the evidence.

3           You have had the opportunity to observe all the

4   witnesses.  It is now your job to decide how believable each

5   witness was in his or her testimony.  You are the sole judges

6   of the credibility of each witness and of the importance of his

7   or her testimony.

8           You should carefully scrutinize all of the testimony

9   of a witness, the circumstances under which the witness

10  testified, the impression the witness made when testifying, and

11  any other matter in evidence that may help you decide the truth

12  and the importance of each witness's testimony.

13          In other words, in assessing credibility, you may size

14  up a witness in light of his or her demeanor, the explanations

15  given and all of the other evidence in the case.  In making

16  your credibility determinations, use your common sense, your

17  good judgment and your everyday life experiences.

18          If you believe that a witness knowingly testified

19  falsely concerning any important matter, whether at trial or in

20  a prior proceeding, you may distrust the witness's testimony

21  concerning other matters.  You may reject all of the testimony

22  or you may accept such parts of the testimony that you believe

23  are true and give it such weight as you think it deserves.

24          In deciding whether to believe a witness, you may take

25  into consideration any evidence of hostility or affection that

USCA4 Appeal: 23-2097    Doc: 11-4    Filed: 12/06/2023    Pg: 115 of 503

1   the witnesses may have towards one of the parties.  Likewise,

2   you should consider evidence of any other interest or motive

3   that the witness may have in cooperating with a particular

4   party.  You should also take into account any evidence that a

5   witness or party may benefit in some way from the outcome of

6   the case.

7        It is your duty to consider whether the witness has

8   permitted any bias or interest to color his or her testimony.

9   If you find that a witness is biased, you should view his or

10  her testimony with caution, weigh it with care and subject it

11  to close and searching scrutiny.

12       Of course, the mere fact that a witness is interested

13  in the outcome of the case does not mean that he or she has not

14  told the truth.  It is for you to decide from your observations

15  and applying your common sense and experience and all the other

16  considerations mentioned whether the possible interest of any

17  witness or of any party has intentionally or otherwise colored

18  or distorted his or her testimony.  You are not required to

19  disbelieve an interested witness.  You may accept as much of

20  his or her testimony as you deem reliable and reject as much as

21  you deem unworthy of acceptance.

22       You have heard testimony from government witnesses who

23  pleaded guilty to charges.  You are instructed that you are to

24  draw no conclusions or inferences about the guilt of any

25  defendant from the fact that a prosecution witness pled guilty

USCA4 Appeal: 23-2097    Doc: 11-4        Filed: 12/06/2023    Pg: 116 of 503
Case 3.17-cv-00416-RDB-DOS Document 1064 05/21/2007 Page Page 162 PageID# 52358 1

1   to charges, even if they are somehow related to the charges

2   against the defendants.  The decision of each witness to plead

3   guilty was a personal decision about his or her own guilt.  It

4   may not be used by you in any way as evidence against or

5   unfavorable to either of the defendants on trial here.

6           Experience will tell you that the government must rely

7   on the testimony of witnesses who admit to participating in

8   various crimes.  The law allows the use of accomplice

9   testimony.  The testimony of an accomplice may alone be enough

10  to establish an element of a crime if the jury believes that

11  the testimony establishes that element beyond a reasonable

12  doubt.

13          However, because of the possible interest an

14  accomplice may have in testifying, an accomplice's testimony

15  should be scrutinized with special care and caution.  It does

16  not follow that simply because a person has admitted

17  participating in one or more crimes, he or she is incapable of

18  telling the truth about what happened.

19          Like the testimony of any other witness, the testimony

20  of an accomplice witness should be given such weight as it

21  deserves in light of the facts and circumstances before you,

22  taking into account the witness's demeanor and candor, the

23  strength and accuracy of his or her recollection, his or her

24  background, and the extent to which his or her testimony is or

25  is not corroborated by other evidence in the case.

JA1497

1           You may consider whether an accomplice witness -- like

2      any other witness -- has an interest in the outcome of the

3      case, and if so, whether it has affected his or her testimony.

4           In evaluating the testimony of an accomplice witness,

5      you should ask yourself whether the accomplice would benefit

6      more by lying or by telling the truth.  Was his or her

7      testimony made up in any way because he believed or hoped that

8      he or she would receive favorable treatment from testifying

9      falsely?  Or did he or she believe that their interests would

10     be best served by testifying truthfully?  If you believe that

11     the witness was motivated by hopes of personal gain, was the

12     motivation one that would cause him to lie, or was it one that

13     would cause him to tell the truth?  Did this motivation color

14     his or her testimony?

15          If you find that the testimony was false, you should

16     reject it.  However, if, after a cautious and careful

17     examination of an accomplice witness's testimony and assessment

18     of his or her credibility, you are satisfied that the witness

19     told the truth, you should accept it as credible and act upon

20     it accordingly.

21          As with any witness, the issue of credibility need not

22     be decided in an all-or-nothing fashion.  Even if you find a

23     witness testified falsely in one part, you still may accept his

24     testimony in other parts, or you may disregard all of it.  This

25     is a determination entirely for you, the jury.

USCA4 Appeal: 23-2097    Doc: 11-4      Filed: 12/06/2023    Pg: 118 of 503
Case 3.17-cv-00461-REP-DDC Document Document 805d 05/21/2327age Page 164 PageID# 523673

 1          The testimony of a witness may be discredited by

 2     showing that the witness testified falsely concerning a

 3     material matter, or by evidence that at some other time the

 4     witness said or did something, or failed to say or do

 5     something, which is inconsistent with the testimony the witness

 6     gave at this trial.

 7          Here, you have heard evidence that witnesses made

 8     statements on earlier occasions that counsel argue are

 9     inconsistent with the witness's trial testimony.  Evidence of a

10     prior inconsistent statement may not be considered by you as

11     affirmative evidence of the fact asserted in the statement.

12     Evidence of the prior inconsistent statement was placed before

13     you for the more limited purpose of helping you decide whether

14     to believe the trial testimony of the witness who contradicted

15     him or herself.  If you find that the witness made an earlier

16     statement that conflicts with his or her testimony, you may

17     consider that fact in deciding how much of his or her

18     testimony, if any, to believe.  If you believe that a witness

19     has been discredited in this manner, it is exclusively your

20     right to give the testimony of that witness whatever weight you

21     think it deserves.

22          In making this determination, you may consider whether

23     the witness purposely made a false statement or whether it was

24     an innocent mistake; whether the inconsistency concerns an

25     important fact, or whether it has to do with a small detail;

1    whether the witness had an explanation for the inconsistency,

2    and whether that explanation appealed to your common sense.

3              You have heard evidence during the trial that

4    witnesses have discussed the facts of the case and their

5    testimony with the lawyers before the witness appeared in

6    court.

7              You may consider that fact when you are evaluating a

8    witness's credibility, but there is nothing either unusual or

9    improper about a witness meeting with lawyers before testifying

10   so that the witness can be aware of the subjects he or she will

11   be questioned about, focus on those subjects and have the

12   opportunity to review relevant exhibits before being questioned

13   about them in court.  Such consultation helps conserve your

14   time and the Court's time.  In fact, it would be unusual for a

15   lawyer to call a witness without such consultation.

16             You may not draw any inference, favorable or

17   unfavorable, from the fact that any person in addition to the

18   two defendants is not on trial here.  You also may not

19   speculate as to the reasons why other persons are not on trial.

20   Nor may you consider the fact that the government has charged

21   others who are not being tried here.  Those matters are wholly

22   outside your concern and have no bearing on your function as

23   jurors.

24             (Continued on next page)

25

USCA4 Appeal: 23-2097    Doc: 11-4    Filed: 12/06/2023    Pg: 120 of 503
Case 3:17-cv-00461-REP Document 1125-4 Filed 05/22/2017 Page 120 of 187 PageID# 52362

1        THE COURT:  There are persons whose names you have

2   heard during the course of the trial but who did not appear

3   here to testify.  I instruct you that each party had an equal

4   opportunity, or lack of opportunity, to call any of these

5   witnesses.  Therefore, you should draw no inference and reach

6   no conclusion as to what they would have testified to had they

7   been called.  Their absence should not affect your judgment in

8   any way.

9        You should, however, remember my instruction that the

10  law does not impose on a defendant in a criminal case the

11  burden or duty of calling any witnesses or producing any

12  evidence.

13       Under our Constitution, a defendant has no obligation

14  to testify or to present any evidence, because it is the

15  government's burden to prove the defendant guilty beyond a

16  reasonable doubt.  In this case, one of the defendants, Timothy

17  Muir, did testify, and he was subject to cross-examination like

18  any other witness.  You should evaluate and examine his

19  testimony, just as you would the testimony of any other

20  witness.

21       One of the defendants, Scott Tucker, did not testify.

22  That burden of proof remains with the government throughout the

23  trial and never shifts to the defendant.  So the burden of

24  proof to prove the case beyond a reasonable doubt remains with

25  the government and a defendant is never required to prove that

1    he is innocent.

2              You may not attach any significance to the fact that

3    Mr. Tucker did not testify.  No adverse inference against him

4    may be drawn by you because he did not take the witness stand.

5    You may not consider this against Mr. Tucker in any way in your

6    deliberations in the jury room.

7              Some of the exhibits that were admitted into evidence

8    were in the form of charts and summaries.  For these charts and

9    summaries that were admitted into evidence, you should consider

10   them as you would any other evidence.  You may consider the

11   underlying evidence in evaluating the charts.

12             There is no legal requirement that the government

13   prove its case through any particular means.  While you are to

14   carefully consider the evidence introduced by the government,

15   you are not to speculate as to why law enforcement used the

16   techniques that they did or why they did not use other

17   techniques.  Your concern is to determine whether, on the

18   evidence or the lack of evidence, the guilt of a defendant on a

19   particular count has been proven beyond a reasonable doubt.

20             Among the exhibits received into evidence, some

21   documents are redacted.  Redacted means that part of the

22   document was taken out.  You are to concern yourself only with

23   the part of the exhibit that has been admitted into evidence.

24   You should not consider or speculate on any possible reason why

25   other parts of the documents have been deleted.

1        In this case you heard evidence in the form of

2   stipulations of testimony.  A stipulation of testimony, as I

3   told you I think at the time, is an agreement between the

4   parties that, if called as a witness, the person would have

5   given certain testimony.  You must accept as true the fact that

6   the witness would have given that testimony.

7        You have also heard evidence in the form of

8   stipulations of fact.  A stipulation of fact is an agreement

9   between the parties that a certain fact is true.  You must

10  regard such agreed-upon facts as true.

11       The weight or importance of the testimony or the fact

12  is a matter for you, the jury, to decide.

13       The government has offered evidence to show that on a

14  different occasion, defendant Scott Tucker engaged in conduct

15  that it views as similar to the conduct charged in the

16  indictment.  The government offered this evidence to endeavor

17  to establish what it views as Mr. Tucker's intent and

18  knowledge, and the absence of mistake or accident as to the

19  offenses charged in the indictment.

20       You will recall there was evidence of a prior

21  conviction that was offered and received on this basis.  You

22  may not consider this evidence as a substitute for proof that

23  Mr. Tucker committed the crimes charged in this indictment.

24  Nor may you consider this evidence as proof that Mr. Tucker has

25  a criminal personality or a bad character or propensity to

Case 23-2097, Doc 11-4, Filed 12/06/2023, Pg 123 of 503
Case 3:17-cv-00461-REP Document 31 Filed 05/21/2021 Page 107 PageID# 5236

1    commit any kind of a crime.  The evidence of Mr. Tucker's prior

2    conviction may not be considered by you for any other purpose

3    than what I explained to you.

4              This evidence may not be considered in any respect as

5    to defendant Timothy Muir.

6              Recordings of conversations have been received into

7    evidence and played for you.  Transcripts of these recorded

8    conversations have also been furnished to you.  Transcripts of

9    the conversations are being given to you solely for your

10   convenience and to assist you in following conversations or

11   identifying speakers.

12             The tapes themselves are the evidence in the case, and

13   the transcripts are not evidence, they are merely an aid to

14   listening.  If you perceive any difference between the

15   transcripts and the recordings, it is the recordings you should

16   consider, and not the transcripts.

17             I instruct you that anything you may have seen or

18   heard about this case outside the courtroom is not evidence and

19   must be disregarded.  Indeed, as I have instructed you

20   throughout the case, you may not read, view, or listen to any

21   media or press report or Internet or social media posting about

22   this case or about the people, companies, or issues referred to

23   during the trial.  Your verdict must be based solely on the

24   evidence or lack of evidence that came out in this courtroom

25   and the Court's instructions on the law.

1          In your deliberations and in reaching your verdict,

2     you must consider each count separately, and you must weigh the

3     evidence as to each charged defendant separately for each

4     count, and determine whether the government has carried its

5     burden of proof with respect to that defendant and that charge.

6     I will provide you with a verdict form, and you will need to

7     report the results of your deliberations for each defendant on

8     each count on the verdict form.  To do so, you will need to

9     keep track during your deliberations of which defendant and

10    which charge you are considering and the legal elements

11    applicable to the charge.  You are to proceed through the

12    questions in the verdict form in the order they are presented.

13    I will give you additional copies of the verdict form so that

14    you can have them during your deliberations, so each of you can

15    have a copy.  But you will only have the one verdict form,

16    returned at the conclusion of the case, signed and dated by

17    your foreperson.

18         I will also give you two copies of the indictment.

19    The indictment, I will not read it, but it will be with you in

20    the jury room, and you should remember the indictment is not

21    evidence.  It's the allegations in this case and it's what the

22    government must prove.  That's what the indictment is.

23         The indictment contains 14 counts.  Each count

24    constitutes a separate offense or crime.  You must consider

25    each count of the indictment separately, and you must return a

USCA4 Appeal: 23-2097    Doc: 11-4    Filed: 12/06/2023    Pg: 125 of 503
Case 3.17-cr-00461-RBS-DEM Document 141-4 Filed 05/21/2027 Page 125 of 504 PageID# 52367

1   separate, unanimous verdict as to each count and to each

2   defendant separately.

3        You may only find a defendant guilty of a particular

4   count if the government has proven each element of the offense

5   charged with respect to that count beyond a reasonable doubt

6   against that defendant.  Your verdict as to one count or one

7   defendant should not control your decision as to any other

8   count or any other defendant.

9        The defendants, Scott Tucker and Timothy Muir, have

10  been charged in this indictment, and as I said, it's just a

11  accusation.  It's the means by which a criminal case is

12  started.  It creates no presumption and permits no inference

13  that a defendant is guilty.  You are to give no weight to the

14  fact that an indictment has been returned against the

15  defendants.

16       I am going to summarize the structure of the

17  indictment and the charges, and then we will break before I

18  give you instructions on the individual counts.

19       There are 14 charges, and they fall into two types of

20  charges:  Conspiracy charges and substantive charges.  I will

21  explain the difference between those two concepts as I go

22  along.

23       Count One charges that the defendants were members of

24  a conspiracy to operate an enterprise that collected one or

25  more unlawful debts.  Counts Two, Three and Four charge that

USCA4 Appeal: 23-2097    Doc: 11-4    Filed: 12/06/2023    Pg: 126 of 503

1    the defendants, through the enterprise, collected unlawful

2    debts.  So Count One is a conspiracy count, and Counts Two,

3    Three and Four are substantive counts.

4         Count Five charges that the defendants were members of

5    a conspiracy to commit wire fraud by misrepresenting the terms

6    and the identity of the lenders of the loans extended by the

7    enterprise.  Count Six charges the defendants with committing

8    the actual crime of wire fraud by misrepresenting the terms and

9    lenders of the loans extended by the enterprise.  So Count Five

10   is a conspiracy count and Count Six is a substantive count.

11        Count Seven charges that the defendants were members

12   of a conspiracy to commit money laundering.  Counts Eight and

13   Nine charge the defendants with the actual crimes of money

14   laundering.  So Count Seven is the conspiracy count and Counts

15   Eight and Nine are the substantive counts.

16        I assure you I am going to go through the elements of

17   each of these counts, but I am giving you kind of the overview.

18        Counts Ten through Fourteen charge that the defendants

19   gave false and inaccurate information, and failed to provide

20   information they were required to provide under federal law,

21   and used a chart or table so as to consistently understate the

22   annual percentage rate of loans, by making disclosures that

23   materially understated the true cost of loans extended by

24   lenders.

25        So you can see from what I have given you in the

USCA4 Appeal: 23-2097    Doc: 11-4    Filed: 12/06/2023    Pg: 127 of 503
Case 3:17-cv-00461-REP Document 1158 Filed 05/22/2023 Page 103 of 492 PageID# 52369

1    overview that there are three different conspiracies charged in

2    the indictment.  A conspiracy is an agreement of two or more

3    people to join together to accomplish some unlawful purpose.

4    You may find a defendant guilty of the crime of conspiracy even

5    if a substantive crime that was the object of the conspiracy is

6    not proven.

7        Both defendants, Mr. Tucker and Mr. Muir, have pleaded

8    not guilty to all counts of the indictment.

9        By presenting a defense and pointing out evidence to

10   you, the defendants have not assumed any burden of proof.  The

11   burden remains on the government to prove each element and

12   every element of the crimes charged beyond a reasonable doubt.

13   In fact, no defendant had to present any defense.  Because a

14   defendant has presented a defense, you can consider that

15   defense in deciding if the government has proven its case

16   beyond a reasonable doubt.

17       Now, the indictment refers to various dates.  I

18   instruct you that it does not matter if a specific event is

19   alleged to have occurred on or about a certain date or month

20   but the testimony or other evidence indicates that in fact it

21   was a different date or month.  It is also not essential that

22   the government prove that a conspiracy started and ended on any

23   specific date.  The law requires only a substantial similarity

24   between the dates alleged in the indictment and the dates

25   established by the evidence.  Further, it is not required that

USCA4 Appeal: 23-2097   Doc: 11-4      Filed: 12/06/2023   Pg: 128 of 503
Case 3.17-cr-00461-GRD00091   Document 1555   Filed 05/22/2027   Page 104 of 94   PageID# 523703

1   the defendant you are considering committed a charged crime

2   throughout the entire period charged in a particular count; it

3   is sufficient for the government to prove beyond a reasonable

4   doubt that at some time during the period charged in the

5   indictment, the defendant participated in the charged crime.

6           The indictment also refers to various amounts of

7   money.  If the indictment charges that certain monetary amounts

8   were involved, and the testimony or exhibits indicate that, in

9   fact, a different monetary amount was involved, it is

10  sufficient if you find that the amounts involved are

11  substantially similar to the amounts alleged in the indictment.

12          With that, ladies and gentlemen, we are going to break

13  for the evening.  Please do not discuss the case among

14  yourselves or with anyone.  There is more to come in my

15  instructions.  And I will see you all for a 9:30 start tomorrow

16  morning.

17          Have a very pleasant evening.

18          (Jury exits courtroom)

19          THE COURT:  I just want counsel to be aware of the

20  note, which was Court Exhibit 19, which was about the conflict

21  in schedule.

22          I hope everybody has a restful evening, and I will see

23  you tomorrow morning at 9:30.

24          (Adjourned to October 13, 2017, at 9:30 a.m.)

25

USCA4 Appeal: 23-2097   Doc: 11-4      Filed: 12/06/2023    Pg: 129 of 503
Case 3:17-cr-00116-RGR Document 605 Filed 10/27/17 Page 1 of 82 PageID# 5237
Case 1:16-cr-00091-PKC Document 808-4 Filed 10/27/17 Page 1 of 82

HadWtuc1                          Charge

 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4             v.                              16 Cr. 91 (PKC)

 5   SCOTT TUCKER and
     TIMOTHY MUIR,                             Trial
 6
                   Defendants.
 7
     ------------------------------x
 8                                             New York, N.Y.
                                               October 13, 2017
 9                                             9:35 a.m.

10
     Before:
11                      HON. P. KEVIN CASTEL

12                                             District Judge
                                                 and a jury
13                         APPEARANCES

14   JOON H. KIM
          Acting United States Attorney for the
15        Southern District of New York
     BY:  NIKETH V. VELAMOOR
16        HAGAN C. SCOTTEN
          SAGAR K. RAVI
17        Assistant United States Attorneys

18   FREEMAN NOOTER & GINSBERG
          Attorneys for Defendant Tucker
19   BY:  LEE A. GINSBERG
          NADJIA LIMANI
20            -and-
     STAMPUR & ROTH
21   BY:  JAMES M. ROTH

22   BATH & EDMONDS, P.A.
          Attorneys for Defendant Muir
23   BY:  THOMAS J. BATH
              -and-
24   BEVERLY VAN NESS

25

HadWtuc1                         Charge

1          (Trial resumed)

2          THE COURT:  Please remain standing for our jurors.

3          (Jury present)

4          THE COURT:  Please be seated.

5          Good morning, ladies and gentlemen.  I hope you had a

6     pleasant evening, and congratulations to the New York Yankees

7     on last night's win.

8          I'm going to pick up where I left off, and I'm going

9     to begin with Count One, which is the charge of conspiracy to

10    collect unlawful debts.  You're going to see that I'm going to

11    spend some time on this count because some of the terms that

12    will apply to some of the other counts will apply here and now,

13    and those definitions will apply to the later counts and I

14    won't have to repeat them for you.  That's why this first count

15    will take a little bit longer than the other counts.

16         Count One charges that defendants Tucker and Muir

17    agreed together and with others to conduct or participate in

18    the conduct of the affairs of an enterprise through the

19    collection of an unlawful debt.  The indictment calls this

20    enterprise the Tucker Payday Lending Organization.  To find a

21    defendant guilty of Count One, the government must prove beyond

22    a reasonable doubt the following elements.

23         Now, I'm going to go through each of these, so I'm

24    just going to give them to you first and then we'll talk about

25    each one.

USCA4 Appeal: 23-2097    Doc: 11-4    Filed: 12/06/2023    Pg: 131 of 503
Case 3:17-cr-00091-FKW-Document Document 800-4 Filed 10/27/17 Page 5 of 32 PageID# 52373

HadWtuc1                    Charge

 1           First, that the charged conspiracy existed during the

 2    period alleged in the indictment;

 3           Second, that the defendant intentionally joined and

 4    participated in this conspiracy at some point during its

 5    existence.

 6           Now, these first two elements will be applied to all

 7    three charged conspiracies, except where I tell you otherwise.

 8    The next four elements describe the alleged illegal objects of

 9    the conspiracy charged in Count One.

10           The third element is that the enterprise alleged in

11    the indictment, referred to as the Tucker Payday Lending

12    Organization, existed;

13           Fourth, that the Tucker Payday Lending Organization

14    affected interstate commerce;

15           Fifth, that the defendant was employed by or

16    associated with the Tucker Payday Lending Organization; and

17           Sixth, that the defendant willfully and knowingly

18    conspired with at least one other person to participate in the

19    conduct of the affairs of that enterprise through the

20    collection of an unlawful debt.

21           Count One, the first element.

22           The first element requires the government to prove

23    beyond a reasonable doubt the existence of a conspiracy.  A

24    conspiracy is an agreement, or an understanding, by two or more

25    persons to accomplish one or more unlawful objectives by

1    working together.  In this case, the government alleges that

2    the unlawful purpose of the conspiracy was to operate an

3    enterprise engaged in the collection of an unlawful debt.

4           To prove that a conspiracy exists, the government must

5    prove that two or more people explicitly or implicitly came to

6    an understanding to achieve the unlawful object charged in the

7    count.  It is not necessary for you to find that the agreement

8    was ever expressed orally or in writing, but the government

9    does have to prove that there was a mutual understanding

10   between at least two people.

11          The indictment charges that the conspiracy lasted from

12   in or about 1997 until at least in or about August 2013.  It is

13   not necessary for the government to prove that the conspiracy

14   lasted throughout the entire period alleged, but only that it

15   existed for some period within that time frame.

16          The second element that the government has to prove

17   beyond a reasonable doubt is that each defendant intentionally

18   joined the conspiracy, either at the outset or at some later

19   point.  To prove this element, the government must prove beyond

20   a reasonable doubt that the defendant knowingly and willfully

21   joined the conspiracy for the purpose of furthering its

22   unlawful object, which is the collection of an unlawful debt.

23          Knowingly means to act consciously and voluntarily,

24   rather than by mistake or accident.  Willfully means to act

25   deliberately and with a purpose to do something that the law

HadWtuc1                    Charge

1    forbids.  The defendant need not have known that he was

2    breaking any particular law, but he must have been aware of the

3    generally unlawful nature of his act.  The question of whether

4    a person acted willfully and knowingly is a question of fact

5    for you to determine, like any other fact question.  This

6    question involves the defendant's state of mind.

7           It is not necessary that a defendant be fully informed

8    of all the details of the conspiracy, or of all of its

9    participants.  He need only know one other member of the

10   conspiracy.  He can join the conspiracy at any point and need

11   not have received any benefit in return.  On the other hand,

12   mere association between the defendant and a conspirator does

13   not make the defendant a member of the conspiracy, even if he

14   knows that the conspiracy exists.  In other words, knowledge

15   and association are not enough; the defendant must have

16   intentionally participated in the conspiracy with the purpose

17   of helping to achieve its unlawful purpose.

18          Once you find that a conspiracy existed and that the

19   defendant was a member, you may take into account against that

20   defendant any acts or statements made by any of his

21   coconspirators, even if such acts or statements were not made

22   in the presence of the defendant or were made without his

23   knowledge.

24          Once a conspiracy is formed, it is presumed to

25   continue until either its objective is accomplished, or until

JA1514

 1  there is some affirmative act of termination by the members.
 2  Similarly, once a person is found to be a member of a
 3  conspiracy, he is presumed to continue as a member of that
 4  conspiracy until the conspiracy is terminated, unless it is
 5  shown by some affirmative proof that the person withdrew and
 6  disassociated himself from it.

 7          The instructions that I have given you on the
 8  definition of conspiracy, the existence of a conspiracy and
 9  membership in a conspiracy apply to Count One as well as to the
10  two other conspiracies that I will talk to you about: the
11  conspiracy to commit wire fraud and the conspiracy to commit
12  money laundering.

13          Now, the objects of each of the conspiracies are
14  different, and that's what I'm going to talk about next.

15          The next four elements relate to the object of the
16  conspiracy in Count One.

17          The third element is that the government must prove
18  beyond a reasonable doubt the existence of an enterprise that
19  the indictment calls the Tucker Payday Lending Organization.
20  The alleged purpose of this enterprise was to enrich its
21  leaders, members and associates through the collection of
22  unlawful debt.  The indictment further charges that the
23  enterprise was in the business of lending money at rates that
24  were unlawful under state usury laws, and that the rates of
25  interest charged were at least twice the maximum enforceable

HadWtuc1                        Charge

1    rates of interest.

2              I'll talk more about usury and maximum enforceable

3    rates of interest and rates of interest a little later in the

4    charge.

5              An enterprise does not have to have a particular name,

6    or for that matter, have any name at all.  Nor must it be

7    registered or licensed as an enterprise.  It does not have to

8    be a commonly recognized legal entity, such as a corporation or

9    a partnership.  It may be a group of people informally

10   associated together for a common purpose of engaging in a

11   course of conduct.  In addition to having a common purpose,

12   this group of people must have a core of personnel who function

13   as a continuing unit.

14             The enterprise must continue to exist in substantially

15   similar form throughout the period charged.  This does not mean

16   that the membership must remain exactly identical, but the

17   enterprise must have a recognizable core that continues during

18   a substantial time period within the time frame charged in the

19   indictment.

20             The fourth element the government must prove beyond a

21   reasonable doubt is that the Tucker Payday Lending Organization

22   was engaged in or had an effect upon interstate commerce.

23   Interstate commerce includes the movement of goods, services,

24   money and individuals between states.

25             The effect upon interstate commerce need not be

USCA4 Appeal: 23-2097    Doc: 11-4    Filed: 12/06/2023    Pg: 136 of 503
Case 3:17-cr-00091-RGJ Document 808-4 Filed 10/24/19 Page 8 of 82 PageID# 523781

HadWtuc1                      Charge

1    substantial.  Nor is it necessary that the effect on interstate

2    commerce have been an adverse or negative effect.

3              It is not necessary to prove that the acts of the

4    defendant you are considering affected interstate commerce as

5    long as the acts of the Tucker Payday Lending Organization

6    itself had such an effect, if you have had that there was such

7    an enterprise.

8              Finally, the government is not required to prove that

9    the defendant knew he was affecting interstate commerce.  All

10   that is necessary is that you find beyond a reasonable doubt

11   that the Tucker Payday Lending Organization engaged in or

12   affected interstate commerce in some minimal way.

13             The fifth element the government must prove beyond a

14   reasonable doubt with respect to Count One is that the

15   defendant you are considering was associated with or was

16   employed by the Tucker Payday Lending Organization.

17             It is not required that the defendant you are

18   considering have been associated with or employed by the

19   enterprise for the entire time that the Tucker Payday Lending

20   Organization existed.  But the government is required to prove

21   beyond a reasonable doubt that at some time during the period

22   charged in the indictment, the defendant you are considering

23   was associated with or employed by the Tucker Payday Lending

24   Organization.

25             The government must also show that the defendant's

1    association with the Tucker Payday Lending Organization was

2    knowing -- that is, made with knowledge of the existence of the

3    Tucker Payday Lending Organization through a general awareness

4    of some of its purposes, activities and personnel.  A person

5    cannot be associated with or employed by an enterprise if he

6    does not know of the enterprise's existence or the nature of

7    its activities.

8          The sixth and final element the government must prove

9    beyond a reasonable doubt with respect to Count One is that the

10   defendant willfully and knowingly agreed to participate,

11   directly or indirectly, in the affairs of the Tucker payday

12   organization through collection of an unlawful debt.

13         "Usury" is the name the law gives to lending money at

14   an illegally high rate of interest.  For the purpose of this

15   case, an "unlawful debt" means a debt that is unenforceable

16   under state law because of the laws relating to usury, and

17   which was incurred in connection with the business of lending

18   money at a rate usurious under state law, where the usurious

19   rate is at least twice the enforceable rate under state law.

20         Usury laws can differ from one state to another, as

21   can enforceable rates of interest.  In New York, the highest

22   enforceable rate of interest on consumer loans is 25 percent

23   per year, and loans above that rate are usurious and

24   unenforceable.  So as to New York, the collection of a consumer

25   debt by a business engaged in lending money that carries an

USCA4 Appeal: 23-2097   Doc: 11-4      Filed: 12/06/2023    Pg: 138 of 503

1   annual interest rate of 50 percent or more is the collection of

2   an unlawful debt.  As you can see in that example, a rate of 50

3   percent is twice the highest enforceable rate of 25 percent.

4           Some states, including Connecticut, Maryland,

5   Massachusetts, Montana, New Hampshire, New Jersey,

6   Pennsylvania, North Carolina, Ohio, Vermont and Washington,

7   D.C., have rates of interest different or even higher than New

8   York, but none of these states allow the enforcement of a

9   consumer loan with a rate of interest greater than 36 percent.

10  So in these states, the collection of a consumer loan by a

11  business engaged in money lending that carries an annual

12  interest rate of 72 percent -- that's two times 36 -- would be

13  an unlawful debt.

14          The government is not required to prove that the

15  defendant knew what the usury rates were in the states that the

16  borrowers lived.  For example, in the case of a New York

17  borrower, the government does not need to prove that the

18  defendant you are considering knew that New York's highest

19  enforceable rate of interest on consumer loans was 25 percent.

20  Nor does the government have to prove that a defendant knew the

21  enforceable rate of interest in any other state.  In this case,

22  ignorance of the specific terms of any law is no excuse to the

23  charged conduct.  The government can meet its burden on the

24  "willfully" and "knowingly" element by proving that a defendant

25  acted deliberately, with knowledge of the actual interest rate

1    charged on the loan.  It may also meet its burden by showing a

2    defendant acted deliberately, with an awareness of the

3    generally unlawful nature of the loan, and also that it was the

4    practice of the business engaged in lending money to make such

5    loans.

6         The focus of the sixth element is on the defendant's

7    agreement to participate in the objective of the Tucker Payday

8    Lending Organization to collect an unlawful debt.  To prove the

9    defendant's agreement, the government need not prove that the

10   defendant you are considering actually engaged in the

11   collection of unlawful debt or even agreed to engage in the

12   collection of an unlawful debt, as long as the government

13   proves that he participated in some manner in the overall

14   objective of the conspiracy.

15        For the purpose of Count One, the government does not

16   have to prove that the defendant himself committed any

17   particular act concerning the collection of debt.  The

18   government only has to prove that the defendant entered into

19   the charged conspiracy and participated in the conspiracy

20   knowing that he, or any of his coconspirators, would engage in

21   the collection of unlawful debt.

22        That completes Count One, ladies and gentlemen.  Let's

23   stand up and stretch and take a deep breath.  OK.

24        Counts Two through Four of the indictment charge the

25   defendants with substantive violations of law.  It is a federal

USCA4 Appeal: 23-2097    Doc: 11-4       Filed: 12/06/2023    Pg: 140 of 503
Case 3:17-cr-00091-PKC Document 308 Filed 10/27/17 Page 12 of 83   PageID# 523825

HadWtuc1                     Charge

1    crime for any person who is employed by or associated with an

2    enterprise that is engaged in or affects interstate commerce to

3    conduct or to participate in the conduct of the affairs of that

4    enterprise through the collection of an unlawful debt.

5              In order to find the defendant guilty of a substantive

6    violation, you must find that the government proved each of the

7    following five elements beyond a reasonable doubt:

8              First, that the enterprise alleged in the indictment,

9    referred to as the Tucker Payday Lending Organization, existed;

10             Second, that the Tucker Payday Lending Organization

11   affected interstate commerce;

12             Third, that the defendant was associated with or

13   employed by the Tucker Payday Lending Organization;

14             Fourth, that the defendant willfully and knowingly

15   engaged in the collection of unlawful debt; and

16             Fifth, that the defendant conducted or participated in

17   the conduct or the affairs of the Tucker Payday Lending

18   Organization through the collection of unlawful debt.

19             As you have seen, the first, second and third elements

20   of the substantive offenses are identical to the third, fourth

21   and fifth elements of the conspiracy offense charged in Count

22   One.  With regard to these elements, you should follow the

23   instructions that I've given you with regard to Count One.

24             The principal difference between Count One and Counts

25   Two through Four relate to the fourth and fifth elements

USCA4 Appeal: 23-2097    Doc: 11-4    Filed: 12/06/2023    Pg: 141 of 503
Case 3:17-cr-00091-PKC Document 808 Filed 10/27/17 Page 13 of 83    PageID# 523836

1   included in Counts Two through Four.  As I have instructed you

2   in the conspiracy count, the defendant you are considering need

3   only have conspired or agreed to participate in the conduct of

4   the affairs of the Tucker Payday Lending Organization, knowing

5   that he, or any of his coconspirators, agreed to the collection

6   of unlawful debt.  But under Counts Two through Four, which are

7   the substantive counts, you cannot convict the defendant you

8   are considering unless you find that he actually conducted or

9   participated in the conduct of the Tucker Payday Lending

10  Organization, directly or indirectly, through the collection of

11  unlawful debt.

12          The fourth element, then, on Counts Two through Four

13  that the government must prove beyond a reasonable doubt is

14  that the defendant willfully and knowingly engaged in the

15  collection of unlawful debt.  Willfully, knowingly and

16  unlawfully have the same meaning on which I have instructed you

17  previously.

18          For each of Counts Two, Three and Four, the indictment

19  alleges five specific unlawful debts that the defendant engaged

20  in collecting.  The government does not need to prove the

21  existence of two or more collections of unlawful debt forming a

22  pattern.  Rather, each individual instance of collection of an

23  unlawful debt constitutes a separate substantive violation.

24  You must, however, unanimously agree that the government has

25  proven beyond a reasonable doubt that the defendant engaged in

USCA4 Appeal: 23-2097    Doc: 11-4    Filed: 12/06/2023    Pg: 142 of 503
Case 3:17-cr-00091-PKC   Document 368   Filed 10/27/17   Page 14 of 88   PageID# 52384

HadWtuc1                          Charge

1    collecting at least one particular debt named in a count before

2    you may convict the defendant on that count.

3           The fifth element on Counts Two through Four is that

4    the defendant conducted or participated in the conduct of the

5    affairs of the Tucker Payday Lending Organization, directly or

6    indirectly, through the collection of unlawful debt.

7           It is not enough that there be an enterprise and that

8    the defendant engaged in the collection of unlawful debt.  More

9    is required.  There must be a meaningful connection between the

10   defendant engaging in the collection of unlawful debt and the

11   affairs of the enterprise.  The defendant must have conducted

12   or participated in the enterprise by collecting or aiding in

13   the collection of unlawful debt.  It is not necessary, however,

14   that the collection of unlawful debt directly furthers the

15   enterprise's activities.  It is enough that the defendant's

16   collection of unlawful debt was related to the enterprise's

17   activities.

18          The fifth element also requires that the defendant

19   have some role in the operation, direction or management of the

20   enterprise.  To conduct or participate in the conduct of the

21   enterprise means that the defendant must have played some part

22   of the operation or management of the enterprise.  The

23   government is not required to prove that a defendant was a

24   member of upper management, and an enterprise is operated not

25   only by those in upper management, but also by those lower down

HadWtuc1                      Charge

1    in the enterprise who act under the direction of upper

2    management.  It is sufficient if you find that defendant

3    provided substantial assistance to those who conducted the

4    enterprise and thereby was involved in playing a part in the

5    direction of the affairs of the enterprise through collection

6    of unlawful debt.

7            Now, the defendant you are considering may be

8    convicted on Counts Two through Four if he aided and abetted --

9    aided and abetted -- others in committing these crimes.

10           The aiding and abetting statute provides that:

11           "Whoever commits an offense against the United States

12   or aids, abets, counsels, commands, induces or procures its

13   commission, is punishable as a principal."

14           It is not necessary for the government to show that

15   the defendant you are considering himself physically committed

16   the crime with which he is charged in order for you to find the

17   defendant guilty.  If the government proves beyond a reasonable

18   doubt that the defendant you are considering was an aider or

19   abettor of the crime charged, you should find the defendant

20   guilty of that crime.

21           A person who aids or abets another to commit an

22   offense is just as guilty of that offense as if he committed it

23   himself.  No one can be convicted of aiding and abetting the

24   criminal acts of another if no crime was committed by the other

25   person in the first place.

JA1524

USCA4 Appeal: 23-2097  Doc: 11-4  Filed: 12/06/2023  Pg: 144 of 503
Case 3:17-cr-00091-PKC Document 308 Filed 10/27/17 Page 16 of 85  PageID# 523369

 1          In order to aid or abet another to commit a crime, it

 2    is necessary that the defendant willfully and knowingly

 3    associate himself in some way with the crime, and that he

 4    willfully and knowingly participate in the crime by doing some

 5    act to help make the crime succeed.

 6          The definitions of "willfully" and "knowingly" that I

 7    have previously given apply here.

 8          To establish that a defendant participated in the

 9    commission of a crime, the government must prove that the

10    defendant engaged in some affirmative conduct or overt act for

11    the specific purpose of bringing about that crime.

12          The mere presence of a defendant where a crime is

13    being committed, even coupled with knowledge by the defendant

14    that a crime is being committed, or merely associating with

15    others who are committing a crime, is not sufficient to

16    establish aiding and abetting.  One who has no knowledge that a

17    crime is being committed or is about to be committed but

18    inadvertently does something that aids in the commission of the

19    crime is not an aider or abettor.  An aider or abettor must

20    know that the crime is being committed and act in a way which

21    is intended to bring about the success of the criminal venture.

22          I will now move to the second way that a defendant may

23    be found guilty of aiding and abetting the crimes charged in

24    Counts Two through Four, and that is by willfully causing the

25    commission of a crime.

JA1525

HadWtuc1                          Charge

1           What does the term "willfully causing" mean?  It does

2     not mean that the defendant in question needs to have

3     physically committed the crime or supervised or participated in

4     the actual commission of the crime charged in the indictment.

5     The meaning of the term "willfully cause" can be found in the

6     answers to the following questions:

7           First, did the defendant you are considering take some

8     action without which the crime would not have succeeded?

9           Second, did the defendant you are considering intend

10    that the crime would actually be committed by others?

11          If the government proves that the answers to both of

12    these questions are yes, then the particular defendant is

13    guilty of the crime charged just as if he had directly

14    committed the crime.  To find that defendant guilty under the

15    provisions of the statute, the government need not prove that

16    he acted through a guilty intermediary; that is, a defendant

17    could be found guilty even if he acted through someone who is

18    entirely innocent of the crime charged in the indictment.

19          You have heard evidence that defendant Scott Tucker

20    received legal advice from lawyers, and you may consider that

21    evidence in deciding whether Mr. Tucker acted willfully and

22    with knowledge.  However, the mere consultation with a lawyer

23    is not itself a defense to criminal conduct.

24          In considering whether Mr. Tucker acted willfully and

25    with knowledge as to Counts One through Four, you must consider

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

JA1526

1    whether Mr. Tucker honestly and in good faith sought the advice

2    of a competent lawyer as to what he may lawfully do.  This

3    means that he sought and obtained legal advice regarding a

4    proposed course of conduct before proceeding with that course

5    of conduct.  You must also consider whether Mr. Tucker fully

6    and honestly presented all relevant facts to the lawyer, and

7    whether he honestly followed such advice in good faith, relying

8    on it and believing it to be correct.  In short, you should

9    consider whether, in seeking and obtaining advice from lawyers,

10   Mr. Tucker intended for his acts to be lawful.  If he did so, a

11   defendant cannot be convicted of a crime that requires willful

12   and unlawful intent, even if such advice were an inaccurate

13   description of the law.

14          On the other hand, no defendant can willfully and

15   knowingly violate the law and excuse himself from the

16   consequences of his conduct by asserting that he followed the

17   advice of a lawyer.  Whether Mr. Tucker acted in good faith for

18   the purpose of seeking guidance as to the specific acts in this

19   case before engaging in those acts, whether he made a full and

20   complete presentation of the facts to his lawyer, and whether

21   he acted substantially in accordance with the advice received,

22   are questions for you to determine.

23          You have heard reference during the trial to the term

24   "tribal sovereign immunity."  Tribal sovereignty means that

25   federally recognized Indian tribes, like states, possess

certain powers of self-government.  Tribal sovereign immunity

is a principle of federal law that protects federally

recognized Indian tribes from being sued by states or others.

It does not preclude suits by the federal government against a

tribe.  It limits the means by which a state can enforce some

of its laws against a federally recognized tribe.  Tribal

sovereign immunity does not provide a tribe or its members with

any rights to violate the law of any state, but it does limit a

state's ability to enforce its laws against a tribe.  The

tribes mentioned in this case are immune from suit by any

state, including under a criminal usury statute.  Immunity,

however, does not make the conduct of the tribe lawful.

That completes the instructions on Counts Two through

Four.  Let's stand up and stretch again, with the deep breath.

Count Five charges both defendants with conspiracy to

commit wire fraud.  To prove Count Five, the government must

prove beyond a reasonable doubt two elements:

First, that the charged conspiracy to commit wire

fraud existed during the period alleged in the indictment; and

Second, that the defendant intentionally joined and

participated in this conspiracy at some point during its

existence with knowledge of its unlawful objective.

The indictment alleges that the object of the

conspiracy in Count Five was to commit wire fraud, and the wire

fraud itself, the substantive count, is Count Six.

USCA4 Appeal: 23-2097   Doc: 11-4   Filed: 12/06/2023   Pg: 148 of 503
Case 3.17-cr-00091-PKC  Document 306  Filed 10/27/17  Page 20 of 83  PageID# 52390

HadWtuc1                    Charge

1        I have instructed you previously on two elements of

2   conspiracy, and you should follow those instructions.  You must

3   find that the conspiracy existed and that the defendant

4   knowingly joined the conspiracy during the period of the

5   conspiracy with knowledge of its unlawful object.

6        The period of the conspiracy is alleged to be from at

7   least in or about 2004 up to and including in or about August

8   2013.

9        Count Six of the indictment charges both defendants

10  with violating the wire fraud statute.  In order to prove a

11  defendant guilty of wire fraud, the government must establish

12  beyond a reasonable doubt each of the following three elements:

13       First, that on or about the times alleged in the

14  indictment -- that is, from in or about 2004 through in or

15  about August 2013 -- there was a scheme or artifice to defraud

16  others of money or property by false or fraudulent pretenses,

17  representations or promises;

18       Second, that the defendant you are considering

19  willfully and knowingly devised or participated in the scheme

20  or artifice to defraud with knowledge of its nature and with

21  specific intent to defraud;

22       Third, in the execution of that scheme, the defendant

23  you are considering used, or caused the use by others, of

24  interstate wires as specified in the indictment.

25       The first element the government must prove beyond a

HadWtuc1                    Charge

1    reasonable doubt is the existence of a scheme or artifice to

2    defraud others of money or property by means of false or

3    fraudulent pretenses, representations or promises.

4           A "scheme or artifice" is simply a plan, device or

5    course of conduct to accomplish an objective.  "Fraud" is a

6    general term.  It is a term that includes all the possible

7    means by which a person seeks to gain some unfair advantage

8    over another person by false representations, false suggestion,

9    false pretenses or concealment of the truth.  The unfair

10   advantage sought can involve money, property or other things of

11   value.

12          Thus, a "scheme to defraud" is merely a plan to

13   deprive another of money or property by trick, deceit,

14   deception or swindle.  In this case, the scheme to defraud is

15   alleged to have been carried out by making false or fraudulent

16   statements, representations, claims and documents.  A

17   statement, representation, claim or document is false if it is

18   untrue when made and was then known to be untrue by the person

19   making it or causing it to be made.  A representation or

20   statement is fraudulent if it was falsely made with the

21   intention to deceive.  Deceitful statements, half-truths or the

22   concealment of material facts, when there is a duty to disclose

23   them, may also constitute false or fraudulent statements.  So,

24   too, may the expression of an opinion not honestly held

25   constitute a false or fraudulent statement.

 1          You may find that a scheme to defraud existed only if

 2     the government has proven beyond a reasonable doubt the

 3     existence of the scheme alleged in the indictment.  A scheme to

 4     defraud need not be shown by direct evidence, but may be

 5     established by all the circumstances and facts in the case.

 6          The false representations and pretenses involved in

 7     the scheme to defraud must be "material."  A material fact is

 8     one which reasonably would be expected to be of concern to a

 9     reasonable and prudent person relying on the statement in

10     making a decision.  That means if you find a particular

11     statement or omission to have been untruthful or misleading,

12     before you can find that statement or omission to be material,

13     you must also find that the statement or omission was one that

14     would have mattered to a reasonable person in making such a

15     decision.

16          In particular, you must find that the statement or

17     omission was one that would have mattered to a reasonable

18     person in some monetary way.  Actual reliance by a person on

19     the representations is not required.  It is sufficient if the

20     misrepresentation is one that is capable of influencing the

21     person's decision and is intended by the defendant to do so.

22          If you find that the government has sustained its

23     burden of proof that a scheme to defraud others of money or

24     property did exist, as charged, you next should consider the

25     second element.

USCA4 Appeal: 23-2097   Doc: 11-4      Filed: 12/06/2023    Pg: 151 of 503
Case 3:17-cr-00091-PKC Document 868 Filed 10/27/17 Page 23 of 83 PageID# 52393

HadWtuc1                    Charge

1          The second element of wire fraud that the government

2    must establish beyond a reasonable doubt is that the defendant

3    you are considering devised or participated in the fraudulent

4    scheme willfully, knowingly and with the specific intent to

5    defraud.

6          The words "devised" and "participated" are words that

7    you are familiar with, and therefore, I do not need to spend

8    much time defining them.

9          To devise scheme to defraud is to concoct or plan it.

10   To participate in a scheme to defraud means to associate

11   oneself with it with a view and intent toward making it

12   succeed.  While a mere onlooker is not a participant in a

13   scheme to defraud, it is not necessary that a participant be

14   someone who personally and visibly executes the scheme to

15   defraud.

16         In order to satisfy this element, I remind you that it

17   is not necessary for the government to establish that the

18   defendant you are considering originated the scheme to defraud.

19   It is sufficient if you find that a scheme to defraud existed,

20   even if originated by another, and that the defendant, while

21   aware of the scheme's existence, knowingly participated in it.

22         It is also not required that the defendant participate

23   in or have knowledge of all of the operations of the scheme.

24   The guilt of a defendant does not depend on how extensively he

25   participated in the scheme, so long as he participated in the

JA1532

USCA4 Appeal: 23-2097    Doc: 11-4    Filed: 12/06/2023    Pg: 152 of 503
Case 3:17-cr-00691-PKC Document 808 Filed 10/27/17 Page 24 of 83 PageID# 52394

HadWtuc1                        Charge

1    scheme with knowledge of its general scope and purpose.

2            It is not necessary that a defendant have participated

3    in the alleged scheme from the beginning.  A person who comes

4    in at a later point with knowledge of the scheme's general

5    operation, although not necessarily all of its details, and

6    intentionally acts in a way to further the unlawful goals,

7    becomes a member of the scheme and is legally responsible for

8    all that may have been done in the past in furtherance of the

9    criminal objective and all that is done thereafter.

10           As I previously noted, before a defendant may be

11   convicted of the wire fraud charge, he must also be shown to

12   have acted willfully and knowingly and with a specific intent

13   to defraud.  I have previously explained the meaning of

14   willfully and knowingly, and you should apply those

15   instructions here.  For this count, however, the government

16   must prove beyond a reasonable doubt that the defendant acted

17   not only willfully and knowingly, but also with the specific

18   intent to defraud others of money or property.  To act with

19   intent to defraud means to act willfully, and with the specific

20   intent to deceive, for the purpose of causing some financial

21   loss to another.

22           Direct proof of willfulness, knowledge and fraudulent

23   intent is almost never available.  Indeed, it would be a rare

24   case where it could be shown that a person wrote or stated that

25   as of a given time in the past he committed an act with

USCA4 Appeal: 23-2097   Doc: 11-4      Filed: 12/06/2023   Pg: 153 of 503
Case 3:17-cr-00091-PKC Document 368 Filed 10/27/17 Page 25 of 83   PageID# 5235

HadWtuc1                    Charge

1    fraudulent intent.  Such direct proof is not required.

2            The ultimate facts of knowledge and criminal intent

3    may be established by circumstantial evidence, based upon a

4    person's outward manifestations, words, conduct, acts and all

5    the surrounding circumstances disclosed by the evidence and the

6    rational or logical inferences that may be drawn therefrom.  In

7    deciding whether the government has proven whether the

8    defendant you are considering had an intent to defraud, you

9    need not limit yourself to just what the particular defendant

10   said, but you may also look at what the defendant did and what

11   others did in relation to the defendant and the entirety of the

12   surrounding circumstances.

13           The third and final element that the government must

14   prove beyond a reasonable doubt as to the wire fraud is that

15   the interstate wire facilities were used in furtherance of the

16   scheme to defraud.  The term "wire facilities" includes

17   telephones, faxes, emails, radio and television.  Here, the

18   government contends that interstate wire facilities were used.

19           The "interstate" requirement means that the wire

20   communication must pass between two or more states, as, for

21   example, a transmission of computer signals from New York and

22   another state, such as Kansas, Oklahoma or Nebraska.

23           It is not necessary for the defendant you are

24   considering to be directly or personally involved in any wire

25   communication, as long as the communication is reasonably

USCA4 Appeal: 23-2097    Doc: 11-4       Filed: 12/06/2023    Pg: 154 of 503
Case 3:17-cr-00155-L-LRC Document 808 Filed 10/27/17 Page 26 of 83   PageID# 52396

1   foreseeable in the execution of the alleged scheme to defraud

2   in which the particular defendant is accused of participating.

3          In this regard, it would be sufficient to establish

4   this element of the crime if the evidence justifies a finding

5   that the defendant caused the wires to be used by others, and

6   this does not mean that the defendant himself must have

7   specifically authorized others to execute a wire communication.

8   When one does an act with knowledge that the use of the wires

9   will follow in the ordinary course of business, or where such

10  use of the wires can reasonably be foreseen, even though not

11  actually intended, then he or she causes the wires to be used.

12         This wire communication requirement is satisfied even

13  if the wire communication was done by a person with no

14  knowledge of the fraudulent scheme, including the victim of the

15  alleged fraud.  The use of the wires need not itself be

16  fraudulent.  Stated another way, the wire communication need

17  not contain any fraudulent representation or even any request

18  for money.  It is sufficient if the wires were used to further

19  or assist in carrying out the scheme to defraud.

20         The government must establish beyond a reasonable

21  doubt the particular use charged in the indictment.  However,

22  the government does not have to prove that the wire was used on

23  the exact date charged in the indictment.  It is sufficient if

24  the evidence establishes beyond a reasonable doubt that the

25  wire was used on a date reasonably near the date alleged in the

HadWtuc1                           Charge

1   indictment.

2           Let me add the following.  Only the wire communication

3   must be reasonably foreseeable, not its interstate component.

4   Thus, if you find that the wire communication was reasonably

5   foreseeable and the interstate wire communications actually

6   took place, then this element is satisfied even if it was not

7   foreseeable that the wire communication would cross state

8   lines.

9           Now, with respect to Count Six, the indictment also

10  charges the defendants with aiding and abetting wire fraud.

11  The definition of aiding and abetting that I previously gave

12  applies here.

13          (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Since an essential element of wire fraud

2     is an intent to defraud, it follows that good faith on the part

3     of a defendant is a defense to that charge.  A defendant has no

4     burden of establishing a defense of good faith.  The burden is

5     on the government to prove fraudulent intent beyond a

6     reasonable doubt, and proving fraudulent intent proves a lack

7     of good faith.

8          Even false representations or statements, or omissions

9     of material facts, do not amount to a fraud unless done with

10    fraudulent intent.  However misleading or deceptive a plan may

11    be, it is not fraudulent if it was devised or carried out in

12    good faith.  An honest belief in the truth of the

13    representations made by a particular defendant, and an honest

14    belief that all material facts have been disclosed, is a

15    complete defense, however inaccurate the statements may turn

16    out to be.

17         In considering whether or not a particular defendant

18    acted in good faith, you are instructed that a belief by the

19    defendant you are considering, if such belief existed, that

20    ultimately everything would work out so that no one would lose

21    any money does not mean that the defendant acted in good faith.

22         No amount of honest belief on the part of the

23    defendant you are considering that the scheme would ultimately

24    aid others will excuse that defendant, if the defendant had the

25    specific intent to harm the individuals by depriving them of

JA1537

USCA4 Appeal: 23-2097   Doc: 11-4      Filed: 12/06/2023    Pg: 157 of 503
Case 3:17-cr-00091-KRC   Document 368   Filed 10/27/17   Page 23 of 93   PageID# 52399.2

1    accurate information that was material to their decisions about

2    how to use their assets, even if the defendant sought only to

3    deprive the individuals of accurate information for a limited

4    period of time.

5         Acting with intent to defraud requires acting with a

6    purpose to cause actual financial harm to another.  Actual

7    financial harm includes denying a person or entity access to

8    money.  If a defendant deliberately supplies materially false

9    information in order to obtain money, but believes that no harm

10   will ultimately occur to the person from which he obtained the

11   money -- i.e., that the victim will be better off having

12   entered a lending relationship with the defendant or his

13   associates -- that belief that no harm will result, or even the

14   fact that no harm does result, is no defense.  Thus, if you

15   find that the defendant you are considering intended to inflict

16   harm by obtaining money fraudulently, you may find that the

17   defendant acted with intent to defraud.

18        It is also unimportant whether a victim might have

19   discovered the fraud had he or she probed further.  If you find

20   that a scheme or artifice to defraud existed, it is irrelevant

21   whether you believe that a victim was careless, gullible, or

22   even negligent.

23        Ladies and gentlemen, let's stand up and stretch, with

24   a deep breath.

25        You are truly good-natured people that you can even

USCA4 Appeal: 23-2097   Doc: 11-4   Filed: 12/06/2023   Pg: 158 of 503
Case 3:17-cr-00091-PKC   Document 366   Filed 10/27/17   Page 90 of 93   PageID# 52400

HAD8TUC2                          Charge

 1    muster a slight smile after listening to me at great length.

 2           All right.  Count Seven charges a conspiracy to commit

 3    money laundering.  To prove Count Seven, the government must

 4    prove beyond a reasonable doubt:

 5           First, that the charged conspiracy existed during the

 6    period alleged in the indictment;

 7           Second, that the defendant intentionally joined and

 8    participated in the conspiracy at some point during its

 9    existence and with knowledge of its unlawful object.

10           I have previously instructed you on two elements under

11    the law of conspiracy, and you should follow those instructions

12    here.  The period of the conspiracy to commit money laundering

13    is alleged to be from at least in or about 2004 up to and

14    including in or about August 2013.  The indictment alleges that

15    the money laundering conspiracy charged in Count Seven had two

16    objects:

17           The first object of the conspiracy charged in Count

18    Seven was to participate in a financial transaction that

19    involves the proceeds of specified unlawful activity with the

20    intent to promote the carrying on of that activity.  The

21    indictment charges a violation of that federal statute as a

22    substantive crime in Count Eight.  I will describe the elements

23    of Count Eight in a little bit.

24           The second object of the conspiracy charged in Count

25    Seven was to participate in a financial transaction that

1    involves the proceeds of a specified unlawful activity, knowing

2    that the transaction was designed to conceal or disguise the

3    nature, location, source, ownership or control of those

4    proceeds.  The indictment charges violation of that federal

5    statute as a substantive crime in Count Nine.  I will describe

6    the elements of Count Nine after discussing Count Eight.

7          The government need not prove that the defendant you

8    are considering agreed to accomplish both objects in order to

9    convict the defendant of the conspiracy to commit money

10   laundering charged in Count Seven.  Nor must you find that

11   either object was actually accomplished.  An agreement to

12   accomplish either of the two objects is sufficient.  However,

13   the jury must all agree, unanimously agree on the specific

14   object that the defendant you are considering agreed to try to

15   accomplish.

16         Count Eight charges both defendants with committing

17   the substantive crime of money laundering by engaging in

18   financial transactions that involved the proceeds of illegal

19   activity, specifically, the wire fraud charged in Count Six of

20   the indictment, with the intent to promote the carrying on of

21   further wire fraud transactions.  In order to prove a defendant

22   guilty of conspiring to commit this crime, the government must

23   establish beyond a reasonable doubt the following elements:

24         First, that the defendant conducted or attempted to

25   conduct a financial transaction, which I will define for you.

USCA4 Appeal: 23-2097    Doc: 11-4        Filed: 12/06/2023    Pg: 160 of 503

 1   That financial transaction must in some way or degree affect

 2   interstate commerce;

 3          Second, that the defendant conducted or attempted to

 4   conduct the financial transaction with property or funds that

 5   involved the proceeds of some form of specified unlawful

 6   activity;

 7          Third, that the defendant engaged in or attempted to

 8   engage in the transaction with knowledge that the transaction

 9   involved the proceeds of some form of unlawful activity; and

10          Fourth, to engage in the financial transaction with

11   the intent to promote the carrying on of specified unlawful

12   activity.

13          The first element that the government must prove

14   beyond a reasonable doubt in Count Eight is that the defendant

15   conducted or attempted to conduct a financial transaction

16   involving property constituting the proceeds of specified

17   unlawful activity, namely, wire fraud.

18          The term "conduct" includes the action of initiating,

19   concluding, or participating in initiating or concluding a

20   transaction.

21          A "transaction" includes a purchase, sale, loan,

22   pledge, gift, transfer, delivery, or other disposition of

23   property.

24          The term "financial transaction" means a transaction

25   involving a financial institution which is engaged in, or the

 1   activities of which affect, interstate commerce in any way or

 2   degree, or a transaction which in any way or degree affects

 3   interstate commerce and involves the movement of funds by wire

 4   or other means, or involves one or more monetary instruments,

 5   or involves the transfer of title to any real property,

 6   vehicle, vessel or aircraft.

 7        As I have previously instructed, the term "interstate

 8   commerce" means the movement of goods, services, money, and

 9   individuals between states.

10        The second element that the government must prove

11   beyond a reasonable doubt is that the property involved in the

12   financial transaction constituted the proceeds of some form of

13   specified unlawful activity, the.

14        The term "proceeds" means any property derived from or

15   obtained or retained, directly or indirectly through some form

16   of unlawful activity, including gross receipts of such

17   activity.

18        The term "specified unlawful activity" means any one

19   of a variety of offenses defined by the statute.  In this case,

20   the government has alleged that the funds in question were the

21   proceeds of wire fraud.  I instruct that you, as a matter of

22   law, wire fraud falls within the definition of "specified

23   unlawful activity."  However, it is for you to determine

24   whether the funds were the proceeds of the unlawful activity

25   charged in the indictment.

 1              The third element that the government must prove

 2       beyond a reasonable doubt on Count Eight is that the defendant

 3       engaged in or attempted to engage in a financial transaction

 4       with knowledge that the transaction involved the proceeds of

 5       some form of unlawful activity.

 6              To satisfy this element, the government must prove

 7       that the defendant you are considering conducted or attempted

 8       to conduct a transaction knowing that the property involved in

 9       the transaction represented proceeds from some form, though not

10       necessarily which form, of activity that constitutes a felony

11       under state, federal, or foreign law.  Thus, the government

12       does not have to prove that the conspirators specifically knew

13       that the property involved in the transaction represented the

14       proceeds of the wire fraud alleged here.  The government only

15       has to prove that the defendant conducting or attempting to

16       conduct the financial transaction knew that the transaction

17       represented the proceeds of some illegal activity that was a

18       felony.

19              I instruct you that, as a matter of law, in New York

20       it is a felony to take or receive any money as interest on a

21       loan at a rate exceeding 25 percent per year, although whether

22       that occurred in this case is a matter of fact that you must

23       determine for yourself.

24              The fourth element which the government must prove

25       beyond a reasonable doubt is that the defendant you are

USCA4 Appeal: 23-2097    Doc: 11-4    Filed: 12/06/2023    Pg: 163 of 503
Case 3:17-cr-00091-PRC  Document 808  Filed 10/27/21  Page 95 of 99  PageID# 52405

HAD8TUC2                        Charge

1    considering engaged in or attempted to engage in the financial

2    transaction with intent to promote the carrying on of specified

3    unlawful activity, namely, wire fraud.

4            To act intentionally means to act willfully, not by

5    mistake or accident, with the deliberate purpose of promoting,

6    facilitating or assisting the carrying on of a wire fraud.  If

7    you find that the defendant acted with the intention or

8    deliberate purpose of promoting, facilitating, or assisting in

9    the carrying on of a wire fraud, then the fourth element is

10   satisfied.

11           Count Nine charges both defendants with committing

12   money laundering by engaging in financial transactions that

13   involved the proceeds of wire fraud with the intent to conceal

14   the nature, source, location, ownership or control of those

15   proceeds.  In order to prove the defendant you are considering

16   guilty of this crime, the government must establish beyond a

17   reasonable doubt:

18           First, that the defendant conducted or attempted to

19   conduct a financial transaction;

20           Second, that the defendant conducted or attempted to

21   conduct the financial transaction with property or funds that

22   involved the proceeds of some form of specified unlawful

23   activity;

24           Third, that the defendant engaged in or attempted to

25   engage in the transaction with knowledge that the transaction

JA1544

 1   involved the proceeds of some form of unlawful activity; and

 2              Fourth, that the defendant engaged in or attempted to

 3   engage in the financial transaction knowing that the

 4   transaction was designed in whole or in part to conceal or

 5   disguise the nature, location, source, ownership or control of

 6   the proceeds of specified unlawful activity.

 7              The first three of these elements are identical to the

 8   elements for the money laundering crime charged in Count Eight.

 9   Only the fourth element, regarding the purpose of the financial

10   transaction, is different.  I therefore am only going to

11   provide additional instructions on that element.

12              With respect to the fourth element of the money

13   laundering crime charged in Count Nine, the government must

14   prove beyond a reasonable doubt that the defendant you are

15   considering acted with knowledge that the transaction was

16   designed to conceal or disguise the nature, location, source,

17   ownership or control of the proceeds of the specified unlawful

18   activity, namely, wire fraud.  The terms I have just used have

19   their everyday meaning.

20              If you find that the evidence establishes beyond a

21   reasonable doubt that the defendant you are considering knew of

22   the purpose of the transaction in issue, and that he or she

23   knew that the transaction was either designed to conceal or

24   disguise the true origin of the property in question, then this

25   element is satisfied.

JA1545

1          However, if you find that the defendant knew of the

2     transaction but did not know that it was either designed to

3     conceal or disguise the true origin of the property in

4     question, you must find that this element has not been

5     satisfied and find the defendant not guilty on this count.

6          Proof that the defendant knew the purpose of the

7     financial transaction was to conceal or disguise the location

8     or ownership of the proceeds of specified unlawful activity may

9     be established by proof that the defendant actually knew, or

10    knew because of circumstantial evidence.  In other words, you

11    are entitled to find from the circumstances surrounding the

12    financial transaction what the purpose of the activity was and

13    that the defendant knew of that purpose.

14         Counts Eight and Nine of the indictment also charge

15    the defendants with aiding and abetting money laundering crimes

16    charged in those counts.  I have previously instructed you on

17    the law of aiding and abetting, and you should apply those

18    instructions here.

19         Ladies and gentlemen, let's stand up and stretch, with

20    a deep breath.

21         I now turn to the last counts, Counts Ten through

22    Fourteen of the indictment that charge both defendants with

23    violating a provision of federal law known as the Truth in

24    Lending Act, often called "TILA."  TILA requires a creditor to

25    make certain disclosures to consumers at the outset of a

1    transaction, and those disclosures must accurately reflect the

2    terms of the legal obligations agreed upon by the parties.

3         To find the defendant you are considering guilty of

4    this crime, you must find that the government proved beyond a

5    reasonable doubt that the defendant you are considering

6    willfully and knowingly gave false and inaccurate information

7    under the Truth in Lending Act.

8         I will discuss each concept in turn.  The terms

9    "willfully" and "knowingly" have the same meaning I have

10   previously explained to you.  The terms "false" and

11   "inaccurate" have their everyday meaning.

12        In this case, the government has alleged that the

13   defendants materially understated the true cost of the loans

14   extended by the Tucker Payday Lenders by disclosing false and

15   inaccurate information with respect to the finance charges and

16   total payments due under loans extended by the Tucker Payday

17   Lenders.  I instruct you as a matter of law that finance

18   charges and total payments due under a loan are disclosures

19   required under the Truth in Lending Act (TILA).  Whether the

20   disclosures were false or inaccurate, however, is a

21   determination you must make.

22        In order to find the defendant you are considering

23   guilty in this matter, you must also determine that the false

24   or inaccurate disclosures were material, meaning that the

25   degree of falsehood or inaccuracy was such that it would be

USCA4 Appeal: 23-2097   Doc: 11-4   Filed: 12/06/2023   Pg: 167 of 503
Case 3:17-cr-00126-PKC Document 368 Filed 10/27/17 Page 99 of 99
Case 1:16-cr-00091-PKC Document 308 Filed 10/27/17 Page 99 of 99 PageID# 52409

HAD8TUC2                          Charge

1    material to a borrower.  I previously explained the meaning of

2    "material," and you should apply those instructions here.

3            So that completes the 14 counts.  You will go through

4    the verdict sheet in the order in which the questions are

5    presented.  And, basically, it has each of the 14 counts

6    listed, and then under each of them, the name of each of the

7    defendants and a spot for you to check guilty or not guilty.

8    That's what the verdict sheet consists of.

9            Once you complete the verdict sheet as to questions 1

10   through 14, there is an additional question.  If, but only if,

11   you have found any defendant guilty on any of the Counts Two

12   through Four, you should respond to the following question on

13   the verdict form:  "Has the government proven beyond a

14   reasonable doubt that, at the time of collection of any of the

15   loans you found as the basis for a guilty verdict on Counts Two

16   through Four, the lender, in fact, was defendant Scott Tucker

17   or an entity owned or controlled by him?"  You are to answer

18   that question "Yes" or "No."

19           For the purposes of this question, and solely on the

20   issue of control, you should consider the following factors on

21   the issue of control:  whether Mr. Tucker was the source of

22   funds for the loans, whether he bore the risk of non-repayment

23   of the loans, and whether he had the power to direct the

24   activities of the entity, including day-to-day operations,

25   finances, lending decisions, distribution of profits, hiring

JA1548

USCA4 Appeal: 23-2097    Doc: 11-4    Filed: 12/06/2023    Pg: 168 of 503
Case 3:17-cr-00001-PKC Document 808 Filed 10/27/17 Page 40 of 93    PageID# 52413

1    and termination of employees, advertising and solicitation of

2    customers, and banking and other third-party relationships.

3              Venue.  With respect to any count you are considering,

4    the government, in addition to proving the essential elements

5    of that charge, must also prove that at least one act in

6    furtherance of the charge occurred in the Southern District of

7    New York.  This is called establishing venue.  The Southern

8    District of New York includes all of Manhattan and the Bronx,

9    as well as Westchester, Rockland, Orange, Putnam, Dutchess and

10   Sullivan Counties.

11             With respect to Counts One through Six and Counts Ten

12   through Fourteen, this means that, with regard to each count,

13   you must decide whether the crime charged in a particular

14   count, or any act committed to further or promote the crime,

15   occurred within the Southern District of New York.

16             With respect to money laundering counts charged in

17   Counts Eight and Nine, venue is proper here in the Southern

18   District of New York if you find that a financial or monetary

19   transaction was conducted here, or if you find that the wire

20   fraud charged in Count Six, or any act committed to further or

21   promote the wire fraud charged in Count Six, occurred here, if

22   the defendant participated in the transfer of the proceeds of

23   the wire fraud from the Southern District of New York to where

24   the financial or monetary transaction was conducted.

25             With respect to the conspiracy to commit money

HAD8TUC2                    Charge

1   laundering charged in Count Seven, venue is proper here in the

2   Southern District of New York if you find that venue is proper

3   here for either Counts Eight or Nine, or if an act in

4   furtherance of the conspiracy took place here.

5           Unlike the elements of the offenses which must be

6   proven beyond a reasonable doubt, the government is only

7   required to prove venue by a preponderance of the evidence.  A

8   preponderance of the evidence means that it is more probable

9   than not that some act in furtherance of the crime you are

10  considering occurred in this district.

11          A few concluding remarks.

12          The possible punishment of a defendant in the event of

13  a conviction is not a proper consideration for the jury and

14  should not, in any way, enter into or influence your

15  deliberations.  The duty of imposing sentence belongs to the

16  Court and the Court alone.  Your function is to weigh the

17  evidence and to determine whether the defendant is or is not

18  guilty upon the basis of evidence and the law.

19          Therefore, I instruct you not to consider possible

20  punishment or punishment in any way in your deliberations.

21          You are about to go into the jury room to begin your

22  deliberations.  I will have exhibits actually received into

23  evidence go into the jury room with you.  They will come in in

24  a few minutes.

25          With regard to the recordings, if you want to hear the

JA1550

HAD8TUC2                          Charge

 1    recordings, we will have you come into the courtroom to play

 2    them.

 3           If you want any testimony read back, please send out a

 4    note specifying what you want to hear and we will arrange

 5    either to have it read back in the courtroom or brought in to

 6    you.  Please be as specific as possible in requesting portions

 7    of testimony.  If you want any further explanation of the law

 8    as I have explained it to you, you may also request that.

 9           Your requests for testimony -- in fact, any

10    communication with the Court -- should be made in writing,

11    signed by your foreperson, and given to the deputy marshal.  In

12    any event, do not tell me or anyone else how the jury stands on

13    any issue.  In other words, do not tell me or anyone else what

14    the vote is until after a unanimous verdict is reached.

15           As I said, I am going to send in two copies of the

16    indictment.  That's only an accusation and it's not proof of

17    anything.  But you will have a copy of the indictment, you will

18    have two copies of these jury instructions, and everyone will

19    have a copy of the verdict sheet, although only one is signed

20    and returned.

21           Some of you have taken notes during the trial.  I want

22    to emphasize that notes are simply an aid to memory.  Notes

23    that any of you have made may not be given any greater weight

24    or influence in determining the case than the recollections or

25    impressions of other jurors, whether from notes or memory, with

USCA4 Appeal: 23-2097   Doc: 11-4   Filed: 12/06/2023   Pg: 171 of 503
Case 3:17-cr-00001-PKC Document 368   Filed 10/27/97   Page 43 of 88   PageID# 5241326

 1    respect to the evidence presented or what conclusions, if any,

 2    should be drawn from the evidence.  Any difference between a

 3    juror's recollection and another juror's notes should be

 4    settled by asking to have the court reporter read back the

 5    transcript, for it is the court record rather than any juror's

 6    notes upon which the jury must base its determination of the

 7    facts and its verdict.

 8            As I said, you will get the verdict form to record

 9    your verdicts.  You should proceed through the questions on the

10    verdict form in the order in which they are presented.

11            It is your duty as jurors to consult with one another

12    and to deliberate with a view to reaching an agreement.  Each

13    of you must decide the case for himself or herself, but you

14    should do so only after a consideration of the case with your

15    fellow jurors, and you should not hesitate to change an opinion

16    when convinced that it is erroneous.  Your verdict must be

17    unanimous, but you are not bound to surrender your honest

18    convictions concerning the effect or weight of the evidence for

19    the mere purpose of returning a verdict solely because of the

20    opinion of other jurors.  Discuss and weigh your respective

21    opinions dispassionately, without regard to sympathy, without

22    regard to prejudice or favor for either party, and adopt that

23    conclusion that in your good conscience appears to be in

24    accordance with the evidence and the law.

25            Please remember, you are not partisans.  You are

JA1552

HAD8TUC2                        Charge

1    judges -- judges of the facts -- not representatives of a

2    constituency or a cause.

3            Again, each of you must make your own decision about

4    the proper outcome of the case based on your consideration of

5    the evidence and your discussions with your fellow jurors.  No

6    juror should surrender his or her conscientious beliefs solely

7    for the purpose of returning a unanimous verdict.  If at any

8    point you find yourselves divided, do not inform the Court or

9    anyone of how the jurors are split.  Once you have reached a

10   verdict, do not announce what the verdict is until I ask you to

11   do so in the courtroom.

12           Once you get into the jury room, you may select a

13   foreperson who will be responsible for signing all

14   communications to the Court on behalf of the jury and for

15   handing them to the deputy marshal during your deliberations.

16   This should not be understood to mean that an individual cannot

17   send the Court a note should the foreperson refuse to do so.

18           I will give you the typed text of these instructions,

19   as I said, but it's possible that there is a slight variance

20   between the words I have spoken and the typed text that I will

21   give you.  It is the words I have spoken that control if you

22   find any variance.

23           After you have reached a verdict, your foreperson will

24   advise the deputy marshal outside your door that you have

25   reached a verdict.

1             I will stress that each of you must be in agreement

2    with the verdict that is announced in court.  Once your verdict

3    is announced by your foreperson in open court and officially

4    recorded, it cannot ordinarily be revoked.

5             Your function now is to weigh the evidence in this

6    case and to determine whether the government has or has not

7    proven the guilt of defendants Scott Tucker and Timothy Muir

8    beyond a reasonable doubt with respect to each of the 14 counts

9    in the indictment.

10            You must base your verdict solely on the evidence or

11   lack of evidence in this case and these instructions as to the

12   law, and you are obligated under your oath as jurors to follow

13   the law as I have instructed it, whether you agree or disagree

14   with the particular law in question.  I am sure that if you

15   listen to the views of your fellow jurors and if you apply your

16   own common sense, you will reach a verdict in accordance with

17   the evidence and the law.

18            Finally, let me state that your oath sums up your

19   duty, and that is, without fear or favor to anyone, you will

20   well and truly try the issues, based solely upon the evidence

21   and this Court's instructions as to the law.

22            Ladies and gentlemen, this concludes my instructions.

23   You may stand up and stretch while I meet with the lawyers at

24   the sidebar, and please do not discuss the case until you're

25   inside the jury room.

JA1554

```
 1              (At the sidebar)

 2              THE COURT:  From the government.

 3              MR. SCOTTEN:  Nothing, your Honor.

 4              THE COURT:  From Mr. Tucker.

 5              MR. GINSBERG:  Nothing, your Honor.

 6              THE COURT:  From Mr. Muir.

 7              MR. BATH:  No, sir.

 8              THE COURT:  What I am going to do is instruct the

 9     alternates that they are still on jury duty.  They cannot

10     discuss the case among themselves or with anyone, follow my

11     instructions.  They are subject to recall.

12              All right.  That's about it.

13              You can return to your seats.

14              (In open court)

15              THE COURT:  Ladies and gentlemen, I should tell you

16     that during deliberations, if someone steps out of the room for

17     any reason, you cannot deliberate unless all the jurors are

18     present.  So, for example, if you decide to take a few minutes

19     to step out of the jury room, then you suspend your

20     deliberations, unless and until everyone is present.

21              If the jury has not reached a verdict, I will call you

22     back in around five minutes to 5 tonight.  All right.

23              At this point, with regard to Cecilia Rosa, Nuria

24     Cornielle, and Glenn Stockton, you are not excused from this

25     jury as of yet.  It is possible under the law that you could be
```

 1    called back to participate in deliberations.  So for that

 2    reason, until this jury has reached a verdict, you are still on

 3    jury duty and subject to recall.  You still must follow the

 4    instructions that I have given you about not discussing the

 5    case among yourselves or with anyone, not doing any research,

 6    not doing any investigation, because you may be recalled.  I

 7    will promise you, however, that when and if the jury reaches a

 8    verdict, Flo, my deputy, will give you a call at the phone

 9    number that you have given her to let you know what the verdict

10    is, and also to let you know that you are relieved of this

11    obligation not to discuss the case.

12            So with great admiration to you for your hard service,

13    your being here, your paying attention, being good-spirited and

14    good-natured, I am going to allow you at this point to return

15    to the jury room to gather your belongings and to depart.

16            So, again, your service is most admirable.  You should

17    be proud of what you have done, and you have my appreciation

18    and my admiration.  Thank you.

19            Please leave your notebooks in the jury room.

20            (Alternate jurors exit courtroom)

21            THE COURT:  I ask the deputy marshal to step forward

22    to take the oath.

23            Please come into the well.

24            (Marshal sworn)

25            THE COURT:  Ladies and gentlemen, you may now discuss

USCA4 Appeal: 23-2097   Doc: 11-4      Filed: 12/06/2023    Pg: 176 of 503
Case 3:17-cr-00191-PKC-DLC   Document 808   Filed 10/27/07   Page 48 of 93   PageID# 52413

HAD8TUC2

 1    the case among yourselves.

 2                Thank you.

 3                (At 11:07 a.m., the jury retired to deliberate)

 4                THE COURT:  Please be seated.

 5                Let me begin by saying that this case was actually a

 6    pleasure to preside over because it was so well presented by

 7    the lawyers on both sides.  The openings and closings, the

 8    directs, the crosses, were a pleasure to watch, and I saw some

 9    very fine lawyering in this courtroom, which is always

10    especially enjoyable.  And I realize that this case, like many

11    trials, but probably more so than most trials, what goes on in

12    the courtroom is the tip of the iceberg, because of the number

13    of charges, the number of documents, etc., the amount of

14    preparation on both sides was extraordinary.  You have worked

15    long and hard on this case, over a considerable period of time,

16    and you have my eternal respect.

17                Each of the lawyers in this case, Mr. Scotten, Mr.

18    Velamoor, Mr. Ravi, Mr. Ginsberg, Mr. Roth, Mr. Bath, and their

19    colleagues and associates, are all welcome in this courtroom in

20    the future.  I thought everyone conducted themselves consistent

21    with the highest aspirations of this profession.  I really do.

22    And in a long trial it's possible that things can get difficult

23    or tense at times, but I thought everybody acted in a

24    professional manner.  And my thanks and respect also go to Ms.

25    Limani, also for her hard work in this case.

 1          I make no apologies for being the traffic cop in this
 2    case.  That's what I get a paycheck for doing.  That's what my
 3    job is.  We all have a role.  My role is not to be your best
 4    friend.  My role is to do what I need to do, and I make no
 5    apologies for it, but I just assure you that if anybody at any
 6    time ever had a wounded ego or bruised feelings, you shouldn't.
 7    It's just part of what a trial judge needs to do to keep a case
 8    moving because, as you know, I am obsessed with the people in
 9    the jury box.  I am obsessed with not having their time wasted
10    and that the case goes in in a reasonably smooth fashion
11    without imposing on their time.

12          Now, let me turn to a couple of housekeeping things.
13    I subscribe to what I call an eight-minute rule, which is you
14    have to be able to get back to this courtroom within eight
15    minutes.  That means if you're a prosecutor, you can't go back
16    to your office, or a defense counsel.  There isn't going to be
17    enough time to get back here in eight minutes.  You have to
18    make sure that you're in contact with Flo, and there should be
19    someone from each team who is in the courtroom or extremely
20    nearby.  So if we get a note, I am going to have it shown to
21    you and I am going to get you working on the note.

22          If it's a readback, what you are going to do is you
23    are going to go through the transcript and you are going to
24    figure out what you think is appropriate, see whether you can
25    agree on it, and then we will have the court reporters prepare

1    a redacted transcript, and by redacted, there is colloquy at

2    the sidebar that comes out, if there is an objection sustained,

3    the question and answer will come out, that sort of thing.  And

4    then I will come down, supervise the process, and we will send

5    the transcript into the jury room.

6           I am going to require that both sides confer right now

7    on the received exhibits, and you are going to tender them to

8    my deputy, who is going to tender them to the deputy marshal to

9    be brought into the jury room.  And you heard what I said about

10   the recordings, how we will deal with that.

11          Thank you all very much.

12          MR. SCOTTEN:  Thank you, your Honor.

13          MS. LIMANI:  Thank you, your Honor.

14          (Recess pending verdict)

15          (Jury not present)

16          THE COURT:  So I have two notes from the jury, which

17   have been shared with counsel.

18          Court Exhibit 22:  "Judge, can we get Tim Muir's

19   transcript, please, October 11, during cross-examination, when

20   he stated that he knew that the interest rates were too high."

21          Note number 23:  "Can we have the transcripts for the

22   recordings, please."

23          I gather the parties have clipped pages 2901 through

24   2903, is that correct?

25          MR. VELAMOOR:  Judge, I think both parties agree that

```
 1      the jury should be provided with testimony beginning on
 2      2901:12.  So line 12 on page 2901.  There is a disagreement as
 3      to the end point.
 4              THE COURT:  What is the position of the government?
 5              MR. VELAMOOR:  Our position is that the jury should be
 6      read back 2901, line 12, through 2902, line 16.
 7              THE COURT:  And what is the position of the
 8      defendants?
 9              MR. BATH:  We believe it should end at 2903, line 9.
10              THE COURT:  Just give me a moment, please.
11              Starting point on 2901 again, which line?
12              MR. VELAMOOR:  Line 12.
13              THE COURT:  You want to end it where, Mr. Bath?
14              MR. BATH:  2903, line 9.
15              THE COURT:  And the government wants to end it at?
16              MR. VELAMOOR:  2902:16.
17              THE COURT:  I am going to agree with Mr. Bath.
18              Ordinarily, my preference would be to send this into
19      the jury room.  I am going to have the court reporter read it,
20      2901, line 12, through 2903, line 9.
21              MR. VELAMOOR:  We ask, if the Court is inclined to
22      include more, we would ask that it at least go through 2903:21
23      to complete that exchange.
24              First of all, we are disagreeing with Mr. Muir over
25      the question and whether or not the exchange continues.
```

HAD8TUC2

1              And finally, it resolves with him acknowledging the

2       New York attorney general's position.

3              THE COURT:  Through what, line 21?

4              MR. VELAMOOR:  Which was ultimately the question.

5              THE COURT:  I think that's right.  If I am going to

6       include down to line 9, then I think it's fair to include down

7       to line 21.

8              Any objection, Mr. Bath?

9              MR. BATH:  I am reviewing that right now.

10             I disagree with that position, Judge.

11             THE COURT:  In other words, you want the jury to know

12      what Mr. Muir's position was, but not the position of the

13      statutory officer enforcing the New York statute.

14             MR. BATH:  I don't read it that way.  The question

15      posed about New York was that was the position in New York.  I

16      guess you can read that to be the AG's position or it could be

17      the position of New York under the law.  I am reading it as

18      it's the New York law, not the AG.  When the government

19      transitions to the AG, that's a different topic.  That's my

20      analysis.

21             THE COURT:  Here's the thing.  I think it's a close

22      question.  The government may be right that the readback should

23      end at 2902:16.  But if I am going to go through 2903:9, the

24      Court says to Mr. Muir, "That was certainly the position of New

25      York, right?  And you can say yes, it was, no it wasn't, but

USCA4 Appeal: 23-2097   Doc: 11-4     Filed: 12/06/2023   Pg: 181 of 503
Case 3:17-cr-00012-RCN   Document 868   Filed 10/27/17   Page 93 of 93   PageID# 52423

HAD8TUC2

1    you can't disagree with the question."  And he says, "Then I

2    say no, it wasn't."  And apparently he acknowledged later on

3    that he knew that it was the position of the attorney general

4    of New York, that it was their position.

5           MR. BATH:  I understand that, Judge.  If I could have

6    just second one.

7           THE COURT:  Sure.

8           MR. BATH:  We will take it all, then.

9           THE COURT:  That's fine.

10          MR. BATH:  Could I also make an additional request?  I

11   would ask then that Mr. Muir's questioning by me on redirect,

12   in response to cross-examination, also be read back to the

13   jury.

14          THE COURT:  I am going to decline to do that because

15   the jury was very specific about what they wanted.  If they had

16   said, I want the testimony on a particular subject, I would

17   have given them the direct, the cross and the redirect, but

18   that's not what they asked for.  So thank you.

19          Bring our jury in, please.

20          MR. VELAMOOR:  There is a second note I believe.

21          THE COURT:  The second note, Court Exhibit 23, "Can we

22   have the transcripts for the recordings, please."

23          Any objection?

24          MR. VELAMOOR:  I believe there is, not from us, but

25   there is an objection from defense.

USCA4 Appeal: 23-2097   Doc: 11-4      Filed: 12/06/2023   Pg: 182 of 503
Case 3:17-cr-00001-PKC   Document 808   Filed 10/27/17   Page 94 of 99   PageID# 52424

HAD8TUC2

1      MR. GINSBERG:  The transcripts are not in evidence.

2    That's the problem.

3      THE COURT:  They are an aid to recollection.  I will

4    remind them that it is the recordings that are the evidence.

5    The transcripts are an aid to listening to the tapes and if

6    they want to listen to the tapes, they can.

7      However, this jury has listened to the tapes, with the

8    transcript in front of them as an aid to listening, and if this

9    is what they want, so long as they understand the limitation of

10    the transcript, it seems appropriate.

11      THE COURT:  OK.  Bring our jurors in, please.

12      (Jury present; time noted:  2:28 p.m.)

13      THE COURT:  Good afternoon.

14      Could the foreperson please raise their hand.

15      Excellent.

16      I have the two notes.  I am going to ask you going

17    forward, remember to sign the note for us.  Thank you.

18      So with regard to the first note, "Judge, can we get

19    Tim Muir's transcript, please, October 11, during

20    cross-examination, when he stated that he knew that the

21    interest rates were too high."

22      I am going to ask our court reporter to please read

23    back that portion of the cross-examination.

24      (Record read)

25      THE COURT:  There is a second note which reads, "Can

 1    we have the transcripts for the recordings, please."

 2              Now, ladies and gentlemen, as you remember, I know you

 3    know this, the recordings themselves are the evidence, the

 4    transcripts are an aid to listening to the tapes.  I will allow

 5    you to take the transcripts back to the jury room with you, as

 6    long as you understand that instruction, and it's your

 7    recollection of what you heard on the tapes that controls.

 8              All right.  With that, thank you, ladies and

 9    gentlemen.

10              (Jury resumes deliberations; time noted:  2:35 p.m.)

11              THE COURT:  Thank you.

12              MR. VELAMOOR:  Judge, it looks like some of them took

13    their binders, some didn't.  Should we just leave it at their

14    choice?

15              THE COURT:  Absolutely.

16              So the record is clear, the binders have remained at

17    the jurors' seats in the courtroom since they were first made

18    available to the jurors quite some time ago.  And just now,

19    after my instruction, a couple of jurors took binders back with

20    them.  It looks like, I can't see for sure, but several jurors,

21    I see at least three, who did not.  There may have been more

22    than that.  I just may not be able to see the angles.  So be

23    it.

24              (Recess pending verdict)

25              THE COURT:  The note has been shown to counsel, I am

USCA4 Appeal: 23-2097   Doc: 11-4      Filed: 12/06/2023   Pg: 184 of 503
Case 3:17-cr-00091-PKC-RCM Document 808 Filed 10/27/17 Page 96 of 83   PageID# 5242 69

HAD8TUC2

 1   advised.  It's been marked as Court Exhibit 24.

 2          "Hello, Judge.  Can you give further clarification on

 3   what collection of unlawful debt means?"  Collection of

 4   unlawful debt is in quotes.  "Still unclear to us."

 5          "Also, can you provide more clarification on elements

 6   four and five of Counts Two."  It says "Counts Two," and then

 7   it says "(2-4)."  So I think they are talking about elements

 8   four and five of Counts Two through Four, is the way I

 9   interpret it.

10          So let me hear what the government has to say, and

11   then I will hear what the defendants have to say.

12          MR. SCOTTEN:  Your Honor, I think we are broadly in

13   agreement that, given that the jury's request is not that

14   specific yet, the Court should reread its instructions in these

15   areas.

16          I think we are also agreed that for elements four and

17   five of Counts Two through Four, the Court should reread those

18   elements in their entirety, which are on pages 33 through 35,

19   and they are clearly labeled in the Court's instructions as

20   those elements.

21          With respect to unlawful debt, there is no definition

22   we are aware of given for "collection of."  But the Court

23   defines unlawful debt, which we at least imagine is the

24   contentious part, pretty thoroughly.

25          The parties are also agreed that that definition

1    begins on page 29 of the Court's instructions, at the bottom of

2    the page, in the last paragraph, beginning with the second

3    sentence of that paragraph, "For purposes of this case, an

4    unlawful debt," and then the Court goes on.

5            The government would ask the Court to read what we

6    think is the entirety of its definition, since the jury's

7    question is pretty vague and general, that we believe runs to

8    page 31, ending at the end of sort of the first paragraph that

9    carries over.  So ending "to make such loans, not continuing on

10   where it says "the focus of this sixth element."

11           THE COURT:  Let me understand your position.  Let's

12   see now.

13           Let me hear the defendants' position.

14           MR. GINSBERG:  We agree with the government on the

15   first issue, your Honor, elements four and five.

16           THE COURT:  That I should read the entire instruction

17   on four and five again, is that what you mean by that?

18           MR. GINSBERG:  Yes.

19           THE COURT:  All right.

20           MR. GINSBERG:  On the second question, we believe

21   that --

22           THE COURT:  The second question is elements four and

23   five on Counts Two through Four.

24           So the first question, go ahead.

25           MR. GINSBERG:  The first question, we believe that

1    your Honor should read the last paragraph on page 29, starting

2    where it says, "For purposes of this case, an unlawful debt,"

3    and end at the top of page 30, where it says "under state law."

4    We think the rest of it is not what the jury is asking, the

5    specific rates in each state.

6            THE COURT:  Let me hear from Mr. Bath.

7            MR. BATH:  Not being familiar with your Honor's

8    procedure, I don't why the Court couldn't maybe just refer them

9    to those pages.  They can read.  We have given these

10   instructions.  I understand that they are asking for more

11   clarification.  I'm not sure just reading it again to them

12   versus just telling them they can read whatever pages, or just

13   refer them back generally to the instructions, I don't know

14   that we are clarifying it.  Maybe that makes us feel like we

15   are answering their question, but I'm not sure we are.  I would

16   just ask that you tell them they have got the instructions, and

17   refer them back to the instructions they have.

18           THE COURT:  Thank you.

19           The one point where I am not in agreement with either

20   side is -- the question reads, "Can you give further

21   clarification on 'collection of unlawful debt' means.  Still

22   unclear to us."

23           I think the jury sees the world slightly different

24   than a bunch of lawyers, and maybe even a judge who has been

25   sitting here for several weeks.  I am reading something into

1    the word "collection" of.  That's one thing that the trial

2    evidence didn't really focus on a whole lot.

3            I think I agree with the defendants that with regard

4    to the unlawful debt portion, it's beginning on the bottom, the

5    last carry-over paragraph on 29 up to that carry-over sentence

6    at the top of 30.  That's unlawful debt.

7            I would say, lawmakers did not make the making of a

8    loan the federal crime.  The federal crime is the collection

9    of -- making an unlawful debt the federal crime.  The federal

10   crime is the collection of the unlawful debt.  And then say,

11   unlawful debt is as defined here, and I am kind of indifferent

12   whether I read them the instructions again or I hand it to

13   them.  But I think that the question calls for focus on the

14   word "collection," which is to be given its ordinary and

15   customary meaning.  It's not a term of art.

16           The point being the making of a loan is not the crime,

17   as Congress and lawmakers have framed this statute, it is the

18   collection of the unlawful debt.  That's the way I read the

19   plain language of the statute, and I think -- I may be wrong, I

20   may be overreading the question, but I don't want to under-read

21   it and I don't want to overread it.  So that's what I propose

22   to say.

23           Any objection from the government?

24           MR. SCOTTEN:  We agree with the Court's reading.  We

25   are just being very cautious to expand, but no objection.

```
 1              THE COURT:  Mr. Ginsberg.

 2              MR. GINSBERG:  We would stand on our previous

 3    position, your Honor.

 4              THE COURT:  Mr. Bath.

 5              MR. BATH:  We have no objection.

 6              THE COURT:  So bring our jury in, please.

 7              The pages, again, on the fourth and fifth element are

 8    where?

 9              MR. SCOTTEN:  33 to 35, your Honor.

10              THE COURT:  Thank you.

11              (Jury present; time noted:  3:20 p.m.)

12              THE COURT:  Thank you, ladies and gentlemen.

13              So I have the note which reads, "Hello, Judge."  And I

14    say, hello, jury.

15              "Can you give further clarification on what

16    'collection of unlawful debt' means?  Still unclear to us."

17              Let me turn to that portion before I turn to the

18    second question on there.

19              Congress and lawmakers made it a crime and made it

20    unlawful for any person, through collection of an unlawful

21    debt, through an enterprise engaged in or the activities of

22    which affect interstate commerce.

23              Actually, I am saying that incorrectly.  Let me start

24    from the beginning because what I just said to you is wrong,

25    and I want to make sure I get it right.
```

USCA4 Appeal: 23-2097    Doc: 11-4    Filed: 12/06/2023    Pg: 189 of 503
Case 3:17-cv-00461-REC   Document 300   Filed 10/27/17   Page 61 of 83   PageID# 524314

HAD8TUC2

1          So the law is that it shall be unlawful for any

2    person, employed by or associated with any enterprise, engaged

3    in or the activities of which affect interstate or foreign

4    commerce, to conduct or participate, directly or indirectly, in

5    the conduct of such an enterprise through the collection of

6    unlawful debt.

7          So you notice that the way that reads, it's not the

8    making of the loan that is the crime; it's the collection of

9    the unlawful debt.

10          Now, what is an unlawful debt?  It's defined on the

11   bottom of page 29 and up to the top of page 30 of the

12   instructions.

13          For the purposes of this case, an unlawful debt means

14   a debt that is unenforceable under state law because of the

15   laws relating to usury -- and I explained what usury is

16   elsewhere -- and which was incurred in connection with the

17   business of lending money at a rate usurious under state law,

18   where the usurious rate is at least twice the enforceable rate

19   under state law.

20          Now, you look at the instructions, there is an example

21   given, that may or may not be useful to you, but that's the

22   definition of unlawful debt.  And it's the collection of an

23   unlawful debt which is rendered unlawful, when the other

24   elements of the crime are met.  By just focusing on that

25   element, I don't want you to ignore the other elements that I

1    charged you on for Count One and for Counts Two through Four.

2    Now, the second part of your question is, "Can you

3    provide more clarification on elements four and five of Counts

4    Two" -- I read this to mean Counts Two through Four.

5    So the fourth element the government must prove with

6    respect to Counts Two through Four is that the defendant

7    willfully and knowingly engaged in the collection of an

8    unlawful debt. Willfully, knowing and unlawfully have the same

9    meaning on which I have instructed you previously.

10    For each of Counts Two, Three and Four, the indictment

11    alleges five specific unlawful debts that the defendants are

12    alleged to have engaged in collecting. The government does not

13    need to prove the existence of two or more collections of

14    unlawful debt forming a pattern. Rather, each individual

15    instance of collection of an unlawful debt is a separate

16    substantive crime.

17    So on each of the counts, you have to unanimously

18    agree that there was at least -- these are the substantive

19    counts -- that there was at least one unlawful debt that the

20    defendant who you are considering willfully and knowingly

21    engaged in the collection of. And you must unanimously agree

22    that the government has proven beyond a reasonable doubt that

23    the defendant engaged in collecting at least one particular

24    debt named in a count before you may convict the defendant of

25    that count. In other words, it's not good enough if half of

USCA4 Appeal: 23-2097    Doc: 11-4      Filed: 12/06/2023    Pg: 191 of 503
Case 3:17-cr-00091-PK Document 808   Filed 10/27/17   Page 63 of 89
Case 1:16-cr-00091-PKC   Document 300   Filed 10/27/17   Page 63 of 89   PageID# 524336

HAD8TUC2

 1    you think it was this particular debt and the other half of you

 2    think it was a different debt.  You all have to agree on at

 3    least one unlawful debt and the collection of one unlawful debt

 4    under that count.

 5         The fifth element the government must prove with

 6    respect to Counts Two through Four is that the defendant

 7    conducted or participated in the conduct of the affairs of the

 8    Tucker payday lending organization, directly or indirectly,

 9    through the collection of unlawful debt.

10         It is not enough that there be an enterprise and that

11    the defendant engaged in the collection of unlawful debt.  More

12    is required.  There must be a meaningful connection between the

13    defendant engaging in the collection of unlawful debt and the

14    affairs of the enterprise.  The defendant must have conducted

15    or participated in the enterprise by collecting or aiding in

16    the collection of unlawful debt.  It is not necessary, however,

17    that the collection of unlawful debt directly further the

18    enterprise's activities.  It is enough that the defendant's

19    collection of unlawful debt was related to the enterprise's

20    activities.

21         The fifth element also requires that the defendant

22    have some role in the operation, direction or management of the

23    enterprise.  To conduct or participate in the conduct of the

24    enterprise means the defendant must have played some part in

25    the operation or management of the enterprise.  The government

USCA4 Appeal: 23-2097    Doc: 11-4    Filed: 12/06/2023    Pg: 192 of 503
Case 3:17-cr-00291-PKC Document 806 Filed 10/27/17 Page 64 of 93    PageID# 524347

HAD8TUC2

```
 1    is not required to prove that the defendant was a member of

 2    upper management, and an enterprise is operated not only by

 3    those in upper management, but also those lower down in the

 4    enterprise who act under the direction of upper management.  It

 5    is sufficient if you find that the defendant provided

 6    substantial assistance to those who conducted the enterprise,

 7    and thereby was involved in playing a part in the direction of

 8    the affairs of the enterprise through collection of unlawful

 9    debt.

10             Thank you, ladies and gentlemen.  You may return.

11             (Jury resumes deliberations; time noted:  3:30 p.m.)

12             THE COURT:  Anything further?

13             MR. SCOTTEN:  No, your Honor.

14             THE COURT:  We are adjourned.  Thank you.

15             (Recess pending verdict)

16             THE COURT:  I have an envelope that I understand came

17    in at 4:10 p.m., and I have been advised that it's the jury's

18    verdict.

19             Please bring our jury in.

20             (Jury present; time noted:  4:22 p.m.)

21             THE COURT:  Madam foreperson, I have an envelope here.

22    Does this contain the jury's verdict?

23             THE FOREPERSON:  It does.

24             THE COURT:  Is it signed and dated by you?

25             THE FOREPERSON:  Yes.
```

USCA4 Appeal: 23-2097    Doc: 11-4      Filed: 12/06/2023    Pg: 193 of 503
Case 3:17-cr-00092-RCT Document 808 Filed 10/27/17 Page 85 of 93 PageID# 524358

HAD8TUC2

```
 1              THE COURT:  Is the verdict unanimous?

 2              THE FOREPERSON:  Yes.

 3              THE COURT:  All right.

 4              Madam Deputy, if you will return this to the

 5    foreperson and take the jury's verdict.

 6              If you'd please stand.

 7              THE DEPUTY CLERK:  As to Count One:  Conspiracy to

 8    collect unlawful debts.

 9              As to Scott Tucker, guilty or not guilty?

10              THE FOREPERSON:  Guilty.

11              THE DEPUTY CLERK:  Timothy Muir, guilty or not guilty?

12              THE FOREPERSON:  Guilty.

13              THE COURT:  Count Two:  Collection of unlawful debts

14    (Ameriloan, United Cash Loans and US FastCash).

15              As to Scott Tucker.

16              THE FOREPERSON:  Guilty.

17              THE DEPUTY CLERK:  As to Timothy Muir.

18              THE FOREPERSON:  Guilty.

19              THE DEPUTY CLERK:  Count Three:  Collection of

20    unlawful debts (500 FastCash).

21              As to Scott Tucker.

22              THE FOREPERSON:  Guilty.

23              THE DEPUTY CLERK:  Timothy Muir.

24              THE FOREPERSON:  Guilty.

25              THE DEPUTY CLERK:  Count Four:  Collection of unlawful
```

HAD8TUC2

1   debts (One Click Cash).

2           As to Scott Tucker.

3           THE FOREPERSON:  Guilty.

4           THE DEPUTY CLERK:  Timothy Muir.

5           THE FOREPERSON:  Guilty.

6           THE DEPUTY CLERK:  Count Five:  Conspiracy to commit

7   wire fraud.

8           As to Scott Tucker.

9           THE FOREPERSON:  Guilty.

10          THE DEPUTY CLERK:  As to Timothy Muir.

11          THE FOREPERSON:  Guilty.

12          THE DEPUTY CLERK:  Count Six:  Wire fraud.

13          As to Scott Tucker.

14          THE FOREPERSON:  Guilty.

15          THE DEPUTY CLERK:  Timothy Muir.

16          THE FOREPERSON:  Guilty.

17          THE DEPUTY CLERK:  Count Seven:  Money laundering

18  conspiracy.

19          As to Scott Tucker.

20          THE FOREPERSON:  Guilty.

21          THE DEPUTY CLERK:  Timothy Muir.

22          THE FOREPERSON:  Guilty.

23          THE DEPUTY CLERK:  Count Eight:  Promotion money

24  laundering.

25          As to Scott Tucker.

HAD8TUC2

```
 1                THE FOREPERSON:  Guilty.

 2                THE DEPUTY CLERK:  Timothy Muir.

 3                THE FOREPERSON:  Guilty.

 4                THE DEPUTY CLERK:  Count Nine:  Concealment money

 5     laundering.

 6                Scott Tucker.

 7                THE FOREPERSON:  Guilty.

 8                THE DEPUTY CLERK:  Timothy Muir.

 9                THE FOREPERSON:  Guilty.

10                THE DEPUTY CLERK:  Count Ten:  False Truth in Lending

11     Act disclosures (Ameriloan).

12                Scott Tucker.

13                THE FOREPERSON:  Guilty.

14                THE DEPUTY CLERK:  Timothy Muir.

15                THE FOREPERSON:  Guilty.

16                THE DEPUTY CLERK:  Count Eleven:  False Truth in

17     Lending Act disclosures (United Cash Loans).

18                Scott Tucker.

19                THE FOREPERSON:  Guilty.

20                THE DEPUTY CLERK:  Timothy Muir.

21                THE FOREPERSON:  Guilty.

22                THE DEPUTY CLERK:  Count Twelve:  False Truth in

23     Lending Act disclosures (US FastCash).

24                Scott Tucker.

25                THE FOREPERSON:  Guilty.
```

JA1576

USCA4 Appeal: 23-2097  Doc: 11-4  Filed: 12/06/2023  Pg: 196 of 503

Case 3:17-cr-00091-PKC Document 808 Filed 10/27/17 Page 68 of 89
Case 1:16-cr-00091-PKC Document 368 Filed 2/27/17 Page 68 of 89 PageID# 52435 1

HAD8TUC2

 1              THE DEPUTY CLERK:  Timothy Muir.

 2              THE FOREPERSON:  Guilty.

 3              THE DEPUTY CLERK:  Count Thirteen:  False Truth in

 4      Lending Act disclosures (500 FastCash).

 5              Scott Tucker.

 6              THE FOREPERSON:  Guilty.

 7              THE DEPUTY CLERK:  Timothy Muir.

 8              THE FOREPERSON:  Guilty.

 9              THE DEPUTY CLERK:  Count Fourteen:  False Truth in

10      Lending Act disclosure (One Click Cash).

11              Scott Tucker.

12              THE FOREPERSON:  Guilty.

13              THE DEPUTY CLERK:  Timothy Muir.

14              THE FOREPERSON:  Guilty.

15              THE DEPUTY CLERK:  Has the government proven beyond a

16      reasonable doubt that, at the time of collection of any of the

17      loans you found as the basis for a guilty verdict on Counts Two

18      through Four, the lender, in fact, was defendant Scott Tucker

19      or an entirety owned or controlled by him?

20              Yes or no.

21              THE FOREPERSON:  Yes.

22              THE COURT:  All right.  Thank you, Madam Foreperson.

23              Madam Deputy, if you would please poll the jury.

24              (Jury polled; each juror answered in the affirmative)

25              THE DEPUTY CLERK:  The jury has been polled.

1          THE COURT:  Any objection to my discharging the jury?

2          MR. VELAMOOR:  No, your Honor.

3          MR. GINSBERG:  No, your Honor.

4          MR. BATH:  No, sir.

5          THE COURT:  Ladies and gentlemen, there was a judge

6     who sat on this court from 1950 to 1988.  His name was Edward

7     Weinfeld, and he had a very peculiar custom.  At the end of a

8     jury trial, he would say to the jurors, "I will not thank you."

9     Everybody thought this was odd till he went on to speak.

10    Because to thank you is to cheapen what you have done.  You

11    have come here as citizens of the United States.  You were

12    called upon to serve, and you came and you served, and your

13    service was long and it was hard.

14          You are people who quite possibly would never have met

15    one another had you not been called to sit on this jury.  You

16    came.  You came and you worked hard.  You came when you were

17    asked.  You arrived on time.  You got back from lunch on time.

18    You didn't complain.  You served.  This is something you can be

19    proud of for the rest of your lives.  And every word I say to

20    you I would say to you even if your verdict was very different

21    than the one you returned.  I am indifferent to what your

22    verdict is.  But I am in awe of your service, important

23    service, hard service, difficult service.  You know that, and I

24    know that.

25          It's hard not just because it's difficult sitting and

USCA4 Appeal: 23-2097    Doc: 11-4    Filed: 12/06/2023    Pg: 198 of 503
HAD8TUC2

```
 1    listening to problems that you're not involved in, but it's
 2    difficult also because it's draining on you, because you know
 3    that the stakes are high for all concerned.  That's part of
 4    what makes it difficult.  But you're willingness to come and
 5    serve keeps our American judicial system, our jury system,
 6    alive, and years from now you can look back on this with great,
 7    great pride.
 8              Now, we are coming into the fall holiday season.  You
 9    are going to be at Thanksgiving parties and the like, and it's
10    going to come to pass that you will encounter someone who you
11    know, maybe a friend, maybe a cousin.  I don't want you to be
12    mean to anybody, but I want you to think back on your service,
13    and if this friend or cousin tells you how they plan to beat
14    their way out of jury service, I want you to think of me, I
15    want you to think of your own service, and in a very kind way
16    let them know that you don't think that's funny.  It's not any
17    funnier than somebody saying, I just cheated on my income tax,
18    or I stole, or I did something else that was wrong.
19              You see, if we didn't have juries, I want you to think
20    of how it would work in this country.  We would have men and
21    women who wear black robes deciding guilt or lack of guilt in a
22    case like this.  And no matter how fair that judge tried to be,
23    or was in fact, there would always be lingering questioning in
24    somebody's mind.  Who is that judge?  Who appointed him or her?
25    Where did they grow up?  What was their life about?  What
```

1   prejudices do they hold?  But when you have a system of twelve

2   people, from all walks of life who, as I said before, never

3   would have met one another, and they come together and act as a

4   jury, they act in unison, it's as fair as we are going to get

5   in this very imperfect world that we live in.  And you have

6   been the ones who acted together, consistent with your oath.

7           So one other point.  I have told you all along, you're

8   free to talk about the case.  One piece of advice I am going to

9   give you, one comment I will make, is some jurors who have

10  served in this courthouse have decided on their own to follow a

11  rule, and the rule goes like this.  They will tell everybody

12  about what happened in the courtroom, they will tell them what

13  the outcome of the case was, they will tell them about the

14  wonderful judge who presided in the case, or the not so

15  wonderful judge who presided in the case, about the lawyers,

16  about the deputy, about the witnesses.  But the one thing they

17  won't speak about is what goes on in the jury room between

18  their fellow jurors, because that is something very personal

19  and something very private.  You can do what you want, but

20  that's a rule that you may want to consider following, keeping

21  that to yourself and your fellow jurors.

22          Now, life is strange and it may come to pass that we

23  cross paths again.  Maybe on the subway.  I don't know where it

24  will be.  But if that should come to pass, I hope you will

25  please remind me of where we first came to know one another.

```
 1              So, ladies and gentlemen, with the utmost of
 2    admiration, you are discharged and you're free to go.  Your
 3    service is complete.
 4              (Jury excused)
 5              THE COURT:  Any applications?
 6              MR. VELAMOOR:  Yes, your Honor.  We seek remand as to
 7    both defendants.
 8              THE COURT:  Let me hear the basis for your
 9    application.
10              MR. VELAMOOR:  The basis is as follows.
11              First of all, as the Court knows, the burden is now
12    shifted to both defendants to establish that they should remain
13    on bail.  We seek remand primarily based on a risk of flight.
14              Now, we recognize in making this application that both
15    defendants have family ties here in this country, but we think
16    this case is overcome by other factors.  Specifically, as the
17    Court knows, the crimes for which they were convicted are very
18    serious.  They carry substantial terms of incarceration.  And
19    they both have gone to trial with the expectation of being
20    found not guilty, and, therefore, this is a significant change
21    of circumstances in their minds.
22              I think it's also the case that the crimes were
23    serious in terms of the lending activities, but as the Court
24    knows from having presided over this trial, there were also
25    crimes primarily of disobedience and disregard to courts, and a
```

1    disregard of the ability of courts to control their activities,

2    the legitimacy of courts in stopping them from engaging in

3    activities that they thought they should be able to continue

4    doing for years.  In that capacity, they filed false affidavits

5    in courts, they made false representations to courts.  I think

6    all of that conduct bears on a greater risk of flight.

7        There are also, I think, specific factors of which we

8    would point to as to each of the defendants.

9        With respect to Mr. Tucker, in particular, we have

10   frozen all the assets that we know about, but we don't believe,

11   by any stretch of the imagination, we found all of the moneys

12   that flowed to him from this conspiracy.  So we think he has

13   access to additional financing.

14       There is an episode that we have become aware of

15   during the pendency of this case that adds to our concerns.

16   Specifically, we learned, for example, that Mr. Tucker had a

17   first-class flight from Kansas City to New York paid for by an

18   associate of his Mr. Feingold, who we understand to be someone

19   with a criminal record of his own.  That he has access to

20   financing from that individual, perhaps other individuals,

21   furthers our concerns that this defendant continues to have

22   access to money and financing that can be used to flee if he so

23   desired.

24       THE COURT:  What is his present bail conditions?

25       MR. VELAMOOR:  We will pull those up in a second.

 1                    THE COURT:  That's fine.

 2             Go ahead.  Talk about Mr. Muir.

 3             MR. VELAMOOR:  Concerning Mr. Muir, we understand that

 4      he has family here in the United States, but we also believe

 5      that he is not a citizen of this country at this point.

 6      Therefore, he unlike Mr. Tucker faces the risk of deportation

 7      after --

 8                    THE COURT:  Say this again.

 9             MR. VELAMOOR:  Mr. Muir we understand not to be a

10      citizen of this country, and therefore we believe faces the

11      risk of deportation, based on the crimes for which he has been

12      convicted, after completing service of any term of imprisonment

13      that the Court imposes.

14             So for those reasons, we will pull up the bail

15      conditions as soon as we can, but we believe --

16                    THE COURT:  I may be able to get them.

17             MR. VELAMOOR:  So for these reasons, given the

18      defendants' burden to prove by clear and convincing evidence

19      that they are not a risk of flight, we don't think they could

20      be meet that burden.

21                    THE COURT:  Let me look at the bail conditions.

22             It looks like, as to Mr. Muir, a $400,000 bond, to be

23      signed by February 23, 2016, cosigned by defendant's wife by

24      March 5, 2016, secured by defendant and defendant's wife

25      interest in Overland Park, Kansas.  I assume residence.

1    Surrender passport and make no new applications.  Travel to

2    District of Kansas, Western District of Missouri, Southern and

3    Eastern Districts of New York.

4            As to Mr. Tucker, it looks like a $2 million personal

5    recognizance bond, to be signed by February 23, 2016, and

6    cosigned by three financially responsible persons by March 5,

7    and secured by property at 2405 West 114th Street, Leawood,

8    Kansas, owned by defendant and his wife.  Surrender passport

9    and make no new applications.  Travel restricted to the same

10   districts as in the case of Mr. Muir.  Defendant will not use

11   any private plane, will transfer control and custody of any

12   private plane to a third party acceptable to the government.

13           Now, I don't know whether there was any modification

14   after that.  I will ask defense counsel whether they are aware

15   of any.  And I will hear from Mr. Tucker's counsel.

16           MR. GINSBERG:  First, your Honor, I'm not aware of any

17   modifications from the time I entered the case.

18           I understand what the government's argument is.

19   However, as your Honor heard during the course of this trial,

20   and probably knew from pretrial motions, these proceedings,

21   before even the criminal charges were brought, have been going

22   on for a long time.  Mr. Tucker was well aware, given the FTC

23   lawsuit, and then the criminal indictment, that he faced the

24   possibility of conviction.  However the government wishes to

25   frame what his beliefs were, it was his hope that he was not

USCA4 Appeal: 23-2097    Doc: 11-4    Filed: 12/06/2023    Pg: 204 of 503
Case 3:17-cr-00091-PKC    Document 805    Filed 10/27/17    Page 18 of 33    PageID# 52469

HAD8TUC2

1    going to be found guilty.

2            He has travelled back and forth to New York, and other

3    places that the Court permitted, on many occasions.  He has a

4    family.  He has a wife and two children.  His house is part of

5    the bail package.

6            THE COURT:  How old are the children?

7            MR. GINSBERG:  16 and 18, your Honor.

8            THE COURT:  Go ahead.

9            MR. GINSBERG:  He obviously attended all of the

10   proceedings here and the trial knowing what the evidence was as

11   it was being presented.

12           In terms of the two more specific allegations, that

13   is, the government has some, I think at the moment, unfounded

14   belief that he has assets that he could use if he remained out

15   on bail, and I suppose they suggest by that that he could use

16   to flee, not just this jurisdiction and Kansas, but the

17   country.  I don't know that there is any basis for that

18   whatsoever.  The government might have a belief, but I don't

19   believe there is any evidence of that.

20           As to the one flight that was paid for by his friend

21   and was a first-class ticket, whatever that amount of money

22   was, the cost of a flight from Kansas to New York round-trip is

23   far different from what kinds of financial resources Mr. Tucker

24   or any defendant would need if he intended to leave the United

25   States and to live elsewhere.  Certainly, we have no reason to

1    believe that that would happen, but even just looking at the

2    financial factors, I don't believe that is a basis to change

3    his bail conditions.

4           Beyond that, your Honor, the Court has the ability to

5    add additional conditions to the current bail and modify it in

6    a number of ways.  The Court could order home confinement, the

7    Court could order electronic monitoring and more regular

8    reporting to pretrial services, and all kinds of things that I

9    think would ensure the Court that he is being watched on a

10   regular basis and would not have really the ability to flee.  I

11   am sure it's happened in the past, but I think your Honor could

12   impose conditions that are stricter than they are now and would

13   ensure his compliance with any new bail conditions.

14          But overall, your Honor, I think that the fact that

15   this matter, the whole matter, that is, all of the allegations

16   had been going on for such a long time, and that all during

17   that period of time, frankly, even before the FTC decided to

18   freeze his assets, if Mr. Tucker wanted to, he could have left

19   the United States.  He might have had more assets to take with

20   him before they were frozen by the FTC.  He had the ability to

21   run up to this case.

22          I should also make the Court aware that prior to the

23   charges being filed in this case, when Mr. Tucker had counsel,

24   private counsel both in Kansas and in New York, there was a

25   very long process, I am not sure exactly the amount of time,

HAD8TUC2

1    but months and months, if not more than a year, in which his

2    lawyers engaged with the United States Attorney's Office in an

3    effort to convince them not to bring charges.  They were

4    unsuccessful in doing that.  They were told they were going to

5    be unsuccessful in doing that.  There was an initial indictment

6    in this case, which charged only a few of the counts, then a

7    superseding indictment was brought, and during that entire

8    time, he continued to remain in the United States, and he

9    continued to remain to obey the conditions of his bail.

10            THE COURT:  The elephant in the room, of course, is

11    that was at a point in time before he was convicted.  He put on

12    a substantial defense, and the jury has convicted him, and now

13    the calculus changes.

14            MR. GINSBERG:  That's always the case when there is a

15    conviction, your Honor.  I understand that.  I don't think,

16    however, that given the way that the statute is written, that

17    the Court could not set additional conditions, modify the

18    current bail in such a way as to ensure to the Court that Mr.

19    Tucker will return, will not leave the country and will come

20    back for his presentence interview and come back for his

21    sentence.

22            I think that's particularly so, besides all the other

23    things, I want to stress again his family.  It's one thing if

24    you have an individual who doesn't have a family, and whether

25    they have a lot of money or a little money, they could take off

1   and be on their own someplace else in the world.  But when you

2   have a wife and two children, I think that becomes much less

3   likely that you would do that, for all the obvious reasons.

4          So I would urge your Honor to impose additional

5   conditions on Mr. Tucker, such as those I had recommended and

6   anything else your Honor believes would be appropriate, and I

7   think that would ensure that he returns to court when required.

8          THE COURT:  All right.  Let me hear from Mr. Bath.

9          MR. BATH:  Thank you, Judge.

10         Mr. Muir was born in -- there have been no

11  modifications.  Mr. Muir was born in Australia but has lived in

12  the United States since 1978.  I believe he is a lawful

13  permanent resident, is the correct term.  He of course is

14  married.  His wife Stephanie is a lawyer in Kansas City.

15  Mr. Muir's mother lives in Kansas City.  Stephanie's mother is

16  from Kansas City.  He has an eight-year-old daughter and a

17  12-year-old stepdaughter at home.  He has, frankly, like Mr.

18  Ginsberg said, I think every reason to continue to comply with

19  his bond conditions, to make sure he can go home and take care

20  of his family and make sure arrangements are made anticipating

21  that he could very well be going to prison.

22         I think, like Mr. Ginsberg said, I think there can be

23  modifications made.  Mr. Muir has shown up for every court

24  appearance.  He has made all of the appointments with

25  presentence.  They come and visit his house, etc., etc.  I

USCA4 Appeal: 23-3097    Doc: 11-4    Filed: 12/06/2023    Pg: 208 of 503
Case 3:17-cr-00091-PKC    Document 808   Filed 10/27/17    Page 87 of 88    PageID# 52450

HAD8TUC2

 1   recognize the calculus has changed, but I think he has

 2   motivations and you have assurances that he will appear for all

 3   future court appearances.

 4           THE COURT:  I am going to allow the two defendants to

 5   remain free pending sentencing, and I am going to impose

 6   changed conditions:  Home confinement with electronic

 7   monitoring and strict supervision.

 8           This is not a situation where there will be

 9   modifications to go out of the home for employment purposes.

10   It will be up to the discretion of the probation officer or

11   pretrial services officer, but my expectation is the exceptions

12   would be for any medical appointments or religious observances,

13   and that's about it.

14           The other thing, I am asking my deputy to give me a

15   date for sentencing, and I do not anticipate adjourning the

16   date for sentencing.  So that's the way this will be.  So if

17   the thought is that sentencing is going to get put off

18   indefinitely while reports are going to be prepared,

19   psychological reports, medical reports or the like, I don't

20   anticipate that.  So I am putting the cards face up on the

21   table.

22           Let me give you a date for sentencing.

23           MR. GINSBERG:  Your Honor.

24           THE COURT:  One second, please.

25           MR. GINSBERG:  I'm sorry.

```
 1              THE COURT:  Yes, Mr. Ginsberg.

 2              MR. GINSBERG:  I was just going to ask your Honor

 3     about the time.  I am sure your Honor is aware that usually

 4     completion of the probation report and things of that nature

 5     take these days at least 90 days or longer.  So I would ask

 6     your Honor to consider putting the sentence off till late

 7     February or early March.  I know I have a couple of commitments

 8     out of town in February.  As your Honor said, you don't want to

 9     change the date.  So I think that would be safer.

10              THE COURT:  I have a sentencing date that I am going

11     to set, and I am going to ask for an expedited report from

12     probation.

13              Flo.

14              THE DEPUTY CLERK:  January 5, 2018, for Mr. Muir at 2

15     p.m., and for Mr. Tucker at 3 p.m.

16              THE COURT:  Yes, sir.

17              MR. VELAMOOR:  Just on the bail issue.  My belief is

18     that both defendants are being supervised out of the district

19     of residence, which I think is Kansas.

20              THE COURT:  Yes.

21              MR. VELAMOOR:  I am assuming there is going to have to

22     be some kind of coordination with the office there where they

23     will impose these conditions.  We have some concern as to how

24     quickly and efficiently that is going to be done, especially

25     since we are now on Friday afternoon.  This intervening time
```

USCA4 Appeal: 23-3907    Doc: 11-4    Filed: 12/06/2023    Pg: 210 of 503
Case 3:17-cr-00051-RCJ    Document 805    Filed 10/27/17    Page 92 of 83    PageID# 52452

HAD8TUC2

1    period gives us great concern before the electronic monitoring

2    is put in place.  We don't know, frankly, what flights, when

3    the defendants plan to return.

4              THE COURT:  Let me find out.

5          When does Mr. Tucker plan to return?

6              MR. ROTH:  For the record, Mr. Tucker has been here

7    for the duration of the trial and hasn't gone back, and he was

8    here two weeks before, so he has been here seven weeks.  He

9    will pack up his stuff and head out no later than Sunday.  And

10   I would indicate that there is correspondence.  I met with

11   pretrial here during the course of this trial last week.  So

12   they are in touch with Kansas people over there.

13             THE COURT:  I am sure they are.

14         I am going to leave it to the assistant United States

15   attorneys to be in touch with pretrial services to inform them

16   of the bail modification and to get their assistance.

17             MR. VELAMOOR:  That's fine.  Can we also, perhaps,

18   have a court deadline by which we could use to incentivize the

19   office over there to impose the conditions, the electronic

20   monitoring and home detention.  We would also ask, even before

21   that bracelet is put in place, that they remain in home

22   detention.

23             THE COURT:  The home confinement starts as of now.

24   The electronic monitoring, that I would anticipate would be

25   completed by Tuesday of next week.

```
 1              MR. VELAMOOR:  OK.
 2              THE COURT:  Existing bail conditions for Scott Tucker
 3    and Timothy Muir continue, with home confinement effective
 4    immediately and electronic monitoring to be implemented by
 5    pretrial services by October 17, 2017.
 6              Anything further from the government?
 7              MR. VELAMOOR:  Nothing further, your Honor.
 8              THE COURT:  Anything further from the defendants?
 9              MR. BATH:  Mr. Muir might go back tonight, planning to
10    come back on Sunday.  So I think we will stick with that plan.
11    He will go home and he will be home, and I will work out
12    getting everything back to Kansas City.
13              THE COURT:  I have no objection to that.
14              Anything else?
15              All right.  I don't think there is anything else to be
16    said.  I said what I said before the jury verdict after the
17    jury was charged, and I certainly hope that the lawyers who
18    worked so hard get some peace and reacquainted with their
19    families.
20              We are adjourned.
21              (Trial concluded)
22
23
24
25
```

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### RICHMOND DIVISION

| | |
|---|---|
| LULA WILLIAMS, *et al*., | ) |
| | ) |
| Plaintiffs, | ) |
| | )   Case No. 3:17-cv-00461 (REP) |
| v. | ) |
| | ) |
| BIG PICTURE LOANS, LLC, *et al*., | ) |
| | ) |
| Defendants. | ) |
| | ) |

## DEFENDANT MATT MARTORELLO'S STATEMENT OF POSITION REGARDING GOOD FAITH DEFENSE PURSUANT TO ORDER AT DOCKET NO. 1247

Defendant Matt Martorello, by and through his undersigned counsel, pursuant to the *Order* at Docket No. 1247 (the "Order"), hereby submits his statement of position as to his good faith defense:

### A.    Statement of belief held.

At all relevant times, Martorello has maintained a good faith belief that Red Rock Tribal Lending, LLC's ("RRTL") loans and, subsequently, Big Picture Loans, LLC's ("BPL") loans were governed by the laws of the Lac Vieux Desert Band of Lake Superior Chippewa Indians (the "Tribe") and applicable federal law and were lawful. Martorello's state of mind was informed by, and was shared by attorneys for Bellicose and the Tribe. Public sources of information regarding the history of tribal sovereign lending, statements of state and federal agencies and the beliefs of other layman involved in the deal also informed Martorello's state of mind.

### B.    Statement of oral advice or opinions received.

Since 2011, Martorello has been in contact with several attorneys, representing both his companies and the Tribe. These attorneys stated their opinions at various times that RRTL's and

BPL's loans were lawful and governed by the Tribe's laws and applicable federal law. The substance of those opinions is set forth in deposition testimony provided in this case.

### (i)    Jennifer Weddle

Jennifer Weddle is the Co-Chair of Greenberg Traurig, LLP's American Indian Law Practice and has substantial legal and professorial experience in tribal lending and related Indian law. *See* Ex. PPP (Weddle Ex. 29). Weddle and Greenberg Traurig were retained by entities affiliated with Martorello beginning in 2011. *See* Ex. QQQ (Weddle Ex. 2) at ¶ 6. Relevant to the Court's Order, Weddle testified during her deposition at follows:

- She understood that LVD's laws would apply to the consumer loans made by RRTL and PepperCash and stated that "the whole point of the deal was to allow" the Tribe "to establish lending businesses and make loans pursuant to its tribal laws." Ex. A (Weddle Dep.) at 60:12-22.

- The parties intended for state law not to be applicable. *See id.* at 60:23-25.

- Weddle had this understanding at the outset of the transaction and maintained it from the beginning through January 2016. *See id.* at 61:1-6.

- It was Weddle's understanding and belief that the loans to consumers would be lawful under tribal law and that understanding never changed from the time she was retained in 2011 through 2016 when Bellicose was sold to the Tribe. *See id.* at 61:24-62:8.

- Weddle testified that she would not have provided services to Bellicose if she believed the services it would be providing would break the law. *See id.* at 66:4-67:6.

JA1594

- Weddle testified that, in her view from 2011 to present, loans made by sovereign Indian tribes can be made with state usury laws not applying and she does not believe that states have authority to regulate tribal lending entities in that regard. *See id.* at 68:6-69:6.

- Weddle testified to her view that the economics between the Tribe and Martorello's company were standard at the time, that there was no restriction at the time the servicing agreement was entered into in 2011 through the date of her testimony as to the amount of fees or money that a servicer could earn as a result of providing services to a tribal lending entity. *See id.* at 103:5-104:3.

- Weddle testified that, based on her involvement in representing Bellicose, that she did not believe Martorello, or any entity in which he was a principal, had control or ownership of the tribal lending entities. *See id.* at 107:6:11; *see also id.* at 108:5-19; 110:4-15; 111:14-23. "[T]he tribal nature of the entities was never in doubt." *Id.* at 108:1-3.

- Weddle testified that she had no concerns about whether the consumer-facing material and messaging was compliant with federal law. *See id.* at 123:16-25.

- Weddle testified that the decisions in *Otoe-Missouria* did not impact her belief that tribal law applied to the consumer contracts between the Tribe's lending entities and consumers. *See id.* at 128:18-129:15.

- Weddle testified that Greenburg Traurig issued an opinion letter on August 19, 2013, *see infra* Ex. BB, which more than a dozen of the firm's attorneys were involved in drafting, stating that state law does not apply to tribal loans. *See id.* at

JA1595

130:3-139:7.  Weddle said that she agreed with the opinions in the letter then and continued to hold them at the time of her testimony.  *See id.* at 137:12-19.

- Weddle testified that Greenburg Traurig issued an opinion letter on November 30, 2012, *see infra* Ex. BB, which opines that the consumer loans made by the Tribe's lending entity are enforceable under the tribe's law.  *See id.* at 139:23-141:21.

- Weddle testified that the adverse rulings in cases in involving Western Sky did not cause her to question her believe that the Tribe's laws applied to the lending agreements between RRTL and consumers because Western Sky's business was much different than that of sovereign lenders acting as arms of the tribe. *See id.* at 143:21-148:15.

- Weddle testified that she did not believe there was anything unlawful about the RRTL lending operations from inception to the date of her testimony.  *See id.* at 149:2-10.

- Weddle testified that "no one's understanding of the legality of the lending had changed" after the district court's decision in *Otoe-Missouria* was issued.  *See id.* at156:8-12.

- Weddle assisted Rosette LLP in responding to correspondence from state regulatory authorities. 164:13-165:10, 171:2-173:5.

- Weddle testified that the outcomes of the *Otoe Missouria* litigation, the Western Sky litigation, the Cash Call litigation and the litigation against Scott Tucker and Charles Hallinan did not alter her opinion as to the lawfulness of RRTL's loans because the facts relating to RRTL's operations were different.  *See id.* at 178:24-184:10; 202:2-19.

JA1596

Martorello submits that Weddle's views, as expressed in her testimony, formed the backdrop of his good faith belief that the loans issued by the Tribe's lending entities were governed by the Tribe's laws and were lawful.

      **(ii)    Daniel Gravel**

Daniel Gravel was General Counsel at Bellicose Capital from August 2012 to April 2015. *See, e.g.*, Ex. B at 95:2-6. Relevant to the Court's Order, Gravel testified during his deposition as follows:

- Gravel testified that he did not believe that the lending activities of Red Rock or Duck Creek were illegal or that he was engaging in illegal activity in his work at Bellicose Capital and Bellicose VI. *See id.* at 71:12-72:2. Nor did anyone suggest to Gravel that Red Rock and Duck Creek were engaging in illegal activity or that he was engaging in illegal activity. *See id.* at 72:3-11.

- Martorello never told Gravel anything that would suggest he believed tribal law did not apply to the lending contracts between the Tribe's lending entities and consumers. *See id.* at 72:12-22.

- Operation ChokePoint and his recollection of the activities of the New York Division of Financial Services did not change Gravel's view regarding the legality of the Tribe's lending activities. *See id.* at 75:8-76:16; 77:13-78:3; 82:9-18; 161:2-19.

- Gravel testified that the case law that developed during that time did not impact his view regarding whether RRTL's conduct was lawful because Bellicose had received legal opinions that the conduct of the tribal lending entities was legal. *See id.* at 85:20-86:11.

JA1597

- Gravel testified that the economics between Bellicose and the Tribal entities did not cause him to believe that the conduct was illegal.  *See id.* at 88:5-15.

- Gravel testified the he understood Martorello's state of mind to be that the loans were lawful under the Tribe's law and that state law did not apply.  *See id.* at 136:1-137:19.

Martorello submits that Gravel's views, as expressed in his testimony, formed the backdrop of his good faith belief that the loans issued by the Tribe's lending entities were governed by the Tribe's laws and were lawful.

### (iii)    John Williams

John Williams is a former partner at Conner & Winters LLP with more than 25 years of experience in Indian law.  *See* Ex. SSS.  Williams is an adjunct professor of Indian law at The University of Tulsa.[1]  He was retained by Bellicose Capital to facilitate its sale to the Tribe.  Relevant to the Court's Order, Williams testified during his deposition as follows:

- Williams testified that, in his experience, state laws generally do not apply to Native American tribes and that he was unaware of any legal limitation on tribal authority in the area of online consumer lending.  *See* Ex. C at 20:10-20.

- Williams was involved in drafting the documents to facilitated the sale of Bellicose to the Tribe's entity.  *See id.* at 58:20-59:1.  He further testified that the sale was not a sham.  *See id.* at 126:1-9.

Martorello submits that Williams's views, as expressed in his testimony, formed the backdrop of his good faith belief that the loans issued by the Tribe's lending entities were governed by the Tribe's laws and were lawful.

---

[1] *See* https://law.utulsa.edu/law-faculty/profile/john-williams/#About.

JA1598

**(iv)     Jennifer Galloway**

Jennifer Galloway is an attorney who had 20 years of experience at the time of her deposition. She was hired by Bellicose at the end of 2011 to provide legal advice for compliance with consumer federal lending law.  Relevant to the Court's Order, Galloway testified during her deposition as follows:



- ██████████████████████████████████████
  ██████████████████████████████████████
  █████████████████████████████████████
  ███████████████████████████████████████
  ████████████████████████████████████
  ███████████████████████████████████
  ███████████████████████████████████
  █████████████████████████████████████
  ██████████████████████████████████████
  ████████████████████████████████
  ███████████████████████████████████
  █████████████████████████████. *See id.*

- ████████████████████████████████████
  ████████████████████████████████████████
  ██████████████████████████████████ *Id.*

at 43:16-45:1.  *See also id.* at 51:7-22.

- Galloway testified that she understood originations of the Tribe's loans beginning in 2011 occurred on the Tribe's reservation.  *See id.* at 67:13-68:19.

JA1599

Martorello submits that Galloway's views, including that his companies and the Tribal lending entities were in compliance with federal consumer lending laws, formed the backdrop of his good faith belief that the loans issued by the Tribe's lending entities were lawful.

      **(v)    Rob Rosette**

Rob Rosette was the founder of Rosette, LLP, a firm specializing in federal Indian law, and which represented the Tribe since prior to April 2010. Ex. RRR (Wichtman Ex. 1) at ¶¶ 3, 5. Relevant to the Court's Order, Rosette testified during his deposition that the outcome of the *Otoe-Missouria* case did not alter his opinion that online tribal lending is legal and that he shared this opinion with Martorello. *See* Ex. E at 137:3-143:2.

      **(vi)    Karrie Wichtman**

Karrie Wichtman was an attorney at Rosette, LLP from April 2010 to July 2018 before becoming the Tribe's General Counsel. Ex. RRR (Wichtman Ex. 1) at ¶ 3. Relevant to the Court's Order, Wichtman testified during her deposition as follows:

- Wichtman testified that she had several conversations beginning in 2012 until 2016 on the issue of whether or not the tribal lending businesses were legal and she always took the view that the businesses were legal. *See* Ex. G at 48:2-51:8.

- Wichtman further testified that she told Martorello that the "sovereign lending model was sound" and that the Tribe's entities were not structured in the same way as "Western Skys, AMGs, Cash Calls, Butch Webb's". *Id.* at 59:2-16.

- Wichtman testified that the decisions in the *Otoe-Missouria* case did not cause her to believe that the Tribe's lending business was illegal and that she had conversations with Martorello to this effect. *See id.* at 59:17-63:1.

- Through her testimony, Wichtman also confirmed her belief as to the accuracy of numerous legal opinions she issued and shared with Martorello. *See id.* at 152:7-173:18.

Martorello submits that Wichtman's views, as expressed in her testimony, formed the backdrop of his good faith belief that the loans issued by the Tribe's lending entities were governed by the Tribe's laws and were lawful.

### C. Statement of documents reflecting written advice or reflecting the substance of oral advice.

Martorello's good faith belief is informed by counsel representing his companies, counsel representing the Tribe, and public sources of information.

| Date | Source | Description | Bates # |
|------|--------|-------------|---------|
| December 12, 2011 | Greenberg Traurig, LLP | Email from Jennifer Weddle to Matt Martorello and others, attaching draft revised consumer loans documents and stating that "[w]e tried to put in solid notice provisions for the consumers in compliance with the *Tribe's Consumer Code*." (emphasis added). | Ex. H (Weddle Dep. Ex. 10) |
| December 28, 2011 | Greenberg Traurig, LLP | Email from Weddle to Wichtman stating that Martorello was speaking to her partner, the former regional director for FTC, to do "a federal law compliance audit for RRTL and DCTF to make sure all procedures are federal complaint". | Ex. I (Weddle Ex. 16) |
| February 21, 2012 | Greenberg Traurig, LLP | Email from Weddle, copying Martorello, regarding a draft response to a letter received from the Ohio Attorney General, wherein she states the Tribe's business "is not subject to state regulation." | Ex. J (Rosette_Revised_ 004283); Ex. K (Rosette_Revised_ 004287) |
| March 22, 2012 | Greenberg Traurig, LLP | Email from Weddle to Martorello and Witchtman regarding a draft response to a complaint received from the State of South Dakota. Weddle states, "[u]nder no circumstances would it be appropriate | Ex. L (Rosettte_Revised_ 007062) |

JA1601

| Date | Source | Description | Bates # |
|------|--------|-------------|---------|
| | | to start refunding full amounts when Peppercash has done nothing wrong." | |
| April 19, 2012 | Greenberg Traurig, LLP | Email from Weddle, to Martorello and others, attaching a draft response letter to the Wisconsin Bureau of Consumer Protection, wherein she writes that "Wisconsin law is not enforceable as applied to the activities of the Company" and the loan agreement at issue is "governed by the laws of the [Tribe]." | Ex. M (Rosette_Revised_ 005605); Ex. N (Rosette_Revised_ 005636) |
| May 1, 2012 | Rosette LLP | Email exchange between Wichtman and Martorello, copying others, regarding a request by a vendor to include a sovereign immunity waiver in a contract. Wichtman states " ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." | Ex. O (Wichtman Ex. 20) |
| June 26, 2012 | Greenberg Traurig, LLP | Email from Weddle to Martorello and others, attaching a draft response letter to the New York Attorney General regarding a consumer complaint, wherein she states that t▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ | Ex. P (Rosette_Revised_ 007325); Ex. Q (Rosette_Revised_ 007329) |
| July 6, 2012 | Greenburg Traurig, LLP | Email from Weddle to Martorello and others regarding draft response relating to an Oklahoma resident that obtained a PepperCash loan. Weddle states "Oklahoma law has no bearing on his loan." | Ex. R (Weddle Ex. 24) |
| August 9, 2012 | Rosette LLP | Email from Wichtman to Martorello and others regarding a draft response to the state of Tennessee, stating Tennessee ▮▮▮▮▮▮▮▮▮ | Ex. S (Rosette_Revised_ 003219) |
| August 23, 2013 | Greenburg Traurig, LLP | Email from Martorello to Wichtman attaching a memorandum from Weddle on "Georgia Payday Lending Laws & Third Party Liability". The memorandum opines that "as long as it is the sovereign entity make the loans and acquiring | Ex. T (Docket No. 678-5) |

JA1602

| Date | Source | Description | Bates # |
|------|--------|-------------|---------|
| | | leads, there should not be any 'downstream' criminal liability." | |
| August 29, 2012 | Rosette, LLP<br><br>Greenberg Traurig, LLP | Emails between Weddle and Wichtman, copying Martorello, regarding a draft response to the Attorney General of Minnesota.  Wichtman states that the ███████████████████████████████████████████████████████."  Weddle responds: "This is great." | Ex. U (Rosette_Revised_035699) |
| November 3, 2012 | Greenberg Traurig, LLP | In a letter to a third party creditor to RRTL issued after review of various relevant documents, Weddle opined that RRTL's loans "are enforceable under the Tribe's Laws" and further opined that the creditors' covenants are valid, enforceable and consistent with applicable tribal and federal laws. | Ex. V (Martorello_012696) |
| December 2, 2012 | Greenberg Traurig, LLP | Email from C. Ben Huber, copying Martorello, attaching an opinion letter from Greenberg Traurig.  In the letter, issued after review of various relevant documents, Weddle opined that RRTL's loans "are enforceable under the Tribe's Laws" and further opined that the creditors' covenants are valid, enforceable and consistent with applicable tribal and federal laws. | Ex. W (Weddle Ex. 19) |
| December 10, 2012 | | Email exchange between Martorello and accountants at Deloitte regarding Bellicose valuation issues, wherein Martorello states "I don't want you to think we are doing anything wrong, we certainly are NOT. We use some of the biggest law firms in the country and they CERTAINLY would not be willing to service us and advise us if we were." (emphasis in original). | Ex. X (Weddle Ex. 28) |
| April 16, 2013 | Greenberg Traurig, LLP | Email from Weddle and received by Martorello regarding a summary judgment ruling issued in the Western Sky case.  Weddle writes:  "This is an isolated district court ruling that will certainly be appealed.  And we all know that the nature of Western Sky's business and arguments is much | Ex. Y (Weddle Ex. 20 |

| Date | Source | Description | Bates # |
|------|--------|-------------|---------|
| | | different than that of sovereign lenders acting as arms of tribes." | |
| July 8, 2013 | Rosette, LLP | Email exchange between Wichtman and Martorello, copying others.  Wichtman states: "█████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████." | Ex. Z (Wichtman Ex. 7) |
| July 10, 2013 | | Email exchange between the CEO of LVD's bank and Martorello regarding regulatory issues.  The CEO states that "I had a file full of case law to support what we were doing." | Ex. AA (Gerber Ex. 20) |
| August 19, 2013 | Greenberg Traurig, LLP | Email from Jennifer Weddle referring to an attached letter authored by co-head of GT's Indian law department and former U.S. Attorney for the state of Colorado, Troy Eid, to an ACH provider to a tribal lender. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ | Ex. BB (ROSETTE_REVI SED_002801 and ROSETTE_REVIS ED_002802) |
| September 5, 2013 | FDIC | Email from the CEO of LVD's bank informing Martorello that the FDIC had informed him that "TLE[]s [Tribal Lending Entities] are not illegal" and so CVB may continue banking for RRTL. | Ex. CC (Gerber Ex. 16) |
| September 9, 2013 | Rosette Law | Email exchange between Wichtman and the CEO of LVD's bank, stating that RRTL operates "in accordance with Tribal law . . . and all applicable federal laws.  State law is not applicable to any of the Tribe's lending entities or their activities." | Ex. DD (Chippewa_00000 9) |
| October 3, 2013 | Rosette Law | Email exchange between Wichtman and Martorello, copying others, regarding the district court decision in *Otoe-Missouria* denying the | Ex. EE (Weddle Ex. 21) |

| Date | Source | Description | Bates # |
|------|--------|-------------|---------|
| | | Tribe's motion for preliminary injunction. Wichtman states that the decision does not change the legal requirements under which the Tribe's businesses operated because it was not "a final judgment of a court of competent jurisdiction, after all appeals thereof". | |
| October 8, 2013 | Rosette Law | Opinion letter from Wichtman to ACH processor setting forth analysis of the district court's decision in *Otoe-Missouria*, which states that the ███████████████████████ | Ex. FF (MidMarch_DD 000536) |
| October 13, 2013 | National Congress of American Indians ("NCAI") | NCAI issues a resolution announcing that "NCAI supports member tribes offering online short term consumer financial products and services, which are authorized under tribal law, consistent with federal consumer protection laws as well as relevant Congressional directives". | Ex. GG (LVRM_00079590) |
| November 2013 | Rosette, LLP | In emails sent from Rosette in November 2013, Martorello is informed of conversations with ███████████████████████ | Ex. HH (Rosette_Revised_052240); Ex. II (Rosette-Revised_052243); and Ex. JJ (Rosette_Revised_044365) |
| January 10, 2014 | Rosette, LLP | Opinion letter from Wichtman setting forth basis for the position that Duck Creek Tribal Financial, LLC "is properly authorized under Tribal law to provide short term consumer finance products to consumers". | Ex. KK (Wichtman Ex. 12) |
| January 22, 2014 | Rosette, LLP | Opinion letter from Wichtman regarding the Tribal Dispute Resolution mechanism and the operations of RRTL. | Ex. LL (Wichtman Ex. 13) |

JA1605

| Date | Source | Description | Bates # |
|------|--------|-------------|---------|
| January 22, 2014 | Rosette, LLP | Memorandum from Rosette LLP summarizing *People v. MNE* (California Court of Appeal, January 21, 2014), ██████████████ | Ex. MM (LVD-DEF00017817); Ex. NN (Wichtman Ex. 14) |
| January 24, 2014 | Dechert LLP | Letter from David Bernick to the Second Circuit regarding the *People v. MNE* decision, stating the court in that case "acknowledged the tribal sovereign right to conduct business with third parties and held that these relationships in no way diminish the sovereign character of the business activities." | Ex. OO (LVD-DEF00006121) |
| April, 24 2014 | Greenberg Traurig, LLP | Weddle authors and emails "Nothing Nefarious" to Martorello.  The article is published in The Federal Lawyer and canvasses federal Indian law to detail why state law does not apply to online tribal lenders. | Ex. PP (Rosette_Revised_042100) and Ex. QQ (Martorello_012230) |
| May 9, 2014 | Rosette, LLP | Opinion letter from Wichtman to a RRLT vendor, concluding "███████████ | Ex. RR (Rosette_Revised_047173); Ex. SS (Rosette_Revised_047176) |
| June 5, 2014 | | Email exchange regarding RRTL registering with CFPB to co-regulate consumer complaints. | Ex. TT (Rosette_Revised_030630) |
| August 25, 2014 | Rosette, LLP | Email from Rosette to Martorello regarding a ███████████ . | Ex. UU (Rosette_Revised_052397) |
| October 1, 2014 | Rosette Law | Press Release by Rosette LLP regarding the Second Circuit's *Otoe-Missouria* decision and | Ex. VV (Wichtman Ex. 11) |

JA1606

| Date | Source | Description | Bates # |
|------|--------|-------------|---------|
| | | calling it "a clear victory" for RRTL as it demonstrates *California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987) controls the anlaysis. | |
| October 1, 2014 | Dechert LLP | Email exchange between Wichtman and Martorello regarding the Second Circuit's decision in *Otote-Missouria* ▮▮▮▮▮▮▮▮ | Ex. WW (Rosette_Revised_053383) |
| November 3, 2014 | Rosette LLP | Letter from Wichtman to ▮▮▮▮▮▮ "summarizing the basis for our position that RRTL is properly authorized under applicable tribal law to provide short term consumer finance products to consumers". | Ex. XX (Wichtman Ex. 15) |
| November 4, 2014 | Rosette, LLP | Email from Wichtman to Martorello regarding the Second Circuit's decision in *Otoe-Missouria*, stating ▮▮▮▮▮▮▮▮▮▮. | Ex. YY (Wichtman Ex. 6) |
| December 16, 2014 | Conner & Winters, LLP | Email from Williams to Martorello discussing *Tucker* case. Williams says that "government will have to prove intent to violate a law." | Ex. ZZ (Williams Ex. 23) |
| December 25, 2014 | | Email from Martorello to Williams seeking advice regarding a letter received by the Tribe's lending entities from the Colorado Attorney General. | Ex. AAA (Williams Ex. 24) |
| April 2015 | Greenberg Traurig, LLP | Weddle authors "Suffer no Tyranny", which is published in the Federal Lawyer. The article details the difference in tribal and state policy choices and states that "[i]nternet consumer lending" is an "area[] where state law has no force or effect on tribal entities" and "Congress has not acted to vest states with power over tribes [in the area of Internet consumer lending]. Instead, Congress has done the opposite…" | Ex. BBB (Martorello_012237) |
| April 20, 2015 | Rosette, LLP | Rosette, LLP issues a memorandum regarding its 2015 Federal and State Lending Strateg ▮▮▮▮▮▮ | Ex. CCC (Rosette_Revised_002416) and Ex. DDD |

JA1607

| Date | Source | Description | Bates # |
|------|--------|-------------|---------|
|  |  | ████████████████████████████ | (Rosette_Revised_002420) |
| May 13, 2015 |  | Tribal Chairman James Williams, Jr. makes a written submission on behalf of Duck Creek Tribal Financial, LLC to the SBREFA Panel for Potential CFPB Rulemaking for Payday, Vehicle, Title and Similar Loans. | Ex. EEE (Rosette_Revised_000977) |
| November, 2015 | FDIC | FDIC issues "Guidelines for Payday Lending," which acknowledges that home state interest rate exportation in subprime lending is occurring through bank programs administered by off-site non-bank "third party originators" that originate, collect, advertise and solicit through their arrangements with FDIC banks. | Ex. FFF (Martorello_012194) |
| November 3, 2015 | Rosette Law | Letter from Wichtman to ████████ "summarizing the basis for our position that DCTF is properly authorized under applicable tribal law to provide short term consumer finance products to consumers". T████████████████████████████ | Ex. GGG (Wichtman Ex. 16) |
| December 8, 2015 | Rosette Law | Opinion letter from Wichtman to a third party hedge fund that provided debt for RRTL's loan capital, which opines, ████████████████████████████ | Ex. HHH (CW_03427) |
| 2015 | Jennifer Galloway | 2015 Regulatory Compliance Review for Duck Creek Tribal Financial and Red Rock Tribal Lending. | Ex. III (Galloway Ex. 2) |
| January 26, 2016 | Rosette Law | Opinion letter issued by Wichtman to Eventide Credit Acquisitions, LLC.  The letter opines that the Tribal Consumer Financial Services Regulatory Code "specifically authorizes the | Ex. JJJ (Martorello_009950) |

JA1608

| Date | Source | Description | Bates # |
|------|--------|-------------|---------|
| | | conduct of the Borrower's Business" and that the "Consumer Loans offered by Big Picture in furtherance of its Business are valid and legally enforceable pursuant to the Code and applicable federal law." | |
| February 16, 2016 | Rosette Law | Opinion letter issued by Wichtman to a lender to BPL. After analyzing 25 documents and contracts, the letter opines that ███████ ████████████████████████████████ | Ex. KKK (Rosette_Revised_025001) |
| July 29, 2016 | FDIC | FDIC issues guidance acknowledge that bank "originat[e] loans for third parties" to export state interest rates under federal preemption. "In these situations, an insured institution typically serves as the originator for an entity that lacks the necessary licenses or charter to lend on its own behalf or seeks to take advantage of the institution's ability to export interest rates." | Ex. LLL (https://www.fdic.gov/news/financial-institution-letters/2016/fil16050a.pdf (page 2)) |
| March 9, 2017 | Hudson Cook, LLP | Rick Hackett, former Assistant Director of CFPB, issues Martorello a legal memorandum detailing the rise of regulatory pressures, "Operation Chokepoint", in late fall 2013 and subsequent self-admonishment by Congress, the DOJ and the FDIC. He opines that Martorello was correct to believe in the continuity of his business by 2015. | Ex. MMM (Martorello_011257) |
| November 27, 2017 | Greenberg Traurig, LLP | Weddle authors an Amicus brief on behalf of the National Congress of American Indians ("NCAI") in *CFPB v. Golden Valley Lending, Inc. et al.*, No. 2:17-cv-02521-JAR-JPO (D. Kan.) where she argues that "[t]here is no applicable state law here". | Ex. OOO (JUSTIN_MARTORELLO_08113); http://www.ncai.org/resources/NCAI_Brief_in_Support_of_MTD_Case_No_2_17-cv-02521.pdf |

Dated: May 23, 2023

_/s/ John David Taliaferro_
John David Taliaferro (Va. Bar. 71502)
LOEB & LOEB LLP

JA1609

901 New York Ave., NW
Suite 300-E
Washington, DC 20001
Tel. (202) 618-5015
Facsimile: (202) 318-0691
jtaliaferro@loeb.com

Bernard R. Given (*pro hac vice*)
LOEB & LOEB LLP
10100 Santa Monica Blvd., Suite 2200
Los Angeles, CA 90067
Telephone: (310) 282-2348
Facsimile: (310) 742-0414
bgiven@loeb.com

*Counsel for Defendant Matt Martorello*

JA1610

## CERTIFICATE OF SERVICE

I certify that on this 23rd day of May, 2023, a true and correct copy of the foregoing was served upon all parties that are registered to receive electronic service through the Court's ECF notice system in the above case.


_/s/ John David Taliaferro_
John David Taliaferro (Va. Bar. 71502)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | |
|---|---|
| LULA WILLIAMS, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| v. | )  Civil Action No. 3:17-cv-461 (REP) |
| | ) |
| BIG PICTURE LOANS, LLC, *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**PLAINTIFFS' OBJECTION TO DEFENDANT MATT MARTORELLO'S**
**STATEMENT OF POSITION REGARDING GOOD FAITH DEFENSE**

Plaintiffs, by counsel, on behalf of themselves and the classes certified by this Court,

submit this objection to Defendant Matt Martorello's Statement of Position Regarding Good Faith

Defense Pursuant to Order at Docket No. 1247 (Dkt. 1261).

**LEGAL FRAMEWORK**

"There is a defense which often is referred to as 'good faith reliance on the advice of

counsel.'" *United States v. Okun*, 2009 WL 414009, at *6 (E.D. Va. Feb. 18, 2009). "Though often

referred to as the 'advice of counsel defense,' this label is actually a misnomer" because "when

proven," it "negates the element of wrongful intent of a defendant that is required for a conviction."

*U.S. v. Stevens*, 771 F.Supp.2d 556 (D. Md. 2011) (quoting *United States v. Peterson*, 101 F.3d

375, 381 (5th Cir.1996)); *see also Okun*, 2009 WL 414009 at *6 ("good faith reliance on the advice

of counsel is a defense to specific intent crimes such as mail and wire fraud because such reliance

tends to negate the required *mens rea*.").[1] To be "entitled to a jury instruction on this defense," a

---

[1] As explained in Plaintiffs' other briefing, good faith reliance on advice of counsel is inapplicable
to a civil RICO claim for collection of an unlawful debt. For the purpose of this objection, however,
Plaintiffs will assume that the good faith defense applies.

defendant must establish two elements: "(a) full disclosure of all pertinent facts to an expert, and (b) good faith reliance on the expert's advice." *Okun*, 2009 WL 414009 at *6; *see also United States v. Westbrooks*, 780 F.3d 593, 596 (4th Cir. 2015) (same).

Where applicable, the good faith defense "is not a free-floating state of mind." *Id.* at *7. In other words, a defendant cannot just generically claim "my lawyer told me it was legal." Instead, any good faith defense "must be tethered to the charges at issue because good faith is relevant in assessing the defendant's state of mind only where state of mind or knowledge are elements of the offense." *Id.* This means that any possible defense "depends on the substance of the advice and whether it is actually linked" to the elements of a claim. *Id.* Moreover, "[i]t is critical to admissibility that the advice was received by the defendant 'before taking action.'" *Id.* at *8 (quoting *United States v. O'Connor*, 158 F. Supp. 2d 697, 728 (E.D. Va. 2001).

In recognition of these principles, the Court directed Martorello to "file a statement setting forth the factual basis of his proposed 'good faith' defense," including "(a) a statement of what belief(s) he held; (b) the substantive advice that he was allegedly provided; (c) the date the advice was given; (d) the identity of the person who provided the advice; (e) whether the advice was written or oral; (f) all written advice upon which he allegedly relied; and (g) all documents in which he comments or describes the advice." ECF No. 1247 at pg. 1-2. Martorello's response not only disregarded this Court's express directives, it contradicted his discovery responses on these precise issues.

### MARTORELLO'S STATEMENT FAILED TO COMPLY WITH THE COURT'S ORDER AND THEREBY PREVENTS PROPER ASSESSMENT OF THE DEFENSE

To begin, Martorello's response merely claims that he "maintained a good faith belief" that the loans were "governed by the laws of the Lac Vieux Desert Band of Lake Superior Chippewa Indians [] and applicable federal law and were lawful." ECF No. 1261 at 1. This statement, in

2

essence, amounts to nothing more than a generic claim that Martorello thought the loans were

lawful. Put differently, Martorello never identifies what belief he actually held. Therefore, there is

no way for to refute any alleged basis for a good faith belief. For example, Plaintiffs could show

that discovery has confirmed that Martorello was keenly aware of this important legal issue as

early as October 2013 as he wrote:

> It's impossible to buy any volume, debt providers are asking what would happen to
> everything if the ruling in NY were upheld (certain death and all vendors
> includingspvi, banks, ACH processors, bureaus etc **would all obviously shut down
> if it were considered off reservation activity**), and the class actions against banks
> and personal threats of enforcement against individuals by regulators all has
> everyone spooked. No joke, several of the biggest services have shut down.

Ex. 1 at Rosette_Revised 045573 (emphasis added). Because of this and other similar evidence,

Martorello's defense lacks any specificity or attempt to link his belief to the claim.

Consistent with this, Martorello refuses to provide any specificity regarding the substantive

advice he was provided or the date the advice was given. Further, the evidence in the record shows

that as early as August 20, 2012, Weddle informed Martorello as follows:

- "However, because tribal sovereign immunity only protects the tribe or tribal entity
  from enforcement of state laws (not their applicability), a state may seek to enforce its
  laws against individuals of the entity and affiliated third parties."

- "Tribal sovereign immunity is broad but not unlimited. While tribes are immune from
  enforcement of state laws, immunity does not protect non-tribal members, officers, or
  managers from criminal or civil liability, nor does it protect affiliated third parties."

- "Therefore, if a tribally-owned entity violates a state licensing or usury law and the
  state statute allows for enforcement against individual officers or related affiliates,
  tribal sovereign immunity could not protect the non-Indian individual officers or
  members or third party vendors from potential prosecution, although potential defense
  arguments about the impropriety of piercing the corporate veil would also be
  available."

- "Prosecution of third parties through state lending, or related criminal aiding and
  abetting, laws is supported by the Model Penal Code."

- "As applied to RRTL's and DCTF's operations, the limitation means that there is a

legal potential for prosecution of any entity not operating under the umbrella of the Tribe's sovereign immunity—i.e., any entity that is not directly operating as an arm of the tribe. To wit, 7X as an affiliated, but not protected, entity might be susceptible to prosecution. The exact extent of potential liability is dependent upon the scope and applicability of Georgia law."

- "The Georgia Attorney General would argue that a lead provider was subject to the [Georgia Payday Lending Act] because it engages in the 'arranging' of payday loans, as prohibited by the statute."

- "Georgia case law, unfortunately, adopts a broad interpretation of the [Georgia Payday Lending Act], holding that the Act is flexible in its application, prohibiting payday loans in whatever form or method transacted."

- "Here, however, the conduct criminalized by the Act is relatively clear: making payday loans. Officers of non-tribal servicers [] therefore could face liability under the Act for aiding and abetting payday lending for tribal entities or the tribe themselves."

- "Whether a third party can be held civilly or criminally liable for state lending violations is ultimately dependent upon state statue, which varies widely amongst the states."

- "Criminal liability of individual officers is entirely dependent upon state statute. Most states limit penalties to those actually engaged in the act of lending and/or receiving usurious or unlicensed funds. However, a small number of states, like New York, specifically assign liability to individual corporate officers and indirect participants of usurious and/or unlicensed activity."

- "It is possible that individuals or third-party service-providers could be held liable for criminal violations of Georgia law, but we do not see attempted prosecutions by Georgia as particularly likely."

Ex. 2 at Rosette_Revised_001986-1996. And importantly, this memorandum by Weddle pertained to an assessment of the services provided by Martorello's marketing company, 7X Services, not the comprehensive services provided by SourcePoint VI.

Additionally, in her most recent deposition testimony, Jennifer Weddle unequivocally says she never had the "full disclosure of facts" necessary to provide the legal opinion regarding Mr. Martorello's potential liability for participating in the lending enterprise:

**Q.   Do you recall ever providing Mr. Martorello personally a legal opinion regarding his role in the lending entities or with Bellicose?**

4

JA1615

A.   No.

Q.   And so you never told Mr. Martorello that what he was doing in his role was legal, correct?
A.   I don't recall having any information about what Mr. Martorello was doing individually in his role or any operational visibility whatsoever into Bellicose or SourcePoint.  As I say, our engagement was really limited to establishing the contractual relationships, and then collaborating with the tribe's counsel on policy issues thereafter.

Q.   And you had previously testified before that you didn't have any personal knowledge of what the tribe was doing in terms of running Red Rock Tribal Lending.  Is that still your testimony today?
A.   Yes, it is.

. . .

Q.   Ms. Weddle, did you ever give Mr. Martorello advice about the risks of being involved in Bellicose or SourcePoint?
 A.   So, again, my recollection is that Greenberg Traurig represented Bellicose and SourcePoint over a period of years.  And I don't recall any specific advice related to Mr. Martorello regarding individual liability.

Q.   Okay.  Did you provide any advice to Bellicose regarding any potential liability for its role in the lending operation?
A.   Again, not having the document in front of me, I think generally the memorandum that I recall was, yes, about institutional risk associated with providing the services under those servicing agreements, but not related to any operational knowledge.

Q.   So is it fair to say that you provided advice generally about the risks related to the lending operation, but you couldn't provide more specific advice because you didn't know what Mr. Martorello's specific role was in Bellicose?
A.   That's correct, I don't -- I don't recall having any information about the operations and roles of any respective parties going forward from the servicing agreements.  Generally our role was related to, like I say, the commercial financings and certain policy issues that might arise from time to time.

Q.   And in order to provide advice about potential liability for Bellicose or Mr. Martorello's role as a principal of Bellicose, is it fair to say you would have needed to know information about his actual role and responsibilities in Bellicose?
A.   I would say yes, it would be standard practice if you are being asked to opine on particular potential for liability. That yes, you should have all the facts and information before you in order to provide that kind of analysis.

**Q.  And you did not have all the facts as to Mr. Martorello as a principal of Bellicose and Bellicose's role in Red Rock or Duck Creek, correct?**
A.   Correct.  I would say it would be very rare for a law firm to have knowledge of its clients' operations in that kind of level.

Ex. 3 at 47:4-24; 62:4-64:12 (form objections removed).

Instead of providing the specific advice received from attorneys, Martorello generically cites to deposition testimony of lawyers about their theories or views on the law. For example, Martorello asserts that it "was Weddle's understanding and belief that the loans to consumers would be lawful under tribal law and that understanding never changed from the time she was retained in 2011 through 2016 when Bellicose was sold to the Tribe." ECF No. 1261 at 2. But what Weddle supposedly "believed," and what she told Martorello are two different things. And Martorello—who answers "I don't know" or "I don't recall" to nearly every question asked to him in a deposition—cannot point to vague deposition testimony of others to supply the basis of his good faith defense. As this Court explained in a similar situation:

Neither [defendants] ever sought or received professional advice or a legal opinion, oral or written, regarding the legitimacy of the Invest in America program or the Bahamian loan scheme. In this regard, although [defendants] contend that they received a legal opinion from Attorney James Schmidt, identified supra ¶ 7, the evidence simply does not support this contention. To the contrary, the trial record reflects that Schmidt provided only CIBC with an opinion letter regarding certain limited aspects of the Bahamian loan scheme, in response to various concerns CIBC had about the "in and out nature" of the loan transactions. This opinion letter, requested by CIBC and dated March 7, 1997, was addressed solely to Hywel Jones and expressly stated that "[s]aid opinion letter is issued exclusively for the benefit of the addressee." The opinion letter in no way addressed the legality of the overall Bahamian loan scheme or, as [defendants] contend, contained an opinion that the Bahamian money transactions created bona fide loans that satisfied INS regulations. Moreover, the substance of the opinion letter makes clear that [defendants] did not make full disclosure to Schmidt regarding the Bahamian loan scheme. Additionally, there is no evidence in the record that either [defendants] ever received or possessed a copy of the Schmidt letter or that they acted in reliance on Schmidt's professional legal advice. To the contrary, the record establishes that O'Connor and Geisler paid Schmidt not to provide legal advice, but rather simply to introduce them to an offshore bank willing to participate in the Invest in America scheme.

*United States v. O'Connor*, 158 F. Supp. 2d 697, 711–12 (E.D. Va. 2001) (footnotes omitted). All of these same deficiencies are present in Martorello's statement of position. It does not remotely attempt to establish: (1) who provided the advice to Martorello; (2) what advice they provided; (3) when they did it; and (4) whether it was updated after it proved to be wrong. And many of the documents were not even produced or addressed to Martorello, but rather produced in discovery by others to whom the documents are addressed too.

Furthermore, as explained above, "[i]t is critical to admissibility that the advice was received by the defendant 'before taking action.'" *Okun*, 2009 WL 414009 at \*8 (quoting *O'Connor*, 158 F. Supp. 2d at 728. Here, **every document** identified by Martorello was received after Martorello entered into the October 2011 Servicing Agreement with the Tribe and went live with the usurious lending enterprise. Martorello, in other words, was already took the unlawful action before he received any of the purported advice.

### MARTORELLO'S RESPONSE RELIES ON WITNESSES AND DOCUMENTS NEVER IDENTIFIED IN HIS DISCOVERY RESPONSES ON THIS VERY ISSUE

In addition to failing to comply with the Court's Order, Martorello's statement includes many new documents never previously identified in response to targeted discovery, including after this Court entered an order requiring him to supplement his discovery on this very issue. More specifically, Marotrello's statement includes two attorneys and forty documents never identified in his discovery responses as to his good faith defense.

As the Court will recall, one of the many discovery disputes in this case involved Plaintiffs' efforts to uncover information related to Martorello's good faith basis defense. After motions' practice on this and other issues, two relevant orders were entered with respect to this issue. First, per an agreed order dated January 23, 2019, Martorello "agreed to supplement his response to

JA1618

Interrogatory No. 13." ECF No. 327 at ¶ 4.[2] And second, over Martorello's objection, the Court entered a Memorandum Order dated March 28, 2019. ECF No. 441. In relevant part, this Order provided that the motion is "granted and Martorello shall produce all documents responsive to Document Requests 6 and 21[.]" ECF 441 at ¶ 2(C).[3] This Order further provided that the documents "shall be identified and keyed to the discovery request to which they are being produced." *Id.* at ¶ 3.

Following the entry of these Orders, Martorello supplemented his interrogatory response as follows:

> RESPONSE: Martorello does intend to assert good faith as a defense in this matter based, in part, on non-privileged information provided by attorneys Jennifer Weddle, Karrie Wichtman, Blake Sims, Rick Hackett, John Williams, Saba Bazzazieh, Tanya Gibbs, and Robert Rosette, as well as others at their respective law firms, as well as from additional non-attorney public sources, about the legality of the tribal business model and LVD's lending operations. Martorello reserves the right to revise or supplement this response. Martorello incorporates herein his response to the Plaintiffs' corresponding Document Request.

Ex. 4 at Int. No. 13. In turn, Martorello's response to Plaintiffs' document request:

> RESPONSE: Subject to the foregoing objection, Martorello directs Plaintiffs to the chart being produced herewith which identifies the Request for Production to which each produced document pertains, including: LVD-DEF00004956, LVD-DEF00006116, LVD-DEF00006161, LVD-DEF00011623, LVD-DEF00016393, LVD-DEF00016707, LVD-DEF00017711, LVD-DEF00017721, LVD-DEF00017855, LVD-DEF00018126, LVD-DEF00018187, LVD-DEF00018372, LVD-DEF00018465, LVD-DEF00018469, LVD-DEF00018871, LVD-DEF00019065, LVD-DEF00019067, LVD-DEF00019071, LVD-DEF00019104, LVD-DEF00019134, LVD-DEF00021313, MARTORELLO_003936, MARTORELLO_005411, MARTORELLO_007912, MARTORELLO_008128, MARTORELLO_008614, MARTORELLO_011167, MARTORELLO_011582,

---

[2] This interrogatory requested: "If you intend to assert subjective good faith as a defense to any of the Plaintiffs' claims, identify all advice you received from any attorney regarding the legality of the tribal business model and/or the LVD's lending operation." See Ex. 4.

[3] Request for Production No. 21 states: "If you intend to assert subjective good faith to any element of any claim alleged by Plaintiffs, all documents showing any legal advice you received pertaining to tribal lending and/or the legality of LVD's lending operation."

MARTORELLO_011588, MARTORELLO_011673, MARTORELLO_011689, and LVD-DEF00018962, as well as Presidential Executive Order 13647 (June 26, 2013), and the Native American Development, Trade Promotion, and Tourism Act of 2000. Martorello reserves the right to revise or supplement this response.

SUPPLEMENTAL RESPONSE: Pursuant to the Court's Memorandum Order (ECF No. 441), Martorello directs Plaintiffs to the chart being produced herewith which identifies the Request for Production to which each produced document pertains, including any supplemental documents related to this request. In addition, Martorello further identifies the following items produced by Rosette LLP: Rosette 000999-001004, Rosette 002699-002705, Rosette 002801-002815, MidMarch_DD 000536-545. Martorello reserves the right to supplement this response as his review of Rosette LLP's rolling production and other third party productions continue.

Ex. 5 at RFP No. 21. Other than the documents identified in the response, Martorello's chart did not contain any additional documents allegedly supporting his good faith defense. Ex. 6 (Martorello's Chart).

Martorello's position has now drastically shifted. Contrary to his responses to discovery, Martorello is now relying on two attorneys, Dan Gravel and Jennifer Galloway, who were never identified in his interrogatory response. *See* Ex. 4 at Int. No. 13. Worse yet, Martorello is relying on forty documents that were never identified as supporting his good faith basis defense. *Compare* Ex. 5 at RFP No. 21; *with* ECF No. 1261. In particular, Martorello only disclosed the following exhibits relied upon in his statement of position: BB, EE, FF, KK, LL, MM, CCC, GGG, JJJ, MMM. Other than these ten exhibits, the remaining forty exhibits were never identified by Martorello—even after two orders from this Court requiring him to supplement this information.[4]

## CONCLUSION

Even if the Court determines that a good faith defense is available to the RICO claims in this case, Martorello should be prohibited from supporting it because he failed to establish the necessary elements of the defense under the governing law as explained in Part 1. Plaintiffs further

---

[4] Plaintiffs have requested a meet and confer with Martorello's counsel so they can submit an agreed order as to which documents were never previously identified.

object to the belated identification and use of these witnesses and documents never previously disclosed in discovery as explained in Part 2. Thus, Plaintiffs request to the Court to prohibit Martorello from asserting the defense for the reasons explained in Part 1 or, alternatively, limit any such defense as identified in his discovery responses.

Respectfully submitted,
**PLAINTIFFS,** *on behalf of themselves and the classes as certified by the Court*

By: _/s/ Kristi C. Kelly_____
                    Counsel

Kristi Cahoon Kelly (VSB #72791)
Andrew Joseph Guzzo (VSB #82170)
KELLY GUZZO, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
Phone: 703-424-7572
Fax: 703-591-0167
Email: kkelly@kellyguzzo.com
Email: aguzzo@kellyguzzo.com

Leonard Anthony Bennett
Consumer Litigation Associates
763 J Clyde Morris Boulevard, Suite 1A
Newport News, VA 23601
Telephone: 757-930-3660
Facsimile: 757-930-3662
Email: lenbennett@clalegal.com
*Counsel for Plaintiffs*

JA1621

# Exhibit 1

| | |
|---|---|
| **From:** | Matt Martorello |
| **To:** | Karrie Wichtman |
| **Subject:** | Re: Payday US Offer Deactivation Notice |
| **Date:** | Tuesday, October 29, 2013 4:28:04 PM |

Not directly,  but like my email said all the marketing entities are just about closing up shop, rates on things have skyrocketed, capture just cut us down by 200k a month in buying debt, most of the servicers like spvi have literally gone out of business.  It's impossible to buy any volume, debt providers are asking what would happen to everything if the ruling in NY were upheld (certain death and all vendors including spvi, banks, ACH processors, bureaus etc would all obviously shut down if it were considered off reservation activity), and the class actions against banks and personal threats of enforcement against individuals by regulators all has everyone spooked.  No joke, several of the biggest servicers have shut down.  Though I bet they come back if things end well.

Desperately hoping that Rule 19 works and a favorable outcome on the appeal!


-------- Original message --------
From: Karrie Wichtman <kwichtman@rosettelaw.com>
Date: 10/29/2013 2:40 PM (GMT-07:00)
To: Matt Martorello <mattm@bellicosevi.com>
Subject: Re: Payday US Offer Deactivation Notice


Is this one our vendor companies?

Sent from my iPhone

On Oct 29, 2013, at 3:24 PM, "Matt Martorello" <mattm@bellicosevi.com> wrote:



-------- Original message --------
From: Sam Lepore <snlepore@yahoo.com>
Date: 10/29/2013 11:54 AM (GMT-07:00)
To: Matt Martorello <mattm@bellicosevi.com>
Subject: Fw: Payday US Offer Deactivation Notice


Hey Matt-

Issues in the US with Payday?  You seeing this?



Thanks,

**Sam Lepore**
Cell: 856.297.6827
Email: sam@samlepore.com
www.samlepore.com

[facebook.com/SouthJerseyRealEstateTrends](facebook.com/SouthJerseyRealEstateTrends)
[twitter.com/samlepore](twitter.com/samlepore)



----- Forwarded Message -----
**From:** Leadnomics <[partner-platform@leadnomics.com](mailto:partner-platform@leadnomics.com)>
**To:** [snlepore@yahoo.com](mailto:snlepore@yahoo.com)
**Sent:** Tuesday, October 29, 2013 1:47 PM
**Subject:** Payday US Offer Deactivation Notice

October 29th, 2013

As most of you are aware, the current regulatory climate in the US has resulted in significantly less lead buying in the US Payday Market. Unfortunately, this has impacted our ability to provide our publishers with a compelling offer. Therefore, after careful deliberation, we have decided to suspend lead generation activities within the US Payday market, **effective Friday, November 1.**

We will continue to focus on offers that perform better for you including Payday UK, Auto Insurance, and our newest vertical, Health Insurance.

Your account manager is available to answer any questions you might have. We thank you for your trust and

patronage in the past,
and look forward to
working with you again
in the future.

**Our All-new Payday UK Offer**

# CashAdvancer UK

We are very pleased to
announce our re-entry
into the UK payday
market with our premier
offer, **CashAdvancer
UK**. Our team has been
working tirelessly to
create and optimize this
offer to ensure high
conversion rates and
EPCs, and we've
already been seeing
great results.

CashAdvancer UK is
completely mobile
optimized and features
a brand-new form
design. Reach out to
your account manager
to get set up to run this
today.

As always, we are here
when you need us.

Sincerely,

*The Leadnomics Partner
Platform Team*

_____

Visit Us Online | Like Us on
Facebook | Follow Us on

Twitter | Check Out Our Blog

Copyright © 2013. All Rights Reserved.

**Forward this email**

This email was sent to snlepore@yahoo.com by partner-platform@leadnomics.com |
Update Profile/Email Address | Instant removal with SafeUnsubscribe™ | Privacy Policy.

Leadnomics | 2929 Arch St | Philadelphia | PA | 19104

**This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

**This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

Exhibit 2

| | |
|---|---|
| **From:** | mattm@bellicosevi.com |
| **To:** | Karrie Wichtman |
| **Subject:** | FW: Updated Georgia Analysis Memorandum |
| **Date:** | Thursday, August 23, 2012 7:42:18 AM |
| **Attachments:** | image001.jpg |
| | 97931231_4.DOCX.docx |

I wanted to share this with you. I'd asked for an opinion on if the state of GA were to say that the tribal loans are illegal and criminal, could Matt be put in jail for "aiding and abetting"? Scary thought, but if I could then so could any officers of lead providers, credit bureaus, etc. etc.

I think it's great information, though I wanted it addressing SPVI rather than 7x which they are fixing. I believe there are 13 states with criminal statutes (IL becomes one of them on Jan 1, 2013) and I'm getting that list and will share that with you too.

I just don't know how it works if a tribal loan were determined to be illegal by a state with a criminal statute, what's next?

Sorry to bombard you, I forgot you were gone! Welcome back though, we are building toward perfection here. I am very optimistic.


**Regards,**


**Matt Martorello**
Mobile: 773-209-7720
Email: MattM@BellicoseVI.com



**This email and any files transmitted with it are confidential and contain privileged or copyright information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

**From:** weddlej@gtlaw.com [mailto:weddlej@gtlaw.com]
**Sent:** Monday, August 20, 2012 7:46 PM
**To:** mattm@bellicosevi.com
**Subject:** Updated Georgia Analysis Memorandum


Matt –

We've updated the memo, which I'm hoping is closer to what you're looking for. Please take a look, and let me know if you'd like more changes. There isn't a bright-line answer here from a legal standpoint, as you'll see, although we've tried to highlight that, as a practical matter, we see the risk as lower. Give me a call if you'd like to discuss.

Thanks and best,

ROSETTE_REVISED_004994

JA1028

**Jennifer H. Weddle**
Shareholder, Co-Chair, American Indian Law Practice Group
Greenberg Traurig, LLP | 1200 17th Street, Suite 2400 | Denver, Colorado 80202
Tel 303.572.6565 | Fax 720.904.7665
weddlej@gtlaw.com | www.gtlaw.com

ALBANY · AMSTERDAM · ATLANTA · AUSTIN · BOSTON · CHICAGO · DALLAS · DELAWARE · DENVER · FORT LAUDERDALE · HOUSTON · LAS
VEGAS · LONDON* · LOS ANGELES · MEXICO CITY+ · MIAMI · NEW JERSEY · NEW YORK · ORANGE COUNTY · ORLANDO · PALM BEACH
COUNTY · PHILADELPHIA · PHOENIX · SACRAMENTO · SAN FRANCISCO · SHANGHAI · SILICON VALLEY · TALLAHASSEE · TAMPA · TEL
AVIV^ · TYSONS CORNER · WARSAW~ · WASHINGTON, D.C. · WHITE PLAINS
*OPERATES AS GREENBERG TRAURIG MAHER LLP  +OPERATES AS GREENBERG TRAURIG, S.C.  ^A BRANCH OF GREENBERG TRAURIG, P.A., FLORIDA,
USA  ~OPERATES AS GREENBERG TRAURIG GRZESIAK SP.K.
**STRATEGIC ALLIANCE WITH AN INDEPENDENT LAW FIRM**
MILAN · ROME

---

If you are not an intended recipient of confidential and privileged information in this email,
please delete it, notify us immediately at postmaster@gtlaw.com, and do not use or
disseminate such information. Pursuant to IRS Circular 230, any tax advice in this email may
not be used to avoid tax penalties or to promote, market or recommend any matter herein.



# CONFIDENTIAL ATTORNEY-CLIENT PRIVILEGED MEMORANDUM

**TO:**    Bellicose, V.I.

**FROM:**  Jennifer Weddle & Maranda Compton

**DATE:**  August 20, 2012

**RE:**    Georgia Payday Lending Laws & Third Party Liability

---

## I.    INTRODUCTION

You have asked Greenberg Traurig to review the risk to RRTL and DCTF and their service providers associated with acquiring leads from a lead-provider for Georgia-based consumers and/or directly marketing to Georgia consumers. In short, as long as it is the sovereign entity making the loans and acquiring the leads, there should not be any "downstream" criminal liability. A tribal entity operating as an arm of the tribe, regardless of location, is entitled to sovereign immunity. However, individuals and third-party vendors are susceptible to state enforcement and investigatory actions, as well as potential civil and criminal penalties in certain situations. Below please find a brief summary of the applicable case law and federal and state statutes. As always, please feel free to contact us with any additional questions or concerns.

## II.    ANALYSIS

### A.    LIABILITY OF TRIBAL ENTITY PURCHASING LEADS

RRTL and DCTF are owned and operated as arms of the tribe and will be immune from state enforcement and investigatory actions. Sovereign immunity prevents a state from enforcing its laws against a tribe or tribal entity operating as an arm-of-the-tribe. *Kiowa Tribe of Oklahoma v. Mfg. Tech., Inc.*, 523 U.S. 751 (1998). This immunity applies without distinction to governmental and commercial activities conducted both on- and off- the reservation and is shared with economic enterprises of the tribe. *Id.* at 760. However, while tribal sovereign immunity prevents a state from enforcing its laws against a tribe, it does not prevent a state from regulating on-reservation, tribal activity. *Okla. Tax. Comm'n v. Citizen Band of Potawatomi Indian Tribe*, 498 U.S. 505, 515 (1991) ("There is a difference between the right to demand compliance with state laws and the means available to enforce them").

In order to remain free from state regulation, any Georgia activities must be performed by RRTL and DCTF as arms of the tribe. A court determining the applicability of tribal sovereign immunity to an entity will inquire into whether the entity acts as an arm of the tribe so that is activities are properly deemed to be those of the tribe.[1] While the specific inquiry varies by jurisdiction, factors generally considered center on: (1) whether the tribe created the entity

---

[1] *Allen v. Gold Country Casino*, 464 F.3d 1044, 1046 (9th Cir. 2006); *Ninigret Dev. Corp. v. Narrangansett Indian Wtuomuck Hous. Auth.*, 207 F.3d 21, 29 (1st Cir. 2000); *Cash Advance and Preferred Cash Loans v. State*, 242 P.3d 1099 (Colo. 2010).

pursuant to tribal law and dependent upon tribal government approval; (2) whether the tribe owns and controls the entity; (3) whether the entity's benefits, both economic and otherwise, are inured to the tribe in its sovereign capacity – i.e., enable the tribe to develop self-sufficiency, promote tribal economic development, and generate jobs and revenue to support the tribe's governmental services and programs; and (4) whether the entity's immunity directly protects tribal sovereignty.[2]

RRTL's or DCTF are not directly subject to Georgia regulation for acquisition of leads through 7X any more than they are subject to any other potential state enforcement and investigative actions. However, because tribal sovereign immunity only protects a tribe or tribal entity from the enforcement of state laws (not their applicability), a state may seek to enforce its laws against individuals of the entity and affiliated third parties.

## B.    SOVEREIGN IMMUNITY & THIRD PARTY LIABILITY FROM STATE ACTION

Tribal sovereign immunity is broad but not unlimited. While tribes are immune from enforcement of state laws, immunity does not protect non-tribal members, officers, or managers from criminal or civil liability, nor does it protect affiliated third parties. As recently discussed in the Denver District Court Order entered in *Colorado v. Cash Advance*, Order, No. 05CV1143 (Feb. 14, 2012), a state can subpoena and seek enforcement against any non-tribal entity or officer. Order at 22. While an arm-of-the-tribe analysis would still be utilized to determine whether the activity is performed by an entity acting as an arm of the tribe, if an entity is found not to be acting as an arm of the tribe, the tribe's immunity will not protect its activities from not state-initiated investigative or, if applicable, enforcement action. Therefore, if a tribally-owned entity violates a state licensing or usury law and the state statute allows for enforcement against individual officers or related affiliates, tribal sovereign immunity could not protect the non-Indian individual officers or members or third party vendors from potential prosecution, although potential defense arguments about the impropriety of piercing the corporate veil would also be available.

Prosecution of third parties through state lending, or related criminal aiding and abetting, laws is supported by the Model Penal Code. The Model Penal Code provides some general guidance as to third-party liability. Section 5.04 states that "it is immaterial to the liability of a person who conspires with another to commit a crime that . . . the person with whom he or she conspires . . . has an immunity to prosecution or conviction for the commission of the crime."[3] Furthermore, Section 2.06 – addressing liability for conduct of another; complicity – states that "an accomplice may be convicted on proof of the commission of the offense and of his complicity, therein, though the person claimed to have committed the offense . . . has an immunity to prosecution or conviction."[4] In general, these provisions have been widely accepted in the fifty state criminal codes.[5]

---

[2] *Cash Advance,* 242 P.3d at 1099 (2010).

[3] MODEL PENAL CODE § 5.04(1)(b).

[4] MODEL PENAL CODE § 2.06(7).

[5] Many portions of the Georgia Criminal Code are based upon the Model Penal Code and the Illinois Criminal Code. *See Warren v. State*, 255 Ga. 151, 156 n.13 (Ga. 1985); *see also Haynes v. State*, 249 Ga. 119, 128-129 (Ga. 1982). Georgia criminal precedents thus frequently rely upon the Model Penal Code and its commentary in interpretations of Georgia law. *Drinkard v.*

As applied to RRTL's and DCTF's operations, this limitation means that there is a legal potential for prosecution of any entity not operating under the umbrella of the Tribe's sovereign immunity – i.e., any entity that is not directly operating as an arm of the tribe. To wit, 7X as an affiliated, but not protected, entity might be susceptible to prosecution. The exact extent of potential liability is dependent upon the scope and applicability of Georgia law.

## C.    SCOPE AND APPLICABILITY OF GEORGIA LAW

### 1.    *Georgia Payday Lending Act*

Georgia's Payday Lending Act[6] (the "Act") is decidedly broad. Under the Act, it is unlawful for "*any* person to engage in *any* business, . . . which consists in whole or in part of making, offering, arranging, or acting as an agent in the making of loans of $3,000 or less. . . ."[7] Any person who is convicted of violating this provision of the Georgia Code is guilty of a misdemeanor and may be punished by either not more than one year imprisonment or a fine not exceeding $5,000.00.[8] Additionally, the Act penalizes, identically, any person who "aids or abets" in such a violation.[9] Even beyond the express language of the applicable provisions, the legislative intent of the statue is expansive. In drafting the Act, the General Assembly "determined that various payday lenders have created certain schemes and methods in order to attempt to disguise these transactions," and attempted to draft the Act to encompass all of these "schemes and methods."

The broad language of the statute and the legislative intent invite the Attorney General and Georgia courts to interpret its scope broadly. Therefore, while the statute does not expressly state that it is applicable to individual officers or third-party affiliates, the Attorney General could argue that it impliedly extends to both.

The language of the statute expressly includes any person (including individuals), engaging in any type of business (ostensibly including lead providers) which consists of "arranging" loans of $3,000 or less.[10] The Georgia Attorney General would argue that a lead provider was subject to the Act because it engages in the "arranging" of payday loans, as prohibited by the statute. "Arranging" is undefined by statute and the legislative history fails to offer any guidance as to the scope its intent. However, Georgia case law, unfortunately, adopts

---

*Walker*, 636 S.E.2d 530, (Ga. 2006). We therefore expect that Georgia courts would rely upon these sections of the Model Penal Code when construing accomplice liability under the Georgia state law.

[5] GA. CODE. ANN. § 16-17-1, *et seq.*

[5] GA. CODE. ANN. § 16-17-2(a)(emphasis added).

[5] GA. CODE. ANN. § 16-17-2(d).

[5] *Id.*

[5] *See, e.g., Drinkard v. Walker*, 636 S.E.2d 530, (Ga. 2006). We therefore expect that Georgia courts would rely upon these sections of the Model Penal Code when construing accomplice liability under the Georgia state law.

[6] GA. CODE. ANN. § 16-17-1, *et seq.*

[7] GA. CODE. ANN. § 16-17-2(a)(emphasis added).

[8] GA. CODE. ANN. § 16-17-2(d).

[9] *Id.*

[10] *Id.*

a broad interpretation of the Act, holding that the Act is flexible in its application, prohibiting payday loans in whatever form or method transacted.  Specifically, the Georgia Supreme Court has held that even if the Act does not prohibit a particular lending scheme or business structure, the Legislature drafted the Act broadly enough to encompass a variety of arrangements and the affiliated parties.[11]  This broad interpretation is also bolstered by the express naming of arbiters and arbitration companies as parties that might aid or abet in the violation of the Act.[12]

### 2.    Aiding & Abetting Under Georgia Law

Notwithstanding immunities that may be enjoyed by the tribe or its enterprises, non-tribal entities could be held liable for aiding and abetting tribal violations of the Act.[13]  Aiding and abetting encompasses the concept of helping in the commission of a crime.[14]  Georgia defines aiding and abetting as follows:

> "Aid and abet" means to "[h]elp, assist, or facilitate the commission of a crime, promote the accomplishment thereof, help in advancing or bringing it about, or encourage, counsel, or incite as to its commission.  It comprehends all assistance rendered by words, acts, encouragement, support, or presence, actual or constructive, to render assistance if necessary."  "In essence, ... a defendant must be an accessory before the fact."[15]

Any person who aids and abets another in the commission of a misdemeanor is regarded as guilty as the actual perpetrator of the crime and may be indicted as such.[16]  If the tribe or its enterprises violate the Act, it thus stands to reason that non-tribal servicers of tribal payday lending businesses, as well as the officers of said entities, could be held liable as principals if Georgia pursued them.[17]

To be sure, Georgia has not adopted the Model Penal Code in full, nor has any other state.  But many portions of the Georgia Criminal Code *are* based upon the Model Penal Code, as well as the Illinois Criminal Code.[18]  Moreover, Georgia criminal precedents frequently rely upon the

---

[11] *Glenn v. State*, 644 S.E.2d 826, 828 (Ga. 2007)(holding that the selling of land options with rebates or check cashing both fall under the purview of the Act. "The Legislature expressly recognized that 'various payday lenders have created certain schemes and methods in order to attempt to disguise these transactions,' and accordingly defined the prohibited conduct in a manner to encompass all of the creative ways payday lenders might use to avoid the Act")(citing Ga. Code Ann. § 16-17-1(c)).

[12] Ga. Code Ann. § 16-17-1(d).

[13] *Id.* ("Any person who aids or abets such a violation, including any arbiter or arbitration company, shall likewise be guilty of a misdemeanor of a high and aggravated nature and shall be punished as set forth in this section").

[14] *Sharpe v. State*, 531 S.E.2d 84, 89 (Ga. 2000).

[15] *Jones v. State*, 503 S.E.2d 902, 904 (Ga. App. 1998).

[16] *Moon v. State*, 85 Ga. App. 212, 214 (1952).

[17] *Brawner v. State*, 87 Ga. App. 746, 749 (1953).

[18] *See Warren v. State*, 255 Ga. 151, 156 n.13 (Ga. 1985); *see also Haynes v. State*, 249 Ga. 119, 128-129 (Ga. 1982).

Model Penal Code and its commentary in interpreting of Georgia law.[19]  We therefore expect that Georgia courts would rely upon the same sections of the Model Penal Code referenced above in considering whether officers should be held criminally liable under the Act.

Liability could also hinge on interpretation of the statute and whether the officers in question had been given "fair warning of the nature of the conduct forbidden and the sentence authorized upon conviction."[20]  But Georgia criminal statutes are narrowly construed against the state and liberally in favor of the defendant.[21]  That is, no person can be held responsible for criminal conduct which is not reasonably understood as being illegal.[22]  Here, however, the conduct criminalized by the Act is relatively clear: making payday loans.  Officers of non-tribal servicers are therefore could face liability under the Act for aiding and abetting payday lending for tribal entities or the tribes themselves.

###### 3.  *Officer Liability Under Georgia Law: Piercing the Corporate Veil and Individual Culpability*

Even if the Georgia law could reach a non-tribal entity or affiliate, there is still an additional step to hold individual officers liable.  It is a longstanding principle that officers and shareholders are generally not personally liable for corporate acts.[23]  Individual officer of a corporate entity may only be held liable under two circumstances:  (1) where the corporate veil is pierced, or (2) where the officer is individually liable.  The former involves misuse of the corporate form and the latter is a product of the officer's individual misconduct.

The concept of piercing the corporate veil is applied in Georgia to remedy injustices which arise where a party has "overextended" its privilege in the use of a corporate entity in order to "defeat justice, perpetuate fraud, or to evade contractual or tort responsibility."[24]  To pierce the corporate veil, there must be evidence of abuse of the corporate form.  To prove such, it is necessary to show that the shareholders disregarded the corporate entity and made it a "mere instrumentality for the transaction for their own affairs" so that "there is such unity of interest

---

[19] *See, e.g., Drinkard v. Walker*, 636 S.E.2d 530, (Ga. 2006).

[20]    § 16-1-2(2).  *See also City of Jesup v. Bennett*, 226 Ga. 606, 609 (1970) (internal citations omitted) ("In reaching a correct result in this case we are not unmindful that, where the language of an Act is plain and unequivocal, judicial construction is not only unnecessary but is forbidden. However, even though the literal language of an Act may be plain and unequivocal it is the duty of the courts, in determining the legislative intent under the cardinal rule first alluded to, to refrain from ascribing to the legislature a wholly unreasonable intention or an intention to do a futile and useless thing.  So, where to construe an Act of the legislature in a particular way would, while hewing to its literal terms, result in defeating the obvious legislative purposes and intent, such construction will not be given where an obvious typographical or clerical error can be corrected so as to carry out such intent.  Finally, in construing the statute so as to give effect to the legislative intent a mere segment of the statute should not be lifted out of context and construed without consideration of all the other parts of the statute.")

[21] *Billingsley v. State*, 183 Ga. App. 850, 852 (1987).

[22] *State v. Luster*, 204 Ga. App. 156, 157(1992).

[23] *Milk v. Total Pay & HR Solutions*, 634 S.E.2d 406 (Ga. App. 1995).

[24] *Amason v. Whitehead*, 367 S.E.2d 107 (Ga. App. 1988).

and ownership that [25]  Specifically, Georgia courts have found that evidence of such abuse can be shown by a "commingling on an interchangeable or joint basis or confusing the otherwise separate properties, records, or control."[26]  Unless the Georgia Attorneys General Office could produce evidence that the individual officers of 7X abused the corporate form by disregarding the separateness of the corporation through commingling or confusing its assets, records or control with their own, a Georgia court would not find that the corporate veil could be pierced.

When the evidence is insufficient to pierce the corporate veil, the liability of the corporate officers for a tortious or criminal act committed by the corporation is dependent upon separate evidence of the individual officer's direct participation in the misconduct.[27]  A corporate officer who takes part in the commission of a tortious or criminal act committed by the corporation is personally liable therefor, but an officer of a corporation who takes no part in the commission of a tortious or criminal act by the corporation is not personally liable unless he or she specifically directed the particular act to be done or participated or cooperated therein."[28] Georgia courts have found that "an officer of a corporation cannot assert that criminal acts, in the form of corporate acts, were not his acts merely because carried out by him through the instrumentality of the corporation which he controlled and dominated in all respects and which he employed for that purpose."[29]  Therefore, unless the Georgia Attorney General can produce evidence that an individual officer of 7X (or other non-tribal affiliate) personally "arranged" payday loans, culpability cannot be individually assigned.

## D.    GEORGIA'S  ABILITY TO PURSUE THIRD PARTIES: EXAMPLES FROM THE TRUE LENDER, GAMING, AND THE CIGARETTE TAX CONTEXTS

To better understand how Georgia might pursue a lead provider as a third-party affiliate of a tribal entity, we turn to three analogous contexts: Partnerships between In-State Agents and Out-of-State Banks; Gaming; and Cigarette Sales.

### 1.    *True Lender Analysis: Partnership Agreements between In-State Agents and Out-of-State Banks*

Because many state usury and lending laws provide an exception for out-of-state, FDIC-regulated banks, many in-state entities entered into partnership agreements with out-of-state banks to offer short-term loans.  Through these agreements, an in-state entity would operate merely as an agent or "broker" in the entering into of certain short-term, small credit loans on behalf of the out-of-state bank.  This behavior guided many states, including Georgia, to amend or create stricter laws regarding the "true lender" in such arrangements.

Georgia's Payday Lending Act was created with the specific intent of preventing this behavior.  In the Act's Legislative Intent, the General Assembly expressly declares that "the use of agency or partnership agreements between in state entities and out-of-state banks, whereby the in-state agent holds a predominant economic interest in the revenues generated by payday loans made to Georgia residents, is a scheme or contrivance by which the agent seeks to circumvent

---

[25] *Baillie Lumber Co. v. Thompson, 612 S.E.2d 296, 297 (Ga. 1988).*

[26] *Pazur v. Belcher*, 659 S.E.2d 804

[27] *Beasley v. A Better Gas Co.*, 604 S.E.2d 202 (Ga. App. 2004).

[28] *Lawton v. Temple-Warren Ford. Inc.*, 416 S.E.2d 527 (Ga. App. 1992).

[29] *Parish v. State*, 342 S.E.2d 360 (Ga. App. 1986).

[Georgia law]."[30]   The "true lender" in these "schemes," the General Assembly reasoned, was the in-state entity.

When addressing the "true lender" issue, a Georgia Court of Appeals found that despite the presence of the out-of-state bank exception in the statute and a partnership agreement between the parties, the in-state agent of an out-of-state bank could still be subject to investigations for potential violations of Georgia law.[31]  In the specific case, Advance America, a Georgia-based lender made short-term consumer loans as an agent for, and pursuant to a Marketing and Servicing Agreement with, BankWest, Inc., a South Dakota federally-insured state bank.  The court held that Advance America was still subject to the State's investigative authority because "parties to a private contract who admittedly make loans to Georgia residents cannot, by virtue of [provisions of that contract], exempt themselves from investigation."[32]  The court reasoned that the State's investigatory power included the ability to determine if Advance America was the de facto lender.  In coming to this conclusion, the court was troubled by various terms in the Marketing and Servicing Agreement, specifically: that Advance America received a majority of the fee or interest charged on each loan and retained a majority of the risk of loss; Advance America agreed to indemnify BankWest for claims relating to the loans; and that Advance America operated independently in states where payday lending was legal but as an agent for an out-of-state bank in states where payday lending was illegal.

### 2.   _Gaming: The Inapplicability of Cabazon and other Gaming Cases_

While at first blush it might appear that the liability of third parties associated in tribal lending is most similar to cases involving tribal casinos, tribal casino operations are uniquely situated because of the statutory and procedural guidelines established by the Indian Gaming Regulatory Act ("IGRA").  Among IGRA's numerous requirements, a tribe must authorize its casino through a tribal ordinance and an interstate gaming compact. 25 U.S.C. § 2710(d)(1). Therefore, states are not often in the position of pursuing regulatory or criminal claims against tribes or affiliated entities and, if they do, they do so through the procedures provided for in IGRA. Beyond the procedures for state enforcement provided for under IGRA, specific states have also tried to pursue enforcement under Public Law 280.  Under P.L. 280, Congress expressly granted six states[33] extensive criminal and civil jurisdiction over tribal lands within the affected states. The statute provided for a broad grant of criminal jurisdiction over offenses committed by or against Indians within all Indian Country within the State and a more limited grant of civil jurisdiction.

In _California v. Cabazon Band of Mission Indians,_[34] California attempted to apply state gaming restrictions on tribal land under its P.L. 280 authority.  The Supreme Court rejected the state's argument and adopted a "criminal/prohibitory" "civil/regulatory" distinction.[35]  The court held that "if the intent of a state law is generally to prohibit certain conduct, it falls within PL 280's grant of criminal jurisdiction, but if the state law generally permits the conduct at issue,

---

[30] GA. CODE. ANN. § 16-17-1(c).

[31] _BankWest, Inc. v. Oxendine_, 266 Ga.App. 771 (2004).

[32] _Id._ at 775.

[33] Five states initially – California, Minnesota, Nebraska, Oregon, and Wisconsin – then Alaska upon statehood.

[34] 480 U.S. 202 (1987).

[35] _Id._ at 209.

subject to regulation, it must be classified as civil/regulatory and PL 280 does not authorize its enforcement on an Indian reservation."[36]  Because the Court found that California did not prohibit all forms of gambling (allowing bingo and promoting a state lottery), it held that the state's relationship to the behavior was regulatory in nature and therefor unenforceable on Indian lands.  Furthermore, the Court rejected California's argument that *unregulated* bingo was a misdemeanor and, therefore, may be prohibited under the state's broad criminal jurisdiction on Indian reservations.  As the court reasoned, "but that an otherwise regulatory law is enforceable by criminal as well as civil means does not necessarily convert it into a criminal law within the meaning of PL 280."[37]

As applied to Georgia payday lending laws, state jurisdiction under PL 280 is inapplicable for two reasons: first, Georgia is not a PL 280 state; second, even if it were granted PL 280 jurisdictional authority (extremely unlikely given the basic federal departure from PL 280 as an outdated "termination era" policy), the Georgia law only seeks to regulate, but does not prohibit outright, the provision of payday loans in the state.

### 3.    *Cigarette Taxes and the Culpability of Manufacturers and Wholesalers*

Unlike in the gaming context, the relationship of wholesalers of cigarettes to tribal cigarette retailers is comparable to tribal lending entities and affiliated third parties.  The Supreme Court has, on numerous instances, addressed the ability of states to regulate tribal sales of cigarettes to non-members and the scope of a state's authority to enforce those regulations.  In these instances, the Supreme Court has consistently upheld a state's right to tax a tribal entity's on-reservation sales to non-members.[38]  And a state's effort to enforce those laws is not entirely foreclosed by sovereign immunity.  As the Court stated in *Potawatomi*:

> "There is no doubt that sovereign immunity bars the State from pursuing the most efficient remedy, but we are not persuaded that it lacks any adequate alternatives.  We have never held that individual agents or officers of a tribe are not liable for damages in action brought by the State.  And under today's decisions, States may of course collect the sales tax from cigarette wholesalers, either by seizing unstamped cigarettes off the reservation, or by assessing wholesalers who supplied unstamped cigarettes to the tribal stores.  States may also enter into agreements with the tribes to adopt a mutually satisfactory regime for the collection of this sort of tax.  And if Oklahoma and other States similarly situated find that none of these alternatives produced the revenues to which they are entitled, they may of course seek appropriate legislation from Congress."[39]

Just as a state may seek to collect taxes from wholesalers or make off-reservation seizures of a wholesaler's illegally transported products, a state could seek to enforce its state

---

[36] *Id.*

[37] *Id.* at 211.

[38] *Potawatomi*, 498 U.S. at 512 ("Oklahoma argues that the Potawatomi's tribal immunity notwithstanding, it has the authority to tax sales of cigarettes to nonmembers of the Tribe at the Tribe's convenience store.  We agree.")

[39] 498 U.S. at 514.

lending laws through investigative and adjudicatory action against a tribal lender's third party vendors or servicers.[40]

## E.    OTHER STATE STATUTES

Whether a third party can be held civilly or criminally liable for state lending violations is ultimately dependent upon state statue, which varies widely amongst the states. Most state statues require individual knowledge for culpability associated with usury or licensing violations. Some states extend criminal liability to officers and members of violative entities. And a few states extend criminal liability even to those who directly or indirectly fund or participate in the violations.

Examples of how states with large population centers treat usury and licensing violations is instructive in considering how Georgia might try to enforce its laws.

### 1.    California

California law assesses civil and criminal penalties for violations of the state's usury laws. However, liability is limited to the person or entity that actually lent and received funds in excess of the state's usury laws. Specifically, the California "loan-sharking" law holds criminally liable any person, company, association or corporation "who willfully makes or negotiates, for himself or another, a loan of money, . . . and who directly or indirectly charges, contracts for, or receives with respect to any such loan any interest or charge of any nature, the value of which is in excess of that allowed by law."[41] A violation of the California loan-sharking law is a felony and is punishable by not more than five years in state prison or one year in county jail.

Importantly, the California courts have interpreted this language to require conscious participation in the violation by the member, officer or director who is to be punished therefor.[42] "The mere fact that [a person] is such member, officer or director at the time of the violation is not enough."[43] Therefore, in California, service-provider's members and/or officers cannot be held criminally liable unless he or she, in his or her role in the company, approves a loan or receives funds in excess of the state's usury laws.

### 2.    Arizona

Arizona law makes usury a class 1 misdemeanor, a lesser offense than in California. However, unlike California, those that may be prosecuted for usury include both those that "knowingly engage in" or those that "directly or indirectly provide financing for the business of making loans at a higher rate of interest or consideration than authorized by law."[44] The violation for licensing is simply the voiding of any loan.[45]

---

[40] *See e.g., Dept. of Tax. and Fin. v. Milhelm Attea & Bros.*, 512 U.S. 61 (1994).

[41] CAL. CIV. CODE § 1916-3(b),

[42] *People v. Campbell*, 291 P. 161 (Cal. Ct. App. 1930).

[43] *Id.*

[44] ARIZ. REV. STAT. § 13-2208.

[45] ARIZ. REV. STAT. § 6-613 ("Any consumer lender loan that is made by a person who . . . is not licensed is void, and the person making that consumer lender loan has no right to collect, receive

The language of the Arizona usury law is broad and no case law exists to provide further guidance or interpretation. However, the plain language of the statute does not implicate a service-provider's services and/or its officers or members. Servicing companies do not actually "engage in" the business of loaning money. Finally, the statute does not extend liability to individual officers or members. Therefore, individually liability is not a significant risk.

### 3. New York

New York's usury and licensing laws apply broadly. New York's criminal usury statutes, like others, still requires a personal violation, requiring an individual to "knowingly charge, take, or receive" interest at a rate exceeding 25% per annum in order to be in violation.[46] However, a violation of New York's licensing requirement is much more broad. "Any person or other entity, including the officers, directors, agents, and employees thereof, which shall violate or participate in the violation" of the licensing requirement "shall be guilty of a misdemeanor."[47] Under this language, it is possible that individual officers of service-providers could be held personally liable for "participating" in licensing violations in New York.

### 4. Texas

Texas only assesses criminal penalties for usury and such penalties are only assessed for the actual contracting for, charging or, or receipt of usurious interest.[48] Without the occurrence of any one of those conditions, the penalty provisions are not triggered.[49] Therefore, because neither service-providers, nor their officers, will be specifically nor individually contracting for, charging, or receiving usurious interest, they do not bear a significant risk of criminal liability.

### 5. Florida

Florida usury law is similar to other states in that violations are only assessed against the person or company actually engaged in lending and/or receiving funds.[50] Licensing violations are applied to any financial institution, "or its officers, directors, or employees."[51] Florida courts have found usury and licensing violation analogous to officer liability for tortious conduct, so that principals of a lender can only be personally liable for damages arising from the lender's usurious or unlicensed conduct to the extent of the individual's knowledge and participation in the transaction.[52] Furthermore, "transaction" has been interpreted to mean the specific transaction or transactions in question.[53] Therefore, unless a service-provider's officers have

---

or retain any principal, finance charges or other fees in connection with that consumer lender loan."

[46] N.Y. PENAL LAW § 190.40. Criminal usury in the first degree requires a previous conviction of criminal usury. N.Y. PENAL LAW § 190.42.

[47] N.Y. BANKING LAW § 358. See also N.Y. BANKING LAW § 340 (Doing business without license prohibited).

[48] TEX. FIN. CODE ANN. § 305.001.

[49] *Tanner Dev. Co. v. Ferguson*, 561 S.W.2d 777 (Tex. 1997).

[50] FLA. STAT. § 687.071.

[51] FLA. STAT. § 655.942.

[52] *Alliegro v. Pan American Bank of Miami*, 136 So.2d 656 (Fla. Dist. Ct. App. 1962), *cert. den.* 149 So.2d 45.

[53] *Kay v. Amendola*, 129 So.2d 170 (Fla. Dist. Ct. App. 1961).

personal knowledge of or participate in specific usurious or unlicensed transactions, liability cannot be assessed against them.

## III.    CONCLUSION

Criminal liability of individual officers is entirely dependent upon state statute. Most states limit penalties to those actually engaged in the act of lending and/or receiving usurious or unlicensed funds. However, a small number of states, like New York, specifically assign liability to individual corporate officers and indirect participants of usurious and/or unlicensed activity.

Georgia's broad payday lending laws and the willingness of Georgia courts to apply those laws expansively, signals that the state might pursue non-Indian third party vendors, including engaged in the chain of acquiring Georgia consumer information from a lead provider or in direct-marketing to Georgia consumers. But Georgia's ability to go-after third-party service providers is by no means clear.

As a practical matter, it is worth noting that, even where it is statutorily provided for, individual criminal or civil liability against individual service-provider officers would be difficult to assess. States would generally gain information of a service-provider's activities through investigatory subpoenas served on known lending entities, which in this case are immune from state enforcement actions. While, as stated in section A of our analysis above, a state could certainly subpoena and/or initiate an enforcement action against a non-tribal service-provider, it will likely be difficult for state enforcement agencies to gain the necessary information to do so. And even if Georgia had that information, from a policy perspective, it is difficult to assess why Georgia would make the choice to attack an individual's or a third-party's provision of services to an Indian tribal government clearly acting pursuant to its sovereign authority. If Georgia undertook such an effort, the state could readily expect significant tribal opposition.

It is possible that individuals or third-party service-providers could be held liable for criminal violations of Georgia law, but we do not see attempted prosecutions by Georgia as particularly likely. Georgia has been deferring in significant part to the FTC and the CFPB in these matters and would likely follow their lead on any third-party efforts. As you know, the FTC's third-party enforcement efforts in the tribal model context are in their infancy and pending in the *Tucker* litigation in Nevada, which we continue to monitor closely.

Exhibit 3

**LULA WILLIAMS, ET AL. vs BIG PICTURE LOANS, LLC, ET AL.**
**Jennifer Weddle on 05/08/2023**

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE EASTERN DISTRICT OF VIRGINIA

 3                       Richmond Division

 4     Civil Action No. 3:17-cv-00461 (REP)
       _____
 5
       REMOTE VIDEOTAPED DEPOSITION OF:
 6     JENNIFER WEDDLE - May 8, 2023
       _____
 7

 8     LULA WILLIAMS, et al.,

 9          Plaintiffs,

10     v.

11

12     BIG PICTURE LOANS, LLC, et al.,

13          Defendants.
       _____
14

15              PURSUANT TO NOTICE, the remote
       videotaped deposition of JENNIFER WEDDLE, taken on
16     behalf of the Plaintiffs, in Denver, Colorado, by
       remote means, on May 8, 2023, at 9:05 a.m. MDT, before
17     Wendy C. Heath, Registered Professional Reporter,
       Certified Realtime Reporter, appearing remotely from
18     Jefferson County, Colorado.

19

20

21

22

23

24

25
```

**LULA WILLIAMS, ET AL. vs BIG PICTURE LOANS, LLC, ET AL.**
**Jennifer Weddle on 05/08/2023**                                    Page 2

```
 1                    REMOTE APPEARANCES

 2    FOR THE PLAINTIFFS:

 3              KRISTI CAHOON KELLY, ESQ.
                ANDREW JOSEPH GUZZO, ESQ.
 4              Kelly Guzzo, PLC
                3925 Chain Bridge Road
 5              Suite 202
                Fairfax, Virginia 22030
 6              703-424-7570
                Kkelly@kellyguzzo.com
 7              Aguzzo@kellyguzzo.com

 8
      FOR THE DEPONENT JENNIFER WEDDLE:
 9
                WILLIAM D. HAUPTMAN, ESQ.
10              Wheeler Trigg O'Donnell LLP
                370 17th Street
11              Suite 4500
                Denver, Colorado 80202
12              303-244-1800
                Hauptman@wtotrial.com
13

14    FOR THE DEFENDANT MATTHEW MARTORELLO:

15              ALICIA M. CLOUGH, ESQ.
                Loeb & Loeb, LLP
16              10100 Santa Monica Boulevard
                Suite 2200
17              Los Angeles, California 90067
                310-282-2338
18              Aclough@loeb.com

19
      Also Present:
20
                Javonte Parson, Videographer
21              Fiona McKeown, paralegal, Loeb & Loeb, LLP

22

23

24

25
```

USCA4 Appeal: 23-2087    Doc: 11-4    Filed: 12/06/2023    Pg: 263 of 503
Case 3:17-cv-00461-REP   Document 1270-3   Filed 05/24/23   Page 4 of 8 PageID# 55229

| | | |
|---|---|---|
| 1 | conversations, but I don't recall the delivery of a | 10:12 |
| 2 | legal opinion to Bellicose.  But that was more than a | 10:12 |
| 3 | decade ago, so I really don't recall. | 10:12 |
| 4 | **Q.   Do you recall ever providing** | 10:12 |
| 5 | **Mr. Martorello personally a legal opinion regarding** | 10:12 |
| 6 | **his role in the lending entities or with Bellicose?** | 10:12 |
| 7 | A.   No. | 10:13 |
| 8 | **Q.   And so you never told Mr. Martorello** | 10:13 |
| 9 | **that what he was doing in his role was legal, correct?** | 10:13 |
| 10 | MR. HAUPTMAN:  Object to form. | 10:13 |
| 11 | MS. CLOUGH:  Object to form. | 10:13 |
| 12 | A.   I don't recall having any information | 10:13 |
| 13 | about what Mr. Martorello was doing individually in | 10:13 |
| 14 | his role or any operational visibility whatsoever into | 10:13 |
| 15 | Bellicose or SourcePoint.  As I say, our engagement | 10:13 |
| 16 | was really limited to establishing the contractual | 10:13 |
| 17 | relationships, and then collaborating with the tribe's | 10:13 |
| 18 | counsel on policy issues thereafter. | 10:13 |
| 19 | **Q.   (BY MS. KELLY)  And you had previously** | 10:13 |
| 20 | **testified before that you didn't have any personal** | 10:13 |
| 21 | **knowledge of what the tribe was doing in terms of** | 10:13 |
| 22 | **running Red Rock Tribal Lending.  Is that still your** | 10:14 |
| 23 | **testimony today?** | 10:14 |
| 24 | A.   Yes, it is. | 10:14 |
| 25 | **Q.   And do you have any personal knowledge** | 10:14 |

JA1644

USCA4 Appeal: 23-2087    Doc: 11-4    Filed: 12/06/2023    Pg: 264 of 503

| | | |
|---|---|---|
| 1 | communication, I would assert attorney-client | 10:34 |
| 2 | privilege.  But I think that Ms. Weddle also answered | 10:34 |
| 3 | the question already. | 10:34 |
| 4 | **Q.    (BY MS. KELLY)  Ms. Weddle, did you ever** | 10:35 |
| 5 | **give Mr. Martorello advice about the risks of being** | 10:35 |
| 6 | **involved in Bellicose or SourcePoint?** | 10:35 |
| 7 | MR. HAUPTMAN:  Object to form. | 10:35 |
| 8 | MS. CLOUGH:  Same objection. | 10:35 |
| 9 | MS. KELLY:  And, sorry, Alicia, is your | 10:35 |
| 10 | objection to form? | 10:35 |
| 11 | MS. CLOUGH:  That's right. | 10:35 |
| 12 | MS. KELLY:  Okay. | 10:35 |
| 13 | A.   So, again, my recollection is that | 10:35 |
| 14 | Greenberg Traurig represented Bellicose and | 10:35 |
| 15 | SourcePoint over a period of years.  And I don't | 10:35 |
| 16 | recall any specific advice related to Mr. Martorello | 10:35 |
| 17 | regarding individual liability. | 10:35 |
| 18 | **Q.    (BY MS. KELLY)  Okay.  Did you provide** | 10:35 |
| 19 | **any advice to Bellicose regarding any potential** | 10:35 |
| 20 | **liability for its role in the lending operation?** | 10:35 |
| 21 | A.   Again, not having the document in front | 10:35 |
| 22 | of me, I think generally the memorandum that I recall | 10:35 |
| 23 | was, yes, about institutional risk associated with | 10:36 |
| 24 | providing the services under those servicing | 10:36 |
| 25 | agreements, but not related to any operational | 10:36 |

**LULA WILLIAMS, ET AL. vs BIG PICTURE LOANS, LLC, ET AL.**
Jennifer Weddle on 05/08/2023                    Page 63

| | | |
|---|---|---|
| 1 | knowledge. | 10:36 |
| 2 |      **Q.  So is it fair to say that you provided** | 10:36 |
| 3 | **advice generally about the risks related to the** | 10:36 |
| 4 | **lending operation, but you couldn't provide more** | 10:36 |
| 5 | **specific advice because you didn't know what** | 10:36 |
| 6 | **Mr. Martorello's specific role was in Bellicose?** | 10:36 |
| 7 |      MR. HAUPTMAN:  Objection to form. | 10:36 |
| 8 |      MS. CLOUGH:  Object to form, misstates | 10:36 |
| 9 | testimony. | 10:36 |
| 10 |      A.  That's correct, I don't -- I don't | 10:36 |
| 11 | recall having any information about the operations and | 10:36 |
| 12 | roles of any respective parties going forward from the | 10:36 |
| 13 | servicing agreements.  Generally our role was related | 10:36 |
| 14 | to, like I say, the commercial financings and certain | 10:36 |
| 15 | policy issues that might arise from time to time. | 10:37 |
| 16 |      **Q.  (BY MS. KELLY)  And in order to provide** | 10:37 |
| 17 | **advice about potential liability for Bellicose or** | 10:37 |
| 18 | **Mr. Martorello's role as a principal of Bellicose, is** | 10:37 |
| 19 | **it fair to say you would have needed to know** | 10:37 |
| 20 | **information about his actual role and responsibilities** | 10:37 |
| 21 | **in Bellicose?** | 10:37 |
| 22 |      MR. HAUPTMAN:  Object to form. | 10:37 |
| 23 |      MS. CLOUGH:  Object to form. | 10:37 |
| 24 |      A.  I would say yes, it would be standard | 10:37 |
| 25 | practice if you are being asked to opine on particular | 10:37 |

**LULA WILLIAMS, ET AL. vs BIG PICTURE LOANS, LLC, ET AL.**
Jennifer Weddle on 05/08/2023                              Page 64

| | | |
|---|---|---|
| 1 | potential for liability.  That yes, you should have | 10:37 |
| 2 | all the facts and information before you in order to | 10:37 |
| 3 | provide that kind of analysis. | 10:37 |
| 4 | Q.   (BY MS. KELLY)  And you did not have all | 10:37 |
| 5 | the facts as to Mr. Martorello as a principal of | 10:37 |
| 6 | Bellicose and Bellicose's role in Red Rock or Duck | 10:37 |
| 7 | Creek, correct? | 10:38 |
| 8 | MR. HAUPTMAN:  Object to form. | 10:38 |
| 9 | MS. CLOUGH:  Object to form. | 10:38 |
| 10 | A.   Correct.  I would say it would be very | 10:38 |
| 11 | rare for a law firm to have knowledge of its clients' | 10:38 |
| 12 | operations in that kind of level. | 10:38 |
| 13 | Q.   (BY MS. KELLY)  Ms. Weddle, I want to | 10:38 |
| 14 | show you, this is Mr. Martorello's third amended | 10:38 |
| 15 | initial disclosures that were served about a month or | 10:38 |
| 16 | two ago.  And he lists out the information that you | 10:38 |
| 17 | would have personal knowledge about.  And I just want | 10:38 |
| 18 | to go through with you and confirm whether or not you | 10:38 |
| 19 | have personal knowledge about the certain topics here. | 10:38 |
| 20 | Okay? | 10:38 |
| 21 | A.   Okay. | 10:38 |
| 22 | Q.   Do you have any personal knowledge about | 10:39 |
| 23 | the tribe's entrance into online lending? | 10:39 |
| 24 | A.   I have personal knowledge and | 10:39 |
| 25 | recollection of their entrance into the particular | 10:39 |

**LULA WILLIAMS, ET AL. vs BIG PICTURE LOANS, LLC, ET AL.**
Jennifer Weddle on 05/08/2023                                        Page 135

 1                        REPORTER'S CERTIFICATE

 2   STATE OF COLORADO          )
                                )   ss.
 3   CITY AND COUNTY OF DENVER  )

 4

 5              I, WENDY C. HEATH, Registered
     Professional Reporter, and Certified Realtime
 6   Reporter, in the State of Colorado, do hereby certify
     that previous to the commencement of the examination,
 7   the said deponent, JENNIFER WEDDLE, verbally declared
     her testimony in this matter was under the penalty of
 8   perjury; that the said deposition was taken in machine
     shorthand by me at the time and place aforesaid and
 9   was thereafter reduced to typewritten form; that the
     foregoing is a true transcript of the questions asked,
10   testimony given, and proceedings had.

11              I further certify that I am not employed
     by, related to, nor of counsel for any of the parties
12   herein, nor otherwise interested in the outcome of
     this litigation.

13                          _____

14                          Wendy C. Heath, RPR, CRR

15                          Dated: May 16th, 2023

16

17

18

19

20

21

22

23

24

25

Exhibit 4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | |
|---|---|
| LULA WILLIAMS, *et al*., | ) |
| | ) |
| Plaintiffs, | ) |
| v. | ) Civil Action No. 3:17-cv-461 (REP) |
| | ) |
| BIG PICTURE LOANS, LLC, *et al*., | ) |
| | ) |
| Defendants. | ) |
| | ) |

**REVISED OBJECTIONS AND RESPONSES OF**
**DEFENDANT MATT MARTORELLO**
**TO PLAINTIFF GEORGE HENGLE'S SECOND SET OF INTERROGATORIES**

Defendant Matt Martorello ("Martorello"), by counsel, hereby provides revised

objections and responses to Plaintiff George Hengle's Second Set of Interrogatories to

Defendant Matt Martorello as set forth below.

**INTRODUCTORY STATEMENT REGARDING THE PARTIES' ONGOING**
**COLLECTIVE DISCOVERY EFFORTS**

Pursuant to ongoing discussions among counsel regarding the scope and parameters of

the collection, review, and production of information in discovery for this action, the parties

have agreed, as reflected in the Court's Order of January 23, 2019 (Dkt. 326), to work to

establish a formal ESI protocol in an effort to identify potential additional documents for review

and possible production in discovery for this case. Accordingly, it is possible that the ESI

protocol and further related efforts will result in the discovery and disclosure of additional

information responsive to these discovery requests.

1

JA1650

involved.

> **RESPONSE:  Martorello believes that only Duck Creek Tribal Financial, Red Rock Tribal Lending, and Big Picture Loans performed loan collection functions.**

11.    Identify any amendments to the Servicing Agreement between Red Rock and SourcePoint dated July 31, 2012, and all documents related to those amendments.

> **RESPONSE:  Martorello directs Plaintiffs to the following servicing agreements between Red Rock and SourcePoint:  MM_003474; MM_003598; MM_004604; MM_009292; AND LVD-DEF00021406.**

12.    If you intend to rely on advice of counsel as a defense to any of the Plaintiffs' claims, identify: (1) the substance of any advice you received; (2) the attorney who provided it; (3) the date it was provided; and (4) any advice you received to the contrary.

> **RESPONSE:  Martorello does not intend to rely upon advice of counsel as a defense in this matter at this time.  However, if the Court orders that Martorello must waive privilege to assert his good faith defense, Martorello may then elect to assert an advice of counsel defense.**

13.    If you intend to assert subjective good faith as a defense to any of the Plaintiffs' claims, identify all advice you received from any attorney regarding the legality of the tribal business model and/or the LVD's lending operation.

> **RESPONSE:  Martorello does intend to assert good faith as a defense in this matter based, in part, on non-privileged information provided by attorneys Jennifer Weddle, Karrie Wichtman, Blake Sims, Rick Hackett, John Williams, Saba Bazzazieh, Tanya Gibbs, and Robert Rosette, as well as others at their respective law firms, as well as from additional non-attorney public sources, about the legality of the tribal business model and LVD's lending operations.  Martorello reserves the right to revise or supplement this response.  Martorello incorporates herein his response to the Plaintiffs' corresponding Document Request.**

<div align="center">5</div>

## CERTIFICATE OF SERVICE

I hereby certify that on the 30th day of January, 2019, a copy of the foregoing was

sent  via electronic mail to all counsel of record.


*/s/ Jonathan P. Boughrum*
Jonathan P. Boughrum
ARMSTRONG TEASDALE LLP
1500 Market Street
East Tower, 12th Floor
Philadelphia, PA  19102
*Counsel for Matt Martorello*

14

Exhibit 5

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | |
|---|---|
| LULA WILLIAMS, *et al*., | ) |
| | ) |
| Plaintiffs, | ) |
| v. | ) Civil Action No. 3:17-cv-461 (REP) |
| | ) |
| BIG PICTURE LOANS, LLC, *et al*., | ) |
| | ) |
| Defendants. | ) |
| | ) |

**SUPPLEMENTAL OBJECTIONS AND RESPONSES**
**OF DEFENDANT MATT MARTORELLO TO PLAINTIFFS' THIRD SET**
**OF REQUESTS FOR PRODUCTION OF DOCUMENTS**
**PER MEMORANDUM ORDER (ECF No. 441)**

Per Memorandum Order (ECF No. 441) Defendant Matt Martorello ("Martorello"), by counsel, hereby provides his Supplemental Objections and Responses to Plaintiff George Hengle's Third Set of Requests for Production of Documents to Defendant Matt Martorello.

**INTRODUCTORY STATEMENT**
**REGARDING THE PARTIES' ONGOING ESI PROTOCOL EFFORTS AND**
**IDENTIFICATION OF DOCUMENTS TO PARTICULAR DOCUMENT REQUESTS**

Pursuant to ongoing discussions among counsel regarding the scope and parameters of an ESI Protocol as reflected in the parties' Joint Status Report Regarding ESI Protocol (ECF No. 451) and the Court's Order of April 5, 2019 (ECF No. 460), it is possible that the ESI Protocol and further related efforts will result in the discovery and production of additional documents responsive to these discovery requests.

Further, with respect to identifying the request(s) in response to which a particular document is being produced, where a document is responsive to more than one request, Martorello has endeavored to identify each request. Martorello reserves the right to make

1

**SUPPLEMENTAL RESPONSE: Pursuant to the Court's Memorandum Order (ECF No. 441), Martorello directs Plaintiffs to the chart being produced herewith which identifies the Request for Production to which each produced document pertains, including any supplemental documents related to this request.**

9.  All communications between you and any third parties pertaining to Big Picture

Loans, Red Rock, Castle Payday, and/or the LVD.

**RESPONSE:  Martorello directs Plaintiffs to the chart being produced herewith which identifies the Request for Production to which each produced document pertains.**

**SUPPLEMENTAL RESPONSE: Pursuant to the Court's Memorandum Order (ECF No. 441), Martorello directs Plaintiffs to the chart being produced herewith which identifies the Request for Production to which each produced document pertains, including any supplemental documents related to this request as modified by Exhibit 17 to ECF No. 338 filed on January 25, 2019.**

16.  All communications between you and Justin Martorello pertaining to tribal

lending, Big Picture Loans, Red Rock, Castle Payday, and/or the LVD.

**OBJECTION: Martorello objects to this Request on the ground that it calls for information potentially protected by the attorney-client privilege and/or work product doctrine.**

**RESPONSE:  Subject to the foregoing objections, Martorello directs Plaintiffs to the chart being produced herewith which identifies the Request for Production to which each produced document pertains.  Martorello also directs Plaintiffs to the text message privilege log reflecting communications by and among himself, Justin Martorello, and their shared legal counsel.**

**SUPPLEMENTAL RESPONSE: Pursuant to the Court's Memorandum Order (ECF No. 441), Martorello directs Plaintiffs to the chart being produced herewith which identifies the Request for Production to which each produced document pertains, including any supplemental documents related to this request.**

21.  If you intend to assert subjective good faith to any element of any claim alleged by

Plaintiffs, all documents showing any legal advice you received pertaining to tribal lending

3

JA1655

and/or the legality of LVD's lending operation.

**OBJECTION: Martorello objects to this Request on the ground that it calls for information potentially protected by the attorney-client privilege and/or work product doctrine.**

**RESPONSE: Subject to the foregoing objection, Martorello directs Plaintiffs to the chart being produced herewith which identifies the Request for Production to which each produced document pertains, including: LVD-DEF00004956, LVD-DEF00006116, LVD-DEF00006161, LVD-DEF00011623, LVD-DEF00016393, LVD-DEF00016707, LVD-DEF00017711, LVD-DEF00017721, LVD-DEF00017855, LVD-DEF00018126, LVD-DEF00018187, LVD-DEF00018372, LVD-DEF00018465, LVD-DEF00018469, LVD-DEF00018871, LVD-DEF00019065, LVD-DEF00019067, LVD-DEF00019071, LVD-DEF00019104, LVD-DEF00019134, LVD-DEF00021313, MARTORELLO_003936, MARTORELLO_005411, MARTORELLO_007912, MARTORELLO_008128, MARTORELLO_008614, MARTORELLO_011167, MARTORELLO_011582, MARTORELLO_011588, MARTORELLO_011673, MARTORELLO_011689, and LVD-DEF00018962, as well as Presidential Executive Order 13647 (June 26, 2013), and the Native American Development, Trade Promotion, and Tourism Act of 2000. Martorello reserves the right to revise or supplement this response.**

**SUPPLEMENTAL RESPONSE: Pursuant to the Court's Memorandum Order (ECF No. 441), Martorello directs Plaintiffs to the chart being produced herewith which identifies the Request for Production to which each produced document pertains, including any supplemental documents related to this request. In addition, Martorello further identifies the following items produced by Rosette LLP: Rosette 000999-001004, Rosette 002699-002705, Rosette 002801-002815, MidMarch_DD 000536-545. Martorello reserves the right to supplement this response as his review of Rosette LLP's rolling production and other third party productions continue.**

22. Copies of your tax returns, including all schedules and amendments, since January 1, 2010.

**OBJECTION: Martorello objects to this Request on the grounds that it is not limited to information relevant to a party's claims or defenses in this case and requests information not proportional to the needs of this case, including because it is not limited in the scope of information that it seeks.**

**SUPPLEMENTAL RESPONSE: Pursuant to the Court's Memorandum Order (ECF No. 441), Martorello directs Plaintiffs to the chart being produced herewith which identifies the Request for Production to which each produced document pertains, including documents related to this request. Martorello is producing**

4

## CERTIFICATE OF SERVICE

I hereby certify that on the 27th day of April, 2019, a copy of the foregoing **was** sent

via electronic mail to all counsel of record.

/s/  *Michelle L. Alamo*_____

Michael C. Witsch (admitted *pro hac vice*)
Jonathan P. Boughrum (admitted *pro hac vice*)
Richard L. Scheff (admitted *pro hac vice*)
ARMSTRONG TEASDALE, LLP
One Commerce Square, 29th Floor
2005 Market Street
Philadelphia, PA 19103
Telephone: (267) 780-2000
Facsimile: (267) 405-9070
Email: mwitsch@armstrongteasdale.com
Email: jboughrum@ armstrongteasdale.com
Email: rscheff@ armstrongteasdale.com

Michelle Lynne Alamo (admitted *pro hac vice*)
ARMSTRONG TEASDALE, LLP
4643 S. Ulster Street, Suite 800
Denver, CO 80237
Telephone: (720) 722-7189
Facsimile: (720) 200-0679
Email: malamo@armstrongteasdale.com

JA1657

Exhibit 6

*Williams v. Big Picture Loans, LLC, et al.*
E.D. Virginia Civil Action No. 17-cv-461 (REP)
Martorello Response Chart - Production 19

| Bates Begin | Bates End | Williams Document Request (Set. Request) |
|---|---|---|
| MARTORELLO_027810 | MARTORELLO_027810 | 3.05 |
| MARTORELLO_027811 | MARTORELLO_027816 | 3.40 |
| MARTORELLO_027817 | MARTORELLO_027822 | 3.40 |
| MARTORELLO_027823 | MARTORELLO_027831 | 3.40 |
| MARTORELLO_027832 | MARTORELLO_027837 | 3.40 |
| MARTORELLO_027838 | MARTORELLO_027843 | 3.40 |
| MARTORELLO_027844 | MARTORELLO_027851 | 3.40 |
| MARTORELLO_027852 | MARTORELLO_027857 | 3.40 |
| MARTORELLO_027858 | MARTORELLO_027865 | 3.40 |
| MARTORELLO_027866 | MARTORELLO_027870 | 3.40 |
| MARTORELLO_027871 | MARTORELLO_027876 | 3.40 |
| MARTORELLO_027877 | MARTORELLO_027884 | 3.40 |
| MARTORELLO_027885 | MARTORELLO_027889 | 3.40 |
| MARTORELLO_027890 | MARTORELLO_027895 | 3.40 |
| MARTORELLO_027896 | MARTORELLO_027905 | 3.40 |
| MARTORELLO_027906 | MARTORELLO_027911 | 3.40 |
| MARTORELLO_027912 | MARTORELLO_027912 | 3.05 |
| MARTORELLO_027913 | MARTORELLO_027913 | 3.05 |
| MARTORELLO_027914 | MARTORELLO_027919 | 3.40 |
| MARTORELLO_027920 | MARTORELLO_027920 | 3.05 |
| MARTORELLO_027921 | MARTORELLO_027928 | 3.40 |
| MARTORELLO_027929 | MARTORELLO_027934 | 3.40 |
| MARTORELLO_027935 | MARTORELLO_027940 | 3.40 |
| MARTORELLO_027941 | MARTORELLO_027947 | 3.40 |
| MARTORELLO_027948 | MARTORELLO_027953 | 3.40 |
| MARTORELLO_027954 | MARTORELLO_027957 | 3.40 |
| MARTORELLO_027958 | MARTORELLO_027963 | 3.40 |
| MARTORELLO_027964 | MARTORELLO_027969 | 3.40 |
| MARTORELLO_027970 | MARTORELLO_027974 | 3.40 |
| MARTORELLO_027975 | MARTORELLO_027979 | 3.40 |
| MARTORELLO_027980 | MARTORELLO_027984 | 3.40 |
| MARTORELLO_027985 | MARTORELLO_027990 | 3.40 |
| MARTORELLO_027991 | MARTORELLO_027994 | 3.40 |
| MARTORELLO_027995 | MARTORELLO_027998 | 3.40 |
| MARTORELLO_027999 | MARTORELLO_028004 | 3.40 |
| MARTORELLO_028005 | MARTORELLO_028010 | 3.40 |
| MARTORELLO_028011 | MARTORELLO_028014 | 3.40 |
| MARTORELLO_028015 | MARTORELLO_028020 | 3.40 |
| MARTORELLO_028021 | MARTORELLO_028026 | 3.40 |
| MARTORELLO_028027 | MARTORELLO_028032 | 3.40 |
| MARTORELLO_028033 | MARTORELLO_028038 | 3.40 |
| MARTORELLO_028039 | MARTORELLO_028043 | 3.40 |
| MARTORELLO_028044 | MARTORELLO_028049 | 3.40 |
| MARTORELLO_028050 | MARTORELLO_028055 | 3.40 |
| MARTORELLO_028056 | MARTORELLO_028059 | 3.40 |
| MARTORELLO_028060 | MARTORELLO_028063 | 3.40 |
| MARTORELLO_028064 | MARTORELLO_028067 | 3.40 |
| MARTORELLO_028068 | MARTORELLO_028071 | 3.40 |
| MARTORELLO_028072 | MARTORELLO_028075 | 3.40 |
| MARTORELLO_028076 | MARTORELLO_028079 | 3.40 |
| MARTORELLO_028080 | MARTORELLO_028083 | 3.40 |
| MARTORELLO_028084 | MARTORELLO_028087 | 3.40 |
| MARTORELLO_028088 | MARTORELLO_028091 | 3.40 |
| MARTORELLO_028092 | MARTORELLO_028095 | 3.40 |
| MARTORELLO_028096 | MARTORELLO_028098 | 3.40 |
| MARTORELLO_028099 | MARTORELLO_028102 | 3.40 |

JA1659

*Williams v. Big Picture Loans, LLC, et al.*
E.D. Virginia Civil Action No. 17-cv-461 (REP)
Martorello Response Chart - Production 19

| Bates Begin | Bates End | Williams Document Request (Set. Request) |
|---|---|---|
| MARTORELLO_028103 | MARTORELLO_028106 | 3.40 |
| MARTORELLO_028107 | MARTORELLO_028110 | 3.40 |
| MARTORELLO_028111 | MARTORELLO_028114 | 3.40 |
| MARTORELLO_028115 | MARTORELLO_028120 | 3.40 |
| MARTORELLO_028121 | MARTORELLO_028124 | 3.40 |
| MARTORELLO_028125 | MARTORELLO_028128 | 3.40 |
| MARTORELLO_028129 | MARTORELLO_028132 | 3.40 |
| MARTORELLO_028133 | MARTORELLO_028136 | 3.40 |
| MARTORELLO_028137 | MARTORELLO_028140 | 3.40 |
| MARTORELLO_028141 | MARTORELLO_028145 | 3.40 |
| MARTORELLO_028146 | MARTORELLO_028149 | 3.40 |
| MARTORELLO_028150 | MARTORELLO_028153 | 3.40 |
| MARTORELLO_028154 | MARTORELLO_028157 | 3.40 |
| MARTORELLO_028158 | MARTORELLO_028161 | 3.40 |
| MARTORELLO_028162 | MARTORELLO_028165 | 3.40 |
| MARTORELLO_028166 | MARTORELLO_028172 | 3.40 |
| MARTORELLO_028173 | MARTORELLO_028176 | 3.40 |
| MARTORELLO_028177 | MARTORELLO_028180 | 3.40 |
| MARTORELLO_028181 | MARTORELLO_028184 | 3.40 |
| MARTORELLO_028185 | MARTORELLO_028188 | 3.40 |
| MARTORELLO_028189 | MARTORELLO_028193 | 3.40 |
| MARTORELLO_028194 | MARTORELLO_028197 | 3.40 |
| MARTORELLO_028198 | MARTORELLO_028201 | 3.40 |
| MARTORELLO_028202 | MARTORELLO_028205 | 3.40 |
| MARTORELLO_028206 | MARTORELLO_028206 | 3.05 |
| MARTORELLO_028207 | MARTORELLO_028210 | 3.40 |
| MARTORELLO_028211 | MARTORELLO_028214 | 3.40 |
| MARTORELLO_028215 | MARTORELLO_028219 | 3.40 |
| MARTORELLO_028220 | MARTORELLO_028223 | 3.40 |
| MARTORELLO_028224 | MARTORELLO_028225 | 3.05 |
| MARTORELLO_028226 | MARTORELLO_028227 | 3.05 |
| MARTORELLO_028228 | MARTORELLO_028231 | 3.40 |
| MARTORELLO_028232 | MARTORELLO_028233 | 3.05 |
| MARTORELLO_028234 | MARTORELLO_028237 | 3.40 |
| MARTORELLO_028238 | MARTORELLO_028238 | 3.05 |
| MARTORELLO_028239 | MARTORELLO_028242 | 3.40 |
| MARTORELLO_028243 | MARTORELLO_028246 | 3.40 |
| MARTORELLO_028247 | MARTORELLO_028252 | 3.40 |
| MARTORELLO_028253 | MARTORELLO_028253 | 3.05 |
| MARTORELLO_028254 | MARTORELLO_028254 | 3.05 |
| MARTORELLO_028255 | MARTORELLO_028258 | 3.40 |
| MARTORELLO_028259 | MARTORELLO_028262 | 3.40 |
| MARTORELLO_028263 | MARTORELLO_028266 | 3.40 |
| MARTORELLO_028267 | MARTORELLO_028270 | 3.40 |
| MARTORELLO_028271 | MARTORELLO_028274 | 3.40 |
| MARTORELLO_028275 | MARTORELLO_028280 | 3.40 |
| MARTORELLO_028281 | MARTORELLO_028284 | 3.40 |
| MARTORELLO_028285 | MARTORELLO_028288 | 3.40 |
| MARTORELLO_028289 | MARTORELLO_028291 | 3.40 |
| MARTORELLO_028292 | MARTORELLO_028295 | 3.40 |
| MARTORELLO_028296 | MARTORELLO_028299 | 3.40 |
| MARTORELLO_028300 | MARTORELLO_028305 | 3.40 |
| MARTORELLO_028306 | MARTORELLO_028308 | 3.40 |
| MARTORELLO_028309 | MARTORELLO_028312 | 3.40 |
| MARTORELLO_028313 | MARTORELLO_028316 | 3.40 |
| MARTORELLO_028317 | MARTORELLO_028320 | 3.40 |

*Williams v. Big Picture Loans, LLC, et al.*
E.D. Virginia Civil Action No. 17-cv-461 (REP)
Martorello Response Chart - Production 19

| Bates Begin | Bates End | Williams Document Request (Set. Request) |
|---|---|---|
| MARTORELLO_028321 | MARTORELLO_028324 | 3.40 |
| MARTORELLO_028325 | MARTORELLO_028329 | 3.40 |
| MARTORELLO_028330 | MARTORELLO_028333 | 3.40 |
| MARTORELLO_028334 | MARTORELLO_028337 | 3.40 |
| MARTORELLO_028338 | MARTORELLO_028341 | 3.40 |
| MARTORELLO_028342 | MARTORELLO_028345 | 3.40 |
| MARTORELLO_028346 | MARTORELLO_028348 | 3.40 |
| MARTORELLO_028349 | MARTORELLO_028354 | 3.40 |
| MARTORELLO_028355 | MARTORELLO_028358 | 3.40 |
| MARTORELLO_028359 | MARTORELLO_028362 | 3.40 |
| MARTORELLO_028363 | MARTORELLO_028366 | 3.40 |
| MARTORELLO_028367 | MARTORELLO_028370 | 3.40 |
| MARTORELLO_028371 | MARTORELLO_028374 | 3.40 |
| MARTORELLO_028375 | MARTORELLO_028379 | 3.40 |
| MARTORELLO_028380 | MARTORELLO_028383 | 3.40 |
| MARTORELLO_028384 | MARTORELLO_028386 | 3.40 |
| MARTORELLO_028387 | MARTORELLO_028390 | 3.40 |
| MARTORELLO_028391 | MARTORELLO_028394 | 3.40 |
| MARTORELLO_028395 | MARTORELLO_028398 | 3.40 |
| MARTORELLO_028399 | MARTORELLO_028404 | 3.40 |
| MARTORELLO_028405 | MARTORELLO_028408 | 3.40 |
| MARTORELLO_028409 | MARTORELLO_028412 | 3.40 |
| MARTORELLO_028413 | MARTORELLO_028415 | 3.40 |
| MARTORELLO_028416 | MARTORELLO_028418 | 3.40 |
| MARTORELLO_028419 | MARTORELLO_028422 | 3.40 |
| MARTORELLO_028423 | MARTORELLO_028429 | 3.40 |
| MARTORELLO_028430 | MARTORELLO_028433 | 3.40 |
| MARTORELLO_028434 | MARTORELLO_028436 | 3.40 |
| MARTORELLO_028437 | MARTORELLO_028439 | 3.40 |
| MARTORELLO_028440 | MARTORELLO_028441 | 3.40 |
| MARTORELLO_028442 | MARTORELLO_028443 | 3.09 |
| MARTORELLO_028444 | MARTORELLO_028445 | 3.05 |
| MARTORELLO_028446 | MARTORELLO_028452 | 3.05 |
| MARTORELLO_028453 | MARTORELLO_028453 | 3.05 |
| MARTORELLO_028454 | MARTORELLO_028454 | 3.05 |
| MARTORELLO_028455 | MARTORELLO_028455 | 3.05 |
| MARTORELLO_028456 | MARTORELLO_028562 | 3.05 |
| MARTORELLO_028563 | MARTORELLO_028662 | 3.05 |
| MARTORELLO_028663 | MARTORELLO_028665 | 3.39 |
| MARTORELLO_028666 | MARTORELLO_028666 | 3.05 |
| MARTORELLO_028667 | MARTORELLO_028667 | 3.05 |
| MARTORELLO_028668 | MARTORELLO_028668 | 3.05 |
| MARTORELLO_028669 | MARTORELLO_028700 | 3.05 |
| MARTORELLO_028701 | MARTORELLO_028702 | 3.05 |
| MARTORELLO_028703 | MARTORELLO_028710 | 3.05 |
| MARTORELLO_028711 | MARTORELLO_028711 | 3.05 |
| MARTORELLO_028712 | MARTORELLO_028712 | 3.05 |
| MARTORELLO_028713 | MARTORELLO_028713 | 3.05 |
| MARTORELLO_028714 | MARTORELLO_028714 | 3.05 |
| MARTORELLO_028715 | MARTORELLO_028715 | 3.05 |
| MARTORELLO_028716 | MARTORELLO_028716 | 3.05 |
| MARTORELLO_028717 | MARTORELLO_028717 | 3.05 |
| MARTORELLO_028718 | MARTORELLO_028718 | 3.05 |
| MARTORELLO_028719 | MARTORELLO_028719 | 3.05 |
| MARTORELLO_028720 | MARTORELLO_028720 | 3.05 |
| MARTORELLO_028721 | MARTORELLO_028721 | 3.05 |

*Williams v. Big Picture Loans, LLC, et al.*
E.D. Virginia Civil Action No. 17-cv-461 (REP)
Martorello Response Chart - Production 19

| Bates Begin | Bates End | Williams Document Request (Set. Request) |
|---|---|---|
| MARTORELLO_028722 | MARTORELLO_028722 | 3.05 |
| MARTORELLO_028723 | MARTORELLO_028723 | 3.05 |
| MARTORELLO_028724 | MARTORELLO_028725 | 3.05 |
| MARTORELLO_028726 | MARTORELLO_028726 | 3.05 |
| MARTORELLO_028727 | MARTORELLO_028727 | 3.05 |
| MARTORELLO_028728 | MARTORELLO_028729 | 3.05 |
| MARTORELLO_028730 | MARTORELLO_028737 | 3.05 |
| MARTORELLO_028738 | MARTORELLO_028738 | 3.05 |
| MARTORELLO_028739 | MARTORELLO_028739 | 3.05 |
| MARTORELLO_028740 | MARTORELLO_028740 | 3.05 |
| MARTORELLO_028741 | MARTORELLO_028847 | 3.05 |
| MARTORELLO_028848 | MARTORELLO_028947 | 3.05 |
| MARTORELLO_028948 | MARTORELLO_028949 | 3.05 |
| MARTORELLO_028950 | MARTORELLO_028956 | 3.05 |
| MARTORELLO_028957 | MARTORELLO_028957 | 3.05 |
| MARTORELLO_028958 | MARTORELLO_028959 | 3.39 |
| MARTORELLO_028960 | MARTORELLO_028986 | 3.39 |
| MARTORELLO_028987 | MARTORELLO_028988 | 3.39 |
| MARTORELLO_028989 | MARTORELLO_028992 | 3.39 |
| MARTORELLO_028993 | MARTORELLO_029049 | 3.39 |
| MARTORELLO_029050 | MARTORELLO_029054 | 3.39 |
| MARTORELLO_029055 | MARTORELLO_029118 | 3.39 |
| MARTORELLO_029119 | MARTORELLO_029126 | 3.39 |
| MARTORELLO_029127 | MARTORELLO_029128 | 3.39 |
| MARTORELLO_029129 | MARTORELLO_030469 | 3.39 |
| MARTORELLO_030470 | MARTORELLO_030470 | 3.39 |
| MARTORELLO_030471 | MARTORELLO_030477 | 3.39 |
| MARTORELLO_030478 | MARTORELLO_030482 | 3.39 |
| MARTORELLO_030483 | MARTORELLO_030555 | 3.39 |
| MARTORELLO_030556 | MARTORELLO_030590 | 3.39 |
| MARTORELLO_030591 | MARTORELLO_030593 | 3.39 |
| MARTORELLO_030594 | MARTORELLO_030595 | 3.39 |
| MARTORELLO_030596 | MARTORELLO_030597 | 3.39 |
| MARTORELLO_030598 | MARTORELLO_030605 | 3.39 |
| MARTORELLO_030606 | MARTORELLO_030616 | 3.39 |
| MARTORELLO_030617 | MARTORELLO_030625 | 3.39 |
| MARTORELLO_030626 | MARTORELLO_030635 | 3.39 |
| MARTORELLO_030636 | MARTORELLO_030642 | 3.39 |
| MARTORELLO_030643 | MARTORELLO_030649 | 3.39 |
| MARTORELLO_030650 | MARTORELLO_030656 | 3.39 |
| MARTORELLO_030657 | MARTORELLO_030662 | 3.39 |
| MARTORELLO_030663 | MARTORELLO_030671 | 3.39 |
| MARTORELLO_030672 | MARTORELLO_030681 | 3.39 |
| MARTORELLO_030682 | MARTORELLO_030690 | 3.39 |
| MARTORELLO_030691 | MARTORELLO_030697 | 3.39 |
| MARTORELLO_030698 | MARTORELLO_030704 | 3.39 |
| MARTORELLO_030705 | MARTORELLO_030713 | 3.39 |
| MARTORELLO_030714 | MARTORELLO_030717 | 3.39 |
| MARTORELLO_030718 | MARTORELLO_030724 | 3.39 |
| MARTORELLO_030725 | MARTORELLO_030728 | 3.39 |
| MARTORELLO_030729 | MARTORELLO_030733 | 3.39 |
| MARTORELLO_030734 | MARTORELLO_030739 | 3.39 |
| MARTORELLO_030740 | MARTORELLO_030742 | 3.39 |
| MARTORELLO_030743 | MARTORELLO_030748 | 3.39 |
| MARTORELLO_030749 | MARTORELLO_030752 | 3.39 |
| MARTORELLO_030753 | MARTORELLO_030761 | 3.39 |

*Williams v. Big Picture Loans, LLC, et al.*
E.D. Virginia Civil Action No. 17-cv-461 (REP)
Martorello Response Chart - Production 19

| Bates Begin | Bates End | Williams Document Request (Set. Request) |
|---|---|---|
| MARTORELLO_030762 | MARTORELLO_030768 | 3.39 |
| MARTORELLO_030769 | MARTORELLO_030777 | 3.39 |
| MARTORELLO_030778 | MARTORELLO_030785 | 3.39 |
| MARTORELLO_030786 | MARTORELLO_030792 | 3.39 |
| MARTORELLO_030793 | MARTORELLO_030798 | 3.39 |
| MARTORELLO_030799 | MARTORELLO_030804 | 3.39 |
| MARTORELLO_030805 | MARTORELLO_030811 | 3.39 |
| MARTORELLO_030812 | MARTORELLO_030815 | 3.39 |
| MARTORELLO_030816 | MARTORELLO_030820 | 3.39 |
| MARTORELLO_030821 | MARTORELLO_030835 | 3.39 |
| MARTORELLO_030836 | MARTORELLO_030842 | 3.39 |
| MARTORELLO_030843 | MARTORELLO_030849 | 3.39 |
| MARTORELLO_030850 | MARTORELLO_030856 | 3.39 |
| MARTORELLO_030857 | MARTORELLO_030862 | 3.39 |
| MARTORELLO_030863 | MARTORELLO_030869 | 3.39 |
| MARTORELLO_030870 | MARTORELLO_030878 | 3.39 |
| MARTORELLO_030879 | MARTORELLO_030887 | 3.39 |
| MARTORELLO_030888 | MARTORELLO_030897 | 3.39 |
| MARTORELLO_030898 | MARTORELLO_030905 | 3.39 |
| MARTORELLO_030906 | MARTORELLO_030910 | 3.39 |
| MARTORELLO_030911 | MARTORELLO_030915 | 3.39 |
| MARTORELLO_030916 | MARTORELLO_030924 | 3.39 |
| MARTORELLO_030925 | MARTORELLO_030928 | 3.39 |
| MARTORELLO_030929 | MARTORELLO_030933 | 3.39 |
| MARTORELLO_030934 | MARTORELLO_030940 | 3.39 |
| MARTORELLO_030941 | MARTORELLO_030948 | 3.39 |
| MARTORELLO_030949 | MARTORELLO_030953 | 3.39 |
| MARTORELLO_030954 | MARTORELLO_030960 | 3.39 |
| MARTORELLO_030961 | MARTORELLO_030964 | 3.39 |
| MARTORELLO_030965 | MARTORELLO_030972 | 3.39 |
| MARTORELLO_030973 | MARTORELLO_030981 | 3.39 |
| MARTORELLO_030982 | MARTORELLO_030990 | 3.39 |
| MARTORELLO_030991 | MARTORELLO_030994 | 3.39 |
| MARTORELLO_030995 | MARTORELLO_030998 | 3.39 |
| MARTORELLO_030999 | MARTORELLO_031002 | 3.39 |
| MARTORELLO_031003 | MARTORELLO_031008 | 3.39 |
| MARTORELLO_031009 | MARTORELLO_031013 | 3.39 |
| MARTORELLO_031014 | MARTORELLO_031021 | 3.39 |
| MARTORELLO_031022 | MARTORELLO_031029 | 3.39 |
| MARTORELLO_031030 | MARTORELLO_031036 | 3.39 |
| MARTORELLO_031037 | MARTORELLO_031045 | 3.39 |
| MARTORELLO_031046 | MARTORELLO_031058 | 3.39 |
| MARTORELLO_031059 | MARTORELLO_031072 | 3.39 |
| MARTORELLO_031073 | MARTORELLO_031083 | 3.39 |
| MARTORELLO_031084 | MARTORELLO_031090 | 3.39 |
| MARTORELLO_031091 | MARTORELLO_031093 | 3.39 |
| MARTORELLO_031094 | MARTORELLO_031096 | 3.39 |
| MARTORELLO_031097 | MARTORELLO_031099 | 3.39 |
| MARTORELLO_031100 | MARTORELLO_031102 | 3.39 |
| MARTORELLO_031103 | MARTORELLO_031105 | 3.39 |
| MARTORELLO_031106 | MARTORELLO_031108 | 3.39 |
| MARTORELLO_031109 | MARTORELLO_031111 | 3.39 |
| MARTORELLO_031112 | MARTORELLO_031114 | 3.39 |
| MARTORELLO_031115 | MARTORELLO_031117 | 3.39 |
| MARTORELLO_031118 | MARTORELLO_031120 | 3.39 |
| MARTORELLO_031121 | MARTORELLO_031123 | 3.39 |

| Bates Begin | Bates End | Williams Document Request (Set. Request) |
|---|---|---|
| MARTORELLO_031124 | MARTORELLO_031126 | 3.39 |
| MARTORELLO_031127 | MARTORELLO_031130 | 3.39 |
| MARTORELLO_031131 | MARTORELLO_031134 | 3.39 |
| MARTORELLO_031135 | MARTORELLO_031138 | 3.39 |
| MARTORELLO_031139 | MARTORELLO_031143 | 3.39 |
| MARTORELLO_031144 | MARTORELLO_031148 | 3.39 |
| MARTORELLO_031149 | MARTORELLO_031153 | 3.39 |
| MARTORELLO_031154 | MARTORELLO_031158 | 3.39 |
| MARTORELLO_031159 | MARTORELLO_031164 | 3.39 |
| MARTORELLO_031165 | MARTORELLO_031169 | 3.39 |
| MARTORELLO_031170 | MARTORELLO_031173 | 3.39 |
| MARTORELLO_031174 | MARTORELLO_031180 | 3.39 |
| MARTORELLO_031181 | MARTORELLO_031187 | 3.39 |
| MARTORELLO_031188 | MARTORELLO_031192 | 3.39 |
| MARTORELLO_031193 | MARTORELLO_031203 | 3.39 |
| MARTORELLO_031204 | MARTORELLO_031211 | 3.39 |
| MARTORELLO_031212 | MARTORELLO_031219 | 3.39 |
| MARTORELLO_031220 | MARTORELLO_031231 | 3.39 |
| MARTORELLO_031232 | MARTORELLO_031241 | 3.39 |
| MARTORELLO_031242 | MARTORELLO_031248 | 3.39 |
| MARTORELLO_031249 | MARTORELLO_031255 | 3.39 |
| MARTORELLO_031256 | MARTORELLO_031265 | 3.39 |
| MARTORELLO_031266 | MARTORELLO_031272 | 3.39 |
| MARTORELLO_031273 | MARTORELLO_031281 | 3.39 |
| MARTORELLO_031282 | MARTORELLO_031291 | 3.39 |
| MARTORELLO_031292 | MARTORELLO_031301 | 3.39 |
| MARTORELLO_031302 | MARTORELLO_031320 | 3.39 |
| MARTORELLO_031321 | MARTORELLO_031332 | 3.39 |
| MARTORELLO_031333 | MARTORELLO_031339 | 3.39 |
| MARTORELLO_031340 | MARTORELLO_031345 | 3.39 |
| MARTORELLO_031346 | MARTORELLO_031350 | 3.39 |
| MARTORELLO_031351 | MARTORELLO_031355 | 3.39 |
| MARTORELLO_031356 | MARTORELLO_031360 | 3.39 |
| MARTORELLO_031361 | MARTORELLO_031363 | 3.39 |
| MARTORELLO_031364 | MARTORELLO_031373 | 3.39 |
| MARTORELLO_031374 | MARTORELLO_031378 | 3.39 |
| MARTORELLO_031379 | MARTORELLO_031383 | 3.39 |
| MARTORELLO_031384 | MARTORELLO_031387 | 3.39 |
| MARTORELLO_031388 | MARTORELLO_031391 | 3.39 |
| MARTORELLO_031392 | MARTORELLO_031394 | 3.39 |
| MARTORELLO_031395 | MARTORELLO_031397 | 3.39 |
| MARTORELLO_031398 | MARTORELLO_031400 | 3.39 |
| MARTORELLO_031401 | MARTORELLO_031405 | 3.39 |
| MARTORELLO_031406 | MARTORELLO_031410 | 3.39 |
| MARTORELLO_031411 | MARTORELLO_031415 | 3.39 |
| MARTORELLO_031416 | MARTORELLO_031418 | 3.39 |
| MARTORELLO_031419 | MARTORELLO_031422 | 3.39 |
| MARTORELLO_031423 | MARTORELLO_031426 | 3.39 |
| MARTORELLO_031427 | MARTORELLO_031430 | 3.39 |
| MARTORELLO_031431 | MARTORELLO_031442 | 3.39 |
| MARTORELLO_031443 | MARTORELLO_031452 | 3.39 |
| MARTORELLO_031453 | MARTORELLO_031463 | 3.39 |
| MARTORELLO_031464 | MARTORELLO_031473 | 3.39 |
| MARTORELLO_031474 | MARTORELLO_031482 | 3.39 |
| MARTORELLO_031483 | MARTORELLO_031491 | 3.39 |
| MARTORELLO_031492 | MARTORELLO_031498 | 3.39 |

JA1664

*Williams v. Big Picture Loans, LLC, et al.*
E.D. Virginia Civil Action No. 17-cv-461 (REP)
Martorello Response Chart - Production 19

| Bates Begin | Bates End | Williams Document Request (Set. Request) |
|---|---|---|
| MARTORELLO_031499 | MARTORELLO_031509 | 3.39 |
| MARTORELLO_031510 | MARTORELLO_031519 | 3.39 |
| MARTORELLO_031520 | MARTORELLO_031525 | 3.39 |
| MARTORELLO_031526 | MARTORELLO_031531 | 3.39 |
| MARTORELLO_031532 | MARTORELLO_031537 | 3.39 |
| MARTORELLO_031538 | MARTORELLO_031546 | 3.39 |
| MARTORELLO_031547 | MARTORELLO_031559 | 3.39 |
| MARTORELLO_031560 | MARTORELLO_031566 | 3.39 |
| MARTORELLO_031567 | MARTORELLO_031574 | 3.39 |
| MARTORELLO_031575 | MARTORELLO_031584 | 3.39 |
| MARTORELLO_031585 | MARTORELLO_031591 | 3.39 |
| MARTORELLO_031592 | MARTORELLO_031602 | 3.39 |
| MARTORELLO_031603 | MARTORELLO_031610 | 3.39 |
| MARTORELLO_031611 | MARTORELLO_031621 | 3.39 |
| MARTORELLO_031622 | MARTORELLO_031624 | 3.39 |
| MARTORELLO_031625 | MARTORELLO_031628 | 3.39 |
| MARTORELLO_031629 | MARTORELLO_031632 | 3.39 |
| MARTORELLO_031633 | MARTORELLO_031636 | 3.39 |
| MARTORELLO_031637 | MARTORELLO_031640 | 3.39 |
| MARTORELLO_031641 | MARTORELLO_031644 | 3.39 |
| MARTORELLO_031645 | MARTORELLO_031648 | 3.39 |
| MARTORELLO_031649 | MARTORELLO_031652 | 3.39 |
| MARTORELLO_031653 | MARTORELLO_031657 | 3.39 |
| MARTORELLO_031658 | MARTORELLO_031660 | 3.39 |
| MARTORELLO_031661 | MARTORELLO_031664 | 3.39 |
| MARTORELLO_031665 | MARTORELLO_031667 | 3.39 |
| MARTORELLO_031668 | MARTORELLO_031671 | 3.39 |
| MARTORELLO_031672 | MARTORELLO_031674 | 3.39 |
| MARTORELLO_031675 | MARTORELLO_031677 | 3.39 |
| MARTORELLO_031678 | MARTORELLO_031681 | 3.39 |
| MARTORELLO_031682 | MARTORELLO_031686 | 3.39 |
| MARTORELLO_031687 | MARTORELLO_031690 | 3.39 |
| MARTORELLO_031691 | MARTORELLO_031694 | 3.39 |
| MARTORELLO_031695 | MARTORELLO_031698 | 3.39 |
| MARTORELLO_031699 | MARTORELLO_031711 | 3.39 |
| MARTORELLO_031712 | MARTORELLO_031722 | 3.39 |
| MARTORELLO_031723 | MARTORELLO_031731 | 3.39 |
| MARTORELLO_031732 | MARTORELLO_031742 | 3.39 |
| MARTORELLO_031743 | MARTORELLO_031749 | 3.39 |
| MARTORELLO_031750 | MARTORELLO_031757 | 3.39 |
| MARTORELLO_031758 | MARTORELLO_031766 | 3.39 |
| MARTORELLO_031767 | MARTORELLO_031774 | 3.39 |
| MARTORELLO_031775 | MARTORELLO_031782 | 3.39 |
| MARTORELLO_031783 | MARTORELLO_031789 | 3.39 |
| MARTORELLO_031790 | MARTORELLO_031795 | 3.39 |
| MARTORELLO_031796 | MARTORELLO_031804 | 3.39 |
| MARTORELLO_031805 | MARTORELLO_031810 | 3.39 |
| MARTORELLO_031811 | MARTORELLO_031819 | 3.39 |
| MARTORELLO_031820 | MARTORELLO_031827 | 3.39 |
| MARTORELLO_031828 | MARTORELLO_031834 | 3.39 |
| MARTORELLO_031835 | MARTORELLO_031840 | 3.39 |
| MARTORELLO_031841 | MARTORELLO_031850 | 3.39 |
| MARTORELLO_031851 | MARTORELLO_031857 | 3.39 |
| MARTORELLO_031858 | MARTORELLO_031863 | 3.39 |
| MARTORELLO_031864 | MARTORELLO_031867 | 3.39 |
| MARTORELLO_031868 | MARTORELLO_031871 | 3.39 |

JA1665

*Williams v. Big Picture Loans, LLC, et al.*
E.D. Virginia Civil Action No. 17-cv-461 (REP)
Martorello Response Chart - Production 19

| Bates Begin | Bates End | Williams Document Request (Set. Request) |
|---|---|---|
| MARTORELLO_031872 | MARTORELLO_031874 | 3.39 |
| MARTORELLO_031875 | MARTORELLO_031877 | 3.39 |
| MARTORELLO_031878 | MARTORELLO_031880 | 3.39 |
| MARTORELLO_031881 | MARTORELLO_031884 | 3.39 |
| MARTORELLO_031885 | MARTORELLO_031887 | 3.39 |
| MARTORELLO_031888 | MARTORELLO_031893 | 3.39 |
| MARTORELLO_031894 | MARTORELLO_031900 | 3.39 |
| MARTORELLO_031901 | MARTORELLO_031903 | 3.39 |
| MARTORELLO_031904 | MARTORELLO_031912 | 3.39 |
| MARTORELLO_031913 | MARTORELLO_031918 | 3.39 |
| MARTORELLO_031919 | MARTORELLO_031922 | 3.39 |
| MARTORELLO_031923 | MARTORELLO_031926 | 3.39 |
| MARTORELLO_031927 | MARTORELLO_031936 | 3.39 |
| MARTORELLO_031937 | MARTORELLO_031944 | 3.39 |
| MARTORELLO_031945 | MARTORELLO_031952 | 3.39 |
| MARTORELLO_031953 | MARTORELLO_031956 | 3.39 |
| MARTORELLO_031957 | MARTORELLO_031961 | 3.39 |
| MARTORELLO_031962 | MARTORELLO_031965 | 3.39 |
| MARTORELLO_031966 | MARTORELLO_031970 | 3.39 |
| MARTORELLO_031971 | MARTORELLO_031974 | 3.39 |
| MARTORELLO_031975 | MARTORELLO_031977 | 3.39 |
| MARTORELLO_031978 | MARTORELLO_031980 | 3.39 |
| MARTORELLO_031981 | MARTORELLO_031989 | 3.39 |
| MARTORELLO_031990 | MARTORELLO_031995 | 3.39 |
| MARTORELLO_031996 | MARTORELLO_032002 | 3.39 |
| MARTORELLO_032003 | MARTORELLO_032006 | 3.39 |
| MARTORELLO_032007 | MARTORELLO_032013 | 3.39 |
| MARTORELLO_032014 | MARTORELLO_032017 | 3.39 |
| MARTORELLO_032018 | MARTORELLO_032021 | 3.39 |
| MARTORELLO_032022 | MARTORELLO_032025 | 3.39 |
| MARTORELLO_032026 | MARTORELLO_032031 | 3.39 |
| MARTORELLO_032032 | MARTORELLO_032039 | 3.39 |
| MARTORELLO_032040 | MARTORELLO_032044 | 3.39 |
| MARTORELLO_032045 | MARTORELLO_032050 | 3.39 |
| MARTORELLO_032051 | MARTORELLO_032055 | 3.39 |
| MARTORELLO_032056 | MARTORELLO_032063 | 3.39 |
| MARTORELLO_032064 | MARTORELLO_032072 | 3.39 |
| MARTORELLO_032073 | MARTORELLO_032079 | 3.39 |
| MARTORELLO_032080 | MARTORELLO_032086 | 3.39 |
| MARTORELLO_032087 | MARTORELLO_032094 | 3.39 |
| MARTORELLO_032095 | MARTORELLO_032103 | 3.39 |
| MARTORELLO_032104 | MARTORELLO_032109 | 3.39 |
| MARTORELLO_032110 | MARTORELLO_032121 | 3.39 |
| MARTORELLO_032122 | MARTORELLO_032126 | 3.39 |
| MARTORELLO_032127 | MARTORELLO_032129 | 3.39 |
| MARTORELLO_032130 | MARTORELLO_032133 | 3.39 |
| MARTORELLO_032134 | MARTORELLO_032136 | 3.39 |
| MARTORELLO_032137 | MARTORELLO_032139 | 3.39 |
| MARTORELLO_032140 | MARTORELLO_032141 | 3.39 |
| MARTORELLO_032142 | MARTORELLO_032147 | 3.39 |
| MARTORELLO_032148 | MARTORELLO_032151 | 3.39 |
| MARTORELLO_032152 | MARTORELLO_032154 | 3.39 |
| MARTORELLO_032155 | MARTORELLO_032159 | 3.39 |
| MARTORELLO_032160 | MARTORELLO_032163 | 3.39 |
| MARTORELLO_032164 | MARTORELLO_032167 | 3.39 |
| MARTORELLO_032168 | MARTORELLO_032172 | 3.39 |

*Williams v. Big Picture Loans, LLC, et al.*
E.D. Virginia Civil Action No. 17-cv-461 (REP)
Martorello Response Chart - Production 19

| Bates Begin | Bates End | Williams Document Request (Set. Request) |
|---|---|---|
| MARTORELLO_032173 | MARTORELLO_032175 | 3.39 |
| MARTORELLO_032176 | MARTORELLO_032178 | 3.39 |
| MARTORELLO_032179 | MARTORELLO_032184 | 3.39 |
| MARTORELLO_032185 | MARTORELLO_032188 | 3.39 |
| MARTORELLO_032189 | MARTORELLO_032194 | 3.39 |
| MARTORELLO_032195 | MARTORELLO_032199 | 3.39 |
| MARTORELLO_032200 | MARTORELLO_032210 | 3.39 |
| MARTORELLO_032211 | MARTORELLO_032217 | 3.39 |
| MARTORELLO_032218 | MARTORELLO_032226 | 3.39 |
| MARTORELLO_032227 | MARTORELLO_032233 | 3.39 |
| MARTORELLO_032234 | MARTORELLO_032238 | 3.39 |
| MARTORELLO_032239 | MARTORELLO_032245 | 3.39 |
| MARTORELLO_032246 | MARTORELLO_032253 | 3.39 |
| MARTORELLO_032254 | MARTORELLO_032264 | 3.39 |
| MARTORELLO_032265 | MARTORELLO_032276 | 3.39 |
| MARTORELLO_032277 | MARTORELLO_032293 | 3.39 |
| MARTORELLO_032294 | MARTORELLO_032303 | 3.39 |
| MARTORELLO_032304 | MARTORELLO_032306 | 3.39 |
| MARTORELLO_032307 | MARTORELLO_032318 | 3.39 |
| MARTORELLO_032319 | MARTORELLO_032326 | 3.39 |
| MARTORELLO_032327 | MARTORELLO_032337 | 3.39 |
| MARTORELLO_032338 | MARTORELLO_032355 | 3.39 |
| MARTORELLO_032356 | MARTORELLO_032370 | 3.39 |
| MARTORELLO_032371 | MARTORELLO_032382 | 3.39 |
| MARTORELLO_032383 | MARTORELLO_032388 | 3.39 |
| MARTORELLO_032389 | MARTORELLO_032400 | 3.39 |
| MARTORELLO_032401 | MARTORELLO_032412 | 3.39 |
| MARTORELLO_032413 | MARTORELLO_032423 | 3.39 |
| MARTORELLO_032424 | MARTORELLO_032436 | 3.39 |
| MARTORELLO_032437 | MARTORELLO_032441 | 3.39 |
| MARTORELLO_032442 | MARTORELLO_032451 | 3.39 |
| MARTORELLO_032452 | MARTORELLO_032456 | 3.39 |
| MARTORELLO_032457 | MARTORELLO_032464 | 3.39 |
| MARTORELLO_032465 | MARTORELLO_032470 | 3.39 |
| MARTORELLO_032471 | MARTORELLO_032477 | 3.39 |
| MARTORELLO_032478 | MARTORELLO_032483 | 3.39 |
| MARTORELLO_032484 | MARTORELLO_032491 | 3.39 |
| MARTORELLO_032492 | MARTORELLO_032501 | 3.39 |
| MARTORELLO_032502 | MARTORELLO_032514 | 3.39 |
| MARTORELLO_032515 | MARTORELLO_032526 | 3.39 |
| MARTORELLO_032527 | MARTORELLO_032534 | 3.39 |
| MARTORELLO_032535 | MARTORELLO_032541 | 3.39 |
| MARTORELLO_032542 | MARTORELLO_032547 | 3.39 |
| MARTORELLO_032548 | MARTORELLO_032553 | 3.39 |
| MARTORELLO_032554 | MARTORELLO_032558 | 3.39 |
| MARTORELLO_032559 | MARTORELLO_032570 | 3.39 |
| MARTORELLO_032571 | MARTORELLO_032580 | 3.39 |
| MARTORELLO_032581 | MARTORELLO_032588 | 3.39 |
| MARTORELLO_032589 | MARTORELLO_032593 | 3.39 |
| MARTORELLO_032594 | MARTORELLO_032602 | 3.39 |
| MARTORELLO_032603 | MARTORELLO_032607 | 3.39 |
| MARTORELLO_032608 | MARTORELLO_032613 | 3.39 |
| MARTORELLO_032614 | MARTORELLO_032621 | 3.39 |
| MARTORELLO_032622 | MARTORELLO_032631 | 3.39 |
| MARTORELLO_032632 | MARTORELLO_032640 | 3.39 |
| MARTORELLO_032641 | MARTORELLO_032652 | 3.39 |

*Williams v. Big Picture Loans, LLC, et al.*
E.D. Virginia Civil Action No. 17-cv-461 (REP)
Martorello Response Chart - Production 19

| Bates Begin | Bates End | Williams Document Request (Set. Request) |
|---|---|---|
| MARTORELLO_032653 | MARTORELLO_032657 | 3.39 |
| MARTORELLO_032658 | MARTORELLO_032667 | 3.39 |
| MARTORELLO_032668 | MARTORELLO_032675 | 3.39 |
| MARTORELLO_032676 | MARTORELLO_032685 | 3.39 |
| MARTORELLO_032686 | MARTORELLO_032694 | 3.39 |
| MARTORELLO_032695 | MARTORELLO_032702 | 3.39 |
| MARTORELLO_032703 | MARTORELLO_032711 | 3.39 |
| MARTORELLO_032712 | MARTORELLO_032720 | 3.39 |
| MARTORELLO_032721 | MARTORELLO_032729 | 3.39 |
| MARTORELLO_032730 | MARTORELLO_032739 | 3.39 |
| MARTORELLO_032740 | MARTORELLO_032747 | 3.39 |
| MARTORELLO_032748 | MARTORELLO_032757 | 3.39 |
| MARTORELLO_032758 | MARTORELLO_032766 | 3.39 |
| MARTORELLO_032767 | MARTORELLO_032775 | 3.39 |
| MARTORELLO_032776 | MARTORELLO_032783 | 3.39 |
| MARTORELLO_032784 | MARTORELLO_032794 | 3.39 |
| MARTORELLO_032795 | MARTORELLO_032805 | 3.39 |
| MARTORELLO_032806 | MARTORELLO_032821 | 3.39 |
| MARTORELLO_032822 | MARTORELLO_032828 | 3.39 |
| MARTORELLO_032829 | MARTORELLO_032833 | 3.39 |
| MARTORELLO_032834 | MARTORELLO_032844 | 3.39 |
| MARTORELLO_032845 | MARTORELLO_032852 | 3.39 |
| MARTORELLO_032853 | MARTORELLO_032861 | 3.39 |
| MARTORELLO_032862 | MARTORELLO_032868 | 3.39 |
| MARTORELLO_032869 | MARTORELLO_032878 | 3.39 |
| MARTORELLO_032879 | MARTORELLO_032883 | 3.39 |
| MARTORELLO_032884 | MARTORELLO_032890 | 3.39 |
| MARTORELLO_032891 | MARTORELLO_032895 | 3.39 |
| MARTORELLO_032896 | MARTORELLO_032902 | 3.39 |
| MARTORELLO_032903 | MARTORELLO_032908 | 3.39 |
| MARTORELLO_032909 | MARTORELLO_032913 | 3.39 |
| MARTORELLO_032914 | MARTORELLO_032917 | 3.39 |
| MARTORELLO_032918 | MARTORELLO_032921 | 3.39 |
| MARTORELLO_032922 | MARTORELLO_032925 | 3.39 |
| MARTORELLO_032926 | MARTORELLO_032933 | 3.39 |
| MARTORELLO_032934 | MARTORELLO_032939 | 3.39 |
| MARTORELLO_032940 | MARTORELLO_032945 | 3.39 |
| MARTORELLO_032946 | MARTORELLO_032955 | 3.39 |
| MARTORELLO_032956 | MARTORELLO_032960 | 3.39 |
| MARTORELLO_032961 | MARTORELLO_032972 | 3.39 |
| MARTORELLO_032973 | MARTORELLO_032978 | 3.39 |
| MARTORELLO_032979 | MARTORELLO_032983 | 3.39 |
| MARTORELLO_032984 | MARTORELLO_032987 | 3.39 |
| MARTORELLO_032988 | MARTORELLO_032997 | 3.39 |
| MARTORELLO_032998 | MARTORELLO_033001 | 3.39 |
| MARTORELLO_033002 | MARTORELLO_033008 | 3.39 |
| MARTORELLO_033009 | MARTORELLO_033017 | 3.39 |
| MARTORELLO_033018 | MARTORELLO_033026 | 3.39 |
| MARTORELLO_033027 | MARTORELLO_033034 | 3.39 |
| MARTORELLO_033035 | MARTORELLO_033041 | 3.39 |
| MARTORELLO_033042 | MARTORELLO_033049 | 3.39 |
| MARTORELLO_033050 | MARTORELLO_033057 | 3.39 |
| MARTORELLO_033058 | MARTORELLO_033063 | 3.39 |
| MARTORELLO_033064 | MARTORELLO_033073 | 3.39 |
| MARTORELLO_033074 | MARTORELLO_033081 | 3.39 |
| MARTORELLO_033082 | MARTORELLO_033090 | 3.39 |

*Williams v. Big Picture Loans, LLC, et al.*
E.D. Virginia Civil Action No. 17-cv-461 (REP)
Martorello Response Chart - Production 19

| Bates Begin | Bates End | Williams Document Request (Set. Request) |
|---|---|---|
| MARTORELLO_033091 | MARTORELLO_033100 | 3.39 |
| MARTORELLO_033101 | MARTORELLO_033108 | 3.39 |
| MARTORELLO_033109 | MARTORELLO_033116 | 3.39 |
| MARTORELLO_033117 | MARTORELLO_033121 | 3.39 |
| MARTORELLO_033122 | MARTORELLO_033128 | 3.39 |
| MARTORELLO_033129 | MARTORELLO_033132 | 3.39 |
| MARTORELLO_033133 | MARTORELLO_033136 | 3.39 |
| MARTORELLO_033137 | MARTORELLO_033142 | 3.39 |
| MARTORELLO_033143 | MARTORELLO_033147 | 3.39 |
| MARTORELLO_033148 | MARTORELLO_033149 | 3.39 |
| MARTORELLO_033150 | MARTORELLO_033154 | 3.39 |
| MARTORELLO_033155 | MARTORELLO_033166 | 3.39 |
| MARTORELLO_033167 | MARTORELLO_033173 | 3.39 |
| MARTORELLO_033174 | MARTORELLO_033178 | 3.39 |
| MARTORELLO_033179 | MARTORELLO_033184 | 3.39 |
| MARTORELLO_033185 | MARTORELLO_033189 | 3.39 |
| MARTORELLO_033190 | MARTORELLO_033194 | 3.39 |
| MARTORELLO_033195 | MARTORELLO_033202 | 3.39 |
| MARTORELLO_033203 | MARTORELLO_033210 | 3.39 |
| MARTORELLO_033211 | MARTORELLO_033221 | 3.39 |
| MARTORELLO_033222 | MARTORELLO_033230 | 3.39 |
| MARTORELLO_033231 | MARTORELLO_033240 | 3.39 |
| MARTORELLO_033241 | MARTORELLO_033248 | 3.39 |
| MARTORELLO_033249 | MARTORELLO_033257 | 3.39 |
| MARTORELLO_033258 | MARTORELLO_033266 | 3.39 |
| MARTORELLO_033267 | MARTORELLO_033277 | 3.39 |
| MARTORELLO_033278 | MARTORELLO_033290 | 3.39 |
| MARTORELLO_033291 | MARTORELLO_033299 | 3.39 |
| MARTORELLO_033300 | MARTORELLO_033302 | 3.39 |
| MARTORELLO_033303 | MARTORELLO_033305 | 3.39 |
| MARTORELLO_033306 | MARTORELLO_033307 | 3.39 |
| MARTORELLO_033308 | MARTORELLO_033309 | 3.39 |
| MARTORELLO_033310 | MARTORELLO_033311 | 3.39 |
| MARTORELLO_033312 | MARTORELLO_033314 | 3.39 |
| MARTORELLO_033315 | MARTORELLO_033316 | 3.39 |
| MARTORELLO_033317 | MARTORELLO_033318 | 3.39 |
| MARTORELLO_033319 | MARTORELLO_033320 | 3.39 |
| MARTORELLO_033321 | MARTORELLO_033323 | 3.39 |
| MARTORELLO_033324 | MARTORELLO_033325 | 3.39 |
| MARTORELLO_033326 | MARTORELLO_033328 | 3.39 |
| MARTORELLO_033329 | MARTORELLO_033336 | 3.39 |
| MARTORELLO_033337 | MARTORELLO_033342 | 3.39 |
| MARTORELLO_033343 | MARTORELLO_033349 | 3.39 |
| MARTORELLO_033350 | MARTORELLO_033356 | 3.39 |
| MARTORELLO_033357 | MARTORELLO_033358 | 3.39 |
| MARTORELLO_033359 | MARTORELLO_033360 | 3.39 |
| MARTORELLO_033361 | MARTORELLO_033362 | 3.39 |
| MARTORELLO_033363 | MARTORELLO_033365 | 3.39 |
| MARTORELLO_033366 | MARTORELLO_033368 | 3.39 |
| MARTORELLO_033369 | MARTORELLO_033371 | 3.39 |
| MARTORELLO_033372 | MARTORELLO_033374 | 3.39 |
| MARTORELLO_033375 | MARTORELLO_033378 | 3.39 |
| MARTORELLO_033379 | MARTORELLO_033381 | 3.39 |
| MARTORELLO_033382 | MARTORELLO_033384 | 3.39 |
| MARTORELLO_033385 | MARTORELLO_033387 | 3.39 |
| MARTORELLO_033388 | MARTORELLO_033390 | 3.39 |

JA1669

*Williams v. Big Picture Loans, LLC, et al.*
E.D. Virginia Civil Action No. 17-cv-461 (REP)
Martorello Response Chart - Production 19

| Bates Begin | Bates End | Williams Document Request (Set. Request) |
|---|---|---|
| MARTORELLO_033391 | MARTORELLO_033393 | 3.39 |
| MARTORELLO_033394 | MARTORELLO_033400 | 3.39 |
| MARTORELLO_033401 | MARTORELLO_033406 | 3.39 |
| MARTORELLO_033407 | MARTORELLO_033416 | 3.39 |
| MARTORELLO_033417 | MARTORELLO_033428 | 3.39 |
| MARTORELLO_033429 | MARTORELLO_033432 | 3.39 |
| MARTORELLO_033433 | MARTORELLO_033435 | 3.39 |
| MARTORELLO_033436 | MARTORELLO_033438 | 3.39 |
| MARTORELLO_033439 | MARTORELLO_033441 | 3.39 |
| MARTORELLO_033442 | MARTORELLO_033445 | 3.39 |
| MARTORELLO_033446 | MARTORELLO_033448 | 3.39 |
| MARTORELLO_033449 | MARTORELLO_033451 | 3.39 |
| MARTORELLO_033452 | MARTORELLO_033454 | 3.39 |
| MARTORELLO_033455 | MARTORELLO_033457 | 3.39 |
| MARTORELLO_033458 | MARTORELLO_033460 | 3.39 |
| MARTORELLO_033461 | MARTORELLO_033463 | 3.39 |
| MARTORELLO_033464 | MARTORELLO_033466 | 3.39 |
| MARTORELLO_033467 | MARTORELLO_033469 | 3.39 |
| MARTORELLO_033470 | MARTORELLO_033472 | 3.39 |
| MARTORELLO_033473 | MARTORELLO_033475 | 3.39 |
| MARTORELLO_033476 | MARTORELLO_033478 | 3.39 |
| MARTORELLO_033479 | MARTORELLO_033480 | 3.39 |
| MARTORELLO_033481 | MARTORELLO_033482 | 3.39 |
| MARTORELLO_033483 | MARTORELLO_033484 | 3.39 |
| MARTORELLO_033485 | MARTORELLO_033492 | 3.39 |
| MARTORELLO_033493 | MARTORELLO_033505 | 3.39 |
| MARTORELLO_033506 | MARTORELLO_033511 | 3.39 |
| MARTORELLO_033512 | MARTORELLO_033524 | 3.39 |
| MARTORELLO_033525 | MARTORELLO_033531 | 3.39 |
| MARTORELLO_033532 | MARTORELLO_033539 | 3.39 |
| MARTORELLO_033540 | MARTORELLO_033546 | 3.39 |
| MARTORELLO_033547 | MARTORELLO_033558 | 3.39 |
| MARTORELLO_033559 | MARTORELLO_033565 | 3.39 |
| MARTORELLO_033566 | MARTORELLO_033574 | 3.39 |
| MARTORELLO_033575 | MARTORELLO_033578 | 3.39 |
| MARTORELLO_033579 | MARTORELLO_033581 | 3.39 |
| MARTORELLO_033582 | MARTORELLO_033583 | 3.39 |
| MARTORELLO_033584 | MARTORELLO_033586 | 3.39 |
| MARTORELLO_033587 | MARTORELLO_033590 | 3.39 |
| MARTORELLO_033591 | MARTORELLO_033592 | 3.39 |
| MARTORELLO_033593 | MARTORELLO_033594 | 3.39 |
| MARTORELLO_033595 | MARTORELLO_033597 | 3.39 |
| MARTORELLO_033598 | MARTORELLO_033599 | 3.39 |
| MARTORELLO_033600 | MARTORELLO_033606 | 3.39 |
| MARTORELLO_033607 | MARTORELLO_033615 | 3.39 |
| MARTORELLO_033616 | MARTORELLO_033624 | 3.39 |
| MARTORELLO_033625 | MARTORELLO_033630 | 3.39 |
| MARTORELLO_033631 | MARTORELLO_033643 | 3.39 |
| MARTORELLO_033644 | MARTORELLO_033652 | 3.39 |
| MARTORELLO_033653 | MARTORELLO_033662 | 3.39 |
| MARTORELLO_033663 | MARTORELLO_033671 | 3.39 |
| MARTORELLO_033672 | MARTORELLO_033680 | 3.39 |
| MARTORELLO_033681 | MARTORELLO_033688 | 3.39 |
| MARTORELLO_033689 | MARTORELLO_033694 | 3.39 |
| MARTORELLO_033695 | MARTORELLO_033700 | 3.39 |
| MARTORELLO_033701 | MARTORELLO_033710 | 3.39 |

*Williams v. Big Picture Loans, LLC, et al.*
E.D. Virginia Civil Action No. 17-cv-461 (REP)
Martorello Response Chart - Production 19

| Bates Begin | Bates End | Williams Document Request (Set. Request) |
|---|---|---|
| MARTORELLO_033711 | MARTORELLO_033720 | 3.39 |
| MARTORELLO_033721 | MARTORELLO_033729 | 3.39 |
| MARTORELLO_033730 | MARTORELLO_033736 | 3.39 |
| MARTORELLO_033737 | MARTORELLO_033746 | 3.39 |
| MARTORELLO_033747 | MARTORELLO_033756 | 3.39 |
| MARTORELLO_033757 | MARTORELLO_033766 | 3.39 |
| MARTORELLO_033767 | MARTORELLO_033769 | 3.39 |
| MARTORELLO_033770 | MARTORELLO_033771 | 3.39 |
| MARTORELLO_033772 | MARTORELLO_033774 | 3.39 |
| MARTORELLO_033775 | MARTORELLO_033777 | 3.39 |
| MARTORELLO_033778 | MARTORELLO_033780 | 3.39 |
| MARTORELLO_033781 | MARTORELLO_033783 | 3.39 |
| MARTORELLO_033784 | MARTORELLO_033787 | 3.39 |
| MARTORELLO_033788 | MARTORELLO_033790 | 3.39 |
| MARTORELLO_033791 | MARTORELLO_033794 | 3.39 |
| MARTORELLO_033795 | MARTORELLO_033797 | 3.39 |
| MARTORELLO_033798 | MARTORELLO_033801 | 3.39 |
| MARTORELLO_033802 | MARTORELLO_033810 | 3.39 |
| MARTORELLO_033811 | MARTORELLO_033815 | 3.39 |
| MARTORELLO_033816 | MARTORELLO_033821 | 3.39 |
| MARTORELLO_033822 | MARTORELLO_033827 | 3.39 |
| MARTORELLO_033828 | MARTORELLO_033833 | 3.39 |
| MARTORELLO_033834 | MARTORELLO_033841 | 3.39 |
| MARTORELLO_033842 | MARTORELLO_033848 | 3.39 |
| MARTORELLO_033849 | MARTORELLO_033856 | 3.39 |
| MARTORELLO_033857 | MARTORELLO_033863 | 3.39 |
| MARTORELLO_033864 | MARTORELLO_033876 | 3.39 |
| MARTORELLO_033877 | MARTORELLO_033882 | 3.39 |
| MARTORELLO_033883 | MARTORELLO_033890 | 3.39 |
| MARTORELLO_033891 | MARTORELLO_033896 | 3.39 |
| MARTORELLO_033897 | MARTORELLO_033908 | 3.39 |
| MARTORELLO_033909 | MARTORELLO_033918 | 3.39 |
| MARTORELLO_033919 | MARTORELLO_033924 | 3.39 |
| MARTORELLO_033925 | MARTORELLO_033934 | 3.39 |
| MARTORELLO_033935 | MARTORELLO_033944 | 3.39 |
| MARTORELLO_033945 | MARTORELLO_033953 | 3.39 |
| MARTORELLO_033954 | MARTORELLO_033960 | 3.39 |
| MARTORELLO_033961 | MARTORELLO_033969 | 3.39 |
| MARTORELLO_033970 | MARTORELLO_033975 | 3.39 |
| MARTORELLO_033976 | MARTORELLO_033984 | 3.39 |
| MARTORELLO_033985 | MARTORELLO_033992 | 3.39 |
| MARTORELLO_033993 | MARTORELLO_034000 | 3.39 |
| MARTORELLO_034001 | MARTORELLO_034011 | 3.39 |
| MARTORELLO_034012 | MARTORELLO_034017 | 3.39 |
| MARTORELLO_034018 | MARTORELLO_034027 | 3.39 |
| MARTORELLO_034028 | MARTORELLO_034035 | 3.39 |
| MARTORELLO_034036 | MARTORELLO_034044 | 3.39 |
| MARTORELLO_034045 | MARTORELLO_034051 | 3.39 |
| MARTORELLO_034052 | MARTORELLO_034057 | 3.39 |
| MARTORELLO_034058 | MARTORELLO_034065 | 3.39 |
| MARTORELLO_034066 | MARTORELLO_034075 | 3.39 |
| MARTORELLO_034076 | MARTORELLO_034086 | 3.39 |
| MARTORELLO_034087 | MARTORELLO_034096 | 3.39 |
| MARTORELLO_034097 | MARTORELLO_034103 | 3.39 |
| MARTORELLO_034104 | MARTORELLO_034108 | 3.39 |
| MARTORELLO_034109 | MARTORELLO_034116 | 3.39 |

*Williams v. Big Picture Loans, LLC, et al.*
E.D. Virginia Civil Action No. 17-cv-461 (REP)
Martorello Response Chart - Production 19

| Bates Begin | Bates End | Williams Document Request (Set. Request) |
|---|---|---|
| MARTORELLO_034117 | MARTORELLO_034122 | 3.39 |
| MARTORELLO_034123 | MARTORELLO_034128 | 3.39 |
| MARTORELLO_034129 | MARTORELLO_034136 | 3.39 |
| MARTORELLO_034137 | MARTORELLO_034145 | 3.39 |
| MARTORELLO_034146 | MARTORELLO_034152 | 3.39 |
| MARTORELLO_034153 | MARTORELLO_034161 | 3.39 |
| MARTORELLO_034162 | MARTORELLO_034165 | 3.39 |
| MARTORELLO_034166 | MARTORELLO_034170 | 3.39 |
| MARTORELLO_034171 | MARTORELLO_034173 | 3.39 |
| MARTORELLO_034174 | MARTORELLO_034177 | 3.39 |
| MARTORELLO_034178 | MARTORELLO_034186 | 3.39 |
| MARTORELLO_034187 | MARTORELLO_034191 | 3.39 |
| MARTORELLO_034192 | MARTORELLO_034193 | 3.39 |
| MARTORELLO_034194 | MARTORELLO_034202 | 3.39 |
| MARTORELLO_034203 | MARTORELLO_034210 | 3.39 |
| MARTORELLO_034211 | MARTORELLO_034216 | 3.39 |
| MARTORELLO_034217 | MARTORELLO_034220 | 3.39 |
| MARTORELLO_034221 | MARTORELLO_034224 | 3.39 |
| MARTORELLO_034225 | MARTORELLO_034230 | 3.39 |
| MARTORELLO_034231 | MARTORELLO_034234 | 3.39 |
| MARTORELLO_034235 | MARTORELLO_034241 | 3.39 |
| MARTORELLO_034242 | MARTORELLO_034244 | 3.39 |
| MARTORELLO_034245 | MARTORELLO_034252 | 3.39 |
| MARTORELLO_034253 | MARTORELLO_034255 | 3.39 |
| MARTORELLO_034256 | MARTORELLO_034267 | 3.39 |
| MARTORELLO_034268 | MARTORELLO_034278 | 3.39 |
| MARTORELLO_034279 | MARTORELLO_034286 | 3.39 |
| MARTORELLO_034287 | MARTORELLO_034295 | 3.39 |
| MARTORELLO_034296 | MARTORELLO_034299 | 3.39 |
| MARTORELLO_034300 | MARTORELLO_034301 | 3.39 |
| MARTORELLO_034302 | MARTORELLO_034303 | 3.39 |
| MARTORELLO_034304 | MARTORELLO_034305 | 3.39 |
| MARTORELLO_034306 | MARTORELLO_034307 | 3.39 |
| MARTORELLO_034308 | MARTORELLO_034309 | 3.39 |
| MARTORELLO_034310 | MARTORELLO_034316 | 3.39 |
| MARTORELLO_034317 | MARTORELLO_034325 | 3.39 |
| MARTORELLO_034326 | MARTORELLO_034336 | 3.39 |
| MARTORELLO_034337 | MARTORELLO_034349 | 3.39 |
| MARTORELLO_034350 | MARTORELLO_034360 | 3.39 |
| MARTORELLO_034361 | MARTORELLO_034371 | 3.39 |
| MARTORELLO_034372 | MARTORELLO_034387 | 3.39 |
| MARTORELLO_034388 | MARTORELLO_034396 | 3.39 |
| MARTORELLO_034397 | MARTORELLO_034406 | 3.39 |
| MARTORELLO_034407 | MARTORELLO_034415 | 3.39 |
| MARTORELLO_034416 | MARTORELLO_034424 | 3.39 |
| MARTORELLO_034425 | MARTORELLO_034437 | 3.39 |
| MARTORELLO_034438 | MARTORELLO_034447 | 3.39 |
| MARTORELLO_034448 | MARTORELLO_034456 | 3.39 |
| MARTORELLO_034457 | MARTORELLO_034466 | 3.39 |
| MARTORELLO_034467 | MARTORELLO_034474 | 3.39 |
| MARTORELLO_034475 | MARTORELLO_034482 | 3.39 |
| MARTORELLO_034483 | MARTORELLO_034493 | 3.39 |
| MARTORELLO_034494 | MARTORELLO_034504 | 3.39 |
| MARTORELLO_034505 | MARTORELLO_034513 | 3.39 |
| MARTORELLO_034514 | MARTORELLO_034521 | 3.39 |
| MARTORELLO_034522 | MARTORELLO_034531 | 3.39 |

*Williams v. Big Picture Loans, LLC, et al.*
E.D. Virginia Civil Action No. 17-cv-461 (REP)
Martorello Response Chart - Production 19

| Bates Begin | Bates End | Williams Document Request (Set. Request) |
|---|---|---|
| MARTORELLO_034532 | MARTORELLO_034541 | 3.39 |
| MARTORELLO_034542 | MARTORELLO_034549 | 3.39 |
| MARTORELLO_034550 | MARTORELLO_034558 | 3.39 |
| MARTORELLO_034559 | MARTORELLO_034568 | 3.39 |
| MARTORELLO_034569 | MARTORELLO_034577 | 3.39 |
| MARTORELLO_034578 | MARTORELLO_034579 | 3.39 |
| MARTORELLO_034580 | MARTORELLO_034582 | 3.39 |
| MARTORELLO_034583 | MARTORELLO_034585 | 3.39 |
| MARTORELLO_034586 | MARTORELLO_034588 | 3.39 |
| MARTORELLO_034589 | MARTORELLO_034591 | 3.39 |
| MARTORELLO_034592 | MARTORELLO_034594 | 3.09; 3.39 |
| MARTORELLO_034595 | MARTORELLO_034597 | 3.05 |
| MARTORELLO_034598 | MARTORELLO_034607 | 3.05 |
| MARTORELLO_034608 | MARTORELLO_034608 | 3.05 |
| MARTORELLO_034609 | MARTORELLO_034609 | 3.05 |
| MARTORELLO_034610 | MARTORELLO_034611 | 3.05 |
| MARTORELLO_034612 | MARTORELLO_034612 | 3.05 |
| MARTORELLO_034613 | MARTORELLO_034614 | 3.05 |
| MARTORELLO_034615 | MARTORELLO_034618 | 3.05 |
| MARTORELLO_034619 | MARTORELLO_034630 | 3.05 |
| MARTORELLO_034631 | MARTORELLO_034632 | 3.05 |
| MARTORELLO_034633 | MARTORELLO_034633 | 3.05 |
| MARTORELLO_034634 | MARTORELLO_034634 | 3.05 |
| MARTORELLO_034635 | MARTORELLO_034635 | 3.05 |
| MARTORELLO_034636 | MARTORELLO_034636 | 3.05 |
| MARTORELLO_034637 | MARTORELLO_034637 | 3.05 |
| MARTORELLO_034638 | MARTORELLO_034638 | 3.05 |
| MARTORELLO_034639 | MARTORELLO_034642 | 3.05 |
| MARTORELLO_034643 | MARTORELLO_034644 | 3.05 |
| MARTORELLO_034645 | MARTORELLO_034646 | 3.05 |
| MARTORELLO_034647 | MARTORELLO_034647 | 3.05 |
| MARTORELLO_034648 | MARTORELLO_034650 | 3.05 |
| MARTORELLO_034651 | MARTORELLO_034651 | 3.05 |
| MARTORELLO_034652 | MARTORELLO_034654 | 3.05 |
| MARTORELLO_034655 | MARTORELLO_034657 | 3.05 |
| MARTORELLO_034658 | MARTORELLO_034660 | 3.05 |
| MARTORELLO_034661 | MARTORELLO_034663 | 3.05 |
| MARTORELLO_034664 | MARTORELLO_034675 | 3.05 |
| MARTORELLO_034676 | MARTORELLO_034679 | 3.05 |
| MARTORELLO_034680 | MARTORELLO_034680 | 3.05 |
| MARTORELLO_034681 | MARTORELLO_034683 | 3.05 |
| MARTORELLO_034684 | MARTORELLO_034685 | 3.05 |
| MARTORELLO_034686 | MARTORELLO_034687 | 3.05 |
| MARTORELLO_034688 | MARTORELLO_034689 | 3.05 |
| MARTORELLO_034690 | MARTORELLO_034691 | 3.05 |
| MARTORELLO_034692 | MARTORELLO_034698 | 3.05 |
| MARTORELLO_034699 | MARTORELLO_034700 | 3.05 |
| MARTORELLO_034701 | MARTORELLO_034707 | 3.05 |
| MARTORELLO_034708 | MARTORELLO_034708 | 3.05 |
| MARTORELLO_034709 | MARTORELLO_034713 | 3.05 |
| MARTORELLO_034714 | MARTORELLO_034714 | 3.05 |
| MARTORELLO_034715 | MARTORELLO_034719 | 3.05 |
| MARTORELLO_034720 | MARTORELLO_034725 | 3.05 |
| MARTORELLO_034726 | MARTORELLO_034729 | 3.05 |
| MARTORELLO_034730 | MARTORELLO_034730 | 3.05 |
| MARTORELLO_034731 | MARTORELLO_034735 | 3.05 |

JA1673

*Williams v. Big Picture Loans, LLC, et al.*
E.D. Virginia Civil Action No. 17-cv-461 (REP)
Martorello Response Chart - Production 19

| Bates Begin | Bates End | Williams Document Request (Set. Request) |
|---|---|---|
| MARTORELLO_034736 | MARTORELLO_034736 | 3.05 |
| MARTORELLO_034737 | MARTORELLO_034745 | 3.05 |
| MARTORELLO_034746 | MARTORELLO_034746 | 3.05 |
| MARTORELLO_034747 | MARTORELLO_034750 | 3.05 |
| MARTORELLO_034751 | MARTORELLO_034760 | 3.05 |
| MARTORELLO_034761 | MARTORELLO_034761 | 3.05 |
| MARTORELLO_034762 | MARTORELLO_034766 | 3.05 |
| MARTORELLO_034767 | MARTORELLO_034767 | 3.05 |
| MARTORELLO_034768 | MARTORELLO_034768 | 3.05 |
| MARTORELLO_034769 | MARTORELLO_034769 | 3.05 |
| MARTORELLO_034770 | MARTORELLO_034771 | 3.05 |
| MARTORELLO_034772 | MARTORELLO_034772 | 3.05 |
| MARTORELLO_034773 | MARTORELLO_034773 | 3.05 |
| MARTORELLO_034774 | MARTORELLO_034774 | 3.05 |
| MARTORELLO_034775 | MARTORELLO_034775 | 3.05 |
| MARTORELLO_034779 | MARTORELLO_034779 | 3.05 |
| MARTORELLO_034780 | MARTORELLO_034783 | 3.05 |
| MARTORELLO_034784 | MARTORELLO_034784 | 3.05 |
| MARTORELLO_034785 | MARTORELLO_034785 | 3.05 |
| MARTORELLO_034786 | MARTORELLO_034789 | 3.05 |
| MARTORELLO_034790 | MARTORELLO_034793 | 3.05 |
| MARTORELLO_034794 | MARTORELLO_034795 | 3.05 |
| MARTORELLO_034796 | MARTORELLO_034799 | 3.05 |
| MARTORELLO_034800 | MARTORELLO_034800 | 3.05 |
| MARTORELLO_034801 | MARTORELLO_034801 | 3.05 |
| MARTORELLO_034802 | MARTORELLO_034802 | 3.05 |
| MARTORELLO_034803 | MARTORELLO_034803 | 3.05 |
| MARTORELLO_034804 | MARTORELLO_034804 | 3.05 |
| MARTORELLO_034805 | MARTORELLO_034805 | 3.05 |
| MARTORELLO_034806 | MARTORELLO_034806 | 3.05 |
| MARTORELLO_034807 | MARTORELLO_034807 | 3.05 |
| MARTORELLO_034808 | MARTORELLO_034808 | 3.05 |
| MARTORELLO_034809 | MARTORELLO_034809 | 3.05 |
| MARTORELLO_034810 | MARTORELLO_034810 | 3.05 |
| MARTORELLO_034811 | MARTORELLO_034811 | 3.05 |
| MARTORELLO_034812 | MARTORELLO_034812 | 3.05 |
| MARTORELLO_034813 | MARTORELLO_034813 | 3.05 |
| MARTORELLO_034814 | MARTORELLO_034814 | 3.05 |
| MARTORELLO_034815 | MARTORELLO_034815 | 3.05 |
| MARTORELLO_034816 | MARTORELLO_034816 | 3.05 |
| MARTORELLO_034817 | MARTORELLO_034819 | 3.06s |
| MARTORELLO_034820 | MARTORELLO_034861 | 3.06s |
| MARTORELLO_034862 | MARTORELLO_034868 | 3.06s |
| MARTORELLO_034869 | MARTORELLO_034877 | 3.06s |
| MARTORELLO_034878 | MARTORELLO_034887 | 3.06s |
| MARTORELLO_034888 | MARTORELLO_034903 | 3.06s |
| MARTORELLO_034904 | MARTORELLO_034930 | 3.06s |
| MARTORELLO_034931 | MARTORELLO_034932 | 3.06s |
| MARTORELLO_034933 | MARTORELLO_034961 | 3.06s |
| MARTORELLO_034962 | MARTORELLO_034965 | 3.06s |
| MARTORELLO_034966 | MARTORELLO_034970 | 3.06s |
| MARTORELLO_034971 | MARTORELLO_035048 | 3.06s |
| MARTORELLO_035049 | MARTORELLO_035052 | 3.06s |
| MARTORELLO_035053 | MARTORELLO_035082 | 3.06s |
| MARTORELLO_035083 | MARTORELLO_035086 | 3.06s |
| MARTORELLO_035087 | MARTORELLO_035106 | 3.06s |

| Bates Begin | Bates End | Williams Document Request (Set. Request) |
|---|---|---|
| MARTORELLO_035107 | MARTORELLO_035127 | 3.06s |
| MARTORELLO_035128 | MARTORELLO_035130 | 3.06s |
| MARTORELLO_035131 | MARTORELLO_035133 | 3.06s |
| MARTORELLO_035134 | MARTORELLO_035206 | 3.22 |
| MARTORELLO_035207 | MARTORELLO_035208 | 3.33; 3.34 |
| MARTORELLO_035209 | MARTORELLO_035209 | 3.33 |
| MARTORELLO_035210 | MARTORELLO_035210 | 3.33 |
| MARTORELLO_035211 | MARTORELLO_035213 | 3.09 |
| MARTORELLO_035214 | MARTORELLO_035219 | 3.31; 3.32 |
| MARTORELLO_035220 | MARTORELLO_035226 | 3.31; 3.32 |
| MARTORELLO_035227 | MARTORELLO_035233 | 3.31; 3.32 |
| MARTORELLO_035234 | MARTORELLO_035241 | 3.31; 3.32 |
| MARTORELLO_035242 | MARTORELLO_035242 | 3.31; 3.32 |
| MARTORELLO_035243 | MARTORELLO_036583 | 3.31; 3.32 |
| MARTORELLO_036584 | MARTORELLO_036591 | 3.31; 3.32 |
| MARTORELLO_036592 | MARTORELLO_036596 | 3.09 |
| MARTORELLO_036597 | MARTORELLO_036599 | 3.13 |
| MARTORELLO_036600 | MARTORELLO_036602 | 3.13 |
| MARTORELLO_036603 | MARTORELLO_036617 | 3.09 |
| MARTORELLO_036618 | MARTORELLO_036619 | 3.09 |
| MARTORELLO_036620 | MARTORELLO_036620 | 3.09 |
| MARTORELLO_036621 | MARTORELLO_036621 | 3.09 |
| MARTORELLO_036622 | MARTORELLO_036622 | 3.09 |
| MARTORELLO_036623 | MARTORELLO_036653 | 3.09 |
| MARTORELLO_036654 | MARTORELLO_036655 | 3.13 |
| MARTORELLO_036656 | MARTORELLO_036657 | 3.24; 3.31; 3.32 |
| MARTORELLO_036658 | MARTORELLO_036658 | 3.24 |
| MARTORELLO_036659 | MARTORELLO_036661 | 3.24; 3.31; 3.32 |
| MARTORELLO_036662 | MARTORELLO_036664 | 3.24; 3.33 |
| MARTORELLO_036665 | MARTORELLO_036665 | 3.24; 3.33 |
| MARTORELLO_036666 | MARTORELLO_036666 | 3.24 |
| MARTORELLO_036667 | MARTORELLO_036667 | 3.24 |
| MARTORELLO_036668 | MARTORELLO_036668 | 3.24 |
| MARTORELLO_036669 | MARTORELLO_036669 | 3.33 |
| MARTORELLO_036670 | MARTORELLO_036670 | 3.33 |
| MARTORELLO_036671 | MARTORELLO_036672 | 3.09 |
| MARTORELLO_036673 | MARTORELLO_036674 | 1.01; 1.02; 1.31; 3.09; 3.31 |
| MARTORELLO_036675 | MARTORELLO_036677 | 3.09 |
| MARTORELLO_036678 | MARTORELLO_036683 | 1.09; 1.55; 3.12; 3.13; 3.14 |
| MARTORELLO_036684 | MARTORELLO_036690 | 3.12; 3.13; 3.14 |
| MARTORELLO_036691 | MARTORELLO_036697 | 3.09 |
| MARTORELLO_036698 | MARTORELLO_036706 | 3.13 |
| MARTORELLO_036707 | MARTORELLO_036713 | 3.13 |
| MARTORELLO_036714 | MARTORELLO_036716 | 3.09 |
| MARTORELLO_036717 | MARTORELLO_036719 | 3.09 |
| MARTORELLO_036720 | MARTORELLO_036723 | 3.09 |
| MARTORELLO_036724 | MARTORELLO_036727 | 3.09 |
| MARTORELLO_036728 | MARTORELLO_036731 | 3.09 |
| MARTORELLO_036732 | MARTORELLO_036734 | 3.09 |
| MARTORELLO_036735 | MARTORELLO_036738 | 3.09 |
| MARTORELLO_036739 | MARTORELLO_036744 | 3.09; 3.14 |
| MARTORELLO_036745 | MARTORELLO_036763 | 3.09; 3.14 |
| MARTORELLO_036764 | MARTORELLO_036764 | 3.09 |
| MARTORELLO_036765 | MARTORELLO_036768 | 3.09 |
| MARTORELLO_036769 | MARTORELLO_036769 | 3.09 |
| MARTORELLO_036770 | MARTORELLO_036783 | 3.09 |

*Williams v. Big Picture Loans, LLC, et al.*
E.D. Virginia Civil Action No. 17-cv-461 (REP)
Martorello Response Chart - Production 19

| Bates Begin | Bates End | Williams Document Request (Set. Request) |
|---|---|---|
| MARTORELLO_036784 | MARTORELLO_036786 | 3.09; 3.14 |
| MARTORELLO_036787 | MARTORELLO_036790 | 3.09; 3.14 |
| MARTORELLO_036791 | MARTORELLO_036799 | 3.09; 3.14 |
| MARTORELLO_036800 | MARTORELLO_036805 | 3.12; 3.13; 3.14 |
| MARTORELLO_036806 | MARTORELLO_036812 | 3.12; 3.13; 3.14 |
| MARTORELLO_036813 | MARTORELLO_036819 | 3.12; 3.13; 3.14 |
| MARTORELLO_036820 | MARTORELLO_036826 | 3.12; 3.13; 3.14 |
| MARTORELLO_036827 | MARTORELLO_036827 | 3.09 |
| MARTORELLO_036828 | MARTORELLO_036836 | 3.09 |
| MARTORELLO_036837 | MARTORELLO_036845 | 3.09 |
| MARTORELLO_036846 | MARTORELLO_036852 | 3.12; 3.13; 3.14 |
| MARTORELLO_036853 | MARTORELLO_036859 | 3.12; 3.13; 3.14 |
| MARTORELLO_036860 | MARTORELLO_036872 | 3.24; 3.31; 3.32 |
| MARTORELLO_036873 | MARTORELLO_036878 | 3.24; 3.31; 3.32 |
| MARTORELLO_036879 | MARTORELLO_036883 | 3.09 |
| MARTORELLO_036884 | MARTORELLO_036886 | 3.09 |
| MARTORELLO_036887 | MARTORELLO_036887 | 3.09 |
| MARTORELLO_036888 | MARTORELLO_036889 | 3.09 |
| MARTORELLO_036890 | MARTORELLO_036892 | 3.09 |
| MARTORELLO_036893 | MARTORELLO_036901 | 3.24; 3.31; 3.32 |
| MARTORELLO_036902 | MARTORELLO_036907 | 3.09 |
| MARTORELLO_036908 | MARTORELLO_036909 | 3.09 |
| MARTORELLO_036910 | MARTORELLO_036910 | 3.13 |
| MARTORELLO_036911 | MARTORELLO_036917 | 3.13 |
| MARTORELLO_036918 | MARTORELLO_036924 | 3.09 |
| MARTORELLO_036925 | MARTORELLO_036931 | 3.09 |
| MARTORELLO_036932 | MARTORELLO_036933 | 3.13 |
| MARTORELLO_036934 | MARTORELLO_036940 | 3.13 |
| MARTORELLO_036941 | MARTORELLO_036947 | 3.13 |
| MARTORELLO_036948 | MARTORELLO_036958 | 3.24; 3.31; 3.32 |
| MARTORELLO_036959 | MARTORELLO_036959 | 3.24; 3.31; 3.32 |
| MARTORELLO_036960 | MARTORELLO_036968 | 3.09; 3.31; 3.32 |
| MARTORELLO_036969 | MARTORELLO_036977 | 3.09; 3.31; 3.32 |
| MARTORELLO_036978 | MARTORELLO_036987 | 3.09; 3.31; 3.32 |
| MARTORELLO_036988 | MARTORELLO_036999 | 3.24; 3.31; 3.32 |
| MARTORELLO_037000 | MARTORELLO_037000 | 3.24; 3.31; 3.32 |
| MARTORELLO_037001 | MARTORELLO_037001 | 3.24; 3.31; 3.32 |
| MARTORELLO_037002 | MARTORELLO_037004 | 3.09 |
| MARTORELLO_037005 | MARTORELLO_037006 | 3.09 |
| MARTORELLO_037007 | MARTORELLO_037009 | 3.09 |
| MARTORELLO_037010 | MARTORELLO_037012 | 3.24; 3.31; 3.32 |
| MARTORELLO_037013 | MARTORELLO_037033 | 3.24; 3.31; 3.32 |
| MARTORELLO_037034 | MARTORELLO_037034 | 3.24; 3.31; 3.32 |
| MARTORELLO_037035 | MARTORELLO_037038 | 3.24; 3.31; 3.32 |
| MARTORELLO_037039 | MARTORELLO_037045 | 3.24; 3.31; 3.32 |
| MARTORELLO_037046 | MARTORELLO_037046 | 3.24; 3.31; 3.32 |
| MARTORELLO_037047 | MARTORELLO_037075 | 3.24; 3.31; 3.32 |
| MARTORELLO_037076 | MARTORELLO_037096 | 3.24; 3.31; 3.32 |
| MARTORELLO_037097 | MARTORELLO_037102 | 3.24; 3.31; 3.32 |
| MARTORELLO_037103 | MARTORELLO_037113 | 3.16 |
| MARTORELLO_037114 | MARTORELLO_037116 | 3.24 |
| MARTORELLO_037117 | MARTORELLO_037120 | 3.09; 3.31; 3.32; 3.33 |
| MARTORELLO_037121 | MARTORELLO_037121 | 3.09; 3.31; 3.32; 3.33 |
| MARTORELLO_037122 | MARTORELLO_037122 | 3.09; 3.31; 3.32; 3.33 |
| MARTORELLO_037123 | MARTORELLO_037123 | 3.09; 3.31; 3.32; 3.33 |
| MARTORELLO_037124 | MARTORELLO_037126 | 3.24 |

*Williams v. Big Picture Loans, LLC, et al.*
E.D. Virginia Civil Action No. 17-cv-461 (REP)
Martorello Response Chart - Production 19

| Bates Begin | Bates End | Williams Document Request (Set. Request) |
|---|---|---|
| MARTORELLO_037127 | MARTORELLO_037130 | 3.24 |
| MARTORELLO_037131 | MARTORELLO_037138 | 3.24; 3.31; 3.32 |
| MARTORELLO_037139 | MARTORELLO_038479 | 3.24; 3.31; 3.32 |
| MARTORELLO_038480 | MARTORELLO_038487 | 3.24; 3.31; 3.32 |
| MARTORELLO_038488 | MARTORELLO_038489 | 3.33 |
| MARTORELLO_038490 | MARTORELLO_038490 | 3.33 |
| MARTORELLO_038491 | MARTORELLO_038492 | 3.24 |
| MARTORELLO_038493 | MARTORELLO_038495 | 3.24 |
| MARTORELLO_038496 | MARTORELLO_038498 | 3.24 |
| MARTORELLO_038499 | MARTORELLO_038512 | 3.09 |
| MARTORELLO_038513 | MARTORELLO_038514 | 3.24 |
| MARTORELLO_038515 | MARTORELLO_038545 | 3.24 |
| MARTORELLO_038546 | MARTORELLO_038547 | 3.24 |
| MARTORELLO_038548 | MARTORELLO_038549 | 3.24 |
| MARTORELLO_038550 | MARTORELLO_038552 | 3.24; 3.31; 3.32 |
| MARTORELLO_038553 | MARTORELLO_038553 | 1.20; 1.41; 1.42 ; 1.47; 1.48; 1.55; 1.61 ; 1.62 ; 1.72; 3.09; 3.13 |
| MARTORELLO_038554 | MARTORELLO_038554 | 3.24 |
| MARTORELLO_038555 | MARTORELLO_038555 | 3.24 |
| MARTORELLO_038556 | MARTORELLO_038556 | 3.24 |
| MARTORELLO_038557 | MARTORELLO_038559 | 3.33; 3.34 |
| MARTORELLO_038560 | MARTORELLO_038560 | 3.33; 3.34 |
| MARTORELLO_038561 | MARTORELLO_038561 | 3.33; 3.34 |
| MARTORELLO_038562 | MARTORELLO_038562 | 3.33; 3.34 |
| MARTORELLO_038563 | MARTORELLO_038571 | 3.13 |
| MARTORELLO_038572 | MARTORELLO_038578 | 3.13 |
| MARTORELLO_038579 | MARTORELLO_038581 | 3.09 |
| MARTORELLO_038582 | MARTORELLO_038585 | 3.09 |
| MARTORELLO_038586 | MARTORELLO_038589 | 3.09 |
| MARTORELLO_038590 | MARTORELLO_038592 | 3.09 |
| MARTORELLO_038593 | MARTORELLO_038595 | 3.09 |
| MARTORELLO_038596 | MARTORELLO_038599 | 3.09 |
| MARTORELLO_038600 | MARTORELLO_038605 | 3.09 |
| MARTORELLO_038606 | MARTORELLO_038624 | 3.09 |
| MARTORELLO_038625 | MARTORELLO_038631 | 3.12; 3.13; 3.14 |
| MARTORELLO_038632 | MARTORELLO_038638 | 3.12; 3.13; 3.14 |
| MARTORELLO_038639 | MARTORELLO_038646 | 3.12; 3.13; 3.14 |
| MARTORELLO_038647 | MARTORELLO_038653 | 3.12; 3.13; 3.14 |
| MARTORELLO_038654 | MARTORELLO_038660 | 3.12; 3.13; 3.14 |
| MARTORELLO_038661 | MARTORELLO_038667 | 3.12; 3.13; 3.14 |
| MARTORELLO_038668 | MARTORELLO_038680 | 3.24; 3.31; 3.32 |
| MARTORELLO_038681 | MARTORELLO_038687 | 3.24; 3.31; 3.32 |
| MARTORELLO_038688 | MARTORELLO_038692 | 3.24; 3.31; 3.32 |
| MARTORELLO_038693 | MARTORELLO_038693 | 3.24; 3.31; 3.32 |
| MARTORELLO_038694 | MARTORELLO_038696 | 3.09 |
| MARTORELLO_038697 | MARTORELLO_038705 | 3.24; 3.31; 3.32 |
| MARTORELLO_038706 | MARTORELLO_038713 | 3.14 |
| MARTORELLO_038714 | MARTORELLO_038722 | 3.14 |
| MARTORELLO_038723 | MARTORELLO_038723 | 3.13 |
| MARTORELLO_038724 | MARTORELLO_038730 | 3.13 |
| MARTORELLO_038731 | MARTORELLO_038732 | 3.13 |
| MARTORELLO_038733 | MARTORELLO_038739 | 3.13 |
| MARTORELLO_038740 | MARTORELLO_038746 | 3.13 |
| MARTORELLO_038747 | MARTORELLO_038757 | 3.24; 3.31; 3.32 |
| MARTORELLO_038758 | MARTORELLO_038766 | 3.09; 3.31; 3.32 |
| MARTORELLO_038767 | MARTORELLO_038772 | 3.24; 3.31; 3.32 |

JA1677

*Williams v. Big Picture Loans, LLC, et al.*
E.D. Virginia Civil Action No. 17-cv-461 (REP)
Martorello Response Chart - Production 19

| Bates Begin | Bates End | Williams Document Request (Set. Request) |
|---|---|---|
| MARTORELLO_038773 | MARTORELLO_038773 | 3.09 |
| MARTORELLO_038774 | MARTORELLO_038775 | 3.09; 3.12; 3.13; 3.14; 3.35 |
| MARTORELLO_038776 | MARTORELLO_038776 | 3.33 |
| MARTORELLO_038777 | MARTORELLO_038777 | 3.33 |
| MARTORELLO_038778 | MARTORELLO_038778 | 3.33 |
| MARTORELLO_038779 | MARTORELLO_038779 | 3.33 |
| MARTORELLO_038780 | MARTORELLO_038780 | 3.33 |
| MARTORELLO_038781 | MARTORELLO_038781 | 3.33 |
| MARTORELLO_038782 | MARTORELLO_038786 | 3.24; 3.31; 3.32 |
| MARTORELLO_038787 | MARTORELLO_038787 | 3.24; 3.31; 3.32 |
| MARTORELLO_038788 | MARTORELLO_038788 | 3.24; 3.31; 3.32 |
| MARTORELLO_038789 | MARTORELLO_038789 | 3.24; 3.31; 3.32 |
| MARTORELLO_038790 | MARTORELLO_038790 | 3.24; 3.31; 3.32 |
| MARTORELLO_038791 | MARTORELLO_038791 | 3.24; 3.31; 3.32 |
| MARTORELLO_038792 | MARTORELLO_038792 | 3.24; 3.31; 3.32 |
| MARTORELLO_038793 | MARTORELLO_038793 | 3.24; 3.31; 3.32 |
| MARTORELLO_038794 | MARTORELLO_038794 | 3.24; 3.31; 3.32 |
| MARTORELLO_038795 | MARTORELLO_038796 | 3.24 |
| MARTORELLO_038797 | MARTORELLO_038797 | 3.24 |
| MARTORELLO_038798 | MARTORELLO_038800 | 3.24 |
| MARTORELLO_038801 | MARTORELLO_038803 | 3.24 |
| MARTORELLO_038804 | MARTORELLO_038804 | 3.24 |
| MARTORELLO_038805 | MARTORELLO_038805 | 3.24 |
| MARTORELLO_038806 | MARTORELLO_038806 | 3.24 |
| MARTORELLO_038807 | MARTORELLO_038807 | 3.13 |
| MARTORELLO_038808 | MARTORELLO_038808 | 3.13 |
| MARTORELLO_038809 | MARTORELLO_038809 | 3.13 |
| MARTORELLO_038810 | MARTORELLO_038810 | 3.13 |
| MARTORELLO_038811 | MARTORELLO_038811 | 3.13 |
| MARTORELLO_038812 | MARTORELLO_038813 | 3.24 |
| MARTORELLO_038814 | MARTORELLO_038814 | 3.24 |
| MARTORELLO_038815 | MARTORELLO_038818 | 3.24 |
| MARTORELLO_038819 | MARTORELLO_038819 | 3.24 |
| MARTORELLO_038820 | MARTORELLO_038820 | 3.24 |
| MARTORELLO_038821 | MARTORELLO_038826 | 3.24; 3.31; 3.32 |
| MARTORELLO_038827 | MARTORELLO_038827 | 1.31; 3.24 |
| MARTORELLO_038828 | MARTORELLO_038903 | 1.31; 3.24 |
| MARTORELLO_038904 | MARTORELLO_038934 | 1.31; 3.24 |
| MARTORELLO_038935 | MARTORELLO_038938 | 3.24; 3.31; 3.32 |
| MARTORELLO_038939 | MARTORELLO_038942 | 3.24; 3.31; 3.32 |
| MARTORELLO_038943 | MARTORELLO_038952 | 3.09 |
| MARTORELLO_038953 | MARTORELLO_038954 | 3.09 |
| MARTORELLO_038955 | MARTORELLO_038961 | 3.09 |
| MARTORELLO_038962 | MARTORELLO_038962 | 3.09 |
| MARTORELLO_038963 | MARTORELLO_038967 | 3.09 |
| MARTORELLO_038968 | MARTORELLO_038977 | 3.09 |
| MARTORELLO_038978 | MARTORELLO_038978 | 3.09 |
| MARTORELLO_038979 | MARTORELLO_038993 | 3.09 |
| MARTORELLO_038994 | MARTORELLO_038995 | 3.13; 3.24 |
| MARTORELLO_038996 | MARTORELLO_038996 | 3.13; 3.24 |
| MARTORELLO_038997 | MARTORELLO_038998 | 3.09; 3.35 |
| MARTORELLO_038999 | MARTORELLO_039000 | 3.13; 3.24 |
| MARTORELLO_039001 | MARTORELLO_039001 | 3.13; 3.24 |
| MARTORELLO_039002 | MARTORELLO_039002 | 3.09 |
| MARTORELLO_039003 | MARTORELLO_039005 | 3.09 |
| MARTORELLO_039006 | MARTORELLO_039008 | 3.24; 3.31; 3.32 |

*Williams v. Big Picture Loans, LLC, et al.*
E.D. Virginia Civil Action No. 17-cv-461 (REP)
Martorello Response Chart - Production 19

| Bates Begin | Bates End | Williams Document Request (Set. Request) |
|---|---|---|
| MARTORELLO_039009 | MARTORELLO_039010 | 3.24; 3.31; 3.32 |
| MARTORELLO_039011 | MARTORELLO_039012 | 3.09 |
| MARTORELLO_039013 | MARTORELLO_039014 | 3.09 |
| MARTORELLO_039015 | MARTORELLO_039016 | 3.09 |
| MARTORELLO_039017 | MARTORELLO_039018 | 3.09 |
| MARTORELLO_039019 | MARTORELLO_039020 | 3.09; 3.35 |
| MARTORELLO_039021 | MARTORELLO_039027 | 3.09 |
| MARTORELLO_039028 | MARTORELLO_039031 | 3.09 |
| MARTORELLO_039032 | MARTORELLO_039033 | 3.09; 3.13; 3.24 |
| MARTORELLO_039034 | MARTORELLO_039035 | 3.09; 3.13; 3.24 |
| MARTORELLO_039036 | MARTORELLO_039037 | 3.09 |
| MARTORELLO_039038 | MARTORELLO_039038 | 3.09 |
| MARTORELLO_039039 | MARTORELLO_039043 | 3.09 |
| MARTORELLO_039044 | MARTORELLO_039049 | 3.24; 3.31; 3.32 |
| MARTORELLO_039050 | MARTORELLO_039051 | 3.24; 3.31; 3.32 |
| MARTORELLO_039052 | MARTORELLO_039058 | 3.09; 3.13 |
| MARTORELLO_039059 | MARTORELLO_039065 | 3.09; 3.13 |
| MARTORELLO_039066 | MARTORELLO_039073 | 3.09; 3.13 |
| MARTORELLO_039074 | MARTORELLO_039077 | 3.09; 3.13 |
| MARTORELLO_039078 | MARTORELLO_039080 | 3.09 |
| MARTORELLO_039081 | MARTORELLO_039083 | 3.09 |
| MARTORELLO_039084 | MARTORELLO_039090 | 3.09 |
| MARTORELLO_039091 | MARTORELLO_039096 | 3.09 |
| MARTORELLO_039097 | MARTORELLO_039098 | 3.09 |
| MARTORELLO_039099 | MARTORELLO_039104 | 3.09 |
| MARTORELLO_039105 | MARTORELLO_039111 | 3.09 |
| MARTORELLO_039112 | MARTORELLO_039116 | 3.09 |
| MARTORELLO_039117 | MARTORELLO_039119 | 3.09 |
| MARTORELLO_039120 | MARTORELLO_039122 | 3.09 |
| MARTORELLO_039123 | MARTORELLO_039125 | 3.09 |
| MARTORELLO_039126 | MARTORELLO_039127 | 3.09 |
| MARTORELLO_039128 | MARTORELLO_039128 | 3.09 |
| MARTORELLO_039129 | MARTORELLO_039133 | 3.24 |
| MARTORELLO_039134 | MARTORELLO_039138 | 3.24 |
| MARTORELLO_039139 | MARTORELLO_039139 | 3.09 |
| MARTORELLO_039140 | MARTORELLO_039141 | 3.09 |
| MARTORELLO_039142 | MARTORELLO_039146 | 3.09 |
| MARTORELLO_039147 | MARTORELLO_039148 | 3.09 |
| MARTORELLO_039149 | MARTORELLO_039149 | 3.13 |
| MARTORELLO_039150 | MARTORELLO_039150 | 3.13 |
| MARTORELLO_039151 | MARTORELLO_039151 | 3.13 |
| MARTORELLO_039152 | MARTORELLO_039152 | 3.13 |
| MARTORELLO_039153 | MARTORELLO_039153 | 3.09; 3.31; 3.32 |
| MARTORELLO_039154 | MARTORELLO_039154 | 3.13; 3.35 |
| MARTORELLO_039155 | MARTORELLO_039176 | 3.13; 3.35 |
| MARTORELLO_039177 | MARTORELLO_039182 | 3.13; 3.35 |
| MARTORELLO_039183 | MARTORELLO_039210 | 3.13; 3.35 |
| MARTORELLO_039211 | MARTORELLO_039211 | 3.13; 3.35 |
| MARTORELLO_039212 | MARTORELLO_039215 | 3.24 |
| MARTORELLO_039216 | MARTORELLO_039219 | 3.24 |
| MARTORELLO_039220 | MARTORELLO_039222 | 3.24 |
| MARTORELLO_039223 | MARTORELLO_039225 | 3.24 |
| MARTORELLO_039226 | MARTORELLO_039227 | 3.09 |
| MARTORELLO_039228 | MARTORELLO_039327 | 3.09 |
| MARTORELLO_039328 | MARTORELLO_039328 | 3.09 |
| MARTORELLO_039329 | MARTORELLO_039329 | 3.09 |

JA1679

*Williams v. Big Picture Loans, LLC, et al.*
E.D. Virginia Civil Action No. 17-cv-461 (REP)
Martorello Response Chart - Production 19

| Bates Begin | Bates End | Williams Document Request (Set. Request) |
|---|---|---|
| MARTORELLO_039330 | MARTORELLO_039330 | 3.09; 3.31 |
| MARTORELLO_039331 | MARTORELLO_039331 | n/a |
| MARTORELLO_039332 | MARTORELLO_039333 | 3.06s; 3.31 |
| MARTORELLO_039334 | MARTORELLO_039360 | n/a |
| MARTORELLO_039361 | MARTORELLO_039362 | 3.06s |
| MARTORELLO_039363 | MARTORELLO_039366 | 3.06s |
| MARTORELLO_039367 | MARTORELLO_039423 | 3.06s |
| MARTORELLO_039424 | MARTORELLO_039428 | 3.06s |
| MARTORELLO_039429 | MARTORELLO_039492 | 3.06s |
| MARTORELLO_039493 | MARTORELLO_039500 | n/a |
| MARTORELLO_039501 | MARTORELLO_039502 | 3.06s |
| MARTORELLO_039503 | MARTORELLO_040843 | 3.06s |
| MARTORELLO_040844 | MARTORELLO_040844 | 3.06s |
| MARTORELLO_040845 | MARTORELLO_040851 | 3.06s; 3.39 |
| MARTORELLO_040852 | MARTORELLO_040856 | n/a |
| MARTORELLO_040857 | MARTORELLO_040929 | 3.06s |
| MARTORELLO_040930 | MARTORELLO_040964 | 3.06s |
| MARTORELLO_040965 | MARTORELLO_040967 | 3.06s; 3.39 |
| MARTORELLO_040968 | MARTORELLO_040969 | 3.06s; 3.39 |
| MARTORELLO_040970 | MARTORELLO_040971 | 3.06s |
| MARTORELLO_040972 | MARTORELLO_040979 | 3.39 |
| MARTORELLO_040980 | MARTORELLO_040990 | 3.39 |
| MARTORELLO_040991 | MARTORELLO_040999 | 3.39 |
| MARTORELLO_041000 | MARTORELLO_041009 | 3.39 |
| MARTORELLO_041010 | MARTORELLO_041010 | 3.13 |
| MARTORELLO_041011 | MARTORELLO_041018 | 3.13 |
| MARTORELLO_041019 | MARTORELLO_041020 | 3.09 |
| MARTORELLO_041021 | MARTORELLO_041022 | 3.09 |
| MARTORELLO_041023 | MARTORELLO_041024 | 3.09 |
| MARTORELLO_041025 | MARTORELLO_041026 | 3.09 |
| MARTORELLO_041027 | MARTORELLO_041028 | 3.09 |
| MARTORELLO_041029 | MARTORELLO_041030 | 3.09 |
| MARTORELLO_041031 | MARTORELLO_041032 | 3.09 |
| MARTORELLO_041033 | MARTORELLO_041035 | 3.09 |
| MARTORELLO_041036 | MARTORELLO_041037 | 3.16 |
| MARTORELLO_041038 | MARTORELLO_041039 | 3.16 |
| MARTORELLO_041040 | MARTORELLO_041040 | 3.09; 3.35 |
| MARTORELLO_041041 | MARTORELLO_041042 | 3.09; 3.35 |
| MARTORELLO_041043 | MARTORELLO_041044 | 3.09; 3.35 |
| MARTORELLO_041045 | MARTORELLO_041045 | 3.09; 3.35 |
| MARTORELLO_041046 | MARTORELLO_041051 | 3.09 |
| MARTORELLO_041052 | MARTORELLO_041054 | 3.24; 3.31; 3.32 |
| MARTORELLO_041055 | MARTORELLO_041058 | 3.09; 3.13 |
| MARTORELLO_041059 | MARTORELLO_041060 | 3.09; 3.13; 3.35 |
| MARTORELLO_041061 | MARTORELLO_041061 | 3.14 |
| MARTORELLO_041062 | MARTORELLO_041062 | 3.14 |
| MARTORELLO_041063 | MARTORELLO_041063 | 3.14 |
| MARTORELLO_041064 | MARTORELLO_041065 | 3.33 |
| MARTORELLO_041066 | MARTORELLO_041066 | 3.33 |
| MARTORELLO_041067 | MARTORELLO_041070 | 3.24; 3.31; 3.32 |
| MARTORELLO_041071 | MARTORELLO_041073 | 3.24; 3.31; 3.32 |
| MARTORELLO_041074 | MARTORELLO_041076 | 3.24; 3.31; 3.32 |
| MARTORELLO_041077 | MARTORELLO_041079 | 3.24; 3.31; 3.32 |
| MARTORELLO_041080 | MARTORELLO_041082 | 3.09 |
| MARTORELLO_041083 | MARTORELLO_041084 | 3.13 |
| MARTORELLO_041085 | MARTORELLO_041091 | 3.13 |

JA1680

*Williams v. Big Picture Loans, LLC, et al.*
E.D. Virginia Civil Action No. 17-cv-461 (REP)
Martorello Response Chart - Production 19

| Bates Begin | Bates End | Williams Document Request (Set. Request) |
|---|---|---|
| MARTORELLO_041092 | MARTORELLO_041094 | 3.24; 3.31; 3.32 |
| MARTORELLO_041095 | MARTORELLO_041096 | 3.24; 3.31; 3.32 |
| MARTORELLO_041097 | MARTORELLO_041102 | 3.24; 3.31; 3.32 |
| MARTORELLO_041103 | MARTORELLO_041104 | 3.09; 3.31; 3.32 |
| MARTORELLO_041105 | MARTORELLO_041106 | 3.09; 3.31; 3.32 |
| MARTORELLO_041107 | MARTORELLO_041108 | 3.09; 3.31; 3.32 |
| MARTORELLO_041109 | MARTORELLO_041114 | 3.09 |
| MARTORELLO_041115 | MARTORELLO_041116 | 3.09; 3.31; 3.32 |
| MARTORELLO_041117 | MARTORELLO_041122 | 3.09 |
| MARTORELLO_041123 | MARTORELLO_041129 | 3.09 |
| MARTORELLO_041130 | MARTORELLO_041130 | 3.14; 3.31 |
| MARTORELLO_041131 | MARTORELLO_041139 | 3.13 |
| MARTORELLO_041140 | MARTORELLO_041141 | 3.09; 3.35 |
| MARTORELLO_041142 | MARTORELLO_041149 | 3.09; 3.35 |
| MARTORELLO_041150 | MARTORELLO_041150 | 3.09 |
| MARTORELLO_041151 | MARTORELLO_041161 | 3.09 |
| MARTORELLO_041162 | MARTORELLO_041162 | 3.12; 3.13; 3.14; 3.35 |
| MARTORELLO_041163 | MARTORELLO_041163 | 3.12; 3.13; 3.14; 3.35 |
| MARTORELLO_041164 | MARTORELLO_041183 | 3.12; 3.13; 3.14; 3.35 |
| MARTORELLO_041184 | MARTORELLO_041190 | 3.12; 3.13; 3.14; 3.35 |
| MARTORELLO_041191 | MARTORELLO_041198 | 3.13 |
| MARTORELLO_041199 | MARTORELLO_041227 | 3.13 |
| MARTORELLO_041228 | MARTORELLO_041234 | 3.13 |
| MARTORELLO_041235 | MARTORELLO_041241 | 3.13 |
| MARTORELLO_041242 | MARTORELLO_041242 | 3.35 |
| MARTORELLO_041243 | MARTORELLO_041243 | 3.35 |
| MARTORELLO_041244 | MARTORELLO_041244 | 3.35 |
| MARTORELLO_041245 | MARTORELLO_041245 | 3.35 |
| MARTORELLO_041246 | MARTORELLO_041246 | 3.35 |
| MARTORELLO_041247 | MARTORELLO_041247 | 3.35 |
| MARTORELLO_041248 | MARTORELLO_041248 | 3.35 |
| MARTORELLO_041249 | MARTORELLO_041249 | 3.35 |
| MARTORELLO_041250 | MARTORELLO_041251 | 3.09; 3.31; 3.32 |
| MARTORELLO_041252 | MARTORELLO_041252 | 3.09; 3.31; 3.32 |
| MARTORELLO_041253 | MARTORELLO_041253 | 3.31 |
| MARTORELLO_041254 | MARTORELLO_041255 | 3.31 |
| MARTORELLO_041256 | MARTORELLO_041258 | 3.14; 3.31 |
| MARTORELLO_041259 | MARTORELLO_041266 | 3.09 |
| MARTORELLO_041267 | MARTORELLO_041267 | 3.09; 3.13 |
| MARTORELLO_041268 | MARTORELLO_041268 | 3.09 |
| MARTORELLO_041269 | MARTORELLO_041269 | 3.09; 3.31; 3.32; 3.35 |
| MARTORELLO_041270 | MARTORELLO_041270 | 3.09; 3.31; 3.32; 3.35 |
| MARTORELLO_041271 | MARTORELLO_041274 | 3.09; 3.31; 3.32 |
| MARTORELLO_041275 | MARTORELLO_041278 | 3.09; 3.31; 3.32 |
| MARTORELLO_041279 | MARTORELLO_041281 | 3.09; 3.31; 3.32 |
| MARTORELLO_041282 | MARTORELLO_041284 | 3.09 |
| MARTORELLO_041285 | MARTORELLO_041287 | 3.09 |
| MARTORELLO_041288 | MARTORELLO_041288 | 3.09 |
| MARTORELLO_041289 | MARTORELLO_041290 | 3.09; 3.35 |
| MARTORELLO_041291 | MARTORELLO_041292 | 3.09 |
| MARTORELLO_041293 | MARTORELLO_041294 | 3.09; 3.31; 3.35 |
| MARTORELLO_041295 | MARTORELLO_041295 | 3.09; 3.35 |
| MARTORELLO_041296 | MARTORELLO_041296 | 3.09; 3.35 |
| MARTORELLO_041297 | MARTORELLO_041300 | 3.13 |
| MARTORELLO_041301 | MARTORELLO_041302 | 3.13 |
| MARTORELLO_041303 | MARTORELLO_041303 | 3.24 |

*Williams v. Big Picture Loans, LLC, et al.*
E.D. Virginia Civil Action No. 17-cv-461 (REP)
Martorello Response Chart - Production 19

| Bates Begin | Bates End | Williams Document Request (Set. Request) |
|---|---|---|
| MARTORELLO_041304 | MARTORELLO_041304 | 3.24 |
| MARTORELLO_041305 | MARTORELLO_041305 | 3.24 |
| MARTORELLO_041306 | MARTORELLO_041306 | 3.09 |
| MARTORELLO_041307 | MARTORELLO_041307 | 3.09 |
| MARTORELLO_041308 | MARTORELLO_041312 | 3.09 |
| MARTORELLO_041313 | MARTORELLO_041316 | 3.09 |
| MARTORELLO_041317 | MARTORELLO_041317 | 3.09 |
| MARTORELLO_041318 | MARTORELLO_041320 | 3.09 |
| MARTORELLO_041321 | MARTORELLO_041324 | 3.09 |
| MARTORELLO_041325 | MARTORELLO_041325 | 3.09 |
| MARTORELLO_041326 | MARTORELLO_041327 | 3.09 |
| MARTORELLO_041328 | MARTORELLO_041329 | 3.09 |
| MARTORELLO_041330 | MARTORELLO_041332 | 3.09 |
| MARTORELLO_041333 | MARTORELLO_041335 | 3.09 |
| MARTORELLO_041336 | MARTORELLO_041338 | 3.09 |
| MARTORELLO_041339 | MARTORELLO_041340 | 3.09 |
| MARTORELLO_041341 | MARTORELLO_041341 | 3.09 |
| MARTORELLO_041342 | MARTORELLO_041346 | 3.24 |
| MARTORELLO_041347 | MARTORELLO_041356 | 3.09 |
| MARTORELLO_041357 | MARTORELLO_041357 | 3.24 |
| MARTORELLO_041358 | MARTORELLO_041362 | 3.24 |
| MARTORELLO_041363 | MARTORELLO_041374 | 3.24; 3.31; 3.32 |
| MARTORELLO_041375 | MARTORELLO_041378 | 3.24; 3.31; 3.32 |
| MARTORELLO_041379 | MARTORELLO_041382 | 3.31; 3.32 |
| MARTORELLO_041383 | MARTORELLO_041383 | 3.24; 3.31; 3.32 |
| MARTORELLO_041384 | MARTORELLO_041387 | 3.24; 3.31; 3.32 |
| MARTORELLO_041388 | MARTORELLO_041388 | 3.24; 3.31; 3.32 |
| MARTORELLO_041389 | MARTORELLO_041391 | 3.13 |
| MARTORELLO_041392 | MARTORELLO_041430 | 3.13 |
| MARTORELLO_041431 | MARTORELLO_041469 | 3.13 |
| MARTORELLO_041470 | MARTORELLO_041509 | 3.13 |
| MARTORELLO_041510 | MARTORELLO_041551 | 3.13 |
| MARTORELLO_041552 | MARTORELLO_041553 | 3.09 |
| MARTORELLO_041554 | MARTORELLO_041554 | 3.09; 3.35 |
| MARTORELLO_041555 | MARTORELLO_041556 | 3.24; 3.31; 3.32 |
| MARTORELLO_041557 | MARTORELLO_041559 | 3.24; 3.31; 3.32 |
| MARTORELLO_041560 | MARTORELLO_041564 | 3.09; 3.31; 3.32 |
| MARTORELLO_041565 | MARTORELLO_041566 | 3.09; 3.31; 3.32 |
| MARTORELLO_041567 | MARTORELLO_041567 | 3.14 |
| MARTORELLO_041568 | MARTORELLO_041595 | 3.14 |
| MARTORELLO_041596 | MARTORELLO_041616 | 3.14 |
| MARTORELLO_041617 | MARTORELLO_041641 | 3.14 |
| MARTORELLO_041642 | MARTORELLO_041648 | 3.14 |
| MARTORELLO_041649 | MARTORELLO_041649 | 3.14 |
| MARTORELLO_041650 | MARTORELLO_041677 | 3.14 |
| MARTORELLO_041678 | MARTORELLO_041698 | 3.14 |
| MARTORELLO_041699 | MARTORELLO_041723 | 3.14 |
| MARTORELLO_041724 | MARTORELLO_041730 | 3.14 |
| MARTORELLO_041731 | MARTORELLO_041733 | 3.14 |
| MARTORELLO_041734 | MARTORELLO_041752 | 3.14 |
| MARTORELLO_041753 | MARTORELLO_041763 | 3.12; 3.13; 3.14 |
| MARTORELLO_041764 | MARTORELLO_041764 | 3.12; 3.13; 3.14 |
| MARTORELLO_041765 | MARTORELLO_041765 | 3.12; 3.13; 3.14 |
| MARTORELLO_041766 | MARTORELLO_041772 | 3.12; 3.13; 3.14 |
| MARTORELLO_041773 | MARTORELLO_041782 | 3.09; 3.31; 3.32 |
| MARTORELLO_041783 | MARTORELLO_041790 | 3.09; 3.31; 3.32 |

*Williams v. Big Picture Loans, LLC, et al.*
E.D. Virginia Civil Action No. 17-cv-461 (REP)
Martorello Response Chart - Production 19

| Bates Begin | Bates End | Williams Document Request (Set. Request) |
|---|---|---|
| MARTORELLO_041791 | MARTORELLO_041797 | 3.12; 3.13; 3.14; 3.16 |
| MARTORELLO_041798 | MARTORELLO_041804 | 3.12; 3.13; 3.14; 3.16 |
| MARTORELLO_041805 | MARTORELLO_041812 | 3.12; 3.13; 3.14; 3.16 |
| MARTORELLO_041813 | MARTORELLO_041819 | 3.12; 3.13; 3.14; 3.16 |
| MARTORELLO_041820 | MARTORELLO_041828 | 3.12; 3.14; 3.16 |
| MARTORELLO_041829 | MARTORELLO_041837 | 3.09; 3.31; 3.32 |
| MARTORELLO_041838 | MARTORELLO_041845 | 3.12; 3.13; 3.14 |
| MARTORELLO_041846 | MARTORELLO_041852 | 3.12; 3.13; 3.14 |
| MARTORELLO_041853 | MARTORELLO_041860 | 3.09; 3.31; 3.32 |
| MARTORELLO_041861 | MARTORELLO_041869 | 3.09; 3.31; 3.32 |
| MARTORELLO_041870 | MARTORELLO_041873 | 3.09 |
| MARTORELLO_041874 | MARTORELLO_041876 | 3.09 |
| MARTORELLO_041877 | MARTORELLO_041880 | 3.09 |
| MARTORELLO_041881 | MARTORELLO_041883 | 3.09 |
| MARTORELLO_041884 | MARTORELLO_041884 | 3.39 |
| MARTORELLO_041885 | MARTORELLO_041888 | 3.24 |
| MARTORELLO_041889 | MARTORELLO_041897 | 3.40 |
| MARTORELLO_041898 | MARTORELLO_041900 | 3.09; 3.31; 3.32 |
| MARTORELLO_041901 | MARTORELLO_041901 | 3.09; 3.31; 3.32 |
| MARTORELLO_041902 | MARTORELLO_041902 | 3.09; 3.31; 3.32 |
| MARTORELLO_041903 | MARTORELLO_041904 | 3.09; 3.31; 3.32 |
| MARTORELLO_041905 | MARTORELLO_041913 | 3.39 |
| MARTORELLO_041914 | MARTORELLO_041917 | 3.24 |
| MARTORELLO_041918 | MARTORELLO_041925 | 3.39 |
| MARTORELLO_041926 | MARTORELLO_041928 | 3.39 |
| MARTORELLO_041929 | MARTORELLO_041929 | 3.39 |
| MARTORELLO_041930 | MARTORELLO_041933 | 3.24 |
| MARTORELLO_041934 | MARTORELLO_041934 | 3.39 |
| MARTORELLO_041935 | MARTORELLO_041942 | 3.39 |
| MARTORELLO_041943 | MARTORELLO_041951 | 3.39 |
| MARTORELLO_041952 | MARTORELLO_041957 | 3.39 |
| MARTORELLO_041958 | MARTORELLO_041966 | 3.39 |
| MARTORELLO_041967 | MARTORELLO_041968 | 3.09; 3.13; 3.14; 3.35 |
| MARTORELLO_041969 | MARTORELLO_041970 | 3.39 |
| MARTORELLO_041971 | MARTORELLO_041979 | 3.39 |
| MARTORELLO_041980 | MARTORELLO_041982 | 3.39 |
| MARTORELLO_041983 | MARTORELLO_041990 | 3.39 |
| MARTORELLO_041991 | MARTORELLO_041998 | 3.39 |
| MARTORELLO_041999 | MARTORELLO_041999 | 3.05 |
| MARTORELLO_042000 | MARTORELLO_042002 | 3.05 |
| MARTORELLO_042003 | MARTORELLO_042005 | 3.05 |
| MARTORELLO_042006 | MARTORELLO_042008 | 3.09 |
| MARTORELLO_042009 | MARTORELLO_042009 | 3.09 |
| MARTORELLO_042010 | MARTORELLO_042010 | 3.09 |
| MARTORELLO_042011 | MARTORELLO_042011 | 3.09 |
| MARTORELLO_042012 | MARTORELLO_042012 | 3.09 |
| MARTORELLO_042013 | MARTORELLO_042013 | 3.09 |
| MARTORELLO_042014 | MARTORELLO_042014 | 3.05 |
| MARTORELLO_042015 | MARTORELLO_042015 | 3.05 |
| MARTORELLO_042016 | MARTORELLO_042017 | 3.05 |
| MARTORELLO_042018 | MARTORELLO_042021 | 3.05 |
| MARTORELLO_042022 | MARTORELLO_042023 | 3.05 |
| MARTORELLO_042024 | MARTORELLO_042026 | 3.05 |
| MARTORELLO_042027 | MARTORELLO_042027 | 3.05 |
| MARTORELLO_042028 | MARTORELLO_042034 | 3.05 |
| MARTORELLO_042035 | MARTORELLO_042036 | 3.05 |

*Williams v. Big Picture Loans, LLC, et al.*
E.D. Virginia Civil Action No. 17-cv-461 (REP)
Martorello Response Chart - Production 19

| Bates Begin | Bates End | Williams Document Request (Set. Request) |
|---|---|---|
| MARTORELLO_042037 | MARTORELLO_042043 | 3.05 |
| MARTORELLO_042044 | MARTORELLO_042044 | 3.05 |
| MARTORELLO_042045 | MARTORELLO_042051 | 3.05 |
| MARTORELLO_042052 | MARTORELLO_042052 | 3.05 |
| MARTORELLO_042053 | MARTORELLO_042059 | 3.05 |
| MARTORELLO_042060 | MARTORELLO_042067 | 3.24; 3.31; 3.32 |
| MARTORELLO_042068 | MARTORELLO_042068 | 3.24; 3.31; 3.32 |
| MARTORELLO_042069 | MARTORELLO_042069 | 3.24; 3.31; 3.32 |
| MARTORELLO_042070 | MARTORELLO_042073 | 3.24; 3.31; 3.32 |
| MARTORELLO_042074 | MARTORELLO_042076 | 3.24 |
| MARTORELLO_042077 | MARTORELLO_042077 | 3.24 |
| MARTORELLO_042078 | MARTORELLO_042078 | 3.24 |
| MARTORELLO_042079 | MARTORELLO_042079 | 3.24 |
| MARTORELLO_042080 | MARTORELLO_042080 | 3.24 |
| MARTORELLO_042081 | MARTORELLO_042081 | 3.24 |
| MARTORELLO_042082 | MARTORELLO_042082 | 3.24 |
| MARTORELLO_042083 | MARTORELLO_042083 | 3.24 |
| MARTORELLO_042084 | MARTORELLO_042084 | 3.24 |
| MARTORELLO_042085 | MARTORELLO_042086 | 3.09 |
| MARTORELLO_042087 | MARTORELLO_042087 | 3.24; 3.31; 3.32 |
| MARTORELLO_042088 | MARTORELLO_042088 | 3.24; 3.31; 3.32 |
| MARTORELLO_042089 | MARTORELLO_042089 | 3.09; 3.31; 3.32 |
| MARTORELLO_042090 | MARTORELLO_042091 | 3.09; 3.31; 3.32 |
| MARTORELLO_042092 | MARTORELLO_042093 | 3.09; 3.31; 3.32 |
| MARTORELLO_042094 | MARTORELLO_042100 | 3.24; 3.31; 3.32 |
| MARTORELLO_042101 | MARTORELLO_042102 | 3.24 |
| MARTORELLO_042103 | MARTORELLO_042103 | 3.24 |
| MARTORELLO_042104 | MARTORELLO_042107 | 3.24 |
| MARTORELLO_042108 | MARTORELLO_042108 | 3.24 |
| MARTORELLO_042109 | MARTORELLO_042109 | 3.24 |
| MARTORELLO_042110 | MARTORELLO_042115 | 3.24; 3.31; 3.32 |
| MARTORELLO_042116 | MARTORELLO_042118 | 3.24; 3.31; 3.32 |
| MARTORELLO_042119 | MARTORELLO_042123 | 3.24; 3.31; 3.32 |
| MARTORELLO_042124 | MARTORELLO_042126 | 3.24; 3.31; 3.32 |
| MARTORELLO_042127 | MARTORELLO_042163 | 3.24; 3.31; 3.32 |
| MARTORELLO_042164 | MARTORELLO_042164 | 3.24; 3.31; 3.32 |
| MARTORELLO_042165 | MARTORELLO_042169 | 3.24; 3.31; 3.32 |
| MARTORELLO_042170 | MARTORELLO_042174 | 3.24; 3.31; 3.32 |
| MARTORELLO_042175 | MARTORELLO_042177 | 3.24; 3.31; 3.32 |
| MARTORELLO_042178 | MARTORELLO_042179 | 3.24; 3.31; 3.32 |
| MARTORELLO_042180 | MARTORELLO_042180 | 3.24; 3.31; 3.32 |
| MARTORELLO_042181 | MARTORELLO_042183 | 3.24 |
| MARTORELLO_042184 | MARTORELLO_042184 | 3.09 |
| MARTORELLO_042185 | MARTORELLO_042284 | 3.09 |
| MARTORELLO_042285 | MARTORELLO_042285 | 3.09 |
| MARTORELLO_042286 | MARTORELLO_042286 | 3.09 |
| MARTORELLO_042287 | MARTORELLO_042298 | 3.24; 3.31; 3.32 |
| MARTORELLO_042299 | MARTORELLO_042306 | 3.24; 3.31; 3.32 |
| MARTORELLO_042307 | MARTORELLO_043647 | 3.09 |
| MARTORELLO_043648 | MARTORELLO_043658 | 3.09 |
| MARTORELLO_043659 | MARTORELLO_043720 | 3.09 |
| MARTORELLO_043721 | MARTORELLO_043721 | 3.09 |
| MARTORELLO_043722 | MARTORELLO_043722 | 3.09 |
| MARTORELLO_043723 | MARTORELLO_043784 | 3.09 |
| MARTORELLO_043785 | MARTORELLO_043785 | 3.09 |
| MARTORELLO_043786 | MARTORELLO_043786 | 3.09 |

*Williams v. Big Picture Loans, LLC, et al.*
E.D. Virginia Civil Action No. 17-cv-461 (REP)
Martorello Response Chart - Production 19

| Bates Begin | Bates End | Williams Document Request (Set. Request) |
|---|---|---|
| MARTORELLO_043787 | MARTORELLO_043837 | 3.09 |
| MARTORELLO_043838 | MARTORELLO_043840 | 3.09 |
| MARTORELLO_043841 | MARTORELLO_043858 | 3.09 |
| MARTORELLO_043859 | MARTORELLO_043923 | 3.09 |
| MARTORELLO_043924 | MARTORELLO_043924 | 3.05 |
| MARTORELLO_043925 | MARTORELLO_043928 | 3.05 |
| MARTORELLO_043929 | MARTORELLO_043929 | 3.05 |
| MARTORELLO_043930 | MARTORELLO_043933 | 3.05 |
| MARTORELLO_043934 | MARTORELLO_043937 | 3.05 |
| MARTORELLO_043938 | MARTORELLO_043941 | 3.05 |
| MARTORELLO_043942 | MARTORELLO_043946 | 3.05 |
| MARTORELLO_043947 | MARTORELLO_043950 | 3.05 |
| MARTORELLO_043951 | MARTORELLO_043952 | 3.05 |
| MARTORELLO_043953 | MARTORELLO_043957 | 3.05 |
| MARTORELLO_043958 | MARTORELLO_043958 | 3.05 |
| MARTORELLO_043959 | MARTORELLO_043959 | 3.05 |
| MARTORELLO_043960 | MARTORELLO_043963 | 3.05 |
| MARTORELLO_043964 | MARTORELLO_043973 | 3.05 |
| MARTORELLO_043974 | MARTORELLO_043980 | 3.05 |
| MARTORELLO_043981 | MARTORELLO_043981 | 3.05 |
| MARTORELLO_043982 | MARTORELLO_043984 | 3.05 |
| MARTORELLO_043985 | MARTORELLO_043987 | 3.05 |
| MARTORELLO_043988 | MARTORELLO_043999 | 3.05 |
| MARTORELLO_044000 | MARTORELLO_044003 | 3.05 |
| MARTORELLO_044004 | MARTORELLO_044007 | 3.05 |
| MARTORELLO_044008 | MARTORELLO_044008 | 3.05 |
| MARTORELLO_044009 | MARTORELLO_044011 | 3.05 |
| MARTORELLO_044012 | MARTORELLO_044014 | 3.05 |
| MARTORELLO_044015 | MARTORELLO_044016 | 3.05 |
| MARTORELLO_044017 | MARTORELLO_044021 | 3.39 |
| MARTORELLO_044022 | MARTORELLO_044030 | 3.39 |
| MARTORELLO_044031 | MARTORELLO_044035 | 3.39 |
| MARTORELLO_044036 | MARTORELLO_044039 | 3.39 |
| MARTORELLO_044040 | MARTORELLO_044047 | 3.39 |
| MARTORELLO_044048 | MARTORELLO_044056 | 3.39 |
| MARTORELLO_044057 | MARTORELLO_044065 | 3.39 |
| MARTORELLO_044066 | MARTORELLO_044071 | 3.39 |
| MARTORELLO_044072 | MARTORELLO_044079 | 3.39 |
| MARTORELLO_044080 | MARTORELLO_044086 | 3.39 |
| MARTORELLO_044087 | MARTORELLO_044089 | 3.39 |
| MARTORELLO_044090 | MARTORELLO_044092 | 3.39 |
| MARTORELLO_044093 | MARTORELLO_044096 | 3.39 |
| MARTORELLO_044097 | MARTORELLO_044102 | 3.39 |
| MARTORELLO_044103 | MARTORELLO_044111 | 3.39 |
| MARTORELLO_044112 | MARTORELLO_044120 | 3.39 |
| MARTORELLO_044121 | MARTORELLO_044124 | 3.39 |
| MARTORELLO_044125 | MARTORELLO_044130 | 3.39 |
| MARTORELLO_044131 | MARTORELLO_044140 | 3.39 |
| MARTORELLO_044141 | MARTORELLO_044177 | 3.23 |
| MARTORELLO_044178 | MARTORELLO_044186 | 3.23 |
| MARTORELLO_044187 | MARTORELLO_044204 | 3.23 |
| MARTORELLO_044205 | MARTORELLO_044225 | 3.23 |
| MARTORELLO_044226 | MARTORELLO_044272 | 3.23 |
| MARTORELLO_044273 | MARTORELLO_044319 | 3.23 |
| MARTORELLO_044320 | MARTORELLO_044354 | 3.23 |
| MARTORELLO_044355 | MARTORELLO_044390 | 3.23 |

JA1685

*Williams v. Big Picture Loans, LLC, et al.*
E.D. Virginia Civil Action No. 17-cv-461 (REP)
Martorello Response Chart - Production 19

| Bates Begin | Bates End | Williams Document Request (Set. Request) |
|---|---|---|
| MARTORELLO_044391 | MARTORELLO_044440 | 3.23 |
| MARTORELLO_044441 | MARTORELLO_044476 | 3.23 |
| MARTORELLO_044477 | MARTORELLO_044518 | 3.23 |
| MARTORELLO_044519 | MARTORELLO_044560 | 3.23 |
| MARTORELLO_044561 | MARTORELLO_044586 | 3.23 |
| MARTORELLO_044587 | MARTORELLO_044628 | 3.23 |
| MARTORELLO_044629 | MARTORELLO_044681 | 3.23 |
| MARTORELLO_044682 | MARTORELLO_044762 | 3.23 |
| MARTORELLO_044763 | MARTORELLO_044768 | 3.23 |
| MARTORELLO_044769 | MARTORELLO_044772 | 3.23 |
| MARTORELLO_044773 | MARTORELLO_044779 | 3.23 |
| MARTORELLO_044780 | MARTORELLO_044812 | 3.23 |
| MARTORELLO_044813 | MARTORELLO_045957 | 3.23 |
| MARTORELLO_045958 | MARTORELLO_045964 | 3.23 |
| MARTORELLO_045965 | MARTORELLO_045983 | 3.23 |
| MARTORELLO_045984 | MARTORELLO_045999 | 3.23 |
| MARTORELLO_046000 | MARTORELLO_046015 | 3.23 |
| MARTORELLO_046016 | MARTORELLO_046039 | 3.23 |
| MARTORELLO_046040 | MARTORELLO_046076 | 3.23 |
| MARTORELLO_046077 | MARTORELLO_046109 | 3.23 |
| MARTORELLO_046110 | MARTORELLO_046129 | 3.23 |
| MARTORELLO_046130 | MARTORELLO_046159 | 3.23 |
| MARTORELLO_046160 | MARTORELLO_046186 | 3.23 |
| MARTORELLO_046187 | MARTORELLO_046199 | 3.23 |
| MARTORELLO_046200 | MARTORELLO_046212 | 3.23 |
| MARTORELLO_046213 | MARTORELLO_046225 | 3.23 |
| MARTORELLO_046226 | MARTORELLO_046233 | 3.23 |
| MARTORELLO_046234 | MARTORELLO_046247 | 3.23 |
| MARTORELLO_046248 | MARTORELLO_046256 | 3.23 |
| MARTORELLO_046257 | MARTORELLO_046271 | 3.23 |
| MARTORELLO_046272 | MARTORELLO_046284 | 3.23 |
| MARTORELLO_046285 | MARTORELLO_046302 | 3.23 |
| MARTORELLO_046303 | MARTORELLO_046317 | 3.23 |
| MARTORELLO_046318 | MARTORELLO_046328 | 3.23 |
| MARTORELLO_046329 | MARTORELLO_046346 | 3.23 |
| MARTORELLO_046347 | MARTORELLO_046364 | 3.23 |
| MARTORELLO_046365 | MARTORELLO_046433 | 3.22 |
| MARTORELLO_046434 | MARTORELLO_046458 | 3.22 |
| MARTORELLO_046459 | MARTORELLO_046536 | 3.22 |
| MARTORELLO_046537 | MARTORELLO_046650 | 3.22 |
| MARTORELLO_046651 | MARTORELLO_046681 | 3.23 |
| MARTORELLO_046682 | MARTORELLO_046687 | 3.23 |
| MARTORELLO_046688 | MARTORELLO_046701 | 3.23 |
| MARTORELLO_046702 | MARTORELLO_046729 | 3.22 |
| MARTORELLO_046730 | MARTORELLO_046778 | 3.22 |
| MARTORELLO_046779 | MARTORELLO_046851 | 3.22 |
| MARTORELLO_046852 | MARTORELLO_046934 | 3.22 |
| MARTORELLO_046935 | MARTORELLO_047055 | 3.22 |
| MARTORELLO_047056 | MARTORELLO_047138 | 3.22 |
| MARTORELLO_047139 | MARTORELLO_047141 | 3.22 |
| MARTORELLO_047142 | MARTORELLO_047151 | 3.23 |
| MARTORELLO_047152 | MARTORELLO_047173 | 3.23 |
| MARTORELLO_047174 | MARTORELLO_047208 | 3.23 |
| MARTORELLO_047209 | MARTORELLO_047267 | 3.23 |

JA1686

# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

RENEE GALLOWAY, et al.,                :
                                       :
                    Plaintiffs,        :
                                       :
v.                                     :        Civil Action No. 3:18-cv-406-REP
                                       :
BIG PICTURE LOANS, LLC, et al.,        :
                                       :
                    Defendants.        :

## DECLARATION OF JOETTE PETE

I, Joette Pete, hereby make this Declaration under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1.     My name is Joette Pete. I am the former Vice Chairwoman of the Lac Vieux Desert Band of Lake Superior Chippewa Indians. I served in this capacity between 2010 and 2016. I am over the age of twenty-one and otherwise competent to testify as to the matters contained herein. I have personal knowledge of these matters contained herein based on my experience as Vice Chairwoman, as well as a tribal member of the Lac Vieux Desert Band of Lake Superior Chippewa Indians.

2.     In 2011, Tribal Council was approached by Matt Martorello with an opportunity to participate in a lending business. In the fall of 2011, Martorello visited our reservation to meet with Tribal Council to present the deal. During this presentation, Martorello explained that his company would run the business if LVD

1

JA1688

allowed him to claim that LVD law applied to the loans. Under the deal, LVD would receive 2% of the gross revenue from the loans.

3. When Tribal Council initially agreed to the deal with Martorello, we understood that all aspects of the lending business would be handled by Martorello and that the Tribe would have no risk. It was understood that Martorello's company would handle everything, including underwriting, marketing, servicing, funding, and collection of the loans. Because Martorello was going to completely run the lending business, he received the most of the profits.

4. For Martorello to be able to claim that LVD law applied to the consumer loans, the deal required that Red Rock "originate" the loans. But, this responsibility was immaterial because Red Rock would have no reason to reject a loan that satisfied Martorello's lending criteria because Martorello ran the business and bore all the risk. After the inception of the business, it was operated completely by Martorello until government regulators and litigation against competitors began. As these cases proceeded, efforts were made to create the appearance of the Tribe's involvement, but the Tribe had no substantive involvement.

5. I have read the declaration of Michelle Hazen submitted in connection with the lawsuits against Big Picture, Ascension, and Matt Martorello. It is my understanding that it is inaccurate for Hazen to assert that "All of Red Rock's employees, computers, and records were on LVD's reservation lands at all times." I

2

JA1689

understand that Martorello operated Red Rock exclusively for a significant amount of time after its inception. I understand that some employees, computers, and records were located off the reservation.

6.     It is also inaccurate for Hazen to claim that Red Rock contracted with Bellicose VI "to learn the lending industry." That was never the goal when LVD formed Red Rock; nor did Martorello attempt to teach us anything about the business. Tribal Council and other members of the tribe did not have access to information regarding the business. Instead, the relationship with Martorello was presented as an opportunity to make money, with no risk of loss, in exchange for rubberstamping LVD's name on loans. And that is what occurred.

7.     Additionally, although business information was kept secret from Tribal Council, it was my understanding that the co-managers did not receive a salary or compensation for their roles as co-managers, at least for the first two years of the business. Instead, the co-managers were volunteers, who were involved for "optics" and to provide pro forma approval of recommendations provided by Bellicose. I believe both co-managers worked other full-time jobs, in addition to their service as tribal council members, at least until January 2014 after we started making structural changes due to lawsuits against the business model.

8.     Similarly, it is also inaccurate and misleading for Hazen to assert that "LVD had gained considerable experience and knowledge of the online lending

industry" thereby prompting it to look for ways "to expand its online lending business to earn money for LVD." This is inaccurate because Martorello initiated and developed the concept to restructure after the district court ruled against Red Rock in its litigation against the New York Department of Financial Services.

9.    For example, less than three weeks after the district court's decision in Otoe-Missouria, I received the e-mail attached hereto as Exhibit 1 from Martorello. In this e-mail, Martorello detailed his "concept" to "facilitate a transition to LVD" of his "businesses." This e-mail was sent shortly after another e-mail from Martorello, where he detailed his fears that the Otoe-Missouria decision would "precipitate" a potential investigation and prosecution of him personally. Attached as Exhibit 2 is a true and accurate copy of that e-mail correspondence. This is the first time we were ever presented with the opportunity "to own" the business, but it would still be controlled by Martorello as proposed.

10.    In 2014-2016, LVD's Tribal Council did not look for ways to expand its business and did not gain considerable experience and knowledge of the industry. The restructure was driven by Martorello's desire to attempt to obtain sovereign immunity for his businesses. Other than receiving our monthly proceeds, Tribal Council had nominal involvement and little understanding about the operations of the business, and the Tribe was not in a position to run the business.

4

11.     As part of the restructure, I have learned that Matt Martorello's emails were destroyed. I did not participate in the destruction of Martorello's emails. I do not know who performed this task, and to my knowledge, it was not presented to Tribal Council for approval. However, it does not surprise me that the e-mails were destroyed because a shredding company was also hired to destroy paper records related to the business. This had never been done in the past and was performed specifically to conceal the truth about the business.

12.     And unless they were deleted/destroyed, Tribal Council kept audio recordings of our monthly meetings. These audio recordings would be consistent with the statements herein and would show the lack of meaningful involvement of Tribal Council in the lending business.

I have reviewed this Declaration and declare under penalty of perjury that the foregoing statements are true to the best of my knowledge and belief.

Date: August 20, 2019

Joette Pete

5

## Joette Pete-Baldwin

| | |
|---|---|
| **From:** | Matt Martorello <mattm@bellicosevi.com> |
| **Sent:** | Monday, October 14, 2013 4:14 PM |
| **To:** | Karrie Wichtman; Chairman James Williams; Cheryl McGeshick; Eli Edwards; gkway@lvdtribal.com; Henry Smith; Joette Pete-Baldwin (joette.pete@lvdtribal.com); John McGeshick, Jr.; Susan McGeshick (susan.mcgeshick@lvdcasino.com); Tyrone McGeshick (tyrone.mcgeshick@lvdcasino.com) |
| **Cc:** | Craig Mansfield (craig.mansfield@lvdcasino.com); Justin Martorello |
| **Subject:** | SPVI Equity Transfer to LVD |

Good afternoon,

Below is the beginning of a concept I have to facilitate a transition to LVD of MY businesses. The abrupt termination of RRTL/DCTF, as it is written in the existing servicing agreements, is an oversimplified end that we have for some time been meaning to revisit. I think it is time to move forward on the proper legacy plan for how our companies come together. I believe Rob and Karrie can provide some highlights, but I do believe the items below should be able to get us to a term sheet with the goal of FINAL documents delivered on 10/30/13. The documents will not be as daunting as the list below appears, for tax structuring reasons, it is a little more complicated than it appears.

- Assign today to LVD - 51% of Bellicose VI, LLC Equity only membership interest tied to the SPVI subsidiary only (i.e. SPVI is a wholly owned sub of Bellicose, as it must be for tax reasons. Therefore, LVD's equity share for the subsidiary would be at the Bellicose parent company level):
  - LVD will own 51% equity, but 0% profits interest until month 49 when it becomes 100% equity and 80% profits
  - BlueTech will own 49% equity, but 100% profits interest until month 49 when it becomes 0% equity and 20% profits
  - Current Manager (myself) will be locked in as the decision maker for 48 months, at which point they will hire a new Manager to replace me
  - In month 49, Profits will be 80% LVD and 20% BlueTech for 10 years, after which it is 100% profits to LVD.
- Assign today to LVD - 51% of 7X Services, LLC Equity only for a membership class tied to:
  - Iron Fence Investments, LLC
  - Obsidian Armor Fund, LLC (note this will be dissolved before the 48 month mark)
  - WMS (where both WMS and SPVI terminate the existing option agreements)
  - On January 1st, due to my forthcoming 2014 restructuring, Bellicose VI, LLC will be transferred 100% to 7X Services, LLC and LVD's Equity will be shifted to DIRECTLY to SPVI (as we move from the VIs to Puerto Rico)
- Other:
  - Appropriate waivers of SI to protect the Assignors and Managers
  - Structured to ensure the integrity of sovereign immunity
  - It is possible the currently Delaware and Virgin Islands LLCs, may need to be migrated to be LVD LLCs (perhaps AFTER the closing in the interest of time)
  - Castle stops NEW customer loans beginning on January 31, 2014 and only does VIP loans thereafter (same as DCTF today)
  - Tribe uses its own capital to launch a new portfolio in Q1 2014, in which SPVI generates the same fees from the TLE, but LVD gets to keep 75% of the profits interest on the SPVI side for servicing the portfolio, until that 48th month. Adjusts the same thereafter. (This is required for tax purposes)
  - Proper indemnities to the Assignors and Managers
  - No strings attached, no requirements, no liability to LVD by Assignors or Managers on the new LVD portfolio, RRTL, DCTF, or on anything that may happen after month 48. Best efforts basis.

1

JPB 00988
JA1693

## Joette Pete-Baldwin

| From: | Matt Martorello <mattm@bellicosevi.com> |
|---|---|
| Sent: | Wednesday, October 02, 2013 4:28 PM |
| To: | Karrie Wichtman; Chairman James Williams; gkway@duckcreektf.com; Craig Mansfield |
| Cc: | Justin Martorello; Daniel Gravel; weddlej@gtlaw.com; Saba Bazzazieh; Rob Rosette; Cheryl McGeshick; Eli Edwards; gkway@lvdtribal.com; Henry Smith; Joette Pete-Baldwin (joette.pete@lvdtribal.com); John McGeshick, Jr.; Susan McGeshick (susan.mcgeshick@lvdcasino.com); Tyrone McGeshick (tyrone.mcgeshick@lvdcasino.com) |
| Subject: | RE: Notice to Cease Servicing Origination of New Loans to NY consumers |

Thanks for the clarification on these points of distinction Karrie, we'll take a closer look at the details of the provisions and circle back shortly. Simply put in the meantime, we do recommend that RRTL and DCTF stop issuing new and returning customer loans in the State of NY at this time.

**From:** Karrie Wichtman [mailto:kwichtman@rosettelaw.com]
**Sent:** Wednesday, October 2, 2013 4:39 PM
**To:** Matt Martorello; Chairman James Williams; gkway@duckcreektf.com; Craig Mansfield
**Cc:** Justin Martorello; Daniel Gravel; weddlej@gtlaw.com; Saba Bazzazieh; Rob Rosette; Cheryl McGeshick; Eli Edwards; gkway@lvdtribal.com; Henry Smith; Joette Pete-Baldwin (joette.pete@lvdtribal.com); John McGeshick, Jr.; Susan McGeshick (susan.mcgeshick@lvdcasino.com); Tyrone McGeshick (tyrone.mcgeshick@lvdcasino.com)
**Subject:** RE: Notice to Cease Servicing Origination of New Loans to NY consumers

Matt and SPVI Team,

Please advise as to the intent of your email as it is my understanding that your email and the citation to Section 9.4 of the Servicing Agreement is effectively a declaration of breach or dispute being asserted in writing in accordance with Section 18.1 of the Servicing Agreement, considering that that provision cited calls for cessation of the obligations of the parties to one another under the Agreement and states that the "Agreement shall be of no further force and effect". Claiming such a breach under 9.4 necessarily requires that such material change in law be based upon "a final judgment of a court of competent jurisdiction, after all appeals thereof". The Order of the Court denying the Plaintiff's Preliminary Injunction is certainly not such an order as it is not a final judgment of a court, appealable and while no such appeals have yet been file we have 30 days from yesterday's date to do so. Transmitting such a notice declaring a breach, if that is the intent here, is unwarranted and unsupported by the facts at hand. It matters not how Judge Sullivan's order will be regarded by overzealous regulatory agencies but rather that such an order IS NOT, in fact, a final order of the Court on the merits changing a material aspect of the Legal Requirements governing the agreement of the parties. Furthermore the provision does not appear to allow for the singling out of a particular state, in this case NY, to wind down business- which is the cause for my confusion – and leads me to believe that it is not your intent at all to make such a declaration of breach.

Indeed, your email, the concerns expressed, and the recommendations therein seem to fall more in line with Section 4.2 in that as the Servicer you have been contracted to advise the Enterprise regarding the "orderly administration and management of Enterprise in the areas of financial reporting, financing, regulatory compliance, marketing, human resources, development of third party servicer relationships, collections and risk assessment". Among other provisions included in Section 4.2 , your observations, and recommendation to the Enterprise not to lend to and wind down business involving residents in the State of New York surely fits within Section 4.2.1 (a) whereby the "Servicer will be responsible for providing pre-qualified leads to Enterprise and providing the necessary credit-modeling data and risk assessment strategies by which the Enterprise may evaluate to whether or not to extend funds to an individual borrower based on criteria that has been established by the Enterprise." Note that the Agreement, in that same section, however,

1

makes quite clear that "The criteria used to extend funds to individual borrowers will remain within the sole and absolute discretion of the Enterprise and the Enterprise shall execute all necessary loan documentation". Therefore, in the spirit of clarification of your earlier email, would you agree that a better way to approach this matter may be for the Servicer as provided for in Section 4.2.1 (a) to make a recommendation to the Enterprise that in light of recent enforcement actions taken by the State of NY Department of Financial Services, the pending litigation and the recent preliminary Order of the Court, that the Enterprise refrain, immediately, and until further notice, from making new loans in the State of New York and that current loans be wound down until paid in full or some other disposition of the debt to the Enterprise has been reached?

I look forward to your response so that I may advise my client.

Regards,

**Karrie S. Wichtman, Partner**
**Rosette, LLP**
**Attorneys at Law**
Michigan Office
25344 Red Arrow Hwy, Suite B
Mattawan, MI 49071
269.283.5005 – Office
480.242.6959 - Cell
517.913.6443 – Fax
kwichtman@rosettelaw.com
www.rosettelaw.com

CONFIDENTIAL COMMUNICATION: THIS MESSAGE IS A CONFIDENTIAL ATTORNEY COMMUNICATION ONLY FOR USE BY THE INTENDED RECIPIENT. ANY INADVERTENT RECEIPT SHALL NOT CONSTITUTE A WAIVER OF ATTORNEY-CLIENT OR WORK PRODUCT PROTECTION. IF RECEIVED IN ERROR, PLEASE NOTIFY KARRIE S. WICHTMAN IMMEDIATELY AND DELETE THIS MESSAGE. THANK YOU FOR YOUR COOPERATION.

**From:** Matt Martorello [mailto:mattm@bellicosevi.com]
**Sent:** Wednesday, October 2, 2013 2:50 PM
**To:** Chairman James Williams; gkway@duckcreektf.com; Craig Mansfield
**Cc:** Karrie Wichtman; Justin Martorello; Daniel Gravel
**Subject:** Notice to Cease Servicing Origination of New Loans to NY consumers

Dear Mr. Chairman and Team:

Due to Judge Sullivan's ruling, we believe we have an involuntary termination event under the Servicing Agreement as it relates to loans made in the State of New York. As you know, the Servicing Agreement provides:

## Involuntary Termination Due to Changes in Legal Requirements

It is the understanding and intention of the parties that the establishment and operation of Enterprise conforms to and complies with all Legal Requirements. If during the term of this Agreement, Enterprise, or any material aspect of the business conducted by Enterprise, becomes prohibited by operation of federal law or determined by final judgment of a court of competent jurisdiction, after all appeals thereof, to be unlawful under applicable law, the obligations of the parties hereto shall cease, and this Agreement shall be of no further force and effect; provided that (i) the Servicer shall have the rights in Section 4.4 of this Agreement; (ii) the Servicer and the Enterprise shall retain all money previously paid to them pursuant to Section 6 of this Agreement; (iii) funds of Enterprise in any account shall be paid and distributed as

2

provided in Section 6 of this Agreement, provided any Authorized Debt shall be paid in full; (iv) any money lent by or guaranteed by the Servicer or its affiliates to Servicer shall be repaid to the Servicer to the extent provided in a written agreement entered in connection therewith, with recovery of monetary payments or damages limited in recourse to Enterprise assets and any such payments or damages shall be made only after payment in full of any and all amounts under any Authorized Debt; and (v) the Enterprise, directly or indirectly, shall retain its interest in the title to all Enterprise assets, fixtures, supplies and equipment subject to any requirements of financing arrangements. Nothing contained in this Section 9.4 shall be read to preclude either or both parties from contesting any actions which could lead to the involuntary cessation of business by Enterprise.

While we understand that an appeal of Judge Sullivan's order is imminent, our concern is that Judge Sullivan's order finding that tribal enterprises are subject to New York's anti-usury laws will be regarded as sufficiently final by the State of New York such that it will precipitate their potential investigation and potential prosecution of us personally and our companies if we continue to provide New York-related services at this time.

We might be able to resume servicing New York loans at some point in the future, but for now, Judge Sullivan's Order presents a significant potential liability for us and we do not believe that we should service any new New York loans. We are willing to wind down our New York services and see existing loans through to their completion, but we simply cannot flaunt the clear ruling from Judge Sullivan's order, however legally incorrect it might be.

This action applies both to services performed for the Red Rock Tribal Lending, LLC and Duck Creek Tribal Financial, LLC portfolios.

**Regards,**

**Matt Martorello**
Mobile: 773-209-7720
Email: mm@BellicoseVI.com



\*\*This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.\*\*

\*\*This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.\*\*

3

Exhibit 2

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2            IN AND FOR THE DISTRICT OF VIRGINIA
 3                   RICHMOND DIVISION
 4
                                      )
 5     LULA WILLIAMS, GLORIA          )
       TURNAGE, GEORGE HENGLE, DOWIN  )
 6     COFFY, and FELIX GILLISON,     )
       JR., on behalf of themselves   )
 7     and all individuals similarly  )  No. 3:17-cv-00461
       situated,                      )
 8                                    )
                       Plaintiffs,    )
 9                                    )
                  vs.                 )
10                                    )
       BIG PICTURE LOANS, LLC; MATT   )
11     MARTORELLO; ASCENSION          )
       TECHNOLOGIES, INC.; DANIEL     )
12     GRAVEL; JAMES WILLIAMS, JR.;   )
       GERTRUDE MCGESHICK; SUSAN      )
13     MCGESHICK; and                 )
       GIIWEGIIZHIGOODWAY MARTIN,     )
14                                    )
                       Defendants.    )
15                                    )
16            VIDEOTAPED DEPOSITION OF
17               WARREN SCOTT MERRITT
18           Taken in behalf of Defendants
19                     *   *   *
20               March 21, 2019
21          400 Columbia Street, Suite 140
22               Vancouver, WA 98660
23
        Job No. CS3256218
24      Janette M. Schmitt, CSR, CCR, RPR
25      Court Reporter
```

 1      A.   Yes.

 2      Q.   -- but in your capacity for Answers, Etc.?

 3      A.   Yes.

 4      Q.   Okay.  At the time you attended the trade

 5  show, were you doing any consulting work with or for

 6  Mr. Rosette or Ms. Wichtman also?

 7      A.   Not for them, no.

 8      Q.   Okay.  And -- and I'll back up a little bit

 9  too.  So -- and were you doing any consulting work,

10  either directly or indirectly, on behalf of LVD?

11      A.   No.

12      Q.   This was the first time you met

13  Mr. Martorello?

14      A.   Yes.

15      Q.   So tell me about that.

16      A.   If I recall, I was introduced by a mutual

17  colleague, and I -- I don't recall who that is, and

18  started talking.  And my hopes at the time -- my

19  intent was to see if I could do a deal -- software

20  deal with him, because he wasn't entirely happy with

21  his current solution.

22      Q.   So how did you first come to meet him at

23  the trade show?

24      A.   Somebody introduced us.

25      Q.   Do you recall who?

Page 31

1      Q.   You mentioned that you then introduced Matt

2   to Mr. Rosette?

3      A.   Yeah.  Matt indicated that he had an

4   interest in working with Native American tribes.

5      Q.   What specifically do you recall Matt

6   telling you about his interest?

7      A.   Just that he was interested.  I don't know

8   if he -- he gave me a reason.  I mean, there are

9   several reasons why -- the typical, but I don't want

10   to speculate.

11      Q.   I understand you don't want to speculate as

12   to Mr. Martorello's reasons.  But what are some of

13   the typical reasons, in your experience, that

14   individuals are interested in doing business with

15   Native American tribes?

16      A.   To really streamline compliance.  Indian

17   tribes will adopt their own lending regulations, so

18   it's easier to conduct business in multiple states,

19   and so you don't have to worry about 50 different

20   states' rules -- lending rules.

21           So the tribes can lend money to virtually

22   any state as long as they adhere to federal and

23   their tribal laws.

24      Q.   So beyond that Mr. Martorello was

25   interested, in your ter -- in your words, interested

Page 32

1   in, did you say, doing work with tribes?

2       A.   Yes.

3       Q.   Okay.  You don't recall anything

4   specifically that he told you?

5       A.   Not really, no.  I mean, I have dozens of

6   those conversations at every trade show.

7       Q.   Okay.  So what made you -- what led you,

8   then, to introduce him to Mr. Rosette?

9       A.   Just his -- his interest in working with

10  the tribe.  I knew Rob -- Rob's a very well-known

11  attorney in that space.

12      Q.   At the time that you introduced

13  Mr. Martorello to Mr. Rosette, had Mr. Rosette or

14  anyone -- or Ms. Wichtman or anyone else indicated

15  to you that LVD was interested in finding a service

16  provider?

17      A.   No.

18      Q.   Had you had any interactions with anyone

19  specifically at the tribe or its -- any of its

20  corporate entities?

21      A.   LVD?

22      Q.   Uh-huh.

23      A.   No.

24      Q.   When did you introduce Mr. Martorello to

25  Mr. Rosette?

Page 93

1    you told him the LVD had a tribal code and was set

2    to make loans?

3        A.   Inaccurate.

4        Q.   Okay.  And it would be inaccurate in part

5    because Matt approached you and told you he was

6    interested in finding a tribal partner; right?

7             MS. ALAMO:  Objection.  Mischaracterizes

8    his testimony.

9             THE WITNESS:  Repeat the question, please.

10       Q.   (By Mr. Guzzo)  I said it would be

11   inaccurate because Matt actually approached you and

12   said he was interested in finding a tribal partner;

13   is that right?

14       A.   Matt was introduced to me, and he didn't

15   approach me.

16       Q.   Well -- okay.  And after he was introduced

17   to you, he was the one that indicated his

18   willingness or his desire to find a tribal partner;

19   right?

20       A.   That's correct.

21       Q.   Yeah.  And if Matt testified that you

22   introduced him to members of the LVD's tribal

23   council, that would be inaccurate too; right?

24       A.   Correct.

25       Q.   And you didn't introduce him to the

Page 124

```
 1              C E R T I F I C A T E
 2
 3         I, Janette M. Schmitt, a Certified Court
 4    Reporter for Washington, pursuant to RCW 5.28.010
 5    authorized to administer oaths and affirmations in
 6    and for the State of Washington, do hereby certify
 7    that, WARREN SCOTT MERRITT personally appeared
 8    before me at the time and place set forth in the
 9    caption hereof; that at said time and place I
10    reported in Stenotype all testimony adduced and
11    other oral proceedings had in the foregoing matter;
12    that thereafter my notes were reduced to typewriting
13    under my direction pursuant to Washington
14    Administrative Code 308-14-135, the transcript
15    preparation format guideline; and that the foregoing
16    transcript, pages 1 to 125, both inclusive,
17    constitutes a full, true and accurate record of all
18    such testimony adduced and oral proceedings had, and
19    of the whole thereof.
20              Witness my hand and CCR stamp at Vancouver,
21    Washington, this 26th of March, 2019.
22
23    _____
                  JANETTE M. SCHMITT
24                Certified Court Reporter
                  Certificate No. 2252
25                Commission Expires:  7/30/2019
```

# Exhibit 3

## Darcie Pace

| | |
|---|---|
| **From:** | mattm@bellicosevi.com |
| **Sent:** | Friday, August 26, 2011 7:32 AM |
| **To:** | Flint Richardson |
| **Cc:** | Scott Merritt; Robert Rosette |
| **Subject:** | Re: Question on Docs |

I'd agree with that for sure. If she's already been around these documents several times then we will see what she can do. She's on vacation until the 2nd though. I don't think we'll make the 9/15 and 10/1 dates we targeted.  With the back and forth that will e required, I'd be happy to have things wrapped up for 11/1 if we can move efficiently.

Ryan Bloom will be reaching out to Rob to conduct their diligence on the tribe. That should happen today.

On Aug 26, 2011, at 7:24 AM, Flint Richardson <flint@wsedge.biz> wrote:

> Matt – to the extent that you already have counsel on board that is fine.  Claudia (and Christina who works with her) have completed a few large scale deals which is helpful.  Wheeler is ok, personally I think his agreements are the least complex and I don't believe that he may have built in the same level of protection for his clients.

> Rob – thoughts here?

> **Flint Richardson | CPA** | Chandler | AZ| 85225 |
> office 480.889.4888 | fax 480.889.8997 | flint@wsedge.biz |

> **<IMAGE003.JPG>**

> **********************************************************************************
> ********************************************************************
> ********

This e-mail message may contain legally privileged and/or confidential information. If you are not the intended recipient(s), or the employee or agent responsible for delivery of this message to the intended recipient(s), you are hereby notified that any dissemination, distribution or copying of this e-mail message is strictly prohibited. If you have received this message in error, please immediately notify the sender and delete this e-mail message from your computer.

CONFIDENTIAL                                                    ROSETTE_REVISED_052406

JA1705

**IRS CIRCULAR 230 DISCLOSURE**:  To ensure compliance with Treasury Department regulations, we inform you that any U.S. federal tax advice contained in this correspondence (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties that may be imposed under the U.S. Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

**From:** mattm@bellicosevi.com [mailto:mattm@bellicosevi.com]
**Sent:** Friday, August 26, 2011 2:20 AM
**To:** Flint Richardson
**Cc:** Scott Merritt; Rob Rosette
**Subject:** Re: Question on Docs

Does her structure differ somehow? I'm curious how she will be more value added than the other 3 lawyers we've engaged now. Also, how is Wheeler Neff?

On Aug 26, 2011, at 3:23 AM, "Flint Richardson" <flint@wsedge.biz> wrote:

> Matt – sorry for the delay on getting back to you.  I was sick this afternoon so ended up leaving the office at around 4 and slept/threw up until about 8:30.  Please give Rob a call tomorrow at 480-242-9810 as I will be in transit to MI all morning and he is the expert on agreement type questions.  Following are some initial responses on your questions (the ones that I can answer).          Further, upon further reflection we would in fact recommend that you engage Claudia Callaway in order to assist you with the agreements.  She has a superb structure that we have just completed the review on and we believe that utilizing her on this will expedite us getting this deal done.

> A) If Wells Fargo is subpoenaed, what information is given (names of signors) which exposes whoever is a signor on behalf of Servicer.  Can this be hedged? YES, IF YOU WANT THE TRIBE TO BE THE EXCLUSIVE SIGNER ON THE ACCOUNT.

> B) For the USVI, Bellicose can have nothing to do with "Loan Originations", it can only provide the Analytics and such, and I think the Tribe has to be the originator anyway, correct? YES, CORRECT – CORNERSTONE OF THE SOVEREIGN MODEL. In fact, the Loan Management Software would have to be with the Tribe, and not with Bellicose.  This creates a problem where it says "Servicer, shall determine whether such applicants are eligible for Loans from Consumer Lender based on Consumer Lender's credit granting standards duly adopted from time to time by Consumer Lender and applied by Servicer".  Bellicose wants to provide the IP, but Consumer Lender should be the one making the final decision and originating the loans on Tribal Land.  If I'm not mistaking, that applies to support the Tribal Jurisdiction as well?  Similarly, Bellicose can't be as stated in provision 6 specifically.  The USVI will require better separation that the Tribe is the originator and Bellicose is simply a consultant/Manager.  THE TRIBE ESTABLISHES THE LENDING CRITERIA, AND IS THE LENDER BELLICOSE IS JUST CARRYING OUT THE TRIBE'S DIRECTION.  WE CAN CHANGE THE LANGUAGE HOWEVER YOU WOULD LIKE.

CONFIDENTIAL                                                              ROSETTE_REVISED_052407

JA1706

C) If possible, we'd like the Tribe to be on all vendor documents so any subpoena given to any vendor points to the Tribe.  This does, however, create an issue of protecting the information.  <mark>TRIBE SHOULD BE ON ALL VENDOR DOCUMENTS WEB-SITE, ACH AGREEMENTS ETC – WE AGREE.  INFORMATION IS IN THE POSSESSION OF THE SERVICER.</mark>


Can you elaborate on this: So the Tribal Lending entity has a Tribal Management Company, which is going to be the Bellicose customer – NO, YOUR ENTITY WOULD BE THE SERVICER FOR THE LENDING OPERATION.  THE LLC MANAGERS ARE MANAGERS OF THE LLC ENTITY ON BEHALF OF THE TRIBE BUT ARENT INVOLVED IN THE BUSINESS.

Does it mean that Bellicose is the Manager of the Tribal LLC?  Similarly, in what capacity is Bellicose's name on the operating account of the Tribe?  <mark>NO REPRESENTATIVES FROM THE TRIBE ARE THE LLC'S "MANAGERS".  THE SERVICER, BELLCIOSE OPERATES THE BUSINESS COMPLETELTY.</mark>


**Flint Richardson** | **CPA** | Chandler | AZ| 85225 |
office 480.889.4888 | fax 480.889.8997 | flint@wsedge.biz |


**<IMAGE003.JPG>**


\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

This e-mail message may contain legally privileged and/or confidential information. If you are not the intended recipient(s), or the employee or agent responsible for delivery of this message to the intended recipient(s), you are hereby notified that any dissemination, distribution or copying of this e-mail message is strictly prohibited. If you have received this message in error, please immediately notify the sender and delete this e-mail message from your computer.


**IRS CIRCULAR 230 DISCLOSURE**:  To ensure compliance with Treasury Department regulations, we inform you that any U.S. federal tax advice contained in this correspondence (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties that may be imposed under the U.S. Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

CONFIDENTIAL                                                                          ROSETTE_REVISED_052409

JA1707

**From:** mattm@bellicosevi.com [mailto:mattm@bellicosevi.com]
**Sent:** Thursday, August 25, 2011 11:59 AM
**To:** Flint Richardson; 'Scott Merritt'; Rob Rosette
**Subject:** RE: Question on Docs


This is helpful thanks.  Can you hop on a call real quick with me and walk through this, I'd have to call you though, cell doesn't work down here:


The Servicing Agreement says that it is between Consumer Lender and XYZ Company, another "wholly-owned, unincorporated entity of the _____, created under Tribal law".  I've seen these models before, and I'm not sure which way to go is the best.   My concern/questions surround:


A) If Wells Fargo is subpoenaed, what information is given (names of signors) which exposes whoever is a signor on behalf of Servicer.  Can this be hedged?

B) For the USVI, Bellicose can have nothing to do with "Loan Originations", it can only provide the Analytics and such, and I think the Tribe has to be the originator anyway, correct?  In fact, the Loan Management Software would have to be with the Tribe, and not with Bellicose.  This creates a problem where it says "Servicer, shall determine whether such applicants are eligible for Loans from Consumer Lender based on Consumer Lender's credit granting standards duly adopted from time to time by Consumer Lender and applied by Servicer".  Bellicose wants to provide the IP, but Consumer Lender should be the one making the final decision and originating the loans on Tribal Land.  If I'm not mistaking, that applies to support the Tribal Jurisdiction as well?  Similarly, Bellicose can't be as stated in provision 6 specifically.  The USVI will require better separation that the Tribe is the originator and Bellicose is simply a consultant/Manager.

C) If possible, we'd like the Tribe to be on all vendor documents so any subpoena given to any vendor points to the Tribe.  This does, however, create an issue of protecting the information.


Can you elaborate on this: So the Tribal Lending entity has a Tribal Management Company, which is going to be the Bellicose customer – NO, YOUR ENTITY WOULD BE THE SERVICER FOR THE LENDING OPERATION.  THE LLC MANAGERS ARE MANAGERS OF THE LLC ENTITY ON BEHALF OF THE TRIBE BUT ARENT INVOLVED IN THE BUSINESS.

Does it mean that Bellicose is the Manager of the Tribal LLC?  Similarly, in what capacity is Bellicose's name on the operating account of the Tribe?


**Regards,**

4

CONFIDENTIAL                                                    ROSETTE_REVISED_052409

JA1708

**Matt Martorello**

Mobile: 773-209-7720

Email: MattM@BellicoseVI.com

&lt;image005.jpg&gt;

---

**From:** Flint Richardson [mailto:flint@wsedge.biz]
**Sent:** Thursday, August 25, 2011 2:40 PM
**To:** mattm@bellicosevi.com; 'Scott Merritt'; Rob Rosette
**Subject:** RE: Question on Docs

Matt – see attached document with you initial questions from August 23 along with responses which are underlined.  Following are responses to your email below:

So the Tribal Lending entity has a Tribal Management Company, which is going to be the Bellicose customer – NO, YOUR ENTITY WOULD BE THE SERVICER FOR THE LENDING OPERATION.  THE LLC MANAGERS ARE MANAGERS OF THE LLC ENTITY ON BEHALF OF THE TRIBE BUT ARENT INVOLVED IN THE BUSINESS.

Do we want to service the Tribal Management Company or do we want to service the Tribe directly?  YOU WILL BE THE SERVICER FOR THE UNIQUE LLC THAT IS ESTABLISHED – FOR INSTANCE, YOUR SERVICING AGREEMENT WOULD BE FOR RED ROCK LENDING, LLC (WHICH IS THE TRIBALLY ESTABLISHED ENTITY FOR LENDING)

What's the advantage of the Tribal Lender having the Tribal Service Entity?  Trying to get these docs done and still not certain what the structure looks like in this regard.  PLEASE CALL ME IF YOU HAVE QUESTIONS RELATED TO ANY OF OUR RESPONSES.

Thanks Matt.

CONFIDENTIAL

ROSETTE_REVISED_052509

JA1709

Flint Richardson | **CPA** | Chandler | AZ| 85225 |
office 480.889.4888 | fax 480.889.8997 | flint@wsedge.biz |

**<IMAGE006.JPG>**

**********************************************************************
**********************************************************************
*********************************

This e-mail message may contain legally privileged and/or confidential information. If you are not the intended recipient(s), or the employee or agent responsible for delivery of this message to the intended recipient(s), you are hereby notified that any dissemination, distribution or copying of this e-mail message is strictly prohibited. If you have received this message in error, please immediately notify the sender and delete this e-mail message from your computer.

IRS CIRCULAR 230 DISCLOSURE: To ensure compliance with Treasury Department regulations, we inform you that any U.S. federal tax advice contained in this correspondence (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties that may be imposed under the U.S. Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

**From:** mattm@bellicosevi.com [mailto:mattm@bellicosevi.com]
**Sent:** Thursday, August 25, 2011 11:24 AM
**To:** flint@wsedge.biz; Scott Merritt (smerritt@answersetc.com); Rob Rosette (rosette@rosettelaw.com)
**Subject:** Question on Docs

So the Tribal Lending entity has a Tribal Management Company, which is going to be the Bellicose customer. Do we want to service the Tribal Management Company or do we want to service the Tribe directly? What's the advantage of the Tribal Lender having the Tribal Service Entity? Trying to get these docs done and still not certain what the structure looks like in this regard.

**Regards,**

**Matt Martorello**

Mobile: 773-209-7720

CONFIDENTIAL                    ROSETTE_REVISED_052501

JA1710

Exhibit 4

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

LULU WILLIAMS, et. al.,                )
on behalf of themselves and all        )
others similarly situated,             )
                                       )
        Plaintiffs,                   )          Civil Action No. 3:17-cv-461
v.                                     )
                                       )
BIG PICTURE LOANS, LLC, et. al.')      )
                                       )
                                       )
     Defendants.                       )

Expert Report of Professor Nathalie Martin

I. QUALIFICATIONS AND BACKGROUND

*A. Title and Background*

I am the Frederick M. Hart Chair in Consumer and Clinical Law at the University of New
Mexico School of Law ("UNM School of Law"). Prior to joining the faculty at UNM School of
Law, I taught at Temple University School of Law, and before that, I practiced transactional and
business bankruptcy law. I have been a law professor for nearly three decades and was in
practice for a decade before that. My endowed chair was the first in the country dedicated to
consumer law scholarship and service. It remains one of a handful of endowed chairs dedicated
to consumer law in the country.

*B. Courses*

My current courses include contracts, consumer law, bankruptcy, secured transactions, and the
economic justice clinic. In the past, I also have taught business associations, the sale of goods,
payment systems, real estate transactions, and other commercial and consumer law courses. In
the economic justice clinic, I have represented consumers who have taken out payday and other
high-cost loans.

*C. Professional Honors, Testimony, and Presentations*

I am a member of the American Law Institute, a group of American judges, lawyers, and law
professors that helps write, amend, and pass the Uniform Commercial Code and helps write and
draft the various Restatements of Law.   I am also a member of the American College of
Bankruptcy, an honorary bankruptcy organization for top professionals in the field, the former
Dean of Faculty of the American Board of Certification (which writes the test for national

1

bankruptcy certification), and a former Resident Scholar of the American Bankruptcy Institute, the preeminent nonprofit professional organization for bankruptcy professionals.

I have spoken about high-cost loans to dozens of audiences, including the U.S. Senate Banking Committee and the New Mexico Legislature. For years, I have provided content, context, feedback, and commentary on high-cost loans and high-cost loan scholarship at two consumer law conferences, the Berkeley Consumer Law Scholars' Conference and the Teaching Consumer Law Conference, as well as to various audiences at the annual meeting of the Association of American Law Schools.

*D. Scholarship*

I have written over forty law review articles and a dozen books or treatises, including a twelve-volume treatise on commercial and consumer law known as the MATTHEW BENDER FORMS AND PROCEDURES. My scholarship covers many subjects, including corporate and consumer bankruptcy, elder law, and various consumer and commercial law topics, including continuing-care contracts, corporate contracts, various consumer contracts, real estate contracts, rent-to own contracts, and high-cost lending contracts, among other topics. Attached as Exhibit A is my curriculum vitae, which lists all of my publications for the past ten years and prior to that time.

My largest body of my work, spanning over a dozen articles between 2010 and 2022, focuses on high-cost loan products (which include *payday loans*, *title loans*, and triple and quadruple-digit interest rate *installment loans*). I study and write about high-cost loan contracts, the demographics of those who use high-cost loans, the public's attitudes about high-cost loans and interest rate caps in general, and the business models of certain high-cost lenders, including lenders claiming to be entitled to tribal sovereign immunity. Much of this opinion is based upon my own scholarship and study of high-cost loans, as well as the work of various consumer law nonprofit organizations.[1]

My research on high-cost lending includes the articles listed below:

---

[1] For example, *see* Alex Horowitz, *Reforming Payday Loans Can Save Consumers Billions*, January 20, 2023, https://www.pewtrusts.org/en/research-and-analysis/video/2023/reforming-payday-loans-can-save-consumers-billions,  *State Laws Put Installment Loan Borrowers at Risk: How Outdated Policies Discourage Safer Lending*, October 17, 2018 https://www.pewtrusts.org/en/research-and-analysis/reports/2018/10/17/state-laws-put-installment-loan-borrowers-at-risk; *How Borrowers Choose and Repay Payday Loans*, PEW CHARITABLE TRUST, February 20, 2013, available at http://www.pewtrusts.org/en/research-and-analysis/reports/2013/02/19/how-borrowers-choose-and-repay-payday-loans; Susan K. Urahn,  Travis Plunkett, Nick Bourke, Alex Horowitz, Walter Lake, and  Tara Roche,  *Payday Lending in America: Policy Solutions, Report 3 in the Payday Lending in America series*, THE PEW CHARITABLE TRUSTS, October  2013, 12-13, available at http://www.pewstates.org/uploadedFiles/PCS_Assets/2013/Pew_Payday_Policy_Solutions_Oct_2013.pdf. ;Nick Bourke, Alex Horowitz, and Tara Roche, *Who Borrows, Where They Borrow, and Why ,* July 2012, available at http://www.pewtrusts.org/~/media/legacy/uploadedfiles/pcs_assets/2012/PewPaydayLendingReportpdf.pdf.; *Profiting from Poverty: How Payday Lenders Strip Wealth from Working-Poor for Record Profits*, NATIONAL PEOPLE'S ACTION, January 2012;Uriah King and Leslie Parish, *Springing the Debt Trap: Rate Caps are Only Proven Payday Lending Reform*, CENTER FOR RESPONSIBLE LENDING, December 13, 2011' Borne, Rebecca, Joshua Frank, Peter Smith, and Ellen Schloemer, *Big Bank Payday Loans: High-interest Loans Through Checking Accounts Keep Customers in Long-term Debt*, CENTER FOR RESPONSIBLE LENDING, July 2011.

*Brewing Disharmony: Addressing Tribal Sovereign Immunity Claims in Bankruptcy*, 96 AM. BANKR. L. J. 149 (2022).

*The Power of Community Action: Anti-Payday Loan Ordinances in Three Metropolitan Areas* (2017) (with Robert Mayer).

*What Communities Can Do to Rein In Payday Lending: Strategies for Successful Local Ordinance Campaigns Through a Texas Lens*, 80 DUKE LAW & CONTEMP. PROBS. 147 (2017) (with Robert Mayer).

*Nefarious Neighbors: How Living Near Payday Loan Stores Affects Loan Use*, 88 MISS. L. J. 333 (2019) (with Younghee Lim, Aimee Moles & Trey Bickham).

*Public Opinion and the Limits of State Law: The Case for Federal Usury Caps*, 34 N. ILL. L. REV 259 (2014).

*Interest Rate Caps, State Legislation, and Public Opinion: Does the Law Reflect the Public's Desires?* 89 CHICAGO KENT L. REV. 1 (2013) (with Timothy Goldsmith).

*High-Interest Loans and Class: Do Payday and Title Loans Really Serve the Middle Classes?* 24 LOYOLA CONSUMER L. REV. 524 (2012) (with Ernesto Longa).

*The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?,* 69 WASH & LEE L. REV.751 (2012)(with Joshua Schwartz).

*Grand Theft Auto Loans: Repossession and Demographic Realities in Title Lending*, 77 MISSOURI LAW REV. 41(2012) (with Ozymandias Adams).

*Regulating Payday Loans: Why This Should Make the CFPB'S Short List*, 2 HARV. BUS. L. REV. ONLINE 44 (2011).

*Double Down-and-Out: The Connection Between Payday Loans and Bankruptcy,* 39 SOUTHWESTERN L. REV. 789 (2010) (with Koo Im Tong).

*1,000% Interest—Good While Supplies Last: A Study of Payday Loan Practices and Solutions,* 52 ARIZONA LAW REVIEW 563 (2010).

My research in the area of high-cost loans has been cited by the U.S. Supreme Court, the California Supreme Court, the New Mexico Supreme Court, the Fourth Circuit Court of Appeals, and various federal and state trial courts.

JA1714

1. High-Cost Lending Research: Relevant Empirical Research

I have completed seven empirical studies related to high-cost lending and attitudes toward high-cost lending.

     a. First Study in 2009

I devised my first study, *1,000% Interest—Good While Supplies Last: A Study of Payday Loan Practices and Solutions,* after meeting clients in our clinical law program that had taken out some form of these loans. Before meeting these clients, I had no idea what the terms of these loans were. I sought to determine why interest rates did not drop when more lenders entered the market. I also sought to determine what people were using these loans for and whether consumers shopped around based on interest rates. Finally, I sought to determine if consumers knew the loans were interest-only loans when they took them out. I went into the study with an open mind, just trying to learn the facts. In the study, the article for which was published in the Arizona Law Review, I and my students interviewed 109 consumers outside payday lending stores. Key findings of this study include that: 1.) consumers do not shop for payday loans based on price so supply and demand principles do not reduce loan cost, 2.) most consumers do not understand the loans before they get into them and have no idea they are paying only interest, 3.) the vast majority of consumers do not use the loans for short term needs, but often to meet regular expenses, which means these consumers are worse off the subsequent month than they were before they took out the loan. I also learned that many were paying on multiple loans and loans so old they had no idea what they used the original loan for.

     b. Subsequent Empirical Research

Before I began the first study, I had no idea how many loans consumers carried at a time. I assumed most people used just one loan at a time. Discovering the use of multiple loans at a time led to my next study, an empirical analysis of the debts of over 1,000 bankruptcy debtors to determine what percentage of the debtors used payday loans in a state with lax regulations, and of those, how many loans the borrowers had. I discovered that 19% of debtors in the study used the loans, nearly 70% of those with loans had more than one loan, 37% had more than five loans, and 14% had more than 10 loans.[2]

In my next study, I analyzed state data on *title loans* and discovered, among other things that title lenders do not underwrite the loans for affordability because they rely on the value of the car to be repaid, and also that the loans create a high risk of repossession.[3] I then did a demographic study of borrowers, again using bankruptcy data, and discovered that most payday loan borrowers are not middle-class people as the industry suggests. Instead, these borrowers typically have incomes lower than the median income in their state and also have lower than average

---

[2] 1 *Double Down-and-Out: The Connection Between Payday Loans and Bankruptcy,* 39 SOUTHWESTERN L. REV. 789 (2010)(with Koo Im Tong).
[3] *Grand Theft Auto Loans: Repossession and Demographic Realities in Title Lending*, 77 MISSOURI LAW REV. 41(2012) (with Ozymandias Adams).

home ownership rates.[4] Next I empirically studied the attitudes of the public regarding interest rate caps, discovering what essentially all other polls on the subject have found, namely that consumers from all religious and political groups favor double-digit interest rate caps over no caps.[5] I then completed an empirical study on how local governments can regulate high-cost lending when their state has failed to do so.[6]  Finally, I explored how living near a payday loan store affects payday loan usage.[7]

2. High-Cost Lending Research: Relevant Doctrinal Research

My doctrinal scholarship on high-cost loans includes these two articles on tribal lending:

> *Brewing Disharmony: Addressing Tribal Sovereign Immunity Claims in Bankruptcy*, 96 AM. BANKR. L. J. 149 (2022).

> *The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?,* 69 WASH & LEE L. REV.751 (2012)(with Joshua Schwartz).

My doctrinal scholarship discussing the substance over form doctrine includes the two tribal lending articles listed above, as well as these two articles:

> *The Afterpay Hangover*, J. CONSUMER LAW (2023) (with David Lynn) (forthcoming).

> *Shadow Credit and the Devolution of Consumer Credit Regulation*, 24 LEWIS & CLARK L. REV. 1349 (2021) (with Lydia Pizzonia).

*E. Prior Expert Testimony and Consulting Work*

I have been a trial expert in one case on high-cost lending during the past ten years. The opinion in this case can be found at James v. National Financial, L.L.C., Court of Chancery of Delaware, March 14, 2016, 132 A.3d 799 (2016).

II. SCOPE OF THIS REPORT, SOURCES RELIED UPON, AND SUMMARY OF OPINIONS

In rendering this opinion, I rely on my scholarship, my years of experiences and expertise gleaned from the study of high-cost lending and high-cost loans, my experience teaching in the UNM School of Law clinical law program, my experience, expertise, and general knowledge of the law in the areas in which I teach, and the sources in this report and in my own work.  I also reviewed the Complaint, the Plaintiff's Statement of Position Regarding Material

---

[4] *High-Interest Loans and Class: Do Payday and Title Loans Really Serve the Middle Classes,* 24 LOYOLA CONSUMER L.REV. 524 (2012) (with Ernesto Longa).
[5] *Public Opinion and the Limits of State Law: The Case for Federal Usury Caps,* 34 N. ILL. L. REV 259 (2014).
[6] *What Communities Can Do to Rein In Payday Lending: Strategies for Successful Local Ordinance Campaigns Through a Texas Lens*, 80 DUKE LAW & CONTEMP. PROBS. 147 (2017) (with Robert Mayer).
[7] *Nefarious Neighbors: How Living Near Payday Loan Stores Affects Loan Use*, 88 MISS. L. J. 333 (2019) (co-authored with Younghee Lim, Aimee Moles & Trey Bickham).

Misrepresentation and Omissions, Matt Martorello's Response to Plaintiffs' Statement of Position, the Plaintiffs' Reply in Support of Statement of Position Regarding Material Misrepresentations Made to the Court by Defendants, and Plaintiffs' Statement of Position Regarding How Money from the Alleged Scheme Flowed Through Each of the Martorello Companies. Additionally, I reviewed some of the Exhibits to these pleadings as needed, with particular attention to the Amended and Restated Servicing Agreement Between Red Rock Tribal Lending LLC ("Red Rock") and Sourcepoint VI, LLC, the Intratribal Servicing Agreement Between Big Picture Loans, LLC and Ascension Technologies, LLC, the Ascension Technologies LLC Designation of Authority Policy, the Secured Promissory Note, the Loan and Security Agreement between the tribe and Eventide Credit Acquisitions, LLC ("Eventide"), and the Eventide Operating Agreement.

Part I of this report covers the history, practices, and customs of the high-cost lending industry, including the history and development of the tribal lending model. As explained in more detailed below, it is my opinion that non-tribal payday lenders desire to avoid state laws was the impetus behind the creation of the tribal business model. It is also my opinion—as expressed in my early scholarship on this topic—that the tribal lending model was the most recent incarnation of payday lending regulation avoidance after the federal government took steps to shutdown rent-a-bank arrangements.

Part II of this report cover the structure of the lending enterprise between Martorello, the tribe, and their respective entities, as well it's the consistency of that structure with the tribal lending model. As explained in more detail below, it is my opinion that the structure between Martorello and the tribe was consistent with the tribal lending model in general, and included the hallmark features of these relationships.

## I.     Opinion #1: The History, Practices, and Customs of the High-Cost Lending Industry, Including the History and Development of the Tribal Lending Model.

### A. Background on the Current State of High-Cost Lending and How Lenders Avoid Interest Rate Caps

There are many varieties of high-cost loans, including store-front payday loans, title loans, and installment loans.[8] A true "payday" loan is called a payday loan because its original purpose was to help a customer survive a short-term cash flow crisis between the time of the loan and the customer's next payday. In one common form of payday loan, a consumer borrows money at a rate of between $15 and $25 per $100 borrowed, for a period of fourteen days or less. In other words, if a consumer was paid four days ago but is already out of cash, she can go borrow, for example, $400 between now and her next payday (now ten days away). To get that $400 at the $15 per $100 rate, for example, she would need a checking account and would write a check, or authorize an automatic debit, for $460 post-dated to her next payday.

---

[8] *See* Nathalie Martin, *Public Opinion and the Limits of State Law: The Case for Federal Usury Caps*, 34 N. ILL. L. REV. 259, 267-69 (2014) (describing different types of high-cost loans including high-cost installment loans).

When payday comes, this consumer can either let the check or debit clear, or she can go in and pay another $60 to borrow the same $400 for the next two weeks. The loan is interest-only. When taken as an annual percentage rate (calculated by multiplying this rate by twenty-six two-week periods over the course of a year), these terms result in an interest rate of roughly 390% per annum or higher. Annualized, these loans run anywhere from 390% to 500% per annum, depending on how long the loan is outstanding.

Title loans are a different form of high-cost loan. In these loans, the lender takes an unencumbered auto title as collateral for the loan. These loans typically run 25% per month or 300% per annum.[9] There are also high-cost installment loans, including high-cost internet installment loans, which are among the most expensive in the industry.[10] People refer to all of these loans as payday loans because the public recognizes that name, but each type is slightly different.

High-cost loans are regulated at the state level. Many forms of high-cost loans, other than traditional payday loans, were designed to get around state payday loan regulations that typically limit interest and fees, rollovers, and numbers of loans per year, and also require that loans be placed in a public database. Most of these state statutes apply only to loans of short duration.  A typical lender work-around is to offer only longer loans.  This change in practice has led to a proliferation of longer, high cost "installment loans," which are now more common than payday loans.

The phenomenon of morphing loans into another form in order to avoid state laws is discussed in many of my law review articles, particularly my piece in the Arizona Law Review.[11] The move to offer high-cost installment loans instead of traditional payday loans has occurred all over the country in both storefronts and on line. These installment loans are often more expensive than the previous payday loans. In one such loan, a customer borrowed $100, to be repaid in twenty-six bi-weekly installments of $40.16 each, plus a final installment of $55.34. In total, this borrower was scheduled to pay a total of $1,099.71 on a $100 loan. The annual percentage rate on the loan was 1,147%.[12] Due to these and other work-arounds, most states now cap interest on high-cost loans.[13]

---

[9] *See* Nathalie Martin and Ozymandias Adams, *Grand Theft Auto Loans: Repossession and Demographic Realities in Title Lending*, 77 Mo. L. Rev. 41, 48 (2012).

[10] *See, e.g.*, State ex rel. King v. B&B Inv. Group, Inc., 329 P.3d 658, 663 (N.M. 2014).

[11] Nathalie Martin, *1,000% Interest—Good While Supplies Last: A Study of Payday Loan Practices and Solutions,* 52 ARIZONA LAW REVIEW 563 (2010). As one example of such morphing, in Illinois a statue was passed that applied only to loans of less than 31 days. As one scholar explains:

> Regulators in Illinois imposed rules in 2001 that were designed to [curb the number of payday loans and roll-overs]. Customers were allowed to borrow no more than $400; only two renewals were permitted, with some of the principal paid down each time; and a cooling-off period was mandated to prevent borrowers from using the proceeds of a new loan to pay off the old one. The state . . . promised to establish a database to track loan activity and enforce the rules.

Robert Mayer, *One Payday, Many Payday Loans: Short-Term Lending Abuse in Milwaukee County* (working paper, 8), *available at* http://lwvmilwaukee.org/mayer21.pdf (last accessed Aug. 6, 2009).

[12] *State ex rel. King v. B&B Inv. Group, Inc.,* 329 P.3d 658, 663 (N.M. 2014).

[13] Carolyn Carter, *Predatory Installment Lending in the States (2022),* June 28, 2022, NCLC, https://www.nclc.org/resources/predatory-installment-lending-in-the-states-2022/. Further elaborating, this source states that:

*B. The Background and History of High-Cost Lending and the Rise of Rent-Bank and Rent-a Tribe*

For most of our country's history, almost all states capped interest rates at 18% or even lower.[14] Usury laws, and substance over form analysis, originally applied to all lenders including banks. When the National Bank Acts were passed in 1863 and 1864, however, these laws gave national banks the choice of two alternative usury caps—a state one or a federal one—both of which were true usury caps.[15]

Both the rent-a-bank and rent-a-tribe methods described below were made possible through the 1978 Supreme Court's decision in *Marquette National Bank of Minneapolis v. First of Omaha Service Corp,*[16] which permitted national banks to export the interest rates allowed in their home state across state lines, and preempt the usury law of the borrower's home state.[17] Stated another way, lenders could use those national banks as conduits because they were exempt from state interest rate caps set by state laws. Under these arrangements, the payday lenders funded, serviced, and collected loans that were nominally made by the national banks, and the national banks received a small payment in return for fronting the loans.

If the bank in the unlimited interest rate state was made to look like it was the actual lender, then the bank's right to avoid state usury limits would apply to the loans.[18]  State usury caps were

- 19 states and the District of Columbia cap the annual percentage rate (APR) at 36% or less.
- 13 states cap the APR between 36% and 60%.
- 13 states cap the APR at more than 60%.
- Three states—Idaho, Utah, and Wisconsin—require only that the loan not be "unconscionable" (a legal principle that bans terms that shock the conscience).
- Two states—Delaware and Missouri—impose no cap at all.

The NCLC map below shows the maximum APRs allowed by the states for closed-end installment loans as of 2022. *Id.* These numbers do not reflect 36% caps recently passed in Colorado and New Mexico in 2023 and 2022 respectively.



[14] Christopher Lewis Peterson, *Usury Law, Payday Loans, and Statutory Sleight of Hand: Salience Distortion and American Credit Pricing Limits*, 92 MINNESOTA LAW REVIEW 1110, 1111 (2008)

[15] Kimball v. Nat'l Bank of North America, N. A., 468 F. Supp. 1069, 1071 (D.C.N.Y., 1979).

[16] 439 U.S. 299, 318-19 (1978).

[17] *Id.* State chartered depository institutions obtained the same most favored lender status when Congress enacted § 521 of the Depository Institutions Deregulation and Monetary Control Act of 1980 (codified at 12 U.S.C. § 1831d).

[18] This partnership scheme was the industry's primary action plan to avoid regulatory restrictions. *See* Elizabeth R. Schiltz, *The Amazing, Elastic, Ever-Expanding Exportation Doctrine and Its Effects on Predatory Lending*

essentially preempted, though the practice violated the substance over form rule.[19] In "rent-a-bank" and the newer so-called "rent-a- tribe" arrangements described below, the high-rate lender assumes most, if not all, of the risk of nonpayment of the loans and also arranges the loans. In a rent-a-bank transaction, the high-rate lender provides the initial lending capital, markets the loans, takes the applications, controls the underwriting and approval process, and merely forwards the borrower's information to the bank to perform the ministerial function of advancing the funds.[20] The high-rate lender then purchases the loan from the bank, thus assuming the entire economic risk of nonpayment, as well as the potential economic upside of the loan.[21]

Once rent-a-bank schemes appeared, federal regulators took steps to shut them down whenever it appeared that the loans were really made by and for the non-bank, high-rate lender.[22] The FDIC eventually invalidated rent-a-bank, by bringing actions against banks engaged in these agreements.[23]

---

*Regulations*, 88 MINN. L. REV. 518, 581-583, 621- 22 (2004) (discussing renting charters and concluding that applying the exportation doctrine to non-bank lenders is not justified under principles of banking law).

[19] Christopher Lewis Peterson, *'Warning: Predatory Lender' - A Proposal for Candid Predatory Small Loan Ordinances,* 69 WASH. & LEE L. REV. 893, 897-898 (2012). Attempts to evade usury laws are not new. In 1825, the Supreme Court remarked:

> Usury is a mortal taint wherever it exists, and no subterfuge shall be permitted to conceal it from the eye of the law; this is the substance of all the cases, and they only vary as they follow the detours through which they have had to pursue the money lender.

De Wolf v. Johnson, 23 U.S. 367, 385 (1825). In 1835, Chief Justice Marshall explained this concept in greater detail in *Scott v. Lloyd*:

> The ingenuity of lenders has devised many contrivances, by which, under forms sanctioned by law, the [usury] statute may be evaded. Among the earliest and most common of these is the purchase of annuities, secured upon real estate or otherwise.
> . . . . The purchase of an annuity therefore, or rent charge, if a bona fide sale, has never been considered as usurious, though more than six per cent profit be secured. Yet it is apparent, that if giving this form to the contract will afford a cover which conceals it from judicial investigation, the [usury] statute would become a dead letter. Courts, therefore, preceived [sic] the necessity of disregarding the form, and examining into the real nature of the transaction. If that be in fact a loan, no shift or device will protect it. Scott v Lloyd, 34 U.S. 418, 446–47 (1835); *see also* 12 U.S.C. § 38 (2018).

[20] Commonwealth of Pennsylvania v. Think Fin., Inc., No. 14-CV-7139, 2016 WL 183289, at *2 (E.D. Pa. Jan. 14, 2016).

[21] *Id*.

[22] In 2000, both the Office of the Comptroller of the Currency and the Office of Thrift Supervision issued letters warning national banks and thrifts of the potential credit, transaction, reputation, compliance, and legal risks involved with payday lending. *See* OCC Advisory Letter No. AL 2000-10 (Nov. 27, 2000), *available at* https://www.occ.treas.gov/news-issuances/advisory-letters/2000/advisory-letter-2000-11.pdf *See also* Office of Thrift Supervision, Letter P-2000-4 (Feb. 3, 2000) (OTS will conduct examinations of the thrift's partner in payday lending to the same extent as it will of the thrift).

[23] *See, e.g.,* Republic Bancorp Inc, SEC Form 8-K at ITEM 1.01 (Feb. 24, 2006), ("By letter to the Bank dated February 17, 2006, the FDIC cited inherent risks associated with payday lending activities and asked the Bank to consider terminating this line of business. Consequently, on February 24, 2006, the Bank and ACE amended the agreement regarding the Bank's payday loan activities in Texas, Pennsylvania and Arkansas."), *available at* www.sec.gov/Archives/edgar/data/921557/000110465906011951/a06-5812_18k.htm.   In fact, Second Bank's

High-cost lenders, however, were still looking for ways to continue lending at triple-digit and even quadruple-digit interest rates. Eventually a new work-around was created in which existing high-cost lenders teamed with Native American tribes in hopes of availing themselves of these tribal partners' tribal sovereign immunity.

### C. Background on the Business Structure of Tribal Lenders

As explained above, the shut-down of rent-a-bank led to a new work-around, sometimes referred to as "rent-a-tribe," the tribal lending model, or the sovereign model. Under this new structure for lending, an existing lender forms an alliance with a Native American tribe in an attempt to use the tribe's sovereign immunity and provide loans in states in which the loans are illegal.[24]    Rather than claiming to be based in a state with permissive lending statutes and using a bank's ability to export rates across state lines, lenders claim that the tribes with which they partner are the real lenders.  The lenders then assert that due to these tribal partnerships, their loans are protected by sovereign immunity and not subject to state usury laws.[25] Low tribal profits and little tribal control are the hallmarks of these relationships. As my prior scholarship explains:

> Typically, a non-tribal payday lender makes an arrangement with a tribe under which the tribe receives a percentage of the profits, or simply a monthly fee, and otherwise forbidden practices of the lender are presumably shielded by tribal immunity. This is described in the payday lending industry as the "sovereign model."[26] Although there is little sunlight on the true financial arrangements between the tribes and payday lenders, under one such agreement, between one and two percent of the payday profits of one "tribal" lender actually went to the tribes.[27] By contrast, the Indian Gaming Regulatory Act, which extensively regulates the Indian gaming industry for the benefit of tribes, mandates that at least 70% of the profits from each gaming enterprise go directly go to the tribe … with a maximum of 30% going to a non-tribal consultants and mangers.[28]

---

relationship with a Think Finance subsidiary (ThinkCash) was explicitly mentioned by the FDIC in charges it brought against Second Bank in 2007. In the Matter of Second Bank of Delaware, and CompuCredit Corporation, Notice of Charges for an Order to Cease and Desist and For Restitution, Federal Deposit Insurance Corporation, FDIC-07-256b, FDIC-07-257k, at 8 (June 10, 2008), *available at* http://www.fdic.gov/news/news/press/2008/FBD_Notice_of_Charges.pdf.

[24] Megan Leonhard, *Payday loans can have interest rates over 600%—here's the typical rate in every U.S. state*, CNBC, Feb 16, 2021, available at https://www.cnbc.com/2021/02/16/map-shows-typical-payday-loan-rate-in-each-state.html, last visited on June 30, 2021.

[25] *See* Western Sky Fin., L.L.C. v. Maryland Comm'r of Fin. Regulation, No. WDQ 11-1256, 2011 WL 4929485, at *1 (D. Md. Oct. 13, 2011) (describing loan contract that asserts agreement is not subject to any state law); Online Payday Loan Companies Ignoring Colorado Law, CBS4 News (Nov. 14, 2011), *available at* http://denver.cbslocal.com; Jessica Silver-Greenberg, *Payday Lenders Join With Indian Tribes*, Wall St. J., Feb. 10, 2011, *available at* www.wsj.com. *See also* Allen J. Parker & Assoc., Inc., Payday Lending -- the Sovereign Model 3 (Apr. 2012) (publication by consultant for payday lenders).

[26] *See* http://www.consultants4tribes.com/category/sovereign-model/ and *see* http://paydayloanindustryblog.com/Payday%20loan%20industry/sovereign-nation-model/

[27] Real Parties in Interest's Answer to MTE Financial Services, Inc.'s Petition for Review and Request for Stay at 4, No. S194110, 2011 WL 2907024, at *4 (Cal. June23, 2011). ("Veririfed discovery responses in this case supplied by another defendant, Processing Solutions, LLC, states that MTE received between 1% and 2% of the total loan revenue.").

[28] IGRA 25 U.S.C. § 2711(7).

10

As a result of the rent-a-tribe method, many high-cost internet loans are made by entities that claim immunity based on their tribal partnerships.[29] Because payday loans are regulated at the state level, and tribes are bound by state law but cannot be sued for violations of such laws due to tribal sovereign immunity, lenders see opportunities to skirt state usury caps.[30] One industry web site explains the allure for the non-tribal party to these arrangements:

> Due to the strict regulations that are hitting the payday loan industry hard, many lenders are now turning to Indian Tribes to help them out. The American Indian Tribes throughout the United States have been granted sovereign immunity which means that they are not held subject to the laws that payday loans are currently going up against. There are 12 states which have banned payday lending but as long as their [sic] is an Indian tribe who runs the operation on this sovereign land, the lenders can continue their business even where payday loans have already been banned. Similar to the Casino boom, payday loans are the new financial strategy that many are using as a loophole through the strict payday loan laws.
> …
> It is no surprise that many lending companies are currently seeking out American Indian Tribes in an effort to save their businesses by escaping US lending laws. Tribal leaders are paid a few thousand dollars a month for allowing a payday lender to incorporate on tribal land. The more lenders that tribes allow to move onto their reservation, the larger the profit that they make.[31]

As this excerpt articulates, most lenders using this model are not created or controlled by tribes or even by tribal members. It is most common for existing lenders to form an alliance with a tribe *after* loans have been curtailed in a particular market.[32]  Moreover, most "tribal" lending entities are owned by close corporations in which the decision-making lies with a non-tribal member, making the tribe's involvement minimal.

Typically, an existing lender contacts a tribe through an intermediary and proposes a lending partnership in which the tribe receives 1-5% of loan profits in exchange for allowing the lender to use the tribe's sovereign immunity.[33]  The tribe typically has little control over the business

---

[29]Kyra Taylor and Leslie Bailey, and Victoria W. Ni, *Stretching the Envelope of Tribal Sovereign Immunity?: An Investigation of the Relationships Between Online Payday Lenders and Native American Tribes,* Public Justice Foundation, at 1, available at https://www.publicjustice.net/wp-content/uploads/2018/01/SVCF-Report-FINAL-Dec-4.pdf.*see also* Nathalie Martin and Joshua Schwartz, *The Alliance between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?*, 69 WASH. & LEE L. REV. 751, 751 (2012).

[30]  Taylor, Bailey, & Ni, *supra* note 29, at 1.

[31] The Connection Between Indian Tribes and Payday Lending, ONLINE CASH ADVANCE, *cited in Public Opinion and the Limits of State Law: The Case for Federal Usury Caps*, 34 N. ILL. L. REV 259, 280(2014).

[32] Commonwealth of Pennsylvania v. Think Fin., Inc., No. 14-CV-7139, 2016 WL 183289, at *11 (E.D. Pa. Jan. 14, 2016).

[33] Taylor, Bailey, & Ni, *supra* note 29, at 157; *see also* Consumer Financial Protection Bureau V. CashCall, Inc. et al., 2018 WL 485963(C.D. Ca. 2018), at *2-4 (describing role of attorney Claudia Callaway in facilitating tribal lending).

decisions or management of the business.[34] The tribe, while perhaps employing a few members in clerical positions on tribal land, stands by and receives its small percentage of the profits.[35]

The Public Justice Foundation recently created a detailed, 200-page inventory of tribal lenders, describing which high-cost loan companies have worked with which tribes.[36] This report details the lack of control tribes typically have over these lending arrangements, even if the lender claims to be "100% owned" by the tribe. For example, when the Chippewa Cree formed an alliance with Think Finance Inc. ("Think Finance") and Plain Green, LLC as a "wholly owned subsidiary" of the tribe, Think Finance and its subsidiaries received about 95 percent (95%) of the loan profits while Plain Green received just 4.5%.[37] When Chippewa Cree tribal Chairman St. Mark questioned the fairness of the Plain Green, LLC and Think Finance division of profits, Think Finance told the tribal council that Chairman St. Marks needed to be removed from office or Think Finance would end its business arrangement with the tribe.[38] Think Finance explicitly insisted that the tribal council impeach Chairman St. Marks.[39] Think Finance could make this demand because it controlled all of the money in the partnership. Yet Plain Green was a 100% wholly-owned subsidiary of the Chippewa Cree tribe.[40]

Based on my training, education, and experience, it is my opinion that non-tribal payday lenders desire to avoid state laws was the impetus behind the creation of the tribal business model. It is also my opinion—as expressed in my early scholarship on this topic—that the tribal lending model was the most recent incarnation of payday lending regulation avoidance after the federal government took steps to shutdown rent-a-bank arrangements.

## II.     Opinion # 2: The Structure and Scope of Martorello's Relationship with the Tribe, As Well As Its Consistency with the Tribal Lending Model.

This section describes the structure of this lending business through some of the corporate documents executed in connection with this business.

### The Original Transaction and the Initial Operating Agreement

In this transaction, in 2012, Martorello and the Tribe signed a document named Amended and Restated Servicing Agreement Between Red Rock Tribal Lending LLC ("Red Rock") and Sourcepoint VI, LLC (the "Initial Operating Agreement").[41] As described below, under this

---

[34] *Id.; see also* Otoe-Missouria Tribe of Indians v. New York State Dept. of Financial Services, 769 F.3d 105 (2d Cir 2014); Otoe–Missouria Tribe of Indians, v. New York State Department Of Financial Services, 974 F.Supp.2d 353 (S.D.N Y.2013); Gibbs, et al., v. Haynes Investments, LLC, et al., Defendants., 368 F.Supp.3d 901 ( E.D. Va.2019); Gibbs V.  Elevate Credit, Inc., 2021 WL 4851066 United States District Court, (E.D. Virginia, Richmond Division); Consumer Fin. Prot. Bureau v. CashCall, Inc., 2016 WL 4820635, at *5; CashCall, Inc. v. Morrisey, 2014 WL 2404300, at *6 (W. Va. May 30, 2014); Commonwealth of Pennsylvania v. Think Fin., Inc., No. 2016 WL 183289, at *11.
[35] Taylor, Bailey, & Ni, *supra* note 29, at 157.
[36] *Id.*
[37] *Id.*
[38] *Id.* at 163.
[39] *Id.*
[40] *Id.* at 209.
[41] Amended and Restated Servicing Agreement Between Red Rock Tribal Lending LLC and Sourcepoint VI, LLC, Ex.42 to Plaintiff's Statement of Position Regarding Material Misrepresentation and Omissions.

agreement, Red Rock was 100% owned by the tribe, but relinquished most of the control over the lending business and received just 1-2% of its profits.

Red Rock was one party to the Initial Operating Agreement and the other party was Sourcepoint VI, LLC ("Sourcepoint"). Sourcepoint was assigned its rights under the Initial Operating Agreement from Bellicose VI, LLC ("Bellicose"). Since both Bellicose and Sourcepoint were owned and controlled by Martorello, these entities are referred to here as the "Martorello Parties." In the Initial Operating Agreement, the Martorello Parties are named the "Servicer" and Red Rock Tribal Lending LLC is named the "Enterprise."

The Initial Operating Agreement had a seven-year term which automatically renewed for another two years unless terminated.[42] Section 3.3.1 contained the following non-competition clause:

> In consideration for Servicer providing its expertise to the Enterprise, the Enterprise agrees that so long as this Agreement is in effect neither it nor any Affiliate shall, directly or indirectly, either on its own or through any agent, joint venture, subsidiary or independent contractor, engage in the Unsecured Lending Business anywhere in the world except through the Enterprise without engaging the Servicer to provide the management and consulting services contemplated by this Agreement.[43]

Section 3.1 provided that the Servicer has "authority and responsibility over all communication and interaction whatsoever between Enterprise and each service provider, lender and other agents of Enterprise."[44] Section 4.2.1 sets out the Servicer's broad duties which included selecting and forming relationships with service providers and lenders and suggesting practices and recommendations to tribal representatives regarding:

> generally accepted industry practices for lenders and service providers,
> regulatory and compliance standards for the Enterprise,
> training and education standards,
> financial reporting, and
> website, marketing, and customer relations.[45]

Part 4.2.1(i) provided that the Servicer would provide pre-qualified leads, credit-modelling data, and risk assessment data to the Enterprise. Additionally, Section 1.4 provided that the Servicer would develop, manage, and provide operation guidelines regarding the lending business and also provide investment and capital management services, management, operations, marketing consulting, and analytic services, including risk assessment management.

---

[42] Under Section 3.2, "the term of the Agreement begins on the Effective Date of this Agreement (October 25, 2011), *Id.* Section 3.2 The Term automatically renews for an additional period of two (2) years unless either party provides written notice to the other Party at least one hundred twenty (120) days, but no greater than one (I) year, prior to the end of the term." *Id.*

[43] *Id.* Section 3.3.1.

[44] *Id.* Section 3.1.

[45] *Id.* Section 4.2.1.

Regarding the revenue sharing agreement, Section 2.25 provided that tribe would get what amounts to roughly 1-2% of the profits of the business,[46] with the rest going to the Martorello parties. Section 3.5.1 further elaborates on this revenue-sharing arrangement. It provided that "the success of the business is based in large part upon the services provided to the Enterprise by the Servicer. As a result, Enterprise has agreed to a performance-based fee equal to cash basis revenue remaining after payment of Tribal Net Profits, Servicer advances, and all Servicing Expenses."[47]

Regarding the handling of the funds and access to bank accounts, Section 4.9 provided that Servicer would "collect all gross revenues and other proceeds connected with or arising from the operation of the Enterprise, and to deposit such funds daily."  Section 4.4 provided that the Servicer had the sole signatory and transfer authority over these bank accounts, meaning that the Enterprise had no access to these funds.[48] More specifically, Section 4.4 provided:

> The Servicer shall select a bank or banks for the establishment of (i) a primary bank account by Enterprise into which all funds generated by the Unsecured Lending Business will be transferred and deposited (the "Primary Bank Account") and (ii) any other bank accounts by Enterprise subject to the Deposit Account Control Agreement as the Servicer deems necessary or appropriate to conduct the Unsecured Lending Business consistent with this Agreement, e.g., an account to hold the Regulatory and Litigation Reserve Fund (as defined below). Unless otherwise mutually agreed in writing by the Enterprise and Servicer, the Servicer shall have sole signatory and transfer authority over such bank accounts. Servicer shall have sole authority to sweep monies from such bank accounts for distributions made to the Enterprise consistent with Sections 3.5.1 and 6.4. In addition to the foregoing, Servicer shall further have the sole authority to instruct and direct any ACH providers that Enterprise may engage to assist it in operating the Unsecured Lending Business, to the extent provided by this Agreement.[49]

Regarding disbursements to the tribe, Section 6.3 provided that:

---

[46] More specifically, Section 2.25 defines "Tribal Net Profits" as the sum of Gross Revenues plus bad debt recoveries minus the sum of charge backs and bad debt charge-offs and multiplying the sum of this amount by two (2) percent calculated on a monthly basis all calculated on a cash basis. At this time, an entity owned by the Rosette Law Firm got half of the 2% reserved for the tribal entity. *Id.* Section 2.25.

[47] Section 2.22 defines "Servicing Expenses" as:

> the expenses of the operation of Enterprise, incurred pursuant to the Servicing Budget, including but not limited to the following: (I) the payment of salaries, wages, and benefit programs for all employees of Enterprise subject to the approval described in Section 4.3; (2) supplies for Enterprise; (3) utilities; (4) repairs and maintenance of any facility used by Enterprise for the conduct of its business; (5) interest expense on Authorized Debt of Enterprise; (6) insurance and bonding; (7) advertising and marketing; (8) professional fees; (9) reasonable travel expenses for officers and employees of Enterprise, Servicer or its affiliates to inspect and oversee Enterprise; (10) the Regulatory and Litigation Reserve fund expense; (II) security costs; (12) underwriting expenses; (13) bad debt expenses and (14) legal or professional fees incurred for lobbying or litigation that is not adequately covered by the Regulatory and Litigation fund.

*Id.* Section 2.22.

[48] *Id.* Section 4.4.

[49] *Id.*

14

All revenues received by Enterprise in connection with the Unsecured Lending Business shall be deposited into the Primary Bank Account. These revenues shall, in turn, be disbursed by Servicer, for and on behalf of Enterprise, from the Primary Bank Account to pay, to the extent available, Servicing Expenses.[50]

In my opinion, the structure between Martorello and the tribe was consistent with and similar to the structures described above for tribal lending in general. As explained above, low tribal profits and little tribal control are the hallmarks of these relationships. It is my opinion that the structure between Martorello and the tribe featured these hallmarks and continued until Martorello restructured the business as a sale of Bellicose to the tribe in 2016, and a renaming of the business from Red Rock Lending LLC to Big Picture Loans. This restructuring and renaming is more particularly described below.

<u>The Sale and Rebranding of Big Picture Loans and Ascension Technologies</u>

In 2016, Martorello restructured the business as a sale of Bellicose to the tribe for $300 million, through two new 100% owned tribal entities. One of these new corporations is a new unsecured loan business named by Martorello as Big Picture Loans ("Big Picture"), which replaced Red Rock Tribal Lending, LLC. The other is Ascension Technologies, LLC ("Ascension"), which essentially replaced Bellicose as the servicer. Despite that both of these corporate parties to the transaction are 100% owned by the tribe under the $300 million sale, the tribe continues to receive a small percentage of profits and to have little decision-making power over the business. Ascension is 100% controlled by its non-tribal President Brian McFadden.[51] Collectively, the sale and other documents give McFadden and Martorello control over Big Picture and Ascension.

These details are found in: (1) the Intratribal Servicing Agreement Between Big Picture Loans, LLC and Ascension Technologies, LLC ("New Servicing Agreement"), dated February 16, 2016,[52] (2) the Ascension Technologies LLC Delegation of Authority Policy, dated January 22, 2016 ("Designation of Authority Policy"),  and executed between two tribal managers of Ascension Technologies and President Brian McFadden,[53] (3) the Secured Promissory Note,[54]

---

[50] *Id.* Section 6.3
[51] Intratribal Servicing Agreement Between Big Picture Loans, LLC and Ascension Technologies, LLC, Ex. 83 to Plaintiff's Statement of Position Regarding Material Misrepresentation and Omissions; Ascension Technologies LLC Delegation of Authority Policy, Ex.82 to Plaintiff's Statement of Position Regarding Material Misrepresentation and Omissions; Loan and Security Agreement between the tribe and Eventide Credit Acquisitions, LLC, Ex. 86 to Plaintiff's Statement of Position Regarding Material Misrepresentation and Omissions.
[52] Intratribal Servicing Agreement Between Big Picture Loans, LLC and Ascension Technologies, LLC, Ex. 83 to Plaintiff's Statement of Position Regarding Material Misrepresentation and Omissions.
[53] Ascension Technologies LLC Delegation of Authority Policy, Ex.82 to Plaintiff's Statement of Position Regarding Material Misrepresentation and Omissions.
[54] Secured Promissory Note dated September 14, 2015, at Martorello_000129.

and (4) the Loan and Security Agreement between the tribe and Eventide Credit Acquisitions, LLC ("Eventide"), dated September 14, 2015.[55]

As set out above, Martorelllo fashioned the new arrangement as a sale of his company Bellicose, the servicer of former lender Red Rock, to the tribe for $300 million. To facilitate this sale, Martorello created a third corporation, Eventide Credit Acquisitions, LLC ('Eventide') to hold the $300 million note executed by the tribe. In the sale, the tribal lending business was renamed Big Picture and the tribe executed the $300 million note.

Lender Eventide's Operating Agreement provides for two different share classes. First, the Operating Agreement creates a "Class A Voting Interest," which is "the only Class of Membership entitled to vote on any and all matters presented to the Company for Member approval."[56] These Class A Voting Interests were all owned by companies wholly owned or managed by Martorello.[57] In addition, the Operating Agreement created a "Class A Economic Interest," which is separate from a voting interest. This interest entitled a shareholder to an "economic interest in the Company's future net profits and net losses[.]"[58] Martorello—through companies or trusts owned by him—owns 85% of the Class A Economic Interest in Eventide. The rest is owned by Martorello's brother Justin Martorello (10%), his long-time business partner Brian McFadden (2%), and two former executives from Bellicose (1.5% each). If he wishes, Martorello can buy any of these other owners out at any time,[59] meaning that Martorello may reclaim any of the economic shares.

In connection with the loan and the sale, the tribe (through Tribal Economic Development Holdings, LLC) signed a Loan and Security Agreement with Eventide, dated September 14, 2015 ("Security Agreement") collateralizing the $300 million loan and providing that until the $300 million loan is paid by the tribe in full, the New Servicing Agreement cannot…without Eventides' approval…. be amended in any way,[60] nor can any delegation of authority be modified, nor any manger, director, or officer be terminated or replaced.[61] In other words, through these transactional documents, Martorello was able to retain significant control over Big Picture, Ascension, and Eventide, and thus the lending business operations. This is similar to the structures described above for tribal lending in general.

Under this restructured deal, the servicer, whose duties are described above, is now Ascension. The President of Ascension is non-tribal member Brian McFadden, who cannot be removed by

---

[55] Loan and Security Agreement between the tribe and Eventide Credit Acquisitions, LLC, Ex. 86 to Plaintiff's Statement of Position Regarding Material Misrepresentation and Omissions.

[56] *See* Section II(C) of Eventide's Operating Agreement, Ex.87 to Plaintiff's Statement of Position Regarding Material Misrepresentation and Omissions.

[57] *See id.* Schedule A.

[58] *See id.* Section II(C).

[59] *See id.* Section H(iv).

[60] *See* Section 5.12 of Loan and Security Agreement between the tribe and Eventide Credit Acquisitions, LLC, Ex. 86 to Plaintiff's Statement of Position Regarding Material Misrepresentation and Omissions.

[61] *See id.* Section 5.14.

JA1727

the Tribe. In the Delegation of Authority Policy, two tribal managers delegate to McFadden these tasks:

    a)  approval of Ascension strategic direction, goals and targets which shall be communicated to Co-Managers in accordance with Section 1.5 but no less frequently than quarterly.

    b)  authority to execute documents on behalf of Ascension, subject to the limitations contained in Sections 1.2(a) and 1.3 herein;

    c)  authority to open and maintain bank accounts and to interface with any lockbox service providers in the ordinary course of business of Ascension; provided however Co-Managers are informed of the locations and account numbers for any bank accounts opened pursuant to this delegation;

    d)  authority to adopt, terminate, or change employee benefit plans or programs, except major additions or changes to major employee benefit plans or programs as set forth in Section 1.2(d) above; and

    e)  authority regarding all matters necessary for the day to day management of Ascension, including delegation to subordinates, and the implementation of corporate objectives that are not specifically reserved to the Co-Managers set forth in Section 1.2 or Member set forth in Section 1.3.[62]

According to this section, McFadden has the right to execute all documents on behalf of Ascension, to open and maintain bank accounts, and to perform "all matters necessary for the day to day management of Ascension, including delegation to subordinates and the implementation of corporate objectives…"[63] Regarding communications with the outside world, under Sections 3.1 and 3.2:

    All verbal communications with media, regulatory bodies, or other entities which may have a material effect on Ascension, are limited to the President, or a person directly delegated by the President to speak on behalf of Ascension or pursuant to Ascension's written and duly adopted communications policy. Any such inquiries as well as how they were handled shall be reported to the Co-Managers within a reasonable time of the inquiry.

    Any written communication with media, regulatory bodies, or other entities which may have a material effect on Ascension, must be approved by the President, or a person directly delegated by the President, priori to release. The President, or President's delegee, must circulate any proposed release to news media to the Co-managers prior to release.[64]

---

[62] *See* Section 1.4 of Ascension Technologies LLC Delegation of Authority Policy, Ex.82 to Plaintiff's Statement of Position Regarding Material Misrepresentation and Omissions.
[63] *Id.*
[64] *Id.* Sections 3.1 and 3.2.

17

JA1728

Section 4 provides that these polices cannot be changed without McFadden's approval.[65] Regarding the distribution of funds under the restructured transaction, while the fee structure is changed somewhat, the percentages to the tribe remain small. Specifically, under Section 1.2 of the Secured Promissory Note, the amount to be distributed to the respective parties is described as the Net Cash Available. The Net Cash Available is distributed as follows: first, 4% of goes to the tribe, with half of that to be reinvested in the business,[66] next the expenses are then paid, and then the rest goes to Eventide.

Finally, regarding the New Servicing Agreement, under Section 3.2, the term of the agreement is extended to ten years and it automatically renews for two more years if not terminated.[67] In terms of the duties of the servicer, these duties are similar to those of the servicer in the Initial Servicing Agreement. For example, Section 4.2.1 contains the duties of servicer, and for the most part, those duties track the duties of servicer found in 4.2.1 of the Initial Operating Agreement.[68] Finally, the New Servicing Agreement provides no remedy for the servicer's breach, but as to a breach on the part of the enterprise, provides that:

---

[65] *Id.* Section 4.

[66] *See* Section 1.2 of the Secured Promissory Note dated September 14, 2015, at Martorello_000129.

[67] *See* Section 3.2 of New Servicing Agreement, Ex. 83 to Plaintiff's Statement of Position Regarding Material Misrepresentation and Omissions.

[68] *Id.* Section 4.1.1, which provides that in providing services to Enterprise and its Subsidiaries, the Servicer's duties include, without limitation, the following:

> Consistent with the Servicing Budget, the Servicer shall develop and recommend to the Enterprise and its Subsidiaries reasonable measures for the orderly administration and management of Enterprise in the areas of financial reporting, financing, regulatory compliance, marketing, human resources, development of vendor relationships, collections and risk assessment, and shall implement such recommendations, including:
>
> (a) Screening of and selecting vendors and Commercial Finance Providers, and negotiating agreements with such vendors and Commercial Finance Providers on behalf of the Enterprise on such terms and conditions as Servicer may reasonably determine to be appropriate;
>
> (b) Development and promotion of sound and positive business relationships on behalf of Enterprise with the designated vendors and Commercial Finance Providers, including, but not limited to, the enforcement or termination of agreements with such vendors and Commercial Finance Providers;
>
> (c) Identification of vendors needed for the Small Loan Transaction Business;
>
> (d) Preparation of suggested practices and recommendations of suggested practices governing the operations of the Enterprise and its Subsidiaries to provide that operations are conducted in a manner that is consistent with the best interests of Enterprise and its Subsidiaries and generally accepted industry standards;
>
> (e) Preparation of regulatory and compliance standards and practices and recommendations to the Enterprise and its Subsidiaries of such standards and practices.to be adopted by the Enterprise and its Subsidiaries provided that such operations are conducted in a manner consistent with the best interests of Enterprise and its Subsidiaries and generally accepted industry standards;
>
> (f) Preparation of training and education standards and recommendations to the Enterprise and its Subsidiaries of suggested practices to be adopted by the designated vendors to provide that such designated vendors are conducting business with the Enterprise in a manner that is consistent with the best interests of Enterprise and its Subsidiaries and generally accepted industry standard;
>
> (g) Assistance to the CEO, at his or her request, in the selection, hiring, training, control and discharge of employees performing regular services for Enterprise and its Subsidiaries in connection with the maintenance, operation, and management of the Small Loan Transaction Business;

> In the event of termination of this Agreement by the Servicer for cause under Section 7.2, the Servicer shall not be required to perform any further services under this Agreement and Enterprise shall indemnify and hold the Servicer harmless against all liabilities of any nature whatsoever relating to Enterprise…[69]

In my opinion, despite the restructure between Martorello and the tribe, the structure of the business model remained consistent with and similar to the structures described above for tribal lending in general because the tribe relinquished independent control and the majority of the profits through the transactional documents.

III.   COMPENSATION

I am being compensated at an hourly rate of $750 per hour for work associated with this report and for preparing for deposition or for trial. To the extent necessary, my hourly rate for time spent in a deposition or for trial testimony is $1,750.

Professor Nathalie Martin

*Nathalie Martin*

_____
Professor Nathalie Martin

---

(h) Preparation of standards for financial reporting and accounting and recommendations to the Enterprise and its Subsidiaries of best practices to be adopted by the designated vendors and Commercial Finance Providers of the Enterprise and its Subsidiaries to provide that such designated vendors and Commercial Finance Providers are conducting business in a manner that is consistent with the best interests of Enterprise and its Subsidiaries and generally accepted accounting standards presented on a cash basis;

(i) Preparation of standards and screening and review of and making recommendations to the Enterprise and its Subsidiaries regarding the website contents, marketing and consumer relations practices and designated vendors to provide that such designated vendors are conducting business in a manner that is consistent with the best interests of Enterprise and its· Subsidiaries and generally accepted industry standards;

(j) Monitoring and supervision of and reporting to the Enterprise and its Subsidiaries regarding the designated vendors to provide that such designated vendors are conducting business in a manner that is consistent with the standards, best practices, policies and requirements established by the Enterprise and its Subsidiaries;

(k) Coordinating pre-qualified leads to Enterprise and its Subsidiaries and providing the necessary credit-modeling data and risk assessment strategies by which the Enterprise and its Subsidiaries may evaluate whether or not to extend funds to an individual borrower based on criteria that has been established by the Enterprise and its Subsidiaries.  The criteria used to extend funds to individual borrowers will remain within the sole and absolute discretion of the Enterprise and/or its Subsidiaries and the Enterprise and/or its Subsidiaries shall execute all necessary loan documentation;

(l) May be responsible for certain training and monitoring employees of the Enterprise and its Subsidiaries that operate the Enterprise's call center on behalf of itself and its Subsidiaries; and

(m) Coordinating sale of Consumer Loan Transactions in default at prevailing market rates, to third-party debt collector vendors of the Enterprise.

[69] *Id*. Section 7.3.

19

Frederick M. Hart Chair in Consumer and Clinical Law
University of New Mexico School of Law

Dated: April 14, 2023

Exhibit A

**Curriculum Vitae**
**NATHALIE D. MARTIN**

**EMPLOYMENT HISTORY**
Frederick M. Hart Chair in Consumer and Clinical Law *University of New Mexico School of Law,* Albuquerque, NM
> Professor of Law since Spring 2004
> Associate Professor since July 2001
> Assistant Professor since Fall of 1998

*Temple University School of Law,* Philadelphia, PA
> Visiting/Adjunct Professor, Temple Rome, Summer 2006, 2004 and 2002 and Temple Greece, Summer of 2001 and Summer of 2000. Taught International Business Transactions (with Stewart Paley)

*Montgomery, McCracken, Walker & Rhoads,* LLP Philadelphia, PA
> Corporate, commercial transactions and business bankruptcy attorney February, 1993 to June, 1996

*Hoyle, Morris & Kerr,* Philadelphia, PA
> Commercial litigation and business bankruptcy attorney
> November, 1990 to January, 1993

*Fine & Ambrogne,* Boston, MA
> Business bankruptcy attorney
> September, 1988 to October, 1989

*Stradley, Ronon, Stevens & Young,* Philadelphia, PA
> Corporate and bankruptcy attorney
> September, 1986 to August, 1988

**EDUCATION**
L.L.M. in Legal Education *Temple University School of Law,* Philadelphia, PA
> Honorable Abraham L. Freedman Fellowship, Sept. 1996-May, 1998

J.D., *Syracuse University College of Law*, Syracuse, NY
> May, 1986, *cum laude*
> Syracuse Law Review, Senior Notes and Comments Editor
> Robert M. Anderson Award for Outstanding Publication
> Justinian Honor Society

B.A, *St. Olaf College*, Northfield, MN
> Philosophy and Psychology, May, 1983
> Year Abroad at Oxford and Cambridge Universities

**PROFESSIONAL RECOGNITION and HONORS**
Frederick M. Hart Chair in Consumer and Clinical Law
   Awarded on October of 2011

Member, *American Law Institute*, since 2011

Member, *American College of Bankruptcy*, since 2013

Dean of Faculty, *American Board Certification*
   2007-2010
   Wrote and administered National certification test for bankruptcy and creditors'
   rights

*State Bar of New Mexico*, 2006 Pinnacle Award
   For highest ranked CLE Program of Year
   Summer 2006

*American Bankruptcy Institute*
   Robert M. Zinman Resident Scholar, Washington, D.C.
   Acted as media contact and scholarly liaison for largest insolvency organization
   in the world
   Fall 2005

Author for *U.S. State Department* Entrepreneurship Web page
   Winter 2006

**BOOKS**

LAWYERING FORM THE INSIDE OUT: LEARNING PROFESSIONAL IDENTITY FORMATION
THROUGH MINDFULNESS AND EMOTIONAL INTELLIGENCE (CAMBRIDGE UNIVERSITY PRESS
(2018).

FORMS AND PROCEDURES (8 VOLUME SET, WITH FRED HART) (MATTHEW BENDER
UPDATED SEMI-ANNUALLY).

EMMANUEL LAW OUTLINES, SECURED TRANSACTIONS, (with Frederick Hart) (Aspen
2006) (updated periodically most recently in 2021).

YOGA FOR LAWYERS: MIND-BODY TECHNIQUES TO FEEL BETTER ALL THE TIME
(AMERICAN BAR ASSOCIATION PRESS 2013).

THE GLANNON GUIDE TO BANKRUPTCY (Aspen 2005)(updated periodically most recently
in 2021).

INSIDE BANKRUPTCY (WITH OCEAN TAMA) (Aspen 2007)(updated periodically most recently in 2011).

WHEN WORLDS COLLIDE: BANKRUPTCY AND ITS IMPACT ON DOMESTIC RELATIONS AND FAMILY LAW (American Bankruptcy Institute 3rd ed. 2005) (with MICHAELA M. WHITE and MARIANNE B. CULHANE).

THE NEW BANKRUPTCY LAW AND YOU (with Stewart Paley) (Wiley 2005).

COUNSELING OLDER AMERICANS, ALI/ABA Book (with Alison Barnes and A. Frank Johns) (2003).


## ARTICLES

B*rewing Disharmony: Addressing Tribal Sovereign Immunity Claims in Bankruptcy*, 96 AM. BANKR. L. J. 149 (2022).

*Bad Apples or a Rotten Tree: Ameliorating the Double Pandemic of COVID 19 and Racial Economic Inequality*, 82 MONT. L. REV. 105 (2021), available at: SSRN.

*Reducing The Wealth Gap Through Fintech 'Advances' in Consumer Banking and Lending*, U. 2021 ILL. L. REV. 459 (2021) (co-authored with Pamela Foohey), available at: UNM-DR.

*Shadow Credit and the Devolution of Consumer Credit Regulation*, 24 LEWIS & CLARK L. REV. 1349 (2021) (co-authored with Lydia Pizzonia), available at: SSRN

*Bringing Relevance Back to Consumer Bankruptcy*, 36 EMORY BANKR. DEV. J. 581 (2020), available at: UNM-DR.

*Nefarious Neighbors: How Living Near Payday Loan Stores Affects Loan Use*, 88 MISS. L. J. 333 (2019) (co-authored with Younghee Lim, Aimee Moles & Trey Bickham). available at: UNM-DR.

*The Virtue of Vulnerability: Mindfulness and Well-Being in Law Schools and the Legal Profession*, 49 SW. L REV. 367 (2019), available at: UNM-DR.

Nathalie Martin & Robert N. Mayer, *What Communities Can Do to Rein In Payday Lending: Strategies for Successful Local Ordinance Campaigns through a Texas Lens*, 80 LAW AND CONTEMPORARY PROBLEMS 147-175 (2017), available at http://scholarship.law.duke.edu/lcp/vol80/iss3/7.

*The Power of Community Action: Anti-Payday Loan Ordinances in Three Metropolitan Areas*, Executive Summary (with Robert Mayer, University of Utah Department of Sociology).

*The Power of Community Action: Anti-Payday Loan Ordinances in Three Metropolitan Areas* (with Robert Mayer, University of Utah Department of Sociology).

*What Communities Can Do to Rein In Payday Lending: Strategies for Successful Local Ordinance Campaigns Through a Texas Lens*, 80 DUKE LAW & CONTEMP. PROBS. 147 (2017) (with Robert Mayer).

*Right Scholarship and the Goddesses of Commercial Law*, 34 COLUMBIA J. GENDER AND THE LAW 124 (2017).

*Survival in the Face of Scarcity: The Undocumented Immigrant Experience*, 58 AZ. L. REV. 103 (2016).

*Giving Credit Where Credit is Due: What We Can Learn from the Banking and Credit Habits of Undocumented Immigrants*, 2015 MICH. STATE L. REV. 989 (2015).

*Think Like a (Mindful) Lawyer,* 34 ULAR LAW. REV. 259 (2015).

*Public Opinion and the Limits of State Law: The Case for Federal Usury Caps,* 34 N. ILL. L. REV 259 (2014).

*Interest Rate Caps, State Legislation, and Public Opinion: Does the law Reflect the Public's Desires?* 89 CHICAGO KENT L. REV. 15 (2013) (with Timothy Goldsmith) (2014).

*Addressing the Foreclosure Crisis through Law School Clinics,* 20 GEORGETOWN J. L. & POVERTY 531 (with Max Weinstein) (2013).

*High-Interest Loans and Class: Do Payday and Title Loans Really Serve the Middle Classes, 24* LOYOLA CONSUMER L. REV. 524 (2012) (with Ernesto Longa).

*The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?* 69 WASH & LEE L. REV. 751 (2012) (with Joshua Schwartz).

*Grand Theft Auto Loans: Repossession and Demographic Realities in Title Lending*, 77 MISSOURI LAW REV. 41 (2012) (with Ozymandias Adams ).

*Regulating Payday Loans: Why This Should Make the CFPB'S Short List*, 2 HARV. BUS. L. REV. ONLINE 44 (2011), available at: http://www.hblr.org/?p=1595.

*Testing Materiality Under the Unfair Practices Acts: What Information Matters When Collecting Time-Barred Debts?* 64 CONSUMER FIN. L. Q. REP. 372 (2010) (with Timothy Goldsmith).
Available at: SSRN

*1,000% Interest—Good While Supplies Last: A Study of Payday Loan Practices and Solutions,* 52 ARIZONA LAW REVIEW 563 (2010).

*Double Down-and-Out: The Connection Between Payday Loans and Bankruptcy,* 39 SOUTHWESTERN L. REV. 789 (2010) (with Koo Im Tong).

*Consumer Scams and the Elderly: Preserving Independence through Shifting Default Rules,* 17 J. ELDER LAW 1 (2009).

*Winners and Losers in Bankruptcy Reform: Do Women and Children Really Come out on Top,* 49 FAM . L. QUAR. 219 (2007).

*Mind Games: Rethinking BAPCPA's Debtor Education Provisions,* 10 SOUTHERN ILLINOIS LAW REVIEW 517 (2007)(with Ocean Tama ).

*American Bankruptcy Laws: Encouraging Risk-Taking and Entrepreneurship, (U.S. Department of State, International Information Programs, Entrepreneurship and Small Business)*, available at http://usinfo.state.gov/journals/ites/0106/ijee/ijee0106.htm.

*Poverty, Culture and the Bankruptcy Code: Narratives from the Money Law Clinic*, 12 CLINICAL L. REV. 203 (2005).

*The Role of History and Culture in Developing Bankruptcy and Insolvency Systems: The Perils of Legal Transplantation*, 28 B.C. COLLEGE INT'L. & COMP. L. REV. 1 (2005), also available at http://law.bepress.com/expresso/eps/172.

*Operating in the Zone: Lessons for Directors and Officers of Corporations Approaching Insolvency (with Mark Paban),* for the American Bar Association, Section of Business Law, Spring Meeting, April 1-4, 2004, Seattle, Washington.

*Common Law Bankruptcy Systems: Similarities and Differences,* 11 AMER. BANKR. INST. L. REV. 367 (2003).

*Explorations in the Classroom: A Book Review of SECURED CREDIT: A SYSTEMS APPROACH,* 26 SEATTLE LAW REVIEW 13 (2002).

*Que es la Diferencia: A Comparison of the First Days of a Chapter 11 Reorganization Case in the United States and Mexico,* 10 U.S.- MEXICO. L.J.85 (2002).

*Funding Long Term Care: Is There a Way to Ensure That Our Assets Will Last Longer Than We Will?,* 3 ELDER'S ADVISOR 66 (2001)(shortened version of Article found at 16 JOURNAL OF CONTEMPORARY HEALTH LAW & POLICY).

*Les Jeux Ne Sont Pas Faits: The Right to Dignified Long-Term Care in the Face on Industry-Wide Financial Failure* (with Elizabeth Rourke), 10 CORNELL JOURNAL OF LAW AND PUBLIC POLICY 129 ( 2000).

*Funding Long-Term Care: Some Risk-Spreaders Create More Risk Than They Cure,* 16 JOURNAL OF CONTEMPORARY HEALTH LAW & POLICY 355 ( 2000).

*The Insolvent Life-care Provider: Who Leads the Dance Between State Continuing-Care Statutes and the Federal Bankruptcy Code*, 61 OHIO STATE LAW JOURNAL 267 (2000).

*Noneconomic Interests in Bankruptcy: Standing On The Outside Looking In*, 59 OHIO STATE LAW JOURNAL 429 (1998).

*Fee Shifting in Bankruptcy: Deterring Frivolous, Fraud Based Objections to Discharge*, 76 NORTH CAROLINA LAW REVIEW 97 (1997).

Note, *Fathers and Families: Expanding Men's Familial Rights*, 36 SYRACUSE LAW REVIEW 1265 (1986).

**EXCERPTS IN LEGAL TEXTS**
*Funding Long-term Care, Some Risk Spreaders Create more Risk than they Cure*, excerpt reprinted in Dolgin and Shepherd, BIOETHICS AND THE LAW 719-20 (2009).

**REPRODUCTIONS OF ARTICLES IN MONOGRAPHS**
*The Role of History and Culture in Developing Bankruptcy and Insolvency Systems: The Perils of Legal Transplantation*, 28 B.C. COLLEGE INT'L. & COMP. L. REV. 1 (2005), also available at http://law.bepress.com/expresso/eps/172., reproduced in CONSUMER BANKRUPTCY: REHABILITATION ISSUES (Ivafia University Press, Hyberbad, India, Edited by Madhuri V 2009) .

*Mind Games: Rethinking BAPCPA's Debtor Education Provisions,* 10 SOUTHERN ILLINOIS LAW REVIEW 517 (2007)(with Ocean Tama y Sweet) reproduced in CONSUMER BANKRUPTCY: REHABILITATION ISSUES (Ivafia University Press, Hyberbad, India, Edited by Madhuri V 2009).

**CURRICULUM DEVELPMENT or ADMINISTRATIVE POSITIONS**

*Associate Dean for Faculty Development,* 2016 -2022

*Committee:*

2022-2023: Chair, Retention, Promotion and Tenure Committee, Main Campus Provost -level Promotion and Tenure Committee, International Programs Committee.

2021-2022: Main Campus Provost -level Promotion and Tenure Committee, Promotion and Tenure Committee, Colloquium Committee.

2020-2021: Main Campus Provost -level Promotion and Tenure Committee, Colloquium Committee, International Committee.

2019-2020: Main Campus Provost -level Promotion and Tenure Committee, Colloquium Committee, International Committee.

2018-2019: Promotion and Tenure Committee, Colloquium Committee, International Committee.

2017-2018: Chair, Faculty Appointments Committee, International Programs Committee, Pipeline Committee.

2016-2017: Fall, Chair, Faculty Appointments Committee; Spring, sabbatical.

2015-2016: Chair, Faculty Appointments Committee, Ad-hoc Voting Committee, International Programs Committee, Kellogg Grant Committee, Library Committee, UNM Main Campus Iberian Studies Grants and Awards Committee.

2014-2015: Associate Dean of Faculty Development, Faculty Colloquium Committee.

2013-2014 Administrative Positions: Director, Law School Economic Development Program.  Committees:  Faculty Appointments Committee, Self-Study Committee.

2012-2013 Administrative Positions: Director, Law School Economic Development Program.  Committees:  Faculty Appointments Committee, Faculty Retention and Promotion Committee, Self-Study Committee, Dean Search Committee.

2011-2012 Administrative Positions: Director, Law School Economic Development Program.  Committees:  Faculty Appointments Committee, Faculty Retention and Promotion Committee.

2010-2011 Administrative Positions: Director, Law School Economic Development Program.  Committees:  Faculty Appointments Committee.

2009-2010 Administrative Positions: Director, Law School Economic Development Program.  Committees:  Faculty Appointments Committee, Faculty Retention and Promotion Committee

2008-2009: Sabbatical

2007-2008:  Administrative Positions: Director, Law School Economic Development Program.  Committees:  Faculty Colloquia Committee.

2006-2007 Committees:  University Faculty Benefits Committee, University Study Abroad Committee, Law School:  Self-Study Committee, Outreach Committee, Financial Aid Committee,

2006-2007 Administrative Positions: Director, Law School Economic Development Program

2005-2006: Committees: Co-Chair, Curriculum Committee

2005-2006 Administrative Positions: Director, Law School Economic Development Program

2004-2005 Committees: Co-chair, Curriculum Committee

2003-2004 Committees: Co-chair, Curriculum Committee, Appointments Committee

2002-2003 Committees: Co-chair, Curriculum Committee, Library Committee, Reference Librarian Search Committee

2001-2002 Committees: Co-chair, Curriculum Committee

2000-2001 Committees: Chair, Student Affairs Committee, Self-Study Committee, University Faculty Senate, Budget Sub-Committee and Indirect Cost Sub-sub-Committee of the University Faculty Senate.

1999-2000 Committees: Self-Study, Tenure and Promotion, Faculty Appointments, University Faculty Senate, Budget Sub-Committee and Indirect Cost Sub-sub-Committee of the University Faculty Senate.

**SERVICE**

Pro Bono Expert Witness Testimony and Other Pro bono Expert Assistance
Amicus brief author, **THE BANK OF NEW YORK v. JOSEPH A. ROMERO and MARY ROMERO,** before the Supreme Court of New Mexico (with Frederick M. Hart, writing on behalf of 12 community groups).

Assisted staff o**f United States Senate Special Committee on Aging** to prepare for hearing on July 21, 2010 on Continuing Care Retirement Communities.

Assisted with passage of new **Continuing-care Retirement Community Statute** in New Mexico, SB70 (Spring 2010).

**Pro Bono Expert Witness testimony** in *In re Plaza de Retiro,* bankruptcy case in New Mexico involving an insolvent life-care facility.

**Pro-bono work for Consumers' Union** in several capacities, most extensively and recently consulted on and helped draft briefs and pleadings for, Logan General Hospital Bankruptcy, Logan, West Virginia, in which theories of article on Non-Economic interests in bankruptcy were used to protect community and public interest groups in sale of hospital.

8

Sample of Academic Presentations

**Speaker and Co-Director,** Teaching Consumer Law Conference (with Houston Law School dean Emeritus Richard Alderman), Santa Fe New Mexico, 2019, 2021, and 2022).

**Commentator, Berkley Scholars' Conference,** March 2018, 2020, and 2021, 2022, and 2023.

**Speaker,** AALS, Panel at 2019 Annual Meeting of the Association of American Law Schools (AALS), on a real estate foreclosure, sponsored by the Real Estate Section January 5, 2016, New York, New York

**Speaker,** AALS, Panel at 2016 Annual Meeting of the Association of American Law Schools (AALS), on a panel sponsored by the Commercial Law Section entitled *Women in Commercial Law*, January 6, 2016, New York, New York.

**Speaker,** AALS, Panel at 2014 Annual Meeting of the Association of American Law Schools (AALS), on a panel sponsored by the Balance in legal Education and Teaching sections, entitled *The Many Connections Between Well-Being and Professionalism in the Practice of Law: Implications for Teaching*, January 5, 2014, New York, New York.

**Speaker**, AALS, Panel on 2013 Annual Meeting of the Association of American Law Schools (AALS), on a panel sponsored by the Commercial and Other Consumer Law section, entitled *Aberrant Contracts*, January 6, 2013, New Orleans, Louisiana.

**Speaker**, AALS, Panel on 2013 annual meeting of the Association of American Law Schools (AALS), on a panel sponsored by the Clinical Legal Education and Poverty Law sections, entitled *The Debt Crisis and the National Response: Big Changes or Tinkering at the Edges?*, January 5, 2013, New Orleans, Louisiana.

**Panelist at Houston Law Center, Consumer Law Conference**
Gave conference paper on defending foreclosures through clinical law programs, May 17, 2012, Houston, Texas

**Speaker,** *Louisiana State University Family Impact Seminar on Predatory Lending,* a day-long bi-annual workshop for legislators, community groups, and nonprofits, regarding issues of impact on families.  This year's Louisiana seminar focused on predatory lending, and I spoke to a group of about 100 people on March 9, 2012.

**Speaker and Organizer**, Loyola Chicago School of Law, Symposium on *The Effects of the Financial Crisis on Consumers,* February 24, 2012, http://www.luc.edu/law/activities/publications/clrsymposium/index.html.  I presented my paper on payday loan customer demographics, and also blogged about the event. http://www.creditslips.org/creditslips/2012/03/loyola-chicago-law-school-hosts-symposium-on-the-effects-of-crisis.html,

**Neighborhood Law Center Conference**
Participated in panel on Bankruptcy and Foreclosure, December 8, 2011. Santa Fe, New Mexico

**Speaker, Consumer Federation of American's High-Cost Credit Summit**
Spoke about payday loans and tribal enterprises. November 30, 2011.
Washington, D.C.

**Symposium Creator and Presenter, Washington and Lee Fringe Banking Symposium**
Gave paper on tribal sovereign immunity and payday loans, November 11, 2011.
Lexington, Virginia

**Moderator, National Conference of Bankruptcy Judges**
Moderated panel about difficult consumer bankruptcy issues, October 15, 2011.
Orlando, Florida

**Faculty Colloquia Presenter, University of San Francisco School of Law**
Gave paper entitled "The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?, September 14, 2011.
San Francisco, California

**Panelist at Northwestern University School of Law, 10th Annual Transactional Clinical Conference**
Led panel on "Transactional Clinics' Impact on Social Justice Issues," April 16, 2011.

**Speaker, Consumer Federation of American's High-Cost Credit Summit**
Spoke about payday and installment loans, December 1, 2010.
Washington D.C.

**Speaker, National Conference of Bankruptcy Judges**
Spoke about bankruptcy trends and payday loans, October 15, 2010.
New Orleans, Louisiana

**Panelist at Houston Law Center, Consumer Law Conference**
Gave conference paper about payday lending and the Consumer Financial Protection Bureau, May 22, 2010.
Houston, Texas

**Symposium Panelist at Southwestern School of Law Conference entitled "Bankruptcy in the new Millennium:  Consumer Bankruptcies**
Gave conference paper on the correlation between bankruptcy filings and the use of payday loans, February 12, 2010.
Los Angeles, California

10

**Speaker, Annual Meeting of the National Association of Attorneys General**
Spoke on payday and installment lending legislation, December 2, 2009.

**Keynote Conference Speaker, Tecnológico de Monterrey in the State of Mexico**
Phi Delta Phi conference. Spoke on Legal Aspects of the U.S. Financial Crisis. October 16, 2010, Mexico City, Mexico

**Speaker to the Asociación Nacional de Abogadas del Empresa, Colegio de Abogadas (The National Association of Corporate Lawyers)**
Spoke on Chapter 11 bankruptcy. October 15, 2010.
Mexico City, Mexico

**Panelist at Annual U.S.-Mexico Institute Conference, gave presentation entitled "A Comparison of the Reorganization Laws in Mexico and the United States"**
Gave conference paper comparing "Ley de Concursos Merchantiles" to Chapter 11 of the Bankruptcy Code, at the U.S. Mexico Law Institute Conference, September 6, 2001 Guanajuato, Mexico

Other AALS Participation
**AALS Section on Elder Law, 2009-2010**
Member of Executive Committee of Section.

**Section Chair, AALS Section on Debtor-Creditor Law, 2005-2006**
Member of Executive Committee of Section 2003-2007.

**Section Chair, AALS Section on New Law Professors, 2004-2005**
Also on executive committee and one of three founders of new section, instituted in 2001.

Additional Continuing Legal Education Presentations (representative sample)
**Bankruptcy Year in Review, Panelist,** reviewed recent bankruptcy cases of note from our district and circuit, New Mexico State Bar Association, 2013, 2011, 2010, 2008, 2004, 2002.

Presentation on **Business Law Developments**, New Mexico Judicial Conclave for all State Court Judges, June 2007.

Presentation for Bankruptcy Section of State Bar on **Ethic and Professionalism**, September 2007.

**Presentation to the State Bar of New Mexico, 2006 Year in Review,** *Basic Bankruptcy Practice in the Brave New World of Bankruptcy Reform, march 2006* (received CLE Pinnacle Award for this presentation).

**Presentation for the American Bar Association Section of Business Law,** Spring Meeting, April 1-4, 2004,Seattle, Washington, on *The Role of Culture in Drafting and Implementing New Bankruptcy Laws: A Look at China, Hong Kong, and Japan.*

**Presentation for the American Bar Association, Section of Business Law,** Spring Meeting, April 1-4, 2004,Seattle, Washington *Operating in the Zone: Lessons for Directors and Officers of Corporations Approaching Insolvency.*

**State Bar of New Mexico, Business Law Year in Review,** Prepared and gave Enron-Themed CLE in game show Format entitled Corporate Scandal Jeopardy (with Business Law Society), November 15, 2002.

**Fellow, National Conference of Bankruptcy Judges, October 2002.** Attended largest and most prestigious conference of U.S. Bankruptcy Judges, at their invitation, as preparation for future contributions to the conference.

**Enron Teach-in,** Organized Forum (with Business Law Society) and Presented Presentation on this Landmark Case, Law School Forum, March 21, 2002.

**State Bar Association, Real Estate Section**, Albuquerque, N.M.
Gave CLE on the Revised Article 9, December 8, 2000.

Exhibit 5

| From: | Matt Martorello |
| To: | Karrie Wichtman; John L. Williams |
| Cc: | Justin Martorello; Tanya Gibbs; Brian McFadden |
| Subject: | RE: AT BPL SA |
| Date: | Thursday, January 14, 2016 3:34:16 PM |

The Lenders care about the person who runs the business of AT. If the Transaction Docs are clear that the position in question and under scrutiny to the lenders is President and CEO (Brian), then I think we're OK. As far as I know, the Manager's don't really do anything... I defer to John on what the TD's say if that jives, and what the authority is of BMF vs the Managers, but if Managers are really only involved per the OA to get feedback from the CEO/President then seems OK. If they do more than that, or if the TD's say the position of concern are the Managers then we'd have some cleaning up to do.

**From:** Karrie Wichtman [mailto:kwichtman@rosettelaw.com]
**Sent:** Thursday, January 14, 2016 5:47 PM
**To:** John L. Williams <JWilliams@cwlaw.com>
**Cc:** Justin Martorello <justinm@bellicosecapital.com>; Tanya Gibbs <tgibbs@rosettelaw.com>; Matt Martorello <mattm@bellicosecapital.com>; Brian McFadden <BrianM@bellicosevi.com>
**Subject:** Re: AT BPL SA

I'll take a look. I haven't looked at the AT docs in a while. I seem to remember Brian was appointed at Matt's direction as President but the Co Mrg were still Shelly and the Chairman. This was understood and fine when AT was created I don't really understand the issue. Collateral is protected under the agreements not positions or people. What has changed?

Sent from my iPhone

On Jan 14, 2016, at 4:12 PM, John L. Williams <JWilliams@cwlaw.com> wrote:

Karrie,

The Operating Agreement puts all the power in the hands of the Manager. The office of President is not mentioned from what I can see. Shouldn't Brian, as President, be the Manager of that sub? If so, that's not the way the resolution is written. Let me know what you think. John.

John L. Williams
Partner
<image001.png>
CONNER & WINTERS, LLP
Attorneys & Counselors at Law
4000 One Williams Center
Tulsa, OK 74172-0148
P 918.586.8990
F 918.586.8674
jwilliams@cwlaw.com
www.cwlaw.com

This message and any attachments may contain information that is highly confidential, privileged, and exempt from disclosure.  Any recipient other than the intended recipient is advised that any dissemination, distribution, copying, or other use of this message is strictly prohibited.

If you have received this message in error, please notify the sender immediately.

**From:** Karrie Wichtman [mailto:kwichtman@rosettelaw.com]
**Sent:** Thursday, January 14, 2016 3:08 PM
**To:** Justin Martorello
**Cc:** Tanya Gibbs; John L. Williams; Matt Martorello; Brian McFadden
**Subject:** Re: AT BPL SA

I think that depends on the structure. Let's look into what the actual operating agreement says before we go changing things around now.

Sent from my iPhone

On Jan 14, 2016, at 1:33 PM, Justin Martorello <justinm@bellicosecapital.com> wrote:

> CEO is the highest ranking officer, above President.
>
> **From:** Tanya Gibbs [mailto:tgibbs@rosettelaw.com]
> **Sent:** Thursday, January 14, 2016 12:32 PM
> **To:** Justin Martorello <justinm@bellicosecapital.com>; Karrie Wichtman <kwichtman@rosettelaw.com>; John L. Williams <JWilliams@cwlaw.com>
> **Cc:** Matt Martorello <mattm@bellicosecapital.com>; Brian McFadden <BrianM@bellicosevi.com>
> **Subject:** RE: AT BPL SA
>
> I don't see a problem with that.  But what's the real difference? And to your earlier question, yes I think we are all set with the servicing agreement.
>
> **Tanya M. Gibbs, Attorney**<image001.png>
> **Rosette, LLP**
> **Attorneys at Law**
> Michigan Office
> 25344 Red Arrow Hwy.
> Mattawan, MI 49071
> 269.283.5005 – Office
> 480.204.8009 - Cell
> 517.913.6443 – Fax
> tgibbs@rosettelaw.com
> www.rosettelaw.com
>
> CONFIDENTIAL COMMUNICATION: THIS MESSAGE IS A CONFIDENTIAL
> ATTORNEY COMMUNICATION ONLY FOR USE BY THE INTENDED
> RECIPIENT.  ANY INADVERTENT RECEIPT SHALL NOT CONSTITUTE A

WAIVER OF ATTORNEY-CLIENT OR WORK PRODUCT PROTECTION.  IF
RECEIVED IN ERROR, PLEASE NOTIFY TANYA M. GIBBS IMMEDIATELY AND
DELETE THIS MESSAGE.  THANK YOU FOR YOUR COOPERATION.

---

**From:** Justin Martorello [mailto:justinm@bellicosecapital.com]
**Sent:** Thursday, January 14, 2016 1:20 PM
**To:** Tanya Gibbs <tgibbs@rosettelaw.com>; Karrie Wichtman
<kwichtman@rosettelaw.com>; John L. Williams <JWilliams@cwlaw.com>
**Cc:** Matt Martorello <mattm@bellicosecapital.com>; Brian McFadden
<BrianM@bellicosevi.com>
**Subject:** RE: AT BPL SA

This reminds me, Brian needs to be the CEO of AT.

---

**From:** Tanya Gibbs [mailto:tgibbs@rosettelaw.com]
**Sent:** Thursday, January 14, 2016 12:13 PM
**To:** Justin Martorello <justinm@bellicosecapital.com>; Karrie Wichtman
<kwichtman@rosettelaw.com>; John L. Williams <JWilliams@cwlaw.com>
**Cc:** Matt Martorello <mattm@bellicosecapital.com>; Brian McFadden
<BrianM@bellicosevi.com>
**Subject:** RE: AT BPL SA

It is.  TC gets to appoint at first and certainly has the ability to remove.
The operating agreements limit removal as follows:

The Manager may be removed as Manager by a majority vote of the
Member, by majority vote of the Tribal Council acting as sole
member of Tribal Economic Development Holdings, LLC if it is
found that the Manager has committed an act constituting willful
misconduct, fraud, or gross negligence.

But this really only applies to the Co-Managers (Jimmer and Shelly) and
arguably Brian as President because he was specifically designated as such
in the AT Creation Resolution.  But TC doesn't have any right to remove
any other employee of AT for any reason.  Brian, as President, has the
authority to hire and fire on AT's side of things.

And if TC tried to remove somebody, your still covered by the Parental
Guaranty.

**Tanya M. Gibbs, Attorney**<image001.png>
**Rosette, LLP**
**Attorneys at Law**
Michigan Office
25344 Red Arrow Hwy.
Mattawan, MI 49071

269.283.5005 – Office
480.204.8009 - Cell
517.913.6443 – Fax
tgibbs@rosettelaw.com
www.rosettelaw.com

CONFIDENTIAL COMMUNICATION: THIS MESSAGE IS A CONFIDENTIAL
ATTORNEY COMMUNICATION ONLY FOR USE BY THE INTENDED
RECIPIENT.  ANY INADVERTENT RECEIPT SHALL NOT CONSTITUTE A
WAIVER OF ATTORNEY-CLIENT OR WORK PRODUCT PROTECTION.  IF
RECEIVED IN ERROR, PLEASE NOTIFY TANYA M. GIBBS IMMEDIATELY AND
DELETE THIS MESSAGE.  THANK YOU FOR YOUR COOPERATION.

**From:** Justin Martorello [mailto:justinm@bellicosecapital.com]
**Sent:** Thursday, January 14, 2016 1:07 PM
**To:** Tanya Gibbs <tgibbs@rosettelaw.com>; Karrie Wichtman
<kwichtman@rosettelaw.com>; John L. Williams <JWilliams@cwlaw.com>
**Cc:** Matt Martorello <mattm@bellicosecapital.com>; Brian McFadden
<BrianM@bellicosevi.com>
**Subject:** RE: AT BPL SA

I thought everything was structured such that the TC was purposely
removed from the businesses.  Why not TEDs co-managers?

Do we all consider the AT BPL SA complete?

**From:** Tanya Gibbs [mailto:tgibbs@rosettelaw.com]
**Sent:** Thursday, January 14, 2016 12:05 PM
**To:** Justin Martorello <justinm@bellicosecapital.com>; Karrie Wichtman
<kwichtman@rosettelaw.com>; John L. Williams <JWilliams@cwlaw.com>
**Cc:** Matt Martorello <mattm@bellicosecapital.com>; Brian McFadden
<BrianM@bellicosevi.com>
**Subject:** RE: AT BPL SA

It is the Tribal Council acting as Member of TED (member of AT).  But
either way par. 5 of the Parental Guaranty says:

The Tribe, Borrower or any Subsidiary shall not terminate or replace any
manager, director or officer of Borrower or the respective Subsidiary or
modify delegations of authority without the prior written consent of
Lender, which shall not be unreasonably withheld, conditioned or
delayed.

**Tanya M. Gibbs, Attorney**<image001.png>
**Rosette, LLP**

CONFIDENTIAL                                    ROSETTE_REVISED_042981

JA1749

**Attorneys at Law**
Michigan Office
25344 Red Arrow Hwy.
Mattawan, MI 49071
269.283.5005 – Office
480.204.8009 - Cell
517.913.6443 – Fax
tgibbs@rosettelaw.com
www.rosettelaw.com

CONFIDENTIAL COMMUNICATION: THIS MESSAGE IS A CONFIDENTIAL
ATTORNEY COMMUNICATION ONLY FOR USE BY THE INTENDED
RECIPIENT.  ANY INADVERTENT RECEIPT SHALL NOT CONSTITUTE A
WAIVER OF ATTORNEY-CLIENT OR WORK PRODUCT PROTECTION.  IF
RECEIVED IN ERROR, PLEASE NOTIFY TANYA M. GIBBS IMMEDIATELY AND
DELETE THIS MESSAGE.  THANK YOU FOR YOUR COOPERATION.

---

**From:** Justin Martorello [mailto:justinm@bellicosecapital.com]
**Sent:** Thursday, January 14, 2016 12:58 PM
**To:** Karrie Wichtman <kwichtman@rosettelaw.com>; John L. Williams
<JWilliams@cwlaw.com>
**Cc:** Tanya Gibbs <tgibbs@rosettelaw.com>; Matt Martorello
<mattm@bellicosecapital.com>; Brian McFadden
<BrianM@bellicosevi.com>
**Subject:** RE: AT BPL SA

TC or TED's co-managers?

---

**From:** Karrie Wichtman [mailto:kwichtman@rosettelaw.com]
**Sent:** Thursday, January 14, 2016 8:42 AM
**To:** John L. Williams <JWilliams@cwlaw.com>
**Cc:** Justin Martorello <justinm@bellicosecapital.com>; Tanya Gibbs
<tgibbs@rosettelaw.com>; Matt Martorello
<mattm@bellicosecapital.com>; Brian McFadden
<BrianM@bellicosevi.com>
**Subject:** Re: AT BPL SA

Sounds good to me.

In answer to the questions directed at Tanya and I- the Capital "T"
transaction docs account for this. The TC replaces but with lender
consent. If an AT license frivolous witch hunt ensues it's a default and
opens the Tribe up to potential liability through the parental guarantee.
However, if licensed folks at AT violate tribal law or other applicable
consumer protection laws or commit a crime that disqualified them from

holding a license, insulating AT employees cannot and should not be absolute.

Karrie

Sent from my iPhone

On Jan 14, 2016, at 9:21 AM, John L. Williams <JWilliams@cwlaw.com> wrote:

> We just date it whatever date we close.  Easy on that one.  I will make the change to the last doc Karrie sent.

John L. Williams
Partner
<image002.png>
CONNER & WINTERS, LLP
Attorneys & Counselors at Law
4000 One Williams Center
Tulsa, OK 74172-0148
P 918.586.8990
F 918.586.8674
jwilliams@cwlaw.com
www.cwlaw.com

This message and any attachments may contain information that is highly confidential, privileged, and exempt from disclosure.  Any recipient other than the intended recipient is advised that any dissemination, distribution, copying, or other use of this message is strictly prohibited.

If you have received this message in error, please notify the sender immediately.

**From:** Justin Martorello [mailto:justinm@bellicosecapital.com]
**Sent:** Tuesday, January 12, 2016 4:20 PM
**To:** Karrie Wichtman; John L. Williams; Tanya Gibbs
**Cc:** Matt Martorello; Brian McFadden
**Subject:** RE: AT BPL SA

Thank you Karrie.

Karrie and Tanya:
Question about TFSRA licensing…  Let's say that there's a coop within LVD to oust AT managers, and so the TFSRA revokes licenses for Brian and/or managers.
- Who would be responsible for making replacements?
- Will AT be required to approve?
- Basically, how do we protect the "licensed" managers of AT?

John:
We wanted to remove ("M") Merger to eliminate reference to previously existing non-tribal entities.  How do we provide for an effective date here that does not come before the Merger date?

---

**From:** Karrie Wichtman [mailto:kwichtman@rosettelaw.com]
**Sent:** Tuesday, January 12, 2016 3:48 PM
**To:** Justin Martorello <justinm@bellicosecapital.com>; John L. Williams (JWilliams@cwlaw.com) <JWilliams@cwlaw.com>; Tanya Gibbs <tgibbs@rosettelaw.com>
**Cc:** Matt Martorello <mattm@bellicosecapital.com>; Brian McFadden <BrianM@bellicosevi.com>
**Subject:** RE: AT BPL SA

Responses to comments and questions.

Karrie S. Wichtman, Partner
ROSETTE, LLP
Michigan Office
Attorneys at Law
25344 Red Arrow Highway
Mattawan, Michigan 49071
269.283.5005 Office
517.913.6443 Facsimile
480.242.6959 Cell
kwichtman@rosettelaw.com
rosettelaw.com

CONFIDENTIAL COMMUNICATION: THIS MESSAGE IS A CONFIDENTIAL ATTORNEY COMMUNICATION ONLY FOR USE BY THE INTENDED RECIPIENT.  ANY INADVERTENT RECEIPT SHALL NOT CONSTITUTE A WAIVER OF ATTORNEY-CLIENT OR WORK PRODUCT PROTECTION.  IF RECEIVED IN ERROR, PLEASE NOTIFY KARRIE S. WICHTMAN IMMEDIATELY AND DELETE THIS MESSAGE.  THANK YOU FOR YOUR COOPERATION.

---

**From:** Justin Martorello [mailto:justinm@bellicosecapital.com]
**Sent:** Wednesday, January 6, 2016 10:15 PM
**To:** John L. Williams (JWilliams@cwlaw.com)

<JWilliams@cwlaw.com>; Karrie Wichtman
<kwichtman@rosettelaw.com>; Tanya Gibbs
<tgibbs@rosettelaw.com>
**Cc:** Matt Martorello <mattm@bellicosecapital.com>; Brian
McFadden <BrianM@bellicosevi.com>
**Subject:** AT BPL SA

Minimal comments and questions from MM.  See attached.


Regards,

**Justin Martorello**
Phone: 773.263.1554
Email: JustinM@BellicoseCapital.com
<image003.png>

**This email and any files transmitted with it are
confidential and may contain privileged or copyrighted
information. You must not present this message to
another party without gaining permission from the
sender. If you are not the intended recipient you must not
copy, distribute or use this email or the information
contained in it for any purpose other than to notify us. If
you have received this message in error, please notify the
sender immediately, and delete this email from your
system.**
**This email and any files transmitted with it are
confidential and may contain privileged or copyrighted
information. You must not present this message to
another party without gaining permission from the
sender. If you are not the intended recipient you must not
copy, distribute or use this email or the information
contained in it for any purpose other than to notify us. If
you have received this message in error, please notify the
sender immediately, and delete this email from your
system.**

**This email and any files transmitted with it are confidential and
may contain privileged or copyrighted information. You must not
present this message to another party without gaining permission
from the sender. If you are not the intended recipient you must not
copy, distribute or use this email or the information contained in it for
any purpose other than to notify us. If you have received this message
in error, please notify the sender immediately, and delete this email
from your system.**
**This email and any files transmitted with it are confidential and
may contain privileged or copyrighted information. You must not
present this message to another party without gaining permission
from the sender. If you are not the intended recipient you must not

copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

**This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

**This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

**This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

# Exhibit 6

| | |
|---|---|
| **From:** | Matt Martorello |
| **To:** | Karrie Wichtman |
| **Subject:** | RE: DM Recommendation |
| **Date:** | Tuesday, August 26, 2014 8:36:13 PM |
| **Attachments:** | image001.png |

Remember when we started, that all of these vendors and systems Jennifer is white boarding out were tied internally within SPVI systems behind the scenes, just like services do in the banking and credit card space. The vendor contracts and formulas used were are very closely guarded internal IP and entirely unattainable by the clients. Running clients through it all is what we built and do.  The only reason we moved elements to be direct with client was because the risk of working with tribal clients was more and more dangerous and optics became very important.  So the trust element came into play as a necessity and exposure of IP may have been the result.

If there is a fundamental disagreement on IP ownership though, I'd Imagine the elements I mentioned required in a deal are far from obtainable.  In fact, I think if that were the case, LVD would essentially make the claim that they already own us today.

Sent via the Samsung GALAXY S® 5, an AT&T 4G LTE smartphone

-------- Original message --------
From: Karrie Wichtman
Date:08/26/2014 10:35 PM (GMT-04:00)
To: Matt Martorello
Subject: RE: DM Recommendation

Matt,

I am at a total loss with regard to your response.

I wasn't recommending that SPVI disclose its secret sauce but only that SPVI be willing to explain to the Co-Managers what exactly they are approving.  For example, do Jimmer and Shelly even know what "DM" means because I don't.  Perhaps I got overzealous with the questions but I have Tribal leaders in my ear eager to learn the business and excited about the restructure.  Your statements with regard to the "should an acquisition occur" and "would be relevant questions for the eyes of Management and those in the acquiring company on a need to know basis as well" have me in a tailspin.  How confident are you that the acquisition will happen because my client is very excited about it as demonstrated by their willingness through formal Tribal Council action to move forward today?  Also, if the Tribe is buying SPVI aren't these questions relevant due diligence so that they know what they are buying and after acquisition who determines who needs to know would be the Tribe not Management.  I guess I would like to know who Management is?  Here's the other thing that I don't understand about your response.  Wasn't the DM – which I have figured out to mean Direct Mail -created for RRTL?  I can't locate any provision in the Servicing that says that IP produced for the Company is SPVI IP.  In fact, it is my opinion that RRTL owns the IP - so you can imagine why it is hard for me to understand why the Co-Managers would not be able to ask questions about

CONFIDENTIAL                                                ROSETTE_REVISED 045267

documents attached to the approval as support for the basis of the recommendation.

I am not trying to be a bull in a China shop, I am just trying to understand your response?

Sincerely,


Karrie S. Wichtman, Partner
ROSETTE, LLP
Michigan Office
Attorneys at Law
25344 Red Arrow Highway
Mattawan, Michigan 49071
269.283.5005 Office
517.913.6443 Facsimile
480.242.6959 Cell
kwichtman@rosettelaw.com
rosettelaw.com


CONFIDENTIAL COMMUNICATION: THIS MESSAGE IS A CONFIDENTIAL ATTORNEY COMMUNICATION
ONLY FOR USE BY THE INTENDED RECIPIENT.  ANY INADVERTENT RECEIPT SHALL NOT CONSTITUTE A
WAIVER OF ATTORNEY-CLIENT OR WORK PRODUCT PROTECTION.  IF RECEIVED IN ERROR, PLEASE
NOTIFY KARRIE S. WICHTMAN IMMEDIATELY AND DELETE THIS MESSAGE.  THANK YOU FOR YOUR
COOPERATION.

---

**From:** Matt Martorello [mailto:mattm@bellicosevi.com]
**Sent:** Tuesday, August 26, 2014 9:34 PM
**To:** Karrie Wichtman; 'gkway@duckcreektf.com'; Daniel Gravel; Chairman James Williams
**Cc:** jennifers@duckcreektf.com; Justin Martorello; James Dowd; Brian McFadden; Ivelisse Morales;
Tanya Gibbs; Rob Rosette
**Subject:** RE: DM Recommendation

We respectfully opt to continue to keep any details of SPVI IP (including DM) explicitly for
internal eyes only, both for the protection of our business and maintaining the integrity of an
acquisition of the SPVI business.  Should an acquisition actually transpire, obviously these
would be relevant questions for the eyes of Management and those in the acquiring company
on a need to know basis as well (I.e. Certain IP, even in small doses, should at all times be
aggressively protected when the result is such a massive competitive advantage, like the
process of even just utilizing DM itself which SPVI owns and created).


Sent via the Samsung GALAXY S® 5, an AT&T 4G LTE smartphone


-------- Original message --------

From: Karrie Wichtman
Date:08/26/2014 8:33 PM (GMT-04:00)
To: "'gkway@duckcreektf.com'" , Daniel Gravel , Chairman James Williams
Cc: jennifers@duckcreektf.com, Matt Martorello , Justin Martorello , James Dowd , Brian
McFadden , Ivelisse Morales , Tanya Gibbs
Subject: RE: DM Recommendation

Good Evening Shelly,

The campaign being recommended is largely similar to the one approved several months ago. While
the modeling and selection criteria seems to vary for this campaign, the look and feel is largely the
same.  I assume that the email from Blake Sims was included as an FYI and from a compliance
perspective is largely being disregarded because Mr. Sims pointed to CA law but nothing necessarily
in federal law that requires Red Rock to comply with CA law or register the campaign with the
Commissioner of Business Oversight.  Also, based on the MNE case and the fact that the
enforcement authority of these laws and regs by the Commissioner is non-existent when a true TLE
is concerned.  This line of reasoning would be consistent throughout the states regardless of the
regulatory laws of those states.  Are those assumptions correct, Dan?  I do wonder though as to the
purpose of calling out the exemption that can be given by the Commissioner of Business Oversight in
CA, when to the best of my knowledge no such exemption has been granted.  What am I missing?

With regard to the other documents, while not needed for approval for the campaign to move
forward, due to the desire to learn and the pending restructure it is my recommendation that you
set up a conference call with SPVI to determine for each document (as applicable):

1.  Who created the document/concept?  Vendor/Individual/Both
2.  Who created the models and the criteria for the models re: where the campaign should be
    launched? Vendor/Individual/Both
3.  How will the data be tracked and compiled to measure success?
4.  Who will track the data and compile it?
5.  How will such data be reported to the Company and by whom?

It is never too soon to learn who is doing what, where, why, how and when it will be done with
regard to every aspect of the business.

Sincerely,


Karrie S. Wichtman, Partner
ROSETTE, LLP
Michigan Office
Attorneys at Law
25344 Red Arrow Highway
Mattawan, Michigan 49071
269.283.5005 Office
517.913.6443 Facsimile
480.242.6959 Cell


CONFIDENTIAL                                                ROSETTE_REVISED 045269
                                                           JA1758

kwichtman@rosettelaw.com
rosettelaw.com

CONFIDENTIAL COMMUNICATION: THIS MESSAGE IS A CONFIDENTIAL ATTORNEY COMMUNICATION
ONLY FOR USE BY THE INTENDED RECIPIENT.  ANY INADVERTENT RECEIPT SHALL NOT CONSTITUTE A
WAIVER OF ATTORNEY-CLIENT OR WORK PRODUCT PROTECTION.  IF RECEIVED IN ERROR, PLEASE
NOTIFY KARRIE S. WICHTMAN IMMEDIATELY AND DELETE THIS MESSAGE.  THANK YOU FOR YOUR
COOPERATION.

**From:** gkway@duckcreektf.com [mailto:gkway@duckcreektf.com]
**Sent:** Tuesday, August 26, 2014 7:49 PM
**To:** Daniel Gravel; Chairman James Williams
**Cc:** Karrie Wichtman; jennifers@duckcreektf.com; Matt Martorello; Justin Martorello; James Dowd;
Brian McFadden; Ivelisse Morales
**Subject:** RE: DM Recommendation

Karrie, Jennifer and Chairman

Do you have any concerns with this campaign?  I know  SP is anxious to get this campaign
going.  Please let me know so that I can sign the approval form.

Thanks.

Shelly

| --------- Original Message ---------
| Subject: DM Recommendation
| From: "Daniel Gravel" <DanielG@bellicosevi.com>
| Date: 8/26/14 4:07 pm
| To: "Gkway - DCTF (gkway@duckcreektf.com)" <gkway@duckcreektf.com>,
| "Chairman James Williams" <jim.williams@lvdtribal.com>
| Cc: "Karrie Wichtman" <kwichtman@rosettelaw.com>, "jennifers@duckcreektf.com"
| <jennifers@duckcreektf.com>, "Matt Martorello" <mattm@bellicosevi.com>, "Justin
| Martorello" <JustinM@BellicoseVI.com>, "James Dowd"
| <jamesd@bellicosecapital.com>, "Brian McFadden" <BrianM@bellicosevi.com>,
| "Ivelisse Morales" <ivelissem@bellicosecapital.com>
|
| Shelly and Chairman Williams:
|
| Please see attached recommendation for a direct mail campaign, DM, and supporting
| documentation.
|
| Let us know if you want to discuss.
|
| Thanks,
|
| **Dan Gravel**
| **General Counsel**

# Exhibit 7

| | |
|---|---|
| **From:** | mattm@bellicosevi.com |
| **To:** | Karrie Wichtman |
| **Subject:** | RE: CFPB and Tribes |
| **Date:** | Tuesday, June 19, 2012 9:11:50 AM |
| **Attachments:** | image001.jpg |
| | image002.png |

That's really great news. I'd love to switch the portfolios over to self-financed entities when they are ready! Right around the end of the Alpha line of credit in 36 months should be perfect timing.

I wish I could come up with an answer quickly on the NAFCC/NALA stuff, but I have to think about it. I'm not that familiar with it and its goals vs. OLA or the costs. I think the costs were extremely high vs. OLA for NALA. I have to review their website at some point here and see what they are about.

The one thing I don't want is the TLM relationship to be a sour point for the Tribe's attitude about the SPVI relationship ("if it were a different Servicer, we wouldn't have to pay TLM any more"). Just let me know how I can help!


**Regards,**

**Matt Martorello**
Mobile: 773-209-7720
Email: MattM@BellicoseVI.com



**This email and any files transmitted with it are confidential and contain privileged or copyright information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

---

**From:** Karrie Wichtman [mailto:kwichtman@rosettelaw.com]
**Sent:** Monday, June 18, 2012 2:14 PM
**To:** mattm@bellicosevi.com
**Subject:** RE: CFPB and Tribes

Matt,

No apologies necessary. I appreciate your comprehensive responses and the fact that you took the time to do so. I will discuss your concerns re: anonymity and the NAFCC/NALA involvement with Shelly and Craig. We do plan to attend the Denver event of the two organizations this week, however, rest assured that proprietary information will not be shared regarding the LVD tribal entities or SPVI. I also cannot see any competitor weakening the SPVI and LVD relationship, they are quite happy with the services provided by SPVI and are looking forward to a long business relationship. I am not sure that the Tribe, itself, has the means to support the involvement with NAFCC/NALA, thus the request to access lobby/litigation reserve funds to allow for their continued involvement. Given, SPVI's stance on participation, is this even an option?

Overall, sounds like our weaknesses are covered or at least being addressed. I did not mean to convey that the Tribe was not happy with the current percentage received and I am glad that the current pay structure has been found legally sound, at least in one circuit. I hope you did not take it that way – it was just an area, if I were a regulator, I would attack. Your explanation regarding the risk associated with your investment paints a clearer picture as to the defensibility of the model. That is what I was hoping for. With regard to LVD receiving more profits, I believe that they will be in a position to make such an investment, if they so desire in the near future (18-24 months), given the return on investments that have closed this year and the capital gains that they will likely see from those as well as the re-investment in their own facility which will change almost the entire face of the gaming floor this summer. It would be great to see them graduate to the lender level. As far as TLM, the agreements had no termination date and ceased only when the relationship ceased between the vendors, investors and the Tribe. Furthermore, the "consulting fee" was to be received for any investment, indirect or indirect, of "Bona Fide Investors" to the Tribe's Lending business for which TLM made some sort of introduction between the vendor/investor and the Tribe. This includes "any and all assignees, associates, affiliates, partners, agents, employees or any other entity or person that benefits through its contact or communication." I am a little unclear about how far this reaches – I know the intent is as far as any investor making any investment in the Tribe's lending businesses, however, in the case where we find ourselves with RRTL and Alpha, TLM has had no involvement with the due diligence or anything else associated with this potential additional funding source – but because of the SPVI introduction and the potential argument that Alpha has an "associate" relationship with SPVI – the consulting fee will be expected by TLM when that funding falls into place. I also think the agreement was to include any servicer regardless of introduction through its non-circumvent clause. And no, the consulting agreement does not have a cap regarding the amount of Tribal Net Profits it may receive. I fear that even in the scenario of opening a new portfolio, because of the TLM introduction of SPVI to the Tribe, they would argue that they get the fee from that too. I, however, believe that the Tribe making its own investment is entirely different, regardless of the use of the same Servicer, and will be arguing that TLM is entitled to no such fee if that were to come to fruition. I am aware that TLM has approached some of its clients with a buy-out opportunity, I am certain it will be offered to LVD as well, I just hope that it is a fair proposal, that the Tribe sees the advantages of doing such, and that they have the means to make it happen.

Thank you for the opportunity to speak candidly and for the honesty in your responses. Personally, I think it is your willingness to have discussions like these that set you apart from other Servicers and greatly contributes to your success!

Sincerely,

**Karrie S. Wichtman, Attorney**
**Rosette, LLP**
**Attorneys at Law**
Michigan Office
25344 Red Arrow Hwy, Suite B
Mattawan, MI 49071
269.283.5005 – Office

480.242.6959 - Cell

517.913.6443 – Fax

kwichtman@rosettelaw.com

www.rosettelaw.com

CONFIDENTIAL COMMUNICATION: THIS MESSAGE IS A CONFIDENTIAL ATTORNEY COMMUNICATION ONLY FOR USE BY THE INTENDED RECIPIENT.  ANY INADVERTENT RECEIPT SHALL NOT CONSTITUTE A WAIVER OF ATTORNEY-CLIENT OR WORK PRODUCT PROTECTION.  IF RECEIVED IN ERROR, PLEASE NOTIFY KARRIE S. WICHTMAN IMMEDIATELY AND DELETE THIS MESSAGE.  THANK YOU FOR YOUR COOPERATION.

---

**From:** mattm@bellicosevi.com [mailto:mattm@bellicosevi.com]
**Sent:** Monday, June 18, 2012 10:53 AM
**To:** Karrie Wichtman
**Subject:** RE: CFPB and Tribes

Thanks Karrie, sorry for the delay… my thoughts are below (sorry so lengthy)

**Regards,**

**Matt Martorello**
Mobile: 773-209-7720
Email: MattM@BellicoseVI.com



**This email and any files transmitted with it are confidential and contain privileged or copyright information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

---

**From:** Karrie Wichtman [mailto:kwichtman@rosettelaw.com]
**Sent:** Friday, June 15, 2012 5:54 PM
**To:** mattm@bellicosevi.com
**Subject:** RE: CFPB and Tribes

Matt,

As far as I know we have not received anything.  I will inquire with the Chairman, his Executive Secretary, Shelly and Craig to see if something was received.  Jennifer gave me the heads up about these letters about a month ago and I did inform the Tribe that we might be getting one.  As far as the NAFCC/NALA, I understand your concern about calling unnecessary attention to ourselves, however, the advocacy work that is being done by the NAFCC and being in the know through our participation gives us an advantage of not being surprised when issues arise such as the recent legislation proposed by Senator Merkley.  Are you saying that you would rather Shelly and I not go out to Denver next week to attend the merger meeting scheduled between the NAFCC/NALA?  I guess I am more afraid about not being involved and allowing someone else to dictate to us what

best practices are or will be, as well as ensure that the folks making the decisions are the Tribal entities and not someone else.*[Matt Martorello]* This sounds like a deeper more fundamental interest for tribes to ensure the right groundwork is being laid for a budding new industry. We at SPVI seem to favor letting the other players bear the brunt and defend aggressively (which thankfully guys like Tucker have done a great job at standing strong) giving us the free look at how to avoid expensive legal trouble. We have the same perspective for our offshore lenders and even our state licensed lender. In fact, at OLA we very rarely go and have found reporters crashing events there to try to get intel. We much prefer to operate through trusted 3rd parties for these events and stay off the radar. We are also concerned that the Tribe will be working closely with other large competing Servicer's to SPVI now, which could lead to a competitive disadvantage for SPVI if the Tribe decides that it does not want the exclusive anymore, or if a competitor to SPVI weakens the enthusiasm of LVD having the relationship with SPVI as it is. So as we finance the build of a stronger tribal lending business and we are betting on the long-term year 3 profitability, we don't want to lose out on the returns associated with such intellectual and financial investment.

As far as the ability of the CFPB being able to investigate Tribes, it is my understanding that the CFPB's authority is regulatory in nature and derived from the Dodd-Frank bill in which Tribes are treated as States over which the CFPB has no regulatory control. I am not certain, however, about the FTC's reach. *[Matt Martorello]* This is wonderful, sounds like the FTC is the only potential issue here. I know Tucker is challenging the authority of the FTC right now for the first time ever by a Tribe. So we'll learn soon on how that pans out. SPVI is working on a new loan product/consumer loan agreement and working with the software system to make it work. This will address each concern the FTC had with Tucker so that they can never have such concerns with SPVI clients. We are planning to have that wrapped up in the next 3 or 4 weeks.

We have a fight coming and I understand you wanting to lay low, but we can't escape it forever. I am not saying I want to waive a banner and say "look at us" but our model is one of the best there is, we have made every effort to ensure tribal control, and are tweaking things almost constantly, it seems, to allow for more tribal control. While some may attack the role of the Servicer, your role is integral to our success – you have the know-how and the funding sources to ensure that the business is fruitful for the Tribe. You asked me a little while ago, if there is anything that I would change about our current model or if I were a regulator how I would attack it. Personally, I see only a few issues – on the regulatory side, the Tribal Regulatory Authority that is, it needs to have a designated employee, even if only part time, to ensure that licensing is done correctly and tracked and that audits of lending practices are performed. We are certainly in compliance with the law at present, but internally the Tribe's need to embrace this as a new position intended to strengthen the model and protect the Tribe and consumers.*[Matt Martorello]* I don't foresee any more licenses being required in the near term. I guess it depends on what the TRA decides it wants to do on this compliance stuff. Annual review? If so, I'd imagine just requiring somebody's attention for 2 - 3 weeks a year to get through that process. The second piece is the profit to the Servicer, we have to be prepared to show that the percentage of net profit that the Servicer is receiving is defensible compared to what the Tribe is receiving. In the casino management context there is a certain percentage cap per regulations at 30%, or maybe 40% I believe, that a manager is legally allowed to receive in order to ensure that the benefit of the business is to the Tribe and not the Manager. That being said, the fact that in our current arrangement the Servicer pays all operating expenses and

then throwing in the Lobby/Litigation account and potential expenses there, and the minimum guaranteed payment to the Tribe, certainly takes a bite out of any net profit realized by the Servicer, but what does that calculation truly look like in our situation?  I think that is where we will  be attacked and it is the weakest link in the model.  *[Matt Martorello]*  This was tested in Colorado with Tucker at 1% and the Supreme Court of Colorado upheld it with flying colors, and no justification was even necessary for them to do so.  There was a specific comment you see in the decision about it that was very supportive.  I'd imagine that casino fee discussion might come up in a lot of circles over the next year or so.  The thing is, this industry is nothing like the casino industry.  The casino industry has a calculated definable "edge" in which you make money and it's a cash business vs. having everything out on the street in loans that you may never get back (operational risk of massive losses which is common, ACH/Bank risk of closure, regulator risk of lawsuit and ending industry before you reach your period of profitability, etc.).  In payday lending, more lenders fail and LOSE their entire investment than there are lenders that succeed.  Even despite the bank/ach/regulatory risk!  Folks jump into this business thinking the profits are so large, but they don't know what they are doing.  It is so very sensitive to underwriting and marketing and operations, that one little tweak the wrong way and you are losing massive dollars before you even know you have a problem on your hands (this is because you lend money today, and you don't know how it did for another month or two… meanwhile, you've been putting out all of your funds under a model before you've realized the model is flawed and losing 50% of cash put in each month).  Majority of lenders fail.  Those that don't fail are facing diminishing profits, increased competition, restrictions in marketing efforts from Google, and now the legal bills are several times as costly as they used to be thanks to increased regulation.  All the while, the "end" is always around each corner with the FTC and CFPB and the banks/ACH providers getting heavily influenced to stop serving lenders.  In fact, if we don't have a Wells Fargo replacement done, Iron Fence would likely lose $4,000,000 come July 1.  If we lost our ACH provider and had no replacement, Iron Fence would lose even more than that.  The risk in this industry is massive and takes many forms.  In a casino in know I'm only giving back 97% of every dollar played in Blackjack and I know I can't have all of my money frozen (like losing my bank/ACH), I can't have the FTC come in and file suit for likely more assets than I have, etc. etc.  Also, I don't have options in the casino model where in Lending I can operate via offshore, state COL, state-by-state, etc.

RRTL for example has paid TNP of about $80k I think, maybe $100k…  Iron Fence has loaned RRTL over $5,000,000 and SPVI has lost over $2,000,000 to date on servicing RRTL by eating the expenses with no revenue.  If the FTC shut RRTL down today, we would be in trouble.  This will continue this way for about 18 months where RRTL will have SPVI on the losing end and TNP will have been over $400k.  This is why SPVI gets compensated on the back-end (which unlike the casino business there may never be a back end) in years 3 and 4 when it will break-even.  SPVI is guaranteeing TNP in an industry where majority of entrants fail and hoping to get to profitability in year 4.

Another consideration is that unlike the Casino model, there are alternatives.  Offshore lending means no FTC involvement and legal costs associated with that fight, no CFPB issues, and no recurring legal expenses with dealing with BBB inquiries and AG letters (today is arguably the best model to raise capital for).  Choice of law state licensed lending is also still a viable alternative, as is state-by-state licensed lenders like the $1bn company cashnetusa.com does very well, and is a public company.  But so long as these other options are out there the Servicing Fees will won't ever reach

anything close to the casino model.

The biggest proponent I know of, but is a very private study, was done by a Servicer that I am close friends with. Their entity had Ernst & Young come in and do an economic study on what the right fee relative to industry risk was, and this was done 3 years ago. Today the cost of leads have increased about 70%, and the regulatory/legal risk has reached all new levels. E&Y came out deciding that the lender was entitled to a bond yield of equivalent risk, and the result was converted into a low single digits % of revenue. So this is how the Servicer built their contract and bills the Lending entity, and this study is required to provide to the IRS (the most diligent of all in terms of fair pricing) with confidence that the model in which the Servicer charges the lender is fair.

Now all of that said, I get the feeling the Tribes may want more money. They may feel it's not that hard, that they could do it on their own, etc. That they are getting more involved now with CFPB/FTC attacks. However, the level of sophistication behind the scenes built into the IP that SPVI uses, which makes SPVI clients succeed while majority of lenders fail, is massive. Going at it alone is an exercise in how much money do you want to lose before you make it up the learning curve high enough to know how to do it right. That takes a lot of analytics to get there and the faster the better.

Today, I am VERY interested in going to Tribes that can self-finance, and I would offer something equating to about 25% of the Net Profit in such a deal. I would do this with every Tribe I could get. The reason that number is not 51% is because I'm better off operating with other models/lenders, or lending myself as a choice of law or state licensed lender even if it is the Tribe's money, the time and effort it takes to manage portfolios is a limited skill set. I would say the minimum investment would be $3,000,000. I would love to do something like this with LVD on a 3rd portfolio that is capitalized by the Tribe itself. Obviously with RRTL/DCTF the risk is all Iron Fence, but this model allows the Tribe to fund it, the Tribe to take the financial risk, and the Tribe to enjoy higher benefits. They would earn more than any tribe out there, but they would be responsible for to fund their own venture. Maybe we should do a 3rd portfolio in something similar to this model if LVD has the funds.

One comment pertaining to the interest of assessing market value… Servicers are not all apples to apples. You might think one Servicer's model is cheaper than another, but their practices will yield 1/2 the revenue as ours, per dollar invested (Think Finance for example). Or they charge a flat $100 fee per originated loan and they mark up their leads by 50% to minimize the profitability of the lender BEFORE they do a split that looks larger on the surface (also like Think Finance).

Lastly, the TLM piece is problematic for a whole host of reasons, and while I do not have any doubt that for bringing the regulatory structure and the Servicers to the table there should be a  fee paid to TLM and notwithstanding their recent timely and effective resolution to the Wells Fargo issue and leading us to USB, 50% of the Tribe's profits has always been a bit excessive in my opinion. However, that is the agreement entered into by the Tribe, and incorporated into our agreement, and ultimately the Tribe has benefitted greatly from the introduction and the entry into the on-line lending industry. However, if there was a way to pay for the value received by TLM as a result of the introduction and structural documents provided and part amicably with TLM, I would hope that the Tribe would pursue it.*[Matt Martorello]* I understand this completely. Is there a duration to the

TLM relationship?  Or is there a cap on the maximum amount they get from TNP?  Most importantly, does LVD have to pay them on EVERY relationship they get into, even if TLM doesn't make the intro to the Servicer?

Those are my thoughts...☺

Sincerely,

**Karrie S. Wichtman, Attorney**
**Rosette, LLP**
**Attorneys at Law**
Michigan Office
25344 Red Arrow Hwy, Suite B
Mattawan, MI 49071
269.283.5005 – Office
480.242.6959 - Cell
517.913.6443 – Fax
kwichtman@rosettelaw.com
www.rosettelaw.com

CONFIDENTIAL COMMUNICATION: THIS MESSAGE IS A CONFIDENTIAL ATTORNEY COMMUNICATION ONLY FOR USE BY THE INTENDED RECIPIENT.  ANY INADVERTENT RECEIPT SHALL NOT CONSTITUTE A WAIVER OF ATTORNEY-CLIENT OR WORK PRODUCT PROTECTION.  IF RECEIVED IN ERROR, PLEASE NOTIFY KARRIE S. WICHTMAN IMMEDIATELY AND DELETE THIS MESSAGE.  THANK YOU FOR YOUR COOPERATION.

---

**From:** mattm@bellicosevi.com [mailto:mattm@bellicosevi.com]
**Sent:** Friday, June 15, 2012 3:48 PM
**To:** Karrie Wichtman
**Subject:** CFPB and Tribes

I heard many tribes received investigation letters from the CFPB on Wednesday, did you hear anything about this?  I'm kind of an advocate right now for LVD to be laying low and under the radar while we let everyone else sort things out over the very rocky next 6 months.  I think the NALA/NAFCC stuff has a great purpose for a voice, but I think it's best done at an anonymous level via 3rd parties like yourself who have client-attorney privilege.  Being super active, I think makes it easier to put up a target for FTC/CFPB to figure out who to send investigations to.  Just wondering what your thoughts are on this, because admittedly I know little to nothing about the organizations or the ability for the CFPB to investigate at all (or the FTC for that matter).

**Regards,**

**Matt Martorello**
Mobile: 773-209-7720
Email: MattM@BellicoseVI.com



**This email and any files transmitted with it are confidential and contain privileged or copyright information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

Exhibit 8

| From: | Brian McFadden [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=9BDAFD8AA3054771A267C9EC0ADB1023-BRIANM] |
|---|---|
| Sent: | 6/9/2015 2:05:37 PM |
| To: | Justin Martorello [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=ca22bd144e3249baa961c7bae16f1d00-justinm_8b6]; Matt Martorello [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=647b6452bfea4194b876f4fb8942ee4c-mattm_7b31d] |
| Subject: | RE: Standing Bi-Monthly Meeting |

I agree. I can bring it up in the compliance meeting, have Jenn fill me in after the meeting and then I'll make recommendations.

---

**From:** Justin Martorello
**Sent:** Tuesday, June 09, 2015 2:01 PM
**To:** Brian McFadden; Matt Martorello
**Subject:** RE: Standing Bi-Monthly Meeting

Good point.  I Agree that the TFSRA should be knowledgeable about the product and applicable federal and tribal laws.  But, they're treating the meetings as-if they were going to visit with their next door neighbor.  This can't be a handshake deal.  There should be a MOU with NDA and a defined scope of meeting that limits the discussion specifically to the CMS Training.   Anything outside #2 is not relevant, should not be permitted during training sessions, and should be communicated through proper legal channels.


## PROPOSED BI-MONTHLY MEETINGS W/ BUSINESS AND TFSRA

1. Begin additional diligence on vendors who have been licensed to determine product and service offerings.  These are not necessarily business items.
2. Training (to occur when during bi-monthly meetings) CMS
   a. Consumer Protection Laws
   b. Banking laws
   c. Consumer Financial Protection Policies General business information – not specifics – from start to finish
   d. DCTF overview of functions – in example form not specifics
   e. Other CMS training appropriate to share

3. AG Letter discussion – discuss contents of letters, business response, and follow up
4. Bi-monthly meeting to have business/regulator discussion regarding any issues

**Standing Agenda Items**
   1. State Regulatory Response review
   2. Training:_____
   3. Industry Hot Topics


**Proposed Calendar and Meeting Times for 2015**
July 8th 8:00 CST
August 12th 8:00 CST
October 14th 8:00 CST
December 30th 8:00 CST


**Proposed Invitees**
Shelly
Karrie or Tanya G.

JA1770

CONFIDENTIAL
LVD-DEF00023203

Brittany
DCTF staff as appropriate (to describe the roles and responsibilities)
TFRSA Agents

---

**From:** Brian McFadden
**Sent:** Tuesday, June 9, 2015 12:20 PM
**To:** Justin Martorello; Matt Martorello
**Subject:** RE: Standing Bi-Monthly Meeting

I see the value in the meetings as long as they are "training" meetings. Going over the CMS and policies. I don't see the value in some of the other aspects. It's important the TFSRA staff is knowledgeable about this stuff or they serve no purpose. It would not be good for a regulator to come in and talk to them if they don't understand the policies.

---

**From:** Brian McFadden
**Sent:** Tuesday, June 09, 2015 11:19 AM
**To:** Justin Martorello; Matt Martorello
**Subject:** RE: Standing Bi-Monthly Meeting

I'm on a call now, but will review the doc Karrie sent when I'm done. Then I'll get back to you.

---

**From:** Justin Martorello
**Sent:** Tuesday, June 09, 2015 11:15 AM
**To:** Brian McFadden; Matt Martorello
**Subject:** RE: Standing Bi-Monthly Meeting

What's the best way to interject here?

---

**From:** Brian McFadden
**Sent:** Tuesday, June 9, 2015 11:11 AM
**To:** Justin Martorello; Matt Martorello
**Subject:** RE: Standing Bi-Monthly Meeting

Chairman wanted some meeting/training with the TFSRA. He wanted them to be more knowledgeable about the product. However, I didn't know they were setting up regular meetings.

---

**From:** Justin Martorello
**Sent:** Tuesday, June 09, 2015 10:53 AM
**To:** Matt Martorello
**Cc:** Brian McFadden
**Subject:** FW: Standing Bi-Monthly Meeting

---

**From:** Karrie Wichtman [mailto:kwichtman@rosettelaw.com]
**Sent:** Tuesday, June 9, 2015 10:25 AM
**To:** 'shellyh@duckcreektf.com'; jennifers@duckcreektf.com
**Cc:** Tanya Gibbs
**Subject:** RE: Standing Bi-Monthly Meeting

JA1771

CONFIDENTIAL

LVD-DEF00023204

I think you are correct about the August timeline. Jen put a June date down and I pushed it to July. I think we should start sooner rather than later. July 7th it is. And yes – the Chairman should attend. I think our first training session should be "The Loan Process".

Sincerely,


Karrie S. Wichtman, Partner
ROSETTE, LLP
Michigan Office
Attorneys at Law
25344 Red Arrow Highway
Mattawan, Michigan 49071
269.283.5005 Office
517.913.6443 Facsimile
480.242.6959 Cell
kwichtman@rosettelaw.com
rosettelaw.com


CONFIDENTIAL COMMUNICATION: THIS MESSAGE IS A CONFIDENTIAL ATTORNEY COMMUNICATION ONLY FOR USE BY THE INTENDED RECIPIENT. ANY INADVERTENT RECEIPT SHALL NOT CONSTITUTE A WAIVER OF ATTORNEY-CLIENT OR WORK PRODUCT PROTECTION. IF RECEIVED IN ERROR, PLEASE NOTIFY KARRIE S. WICHTMAN IMMEDIATELY AND DELETE THIS MESSAGE. THANK YOU FOR YOUR COOPERATION.


**From:** shellyh@duckcreektf.com [mailto:shellyh@duckcreektf.com]
**Sent:** Tuesday, June 9, 2015 9:42 AM
**To:** jennifers@duckcreektf.com; Karrie Wichtman
**Cc:** Tanya Gibbs
**Subject:** RE: Standing Bi-Monthly Meeting

The Chairman should also be an invitee. And I thought we weren't going to meet until August. If we are going to meet in July that is fine but I am on vacation beginning July 8th so as long as we get it done before then I am fine with meeting in July.


--------- Original Message ---------
Subject: RE: Standing Bi-Monthly Meeting
From: jennifers@duckcreektf.com
Date: 6/8/15 7:12 am
To: "Karrie Wichtman" <kwichtman@rosettelaw.com>, "'shellyh@duckcreektf.com'" <shellyh@duckcreektf.com>
Cc: "Tanya Gibbs" <tgibbs@rosettelaw.com>

Karrie - I couldn't remember what dates we talked about - just that we discussed Tuesdays or Thursdays. So I threw some dates and times out there - hopefully those are okay. Also invitee list. So I just added on to your proposal. Happy Monday!

jennifer steiner, Chief Operating Officer
jennifers@duckcreektf.com
612-237-5074

JA1772

LVD-DEF00023205

-------- Original Message --------
Subject: Standing Bi-Monthly Meeting
From: Karrie Wichtman <kwichtman@rosettelaw.com>
Date: Mon, June 08, 2015 6:55 am
To: "'shellyh@duckcreektf.com'" <shellyh@duckcreektf.com>,
"'jennifers@duckcreektf.com'" <jennifers@duckcreektf.com>
Cc: Tanya Gibbs <tgibbs@rosettelaw.com>

All,

Attached are my notes from our discussion about the proposed bi-monthly
meeting between the business and the TFSRA from last week.  Please let
me know if you have any questions.

Sincerely,


Karrie S. Wichtman, Partner
ROSETTE, LLP
Michigan Office
Attorneys at Law
25344 Red Arrow Highway
Mattawan, Michigan 49071
269.283.5005 Office
517.913.6443 Facsimile
480.242.6959 Cell
kwichtman@rosettelaw.com
rosettelaw.com

CONFIDENTIAL COMMUNICATION: THIS MESSAGE IS A CONFIDENTIAL
ATTORNEY COMMUNICATION ONLY FOR USE BY THE INTENDED
RECIPIENT.  ANY INADVERTENT RECEIPT SHALL NOT CONSTITUTE A
WAIVER OF ATTORNEY-CLIENT OR WORK PRODUCT PROTECTION.  IF
RECEIVED IN ERROR, PLEASE NOTIFY KARRIE S. WICHTMAN IMMEDIATELY
AND DELETE THIS MESSAGE.  THANK YOU FOR YOUR COOPERATION.

JA1773

CONFIDENTIAL                                                LVD-DEF00023206

Exhibit 9

# RE: Re: LVD Regulartory Office

Justin Martorello [justinm@bellicosecapital.com]

**Sent:** 6/10/2015 7:25 AM

**To:** "Brian McFadden" <BrianM@bellicosevi.com>, shellyh@duckcreektf.com, "Karrie Wichtman" <kwichtman@rosettelaw.com>, "Matt Martorello" <mattm@bellicosevi.com>

**Cc:** "Tanya Gibbs" <tgibbs@rosettelaw.com>, "Justin Martorello" <JustinM@BellicoseVI.com>, "Jim Williams" <jim.williams@lvdtribal.com>

---

Karrie just called and I'm happy to say that we are on the same page.

We agree that:
1. there must be MOA between the lender and the authority (to protect the lenders interests);
2. the objective of the MOA should be defined in order to provide them with the most effective educational and training material;
3. the scope of all meetings must be clearly defined and adhered to; and
4. any topics or examples outside the defined scope is inappropriate for this venue and should be redressed through appropriate channels.

We also touched on the TFSRA request letter.

Karrie is calling me tomorrow to continue the discussion of both the MOA and the TFSRA request.

Thanks,
Justin

---

**From:** Brian McFadden
**Sent:** Wednesday, June 10, 2015 10:06 AM
**To:** shellyh@duckcreektf.com; Karrie Wichtman; Matt Martorello
**Cc:** Tanya Gibbs; Justin Martorello; Jim Williams
**Subject:** RE: Re: LVD Regulartory Office

I can move things around and make anytime work on Monday.

**From:** shellyh@duckcreektf.com [mailto:shellyh@duckcreektf.com]
**Sent:** Wednesday, June 10, 2015 9:52 AM
**To:** Karrie Wichtman; Matt Martorello
**Cc:** Tanya Gibbs; Justin Martorello; Jim Williams; Brian McFadden
**Subject:** RE: Re: LVD Regulartory Office

Monday is fine and sorry didn't mean to alarm anyone!!!

--------- Original Message ---------
Subject: Re: LVD Regulartory Office
From: "Karrie Wichtman" <kwichtman@rosettelaw.com>
Date: 6/9/15 3:08 pm

JA1775

CONFIDENTIAL                                                                    LVD-DEF00018733

To: "Matt Martorello" <mattm@bellicosevi.com>
Cc: "Tanya Gibbs" <tgibbs@rosettelaw.com>, "Justin Martorello"
<JustinM@BellicoseVI.com>, "shellyh@duckcreektf.com" <shellyh@duckcreektf.com>,
"Jim Williams" <jim.williams@lvdtribal.com>, "Brian McFadden"
<BrianM@bellicosevi.com>

No, Monday is not too late. However, next week is even crazier as the Chairman, Tanya
and I will be in DC.

Really there is no cause for alarm. There is a general discontent that exist Los with the
TFSRA and them understanding their function within the regulatory construct. The
Chairman asked a few weeks ago that the business make an effort to provide the TFSRA
with information related GENERALLY to the industry and the operation of the business. I
met with Shelly and Jennifer last week and we came up with a standing agenda in which
we (TLEs and TFSRA) would have bi-MONTHLY meetings to (1) provide and receive
training on the gamut of consumer protection laws and how they relate to the business, (2)
discussion regarding state regulatory inquiries and the business response so that trends can
be identified as well as allow the TFSRA to be informed when they approach or are
approached by states to engage in cooperative relationships for consumer protection, and
industry hot topics, i.e CFPB rule making etc. Both myself and the TFSRAs attorney have
been careful to explain that differences in roles between business and regulators and the
bright line that exists between the two that must remain. Business and regulators meet and
discuss all of the time, I don't see this as any different. In the end, I believe it will serve to
strengthen the model and give the regulators the confidence needed to engage with any
state or federal counterpart. So long as the lines are not blurred, I see no harm done.

Karrie

Sent from my iPhone

On Jun 9, 2015, at 4:37 PM, Matt Martorello <mattm@bellicosevi.com> wrote:

> I'm all for that! Ok, I know this week is crazy for people so is Monday too late?
>
> From: Tanya Gibbs [mailto:tgibbs@rosettelaw.com]
> Sent: Tuesday, June 9, 2015 5:36 PM
> To: Matt Martorello; Justin Martorello; shellyh@duckcreektf.com
> Cc: Karrie Wichtman; Jim Williams; Brian McFadden
> Subject: RE: LVD Regulartory Office
>
> There's no trouble. The TFSRA is trying to better understand the business and
> the regular reports provided to it by the TLEs. The request for information is
> similar in that they want to be aware of the current state regulatory requests so
> they can work towards building working relationships with state regulatory
> bodies to handle any consumer protection issues that may arise and foster
> some trust between the state, the Tribe, and the TLEs.

CONFIDENTIAL ... LVD-DEF00018734

Nothing to be concerned about. But we can have a group chat to discuss further.

Tanya M. Gibbs, Attorney
Rosette, LLP
Attorneys at Law
Michigan Office
25344 Red Arrow Hwy.
Mattawan, MI 49071
269.283.2005 - Office
480.204.8009 - Cell
517.913.6443 - Fax
tgibbs@rosettelaw.com
www.rosettelaw.com

CONFIDENTIAL COMMUNICATION: THIS MESSAGE IS A CONFIDENTIAL ATTORNEY COMMUNICATION ONLY FOR USE BY THE INTENDED RECIPIENT. ANY INADVERTENT RECEIPT SHALL NOT CONSTITUTE A WAIVER OF ATTORNEY-CLIENT OR WORK-PRODUCT PROTECTION. IF RECEIVED IN ERROR, PLEASE NOTIFY TANYA M. GIBBS IMMEDIATELY AND DELETE THIS MESSAGE. THANK YOU FOR YOUR COOPERATION.

On Tue, Jun 9, 2015 at 2:31 PM -0700, "Matt Martorello" <mattm@bellicosevi.com> wrote:

Whoa... is there a MOU drafted between TLE and TFSRA?

Why would the TLE expose itself to liability via biweekly meetings, about what subjects? I don't know of any other regulator and regulated entity under that sort of arrangement, something wrong we should be aware of?

Is there any kind of trouble that the TLE is in or about to be in that we should be aware of in context of the pending sale? Let's get everyone on a call and discuss whenever is convenient.

From: shellyh@duckcreekfl.com [mailto:shellyh@duckcreekfl.com]
Sent: Tuesday, June 9, 2015 4:54 PM
To: Justin Martorello
Cc: Matt Martorello; Brian McFadden; Karrie Wichtman; Tanya Gibbs; Jim Williams
Subject: FWD: LVD Regulartory Office

Hi guys,

I received this email today and I do believe that we will be sharing the requested information at our bi-monthly meeting with the TFSRA that will begin on july 6th.

Thanks.

Shelly

--------- Original Message ---------
Subject: LVD Regulartory Office
From: tfsra@lvdtribal.com
Date: 6/9/15 11:37 am
To: shellyh@duckcreektf.com, jennifers@duckcreektf.com
Cc: tfsra@lvdtribal.com

See attachment for PDF scan!

**This email and any files transmitted with it are confidential and may contain
privileged or copyrighted information. You must not present this message to
another party without gaining permission from the sender. If you are not the
intended recipient you must not copy, distribute or use this email or the
information contained in it for any purpose other than to notify us. If you have
received this message in error, please notify the sender immediately, and
delete this email from your system.**
**This email and any files transmitted with it are confidential and may contain
privileged or copyrighted information. You must not present this message to
another party without gaining permission from the sender. If you are not the
intended recipient you must not copy, distribute or use this email or the
information contained in it for any purpose other than to notify us. If you have
received this message in error, please notify the sender immediately, and
delete this email from your system.**

**This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You
must not present this message to another party without gaining permission from the sender. If you are not the intended
recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to
notify us. If you have received this message in error, please notify the sender immediately, and delete this email from
your system.**

Copyright © 2003-2015. All rights reserved.

JA1778

CONFIDENTIAL    LVD-DEF00018736

Exhibit 10

**JAMES WILLIAMS, JR. on 11/13/2017**

```
 1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE EASTERN DISTRICT OF VIRGINIA
 2                            RICHMOND DIVISION

 3   LULA WILLIAMS, et al. on behalf of
     themselves and all other similarly
 4   situated individuals,

 5                    Plaintiffs,

 6                            Civil Action No. 3:17-cv-461 (REP)
     v
 7
     BIG PICTURE LOANS, LLC, et al.,
 8
              Defendants.
 9   _____

10   VIDEOTAPED DEPOSITION OF:
     JAMES WILLIAMS, JR.
11   Monday, November 13, 2017
     Comfort Suites
12   2463 US 41 W
     Marquette, Michigan 49855
13
     APPEARANCES:      MR. ANDREW J. GUZZO
14                     KELLY & CRANDALL, PLC
                       Attorney for Plaintiffs
15                     3925 Chain Bridge Road, Suite 202
                       Fairfax, Virginia 22030
16
                       MR. JUSTIN GRAY
17                     ROSETTE, LLP
                       Attorney for Defendant Big Picture Loans, LLC,
18                     Ascension Technologies, LLC, James Williams,
                       Jr., Gertrude McGeshick, Susan McGeshick,
19                     Giiwegiizhigookway Martin
                       25344 Red Arrow Highway
20                     Mattawan, Michigan 49071

21                     MS. KARRIE S. WICHTMAN
                       ROSETTE, LLP
22                     Attorney for Big Picture Loans, LLC,
                       Ascension Technologies, LLC, James Williams,
23                     Jr., Gertrude McGeshick, Susan McGeshick,
                       Giiwegiizhigookway Martin
24                     25344 Red Arrow Highway, Suite B
                       Mattawan, Michigan 49071

25
```

USCA4 Appeal: 23-2097   Doc: 11-4      Filed: 12/06/2023   Pg: 400 of 503
Case 3.17-cv-00461-REP   Document 1299-10   Filed 06/07/23   Page 3 of 4 PageID# 56009

JAMES WILLIAMS, JR. on 11/13/2017

```
 1       your knowledge, has there been an amendment to

 2       Regulation 1.1 since that time?

 3   A   I -- I wouldn't think so.

 4   Q   Okay.

 5             MR. GRAY:  Asked and answered.

 6             THE WITNESS:  If -- if it was, there -- it

 7       would've been -- it would've been updated.

 8   BY MR. GUZZO:

 9   Q   Who is on the TFSRA?

10   A   Lilly Williams and Misaabe McGeshick.

11   Q   And are you related to Lilly Williams?

12   A   Yeah, she's my sister.

13   Q   And is Misaabe McGeshick an enrolled member of the LVD?

14   A   Yes.

15   Q   Is that a male or female?

16   A   Male.

17   Q   Male.  Is he related to either of the McGeshick's who

18       are on the Tribal Council?

19   A   Cousin.

20   Q   Cousin.  It's my understanding that there used to be

21       three TFSRA agents.

22   A   Mm-mm.

23   Q   Is that right?

24   A   Yes.

25   Q   What happened to the other person who prior -- who
```

JAMES WILLIAMS, JR. on 11/13/2017

```
 1   STATE OF MICHIGAN    )

 2                        )

 3   COUNTY OF DELTA      )

 4       I certify that this transcript is a complete, true and

 5   correct record of the testimony of James Williams, Jr. held

 6

 7   in this case on November 13, 2017.

 8

 9       I also certify that prior to taking this deposition

10

11   James Williams, Jr. was duly sworn to tell the truth.

12

13       I also certify that I am not related to or employed by

14

15   any party to this cause or their respective attorneys; nor am

16

17   I financially interested in the action.

18

19   November 22, 2017          _____

20   DATE                       Tammy L. Hanson, CER 7005

21                              Hanson Reporting

22                                             th

23                              1500 South 30  Street

24                              Escanaba, Michigan 49829

25                              906-786-0422
```

Exhibit 11





James H Williams Jr | Timeline | 2016 | Add Friend

James H Williams Jr

Natalie Home

Works at Lac Vieux Desert
Worked at LVD Casino
Studied at The Old School Of Hard Knocks
Went to Watersmeet High School
Lives in Watersmeet, Michigan
From Watersmeet, Michigan

touchdown!!

Like Comment Share

64

**Beth Marie** Congratulations #32 & the Lions 🙂
Like · Reply · 1 · October 22, 2016 at 5:16pm

**Delores Williams** Score?
Like · Reply · October 22, 2016 at 5:19pm

Delores Williams replied · 2 Replies

Write a comment...

Photos

Friends · 479

See what you have in common with James's friends. View

**James H Williams Jr** is with Toni Edwards-Williams.
October 20, 2016 ·

My love and I got away for the night😍 and met up with amazing friends and family!!! I'm so blessed for this life I live! Be good to each other!! Be safe!

Featured Albums

English (US) · Español · Português (Brasil) · Français (France) · Deutsch

Privacy · Terms · Advertising · Ad Choices · Cookies · More
Facebook © 2017

Chat (Off)

Works at Lac Vieux Desert
Worked at LVD Casino
Studied at The Old School Of Hard Knocks
Went to Watersmeet High School
Lives in Watersmeet, Michigan
From Watersmeet, Michigan

Photos

Friends · 479

See what you have in common with James's friends. View

Featured Albums

English (US) · Español · Português (Brasil) · Français (France) · Deutsch

Privacy · Terms · Advertising · Ad Choices · Cookies · More
Facebook © 2017

James H Williams Jr | Timeline | 2016 | Add Friend

Like Comment Share

170

**Delores Williams** Love you two!
Like · Reply · 1 · October 20, 2016 at 10:27pm

**Michelle Reed**
Like · Reply · 1 · October 20, 2016 at 10:42pm

**Lilly Williams** Love you two more then words!!
Like · Reply · 2 · October 20, 2016 at 10:42pm

**Delores Williams** Good night!
Like · Reply · 2 · October 20, 2016 at 10:43pm

**Tracy Niemi** Have a great time!
Like · Reply · 1 · October 20, 2016 at 10:44pm

**Beth Marie** Happy dance! You deserve a break!
Like · Reply · 1 · October 20, 2016 at 11:22pm

**Rosann Otradovec** U too. Nice pic u guys
Like · Reply · 1 · October 21, 2016 at 3:52am

**Beverly Pitts Graff** Pretty as ever Toni!
Like · Reply · 1 · October 21, 2016 at 5:47am

**Tom Williams Sr.** Ahow boozho you's
Like · Reply · 1 · October 21, 2016 at 8:08am

**Racquel Zortman-Bell** Yes, crazy to see so many family and friends at the game. Even though my Bears lost.. Great memories!
Like · Reply · 1 · October 21, 2016 at 8:55am

**Toni Edwards-Williams** Never saw u after the game now wanna meet for bloody Mary's?
Like · Reply · October 21, 2016 at 10:07am

Chat (Off)





James H Williams Jr | Timeline | 2010 | Add Friend

Worked at LVD Casino
Studied at The Old School Of Hard Knocks
Went to Watersmeet High School
Lives in Watersmeet, Michigan
From Watersmeet, Michigan

Photos

Friends · 479

See what you have in common with James's friends. View

Featured Albums

English (US) · Español · Português (Brasil) · Français (France) · Deutsch

Privacy · Terms · Advertising · Ad Choices · Cookies · More
Facebook © 2017

**James H Williams Jr** updated his profile picture.
January 13, 2013

Share

12

**James H Williams Jr** missing my sister lilly!! love you Sis
January 13, 2013 at 11:56am · 2

**Ed Havican** LOOKIN GOOD BROTHA.
January 13, 2013 at 1:33pm

**James H Williams Jr** thanks bro miss ya
January 13, 2013 at 1:53pm

**Joleen McGeshick** lookn gud! but how come ur face is so dang dark cuz? lol
January 15, 2013 at 12:15pm · 2

**Lilly Williams** Miss you too Bro Bro!! You look way handsome in this and I just look Red, lol!! Hope to see you real soon.. Love you.. ❤
January 16, 2013 at 11:40am

**Delores Williams** Can't believe these two are mine!! Love you both so very much.. You make a momma proud!!! ❤ 🙂
January 16, 2013 at 1:24pm · 1

**Lilly Williams** How come you gave him all the color and left me to the tanning beds??
January 16, 2013 at 1:35pm · 1

**James H Williams Jr** Our name shall be callllleed salt and pepper!!
January 16, 2013 at 1:37pm · 4

**Delores Williams** Ask your dad!! lol 🙂
January 16, 2013 at 1:38pm · 2

Posts from 2012

Chat (Off)

James H Williams Jr | Timeline | 2010 | Add Friend

Worked at LVD Casino
Studied at The Old School Of Hard Knocks
Went to Watersmeet High School
Lives in Watersmeet, Michigan
From Watersmeet, Michigan

Photos

Friends · 479

See what you have in common with James's friends. View

Featured Albums

English (US) · Español · Português (Brasil) · Français (France) · Deutsch

Privacy · Terms · Advertising · Ad Choices · Cookies · More
Facebook © 2017

Sons of Anarchy - Richard Thompson "Dad's Gonna Kill Me"
YOUTUBE.COM

Share

2

**James H Williams Jr**
May 11, 2012

best dance video ever!!! haha Looks like Carl on "Fresh Prince of Bellair!!!!

The Black Keys - Lonely Boy (First Listen)
© 2011 WMG "Lonely Boy" is the first single off the new album, El Camino. Download the album today - Official store - http://wbr.fm/TBKElCamino iTunes - http...
YOUTUBE.COM

Share

1

**Bobbie Blackburn** we were just talking about carlton this morning...tooo funny
May 11, 2012 at 7:11pm

**James H Williams Jr**
May 7, 2012

Would like to wish my baby sister Lilly a Happy Birhday today. I love you with all my heart and I wish I could of spend your day with you so I could see that beautiful smile..

Share

10

**Jill Mansfield** Happy Birthday,have a wonderful day.
May 7, 2012 at 8:01am

**Nancy Major** Happy Birthday Lilly, have a fantastic day.
May 7, 2012 at 9:01am

**Lilly Williams** Geez I'm just now seeing this!! Thank you so much bro, I love you!! ❤
May 15, 2012 at 9:19am

**Delores Williams** Yeah, you do find some good stuff once in a while on FB!!
May 15, 2012 at 9:36am · 1

Chat (Off)

James H Williams Jr | Timeline | 2010 | Add Friend

Worked at LVD Casino
Studied at The Old School Of Hard Knocks
Went to Watersmeet High School
Lives in Watersmeet, Michigan
From Watersmeet, Michigan

Photos

Friends · 479

See what you have in common with James's friends. View

Featured Albums

English (US) · Español · Português (Brasil) · Français (France) · Deutsch

Privacy · Terms · Advertising · Ad Choices · Cookies · More
Facebook © 2017

Share

13

**Michelle Reed** I want some
May 6, 2012 at 9:26pm

**James H Williams Jr** Hope your have fun Michelle!!! I will cook some for you when we come out again!!
May 7, 2012 at 6:48am · 1

**James H Williams Jr** You would of love it shasta but wasn't enough to go around!!
May 7, 2012 at 6:49am

**James H Williams Jr** especially when you say Chickens!! haha
May 7, 2012 at 6:50am

**James H Williams Jr** It was hodag good Shelly!
May 7, 2012 at 6:50am

**Michelle Hazen** Can't wait to taste it at Ho Ho Hodag
May 7, 2012 at 8:10am

**Delores Williams** Why do you do that when I'm out of town??
May 7, 2012 at 11:39am

**Michelle Hazen** Haha get em Dee! Better yet why do you do that and put it on fb like u teasing us!
May 7, 2012 at 11:41am

**James H Williams Jr**
April 28, 2012

is having a cookout with my sister lilly and friends! it's going to be a nice day!! wish my two boy's were home to join us!! Miss you James and Darren and love you guy's very much!! I will eat your share of the walleye! haha

Share

11

**Giiwegiizhigookway Martin** Thank you all so much for the help.... Love you all.
April 28, 2012 at 2:49pm

**James H Williams Jr** Love you to Giiwe!! have a wonderful day!!
April 28, 2012 at 2:49pm

**Jill Mansfield** save some for me.lol
April 28, 2012 at 2:49pm

**Michelle Hazen** Man why didn't I get invited I like ealleye
April 28, 2012 at 2:51pm

**Michelle Hazen** Haha I meant walleye
April 28, 2012 at 2:51pm

**James H Williams Jr** because I wasn't havinge ealleyes!! haha
April 28, 2012 at 2:53pm

**James H Williams Jr** and because you said you was going to get your wooden nails done
April 28, 2012 at 2:53pm

**Michelle Hazen** Lol I knew u were going to say that u ass
April 28, 2012 at 2:54pm

**James H Williams Jr** Haha Well Hodag is just around the corner!!! It feels like a rainbow gathering when we come together at the HOHO!!
April 28, 2012 at 2:58pm · 1

**James H Williams Jr** Are name of camp this year is going to be called the HODAG RAINBOWS!!!
April 28, 2012 at 2:59pm · 1

**Michelle Hazen** Lol ok sounds good! Can't wait

Chat (Off)





James H Williams Jr | Timeline | 2010 | Add Friend

Worked at LVD Casino
Studied at The Old School Of Hard Knocks
Went to Watersmeet High School
Lives in Watersmeet, Michigan
From Watersmeet, Michigan

Photos

Friends · 479

See what you have in common with James's friends. View

Featured Albums

English (US) · Español · Português (Brasil) · Français (France) · Deutsch

Privacy · Terms · Advertising · Ad Choices · Cookies · More
Facebook © 2017

**James H Williams Jr** added a new photo — with Toni Edwards-Williams.
March 13, 2010 · BlackBerry Smartphones App

Share

**Michelle Hazen** OMG.....he is adorable. Great job on the outfit Toni. Wow Kayne is all growed up....I bet he spent more time snagging than dancing hey????? Hope you guys had a good at the Pow Wow.
March 13, 2010 at 8:10pm

**Lilly Williams** Look at those lips!! I agree with Shelly!! LOL
March 15, 2010 at 12:51pm

Album **Mobile Uploads**

**James H Williams Jr** added a new photo — with Garrett Williams and Toni Edwards-Williams.
March 13, 2010 · BlackBerry Smartphones App

Chat (Off)

Profile Pictures
16 of 16

Share
Options

**James H Williams Jr**
January 22, 2010

Share

2

**Lilly Williams** You look so handsome in this pic!!! Can't wait to see you bro, I love you!!!!
January 22, 2010 at 12:29pm

Friend Requests See All
**Maria Moon**
Confirm Friend











James H Williams Jr's Photos

in Cover Photos

Share

Options

James H Williams Jr

January 13, 2013 ·

Share

1

James H Williams Jr Is missing his sister Lilly Williams

January 13, 2013 at 11:52am

Friend Requests See All

Howard Kira

Confirm Friend

Check-Ins

Chat (Off)

Search Natalie Home

James H Williams Jr's Photos

in Mobile Uploads

Share

Options

**James H Williams Jr**
March 15, 2010 ·

With Ed Havican, Toni Edwards-Williams and Garrett Williams.

Share

1 Share 1 Comment

**Lilly Williams** I love it!!
March 15, 2010 at 12:48pm

Friend Requests See All

**Howard Kira**
Confirm Friend

See All

Check-Ins

Chat (Off)

James H Williams Jr's Photos
in Mobile Uploads

Share Options

**James H Williams Jr**
March 15, 2010 ·

Share

**Lilly Williams** He's so cute, probably a good lil dancer too!!
March 15, 2010 at 12:47pm

Friend Requests See All

**Howard Kira**
Confirm Friend

Check-Ins

James H Williams Jr's Photos
in Mobile Uploads

Share

Options

**James H Williams Jr**
March 15, 2010 ·

With Toni Edwards-Williams and Garrett Williams.

Share

**Lilly Williams** Can't wait to see them in action!!
March 15, 2010 at 12:45pm

Friend Requests See All

Howard Kira
Confirm Friend

Check-Ins

Search Natalie Home

James H Williams Jr's Photos

in Mobile Uploads

Share

Options

**James H Williams Jr**
March 15, 2010 ·

With Toni Edwards-Williams and Edmond George Edwards.

Share

**Edmond George Edwards** Awesome!
March 15, 2010 at 8:43am

**Lilly Williams** Very nice!!
March 15, 2010 at 12:43pm

Friend Requests See All

**Howard Kira**
Confirm Friend

See All

Check-Ins

Chat (Off)





Search Natalie Home

James H Williams Jr's Photos

in Mobile Uploads

Share

Options

**James H Williams Jr**

March 15, 2010 ·

With Jim Williams, Toni Edwards-Williams and Nancy Major.

Share

**Lilly Williams** I love this Picture they both look so handsome!! Kayne has a really nice outfit,,

March 15, 2010 at 12:43pm

Friend Requests See All

**Howard Kira**

Confirm Friend

See All

Check-Ins

Chat (Off)

James H Williams Jr's Photos
in Mobile Uploads

Share Options

James H Williams Jr
March 15, 2010 ·

With Toni Edwards-Williams and Garrett Williams.

Share

Lilly Williams I love the outfits the boys have.. Toni you did an awesome job!!
March 15, 2010 at 12:54pm

Friend Requests See All

Howard Kira
Confirm Friend

Check-Ins

James H Williams Jr's Photos
in Mobile Uploads

Share

Options

**James H Williams Jr**
March 15, 2010 ·

Share

**Lilly Williams** G I can't wait to see him dance I bet he's all smooth..LOL
March 15, 2010 at 12:53pm

Friend Requests See All

**Howard Kira**
Confirm Friend





James H Williams Jr's Photos
in Mobile Uploads

Share
Options

**James H Williams Jr**
January 24, 2010

Go Vikings — with Toni Edwards-Williams.

Share

**Nancy Major** Ahahahaha, NICE 😃
January 24, 2010 at 7:48pm

**Lilly Williams** Love the braids!!
January 25, 2010 at 11:31am

Friend Requests See All

**Howard Kira**
Confirm Friend

# Exhibit 12

```
 1                                                      1

 2                  IN THE UNITED STATES DISTRICT COURT
                  FOR THE EASTERN DISTRICT OF VIRGINIA
 3                         RICHMOND DIVISION

 4   LULA WILLIAMS, et al. on behalf of
     themselves and all other similarly
 5   situated individuals,

 6                  Plaintiffs,

 7                         Civil Action No. 3:17-cv-461 (REP)
     v
 8
     BIG PICTURE LOANS, LLC, et al.,
 9
                 Defendants.
10   _____

11   VIDEOTAPED DEPOSITION OF:
     SUSAN McGESHICK
12   Tuesday, November 14, 2017
     Comfort Suites
13   2463 US 41 West
     Marquette, Michigan 49855
14
     APPEARANCES:    MR. ANDREW J. GUZZO
15                   KELLY & CRANDALL, PLC
                     Attorney for Plaintiffs
16                   3925 Chain Bridge Road, Suite 202
                     Fairfax, Virginia 22030
17
                     MR. JUSTIN GRAY
18                   ROSETTE, LLP
                     Attorney for Defendant Big Picture Loans, LLC,
19                   Ascension Technologies, LLC, James Williams,
                     Jr., Gertrude McGeshick, Susan McGeshick,
20                   Giiwegiizhigookway Martin
                     25344 Red Arrow Highway
21                   Mattawan, Michigan 49071

22                   MS. KARRIE S. WICHTMAN
                     ROSETTE, LLP
23                   Attorney for Big Picture Loans, LLC,
                     Ascension Technologies, LLC, James Williams,
24                   Jr., Gertrude McGeshick, Susan McGeshick,
                     Giiwegiizhigookway Martin
25                   25344 Red Arrow Highway, Suite B
                     Mattawan, Michigan 49071
```

SUSAN MCGESHICK on 11/14/2017

```
 1   A    Yes.

 2   Q    And who is that?

 3   A    My nephew.

 4   Q    And who's that?

 5   A    Misaabe McGeshick.

 6   Q    And who is his employer?

 7   A    Lac Vieux Desert.

 8   Q    And what position does he hold?

 9   A    He's a regulatory agent.

10   Q    And so what are his responsibilities as a regulatory

11        agent?

12   A    I don't have the exact -- exactly what he does, but I

13        know he's on the -- he's a Tribal Financial Regulatory

14        Agent.

15   Q    Okay.  And I -- I'm not asking you to tell me exactly

16        what he does.  I just want you to tell me what you know

17        about what he does.  It -- you know, it could be general

18        if that's all you know.  You know, you don't have to

19        tell me --

20   A    I --.

21   Q    So, you keep saying exactly and I just want to be --

22   A    Yeah.

23   Q    -- careful with --

24   A    Okay.

25   Q    -- that terminology.  So, do you know what he does on a
```

USCA4 Appeal: 23-2097    Doc: 11-4    Filed: 12/06/2023    Pg: 423 of 503
Case 3:17-cv-00461-REP   Document 1299-12   Filed 06/07/23   Page 4 of 4 PageID# 56032

SUSAN MCGESHICK on 11/14/2017

```
 1                                                           94

 2   STATE OF MICHIGAN    )

 3                        )

 4   COUNTY OF DELTA      )

 5       I certify that this transcript is a complete, true and

 6   correct record of the testimony of Susan McGeshick held in

 7   this case on November 14, 2017.

 8

 9       I also certify that prior to taking this deposition

10

11   Susan McGeshick was duly sworn to tell the truth.

12

13       I also certify that I am not related to or employed by

14

15   any party to this cause or their respective attorneys; nor am

16

17   I financially interested in the action.

18

19   December 1, 2017       _____

20   DATE                   Tammy L. Hanson, CER 7005

21                          Hanson Reporting

22                                        th

23                          1500 South 30  Street

24                          Escanaba, Michigan 49829

25                          906-786-0422
```

Exhibit 13

# EXCLUSIVITY AGREEMENT
## and LETTER OF INTENT

This EXCLUSIVITY AGREEMENT and LETTER OF INTENT ("hereinafter "Agreement"), made and entered into as of this _____ day of July, 2011 ("Execution Date"),  by and between Tribal Loan Management, LLC, ('TLM"), and Tribal Lending Solutions, LLC, which is wholly owned and operated by Scott Merrit, Kyle Silcox, Tim Mackin, Todd Pebles and Curt Potts in their individual capacities ("TLS") (which TLM and TLS shall be collectively referred to as "Developer") on the one hand, and the Lac Vieux Desert Band of Lake Superior Chippewa Indians, a federally recognized Indian Tribe ("Tribe") on the other hand (the Developer and the Tribe are hereinafter collectively referred to as the "Parties").

## Preliminary Statements

WHEREAS,   The Tribe is a federally recognized Indian Tribe and is recognized as possessing powers of self-government, including but not limited to the power to authorize and conduct lending on its lands located within the boundaries of the Lac Vieux Desert Band of Lake Superior Chippewa Indians Reservation, subject to the applicable provisions of Tribal, State and Federal law, and with primary regulatory governance of the Tribe.

WHEREAS,   The land upon which the Tribe intends to develop and operate a lending operation providing small loans to consumers over the internet ("Project") is on the sovereign Tribe's Reservation.

WHEREAS,   With the assistance of the Developer, the Tribe intends to adopt laws to authorize Tribal lending, and to promulgate regulations for a Tribal regulatory agency to ensure integrity and compliance with applicable laws for the lending operation.

WHEREAS,   The Tribe presently lacks the financial resources, expertise, and requisite hardware or software to develop the Project, as defined herein.

WHEREAS,   Developer has represented to the Tribe that it has the financial capacity and ability to develop and coordinate the Project, and believes it can make satisfactory arrangements to meet all other financial obligations contained herein.

WHEREAS,   The Tribe and the Developer are acting by and through their respective duly appointed and authorized officers.

WHEREAS,   The Parties intend to deal exclusively with each other and in good faith for the purpose of negotiating and entering into the Transaction Documents which shall include various additional Development Agreements, various Finance and Loan Agreements, Investor Referral Agreements, Hardware and Software Agreements and such other agreements as the Parties deem necessary to memorialize their understanding of their obligations with respect to the Project (collectively, the "Transaction Documents") which will more fully describe the Parties' ongoing relationship with respect to the Project; however, until such time as the

1

Transaction Documents are executed, this Agreement shall serve as the Parties' binding agreement with respect to the matters addressed herein.

WHEREAS, The Developer, with the Tribe's assistance, intends to provide advice regarding i) the overall development of the Project to provide an entire turn-key lending operation to provide consumers with small loans; ii) requisite and applicable approvals; iii) equipping and furnishing of the appropriate hardware and software to run the operation as well as the call center; iv) a business structure and pro-forma models for the Project to achieve maximum profitability to the Tribe in its first month of operation; v) establishing internal control systems and manuals, financial statements, and budgets; vi) staffing needs and necessary training of personnel; and vii) development and implementation of an overall marketing plan for trade-shows and attraction of additional investors.

WHEREAS, The Tribe understands that the Developer is required to spend significant resources both in up-front cash, and to exploit relationships and expertise to create the Project and provide a turn-key lending operation, and the Tribe agrees to cooperate with the Developer to facilitate the development of the Project, including negotiating in good faith to conclude all of the various transaction Documents to allow the Project to come to fruition, which means that once all of the various Transaction Documents are completed, the Tribe, as the owner of the Project and the lender to the consumers, shall realize approximately $3.00 per transaction in net revenues for new loans and approximately $.75 for loan extensions and approximately $1.50 for renewed loans after all operating expenses are paid by the Tribe and loan is transacted.

<p align="center">**AGREEMENT**</p>

<p align="center">**ARTICLE I**<br>**ENGAGEMENT OF DEVELOPER**</p>

**1.1.**     **Engagement of Developer.** Subject to the terms, conditions and contingencies set forth herein, the Tribe hereby engages Developer, on an exclusive basis, to negotiate and enter into the Transaction Documents with any and all parties, including with TLM, TLS and other parties introduced to the Tribe, to develop and manage all aspects of the Project.

**1.2.**     **Terms for Transaction Documents.** The Transaction Documents shall provide the terms and conditions for the finance, development, and management of the Project and shall specifically include the following terms:

**(a)**     After operating expenses are paid and any and all loans are transacted, the Transaction Documents shall be structured in such a manner whereby all net revenues flowing back to the Tribe should equal approximately $3.00 per new lending transaction and approximately $.75 for loan extensions and approximately $1.50 loan renewals.

**(b)**     With regard to any loan and finance agreements between the Tribe and third party lenders/investors, the Tribe's loan from any such lender/investor shall be a

<p align="center">2</p>

limited recourse obligation, and be secured by and repaid through specifically any revenues derived from the Project, and shall not encumber any existing Tribal or trust asset.

        **(c)**      With regard to any small loan agreement between the Tribe and any end user/consumer, the Tribe shall have agreements with third party lenders/investors to purchase any small loans that default or become delinquent, if initial attempts at collection do not result in debt repayment.

        **(d)**      Except for in-kind support, such as Tribal staff and professional services and existing physical facilities and associated infrastructure, that should be provided by the Tribe from time-to-time, and subject to the Tribe's sole discretion, the Project's development costs will be arranged solely by Developers and shall impose no costs to the Tribe. *(TLM)*

        **(e)**      The Developer, and any and all parties which shall become subject to the Transaction Documents, shall comply with Tribal law and all regulations promulgated to authorize the Tribe to lend, and any and all parties may be required to be licensed as a suitable vendor by the Tribe's regulatory agency on a case-by-case basis. *(Lending Agency)*

        **(f)**      The Developers shall be responsible for identifying all parties necessary for the development and operation of the Project, as well as structuring the Transaction Documents so that the Project may operate, and the Tribe agrees to work in good faith with the Developer to enter such Transaction Documents as they are presented including providing a waiver of its sovereign immunity on a case-by-case basis.

<div align="center">

**ARTICLE II**
**COMMITMENT**

</div>

        **2.1**    **Commitment by Developer.**  Upon execution of this Agreement, Developers shall immediately begin to:

        i)      Identify investors for the purpose of providing the Tribe with working capital to be utilized for the Tribe's lending business;

        ii)      Provide the Tribe with the ability to utilize the intellectual property, software, and hardware necessary:

        iii)      Consult with the Tribe to set up all requisite hardware, software, and other items needed for the Project, as well as setting up the Tribal call-center to administer the Tribal loans;

        iv)      Identify all relevant parties and negotiate and draft all Transaction Documents to implement the Project;

<div align="center">3</div>

v)      Provide the Tribe with all draft Tribal governmental enterprise documents to be the sole owner of the Project; and

vi)     Provide the Tribe with all draft Tribal governmental laws and regulations to authorize the Project and regulate the lending operation.

**2.2     Commitment by Tribe.**      Upon execution of this Agreement, Tribe shall immediately begin to:

i)      Meet regularly with the Developer to answer relevant questions regarding the Project, and work in good faith with the Developers to identify work space for the operation of the Project and the call center;

ii)     Provide Developer access to those areas where the Project is being set-up, developed, and operated;

iii)    Timely consider, negotiate in good faith, and approve any and all Transaction Documents, to bring the Project to fruition;

iv)     Timely consider and adopt any and all requisite Tribal laws and regulations to properly authorize and regulate the Project; and

v)      Take such other steps as the Tribe determines necessary or appropriate to facilitate the Developer's work to bring the Project to fruition.

### ARTICLE III
### MISCELLANEOUS

**3.1     Statutory and Regulatory Requirements.**  Upon execution of the Transaction Documents, the Parties acknowledge and agree they will use good faith efforts to satisfy any requisite Tribal, State or Federal statutory and regulatory conditions that are applicable within a commercially reasonable time period.

**3.2     Compliance.**  During the letter of intent, the Parties shall comply with any and all applicable requirements of the Tribe, State, and United States.

**3.3     Dispute Resolution and Waiver of Sovereign Immunity.** The Parties agree that any disputes that arise between the Parties under this Agreement or the Transaction Documents contemplated hereby shall initially be referred to Rob Rosette of TLM, or his designee, and the Chairman of the Tribe, or his designee, who shall attempt to resolve the issue by mutual agreement.  If those two individuals are unable to resolve the issue, the dispute shall be resolved by binding arbitration under the auspices of the American Arbitration Association in Maricopa County, Arizona.  The Tribe grants a limited, transactional waiver of its sovereign immunity from suit exclusively to the Developer, and no other person or entity, for the sole and exclusive purpose of permitting or compelling arbitration and other remedies as provided in this Section to

4

enforce an arbitration award. This limited waiver of sovereign immunity shall become effective upon execution of this letter of intent by the Tribal Council of the Lac Vieux Desert Band of Lake Superior Chippewa Indians in accordance with the Tribe's governing documents.

**3.4    Severability.** If any provision of this Agreement is determined, or alleged, to be unenforceable because Federal or State approval thereof is required and has not been obtained, such provision may, upon the mutual consent of the Parties, be severed from this Agreement and the remaining provisions hereof remain in full force and effect, provided that the basic understanding of the Parties as expressed in this Agreement are maintained.

**3.5    Additional Terms and Conditions.** The above terms and conditions will be expanded upon during the preparation and good faith negotiation of the Transaction Documents. The Transaction Documents will also include other standard and commercially reasonable terms and conditions consistent with agreements of this nature and terms and conditions consistent with this Agreement.

**3.6    Non-Disclosure/Confidentiality.**    Neither the Tribe nor Developer shall reveal the terms and conditions of this Agreement or the Transaction Documents except as necessary to prepare the documentation and conduct due diligence in accordance with the foregoing. During the course of this Agreement, each party may have access to confidential or proprietary information or trade secrets of the other ("Confidential Information"). Except as expressly required in the course of performance of this Agreement, neither party will, without prior written consent of the other, directly or indirectly, disclose, disseminate, publish, distribute or otherwise make known to any third person or use for any purpose any such confidential or proprietary information or trade secrets of the other. Further, the Tribe agrees not to sell, assign, trade, distribute, make available or divulge the Confidential Information or any part thereof to any other person, firm or corporation, except as otherwise provided for in this Agreement or as specifically authorized in writing by the Developer. Tribe agrees to protect the information in the Confidential Information in the same manner as it protects its own confidential and proprietary information, which shall not be less than reasonable care.

<center>SIGNATURES ON FOLLOWING PAGE</center>

<center>5</center>

Effective as of the Execution Date defined herein.

TRIBAL LOAN MANAGEMENT, LLC:


By: _____     Date: _____
      Flint Richardson, Member


TRIBAL LENDING SOLUTIONS, LLC:


By: _____     Date: _____
      Scott Merritt, Member



LAC VIEUX DESERT BAND OF LAKE SUPERIOR CHIPPEWA INDIANS:


By: _____     Date: _____
      Alan M. Shively, Tribal Chairman

6

# Exhibit 14

| | |
|---|---|
| **From:** | Rebecca Hampton <RH@bellicosevi.com> |
| **Sent:** | August 23, 2011 5:20 PM |
| **To:** | hampton.rl@gmail.com |
| **Subject:** | Fwd: FW: LMS Update |
| **Attachments:** | AVG certification.txt, image001.png, image002.jpg |

solicitations

**From**: "Rebecca Hampton" <hampton.rl@gmail.com>
**Sent**: Thursday, July 28, 2011 5:20 PM
**To**: rh@bellicosevi.com
**Subject**: Fwd: FW: LMS Update

---------- Forwarded message ----------
From: **Matt Martorello** <MattM@bellicosevi.com>
Date: Thu, Jul 14, 2011 at 7:32 PM
Subject: FW: LMS Update
To: Rebecca Hampton <hampton.rl@gmail.com>

Please save this communication to demonstrate a potential client's interest in Bellicose services.

**From:** Doug Ulrich [mailto:dougulrich@azoblue.com]
**Sent:** Thursday, July 14, 2011 6:35 PM
**To:** Matt Martorello
**Cc:** Todd Woodyatt; jmartorello@apriorisolutions.com
**Subject:** RE: LMS Update

We told her .5% referral fee, I know it's generous to leave her the entire .5% net proceeds, but we really like her.

**DOUG ULRICH**

*Managing Partner*

AzoBlue Software Inc.

JA1813

847-448-0091 (w)
847-962-1414 (m)

dougulrich@azoblue.com
www.azoblue.com

---

**From:** Matt Martorello [mailto:MattM@bellicoseVI.com]
**Sent:** Thursday, July 14, 2011 6:24 PM
**To:** Doug Ulrich
**Cc:** Todd Woodyatt; jmartorello@apriorisolutions.com
**Subject:** RE: LMS Update

Thanks for the referral! We're happy to do it at Bellicose. We can do an entire soup to nuts deal for her. Our fee is generally 99% of Net Revenue, less the operating expenses of the portfolio. She gets 1% of net revenue off the top. Let me know if she's interested and we'll prepare a proposal.

If not let me know, maybe I can find something different for her if she's looking for something less "all encompassing".

---

**From:** Doug Ulrich [mailto:dougulrich@azoblue.com]
**Sent:** Thursday, July 14, 2011 6:11 PM
**To:** Matt Martorello
**Cc:** Todd Woodyatt; jmartorello@apriorisolutions.com
**Subject:** RE: LMS Update

Good Day Matt,

We had a conversation with a small Brick and Mortar lender today, she was asking if we knew anyone that we could recommend for analysts for scoring models?

JA1814

Confidential                      REBECCA_MARTORELLO_0000002

She is small now, 4 location opening up 3 more and eventually looking to go online and she'll need consulting on the how, who and where to open an LLC offshore.

I know we're in discussions on how to construct an end to end solution… however in the meantime ??

She asked us what we thought of Mosaic…. Well we'd prefer to send her in another direction, if this is not something of interest whom would you recommend?

Cheers!!

**DOUG ULRICH**

*Managing Partner*

AzoBlue Software Inc.

847-448-0091 (w)
847-962-1414 (m)

dougulrich@azoblue.com
www.azoblue.com

---

**From:** Matt Martorello [mailto:MattM@bellicoseVI.com]
**Sent:** Thursday, July 14, 2011 5:58 PM
**To:** Todd Woodyatt; mmartorello@apriorisolutions.com
**Cc:** Doug Ulrich; Jeff Kramer; 'Justin Martorello'
**Subject:** RE: LMS Update

Ok, let's get that done since we may be using them in about 2 months.  Thanks

---

**From:** Todd Woodyatt [mailto:toddwoodyatt@azoblue.com]
**Sent:** Thursday, July 14, 2011 5:58 PM

JA1815

REBECCA_MARTORELLO_0000003

**To:** mmartorello@apriorisolutions.com
**Cc:** Doug Ulrich; Jeff Kramer; Justin Martorello
**Subject:** RE: LMS Update


We have only integrated with their AIR product, not ACH, but I don't see any problem in doing so.

---

**Todd Woodyatt**
Managing Partner


| | | |
|---|---|---|
| **Direct:** 847 448 0103 | **Email:** | **AzoBlue Group, Inc.** |
| **Office:** 847 462 4444 Ext. 1001 | toddwoodyatt@azoblue.com | 9239 South Route 31 |
| **Cell:** 847 987 0306 | **Fax:** 518 602 0785 | Lake in the Hills, IL 60156 |

---

**From:** mmartorello@apriorisolutions.com [mailto:mmartorello@apriorisolutions.com]
**Sent:** Wednesday, July 13, 2011 10:51 AM
**To:** Todd Woodyatt
**Cc:** Doug Ulrich; Jeff Kramer; Justin Martorello
**Subject:** RE: LMS Update


Are you integrated with Intercept for ACH?

-------- Original Message --------
Subject: Re: LMS Update
From: Todd Woodyatt <toddwoodyatt@azoblue.com>
Date: Tue, July 12, 2011 9:00 pm
To: "mmartorello@apriorisolutions.com"
<mmartorello@apriorisolutions.com>
Cc: Doug Ulrich <dougulrich@azoblue.com>, Jeff Kramer
<jeffkramer@azoblue.com>, Justin Martorello
<JMartorello@AprioriSolutions.com>

Matt

JA1816

Confidential                    REBECCA_MARTORELLO_0000004

I'll get you an update on all these items shortly. We were really hit hard the last two days from the storm that went through. It's been heads down, keep the lights on mode. I know we are close. We have had some integration challenges with LST that have put us back a week or so. I'll explain later.

I'll send you a more detailed note in just a little bit.

Sent from my iPhone

On Jul 12, 2011, at 10:18 PM, "mmartorello@apriorisolutions.com" <mmartorello@apriorisolutions.com> wrote:

Hey guys, hadn't heard anything on Bellicose email, is the MattM@ created and mmartorello set to forward to it now?  I'd like to get that done.  Please update us on changes to website as we go, sent that over last night.

Most importantly, Epic is really getting to be a drag with timeouts right now and we're anxious to get this done. We can't have the timeouts killing our volume.

Where do we stand on LMS?  Timeline/update on the LMS?

The message does not contain any threats
AVG for MS Exchange Server (9.0.901 - 271.1.1/3761)

---



---



Confidential                                   REBECCA_MARTORELLO_0000005

# Exhibit 15

## FW: Update

| | |
|---|---|
| **From:** | Craig Mansfield <craig.mansfield@lvdcasino.com> |
| **To:** | craiginlol63@gmail.com |
| **Date:** | Thu, 22 Mar 2012 12:15:36 -0500 |

**From:** mattm@bellicosevi.com [mailto:mattm@bellicosevi.com]
**Sent:** Thursday, March 22, 2012 11:45 AM
**To:** Craig Mansfield
**Cc:** jm@bellicosevi.com
**Subject:** RE: Update

Thanks Craig, how about 4/23 - 4/27 at the Chicago office? This is where the duties that will be happening at LVD are occurring today (email, strategy, ACH) so you can see it live in action and sit with the crew, etc.

Regards,

**Matt Martorello**
Mobile: 773-209-7720
Email: MattM@BellicoseVI.com

BELLICOSE VI

**This email and any files transmitted with it are confidential and contain privileged or copyright information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

**From:** Craig Mansfield [mailto:craig.mansfield@lvdcasino.com]
**Sent:** Thursday, March 22, 2012 9:59 AM
**To:** mattm@bellicosevi.com
**Subject:** RE: Update

Matt,
I did sign the employment offer on 3-16-2012 and gave a copy to Michelle Allen. I also sent you a text message stating that I needed to be in Watersmeet on April 20th.
I believe the next step would be training. Let me know when you would like me to start training.

Craig

**From:** mattm@bellicosevi.com [mailto:mattm@bellicosevi.com]
**Sent:** Wednesday, March 21, 2012 2:47 PM

CONFIDENTIAL

CM0000869

JA1819

**To:** Craig Mansfield (craig.mansfield@lvdcasino.com) (craig.mansfield@lvdcasino.com)
**Subject:** Update

Hey Craig, just checking in to see if any update on the position.

**Regards,**

**Matt Martorello**
Mobile: 773-209-7720
Email: MattM@BellicoseVI.com

🌐 BELLICOSE VI

**This email and any files transmitted with it are confidential and contain privileged or copyright information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.****

CM0000870

# Exhibit 16

| | |
|---|---|
| **From:** | mattm@bellicosevi.com |
| **To:** | Karrie Wichtman |
| **Subject:** | FW: Updated Georgia Analysis Memorandum |
| **Date:** | Thursday, August 23, 2012 7:42:18 AM |
| **Attachments:** | image001.jpg |
| | 97931231_4.DOCX.docx |

I wanted to share this with you.  I'd asked for an opinion on if the state of GA were to say that the tribal loans are illegal and criminal, could Matt be put in jail for "aiding and abetting"?  Scary thought, but if I could then so could any officers of lead providers, credit bureaus, etc. etc.

I think it's great information, though I wanted it addressing SPVI rather than 7x which they are fixing.  I believe there are 13 states with criminal statutes (IL becomes one of them on Jan 1, 2013) and I'm getting that list and will share that with you too.

I just don't know how it works if a tribal loan were determined to be illegal by a state with a criminal statute, what's next?

Sorry to bombard you, I forgot you were gone!   Welcome back though, we are building toward perfection here.  I am very optimistic.


**Regards,**

**Matt Martorello**
Mobile: 773-209-7720
Email: MattM@BellicoseVI.com



**This email and any files transmitted with it are confidential and contain privileged or copyright information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

**From:** weddlej@gtlaw.com [mailto:weddlej@gtlaw.com]
**Sent:** Monday, August 20, 2012 7:46 PM
**To:** mattm@bellicosevi.com
**Subject:** Updated Georgia Analysis Memorandum

Matt —

We've updated the memo, which I'm hoping is closer to what you're looking for.  Please take a look, and let me know if you'd like more changes.  There isn't a bright-line answer here from a legal standpoint, as you'll see, although we've tried to highlight that, as a practical matter, we see the risk as lower.  Give me a call if you'd like to discuss.

Thanks and best,

ROSETTE_REVISED_0033984

JA1822

**Jennifer H. Weddle**
Shareholder, Co-Chair, American Indian Law Practice Group
Greenberg Traurig, LLP | 1200 17th Street, Suite 2400 | Denver, Colorado 80202
Tel 303.572.6565 | Fax 720.904.7665
weddlej@gtlaw.com | www.gtlaw.com

ALBANY · AMSTERDAM · ATLANTA · AUSTIN · BOSTON · CHICAGO · DALLAS · DELAWARE · DENVER · FORT LAUDERDALE · HOUSTON · LAS VEGAS · LONDON* · LOS ANGELES · MEXICO CITY+ · MIAMI · NEW JERSEY · NEW YORK · ORANGE COUNTY · ORLANDO · PALM BEACH COUNTY · PHILADELPHIA · PHOENIX · SACRAMENTO · SAN FRANCISCO · SHANGHAI · SILICON VALLEY · TALLAHASSEE · TAMPA · TEL AVIV^ · TYSONS CORNER · WARSAW~ · WASHINGTON, D.C. · WHITE PLAINS
*OPERATES AS GREENBERG TRAURIG MAHER LLP  +OPERATES AS GREENBERG TRAURIG, S.C.  ^A BRANCH OF GREENBERG TRAURIG, P.A., FLORIDA, USA  ~OPERATES AS GREENBERG TRAURIG GRZESIAK SP.K.
**STRATEGIC ALLIANCE WITH AN INDEPENDENT LAW FIRM**
MILAN · ROME

---

If you are not an intended recipient of confidential and privileged information in this email, please delete it, notify us immediately at postmaster@gtlaw.com, and do not use or disseminate such information. Pursuant to IRS Circular 230, any tax advice in this email may not be used to avoid tax penalties or to promote, market or recommend any matter herein.

**GT** GreenbergTraurig

# CONFIDENTIAL ATTORNEY-CLIENT PRIVILEGED MEMORANDUM

**TO:**   Bellicose, V.I.

**FROM:**   Jennifer Weddle & Maranda Compton

**DATE:**   August 20, 2012

**RE:**   Georgia Payday Lending Laws & Third Party Liability

---

## I.      INTRODUCTION

You have asked Greenberg Traurig to review the risk to RRTL and DCTF and their service providers associated with acquiring leads from a lead-provider for Georgia-based consumers and/or directly marketing to Georgia consumers.  In short, as long as it is the sovereign entity making the loans and acquiring the leads, there should not be any "downstream" criminal liability.  A tribal entity operating as an arm of the tribe, regardless of location, is entitled to sovereign immunity.  However, individuals and third-party vendors are susceptible to state enforcement and investigatory actions, as well as potential civil and criminal penalties in certain situations.  Below please find a brief summary of the applicable case law and federal and state statutes.  As always, please feel free to contact us with any additional questions or concerns.

## II.      ANALYSIS

### A.      LIABILITY OF TRIBAL ENTITY PURCHASING LEADS

RRTL and DCTF are owned and operated as arms of the tribe and will be immune from state enforcement and investigatory actions.  Sovereign immunity prevents a state from enforcing its laws against a tribe or tribal entity operating as an arm-of-the-tribe.  *Kiowa Tribe of Oklahoma v. Mfg. Tech., Inc.,* 523 U.S. 751 (1998).  This immunity applies without distinction to governmental and commercial activities conducted both on- and off- the reservation and is shared with economic enterprises of the tribe.  *Id.* at 760.  However, while tribal sovereign immunity prevents a state from enforcing its laws against a tribe, it does not prevent a state from regulating on-reservation, tribal activity.  *Okla. Tax. Comm'n v. Citizen Band of Potawatomi Indian Tribe*, 498 U.S. 505, 515 (1991) ("There is a difference between the right to demand compliance with state laws and the means available to enforce them").

In order to remain free from state regulation, any Georgia activities must be performed by RRTL and DCTF as arms of the tribe.  A court determining the applicability of tribal sovereign immunity to an entity will inquire into whether the entity acts as an arm of the tribe so that is activities are properly deemed to be those of the tribe.[1]  While the specific inquiry varies by jurisdiction, factors generally considered center on: (1) whether the tribe created the entity

---

[1] *Allen v. Gold Country Casino*, 464 F.3d 1044, 1046 (9th Cir. 2006); *Ninigret Dev. Corp. v. Narrangansett Indian Wtuomuck Hous. Auth.*, 207 F.3d 21, 29 (1st Cir. 2000); *Cash Advance and Preferred Cash Loans v. State*, 242 P.3d 1099 (Colo. 2010).

   ROSETTE_REVISED_000986

pursuant to tribal law and dependent upon tribal government approval; (2) whether the tribe owns and controls the entity; (3) whether the entity's benefits, both economic and otherwise, are inured to the tribe in its sovereign capacity – i.e., enable the tribe to develop self-sufficiency, promote tribal economic development, and generate jobs and revenue to support the tribe's governmental services and programs; and (4) whether the entity's immunity directly protects tribal sovereignty.[2]

RRTL's or DCTF are not directly subject to Georgia regulation for acquisition of leads through 7X any more than they are subject to any other potential state enforcement and investigative actions.  However, because tribal sovereign immunity only protects a tribe or tribal entity from the enforcement of state laws (not their applicability), a state may seek to enforce its laws against individuals of the entity and affiliated third parties.

## B.    SOVEREIGN IMMUNITY & THIRD PARTY LIABILITY FROM STATE ACTION

Tribal sovereign immunity is broad but not unlimited.  While tribes are immune from enforcement of state laws, immunity does not protect non-tribal members, officers, or managers from criminal or civil liability, nor does it protect affiliated third parties.  As recently discussed in the Denver District Court Order entered in *Colorado v. Cash Advance*, Order, No. 05CV1143 (Feb. 14, 2012), a state can subpoena and seek enforcement against any non-tribal entity or officer.  Order at 22.  While an arm-of-the-tribe analysis would still be utilized to determine whether the activity is performed by an entity acting as an arm of the tribe, if an entity is found not to be acting as an arm of the tribe, the tribe's immunity will not protect its activities from not state-initiated investigative or, if applicable, enforcement action.  Therefore, if a tribally-owned entity violates a state licensing or usury law and the state statute allows for enforcement against individual officers or related affiliates, tribal sovereign immunity could not protect the non-Indian individual officers or members or third party vendors from potential prosecution, although potential defense arguments about the impropriety of piercing the corporate veil would also be available.

Prosecution of third parties through state lending, or related criminal aiding and abetting, laws is supported by the Model Penal Code.  The Model Penal Code provides some general guidance as to third-party liability.  Section 5.04 states that "it is immaterial to the liability of a person who conspires with another to commit a crime that . . . the person with whom he or she conspires . . . has an immunity to prosecution or conviction for the commission of the crime."[3]  Furthermore, Section 2.06 – addressing liability for conduct of another; complicity – states that "an accomplice may be convicted on proof of the commission of the offense and of his complicity, therein, though the person claimed to have committed the offense . . . has an immunity to prosecution or conviction."[4]  In general, these provisions have been widely accepted in the fifty state criminal codes.[5]

---

[2] *Cash Advance,* 242 P.3d at 1099 (2010).

[3] MODEL PENAL CODE § 5.04(1)(b).

[4] MODEL PENAL CODE § 2.06(7).

[5] Many portions of the Georgia Criminal Code are based upon the Model Penal Code and the Illinois Criminal Code.  *See Warren v. State*, 255 Ga. 151, 156 n.13 (Ga. 1985); *see also Haynes v. State*, 249 Ga. 119, 128-129 (Ga. 1982).   Georgia criminal precedents thus frequently rely upon the Model Penal Code and its commentary in interpretations of Georgia law.  *Drinkard v.*

As applied to RRTL's and DCTF's operations, this limitation means that there is a legal potential for prosecution of any entity not operating under the umbrella of the Tribe's sovereign immunity – i.e., any entity that is not directly operating as an arm of the tribe.  To wit, 7X as an affiliated, but not protected, entity might be susceptible to prosecution.  The exact extent of potential liability is dependent upon the scope and applicability of Georgia law.

## C.    SCOPE AND APPLICABILITY OF GEORGIA LAW

### 1.    *Georgia Payday Lending Act*

Georgia's Payday Lending Act[6] (the "Act") is decidedly broad.  Under the Act, it is unlawful for "*any* person to engage in *any* business, . . . which consists in whole or in part of making, offering, arranging, or acting as an agent in the making of loans of $3,000 or less. . . ."[7] Any person who is convicted of violating this provision of the Georgia Code is guilty of a misdemeanor and may be punished by either not more than one year imprisonment or a fine not exceeding $5,000.00.[8]   Additionally, the Act penalizes, identically, any person who "aids or abets" in such a violation.[9]  Even beyond the express language of the applicable provisions, the legislative intent of the statue is expansive.  In drafting the Act, the General Assembly "determined that various payday lenders have created certain schemes and methods in order to attempt to disguise these transactions," and attempted to draft the Act to encompass all of these "schemes and methods."

The broad language of the statute and the legislative intent invite the Attorney General and Georgia courts to interpret its scope broadly.  Therefore, while the statute does not expressly state that it is applicable to individual officers or third-party affiliates, the Attorney General could argue that it impliedly extends to both.

The language of the statute expressly includes any person (including individuals), engaging in any type of business (ostensibly including lead providers) which consists of "arranging" loans of $3,000 or less.[10]  The Georgia Attorney General would argue that a lead provider was subject to the Act because it engages in the "arranging" of payday loans, as prohibited by the statute.  "Arranging" is undefined by statute and the legislative history fails to offer any guidance as to the scope its intent.  However,  Georgia case law, unfortunately, adopts

---

*Walker*, 636 S.E.2d 530, (Ga. 2006).  We therefore expect that Georgia courts would rely upon these sections of the Model Penal Code when construing accomplice liability under the Georgia state law.

[5] GA. CODE. ANN. § 16-17-1, *et seq.*

[5] GA. CODE. ANN. § 16-17-2(a)(emphasis added).

[5] GA. CODE. ANN. § 16-17-2(d).

[5] *Id.*

[5] *See, e.g., Drinkard v. Walker*, 636 S.E.2d 530, (Ga. 2006).  We therefore expect that Georgia courts would rely upon these sections of the Model Penal Code when construing accomplice liability under the Georgia state law.

[6] GA. CODE. ANN. § 16-17-1, *et seq.*

[7] GA. CODE. ANN. § 16-17-2(a)(emphasis added).

[8] GA. CODE. ANN. § 16-17-2(d).

[9] *Id.*

[10] *Id.*

a broad interpretation of the Act, holding that the Act is flexible in its application, prohibiting payday loans in whatever form or method transacted. Specifically, the Georgia Supreme Court has held that even if the Act does not prohibit a particular lending scheme or business structure, the Legislature drafted the Act broadly enough to encompass a variety of arrangements and the affiliated parties.[11] This broad interpretation is also bolstered by the express naming of arbiters and arbitration companies as parties that might aid or abet in the violation of the Act.[12]

### 2.    Aiding & Abetting Under Georgia Law

Notwithstanding immunities that may be enjoyed by the tribe or its enterprises, non-tribal entities could be held liable for aiding and abetting tribal violations of the Act.[13] Aiding and abetting encompasses the concept of helping in the commission of a crime.[14] Georgia defines aiding and abetting as follows:

> "Aid and abet" means to "[h]elp, assist, or facilitate the commission of a crime, promote the accomplishment thereof, help in advancing or bringing it about, or encourage, counsel, or incite as to its commission. It comprehends all assistance rendered by words, acts, encouragement, support, or presence, actual or constructive, to render assistance if necessary." "In essence, ... a defendant must be an accessory before the fact."[15]

Any person who aids and abets another in the commission of a misdemeanor is regarded as guilty as the actual perpetrator of the crime and may be indicted as such.[16] If the tribe or its enterprises violate the Act, it thus stands to reason that non-tribal servicers of tribal payday lending businesses, as well as the officers of said entities, could be held liable as principals if Georgia pursued them.[17]

To be sure, Georgia has not adopted the Model Penal Code in full, nor has any other state. But many portions of the Georgia Criminal Code *are* based upon the Model Penal Code, as well as the Illinois Criminal Code.[18] Moreover, Georgia criminal precedents frequently rely upon the

---

[11] *Glenn v. State*, 644 S.E.2d 826, 828 (Ga. 2007)(holding that the selling of land options with rebates or check cashing both fall under the purview of the Act. "The Legislature expressly recognized that 'various payday lenders have created certain schemes and methods in order to attempt to disguise these transactions,' and accordingly defined the prohibited conduct in a manner to encompass all of the creative ways payday lenders might use to avoid the Act")(citing Ga. Code Ann. § 16-17-1(c)).

[12] Ga. Code Ann. § 16-17-1(d).

[13] *Id.* ("Any person who aids or abets such a violation, including any arbiter or arbitration company, shall likewise be guilty of a misdemeanor of a high and aggravated nature and shall be punished as set forth in this section").

[14] *Sharpe v. State*, 531 S.E.2d 84, 89 (Ga. 2000).

[15] *Jones v. State*, 503 S.E.2d 902, 904 (Ga. App. 1998).

[16] *Moon v. State*, 85 Ga. App. 212, 214 (1952).

[17] *Brawner v. State*, 87 Ga. App. 746, 749 (1953).

[18] *See Warren v. State*, 255 Ga. 151, 156 n.13 (Ga. 1985); *see also Haynes v. State*, 249 Ga. 119, 128-129 (Ga. 1982).

Model Penal Code and its commentary in interpreting of Georgia law.[19]  We therefore expect that Georgia courts would rely upon the same sections of the Model Penal Code referenced above in considering whether officers should be held criminally liable under the Act.

Liability could also hinge on interpretation of the statute and whether the officers in question had been given "fair warning of the nature of the conduct forbidden and the sentence authorized upon conviction."[20]  But Georgia criminal statutes are narrowly construed against the state and liberally in favor of the defendant.[21]  That is, no person can be held responsible for criminal conduct which is not reasonably understood as being illegal.[22]  Here, however, the conduct criminalized by the Act is relatively clear: making payday loans.  Officers of non-tribal servicers are therefore could face liability under the Act for aiding and abetting payday lending for tribal entities or the tribes themselves.

3. *Officer Liability Under Georgia Law: Piercing the Corporate Veil and Individual Culpability*

Even if the Georgia law could reach a non-tribal entity or affiliate, there is still an additional step to hold individual officers liable.  It is a longstanding principle that officers and shareholders are generally not personally liable for corporate acts.[23]  Individual officer of a corporate entity may only be held liable under two circumstances:  (1) where the corporate veil is pierced, or (2) where the officer is individually liable.  The former involves misuse of the corporate form and the latter is a product of the officer's individual misconduct.

The concept of piercing the corporate veil is applied in Georgia to remedy injustices which arise where a party has "overextended" its privilege in the use of a corporate entity in order to "defeat justice, perpetuate fraud, or to evade contractual or tort responsibility."[24]  To pierce the corporate veil, there must be evidence of abuse of the corporate form.  To prove such, it is necessary to show that the shareholders disregarded the corporate entity and made it a "mere instrumentality for the transaction for their own affairs" so that "there is such unity of interest

---

[19] *See, e.g., Drinkard v. Walker*, 636 S.E.2d 530, (Ga. 2006).
[20]   § 16-1-2(2).  *See also City of Jesup v. Bennett*, 226 Ga. 606, 609 (1970) (internal citations omitted) ("In reaching a correct result in this case we are not unmindful that, where the language of an Act is plain and unequivocal, judicial construction is not only unnecessary but is forbidden. However, even though the literal language of an Act may be plain and unequivocal it is the duty of the courts, in determining the legislative intent under the cardinal rule first alluded to, to refrain from ascribing to the legislature a wholly unreasonable intention or an intention to do a futile and useless thing.  So, where to construe an Act of the legislature in a particular way would, while hewing to its literal terms, result in defeating the obvious legislative purposes and intent, such construction will not be given where an obvious typographical or clerical error can be corrected so as to carry out such intent.  Finally, in construing the statute so as to give effect to the legislative intent a mere segment of the statute should not be lifted out of context and construed without consideration of all the other parts of the statute.")
[21] *Billingsley v. State*, 183 Ga. App. 850, 852 (1987).
[22] *State v. Luster*, 204 Ga. App. 156, 157(1992).
[23]*Milk v. Total Pay & HR Solutions*, 634 S.E.2d 406 (Ga. App. 1995).
[24] *Amason v. Whitehead*, 367 S.E.2d 107 (Ga. App. 1988).

and ownership that [25]  Specifically, Georgia courts have found that evidence of such abuse can be shown by a "commingling on an interchangeable or joint basis or confusing the otherwise separate properties, records, or control."[26]  Unless the Georgia Attorneys General Office could produce evidence that the individual officers of 7X abused the corporate form by disregarding the separateness of the corporation through commingling or confusing its assets, records or control with their own, a Georgia court would not find that the corporate veil could be pierced.

When the evidence is insufficient to pierce the corporate veil, the liability of the corporate officers for a tortious or criminal act committed by the corporation is dependent upon separate evidence of the individual officer's direct participation in the misconduct.[27]  A corporate officer who takes part in the commission of a tortious or criminal act committed by the corporation is personally liable therefor, but an officer of a corporation who takes no part in the commission of a tortious or criminal act by the corporation is not personally liable unless he or she specifically directed the particular act to be done or participated or cooperated therein."[28] Georgia courts have found that "an officer of a corporation cannot assert that criminal acts, in the form of corporate acts, were not his acts merely because carried out by him through the instrumentality of the corporation which he controlled and dominated in all respects and which he employed for that purpose."[29]  Therefore, unless the Georgia Attorney General can produce evidence that an individual officer of 7X (or other non-tribal affiliate) personally "arranged" payday loans, culpability cannot be individually assigned.

**D.** **GEORGIA'S  ABILITY TO PURSUE THIRD PARTIES: EXAMPLES FROM THE TRUE LENDER, GAMING, AND THE CIGARETTE TAX CONTEXTS**

To better understand how Georgia might pursue a lead provider as a third-party affiliate of a tribal entity, we turn to three analogous contexts: Partnerships between In-State Agents and Out-of-State Banks; Gaming; and Cigarette Sales.

*1.* *True Lender Analysis: Partnership Agreements between In-State Agents and Out-of-State Banks*

Because many state usury and lending laws provide an exception for out-of-state, FDIC-regulated banks, many in-state entities entered into partnership agreements with out-of-state banks to offer short-term loans.  Through these agreements, an in-state entity would operate merely as an agent or "broker" in the entering into of certain short-term, small credit loans on behalf of the out-of-state bank.  This behavior guided many states, including Georgia, to amend or create stricter laws regarding the "true lender" in such arrangements.

Georgia's Payday Lending Act was created with the specific intent of preventing this behavior.  In the Act's Legislative Intent, the General Assembly expressly declares that "the use of agency or partnership agreements between in state entities and out-of-state banks, whereby the in-state agent holds a predominant economic interest in the revenues generated by payday loans made to Georgia residents, is a scheme or contrivance by which the agent seeks to circumvent

---

[25] *Baillie Lumber Co. v. Thompson, 612 S.E.2d 296, 297 (Ga. 1988).*

[26] *Pazur v. Belcher*, 659 S.E.2d 804

[27] *Beasley v. A Better Gas Co.*, 604 S.E.2d 202 (Ga. App. 2004).

[28] *Lawton v. Temple-Warren Ford. Inc.*, 416 S.E.2d 527 (Ga. App. 1992).

[29] *Parish v. State*, 342 S.E.2d 360 (Ga. App. 1986).

[Georgia law]."[30]    The "true lender" in these "schemes," the General Assembly reasoned, was the in-state entity.

When addressing the "true lender" issue, a Georgia Court of Appeals found that despite the presence of the out-of-state bank exception in the statute and a partnership agreement between the parties, the in-state agent of an out-of-state bank could still be subject to investigations for potential violations of Georgia law.[31]    In the specific case, Advance America, a Georgia-based lender made short-term consumer loans as an agent for, and pursuant to a Marketing and Servicing Agreement with, BankWest, Inc., a South Dakota federally-insured state bank.    The court held that Advance America was still subject to the State's investigative authority because "parties to a private contract who admittedly make loans to Georgia residents cannot, by virtue of [provisions of that contract], exempt themselves from investigation."[32]    The court reasoned that the State's investigatory power included the ability to determine if Advance America was the de facto lender.    In coming to this conclusion, the court was troubled by various terms in the Marketing and Servicing Agreement, specifically: that Advance America received a majority of the fee or interest charged on each loan and retained a majority of the risk of loss; Advance America agreed to indemnify BankWest for claims relating to the loans; and that Advance America operated independently in states where payday lending was legal but as an agent for an out-of-state bank in states where payday lending was illegal.

### 2.    Gaming: The Inapplicability of Cabazon and other Gaming Cases

While at first blush it might appear that the liability of third parties associated in tribal lending is most similar to cases involving tribal casinos, tribal casino operations are uniquely situated because of the statutory and procedural guidelines established by the Indian Gaming Regulatory Act ("IGRA").    Among IGRA's numerous requirements, a tribe must authorize its casino through a tribal ordinance and an interstate gaming compact. 25 U.S.C. § 2710(d)(1). Therefore, states are not often in the position of pursuing regulatory or criminal claims against tribes or affiliated entities and, if they do, they do so through the procedures provided for in IGRA. Beyond the procedures for state enforcement provided for under IGRA, specific states have also tried to pursue enforcement under Public Law 280.    Under P.L. 280, Congress expressly granted six states[33] extensive criminal and civil jurisdiction over tribal lands within the affected states. The statute provided for a broad grant of criminal jurisdiction over offenses committed by or against Indians within all Indian Country within the State and a more limited grant of civil jurisdiction.

In *California v. Cabazon Band of Mission Indians,*[34] California attempted to apply state gaming restrictions on tribal land under its P.L. 280 authority.    The Supreme Court rejected the state's argument and adopted a "criminal/prohibitory" "civil/regulatory" distinction.[35]    The court held that "if the intent of a state law is generally to prohibit certain conduct, it falls within PL 280's grant of criminal jurisdiction, but if the state law generally permits the conduct at issue,

---

[30] GA. CODE. ANN. § 16-17-1(c).

[31] *BankWest, Inc. v. Oxendine*, 266 Ga.App. 771 (2004).

[32] *Id.* at 775.

[33] Five states initially – California, Minnesota, Nebraska, Oregon, and Wisconsin – then Alaska upon statehood.

[34] 480 U.S. 202 (1987).

[35] *Id.* at 209.

subject to regulation, it must be classified as civil/regulatory and PL 280 does not authorize its enforcement on an Indian reservation."[36]   Because the Court found that California did not prohibit all forms of gambling (allowing bingo and promoting a state lottery), it held that the state's relationship to the behavior was regulatory in nature and therefor unenforceable on Indian lands.   Furthermore, the Court rejected California's argument that *unregulated* bingo was a misdemeanor and, therefore, may be prohibited under the state's broad criminal jurisdiction on Indian reservations.   As the court reasoned, "but that an otherwise regulatory law is enforceable by criminal as well as civil means does not necessarily convert it into a criminal law within the meaning of PL 280."[37]

As applied to Georgia payday lending laws, state jurisdiction under PL 280 is inapplicable for two reasons: first, Georgia is not a PL 280 state; second, even if it were granted PL 280 jurisdictional authority (extremely unlikely given the basic federal departure from PL 280 as an outdated "termination era" policy), the Georgia law only seeks to regulate, but does not prohibit outright, the provision of payday loans in the state.

### 3. Cigarette Taxes and the Culpability of Manufacturers and Wholesalers

Unlike in the gaming context, the relationship of wholesalers of cigarettes to tribal cigarette retailers is comparable to tribal lending entities and affiliated third parties.   The Supreme Court has, on numerous instances, addressed the ability of states to regulate tribal sales of cigarettes to non-members and the scope of a state's authority to enforce those regulations.   In these instances, the Supreme Court has consistently upheld a state's right to tax a tribal entity's on-reservation sales to non-members.[38]   And a state's effort to enforce those laws is not entirely foreclosed by sovereign immunity.   As the Court stated in *Potawatomi*:

> "There is no doubt that sovereign immunity bars the State from pursuing the most efficient remedy, but we are not persuaded that it lacks any adequate alternatives. We have never held that individual agents or officers of a tribe are not liable for damages in action brought by the State.  And under today's decisions, States may of course collect the sales tax from cigarette wholesalers, either by seizing unstamped cigarettes off the reservation, or by assessing wholesalers who supplied unstamped cigarettes to the tribal stores.  States may also enter into agreements with the tribes to adopt a mutually satisfactory regime for the collection of this sort of tax.  And if Oklahoma and other States similarly situated find that none of these alternatives produced the revenues to which they are entitled, they may of course seek appropriate legislation from Congress."[39]

Just as a state may seek to collect taxes from wholesalers or make off-reservation seizures of a wholesaler's illegally transported products, a state could seek to enforce its state

---

[36] *Id.*

[37] *Id.* at 211.

[38] *Potawatomi*, 498 U.S. at 512 ("Oklahoma argues that the Potawatomi's tribal immunity notwithstanding, it has the authority to tax sales of cigarettes to nonmembers of the Tribe at the Tribe's convenience store.  We agree.")

[39] 498 U.S. at 514.

lending laws through investigative and adjudicatory action against a tribal lender's third party vendors or servicers.[40]

## E.  OTHER STATE STATUTES

Whether a third party can be held civilly or criminally liable for state lending violations is ultimately dependent upon state statue, which varies widely amongst the states. Most state statues require individual knowledge for culpability associated with usury or licensing violations. Some states extend criminal liability to officers and members of violative entities. And a few states extend criminal liability even to those who directly or indirectly fund or participate in the violations.

Examples of how states with large population centers treat usury and licensing violations is instructive in considering how Georgia might try to enforce its laws.

### 1.    California

California law assesses civil and criminal penalties for violations of the state's usury laws. However, liability is limited to the person or entity that actually lent and received funds in excess of the state's usury laws. Specifically, the California "loan-sharking" law holds criminally liable any person, company, association or corporation "who willfully makes or negotiates, for himself or another, a loan of money, . . . and who directly or indirectly charges, contracts for, or receives with respect to any such loan any interest or charge of any nature, the value of which is in excess of that allowed by law."[41] A violation of the California loan-sharking law is a felony and is punishable by not more than five years in state prison or one year in county jail.

Importantly, the California courts have interpreted this language to require conscious participation in the violation by the member, officer or director who is to be punished therefor.[42] "The mere fact that [a person] is such member, officer or director at the time of the violation is not enough."[43] Therefore, in California, service-provider's members and/or officers cannot be held criminally liable unless he or she, in his or her role in the company, approves a loan or receives funds in excess of the state's usury laws.

### 2.    Arizona

Arizona law makes usury a class 1 misdemeanor, a lesser offense than in California. However, unlike California, those that may be prosecuted for usury include both those that "knowingly engage in" or those that "directly or indirectly provide financing for the business of making loans at a higher rate of interest or consideration than authorized by law."[44] The violation for licensing is simply the voiding of any loan.[45]

---

[40] *See e.g., Dept. of Tax. and Fin. v. Milhelm Attea & Bros.*, 512 U.S. 61 (1994).

[41] CAL. CIV. CODE § 1916-3(b),

[42] *People v. Campbell*, 291 P. 161 (Cal. Ct. App. 1930).

[43] *Id.*

[44] ARIZ. REV. STAT. § 13-2208.

[45] ARIZ. REV. STAT. § 6-613 ("Any consumer lender loan that is made by a person who . . . is not licensed is void, and the person making that consumer lender loan has no right to collect, receive

The language of the Arizona usury law is broad and no case law exists to provide further guidance or interpretation. However, the plain language of the statute does not implicate a service-provider's services and/or its officers or members. Servicing companies do not actually "engage in" the business of loaning money. Finally, the statute does not extend liability to individual officers or members. Therefore, individually liability is not a significant risk.

### 3.    New York

New York's usury and licensing laws apply broadly. New York's criminal usury statutes, like others, still requires a personal violation, requiring an individual to "knowingly charge, take, or receive" interest at a rate exceeding 25% per annum in order to be in violation.[46] However, a violation of New York's licensing requirement is much more broad. "Any person or other entity, including the officers, directors, agents, and employees thereof, which shall violate or participate in the violation" of the licensing requirement "shall be guilty of a misdemeanor."[47] Under this language, it is possible that individual officers of service-providers could be held personally liable for "participating" in licensing violations in New York.

### 4.    Texas

Texas only assesses criminal penalties for usury and such penalties are only assessed for the actual contracting for, charging for, or receipt of usurious interest.[48] Without the occurrence of any one of those conditions, the penalty provisions are not triggered.[49] Therefore, because neither service-providers, nor their officers, will be specifically nor individually contracting for, charging, or receiving usurious interest, they do not bear a significant risk of criminal liability.

### 5.    Florida

Florida usury law is similar to other states in that violations are only assessed against the person or company actually engaged in lending and/or receiving funds.[50] Licensing violations are applied to any financial institution, "or its officers, directors, or employees."[51] Florida courts have found usury and licensing violation analogous to officer liability for tortious conduct, so that principals of a lender can only be personally liable for damages arising from the lender's usurious or unlicensed conduct to the extent of the individual's knowledge and participation in the transaction.[52] Furthermore, "transaction" has been interpreted to mean the specific transaction or transactions in question.[53] Therefore, unless a service-provider's officers have

---

or retain any principal, finance charges or other fees in connection with that consumer lender loan."

[46] N.Y. PENAL LAW § 190.40. Criminal usury in the first degree requires a previous conviction of criminal usury. N.Y. PENAL LAW § 190.42.

[47] N.Y. BANKING LAW § 358. See also N.Y. BANKING LAW § 340 (Doing business without license prohibited).

[48] TEX. FIN. CODE ANN. § 305.001.

[49] *Tanner Dev. Co. v. Ferguson*, 561 S.W.2d 777 (Tex. 1997).

[50] FLA. STAT. § 687.071.

[51] FLA. STAT. § 655.942.

[52] *Alliegro v. Pan American Bank of Miami*, 136 So.2d 656 (Fla. Dist. Ct. App. 1962), *cert. den.* 149 So.2d 45.

[53] *Kay v. Amendola*, 129 So.2d 170 (Fla. Dist. Ct. App. 1961).

personal knowledge of or participate in specific usurious or unlicensed transactions, liability cannot be assessed against them.

## III.    CONCLUSION

Criminal liability of individual officers is entirely dependent upon state statute.  Most states limit penalties to those actually engaged in the act of lending and/or receiving usurious or unlicensed funds.  However, a small number of states, like New York, specifically assign liability to individual corporate officers and indirect participants of usurious and/or unlicensed activity.

Georgia's broad payday lending laws and the willingness of Georgia courts to apply those laws expansively, signals that the state might pursue non-Indian third party vendors, including engaged in the chain of acquiring Georgia consumer information from a lead provider or in direct-marketing to Georgia consumers. But Georgia's ability to go-after third-party service providers is by no means clear.

As a practical matter, it is worth noting that, even where it is statutorily provided for, individual criminal or civil liability against individual service-provider officers would be difficult to assess.  States would generally gain information of a service-provider's activities through investigatory subpoenas served on known lending entities, which in this case are immune from state enforcement actions.  While, as stated in section A of our analysis above, a state could certainly subpoena and/or initiate an enforcement action against a non-tribal service-provider, it will likely be difficult for state enforcement agencies to gain the necessary information to do so.  And even if Georgia had that information, from a policy perspective, it is difficult to assess why Georgia would make the choice to attack an individual's or a third-party's provision of services to an Indian tribal government clearly acting pursuant to its sovereign authority.  If Georgia undertook such an effort, the state could readily expect significant tribal opposition.

It is possible that individuals or third-party service-providers could be held liable for criminal violations of Georgia law, but we do not see attempted prosecutions by Georgia as particularly likely.  Georgia has been deferring in significant part to the FTC and the CFPB in these matters and would likely follow their lead on any third-party efforts.  As you know, the FTC's third-party enforcement efforts in the tribal model context are in their infancy and pending in the *Tucker* litigation in Nevada, which we continue to monitor closely.

Exhibit 17

MICHELLE HAZEN on 10/16/2017

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE EASTERN DISTRICT OF VIRGINIA

 3                     Richmond Virginia

 4       -------------------------------X

 5       LULA WILLIAMS, ET AL. ON BEHALF

 6       OF THEMSELVES AND ALL OTHER

 7       SIMILARLY SITUATED INDIVIDUALS,

 8                     Plaintiffs,        Civil Action No.

 9              v.                        3:17-CV-461 (REP)

10       BIG PICTURE LOANS, LLC, ET AL.,

11                     Defendants.

12       -------------------------------X

13

14              Deposition of MICHELLE HAZEN

15                     October 16, 2017

16                       10:18 a.m.

17

18              Troutman Sanders, LLP
           1850 Towers Crescent Plaza, Suite 500
19           Tysons Corner, Virginia 22182

20

21

22       Lisa R. Barbera              JOB NO. 182180
```

USCA4 Appeal: 23-2097    Doc: 11-4    Filed: 12/06/2023    Pg: 456 of 503

**MICHELLE HAZEN on 10/16/2017**

```
 1        Q.   And was he also a comanager of Red Rock

 2   Tribal Lending with you?  Actually, I'll withdraw my

 3   question.

 4             Do you know if Mr. Williams or Craig

 5   Mansfield were a comanager of Red Rock Tribal

 6   Lending with you?

 7        A.   I don't recall.

 8        Q.   Okay.  When did you become a comanager or

 9   CEO of the tribal lending entities?

10             MR. GRAY:  Objection to the form.  Can you

11        clarify which entities?

12             MS. KELLY:  Either one.

13             THE WITNESS:  Can you repeat your

14        question?  I'm sorry.

15   BY MS. KELLY:

16        Q.   At what time did you get involved with

17   either of the tribal lending entities, either as a

18   CEO or comanager?

19        A.   2011.

20        Q.   And in 2011, which tribal lending entity

21   were you involved with?

22        A.   Red Rock Tribal Lending.
```

**MICHELLE HAZEN on 10/16/2017**

```
 1        A.   Yes.

 2        Q.   And then -- at the bottom, there's SQAs.

 3   Do you see that?

 4        A.   Yes.

 5        Q.   What does that stand for?

 6        A.   Senior quality assurance.

 7        Q.   And do you know where those individuals

 8   are located?

 9        A.   St. Croix.

10        Q.   So those people are not located at the

11   call center; is that correct?

12        A.   Yes.

13        Q.   Do you know where the 269 call center

14   employees are located?

15        A.   Philippines.

16        Q.   Okay.  And then below that, you see junior

17   QAs.  Do you see that?

18        A.   Yes.

19        Q.   And there's eight of those people listed.

20   Do you know where those junior QAs are located?

21        A.   St. Croix.

22             MS. KELLY:  Okay.  Mark this, please.
```

USCA4 Appeal: 23-2097 Doc: 11-4 Filed: 12/06/2023 Pg: 458 of 503

```
 1        mischaracterization of testimony.

 2             THE WITNESS:  No.  After the application

 3        is completed, that underwriting -- step number

 4        two in the underwriting.

 5   BY MS. KELLY:

 6        Q.   Okay.  What's the underwriting process?

 7        A.   It's -- it's a decision engine where all

 8   of the models, that are approved by Big Picture

 9   Loans, are put into a decision engine.

10        Q.   Right.  But it's an automated process.

11        A.   Yes.

12        Q.   When I type my information in on the

13   website, and I put it all in, a decision is made and

14   then the loan agreement pops up and then I scroll

15   through it; right?

16             MR. GRAY:  Objection to form.

17             THE WITNESS:  Yes.

18   BY MS. KELLY:

19        Q.   And I check the box to sign my name;

20   right?

21             MR. GRAY:  Asked and answered.

22             THE WITNESS:  Yes.
```

MICHELLE HAZEN on 10/16/2017

1   BY MS. KELLY:

2       Q.   And none of that is handled by Big Picture

3   employees because it is an automated process;

4   correct?

5           MR. GRAY:  Objection.

6       Mischaracterization.

7           THE WITNESS:  Yes.

8   BY MS. KELLY:

9       Q.   Okay.  And so after a consumer signs the

10  loan agreement, Big Picture then checks the document

11  to make sure it looks right and calls to verify

12  their bank information; correct?

13          MR. GRAY:  Objection.  That's a

14      mischaracterization of testimony.  It's asked

15      and answered already.

16          THE WITNESS:  Can you repeat the question?

17  BY MS. KELLY:

18      Q.   Sure.  After I sign the agreement, it then

19  goes to Big Picture employees on tribal land to look

20  over the agreement, make sure everything's in the

21  right spot, and verify the bank information I

22  provided?

USCA4 Appeal: 23-2097    Doc: 11-4       Filed: 12/06/2023    Pg: 460 of 503

```
 1              MR. GRAY:  Same objection.

 2              THE WITNESS:  Yes.

 3    BY MS. KELLY:

 4       Q.  Do any employees that are not located on

 5    the reservation, ever call the banks to verify bank

 6    information?

 7              MR. GRAY:  Objection to form.

 8              THE WITNESS:  Yes.

 9    BY MS. KELLY:

10       Q.  Which employees do that?

11       A.  The call center.

12       Q.  The call center in the Philippines?

13       A.  Yes.

14       Q.  And is that done by other CSRs?

15              MR. GRAY:  Objection, form.

16              THE WITNESS:  By other CSRs?  What do you

17       mean, in the Philippines?

18    BY MS. KELLY:

19       Q.  Other -- yes.  CSRs located in the

20    Philippines.  Is that the job title that handles

21    that, a customer service representative?

22       A.  Yes.
```

**MICHELLE HAZEN on 10/16/2017**

```
 1        Q.   Okay.  How many -- in terms of a breakdown

 2   on at monthly basis, there's 10,000, on average,

 3   loans originated, or loans that are accepted -- let

 4   me rephrase that.

 5             There's approximately 10,000 loans on

 6   average a month.  Of those 10,000, how many would

 7   the employees on tribal land call to verify the bank

 8   information for versus employees located elsewhere?

 9             MR. GRAY:  Objection to form and

10        mischaracterizes testimony.

11             THE WITNESS:  I don't know.

12   BY MS. KELLY:

13        Q.   Do you have any idea what percentage the

14   employees on tribal land -- what percentage they

15   handle versus what the percentage in the other

16   offices handle?

17             MR. GRAY:  Asked and answered.

18             THE WITNESS:  Off the top of my head, no.

19   BY MS. KELLY:

20        Q.   So looking at your declaration, paragraph

21   30, we just went over the process for taking out a

22   loan online.  And so items A, B, and C, are all part
```

USCA4 Appeal: 23-2097    Doc: 11-4    Filed: 12/06/2023    Pg: 462 of 503

**MICHELLE HAZEN on 10/16/2017**

```
 1    CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

 2              I, Lisa Barbera, Shorthand Reporter and

 3         Notary Public, the officer before whom the

 4         foregoing deposition was taken, do hereby

 5         certify that the foregoing transcript is a true

 6         and correct record of the testimony given; that

 7         said testimony was taken by me stenographically

 8         and thereafter reduced to typewriting under my

 9         supervision; and that I am neither counsel for

10         or related to, nor employed by any of the

11         parties to this case and have no interest,

12         financial or otherwise, in its outcome.

13              IN WITNESS WHEREOF, I have hereunto set my

14         hand and affixed my notarial seal this 19th day

15         of October, 2017.

16              My commission expires:

17              April 30, 2022

18

19         Lisa Barbera

20         _____

21    NOTARY PUBLIC IN AND FOR THE

22    STATE OF DISTRICT OF COLUMBIA
```

Exhibit 18

**SERVICING AGREEMENT**

**BETWEEN**

**RED ROCK TRIBAL LENDING, LLC**

**AND**

**BELLICOSE VI, INC.**

**OCTOBER 25, 2011**

JA1845

CONFIDENTIAL

MARTORELLO_026256

## TABLE OF CONTENTS

1.   Recitals..................................................................................................................1
2.   Definitions............................................................................................................2
3.   Covenants.............................................................................................................5
4.   Business and Affairs in Connection with Enterprise. ..........................................8
5.   Liens and Debt. ..................................................................................................16
6.   Servicer Fee Reimbursement, Disbursement, and Capital Contribution. ...........16
7.   General Provisions. ............................................................................................17
8.   Warranties. .........................................................................................................22
9.   Grounds for Termination. ..................................................................................23
10.  Conclusion Of the Servicing Term ....................................................................25
11.  Consents and Approvals. ...................................................................................25
12.  Disclosures. .......................................................................................................25
13.  No Present Lien Lease or Joint Venture ............................................................26
14.  Enterprise's Limited Waiver of Sovereign Immunity .......................................26
15.  Time is of the Essence .......................................................................................27
16.  Tribal Assets ......................................................................................................28
17.  Governing Law ..................................................................................................28
18.  Dispute Resolution.............................................................................................28
19.  Performance During Disputes............................................................................31
20.  Confidential Information ...................................................................................31
21.  Execution ...........................................................................................................32
22.  Enterprise Name.................................................................................................32
23.  Intent to Negotiate New Agreement ..................................................................32
24.  Entire Agreement ...............................................................................................32
25.  Additional Actions .............................................................................................32
26.  Representation.....................................................................................................33

**Schedule 1.0 – Tribal Laws**

**Schedule 18.2.1 - List of Pre-Approved Arbitrators**

*i*

CONFIDENTIAL                                                      MARTORELLO_026257

*ii*

JA1847

MARTORELLO_026258

# SERVICING AGREEMENT

**THIS SERVICING AGREEMENT** ("Agreement") is made and entered into as of this 25th day of October 2011, by and between RED ROCK TRIBAL LENDING, LLC ("Enterprise"), an economic development arm and instrumentality of, and a limited liability company wholly owned by the LAC VIEUX DESERT BAND OF LAKE SUPERIOR CHIPPEWA INDIANS ("Tribe"), a federally-recognized Indian Tribe and sole member of the Enterprise, and BELLICOSE VI, INC. ("Servicer"), a U.S. Virgin Islands corporation with offices in the U.S. Virgin Islands. Each of Enterprise and Servicer may be referenced hereinafter individually as a "Party" or together, as the "Parties."

1.   **Recitals.**

**1.1**   The Tribe is a federally-recognized Indian tribe. The Tribe possesses sovereign governmental authority pursuant to the Tribe's inherent and recognized powers of self-government.

**1.2**   The Tribe has established Enterprise, a limited liability company wholly owned by and formed under the laws of the Tribe, as an economic development arm and instrumentality of the Tribe.

**1.2.1**   The purpose of Enterprise is to promote the self-sufficiency of the Tribe and to address the socio-economic needs of the Tribe, its members, its families, and its community by building capital within the tribal community. This capital will subsequently be dispersed to the Tribe through the Enterprise, and used at the Tribe's discretion for the benefit of its members and the community through tribal initiatives and tribal governmental programs. The increase of such capital, as well as the initiatives and programs funded by it, will guarantee that the Tribe can continue to care for itself, its members, and its community by promoting greater self-determination, political and social autonomy.

**1.2.2**   The Enterprise, pursuant to its Governing Documents, has the exclusive right to develop and operate the Tribe's financial services business that will provide small-denomination short-term financial services and other related goods and services to consumers through its internet call-center and field representative operations and has been directed and authorized to take any and all action as is deemed necessary or desirable in connection with such business and services, including but not limited to the authority to act as the exclusive agent to enter into and to exercise the rights and perform the obligation of Enterprise under this Agreement.

**1.2.3**   The Tribe, through Enterprise, desires to engage in internet-based unsecured lending, as hereinafter defined, and provision of financial services. It is the Tribe's hope that Enterprise's endeavors will improve the economic conditions of its members; enable the Tribe to better serve the social, economic, educational and health needs of the Tribe, its members, and its community; increase Tribal revenues; enhance the Tribe's economic self-sufficiency and self-determination; and provide positive, long-term social, environmental and economic benefits.

*1*

JA1848

CONFIDENTIAL

MARTORELLO_026259

**1.3**    Enterprise is seeking managerial, technical and financial experience and expertise for the development and operation of the new Unsecured Lending Business, as defined below. The Servicer is a company located in the U.S. Virgin Islands which provides management and consulting services to companies engaged in the Unsecured Lending Business and is willing and able to provide such assistance, experience, expertise and instruction to the Enterprise.

**1.4**    The Enterprise, through a contractual relationship, desires to retain and engage the Servicer as its independent contractor to consult to, develop, manage, and provide operational guidelines regarding the Unsecured Lending Business and any expansion thereof during the term of this Agreement and conforming with the provisions of this Agreement.  In addition to providing investment and capital management services, management, operations and marketing consulting, Servicer also provides analytic services to its roster of clients, including risk assessment and management. The parties believe that Servicer possesses the necessary experience and skill to effectively analyze portfolio composition, trends in performance and predictive measures of potential new customers to the Enterprise to increase the profitability and overall risk profile of the Enterprise.

**1.5**    Each Party represents and warrants that the individuals executing this Agreement, as set forth in the signature blocks below, are fully and properly authorized under controlling law to enter into this Agreement on behalf of their respective organizations; and that the respective organizations have duly approved and ratified the terms of this Agreement.

**1.6**    In addition to the representations and warranties made in Section 12.1 herein, each Party represents and warrants that the individuals executing this Agreement, Enterprise management and Servicer management, do not have criminal records involving any financial crimes or crimes of dishonesty that might trigger any concern from any regulatory body with respect to their involvement in a consumer financial services business.

**1.7**    The Servicer further represents and warrants that it, along with all other members of the management as well as employees having any responsibility for the business of the Enterprise, meets the eligibility requirements for licensing pursuant to the Tribe's Consumer Financial Services Regulatory Code.  Proper licensing is a requirement for entering into this Agreement and the Transaction Documents.

**2.**    **Definitions**. Unless otherwise specified in this Agreement, as they are used in this Agreement, the terms listed below shall have the meaning assigned to them in this Section:

**2.1**    **Affiliate**. "Affiliate" means as to Servicer or Enterprise, any corporation, partnership, limited liability company, joint venture, trust, department or agency or individual controlled by, under common control with, or which controls, directly or indirectly Servicer or Enterprise. "Control" means (i) ownership, control, or power to vote twenty five percent (25%) or more of the outstanding shares of any class of voting securities, directly or indirectly or acting through one (1) or more persons, (ii) control in any manner over the election of a majority of the directors, trustees, or general partners (or individuals exercising similar functions), or (iii) the power to exercise, directly or indirectly, a controlling influence over management or policies.

JA1849

CONFIDENTIAL

MARTORELLO_026260

**2.2** **Authorized Debt**. "Authorized Debt" shall have the meaning given to it in Section 5.2.

**2.3** **Commencement Date**. "Commencement Date" shall be the Effective Date.

**2.4** **Commercial Finance Provider**. "Commercial Finance Provider" shall mean any entity that provides credit to Enterprise for the making of Consumer Loan Transactions.

**2.5** **Consumer Loan Transaction**. "Consumer Loan Transaction" means any form of consumer financial services transaction provided by a financial services provider to a consumer or other person that is unsecured or secured by way of ACH agreements.

**2.6** **Effective Date**. The "Effective Date" shall mean the date above written.

**2.7** **Enterprise**. The "Enterprise" is the instrumentality and commercial subdivision of the Tribe formed to engage in (a) the Unsecured Lending Business; and (b) any other lawful commercial activity allowed upon approval of the Tribe as sole member of the Enterprise pursuant to Enterprise's Governing Documents. The Enterprise shall not include any commercial enterprise conducted by the Tribe or any other instrumentality of the Tribe other than as set forth immediately above in this Section 1.2. Enterprise shall have the sole proprietary interest in and responsibility for the conduct of all activities conducted by Enterprise, subject to the rights and responsibilities of the Servicer under this Agreement.

**2.8** **Enterprise Employees**. "Enterprise Employees" shall mean a generic reference to those employees who are employed by Enterprise.

**2.9** **Fiscal Year**. "Fiscal Year" shall mean each twelve (12) month period, or portion thereof, ending on December 31 of each year, or on such other date as may be adopted by Enterprise in the future as the ending date of its fiscal year.

**2.10** **Governing Documents**. "Governing Document" shall mean Enterprise's Articles of Organization and Operating Agreement, if any.

**2.11** **Governmental Action**. "Governmental Action" shall mean any resolution, ordinance, statute, regulation, order or decision regardless of how constituted having the force of law or legal authorization of the Tribe or any instrumentality or agency of the Tribe.

**2.12** **Gross Revenues**. "Gross Revenues" shall mean all revenues of any nature derived directly or indirectly from the operation of Enterprise (including the gross revenues of all Subsidiaries) on a consolidated basis.

**2.13** **Legal Requirements**. "Legal Requirements" shall mean singularly and collectively all applicable laws including without limitation all applicable tribal and federal law.

**2.14** **Net Revenues**. "Net Revenues" for the purpose of this Agreement shall mean Gross Revenues of the Enterprise less all Servicing Expenses.

*3*

JA1850

MARTORELLO_026261

**2.15    New Transaction**. "New Transaction" means a Consumer Loan Transaction with a new customer.

**2.16    Operations Manager**. "Operations Manager" shall mean the person employed by Enterprise, if any, to direct the day-to-day operations of Enterprise and to coordinate with the Servicer as defined above as well as any other entities providing services to the Enterprise.

**2.17    Primary Bank Account**. "Primary Bank Account" shall have the meaning given to it in Section 4.4.

**2.18    Refinancing Transaction**. "Refinancing Transaction" means a Consumer Loan Transaction that extends or refinances, in whole or in part, an outstanding Consumer Loan.

**2.19    Regulatory and Litigation Reserve Fund**. "Regulatory and Litigation Reserve Fund" shall mean that fund established pursuant to Section 4.5 of this Agreement and shall be considered a Servicing Expense of Enterprise.

**2.20    Repeat Transaction**. "Repeat Transaction" means a Consumer Loan Transaction with an existing customer that is not a Refinancing Transaction.

**2.21    Servicing Budget**. "Servicing Budget" shall have the meaning given to it in Section 4.5.

**2.22    Servicing Expenses**. "Servicing Expenses" shall mean the expenses of the operation of Enterprise, incurred pursuant to the Servicing Budget, including but not limited to the following: (1) the payment of salaries, wages, and benefit programs for all employees of Enterprise subject to the approval described in Section 4.3; (2) supplies for Enterprise; (3) utilities; (4) repairs and maintenance of any facility used by Enterprise for the conduct of its business; (5) reserves established for the repayment of any principal or interest on any Authorized Debt of Enterprise; (6) insurance and bonding; (7) advertising and marketing; (8) professional fees; (9) reasonable travel expenses for officers and employees of Enterprise, Servicer or its affiliates to inspect and oversee Enterprise; (10) the Regulatory and Litigation Reserve fund expense; (11) security costs; (12) underwriting expenses; (13) bad debt expenses and (14) legal or professional fees incurred for lobbying or litigation that is not adequately covered by the Regulatory and Litigation fund.. Any expenses not referenced or provided for in this Section that are added as Servicing Expenses after approval of this Agreement and the Servicing Budget in effect at the time must first be approved in writing by the Servicer and the Enterprise as provided for in this Agreement. Each of the above listed expenses is subject to the annual budgetary process and its resolution processes at Section 4.5 of this Agreement.

**2.23    Unsecured Lending Business**. "Unsecured Lending Business" means the activities of a financial services provider in providing Consumer Loan Transactions and other related financial services to consumers or other persons.

**2.24    Tribal Council**. "Tribal Council" means the governing body of the Lac Vieux Desert Band of Lake Superior Chippewa Indians.

*4*

JA1851

MARTORELLO_026262

**2.25    Tribal Net Profits**. "Tribal Net Profits" is calculated by adding the sum of Gross Revenues plus bad debt recoveries minus the sum of charge backs and bad debt charge-offs and multiplying the sum of this amount by two (2) percent calculated on a monthly basis all calculated on a cash basis.

**2.26    Tribal Representatives**. "Tribal Representatives" shall mean the person or persons designated by the Enterprise, to serve as its liaisons to the Servicer, and who shall be responsible for assisting in the implementation of tribal policies as such policies relate to Enterprise and the Unsecured Lending Business. The Enterprise may remove and replace the Tribal Representatives in its sole and absolute discretion. The Tribal Representatives shall have the right to attend as an observer all meetings of Enterprise regarding management of Enterprise and shall have access to all documents and records of Enterprise. The salary, wages and benefits of the Tribal Representative(s) are a Servicing Expense of the Enterprise. The Tribal Representatives serve hereunder on behalf and for the benefit of the Enterprise and for purposes of decision-making are no way a substitute for the Tribe itself as sole member of the Enterprise.

**3.    Covenants**. In consideration of the mutual covenants contained in this Agreement, the Parties agree and covenant as follows:

**3.1    Engagement of Servicer**. The Enterprise hereby retains and engages Servicer as its independent contractor for the purposes of providing those business management, consulting and professional services to Enterprise pursuant to the terms of this Agreement and advising the Operations Manager of the Enterprise and the Tribal Representatives. Servicer shall have the authority and responsibility over all communication and interaction whatsoever between Enterprise and each service provider, lender and other agents of Enterprise (for purposes of this Agreement, the service provider, lender and other agents of Enterprise or its subsidiaries shall be referred to as "Authorized Agents"). Nothing contained herein grants or is intended to grant Servicer a titled interest to or in Enterprise. The Servicer hereby accepts such retention and engagement as an independent contractor. Enterprise acknowledges that the services contemplated by this Agreement shall be provided by the Servicer from its offices in the U.S. Virgin Islands. Enterprise also acknowledges that the fees to be paid to Servicer as defined in Section 3.5.1 herein, are in fact performance-based fees, and are based solely on the profitability of the Enterprise following commencement of this Agreement. Enterprise also acknowledges that any tax or earnings statements to be issued to Servicer as a result of any payments made pursuant to this Agreement shall be filed with the Virgin Islands Bureau of Internal Revenue and not with the Internal Revenue Service as the Servicer is subject to the administration of tax laws by the Virgin Islands Bureau of Internal Revenue and not the Internal Revenue Service.

**3.2    Term**. The term of this Agreement shall begin on the Effective Date of this Agreement and continue until December 31, 2018 ("Term"). The Term shall automatically renew for an additional period of two (2) years unless either Party hereto provides written notice to the other Party at least one hundred twenty (120) days, but no greater than one (1) year, prior to the end of the Term.

JA1852

CONFIDENTIAL

MARTORELLO_026263

### 3.3    Restrictions on Competition.

**3.3.1**    In consideration for Servicer providing its expertise to the Enterprise, the Enterprise agrees that so long as this Agreement is in effect neither it nor any Affiliate shall, directly or indirectly, either on its own or through any agent, joint venture, subsidiary or independent contractor, engage in the Unsecured Lending Business anywhere in the world except through the Enterprise without engaging the Servicer to provide the management and consulting services contemplated by this Agreement.  The exclusivity provisions contained in this Paragraph 3.3.1. shall apply so long as Servicer achieves performance targets described herein.  Performance targets are equal to Tribal Net Profits generated by the Enterprise on a monthly basis. The exclusivity provision shall remain in effect to the extent that the Tribal Net Profits as listed in Table 3.3.1 for a particular monthly amount is not achieved but the difference between the required amount and the actual amount are recouped (on a cumulative basis) in any three (3) consecutive month period of time (on a cumulative basis for the two Bellicose V.I.-managed Tribal-lending entities contemplated at this time, including Red Rock Tribal Lending, LLC and North Country Financial, LLC):

### Table 3.3.1 Tribal Net Profit

| Month | Tribe Net Profit |
|-------|------------------|
| 3 | 42,000 |
| 4 | 45,000 |
| 5 | 50,000 |
| 6 | 55,000 |
| 7 | 50,000 |
| 8 | 65,000 |
| 9 | 75,000 |
| 10 | 80,000 |
| 11 | 90,000 |
| 12 | 100,000 |
| 13 | 110,000 |
| 14 | 120,000 |
| 15 | 130,000 |
| 16 | 145,000 |
| 17 | 160,000 |
| 18 | 175,000 |
| 19 | 190,000 |
| 20 | 200,000 |

The Enterprise acknowledges that the Unsecured Lending Business can be conducted throughout the world (both as to the location of the consumers as well as operations) and that the worldwide restriction is appropriate. Nothing herein shall be taken to restrict the Enterprise, the Tribe, or its Affiliates from engaging in businesses that provide services, which in themselves do not compete with the Unsecured Lending Business. The Enterprise further agrees that it shall not solicit for employment or hire any employees of Servicer.  In no event shall failure to meet the

*6*

CONFIDENTIAL

MARTORELLO_026264

thresholds contained in this Section be considered a breach of this Agreement. Rather, they are significant only to the application or not of the non-compete provisions of this Section. The Parties agree that having two or more entities in the payday lending space or otherwise engaged in the Unsecured Lending Business, including North Country Financial, LLC and Enterprise, is not a violation of this section restricting competition so long as any such entity is serviced by Servicer and/or its successors or assigns.

      3.3.2   The Enterprise has carefully read and considered the provisions of this Section and, having done so, agrees that the covenants set forth in this Section are fair and reasonable and are reasonably required to protect the legitimate business interests of the Servicer and the Enterprise including, but not limited to, protection of trade secrets, the Servicer's investment in its Confidential Information (as hereinafter defined), and the Servicer's goodwill and relationships with its clients and vendors. The Enterprise agrees that the covenants set forth in this Section do not unreasonably impair the ability of the Enterprise to conduct any unrelated business. The Parties hereto agree that if a court of competent jurisdiction holds any of the covenants set forth in this Section unenforceable, the court shall substitute an enforceable covenant that preserves, to the maximum lawful extent, the scope, duration and all other aspects of the covenant deemed unenforceable, and that the covenant substituted by the court shall be immediately enforceable against the Enterprise. The foregoing shall not be deemed to affect the right of the parties hereto to appeal any decision by a court concerning this Agreement.

      **3.4**   <u>**Servicer's Compliance With Law.; Licenses**</u>. The Servicer covenants that it will at all times comply with all Legal Requirements and any licenses issued under any of the foregoing. If applicable, the Tribe shall not unreasonably withhold, withdraw, qualify or condition such licenses. Enterprise, through the Tribal Representatives will ensure that Servicer is made fully aware of and has acquired all applicable tribal licenses prior to commencement of Enterprise business activities.

      **3.5**   <u>**Servicing Fee.**</u>

      **3.5.1**   The Parties hereto have agreed that the success of the business is based in large part upon the services provided to the Enterprise by the Servicer. As a result, Enterprise has agreed to a performance-based fee equal to that amount remaining after payment of Tribal Net Profits, Servicer advances, all Servicing Expenses and any principal or interest on borrowed funds in accordance with Section 6.4. The Servicing Fees shall be paid monthly, with the Servicer having the ability to sweep Enterprise bank account amounts into the Servicer's bank accounts, on or before the fifteenth (15th) day of the ensuing month. The Enterprise acknowledges and agrees that the Servicer is not responsible for the performance or activities of any of the lenders or servicing companies that may be doing business with the Enterprise, nor any minimum revenue from the Unsecured Lending Business. However, Servicer has agreed that that the minimum amount per month which shall be paid to the Enterprise shall be twenty thousand dollars ($20,000).

      **3.5.2**   Payment of the Servicing Fee shall be subject to and reduced by the obligations of the Servicer to make the payments specified in Sections 3.5.1, 4.6, 7.15 hereof.

JA1854

CONFIDENTIAL

MARTORELLO_026265

**3.5.3**   The Enterprise acknowledges and agrees that Servicer, subject to Legal Requirements and the limitations of Section 4.1.1,  shall have the right to enter into agreements with servicing companies or lenders providing goods or services to the Enterprise, and Servicer may be separately compensated under such agreements.

**3.6**   **No Preexisting Contracts**. The Enterprise covenants that there are no valid preexisting contractual impediments to the entry by the Enterprise into this Agreement. Further, the Enterprise agrees to indemnify Servicer and hold harmless its Affiliates for any loss, cost, judgment, settlement or other compromise related to any claim arising out of or related to any alleged pre-existing contractual relationship. Servicer shall be limited to recovery of such indemnification from the assets of Enterprise and shall have no right to indemnification from other assets of the Tribe or any of Tribe's other Affiliates.

**3.7**   **Agreement Scope**. The Enterprise is entering into this Agreement with Servicer in order to avail itself of the expertise of Servicer in developing a profitable Unsecured Lending Business. In recognition of the Servicer's expertise, the scope of this Servicing Agreement covers all aspects of the management of the Unsecured Lending Business, however oversight of the day to day operations of the Enterprise and management of the Enterprise's employees shall be vested in the Operations Manager and/or the Tribal Representatives.

**3.8**   **Certain Activities of Enterprise**.  The Enterprise covenants that adequate high speed internet access, and sufficient remote access for the Enterprise to all hardware and software which it is responsible to acquire and install shall be at all times available to Enterprise and Servicer to conduct the Unsecured Lending Business contemplated by this Agreement.  Any physical facilities located within the Tribe's jurisdiction shall be maintained in a secure manner to protect sensitive consumer financial information potentially contained therein, including but not limited to protection by the latest security encryption technology for privacy protection which shall also be provided by the Servicer, as approved by the Servicer.  Servicer shall have the sole discretion to request upgrades or additions to and to approve the security/encryption technology used in connection with the Unsecured Lending Business which shall be treated as Servicing Expense of the business.  If such a request is made following the Tribe's annual approval of a Servicing Budget that does not contain such upgrades or additions, Servicer shall seek approval of the Tribe pursuant to its Governing Documents, approval of which will not be unreasonably withheld, prior to incurring such additional servicing expenses.

**4.**   **Business and Affairs in Connection with Enterprise.**

**4.1**   **Servicer's Authority and Responsibility**.   It is the Parties' intentions that Servicer shall provide such management, consulting and analytical services as it deems necessary to assist the Enterprise in undertaking the Unsecured Lending Business contemplated herein.

**4.1.1**   The Servicer is hereby granted the necessary power and authority to act in order to fulfill its responsibilities under this Agreement, including the execution and delivery of any and all agreements necessary or appropriate to effectuate the terms hereof subject to the limitations of the Section 4.1.1 herein. It should be noted, however, that Servicer has no authority

*8*

JA1855

MARTORELLO_026266

to engage in origination activities, execute loan documentation, or approve the issuance of loans to third parties. Final determination as to whether to lend to a consumer rests with the Enterprise.

    **4.1.2**   Servicer shall, unless otherwise agreed to herein, require express written consent from the Tribe as sole member of the Enterprise to do any of the following: (1) to borrow, pledge, assign, convey, encumber, grant security interest in, guaranty, or otherwise restrict the assets of the Enterprise; (2) to sell or otherwise dispose of all or substantially all of the assets of Enterprise; (3) to waive the sovereign immunity of the Enterprise.

    **4.2**    <u>**Duties of the Servicer**</u>. In providing services to Enterprise, the Servicer's duties may include, without limitation, the following:

    **4.2.1**  <u>**Operations**</u>. Consistent with the Servicing Budget, the Servicer shall develop and recommend to the Enterprise and to the Operations Manager and Tribal Representatives, reasonable measures for the orderly administration and management of Enterprise in the areas of financial reporting, financing, regulatory compliance, marketing, human resources, development of third party servicer relationships, collections and risk assessment, including:

    **(a)**    Screening of and selecting service providers and lenders, and negotiating agreements with such service providers and lenders on behalf of the Enterprise on such terms and conditions as Servicer may reasonably determine to be appropriate, including but not limited to potentially securing a funding agreement between Alpha Credit Resources, LLC and the Enterprise, whereby Alpha Credit Resources, LLC may serve as Commercial Finance Provider for the Unsecured Lending Business;

    **(b)**    Development and promotion of sound and positive business relationships on behalf of Enterprise with the designated service providers and lenders, including, but not limited to, the enforcement or termination of agreements with such service providers and lenders;

    **(c)**    Preparation of suggested practices and recommendations to the Tribal Representative of such suggested practices governing the operations of the Enterprise to provide that such operations are conducted in a manner that is consistent with the best interests of Enterprise and generally accepted industry standards;

    **(d)**    Preparation of regulatory and compliance standards and practices and recommendations to the Enterprise of such standards and practices to be adopted by the Enterprise provide that such operations are conducted in a manner consistent with the best interests of Enterprise and generally accepted industry standards;

    **(e)**    Preparation of training and education standards and recommendations to the Enterprise of such suggested practices to be adopted by the designated service providers and lenders to provide that such designated service providers and lenders are conducting business with the Enterprise in a manner that is consistent with the best interests of Enterprise and generally accepted industry standards;

JA1856

CONFIDENTIAL

MARTORELLO_026267

(f)     Preparation of standards for financial reporting and accounting and recommendations to the Enterprise of such best practices to be adopted by the designated service providers and lenders of the Enterprise provide that such designated service providers and lenders are conducting business in a manner that is consistent with the best interests of Enterprise and generally accepted accounting standards presented on a cash basis;

(g)     Preparation of standards and screening and review of and making recommendations to the Enterprise regarding the website contents, marketing and consumer relations practices of designated service providers and lenders to provide that such designated service providers and lenders are conducting business in a manner that is consistent with the best interests of Enterprise and generally accepted industry standards;

(h)     Monitor and supervision of and reporting to the Enterprise regarding the designated service providers and lenders to provide that such designated service providers and lenders are conducting business in a manner that is consistent with the standards, best practices, policies and requirements established by the Enterprise;

(i)     Servicer will be responsible for providing pre-qualified leads to Enterprise and providing the necessary credit-modeling data and risk assessment strategies by which the Enterprise may evaluate to whether or not to extend funds to an individual borrower based on criteria that has been established by the Enterprise. The criteria used to extend funds to individual borrowers will remain within the sole and absolute discretion of the Enterprise and the Enterprise shall execute all necessary loan documentation;

(j)     Servicer may also be responsible for training and monitoring employees of the Enterprise that operate the Enterprise's call center; and

(k)     Sale and transfer of Enterprise's right of collection of collateral on any Loan Transactions that become in default prior to settlement. Servicer shall sell Loan Transactions in default at prevailing market rates, to a third-party debt collector, with the third-party debt collector to effect the collection of the debt. This third-party debt buyer may be Capture Financial LLC or such other third-party debt as may be determined to be appropriate by the Parties.

**4.2.2   Contracts in Enterprise's Name.** Contracts for the operations of Enterprise shall be entered into in the name of Enterprise and shall be executed by the Enterprise. In no event shall Servicer be empowered to waive the sovereign immunity of the Enterprise or the Tribe in any contract, including but not limited to any contract for the operations of the Enterprise or for the supply of goods and services. No contracts for the supply of goods or services to Enterprise shall be entered into with parties affiliated with the Servicer or its officers or directors unless the affiliation is disclosed to and approved by Enterprise, which approval shall not be unreasonably withheld subject to the limitations of Section 4.1.1 herein. Servicer shall deliver all contracts executed by it on behalf of Enterprise to Enterprise on a monthly basis. The Servicer acknowledges that Enterprise and the Tribe retain exclusive sovereign control over the Enterprise's and the Tribe's immunity, respectively. If Servicer determines that a limited waiver of Enterprise's Tribal sovereign immunity is necessary and desirable for inclusion in any contract on behalf of the Enterprise, Servicer shall summarize the

*10*

JA1857

CONFIDENTIAL

MARTORELLO_026268

need for such waiver and the underlying contract for the Enterprise to seek approval of the Tribal Representative(s) and the Tribe as sole member of the Enterprise. Only after the matter has been forwarded for review to the Tribe's legal counsel, presented to the Tribal Council by the Tribal Representative(s), and authorized by Tribal Council resolution, shall the Servicer be authorized to execute the contract on behalf of the Enterprise.

**4.2.3    Consumer Loan Transaction Covenants and Agreements**. The Servicer shall assist the Enterprise with the compilation and provision of information and reports (financial and otherwise) as may be reasonably requested by the Tribe as sole member of the Enterprise in connection with the business of Enterprise or as required under Authorized Debt of Enterprise as defined in Section 5.2 herein, including any reports required to comply with the covenants and agreements contained therein. The Servicer shall promptly advise the Enterprise in the event that the Servicer becomes aware of any matter that may cause a default by Enterprise under any documents evidencing any indebtedness or obligation of Enterprise.

**4.3    Employees.**

**4.3.1    Servicer's Responsibility**. Subject to the Servicing Budget, Legal Requirements and the terms of this Agreement, Servicer shall have the exclusive responsibility for identifying and recommending third-party service providers needed for the business of the Unsecured Lending Business and shall assist the Operations Manager, at his or her request, in the selection, hiring, training, control and discharge of employees performing regular services for Enterprise in connection with the maintenance, operation, and management of the Unsecured Lending Business. Enterprise shall not engage any third-party service providers needed for the business of the Unsecured Lending Business without the benefit of Servicer's prior advice and approval, for which approval shall not be unreasonably withheld.

**4.3.2    Enterprise Employees**. Subject to the Servicing Budget, Servicer shall assist the Operations Manager and/or Tribal Representatives in directing the hiring and management of sufficient employees to effectively staff the Unsecured Lending Business, if any.

**4.3.3    Tribal Representative(s)**. Tribal Representative(s) shall have the full access to inspect all aspects of Enterprise, including the daily operations of Enterprise, and to verify daily Gross Revenues and all income of Enterprise. The Servicer or a designee otherwise appointed by the Servicer may accompany the Tribal Representative(s) upon any inspection.

**4.3.4    Indian and Other Preference, Wages, and Training**. The Servicer shall, during the term of this Agreement, be required to give preference in recruiting, training and recommending employment to Native Americans in any job category of the Enterprise, in accordance with any employment preference laws or policy now existing or later adopted by the Tribe.

**4.4    Enterprise Bank Accounts**. The Servicer shall select a bank or banks for the establishment of (i) a primary bank account by Enterprise into which all funds generated by the Unsecured Lending Business will be transferred and deposited (the "Primary Bank Account") and (ii) any other bank accounts by Enterprise subject to the Deposit Account Control

*11*

JA1858

MARTORELLO_026269

Agreement as the Servicer deems necessary or appropriate to conduct the Unsecured Lending Business consistent with this Agreement, e.g., an account to hold the Regulatory and Litigation Reserve Fund (as defined below). Unless otherwise mutually agreed in writing by the Enterprise and Servicer, the Servicer shall have sole signatory and transfer authority over such bank accounts. Servicer shall have sole authority to sweep monies from such bank accounts for distributions made to the Enterprise consistent with Sections 3.5.1 and 6.4. In addition to the foregoing, Servicer shall further have the sole authority to instruct and direct any ACH providers that Enterprise may engage to assist it in operating the Unsecured Lending Business, to the extent provided by this Agreement. The right to consent to change any bank account into which the funds generated by the Unsecured Lending Business will be transferred and deposited by any such ACH providers rests mutually with Enterprise and Servicer. The signed authorization of both Servicer and Enterprise shall be required for any change to any bank account into which the funds generated by the Unsecured Lending Business will be transferred and deposited by any such ACH providers. This section shall not apply in the event of a default; in the event of a default, the Security Agreement will allow Iron Fence Investments, Inc. to override this section.

**4.5    Servicing Budget and Business Plan.** Servicer shall provide to the Tribal Representatives an initial Servicing Budget and Business Plan ("Servicing Budget") for the review and consent of the Enterprise, which consent shall not be unreasonably withheld or delayed. Servicer shall, not less than ninety (90) days prior to the commencement of each full or partial year, submit to the Tribal Representative(s), for approval by the Enterprise and the Tribe as sole member of the Enterprise, a proposed Servicing Budget for the ensuing full or partial year, as the case may be. The Servicing Budget shall include a Regulatory and Litigation Reserve Fund and such other reserves as are deemed necessary for the conduct of the Unsecured Lending Business.

The Enterprise's and Tribe's approval of the Servicing Budget shall not be unreasonably withheld or delayed. Servicer shall meet with the Tribal Representative(s) to discuss the proposed Servicing Budget, and if requested, with the Tribe as sole member of the Enterprise. The Enterprise's and the Tribe's as sole member of the Enterprise approval shall be deemed given unless a specific written objection thereto is delivered by it to Servicer within sixty (60) days after Servicer and the Tribal Representative and/or the Tribe as sole member of the Enterprise have met to discuss the proposed Servicing Budget. If the Tribal Representative for any reason declines to meet with Servicer to discuss a proposed Servicing Budget, the Servicer shall meet with the Tribe as sole member of the Enterprise. The Enterprise and the Tribe as sole member of the Enterprise shall review the Servicing Budget on a line-by-line basis. To be effective, any notice which disapproves a proposed Servicing Budget must contain specific objections to individual Budget line items.

If the proposed Servicing Budget contains disputed budget item(s), the Enterprise and Servicer agree to cooperate with each other in good faith to resolve the disputed or objectionable proposed item(s). In the event the Enterprise and Servicer are not able to reach mutual agreement concerning any disputed or objectionable item(s) within a period of sixty (60) days after the date the Enterprise provides written notice of its objection to Servicer, either Party shall be entitled to submit the dispute to arbitration in accordance with Section 18. If the Enterprise and Servicer are unable to resolve the disputed or objectionable item(s) prior to the commencement of the applicable year, the undisputed portions of the proposed Servicing Budget

*12*

JA1859

CONFIDENTIAL

MARTORELLO_026270

shall be deemed to be adopted and approved and the corresponding line item(s) contained in the Servicing Budget for the preceding year shall be adjusted as set forth herein and shall be substituted in lieu of the disputed item(s) in the proposed Servicing Budget. Those line items which are in dispute shall be determined as follows:

Pending resolution of any disputes over the Servicing Budget, each line item shall be determined by increasing the preceding year's actual expense for the corresponding line items by an amount determined by Servicer which does not exceed the Consumer Price Index for All Urban Consumers published by the Bureau of Labor Statistics of the United States Department of Labor, U.S. City Average, all items (1982-1984=100) for the year prior to the year with respect to which the adjustment to the line item(s) is being calculated or any successor or replacement index thereto. The resulting Servicing Budget obtained in accordance with the preceding sentence shall be deemed to be the Servicing Budget in effect until such time as the Enterprise and Servicer have resolved the disputed items.

Servicer may, subject to approval by the Enterprise if such a change requires reallocation of more than fifteen percent (15%) of the particular line items being affected, revise the Servicing Budget from time to time, as necessary, to reflect any unpredicted significant changes, variables or events or to include significant, additional, unanticipated items of expense. Servicer may, after notice to the Tribal Representatives, reallocate part or all of the amounts budgeted with respect to any line item to another line item and to make such other modifications to the Servicing Budget as Servicer deems necessary when such reallocation is fifteen percent (15%) or less than for the line items being affected. The Enterprise acknowledges that the Servicing Budget is intended only to be a reasonable estimate of Enterprise revenue and expenses for the ensuing year. Servicer shall not be deemed to have made any guaranty, warranty or representation whatsoever in connection with the Servicing Budget, however Servicer shall act in good faith when projecting, proposing and presenting an Servicing Budget to the Enterprise for its approval.

**4.6    Regulatory and Litigation Matters**. If any claim or legal action, except an action to impose taxes as contained in 7.5.1 of the Agreement, is brought against the Enterprise, the Tribe, the Servicer, Enterprise or any employee of the Servicer having responsibilities related to the Enterprise or of Enterprise, or official or employee of the Tribe by any person arising out of the operation of Enterprise or against the Servicer, its parent or Affiliates, employees, directors, managers or members arising out of Servicer's provision of services to the Unsecured Lending Business of Enterprise or performance hereunder or the execution of this Agreement or any other related agreement by Enterprise and Servicer, Enterprise, or the Servicer, as appropriate, shall defend such action. Any cost of such litigation, including any judgment rendered in an action arising out of the operation of Enterprise and the cost of any legal action brought by the Enterprise or Servicer against any third party, shall constitute a Servicing Expense. The only exception to the foregoing shall be that each Party will be responsible for its own acts if same are proven to constitute fraud or willful or wanton misconduct. Nothing in this Section shall be construed to waive, in whole or in part, the Tribe's or Enterprise's sovereign immunity, except as contemplated in the limited waiver of sovereign immunity contained in Section 14 herein.

JA1860

CONFIDENTIAL

MARTORELLO_026271

The Enterprise and Servicer shall establish and maintain a separate and segregated joint signature bank account ("Regulatory and Litigation Reserve Fund") that shall contain a balance of not less than, but no more than, Fifty Thousand Dollars ($50,000). The Regulatory and Litigation Reserve Fund shall be funded with one dollar ($1.00) for every New Transaction and ($.50) for every Repeat Transaction and Refinancing Transaction, as those terms are defined herein. The exclusive purpose of the Regulatory and Litigation Reserve Fund is to provide funding for Enterprise of the costs of any litigation, defense, responses to regulatory inquiries, litigation and other similar expenses arising out of the business of Enterprise. If any claim or legal action is brought against the Tribe, Servicer, Enterprise, or any Affiliate or any employee or director thereof, or any official of the Tribe by any person arising out of the operation of Enterprise, Enterprise, in collaboration and coordination with the Servicer, shall defend such action with monies in the joint signature account described herein as Servicer and Enterprise may agree. Any cost of such regulatory action or litigation, including any judgment rendered in an action arising out of the operation of Enterprise and the cost of any legal action brought by Servicer or Enterprise against any third party, shall be paid by the Regulatory and Litigation Reserve Fund to the extent funds are at the time of payment available therein or if funds are not at the time of such payment then available the amount paid in excess of available funds shall constitute a Servicing Expense. In the event Servicer expends any monies from the Regulatory and Litigation Reserve Fund, the Regulatory and Litigation Reserve Fund shall be replenished in the same manner of initial funding described in the first sentence of this paragraph beginning the first day of the first month following such an expenditure and continue until the Regulatory and Litigation Reserve Fund is again fully funded at $50,000.

To the extent Enterprise maintains or acquires any insurance policy that might cover the cost of defense of any action or any liability resulting from an action against the Enterprise or operation of the Unsecured Lending Business, Enterprise shall name Servicer as an additional insured under any such insurance policy. To the extent there is any such insurance coverage available, Servicer shall seek to use such insurance monies before use of Regulatory and Litigation Reserve Fund monies in defense of any claim or legal action brought against the Tribe, Servicer, Enterprise, or any Affiliate or any employee or director thereof, or any official of the Tribe by any person arising out of the operation of Enterprise, in collaboration and coordination with the Servicer. If, in Servicer's sole discretion, it is not practicable to expend insurance monies before Regulatory and Litigation Reserve Fund monies, Servicer shall seek to replenish any spent Regulatory and Litigation Reserve Fund monies with reimbursement under any applicable insurance policy. To the extent the Regulatory and Litigation Reserve Fund is insufficient to cover the costs of defense of any action or liability, Servicer shall advance monies that it deems necessary and appropriate to defend against such action or liability. Servicer shall be able to be reimbursed with distributions from the Regulatory and Litigation Reserve Fund as it might later be replenished in the manner described in this Paragraph 4.6.

**4.7** **No Servicer Wages or Salaries**. Neither the Servicer nor any of Servicer's employees, officers, directors or principals shall be compensated by wages from or contract payments by Enterprise for their efforts or for any work which they perform under this Agreement other than the Servicing Fee paid to Servicer under Section 6.2.

*14*

JA1861

MARTORELLO_026272

**4.8    Internal Control Systems**. The Servicer shall recommend and assist the Operations Manager and Tribal Representatives in implementing accounting standards applicable to the unsecured consumer lending industry.

**4.9    Daily Deposits to Bank Account**. The Servicer shall collect all gross revenues and other proceeds connected with or arising from the operation of Enterprise and all other activities of Enterprise and deposit proceeds daily into a bank account established under Section 4.4 consistent with Paragraph 3.5.1 herein, except as to any restrictions on cash deposits imposed by the local bank.

**4.10    No Cash Disbursements**. The Servicer shall not make any cash disbursements from the bank accounts or on hand cash except for the disbursements from any petty cash fund of Enterprise maintained in accordance with the Servicing Budget. Any and all other payments or disbursements by the Servicer shall be made by check or wire transfer drawn against a bank account.

**4.11    Transfers Between Accounts**. The Servicer has the authority to transfer funds among the bank accounts of Enterprise unless otherwise provided by the Servicing Budget, in order to pay Servicing Expenses, pay the Servicing Fee, or to pay a debt service and any other payments provided for in Section 6 or elsewhere in this Agreement.

**4.12    Accounting and Books of Account.**

**4.12.1 Statements**. The Servicer shall prepare and provide to Enterprise servicing statements on a monthly, quarterly, and annual basis, which shall include: comparative statements of all revenues after the first full year of operation, statements of all other amounts collected and received, and all deductions and disbursements made there from in connection with Enterprise. The monthly and quarterly servicing reports shall be delivered by the twenty-first (21st) day of the following month, with the annual servicing report delivered within ninety (90) days of the year-end and shall be in form satisfactory to meet all requirements under any Authorized Debt as defined in Section 5.2. The Enterprise shall include as an Servicing Expense the annual compilation of the books and records of Enterprise and any Subsidiaries as Enterprise deems necessary by a certified public accounting firm selected by the Enterprise subject to the reasonable consent of Servicer, which consent shall not be unreasonably withheld. Such reviews may be used by the Servicer for reporting purposes under applicable laws, if required. The reviewers shall have access to all books and records, all cash management procedure manuals, all internal control manuals, and all other records, documents, papers and persons of Enterprise or employed by Enterprise or Servicer as the reviewers shall deem necessary. For each review performed, the reviewers shall provide Servicer with a letter noting any control weaknesses or other items which it believes should be brought to the attention of the Servicer, and shall permit Servicer to respond to the letter with changes to the operations of Enterprise deemed appropriate by the Servicer which address any concerns expressed in the draft letter within thirty (30) days. The Enterprise warrants that it shall retain in the strictest confidence the information provided by Enterprise, and shall include in any reports concerning Servicer's financial affairs only such portions of information supplied by Enterprise as is required by statute to be provided.

15

JA1862

CONFIDENTIAL

MARTORELLO_026273

**4.12.2 Accounting Standards**. Servicer shall maintain the books and records reflecting the operations of Enterprise in accordance with the accounting practices of Servicer on a cash basis consistently applied and shall adopt and follow a fiscal year end of December 31. The accounting records reflecting detailed day-to-day transactions of Enterprise's operations shall be kept by Servicer and made available to the Tribal Representative(s) upon request. The accounting systems and procedures shall, at a minimum (i) include an adequate system of internal accounting controls; (ii) permit the preparation of financial statements on a cash basis; (iii) permit the calculation and payment of the Servicing Fee; (iv) provide for the allocation of servicing expenses or overhead expenses among Enterprise and any other user of shared facilities and services; and (vi) provide for disbursements to Enterprise

**4.13    Enterprise Servicing Standards**. Servicer shall operate Enterprise in accordance with servicing standards mutually agreed upon by the Servicer and the Enterprise, which standards shall be consistent with the servicing standards of the industry generally.

**5.    Liens and Debt.**

**5.1    Liens**. The Enterprise specifically represents and warrants to the Servicer that during the term of this Agreement Enterprise shall not act in any way whatsoever, either directly or indirectly, to cause any Party to become an encumbrance or lienholder of any facility utilized by Enterprise or any tangible or intangible personal property assets of Enterprise, other than, as to the tangible or intangible personal property assets of Enterprise only, a creditor of Enterprise, or the Servicer, provided the Servicer is a creditor or is guaranteeing the amounts due under Authorized Debt, or to allow any Party to obtain any interest in this Agreement without the prior written consent of the Servicer.

**5.2    Authorized Debt**. "Authorized Debt" shall mean debt incurred by Enterprise to operate the Unsecured Lending Business, including from one or more Commercial Finance Providers, and any extensions or renewals of such debt.

**6.    Servicer Fee Reimbursement, Disbursement, and Capital Contribution.**

**6.1    Disbursements at the Commencement of the Term**.    On the Effective Date, Servicer shall pay from its own account, and not the account of Enterprise, to Enterprise as directed by Enterprise the sum of five thousand and No/100 Dollars ($5,000.00) to reimburse the Enterprise for due diligence-related costs.

**6.2    Servicing Fee**. Servicer is authorized by Enterprise to pay itself its Servicing Fee in accordance with the terms of Section 3.5.1 hereof.

**6.3    Disbursements**. All revenues received by Enterprise in connection with the Unsecured Lending Business shall be deposited into the Primary Bank Account. These revenues shall, in turn, be disbursed by Servicer, for and on behalf of Enterprise, from the Primary Bank Account to pay, to the extent available, Servicing Expenses.

**6.4    Payment of Fees and Tribal Disbursement**. No later than fifteen (15) days or such other time period as provided in this Agreement after the end of each calendar month of operations, the Servicer shall calculate and report to the Enterprise the Gross Revenuesfor the

16

JA1863

preceding month and shall disburse the funds in the Primary Bank Account (or otherwise set aside reserves out of such funds as permitted by this Agreement) to the extent due and payable in the following order of priority:

> 6.4.1  To the Enterprise, 50% of Tribal Net Profits and to Tribal Loan Management, LLC, 50% of Tribal Net Profits in accordance with Section 7.15;

> 6.4.2  To Servicer, an amount sufficient to reimburse Servicer for any amounts advanced to the Enterprise by Servicer;

> 6.4.3  To all service providers, including Servicer, all Servicing Expenses, including allocations to reserves as provided in the Servicing Budget, including any additional monies owed to Servicer, to the extent the same have not been paid during the course of the preceding calendar month;

> 6.4.4  To any creditor of the Enterprise, an amount sufficient to repay any principal or interest outstanding under any Authorized Debt extended by such creditor but only to the extent then required to be repaid (and which amount(s) shall first be paid out of any reserves established for the repayment of any such debt); and

> 6.4.5  To the Servicer, the Servicing Fee in the manner directed by the Servicer (which shall be paid monthly pursuant to Section 3.5.1 hereof).

## 7.    General Provisions.

7.1    **Notice**. All notices and other communications hereunder shall be in writing, and shall be deemed to have been duly given (a) upon hand delivery thereof, (b) upon facsimile and written confirmation of transmission, (c) upon receipt of any overnight deliveries, or (d) on the third (3rd) business day after mailing United States registered or certified mail, return receipt requested, postage prepaid, addressed to each Party at the following addresses:

**If to Enterprise:**    Red Rock Tribal Lending, LLC
P.O. Box 249
Watersmeet, MI  49969

Lac Vieux Desert Band of Lake Superior Chippewa Indians,
As sole member of Red Rock Tribal Lending, LLC
Attn: General Counsel
P.O. Box 249
Watersmeet, Michigan 49969

**If to Servicer:**    Bellicose VI, Inc.
2106 Company Street, Suite 4
Christiansted, VI   000820

*17*

JA1864

CONFIDENTIAL    MARTORELLO_026275

**7.2   Authorization**. The Enterprise and Servicer represent and warrant to each other that they each have full power and authority to execute this Agreement and to be bound by and perform the terms hereof.   The Enterprise further warrants that it has complied with all applicable tribal laws and procedures necessary to effectuate its obligations herein, including but not limited to any requisite Tribal approvals.  Upon request, each Party shall furnish the other evidence of the authority represented in this Paragraph 7.2.

**7.3   Relationship**. Servicer and Enterprise or the Tribe as sole member of the Enterprise shall not be construed as joint-venturers or partners of each other by reason of this Agreement and none shall have the power to bind or obligate the other except as set forth in this Agreement.

**7.4   Servicer's Contractual Authority in the Performance of this Agreement**. Subject to the provisions of Section 4.2.2, and applicable law, Servicer is authorized to negotiate, and perform for the account of Enterprise any contracts deemed necessary or appropriate by Servicer and executed by the Enterprise to perform Enterprise's obligations under this Agreement and any other agreement or other instrument reasonable necessary or appropriate in the conduct of the Unsecured Lending Business or authorized herein.

**7.5   Further Actions**. Enterprise and Servicer agree to execute all contracts, agreements and documents and to take all actions necessary to comply with the provisions of this Agreement and the intent hereof.

**7.5.1   Taxes**. If any state or any local government attempts to impose any possessory interest tax upon any Party to this Agreement or upon any facility utilized by Enterprise, in the name of the appropriate Party or parties in interest, will, upon the request of either Party, resist such attempt through legal action. The costs of such action and the compensation of legal counsel shall be an Servicing Expense of Enterprise. Any such tax shall constitute an Servicing Expense of Enterprise. This Section shall in no manner be construed to imply that any Party to this Agreement or Enterprise, or Authorized Agents are liable for any such tax, or that any state or federal tax on the Servicer's income is to be considered an expense of Enterprise or Authorized Agents.

**7.5.2   Tribal Taxes**. The Enterprise agrees that neither it nor any agent, agency, affiliate or representative of the Enterprise will impose any taxes, fees, assessments, or other charges of any nature whatsoever on payments of any debt service to Servicer, or to any Authorized Agents, or to any lender furnishing financing for any facility utilized by or for Enterprise, or on Enterprise or the revenues therefrom, or on any Servicing Fee as described in Section 3.5 of this Agreement; provided, however, Enterprise may assess a tax upon Servicer or an Authorized Agent in the nature of a business license and occupation tax or other tax assessed against Servicer or an Authorized Agent by any state, but only to the extent that same is a dollar for dollar set off against the state tax. The Enterprise further agrees that neither it nor any agent, agency, affiliate or representative of the Enterprise will impose any taxes, fees, assessments or other charges of any nature whatsoever on the salaries or benefits, or dividends paid to, any of the Servicer's stockholders, officers, directors, or employees or any of the stockholders, officers, directors, or employees of Enterprise, or any of the Subsidiaries of Enterprise or Servicer, or any of the Authorized Agents. The Enterprise further agrees that the amount of any

*18*

JA1865

CONFIDENTIAL                                                    MARTORELLO_026276

tax, fee, assessment or other charge of any nature whatsoever that may subsequently be imposed contrary to this Section 7.5.2 shall be added to the Servicing Fee to which the Servicer is entitled under this Agreement. Servicer retains the right, in its sole discretion, to terminate this Agreement and all accompanying agreements if it reasonably determines that any statute or regulation of the Tribe renders operation of Enterprise uncompetitive. Should the Servicer terminate this Agreement pursuant to this Section, the Servicer shall retain the right to repayment of money lent to Enterprise on a limited recourse basis, limited exclusive to the assets of the Enterprise and to no other assets of the Tribe or any other arm or affiliate of the Tribe. Except as otherwise provided herein, if any taxes, fees or assessments are levied by the Tribe on Enterprise, Servicer, or any Authorized Agent, such taxes and assessments shall be abated for the term of this Agreement. Nothing herein shall limit the Tribe's ability to tax its members or businesses operating within the regulatory jurisdiction of the Tribe.

   **7.5.3   Situs of the Contracts**. This Agreement, as well as all contracts entered into between Enterprise and any person or any entity providing services to Enterprise or to the Servicer on behalf of Enterprise, shall be deemed entered into at the Tribal Administration Office of the Tribe in Watersmeet, Michigan, and shall be subject to all Legal Requirements of the Tribe and federal law, except as otherwise expressly provided herein.

   **7.5.4   Enforcement**. Authorized Agents are agreed to be intended third party beneficiaries of this Section 7.5 and shall have the right to enforce same to the extent of any breach thereof as same applies to such Authorized Agent.

   **7.6   Defense**. Except for disputes between Enterprise and Servicer, Servicer shall bring and/or defend and/or settle any claim or legal action brought against Servicer or Enterprise and/or the Tribe, individually, jointly or severally in connection with the operation of Enterprise. Servicer and Enterprise shall consult and agree on who Enterprise shall retain as legal counsel, accountants and such other professionals, consultants and specialists to defend and/or settle any such claim or cause of action, and such professionals shall be under the supervision of Servicer, subject to the approval of the Enterprise. In all claims or legal actions bringing claims against Enterprise and/or the Tribe involving questions of jurisdiction, tribal sovereignty or sovereign immunity issues, the Servicer shall consult with Enterprise and the Tribe concerning the presentation and defense of such actions and the Tribe and Enterprise shall provide any information necessary to assist in the Servicer's and Enterprise's defense of any such claims or legal actions. All liabilities, reasonable costs, and expenses, including attorneys' fees and disbursements, incurred in defending and/or settling any such claim or legal action which are not covered by insurance shall be paid from the Regulatory and Litigation Reserve Fund to be established by Enterprise and the Servicer pursuant to Section 6.3, or otherwise as an Servicing Expense. Nothing contained herein is a grant to the Servicer of the right to waive tribal sovereign immunity of the Tribe or of Enterprise.

   **7.7   Tribal Laws**. The Enterprise represents that attached hereto as Schedule 1.0 is a complete copy of each and every law of the Tribe or otherwise that may pertain to the transactions and activities contemplated to be conducted pursuant to this Agreement and the agreements between Enterprise and each designated service provider and lender of the Subsidiaries and between Enterprise and such Subsidiaries; and furthermore, that except as provided in such laws set forth in Schedule 1.0, there are no laws, requirements or restrictions

*19*

JA1866

MARTORELLO_026277

that are reasonably known to the Parties as of the effective date of this Agreement that could apply to such transactions and activities, including but limited to laws, requirements or restrictions related to civil or criminal usury.   Any passage by the Tribe of any law or requirement that, in Servicer's discretion, is determined to have a material negative impact on the financial benefits of this Agreement may be regarded as a breach of this Agreement by Enterprise, and actionable by Servicer under the dispute resolution provisions herein.

     **7.8**    **Waivers**. No failure or delay by Servicer or Enterprise to insist upon the strict performance of any covenant, agreement, term or condition of this Agreement, or to exercise any right or remedy consequent upon the breach thereof, shall constitute a waiver of any such breach or any subsequent breach of such covenant, agreement, term or condition. No covenant, agreement, term, or condition of this Agreement and no breach thereof shall be waived, altered or modified except by written instrument. No waiver of any breach shall affect or alter this Agreement, but each and every covenant, agreement, term and condition of this Agreement shall continue in full force and effect with respect to any other then existing or subsequent breach thereof.

     **7.9**    **Captions**. The captions for each Section are intended for convenience only.

     **7.10**    **Severability**. If any of the terms and provisions hereof shall be held invalid or unenforceable, such invalidity or unenforceability shall not affect any of the other terms or provisions hereof. If, however, any material part of a Party's rights under this Agreement shall be declared invalid or unenforceable (specifically including Servicer's right to receive its Servicing Fees) the Party whose rights have been declared invalid or unenforceable shall have the option to terminate this Agreement upon thirty (30) days written notice to the other Party, without liability on the part of the terminating Party.

     **7.11**    **Interest**. Any amount payable to Servicer or Enterprise by the other which has not been paid as provided herein shall accrue interest as may be agreed upon by the parties.

     **7.12**    **Reimbursement**. The performance by Servicer of its responsibilities under this Agreement are conditioned upon Enterprise generating sufficient funds from borrowings and operations to enable Servicer on a timely basis to perform its obligations hereunder. Notwithstanding the foregoing, Servicer shall, according to the terms of this Agreement may, at its option if not so required, advance funds or contribute property, on behalf of Enterprise, subject to the prior approval of the Enterprise, to satisfy obligations of Enterprise in connection with Enterprise and this Agreement. Servicer shall keep appropriate records to document all reimbursable expenses paid by Servicer, which records shall be made available for inspection by Enterprise through the Tribal Representative(s) or its agents upon request and supplied to the Tribe as sole member of the Enterprise on a monthly basis. Enterprise agrees to reimburse Servicer with interest from future Net Revenues of Enterprise for money paid or property contributed by Servicer to satisfy obligations of Enterprise in connection with this Agreement. Interest shall be calculated at the rate set forth in Section 7.11, or if no rate was agreed upon at six percent (6%) per annum, from the date the Servicer advances monies to the date reimbursement is made. The Servicer's sole source of such reimbursement shall be from the assets of Enterprise.

CONFIDENTIAL                                                                MARTORELLO_026278

**7.13    Travel and Out-of-Pocket Expenses**. Subject to the Servicing Budget, all travel and out-of-pocket expenses of Enterprise or Servicer or employees of Enterprise reasonably incurred in the performance of their duties shall be an Servicing Expense.

**7.14    Third-Party Beneficiary**. This Agreement is exclusively for the benefit of the parties hereto and it may not be enforced by any Party other than the parties to this Agreement and shall not give rise to liability to any third party other than the authorized successors and assigns of the parties hereto.

**7.15    Brokerage or Other Fees**. Servicer and Enterprise acknowledge that Tribal Loan Management, LLC has brokered the transaction between the Tribe, as sole member of the Enterprise, and Servicer.  Further, the Enterprise has authorized that fifty percent (50%) of the Tribal Net Profits due to the Tribe pursuant to Section 3.5.1 with the minimum set forth therein be paid directly to Tribal Loan Management, LLC by the Servicer on behalf of the Enterprise concurrent with the payment to the Enterprise on a monthly basis along with a copy of the monthly financial statements of the Enterprise.   Servicer and Enterprise hereby agree to indemnify and hold the other harmless from and against any and all claims, loss, liability, damage or expenses (including reasonable attorneys' fees) suffered or incurred by the other Party as a result of a claim brought by a person or entity engaged or claiming to be engaged as a finder, broker or agent by the indemnifying Party except for those listed in this Paragraph 7.15.

**7.16    Survival of Covenants**. Any covenant, term or provision of this Agreement which, in order to be effective, must survive the termination or expiration of this Agreement, shall survive any such termination or expiration for a period of one (1) year following the termination or expiration of this Agreement.

**7.17    Survival of Remedy**.   Subsequent to any termination of this Agreement, the dispute resolution provisions of this Agreement, including but not limited to the waiver of the Enterprise's sovereign immunity, shall remain available to the Parties with respect to disputes arising out of or relating to this Agreement prior or subsequent for a period of one (1) year after the termination date.

**7.18    Periods of Time**. Whenever any determination is to be made or action is to be taken on a date specified in this Agreement, if such date shall fall on a Saturday, Sunday or any holiday observed by the Tribe, then in such event, said date shall be extended to the next day which is not a Saturday, Sunday or Tribal holiday.

**7.19    Preparation of Agreement**. This Agreement shall not be construed more strongly against either Party regardless of who is responsible for its preparation.

**7.20    Exhibits**. All exhibits and schedules attached hereto are incorporated herein by reference and made a part hereof as if fully rewritten or reproduced herein.

**7.21    Successors, Assigns, and Subcontracting**. The benefits and obligations of this Agreement shall inure to and be binding upon the parties hereto and their respective successors and assigns. Enterprise's (subject to the limitations of its Governing Documents) prior written consent shall be required for Servicer to assign or subcontract any of its rights, interests or obligations as Servicer hereunder to any successor or assign, except to any parent, subsidiary or

21

JA1868

MARTORELLO_026279

affiliate of Servicer. The Enterprise shall, with the prior written consent of the Servicer, which consent shall not be unreasonably withheld, have the right to assign this Agreement and the assets of Enterprise to an instrumentality of the Tribe, including an entity wholly owned by the Tribe organized to conduct the business of Enterprise for the Tribe that assumes all obligations herein. Any assignment by the Enterprise shall not prejudice the rights of the Servicer under this Agreement. No assignment authorized hereunder shall be effective until all necessary government approvals, if any, have been obtained.

**7.22    Modification**. Any change to or modification of this Agreement must be in writing signed by all parties hereto.

## 8.    Warranties.

**8.1    Warranties**. The Servicer and Enterprise each warrant and represent that they shall not act in any way whatsoever, directly or indirectly, to cause this Agreement to be amended, modified, canceled, or terminated, except pursuant to Section 7.22. The Servicer and Enterprise warrant and represent that they shall take all actions necessary to ensure that this Agreement shall remain in full force and effect at all times.

**8.2    Interference in Tribal Affairs**. The Servicer agrees not to interfere in or attempt to influence the internal affairs or government decisions of Tribal government by offering cash incentives, by making written or oral threats to the personal or financial status of any person, or by any other action, specifically including actions in the normal course of business of the Servicer that only affect the activities of Enterprise, except for contact with Enterprise, authorized Enterprise employees, or the Tribe as contemplated in this Agreement. For the purposes of this Section 8.2, if any such undue interference in Tribal affairs is alleged by the Enterprise in writing and through arbitration it is found that the Servicer has unduly interfered with the internal affairs of the Tribal government and has not taken sufficient action to cure and prevent such interference, that finding of interference shall be grounds for termination of the Agreement.

**8.3    No Political Interference with Operations**. The Enterprise agrees that it shall not, through the Tribe's elected government officials or tribal employees, interfere with the day-to-day operations of Servicer or of the Subsidiaries.

**8.4    Prohibition of Payments to Members of Tribal Government**. The Servicer represents and warrants that no payments have been or will be made to any member of the Tribal government, any Tribal official, any relative of a member of Tribal government or Tribal official, or any Tribal government employee for the purpose of obtaining any special privilege, gain, advantage or consideration. Any payment received by a Tribal Representative in the performance of his or her duties as Tribal Representative shall not constitute a prohibited payment.

**8.5    Prohibition of Hiring Members of Tribal Government**. No member of the Tribe may be employed at Enterprise without a written waiver of this Section 8.5 by the Tribe adopted by motion or Resolution of the Tribal Council, and as otherwise required by applicable law. This provision shall not apply to the hiring or selection of the Tribal Representative.

JA1869

CONFIDENTIAL

MARTORELLO_026280

**8.6**    **Prohibition of Financial Interest in Enterprise**. No member of the Tribal government or relative of a member of the Tribal government shall have a direct or indirect financial interest in Enterprise greater than the interest of any other member of the Tribe, nor shall any such person have any direct or indirect financial interest in the Servicer, its parents, subsidiaries or affiliates.

**8.7**    **Definitions**. As used in this Section 8, the term "member of the Tribal government" means the Tribal Representatives or any member of the Tribal Council, or other tribal elected official, or any independent board or body created to oversee any aspect of Enterprise or its business and any Tribal Court official; the term "relative" means an individual residing in the same household who is related as a spouse, father, mother, son or daughter.

**9.**    **Grounds for Termination.**

**9.1**    **Voluntary Termination and Termination for Cause**. This Agreement may be terminated as set forth in this Agreement.

**9.2**    **Voluntary Termination**. This Agreement may be terminated upon the mutual written consent and approval of the Parties. This Agreement may also be terminated voluntarily solely by Servicer upon one hundred and eighty (180) days written notice to the other Party pursuant to the notice provisions of Section 7.1 herein. The Enterprise may terminate this agreement upon one hundred and eighty (180) days written notice following the period in which any Authorized Debt is outstanding in which any Bellicose VI guaranty remains outstanding.

**9.3**    **Termination for Cause**. Any of the parties may terminate this Agreement if any of the Parties commits or allows to be committed any material breach of this Agreement. A material breach of this Agreement shall include, but not be limited to, a failure of either Party to perform any monetary obligation within five (5) days of when due, or any nonmonetary material duty or obligation on its part for any twenty (20) consecutive days after notice. A Party may not terminate this Agreement on grounds of material breach unless it has provided written notice to the other parties of its intention to declare a default and to terminate this Agreement and the defaulting Party thereafter fails to cure or take steps to substantially cure the default within ninety (90) days following receipt of such notice. The discontinuance or correction of a material breach shall constitute a cure thereof.

In the event of any termination for cause, regardless of fault, the Parties shall retain all money previously paid to them pursuant to Section 6 of this Agreement and shall receive all amounts currently owed to them under this Agreement.

An election to pursue damages or other equitable remedies while this Agreement remains in effect pursuant to the provisions of Section 9.6 or 9.7 shall not preclude the injured Party from providing notice of termination pursuant to this Section 9.3. Neither shall termination preclude a suit for damages.

**9.4**    **Involuntary Termination Due to Changes in Legal Requirements**. It is the understanding and intention of the parties that the establishment and operation of Enterprise conforms to and complies with all Legal Requirements. If during the term of this Agreement, Enterprise, or any material aspect of the business conducted by Enterprise, becomes prohibited

JA1870

CONFIDENTIAL                                                          MARTORELLO_026281

by operation of federal law or determined by final judgment of a court of competent jurisdiction, after all appeals thereof, to be unlawful under applicable law, the obligations of the parties hereto shall cease, and this Agreement shall be of no further force and effect; provided that (i) the Servicer shall have the rights in Section 4.4 of this Agreement; (ii) the Servicer and the Enterprise shall retain all money previously paid to them pursuant to Section 6 of this Agreement; (iii) funds of Enterprise in any account shall be paid and distributed as provided in Section 6 of this Agreement, provided any Authorized Debt shall be paid in full; (iv) any money lent by or guaranteed by the Servicer or its affiliates to Servicer shall be repaid to the Servicer to the extent provided in a written agreement entered in connection therewith, with recovery of monetary payments or damages limited in recourse to Enterprise assets and any such payments or damages shall be made only after payment in full of any and all amounts under any Authorized Debt; and (v) the Enterprise, directly or indirectly, shall retain its interest in the title to all Enterprise assets, fixtures, supplies and equipment subject to any requirements of financing arrangements. Nothing contained in this Section 9.4 shall be read to preclude either or both parties from contesting any actions which could lead to the involuntary cessation of business by Enterprise.

9.5     **Consequences of Servicer's Breach**. In the event of the termination of this Agreement by Enterprise for cause under Section 9.3, the Servicer shall not, prospectively from the date of termination, except as provided in Section 9.3, have the right to its Servicing Fee from Enterprise, but such termination shall not affect the Servicer's rights relating to reimbursement for any amounts it has loaned Enterprise under this Agreement through the date of termination or other agreements entered pursuant hereto. Any Net Revenues accruing through the date of termination shall be distributed in accordance with Section 6 of this Agreement.

9.6     **Consequences of Enterprise's Breach**. In the event of termination of this Agreement by the Servicer for cause under Section 9.3, the Servicer shall not be required to perform any further services under this Agreement and Enterprise shall indemnify and hold the Servicer harmless against all liabilities of any nature whatsoever relating to Enterprise, but only insofar as these liabilities result from acts within the control of Enterprise or its agents or created by the termination of this Agreement, and also with the source for such indemnification limited to the assets or future earnings of Enterprise and without recourse to other assets of the Tribe. The parties acknowledge and agree that termination of this Agreement may not be a sufficient or appropriate remedy for breach by Enterprise, and further agree that pursuant to the other provisions of this Agreement, the Servicer shall, upon breach of this Agreement by Enterprise, have the right to pursue such remedies (in addition to termination) at law or equity as it determines are best able to compensate it for such breach, including, without limitation monetary compensation, except that the source for such compensation shall be limited to the assets or future earnings of Enterprise without recourse to other assets of the Tribe, specifically the Servicing Fee pursuant to Section 6 for a term equal to the then remaining term of this Agreement at the amount specified in Section 6 provided any such payments or damages shall be subordinate to the payment of the amounts due under any Authorized Debt.    Enterprise specifically acknowledges and agrees that there will be irreparable harm to the Servicer and that damages will be difficult to determine if Enterprise commits any breach, and Enterprise therefore further acknowledges that an injunction and/or other equitable relief is an appropriate remedy for any such breach.  In such event, the Servicer shall have the right to its Servicing Fee accruing through the date of termination as provided in Section 6 of this Agreement, the repayment of

24

JA1871

MARTORELLO_026282

unpaid principal and interest and other amounts due under any loans from it to Enterprise, provided any such payments or damages shall be subordinate to the payment of the amounts due under any Authorized Debt as defined in Section 5.2.

**10.    Conclusion Of the Servicing Term**. Upon the conclusion of the Term of this Agreement, or the termination of this Agreement under other of its provisions, in addition to other rights under this Agreement, the Servicer shall have the following rights:

**10.1    Transition**. If termination occurs at any time other than upon the conclusion of its Term, Servicer shall be entitled to a reasonable period of not less than thirty (30) days to transition services for which it has been retained to provide to Enterprise to the Tribe or its designee. Any property or equipment of Servicer that may be located at any location of the Tribe or Enterprise shall be returned to Servicer. Any property or equipment of Enterprise that may be located at any location of the Tribe or Enterprise shall be returned to Enterprise.

**10.2    Undistributed Net Revenues and Remaining Regulatory and Litigation Reserve Fund Monies**. If Enterprise has accrued Net Revenues which have not been distributed under Section 6 of this Agreement, the Servicer shall receive that Servicing Fee equal to that Fee it would have received had the distribution occurred during the Term of the Servicing Agreement. Any monies remaining in the Regulatory and Litigation Reserve Fund twelve (12) months after the conclusion of the management term shall be distributed fifty-fifty to the Servicer and Enterprise in accord with the proportion the Parties contributed those monies to the Regulatory and Litigation Reserve Fund.

**11.    Consents and Approvals.**

**11.1    Enterprise**. Where approval or consent or other action of Enterprise is required, such approval shall mean the written approval of the Enterprise subject to its Governing Documents.   Should the Governing Documents require the Tribe as sole member of the Enterprise to act, such action should be evidenced by a duly enacted resolution or properly recorded motion at a meeting of the Tribal Council thereof. Any such approval, consent or action shall not be unreasonably withheld or delayed.

**11.2    Servicer**. Where approval or consent or other action of the Servicer is required, such approval shall mean the written approval of the Operations Manager. Any such approval, consent or other action shall not be unreasonably withheld or delayed.

**12.    Disclosures.**

**12.1    Warranties. The Servicer warrants and represents as follows**: (i) no person or entity has any beneficial ownership interest in the Servicer other than as set forth herein; (ii) no officer, director or owner of 5% or more of the stock of the Servicer has been arrested, indicted for, convicted of, or pleaded nolo contendere to any felony or any offense related to business of payday loans or the payday loan industry in general, or had any association with individuals or entities known to be connected with organized crime; and (iii) no offices or director of the Servicer, has been arrested, indicted for, convicted of, or pleaded nolo contendere to any felony or any offense described in subsection (ii) above, or had any association with individuals or entities known to be connected with organized crime.

*25*

JA1872

CONFIDENTIAL    MARTORELLO_026283

**12.2    Disclosure Amendments**. The Servicer agrees that whenever there is any material change in the information disclosed pursuant to this Section 12 it shall notify the Enterprise in writing pursuant to Section 7.1. All of the warranties and agreements contained in this Section 12 shall apply to any person or entity that would be listed in this Section 12 as a result of such changes.

**12.3    Breach of Servicer Warranties and Agreements**. The material breach of any warranty or agreement of the Servicer contained in this Section 12 shall be grounds for immediate termination of this Agreement; provided that if a breach of the warranty contained in clause (ii) of Section 12.2 is discovered, and such breach was not disclosed but all officers and directors of the Servicer sign sworn affidavits that they had no knowledge of such breach, then the Servicer shall have thirty (30) days after notice from Enterprise to terminate the interest of the offending person or entity and, if such termination takes place, this Agreement shall remain in full force and effect.

**13.    No Present Lien Lease or Joint Venture**. The parties agree and expressly warrant that neither the Servicing Agreement nor any exhibit thereto is a mortgage or lease and, consequently, does not convey any present interest whatsoever in Enterprise or its assets, nor any proprietary interest in Enterprise itself. The parties further agree and acknowledge that it is not their intent, and that this Agreement shall not be construed, to create a joint venture between Enterprise and the Servicer; rather, the Servicer shall be deemed to be an independent contractor for all purposes hereunder.

**14.    Enterprise's Limited Waiver of Sovereign Immunity**. Subject to the provisions hereof, Enterprise, to the extent that Enterprise can avail itself to the sovereign immunity of the Tribe, the Enterprise hereby clearly, expressly and irrevocably grants to Servicer and its respective successors and assigns hereunder a clear, express and unequivocal waiver of tribal sovereign immunity, to the extent limited herein, from suits, actions or arbitration or mediation proceedings and consents to suits, actions or arbitration or mediation proceedings arising under this Agreement, all in accordance with the terms and limitations herein. Enterprise hereby makes this limited waiver of sovereign immunity as follows:

**14.1**    For the purpose of allowing the Servicer to take any and all actions necessary to enforce the provisions of this Agreement pursuant to the alternative dispute resolution procedures set forth in Section 18, including mediation, arbitration, and judicial enforcement proceedings which seek injunctive or declaratory relief and/or damages (as limited in Paragraph 16), specific performance or other legal and equitable remedies in the court or courts authorized by this Agreement and to effect enforcement of any remedy granted herein. This waiver of sovereign immunity also applies to any attempt by a later tribal government to revoke the Enterprise's waiver of sovereign immunity or consents herein. The Enterprise waives its sovereign immunity, if applicable, from a judgment or order (including any appellate judgment or order) and post judgment proceedings supplemental thereto consistent with the terms and provisions hereof, which is final because either the time for appeal thereof has expired or the judgment or an order issued by a court having final appellate jurisdiction over the matter.

**14.2**    Subject to this Section 14, pursuant to its limited waiver, Enterprise expressly waives its immunity from suit and consents to be hailed into mediation or arbitration as provided

*26*

JA1873

MARTORELLO_026284

in Section 18 and/or to be sued in any of the following: the Lac Vieux Desert Band of Lake Superior Chippewa Tribal Court, Michigan state courts, and the United States District Court for the Western District of Michigan and appellate courts therefrom for all three (3) jurisdictions for any claims by the Servicer arising out of this Agreement. As to any claims by the Servicer or its successors or assigns arising under this Agreement, Enterprise waives its rights to claim it is a tribal entity and/or is operating as a subordinate part of the tribal government entitling as a defense to legal action by the Servicer or its successors or assigns in accord with this Paragraph 14.2.

14.3    Enterprise agrees that it shall not plead or raise as a defense to any action brought by the Servicer or its successors or assigns any right or claim of right to the requirement of exhaustion of tribal court remedies, as the parties have expressly agreed, subject to 14.2 above. The Enterprise waives its rights to have any dispute, controversy, suit, action or proceeding, if any, heard in any tribal court or other tribunal or forum, council or adjudicative body of the whether or not such forum now exists or is hereafter created. The Enterprise hereby expressly waives any requirement which may exist for exhaustion of any remedies available in any tribal forum prior to the commencement of any dispute, controversy, suit, action proceeding in any state or federal court even if any such tribal forum would have concurrent jurisdiction over any such dispute, controversy, suit, action or proceeding but for such waiver, and any application of the abstention doctrine and any other law or interpretation thereof that might otherwise require, as a matter of law or comity, that resolution of any claim, controversy or dispute be heard first in a tribal forum.

14.4    The limited waiver of sovereign immunity granted here does not include any waiver, either express or implied, to any third party.

14.5    The Enterprise covenants and agrees that the clear, express and unequivocal limited waiver of sovereign immunity and other waivers contained herein are irrevocable and agrees not to revoke or limit, in whole or in part, such waiver of sovereign immunity or other waivers contained herein or in any way attempt to revoke or limit, in whole or in part, such waiver of sovereign immunity or other waivers, as the case may be. In the event that the Enterprise (i) revokes, limits, or attempts to revoke or limit the waivers granted herein, (ii) takes any action that is inconsistent with the waivers granted herein, or (iii) fails to submit to the jurisdiction of the tribal, state or federal courts or arbitration tribunals as provided herein, the parties expressly recognize and agree that there remains no adequate remedy at law available to the Parties and that they will be injured. In any such event, Enterprise hereby agrees that the Servicer may seek immediate judicial injunctive relief as provided herein.

14.6    The limited waiver of sovereign immunity of Enterprise as provided for in this Section shall expire at the conclusion of the longer of (i) one (1) year after the termination or expiration of this Agreement, or (ii) at the conclusion of any mediation, arbitration or litigation matter with respect to this Agreement pending at the termination or expiration of this Agreement, including the conclusion of any potential appeals available from such proceedings.

15.    **Time is of the Essence**. Time is of the essence in the performance of this Agreement.

JA1874

CONFIDENTIAL                                                                                   MARTORELLO_026285

16.  **Tribal Assets**. The Servicer understands and agrees that notwithstanding anything to the contrary herein, the obligations of the Enterprise hereunder are unsecured obligations and no recourse may be made against any assets of the Tribe, and recourse may only be made against the revenues and personal property of Enterprise after entry of a judgment in a court of competent jurisdiction as provided by the applicable law and the provisions of this Agreement related to an arbitration and provided that obligations due under any Authorized Debt have been paid in full or payment of the judgment is approved by the Lender under any Authorized Debt.

17.  **Governing Law**. The interpretation, validity and performance of this Agreement shall be governed by the laws of the Tribe and of the State of Michigan, without regard to the conflicts of law rules of such Tribe or State. If any of the terms and provisions of this Agreement shall be held invalid or unenforceable for any reason, such invalidity or unenforceability shall not affect any of the other terms or provisions hereof, all such other terms and provisions to be valid and enforceable to the fullest extent permitted by law.

18.  **Dispute Resolution**. All disputes, controversies or claims between the Parties arising out of or relating to this Agreement, including without limitation any dispute, controversy or claim between the Parties regarding the rights, duties, adequacy of performance, breach, or liabilities of a Party under any provision of this Agreement or the validity or enforceability of this Agreement ("Dispute"), shall be resolved by binding arbitration conducted in accordance with the provisions of this Section ("Arbitration Proceedings") and per the limited waiver of tribal sovereign immunity contained in Section 14 above. If a Party ("Complaining Party") concludes that the other Party ("Responding Party") has failed to comply with, or is proposing to take action which is inconsistent or will breach any term or condition of this Agreement, and the Parties informal efforts to resolve the Dispute as set forth in Paragraph 18.1 below have been unsuccessful, the Complaining Party may give written notice to the Responding Party ("Notice of Dispute"), which specifies: (a) the nature of the Dispute; (b) the corrective action which must be taken to remove, or, where appropriate, to commence removal of, the Dispute, if the Dispute is susceptible to cure ("Corrective Action"); (c) a reasonable time limit within which the Corrective Action must be taken ("Time Limit"); and (d) the amount of damages or losses asserted to have arisen from the Dispute. Except in the case of emergencies, no Arbitration Proceedings on a Dispute may be commenced by a Party unless prior Notice of Dispute and opportunity to take Corrective Action have been given as provided in this Subsection. If, within the Time Limit, the Responding Party fails in the reasonable judgment of the Complaining Party to take substantial steps to make the Corrective Action provided for in the Notice of Dispute then, with respect to the Dispute, either Party may initiate Arbitration Proceedings under Paragraph 18.2 with respect to the asserted Dispute. Each of the Parties hereby agrees that this arbitration provision is valid and enforceable and therefore waives any defense or assertion to the contrary.

18.1  **Negotiations/Mediation**. Before Arbitration Proceedings are commenced, the Parties shall use their best efforts to settle the Dispute by negotiating with each other in good faith and, recognizing their mutual interests, attempting to reach a just and equitable solution satisfactory to both Parties. Should the Parties' good faith efforts to resolve a Dispute be unsuccessful, the Parties agree that prior to resorting to judicial or arbitral avenues of relief, they may engage a mutually-acceptable mediator to assist them in resolving the Dispute. If the Parties do not reach a solution within a period of thirty (30) days from the date on which the Dispute was first asserted in writing, then the provisions in Paragraph 18.2 below shall apply.

*28*

JA1875

                                              MARTORELLO_026286

**18.2    Binding Arbitration**.  Subject to the requirements and limitations of Paragraph 18.1, either Party shall have the right to have the Dispute decided by Arbitration Proceedings in the manner provided in this Paragraph 18.2.

**18.2.1 Notice of Intent**.  A Party intending to demand arbitration shall first serve written notice of that intent ("Notice of Intent to Arbitrate") on the other Party and shall promptly thereafter file the Notice of Intent to Arbitrate with any arbitration organization of its choosing in accordance with the that arbitration organization's rules and pay the required fees. A Notice of Intent to Arbitrate shall specify:  (a) the matters to be submitted to arbitration; (b) the nature of the relief to be sought in the arbitration; and (c) the name of the "Pre-Approved Arbitrator" desired to be selected by the Party.  The Parties have established a list of pre-approved, mutually acceptable arbitrators, "Pre-Approved Arbitrators," whom either Party may identify as the decider for any Dispute under any arbitration organization's rules.  The list of Pre-Approved Arbitrators is contained at Schedule 18.2.1 hereto..

**18.2.2 Response**.  Within ten (10) days after the service of a Notice of Intent to Arbitrate, the other Party shall serve a written response ("Response") specifying (a) any additional matters it intends to submit to arbitration relating to the Dispute, and (b) the nature of any relief it intends to seek in the arbitration. The responding Party shall promptly thereafter file the Response with the arbitration organization that received the Notice of Intent and pay any required fees.  In the event that the Pre-Approved Arbitrator identified by the Party initiating a Notice of Intent to Arbitrate is unavailable to serve for whatever reason, the responding Party shall in its Response identify an alternate Pre-Approved Arbitrator from Schedule 18.2.1 to hear the Dispute.  The Parties shall alternate identification of Pre-Approved Arbitrators no longer than each ten (10) days until a Pre-Approved Arbitrator who is able to serve in the timeframes provided in this Agreement is identified.

**18.2.3 Arbitrators**.  The Pre-Approved Arbitrators identified from Schedule 18.2.1 shall be the "Decider Arbitrator."  Any Arbitration Proceedings shall take place exclusively before the single Decider Arbitrator.  Any Decider Arbitrator shall be competent and professionally experienced in the matter being arbitrated.  The Parties further agree that no arbitrator shall be an officer, agent, employee, stockholder or contractor of any Party or its affiliates, and nor shall any arbitrator be a member or descendent or spouse of a member or descendent of the Tribe.  If no Pre-Approved Arbitrator can serve then the Decider Arbitrator to be appointed shall be selected by the arbitration organization that received the Notice of Intent. All arbitrators, no matter how designated or appointed, shall act as neutral arbitrators.  All decisions, awards, orders and other rulings of the arbitrators, relief awarded, or other substantive or procedural matters ("Decisions") shall be made by only the duly-appointed Decider Arbitrator, shall be in writing signed by the Decider Arbitrator, and shall include the findings of fact and conclusions of law on which the Decision is based.

**18.2.4 Conduct of Arbitration**.  After the Notice of Intent to Arbitrate has been delivered, arbitration shall be considered commenced as to all matters properly submitted under the foregoing provisions, and shall thereafter be prosecuted with diligence in accordance with the following provisions, unless the Parties agree otherwise.  The Decider Arbitrator shall apply the governing law specified in Section 17, and shall follow such rules of discovery and evidence as the United States District Court for the State of Michigan would apply.  Within sixty (60)

JA1876

CONFIDENTIAL                                                                        MARTORELLO_026287

days of commencement of the arbitration actions, and after receiving evidence and hearing witnesses, if any, the Decider Arbitrator shall render his or her award, accompanied by findings of fact and a statement of reasons for the decision.

**18.2.5 Standard of Review.** All Decisions rendered by the Decider Arbitrator shall be determined in light of the nature of the Dispute, the circumstances surrounding the Dispute, applicable Laws, and the rights and interests of the Parties, so as to do substantial justice to the Parties. No order in Arbitration Proceedings may terminate this Agreement except upon (a) a determination that the Dispute on which the order is based constitutes a major and material default under this Agreement, or (b) upon a determination of repeated defaults sufficient to indicate callous indifference to a Party's obligations under this Agreement; provided that in no event shall this Agreement be subject to termination for breach of a term or conditions the breach of which the Parties have agreed shall not be the basis for termination of this Agreement.

**18.2.6 Place of Arbitration.** All hearings and other proceedings in the arbitration shall be held at Marquette, Michigan, unless otherwise designated by the Parties.

**18.2.7 Relief Available.** With respect to the matters submitted to Arbitration Proceedings, the Decider Arbitrator shall have authority to:

    **(a)** issue appropriate Interlocutory Orders to mitigate damage or prevent irreparable injury to a Party; and

    **(b)** render a final decision which:

        **(i)** determines or declares the rights, duties, adequacy of performance, breach or liabilities of a Party under the Agreement;

        **(ii)** orders a Party to specifically perform its obligations under the Agreement;

        **(iii)** awards appropriate injunctive, declaratory or compensatory monetary relief for the benefit of a Party; and/or

        **(iv)** contains such further relief and provisions as the arbitrators have jurisdiction and authority to grant.

The Decider Arbitrator shall not have jurisdiction or authority to assess special, consequential or punitive damages against either Party. Except as inconsistent with the provisions of this Section 18, the arbitration shall be conducted in accord with the Commercial Rules of the American Arbitration Association then in effect.

**18.2.8 Decision Binding; Enforcement.** The Decision of the Decider Arbitrator shall become a "Final Decision" at the time rendered. All Final Decisions shall be conclusive and binding on the Parties with respect to the matters decided, and shall be complied with by the Parties. A Party may enter a Final Decision and institute Judicial Proceedings for the sole purpose of enforcing a Final Decision in any tribunal specific in Section 14 above. In

JA1877

CONFIDENTIAL

MARTORELLO_026288

such Judicial Proceedings, neither Party, without consent of the other Party, shall be entitled to contend that the Final Decision should be vacated, modified or corrected and the Parties hereby expressly waive all other rights and remedies that might otherwise be available in the Judicial Proceeding.

    **18.2.9  Costs of Arbitration**.  All costs of arbitration, including the fees and expenses of the Decider Arbitrator, shall initially be borne equally by the Parties, but ultimate responsibility for such costs shall be determined by the Decider Arbitrator in the course of his or her decision and/or award according to the extent to which each Party prevailed on the issues subject to the arbitration.  Each Party shall bear the costs and expenses for the presentation of its case, including the fees of its attorneys and experts.

    **18.2.10  Survival of Remedy**.  Subsequent to any expiration or termination of this Agreement, this Section shall remain available to the Parties with respect to Disputes arising out of or relating to this Agreement, whether such Dispute arose prior or subsequent to the expiration or termination of the Agreement, for the longer of (i) one (1) year, or (ii) the conclusion of any proceedings timely initiated pursuant to this Section 18, including the conclusion of any appeals allowed by proceedings hereunder.

**19.  Performance During Disputes**.  It is mutually agreed that during any kind of controversy, claim, disagreement or dispute, including a dispute as to the validity of this Agreement or to terminate the Agreement for cause, Servicer shall remain in Enterprise as Servicer; and Enterprise and Servicer shall continue their performance of the provisions of this Agreement and its exhibits, subject to the maintenance of any licenses required to perform such duties.  Servicer shall be entitled to seek injunctive relief from such court or other competent authority as contemplated by Section 14 of this Agreement to maintain the status quo in the event of a threatened eviction during any dispute, controversy, claim or disagreement arising out of this Agreement.

**20.  Confidential Information**.  Each of the Parties agree that any information received concerning any other Party during the performance of this Agreement, regarding a Party's organization, financial matters, marketing plans, or other information of a proprietary nature (the "Confidential Information"), will be treated by all Parties in full confidence and except as required to allow Servicer or Enterprise to perform their respective covenants and obligations hereunder, or in response to legal process or appropriate and necessary inquiry, and will not be revealed to any other persons, firms or organizations; provided, however, that a Party may disclose such information to such of its officers, employees or agents who need to know the information for purposes of performing services to such Party for purposes related to this Agreement and who agree to keep such information confidential and to be bound by this Section to the same extent as if they were signatories to and bound by this Agreement. The provisions of Sections 3.3.2 and 3.3.3 shall apply to the enforcement of this Section. The provisions of this Section shall survive the termination of this Agreement.  Confidential Information shall include all information, data, knowledge, and know-how (in whatever form and however communicated) relating to the Enterprise, or to its businesses, operations, properties, products, strategies, plans, markets, or financial positions, that is delivered or disclosed by Servicer, or any Servicer representative, or any of its officers, directors, partners, employees, agents, affiliates, or shareholders, to Enterprise in writing, electronically, verbally, or through visual means, or which

*31*

JA1878

MARTORELLO_026289

Enterprise learns or obtains aurally, through observation or through analyses, interpretations, compilations, studies, or evaluations of such information, data, knowledge, or know-how regardless of whether or not any such information is marked or designated "confidential."

The obligations not to use or disclose the Confidential Information shall not apply to Confidential Information which (a) has been made previously available to the public by Enterprise or the Tribe as sole member of Enterprise or Servicer or Servicer's affiliates or becomes generally available to the public, unless the Confidential Information being made available to the public results in a breach of this Agreement; (b) prior to disclosure to Enterprise or Servicer or Servicer's affiliates, was already rightfully in any such person's possession; or (c) is obtained by Enterprise or Servicer or Servicer's affiliates from a third party who is lawfully in possession of such Information, and not in violation of any contractual, legal or fiduciary obligation to Enterprise or the Tribe as sole member of Enterprise or Servicer or Servicer's affiliates, with respect to such Confidential Information and who does not require Enterprise or Servicer or Servicer's affiliates to refrain from disclosing such Confidential Information to others.

**21.    Execution**. This Agreement is being executed in three (3) counterparts. Each of the three originals is equally valid and binding upon the parties.

**22.    Enterprise Name**. Enterprise shall be operated under the business name of Red Rock Tribal Lending, LLC, and such trade names as both the Servicer and Enterprise and the Tribe as sole member of Enterprise shall agree.

**23.    Intent to Negotiate New Agreement**. On or before one hundred twenty (120) days before the end of the Term of this Agreement, Enterprise shall give Servicer notice of its intent regarding their willingness to enter into negotiations for a new Servicing Agreement to be effective upon the conclusion of this Agreement. If Enterprise and Servicer are unable to agree to the terms of a new agreement or if Enterprise decide not to enter into negotiations for a new agreement, then Enterprise and Servicer shall agree upon a transition plan within thirty (30) days' notice from Enterprise of its intention not to negotiate a new Servicing Agreement which plan shall be sufficient to allow Enterprise to operate Enterprise and provide for the orderly transition of the management of Enterprise.

**24.    Entire Agreement**. This Agreement, including the Exhibits referred to herein and any document executed by the Parties simultaneously herewith, constitutes the entire understanding and agreement of the Parties hereto and supersedes all other prior agreements and understandings, written or oral, between the Parties.

**25.    Additional Actions**. Each of the Parties agrees to execute, deliver and, if necessary, record any and all additional instruments, certifications, amendments, modifications and other documents as may be reasonably required by another Party in order to effectuate, complete, perfect, continue or preserve the respective rights, obligations, liens and interests of the parties hereto to the fullest extent permitted by law; provided, that any such additional instrument, certification, amendment, modification or other document shall not materially change the respective rights, remedies or obligations of Enterprise or the Servicer under this Agreement or any other agreement or document related hereto.  Each of the parties further agrees to review and

JA1879

CONFIDENTIAL                                                                                    MARTORELLO_026290

consider the tax benefits that arise from the operation of Enterprise pursuant to the terms of this Agreement and to allocate such tax benefits among the parties in order to promote the respective interests of the parties hereto to the fullest extent permitted by law.

26.   **Representation**. The Tribe and Enterprise have been represented by Rosette, LLP in connection with the negotiation of this Agreement, and Servicer has been represented by Greenberg Traurig LLP. Each Party has had its attorneys fully explain and counsel it in connection with the rights and obligations imposed upon such Party under this Agreement and the agreements and other documents contemplated to be executed in connection with the Unsecured Lending Business.   Each Party has a complete understanding of such rights and obligations and is entering into the Agreement notwithstanding any covenants or restrictions set forth herein that may impose obligations on the parties.

**[remainder of page intentionally left blank]**

JA1880

CONFIDENTIAL

MARTORELLO_026291

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement on the day and year first above written.

**RED ROCK TRIBAL LENDING, LLC**

By: _____

Name: Craig Mansfield

Title: Co-Manager

By: _____

Name: Michelle Allen

Title: Co-Manager

**BELLICOSE VI, INC.**

By _____

Name: Matt Martorello

Title: President

1

JA1881

CONFIDENTIAL                                                                      MARTORELLO_026292

**Schedule 1.0**

JA1882

CONFIDENTIAL

MARTORELLO_026293

PLEASE REFER TO TAB A4 OF THIS BINDER

JA1883

CONFIDENTIAL

MARTORELLO_026294

**Schedule 18.2.1 - List of Pre-Approved Arbitrators**

List of Pre-Approved Arbitrators from Indian Country

Robert Anderson

John Bickerman

Robert Clinton

Matthew L.M. Fletcher

JoAnn Cook-Gasco

B.J. Jones

Stacey Leeds

Carrie Newton Lyons

John Petoskey

Michael Petoskey

Frank Pommerscheim

Wenona Singel

Jill Tompkins

Kevin Washburn

Robert A. Williams

*3*

CONFIDENTIAL

JA1884

MARTORELLO_026295