No. 23-2097

_____

**In The United States Court Of Appeals
For The Fourth Circuit**

**LULA WILLIAMS,**
*Plaintiff-Appellee*

**v.**

**MATT MARTORELLO,**
*Defendant-Appellant,*

On Appeal From The United States District Court
For The Eastern District Of Virginia (Robert E. Payne)
(3:17-cv-00461-REP)

_____

**JOINT APPENDIX
VOLUME V**

_____

Matthew William Wessler               Steven D. Gordon
Gupta Wessler PLLC                    Holland & Knight LLP
1900 L Street NW, Suite 312           800 17th Street, N.W., Suite 1100
Washington, D.C. 20036                Washington, D.C. 20006
Telephone: (202) 888-1741             Telephone: (202) 955-3000
E-mail : matt@guptawessler.com        E-mail: steven.gordon@hklaw.com

*Counsel for Appellee*                *Counsel for Appellant*

December 6, 2023

Krisi Cahoon Kelly
Andrew Joseph Guzzo
Kelly Guzzo, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
Telephone: (703) 424-7576
E-mail:  kkelly@kellyguzzo.com
E-mail:  aguzzo@kellyguzzo.com

*Counsel for Appellee*

VOLUME V

TABLE OF CONTENTS

| 20 | Exhibits #19 - #63 to plaintiffs' opposition to Martorello's motion for summary judgment | JA1885-JA2236 |
|----|---|---|
| 21 | Transcript of proceedings held on June 7, 2023, pp. 1-148 | JA2237-JA2384 |

# Exhibit 19

| | |
|---|---|
| **From:** | Matt Martorello |
| **To:** | shellyh@duckcreektf.com; Jennifer Steiner; Justin Martorello |
| **Cc:** | Karrie Wichtman |
| **Subject:** | RE: 2015 Budget |
| **Date:** | Tuesday, December 2, 2014 10:27:37 AM |

Thanks, see below.

**From:** shellyh@duckcreektf.com [mailto:shellyh@duckcreektf.com]
**Sent:** Tuesday, December 2, 2014 2:12 PM
**To:** Matt Martorello; Jennifer Steiner; Justin Martorello; Brian McFadden
**Cc:** Daniel Gravel; Simon Liang; Karrie Wichtman
**Subject:** RE: 2015 Budget

Matt,

Thanks for the response on these issues....again very much appreciated. I can get the salary information you requested but I do believe there are other factors to take into consideration in terms of the type of industry and the fact that lending is a highly regulated environment that assumes a lot of liability.  I can tell you off the top of my head that the last General Manager was at $124k a year and then upon his departure the C-Store Manager was put in the position as Interim GM at $80K.  <span style="color:red">Good intel, thanks.</span>

I don't want to get on the defense with the response and I am very open to any and all discussions/suggestions on this budget issue.  I guess I just want to be open and up front about the whole salary thing because I don't like to feel like I am doing something wrong as it seems this budget all became an issue after I received a raise to go to the maximum end of what was approved previously by the Council.  I did not do this on my own, I went through the Co-Manager Jim Williams after seeing the salary ranges that were sent to us.  I do realize that I do not have a bachelor's or masters degree or 5-7years of experience in this particular business and there are many areas that I know I need to work on and develop (which I am looking forward to once I am done with the Council) but I guess I have to ask you to take into consideration the fact that I have volunteered from the get go to do whatever it took to move this business forward for all parties involved.  Although I have a strong belief in the sovereign lending model I still believe that there is much potential for liability because this is such a highly regulated business that is under scrutiny every day.  Just like you, I get a little on edge every time I read something about trouble in the industry.  And my name is on every single thing that goes out of here.....and so yes  I do believe that I carry quite a bit of liability for DCTF.  And although sometimes I wonder why, I only do it because this business has a very critical value to the survival of our social programs for our people.  And for the last year I may not have been in the DCTF office for all of those hours but let me assure you that I have put in endless hours and much of those on the road and away from my family fighting for the stability of the lending industry.  <span style="color:red">The budget issues were still sitting in my inbox before the raises, that wasn't the catalyst. I strongly agree with you on the industry/risk component effecting salary in some of the positions/candidates, great point that I'm well aware of and I didn't mention in my email.</span>

As for Jennifer and Donna I believe that they work 50 plus hours every week and have been nothing but dedicated to getting the DCTF office to a place where the staff can be held to a standard and held accountable for their performance.  I must also say that they have done this in a fashion that has helped each individual grow, develop and build their confidence in their positions and to also make the staff realize the importance of the positions they hold.  <span style="color:red">Great to hear, I don't oversee any of that or have any intention to, or want to.  I'm just stating the important philosophies, which are most important because there is a natural</span>

misalignment of interests due to the "Servicing Expense" formula.  Questions about those sort of specifics only came up recently with the push to do more, concurrent with the 2014 squeeze of the business we've managed to eke through.  The resulting success and ability to compete in competitive space like a collections business for 3rd parties, which will ultimately reveal for itself how efficient things are.  I'm hoping to give you the notice in advance instead of seeing LVD take a hit on a business on account of it on the back end.

As far as a revised concept that puts the onus on Tribal Council and TNP directly for them to manage, decide and engage in these sorts of expenses on their side, I am hoping that you consider how complicated that may get and are real careful that you aren't encouraging the Tribal Council to get too hands on in the business where it is not able to function in a business minded way and have the ability to succeed.  Mixing politics in any business and allowing for micro-management makes for a mess so just want to throw that out there. Definitely wasn't thinking about micro management, just the annual budget itself being LVD internal only as an offset to TNP.

As for the legal bills, I have to say that because of the sovereign model that Rosette has expertise in I do depend on the approval of legal because of the liability that I carry by signing these documents as requested or recommended by SPVI.  There have been situations that I have been asked to sign documents by SPVI and then after the fact there are issues that are pointed out by Rosette.  That is not very comforting for me and because of this, I do need to have the ability to find comfort in legal approval in the documents.  Fair enough, I hear similar concerns from execs in industry much less under siege than Tribal lending!

Ok this is my rant..................thanks for listening!  Likewise, thanks for being upfront!

Have a great day!


Michelle Hazen
Duck Creek Tribal Financial
Co-Manager/CEO
N5384 US Hwy 45, Suite 400
Watersmeet, MI  49969
906.366.7041-cell
shellyh@duckcreektf.com-email


| -------- Original Message --------
| Subject: RE: 2015 Budget
| From: Matt Martorello <mattm@bellicosevi.com>
| Date: Tue, December 02, 2014 9:08 am
| To: "shellyh@duckcreektf.com" <shellyh@duckcreektf.com>, Jennifer
| Steiner <jennifers@duckcreektf.com>, Justin Martorello
| <JustinM@BellicoseVI.com>, Brian McFadden <BrianM@bellicosevi.com>
| Cc: Daniel Gravel <DanielG@bellicosevi.com>, Simon Liang
| <SimonL@bellicosevi.com>, Karrie Wichtman <kwichtman@rosettelaw.com>
|
| Hi guys,
|
| There must have been some miscommunication on the salary sheet sent over, I have to
| apologize for that.  This is the first time I'm seeing this, and I'm not sure that it was
| understood from whoever did it that the purpose of it was to base DCTF compensation

from.  What was provided was about as broad a study as you could find.  The averages "typical" are for major cities, for folks with average levels of experience (i.e. 5 – 7 years), with average educational achievements (bachelor's to masters), and with average size businesses (30 – 40).  Even the "Entry" level is "average" entry level, it doesn't match up Entry level for a small operation in Watersmeet.   I have no idea what "Recommended Start" means, I didn't review or approve this document at all so I'm not assuming it was not recommended as what's recommend from SPVI to DCTF, though it was a poor choice of title in that respect and I'm certain would be interpreted by DCTF to mean exactly as it reads.

Give me some time to digest that and start from there please, in regards to comps.  In the meantime, the accurate comps are for LVD to simply look at the salaries earned by title at:
1) The Casino
2) The Hotel
3) The golf course
4) The restaurant
These will give you the market rates for identical level positions, relative to qualifications for everything from CSR to Team Leads, to Executives.  Can you gather that data?

I can't say yet about hiring a compliance manager, but I don't think it's necessary given the 7 or 8 touches everything receives today from trained personnel, and the deeper touch of the DCTF compliance board.

Collections probably will begin in 2015 in Watersmeet, but that can be dealt with when it becomes more apparent with a proposed adjustment to the Budget.

Travel – Agreed that Shelly should attend NAFSA.  OLA is a bit of a dog and pony show for Vendors to stalk you and the information for folks as dialed in as we are is also old news.  OLA to me is more helpful for the small lenders.  That said, it's up to you.  I get completely bombarded by vendor salesmen when I go so it's always a setback for me.  I passed on an offer for a board position with OLA a few years ago.  I do support OLA's lobbying efforts, though I think their idea of a National Charter is pie in the sky and would destroy tribal lending if successful.  The public policy arguments though need to be had, I wish they'd make much more effort to focus on that.  Up to you on OLA.

A lot of this will be moot if we can get the Sale across the finish line, so my focus is much more so on exactly that and what the purchased business will exactly do after acquisition (facilitating a transition to the new owner).  The one penetrating thought is that if a business doesn't operate efficiently and work hard, they will be destroyed by the competition because the competition is working hard and efficiently.  Simplified, if I'm selling widgets at $10 and have a team that gets paid 2x market salaries and works 30hrs/week (just an extreme example, not drawing any parallels to DCTF), and competitor, LLC uses Chinese manufacturers, a Philippine call center, and works them all 70 hours per week.  Assuming widgets are just the same, they get to sell them at $5.  They've put me out of business.  Today, because of the state of the industry inefficiency can happen and

you certainly get to survive and continue (albeit with less capital on the street, resulting in lower Revenues and Profits), but it's just a bad crutch to lean on for the long term life of the business and for the road ahead for LVD.

Operating in Watersmeet where cost of living and employee compensation is on the low end of the spectrum has some significant benefits to that equation.  Every now and then you may get an outlier.  For example, a rock star expert who you might need to lure to LVD from NYC and have to look at the additional person coming on board as a ROI equation (more like the purchase of an asset) rather than in the traditional  compensation spectrum.   Just stating this to demonstrate I'm not saying to squeeze everything to pennies, just that the efficiency is an important precedent to set moving into a more competitive environment ahead.  Especially if LVD wants to start buying and/or collecting on bad debt for other lenders one day.  That is a very tight margin and competitive business, and it won't be an option if the costs are too high for the lower revenue a client is willing to agree to.  They will go to some other lean operation that can pay up.

That's my rant.  Thanks for listening.

---

**From:** shellyh@duckcreektf.com [mailto:shellyh@duckcreektf.com]
**Sent:** Tuesday, December 2, 2014 11:03 AM
**To:** Matt Martorello; Jennifer Steiner
**Cc:** Daniel Gravel; Simon Liang; Karrie Wichtman
**Subject:** RE: 2015 Budget

Hi Matt,

Thanks for the response on the budget.  Your input is greatly appreciated!

I believe Jennifer forwarded the salary ranges and if you have further concerns please let me know so that we can discuss this further.

As far as the rest of the budget we are certain that we can be accountable for the bottom line for the budget you sent back to us.  However, we want to make sure that our assumptions based on your figures are correct.

- We will not hire a compliance manager

- Collections will not begin in this location in 2015

These two assumptions would explain the reduced training and technology figures and the steady compensation numbers.

My other question would be on the travel.  Do you want either or both of us to attend one of the OLA conference this year?  The registration was $2,400 per person last year and your proposed budget would cover attendance and enrollment fee for one person.  I have also been active in NAFSA and would like to know if you would like me to continue attending those meetings.   I think that it is very important to participate in both of these because of the constant changes and attacks on the lending industry.  Just my thoughts.

Depending on our need in the office throughout the year (in terms of office maintenance and supplies) we may be able to make modifications in some line items to help cover in other areas but I would like to know understand your expectations.

Thanks for you time and input.


Michelle Hazen
Duck Creek Tribal Financial
Co-Manager/CEO
N5384 US Hwy 45, Suite 400
Watersmeet, MI  49969
906.366.7041-cell
shellyh@duckcreektf.com-email



-------- Original Message --------
Subject: 2015 Budget
From: Matt Martorello <mattm@bellicosevi.com>
Date: Mon, December 01, 2014 9:14 am
To: Jennifer Steiner <jennifers@duckcreektf.com>, Shelly Hazen
<shellyh@duckcreektf.com>
Cc: Daniel Gravel <DanielG@bellicosevi.com>, Simon Liang
<SimonL@bellicosevi.com>, Karrie Wichtman
<kwichtman@rosettelaw.com>


The recommended revisions to the Budget sent by DCTF were not accepted by SPVI.

Please review the attached for the changes SPVI is willing to make in regards to the DCTF office portion of the budget, which seemed to be in question.  There is much concern about the inflated line items relative to market based value in the Watersmeet area.  Certain travel budgets, parties, and compensation plans are nowhere near the market universe in Watersmeet or for an operation DCTF's size.  If you have comp data points to demonstrate otherwise, I'd be happy to see them.  The concept and motivation behind that is extremely concerning to the integrity of the "Servicing Expense" classifications, which is due to change.

We are working on a revised concept that puts the onus Tribal Council and TNP directly, for them to manage, decide and engage these sort of expenses on their side of the equation most diligently and whoever LVD should decide.  The Servicing Expense allocation of these items has created a problem which moves the parties (including Alpha) in a very dangerous direction.   A more long term and tactful approach would be extremely prudent.

Further, SPVI will be requiring changes to DCTF's internal legal policies, which I will work with Karrie on directly, in order to ensure the Budgeted items for the legal line item are not exceeded in 2015, which in turn represents a default with Alpha.

Thanks,
Matt

\*\*This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.\*\*

\*\*This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.\*\*

\*\*This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.\*\*

ROSETTE_REVISED 043690

JA1891

# Exhibit 20

When a change is made to regular procedures, policies, marketing efforts, or other business operations, Bellicose VI, LLC and Bellicose Capital, LLC (ON BEHALF OF SPVI) will send a formal recommendation for approval to the Tribes before moving forward with any changes (form attached). These recommendations must always go through the General Counsel/Compliance Director before being passed on to the tribal entities.

## CONTENTS

I.   Employee Profiles
II.  Sourcepoint VI Departments: Key Personal, Functions and Responsibilities
1.   Risk
2.   Analytics
3.   DM
4.   Information Technology
5.   Operations
6.   Payment Processing
7.   Compliance
8.   Legal
9.   Quality Assurance
10.  Finance
11.  Management
12.  Human Resources

## EMPLOYEE PROFILES

### BELLICOSE CAPITAL, LLC

**Matt Martorello,** *President and Member of the Sourcepoint VI Compliance Board*
Oversees the business functions of all BC subsidiaries: ICA and SPVI.  ICA services the casino businesses (Tribe in OK and Offshore Casino Boat in Palm Beach) while SPVI services:  2 Tribal lenders (both LVD) and 1 State by state licensed lender (which is a very different contract for small flat consulting fee to help them out until end of the year.  Also a new subsidiary formed (Dorado Analytics, LLC) which will provide flat rate consulting services to Tribes that want to learn everything about the industry in building their business.

**Justin Martorello,** *VP, COO and Member of the Sourcepoint VI Compliance Board*
Senior executive responsible for the oversight of the Tribal lending entities overall operations including: risk, analytics, compliance, marketing, P&L, operations, and technology.  Also helps with State client in setup.

**David Chaney,** *CFO and Member of the Sourcepoint VI Compliance Board*
Responsible for the overall financial and strategic management activities of Bellicose Capital, including its related online consumer lending activities.

**Brian McFadden,** *Director of Operations*
Responsible for managing and coordinating operations, including the Tribe's off shore call center. Manages payment processing for Tribal client portfolios including; ACH, RCC, Debit/Credit Card. Responsible for operational adherence to company Compliance policies and procedures as they relate to the online consumer lending industry. Manages all aspects of the Tribal lending entity's customer service including Quality Assurance. Coordinates marketing plans for the lending entities, with

JA1893

MARTORELLO_005441

operations to maximize ROI. Monitors Key Performance Indicators and identify/execute opportunities for improvement.  Provides advice to the State operation as well.

**John Norris, *CRO***
Develops statistical credit scoring models using SAS & SQL to be used for the Tribal entities.  Conducts analysis with past transactional loan management system data and credit underwriting data. Builds automated reporting tools for the Tribal lending entities.

**Jose Rivera, *Senior Software Developer***
Works closely with contractors to ensure the quality of the software development cycle. Designs architecture components and data access API for the tribal lending websites. Integrates an ESB software component for the loan approval cycle. Provides support for payday websites in terms of software development perspective.

**Raul Rolon, *Director of Analytics***
Responsible for the use of analytics methodologies to conduct statistical analysis with the objective to improve loan conversion, reduce defaults, improve collections, assess the cost effectiveness of marketing objectives and improve overall business operations.

**Xiomary Moreno, *Senior Accountant***
Organizes, prepares and registers commission fees, interest payments of investment between parent company and subsidiaries. Credit cards, cash, ACH loan payment allocation for tribal lending entities. Audits ACH transactions for lending entities.  Handles full cycle of accounting.

**Ivelisse Morales, *Compliance Specialist***
Engage in day to day monitoring of all aspects of the business to ensure that the company and the Tribal clients are in compliance with applicable laws and regulations. Sample and test customer complaints. Reviews loan agreements. Monitors information security issues.  Conducts compliance audits and issues monthly reports to management with recommendations for improvements.

**Chelsea Wever, *Director of HR***
Consults with and advises the Tribal entities on human resources matters.  Handles internal matters for the same.

**Adil Karam, *IT Manager***
Effectively manages all aspects of information technology including virtual cloud computing, security, networking, installation and upgrades of hardware and software systems. Handles execution of monthly security checklists and audits, troubleshooting/help-desk, VOIP telephony, end-user training, disaster recovery/business continuity, procuring and management of vendors, CAPEX/OPEX/TCO budgeting, and technology risk management.

**Daniel Gravel, *General Counsel, Compliance Director and Sourcepoint VI Compliance Director***
Oversees all aspects of the legal affairs of company and its affiliates and advise management on legal matters. Ensures good corporate governance and legal and regulatory compliance. Drafts and negotiates complex contracts.

**Simon Liang, *Controller***

CONFIDENTIAL

Designed accounting system for RRTL online lending portfolio. Designed Apogee reports for accounting purposes. Member of SPVI team migrated CPD portfolio from Apogee to TDC: pre-migration communication and verification, reporting system implementation, post-migration reconciliation. Coordinated with Deloitte & Touché for RRTL and BVI group 2012 audits. Prepares lenders' monthly financial statements and servicing fee schedules. Prepares weekly and monthly operating reports for decision-making. Supervise EBI accounting team to prepare reports for CPD bookkeeping. Coordinated with BDO for SPVI and RRTL 2012 audits.

**Monique Martinez, *Director of Call Center Operations***
Manages and oversees all operations of the call center used by the Tribal lending entities to provide customer service and help process loans.

**James Dowd, *Director***
Manages vendor relationships for lead purchasing and underwriting data in order to find opportunities for increased efficiency of client portfolios. Active member of Research and Technology team in helping develop management reporting, underwriting strategies and proprietary Direct Mail marketing and risk models for the tribal lending entities. Works with the State lender as well to help them build their underwriting models, processes and strategies.

## BELLICOSE VI, LLC

**Kym Bunn, *Office Manager***
Oversees and manages all functions of the Quality Assurance Department. Coordinates and assists in managing communications and operations of call center.

***Senior Quality Assurance Analysts***
Leaders and subject matter experts.
**K'Tonya Petrus**
**Vernita Joseph**

***Quality Assurance Analysts***
Monitor calls for quality assurance purposes.
**Tishanna Carino**
**Jeannette Guzman**
**Claudia Sorhaindo**
**Donnise Nicholas**


The following employees interact with the Tribal entities on a regular basis via telephone and email in order to successfully complete the duties referred to above:
- Matt Martorello
- Justin Martorello
- Brian McFadden
- James Dowd
- Simon Liang
- Daniel Gravel
- Monique Martinez

JA1895

MARTORELLO_005443

- Ivelisse Morales
- Kym Bunn and the QAA team

## SOURCEPOINT VI DEPARTMENTS
### Risk
#### Key Personal
- Matt Martorello, President
- Justin Martorello, VP and COO
- James Dowd, Director
- Raul Rolon, Director of Analytics
- John Norris, CRO

#### Functions and Responsibilities
- Underwriting best practices and knowhow
- Knowhow and technology to process bureau data in XML and fixed width formats for analytical and model building
    - Automated daily scripts to convert XML underwriting data into tabular (column and row) data for statistical modeling and analysis
- Modeling techniques and experience for developing custom scores and underwriting rules
- Formula for generating bad ABA lists and other ECOA compliant suppression lists
- Fraud best practices and rule sets
- VIP underwriting criteria
- Good customer definition
- Risk Assessments Tools
    - Reports to track the cash flows of customers, i.e. from loan origination, how much cash flows are generated in each successive month

### Analytics
- Queries and software to do the following:
- Investor reporting
- Management reporting
- Affiliate traffic analysis
- Lead auction strategies
- ACH reconciliation and cash flow reconciliation technology
- Data driven Direct Mail, other marketing and operational improvements

### DM
- Interim file selection methodology and processing from credit bureaus
- Custom risk and response scores for predicting likelihood
- Tools for rebuilding and adapting risk and response scores with more data coming in
- Tools for transformation of credit bureau attributes
- Ongoing reporting through the campaigns
- Research and development for various creative concepts
- Generate a daily report to track the performance of the ITA (Invitation to apply) campaign.

JA1896

CONFIDENTIAL

MARTORELLO_005444

## INFORMATION TECHNOLOGY

### Key Personal
Adil Karam, IT Manager
Jose Rivera, Senior Software Developer
Raul Rolon, Director of Analytics

### Functions and Responsibilities
- LAN/WAN Network Architecture, Design and Security
- Hardware Systems/Endpoint Protection and Maintenance
- User Administration and Management
- Data Access Management, Security, and Loss Prevention
- Asset Management and Inventory
- Information Security Policy and Procedures
- IT Compliance Training and Knowledge Base
- Application and Software License Management
- Business Continuity and Disaster Recovery
- Website Architecture, Design and Security
  - Source code, User Interface Design, Database Management
  - Third Party Integration and Management
- Tools to automatized reports (i.e. monthly audit reports: applicants, declined and not able to verify identity)
- Application to scrub SCRA before the list of default loans go to collections as required by the New Default Judgment Rules (under development)
- Application Source Codes (websites, internal reports, etc.)
- Underwriting architecture
- Security architecture
- Infrastructure architecture

### Operations
- Create/ maintain/ deliver Training material
- Create all material for, and maintain, the company Knowledgebase(The Source)
- Created email templates
- Write and maintain call scripts
- Create and manage Charge off procedures
- Manage 3rd party collections vendors
- All customer verification procedures
- Decision Logic instant bank verification processing
- ACH, RCC and Debit Card processing procedures
- Adverse Action notices
- Disaster recovery for all DCTF office processes
- Explanation of Payment options scripts and recordings
- Manage Promo campaigns for good customers
- Maintain the "News Feed", a messaging system to communicate any and all important messages across all organizations
- Create and maintain the settlement calculator and associated algorithm
- Redirect campaign technology
- Single entry and recurring ACH telephone script, procedures, and call recording storage

JA1897

MARTORELLO_005445

- SMS system
  - Create all the templates
  - Create all the triggering events
  - Manage the 2way text message communications direct with customers
  - Opt in procedures for transactional sms and marketing sms
- Transactional emails
  - Create all email content
  - Create/maintain all triggering events
- Manage auto withdraw processing in relation to effective date
- HyperOffice
- The Source
- Call Center training material and Call Scripts
- Wiki Sourcepoint
- Recorded calls
- Daily reports

## Payment Processing

- Acquire and maintain processing relationships
- Create/maintain procedures on the daily payment processing
- Manage the ACH, RCC and Debit Card file upload process
- Maintain accurate return records in the LMS
- Control the state distribution to different payment processors to maintain ample backups
- ACH application and database (this is in production)
- ACH reporting: performance, volume and allocation (more reports to be built in the future)

## Compliance

- Agreements
- CMS Policies and Procedures
- Guides
- Risk Assessments
- Checklists (i.e. Due diligence, Vendor Contract)
- Audit tools (i.e Third Party Collectors)
- Training Materials (Training Slides, Quizzes, Completion Tracking and Confirmation Forms)
- Disclosures

## Legal

- Agreements
- Policies and Procedures
- Guides
- Risk Assessments
- Checklists (i.e. Due diligence, Vendor Contract)
- Audit tools (i.e Third Party Collectors)
- Training Materials
- Disclosures

## QA

- Call Monitoring Audit form for Production (customer service/Sales calls) and Collections
- Monitoring tools and reports
- Training Materials

JA1898

CONFIDENTIAL

MARTORELLO_005446

- Audit forms for collections and production

## Marketing
- Create/manage daily marketing email campaigns
- Create and maintain proven good customer lists
- Adobe Photoshop for campaigns
- Interspire for daily email campaigns
- Compliant campaigns with regulatory and law requirements (i.e. disclosures)
- Marketing materials, including:
- email campaign templates and content
- schedule for touchpoints and promos
- promo codes and offers
- procedures and training for sending email campaigns and using the tool
- images?
- Taglines
- Website content
- Applicable disclaimers
- Email contact lists

## Accounting
- Reconciliation procedure: ACH, RCC, credit/debit card, paper check and money order
- Tribal monthly reporting
- Third party collection reconciliation
- Charge off file conversion Macro (we paid to a freelancer)
- Automate of the procedures: ACH performance report, ACH volume report. I consider that with the ACH application, created and validated by Raul and I, we can add reports that can be benefits for the company and in the decision making.
- Document accounting procedures that can be useful may be if we are going to have an audit in the future. This can help with the standardization in accounting department in the way that we perform the task functions.
  - Basically my daily tasks are manually with the implementation of the ACH application this will decrease and I can work with other tasks that may be my supervisor can delegate to me.

## Finance
- Create a centralize database to host the daily ACH transactions files.
- Design an application to automatically input the daily ACH files to the database.
- Produce reports out of the ACH transaction database using the application gui (graphical user interface).
- Lender weekly reporting to debt investor

## Management
- Vendor relations
- Political navigation
- Financial structuring knowledge
- Organizational structuring knowledge
- Capital structuring knowledge
- Tax efficiency structuring knowledge

JA1899

MARTORELLO_005447

## Human Resources

- New Hire and Onboarding Docs:
  - Employment application
  - Conditional offer letter
  - Dispute resolution agreement
  - Non-disclosure and developments
  - Non-compete
  - Employment Agreement
  - Code of business conduct
  - Drug and alcohol screen consent form
  - Background check release (contacts and training on acquiring checks and what types are applicable to different positions)
  - Agreement to comply with information security standards
  - Probationary period agreement (may not apply to employers outside VI and PR)
  - Employee handbook and policies (this is extensive)
- Other HR docs:
  - Disciplinary action – language, procedure, and proper documentation and filing for the following:
    - Verbal coaching
    - Verbal warning
    - Written Warning
    - Final Written Warning
    - Suspension – including investigation procedure and pay deductions
    - Termination
- Policy against harassment and discrimination
  - Written policy
  - Training – including PowerPoint presentation
  - Procedures for reporting and investigating discrimination or harassment
  - Statement and range of consequences
  - Grievance procedure
- Release Agreement (written agreement and severance packages)
- Information storage materials – payroll, performance, disciplinary action, PTO accruals
- Employee evaluations
- Time off request forms
- One-on-one meeting (manager to direct reports) documents
- Temporary employment agreement
- Independent contractor agreement

JA1900

CONFIDENTIAL

Exhibit 21

## Darcie Pace

| | |
|---|---|
| **From:** | Karrie Wichtman |
| **Sent:** | Friday, November 14, 2014 3:22 PM |
| **To:** | Daniel Gravel |
| **Subject:** | RE: Recommendation to Stop Lending in PA |

The Chairman requested that we place his signature on the recommendation for everyone's records rather than have to wait for Monday.  We have his and Shelly's signature on file for use when they are not available to sign.  This has been happening on a regular basis for quite some time with these recommendations as well as contracts and other items that SPVI asks for expedited signature if the Co-Managers are not available but signature has otherwise been authorized by the Co-Managers.  Why would they not be valid?

Sincerely,


Karrie S. Wichtman, Partner
ROSETTE, LLP
Michigan Office
Attorneys at Law
25344 Red Arrow Highway
Mattawan, Michigan 49071
269.283.5005 Office
517.913.6443 Facsimile
480.242.6959 Cell
kwichtman@rosettelaw.com
rosettelaw.com

CONFIDENTIAL COMMUNICATION: THIS MESSAGE IS A CONFIDENTIAL ATTORNEY COMMUNICATION ONLY FOR USE BY THE INTENDED RECIPIENT.  ANY INADVERTENT RECEIPT SHALL NOT CONSTITUTE A WAIVER OF ATTORNEY-CLIENT OR WORK PRODUCT PROTECTION.  IF RECEIVED IN ERROR, PLEASE NOTIFY KARRIE S. WICHTMAN IMMEDIATELY AND DELETE THIS MESSAGE.  THANK YOU FOR YOUR COOPERATION.

---

**From:** Daniel Gravel [mailto:DanielG@bellicosevi.com]
**Sent:** Friday, November 14, 2014 3:14 PM
**To:** Karrie Wichtman
**Subject:** Re: Recommendation to Stop Lending in PA

What is the purpose here? These signed docs wouldn't be valid anyway, correct?

On Nov 14, 2014, at 3:45 PM, "Karrie Wichtman" <kwichtman@rosettelaw.com> wrote:

> Cameron,
>
> Chairman Williams asked me to get these executed right away.  Can you place the necessary signatures on the documents since approvals by both Co-Managers has been provided, scan and reply to all?
>
> Sincerely,

1

Karrie S. Wichtman, Partner
ROSETTE, LLP
Michigan Office
Attorneys at Law
25344 Red Arrow Highway
Mattawan, Michigan 49071
269.283.5005 Office
517.913.6443 Facsimile
480.242.6959 Cell
kwichtman@rosettelaw.com
rosettelaw.com

CONFIDENTIAL COMMUNICATION: THIS MESSAGE IS A CONFIDENTIAL ATTORNEY COMMUNICATION
ONLY FOR USE BY THE INTENDED RECIPIENT.  ANY INADVERTENT RECEIPT SHALL NOT CONSTITUTE A
WAIVER OF ATTORNEY-CLIENT OR WORK PRODUCT PROTECTION.  IF RECEIVED IN ERROR, PLEASE
NOTIFY KARRIE S. WICHTMAN IMMEDIATELY AND DELETE THIS MESSAGE.  THANK YOU FOR YOUR
COOPERATION.

---

**From:** Daniel Gravel [mailto:DanielG@bellicosevi.com]
**Sent:** Friday, November 14, 2014 10:15 AM
**To:** Michelle Hazen; Chairman James Williams
**Cc:** jennifers@duckcreektf.com; Karrie Wichtman; Matt Martorello; Justin Martorello; Brian McFadden;
James Dowd
**Subject:** Recommendation to Stop Lending in PA

Hi Shelly and Chairman Williams:

Please see attached recommendations.

Let me know if you have any questions.

Thanks,

**Dan Gravel**
**General Counsel**
Email: danielg@bellicosecapital.com
Office: 787-520-6053
Mobile: 781-910-9642
<image001.png>

CONFIDENTIAL COMMUNICATION: The information contained in this email is intended for the individual or entity above. This
email is protected by the Electronic Communications Privacy Act, 18 U.S.C. Sections 2510-2521 and may be legally protected by
the attorney/client privilege and/or work product doctrine. If you are not the intended recipient, please do not read, copy, use,
forward or disclose this communication to others; also, please notify the sender by replying to this message, and then delete this
message from your system.

**This email and any files transmitted with it are confidential and may contain privileged or
copyrighted information. You must not present this message to another party without gaining
permission from the sender. If you are not the intended recipient you must not copy, distribute or
use this email or the information contained in it for any purpose other than to notify us. If you
have received this message in error, please notify the sender immediately, and delete this email

CONFIDENTIAL

ROSETTE_REVISED_059082

JA1903

from your system.** CONFIDENTIAL COMMUNICATION: The information contained in this email is intended for the individual or entity above. This email is protected by the Electronic Communications Privacy Act, 18 U.S.C. Sections 2510-2521 and may be legally protected by the attorney/client privilege and/or work product doctrine. If you are not the intended recipient, please do not read, copy, use, forward or disclose this communication to others; also, please notify the sender by replying to this message, and then delete this message from your system.

**This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.** CONFIDENTIAL COMMUNICATION: The information contained in this email is intended for the individual or entity above. This email is protected by the Electronic Communications Privacy Act, 18 U.S.C. Sections 2510-2521 and may be legally protected by the attorney/client privilege and/or work product doctrine. If you are not the intended recipient, please do not read, copy, use, forward or disclose this communication to others; also, please notify the sender by replying to this message, and then delete this message from your system.

CONFIDENTIAL                                                                    ROSETTE_REVISED_059083

JA1904

# Exhibit 22

**In the Matter Of:**

*Williams v.*
*Big Picture*

---

*James Dowd*
*November 13, 2018*
*Confidential*

---



*Min-U-Script® with Word Index*

1

```
 1              IN THE UNITED STATES DISTRICT COURT
                              FOR THE
 2                  EASTERN DISTRICT OF VIRGINIA
                         RICHMOND DIVISION
 3

 4
     LULA WILLIAMS, et al.,                  )
 5                                           )
                                             )
 6                        Plaintiffs,        )
                                             )
 7          vs.                              ) No. 3:17-cv-00461
                                             )
 8     BIG PICTURE LOANS, LLC, et al.,       )
                                             )
 9                                           )
                          Defendants.        )
10
     STATE OF ILLINOIS       )
11                           )  SS.
     COUNTY OF COOK          )
12

13

14          The videotaped deposition of JAMES V. DOWD

15   taken before Melanie E. Kubiak, Certified Shorthand

16   Reporter, at 180 North LaSalle Street, Suite 2800,

17   Chicago, Illinois, commencing at 9:05 a.m. on the

18   13th day of November, 2018.

19

20

21

22

23

24
```

JA1907

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 27 of 503
Case 3:17-cv-00461-REP   Document 1299-22   Filed 06/07/23   Page 4 of 6 PageID# 56136

1    Q.   Do you recall any time where the Tribe didn't

2  accept any -- Let me rephrase that.

3         Do you recall any times where the Tribe

4  wouldn't accept a recommendation made by Bellicose VI

5  for the Tribe about tribe lending business?

6    A.   I can't recall specifically, but there were a

7  lot of instances over the years.  And a lot of times I

8  wouldn't have been the one directly speaking with them

9  to make the recommendation.

10   Q.   Okay.  Who -- So at times, were you the one --

11 So I assume there were various people at Bellicose VI

12 who would have interacted with the Tribe --

13   A.   Yes.

14   Q.   -- is that correct?

15   A.   Yes.

16   Q.   And sometimes that would include you?

17   A.   Yes.

18   Q.   Who else would that include?

19   A.   I would say virtually all of the employees at

20 the -- the Bellicose VI company at some time or other.

21   Q.   So all of the employees at Bellicose VI would

22 have -- would have at some point potentially interacted

23 with the Tribe to make recommendations to the Tribe

24 about the lending business?

JA1908

**Confidential**

236

1

2    UNITED STATES OF AMERICA          )
     EASTERN DISTRICT OF VIRGINIA      )
3    RICHMOND DIVISION                 )

4

5          I, Melanie E. Kubiak, Certified Shorthand

6    Reporter, do hereby certify that JAMES V. DOWD was first

7    duly sworn by me to testify to the whole truth and that

8    the above videotaped deposition was reported

9    stenographically by me and reduced to typewriting under

10   my personal direction.

11          I further certify that the said videotaped

12   deposition was taken at the time and place specified and

13   that the taking of said deposition commenced on the

14   13th day of November, 2018, at 9:05 a.m.

15          I further certify that I am not a relative or

16   employee or attorney or counsel of any of the parties,

17   nor a relative or employee of such attorney or counsel,

18   nor financially interested directly or indirectly in

19   this action.

20

21

22

23

24

JA1909

**Confidential**

237

1          In witness whereof, I have hereunto set my

2    hand this 16th of November, 2018.

3

4

5

6

7                    _____

8                    MELANIE E. KUBIAK, CSR
                     180 North LaSalle Street
9                    Suite 2800
                     Chicago, Illinois 60601
10                   Phone:  (312) 236-6936

11
     CSR No. 084-004794
12

13

14

15

16

17

18

19

20

21

22

23

24

Exhibit 23

| | |
|---|---|
| **From:** | Matt Martorello |
| **To:** | Karrie Wichtman |
| **Cc:** | Justin Martorello; Tanya Gibbs |
| **Subject:** | RE: New Agreement with O2 |
| **Date:** | Monday, February 23, 2015 7:49:13 PM |

I think that's exactly the role of the President's and his interchangeable cronies. I wouldn't buy Pfizer and then ask to be CEO, or everyone will be out of a job at Pfizer in 12 months when I destroy it. The optics are important due to the bastards out there against us, but the practicality and sustainability of business is the basic necessary foundation over optics.

Of course, O2 could die in a plane crash, and our folks are not indentured servants either. There's no way to plan over 7 years the people that will be where in any organization, only the title/duties/roles that would be filled by humans of a certain qualification level. When one resigns, quits or other, every business has to worry about redundancy. Small companies much more so than big ones.

Anyway, tomorrow in the later afternoon is good for me. How about 4pm ET?

---

**From:** Karrie Wichtman [mailto:kwichtman@rosettelaw.com]
**Sent:** Monday, February 23, 2015 11:29 PM
**To:** Matt Martorello
**Cc:** Justin Martorello; Tanya Gibbs
**Subject:** Re: New Agreement with O2

Thank you for your responses, the short and the little bit longer. Lets talk it through the long way tomorrow. It's not so much about who is learning but (1) that there is someone who is maintaining vendor relationships and watching out for and able to maneuver around, over, under and through industry changes (whether that person is tribal I don't know but it sure makes sense to the model) and (2) having the team in place in to sustain the business after the two years and out scenario Justin spoke of earlier. If those folks are in place great! I understand who the stakeholders are at the beginning and end. I am trying to think long term ( the whole seven generations ahead thing is in my blood). Just like you I want to make sure no default occurs ever and that the business is self sustaining for the Tribe well into the future. The consequences will be too great if this goes away in one, three, five or even seven years. The Tribe is in it for the long haul.

Karrie S. Wichtman, Partner
Rosette, LLP - Michigan Office
25344 Red Arrow Hwy, Suite B
Mattawan, Michigan 49071
Office Number: 269-283-5005
Cellular Number: 480-242-6959
Fax Number: 517-913-6443

THIS MESSAGE IS PRIVILEGED ATTORNEY CLIENT COMMUNICATION INTENDED FOR USE ONLY BY THE INTENDED RECIPIENT. IF YOU RECEIVE THIS MESSAGE IN ERROR PLEASE NOTIFY THE SENDER DELETE AND DISREGARD THIS MESSAGE.

On Feb 23, 2015, at 8:16 PM, Matt Martorello <mattm@bellicosevi.com> wrote:

I guess one question I have is who are you expecting to learn it? There isn't much to "do" for the Buyer since it's built and designed to be sold to be self-sustaining as a passive investment opportunity. The only people I'd recommend be "active" would be folks who have 10+ years of

intensive business expertise, or someone with leadership skills in the world of analytics and stats (with at least a master's degree).  If not, I'd hire those people and compensate them right so I'd feel safe as a passive seller.

I think I need clarity on exactly who you are expecting to learn and what it is you want them to learn.  I can't learn science because the words frustrate me too much.  Just the same, if you're hoping to jam a square peg through a round hole, something will get broke.

---

**From:** Karrie Wichtman [mailto:kwichtman@rosettelaw.com]
**Sent:** Monday, February 23, 2015 9:16 PM
**To:** Justin Martorello
**Cc:** Tanya Gibbs; Matt Martorello
**Subject:** Re: New Agreement with O2

Yes, it provides more color. I have questions and I would like to have a discussion about this. What time works for the two of you? From a tribal perspective two years and out is a scary prospect. I am not certain how this will work or how the Tribe won't need anyone when there is so much to do and learn. This business changes so much on a daily basis- maybe with everything staying stagnant this works but we all know that won't happen. Also I can see the logic in an increase in contract price based on an increase in services, however the Tribe needs to understand what O2 did and what they will do now under the new terms. Also, how does putting a company in charge of things Matt used to do help the Tribe learn the business? At the end of the day, especially if you guys are out in 2 years, with the Tribe holding all the cards they need to be playing with a full deck. Sounds to me like we will be short some aces.

Karrie S. Wichtman, Partner
Rosette, LLP - Michigan Office
25344 Red Arrow Hwy, Suite B
Mattawan, Michigan 49071
Office Number: 269-283-5005
Cellular Number: 480-242-6959
Fax Number: 517-913-6443

THIS MESSAGE IS PRIVILEGED ATTORNEY CLIENT COMMUNICATION INTENDED FOR USE ONLY BY THE INTENDED RECIPIENT. IF YOU RECEIVE THIS MESSAGE IN ERROR PLEASE NOTIFY THE SENDER DELETE AND DISREGARD THIS MESSAGE.

On Feb 23, 2015, at 6:49 PM, Justin Martorello <justinm@bellicosecapital.com> wrote:

+Matt

I understand your confusion.

I don't know that a new resolution is necessary given that the sections originally requiring resolution are nearly identical.  If I am misspeaking in that regard then, yes, we need a new resolution ASAP.  Another option might be asking O2 to take the new Schedule A and amending the original agreement.  Would that help?  I'll look to you for direction about how best to proceed.

Matt has developed a very strong friendship with the owner of O2, Tim.  O2 has

been helping SPVI for about 6 months.  Matt at one point was going to acquire O2 in an effort to help grow and expand the SPVI business beyond the confines of Puerto Rico, into ATL.  As you know, growth/talent when it comes to the level of statistics and programming involved is hard to come by down here.

However, instead of an acquisition (on account of the sale to LVD) Matt wanted to lean on O2 to help the Tribe overcome their upcoming obstacles with growth and transition, beyond the ongoing employment of the Ascension employees who were involved in the sale deal (i.e. me, Brian, Simon, and James).  This contract is only a minor markup in cost to what SPVI had been paying each month (about $10k/month more).  However, the objective is for Tim (owner) and his very sharp team, to now replace Matt in the Senior level review process associated with modeling and statistical analysis.

That's the immediate objective.  O2 and the Ascension employees will then try to build in ATL, again, Tim helping where Matt would have been (recruiting, vetting, training, etc.). Ultimately, the goal is for LVD to not "need" anyone (me, Simon, James, or Brian).  After 2 years, you won't need any of us and you won't need O2.  So it's a 2 year plan we'd been moving on as SPVI which we've evolved a little given the deal.

In short, this is what made Matt comfortable that: A) his removal with the closing would not cause any major hiccups, B) the future removal of BMF, me, Simon, and/or JD would leave the Tribe and the business unabated.  That means that the Tribe can feel certain that this thing is going to carry through after the Note is paid, because it's going to be self-sustaining after just TWO YEARS if we hit our targets! And O2 is contracted to help with exactly that!, and C) it would allow the growth that we hope LVD gets to achieve in a great market (ATL) for this kind of talent (not a lot of Statisticians in PR), for at least the 2 year target, under the oversight of a person Matt knows is very much capable and up to the task with a sharp team to lean on.

Matt would've done this deal even without the sale or will still be happy about if the deal didn't go through because it takes a lot of pressure off anyways.

You'll like these guys, and now you can feel assured that this thing is going to not only last beyond the repayment of the Note, but it's going to be in a place where it can grow even further.

Let me know if you'd like to discuss further or talk with Matt too.

---

**From:** Karrie Wichtman [mailto:kwichtman@rosettelaw.com]
**Sent:** Monday, February 23, 2015 6:05 PM
**To:** Justin Martorello
**Cc:** Tanya Gibbs
**Subject:** Re: New Agreement with O2

I'm confused? How did things change with the contract? I am assuming we are assigning the new contract which wasn't the subject of the first approval so we

may need to get a new resolution.

Karrie S. Wichtman, Partner
Rosette, LLP - Michigan Office
25344 Red Arrow Hwy, Suite B
Mattawan, Michigan 49071
Office Number: 269-283-5005
Cellular Number: 480-242-6959
Fax Number: 517-913-6443

THIS MESSAGE IS PRIVILEGED ATTORNEY CLIENT
COMMUNICATION INTENDED FOR USE ONLY BY THE INTENDED
RECIPIENT. IF YOU RECEIVE THIS MESSAGE IN ERROR PLEASE
NOTIFY THE SENDER DELETE AND DISREGARD THIS MESSAGE.

On Feb 23, 2015, at 11:32 AM, Justin Martorello via Smartsheet
<user@smartsheet.com> wrote:

  Hello,

We finalized a new agreement between SVPI and O2. The new agreement contains a provision
similar to its predecessor so i took the liberty of updating the DRAFT notification for you. Please
find attached the new agreement (specifically section 10 Miscellaneous) and the updated DRAFT
and make any additional edits you think necessary. I'm updating Legal Review back to
"Requested."

Thanks,
Justin

📄 **2015 SPVI consulting_contract_2222015 final w sch A.docx (62k)**
📄 **2015 02 16 Assignment of SPVI to AT - O2 Consulting.docx (45k)**

File links in this email will be active until March 25, 2015

Sent using **Smartsheet**, the online tool that helps coordinate anything with anyone.
Sent by justinm@bellicosecapital.com
© 2015 Smartsheet.com, Inc. | Contact | Privacy Policy

**This email and any files transmitted with it are confidential and may contain
privileged or copyrighted information. You must not present this message to
another party without gaining permission from the sender. If you are not the
intended recipient you must not copy, distribute or use this email or the
information contained in it for any purpose other than to notify us. If you have
received this message in error, please notify the sender immediately, and delete
this email from your system.**

**This email and any files transmitted with it are confidential and may contain privileged or
copyrighted information. You must not present this message to another party without
gaining permission from the sender. If you are not the intended recipient you must not copy,
distribute or use this email or the information contained in it for any purpose other than to
notify us. If you have received this message in error, please notify the sender immediately,
and delete this email from your system.**

**This email and any files transmitted with it are confidential and may contain privileged or copyrighted

Exhibit 24

In the Matter Of:

*LULA WILLIAMS, et al.*

*vs*

*BIG PICTURE LOANS, LLC, et al.*

―――――――――――――――――――――――

*CRAIG MANSFIELD*

*January 18, 2019*

―――――――――――――――――――――――


epiq court reporting solutions

CRAIG MANSFIELD - 01/18/2019

```
 1              UNITED STATES DISTRICT CIRCUIT
            FOR THE EASTERN DISTRICT OF VIRGINIA
 2                    Richmond Division

 3   ----------------------------------------------------------
     LULA WILLIAMS, et al.,
 4
             Plaintiffs,
 5
     v.                               Case No. 3:17-cv-00461
 6
     BIG PICTURE LOANS, LLC, et al.,
 7
             Defendants.
 8   ----------------------------------------------------------

 9

10

11

12

13

14

15   ----------------------------------------------------------

16            VIDEO-RECORDED DEPOSITION

17                    OF

18            CRAIG R. MANSFIELD

19   ----------------------------------------------------------

20

21

22

23

24

25   Taken January 18, 2019      By Christine M. Clark, RPR
```

 1    correct?

 2  A. Yes.

 3  Q. Okay.  And Red Rock and Duck Creek both make unsecured

 4     loans; is that correct?

 5                    MR. DUROCHER:  Or made.

 6                    MR. ALBANESE:  Made.

 7                    MR. DUROCHER:  Thank you.

 8                    MR. ALBANESE:  Yes.  Yes.  They don't exist

 9     anymore.

10  Q. MR. ALBANESE:  Made unsecured loans; is that correct?

11  A. Yes.

12  Q. Why do you need two different entities to make unsecured

13     loans?

14  A. I don't know the answer to that.

15  Q. But you were on the council when Duck Creek was created,

16     right?

17  A. Yes.

18  Q. And you were on the council when Red Rock was created,

19     right?

20  A. Yes.

21  Q. But your testimony today is you don't know why you

22     needed both to be created?

23  A. Again, it was seven years ago.  I don't remember

24     everything verbatim what happened.  It's. . .

25  Q. Okay.

USCA4 Appeal: 23-2087   Doc: 11-5      Filed: 12/06/2023   Pg: 39 of 503

```
 1  A. I've heard it.

 2  Q. Do you know if it was associated with Duck Creek?

 3  A. I don't recall how that all -- how one became the next

 4     or how it all worked together.

 5  Q. Did Red Rock make loans under a particular name?

 6            MR. WITSCH:  Objection to the form, leading.

 7  A. I don't know the answer to that.

 8  Q. MR. ALBANESE:  Okay.  So all right.  Let me back up.

 9     Does the name Castle Payday mean anything to you?

10  A. Yes.

11  Q. Okay.  What's Castle Payday?

12  A. It's -- it's kind of like what Pepper Cash is, and I'm

13     not -- I don't remember everything, how it worked.

14  Q. Okay.  I'm not going to ask you to do this because I

15     can't make you.  But if you were to -- if I were to --

16     if you wanted to find out how everything worked, who

17     would be the first person you called?

18            MR. WITSCH:  Objection to the form.

19            MR. DUROCHER:  Yeah.  Maybe I'd just ask for

20     clarification there.  How everything worked with

21     respect to?

22  Q. MR. ALBANESE:  Okay.  So, Mr. Mansfield, you don't

23     recall the specifics of how Duck Creek, Pepper Cash, Red

24     Rock, and Castle Payday were all related; is that

25     correct?  Is that your testimony?
```

USCA4 Appeal: 23-2097   Doc: 11-5   Filed: 12/06/2023   Pg: 40 of 503

1              MR. WITSCH:  Objection to the form of the

2     question.

3  A. That is correct.

4  Q. MR. ALBANESE:  All right.  If you wanted to figure out

5     how they were all related today, who would you call?

6     Who would be the first person you would call?

7  A. I would ask my provider at the time, my service

8     provider.

9  Q. So and that would be?

10 A. Matt.

11 Q. Matt, Matt Martorello?

12 A. Yeah.

13             MR. WITSCH:  Objection to the form, leading.

14 Q. MR. ALBANESE:  Matt Martorello, he was -- was he the

15    service provider for both Duck Creek and Red Rock?

16 A. Yes, he was.

17 Q. I think you testified earlier that your number one

18    company associated with Matt Martorello was Bellicose;

19    is that correct?

20 A. Yes.

21 Q. Do you remember a company called SourcePoint?

22 A. Only through testimony what it is.

23 Q. Okay.  But you don't know any -- sitting here today, you

24    don't know the difference, if any, between Bellicose and

25    SourcePoint?

USCA4 Appeal: 23-2087    Doc: 11-5    Filed: 12/06/2023    Pg: 41 of 503
Case 3:17-cv-00461-REP   Document 1299-24   Filed 06/07/23   Page 7 of 16 PageID# 56150

```
 1  A. That's correct.
 2  Q. Okay.  Were there certain underwriting criteria in terms
 3     of whether Red Rock or Duck Creek would approve a loan?
 4  A. There were things discussed about that.  Do I remember
 5     exactly what they are?  No, I do not.
 6  Q. But were there underwriting criteria, do you remember,
 7     just in general?
 8  A. Well, there was, I believe so, yes.
 9  Q. Okay.  Do you know who would have developed that
10     underwriting criteria?
11  A. That information would have been provided by our service
12     provider, our paid service provider.
13  Q. Okay.  And your paid service provider was Bellicose?
14  A. Yes.
15  Q. Were there -- do you know if there were any
16     verifications done to ensure that the information that
17     that the borrower was providing was correct?
18  A. No, I do not.
19  Q. Okay.  You said earlier that I think that the -- the
20     tribe ultimately had the authority about whether to fund
21     the loan or not; is that correct?
22  A. Yes.
23  Q. How would they indicate to fund the loan?
24  A. I -- we had the account the money went through that we
25     were the ones that would actually put the money in and
```

USCA4 Appeal: 23-2097    Doc: 11-5      Filed: 12/06/2023    Pg: 42 of 503

1  Q. Okay.  Was Jason your -- you said he was assistant

2     manager?

3  A. Yeah.  He was the assistant for a while.

4  Q. Okay.  After you hired Jason, did you have any other

5     assistant managers while you were co-manager?

6  A. No.  I -- he became the manager after me.

7  Q. Okay.  So and you -- you said the loan authorization

8     took place on reservation grounds ultimately, right?

9     Like the ultimate decision whether to fund the loan,

10    that occurred on tribal grounds?

11 A. What we did was like I would push -- you know, we would

12    run through the process, and at the end of the day we

13    would run the money in and out of the accounts.  That's

14    what we did on the tribal grounds at the very beginning.

15    As far as the information about that, that wasn't my

16    area of expertise, and I'm not 100 percent sure on that.

17 Q. Okay.  But you don't know the precise process about how

18    the --

19 A. No, I don't.

20             MR. ALBANESE:  Okay.

21             MR. DUROCHER:  He didn't --

22             THE WITNESS:  I'm sorry.

23             MR. DUROCHER:  He said no, I don't before he

24    asked his question.

25 Q. MR. ALBANESE:  Yeah.  Sorry.  So you don't know the

USCA4 Appeal: 23-2007    Doc: 11-5       Filed: 12/06/2023    Pg: 43 of 503

```
 1    precise process on how the decision of whether to fund
 2    the loan occurred?
 3  A. No, I don't.
 4  Q. So can you say for certain here today that it occurred
 5    on tribal grounds?
 6              MR. DUROCHER:  That what occurred on tribal
 7    grounds?
 8              MR. ALBANESE:  The ultimate decision to fund
 9    the loan.
10              MR. WITSCH:  Objection to the form.
11  A. When I was -- at the time that I was involved in it, I
12    don't have the recollection of how that -- how that part
13    worked.
14  Q. Okay.
15  A. I don't know how it is now.  I just don't recall at the
16    very time when we did all of that, the origination.
17  Q. Okay.  So, sitting here today, you don't recall at the
18    time you were co-manager whether the ultimate
19    determination to fund the loan was made on tribal
20    grounds?
21  A. I don't have the recollection, and I don't know the
22    answer to it.
23  Q. Okay.  You said earlier that there would be -- well,
24    let's talk about how the -- you said the money would go
25    in and out of the tribe's bank account; is that correct?
```

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 44 of 503

```
 1    was used --
 2               MR. WITSCH:  Objection to the form.
 3 Q. MR. ALBANESE:  -- in relation to Red Rock loans.
 4               MR. WITSCH:  Objection to the form.
 5 Q. MR. ALBANESE:  Are you aware of any call center in the
 6    Philippines being used at Red Rock?
 7               MR. WITSCH:  Objection to the form.
 8 A. I'm aware there were call centers in the Philippines.
 9    Yes.
10 Q. MR. ALBANESE:  Okay.  And call centers in the
11    Philippines were used at the time you were co-manager of
12    Red Rock?
13               MR. WITSCH:  Objection to the form.
14 A. Yes.
15 Q. MR. ALBANESE:  And what did those call centers do?
16 A. I -- I don't know exactly what they did, but we would
17    support them and answer questions for them.
18 Q. Okay.
19 A. About loans that people had.
20 Q. Okay.  So were they -- were they performing a similar --
21    were the people working at the call center in the
22    Philippines performing a similar function to the people
23    working on tribal grounds, the call center
24    representatives?
25               MR. DUROCHER:  Object to the form.
```

USCA4 Appeal: 23-2097   Doc: 11-5   Filed: 12/06/2023   Pg: 45 of 503

1  A. I don't know the answer to that question.

2  Q. MR. ALBANESE:  Do you know how many people were working

3     at the call center in the Philippines?

4  A. No, I do not.

5  Q. Did you ever talk to -- you directly, did you ever talk

6     to anybody working at the call center in the

7     Philippines?

8  A. I never talked to anybody directly.

9  Q. Okay.  And you don't -- do you know -- well, never mind.

10    Scratch that.  Let's talk about -- oh, so you can pull

11    out Exhibit 17 again.

12             MR. DUROCHER:  It's in this stack right

13    here.  I can find it for you.

14             MR. WITSCH:  I'm sorry.  John, you said 17?

15             MR. ALBANESE:  Yeah.  It's the email.  It's

16    the resignation email.

17             MR. WITSCH:  Thank you.

18 Q. MR. ALBANESE:  So you resigned on January 16th, 2014; is

19    that correct?

20 A. That's correct.

21 Q. Why did you resign?

22 A. Well, at the very beginning I was interested in

23    business.  I thought I could do a lot more to help out

24    than I actually found out what I could do.  As far as

25    what I believe that the company needed at the time was

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 46 of 503

1    somebody that would be more dedicated to being a

2    co-manager, where I was in charge of at times different

3    entities, and I had a full-time position running the

4    hotel.

5  Q. So is it fair to say you were stretched pretty thin?

6  A. I was stretched.

7  Q. Okay.  So, in other words, you just feel you couldn't

8    commit enough of yourself to the tribal lending

9    entities?

10 A. That's correct.

11 Q. Okay.  Let's look at Exhibit 9, which is the servicing

12   agreement between Red Rock and SourcePoint.  How much

13   were you paid, or were you paid to be the co-manager at

14   Duck Creek and Red Rock?

15 A. No, I wasn't.

16 Q. So you didn't receive any --

17 A. I received as much money as every tribal member received

18   from it.

19 Q. Okay.  But you didn't take a separate salary for being

20   the co-manager at Duck Creek and Red Rock?

21 A. Not as a co-manager, no.

22          MR. DUROCHER:  Sort of like a federal

23   employee these days, right?

24          MR. ALBANESE:  Yeah.  Right.  Nobody's

25   getting paid.

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 47 of 503

```
 1  Q. MR. ALBANESE:  Did you get a salary at Sovereign Lending
 2     Solutions as a co-manager?
 3  A. No, I didn't.
 4  Q. Okay.  Were you -- was your only salary through your
 5     work at the casino or hotel?
 6  A. Yes.  The only other time I received payment was when I
 7     was the operations manager for the three to month
 8     period.
 9  Q. Oh, who was the operations manager after you?
10  A. It would have been my assistant.
11  Q. Okay.  How much -- do you recall how much you were
12     getting paid as the operations manager?
13  A. Somewhere around $23 an hour.
14  Q. And you said earlier you were working -- when you were
15     operations manager, you were working 40 hours a week at
16     the --
17  A. I was still working my full-time position at the other
18     place.
19  Q. Okay.  Do you know if your co-manager, Michelle Allen,
20     was paid at the time for being a co-manager?
21  A. I don't have any knowledge of that.
22  Q. Can you look at -- it's page 11 of the document.  And
23     then if you go to at the top, there's the little k.
24  A. Mm-hmm.
25  Q. Subsection (k), I'm just going to read the second
```

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 48 of 503
Case 3:17-cv-00461-REP   Document 1299-24   Filed 06/07/23   Page 14 of 16 PageID# 56157

```
 1  Q. MR. ALBANESE:  Can we look at page 9 here?  I'm going to
 2     just kind of go through these duties here at the bottom
 3     of 4.2.  So 4.2.1, it says, Consistent with the
 4     Servicing Budget, the Servicer shall develop and
 5     recommend to the Enterprise and to the Operations
 6     Manager and Tribal Representatives, reasonable measures
 7     for orderly administration and management of the
 8     Enterprise in the areas of financial reporting,
 9     financing, regulatory compliance, marketing, human
10     resources, development of third-party servicer
11     relationships, collections and risk assessment,
12     including:  (a) Screening and selecting service
13     providers and lenders, and negotiating agreements with
14     such service providers and lenders on behalf of the
15     Enterprise on such terms and conditions as Servicer may
16     reasonably determine to be appropriate, including but
17     not limited to potentially securing a funding agreement
18     between Alpha Credit Resources and the Enterprise,
19     whereby Alpha Credit Resources, LLC may serve as a --
20     may serve as Commercial Finance Provider for the
21     Unsecured Lending Business.
22         Did I read that correctly?
23  A. Yes.
24  Q. Did you have any -- did you, as co-manager, did you have
25     any role in the screening of and selecting service
```

CRAIG MANSFIELD - 01/18/2019                    Page 129

 1    providers and lenders?

 2  A. I do not recall that, no.

 3  Q. Okay.  Do you know if Michelle Allen had any role in

 4    screening of and selecting service providers and

 5    lenders?

 6  A. I don't have any, no.

 7  Q. Did you have any role in negotiating agreements with

 8    such service providers and lenders?

 9  A. No.

10  Q. Okay.  Do you know if Michelle Allen had any role in

11    that?

12  A. I am not sure.  No.  I don't know if she did or not.

13  Q. Is it fair to say that your servicer performed those

14    tasks, to your knowledge?

15              MR. WITSCH:  Objection to the form, calls

16    for speculation.

17  A. It would be fair to say that he would make suggestions

18    to us as to which direction we should go, and, if there

19    was, then we would follow it, or, if we discussed it and

20    thought that it was something we should do, then we

21    could go that route.

22  Q. So, when you say he, you mean Matt Martorello?

23  A. Bellicose.  Yes.  Matt Martorello.

24  Q. Okay.  Did you have interactions with anyone else at

25    Bellicose other than Matt Martorello?  And I think

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 50 of 503
Case 3:17-cv-00461-REP   Document 1299-24   Filed 06/07/23   Page 16 of 16 PageID# 56159

```
 1   STATE OF MINNESOTA

 2                        CERTIFICATE

 3   COUNTY OF CARVER

 4           I, Christine M. Clark, RPR, hereby certify
     that I reported the Video-Recorded Deposition of Craig
 5   R. Mansfield, on this 18th day of January, 2019, in
     Minneapolis, Minnesota, and that the witness was by me
 6   first duly sworn to tell the truth and nothing but the
     truth concerning the matter in controversy aforesaid;

 7
             That I was then and there a notary public in and
 8   for the County of Carver, State of Minnesota; that by
     virtue thereof I was duly authorized to
 9   administer an oath;

10           That the foregoing transcript is a true and
     correct transcript of my stenographic notes in
11   said matter, transcribed under my direction and
     control;

12
             That the cost of the original has been
13   charged to the party who noticed the deposition and
     that all parties who ordered copies have been
14   charged at the same rate for such copies;

15           That the reading and signing of the
     deposition was not waived;

16
             That I am not related to any of the
17   parties hereto, nor interested in the outcome of the
     action and have no contract with any parties,
18   attorneys or persons with an interest in the action
     that has a substantial tendency to affect my
19   impartiality;

20           WITNESS MY HAND AND SEAL this 30th day of
     January 2019.
21

22                      ------------------------
23                      Christine M. Clark, RPR
                        Notary Public
24

25
```

# Exhibit 25

| | |
|---|---|
| **From:** | Matt Martorello |
| **To:** | Saba Bazzazieh; Justin Martorello |
| **Cc:** | Karrie Wichtman |
| **Subject:** | RE: TLE Operational Diagram.pdf |
| **Date:** | Wednesday, September 04, 2013 9:49:55 AM |

The diagram is consistent, thanks...

**What was mentioned on the call in regards to reactions from the NY article:**

-RRTL has loans to 3rd party financing companies that will be coming due in the very near future

-On August 5th, one of RRTL's lenders decided that it's source investors were less likely to renew their loans via new Notes

-On August 6th, RRTL stopped buying leads to generate traffic in an effort to have the funds available for the debt payments that were not likely to be renewed

-Loan portfolio to this date has shrunk by roughly 25%, or $7mm in outstanding receivables.

-RRTL still make new and returning customer loans, but has stopped deploying its marketing budget for growth, which was roughly $2mm per month

---

**From:** Saba Bazzazieh [mailto:sbazzazieh@rosettelaw.com]
**Sent:** Wednesday, September 4, 2013 12:23 PM
**To:** Justin Martorello
**Cc:** Karrie Wichtman; Matt Martorello
**Subject:** FW: TLE Operational Diagram.pdf

Justin:

Can you please review the attached operational diagram and let me know if it is consistent with Red Rock's structure?  If not, please let me know how Red Rock differs.

Can you also please put together a brief summary of the information you provided on the call today with regard to RRTL not purchasing new loans nation-wide?  We will need to supplement Chairman Williams' declaration with regard to the specific operational impacts that RRTL has faced post-DFS actions.

Any information that you can provide would be very helpful as we are working on a very tight timeframe.

I appreciate your assistance.

Saba Bazzazieh
Rosette, LLP
Attorneys at Law
565 W. Chandler Blvd., Suite 212
Chandler, AZ 85225
Mobile: (480) 240-0238
Office: (480) 889-8990

Fax:  (480) 889-8997
sbazzazieh@rosettelaw.com
www.rosettelaw.com

CONFIDENTIAL COMMUNICATION: THIS MESSAGE IS A CONFIDENTIAL ATTORNEY COMMUNICATION
ONLY FOR USE BY THE INTENDED RECIPIENT.  ANY INADVERTENT RECEIPT SHALL NOT CONSTITUTE A
WAIVER OF ATTORNEY-CLIENT OR WORK PRODUCT PROTECTION.  IF RECEIVED IN ERROR, PLEASE
NOTIFY SENDER IMMEDIATELY AND DELETE THIS MESSAGE.  THANK YOU FOR YOUR COOPERATION.

---

**From:** Eric Lau [mailto:eric.lau@macfarlanegp.com]
**Sent:** Wednesday, September 04, 2013 8:14 AM
**To:** David Bernick; Michael Doluisio; Martin Wong; Saba Bazzazieh; Rob Rosette; Edward Gehres; Karrie
Wichtman
**Subject:** Fwd: TLE Operational Diagram.pdf

I'm a visual guy so I tried to lay out the operational structure for a better understanding among
the group.

I'll be a little late to the call but will be on to discuss.

Sent from my iPhone

**This email and any files transmitted with it are confidential and may contain privileged or
copyrighted information. You must not present this message to another party without gaining
permission from the sender. If you are not the intended recipient you must not copy, distribute
or use this email or the information contained in it for any purpose other than to notify us. If
you have received this message in error, please notify the sender immediately, and delete this
email from your system.**

# Exhibit 26

| | |
|---|---|
| **From:** | mattm@bellicosevi.com |
| **To:** | Karrie Wichtman; Craig Mansfield (craig.mansfield@lvdcasino.com) (craig.mansfield@lvdcasino.com); Me (shelly.allen@lvdtribal.com); Van Hoffman (vfhoffman@gmail.com); Will Londo (will.londo@lvdtribal.com) |
| **Cc:** | jm@bellicosevi.com |
| **Subject:** | LVD Visit |
| **Date:** | Thursday, January 12, 2012 4:54:48 PM |
| **Attachments:** | image001.jpg |

Hey guys, I'm happy to report that I was able to work it out for Justin and I to do an onsite visit in early Feb.  We arrive late on 2/7 and we leave first thing 2/10.  So the 8th and the 9th we are onsite all day/evening long.

If we have a space picked to the point where we can meet with potential Manager candidates on those dates, that would be ideal.  We've also done a lot of interviewing via phone as well, so don't worry if the timing doesn't end up working out.  It would be nice if we could visit with council and help with discussions on what's going on business wide if possible as well (LVD Operations Center plan, Alpha line of credit, ALMOST launch of Castle, and the stellar performance of PepperCash).

It'd also be great if we just so happen to find the time to do one of those snowmobile tours as well :)

We'll give a call to book our rooms soon.  Just wanted to give you all the heads up about 2/8 and 2/9!


**Regards,**

**Matt Martorello**
Mobile: 773-209-7720
Email: MattM@BellicoseVI.com



**This email and any files transmitted with it are confidential and contain privileged or copyright information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

Exhibit 27

| | |
|---|---|
| **From:** | Matt Martorello |
| **To:** | Karrie Wichtman; Tanya Gibbs |
| **Subject:** | RE: AG letters |
| **Date:** | Friday, October 10, 2014 10:51:28 AM |
| **Attachments:** | image001.png |
| | image002.png |
| | image003.png |
| | image004.png |

I can't urge any stronger that LVD not proceed even if otoe does.  SPVI won't be willing to testify, or do anything as the result of another filing will certainly end in a slew of attacks on me, SPVI and my team.  I take the result now as a win and I can't be a part of anything further by any stretch of the imagination.

-------- Original message --------
From: Karrie Wichtman <kwichtman@rosettelaw.com>
Date:10/10/2014 12:40 PM (GMT-04:00)
To: Matt Martorello <mattm@bellicosevi.com>, Tanya Gibbs <TGibbs@rosettelaw.com>
Cc:
Subject: RE: AG letters

There is a tentative meeting schedule in DC to discuss litigation strategy (the pros and cons of moving forward or not) sometime next week.  Once there is a tentative plan, you will be the first to know.  If you have input please share it so I can forward it on to Saba as she will be present at the meeting.  Obviously, whatever is being recommended will ultimately need to be approved by the Tribal Councils of both Tribes so there will be follow up meetings on that front as well.

Sincerely,


Karrie S. Wichtman, Partner
ROSETTE, LLP
Michigan Office
Attorneys at Law
25344 Red Arrow Highway
Mattawan, Michigan 49071
269.283.5005 Office
517.913.6443 Facsimile
480.242.6959 Cell
kwichtman@rosettelaw.com
rosettelaw.com

CONFIDENTIAL COMMUNICATION: THIS MESSAGE IS A CONFIDENTIAL ATTORNEY COMMUNICATION ONLY FOR USE BY THE INTENDED RECIPIENT.  ANY INADVERTENT RECEIPT SHALL NOT CONSTITUTE A WAIVER OF ATTORNEY-CLIENT OR WORK PRODUCT PROTECTION.  IF RECEIVED IN ERROR, PLEASE NOTIFY KARRIE S. WICHTMAN IMMEDIATELY AND DELETE THIS MESSAGE.  THANK YOU FOR YOUR COOPERATION.

---

**From:** Matt Martorello [mailto:mattm@bellicosevi.com]
**Sent:** Friday, October 10, 2014 12:10 PM
**To:** Karrie Wichtman; Tanya Gibbs
**Subject:** RE: AG letters

Sounds great!  I think we could do well to take the communications with those folks to the next level.  Certainly won't hurt, and I'm sure it will leave an impact with those folks to one degree or another.

What's the latest on NY?  Is it over?

---

**From:** Karrie Wichtman [mailto:kwichtman@rosettelaw.com]
**Sent:** Friday, October 10, 2014 12:06 PM
**To:** Matt Martorello; Tanya Gibbs
**Subject:** RE: AG letters

I am happy to begin to focus my efforts in this area.  I would like to get Shelly and the Chairman on board as well.  I will plan to discuss it with them the next time I go to LVD.

Sincerely,


Karrie S. Wichtman, Partner
ROSETTE, LLP
Michigan Office
Attorneys at Law

CONFIDENTIAL

25344 Red Arrow Highway
Mattawan, Michigan 49071
269.283.5005 Office
517.913.6443 Facsimile
480.242.6959 Cell
kwichtman@rosettelaw.com
rosettelaw.com

CONFIDENTIAL COMMUNICATION: THIS MESSAGE IS A CONFIDENTIAL ATTORNEY COMMUNICATION ONLY FOR USE BY THE INTENDED RECIPIENT.  ANY INADVERTENT RECEIPT SHALL NOT CONSTITUTE A WAIVER OF ATTORNEY-CLIENT OR WORK PRODUCT PROTECTION.  IF RECEIVED IN ERROR, PLEASE NOTIFY KARRIE S. WICHTMAN IMMEDIATELY AND DELETE THIS MESSAGE.  THANK YOU FOR YOUR COOPERATION.

---

**From:** Matt Martorello [mailto:mattm@bellicosevi.com]
**Sent:** Friday, October 10, 2014 11:57 AM
**To:** Karrie Wichtman; Tanya Gibbs
**Subject:** RE: AG letters

Thanks!  What do you think about LVD taking its own direct approach to communicate and visit with Banking Commissions, rather than solely lumping in with NAFSA?  Seems like we have much more control of timing, message, and effort this way.

I know other Tribes have MOUs in a few states.  I'm guessing NAFSA wasn't out getting MOUs for just those few, but  I feel like we need to give LVD that same direct effort to really move furthest in fastest for the good fight.  And Karrie is just the person to do it!

---

**From:** Karrie Wichtman [mailto:kwichtman@rosettelaw.com]
**Sent:** Friday, October 10, 2014 11:53 AM
**To:** Matt Martorello; Tanya Gibbs
**Subject:** RE: AG letters

Hi Matt,

After the letters are sent it has been my experience that we have received very few responses.  I can recall one from Arkansas which you received a copy of in the past.  One from Maryland, I believe, where they thanked us for our letter and closed the matter.  And a similar letter from Florida.  Other than that we typically don't receive a response.  As far as the consultative push, I agree and will get you a report from Alex Lozada in our office regarding the outreach being coordinated on behalf of NAFSA and our clients with State AGs and other DFS type regulators so that we can better consider where we can harness these efforts.  I know off hand that it has been NM, SD, AZ, VT, CA, and MI but there may be more than that.

Sincerely,

Karrie S. Wichtman, Partner
ROSETTE, LLP
Michigan Office
Attorneys at Law
25344 Red Arrow Highway
Mattawan, Michigan 49071
269.283.5005 Office
517.913.6443 Facsimile
480.242.6959 Cell
kwichtman@rosettelaw.com
rosettelaw.com

CONFIDENTIAL COMMUNICATION: THIS MESSAGE IS A CONFIDENTIAL ATTORNEY COMMUNICATION ONLY FOR USE BY THE INTENDED RECIPIENT.  ANY INADVERTENT RECEIPT SHALL NOT CONSTITUTE A WAIVER OF ATTORNEY-CLIENT OR WORK PRODUCT PROTECTION.  IF RECEIVED IN ERROR, PLEASE NOTIFY KARRIE S. WICHTMAN IMMEDIATELY AND DELETE THIS MESSAGE.  THANK YOU FOR YOUR COOPERATION.

---

**From:** Matt Martorello [mailto:mattm@bellicosevi.com]
**Sent:** Friday, October 10, 2014 11:47 AM
**To:** Tanya Gibbs
**Cc:** Karrie Wichtman
**Subject:** FW: AG letters

Hi Tanya, I am curious what level of response have these been met with from LVD and even more so, if any subsequent replies were received from the States.  It seems that the authors of these letters are a big part of the bigger push on federal regulators, and that candid educational communications (even if they end in disagreement) would be a very valuable tact to educating these states about sovereign rights.  I'm wondering if we can ask LVD to take a more consultative approach state by state to try to get to MOUs and other agreements.

JA1959

Anyway, some of these letters demand replies and other commentary, which I believe is always provided.  Have we ever received a response after that?  I'd like to see the message in those replies after they get ours.  Have we ever received any or do they get our reply and then go silent thereafter?

---

**From:** Brian McFadden
**Sent:** Friday, October 10, 2014 10:47 AM
**To:** Matt Martorello
**Subject:** FW: AG letters

This is not all of them, but most.

---

**From:** Spring Holtz [mailto:sholtz@rosettelaw.com]
**Sent:** Friday, October 10, 2014 10:40 AM
**To:** Brian McFadden
**Cc:** Tanya Gibbs
**Subject:** RE: AG letters

Attached are the AG Letter I found that we had on file.  I am send Tanya a list of the ones I could not find to see if she can locate them. Also, there are 2 on the list without names, only a date.



**Spring Holtz, Administrative Assistant**
**Rosette, LLP**
**Attorneys at Law**

Michigan Office
25344 Red Arrow Hwy., Ste. B
Mattawan, MI  49071
269.283.5005 – Office
517-913-6443 – Fax
sholtz@rosettelaw.com
www.rosettelaw.com

CONFIDENTIAL COMMUNICATION: THIS MESSAGE IS A CONFIDENTIAL ATTORNEY COMMUNICATION ONLY FOR USE BY THE INTENDED RECIPIENT.  ANY INADVERTENT RECEIPT SHALL NOT CONSTITUTE A WAIVER OF ATTORNEY-CLIENT OR WORK PRODUCT PROTECTION.  IF RECEIVED IN ERROR, PLEASE NOTIFY SPRING HOLTZ  IMMEDIATELY AND DELETE THIS MESSAGE.  THANK YOU FOR YOUR COOPERATION.

---

**From:** Brian McFadden [mailto:BrianM@bellicosevi.com]
**Sent:** Thursday, October 09, 2014 2:49 PM
**To:** Tanya Gibbs
**Cc:** Spring Holtz
**Subject:** RE: AG letters

I only need the 18 outlined below for now.

| Date received | PPC/CPD | App# | Name | Issue | Current Status | |
|---|---|---|---|---|---|---|
| 3/12/2014 | CPD | 59653230 | Antoinette Jenkins | AG Letter | Legal Letter sent via USPS | CT |
| 4/1/2014 | CPD | 59945036 | Cherie Madore | AG letter | Legal Letter sent via USPS | CO |
| 5/12/2014 | CPD | 59947207 | Jennifer Westburg | AG letter | Legal Letter sent via USPS | OR |
| 5/7/2014 | CPD | 59619771 | Joseph Beck | AG letter | Legal Letter sent via USPS | AZ |
| 11/13/2013 | CPD | 59636813 | Juanito Vargas | AG letter | Legal Letter sent via USPS | NJ |
| 4/21/2014 | CPD | 57164175 | Kathleen Pfeiffer | AG letter | Legal Letter sent via USPS | MA |
| 1/21/2014 | CPD | 59584728 | Linda Lazier | AG letter | Legal Letter sent via USPS | NJ |

| | | | | | | |
|---|---|---|---|---|---|---|
| 12/24/2013 | CPD | 59740851 | Luther Sullivan | AG letter | Legal Letter sent via USPS | CT |
| 11/13/2013 | CPD | N/A | N/A | AG letter | Legal Letter sent via USPS | MA |
| 12/27/2013 | CPD | N/A | N/A | AG letter | Legal Letter sent via USPS | MA |
| 12/27/2013 | CPD | 57161159 | Notawyah Smith | ag letter | Legal Letter sent via USPS | CT |
| 9/2/2014 | CPD | 57221524 | Pamela Zuckerman | District Attorney letter | Legal Letter sent via USPS | MA |
| 7/28/2014 | CPD | 59812149 | Richard Prokop | ag letter | Legal Letter sent via USPS | PA |
| 10/15/2013 | PPC | 588676 | Stephanie Swesey | AG letter | Legal Letter sent via USPS | AZ |
| 1/29/2014 | CPD | 60002676 | Steve Lewis | AG letter | Legal Response created | NC |
| 6/19/2014 | PPC | 503855 | Teresa Mayes | AG letter | Legal Letter sent via USPS | CT |
| 6/19/2014 | CPD | 59782840 | Teresa Mayes | AG letter | Legal Letter sent via USPS | ct |
| 2/25/2014 | CPD | 59999576 | Tonya Feimster | AG letter | Legal Letter sent via USPS | NC |

**From:** Brian McFadden
**Sent:** Thursday, October 09, 2014 2:36 PM
**To:** 'Tanya Gibbs'
**Cc:** Spring Holtz
**Subject:** RE: AG letters

Yes I can get her access, but I am going to be updating the process and pulling out of Hyper Office to a new and better system.

If I gave you a list of the AG letters I need would that be easier? It should cut the number down by about 1/2

**From:** Tanya Gibbs [mailto:TGibbs@rosettelaw.com]
**Sent:** Thursday, October 09, 2014 1:19 PM
**To:** Brian McFadden
**Cc:** Spring Holtz
**Subject:** RE: AG letters

Ok. This might take a few days, just FYI...there are a lot of them. Also, is it possible to get Spring access to Hyperoffice? I'd like her to keep me on track in responding to these things.

Spring, please locate the files and scan the AG letters to Brian and copy me on it.

Thanks!

**Tanya M. Gibbs, Attorney**
**Rosette, LLP**
**Attorneys at Law**
Michigan Office
25344 Red Arrow Hwy, Suite B
Mattawan, MI 49071
269.283.5005 – Office
480.204.8009 - Cell
517.913.6443 – Fax
tgibbs@rosettelaw.com
www.rosettelaw.com

CONFIDENTIAL COMMUNICATION: THIS MESSAGE IS A CONFIDENTIAL ATTORNEY COMMUNICATION ONLY FOR USE BY THE INTENDED RECIPIENT. ANY INADVERTENT RECEIPT SHALL NOT CONSTITUTE A WAIVER OF ATTORNEY-CLIENT OR WORK PRODUCT PROTECTION. IF RECEIVED IN ERROR, PLEASE NOTIFY TANYA M. GIBBS IMMEDIATELY AND DELETE THIS MESSAGE. THANK YOU FOR YOUR COOPERATION.

**From:** Brian McFadden [mailto:BrianM@bellicosevi.com]

**Sent:** Thursday, October 9, 2014 1:17 PM
**To:** Tanya Gibbs
**Cc:** Spring Holtz
**Subject:** RE: AG letters

All I need is the letters from the AGs.

---

**From:** Tanya Gibbs [mailto:TGibbs@rosettelaw.com]
**Sent:** Thursday, October 09, 2014 1:16 PM
**To:** Brian McFadden
**Cc:** Spring Holtz
**Subject:** RE: AG letters

Ok. I'll be having our secretary find the files, scan and email them to you. I've copied her here. Do you need just the letters from the AG or would you like our responses too?

**Tanya M. Gibbs, Attorney**
**Rosette, LLP**
**Attorneys at Law**
Michigan Office
25344 Red Arrow Hwy, Suite B
Mattawan, MI 49071
269.283.5005 – Office
480.204.8009 – Cell
517.913.6443 – Fax
tgibbs@rosettelaw.com
www.rosettelaw.com

CONFIDENTIAL COMMUNICATION: THIS MESSAGE IS A CONFIDENTIAL ATTORNEY COMMUNICATION ONLY FOR USE BY THE INTENDED RECIPIENT.  ANY INADVERTENT RECEIPT SHALL NOT CONSTITUTE A WAIVER OF ATTORNEY-CLIENT OR WORK PRODUCT PROTECTION.  IF RECEIVED IN ERROR, PLEASE NOTIFY TANYA M. GIBBS IMMEDIATELY AND DELETE THIS MESSAGE.  THANK YOU FOR YOUR COOPERATION.

---

**From:** Brian McFadden [mailto:BrianM@bellicosevi.com]
**Sent:** Thursday, October 9, 2014 1:10 PM
**To:** Tanya Gibbs
**Subject:** RE: AG letters

Last oct.

---

**From:** Tanya Gibbs [mailto:TGibbs@rosettelaw.com]
**Sent:** Thursday, October 09, 2014 12:11 PM
**To:** Brian McFadden
**Subject:** RE: AG letters

We should have files with them. Do you need them from January 2014 or from last last October 2013?

**Tanya M. Gibbs, Attorney**
**Rosette, LLP**
**Attorneys at Law**
Michigan Office
25344 Red Arrow Hwy, Suite B
Mattawan, MI 49071
269.283.5005 – Office
480.204.8009 - Cell
517.913.6443 – Fax
tgibbs@rosettelaw.com
www.rosettelaw.com

CONFIDENTIAL COMMUNICATION: THIS MESSAGE IS A CONFIDENTIAL ATTORNEY COMMUNICATION ONLY FOR USE BY THE INTENDED RECIPIENT.  ANY INADVERTENT RECEIPT SHALL NOT CONSTITUTE A WAIVER OF ATTORNEY-CLIENT OR WORK PRODUCT PROTECTION.  IF RECEIVED IN ERROR, PLEASE NOTIFY TANYA M. GIBBS IMMEDIATELY AND DELETE THIS MESSAGE.  THANK YOU FOR YOUR COOPERATION.

---

**From:** Brian McFadden [mailto:BrianM@bellicosevi.com]
**Sent:** Thursday, October 9, 2014 12:06 PM
**To:** Tanya Gibbs

ROSETTE_REVISED_049993

JA1942

**Subject:** AG letters

Tanya,

Do you have copies of all the AG letters received by CPD and PPC in the last year? I need to get a copy of them. I'm working on a new solution that is much better than the Hyper Office system that we use now.

Thanks,

**Brian McFadden**
875 Carretera 693, Suite 203 | Dorado, PR 00646
Mobile: 616-405-4578
Email: BrianM@BellicoseCapital.com



**This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

**This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

**This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

**This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

**This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

**This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

**This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

**This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

# Exhibit 28

| | |
|---|---|
| **From:** | Karrie Wichtman |
| **To:** | Matt Martorello |
| **Cc:** | Justin Martorello; "gkway@lvdtribal.com"; Jimmer; Saba Bazzazieh; Robert Rosette |
| **Subject:** | RE: WSJ Press |
| **Date:** | Tuesday, November 04, 2014 10:25:20 AM |
| **Attachments:** | image001.jpg |

Matt,

Below is the statement that was released to the press last Friday.  Unfortunately, as you can see from the WSJ article much of the tribal sovereignty language was not used.  What is released and what is reported are often two different things.  I agree that statements in the opinion are strong and that we are on the best footing that we have ever been. The matter was not ever litigated on the merits.   The bottom line is that many don't really understand what happened from a procedural stand point and no amount of message crafting could get them there.  The statement issued by my firm indicates all of the reasons that this case was a victory and even that needed to be tempered in order for us to gain the support of Indian law scholars and others to begin to more appropriately fight the public policy debate.  To attempt to run a story that hailed victory for the Tribes when they were actually dismissing the lawsuit would have gotten us a significant amount of bad press and so the option was to … go quietly into the night and restructure based on what we know from the opinion in order to build an even stronger case for future litigation.  Attempts were made after the release to remove the pay day language through explaining the products offered to which the WSJ refused.  As for the NY DFS spokesperson, I would not expect anything less – and the Court's ruling clarifies nothing at all with regard to NY regulatory authority.  I will be sure to loop you in on any future discussions planned for response to the article.  Your perspective is welcome and needed.

# Statement: Tribal Chairmen Update on E-Commerce Litigation with New York

*Appeals Court Opinion a Significant Recognition of Native American Sovereign Rights; Considerable Resources Required Prevent Continuing Further*

NEW YORK, NY (October 31, 2014) – John Shotton, Tribal Council Chairman of the Otoe-Missouria Tribe of Indians, and James Williams Jr., Tribal Council Chairman of the Lac Vieux Desert Band of Lake Superior Chippewa Indians, co-plaintiffs in the case Otoe-Missouria Tribe et al v. New York State Department of Financial Services et al (No. 13-cv-5930), made the following joint statement:

"The recent ruling by the Second Circuit of the United States Court of Appeals in our litigation filed last year against the state of New York was a pivotal recognition of sovereign rights for our Tribes and all Indian Nations. The court's opinion recognized and affirmed the important Tribal interests at play, the legitimacy of our Tribal businesses, and the need to balance the interests of two sovereigns. However, the case has consumed considerable resources, and while our Tribes will remain resilient despite the State of New York's targeted attack, after careful consideration the Otoe-Missouria Tribe and the Lac Vieux Desert Band of Lake Superior Chippewa have decided to dismiss the litigation.

"While we hoped when we first pursued this action that we would be able to quickly undo the damage caused and avoid a prolonged and material interruption to our businesses, the fact of the matter is the state's unjust interference in the businesses of the Tribes have caused irreparable harm that further legal proceedings would simply be unable to remedy.

"E-commerce remains an essential tool for Native American tribes, many of whom reside on remote reservations that limit opportunities for economic development. Vital social programs provided by tribes, including health care, elder care, education, nutrition assistance, housing, and more, are dependent on the revenues of our tribally-owned businesses. E-commerce represents the future for Indian country, and we intend to continue to operate in all areas where we determine it is in the interests of our businesses as authorized and regulated by Tribal law, consistent with federal consumer protection laws and the expressed goals of the federal government regarding promotion of tribal economic development. We will also continue to seek the support of relevant federal agencies to assist us in ensuring the longevity of our businesses, thereby fulfilling the federal government's trust responsibility to the Tribes.

"We strongly believe the actions of the state of New York do not comport with long established legal precedent and federal law regarding Native Americans' sovereign rights, and in the importance of continuing to ensure those rights remain preserved. We are pleased that the U.S. Court of Appeals recognized and reaffirmed the importance the significant interests of Indian Country in economic development and the novel issues presented when Tribes engage in e-commerce."

###

**Media Contact:** Brian Bartlett
brianbartlett@rational360.com
(202) 236-2144

Sincerely,

Karrie S. Wichtman, Partner
ROSETTE, LLP
Michigan Office
Attorneys at Law
25344 Red Arrow Highway
Mattawan, Michigan 49071
269.283.5005 Office
517.913.6443 Facsimile
480.242.6959 Cell
kwichtman@rosettelaw.com
rosettelaw.com

CONFIDENTIAL COMMUNICATION: THIS MESSAGE IS A CONFIDENTIAL ATTORNEY COMMUNICATION

ONLY FOR USE BY THE INTENDED RECIPIENT.  ANY INADVERTENT RECEIPT SHALL NOT CONSTITUTE A
WAIVER OF ATTORNEY-CLIENT OR WORK PRODUCT PROTECTION.  IF RECEIVED IN ERROR, PLEASE
NOTIFY KARRIE S. WICHTMAN IMMEDIATELY AND DELETE THIS MESSAGE.  THANK YOU FOR YOUR
COOPERATION.

---

**From:** Matt Martorello [mailto:mattm@bellicosevi.com]
**Sent:** Tuesday, November 4, 2014 10:06 AM
**To:** Karrie Wichtman
**Cc:** Justin Martorello; 'gkway@lvdtribal.com'; Jimmer
**Subject:** WSJ Press

Certainly not the splash for public it could've been, this more likely works against the industry than
for it.  There were so many comments by the panel that outright demonstrate the legality of tribal
lending that could've been touted as victorious, but NY gets to win on that front with their comment
below about appeals court.  It needed to be said, b/c the credit bureaus and banks will never read
the case, they'll just read what's below… "it was a baseless attempt to overturn what the court had
already decided in NY's favor"…  I wouldn't call this message properly handled by the professional PR
team at all.  I think if I'm a banker, I read this as worse, when in fact those that read and know all the
commentary that was not highlighted in the message (like us) know it was actually a rather
victorious decision in many respects.  The rest of the world needed to keep the businesses alive
don't get the hear that:

## Wall Street Journal: Tribes Drop Payday-Loan Suit Against New York State

Two Indian tribes with online lending operations on Friday said they are dropping a
lawsuit filed against New York state, abandoning an effort to block the state from
restricting their businesses.

New York's top banking regulator, Benjamin Lawsky , last year urged banks in his state to
stop processing payments for lenders that violate the state's cap on interest rates.

The Oklahoma-based Otoe Missouria Tribe and Michigan-based Lac Vieux Desert Band of
Lake Superior Chippewa Indians responded with a federal lawsuit against the state,
arguing New York's campaign against payday lenders was trampling on their rights as
sovereign tribes.

The tribes said their operations are located on reservation land and not subject to
oversight by any state. But the tribes suffered a setback in October when a federal
appeals court denied a temporary injunction that would have barred New York from
restricting tribal lending while their case was litigated.

In a joint written statement Friday, the tribes said the case had "consumed considerable
resources" over the past year.

"While we hoped when we first pursued this action that we would be able to quickly undo
the damage caused and avoid a prolonged and material interruption to our businesses,
the fact of the matter is the state's unjust interference in the businesses of the tribes
have caused irreparable harm that further legal proceedings would simply be unable to

remedy," the tribes' chairmen, John Shotton and James Williams Jr. , said.

"We are pleased they intend to drop their baseless litigation after the appeals court ruled that New York has the clear power to enforce its laws," said Matt Anderson, a spokesman for Mr. Lawsky.

Tribes say they have turned to lending as a way to foster economic development and alleviate poverty. But online lending by tribes have faced opposition from officials in states such as New York that have laws banning or limiting payday loans.

**Regards,**

**Matt Martorello**
Mobile: 773-209-7720
Email: mm@BellicoseVI.com



**This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

# Exhibit 29

| | |
|---|---|
| **From**: | Matt Martorello [mattm@bellicosevi.com] |
| **Sent**: | 8/14/2014 12:51:23 PM |
| **To**: | Jim Williams, Jr. [jim.williams@lvdtribal.com] |
| **Subject**: | RE: Contact |

Any thoughts on date? I'd prefer if you come just yourself so we can speak frankly and in great depth (and feel free to bring your wife). I'd also prefer you bring golf clubs and maybe swim trunks?

---

**From:** Matt Martorello
**Sent:** Wednesday, August 13, 2014 3:29 PM
**To:** 'Jim Williams, Jr.'
**Subject:** RE: Contact

Awesome, I'm here pretty much all the time, other than 8/27 to 9/1. How about somewhere around 9/3 to 9/5 or something like that?

---

**From:** Jim Williams, Jr. [mailto:jim.williams@lvdtribal.com]
**Sent:** Wednesday, August 13, 2014 3:27 PM
**To:** Matt Martorello
**Subject:** RE: Contact

Sure, what date would be good for you Matt.

---

**From:** Matt Martorello [mailto:mattm@bellicosevi.com]
**Sent:** Wednesday, August 13, 2014 12:49 PM
**To:** Jim Williams, Jr.
**Subject:** RE: Contact

Can you schedule a visit to Puerto Rico?

---

**From:** Jim Williams, Jr. [mailto:jim.williams@lvdtribal.com]
**Sent:** Wednesday, August 13, 2014 1:34 PM
**To:** Matt Martorello
**Subject:** RE: Contact

Great Matt!! But really would like to sit down would you, it's been a long time.

---

**From:** Matt Martorello [mailto:mattm@bellicosevi.com]
**Sent:** Monday, August 11, 2014 11:19 AM
**To:** jim.williams@lvdtribal.com
**Subject:** Contact

Hey Jimmer,

I think I called you too early on Friday, might have got my times mixed up. I got a full voicemail message.

Otherwise, we're working on something we should have in the next few days which will have some talking points to go over about the concept for a potential bigger deal for LVD learning the Servicing business. Maybe we should start from there with a phone call, and then if we're close you can come to Puerto Rico to finalize business terms?

Now, all that said, I have two pieces of great news for LVD:

JA1950

CONFIDENTIAL

1) My investors are funding Iron Fence with another $2mm for us to finance TLEs with, this will help LVD for a big August/September month in terms of new loan volume
2) Alpha Credit is probably 3 weeks away from providing another $7mm under the line, and reducing the interest rate to 30%. A double win.

**Regards,**

**Matt Martorello**
Mobile: 773-209-7720
Email: mm@BellicoseVI.com



**This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

**This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

**This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

CONFIDENTIAL

JA1951

LVD-DEF00020787

Exhibit 30

## Darcie Pace

| | |
|---|---|
| **From:** | Matt Martorello <mattm@bellicosevi.com> |
| **Sent:** | Tuesday, August 26, 2014 12:42 AM |
| **To:** | 'Chairman James Williams'; gkway@duckcreektf.com |
| **Cc:** | Nicole St. Germain; Karrie Wichtman; Robert Rosette; Justin Martorello |
| **Subject:** | Model for Tribal Council Review |
| **Attachments:** | Sale Model.xlsx |

| | |
|---|---|
| **Importance:** | High |

Great speaking with you today Mr. Chairman,

In an effort to put this on an extremely rapid pace, I wanted to get information to you immediately for disclosure at tomorrow morning's meeting with counsel. This model (attached) will help everyone very clearly see how the deal works, for which SPVI is seeking a firm buyer commitment for its business in very short order.

The model varies on some minor moving parts yet to be determined (like interest rate). However, **this is what you should focus on, cash to Tribal government by year:**



**NOTE THE GREEN PART**... It says **$58,086,901.20**... This is how much money LVD is forecasted to make EACH YEAR, after the business is paid for in full ("PIF"). Let's just get from here to there and not get caught up in too many details. Let's set up the business for long term success, and feel very good about what we've accomplished in this deal for LVD and the precedent we set for Indian Country in similar/future deals that will inevitably follow. Then, let's also feel good about the very many great things this money will do in the years ahead both directly and by way of investment, within Indian Country and in whatever other avenues LVD should choose to pursue.

This is very real, and in fact like Rob said, if the note isn't paid back after Year 7 the business is yours anyways. Every month I'm going to want to see you hit the #s, I'm going to want to make sure that you have the $20mm+ financers still in place, and that you are hitting all of the metrics that drive this spreadsheet. All because the better that you do after you buy the company, the sooner we get payment on our note! The objective of current ownership of SPVI/Bellicose after the deal, is to avoid "misuse" or "bad boy acts" of any kind, and really to make sure that we get paid on the note (sooner is always better than later) and we move quickly to transition the business into very capable hands.

I won't get too winded on the details of the spreadsheet. It's simply the metrics we've proven to drive revenue on the $20mm portfolio. That, along with consolidated financials between the entities and the waterfall at the bottom. Forecasts are always forecasts, but with the 7 year hard stop, in any scenario, you're owning this business on day 1 and you are free and clear at the end of the term.

To be fair to LVD, I have to stress the urgency on our end a little further. The concept is that we're looking to sell our business with $0 down Seller Financing, no obligation on TNP used to pay for it, a very nice profit distribution along the way, and a huge windfall of distributions after the business is paid for. Many would love to be a buyer of such a

CONFIDENTIAL

1

ROSETTE_REVISED_049541

business, and SPVI/BVI are looking to move very quickly on such an exit.   I didn't bring this up on the call because I didn't want you to feel I was being pushy, and rather than putting the business on the "auction block" to the highest bidder, we're coming exclusively to LVD out of respect for our relationship and wanting to secure a brighter future for the Tribe.  But it is important that LVD knows that time is of the essence for SPVI/BVI in getting a sale done.  I just ask that if LVD is interested or not interested, we move as quickly as SPVI/BVI needs to so that we're not inadvertently disadvantaged.

Looking forward to hearing details on the deal's reception by council tomorrow.


**Regards,**

**Matt Martorello**
Mobile: 773-209-7720
Email: mm@BellicoseVI.com



**This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

CONFIDENTIAL                                                                      ROSETTE_REVISED_049512

JA1954

**Forecasted Gross Revenue**

| | | | **Sale and Note Economics** |
|---|---|---|---|
| Outstanding A/R Balance | $ | 20,000,000.00 | Multiple (Months) |
| Average Fee per $100 (60/40) | | 31% | Sale Price |
| Cleared rate per ACH | | 91% | Interest Rate |
| ACH attempts per loan/month | | 2.1665 | Monthly Int Payment |
| **Gross Revenue projection per month** | **$** | **12,223,393.00** | |
| | | | 5 years Paid on Note |

| **Waterfall** | | **Month 1** | | **Month 2** | | **Month 3** |
|---|---|---|---|---|---|---|
| Gross Revenue | $ | 12,223,393.00 | $ | 12,223,393.00 | $ | 12,223,393.00 |
| Bad Debt Expense (30%) | $ | 3,667,017.90 | $ | 3,667,017.90 | $ | 3,667,017.90 |
| Marketing Expense | $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 |
| Underwriting/ACH Expense | $ | 250,000.00 | $ | 250,000.00 | $ | 250,000.00 |
| Call Center Expense | $ | 180,000.00 | $ | 180,000.00 | $ | 180,000.00 |
| Legal Fees | $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 |
| VPCS | $ | 8,800.00 | $ | 8,800.00 | $ | 8,800.00 |
| Accounting, CC and banking Fees | $ | 20,000.00 | $ | 20,000.00 | $ | 20,000.00 |
| IT Expense | $ | 5,000.00 | $ | 5,000.00 | $ | 5,000.00 |
| Interest Expense (ACR and IFI) | $ | 500,000.00 | $ | 500,000.00 | $ | 500,000.00 |
| Licensing | $ | 12,000.00 | $ | 12,000.00 | $ | 12,000.00 |
| Postage and Misc Expense | $ | 350,000.00 | $ | 350,000.00 | $ | 350,000.00 |
| Payroll Expense | $ | 200,000.00 | $ | 200,000.00 | $ | 200,000.00 |
| LMS and Systems | $ | 75,000.00 | $ | 75,000.00 | $ | 75,000.00 |
| NAFSA/OLA | $ | 15,000.00 | $ | 15,000.00 | $ | 15,000.00 |
| Expenses | $ | 5,382,817.90 | $ | 5,382,817.90 | $ | 5,382,817.90 |
| Tribal Ownership Distribution | $ | 342,255.00 | $ | 342,255.00 | $ | 342,255.00 |
| Interest Payment on Sale Note | $ | - | $ | - | $ | - |
| Funding to replenish AR Outstanding | $ | - | $ | - | $ | - |
| Funding to pay down Sale Note | $ | 6,498,320.10 | $ | 6,498,320.10 | $ | 6,498,320.10 |

CONFIDENTIAL

| | | |
|---|---:|---|
| s | | |
| | 32 | |
| $ | 391,148,576.00 | |
| | 0% | |
| $ | - | |
| | | |
| $ | 385,792,145.71 | |

| Tribal Income by Year | | |
|---|---|---:|
| Year 1 | $ | 4,107,060.05 |
| Year 2 | $ | 4,107,060.05 |
| Year 3 | $ | 4,107,060.05 |
| Year 4 | $ | 6,160,590.07 |
| Year 5 | $ | 6,160,590.07 |
| **Annually after PIF** | **$** | **58,086,901.20** |

| Month 4 | | Month 5 | | Month 6 | | Month 7 | | Month 8 | |
|---:|---|---:|---|---:|---|---:|---|---:|---|
| $ | 12,223,393.00 | $ | 12,223,393.00 | $ | 12,223,393.00 | $ | 12,223,393.00 | $ | 12,223,393.00 |
| | | | | | | | | | |
| $ | 3,667,017.90 | $ | 3,667,017.90 | $ | 3,667,017.90 | $ | 3,667,017.90 | $ | 3,667,017.90 |
| $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 |
| $ | 250,000.00 | $ | 250,000.00 | $ | 250,000.00 | $ | 250,000.00 | $ | 250,000.00 |
| $ | 180,000.00 | $ | 180,000.00 | $ | 180,000.00 | $ | 180,000.00 | $ | 180,000.00 |
| $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 |
| $ | 8,800.00 | $ | 8,800.00 | $ | 8,800.00 | $ | 8,800.00 | $ | 8,800.00 |
| $ | 20,000.00 | $ | 20,000.00 | $ | 20,000.00 | $ | 20,000.00 | $ | 20,000.00 |
| $ | 5,000.00 | $ | 5,000.00 | $ | 5,000.00 | $ | 5,000.00 | $ | 5,000.00 |
| $ | 500,000.00 | $ | 500,000.00 | $ | 500,000.00 | $ | 500,000.00 | $ | 500,000.00 |
| $ | 12,000.00 | $ | 12,000.00 | $ | 12,000.00 | $ | 12,000.00 | $ | 12,000.00 |
| $ | 350,000.00 | $ | 350,000.00 | $ | 350,000.00 | $ | 350,000.00 | $ | 350,000.00 |
| $ | 200,000.00 | $ | 200,000.00 | $ | 200,000.00 | $ | 200,000.00 | $ | 200,000.00 |
| $ | 75,000.00 | $ | 75,000.00 | $ | 75,000.00 | $ | 75,000.00 | $ | 75,000.00 |
| $ | 15,000.00 | $ | 15,000.00 | $ | 15,000.00 | $ | 15,000.00 | $ | 15,000.00 |
| $ | 5,382,817.90 | $ | 5,382,817.90 | $ | 5,382,817.90 | $ | 5,382,817.90 | $ | 5,382,817.90 |
| $ | 342,255.00 | $ | 342,255.00 | $ | 342,255.00 | $ | 342,255.00 | $ | 342,255.00 |
| $ | - | $ | - | $ | - | $ | - | $ | - |
| $ | - | $ | - | $ | - | $ | - | $ | - |
| $ | 6,498,320.10 | $ | 6,498,320.10 | $ | 6,498,320.10 | $ | 6,498,320.10 | $ | 6,498,320.10 |

ROSETTE_REVISED_04954

JA1956

| Tier down by year "Funding to replenish AR" | | | |
|---|---|---|---|
| Year 1 | 0% | $ | - |
| Year 2 | 0% | $ | - |
| Year 3 | 0% | $ | - |
| Year 4 | 0% | $ | - |
| Year 5 | 0% | $ | - |

| | Month 9 | Month 10 | Month 11 | Month 12 | Month 13 |
|---|---|---|---|---|---|
| $ | 12,223,393.00 | 12,223,393.00 | 12,223,393.00 | 12,223,393.00 | 12,223,393.00 |
| $ | 3,667,017.90 | 3,667,017.90 | 3,667,017.90 | 3,667,017.90 | 3,667,017.90 |
| $ | 50,000.00 | 50,000.00 | 50,000.00 | 50,000.00 | 50,000.00 |
| $ | 250,000.00 | 250,000.00 | 250,000.00 | 250,000.00 | 250,000.00 |
| $ | 180,000.00 | 180,000.00 | 180,000.00 | 180,000.00 | 180,000.00 |
| $ | 50,000.00 | 50,000.00 | 50,000.00 | 50,000.00 | 50,000.00 |
| $ | 8,800.00 | 8,800.00 | 8,800.00 | 8,800.00 | 8,800.00 |
| $ | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 |
| $ | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 |
| $ | 500,000.00 | 500,000.00 | 500,000.00 | 500,000.00 | 500,000.00 |
| $ | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 |
| $ | 350,000.00 | 350,000.00 | 350,000.00 | 350,000.00 | 350,000.00 |
| $ | 200,000.00 | 200,000.00 | 200,000.00 | 200,000.00 | 200,000.00 |
| $ | 75,000.00 | 75,000.00 | 75,000.00 | 75,000.00 | 75,000.00 |
| $ | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 |
| $ | 5,382,817.90 | 5,382,817.90 | 5,382,817.90 | 5,382,817.90 | 5,382,817.90 |
| $ | 342,255.00 | 342,255.00 | 342,255.00 | 342,255.00 | 342,255.00 |
| $ | - | - | - | - | - |
| $ | - | - | - | - | - |
| $ | 6,498,320.10 | 6,498,320.10 | 6,498,320.10 | 6,498,320.10 | 6,498,320.10 |

| | Month 14 | | Month 15 | | Month 16 | | Month 17 | | Month 18 |
|---|---|---|---|---|---|---|---|---|---|
| $ | 12,223,393.00 | $ | 12,223,393.00 | $ | 12,223,393.00 | $ | 12,223,393.00 | $ | 12,223,393.00 |
| | | | | | | | | | |
| $ | 3,667,017.90 | $ | 3,667,017.90 | $ | 3,667,017.90 | $ | 3,667,017.90 | $ | 3,667,017.90 |
| $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 |
| $ | 250,000.00 | $ | 250,000.00 | $ | 250,000.00 | $ | 250,000.00 | $ | 250,000.00 |
| $ | 180,000.00 | $ | 180,000.00 | $ | 180,000.00 | $ | 180,000.00 | $ | 180,000.00 |
| $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 |
| $ | 8,800.00 | $ | 8,800.00 | $ | 8,800.00 | $ | 8,800.00 | $ | 8,800.00 |
| $ | 20,000.00 | $ | 20,000.00 | $ | 20,000.00 | $ | 20,000.00 | $ | 20,000.00 |
| $ | 5,000.00 | $ | 5,000.00 | $ | 5,000.00 | $ | 5,000.00 | $ | 5,000.00 |
| $ | 500,000.00 | $ | 500,000.00 | $ | 500,000.00 | $ | 500,000.00 | $ | 500,000.00 |
| $ | 12,000.00 | $ | 12,000.00 | $ | 12,000.00 | $ | 12,000.00 | $ | 12,000.00 |
| $ | 350,000.00 | $ | 350,000.00 | $ | 350,000.00 | $ | 350,000.00 | $ | 350,000.00 |
| $ | 200,000.00 | $ | 200,000.00 | $ | 200,000.00 | $ | 200,000.00 | $ | 200,000.00 |
| $ | 75,000.00 | $ | 75,000.00 | $ | 75,000.00 | $ | 75,000.00 | $ | 75,000.00 |
| $ | 15,000.00 | $ | 15,000.00 | $ | 15,000.00 | $ | 15,000.00 | $ | 15,000.00 |
| $ | 5,382,817.90 | $ | 5,382,817.90 | $ | 5,382,817.90 | $ | 5,382,817.90 | $ | 5,382,817.90 |
| $ | 342,255.00 | $ | 342,255.00 | $ | 342,255.00 | $ | 342,255.00 | $ | 342,255.00 |
| $ | - | $ | - | $ | - | $ | - | $ | - |
| $ | - | $ | - | $ | - | $ | - | $ | - |
| $ | 6,498,320.10 | $ | 6,498,320.10 | $ | 6,498,320.10 | $ | 6,498,320.10 | $ | 6,498,320.10 |

| | Month 19 | | Month 20 | | Month 21 | | Month 22 | | Month 23 |
|---|---|---|---|---|---|---|---|---|---|
| $ | 12,223,393.00 | $ | 12,223,393.00 | $ | 12,223,393.00 | $ | 12,223,393.00 | $ | 12,223,393.00 |
| | | | | | | | | | |
| $ | 3,667,017.90 | $ | 3,667,017.90 | $ | 3,667,017.90 | $ | 3,667,017.90 | $ | 3,667,017.90 |
| $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 |
| $ | 250,000.00 | $ | 250,000.00 | $ | 250,000.00 | $ | 250,000.00 | $ | 250,000.00 |
| $ | 180,000.00 | $ | 180,000.00 | $ | 180,000.00 | $ | 180,000.00 | $ | 180,000.00 |
| $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 |
| $ | 8,800.00 | $ | 8,800.00 | $ | 8,800.00 | $ | 8,800.00 | $ | 8,800.00 |
| $ | 20,000.00 | $ | 20,000.00 | $ | 20,000.00 | $ | 20,000.00 | $ | 20,000.00 |
| $ | 5,000.00 | $ | 5,000.00 | $ | 5,000.00 | $ | 5,000.00 | $ | 5,000.00 |
| $ | 500,000.00 | $ | 500,000.00 | $ | 500,000.00 | $ | 500,000.00 | $ | 500,000.00 |
| $ | 12,000.00 | $ | 12,000.00 | $ | 12,000.00 | $ | 12,000.00 | $ | 12,000.00 |
| $ | 350,000.00 | $ | 350,000.00 | $ | 350,000.00 | $ | 350,000.00 | $ | 350,000.00 |
| $ | 200,000.00 | $ | 200,000.00 | $ | 200,000.00 | $ | 200,000.00 | $ | 200,000.00 |
| $ | 75,000.00 | $ | 75,000.00 | $ | 75,000.00 | $ | 75,000.00 | $ | 75,000.00 |
| $ | 15,000.00 | $ | 15,000.00 | $ | 15,000.00 | $ | 15,000.00 | $ | 15,000.00 |
| $ | 5,382,817.90 | $ | 5,382,817.90 | $ | 5,382,817.90 | $ | 5,382,817.90 | $ | 5,382,817.90 |
| $ | 342,255.00 | $ | 342,255.00 | $ | 342,255.00 | $ | 342,255.00 | $ | 342,255.00 |
| $ | - | $ | - | $ | - | $ | - | $ | - |
| $ | - | $ | - | $ | - | $ | - | $ | - |
| $ | 6,498,320.10 | $ | 6,498,320.10 | $ | 6,498,320.10 | $ | 6,498,320.10 | $ | 6,498,320.10 |

CONFIDENTIAL

| | Month 24 | | Month 25 | | Month 26 | | Month 27 | | Month 28 |
|---|---|---|---|---|---|---|---|---|---|
| $ | 12,223,393.00 | $ | 12,223,393.00 | $ | 12,223,393.00 | $ | 12,223,393.00 | $ | 12,223,393.00 |
| | | | | | | | | | |
| $ | 3,667,017.90 | $ | 3,667,017.90 | $ | 3,667,017.90 | $ | 3,667,017.90 | $ | 3,667,017.90 |
| $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 |
| $ | 250,000.00 | $ | 250,000.00 | $ | 250,000.00 | $ | 250,000.00 | $ | 250,000.00 |
| $ | 180,000.00 | $ | 180,000.00 | $ | 180,000.00 | $ | 180,000.00 | $ | 180,000.00 |
| $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 |
| $ | 8,800.00 | $ | 8,800.00 | $ | 8,800.00 | $ | 8,800.00 | $ | 8,800.00 |
| $ | 20,000.00 | $ | 20,000.00 | $ | 20,000.00 | $ | 20,000.00 | $ | 20,000.00 |
| $ | 5,000.00 | $ | 5,000.00 | $ | 5,000.00 | $ | 5,000.00 | $ | 5,000.00 |
| $ | 500,000.00 | $ | 500,000.00 | $ | 500,000.00 | $ | 500,000.00 | $ | 500,000.00 |
| $ | 12,000.00 | $ | 12,000.00 | $ | 12,000.00 | $ | 12,000.00 | $ | 12,000.00 |
| $ | 350,000.00 | $ | 350,000.00 | $ | 350,000.00 | $ | 350,000.00 | $ | 350,000.00 |
| $ | 200,000.00 | $ | 200,000.00 | $ | 200,000.00 | $ | 200,000.00 | $ | 200,000.00 |
| $ | 75,000.00 | $ | 75,000.00 | $ | 75,000.00 | $ | 75,000.00 | $ | 75,000.00 |
| $ | 15,000.00 | $ | 15,000.00 | $ | 15,000.00 | $ | 15,000.00 | $ | 15,000.00 |
| $ | 5,382,817.90 | $ | 5,382,817.90 | $ | 5,382,817.90 | $ | 5,382,817.90 | $ | 5,382,817.90 |
| $ | 342,255.00 | $ | 342,255.00 | $ | 342,255.00 | $ | 342,255.00 | $ | 342,255.00 |
| $ | - | $ | - | $ | - | $ | - | $ | - |
| $ | - | $ | - | $ | - | $ | - | $ | - |
| $ | 6,498,320.10 | $ | 6,498,320.10 | $ | 6,498,320.10 | $ | 6,498,320.10 | $ | 6,498,320.10 |

CONFIDENTIAL

| | Month 29 | | Month 30 | | Month 31 | | Month 32 | | Month 33 |
|---|---|---|---|---|---|---|---|---|---|
| $ | 12,223,393.00 | $ | 12,223,393.00 | $ | 12,223,393.00 | $ | 12,223,393.00 | $ | 12,223,393.00 |
| | | | | | | | | | |
| $ | 3,667,017.90 | $ | 3,667,017.90 | $ | 3,667,017.90 | $ | 3,667,017.90 | $ | 3,667,017.90 |
| $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 |
| $ | 250,000.00 | $ | 250,000.00 | $ | 250,000.00 | $ | 250,000.00 | $ | 250,000.00 |
| $ | 180,000.00 | $ | 180,000.00 | $ | 180,000.00 | $ | 180,000.00 | $ | 180,000.00 |
| $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 |
| $ | 8,800.00 | $ | 8,800.00 | $ | 8,800.00 | $ | 8,800.00 | $ | 8,800.00 |
| $ | 20,000.00 | $ | 20,000.00 | $ | 20,000.00 | $ | 20,000.00 | $ | 20,000.00 |
| $ | 5,000.00 | $ | 5,000.00 | $ | 5,000.00 | $ | 5,000.00 | $ | 5,000.00 |
| $ | 500,000.00 | $ | 500,000.00 | $ | 500,000.00 | $ | 500,000.00 | $ | 500,000.00 |
| $ | 12,000.00 | $ | 12,000.00 | $ | 12,000.00 | $ | 12,000.00 | $ | 12,000.00 |
| $ | 350,000.00 | $ | 350,000.00 | $ | 350,000.00 | $ | 350,000.00 | $ | 350,000.00 |
| $ | 200,000.00 | $ | 200,000.00 | $ | 200,000.00 | $ | 200,000.00 | $ | 200,000.00 |
| $ | 75,000.00 | $ | 75,000.00 | $ | 75,000.00 | $ | 75,000.00 | $ | 75,000.00 |
| $ | 15,000.00 | $ | 15,000.00 | $ | 15,000.00 | $ | 15,000.00 | $ | 15,000.00 |
| $ | 5,382,817.90 | $ | 5,382,817.90 | $ | 5,382,817.90 | $ | 5,382,817.90 | $ | 5,382,817.90 |
| $ | 342,255.00 | $ | 342,255.00 | $ | 342,255.00 | $ | 342,255.00 | $ | 342,255.00 |
| $ | - | $ | - | $ | - | $ | - | $ | - |
| $ | - | $ | - | $ | - | $ | - | $ | - |
| $ | 6,498,320.10 | $ | 6,498,320.10 | $ | 6,498,320.10 | $ | 6,498,320.10 | $ | 6,498,320.10 |

ROSETTE_REVISED_049540

JA1961

| Month 34 | | Month 35 | | Month 36 | | Month 37 | | Month 38 | |
|---|---|---|---|---|---|---|---|---|---|
| $ | 12,223,393.00 | $ | 12,223,393.00 | $ | 12,223,393.00 | $ | 12,223,393.00 | $ | 12,223,393.00 |
| $ | 3,667,017.90 | $ | 3,667,017.90 | $ | 3,667,017.90 | $ | 3,667,017.90 | $ | 3,667,017.90 |
| $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 |
| $ | 250,000.00 | $ | 250,000.00 | $ | 250,000.00 | $ | 250,000.00 | $ | 250,000.00 |
| $ | 180,000.00 | $ | 180,000.00 | $ | 180,000.00 | $ | 180,000.00 | $ | 180,000.00 |
| $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 |
| $ | 8,800.00 | $ | 8,800.00 | $ | 8,800.00 | $ | 8,800.00 | $ | 8,800.00 |
| $ | 20,000.00 | $ | 20,000.00 | $ | 20,000.00 | $ | 20,000.00 | $ | 20,000.00 |
| $ | 5,000.00 | $ | 5,000.00 | $ | 5,000.00 | $ | 5,000.00 | $ | 5,000.00 |
| $ | 500,000.00 | $ | 500,000.00 | $ | 500,000.00 | $ | 500,000.00 | $ | 500,000.00 |
| $ | 12,000.00 | $ | 12,000.00 | $ | 12,000.00 | $ | 12,000.00 | $ | 12,000.00 |
| $ | 350,000.00 | $ | 350,000.00 | $ | 350,000.00 | $ | 350,000.00 | $ | 350,000.00 |
| $ | 200,000.00 | $ | 200,000.00 | $ | 200,000.00 | $ | 200,000.00 | $ | 200,000.00 |
| $ | 75,000.00 | $ | 75,000.00 | $ | 75,000.00 | $ | 75,000.00 | $ | 75,000.00 |
| $ | 15,000.00 | $ | 15,000.00 | $ | 15,000.00 | $ | 15,000.00 | $ | 15,000.00 |
| $ | 5,382,817.90 | $ | 5,382,817.90 | $ | 5,382,817.90 | $ | 5,382,817.90 | $ | 5,382,817.90 |
| $ | 342,255.00 | $ | 342,255.00 | $ | 342,255.00 | $ | 513,382.51 | $ | 513,382.51 |
| $ | - | $ | - | $ | - | $ | - | $ | - |
| $ | - | $ | - | $ | - | $ | - | $ | - |
| $ | 6,498,320.10 | $ | 6,498,320.10 | $ | 6,498,320.10 | $ | 6,327,192.59 | $ | 6,327,192.59 |

| | Month 39 | | Month 40 | | Month 41 | | Month 42 | | Month 43 |
|---|---|---|---|---|---|---|---|---|---|
| $ | 12,223,393.00 | $ | 12,223,393.00 | $ | 12,223,393.00 | $ | 12,223,393.00 | $ | 12,223,393.00 |
| | | | | | | | | | |
| $ | 3,667,017.90 | $ | 3,667,017.90 | $ | 3,667,017.90 | $ | 3,667,017.90 | $ | 3,667,017.90 |
| $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 |
| $ | 250,000.00 | $ | 250,000.00 | $ | 250,000.00 | $ | 250,000.00 | $ | 250,000.00 |
| $ | 180,000.00 | $ | 180,000.00 | $ | 180,000.00 | $ | 180,000.00 | $ | 180,000.00 |
| $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 |
| $ | 8,800.00 | $ | 8,800.00 | $ | 8,800.00 | $ | 8,800.00 | $ | 8,800.00 |
| $ | 20,000.00 | $ | 20,000.00 | $ | 20,000.00 | $ | 20,000.00 | $ | 20,000.00 |
| $ | 5,000.00 | $ | 5,000.00 | $ | 5,000.00 | $ | 5,000.00 | $ | 5,000.00 |
| $ | 500,000.00 | $ | 500,000.00 | $ | 500,000.00 | $ | 500,000.00 | $ | 500,000.00 |
| $ | 12,000.00 | $ | 12,000.00 | $ | 12,000.00 | $ | 12,000.00 | $ | 12,000.00 |
| $ | 350,000.00 | $ | 350,000.00 | $ | 350,000.00 | $ | 350,000.00 | $ | 350,000.00 |
| $ | 200,000.00 | $ | 200,000.00 | $ | 200,000.00 | $ | 200,000.00 | $ | 200,000.00 |
| $ | 75,000.00 | $ | 75,000.00 | $ | 75,000.00 | $ | 75,000.00 | $ | 75,000.00 |
| $ | 15,000.00 | $ | 15,000.00 | $ | 15,000.00 | $ | 15,000.00 | $ | 15,000.00 |
| $ | 5,382,817.90 | $ | 5,382,817.90 | $ | 5,382,817.90 | $ | 5,382,817.90 | $ | 5,382,817.90 |
| $ | 513,382.51 | $ | 513,382.51 | $ | 513,382.51 | $ | 513,382.51 | $ | 513,382.51 |
| $ | - | $ | - | $ | - | $ | - | $ | - |
| $ | - | $ | - | $ | - | $ | - | $ | - |
| $ | 6,327,192.59 | $ | 6,327,192.59 | $ | 6,327,192.59 | $ | 6,327,192.59 | $ | 6,327,192.59 |

CONFIDENTIAL

ROSETTE_REVISED_049851

| | Month 44 | | Month 45 | | Month 46 | | Month 47 | | Month 48 |
|---|---|---|---|---|---|---|---|---|---|
| $ | 12,223,393.00 | $ | 12,223,393.00 | $ | 12,223,393.00 | $ | 12,223,393.00 | $ | 12,223,393.00 |
| | | | | | | | | | |
| $ | 3,667,017.90 | $ | 3,667,017.90 | $ | 3,667,017.90 | $ | 3,667,017.90 | $ | 3,667,017.90 |
| $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 |
| $ | 250,000.00 | $ | 250,000.00 | $ | 250,000.00 | $ | 250,000.00 | $ | 250,000.00 |
| $ | 180,000.00 | $ | 180,000.00 | $ | 180,000.00 | $ | 180,000.00 | $ | 180,000.00 |
| $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 |
| $ | 8,800.00 | $ | 8,800.00 | $ | 8,800.00 | $ | 8,800.00 | $ | 8,800.00 |
| $ | 20,000.00 | $ | 20,000.00 | $ | 20,000.00 | $ | 20,000.00 | $ | 20,000.00 |
| $ | 5,000.00 | $ | 5,000.00 | $ | 5,000.00 | $ | 5,000.00 | $ | 5,000.00 |
| $ | 500,000.00 | $ | 500,000.00 | $ | 500,000.00 | $ | 500,000.00 | $ | 500,000.00 |
| $ | 12,000.00 | $ | 12,000.00 | $ | 12,000.00 | $ | 12,000.00 | $ | 12,000.00 |
| $ | 350,000.00 | $ | 350,000.00 | $ | 350,000.00 | $ | 350,000.00 | $ | 350,000.00 |
| $ | 200,000.00 | $ | 200,000.00 | $ | 200,000.00 | $ | 200,000.00 | $ | 200,000.00 |
| $ | 75,000.00 | $ | 75,000.00 | $ | 75,000.00 | $ | 75,000.00 | $ | 75,000.00 |
| $ | 15,000.00 | $ | 15,000.00 | $ | 15,000.00 | $ | 15,000.00 | $ | 15,000.00 |
| $ | 5,382,817.90 | $ | 5,382,817.90 | $ | 5,382,817.90 | $ | 5,382,817.90 | $ | 5,382,817.90 |
| $ | 513,382.51 | $ | 513,382.51 | $ | 513,382.51 | $ | 513,382.51 | | 513,382.51 |
| $ | - | $ | - | $ | - | $ | - | $ | - |
| $ | - | $ | - | $ | - | $ | - | $ | - |
| $ | 6,327,192.59 | $ | 6,327,192.59 | $ | 6,327,192.59 | $ | 6,327,192.59 | $ | 6,327,192.59 |

ROSETTE_REVISED_049852

JA1964

| | Month 49 | | Month 50 | | Month 51 | | Month 52 | | Month 53 |
|---|---|---|---|---|---|---|---|---|---|
| $ | 12,223,393.00 | $ | 12,223,393.00 | $ | 12,223,393.00 | $ | 12,223,393.00 | $ | 12,223,393.00 |
| | | | | | | | | | |
| $ | 3,667,017.90 | $ | 3,667,017.90 | $ | 3,667,017.90 | $ | 3,667,017.90 | $ | 3,667,017.90 |
| $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 |
| $ | 250,000.00 | $ | 250,000.00 | $ | 250,000.00 | $ | 250,000.00 | $ | 250,000.00 |
| $ | 180,000.00 | $ | 180,000.00 | $ | 180,000.00 | $ | 180,000.00 | $ | 180,000.00 |
| $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 |
| $ | 8,800.00 | $ | 8,800.00 | $ | 8,800.00 | $ | 8,800.00 | $ | 8,800.00 |
| $ | 20,000.00 | $ | 20,000.00 | $ | 20,000.00 | $ | 20,000.00 | $ | 20,000.00 |
| $ | 5,000.00 | $ | 5,000.00 | $ | 5,000.00 | $ | 5,000.00 | $ | 5,000.00 |
| $ | 500,000.00 | $ | 500,000.00 | $ | 500,000.00 | $ | 500,000.00 | $ | 500,000.00 |
| $ | 12,000.00 | $ | 12,000.00 | $ | 12,000.00 | $ | 12,000.00 | $ | 12,000.00 |
| $ | 350,000.00 | $ | 350,000.00 | $ | 350,000.00 | $ | 350,000.00 | $ | 350,000.00 |
| $ | 200,000.00 | $ | 200,000.00 | $ | 200,000.00 | $ | 200,000.00 | $ | 200,000.00 |
| $ | 75,000.00 | $ | 75,000.00 | $ | 75,000.00 | $ | 75,000.00 | $ | 75,000.00 |
| $ | 15,000.00 | $ | 15,000.00 | $ | 15,000.00 | $ | 15,000.00 | $ | 15,000.00 |
| $ | 5,382,817.90 | $ | 5,382,817.90 | $ | 5,382,817.90 | $ | 5,382,817.90 | $ | 5,382,817.90 |
| $ | 513,382.51 | $ | 513,382.51 | $ | 513,382.51 | $ | 513,382.51 | | 513,382.51 |
| $ | - | $ | - | $ | - | $ | - | $ | - |
| $ | - | $ | - | $ | - | $ | - | $ | - |
| $ | 6,327,192.59 | $ | 6,327,192.59 | $ | 6,327,192.59 | $ | 6,327,192.59 | $ | 6,327,192.59 |

CONFIDENTIAL

ROSETTE_REVISED_049858

JA1965

| | Month 54 | | Month 55 | | Month 56 | | Month 57 | | Month 58 |
|---|---|---|---|---|---|---|---|---|---|
| $ | 12,223,393.00 | $ | 12,223,393.00 | $ | 12,223,393.00 | $ | 12,223,393.00 | $ | 12,223,393.00 |
| | | | | | | | | | |
| $ | 3,667,017.90 | $ | 3,667,017.90 | $ | 3,667,017.90 | $ | 3,667,017.90 | $ | 3,667,017.90 |
| $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 |
| $ | 250,000.00 | $ | 250,000.00 | $ | 250,000.00 | $ | 250,000.00 | $ | 250,000.00 |
| $ | 180,000.00 | $ | 180,000.00 | $ | 180,000.00 | $ | 180,000.00 | $ | 180,000.00 |
| $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 | $ | 50,000.00 |
| $ | 8,800.00 | $ | 8,800.00 | $ | 8,800.00 | $ | 8,800.00 | $ | 8,800.00 |
| $ | 20,000.00 | $ | 20,000.00 | $ | 20,000.00 | $ | 20,000.00 | $ | 20,000.00 |
| $ | 5,000.00 | $ | 5,000.00 | $ | 5,000.00 | $ | 5,000.00 | $ | 5,000.00 |
| $ | 500,000.00 | $ | 500,000.00 | $ | 500,000.00 | $ | 500,000.00 | $ | 500,000.00 |
| $ | 12,000.00 | $ | 12,000.00 | $ | 12,000.00 | $ | 12,000.00 | $ | 12,000.00 |
| $ | 350,000.00 | $ | 350,000.00 | $ | 350,000.00 | $ | 350,000.00 | $ | 350,000.00 |
| $ | 200,000.00 | $ | 200,000.00 | $ | 200,000.00 | $ | 200,000.00 | $ | 200,000.00 |
| $ | 75,000.00 | $ | 75,000.00 | $ | 75,000.00 | $ | 75,000.00 | $ | 75,000.00 |
| $ | 15,000.00 | $ | 15,000.00 | $ | 15,000.00 | $ | 15,000.00 | $ | 15,000.00 |
| $ | 5,382,817.90 | $ | 5,382,817.90 | $ | 5,382,817.90 | $ | 5,382,817.90 | $ | 5,382,817.90 |
| $ | 513,382.51 | $ | 513,382.51 | $ | 513,382.51 | $ | 513,382.51 | $ | 513,382.51 |
| $ | - | $ | - | $ | - | $ | - | $ | - |
| $ | - | $ | - | $ | - | $ | - | $ | - |
| $ | 6,327,192.59 | $ | 6,327,192.59 | $ | 6,327,192.59 | $ | 6,327,192.59 | $ | 6,327,192.59 |

CONFIDENTIAL

| **Month 59** | **Month 60** | **Month 61+** |
|---|---|---|
| $ 12,223,393.00 | $ 12,223,393.00 | $ 12,223,393.00 |
| $ 3,667,017.90 | $ 3,667,017.90 | $ 3,667,017.90 |
| $ 50,000.00 | $ 50,000.00 | $ 50,000.00 |
| $ 250,000.00 | $ 250,000.00 | $ 250,000.00 |
| $ 180,000.00 | $ 180,000.00 | $ 180,000.00 |
| $ 50,000.00 | $ 50,000.00 | $ 50,000.00 |
| $ 8,800.00 | $ 8,800.00 | $ 8,800.00 |
| $ 20,000.00 | $ 20,000.00 | $ 20,000.00 |
| $ 5,000.00 | $ 5,000.00 | $ 5,000.00 |
| $ 500,000.00 | $ 500,000.00 | $ 500,000.00 |
| $ 12,000.00 | $ 12,000.00 | $ 12,000.00 |
| $ 350,000.00 | $ 350,000.00 | $ 350,000.00 |
| $ 200,000.00 | $ 200,000.00 | $ 200,000.00 |
| $ 75,000.00 | $ 75,000.00 | $ 75,000.00 |
| $ 15,000.00 | $ 15,000.00 | $ 15,000.00 |
| $ 5,382,817.90 | $ 5,382,817.90 | $ 5,382,817.90 |
| $ 513,382.51 | $ 513,382.51 | $ 4,840,575.10 |
| $ - | $ - | $ - |
| $ - | $ - | $ 2,000,000.00 |
| $ 6,327,192.59 | $ 6,327,192.59 | $ - |

ROSETTE_REVISED_019855

JA1967

# Exhibit 31

**Darcie Pace**

| | |
|---|---|
| **From:** | Matt Martorello <mattm@bellicosevi.com> |
| **Sent:** | Monday, August 25, 2014 11:36 AM |
| **To:** | Robert Rosette |
| **Subject:** | FYI |

So here is what I'm thinking (for now).  If we can't reach terms with LVD to buy SPVI, then SPVI will be sold to another Tribe (likely Middletown).  If we do reach terms, then some of my team will likely proceed with MTR in a new entity, to help them stand up a business.

So I'm sort of on hold (and MTR) until we know if LVD is going to be able to come to terms on SPVI or not.

**Regards,**

**Matt Martorello**
Mobile: 773-209-7720
Email: mm@BellicoseVI.com



**This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

CONFIDENTIAL                                                  ROSETTE_REVISED_049520

JA1969

# Exhibit 32

| From: | Matt Martorello |
|---|---|
| To: | Karrie Wichtman |
| Subject: | RE: DM Recommendation |
| Date: | Tuesday, August 26, 2014 8:18:51 PM |
| Attachments: | image001.png |

At this stage, I was told council only approved evolving the term sheet into something that would be reviewed later to ask questions about, and if approved, then it'd be binding.  I didn't hear anything back from the Chairman to my email, nor did I get any sense of excitement from anyone, which is really perplexing.  It makes me wonder if some folks think they can operate without spvi or want to learn more to complete the puzzle and reverse engineer.

There are a lot of legal details to go through yet on the deal. Especially in a seller financing.  The tribe will have to be comfortable with full waivers for misuse, bad acts, etc.  (Rob said they would, but he is not LVD).

Plus, the seller will have to keep a final say so in business decisions to protect the business from being destroyed by the new owner before paid.  The business needs to be treated very delicately and protected if it is to survive.  Risk and reward carefully measured.  No need to reinvent the wheel or shake things up, just need to keep it alive and then use the earnings from it to take risks with and do other things.

In any event, many extreme protections will be necessary to make sure the sale price occurs, and that IP is not misused (I.e. Escrow for example is common).  These sort of things are mandatory in such a deal format, and I don't have any certainty that they're going to be agreed to or not right now.  My goal is to keep the business alive through Note repayment.

In fact, every vendor but me has a waiver but SPVI.  If LVD were to snoop, and then not do the deal after learning everything about us, and the details and IP, I'd have zero recourse today when they use it to start their own servicing business.  Tribal leaders will need to understand all of these things, then maybe they understand why we have to protect the business and IP.

The Servicer is a Servicer, so the IP it builds is its own, and for the use of its clients (multiple) which it services, or has serviced from even the pre-LVD days.  If it weren't SPVI IP, we'd have some real problems, and I guess any clients would have to deal with previous lenders claiming the same thing today.  The concept of IP sale in and of itself was evident of IP ownership.

Similarly, the Tribe will need to be comfortable that key officers and myself will continue to exist in the industry. With Middletown and possibly another Tribe, or even as a state licensed lender.

We later evolved to recommendations and sharing a bit to be helpful, but certain items and code will never even be shared with most of my current employees, because nobody else in the subprime industry does it, and it is too valuable to put at risk as one leak would destroy the business.  Even talking about DM is a very bad idea, as small a thing as it is, due to competition and the value and power of what we've created.  Just knowing "DM is good" makes people want to study it and spend years figuring it out.

That said, even in due diligence, some information will be extremely limited and some IP held in escrow after closing until satisfaction of the note.  It can't get out to the world.

As for Management I don't know what that looks like yet post transaction.  I've discussed staying on as Manager of LLC or maybe not even whatsoever.  I'd love to just turn over the keys and be hands off. However, I very much need to make sure the business can sustain.

All of this would be entirely different if we were talking about a cash purchase deal, but the nature of the transaction has to permeate throughout the documents and details.  I do hope a deal is imminent.  However, I have no idea how council is thinking or will think. I don't know if they will see the nature of the transaction requires such a level of care or not.

Admittedly, I am very paranoid, but I think I have many good reasons to be.  I just would prefer to take one step at a time (yet need to move as quickly as possible).

Sent via the Samsung GALAXY S® 5, an AT&T 4G LTE smartphone

-------- Original message --------
From: Karrie Wichtman
Date:08/26/2014 10:35 PM (GMT-04:00)
To: Matt Martorello
Subject: RE: DM Recommendation

Matt,

I am at a total loss with regard to your response.

I wasn't recommending that SPVI disclose its secret sauce but only that SPVI be willing to explain to the Co-Managers what exactly they are approving.  For example, do Jimmer and Shelly even know what "DM" means because I don't.  Perhaps I got overzealous with the questions but I have Tribal leaders in my ear eager to learn the business and excited about the restructure.  Your statements with regard to the "should an acquisition occur" and "would be relevant questions for the eyes of Management and those in the acquiring company on a need to know basis as well" have me in a tailspin.  How confident are you that the acquisition will happen because my client is very excited about it as demonstrated by their willingness through formal Tribal Council action to move forward today?  Also, if the Tribe is buying SPVI aren't these questions relevant due diligence so that they know what they are buying and after acquisition who determines who needs to know would be the Tribe not Management.  I guess I would like to know who Management is?  Here's the other thing that I don't understand about your response.  Wasn't the DM – which I have figured out to mean Direct Mail -created for RRTL?  I can't locate any provision in the Servicing that says that IP produced for the Company is SPVI IP.  In fact, it is my opinion that RRTL owns the IP - so you can imagine why it is hard for me to understand why the Co-Managers would not be able to ask questions about documents attached to the approval as support for the basis of the recommendation.

I am not trying to be a bull in a China shop, I am just trying to understand your response?

Sincerely,

Karrie S. Wichtman, Partner

ROSETTE, LLP
Michigan Office
Attorneys at Law
25344 Red Arrow Highway
Mattawan, Michigan 49071
269.283.5005 Office
517.913.6443 Facsimile
480.242.6959 Cell
kwichtman@rosettelaw.com
rosettelaw.com

CONFIDENTIAL COMMUNICATION: THIS MESSAGE IS A CONFIDENTIAL ATTORNEY COMMUNICATION
ONLY FOR USE BY THE INTENDED RECIPIENT.  ANY INADVERTENT RECEIPT SHALL NOT CONSTITUTE A
WAIVER OF ATTORNEY-CLIENT OR WORK PRODUCT PROTECTION.  IF RECEIVED IN ERROR, PLEASE
NOTIFY KARRIE S. WICHTMAN IMMEDIATELY AND DELETE THIS MESSAGE.  THANK YOU FOR YOUR
COOPERATION.

---

**From:** Matt Martorello [mailto:mattm@bellicosevi.com]
**Sent:** Tuesday, August 26, 2014 9:34 PM
**To:** Karrie Wichtman; 'gkway@duckcreektf.com'; Daniel Gravel; Chairman James Williams
**Cc:** jennifers@duckcreektf.com; Justin Martorello; James Dowd; Brian McFadden; Ivelisse Morales;
Tanya Gibbs; Rob Rosette
**Subject:** RE: DM Recommendation

We respectfully opt to continue to keep any details of SPVI IP (including DM) explicitly for
internal eyes only, both for the protection of our business and maintaining the integrity of an
acquisition of the SPVI business.  Should an acquisition actually transpire, obviously these
would be relevant questions for the eyes of Management and those in the acquiring company
on a need to know basis as well (I.e. Certain IP, even in small doses, should at all times be
aggressively protected when the result is such a massive competitive advantage, like the
process of even just utilizing DM itself which SPVI owns and created).

Sent via the Samsung GALAXY S® 5, an AT&T 4G LTE smartphone

-------- Original message --------
From: Karrie Wichtman
Date:08/26/2014 8:33 PM (GMT-04:00)
To: "'gkway@duckcreektf.com'" , Daniel Gravel , Chairman James Williams
Cc: jennifers@duckcreektf.com, Matt Martorello , Justin Martorello , James Dowd , Brian
McFadden , Ivelisse Morales , Tanya Gibbs
Subject: RE: DM Recommendation

Good Evening Shelly,

The campaign being recommended is largely similar to the one approved several months ago. While the modeling and selection criteria seems to vary for this campaign, the look and feel is largely the same. I assume that the email from Blake Sims was included as an FYI and from a compliance perspective is largely being disregarded because Mr. Sims pointed to CA law but nothing necessarily in federal law that requires Red Rock to comply with CA law or register the campaign with the Commissioner of Business Oversight. Also, based on the MNE case and the fact that the enforcement authority of these laws and regs by the Commissioner is non-existent when a true TLE is concerned. This line of reasoning would be consistent throughout the states regardless of the regulatory laws of those states. Are those assumptions correct, Dan? I do wonder though as to the purpose of calling out the exemption that can be given by the Commissioner of Business Oversight in CA, when to the best of my knowledge no such exemption has been granted. What am I missing?

With regard to the other documents, while not needed for approval for the campaign to move forward, due to the desire to learn and the pending restructure it is my recommendation that you set up a conference call with SPVI to determine for each document (as applicable):

1.  Who created the document/concept? Vendor/Individual/Both
2.  Who created the models and the criteria for the models re: where the campaign should be launched? Vendor/Individual/Both
3.  How will the data be tracked and compiled to measure success?
4.  Who will track the data and compile it?
5.  How will such data be reported to the Company and by whom?

It is never too soon to learn who is doing what, where, why, how and when it will be done with regard to every aspect of the business.

Sincerely,


Karrie S. Wichtman, Partner
ROSETTE, LLP
Michigan Office
Attorneys at Law
25344 Red Arrow Highway
Mattawan, Michigan 49071
269.283.5005 Office
517.913.6443 Facsimile
480.242.6959 Cell
kwichtman@rosettelaw.com
rosettelaw.com

CONFIDENTIAL COMMUNICATION: THIS MESSAGE IS A CONFIDENTIAL ATTORNEY COMMUNICATION ONLY FOR USE BY THE INTENDED RECIPIENT. ANY INADVERTENT RECEIPT SHALL NOT CONSTITUTE A WAIVER OF ATTORNEY-CLIENT OR WORK PRODUCT PROTECTION. IF RECEIVED IN ERROR, PLEASE NOTIFY KARRIE S. WICHTMAN IMMEDIATELY AND DELETE THIS MESSAGE. THANK YOU FOR YOUR

COOPERATION.


**From:** gkway@duckcreektf.com [mailto:gkway@duckcreektf.com]
**Sent:** Tuesday, August 26, 2014 7:49 PM
**To:** Daniel Gravel; Chairman James Williams
**Cc:** Karrie Wichtman; jennifers@duckcreektf.com; Matt Martorello; Justin Martorello; James Dowd; Brian McFadden; Ivelisse Morales
**Subject:** RE: DM Recommendation

Karrie, Jennifer and Chairman

Do you have any concerns with this campaign?  I know  SP is anxious to get this campaign going.  Please let me know so that I can sign the approval form.

Thanks.

Shelly

> --------- Original Message ---------
> Subject: DM Recommendation
> From: "Daniel Gravel" <DanielG@bellicosevi.com>
> Date: 8/26/14 4:07 pm
> To: "Gkway - DCTF (gkway@duckcreektf.com)" <gkway@duckcreektf.com>,
> "Chairman James Williams" <jim.williams@lvdtribal.com>
> Cc: "Karrie Wichtman" <kwichtman@rosettelaw.com>, "jennifers@duckcreektf.com"
> <jennifers@duckcreektf.com>, "Matt Martorello" <mattm@bellicosevi.com>, "Justin
> Martorello" <JustinM@BellicoseVI.com>, "James Dowd"
> <jamesd@bellicosecapital.com>, "Brian McFadden" <BrianM@bellicosevi.com>,
> "Ivelisse Morales" <ivelissem@bellicosecapital.com>
>
> Shelly and Chairman Williams:
>
> Please see attached recommendation for a direct mail campaign, DM, and supporting documentation.
>
> Let us know if you want to discuss.
>
> Thanks,
>
> **Dan Gravel**
> **General Counsel**
> Email: danielg@bellicosecapital.com
> Office: 787-520-6053
> Mobile: 781-910-9642
>
> 
>
> CONFIDENTIAL COMMUNICATION: The information contained in this email is intended for the individual or entity

# Exhibit 33



WHOIS

HOME    DOMAINS    WEBSITES    HOSTING    CLOUD    EMAIL    SECURITY    WHOIS    SUPPORT    LOGIN

# bigpictureloans.com

Updated 1 second ago

## Domain Information

| | |
|---|---|
| Domain: | bigpictureloans.com |
| Registrar: | GoDaddy.com, LLC |
| Registered On: | 2013-09-18 |
| Expires On: | 2023-09-18 |
| Updated On: | 2017-11-14 |
| Status: | clientDeleteProhibited<br>clientRenewProhibited<br>clientTransferProhibited<br>clientUpdateProhibited |
| Name Servers: | kip.ns.cloudflare.com<br>ulla.ns.cloudflare.com |

## Registrant Contact

| | |
|---|---|
| Organization: | Big Picture Loans, LLC |
| State: | MI |
| Country: | US |
| Email: | Select Contact Domain Holder link at https://www.godaddy.com/whois/results.aspx?domain=bigpictureloans.com |

## Administrative Contact

| | |
|---|---|
| Email: | Select Contact Domain Holder link at https://www.godaddy.com/whois/results.aspx?domain=bigpictureloans.com |

## Technical Contact

| | |
|---|---|
| Email: | Select Contact Domain Holder link at https://www.godaddy.com/whois/results.aspx?domain=bigpictureloans.com |

## Raw Whois Data

```
Domain Name: bigpictureloans.com
Registry Domain ID: 1828037274_DOMAIN_COM-VRSN
Registrar WHOIS Server: whois.godaddy.com
Registrar URL: http://www.godaddy.com
Updated Date: 2017-11-14T16:33:16Z
Creation Date: 2013-09-18T15:57:40Z
```

Interested in similar domains?

hugepictureloans.com      Buy Now

hugepictureloans.net      Buy Now

bipilo.net      Buy Now

largepictureloans.com      Buy Now

bigpictureloansonline.com      Buy Now

.space

$24.88   $1.48

BUY NOW

*Offer ends 31st January 2019

On Sale!



.MOBI @ $4.48   $14.88



Introducing

WORDPRESS HOSTING

$3.58/mo

VIEW MORE

JA1977

```
Registrar Registration Expiration Date: 2023-09-18T15:57:40Z
Registrar: GoDaddy.com, LLC
Registrar IANA ID: 146
Registrar Abuse Contact Email: abuse@godaddy.com
Registrar Abuse Contact Phone: +1.4806242505
Domain Status: clientTransferProhibited
http://www.icann.org/epp#clientTransferProhibited
Domain Status: clientUpdateProhibited
http://www.icann.org/epp#clientUpdateProhibited
Domain Status: clientRenewProhibited
http://www.icann.org/epp#clientRenewProhibited
Domain Status: clientDeleteProhibited
http://www.icann.org/epp#clientDeleteProhibited
Registrant Organization: Big Picture Loans, LLC
Registrant State/Province: MI
Registrant Country: US
Registrant Email: Select Contact Domain Holder link at
https://www.godaddy.com/whois/results.aspx?domain=bigpictureloans.com
Admin Email: Select Contact Domain Holder link at
https://www.godaddy.com/whois/results.aspx?domain=bigpictureloans.com
Tech Email: Select Contact Domain Holder link at
https://www.godaddy.com/whois/results.aspx?domain=bigpictureloans.com
Name Server: KIP.NS.CLOUDFLARE.COM
Name Server: ULLA.NS.CLOUDFLARE.COM
DNSSEC: signedDelegation
URL of the ICANN WHOIS Data Problem Reporting System: http://wdprs.internic.net/
>>> Last update of whois database: 2019-01-10T19:00:00Z <<<

For more information on Whois status codes, please visit
https://www.icann.org/resources/pages/epp-status-codes-2014-06-16-en

Notes:

IMPORTANT: Port43 will provide the ICANN-required minimum data set per
ICANN Temporary Specification, adopted 17 May 2018.
Visit https://whois.godaddy.com to look up contact data for domains
not covered by GDPR policy.

The data contained in GoDaddy.com, LLC's WhoIs database,
while believed by the company to be reliable, is provided "as is"
with no guarantee or warranties regarding its accuracy.  This
information is provided for the sole purpose of assisting you
in obtaining information about domain name registration records.
Any use of this data for any other purpose is expressly forbidden without the
prior written
permission of GoDaddy.com, LLC.  By submitting an inquiry,
you agree to these terms of usage and limitations of warranty.  In particular,
you agree not to use this data to allow, enable, or otherwise make possible,
dissemination or collection of this data, in part or in its entirety, for any
purpose, such as the transmission of unsolicited advertising and
and solicitations of any kind, including spam.  You further agree
not to use this data to enable high volume, automated or robotic electronic
processes designed to collect or compile this data for any purpose,
including mining this data for your own personal or commercial purposes.

Please note: the registrant of the domain name is specified
in the "registrant" section.  In most cases, GoDaddy.com, LLC
is not the registrant of domain names listed in this database.
```

## related domain names

godaddy.com    icann.org    cloudflare.com    internic.net

### Domains

Register Domain Name

Transfer Domain Name

View Domain Pricing

### Hosting & Products

Linux Hosting

Windows Hosting

WordPress Hosting

### Infrastructure

Datacenter Details

Hosting Security

24 x 7 Servers Monitoring

### Follow Us

LOGIN    OR    CREATE AN ACCOUNT

JA1978

| | | |
|---|---|---|
| Whois Lookup | Linux Reseller Hosting | Backup and Recovery |
| Name Suggestion Tool | Windows Reseller Hosting | |
| Free with Every Domain | Dedicated Servers | **Support** |
| Domain Offers | Managed Servers | View Knowledge Base |
| | Cloud Hosting | Contact Support |
| | Website Builder | Report Abuse |
| | Business Email | About Whois |
| | Enterprise Email | |
| | G Suite | |
| | SSL Certificates | |
| | Sitelock | |

Copyright © Whois.com. All rights reserved

Privacy Policy | Legal Agreement

JA1979

# Exhibit 34

---

Message

| | |
|---|---|
| **From:** | Marco Icardo [micardo@phenomenon.com] |
| **Sent:** | 9/30/2013 1:34:06 AM |
| **To:** | Margaret Ho [mho@phenomenon.com]; Arti Amin [aamin@phenomenon.com] |
| **Subject:** | Fwd: Outstanding Bellicose Deliverables |
| **Attachments:** | BellicoseCommPlan100.9.30.13.pdf; Untitled attachment 00012.htm |

FYI

Sent from my iPhone


Begin forwarded message:

> **From:** "Gayles, Valencia" <vgayles@phenomenon.com>
> **Date:** September 29, 2013 at 5:02:18 PM PDT
> **To:** Krishnan Menon <kmenon@phenomenon.com>, Dulari Amin <damin@phenomenon.com>,
> Ariel Jalalli <ajalali@phenomenon.com>, Arash Kazeminejad <arash@phenomenon.com>,
> Marco Icardo <micardo@phenomenon.com>, Sinden Lee <slee@phenomenon.com>, Katherine
> Koh <kkoh@phenomenon.com>
> **Subject: Outstanding Bellicose Deliverables**
>
> Hi all,,
>
> This serves as follow up regarding the outstanding deliverables to Bellicose following
> the fall-out:
>
> **-Timesheet reporting**
> It's been agreed upon with clients that timesheets (Pheno and Dev) will be provided and
> reviewed with clients every Tuesday, along with status report and weekly list of priority
> projects.  We'll have timesheets for Krish and Dulari's review Monday afternoon.
>
> **-CMS/Platform and Xcentium relationship**
> -Revised Xcentium invoices for 7/27-9/15, reflecting 50% discount, forwarded to clients
> Clients agreed to move forward with CMS on 9/26; contact report issued; email with client
> confirming approval received and routed.  The following deliverables agreed upon in contact
> report:
> •Pheno -continue managing platform development as approved by Bellicose (Arash and Dulari
> are preparing addendum to SOW #1 confirming that Xcentium will be managed by Pheno, but
> liabilty, billing and payment rest solely between Xcentium and Bellicose.  I've let clients know
> this is in the works and will track via status report - i.e. revised SOW to be provided this week
> **Arash, please confirm**).
> •Pheno- provide Bellicose with SEM proposal (meeting scheduled for Monday 9/30)
> •Pheno - facilitate Xcentium to execute direct SOW with Bellicose (Arash and Dulari consulted
> on SOW; Arash has taken the lead on working with Xcentium to craft SOW. I've let clients know
> this is forthcoming and will add this item to weekly status report - to be provided this week
> **Arash, please confirm**)
>
> **The cost of 1.0, 1.5 and 2.0 - retainer and anticipated dev costs**
> **Milestone deliverable dates for 1.0, 1.5 and 2.0**
> Ariel and Sinden working on this.  Assignment keeps shifting due to new requests.  We will
> track on status report and review with clients weekly.

JA1981

CONFIDENTIAL

PHEN0002897

**Communication Plan for Bellicose**
Plan is attached.  **Krish, please review**
Still need to confirm timing of different site iterations (ie 1.5 and 2.0) with team on Monday
We'll also take a detailed look into what it will take to deliver the various suggested innovations, with an eye to which we can deliver immediately and which are more long term.

Plan takes into consideration Friday's news that the State property will now be launched to do business in California only.  CA License still pending - should be forthcoming in  45 days or less.  Additional states will not be brought on board (even Utah, for which Bellicose currently has an approved license) until California is up and running and successful.

Best,
-v

**VALENCIA GAYLES**
**Group Brand Director**

PHENOMENON
5900 Wilshire Boulevard, Floor 28
Los Angeles, CA 90036
c 310.925.2045
w 310.648.4029
@vgayles
phenomenon.com

JA1982

CONFIDENTIAL                                                                   PHEN0002898

**BELLICOSE :: SEPTEMBER 30, 2013**

# Communications Plan

**PHENOMENON**®

Confidential ©2013 **PHENOMENON**

JA1983

OBJECTIVES

# GOALS FOR TODAY

- Share a proposed Communications Plan that will help Bellicose achieve expressed success metrics in a timely fashion.

- Based on this plan, discuss the ideal marketing mix for each brand, as well as the most relevant and appropriate product innovations.

2

JA1984

CONFIDENTIAL

PHEN0002900



Objectives

CONFIDENTIAL

OBJECTIVES

# PRIMARY BUSINESS OBJECTIVES

## DURING IMMERSION, THE PRIMARY OBJECTIVES IDENTIFIED FOR BELLICOSE WERE:

- **TRIBAL-** Grow the Tribal business (starting with lending, and including Indian Country Analytics); Bellicose slated to end consultancy relationship with each tribe within 7-8 years

- **STATE -** Successfully launch the State business; potential objective to sell to bank in 4-5 years

- **BELLICOSE -** Define, position and promote Bellicose to new tribes and investors

4

CONFIDENTIAL

JA1986

PHEN0002902

OBJECTIVES

# CURRENT LANDSCAPE
## SINCE IMMERSION, THE LANDSCAPE HAS CHANGED:

- **TRIBAL**
  - **Castle** - Re-branding on permanent hold due to lawsuit; Site optimization in progress; Property will be promoted via marketing (direct), plus leads provided via aggregator;  Bellicose priority
  - **First Nation** - Launch put on permanent hold by Bellicose

JA1987

CONFIDENTIAL

PHEN0002903

# CURRENT LANDSCAPE
## SINCE IMMERSION, THE LANDSCAPE HAS CHANGED:

- **TRIBAL**
  - **Chorus Loans** - New tribal entity; Large fund; 10/15 launch; Promote via marketing (direct), plus leads provided via aggregator; Secondary priority
  - **Big Picture Loans** - New tribal entity (Fort Belknap); Smaller fund; 9/30 launch; No marketing support; Aggregator provided leads; Tertiary priority

CONFIDENTIAL

JA1988

PHEN0002904

OBJECTIVES

# CURRENT LANDSCAPE
## SINCE IMMERSION, THE LANDSCAPE HAS CHANGED:

- **STATE**
  - **Balance Credit** - Now to be launched as only a CA property.  CA license application pending and should be completed in 45 days (2nd/3rd week of November).  Additional states, (including UT, which is licensed), will not be launched until CA is up and running and deemed successful.

JA1989

CONFIDENTIAL

PHEN0002905



Communications Plan

CONFIDENTIAL

JA1990

PHEN0002906

| STRATEGY | TACTICS |
|---|---|
| **DIVERSIFY**<br>■ Variety of Tribal Affiliations<br>■ State Entity<br>■ Money Collection | **PORTFOLIO STRATEGY**<br>■ In addition to LVD/Red Rock (Castle), party to the suit vs NY State and Middletown Rancheria (First Nation) - both of whom share legal counsel, Bellicose has procured additional tribal business with entities not related to LVD or Middletown - i.e. Fort Belknap (Big Picture Loans) and ? (Chorus Loans)<br>■ Bellicose is also expanding into State lending via Balance Credit, debuting in CA in November<br>■ A portfolio strategy is employed by Bellicose, with each brand addressing a key emotional barrier & providing a relevant feature<br>**COLLECTION OPTIONS**.<br>■ The challenge to ACH is being dealt with primarily by NAFSA. E-check is an automatic opt-in option<br>■ The third option is Debit Card, for which an application opt-in and email campaign have been employed |
| **OPTIMIZE EXISTING PROPERTIES**<br>■ Castle<br>■ Pepper | **SHORT-TERM v1.0/1.5**<br>■ Quick hits to improve current site experience<br>■ Castle and Pepper page load speed optimized and debit card implementation /Complete<br>■ Google Analytics for Pepper Cash/Completed; in progress for Castle<br>■ Short list of v1.5 UX optimizations to be completed w/o 10/14; Remaining 15 UX optimizations completed early Nov<br>**MEDIUM-TERM v2.0+ (Castle only)**<br>■ Incorporate brand principles through a new site structure, site messaging and features; optimize and enhance<br>**LONG-TERM v3.0+ (Castle only)**<br>■ Introduce innovative solutions, including mobile solution(s) and an enhanced loan product |

9

JA1991

CONFIDENTIAL

| STRATEGY | TACTICS |
|---|---|
| **LAUNCH NEW PROPERTIES** | **SHORT-TERM v1.0/1.5** |
| ▪ Big Picture Loans (Tribal) | ▪ Quick hits to improve current site experience |
| ▪ Chorus Loans (Tribal) | ▪ Big Picture Loans - Launch Date TBD pending ACH configuration; originally planned for 10/4 |
| ▪ Balance Loans (State) | ▪ Chorus Loans - 10/15 launch |
| | ▪ Balance Credit /CA - Launch Date to be confirmed; some time between 11/11 and 11/29 |
| | **MEDIUM-TERM v2.0+** |
| | ▪ Incorporate brand principles through a new site structure, site messaging and features; optimize and enhance (e.g. re-skin graphics) |
| | **LONG-TERM v3.0+** |
| | ▪ Introduce innovative solutions, including mobile solution(s) and an enhanced loan product |

10

JA1992

CONFIDENTIAL

| STRATEGY | TACTICS |
|---|---|
| **ACQUISITION** | **INCREASE ACQUISITION** |
| | ■ Reduce dependency on aggregators by utilizing Direct Marketing, SEM, Email |
| | ■ Optimize all points of contact (email, call center, direct) |
| | ■ Marketing (TV, Print, Radio, OOH, Digital) |
| | ■ Innovation - e.g. Need type based marketing (e.g. at point of purchase); Scan card and text to apply; Peer-based/crowd-funded application process; Free membership Angie's List; Payment directly to creditors; Recurring micro-payments |
| **CONVERSION** | **SHORT-TERM v1.0+/1.5** |
| | ■ Quick hits to improve current site experience - application flow and landing pages |
| | ■ Email follow-up in response to opt-outs and incomplete apps |
| | **MEDIUM-TERM v2.0+** |
| | ■ Incorporate brand principles through a new site structure, site messaging and features; optimize and enhance |
| | **LONG-TERM v3.0+** |
| | ■ Introduce innovative solutions, including mobile solution(s) and an enhanced loan product, e.g. Co-op dividends; Recurring micro-payments; Payment directly to creditors; |

11

JA1993

PHEN0002909

| STRATEGY | TACTICS |
|----------|---------|
| **RETENTION** | **SHORT-TERM v1.0+/1.5** |
| | ■ Quick hits to improve current site experience |
| | **MEDIUM-TERM v2.0+** |
| | Incorporate brand principles through a new site structure, site messaging and features; optimize and enhance (e.g. re-skin graphics) |
| | **LONG-TERM  v3.0+** |
| | ■ Introduce innovative solutions - e.g. Value add mobile apps; Proprietary retention/reapplication algorithm; Personalized loan products - including pre-qual options; Peer-based/crowd-funded application process |
| **RAISE CAPITAL** | **DEFINE, POSITION AND GROW SOURCEPOINT** |
| | ■ Re-brand with portfolio strategy |
| | ■ Change name from SourcePoint to Liont |
| | ■ Produce Marketing Materials - portfolio, site, collateral |
| **INDIAN ANALYTICS** | **MARKET AND SELL-IN** |
| | ■ Brand as full-service entity  that provides slot machines, analytics, management and marketing |
| | ■ Produce Marketing Materials - portfolio, site (section within Liont site), collateral |

12

JA1994

PHEN0002910

NEXT STEPS

# NEXT STEPS

- Discuss feedback and timing on Communications Plan

- Make refinements

- Map out near-term vs. longer-term opportunities

13

JA1995

CONFIDENTIAL

PHEN0002911



Appendix

JA1996

## WHAT THIS MEANS

| Brand | Benefit Area | Brand Idea | Branding Implications | Hero Feature to Highlight |
|---|---|---|---|---|
| **Balance** | Immediacy & Simplicity | Consider it done | Imagery and graphics should focus on immediacy and efficiency Copy should be short and concise Site should feature minimal content and pages | Real-time approvals and immediate (15 minute) deposits |
| **Big Picture** | Humanity & Approachability | For what matters most | Imagery and graphics should focus on families and uplifting moments Colors should be bright and positive Copy should be friendly and conversational | Testimonials from borrowers |
| **Castle (On hold)** | Guidance | Partners in your time of need | Imagery should connote partnership/ working together Copy and messaging should provide guidance and advisement A focus should be placed on customer service | Payment Plans & Grace Period |
| **Chorus** | Transparency & Clarity | Clarity that cuts through confusion. | Imagery and graphics should focus on transparency, clarity, and focus. Copy and messaging should focus on providing clear information. | 24 hour chat functionality & Loan Calculator |

CONFIDENTIAL    JA1997    PHEN0002913

**FUTURE STATE**



Sourcepoint VI
Name: TBD
Brand Idea: Fortune favors the bold

Tribes

Castle
Name: TBD
Benefit Area:  Guidance
Brand Idea:Partners in your time of need

Balance
Benefit Area:  Immediacy/Simplicity
Brand Idea:  Consider it done

First Nation
Name: TBD
Benefit Area: TBD
Brand Idea: TBD

Chorus
Benefit Area:  Transparency/Clarity
Brand Idea:  Clarity that cuts through
confusion.

Big Picture
Benefit Area:  Humanity
Brand Idea:  For what matters most

JA1998

12

**Corporate Equity/Member Interests**



JA1999

CONFIDENTIAL



CONFIDENTIAL

JA2000

PHEN0002916

# Exhibit 35

---

**Message**

---

| | |
|---|---|
| **From:** | Arash Kazeminejad [arash@phenomenon.com] |
| **Sent:** | 10/22/2013 1:40:42 AM |
| **To:** | legal@phenomenon.com |
| **Subject:** | Fwd: XCentium SOW 2 |
| **Attachments:** | XCentium_SOW2 (4)-signed.pdf; XCentium_MSA_Bellicose redline_XC 10-15a-signed.pdf |

---

---------- Forwarded message ----------
From: **Justin Martorello** <JustinM@bellicosevi.com>
Date: Mon, Oct 21, 2013 at 5:54 PM
Subject: RE: XCentium SOW 2
To: "steve.miller@xcentium.com" <steve.miller@xcentium.com>, Matt Martorello <mattm@bellicosevi.com>
Cc: Amrit Raj <amrit.raj@xcentium.com>, Arash Kazeminejad <arash@phenomenon.com>,
"bill.long@xcentium.com" <bill.long@xcentium.com>


MSA and SOW attached.  Please return fully executed versions.


Thanks!


**From:** Steve Miller [mailto:steve.miller@xcentium.com]
**Sent:** Monday, October 21, 2013 4:03 PM
**To:** steve.miller@Xcentium.com; Justin Martorello; Matt Martorello
**Cc:** 'Amrit Raj'; 'Arash Kazeminejad'; bill.long@xcentium.com; James Dowd
**Subject:** RE: XCentium SOW 2
**Importance:** High


Justin – good morning. Can we get the SOW and MSA signed and back to us today? Please let Amrit or I know if you have any questions.


Thanks!


**Steve Miller** | XCentium | Partner | **(719) 360-2368**

NOTICE.  The information contained in this electronic mail transmission is intended for the use of the named individual or entity to which it is addressed and may contain information that is privileged or otherwise confidential. It is not intended for transmission to, or receipt by, any individual or entity other than the named addressee. If you have received this electronic transmission in error, please delete it without copying or forwarding it, and notify the sender of the error.

---

**From:** Steve Miller [mailto:steve.miller@xcentium.com]
**Sent:** Friday, October 18, 2013 2:11 PM
**To:** 'Justin Martorello'; 'Matt Martorello'
**Cc:** 'Amrit Raj'; Arash Kazeminejad; bill.long@xcentium.com; 'James Dowd'
**Subject:** RE: XCentium SOW 2

JA2002

CONFIDENTIAL

PHEN0003893

Hi Justin – Updated SOW per our conversation attached

**Steve Miller** | XCentium | **Partner** | **(719) 360-2368**

NOTICE: The information contained in this electronic mail transmission is intended for the use of the named individual or entity to which it is addressed and may contain information that is privileged or otherwise confidential. It is not intended for transmission to, or receipt by, any individual or entity other than the named addressee. If you have received this electronic transmission in error, please delete it without copying or forwarding it, and notify the sender of the error.

---

**From:** Justin Martorello [mailto:JustinM@BellicoseVI.com]
**Sent:** Friday, October 18, 2013 10:45 AM
**To:** steve.miller@Xcentium.com; Matt Martorello
**Cc:** Amrit Raj; Arash Kazeminejad; bill.long@xcentium.com; James Dowd
**Subject:** RE: XCentium SOW 2


This is a good starting point.


Some notable changes below.  We might want to do a call to discuss.


1.   Castle and Pepper Bootstrap
a.   10 of 20 minor enhancements are being applied today and tomorrow.
b.   The remaining 10 will not be applied to Bootstrap
2.   CMS
a.   To be completed mid-next month
b.   Castle, Pepper and Balance will be added to CMS
c.   No Balance integrations – only the shell will exist
         i.   Balance will be sold and the site will be included
         ii.   Since we cannot say which Loan Management System the buyer will choose, integrations are pointless
d.   Bootstrap versions of Castle and Pepper will be scrapped
3.   Chorus and BigPicture
a.   FULL STOP – given the massive attacks on the industry we do not plan use these sites
b.   We may decide to use them in the next few months if things change for the better




**From:** Steve Miller [mailto:steve.miller@xcentium.com]
**Sent:** Friday, October 18, 2013 10:15 AM
**To:** Matt Martorello; Justin Martorello
**Cc:** Amrit Raj; Arash Kazeminejad; bill.long@xcentium.com; James Dowd
**Subject:** XCentium SOW 2


JA2003

CONFIDENTIAL

PHEN0003894

Justin – Attached is SOW2 to cover completion of dev work for the LMS framework. Also included in the SOW is a second phase for supporting the LMS post rollout. Please review, I will follow up this afternoon.


Thank You! We appreciate your business.


**Steve Miller** | XCentium | **Partner** | **(719) 360-2368**

NOTICE:  The information contained in this electronic mail transmission is intended for the use of the named individual or entity to which it is addressed and may contain information that is privileged or otherwise confidential. It is not intended for transmission to, or receipt by, any individual or entity other than the named addressee. If you have received this electronic transmission in error, please delete it without copying or forwarding it, and notify the sender of the error.


\*\*This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.\*\*

\*\*This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.\*\*


--
**Arash Kazeminejad**
**Director, Resource Management**

**PHENOMENON**
5900 Wilshire Boulevard, Floor 28
Los Angeles, CA 90036
w +1.323.648.4045
@phenomenon
phenomenon.com


JA2004

CONFIDENTIAL

PHEN0003895

STATEMENT OF WORK - TIME AND MATERIALS

The following information is provided to detail the scope of services that XCentium will perform for Sourcepoint VI, LLC ("Client") on a time and materials basis. The LOAN MANAGEMENT SYSTEM DEVELOPMENT ("Project") will be described within this document in detail below. The scope of work is described in section 1, below ("Scope"). If the scope of these project changes, the terms of this agreement including rates and estimates of amount of time required to complete the Project may be revised and shall be revisited to ensure mutual understanding.

This Project began on October 16, 2013 and is projected to extend to January 30th 2014. Subsequent SOWs will be issued on a monthly basis. This SOW may be amended from time to time based on the requirement identification during the design phase. Such amended versions will be mutually agreed upon, attached to, and subject to the Agreement and this SOW.

## 1. Scope

 Scope, Deliverables, and Schedule of Services to Be Provided: XCentium will perform development, QA and deployment services as directed by Phenomenon Marketing Inc., Client's Project Management and Marketing contractor. The primary goals of this statement of work are as follows:

1. Completion of the new Loan Management System (LMS) Platform utilizing the Orchard CMS/MVC framework.
2. Migration of CastlePayDay and PepperCash sites to the LMS PlatformSupport and maintenance of the LMS Platform upon completion

## The following services are expected to be performed:

- Front and Backend Development
- HTML/CSS/jQuery/JavaScript development
- CMS and loan management system integration
- GDS link decision integration
- Google analytics integration and customization
- Integration of loan application and eSignature
- Capture additional debit card information from application form
- Integration with Repay Debit Card Merchant Gateway
- Bug fixes and optimization to code provided for integration
- Completion of new LMS platform utilizing the Orchard CMS/MVC framework
- Completion of UX optimizations as directed by the Phenomenon UX group
- PepperCash.com
- CastlePayday.com
- Migration of Peppercash.com and CastlePayday.com to new LMS platform
- Addition of State Specific shell to LMS platform so as to allow for future development of dynamically generated Rates and Conditions based on State.
- LMS Platform to be coded to allow for ease of packaging and selling to 3rd party entities.
- LMS Platform to be coded in such a way as to have an abstraction layer between the LMS Platform and the back end LMS
- Continued production support and occasional minor enhancements to PepperCash and CastlePayday sites if required.
- Production and maintenance support of the new LMS framework

This statement of work covers two phases. Phase one will include completion of the LMS framework and the

JA2005

CONFIDENTIAL                                                                                                      PHEN0003896

work necessary to migrate both all existing sites to the new LMS framework. Phase two will include production and maintenance support of the sites on the new LMS framework until the end of the SOW period (Jan 30, 2014). The expected delivery date of LMS Framework is 11/27/2013, but may occur sooner or later depending on changing requirements.

## 2. Fees

The allotted maximum time per month is 750 hours at a rate of $140/hour. XCentium must ask for and receive written approval in advance from Sourcepoint VI to work beyond the 750 hour threshold. XCentium can only invoice for hours actually worked. The hours consumed by the XCentium will decrease following deployment of the LMS platform. The fee estimate therefore will have two phases

Phase one – LMS Development estimated monthly fees

| Resource | Hours/month | Rate | Estimate |
|---|---|---|---|
| Bill Long | 180 | 140 | $25,200 |
| Rick Zaki | 170 | 140 | $23,800 |
| Matt Glover | 170 | 140 | $23,800 |
| David Brandenburg | 170 | 140 | $23,800 |
| Steve Miller | 60 | 140 | $8,400 |
| **Totals** | **750** | | **$105,000** |

Phase two - LMS support and maintenance estimated monthly fees

| Resource | Hours/month | Rate | Estimate |
|---|---|---|---|
| Bill Long | **40** | 140 | $5600 |
| Rick Zaki | **20** | 140 | $2800 |
| Matt Glover | 40 | 140 | $5600 |
| | | | |
| Steve Miller | 20 | 140 | $2800 |
| **Totals** | **120** | | **$16,800** |

## 3. Timeline

This SOW covers the period 10-13-2013 to 1-30-2014.
Phase 1 covers the period 10-13-2013 until the LMS platform has been completed and accepted by Client.
Phase 2 covers the period from LMS acceptance until 1-30-2014.

JA2006

CONFIDENTIAL

PHEN0003897

Sourcepoint VI: LMS DEVELOPMENT

## 4. Assumptions

- ☐ Client will provide access to source systems
- ☐ Work will be done remotely
- ☐ Phenomenon will provide project tasks and priorities on behalf of the client
- ☐ Client will provide User Acceptance Testing

## 5. Invoicing

XCentium will invoice Client Ten Thousand Dollars ($10,000.00) as a retainer at the signing of this SOW and this invoice will be due immediately. XCentium will send invoices related to the Bellicose VI work to PHENOMENON before they are sent to Client, so as to allow PHENOMENON to review and approve documented hours and work. Additionally, XCentium will provide PHENOMENON weekly timesheet reporting, which PHENOMENON will review with Bellicose IV weekly, so as to help manage and prioritize future workload.  These timesheet reports will be provided by Monday 10am PST. All work will be invoiced on time and materials, hourly basis. XCentium will submit an invoice bi-weekly to Client for all fees and direct expenses incurred hereunder. Invoices shall be generated from XCentium's standard time records.  Time records for each XCentium consultant performing work hereunder shall be available to Client upon request.  XCentium standard time records shall be the basis for determining fees to be billed to Client under this Agreement. The last two (2) invoices of the project will be credited against the retainer and any remaining credit will be refunded to the client within ten (10) days of project closure.

The undersigned parties do hereby agree and warrant that on the date that this document has been signed are duly authorized to act on behalf of their respective organizations and are duly able to take all appropriate action to execute this SOW.   This SOW is valid for a period of ten (10) days following delivery to Client.

**This Statement of Work is incorporated into the Master Services Agreement dated   10/16   , 2013**

| XCentium | Sourcepoint VI |
|---|---|
| By: | By: _(signature)_ |
| Name: | Name:  Justin Martorello |
| Title: | Title:  **Vice President** |
| Date: | Date:  10/21/2013 |

JA2007

CONFIDENTIAL

## MASTER SERVICES AGREEMENT

This Master Services Agreement (the "Agreement") is dated as of October _16_, 2013 (the "Effective Date"), and is made by and between SolnSoft LLC (DBA XCentium), a California Limited Liability Company ("XCentium"), and Bellicose VI, LLC, with an office at 5322 Yacht Haven Grande, Box 7, St. Thomas, VI 00802 ("Client"), with respect to certain consulting and professional services to be provided by XCentium as described herein. XCentium and Client may individually be referred to as a "Party" and collectively as "Parties". The Parties hereby agree to the following terms and conditions in connection with the providing of such services.

1. **Services**. XCentium shall perform, for Client, the consulting and professional services ("Services") specified in one or more Statements of Work ("SOW"), each of which shall incorporate by reference the terms and conditions of this Agreement as though the terms and conditions were contained therein. Changes to the nature and scope of the Services shall be made only in a writing executed by authorized representatives of both Parties. Notwithstanding the foregoing, if XCentium, due to some urgency on the part of and at the request of Client, performs work that is not covered by a Statement of Work or that exceeds the nature or scope of Services defined in the applicable Statement of Work, such work shall be deemed Services provided pursuant to this Agreement for which Client shall compensate XCentium. If there is any conflict between the terms of this Agreement and the SOW, the SOW shall control.

2. **Compensation**. The parties agree that XCentium shall be compensated by Client for its consulting and professional fees as invoiced and as specified in the Statements of Work. XCentium shall also be compensated by Client for any pre-approved software or hardware which is purchased from third party vendors ("Third Party Products") on behalf of and then sold to Client. Client shall pay all undisputed amounts payable to XCentium hereunder within twenty (20) days of Client's receipt of an invoice. Any undisputed invoice remaining unpaid for more than thirty (30) days from Client's receipt thereof shall accrue interest at a rate of one and one-half percent (1½%) per month. In addition, Client shall reimburse XCentium for all reasonable expenses pre-approved in writing and incurred, including, but not limited to, travel and lodging expenses, communications charges and supplies.

3. **Term**. Either party may terminate this Agreement by giving thirty (30) days' prior written notice to the other. In the event of any such termination, XCentium shall be compensated pro rata for its professional and consulting fees and for expenses incurred with respect to the Services through the effective date of termination (including the notice period) in accordance with Section 2, herein, but will not be entitled to any additional compensation. Notwithstanding the foregoing, Client may terminate this Agreement immediately in the event that XCentium materially breaches any of the provisions of this Agreement.

4. **Client Dependencies**. Client understands that XCentium's performance is dependent on timely decisions and approvals by Client. Client can only reject items delivered by XCentium ("Deliverables") if the Deliverables are not in substantial conformance with the specifications set forth in the applicable Statement of Work and Client provides a written statement setting forth the reasons for rejection. All Deliverables provided to the Client for approval shall be deemed accepted if, within ten (10) days after delivery, Client has not provided to XCentium the written notice identifying specifically the basis for not approving the Deliverable.

5. **Lost Time.** XCentium shall use reasonable efforts to make timely deliveries under this Agreement, however, given the complexities of the project described in the SOW and XCentium's reliance on Client performance and assistance, delivery dates cannot be guaranteed. XCentium's scheduled commitments under this Agreement, including any delivery of any deliverable or achievement of any milestones, that are dependent upon resolution of the cause of a Lost Time Event shall be extended by the period of the delay caused by the Lost Time Event. XCentium's failure to meet its commitments, which result from a Lost Time Event, shall not constitute a breach of this Agreement by XCentium.

Both parties shall cooperate in good faith to avoid events within each other's respective control that would result in XCentium being delayed in performing the Services under the schedule provided for in the SOW, despite XCentium being willing and able to perform the Services in a timely fashion. Any such events, the avoidance of which was within Client's reasonable control, shall be lost time events ("Lost Time Events"). XCentium shall immediately notify Client of any potential Lost Time Event and provide a reasonable estimate of the corresponding delay ("Lost Time").

For a lost time event, , Client shall pay XCentium for the lesser of:
1) the amount of time of the actual delay (up to 8 hours per day), multiplied by the hourly rate of each consultant

JA2008

PHEN0003899

affected by the Lost Time Event up to a maximum of thirty (30) days, or 2) if the amount of time estimated to complete particular deliverable affected by the Lost Time Event is less than thirty days, the amount of time of the estimate (up to 8 hours per day) multiplied by the hourly rate of each consultant that would have worked on the affected deliverable.

XCentium must submit an invoice related to such deliverable or Lost Time Event in accordance with this Agreement.

6. **Confidentiality**. "Confidential Information" refers to the materials and information disclosed in any manner (whether orally, visually, or in tangible form) by Client to XCentium that is marked or otherwise identified as confidential at the time of disclosure, or which given facts and circumstances under which such material or information is disclosed, should reasonably be considered confidential. XCentium agrees that it will not disclose, resell, or otherwise transfer Confidential Information to any person or entity (except parents, affiliates, employees, agents and subsidiaries with a reasonable need to know, provided that each aforementioned party agrees to be bound by this provision prior to disclosure), copy, use or modify Confidential Information received from Client for any purpose not authorized by Client. This covenant will be enforceable during the term of this Agreement and will continue to remain in effect after the termination of this Agreement. The confidentiality and disclosure requirements contained in this Section shall not apply where the subject Confidential Information: (a) was already in XCentium's possession at the time of the disclosure; (b) is rightfully received by XCentium from a person or entity legally in possession of such information and; (c) is or hereafter becomes public knowledge through no act or fault of XCentium; (d) is proven by written evidence to have been independently developed by XCentium without any reference to the Confidential Information; or (e) is disclosed by XCentium pursuant to the requirement or request of a governmental or judicial entity having valid jurisdiction, or pursuant to the operation of law, provided however, in the event that a XCentium must disclose Confidential Information to a court or other governmental agency XCentium shall (1) provide Client prompt and timely written notice, which for purposes of this Section shall mean no less than five (5) business days, so that Client may take steps to oppose such disclosure, and (2) cooperate with Client in its attempts to oppose such disclosure and seek a suitable protective order, provided that such opposition is reasonable in light of applicable law or regulation. In any event of compelled disclosure, XCentium shall disclose only that portion of the Confidential Information that it is legally required to disclose and will exercise its best efforts to obtain assurances that confidential treatment will be accorded such disclosed Confidential Information.

7. **Data Security**. XCentium will maintain at all times during the term of this Agreement comprehensive information security programs designed to protect the physical and technical security, confidentiality, and integrity of any sensitive consumer information provided to or maintained by XCentium ("Data"). In the event that any Data has been disclosed or revealed by XCentium to, or accessed by, any unauthorized person or to any unauthorized third party, whether inadvertently, by means of a breach of XCentium's security processes or otherwise (a "Security Breach"), XCentium shall promptly after it becomes aware of such Security Breach, provide Client with written notice of such Security Breach, and immediately and at its own expense investigate and take steps to identify, prevent, and mitigate the effects of such Security Breach. Further, XCentium agrees to bear any cost or loss that Client may incur as a result of such Security Breach ( including without limitation the cost of any notification to affected Consumers) required of or undertaken by Client and/or the cost, including any fines or penalties of complying with any governmental inquiry or investigation related to any such Security Breach.

8. **Work Product**. The Parties hereto understand this to be a contract for services wherein the materials, services, development, inventions, and innovations developed by XCentium specifically for use by Client shall be considered a "work-made-for-hire," and shall be the exclusive property of Client. XCentium hereafter assigns all right, title, and interest in the same to Client. XCentium acknowledges and agrees that it does not have nor will it claim to have, either under this Agreement or otherwise, and right, title, or interest of any kind or nature in or to the materials so created specifically for Client hereunder. Notwithstanding the foregoing, any and all reports, methodologies, processes, procedures, technologies, designs, concepts, ideas, inventions, management tools, databases, know-how, and trade secrets of XCentium in existence or hereinafter created that XCentium uses in connection with Client or the services rendered under this Agreement, or incorporates into Client's operations, processes, marketing plans, or programs or other aspects of the services ("XCentium Intellectual Property"), are and shall remain the sole and exclusive property of XCentium. To the extent that XCentium Intellectual Property is incorporated into any work product or deliverable developed by XCentium hereunder, XCentium hereby grants to Client a non-exclusive, royalty-free right to use, display, distribute, modify, and copy derivative works (collectively, "Distribute") and have Distributed, to and by third parties, such XCentium Intellectual Property in conjunction with such work product or deliverable and modified versions thereof. For avoidance of doubt, any databases and other information created by and for Client's use with respect to its customers and other business contacts, and/or

JA2009

PHEN0003900

containing individually-identifying information relating to Client's customers, associates, or others shall not be considered XCentium Intellectual Property ("Client Data"). All Client Data (and any derivative works thereof or modifications thereto) is and will remain the exclusive property of Client or its affiliates, as applicable. XCentium will not possess or assert any lien or other right against or to Client Data. No Client Data, or any part thereof, will be sold, assigned, leased, or otherwise disposed of to third parties by XCentium or commercially exploited by or on behalf of XCentium, its employees, or agents. XCentium shall, upon termination or expiration of this Agreement, promptly return to Client all or any requested portion of Client's Data that may be in XCentium's possession or control. Except as set forth in this Agreement, Client shall not have or acquire any right, claim, title, or interest in or to any XCentium Intellectual Property and shall treat XCentium Intellectual Property as Confidential Information. Likewise, any and all reports, methodologies, processes, procedures, technologies, designs, concepts, ideas, inventions, management tools, databases, know-how, trade secrets, and other intellectual property of Client in existence or hereinafter created that XCentium may use or be provided with in connection with the services rendered under this Agreement and any SOW ("Client Intellectual Property") are and shall remain the sole and exclusive property of Client. XCentium shall not have or acquire any right, claim, title, or interest in or to any Client Intellectual Property and shall treat Client Intellectual Property as Confidential Information.

9. **Indemnification**. The Client hereby agrees to indemnify and hold harmless XCentium and its employees, principals (partners, directors, shareholders, members, managers or other holders of an ownership interest, as the case may be) and agents, from and against any third party claims, demands, loss, damage or expense relating to or resulting from (i) bodily injury or death of any person or damage to real and/or tangible personal property directly caused by the gross negligence or willful misconduct of Client, its personnel or agents; (ii) material breach of any warranty, covenant or representation of Client hereunder; (iii) the use by the Client of XCentium's Services or any Deliverable or (iv) any claim against XCentium that any product or written materials  provided by Client infringes any intellectual property or privacy or publicity right of any third party, and will reimburse XCentium for all expenses (including attorneys' fees) as incurred by XCentium in connection with any such action or claim.

XCentium hereby agrees to indemnify and hold harmless Client and its employees, principals (partners, directors, shareholders, members, managers or other holders of an ownership interest, as the case may be) and agents, from and against any third party claims, demands, loss, damage or expense relating to or resulting from (i) bodily injury or death of any person or damage to real and/or tangible personal property directly caused by the gross negligence or willful misconduct of XCentium, its personnel or agents; (ii) material breach of any warranty, covenant or representation of XCentium hereunder; (iii) any claim against Client that any product or written materials  provided by XCentium infringes any intellectual property or privacy or publicity right of any third party, and will reimburse Client for all expenses (including attorneys' fees) as incurred by Client in connection with any such action or claim.

10. **Non-solicitation of Employees**. Neither Party, nor any of its subsidiaries, affiliates, employees or agents, shall, either directly or indirectly, (i) solicit, entice, or induce any employee, subcontractor or agent of the other Party who has been involved in the provision of Services under this Agreement to leave the employment or to sever its relationship with the other Party during the term of this Agreement or for one year thereafter; or (ii) hire, employ, or engage the services of (other than under the terms of this Agreement) any employee, subcontractor or agent of the other Party who has been involved in the provision of Services under this Agreement during the term of this Agreement or for one year thereafter.

11. **Independent Contractor**. The Parties agree that XCentium is an independent contractor to Client and will not be deemed an employee of Client for any purpose whatsoever. Without limiting the foregoing, all income taxes arising from or in connection with professional fees paid by Client to XCentium for the services provided under this Agreement shall be borne by XCentium.  Neither Party nor its directors, officers, members, managers, partners, employees or agents shall have authority to bind or make any commitment on behalf of the other Party.

12. **Survival and Succession**. This Agreement shall survive the completion or termination of the Services and any related services provided by XCentium. Further, this Agreement, in its entirety, shall inure to the benefit of and be binding on the successors and assigns of the Client and XCentium.

13. **Assignment**. Neither of the Parties hereto shall assign or transfer its interest in this Agreement or any portion thereof without the prior written consent of the other party except that (i) upon receipt of approval from XCentium concerning the creditworthiness of a possible assignee ("Possible  Assignee"), which approval shall not be unreasonably withheld, Client may assign or transfer its rights and obligations under this Agreement to a Possible Assignee, if the Possible Assignee is a subsidiary or entity controlling, controlled by or under common control with Client (an "Affiliate") or to any entity that acquires all or substantially all of the assets of Client or more than 50% of

JA2010

CONFIDENTIAL

the current outstanding voting stock of Client and (ii) XCentium shall be entitled to assign the right to receive any compensation received hereunder to a third party without the prior written consent of Client, subject to restrictions of applicable law.

14. **Limitation of Liability**. NOTWITHSTANDING ANYTHING TO THE CONTRARY HEREIN, ALL LIABILITY OF XCENTIUM UNDER THIS AGREEMENT SHALL BE LIMITED TO THE AMOUNTS OWED TO XCENTIUM BY CLIENT FOR WORK ACTUALLY PERFORMED BY XCENTIUM PURSUANT TO THE SPECIFIC SOW WHICH IS THE SUBJECT OF ANY SUCH CLAIM OR DISPUTE AND THERE SHALL BE NO LIABILITY FOR ANY SPECIAL, CONSEQUENTIAL, INCIDENTAL OR PUNITIVE LOSS (INCLUDING, BUT NOT LIMITED TO, BUSINESS INTERRUPTION, LOST BUSINESS OR LOST SAVINGS), WHETHER BASED ON A THEORY OF BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE) OR OTHERWISE. WITH REGARD TO SERVICES PERFORMED BY XCENTIUM FOR CLIENT, SUCH SERVICES ARE PERFORMED WITH NO IMPLIED OR EXPRESS WARRANTIES FOR FITNESS FOR ANY PARTICULAR USE, FUNCTIONALITY, OPERABILITY OR MARKETABILITY.  XCENTIUM DOES NOT IN ANY WAY WARRANT ANY THIRD PARTY PRODUCTS, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE OR NON-INFRINGEMENT, AND CLIENT AGREES THAT ANY AND ALL WARRANTY CLAIMS REGARDING THIRD PARTY PRODUCTS SHALL BE MADE DIRECTLY TO THE THIRD PRODUCT PARTY VENDORS AND MANUFACTURERS ONLY AND NOT TO XCENTIUM.

15. **Representations and Warranties of XCentium**. XCentium represents and warrants that:

(a)    It will comply with all applicable laws and regulations in its performance of this Agreement.

(b)    It will follow reasonable quality assurance procedures and maintain confidentiality of Confidential Information.

(c)    It will obtain and keep current any licenses that may be required for it to engage in the provision of the services described in this Agreement.

(d)    It will maintain internal policies that it shall follow in its provision of the services described in this Agreement.

(e)    It will maintain a compliance department in order to ensure compliance with applicable laws and regulations.

(f)    It will at all times take all reasonable steps in accordance with the highest industry standards to guard against data security breaches and will maintain appropriate administrative, technical and physical safeguards to protect sensitive customer information. It will promptly disclose any data breaches to Client.

16. **Audit Rights**. Client shall have the right to audit XCentium relative to XCentium's provision of services to Client and related to XCentium's compliance with this Agreement and all applicable laws and regulations related to its provision of services, and XCentium shall provide access to any of its books, records and personnel in order for Client to perform the audit described in this section, in each case during XCentium's normal business hours and upon reasonable prior notice to XCentium. XCentium agrees that Client may use commercially reasonable methods to confirm compliance with the terms and conditions of this Agreement and all applicable laws and regulations.

17. **Severability**. The various provisions and sub-provisions of this Agreement are severable and if any provision or sub-provision or part thereof is held to be unenforceable by any court of competent jurisdiction, then such enforceability shall not affect the validity or enforceability of the remaining provisions or sub-provisions or parts thereof.

18. **Entire Agreement/Governing Law**. This Agreement (including attached Statements of Work, exhibits and other attachments) constitutes the entire agreement between the Parties and supersedes all prior discussions, agreements and understandings, oral and written, and may not be modified or amended except in writing signed by both Parties. The laws of the State of California, excluding that body of law controlling conflicts of law, will govern all disputes arising out of or relating to this Agreement and venue shall lie in the Los Angeles County Superior Court.

19. **Attorneys' Fees**. Should it be necessary for XCentium to retain counsel in an effort to collect fees due as a result of this Agreement, the prevailing party in such effort, whether a lawsuit is filed or not, shall be entitled to

CONFIDENTIAL

JA2011

PHEN0003902

recover its reasonable attorneys' fees and the costs associated with such effort.

20. **Notices**. Any notices under this Agreement shall be sent by certified mail, return receipt requested, or by facsimile (provided that the sender received electronic confirmation of receipt by recipient) to the address specified below or such other address as the party specifies in writing. Such notice will be effective, if by facsimile upon receipt or if by mail, forty-eight (48) hours after being deposited at a United States Postal Facility for the collection of mail.

21. **No Waiver**. In no event shall any delay, neglect or forbearance on the part of Client or XCentium in enforcing any provision of this Agreement be or be deemed to be a waiver thereof or in any way prejudice any right of Client or XCentium under this Agreement.

22. **Counterparts**. This Agreement may be executed in counterparts, and all such counterparts will constitute one agreement. Signatures transmitted via facsimile, and facsimiles of this Agreement, shall be as valid and have the same force and effect as the original. Each Party represents and warrants to the other that the individual executing this Agreement on its behalf is duly authorized to do so.

| SOLNSOFT LLC (DBA XCentium) | Sourcepoint VI, LLC |
|---|---|
| By: | By: |
| Name: | Name: Justin Martorello |
| Title: | Title: Vice President |
| Date: | Date: 10/16/2013 |

CONFIDENTIAL                                                                                                   PHEN0003903

Exhibit 36

**From:** Matt Martorello
**To:** Karrie Wichtman; Justin Martorello
**Subject:** RE: 2014 08 22 TC Resolution 2014____ Approving Chorus Loans_final.docx
**Date:** Monday, August 25, 2014 11:27:30 AM
**Attachments:** BigPicture_DesignsR03 20130923.pdf
Big Picture Brand Pyramid.pdf

Ok, sorry for the run around here Karrie... Chorus has been sold.  Attached is another really great brand with just as much energy, money and time spent into developing.  Assuming LVD buys SPVI, BigPictureLoans.com would be an excellent domain.  If LVD doesn't buy SPVI, then FirstNationLoans.com is the domain we can provide (which we haven't yet gotten around to build out/design).

-----Original Message-----
From: Karrie Wichtman [mailto:kwichtman@rosettelaw.com]
Sent: Monday, August 25, 2014 11:58 AM
To: Matt Martorello; Justin Martorello
Subject: 2014 08 22 TC Resolution 2014____ Approving Chorus Loans_final.docx


**This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

ROSETTE043437

JA2014

PHENOMENON

Confidential ©2013 PHENOMENON

# Big Picture Site Designs

BELLICOSE \\ 2013.09.23



CONFIDENTIAL                                                                    ROSETTE043439

JA2016



CONFIDENTIAL

ROSETTE043440

JA2017



CONFIDENTIAL

ROSETTE043441



CONFIDENTIAL

ROSETTE043442

JA2019



ROSETTE043444

CONFIDENTIAL

JA2021

# BIG PICTURE LOANS

| HOME | APPLY NOW | CUSTOMER LOGIN | REQUIREMENTS | FAQ | CONTACT |

**APPLY NOW!**

## REQUIREMENTS

**You have questions?**
Here is some information that may provide the answers!

### Apply online in under a few minutes!

- You must have steady income of at least $700.00 per month.
- You must be able to show a verifiable source of income.
- You must have an open bank account in good standing.
- You must be reachable by phone.
- You must be at least 18 years old and a US citizen.

### How the process works

1. Review the terms of website use and privacy policy.
2. Fill out the application using our secure website and submit.
3. Electronically sign your loan documents.
4. Print out your loan documents and retain for your files.
5. A customer service representative may call to verify your information and employment.
6. If you loan is approved, Castle Payday will deposit the loan proceeds into your bank account or mail you a check the next business day, depending on your funding selection.

Home | Apply Now | Customer Login | Requirements | About | FAQ
Educational Reputation | Contact Us | Privacy Policy | Terms of Website Use

BigPictureLoans.com | ©2013 | All Rights Reserved | 888.942.2727

First time BigPictureLoans.com customers typically qualify for a loan of $200 to $1,000. Real Rock Tribal Lending, LLC (D.B.A. BigPictureLoans.com) is a tribal enterprise wholly owned and operated by the Lac Vieux Desert Band of Lake Superior Chippewa Indians, a federally recognized American Indian tribe and sovereign government. Applicable tribal and federal law shall govern any agreement entered into as a result of your loan application. BigPictureLoans.com's contents do not supply a solicitation or offer for loans in all areas. Areas of operation may change even as actual notice. Services mentioned on this website may or may not be available in your particular area. Each communication or transaction conducted via BigPictureLoans.com will be deemed to have occurred in BigPictureLoans.com's Lac Vieux Desert Band of Lake Superior Chippewa Indians office, regardless of the location where you accessed or viewed this website. All content existing and/or submitted to and in association with this website will be considered BigPictureLoans.com's property. All communications with the company are deemed confidential. Any unauthorized reproduction, distribution or disclosure is prohibited absent company's express written consent.

Consumer Notice:
Big Picture Loans should be used for short-term financial needs only, not as a long-term financial solution. Individuals with credit difficulties should seek credit counseling.

ROSETTE042446

CONFIDENTIAL

JA2022

**BIG PICTURE LOANS**

| HOME | APPLY NOW | CUSTOMER LOGIN | REQUIREMENTS | FAQ | CONTACT |

**APPLY NOW!**

**You have questions?**
Here is some information that may provide the answers!

# FAQ

**Q: How much can I borrow from Big Picture?**
A: The amount you can borrow is contingent upon your income level and various underwriting criteria.

**Q: How quickly will I receive my loan from Big Picture?**
A: If all the pertinent information is received by 8:00 p.m. EST and can be verified, you will generally receive your money the next business day.

**Q: Will someone from Big Picture contact me after I've submitted my loan application?**
A: If you have applied between 9:00 a.m. and 8:00 p.m. EST on business days (Monday-Friday, except for holidays) and included all necessary information, you should expect to hear from us within 15 minutes. Otherwise you will hear from us within one business day. We will call or email you for missing information.

**Q: How will I know if I'm approved for a loan?**
A: The amount you can borrow is contingent upon your income level and various underwriting criteria.

**Q: Once paid off, when can I apply for another loan?**
A: You can apply for a new loan any time after your current loan is paid off. We may ask you to prove your previous loan has been paid in full, unless the previous loan was paid more than three business days prior to applying for a new loan.

**Q: What is required to obtain a Big Picture loan?**
A: Qualifying is easy. You merely need to meet the following minimum requirements:

Currently receive regular income of at least $700/month
Be at least 18 years of age and a U.S. resident
Have an active bank account in good standing

Even bankruptcy, bounced checks, charge-offs and other credit problems won't prevent you from receiving a loan from Castle Payday. Other requirements may apply. Castle Payday loans are not available in all states. States serviced by Castle Payday may change from time to time with or without notice.

**Q: Does Big Picture's status as a tribal entity have any effect on my loan?**
A: The Lac Vieux Desert Band of Lake Superior Chippewa Indians is a federally recognized American Indian tribe with governmental headquarters in Watersmeet, Michigan. Castle is an economic arm of the tribe, created by the Lac Vieux Desert Band of Lake Superior Chippewa Indians' tribal council, which operates under tribal law for the tribe's benefit. As such, Castle is an entity with tribal sovereign immunity from lawsuits. The tribe, through its economic-development arm doing business as Castle, is dedicated to serving its customers efficiently and effectively. For any customer disputes that may arise, the tribe established the Tribal Dispute Resolution Procedure. For more information on the Tribal Dispute Resolution Procedure, please refer to your loan documents or contact Castle.

**Q: Do either the laws of my state of residence or where I am applying for a loan govern my loan agreement?**
A: No. Your loan agreement will be governed by and construed in accordance with the laws of the Lac Vieux Desert Band of Lake Superior Chippewa Indians, and to the extent applicable, the laws of the United States. The laws of your state of residence or the state where you enter into a transaction with CastlePayday will not apply to any agreement you enter into with us. Indian tribes are sovereign and are not obligated to adhere to state law absent congressional authorization.

Home | Apply Now | Customer Login | Requirements | Rates | FAQ
Educational Resources | Contact Us | Privacy Policy | Terms of Website Use

BigPictureLoans.com | ©2015 | All Rights Reserved | 1.888.946.2727

First time BigPictureLoans.com customers typically qualify for a loan of $200 to $1,000. Red Rock Tribal Lending, LLC (D.B.A. BigPictureLoans.com) is a tribal enterprise wholly owned and operated by the Lac Vieux Desert Band of Lake Superior Chippewa Indians, a federally recognized American Indian tribe and sovereign government. Applicable tribal and federal law shall govern any agreement entered into as a result of your loan application. BigPictureLoans.com's contents do not signify a solicitation or offer for loans in all areas. Areas of operation may change with or without notice. Services mentioned on this website may or may not be available in your particular area. Each communication or transaction conducted via BigPictureLoans.com will be deemed to have occurred in BigPictureLoans.com's Lac Vieux Desert Band of Lake Superior Chippewa Indians offices, regardless of the location where you accessed or viewed this website. All content sensing and/or submitted to and in association with this website will be considered BigPictureLoans.com's copyrighted property. All communications with the company are deemed confidential. Any unauthorized reproduction, distribution, or disclosure is prohibited without the company's express written consent.

Consumer Notice:
Big Picture loans should be used for short-term financial needs only, not as a long-term financial solution. Individuals with credit difficulties should seek credit counseling.

JA2023

ROSETTE043446

# BIG PICTURE LOANS

HOME | APPLY NOW | CUSTOMER LOGIN | REQUIREMENTS | FAQ | CONTACT

## Reach out!
### Feel free to contact us any time!

**APPLY NOW!**

# CONTACT US

**Customer Service**
Phone: 1-888-945-2727
Fax: 1-866-269-3526

**For Questions, Comments or Complaints:**
Email: support@Big-PictureLoans.com

**Hours of Operation:**
Mon-Thu. 8 a.m. to 8 p.m. EST
Fri. 8 a.m. to 6 p.m. EST
Sat-Sun. 9 a.m. to 6 p.m. EST

**Mailing Address:**
CastlePayday.com
Attn: Customer Support
PO Box 704
Watersmeet, MI 49969

Home | Apply Now | Customer Login | Requirements | Rates | FAQ
Educational Resources | Contact Us | Privacy Policy | Terms of Website Use

Big-PictureLoans.com | ©2017 | All Rights Reserved | 1-888-945-2727

First time BigPictureLoans.com customers typically qualify for a loan of $200 to $1,000. Real Rock Tribal Lending, LLC (D/B/A BigPictureLoans.com) is a tribal enterprise wholly owned and operated by the Lac Vieux Desert Band of Lake Superior Chippewa Indians, a federally recognized American Indian tribe and sovereign government. Applicable tribal and federal law shall govern any agreement entered into as a result of your loan application. BigPictureLoans.com's customers do not primarily a solicitation or offer for loans in all areas. Areas of operation may change with or without notice. Services mentioned on this website may or may not be available in your particular area. ("Loan communication or translation conducted via BigPictureLoans.com will be deemed tribal law-occurred in BigPictureLoans.com's Lac Vieux Desert Band of Lake Superior Chippewa Indians offices, regardless of the location where you accessed or viewed this website. All content existing audio submitted to and in association with this website are the considered BigPictureLoans.com's copyrighted property. All communications with the company are deemed confidential. Any unauthorized reproduction, distribution, or disclosure is prohibited without the company's express written consent.

Consumer Notice:
Big Picture loans should be used for short term financial needs only, not as a long-term financial solution. Individuals with credit difficulties should seek credit counseling.

ROSETTE.043447

CONFIDENTIAL

JA2024

**BIG PICTURE LOANS**

| HOME | APPLY NOW | CUSTOMER LOGIN | REQUIREMENTS | FAQ | CONTACT |

## APPLY NOW!

### New Customer Pricing Terms

**AMOUNT YOU WANT TO BORROW:** **$400**

$200                                    $1000

| ANNUAL PERCENTAGE RATE* | BORROWING | $400 | = 1ST FINANCE CHARGE |
| 888 % | | TOTAL TO PREPAY LOAN IN FULL ON OR BEFORE YOUR 1ST DUE DATE. | **$540.00** |

## Payment Schedule for selected Loan Amount

| Payment | Principle Balance | Fee Balance | Total Due | Amount to Payoff |
|---------|-------------------|-------------|-----------|------------------|
| 1 | $400.00 | $140.00 | $140.00 | $540.00 |
| 2 | $400.00 | $140.00 | $140.00 | $540.00 |
| 3 | $400.00 | $140.00 | $140.00 | $540.00 |
| 4 | $400.00 | $140.00 | $140.00 | $540.00 |
| 5 | $400.00 | $140.00 | $140.00 | $540.00 |
| 6 | $400.00 | $140.00 | $165.00 | $540.00 |
| 7 | $375.00 | $131.25 | $156.25 | $506.25 |
| 8 | $350.00 | $122.50 | $147.50 | $472.50 |
| 9 | $325.00 | $113.75 | $138.75 | $438.75 |
| 10 | $300.00 | $105.00 | $130.00 | $405.00 |
| 11 | $275.00 | $96.25 | $121.25 | $371.25 |
| 12 | $250.00 | $87.50 | $112.50 | $337.50 |
| 13 | $225.00 | $78.75 | $103.75 | $303.75 |
| 14 | $200.00 | $70.00 | $95.00 | $270.00 |
| 15 | $175.00 | $61.25 | $86.25 | $236.25 |
| 16 | $150.00 | $52.50 | $77.50 | $202.50 |
| 17 | $125.00 | $43.75 | $68.75 | $168.75 |
| 18 | $100.00 | $35.00 | $60.00 | $135.00 |
| 19 | $75.00 | $26.25 | $51.25 | $101.25 |
| 20 | $50.00 | $17.50 | $42.50 | $67.50 |
| 21 | $25.00 | $8.75 | $33.75 | $33.75 |

* Your APR may vary based on when your first pay date is scheduled. The APR calculation above is based on payments being made every 14 days.
APRs and payment amounts may vary based on loan term. Complete disclosures of APR, fees & other payment terms are contained in your loan agreement.

First time BigPictureLoans.com customers typically qualify for a loan of $200 to $1,000. Red Rock Tribal Lending, LLC (D.B.A. BigPictureLoans.com) is a tribal enterprise wholly owned and operated by the Lac Vieux Desert Band of Lake Superior Chippewa Indians, a federally recognized American Indian tribe and sovereign government. Applicable tribal and federal law shall govern any agreement entered into as a result of your loan application. BigPictureLoans.com's contents do not signify a solicitation or offer for loans in all areas. Areas of operation may change with or without notice. Services mentioned on this website may or may not be available in your particular area. Each communication or transaction conducted via BigPictureLoans.com will be deemed to have occurred in BigPictureLoans.com's Lac Vieux Desert Band of Lake Superior Chippewa Indians offices, regardless of the location where you accessed or viewed this website. All content including services submitted to and/or association with this website will be considered BigPictureLoans.com's copyrighted property. All communications with the company are deemed confidential. Any unauthorized reproduction, distribution, or disclosure is prohibited without the company's express written consent.

Consumer Notice:
Big Picture loans should be used for short term financial needs only, not as a long term financial solution. Individuals with credit difficulties should seek credit counseling.

JA2025

CONFIDENTIAL                                                                                ROSETTE043448

# BIG PICTURE LOANS

| HOME | APPLY NOW | CUSTOMER LOGIN | REQUIREMENTS | FAQ | CONTACT |

**APPLY NOW!**

Big Picture Loans
Educational Resources

| BUDGETING | CREDIT | MONEY MANAGEMENT | IDENTITY THEFT | LIFE CHANGES |

**Watch More Budgeting Videos:**

> **Budgeting Made Easy**
> **Managing Debt**
> **The Budget**
> **Credit Tips to Live By**
> **Student Loan Strategies**

## Learn About Finance

Congratulations on taking this important step to a brighter financial future. This website has over forty videos to help you improve your personal finances. These free tools help you become debt free, use your money wisely, plan for the future, and build wealth. The topics range from budgeting, money management and credit. We also include a section on critical life changing events, and how they can affect you financially. These videos demonstrate our dedication to personal financial literacy and providing a debt-free life for Americans. Simply click any of the topics to begin your video education series.

**MyMoney.gov** - the Federal Government's website dedicated to helping Americans understand more about their money - how to save it, invest it, and manage it to meet their personal goals.

**5 Tips: Improving your credit score** - Board of Governors of the Federal Reserve System. (FederalReserve.gov)

**Consumer Protection** - Your everyday guide to help you prevent identity theft, understand credit and be a smart shopper. (USA.gov)

**Free Credit Report** - This is the official site to obtain a free credit report (AnnualCreditReport.com)

Home | Apply Now | Customer Login | Requirements | Rates | FAQ
Educational Resources | Contact Us | Privacy Policy | Terms of Website Use

Consumer Notices:

Big Picture loans should be used for short-term financial needs only, not as a long-term financial solution. Individuals with credit difficulties should seek credit counseling.

ROSETTE244449

CONFIDENTIAL

HOME        APPLY NOW        CUSTOMER LOGIN        REQUIREMENTS        FAQ        CONTACT

**APPLY NOW!**

Big Picture Loans
Privacy Policy

## PRIVACY POLICY
### Red Rock Tribal Lending, LLC dba Big Picture Loans

Rev July 2015

| FACTS | What does Red Rock Tribal Lending, LLC do with your personal information? |
|---|---|
| Why? | Financial companies choose how they share your personal information. Federal law gives consumers the right to limit some but not all sharing. Federal law also requires lenders to tell you how they collect, share, and protect your personal information. Please read this notice carefully to understand what we do. |
| What? | The types of personal information we collect and share depend on the product or service you have with us. This information can include: Social Security number and income; Account balances and payment history; Credit history and credit scores |
| How? | All financial companies need to share customers' personal information to run their everyday business. In the section below, we list the reasons financial companies can share their customers' personal information; the reasons Red Rock Tribal Lending, LLC chooses to share; and whether you can limit this sharing. |

| Reasons we can share your personal information | Does Red Rock Tribal Lending share? | Can you limit this sharing? |
|---|---|---|
| For our everyday business purposes— such as to process your transactions, maintain your account(s), respond to court orders and legal investigations, or report to credit bureaus | YES | NO |
| For our marketing purposes— to offer our products and services to you | YES | NO |
| For joint marketing with other financial companies | NO | We Don't Share |
| For our affiliates' everyday business purposes— information about your transactions and experiences | NO | NO |
| For our affiliates' everyday business purposes— information about your creditworthiness | NO | We Don't Share |
| For nonaffiliates to market to you | NO | We Don't Share |

| To limit our sharing | Call 1-888-945-2727; Visit us online: www.BigPictureLoans.com or Contact us via email: support@BigPictureLoans.com |
|---|---|
| | Please note: If you are a new customer, we can begin sharing your information as soon as the same day that you apply for a loan. When you are no longer our customer, we continue to share your information as described in this notice. However, you can contact us at any time to limit our sharing. |
| Questions? | Call 1-888-945-2727 or go to www.BigPictureLoans.com. |

**What we do**

| How does Red Rock Tribal Lending, LLC protect my personal information? | To protect your personal information from unauthorized access and use, we use security measures that comply with federal law. These measures include computer safeguards and secured files and buildings. |
|---|---|
| How does Red Rock Tribal Lending, LLC collect my personal information? | We collect your personal information, for example, when you: Apply for a loan; Give us your income information; Provide employment information; Provide account information; Give us your contact information. We also collect your personal information from others, such as credit bureaus, affiliates, or other companies. |
| Why can't I limit all sharing? | Federal law gives you the right to limit only: sharing for affiliates' everyday business purposes—information about your creditworthiness; affiliates from using your information to market to you; sharing for nonaffiliates to market to you |
| What happens when I limit sharing for an account I hold jointly with someone else? | Your choices will apply to everyone on your account. |

**Definitions**

| Affiliates | Companies related by common ownership or control. They can be financial and nonfinancial companies. Duck Creek Tribal Financial, LLC |
|---|---|
| Nonaffiliates | Companies not related by common ownership or control. They can be financial and nonfinancial companies. Nonaffiliates we share with can include service providers, direct mail, data processor, advertisers, direct marketing companies for application resell and other purposes. |
| Joint Marketing | A formal agreement between nonaffiliated financial companies that together market financial products or services to you. Our joint marketing partners include financial institutions, credit card companies, partners that promote our products, pre-paid debit card providers and other lending companies. |

**Short Message Services ("SMS")**

By submitting your information at the Website, you agree to receive mobile marketing including, but not limited to, text-message based marketing, from us and our third party advertisers and marketers. Notwithstanding that your mobile telephone number may be listed on state and/or federal do-not-call registries, we retain the right to contact you via text-message based marketing in accordance with applicable federal law. In addition, by registering and/or using the Website, you agree that such act constitutes an inquiry and/or application for purposes of the Amended Telemarketing Sales Rule (16 CFR 310 et seq.), as amended from time to time (the "Rule"). Notwithstanding that your telephone number may be listed on the Federal Trade Commission's Do-Not-Call List, we retain the right to contact you via text-marketing in accordance with the Rule.

**SMS Help Resources**

By submitting your information at the Website, you agree to receive mobile marketing including, but not limited to, text-message.

**Short Message Services ("SMS")**

For help or additional information regarding our SMS courtesy text services please email us at support@BigPictureLoans.com or reply "HELP" anytime from your mobile device to the message you receive.

**SMS Opt-out Information and Notice**

You may opt-out of receiving communications from us and or our third-party partners by not submitting your information. During registration and/or when you submit personally identifiable information to us at the Website, you have option to request that we share your personal information (other than your Sensitive Information) with third parties to receive marketing communications. When contacted by any of these companies or third parties, you should notify them directly of your choices regarding their use and sharing of your information. As noted, we use personal information to provide promotional offers by SMS to our Website users. We may maintain separate SMS lists for different purposes. If SMS recipients wish to end their SMS subscription from a particular list, they need to reply "STOP" to the SMS message they received. Additionally, you may opt-out from receiving any additional SMS communications regarding the Website, by sending your request in writing via email to OptOut@BigPictureLoans.com.

Home | Apply Now | Customer Login | Requirements | Rates | FAQ        BigPictureLoans.com | ©2015 | All Rights Reserved | 1-888-945-2727

Disclosure Resources | Contact us | Privacy Policy | Terms of Website Use

JA2027



CONFIDENTIAL

APPLY NOW!

## TERMS OF WEBSITE USE

### Information Provided on Website

### Site Security

### Privacy Policy

### Linking

### Disclaimers of Warranties

### Limitations of Liability

### Indemnity

### Tribal Dispute Resolution Procedure

### No Waiver of Sovereign Immunity

### Agreement to Pursue All Disputes Through the Tribal Dispute Resolution Procedure and Waiver of Jury Trial

### Agreement to Not to Bring, Join or Participate in Class Actions

### Minors

### Content Submitted or Made Available for Inclusion in the Site

### Conduct of Site Visitors

### Dealings with Advertisers

### Notices

### International Use

### Miscellaneous

### Contact

JA2029

# BIG PICTURE LOANS

| HOME | APPLY NOW | CUSTOMER LOGIN | REQUIREMENTS | FAQ | CONTACT |

## Again, we woud like to congratulate you!
### Your application is complete pending verification.

#### What's Next...
Your money will be deposited into your bank account as soon as we verify your information - usually in just a day!

#### Remember:
You'll receive an email reminder prior to each payment due date. If you selected ACH, your payment will automatically be deducted from your bank account on the due date.

#### Money Saving Reminders
When your budget allows, you can save by:
Paying off your loan early. The sooner you pay, the more you'll save.
Paying extra on your due date. This will reduce your future payments and save future finance charges.

#### Debit Card Verification
We are unable to validate the devit card you submitted with your application. By having a debit card on file, you may qualify for instant funding in the future. Set up a debit card profile.

**PRINT DOCUMENTS**

## QUESTIONS/ Call (888) 945-2727 or email support@BigPictureLoans.com

### PRIVACY POLICY
#### Red Rock Tribal Lending, LLC dba Big Picture Loans

Rev. July 2013

| FACTS | What does Red Rock Tribal Lending, LLC do with your personal information? |
|---|---|
| Why? | Financial companies choose how they share your personal information. Federal law gives consumers the right to limit some but not all sharing. Federal law also requires lenders to tell you how they collect, share, and protect your personal information. Please read this notice carefully to understand what we do. |
| What? | The types of personal information we collect and share depend on the product or service you have with us. This information can include: <br> Social Security number and income <br> Account balances and payment history <br> Credit history and credit scores |
| How? | All financial companies need to share customers' personal information to run their everyday business. In the section below, we list the reasons financial companies can share their customers' personal information; the reasons Red Rock Tribal Lending, LLC chooses to share; and whether you can limit this sharing. |

Home | Apply Now | Customer Login | Requirements | Rates | FAQ      BigPictureLoans.com | ©2013 | All Rights Reserved | 1.888.945.2727
Educational Resources | Contact Us | Privacy Policy | Terms of Website Use

First time BigPictureLoans.com customers typically qualify for a loan of $200 to $1,000. Red Rock Tribal Lending, LLC (D.B.A. BigPictureLoans.com) is a tribal enterprise wholly owned and operated by the Lac Vieux Desert Band of Lake Superior Chippewa Indians, a federally recognized American Indian tribe and sovereign government. Applicable tribal and federal law shall govern any agreement entered into as a result of your loan application. BigPictureLoans.com's contents do not signify a solicitation or offer for loans in all areas. Areas of operation may change with or without notice. Services mentioned on this website may or may not be available in your particular area. Each communication or transaction conducted via BigPictureLoans.com will be deemed to have occurred in BigPictureLoans.com's Lac Vieux Desert Band of Lake Superior Chippewa Indians offices, regardless of the location where you accessed or viewed this website. All content existing and/or submitted to and in association with this website will be considered BigPictureLoans.com's copyrighted property. All communications with the company are deemed confidential. Any unauthorized reproduction, distribution, or disclosure is prohibited without the company's express written consent.

Consumer Notice:
Big Picture loans should be used for short-term financial needs only, not as a long-term financial solution. Individuals with credit difficulties should seek credit counseling.

JA2030    ROSETTE043453

# BIG PICTURE LOANS

| HOME | APPLY NOW | CUSTOMER LOGIN | REQUIREMENTS | FAQ | CONTACT |

**Customer Name:** John Doe

**Customer Name:** John Doe

| Application #: | 59443854 |
| Application Date: | 9/11/2013 |
| Next Payment Date: | 9/20/2013 |

**TO PAY IN FULL**

| Loan Amount: | $800.00 |
| Finance Charge: | $200.00 |
| Pay Off Balance: | Pending |

**Your application is currently pending, please review, sign your documents, or contact us if you have any questions.**

\* The pay off balance is valid until the next payment date.

**PREVIEW AND SIGN DOCUMENTS**

**If you have any questions please contact us at: (888) 945-2727**

Home | Apply Now | Customer Login | Requirements | Rates | FAQ
Educational Resources | Contact Us | Privacy Policy | Terms of Website Use

BigPictureLoans.com | ©2013 | All Rights Reserved | 1.888.945.2727

First time BigPictureLoans.com customers typically qualify for a loan of $200 to $1,000. Red Rock Tribal Lending, LLC (DBA BigPictureLoans.com) is a legal, enterprise wholly owned and operated by the Lac Vieux Desert Band of Lake Superior Chippewa Indians, a federally recognized American Indian tribe and a sovereign government, and does not rely on state or federal law and governs any agreement entered into as a result of your loan application. BigPictureLoans.com's consumers do not signify a solicitation to offer for loans in all areas. Areas of operation may change, with or without notice. Services mentioned on this website may or may not be available in your particular area. Each communication or transaction conducted via BigPictureLoans.com will be deemed to have occurred in BigPictureLoans.com's Lac Vieux Desert Band of Lake Superior Chippewa Indians offices, regardless of the location where you accessed or viewed this website. All content residing and/or submitted to and in association with this website will be considered BigPictureLoans.com's copyrighted property. All communications with the company are deemed confidential, any unauthorized reproduction, distribution, or disclosure is prohibited without the company's express written consent.

Consumer Notice:
Big Picture loans should be used for short-term financial needs only, not as a long-term financial solution. Consumers with credit difficulties should seek credit counseling.

ROSETTE43454

CONFIDENTIAL

JA2031

# BIG PICTURE LOANS

HOME | APPLY NOW | CUSTOMER LOGIN | REQUIREMENTS | FAQ | CONTACT

**APPLY NOW!**

## LOAN APPLICATION RESULTS

Unfortunately we are unable to approve your loan application.

We're sorry but we are unable to approve your loan application. We hope to help you see The Big Picture in the future, so feel free to try again at a later date.

Home | Apply Now | Customer Login | Requirements | Rates | FAQ
Educational Resources | Contact Us | Privacy Policy | Terms of Website Use

BigPictureLoans.com | ©2013 | All Rights Reserved | 1.888.545.2727

First time BigPictureLoans.com customers typically qualify for a loan of $200 to $1,000. Red Rock Tribal Lending, LLC (D.B.A. BigPictureLoans.com) is a tribal enterprise wholly owned and operated by the Lac Vieux Desert Band of Lake Superior Chippewa Indians, a federally recognized American Indian tribe and sovereign government. Applicable tribal and federal law shall govern any agreement entered into as a result of your loan application. BigPictureLoans.com's contents do not signify a solicitation or offer for loans in all areas. Areas of operation may change with or without notice. Services mentioned on this website may or may not be available in your particular area. Each communication or transaction conducted via BigPictureLoans.com will be deemed to have occurred in BigPictureLoans.com's Lac Vieux Desert Band of Lake Superior Chippewa Indians offices, regardless of the location where you accessed or viewed this website. All content existing and/or submitted to and in association with this website will be considered BigPictureLoans.com's copyrighted property. All communications with the company are deemed confidential. Any unauthorized reproduction, distribution, or disclosure is prohibited without the company's express written consent.

Consumer Notice:

Big Picture loans should be used for short-term financial needs only, not as a long-term financial solution. Individuals with credit difficulties should seek credit counseling.

ROSETTE04455

CONFIDENTIAL

JA2032

**THANKS!**

**PHENOMENON**

BRAND PYRAMID

# Big Picture Loans



**Brand Idea**
For what matters most.

**Personality**
Approachable. Direct. Assuring.

**Values**
Empathy. Trust. Simplicity.

**Emotional Benefit**
Freedom to focus on life beyond your financial stress.

**Functional Benefit**
A quick, reliable solution that is worry-free.

**Aspirational Target**
For responsible individuals who need money and are overwhelmed by their financial worries.

**Pivotal Insight**
Financial distress can be a huge burden that overshadows everything else in life.

ROSETTE043457

CONFIDENTIAL

JA2034

Exhibit 37

| From: | Matt Martorello |
|---|---|
| To: | Karrie Wichtman; Justin Martorello |
| Subject: | RE: 2014 08 22 TC Resolution 2014____ Approving Chorus Loans_final.docx |
| Date: | Monday, August 25, 2014 12:52:23 PM |

BigPictureLoans.com

-----Original Message-----
From: Karrie Wichtman [mailto:kwichtman@rosettelaw.com]
Sent: Monday, August 25, 2014 3:48 PM
To: Matt Martorello; Justin Martorello
Subject: RE: 2014 08 22 TC Resolution 2014____ Approving Chorus Loans_final.docx

Which one do you want me to use?  Let's talk about that today so I can modify the docs accordingly.

Karrie S. Wichtman, Partner
Rosette, LLP
Attorneys at Law
Michigan Office
25344 Red Arrow Hwy, Suite B
Mattawan, MI 49071
269.283.5005 - Office
480.242.6959 - Cell
517.913.6443 - Fax
kwichtman@rosettelaw.com
www.rosettelaw.com

CONFIDENTIAL COMMUNICATION: THIS MESSAGE IS A CONFIDENTIAL ATTORNEY
COMMUNICATION ONLY FOR USE BY THE INTENDED RECIPIENT.  ANY INADVERTENT RECEIPT
SHALL NOT CONSTITUTE A WAIVER OF ATTORNEY-CLIENT OR WORK PRODUCT PROTECTION.  IF
RECEIVED IN ERROR, PLEASE NOTIFY KARRIE S. WICHTMAN IMMEDIATELY AND DELETE THIS
MESSAGE.  THANK YOU FOR YOUR COOPERATION.

-----Original Message-----
From: Matt Martorello [mailto:mattm@bellicosevi.com]
Sent: Monday, August 25, 2014 2:26 PM
To: Karrie Wichtman; Justin Martorello
Subject: RE: 2014 08 22 TC Resolution 2014____ Approving Chorus Loans_final.docx

Ok, sorry for the run around here Karrie... Chorus has been sold.  Attached is another really great brand with just as
much energy, money and time spent into developing.  Assuming LVD buys SPVI, BigPictureLoans.com would be
an excellent domain.  If LVD doesn't buy SPVI, then FirstNationLoans.com is the domain we can provide (which
we haven't yet gotten around to build out/design).

-----Original Message-----
From: Karrie Wichtman [mailto:kwichtman@rosettelaw.com]
Sent: Monday, August 25, 2014 11:58 AM
To: Matt Martorello; Justin Martorello
Subject: 2014 08 22 TC Resolution 2014____ Approving Chorus Loans_final.docx

**This email and any files transmitted with it are confidential and may contain privileged or copyrighted
information. You must not present this message to another party without gaining permission from the sender. If you
are not the intended recipient you must not copy, distribute or use this email or the information contained in it for

any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

**This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

# Exhibit 38

# Lac Vieux Desert Band Of Lake Superior Chippewa Tribal Government

**P.O. Box 249, Pow Wow Trail • Watersmeet, Michigan 49969**
**Phone: 906-358-4577 • Fax: 906-358-4785**

*Executive Officers:*
James Williams, Jr., Tribal Chairman
Joette Pete-Baldwin, Tribal Vice-Chairwoman
Susan M. McGeshick, Treasurer
Michelle Hazen, Tribal Secretary



*Council Members:*
Eli Edwards
Cheryl McGeshick
John McGeshick, Jr.
Tyrone McGeshick
Henry Smith

### RESOLUTION # T2014 -*0606*

### APPROVING THE CREATION OF THE WHOLLY OWNED AND OPERATED TRIBAL LENDING ENTITY – BIG PICTURE LOANS, LLC

**WHEREAS**, the Lac Vieux Desert Band of Lake Superior Chippewa Indians ("Tribe") is a federally recognized Indian Tribe organized pursuant to Section 16 of the Indian Reorganization Act of June 18, 1934, 48 Stat. 984, 25 U.S.C. §476; and,

**WHEREAS**, the Tribal Council ("Council") of the Tribe is empowered pursuant to Article IV, Section 1(f), of the Tribe's Constitution to "manage the economic affairs, enterprises, property, both real and personal, and other interest of the [Tribe]"; and,

**WHEREAS,** The Council is authorized pursuant to Article IV, Section 1(b) of the Tribal Constitution to enact resolutions or ordinances; and

**WHEREAS**, The Council in its effort to diversify the economy of the Tribe's Reservation in order to improve the Tribe's economic self- sufficiency did create, pursuant to tribal law, an independent tribally chartered entity, to transact business in the form of tribally-owned lending enterprises known as Red Rock Tribal; Lending, LLC and Duck Creek Tribal Financial, LLC ("the Companies"), of which the Tribe is sole Member, pursuant to Resolution 2011-041 and Resolution 2011-050 and Resolution 2011-058, respectively; and,

**WHEREAS,** James Williams, Jr. and Michelle Hazen, aka giizhigookway and Michelle Allen, are appointed were appointed as Co-Managers of the Companies pursuant to the Companies' Operating Agreement; and,

**WHEREAS,** the Council in accordance with its strategic economic development efforts wishes to create an additional independent tribally chartered entity, that may ultimately consolidate the business of the Companies, to transact business in the form of one (1) tribally-owned lending enterprise; and,

**WHEREAS,** on August *26*, 2014, pursuant to Council Resolution T2014-*068* the Council enacted the Lac Vieux Desert Business Entities Ordinance; and,

JA2039

CONFIDENTIAL

LVD-DEF00000089

**WHEREAS,** the Council has been presented with Articles of Organization and an Operating Agreement for the tribally chartered business entity to be known as Big Picture Loans, LLC ("Big Picture"), of which the Tribe is named as the sole member; and,

**WHEREAS,** the Council believes it to be in the best interest of the Tribe to create such an entity which, as a wholly owned and operated instrumentality of the Tribe, shall be possessed of all of the privileges of the Tribe, including but not limited to the sovereign immunity of the Tribe which shall not be waived unless authorized by the Council in accordance with the terms of the Operating Agreement; and,

**WHEREAS,** the Council, in furtherance of the business of Big Picture, and therefore in furtherance of the business enterprises of the tribe, consistent with the Companies, finds that all information and records of Big Picture are confidential and deemed Tribal Records as provided for in the Tribal Constitution and may not be disclosed except as provided for in accordance applicable Tribal or federal law or contract providing for access to such information and records; and,

**WHEREAS,** the Council, in furtherance of business of the Big Picture, and therefore in furtherance of the business enterprises of the Tribe, believes that it is in the best interest of the Tribe to appoint Michelle Hazen and Chairman James Williams, Jr. as Co-Managers of Big Picture who will be possessed of all power and authority, consistent with the attached Articles of Organization and Operating Agreement, to conduct the business of the Company; and,

**WHEREAS,** the Council, in furtherance of the business of Big Picture, specifically indemnify and defend the Co-Managers Williams and Hazen, and all of their successors, against all liabilities, losses, and costs (including attorneys' fees) incurred or suffered by either Co-Manager in connection with the business of Big Picture subject to the limitations set forth in the Operating Agreement;

**THEREFORE BE IT RESOLVED,** that the Council hereby adopts the Articles of Organization and Operating Agreement of the wholly owned and operated tribally chartered business entity to be known as Big Picture Loans, LLC ("Big Picture") of which the Lac Vieux Desert Band of Lake Superior Chippewa Indians shall be now and forever, the sole member; and

**BE IT FURTHER RESOLVED,** that the Council hereby declares that Big Picture, as a wholly owned and operated instrumentality of the Tribe, shall be possessed of all of the privileges of the Tribe, including but not limited to the sovereign immunity of the Tribe which shall not be waived unless authorized by the Council in accordance with the terms of the Operating Agreement; and,

**BE IT FURTHER RESOLVED,** that the Council, hereby declares that all information and records of Big Picture are confidential and deemed Tribal Records as provided for in the Tribal Constitution and may not be disclosed except as provided for in accordance applicable Tribal or federal law or contract providing for access to such information and records; and,

**BE IT FURTHER RESOLVED,** that the Council, acting on behalf of the Tribe as sole member of Big Picture, hereby appoints Chairman James Williams, Jr. and Michelle Hazen who are possessed of all

JA2040

CONFIDENTIAL

LVD-DEF00000090

power and authority, consistent with the attached Articles of Organization and Operating Agreement, to conduct the business of Big Picture; and,

**BE IT FURTHER RESOLVED,** that the Council, hereby approves authorizes and directs Co-Managers to take the necessary steps to conduct the business of Big Picture including but not limited to the registration of the business necessary to receive a tax identification number and the opening of bank accounts at one or more financial institutions of their choosing, including Chippewa Valley Bank, as well as the execution and delivery of any and all documents, including but not limited to signature cards for each account, necessary to conduct the business of Big Picture; and

**BE IT FURTHER RESOLVED,** that the Council, acting on behalf of the Tribe as sole member of Big Picture, hereby indemnifies and shall defend Co-Managers Williams an Hazen, and all of their successors, against all liabilities, losses, and costs (including attorneys' fees) incurred or suffered by the Manager in connection with the business of Big Picture subject to the limitations set forth in the Operating Agreement.

## CERTIFICATION

I, the undersigned, as Chairman of the Lac Vieux Desert Band of Lake Superior Chippewa Indians, a tribal government operating under a Constitution adopted pursuant to Section 16 of the Indian Reorganization Act 25 U.S.C. 476 and, more specifically, 25 U.S.C. 1300(h), do hereby certify that the Tribal Council of the Band is composed of nine (9) members, of whom eight (8), constituting a quorum, were present at a meeting duly called, noticed, convened and held on the 20th day of August 2014 and that the foregoing resolution was duly adopted at said meeting by an affirmative vote of seven (5) members, zero (0) against, and zero (0) abstaining, and that the said resolution has not been rescinded or amended in any way.

_Michelle Hazen_
Michelle Hazen – Secretary

_James Williams, Jr._
James Williams, Jr., Tribal Chairman

JA2041

CONFIDENTIAL

LVD-DEF00000091

# Exhibit 39

## Darcie Pace

| | |
|---|---|
| **From:** | Karrie Wichtman |
| **Sent:** | Tuesday, July 22, 2014 9:21 AM |
| **To:** | Daniel Gravel; Matt Martorello; gkway@duckcreektf.com; Jim Williams Jr. |
| **Cc:** | Justin Martorello; Brian McFadden; James Dowd |
| **Subject:** | RE: Rebrand from "Payday" |

I think it imperative that all vendor contracts under the new branding include Gkway and Chairman Williams in all discussions, or at a minimum Gkway.  This will strengthen the sovereign model as well as assist the CEO and Co-Managers with developing a new level of intimacy with the operation of the business that will be needed if it is expected that the "New Deal" will also be born out of this rebrand.

Just my thoughts...

Sincerely,



**Karrie S. Wichtman, Partner**
**Rosette, LLP**
**Attorneys at Law**
Michigan Office
25344 Red Arrow Hwy, Suite B
Mattawan, MI 49071
269.283.5005 – Office
480.242.6959 - Cell
517.913.6443 – Fax
kwichtman@rosettelaw.com
www.rosettelaw.com

CONFIDENTIAL COMMUNICATION: THIS MESSAGE IS A CONFIDENTIAL ATTORNEY COMMUNICATION ONLY FOR USE BY THE INTENDED RECIPIENT.  ANY INADVERTENT RECEIPT SHALL NOT CONSTITUTE A WAIVER OF ATTORNEY-CLIENT OR WORK PRODUCT PROTECTION.  IF RECEIVED IN ERROR, PLEASE NOTIFY KARRIE S. WICHTMAN IMMEDIATELY AND DELETE THIS MESSAGE.  THANK YOU FOR YOUR COOPERATION.

**From:** Daniel Gravel [mailto:DanielG@bellicosevi.com]
**Sent:** Tuesday, July 22, 2014 9:13 AM
**To:** Matt Martorello; Karrie Wichtman; gkway@duckcreektf.com; Jim Williams Jr.
**Cc:** Justin Martorello; Brian McFadden; James Dowd
**Subject:** RE: Rebrand from "Payday"

Karrie:

Here is the initial list of items we will be working on for Chorus:

1. Consulting agreement review/assignment
2. Revise loan agreement and all customer facing docs and scripts
3. New vendor contracts
4. Review/revise internal policy/procedure docs, such as Recommendation Form, for new entity.

CONFIDENTIAL                                                                ROSETTE_REVISED_053406

JA2043

5.    Website/branding

There are many vendor contracts, so I will start requesting new ones immediately.

Thanks,

**Dan Gravel**
**General Counsel**
Email: danielg@bellicosecapital.com
Office: 787-520-6053
Mobile: 781-910-9642



CONFIDENTIAL COMMUNICATION: The information contained in this email is intended for the individual or entity above. This email is protected by the Electronic Communications Privacy Act, 18 U.S.C. Sections 2510-2521 and may be legally protected by the attorney/client privilege and/or work product doctrine. If you are not the intended recipient, please do not read, copy, use, forward or disclose this communication to others; also, please notify the sender by replying to this message, and then delete this message from your system.

**From:** Matt Martorello
**Sent:** Monday, July 21, 2014 3:02 PM
**To:** Karrie Wichtman; gkway@duckcreektf.com; Jim Williams Jr.
**Cc:** Daniel Gravel; Justin Martorello
**Subject:** RE: Rebrand from "Payday"

Dan is working on this task list. Sounds like Assignment will be easiest and doesn't protect from any hidden risk that you'd want to limit on pass through from RRTL to new entity.

If I can get this 17mb file down to a better size to email you guys on the work and imaging done for ChorusLoans, I think you'd absolutely love the new design.  Domain names in this space are very very rare and hard to come by, then trying to get a TM to protect it from competition is another issue, so SPVI did a lot of work created Chorus which I think you'll enjoy when I can send this to you.

**From:** Karrie Wichtman [mailto:kwichtman@rosettelaw.com]
**Sent:** Friday, July 18, 2014 9:47 AM
**To:** Matt Martorello; gkway@duckcreektf.com; Jim Williams Jr.
**Cc:** Daniel Gravel; Justin Martorello
**Subject:** RE: Rebrand from "Payday"

What exactly will be done on your end so that efforts are not being duplicated?



**Karrie S. Wichtman, Partner**
**Rosette, LLP**
**Attorneys at Law**
Michigan Office
25344 Red Arrow Hwy, Suite B
Mattawan, MI 49071
269.283.5005 – Office
480.242.6959 - Cell
517.913.6443 – Fax
kwichtman@rosettelaw.com

CONFIDENTIAL                                    ROSETTE_REVISED_058407

JA2044

www.rosettelaw.com

CONFIDENTIAL COMMUNICATION: THIS MESSAGE IS A CONFIDENTIAL ATTORNEY COMMUNICATION ONLY FOR USE BY THE INTENDED RECIPIENT.  ANY INADVERTENT RECEIPT SHALL NOT CONSTITUTE A WAIVER OF ATTORNEY-CLIENT OR WORK PRODUCT PROTECTION.  IF RECEIVED IN ERROR, PLEASE NOTIFY KARRIE S. WICHTMAN IMMEDIATELY AND DELETE THIS MESSAGE.  THANK YOU FOR YOUR COOPERATION.

**From:** Matt Martorello [mailto:mattm@bellicosevi.com]
**Sent:** Friday, July 18, 2014 9:36 AM
**To:** gkway@duckcreektf.com; Jim Williams Jr.
**Cc:** Karrie Wichtman; Daniel Gravel; Justin Martorello
**Subject:** RE: Rebrand from "Payday"

Great, we'll start getting ready on our end.  Thanks!

**From:** gkway@duckcreektf.com [mailto:gkway@duckcreektf.com]
**Sent:** Friday, July 18, 2014 9:35 AM
**To:** Matt Martorello; Jim Williams Jr.
**Cc:** 'Karrie Wichtman'; Daniel Gravel; Justin Martorello
**Subject:** RE: Rebrand from "Payday"

I certainly do agree and yes I would be happy to present this to the Council.

*giizhigookway*
*CEO/Co-Manager*
*Duck Creek Tribal Financial*
*P.O. Box 704*
*Watersmeet, MI  49969*
*906.358.2008-Office*
*906.358.2010-Fax*
*906.366.7041-Cell*
*gkway@duckcreektf.com*

-------- Original Message --------
Subject: RE: Rebrand from "Payday"
From: Matt Martorello <mattm@bellicosevi.com>
Date: Fri, July 18, 2014 6:30 am
To: "gkway@duckcreektf.com" <gkway@duckcreektf.com>, Jim Williams Jr. <jim.williams@lvdtribal.com>
Cc: 'Karrie Wichtman' <kwichtman@rosettelaw.com>, Daniel Gravel <DanielG@bellicosevi.com>, Justin Martorello <JustinM@BellicoseVI.com>

Gkway, as CEO for RRTL, do you feel comfortable representing RRTL to council on this?  And assuming you agree LVD should move away from "Payday", do you feel comfortable leading the charge in getting this rebrand done?  I think we need to make sure we have someone who can "own the process" to get it over the finish line.

Looking forward to your thoughts

**From:** Matt Martorello
**Sent:** Friday, July 18, 2014 9:26 AM

CONFIDENTIAL                    ROSETTE_REVISED_053408

JA2045

**To:** gkway@duckcreektf.com; Jim Williams Jr.
**Cc:** 'Karrie Wichtman'; Daniel Gravel; Justin Martorello
**Subject:** Rebrand from "Payday"
**Importance:** High

Hi guys,

We've been mentioning for a very long time now, CastlePayday needs a rebrand.  Rather than tie it to other things that may take 6 months to complete, it's time to get it done.  RRTL has been blacklisted and rolled through the mud in the press.  Also, "Payday" is not an accurate description and is virtually about to be outlawed by the CFPB (likely a no renewal and cool off periods are coming in August).  I think it's time to get away from the word "Payday" and the black mark of RRTL before the rules come out and things get hotter.  I know for sure, many banks have turned down RRTL because it says Payday in the title, even if it is not a payday lender.

I suggest forming ASAP a new LLC with a new domain/brand, for purposes of transferring all contracts, assets, bank accounts, liabilities, etc. over to the new entities when ready.   We will gladly facilitate the work, but need the entity formed and approval to begin doing so as step 1.  It will take some time (months), after the new entity and approval by Tribal council is provided so the sooner we can get moving away from "Payday" and the poor image of RRTL the better.


**Regards,**

**Matt Martorello**
Mobile: 773-209-7720
Email: mm@BellicoseVI.com



**This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

**This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

**This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in

CONFIDENTIAL                                              ROSETTE_REVISED_053408
                                                                              JA2046

USCA4 Appeal: 23-2097      Doc: 11-5         Filed: 12/06/2023      Pg: 166 of 503

# Exhibit 40

Message
_____

**From**:        Matt Martorello [matt@liontllc.com]
**Sent**:        10/2/2015 4:59:01 PM
**To**:          Zayra Emanuelli [zayra@liontllc.com]
**Subject**:     Forecasts


We will note all of these things for support, but FYI…


The new RRTL forecast from which we build the SPVI/BCap/BVI valuation will be driven from the same
forecast that we send to the client for their 2016 business plan.  It will also be sent as the forecast
to the debt holders.  This supports that it is legit.


Also, the 2016 assumptions are:

1)      Certain elements about Notes and paying them down, which effect Servicing Revenue

2)      Top line Revenue will be that 75% of 60% (this matches closely with Jan to June 2015 actual and
should be documents to prove that it is a good assumption from the history)

a.      That is 75% of principal on the street comes due in any given month

b.      50% of the pool will be VIPs (25% fee) and 50% will be New (35% fee).  The weighted average of
that is 60% and this gets us to top line revenue (these formulas match Jan to June 2015)

3)      For there, Service Returns, Lead Sales, Bad Debt and the Collections Revenue will just be a % of
revenue based on whatever it was from Jan to June 2015


The important thing about Jan to June 2015 is that the portfolio was not in growth mode, it was stagnant
right around $20mm the entire time.  However, you can see marketing expense when up in June a lot so that
was what lead to big volumes in the months ahead as they started to grow. We want to isolate Jan to June
2015 and show the % assumptions match the actuals for a CONSTANT level portfolio.


Part 2 is going to be how to unwind in 2017.  The revenue trail should've been longer so after we nail
down 2016, we can figure out post CFPB rule for 2017.


Important sidenote…  Some elements of this valuation will be taxed at about a 10% capital gains rate.
Others will be taxed at the lower 4% tax rate.  We will need BDO to quantify what was already earned via
work performed (i.e. loans that are on the street and performing were ALREADY earned and are taxed as
earned income) vs "goodwill" which is the FMV minus the portion that was already earned compensation.
I'm hoping to see as much at the 4% rate of course as possible.


Some thoughts to share on FMV vs FV.  Everyone knows the CFPB rule shuts down the business and there is a
court decision that shows the CFPB does control Tribes.  We will provide all the support in the world for
this, so we can support FMV.  If nobody can argue with us about FMV that we did it right, then it doesn't
matter what FV is later on.  But if someone asks:

1)      the Tribe is buying it b/c our contract gets terminated and they want this to continue.

2)      Operation Choke Point is a risk for SPVI owners but not for the Tribe.

3)      All the lawsuits against Servicers is removed from the equation for the Tribe to lose us.

4)      They feel they have a shot at suing the CFPB and keeping this thing going for years.

5)      They pay $0 cash so they have no risk

6)      If they get another vendor, even at a way better pricing, they risk that they mess it up.

7)      They risk that they lose their debt investors if we go away, this deal keeps debt investors
comfortable to remain, whereas they'd leave if a new vendor replaced us

CONFIDENTIAL PURSUANT TO
PARTIES' PROTECTIVE ORDER

8)      Or if they tried it on their own

9)      There's 1 year left until the rule, why get aggressive and risky and spend money if it might all end in 12 months?

10)     IN THE UNLIKELY EVENT that the CFPB rule doesn't take them down, then they pay as they go via a Seller financed deal rather than taking risk.  The deal should be paid off in 4 years.

11)     Their price is Future value, it is not present value.  Hence the difference between FMV (PV) and FV (FV).


One more note for FMV, there is the risk that we get shut off from banking immediately (or the Tribe does) and we suffer catastrophic damages even worse than CFPB rule.  We have to notate that and demonstrate that building in for that risk would SERIOUSLY lower the valuation, but we are conservatively leaving it out of the model (for now, we should talk about it with BDO).


Best,



Matt Martorello / President

773-209-7720 / Matt@LiontLLC.com <mailto:Matt@LiontLLC.com>


Liont, LLC

875 Carretera 693, Suite 202, Dorado, PR 00646

http://www.LiontLLC.com

CONFIDENTIAL PURSUANT TO
PARTIES' PROTECTIVE ORDER

JA2049

Liont_09846

# Exhibit 41

**Shagun Chopra**

Senior Research Analyst | Valuation

Aranca | Floor 2, Wing-B, Supreme Business Park, Hiranandani Gardens, Powai, Mumbai 400 076. | Tel: +91.22.3937 9999 | www.aranca.com | https://www.linkedin.com/in/shagunchopra

This communication and any attached files may contain privileged and confidential information, and is intended solely for the use of the addressee(s). If you received this communication in error, please notify the sender by reply e-mail and then destroy the message, all attachments and any copies. Furthermore, you are not to copy, disclose, or distribute this e-mail or its contents to any other person and any such actions are unlawful. Internet communications cannot be guaranteed to be timely, secure, error or virus-free. The sender does not accept liability for any errors or omissions. Any views expressed in this message are those of the individual sender, except where the sender specifically states them to be the views of Aranca.

Aranca is an ISO 27001:2013 certified company.

---

**From:** Matt Martorello [mailto:matt@liontllc.com]
**Sent:** Saturday, December 05, 2015 4:05 AM
**To:** Shagun Chopra; Zayra Emanuelli
**Cc:** manish.goyal@aranca.com; 'Pooja Gala'; Luis Jimenez
**Subject:** RE: Bellicose Capital Valuation

My comments:

- Page 8 – SPVI is located in Puerto Rico, not USVI - Done
- Page 8 – change "which operate in the tribal payday lending industry" to "which provide services to lenders in the online tribal consumer lending industry" (Note, we are consultants to lenders, and the lenders are not "payday" but rather "online tribal consumer lenders". You use the term "payday" throughout the document, and though it is relevant and similar in many places, these are not payday lenders our clients) – Done. Have changed 'payday lending' references to 'consumer lending' while referring to Bellicose and related entities in other parts of the report. But, retained payday loan references when talking about the industry in general.
- Page 8 and Page 9 – change to "SPVI primarily provides outsourced marketing, underwriting and loan management consulting services for online tribal consumer lending businesses". - Done
- Page 9 – 1st bullet – CP wasn't "renamed" as DCTF but rather the 3rd party owner of CP sold the business to the Tribe, which bought CP under the Tribal LLC called DCTF. CP was originally owned by a Costa Rica citizen. Opex rights with CP terminated with that transaction, and BVI began servicing DCTF from scratch. So Opex was not actually related to BVI at all. In fact, you might want to cut out everything before DCTF formation and its partnership with BVI. Everything before that was not related to Bellicose, but more a private matter related to me. –Done. We prefer not to eliminate the reference to Opex, since it gives an overview of the services provided and inter-relationship of entities.
- Page 9 – part 2 – requires clarification. I want it to be clear that we do not have the right to distribute DCTF's "net income". But rather that SPVI has the right to reinvestment SPVI's earnings it makes from providing services to DCTF. So it is SPVI's net income that is used in the fashion you describe, it is not the Tribe's/DCTF net income that is used which is how it reads. Further, this is not a service provided to the Tribe. This is just services related to broker agreements with 3rd parties who lent money to SPVI. As it reads, the Tribe is paying SPVI to do this with its own Net Income, which is not accurate. – Done. Was based on Inputs provided at the time of the previous report, changed now.
- Please confirm that ICA pays BVI (not BC) for Management fee, per diagram on Page 10 – The diagram does indicate that ICA pays BVI, not BCap. Added one more label to make it more clear.
- Page 12 – I feel the risks of continuity of the business could be enhanced from the cases and lawsuits and the CFPB rule isn't mentioned at all here. – added a reference to CFPB. Since the cases/lawsuits have been mentioned in the 'Industry section', added a link to the 'Industry Section'.
- Page 17 – Note that Bay Mills v Michigan the supreme listed explicitly ways in which the State could shut down the casino. – Added. Similar efforts would be attempted by State governments to shut down tribal lenders (and are being attempted in fact). PA vs Elevate/Think Finance and Ken Reese is the most significant issue/risk to SPVI, that and the CFPB rule. – Included reference to lawsuit highlighting all allegations on the tribal entities on

JA2051

CONFIDENTIAL

Pg 22. Also mentioned that the judgment in the said case is awaited. PA could bring the same claims against SPVI for sure. NY DFS have issues too. NY DFS named RRTL as illegal of 35 lenders in the Wall Street Journal I believe it was. RRTL sued NY DFS and lost... NY DFS went after Money Mutual/Montell Williams for helping service Tribal lenders and they could go after SPVI as well. . – Included information on Pg 12 under Risks section.

- It's also worth noting that RRTL has received threats from several state AGs demanding they stop lending or they will come after them. Helps support the 90/10 argument. – reference added in Company Risks section.

- Page 39 – You missed the stock EVNA.... It's gone from a $1BN market cap down to $220mm in the last 18 months! And it's not even tribal and they do $1Bn a year in Revenue and $100mm a year in earnings. – We had included and considered this stock, but when we removed casino companies from the exhibit list it advertently got deleted. Have revised the exhibits to ensure it is there now.

In general, nobody will argue with your valuation methods because these are very well founded fundamentally. The only area that could ever be debated would be the 90%/10% assumptions that this business will come to an end.

Therefore, I think it's vital that you input ALL of the support you can that says the CFPB rule will shut this business down, and how operation choke point is hurting everyone. I felt there were some elements missing. In fact, CFPB has already been challenged by a Tribal Servicer that received a CID. Perhaps it was Think Finance... CFPB won in court that they ARE applicable and allowed to server their CID on Think Finance and the Tribe. That case wasn't noted. FTC fought with Scott Tucker and Tribal Lender on if they are applicable to Tribal lending, the court decided FTC does have jurisdiction over tribes. Also, it's not accurate that federal law applies to Tribal businesses, It's not certain but Tribes think it is possible that federal law DOES apply. – Added Think Finance case reference and its implications along with relevant case-laws in the Industry section.

All of this contradicts your statements on Page 22, where you're saying "CFPB may have their hands tied with Tribal". If you want to support that CFPB rule or fines by CFPB may destroy SPVI and/or their clients, and 90/10 valuation assumption is logical, I think this section needs to be enhanced. Page 22 entire CFPB section is a problem and it is inaccurate. You are saying in the models that CFPB will end this business. However, in this provision you're listing all the reasons which CFPB doesn't have authority? I don't think what you're saying there is accurate either. – It is important to indicate both sides of the legal picture. That is why our report carries cases which support tribal sovereignty and those which indicate its weakening in the recent time. The ultimate conclusion being that is that there is a very real risk of the guidelines affecting tribal lending businesses. To make this further clear, I have made small changes in the Industry section. What also needs to be noted here is that we are focusing on the combined effect of CFPB and Operation Chokepoint to support the 90-10% probability, and Operation Chokepoint is the reason we can assume definite end points for the business.

I think it's important to note that the proposed rule as of June 30 by the CFPB, has been issued and what it reads since the rule has been posted. Added proposed rules on Page 23. Also note that the expected live date is in Q1 2017 as CFPB says in their releases (you can even site it), and that it will destroy 82% revenue decline to not JUST payday lenders, but to "consumer installment lenders" like our clients as well. Since they are not Payday, it should be noted the rule destroys Payday and Installment of similar APR and structure as well. The rule is available as proposed, and there is public record of it having been planned for 2017 Q1 effective date (at least it was thought to on June 30, 2015)... it should be in here since it's so important to the 90/10 thing. – We could not source CFPB timeline from an official source, but ENOVA's investor presentation and other online sources indicate the expected timeline of introduction. Our report includes a reference to the Q1 Jan timeline as well as the 82% decline in the Industry section.

If we were to assume there was no 90/10 termination of business, and we assumed we'd remain a going concern over the years, can you highlight for us what that valuation would have been? I think that puts us in a position where if we are ever audited or challenged about the 90/10, we can show what the valuation per DCF would have been. Which I don't think would have been terribly different and might even justify a higher CSRP than 35%. Don't forget, ALL of the debt will mature before 5 years comes around, and there is no way to know if they'll renew especially with all these CFPB and regulatory and legal fights happening around us. Don't think including DCF valuation based on going concern in the report is a good idea as it is contrary to our argument that the business is likely to cease in the next two years. With the current circumstances, extending projections beyond 2017 will be highly speculative too. However just to give you

JA2052

an estimate, we ran a DCF analysis using high level assumptions based on historical track record such as revenue growth 15%, CoS 5% and Opex 14% and a perpetual growth rate of 4% under Gordon Growth Method. The value is well above 100million even with a CSRP of 50%. In our view, Bellicose should not be valued as a going concern unless CFPB or Operation Chokepoint timeline gets extended much beyond 2017.

We should:

1) Do everything we can to substantiate the 90/10 major effect on valuation – We have supported the 90-10 assumption in the Valuation section drawing references from the Industry section.

2) Map out if that weren't applied, what would've been the valuation so that we can see how big this effect was. – Please refer the DCF comment above.

Hope that helps support the valuation.

---

**From:** Shagun Chopra [mailto:shagun.chopra@aranca.com]
**Sent:** Friday, December 4, 2015 7:30 AM
**To:** Matt Martorello <matt@liontllc.com>; Zayra Emanuelli <zayra@liontllc.com>
**Cc:** manish.goyal@aranca.com; 'Pooja Gala' <pooja.gala@aranca.com>; Luis Jimenez <luis@liontllc.com>
**Subject:** RE: Bellicose Capital Valuation

Hi Matt,

Thank you for the confirmation. We have put together our analysis in the final valuation report. Please note that we have fixed a minor inconsistency in the model as a result of which the concluded equity value of the Company (on a consolidated basis) now stands at **$23.97 million**. The revised model as well as the draft valuation report are attached with this mail.

Please let me know if you have any comments on the draft report. If not, I'll send the certified copy of the report next week.

Thanks,
Shagun

*Classification: Confidential*

**Shagun Chopra**

**Senior Research Analyst | Valuation**

**Aranca** | Floor 2, Wing-B, Supreme Business Park, Hiranandani Gardens, Powai, Mumbai 400 076. | Tel: +91.22.3937 9999 | www.aranca.com | https://www.linkedin.com/in/shagunchopra

This communication and any attached files may contain privileged and confidential information, and is intended solely for the use of the addressee(s). If you received this communication in error, please notify the sender by reply e-mail and then destroy the message, all attachments and any copies. Furthermore, you are not to copy, disclose, or distribute this e-mail or its contents to any other person and any such actions are unlawful. Internet communications cannot be guaranteed to be timely, secure, error or virus-free. The sender does not accept liability for any errors or omissions. Any views expressed in this message are those of the individual sender, except where the sender specifically states them to be the views of Aranca.

Aranca is an ISO 27001:2013 certified company.

---

**From:** Matt Martorello [mailto:matt@liontllc.com]
**Sent:** Tuesday, December 01, 2015 12:25 AM
**To:** Shagun Chopra; Zayra Emanuelli
**Cc:** manish.goyal@aranca.com; 'Pooja Gala'; Luis Jimenez
**Subject:** RE: Bellicose Capital Valuation

JA2053

Exhibit 42

**To:** manish.goyal@aranca.com[manish.goyal@aranca.com]
**From:** Matt Martorello
**Sent:** Wed 12/7/2016 2:22:14 PM
**Subject:** RE: PR Hybrid

I'd like to supplement this to keep you up to speed... Do you have any experts on staff in this area who could be helpful to figuring out tax treatment on all of this in addition to the asset by asset valuations? Thinking about 2012, 3 ways this 7.7mm liquidation value could go.

1) Customer Contracts, if in reviewing the agreement I take the position that they owned all IP, not me. I've waffled on this one thinking back further... Tax treatment = Potentially Section 936 Operating Intangible, may or may not be subject to ATB election (all very material, could be 100% US sourced Ordinary Income instead of bifurcated to PR day count at 0%, and capital gains for US day count)

2) A series of IP, and to a lesser extent maybe the customer contract. if I owned the IP... Tax Treatment = asset by asset where maybe some is Operating Intangible again.

3) Goodwill, which sounds a lot like customer contract in this instance, but perhaps it is something more. Perhaps it is "potential" of the business... Tax treatment = based on where it's created, definition of created is still unclear

Based on what we know, we now have to decide which of the 3 were prevalent here, and that seems much more of an art form than a science.

Like to nail down the tax treatment of each while we continue reviewing classifications closely.


-------- Original message --------
From: Matt Martorello <matt@liontllc.com>
Date: 12/6/16 5:07 PM (GMT-04:00)
To: manish.goyal@aranca.com
Subject: FW: PR Hybrid

Hi Manish, I recently did a deep dive to see what potential IP existed as part of the $7.7mm miscellaneous "liquidation value" and came up with a lot of clarity I think.  Let me know your opinion on IP ownership, GW, and $7.7mm being 100% customer contracts:

## 2012 Potential for Intangible Assets:

**About IP**:  The client/Tribe often argued with me that they view all of the IP and data as their property.  They strongly believed that SPVI was paid to create the IP for them, and to facilitate them in using it.  Early on, I agreed with their position, but in 2014 I argued opposite to that (as I wanted to sell the business, it felt pretty pertinent).  Now, reading the contracts, nothing is stated about IP, but it is very clear in Section 4.2 that SPVI is hired for the service of creating all of these business methods for the Tribe.  It appears pretty clear that the Tribe was correct, in that the IP created to service their business, was always their property.

As such, I am of the opinion that the only IP of any relevance was the contracts with the clients.  With that, I'm not sure there could have been any GW, since this was 1 contract/client business (1 tribe with 2 portfolios) and there was no public face at all to the business (i.e. no reputation value).  The value of the repeat customers/reputation, is really identified directly as these 2 servicing contracts.  Such that, putting the value on these servicing contracts and having GW, would sound redundant.  I think this is supported by the

JA2055

MARTORELLO_011445

DT for some reason avoiding calling $7.7mm Goodwill. My inclination is that this all supports $7.7mm being classified entirely as "customer contracts".

**Summary of the Businesses:**

1) Bellicose

   a. (holding company) earns no income,

   b. Employer for 100% of the employees. Heavy majority of which worked solely on the SPVI contracts

2) SPVI (sub)

   a. Contracted with 3 clients to provide services to build/operate their businesses (2 of the same Native American Tribe).

   b. Provided managerial, technical and financial expertise for development of the clients' unsecured lending businesses.

   c. By separate contract, call center outsourcing services, project management and consulting services by marking up a contract SPVI had with LCI (call center in Philippines). LCI would charge about $5.60 an hour and we would bill clients at US rates of about $14.50 an hour (average was probably $120k every 2 weeks in billing of SPVI clients)

   d. It was estimated that the industry would be wiped out in Feb 2014 by the new CFPB, and/or operation chokepoint tactics.

       i. Accurately enough, the clients lost the ability to debit borrower bank accounts in January 2014 when their ACH provider was shut down with no warning as a direct result of Operation Choke Point. The clients were in default with their hedge fund, and very narrowly escaped massive disaster. One week later, the Tribes were able to get a new ACH provider. The clients made no loans for many months after out of fear banking would be fully cut off for good.

3) Iron Fence

   a. Lending entity, it borrows money from 3rd parties (and some from Bellicose too) and lends to the clients earning a 1% APR spread on the money if managed efficiently, which it often was not timed right to earn the spread.

   b. Maturity dates were 12/31/2018

4) ICA

   a. Provides consulting related to 2 deals, to affiliates:

CONFIDENTIAL                                    MARTORELLO_011446

   i. One is to SourcePoint LLC (not to be confused with SPVI) for managing (consulting services) it's deal with a tribal casino in Oklahoma (Grand Lake Casino) where SP leased 230 slot machines to the tribe

   ii. Other is to SP LLC for setting up an investment related to a casino boat venture

**To be considered as potential IP - by entity:**

A) SourcePoint VI, LLC:

 a. Customer Contracts:

  i. RRTL (LVD Tribe) and DCTF (LVD Tribe) were identical:

    1. Termination Date – 12/31/18 (auto 2 year renewal, unless notified)

    2. Assignable with consent of the Tribe

    3. Payment to SPVI is performance based:

      a. Tribe takes a distribution calculated as Sum of Gross Revenues plus Bad Debt Recovery, minus the sum of Charge Backs and Bad Debt Charge Off, and multiplying all of the foregoing by 2%. Remainder (if any) is SPVI's Servicing Fee.

      b. SPVI promised a $20k/month minimum to the Tribe, several months SPVI earned nothing for revenues

    4. RRTL cannot compete (given nature of the performance based servicing fee to SPVI)

  ii. WMS – This business was being terminated immediately (Q1 2013), no valuation work was done by DT on this immaterial business relationship with SPVI

 b. Hot Assets

  i. Subject to careful review of Section 4.2 (unclear yet)

 c. Company Books/Records?

 d. Goodwill (Given the above… i.e. all of the value is the 2 customer contracts with just 1 party, I'm not sure this is possible to exist. There was no "reputation" value.)

B) Bellicose IP:

 a. ALL employees were Bellicose employees (however, DT did NAV for BVI and therefore I'm not sure a valuation of the Management team is relevant)

  i. Agreement existed b/w Bellicose and SPVI dated 1/1/13, but it was ignored (was supposed to be $80k/month).

JA2057

MARTORELLO_011447

      ii.   2014 we did $40k monthly fee and paid it from Jan 2014 and after

  b.   QA center over the outsourced call centers, located in St Croix (6 employees monitoring the outsourced call centers and training them better)

C)  Iron Fence Investments:

  a.   Relationship with OAF, LLC - who provided debt to IFI, and in turn went to clients

  b.   Company Books/Records

D)  Tribe (listing this in case different interpretation is made for ownership of IP, based on read of the Servicing Agreement.  If there is, I can elaborate on below later):

  a.   U/W Methods – New Customers

  b.   U/W Methods – Returning Customers

  c.   Marketing Methods – New Customers

  d.   Marketing Methods – Returning Customers

  e.   Domain(s)?

  f.   Financial Forecasting, Budgets, Working Capital Management for Loan deployment of customers

  g.   SOPs to handle live customer leads and open loan accounts, at the call center level

  h.   Training Manuals for new employees

  i.   Collections Strategy for Bad Debt – Nothing unique, just a schedule of when to call folks post default and rules for how to address bad debt accounts and what is allowed for CSRs or Managers to settle with the customers

  j.   Vendor Relationships – All of these relationships can be obtained by just going to trade shows and visiting their booths, I don't believe there is anything material.  **All of these contracts at this time were between the 3rd party and SPVI, in order to protect SPVI, though reading the contract now I think I was supposed to ask their approval to have done that (i.e. subcontract for my services required their consent)**:

    i.   Lead Providers

    ii.   Debt Buyers

    iii.   Underwriting data providers

    iv.   Outside call centers

JA2058

CONFIDENTIAL

MARTORELLO_011448

     v.   Loan Management Software

     b.   Compliance Management Manuals – Did not exist in 2012

---

**From:** Matt Martorello
**Sent:** Tuesday, December 6, 2016 2:03 PM
**To:** 'jbradley@buddlarner.com' <jbradley@buddlarner.com>
**Cc:** Zayra Emanuelli <zayra@liontllc.com>
**Subject:** PR Hybrid
**Importance:** High

Hi John,

I fear sending you the confusing opinion letter puts us several steps back to getting to some pressing issues. Here are the 2 most pressing issues, which I view as independent of the opinion letter:

This is about Goodwill created (or not created) in 2012, when I liquidated a C-Corp that I was sole shareholder of, and continued the basis (with adjusted basis) personally, through the disregarded entity Bellicose Capital, LLC (the entity later assigned into the Hybrid in 2015).  Only the 2012 liquidation of C-corp is relevant for these questions:

1)  #1 priority to figure out:
    a.   Could GW have existed from a liquidation of a business to myself in 2012?
       i.   Is that even possible for me to pay for "reputation of the business" when all I am doing is taking out all of the assets?
      ii.   PMA lawyer said on the last call, he doesn't think we could have GW in 2012 but he had to research it.
     iii.   BDO said today they don't think I'd have GW from the 2012 transaction.  BDO also seemed to think to the extent GW represents repetition of customers, that it'd be captured for me in the value of my 2 servicing contracts (I only have 2 long-term clients)
    b.   The valuation team is beginning their asset-by-asset valuation today for 2012.  Do we tell them that the sum of IP valuations they are doing must total $7.7mm (with or w/o GW, per outcome above)?:
       i.   $7.7mm is the "liquidation value" per Deloitte 2012 FMV study (attached), not sure why they did not call it GW.  The accounting firm, in 2013 and 2014 called it GW for amortization purposes but they say it doesn't matter.  It was never impairment tested.
      ii.   BDO's valuation people said today, under any circumstance, NAV including intangibles and GW MUST total the 7.7mm liquidation value so the values equate exactly to the DCF values that Deloitte performed.

So the fundamental question is, did any of that $7.7mm "liquidation value" equate to GW in 2012?

I'm attaching the 2012 return and 2012 DT valuation.

Best,

CONFIDENTIAL



**Matt Martorello** / President
773-209-7720 / **Matt@LiontLLC.com**

**Liont, LLC**
875 Carretera 693, Suite 202, Dorado, PR 00646
**http://www.LiontLLC.com**

This electronic mail, including any attachments, is confidential and intended solely for the use of the individual to whom it is addressed.  Use or distribution by any unintended recipient is prohibited. Please notify the sender immediately if you have received this email by error and delete this email and all attachments from your system.

CONFIDENTIAL                                                                                    MARTORELLO_011450

# Exhibit 43

Message

---

**From**: Matt Martorello [matt@liontllc.com]
**Sent**: 8/26/2015 3:13:30 AM
**To**: Simon Liang [Simon@liontllc.com]
**CC**: Zayra Emanuelli [zayra@liontllc.com]
**Subject**: RE: Forecasts for Valuation

ECA – ignored
ICA – Once we get financials through July, we can easily do the forecast but ICA has 2 deals:
1) Tribe in OK which has been in great legal conflict for 8 or 9 months, so we'll have to decide how to view that as a going concern
2) SourcePoint, LLC has a contract with ICA to pay them about $9mm, but it never made a payment and seems unlikely that it will.  ICA already earned that and paid it's taxes on the income.  So I'm not sure this would be relevant.  Have to discuss with BDO I think. Zayra do you have this contract on file somewhere?
    a. ICA doesn't get paid from PBG right now, but something we can fix after we get the structure in proper order.
SPVI – Simon, please send the schedule of debt maturity dates going forward.  We have to look at the likelihood of those to renew and build that in.  Zayra, let's do a 5 year model and if we need to trim it back later we certainly can.  We should talk more with BDO about how to value in the CFPB rule, and even the expiration of the contract between SPVI and the Tribal client which I think is over in 2018 (Zayra please look up that contract)?  Anyone have the Servicing Agreement?  I'm sure the Tribe would want better terms at renewal, so have to discuss how to price that in too.
BC – this is easy and dependent on SPVI model first
BVI – also easy and dependent on SPVI model first

Zayra, have a look at the Aranca July 2014 409a valuations.  They ended forecasts at 2 years because they saw that either Operation Chokepoint (bank accounts and ACH processing gets shut off) or CFPB rule would end the business.  This was supported by news articles mainly.  Did BDO say that if the debt is less than 50% likely to renew that we should assume it expires?  I guess I didn't hear them say the same about Operation Choke Point and CFPB risk?  Is that so?  If that's the case, this is a model that only exists until the point at which the CFPB rule is projected to go into effect.  Which we can look up.

SPVI is the first priority, maybe we need a call Friday with BDO to discuss questions above for how we should do our modeling.  SPVI let's assume is going to be 5 years, but it's all based on a few things:
1) the client's business which is 100% funded by Debt and 0% equity.  So if the debt goes away, they are over and SPVI is over.  Some of the debt certainly will not renew and getting more debt from new parties we definitely cannot assume in the models.
2) Operation Choke Point may result in losing bank/ACH
3) Lawsuits by AGs and regulators against SPVI, myself, or the client (as the reports and cases filed to date against competitors supports) may end the business or seriously shrink the business
4) The business loses states every few months, meaning there will not be growth even if it were a going concern, but rather it'd be shrinking (i.e. PA, CT, CO were all major losses in 2014)
5) CFPB rule was proposed which if implemented ends the business.
So let's start with 5 year going concern and then shrink it by these factors above.

---

**From:** Simon Liang
**Sent:** Monday, August 24, 2015 5:21 PM
**To:** Matt Martorello <matt@liontllc.com>
**Cc:** Zayra Emanuelli <zayra@liontllc.com>
**Subject:** Re: Forecasts for Valuation

CONFIDENTIAL PURSUANT TO
PARTIES' PROTECTIVE ORDER

Matt,

I agree that ECA can be ignored. I'm working on BC and BVI financials. I will also send you IFI financials which should be consolidated with SPVI or BC for valuation purposes. Attached are BC, SPVI, ICA forecasts for 1/1/14 and 7/1/14 valuations. Please let us know how do you think and we can update them accordingly.

Zayra, is Juan able to do anything with ICA and KH?

---

**From:** Matt Martorello
**Sent:** Monday, August 24, 2015 2:33 PM
**To:** Simon Liang
**Cc:** Zayra Emanuelli
**Subject:** Forecasts for Valuation

Hi Simon,

For the restructuring valuations, the following entities will be valued as of 6/30/15:

1) Kairos Holdings, LLC
a. Bellicose Capital, LLC (also as of 7/31/15 for Gallant PR)
b. SourcePoint VI, LLC (also as of 7/31/15 for Gallant PR)
c. Bellicose VI, LLC (also as of 7/31/15 for Gallant PR)
d. Indian Country Analytics, LLC
e. Eventide Credit Acquisitions, LLC

-Eventide we can forget about.
-Obviously we'll need financials of the others done through 7/31/15 and make sure the Balance Sheets have been cleaned up to avoid any tax inaccuracies.
-Also, we need forecasts for SPVI, BVI, ICA. Do you have something a template you can provide for those? Maybe based on the forecasts we did for the 2014 409a study for BCap? Along with the 2013 Deloitte forecasts done for Indian Country Analytics?

Best,


LIONT

**Matt Martorello** / President
773-209-7720 / **Matt@LiontLLC.com**
**Liont, LLC**
875 Carretera 693, Suite 202, Dorado, PR 00646
**http://www.LiontLLC.com**

CONFIDENTIAL PURSUANT TO
PARTIES' PROTECTIVE ORDER

Exhibit 44

**To:** Ashish Rane[ashish.rane@aranca.com]
**Cc:** Zayra Emanuelli[zayra@liontllc.com]
**From:** Matt Martorello
**Sent:** Fri 3/10/2017 4:33:58 PM
**Subject:** RE: DRAFT memorandum regarding timing of evolution of CFPB rule
Memo regarding Small Dollar Rule history; Final 03-10-2017.docx

That was fast, final version attached for your records and incorporation to study/content

**From:** Matt Martorello
**Sent:** Friday, March 10, 2017 12:13 PM
**To:** 'Ashish Rane' <ashish.rane@aranca.com>
**Cc:** Zayra Emanuelli <zayra@liontllc.com>
**Subject:** FW: DRAFT memorandum regarding timing of evolution of CFPB rule

Wanted to get you the draft, some very minor edits may be coming later today or next week, but I think you'll find this very convincing as to why we thought (and data supported) "end of days in 2015" followed by 2016 suspecting we were in fact a "going concern" and **even at a competitive advantage** come Q2 2016!

You'll notice that the rule went from shutting everyone down, to shutting down the storefront payday product (meaning that entire demand and market opens up to online install, as a massive competitive advantage!)

As for Chokepoint, you'll see the data showing the choking off of transactional volume (a lot of fear prevalent in the markets). Followed by a very strong recovery in 2nd Half of 2015 and on into 2016. You could imagine, this isn't only about the lenders and their volume, but a debt provider whose borrower puts out 100% of the borrowed funds and then suddenly cannot access banking to get that money back, would certainly be jumping on the sidelines in 2014/2015.

**From:** Hackett, Rick [mailto:rhackett@hudco.com]
**Sent:** Friday, March 10, 2017 11:25 AM
**To:** Matt Martorello <matt@liontllc.com>
**Cc:** Tim Ranney (tranney@clarityservices.com) <tranney@clarityservices.com>; Hackett, Rick <rhackett@hudco.com>
**Subject:** DRAFT memorandum regarding timing of evolution of CFPB rule

Dear Matt

I attach a DRAFT of the memo you requested.
Please let me know if it is acceptable and I will issue it in final.
Thanks
Rick


Richard P. Hackett
Partner, Admitted in Maine
Hudson Cook, LLP
Direct: (207) 541-9556 | Cell:  (207) 210-3409
22 Free Street | Suite 205 | Portland, ME 04101

JA2065

# HUDSON
## COOK

The information contained in this transmission may be privileged and may constitute attorney work product. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact Richard Hackett at rhackett@hudco.com or (207) 541-9556 and destroy all copies of the original message and any attachments.

JA2066

CONFIDENTIAL

MARTORELLO_011672



**HUDSON COOK**

Hudson Cook, LLP • Attorneys at Law • www.hudco.com

22 Free Street | Suite 205 | Portland, ME 04101
Direct: 207-541-9556 • Cell: 207-210-3409

rhackett@hudco.com

## PRIVILEGED AND CONFIDENTIAL MEMORANDUM

**To:**      Matt Martorello

**From:**    Rick Hackett

**Date:**    March 9, 2017

**Subject:** History of Federal Regulatory Intervention in Small Dollar Lending

Matt,

*Context*

You have asked us to reconstruct the history of developments in federal regulatory intervention in the small dollar lending market during the period 2015-2016. We have particularly focused in this memo on the public pronouncements and the known stakeholder interactions of the CFPB, which has now proposed a rule that will significantly impact small dollar installment lenders like your business, as well as other markets such as storefront payday lending and auto title lending. We also review briefly the information we have regarding the impact of Operation Chokepoint, an effort of the Department of Justice (DOJ) and the federal prudential banking regulators. As you requested, our primary focus is the change in outlook for your online installment lending servicing business between the end of Q2 2015 and the end of January 2016.

Although your companies are clients of Hudson Cook LLP, this memorandum is not intended to provide any legal advice or opinion. This work has been prepared in our capacity as business consultants to Clarity Services, and is intended to provide an accurate record of activities in which we participated in that capacity. In addition, given the sensitive nature of the work of the Small Dollar Round Table (described below), you have agreed to limit distribution of this memorandum to company officials, consultants, attorneys and advisors who have a need to access this information in support of the company's dealings with relevant government authorities, as well as to those authorities themselves.

*Summary Conclusions*

Beginning in the late fall of 2013, Operation Chokepoint severely threatened online lenders, who were faced with the loss of critical access to the payments system. This resulted both from "back channel" pressure on depository institutions by bank examiners who "blacklisted" high rate lenders and from pubic attacks by DOJ in the *Four Oaks* case. We can observe the resulting negative effects in transaction flow of lender business that we studied in our work with Clarity Services. However, by late 2015 that transaction flow appears to have recovered substantially, suggesting that the pressure on lender access to banking services had diminished by the end of 2015.

Of greater significance, the CFPB's publication of its Outline of Proposals for Payday, Auto Title and Similar Loans ("SBREFA Outline") on March 26, 2015 sent shock waves through the affected industries. By mid-2015 available information about CFPB intentions suggested that single payment (payday) lenders would be put out of business completely and online lenders of all types would face insurmountable regulatory requirements to document

HC#                                                                                    Hudson Cook, LLP
*Attorney-Client Communication*                                          *Confidential & Privileged*

JA2067

CONFIDENTIAL                                                                       MARTORELLO_011673



**HUDSON COOK**

Hudson Cook, LLP • Attorneys at Law • www.hudco.com

consumer ability to repay (ATR). However, subsequent to the SBREFA hearing in April 2015, the CFPB engaged extensively with industry to obtain practical input into the process of refining its SBREFA Outline into a detailed rule. That input ultimately resulted, in June 2016, in a set of proposals that clearly favored online installment lenders who had the ability and history of using automated data inputs to underwrite loans, and clearly disfavored storefront single payment lenders, who utilize little or no underwriting. This memo reviews the history of public, but not published, interactions with the Bureau that led to a more optimistic view of online installment lender prospects by early 2016. We understand that you were privy to these developments indirectly, as a customer of Clarity Services. Clarity was an active and continuing participant in the regulatory interactions described below.

*Operation Chokepoint*

We have published detailed information about the effects of Operation Chokepoint on the online lending market, in our capacity as consultants to Clarity Services. In that capacity, we have access to de-identified versions of the Clarity production database. That database contains the history of hundreds of millions of loan applications and tens of millions of loan transactions of hundreds of small dollar lenders, mostly online. Our work is published at www.nonprime101.com.

Our first review of the results of Operation Chokepoint was published in February, 2015. See the link below.[1] Our data in 2015 showed a significant loss of business by online lenders correlating with the first reports of Operation Chokepoint activities. That loss affected online installment lenders most severely, because those lenders must rely on ACH access to consumer accounts to receive payments over an extended period of time. The mere threat of a future interruption of ACH access by the ODFI (the bank of account for the lender) would force curtailment of new loans. Since Chokepoint was completely opaque, taking the form of secret pressure by bank examiners on depositories, that was unpredictable as to timing, the threat to a longer term lender was impossible to quantify, but severe. This opacity and uncertainty necessarily affected the ability of lenders to obtain funding for ongoing operations from capital sources.

Our 2015 data showed the results on the market in Figure 1:

**FIGURE 1: COUNT OF LOANS BY TYPE BY QUARTER**

[1] https://www.nonprime101.com/wp-content/uploads/2016/07/Regulatory-Intervention-Report-4-v2-3415.pdf

JA2068

CONFIDENTIAL                                                                   MARTORELLO_011674

# HUDSON COOK

Hudson Cook, LLP • Attorneys at Law • www.hudco.com

**TRIBAL LENDERS**



As you can see from Figure 1, Operation Chokepoint began in the fall of 2013 and severely impacted all tribal originated online loans, with the greatest impact on installment loans. At the time of our study in early 2015, there was no indication of recovery of online installment business.

We recently had occasion to conduct a new study of online lending volumes, this time tracking trends for a group of lenders who have been customers of Clarity for at least 3 years. Unlike the data shown above, this study includes both tribal lenders and state licensed online lenders. As shown in Figure 2, online lending has recovered significantly from the effects of Chokepoint, even though some lenders continue to report difficulties maintaining multiple banking relationships.

**Figure 2: Growth of Count of Online Loans Quarterly 2013-2016; Q1 2013 = 100**

JA2069

CONFIDENTIAL                                                                    MARTORELLO_011675

**HUDSON COOK**

Hudson Cook, LLP • Attorneys at Law • www.hudco.com



As seen in Figure 2, our mix of tribal and state-licensed online installment lenders showed the severe business dip seen on our study of tribal lenders in 2013-2014. By Q2 2015, however, that retrenchment ended and began a sustained recovery, although it was not clear the recovery was continuous until the end of 2015. Our data also shows a reduction in online installment volume in 2016. Even in 2016, however, the market retained volume that is 400% of the levels of Q1 2014, the worst point in Choke Point. Our data suggests that reductions in 2016 volumes reflect tighter credit criteria and not reduced demand. We will publish a paper on this issue in April 2017.

The market data above reflects the state of public information about Operation Chokepoint by early 2016. DOJ did not file additional cases after *Four Oaks.* In additional, Congressional pressure was placed on DOJ and the prudential banking regulators by legislators who strongly opposed non-transparent attempts to harm lawful businesses through the secret supervisory process.

Thus, by January 2016, it was reasonable to conclude, and the market had concluded, that the threat presented by Operation Chokepoint had run its course – or was at least manageable.

### *CFPB Rulemaking*

From the publication of its first data study on storefront payday lending in April 2013, the CFPB had telegraphed that it was severely troubled by consumer use patterns in single-payment or payday loans. The publication of the SBREFA Outline in March 2015, however, was the first formal indication that the Bureau planned to regulate other liquidity products such as installment loans and title loans.

The approach of the SBREFA Outline was necessarily broad brush and non-specific. The SBREFA process requires providing just enough information to put small businesses on notice of the potential scope of a future rulemaking, in order to allow them to participate in a public hearing through "Small Entity Representatives" chosen by the CFPB.

JA2070

CONFIDENTIAL                                                              MARTORELLO_011676



HUDSON COOK, LLP • Attorneys at Law • www.hudco.com

The SBREFA outline was fairly specific, however, in its description of proposed underwriting requirements. It suggested that lenders would be required to compute consumer cash flows in order to demonstrate ATR for a loan. The lender would need to show computations demonstrating that the consumer's income was sufficient to pay existing legal obligations, costs of living, and the new loan payment, without being cash-flow negative in any pay period over the term of the loan. More significant for online lenders, the SBREFA Outline suggested that lenders would need to manually review proof of income, and proof of obligations such as residential leases and child support orders. Given the small dollar amounts involved, the outlined requirements involved costs that would outweigh the revenues from the loans involved.

Such was the state of play in June 2015.

As we now know, the CFPB significantly moderated the ATR approach in its actual proposed rule in June 2016. It authorized use of images of income documents and even use of databases built off of such images to verify income. It also authorized "screen scraping" of bank account information showing income. More important for the online installment industry, it clarified that proof of a consumer's existing obligations need only involve consumer-stated information (which can be collected easily in an online application) and verification of that information through automated data feeds, namely a major bureau credit report and a specialty credit report (the latter covering small dollar lending). Finally, information regarding a consumer's living expenses could be proxied by using publicly available datasets, such as those published by the Bureau of labor Statistics (BLS).

The ramifications for online installment lenders of the June 2016 evolution of CPFB thinking were strongly positive. Online installment lenders are already adept at utilizing automated data feeds for underwriting. In addition, commercially available products to combine those feeds with BLS proxies to produce a "regulatory ATR" analysis were announced shortly after the June rule proposal.[2] While it was likely that some current customers of online installment lenders could not pass a regulatory ATR test, it was also likely that most of the storefront payday customers would be denied that product as a result of the rule.[3] Those customers who were pushed out of the storefront payday market, however, would very likely qualify for the smaller payments of an installment loan.[4]

In short, the Bureau's ultimate proposal was workable for online installment lenders, in a way that the SBREFA Outline was not, and the rule proposal also promised to displace a large number of storefront payday customers into the online installment market.

We understand your ultimate question to be: was it reasonable to predict this outcome in January 2016? We believe a knowledgeable observer of the regulatory interaction at that time would say "yes."

*What Industry Insiders Knew Before June 2016*

Beginning as far back as 2011, when I served as Assistant Director of the CFPB responsible for the small dollar market, CFPB sought regular interaction with small dollar lender trade associations and major market participants. CFPB also regularly interacted with consumer advocate groups about small dollar lending, including Pew Research,

---

[2] See, for example, Clarity Services ClearAbility product.
[3] The storefront payday industry would almost certainly contract by over 80% under the rule, and perhaps disappear entirely except in large cities, given the significant overhead costs of the bricks and mortar channel.
See **https://www.nonprime101.com/wp-content/uploads/2017/02/report-9-updated.pdf**
[4] See **https://www.nonprime101.com/wp-content/uploads/2017/01/Report-8-Can-Storefront-Payday-Borrowers-Become-Installment-Loan-Borrowers-Web-1.23.pdf**

*Confidential & Privileged*

JA2071

CONFIDENTIAL                                                                                    MARTORELLO_011677



**HUDSON COOK**

Hudson Cook, LLP • Attorneys at Law • www.hudco.com

National Consumer Law Center, The Center for Responsible Lending, The National Council of La Raza and others. CFPB's purpose included informing the stakeholders of the results of ongoing research, receiving input on related research and policy arguments, and understanding business realities in the affected markets. CFPB's overarching purpose was to continue the availability of small dollar credit, but in a much safer and sustainable form than the market currently provided. CFPB also sought to promote dialogue between stakeholders, believing its job would be made easier and less controversial, to the extent that principles and approaches could be hammered out that were acceptable to both industry and consumer advocates.

In view of CFPB's approach, a group of online installment lenders as well as selected vendors to the industry (including Clarity Services), reached out to the consumer advocate groups identified above and invited them to participate in a series of round tables to discuss the impending rule. Encouraged by a non-partisan moderator hired to lead the group, many of the consumer advocates joined that effort.

The "Small Dollar Roundtable (SDR)," as it came to be known, began meeting in December 2014. By February 2015, it scheduled its first joint meeting with Bureau officials and rule writers. Some of the early concepts from that time period showed up in the SBREFA outline.

Soon after the April, 2015, SBREFA hearing, the CFPB reached out to the SDR for another meeting. Among other things, the Bureau sought industry ideas on how their ATR approach could be made workable in the real world of automated underwriting. By the fall of 2015, the SDR had met a half dozen times and had agreed on underwriting principles. Those presented to the CPFB in **October 2015**, included the following:

"The Small Dollar Roundtable supports the use of third party verification of income and expenses:

- The CFPB regulation should allow lenders to use non-paper based electronic information feeds to make underwriting decisions, to the extent that such information is from third party transaction or other business records, and not solely from self-certified consumer information.

- Permissible electronic sources should include commercial or governmental records maintained in the ordinary course, provided the lender reasonably believes they are reliable.

- Third party transaction information is permitted as long as it is generated from customer transactions.

The Small Dollar Roundtable supports the use of third party statistical proxies for calculating expenses, where no electronic feed of customer-specific information is available. As an example, BLS or census data for housing expense would be reasonable proxy where no mortgage exists, provided that the proxy is made specific to the consumer's residential location (e.g., census tract or Zip+4). Proxies may not be used for income verification."

The foregoing approaches all made their way into the June 2016 rule proposal.

While the CFPB provided no formal assurance that it would follow these suggestions in 2015, this writer felt it was likely that CFPB would be heavily influenced by the SDR's recommendation. The SDR's input

JA2072

CONFIDENTIAL                                                      MARTORELLO_011678



**HUDSON COOK**

Hudson Cook, LLP • Attorneys at Law • www.hudco.com

provided both  (a) a workable way to achieve CFPB goals of low-cost in-depth underwriting (at high speeds), and (b)  a solution that many consumer advocates thought was sufficient in reducing risks to consumers. Based on this logic, in 2015 Clarity Services accelerated its plans to build an automated ATR system based on the foregoing principles and shared those plans with its customers – as well as its optimism that the system approach would fit the rule proposal.

We understand that your company was one of the Clarity customers who was brought into the loop on these developments in late 2015.[5] If that is the case, then you had a reasonable basis in early 2016 to conclude that there was a good opportunity for business continuation under the impending CPFB rule proposal – indeed the rule might increase your business due to its unfavorable treatment of storefront payday lending.

---

[5] The SDR activities were necessarily confidential amongst the participants in 2015, although they were revealed in general terms in the CFPB's rule proposal. The details set forth herein are confidential, and you are not authorized to share them except as provided in the second paragraph of this memorandum.

*Confidential & Privileged*

JA2073

CONFIDENTIAL                                                           MARTORELLO_011679

Exhibit 45

# INTRATRIBAL

# SERVICING AGREEMENT

# BETWEEN

# BIG PICTURE LOANS, LLC

# AND

# ASCENSION TECHNOLOGIES, LLC

February 16, 2016

JA2075

CONFIDENTIAL

LVD-DEF00002335

## TABLE OF CONTENTS

1.   Recitals. ........................................................................................................ 1

2.   Definitions ................................................................................................... 1

3.   Covenants ..................................................................................................... 2

4.   Business and Affairs in Connection with Enterprise. ......................................... 4

5.   Liens .............................................................................................................. 7

6.   General Provisions. ......................................................................................... 7

7.   Grounds for Termination. ................................................................................ 9

8.   Consents and Approvals ................................................................................ 10

9.   Disclosures. ................................................................................................. 10

10.  Intratribal Dispute Resolution ...................................................................... 10

11.  Time is of the Essence .................................................................................. 10

12.  Governing Law ............................................................................................ 10

13.  Performance During Disputes ....................................................................... 10

14.  Confidential Information ............................................................................... 10

15.  Entire Agreement ......................................................................................... 11

16.  Additional Actions ....................................................................................... 11

*i*

JA2076

CONFIDENTIAL

LVD-DEF00002336

## INTRATRIBAL SERVICING AGREEMENT

**THIS INTRATRIBAL SERVICING AGREEMENT** (this "Agreement") is made and entered into as of February 16, 2016 (the "Effective Date") by and between BIG PICTURE LOANS, LLC ("Enterprise") and its Subsidiaries, and a limited liability company and wholly owned subsidiary of Tribal Economic Development Holdings, LLC ("TED"), a wholly owned and operated economic arm and instrumentality of the LAC VIEUX DESERT BAND OF LAKE SUPERIOR CHIPPEWA INDIANS (the "Tribe"), a federally-recognized Indian Tribe, and ASCENSION TECHNOLOGIES, LLC, a limited liability company and wholly owned subsidiary of TED ("Servicer"). Each of Enterprise and Servicer may be referenced hereinafter individually as a "Party" or together, as the "Parties."

1. **Recitals.**

    **1.1**    The Tribe is a federally-recognized Indian tribe. The Tribe possesses sovereign governmental authority pursuant to the Tribe's inherent and recognized powers of self-government.

    **1.2**    The Tribe has established Enterprise and Servicer as limited liability companies wholly owned by TED and formed under the laws of the Tribe, as economic development arms and instrumentalities of the Tribe whose purpose is to promote the self-sufficiency of the Tribe and to address the socio-economic needs of the Tribe, its members, its families, and its community by building capital within the tribal community. The Tribe, through Enterprise, is engaged in small loan transaction business. It is the Tribe's hope that Enterprise's endeavors will improve the economic conditions of its members; enable the Tribe to better serve the social, economic, educational and health needs of the Tribe, its members, and its community; increase Tribal revenues; enhance the Tribe's economic self-sufficiency and self-determination; and provide positive, long-term social, environmental and economic benefits. Enterprise wishes to use its Affiliate, Servicer, to provide managerial, technical and financial experience and expertise for the continued development and operation of its Small Loan Transaction Business, as defined below.

    **1.5**    The Servicer represents and warrants that it, along with all other members of the management having any responsibility for the servicing of the business of the Enterprise, meets the eligibility requirements for licensing pursuant to the Tribal Consumer Financial Services Regulatory Code ("Code"). Proper licensing pursuant to the Code is a requirement for entering into this Agreement.

2. **Definitions**. Unless otherwise specified in this Agreement, as they are used in this Agreement, the terms listed below shall have the meaning assigned to them in this Section:

    **2.1**    **Affiliate**. "Affiliate" means as to Servicer or Enterprise, any corporation, partnership, limited liability company, joint venture, trust, department or agency controlled by, under common control with, or which controls, directly or indirectly Servicer or Enterprise. "Control" means (i) ownership, control, or power to vote twenty five percent (25%) or more of the outstanding shares of any class of voting securities, directly or indirectly or acting through one (1) or more persons, (ii) control in any manner over the election of a majority of the directors, trustees or general partners (or individuals exercising similar functions), or (iii) the power to exercise, directly or indirectly, a controlling influence over management or policies.

*1*

CONFIDENTIAL

**2.2** **Authorized Debt**. "Authorized Debt" shall mean debt incurred by Enterprise, a Subsidiary, or TED to operate the Small Loan Transaction Business or in the past acquisition of other entities, including from one or more Commercial Finance Providers, and any extensions or renewals of such debt.

**2.3** **Chief Executive Officer.** "Chief Executive Officer" or "CEO" shall mean the person employed by Enterprise to direct the day-to-day operations of Enterprise and to coordinate with the Servicer as defined above as well as any other entities providing services to the Enterprise.

**2.4** **Commercial Finance Provider.** "Commercial Finance Provider" shall mean any entity that provides credit to Enterprise, its Subsidiaries, or TED or any TED subsidiaries.

**2.5** **Consumer Loan Transaction.** "Consumer Loan Transaction" means any form of consumer financial services transaction provided by a financial services licensee allowable under the Code.

**2.6** **Enterprise**. The "Enterprise" is the instrumentality and commercial subdivision of the Tribe held by the Tribe's holding company, TED, formed to engage in the Small Loan Transaction Business.

**2.7** **Legal Requirements**. "Legal Requirements" shall mean singularly and collectively all applicable laws including without limitation all Tribal and federal laws and regulations, as amended and in effect from time to time.

**2.8** **Operating Budget.** "Operating Budget" shall consist of categorically budgeted expenses necessary to operate the Small Loan Transaction Business.

**2.9** **Servicing Budget**. "Servicing Budget" shall consist of categorically budgeted expenses necessary to carry out its responsibilities under this Agreement.

**2.10** **Servicing Fee**. "Servicing Fee" shall have that meaning given to it in Section 3.4.

**2.11** **Small Loan Transaction Business**. "Small Loan Transaction Business" means the activities of a financial services provider in providing Consumer Loan Transactions pursuant to Section 2.5 of the Code.

**2.12** **Subsidiary**. "Subsidiary" shall mean any entity formed and wholly-owned by Enterprise.

**2.13** **TED**. "TED" means the Tribal entity known as Tribal Economic Development Holding, LLC, the parent entity of Enterprise and Servicer.

**3.** **Covenants**. In consideration of the mutual covenants contained in this Agreement, the Parties agree and covenant as follows:

**3.1** **Engagement of Servicer**. The Enterprise hereby retains and engages Servicer as its independent contractor for itself and its Subsidiaries for the purposes of providing those business management, consulting and professional services to Enterprise pursuant to the terms of

JA2078

CONFIDENTIAL

LVD-DEF00002338

this Agreement and advising the CEO of the Enterprise. Servicer shall have the authority and responsibility to manage communication and interaction between Enterprise and each vendor, Commercial Finance Provider and other agents of Enterprise. Nothing contained herein grants or is intended to grant Servicer a titled interest to or in Enterprise. The Servicer hereby accepts such retention and engagement as an independent contractor. Enterprise acknowledges that most of the services contemplated by this Agreement shall be provided by the Servicer from its office locations.

**3.2**   **Term**. The term of this Agreement shall begin on the Effective Date of this Agreement and continue until ten (10) years from the Effective Date ("Term"). The Term shall automatically renew for an additional period of two (2) years unless either Party hereto provides written notice to the other Party at least one hundred twenty (120) days, but no greater than one (1) year, prior to the end of the Term.

**3.3**   **Servicer's Compliance With Law; Licenses**. The Servicer covenants that it will at all times comply with all Legal Requirements and maintain any required licenses issued under any of the foregoing.

**3.4**   **Servicing Fee**. Enterprise agrees to pay Servicer the following fee (the "Servicing Fee"), calculated on a monthly basis, the sum of the following:

**3.4.1**   Manpower charges. Servicer will charge (i) 110% of the hourly salary costs which shall be based on the historical labor-only costs charged in providing the services under this Agreement by the previous servicer, and (ii) pay 100% of all associated payroll taxes and other employment expenses for Servicer's employees. Servicer agrees to keep staffing levels to those typical in the marketplace and to follow the Servicing Budget.

**3.4.2**   Internal Expenses. Those internal costs, including expenses to Affiliates and the Tribe, travel expenses, supplies, etc. capped by the Servicing Budget.

**3.4.3**   Non-affiliated Overhead Expenses. The non-affiliated, third-party costs associated with overhead expenses (such as phone, rental space, non-affiliated vendors etc.) incurred by Servicer in the course of providing service under this Agreement shall be allocated (i) 100% to Enterprise as Enterprise is the sole beneficiary of the expense, and (ii) for expenses where the Enterprise is not the sole beneficiary, to Enterprise by a mutually agreed upon methodology that ensures a fair distribution of costs and follows generally accepted accounting principles (GAAP).

**3.4.4**   Enterprise/Servicer Retention Incentive Plan. In an effort to retain employees hired by Servicer after the Effective Date of this Agreement, Servicer will set up a bonus plan that may be no more than 150% of employee wages and approved in the annual Servicing Budget.

**3.5**   **No Preexisting Contracts**. The Enterprise covenants that there are no valid preexisting contractual impediments to the entry by the Enterprise into this Agreement.

**3.6**   **Engagement of Vendors.** During the term of this Agreement, Enterprise covenants that it will not engage any vendor needed for the Small Loan Transaction Business

3

CONFIDENTIAL

JA2079

LVD-DEF00002339

without the benefit of satisfactory completion of Servicer's due diligence and recommendation to engage vendor.

**4.     Business and Affairs in Connection with Enterprise.**

  **4.1     Servicer's Authority and Responsibility**.  It is the Parties' intentions that Servicer shall provide management, consulting and analytical services to assist the Enterprise and its Subsidiaries in operating its Small Loan Transaction Business.  In this role, Servicer is hereby granted the necessary power and authority to act in order to fulfill its responsibilities under this Agreement. However, the execution of agreements necessary or appropriate to effectuate the terms of this Agreement will be entered into by the Enterprise such agreements are in the name of the Enterprise.  Servicer has no authority to engage in origination activities, execute loan documentation, or approve the issuance of loans to consumers. Final determination as to whether to lend to a consumer rests with Enterprise and its Subsidiaries.  Servicer shall owe a fiduciary duty to the Enterprise and its Subsidiaries.

  **4.2     Duties of the Servicer**. In providing services to Enterprise and its Subsidiaries, the Servicer's duties include, without limitation, the following:

   **4.2.1     Operations**. Consistent with the Servicing Budget, the Servicer shall develop and recommend to the Enterprise and its Subsidiaries reasonable measures for the orderly administration and management of Enterprise in the areas of financial reporting, financing, regulatory compliance, marketing, human resources, development of vendor relationships, collections and risk assessment, and shall implement such recommendations, including:

    **(a)**     Screening of and selecting vendors and Commercial Finance Providers, and negotiating agreements with such vendors and Commercial Finance Providers on behalf of the Enterprise on such terms and conditions as Servicer may reasonably determine to be appropriate;

    **(b)**     Development and promotion of sound and positive business relationships on behalf of Enterprise with the designated vendors and Commercial Finance Providers, including, but not limited to, the enforcement or termination of agreements with such vendors and Commercial Finance Providers;

    **(c)**     Identification of vendors needed for the Small Loan Transaction Business;

    **(d)**     Preparation of suggested practices and recommendations of suggested practices governing the operations of the Enterprise and its Subsidiaries to provide that operations are conducted in a manner that is consistent with the best interests of Enterprise and its Subsidiaries and generally accepted industry standards;

    **(e)**     Preparation of regulatory and compliance standards and practices and recommendations to the Enterprise and its Subsidiaries of such standards and practices to be adopted by the Enterprise and its Subsidiaries provided that such operations are conducted in a manner consistent with the best interests of Enterprise and its Subsidiaries and generally accepted industry standards;

*4*

JA2080

LVD-DEF00002340

(f)    Preparation of training and education standards and recommendations to the Enterprise and its Subsidiaries of suggested practices to be adopted by the designated vendors to provide that such designated vendors are conducting business with the Enterprise in a manner that is consistent with the best interests of Enterprise and its Subsidiaries and generally accepted industry standards;

(g)    Assistance to the CEO, at his or her request, in the selection, hiring, training, control and discharge of employees performing regular services for Enterprise and its Subsidiaries in connection with the maintenance, operation, and management of the Small Loan Transaction Business;

(h)    Preparation of standards for financial reporting and accounting and recommendations to the Enterprise and its Subsidiaries of best practices to be adopted by the designated vendors and Commercial Finance Providers of the Enterprise and its Subsidiaries to provide that such designated vendors and Commercial Finance Providers are conducting business in a manner that is consistent with the best interests of Enterprise and its Subsidiaries and generally accepted accounting standards presented on a cash basis;

(i)    Preparation of standards and screening and review of and making recommendations to the Enterprise and its Subsidiaries regarding the website contents, marketing and consumer relations practices and designated vendors to provide that such designated vendors are conducting business in a manner that is consistent with the best interests of Enterprise and its Subsidiaries and generally accepted industry standards;

(j)    Monitoring and supervision of and reporting to the Enterprise and its Subsidiaries regarding the designated vendors to provide that such designated vendors are conducting business in a manner that is consistent with the standards, best practices, policies and requirements established by the Enterprise and its Subsidiaries;

(k)    Coordinating pre-qualified leads to Enterprise and its Subsidiaries and providing the necessary credit-modeling data and risk assessment strategies by which the Enterprise and its Subsidiaries may evaluate whether or not to extend funds to an individual borrower based on criteria that has been established by the Enterprise and its Subsidiaries. The criteria used to extend funds to individual borrowers will remain within the sole and absolute discretion of the Enterprise and/or its Subsidiaries and the Enterprise and/or its Subsidiaries shall execute all necessary loan documentation;

(l)    May be responsible for certain training and monitoring employees of the Enterprise and its Subsidiaries that operate the Enterprise's call center on behalf of itself and its Subsidiaries; and

(m)    Coordinating sale of Consumer Loan Transactions in default at prevailing market rates, to third-party debt collector vendors of the Enterprise.

**4.2.2**    <u>Consumer Loan Transaction Covenants and Agreements</u>. The Servicer shall assist the Enterprise and its Subsidiaries with the compilation and provision of information and reports (financial and otherwise) as may be reasonably requested by the CEO of the Enterprise and its Subsidiaries in connection with the business of Enterprise and its Subsidiaries or as

5

CONFIDENTIAL

JA2081

LVD-DEF00002341

required under Authorized Debt of Enterprise, including any reports required to comply with the covenants and agreements contained therein. The Servicer shall promptly advise the Enterprise in the event that the Servicer becomes aware of any matter that may cause a default by Enterprise or a Subsidiary under any documents evidencing any indebtedness or obligation of Enterprise or a Subsidiary.

**4.3    Employees.** Indian and Other Preference, Wages, and Training.  The Servicer shall, during the term of this Agreement, be required to give preference in recruiting, training and recommending employment to Native Americans in any job category of the Enterprise, in accordance with any employment preference laws of the Tribe now existing or later and the "near reservation" exception to Title VII of the Civil Rights Act of 1964, as applicable.

**4.4    Enterprise Bank Accounts.** In coordinating services to the Enterprise and its Subsidiaries, the Servicer shall follow any deposit account control or lockbox agreements established by the Enterprise and/or its Subsidiaries and mutually agreed to by the Commercial Finance Providers of Enterprise or its Subsidiaries.

**4.5    Operating Budget and Servicing Budget.**

**4.5.1    Operating Budget.**  Ninety (90) days prior to years end, Servicer shall provide to Enterprise an Operating Budget for the review and consent of Enterprise which meets all requirements under any agreement for Authorized Debt for an affiliated transaction.

**4.5.2    Servicing Budget.**  Ninety (90) days prior to year end, Servicer shall provide to Enterprise a Servicing Budget for the review and consent of Enterprise which meets all requirements under any agreement for Authorized Debt for an affiliated transaction.

**4.6    Internal Control Systems.** The Servicer shall recommend and assist the Enterprise and its Subsidiaries in implementing accounting standards applicable to the Small Loan Transaction Business.

**4.7    Daily Deposits to Bank Account.** The Servicer shall insure that gross revenues and other proceeds connected with or arising from the operation of Enterprise and its Subsidiaries are deposited daily into Enterprise and/or Subsidiary bank accounts pursuant to any applicable lockbox agreement and deposit account control agreements in effect under Section 4.4 except as to any restrictions on cash deposits imposed by the local bank.

**4.8    No Cash Disbursements.** The Servicer shall not have any authority to make any cash disbursements from the bank accounts or on hand cash.

**4.9    Accounting and Books of Account.**

**4.9.1    Statements.** The Servicer shall prepare and provide to TED and Enterprise and/or its Subsidiaries servicing statements on a monthly, quarterly, and annual basis, which shall include: comparative statements of all revenues after the first full year of operation, statements of all other amounts collected and received, and all deductions and disbursements made there from in connection with Enterprise. The monthly and quarterly servicing reports shall be delivered by the twenty-first (21st) day of the following month, with the annual servicing report delivered

CONFIDENTIAL

JA2082

LVD-DEF00002342

within ninety (90) days of the year-end and shall be in form satisfactory to meet all requirements under any Authorized Debt. In preparing such servicing reports, Servicer shall have access to all books and records, all cash management procedure manuals, all internal control manuals, and all other records, documents, papers and persons of Enterprise and its Subsidiaries or employed by Enterprise and its Subsidiaries that Servicer deems necessary. For each servicing review performed, Servicer shall provide the Enterprise and any appropriate Subsidiary with a letter noting any control weaknesses or other items which it believes should be brought to the attention of the Enterprise.

   **4.9.2**  **Accounting Standards**. Servicer shall maintain the books and records reflecting the operations of TED, Enterprise and its Subsidiaries (as related to the Small Loan Transaction Business) in accordance with accounting practices as required by the Enterprise or any requirement imposed by Authorized Debt. The accounting systems and procedures shall, at a minimum (i) include an adequate system of internal accounting controls; (ii) permit the preparation of financial statements on a cash basis; (iii) permit the calculation and payment of the Servicing Fee; and (iv) provide for funds flow pursuant to any agreement for Authorized Debt.

**5.**  **Liens**. As required by any agreements for Authorized Debt, neither Enterprise nor Servicer shall act in any way whatsoever, either directly or indirectly, to cause any Party to become an encumbrance or lienholder of any tangible or intangible personal property assets of Enterprise and its Subsidiaries.

**6.**  **General Provisions.**

   **6.1**  **Notice**. All notices and other communications hereunder shall be in writing, and shall be deemed to have been duly given (a) upon hand delivery thereof, (b) upon facsimile and written confirmation of transmission, (c) upon receipt of any overnight deliveries, or (d) on the third (3rd) business day after mailing United States registered or certified mail, return receipt requested, postage prepaid, addressed to each Party at the following addresses:

**If to Enterprise and/ or a Subsidiary**:

      Big Picture Loans, LLC
      P.O. Box 704
      Watersmeet, MI  49969

      with a copy to:

      Rosette, LLP

      25344 Red Arrow Hwy.
      Mattawan, Michigan 49071

**If to Servicer**:      Ascension Technologies, LLC
      P.O. Box 704
      Watersmeet, MI  49969

7

CONFIDENTIAL

JA2083

LVD-DEF00002343

with a copy to:

Attn: President

954 Ponce de Leon Avenue
[ Redacted ] Plaza Suite 601
San Juan, PR 00908

**6.2     Authorization**. The Enterprise and Servicer represent and warrant to each other that they each have full power and authority to execute this Agreement and to be bound by and perform the terms hereof. The Enterprise further warrants that it has complied with all applicable Tribal laws and procedures necessary to effectuate its obligations herein, including but not limited to any requisite Tribal approvals. Upon request, each Party shall furnish the other evidence of the authority represented in this Section 6.2.

**6.3     Further Actions**. Enterprise and Servicer agree to execute all contracts, agreements and documents and to take all actions necessary to comply with the provisions of this Agreement and the intent hereof.

**6.3.1     Situs of the Contracts**. This Agreement, as well as all contracts entered into between Enterprise and any person or any entity providing services to Enterprise or to the Servicer on behalf of Enterprise, shall be deemed entered into at the Big Picture Loans, LLC Office in Watersmeet, Michigan, and shall be subject to all Legal Requirements of the Tribe and applicable federal law, except as otherwise expressly provided herein.

**6.4     Tribal Laws**. The Servicer shall stay apprised of Tribal Law and assist Enterprise in meeting all requirements of Tribal Law as well as other Legal Requirements.

**6.5     Waivers**. No failure or delay by Servicer or Enterprise to insist upon the strict performance of any covenant, agreement, term or condition of this Agreement, or to exercise any right or remedy consequent upon the breach thereof, shall constitute a waiver of any such breach or any subsequent breach of such covenant, agreement, term or condition. No covenant, agreement, term, or condition of this Agreement and no breach thereof shall be waived, altered or modified except by written instrument. No waiver of any breach shall affect or alter this Agreement, but each and every covenant, agreement, term and condition of this Agreement shall continue in full force and effect with respect to any other then existing or subsequent breach thereof.

**6.6     Captions**. The captions for each Section are intended for convenience only.

**6.7     Severability**. If any of the terms and provisions hereof shall be held invalid or unenforceable, such invalidity or unenforceability shall not affect any of the other terms or provisions hereof. If, however, any material part of a Party's rights under this Agreement shall be declared invalid or unenforceable (specifically including Servicer's right to receive its Servicing Fees) the Party whose rights have been declared invalid or unenforceable shall have the option to terminate this Agreement upon thirty (30) days written notice to the other Party, without liability on the part of the terminating Party.

8

JA2084

CONFIDENTIAL

LVD-DEF00002344

**6.8**   **Survival of Covenants**. Any covenant, term or provision of this Agreement which, in order to be effective, must survive the termination or expiration of this Agreement, shall survive any such termination or expiration for a period of one (1) year following the termination or expiration of this Agreement.

**6.9**   **Survival of Remedy**. Subsequent to any termination of this Agreement, the dispute resolution provisions of this Agreement shall remain available to the Parties with respect to disputes arising out of or relating to this Agreement prior or subsequent for a period of one (1) year after the termination date.

**6.10**   **Periods of Time**. Whenever any determination is to be made or action is to be taken on a date specified in this Agreement, if such date shall fall on a Saturday, Sunday or any holiday observed by the Tribe, then in such event, said date shall be extended to the next day which is not a Saturday, Sunday or Tribal holiday.

**6.11**   **Modification**. Any change to or modification of this Agreement must be in writing signed by all parties hereto.

## 7.   **Grounds for Termination**.

**7.1**   **Voluntary Termination**. This Agreement may be terminated upon the mutual written consent and approval of the Parties.

**7.2**   **Termination for Cause**. Either of the parties may terminate this Agreement if the other Party commits or allows to be committed any material breach of this Agreement. A material breach of this Agreement shall include, but not be limited to, a failure of either Party to perform any monetary obligation within five (5) days of when due, or any nonmonetary material duty or obligation on its part for any twenty (20) consecutive days after notice. A Party may not terminate this Agreement on grounds of material breach unless it has provided written notice to the other Party of its intention to declare a default and to terminate this Agreement and the defaulting Party thereafter fails to cure or take steps to substantially cure the default within ninety (90) days following receipt of such notice. The discontinuance or correction of a material breach shall constitute a cure thereof.

**7.3**   **Consequences of Enterprise's Breach**. In the event of termination of this Agreement by the Servicer for cause under Section 7.2, the Servicer shall not be required to perform any further services under this Agreement and Enterprise shall indemnify and hold the Servicer harmless against all liabilities of any nature whatsoever relating to Enterprise, but only insofar as these liabilities result from acts within the control of Enterprise or its agents or created by the termination of this Agreement, and also with the source for such indemnification limited to the assets or future earnings of Enterprise and without recourse to other assets of the Tribe.

JA2085

CONFIDENTIAL

LVD-DEF00002345

8.    **Consents and Approvals**. As Subsidiaries of TED, each party has secured the necessary approvals to enter into this Agreement under their formation documents and the corporate structure.

9.    **Disclosures.**

    **9.1**    **Warranties**. The Servicer warrants and represents as follows: (i) no officer, director of the Servicer has been arrested, indicted for, convicted of, or pleaded nolo contendere to any felony or any offense related to the business of consumer lending or the Small Loan Transaction industry in general, or had any association with individuals or entities known to be connected with organized crime; and (ii) no officer or director of the Servicer, has or had any association with individuals or entities known to be connected with organized crime.

    **9.2**    **Disclosure Amendments**. The Servicer agrees that whenever there is any material change in the information disclosed pursuant to this Section 9 it shall notify the Enterprise in writing pursuant to Section 6.1.

10.    **Intratribal Dispute Resolution**. Both Parties shall attempt to resolve any dispute by mutual agreement between the Parties.

11.    **Time is of the Essence**. Time is of the essence in the performance of this Agreement.

12.    **Governing Law**. The interpretation, validity and performance of this Agreement shall be governed by the laws of the Tribe and in the absence of Tribal law, the laws of the State of Michigan, without regard to the conflicts of law rules of such Tribe or State. If any of the terms and provisions of this Agreement shall be held invalid or unenforceable for any reason, such invalidity or unenforceability shall not affect any of the other terms or provisions hereof, all such other terms and provisions to be valid and enforceable to the fullest extent permitted by law.

13.    **Performance During Disputes**. It is mutually agreed that during any kind of controversy, claim, disagreement or dispute, including a dispute as to the validity of this Agreement or to terminate the Agreement for cause, Servicer shall continue its performance of the provisions of this Agreement, subject to the maintenance of any licenses required to perform such duties.

14.    **Confidential Information**. Each of the Parties agree that any information received concerning any other Party during the performance of this Agreement, regarding a Party's organization, financial matters, marketing plans, or other information of a proprietary nature (the "Confidential Information"), will be treated by all Parties in full confidence and except as required to allow Servicer or Enterprise and its Subsidiaries to perform their respective covenants and obligations hereunder, or in response to legal process or appropriate and necessary inquiry, and will not be revealed to any other persons, firms or organizations; provided, however, that a Party may disclose such information to such of its officers, employees or agents who need to know the information for purposes of performing services to such Party for purposes related to this Agreement and who agree to keep such information confidential and to be bound by this Section to the same extent as if they were signatories to and bound by this Agreement. The provisions of this Section shall survive the termination of this Agreement.  Confidential Information shall include all information, data, knowledge, and know-how (in whatever form and however communicated) relating to the Enterprise and its Subsidiaries, or to its businesses, operations,

*10*

JA2086

CONFIDENTIAL

properties, products, strategies, plans, markets, or financial positions, that is delivered or disclosed by Servicer, or any Servicer representative, or any of its officers, directors, partners, employees, agents, affiliates, to Enterprise and its Subsidiaries in writing, electronically, verbally, or through visual means, or which Enterprise and its Subsidiaries learns or obtains aurally, through observation or through analyses, interpretations, compilations, studies, or evaluations of such information, data, knowledge, or know-how regardless of whether or not any such information is marked or designated "confidential."

The obligations not to use or disclose the Confidential Information shall not apply to Confidential Information which (a) has been made previously available to the public by Enterprise, a Subsidiary, TED, Servicer or the Tribe or becomes generally available to the public, unless the Confidential Information being made available to the public results in a breach of this Agreement; (b) prior to disclosure to a Party, the information was already rightfully in any such person's possession; or (c) is obtained by a Party from a third party who is lawfully in possession of such Information, and not in violation of any contractual, legal or fiduciary obligation to any Party with respect to such Confidential Information.

**15.    Entire Agreement**. This Agreement constitutes the entire understanding and agreement of the Parties hereto and supersedes all other prior agreements and understandings, written or oral, between the Parties.

**16.    Additional Actions**. Each of the Parties agrees to execute, deliver and, if necessary, record any and all additional instruments, certifications, amendments, modifications and other documents as may be reasonably required by another Party in order to effectuate, complete, perfect, continue or preserve the respective rights, obligations, liens and interests of the parties hereto to the fullest extent permitted by law; provided, that any such additional instrument, certification, amendment, modification or other document shall not materially change the respective rights, remedies or obligations of Enterprise and its Subsidiaries or the Servicer under this Agreement or any other agreement or document related hereto.

**[remainder of page intentionally left blank]**

*11*

CONFIDENTIAL

JA2087

LVD-DEF00002347

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the Effective Date.

BIG PICTURE LOANS, LLC

By: _Michelle Hazen_

Name: Michelle Hazen
Title: CEO

ASCENSION TECHNOLOGIES, LLC

By _Brian McFadden_

Name: Brian McFadden
Title: President

*Signature Page to Servicing Agreement*

CONFIDENTIAL

JA2088

LVD-DEF00002348

# Exhibit 46

# ASCENSION TECHNOLOGIES, LLC
## Delegation of Authority Policy

Ascension Technologies, LLC Co-Managers
Effective January 22, 2016

## 1. GENERAL PURPOSE

1.1. **Objective.** The Ascension Technologies, LLC ("Ascension") Co-Managers establish this Delegation of Authority Policy (the "Policy") to establish those powers granted to the President and those specifically reserved for determination by the Co-Managers.

1.2. **Matters Reserved For the Co-Managers.** The matters specifically reserved for the Co-Managers under this Policy include:

    a) approval of Ascension contracts that create an obligation for Ascension over $100,000 in a calendar year, as described in Co-Manager Meeting Minutes dated February 18, 2015;

    b) appointment and succession of the President of Ascension; and

    c) approval of adoption of any new major employee benefit plans and programs and approval of any major amendment of an existing major employee benefit plan or program (e.g., Pension Plan and Savings Plan) which might significantly alter the scope, nature or degree of benefits as presented by the President or otherwise accounted for in the Operating or Servicing Budget.

1.3. **Matters Reserved for the Member.** The matters specifically reserved for the Tribal Council as Member of Tribal Economic Development Holdings, LLC pursuant to Ascension's Operating Agreement include:

    a) approval of any agreement to borrow, pledge, assign, convey, encumber, grant security interest in, guaranty, or otherwise restrict the assets of Ascension;

    b) approval of any sale or other disposal of all or substantially all of the assets of Ascension; and

    c) approval of any waiver of sovereign immunity of Ascension.

JA2090

CONFIDENTIAL

LVD-DEF00002881

1.4. Matters Delegated to the President.  The Co-Managers expressly grant to the President:

   a) approval of Ascension strategic direction, goals and targets which shall be communicated to Co-Managers in accordance with Section 1.5 but no less frequently than quarterly.

   b) authority to execute documents on behalf of Ascension, subject to the limitations contained in Sections 1.2(a) and 1.3 herein;

   c) authority to open and maintain bank accounts and to interface with any lockbox service providers in the ordinary course of business of Ascension; provided however Co-Managers are informed of the locations and account numbers for any bank accounts opened pursuant to this delegation;

   d) authority to adopt, terminate, or change employee benefit plans or programs, except major additions or changes to major employee benefit plans or programs as set forth in Section 1.2(d) above; and

   e) authority regarding all matters necessary for the day to day management of Ascension, including delegation to subordinates, and the implementation of corporate objectives that are not specifically reserved to the Co-Managers set forth in Section 1.2 or Member set forth in Section 1.3.

1.5. Reporting by the President to the Co-Managers.  As part of the framework established by this Policy, the President is required to report regularly to the Co-Managers concerning the authority exercised and matters which come, or may come within, the scope of matters reserved for the Co-Managers or Member.

2. EXPENDITURE APPROVAL POLICY

The President has the authority to make expenditures in a manner consistent with the approved annual operating budget of Ascension, as limited by Section 1.2(a) herein.

3. COMMUNICATIONS ON BEHALF OF ASCENSION

3.1. Verbal communications.  All verbal communications with media, regulatory bodies, or other entities which may have a material effect on Ascension, are limited to the President, or a person directly delegated by the President to speak on behalf of Ascension or pursuant to Ascension's written and duly adopted communications policy.  Any such inquiries as well as how they were handled shall be reported to the Co-Managers within a reasonable time of the inquiry.

3.2. Written communications.  Any written communication with media, regulatory bodies, or other entities which may have a material effect on Ascension, must to be

Ascension Technologies, LLC Delegation of Authority Policy—approved January 22, 2016

2

JA2091

CONFIDENTIAL

LVD-DEF00002882

approved by the President, or a person directly delegated by the President, prior to release. The President, or the President's delegee, must circulate any proposed press release to news media to the Co-Managers prior to release.

4. CHANGES

Changes in this Policy require the unanimous approval of the Co-Managers and President.

5. PREVIOUS POLICIES

Unless incorporated by reference herein, this Policy represents the complete authority of the President adopted by the Co-Managers.

Approved this  22   day of January, 2016, by:

CO-MANAGER, ASCENSION
TECHNOLOGIES, LLC

By: _Michelle Hazen_

Name: Michelle Hazen
Title: Co-Manager

CO-MANAGER, ASCENSION
TECHNOLOGIES, LLC

By: _____

Name: James Williams, Jr.
Title: Co-Manager

JA2092

CONFIDENTIAL                                                                 LVD-DEF00002883

Accepted by:

PRESIDENT, ASCENSION TECHNOLOGIES,
LLC

By _____

Name: Brian McFadden
Title: President

Ascension Technologies, LLC Delegation of Authority Policy—approved January 22, 2016
4

JA2093

LVD-DEF00002884

CONFIDENTIAL

Exhibit 47

# LOAN AND SECURITY AGREEMENT

This LOAN AND SECURITY AGREEMENT (this "Agreement"), executed on September 14 , 2015 to become effective as of Close as defined in the Merger Agreement the Effective Date, by and between Tribal Economic Development Holdings, LLC, (together with its Subsidiaries as defined herein, successors and assigns, the "Borrower"), a wholly-owned holding company of the Lac Vieux Desert Band of Lake Superior Chippewa Indians, a federally recognized Indian tribe (the "Tribe"), and Eventide Credit Acquisitions, LLC, a Delaware limited liability company (together with its successors or assigns, the "Lender"). All capitalized terms that are not otherwise defined herein shall have the meanings ascribed to them in the Transaction Documents (as hereinafter defined).

This Agreement is made and delivered by Borrower in connection with the acquisition through merger of Bellicose Capital, LLC, a Delaware limited liability company (the "Company") by Borrower's subsidiary, LVD Tribal Acquisition Company, LLC, pursuant to that certain Agreement and Plan of Merger, executed on September 14 , 2015 but effective as of the Effective Date of the Merger Agreement among, Borrower, Bellicose Capital, LLC, and Eventide Credit Acquisitions, LLC (the "Merger Agreement"). Borrower and Lender may each be referred to as "Party" and collectively as "Parties."

## 1.    THE LOAN

1.1    Loan.  Subject to the terms and conditions of this Agreement, Lender hereby agrees to loan to or for the benefit of Borrower a principal amount equal to the Acquisition Amount as defined in the Merger Agreement to fund the purchase price for Company (the "Loan").  Should the Merger Agreement be canceled due to the failure to meet the conditions precedent in the Merger Agreement, this Agreement and the Note shall terminate.  The Loan shall be evidenced by that certain Promissory Note, dated as of the date hereof (the "Note") given by Borrower to the order of Lender, in the face amount of the Acquisition Amount.  This Agreement, the Note, the Merger Agreement, the Servicing Agreement, lockbox agreements, any deposit account control agreements, the Parental Guarantee and Sovereign Immunity Waiver Agreement and any and all other documents, amendments or renewals executed and delivered and/or held in escrow in connection with any of the foregoing, including any guaranties of any obligation of Borrower are collectively hereinafter referred to as the "Transaction Documents."

1.2    Interest.  Interest respecting the outstanding principal balance of the Loan will be charged to Borrower from time to time outstanding at the rate specified in the Note in accordance with the terms of the Note or as otherwise set forth in this Agreement.  Interest on the Loan will be based on the actual number of days elapsed in a given calendar month and an assumed 360-day year.

1.3    Payments.  Payments shall be set forth in the Note.

1.4    Conduct of Business.  Borrower, through Borrower's Subsidiaries, is (and throughout the term of the Loan shall be) engaged  in the business related to consumer lending for the Tribe (the "Business"), and Borrower's Subsidiaries shall not conduct any business activities unrelated to the Business while any Obligations (as hereinafter defined) are outstanding.

JA2095

MARTORELLO_000067

## 2.    GRANT OF SECURITY INTEREST

2.1    <u>Grant of Security Interest</u>.  In consideration of Lender's extending credit and other financial accommodations to or for the benefit of Borrower, Borrower and its Subsidiaries hereby grant to Lender a security interest in, a lien on and pledge and assignment of the Collateral (as hereinafter defined), including, without limitation, all claims against third parties arising out of or related to the Collateral.  The security interest granted by this Agreement is given to and shall be held by Lender as security for the payment and performance of all Obligations, including, without limitation, all amounts outstanding pursuant to the Note.  Borrower and Subsidiaries hereby authorized the filing of by Lender of any financing statement in any applicable jurisdiction, and such financing statement may describe the collateral as "all assets" or a similar description.

2.2    <u>Definitions</u>.  As used herein, the following definitions shall have the following meanings:

(a)    "<u>Business Day</u>"" shall mean any day other than a Saturday, Sunday or day that is or shall be a federal  holiday or a day on which banking institutions are required or authorized to close.

(b)    "<u>Collateral</u>" shall mean all of Borrower's and any Subsidiary's present and future right, title and interest in, to and under the following described property whether (unless otherwise defined herein, each capitalized term used herein shall have the meaning given to it in the UCC) whether directly owned by Borrower or owned by a Subsidiary:

(i)    all now existing and hereafter acquired or arising Accounts, Goods, General Intangibles, Payment Intangibles, Financial Assets, Deposit Accounts (including, without limitation, the Collateral Account), Chattel Paper (including, without limitation, Electronic Chattel Paper), Documents, Instruments, Software, Investment Property, Letters of Credit, Letter-of-Credit Rights, Commercial Tort Claims, money, Equipment, Inventory, Fixtures, and Supporting Obligations, together with all products of and Accessions to any of the foregoing and all Proceeds of any of the foregoing (including without limitation all insurance policies and proceeds thereof), and those agreements held in escrow for benefit of Lender in an Event of Default providing for the potential merger of Ascension Technologies, LLC; the control of certain intellectual property interests (specifically including website domain names); and certain vendor agreements;

(ii)    to the extent, if any, not included in clause (i) above, each and every other item of personal property and fixtures, whether now existing or hereafter arising or acquired, including, without limitation, all software use licenses, contracts and agreements, and all collateral for the payment or performance of any contract or agreement, together with all products and Proceeds (including all insurance policies and proceeds) of any accessions to any of the foregoing; and

(iii)    all present and future business records and information relating to any of the foregoing, including computer tapes and other storage media containing the same and computer programs and software (including without limitation, source code, object code and related manuals and documentation and all licenses to use such

JA2096

CONFIDENTIAL

MARTORELLO_000068

software) for accessing and manipulating such information, provided Borrower and its Subsidiaries may retain copies of the same business records and information as required by applicable law.

All such information shall be subject to Section 5.17 of this Agreement.

(c)    "Collateral Account" shall mean any account(s) of Borrower or a Subsidiary (including banking, ACH processing, reserve or other accounts in which Borrower or a Subsidiary may have an economic interest) through which Borrower or the Subsidiary conducts its Business and maintains a deposit account control agreements and lockbox agreements to protect the interests of Lender unless otherwise waived by Lender.

(d)    "Consumer" shall have the meaning given under the Code.

(e)    "Consumer Loan" shall mean a "Small Loan Transaction" as defined in the Tribal Consumer Financial Services Regulatory Code.

(f)    "Financial Assets" shall mean any security for an obligation of a person or a share participation or other interest in a person or in property or an enterprise of a person which is, or is of a type, dealt in or traded on financial markets, or which is recognized in any area which it is issued or dealt in as a medium for investment, or any property that is held by a securities intermediary for another person in Investment Property if the securities intermediary has expressly agreed with the other person that the property is to be treated as a financial asset.

(g)    "Investment Property" means a security, whether certificated or uncertificated, security entitlement, securities account, contract, or commodity account.

(h)    "Material Adverse Effect" shall mean, with respect to Borrower, any event, occurrence, development, fact, condition or change that individually or in the aggregate is or would be reasonably likely to be materially adverse to the operations or financial performance of Borrower or any of Borrower's Subsidiaries.

(i)    "Obligation(s)" shall mean, without limitation, all loans, advances, indebtedness, notes, liabilities and amounts, liquidated or unliquidated, owing by Borrower to Lender at any time, of each and every kind, nature and description, whether arising under this Agreement or otherwise, and whether secured or unsecured, direct or indirect (that is, whether the same are due directly by Borrower to Lender; or are due indirectly by Borrower to Lender as endorser, guarantor or other surety, or as borrower of obligations due third persons which have been endorsed or assigned to Lender, or otherwise), absolute or contingent, due or to become due, now existing or hereafter arising or contracted, including, without limitation, payment when due of all amounts outstanding respecting any of the Transaction Documents. Said term shall also include all interest and other charges chargeable to Borrower or due from Borrower to Lender from time to time and all fees, costs and expenses referred to in this Agreement.

(j)    "Person" or "party" shall mean individuals, partnerships, corporations, limited liability companies and all other entities.

JA2097

CONFIDENTIAL

MARTORELLO_000069

(k)   "Senior Debt" shall mean (1) the debt owed to Alpha Credit Resources, LLC, a Delaware limited liability company by Borrower or a Subsidiary; (2) those notes owed and acquired through the merger of Bellicose Capital, LLC into LVD Tribal Acquisition Company, LLC ("TAC"), and subsequently assigned by TAC to Borrower as set forth in Exhibit A of the Merger Agreement; (3) the successor in interest to the line of credit provided by Source Point VI, LLC originally held by Red Rock Lending, LLC and transferred to Big Picture Loans, LLC and reaffirmed; (4) the successor in interest to the line of credit provided by Source Point VI, LLC and Big Picture Loans, LLC as reaffirmed; and (5) such other debt as agreed to in writing by Lender pursuant to the Transaction documents.

(l)   "Senior Lender" shall mean any party providing Senior Debt, and collectively, "Senior Lenders."

(m)   "Subsidiary" shall mean Big Picture Loans, LLC, Ascension Technologies, LLC, LVD Tribal Acquisition Company, LLC and any other entity created as allowed under the Transaction Documents (collectively referred to as the "Subsidiaries")

(n)   "UCC" shall mean the Uniform Commercial Code in effect in the State of Delaware from time to time.

(o)   "Tribal" shall mean of or relating to the Tribe.

All other capitalized terms used in this Agreement shall have the meanings accorded to them in the UCC, and if not defined therein, the Merger Agreement or other applicable Transaction Document, or otherwise they shall have the word's or term's normal and customary use within the industry. Definitions referenced or used herein are for interpretation of this Agreement and the Transaction Documents only.

2.3   Ordinary Course of Business. Lender hereby authorizes and permits Borrower through the lockbox(es) established by mutual agreement and under the deposit account control agreements (unless other waived by Lender) to receive from its Subsidiaries the proceeds of the Collateral at Borrower's own cost and expense, and also liability, if any, subject to Borrower's and the Subsidiaries' obligations under this Agreement and the Note; provided however, that following an Event of Default or at maturity, the Lender may terminate all or any part of the authority and permission granted to Borrower and/or any Subsidiary with reference to the Collateral. Subject to the Senior Debt requirements, all proceeds of and collections of Collateral shall be retained by the lockbox agent and used for purposes of satisfying Section 1.2 of the Note and making disbursements thereunder. Borrower and its Subsidiaries acknowledge and agree that the lockbox agent must direct all funds available from each Subsidiary and the Borrower to follow the cash waterfall established by Section 1.2 of the Note. From and after an Event of Default which has not been waived by Lender, all proceeds of and collections of the Collateral shall be held in trust by Borrower and/or any Subsidiary for the benefit of Lender and shall not be commingled with any other funds or deposited in any bank account of Borrower or a Subsidiary other than a Collateral Account; and, from and after an Event of Default which has not been waived by Lender, Borrower and each Subsidiary agrees to deliver to Lender on the dates of receipt thereof by Borrower and/or its Subsidiaries, duly endorsed to Lender or to bearer, or assigned to Lender, as

JA2098

CONFIDENTIAL

MARTORELLO_000070

may be appropriate, all proceeds of the Collateral in the identical form received by Borrower and/or any Subsidiary.

2.4    Records.  Borrower and/or each Subsidiary shall deliver to Lender from time to time promptly at its request all invoices, original documents of title, contracts, chattel paper, instruments and any other writings relating thereto, and other evidence of performance of contracts, or evidence of the rendering of services of Borrower, or Subsidiary; and Borrower and/ or each Subsidiary will deliver to Lender promptly at Lender's request from time to time additional copies of any or all of such papers or writings, and such other information with respect to any of the Collateral and such schedules of accounts and such other writings as Lender may in its sole discretion deem to be necessary or effectual to evidence any loan or Consumer Loan hereunder or Lender's security interest in the Collateral.

2.5    Legends.  Borrower or Subsidiary shall promptly make, stamp or record such entries or legends on Borrower's or that Subsidiary's books and records or on any of the Collateral (including, without limitation, chattel paper or electronic chattel paper) as Lender shall request from time to time, to indicate and disclose that Lender has a security interest in such Collateral.  Such books and records may be maintained in electronic form (provided that any Consumer Loan shall be evidenced by electronic records which at all times comply with the requirements of all applicable federal and Tribal laws) and the entries or legends indicating or disclosing Lender's security interest shall be made electronically on any such electronic records.

## 3.    REPRESENTATIONS AND WARRANTIES

Borrower and each Subsidiary represent and warrant to Lender that the following are, and after giving effect to the transactions contemplated by this Agreement and the other Transaction Documents will be, true, correct and complete:

3.1    Organization and Qualification.  Borrower and Borrower's Subsidiaries are each duly formed and existing limited liability companies under Tribal law and are wholly-owned subsidiaries of Borrower, and therefore the Tribe.  Borrower and Borrower's Subsidiaries are in good standing under Tribal law and each has the power to own its property and conduct its business as now conducted and as currently proposed to be conducted.

3.2    Subsidiaries.  Borrower shall not during the term of this Agreement create additional subsidiaries without the written consent of Lender, but may terminate and dissolve at will any subsidiary that has terminated operations provided that such termination may not create a Material Adverse Effect.

3.3    Corporate Records.  Borrower's and Borrower's Subsidiaries' articles of organization have been duly filed and their articles of organization and operating agreement are in proper order.  All outstanding equity issued by Borrower and Borrower's Subsidiaries was and is properly issued and all books and records of Borrower and each Subsidiary, including but not limited to its minute books, operating agreement, and books of account, are accurate and up to date and will be so maintained.

3.4    Title to Properties; Absence of Liens.  Borrower and each Subsidiary has good and clear record and marketable title to all of its properties and assets, and all of its properties and assets,

-5-

CONFIDENTIAL

JA2099

MARTORELLO_000071

including the Collateral (as defined herein) to the extent owned by Borrower or a Subsidiary, are free and clear of all mortgages, liens, pledges, charges, encumbrances and setoffs, other than the Senior Debt and other security interests outstanding as of the Effective Date ("Permitted Liens").

3.5    Places of Business.  Borrower's principal place of business and chief executive office are located within Tribal jurisdiction at N5384 U.S. Hwy. 45, P. O. Box 704, Watersmeet, Michigan, 49969, and Borrower shall, during the term of this Agreement, keep Lender currently and accurately informed in writing of each of its and its Subsidiaries other places of business, and shall not change the location of any such principal place of business or open or close, move or change any existing or new place of business without giving Lender at least thirty (30) days prior written notice thereof unless otherwise waived by the Lender.

3.6    Valid Obligations.  The execution, delivery and performance of the Transaction Documents have been duly authorized by all necessary action and the Transaction Documents represent the legal, valid and binding obligation of Borrower and its Subsidiaries and are fully enforceable according to their terms, except as limited by (a) bankruptcy, insolvency, reorganization, receivership, moratorium and other laws affecting creditors' rights and (b) the exercise of judicial discretion and the application of principles of equity, good faith, fair dealing, reasonableness, conscionability and materiality (regardless of whether the applicable agreements are considered in a proceeding in equity or at law).

3.7    Conflicts.  There is no provision in Borrower's or any Subsidiary's organizational documents, if any, or in any indenture, contract or agreement to which Borrower or a Subsidiary is a party which prohibits, limits or restricts the execution, delivery or performance of Borrower's or a Subsidiaries obligations under the Transaction Documents other than those associated with the Senior Debt and 5.2 (c) of the Operating Agreement of the Borrower, as it exists on the Effective Date.

3.8    Approvals.  The execution, delivery and performance of the Transaction Documents have been duly authorized and approved by the Tribe, as member of the Borrower, do not and will not require any additional approval of or filing with any Tribal or governmental agency or authority or any other Person.

3.9    Litigation.  At the time of execution of this document, there are no actions, suits or proceedings pending or, to the knowledge of Borrower, threatened against Borrower or the Subsidiaries which would be reasonably expected to cause a Material Adverse Effect.

3.10    Title to Collateral.  As of the Effective Date and subject to Section 6.4, Borrower is the lawful owner of its assets constituting the Collateral, and the Collateral and each item thereof is free of all restrictions, liens, encumbrances or other rights, title or interests, credits, defenses, recoupments, set-offs or counterclaims whatsoever, other than the security interest granted to Lender hereby and the Permitted Liens.  Borrower has full power and authority to grant to Lender a security interest in the Collateral, and neither Borrower nor any of Borrower's Subsidiaries have transferred, assigned, sold, pledged, encumbered, subjected to lien or granted any security interest in, and will not transfer, assign, sell, pledge, encumber, subject to lien or grant any security interest in any of the Collateral (or any of Borrower's or its Subsidiaries' right, title or interest therein), to any person other than Lender or the holder of a Permitted Lien.  The Collateral is valid and genuine

-6-

JA2100

MARTORELLO_000072

in all respects.  Except as to claims by a Senior Lender, Borrower and each Subsidiary will warrant and defend Lender's right to and interest in the Collateral against all claims and demands of all persons whatsoever.

3.11    Third Parties.  Lender shall not be deemed to have assumed any liability or responsibility to Borrower, a Subsidiary or any third person for the correctness, validity or genuineness of any instruments or documents that may be released or endorsed to Borrower or a Subsidiary by Lender (which shall automatically be deemed to be without recourse to Lender in any event) or for the existence, character, quantity, quality, condition, value or delivery of any goods purporting to be represented by any such documents; and Lender, by accepting such security interest in the Collateral owned by Borrower or a Subsidiary, or by releasing any Collateral to Borrower or Subsidiary, shall not be deemed to have assumed any obligation or liability to any Consumer or to any other third party, and Borrower and each Subsidiary agree to indemnify and defend Lender and hold Lender harmless in respect to any claim or proceeding arising out of any matter referred to in this paragraph.

3.12    Taxes.  Borrower and each Subsidiary has filed, or will file, all applicable and required Federal, Tribal, state and other tax returns (except for such returns for which current and valid extensions have been filed), and all taxes, assessments and other governmental charges due from Borrower or a Subsidiary have been fully paid.  Borrower and each Subsidiary have established on their books reserves adequate for the payment of all applicable and required Federal, Tribal, state and other tax liabilities (if any).

3.13    Use of Proceeds.  Funds received under this Agreement may only be used for the acquisition of Bellicose Capital, LLC by TAC, and Borrower and/or its Subsidiaries shall receive good and valuable consideration in connection with such acquisition.

3.14    Compliance with Law.  As of the Effective Date, Borrower and each Subsidiary are in compliance with all applicable laws.

3.15    Disclosure.  This Agreement (together with all exhibits and schedules hereto), the other Transaction Documents and the other agreements, certificates and other documents furnished to Lender by or on behalf of Borrower and each Subsidiary related to effectuating the Transaction Documents do not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained herein or therein, in the light of the circumstances under which they were made, not misleading.  There is no fact known to Borrower or a Subsidiary which has not been disclosed to Lender in writing which could reasonably be expected to have a Material Adverse Effect.

## 4.    AFFIRMATIVE COVENANTS

4.1    Payments and Performance.  Borrower and each Subsidiary will duly and punctually pay and perform all Obligations on its part to be done or performed under this Agreement.

4.2    Books and Records; Inspection.  Borrower and each Subsidiary will at all times keep proper books of account in which full, true and correct entries will be made of its transactions in accordance with its standard practices, consistently applied.  Borrower and each Subsidiary will at all reasonable times, and on reasonable advance notice, make its books, records, and accounting

JA2101

CONFIDENTIAL

MARTORELLO_000073

practices and procedures available in its offices for a field inspection and examination by Lender and/or Lender's representatives and will permit inspection of the Collateral and all of its properties by Lender and/or Lender's representatives (a "Field Inspection"). Lender may, at its option and expense, require a Field Inspection not more than one (1) time in any calendar quarter, unless an Event of Default shall occur which has not been waived by Lender, in which case Lender shall be permitted to require a Field Inspection as frequently as Lender deems reasonably necessary. In the event that an infraction is found, all reasonable costs and expenses incurred by Lender in connection with any Field Inspection shall be borne by Borrower, otherwise such costs shall be borne by Lender. Borrower and/ or any Subsidiary will from time to time furnish Lender with such information and statements as Lender may request in its sole discretion with respect to the Obligations or Lender's security interest in the Collateral, and Borrower shall have a commercially reasonable time period to produce such information and statements. Borrower shall, during the term of this Agreement, keep Lender currently and accurately informed in writing of each location where Borrower's or a Subsidiary's records relating to its accounts and contract rights are kept, and shall not remove such records to another jurisdiction without giving Lender at least thirty (30) days prior written notice thereof.

4.3    <u>Financial Information</u>. Borrower and each Subsidiary will furnish to Lender:

(a)    real-time, read-only, online access to information concerning sums on deposit (including credits and debits) to any Collateral Account or other pertinent accounts and other information contained in technology used to monitor the Collateral;

(b)    as soon as available to Borrower and each Subsidiary, but in any event within thirty (30) days after the close of each calendar month, a full and complete signed copy of financial statements, which shall include a balance sheet of Borrower and each Subsidiary, as at the end of such month, and statement of profit and loss of Borrower and each Subsidiary reflecting the results of its operations during such month and shall be prepared by Borrower and each Subsidiary and certified by a senior officer of Borrower or each Subsidiary as appropriate having primary responsibility for the preparation of such financial statements as to correctness in accordance with Borrower's standard practices, consistently applied, subject to year-end adjustments;

(c)    as soon as available to Borrower or a Subsidiary, but in any event within thirty (30) days after the close of each calendar quarter, a full and complete signed copy of financial statements, which shall include a balance sheet of Borrower and each Subsidiary, as at the end of such quarter, and statement of profit and loss of Borrower and each Subsidiary reflecting the results of its operations during such quarter and shall be prepared by Borrower or the respective Subsidiary and certified by a senior officer of Borrower or the respective Subsidiary having primary responsibility for the preparation of such financial statements as to correctness in accordance with Borrower's standard practices, consistently applied, subject to year-end adjustments ; and

(d)    promptly, from time to time, such other financial data and information about Borrower or a Subsidiary, including a Subsidiary's Consumer Loans, if applicable, and the performance thereof, as Lender may reasonably request.

JA2102

CONFIDENTIAL                                                                                      MARTORELLO_000074

All information submitted pursuant to this Section 4.3 shall be certified as true, accurate, and complete in all material respects by Borrower or the respective Subsidiary.

4.4    Financial & Operational Performance.  Borrower and its Subsidiaries shall only use the Collateral for the benefit of TED and its Subsidiaries and to meet their fiduciary obligations to Lender under this Agreement.  Borrower and/or its Subsidiaries shall maintain a range of the cumulative loan portfolio (all Consumer Loans on Borrower's or a Subsidiary's balance sheet current up to sixty (60) days past due) of a minimum portfolio size of fifteen million dollars ($15,000,000) to a maximum portfolio size in any given month equal to 1.1 times the previous month's portfolio size.  All funds in excess of those required for (a) balancing requirements of Senior Lenders and (b) the monthly maximum portfolio size, shall be applied to Note payments. As long as Borrower and Subsidiaries meet their fiduciary obligations to maximize Note payments during the term of the Note, Lender agrees that Subsidiaries may do Business such that Note payments may be affected while portfolio size is within the above mentioned range.  Regardless of portfolio size, any additional debt may only be entered into as allowed under this Agreement.

4.5    Conduct of Business.  Borrower and each Subsidiary will maintain its articles of organization and existence in good standing and materially comply with all laws and regulations of the Tribe and of any other governmental authority which may be applicable to it or to the Business.  Each lending Subsidiary will maintain servicing agreements with the servicing Subsidiary in a form substantially the same as that in place at the execution of this agreement and not make any changes that would cause a Material Adverse Effect under this Agreement.

4.6    Contact with Accountant.  Borrower and each Subsidiary hereby authorizes Lender to directly contact and communicate with any accountant employed by Borrower or the respective Subsidiary in connection with the review and/or maintenance of Borrower's or the respective Subsidiary's books and records or preparation of any financial reports delivered by or at the request of Borrower or a Subsidiary to Lender.  To the extent any accountant is so employed, Borrower or the respective Subsidiary shall provide Lender with full contact information for such accountant or any other accountant which may be employed by Borrower or the respective Subsidiary to replace such accountant.

4.7    Taxes.  Borrower and each Subsidiary will promptly pay all applicable real and personal property taxes, assessments and charges and all franchise, income, unemployment, old age benefits, withholding, sales and other taxes assessed against it or payable by it before delinquent; provided that this covenant shall not apply to any tax assessment or charge which is being contested in good faith or any outstanding tax liability of Lender or its subsidiaries incurred prior to the Effective Date.  Lender may, at its option, from time to time, discharge any taxes resulting in a lien or encumbrance on the Collateral, or other charges resulting in liens or encumbrances on any of the Collateral, and Borrower will pay to Lender on demand or Lender in its sole discretion may charge to Borrower all amounts so paid or incurred by it.

4.8    Indemnity.  Borrower and each Subsidiary shall protect, defend (by counsel selected by Lender and reasonably acceptable to Borrower), indemnify and hold harmless Lender and Lender's officers, directors, partners, shareholders, members, employees, attorneys, successors and permitted assigns and any successors to Lender's interest in the Loan, their officers, directors, partners, shareholders, employees, attorneys,  successors and permitted assigns (collectively, the

-9-

CONFIDENTIAL

"Indemnitees") from and against all liabilities (including sums paid in settlement of claims), losses, costs, obligations, demands, suits, liens, damages, fines (including any sums ordered to be paid or expended by Indemnitees by any governmental entity as a fine), penalties or damages arising as a direct or indirect result of any of the following with respect to Borrower's, any Subsidiary's: (a) fraud, (b) intentional material misrepresentation, (c) failure to pay applicable taxes, (d) misapplication of funds (including any sums on deposit from time to time in the Collateral Account), (e) failure to apply funds to pay the Obligations following an Event of Default pursuant to Section 6, (f) additional financing incurred or guaranteed by Borrower or any Subsidiary in violation of the terms of the Transaction Documents, (g) transfer of substantially all of Borrower's or Subsidiary's assets without consent of Lender, (h) gross negligence, (i) willful misconduct, and (j) court costs and attorneys' fees. In addition, Borrower and each Subsidiary shall indemnify and hold harmless the Indemnitees from and against any liabilities or costs incurred by any Indemnitee under the deposit account control agreement between the Parties.

4.9    Insurance. Borrower and each Subsidiary will maintain (or cause to be maintained) in force insurance on its properties against risks customarily insured against by companies engaged in businesses similar to that of Borrower or the respective Subsidiary containing such terms and written by such companies reasonably standard in the industry, with Lender to be named as the loss payee.

4.10    Notification of Default. Within five (5) days of becoming aware of the existence of any condition or event which constitutes an Event of Default, or any condition or event which would upon notice or lapse of time, or both, constitute an Event of Default, Borrower and/ or a Subsidiary shall give Lender written notice thereof specifying the nature and duration thereof and the action being or proposed to be taken with respect thereto.

4.11    Notification of Litigation. Borrower will promptly notify Lender in writing of any litigation or of any investigative or enforcement actions initiated by a governmental agency or authority against it or any Subsidiary which would or is reasonably be expected to have a Material Adverse Effect, and which would cause the potential liability of Borrower and/ or a Subsidiary under such litigation, when aggregated with all other active litigation against Borrower or any Subsidiary, to exceed twenty-five thousand dollars (US$25,000.00), unless the potential liability of Borrower under such litigation is covered by a policy of insurance acceptable to Lender, Lender has been named as an additional insured or additional loss payee and has received reasonably acceptable endorsements from such insurer(s) to such effect, and Lender has been provided evidence satisfactory to Lender that such insurance coverage is in full force and effect. The Parties agree this Section does not apply to correspondence or inquiries received in the ordinary course of business from various state agencies or departments. Without limiting the foregoing, within two (2) days of Borrower or any Subsidiary obtaining knowledge of the existence thereof, Borrower or Subsidiary shall notify Lender of any applicable investigative or enforcement action, and shall immediately forward to Lender, on receipt thereof by Borrower or any Subsidiary, a copy of any written communication or correspondence concerning the foregoing.

4.12    Compliance. Borrower and each Subsidiary shall comply with all applicable requirements of governmental authorities having jurisdiction over Borrower and each Subsidiary, including, without limitation, those relating to money laundering and terrorism, in each case as amended from time to time, and the rules and regulations promulgated thereunder.

JA2104

CONFIDENTIAL                                                            MARTORELLO_000076

4.13   <u>Organizational Documents</u>.  Borrower and each Subsidiary shall comply in all respects with Borrower's or the respective Subsidiary's articles of organization and Borrower's or the respective Subsidiary's operating agreement.

4.14   <u>Location of Collateral</u>.  Borrower and each Subsidiary shall, during the term of this Agreement, keep Lender currently and accurately informed in writing of each location where Borrower's and each Subsidiary's records relating to its accounts and contract rights, including Consumer Loans, respectively, are kept, and shall not remove such records or any of them to another location without giving Lender at least thirty (30) days prior written notice thereof.  The Borrower and Subsidiaries have agreed to pre-signed assignments of all vendor agreements and associated obligations in favor of the Lender and held in escrow for Lender, and for any future vendor agreements shall provide pre-signed assignments to be held in escrow upon the execution of any new vendor agreements.  Further, the Borrower and certain Subsidiaries, have agreed to pre-signed merger agreements to be held in escrow by the Lender.

4.15   <u>Notification of Material Adverse Effect</u>.  Borrower and/or a Subsidiary will immediately notify Lender of any Material Adverse Effect.

4.16   <u>Deposit Account Control Agreements/Lockbox</u>.

(a)   Unless waived in writing by Lender or as otherwise limited pursuant to Section 6.4, the Borrower and each Subsidiary will enter into (1) a deposit account control agreement (or maintain existing deposit account control agreements) for any bank account(s) in which the Subsidiary conducts its business in a form mutually agreeable with Lender and agrees to enter into other banking arrangements only if a mutual agreeable deposit account control agreement is in place and (2) enter into a lockbox agreement in a form mutually agreeable with Lender and third-party provider for the lending Subsidiaries.

(b)   In the event the lockbox agreement is terminated or fails for any reason, the Collateral Account(s) shall be governed by the existing deposit account control agreement(s) to ensure the continued operation of the Business and satisfaction of obligations under the Transaction Documents.  Unless mutually agreed by the Parties, upon the termination or failure of the lockbox agreement required by (a)(ii), a new lockbox agreement will be entered into by Borrower and each Subsidiary in a form mutually agreeable with the Lender and third-party provider for the Subsidiaries

4.17   <u>Costs & Expenses</u>.  The Borrower and each Subsidiary will maintain a fiduciary duty to the Lender to keep costs and expenses (including any capital expenses or other investments) associated with operations within industry standards and that all transactions with affiliates shall occur at no more than arms-length, market rates, and Borrower will not allow any movement of assets or liabilities between affiliates (such movement shall not include payment of affiliates for services rendered under contracts for services) unless approved by Lender.  Any excessive salary or bonus payments must be accounted for the Tribe's distribution under the cash waterfall in the Note or other Tribal equity.  For the term of the Note, neither Borrower nor any Subsidiary shall make any charitable donations or any investments in excess of an aggregate of $5,000 per year for all entities unless approved by Lender.

JA2105

CONFIDENTIAL

MARTORELLO_000077

4.18   <u>Title to Acquired Collateral</u>.   As to Collateral that Borrower (directly or through its Subsidiaries) acquires, Borrower or Subsidiary shall be the lawful owner of its assets constituting the Collateral.  The Collateral and each item thereof will be and shall continue to be free of all restrictions, liens, encumbrances or other rights, title or interests, credits, defenses, recoupments, set-offs or counterclaims whatsoever, other than the security interest granted to Lender hereby and the Permitted Liens.  Borrower and Subsidiaries have full power and authority to grant to Lender a security interest in the Collateral as it is acquired, and neither Borrower nor any of Borrower's Subsidiaries will transfer, assign, sell, pledge, encumber, subject to lien or grant any security interest in any of the Collateral (or any of Borrower's or its Subsidiaries' right, title or interest therein), to any person other than Lender or the holder of a Permitted Lien.  The Collateral will be valid and genuine in all respects.  Except for claims by Senior Debt, Borrower and each Subsidiary will warrant and defend Lender's right to and interest in the Collateral acquired against all claims and demands of all persons whatsoever.

4.19   <u>Licensing and Tribal Law.</u>   Borrower and each Subsidiary shall maintain all licenses and other authorizations required for Borrower or the respective Subsidiary to operate its business.  No Tribal law, regulatory code or other Tribal action exists that could potentially prohibit or interfere with the perfection of the security interest granted under this and the other Transaction Documents except for Section 8.7 of the Code which could potentially interfere with the perfection of the security interest by allowing the seizure of the property owned by a Person or other entity with a license issued by the Tribal Financial Services Regulatory Authority if such property was used in violation of the Code, and Appendix 1 of the Code, which governs secured transactions within the Tribe's jurisdiction.  In the event of any such seizure on behalf of the Tribe or other adverse action, the Borrower and, if applicable, Subsidiary shall use all good faith efforts to ensure that all obligations to Lender are met and all Lender's rights may be fully exercised (including the right to perfect Lender's security interest during the due process required under the Code) under the Transaction Documents.

## 5.   NEGATIVE COVENANTS

5.1   <u>Limitations on Indebtedness</u>.   Other than the Senior Debt, Borrower and each Subsidiary shall not, without the prior written consent of Lender in each instance, issue any evidence of indebtedness or create, assume, guarantee, become contingently liable for, or suffer to exist indebtedness in addition to Permitted Liens.  Neither Borrower nor any Subsidiary will incur additional indebtedness nor take any action that could negatively affect payment under the Note or dilute or burden the equity of Borrower without the express written approval of Lender.

5.2   <u>Sale of Interest</u>.   There shall not be any sale or transfer of ownership of any interest, whether direct or indirect, in Borrower or in any Subsidiary without Lender's prior written consent, unless Lender is paid in full for all Obligations under the Transaction Documents in accordance with the provisions of this Agreement.

5.3   <u>Loans or Advances</u>.   Borrow and each Subsidiary shall not make any loans or advances to any individual, firm or corporation, including without limitation it officers and employees; provided that Borrower or the respective Subsidiary may make advances to its employees in the ordinary course of business which expenses are reimbursable by Borrower or the respective Subsidiary.

JA2106

CONFIDENTIAL

MARTORELLO_000078

5.4    Investments.  Borrower and each Subsidiary shall not make investments in any individual, trust, entity or Tribal or governmental body.  Borrower and each Subsidiary will not purchase or otherwise invest in or hold securities, real estate or other non-operating assets or purchase all or substantially all the assets of any entity other than in connection with an acquisition approved by Lender in writing.

5.5    Merger and Restructuring.  Borrower and each Subsidiary will not dissolve, merge or consolidate or be merged or consolidated with or into any other entity, unless prior to or concurrently therewith Lender is paid in full for all Obligations under the Transaction Documents except as set forth in Section 3.2 of the Merger Agreement.

5.6    Capital Expenditures.  Borrower and each Subsidiary shall not, directly or indirectly, make or commit to make capital expenditures by lease, purchase, or otherwise, except in the ordinary course of business for the purpose of replacing machinery, equipment or other personal property necessary for operating the Business unless pursuant to Section 1.2(b)(4)(b) of the Note.

5.7    Sale of Assets.  Borrower and each Subsidiary shall not sell, lease or otherwise dispose of any of its assets including the Collateral, except the sale of bad debt  in the ordinary course of business, unless prior to or concurrently therewith Lender is paid in full for all Obligations under the Transaction Documents pursuant to any internal restructuring of Borrower's operations and Subsidiaries' but only to the extent that all of the total assets and any liabilities owed to the Lender remain within the new structure and do not create a Material Adverse Effect, and Borrower provides Lender with prior written notice of such restructuring.

5.8    Restriction on Liens.  Borrower and each Subsidiary shall not grant any security interest in, or mortgage of, its respective properties or assets including the Collateral, other than Permitted Liens or such liens as are in favor of Lender.  Any granted in breach of this provision shall be considered void.  Reserve accounts required by non-affiliated, third party vendors do not constitute a "lien" under this Agreement.

5.9    Other Business.  Borrower and each Subsidiary shall not engage in any business other than the Business.

5.10    Change of Name.  Borrower and each Subsidiary shall not change its legal name or the jurisdiction of its organization, without giving Lender at least thirty (30) days' prior written notice thereof.

5.11    Payment Processors.  No Subsidiary shall enter into or modify or permit the modification of any payment processor agreements (such as ACH, RCC or debit card), and all such agreements must require that all transactions must settle to the Collateral Account(s).  In the event of a termination of a payment processor agreement the respective Subsidiary shall replace the terminated payment processor agreement with a new payment processor agreement as soon as reasonably practicable after such termination in a form substantially similar to the prior processor's agreement.  Provided, however, the Subsidiary's failure to replace the terminated payment processor agreement shall not be deemed an Event of Default so long as adequate payment processing relationships exist that allows for the Business to operate in a commercially reasonable manner.  Borrower shall provide Lender a prompt update in the event of any ACH provider

JA2107

CONFIDENTIAL

MARTORELLO_000079

changes or additions by Borrower or a Subsidiary. The payment processor agreements shall contain a provision irrevocably instructing that the payment processor to direct all payments to a lockbox established pursuant to Section 4.16.

5.12     Servicing Agreement.  Neither Borrower nor any Subsidiary shall amend, modify, or terminate the Servicing Agreement between that Subsidiary and Ascension Technologies, LLC during the term of the Loan without the prior written consent of Lender in each instance, which consent shall not be unreasonably withheld, conditioned, or delayed.  To insure quality servicing of the loan portfolio included in the Collateral, neither Borrower nor any of its Subsidiaries will offer services to any other lender without prior written consent from Lender.

5.13     Business Policies.  Neither the Borrower nor any Subsidiary shall make any internal policy decisions which could dilute the value of the Collateral unless such changes are made to mitigate a Material Adverse Effect.

5.14     Management.    Neither the Borrower nor any Subsidiary shall terminate or replace any manager, director or officer of Borrower or the respective Subsidiary or modify delegations of authority without the prior written consent of Lender, which shall not be unreasonably withheld, conditioned or delayed.

5.15     Organizational Documents.  Borrower and each Subsidiary shall not dissolve or modify, alter, amend, or restate in any way its articles of organization or operating agreement without the prior written consent of Lender in each instance, which consent shall not be unreasonably withheld, conditioned, or delayed, unless such modification, alteration, amendment or restatement is clerical, administrative, ministerial, or *de minimis* in nature, including any change in permitted management thereunder.

5.16     Tribal Law.  There will be no changes to Tribal law or regulations that would materially adversely impact Borrower's or a Subsidiary's performance under the Transaction Documents, unless such changes are caused by applicable requirements outside the Tribe's sovereign authority.

5.17     Confidentiality.  The provisions of Section 9 of the Parental Guarantee and Sovereign Immunity Waiver shall apply *mutatis mutandis* to this Agreement.

## 6.     DEFAULT

6.1     Default.  An "Event of Default" shall mean the occurrence of one or more of any of the following events:

(a)     (1) failure to make any payment of principal or interest within three (3) days of the due date, whether at maturity, by acceleration or otherwise under the Note, or, (2) any material breach or default by Borrower or a Subsidiary of an affirmative covenant hereof not substantially cured within ten (10) days, (3) any material breach or default by Borrower or a Subsidiary of a negative covenant hereof, or (4) any breach or default under any agreements regarding the Senior Debt not substantially cured within the time frame allowed under the applicable agreement, provided, however, no Event of Default shall have occurred under (1) and (4) if the failure to make payment is a result of the termination or

-14-

CONFIDENTIAL

failure of the lockbox agreement or responsibility of the Lender under any deposit account control agreement; or

(b)  default of any other liability, obligation or undertaking of Tribe, Borrower or a Subsidiary, including under the Transaction Documents or any material breach of the Transaction Documents or any documents evidencing Borrower's and any Subsidiary's guarantee of indebtedness, or of the Tribe as guarantor under the Parental Guarantee or later-added guarantors or other surety for the Loan, which failure continues after ten (10) days' written notice thereof (provided that if such default is not reasonably susceptible of cure within said ten (10) days, and Borrower or the respective Subsidiary commences a cure of such default within said ten (10) day period, and thereafter diligently pursues such cure, then Borrower or the respective Subsidiary shall have an additional period of ten (10) days in which to effect such cure prior to an Event of Default arising hereunder); or

(c)  if any statement, representation or warranty heretofore, now or hereafter made by Borrower or any Subsidiary in connection with this Agreement or in any supporting financial statement of Borrower or any Subsidiary shall be determined to have been intentionally false in any material respect when made; or

(d)  the liquidation, termination or dissolution of Borrower or a Subsidiary, or the merger or consolidation of Borrower or a Subsidiary into another entity that is not otherwise permitted hereby, or stops processing loans or servicing loans for ninety (90) days of any one hundred twenty (120) day period  or the appointment of a receiver for its property; or

(e)  the institution by or against the Borrower or any Subsidiary of any insolvency proceedings, whether under the United States Bankruptcy Code 11 USC §101 *et seq.* or any other law, in which Borrower or any Subsidiary is alleged to be insolvent or unable to pay its debts as they mature, or the making by Borrower or any Subsidiary of an assignment for the benefit of creditors or the granting by Borrower or any Subsidiary of a trust mortgage for the benefit of creditors and, if such proceeding is instituted against Borrower or any Subsidiary, such proceeding shall not have been dismissed in sixty (60) days; or

(f)  the service upon Lender of a writ in which Lender is named as trustee of Borrower or of any Subsidiary; or

(g)  the decision of the Tribal Financial Services Regulatory Authority to seize control of any of the Collateral; or

(h)  the imposition of any non-appealable fee, fine or order of restitution or reparations by any regulatory authority having requisite jurisdiction upon Borrower or any Subsidiary which exceeds a cumulative amount of one hundred thousand dollars ($100,000) during the term of the Note; or

(i)  a final, non-appealable judgment or judgments for the payment of money enforceable against Borrower or any Subsidiary shall be rendered in excess of twenty-five thousand dollars (US$25,000.00) against Borrower or any Subsidiary, and any such judgment shall remain unsatisfied and in effect for any period of thirty (30) consecutive days without a

JA2109

CONFIDENTIAL                                                      MARTORELLO_000081

stay of execution unless such non-payment would have no Material Adverse Effect on the Business as mutually agreed by the Parties; or

(j)    the occurrence of any Material Adverse Effect; or

(k)    any levy, lien (including mechanics lien) other the Permitted Liens, seizure, attachment, execution or similar process shall be issued or levied on any material portion of the property of Borrower or any Subsidiary, and such lien or levy shall not be removed within sixty (60) days.

6.2    <u>Windup</u>.

(a)    If an Event of Default under Section 6.1(e) shall have occurred, all Obligations shall become immediately due and payable without notice or demand. If any other Event of Default shall have occurred which, to the extent capable, has not been waived by Lender, at the election of Lender, all Obligations shall become immediately due and payable without notice or demand.

(b)    Lender is hereby authorized, at its election, after an Event of Default shall have occurred which has not been waived by Lender, without any further demand or notice except to such extent as notice may be required by applicable law, to take possession and/or sell or otherwise dispose of all or any of the Collateral at a public or private sale and the exercise of any rights under agreements held in escrow; and Lender may also exercise any and all other rights and remedies of a secured party under the UCC or which are otherwise accorded to it in equity or at law, all as Lender may determine, and such exercise of rights in compliance with the requirements of law will not be considered adversely to affect the commercial reasonableness of any sale or other disposition of the Collateral. If notice of a sale or other action by Lender is required by applicable law, unless the Collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, Borrower agrees that ten (10) days' written notice to Borrower, or the shortest period of written notice permitted by such law, whichever is smaller, shall be sufficient notice; and that to the extent permitted by law, Lender, its officers, attorneys and agents may bid and become purchasers at any such sale, if public, and may purchase at any private sale any of the Collateral that is of a type customarily sold on a recognized market or which is the subject of widely distributed standard price quotations. Any sale (public or private) shall be without warranty and free from any right of redemption, which Borrower and all Subsidiaries shall waive and release after default upon Lender's request therefor, and may be free of any warranties as to the Collateral if Lender shall so decide. No purchaser at any sale (public or private) shall be responsible for the application of the purchase money. The net proceeds of sale shall belong to Lender. Upon demand by Lender, Borrower and all Subsidiaries shall assemble the Collateral and make it available to Lender at a place designated by Lender which is reasonably convenient to Lender and Borrower. Borrower and each Subsidiary hereby acknowledges that Lender has extended credit and other financial accommodations to Borrower upon reliance of Borrower's and its Subsidiaries' granting Lender the rights and remedies contained in this Agreement including without limitation the right to take immediate possession of the Collateral upon the occurrence of an Event of Default which has not been waived by Lender and Borrower

JA2110

CONFIDENTIAL

MARTORELLO_000082

and each Subsidiary hereby acknowledges that Lender is entitled to such equitable and injunctive relief to enforce any of its rights and remedies hereunder and Borrower and each Subsidiary hereby waives any defense to such equitable or injunctive relief based upon any allegation of the absence of irreparable harm to Lender.

(c)    No Lender shall be required to marshal any present or future security for (including but not limited to this Agreement and the Collateral subject to the security interest created hereby), or guarantees of, the Obligations or any of them, or to resort to such security or guarantees in any particular order; and all of its rights hereunder and in respect of such securities and guarantees shall be cumulative and in addition to all other rights, however existing or arising. To the extent that it lawfully may, Borrower and each Subsidiary hereby agrees that it will not invoke any law relating to the marshalling of Collateral which might cause delay in or impede the enforcement of Lender's rights under this Agreement or under any other instrument evidencing any of the Obligations or under which any of the Obligations is outstanding or by which any of the Obligations is secured or guaranteed, and to the extent that it lawfully may do so, Borrower and each Subsidiary hereby irrevocably waives the benefits of all such laws. Except as otherwise provided in subsection (e), Lender shall have no duty as to the collection or protection of the Collateral or any income thereon, nor as to the preservation of rights against prior parties, nor as to the preservation of any rights pertaining thereto beyond the safe custody thereof.

(d)    Borrower and its Subsidiaries will accelerate all payments pursuant to Section 6.2(a), or other mutually agreeable methodology, and in good faith pursue winding up the business of the Borrower and its Subsidiaries in a manner that maximizes the value thereto. In the event of windup, the payment methodology shall follow that of Section 1.2 of the Note provided that outstanding Consumer Loan principal returned shall at that point be included in Gross Revenues.

(e)    The Borrower and Subsidiaries will effectuate assignments of all vendor and other agreements and associated obligations, whether held in escrow or otherwise, as directed by the Lender within three (3) Business Days of the occurrence of any event described in subsections 6.2 (a)-(d).

(i)    Borrower and Subsidiaries will prepare assignments of vendor agreements as described in Section 4.14 or will effectuate any pre-signed assignments held in escrow.

(ii)   In the event of assignment under (e)(i), Lender agrees to assume the obligations of said vendor agreements and satisfy the remaining unassigned obligations to other vendors related to the Business through the date of the Event of Default unless otherwise agreed by the Lender.

(f)    In the event of assignment of Consumer Loans after an Event of Default, so long as it is commercially feasible, Lender, its successors or assigns agrees to:

(i)    Provide Borrower with information related to Consumer Loans that were entered into prior to the Event of Default within five (5) Business Days of a request by

-17-

JA2111

MARTORELLO_000083

Borrower or Borrower's designee related to a consumer initiated complaint or an inquiry from a regulatory agency. Such information shall include executed loan agreement(s), payment history and account notes;

(ii) Provide, as soon as is reasonably practicable, Borrower with a database including information related Consumer Loans that were entered into prior to the Event of Default such as: full name, date of birth, state of residency, origination date(s), and customer ID;

(iii) Provide, as soon as is reasonable practicable, Borrower with access to or a copy of any database maintained for the purpose of tracking Consumer complaints or inquiries that occurred prior to the Event of Default; and

(iv) notify the Tribal Financial Services Regulatory Authority of the assignment of Collateral and provide contact information for the holder of the Collateral; and

(v) notify Consumers of the assignment of the Consumer Loan.

(g) Access to Consumer Loan information provided for in subsection (i)-(iii) shall survive the termination of this Agreement for a period not to exceed twelve (12) months after dissolution of the Subsidiary that formerly held the Consumer Loans or the transfer of the Collateral.

6.3    Power of Attorney.  Subject to 6.4, Borrower and each Subsidiary hereby irrevocably constitutes and appoints Lender as Borrower's and/ or each Subsidiary's true and lawful attorney, with full power of substitution, at the sole cost and expense of Borrower but for the sole benefit of Lender, upon the occurrence of an Event of Default which has not been waived by Lender, to convert the Collateral into cash, including, without limitation, completing the manufacture or processing of work in process, and the sale (either public or private) of all or any portion or portions of the Collateral (subject to the notice and other terms provided in Section 6.2, above); to solely enforce collection of the Collateral either in its own name or in the name of Borrower or any Subsidiary beyond 90 days after the transfer of collateral, including, without limitation, executing releases or waivers, compromising or settling with any Consumers and prosecuting, defending, compromising or releasing any action relating to the Collateral; to receive, open and dispose of all mail addressed to Borrower or any Subsidiary and to take therefrom any remittances or proceeds of Collateral in which Lender has a security interest; to notify applicable postal authorities to change the address for delivery of mail addressed to Borrower or any Subsidiary to such address as Lender shall designate; to endorse the name of Borrower or any Subsidiary in favor of Lender upon any and all checks, drafts, money orders, notes, acceptances or other instruments of the same or different nature; to sign and endorse the name of Borrower or any Subsidiary on and to receive as secured party any of the Collateral, any invoices, freight or express receipts, or bills of lading, storage receipts, warehouse receipts, or other documents of title of the same or different nature relating to the Collateral; to act on behalf of Borrower or any Subsidiary under any vendor or servicing contract beyond 90 days after the transfer of collateral to sign the name of Borrower or any Subsidiary on verification of the Collateral beyond 90 days after the transfer of collateral; and to sign, if necessary, and file or record on behalf of Borrower or any Subsidiary any financing or other statement in order to perfect or protect Lender's security interest.  Unless otherwise provided

JA2112

CONFIDENTIAL

MARTORELLO_000084

in this Agreement, Lender shall not be obliged to do any of the acts or exercise any of the powers hereinabove authorized, but if Lender elects to do any such act or exercise any such power, it shall not be accountable for more than it actually receives as a result of such exercise of power, and it shall not be entitled to collect more than an amount equal to the then outstanding Obligations, and any sums received in excess of the then-outstanding Obligations shall be returned to Borrower unless otherwise provided in this Agreement, and it shall not be responsible to Borrower or to any other party except in the event that Lender has been determined, with finality, by an Arbitration Decision (as hereafter defined), that Lender has committed gross negligence or willful misconduct. All powers conferred upon Lender by this Agreement, being coupled with an interest, shall be, once triggered, irrevocable so long as any Obligation of Borrower or any surety to Lender shall remain unpaid or Lender is obligated under this Agreement to extend any credit to Borrower. The Lender shall retain the power of attorney during the pendency of any dispute resolution process. This power of attorney shall not grant Lender with the right or ability to waive the sovereign immunity of the Tribe, Borrower or any Subsidiary.

6.4    <u>Subordination</u>.    The repayment of the Loan and Lender's rights hereunder shall be subordinate to the rights of the Senior Lender.

6.5    <u>Nonexclusive Remedies</u>.    All of Lender's rights and remedies not only under the provisions of this Agreement but also any other Transaction Document shall be cumulative and not alternative or exclusive, and may be exercised by Lender at such time or times and in such order of preference as Lender in its sole discretion may determine.

6.6    <u>Force Majeure.</u>    In the event of an act of God or other natural disaster which makes the carrying out of this Agreement impossible, or if a Party's performance hereunder is rendered illegal or materially adversely affected by reason of changes in applicable federal law  applicable to Borrower's Business or to either Party, or if a Party is advised in writing by a federal governmental authority having or asserting jurisdiction over such Party, in an enforcement action or otherwise, that the performance of its obligations under this Agreement is or may be unlawful, then the Party unable to perform, or whose performance has been rendered illegal or who has been so advised by a federal governmental authority, may terminate this Agreement by giving written notice at least ninety (90) calendar days in advance of termination to the other Party, unless such changes in federal law or communication from a federal governmental authority require earlier termination, in which case termination shall be effective upon such earlier required date.

## 7.    MISCELLANEOUS

7.1    <u>Waivers</u>.    Borrower and each Subsidiary waives notice of intent to accelerate, notice of acceleration, notice of nonpayment, demand, presentment, protest or notice of protest of the Obligations, and all other notices, consents to any renewals or extensions of time of payment thereof, and generally waives any and all suretyship defenses and defenses in the nature thereof.

7.2    <u>Severability</u>.    If any provision of this Agreement or portion of such provision or the application thereof to any person or circumstance shall to any extent be held invalid of this Agreement (or the remainder of such provision) and the application thereof to other persons or circumstance shall not be affected thereby.

JA2113

CONFIDENTIAL

MARTORELLO_000085

7.3 <u>Set-Off</u>.  Subject to Lender's limitations pursuant to Section 6.4, Borrower and each Subsidiary hereby grants to Lender a continuing lien and security interest in any and all deposits or other sums at any time credited by or due from Lender to Borrower and any cash, securities, instruments or other property of Borrower or any Subsidiary in the possession of Lender or subject to the lockbox agreement as required Section 4.16 whether for safekeeping or otherwise, or in transit to or from Lender as security for the full and punctual payment and performance of all of the liabilities and obligations of Borrower to Lender and such deposits and other sums may be applied or set off against such liabilities and obligations of Borrower to Lender as are then due and unpaid, whether or not demand has been made and whether or not other collateral is then available to Lender.

7.4 <u>Indemnification</u>.  Borrower and each Subsidiary shall protect, defend (by counsel selected by Lender and reasonably acceptable to Borrower), indemnify and hold harmless Lender and Lender's officers, directors, partners, members, employees, attorneys, successors and permitted assigns and any successors to Lender's interest in the Loan, their officers, directors, partners, shareholders, employees, attorneys, successors and permitted assigns (collectively, the "<u>Indemnitees</u>") from and against all liabilities (including sums paid in settlement of claims), claims brought or threatened against Lender (as well as from reasonable attorneys' fees and expenses in connection therewith), losses, costs, obligations, demands, suits, liens, damages, fines (including any sums ordered to be paid or expended by Indemnitees by any governmental entity as a fine, penalty or damages) arising as a direct or indirect result of (a) Borrower's or a Subsidiary's Event of Default arising under Section 6.1 of this Agreement, (b) as a result of any investigation or enforcement action initiated by any governmental entity into Borrower's and/ or a Subsidiary's business.  The indemnification provided by this Section 7.4 shall survive payment of the Obligations, any termination of this Agreement, and/or release or discharge executed by Lender in favor of Borrower for a period of four (4) years or twelve (12) months beyond the resolution of any case initiated within the four (4) year period or in the Event of Default for a period not to exceed twelve (12) months after the transfer of Collateral.

7.5 <u>Costs and Expenses</u>.  Borrower and/ or Subsidiary shall pay to Lender any and all reasonable costs and expenses (including, without limitation, reasonable attorneys' fees, and disbursements, court costs, litigation and other expenses) incurred or paid by Lender in establishing, maintaining, protecting or enforcing any of Lender's rights or the Obligations, including, without limitation, any and all such costs and expenses incurred or paid by Lender in defending Lender's security interest in, title or right to the Collateral or in collecting or attempting to collect or enforcing or attempting to enforce payment of the Obligations.

7.6 <u>Counterparts</u>.  This Agreement may be executed in two or more counterparts, each of which shall be an original, but all of which shall constitute but one agreement.  Delivery by any Party of an executed counterpart of a signature page to this Agreement by telecopier, facsimile or portable document format (pdf) shall be effective as delivery of a manually executed counterpart hereof.

7.7 <u>Complete Agreement</u>.  This Agreement and the other Transaction Documents constitute the entire agreement and understanding between and among the Parties hereto relating to the subject matter hereof, and supersedes, all prior proposals, negotiations, agreements and understandings among the parties hereto with respect to such subject matter.

JA2114

CONFIDENTIAL

MARTORELLO_000086

7.8   Binding Effect of Agreement.  This Agreement shall be binding upon and inure to the benefit of the respective heirs, executors, administrators, legal representatives, successors and permitted assigns of the parties hereto, and shall remain in full force and effect (and Lender shall be entitled to rely thereon) until all commitments of Lender hereunder are terminated and all Obligations hereunder are fully paid.  Lender may transfer and assign this Agreement and deliver the Collateral to the assignee, who shall thereupon have all of the rights and liabilities of Lender; and such assigning Lender shall then be relieved and discharged of any responsibility or liability with respect to this Agreement, and the Collateral.  Lender shall provide at least sixty (60) days advance written notice to the Borrower of such an intent to assign.  Borrower and each Subsidiary may not assign or transfer any of its rights or obligations under this Agreement.  Except as expressly provided herein or in the other Transaction Documents, nothing, expressed or implied, is intended to confer upon any party, other than the parties hereto, any rights, remedies, obligations or liabilities under or by reason of this Agreement or the other Transaction Documents.

7.9   Further Assurances.  During the pendency of the merger and after the merger is complete, the Borrower and each Subsidiary will from time to time execute and deliver to Lender, and take or cause to be taken, all such other or further action as Lender may reasonably request in order to effect and confirm or vest more securely in Lender all rights contemplated by this Agreement and the other Transaction Documents or to vest more fully in or assure to Lender the security interest in the Collateral granted to Lender by this Agreement or to comply with applicable Delaware or federal law and to facilitate the collection of the Collateral (including, without limitation, the endorsement of promissory notes and instruments and notifications to obligors on the Collateral).  To the extent permitted by applicable Delaware, Tribal, or federal law, Borrower and each Subsidiary authorizes Lender to file financing statements, continuation statements or amendments, and any such financing statements, continuation statements or amendments may be signed by Lender on behalf of Borrower, if necessary, and may be filed at any time in any jurisdiction.  Lender may at any time and from time to time file financing statements, continuation statements, debentures, mortgage, and any other documents allowed under the laws of the Tribe or any other applicable jurisdiction, and amendments thereto which contain any information required by the laws of the Tribe or any other applicable jurisdiction for the sufficiency or filing office acceptance of any financing statement, continuation statement or amendment, including whether Borrower or the respective Subsidiary is an organization, the type of organization and any organization identification number issued to Borrower or Subsidiary.  Borrower and each Subsidiary agree to furnish any such information to Lender promptly upon request.  In addition, Borrower and each Subsidiary shall at any time and from time to time take such steps as Lender may reasonably request for Lender (a) to obtain an acknowledgement, in form and substance reasonably satisfactory to Lender, of any bailee having possession of any of the Collateral that the bailee holds such Collateral for Lender, (b) to obtain possession and control of any Collateral comprised of deposit accounts, electronic chattel paper, letter of credit rights or investment property, with any agreements establishing control to be in form and substance satisfactory to Lender, and (c) otherwise to insure the continued perfection and priority of Lender's security interest in any of the Collateral and the preservation of its rights therein.  As limited by Section 6.3 herein, Borrower and each Subsidiary hereby constitutes Lender its attorney-in-fact to execute, if necessary, and will file all filings required or so requested for the foregoing purposes, all acts of such attorney being hereby ratified and confirmed; and such power, being coupled with an interest, shall be irrevocable until this Agreement terminates in accordance with its terms, all Obligations are paid in full and

JA2115

CONFIDENTIAL                                                                       MARTORELLO_000087

the Collateral is released.  Lender shall deliver to Borrower a copy, on receipt by Lender from the applicable filing jurisdiction, of any such financing statements.

7.10    Amendments and Waivers.  This Agreement may not be amended, or the obligations of the parties hereto modified, except in a writing executed by all of the parties.  No delay or omission on the part of Lender in exercising any right hereunder shall operate as a waiver of such right or any other right, and waiver on any one or more occasions shall not be construed as a bar to or waiver of any right or remedy of Lender on any future occasion.

7.11    Terms of Agreement.  This Agreement shall continue in full force and effect so long as any Obligations or obligation of Borrower to Lender shall be outstanding, or Lender shall have any obligation to extend any financial accommodation hereunder, and shall not be so construed as to limit or otherwise derogate from any of the rights or remedies of Lender or any of the liabilities, obligations or undertakings of Borrower or any Subsidiary under the Transaction Documents, nor shall any contemporaneous or subsequent agreement between Borrower and Lender be construed to limit or otherwise derogate from any of the rights or remedies of Lender or any of the liabilities, obligations or undertakings of Borrower hereunder, unless such other agreement specifically refers to this Agreement and expressly so provides.

7.12    Notices.  Any notice under or pursuant to this Agreement shall be a signed writing or other authenticated record.  Any such notice shall be deemed duly received and effective (a) if delivered in hand or by telecopier to, or received by, any officer or agent of Borrower or Lender, upon such delivery or receipt, or (b) if sent by overnight courier, on the next business day after being so sent, (c) if sent via electronic medium and reply or other proof of receipt is available, or (d) if mailed by registered or certified mail, return receipt requested, postage prepaid, and properly addressed to Borrower or Lender, two (2) business days after being so mailed.  A party's proper address is that set forth for such party in this Agreement or such address as that party may from time to time hereafter designate by notice to the other party.

> To Lender at:
>
> 875 Carretera 693
> Suite 202
> Dorado, PR 00646
>
> To Borrower and Subsidiaries at:
>
> P.O. Box 704
> Watersmeet, MI 49969
>
> With copy to counsel:
>
> Rosette, LLP
> 25344 Red Arrow Highway, Suite B
> Mattawan, MI 49071.

JA2116

CONFIDENTIAL

MARTORELLO_000088

7.13   Reproductions. This Agreement and all documents which have been or may be hereinafter furnished by one Party to the other Party may be reproduced by either Party by any photographic, photostatic, microfilm, xerographic or similar process, and any such reproduction shall be admissible in evidence as the original itself in any judicial or administrative proceeding allowable pursuant to Section 8.5 herein (whether or not the original is in existence and whether or not such reproduction was made in the regular course of business).

7.14   No Partnership. Nothing contained in this Agreement or the other Transaction Documents shall be deemed to create an equity investment in Borrower or any Subsidiary on the part of Lender or a partnership between Lender and Borrower or any Subsidiary, it being the intent of the parties hereto that only the relationship of lender and borrower shall exist with respect to the Loan. Borrower and each Subsidiary agree that they shall report this transaction for income tax purposes, and file all applicable and related tax returns, in a manner consistent with the form of this transaction as a loan.

7.15   Lender Is Not In Control; Lender-Creditor Relationship.

(a)   None of the covenants or other provisions contained in this Agreement or any of the other Transaction Documents shall, or shall be deemed to, give Lender the right or power to exercise control over the day to day affairs or management of Borrower or any Subsidiary, the power of Lender being limited to the right to exercise the remedies provided for in this Agreement and the other Transaction Documents.

(b)   The relationship between Lender, on the one hand, and Borrower and any Subsidiary, on the other hand, is solely that of creditor and debtor. Lender shall not have (or be deemed to have) any fiduciary relationship or duty to any of Borrower or any Subsidiary, arising out of or in connection with, and there is no agency or joint venture relationship between Lender, on the one hand, and Borrower, a Subsidiary, on the other hand, by virtue of, the Transaction Documents.

7.16   Certification. The individual(s) signing this Agreement on behalf of each Party, by affixing a signature(s) hereon, hereby certify(ies) for the benefit of the receiving Party, that all information submitted to the receiving Party in connection with this Agreement is true and correct in all material respects on and as of the Effective Date.

7.17   Publicity. Except as may be required by applicable law, none of the parties hereto shall issue a publicity release or announcement or otherwise make any public disclosure concerning this Agreement or the transactions contemplated hereby, without prior approval by the other parties hereto. If any announcement is required by applicable law to be made by any party hereto, prior to making such announcement such party will deliver a draft of such announcement to the other parties and shall give the other parties an opportunity to comment thereon. Notwithstanding the foregoing, Lender may disclose a general description of transactions arising under the Transaction Documents for advertising, marketing or other similar purposes upon notice to Borrower and Subsidiaries.

## 8.    TRIBAL WAIVERS OF SOVEREIGN IMMUNITY, DISPUTES AND REMEDIES

8.1   Limited Waiver Of Sovereign Immunity.

-23-

JA2117

MARTORELLO_000089

(a)     Retention of Sovereign Immunity.  By executing this Agreement, neither Borrower nor any Subsidiary waives, limits or modifies its sovereign immunity, except as expressly provided in this Section 8.

(b)     Scope of Waiver.  Subject to the provisions of this Section 8, Borrower and each Subsidiary each hereby expressly and irrevocably grants to Lender, a limited waiver of its sovereign immunity from suit and consents to process and suit in accordance with this Section.  These waivers apply to actions in which Lender alleges a default or breach by Borrower or a Subsidiary of one or more of the specific obligations or duties expressly assumed by Borrower or a Subsidiary under the terms of this Agreement and the Transaction Documents.  These waivers expressly include Lender's or an affiliate's ability to pursue in litigation:

    (i)      specific performance or other specific action, or discontinuance of some action, by Borrower or Subsidiary to bring Borrower or Subsidiary into full compliance with its duties and obligations hereunder; or

    (ii)     money damages for noncompliance with the terms and provisions of this Agreement; or

    (iii)    Borrower and Subsidiaries do not consent to a waiver of their sovereign immunity from suit except for the limited purposes as set forth in this Section 8 and as follows: (A) the dispute shall be brought by and limited to Lender and no other party or entity; (B) the dispute shall be limited to causes of action arising under this Agreement and the Transaction Documents pursuant to Section 8.5 and (C) to enforce any Arbitration Decision (as defined herein) or court order compelling arbitration pursuant to Section 8.5; and (D) any such award or damages resulting from the dispute shall be limited  to the assets and revenues of Borrower and Subsidiaries and no other assets of the Tribe.

(c)     Express Waiver.  Borrower and each Subsidiary hereby expressly and irrevocably waives:

    (i)      its rights to have any dispute, controversy, suit, action or proceeding arising under this Agreement heard in any forum other than the ones set forth in Section 8.2 whether or not such forum now exists or is hereafter created including, without limitation, any Tribal court or other tribunal, forum, council or adjudicative body of the Tribe (each a "Tribal Forum");

    (ii)     any claim or right which it may possess to the exercise of jurisdiction by, any Tribal Forum, including, without limitation, any determination that any Tribal Forum has jurisdiction over any such dispute, controversy, suit, action or proceeding or jurisdiction to determine the scope of such Tribal Forum's jurisdiction, and Lender does not consent to the jurisdiction of any Tribal Forum;

    (iii)    any requirement which may exist for exhaustion of any remedies available in any Tribal Forum prior to the commencement of any dispute, controversy, suit, action or proceeding in any state or federal court even if any such Tribal Forum would

JA2118

CONFIDENTIAL

MARTORELLO_000090

have concurrent jurisdiction over any such dispute, controversy, suit, action or proceeding but for such waiver;

(iv)    its sovereign immunity as to an action by Lender in the United States District Court for the Western District of Michigan or any State of Michigan Circuit Court, and in the federal or state courts having appellate jurisdiction thereover, seeking injunctive and/or declaratory relief and/or money damages against Borrower or Subsidiary based solely upon an attempt by Borrower or Subsidiary to revoke its waiver of its sovereign immunity or other waivers granted under this Section 8 and solely to compel participation in arbitration proceedings pursuant to Section 8.5 and enforce an arbitration decision;

(v)     its sovereign immunity from a judgment or order (including any appellate judgment or order) and post judgment proceedings supplemental thereto consistent with the terms and provisions of this Section 8, which is final because either the time for appeal thereof has expired or the judgment or the order is issued by a court having final appellate jurisdiction over the matter; and

(vi)    its sovereign immunity from the assertion or enforcement of any claim in any Tribal Forum (it being understood that this provision does not detract from or diminish any other waiver of the Borrower or Subsidiary in this Section 8).

8.2    <u>Consent to Jurisdiction</u>.  Borrower and each Subsidiary consents to the jurisdiction of and to accept and be bound by any order or judgment of the United States District Court for the Western District of Michigan or any State of Michigan Circuit Court, and any federal or state court having appellate jurisdiction thereover for enforcement of an Arbitration Decision (as defined herein) consistent with the terms and provisions of this Section 8.  It is the express intent of the parties that their first recourse for dispute resolution shall be to attempt to amicably resolve any issue, and second to the federal and state courts specified herein.

8.3    <u>Enforcement Authorization of Governmental Authorities</u>.  Without in any way limiting the generality of the foregoing, Borrower and each Subsidiary expressly authorize any governmental authorities who have the right and duty under applicable law to take any action authorized or ordered by any court, including, without limitation, to take such action as entering Borrower's or Subsidiary's property, to give effect to any judgment or order entered, subject to this Section 8.

8.4    <u>Governing Law</u>.  This Agreement, and any disputes or controversies arising hereunder, shall be governed by and construed according to the laws of the State of Delaware.

8.5    <u>Dispute Resolution</u>.  In the event that either Party to this Agreement believes that the other Party has failed to comply with any requirement of this Agreement or a Transaction Document, or in the event of any dispute hereunder, including, but not limited to, a dispute over the proper interpretation of the terms and conditions of this Agreement, the following procedures shall be invoked:

(a)    <u>Discussions between the Parties</u>.  The goal of the Parties shall be to first resolve all disputes amicably and voluntarily whenever possible.  A Party asserting noncompliance or seeking

JA2119

CONFIDENTIAL

MARTORELLO_000091

an interpretation of this Agreement first shall serve written notice on the other Party. The notice shall identify the specific Agreement provisions alleged to have been violated or that is in dispute and shall specify in detail the asserting Party's contention and any factual basis for the claim. Senior representatives of both Parties shall meet in person or by phone or other electronic medium within two (2) days of receipt of notice in an effort to resolve the dispute. A failure to meet shall be considered a failure to resolve the dispute and shall invoke Section (b) below.

(b)   Binding Arbitration. After failure to resolve such disputes within two (2) days of notice, either Party may refer a dispute arising under this Agreement to arbitration with the American Arbitration Association (the "AAA"). If the dispute centers around an action of a Party, such action shall be postponed or discontinued during the pendency of the arbitration, provided that the lack of action shall not have a negative impact to the economic value of a Party. The Parties shall endeavor to mutually select one arbitrator from a list of qualified arbitrators, one of whom must have a minimum of five (5) years federal Indian law experience, one of whom must have a minimum of five (5) years experience in financial or banking law, and one to be chosen by the other two and to be provided by the AAA. If the Parties cannot agree on arbitrators within three (3) Business Days, then the arbitrator shall be named by the AAA provided that they have the requisite experience. All hearings and other proceedings for such arbitration shall be held in Marquette, Michigan unless otherwise agreed to by the Parties in writing. The expenses of arbitration charged by the AAA shall be borne equally by the Parties, and each side shall bear its own other costs except that the winning Party may petition the arbitrators to award all or a portion of its expenses incurred in the dispute based on the facts of the dispute. The arbitrator shall determine whether the dispute is arbitrable and shall apply the substantive laws of the State of Delaware as well as the Commercial Arbitration Rules. The arbitrator shall issue a final and binding decision (the "Arbitration Decision") in which the remedies available through arbitration are limited to enforcement of the provisions of this Agreement and any associated equitable or monetary relief. The Arbitration Decision may be enforced as set forth in Section 8.5 (d) below.

(c)   Good Faith. The Party asserting breach or seeking an interpretation of this Agreement under this Section 8.5 shall be deemed to have certified that to the best of such Party's knowledge, information and belief formed after reasonable inquiry, the claim of noncompliance or the request for interpretation of this Agreement is warranted and made in good faith and not for any improper purpose, such as to harass or to cause unnecessary delay or the needless incurring of the cost of resolving the dispute. If the dispute is found to have been initiated in violation of this Section 8.5, then the arbitrator, upon request or upon his or her own initiative, may impose upon the violating Party an appropriate sanction, which may include an award to the other Party of its reasonable expenses incurred in having to participate in the arbitration.

(d)   Enforcement of Arbitration Decision. Notwithstanding any provision of law, either Party to the Agreement may bring an action against the other pursuant to the provisions of this Section 8 solely for the enforcement of the Arbitration Decision. The Parties agree that the Arbitration Decision shall be final, conclusive and binding on the Parties with respect to the matters decided, and shall be complied with by the Parties. In such judicial

JA2120

CONFIDENTIAL

MARTORELLO_000092

proceedings, neither Party, without the prior written consent of the other Party, shall be entitled to contend that such arbitration award should be vacated, modified or corrected, and the Parties hereby expressly waive all other rights and remedies that might otherwise be available in such judicial proceeding.

(e)    Fast-track Injunctive Relief. Either Party may bring an original action in a court of competent jurisdiction pursuant to this Section 8 to prevent actions by the other Party which could have a Material Adverse Effect if taken. Such injunctive relief may only be taken to maintain the status quo during the Dispute Resolution process set forth in this Section 8.5.

8.6    Attorneys Fees. Except as ordered by an Arbitration Decision or a court of competent jurisdiction for enforcement proceedings, all Parties shall bear their own costs, except that the prevailing party shall be reimbursed all reasonable attorneys' fees, in connection with any dispute resolution or enforcement proceedings authorized under this Agreement. Anything in this Agreement to the contrary notwithstanding, the parties expressly agree that this provision shall survive the termination, for any reason, or expiration of this Agreement and any additional agreement contemplated herein.

8.7    Service of Process. Borrower and Lender hereby consent to any and all process which may be served in any such suit, action or proceeding, (i) by mailing a copy thereof by registered or certified mail, postage prepaid, return receipt requested, to the party's address shown in this Agreement or as notified to Lender and (ii) by serving the same upon Borrower in any other manner otherwise permitted by law, and agrees that such service shall in every respect be deemed effective service upon Borrower.

8.8    **JURY WAIVER. BORROWER AND LENDER EACH HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY, AND AFTER AN OPPORTUNITY TO CONSULT WITH LEGAL COUNSEL, (A) TO THE FULLEST EXTENT ALLOWED BY THE LAWS OF THE STATE OF DELAWARE, WAIVE ANY AND ALL RIGHTS TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING IN CONNECTION WITH THIS AGREEMENT, THE OBLIGATIONS, ALL MATTERS CONTEMPLATED HEREBY AND DOCUMENTS EXECUTED IN CONNECTION HEREWITH AND (B) AGREE NOT TO SEEK TO CONSOLIDATE ANY SUCH ACTION WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE, OR HAS NOT BEEN, WAIVED. BORROWER CERTIFIES THAT NEITHER LENDER NOR ANY OF ITS REPRESENTATIVES, AGENTS OR COUNSEL HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT LENDER WOULD NOT IN THE EVENT OF ANY SUCH PROCEEDING SEEK TO ENFORCE THIS WAIVER OF RIGHT TO TRIAL BY JURY.**

8.9    Irrevocable Waiver. Borrower and each Subsidiary covenants and agrees that each possess the requisite authority from the governing body of the Tribe to give this limited waiver of sovereign immunity and other waivers contained in this Section 8 and that each are irrevocable for one (1) year after termination of all Transaction Documents, or in the Event of Default, for a period not to exceed twelve (12) months after transfer of the Collateral, or for any non-compete period or indemnity period as defined in the Transaction Documents, or for that period of time required to resolve any disputes initiated within the times set forth previously,   whichever is longer. The Borrower and each Subsidiary each agrees not to revoke or limit, in whole or in part, the limited

-27-

JA2121

MARTORELLO_000093

waivers of sovereign immunity or other waivers contained in this Section 8. Borrower and each Subsidiary each hereby consents to the entry of appropriate injunctive relief, consistent with the terms and conditions of this Agreement.

[NO FURTHER TEXT ON THIS PAGE]

-28-

JA2122

CONFIDENTIAL

MARTORELLO_000094

**IN WITNESS WHEREOF,** the undersigned have executed this Loan and Security Agreement as of the date first above written.

**SELLER:**

**Eventide Credit Acquisitions, LLC**

By: _____

Name: _Matt Martorello_____

Its: _President of Manager_____

**BORROWER:**

**Tribal Economic Development Holdings, LLC**

By: _Michelle Hazen_____

Name: Michelle Hazen_____

Its: Co-Manager_____

**SUBSIDIARY:**

**Big Picture Loans, LLC**

By: _Michelle Hazen_____

Name: Michelle Hazen_____

Its: Co-Manager and CEO_____

**SUBSIDIARY:**

**Ascension Technolgies, LLC**

By: _____

Name: Brian McFadden

Its: President

Signature Page

CONFIDENTIAL

# Exhibit 48

# OPERATING AGREEMENT
## OF
## EVENTIDE CREDIT ACQUISITIONS, LLC
### A Delaware Limited Liability Company

THIS OPERATING AGREEMENT (this "Agreement") is made and entered into as of February 9, 2015, by and among the Members whose signatures appear on <u>Schedule A</u>, as may be amended from time to time, which shall be, and remain after subsequent amendment, part and parcel of this Agreement.

Whereas, this Agreement is intended to govern the relationships among the Company, its Manager and its Members.

In consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties, intending to be legally bound, agree as follows:

## SECTION I
## ORGANIZATION & FORMATION

A.  <u>Formation</u>. The Company has been organized as a Delaware limited liability company under and pursuant to the Delaware Limited Liability Company Act (the "Act") by the filing of Certificate of Formation (the "Certificate") with the State of Delaware Secretary of State, on February 9, 2015, as required by the Act.

B.  <u>Name</u>. The name of the Company shall be "Eventide Credit Acquisitions, LLC". Upon proper notice and filing with the State of Delaware Secretary of State, the Company may conduct its business under one or more assumed names.

C.  <u>Purpose</u>. The purpose of the Company is to operate any lawful business permitted by the law of the State of Delaware or any other State, Territory or Commonwealth in which it is registered to do business. The Company shall have all the powers necessary or convenient to affect any purpose for which it is formed, including all powers granted by the Act. The Company is authorized to apply for any and all tax exemptions and other benefits for which it may be eligible, including without limitation, benefits provided by the Department of Economic Development and Commerce of the Commonwealth of Puerto Rico.

D.  <u>Duration</u>. The Company shall continue in existence perpetually, beginning on the date of filing of the Certificate, unless terminated by law or dissolved and terminated pursuant to this Agreement.

E.  <u>No Partnership</u>.  The Members intend that the Company not be a partnership (including, without limitation, a limited partnership) or joint venture, that no Member be a partner or joint venturer for any purposes other than federal, state and territorial tax purposes, and this Agreement may not be construed to suggest otherwise.

F.  <u>Registered Office, Resident Agent and Place of Business</u>. The registered office and principal place of business of the Company shall be at 1407 Plantation Village, Dorado, Puerto Rico 00646 or such other place or places as the Manager may hereafter determine. The Resident Agent of the Company for service of process in Delaware shall be Incorporating Services, Ltd., 3500 South Dupont Highway, Dover, DE 19901.

## SECTION II
## MEMBERS, MEMBERSHIP INTEREST & CLASSES

A.  <u>Definitions</u>.

JA2125

CONFIDENTIAL

MARTORELLO_004581

(i) "Act" shall mean the Delaware Limited Liability Company Act, Title 6 of the Delaware Code, as in effect in the State of Delaware and as amended from time to time. Reference to any section of the Act shall be deemed to refer to a similar provision in any amendment to the Act. To the extent the Company redomiciles, it may be required to amend and restate this Agreement in accordance with the laws of its new domicile.

(ii) "Additional Member" shall mean any Member admitted, to the Company after the date of this Agreement as provided for in Section II E.

(iii) "Capital Account" shall mean the account maintained for each Member described in Section III of the Agreement.

(iv) "Capital Contribution" shall mean, with respect to any Member, the total amount of contributions by all the Members or any class of Members or any one Member, as the case may be (or the predecessor holders of the interests of such Members), to the capital of the Company in cash, property, or services for an interest in the Company, valued at fair market value without deduction of selling, organization, or other expenses; and shall include all such contributions to the capital of the Company whenever made.

(v) "Class" or "Classes": Membership Interests may include voting interest, economic interest and equity interest, and may be divided into separate Classes in the sole discretion of the Manager, which Classes and Membership Interests shall have such rights and preferences as the Manager shall determine, including (without limitation) different fee, expense and allocation structures and different voting privileges. The Manager shall cause separate and distinct records to be kept with respect to Company Property associated with each Class. Certain classes of the Company shall entitle a Member to participate only in the future profits, losses and/or appreciation of the Company Property allocated to a particular Class of Membership Interest. The designation of Class and rights of any Member, shall be designated by the Manager, and shall either be described herein in this Agreement, or made pursuant to an ancillary agreement among the Company and the proposed Member.  All Classes of Membership Interest shall be shown on Schedule A, attached hereto and made a part hereof, as amended from time to time.

(vi) "Company Property" or "Property" each shall mean the real property and any other assets or property (tangible or intangible, personalty or real, choate or inchoate, fixed or contingent) of the Company, including all earnings and proceeds which may arise therefrom from time to time.

(vii) "Economic Interest" shall mean a Member's share of the Classes' future net profits and net losses specifically associated with a particular Class pursuant to this Agreement. Economic Interests shall be non-voting interests. It is the intention of the parties hereto that all Economic Interests shall be deemed to be "profits interests" of the Company in accordance with Rev. Proc. 93-27 and 2001-43 and that the Economic Interest holders are only entitled to participate in the future net profits and or net losses of the Company accruing after each Member's date of execution of this Agreement and are not entitled to participate in profits or losses related to the sale of assets or equity.

(vii) "Equity Interest" shall mean a Member's share of the value upon a sale or liquidation of the Company, its subsidiaries, or the asset(s) specifically associated with a particular Class of Equity Interest and set forth in section II C below.

(viii) "Initial Capital Contribution" shall mean, with respect to any Member, the initial contribution by such Member to the capital of the Company as set forth on Schedule A hereto.

2

JA2126

CONFIDENTIAL

MARTORELLO_004582

(ix) "Internal Revenue Code" shall mean the Internal Revenue Code of 1986, as amended from time to time, or any corresponding provision or provisions of succeeding laws. The term "Internal Revenue Code" shall be abbreviated as "IRC" or "Code".

(x) "Member" shall mean each of the persons or entities holding a Membership Interest in the Company and each of the persons or entities who may hereafter become a Member holding a Membership Interest.  Members' rights to participate in the management and affairs of the Company, to share in the profits, gains or losses of the Company, to share in the value upon sale or liquidation of the asset(s) associated with a particular Class of Membership Interest, or to vote at meetings of the Members shall be determined pursuant to this Agreement, or to any ancillary agreements between the Member and the Company executed contemporaneously with this Agreement, or to any resolutions of the Members executed in connection with the issuance of a new class of interests.

(xi) "Membership Interest" shall mean a Member's voting interest, economic interest and/or equity interest in a particular Class, including the right to vote associated with such Membership Interest, if any, and such other rights and privileges that the Member may enjoy by being such a Member.

(xii) "Voting Interest" shall mean with respect to each Class A Member, such Class A Member's right to vote on, consent to or otherwise participate in any decision or action of or by the Members granted pursuant to this Operating Agreement or the Act. A.

B.      Members.  The Members are set forth on Schedule A hereto, and shall include any other person hereafter admitted to the Company as a Member as provided in this Agreement.  The term "Members" shall not include any person who has ceased to be a member of the Company.

C.      Classes.  The following Classes have been designated by the Manager as of the Effective Date of this Agreement:

(i)      Class A Membership Interest.  Class A Membership Interest shall be the membership interest in the Company not otherwise designated to any other Class of Membership Interest.

(a) Class A Voting Interest: Class A Voting Interest shall be the only Class of Membership entitled to vote on any and all matters presented to the Company for Member approval.  Class A Voting Interest shall not include an Economic Interest or an Equity Interest.

(b) Class A Economic Interest: Class A Economic Interest shall be a Class A Member's economic interest in the Company's future net profits and net losses pursuant to this Operating Agreement and the Act, as more particularly set forth in Schedule A to this Operating Agreement as the same may be amended from time to time by the Class A Members holding Class A Voting Interest, but shall not include any right to participate in the management or affairs of the Company, including the right to vote on, consent to or otherwise participate in any decision of the Class A Members holding Class A Voting Interest, nor shall it include an Equity Interest.

(c) Class A Equity Interest:  Class A Equity Interest shall be entitled to the value of the Company upon sale or liquidation, the gain or losses from the sale of some or all of the companies assets, and the sharing in liabilities pursuant to this Operating Agreement and the Act, as more particularly set forth in Schedule A to this Operating Agreement as the same may be amended from time to time by the Manager, but shall not include any right to participate in the management or affairs of the Company, including the right to vote on, consent to or otherwise participate in any decision of the Class A Members holding Class A Voting Interest, nor shall it include an Economic Interest.

3

JA2127

CONFIDENTIAL

MARTORELLO_004583

D.    Representations and Warranties of the Members.  As of the date on which any person becomes a Member, such person severally (and not jointly) hereby represents and warrants, as to itself and no other Member, to, and covenants with, the Company and each of the other Members that: (i) such person understands that the offer and sale or other transfer of the Membership Interest to such person have not been registered under the Securities Act or the securities laws of any state or territory, and further understands that such Membership Interest has not been approved or disapproved by the Securities and Exchange Commission or any other federal or state agency; (ii) such person understands that there are substantial restrictions on the transfer of Membership Interests, including without limitation, that Membership Interests may not be transferred except as permitted by this Section II; (iii) such person has carefully reviewed and understands this Agreement in its entirety; (iv) the Manager has not made and hereby makes no warranties or representations to such person other than those set forth in this Agreement.

E.    Membership Interests; Additional Membership Interests.  Ownership of the Company shall be divided into and represented by Membership Interests.  The Class and types of Membership Interests of the Members are set forth on Schedule A.  The Manager is expressly authorized to provide for the issuance from time to time of additional Membership Interests for such consideration, and with rights, privileges, preferences, qualifications, limitations and restrictions as shall be stated and expressed in the resolution or resolutions adopted by the Manager providing for the issuance of additional Membership Interests and as may be permitted by the Act.  The Manager shall reflect the issuance of any additional Membership Interest and, if applicable, the admission of a new Member, pursuant to an amendment to Schedule A, which such amendment shall not be required to be executed by any other Member.

F.    Transfer of Membership Interests.  Subject to the limitations of transferability set forth herein in this Agreement, Members may transfer any or all of their Membership Interest to any person or persons, at any time and from time to time.  Subject to the provisions of this Section, Members may assign their Membership Interest in the Company in whole or in part. The assignment of a Membership Interest does not itself entitle the assignee to participate in the management and affairs of the Company or to become a Member. Such assignee is entitled only to receive the distributions of cash and other property and the allocations of income, gains, losses, deductions, credits or similar items to which its assignor would have been entitled to, and such assignee shall only become an assignee of a Membership Interest and not a substituted Member. An assignee of Membership Interest shall be admitted as a substitute Member and shall be entitled to all the rights and powers of the assignor only if the Manager consents in writing. If admitted, the substitute Member, has to the extent assigned, all of the rights and powers, and is subject to all of the restrictions and liabilities of the Members.

H.    Right of First Refusal.  Before any Membership Interest ("Interest") held by any Member is sold or otherwise transferred (including, but not limited to transfer by gift, operation of law, or pursuant to Section II H below) the Company shall have an uncontested and irrevocable right of first refusal to purchase the Interest on the following terms and conditions:

(i)    The selling Member shall deliver to the Company a written notice stating: (a) the Member's bona fide intention to sell or otherwise transfer such Interest; (b) the name of the proposed purchaser or other transferee ("Proposed Transferee"); (c) the percent of Interest to be transferred to each Proposed Transferee; (d) the bona fide cash price or other consideration to be exchanged for the Interest ("Offered Price"); and (e) the terms and conditions of the proposed transfer.

(ii)    At any time within forty-five (45) days after receipt of this notice, the Company may, by written notice to the selling Member, elect to purchase all, or any part of the Interest at Fair Market Value (as defined in Section J below) or at the Offered Price, whichever price is lower.

(iii)    The right of first refusal shall not terminate upon any transfer of Interest.

4

JA2128

CONFIDENTIAL

(iv)     The right of first refusal shall be freely assignable by the Company at any time and in its sole discretion.

(v)     Any transfer done without adherence to this Section II F shall be void.

I.     <u>Mandatory Repurchase</u>.  The Manager, in his sole and absolute discretion, may require a Member to sell all or a portion of the Interest of such Member, on not less than fourteen (14) days' notice (a "Mandatory Repurchase").  Such Mandatory Repurchase shall become effective on the date (the "Repurchase Date") specified in such notice.  A Member who is so required to sell its Interest pursuant to this Section shall receive the Fair Market Value of the Interest, computed as of the date on which such Mandatory Repurchase shall become effective (a Member whose Interest is repurchased pursuant to this Section is referred to herein as a "Repurchased Member").

J.     <u>Payments in Connection with Mandatory Repurchase</u>.

(i)     Within 30 days after a Repurchase Date there shall be paid or distributed to a Repurchased Member an amount in cash, or, in the discretion of the Manager, in securities selected by the Manager, or, in the discretion of the Manager, partly in cash and partly in securities selected by the Manager, equal in value to not less than 90% of the estimated Fair Market Value of the Interest being repurchased. Within 30 days after the Manager has determined the Fair Market Value of the Interest being redeemed or repurchased as of such date, the Company shall pay to the Repurchased Member in cash, or, in the discretion of the Manager, in securities selected by the Manager, or, in the discretion of the Manager, partly in cash and partly in securities selected by the Manager, the amount of the excess, if any, of the Fair Market Value of the redeemed or repurchased Interest over the amount so paid.

a.     "Fair Market Value" shall mean the value of the Interest, as applicable, as determined by Manager using reasonable valuation criteria, all in the Manager's sole discretion.

b.     The Company's assets will be valued from time to time in the discretion of the Manager.  In those cases where an exchange-based pricing mechanism is unavailable, the Manager or Manager's representative will develop an assessment of Fair Market Value, which will be reviewed and approved by the Manager whose consent shall not be unreasonably withheld.  In the absence of bad faith, such determination, as approved by the Manager, shall be conclusive.  Fair Market Value shall reflect any declared but unpaid distributions with respect to the Interest.

(ii)     If, in the discretion of the Manager, the assets of the Company are committed in such a manner as not to reasonably permit immediate withdrawal of such assets, then, on the applicable Repurchase Date (the "Repurchase Effective Date"), the Manager may adopt a deferred payment system in accordance with the following:

a.     The Manager will attempt to liquidate, as of the earliest date on or after the Repurchase Effective Date upon which the Company is permitted to do so or on which market conditions make same feasible, from the Company's investments, such portion thereof as is allocable to the Interest of the Repurchased Member;

b.     Within 30 days following the Repurchase Effective Date, the Repurchased Member will be entitled to receive an amount equal to the Repurchased Member's percentage of all cash and the fair market value of all liquid securities held directly by the Company with respect to any applicable Interest; provided, however, that any such amount shall be subject to the provisions of this Section;

5

JA2129

CONFIDENTIAL

MARTORELLO_004585

     c.    The balance due to the Repurchased Member shall be paid from time to time, within 30 days after the Company receives the proceeds from the liquidation of the previously illiquid portion of the Company's investments, but only to the extent that such proceeds plus the Repurchased Member's percentage of cash and the fair market value of liquid securities held by the Company with respect to any applicable Membership exceed such Member's percentage of the Company's liabilities and any amount retained pursuant to this Section with respect to any applicable Membership; provided, however, that in any event, at least 80% of the amount due a Repurchased Member shall be paid within one year following the Redemption Effective Date; and

     d.    The Fair Market Value of the Interest attributable to a Repurchased Member shall be subject to an adjustment equal to a credit or charge for the Repurchased Member's percentage of the increase or decrease in the net asset value of the Company's investments with respect to any applicable Interest from the Redemption Effective Date through the date on which final payment of such Repurchased Member's percentage is made.

K.    <u>Involuntary Transfers</u>.  In the event of an Involuntary Transfer of any Interest to any person, the transferee (which term, as used herein, shall include any and all transferees and subsequent transferees of the initial transferee) shall take and hold such Interest subject to this Agreement and to all the obligations and restrictions upon the transferor, and shall observe and comply with this Agreement and with such obligations and restrictions.  As used in this Section II, the term "Involuntary Transfer" shall mean any transaction, proceeding or action by or in which a Member or other person is involuntarily deprived or divested of any right, title or interest in or to any Interest (including without limitation, a seizure under levy of attachment or execution, transfer to a trustee in bankruptcy or receiver or other officer or agency pursuant to a statute pertaining to escheat or abandoned property, a Member's death or the appointment of a guardian with respect to a Member).

L.    <u>Admission of New Members</u>.  No person shall be admitted as a Member of the Company unless: (i) the Manager shall have consented in writing to the admission of such person as a new Member; (ii) the person has executed and delivered all documents reasonably deemed appropriate by the Manager to reflect such person's admission as a Member, and its agreement to be bound by this Agreement; and (iii) such person has paid all expenses connected with its admission.

SECTION III
CAPITAL ACCOUNT

A.    <u>Capital Account</u>.  A capital account ("Capital Account") shall be maintained for the Members, and any additional Members in accordance with the provisions of this Section and subject to any ancillary agreements entered into between the Company and the Members.

    (i)    Increases in Capital Account.  The Capital Account of the Members shall be increased by:

     a.    The fair market value of the Members' initial capital contribution and any additional capital contributions by the Members to the Company.  If any property, other than cash, is contributed to or distributed by the Company, the adjustments to Capital Accounts required by Treasury Regulation Section 1.704-1(b)(2)(iv)(d), (e), (f) and (g) and Section 1.704-1(b)(4)(i) shall be made.

     b.    The Members' share of the increase in the tax basis of Company property, if any, arising out of the recapture of any tax credit.

     c.    Allocations to the Members of profit.

6

JA2130

CONFIDENTIAL

MARTORELLO_004586

d.      The Members' share of Company income or gain (including income and gain exempt from income taxation) as provided under this Agreement, or otherwise by Regulation Section 1.704-1(b)(2)(iv).

e.      The Members' share of the amount of Company liabilities that are assumed by the Members.

(ii)     Decreases in Capital Account.  The Capital Account of the Members shall be decreased by:

a.      The Members' share of the amount of money distributed to the Members of the Company pursuant to any provision of this Agreement.

b.      The Members' share of the fair market value of property distributed to the Members by the Company (net liabilities secured by such distributed property that such Members are considered to assume or take subject to Code Section 752).

c.      Allocations to the Members of losses.

d.      Allocations to the Members of deductions, expenses, Nonrecourse Deductions and net losses allocated to it pursuant to this Agreement, and the Members' share of Company expenditures which are neither deductible nor properly chargeable to Capital Accounts under Code Section 705(a)(2)(B) or are treated as such expenditures under Treasury Regulation Section 1.704-1(b)(2)(iv)(i). "Nonrecourse Deductions" shall have the meaning set forth in Treasury Regulation Section 1.704-2.

e.      The Members' share of the amount of any liabilities of the Members that are assumed by the Company.

## SECTION IV
## ALLOCATIONS AND DISTRIBUTIONS

A.    Allocations.

(i)      Allocations shall be made at such times as the Manager shall deem, in his sole discretion, to the Members listed and described on Schedule A attached hereto in accordance with the terms and rights of their interests.  Except as may be expressly provided otherwise in this Section IV or agreed to among the parties, and subject to the provisions of Sections 704(b) and 704(c) of the Code, the net income, net loss, or gains of the Company for each year of the Company shall be allocated to the Members, in accordance with the rights attributable to their respective Interests.

(ii)     Net profits, net losses, or any other items allocable to any period shall be determined by the Manager, in his discretion, using any permissible method under Code Section 706 and the related Treasury Regulations and in accordance with the rights attributable to their respective Interests.

(iii)    Acknowledgement.  The Members are aware of the income and other tax consequences of the allocations in or referred to by this Section IV and hereby agree to be bound by the provisions of this Section IV in reporting the share of items of Company income, gain, loss, deduction and expense for tax purposes.

(iv)    Determination by Manager of Certain Matters.  All matters not expressly provided for by the terms of this Agreement concerning the manner in which capital accounts and allocations are computed shall be determined in good faith by the Manager, in his reasonable discretion, whose determination shall be final and conclusive as to all the Members.  In the event the Manager determines that it is prudent to modify the

7

JA2131

CONFIDENTIAL                                                                    MARTORELLO_004587

manner in which capital accounts or any allocations under this Agreement are computed in order to comply with Section 704(b) of the Code and Treasury Regulations thereunder, the Manager shall make such modification. In the event that unanticipated events might otherwise cause this Agreement not to comply with such law, the Manager, consistent with the prior sentence, shall make such modifications as he deems reasonable.

B.　　Allocations for Tax Purposes.　Except as otherwise provided in and after giving effect to Section IV A, as of the end of each fiscal year, items of Company income, gain, loss, deduction and expense, shall be allocated among the Members pursuant to this Section IV B and as otherwise agreed to in writing by the parties for federal income tax purposes. In accordance with Code Section 704(c) and the related Treasury Regulations, income, gain, loss and deduction with respect to any property contributed to the capital of the Company, solely for tax purposes, will be allocated among the Members so as to take account of any variation between the adjusted basis to the Company of the property for federal income tax purposes and the initial Book Value of the property. If the Book Value of any Company asset is adjusted under clause "b." of the definition of Book Value, subsequent allocations of income, gain, loss and deduction with respect to that asset will take account of any variation between the adjusted basis of the asset for federal income tax purposes and its Book Value in the same manner as under Code Section 704(c) and the related Treasury Regulations. Any elections or other decisions relating to allocations under this Section IV B will be made in any manner that the Manager determines reasonably reflects the purpose and intention of this Agreement. The allocations in or referred to by this Section IV B are solely for federal, state, territorial and local income tax purposes and shall not affect, or in any way be taken into account in computing, any Member's capital account or share of net profit or net loss or other items described in this Agreement.

C.　　Acknowledgement.　The Members are aware of the income and other tax consequences of the allocations in or referred to by this Section IV and hereby agree to be bound by the provisions of this Section IV in reporting their shares of items of Company income, gain, loss, deduction and expense for tax purposes.

D.　　Certain Tax Related Definitions.　For the purposes of this Agreement, unless the context otherwise requires:

(i)　　"Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in such Member's capital account as of the end of the relevant fiscal year or other period, after giving effect to the following adjustments.

a.　　Credit to such capital account any amounts which such Member is obligated to restore or is deemed to be obligated to restore pursuant to the penultimate sentence of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5);

b.　　Debit to such capital account the item described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6); and

c.　　Credit and debit to such capital account, in the sole and absolute discretion of the Manager, any other items required or permitted under Section 704(b) of the Code and Treasury Regulations thereunder.

(ii)　　"Book Value" means with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

a.　　the initial Book Value of any asset contributed by a Member to the Company shall be the asset's gross fair market value at the time of the contribution;

8

JA2132

MARTORELLO_004588

     b.    the Book Value of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Manager in his reasonable judgment:

     1.    if any adjustment is necessary or appropriate to reflect the relative economic interests of the Members in the Company as of (x) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a *de minims* capital contribution, or (y) the distribution by the Company to a Member of more than a *de minims* amount of Company property as consideration for an interest in the Company;

     2.    As of the liquidation of the Company within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g); and

     3.    Whenever else allowed under Treasury Regulations Section 1.704-1(b)(2)(iv)(f) or Proposed Treasury Regulations Section 1.704-1(b)(2)(iv)(s).

     c.    The Book Value of any Company asset distributed to any Member will be the gross fair market value of the asset on the date of distribution; and

     d.    The Book Value of Company assets will be increased or decreased to reflect any adjustment to the adjusted basis of the assets under Code Section 734(b) or 743(b), but only to the extent that the adjustment is taken into account in determining capital accounts under Treasury Regulations Section 1.704-1(b)(2)(iv)(m), provided that Book Values will not be adjusted hereunder to the extent that the Manager determines that an adjustment under clause "b." is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment under this clause "d."

     e.    After the Book Value of any asset has been adjusted under this Section IV F(ii) above, Book Value will be adjusted by the depreciation taken into account with respect to the asset for purposes of computing net profit and net loss.

     (iii)    "Treasury Regulations" means the Income Tax Regulations promulgated under the Internal Revenue Code, as such regulations may be amended from time to time (including corresponding provisions of successor regulations).

E.    <u>Distributions</u>.

     (i)    The Manager, in his sole and absolute discretion, may at any time cause the Company to distribute to Members in accordance with their respective Interest any cash available for distribution with respect to each Interest.  The Manager shall reserve the right to make distributions to certain Classes of Interests and not to others, as well as certain Members and not to others.

     (ii)    The Manager, in his sole and absolute discretion, may use the capital accounts of any Member and any class or type of Membership Interest for purposes that it deems appropriate, including funding or investing in companies related or unrelated to the Company subsidiary associated with a particular type of Membership Interest, and no interest or other benefits shall accrue to the Member whose capital account is so used.

     (iii)    Distributions made pursuant to this Section IV E will be calculated separately for each Interest and will be distributed to the Members participating in that Interest based on their respective Interest, as applicable.

     (iv)    The Members agree to be bound by all the provisions of this Section IV in reporting their share of Company income and loss for income tax purposes.

JA2133

CONFIDENTIAL

MARTORELLO_004589

F.    Distributions upon Liquidation of the Company.

(i)    At the termination of the Company and after the Company has satisfied or provided for the satisfaction of all the Company's debts and other obligations, the Company's assets will be distributed to the Members and any dissociated members whose interests have not been previously redeemed first, in discharge of their respective capital interests; and then, in proportion to the respective Membership Interest, as applicable. Assets will be distributed only to Members holding Equity Interests in the Company, unless so determined by the Manager in his sole and absolute discretion.

(ii)    If the Company lacks sufficient assets to make the distributions described in the foregoing paragraph, the Company will make distributions in proportion to the amount of the respective capital interest of the Members and any dissociated members whose interests have not been previously redeemed, and all in accordance with each Member's respective Membership Interest.

## SECTION V
## MANAGEMENT OF THE COMPANY

A.    The business and affairs of the Company shall be managed by or under the direction of the Manager, who may exercise all powers of the Company and do all such lawful acts and things as are not by statute, the Certificate, or by this Agreement directed or required to be exercised and done by the Members having a right to vote ("Manager"). The Manager of the Company shall be: Liont, LLC.

B.    Without prejudice to such general powers, but subject to the same limitations, it is hereby expressly declared that the Manager shall have the following powers:

(i)    to conduct, manage and control the business and affairs of the Company and to make such rules and regulations therefor not inconsistent with the law, the Certificate or this Agreement, as the Manager shall deem to be in the best interest of the Company;

(ii)    to appoint and remove at his pleasure the Officers (if any), agents and employees of the Company, prescribe their duties and fix their compensation;

(iii)    to appoint boards or committees in accordance with Section K of this Article.

(iv)    to borrow money and incur indebtedness for the purposes of the Company, and to cause to be executed and delivered therefor, in the Company's name, promissory notes, bonds, debentures, deeds of trust, mortgages, pledges, hypothecations, or other evidences of debt and securities therefor;

(v)    to amend this Agreement, with the consent of the Members holding 51% of the Class A Voting Interests;

(vi)    to make all other arrangements and do all things which are necessary or convenient to the conduct, promotion or attainment of business, purposes or activities of the Company.

C.    The Manager shall hold office until his successor is elected and qualified, or his earlier death, dissolution, resignation or removal.

D.    A vacancy in the Manager shall be deemed to exist in case of the death, dissolution, resignation or removal of a Manager, if the authorized number of Managers is increased, or if the Members fail, at any meeting of Members at which any Manager or Managers are to be elected by those Members with Class A Voting Interest, to elect the full authorized number of Managers to be voted for at such meeting. Unless the

JA2134

CONFIDENTIAL

MARTORELLO_004590

Members shall have elected a Manager to fill a vacancy, vacancies may be filed by (i) a majority of the Managers then in office, whether or not less than a quorum, or by a sole remaining Manager, or (ii) failing the election of a Manager pursuant to clause (i), by the Members with Class A Voting Interest.

E.      Any Manager may be removed, with or without cause, by the vote of Members holding not less than a majority of Class A Voting Interests represented and voting at a duly held meeting at which a quorum is present (which Members voting affirmatively also constitute at least a majority of the required quorum), or, in lieu of a meeting, by way of written consent of Members holding fifty-one percent (51%) of the Class A Voting Interests.

F.      No Manager shall receive any compensation for serving as a Manager, except that (i) a Manager shall receive such compensation as is otherwise determined by the Members holding Class A Voting Interest, and (ii) a Manager shall be reimbursed for reasonable and necessary expenses.

G.      Except as expressly set forth in this Agreement or required by law, no Manager shall be personally liable for any debt, obligation or liability of the Company, whether arising in contract, tort or otherwise, solely by reason of being a Manager of the Company.

H.      <u>Compensation and Fees</u>.

        (i)      No Member shall be paid any fee or other compensation whatsoever for services as a Manager or otherwise, whether ordinary or extraordinary, foreseen or unforeseen, rendered to or for the benefit of the Company, except as otherwise provided in this Section.

        (ii)      The Manager shall be paid such compensation for his services as shall be set forth by the majority holders Class A Voting Interest.

I.      <u>Certain Related Party Transactions Permitted</u>.   The Company may (i) employ or retain a Member or a person directly or indirectly related to or affiliated with an Member to render or perform a service on behalf of the Company, and/or (ii) contract to purchase property from a Member or a person directly or indirectly related to or affiliated with a Member, provided that the charges made for services rendered and materials furnished by such Member, person or persons must be reasonable and competitive with those charged by others in the same line of business and not so related.

J.      <u>No Resignation</u>.   Except pursuant to an authorized transfer of its entire Membership Interest in accordance with this Agreement, no Member shall have the right to resign from the Company as a Member prior to the dissolution and winding up of the Company without the prior written consent of the Manager. Any Member which purports to resign from the Company in violation of the foregoing provision or which has ceased for any reason to be a Member shall be liable to the Company and the other Members for any damages sustained by reason of such resignation or cessation.

K.      <u>Boards and Committees</u>. The Manager may appoint individuals to serve on boards or committees to assist the Manager in overseeing certain aspects of the Company's operations, including but not limited to appointing a board to oversee the Company's legal and regulatory compliance. The manner of functioning of said boards and committees will be as set forth by the Manager in a separate written resolution.

L.      <u>Indemnity</u>. Neither the Manager nor any of the Company's officers, directors, partners, employees, agents, affiliates, successors or assigns shall be liable to the Company or the Members for any loss or damage incurred by reason of any act performed or omitted in connection with the activities of the Company or in dealing with third parties on behalf of the Company, unless such act or omission was taken or omitted by such Manager or such other persons as noted above, in bad faith, and such act or omission constitutes fraud, gross negligence or willful breach of fiduciary duty.

11

JA2135

MARTORELLO_004591

The Company, its receiver or its trustee, shall indemnify and save harmless the Manager and its officers, directors, partners, employees, agents, Affiliates, successors and assigns, including any guarantors of Company obligations (each of the foregoing being a "Covered Person"), from any claim, liability, loss, judgment or damage incurred by them by reason of any act performed or omitted to be performed in connection with the activities of the Company or in dealing with third parties on behalf of the Company, including costs and attorneys' fees (which attorneys' fees may be paid as incurred) and any amounts expended in the settlement of any claims of liability, loss or damage provided that the act or omission of the Covered Person is not found by a final, non-appealable ruling of a court of competent jurisdiction to have resulted from an act or omission of the Covered Person taken in bad faith and that constitutes fraud, gross negligence or willful breach of fiduciary duty by the Covered Person. The Company shall advance all sums required to indemnify and hold each Covered Person harmless as provided herein from the initiation of any claim against such Covered Persons, subject to acknowledgment in writing by such Covered Person of the obligation to reimburse the Company in the event that, following the entry of a final, non-appealable judgment, it is determined that the Company was not obligated to indemnify such Person pursuant to this Agreement. All judgments against the Company and a Covered Person, wherein the Covered Person is entitled to indemnification, must first be satisfied from Company assets before the Covered Person shall be responsible for such obligations. The Company shall not pay for any insurance covering liability of a Covered Person for actions or omissions for which indemnification is not permitted hereunder; provided, that nothing contained herein shall preclude the Company from purchasing and paying for such types of insurance, including extended coverage liability and casualty and worker's compensation, as would be customary for any person owning comparable property and engaged in a similar business or from naming the Manager and any Covered Person as additional insured parties thereunder. The provisions of this Section shall survive the termination of the Company.

## SECTION VI
## MEETING OF MEMBERS

A.      Meetings and Voting.  Notwithstanding anything to the contrary herein, only Members owning Class A Voting Interests in the Company, which confer voting rights, shall be entitled to vote with regards to any issue concerning the Company. Neither an assignee nor transferee may vote any Class A Voting Interest unless such assignee or transferee is admitted as a Member with voting rights.  Furthermore, Members who only hold Economic Interests or Equity Interests in the Company shall not be entitled to vote on any issues concerning the Company.

B.      Special Meetings.  Special meetings of the Members may be called at any time by the Manager and shall be called at the written request of the holders of a majority of the Class A Voting Interest then outstanding and entitled to vote thereat. The meeting may be dispensed with if all Members who would have been entitled to vote on such action if such meeting was held consent in writing to the action to be taken.

C.      Place of Meetings.  All meetings of the Members shall be held in the Commonwealth of Puerto Rico at the principal office of the Company, or at such other places as shall be designated in the notices or waivers of notice of such meetings and may be held telephonically.

D.      Notice of Meetings.

        (i)      Except as otherwise provided by statute, written notice of each meeting of the Members, stating the time when and the place where it is to be held, shall be served either personally, by mail, or by email or other electronic communication,, not less than ten (10) or more than fifty (50) days before the meeting, upon each Member of record entitled to vote at such meeting, or the Member's designated agent, and to any other member to whom the giving of notice may be required by law.  Notice of a meeting shall

12

JA2136

CONFIDENTIAL

MARTORELLO_004592

also state the purpose or purposes for which the meeting is called, and shall indicate that it is being issued by, or at the direction of, the person or persons calling the meeting. If mailed, such notice shall be directed to each such Member entitled to vote at the Member's address as it appears on the records of the Members of the Company, unless he or she has previously notified the Manager of the Company in writing that notices intended for the Member to be mailed to the Member's agent and/or some other address, in which case, it shall be mailed to the person and address designated in such request.

(ii)     Notice of any meeting need not be given to any person who may become a Member of record after the mailing of such notice and prior to the meeting, or to any Member who attends such meeting in person or by proxy, or to any Member who, in person or by proxy, submits a signed waiver of notice either before or after such meeting. Holders of non-voting Classes of Membership Interest shall only be permitted to attend Member meetings if they receive advance written permission of the Manager, which permission the Manager may withhold in his sole discretion.

(iii)     Whenever the vote of the Members at a meeting thereof is required or permitted to be taken in connection with any Company action, by any Section of this Agreement, the meeting and vote of the Members may be dispensed with, if all other Members who would have been entitled to vote upon the action if such meeting were held, shall consent in writing to such Company action being taken.

(iv)     Whenever any notice is required to be given under the provisions of this Section, or under the provisions of the Certificate, a waiver thereof in writing, signed by the person or persons entitled to said notice, whether before or after the time stated in said notice, shall be deemed equivalent thereto.

E.     Quorum.   Except as otherwise provided herein, or by the applicable provisions of the Delaware Code, or in the Certificate, at all meetings of the Members of the Company, the presence at the commencement of such meetings in person or by proxy of any number of Members holding of record a majority of the total number of the Class A Voting Interests of the Company then issued and outstanding and entitled to vote shall be necessary and sufficient to constitute a quorum for the transaction of any business. The withdrawal of any Member holding Class A Voting Interests after the commencement of a meeting shall have no effect on the existence of a quorum after a quorum has been established at such meeting.

F.     Voting.

(i)     Except as otherwise provided by the Certificate, any Company action to be taken by vote of the Members shall be authorized by a majority of votes cast at a meeting of Members at which a quorum is present by the holders of Class A Voting Interest.

(ii)     Each Member entitled to vote or to express consent or dissent without a meeting, may do so by proxy; provided, however, that the instrument authorizing such proxy to act shall have been executed in writing by the Member or the Member's attorney in fact thereunto duly authorized in writing. No proxy shall be valid after expiration of eleven (11) months from the date of its execution, unless the person executing same directs in said proxy that it shall continue in force for a longer period of time.  Such instrument shall be exhibited to the Manager at the meeting and shall be filed with the records of the Company.

(iii)     Class A Voting Interest registered in the name of another entity, if entitled to be voted, may be voted by the President (or the equivalent) of said entity or a proxy appointed by the President of such other entity, unless some other person has been appointed to vote such shares pursuant to a by-law or a resolution of the board of directors (or the equivalent) of such other entity, in which case such person may vote such Class A Voting Interest. Any fiduciary may vote Class A Voting Interest registered in the name of such entity as such fiduciary, either in person or by proxy.

JA2137

CONFIDENTIAL

MARTORELLO_004593

(iv)    Any resolution in writing, signed by all the Class A Voting Interest, shall be and constitute action by such members to the effect therein expressed, with the same force and effect as if the same had been duly passed by fifty-one percent (51%) of the Class A Voting Interests at a duly called meeting of members of such resolution.

## SECTION VII
## EXCULPATION OF LIABILITY; INDEMNIFICATION

A.    <u>Liability of Members to the Company and One Another</u>.  No Member shall be liable for the debts, liabilities, contracts, or any other obligation of the Company, except to the extent expressly provided herein or under Delaware law, or as expressly provided otherwise.  No Member shall be liable for the debts or liabilities of any other Member.  With respect to the Company and its business and the enterprise established by this Agreement, no Member shall be liable, responsible or accountable in damages or otherwise to the Company or any other Member for any act performed by it (i) within the scope of the authority conferred on it by this Agreement and in good faith; (ii) based on the good faith opinion of legal counsel or other appropriate expert; or (iii) otherwise made in good faith.

B.    <u>Indemnification</u>.

(i)    The Company, its receiver or its trustee, shall indemnify any Member, employee or agent of the Company who was or is a party or is threatened to be made a party to a threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, or investigative, and whether formal or informal, other than an action by or in the right of the Company, by reason of the fact that such person is or was a Member, employee or agent of the Company, against expenses, including attorneys' fees, judgments, penalties, fines and amounts paid in settlement actually and reasonably incurred by such person in connection with the action, suit or proceeding, if the person acted in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner that such person reasonably believed to be in the best interests of the Company and with respect to a criminal action or proceeding, if such person had no reasonable cause to believe such person's conduct was unlawful.

(ii)    Any Member, employee or agent of the Company shall be indemnified against actual and reasonable expenses, including attorneys' fees, incurred by such person in connection with the action, suit or proceeding and any action, suit or proceeding brought to enforce the mandatory indemnification provided herein.  The Company shall advance all sums required to indemnify and hold each Member, employee or agent of the Company harmless as provided herein from the initiation of any claim against such persons, subject to acknowledgment in writing by such persons of the obligation to reimburse the Company in the event that, following the entry of a final, non-appealable judgment, it is determined that the Company was not obligated to indemnify such persons pursuant to this Agreement.

## SECTION VIII
## DISSOLUTION AND LIQUIDATION

A.    <u>Dissolution</u>.  The Company shall dissolve and its affairs shall be wound up on the first to occur of the following:

(i)    The written consent of the Members holding at least fifty-one percent of the Class A Voting Interests;

(ii)    The entry of a decree of judicial dissolution of the Company under Section 1801(4) of the Act or a judicial determination under Section 1805(5) of the Act.

(iii)    The sale of all or substantially all of the assets of the Company.

14

JA2138

MARTORELLO_004594

The death, insanity, retirement, resignation, expulsion, bankruptcy, or dissolution of any Member, or the occurrence of any other event that terminates the continued membership of a Member in the Company, shall not cause a dissolution of the Company.

B.    Liquidation.  On dissolution of the Company, the Manager shall act as liquidator.  The liquidator shall proceed diligently to wind up the affairs of the Company and make final distributions as provided herein and in the Act.  The costs of liquidation shall be borne as a Company expense.  Until final distribution, the liquidator shall continue to manage the Company with all of the power and authority of the Manager.

## SECTION IX
## CONFIDENTIALITY; NON-DISCLOSURE; NON-SOLICITATION; AND NON-COMPETE

Each Member of the Company shall be required to execute, prior to the issuance of any Interest in the Company, a separate confidentiality, non-disclosure, non-solicitation and non-compete agreement.

## SECTION X
## BOOKS AND RECORDS

A.    Access to Books and Records.  To the fullest extent permissible under law, all non-voting Classes hereby waive any rights they may have under the laws of the State of Delaware, or otherwise, to access the books and records of the Company.

B.    No Access to Information.  Notwithstanding any right of access to the books and records of the Company that may be applicable, under no circumstances shall any books or records be deemed to include any books and records concerning the information deemed to be covered by the agreements executed pursuant to Section IX, and all non-voting Classes and Interests hereby irrevocably waive any access whatsoever to any of said information.  All non-voting Classes and Interests hereby covenant and agree that it is unreasonable and otherwise improper under all circumstances to demand access to said information.

## SECTION XI
## MISCELLANEOUS PROVISIONS

A.    Section Headings.  The Section headings and numbers contained in this Agreement have been inserted only as a matter of convenience and for reference, and in no way shall be construed to define, limit or describe the scope or intent of any provision of this Agreement.

B.    Severability.  The invalidity or unenforceability of any particular provision of this Agreement shall not affect the other provisions hereof, and this Agreement shall be construed in all respects as if such invalid or unenforceable provisions were omitted.

C.    Amendment.  This Agreement may be amended or revoked at any time, in writing, with the consent of the Manager or a vote of the Members holding fifty-one percent (51%) of the outstanding Class A Voting Interests. No change or modification to this Agreement shall be valid unless in writing and signed by the Manager or the Members entitled to vote.

D.    Binding Effect. Subject to the provisions of this Agreement relating to transferability, this Agreement will be binding upon and shall inure to the benefit of the parties, and their respective distributees, heirs, successors and assigns.

JA2139

CONFIDENTIAL

MARTORELLO_004595

E.    Governing Law.  Regardless of the place where this Agreement may be executed by the Member, the rights and obligations of the Member, and any claims and disputes relating thereto, shall be subject to, governed by, construed and enforced in accordance with the laws of the State of Delaware.

F.    Power of Attorney.  Each Member hereby appoints the Manager to exercise the rights set forth in this Section XI F, acting individually, as the true and lawful representative of such Member and attorney-in-fact, in such Member's name, place and stead, to:

      (i)    Complete or correct, on behalf of such Member, all documents to be executed by such Member in connection with such Member's subscription for an Interest, including, without limitation, filling in or amending amounts, dates, and other pertinent information.

      (ii)    Make, execute, sign, acknowledge, swear to, and file: (i) any and all instruments, certificates, and other documents which may be deemed necessary or desirable to effect the winding-up and termination of the Company; (ii) any business certificate, fictitious name certificate, amendment thereto, or other instrument, agreement, or document of any kind necessary or desirable to accomplish the business, purpose and objectives of the Company, or required by any applicable federal, state, territorial, tribal or local law; (iii) any counterpart of this Agreement to be entered into pursuant to this Agreement and any amendment to which such Member is a signatory; (iv) any amendments to this Agreement; (v) all certificates and other instruments conforming with this Agreement that are necessary or appropriate to qualify, continue and terminate the Company as a foreign limited liability company in all such jurisdictions in which the Company may conduct its business; (vi) any and all certificates, documents, and other instruments necessary or desirable for purposes of applying to and complying with the Puerto Rico Department of Economic Development and Commerce tax incentives program; (vii) all other filings with agencies of the federal government, of any state, territorial, tribal or local government, or of any other jurisdictions, which the Manager considers necessary or desirable to carry out the purposes of this Agreement and the business of the Company.

      (iii)    This power of attorney granted pursuant to this Section XI F is a special power of attorney coupled with an interest and is irrevocable and shall survive the death, disability, or cessation of the existence as a legal entity of a Member; and shall survive the delivery of an assignment by a Member of the whole or any portion of its interest in the Company, except that, when the assignee thereof has been approved by the Manger for admission to the Company as a Member, the power of attorney shall survive the delivery of such assignment for the sole purpose of enabling the Manger to execute, acknowledge, and file any instrument necessary to effect such substitution.

G.    Waiver of Certain Rights.  All holders of non-voting Classes of Membership Interest irrevocably waive any right they may have to maintain any action for dissolution of the Company or for partition of the property of the Company.

H.    Arbitration.

      (i)    Any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled by arbitration administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules, and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. The prevailing party shall recover its costs and expenses of arbitration and the collection of the award, including its reasonable attorney fees.

      (ii)    Solely upon agreement of the parties, the parties may dispense with administration by the American Arbitration Association and agree to self-administer any dispute or, alternatively, agree to have the dispute administered by any other agreed upon organization/tribunal and pursuant to any other agreed upon rules.

16

JA2140

MARTORELLO_004596

(iii)    Any self-administered arbitration shall be conducted in English before an arbitrator chosen by the parties and who shall reside in the Commonwealth of Puerto Rico.  Any certified mediator in Puerto Rico shall be deemed to have the minimum qualifications to arbitrate the dispute.  The parties shall split the arbitrator's fees, including any required prepayment deposit.  The arbitration shall be governed by the Commercial Rules of the American Arbitration Association ("AAA") including the Fast Track/Expedited Procedures except as modified herein.  Within 10 days of the written notice and a demand for arbitration, the parties shall provide to each other the names of 3 persons residing in Puerto Rico, who would be acceptable as arbitrators.  If the parties agree on any person, that person shall be chosen as the arbitrator.  If the agreed upon person declines to act as the arbitrator for any reason, the parties shall have 5 days to submit alternate names.  If the parties are unable to agree on an arbitrator within 25 days of the written notice and demand for arbitration, either party may proceed with AAA administered arbitration pursuant to clause (a) above.  If an arbitrator is agreed upon, the final arbitration hearing shall commence within 120 days of the arbitrator being chosen. The arbitrator shall hold an initial hearing, which may be held telephonically, and shall enter a scheduling order.  The parties may, but are not required, to mediate the case prior to the final hearing.  The parties may modify these rules to the extent there is agreement by the parties to do so.  The decision of the arbitrator shall be final and binding.  Judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.

I.    <u>Entire Agreement</u>.    This Agreement, including Schedules, supersedes all previous Operating Agreements entered into by the Company.

[SIGNATURES TO FOLLOW ON SCHEDULE A]

17

JA2141

CONFIDENTIAL

MARTORELLO_004597

SCHEDULE A
OF
THE OPERATING AGREEMENT
OF
EVENTIDE CREDIT ACQUISITIONS. LLC


MEMBER LISTING/INTEREST/PERCENTAGE INTEREST

| | Voting Interest | Date Issued | Economic Interest | Date Issued | Equity Interest | Date Issued |
|---|---|---|---|---|---|---|
| **Class A Membership Interest:** | | | | | | |
| Member: | | | | | | |
| Kairos Holdings, LLC | 1,000 Units (100%) | 2/9/2015 | 595 Units (59.5%) | 2/9/2015 | 595 Units (59.5%) | 2/9/2015 |
| Gallant Capital, LLC | N/A | | 255 Units (25.5%) | 7/15/2015 | 255 Units (25.5%) | 7/15/2015 |
| Justin Martorello | N/A | | 100 Units (10.0%) | 2/9/2015 | 100 Units (10.0%) | 2/9/2015 |
| Brian McFadden | N/A | | 15 Units (1.5%) | 2/9/2015 | 15 Units (1.5%) | 2/9/2015 |
| | | | 5 Units (0.5%) | 3/1/2015 | 5 Units (0.5%) | 3/1/2015 |
| | | | 20 Units (2.0%) | | 20 Units (2.0%) | |
| James Dowd | N/A | | 15 Units (1.5%) | 2/9/2015 | 15 Units (1.5%) | 2/9/2015 |
| Simon Liang | N/A | | 15 Units (1.5%) | 2/9/2015 | 15 Units (1.5%) | 2/9/2015 |

Date Amended: July 15, 2015

ACCEPTED AND AGREED

By its Manager, LIONT, LLC


By: _____
Name: Matt Martorello
Title: President


By GALLANT CAPITAL, LLC


By: _____
Name: Matt Martorello
Title: President of its Manager


18

JA2142

CONFIDENTIAL

MARTORELLO_004598

# Exhibit 49

CONFIDENTIAL PURSUANT TO PARTIES' PROTECTIVE ORDER

JUSTIN_MARTORELLO_00157

| Type | Direction | Date | Time | Party | Description | Attachment #1 | Attachment #2 |
|------|-----------|------|------|-------|-------------|---------------|---------------|
| ███ | ███ | ███ | ███ | ███ | ████████████ | | |
| ███ | ███ | ███ | ███ | ███ | ████ | | |
| ███ | ███ | ███ | ███ | ███ | ████████████ | | |
| SMS Messages | Incoming | 8/29/2016 | 8/29/2016 9:33:06 AM(UTC-4) | From: +17732097720 Cell Matt | I am starting to suspect Brian and James are getting too big for their britches | | |
| SMS Messages | Incoming | 8/29/2016 | 8/29/2016 9:34:10 AM(UTC-4) | From: +17732097720 Cell Matt | Meaning they see the monthly wires and are starting to think they deserve a lot more of it now than the $1mm a year Brian makes for being a hired CEO.  Just a suspicion from some comments so far. | | |
| SMS Messages | Incoming | 8/29/2016 | 8/29/2016 9:36:16 AM(UTC-4) | From: +17732097720 Cell Matt | He may have to be disappointed somewhere down the near term road, he's not the founder and  $1mm a year buys a lot of very capable replacements.  When Eventide is asked to support a crazy bonus package, the answer is going to be no. | | |
| ███ | ███ | ███ | ███ | ███ | ████ | | |
| ███ | ███ | ███ | ███ | ███ | ████████ | | |
| ███ | ███ | ███ | ███ | ███ | ████ | | |
| ███ | ███ | ███ | ███ | ███ | ██████ | | |
| ███ | ███ | ███ | ███ | ███ | ██████████ | | |
| ███ | ███ | ███ | ███ | ███ | █████ | | |

JA2144

# Exhibit 50

# EVENTIDE CREDIT ACQUISTIONS, LLC

Michelle Hazen
Ascension Technologies, LLC
P.O. Box 703
Watersmeet, MI 49969

*Re: Consent to Ascension Technologies, LLC Atlanta Office Expansion*

Ms. Hazen:

Pursuant to Loan and Security Agreement dated October 7, 2015 and, more specifically, Section 4(b) of the related Promissory Note ("Note") dated January 26, 2016 by and between Eventide Credit Acquisitions, LLC ("Eventide") and Tribal Economic Development Holdings, LLC (together with its Subsidiaries, including Big Picture Loans, LLC and Ascension Technologies, LLC), Eventide must provide written consent and approval of a budget before Borrower or its Subsidiaries expand the Business in such a manner as to materially reduce payments under the Note.

Please let this letter serve as Eventide's formal written consent to Ascension Technologies, LLC's expansion and establishment of an office in Atlanta, Georgia pursuant to the attached organizational chart and budget.

Sincerely,

Matt Martorello
Eventide Credit Acquisitions, LLC

JA2146

CONFIDENTIAL

LVD-DEF00003643

# Exhibit 51

**EVENTIDE CREDIT ACQUISITIONS, LLC**
875 Carretera 693, Suite 202
Dorado, Puerto Rico 00646

11/03/2016

Michelle Hazen
Big Picture Loans, LLC
P.O. Box 704
Watersmeet, MI 49969

*Re: Consent to Additional Indebtedness – Deborah M. Arenberg Living Trust*

Ms. Hazen:

Pursuant to Section 5.1 of the Loan and Security Agreement ("Agreement") dated October 7, 2015 by and between Eventide Credit Acquisitions, LLC ("Eventide") and Tribal Economic Development Holdings, LLC (together with its Subsidiaries Big Picture Loans, LLC ("BPL") and Ascension Technologies, LLC ("AT"), together ("TED"), Eventide must provide written consent before Borrower or any of its Subsidiaries issue any indebtedness in addition to the Permitted Liens.

Eventide has been informed that the Permitted Lien for Noteholder Deborah M. Arenberg Living Trust ("Noteholder") authorized pursuant to Section 3.4 of the Agreement has almost reached maturity. Eventide is also informed that the Noteholder wishes to reinvest in the Business of BPL in the amount of $276,148.16.

Please let this letter serve as Eventide's formal written consent to the Loan and Security Agreement and related Promissory Note for $276,148.16 by and between Big Picture Loans, LLC and Noteholder which shall constitute a Permitted Lien under the Agreement.

Sincerely,

Matt Martorello
Eventide Credit Acquisitions, LLC

JA2148

CONFIDENTIAL

MARTORELLO_000020

USCA4 Appeal: 23-2097 Doc: 11-5 Filed: 12/06/2023 Pg: 268 of 503

# Exhibit 52

EVENTIDE CREDIT ACQUISITIONS, LLC
875 Carretera 693, Suite 202
Dorado, Puerto Rico 00646

11/3/2016

Michelle Hazen
Big Picture Loans, LLC
P.O. Box 704
Watermeet, MI 49969

*Re: Consent to Additional Indebtedness - DTA Trinity Wealth Transfer Trust*

Ms. Hazen:

Pursuant to Section 5.1 of the Loan and Security Agreement ("Agreement") dated October 7, 2015 by and between Eventide Credit Acquisitions, LLC ("Eventide") and Tribal Economic Development Holdings, LLC (together with its Subsidiaries Big Picture Loans, LLC ("BPL") and Ascension Technologies, LLC ("AT"), together ("TED"), Eventide must provide written consent before Borrower or any of its Subsidiaries issue any indebtedness in addition to the Permitted Liens.

Eventide has been informed that the Permitted Lien for Noteholder DTA Trinity Wealth Transfer Trust ("Noteholder") authorized pursuant to Section 3.4 of the Agreement has almost reached maturity.  Eventide is also informed that the Noteholder wishes to reinvest in the Business of BPL in the amount of $720,593.16.

Please let this letter serve as Eventide's formal written consent to the Loan and Security Agreement and related Promissory Note for $720,593.16 by and between Big Picture Loans, LLC and Noteholder which shall constitute a Permitted Lien under the Agreement.

Sincerely,

Matt Martorello
Eventide Credit Acquisitions, LLC

JA2150

CONFIDENTIAL                                                                    MARTORELLO_000021

# Exhibit 53

EVENTIDE CREDIT ACQUISITIONS, LLC
875 Carretera 693, Suite 202
Dorado, Puerto Rico 00646

11/03/2016

Michelle Hazen
Big Picture Loans, LLC
P.O. Box 704
Watersmeet, MI 49969

    *Re: Consent to Additional Indebtedness – Terrance J. Arenberg*

Ms. Hazen:

    Pursuant to Section 5.1 of the Loan and Security Agreement ("Agreement") dated October 7, 2015 by and between Eventide Credit Acquisitions, LLC ("Eventide") and Tribal Economic Development Holdings, LLC (together with its Subsidiaries Big Picture Loans, LLC ("BPL") and Ascension Technologies, LLC ("AT"), together ("TED"), Eventide must provide written consent before Borrower or any of its Subsidiaries issue any indebtedness in addition to the Permitted Liens.

    Eventide has been informed that the Permitted Lien for Noteholder Terrance J. Arenberg ("Noteholder") authorized pursuant to Section 3.4 of the Agreement has almost reached maturity. Eventide is also informed that the Noteholder wishes to reinvest in the Business of BPL in the amount of $750,000.00.

    Please let this letter serve as Eventide's formal written consent to the Loan and Security Agreement and related Promissory Note for $750,000.00 by and between Big Picture Loans, LLC and Noteholder which shall constitute a Permitted Lien under the Agreement.

Sincerely,

Matt Martorello
Eventide Credit Acquisitions, LLC

JA2152

CONFIDENTIAL                                                    MARTORELLO_000022

Exhibit 54

**EVENTIDE CREDIT ACQUISITIONS, LLC**
875 Carretera 693, Suite 202
Dorado, Puerto Rico 00646

11/03/2016

Michelle Hazen
Big Picture Loans, LLC
P.O. Box 704
Watersmeet, MI 49969

*Re: Consent to Additional Indebtedness – Timothy P. Arenberg*

Ms. Hazen:

Pursuant to Section 5.1 of the Loan and Security Agreement ("Agreement") dated October 7, 2015 by and between Eventide Credit Acquisitions, LLC ("Eventide") and Tribal Economic Development Holdings, LLC (together with its Subsidiaries Big Picture Loans, LLC ("BPL") and Ascension Technologies, LLC ("AT"), together ("TED"), Eventide must provide written consent before Borrower or any of its Subsidiaries issue any indebtedness in addition to the Permitted Liens.

Eventide has been informed that the Permitted Lien for Noteholder Timothy P. Arenberg ("Noteholder") authorized pursuant to Section 3.4 of the Agreement has almost reached maturity. Eventide is also informed that the Noteholder wishes to reinvest in the Business of BPL in the amount of $900,000.00.

Please let this letter serve as Eventide's formal written consent to the Loan and Security Agreement and related Promissory Note for $900,000.00 by and between Big Picture Loans, LLC and Noteholder which shall constitute a Permitted Lien under the Agreement.

Sincerely,

Matt Martorello
Eventide Credit Acquisitions, LLC

JA2154

CONFIDENTIAL                                              MARTORELLO_000023

Exhibit 55

## TRIBAL ECONOMIC DEVELOPMENT HOLDINGS, LLC

10/28/2016

Matt Martorello
Eventide Credit Acquisitions, LLC
875 Carretera 693, Suite 202,
Dorado, PR 00646

*Re:    Lender Written Consent - Risk and Analytics Manager and Vice President of Marketing*

Mr. Martorello:

Pursuant to that certain Loan and Security Agreement dated October 7, 2015 by and between Eventide Credit Acquisitions, LLC ("Eventide") by Tribal Economic Development Holdings, LLC ("TED") and its Subsidiaries including Big Picture Loans, LLC ("BPL") and Ascension Technologies, LLC ("AT"), and more specifically pursuant Section 1.2 (b)(4)(b) of associated Secured Promissory Note ("Note") dated January 26, 2016 issued to Eventide by TED (the "Borrower"). Eventide must provide written consent of a budget before Borrower or any of its Subsidiaries can expand (i) the Business in such a manner that could materially reduce payments under the Note; and (2) can incur labor expenses in an amount five percent (5%) greater than "the historical labor costs charged to Borrower [TED] or a Subsidiary by previous service providers."

On or about June 7, 2016, Eventide was informed of certain personnel costs associated with proposed organizational changes related to the expansion of the AT Atlanta office. Specifically, Eventide was advised that:

1.  AT has taken steps to hire a Risk and Analytics Manager who is scheduled to start in the AT Atlanta office on November 1, 2016.
2.  The negotiated starting salary of the Risk and Analytics Manager is $200,000.00, an amount that exceeds the amount to which Eventide had previously consented.
3.  As part of the "natural evolution of the Business" AT has also taken steps to hire a Vice President of Marketing who is also scheduled to start in the AT Atlanta office on November 1, 2016.
4.  The negotiated salary for the Vice President of Marketing is $185,000.00

Recognizing that written consent is required under the Loan and Security Agreement and associated Note, the purpose of this letter is document Eventide's written consent of the verbal consent given by Eventide on or about June 7, 2016 to the additional expenses associated with hiring the Risk and Analytics Manager and Vice President of Marketing at the AT Atlanta office as indicated herein. TED and its Subsidiaries represent and warrant that the proposed personnel changes will improve the operational efficiency of the Subsidiaries thus meeting TED's and its Subsidiaries' fiduciary obligation to maximize repayment under the Note.

Sincerely,

*Michelle Hzg*

Michelle Hazen
Tribal Economic Development Holdings, LLC

Agreed to and accepted:

Matt Martorello
Eventide Credit Acquisitions, LLC

**11/17/16**

Date

ECA Consent to Personnel Changes Announce June 7, 2016
Page 1 of 1

CONFIDENTIAL                                                                                        LVD-DEF00015613

# Exhibit 56

**CONFIDENTIAL – ATTORNEY'S EYES ONLY**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | |
|---|---|
| LULA WILLIAMS, GLORIA TURNAGE, GEORGE HENGLE, DOWIN COFFY, and FELIX GILLISON, JR., *on behalf of themselves and all individuals similarly situated*, | Civil Case No. 3:17-cv-00461-REP |
| Plaintiffs, | Hon. Robert E. Payne |
| v. | |
| BIG PICTURE LOANS, LLC; MATT MARTORELLO; ASCENSION TECHNOLOGIES, INC.; DANIEL GRAVEL; JAMES WILLIAMS, JR.; GERTRUDE MCGESHICK; SUSAN MCGESHICK; and GIIWEGIIZHIGOOKWAY MARTIN, | |
| Defendants. | |

_____/

**DEFENDANT ASCENSION TECHNOLOGIES, LLC'S
FIRST AMENDED AND SUPPLEMENTED RESPONSE
TO PLAINTIFF LULA WILLIAMS'S FIRST SET OF INTERROGATORIES**

Defendant Ascension Technologies, LLC ("Ascension"), by counsel, submits this document under protest and as a defensive measure made necessary by the Court's September 1, 2017, Order. Based on that order, Ascension supplies this document solely for the limited purpose of disputing this Court's jurisdiction as Plaintiffs have failed to make any showing or allegation sufficient to overcome tribal sovereign immunity. Nothing about this submission constitutes a lawful waiver of tribal sovereign immunity or is intended to waive tribal sovereign immunity or any other defenses. Ascension submits this document under the parties' protective order prohibiting disclosure.

**PRELIMINARY STATEMENT**

Ascension's investigation of the facts relating to this case is still ongoing. As such, Ascension continues to investigate Plaintiffs' claims, continues to participate in discovery, and continues to prepare for trial. All of Ascension's objections, and subsequent responses, are based upon the information presently available and upon Ascension's records. Ascension anticipates that further discovery and further independent investigation may supply additional facts which may clarify and add meaning to facts presently known, as well as establish new factual matters, all of which may lead to substantial addition to, changes in, and variations to the objections here and subsequent responses. The following objections are given without prejudice to Ascension's right to produce evidence of any subsequently discovered fact or facts that Ascension may later recall.

Ascension's submits this document in a good faith effort to supply as much factual information as is presently known, but these submissions should not prejudice Ascension in

# ATTACHMENT 2

CONFIDENTIAL - ATTORNEYS' EYES ONLY

## Ascension

| Primary Office | Last Name | First Name | Hire Date | Annual Salary | Position Status | Termination Date | Compensation-2016 | Compensation-2017 |
|---|---|---|---|---|---|---|---|---|
| Atlanta | | | 01/27/2016 | | Active | | | |
| Atlanta | | | 04/10/2017 | | Terminated | 06/20/2017 | | |
| Atlanta | | | 11/01/2016 | | Active | | | |
| Atlanta | | | 07/10/2017 | | Active | | | |
| Atlanta | | | 07/24/2017 | | Active | | | |
| Atlanta | | | 11/28/2016 | | Active | | | |
| Atlanta | | | 12/12/2016 | | Active | | | |
| Atlanta | | | 01/27/2016 | | Active | | | |
| Atlanta | | | 06/05/2017 | | Terminated | 08/07/2017 | | |
| Atlanta | | | 05/22/2017 | | Active | | | |
| Atlanta | | | 11/28/2016 | | Active | | | |
| Atlanta | | | 05/02/2017 | | Terminated | 08/09/2017 | | |
| Atlanta | | | 11/01/2016 | | Active | | | |
| Atlanta | | | 01/30/2017 | | Active | | | |
| Atlanta | | | 02/14/2017 | | Terminated | 03/17/2017 | | |
| Atlanta | | | 05/08/2017 | | Active | | | |
| Atlanta | | | 08/01/2016 | | Active | | | |
| Puerto Rico | | | 01/27/2016 | | Active | | | |
| Puerto Rico | | | 01/27/2016 | | Terminated | 04/27/2017 | | |
| Puerto Rico | | | 01/27/2016 | | Active | | | |
| Puerto Rico | | | 05/15/2017 | | Terminated | 08/11/2017 | | |
| Puerto Rico | | | 01/27/2016 | | Active | | | |
| Puerto Rico | | | 01/27/2016 | | Active | | | |
| Puerto Rico | | | 01/27/2016 | | Terminated | 04/12/2017 | | |
| Puerto Rico | | | 01/27/2016 | | Active | | | |
| Puerto Rico | | | 01/27/2016 | | Active | | | |
| Puerto Rico | | | 01/27/2016 | | Active | | | |
| Puerto Rico | | | 01/27/2016 | | Active | | | |
| Virgin Islands | | | 08/01/2017 | | Active | | | |
| Virgin Islands | | | 01/27/2016 | | Active | | | |
| Virgin Islands | | | 01/27/2016 | | Active | | | |
| Virgin Islands | | | 06/01/2017 | | Active | | | |
| Virgin Islands | | | 02/01/2017 | | Active | | | |
| Virgin Islands | | | 01/27/2016 | | Active | | | |
| Virgin Islands | | | 01/27/2016 | | Active | | | |
| Virgin Islands | | | 05/16/2016 | | Terminated | 11/04/2016 | | |
| Virgin Islands | | | 01/27/2016 | | Terminated | 05/19/2017 | | |
| Virgin Islands | | | 06/01/2017 | | Active | | | |
| Virgin Islands | | | 01/27/2016 | | Terminated | 04/15/2016 | | |
| Virgin Islands | | | 02/01/2017 | | Active | | | |
| Virgin Islands | | | 09/01/2017 | | Active | | | |

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

LULA WILLIAMS, GLORIA TURNAGE,
GEORGE HENGLE, DOWIN COFFY, and                Civil Case No. 3:17-cv-00461-REP
FELIX GILLISON, JR., *on behalf of themselves
and all individuals similarly situated*, :

                    Plaintiffs,                 Hon. Robert E. Payne

v.

BIG PICTURE LOANS, LLC; MATT MARTORELLO;
ASCENSION TECHNOLOGIES, INC.;
DANIEL GRAVEL; JAMES WILLIAMS, JR.;
GERTRUDE MCGESHICK; SUSAN MCGESHICK;
and GIIWEGIIZHIGOOKWAY MARTIN,

                    Defendants.
_____ /


I, Brian Mcfadden, as President of Ascension Technologies, LLC, state that I have read

*Plaintiff Lula Williams's First Set of Interrogatories to Defendant Ascension Technologies, LLC*

and that the answers contained in *Defendant Ascensions First Amended and Supplemented*

*Responses to Plaintiffs' First Set of Interrogatories* are true and accurate to the best of my

knowledge, information and belief as President of Ascension Technologies, LLC, subject to

penalties of 28 U.S.C §1746, relating to unsworn falsification to authorities.


Dated:  10/11/2017                          _____

                                            Brian Mcfadden
                                            President of Ascension Technologies, LLC

JA2161

Exhibit 57

| | |
|---|---|
| **From:** | Matt Martorello |
| **To:** | Karrie Wichtman |
| **Subject:** | Re: Payday US Offer Deactivation Notice |
| **Date:** | Tuesday, October 29, 2013 4:28:04 PM |

Not directly, but like my email said all the marketing entities are just about closing up shop, rates on things have skyrocketed, capture just cut us down by 200k a month in buying debt, most of the servicers like spvi have literally gone out of business. It's impossible to buy any volume, debt providers are asking what would happen to everything if the ruling in NY were upheld (certain death and all vendors including spvi, banks, ACH processors, bureaus etc would all obviously shut down if it were considered off reservation activity), and the class actions against banks and personal threats of enforcement against individuals by regulators all has everyone spooked. No joke, several of the biggest servicers have shut down. Though I bet they come back if things end well.

Desperately hoping that Rule 19 works and a favorable outcome on the appeal!

-------- Original message --------
From: Karrie Wichtman <kwichtman@rosettelaw.com>
Date: 10/29/2013 2:40 PM (GMT-07:00)
To: Matt Martorello <mattm@bellicosevi.com>
Subject: Re: Payday US Offer Deactivation Notice

Is this one our vendor companies?

Sent from my iPhone

On Oct 29, 2013, at 3:24 PM, "Matt Martorello" <mattm@bellicosevi.com> wrote:

-------- Original message --------
From: Sam Lepore <snlepore@yahoo.com>
Date: 10/29/2013 11:54 AM (GMT-07:00)
To: Matt Martorello <mattm@bellicosevi.com>
Subject: Fw: Payday US Offer Deactivation Notice

Hey Matt-

Issues in the US with Payday? You seeing this?

Thanks,

**Sam Lepore**
Cell: 856.297.6827
Email: sam@samlepore.com
www.samlepore.com

CONFIDENTIAL

[facebook.com/SouthJerseyRealEstateTrends](facebook.com/SouthJerseyRealEstateTrends)
[twitter.com/samlepore](twitter.com/samlepore)



----- Forwarded Message -----
**From:** Leadnomics <[partner-platform@leadnomics.com](mailto:partner-platform@leadnomics.com)>
**To:** [snlepore@yahoo.com](mailto:snlepore@yahoo.com)
**Sent:** Tuesday, October 29, 2013 1:47 PM
**Subject:** Payday US Offer Deactivation Notice

October 29th, 2013

As most of you are aware, the current regulatory climate in the US has resulted in significantly less lead buying in the US Payday Market. Unfortunately, this has impacted our ability to provide our publishers with a compelling offer. Therefore, after careful deliberation, we have decided to suspend lead generation activities within the US Payday market, **effective Friday, November 1.**

We will continue to focus on offers that perform better for you including Payday UK, Auto Insurance, and our newest vertical, Health Insurance.

Your account manager is available to answer any questions you might have. We thank you for your trust and

patronage in the past, and look forward to working with you again in the future.

**Our All-new Payday UK Offer**

# CashAdvancer UK

We are very pleased to announce our re-entry into the UK payday market with our premier offer, **CashAdvancer UK**. Our team has been working tirelessly to create and optimize this offer to ensure high conversion rates and EPCs, and we've already been seeing great results.

CashAdvancer UK is completely mobile optimized and features a brand-new form design. Reach out to your account manager to get set up to run this today.

As always, we are here when you need us.

Sincerely,

*The Leadnomics Partner Platform Team*

_____

Visit Us Online | Like Us on Facebook | Follow Us on

Twitter | Check Out Our Blog

Copyright © 2013. All Rights Reserved.

**Forward this email**

This email was sent to snlepore@yahoo.com by partner-platform@leadnomics.com |
Update Profile/Email Address | Instant removal with SafeUnsubscribe™ | Privacy Policy.

Leadnomics | 2929 Arch St | Philadelphia | PA | 19104

\*\*This email and any files transmitted with it are confidential and may contain privileged
or copyrighted information. You must not present this message to another party without
gaining permission from the sender. If you are not the intended recipient you must not
copy, distribute or use this email or the information contained in it for any purpose other
than to notify us. If you have received this message in error, please notify the sender
immediately, and delete this email from your system.\*\*

\*\*This email and any files transmitted with it are confidential and may contain privileged or
copyrighted information. You must not present this message to another party without gaining
permission from the sender. If you are not the intended recipient you must not copy, distribute or use
this email or the information contained in it for any purpose other than to notify us. If you have
received this message in error, please notify the sender immediately, and delete this email from your
system.\*\*

# Exhibit 58

# Filed Under Seal

# Exhibit 59

**AMENDED & RESTATED SERVICING AGREEMENT**

**BETWEEN**

**RED ROCK TRIBAL LENDING, LLC**

**AND**

**SOURCEPOINT VI, LLC**

**JULY 31, 2012, with retroactive effect to OCTOBER 25, 2011**

JA2169

CONFIDENTIAL

MARTORELLO_003474

# TABLE OF CONTENTS

1.  Recitals. ....................................................................................................................1
2.  Definitions. ...............................................................................................................3
3.  Covenants ..................................................................................................................5
4.  Business and Affairs in Connection with Enterprise. .............................................9
5.  Liens and Debt. .......................................................................................................16
6.  Servicer Fee Reimbursement, Disbursement, and Capital Contribution. ............17
7.  General Provisions. ................................................................................................18
8.  Warranties. ..............................................................................................................22
9.  Grounds for Termination. ......................................................................................23
10. Conclusion Of the Servicing Term .......................................................................25
11. Consents and Approvals .........................................................................................25
12. Disclosures. ............................................................................................................26
13. No Present Lien Lease or Joint Venture ................................................................26
14. Enterprise's Limited Waiver of Sovereign Immunity ...........................................26
15. Time is of the Essence ...........................................................................................28
16. Tribal Assets ...........................................................................................................28
17. Governing Law .......................................................................................................28
18. Dispute Resolution .................................................................................................28
19. Performance During Disputes ................................................................................31
20. Confidential Information .........................................................................................32
21. Execution ................................................................................................................32
22. Enterprise Name .....................................................................................................32
23. Intent to Negotiate New Agreement .......................................................................32
24. Entire Agreement ....................................................................................................33
25. Additional Actions ..................................................................................................33
26. Representation .........................................................................................................33

**Schedule 1.0 – Tribal Laws**

**Schedule 18.2.1 - List of Pre-Approved Arbitrators**

*i*

JA2170

MARTORELLO_003475

*ii*

JA2171

CONFIDENTIAL

MARTORELLO_003476

## AMENDED AND RESTATED SERVICING AGREEMENT

**THIS AMENDED AND RESTATED SERVICING AGREEMENT** ("Agreement") is made and entered into as of this 31st day of July 2012, and hereby amends and restates, in its entirety, the October 25, 2011 Servicing Agreement entered into by and between RED ROCK TRIBAL LENDING, LLC ("Enterprise"), an economic development arm and instrumentality of, and a limited liability company wholly owned by the LAC VIEUX DESERT BAND OF LAKE SUPERIOR CHIPPEWA INDIANS ("Tribe"), a federally-recognized Indian Tribe and sole member of the Enterprise, and BELLICOSE VI, INC., a U.S. Virgin Islands corporation with offices in the U.S. Virgin Islands to reflect the April 15, 2012 assignment of rights and interest in the October 25, 2011 Agreement from BELLICOSE VI, INC. to SOURCEPOINT VI, LLC, a U.S. Virgin Islands limited liability company, and BELLICOSE VI, INC. subsidiary, with offices in the U.S. Virgin Islands ("Servicer"), to incorporate amendments agreed to by and between the Enterprise and the Servicer effective May 15, 2012, and to make such amendments both the Enterprise and the Servicer agree more accurately reflect the operation of the Enterprise and the role of the Servicer. This Agreement and the terms provided for herein shall be retroactively effective to October 25, 2011. Each of Enterprise and Servicer may be referenced hereinafter individually as a "Party" or together, as the "Parties."

1.   **Recitals.**

     1.1     The Tribe is a federally-recognized Indian tribe. The Tribe possesses sovereign governmental authority pursuant to the Tribe's inherent and recognized powers of self-government.

     1.2     The Tribe has established Enterprise, a limited liability company wholly owned by and formed under the laws of the Tribe, as an economic development arm and instrumentality of the Tribe.

          1.2.1     The purpose of Enterprise is to promote the self-sufficiency of the Tribe and to address the socio-economic needs of the Tribe, its members, its families, and its community by building capital within the tribal community. This capital will subsequently be dispersed to the Tribe through the Enterprise, and used at the Tribe's discretion for the benefit of its members and the community through tribal initiatives and tribal governmental programs. The increase of such capital, as well as the initiatives and programs funded by it, will guarantee that the Tribe can continue to care for itself, its members, and its community by promoting greater self-determination, political and social autonomy.

          1.2.2     The Enterprise, pursuant to its Governing Documents, has the exclusive right to develop and operate the Tribe's financial services business that will provide small-denomination short-term financial services and other related goods and services to consumers through its internet call-center and field representative operations and has been directed and authorized to take any and all action as is deemed necessary or desirable in connection with such business and services, including but not limited to the authority to act as the exclusive agent to enter into and to exercise the rights and perform the obligation of Enterprise under this Agreement.

*1*

JA2172

MARTORELLO_003477

   **1.2.3** The Tribe, through Enterprise, is engaged in internet-based unsecured lending, as hereinafter defined, and provision of financial services. It is the Tribe's hope that Enterprise's endeavors will improve the economic conditions of its members; enable the Tribe to better serve the social, economic, educational and health needs of the Tribe, its members, and its community; increase Tribal revenues; enhance the Tribe's economic self-sufficiency and self-determination; and provide positive, long-term social, environmental and economic benefits.

   **1.3** Enterprise is seeking managerial, technical and financial experience and expertise for the development and operation of the new Unsecured Lending Business, as defined below. The Servicer is a company located in the U.S. Virgin Islands which provides management and consulting services to companies engaged in the Unsecured Lending Business and is willing and able to provide such assistance, experience, expertise and instruction to the Enterprise.

   **1.4** The Enterprise, through a contractual relationship, desires to retain and engage the Servicer as its independent contractor to consult to, develop, manage, and provide operational guidelines regarding the Unsecured Lending Business and any expansion thereof during the term of this Agreement and conforming with the provisions of this Agreement. In addition to providing investment and capital management services, management, operations and marketing consulting, Servicer also provides analytic services to its roster of clients, including risk assessment and management. The parties believe that Servicer possesses the necessary experience and skill to effectively analyze portfolio composition, trends in performance and predictive measures of potential new customers to the Enterprise to increase the profitability and overall risk profile of the Enterprise.

   **1.5** <u>The Enterprise and the Servicer entered into such a contractual relationship on October 25, 2011. The Enterprise and the Servicer desire to amend and restate, in its entirety, the October 25, 2011 Servicing Agreement to</u> reflect the April 15, 2012 assignment of rights and interest in the October 25, 2011 Servicing Agreement to SOURCEPOINT VI, LLC, a U.S. Virgin Islands limited liability company, and Bellicose VI, Inc. subsidiary, with offices in the U.S. Virgin Islands, to incorporate amendments agreed to by and between the Enterprise and the Servicer effective May 15, 2012, and to make such amendments both the Enterprise and the Servicer agree more accurately reflect the operation of the Enterprise and the role of the Servicer.

   **1.6** Each Party represents and warrants that the individuals executing this Agreement, as set forth in the signature blocks below, are fully and properly authorized under controlling law to enter into this Agreement on behalf of their respective organizations; and that the respective organizations have duly approved and ratified the terms of this Agreement.

   **1.7** In addition to the representations and warranties made in Section 12.1 herein, each Party represents and warrants that the individuals executing this Agreement, Enterprise management and Servicer management, do not have criminal records involving any financial crimes or crimes of dishonesty that might trigger any concern from any regulatory body with respect to their involvement in a consumer financial services business.

   **1.8** The Servicer further represents and warrants that it, along with all other members of the management as well as employees having any responsibility for the business of the

*2*

Enterprise, meets the eligibility requirements for licensing pursuant to the Tribe's Consumer Financial Services Regulatory Code. Proper licensing is a requirement for entering into this Agreement and the Transaction Documents.

**2.** **Definitions**. Unless otherwise specified in this Agreement, as they are used in this Agreement, the terms listed below shall have the meaning assigned to them in this Section:

**2.1** **Affiliate**. "Affiliate" means as to Servicer or Enterprise, any corporation, partnership, limited liability company, joint venture, trust, department or agency or individual controlled by, under common control with, or which controls, directly or indirectly Servicer or Enterprise. "Control" means (i) ownership, control, or power to vote twenty five percent (25%) or more of the outstanding shares of any class of voting securities, directly or indirectly or acting through one (1) or more persons, (ii) control in any manner over the election of a majority of the directors, trustees, or general partners (or individuals exercising similar functions), or (iii) the power to exercise, directly or indirectly, a controlling influence over management or policies.

**2.2** **Authorized Debt**. "Authorized Debt" shall have the meaning given to it in Section 5.2.

**2.3** **Commencement Date**. "Commencement Date" shall be the Effective Date.

**2.4** **Commercial Finance Provider**. "Commercial Finance Provider" shall mean any entity that provides credit to Enterprise for the making of Consumer Loan Transactions.

**2.5** **Consumer Loan Transaction**. "Consumer Loan Transaction" means any form of consumer financial services transaction provided by a financial services provider to a consumer or other person that is unsecured or secured by way of ACH agreements.

**2.6** **Effective Date**. The "Effective Date" shall mean October 25, 2011.

**2.7** **Enterprise**. The "Enterprise" is the instrumentality and commercial subdivision of the Tribe formed to engage in (a) the Unsecured Lending Business; and (b) any other lawful commercial activity allowed upon approval of the Tribe as sole member of the Enterprise pursuant to Enterprise's Governing Documents. The Enterprise shall not include any commercial enterprise conducted by the Tribe or any other instrumentality of the Tribe other than as set forth immediately above in this Section 1.2. Enterprise shall have the sole proprietary interest in and responsibility for the conduct of all activities conducted by Enterprise, subject to the rights and responsibilities of the Servicer under this Agreement.

**2.8** **Enterprise Employees**. "Enterprise Employees" shall mean a generic reference to those employees who are employed by Enterprise.

**2.9** **Fiscal Year**. "Fiscal Year" shall mean each twelve (12) month period, or portion thereof, ending on December 31 of each year, or on such other date as may be adopted by Enterprise in the future as the ending date of its fiscal year.

**2.10** **Governing Documents**. "Governing Document" shall mean Enterprise's Articles of Organization and Operating Agreement, if any.

3

CONFIDENTIAL

MARTORELLO_003479

**2.11   Governmental Action**. "Governmental Action" shall mean any resolution, ordinance, statute, regulation, order or decision regardless of how constituted having the force of law or legal authorization of the Tribe or any instrumentality or agency of the Tribe.

**2.12   Gross Revenues**. "Gross Revenues" shall mean all revenues of any nature derived directly or indirectly from the operation of Enterprise (including the gross revenues of all Subsidiaries) on a consolidated basis.

**2.13   Legal Requirements**. "Legal Requirements" shall mean singularly and collectively all applicable laws including without limitation all applicable tribal and federal law.

**2.14   Net Revenues**. "Net Revenues" for the purpose of this Agreement shall mean Gross Revenues of the Enterprise less all Servicing Expenses.

**2.15   New Transaction**. "New Transaction" means a Consumer Loan Transaction with a new customer.

**2.16   Operations Manager**. "Operations Manager" shall mean the person employed by Enterprise, if any, to direct the day-to-day operations of Enterprise and to coordinate with the Servicer as defined above as well as any other entities providing services to the Enterprise.

**2.17   Primary Bank Account**. "Primary Bank Account" shall have the meaning given to it in Section 4.4.

**2.18   Refinancing Transaction**.   "Refinancing Transaction" means a Consumer Loan Transaction that extends or refinances, in whole or in part, an outstanding Consumer Loan.

**2.19   Regulatory and Litigation Reserve Fund**.   "Regulatory and Litigation Reserve Fund" shall mean that fund established pursuant to Section 4.5 of this Agreement and shall be considered a Servicing Expense of Enterprise.

**2.20   Repeat Transaction**. "Repeat Transaction" means a Consumer Loan Transaction with an existing customer that is not a Refinancing Transaction.

**2.21   Servicing Budget**.   "Servicing Budget" shall have the meaning given to it in Section 4.5.

**2.22   Servicing Expenses**. "Servicing Expenses" shall mean the expenses of the operation of Enterprise, incurred pursuant to the Servicing Budget, including but not limited to the following: (1) the payment of salaries, wages, and benefit programs for all employees of Enterprise subject to the approval described in Section 4.3; (2) supplies for Enterprise; (3) utilities; (4) repairs and maintenance of any facility used by Enterprise for the conduct of its business; (5) interest expense on Authorized Debt of Enterprise; (6) insurance and bonding; (7) advertising and marketing; (8) professional fees; (9) reasonable travel expenses for officers and employees of Enterprise, Servicer or its affiliates to inspect and oversee Enterprise; (10) the Regulatory and Litigation Reserve fund expense; (11) security costs; (12) underwriting expenses; (13) bad debt expenses and (14) legal or professional fees incurred for lobbying or litigation that is not adequately covered by the Regulatory and Litigation fund.. Any expenses not referenced or

*4*

CONFIDENTIAL

MARTORELLO_003480

provided for in this Section that are added as Servicing Expenses after approval of this Agreement and the Servicing Budget in effect at the time must first be approved in writing by the Servicer and the Enterprise as provided for in this Agreement. Each of the above listed expenses is subject to the annual budgetary process and its resolution processes at Section 4.5 of this Agreement.

**2.23**   **Unsecured Lending Business**.   "Unsecured Lending Business" means the activities of a financial services provider in providing Consumer Loan Transactions and other related financial services to consumers or other persons.

**2.24**   **Tribal Council**. "Tribal Council" means the governing body of the Lac Vieux Desert Band of Lake Superior Chippewa Indians.

**2.25**   **Tribal Net Profits**.  "Tribal Net Profits" is calculated by adding the sum of Gross Revenues plus bad debt recoveries minus the sum of charge backs and bad debt charge-offs and multiplying the sum of this amount by two (2) percent calculated on a monthly basis all calculated on a cash basis.

**2.26**   **Tribal Representatives**. "Tribal Representatives" shall mean the person or persons designated by the Enterprise, to serve as its liaisons to the Servicer, and who shall be responsible for assisting in the implementation of tribal policies as such policies relate to Enterprise and the Unsecured Lending Business. The Enterprise may remove and replace the Tribal Representatives in its sole and absolute discretion. The Tribal Representatives shall have the right to attend as an observer all meetings of Enterprise regarding management of Enterprise and shall have access to all documents and records of Enterprise.  The salary, wages and benefits of the Tribal Representative(s) are a Servicing Expense of the Enterprise.   The Tribal Representatives serve hereunder on behalf and for the benefit of the Enterprise and for purposes of decision-making are no way a substitute for the Tribe itself as sole member of the Enterprise.

**3.**   **Covenants**. In consideration of the mutual covenants contained in this Agreement, the Parties agree and covenant as follows:

**3.1**   **Engagement of Servicer**.  The Enterprise hereby retains and engages Servicer as its independent contractor for the purposes of providing those business management, consulting and professional services to Enterprise pursuant to the terms of this Agreement and advising the Operations Manager of the Enterprise and the Tribal Representatives.  Servicer shall have the authority and responsibility over all communication and interaction whatsoever between Enterprise and each service provider, lender and other agents of Enterprise (for purposes of this Agreement, the service provider, lender and other agents of Enterprise or its subsidiaries shall be referred to as "Authorized Agents").  Nothing contained herein grants or is intended to grant Servicer a titled interest to or in Enterprise. The Servicer hereby accepts such retention and engagement as an independent contractor. Enterprise acknowledges that the services contemplated by this Agreement shall be provided by the Servicer from its offices in the U.S. Virgin Islands. Enterprise also acknowledges that the fees to be paid to Servicer as defined in Section 3.5.1 herein, are in fact performance-based fees, and are based solely on the profitability of the Enterprise following commencement of this Agreement. Enterprise also acknowledges that any tax or earnings statements to be issued to Servicer as a result of any payments made pursuant

5

JA2176

MARTORELLO_003481

to this Agreement shall be filed with the Virgin Islands Bureau of Internal Revenue and not with the Internal Revenue Service as the Servicer is subject to the administration of tax laws by the Virgin Islands Bureau of Internal Revenue and not the Internal Revenue Service.

**3.2**   **Term**. The term of this Agreement shall begin on the Effective Date of this Agreement and continue until December 31, 2018 ("Term"). The Term shall automatically renew for an additional period of two (2) years unless either Party hereto provides written notice to the other Party at least one hundred twenty (120) days, but no greater than one (1) year, prior to the end of the Term.

**3.3**   **Restrictions on Competition.**

**3.3.1**   In consideration for Servicer providing its expertise to the Enterprise, the Enterprise agrees that so long as this Agreement is in effect neither it nor any Affiliate shall, directly or indirectly, either on its own or through any agent, joint venture, subsidiary or independent contractor, engage in the Unsecured Lending Business anywhere in the world except through the Enterprise without engaging the Servicer to provide the management and consulting services contemplated by this Agreement.  The exclusivity provisions contained in this Paragraph 3.3.1. shall apply so long as Servicer achieves performance targets described herein.  Performance targets are equal to Tribal Net Profits generated by the Enterprise on a monthly basis. The exclusivity provision shall remain in effect to the extent that the Tribal Net Profits as listed in Table 3.3.1 for a particular monthly amount is not achieved but the difference between the required amount and the actual amount are recouped (on a cumulative basis) in any three (3) consecutive month period of time (on a cumulative basis for the two SourcePoint V.I.-managed Tribal-lending entities contemplated at this time, including Red Rock Tribal Lending, LLC and Duck Creek Tribal Financial, LLC, formerly known as North Country Financial, LLC):

**Table 3.3.1 Tribal Net Profit**

6

CONFIDENTIAL

JA2177

MARTORELLO_003482

| Month | Tribe Net Profit |
|-------|------------------|
| 3 | 42,000 |
| 4 | 45,000 |
| 5 | 50,000 |
| 6 | 55,000 |
| 7 | 50,000 |
| 8 | 65,000 |
| 9 | 75,000 |
| 10 | 80,000 |
| 11 | 90,000 |
| 12 | 100,000 |
| 13 | 110,000 |
| 14 | 120,000 |
| 15 | 130,000 |
| 16 | 145,000 |
| 17 | 160,000 |
| 18 | 175,000 |
| 19 | 190,000 |
| 20 | 200,000 |

The Enterprise acknowledges that the Unsecured Lending Business can be conducted throughout the world (both as to the location of the consumers as well as operations) and that the worldwide restriction is appropriate. Nothing herein shall be taken to restrict the Enterprise, the Tribe, or its Affiliates from engaging in businesses that provide services, which in themselves do not compete with the Unsecured Lending Business. The Enterprise further agrees that it shall not solicit for employment or hire any employees of Servicer. In no event shall failure to meet the thresholds contained in this Section be considered a breach of this Agreement. Rather, they are significant only to the application or not of the non-compete provisions of this Section. The Parties agree that having two or more entities in the payday lending space or otherwise engaged in the Unsecured Lending Business, including Duck Creek Tribal Financial, LLC, formerly known as North Country Financial, LLC and Enterprise, is not a violation of this section restricting competition so long as any such entity is serviced by Servicer and/or its successors or assigns.

**3.3.2** The Enterprise has carefully read and considered the provisions of this Section and, having done so, agrees that the covenants set forth in this Section are fair and reasonable and are reasonably required to protect the legitimate business interests of the Servicer and the Enterprise including, but not limited to, protection of trade secrets, the Servicer's investment in its Confidential Information (as hereinafter defined), and the Servicer's goodwill and relationships with its clients and vendors. The Enterprise agrees that the covenants set forth in this Section do not unreasonably impair the ability of the Enterprise to conduct any unrelated business. The Parties hereto agree that if a court of competent jurisdiction holds any of the covenants set forth in this Section unenforceable, the court shall substitute an enforceable covenant that preserves, to the maximum lawful extent, the scope, duration and all other aspects of the covenant deemed unenforceable, and that the covenant substituted by the

7

CONFIDENTIAL

court shall be immediately enforceable against the Enterprise.  The foregoing shall not be deemed to affect the right of the parties hereto to appeal any decision by a court concerning this Agreement.

**3.4**   **Servicer's Compliance With Law.; Licenses**.  The Servicer covenants that it will at all times comply with all Legal Requirements and any licenses issued under any of the foregoing.  If applicable, the Tribe shall not unreasonably withhold, withdraw, qualify or condition such licenses.  Enterprise, through the Tribal Representatives will ensure that Servicer is made fully aware of and has acquired all applicable tribal licenses prior to commencement of Enterprise business activities.

**3.5**   **Servicing Fee.**

**3.5.1**   The Parties hereto have agreed that the success of the business is based in large part upon the services provided to the Enterprise by the Servicer.  As a result, Enterprise has agreed to a performance-based fee equal to cash basis revenue remaining after payment of Tribal Net Profits, Servicer advances, and all Servicing Expenses .  The Servicing Fees shall be paid monthly, with the Servicer having the ability to sweep Enterprise bank account amounts into the Servicer's bank accounts, on or before the fifteenth (15th) day of the ensuing month. The Enterprise acknowledges and agrees that the Servicer is not responsible for the performance or activities of any of the lenders or servicing companies that may be doing business with the Enterprise, nor any minimum revenue from the Unsecured Lending Business.  However, Servicer has agreed that that the minimum amount per month which shall be paid to the Enterprise shall be twenty thousand dollars ($20,000).

**3.5.2**   Payment of the Servicing Fee shall be subject to and reduced by the obligations of the Servicer to make the payments specified in Sections 3.5.1 and  4.6hereof.

**3.5.3**   The Enterprise acknowledges and agrees that Servicer, subject to Legal Requirements and the limitations of Section 4.1.1,  shall have the right to enter into agreements with servicing companies or lenders providing goods or services to the Enterprise, and Servicer may be separately compensated under such agreements.

**3.6**   **No Preexisting Contracts**.  The Enterprise covenants that there are no valid preexisting contractual impediments to the entry by the Enterprise into this Agreement.  Further, the Enterprise agrees to indemnify Servicer and hold harmless its Affiliates for any loss, cost, judgment, settlement or other compromise related to any claim arising out of or related to any alleged pre-existing contractual relationship.  Servicer shall be limited to recovery of such indemnification from the assets of Enterprise and shall have no right to indemnification from other assets of the Tribe or any of Tribe's other Affiliates.

**3.7**   **Agreement Scope**.  The Enterprise is entering into this Agreement with Servicer in order to avail itself of the expertise of Servicer in developing a profitable Unsecured Lending Business. In recognition of the Servicer's expertise, the scope of this Servicing Agreement covers all aspects of the management of the Unsecured Lending Business, however oversight of the day to day operations of the Enterprise and management of the Enterprise's employees shall be vested in the Operations Manager and/or the Tribal Representatives.

*8*

JA2179

CONFIDENTIAL

MARTORELLO_003484

**3.8**    **Certain Activities of Enterprise**.  The Enterprise covenants that adequate high speed internet access, and sufficient remote access for the Enterprise to all hardware and software which it is responsible to acquire and install shall be at all times available to Enterprise and Servicer to conduct the Unsecured Lending Business contemplated by this Agreement.  Any physical facilities located within the Tribe's jurisdiction shall be maintained in a secure manner to protect sensitive consumer financial information potentially contained therein, including but not limited to protection by the latest security encryption technology for privacy protection which shall also be provided by the Servicer, as approved by the Servicer.  Servicer shall have the sole discretion to request upgrades or additions to and to approve the security/encryption technology used in connection with the Unsecured Lending Business which shall be treated as Servicing Expense of the business.  If such a request is made following the Tribe's annual approval of a Servicing Budget that does not contain such upgrades or additions, Servicer shall seek approval of the Tribe pursuant to its Governing Documents, approval of which will not be unreasonably withheld, prior to incurring such additional servicing expenses.

**4.**    **Business and Affairs in Connection with Enterprise.**

**4.1**    **Servicer's Authority and Responsibility**.  It is the Parties' intentions that Servicer shall provide such management, consulting and analytical services as it deems necessary to assist the Enterprise in undertaking the Unsecured Lending Business contemplated herein.

**4.1.1**    The Servicer is hereby granted the necessary power and authority to act in order to fulfill its responsibilities under this Agreement, including the execution and delivery of any and all agreements necessary or appropriate to effectuate the terms hereof subject to the limitations of the Section 4.1.1 herein. It should be noted, however, that Servicer has no authority to engage in origination activities, execute loan documentation, or approve the issuance of loans to third parties. Final determination as to whether to lend to a consumer rests with the Enterprise.

**4.1.2**    Servicer shall, unless otherwise agreed to herein, require express written consent from the Tribe as sole member of the Enterprise to do any of the following: (1) to borrow, pledge, assign, convey, encumber, grant security interest in, guaranty, or otherwise restrict the assets of the Enterprise; (2) to sell or otherwise dispose of all or substantially all of the assets of the Enterprise; (3) to waive the sovereign immunity of the Enterprise.

**4.2**    **Duties of the Servicer**. In providing services to Enterprise, the Servicer's duties may include, without limitation, the following:

**4.2.1**    **Operations**. Consistent with the Servicing Budget, the Servicer shall develop and recommend to the Enterprise and to the Operations Manager and Tribal Representatives, reasonable measures for the orderly administration and management of Enterprise in the areas of financial reporting, financing, regulatory compliance, marketing, human resources, development of third party servicer relationships, collections and risk assessment, including:

**(a)**    Screening of and selecting service providers and lenders, and negotiating agreements with such service providers and lenders on behalf of the Enterprise on

*9*

such terms and conditions as Servicer may reasonably determine to be appropriate, including but not limited to potentially securing a funding agreement between Alpha Credit Resources, LLC and the Enterprise, whereby Alpha Credit Resources, LLC may serve as Commercial Finance Provider for the Unsecured Lending Business;

      **(b)**    Development and promotion of sound and positive business relationships on behalf of Enterprise with the designated service providers and lenders, including, but not limited to, the enforcement or termination of agreements with such service providers and lenders;

      **(c)**    Preparation of suggested practices and recommendations to the Tribal Representative of such suggested practices governing the operations of the Enterprise to provide that such operations are conducted in a manner that is consistent with the best interests of Enterprise and generally accepted industry standards;

      **(d)**    Preparation of regulatory and compliance standards and practices and recommendations to the Enterprise of such standards and practices to be adopted by the Enterprise provide that such operations are conducted in a manner consistent with the best interests of Enterprise and generally accepted industry standards;

      **(e)**    Preparation of training and education standards and recommendations to the Enterprise of such suggested practices to be adopted by the designated service providers and lenders to provide that such designated service providers and lenders are conducting business with the Enterprise in a manner that is consistent with the best interests of Enterprise and generally accepted industry standards;

      **(f)**    Preparation of standards for financial reporting and accounting and recommendations to the Enterprise of such best practices to be adopted by the designated service providers and lenders of the Enterprise provide that such designated service providers and lenders are conducting business in a manner that is consistent with the best interests of Enterprise and generally accepted accounting standards presented on a cash basis;

      **(g)**    Preparation of standards and screening and review of and making recommendations to the Enterprise regarding the website contents, marketing and consumer relations practices of designated service providers and lenders to provide that such designated service providers and lenders are conducting business in a manner that is consistent with the best interests of Enterprise and generally accepted industry standards;

      **(h)**    Monitor and supervision of and reporting to the Enterprise regarding the designated service providers and lenders to provide that such designated service providers and lenders are conducting business in a manner that is consistent with the standards, best practices, policies and requirements established by the Enterprise;

      **(i)**    Servicer will be responsible for providing pre-qualified leads to Enterprise and providing the necessary credit-modeling data and risk assessment strategies by which the Enterprise may evaluate to whether or not to extend funds to an individual borrower based on criteria that has been established by the Enterprise. The criteria used to extend funds to

*10*

JA2181

CONFIDENTIAL

MARTORELLO_003486

individual borrowers will remain within the sole and absolute discretion of the Enterprise and the Enterprise shall execute all necessary loan documentation;

(j)     Servicer may also be responsible for training and monitoring employees of the Enterprise that operate the Enterprise's call center; and

(k)     Sale and transfer of Enterprise's right of collection of collateral on any Loan Transactions that become in default prior to settlement. Servicer shall sell Loan Transactions in default at prevailing market rates, to a third-party debt collector, with the third-party debt collector to effect the collection of the debt. This third-party debt buyer may be Capture Financial LLC or such other third-party debt as may be determined to be appropriate by the Parties.

**4.2.2  Contracts in Enterprise's Name.** Contracts for the operations of Enterprise shall be entered into in the name of Enterprise and shall be executed by the Enterprise. In no event shall Servicer be empowered to waive the sovereign immunity of the Enterprise or the Tribe in any contract, including but not limited to any contract for the operations of the Enterprise or for the supply of goods and services. No contracts for the supply of goods or services to Enterprise shall be entered into with parties affiliated with the Servicer or its officers or directors unless the affiliation is disclosed to and approved by Enterprise, which approval shall not be unreasonably withheld subject to the limitations of Section 4.1.1 herein. Servicer shall deliver all contracts executed by it on behalf of Enterprise to Enterprise on a monthly basis. The Servicer acknowledges that Enterprise and the Tribe retain exclusive sovereign control over the Enterprise's and the Tribe's immunity, respectively. If Servicer determines that a limited waiver of Enterprise's Tribal sovereign immunity is necessary and desirable for inclusion in any contract on behalf of the Enterprise, Servicer shall summarize the need for such waiver and the underlying contract for the Enterprise to seek approval of the Tribal Representative(s) and the Tribe as sole member of the Enterprise. Only after the matter has been forwarded for review to the Tribe's legal counsel, presented to the Tribal Council by the Tribal Representative(s), and authorized by Tribal Council resolution, shall the Servicer be authorized to execute the contract on behalf of the Enterprise.

**4.2.3  Consumer Loan Transaction Covenants and Agreements.** The Servicer shall assist the Enterprise with the compilation and provision of information and reports (financial and otherwise) as may be reasonably requested by the Tribe as sole member of the Enterprise in connection with the business of Enterprise or as required under Authorized Debt of Enterprise as defined in Section 5.2 herein, including any reports required to comply with the covenants and agreements contained therein. The Servicer shall promptly advise the Enterprise in the event that the Servicer becomes aware of any matter that may cause a default by Enterprise under any documents evidencing any indebtedness or obligation of Enterprise.

**4.3     Employees.**

**4.3.1  Servicer's Responsibility.** Subject to the Servicing Budget, Legal Requirements and the terms of this Agreement, Servicer shall have the exclusive responsibility for identifying and recommending third-party service providers needed for the business of the Unsecured Lending Business and shall assist the Operations Manager, at his or her request, in

*11*

JA2182

MARTORELLO_003487

the selection, hiring, training, control and discharge of employees performing regular services for Enterprise in connection with the maintenance, operation, and management of the Unsecured Lending Business. Enterprise shall not engage any third-party service providers needed for the business of the Unsecured Lending Business without the benefit of Servicer's prior advice and approval, for which approval shall not be unreasonably withheld.

       **4.3.2**  **Enterprise Employees**. Subject to the Servicing Budget, Servicer shall assist the Operations Manager and/or Tribal Representatives in directing the hiring and management of sufficient employees to effectively staff the Unsecured Lending Business, if any.

       **4.3.3**  **Tribal Representative(s)**. Tribal Representative(s) shall have the full access to inspect all aspects of Enterprise, including the daily operations of Enterprise, and to verify daily Gross Revenues and all income of Enterprise. The Servicer or a designee otherwise appointed by the Servicer may accompany the Tribal Representative(s) upon any inspection.

       **4.3.4**  **Indian and Other Preference, Wages, and Training**. The Servicer shall, during the term of this Agreement, be required to give preference in recruiting, training and recommending employment to Native Americans in any job category of the Enterprise, in accordance with any employment preference laws or policy now existing or later adopted by the Tribe.

    **4.4**  **Enterprise Bank Accounts**. The Servicer shall select a bank or banks for the establishment of (i) a primary bank account by Enterprise into which all funds generated by the Unsecured Lending Business will be transferred and deposited (the "Primary Bank Account") and (ii) any other bank accounts by Enterprise subject to the Deposit Account Control Agreement as the Servicer deems necessary or appropriate to conduct the Unsecured Lending Business consistent with this Agreement, e.g., an account to hold the Regulatory and Litigation Reserve Fund (as defined below). Unless otherwise mutually agreed in writing by the Enterprise and Servicer, the Servicer shall have sole signatory and transfer authority over such bank accounts. Servicer shall have sole authority to sweep monies from such bank accounts for distributions made to the Enterprise consistent with Sections 3.5.1 and 6.4. In addition to the foregoing, Servicer shall further have the sole authority to instruct and direct any ACH providers that Enterprise may engage to assist it in operating the Unsecured Lending Business, to the extent provided by this Agreement. The right to consent to change any bank account into which the funds generated by the Unsecured Lending Business will be transferred and deposited by any such ACH providers rests mutually with Enterprise and Servicer. The signed authorization of both Servicer and Enterprise shall be required for any change to any bank account into which the funds generated by the Unsecured Lending Business will be transferred and deposited by any such ACH providers. This section shall not apply in the event of a default; in the event of a default, the Security Agreement will allow Iron Fence Investments, Inc. to override this section.

    **4.5**  **Servicing Budget and Business Plan**. Servicer shall provide to the Tribal Representatives an initial Servicing Budget and Business Plan ("Servicing Budget") for the review and consent of the Enterprise, which consent shall not be unreasonably withheld or delayed. Servicer shall, not less than ninety (90) days prior to the commencement of each full or partial year, submit to the Tribal Representative(s), for approval by the Enterprise and the Tribe

12

CONFIDENTIAL

MARTORELLO_003488

as sole member of the Enterprise, a proposed Servicing Budget for the ensuing full or partial year, as the case may be. The Servicing Budget shall include a Regulatory and Litigation Reserve Fund and such other reserves as are deemed necessary for the conduct of the Unsecured Lending Business.

The Enterprise's and Tribe's approval of the Servicing Budget shall not be unreasonably withheld or delayed. Servicer shall meet with the Tribal Representative(s) to discuss the proposed Servicing Budget, and if requested, with the Tribe as sole member of the Enterprise. The Enterprise's and the Tribe's as sole member of the Enterprise approval shall be deemed given unless a specific written objection thereto is delivered by it to Servicer within sixty (60) days after Servicer and the Tribal Representative and/or the Tribe as sole member of the Enterprise have met to discuss the proposed Servicing Budget. If the Tribal Representative for any reason declines to meet with Servicer to discuss a proposed Servicing Budget, the Servicer shall meet with the Tribe as sole member of the Enterprise. The Enterprise and the Tribe as sole member of the Enterprise shall review the Servicing Budget on a line-by-line basis. To be effective, any notice which disapproves a proposed Servicing Budget must contain specific objections to individual Budget line items.

If the proposed Servicing Budget contains disputed budget item(s), the Enterprise and Servicer agree to cooperate with each other in good faith to resolve the disputed or objectionable proposed item(s). In the event the Enterprise and Servicer are not able to reach mutual agreement concerning any disputed or objectionable item(s) within a period of sixty (60) days after the date the Enterprise provides written notice of its objection to Servicer, either Party shall be entitled to submit the dispute to arbitration in accordance with Section 18. If the Enterprise and Servicer are unable to resolve the disputed or objectionable item(s) prior to the commencement of the applicable year, the undisputed portions of the proposed Servicing Budget shall be deemed to be adopted and approved and the corresponding line item(s) contained in the Servicing Budget for the preceding year shall be adjusted as set forth herein and shall be substituted in lieu of the disputed item(s) in the proposed Servicing Budget. Those line items which are in dispute shall be determined as follows:

Pending resolution of any disputes over the Servicing Budget, each line item shall be determined by increasing the preceding year's actual expense for the corresponding line items by an amount determined by Servicer which does not exceed the Consumer Price Index for All Urban Consumers published by the Bureau of Labor Statistics of the United States Department of Labor, U.S. City Average, all items (1982-1984=100) for the year prior to the year with respect to which the adjustment to the line item(s) is being calculated or any successor or replacement index thereto. The resulting Servicing Budget obtained in accordance with the preceding sentence shall be deemed to be the Servicing Budget in effect until such time as the Enterprise and Servicer have resolved the disputed items.

Servicer may, subject to approval by the Enterprise if such a change requires reallocation of more than fifteen percent (15%) of the particular line items being affected, revise the Servicing Budget from time to time, as necessary, to reflect any unpredicted significant changes, variables or events or to include significant, additional, unanticipated items of expense. Servicer may, after notice to the Tribal Representatives, reallocate part or all of the amounts budgeted with respect to any line item to another line item and to make such other modifications to the

13

CONFIDENTIAL

JA2184

MARTORELLO_003489

Servicing Budget as Servicer deems necessary when such reallocation is fifteen percent (15%) or less than for the line items being affected. The Enterprise acknowledges that the Servicing Budget is intended only to be a reasonable estimate of Enterprise revenue and expenses for the ensuing year. Servicer shall not be deemed to have made any guaranty, warranty or representation whatsoever in connection with the Servicing Budget, however Servicer shall act in good faith when projecting, proposing and presenting an Servicing Budget to the Enterprise for its approval.

**4.6    Regulatory and Litigation Matters**. If any claim or legal action, except an action to impose taxes as contained in 7.5.1 of the Agreement, is brought against the Enterprise, the Tribe, the Servicer, Enterprise or any employee of the Servicer having responsibilities related to the Enterprise or of Enterprise, or official or employee of the Tribe by any person arising out of the operation of Enterprise or against the Servicer, its parent or Affiliates, employees, directors, managers or members arising out of Servicer's provision of services to the Unsecured Lending Business of Enterprise or performance hereunder or the execution of this Agreement or any other related agreement by Enterprise and Servicer, Enterprise, or the Servicer, as appropriate, shall defend such action. Any cost of such litigation, including any judgment rendered in an action arising out of the operation of Enterprise and the cost of any legal action brought by the Enterprise or Servicer against any third party, shall constitute a Servicing Expense. The only exception to the foregoing shall be that each Party will be responsible for its own acts if same are proven to constitute fraud or willful or wanton misconduct. Nothing in this Section shall be construed to waive, in whole or in part, the Tribe's or Enterprise's sovereign immunity, except as contemplated in the limited waiver of sovereign immunity contained in Section 14 herein.

The Enterprise and Servicer shall establish and maintain a separate and segregated joint signature bank account ("Regulatory and Litigation Reserve Fund") that shall contain a balance of not less than, but no more than, Fifty Thousand Dollars ($50,000). The Regulatory and Litigation Reserve Fund shall be funded with one dollar ($1.00) for every New Transaction and ($.50) for every Repeat Transaction and Refinancing Transaction, as those terms are defined herein. The exclusive purpose of the Regulatory and Litigation Reserve Fund is to provide funding for Enterprise of the costs of any litigation, defense, responses to regulatory inquiries, litigation and other similar expenses arising out of the business of Enterprise. If any claim or legal action is brought against the Tribe, Servicer, Enterprise, or any Affiliate or any employee or director thereof, or any official of the Tribe by any person arising out of the operation of Enterprise, Enterprise, in collaboration and coordination with the Servicer, shall defend such action with monies in the joint signature account described herein as Servicer and Enterprise may agree. Any cost of such regulatory action or litigation, including any judgment rendered in an action arising out of the operation of Enterprise and the cost of any legal action brought by Servicer or Enterprise against any third party, shall be paid by the Regulatory and Litigation Reserve Fund to the extent funds are at the time of payment available therein or if funds are not at the time of such payment then available the amount paid in excess of available funds shall constitute an Servicing Expense. In the event Servicer expends any monies from the Regulatory and Litigation Reserve Fund, the Regulatory and Litigation Reserve Fund shall be replenished in the same manner of initial funding described in the first sentence of this paragraph beginning the first day of the first month following such an expenditure and continue until the Regulatory and Litigation Reserve Fund is again fully funded at $50,000.

*14*

CONFIDENTIAL

MARTORELLO_003490

To the extent Enterprise maintains or acquires any insurance policy that might cover the cost of defense of any action or any liability resulting from an action against the Enterprise or operation of the Unsecured Lending Business, Enterprise shall name Servicer as an additional insured under any such insurance policy. To the extent there is any such insurance coverage available, Servicer shall seek to use such insurance monies before use of Regulatory and Litigation Reserve Fund monies in defense of any claim or legal action brought against the Tribe, Servicer, Enterprise, or any Affiliate or any employee or director thereof, or any official of the Tribe by any person arising out of the operation of Enterprise, in collaboration and coordination with the Servicer. If, in Servicer's sole discretion, it is not practicable to expend insurance monies before Regulatory and Litigation Reserve Fund monies, Servicer shall seek to replenish any spent Regulatory and Litigation Reserve Fund monies with reimbursement under any applicable insurance policy. To the extent the Regulatory and Litigation Reserve Fund is insufficient to cover the costs of defense of any action or liability, Servicer shall advance monies that it deems necessary and appropriate to defend against such action or liability. Servicer shall be able to be reimbursed with distributions from the Regulatory and Litigation Reserve Fund as it might later be replenished in the manner described in this Paragraph 4.6.

**4.7** **No Servicer Wages or Salaries**. Neither the Servicer nor any of Servicer's employees, officers, directors or principals shall be compensated by wages from or contract payments by Enterprise for their efforts or for any work which they perform under this Agreement other than the Servicing Fee paid to Servicer under Section 6.2.

**4.8** **Internal Control Systems**. The Servicer shall recommend and assist the Operations Manager and Tribal Representatives in implementing accounting standards applicable to the unsecured consumer lending industry.

**4.9** **Daily Deposits to Bank Account**. The Servicer shall collect all gross revenues and other proceeds connected with or arising from the operation of Enterprise and all other activities of Enterprise and deposit proceeds daily into a bank account established under Section 4.4 consistent with Paragraph 3.5.1 herein, except as to any restrictions on cash deposits imposed by the local bank.

**4.10** **No Cash Disbursements**. The Servicer shall not make any cash disbursements from the bank accounts or on hand cash except for the disbursements from any petty cash fund of Enterprise maintained in accordance with the Servicing Budget. Any and all other payments or disbursements by the Servicer shall be made by check or wire transfer drawn against a bank account.

**4.11** **Transfers Between Accounts**. The Servicer has the authority to transfer funds among the bank accounts of Enterprise unless otherwise provided by the Servicing Budget, in order to pay Servicing Expenses, pay the Servicing Fee, or to pay a debt service and any other payments provided for in Section 6 or elsewhere in this Agreement.

**4.12** **Accounting and Books of Account.**

**4.12.1** **Statements**. The Servicer shall prepare and provide to Enterprise servicing statements on a monthly, quarterly, and annual basis, which shall include:

*15*

CONFIDENTIAL

JA2186

MARTORELLO_003491

comparative statements of all revenues after the first full year of operation, statements of all other amounts collected and received, and all deductions and disbursements made there from in connection with Enterprise. The monthly and quarterly servicing reports shall be delivered by the twenty-first (21st) day of the following month, with the annual servicing report delivered within ninety (90) days of the year-end and shall be in form satisfactory to meet all requirements under any Authorized Debt as defined in Section 5.2. The Enterprise shall include as an Servicing Expense the annual compilation of the books and records of Enterprise and any Subsidiaries as Enterprise deems necessary by a certified public accounting firm selected by the Enterprise subject to the reasonable consent of Servicer, which consent shall not be unreasonably withheld. Such reviews may be used by the Servicer for reporting purposes under applicable laws, if required. The reviewers shall have access to all books and records, all cash management procedure manuals, all internal control manuals, and all other records, documents, papers and persons of Enterprise or employed by Enterprise or Servicer as the reviewers shall deem necessary. For each review performed, the reviewers shall provide Servicer with a letter noting any control weaknesses or other items which it believes should be brought to the attention of the Servicer, and shall permit Servicer to respond to the letter with changes to the operations of Enterprise deemed appropriate by the Servicer which address any concerns expressed in the draft letter within thirty (30) days. The Enterprise warrants that it shall retain in the strictest confidence the information provided by Enterprise, and shall include in any reports concerning Servicer's financial affairs only such portions of information supplied by Enterprise as is required by statute to be provided.

       **4.12.2 Accounting Standards**. Servicer shall maintain the books and records reflecting the operations of Enterprise in accordance with the accounting practices of Servicer on a cash basis consistently applied and shall adopt and follow a fiscal year end of December 31. The accounting records reflecting detailed day-to-day transactions of Enterprise's operations shall be kept by Servicer and made available to the Tribal Representative(s) upon request. The accounting systems and procedures shall, at a minimum (i) include an adequate system of internal accounting controls; (ii) permit the preparation of financial statements on a cash basis; (iii) permit the calculation and payment of the Servicing Fee; (iv) provide for the allocation of servicing expenses or overhead expenses among Enterprise and any other user of shared facilities and services; and (vi) provide for disbursements to Enterprise

       **4.13**   **Enterprise Servicing Standards**. Servicer shall operate Enterprise in accordance with servicing standards mutually agreed upon by the Servicer and the Enterprise, which standards shall be consistent with the servicing standards of the industry generally.

**5.**   **Liens and Debt.**

       **5.1**   **Liens**. The Enterprise specifically represents and warrants to the Servicer that during the term of this Agreement Enterprise shall not act in any way whatsoever, either directly or indirectly, to cause any Party to become an encumbrance or lienholder of any facility utilized by Enterprise or any tangible or intangible personal property assets of Enterprise, other than, as to the tangible or intangible personal property assets of Enterprise only, a creditor of Enterprise, or the Servicer, provided the Servicer is a creditor or is guaranteeing the amounts due under Authorized Debt, or to allow any Party to obtain any interest in this Agreement without the prior written consent of the Servicer.

*16*

CONFIDENTIAL

**5.2**  **Authorized Debt**. "Authorized Debt" shall mean debt incurred by Enterprise to operate the Unsecured Lending Business, including from one or more Commercial Finance Providers, and any extensions or renewals of such debt.

**6.**  **Servicer Fee Reimbursement, Disbursement, and Capital Contribution.**

**6.1**  **Disbursements at the Commencement of the Term**.  On the Effective Date, Servicer shall pay from its own account, and not the account of Enterprise, to Enterprise as directed by Enterprise the sum of five thousand and No/100 Dollars ($5,000.00) to reimburse the Enterprise for due diligence-related costs.

**6.2**  **Servicing Fee**. Servicer is authorized by Enterprise to pay itself its Servicing Fee in accordance with the terms of Section 3.5.1 hereof.

**6.3**  **Disbursements**. All revenues received by Enterprise in connection with the Unsecured Lending Business shall be deposited into the Primary Bank Account. These revenues shall, in turn, be disbursed by Servicer, for and on behalf of Enterprise, from the Primary Bank Account to pay, to the extent available, Servicing Expenses.

**6.4**  **Payment of Fees and Tribal Disbursement**. No later than fifteen (15) days or such other time period as provided in this Agreement after the end of each calendar month of operations, the Servicer shall calculate and report to the Enterprise the Gross Revenues for the preceding month and shall disburse the funds in the Primary Bank Account (or otherwise set aside reserves out of such funds as permitted by this Agreement) to the extent due and payable in the following order of priority unless otherwise agreed by the Parties with regard to Servicer Advances:

**6.4.1**  To the Enterprise, 100% of Tribal Net Profits; ;

**6.4.2**  To Servicer, an amount sufficient to reimburse Servicer for any amounts advanced to the Enterprise by Servicer if such amounts exceed ten thousand dollars ($10,000.00) and remain unpaid at month end;

**6.4.3**  To all service providers, including Servicer, all Servicing Expenses, including allocations to reserves as provided in the Servicing Budget, including any additional monies owed to Servicer, to the extent the same have not been paid during the course of the preceding calendar month;

**6.4.4**  To any creditor of the Enterprise, an amount sufficient to repay any principal or interest outstanding under any Authorized Debt extended by such creditor but only to the extent then required to be paid; and

**6.4.5**  To the Servicer, the Servicing Fee in the manner directed by the Servicer (which shall be paid monthly pursuant to Section 3.5.1 hereof).

17

CONFIDENTIAL

MARTORELLO_003493

## 7.   General Provisions.

**7.1   Notice**. All notices and other communications hereunder shall be in writing, and shall be deemed to have been duly given (a) upon hand delivery thereof, (b) upon facsimile and written confirmation of transmission, (c) upon receipt of any overnight deliveries, or (d) on the third (3rd) business day after mailing United States registered or certified mail, return receipt requested, postage prepaid, addressed to each Party at the following addresses:

**If to Enterprise**:          Red Rock Tribal Lending, LLC
                          P.O. Box 704
                          Watersmeet, MI  49969

                          Lac Vieux Desert Band of Lake Superior Chippewa Indians,
                          As sole member of Red Rock Tribal Lending, LLC
                          Attn: General Counsel
                          P.O. Box 249
                          Watersmeet, Michigan 49969

**If to Servicer**:          SourcePoint VI, LLC.
                          5322 Yacht Haven Grande, Box 7
                          St. Thomas, VI  00802

**7.2   Authorization**. The Enterprise and Servicer represent and warrant to each other that they each have full power and authority to execute this Agreement and to be bound by and perform the terms hereof.  The Enterprise further warrants that it has complied with all applicable tribal laws and procedures necessary to effectuate its obligations herein, including but not limited to any requisite Tribal approvals.  Upon request, each Party shall furnish the other evidence of the authority represented in this Paragraph 7.2.

**7.3   Relationship**. Servicer and Enterprise or the Tribe as sole member of the Enterprise shall not be construed as joint-venturers or partners of each other by reason of this Agreement and none shall have the power to bind or obligate the other except as set forth in this Agreement.

**7.4   Servicer's Contractual Authority in the Performance of this Agreement**. Subject to the provisions of Section 4.2.2, and applicable law, Servicer is authorized to negotiate, and perform for the account of Enterprise any contracts deemed necessary or appropriate by Servicer and executed by the Enterprise to perform Enterprise's obligations under this Agreement and any other agreement or other instrument reasonable necessary or appropriate in the conduct of the Unsecured Lending Business or authorized herein.

**7.5   Further Actions**. Enterprise and Servicer agree to execute all contracts, agreements and documents and to take all actions necessary to comply with the provisions of this Agreement and the intent hereof.

*18*

JA2189

MARTORELLO_003494

**7.5.1** **Taxes**. If any state or any local government attempts to impose any possessory interest tax upon any Party to this Agreement or upon any facility utilized by Enterprise, in the name of the appropriate Party or parties in interest, will, upon the request of either Party, resist such attempt through legal action. The costs of such action and the compensation of legal counsel shall be an Servicing Expense of Enterprise. Any such tax shall constitute an Servicing Expense of Enterprise. This Section shall in no manner be construed to imply that any Party to this Agreement or Enterprise, or Authorized Agents are liable for any such tax, or that any state or federal tax on the Servicer's income is to be considered an expense of Enterprise or Authorized Agents.

**7.5.2** **Tribal Taxes**. The Enterprise agrees that neither it nor any agent, agency, affiliate or representative of the Enterprise will impose any taxes, fees, assessments, or other charges of any nature whatsoever on payments of any debt service to Servicer, or to any Authorized Agents, or to any lender furnishing financing for any facility utilized by or for Enterprise, or on Enterprise or the revenues therefrom, or on any Servicing Fee as described in Section 3.5 of this Agreement; provided, however, Enterprise may assess a tax upon Servicer or an Authorized Agent in the nature of a business license and occupation tax or other tax assessed against Servicer or an Authorized Agent by any state, but only to the extent that same is a dollar for dollar set off against the state tax. The Enterprise further agrees that neither it nor any agent, agency, affiliate or representative of the Enterprise will impose any taxes, fees, assessments or other charges of any nature whatsoever on the salaries or benefits, or dividends paid to, any of the Servicer's stockholders, officers, directors, or employees or any of the stockholders, officers, directors, or employees of Enterprise, or any of the Subsidiaries of Enterprise or Servicer, or any of the Authorized Agents. The Enterprise further agrees that the amount of any tax, fee, assessment or other charge of any nature whatsoever that may subsequently be imposed contrary to this Section 7.5.2 shall be added to the Servicing Fee to which the Servicer is entitled under this Agreement. Servicer retains the right, in its sole discretion, to terminate this Agreement and all accompanying agreements if it reasonably determines that any statute or regulation of the Tribe renders operation of Enterprise uncompetitive. Should the Servicer terminate this Agreement pursuant to this Section, the Servicer shall retain the right to repayment of money lent to Enterprise on a limited recourse basis, limited exclusive to the assets of the Enterprise and to no other assets of the Tribe or any other arm or affiliate of the Tribe. Except as otherwise provided herein, if any taxes, fees or assessments are levied by the Tribe on Enterprise, Servicer, or any Authorized Agent, such taxes and assessments shall be abated for the term of this Agreement. Nothing herein shall limit the Tribe's ability to tax its members or businesses operating within the regulatory jurisdiction of the Tribe.

**7.5.3** **Situs of the Contracts**. This Agreement, as well as all contracts entered into between Enterprise and any person or any entity providing services to Enterprise or to the Servicer on behalf of Enterprise, shall be deemed entered into at the Tribal Administration Office of the Tribe in Watersmeet, Michigan, and shall be subject to all Legal Requirements of the Tribe and federal law, except as otherwise expressly provided herein.

**7.5.4** **Enforcement**. Authorized Agents are agreed to be intended third party beneficiaries of this Section 7.5 and shall have the right to enforce same to the extent of any breach thereof as same applies to such Authorized Agent.

*19*

CONFIDENTIAL

JA2190

MARTORELLO_003495

**7.6** **Defense**. Except for disputes between Enterprise and Servicer, Servicer shall bring and/or defend and/or settle any claim or legal action brought against Servicer or Enterprise and/or the Tribe, individually, jointly or severally in connection with the operation of Enterprise. Servicer and Enterprise shall consult and agree on who Enterprise shall retain as legal counsel, accountants and such other professionals, consultants and specialists to defend and/or settle any such claim or cause of action, and such professionals shall be under the supervision of Servicer, subject to the approval of the Enterprise. In all claims or legal actions bringing claims against Enterprise and/or the Tribe involving questions of jurisdiction, tribal sovereignty or sovereign immunity issues, the Servicer shall consult with Enterprise and the Tribe concerning the presentation and defense of such actions and the Tribe and Enterprise shall provide any information necessary to assist in the Servicer's and Enterprise's defense of any such claims or legal actions. All liabilities, reasonable costs, and expenses, including attorneys' fees and disbursements, incurred in defending and/or settling any such claim or legal action which are not covered by insurance shall be paid from the Regulatory and Litigation Reserve Fund to be established by Enterprise and the Servicer pursuant to Section 6.3, or otherwise as an Servicing Expense. Nothing contained herein is a grant to the Servicer of the right to waive tribal sovereign immunity of the Tribe or of Enterprise.

**7.7** **Tribal Laws**. The Enterprise represents that attached hereto as Schedule 1.0 is a complete copy of each and every law of the Tribe or otherwise that may pertain to the transactions and activities contemplated to be conducted pursuant to this Agreement and the agreements between Enterprise and each designated service provider and lender of the Subsidiaries and between Enterprise and such Subsidiaries; and furthermore, that except as provided in such laws set forth in Schedule 1.0, there are no laws, requirements or restrictions that are reasonably known to the Parties as of the effective date of this Agreement that could apply to such transactions and activities, including but limited to laws, requirements or restrictions related to civil or criminal usury.    Any passage by the Tribe of any law or requirement that, in Servicer's discretion, is determined to have a material negative impact on the financial benefits of this Agreement may be regarded as a breach of this Agreement by Enterprise, and actionable by Servicer under the dispute resolution provisions herein.

**7.8** **Waivers**. No failure or delay by Servicer or Enterprise to insist upon the strict performance of any covenant, agreement, term or condition of this Agreement, or to exercise any right or remedy consequent upon the breach thereof, shall constitute a waiver of any such breach or any subsequent breach of such covenant, agreement, term or condition. No covenant, agreement, term, or condition of this Agreement and no breach thereof shall be waived, altered or modified except by written instrument. No waiver of any breach shall affect or alter this Agreement, but each and every covenant, agreement, term and condition of this Agreement shall continue in full force and effect with respect to any other then existing or subsequent breach thereof.

**7.9** **Captions**. The captions for each Section are intended for convenience only.

**7.10** **Severability**. If any of the terms and provisions hereof shall be held invalid or unenforceable, such invalidity or unenforceability shall not affect any of the other terms or provisions hereof. If, however, any material part of a Party's rights under this Agreement shall be declared invalid or unenforceable (specifically including Servicer's right to receive its Servicing

*20*

CONFIDENTIAL

MARTORELLO_003496

Fees) the Party whose rights have been declared invalid or unenforceable shall have the option to terminate this Agreement upon thirty (30) days written notice to the other Party, without liability on the part of the terminating Party.

**7.11    Interest**. Any amount payable to Servicer or Enterprise by the other which has not been paid as provided herein shall accrue interest as may be agreed upon by the parties.

**7.12    Reimbursement**. The performance by Servicer of its responsibilities under this Agreement are conditioned upon Enterprise generating sufficient funds from borrowings and operations to enable Servicer on a timely basis to perform its obligations hereunder. Notwithstanding the foregoing, Servicer shall, according to the terms of this Agreement may, at its option if not so required, advance funds or contribute property, on behalf of Enterprise, subject to the prior approval of the Enterprise, to satisfy obligations of Enterprise in connection with Enterprise and this Agreement. Servicer shall keep appropriate records to document all reimbursable expenses paid by Servicer, which records shall be made available for inspection by Enterprise through the Tribal Representative(s) or its agents upon request and supplied to the Tribe as sole member of the Enterprise on a monthly basis. Enterprise agrees to reimburse Servicer with interest from future Net Revenues of Enterprise for money paid or property contributed by Servicer to satisfy obligations of Enterprise in connection with this Agreement. Interest shall be calculated at the rate set forth in Section 7.11, or if no rate was agreed upon at six percent (6%) per annum, from the date the Servicer advances monies to the date reimbursement is made. The Servicer's sole source of such reimbursement shall be from the assets of Enterprise.

**7.13    Travel and Out-of-Pocket Expenses**. Subject to the Servicing Budget, all travel and out-of-pocket expenses of Enterprise or Servicer or employees of Enterprise reasonably incurred in the performance of their duties shall be an Servicing Expense.

**7.14    Third-Party Beneficiary**. This Agreement is exclusively for the benefit of the parties hereto and it may not be enforced by any Party other than the parties to this Agreement and shall not give rise to liability to any third party other than the authorized successors and assigns of the parties hereto.

**7.15    Survival of Covenants**. Any covenant, term or provision of this Agreement which, in order to be effective, must survive the termination or expiration of this Agreement, shall survive any such termination or expiration for a period of one (1) year following the termination or expiration of this Agreement.

**7.16    Survival of Remedy**. Subsequent to any termination of this Agreement, the dispute resolution provisions of this Agreement, including but not limited to the waiver of the Enterprise's sovereign immunity, shall remain available to the Parties with respect to disputes arising out of or relating to this Agreement prior or subsequent for a period of one (1) year after the termination date.

**7.17    Periods of Time**. Whenever any determination is to be made or action is to be taken on a date specified in this Agreement, if such date shall fall on a Saturday, Sunday or any

21

JA2192

holiday observed by the Tribe, then in such event, said date shall be extended to the next day which is not a Saturday, Sunday or Tribal holiday.

**7.18** **Preparation of Agreement**. This Agreement shall not be construed more strongly against either Party regardless of who is responsible for its preparation.

**7.19** **Exhibits**. All exhibits and schedules attached hereto are incorporated herein by reference and made a part hereof as if fully rewritten or reproduced herein.

**7.20** **Successors, Assigns, and Subcontracting**. The benefits and obligations of this Agreement shall inure to and be binding upon the parties hereto and their respective successors and assigns. Enterprise's (subject to the limitations of its Governing Documents) prior written consent shall be required for Servicer to assign or subcontract any of its rights, interests or obligations as Servicer hereunder to any successor or assign, except to any parent, subsidiary or affiliate of Servicer. The Enterprise shall, with the prior written consent of the Servicer, which consent shall not be unreasonably withheld, have the right to assign this Agreement and the assets of Enterprise to an instrumentality of the Tribe, including an entity wholly owned by the Tribe organized to conduct the business of Enterprise for the Tribe that assumes all obligations herein. Any assignment by the Enterprise shall not prejudice the rights of the Servicer under this Agreement. No assignment authorized hereunder shall be effective until all necessary government approvals, if any, have been obtained.

**7.21** **Modification**. Any change to or modification of this Agreement must be in writing signed by all parties hereto.

## 8. **Warranties.**

**8.1** **Warranties**. The Servicer and Enterprise each warrant and represent that they shall not act in any way whatsoever, directly or indirectly, to cause this Agreement to be amended, modified, canceled, or terminated, except pursuant to Section 7.22. The Servicer and Enterprise warrant and represent that they shall take all actions necessary to ensure that this Agreement shall remain in full force and effect at all times.

**8.2** **Interference in Tribal Affairs**. The Servicer agrees not to interfere in or attempt to influence the internal affairs or government decisions of Tribal government by offering cash incentives, by making written or oral threats to the personal or financial status of any person, or by any other action, specifically including actions in the normal course of business of the Servicer that only affect the activities of Enterprise, except for contact with Enterprise, authorized Enterprise employees, or the Tribe as contemplated in this Agreement. For the purposes of this Section 8.2, if any such undue interference in Tribal affairs is alleged by the Enterprise in writing and through arbitration it is found that the Servicer has unduly interfered with the internal affairs of the Tribal government and has not taken sufficient action to cure and prevent such interference, that finding of interference shall be grounds for termination of the Agreement.

**8.3** **No Political Interference with Operations**. The Enterprise agrees that it shall not, through the Tribe's elected government officials or tribal employees, interfere with the day-to-day operations of Servicer or of the Subsidiaries.

*22*

CONFIDENTIAL

MARTORELLO_003498

**8.4**  **Prohibition of Payments to Members of Tribal Government**. The Servicer represents and warrants that no payments have been or will be made to any member of the Tribal government, any Tribal official, any relative of a member of Tribal government or Tribal official, or any Tribal government employee for the purpose of obtaining any special privilege, gain, advantage or consideration. Any payment received by a Tribal Representative or Operations Manager in the performance of his or her duties as they relate to the business of the Enterprise shall not constitute a prohibited payment.

**8.5**  **Prohibition of Financial Interest in Enterprise**. No member of the Tribal government or relative of a member of the Tribal government shall have a direct or indirect financial interest in Enterprise greater than the interest of any other member of the Tribe, nor shall any such person have any direct or indirect financial interest in the Servicer, its parents, subsidiaries or affiliates. For purposes of this Section direct or indirect financial interest refers to ownership interest or right to receive Tribal Net Profits as defined by this Agreement. The individual who serves in the capacity of Tribal Representative, or other individuals employed by the Enterprise as Operations Manager or in some other capacity shall not be deemed to have a direct or indirect financial interest in the Enterprise as is prohibited by this Section.

**8.6**  **Definitions**. As used in this Section 8, the term "member of the Tribal government" means the Tribal Representatives or any member of the Tribal Council, or other tribal elected official, or any independent board or body created to oversee any aspect of Enterprise or its business and any Tribal Court official; the term "relative" means an individual residing in the same household who is related as a spouse, father, mother, son or daughter.

**9.**  **Grounds for Termination.**

**9.1**  **Voluntary Termination and Termination for Cause**. This Agreement may be terminated as set forth in this Agreement.

**9.2**  **Voluntary Termination**. This Agreement may be terminated upon the mutual written consent and approval of the Parties. This Agreement may also be terminated voluntarily solely by Servicer upon one hundred and eighty (180) days written notice to the other Party pursuant to the notice provisions of Section 7.1 herein. The Enterprise may terminate this agreement upon one hundred and eighty (180) days written notice following the period in which any Authorized Debt is outstanding in which any Bellicose VI or SourcePoint VI guaranty remains outstanding.

**9.3**  **Termination for Cause**. Any of the parties may terminate this Agreement if any of the Parties commits or allows to be committed any material breach of this Agreement. A material breach of this Agreement shall include, but not be limited to, a failure of either Party to perform any monetary obligation within five (5) days of when due, or any nonmonetary material duty or obligation on its part for any twenty (20) consecutive days after notice. A Party may not terminate this Agreement on grounds of material breach unless it has provided written notice to the other parties of its intention to declare a default and to terminate this Agreement and the defaulting Party thereafter fails to cure or take steps to substantially cure the default within

*23*

JA2194

CONFIDENTIAL

MARTORELLO_003499

ninety (90) days following receipt of such notice. The discontinuance or correction of a material breach shall constitute a cure thereof.

In the event of any termination for cause, regardless of fault, the Parties shall retain all money previously paid to them pursuant to Section 6 of this Agreement and shall receive all amounts currently owed to them under this Agreement.

An election to pursue damages or other equitable remedies while this Agreement remains in effect pursuant to the provisions of Section 9.6 or 9.7 shall not preclude the injured Party from providing notice of termination pursuant to this Section 9.3. Neither shall termination preclude a suit for damages.

9.4    **Involuntary Termination Due to Changes in Legal Requirements**. It is the understanding and intention of the parties that the establishment and operation of Enterprise conforms to and complies with all Legal Requirements. If during the term of this Agreement, Enterprise, or any material aspect of the business conducted by Enterprise, becomes prohibited by operation of federal law or determined by final judgment of a court of competent jurisdiction, after all appeals thereof, to be unlawful under applicable law, the obligations of the parties hereto shall cease, and this Agreement shall be of no further force and effect; provided that (i) the Servicer shall have the rights in Section 4.4 of this Agreement; (ii) the Servicer and the Enterprise shall retain all money previously paid to them pursuant to Section 6 of this Agreement; (iii) funds of Enterprise in any account shall be paid and distributed as provided in Section 6 of this Agreement, provided any Authorized Debt shall be paid in full; (iv) any money lent by or guaranteed by the Servicer or its affiliates to Servicer shall be repaid to the Servicer to the extent provided in a written agreement entered in connection therewith, with recovery of monetary payments or damages limited in recourse to Enterprise assets and any such payments or damages shall be made only after payment in full of any and all amounts under any Authorized Debt; and (v) the Enterprise, directly or indirectly, shall retain its interest in the title to all Enterprise assets, fixtures, supplies and equipment subject to any requirements of financing arrangements. Nothing contained in this Section 9.4 shall be read to preclude either or both parties from contesting any actions which could lead to the involuntary cessation of business by Enterprise.

9.5    **Consequences of Servicer's Breach**. In the event of the termination of this Agreement by Enterprise for cause under Section 9.3, the Servicer shall not, prospectively from the date of termination, except as provided in Section 9.3, have the right to its Servicing Fee from Enterprise, but such termination shall not affect the Servicer's rights relating to reimbursement for any amounts it has loaned Enterprise under this Agreement through the date of termination or other agreements entered pursuant hereto. Any Net Revenues accruing through the date of termination shall be distributed in accordance with Section 6 of this Agreement.

9.6    **Consequences of Enterprise's Breach**. In the event of termination of this Agreement by the Servicer for cause under Section 9.3, the Servicer shall not be required to perform any further services under this Agreement and Enterprise shall indemnify and hold the Servicer harmless against all liabilities of any nature whatsoever relating to Enterprise, but only insofar as these liabilities result from acts within the control of Enterprise or its agents or created by the termination of this Agreement, and also with the source for such indemnification limited

*24*

CONFIDENTIAL

to the assets or future earnings of Enterprise and without recourse to other assets of the Tribe. The parties acknowledge and agree that termination of this Agreement may not be a sufficient or appropriate remedy for breach by Enterprise, and further agree that pursuant to the other provisions of this Agreement, the Servicer shall, upon breach of this Agreement by Enterprise, have the right to pursue such remedies (in addition to termination) at law or equity as it determines are best able to compensate it for such breach, including, without limitation monetary compensation, except that the source for such compensation shall be limited to the assets or future earnings of Enterprise without recourse to other assets of the Tribe, specifically the Servicing Fee pursuant to Section 6 for a term equal to the then remaining term of this Agreement at the amount specified in Section 6 provided any such payments or damages shall be subordinate to the payment of the amounts due under any Authorized Debt. Enterprise specifically acknowledges and agrees that there will be irreparable harm to the Servicer and that damages will be difficult to determine if Enterprise commits any breach, and Enterprise therefore further acknowledges that an injunction and/or other equitable relief is an appropriate remedy for any such breach. In such event, the Servicer shall have the right to its Servicing Fee accruing through the date of termination as provided in Section 6 of this Agreement, the repayment of unpaid principal and interest and other amounts due under any loans from it to Enterprise, provided any such payments or damages shall be subordinate to the payment of the amounts due under any Authorized Debt as defined in Section 5.2.

**10.    Conclusion Of the Servicing Term**. Upon the conclusion of the Term of this Agreement, or the termination of this Agreement under other of its provisions, in addition to other rights under this Agreement, the Servicer shall have the following rights:

**10.1    Transition**. If termination occurs at any time other than upon the conclusion of its Term, Servicer shall be entitled to a reasonable period of not less than thirty (30) days to transition services for which it has been retained to provide to Enterprise to the Tribe or its designee. Any property or equipment of Servicer that may be located at any location of the Tribe or Enterprise shall be returned to Servicer. Any property or equipment of Enterprise that may be located at any location of the Tribe or Enterprise shall be returned to Enterprise.

**10.2    Undistributed Net Revenues and Remaining Regulatory and Litigation Reserve Fund Monies**. If Enterprise has accrued Net Revenues which have not been distributed under Section 6 of this Agreement, the Servicer shall receive that Servicing Fee equal to that Fee it would have received had the distribution occurred during the Term of the Servicing Agreement. Any monies remaining in the Regulatory and Litigation Reserve Fund twelve (12) months after the conclusion of the management term shall be distributed fifty-fifty to the Servicer and Enterprise in accord with the proportion the Parties contributed those monies to the Regulatory and Litigation Reserve Fund.

**11.    Consents and Approvals.**

**11.1    Enterprise**. Where approval or consent or other action of Enterprise is required, such approval shall mean the written approval of the Enterprise subject to its Governing Documents. Should the Governing Documents require the Tribe as sole member of the Enterprise to act, such action should be evidenced by a duly enacted resolution or properly

*25*

JA2196

MARTORELLO_003501

recorded motion at a meeting of the Tribal Council thereof. Any such approval, consent or action shall not be unreasonably withheld or delayed.

**11.2    Servicer**. Where approval or consent or other action of the Servicer is required, such approval shall mean the written approval of the Operations Manager. Any such approval, consent or other action shall not be unreasonably withheld or delayed.

## 12.    Disclosures.

**12.1    Warranties. The Servicer warrants and represents as follows**: (i) no person or entity has any beneficial ownership interest in the Servicer other than as set forth herein; (ii) no officer, director or owner of 5% or more of the stock of the Servicer has been arrested, indicted for, convicted of, or pleaded nolo contendere to any felony or any offense related to business of payday loans or the payday loan industry in general, or had any association with individuals or entities known to be connected with organized crime; and (iii) no offices or director of the Servicer, has been arrested, indicted for, convicted of, or pleaded nolo contendere to any felony or any offense described in subsection (ii) above, or had any association with individuals or entities known to be connected with organized crime.

**12.2    Disclosure Amendments**. The Servicer agrees that whenever there is any material change in the information disclosed pursuant to this Section 12 it shall notify the Enterprise in writing pursuant to Section 7.1. All of the warranties and agreements contained in this Section 12 shall apply to any person or entity that would be listed in this Section 12 as a result of such changes.

**12.3    Breach of Servicer Warranties and Agreements**. The material breach of any warranty or agreement of the Servicer contained in this Section 12 shall be grounds for immediate termination of this Agreement; provided that if a breach of the warranty contained in clause (ii) of Section 12.2 is discovered, and such breach was not disclosed but all officers and directors of the Servicer sign sworn affidavits that they had no knowledge of such breach, then the Servicer shall have thirty (30) days after notice from Enterprise to terminate the interest of the offending person or entity and, if such termination takes place, this Agreement shall remain in full force and effect.

## 13.    No Present Lien Lease or Joint Venture. 
The parties agree and expressly warrant that neither the Servicing Agreement nor any exhibit thereto is a mortgage or lease and, consequently, does not convey any present interest whatsoever in Enterprise or its assets, nor any proprietary interest in Enterprise itself. The parties further agree and acknowledge that it is not their intent, and that this Agreement shall not be construed, to create a joint venture between Enterprise and the Servicer; rather, the Servicer shall be deemed to be an independent contractor for all purposes hereunder.

## 14.    Enterprise's Limited Waiver of Sovereign Immunity. 
Subject to the provisions hereof, Enterprise, to the extent that Enterprise can avail itself to the sovereign immunity of the Tribe, the Enterprise hereby clearly, expressly and irrevocably grants to Servicer and its respective successors and assigns hereunder a clear, express and unequivocal waiver of tribal sovereign immunity, to the extent limited herein, from suits, actions or arbitration or mediation proceedings

*26*

CONFIDENTIAL

JA2197

MARTORELLO_003502

and consents to suits, actions or arbitration or mediation proceedings arising under this Agreement, all in accordance with the terms and limitations herein. Enterprise hereby makes this limited waiver of sovereign immunity as follows:

**14.1**  For the purpose of allowing the Servicer to take any and all actions necessary to enforce the provisions of this Agreement pursuant to the alternative dispute resolution procedures set forth in Section 18, including mediation, arbitration, and judicial enforcement proceedings which seek injunctive or declaratory relief and/or damages (as limited in Paragraph 16), specific performance or other legal and equitable remedies in the court or courts authorized by this Agreement and to effect enforcement of any remedy granted herein.  This waiver of sovereign immunity also applies to any attempt by a later tribal government to revoke the Enterprise's waiver of sovereign immunity or consents herein.  The Enterprise waives its sovereign immunity, if applicable, from a judgment or order (including any appellate judgment or order) and post judgment proceedings supplemental thereto consistent with the terms and provisions hereof, which is final because either the time for appeal thereof has expired or the judgment or an order issued by a court having final appellate jurisdiction over the matter.

**14.2**  Subject to this Section 14, pursuant to its limited waiver, Enterprise expressly waives its immunity from suit and consents to be hailed into mediation or arbitration as provided in Section 18 and/or to be sued in any of the following: the Lac Vieux Desert Band of Lake Superior Chippewa Tribal Court, Michigan state courts, and the United States District Court for the Western District of Michigan and appellate courts therefrom for all three (3) jurisdictions for any claims by the Servicer arising out of this Agreement.  As to any claims by the Servicer or its successors or assigns arising under this Agreement, Enterprise waives its rights to claim it is a tribal entity and/or is operating as a subordinate part of the tribal government entitling as a defense to legal action by the Servicer or its successors or assigns in accord with this Paragraph 14.2.

**14.3**  Enterprise agrees that it shall not plead or raise as a defense to any action brought by the Servicer or its successors or assigns any right or claim of right to the requirement of exhaustion of tribal court remedies, as the parties have expressly agreed, subject to 14.2 above.  The Enterprise waives its rights to have any dispute, controversy, suit, action or proceeding, if any, heard in any tribal court or other tribunal or forum, council or adjudicative body of the whether or not such forum now exists or is hereafter created.  The Enterprise hereby expressly waives any requirement which may exist for exhaustion of any remedies available in any tribal forum prior to the commencement of any dispute, controversy, suit, action proceeding in any state or federal court even if any such tribal forum would have concurrent jurisdiction over any such dispute, controversy, suit, action or proceeding but for such waiver, and any application of the abstention doctrine and any other law or interpretation thereof that might otherwise require, as a matter of law or comity, that resolution of any claim, controversy or dispute be heard first in a tribal forum.

**14.4**  The limited waiver of sovereign immunity granted here does not include any waiver, either express or implied, to any third party.

**14.5**  The Enterprise covenants and agrees that the clear, express and unequivocal limited waiver of sovereign immunity and other waivers contained herein are irrevocable and

27

JA2198

CONFIDENTIAL

MARTORELLO_003503

agrees not to revoke or limit, in whole or in part, such waiver of sovereign immunity or other waivers contained herein or in any way attempt to revoke or limit, in whole or in part, such waiver of sovereign immunity or other waivers, as the case may be.  In the event that the Enterprise (i) revokes, limits, or attempts to revoke or limit the waivers granted herein, (ii) takes any action that is inconsistent with the waivers granted herein, or (iii) fails to submit to the jurisdiction of the tribal, state or federal courts or arbitration tribunals as provided herein, the parties expressly recognize and agree that there remains no adequate remedy at law available to the Parties and that they will be injured.  In any such event, Enterprise hereby agrees that the Servicer may seek immediate judicial injunctive relief as provided herein.

      **14.6**    The limited waiver of sovereign immunity of Enterprise as provided for in this Section shall expire at the conclusion of the longer of (i) one (1) year after the termination or expiration of this Agreement, or (ii) at the conclusion of any mediation, arbitration or litigation matter with respect to this Agreement pending at the termination or expiration of this Agreement, including the conclusion of any potential appeals available from such proceedings.

**15.**    <u>Time is of the Essence</u>. Time is of the essence in the performance of this Agreement.

**16.**    <u>Tribal Assets</u>. The Servicer understands and agrees that notwithstanding anything to the contrary herein, the obligations of the Enterprise hereunder are unsecured obligations and no recourse may be made against any assets of the Tribe, and recourse may only be made against the revenues and personal property of Enterprise after entry of a judgment in a court of competent jurisdiction as provided by the applicable law and the provisions of this Agreement related to an arbitration and provided that obligations due under any Authorized Debt have been paid in full or payment of the judgment is approved by the Lender under any Authorized Debt.

**17.**    <u>Governing Law</u>.  The interpretation, validity and performance of this Agreement shall be governed by the laws of the Tribe and of the State of Michigan, without regard to the conflicts of law rules of such Tribe or State.  If any of the terms and provisions of this Agreement shall be held invalid or unenforceable for any reason, such invalidity or unenforceability shall not affect any of the other terms or provisions hereof, all such other terms and provisions to be valid and enforceable to the fullest extent permitted by law.

**18.**    <u>Dispute Resolution</u>. All disputes, controversies or claims between the Parties arising out of or relating to this Agreement, including without limitation any dispute, controversy or claim between the Parties regarding the rights, duties, adequacy of performance, breach, or liabilities of a Party under any provision of this Agreement or the validity or enforceability of this Agreement ("Dispute"), shall be resolved by binding arbitration conducted in accordance with the provisions of this Section ("Arbitration Proceedings") and per the limited waiver of tribal sovereign immunity contained in Section 14 above.  If a Party ("Complaining Party") concludes that the other Party ("Responding Party") has failed to comply with, or is proposing to take action which is inconsistent or will breach any term or condition of this Agreement, and the Parties informal efforts to resolve the Dispute as set forth in Paragraph 18.1 below have been unsuccessful, the Complaining Party may give written notice to the Responding Party ("Notice of Dispute"), which specifies: (a) the nature of the Dispute; (b) the corrective action which must be taken to remove, or, where appropriate, to commence removal of, the Dispute, if the Dispute is susceptible to cure ("Corrective Action"); (c) a reasonable time limit within which the Corrective

*28*

CONFIDENTIAL

Action must be taken ("Time Limit"); and (d) the amount of damages or losses asserted to have arisen from the Dispute. Except in the case of emergencies, no Arbitration Proceedings on a Dispute may be commenced by a Party unless prior Notice of Dispute and opportunity to take Corrective Action have been given as provided in this Subsection. If, within the Time Limit, the Responding Party fails in the reasonable judgment of the Complaining Party to take substantial steps to make the Corrective Action provided for in the Notice of Dispute then, with respect to the Dispute, either Party may initiate Arbitration Proceedings under Paragraph 18.2 with respect to the asserted Dispute. Each of the Parties hereby agrees that this arbitration provision is valid and enforceable and therefore waives any defense or assertion to the contrary.

**18.1    Negotiations/Mediation.** Before Arbitration Proceedings are commenced, the Parties shall use their best efforts to settle the Dispute by negotiating with each other in good faith and, recognizing their mutual interests, attempting to reach a just and equitable solution satisfactory to both Parties. Should the Parties' good faith efforts to resolve a Dispute be unsuccessful, the Parties agree that prior to resorting to judicial or arbitral avenues of relief, they may engage a mutually-acceptable mediator to assist them in resolving the Dispute. If the Parties do not reach a solution within a period of thirty (30) days from the date on which the Dispute was first asserted in writing, then the provisions in Paragraph 18.2 below shall apply.

**18.2    Binding Arbitration.** Subject to the requirements and limitations of Paragraph 18.1, either Party shall have the right to have the Dispute decided by Arbitration Proceedings in the manner provided in this Paragraph 18.2.

**18.2.1    Notice of Intent.** A Party intending to demand arbitration shall first serve written notice of that intent ("Notice of Intent to Arbitrate") on the other Party and shall promptly thereafter file the Notice of Intent to Arbitrate with any arbitration organization of its choosing in accordance with the that arbitration organization's rules and pay the required fees. A Notice of Intent to Arbitrate shall specify: (a) the matters to be submitted to arbitration; (b) the nature of the relief to be sought in the arbitration; and (c) the name of the "Pre-Approved Arbitrator" desired to be selected by the Party. The Parties have established a list of pre-approved, mutually acceptable arbitrators, "Pre-Approved Arbitrators," whom either Party may identify as the decider for any Dispute under any arbitration organization's rules. The list of Pre-Approved Arbitrators is contained at Schedule 18.2.1 hereto..

**18.2.2    Response.** Within ten (10) days after the service of a Notice of Intent to Arbitrate, the other Party shall serve a written response ("Response") specifying (a) any additional matters it intends to submit to arbitration relating to the Dispute, and (b) the nature of any relief it intends to seek in the arbitration. The responding Party shall promptly thereafter file the Response with the arbitration organization that received the Notice of Intent and pay any required fees. In the event that the Pre-Approved Arbitrator identified by the Party initiating a Notice of Intent to Arbitrate is unavailable to serve for whatever reason, the responding Party shall in its Response identify an alternate Pre-Approved Arbitrator from Schedule 18.2.1 to hear the Dispute. The Parties shall alternate identification of Pre-Approved Arbitrators no longer than each ten (10) days until a Pre-Approved Arbitrator who is able to serve in the timeframes provided in this Agreement is identified.

*29*

CONFIDENTIAL

MARTORELLO_003505

**18.2.3** **Arbitrators**.  The Pre-Approved Arbitrators identified from Schedule 18.2.1 shall be the "Decider Arbitrator." Any Arbitration Proceedings shall take place exclusively before the single Decider Arbitrator.  Any Decider Arbitrator shall be competent and professionally experienced in the matter being arbitrated.  The Parties further agree that no arbitrator shall be an officer, agent, employee, stockholder or contractor of any Party or its affiliates, and nor shall any arbitrator be a member or descendent or spouse of a member or descendent of the Tribe.  If no Pre-Approved Arbitrator can serve then the Decider Arbitrator to be appointed shall be selected by the arbitration organization that received the Notice of Intent. All arbitrators, no matter how designated or appointed, shall act as neutral arbitrators.  All decisions, awards, orders and other rulings of the arbitrators, relief awarded, or other substantive or procedural matters ("Decisions") shall be made by only the duly-appointed Decider Arbitrator, shall be in writing signed by the Decider Arbitrator, and shall include the findings of fact and conclusions of law on which the Decision is based.

**18.2.4** **Conduct of Arbitration**.  After the Notice of Intent to Arbitrate has been delivered, arbitration shall be considered commenced as to all matters properly submitted under the foregoing provisions, and shall thereafter be prosecuted with diligence in accordance with the following provisions, unless the Parties agree otherwise.  The Decider Arbitrator shall apply the governing law specified in Section 17, and shall follow such rules of discovery and evidence as the United States District Court for the State of Michigan would apply.  Within sixty (60) days of commencement of the arbitration actions, and after receiving evidence and hearing witnesses, if any, the Decider Arbitrator shall render his or her award, accompanied by findings of fact and a statement of reasons for the decision.

**18.2.5** **Standard of Review**.  All Decisions rendered by the Decider Arbitrator shall be determined in light of the nature of the Dispute, the circumstances surrounding the Dispute, applicable Laws, and the rights and interests of the Parties, so as to do substantial justice to the Parties. No order in Arbitration Proceedings may terminate this Agreement except upon (a) a determination that the Dispute on which the order is based constitutes a major and material default under this Agreement, or (b) upon a determination of repeated defaults sufficient to indicate callous indifference to a Party's obligations under this Agreement; provided that in no event shall this Agreement be subject to termination for breach of a term or conditions the breach of which the Parties have agreed shall not be the basis for termination of this Agreement.

**18.2.6** **Place of Arbitration**.  All hearings and other proceedings in the arbitration shall be held at Marquette, Michigan, unless otherwise designated by the Parties.

**18.2.7** **Relief Available**.  With respect to the matters submitted to Arbitration Proceedings, the Decider Arbitrator shall have authority to:

    **(a)**    issue appropriate Interlocutory Orders to mitigate damage or prevent irreparable injury to a Party; and

    **(b)**    render a final decision which:

JA2201

CONFIDENTIAL

MARTORELLO_003506

(i)    determines or declares the rights, duties, adequacy of performance, breach or liabilities of a Party under the Agreement;

(ii)    orders a Party to specifically perform its obligations under the Agreement;

(iii)    awards appropriate injunctive, declaratory or compensatory monetary relief for the benefit of a Party; and/or

(iv)    contains such further relief and provisions as the arbitrators have jurisdiction and authority to grant.

The Decider Arbitrator shall not have jurisdiction or authority to assess special, consequential or punitive damages against either Party.   Except as inconsistent with the provisions of this Section 18, the arbitration shall be conducted in accord with the Commercial Rules of the American Arbitration Association then in effect.

**18.2.8 Decision Binding; Enforcement**.   The Decision of the Decider Arbitrator shall become a "Final Decision" at the time rendered.  All Final Decisions shall be conclusive and binding on the Parties with respect to the matters decided, and shall be complied with by the Parties.  A Party may enter a Final Decision and institute Judicial Proceedings for the sole purpose of enforcing a Final Decision in any tribunal specific in Section 14 above.  In such Judicial Proceedings, neither Party, without consent of the other Party, shall be entitled to contend that the Final Decision should be vacated, modified or corrected and the Parties hereby expressly waive all other rights and remedies that might otherwise be available in the Judicial Proceeding.

**18.2.9 Costs of Arbitration**.   All costs of arbitration, including the fees and expenses of the Decider Arbitrator, shall initially be borne equally by the Parties, but ultimate responsibility for such costs shall be determined by the Decider Arbitrator in the course of his or her decision and/or award according to the extent to which each Party prevailed on the issues subject to the arbitration. Each Party shall bear the costs and expenses for the presentation of its case, including the fees of its attorneys and experts.

**18.2.10 Survival of Remedy**.   Subsequent to any expiration or termination of this Agreement, this Section shall remain available to the Parties with respect to Disputes arising out of or relating to this Agreement, whether such Dispute arose prior or subsequent to the expiration or termination of the Agreement, for the longer of (i) one (1) year, or (ii) the conclusion of any proceedings timely initiated pursuant to this Section 18, including the conclusion of any appeals allowed by proceedings hereunder.

**19.    Performance During Disputes**. It is mutually agreed that during any kind of controversy, claim, disagreement or dispute, including a dispute as to the validity of this Agreement or to terminate the Agreement for cause, Servicer shall remain in Enterprise as Servicer; and Enterprise and Servicer shall continue their performance of the provisions of this Agreement and its exhibits, subject to the maintenance of any licenses required to perform such duties.  Servicer shall be entitled to seek injunctive relief from such court or other competent authority as contemplated by Section 14 of this Agreement to maintain the status quo in the event

*31*

CONFIDENTIAL

of a threatened eviction during any dispute, controversy, claim or disagreement arising out of this Agreement.

**20.** **Confidential Information**. Each of the Parties agree that any information received concerning any other Party during the performance of this Agreement, regarding a Party's organization, financial matters, marketing plans, or other information of a proprietary nature (the "Confidential Information"), will be treated by all Parties in full confidence and except as required to allow Servicer or Enterprise to perform their respective covenants and obligations hereunder, or in response to legal process or appropriate and necessary inquiry, and will not be revealed to any other persons, firms or organizations; provided, however, that a Party may disclose such information to such of its officers, employees or agents who need to know the information for purposes of performing services to such Party for purposes related to this Agreement and who agree to keep such information confidential and to be bound by this Section to the same extent as if they were signatories to and bound by this Agreement. The provisions of Sections 3.3.2 and 3.3.3 shall apply to the enforcement of this Section. The provisions of this Section shall survive the termination of this Agreement. Confidential Information shall include all information, data, knowledge, and know-how (in whatever form and however communicated) relating to the Enterprise, or to its businesses, operations, properties, products, strategies, plans, markets, or financial positions, that is delivered or disclosed by Servicer, or any Servicer representative, or any of its officers, directors, partners, employees, agents, affiliates, or shareholders, to Enterprise in writing, electronically, verbally, or through visual means, or which Enterprise learns or obtains aurally, through observation or through analyses, interpretations, compilations, studies, or evaluations of such information, data, knowledge, or know-how regardless of whether or not any such information is marked or designated "confidential."

The obligations not to use or disclose the Confidential Information shall not apply to Confidential Information which (a) has been made previously available to the public by Enterprise or the Tribe as sole member of Enterprise or Servicer or Servicer's affiliates or becomes generally available to the public, unless the Confidential Information being made available to the public results in a breach of this Agreement; (b) prior to disclosure to Enterprise or Servicer or Servicer's affiliates, was already rightfully in any such person's possession; or (c) is obtained by Enterprise or Servicer or Servicer's affiliates from a third party who is lawfully in possession of such Information, and not in violation of any contractual, legal or fiduciary obligation to Enterprise or the Tribe as sole member of Enterprise or Servicer or Servicer's affiliates, with respect to such Confidential Information and who does not require Enterprise or Servicer or Servicer's affiliates to refrain from disclosing such Confidential Information to others.

**21.** **Execution**. This Agreement is being executed in three (3) counterparts. Each of the three originals is equally valid and binding upon the parties.

**22.** **Enterprise Name**. Enterprise shall be operated under the business name of Red Rock Tribal Lending, LLC, and such trade names as both the Servicer and Enterprise and the Tribe as sole member of Enterprise shall agree.

**23.** **Intent to Negotiate New Agreement**. On or before one hundred twenty (120) days before the end of the Term of this Agreement, Enterprise shall give Servicer notice of its intent

*32*

CONFIDENTIAL

MARTORELLO_003508

regarding their willingness to enter into negotiations for a new Servicing Agreement to be effective upon the conclusion of this Agreement. If Enterprise and Servicer are unable to agree to the terms of a new agreement or if Enterprise decide not to enter into negotiations for a new agreement, then Enterprise and Servicer shall agree upon a transition plan within thirty (30) days' notice from Enterprise of its intention not to negotiate a new Servicing Agreement which plan shall be sufficient to allow Enterprise to operate Enterprise and provide for the orderly transition of the management of Enterprise.

**24.**   **Entire Agreement**. This Agreement, including the Exhibits referred to herein and any document executed by the Parties simultaneously herewith, constitutes the entire understanding and agreement of the Parties hereto and supersedes all other prior agreements and understandings, written or oral, between the Parties.

**25.**   **Additional Actions**. Each of the Parties agrees to execute, deliver and, if necessary, record any and all additional instruments, certifications, amendments, modifications and other documents as may be reasonably required by another Party in order to effectuate, complete, perfect, continue or preserve the respective rights, obligations, liens and interests of the parties hereto to the fullest extent permitted by law; provided, that any such additional instrument, certification, amendment, modification or other document shall not materially change the respective rights, remedies or obligations of Enterprise or the Servicer under this Agreement or any other agreement or document related hereto. Each of the parties further agrees to review and consider the tax benefits that arise from the operation of Enterprise pursuant to the terms of this Agreement and to allocate such tax benefits among the parties in order to promote the respective interests of the parties hereto to the fullest extent permitted by law.

**26.**   **Representation**. The Tribe and Enterprise have been represented by Rosette, LLP in connection with the negotiation of this Agreement, and Servicer has been represented by Greenberg Traurig LLP. Each Party has had its attorneys fully explain and counsel it in connection with the rights and obligations imposed upon such Party under this Agreement and the agreements and other documents contemplated to be executed in connection with the Unsecured Lending Business. Each Party has a complete understanding of such rights and obligations and is entering into the Agreement notwithstanding any covenants or restrictions set forth herein that may impose obligations on the parties.

**[remainder of page intentionally left blank]**

*33*

CONFIDENTIAL

JA2204

MARTORELLO_003509

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement on the day and year first above written.

RED ROCK TRIBAL LENDING, LLC

By: _Craig Mansfield_ _____

Name: Craig Mansfield

Title: Co-Manager

By: _Michelle Allen_ _____

Name: Michelle Allen

Title: Co-Manager

SOURCEPOINT VI, LLC

By _____

Name: Matt Martorello

Title: President

*1*

CONFIDENTIAL

**Schedule 1.0**

*2*

JA2206

CONFIDENTIAL                                                          MARTORELLO_003511

## Schedule 18.2.1 - List of Pre-Approved Arbitrators

List of Pre-Approved Arbitrators from Indian Country

Robert Anderson

John Bickerman

Robert Clinton

Matthew L.M. Fletcher

JoAnn Cook-Gasco

B.J. Jones

Stacey Leeds

Carrie Newton Lyons

John Petoskey

Michael Petoskey

Frank Pommerscheim

Wenona Singel

Jill Tompkins

Kevin Washburn

Robert A. Williams

*3*

CONFIDENTIAL

JA2207

MARTORELLO_003512

Exhibit 60

**AMENDED AND RESTATED**
**OPERATING AGREEMENT**
**OF**
**BELLICOSE CAPITAL, LLC**
A Delaware Limited Liability Company

THIS AMENDED AND RESTATED **OPERATING AGREEMENT (this "Agreement") is made and** entered into as of July 1, 2014, by and among the Members whose signatures appear on Schedule A, as may be amended from time to time, which shall be, and remain after subsequent amendment, part and parcel of this Agreement.

Whereas, the Members of the Company entered into an Operating Agreement dated January 1, 2014 (the **"Original Agreement"**), and subsequently entered into an Amended and Restated Operating Agreement made **effective retroactive to January 1, 2014 ("Amended Agreement")** in order to clarify certain errors and ambiguities contained in the Original Agreement;

Whereas the Company now wishes to further amend and restate the Amended Agreement; and

Whereas, this Agreement is intended to govern the relationships among the Company, its Manager and its Members.

In consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties, intending to be legally bound, agree as follows:

**SECTION I**
**ORGANIZATION & FORMATION**

A.      Formation. The Company has been organized as a Delaware limited liability company under and pursuant to the Delaware Limited Liability Company Act **(the "Act")** by the filing of Articles of Organization **("Articles") with the** State of Delaware Division of Corporations, on October 9, 2013, as required by the Act.

B.      Name. **The name of the Company shall be "Bellicose Capital, LLC". Upon proper notice and filing** with the State of Delaware Division of Corporations, the Company may conduct its business under one or more assumed names.

C.      Purpose. The purpose of the Company is to operate any lawful business permitted by the law of the State of Delaware or any other State, Territory or Commonwealth in which it is registered to do business. The Company shall have all the powers necessary or convenient to affect any purpose for which it is formed, including all powers granted by the Act. The Company is authorized to apply for any and all tax exemptions and other benefits for which it may be eligible, including without limitation, benefits provided by the Department of Economic Development and Commerce of the Commonwealth of Puerto Rico.

D.      Duration. The Company shall continue in existence perpetually, beginning on the date of filing of the Articles, unless terminated by law or dissolved and terminated pursuant to this Agreement.

E.      No Partnership. The Members intend that the Company not be a partnership (including, without limitation, a limited partnership) or joint venture, that no Member be a partner or joint venturer for any purposes other than federal, state and territorial tax purposes, and this Agreement may not be construed to suggest otherwise.

JA2209

F.    <u>Registered Office, Resident Agent and Place of Business</u>. The registered office and principal place of business of the Company shall be at **203 Galeria De Artes y Ciencias I, Dorado, Puerto Rico** or such other place or places as the Manager may hereafter determine. The Resident Agent of the Company for service of process in Delaware shall be Incorporating Services, Ltd., 3500 South Dupont Highway, Dover, DE 19901.

## SECTION II
## MEMBERS, MEMBERSHIP INTEREST & CLASSES

A.    <u>Definitions</u>.

(i) **"Act"** shall mean the Delaware Limited Liability Company Act, Title 6 of the Delaware Code, as in effect in the State of Delaware and as amended from time to time. Reference to any section of the Act shall be deemed to refer to a similar provision in any amendment to the Act. To the extent the Company redomiciles, it may be required to amend and restate this Agreement in accordance with the laws of its new domicile.

(ii) "Additional Member" shall mean any Member admitted, to the Company after the date of this Agreement as provided for in Section II D.

(iii) "Capital Account" shall mean the account maintained for each Member described in Section III of the Agreement.

(iv) "Capital Contribution" shall mean, with respect to any Member, the total amount of contributions by all the Members or any class of Members or any one Member, as the case may be (or the predecessor holders of the interests of such Members), to the capital of the Company in cash, property, or services for an interest in the Company, valued at fair market value without deduction of selling, organization, or other expenses; and shall include all such contributions to the capital of the Company whenever made.

(v) **"Class"** or **"Classes"**: Membership Interests may include voting interest, economic interest and equity interest, and may be divided into separate Classes in the sole discretion of the Manager, which Classes and Membership Interests shall have such rights and preferences as the Manager shall determine, including (without limitation) different fee, expense and allocation structures and different voting privileges. The Manager shall cause separate and distinct records to be kept with respect to Company Property associated with each Class. Certain classes of the Company shall entitle a Member to participate only in the future profits, losses and/or appreciation of the Company Property allocated to a particular Class of Membership Interest. The designation of Class and rights of any Member, shall be designated by the Manager, and shall either be described herein in this Agreement, or made pursuant to an ancillary agreement among the Company and the proposed Member.  All Classes of Membership Interest shall be shown on <u>Schedule A</u>, attached hereto and made a part hereof, as amended from time to time.

(vi) **"Company Property"** or **"Property"** each shall mean the real property and any other assets or property (tangible or intangible, personalty or real, choate or inchoate, fixed or contingent) of the Company, including all earnings and proceeds which may arise therefrom from time to time.

(vii) **"Economic Interest"** shall mean a Member's share of the **Classes'** future net profits and net losses specifically associated with a particular Class pursuant to this Agreement. Economic Interests shall be non-voting interests. It is the intention of the parties hereto that all Economic Interests shall be deemed to be **"profits interests"** of the Company in accordance with Rev. Proc. **93**-27 and 2001-43 and that the Economic Interest holders are only entitled to participate in the future net profits and or net losses of the Company accruing after each Member's date of execution of this Agreement and are not entitled to participate in profits or losses related to the sale of assets or equity.

2

JA2210

(vii) **"Equity Interest" shall mean a Member's** share of the value upon a sale or liquidation of the Company, its subsidiaries, or the asset(s) specifically associated with a particular Class of Equity Interest and set forth in section II C below.

(viii) "Initial Capital Contribution" shall mean, with respect to any Member, the initial contribution by such Member to the capital of the Company as set forth on Schedule A hereto.

(ix) "Internal Revenue Code" shall mean the Internal Revenue Code of 1986, as amended from time to time, or any corresponding provision or provisions of succeeding laws. The term "Internal Revenue Code" shall be abbreviated as "IRC" or "Code".

(x) "Member" **shall mean each of the persons or entities holding a Membership Interest in the** Company and each of the persons or entities who may hereafter become a Member holding a Membership Interest. Members' rights to participate in the management and affairs of the Company, to share in the profits, gains or losses of the Company, to share in the value upon sale or liquidation of the asset(s) associated with a particular Class of Membership Interest, or to vote at meetings of the Members shall be determined pursuant to this Agreement, or to any ancillary agreements between the Member and the Company executed contemporaneously with this Agreement, or to any resolutions of the Members executed in connection with the issuance of a new class of interests.

(xi) "Membership Interest" **shall mean a Member's** voting interest, economic interest and/or equity interest in a particular Class, including the right to vote associated with such Membership Interest, if any, and such other rights and privileges that the Member may enjoy by being such a Member.

B.      Members.  The Members are set forth on Schedule A hereto, and shall include any other person hereafter admitted to the Company as a Member **as provided in this Agreement.  The term "Members" shall** not include any person who has ceased to be a member of the Company.

C.      Classes.  The following Classes have been designated by the Manager as of the Effective Date of this Agreement:

(i)      Class A Membership Interest.  Class A Membership Interest shall be the membership interest in the Company not otherwise designated to any other Class of Membership Interest.

(a) Class A Voting Interest: Class A Voting Interest shall be the only Class of Membership entitled to vote on any and all matters presented to the Company for Member approval.  Class A Voting Interest shall not include an Economic Interest or an Equity Interest.

(b) Class A Economic Interest: **Class A Economic Interest shall be a Class A Member's economic interest in the Company's** future net profits and net losses pursuant to this Operating Agreement and the Act, as more particularly set forth in Schedule A to this Operating Agreement as the same may be amended from time to time by the Class A Members holding Class A Voting Interest, but shall not include any right to participate in the management or affairs of the Company, including the right to vote on, consent to or otherwise participate in any decision of the Class A Members holding Class A Voting Interest, nor shall it include an Equity Interest.

(c) Class A Equity Interest:  Class A Equity Interest shall be entitled to the value of the Company upon sale or liquidation, the gain or losses from the sale of some or all of the companies assets, and the sharing in liabilities pursuant to this Operating Agreement and the Act, as more particularly set forth in Schedule A to this Operating Agreement as the same may be amended from time to time by the Manager, but shall not include any right to participate in the management or affairs of the Company, including the right to

3

JA2211

MARTORELLO_000301

vote on, consent to or otherwise participate in any decision of the Class A Members holding Class A Voting Interest, nor shall it include an Economic Interest.

(ii)    <u>Class B Membership Interest</u>.  Class B Membership Interest shall be the membership interest in the Company based solely upon the value and profitability of the subsidiary entity, **SourcePoint VI, LLC**. <u>No other</u> net profits, net losses, or distributions or value upon sale or liquidation attributable to the Company or any of its other subsidiaries shall be payable, under any circumstances, to the Class B Membership Interest holders, as are set forth in <u>Schedule A</u> to this Agreement as the same may be amended from time to time by the Manager.  Class B Membership Interest <u>shall not include,</u> under any circumstances, any right to participate in the management or affairs of the Company, including the right to vote on, consent to or otherwise participate in any decision of the Company; the right to vote on any matter presented to the Class A Members holding Class A Voting Interest; or any decision whatsoever regarding the Class B Membership Interest or the subsidiary entity: SourcePoint VI, LLC.

(a) <u>Class B Economic Interest</u>: Class B Economic Interests shall only be entitled to the net profits and net losses derived solely from the wholly owned subsidiary of the Company, SourcePoint VI, LLC, from the applicable issue date set forth on Schedule A. Class B Economic Interest shall not include any right to participate in the management or affairs of the Company, including the right to vote on, consent to or otherwise participate in any decision of the Class A Members holding Class A Voting Interest, nor shall it include an Equity Interest.

(b) <u>Class B Equity Interest</u>.  Class B Equity Interest shall be entitled to the value of the Class B Membership Interest only, which shall be based solely upon the value of the subsidiary entity, SourcePoint VI, LLC and/or some or all of its assets and liabilities, upon sale or liquidation, but shall not include any right to participate in the management or affairs of the Company, including the right to vote on, consent to or otherwise participate in any decision of the Class A Members holding Class A Voting Interest, nor shall it include an Economic Interest.

(iii)    <u>Class C Membership Interest</u>.  Class C Membership Interest shall be the membership interest in the Company based solely upon the value and profitability of the subsidiary entity, **Green Key Technologies, LLC**.  <u>No other</u> net profits, net losses, or distributions or value upon sale or liquidation attributable to the Company or any of its other subsidiaries shall be payable, under any circumstances, to the Class C Membership Interest holders, as are set forth in <u>Schedule A</u> to this Agreement as the same may be amended from time to time by the Manager.  Class C Membership Interest <u>shall not include,</u> under any circumstances, any right to participate in the management or affairs of the Company, including the right to vote on, consent to or otherwise participate in any decision of the Company; the right to vote on any matter presented to the Class A Members holding Class A Voting Interest; or any decision whatsoever regarding the Class C Membership Interest or the subsidiary entity: Green Key Technologies, LLC.

(a) <u>Class C Economic Interest</u>: Class C Economic Interests shall only be entitled to the net profits and net losses derived solely from the wholly owned subsidiary of the Company, Green Key Technologies, LLC, from the applicable issue date set forth on Schedule A. Class C Economic Interest shall not include any right to participate in the management or affairs of the Company, including the right to vote on, consent to or otherwise participate in any decision of the Class A Members holding Class A Voting Interest, nor shall it include an Equity Interest.

(b) <u>Class C Equity Interest</u>.  Class C Equity Interest shall be entitled to the value of the Class C Membership Interest only, which shall be based solely upon the value of the subsidiary entity, Green Key Technologies, LLC and/or some or all of its assets and liabilities, upon sale or liquidation, but shall not include any right to participate in the management or affairs of the Company, including the right to vote on, consent to or otherwise participate in any decision of the Class A Members holding Class A Voting Interest, nor shall it include an Economic Interest.

4

JA2212

MARTORELLO_000302

D.    <u>Representations and Warranties of the Members</u>.  As of the date on which any person becomes a Member, such person severally (and not jointly) hereby represents and warrants, as to itself and no other Member, to, and covenants with, the Company and each of the other Members that: (i) such person understands that the offer and sale or other transfer of the Membership Interest to such person have not been registered under the Securities Act or the securities laws of any state or territory, and further understands that such Membership Interest has not been approved or disapproved by the Securities and Exchange Commission or any other federal or state agency; (ii) such person understands that there are substantial restrictions on the transfer of the Membership Interests, including without limitation, that Membership Interests may not be transferred except as permitted by this Section II; (iii) such person has carefully reviewed and understands this Agreement in its entirety; (iv) the Manager has not made and hereby makes no warranties or representations to such person other than those set forth in this Agreement.

E.    <u>Membership Interests; Additional Membership Interests</u>.  Ownership of the Company shall be divided into and represented by Membership Interests.  The Class and types of Membership Interests of the Members are set forth on <u>Schedule A</u>.  The Manager is expressly authorized to provide for the issuance from time to time of additional Membership Interests for such consideration, and with rights, privileges, preferences, qualifications, limitations and restrictions as shall be stated and expressed in the resolution or resolutions adopted by the Manager providing for the issuance of additional Membership Interests and as may be permitted by the Act.  The Manager shall reflect the issuance of any additional Membership Interest and, if applicable, the admission of a new Member, pursuant to an amendment to <u>Schedule A</u>, which such amendment shall not be required to be executed by any other Member.

F.    <u>Transfer of Membership Interests</u>.  Subject to the limitations of transferability set forth herein in this Agreement, Members may transfer any or all of their Membership Interest to any person or persons, at any time and from time to time.  Subject to the provisions of this Section, Members may assign their Membership Interest in the Company in whole or in part. The assignment of a Membership Interest does not itself entitle the assignee to participate in the management and affairs of the Company or to become a Member. Such assignee is entitled only to receive the distributions of cash and other property and the allocations of income, gains, losses, deductions, credits or similar items to which its assignor would have been entitled to, and such assignee shall only become an assignee of a Membership Interest and not a substituted Member. An assignee of Membership Interest shall be admitted as a substitute Member and shall be entitled to all the rights and powers of the assignor only if the Manager consents in writing. If admitted, the substitute Member, has to the extent assigned, all of the rights and powers, and is subject to all of the restrictions and liabilities of the Members.

H.    <u>Right of First Refusal</u>.  Before any Membership Interest (**"Interest"**) held by any Member is sold or otherwise transferred (including, but not limited to transfer by gift, operation of law, or pursuant to Section II H below) the Company shall have an uncontested and irrevocable right of first refusal to purchase the Interest on the following terms and conditions:

(i)    **The selling Member shall deliver to the Company a written notice stating: (a) the Member's** bona fide intention to sell or otherwise transfer such Interest; (b) the name of the proposed purchaser or other **transferee ("Proposed Transferee"); (c) the percent of Interest to be transferred to each Proposed Transferee;** (d) the bona fide cash price or other consideration to be exchanged for the **Interest ("Offered Price"); and (e)** the terms and conditions of the proposed transfer.

(ii)    At any time within forty-five (45) days after receipt of this notice, the Company may, by written notice to the selling Member, elect to purchase all, or any part of the Interest at Fair Market Value (as defined in Section J below) or at the Offered Price, whichever price is lower.

(iii)    The right of first refusal shall not terminate upon any transfer of Interest.

5

JA2213

MARTORELLO_000303

(iv)     The right of first refusal shall be freely assignable by the Company at any time and in its sole discretion.

(v)     Any transfer done without adherence to this Section II F shall be void.

I.     <u>Mandatory Repurchase</u>.  The Manager, in his sole and absolute discretion, may require a Member to sell all **or a portion of the Interest of such Member, on not less than fourteen (14) days' notice (a "Mandatory Repurchase").  Such Mandatory Repurchase shall become effective on the date (the "Repurchase Date")** specified in such notice.  A Member who is so required to sell its Interest pursuant to this Section shall receive the Fair Market Value of the Interest, computed as of the date on which such Mandatory Repurchase shall become effective (a Member whose Interest is repurchased pursuant to this Section is referred to herein as a **"Repurchased Member").**

J.     <u>Payments in Connection with Mandatory Repurchase</u>.

(i)     Within 30 days after a Repurchase Date there shall be paid or distributed to a Repurchased Member an amount in cash, or, in the discretion of the Manager, in securities selected by the Manager, or, in the discretion of the Manager, partly in cash and partly in securities selected by the Manager, equal in value to not less than 90% of the estimated Fair Market Value of the Interest being repurchased. Within 30 days after the Manager has determined the Fair Market Value of the Interest being redeemed or repurchased as of such date, the Company shall pay to the Repurchased Member in cash, or, in the discretion of the Manager, in securities selected by the Manager, or, in the discretion of the Manager, partly in cash and partly in securities selected by the Manager, the amount of the excess, if any, of the Fair Market Value of the redeemed or repurchased Interest over the amount so paid.

a.     **"Fair Market Value" shall mean the value of the Interest, as applicable, as determined by Manager using reasonable valuation criteria, all in the Manager's sole discretion.**

b.     **The Company's assets will be valued from time to time in the discretion of the** Manager.  In those cases where an exchange-**based pricing mechanism is unavailable, the Manager or Manager's** representative will develop an assessment of Fair Market Value, which will be reviewed and approved by the Manager whose consent shall not be unreasonably withheld.  In the absence of bad faith, such determination, as approved by the Manager, shall be conclusive.  Fair Market Value shall reflect any declared but unpaid distributions with respect to the Interest.

(ii)     If, in the discretion of the Manager, the assets of the Company are committed in such a manner as not to reasonably permit immediate withdrawal of such assets, then, on the applicable Repurchase Date (the "Repurchase Effective Date"), the Manager may adopt a deferred payment system in accordance with the following:

a.     The Manager will attempt to liquidate, as of the earliest date on or after the Repurchase Effective Date upon which the Company is permitted to do so or on which market conditions make same feasible, from the Company's investments, such portion thereof as is allocable to the Interest of the Repurchased Member;

b.     Within 30 days following the Repurchase Effective Date, the Repurchased Member will be entitled to receive an amount equal to the Repurchased Member's percentage of all cash and the fair market value of all liquid securities held directly by the Company with respect to any applicable Interest; provided, however, that any such amount shall be subject to the provisions of this Section;

JA2214

CONFIDENTIAL

MARTORELLO_000304

c.     The balance due to the Repurchased Member shall be paid from time to time, within 30 days after the Company receives the proceeds from the liquidation of the previously illiquid portion of the Company's investments, but only to the extent that such proceeds plus the Repurchased Member's percentage of cash and the fair market value of liquid securities held by the Company with respect to any applicable Membership exceed such Member's percentage of the Company's liabilities and any amount retained pursuant to this Section with respect to any applicable Membership; provided, however, that in any event, at least 80% of the amount due a Repurchased Member shall be paid within one year following the Redemption Effective Date; and

d.     The Fair Market Value of the Interest attributable to a Repurchased Member shall be subject to an adjustment equal to a credit or charge for the Repurchased Member's percentage of the increase or decrease in the net asset value of the Company's investments with respect to any applicable Interest from the Redemption Effective Date through the date on which final payment of such Repurchased Member's percentage is made.

K.     <u>Involuntary Transfers</u>.  In the event of an Involuntary Transfer of any Interest to any person, the transferee (which term, as used herein, shall include any and all transferees and subsequent transferees of the initial transferee) shall take and hold such Interest subject to this Agreement and to all the obligations and restrictions upon the transferor, and shall observe and comply with this Agreement and with such obligations and restrictions.  As used in this Section II, **the term "Involuntary Transfer" shall mean any transaction,** proceeding or action by or in which a Member or other person is involuntarily deprived or divested of any right, title or interest in or to any Interest (including without limitation, a seizure under levy of attachment or execution, transfer to a trustee in bankruptcy or receiver or other officer or agency pursuant to a statute pertaining to escheat **or abandoned property, a Member's death or the appointment of a guardian with respect** to a Member).

L.     <u>Admission of New Members</u>.  No person shall be admitted as a Member of the Company unless: (i) the Manager shall have consented in writing to the admission of such person as a new Member; (ii) the person has executed and delivered all documents reasonably deemed appropriate by the Manager to reflect such **person's admission as a Member, and its agreement to be bound by this Agreement; and (iii) such person** has paid all expenses connected with its admission.

## SECTION III
## CAPITAL ACCOUNT

A.     <u>Capital Account</u>.  **A capital account ("Capital Account") shall be maintained for** the Members, and any additional Members in accordance with the provisions of this Section and subject to any ancillary agreements entered into between the Company and the Members.

(i)     Increases in Capital Account.  The Capital Account of the Members shall be increased by:

a.  The fair market value of the Members**' initial capital contri**bution and any additional capital contributions by the Members to the Company.  If any property, other than cash, is contributed to or distributed by the Company, the adjustments to Capital Accounts required by Treasury Regulation Section 1.704-1(b)(2)(iv)(d), (e), (f) and (g) and Section 1.704-1(b)(4)(i) shall be made.

b.    The Members**' share of the increase in the tax basis of Company property, if any,** arising out of the recapture of any tax credit.

c.     Allocations to the Members of profit.

7

JA2215

MARTORELLO_000305

d.   **The Members' share of** Company income or gain (including income and gain exempt from income taxation) as provided under this Agreement, or otherwise by Regulation Section 1.704-1(b)(2)(iv).

e.   **The Members' share of** the amount of Company liabilities that are assumed by the Members.

(ii)   Decreases in Capital Account.  The Capital Account of the Members shall be decreased by:

a.   **The Members' share of** the amount of money distributed to the Members of the Company pursuant to any provision of this Agreement.

b.   **The Members' share of** the fair market value of property distributed to the Members by the Company (net liabilities secured by such distributed property that such Members are considered to assume or take subject to Code Section 752).

c.   Allocations to the Members of losses.

d.   Allocations to the Members of deductions, expenses, Nonrecourse Deductions and net losses allocated to it pursuant to this Agreement, and the Members' **share of Company expenditures which** are neither deductible nor properly chargeable to Capital Accounts under Code Section 705(a)(2)(B) or are treated as such expenditures under Treasury Regulation Section 1.704-**1(b)(2)(iv)(i). "Nonrecourse Deductions"** shall have the meaning set forth in Treasury Regulation Section 1.704-2.

e.   **The Members' share of** the amount of any liabilities of the Members that are assumed by the Company.

## SECTION IV
## ALLOCATIONS AND DISTRIBUTIONS

A.   <u>Allocations</u>.

(i)   Allocations shall be made at such times as the Manager shall deem, in his sole discretion, to the Members listed and described on <u>Schedule A</u> attached hereto in accordance with the terms and rights of their interests.  Except as may be expressly provided otherwise in this Section IV or agreed to among the parties, and subject to the provisions of Sections 704(b) and 704(c) of the Code, the net income, net loss, or gains of the Company for each year of the Company shall be allocated to the Members, in accordance with the rights attributable to their respective interests.

(ii)   Net profits, net losses, or any other items allocable to any period shall be determined by the Manager, in his discretion, using any permissible method under Code Section 706 and the related Treasury Regulations and in accordance with the rights attributable to their respective interests.

(iii)   Acknowledgement.  The Members are aware of the income and other tax consequences of the allocations in or referred to by this Section IV and hereby agree to be bound by the provisions of this Section IV in reporting the share of items of Company income, gain, loss, deduction and expense for tax purposes.

(iv)   Determination by Manager of Certain Matters.  All matters not expressly provided for by the terms of this Agreement concerning the manner in which capital accounts and allocations are computed shall be determined in good faith by the Manager, in his reasonable discretion, whose determination shall be final and conclusive as to all the Members.  In the event the Manager determines that it is prudent to modify the manner in which capital accounts or any allocations under this Agreement are computed in order to comply with Section 704(b) of the Code and Treasury Regulations thereunder, the Manager shall make such

8

JA2216

CONFIDENTIAL

MARTORELLO_000306

modification. In the event that unanticipated events might otherwise cause this Agreement not to comply with such law, the Manager, consistent with the prior sentence, shall make such modifications as he deems reasonable.

B.  <u>Allocations for Tax Purposes</u>. Except as otherwise provided in and after giving effect to Section IV A, as of the end of each fiscal year, items of Company income, gain, loss, deduction and expense, shall be allocated among the Members pursuant to this Section IV B and as otherwise agreed to in writing by the parties for federal income tax purposes. In accordance with Code Section 704(c) and the related Treasury Regulations, income, gain, loss and deduction with respect to any property contributed to the capital of the Company, solely for tax purposes, will be allocated among the Members so as to take account of any variation between the adjusted basis to the Company of the property for federal income tax purposes and the initial Book Value of the property. If the Book Value of any C**ompany asset is adjusted under clause "b." of the definition of Book** Value, subsequent allocations of income, gain, loss and deduction with respect to that asset will take account of any variation between the adjusted basis of the asset for federal income tax purposes and its Book Value in the same manner as under Code Section 704(c) and the related Treasury Regulations. Any elections or other decisions relating to allocations under this Section IV B will be made in any manner that the Manager determines reasonably reflects the purpose and intention of this Agreement. The allocations in or referred to by this Section IV B are solely for federal, state, territorial and local income tax purposes and shall not affect, or in any way be taken into account in co**mputing, any Member's capital account or share of net profit or net loss or** other items described in this Agreement.

C.  <u>Acknowledgement</u>. The Members are aware of the income and other tax consequences of the allocations in or referred to by this Section IV and hereby agree to be bound by the provisions of this Section IV in reporting their shares of items of Company income, gain, loss, deduction and expense for tax purposes.

D.  <u>Certain Tax Related Definitions</u>. For the purposes of this Agreement, unless the context otherwise requires:

(i)  **"Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in such Member's capital account as of the end of the relevant fiscal year or other period, after giving** effect to the following adjustments.

a.  Credit to such capital account any amounts which such Member is obligated to restore or is deemed to be obligated to restore pursuant to the penultimate sentence of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5);

b.  Debit to such capital account the item described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6); and

c.  Credit and debit to such capital account, in the sole and absolute discretion of the Manager, any other items required or permitted under Section 704(b) of the Code and Treasury Regulations thereunder.

(ii)  **"Book Value" means with respect to any asset, the asset's adjusted basis for federal income** tax purposes, except as follows:

a.  the initial Book Value of any asset contributed by a Member to the Company shall be **the asset's gross fair market value at the time of the contribution;**

b.  the Book Value of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Manager in his reasonable judgment:

JA2217

CONFIDENTIAL

MARTORELLO_000307

       1.     if any adjustment is necessary or appropriate to reflect the relative economic interests of the Members in the Company as of (x) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a *de minims* capital contribution, or (y) the distribution by the Company to a Member of more than a *de minims* amount of Company property as consideration for an interest in the Company;

       2.     As of the liquidation of the Company within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g); and

       3.     Whenever else allowed under Treasury Regulations Section 1.704-1(b)(2)(iv)(f) or Proposed Treasury Regulations Section 1.704-1(b)(2)(iv)(s).

       c.     The Book Value of any Company asset distributed to any Member will be the gross fair market value of the asset on the date of distribution; and

       d.     The Book Value of Company assets will be increased or decreased to reflect any adjustment to the adjusted basis of the assets under Code Section 734(b) or 743(b), but only to the extent that the adjustment is taken into account in determining capital accounts under Treasury Regulations Section 1.704-1(b)(2)(iv)(m), provided that Book Values will not be adjusted hereunder to the extent that the Manager **determines that an adjustment under clause "b." is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment under this clause "d."**

       e.     After the Book Value of any asset has been adjusted under this Section IV F(ii) above, Book Value will be adjusted by the depreciation taken into account with respect to the asset for purposes of computing net profit and net loss.

       (iii)     **"Treasury Regulations" means the Income Tax** Regulations promulgated under the Internal Revenue Code, as such regulations may be amended from time to time (including corresponding provisions of successor regulations).

E.     <u>Distributions</u>.

       (i)     The Manager, in his sole and absolute discretion, may at any time cause the Company to distribute to Members in accordance with their respective Interest any cash available for distribution with respect to each Interest. The Manager shall reserve the right to make distributions to certain Classes of Interests and not to others, as well as certain Members and not to others.

       (ii)     The Manager, in his sole and absolute discretion, may use the capital accounts of any Member and any class or type of Membership Interest for purposes that it deems appropriate, including funding or investing in companies related or unrelated to the Company subsidiary associated with a particular type of Membership Interest, and no interest or other benefits shall accrue to the Member whose capital account is so used.

       (iii)     Distributions made pursuant to this Section IV E will be calculated separately for each Interest and will be distributed to the Members participating in that Interest based on their respective Interest, as applicable.

       (iv)     The Members agree to be bound by all the provisions of this Section IV in reporting their share of Company income and loss for income tax purposes.

F.     <u>Distributions upon Liquidation of the Company</u>.

10

JA2218

CONFIDENTIAL

MARTORELLO_000308

(i)      At the termination of the Company and after the Company has satisfied or provided for the **satisfaction of all the Company's debts and other obligations, the Company's assets will be distributed to the** Members and any dissociated members whose interests have not been previously redeemed first, in discharge of their respective capital interests; and then, in proportion to the respective Membership Interest, as applicable. Assets will be distributed only to Members holding Equity Interests in the Company, unless so determined by the Manager in his sole and absolute discretion.

(ii)      If the Company lacks sufficient assets to make the distributions described in the foregoing paragraph, the Company will make distributions in proportion to the amount of the respective capital interest of the Members and any dissociated members whose interests have not been previously redeemed, and all in accordance with each **Member's respective Membership Interest**.

## SECTION V
## MANAGEMENT OF THE COMPANY

A.      The business and affairs of the Company shall be managed by or under the direction of the Manager, who may exercise all powers of the Company and do all such lawful acts and things as are not by statute, the Articles, or by this Agreement directed or required to be exercised and done by the Members having a right to vote.  The Manager of the Company shall be: <u>MBM Services, LLC</u>.

B.      Without prejudice to such general powers, but subject to the same limitations, it is hereby expressly declared that the Manager shall have the following powers:

(i)      to conduct, manage and control the business and affairs of the Company and to make such rules and regulations therefor not inconsistent with the law, the Articles or this Agreement, as the Manager shall deem to be appropriate;

(ii)      to appoint and remove at his pleasure the Officers (if any), agents and employees of the Company, prescribe their duties and fix their compensation;

(iii)      to appoint boards or committees in accordance with Section K of this Article.

(iv)      to borrow money and incur indebtedness for the purposes of the Company, and to cause to **be executed and delivered therefor, in the Company's name, promissory notes, bonds, debentures, deeds of** trust, mortgages, pledges, hypothecations, or other evidences of debt and securities therefor;

(v)      to amend this Agreement, with the consent of the Members holding 51% of the Class A Voting Interests;

(vi)      to make all other arrangements and do all things which are necessary or convenient to the conduct, promotion or attainment of business, purposes or activities of the Company.

C.      The Manager shall hold office until his successor is elected and qualified, or his earlier death, dissolution, resignation or removal.

D.      A vacancy in the Manager shall be deemed to exist in case of the death, dissolution, resignation or removal of a Manager, if the authorized number of Managers is increased, or if the Members fail, at any meeting of Members at which any Manager or Managers are to be elected by those Members with Class A Voting Interest, to elect the full authorized number of Managers to be voted for at such meeting.  Unless the Members shall have elected a Manager to fill a vacancy, vacancies may be filed by (i) a majority of the Managers then in office, whether or not less than a quorum, or by a sole remaining Manager, or (ii) failing the election of a Manager pursuant to clause (i), by the Members with Class A Voting Interest.

11

CONFIDENTIAL

JA2219

MARTORELLO_000309

E.      Any Manager may be removed, with or without cause, by the vote of Members holding not less than a majority of Class A Voting Interests represented and voting at a duly held meeting at which a quorum is present (which Members voting affirmatively also constitute at least a majority of the required quorum), or, in lieu of a meeting, by way of written consent of Members holding fifty-one percent (51%) of the Class A Voting Interests.

F.      No Manager shall receive any compensation for serving as a Manager, except that (i) a Manager shall receive such compensation as is otherwise determined by the Members holding Class A Voting Interest, and (ii) a Manager shall be reimbursed for reasonable and necessary expenses.

G.      Except as expressly set forth in this Agreement or required by law, no Manager shall be personally liable for any debt, obligation or liability of the Company, whether arising in contract, tort or otherwise, solely by reason of being a Manager of the Company.

H.      <u>Compensation and Fees</u>.

        (i)      No Member shall be paid any fee or other compensation whatsoever for services as a Manager or otherwise, whether ordinary or extraordinary, foreseen or unforeseen, rendered to or for the benefit of the Company, except as otherwise provided in this Section.

        (ii)      The Manager shall be paid such compensation for his services as shall be set forth by the majority holders Class A Voting Interest.

I.      <u>Certain Related Party Transactions Permitted</u>.  The Company may (i) employ or retain a Member or a person directly or indirectly related to or affiliated with an Member to render or perform a service on behalf of the Company, and/or (ii) contract to purchase property from a Member or a person directly or indirectly related to or affiliated with a Member, provided that the charges made for services rendered and materials furnished by such Member, person or persons must be reasonable and competitive with those charged by others in the same line of business and not so related.

J.      <u>No Resignation</u>.  Except pursuant to an authorized transfer of its entire Membership Interest in accordance with this Agreement, no Member shall have the right to resign from the Company as a Member prior to the dissolution and winding up of the Company without the prior written consent of the Manager. Any Member which purports to resign from the Company in violation of the foregoing provision or which has ceased for any reason to be a Member shall be liable to the Company and the other Members for any damages sustained by reason of such resignation or cessation.

K.      <u>Boards and Committees</u>. The Manager may appoint individuals to serve on boards or committees to **assist the Manager in overseeing certain aspects of the Company's operations, including but not limited to appointing a board to oversee the Company's** legal and regulatory compliance. The manner of functioning of said boards and committees will be as set forth by the Manager in a separate written resolution.

L.      <u>Indemnity</u>. Neither the Manager nor any of **the Company's officers, directors, partners, employe**es, agents, affiliates, successors or assigns shall be liable to the Company or the Members for any loss or damage incurred by reason of any act performed or omitted in connection with the activities of the Company or in dealing with third parties on behalf of the Company, unless such act or omission was taken or omitted by such Manager or such other persons as noted above, in bad faith, and such act or omission constitutes fraud, gross negligence or willful breach of fiduciary duty.

The Company, its receiver or its trustee, shall indemnify and save harmless the Manager and its officers, directors, partners, employees, agents, Affiliates, successors and assigns, including any guarantors of Company

12

JA2220

CONFIDENTIAL

MARTORELLO_000310

obligations (each of the foregoing being a "Covered Person"), from any claim, liability, loss, judgment or damage incurred by them by reason of any act performed or omitted to be performed in connection with the activities of the Company or in dealing with third parties on behalf of the Company, including costs and attorneys' fees (which attorneys' fees may be paid as incurred) and any amounts expended in the settlement of any claims of liability, loss or damage provided that the act or omission of the Covered Person is not found by a final, non-appealable ruling of a court of competent jurisdiction to have resulted from an act or omission of the Covered Person taken in bad faith and that constitutes fraud, gross negligence or willful breach of fiduciary duty by the Covered Person. The Company shall advance all sums required to indemnify and hold each Covered Person harmless as provided herein from the initiation of any claim against such Covered Persons, subject to acknowledgment in writing by such Covered Person of the obligation to reimburse the Company in the event that, following the entry of a final, non-appealable judgment, it is determined that the Company was not obligated to indemnify such Person pursuant to this Agreement. All judgments against the Company and a Covered Person, wherein the Covered Person is entitled to indemnification, must first be satisfied from Company assets before the Covered Person shall be responsible for such obligations. The Company shall not pay for any insurance covering liability of a Covered Person for actions or omissions for which indemnification is not permitted hereunder; provided, that nothing contained herein shall preclude the Company from purchasing and paying for such types of insurance, including extended coverage liability and casualty and worker's compensation, as would be customary for any person owning comparable property and engaged in a similar business or from naming the Manager and any Covered Person as additional insured parties thereunder. The provisions of this Section shall survive the termination of the Company.

## SECTION VI
## MEETING OF MEMBERS

A.      Meetings and Voting. Notwithstanding anything to the contrary herein, only Members owning Class A Voting Interests in the Company, which confer voting rights, shall be entitled to vote with regards to any issue concerning the Company. Neither an assignee nor transferee may vote any Class A Voting Interest unless such assignee or transferee is admitted as a Member with voting rights. Furthermore, Members who only hold Economic Interests or Equity Interests in the Company shall not be entitled to vote on any issues concerning the Company.

B.      Special Meetings. Special meetings of the Members may be called at any time by the Manager and shall be called at the written request of the holders of a majority of the Class A Voting Interest then outstanding and entitled to vote thereat. The meeting may be dispensed with if all Members who would have been entitled to vote on such action if such meeting was held consent in writing to the action to be taken.

C.      Place of Meetings. All meetings of the Members shall be held in the Commonwealth of Puerto Rico at the principal office of the Company, or at such other places as shall be designated in the notices or waivers of notice of such meetings and may be held telephonically.

D.      Notice of Meetings.

        (i)      Except as otherwise provided by statute, written notice of each meeting of the Members, stating the time when and the place where it is to be held, shall be served either personally, by mail, or by email or other electronic communication,, not less than ten (10) or more than fifty (50) days before the meeting, upon each Member of record entitled to vote at such meeting, or the Member's designated agent, and to any other member to whom the giving of notice may be required by law. Notice of a meeting shall also state the purpose or purposes for which the meeting is called, and shall indicate that it is being issued by, or at the direction of, the person or persons calling the meeting. If mailed, such notice shall be directed to each such Member entitled to vote at the Member's address as it appears on the records of the Members of the Company, unless he or she has previously notified the Manager of the Company in writing that notices intended for the Member to be

13

JA2221

MARTORELLO_000311

mailed to the **Member's agent and/or some other address, in which case, it shall be mailed to the person and** address designated in such request.

(ii)    Notice of any meeting need not be given to any person who may become a Member of record after the mailing of such notice and prior to the meeting, or to any Member who attends such meeting in person or by proxy, or to any Member who, in person or by proxy, submits a signed waiver of notice either before or after such meeting. Holders of non-voting Classes of Membership Interest shall only be permitted to attend Member meetings if they receive advance written permission of the Manager, which permission the Manager may withhold in his sole discretion.

(iii)    Whenever the vote of the Members at a meeting thereof is required or permitted to be taken in connection with any Company action, by any Section of this Agreement, the meeting and vote of the Members may be dispensed with, if all other Members who would have been entitled to vote upon the action if such meeting were held, shall consent in writing to such Company action being taken.

(iv)    Whenever any notice is required to be given under the provisions of this Section, or under the provisions of the Articles, a waiver thereof in writing, signed by the person or persons entitled to said notice, whether before or after the time stated in said notice, shall be deemed equivalent thereto.

E.    <u>Quorum</u>.   Except as otherwise provided herein, or by the applicable provisions of the Delaware Code, or in the Articles, at all meetings of the Members of the Company, the presence at the commencement of such meetings in person or by proxy of any number of Members holding of record a majority of the total number of the Class A Voting Interests of the Company then issued and outstanding and entitled to vote shall be necessary and sufficient to constitute a quorum for the transaction of any business.  The withdrawal of any Member holding Class A Voting Interests after the commencement of a meeting shall have no effect on the existence of a quorum after a quorum has been established at such meeting.

F.    <u>Voting</u>.

(i)    Except as otherwise provided by the Articles, any Company action to be taken by vote of the Members shall be authorized by a majority of votes cast at a meeting of Members at which a quorum is present by the holders of Class A Voting Interest.

(ii)    Each Member entitled to vote or to express consent or dissent without a meeting, may do so by proxy; provided, however, that the instrument authorizing such proxy to act shall have been executed in writing by the Member or the Member's attorney in fact thereunto duly authorized in writing.  No proxy shall be valid after expiration of eleven (11) months from the date of its execution, unless the person executing same directs in said proxy that it shall continue in force for a longer period of time.  Such instrument shall be exhibited to the Manager at the meeting and shall be filed with the records of the Company.

(iii)    Class A Voting Interest registered in the name of another entity, if entitled to be voted, may be voted by the President (or the equivalent) of said entity or a proxy appointed by the President of such other entity, unless some other person has been appointed to vote such shares pursuant to a by-law or a resolution of the board of directors (or the equivalent) of such other entity, in which case such person may vote such Class A Voting Interest. Any fiduciary may vote Class A Voting Interest registered in the name of such entity as such fiduciary, either in person or by proxy.

(iv)    Any resolution in writing, signed by all the Class A Voting Interest, shall be and constitute action by such members to the effect therein expressed, with the same force and effect as if the same had been duly passed by fifty-one percent (51%) of the Class A Voting Interests at a duly called meeting of members of such resolution.

14

JA2222

CONFIDENTIAL

MARTORELLO_000312

## SECTION VII
## EXCULPATION OF LIABILITY; INDEMNIFICATION

A. <u>Liability of Members to the Company and One Another</u>.  No Member shall be liable for the debts, liabilities, contracts, or any other obligation of the Company, except to the extent expressly provided herein or under Delaware law, or as expressly provided otherwise.  No Member shall be liable for the debts or liabilities of any other Member.  With respect to the Company and its business and the enterprise established by this Agreement, no Member shall be liable, responsible or accountable in damages or otherwise to the Company or any other Member for any act performed by it (i) within the scope of the authority conferred on it by this Agreement and in good faith; (ii) based on the good faith opinion of legal counsel or other appropriate expert; or (iii) otherwise made in good faith.

B. <u>Indemnification</u>.

(i)      Except as otherwise provided in this Section, the Company shall indemnify the Member and may indemnify any employee or agent of the Company who was or is a party or is threatened to be made a party to a threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, or investigative, and whether formal or informal, other than an action by or in the right of the Company, by reason of the fact that such person is or was an Member, employee or agent of the Company, against expenses, including attorneys**' fees, judgments, penalties, fines and amounts paid in settlement actually and reasonably** incurred by such person in connection with the action, suit or proceeding, if the person acted in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner that such person reasonably believed to be in the best interests of the Company and with respect to a criminal action or proceeding, if such person had no reasonable cause to believe such **person's conduct was** unlawful.

(ii)      To the extent that any Member, employee or agent of the Company has been successful on the merits or otherwise in defense of an action, suit or proceeding or in defense of any claim, issue or other matter in the action, suit or proceeding, such person shall be indemnified against actual and reasonable **expenses, including attorneys' fees, incurred by such person in connection with the action, suit or proceeding** and any action, suit or proceeding brought to enforce the mandatory indemnification provided herein.

(iii)      Any indemnification permitted under this Section, unless ordered by a court, shall be made by the Company only as authorized in the specific case upon a determination that the indemnification is proper under the circumstances because the person to be indemnified has met the applicable standard of conduct and upon an evaluation of the reasonableness of expenses and amounts paid in settlement. This determination and evaluation shall be made by a majority vote of the Members who are not parties or threatened to be made parties to the action, suit or proceeding. Notwithstanding the foregoing to the contrary, no indemnification shall be provided to any manager, employee or agent of the Company for or in connection with the receipt of a financial benefit to which such person is not entitled, voting for or assenting to a distribution to the Members in violation of this Agreement or the Act, or a knowing violation of law.

## SECTION VIII
## DISSOLUTION AND LIQUIDATION

A. <u>Dissolution</u>.  The Company shall dissolve and its affairs shall be wound up on the first to occur of the following:

(i)      The written consent of the Members holding at least fifty-one percent of the Class A Voting Interests;

JA2223

CONFIDENTIAL

MARTORELLO_000313

(ii)      The entry of a decree of judicial dissolution of the Company under Section 1801(4) of the Act or a judicial determination under Section 1805(5) of the Act.

(iii)      The sale of all or substantially all of the assets of the Company.

The death, insanity, retirement, resignation, expulsion, bankruptcy, or dissolution of any Member, or the occurrence of any other event that terminates the continued membership of a Member in the Company, shall not cause a dissolution of the Company.

B.      <u>Liquidation</u>.  On dissolution of the Company, the Manager shall act as liquidator.  The liquidator shall proceed diligently to wind up the affairs of the Company and make final distributions as provided herein and in the Act.  The costs of liquidation shall be borne as a Company expense.  Until final distribution, the liquidator shall continue to manage the Company with all of the power and authority of the Manager.

**SECTION IX**
**CONFIDENTIALITY; NON-DISCLOSURE; NON-SOLICITATION; AND NON-COMPETE**

Each Member of the Company shall be required to execute, prior to the issuance of any interest in the Company, a separate confidentiality, non-disclosure, non-solicitation and non-compete agreement.

**SECTION X**
**BOOKS AND RECORDS**

A.      <u>Access to Books and Records</u>.  Upon the written request stating the reason for such request of any holder of Class B or Class C Membership Interest for purposes reasonably related to the interest of that person as a Member, the Manager shall permit said Member the right, upon reasonable notice for the purposes reasonably related to the interest of the person as a Member, to (i) inspect during normal business hours any of the Company records maintained by the Company that were created on or after the date said Member acquired his/her Membership Interest; and (ii) obtain from the Manager, promptly after their becoming available, a copy of the Company's federal, state, and local income tax or information returns for each Fiscal Year.

B.      <u>No Access to Information</u>.  Notwithstanding any right of access to the books and records of the Company that may be applicable, under no circumstances shall any books or records be deemed to include any books and records concerning the information deemed to be covered by the agreements executed pursuant to Section IX, and all non-voting Classes and Interests hereby irrevocably waive any access whatsoever to any of said information.  All non-voting Classes and Interests hereby covenant and agree that it is unreasonable and otherwise improper under all circumstances to demand access to said information.

**SECTION XI**
**MISCELLANEOUS PROVISIONS**

A.      <u>Section Headings</u>.  The Section headings and numbers contained in this Agreement have been inserted only as a matter of convenience and for reference, and in no way shall be construed to define, limit or describe the scope or intent of any provision of this Agreement.

B.      <u>Severability</u>.  The invalidity or unenforceability of any particular provision of this Agreement shall not affect the other provisions hereof, and this Agreement shall be construed in all respects as if such invalid or unenforceable provisions were omitted.

16

JA2224

CONFIDENTIAL

MARTORELLO_000314

C.      Amendment.  This Agreement may be amended or revoked at any time, in writing, with the consent of the Manager or a vote of the Members holding fifty-one percent (51%) of the outstanding Class A Voting Interests. No change or modification to this Agreement shall be valid unless in writing and signed by the Manager or the Members entitled to vote.

D.      Binding Effect. Subject to the provisions of this Agreement relating to transferability, this Agreement will be binding upon and shall inure to the benefit of the parties, and their respective distributees, heirs, successors and assigns.

E.      Governing Law.  Regardless of the place where this Agreement may be executed by the Member, the rights and obligations of the Member, and any claims and disputes relating thereto, shall be subject to, governed by, construed and enforced in accordance with the laws of the State of Delaware.

F.      Power of Attorney.  Each Member hereby appoints the Manager to exercise the rights set forth in this Section XI F, acting individually, as the true and lawful representative of such Member and attorney-in-fact, in such Member's name, place and stead, to:

        (i)      Complete or correct, on behalf of such Member, all documents to be executed by such Member in connection with such Member's subscription for an Interest, including, without limitation, filling in or amending amounts, dates, and other pertinent information.

        (ii)      Make, execute, sign, acknowledge, swear to, and file: (i) any and all instruments, certificates, and other documents which may be deemed necessary or desirable to effect the winding-up and termination of the Company; (ii) any business certificate, fictitious name certificate, amendment thereto, or other instrument, agreement, or document of any kind necessary or desirable to accomplish the business, purpose and objectives of the Company, or required by any applicable federal, state, territorial, tribal or local law; (iii) any counterpart of this Agreement to be entered into pursuant to this Agreement and any amendment to which such Member is a signatory; (iv) any amendments to this Agreement; (v) all certificates and other instruments conforming with this Agreement that are necessary or appropriate to qualify, continue and terminate the Company as a foreign limited liability company in all such jurisdictions in which the Company may conduct its business; (vi) any and all certificates, documents, and other instruments necessary or desirable for purposes of applying to and complying with the Puerto Rico Department of Economic Development and Commerce tax incentives program; (vii) all other filings with agencies of the federal government, of any state, territorial, tribal or local government, or of any other jurisdictions, which the Manager considers necessary or desirable to carry out the purposes of this Agreement and the business of the Company.

        (iii)      This power of attorney granted pursuant to this Section XI F is a special power of attorney coupled with an interest and is irrevocable and shall survive the death, disability, or cessation of the existence as a legal entity of a Member; and shall survive the delivery of an assignment by a Member of the whole or any portion of its interest in the Company, except that, when the assignee thereof has been approved by the Manger for admission to the Company as a Member, the power of attorney shall survive the delivery of such assignment for the sole purpose of enabling the Manger to execute, acknowledge, and file any instrument necessary to effect such substitution.

G.      Waiver of Certain Rights.  All holders of non-voting Classes of Membership Interest irrevocably waive any right they may have to maintain any action for dissolution of the Company or for partition of the property of the Company.

H.      Arbitration.

        (i)      Any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled by arbitration administered by the American Arbitration Association in accordance with its

17

JA2225

CONFIDENTIAL

MARTORELLO_000315

Commercial Arbitration Rules, and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. The prevailing party shall recover its costs and expenses of arbitration and the collection of the award, including its reasonable attorney fees.

      (ii)     Solely upon agreement of the parties, the parties may dispense with administration by the American Arbitration Association and agree to self-administer any dispute or, alternatively, agree to have the dispute administered by any other agreed upon organization/tribunal and pursuant to any other agreed upon rules.

      (iii)     Any self-administered arbitration shall be conducted in English before an arbitrator chosen by the parties and who shall reside in the Commonwealth of Puerto Rico. Any certified mediator in Puerto Rico shall be deemed to have the minimum qualifications to arbitrate the dispute. The parties shall split the **arbitrator's fees, including any required** prepayment deposit. The arbitration shall be governed by the **Commercial Rules of the American Arbitration Association ("AAA") including the Fast Track/Expedited** Procedures except as modified herein. Within 10 days of the written notice and a demand for arbitration, the parties shall provide to each other the names of 3 persons residing in Puerto Rico, who would be acceptable as arbitrators. If the parties agree on any person, that person shall be chosen as the arbitrator. If the agreed upon person declines to act as the arbitrator for any reason, the parties shall have 5 days to submit alternate names. If the parties are unable to agree on an arbitrator within 25 days of the written notice and demand for arbitration, either party may proceed with AAA administered arbitration pursuant to clause (a) above. If an arbitrator is agreed upon, the final arbitration hearing shall commence within 120 days of the arbitrator being chosen. The arbitrator shall hold an initial hearing, which may be held telephonically, and shall enter a scheduling order. The parties may, but are not required, to mediate the case prior to the final hearing. The parties may modify these rules to the extent there is agreement by the parties to do so. The decision of the arbitrator shall be final and binding. Judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.

I.    <u>Entire Agreement</u>.   This Agreement, including Schedules, supersedes all previous Operating Agreements entered into by the Company.

[SIGNATURES TO FOLLOW ON SCHEDULE A]

18

JA2226

MARTORELLO_000316

**SCHEDULE A**
**OF**
**THE AMENDED AND RESTATED OPERATING AGREEMENT**
**OF**
**BELLICOSE CAPITAL, LLC**

**MEMBER LISTING/INTEREST/PERCENTAGE INTEREST**

| Interest | Voting Interest | Date Issued | Economic Interest | Date Issued | Equity Interest | Date Issued |
|---|---|---|---|---|---|---|
| **Class A Membership Interest: Member:** | | | | | | |
| Alpha Tau Capital, LLC | 1,000 Units (100%) | 1/1/2014 | 700 Units (70%) | 1/1/2014 | 1,000 Units (100%) | 1/1/2014 |
| MBM Services, LLC | 0 Units (0%) | | 300 Units (30%) | 1/1/2014 | 0 Units (0%) | |
| **Class B Membership Interest: Member:** | | | | | | |
| Alpha Tau Capital, LLC | N/A | | 600 Units (60.0%) | 1/1/2014 | 855 Units (85.5%) | 1/1/2014 |
| MBM Services, LLC | N/A | | 255 Units (25.5%) | 1/1/2014 | 0 Units (0%) | |
| Justin Martorello | N/A | | 100 Units (10.0%) | 1/1/2014 | 100 Units (10.0%) | 1/1/2014 |
| Brian McFadden | N/A | | 15 Units (1.5%) | 7/1/2014 | 15 Units (1.5%) | 7/1/2014 |
| James Dowd | N/A | | 15 Units (1.5%) | 7/1/2014 | 15 Units (1.5%) | 7/1/2014 |
| Simon Liang | N/A | | 15 Units (1.5%) | 7/1/2014 | 15 Units (1.5%) | 7/1/2014 |
| **Class C Membership Interest: Member:** | | | | | | |
| Alpha Tau Capital, LLC | N/A | | 800 Units (80%) | 1/1/2014 | 800 Units (80%) | 1/1/2014 |
| Justin Martorello | N/A | | 200 Units (20%) | 1/1/2014 | 200 Units (20%) | 1/1/2014 |

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement on and as of the date first above written.

ACCEPTED AND AGREED:


By: _____          By: _____
Name: Alpha Tau Capital                Name: MBM Services, LLC
By the President of its Manager, Matt Martorello    By its President, Matt Martorello
Title:  Class A, B & C Member          Title: Class A & B Member


By: _____          By: _____
Name: Justin Martorello                Name: Brian McFadden
Title:  Class B & C Member              Title: Class B Member

19

JA2227

MARTORELLO_000317

By: _____          By: _____
Name: James Dowd                     Name: Simon Liang
Title:  Class B Member               Title: Class B Member

20

JA2228

CONFIDENTIAL                                          MARTORELLO_000318

**SCHEDULE A**
**OF**
**THE AMENDED AND RESTATED OPERATING AGREEMENT**
**OF**
**BELLICOSE CAPITAL, LLC**

**MEMBER LISTING/INTEREST/PERCENTAGE INTEREST**

| Interest | Voting Interest | Date Issued | Economic Interest | Date Issued | Equity Interest | Date Issued |
|---|---|---|---|---|---|---|
| Class A Membership Interest: Member: | | | | | | |
| Alpha Tau Capital, LLC | 1,000 Units (100%) | 1/1/2014 | 700 Units (70%) | 1/1/2014 | 1,000 Units (100%) | 1/1/2014 |
| MBM Services, LLC | 0 Units (0%) | | 300 Units (30%) | 1/1/2014 | 0 Units (0%) | |
| | | | | | | |
| Class B Membership Interest: Member: | | | | | | |
| Alpha Tau Capital, LLC | N/A | | 600 Units (60.0%) | 1/1/2014 | 855 Units (85.5%) | 1/1/2014 |
| MBM Services, LLC | N/A | | 255 Units (25.5%) | 1/1/2014 | 0 Units (0%) | |
| Justin Martorello | N/A | | 100 Units (10.0%) | 1/1/2014 | 100 Units (10.0%) | 1/1/2014 |
| Brian McFadden | N/A | | 15 Units (1.5%) | 7/1/2014 | 15 Units (1.5%) | 7/1/2014 |
| James Dowd | N/A | | 15 Units (1.5%) | 7/1/2014 | 15 Units (1.5%) | 7/1/2014 |
| Simon Liang | N/A | | 15 Units (1.5%) | 7/1/2014 | 15 Units (1.5%) | 7/1/2014 |
| | | | | | | |
| Class C Membership Interest: Member: | | | | | | |
| Alpha Tau Capital, LLC | N/A | | 800 Units (80%) | 1/1/2014 | 800 Units (80%) | 1/1/2014 |
| Justin Martorello | N/A | | 200 Units (20%) | 1/1/2014 | 200 Units (20%) | 1/1/2014 |

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement on and as of the date first above written.

ACCEPTED AND AGREED:

By: _____
Name: Alpha Tau Capital
By the President of its Manager, Matt Martorello
Title: Class A, B & C Member

By: _____
Name: MBM Services, LLC
By its President, Matt Martorello
Title: Class A & B Member

By: _____
Name: Justin Martorello
Title: Class B & C Member

By: _____
Name: Brian McFadden
Title: Class B Member

19

JA2229

CONFIDENTIAL

MARTORELLO_000319

SCHEDULE A
OF
THE AMENDED AND RESTATED OPERATING AGREEMENT
OF
BELLICOSE CAPITAL, LLC

MEMBER LISTING/INTEREST/PERCENTAGE INTEREST

| Interest | Voting Interest | Date Issued | Economic Interest | Date Issued | Equity Interest | Date Issued |
|---|---|---|---|---|---|---|
| Class A Membership Interest: Member: | | | | | | |
| Alpha Tau Capital, LLC | 1,000 Units (100%) | 1/1/2014 | 700 Units (70%) | 1/1/2014 | 1,000 Units (100%) | 1/1/2014 |
| MBM Services, LLC | 0 Units (0%) | | 300 Units (30%) | 1/1/2014 | 0 Units (0%) | |
| Class B Membership Interest: Member: | | | | | | |
| Alpha Tau Capital, LLC | N/A | | 600 Units (60.0%) | 1/1/2014 | 855 Units (85.5%) | 1/1/2014 |
| MBM Services, LLC | N/A | | 255 Units (25.5%) | 1/1/2014 | 0 Units (0%) | |
| Justin Martorello | N/A | | 100 Units (10.0%) | 1/1/2014 | 100 Units (10.0%) | 1/1/2014 |
| Brian McFadden | N/A | | 15 Units (1.5%) | 7/1/2014 | 15 Units (1.5%) | 7/1/2014 |
| James Dowd | N/A | | 15 Units (1.5%) | 7/1/2014 | 15 Units (1.5%) | 7/1/2014 |
| Simon Liang | N/A | | 15 Units (1.5%) | 7/1/2014 | 15 Units (1.5%) | 7/1/2014 |
| Class C Membership Interest: Member: | | | | | | |
| Alpha Tau Capital, LLC | N/A | | 800 Units (80%) | 1/1/2014 | 800 Units (80%) | 1/1/2014 |
| Justin Martorello | N/A | | 200 Units (20%) | 1/1/2014 | 200 Units (20%) | 1/1/2014 |

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement on and as of the date first above written.

ACCEPTED AND AGREED:

By: _____
Name: Alpha Tau Capital
By the President of its Manager, Matt Martorello
Title: Class A, B & C Member

By: _____
Name: MBM Services, LLC
By its President, Matt Martorello
Title: Class A & B Member

By: _____
Name: Justin Martorello
Title: Class B & C Member

By: _Brian McFadden_
Name: Brian McFadden
Title: Class B Member

19

JA2230

CONFIDENTIAL

By: _____
Name: James Dowd
Title:  Class B Member

By: _____
Name: Simon Liang
Title: Class B Member

JA2231

CONFIDENTIAL

MARTORELLO_000321

SCHEDULE A
OF
THE AMENDED AND RESTATED OPERATING AGREEMENT
OF
BELLICOSE CAPITAL, LLC

MEMBER LISTING/INTEREST/PERCENTAGE INTEREST

| Interest | Voting Interest | Date Issued | Economic Interest | Date Issued | Equity Interest | Date Issued |
|---|---|---|---|---|---|---|
| Class A Membership Interest: Member: | | | | | | |
| Alpha Tau Capital, LLC | 1,000 Units (100%) | 1/1/2014 | 700 Units (70%) | 1/1/2014 | 1,000 Units (100%) | 1/1/2014 |
| MBM Services, LLC | 0 Units (0%) | | 300 Units (30%) | | 0 Units (0%) | |
| Class B Membership Interest: Member: | | | | | | |
| Alpha Tau Capital, LLC | N/A | | 600 Units (60.0%) | 1/1/2014 | 855 Units (85.5%) | 1/1/2014 |
| MBM Services, LLC | N/A | | 255 Units (25.5%) | 1/1/2014 | 0 Units (0%) | |
| Justin Martorello | N/A | | 100 Units (10.0%) | 1/1/2014 | 100 Units (10.0%) | 1/1/2014 |
| Brian McFadden | N/A | | 15 Units (1.5%) | 7/1/2014 | 15 Units (1.5%) | 7/1/2014 |
| James Dowd | N/A | | 15 Units (1.5%) | 7/1/2014 | 15 Units (1.5%) | 7/1/2014 |
| Simon Liang | N/A | | 15 Units (1.5%) | 7/1/2014 | 15 Units (1.5%) | 7/1/2014 |
| Class C Membership Interest: Member: | | | | | | |
| Alpha Tau Capital, LLC | N/A | | 800 Units (80%) | 1/1/2014 | 800 Units (80%) | 1/1/2014 |
| Justin Martorello | N/A | | 200 Units (20%) | 1/1/2014 | 200 Units (20%) | 1/1/2014 |

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement on and as of the date first above written.

ACCEPTED AND AGREED:

By: _____
Name: Alpha Tau Capital
By the President of its Manager, Matt Martorello
Title:  Class A, B & C Member

By: _____
Name: MBM Services, LLC
By its President, Matt Martorello
Title: Class A & B Member

By: _____
Name: Justin Martorello
Title:  Class B & C Member

By: _____
Name: Brian McFadden
Title: Class B Member

19

JA2232

CONFIDENTIAL

MARTORELLO_000322

By: _____
Name: James Dowd
Title: Class B Member

By: _____
Name: Simon Liang
Title: Class B Member

JA2233

CONFIDENTIAL

MARTORELLO_000323

# Exhibit 61

# Filed Under Seal

JA2234

# Exhibit 62

# Filed Under Seal

# Exhibit 63

# Filed Under Seal

1

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF VIRGINIA
 2                   RICHMOND DIVISION

 3   _____
                                   )
 4   LULA WILLIAMS, et al.         )
                                   )
 5   v.                            )    Civil Action No.:
                                   )    3:17 CV 461
 6   BIG PICTURE LOANS, LLC, et al.)
     _____)
 7                                      June 7, 2023

 8
                         DAY 1
 9          COMPLETE TRANSCRIPT OF HEARING
            BEFORE THE HONORABLE ROBERT E. PAYNE
10          UNITED STATES DISTRICT COURT JUDGE

11

12   APPEARANCES:

13   Leonard Anthony Bennett, Esquire
     CONSUMER LITIGATION ASSOCIATES
14   763 J. Clyde Morris Boulevard, Suite 1A
     Newport News, VA 23601
15
     Kristi C. Kelly, Esquire
16   Andrew J. Guzzo, Esquire
     Casey S. Nash, Esquire
17   James Patrick McNichol, Esquire
     KELLY GUZZO, PLC
18   3925 Chain Bridge Road, Suite 202
     Fairfax, VA 22030
19
              Counsel on behalf of the Plaintiffs
20

21

22

23

24             TRACY J. STROH, RPR
              OFFICIAL COURT REPORTER
25          UNITED STATES DISTRICT COURT
```

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 357 of 503
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 2 of 214 PageID# 56739

2

```
 1  APPEARANCES (CONTINUED):

 2  Bethany D. Simmons, Esquire
    LOEB & LOEB LLP
 3  345 Park Avenue
    New York, NY 10154
 4
    John David Taliaferro, Esquire
 5  LOEB & LOEB LLP
    901 New York Ave NW, Suite 300 East
 6  Washington, DC 20001

 7  Bernard Robert Given, II, Esquire
    LOEB & LOEB LLP
 8  10100 Santa Monica Boulevard, Suite 2200
    Los Angeles, CA 90067
 9
               Counsel on behalf of the Defendant
10             Matt Martorello

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    (The proceeding commenced at 10:36 a.m.)

 2                    THE CLERK:  Case number 3:17 CV 461, Lula

 3     Williams, et al. v. Big Picture Loans, LLC, et al.

 4                    The plaintiffs are represented by Leonard

 5     Bennett, Kristi Kelly, Andrew Guzzo, Casey Nash, and

 6     J. Patrick McNichol.

 7                    The defendant, Matt Martorello, is represented

 8     by John Taliaferro, Bernard Given II, and Bethany Simmons.

 9                    Are counsel ready to proceed?

10                    MR. GUZZO:  Plaintiffs are ready to proceed,

11     Your Honor.

12                    MR. TALIAFERRO:  Defendant is ready to proceed,

13     Your Honor.

14                    THE COURT:  All right.  In reviewing the papers,

15     it seems to me that a threshold question that will help

16     resolve all of -- a lot of the motions -- there are two of

17     those.  One is what law applies, and the other is the

18     availability of -- however couched -- mistake of law/good

19     faith defense.

20                    So I wonder if that's not the first thing to

21     take up is what law we're talking about.

22                    MR. GUZZO:  Your Honor, the plaintiffs agree

23     with that, both of those assessments.

24                    MR. TALIAFERRO:  Your Honor, we agree with that

25     as well.  We think that a number of these would be
```

 1    resolved by addressing those two issues.

 2           I think --

 3           THE COURT:  Come over here.  I can't hear you

 4    very well.  Sorry.  It's easier to hear him because he's

 5    straight, but you're -- I don't know what the acoustics

 6    are in this place, but different.

 7           MR. TALIAFERRO:  We agree with that order,

 8    Your Honor.

 9           I don't know if Mr. Guzzo has a preferred manner

10    of presenting that, but those issues are teed up in their

11    motion for summary judgment to which --

12           THE COURT:  Well, it's teed up in a lot of

13    papers, and so I need first to identify the papers from

14    each of you as to which that issue is implicated.  So

15    let's try that first.

16           MR. TALIAFERRO:  Understood, Your Honor.

17           THE COURT:  All right.  We have -- so we'll deal

18    with the applicable law issue.  But we need to define what

19    applicable law means as it is being -- as it has been

20    briefed.  And the applicable law issue, as I understand

21    it, is what law governs the validity of the notes, the

22    loans?  Is it tribal law or is it Virginia law?

23           Is that right?  Is that what the basic issue is?

24           MR. GUZZO:  Your Honor, we believe that is the

25    threshold issue before the Court and the most critical

USCA4 Appeal: 23-2097   Doc: 11-5   Filed: 12/06/2023   Pg: 360 of 503
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 5 of 214 PageID# 56742

5

1   one.

2           THE COURT:  Do you agree?

3           MR. TALIAFERRO:  We do agree, Your Honor.

4           THE COURT:  Okay.  All right.  So the law

5   governing the loans, tribal or Virginia.

6           Now, which of your motions call that issue into

7   assessment, Mr. Guzzo?

8           Give me the brief name and the ECF number of the

9   motion.  I don't need all the briefs and all that.  Just

10  which ones.

11          MR. GUZZO:  The docket ECFs for our motion is

12  Docket 1165, which is entitled Plaintiffs' Motion for

13  Partial Summary Judgment, and then the memorandum in

14  support is ECF --

15          THE COURT:  No.  I just need the motion.

16          MR. GUZZO:  Okay.

17          THE COURT:  Any other motion that is pending,

18  motion in limine, any other motion that is pending on your

19  side that implicates the question of applicable law?

20          MR. GUZZO:  Also ECF 1246.  Motions in limine 2

21  and 3 deal with this issue directly as well, Your Honor.

22          MR. BENNETT:  1174.

23          MR. GUZZO:  Sorry, Your Honor.  I apologize.

24  1174.

25          THE COURT:  Not 1246?

```
 1                    MR. GUZZO:  Correct.

 2                    THE COURT:  Huh?

 3                    MR. GUZZO:  Yeah, not 1246.  I misspoke.  Sorry.

 4                    THE COURT:  All right.

 5                    And from your side, then, that is it on that

 6   point?

 7                    MR. GUZZO:  Yes, Your Honor.

 8                    THE COURT:  We'll get -- all right, sir.

 9                    THE CLERK:  Judge, I believe 1174 is the

10   memorandum in support to the motion in limine.

11                    The motion itself is 1173.

12                    MR. BENNETT:  That's correct.

13                    THE COURT:  Thank you, Ms. Brown.

14                    All right.

15                    Now, you go by Taliaferro, don't you?

16                    MR. TALIAFERRO:  Yes, sir.

17                    THE COURT:  Not Taliaferro.

18                    MR. TALIAFERRO:  Yes, sir.

19                    THE COURT:  I don't know which branch of your

20   family goes by which one, but you confuse me every time I

21   have to deal with one of you.

22                    MR. TALIAFERRO:  I apologize.  It was not my

23   choice.

24                    THE COURT:  It wasn't your choice, and none of

25   that is of your making, is it?
```

USCA4 Appeal: 23-2097   Doc: 11-5   Filed: 12/06/2023   Pg: 362 of 503
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 7 of 214 PageID# 56744

7

 1                    MR. TALIAFERRO:  It is not.

 2                    THE COURT:  All right.  Mr. Taliaferro, from

 3    your side, what are the motions that --

 4                    MR. TALIAFERRO:  Our opposition to their motion

 5    for summary judgment is Docket 1218.

 6                    THE COURT:  How about your motion?  Is there

 7    any of your -- and then your oppositions to 2 and 3, their

 8    motions in limine, but your affirmative motions is what I

 9    was getting at.

10                    MR. TALIAFERRO:  Not on the choice of law issue.

11                    THE COURT:  Okay.  All right.

12                    MR. TALIAFERRO:  We have the good faith

13    statement on the good faith defense, but --

14                    THE COURT:  Okay.  We'll get to this in just a

15    minute.

16                    MR. TALIAFERRO:  Not our affirmative motions,

17    but our opposition to their motion for summary judgment is

18    1218.

19                    THE COURT:  Yeah.  And then you oppose motion in

20    limine --

21                    MR. TALIAFERRO:  We oppose the motion in

22    limine --

23                    THE COURT:  I don't have a list right here of

24    which you opposed and which you didn't.  I thought I had

25    it, but I don't have it.

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 363 of 503
Case 3:17-cv-00461-REP  Document 1316  Filed 06/15/23  Page 8 of 214 PageID# 56745

8

```
 1              MR. TALIAFERRO:  We did oppose the two that

 2   Mr. Guzzo --

 3              THE COURT:  Two and 3.

 4              MR. TALIAFERRO:  Two and 3.

 5              THE COURT:  All right.

 6              MR. TALIAFERRO:  And I believe that's at

 7   Docket 1255.

 8              THE COURT:  Now, we need to also know -- the

 9   question presents itself, in your papers, the use of three

10   phrases:  Good faith defense, mistake of law, and advice

11   of counsel.

12              Now, all of them are wrapped up in what I

13   understand is a mistake of law question.  I don't know

14   that there's really a separate analytical structure

15   looking at the issues, given the way that you all have

16   briefed them.  They seem to me to be all of one piece, and

17   that is can he -- the defendant assert a mistake of law

18   defense.  Am I correct in the way I've read those papers?

19              MR. TALIAFERRO:  You are correct, Your Honor.

20              I would add one nuance to that, which is if the

21   Court finds that there is a willfulness or knowing element

22   to the RICO claims, then we would further assert that that

23   is an element to which those matters can be raised as a

24   defense to the scienter requirement.

25              THE COURT:  All right.  Now, tell me this.  In
```

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 364 of 503
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 9 of 214 PageID# 56746

9

 1   which of the papers that you have filed calling for

 2   decision; i.e., motions, is the mistake of law defense --

 3   apart from the scienter requirement for RICO, which is --

 4   where is the mistake of law defense called for decision in

 5   your papers, your motions?

 6                   MR. TALIAFERRO:  If I could have just one

 7   minute, Your Honor.

 8                   THE COURT:  Sure.

 9                   To begin with, I'm talking about where you have

10   called upon the Court for a decision by filing a motion

11   that necessitates confronting these questions.

12                   Yes.

13                   MR. TALIAFERRO:  So, Your Honor, we would submit

14   that that's raised in three briefs.

15                   THE COURT:  Briefs or motions?

16                   MR. TALIAFERRO:  Not in -- not in motions here

17   today.

18                   THE COURT:  We're not going to hear your summary

19   judgment motions.

20                   MR. TALIAFERRO:  I understand that.

21                   THE COURT:  That's 1254 and 55 is your brief.

22                   MR. TALIAFERRO:  Correct.

23                   THE COURT:  So what of the motions that are

24   present today do we have from your side that present --

25   leave the RICO/scienter off the list for right now, we'll

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 365 of 503
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 10 of 214 PageID# 56747

10

 1  get to that in a minute -- raise the question of mistake

 2  of law, good faith, advice of counsel?

 3           MR. TALIAFERRO:  So those are raised in

 4  oppositions to plaintiffs' motions that are on docket for

 5  today.  They're not raised in motions that we have

 6  filed --

 7           THE COURT:  All right.

 8           MR. TALIAFERRO:  -- today.

 9           THE COURT:  I'll get to the plaintiffs' motions,

10  then.

11           All right.  And then the scienter requirement,

12  where is that raised other in the summary judgment motion?

13           MR. TALIAFERRO:  It is raised in our opposition

14  to their omnibus motion in limine.  That's 1205.

15           THE COURT:  You've relayed -- their omnibus

16  motion has a series of them.  Which of the motions in

17  limine within there does this point relate?  That is,

18  their motion is 1173, and it has something like 15

19  motions, or something in it.

20           MR. TALIAFERRO:  It is their number 5.

21           THE COURT:  Five.

22           MR. TALIAFERRO:  So it is our opposition to

23  their number 5.

24           THE COURT:  All right.  Okay.  Now I need to get

25  the plaintiffs' recitation.  Thank you.  And then --

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 366 of 503
Case 3:17-cv-00461-REP    Document 1316    Filed 06/15/23    Page 11 of 214 PageID# 56748

11

```
 1              MR. TALIAFERRO:  Then I -- just to add, we have
 2   filed the statement of good faith.
 3              THE COURT:  And what is that?
 4              MR. TALIAFERRO:  That is number 1261.
 5              THE COURT:  That statement of good faith is the
 6   one I asked you to put together all the evidence at one
 7   place.  That's what you're short-forming that to?
 8              MR. TALIAFERRO:  Yes, Your Honor.
 9              THE COURT:  And that number is what?
10              MR. TALIAFERRO:  1261.
11              THE COURT:  1261.  All right.  Thank you.
12              All right, Mr. Guzzo.  From your standpoint,
13   where does the mistake of law come in in your motions in
14   limine?
15              MR. GUZZO:  We agree with what
16   Mr. Taliaferro said, Your Honor.  It's primarily addressed
17   in motion in limine number 5.
18              THE COURT:  Well, now, you know you see there.
19   That's what you call a qualifier, that little one word.
20   And then you get to the Court of Appeals, and you say,
21   Well, he decided the primary, but he didn't look at the
22   secondary, the tertiary, the quadrennium.
23              Is it in anything other than 5?
24              MR. GUZZO:  No, Your Honor.  I believe it
25   touches on some of the other issues in the case, but the
```

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 367 of 503
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 12 of 214 PageID# 56749

12

 1  legal argument that it's not available, as well as the

 2  reasons why, are adequately and completely briefed in

 3  number 5.

 4          THE COURT:  Well, they are also, in my view,

 5  implicated in the motions in limine of all the experts.

 6          MR. GUZZO:  That's correct.

 7          THE COURT:  Because all the experts talk

 8  about -- are offered really for the purpose of a good

 9  faith defense.

10          MR. GUZZO:  That's correct, Your Honor.

11          THE COURT:  All right.  Now, the lynchpin of any

12  of these defenses -- mistake of law, good faith, advice of

13  counsel -- of course, is the testimony of Mr. Martorello

14  before the jury.

15          Is he going to testify?  Is it his plan to

16  testify on those topics?

17          If he is, I wish to say that I wish for you to

18  bring to his attention the fact that he already has been

19  found to have lied to this Court, and that's been affirmed

20  by the Fourth Circuit, and that he must be mindful that

21  doing that carries consequences.

22          And I want to make sure he understands that

23  he -- if he says something -- if he testifies, if it comes

24  to pass and it's not true, he's going to face the

25  consequences of it.

1              Have you told him that?

2              MR. TALIAFERRO:  We have advised him of that,

3    Your Honor.

4              THE COURT:  I don't need to know any more

5    details.  As long as you've advised him.

6              Is it his intent to testify?

7              MR. TALIAFERRO:  It is.

8              THE COURT:  All right.

9              MR. TALIAFERRO:  Plaintiffs subpoenaed him

10   yesterday, and he intends to comply with that suspect.

11             THE COURT:  Okay.  All right.  Thank you.

12             All right.  Let's deal with the applicable law

13   now first.

14             MR. GUZZO:  Good morning, Your Honor, and may it

15   please the Court.

16             I've prepared a PowerPoint today to aid in my

17   presentation.  Given that it's gone in a little bit

18   different direction, I'm going to just jump to the slides

19   that we're going to discuss right now, if that's all

20   right.

21             I also have a printed out copy for Your Honor

22   and his clerk.  If I could pass those up.

23             THE COURT:  I appreciate having one.  And you've

24   given them to the other side?  You've given them to the

25   other side?

```
 1              MR. GUZZO:  I have, yes, Your Honor.

 2              Just to begin on the "what law applies"

 3   question, Your Honor -- and I'm at the third slide in what

 4   I've presented to you.  I think it's important to begin by

 5   noting --

 6              THE COURT:  It's not numbered.  What do I do?

 7   Count pages?

 8              MR. GUZZO:  Sorry, Your Honor.

 9              THE COURT:  "The parties agree the Court must

10   determine the applicable law."  Is that what it is?

11              MR. GUZZO:  Yes.

12              THE COURT:  All right.

13              MR. GUZZO:  And then I'm just going to go

14   through the sequential slides here.

15              And I think it's important to begin by noting

16   that the parties have disagreed on a lot of the facts and

17   the law in that case, but there's one thing that we agree

18   on, and that agreement is that the Court must decide this

19   issue before trial.

20              Clipped in here to this PowerPoint is ECF 1205

21   at page 2, and this is Martorello's response to our

22   motions in limine.  And in here, he says, "The Court will

23   rule on the question of whether LVD's law or Virginia law

24   governs plaintiffs' loans prior to trial."

25              So there's no dispute this should go to the
```

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 370 of 503
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 15 of 214 PageID# 56752

15

 1  jury, that this question isn't a question of law for the

 2  Court to determine.

 3          In addition to that, Your Honor, I want to point

 4  out that in the most recent class action case that was

 5  about to go to trial, our firms represented the plaintiffs

 6  in that case in the Northern District of California.

 7          THE COURT:  Is that the *Brice* case?

 8          MR. GUZZO:  It is.  In that case, on the motion

 9  for partial summary judgment, the Court granted the

10  plaintiffs' motion in that case and found that California

11  law and not tribal law applied.  So there is some

12  persuasive authority certainly for the Court and that

13  supports the plaintiffs' position.

14          THE COURT:  What was the nature of the claim in

15  *Brice*?

16          MR. GUZZO:  It was very identical to this case,

17  Your Honor.

18          THE COURT:  Which count?

19          MR. GUZZO:  All counts.  It was a RICO 1962(c)

20  claim, a RICO 1962(d) claim, and an unjust enrichment

21  claim, and a usury claim.  And there was also the

22  California version of its UDAAP.  I forget the name of the

23  statute.  It was unfair competition, or something along

24  those lines, but those were the five counts at issue in

25  this case.

USCA4 Appeal: 23-2097   Doc: 11-5   Filed: 12/06/2023   Pg: 371 of 503
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 16 of 214 PageID# 56753

16

```
 1              THE COURT:  All right.

 2              MR. GUZZO:  So now turning to just the next

 3   slide, in determining which law applies, it's our position

 4   that there's two questions that need to be answered.  The

 5   first question is whether online lending constitutes

 6   off-the-reservation activity.  The reason why that is

 7   important is because the Supreme Court has held, and

 8   repeatedly reaffirmed, that state law applies to

 9   off-the-reservation conduct.

10              So in this case, if it's determined that the

11   transactions and the loans and the conduct at issue

12   constitutes off-reservation activity, then generally

13   applicable state laws would apply.  That general rule

14   could then be negated by an enforceable choice of law

15   provision.

16              So in order to determine what law applies, the

17   Court also needs to consider whether there's an

18   enforceable choice of law provision; in this case, the

19   tribal choice of law provision.  It's our position that

20   answering these questions is really easy in this case.

21              As to the first question, Your Honor, that

22   analysis begins and ends with the Fourth Circuit's

23   decision in *Hengle*.  And as to the second question, that

24   analysis begins and ends with Your Honor's decision in

25   this case and its affirmance by the Fourth Circuit on
```

1    appeal.

2              So beginning with the first question, I've

3    clipped into this slide Judge Novak's opinion from 2020,

4    in January.  And there is a specific section in that

5    opinion entitled "Plaintiffs' Loans Constitute

6    Off-Reservation Conduct Subject to State Law."  And in

7    that opinion, the tribe -- Judge Novak rejected an

8    identical argument to the one that Martorello is now

9    making before this Court.

10             That argument was that the tribal lending

11   entities approved loan applications on the tribe's

12   reservation, therefore, making it on-the-reservation

13   conduct not subject to state law.  That was the exact

14   argument in *Hengle*, and I believe it's the defendants a

15   position today.

16             Answering that argument on the next slide,

17   Judge Novak said, Even accepting the tribal officials'

18   contention that the plaintiffs' loans originated on the

19   reservation, that fact alone does not render the lending

20   activities wholly on-the-reservation conduct.

21             Instead, Judge Novak said the plaintiffs resided

22   on non-Indian lands when applying for their respective

23   loans, they executed their loan agreements and made

24   payments from Virginia, and in sum, the plaintiffs never

25   traveled to the reservation.

USCA4 Appeal: 23-2097   Doc: 11-5   Filed: 12/06/2023   Pg: 373 of 503
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 18 of 214 PageID# 56755

18

1          He then -- Judge Novak concluded, Such activity

2     proves directly analogous to lending activity that other

3     courts have clearly found -- that is, constitute --

4          THE COURT:  Did that case get appealed to the

5     Fourth Circuit?

6          MR. GUZZO:  It did, Your Honor.

7          THE COURT:  Did the Fourth Circuit affirm that

8     finding?

9          MR. GUZZO:  It did.  And two slides away is the

10    Fourth Circuit's affirmance of that decision.

11         And in doing that, the Fourth Circuit expressly

12    addressed this same argument.  And they noted that the

13    tribal officials were making the argument that it was

14    on-the-reservation conduct.  And the Fourth Circuit said,

15    The conduct alleged is not limited to where the parties

16    made and accepted the agreements.

17         It then goes on to do the same analysis that

18    Judge Novak did, that the plaintiffs never traveled to the

19    reservation, that the loans were marketed in Virginia,

20    accepted in Virginia, and applied in Virginia.

21         And so, Your Honor, we would submit that *Hengle*

22    controls on this question of at least the first inquiry of

23    does online lending activities constitute off- or

24    on-reservation conduct.

25         I'd also point out, Your Honor, there's no

JA2254

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 374 of 503
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 19 of 214 PageID# 56756

19

```
 1   conflicting authority.  Obviously, Your Honor, sitting in
 2   a District Court within the Fourth Circuit, is bound by
 3   Hengle.  But even Hengle went on to cite four cases that
 4   have expressly found this, too.  They're a couple slides
 5   down.  They are also in our briefing, Your Honor.  But I
 6   just wanted to point out there's absolutely no
 7   counter-authority on this point.
 8            THE COURT:  Where is the other cases cited by
 9   the Fourth Circuit?
10            MR. GUZZO:  There should be a slide you have
11   that says "No Conflicting Authority," beginning with the
12   Colorado v. W. Sky case.
13            THE COURT:  I see.
14            MR. GUZZO:  So that was the first federal case
15   to address this issue.  And it pretty much said exactly
16   what Hengle says, that the consumers don't travel to the
17   reservation, that they are made and collected in the
18   state.
19            The Otoe-Missouria decision, which Your Honor I
20   think is probably --
21            THE COURT:  Did the Second Circuit affirm that
22   aspect of the District Court's decision in Otoe-Missouria?
23            MR. GUZZO:  They did not affirm the District
24   Court's conclusion that it constituted off-the-reservation
25   activity because the Second Circuit said there was a lot
```

JA2255

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 375 of 503
Case 3:17-cv-00461-REP    Document 1316    Filed 06/15/23    Page 20 of 214 PageID# 56757

20

 1  of questions left to be addressed.  At times in the

 2  opinion, they hinted that they thought the District Court

 3  was correct, but they just said that because it came on a

 4  preliminary injunction --

 5            THE COURT:  They didn't decide it because it

 6  came on a preliminary injunction.

 7            MR. GUZZO:  Correct, Your Honor.  However, six

 8  years later --

 9            THE COURT:  So they had to decide that there was

10  a likelihood of success or no likelihood of success.

11            MR. GUZZO:  Correct.

12            Six years later, however, the Second Circuit did

13  decide this issue, and it was positively cited and adopted

14  by both Judge Novak and the Fourth Circuit in *Hengle*, and

15  that's in the *Gingras* case, Your Honor.

16            And I clipped into the slide the relevant

17  language from that case, and it says, "The tribal

18  defendants here engaged in conduct outside of Indian lands

19  when they extended loans to the plaintiffs in Vermont."

20            For that reason, they found that the plaintiffs

21  in that case could bring an *Ex parte Young* style case

22  against the tribal officials, just like the Fourth Circuit

23  found in *Hengle*.

24            The next slide, Your Honor, I just wanted to

25  point out is an e-mail from Mr. Martorello in October of

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 376 of 503
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 21 of 214 PageID# 56758

21

1  2013.  And this e-mail shows that ten years ago, he was

2  very familiar with the importance of this very issue.

3          In this e-mail, he's writing to Ms. Wichtman,

4  and he's discussing --

5          THE COURT:  What does his knowledge have to do

6  with this, given the argument that he doesn't -- there's

7  no knowledge, no scienter requirement?

8          MR. GUZZO:  It's just to prove --

9          THE COURT:  Are you bringing that into the case

10 now for me to decide on this issue?

11         MR. GUZZO:  No, Your Honor.  This is just to

12 show you that I think the position that he's taking before

13 the Court today is very different than something he knew

14 ten years ago, but it's completely irrelevant to your

15 decision.  So I'll skip it.

16         THE COURT:  All right.

17         MR. GUZZO:  And then finally on this point,

18 Your Honor, I just want to make it clear, there's no

19 dispute of material fact as to whether -- as to the issues

20 that we believe you need the facts to determine whether

21 it's on- or off-the-reservation activity.

22         Just a few items.  Exhibit 1 to our motion for

23 summary judgment is the servicing agreement, and that's at

24 ECF 1166-1.  And that servicing agreement establishes that

25 the enterprise is going to engage in Internet-based

1  lending.

2          Similarly, paragraph 140 of our statement of

3  material facts, Mr. Martorello answered undisputed to

4  that, and that fact was that the loan data that the tribe

5  produced in this case contains a field entitled "Loan

6  State," which signifies where the consumer resided at the

7  time the loan was originated.

8          Martorello's counter-statement of facts at 1218

9  also repeatedly acknowledges that the loans are made

10 online.  That's at paragraphs 3, 7, 28, 35, and 60.

11         And Martorello also submitted a declaration in

12 this case, a copy of which is at ECF 106-1, that

13 repeatedly characterizes the activities as online lending

14 activities.

15         I don't think they're going to make a different

16 argument today, Your Honor, but I just wanted to make sure

17 that we all understand that the facts in this case, there

18 is absolutely no dispute that this is with an online

19 lending business and that Virginia consumers didn't drive

20 to the Upper Peninsula in Michigan to take out these

21 loans.

22         So all that being said, the result is that

23 substantive state law applies to off-reservation conduct.

24         And in the next slide, I clipped in what the

25 Fourth Circuit said following its discussion of whether

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 378 of 503
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 23 of 214 PageID# 56760

23

1    the loans constitute on- or off-the-reservation activity.

2    And the holding of the Fourth Circuit was, in sum,

3    substantive state law applies to off-reservation conduct,

4    and although the tribe itself cannot be sued, its members

5    and officers can be.

6            From this principle, it naturally flows that a

7    non-tribal member who's engaging in those same activities

8    in the tribe can be held responsible under state law

9    because it constitutes off-the-reservation activity.

10           Seeking to avoid that conclusion from *Hengle*,

11   Your Honor, Martorello's opposition raises a new issue,

12   and that's that the Court should apply an interest

13   balancing test that is from the Supreme Court's decision

14   in *Bracker*.

15           THE COURT:  Was that issue presented to the

16   Fourth Circuit in *Hengle*?

17           MR. GUZZO:  No, Your Honor, it was not.  And the

18   reason why it wasn't is because I think the law is pretty

19   clear on this point, and this comes from the supplemental

20   authority we filed this week in the Supreme Court's case

21   in *Wagnon*.  In there, the Supreme Court said that the

22   interest-balancing test only applies where a state asserts

23   authority over conduct of non-Indians engaging in activity

24   on the reservation.  It does not apply where, as here, a

25   state law arises as a result of a transaction that occurs

USCA4 Appeal: 23-2097   Doc: 11-5   Filed: 12/06/2023   Pg: 379 of 503

24

1  off the reservation.

2         The Supreme Court added to that that limiting

3  the interest-balancing test exclusively to on-reservation

4  transactions was consistent with a number of its other

5  cases.

6         So we would submit that that is the

7  inappropriate test to apply and *Hengle* controls.  *Hengle*

8  finds that it's off-the-reservation conduct and therefore

9  substantive state law would apply.

10        Then just really quickly, on the second

11 question, Your Honor, I'm not sure what they're going to

12 say on this today, but I think their briefing, at least in

13 their most recent summary judgment motion, seems to cave a

14 little bit on this issue, and that's the enforceability of

15 the trial choice of law provisions, which is the second

16 issue.

17        In your July 21st, 2021, memorandum opinion, you

18 found that even though there was no expressed renunciation

19 of federal law, the net result of the loan contract is

20 that the consumers have no meaningful way to vindicate

21 their federal rights.

22        The Fourth Circuit, of course, affirmed you on

23 this point.  They said the net effect of the loan

24 agreement and the code made clear that a borrower

25 cannot -- does not permit a borrower to effectively

JA2260

USCA4 Appeal: 23-2097    Doc: 11-5       Filed: 12/06/2023    Pg: 380 of 503
Case 3:17-cv-00461-REP    Document 1316    Filed 06/15/23    Page 25 of 214 PageID# 56762

25

1   vindicate their federal rights.

2          So between the first issue and the second issue,

3   just to wrap up our point, *Hengle* says it's

4   on-the-reservation conduct, thereby making the loans

5   subject to generally applicable state law, and then there

6   is no enforceable choice of law provision and therefore,

7   that general rule applies.

8          And then one final point on this, Your Honor, is

9   on the balancing test argument, when courts engage in that

10  analysis, they're often picking between two different

11  substantive laws that are enforceable.

12         In this case, Your Honor has found that tribal

13  law is unenforceable because it waives a borrower's rights

14  and remedies.  The Fourth Circuit has found the same thing

15  as to the code.  Not just the choice of law provision, but

16  the actual substantive code.

17         And so here, if you're going to even engage in a

18  balancing test, you have only one enforceable selectable

19  law, and that's Virginia's law because the tribal code is

20  unenforceable.

21         And in both *Brice* and *Gingras*, the District

22  Courts used that as a basis -- as a secondary basis to not

23  apply tribal law, that they couldn't.

24         So for all those reasons, we would submit that

25  Virginia law applies.

1           THE COURT:  All right.

2           MR. GUZZO:  Thank you, Your Honor.

3           THE COURT:  Who's going to argue?

4           MR. TALIAFERRO:  Your Honor, Ms. Simmons is

5    going to argue this for defendant.

6           THE COURT:  All right.

7           MS. SIMMONS:  Good morning, Your Honor.

8           THE COURT:  Good morning.

9           MS. SIMMONS:  So we obviously agree, and

10   Mr. Taliaferro highlighted this, that we absolutely agree

11   that there's two fundamental issues here today and that

12   the first really is the question of whether or not

13   Virginia law applies here.

14           Now, we are not arguing that if the Court

15   ultimately reaches the question of whether it needs to

16   engage in a choice of law analysis -- a traditional choice

17   of law analysis, that *Hengle v. Treppa* controls and

18   Virginia law would apply.  So that's the first point.

19           THE COURT:  You agree with that?

20           MS. SIMMONS:  We agree that *Hengle v. Treppa*

21   would control a traditional choice of law analysis.  But

22   that's not where we believe the Court should start.

23           The case involves -- and this is not a secret,

24   right?  Obviously, we know this.  The case involved loans

25   extended by entities that are arms of a tribe, and so we

27

1   submit that the Court should first engage in an Indian

2   commerce clause analysis.  And that's the way we've

3   briefed it.

4               THE COURT:  Has any court held that --

5               MS. SIMMONS:  Your Honor --

6               THE COURT:  -- in a case like this?

7               MS. SIMMONS:  That's the starting point.  We

8   think that if you get into the analysis of

9   *Otoe-Missouria* --

10              THE COURT:  No.  Has any court held that in a

11  case like this?

12              MS. SIMMONS:  Well, the *Otoe-Missouria* case

13  itself held that it first needed to go through the Indian

14  commerce clause analysis.  And so we submit that that's

15  the starting point.

16              They didn't start, in that case, with a

17  traditional choice of law analysis specifically because

18  there was tribal entities involved.

19              THE COURT:  What did the *Otoe* court do with that

20  analysis?

21              MS. SIMMONS:  They engaged in the who, what,

22  where of the Indian commerce clause test, and they said

23  you have to answer those questions.  And if you answer

24  those questions and they're in the affirmative, then you

25  can move on to the question of balancing the federal

28

1   interests of tribes, the federal government, and the

2   states.

3              And so we're submitting that the Court should

4   engage in that analysis.

5              THE COURT:  Did they do that?  Did that court do

6   that.

7              MS. SIMMONS:  In the *Otoe* case?  They did do

8   that in that case, Your Honor.

9              THE COURT:  What result?

10             MS. SIMMONS:  So in that case, they said that

11  the "who," I believe, was satisfied and the "what" might

12  be satisfied.  But in general, the issue in that case was

13  that the facts were insufficiently developed for them to

14  make an ultimate determination.

15             THE COURT:  So they didn't decide it?

16             MS. SIMMONS:  They didn't decide that.

17             THE COURT:  All right.

18             MS. SIMMONS:  But that's the framework that we

19  submit the Court should start from.  So under that

20  framework --

21             THE COURT:  Did the Second Circuit take that

22  issue up?

23             MS. SIMMONS:  The Second Circuit took the issue

24  up, and they agreed that that's the framework that we

25  should start with.  So that's where we're asking the Court

JA2264

 1  to start here.

 2          And this is the test that --

 3          THE COURT:  So you want me to apply the Second

 4  Circuit's rule?

 5          MS. SIMMONS:  Excuse me?

 6          THE COURT:  You want me to apply the Second

 7  Circuit's rule?

 8          MS. SIMMONS:  It's not the Second Circuit's

 9  rule, Your Honor.  It's the *Bracker* test and the *Cabazon*

10  test.  It's the Second Circuit's formulation of how you

11  would apply that, but it's the test that comes from the

12  Supreme Court.

13          THE COURT:  But the Supreme Court said you don't

14  do that unless there are two viable choices of law.  And

15  you have one that's not viable, according to them.  What

16  do you say about that?

17          MS. SIMMONS:  Your Honor, the -- we say that we

18  don't get to that point because the first point -- the

19  first question is the Indian commerce clause analysis.

20  The federal interest themselves would require and preempt

21  application of Virginia law if the tribe's interests are

22  sufficient under the *Cabazon* test.

23          So the -- the Second Circuit in *Otoe* said,

24  Factual questions pervade every step of the analysis

25  required by the Indian commerce clause.  And then for that

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 385 of 503
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 30 of 214 PageID# 56767

30

 1  particular reason, it held that tribes -- that the tribes

 2  could not show a likelihood of success on the merits.

 3          So here -- and I want to walk through that

 4  analysis.

 5          THE COURT:  What's the "who"?

 6          MS. SIMMONS:  The "who" here is the tribes, the

 7  tribal entities, Red Rock and Big Picture.

 8          So the "who" question says who does the

 9  regulation at issue seek to regulate, right?  And here,

10  the answer is easy.  And I didn't hear Mr. Guzzo or see

11  anything in plaintiffs' papers that would argue that

12  Virginia's usury regulations, usury laws, are seeking to

13  regulate the Indian tribes.  The borrower's conduct is not

14  regulated by a usury statute.  It's the lender itself.

15          So then the second one, again, because this one

16  is easier, I think is the "what."  So Virginia usury's

17  laws fix the time, place, and manner in which loan

18  originations can be conducted.  I don't think that there's

19  any substantive disagreement on that.

20          In the recent Supreme Court case of *Ysleta del*

21  *Sur Pueblo v. Texas*, the Supreme Court recognized that

22  these are the types of laws that are regulatory in nature,

23  as opposed to prohibitions.  And it also held that, and

24  recognized that, a law can be permissive and therefore

25  it's regulatory or it can be prohibitive.

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 386 of 503
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 31 of 214 PageID# 56768

31

        Here, Virginia law permits loans to be made with
an interest rate above 12 percent under a variety of
different circumstances.  And there's exceptions set forth
in the statute itself.  And so it's clear that the
Virginia usury statute is regulatory as opposed to
prohibitive.

        And so then that gets us to the question of
where, right?  And we're mindful of the -- the Fourth
Circuit's decision in *Hengle v. Treppa*, which did two
things that we have to address at the outset.

        First, it engaged -- it did engage in a choice
of law analysis, but it did so upon the agreement of the
parties, in the first instance, that Virginia choice of
law rules applied.  We're not starting from there.  We're
starting from the *Cabazon* and the *Bracker* test.

        And then second, it affirmed the District
Court's decision that the tribal officials that had been
sued were engaging in off-reservation conduct by bringing
plaintiffs' suit -- which brought the plaintiffs' suit
within the ambit of *Bay Mills*.

        But in doing so, the Fourth Circuit cited to
four cases.  They were *Otoe-Missouria*, the *Gingras* case,
the *Hallinan* case, and *Colorado v. W. Sky*.  And Mr. Guzzo,
you know, provided some facts about that, but I want to
focus on a few specific issues.

USCA4 Appeal: 23-2097   Doc: 11-5   Filed: 12/06/2023   Pg: 387 of 503
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 32 of 214 PageID# 56769

32

1              First, *Colorado v. W. Sky* --

2              THE COURT:  How can I say that the

3    Fourth Circuit wrongly relied on those cases?  How do I

4    have the authority to do that?

5              MS. SIMMONS:  Because --

6              THE COURT:  You don't think they might smack my

7    fingers if I did that?

8              MS. SIMMONS:  No, Your Honor.  I think that

9    there's a couple of reasons.

10             The first is each and every one of those cases,

11   I believe, my recollection is, were at the early stages of

12   the case.  In *Otoe*, it was a preliminary injunction, and

13   in the remainder, they were motions to dismiss.  The

14   *Gingras* one I'm not certain, but I believe it was on a

15   motion to dismiss.  Yeah.  I'm sorry.  My notes say it

16   was.  So those were all in the early stages --

17             THE COURT:  Was this issue presented in *Brice*?

18             MS. SIMMONS:  In the *Brice* case, Your Honor, I

19   believe the choice of law analysis there was somewhat

20   different.  The question -- I don't believe that the Court

21   there engaged in the *Bracker* and *Cabazon* analysis.

22             THE COURT:  All right.

23             MS. SIMMONS:  Instead, it engaged in the

24   traditional choice of law analysis.

25             THE COURT:  All right.

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 388 of 503
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 33 of 214 PageID# 56770

33

1          MS. SIMMONS:  So focusing on the four cases that
2    the Fourth Circuit cited, they were *Colorado v. W. Sky* is
3    the first one, and that case is entirely distinguishable
4    because it involved a South Dakota LLC that was owned and
5    operated by a tribal member.  So there was no instance to
6    apply the *Bracker* or *Cabazon* test because it just was
7    wholly inapplicable.

8          The next cases were both *Gingras* and *Hallinan*,
9    and they themselves relied upon statements in
10   *Otoe-Missouria* that said online lending constitutes
11   off-reservation conduct.

12         So that leaves -- that, in sum, leaves the
13   actual applicable body of case law that all of these cases
14   are relying on as the Second Circuit's decision in
15   *Otoe-Missouria* that online lending is off-reservation
16   conduct.

17         But that brings us back in the initial point
18   that was made in *Otoe-Missouria*, which is that the Indian
19   commerce clause analysis is fact intensive, and all of the
20   cases that have made an off-reservation finding did it at
21   the early stages of litigation on the records available on
22   motions to dismiss.  And then moreover, in *Otoe-Missouria*,
23   the Second Circuit also recognized that despite the fact
24   that one side of the transaction involved consumers, a
25   court might ultimately conclude that the transactions

USCA4 Appeal: 23-2097   Doc: 11-5   Filed: 12/06/2023   Pg: 389 of 503
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 34 of 214 PageID# 56771

34

```
 1   being regulated by New York could be regarded as
 2   on-reservation conduct based on the extent to which one
 3   side of the transaction is firmly rooted on the
 4   reservation.  That's the analysis that we're asking the
 5   Court to undertake.
 6              THE COURT:  Has the Supreme Court held that?
 7              MS. SIMMONS:  It has not.
 8              THE COURT:  It hasn't bought that line, has it?
 9              MS. SIMMONS:  I don't think that it's considered
10   that line, Your Honor.
11              THE COURT:  Okay.
12              MS. SIMMONS:  So that's the analysis that we're
13   asking the Court to undertake is one side of the
14   transaction so firmly rooted on the reservation that the
15   Court still needs to engage in the Indian commerce clause
16   analysis.
17              We think that that analysis is particularly
18   appropriate in light of the stated purposes of NABDA, and
19   we also submit that it's particularly appropriate given
20   the evidence that shows that the tribe has made a
21   substantial investment into its online lending business
22   and that it relies on its online lending business to fund
23   substantial portions of its budget.
24              THE COURT:  All right.
25              MS. SIMMONS:  Your Honor, if the Court finds
```

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 390 of 503
Case 3:17-cv-00461-REP    Document 1316    Filed 06/15/23    Page 35 of 214 PageID# 56772

35

1   that it needs to engage in that analysis, we submit that

2   the plaintiffs have not met their burden on summary

3   judgment because they didn't --

4           THE COURT:  Well, how is it going to come up at

5   trial?  You're saying it has to be tried.  Your point is

6   it needs to be tried by the jury.

7           MS. SIMMONS:  No, Your Honor.  We submit that --

8           THE COURT:  That isn't the law, as I understand

9   it, in choice of law.

10          MS. SIMMONS:  Your Honor, we submit that the

11  Court, at minimum, should defer this issue until our --

12  the hearing on our motion for summary judgment, which is

13  set for June 20th.  Because we did, in fact, submit

14  substantial facts that would demonstrate that one side of

15  this transaction is firmly rooted on the reservation.

16          Finally, Your Honor, I want to address just a

17  couple of brief points raised by Mr. Guzzo in his

18  argument.  The first was the suggestion that --

19          THE COURT:  You're saying that that particular

20  analysis, which no court that has decided in context of

21  any case like this has applied, I should actually go

22  against what the Fourth Circuit held in *Hengle*.  Is that

23  what you want me to do?

24          MS. SIMMONS:  No, Your Honor.  I'm suggesting

25  that all of those cases consider that issue at the motion

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 391 of 503
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 36 of 214 PageID# 56773

36

 1  to dismiss stage or their preliminary injunction stage.

 2  This is a different procedural posture, that the analysis

 3  is fact intensive, and we submit that the Court should

 4  engage in a factual analysis.

 5          THE COURT:  A jurisdictional argument, is it?

 6          MS. SIMMONS:  Excuse me?

 7          THE COURT:  Is it a jurisdictional argument?

 8          MS. SIMMONS:  A jurisdictional argument as the

 9  Indian commerce clause?

10          THE COURT:  Let's go at it this way.  Is that in

11  your answer anywhere or affirmative defense?  Is that

12  anywhere presented in this case other than in this brief?

13          MS. SIMMONS:  The application of the Indian

14  commerce clause?

15          THE COURT:  Yes.

16          MS. SIMMONS:  It's certainly raised in

17  Mr. Martorello's responses to interrogatories.

18          THE COURT:  No, I didn't ask you about that.  I

19  asked you about his answer, answer to the complaint.

20          MS. SIMMONS:  Is it in his answer?

21          THE COURT:  Is it in the answer in any way, form

22  or fashion?

23          MS. SIMMONS:  Your Honor, I believe -- I don't

24  have that in front of me.

25          THE COURT:  I didn't see any.  It's not in the

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 392 of 503
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 37 of 214 PageID# 56774

37

1  affirmative defense that I know of.  I don't know that it

2  necessarily has to be, but it's not anywhere in the case

3  that's been brought to me except in this paper.  This is

4  the first time it raises its head at the end of the case,

5  right before the trial.

6         So I'm not quite sure why it's appropriate for

7  me to follow that analysis and break with what the

8  Fourth Circuit has told me the law is.

9         All right.  Let me hear from them, hear what

10  they have to say.

11         MS. SIMMONS:  Okay.  Thank you, Your Honor.

12         THE COURT:  Is it in his answer or affirmative

13  defense?

14         MR. GUZZO:  It's not, Your Honor.

15         THE COURT:  Has it ever been presented in any

16  issue in this case?  There's a lot of it so I'm asking.  I

17  don't have a perfect memory.  Has it been presented or is

18  it presented for the benefit of the first time in these

19  papers?

20         MR. GUZZO:  To my knowledge, Your Honor -- I

21  don't have the perfect memory either, but I am really

22  familiar with the briefing and what's gone on in this

23  case.  His opposition brief was the first time we've ever

24  heard this.

25         And I wanted to point your attention to

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 393 of 503
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 38 of 214 PageID# 56775

38

1  Docket 949, Martorello moved to stay this case two years

2  ago, three years ago based on *Hengle* and argued to this

3  Court that that case presented potentially dispositive

4  legal questions that were identical in this case.  And so

5  long ago in this case, he recognized that *Hengle* was going

6  to dictate the outcome on this issue.

7          THE COURT:  Well, no.  But new lawyers get into

8  the case.  They think about things, and they have new

9  knowledge, and they raise questions.  I don't know what

10 this is.  Is this -- but let's assume it is an issue

11 that's properly before me in the pleading structure that

12 we have.  What's your substantive response to all that?

13         Now, I understand her argument.  She says that

14 the Second Circuit in *Otoe* says you have to do the Indian

15 commerce clause analysis and that it decided there was no

16 analysis of the sort could be done because it was fact

17 intensive, and then she wants me to wait until their

18 summary judgment motion before I decide what applicable

19 law applies so I can consider the Indian commerce clause

20 analysis that they presented in their motion for summary

21 judgment.

22         Is that about right?

23         MS. SIMMONS:  Yes, Your Honor.

24         THE COURT:  Okay.

25         MR. GUZZO:  A few responses to that, Your Honor.

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 394 of 503
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 39 of 214 PageID# 56776

39

1   First, on the --

2           THE COURT:  That calls for a few.

3           MR. GUZZO:  On the issue of whether to defer it,

4   Martorello provided a statement of counter material facts

5   in his opposition to our motion for summary judgment.

6           THE COURT:  Yes.

7           MR. GUZZO:  His statement of facts in support of

8   his motion for summary judgment, I wouldn't describe it as

9   a copy and paste, but they're almost identical factual

10  statements.  And so I think the Court --

11          THE COURT:  Almost identical to what?

12          MR. GUZZO:  The statement of facts he put in his

13  opposition to our motion, in addition --

14          THE COURT:  The same as his summary judgment?

15          MR. GUZZO:  Correct, Your Honor.

16          THE COURT:  That's what I thought.

17          MR. GUZZO:  So there's no reason to defer that

18  based on fact considerations.  And that's especially true

19  because obviously the Fourth Circuit's decision in *Hengle*

20  we believe controls here.  But the *Bracker* test is

21  considering on-the-reservation conduct.  And so the reason

22  why it goes through the "who," the "what" and the "where"

23  is because sometimes states try to impose laws on tribes

24  when they are on the reservation, when it's purely

25  on-the-reservation conduct.

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 395 of 503
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 40 of 214 PageID# 56777

40

1              So, for example, the state of California has
2    tried to impose laws about gambling on tribal reservations
3    and making that illegal.  And so courts then engage in the
4    balancing test when a state is purely trying to regulate
5    on tribal land conduct, consumers from California driving
6    in to the reservation to gamble on the tribe's land.
7    That's when a court would engage in a balancing analysis.

8              But here, the transaction is entirely different.
9    The consumers are in Virginia.

10             In the *Otoe-Missouria* case, the Second Circuit
11   recognized this and discussed it.  It -- it said, A court
12   must know who a regulation targets and where the targeted
13   activity takes place.  Only then it can either test for
14   discriminatory laws, as in *Mescalero*, which is the
15   Supreme Court seminal case saying off-the-reservation
16   conduct applies to Native Americans or balance competing
17   interests, as in *Bracker*.

18             So the answer of where this activity occurs was
19   answered by *Hengle*.  And that's our position on this issue
20   is that that battle has been lost before the
21   Fourth Circuit, and the *Bracker* on-the-reservation test
22   simply doesn't apply here.

23             Even in the *Otoe* litigation, Your Honor, the
24   Court pointed out plaintiffs not only provided
25   insufficient evidence to establish that the loans should

JA2276

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 396 of 503
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 41 of 214 PageID# 56778

41

1   be treated as on-the-reservation activity.  That's at 115

2   of that decision.  And then they went on to really

3   criticize their position and said, As the District Court

4   noted, the plaintiffs built a wobbly foundation for their

5   contention that New York regulated activity that occurred

6   on the tribal land.  And it goes on to discuss all of

7   these insufficiences in the pleading that was presented to

8   that Court.

9            And --

10           THE COURT:  Has the Indian commerce clause

11  rationale, the *Bracker* test, the balancing, ever been

12  applied where there's a law at issue of general

13  applicability that applies to the whole world at large?

14  It doesn't apply to people just on the Indian reservations

15  and then people come in and do what they want to under

16  that law.

17           I mean, that's what we have here.  We have a law

18  of general application that wasn't targeting anybody.

19           MR. GUZZO:  That's exactly correct, Your Honor.

20           THE COURT:  Except people who were lending

21  money.  It didn't make any difference whether they were

22  Indian tribes.  They could be churches.  They could be

23  money lenders on the corner.

24           MR. GUZZO:  It would apply to a Canadian

25  government, Your Honor.  It's a generally applicable state

42

1  statute.

2          THE COURT:  Well, they might have immunity.  I

3  don't know.

4          MR. GUZZO:  But they would argue the tribe has

5  immunity, right?  That's the difference between whether

6  the law applies and whether you can enforce it.

7          And here, we can enforce it because of

8  Mr. Martorello's role against him.

9          THE COURT:  In *Otoe* and in the Indian tribe

10  reservation, the Indian commerce clause reservation, was

11  it a case in which the tribes weren't involved or were the

12  tribes involved?

13          MR. GUZZO:  In that case, Your Honor, it was --

14  it was very similar to here.  It was a -- it would be our

15  position that it was a Rosette setup.  The *Otoe* -- the

16  tribe that was in that case has been -- it was American

17  Web Loan, who was -- or sorry -- Great Plains, who was the

18  defendant in the *Gibbs* matters before Judge Lauck.  They

19  teamed up with Red Rock to file that suit, with the

20  backing of *Think Finance* in that case.  That was what was

21  really going on behind the scenes in that case.  It's the

22  same tribal lender.

23          That *Think Finance* matter has settled for over

24  $150 million in class settlements and I think something

25  like $800 million of debt cancellation.  That ended up in

43

the *Think Finance* bankruptcy court involving our firms,

myself, Mr. Bennett, Ms. Kelly, and our team.

In here, one of the things in *Otoe* that the

Court discusses is that the tribe doesn't have a

legitimate interest in selling its sovereign immunity to

avoid state laws.

So one of the things the Second Circuit was

really concerned about was the affidavits by Red Rock were

vague and conclusory in this point.  And we have evidence

in this case that shows that the actual information that

came to those affidavits came from Mr. Martorello and his

brother.  When they were reaching out to submit the

affidavits in the *Otoe* case, that information came from

Mr. Martorello and his brother because at the time, in

2013, they knew the information about Red Rock's

operations.

So the Second Circuit sniffed it out and said we

don't know about your servers, your websites, and all of

these different things, and didn't apply the test.

Six years later, then, in *Gingras v. Think*

*Finance*, the Second Circuit clearly held that it was

on-the-reservation conduct, and therefore, the *Mescalero*

test applies.

THE COURT:  All right.  Anything else?

MR. GUZZO:  No, Your Honor.  That's it on that

1    point.

2            THE COURT:  All right.

3            The applicable law in this case is the law of

4    Virginia.  It is not the tribal law.  An opinion will

5    issue.

6            The next issue is the mistake of law issue.

7    What's the best way to tee that up?  Let you go first

8    because it's really something you're asserting and let

9    them say -- let them respond?  How would you like to deal

10   with that?

11           MR. TALIAFERRO:  Your Honor, we're happy to go

12   first.  There may be an issue with whether -- well, this

13   is intertwined with the RICO/scienter requirement on which

14   if the Court --

15           THE COURT:  It is not intertwined.  It's

16   connected.

17           MR. TALIAFERRO:  Excuse me.  It's connected.

18   And on that issue, if the Court holds that that's a

19   knowledge or a willingness requirement, then that's an

20   issue on which the plaintiffs have the burden of proof.

21           THE COURT:  I'm not asking you burden of proof.

22   I'm asking you which one of you want to talk about it

23   first because both of you have positions on it and you

24   seem to be -- your side seems to be asserting it as an

25   affirmative defense.  Whether they have the ultimate

USCA4 Appeal: 23-2097   Doc: 11-5   Filed: 12/06/2023   Pg: 400 of 503
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 45 of 214 PageID# 56782

45

1   burden as an element in the scienter or not is still the

2   same thing in some ways.

3            But the only -- I guess you're saying that

4   there's a kind of knowledge that's involved in the

5   scienter aspect of the RICO claim that's not like the good

6   faith/mistake of law/advice of counsel question, are you?

7            MR. TALIAFERRO:  We would say that the --

8            THE COURT:  If it's the same basic issue, then

9   I'll just let one of you pick which one want to go first

10  and go first.

11           MR. TALIAFERRO:  We would agree that it's the

12  same basic issue.

13           THE COURT:  Okay.  Do you want to go first or do

14  you want them to go first?

15           MS. SIMMONS:  We think it's appropriate for them

16  to go first.

17           MR. TALIAFERRO:  We're happy to let plaintiffs

18  go first, Your Honor.

19           THE COURT:  All right.

20           This is your motion in limine 5, is it?

21           MR. GUZZO:  Yes, Your Honor.  And Ms. Kelly is

22  going to address the motion in limine issues, including

23  the evidentiary and procedural.

24           I'm prepared to talk about it from a "it's not

25  available at all" legal perspective, if that's okay with

46

 1    Your Honor.  That's how we briefed it in our reply brief.

 2              THE COURT:  So this is your reply to their

 3    response to the summary judgment?

 4              MR. GUZZO:  Correct.

 5              THE COURT:  All right.

 6              MR. GUZZO:  And if Your Honor still has --

 7              THE COURT:  Are you just going to henceforth

 8    call it mistake of law or what?  We've got three different

 9    terms, and nobody has adopted any single one, but I don't

10    think they are any different here.

11              MR. GUZZO:  I don't think they are any

12    different, Your Honor.  And I'm just going to go

13    through what I think are the sources to show that it's --

14              THE COURT:  For a mistake of law defense, you

15    have to say, I had this opinion, and this opinion is this.

16    I relied on this opinion and here it is.

17              You don't have that.  There's no "this opinion"

18    in this case.  It hasn't been filed.  I haven't seen it.

19              MR. GUZZO:  I agree with that, Your Honor.

20              THE COURT:  The best I can tell, there isn't

21    one.  I've asked for it.  I've said, Let me see it so I

22    can read it, understand it, study it.  There's nothing

23    here.

24              MR. GUZZO:  I agree with that.

25              THE COURT:  I don't see that it's really -- even

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 402 of 503
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 47 of 214 PageID# 56784

47

though it's sometimes called a mistake of law defense
because it's wrapped around in a theory that Martorello
says, in various ways or another, Well, I talked to this
guy and I talked to that guy, and I talked to this person.
I talked to that person, and he, she or it told me this.

I say, Where is the he, she or it?

And they submitted it as part of the exhibits to
that statement.

When I read those, what was told in there, I was
perplexed about why it constitutes a reliance that I
thought this was okay.  Because best interpreted that
information says it's highly risky, and then he basically
makes the choice, I'm taking the risk.

And then the question comes, there's another way
it's asserted in the papers, well, I made a mistake of
law.  I judged what they told me to be hunky-dory and I
could go forward, and that was -- then I was mistaken.
But it was a good faith belief because I had this
information from these people that told me it was risky.

I mean, that's the way -- if you read all of
this together, that's the way it comes out.  And so it
really seems to me to be a mistake of law defense, but I'm
asking you all to tell me what you think.

At the outset, when I was asking you how to
categorize it, everybody seemed to agree that it was best

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 403 of 503
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 48 of 214 PageID# 56785

48

 1    to call it mistake of law.  Is that where you still are?

 2              MR. GUZZO:  Your Honor, I think that's exactly

 3    right.

 4              THE COURT:  All right.

 5              MR. GUZZO:  And one point I would add to that --

 6    and it's jumping down a few slides, but it's been filed at

 7    ECF 1266.  We have a memo in this case --

 8              THE COURT:  What's filed?  What slide I mean?

 9              MR. GUZZO:  It is slide -- sorry, Your Honor.

10    Give me one second.

11              THE COURT:  I want you to take this at lunch and

12    put numbers at the bottom of the page so I can --

13              MR. GUZZO:  I would do that.  And I actually

14    have a black-and-white version with numbers, Your Honor,

15    if I could pass that up to you.

16              THE COURT:  Yeah, that would be fine.  If

17    they've got the numbers, that's easier to follow.

18              MR. GUZZO:  And I'll open it to the page I want

19    to discuss, which is page 32.

20              THE COURT:  Do you have one for the --

21              MR. GUZZO:  They have a copy of it.

22              THE COURT:  Do you have one for the law clerk so

23    we're all on the same page?

24              MR. GUZZO:  I --

25              MR. TALIAFERRO:  Andrew, we have an extra copy

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 404 of 503

49

```
 1    with numbers.

 2              MR. GUZZO:  Appreciate it.

 3              THE COURT:  Mr. Taliaferro, years ago -- just

 4    stay where you are -- I was in London, and I went to see

 5    the courts function there.  And I will never forget what I

 6    saw there when a young woman barrister handed to her

 7    opponent the law that he was trying to beat her with.  And

 8    I thought to myself, wouldn't it be nice if we did that

 9    here.

10              Thank you for your courtesy, professional

11    courtesy.

12              MR. TALIAFERRO:  Thank you, Your Honor.

13              MR. BENNETT:  Mr. Taliaferro has done a number

14    of those courtesies in this case with us, Judge.

15              THE COURT:  Okay.  Thank you.

16              MR. GUZZO:  As well as the whole team,

17    Your Honor.

18              THE COURT:  All right.

19              MR. GUZZO:  So the PowerPoint -- the slide here

20    I want to discuss, Your Honor, is -- and this document is

21    at ECF 1266 in the docket.

22              And this is a clip from a memorandum from

23    Jennifer Weddle to Mr. Martorello.  He asked for a legal

24    opinion.  And it's about a nine-page document, and I've

25    clipped out a couple of the important statements in that
```

USCA4 Appeal: 23-2097   Doc: 11-5   Filed: 12/06/2023   Pg: 405 of 503
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 50 of 214 PageID# 56787

50

1   actual --

2            THE COURT:  They are slides 31 and 32 -- I mean

3   page 16, 31, 32.  Which one do you want me to --

4            MR. GUZZO:  The one -- the slide where it says

5   "Weddle informed Martorello."

6            THE COURT:  All right.

7            MR. GUZZO:  So this is just a clip from a long

8   memo, Your Honor, that shows that the attorney that

9   represented Mr. Martorello's company in this case did not

10  provide him a legal opinion that these loans were legal,

11  that they constituted off-the-reservation activity, that

12  he couldn't be held liable under usury laws or that the --

13  that his conduct was legal.  In fact, she told him exactly

14  the opposite in August of 2012, which is before the class

15  period even started in this case.

16           And so the first clip, she discusses that

17  Red Rock are not directly subject to Georgia regulations

18  because they aren't subject to state enforcement.  It

19  says, However, because tribal sovereign immunity only

20  protects a tribe or the tribal entity from the enforcement

21  of state laws -- and then in parentheses, not their

22  applicability -- a state may seek to enforce its laws

23  against individuals of the entity and affiliated third

24  parties like Mr. Martorello.

25           The memo continues, Tribal sovereign immunity is

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 406 of 503
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 51 of 214 PageID# 56788

51

1   broad but not unlimited.  While tribes are immune from

2   enforcement of state laws, immunity does not protect

3   non-tribal members, officers or managers from criminal or

4   civil liability, nor does it protect third parties.

5           The third clip is from the conclusion of that

6   memorandum where she says, It is possible that individuals

7   or third-party service providers could be held liable for

8   criminal violations of Georgia law.  But then she says but

9   we don't see that, you know, prosecutions as particularly

10  likely.  So it was more you're violating the law, but we

11  don't think anyone is going to come after you.

12          So as far as the opinion that Mr. Martorello

13  received from his attorney, this is -- this now goes back

14  to August 2012.  That's before *Otoe-Missouria*, before

15  *Hengle*, before --

16          THE COURT:  What date is this, August of 2012?

17          MR. GUZZO:  It is August 20th of 2012.

18          THE COURT:  And Weddle was Martorello's

19  attorney?

20          MR. GUZZO:  She was retained by SourcePoint and

21  Bellicose.  So I think the retainer agreement would have

22  said, and the testimony is, that she represented the

23  companies and then him within the control group as the

24  manager, president and owner of SourcePoint and Bellicose.

25          THE COURT:  He was the manager?

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 407 of 503
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 52 of 214 PageID# 56789

52

 1          MR. GUZZO:  Correct, Your Honor.

 2          THE COURT:  Okay.  So that --

 3          MR. GUZZO:  So now I just want to step back --

 4          THE COURT:  Does that mean that there isn't a

 5  defense available?

 6          MR. GUZZO:  So I would -- I think in order to

 7  qualify for the defense, Your Honor -- and this comes from

 8  your decision in the *Okun* case.  If you're going to use

 9  good faith or mistake of law, you have two elements you

10  have to prove.  And this is from your decision is that you

11  had a full disclosure to the attorney and you received an

12  opinion that said -- that provided you the cover.

13          And here, even assuming that the defense applies

14  to begin with, which I'm going to address in a minute, we

15  don't have that in this case.  We don't have an opinion to

16  Mr. Martorello that says what you're doing is illegal.

17          All we have is a letter from his actual attorney

18  that his marketing company could be responsible for

19  engaging and soliciting consumers in Georgia, and then she

20  explains the law.

21          Now, to back up a little bit, Your Honor.  The

22  first thing I want to mention is in June of 2011,

23  Your Honor asked the parties to file a statement of

24  position before this Court that listed the elements.  And

25  at that time, Martorello was represented by the same

53

1   counsel he is today.  And his statement of position on the

2   elements did not contain this mistake of law, willfulness,

3   actual knowledge.  That's at --

4            THE COURT:  Where is that?

5            MR. GUZZO:  ECF 1099.  And I believe that should

6   be on slide 10 for Your Honor.

7            THE COURT:  Now, why would that be an element of

8   the offense?

9            MR. GUZZO:  It's --

10            THE COURT:  Because what?  What was it missing?

11            MR. GUZZO:  He is missing any statement that we

12   are required to prove knowledge of the law or that mistake

13   of law can be a defense to this claim or that knowledge of

14   illegality is an issue.

15            We fought this issue -- "we" meaning my firm and

16   Mr. Bennett -- in a case called *Mao v. Global Trust* in

17   front of Judge Young.  And he found in that case -- and

18   it's in the PowerPoint -- that RICO does not require proof

19   that a defendant knew their conduct violated state law.

20            Clipped here is the beginning part of the

21   opinion, which has a section entitled "Knowledge of

22   Illegality."

23            THE COURT:  Where is that?

24            MR. GUZZO:  It should be slide 11.

25            THE COURT:  Huh?

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 409 of 503
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 54 of 214 PageID# 56791

54

1          MR. GUZZO:  It should be slide 11.

2          THE COURT:  The slide numbers are the number of

3    the page or the number of the individual things there in

4    it?

5          MR. GUZZO:  The page number.

6          THE COURT:  The page number in the lower

7    right-hand corner.  *Mao*.  Okay.

8          MR. GUZZO:  So I've clipped in here, there the

9    defendants were claiming that the very essence of a RICO

10   claim was that the participants worked together to engage

11   in illegal conduct.

12         They said we're debt buyers.  We didn't know

13   that these loans weren't illegal.  We weren't this tribal

14   lending enterprise.  We weren't involved.

15         So Judge Young here quotes from their brief and

16   says, If defendants did not know the debts were illegal,

17   they could not have been acting with the purpose to engage

18   in illegal conduct.  That was the defendants' expressed

19   argument in that case.  Judge Young rejected that in *Mao*.

20   And I've clipped in here his opinion, Plaintiffs do not

21   have to allege knowledge of illegality.  The purpose may

22   be that the defendants associated together for collecting

23   unlawful debt, whether they knew it or not.

24         And the reason he came to this conclusion,

25   Your Honor, is that the unlawful debt prohibition in the

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 410 of 503
Case 3:17-cv-00461-REP    Document 1316    Filed 06/15/23    Page 55 of 214 PageID# 56792

55

1    RICO statute is an offense of general intent.  There's no

2    willfulness.  There's no knowledge requirement embedded in

3    the statutory text of RICO.

4          And so one of the cases that we provided to

5    Your Honor on Monday was the Fourth Circuit's decision in

6    *Lawson* where the Fourth Circuit was interpreting almost --

7    a very similar statute, and that statute was

8    18 U.S.C. 1955, which is the prohibition against illegal

9    gambling.  And that statute says whoever conducts,

10   manages, supervises, directs, owns part of an illegal

11   gambling business is in violation of this federal statute.

12         THE COURT:  RICO or 1955?

13         MR. GUZZO:  18 U.S.C. 1955.  And then I'm going

14   to draw a parallel to it to RICO, but I want to go over

15   what the Fourth Circuit said as to that statute.

16         And what's important about that statute is that,

17   in part, it defined illegal gambling based on conduct in

18   violation of state law.  So that became the issue in

19   *Lawson* that was before the Fourth Circuit.

20         And there, the defendant, on appeal, argued that

21   the District Court erred by failing to instruct the jury

22   that the defendants must know their conduct constituted

23   illegal gambling under South Carolina law.

24         The defendant further argued that the

25   District Court's construction of the statute improperly

USCA4 Appeal: 23-2097     Doc: 11-5     Filed: 12/06/2023     Pg: 411 of 503
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 56 of 214 PageID# 56793

56

1  eliminated any mens rea requirement and allowed the

2  government to obtain a conviction simply by showing the

3  defendant conducted the enterprise and engaged in the

4  gambling conduct.

5         The Fourth Circuit rejected that argument and

6  said, We hold 1955 is a general intent crime, which does

7  not require the government to establish the defendants

8  knew that their conduct violated state law.

9         Therefore, the Court affirmed that the District

10  Court's refusal to give a good faith instruction in that

11  case and said it's unavailable under these circumstances

12  because the gambling statute was a general intent statute.

13         The same is true here, Your Honor.

14         THE COURT:  *Lawson* was cited in the papers you

15  filed last week or earlier this week?

16         MR. GUZZO:  On Monday, Your Honor.  And they

17  were kind enough to agree to our --

18         THE COURT:  Point me to the citation.

19         MR. GUZZO:  The citation is *U.S. v. Lawson*,

20  677 F.3d 629.  And then the -- and then the provision I

21  was just discussing is at page 652 through 653.

22         THE COURT:  All right.

23         MR. GUZZO:  And so we think the Fourth Circuit

24  would interpret very similar statutory language here in

25  RICO as to the gambling.

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 412 of 503

57

```
 1            A couple other points on this, Your Honor.
 2   First is that this issue came up in Brice, the good faith
 3   issue.  And, again, both cases had the same claims.  And
 4   the Brice court excluded any good faith defense or
 5   instruction and said defendants have not shown how a good
 6   faith defense is relevant to any of the claims presented
 7   to the jury.  And that was as to the RICO claim, as well
 8   as the unjust enrichment.
 9            In addition to Brice, going beyond what
10   Judge Young said in Mao and the Fourth Circuit, there's no
11   conflicting authority interpreting this statute and that
12   it's a specific intent, that somehow it incorporates a
13   mistake of defense.
14            So there's a few cases on this, the Pepe out of
15   the Eleventh Circuit, Biasucci out of the Second Circuit,
16   and the Baker out of the Ninth Circuit, all interpreting
17   RICO to be -- this component of RICO to be a general
18   intent offense.
19            There is some portions of RICO, like the mail
20   and wire fraud component of it, that do build in the
21   specific intent to defraud.  And then knowledge might --
22            THE COURT:  It's part of the predicate offense.
23            MR. GUZZO:  Exactly.  That's exactly right,
24   Your Honor.
25            There's also a Supreme Court guidance on this
```

JA2293

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 413 of 503
Case 3:17-cv-00461-REP    Document 1316    Filed 06/15/23    Page 58 of 214 PageID# 56795

58

1    from the *Jerman* case, which is an FDCPA case, where the
2    Supreme Court says, "When Congress has intended to provide
3    a mistake of law defense to civil liabilities, it has done
4    so more explicitly than here."
5            And in that case, the Supreme Court was dealing
6    with the bona fide error defense under the FDCPA and what
7    that meant, and the defendant was trying to argue that it
8    was a mistake of law defense.  And the Supreme Court
9    rejected that argument and noted that when Congress wants
10   to create a mistake of law defense, it does it explicitly.
11   There's nothing in the RICO statute that does that.
12           In addition, in *Jerman*, the Court noted that if
13   Congress wanted to confine liability to willful
14   violations, it can do that, too, but there's nothing in
15   the text of the RICO statute.
16           So that brings me to my final point on this
17   area, Your Honor, which is, now, there is cases from the
18   Fourth Circuit that says the defendant must knowingly and
19   willfully engage in the conspiracy.
20           All the Fourth Circuit is saying, in our opinion
21   there, is that a defendant must know the facts of what
22   they are doing and not be accidental.  So let's say
23   Mr. Martorello was a payment processor or a credit bureau
24   who had no idea, no knowledge --
25           THE COURT:  He has to know what they're doing

JA2294

USCA4 Appeal: 23-2097   Doc: 11-5   Filed: 12/06/2023   Pg: 414 of 503

59

1   and he has to voluntarily and willingly join it.

2           MR. GUZZO:  That's exactly right.

3           THE COURT:  That's what the instruction in the

4   conspiracy statute says.  It's been approved all along.

5           MR. GUZZO:  And so that's exactly our point,

6   Your Honor, is that it's not in the statute, and you can't

7   just pluck the term knowingly and willfully out of a

8   Fourth Circuit case that's dealing with something else and

9   use that as a basis to say mistake of law is a defense in

10  this case.  It's -- it's not.

11          And based on all of the authorities presented,

12  we would submit that no court has -- the overwhelming

13  majority of courts, all of them, have found it's not.

14          And that's all I have on that, Your Honor.

15          MR. BENNETT:  Your Honor, may I -- may I be

16  excused?

17          THE COURT:  Are you coming back to join us for

18  the afternoon or are you taking a holiday?

19          MR. BENNETT:  I am coming back.  We have an

20  associate that's being sworn in at the convention center.

21          THE COURT:  Go take care of it.

22          MR. BENNETT:  Thank you.

23          MR. GUZZO:  One other point on this,

24  Your Honor -- sorry -- is we also, in motion in limine

25  number 5, have some procedural or evidentiary issues about

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 415 of 503
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 60 of 214 PageID# 56797

60

 1  why Mr. Martorello should not be able to assert this

 2  defense.  Ms. Kelly is handling the motion in limine for

 3  us.  I don't know if Your Honor wants to hear about those

 4  now or --

 5          THE COURT:  I want to finish the thinking on

 6  this right now.  We'll hear it after we hear --

 7          MR. GUZZO:  Okay.  Great.  Thank you,

 8  Your Honor.

 9          THE COURT:  Well, excuse me.  I need to quit at

10  12:15.  So we'll -- you go where you are as of 12:15, and

11  then when we come back, I'll hear the rest of it.

12          MS. SIMMONS:  Understood, Your Honor.

13          May I proceed?

14          THE COURT:  Yeah.

15          MS. SIMMONS:  Okay.  So the threshold question

16  we believe here is -- and Your Honor has -- has conceived

17  of it as a mistake of law.

18          The question we think that the Court has to

19  answer is --

20          THE COURT:  Just a minute.  Just a minute.  I

21  didn't conceive of it.  You all conceived of it.  He

22  agreed with that's what it was.  The plaintiffs agreed

23  that's what it was.  It's in your briefs.  It is

24  articulated in three different ways, advice of counsel,

25  good faith, mistake of law, but its predominant thesis is

61

1    it's a mistake of law.

2          MS. SIMMONS:  Yes, Your Honor.  I just meant --

3    what I was trying to say was --

4          THE COURT:  But you said I conceived of it.  And

5    then you go to the Fourth Circuit and say, That old man

6    sat down there and concocted this whole thing out of whole

7    cloth.

8          MS. SIMMONS:  No, Your Honor.  I was just going

9    to say, when I have conceived of this argument and I've

10   drafted it, I did not refer to it as a mistake of law.  So

11   I may not use that terminology, but I'm certainly on the

12   same page with what we're discussing and what we're

13   arguing here.  That's all I meant.

14         So the question is --

15         THE COURT:  Good.  You take part of the blame.

16         MS. SIMMONS:  I don't know if I'd go that far,

17   Your Honor.

18         The question is does section 1962(d), the

19   conspiracy section of the RICO statute, have a scienter

20   element that would place the burden on plaintiffs to show

21   that Martorello willfully agreed that he, or some member

22   of the alleged RICO conspiracy, would engage in the

23   collection of unlawful debt.  And we submit that it does

24   have that scienter requirement as the first point.

25         So in the *United States* --

JA2297

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 417 of 503
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 62 of 214 PageID# 56799

62

1          THE COURT:  Mark that right there.  I need to

2    have that typed up.

3          That isn't how these briefs read.

4          MS. SIMMONS:  Excuse me?

5          THE COURT:  That isn't how these briefs put that

6    issue.

7          MS. SIMMONS:  I think that it is how the --

8          THE COURT:  It's a refinement on it that I don't

9    think is quite in the papers.

10          MS. SIMMONS:  It's certainly the intention of

11    the portion of our opposition to their motion for summary

12    judgment on this point.

13          So in *United States v. Mouzone* -- and I don't

14    know if I'm pronouncing it correctly, but that's how it's

15    coming out -- the Fourth Circuit articulated that there's

16    three elements for a section 1962(d) claim.  And they are

17    that, (1) an enterprise affecting interstate commerce

18    existed; (2), the defendant knowingly and intentionally

19    agreed with another person to conduct or participate in

20    the affairs of the enterprise; and number (3) -- and this

21    is the one we're focused on -- defendant knowingly and

22    willfully agreed that he, or some other member, would

23    conduct at least two racketeering acts.

24          So as set forth in our brief, there's a

25    requirement in RICO to show a conscious wrongdoing.  And

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 418 of 503
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 63 of 214 PageID# 56800

63

1  this comports with the fact that the Supreme Court has

2  said that RICO penalties are drastic, and the

3  Fourth Circuit has recognized that courts must exercise

4  caution in effectuating its remedial purposes.

5           So if we look at the case of *United States v.*

6  *Grote*, which was a Second Circuit case, and that's at

7  961 F.3d 105, the facts of that case involve the

8  collection of an unlawful debt.  And that was -- the

9  defendants in that case were Tucker and Muir, and they

10 were also engaged in a tribal lending enterprise.

11          At trial, the parties agreed that the

12 requisite --

13          THE COURT:  This was a criminal trial?

14          MS. SIMMONS:  Excuse me?

15          THE COURT:  A criminal trial?

16          MS. SIMMONS:  It was, yes, Your Honor.

17          At trial, the parties agreed that the requisite

18 mental state for RICO counts was willfulness, and then the

19 defendants proceeded to defend primarily on the grounds

20 that the loans were operated by Native American tribes,

21 were not subject to state usury laws, and that even if

22 they were lawful, defendants had a good faith belief that

23 they were lawful by virtue of the tribe's involvement and

24 so their conduct was not willful.

25          And so the existence of Mr. Martorello's good

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 419 of 503
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 64 of 214 PageID# 56801

64

1  faith belief goes to the question of whether or not he

2  could have engaged in willful conduct.

3          In that case, in a footnote, the Court said,

4  "Willfulness generally requires a showing of knowledge of

5  unlawfulness."  And it did so in citation to the Supreme

6  Court's decision in Bryan v. United States at

7  524 U.S. 184.

8          So if we are correct, and we think we are, that

9  a section 1962(d) claim requires a showing of willfulness

10  to engage in the collection of unlawful debt, then

11  Mr. Martorello should be entitled to present evidence of

12  his good faith belief.

13          THE COURT:  Good faith belief of what?

14          MS. SIMMONS:  That he was not engaging in the

15  collection of unlawful debt, that he -- that he had a good

16  faith belief that tribal law would apply to the loans.

17          THE COURT:  So he had a good -- he was mistaken?

18          MS. SIMMONS:  He had a good faith belief

19  informed upon all of the --

20          THE COURT:  And based on what I've held, he's

21  mistaken.

22          MS. SIMMONS:  Correct, that he was mistaken.

23          THE COURT:  So it's mistake of law.

24          MS. SIMMONS:  Yes, Your Honor.

25          THE COURT:  He made a mistake of law.

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 420 of 503
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 65 of 214 PageID# 56802

65

```
 1              MS. SIMMONS:  Yes, Your Honor.

 2              THE COURT:  Okay.

 3              MS. SIMMONS:  But the case law saying that

 4    mistake of law is not a defense we submit doesn't apply

 5    here because there is a willfulness element, which, in and

 6    of itself, allows a defendant to present evidence of his

 7    good faith belief that it wasn't unlawful.  And so that's

 8    why this type of evidence is relevant.

 9              So in the Grote case, the Court instructed the

10    jury as to willfulness in regards to the conspiracy

11    element, and it barred the jury from rendering a guilty

12    verdict on the count unless it found that the defendants

13    were aware of the unlawfulness of their lending scheme.

14              In a separate section of that case, the Court

15    discusses whether or not there is also a willfulness

16    requirement under section 1962(c) because the plaintiff --

17    or excuse me -- the defendants in that case had argued

18    that the Court improperly did not instruct as to that

19    element, and the Court held that there was no plain error

20    because there was ample evidence of willfulness in that

21    particular case.

22              But in doing so, it also discussed its prior

23    decision in Biasucci, which was a case that held that --

24    and it was one of the earlier cases interpreting RICO --

25    that the scienter element of a RICO offense is only that
```

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 421 of 503
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 66 of 214 PageID# 56803

66

1    of the underlying state law predicate offense.  And that's

2    the argument that I understood plaintiffs to be making

3    here.

4              We submit that that argument fails in part

5    because of the Supreme Court's later decision --

6              THE COURT:  Say that again.  Make your point

7    again.

8              MS. SIMMONS:  Plaintiffs argue that there is no

9    scienter element as part of the RICO statute itself, that

10   the only scienter requirement is that of the underlying

11   predicate offense.  So, for example --

12             THE COURT:  That is, you have to look at what

13   the elements of the underlying offense is and if it has a

14   willfulness component requirement, then that's an element

15   of that offense.  If it doesn't, it doesn't.  Is that what

16   you're saying?

17             MS. SIMMONS:  That's their argument, Your Honor.

18             THE COURT:  Yeah.

19             MS. SIMMONS:  And it's based upon, for example,

20   the line of cases from the Second Circuit that held that

21   that would be the case.  And that case I believe was from

22   1986.  So one of the early RICO cases.

23             Subsequently, the Supreme Court issued the

24   decision in *X-Citement Video*.  And in that case, the

25   Supreme Court said that generally speaking, there has to

JA2302

67

 1   be an intent element in criminal statutes.

 2          And here, RICO is a criminal statute that allows

 3   for a private right of action.

 4          So --

 5          THE COURT:  So it's the *Elonis* case; is that

 6   right?

 7          MS. SIMMONS:  Excuse me?

 8          THE COURT:  It's the *Elonis* case?

 9          MS. SIMMONS:  I'm referring to the *Grote* case,

10   Your Honor.

11          THE COURT:  Yes, *Grote*.  And then what's the

12   Supreme Court case that you say changed it?

13          MS. SIMMONS:  It's *X-Citement Video*, Your Honor.

14          THE COURT:  *X-Citement Video* versus whom?

15          MS. SIMMONS:  I believe it was the

16   United States, Your Honor, but let me just confirm that.

17          THE COURT:  Well, they quoted *Elonis*, which is

18   575 U.S. 723.  However, the Supreme Court -- they said in

19   *Grote*, in talking about its earlier decision in *Biasucci*,

20   says, "The Supreme Court's recent reaffirmation of a

21   presumption in favor of scienter requirement is applicable

22   to each of the statutory elements that criminalizes

23   otherwise innocent conduct."

24          And the quote from the Second Circuit in that

25   case, *Grote*, quoted *Elonis* against the United States.  Is

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 423 of 503
Case 3:17-cv-00461-REP  Document 1316  Filed 06/15/23  Page 68 of 214 PageID# 56805

68

1    that the same case you're talking about?

2          MS. SIMMONS:  It's not, Your Honor.  I was

3    pointing to *X-Citement Video*.  But I believe it has the

4    same general proposition.

5          THE COURT:  What's *X-Citement Video*.

6          MS. SIMMONS:  Your Honor, in that case --

7          THE COURT:  What's the citation?

8          MS. SIMMONS:  Its 513 U.S. 64.

9          And the *Grote* case cites to this case as well.

10   And in that case, the Supreme Court construed

11   18 U.S.C. 2252.

12         THE COURT:  Well, now, is there a case that

13   holds that the principle that applies in criminal cases

14   applies in civil cases, given the general rule that the

15   Supreme Court says that there's -- unless Congress says

16   so, there's no mistake of law defense?

17         MS. SIMMONS:  Is the Court asking if there's

18   a --

19         THE COURT:  Is there any case which addresses

20   the point we have to address right here?

21         MS. SIMMONS:  Your Honor, our position is RICO

22   section 1962 is in Title 18.  It's a criminal statute that

23   happens to permit a private right of action.  And so a

24   separate analysis or a second line of cases applying a

25   different scienter element, depending on if it's a civil

USCA4 Appeal: 23-2097   Doc: 11-5   Filed: 12/06/2023   Pg: 424 of 503
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 69 of 214 PageID# 56806

69

 1   or a criminal case is inappropriate.

 2             THE COURT:  Isn't what?

 3             MS. SIMMONS:  Would not be appropriate.

 4             THE COURT:  Why would that be?  Why would it not

 5   be appropriate?

 6             MS. SIMMONS:  To apply a different scienter

 7   requirement depending upon if the plaintiff is the

 8   United States or a private plaintiff, Your Honor?

 9             THE COURT:  Well, is there -- you're saying, as

10   I understand it, the mere fact that even though a lot of

11   courts have said there isn't any scienter requirement for

12   RICO beyond whatever is in the underlying predicate

13   offense, that the cases that you rely on and they rely on,

14   *X-Citement Video* and *Elonis*, stand for the proposition

15   that in any statute that is a criminal statute that also

16   affords a private right of action, a scienter requirement

17   is imported.  Is that your point?

18             MS. SIMMONS:  Our point is that there is a line

19   of cases that have read in a willfulness requirement to

20   RICO under section 1962(d).

21             So in contrast to *Lawson*, which was the case

22   that plaintiffs cited for the proposition of general

23   intent, you read that case.  There's a section that makes

24   clear that it has been interpreted as a general intent

25   statute through the body of case law.

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 425 of 503
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 70 of 214 PageID# 56807

70

1          Here, the opposite is true.  We submit that

2    there's a body of case law providing that there is, in

3    fact, a willfulness element to a section 1962(d) claim.

4    And that's consistent with the Fourth --

5          THE COURT:  Well, that's in the criminal arena.

6          MS. SIMMONS:  I am unaware of a body of cases

7    construing RICO that says that the elements would be

8    different depending upon if it is a criminal case or a

9    civil case.

10          Certainly the burden of proof is different,

11    which is obviously in a criminal case, it's beyond a

12    reasonable doubt and in the civil -- in the instance of a

13    civil case, it's preponderance of the evidence.

14          But in terms of the elements themselves, I

15    haven't seen any case law -- I'm not aware of case law

16    that would permit a difference as to the elements of the

17    offense itself.

18          THE COURT:  Where, in your brief, are your cases

19    that you say have the willful -- other than -- you've got

20    the Fourth Circuit cases, the names I can't pronounce.

21          MS. SIMMONS:  I can't either.

22          The *Grote* case, Your Honor, discusses this,

23    extensively.

24          THE COURT:  You're talking about the cases cited

25    in *Grote*, then?

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 426 of 503
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 71 of 214 PageID# 56808

71

1          MS. SIMMONS:  *Grote* itself does.  And then the

2     cases cited in it.

3          THE COURT:  But is there any federal case -- I

4     mean any case that holds that a civil RICO element case

5     has the knowledge element that you're arguing for?  Is

6     there any civil case that holds that?

7          MS. SIMMONS:  Your Honor, there's very few civil

8     RICO cases involving the collection of unlawful debt that

9     have made it to trial or the summary judgment stage.

10          THE COURT:  Well, are there any civil cases that

11     are RICO in which any court has ever held that the

12     knowledge element that you're talking about is part of

13     what you have to tell the jury?  Any case, any civil case?

14     Because I'm -- I didn't see it in the papers.

15          MS. SIMMONS:  Your Honor, the one I would point

16     the Court to is *Hengle v. Asner* itself, which was at a

17     motion to dismiss stage.  So certainly not to the point of

18     where we're instructing the jury.

19          But in that case, in discussing the element

20     required under a 1962(d) claim, the Court cited to the

21     *Mouzone* case that we are citing to here.

22          THE COURT:  District or circuit court cited to

23     that case?

24          MS. SIMMONS:  It was the District Court in

25     *Hengle v. Asner* cited to that case.

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 427 of 503

72

```
 1              THE COURT:  So the District Circuit, as part of
 2    the framing of the issue, said this is elements of the
 3    offense, and they cited the Mouzone elements; is that
 4    right?
 5              MS. SIMMONS:  Yes.
 6              THE COURT:  And it was in the Hengle case here?
 7              MS. SIMMONS:  Yes.
 8              THE COURT:  Did the Fourth Circuit address any
 9    of that when it went up to the Fourth Circuit?
10              MS. SIMMONS:  I don't believe that it did,
11    Your Honor.
12              THE COURT:  I didn't see it.  Okay.
13              MS. SIMMONS:  So in that case, Your Honor, in
14    Hengle v. Asner, the allegations were that plaintiffs had
15    alleged -- the Court found that plaintiffs had alleged
16    sufficient facts to support a plausible inference that the
17    defendants had agreed to engage in a conspiracy with other
18    individuals and entities with knowledge that the objective
19    of the conspiracy would be the collection of unlawful
20    debts.
21              And then the defendants, at least on the motion
22    to dismiss, countered that they had withdrawn from the
23    enterprise, even to the extent that there was, which
24    indicated a -- an intent on their part not to be involved
25    in the collection of unlawful debt.
```

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 428 of 503
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 73 of 214 PageID# 56810

73

```
 1             The Court countered that their decision to

 2    withdraw highlighted their perception of the unlawfulness.

 3    So the Court wasn't saying specifically that there was a

 4    knowing element, but it certainly was considering the

 5    question of whether or not the defendant knew the debts

 6    were unlawful.

 7             THE COURT:  All right.  We'll take a one-hour

 8    recess.

 9             MS. SIMMONS:  Thank you, Your Honor.

10             (Recess from 12:15 p.m. until 1:21 p.m.)

11             THE COURT:  All right.  Mr. Simmons, you were

12    talking on the clock when the time ran out.

13             MS. SIMMONS:  May I proceed, Your Honor?

14             THE COURT:  Yes.

15             MS. SIMMONS:  So just a couple of additional

16    points, Your Honor.  I wanted to spend a little bit of

17    time on a couple of cases that the plaintiffs had cited in

18    their initial argument.

19             I believe I already addressed the *Lawson* case,

20    which is --

21             THE COURT:  Yes, you did.

22             MS. SIMMONS:  So the next one was the *Mao v.*

23    *Global Trust Management* case.  And in that case, it was a

24    putative class action by individuals that received loans

25    from American Web Loan, which was associated with the
```

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 429 of 503
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 74 of 214 PageID# 56811

74

1    tribe.

2            In that case, the question of knowledge of the

3    illegality was with respect to the section 1962(c) claim,

4    and it didn't go into the same analysis with respect to

5    the 1962(d) claim.  We also think, again, that the *Mouzone*

6    case controls.

7            THE COURT:  If there's a scienter for one and

8    the scienter to the other, 62(d) and 62(c), you're saying

9    they are the same or different?  I'm not following you.

10           MS. SIMMONS:  I'm saying that in that case, the

11   Court was analyzing whether or not the illegality --

12   knowledge of the illegality of the loans -- whether or not

13   the plaintiffs needed to plead that for their section

14   1962(c) claim, as opposed to the issue that we're

15   addressing here, which is the 1962(d) claim, the

16   conspiracy claim.

17           THE COURT:  What's the difference?

18           MS. SIMMONS:  My understanding is that they have

19   a -- that they do have a different knowledge requirement.

20           I think the case law on section 1962(c) doesn't

21   have the same willfulness element read into it as the

22   1962(c) claim does.

23           THE COURT:  62(c) is what?

24           MS. SIMMONS:  That's the -- the general RICO

25   statute that says if -- that's the one that we conceive of

1  so if Mr. Martorello engaged in the management or control

2  of the enterprise, then he could be liable for RICO there.

3          THE COURT:  So you say there's no knowledge

4  requirement there?

5          MS. SIMMONS:  Well, there's knowledge

6  requirement, but it's not the same willfulness

7  requirement.  So that's that issue.

8          THE COURT:  So it's the willfulness requirement

9  that brings in the mistake of law/good faith defense to

10 just the conspiracy claim?

11         MS. SIMMONS:  It does, Your Honor.

12         Then they also cited to the *Brice v. Stinson*

13 case.  We addressed this case in response to our motion in

14 limine.  In that particular case, the defendants, in

15 opposing the motion in limine, didn't cite to any case law

16 that would demonstrate their ability to bring forward a

17 good faith defense.  In fact, I don't think that they

18 cited to any case law whatsoever.  Their response was more

19 along the lines of, of course, plaintiffs knew that we

20 were going to be presenting a good faith defense.  So we

21 don't think that that is controlling either.

22         THE COURT:  Tell me exactly how I would instruct

23 the jury on this.

24         MS. SIMMONS:  So we think that --

25         THE COURT:  The elements.  They cite -- they

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 431 of 503
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 76 of 214 PageID# 56813

76

1    cite your former and your current statement of the

2    elements.

3            MS. SIMMONS:  So in terms of what are the

4    elements of the claim?

5            So in that case -- or in that instance, which

6    was our statement of the elements at ECF 1099 -- and we

7    would note --

8            THE COURT:  ECF 1218 at 33.  They gave you this,

9    didn't they?

10           MS. SIMMONS:  Yes, Your Honor.

11           THE COURT:  Page 11, slide 21.  They say that's

12   Martorello's new statement of the elements, and they cite

13   ECF 1218 at 33 as the basis for it.

14           Is that your statement of the elements of a

15   1962(d) claim?

16           MS. SIMMONS:  And my response, Your Honor, is

17   that in our statement of the elements at ECF 1099, we also

18   cited to the *Mouzone* case, which is what we're relying on

19   here as the basis for the willfulness instruction.

20           THE COURT:  That didn't answer my question.  My

21   question is is this the current statement of what you

22   think the elements are for 1962(d)?

23           MS. SIMMONS:  Yes, Your Honor.

24           THE COURT:  Okay.  So that each defendant

25   knowingly and intentionally agreed with another person to

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 432 of 503
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 77 of 214 PageID# 56814

77

1   conduct or participate in the affairs of the enterprise

2   and that each defendant knowingly and willfully agreed

3   that he, or some members of the conspiracy, would commit

4   at least two racketeering acts, citing *Barnett*, quoting

5   *Mouzone*, right?

6           MS. SIMMONS:  Yes, Your Honor.  That's

7   consistent with the elements that we suggested and as part

8   of my opening as well.

9           THE COURT:  It isn't consistent with the

10  elements that you cited in ECF 1099.

11          MS. SIMMONS:  Which cites the *Mouzone* case.

12          THE COURT:  But you don't say anything about

13  knowledge.

14          MS. SIMMONS:  In that particular.

15          THE COURT:  Look at the preceding page.

16          MS. SIMMONS:  On 1099?

17          THE COURT:  Look at the preceding page.

18          MS. SIMMONS:  Your Honor, I agree it doesn't

19  discuss the knowledge requirement.

20          THE COURT:  At all.

21          MS. SIMMONS:  It doesn't.  But it does cite to

22  *Mouzone*, which does discuss the knowledge requirement.

23          THE COURT:  Uh-huh.  All right.

24          MS. SIMMONS:  So --

25          THE COURT:  Well, let's say that there's a

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 433 of 503
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 78 of 214 PageID# 56815

78

 1    knowledge requirement.  What's the knowledge got to be of?

 2              MS. SIMMONS:  It has to be -- so the scienter

 3    requirement has to be willfulness, and willfulness

 4    requires a showing --

 5              THE COURT:  This doesn't say willfulness.  It

 6    says intentional.

 7              MS. SIMMONS:  It does say willfulness,

 8    Your Honor, in the third element.

 9              THE COURT:  So is that what you're talking

10    about, knowingly and willfully?

11              MS. SIMMONS:  Yes, Your Honor.

12              So the case law says that if there is a

13    willfulness element or a willfulness showing, that the

14    plaintiffs have the burden to prove --

15              THE COURT:  We're talking about willfulness or

16    knowledge?

17              MS. SIMMONS:  We're talking about willfulness,

18    Your Honor.

19              THE COURT:  All right.  So it's the concept of

20    willfulness that animates the ability to present a

21    defense --

22              MS. SIMMONS:  Yes.

23              THE COURT:  -- of mistake of law?

24              MS. SIMMONS:  Yes, Your Honor.  Because when a

25    willfulness instruction is given, generally it also

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 434 of 503
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 79 of 214 PageID# 56816

79

1   provides that if the defendant -- if the jury finds that

2   the defendant had a good faith belief that his conduct was

3   not unlawful, then that is inconsistent with a finding of

4   willfulness.

5           And we cited a number of cases at Docket

6   Number 1281-1 that discuss the appropriate types of jury

7   charges that can be given if willfulness is an element of

8   the underlying offense.

9           THE COURT:  All right.  Anything else?

10          MS. SIMMONS:  Do you want counsel to go through

11  the statement of position on the good faith and the

12  evidence itself or just address the legal argument?

13          THE COURT:  That's up to you, how you want to

14  proceed.

15          MS. SIMMONS:  So, Your Honor, I -- so we'll

16  address it.

17          THE COURT:  Which document is it?  I just need

18  to find it.

19          MS. SIMMONS:  Sure.  It's Number 1247.

20          THE COURT:  Statement of position regarding good

21  faith defense pursuant to --

22          MS. SIMMONS:  I apologize, Your Honor.  That was

23  the order itself.  The statement of position is at --

24          THE COURT:  1275.

25          MS. SIMMONS:  Yes.  I apologize, Your Honor.

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 435 of 503
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 80 of 214 PageID# 56817

80

```
 1                 THE COURT:  All right.

 2                 MR. GUZZO:  I think it's 1261, Your Honor.  We

 3    filed an objection to that, and it's Docket 1270.  So it's

 4    got to come before that, and I believe it's at

 5    Docket 1261.

 6                 THE COURT:  Well, I have something here that

 7    says "Martorello Statement of Position Regarding Good

 8    Faith Defense Pursuant to Order at 1247."  The order was

 9    1247.

10                 MR. GUZZO:  The order is 1247, and the --

11                 THE COURT:  He's required to state the belief to

12    state the oral opinions and -- I just need to make sure

13    I've got the right thing.

14                 MS. SIMMONS:  Just one moment, Your Honor.  I

15    just don't have the ECF stamped copy in my binder.

16                 MS. KELLY:  I have on extra copy if you want it,

17    Judge.

18                 MS. SIMMONS:  So, Your Honor, the notice was

19    filed at Docket Number 1261 -- the statement of position.

20    Excuse me.

21                 THE COURT:  Well, what is 1275?

22                 MR. BENNETT:  That's the sealed filing of the

23    memorandum in support.

24                 MS. SIMMONS:  Okay.

25                 THE COURT:  So it's the sealed filing of --
```

USCA4 Appeal: 23-2097     Doc: 11-5     Filed: 12/06/2023     Pg: 436 of 503
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 81 of 214 PageID# 56818

81

 1          MR. BENNETT:  1261 is the statement.  1262 is

 2   the memorandum.  1275 is the sealed memorandum.

 3          THE COURT:  1275 is the sealed memorandum.  So

 4   that's what I want to be looking at.  It's got everything

 5   in it, right?

 6          MS. SIMMONS:  Yes, Your Honor.  And the Court

 7   should have received courtesy copies of the entire binder,

 8   including the 1261 and the unsealed version.

 9          THE COURT:  Well, if I've got the sealed

10   version, I've got everything that's in the unsealed

11   version in 1261 or 2, right?

12          MS. SIMMONS:  I believe so, Your Honor.

13          THE COURT:  Okay.  All right.  What do you have

14   to say about it?

15          MS. SIMMONS:  So, Your Honor, a couple of

16   points.  The first is in plaintiffs' response to that

17   statement of position, they again focus completely upon

18   the advice of counsel question.  And we submit, and we

19   submitted in our opposition to their motion for summary

20   judgment itself, that that's too narrow and that

21   Mr. Martorello has evidence and the case law would permit

22   him to present that evidence even if it doesn't amount to

23   specifically an advice of counsel.

24          And so the documents that are set forth and

25   attached --

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 437 of 503
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 82 of 214 PageID# 56819

82

1          THE COURT:  Well, I think that's why I ordered
2   this filing is to see what you were talking about.
3          MS. SIMMONS:  Yes, Your Honor.  And we submit
4   that this shows exactly what we're talking about.  The
5   documents that Mr. Martorello received and the things that
6   he was told by counsel, whether or not it would have been
7   counsel for Bellicose or the tribe itself, that there's
8   ample evidence --
9          THE COURT:  Okay.  The opinion that he had is
10  that the loans were governed by the laws of the tribe.
11         MS. SIMMONS:  Yes, Your Honor.  And we submit
12  that that was a good faith belief, based upon this whole
13  binder of documents.
14         With respect to the Georgia law memo, in
15  particular --
16         THE COURT:  You're just drifting off the boat
17  here.  Okay.  So this is -- so the basis, then, of his
18  mistake of law is in B, the oral advice or opinions
19  received, right?
20         MS. SIMMONS:  And C, Your Honor, which also goes
21  through --
22         THE COURT:  Answer the question.  It's in B,
23  right?
24         MS. SIMMONS:  Yes, Your Honor, it is in B.  It's
25  also in C.

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 438 of 503

83

```
 1            THE COURT:  I know.  I'm trying to go one thing
 2   at a time.  You have a way of taking -- going from zero to
 3   60 when I want to go zero to ten and take it bit by bit.
 4            MS. SIMMONS:  I understand.
 5            THE COURT:  And in the process, then everything
 6   in between gets allotted.  And what I'm trying to do is
 7   focus on particular parts of the argument so I can
 8   understand it.
 9            It is, I will tell you, a bizarre argument, one
10   that, in 30 years of doing this job, I've not come across
11   quite this way, and it's been explained in ways that are
12   very confusing, as you yourself just pointed out.
13            They think that it's an advice of counsel
14   defense.  That's a little bit different than a mistake of
15   law, I think.  I don't know.  But they may require
16   different analytical modes and constructs, and so I'm
17   trying to take these things in bits and pieces.
18            So the first thing is oral advice and opinions
19   received that are the basis for his view that the loans
20   were governed by the laws of the tribe.
21            All right.  He has been in contact with several
22   attorneys, you say.  And they stated their positions.
23            So now we're talking about that and we're on
24   B(i), right?
25            MS. SIMMONS:  Yes, Your Honor.
```

JA2319

```
 1            THE COURT:  And are we going to have Ms. Weddle

 2   come in here and testify?

 3            MS. SIMMONS:  We'll be presenting her testimony

 4   by deposition.

 5            THE COURT:  Where does she work?

 6            MS. SIMMONS:  She works out of the Greenberg

 7   Traurig office I believe in Denver, Colorado.

 8            THE COURT:  All right.  So you got her

 9   testimony.  She testifies to what she understood, but

10   that's irrelevant.  It's what she told him.

11            So where in here is what -- this is just pap.

12   You're trying to get in her opinion, and you can't do

13   that.

14            So where in this (i) is what she actually told

15   him?  Because that's the only thing that there can be,

16   that can form a basis for his opinion, and I don't see it.

17            MS. SIMMONS:  Your Honor, it all forms the basis

18   for her opinion.

19            THE COURT:  No.  I want you to take these bullet

20   points and I want you to show me the one that constitutes

21   what she told him because I don't see that.  And I may be

22   misreading it, and I don't want to.

23            MS. SIMMONS:  Your Honor, this is all reflective

24   of the advice that she gave Mr. Martorello.

25            THE COURT:  Would you like to argue this from
```

JA2320

1   now on?

2          I am going to have an answer to my questions or

3   you're going to sit down.  Don't -- if you don't know the

4   answer, say I don't know it.

5          MS. SIMMONS:  Your Honor --

6          THE COURT:  If you say it's not there, say it's

7   not there, but don't say anything else other than this.

8          Look at bullet point number such and such and

9   that is something she told him.  Now, that's what I want

10  to know.  So tell me what it is that she told him, please.

11         MS. SIMMONS:  Your Honor, none of these directly

12  say what she would have directly told Mr. Martorello that

13  I am aware of.  We --

14         THE COURT:  All right.  Hold it.

15         All right.  Now we're moving to Daniel Gravel,

16  B(ii).  Which of these bullet points represents what he

17  told Martorello?  I didn't see it, but if it's there and I

18  misunderstood it, I want to know.

19         MS. SIMMONS:  Your Honor, I don't believe

20  there's anything that Mr. Gravel directly testified that

21  said he told Mr. Martorello something.

22         THE COURT:  All right.  Mr. Williams, B(iii).

23  Which of these bullet points tell -- explain what he told

24  to Martorello?

25         MS. SIMMONS:  He testified as to his general

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 441 of 503
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 86 of 214 PageID# 56823

86

1    experience, Your Honor.  I don't --

2              THE COURT:  The answer is none, right?  None?

3              MS. SIMMONS:  Not specifically in the testimony.

4              THE COURT:  Jennifer Galloway.  Which of these

5    bullet points show what she told Martorello?

6              MS. SIMMONS:  She testified that --

7              THE COURT:  Which one?  Just point them out.

8              MS. SIMMONS:  Excuse me?

9              THE COURT:  Which bullet point.  They are not

10   numbered.  There are three on page 7.  Any of those

11   something she --

12             MS. SIMMONS:  She testified that the tribe's

13   loans were in compliance with federal law.

14             THE COURT:  I don't care what she testified.

15   That's her opinion as to what they were.  I didn't ask

16   that.

17             The question I asked was which of these bullet

18   points show something that she told Martorello?

19             MS. SIMMONS:  I don't believe that those are

20   there, Your Honor.

21             THE COURT:  Rob Rosette.

22             MS. SIMMONS:  Mr. Rosette testified that --

23             THE COURT:  Is there anything -- it says -- this

24   case says did not alter -- he had testified during his

25   deposition that the outcome of his opinion that online

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 442 of 503
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 87 of 214 PageID# 56824

87

1    tribal lending is legal and that he shared this opinion

2    with Martorello.

3            MS. SIMMONS:  Yes, Your Honor, that's what it

4    says.

5            THE COURT:  All right.  Now, that statement

6    relates back to some antecedent opinion.  And then it

7    says, "And that he shared this opinion with Martorello."

8    So what opinion did he share with Martorello is what I

9    want to know?

10           MS. SIMMONS:  His opinion that the

11   *Otoe-Missouria* case did not alter the question of whether

12   or not online tribal lending was legal.

13           THE COURT:  All right.  Karrie Wichtman, (vi).

14   Which of those bullet points represent something that she

15   told Martorello?

16           MS. SIMMONS:  I believe all three -- all four

17   bullet points -- excuse me, Your Honor -- support that

18   argument.

19           THE COURT:  Nope.

20           MS. SIMMONS:  She testified --

21           THE COURT:  I'm not asking about support for an

22   argument.  I want to know which ones -- now, please, I

23   don't understand why you can't understand my simple

24   request.  That you just answer whether it actually

25   reflects something she told him.  That's all I want to

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 443 of 503

88

1    know.

2              MS. SIMMONS:  Your Honor, that's the question

3    I'm trying to answer, and I do believe that each of those

4    bullet points reflects that.

5              THE COURT:  The first one doesn't.  She had

6    several conversations.  She doesn't say with whom.

7              MS. SIMMONS:  I believe it omits Martorello, but

8    I believe the -- the testimony itself covers that,

9    Your Honor.  I'm looking.

10             THE COURT:  And I see the second one, and I see

11   the third one.  All right.  And I see the fourth one.  But

12   I don't see the first one.

13             MS. SIMMONS:  So in the transcript itself, which

14   is at Exhibit G --

15             THE COURT:  Where is this Wichtman lawyer?

16   Where is she?

17             MS. SIMMONS:  The Upper Peninsula -- or I'm

18   sorry.  She's in Michigan, Your Honor.  I don't know if

19   it's Upper Peninsula or if it's the Lower Peninsula.

20             THE COURT:  Is she going to be here at trial?

21             MS. SIMMONS:  We'll be presenting her by

22   deposition, Your Honor.

23             THE COURT:  Did you ask her to come to trial?

24             MS. SIMMONS:  We have not yet spoken to her

25   about that.

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 444 of 503

89

```
 1              THE COURT:  Did you pay for her to come?

 2              MR. GIVEN:  I'm sorry.  I have to interrupt.  I

 3    have knowledge of that.

 4              We have asked her to come.  She's refused to

 5    come.

 6              THE COURT:  She refused?

 7              MR. GIVEN:  Ms. Wichtman -- the tribe has

 8    refused to cooperate in any discovery for the last point

 9    of time.  We actually have motion to compel hearings in

10    front of Judge Dein in Massachusetts on the related case.

11              THE COURT:  Have you asked her to come here for

12    this trial?

13              MR. GIVEN:  Yes, I have.

14              THE COURT:  And she's refused?

15              MR. GIVEN:  Correct.

16              THE COURT:  Okay.  Some lawyer that does that.

17              MS. SIMMONS:  So as to the first point,

18    Your Honor --

19              THE COURT:  All right.  I've got that.

20              MS. SIMMONS:  In Exhibit G, the question was,

21    "Did you ever tell Mr. Martorello that Bellicose and

22    SourcePoint's provision of consulting management and

23    servicing to Red Rock and Duck Creek constituted illegal

24    acts?"

25              And her response was, "Not that I recall."
```

JA2325

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 445 of 503
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 90 of 214 PageID# 56827

90

 1          THE COURT:  Then that statement here is not a
 2  correct statement because it says that she testified she
 3  had conversations and always took the view that the
 4  businesses were legal.
 5          What the citation you just read to me was that
 6  she never told him that it was illegal.  That's different.
 7  She can't -- that's not same information.  It's not -- not
 8  telling somebody that something was illegal is far
 9  different than saying it's legal.  And so that's -- that's
10  out.
11          MS. SIMMONS:  So, Your Honor --
12          THE COURT:  How about the others?  I have to
13  read the others that carefully, too?  I guess I better get
14  back into the books and read some more.
15          What about this Wichtman, the next one, 59:2-16?
16  What did she say?  Where is that one?  I don't think I
17  have the backup up here.  But we know that the first one
18  is wrong.
19          MS. SIMMONS:  Your Honor, on that one, she was
20  referring to conversations with Ms. Weddle, and she told
21  Ms. Weddle that her view was that it was legal.  So I
22  agree it wasn't directly --
23          THE COURT:  Then you cited to me something that
24  was not correct.  This is wrong.  It's out, the first
25  bullet point under Karrie Wichtman.

 1          Now, what does the second one say, as long as
 2   we're looking at them?
 3          MS. SIMMONS:  Your Honor, it's on page 59 of
 4   Ms. --
 5          THE COURT:  Read it to me.
 6          MS. SIMMONS:  It says, "Can you describe what
 7   you told him?"
 8          "I told him, you know, that the tribal sovereign
 9   lending model was sound and that we weren't structured in
10   the same way and that all of the -- I think that the
11   Western Skys, AMGs, CashCalls, Butch Webbs of the world
12   could be distinguished from the operation of Red Rock and
13   Duck Creek and the involvement of the tribe.  You know, I
14   mean, we truly believed in the tribal lending model and
15   the structure that we put in place in order to operate the
16   tribe's business."  And then she goes on.
17          THE COURT:  Sound.  Not legal.  Big difference
18   between whether something is sound or legal.  So that's
19   not an opinion that he got from a lawyer that it was
20   legal.  It's that it was sound.
21          What's the next one, 59:17?
22          MS. SIMMONS:  "Are you familiar with a case that
23   was solved in the Southern District of New York by the
24   Otoe-Missouria tribe and others?"
25          Answer, "Yes."

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 447 of 503
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 92 of 214 PageID# 56829

92

1          "And did you discuss with Mr. Martorello about

2    the case, both the District Court and the Court of

3    Appeals?"

4               Answer, "Yes."

5          "And did you -- did you and Mr. Martorello

6    discuss" -- well, sorry.  And then there's a "strike

7    that."

8          "Did the result of the case cause you to believe

9    that the Red Rock and Duck Creek lending operation was

10   illegal?"

11              Answer, "No."

12              THE COURT:  The answer does not say that she

13   shared that with Mr. Martorello.

14              Last one, 152:7 to -- good grief.  That's long.

15   Have you got that?  I'll just read it myself.

16              So nothing in that -- that bunch of passages so

17   far has provided the basis for a good faith defense

18   anyway.  So let's see what this one says.  Have you got

19   it?

20              MS. SIMMONS:  Your Honor, it's a very long

21   passage.

22              THE COURT:  I know.  Have you got it and I'll

23   read it.

24              MS. SIMMONS:  I have it.

25              THE COURT:  Would you mind handing it to me?

USCA4 Appeal: 23-2097    Doc: 11-5      Filed: 12/06/2023    Pg: 448 of 503

93

1          MS. SIMMONS:  So the question -- yes,

2  Your Honor.  I apologize.

3          Do you want the entirety of Exhibit G or just

4  this particular excerpt?

5          THE COURT:  152, line 7, to 173, line 18.

6          What is the document being referred to on

7  page 153?

8          MS. SIMMONS:  I will have to pull up the

9  transcript itself.  Oh, so it's -- it says -- they're

10 talking about a legal opinion that was issued --

11         THE COURT:  Yes.  What opinion is it?

12         MS. SIMMONS:  I have to pull up the full

13 transcript, Your Honor.  I don't have -- I don't have the

14 exhibit that was referring to there.

15         THE COURT:  You find it, if you would, please,

16 while I -- there's also another one.  They gave

17 Ms. Wichtman another document, a supplement to the legal

18 opinion she just testified to about on page 153.

19         MS. SIMMONS:  Your Honor, I don't have access to

20 the full deposition transcript at the moment.

21         THE COURT:  Do you have the opinions -- it's an

22 opinion to LST --

23         MS. SIMMONS:  LST --

24         THE COURT:  -- Financial, and then there's a

25 supplement to it.

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 449 of 503
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 94 of 214 PageID# 56831

94

1          MS. SIMMONS:  Yes, Your Honor.  So --

2          THE COURT:  So the plaintiffs, do you have any

3  of that with you?

4          MS. SIMMONS:  Your Honor, it would be attached

5  as one of these other exhibits.  So --

6          THE COURT:  Why don't you look for it while I'm

7  reading.  Tell me which one it is.

8          MS. SIMMONS:  Okay.

9          MS. KELLY:  I have it here, Judge.

10          MR. GIVEN:  Where is it so we can all find it?

11          MS. KELLY:  It's a MidMarch document, I believe.

12  It's Exhibit FF to the 1261.

13          MS. SIMMONS:  Thank you.

14          MR. GIVEN:  Thank you.

15          THE COURT:  Up to the first pages, she did not

16  discuss -- on to another document.  Now, from page 153 to

17  161, she did not discuss it with Martorello.  All she said

18  is he was carbon copied on it.  She can't testify about

19  telling him anything in those two documents.

20          There appears, then, to be another document on

21  number -- on page 162 of the deposition, but it appears,

22  from the preceding discussion, that -- it's hard to

23  understand what they are doing here, but it's some

24  document -- no.  Wait a minute.  Let me go back a minute.

25          Some document referred to on page 162 as a form

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 450 of 503
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 95 of 214 PageID# 56832

95

1   of document which comes out from the Rosette Law Firm to

2   tribal lending clients in the form of a memorandum.

3          Whatever that document was, it says, "Did you

4   discuss this decision with Mr. Martorello?"

5          Nothing in the preceding question or answer

6   suggests there was a decision at all mentioned, but that

7   might be in the document.  I don't know.  It may be that

8   this is an update and it contains a discussion of some

9   kind of decision.  But there's nothing in here to indicate

10  what it is.

11         Then she says -- and the question was, "Did you

12  share the views that are expressed in this exhibit with

13  Mr. Martorello?"

14         "I'm sure that this was the basis of our

15  discussion, yes."

16         That's not clear, but fairly interpreted is that

17  she did share it with him and discuss it with him.

18         And she says she remembers discussing cases and

19  types of concepts with Martorello over the years.  That

20  doesn't -- that's nothing specific.  But you can't tell

21  what it is without looking at the document.

22         On page 165 of the transcript, there's referred

23  to some document about the legality of tribal lending

24  operations.

25         MS. KELLY:  Judge, those documents are Exhibits

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 451 of 503
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 96 of 214 PageID# 56833

96

1    XX, YY to 1261 from Mr. Martorello.  They are letters to

2    the LVD's banker to encourage him to keep letting him do

3    ACH transactions.

4                THE COURT:  Letting who do them?

5                MS. KELLY:  Pardon?

6                THE COURT:  According to this deposition it

7    doesn't have anything to do with Martorello.  It's just

8    asking if she agrees with the documents.  And it doesn't

9    say -- nothing here -- there are parts of these documents,

10   whatever they are, that talk about the legality, but they

11   don't say anything about discussing them with Martorello.

12               So unless he actually got it or somebody told

13   him something, it can't be the basis for a belief at all.

14               MS. SIMMONS:  And so, in response, Your Honor,

15   section C of our statement of position attaches documents

16   and --

17               THE COURT:  Excuse me.  We're getting there.

18   But I'm not talking about those yet.  I'm talking about B.

19   So unless you show me something that connects something

20   that I -- then they wouldn't come in anyway.  But I am

21   interested in doing that.  So you can pull these

22   documents, find them and tonight you can mark them.  We'll

23   come back and talk about them tomorrow.

24               MS. SIMMONS:  Okay.

25               THE COURT:  They are the ones that relate --

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 452 of 503
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 97 of 214 PageID# 56834

97

1  that are mentioned in -- Karrie Wichtman, the part of the

2  transcript from 152-7 to 173-18.  That will be what you do

3  tonight or maybe during a break.  We'll see.  Okay.

4          Now we can go to section C.

5          MS. SIMMONS:  And so, Your Honor, certainly the

6  following exhibits were supplied to -- Mr. Martorello was

7  copied or received copies of at least the following

8  exhibits that we've attached.

9          THE COURT:  You mean C?

10         MS. SIMMONS:  Under section C, there's a table

11 that refers to a number of documents that we submit

12 support Mr. Martorello's good faith defense, and those

13 documents show and support the testimony that we received,

14 which I understand Your Honor disagrees with that

15 position, but --

16         THE COURT:  I don't disagree with it.  You can't

17 put it in.

18         MS. SIMMONS:  Understood, Your Honor.

19         THE COURT:  With what I told you, if

20 something -- if you represented that he relied on it, he

21 has to have seen it first.  If he hasn't seen it, you

22 can't put it in.  It doesn't go to the defense at all.

23         Now, this stuff here in C --

24         MS. SIMMONS:  So we've included --

25         THE COURT:  Just wait a minute.  So let's just

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 453 of 503
Case 3:17-cv-00461-REP  Document 1316  Filed 06/15/23  Page 98 of 214 PageID# 56835

98

1   take a couple of these.  I want to show you what's the

2   problem with what you are talking about.

3           You have put together this notion that

4   somewhere -- because somewhere in a document this is some

5   mention of something in the way of tribal lending, that

6   it's the basis for something.  That isn't the way it

7   works.  To put in -- for me to have a basis that something

8   in a document said something, I have to, A, have seen the

9   document and then what was said in there has to be

10  reasonably the basis for what you want to say I reasonably

11  thought.

12          Just take the first one.  December 12th, 2011, a

13  draft revised consumer loan document stating "we tried to

14  put solid notice provisions for the consumers in

15  compliance with the Tribe's Consumer Code."  That doesn't

16  say anything.  That doesn't do anything to advance what

17  his belief was or wasn't.  It doesn't.  Now, there may be

18  some -- he may be able to give life to it by testifying,

19  but what's here doesn't do that.

20          And you can't just use documents that have some

21  general appurtenance to a topic to bring home the

22  evidentiary point in the document, it doesn't work that

23  way.

24          Let's try the next one.  Weddle.  E-mail from

25  Weddle to Wichtman stating that Martorello was speaking to

USCA4 Appeal: 23-2097   Doc: 11-5   Filed: 12/06/2023   Pg: 454 of 503

1    her parter, the former regional director for FTC to do a

2    "federal law compliance office for RRTL and DCTF to make

3    sure all procedures are federal compliant."

4              What?  What does that do but waste the time of

5    the fact finder?  It doesn't prove anything.

6              MS. SIMMONS:  Your Honor, it shows

7    Mr. Martorello's intent to comply with the law.

8              THE COURT:  No, it doesn't.  It's not probative

9    of any such thing.  And if it is probative, Rule 403 would

10   keep it out because it leads to confusion and delay and

11   the need for other evidence to address the peripheral

12   point being made.  And you have to have two steps in

13   between this one and the point -- between what's in -- you

14   represent is in December 28, 2011.  You have to do that.

15   You have to have a linkage.  If you don't have it, you

16   fail.

17             Next one.

18             MS. SIMMONS:  So Exhibit J, Your Honor, is a

19   draft response to the Ohio Attorney General.  And I admit,

20   Your Honor, that it doesn't appear that we included the

21   draft response.  That was an omission.

22             But the e-mail itself went to Mr. Martorello,

23   and we would submit that the letter discusses the fact

24   that -- it takes the position that state law is

25   inapplicable.

USCA4 Appeal: 23-2097   Doc: 11-5   Filed: 12/06/2023   Pg: 455 of 503
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 100 of 214 PageID# 56837

100

1          THE COURT:  Okay.  That's a mistake of law.

2     That's not advice of counsel.  It's mistake of law.

3          MS. SIMMONS:  I apologize, Your Honor.

4     Exhibit --

5          THE COURT:  When I read this, I went through

6     this and I had this abiding belief for every one of these

7     things.

8          MS. SIMMONS:  Your Honor, just --

9          THE COURT:  Many of them didn't go to

10    Martorello.  There's no proof that he got them.  Many of

11    them are drafts, and they all relate to a mistake of law.

12    That is, that tribal law obtains and the state law

13    doesn't.

14          So it has very little to do with -- it has

15    everything to do with that he made a mistake of law.  And

16    the issue is is a mistake of law cognizable as part of the

17    case.  That's the abiding belief I have for all of these.

18          My suggestion to you is you go through all of

19    these and you really whack out everything that doesn't

20    really and truly link to Martorello so I can then look at

21    what looks to Martorello, what didn't, what was he told,

22    instead of drawing inferences that, well, he got this and

23    maybe it relates to what he thought or maybe it doesn't.

24          I'll have to -- I'm going to have to take them

25    at the pretrial conference one by one.

1          MS. SIMMONS:  So, Your Honor, the -- the

2    instruction is to determine which ones we can show that

3    Mr. Martorello received?

4          THE COURT:  Yeah.

5          MS. SIMMONS:  Okay.

6          THE COURT:  He has to know about them, and many

7    of them, there's no indication that he does.  And I don't

8    want to go through any ones that he didn't receive.  Then

9    I have to decide whether they, on their own, are

10   admissible and why.  I'll do that at the pretrial

11   conference, if we get that far.

12         MS. SIMMONS:  Understood, Your Honor.

13         Does the Court want to continue to go through

14   these?

15         THE COURT:  No.  I want you to go sort it out.

16         MS. SIMMONS:  Thank you, Your Honor.

17         We do have a preliminary list that was set forth

18   in our docket at 1281-1, but we'll go back and confirm

19   that there weren't others that should have also been

20   listed there.

21         THE COURT:  I don't want you to add to them.  I

22   want you to say the ones that are in your paper that

23   actually Martorello saw them.

24         MS. SIMMONS:  No, Your Honor, I'm not suggesting

25   that we would be filing additional exhibits.

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 457 of 503
Case 3:17-cv-00461-REP    Document 1316    Filed 06/15/23    Page 102 of 214 PageID# 56839

102

 1                 THE COURT:  Oh, okay.

 2                 MS. SIMMONS:  I'm saying we'll make it clear

 3     which ones Mr. Martorello clearly received and those that

 4     he did not.

 5                 THE COURT:  All right.  What else about your --

 6     your issue on the availability of a mistake of law

 7     defense?

 8                 MS. SIMMONS:  The last point, Your Honor, is

 9     just to briefly address the Georgia law memo that

10     plaintiffs have mentioned.

11                 THE COURT:  Is that the Greenberg Traurig?

12                 MS. SIMMONS:  The Greenberg Traurig, yes,

13     Your Honor.

14                 THE COURT:  I don't understand something.  I've

15     read the papers, and I'm a little bit confused about it.

16                 There is one part of the materials you all cited

17     that says that -- what's the lady's name who's the lawyer

18     there?

19                 MS. SIMMONS:  Jennifer Weddle.

20                 THE COURT:  Weddle.  Ms. Weddle wasn't sure

21     there was even a memo, and then there was for sure a memo.

22     And so I'm kind of confused about whether -- you all have

23     a ground -- basis of knowledge in this that I don't have.

24                 Will you put me in the picture as what this memo

25     is all about, who wrote it, where it came from, et cetera,

JA2338

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 458 of 503
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 103 of 214 PageID# 56840

103

1  et cetera, what we know about it?

2          MS. SIMMONS:  Yes, Your Honor.  So in the record

3  there's a memo from Greenberg Traurig regarding the

4  potential liability for aiding and abetting under Georgia

5  law.  I believe it's 11 pages.  And --

6          THE COURT:  Is that the -- the way it got to be

7  described as a 20-page memo is that your client described

8  it as a 20-page memo.  But is the 11-page memo the memo

9  we're talking about?

10          MS. SIMMONS:  We believe that it is, Your Honor.

11  Plaintiffs have taken an altered position.

12          THE COURT:  What's the position of the

13  plaintiffs on that?  Is it the same thing or not?

14          MR. GUZZO:  We don't believe it is, Your Honor.

15  We believe there's an update to the memo that has not been

16  provided.

17          THE COURT:  Do you know who's got it?

18          MR. GUZZO:  Ms. Kelly is the most familiar.

19          THE COURT:  All right.

20          MR. GUZZO:  She's been taking the lead on that.

21          THE COURT:  All right.  I'll give you a chance

22  in a minute, then.

23          How about that?  They think there's an updated

24  memo, a 20-page one.  Do you know whether there is or not?

25          MS. SIMMONS:  We do not, Your Honor.  We haven't

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 459 of 503
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 104 of 214 PageID# 56841

104

1   seen one.

2           I can address that issue now or we can address

3   it -- if you want me to address our position on that, I

4   can.

5           THE COURT:  You said that's part of what you

6   wanted to present.

7           MS. SIMMONS:  I was more addressing the fact

8   that it's dated August 2012, Your Honor, and the record

9   shows that there were numerous other documents, letters

10  sent saying that the parties believed and understood that

11  state law would not apply.

12          And so, yes, that memo exists.  It was sent in

13  August 2012, but there's numerous documents after that

14  date that take a different position.  That's the point

15  that we want to make on that.

16          THE COURT:  So the -- this document -- you're

17  talking about the 11-page document.

18          MS. SIMMONS:  Yes, Your Honor.

19          THE COURT:  Do I have it?

20          MS. SIMMONS:  Yes.

21          THE COURT:  Is that what was attached to the

22  thing you all filed earlier -- was it last week or earlier

23  this week?

24          MS. SIMMONS:  It's included in this binder of --

25  of the documents with respect to Mr. Martorello's good

USCA4 Appeal: 23-2097   Doc: 11-5   Filed: 12/06/2023   Pg: 460 of 503
Case 3.17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 105 of 214 PageID# 56842

105

1   faith belief.

2               THE COURT:  What exhibit number is it?

3               MS. SIMMONS:  Just give me one second and I'll

4   give you the exhibit number, or I can give you a copy of

5   it.

6               THE COURT:  If you tell us the number, we can

7   try to find it.  Is it in binder 1 or binder 2?  Binder 1

8   has numbered exhibits that end at 38.

9               MS. SIMMONS:  Your Honor, I believe I misspoke

10  on the date of that --

11              THE COURT:  Anybody have a free copy of the best

12  seller 11-page memo?

13              MS. KELLY:  And, Judge, it's --

14              THE COURT:  We'll put it on the paperback list.

15  Publish it in the New York Times.

16              MR. GUZZO:  We have two copies to hand up,

17  Your Honor.

18              THE COURT:  Can I please --

19              MR. GUZZO:  The cover page is an e-mail that

20  attaches it and then the actual memo --

21              THE COURT:  We had them, and I think I've lost

22  it.

23              MS. KELLY:  And, Judge, just for the record, it

24  was filed by plaintiffs at ECF 1266-3.

25              THE COURT:  All right.  And what's your point

USCA4 Appeal: 23-2097   Doc: 11-5   Filed: 12/06/2023   Pg: 461 of 503
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 106 of 214 PageID# 56843

106

1  with respect to this memo?

2          MS. SIMMONS:  My point, Your Honor, was more

3  that that's issued at an early date and there are

4  documents in the record that come after that date which

5  discuss the fact that the attorneys that were working on

6  this matter took the position that state law did not apply

7  to the tribal lending activities.  And so the point that

8  we're making is that particular memo, in and of itself,

9  does not decide the factual question of whether or not

10 Mr. Martorello held a good faith belief.

11         THE COURT:  Okay.  Are you saying that the

12 document that is at 1266-3 gives the opinion that it's not

13 lawful?

14         MS. SIMMONS:  Excuse me?

15         THE COURT:  Are you saying that the document

16 that you gave me, it's 1266-3, it's dated August 23, 2012,

17 and it refers to a memo attached -- or further down the

18 line of August 20th, and then -- or a communication and

19 there is attached confidential attorney-client privilege

20 memorandum, August 2012, and topic is Georgia Payday

21 Lending Laws & Third Party Liability.

22         Are you saying that it is this document that

23 says that the tribal -- online lending was not legal but

24 that later documents took the other view and that's why

25 this one should not be paid attention to?

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 462 of 503
Case 3.17-cv-00461-REP    Document 1316    Filed 06/15/23    Page 107 of 214 PageID# 56844

107

 1          MS. SIMMONS:  It says that the Court is likely

 2  to engage in a *Cabazon* and *Bracker* test.

 3          THE COURT:  In a what?

 4          MS. SIMMONS:  It says that a court is likely to

 5  believe that tribal -- that this is on-reservation conduct

 6  and so -- I don't have it -- I'm trying to pull it up,

 7  Your Honor.  But my recollection is that it says -- that

 8  it says two things, that -- that this is --

 9          THE COURT:  Wait a minute.  Let's stop.  You

10  made the statement to me --

11          MS. SIMMONS:  Mr. Taliaferro is more familiar

12  with this issue.  I'm going to hand it off to him.

13          THE COURT:  All right.  But you made the

14  statement to me that some documents went one way and

15  documents later went the other way.  And all I'm trying to

16  figure out is which document is it that went one way and

17  which documents are the ones that went the other way?

18          MR. TALIAFERRO:  Your Honor, this is the

19  document that suggests that individuals could be subject

20  to aiding and abetting under Georgia law.

21          THE COURT:  It's the one referred to in one of

22  the slides he presented earlier?

23          MR. TALIAFERRO:  Yes, sir.  This is the 11-page

24  memo.

25          THE COURT:  All right.  I know what it says.

1    MR. TALIAFERRO:  And then I believe what

2    Ms. Simmons was saying was we believe that this is

3    contradicted by subsequent documents.

4          THE COURT:  By the same firm?

5          MS. SIMMONS:  Yes.

6          MR. TALIAFERRO:  Yes.

7          THE COURT:  Where are they?

8          MR. TALIAFERRO:  If -- I think that would be in

9    the narrowed list that we can provide -- work on tonight,

10   Your Honor.

11         THE COURT:  Where are those documents?  You say

12   you can get me one tonight?

13         I mean, you say it's been updated.  He says it's

14   been updated.  I want to see it.  If it's something you

15   all are relying on, I've got to understand it.

16         MS. SIMMONS:  So those are attached, Your Honor,

17   we think, to the statement of position, and we'll be

18   prepared to point the Court to specifically what those are

19   in our subsequent submission that the Court has requested.

20         THE COURT:  All right.  Okay.  All right.  Is

21   that it?

22         MS. SIMMONS:  Yep, Your Honor.

23         THE COURT:  All right.  As I understand the

24   position that Mr. Martorello is positing, it is this; that

25   because of the statements made by the Supreme Court of the

1  United States in *Elonis v. United States* and *X-Citement*
2  *Video*, the earlier decisions of the Second Circuit,
3  *Biasucci*, has to be called into question.  And the
4  statement they quoted is, quote, The Supreme Court's
5  recent reaffirmations of a presumption in favor of a
6  scienter requirement applicable to each of the statutory
7  elements that criminalize otherwise innocent conduct reads
8  a scienter requirement into civil RICO cases when the
9  previous case, *Biasucci*, and the subsequent cases from the
10  Seventh and Ninth -- I think -- Circuits say that there is
11  no such case.
12          And then you have -- what's the case that begins
13  with -- *Gingras*, is it?
14          MR. GUZZO:  I think it's *Grote*, G-R --
15          THE COURT:  *Grote* is the criminal case that
16  they're relying on to say -- the Second Circuit is having
17  serious doubts about *Biasucci*.  And there's some -- I
18  understand that.  They even make some strange statements.
19  But the Eleventh and the Third Circuits approved the
20  approach of *Biasucci* in the *Pepe* case, the Eleventh
21  Circuit did, and --
22          MR. GUZZO:  And the *Baker* case out of the
23  Ninth Circuit, Your Honor.
24          THE COURT:  And the *Eufrasio* case was a criminal
25  case.

USCA4 Appeal: 23-2097   Doc: 11-5   Filed: 12/06/2023   Pg: 465 of 503

1         MR. GUZZO:  That's right.

2         THE COURT:  What's the one out of the

3    Ninth Circuit?

4         MR. GUZZO:  It's *Baker*.

5         THE COURT:  *Baker*.

6         So here's the question that really is being put

7    by what they are saying:  Given what the Supreme Court has

8    said about the elements and the knowledge element, do we

9    need to revisit, in view of *Elonis* and the *X-Citement*

10   case, do we need to revisit the notion of what the

11   scienter element is in a RICO 1962(d) case?

12        MR. GUZZO:  No, Your Honor.

13        THE COURT:  Why not?

14        MR. GUZZO:  Because if I understand their

15   position, Your Honor, they are using scienter to mean

16   specific intent.  Specific intent to violate the law.

17        So when they take the Fourth Circuit's use of

18   the term willfully, they are taking that term and they are

19   analogizing it to a specific intent crime.  And what our

20   interpretation is is that there's no scienter -- the

21   statute is silent.  Everybody agrees.

22        And so the question becomes what is the

23   presumption that would apply.

24        THE COURT:  But are there any cases that you

25   know of in which there is a civil liability provision in a

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 466 of 503
Case 3.17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 111 of 214 PageID# 56848

111

1   criminal law case where the elements of scienter are

2   different in a civil case than they would be in a criminal

3   case?

4          MR. GUZZO:  I am not aware of any, Your Honor.

5          THE COURT:  Antitrust law, for example.  You

6   have private causes of action there.  Securities law, you

7   have private causes of action there.

8          Either one of you looked at that issue?  Do we

9   have any analogs in any other arena of the law where you

10  have a criminal case and the criminal case tacks on a

11  civil right of action?

12         You have CERCLA -- for example, there are

13  certain cases that have -- certain aspects of CERCLA that

14  have criminal application and they have civil application.

15  Antitrust comes to mind.  Securities law.  What else comes

16  to mind that provides a circumstance such as this?

17  Anything come to your mind?

18         MR. GUZZO:  I mean, I think even under the FCRA,

19  someone could be criminally liable if they pull someone's

20  reports under false pretenses, and that statute --

21         THE COURT:  That has its own elements in it.

22  But that's a civil case in which there's a criminal

23  liability.  It's actually the reverse.

24         MR. GUZZO:  Yeah.  I'm happy to look into the

25  issue tonight.

JA2347

USCA4 Appeal: 23-2097   Doc: 11-5   Filed: 12/06/2023   Pg: 467 of 503
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 112 of 214 PageID# 56849

112

1          The one thing I would say, though, is during the

2   lunch break, I pulled a Supreme Court case *Carter v.*

3   *United States*.  I have copies for Your Honor.

4          And that case --

5          THE COURT:  Well, hand them up, if you're going

6   to talk about them.

7          MR. GUZZO:  I tabbed it for you as well,

8   Your Honor.

9          THE COURT:  Did you give it to the other side?

10          MR. GUZZO:  I did at the break.

11          THE COURT:  All right.

12          MR. GUZZO:  And there's a paragraph (a) in this

13   case where it's talking about the scienter requirement and

14   that presumption.

15          And you should have a tab that points you right

16   to the Supreme Court where it says, "Properly applied,

17   section 2113, the presumption in favor of a scienter

18   demands only that we read into subsection (a) as requiring

19   proof of general intent; that is, that the defendant

20   possessed knowledge with respect to the actus reus of the

21   crime."

22          Here, the taking of a property of another by

23   force and violence or intimidation.

24          THE COURT:  So what would the scienter

25   requirement be here in this case?

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 468 of 503
Case 3:17-cv-00461-REP    Document 1316    Filed 06/15/23    Page 113 of 214 PageID# 56850

113

 1          MR. GUZZO:  That Martorello knowingly and

 2   deliberately intended to engage in the collection of a

 3   debt knowing that that debt exceeded state interest rates.

 4          THE COURT:  And you agree that such an

 5   instruction should be made.

 6          MS. SIMMONS:  We agree that --

 7          THE COURT:  Given.

 8          MR. GUZZO:  Given.  That he had to know what he

 9   was doing.

10          THE COURT:  What you just said.  I think that's

11   something that my children sometimes say, what he just

12   said.

13          But what you just said is an instruction that

14   has to be given, isn't it?

15          So that is the scienter requirement of RICO.

16          MR. GUZZO:  It's a general intent statute,

17   Your Honor.

18          THE COURT:  You would have to give that intent.

19   If you didn't, you'd get reversed.

20          MR. GUZZO:  Yeah, that he acted knowingly --

21          THE COURT:  Knowingly what?  That's the point.

22   You know, you've got to tell juries directly what it is

23   they are supposed to be focusing on, and that's called

24   instructing them in the elements.  What you just said

25   sounded like a pretty good instruction.  Do you want to

USCA4 Appeal: 23-2097   Doc: 11-5   Filed: 12/06/2023   Pg: 469 of 503

114

1  repeat it?

2          MR. GUZZO:  Knowledge of the facts, not

3  knowledge of the law.  That's the distinguishment.

4          THE COURT:  Mark that, please.  Would you,

5  please?

6          MR. GUZZO:  Mr. Martorello needed to know the

7  facts giving rise to his conduct.

8          THE COURT:  That he knowingly and deliberately

9  engaged in an agreement with other people to collect debts

10 that were unlawful.

11         MR. GUZZO:  That had interest rates that --

12         THE COURT:  Interest rates that exceeded the

13 state law.

14         MR. GUZZO:  Right.  He didn't need to know they

15 were unlawful.  He just needed to know the character of

16 them.

17         THE COURT:  What's that mean?

18         MR. GUZZO:  For example, Your Honor --

19         THE COURT:  What's the character mean?

20         MR. GUZZO:  That -- that the debt wasn't a

21 6 percent loan.

22         THE COURT:  In other words, that the debt

23 exceeded the limit of the state law.

24         MR. GUZZO:  Or at least he had knowledge of the

25 interest rates of them.

JA2350

USCA4 Appeal: 23-2097   Doc: 11-5   Filed: 12/06/2023   Pg: 470 of 503

115

```
 1              THE COURT:  Uh-huh.  You would agree with an
 2   instruction like that, wouldn't you?
 3              MR. TALIAFERRO:  And I think this -- Your Honor,
 4   this would go to our -- the discussion about whether we
 5   think that it includes knowledge of what the law was.
 6              THE COURT:  Yeah, but it doesn't.  I'm not going
 7   to buy that.  We're not going to have that one.  I'm --
 8   we're not talking about that one right now.
 9              You would agree with an instruction to that
10   effect no matter what comes out on that point, right?
11   You've got to.
12              MR. TALIAFERRO:  We would not disagree with that
13   instruction.
14              THE COURT:  You want more.
15              MR. TALIAFERRO:  We want an additional
16   instruction.
17              THE COURT:  I understand that.  But you haven't
18   given up on that.  You've got the right to talk about it.
19   But I'm not asking you that question.
20              I just think I am not able to speak clearly
21   anymore.  I'm not trying to trap you.  I'm trying to
22   figure out where we are.
23              Okay.  So I think we're in agreement that there
24   is a requirement of that sort, but the disagreement is
25   does he have to know what the law is?
```

JA2351

USCA4 Appeal: 23-2097   Doc: 11-5   Filed: 12/06/2023   Pg: 471 of 503
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 116 of 214 PageID# 56853

116

1            MR. GUZZO:  That's right, Your Honor.  So it's

2       our position it's not a strict liability statute.

3       Mr. Martorello doesn't just become liable under RICO

4       because he is part of this conspiracy -- for example,

5       let's just say he was a payment processor and he had no

6       idea about the interest rates.  He's really assisting

7       them, but he has no clue about what's going on, the type

8       of loans that are being made.  We're not suggesting that

9       this is a strict liability statute.

10           THE COURT:  All right.

11           MR. GUZZO:  So to back up where I think the

12      Second Circuit in *Grote* took a problem with *Biasucci* is

13      that I think *Biasucci* could be read to imply that it is a

14      strict liability in statute in some ways.  And that's not

15      our position.  Our position is that we don't have to prove

16      that Mr. Martorello knew that the loans violated state

17      law.

18           THE COURT:  Let me ask you something.  How could

19      he possibly -- how would we even have a case if he

20      possibly did not know that the law -- that the interest

21      rates violated every state law in the country?  I mean,

22      these were 100 percent interest rates.  That's the whole

23      business model.

24           MR. GUZZO:  That's correct, Your Honor.  I

25      mean --

USCA4 Appeal: 23-2097   Doc: 11-5   Filed: 12/06/2023   Pg: 472 of 503

117

```
 1              THE COURT:  So why are you -- I guess it raises
 2   in my mind the question given the volume of information
 3   that shows that he deliberately set out, with knowledge of
 4   a business model, to charge as much interest as they could
 5   possibly milk out of everybody and it would not be
 6   governed by state law, how could you be apprehensive that
 7   you couldn't prove, even if you had to, that he knew that
 8   the state law prohibited interest above -- what is it?
 9   24 percent is the maximum?  Twenty-one?
10              MR. GUZZO:  Virginia's is 12 percent.
11              THE COURT:  Twelve.
12              MR. GUZZO:  And RICO doubles it.  So it would be
13   24 percent.
14              We're not apprehensive about it.  I mean, if
15   that's Your Honor's ruling, I think we have hundreds of
16   documents that would say that --
17              THE COURT:  I ask that question borne of advice
18   that I received from Judge Williams when he was a
19   practicing lawyer and my supervisor, and he asked this
20   question:  Why would you fight something that could
21   possibly get you reversed?  If you can prove it and you
22   know you can sell the jury on it, why would you fight it?
23   Why would you not want it in there so that your record is
24   good?
25              MR. GUZZO:  I --
```

JA2353

```
 1              THE COURT:  That you don't have to answer today
 2   because that's your legal advice to your client.
 3              MR. GUZZO:  No.  No.  I --
 4              THE COURT:  It is a question that I think all
 5   lawyers ought to ask themselves because there's a time for
 6   fighting and a time not to fight.  It's a time when
 7   pushing too hard can risk the long-term future.
 8              MR. GUZZO:  I completely understood that.
 9              THE COURT:  Let's think about that tonight.
10   That will be a good homework assignment.
11              MR. GUZZO:  And I guess just one thing to
12   comment.  We certainly don't think this trial should
13   become a side show of opinions that Martorello actually
14   didn't receive on things that weren't really given to him.
15              And so --
16              THE COURT:  Yes, we're not going to have that.
17              MR. GUZZO:  Okay.
18              THE COURT:  I mean, that's just not going to
19   happen.  The indiscriminate designation of documents is
20   being -- the first step toward eliminating that is going
21   to happen tonight.  That doesn't fly, what I was given in
22   that -- as far as what I -- I read some of those things,
23   and it bothered me.  It needs to be cleaned up.
24              MR. GUZZO:  So --
25              THE COURT:  Go ahead with your part of the
```

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 474 of 503
Case 3.17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 119 of 214 PageID# 56856

119

 1   argument now that we've gotten that out of the way.

 2           MR. GUZZO:  Thank you, Judge.

 3           So just responding to a couple of points by

 4   Ms. Simmons.  First, *Lawson* was decided after *X-Citement*

 5   *Video*.  *Lawson* was a 2012 case.  *X-Citement Video* was a

 6   1994 case, and that's the case that the Supreme Court said

 7   the presumption attaches when the statute is silent.

 8           THE COURT:  What about *Elonis*?  When was it

 9   decided?

10           MR. GUZZO:  I think *Elonis* -- hold on.

11           THE COURT:  2015.

12           MR. GUZZO:  And I don't think it represented a

13   real change in the law.  I think it was really citing the

14   point from *X-Citement Video*.

15           And so post *X-Citement Video*, the Fourth Circuit

16   has still held interpreting, an analogous statute, that

17   it's a general intent statute and affirmed the District

18   Court's denial of the good faith basis defense and --

19           THE COURT:  Are you familiar with the *Hamling*

20   case?

21           MR. GUZZO:  I am not, Your Honor.

22           THE COURT:  You might look at it.

23           MR. GUZZO:  Okay.

24           THE COURT:  418 U.S. 87.  The issue is what you

25   have to have knowledge of.

USCA4 Appeal: 23-2097   Doc: 11-5   Filed: 12/06/2023   Pg: 475 of 503
Case 3.17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 120 of 214 PageID# 56857

120

 1          MR. GUZZO:  And then just --

 2          THE COURT:  The defendant wanted an instruction

 3   that he had to know that the material being mailed was

 4   legally obscene.  The statute prohibited mailing obscene

 5   material.  And, of course, absolutely not, you don't have

 6   to do that.  You just have to prove knowledge or notice of

 7   what the contents were.  The legal issue, whether it was

 8   obscene, was not what was to be dealt with.  And they

 9   cited that with approval.

10          MR. GUZZO:  And that's our position, Your Honor.

11          Then just a --

12          THE COURT:  Well, how did you take a position on

13   a case you hadn't read until I told you about it?  I mean,

14   I could be mistaken about what it says.

15          MR. GUZZO:  I trust you.

16          THE COURT:  That's a mistake.

17          MR. GUZZO:  Just a couple other things.

18   Ms. Simmons talked about Judge Novak's opinion on the

19   elements of a civil RICO offense.

20          THE COURT:  In *Hengle*?

21          MR. GUZZO:  *Hengle v. Asner*.  He, when writing

22   the elements in that case, never put in knowing or

23   willful.  That -- he did cite to Judge Morgan's opinion in

24   the *Solomon* case.  But certainly that case does not stand

25   for the proposition that we have to prove knowledge of the

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 476 of 503
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 121 of 214 PageID# 56858

121

1  law in any sense.  And if you look at the elements that

2  Judge Novak put in that opinion, it's just that people

3  agreed to a subsequent offense and the defendant knew and

4  facilitated it.

5        One final point here is if I understood

6  correctly, Martorello's position was that 1962(c) does not

7  require willfulness but 1962(d) does.

8        THE COURT:  That's correct.  That's what they

9  said.

10       MR. GUZZO:  And I don't -- that, to me, does not

11 make any sense because 1962(c) has heightened requirements

12 that a person must participate in the affairs of the

13 enterprise engaged in the collection of unlawful debt,

14 whereas there's a much lower threshold under the

15 conspiracy.  The person doesn't need to actually

16 participate in the affairs.  But instead, they just have

17 to know and facilitate it.

18       And so I think Mr. Martorello's position that

19 willfulness is -- this knowledge requirement or this

20 willfulness requirement is in one and not the other is

21 really untenable because it needs to be in both or none.

22 You can't -- you can't unwillfully violate 1962.

23       THE COURT:  There's a difference between knowing

24 and willful.  What's the difference?

25       MR. GUZZO:  I think knowing is knowledge of the

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 477 of 503
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 122 of 214 PageID# 56859

122

1   facts, and willful would be voluntary instead of

2   accidental.

3          THE COURT:  Okay.  All right.

4          MR. GUZZO:  And then Ms. Kelly is in charge of

5   the actual substantive response regarding the legal

6   advice.  So --

7          THE COURT:  All right.

8          MR. GUZZO:  I'll turn it over to her.  Thank

9   you, Your Honor.

10         THE COURT:  We'll take a 20-minute recess.

11         (Recess from 2:54 p.m. until 3:03 p.m.)

12         THE COURT:  All right.  Ms. Kelly.

13         MS. KELLY:  Thank you, Judge.  Kristi Kelly on

14  behalf of the plaintiffs.

15         I wanted to briefly respond to Ms. Simmons

16  walking through Mr. Martorello's statement of position

17  regarding the good faith defense pursuant to the court

18  order at Docket 1247.

19         As Your Honor is aware, the plaintiffs filed an

20  objection to that statement of position at ECF 1270, and

21  the basis of that objection was essentially two-fold, and

22  it is also part of our motion in limine number 5.

23         THE COURT:  One, two, what?

24         MS. KELLY:  1270.

25         And it is our position that -- and I think the

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 478 of 503
Case 3.17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 123 of 214 PageID# 56860

123

1    Court made this clear -- that Mr. Martorello did not

2    identify a single piece of advice that he received.  But

3    that's been the case for this whole case.  And I have a

4    binder of discovery materials that we relied on, and I'd

5    like to hand up to the Court.  The defendant has a copy as

6    well.

7              And, Morgan, I'll provide you a copy when I'm

8    done with this one.

9              THE COURT:  You're talking now about what?  What

10   is Number 1275, which is the sealed filing of 1262?  And

11   you objected to it in Number 1270.

12             MS. KELLY:  Right.  And the first basis of our

13   objection -- and I think this is something that the Court

14   has alluded to -- is that it is not clear what

15   Mr. Martorello was ever told, and we did ask him in

16   discovery.

17             If you go to the first tab of the binder that I

18   just provided to Your Honor, it is a consent order that

19   the plaintiffs and Mr. Martorello entered into regarding

20   discovery disputes that we had.

21             THE COURT:  That's ECF 327.

22             MS. KELLY:  That's correct, Judge.

23             And we had a lot of discovery disputes in this

24   case, and this consent order was the result of us sitting

25   in a conference room and hashing out some issues.

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 479 of 503
Case 3:17-cv-00461-REP    Document 1316    Filed 06/15/23    Page 124 of 214 PageID# 56861

124

1          And if you turn to the second page, paragraph 4,

2    it states that "Martorello has withdrawn his objections

3    and will provide full responses to the following

4    interrogatories from Plaintiff *Hengle*'s second set of

5    interrogatories."

6          THE COURT:  What's that got to do with this

7    case?  That's *Hengle*.

8          MS. KELLY:  Mr. Hengle is a plaintiff in this

9    case as well.

10         THE COURT:  Oh, of course he is.  He's a

11   plaintiff in a lot of cases.

12         MS. KELLY:  He is.  He's fallen on some hard

13   times, unfortunately.

14         THE COURT:  He's got a lot of reasons to be a

15   plaintiff, then, huh?

16         MS. KELLY:  And in that same paragraph,

17   "Martorello has agreed to supplement his response to

18   interrogatory number 13."

19         THE COURT:  Okay.

20         MS. KELLY:  So if you turn to Tab 4, it's

21   Mr. Martorello's interrogatory number 13.

22         THE COURT:  It's his interrogatory or his

23   answer?

24         MS. KELLY:  Mr. Martorello's response -- I'm

25   sorry -- to Mr. Hengle's interrogatory number 13.

JA2360

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 480 of 503
Case 3:17-cv-00461-REP    Document 1316    Filed 06/15/23    Page 125 of 214 PageID# 56862

125

```
 1              THE COURT:  Excuse me.  Is Tab 4 the supplement

 2  he agreed to provide in paragraph 4 of ECF 327?

 3              MS. KELLY:  Yes, it is.

 4              THE COURT:  All right.  So see Tab 4.

 5              MS. KELLY:  And if you look --

 6              THE COURT:  And that is ECF 1270-4.

 7              MS. KELLY:  That's correct.  And if you look at

 8  the last page, you can see the certificate of service by

 9  Armstrong Teasdale, who was his counsel at that time.

10              THE COURT:  All right.  Now, where on this do I

11  look?

12              MS. KELLY:  So in this response -- pardon?  Oh,

13  I'm sorry.

14              THE COURT:  I didn't say anything.  If I did, I

15  did it unwittingly, and I apologize.

16              MS. KELLY:  I'm sorry, Judge.

17              So in this response, Mr. Martorello tells us

18  what his good faith basis defense is.  And we asked him to

19  identify all advice you received from any attorney

20  regarding the legality of the tribal business model and/or

21  LDV's lending operation.

22              And I would characterize his response as the

23  free flowing, generic, you know, I believed it was legal.

24  I heard from some lawyers.  These are the lawyers, and

25  some other people.  I read stuff online.  But it's
```

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 481 of 503

126

1   nonspecific.  And if this -- if the Court allows this

2   defense to go forward, he should be bound to this response

3   because he was ordered to supplement it, and he didn't.

4          And I do want to note that in Mr. Martorello's

5   statement of position, he listed additional lawyers that

6   he relied on that are not disclosed in this response.

7          So he identified Daniel Gravel, who is not

8   listed in this response, as an individual who he relied

9   on, and Jennifer Galloway.  And those are the individuals

10  behind (ii) and IV.  And neither one of them are listed

11  here in this response.

12         THE COURT:  He didn't identify Jennifer

13  Galloway?

14         MS. KELLY:  Or Daniel Gravel, Judge.

15         THE COURT:  Spell that name.

16         MS. KELLY:  Like gravel, like rock, G-R-A-V-E-L.

17         THE COURT:  And they are --

18         MS. KELLY:  They are listed --

19         THE COURT:  -- listed in 1275.

20         MS. KELLY:  That's correct, Judge.

21         THE COURT:  So whatever they have got, he can't

22  testify about.

23         MS. KELLY:  That would be our position.  And

24  that's in our motion in limine, and we think --

25         THE COURT:  Which motion in limine is that?

JA2362

USCA4 Appeal: 23-2097   Doc: 11-5   Filed: 12/06/2023   Pg: 482 of 503
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 127 of 214 PageID# 56864

127

1          MS. KELLY:  It's motion in limine 5 by the

2   plaintiffs, and it's also part of our objection.  We tried

3   to lay that out for the Court.

4          As to the documents, Judge, behind tab 2 there

5   is --

6          THE COURT:  Tab 2 of yours?

7          MS. KELLY:  Of the binder that I just provided

8   to Your Honor.  It's also a court order, a memorandum

9   opinion at ECF 441, that I provided here for ease of

10  reference.  And if you turn to the third page, paragraph

11  (C), it grants plaintiffs' motion to compel "and

12  Martorello shall produce all documents responsive to

13  document requests 6 and 21."

14         And then if you go to the next page, behind

15  paragraph (3), the documents required to be produced by

16  paragraphs 2(A) through (J), which includes (C) that we

17  just talked about, "shall be produced to counsel for

18  plaintiffs by April 27th, 2019, and shall be identified

19  and keyed to the discovery request for which they are

20  being produced."

21         And so turning to now tab 5, we have the

22  supplemental request for production response by

23  Mr. Martorello that was provided to plaintiffs' counsel on

24  April 27th, 2019.  And if you look at the bottom of

25  page 3, request 21 states, "If you intend to assert

JA2363

USCA4 Appeal: 23-2097   Doc: 11-5   Filed: 12/06/2023   Pg: 483 of 503
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 128 of 214 PageID# 56865

128

 1   subjective good faith to any element of any claim alleged

 2   by plaintiffs, all documents showing any legal advice you

 3   received pertaining to tribal lending and/or the legality

 4   of the lending operation."

 5            THE COURT:  Which one?

 6            MS. KELLY:  It's 21, request 21, and it's at the

 7   bottom of page 3 where it starts.

 8            THE COURT:  All right.

 9            MS. KELLY:  So if you look on page 4,

10   Mr. Martorello identifies the responsive documents.

11            THE COURT:  All right.

12            MS. KELLY:  And I can represent to the Court,

13   and I've conferred with counsel on this, or we've e-mailed

14   back and forth about this, and I don't think there's any

15   dispute, but defendant's -- Mr. Martorello's 1275

16   identifies 40 documents that are not listed in this

17   supplemental discovery request in response to request 21.

18            There are 10 documents that are included, but

19   there are 40 that are not, and it is plaintiffs' --

20            THE COURT:  That's that table you're talking

21   about?

22            MS. KELLY:  Yeah, their table of documents.

23   It's their table in 1275, starting on page 9.  Of those

24   documents, there are ten that were disclosed to plaintiffs

25   in accordance with the court order.  And I can represent

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 484 of 503
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 129 of 214 PageID# 56866

129

1    to Your Honor that there has not been any prior

2    supplementation of the discovery requests, despite the

3    obligations of Rule 26.

4            THE COURT:  All right.

5            MS. KELLY:  And so it is our position that if

6    Mr. Martorello is allowed to assert this defense, he

7    should be at least limited to this general statement

8    that's in his interrogatories and the ten documents that

9    he disclosed and nothing more because to do so otherwise

10   would violate the rules of this court and anything else

11   should be excluded pursuant to Rule 37(c)(1).

12           THE COURT:  All right.  Anything else?

13           MS. KELLY:  The other thing I do want to just

14   kind of point out, Judge, is that Mr. Martorello's

15   position seems very contrary to the actual documents in

16   the case, and Your Honor did allude to this.  We have the

17   Jennifer Weddle memo that tells him, in 2012, that he

18   could be liable for aiding and abetting and violating

19   state law.

20           And Ms. Simmons indicated that she believes this

21   is the memo that Mr. Martorello is referring to in the

22   e-mail, right, the infamous 20-page memo.

23           THE COURT:  Right.

24           MS. KELLY:  We don't believe so because -- and I

25   have extra copies of the actual memo, if Your Honor wants

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 485 of 503
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 130 of 214 PageID# 56867

130

1   it.  But if you look at the e-mails --

2              THE COURT:  Of what memo?  You have extra copies

3   of what memo?

4              MS. KELLY:  The memo that --

5              THE COURT:  I have document 1266-3, which is the

6   so-called 11-page memo.

7              MS. KELLY:  That's the same document.

8              THE COURT:  Okay.  I have that in front of me.

9              You have that, don't you, Ms. Maloney?

10             MS. KELLY:  Judge, if you'd look at that, I'd

11   like to just point out a couple things.

12             First, if you look at Ms. Weddle's e-mail to

13   Mr. Martorello at the bottom of that first page, she says,

14   "Matt, we've updated the memo, which I'm hoping is closer

15   to what you're looking for."

16             So to me, that makes me think there were other

17   drafts or copies of the memo.  Because in order to get an

18   updated memo or have something that is closer to what he

19   wants, there would need to be some prior draft or

20   exchange.

21             Second, if you look at the top part of that

22   e-mail where Matt forwards this to Karrie Wichtman, in the

23   second paragraph, "I think it's great information, though,

24   I wanted it addressing SPV rather than 7X, which they are

25   fixing."

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 486 of 503
Case 3.17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 131 of 214 PageID# 56868

131

1              So what he's saying there is that Mr. Martorello

2    had a marketing company that provided leads to SourcePoint

3    that was paid as part of this enterprise as well called

4    7X.  And this memo was directed only, like, discussing 7X

5    and the acquisition of leads by 7X.  And Mr. Martorello

6    wanted a memo addressing the liability of SourcePoint,

7    which was the servicing company.

8              And so we believe that that is the memo that is

9    this 20-page aiding and abetting memo.

10             THE COURT:  Wait a minute.  But the first memo

11   down below says -- the memo from Martorello to Weddle,

12   dated August 20th, bottom of page 1 of 1266-3, says,

13   "We've updated the memo."  That means that the memo

14   predated August 20th.

15             MS. KELLY:  Right.  There was --

16             THE COURT:  But -- but the text you're talking

17   about says, "I think it's great information" -- I guess

18   that's the updated memo -- "though I wanted it addressing

19   SPV rather than 7X, which they are fixing."  Which to me

20   says there is yet another memo coming.

21             MS. KELLY:  Exactly.  Exactly.

22             And so it's plaintiffs' position, if you turn to

23   1266-1 and you look at Mr. Martorello's e-mail on page 14

24   of that document --

25             THE COURT:  Wait a minute.  1266-1?  1260 what?

USCA4 Appeal: 23-2097   Doc: 11-5   Filed: 12/06/2023   Pg: 487 of 503
Case 3.17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 132 of 214 PageID# 56869

132

1          MS. KELLY:  1266-1.

2          THE COURT:  What's that?  Where is that?

3          MS. KELLY:  Well, it's the e-mail --

4          THE COURT:  No.  I'm asking myself where it is.

5          MS. KELLY:  Oh.

6          THE COURT:  I don't know what this is.  1266.

7    You gave me 1266-3, and I wrote on it, but I -- do you

8    have 1266-1?

9          MS. KELLY:  I have a copy that has highlights

10   and notes on it.

11         THE COURT:  She's going to get my copy.

12         So this is the same thing as 1266-1; is that

13   right?

14         MS. KELLY:  Yes.  It's an exhibit in our --

15         MR. BENNETT:  But that's Bates -- the one you're

16   looking at, Judge, is Bates-numbered 1166-18, but it's the

17   same document.

18         THE COURT:  It's not Bates-numbered.  It's

19   docket number.  1266-1.

20         MR. BENNETT:  Yes.

21         THE COURT:  All right.  I have that.  And what

22   about it?  You want me to look where?

23         MS. KELLY:  You were asking Ms. Simmons if that

24   is the only memo that there is, and I just walked you

25   through why I think there are other memos --

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 488 of 503
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 133 of 214 PageID# 56870

133

1          THE COURT:  And you wanted me to look at 1266-1

2     to that end.  Where do you want me to look?

3          MS. KELLY:  If you look at page 14 of 16 --

4          THE COURT:  Using the ECF numbering system?

5          MS. KELLY:  Yes, Judge.

6          Now you're in the middle of the page.

7     Mr. Martorello writes in this e-mail, "Several states make

8     it a" -- all caps -- "felony crime to make loans over a

9     certain rate or without a license.  I had a 20-page

10    document done for me to understand the risk that I have as

11    an equity owner for aiding and abetting felony crime" --

12    the aiding and abetting felony crime is bolded -- "in

13    states like Georgia, and you will see the conclusion.  It

14    says something like, quote, yes, it is possible the state

15    will come after you for helping the tribe lend against

16    their laws and charge you" -- in all caps -- "for aiding

17    and abetting as a felony crime in their state.  (In some

18    instances, penalty could be jail time), but we don't think

19    that's going to happen."

20         And so that's the memo that the plaintiffs

21    believe were -- where it's a memo valuing SourcePoint as

22    part of the sale to the tribe, that whole transaction.

23         THE COURT:  Why do you -- what is it that leads

24    you to believe that that is a different memo, as opposed

25    to an error or an overstatement by Mr. Martorello as to

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 489 of 503
Case 3:17-cv-00461-REP    Document 1316    Filed 06/15/23    Page 134 of 214 PageID# 56871

134

1   the length of the document?

2           Do you see the distinction I'm drawing, an error

3   on the other hand versus there is another document?

4           MS. KELLY:  Well, Judge, this is the subject of

5   another motion in limine, but we know that all of the

6   documents that -- the e-mails that Mr. Martorello had were

7   destroyed as part of the sale of the business.  There were

8   provisions in the agreement for that.

9           And so the only way we obtained this e-mail was

10  subpoenaing a third party like Rosette.  And so we don't

11  know -- we don't have the documents because there's no

12  question they were destroyed.  Of what Mr. Martorello

13  received from --

14          THE COURT:  Well, did you ask him?  Did you

15  depose him?  You say, What's that 20-page memo?  Who did

16  it come from?  What date was it?  Is this it?  Hand him

17  the 11-page memo and say, Is this it?

18          MS. KELLY:  We have not had that conversation

19  with him that I'm aware of in the deposition.  We -- we

20  have not asked him about that.

21          We've asked Ms. Weddle about it, and she --

22          THE COURT:  Well, she said she didn't know there

23  was a 20-page memo, or what, but she wasn't sure.  And I

24  don't know -- but she also said that they still have all

25  their files intact.

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 490 of 503
Case 3:17-cv-00461-REP    Document 1316    Filed 06/15/23    Page 135 of 214 PageID# 56872

135

1        MS. KELLY:  Well, that's actually not -- the

2   story has changed over time, Judge.  I want to be clear.

3        THE COURT:  Oh.

4        MS. KELLY:  And so part of the frustration in

5   this case is that positions are taken and then we have to

6   disprove them through third parties and all this --

7        THE COURT:  That's part of litigation.

8        MS. KELLY:  And that's fine.  And we've done

9   that in this case.

10       So Ms. Weddle and her lawyer -- and this is part

11   of our adverse instruction motion in limine.  I don't want

12   to get ahead of myself.

13       But they initially -- as part of the sale,

14   Mr. Martorello and his lawyer inserted a provision into

15   the agreement that required the destruction of all

16   documents that Mr. Martorello had, his e-mails, et cetera,

17   regarding SourcePoint/Bellicose.

18       THE COURT:  Were they SourcePoint documents or

19   Martorello's documents?

20       MS. KELLY:  They were SourcePoint and Bellicose

21   documents.

22       THE COURT:  But not Martorello's personal?

23       MS. KELLY:  Well, it would include his e-mails.

24       We also have an e-mail where he said he was

25   going to remove certain e-mails of his as well prior to

USCA4 Appeal: 23-2097   Doc: 11-5      Filed: 12/06/2023   Pg: 491 of 503
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 136 of 214 PageID# 56873

136

1   the sale that we filed.  And I can direct Your Honor to

2   that when we can discuss that motion in limine or I'm

3   happy to do it now.

4          But the provision required Martorello to give

5   any documents that still existed to the tribe, and the

6   tribe was required to delete them all.  And the tribe

7   confirmed to us that they were deleted.  And the contract

8   provision says that.

9          And we asked Mr. Martorello about the contract

10  provision, and he says it was a form contract from this --

11  the *Hengle* case, the *Hengle* tribal entity sale.  But it

12  wasn't because we were in the *Hengle* case and we had that

13  contract, and if you compare the contracts, that provision

14  is missing.  And I'm happy to walk you through that later.

15         And then when we asked Ms. Weddle for those

16  documents, we were negotiating with her.  We issued a

17  subpoena to her for her file on these issues, and she

18  initially told us that Mr. Martorello contacted her to

19  advise her of this provision and she contacted the tribe

20  and confirmed -- and she instructed all the lawyers at

21  Greenberg Traurig to destroy them, and they did.  And she

22  filed a declaration that we attached saying that.

23              THE COURT:  Yeah.

24              MS. KELLY:  And then Greenberg Traurig now, you

25  know, a year later, when the case was stayed, said, oh,

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 492 of 503
Case 3.17-cv-00461-REP    Document 1316    Filed 06/15/23    Page 137 of 214 PageID# 56874

137

 1   some things may still exist, but we're not going to give

 2   you a list of them and we'll preserve whatever we have.

 3          And so positions have changed about that, and

 4   Ms. Weddle is saying --

 5          THE COURT:  What do you mean "they still exist"?

 6          MS. KELLY:  They wouldn't give us a list of

 7   documents that still exist, but they still say that they

 8   are preserving them.

 9          THE COURT:  Greenberg Traurig is a Virginia law

10   firm?

11          MS. KELLY:  They do have an office in Tysons

12   Corner, I believe.

13          THE COURT:  They're headquartered there, aren't

14   they?  They used to be.

15          MS. KELLY:  I'm not quite sure.

16          But the plaintiffs --

17          THE COURT:  You draft an order saying what you

18   want ordered for them to produce from these files, and

19   I'll sign it.  But I'm going to give them an opportunity

20   to be heard on it.

21          And I want them to know what it is, and I'm

22   going to just send an order that says it has been

23   represented that you've misrepresented things in

24   proceedings in this court and taken two different

25   positions, approbating and reprobating, and here's the

USCA4 Appeal: 23-2097   Doc: 11-5   Filed: 12/06/2023   Pg: 493 of 503
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 138 of 214 PageID# 56875

138

 1   position that was -- I'm going to quote what you just

 2   said.  I'm going to have that prepared, and I'm going to

 3   say I order you to produce these documents that you still

 4   have, and you have ten days to do it, to file a response

 5   or produce the documents, or whatever, something like

 6   that.

 7            MS. KELLY:  Yeah.  So we filed Ms. Weddle's

 8   declaration, and in the last paragraph, that's what she

 9   says, like she notified everyone who worked on it and they

10   destroyed their electronic files, et cetera.

11            THE COURT:  Yeah, but now they're saying that

12   they have some.

13            MS. KELLY:  Exactly.  But --

14            THE COURT:  Where is it said that they have

15   some?

16            MS. KELLY:  I believe --

17            THE COURT:  I don't think law firms can say two

18   things in the response to proceedings that are going on

19   under the supervision of a court.

20            MS. KELLY:  Their response that was filed, you

21   know, about a year later, nine months later is at ECF 698.

22   So the Court has it.

23            But they said they've never been served with a

24   subpoena and --

25            THE COURT:  They hadn't?  I thought you said you

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 494 of 503
Case 3.17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 139 of 214 PageID# 56876

139

 1   had.

 2          MS. KELLY:  We served Ms. Weddle, as the lawyer

 3   who was identified, with a subpoena for her files

 4   regarding Mr. Martorello, and that's the response we got.

 5          And so Ms. Weddle -- it wasn't always clear in

 6   the deposition what her testimony was about the

 7   destruction, and it changed as we were negotiating.

 8          But they do also have objections about privilege

 9   because --

10          THE COURT:  It can't be privileged if he

11   contends it's not privileged.  He cites, in response to a

12   paper in court, that he's relying on nonprivileged

13   documents; inter alia, this document.  It can't be

14   privileged if he says it's not privileged.  And he's the

15   client, for God's sake.

16          MS. KELLY:  But, Judge, he's still asserting

17   privilege for anything after -- or starting in 2015.

18          THE COURT:  It doesn't.

19          MS. KELLY:  When I --

20          THE COURT:  He can't assert privilege for

21   anything that he's relying on where he says, "I'm relying

22   on nonprivileged documents."  That's what he says in his

23   response.

24          MS. KELLY:  Well --

25          THE COURT:  Now, if that's what he's doing,

USCA4 Appeal: 23-2097   Doc: 11-5   Filed: 12/06/2023   Pg: 495 of 503

1  you're going to tighten him up and get him straight and

2  get him out because he can't do that.

3          MS. KELLY:  Judge --

4          THE COURT:  I will bar him from testifying.  I

5  will stop it.  He is not playing games with this Court.  I

6  will make sure that he obeys the rules, and the rules are

7  that if you say something is not privileged and I'm

8  relying on it, then that's all you rely on.

9          MS. KELLY:  So, Judge --

10         THE COURT:  That's it.

11         MS. KELLY:  I think he's --

12         THE COURT:  The gamesmanship in this case is

13  over with --

14         MR. TALIAFERRO:  Your Honor, we --

15         THE COURT:  -- and it's been going on, and I'm

16  tired of it.

17         MR. TALIAFERRO:  Your Honor, if I just may

18  respond to that.  We do not disagree with that.  We are

19  not asserting privilege over the documents held by

20  Greenberg Traurig.

21         THE COURT:  All right.  There's no privilege

22  asserted as to it.

23         MR. TALIAFERRO:  Your Honor, I would just add,

24  just for the record, this Court has already held that it

25  was waived -- Mr. Martorello's attorney-client privilege

USCA4 Appeal: 23-2097 Doc: 11-5 Filed: 12/06/2023 Pg: 496 of 503

141

```
 1   was waived in an earlier ruling.  I don't have that docket
 2   number.
 3              MS. KELLY:  Right.
 4              THE COURT:  Yes, but he said that he's
 5   asserting -- he didn't say, "I'm asserting waived
 6   documents."  He said in his answer, "I'm asserting
 7   nonprivileged documents and communications with lawyers."
 8   Among them" -- and he lists a number.
 9              MR. TALIAFERRO:  That's correct.
10              THE COURT:  So he's stuck with that.
11              MS. KELLY:  Well, Judge, but then -- so
12   Greenberg Traurig -- part of Greenberg Traurig's defense
13   was that there are privileged documents.
14              But -- and when I deposed Ms. Weddle a month
15   ago, she wouldn't answer because Mr. Martorello's counsel
16   objected on the basis of privilege for --
17              THE COURT:  Who?  Who?  What lawyer?
18              MS. KELLY:  She's not here.
19              MR. TALIAFERRO:  That was --
20              THE COURT:  How would she assert privilege if
21   you're not asserting privilege to that very document?
22              MR. TALIAFERRO:  It was not over that document,
23   Your Honor.  It was in -- my understanding is it was in
24   relation to a privilege claimed by Eventide subsequent to
25   the sale to the tribe.
```

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 497 of 503
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 142 of 214 PageID# 56879

142

```
 1             MS. KELLY:  So it was about his --

 2             THE COURT:  It's not about this document.  If

 3   they happen to have a document, they don't have any

 4   privilege in it.

 5             MR. TALIAFERRO:  We have no objection to

 6   Greenberg Traurig producing whatever versions of this memo

 7   they have, Your Honor.

 8             THE COURT:  All right.

 9             MS. KELLY:  So I was asking her about other

10   advice she had given him about --

11             THE COURT:  Given who?

12             MS. KELLY:  Mr. Martorello about the conduct in

13   this case, and Mr. Martorello's counsel objected on the

14   basis of privilege.

15             And so our position is they can't just

16   cherrypick what legal advice they want.  They are only

17   willing to give nonprivileged documents, and we believe

18   the privileged advice was the real advice because every

19   e-mail we have of Mr. Martorello is he's very concerned

20   about the legality of what he's doing.

21             And certainly it's not because someone's telling

22   him, "You're good.  Everything you're doing is legal.

23   There's no risk."  It's because people are telling him,

24   "You might go to jail.  You could be held liable."  You

25   know, he doesn't create trusts in the Cook Islands and put
```

USCA4 Appeal: 23-2097   Doc: 11-5   Filed: 12/06/2023   Pg: 498 of 503
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 143 of 214 PageID# 56880

143

 1    all assets out of his name if he thinks everything he's

 2    doing is above board.

 3             And so what our position is is that he cannot

 4    assert privilege when we're asking the lawyer that he said

 5    he is relying on for advice what did you tell him, he

 6    cannot then assert privilege because he doesn't want us to

 7    know that question.  He just only wants the -- here's the

 8    Law Review argument Jennifer Weddle wrote.  That's totally

 9    different from what someone is told in confidence.

10             And when I asked Ms. Weddle did you ever give

11    him an opinion about his liability, she said no because

12    she never had full disclosure of what his role really was.

13             THE COURT:  She said all that?

14             MS. KELLY:  Yes.  And it's in our objection,

15    Judge, at ECF 1270.

16             And so I asked her, on page 4, "Do you recall

17    ever providing Mr. Martorello personally a legal opinion

18    regarding his role in the lending entities or with

19    Bellicose?"

20             Answer, "No."

21             "And so you never" --

22             THE COURT:  Wait a minute.  What's the document

23    number?

24             MS. KELLY:  It's Document 1270.  And starts at

25    the very bottom of page 4 with the first question.

USCA4 Appeal: 23-2097  Doc: 11-5  Filed: 12/06/2023  Pg: 499 of 503

144

```
 1              THE COURT:  All right.
 2              MS. KELLY:  So the answer to that one on the top
 3    of page 5 is, "No."
 4              "And so you never told Mr. Martorello that what
 5    he was doing in his role was legal, correct?"
 6              And she says, "I don't recall having any
 7    information about what Mr. Martorello was doing
 8    individually in his role or any operational visibility
 9    whatsoever into Bellicose or SourcePoint.  As I say, our
10    engagement was really limited to establishing the
11    contractual relationships and then collaborating with the
12    tribe's counsel on policy issues thereafter."
13              And she previously testified before that she
14    didn't have personal knowledge of what the tribe was doing
15    in terms of running Red Rock tribal lending.
16              "Is that still your testimony today?"
17              "Yes, it is."
18              I go on, "Ms. Weddle, did you ever give
19    Mr. Martorello advice about the risks of being involved in
20    Bellicose or SourcePoint?"
21              She said, "Again, my recollection is Greenberg
22    Traurig represented Bellicose and SourcePoint over a
23    period of years."
24              THE COURT:  Do you want to see if she can go 300
25    words a minute?
```

JA2380

 1              MS. KELLY:  I'm sorry, Judge.

 2              THE COURT:  "So, again, my recollection is that

 3    Greenberg Traurig represented Bellicose and SourcePoint

 4    over a period of years.  I don't recall any specific

 5    advice related to Mr. Martorello regarding individual

 6    liability."

 7              MS. KELLY:  And then I said, "Did you provide

 8    any advice to Bellicose regarding any potential liability

 9    for its role in the lending operation?"

10              And she says, "I think generally the memorandum

11    that I recall was yes, about institutional risk associated

12    with providing the services under those servicing

13    agreements, but not related to any operational knowledge."

14              So she doesn't really know what he's doing and

15    what role the businesses are actually playing.  She just

16    knows the contractual basis, and this is the general risk

17    for an entity that does marketing to a tribe or an entity

18    that's a servicer to a tribe.

19              And my next question fleshes that out.  "So is

20    it fair to say that you provided information generally

21    about the risks related to the lending operation, but you

22    couldn't provide more specific advice because you didn't

23    know what Mr. Martorello's specific role was in

24    Bellicose?"

25              And she says, "That's correct."

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 501 of 503
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 146 of 214 PageID# 56883

146

```
 1              And then I go on to say, "In order to provide

 2    potential advice about potential liability for Bellicose

 3    or Mr. Martorello, the role as a principal of Bellicose,

 4    is it fair to say he would have needed to know information

 5    about his actual role and responsibilities in Bellicose?"

 6              And she says, "I would say yes.  It would be

 7    standard practice if you were being asked to opine on a

 8    particular potential for liability, that yes, you should

 9    have all the facts and information before you in order to

10    provide that kind of analysis."

11              And then the next page, she confirms that she

12    did not have those facts as to Mr. Martorello.

13              And so --

14              THE COURT:  So what is it you object to --

15              MS. KELLY:  So we object for Mr. Martorello --

16              THE COURT:  -- in 1270.

17              MS. KELLY:  We object to Mr. Martorello

18    asserting a good faith defense based on, one, individuals

19    he did not disclose, and two, without stating any actual

20    advice that these people provided.

21              He was court ordered to respond to an

22    interrogatory about the specific legal advice that was

23    provided, and he did not --

24              THE COURT:  Mark that, will you, please?

25              MS. KELLY:  And he did not do that.
```

USCA4 Appeal: 23-2097   Doc: 11-5   Filed: 12/06/2023   Pg: 502 of 503
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 147 of 214 PageID# 56884

147

1          And then he was court ordered to provide all the

2     documents that he relied on, and he did identify 10 that

3     are identified in his statement of position, but he

4     identified an additional 40 that were never disclosed in

5     response to that court order.  And so he should not be

6     able to use information that he did not disclose.

7          And I would submit, Judge, that he should not be

8     able to allow Jennifer Weddle to testify about some

9     aspects of representation and not of others and assert

10    privilege.

11         THE COURT:  Where does she assert privilege in

12    here?  Where in 1270 does she assert that -- is there a

13    discussion of that?  I'm sorry.

14         MS. KELLY:  It's not in 1270.  Hold on.  Sorry.

15         When I was asking her about her role

16    representing Eventide when he was selling the business,

17    because Mr. Martorello sold the business --

18         THE COURT:  Which business?

19         MS. KELLY:  Bellicose and SourcePoint. -- that

20    privilege was sold to the tribe, and so the tribe was not

21    asserting privilege and neither was Mr. Martorello.

22         But when I was asking about Eventide and did you

23    give legal advice about the legality of Eventide,

24    Mr. Martorello's counsel objected on the basis of

25    privilege about conversations that she had about Eventide.

USCA4 Appeal: 23-2097    Doc: 11-5    Filed: 12/06/2023    Pg: 503 of 503
Case 3:17-cv-00461-REP  Document 1316  Filed 06/15/23  Page 148 of 214 PageID# 56885

148

1    And that is part of the Big Picture component of this

2    case.

3               THE COURT:  Well, he can't testify about any of

4    that and neither can he offer any evidence of whatever she

5    did.

6               MS. KELLY:  Okay.  Well, I think that it is not

7    appropriate for Mr. Martorello to selectively pick what

8    information can be disclosed and what can't be disclosed.

9               THE COURT:  I agree.

10              MS. KELLY:  And so I think that's what he's

11   doing with this good faith basis defense, and I think --

12              THE COURT:  So what do you want me to do?  I

13   need to know what you want.

14              MS. KELLY:  I think at most, he should be -- I

15   mean, I think that his interrogatory answer does not

16   comply with how to assert a good faith basis attempt

17   because he did not disclose any specific advice he

18   received from any lawyer.

19              And if the ten documents that are on the

20   statement of position do not contain specific advice he

21   received, there is no good faith basis defense that he can

22   assert in this case because he has violated Rule 26 and he

23   should be precluded from providing any information

24   pursuant --

25              THE COURT:  Under Rule 37.