No. 23-2097

---

**In The United States Court Of Appeals
For The Fourth Circuit**

**LULA WILLIAMS,**
*Plaintiff-Appellee*

**v.**

**MATT MARTORELLO,**
*Defendant-Appellant,*

On Appeal From The United States District Court
For The Eastern District Of Virginia (Robert E. Payne)
(3:17-cv-00461-REP)

---

**JOINT APPENDIX
VOLUME VI**

---

Matthew William Wessler
Gupta Wessler PLLC
1900 L Street NW, Suite 312
Washington, D.C. 20036
Telephone: (202) 888-1741
E-mail : matt@guptawessler.com

Steven D. Gordon
Holland & Knight LLP
800 17th Street, N.W., Suite 1100
Washington, D.C. 20006
Telephone: (202) 955-3000
E-mail: steven.gordon@hklaw.com

*Counsel for Appellee*

*Counsel for Appellant*

December 6, 2023

Krisi Cahoon Kelly
Andrew Joseph Guzzo
Kelly Guzzo, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
Telephone: (703) 424-7576
E-mail:  kkelly@kellyguzzo.com
E-mail:  aguzzo@kellyguzzo.com


*Counsel for Appellee*

VOLUME VI

TABLE OF CONTENTS

| 22 | Transcript of proceedings held on June 7, 2023, pp. 149-214 | JA2385-JA2450 |
|----|----|----|
| 23 | Transcript of proceedings held on June 8, 2023 | JA2451-JA2678 |
| 24 | Martorello's response to plaintiffs' request for reconsideration of court's ruling on satisfaction of RICO 1962(d) elements | JA2679-JA2680 |
| 25 | Martorello's stipulation regarding remaining elements of RICO 1962(c) claim | JA2681-JA2683 |
| 26 | Order granting partial summary judgment as to Count Two | JA2684 |
| 27 | Amended memorandum opinion granting summary judgment | JA2685 JA2754 |
| 28 | Notice of appeal | JA2755-JA2756 |

```
 1              MS. KELLY:  37(c)(1).

 2              THE COURT:  All right.  Let me hear from the

 3     other side.

 4              MR. GIVEN:  Good afternoon, Your Honor.  Barney

 5     Given for defendant, and I'll be handling this portion.

 6              A couple of things, Your Honor.  I first want to

 7     start with Greenberg Traurig.  We have no opposition, if

 8     the Court wants to issue an order asking them to produce

 9     documents that they claim to have been destroyed or

10     something.  That's not the case.  We've not instructed

11     them to destroy anything.

12              My understanding -- and I took Ms. Weddle's

13     deposition the first time a year ago in the related case,

14     which their co-counsel in the other cases was present.

15     But long story short, I think, again, it's very clear that

16     what he says is the 20-page memo is the 11-page memo.  We

17     have asked --

18              THE COURT:  How do you reach that conclusion?

19              MR. GIVEN:  The way I reach the conclusion is

20     I've asked Mr. Martorello.  Mr. Weddle was asked.  We have

21     scoured the files.  There is no subsequent memo.

22              And if you look at the timing, the document she

23     referred to about a previous memo, her document at 1266-1,

24     page 14, that is a December 2012 e-mail.  The 11-page memo

25     was August of 2012.  And that's consistent with the
```

1  timeline in the e-mail that he sent to Mr. John Argyros

2  regarding valuation method.

3          I can represent to the Court we have asked if

4  there's any subsequent memo.  We've asked my client.

5  We've asked Ms. Weddle.  When Ms. Weddle was asked in her

6  deposition by counsel, she said she didn't recall any such

7  memo.

8          Secondly, Ms. Kelly has left out a lot of the

9  timing in the facts, and I just want to remind the Court

10 of a few things on the timing.

11         One moment, Your Honor.

12         It's on number 5.  One moment.  And this is just

13 a timing issue, Your Honor.

14         When the Court originally -- there was -- with

15 the orders that have been presented to the Court, there

16 was a supplemental production by Mr. Martorello.

17 Subsequent to that, the plaintiffs then withdrew their

18 motion to compel and represented to this Court that

19 Mr. Martorello had produced substantially all the

20 documents requested.  That's the last thing that happened.

21 And that was years and years ago, Your Honor.  And we

22 would submit that this -- this effort now to create a

23 fictional spoliation claim is not supported.

24         Secondly, you asked the direct question.  All

25 they had to do is ask Mr. Martorello about this

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 6 of 375
Case 3.17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 151 of 214 PageID# 56888

151

 1    memorandum.  It's been 11 years, and they have never asked

 2    him that question.  They've had 11 years to ask him the

 3    question.  They chose not to.

 4                THE COURT:  They really haven't.  They didn't

 5    start the case until --

 6                MR. GIVEN:  Well, I'm just saying, our question

 7    is one of timeliness, Your Honor, meaning they are

 8    bringing this issue up now, frankly --

 9                THE COURT:  Yeah, but that happens in

10    litigation, particularly when it's drawn out.  There's

11    been appeals.  There have been two appeals in this case.

12    And that kind of thing unfortunately happens.  I don't

13    like it, but --

14                MR. GIVEN:  We understand that, Your Honor.

15    That's fine.

16                THE COURT:  But I think the more important point

17    is what is this withdrawal that you're talking about?

18                MR. GIVEN:  Well, I can tell you exactly the

19    docket number.  So on April 20th, 2021 -- and it's Docket

20    Number 1082 -- plaintiffs withdrew both motions to compel

21    because, quote, Martorello voluntarily produced the vast

22    majority of the documents at issue.

23                Plaintiffs then requested that this Court deem

24    those motions as moot.

25                In an order entered on April 29th, 2021 -- I'm

USCA4 Appeal: 23-2097   Doc: 11-6      Filed: 12/06/2023   Pg: 7 of 375
Case 3.17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 152 of 214 PageID# 56889

152

1    sorry, that's Docket 1082 -- this Court entered an order

2    denying as moot both motions to compel because they were

3    withdrawn.

4            That's the last anything having to do with this.

5    And, again, since that, they have never --

6            THE COURT:  And the motion that they're making

7    doesn't have to do with that.  It has to do with the fact

8    that now you are offering 40-some documents that weren't

9    produced.

10           MR. GIVEN:  We understand that, Your Honor.

11           THE COURT:  And there isn't -- they didn't know

12   that until you offered them.  So that's -- why would that

13   be untimely as an objection?

14           MR. GIVEN:  No.  No.  I was referring to the

15   spoliation argument, not the document.  I'm referring to

16   this alleged second e-mail.  That's all that argument was

17   related to, not this subsequent production of documents.

18           THE COURT:  Oh, I see.

19           MR. GIVEN:  We agree that the 40 documents were

20   not produced in response to the request for production.

21   But again, as we're going through the -- one second.

22           Oh, I'm sorry.  I'm corrected.

23           And we'll get -- we'll get -- we'll get a Bates

24   number, Your Honor.  The documents were produced.  They

25   just weren't listed in the interrogatory.  But I will

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 8 of 375
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 153 of 214 PageID# 56890

153

```
 1   provide the cite to that in the morning.
 2           THE COURT:  The 40 that you're talking about?
 3           MR. GIVEN:  The 40 that we're talking about,
 4   that she's talking about.
 5           So, again, other --
 6           THE COURT:  Well, here's the answer to the
 7   question, really.  If it wasn't produced, you're not going
 8   to use it.
 9           MR. GIVEN:  Right.
10           MS. KELLY:  Well --
11           THE COURT:  So you have to show it was produced.
12           MS. KELLY:  Judge, I think Mr. Given misspoke.
13   They were produced, but they were ordered to identify the
14   documents they're relying on for good faith basis pursuant
15   to a motion to compel we filed, and they supplemented and
16   identified the documents and they were not included as the
17   documents they were relying on.  And that is our position.
18   It is not that they were not produced.
19           THE COURT:  They were produced, but they didn't
20   link them to the defense.
21           MS. KELLY:  Right, which is something we
22   sought --
23           THE COURT:  Which was part of the order.
24           MS. KELLY:  And it was part of our motion to
25   compel an order.
```

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 9 of 375
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 154 of 214 PageID# 56891

154

1          THE COURT:  Then if you didn't do that, you

2     can't put them in either because you violated the order.

3          The reason that order was entered was because

4     they would know what this elusive defense was, because it

5     was elusive.  And I don't know whether you were even in

6     the case at the time.

7          MR. GIVEN:  Yeah, I -- and, Your Honor, I don't

8     disagree with this last characterization.  They were

9     produced but not identified in response to interrogatory.

10    And I don't believe we were in the case, but we understand

11    it is what it is.

12         The last thing, Your Honor, is I wanted to

13    address the Weddle testimony.  Again, I think it's a

14    mischaracterization of her --

15         THE COURT:  Which -- which Weddle testimony?

16         MR. GIVEN:  Well, the testimony that counsel was

17    just referring to basically saying you have to throw out

18    Weddle because --

19         THE COURT:  Pardon me a minute.  She referred to

20    Weddle testimony that is set out in ECF 1270, pages 4, 5,

21    and 6.  That's what she was talking about.

22         MR. GIVEN:  Right.  And we would simply ask the

23    Court, pursuant to the Court's order, recently, timely

24    filed the deposition designations.  They are substantial

25    deposition designations from Ms. Weddle that spell out in

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 10 of 375
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 155 of 214 PageID# 56892

155

1  detail what advice she did give.  And, again, she was very

2  clear in the deposition I took.  And I think in the second

3  deposition, she was engaged by Bellicose and SourcePoint,

4  not Mr. Martorello individually.  We've made no secret of

5  that.  And again, he was the president of those entities.

6  But for -- for counsel to suggest that she gave no advice

7  whatsoever about the nature, legality or anything of the

8  operation is just simply not true.

9           THE COURT:  Well, that's what Ms. Weddle says.

10          MR. GIVEN:  I just ask the Court to please read

11 her deposition designations.

12          THE COURT:  Let me ask you something.  Are you

13 saying that the designations that are set forth on page 4,

14 5 and 6 of ECF 1270, the questions and answers are not

15 properly set forth?

16          MR. GIVEN:  No.  I'm saying we made -- I'm

17 sorry.  Ms. Simmons did the deposition designations.

18          THE COURT:  Yes, she did.

19          "Do you ever recall providing Mr. Martorello

20 personally a legal opinion regarding his role in the

21 lending entities or with Bellicose?"

22          No.

23          N-O.  I mean, it's not equivocal.  How can I

24 misinterpret that?

25          MR. GIVEN:  Your Honor, I can explain the

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 11 of 375
Case 3.17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 156 of 214 PageID# 56893

156

 1  confusion.  That -- those -- I'm not disputing that she

 2  said what she said in the excerpts that counsel has

 3  provided.  I'm saying that's not the full picture.

 4          We've served on counsel -- and again, we can

 5  provide it to the Court, but it's a matter that's served,

 6  not filed.  The deposition designations that were served

 7  very recently by Ms. Simmons included deposition testimony

 8  from Ms. Weddle in the *Williams* case, and I'm saying that

 9  provides a more complete picture.  That's all I'm saying.

10          THE COURT:  Well, it's kind of hard for her to

11  backtrack from that one.  That's an absolute, unqualified

12  no.

13          So what deposition designation?  Have you got

14  them?

15          MR. GIVEN:  We don't have them with us today.

16  It wasn't part of the hearing.  But we can certainly get

17  them printed out and bring them in the morning.

18          THE COURT:  How many are they?  How long are

19  they?  Two pages?  Five pages?  Ten?  What?

20          I'm not reading a whole deposition because I

21  know this.  Here's what I know.  I know that when I ask

22  what time it is, I get told what is the history of

23  Switzerland and how many cantons joined together to form

24  it in what year and why.  And I'm not going to have

25  depositions like that.

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 12 of 375

```
 1              If I ask what time it is, I want the deposition
 2   that says it's 10:00.
 3              MR. GIVEN:  We will print those out, Your Honor.
 4   Again --
 5              THE COURT:  And cut the trash from them.
 6              MR. GIVEN:  We will.  We will provide that in
 7   the morning.
 8              THE COURT:  That effort of litigation does not
 9   obtain here.
10              MR. GIVEN:  We will provide solely the
11   designation -- depo designations of Ms. Weddle.
12              THE COURT:  That put in context these.
13              MR. GIVEN:  Correct.
14              THE COURT:  And it's going to be an interesting
15   exercise for me to read them.
16              MR. GIVEN:  Okay.
17              THE COURT:  Because --
18              MR. GIVEN:  So yes, we'll provide those.
19              THE COURT:  According to what she says here, she
20   didn't provide him information.  If she didn't -- and I'll
21   tell you the other thing is if there's a conflict between
22   the two, the only thing I would think about allowing any
23   of that in is if she puts herself in that witness stand,
24   subjects herself to cross-examination, brings her
25   documents with her and stands tall.  Because if she's got
```

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 13 of 375
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 158 of 214 PageID# 56895

158

1  two different views of things on the same topic, that's

2  approbation and reprobation, and we don't do that.

3           MR. GIVEN:  Your Honor, I don't disagree.  And

4  unfortunately --

5           THE COURT:  Otherwise she's not coming.  I mean,

6  she's not coming.  She's not coming in.  And she owes it

7  to him and to everybody to stand tall and defend what she

8  said.

9           MR. GIVEN:  We have -- Your Honor, I have asked

10 her to come to trial.  I think --

11          THE COURT:  Don't ask her.  Tell her.

12          MR. GIVEN:  Okay.  I'll tell her.

13          THE COURT:  You tell her that her integrity has

14 been called into question by virtue of something that both

15 sides have said that she says opposite things about, and

16 the only way the Court can possibly let Mr. Martorello

17 have the benefit of anything is if she comes to testify

18 herself.

19          MR. GIVEN:  I will advise her --

20          THE COURT:  I'm going to preview her testimony

21 and see.  I don't like what I've seen here with -- there's

22 clear testimony that you don't dispute the accuracy of in

23 which she says she doesn't advise him about anything,

24 about the legality.  That's what she says, and yet you say

25 there's something entirely different than what she said.

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 14 of 375
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 159 of 214 PageID# 56896

159

1          MR. GIVEN:  No.  What I'm saying is she

2    testified -- and again, we'll produce the documents.  I'm

3    saying there's a distinction between what advice she gave

4    him individually versus what advice she gave SourcePoint

5    and Bellicose.

6          And she also testified, Your Honor, that she

7    created the -- the documents that formed -- that formed

8    the entity in conjunction working with the tribal council.

9    That's all I'm saying.

10         I'm not saying that she lied on the portion they

11   were talking about.  I'm saying there's just a distinction

12   between individual advice versus advice to the entities.

13         THE COURT:  What difference does it make that

14   she gave advice to SourcePoint and Bellicose if it didn't

15   go to Martorello?  How can he possibly rely on it?

16         MR. GIVEN:  I think her testimony --

17         THE COURT:  Do you see -- you say there's a

18   difference.  There may not be a difference at all.  It may

19   be a flight of fancy.  It may be an illusion.  It doesn't

20   look right to me.  I've never heard of that situation.

21         Now, there are circumstances where -- and I have

22   no doubt this exists all over the country, all through

23   time -- where I am advising a corporation and I'm giving

24   the corporation advice, and the president of the

25   corporation is sitting right in the room, and I'm telling

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 15 of 375
Case 3.17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 160 of 214 PageID# 56897

160

1   it to him.  That's how I'm giving it to him.  In fact, I

2   did that many times in my career.  But he has it.  He got

3   it.  He knew what was going on.

4           And if she's making a distinction about whether

5   she is advising him as opposed to the corporation and you

6   all want to make a defense on the basis of that, that

7   doesn't fly.

8           MR. GIVEN:  Understood, Your Honor.  We'll

9   provide the designations in the morning.

10          THE COURT:  And if necessary, matters will be

11  referred to the appropriate bar association for her.  I'm

12  not going to have this.

13          If, in fact, she says two different things on

14  the same topic, that's not right.  That's saying something

15  under oath that's not true because one of them can't be

16  true.  But I'll wait and see what designations you have.

17          MR. GIVEN:  Right.  That's all I'm asking,

18  Your Honor.  I have nothing further.  Thank you.

19          THE COURT:  All right.

20          MS. KELLY:  Judge, I'll be really brief.

21  Mr. Martorello had the opportunity to designate

22  Ms. Weddle's deposition transcript in his statement of

23  position of the advice he received regarding his good

24  faith basis, and there's no dispute that Ms. Weddle

25  testifies in the depositions about how she believes in

1   tribal lending and how she thinks it should work and what

2   she believes, but she does not testify that she told

3   SourcePoint, Bellicose or Matt anything.  In fact, the

4   questions I asked her relate to SourcePoint, Bellicose,

5   and Mr. Martorello's liability, and those are her answers

6   on that topic.

7          THE COURT:  Well, it looks like it because

8   there's questions about SourcePoint and Bellicose right

9   here.

10          MS. KELLY:  And if you look at

11   Mr. Martorello's --

12          THE COURT:  I'm going to give them an

13   opportunity to put -- to let me see what they are saying

14   before I make a ruling.  However, I will say this.  I've

15   heard you on the point that he was -- if he did not

16   identify the documents, the 40 documents to the defense as

17   was required in the order, ECF 441, paragraph 3, then they

18   are not coming in.  He can't use them.

19          And the reason that provision was put in

20   there -- I didn't realize at the time we would be so far

21   away from the trial.  But the reason that was put in there

22   at the time was to fix in point of time what the defense

23   was so that the discovery could be had with respect to it.

24          And so if there were to be documents that were

25   to be identified and were the basis of the defense that he

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 17 of 375
Case 3:17-cv-00461-REP    Document 1316    Filed 06/15/23    Page 162 of 214 PageID# 56899

162

1   was offering because his answer was so amorphous, then I

2   wanted it pinned down.  And that's why I did it this way,

3   and I meant it.  And if they weren't identified and linked

4   to the discovery requests they were being produced to,

5   then he's not going to use them as part of his defense and

6   the good faith defense because as I understand it, they

7   all related to the good faith defense, and that is -- he

8   gave a supplemental answer on that.  Where is that?  Which

9   one is that?  Twelve what?

10          MS. KELLY:  The request is tab 5, Judge, and the

11  interrogatory I believe is tab 4.

12          THE COURT:  The answer is tab 4.  That's a very

13  vague response, but he didn't identify Galloway.  He

14  didn't identify Gravel, and they're not going to testify

15  on the defense.

16          And the documents, the 40 documents are not

17  going to come in on the defense, if it comes in at all.

18          What motions in limine does this deal with now?

19          MS. KELLY:  So that would be motion in limine

20  number 5, and then the adverse inference is motion in

21  limine number 6 of the plaintiffs.

22          THE COURT:  Motion in limine 5.  Have we got

23  completely -- wait a minute.  Have we got all of the

24  aspects of motion in limine 5 resolved?

25          MS. KELLY:  So motion in limine 5 is the --

JA2398

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 18 of 375
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 163 of 214 PageID# 56900

163

1                THE COURT:  Excuse me a minute.  I just need to

2  get it.

3                All right.  Motion in limine 5.  What?

4  Plaintiffs' motion in limine 5.  You're omnibus motion in

5  limine, that's Howard Beals.  What are you talking about?

6                MR. GUZZO:  It's Docket 1173 --

7                MS. KELLY:  Docket 1173.

8                MR. GUZZO:  -- is the motion, and then our memo

9  is at Docket 1174.

10               THE COURT:  Right.  And -- all right.  Let's

11  see.  Seventy-four.  Make sure I get it.

12               All right.  Five.

13               MS. KELLY:  So 5 is the advice of counsel,

14  misunderstood law or good faith basis.  And then --

15               THE COURT:  All right.  Now, where does this

16  number -- he cannot offer -- what's her name, the two

17  witnesses?  Gravel and who?

18               MS. KELLY:  Daniel Gravel and Jennifer Galloway.

19               MR. BENNETT:  It starts at page 11, Kristi.

20               THE COURT:  All right.  I've got it.

21               All right.  And that is also -- is that an

22  objection?

23               MS. KELLY:  That's in our objection as well,

24  Judge.

25               THE COURT:  Which objection?

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 19 of 375
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 164 of 214 PageID# 56901

164

1          MS. KELLY:  That was filed at ECF 1270.  It's

2     our objection to Mr. Martorello's statement of position

3     regarding his good faith basis defense.

4          THE COURT:  And that's the same result?

5          MS. KELLY:  It outlines the discovery issues,

6     yes.  And it also discusses the --

7          THE COURT:  All right.  And I have to hold in

8     abeyance.  I want to see what they say about the testimony

9     of Weddle --

10         MS. KELLY:  Okay.

11         THE COURT:  -- in the morning.

12         MS. KELLY:  I just want to clarify one thing for

13    the record, Judge.  The 2021 motion to compel was waiver

14    of privilege, and the Court initially ruled on that in our

15    favor and waived privilege.  Mr. Martorello filed a motion

16    to reconsider, and that was pending, and we were able to

17    agree that Mr. Martorello would produce all the documents

18    in his possession that was on his privilege log, which

19    were not many because it's our position the documents were

20    destroyed.  And so that resolved the motion and mooted it.

21         THE COURT:  Are any of those documents at issue

22    here?

23         MS. KELLY:  No, they are not identified in the

24    discovery that I'm aware of.  I can go back and check, but

25    as far as I know, they are not.

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 20 of 375
Case 3.17-cv-00461-REP    Document 1316    Filed 06/15/23    Page 165 of 214 PageID# 56902

165

1             THE COURT:  All right.

2             Now, we've kind of gotten -- we started off with

3    a motion for partial summary judgment.  What else are you

4    addressing here now?

5             MS. KELLY:  Judge, that's all I plan to address

6    on this issue for the good faith basis, which was part of

7    the motion for summary judgment.

8             I know there are some other issues in the

9    summary judgment about sovereign immunity being available

10   as a defense that I know Mr. Guzzo wanted to address.  I

11   don't know if now is the time to do that.

12            THE COURT:  We've got to get some of it done.

13            MR. TALIAFERRO:  I don't want to interrupt

14   Mr. Guzzo's presentation.  I don't believe that we've

15   claimed sovereign immunity.

16            THE COURT:  What part of the motion are you --

17   summary judgment motion are you talking about so I can get

18   it front of me?

19            MR. GUZZO:  It's issue number 2, Your Honor.

20            THE COURT:  Hold on, please.

21            Okay.  So now -- now, we've talked about the

22   aspect of your motion for summary judgment which deals

23   with the law, right?

24            MR. GUZZO:  What law --

25            THE COURT:  I've ruled on what law applies.

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 21 of 375
Case 3:17-cv-00461-REP    Document 1316    Filed 06/15/23    Page 166 of 214 PageID# 56903

166

 1              MR. GUZZO:  That's right, Your Honor.

 2              THE COURT:  All right.  Wait a minute.

 3              MR. GUZZO:  The second issue that we move for

 4  summary judgment on is that sovereign immunity does not

 5  bar the claims.  That was an affirmative defense asserted

 6  by Martorello in his answer to the complaint.  It was his

 7  third affirmative defense.

 8              And so on page 31 and 32 of our motion for

 9  partial summary judgment briefing, we requested the Court

10  to award us summary judgment on that defense.

11  Mr. Martorello's brief did not respond to this point.

12              I'd also note --

13              THE COURT:  It's affirmative defense number

14  what?

15              MR. GUZZO:  Three.

16              THE COURT:  Spell 3 or number?

17              MS. KELLY:  Number 3.

18              THE COURT:  All right.  Sovereign immunity, and

19  they didn't respond.  They don't oppose.  So it's granted.

20  Is that right?

21              MR. TALIAFERRO:  That's correct, Your Honor, we

22  don't oppose --

23              THE COURT:  All right.

24              MR. TALIAFERRO:  -- that aspect.

25              THE COURT:  We also have had argument on the

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 22 of 375
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 167 of 214 PageID# 56904

167

 1   mistake of law and scienter.  We're going to have some

 2   more on that.  So that's in the open right now.

 3            What else about your summary judgment?

 4            MR. GUZZO:  Then, Your Honor, we also moved on

 5   several elements of our claim.

 6            THE COURT:  All right.  Let's go to those.

 7            MR. GUZZO:  And that starts on page 32 of our

 8   brief and then continues through 40.  And what we did here

 9   is we went through the substantive elements of the claim

10   that Mr. Martorello --

11            THE COURT:  This is section 1962(d) claim?

12            MR. GUZZO:  (d) claim.

13            THE COURT:  What count is that?

14            MR. GUZZO:  That is Count Three of the

15   complaint.

16            And if you see, we, in our brief, starting at

17   32, we argue that summary judgment should be granted, that

18   Mr. Martorello violated 1962(d) as to plaintiffs and the

19   class members.  And we go through the evidence that it

20   can't be disputed that he knew about it, that the evidence

21   shows and it can't be disputed that Mr. Martorello

22   furthered the scheme and accepted millions of dollars in

23   benefits from it.

24            In addition, we argued that summary judgment

25   should be awarded that an enterprise existed -- that

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 23 of 375
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 168 of 214 PageID# 56905

168

 1   starts on page 36 of our brief -- that the loans

 2   constituted unlawful debt under RICO.

 3           THE COURT:  Wait a minute.  Wait a minute.

 4           MR. GUZZO:  Sorry.  I'm going fast.  And that

 5   persons associated with the enterprise engaged in the

 6   collection of unlawful debt.

 7           So our analysis argument in evidence is

 8   submitted there.

 9           And Mr. Martorello --

10           THE COURT:  Well, is there any -- the definition

11   of unlawful debt under RICO is, you said, 21 percent?

12           MR. GUZZO:  Well, the definition is that --

13           THE COURT:  Twice the state rate.

14           MR. GUZZO:  Twice the state.  And that's at

15   18 U.S.C. Section 1961(6).

16           The debt has to be usurious under state or

17   federal law where the usurious rate is at least twice the

18   enforceable rate.  And under 6.2-303 of the Virginia Code,

19   that is what establishes the rate in Virginia is

20   12 percent.

21           And, Your Honor, there's no dispute in this case

22   that the loans far exceeded 24 percent, far exceeded even

23   100 percent.  The parties have received a stipulation as

24   to the class member data on this.

25           It's also in the expert report of Karl Ebert,

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 24 of 375
Case 3.17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 169 of 214 PageID# 56906

169

 1   and it's in Exhibit 56.  So Docket 1166-56, paragraphs 42

 2   through 45.  The average APR charged on these loans was

 3   727 percent in this case.

 4              THE COURT:  All right.

 5              MR. GUZZO:  And so for those reasons, we would

 6   submit, for the reasons in our brief that weren't opposed

 7   on these grounds, that all of these elements of the claim

 8   are satisfied.

 9              THE COURT:  You say that there's no opposition

10   to any of your positions on these points?

11              MR. GUZZO:  Correct, Your Honor.  They did not

12   respond.  Their whole brief really was devoted to that --

13   to their point that we needed to prove knowledge.

14              THE COURT:  All right.

15              MR. GUZZO:  But they didn't say -- they didn't

16   contest that an enterprise exists or that the loans

17   constitute unlawful debt or that Mr. Martorello knew or

18   furthered the scheme.

19              And so under Rule 56(c), and one of the cases we

20   cite in our reply brief, *Azko*, A-Z-K-O, we would submit

21   that those matters are uncontested and that summary

22   judgment should be granted on those elements, thereby

23   really reducing the trial to several issues, primarily

24   damages.

25              THE COURT:  All right.  I'll hear from the

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 25 of 375
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 170 of 214 PageID# 56907

170

 1   defendant at this time.

 2        The way I read the papers, I didn't see contest

 3   to those things.  So help me out, where we stand from your

 4   standpoint.  Who's going to do that, Ms. Simmons or

 5   Mr. Taliaferro or Mr. Given?

 6        Is my reading correct, and his assertion, that

 7   you all did not respond to those particular points?

 8        MS. SIMMONS:  Your Honor, the -- the first basis

 9   was the question of whether or not the debts were

10   unlawful.  The Court has ruled on that.  So we're not --

11   because Virginia law applies, we are not disputing that

12   the debts were unlawful.  The Court has found that, that

13   Virginia law applies.  So that's correct.  We're not

14   arguing that it does.

15        THE COURT:  So I ought to have summary judgment

16   on that?

17        MS. SIMMONS:  Yes.

18        THE COURT:  He said that Mr. Martorello knew

19   about the scheme, that you didn't contest that.  Let's

20   see.  That would be at page 32 through -- excuse me,

21   through 33 and 34.  And I didn't see any opposition about

22   that in the brief either.  So I've taken that Rule 56(c)

23   will kick in.  Am I right or wrong?

24        MS. SIMMONS:  Your Honor, we are not taking the

25   position -- well --

USCA4 Appeal: 23-2097   Doc: 11-6      Filed: 12/06/2023   Pg: 26 of 375
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 171 of 214 PageID# 56908

171

 1            THE COURT:  Let's start again.  The first
 2   question is am I correctly reading your papers that you
 3   did not address their contentions that Mr. Martorello knew
 4   about the scheme, that he acted in furtherance of the
 5   scheme, that he knew the enterprise existed, that the
 6   loans constituted unlawful debt, and that persons engaged
 7   in the collection of unlawful -- persons in the enterprise
 8   engaged in unlawful debt collection?  I didn't see any
 9   dispute sections in your brief challenging that.  Am I
10   right?
11            MS. SIMMONS:  So we are not disputing that they
12   have shown the existence of an enterprise.  We do not
13   agree that they have shown the existence of a scheme,
14   which we submit would require the knowledge of
15   unlawfulness, the willfulness element that we've been
16   discussing today.
17            THE COURT:  Okay.  And -- so this depends on
18   willfulness?
19            MS. SIMMONS:  Correct.
20            THE COURT:  And I guess furtherance of the
21   scheme argument that they make likewise does that, right?
22            MS. SIMMONS:  Right.
23            THE COURT:  And you agree the loans constitute
24   an unlawful debt under Virginia law and 18 U.S.C. 1961(6).
25            MS. SIMMONS:  Given the Court's ruling earlier

1   today, yes.

2          THE COURT:  And you agree that they're entitled

3   to summary judgment on persons associated with the

4   enterprise engaged in the collection of a debt?

5          MS. SIMMONS:  Correct.

6          THE COURT:  Okay.

7          MS. SIMMONS:  We don't dispute that the debts

8   were collected.

9          THE COURT:  And the -- so summary judgment can

10  be entered on those points, but not until -- I can't do

11  anything on the scheme arguments until I hear further from

12  you on this willfulness, right?

13         MS. SIMMONS:  Correct, Your Honor.

14         THE COURT:  Okay.  All right.  I understand.

15         All right.  So that solves that.  What's next?

16  It's 4:15.  We're going to 5, and then we're going to

17  knock off.  We're not going Norfolk hours.  I used to

18  start at 8 and quit at 8.  No longer do that.

19         MR. GUZZO:  Just one point of --

20         THE COURT:  Where do we go?

21         MR. GUZZO:  Sorry.  Go ahead.

22         THE COURT:  Where do we go?  What do we do next?

23         They say that given the rulings that I've made,

24  that you're entitled to summary judgment that

25  Mr. Martorello knew the enterprise existed, that the loans

1    constituted unlawful debts, that the persons associated
2    with the enterprise engaged in the collection of unlawful
3    debts.  They say I cannot grant summary judgment on the
4    first part about that he knew about the scheme or that he
5    furthered the scheme, the second point, because the
6    willfulness issue is still outstanding.

7            Have I said that right, Ms. Simmons?

8            MR. TALIAFERRO:  Yes, Your Honor.

9            THE COURT:  Mr. Taliaferro.  Okay.

10           So what do you say?

11           MR. GUZZO:  Well, I would say I thought they
12   were just a little hung up on the word scheme because they
13   don't agree that --

14           THE COURT:  That's a bad sounding word.

15           MR. GUZZO:  I think it's an accurate sounding
16   word in this particular case, Your Honor.

17           So I would say is that the knowledge element
18   that he knew of the nature of the enterprise and the
19   unlawful debts and the evidence further showing him
20   facilitating that -- I mean, I just hear them taking issue
21   with the word scheme and then injecting a third element,
22   whether we have to prove willfulness, not that they
23   necessarily oppose that he knew about it and that he
24   facilitated it --

25           THE COURT:  I don't think that you oppose the

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 29 of 375
Case 3.17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 174 of 214 PageID# 56911

174

1  record that shows beyond dispute that Mr. Martorello knew

2  what was going on with the whole lending program.

3       MR. TALIAFERRO:  That's correct, Your Honor.  We

4  don't dispute that.

5       THE COURT:  And you don't dispute that

6  Mr. Martorello furthered the whole lending program by what

7  he did.  He did it.  I mean, he set the thing up.  It's

8  undisputed he set the thing up.  It's undisputed that he

9  provided the people.  It's undisputed that he had the

10 servicers.  It's undisputed that they did the leads.  It's

11 undisputed they did the collections.  I don't know what

12 the dispute is, if there is one, about --

13      MR. GIVEN:  Your Honor, I think -- I apologize.

14 I think the dispute is that we will produce evidence that

15 Mr. Martorello did not set it up, that it was actually set

16 up prior by Mr. Rosette.  It's a December memorandum that

17 preceded Mr. Martorello's involvement.

18      So that's where we do take some issue about him

19 being the mastermind or setting it up.  Mr. Rosette set it

20 up.

21      THE COURT:  He set it up at Martorello's

22 insistence.

23      MR. GIVEN:  That's not what I think the evidence

24 will show, Your Honor.  We disagree with that part.

25      THE COURT:  Okay.  So there's a factual dispute

USCA4 Appeal: 23-2097   Doc: 11-6      Filed: 12/06/2023   Pg: 30 of 375
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 175 of 214 PageID# 56912

175

 1    about that.  Where is the factual dispute, then?

 2              MR. GIVEN:  That the --

 3              THE COURT:  Where is the evidence of the factual

 4    dispute?  They say that Martorello was responsible for it.

 5              MR. GUZZO:  Well, I'll sit down and I'll --

 6              THE COURT:  He furthered it.  It doesn't make

 7    any difference that he set it up.

 8              MR. GUZZO:  And that would be my point,

 9    Your Honor.

10              THE COURT:  Their point is -- they're not

11    arguing that he set it up.  Although it seems to me, if I

12    recall correctly, yeah, Rosette was the lawyer who did it,

13    but there was a reason behind all that and that was

14    because Martorello basically told him to after he

15    discovered what a bonanza it was.

16              But apart from that, they're not arguing about

17    that.  They're saying that he furthered it, that there's

18    no dispute that he furthered the operation.

19              MR. GUZZO:  That's correct, Your Honor.

20              THE COURT:  I don't think there's any dispute on

21    that, is there?

22              MR. TALIAFERRO:  It may just be late in the day,

23    Your Honor.  We're having a little trouble finding where

24    the -- what the citation -- what we're looking at for the

25    requirement that Mr. Martorello furthered --

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 31 of 375
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 176 of 214 PageID# 56913

176

```
 1            THE COURT:  Well, the argument, he tells me, is
 2   1169, pages 33 -- excuse me, 34, 35 and 36.  That's their
 3   opening summary judgment brief.  And then it's further
 4   addressed in the reply at what pages?  Your reply,
 5   Mr. Guzzo.  I don't know that you follow the same outline.
 6            MR. GUZZO:  In the reply, which is 1244, it
 7   starts on page --
 8            THE COURT:  1241.
 9            MR. GUZZO:  I'm looking at the unredacted
10   version, but yes, 1241 would be redacted version, and the
11   page number wouldn't change.
12            THE COURT:  Well, let me tell you something.  If
13   it's the 1241 and it's the redacted version, you didn't
14   redact anything.  There's not any redaction in mine, or if
15   you did, I can't find it.
16            I'm not sure that there's a reply to any of that
17   stuff in there in the same organizational format because
18   you address the legal issues.  Maybe -- do you reply to it
19   in -- wait a minute.  There is one redaction.  Page 5.
20            Is it the response to the counter-statement
21   or --
22            MR. GUZZO:  No.  And so I want to direct
23   Your Honor to page 27.  And then there's a separate
24   heading --
25            THE COURT:  Twenty-seven of what?
```

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 32 of 375
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 177 of 214 PageID# 56914

177

1           MR. GUZZO:  Of the reply brief.

2           THE COURT:  All right.

3           MR. GUZZO:  So a lot of the reply brief involves

4  the new issue that was injected by Mr. Martorello of

5  whether actual knowledge applies.

6           THE COURT:  Yeah.

7           MR. GUZZO:  Then we have a section, "Other than

8  his erroneous mistake of law defense, Mr. Martorello does

9  not oppose that he knew and agreed to facilitate" -- we

10 say "scheme."  I'll say program for the purpose of this.

11          THE COURT:  Enterprise.

12          MR. GUZZO:  The enterprise.  And we go through,

13 which tracks our earlier brief, that the elements that he

14 knew were met and that it's not a high bar, and that he

15 does not and cannot contest that he knew about it.

16          And then on page 28 --

17          THE COURT:  Yeah, I see it.

18          MR. GUZZO:  -- we start -- there's a separate

19 heading, "Martorello did not respond to plaintiffs'

20 request for summary judgment, that an enterprise existed,

21 the loans constitute unlawful debt, and persons engaged in

22 the collection of the unlawful" --

23          THE COURT:  Well, they agree with that.

24          MR. GUZZO:  Yeah.  And so I'm just pointing

25 that --

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 33 of 375
Case 3.17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 178 of 214 PageID# 56915

178

 1              THE COURT:  They haven't disputed that.

 2              MR. TALIAFERRO:  I appreciate Mr. Guzzo's

 3  further explanation.  That's correct.

 4              THE COURT:  Okay.

 5              MR. TALIAFERRO:  The recitation that the reply

 6  brief accurately states defendant's position, which is

 7  other than the willful issue, the scienter issue that we

 8  already discussed, we did not dispute the remainder of

 9  that paragraph.

10              THE COURT:  All right.  Okay.

11              I know what to do now.  So what do we do next?

12              MR. GUZZO:  That's all I have, Your Honor.

13  Also, I know you've scheduled this hearing accommodating

14  my schedule.  I know you were looking at it last week, and

15  I forgot to thank you when this all started.  So I wanted

16  to thank you for that.

17              THE COURT:  All right.  We try to respect

18  vacations.  Lawyers get precious few of them.  I hope you

19  went somewhere fun and did something good.

20              MR. GUZZO:  I was in Wyoming in the Grand Tetons

21  with -- I have a 4-year-old and a 1-year-old.  So it was

22  actually our first real family vacation.  So it was really

23  nice.  So thank you.  Gave me a lot of time to think about

24  this, though.

25              THE COURT:  At your age, I probably would have

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 34 of 375
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 179 of 214 PageID# 56916

179

1    considered it to be wonderful to be with my 4-year-old and

2    my 1-year-old.  At my age, it wouldn't have been a

3    vacation.

4              MR. GUZZO:  Times have changed.

5              THE COURT:  Well, I got great grandchildren that

6    age, and they wear me out.

7              Okay.  What's next on our Docket here, folks?

8              MS. KELLY:  Judge, the next item I believe are

9    motions in limine, and I think there are some discrete

10   ones that we could resolve --

11             THE COURT:  Well, I'm pulling the notebook out.

12   I spend more time moving notebooks.

13             MS. KELLY:  I think it's 1174, plaintiffs'

14   motion in limine.

15             THE COURT:  All right.  Plaintiffs' motion in

16   limine.  The motion in limine number 1, I've issued orders

17   on those.  We're not hearing argument.  So which one are

18   we hearing argument about?

19             MS. KELLY:  So we had motion in limine number 2

20   and 3 were both outstanding, but I think the defendant,

21   Mr. Martorello, and plaintiffs agree that both of those

22   were resolved by Your Honor's ruling as to the Virginia

23   law -- that Virginia law applied here.

24             THE COURT:  Do you agree?

25             MR. GIVEN:  Well, Your Honor, I -- we do have

1    one thing is that --

2              THE COURT:  All right.

3              MR. GIVEN:  -- on number 2 -- we agree number 1,

4    there was no opposition there.

5              Number 2, we -- obviously, the Court has ruled

6    that Virginia law applies, but we still believe,

7    notwithstanding the Court's ruling, that the loans were

8    made on the reservation.  That's the only distinction, and

9    that's -- we believe they were made on the reservation.

10             THE COURT:  But the ruling on applicable law

11   solves that.  You're not agreeing to anything.

12             MR. GIVEN:  Correct.

13             THE COURT:  I ruled against you on that.

14             MR. GIVEN:  Okay.  Then that's disposed of.

15             THE COURT:  I just want to know if it's disposed

16   of.  I'm not trying to get you to agree to what you fought

17   so hard to oppose.

18             MR. GIVEN:  And the Court has now disposed of

19   motion in limine number 3, based on its ruling this

20   morning.

21             THE COURT:  All right.

22             MR. GIVEN:  I don't believe that -- oh, go

23   ahead, Kristi.

24             THE COURT:  No.  Go ahead.

25             MR. GIVEN:  I can get rid of a lot of them,

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 36 of 375
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 181 of 214 PageID# 56918

181

 1  Your Honor.  Their motion in limine number 4 -- okay.

 2  Yeah.  Go ahead, Kristi.

 3          THE COURT:  This has to do -- this -- as I read

 4  it, I didn't quite follow it, but then I got into the

 5  motions.  This has to do with expert testimony, doesn't

 6  it?

 7          MS. KELLY:  Judge, so this motion is to exclude

 8  testimony that federal policy supports the commercial

 9  activities that --

10          THE COURT:  I know.  So who's going to put that

11  on?

12          MS. KELLY:  So we can raise it in a motion in

13  limine -- we can address it in a motion in limine and it

14  would dispose of some of the expert testimony or we could

15  hear it with the motions in limine to exclude specific

16  experts who are opining in this.

17          Judge Orrick in the *Brice* case excluded the

18  expert testimony of Mr. Henson and stated that federal

19  policy encouraging American Indian economic development

20  and self-sufficiency was excluded because it was not

21  directly relevant to the resolution of the claims.

22          And so plaintiffs don't believe Mr. Martorello

23  should have testimony that he did this because the federal

24  policy and federal law supported what he was doing because

25  we, in fact --

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 37 of 375

182

```
 1              THE COURT:  Do you think he's going to put on an
 2   argument that he's doing this for the eleemosynary purpose
 3   to advance the tribe's welfare?  I can't believe it.
 4              MS. KELLY:  Well, he --
 5              THE COURT:  Are you all offering any testimony
 6   on this topic?
 7              MR. TALIAFERRO:  Your Honor, I think this is --
 8   the advancement of tribal policy was related to our choice
 9   of law issue.
10              THE COURT:  Yes, I think it was.
11              MR. TALIAFERRO:  And I believe that's been
12   resolved.
13              THE COURT:  I think so, too.  And Judge Orrick's
14   opinion in Brice clearly deals with it as well.  So this
15   motion in limine is granted.  An order will be entered.
16              MS. KELLY:  Thank you, Judge.
17              The -- the next one is the advice of counsel.
18              THE COURT:  Your view -- just so I understand
19   it, your concession is that it's wrapped up in the law
20   part of things?
21              MR. GIVEN:  Correct.
22              THE COURT:  Right.  Not necessarily the expert's
23   view of it.
24              MR. GIVEN:  Correct.
25              THE COURT:  So anyway, it's granted.  This one,
```

USCA4 Appeal: 23-2097 Doc: 11-6 Filed: 12/06/2023 Pg: 38 of 375

1  as this motion is put, it is granted as moot.

2          MS. KELLY:  Okay.

3          THE COURT:  I think that the expert testimony on

4  the topic will fall as well because of what Judge Orrick

5  did in the *Brice* case.

6          All right.  Moot because of law ruling.

7          All right.  Next one is Martorello should be

8  prohibited from asserting a suggestion that he relied on

9  the advice of counsel, misunderstood the law or had a good

10 faith basis to believe his conduct was illegal.

11         We have still matters pending on that, and I'll

12 hold that in abeyance.

13         Number 6 is any adverse inference instruction

14 should be provided to the jury.  You probably mean "an"

15 adverse inference, right?

16         MS. KELLY:  That's correct, Judge.

17         THE COURT:  And that's destruction of highly

18 relevant documents.  And that's -- that is what, now?  Are

19 you ready to address that?

20         MS. KELLY:  Yes, I can.

21         THE COURT:  All right.

22         MS. KELLY:  And I would just -- to start, I

23 would like to address, if Your Honor goes -- well, first,

24 stepping back, it's our position that documents were

25 destroyed in this case and --

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 39 of 375
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 184 of 214 PageID# 56921

184

 1        THE COURT:  Well, is there any dispute that the

 2   documents were destroyed?  I thought that Ms. Weddle said

 3   that all the documents were destroyed.

 4        MS. KELLY:  So stepping back, I first --

 5   Mr. Martorello, when he sold his business to the tribe,

 6   he -- before he sold it, there's an e-mail with his lawyer

 7   regarding the sale transaction -- John Williams -- where

 8   he says he's going to remove stuff before the sale.  Then

 9   John Williams responds, you know, it's also a good idea to

10   have the tribe create a document destruction policy so

11   that they have cover if federal regulators come later and

12   documents are missing.

13        THE COURT:  Nothing wrong with that.

14        MS. KELLY:  That's fine.  But the problem

15   becomes, Judge, when the sale documents insert a provision

16   that -- which if you look at Exhibit 7, it's ECF 1174-7.

17        THE COURT:  It's the contractual provision.

18        MS. KELLY:  That's right, Judge.  And that

19   provision states that "all company information now or that

20   may be discovered on equipment of any kind or in any

21   written materials shall be immediately provided to the

22   acquirer" -- which was the tribe -- "and deleted or

23   destroyed by the holder so holder retains no information

24   of the company."

25        So Mr. Martorello sold the information about

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 40 of 375
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 185 of 214 PageID# 56922

185

1   Bellicose/SourcePoint to the tribe, made them destroy it

2   all.  He didn't want to, in my opinion, get his hands

3   dirty and be the one pushing delete, but he had the tribe

4   do it for him.

5          And then in discovery, when we were doing

6   jurisdictional discovery with the tribe --

7          THE COURT:  When was the destruction?

8          MS. KELLY:  This has been ongoing throughout the

9   case.  That's why -- we knew that there was e-mails

10  deleted early on in the case because Mr. Gray told us

11  that.  When we asked why there were no e-mails with

12  Mr. Martorello, he said that they were all destroyed.

13         THE COURT:  Who said that?

14         MS. KELLY:  Justin Gray, counsel for Rosette,

15  who was counsel for the tribe.  And we --

16         THE COURT:  But the litigation started in '17.

17         MS. KELLY:  That's right.

18         THE COURT:  When was the sale?

19         MS. KELLY:  It was -- it was finalized at the

20  end of 2015, early 2016.

21         THE COURT:  Okay.

22         MS. KELLY:  And so the destruction occurred in

23  early 2016 is my understanding.

24         THE COURT:  Okay.  So how does he have a duty to

25  preserve the documents at that time?

USCA4 Appeal: 23-2097  Doc: 11-6  Filed: 12/06/2023  Pg: 41 of 375
Case 3:17-cv-00461-REP  Document 1316  Filed 06/15/23  Page 186 of 214 PageID# 56923

186

1          MS. KELLY:  Because it's our position that

2     Mr. Martorello knew that there was a threat, a real threat

3     of ongoing litigation because he was aware that federal

4     regulators were issuing CIDs, certain state Attorney

5     Generals were filing lawsuits.  I believe the

6     Pennsylvania --

7          THE COURT:  Issuing what?

8          MS. KELLY:  CIDs, like civil investigative

9     demands.  And the state Attorney General in Pennsylvania,

10    I think, had sued Think Finance at that time as well.  And

11    so he was aware -- and the reason why he sold the

12    business --

13         THE COURT:  When is *Otoe*?  When was that?

14         MS. KELLY:  The District Court decision was in

15    2013, and the Second Circuit affirmed the decision in

16    2014.  So this was all before --

17         THE COURT:  So he knew about actions by the

18    state AGs.

19         MS. KELLY:  That's correct.

20         THE COURT:  He knew about *Otoe* litigation and

21    all that.

22         MS. KELLY:  And he knew about Scott Tucker's

23    indictment.  He knew about the Hallinan indictment.

24         THE COURT:  Who?

25         MS. KELLY:  Charles Hallinan.  He was an

JA2422

1   individual who was criminally prosecuted in Philadelphia

2   for a similar lending scheme.

3             THE COURT:  Had the prosecutions concluded by

4   '17?

5             MS. KELLY:  No, but Tucker was done in 2017.

6             THE COURT:  All right.  What else?

7             MS. KELLY:  He was aware of the CashCall

8   litigation, and he -- there's e-mails where he said he was

9   concerned about a CashCall-type attack on his operation.

10  And so that was the reason for the sale.

11            The CFPB had also sued the tribal lending

12  entities that were --

13            THE COURT:  He knew about the risk of litigation

14  from the 1166-3.

15            MS. KELLY:  That's correct, Judge.

16            THE COURT:  That's 2012?

17            MS. KELLY:  Yes.  Yes.

18            THE COURT:  So I guess the question I have here

19  is if you want this inference, the inference has to come

20  how?  How am I going to do it?  And what does he get to

21  say about it in response?

22            So to the extent that you want an adverse

23  inference based on his knowledge about what was going on

24  in the industry and people getting indicted, and so forth,

25  because that has to do -- you know, the spoliation of

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 43 of 375
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 188 of 214 PageID# 56925

188

1   evidence has to do with the destruction of evidence of

2   value, the question to me then becomes what does he get to

3   put on in response to all that and say no, I didn't do it

4   because of that, I did it because I got this -- I got the

5   advice from a lawyer this was a good way to do business?

6          MS. KELLY:  Well, we asked him why that

7   particular section, section 2.6(d) was included in the

8   contract, and he says it was just a form contract and part

9   of the document.

10          And then when we obtained the actual document

11  that it was based on in the *Hengle* case, that section was

12  missing.  And so that section was added, and it wasn't

13  part of the form document.

14          And when we asked his lawyer, John Williams,

15  about it, he refused to answer on the basis of privilege

16  as to why that was included in this contract and not the

17  other form contract.

18          So --

19          THE COURT:  So I guess the question still is --

20  this is one of those issues of what does this open up?

21          MS. KELLY:  Judge, if you would --

22          THE COURT:  I do think the rule is -- help me if

23  I'm wrong -- that when you're charged with spoliation, the

24  test includes you have to make a finding, if you're going

25  to give a spoliation instruction, that he reasonably

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 44 of 375
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 189 of 214 PageID# 56926

189

1   anticipated litigation.  That opens up the whole bailiwick

2   of what he knew at the time.  So I don't know --

3          MS. KELLY:  If you would permit us, Judge, to

4   confer.

5          THE COURT:  Do you all want to pray over that

6   tonight?

7          MS. KELLY:  Yes, I would like to, Judge.

8          THE COURT:  I think that would be a good idea.

9          MS. KELLY:  I was going to suggest allowing us

10  to confer about this, and your decision on the good faith

11  basis may inform that as well.

12         THE COURT:  Seven has been -- they don't object

13  to that.

14         MR. GIVEN:  That's correct.

15         THE COURT:  Eight.  They don't object to that.

16         MR. GIVEN:  As to the RICO element, that's

17  correct.

18         THE COURT:  Yes.

19         Nine, motion to exclude evidence that Martorello

20  was not the lender.  Are you contending that he personally

21  was the lender?

22         MS. KELLY:  No, Judge.  That -- I will say I

23  could have done a better job drafting that, and our intent

24  was we just want to exclude Mr. Martorello from asserting

25  a defense to the case that he was not the lender so he

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 45 of 375
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 190 of 214 PageID# 56927

190

1   can't be liable joint and severally for lending laws.  And

2   I don't think there's a dispute about that.

3           MR. GIVEN:  There's a huge dispute about that,

4   Your Honor.  We -- we're going to show who the true

5   lenders were.  They were Red Rock Tribal Lending and Big

6   Picture Loans that Mr. Martorello did not own.  So that's

7   something that's a fact issue and will be brought before

8   the jury.  We absolutely assert that he was not the

9   lender.

10          THE COURT:  In this case, what difference does

11  it make that he was not the lender?  I don't know that --

12          MS. KELLY:  I'm sorry.  We agree that he was not

13  the lender.  What I'm saying is we don't want him to use

14  that to say only the lender could be liable under joint

15  and several liability.  So I thought we were kind of

16  agreed on that as long as --

17          MR. GIVEN:  No.  Because it involves Virginia

18  state law, which is now at issue, our Virginia counsel

19  will address that.

20          MR. TALIAFERRO:  Your Honor, this goes to the

21  Virginia statutory provision.  We think there's a case

22  directly on point that limits liability to the actual

23  lender on the Virginia counts.

24          And we're reluctant to agree that he's not the

25  lender because we think that liability, under Virginia

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 46 of 375
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 191 of 214 PageID# 56928

191

1  law, is limited to the lender.

2          THE COURT:  Well, I don't think -- his RICO

3  liability is because of the association with the

4  enterprise and his involvement in it, not because he was

5  the lender.  And he -- I think it's not disputed that he

6  was the principal shareholder and managing person of

7  SourcePoint and Bellicose.  Who was the lender?  Who

8  actually loaned the money?

9          MS. KELLY:  So Mr. Martorello actually had a

10  company that lent the money for the loans under the name

11  of the tribe, through Iron Fence Investments.  He funded

12  the loans.

13          THE COURT:  Wait a minute.  He had - Iron Fence.

14          MS. KELLY:  Which funded the loans.

15          THE COURT:  Loaned the --

16          MS. KELLY:  Money to the tribe.

17          THE COURT:  What entity?

18          MS. KELLY:  To Red Rock -- I'd have to --

19          THE COURT:  To Red Rock and SourcePoint or who?

20          MS. KELLY:  I think -- I would have to

21  double-check the documents to the entity that Iron Fence

22  lent the money to.  It might have been the tribe directly

23  to fund the loans, and he had --

24          THE COURT:  Iron Fence was a company or LLC or

25  what?

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 47 of 375

192

1          MS. KELLY:  It was a company that's still, I

2   think, owned by Mr. Martorello.  I'm not sure if it was an

3   LLC or another corporate structure.  But he had that

4   company that funded the loans.  He had his marketing

5   company, 7X Services, and he had SourcePoint and Bellicose

6   that serviced the loans.  So he had different companies

7   that dealt with different aspects of the lending

8   operation.

9          THE COURT:  Are you contending, insofar as your

10  claim under the Virginia statute, it's the -- which

11  statute is it?

12         MR. TALIAFERRO:  Your Honor, it's the *Greenberg*

13  *v Commonwealth of Virginia.*  I'm going to have to put my

14  reading glasses on.

15         THE COURT:  Which claim is it?

16         MR. TALIAFERRO:  25 Va. 594, 1998, Your Honor.

17  We contend that case is clearly on point.  It limits

18  liability under the Virginia statute to the lender.  We --

19  if you look at our response to number 9, we acknowledge

20  that it's probably not an issue for the RICO claim.

21         THE COURT:  Yeah, which appears to be what it

22  relates to.

23         MR. TALIAFERRO:  We just want to be --

24         THE COURT:  I mean, their paper -- their page 27

25  only mentions it in connection with the RICO claim, as I

USCA4 Appeal: 23-2097   Doc: 11-6      Filed: 12/06/2023   Pg: 48 of 375
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 193 of 214 PageID# 56930

193

1    read it.  It's late in the day.

2           MR. GUZZO:  If Your Honor -- I could just

3    clarify the decision in *Greenberg*, as well as with what

4    the Virginia code says.  This is going to be fully briefed

5    in opposition to Mr. Martorello's motion for summary

6    judgment.  So you're going to get a full brief on this

7    tonight.  I know you probably won't take a look at it

8    tonight.

9           THE COURT:  No, I won't.  Okay.  We'll check it.

10          MR. GUZZO:  There is two -- well, there's a

11   variety of different lending statutes in Virginia.  One is

12   Virginia's general usury statute.  That comes under

13   section 6.2-303 of the Virginia Code.  There is also a

14   Consumer Finance Act.  That is 6.2-1500, and then the

15   section that the Supreme Court was interpreting in

16   *Greenberg* is 6.2-1541(A).

17          THE COURT:  Do you have a claim under that act?

18          MR. GUZZO:  We do not.  We sued him under the

19   general usury statute, which applies to persons taking or

20   receiving payment.  Both Judge Lauck, in *Gibbs*, and

21   Judge Novak, in *Hengle*, determined that that statute -- a

22   person could be held liable even though the money --

23          THE COURT:  Yeah.

24          MR. GUZZO:  -- came through companies.

25          THE COURT:  I think the thing to do is just

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 49 of 375
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 194 of 214 PageID# 56931

194

1   abide the motion for summary judgment briefing and hold

2   number 9 in abeyance.

3         MR. GUZZO:  I think that makes sense.  Thank

4   you, Your Honor.

5         MS. KELLY:  Now I know who's writing our

6   opposition to summary judgment.

7         THE COURT:  Ten is exclude testimony from the

8   depositions from *Smith, Cumming* and *Duggan* actions.  Tell

9   me about that.

10        MS. KELLY:  So, Judge, we had previously briefed

11   this issue prior to the misrepresentation hearing in 2020,

12   and Your Honor ruled then that the depositions that

13   Mr. Martorello wanted to use that were taken in the *Smith*,

14   *Cummings*, and *Duggan* case would not be admissible pursuant

15   to Rule 32.

16        Mr. Martorello, in his opposition, did not

17   oppose this other than to incorporate his prior briefing

18   that your court ruled against in ECF 828.

19        We would --

20        THE COURT:  You're saying that it's controlled

21   by ECF 828 --

22        MS. KELLY:  Yes, Judge.

23        THE COURT:  -- and that they are asserting --

24   they are not opposing it except to the extent they opposed

25   it in the briefing that led up to 828?

195

1          MS. KELLY:  They have added nothing.  But we did

2    receive Mr. Martorello's deposition designations yesterday

3    when we exchanged them -- or Monday -- in this case.  And

4    I would also submit that it would be very cumulative to

5    allow those depositions because both Mr. Martorello and --

6          THE COURT:  Rule 32 didn't deal with cumulative,

7    though.

8          MS. KELLY:  Right, but I'm -- in addition to

9    Rule 32, it would be cumulative because Mr. Martorello

10   intends to use the deposition of James William, Jr., who

11   is the tribal chairman.  That was taken in *Williams*, but

12   then he also wants to use his deposition in *Smith* and

13   *Cumming*, which we were not a part of, which, in one of

14   those, the Court has already excluded.

15         THE COURT:  I thought I excluded all of them.

16         MS. KELLY:  You did.  But I'm just saying we

17   would be playing the same person being deposed three

18   different times in three different cases instead of the

19   deposition once when it was taken in this case.

20         THE COURT:  You don't oppose *Williams* being

21   taken in this case.

22         MS. KELLY:  No.  No.  The ones in this case.

23   And we have an agreement on cross use for all of the

24   *Galloway* cases.  So we do not oppose the use of any

25   depositions in *Galloway* or the *Williams* cases pursuant to

JA2431

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 51 of 375
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 196 of 214 PageID# 56933

196

 1  our agreement.  And they have known about this in 2020.

 2  So if they needed any of these depositions, they could

 3  have retaken them during the time discovery was open.

 4          I will also say that Ms. Hazen was deposed in

 5  *Williams*, and they're seeking to use her deposition in

 6  *Williams* and also her deposition in *Smith*.  So again, the

 7  use would be cumulative there.

 8          And then Ms. Weddle --

 9          THE COURT:  Well, it's not cumulative unless

10  it's on the same lines, it's the same questions, is it?

11          MS. KELLY:  Well, that's true, Judge.  But I'm

12  sure -- I mean, I haven't gone through all the

13  designations yet.  We're working on our

14  counter-designations right now, but, I mean, I guess that

15  would be something we would deal with.

16          THE COURT:  So why don't I just confine my

17  ruling to 828 and be done with it?

18          MS. KELLY:  I think that would make perfect

19  sense.

20          THE COURT:  So why shouldn't 828 prevail?

21          MR. GIVEN:  Well, no.  We -- Your Honor, we --

22  we just reurge it.  We understand the Court ruled, but I

23  do agree with your very last statement.  In fact, the

24  scope in the cross-examination previously was limited and

25  then expanded.  So I don't believe it's cumulative.  But

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 52 of 375
Case 3.17-cv-00461-REP  Document 1316  Filed 06/15/23  Page 197 of 214 PageID# 56934

197

1   we're simply reurging the points made in our brief found

2   at Docket Number 804.  We understand the Court ruled on

3   it.  We're simply reurging it.

4              THE COURT:  All right.

5              MR. GIVEN:  But we don't believe it's

6   cumulative.

7              THE COURT:  All right.  Motion 10 is granted on

8   the basis of the ruling made in ECF 828, and the arguments

9   preserved by the defendant in connection with the

10  defendant in dispute of that ruling don't change.  They

11  are here.  There's no reason to -- they are here to be

12  considered in this particular motion, and there's no

13  reason to change the ruling that I can see from the papers

14  that I have.

15             All right.  That brings us to number 11.

16             MS. KELLY:  And I think that one is agreed,

17  Judge.

18             THE COURT:  Eleven is --

19             MR. GIVEN:  Your Honor, as long as it is

20  reciprocal.  Because that's part of our motion in limine.

21  In other words, as long as they're not able to present

22  evidence or make arguments regarding Mr. Martorello's

23  financial condition.  If it's reciprocal, that's fine.

24             MS. KELLY:  Yeah, we agree.

25             THE COURT:  Didn't I rule on that and say they

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 53 of 375
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 198 of 214 PageID# 56935

198

1    could testify why they got the loans?

2         MS. KELLY:  You haven't -- I don't think you've

3    ruled on that yet.  That's part of Mr. Martorello's

4    motion.  But we agree not to talk about Mr. Martorello's

5    financial -- we've agreed.

6         THE COURT:  They don't want you -- they are

7    willing to agree not to talk about his as long as you

8    don't talk about the plaintiffs'.  Do you all need to talk

9    about the plaintiffs'?

10        MR. GIVEN:  No.  I think something is being

11   confused.  We're limiting it to Mr. Martorello's financial

12   condition.  It should not come up from either side.  We

13   agree.

14        MS. KELLY:  We're agreed on that.  The Court has

15   ruled on 11, 12, and 13 already.

16        THE COURT:  Yeah.  Okay.

17        MR. GIVEN:  Right.

18        THE COURT:  That brings us to 14, nonmonetary

19   benefits to the tribe or that the tribe would be

20   negatively impacted by a decision of the jury.

21        Well, that's essentially the same thing as

22   motion in limine 4, in part except the damage part.  Do

23   you intend to offer evidence that the tribe would be

24   negatively impacted by a jury verdict adverse to

25   Martorello?  I don't know quite how that would work.

USCA4 Appeal: 23-2097    Doc: 11-6       Filed: 12/06/2023    Pg: 54 of 375
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 199 of 214 PageID# 56936

199

1          MR. GIVEN:  Well, we thought they were.  If they

2   are agreeing they're not going to get into that at all,

3   that's fine because I think that would be inconsistent

4   with their position.  So that motion should be --

5          THE COURT:  You kind of lost me there.  Maybe

6   it's late in the day.  They're making a motion they don't

7   want you to put in evidence that the tribe would be

8   negatively impacted by a decision by the jury.  Are you

9   planning to offer that?

10          MR. GIVEN:  It goes to the benefits

11   Mr. Martorello received, and they're going to argue that

12   Mr. Martorello received all the benefits from the lending

13   operation, and we're going to show that that's not

14   correct, that the tribe received substantial benefits from

15   the operation.  That's -- so -- and we're entitled to put

16   that on.

17          THE COURT:  Well, you think you are, but I'm not

18   sure you are.

19          MR. GIVEN:  Fair enough.  I apologize.

20          THE COURT:  It's expert testimony, but I'm not

21   sure you are.

22          MS. KELLY:  So, Judge, our position on that is

23   that, you know, we're not going to argue Martorello

24   received all the money.  We're only going to argue that he

25   received 98 percent because that's what the documents and

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 55 of 375
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 200 of 214 PageID# 56937

200

1   that's what the evidence shows.

2            THE COURT:  Well, it does.  But then the tribe

3   received $300 million worth of --

4            MS. KELLY:  No.  They have a loan saying they

5   have to pay $300 million.

6            THE COURT:  I mean $300 million.  They received

7   all these loans and they get the loans coming in when they

8   pay off the notes, and the issue is how much above

9   300 million do they get?

10           MS. KELLY:  So I think the --

11           THE COURT:  So what I'm saying is I don't really

12  understand what we're talking about here.  Can you help

13  me?

14           MS. KELLY:  Yes.  So we don't believe

15  Mr. Martorello should be able to come into court and say,

16  "If it wasn't for me creating this lending enterprise, you

17  know, they wouldn't have this building where they teach

18  young kids how to read," right?

19           You know, we don't think that Mr. Martorello

20  should be able to talk about what the tribe did with the

21  money or these intangible benefits that the tribe received

22  because they received some portion of the money.

23           We agreed that Mr. Martorello could say, "Well,

24  the tribe made $3 million."  We don't disagree.  But to

25  talk about where the money went and how that money

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 56 of 375
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 201 of 214 PageID# 56938

201

1  benefited the tribe we don't think is appropriate.

2         THE COURT:  Are you planning on offering that

3  kind of evidence?

4         MR. GIVEN:  Yes, because I think it's relevant

5  to -- the monetary/nonmonetary benefits the tribe got is

6  relevant to the entire enterprise and who really

7  controlled, you know, that -- that -- that kind of

8  conduct.  I think that is relevant, Your Honor.

9         And I think it's going to be -- it's going to be

10  misleading and confusing to the jury if they simply get to

11  put on, well, he got this percentage and basically

12  interest is going to be -- he squeezed the tribe.

13         THE COURT:  What did they get other than the

14  2 percent?

15         MR. GIVEN:  Well, they got more than 2 percent.

16  They got several million dollars, plus they did get,

17  Your Honor, when they purchased -- when they purchased

18  Bellicose and SourcePoint, they got substantially more.

19  In fact, they get all the percentage at that point.  From

20  2015 on, they get all the percentage, basically.

21         They have to make a note payment to

22  Mr. Martorello, but it's cash-flow dependent.  In fact, as

23  we put on evidence, they didn't pay that for a year and a

24  half.  They stopped paying it.  We had to go to

25  arbitration.  So that's all relevant, we believe.

```
 1          MS. KELLY:  So we have no problem if they want
 2   to talk about the dollars that the tribe received and the
 3   documents about the note, but we do not think it's
 4   appropriate to talk about how the tribe spent the money
 5   that they received.
 6          THE COURT:  Is that -- are you talking about how
 7   the tribe spent the money?
 8          MR. GIVEN:  Well, it's really to go to the issue
 9   that we want to rebut this inference they are going to lay
10   that we somehow took advantage of the tribe or squeezed
11   the tribe.  That's what we're concerned with is that the
12   jury is going to be left with that inference.
13          THE COURT:  How -- that doesn't make any sense
14   to me.  Because if they got money and they spent it in X
15   way, how does that show that -- how does showing that
16   evidence show that you didn't take advantage of the tribe?
17   How is it probative of that topic at all?
18          MR. GIVEN:  Well, I'm just concerned that the
19   way they -- you know, we can resolve for trial,
20   Your Honor, this issue in terms of approach the bench.  If
21   we believe that they are now creating an inference that we
22   somehow took advantage of the tribe, which I don't think
23   is relevant to this, but they are going to try and poison
24   the well, so to speak --
25          THE COURT:  Oh, there won't be any poison.
```

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 58 of 375
Case 3.17-cv-00461-REP    Document 1316    Filed 06/15/23    Page 203 of 214 PageID# 56940

203

```
 1              Will you?
 2              MS. KELLY:  No, Judge, we will not --
 3              THE COURT:  I'm going to rule that we don't need
 4  to have testimony about nonmonetary benefits from the
 5  tribe.  But if it appears to Mr. Given that you are trying
 6  to paint Mr. Martorello as satan and the tribe as a poor
 7  disadvantaged entity, then I may reconsider what evidence
 8  comes in.
 9              But I think you all have got to remember
10  something.  You get too tied up in a case sometimes.  And
11  the issue here is were these loans usurious and violative
12  of the law and was there a business operation intended to
13  take advantage of that and to do it.
14              And what goes on within the confines of the
15  tribe is interesting in respect to set the table maybe,
16  but too much testimony on that topic isn't going to help
17  the jury understand the gut issue.  And, in fact, what
18  it's going to do -- if you decide you want to open that
19  door, it's going to open the door for them to have some,
20  too, and I'd give some serious thought about trying to
21  pare the case down to what the real issues are and pay
22  attention to the elements because that's enough.
23              MS. KELLY:  Understood, Judge.
24              THE COURT:  And I think both of you will end up
25  with a fair trial if you do that.
```

 1          But if you start making it look like it's a poor
 2  'ole Indian tribe and Mr. Martorello is a -- he takes
 3  advantage of everybody and he's an awful, no good --
 4  dirtier-than-a-dog person, I mean, come on.  That's not a
 5  fair way to try the case, even if you think that.
 6          So that's the ruling.  I'll grant that motion,
 7  14, with leave for you to reopen it, should the
 8  circumstances call for it.  All right?
 9          MR. GIVEN:  Thank you, Your Honor.  Should we --
10  I don't know.  Is this a good point to break, Your Honor,
11  or do you want to --
12          MR. BENNETT:  We only have one more.
13          THE COURT:  I think there's only one more left
14  because the others were agreed to.
15          MR. GIVEN:  You are right, Your Honor.  My
16  apologies.  We're ready to go.
17          THE COURT:  But if you're asking for a point of
18  personal privilege, I've never denied one.
19          MR. GIVEN:  No.  No.  No.  I misunderstood.  I
20  thought there was more than one.  We're ready to proceed.
21          THE COURT:  We've got number 15, which is the
22  settlement with the tribe.
23          MR. GIVEN:  Yes.
24          MS. KELLY:  So the plaintiffs have requested
25  that the Court exclude argument regarding the settlement

JA2440

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 60 of 375
Case 3.17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 205 of 214 PageID# 56942

205

 1  with the tribe.  I believe Mr. Martorello wants to be able

 2  to raise it to show that the settlements shows his lack of

 3  involvement and control.

 4            THE COURT:  The fact of the settlement.

 5            MS. KELLY:  Correct, Judge.

 6            THE COURT:  In other words, the fact that they

 7  can settle their case is evidence that he didn't have

 8  control.  Is that what you're saying?

 9            MS. KELLY:  I believe that's Mr. Martorello's

10  position.

11            MR. GIVEN:  Well, that's not quite correct, but

12  I'll let Ms. Kelly finish.

13            THE COURT:  All right.  Why don't you come tell

14  me what you --

15            MR. GIVEN:  Yes, Your Honor.  Our position --

16            THE COURT:  Come on over here.

17            MR. GIVEN:  Let me do it.  Apologies,

18  Your Honor.  I'll be very brief.

19            We want it for very limited purposes as follows,

20  Your Honor.  One is the settlement was made with the

21  plaintiff over our objection, and we think it's relevant

22  evidence that Mr. Martorello did not direct the affairs of

23  Big Picture.  Because remember Big Picture was created in

24  conjunction with the sale.  Big Picture is owned,

25  operated, controlled by the tribe.

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 61 of 375
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 206 of 214 PageID# 56943

206

          The second matter that's critically important is

our entitlement to contribution.  Some people call it, you

know, settlement contribution.  But the fact is there were

joint tortfeasors until they settled, over our objection,

and the plaintiffs have already received $8.5 million for

these claims, and we're entitled to a contribution or

settlement credit for the amount.  That's the sole purpose

that we seek to put this settlement agreement in.

          THE COURT:  Well, first, what evidence is there

that Martorello does or doesn't direct the affairs of

Big Picture?  I didn't think it was their theory that he

directed the affairs of Big Picture.

          MR. GIVEN:  Oh, I think they're saying the

control lasts until today, and we believed it was cut off

any --

          THE COURT:  What difference does control make?

It's involvement in the affairs of the enterprise.

          MR. GIVEN:  Okay.  We -- that's more well put.

          Mr. Martorello has not been involved -- it's our

position he has not been involved in the affairs of the

enterprise we don't believe at all, but certainly that

cuts off in December of 2015 when the SourcePoint and

Bellicose were sold to the tribe and all Mr. Martorello

has at that point is the note back from the tribe.  That's

it.

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 62 of 375
Case 3.17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 207 of 214 PageID# 56944

207

1          It also goes to the 1962 claim and the test

2    under 1962.  So, again, we're entitled --

3          THE COURT:  (d) or (c)?

4          MR. GIVEN:  Pardon.

5          THE COURT:  (d) or (c)?

6          MR. GIVEN:  (c).  1962(c) claim.

7          THE COURT:  How?

8          MR. GIVEN:  It's -- it involves the test --

9    Ms. Simmons has briefed that.  And I apologize.  This goes

10   outside the motion in limine, but she can address that.

11         MS. SIMMONS:  May I, Your Honor.

12         So it goes to the Supreme Court's decision in

13   *Reves v. Young*, which discusses the requirement under

14   1926(c) to show management or control of an entity.  And

15   we submit the fact that the tribe settled over

16   Mr. Martorello's objection is probative of the fact that

17   he's not in control of what Big Picture is doing.

18         THE COURT:  All right.

19         MR. GIVEN:  That's -- she put it exactly.

20   That's all I have, Your Honor.  Thank you.

21         MS. KELLY:  And so, Judge, our -- in our reply,

22   we said that we're fine with that, but we'll want to

23   refute Mr. Martorello's --

24         THE COURT:  You're fine with what?

25         MS. KELLY:  If Mr. Martorello wants to have the

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 63 of 375
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 208 of 214 PageID# 56945

208

1    settlement disclose that it occurred for the fact that he

2    objected to it, we would agree, but we would want to

3    contradict the position taken by Mr. Martorello in

4    connection with the settlement because in the arbitration,

5    he went to arbitration and sought to intervene to

6    overthrow the settlement in this case.

7            And the reason he went to arbitration -- and

8    Mr. Given's demand letter that was sent was because --

9    some of the reasons -- there's quite a few -- is they

10   moved where they kept the documents.  This is the tribe

11   moved where they kept the documents.  They were not

12   providing proof of their legal bills with Rosette.  They

13   were not providing bank account access so Eventide can

14   track cash left over from reserves taken from the note

15   payments.  They were not providing --

16           THE COURT:  You mean that's why the objection

17   was made, not because -- it was something extrinsic as to

18   why the objection was made to the settlement, and those

19   are all among the things; is that right?

20           MS. KELLY:  That's correct.  Mr. Martorello --

21   so Mr. Martorello got paid on the note based on how much

22   the tribe made on the lending business.  So the tribe

23   would run the business and then they would get to keep a

24   small percentage and Mr. Martorello would get the rest.

25           And so when they settled with the plaintiffs and

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 64 of 375
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 209 of 214 PageID# 56946

209

1  lowered the interest rate and decided to make some other

2  changes to their business -- for example, Mr. Martorello

3  complains about how they capped the APR at, like,

4  699 percent because his profits and his ability to get

5  repaid -- sorry, not profits -- his ability to get repaid

6  more money on the note was negatively impacted.  And so he

7  complains, for a laundry list of reasons, that, to me,

8  show a lot of participation and control still in the Big

9  Picture lending enterprise.

10         And so if they want to raise that and use that

11  as a defense, then we're going to want the opportunity to

12  oppose it using this evidence.

13         THE COURT:  And you would oppose it by doing

14  what?

15         MS. KELLY:  By --

16         THE COURT:  Questioning him on that document or

17  what?

18         MS. KELLY:  That's correct, and introducing this

19  arbitration demand and questioning him about the document.

20  That's correct.  But it would be like additional

21  information that we would need to present.  So --

22         THE COURT:  Well, all right.  I understand.

23         Do you object to that?  Once you introduce the

24  settlement and say he opposed it and you're going to use

25  it to argue he didn't control.  She wants to put in all

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 65 of 375
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 210 of 214 PageID# 56947

210

 1  that stuff to show, actually, he is doing a lot of

 2  directing.

 3          You say it's a fact issue whether he's

 4  directing, and it is, and I understand that.  That's why

 5  you want to use it, though.  So really, there's a lot of

 6  direction going on.

 7          MR. GIVEN:  That's fine.  We just -- we should

 8  be able to put it in for the reasons we stated, subject to

 9  the Court's ruling.  They'll put on whatever they think

10  will be impeachment or cross-examination.  So if that's

11  the case, this motion in limine should be denied, we

12  submit.

13          THE COURT:  My general reaction to all of this

14  is as a friend of the jury, and that is that it boils down

15  to how many angels can stand on the head of a pin, and

16  while it may be marginally relevant, it leads to confusion

17  in the minds of the jury and for the need for a lot of

18  explanation about what goes on in order to allow fair

19  cross-examination on the topic of what you want to open it

20  up for.  But since both of you are willing to commit

21  seppuku, I'm going to deny the motion in limine.

22          MR. GIVEN:  Thank you, Your Honor.

23          THE COURT:  All right.  I think that that's

24  enough for the night.

25          MR. TALIAFERRO:  If I could just briefly,

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 66 of 375
Case 3:17-cv-00461-REP    Document 1316    Filed 06/15/23    Page 211 of 214 PageID# 56948

211

 1  Your Honor.  If I understand the homework assignment, it

 2  has now been limited to the ten documents that were listed

 3  in the interrogatories.

 4            THE COURT:  That's correct.

 5            MR. TALIAFERRO:  Okay.  Thank you, Your Honor.

 6            MR. GIVEN:  I believe it also -- I'm going to

 7  provide you with the Weddle depo designations.

 8            THE COURT:  Yeah.  No, I think he was asking

 9  about a different point.  Yes.

10            MR. TALIAFERRO:  Thank you, Your Honor.

11            THE COURT:  He was talking about his homework,

12  not yours.

13            MR. GIVEN:  Okay.  I stand corrected yet again.

14  The designations we submitted that Ms. Weddle testified to

15  were in *Duggan*.  So there's nothing to submit now because

16  you've excluded that evidence.

17            THE COURT:  Well, I have made that ruling

18  without understanding that, I think.

19            MR. GIVEN:  Her deposition was taken very

20  recently in the *Duggan* case and even more recently in the

21  *Williams* case.  I think that's part of the confusion.

22  Because we're already on the discovery cutoff.  They have

23  already occurred in *Duggan*, which is proceeding a pace in

24  Massachusetts.

25            THE COURT:  Well, I do think the reason for

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 67 of 375
Case 3:17-cv-00461-REP   Document 1316   Filed 06/15/23   Page 212 of 214 PageID# 56949

212

 1    keeping it out in *Duggan*, the participation reason -- what

 2    is it 828?  What was the rule?  Eight something.

 3              MR. GIVEN:  Yeah.  So --

 4              THE COURT:  I think that was a valid reason, but

 5    I did not understand, at the time I asked you to let me

 6    see the other side of what Ms. Weddle had said, that that

 7    was a deposition that was in *Duggan*.  I had understood it

 8    was part of the same deposition that she testified to in

 9    the *Williams* case.

10              MR. GIVEN:  That's my lack of clarity.  I

11    apologize.  That's on me.

12              THE COURT:  So what does that do to the need to

13    look at her designations?

14              MS. KELLY:  So, Judge, I'm not familiar with the

15    *Duggan* transcript.  But I'm -- I am fine if we -- if the

16    Court wanted to look at the designations provided by

17    Mr. Given for the purpose of the good faith basis defense.

18              THE COURT:  I think I have to do that.  I have

19    to look at them at this stage, and you might as well go

20    ahead and prepare them.  I have to look at them.  I don't

21    know what I'll do as a result.

22              MR. GIVEN:  Will do, Your Honor.  Thank you.

23    Thank you for the clarification.

24              THE COURT:  Thank you.  All right.

25              MS. KELLY:  Thank you, Judge.

213

```
 1              THE COURT:  All right.

 2              MR. GIVEN:  We're also going to send them the

 3    transcript from Duggan.

 4              THE COURT:  Okay.

 5              MR. GIVEN:  Make sure everybody is good.  Thank

 6    you, Your Honor.

 7              MR. BENNETT:  So did you take Ms. Weddle in any

 8    other case?

 9              MR. GIVEN:  No, sir.

10              THE COURT:  All right.

11              MR. GIVEN:  Your Honor, what time are we

12    starting tomorrow morning?

13              THE COURT:  5:30.

14              MR. GIVEN:  Okay.  Thank you.  I'll bring my

15    camping bag.

16              THE COURT:  When I went to new judges school,

17    there was a judge from New York.  He was a district judge

18    and he went on the Second Circuit.  His name was Pierre,

19    or something like that.  And he came in to give us

20    instruction in how to deal with preliminary injunctions,

21    and he said the way you deal with preliminary injunctions

22    is that you set them at 7:30 in the morning and you'd be

23    surprised how quickly they disappear.

24              One of the judges who was in the class said,

25    "You'd be surprised how quickly I'd disappear, too."
```

214

1             All right.  Thank you.

2             (The proceeding adjourned at 5:10 p.m.)

3                     REPORTER'S CERTIFICATE

4       I, Tracy J. Stroh, OCR, RPR, Notary Public in and for

5   the Commonwealth of Virginia at large, and whose

6   commission expires September 30, 2023, Notary Registration

7   Number 7108255, do hereby certify that the pages contained

8   herein accurately reflect the stenographic notes taken by

9   me, to the best of my ability, in the above-styled action.

10      Given under my hand this 11th day of June 2023.

11
                      _____
                             /s/
12                    Tracy J. Stroh, RPR

13

14

15

16

17

18

19

20

21

22

23

24

25

JA2450

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 70 of 375
Case 3:17-cv-00461-REP    Document 1317    Filed 06/15/23    Page 1 of 228 PageID# 56952

215

1              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF VIRGINIA
2                  RICHMOND DIVISION

3    _____
                                   )
4    LULA WILLIAMS, et al.         )
                                   )
5    v.                            )    Civil Action No.:
                                   )    3:17 CV 461
6    BIG PICTURE LOANS, LLC, et al.)
     _____)
7                                       June 8, 2023

8
                           DAY 2
9            COMPLETE TRANSCRIPT OF HEARING
          BEFORE THE HONORABLE ROBERT E. PAYNE
10          UNITED STATES DISTRICT COURT JUDGE

11

12   APPEARANCES:

13   Leonard Anthony Bennett, Esquire
     CONSUMER LITIGATION ASSOCIATES
14   763 J. Clyde Morris Boulevard, Suite 1A
     Newport News, VA 23601
15
     Kristi C. Kelly, Esquire
16   Andrew J. Guzzo, Esquire
     Casey S. Nash, Esquire
17   James Patrick McNichol, Esquire
     KELLY GUZZO, PLC
18   3925 Chain Bridge Road, Suite 202
     Fairfax, VA 22030
19
              Counsel on behalf of the Plaintiffs
20

21

22

23

24              TRACY J. STROH, RPR
             OFFICIAL COURT REPORTER
25          UNITED STATES DISTRICT COURT

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 71 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 2 of 228 PageID# 56953

216

```
 1   APPEARANCES (CONTINUED):

 2   Bethany D. Simmons, Esquire
     LOEB & LOEB LLP
 3   345 Park Avenue
     New York, NY 10154
 4
     John David Taliaferro, Esquire
 5   LOEB & LOEB LLP
     901 New York Ave NW, Suite 300 East
 6   Washington, DC 20001

 7   Bernard Robert Given, II, Esquire
     LOEB & LOEB LLP
 8   10100 Santa Monica Boulevard, Suite 2200
     Los Angeles, CA 90067
 9
               Counsel on behalf of the Defendant
10             Matt Martorello

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 72 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 3 of 228 PageID# 56954

217

1                    (The hearing reconvened at 10:04 a.m.)

2                    THE CLERK:  Case number 3:17 CV 461, *Lula*

3  *Williams, et al. v. Big Picture Loans, LLC, et al.*

4                    The plaintiffs are represented by Leonard

5  Bennett, Kristi Kelly, Andrew Guzzo, Casey Nash, and

6  J. Patrick McNichol.

7                    The defendant, Matt Martorello, is represented

8  by John Taliaferro, Bernard Given II, and Bethany Simmons.

9                    Are counsel ready to proceed?

10                   MR. GIVEN:  Yes.

11                   MR. GUZZO:  Yes, Your Honor.  Good morning.

12                   THE COURT:  All right.  Good morning.

13                   I had a partner one time who was fond of saying

14  that "night giveth counsel" and attributing that aphorism

15  to Napoleon.  And I actually went back to look it up, and

16  Napoleon did say that.

17                   Unfortunately, it was most prominently said the

18  night before the Battle at Waterloo started.  So I'm not

19  sure what significance that it really has in our lives,

20  but night did giveth counsel to me as I was thinking

21  through some of what we did yesterday.

22                   In particular, there is the question of the

23  adverse inference.  That is motion in limine, what, 4?

24                   MS. KELLY:  Judge, it's plaintiffs' motion in

25  limine 6.

 1          THE COURT:  Yeah, plaintiffs' motion in

 2   limine 6.

 3          I don't want to mislead you in what I was saying

 4   about that.  When I said that Mr. Martorello would be able

 5   to offer evidence about the genesis and the advice he

 6   received on the contract provision that was put into the

 7   purchase agreement that would effectuate a destruction of

 8   all of the documents transferred by Mr. Martorello to the

 9   tribe and the tribe would do that, I did not mean to

10   suggest that that would open up this general reliance on

11   counsel.

12          It would have to be -- he would be entitled, I

13   think, to put on evidence about what -- where that clause

14   came from, if it came from a lawyer, and what, if any,

15   advice he received from the counsel respecting that

16   provided that he testifies as to it and provided that the

17   lawyer testifies to it.

18          Now, in that regard, I'd like to focus your

19   attention on something, and it's not in the record.  In

20   the course of practice, beginning in 1971 in the civil

21   arena and in the course of this job, which is now some

22   31 years, I have reviewed many asset purchase agreements

23   for many different purposes.  I have reviewed many merger

24   agreements for many different purposes.  I have never seen

25   a clause like this at all.

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 74 of 375

219

```
 1              I have this recollection that there is some
 2    expert testimony that might be pertaining to this where
 3    somebody is going to say that's not a standard clause.  Am
 4    I correct about the fact that somebody's proffering
 5    evidence about that?
 6              I just didn't have the time to go back and read
 7    all the reports on it, or that it is a standard clause.  I
 8    mean, it may be that I've said -- I've gotten it confused,
 9    and I just didn't have time to research it.
10              Can you all help me with what you think the
11    record is about -- is there any expert testimony on this?
12              MS. KELLY:  Judge, Kristi Kelly on behalf of the
13    plaintiffs.
14              What I said yesterday regarding this issue was
15    when we questioned Mr. Martorello about the clause --
16              THE COURT:  Yes.
17              MS. KELLY:  -- he said it was part of the form
18    agreement, which was from the *Hengle* tribal entity sale.
19              THE COURT:  Right.
20              MS. KELLY:  And then we were able to prepare the
21    two agreements.
22              THE COURT:  Right.
23              MS. KELLY:  And so that was my representation
24    was Mr. Martorello's testimony.
25              THE COURT:  Yes, I know that.  I'm not asking
```

JA2455

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 75 of 375
Case 3:17-cv-00461-REP    Document 1317    Filed 06/15/23    Page 6 of 228 PageID# 56957

220

1  that.

2           I'm asking do any of your experts purport to

3  address the -- for lack of a better word, the commonality

4  or the usualness of clauses such as this?  Are you

5  offering any testimony that that's really not correct?

6           MS. KELLY:  The plaintiffs are not.

7           THE COURT:  No.  Okay.

8           Are you offering testimony, Mr. Taliaferro, that

9  it is a standard provision in many agreements, expert

10  testimony?

11           MR. TALIAFERRO:  Good morning, Your Honor.

12  Mr. Taliaferro on behalf of Mr. Martorello.

13           None of our experts are opining on that issue.

14           THE COURT:  That's what I thought.  I'm sorry.

15  I just didn't have the time to go back and go through all

16  of it and just confirm it myself.

17           Well, so I still have -- I still have

18  apprehension about the effect on the jury of an adverse

19  inference in the sense that issue could present a 403

20  problem in whether -- the issue is whether or not it

21  would -- A, we give an adverse inference.  Let the

22  testimony in that he said that.  Let the testimony in -- I

23  assume you have somebody who's going to compare the

24  agreements and say it isn't in there or you're going to

25  ask him, "Here, read this agreement and tell me where it

1    is in there."  Is that one of the two, or both?

2            MS. KELLY:  Judge, the latter.

3            THE COURT:  All right.  And so then that would

4    open up the defendant's right to say whatever it is he

5    wants to say about it, and then we would go -- he would

6    say -- I don't know what he would say because there's

7    no -- there's nothing in the record of the motion in

8    limine that portends what he would say except that he

9    understood that it was part of the *Hengle* agreement; is

10   that right?

11           MS. KELLY:  That's correct, Judge.

12           MR. GIVEN:  May I be briefly heard on that?

13           THE COURT:  Sure.  Come on up.

14           MR. GIVEN:  Thank you.

15           THE COURT:  Absolutely.

16           MR. GIVEN:  Barney Given for the defendant.

17           I think there's a predicate issue, Your Honor,

18   that was not resolved yesterday before we get to that in

19   that the agreement was executed two years before this

20   lawsuit was filed.  It was executed before any sort of

21   demand letter from --

22           THE COURT:  What agreement was it?

23           MR. GIVEN:  Well, the contract.

24           THE COURT:  What date was it?

25           MR. GIVEN:  The contract was executed in

1    December of 2015.

2              THE COURT:  Yes.

3              MR. GIVEN:  And then it was -- it went effective

4    in January of 2016.  This lawsuit was filed in 2017.  So I

5    apologize.  Maybe a year and a half later from when the

6    contract was signed.

7              There was no legal demand.  There's no evidence

8    been put on by plaintiffs that they had sent a demand

9    letter.  They're talking about, well, he must have done

10   this because he was afraid of getting sued, but that's

11   speculation on their part, and I think for that reason, it

12   should be excluded by the rules of evidence.

13             There is no demand letter.  Typically, the

14   threat of litigation is someone either files an actual

15   lawsuit or sends a demand letter.  There was no demand

16   letter from these plaintiffs in existence when the

17   contract was signed, when the agreement was put together.

18   So that's my biggest issue.

19             THE COURT:  There's no dispute about that, is

20   there?

21             MR. GIVEN:  Pardon?

22             THE COURT:  There's no dispute about that?

23             MR. GIVEN:  No.  No.  But if that's the case

24   then how can there be spoliation if there wasn't any

25   pending litigation or threat of litigation from these

USCA4 Appeal: 23-2097   Doc: 11-6   Document 1317   Filed 12/06/2023   Pg: 78 of 375   Page 9 of 228 PageID# 56960
Case 3:17-cv-00461-REP

223

1  plaintiffs.

2          THE COURT:  Have you read the Fourth Circuit's

3  spoliation cases?

4          MR. GIVEN:  I have, Your Honor.  I'm just

5  stating my position.

6          THE COURT:  Well, I understand that.  But you

7  have to come to grips with the fact that what -- the test

8  in the Fourth Circuit is that you know or reasonably

9  should know that litigation is offing in connection with

10 your decision to destroy what could be what has

11 evidentiary value.

12         So their theory is, I believe -- maybe I'm

13 wrong, but in my notes on motion in limine 6 is that he

14 did apprehend litigation and they were, A -- tell me if

15 I'm wrong about this -- the actions by the state Attorney

16 General, and I can't remember what state; B, the *Otoe*

17 2013-14 decisions by the District Court and the Fourth

18 Circuit; the Tucker indictment; the Hallinan indictment,

19 the CashCall trial; and the document 1166-3, which is the

20 memorandum dated August -- in August of 2012, which is the

21 Georgia Payday Lending Laws & Third-party Liability

22 prepared by Jennifer Weddle and Miranda Compton to

23 Bellicose.

24         Those are the things that I believe they say put

25 him on -- give rise to the predicate that you say is

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 79 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 10 of 228 PageID# 56961

224

1  missing.

2           Am I correct about what I've identified?  Is

3  there anything else?

4           MS. KELLY:  Judge.

5           THE COURT:  If there is, you come up and say it,

6  and then Mr. Given can address it all with a full deck.

7           MS. KELLY:  Yes, Judge.  The one thing I would

8  also like to point the Court to, and Mr. -- this was

9  filed, I believe, at ECF 1266-1.  It's been talked about a

10 lot in this case, Judge, already.

11          THE COURT:  This is a document ECF 1266-1?

12          MS. KELLY:  Yes.

13          THE COURT:  All right.

14          MS. KELLY:  And we've referred to it as the

15 e-mail where Mr. Martorello compares his business to a

16 drug cartel, illegal but highly profitable.  But if you

17 turn --

18          THE COURT:  What date is this, now, and where

19 does it appear?

20          MS. KELLY:  So if you go to page 13 of 16 on the

21 ECF.

22          THE COURT:  What is it?

23          MS. KELLY:  Page 13 of 16 on ECF.

24          THE COURT:  All right.  Let me look at that.

25          All right.  And this is from Martorello to John

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 80 of 375
Case 3:17-cv-00461-REP    Document 1317    Filed 06/15/23    Page 11 of 228 PageID# 56962

225

 1  Argyros -- who is that? -- and copy to Richard White.  Who
 2  are those people?
 3          MS. KELLY:  So Mr. Martorello was seeking a
 4  valuation of the business we believe in anticipation of
 5  selling it ultimately to the tribe and for tax purposes to
 6  value it a certain way to make it beneficial to him.
 7          THE COURT:  Right.
 8          MS. KELLY:  So as part of that valuation, he was
 9  providing information to various tax companies, and this
10  is one of the e-mails we received about that.
11          And I just want to highlight a couple of
12  provisions to show his feeling of the threat of litigation
13  pertaining to the business.  And so there's a bullet point
14  on that page.  He says, "What would you value medicinal
15  marijuana stores that are not yet legal and could get shut
16  down any day?  What would you value a drug cartel at?"
17  And then in parentheses he says; "i.e., a business that is
18  illegal, yet very profitable."
19          THE COURT:  Hold on.  All right.
20          MS. KELLY:  And then that next paragraph he
21  says, "This industry is going to be living in the gray
22  area of its legality for another year or two.  State
23  governments will continue to sue the tribes and me saying
24  their state laws apply.  Tribes will continue to say their
25  laws apply."

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 81 of 375
Case 3:17-cv-00461-REP    Document 1317    Filed 06/15/23    Page 12 of 228 PageID# 56963

226

1          The next paragraph, "The FTC right now is suing

2    a competitor, (FTC v. AMG Services and Scott Tucker)."

3    The next sentence says, "Our client arguably employs

4    similar practices and the FTC has begun investigations of

5    several tribal" --

6          THE COURT:  Where is that?  "Our client."  What

7    do you mean "our client"?

8          MS. KELLY:  I think he's referring to himself as

9    a servicer and Red Rock, Duck Creek, the LVD as his

10   client.

11         THE COURT:  So you have to ask him that.  All

12   right.

13         MS. KELLY:  No, I have not, Judge.

14         So, "Our client arguably employs similar

15   practices and the FTC has begun investigations of several

16   tribunal lenders like our client and their service

17   providers."

18         And then if you go to the next paragraph --

19         THE COURT:  "Class action"?

20         MS. KELLY:  "Class action lawsuits follow and

21   are already following Tucker's case with the FTC.  Also,

22   see Martin Butch Webb/Western Sky and look that up."

23         And just so the record is clear, Judge, that's

24   the CashCall case, Western Sky, Martin Butch Webb.

25         The next paragraph, "There is no business with

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 82 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 13 of 228 PageID# 56964

227

1   such risk to it as this.  You will simply not find any

2   business out there that can measure up on risk."

3            Then if you go to the next page, I cited -- in

4   the second half of the page, he says, "Several states make

5   it a" -- all caps -- "felony crime" --

6            THE COURT:  Stop.  I'm trying to find it.

7            Okay.  I see it now.

8            MS. KELLY:  -- "felony crime to make loans over

9   a certain rate or without a license."  He then refers to

10  the 20-page memo he had --

11           THE COURT:  Right.

12           MS. KELLY:  -- by Greenberg Traurig, which we

13  discussed yesterday.

14           THE COURT:  Right.

15           MS. KELLY:  And then if you go a little further,

16  a few more bullet points down, he says, "Bottom line is

17  this business will simply not exist in two to three years

18  anything like it does right now."

19           THE COURT:  All right.

20           MS. KELLY:  So I think Martorello's laying out

21  there the risks that he saw and why he thought --

22           THE COURT:  What does this mean, "We have

23  received dozens of letters from state AGs saying we need

24  to be licensed in sending cease and desist orders"?

25           MS. KELLY:  So that means that --

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 83 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 14 of 228 PageID# 56965

228

1            THE COURT:  Is that the AG things you were

2    talking about?

3            MS. KELLY:  Yeah.  When he says "we," I assume

4    he means the LVD or Red Rock or Duck Creek is being sent

5    letters from different state Attorney Generals saying --

6            THE COURT:  So you can ask him that when you

7    have him on the stand.

8            MS. KELLY:  Okay.  Yes.

9            THE COURT:  I see.

10            MS. KELLY:  But I think this e-mail, which is

11    from late 2012, clearly shows that he anticipated the

12    threat of litigation.  Thank you, Judge.

13            THE COURT:  All right.  Is there anything else?

14    That's it?

15            MS. KELLY:  I think that's it, Judge.

16            THE COURT:  All right.  Mr. Given.  Now you have

17    the full deck.

18            MR. GIVEN:  No.  I'll be very brief.  We just

19    want the right to -- when they ask him that, to

20    cross-examine.  That's all we're asking.

21            We're not going to be bringing -- we can't bring

22    Mr. Williams to trial.  So we're not going to go that path

23    that, you know, he relied on counsel to put that in.

24            THE COURT:  You can't bring who to trial?

25            MR. GIVEN:  Mr. Williams is the lawyer that

 1  drafted that.  I don't think we're going to be able to get

 2  him to trial, and we're not going to go that path anyway.

 3  We simply --

 4           THE COURT:  Who is Mr. Williams?

 5           MR. GIVEN:  He is the attorney that drafted the

 6  contract, the Eventide contract that's in question here --

 7           THE COURT:  Oh, I see.

 8           MR. GIVEN:  -- that had the provision where the

 9  information would be given to the Indians and then they

10  would be the keeper, destroy the information.

11           THE COURT:  All right.

12           MR. GIVEN:  We're not going that path.  We're

13  not going to go that path.  I simply want the right to

14  cross-examine or direct examine Mr. Martorello about what

15  he believed with respect to the provision.  That's all.

16           THE COURT:  Well, that's -- I don't think that's

17  where we're headed.  But I do believe this:  He is

18  entitled -- this is his memo.  If he's cross-examined on

19  it about it.  He is entitled to talk about whether he

20  apprehended legal action.

21           MR. GIVEN:  That's what I'm asking.

22           THE COURT:  He is not entitled to testify about

23  why; i.e., a mistake of law, if we get to that point.  I'm

24  not there yet.  I have other evidence -- other motions.

25           But I'm saying that he is entitled to testify

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 85 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 16 of 228 PageID# 56967

230

1    that notwithstanding all that's said in here, he didn't

2    understand it and that there was a risk of litigation.

3            And then -- before we ever get to that point,

4    we're going to have to have briefing on whether, on that

5    issue, that is a jury issue and you need to put that

6    before the jury or does the Court need to decide that

7    before the inference is given.  So we'll deal with that.

8    You might mark that down in your book as something that

9    needs to be dealt with.

10           MR. GIVEN:  We'll do, and we --

11           THE COURT:  But I -- right now, I'm dealing with

12   just the motion in limine and the adverse inference

13   instruction.  Anything else that you have to say?

14           MR. GIVEN:  No.  We're just requesting that

15   there not be an adverse interest, but they'd be entitled

16   to examine him on those matters and we'd be entitled to

17   cross.  That's all I'm saying.  I think that's --

18           THE COURT:  Well, what you all haven't done,

19   either one of you, is say mechanically how is the adverse

20   inference question addressed.

21           I've done it before, and my recollection is it

22   is a matter -- the predicate issue is a matter for the

23   Court to decide.  But I may be wrong in my recollection of

24   it, and it may be something that goes to the jury.

25           Either way, if it goes to the jury, you're able

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 86 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 17 of 228 PageID# 56968

231

1  to cross-examine on what I said you could cross-examine

2  on.  If it is a matter to be dealt with only with

3  preliminary findings by the Court, if you wish to put on a

4  preliminary -- put on Mr. Martorello as part of the

5  decision that I have to make as the predicate to letting

6  it in, I will let you do that.

7           MR. GIVEN:  That's all we ask.  Thank you,

8  Your Honor.  We're in agreement.

9           THE COURT:  Just understand that at some point

10 in time one can become a thrill seeker by asserting things

11 that one has put in writing when it's directly opposite.

12          MR. GIVEN:  We understand, Your Honor.

13          THE COURT:  Just advise your client of the risk

14 of that.

15          All right.

16          MR. GIVEN:  And we have one more housekeeping

17 matter.

18          THE COURT:  Not yet.

19          MR. GIVEN:  Oh, I'm sorry.

20          THE COURT:  I'm ruling that the motion in limine

21 number 6 of adverse inference instruction will be granted.

22 It is up to you to draft it.  Let me see it.

23          I want briefing from you one week from today is

24 this a question the Court decides; i.e., that there's

25 reasonable apprehension of litigation, or is it a question

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 87 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 18 of 228 PageID# 56969

232

1    the jury does as part of its deliberation.  And then I

2    would want the actual instruction that we would give the

3    jury.

4            I have done it before and I, frankly, can't

5    remember.  I remember this:  There was, at one time, some

6    dispute about procedurally how we proceeded, and it's been

7    so long ago that I dealt with this.  And I just reflected

8    on it last night, that there is some law on that issue and

9    I just haven't looked it up.  So you all get to do that.

10           File joint statements -- file simultaneous

11   statements of position next week.  This is the 8th of

12   June; is that right?

13           That would be the 15th.  Replies on the 17th.

14           Now, while I'm thinking about it -- we'll get to

15   your housekeeping and other things -- the pretrial

16   conference in this case is set for the 26th of June.  I

17   may not be available on that date.  I will know -- or at

18   that time.  We definitely plan to go to the 27th anyway.

19   That's in the schedule.  And then the 28th is the judicial

20   conference of the Fourth Circuit.  So if we need to come

21   back, it will be the 3rd of July.

22           Do we know if Austin against Equifax, did it

23   settle?

24           THE CLERK:  For which date, Judge?

25           THE COURT:  You're in it?

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 88 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 19 of 228 PageID# 56970

233

```
 1            MR. BENNETT:  I am, Judge.  It has not.  There's

 2   a motion that's been briefed.

 3            THE COURT:  What motion?

 4            MR. BENNETT:  This is the Experian arbitration

 5   motion.

 6            THE COURT:  Okay.  All right.  Well, I have a

 7   final pretrial conference on that date, and I probably

 8   won't have a final pretrial conference on the 5th of July

 9   if I haven't decided that by then; is that correct?  Is

10   that your point?

11            MR. BENNETT:  Yes, Your Honor.  I'll make sure,

12   from our side, that we get with the Court to make sure

13   that the dates -- we file an appropriate motion or

14   otherwise, if that date is still sitting there.

15            THE COURT:  Is the briefing in now on that

16   motion on the arbitration?

17            MR. BENNETT:  No, Your Honor, the defendant, in

18   about a week, will file a reply brief, and then it will be

19   closed.

20            THE COURT:  All right.  I guess -- I erased

21   FPTC, and I guess maybe I was setting the argument on

22   July 5th, but it wasn't --

23            MR. BENNETT:  Actually, I think that originally

24   it was set -- it's set for argument I believe maybe the

25   10th.
```

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 89 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 20 of 228 PageID# 56971

234

 1           THE COURT:  Yeah.  So whatever I've got on my

 2   book on August the 5th -- I mean on July the 5th is off.

 3           So here's the question.  Do you want your poison

 4   on the 3rd or the 5th?

 5           MR. TALIAFERRO:  Your Honor, just one --

 6           THE COURT:  That is the continued pretrial --

 7   final pretrial, if we need it.

 8           MR. TALIAFERRO:  Understand, Your Honor.  I did

 9   notify the Court back at the March status conference that

10   I will be out of the country from July -- excuse me --

11   June 30th through July 12th, which was the reason for

12   trial starting on July 13th.  I will be here for the

13   pretrial if it starts on the 27th.  I would just ask that

14   if it's continued to --

15           THE COURT:  Well, we'll start sometime on the

16   26th.  I just don't know what time.  We'll continue --

17   wait.

18           MR. TALIAFERRO:  If it's necessary --

19           THE COURT:  Rather than interrupt your trip to

20   Europe, I'll interrupt my trip to Greensboro.  Is that a

21   fair trade?

22           MR. TALIAFERRO:  Your Honor, I greatly

23   appreciate that.  I hate to think that I interrupted a

24   trip to Greensboro for you.

25           THE COURT:  Well, if it had been to the

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 90 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 21 of 228 PageID# 56972

235

 1   Greenbrier, I might have a different view.  But Greensboro

 2   is easy to decide.  So that will be our schedule.  I just

 3   wanted to alert you of that.

 4            MR. TALIAFERRO:  Thank you, Your Honor.

 5            THE COURT:  Okay.  Where are you going,

 6   Mr. Taliaferro?

 7            MR. TALIAFERRO:  My daughter graduated from high

 8   school, and I'm taking her to Paris.

 9            THE COURT:  I'll tell you, graduation presents,

10   I gave my great-nephew a Garmin personal locator beam, and

11   I thought I was the big thing.  But going to Paris, that's

12   quite a present.  How many children do you have?

13            MR. TALIAFERRO:  I have four, Your Honor.

14            THE COURT:  Oh, my goodness.  I hope that you're

15   well financed.

16            MR. TALIAFERRO:  I'm going to tell the other

17   three that this is also their graduation trip, and then

18   we'll be done.

19            THE COURT:  Let me know, in the future, if you

20   succeed with that approach.  I tried that similar one, and

21   it didn't work.

22            MR. TALIAFERRO:  Thank you, Your Honor.

23            THE COURT:  Particularly with weddings.

24            Go ahead.

25            MR. BENNETT:  I can't compete with that, but

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 91 of 375
Case 3:17-cv-00461-REP  Document 1317  Filed 06/15/23  Page 22 of 228 PageID# 56973

236

 1  from -- this is the first time that the Fourth Circuit

 2  conference would have Ms. Kelly or I there, and we were

 3  registered and -- what I would like to be able to do.

 4  We're invited and registered.  If we could, off the

 5  docket, work between everybody and the Court to try to

 6  make sure that everybody's dates sync up for that.

 7          THE COURT:  You don't go to the judicial

 8  conference on the 28th.  That's for the judges.

 9          MR. BENNETT:  Well, then I go on the 29th?

10          THE COURT:  Well, yeah, that's your business.

11          MR. BENNETT:  Okay.

12          THE COURT:  And you will able to check in on the

13  night of the 28th if you drive fast.

14          MR. BENNETT:  Okay.

15          THE COURT:  I think the lawyers check in on the

16  29th.  Because the judges -- we have a dinner meeting on

17  the 28th, and on the 29th is the judges' business session.

18  The lawyers all arrive on the 29th usually.  You plan a

19  luxury trip to Greensboro.  You're going to be down there

20  for --

21          MR. BENNETT:  You know, we try to work in our

22  vacations at the same time.  And I hear they have a

23  tobacco museum that --

24          THE COURT:  It's a great way to work in your

25  vacation if they went to the Greenbrier, but they focused

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 92 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 23 of 228 PageID# 56974

237

1  on something that I think is a grievous mistake.  Taking

2  away the privilege of lawyers to go to the Greenbrier and

3  have all expenses paid either by the government or by

4  their law firm actually has got to be a taking, I think.

5           So anyway, we can work it out.  But I wanted you

6  to know about the slight problem I had on the 26th.

7           Okay.  All right.  Now, that brings me to the

8  motion in limine on the settlement.  I was walking and

9  started thinking about what I had done to the jury, and

10 then I -- by letting you all commit seppuku, and then it

11 occurred to me I had overlooked a fairly critical issue.

12          The purpose of the settlement, putting the

13 settlement in, is to show that Mr. Martorello opposed it

14 and there, from that, that is evidence that he did not

15 direct the affairs of the enterprise; is that correct?

16          MR. GIVEN:  That is correct.  That's part of the

17 purpose.

18          THE COURT:  What's the other purpose?

19          MR. GIVEN:  The other purpose again, Your Honor,

20 was our claim for contribution for settlement credit.  In

21 other words, as joint tortfeasors, we're entitled to a

22 credit of $8.5 million against any judgment --

23          THE COURT:  You're not going to do that in this

24 case.  You're not going to have that problem at the trial

25 of this case.  We will bifurcate the issue, and if they

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 93 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 24 of 228 PageID# 56975

238

1    return a verdict --

2              MR. GIVEN:  Fair enough.

3              THE COURT:  -- we'll deal with the contribution

4    later.  I've found that trying to do the former creates

5    instructional problems.  It puts the jury into a tailspin.

6              MR. GIVEN:  Under --

7              THE COURT:  You'll have the right, but we don't

8    have that as part of this issue.

9              MR. GIVEN:  Understood, Your Honor, but

10   obviously -- so procedurally, the major issue is it is

11   critical that we be allowed to show, at least present

12   evidence from our part, that it is an indicia of a lack of

13   control over Big Picture loans.

14             THE COURT:  I understand that.

15             MR. GIVEN:  Thank you.

16             THE COURT:  Now, this settlement occurred when?

17             MR. GIVEN:  In -- you all -- we weren't a party

18   to it.  What was the date?

19             THE COURT:  It's okay to not remember every

20   date, but don't pretend like you don't know roughly when

21   it was.

22             MR. GIVEN:  I just don't remember when it was,

23   Your Honor.  I apologize.

24             THE COURT:  What year was it?

25             MS. KELLY:  It was 2019, Judge.  And that's when

JA2474

239

1   Mr. Martorello initiated the arbitration.

2          THE COURT:  Now, here's the question that I

3   have.

4          Would you go in -- on the left side of my desk

5   is the complaint in this case.  Would you let me have it?

6          What time period are we talking about?  Because

7   we're talking about admitting evidence that occurred in

8   2019 as probative of directing the affairs of an

9   enterprise, and I don't think that the affairs of the

10  enterprise are an issue through 2019, but I need to

11  understand that.

12         MS. KELLY:  I believe, Judge, the class is cut

13  off in mid-2019, which would be before Mr. Martorello

14  objected or sought to intervene in this case, if I recall

15  correctly.

16         The class period runs --

17         THE COURT:  How does it get cut off?  You said

18  cut off.  How did it get cut off?  In a class

19  certification order?

20         MS. KELLY:  Correct.  So the class is from, I

21  believe, June of 2013 -- sorry, Judge.  I misspoke.

22         It's through December 20th, 2019.  And so I

23  think the objection, the motion to intervene, was in 2020;

24  is that correct?  Because it was after we had consummated

25  the settlement that Mr. Martorello sought to intervene.

JA2475

```
 1              MR. GIVEN:  I think it was 2019.

 2              MS. KELLY:  I think the final approval was

 3   December 2020, and the motion to intervene was around

 4   Thanksgiving because I remember being somewhere with my

 5   grandma.

 6              THE COURT:  Thanksgiving of what year?

 7              MS. KELLY:  Of 2020.

 8              THE COURT:  And I -- when you say the final

 9   settlement, are you talking about the approval by the

10   Court?

11              MS. KELLY:  Yes.  Sorry, Judge.  I misspoke.  So

12   I believe we consummated a settlement probably in late

13   2019.  I don't recall the exact date.

14              THE COURT:  Well, somebody said December 20,

15   2019.  Consummating means what?  You signed it?  The Court

16   approved it?  What?

17              MS. KELLY:  We agreed to a settlement, and it

18   was preliminarily approved, and final approval was in

19   December of 2020.  But the class period --

20              THE COURT:  You mean it took a year to finally

21   approve it?

22              MS. KELLY:  Well, I think there was issues

23   because Mr. Martorello, we were trying to rope him --

24   like, bring him into the settlement.  So there were

25   additional settlement conferences before we moved for
```

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 96 of 375
Case 3:17-cv-00461-REP    Document 1317    Filed 06/15/23    Page 27 of 228 PageID# 56978

241

1    preliminary approval.  But our class period runs from June

2    of 2013 to December 20th, 2019.

3                    THE COURT:  All right.  Now --

4                    MS. KELLY:  And Mr. Martorello did not seek to

5    intervene until December 2020, I believe.

6                    MR. TALIAFERRO:  Your Honor --

7                    THE COURT:  And he intervened for what purpose?

8                    MR. TALIAFERRO:  I know Ms. Kelly probably has a

9    much bigger handle on this than I do, but I do have here

10   the order on the motion to intervene from the *Galloway III*

11   case.

12                   THE COURT:  What's that got to do with anything?

13                   Oh, the settlement in this case was all wrapped

14   up in *Galloway III*.

15                   MR. TALIAFERRO:  Yes, sir.  Yes, sir.

16                   THE COURT:  All right.  So he -- that's the

17   first time he sought to intervene was in *Galloway III*?

18                   MR. TALIAFERRO:  He sought to intervene in the

19   settlement for *Galloway III* for the purposes of objecting

20   to the settlement.

21                   THE COURT:  When did he file that motion?

22                   MR. TALIAFERRO:  I don't have the date, but I

23   know it was before preliminary approval in 2019 because

24   your court's decision refers to his motion to intervene as

25   Docket Number 42 and the --

242

```
 1              THE COURT:  No.  That's in Galloway.  That's not
 2   in this case.  That's in Galloway.  Galloway wasn't even
 3   filed until after the settlement agreement was
 4   preliminarily approved because it was that approval that
 5   allowed it all to get -- got wrapped up in Galloway III, I
 6   think.
 7              Would you --
 8              MR. BENNETT:  What's the case number in
 9   Galloway III?
10              MR. TALIAFERRO:  19 470.
11              MR. BENNETT:  I believe it was Eventide that
12   intervened, didn't it?
13              THE COURT:  Well, Martorello didn't -- did
14   Martorello that intervened or was it Eventide?
15              MR. TALIAFERRO:  It was Eventide, Your Honor.
16              THE COURT:  So he didn't move to intervene at
17   all?
18              MR. TALIAFERRO:  That's correct.
19              THE COURT:  Has he filed any objection to the
20   settlement at any point in time?
21              MR. GIVEN:  No.
22              THE COURT:  No?  All right.  Well, then that's
23   it.  Unless you're willing to stipulate that he's the
24   alterego of Eventide.
25              MR. TALIAFERRO:  We're not prepared --
```

JA2478

1          THE COURT:  Well, I think you have to if you

2     want to talk about it as to how it applies to him or --

3     so -- all right.

4          Well, then in my judgment, the settlement -- the

5     motion in limine 15 is denied because it will create a

6     tremendous confusion, and under Rule 403, whatever

7     probative value it may have, that at some point in time

8     Mr. Martorello moved -- Eventide moved to intervene, to

9     object to the settlement, and that that shows -- that is,

10    Eventide's objection in that point is probative of

11    Martorello's direction of the enterprise is so attenuated

12    as to not be relevant, but to the extent it is relevant,

13    it is only marginally relevant and Rule 403 would keep it

14    out because of the tremendous amount of extrinsic

15    litigation that would ensue to explain all of it.  Just --

16    just as was foretold in the discussion here, it would be

17    even more so before a jury.

18          So motion in limine 15 is granted, and the

19    settlement will not be discussed.

20          All right.  Where are we now?  Is it your time

21    to show me the Weddle stuff?

22          MR. GIVEN:  Yes, Your Honor.  If I may approach.

23    I've already given a copy to the clerk and opposing

24    counsel.  And these excerpts which were highlighted are

25    intended to show Your Honor the testimony regarding advice

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 99 of 375
Case 3:17-cv-00461-REP    Document 1317    Filed 06/15/23    Page 30 of 228 PageID# 56981

244

 1   of counsel, reliance on counsel, and the reasonableness of

 2   the reliance.  Thus, some of the background.  But the

 3   Court -- obviously, that's our position.  I promised to

 4   deliver these, and there you go.

 5          THE COURT:  Well, I thought you were going to

 6   give me the particular citations marked.

 7          MR. GIVEN:  Well, they're printed out for you to

 8   see.  That's what they are.

 9          THE COURT:  Well, they're printed out, but

10   there's hundreds of pages of them.

11          MR. GIVEN:  There was a lot of them, Your Honor.

12   I mean, I can read them, but those are all the citations.

13   There was quite a bit in that deposition.

14          THE COURT:  And these are the depositions in

15   *Duggan*?

16          MR. GIVEN:  Correct.  Exactly.

17          THE COURT:  All right.  You gave me multiple

18   copies of the same thing?  Yes, you did.

19          MR. GIVEN:  There was a binder clip.  There's

20   copies for your staff.  Everything that is binder clipped

21   is the only copy.

22          THE COURT:  Is there only one thing to read and

23   not --

24          MR. GIVEN:  Correct.  And I apologize.  I was

25   trying to give all your staff copies.

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 100 of 375
Case 3:17-cv-00461-REP  Document 1317  Filed 06/15/23  Page 31 of 228 PageID# 56982

245

1          THE COURT:  Oh, I see.

2          MR. GIVEN:  My apologies.

3          Thank you, Bethany.

4          THE COURT:  Do you have one, Ms. Maloney?

5          MS. MALONEY:  I do.

6          THE COURT:  Are you trying to get this on the

7   best seller list of the New York Times or something?

8          MR. GIVEN:  I've got to do something,

9   Your Honor.

10          THE COURT:  You got stock in the copying

11   company?

12          MR. GIVEN:  I wish.

13          MS. KELLY:  These are really good copies.  They

14   are better than the copies we give.  The paper is shiny.

15          THE COURT:  I need to -- have these been

16   tendered in the record?

17          MR. GIVEN:  Not yet.  I was going to ask the

18   Court's permission to put them in the record.

19          THE COURT:  They're being considered only for

20   the purpose of comparing them to what you cited in your

21   paper.  And you still have the *Duggan* issue.  The *Duggan*

22   issue is that they weren't party to it and I have a ruling

23   to the deposition that this was taken in.  So let me take

24   a quick look at this.

25          MR. GIVEN:  Your Honor, I apologize.  I gave

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 101 of 375
Case 3:17-cv-00461-REP    Document 1317    Filed 06/15/23    Page 32 of 228 PageID# 56983

246

1    away my copy as well.

2              THE COURT:  All right.  You can have one back.

3    Do you want more than one?  I've got plenty of them here.

4    I'll tell you what.  Let's leave one for the clerk to put

5    in the record.  No, you all put it in the record.  After

6    this is over, take the proper steps to put it as hearing

7    exhibit such and such.

8              MR. GIVEN:  That will teach me.  Thank you,

9    Your Honor.

10             THE COURT:  All right.  I'm looking at the

11   transcript now.

12             Who is HCS Network Services?  Is that anybody in

13   this case?

14             MR. GIVEN:  No, Your Honor.  That was a

15   processing entity that would process those bank

16   transactions.

17             THE COURT:  I see.  That's referred to at

18   page 47 that you gave me.  I didn't understand it.

19             Who is NCAI?  It's referred to on page 51.

20             MR. GIVEN:  My understanding, Your Honor, is

21   that's what's -- it's not a Martorello entry.  I believe

22   it's a consumer credit organization or clearinghouse of

23   some sort.

24             THE COURT:  Okay.  All right.

25             MR. GIVEN:  But it's not a Martorello entity.

247

```
 1              THE COURT:  Here it is, the next question down.
 2   It says the National Congress of American Indians.
 3              MR. GIVEN:  Okay.  I was wrong.  But yes, it's
 4   not a Martorello entity.
 5              THE COURT:  All right.  I've read the -- what
 6   are we calling this, Martorello -- I'm going to write on
 7   it -- hearing Exhibit 1 regarding -- which motion in
 8   limine is this?
 9              MR. GIVEN:  Well, this goes to the -- it's
10   actually the advice of counsel issue.  The Court had
11   directed -- we have this conversation -- in fact, there's
12   an order that we've agreed to that Mr. Guzzo is going to
13   tender where you're ordering Greenberg Traurig -- this
14   really went in part to the spoliation motion.  It also,
15   though, went to motion in limine.  It also goes to the
16   advice of counsel defense.
17              THE COURT:  So that's motion in limine 5?
18              MR. GIVEN:  Yes, Your Honor.  I'm not --
19              THE COURT:  I just need to make sure.
20              Just a minute.  This is coming in in response to
21   the -- what document, Ms. Kelly, were you talking about
22   that cites all of the things that she testified no, no,
23   no, no advice?  What document is that so I can find it
24   quickly among the thousands up here on my desk?
25              MS. KELLY:  Judge, that's ECF 1270.
```

JA2483

1          THE COURT:  But what name does it have?

2          MS. KELLY:  "Plaintiffs' objection to Defendant

3   Matt Martorello's Statement of Position Regarding Good

4   Faith Defense."

5          THE COURT:  Okay.  Give me a minute to find

6   that.  Plaintiffs' objection?

7          MS. KELLY:  That's correct, Judge.

8          THE COURT:  And that would be ECF 1270?

9          MS. KELLY:  That's correct.

10         THE COURT:  And in particular, this document,

11  Martorello Hearing Exhibit Re: Motion in Limine 4 and 5,

12  Plaintiffs' Motion in Limine, appears -- is being

13  considered for the sole purpose of determining whether --

14  apart from the issue of ruling 828, I think it is, that

15  has to do with the *Duggan* depositions, it is to determine

16  whether this hearing Exhibit Number 1 is necessary in

17  order to put context to the testimony cited at pages 4, 5

18  and 6 of ECF 1270.  Are we all in agreement that's what

19  we're doing?

20         MR. GIVEN:  Yes, Your Honor.

21         THE COURT:  All right.  I will hear what you

22  have to say at this time, Mr. Given.  How does it show

23  context?

24         MR. GIVEN:  Simply, Your Honor, I'll be very

25  brief.  As I represented to the Court -- and there was

1  testimony in *Duggan*, and I give specific examples.  If we

2  go to page 35.

3              THE COURT:  Of what?

4              MR. GIVEN:  I'm sorry.  35 of the Exhibit 1.

5              THE COURT:  Okay.

6              MR. GIVEN:  Thirty-five on top, there's a

7  question, "Ms. Weddle, you testified earlier that

8  Greenberg Traurig was engaged by Bellicose in connection

9  with establishing this relationship with the LVD tribe,

10 correct?"

11             Answer, "Yes."

12             "And Greenberg Traurig gave legal advice to

13 Bellicose in connection with this engagement?"

14             "Yes."

15             Question, "And did you understand -- was it your

16 understanding that the principals of Bellicose, whomever

17 they may be, would rely on that legal advice?

18             Answer, "That's usually why clients pay for

19 legal advice."

20             That's the first case.  Just showing there was

21 clearly an engagement and intent to provide legal advice,

22 giving context to yesterday.

23             THE COURT:  Okay.  I agree.  But I also say that

24 when one tries to be too clever by half, usually one fails

25 by whole.  Because the answer to that question is either

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 105 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 36 of 228 PageID# 56987

250

1  yes or it's no, and it's not some general statement that

2  that's why people do things.

3          From that, you want a jury to say that she knew

4  that the principals would rely on the legal advice.

5          And, you know, it's one thing to say yes, I know

6  that, I know that and why.  It's another to give a clever

7  little answer, and that answer doesn't carry you across

8  the line.

9          So that's another instance where the lawyer for

10  these people fail them by failing to be candid and

11  straightforward.

12          So that testimony proves nothing.

13          MR. GIVEN:  Okay.  Well --

14          THE COURT:  What else?

15          MR. GIVEN:  I do want to make one comment.  I

16  accept the Court's ruling, but I did want to show where

17  there was testimony there was never an engagement, that

18  clearly showed at least there was an engagement.  It

19  doesn't go to the reliance on the advice, but this

20  testimony is clearly about being engaged.

21          THE COURT:  No, this testimony is not.

22          What is is page 35, line 12 through 17.  That's

23  what is probative.

24          See, you can't use these broad statements.  I

25  actually still am sentient and I'm trying to read this

251

 1  stuff and understand it.

 2          So that particular testimony does show an

 3  engagement.  And so --

 4          MR. GIVEN:  Okay.

 5          THE COURT:  We'll now deal with the *Duggan* part

 6  of that.

 7          MR. GIVEN:  Well, yeah.  And then, Your Honor,

 8  the next one, again, it doesn't again go to reliance, but

 9  on the engagement aspect, page 49.

10          THE COURT:  All right.  Let me get there.  All

11  right.

12          MR. GIVEN:  Lines 18 through 25, just for the

13  purpose of showing engagement again.

14          THE COURT:  Well, let me -- that shows

15  engagement as to what?  It shows engagement as to her

16  being asked to give advice --

17          MR. GIVEN:  Right.

18          THE COURT:  -- respecting whether they should

19  exit the litigation, join the litigation or whatever.

20          MR. GIVEN:  Correct.

21          THE COURT:  Yeah, that's different than -- in

22  other words, that removes it -- that's a different

23  engagement.  So it's not the engagement to which the first

24  thing relates.  The first --

25          MR. GIVEN:  Correct.  It's an ongoing

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 107 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 38 of 228 PageID# 56989

252

1   engagement.  Again, there was --

2            THE COURT:  That doesn't count, as far as I'm

3   concerned.

4            MR. GIVEN:  Okay.

5            THE COURT:  I think it's attenuated.  It's a

6   different topic.  It's not the one that's referred to in

7   the first excerpt, page 35, line 12 to 17.

8            All right.  So that one we still have to decide.

9            MR. GIVEN:  So we're going to have the same,

10  then, on page 51, lines 22 through 25 and on --

11           THE COURT:  Hold on.

12           MR. GIVEN:  Okay.

13           THE COURT:  Page what?

14           MR. GIVEN:  Page 51, lines 22 through 25.

15           THE COURT:  Well, now, that's a different

16  question.

17           MR. GIVEN:  I understand.  It's just --

18           THE COURT:  That's the question as to which

19  privilege was asserted.

20           MR. GIVEN:  I understand.  I'm just trying to

21  show engagement.

22           THE COURT:  Well, I know, but wait a minute.  We

23  can't take isolated facts.  We have to take them -- is

24  this the question I was asking as to which she was told

25  not to answer the question because of a privilege with

1    Eventide?

2              Is it yes, Ms. Kelly?  No?

3              I don't see them claiming a privilege here.  It

4    says, "And when Greenberg Traurig was engaged by Eventide,

5    who is the person Greenberg Traurig was dealing with?"

6              "Just a point of clarification" -- that's of the

7    witness.  "Just a point of clarification, Mr. Given.  Has

8    Eventide also waived attorney-client privilege?"

9              "It has, yes.  With respect to the Greenberg

10   Traurig representation, it has."

11             "Then to answer that question, my specific

12   recollection is Mr. Matt Martorello and Mr. Justin

13   Martorello."

14             Did they, at some later time, they assert a

15   privilege even though that privilege had been waived?

16             MS. KELLY:  That's correct, Judge.  When I took

17   Ms. Weddle's follow-up deposition a few weeks or a month

18   later, the privilege was asserted as to anything related

19   past 2015-2016 regarding Eventide.

20             THE COURT:  Well, they waived the privilege.

21             MR. GIVEN:  Understood.  We can explain,

22   Your Honor.  We're not asserting it.  The order that

23   you're going to sign is going to require them to produce

24   all the documents.

25             THE COURT:  Yes.  Okay.  All right.  I

USCA4 Appeal: 23-2097  Doc: 11-6  Filed: 12/06/2023  Pg: 109 of 375
Case 3:17-cv-00461-REP  Document 1317  Filed 06/15/23  Page 40 of 228 PageID# 56991

254

1      understand.

2              MR. GIVEN:  Thank you.

3              THE COURT:  Anything else?

4              MR. GIVEN:  Let me just check.  I think I had

5      one more thing, Your Honor, and it may just be the same

6      issue on engagement.

7              Yeah, no.  It's cumulative.  It's just page --

8              THE COURT:  All right.

9              MR. GIVEN:  It's -- it's just on page 85.  The

10     question by Mr. Caddell, their co-counsel, or at least

11     joint counsel, "Who was representing Mr. Martorello and

12     his related entities at that time," meaning --

13             THE COURT:  What time are we talking about?

14             MR. GIVEN:  2012, referenced by the question

15     above.

16             THE COURT:  All right.

17             MR. GIVEN:  Answer, "So Bellicose was a client

18     of the firm at that time."

19             And that's all I have there.  Again, it just

20     goes to engagement.

21             But, again, we are joining in the Court's order

22     to require Greenberg Traurig to produce anything because

23     we have not instructed them to withhold anything, destroy

24     anything.  Their file should be put before the Court.

25             THE COURT:  Is there anything with Greenberg

 1  Traurig pending before the Court in the way of one of

 2  these miscellaneous actions or something?

 3          MR. GIVEN:  No, Your Honor.

 4          THE COURT:  There was a complaint registered --

 5  I mean, there was an issue -- this issue was presented to

 6  a court in Colorado?  Yes or no.

 7          MS. KELLY:  I can answer that.

 8          Judge, we subpoenaed Jennifer Weddle, and it was

 9  transferred to this Court, and ultimately we withdrew that

10  subpoena because there were issues we were dealing with

11  with Greenberg Traurig to determine whether documents

12  existed.  And that process essentially ceased in 2020.

13          I will say that when we received the

14  supplemental interrogatory and request for production,

15  which we provided in the binder to your court yesterday,

16  plaintiffs' counsel, seeing that there was no specific

17  advice or no documents that Mr. Martorello received from

18  them that he was relying on, you know, that was okay.  If

19  that was all he had, we didn't think there was any advice

20  that he could say he relied on to have a good faith basis.

21  And so we don't think the standard was met, one.

22          Two, Mr. Given has been up here talking about

23  advice of counsel, but Mr. Martorello has stated in his

24  sworn interrogatory that he is not asserting advice of

25  counsel as a defense to this litigation.

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 111 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 42 of 228 PageID# 56993

256

1          THE COURT:  Where is that?

2          MS. KELLY:  It's in the binder that -- the

3   binder that I provided yesterday.  Judge, it's also

4   attached to this pleading or objection.

5          MR. GIVEN:  Counsel, what year is that

6   interrogatory you're referring to?

7          MS. KELLY:  It was supplemented on I believe

8   January 30th of 2019.

9          MR. GIVEN:  2019.  Okay.

10         THE COURT:  All right.  Which tab in your binder

11  that you gave me, and it's ECF number what?

12         MS. KELLY:  It's ECF 1270.

13         THE COURT:  Dash.

14         MS. KELLY:  Dash 4.

15         THE COURT:  All right.

16         MS. KELLY:  It says, "If you intend to rely on

17  advice of counsel as a defense to any of the plaintiffs'

18  claims, identify, (1), the substance of any advice you

19  received; (2), the attorney who provided it; (3), the date

20  it was provided; and (4), any advice you received to the

21  contrary."

22         Mr. Martorello's response was, "Martorello does

23  not intend to rely upon advice of counsel as a defense in

24  this matter at this time.  However, if the Court orders

25  that Martorello must waive privilege to assert his good

1  faith defense, Martorello may then elect to assert an

2  advice of counsel defense."

3            THE COURT:  All right.  Has a pleading been --

4  advice of counsel is a defense.  Has the answer been

5  amended to include advice of counsel?

6            MR. GIVEN:  It has not, Your Honor.

7            THE COURT:  All right.  Then it's not a defense

8  in the case.

9            MR. GIVEN:  Okay.  Can I just say one thing,

10 Your Honor, please.  Because, again --

11           THE COURT:  I'll give you a chance when she

12 finishes.

13           MR. GIVEN:  Thank you.

14           MS. KELLY:  And, Judge, I'd like to just make a

15 couple more comments about what Mr. Given just presented

16 in the *Duggan* deposition with Ms. Weddle.

17           THE COURT:  That's hearing Exhibit 1?

18           MS. KELLY:  That's correct, Judge.

19           THE COURT:  It was offered -- he pointed out

20 three or four places where it was to show that there was a

21 representation and that the communication with Bellicose

22 was to Martorello.

23           MS. KELLY:  And we would submit, Judge, that

24 that is not in dispute, that there was an initial

25 representation.  And Ms. Weddle testified in *Williams* that

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 113 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 44 of 228 PageID# 56995

258

1   she represented to help with contracts.

2           THE COURT:  Well, that's in what you designated

3   yourself.

4           MS. KELLY:  That's correct.

5           THE COURT:  So that's not in dispute.

6           MS. KELLY:  Right.  But we didn't see anything

7   in this Exhibit 1 where Ms. Weddle testifies about any

8   specific advice that she provided to Mr. Martorello which

9   would inform his good faith basis.

10          THE COURT:  All right.

11          MS. KELLY:  And so we'd like to point that out

12  to the record.

13          I would also like to direct Your Honor, in

14  Exhibit 1 --

15          THE COURT:  Exhibit 1.

16          MS. KELLY:  -- to page 23 of --

17          THE COURT:  You mean Martorello hearing

18  Exhibit 1?

19          MS. KELLY:  Correct, Judge.

20          THE COURT:  Page what?

21          MS. KELLY:  Page 23.

22          THE COURT:  All right.

23          MS. KELLY:  It is consistent with how Ms. Weddle

24  testified in the *Williams* deposition that I recently took.

25          THE COURT:  Where are we talking?

259

 1          MS. KELLY:  The very top of the page.  It's cut

 2   off, but the question says, "And in connection with that

 3   online lending operation, was that conducted on the

 4   reservation?"

 5          Her answer, "I don't have any knowledge of the

 6   operation of the business."

 7          So we would submit that she maintains that she

 8   does not have full disclosure of the operations to provide

 9   an opinion on the legality of the conduct.

10          I would also direct --

11          THE COURT:  I don't understand how a lawyer can

12   advise a company in anything in respect of how -- of the

13   lawfulness or not of a tribal lending operation without

14   understanding what the operations are or because the

15   operation, according to the law in every circuit that I

16   know of that has decided it, has decided that it has to be

17   on the reservation.

18          And if she doesn't understand that, she can't

19   opine as to the legality or not, for she's absent a

20   critical fact in her quiver of knowledge sufficient that

21   is required to give the legal advice.

22          It is most troublesome to me what I see here.  I

23   don't know that there's anything that I have jurisdiction

24   over or can say grace over, but it's distressing when you

25   see the individual pieces add up.

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 115 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 46 of 228 PageID# 56997

260

1          All right.  Anything else?

2          MS. KELLY:  Yeah, there are just two more

3   passages I would like to point Your Honor to in the

4   deposition.  The next one is at the bottom of 37.

5          THE COURT:  That's in Exhibit 1.

6          MS. KELLY:  Exhibit 1.  I'm sorry, Judge, for

7   not being specific.

8          THE COURT:  What page?

9          MS. KELLY:  The bottom of page 37.

10          THE COURT:  Yes.

11          MS. KELLY:  It's line 20, "And do you know if

12   there came a point in time where SourcePoint and Bellicose

13   got sold to the tribe?"

14          "I am aware that it occurred in 2015, yes."

15          And then it's cut off, but it says, "And was

16   Greenberg Traurig involved at all in that transaction?"

17          And then her response is "No."  But that's not

18   provided here.

19          So, again, Ms. Weddle is testifying she was not

20   involved in that transaction.

21          MR. GIVEN:  And we don't dispute that,

22   Your Honor.  We've never alleged that.

23          THE COURT:  So at the bottom of that page, it

24   ought to be, at line 25, "And was Greenberg Traurig

25   involved at" -- and then it goes to page 38, and 38 says

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 116 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 47 of 228 PageID# 56998

261

1    "involved at all" --

2              MS. KELLY:  In that transaction?

3              THE COURT:  -- "in that transaction?"

4          And her answer is no?

5              MS. KELLY:  No.

6              THE COURT:  And that would be on what lines?

7              MS. KELLY:  That would be on lines --

8              THE COURT:  That would be lines 1 through where?

9              MS. KELLY:  One through 3.

10             THE COURT:  All right.  Page 38, lines 1, 2, 3.

11   One through 3.  And that is agreed to?

12             MS. KELLY:  Yes.

13             THE COURT:  All right.

14             MS. KELLY:  And there's one more section that's

15   not provided that I would like to read into the record,

16   and we're happy to provide the page.  It is page 40,

17   line 8 through 13.

18          And the question is --

19             THE COURT:  Page -- just a minute.

20             MS. KELLY:  Sorry.  It's 40.

21             THE COURT:  It's here or not?

22             MS. KELLY:  It is not here, Judge.  I'm sorry.

23             THE COURT:  Oh, okay.  So page 40 says what?

24             MS. KELLY:  It's page 40, lines 8 through 13.

25             THE COURT:  Uh-huh.

1            MS. KELLY:  It says, "Ms. Weddle, we'll get back

2    to the -- you know, to the 2011-2012 time period.  Who, to

3    your understanding, was collecting payments on the

4    consumer loans from the consumers?"

5            Answer, "I don't have any knowledge of the

6    operations of the business."

7            THE COURT:  Okay.  All right.  Thank you.

8            MS. KELLY:  And so, Judge, I just want to --

9            THE COURT:  Let's go back to the more basic

10   question here presented by tab 4, and that is this.

11   "However, if the Court orders that Martorello must waive

12   privilege to assert a good faith defense, Martorello may

13   then elect to assert an advice of counsel defense."

14           All right.  Now, I think I did order that he had

15   to waive privilege in order to assert the advice of

16   counsel defense.  When was that order, and what -- what

17   docket number is it?

18           MS. KELLY:  So I will get --

19           THE COURT:  Your team is looking for that.

20           MS. KELLY:  But I did want --

21           THE COURT:  Here's the point, then.  Once we

22   find that --

23           MS. KELLY:  Okay.

24           THE COURT:  -- after the date of that order, was

25   there ever an answer to an interrogatory or an amendment,

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 118 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 49 of 228 PageID# 57000

263

1  was there an attempt to the answer -- the answer to begin

2  with.  Was there an amendment to the answer that said he's

3  asserting as a defense advice of counsel?

4           MS. KELLY:  No, Judge.

5           THE COURT:  All right.  So usually that's how

6  you put your defenses in is asserting something in your

7  answer.  But apart from that, was there a supplementary

8  discovery response in which the defendant said, "I am

9  asserting advice of counsel," apart from the run-up of the

10 pleadings and briefings in these preliminary motions?

11          MS. KELLY:  No, Judge.

12          THE COURT:  So there's no normal formal

13 assertion of the right of counsel defense -- advice of

14 counsel defense in either the answer or the supplemental

15 discovery responses; is that correct?

16          MS. KELLY:  That's correct.  And as to the

17 advice --

18          THE COURT:  Okay.

19          MS. KELLY:  -- the waiver of privilege motion,

20 we will get you the date in the ECF.  But Mr. Martorello

21 moved to reconsider that motion, and then the parties

22 worked together because Martorello only had possession of

23 a certain number of documents that he was withholding on a

24 log, and it's our position because most of them were

25 destroyed, which is a side issue, but we agreed to

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 119 of 375
Case 3:17-cv-00461-REP    Document 1317    Filed 06/15/23    Page 50 of 228 PageID# 57001

264

1    withdraw our motion to waive the privilege because we had

2    to rebrief it because of things that had transpired in the

3    interim.

4            So that order was under reconsideration and then

5    the parties had to rebrief it and then we ended up not

6    filing it because we resolved it amongst ourselves with

7    Mr. Martorello.

8            THE COURT:  Is there an order -- look, there's

9    an order of the Court that says he's waiving the

10   privileging.  You all proceeded on your own to try to work

11   things out.  That's fine.  And I don't discourage that.  I

12   commend counsel for that.  But is there an order in the

13   record that vacates or amends the order telling him he's

14   got to waive privilege to assert the defense?

15           MS. KELLY:  I don't --

16           THE COURT:  Is there one or not?  I mean,

17   there's how you do business in the courts, particularly in

18   a zoo of a case like this.

19           MS. KELLY:  No, not that I'm aware of.  I just

20   wanted to be clear --

21           THE COURT:  Excuse me.  Have we found the waiver

22   order?

23           MR. BENNETT:  Not yet, Judge.

24           MR. GUZZO:  Not yet.

25           THE COURT:  All right.  Do you all know it, the

1    ECF number?

2              MS. KELLY:  My docket sheet is --

3              THE COURT:  I think that -- you know what

4    Judge Merhige said one time?  If a docket sheet gets over

5    30 pages, counsel ought to have to carry it on his or her

6    back for eternity so that the Court is relieved of that

7    obligation.

8              How are you doing?

9              THE COURT REPORTER:  I'm great.

10             THE COURT:  Anybody else need a recess?  You're

11   all right?  Okay.

12             I was going to give you a chance to chase it

13   down in a recess, if you needed a recess.

14             MR. GUZZO:  That might be helpful.

15             THE COURT:  All right.  Let's take a recess for

16   20 minutes.

17             (Recess from 11:14 a.m. until 11:38 a.m.)

18             THE COURT:  All right.  What have you found?

19             MR. GIVEN:  We have figured it out, I think,

20   Your Honor.

21             THE COURT:  All right.

22             MR. GIVEN:  So the supplemental interrogatory

23   responses, it's in Docket Number -- I'm sorry -- Docket

24   1270-4, in interrogatory 12, it states --

25             THE COURT:  All right.  Just a minute.

1           MR. GIVEN:  Sorry.

2           THE COURT:  Yes, I found that.  And that was in

3    the tab in front of me.

4           MR. GIVEN:  That was in the tab 4 that Ms. Kelly

5    had yesterday.

6           THE COURT:  Right.  So the answer is no.

7    "However, if the Court orders that Martorello must waive

8    privilege to assert his good faith defense, Martorello may

9    then elect to assert an advice of counsel defense."

10          MR. GIVEN:  Right.

11          THE COURT:  That's the answer.

12          MR. GIVEN:  That was not supplemented.  We

13   stipulate to that.

14          However -- where I think we are in agreement is

15   on interrogatory number 13, we did supplement about it,

16   intending to assert a good faith defense.  And I think

17   counsel has agreed that we have properly supplemented as

18   to good faith defense but not advice of counsel.

19          THE COURT:  Are you all in agreement on that?

20          MS. KELLY:  Yes.  And to be clear, the

21   supplementation is what is in tab 4.  There's nothing

22   beyond that.

23          THE COURT:  Right.  The supplementation is the

24   response that is posited to interrogatory 13 as it appears

25   in 1270-4, page 5.

```
 1              MS. KELLY:  Correct.

 2              MR. GIVEN:  Correct.

 3              THE COURT:  Okay.  We got it straight.

 4              MR. GIVEN:  So that's all.

 5              And then I think -- I don't know if the Court

 6   had anything else on that issue.

 7              I think the next matter -- I know you still need

 8   to do the documents, but Ms. Simmons is getting the

 9   computer.

10              We still have our motions in limine.  If maybe

11   we could take those at this point.

12              THE COURT:  We'll take them, but I'm not

13   finished with what I'm doing.

14              MR. GIVEN:  I'm sorry.  My apologies.

15              THE COURT:  Martorello Exhibit 1, then, is in.

16              Now, let me ask you this question.  I have taken

17   it into account in assessing the mistake of law issue.

18              Now, on the parts of the Martorello Exhibit 1

19   that are offered to show that there was counsel -- that

20   Greenberg Traurig was retained as counsel to SourcePoint

21   and in connection therewith, they communicated with

22   Mr. Martorello.

23              As I understand your papers, you don't --

24   plaintiffs don't dispute that he was the chief executive,

25   manager, whatever you -- I guess it was an LLC, wasn't
```

1   it? -- of SourcePoint.  So you're not contesting that he

2   got whatever SourcePoint got, are you?

3            MS. KELLY:  No, Judge.  In fact, yesterday we

4   provided the memo that he received as an executive saying

5   that he could be criminally liable.  We're not saying

6   that.

7            THE COURT:  You're relying on that.

8            MS. KELLY:  That's correct, Judge.

9            THE COURT:  Okay.  So that's not a fact that's

10  an issue, as best I can tell, correct?

11           MS. KELLY:  That's correct, Judge.

12           THE COURT:  You're not going to dispute that?

13           MS. KELLY:  That is -- no, we're not.

14           THE COURT:  All right.  Then the Martorello --

15  the testimony of Weddle that you identified as pertaining

16  to the engagement of -- I said SourcePoint.  It's

17  Bellicose, isn't it?

18           MS. KELLY:  It was Bellicose.

19           THE COURT:  And then there's some question about

20  SourcePoint, too.  So it's both of them.  None of that is

21  an issue.

22           Therefore, the testimony offered to show that

23  Greenberg Traurig was representing those -- whatever

24  entities they were is not relevant at all, and so that

25  testimony need not come in -- cannot come in.  And

1   therefore, in addition the *Duggan* ruling -- *Duggan* issue,

2   which is that the plaintiffs in this case weren't

3   represented at those depositions and the ruling therein

4   reflected in 828, precludes the testimony.

5           However, if you begin to make an issue out of

6   whether there was or wasn't representation and whether or

7   not Martorello got information that was sent to Bellicose

8   or SourcePoint, then I'll revisit that at that time.  But

9   I don't see that it's going to be an issue, given the

10  evidence that you have proffered that you're going to

11  offer.

12          As to the other testimony that is not what I

13  call the retention testimony or the representation

14  testimony that you referred to, Mr. Given, at the various

15  pages you just did, page 35, lines 12 through 25, and the

16  rest of that testimony in Martorello hearing Exhibit 1

17  does not rebut or give context to the deposition testimony

18  cited in 1270, ECF 1270, pages 4, 5 and 6, respecting

19  whether she gave advice to Martorello.  So it's not

20  admissible for that purpose.

21          The record will -- the document will be placed

22  in the record --

23          MS. KELLY:  Okay.

24          THE COURT:  -- as Martorello hearing Exhibit

25  Number 1 to motion in limine 4 and 5.

USCA4 Appeal: 23-2097   Doc: 11-6      Filed: 12/06/2023   Pg: 125 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 56 of 228 PageID# 57007

270

1          All right.  Now, we have -- I see that
2  Ms. Simmons is back.  Is there something else we need to
3  do on that?
4          MR. TALIAFERRO:  Your Honor, I believe at this
5  time we are to our homework assignment from last night,
6  which is to present the Court with our position on the ten
7  documents which were identified in the interrogatory
8  response.
9          THE COURT:  All right.  And the ten documents
10  are where?  What notebook will I find those in?  I had
11  them yesterday, but I'm just not sure what we're talking
12  about.
13          MR. TALIAFERRO:  They would be in the good faith
14  defense binder, but we will limit our discussion to the
15  ten that we -- the parties have agreed were identified in
16  the --
17          THE COURT:  Here it is.
18          MS. KELLY:  Judge, we made binders of just the
19  ten documents for everyone, if that helps.
20          THE COURT:  Will that help?
21          MR. TALIAFERRO:  Yeah, we would accept that.
22          THE COURT:  All right.  And they are the ten
23  documents associated with what document?  ECF -- what is
24  the document -- what's that -- Ms. Maloney, what's that
25  document?  Law.

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 126 of 375

1          MS. MALONEY:  1261.

2          MS. KELLY:  ECF 1261.

3          THE COURT:  Yeah, ECF 1261.

4          MR. TALIAFERRO:  1261.

5          THE COURT:  Can I have that, please?

6          MS. KELLY:  That is the single-sided, and then

7   we have one for Morgan.

8          THE COURT:  May I have that, 1261, or maybe I've

9   already got it.  Let's see.  Hold on.

10          MS. MALONEY:  You should have it.

11          THE COURT:  I don't see it.

12          MS. KELLY:  I think the unredacted version,

13   Judge, is not 1261.

14          THE COURT:  No.  What is it.

15          MS. KELLY:  1270 --

16          THE COURT:  1277, right?

17          MS. KELLY:  1275.

18          MR. GIVEN:  Yeah.  That's correct.

19          THE COURT:  Yes, it's 1275 is the sealed filing

20   of 1262.  Not 1261.  1262.

21          MR. TALIAFERRO:  Ms. Simmons will handle this

22   portion, Your Honor.

23          THE COURT:  And then the documents that we're

24   talking about now are those ten of the ones that are

25   allowed that are cited in the chart that appears in 1275,

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 127 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 58 of 228 PageID# 57009

272

1    pages 9 through 17.

2              So just so my recordkeeping will be straight, of

3    the documents, now, where -- which ones are the ten?  Use

4    the exhibit number on the right-hand column there so I'll

5    just check off which ones I'm talking about.

6              MS. SIMMONS:  Exhibit BB.

7              THE COURT:  Wait just a minute.  BB.

8              MS. SIMMONS:  Exhibit FF.

9              THE COURT:  All right.

10             MS. SIMMONS:  Exhibit KK.

11             THE COURT:  All right.

12             MS. SIMMONS:  Exhibit LL.

13             THE COURT:  All right.

14             MS. SIMMONS:  Exhibit MM.

15             THE COURT:  All right.

16             MS. SIMMONS:  Exhibit CCC.

17             THE COURT:  All right.

18             MS. SIMMONS:  Exhibit DDD.

19             THE COURT:  Just a minute.

20             MS. SIMMONS:  I'm not sure if the -- excuse me.

21             THE COURT:  I don't have an Exhibit DDD.

22             MS. SIMMONS:  Yeah.  I'm looking, Your Honor.

23   I'm not sure --

24             MS. KELLY:  Bethany, we had EE in our binder.

25             MS. SIMMONS:  Okay.  So maybe we're not --

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 128 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 59 of 228 PageID# 57010

273

1              THE COURT:  EE or EEE?

2              MR. TALIAFERRO:  Your Honor, I think, as

3    Ms. Simmons is going to tell you, DDD, which we submitted

4    is the memo that was attached to CCC, which is the cover

5    e-mail.  And that may not be in Ms. Kelly's binder, but --

6              THE COURT:  Well, there's -- there is no -- on

7    your paper 1275, there is no DDD, as I see it.  There is a

8    CCC and unless the page numbers are wrong, which they do

9    not appear to be either by your pagination or the

10   ECF pagination, there is no DDD.  It goes from CCC to EEE.

11             MS. SIMMONS:  So here is -- so this is what I'm

12   referring to as CCC.

13             THE COURT:  CCC says that it's an April 2015

14   source document from Rosette, LLP, and it says, "Rosette,

15   LLP issues a memorandum regarding its 2015 federal and

16   state lending strategy with the goal of maintaining a

17   strong advocacy presence to protect and preserve the

18   longevity of tribal online lending businesses."

19             And the documents -- now, I will say -- oh, I

20   see.  I beg your pardon.  It says Exhibit CCC, and then

21   down at the bottom, it says, "And Exhibit DDD."

22             MS. SIMMONS:  Yes, Your Honor.

23             THE COURT:  Okay.  So it's both of these.

24             MS. SIMMONS:  We submit that it is, although --

25             THE COURT:  Okay.  I see it.  Now, is that it?

1    Is that the ten?

2              MS. SIMMONS:  It's not, Your Honor.  And I

3    actually -- I'm looking at the binder that Ms. Kelly put

4    together, and it looks like there's some differences from

5    our understanding.  And so --

6              THE COURT:  Well, let's do this.  Why don't you

7    do this.  Let's get the documents you say were provided

8    identified -- and all ten of them.  Is EEE one of the ten?

9              MS. SIMMONS:  So, Your Honor, on that point,

10   I -- we've provided to the Court earlier this morning the

11   list of the documents that we think was identified.  It's

12   a separate chart so you have it in one place.  Or I'm

13   sorry.  We provided it to Ms. Maloney.  I have a copy for

14   the Court, if I may, Your Honor.

15             THE COURT:  That would be fine.  But what I'm

16   doing is making notes on what I've already done so I'll

17   use that.  But I want to know, is EEE part of the ten?

18             MS. SIMMONS:  I do not have EEE as part of the

19   ten.

20             THE COURT:  Okay.  After DDD, what is -- is

21   there any more of the ten?

22             MS. SIMMONS:  I have GGG.

23             THE COURT:  All right.

24             MS. SIMMONS:  I have HHH.  I have JJJ, and I

25   have MMM on my list.

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 130 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 61 of 228 PageID# 57012

275

1          THE COURT:  Do you agree that those documents

2  were the ten, Ms. Kelly?

3          Why don't you two go back there and talk for a

4  minute and let's get this -- this is a mechanical issue.

5  It just needs to be sorted out, and we'll be off the

6  record.

7          All right.  It being five minutes to 12, if I

8  had realized there was a problem, I would have just said

9  fix it over lunch.  Can you fix it over lunch?

10          MS. KELLY:  Yes, Judge.

11          MS. SIMMONS:  Yes, Your Honor.

12          THE COURT:  All right.  We'll take the lunch

13  hour at this time and be back at 1:00.

14          MR. GIVEN:  Thank you, Your Honor.

15          (Recess from 11:53 a.m. until 1:18 p.m.)

16          THE COURT:  All right.  So are we in agreement

17  that the ten documents that she identified are the ten

18  documents at issue?  And you've put the ten documents in a

19  binder, right?

20          MR. TALIAFERRO:  I think we are up to 11 by

21  agreement of the parties, but we have a binder for the

22  Court.

23          THE COURT:  What's the 11th one?

24          MR. TALIAFERRO:  It's Exhibit HHH was added.

25          THE COURT:  Okay.  I have ten in my little chart

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 131 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 62 of 228 PageID# 57013

276

1   here.

2              MS. SIMMONS:  I have an updated chart for

3   Your Honor.  May I hand it up?

4              THE COURT:  All right.  Everybody's in agreement

5   that this is what I should be using?

6              MS. KELLY:  The plaintiffs are.

7              MS. SIMMONS:  All right.

8              THE COURT:  Okay.

9              MR. GUZZO:  He has an updated binder.

10             THE COURT:  All right.  So let's start.  Now,

11  what is our task here that we're doing here?

12             Let me see what this chart pertains to in the

13  1275.  This chart is offered in support of the view that

14  Martorello's good faith belief is informed by counsel

15  representing his companies, counsel representing the

16  tribe, and public sources of information.  And these

17  exhibits are the ones that we say support that; is that

18  correct?

19             MS. SIMMONS:  These are the ones that the

20  parties agree were set forth in Martorello's discovery

21  response.  So these are the 11 that the parties agree are

22  at issue.

23             THE COURT:  All right.  The first one is BB; is

24  that right?  So where does it say that -- show that it

25  does what it's purporting to do?

USCA4 Appeal: 23-2097      Doc: 11-6      Filed: 12/06/2023      Pg: 132 of 375

277

```
 1            MS. SIMMONS:  So, Your Honor, this is an e-mail

 2   from Jennifer Weddle to Matt Martorello, Karrie Wichtman,

 3   and copying Justin Martorello.  It's discussing --

 4            THE COURT:  Where on the document does it do

 5   anything?  Just get me to that language first, and then I

 6   can go from there.

 7            MS. SIMMONS:  So, Your Honor it attaches a

 8   letter, a draft letter.

 9            THE COURT:  This is a draft.  The Greenberg

10   Traurig is a draft, right?

11            MS. SIMMONS:  Correct.

12            THE COURT:  All right.

13            MS. SIMMONS:  And in the cover e-mail,

14   Ms. Weddle suggests providing a substantially similar

15   letter to LVD's ACH provider.  And the letter itself goes

16   through --

17            THE COURT:  Wait a minute.  This is from Weddle

18   to Martorello dated August 19, 2013.  So where does it --

19   where does it -- where in the memo, and then the letter,

20   what specific language is said to inform his good faith

21   belief?  Just point me to that language.

22            MS. SIMMONS:  So, Your Honor, we think that

23   there's a number of points in the letter.  But to begin

24   with --

25            THE COURT:  I'm only going to consider the ones
```

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 133 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 64 of 228 PageID# 57015

278

 1  you identify for me.  That's what I have to do.

 2              MS. SIMMONS:  So, Your Honor --

 3              THE COURT:  Is there in the memo, the cover

 4  e-mail itself, any text?  And I don't want to go through

 5  what we went through yesterday.  When I ask where is the

 6  text, I want to know exactly where the text is so I can

 7  highlight and then I can read it.

 8              MS. SIMMONS:  So the letter itself says --

 9              THE COURT:  Excuse me.  I asked the question

10  about the e-mail.  Is there anything in the e-mail?

11              MS. SIMMONS:  I apologize Your Honor.  I meant

12  to say e-mail.  I misspoke.

13              THE COURT:  Where is it?

14              MS. SIMMONS:  The e-mail itself -- there's --

15  it's a suggestion that he --

16              THE COURT:  Is there any language in there that

17  I need to --

18              MS. SIMMONS:  No.  There's nothing you need to

19  highlight about the e-mail itself.

20              THE COURT:  All right.  Now I'll look at the

21  draft letter.  Where in the draft letter do I find

22  something that informs his good faith belief as

23  articulated in the beginning of 1275?  So where is it?

24              MS. SIMMONS:  So if you look to the executive

25  summary portion, Your Honor, on the second page of the

1   letter --

2           THE COURT:  Yes.

3           MS. SIMMONS:  -- Bates stamp 2803, it says, and

4   the underlined language is applicable -- "To the contrary,

5   and let me be clear, any ACH debits to a New York consumer

6   account originated for any Ft. Belknap enterprise,

7   including Blue Sky, is entirely legal."

8           And recall back that the e-mail itself is saying

9   this applies to the LVD analysis as well.

10          THE COURT:  Well, it doesn't say that.  Where

11  does it say that?

12          MS. SIMMONS:  The cover e-mail says that.

13          THE COURT:  Where does it say this applies to

14  the LVD analysis?

15          MS. SIMMONS:  Sorry.  "LVD agrees with this

16  analysis."

17          THE COURT:  Well, that's not the same thing as

18  that it applies to the analysis.  It's that LVD agrees

19  with it.  That doesn't say that the LVD situation matches

20  what is being commented upon in the executive summary.  It

21  says the LVD agrees with this analysis.  That just says

22  the tribe agrees with it.  Okay.

23          MS. SIMMONS:  Okay.

24          THE COURT:  I understand what you're saying.

25          Okay.  Anything else in here that we got, any

```
 1   other text?

 2            MS. SIMMONS:  The second paragraph of the

 3   executive summary, Your Honor --

 4            THE COURT:  Yes.

 5            MS. SIMMONS:  -- also points to --

 6            THE COURT:  It says, "Second?"  Is that what you

 7   want me to --

 8            MS. SIMMONS:  Yes.  That paragraph as well,

 9   Your Honor.

10            THE COURT:  The whole paragraph?

11            MS. SIMMONS:  Yeah.  Because it says, you know,

12   the -- we want to provide you with the context for the

13   lending enterprises, including the background about the

14   legal posture of the enterprises, which are established

15   and operated --

16            THE COURT:  Slow down, please.

17            MS. SIMMONS:  -- pursuant to the tribe

18   sovereignty -- the inherent sovereignty, the robust

19   consumer protection measures the tribe employs --

20            THE COURT:  Okay.  I see it.

21            MS. SIMMONS:  -- and the tremendous good its

22   lending enterprises have brought.

23            THE COURT:  All right.

24            All right.  Anything else in this document?

25            MS. SIMMONS:  Your Honor, there's a --
```

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 136 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 67 of 228 PageID# 57018

281

1          THE COURT:  And remember the question is

2    anything else that is said to inform Martorello's good

3    faith belief as set forth in this document?  And that

4    would be in the first part of the document.  His belief is

5    that the loans were governed by the laws of the LVD Band

6    of Lake Superior Chippewa Indians and applicable federal

7    law and were lawful.  Right?

8          MS. SIMMONS:  Correct, Your Honor.  So if you

9    move to --

10         THE COURT:  So is there anything else in this

11   document that is said to inform that belief?

12         And if I use the word "that belief" anymore, I'm

13   referring to the beliefs set out in paragraph A, page 1,

14   ECF 1275.  So is there anything else that I should look at

15   and highlight when I'm thinking about it?

16         MS. SIMMONS:  Your Honor, that's the executive

17   summary.

18         THE COURT:  That's it.  Okay.

19         MS. SIMMONS:  The reminder of the letter

20   expounds upon why those conclusions are being reached in

21   the executive summary.

22         THE COURT:  Well, I didn't ask you that.  I

23   asked what text -- you're talking about that informs the

24   belief.

25         MS. SIMMONS:  So I --

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 137 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 68 of 228 PageID# 57019

282

 1          THE COURT:  I'm not going to sit here and read

 2  and guess what he discerned from -- and found important.

 3  I can't do that.  That's a speculative endeavor that I

 4  shouldn't do.  I need you to tell me what it is that he

 5  says informed his belief.

 6          MS. SIMMONS:  The conclusions of the letter,

 7  Your Honor, which say --

 8          THE COURT:  All right.  The conclusions in the

 9  executive summary; is that right?

10          MS. SIMMONS:  Yes.

11          THE COURT:  Okay.  Next document.  KK, right?

12          MS. SIMMONS:  Yes, Your Honor -- or the next

13  document I believe is EE.

14          THE COURT:  EE, yes.  Okay.  All right.  And

15  that is a memo from -- who is this?  Gkway, who is that?

16          MS. SIMMONS:  It's a -- it is the -- that's the

17  CEO of Duck Creek, who also goes by Michelle Hazen and

18  Ms. Michelle Allen.  I'm not going to purport to know how

19  to pronounce this name.

20          THE COURT:  Well, that's the tribal name.

21          MS. SIMMONS:  Yes, that's the tribal name.  But

22  she goes by Michelle Hazen.

23          THE COURT:  Michelle Allen.

24          MS. SIMMONS:  Michelle Hazen --

25          THE COURT:  Hazen.

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 138 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 69 of 228 PageID# 57020

283

1          MS. SIMMONS:  -- is I think the more recent.

2          THE COURT:  Okay.  And then we have a copy -- or

3     it's addressed to Martorello inter alia, a bunch of other

4     people.  Matt Martorello.  Okay.  All right.  Now, where

5     in here?

6          MS. SIMMONS:  If you go to the second page,

7     Your Honor, which has the Bates stamp 2700.

8          THE COURT:  All right.  Where?

9          MS. SIMMONS:  Ms. Wichtman says, "I disagree

10    with your statement of Judge Sullivan's 9/30 order" --

11         THE COURT:  Wait just a minute.  "While I

12    disagree," okay, "with your statement Judge Sullivan's" --

13    that actually ought to have a comma there, I suppose; is

14    that right?

15         MS. SIMMONS:  I would have put one in if I would

16    have drafted it, Your Honor.

17         THE COURT:  -- "Judge Sullivan's 9/30 order

18    right now today represents a basis for New York

19    authorities to initiate enforcement proceedings."

20         Is there anything else?

21         MS. SIMMONS:  Your Honor, if you move to --

22         THE COURT:  Is there anything else in that

23    sentence?

24         MS. SIMMONS:  No, Your Honor.

25         THE COURT:  And then anything else in that

1    paragraph?

2              MS. SIMMONS:  No.

3              THE COURT:  All right.  Where?

4              MS. SIMMONS:  If you move to page 2702.

5              THE COURT:  All right.  Paragraph carryover or

6    paragraph beginning, "Indeed."

7              MS. SIMMONS:  The carryover paragraph,

8    Your Honor.

9              THE COURT:  Where?  Which line?

10             MS. SIMMONS:  The sentence beginning, "It

11   matters not."

12             THE COURT:  -- "how Judge Sullivan's order will

13   be regarded by overzealous regulatory agencies but rather

14   that such an order is not, in fact, a final order of the

15   Court on the merits changing a material aspect of the

16   legal requirements governing the agreement of the

17   parties."

18             Okay.  Is there anything else?

19             That's the effect of Judge Sullivan's order

20   language.  Okay.  Is that the *Otoe* order?

21             MS. SIMMONS:  That's the District Court one,

22   yes.

23             THE COURT:  Uh-huh.  All right.  Anything else?

24             MS. SIMMONS:  I believe that's all from that

25   e-mail, Your Honor.

1          THE COURT:  All right.  FF are we on?

2          MS. SIMMONS:  Yes.

3          THE COURT:  That's a Rosette dated October 13th

4   to Craig Colton at LST Financial.  What's this got to do

5   with anything?

6          MS. SIMMONS:  So for this one, Your Honor --

7          THE COURT:  It doesn't show that it goes to

8   Mr. Martorello on the address or the carbon copy

9   recipient.  So --

10          MS. SIMMONS:  Your Honor, on that one, it's

11   produced by MidMarch, which was an entity that was doing

12   diligence for consulting for Mr. Martorello.

13          THE COURT:  How does it connect to Martorello?

14          MS. SIMMONS:  The point is that he received a

15   copy of it.

16          THE COURT:  How do we know that?  It's not on

17   here.

18          MS. SIMMONS:  For this one, my understanding is

19   that plaintiffs are stipulating that he received it.  If

20   that's not correct, let me know.

21          MS. KELLY:  Not on this one.

22          MS. SIMMONS:  Not this one?  Okay.

23          So our position is --

24          THE COURT:  What proof is there that he received

25   it?

USCA4 Appeal: 23-2097   Doc: 11-6     Filed: 12/06/2023   Pg: 141 of 375
Case 3:17-cv-00461-REP  Document 1317  Filed 06/15/23  Page 72 of 228 PageID# 57023

286

1          MS. KELLY:  I mean --

2          THE COURT:  It can't inform his belief if he

3   didn't receive it and read it.  So what evidence is there

4   that he received it, Ms. Simmons?

5          MS. SIMMONS:  The evidence, Your Honor, is the

6   fact that MidMarch had it.  They couldn't have had it if

7   Mr. Martorello didn't have it in the first instance.

8          THE COURT:  And if a frog had wings, he wouldn't

9   hurt himself when he hopped.

10         Look, what's the evidence that he received it?

11  The fact that MidMarch received it doesn't prove that he

12  received it.  What evidence is there?  If there isn't any

13  evidence that he received it, I don't know how I can

14  consider it as informing his belief.

15         MS. SIMMONS:  Your Honor, that's all that I was

16  able to discern from the documents.

17         THE COURT:  All right.  I will not consider it.

18  There's no evidence that Martorello received it.

19         All right.  It can't be considered in my

20  assessment.

21         KK is next.  January 10, 2014, letter from

22  Rosette, and it doesn't say who the addressees are.

23         MS. SIMMONS:  It does not, Your Honor.  For

24  this --

25         THE COURT:  Do we know who the addressees are?

287

1          MS. SIMMONS:  I believe -- so this document is

2    discussed in the deposition of Karrie Wichtman, and she

3    discusses in there who received it.

4          THE COURT:  Well, how does she know who received

5    it?

6          MS. SIMMONS:  Because she's -- I mean, you can

7    look at the deposition transcript.  I had submitted it

8    with --

9          THE COURT:  What does the deposition transcript

10   say?  You can tell me.

11         MS. SIMMONS:  I had given the Court an excerpt

12   of it this morning at Exhibit 1.  Do you need another

13   copy?

14         THE COURT:  Well, I just want you to tell me

15   what part of it says that.  I've got the copy.  What part

16   of the thing says that Martorello received it?  What part

17   of the deposition?

18         MS. SIMMONS:  So on page 157, she says that

19   Payment Data Systems received it.

20         THE COURT:  Hold on.  Hold on.  Page 157.  We're

21   talking about Martorello hearing Exhibit 1; is that right?

22         MS. SIMMONS:  No, Your Honor.  That's the

23   Weddle.  I'm talking about the Wichtman -- the Wichtman

24   deposition excerpt that I handed to the Court earlier.

25         THE COURT:  I don't have that.  I have a -- I

288

```
 1   have a Weddle deposition.  I don't have any Wichtman

 2   deposition.  Do I?

 3             Do you have it?

 4             MS. MALONEY:  I'm looking.

 5             THE COURT:  At the beginning of the hearing, I

 6   don't think I got any.

 7             MS. SIMMONS:  Okay.

 8             THE COURT:  All right.  This is marked Exhibit 1

 9   of some kind.  What's it Exhibit 1 to?

10             MS. SIMMONS:  It's Exhibit 1 to this statement.

11             THE COURT:  Which statement?

12             MS. SIMMONS:  The chart, Your Honor.

13             THE COURT:  I don't have any such thing that

14   you're talking about.  Let me look.

15             This was handed up?  And I have exhibit -- no.

16   That's just the -- that's the list.  That's the new list.

17   And there wasn't an exhibit handed up with it.

18             MS. SIMMONS:  It should be binder clipped to it.

19             THE COURT:  But it isn't.

20             MS. SIMMONS:  Okay.  Well, I have another --

21             THE COURT:  So what you want me to -- take that

22   down.

23             Is this what it is that she -- that you're

24   talking about that you handed up entitled "Defendant Matt

25   Martorello's Supplemental Statement of Position Regarding
```

JA2524

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 144 of 375
Case 3:17-cv-00461-REP    Document 1317    Filed 06/15/23    Page 75 of 228 PageID# 57026

289

1    Good Faith Defense Pursuant to Order at Docket

2    Number 1247?

3              MS. SIMMONS:  It is, Your Honor.  We updated it

4    further.

5              I can't see the version that you have.  I

6    apologize.

7              THE COURT:  Well, I have the version that I have

8    has -- would you hand that to her, please?

9              I want to make sure I've got the right thing.

10   Ms. Maloney has a copy of that that has Exhibit 1 and 2,

11   but I don't have that.  I have what you handed up as

12   Exhibit 1, which is a deposition, but I don't have the

13   version of that document.  Does it have an ECF number at

14   the top?

15             MS. SIMMONS:  No, we didn't file it yet,

16   Your Honor.  We had intended to, and we'll do so after the

17   hearing, but we -- it hasn't been filed yet.

18             THE COURT:  All right.  Exhibit 1 is a two- or

19   three-page excerpt from a deposition of Karrie Wichtman.

20             MS. SIMMONS:  Yes.

21             THE COURT:  And what's Exhibit 2?

22             MS. SIMMONS:  Exhibit 2 is -- was an e-mail,

23   Your Honor, but it deals with a later document.

24             THE COURT:  Well, send me that back up.  You've

25   got that, do you?  Do you all have that?  Make sure you

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 145 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 76 of 228 PageID# 57027

290

1   got the -- we're talking about the same document.

2          Years ago, I was in a multi-district case of

3   great import.  In the middle of my examination of a

4   witness before Judge Merhige, he described that these

5   documents had been Payne-ized.

6          Twenty years later, I was reading another case

7   and I found out that Payne-ized had been coined as a word

8   of art for confused document.  The remedy to Payne-izing

9   is a completely knowledgable legal assistant who handles

10  the documents.  You need to get one.

11          All right.  Now -- do you have, Ms. Kelly, the

12  version -- the extant version of the supplemental

13  statement of position regarding good faith defense and its

14  Exhibit 1?

15          MS. KELLY:  I do, Judge.  I do.

16          THE COURT:  All right.

17          Now, the question on the table is what evidence

18  is there the letter at EE in the chart was ever seen by

19  Martorello.  And you tendered this deposition.  At what

20  page do I read?

21          MS. SIMMONS:  So at 157, she talks about this

22  specific letter.

23          THE COURT:  Wait just a minute.  All right.

24          Okay.  It's a letter dated January 10th of 2014.

25  So that's what we're talking about; is that right?

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 146 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 77 of 228 PageID# 57028

291

1              MS. SIMMONS:  Yes.

2              THE COURT:  And it's redacted in terms of who

3    it's addressed to.  But if you look at the first

4    paragraph, second sentence, "We appreciate your services

5    and thank you for providing payment processing services to

6    the tribe Duck Creek Financial, LLC, doing business as

7    Pepper Cash."  So this was sent to Duck Creek or who?

8    That doesn't tell me anything.

9              MS. SIMMONS:  It was sent on behalf of

10   Duck Creek to the payment processor.

11             THE COURT:  And who is that?

12             MS. SIMMONS:  It's -- it's Payment Data Systems.

13             THE COURT:  Okay.  So the addressee is Payment

14   Data Systems.  All right.

15             Now, what evidence is there that Mr. Martorello

16   received this or read it?

17             MS. SIMMONS:  So the question at the deposition

18   was -- if you look at page 159 of Exhibit 1.

19             THE COURT:  All right.

20             MS. SIMMONS:  And the question at line 10 was,

21   "Did you discuss these concepts with Mr. Martorello?"

22             And her response was, after trying to still

23   figure out who the letter was addressed to, was, "Over

24   time."

25             THE COURT:  But first, she says, "I don't know

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 147 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 78 of 228 PageID# 57029

292

1    who this was addressed -- I mean who was this cc'd to.

2    Yes, over time."

3                You mean that answer means that she discussed it

4    with Martorello over time?

5                MS. SIMMONS:  That's what she appears to be

6    saying in the deposition, that she discussed the concept

7    in this letter over a period of time.

8                THE COURT:  All right.  So what concepts did she

9    discuss?

10               MS. SIMMONS:  So if you look at the letter

11   itself --

12               THE COURT:  No.  What evidence is there in her

13   testimony about the concepts that she discussed with him?

14   There are a lot of concepts here in this document.  So

15   which ones -- is there any evidence of what she actually

16   discussed with him?

17               MS. SIMMONS:  So if you look further up on

18   page 158 -- excuse me.  If you turn back to -- turn back

19   to page 158.

20               THE COURT:  All right.

21               MS. SIMMONS:  And she's saying, on page 2 of the

22   letter --

23               THE COURT:  It's the third paragraph on page 2

24   of Exhibit EE.  Is that what we're on?

25               MS. SIMMONS:  KK, Your Honor.

USCA4 Appeal: 23-2097    Doc: 11-6       Filed: 12/06/2023    Pg: 148 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 79 of 228 PageID# 57030

293

1              THE COURT:  KK.  "Okay.  Turn to page 2 in this

2   paragraph, again, right above the background on LVD

3   Lending Enterprises, the 2(b) paragraph."  Okay.  So what?

4              MS. SIMMONS:  And then she says that it's

5   accurate at the time, and she believes it was accurate

6   today.

7              And then if you go to page 8 of the letter, the

8   Conclusion paragraph.

9              THE COURT:  Page 8 of the letter, Conclusion,

10  uh-huh.

11             So what?  I mean, you're asking her if she

12  thinks it's accurate.

13             The question is did she discuss these concepts

14  with Martorello?

15             And she's very indefinite about it.  Then she

16  says, "Yes, over time."

17             But my question is is there anything in this

18  deposition transcript, Exhibit 1 to the supplemental

19  statement of position about good faith, that shows what

20  concepts she discussed with Martorello?

21             MS. SIMMONS:  So the concepts that were

22  discussed at the deposition were the ones that I just

23  highlighted to the --

24             THE COURT:  That isn't what I asked you.  I said

25  is there anything that says which concept was discussed

294

1    with Martorello?  There's a lot in here.  It's 8 pages of

2    concept.

3              MS. SIMMONS:  And the deposition --

4              THE COURT:  And depending upon what was

5    discussed with him, it may or may not be pertinent to

6    informing the view of things.

7              MS. SIMMONS:  So during the deposition, she said

8    the concepts that were being discussed were the ones that

9    I highlighted to the Court on page 2 and page 8 of the

10   letter, and she said these concepts.

11             THE COURT:  She does not say that in this

12   excerpt that I have.  Is it somewhere else in another

13   excerpt?

14             MS. SIMMONS:  On page 159 at line 10, lines 10

15   to 13 are what we were referencing.

16             THE COURT:  Yeah, these concepts.  We don't have

17   a definition of what these concepts were.

18             MS. SIMMONS:  And, again, I'd submit --

19             THE COURT:  She said that a fair inference is

20   that the concepts means the conclusion?  Is that what

21   you're trying to tell me?

22             MS. SIMMONS:  Yes, that's the fair --

23             THE COURT:  What's your man going to say?

24   You've got a witness.  You know what he says.  What's he

25   going to say?  That he discussed the conclusion with her.

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 150 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 81 of 228 PageID# 57032

295

1  Does he say that?

2        MS. SIMMONS:  Well, depending on what the Court

3  allows him to say, he's going to say that he discussed

4  concepts like this that are contained in all of these

5  various documents.

6        THE COURT:  That is not the question.  That is

7  not the question.  And I don't care.  He's not going to

8  come in here and testify that he did concepts like this.

9  He's going to say that he discussed with her the concepts

10  reflected in the Conclusion section.  Then we know what

11  he's talking about.

12        Listen, this guy will say anything, and I -- he

13  needs to be specific about what he's saying so we can

14  understand what he's saying.

15        MS. SIMMONS:  And we understand the Court on

16  that.

17        THE COURT:  Is he going to say that?  Because if

18  you add her testimony and his, if he says that, then

19  that's evidence that he discussed what's in the Conclusion

20  with her.

21        MS. SIMMONS:  The Conclusion and the paragraph

22  on page 2, Your Honor, yes.

23        THE COURT:  Well, she doesn't say.  She doesn't

24  say she discussed the paragraph -- the natural reading of

25  the questioning, did you discuss these concepts with

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 151 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 82 of 228 PageID# 57033

296

1    Martorello is that there's an antecedent question, and the

2    antecedent question is the Conclusion paragraph.

3              MS. SIMMONS:  He'll say yes, Your Honor.

4              THE COURT:  All right.

5              Now, what part of the Conclusion paragraph

6    supports his informed belief as reflected in ECF 1257.

7              MS. SIMMONS:  The underlined sentence.

8              THE COURT:  All right.  "Under applicable tribal

9    law, DCTF's activities are legal and the process -- proper

10   basis for delivery of consumer finance products to

11   consumers," right?

12             MS. SIMMONS:  Yes.

13             THE COURT:  Okay.

14             MS. SIMMONS:  And the final sentence,

15   Your Honor.

16             THE COURT:  And the final sentence begins?

17             MS. SIMMONS:  "It follows."

18             THE COURT:  "It follows that unless and until

19   Congress explicitly abrogates tribal sovereignty in the

20   arena of short-term online lending, loans made by Indian

21   tribes within their sovereign powers and pursuant to

22   tribal authority, procedures and regulations should --

23   should be deemed lawful."

24             All right.  I've got those.

25             All right.  I gotcha.  I understand what we're

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 152 of 375
Case 3:17-cv-00461-REP    Document 1317    Filed 06/15/23    Page 83 of 228 PageID# 57034

297

1    saying.

2              Basically, she thinks tribal law applies and is

3    lawful for consumer finance products, and she told him

4    that, based on this.

5              All right.  So leads us to the next exhibit.  Is

6    that LL?

7              MS. SIMMONS:  It is, Your Honor.

8              THE COURT:  And that's another one that's not --

9    not addressed.  The address is redacted.  To who is -- to

10   whom is it addressed?  Mr. Louis Hoch, president and COO

11   of what?

12             MS. SIMMONS:  I believe it's also Payment Data

13   Systems.

14             For this one, Your Honor --

15             THE COURT:  It's what?

16             MS. SIMMONS:  I believe that's also Payment Data

17   Systems.

18             THE COURT:  Alto, A-L-T-O?

19             MS. SIMMONS:  Also Payment Data Systems.

20             THE COURT:  Two words, Also Payment or one word?

21             MS. SIMMONS:  The prior letter was to Payment

22   Data Systems.  This one is as well.

23             MR. GIVEN:  In addition.

24             MS. SIMMONS:  In addition.

25             THE COURT:  All right.  And what evidence is

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 153 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 84 of 228 PageID# 57035

298

 1  there that -- there's no connection between Mr. Martorello

 2  and Payment Data Systems.

 3          MS. SIMMONS:  We were not able to locate an

 4  e-mail in the record for this one.

 5          THE COURT:  So this one is not shown to go to

 6  Martorello?

 7          MS. SIMMONS:  Correct.  We were not able to

 8  locate that.

 9          THE COURT:  All right.

10          All right.  That brings us to MM.

11          MS. SIMMONS:  Yes.

12          THE COURT:  A memo -- is it warm in here to you

13  all, stuffy?

14          MR. GIVEN:  It is.

15          THE COURT:  Could you see if they could do

16  something to let us have some air?

17          All right.  MM, Tribal Lending Client from

18  Rosette, January 22, 2014.  Summary of *People v. MNE*.

19  Okay.  So what about this?

20          MS. SIMMONS:  So, Your Honor, for this one, the

21  parties stipulate that there is a cover e-mail that shows

22  that Martorello received this.

23          THE COURT:  All right.  Is that right?

24          MS. KELLY:  That's correct, Judge.

25          THE COURT:  And what part of it informed his

USCA4 Appeal: 23-2097 Doc: 11-6 Filed: 12/06/2023 Pg: 154 of 375

299

1   belief as set forth in 1275, what part of the document, so

2   I can know what we're talking about?

3          MS. SIMMONS:  So the -- the section of the memo

4   that says that --

5          THE COURT:  Page?

6          MS. SIMMONS:  Bates stamp 6117.

7          THE COURT:  6117.  That's the second page of it?

8          MS. SIMMONS:  Yes.

9          THE COURT:  Okay.  And where?

10         MS. SIMMONS:  So it's the section that says

11  that --

12         THE COURT:  What paragraph, starting with?  That

13  directs me to --

14         MS. SIMMONS:  The header begins 1.

15         THE COURT:  All right.

16         MS. SIMMONS:  And it says, "The California Court

17  of Appeal expressly states that revenue sharing between

18  tribes and their lending parities has no impact on whether

19  an entity is an arm of the tribe."

20         THE COURT:  And so that doesn't help me much

21  understand how it informs his belief on anything.  So

22  could you help me?

23         MS. SIMMONS:  My understanding is that

24  Mr. Martorello will testify that something like this

25  informed his understanding that the -- that the revenue

1  split in his servicing agreement with Red Rock is

2  consistent with this concept.

3          THE COURT:  So what?  Why does that -- why does

4  that inform the belief at the beginning of the

5  statement -- at the paragraph at the beginning of page 1,

6  1275, that it's legal, as opposed to equitable?  I don't

7  understand how it's relevant.

8          MS. SIMMONS:  If the entities -- the tribal

9  lending entities were arms of the tribe, that would

10  support the position that tribal law rightfully applies to

11  the consumer loans.

12          THE COURT:  Oh, so this shows that tribal law

13  applies?  That's what the purpose is is to show that

14  tribal law applies.

15          I don't discern that from this heading, but if

16  that's what you're saying it's being offered for, I'll

17  understand what you're saying.  So that's tribal law

18  applies.  All right.

19          And what part of any -- is there any part other

20  than the heading number 1 that goes to that end?  I

21  understand how it relates to his belief now.  So is there

22  anything else in this document other than number 1?

23          MS. SIMMONS:  The fact that --

24          THE COURT:  Page?

25          MS. SIMMONS:  The next page --

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 156 of 375
Case 3:17-cv-00461-REP    Document 1317    Filed 06/15/23    Page 87 of 228 PageID# 57038

301

```
 1                THE COURT:  Paragraph?  What?

 2                MS. SIMMONS:  The next page, Your Honor.  6118.

 3                THE COURT:  All right.

 4                MS. SIMMONS:  And the heading itself, number 2.

 5                THE COURT:  "The Court appears to have provided

 6   an objective arm of the tribe test, rather than a

 7   subjective test, to determine whether the lending entities

 8   were entitled to sovereign immunity."  Why does that go to

 9   the tribal law applicability?

10                MS. SIMMONS:  So if you look at the paragraph

11   underneath the numbers, Your Honor --

12                THE COURT:  Give me the --

13                MS. SIMMONS:  -- the bottom paragraph of 6118.

14                THE COURT:  "With this holding"?

15                MS. SIMMONS:  Yes.

16                THE COURT:  "With this holding, the Court

17   provides a set of criteria for tribal entities in order

18   for them to avoid state regulatory authority.  It is our

19   opinion that all the lending clients are properly

20   structured to meet these three prongs."

21                So, again, that's that tribal law applies; is

22   that right?

23                MS. SIMMONS:  Yes.

24                THE COURT:  Okay.

25                All right.  There --
```

JA2537

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 157 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 88 of 228 PageID# 57039

302

 1           MS. SIMMONS:  Or rather, that state law does not

 2   apply.

 3           THE COURT:  Well, the three prongs that are

 4   articulated in the preceding section all talk about tribal

 5   law.  So it's both that tribal law applies and state law

 6   doesn't; is that right?

 7           MS. SIMMONS:  Yes.

 8           THE COURT:  All right.  Is there any other part

 9   of this document that is pertinent to inform his belief on

10   that or any other forms?

11           MS. SIMMONS:  Page 6119.

12           THE COURT:  Which paragraph?

13           MS. SIMMONS:  The second paragraph under point

14   heading 3 that begins, "Hence."

15           THE COURT:  3 is, "This decision weakens

16   de facto lender theories against non-trial third parties.

17   Hence, to the extent a state's de facto lender theory

18   rests on the fact that the non-tribal third party receives

19   the bulk of the profits, the theory is much weaker as a

20   result of this case."

21           So is that -- what is that as to the

22   applicability of tribal law and not state law again?

23           MS. SIMMONS:  Yes, Your Honor.  It supports the

24   theory that the economics, again, in the servicing

25   agreement, would not have been a basis to set aside the

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 158 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 89 of 228 PageID# 57040

303

1    ability of the tribes to lend under their own law.

2              THE COURT:  Okay.  So it's that the split does

3    not itself render the lending operation non-tribal in

4    nature and so it -- this goes to support the view that

5    tribal law applies?

6              MS. SIMMONS:  We think so, Your Honor.

7              THE COURT:  All right.  Gotcha.  I understand

8    that.

9              All right.  That brings -- anything else in this

10   document?

11             MS. SIMMONS:  No, Your Honor, I don't think so.

12             THE COURT:  All right.  That brings us to

13   document CCC.  What part of this document goes to inform

14   his belief as articulated on the first page of ECF 1275?

15             MS. SIMMONS:  So it -- it's an e-mail itself to

16   Mr. Martorello.  So he received it, and then if you turn

17   to page --

18             THE COURT:  This is from Wichtman to Justin

19   Martorello, not Matt Martorello.

20             MS. SIMMONS:  He's in the CC line.

21             THE COURT:  Who's in the CC line?

22             MS. SIMMONS:  Mr. Martorello's name appears in

23   the CC line.

24             THE COURT:  Okay.  I see.  You're right.

25             All right.  So what do we do?  What part of it

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 159 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 90 of 228 PageID# 57041

304

 1   informs his belief?  Anything in the e-mail?

 2            MS. SIMMONS:  Not the e-mail itself.

 3            THE COURT:  All right.  Then we go to the

 4   document which is attached to the e-mail, which is -- just

 5   a minute -- a document Tribal Lending Clients, April 14,

 6   2015, Federal and State Lending Strategy, letter from

 7   Rosette.  Is that what we're talking about?

 8            MS. SIMMONS:  It is, Your Honor.

 9            THE COURT:  All right.  Where in here -- what in

10   this document informs that belief?

11            MS. SIMMONS:  So for this one, it -- it's the

12   fact that the tribe was engaging with the Consumer

13   Financial Protection Bureau and with the Department of

14   Justice.

15            THE COURT:  Why does that inform his belief that

16   tribal law applies and that it's legal?

17            MS. SIMMONS:  That these entities were aware of

18   the tribal lending operations and weren't taking adverse

19   action against these tribal entities.

20            THE COURT:  Does it say that?  I haven't read

21   all of it.  I've seen this memo before, but I don't

22   remember in the context and I don't know the parts of it.

23   So tell me where it says that.

24            MS. SIMMONS:  The memo itself just talks about

25   the various strategies.  We're saying that Mr. Martorello

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 160 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 91 of 228 PageID# 57042

305

1    will testify that the fact of these types of activities,

2    the fact that the tribe was openly working with the CFPB,

3    openly discussing these issues demonstrates his

4    understanding that these were legal, those entities --

5              THE COURT:  And that tribal law applied.

6              MS. SIMMONS:  Yes.  Stated in the inverse --

7              THE COURT:  Wait.  Wait.  Wait.

8              MS. SIMMONS:  Yes.

9              THE COURT:  That who's working with these?

10             MS. SIMMONS:  Rosette LLP.

11             THE COURT:  The fact that Rosette is working

12   with whom?

13             MS. SIMMONS:  The tribal lending entities.

14             THE COURT:  Tribal lending entities or the

15   regulatory entities?

16             MS. SIMMONS:  So the fact that Rosette was

17   working with the regulatory authorities presenting --

18             THE COURT:  Wait a minute.  The fact that

19   Rosette, working for the tribal lending entities, is

20   working with the regulatory agencies.  What regulatory

21   agencies?

22             MS. SIMMONS:  The ones that are referenced in

23   the memo itself are --

24             THE COURT:  What are they?

25             MS. SIMMONS:  There's headings.  So if you look

JA2541

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 161 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 92 of 228 PageID# 57043

306

1   at the --

2           THE COURT:  There's the Consumer Finance

3   Protection Bureau.  Who else?

4           MS. SIMMONS:  The Department of the Interior.

5           THE COURT:  All right.  Anybody else?

6           MS. SIMMONS:  And it says the Senate Committee.

7           THE COURT:  Anybody else?

8           MS. SIMMONS:  It says the White House, but I'm

9   not -- I have not seen documents showing that Rosette was

10  reaching out to the White House.  So --

11          THE COURT:  No.  Okay.  White House maybe.

12  Okay.  And it shows what?

13          MS. SIMMONS:  That they were engaging in these

14  efforts.

15          THE COURT:  Okay.  It shows they are engaging in

16  these efforts, but what is showing they are engaging in

17  these efforts go to prove that's relevant to his informed

18  belief?

19          MS. SIMMONS:  The fact this these efforts were

20  being engaged in with the federal government on a

21  government-to-government basis informed Martorello's

22  belief that what the tribe was doing was not unlawful.

23          THE COURT:  That tribal law applied?

24          MR. GIVEN:  Yes.

25          MS. SIMMONS:  Yes.

USCA4 Appeal: 23-2097      Doc: 11-6      Filed: 12/06/2023      Pg: 162 of 375

307

1           THE COURT:  Okay.  I see.

2           And there's no particular statement in here to

3  that effect.  It's just that Martorello will testify; is

4  that right?

5           MS. SIMMONS:  Yes.

6           THE COURT:  So this requires foundation if it's

7  to come in, right?

8           MS. SIMMONS:  Yes.

9           THE COURT:  Foundation that he testified he read

10  it and understood it that way.  So it needs foundational

11  evidence.  In other words, the document by itself doesn't

12  show any such thing as what you're saying, but you might

13  get it in if he testifies.

14           MS. SIMMONS:  Yes.

15           THE COURT:  Okay.

16           MS. SIMMONS:  And then if you go to page 1003 of

17  that same document.

18           THE COURT:  Uh-huh.

19           MS. SIMMONS:  Under the State Strategy.

20           THE COURT:  Uh-huh.

21           MS. SIMMONS:  It says, "California and New

22  Mexico."

23           THE COURT:  What about it?

24           MS. SIMMONS:  It says, "The MOUs between the

25  tribes and New Mexico Attorney General's Office."

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 163 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 94 of 228 PageID# 57045

308

1            THE COURT:  What about it?

2            MS. SIMMONS:  So Mr. Martorello will testify

3    that the fact that the tribe entered into a memorandum of

4    understanding with the state of New Mexico that would

5    permit government-to-government regulations supported his

6    belief that tribal law applied.

7            THE COURT:  All right.  I see.

8            All right.

9            MS. SIMMONS:  And that's all for that one,

10   Your Honor.

11           THE COURT:  GGG.

12           MS. SIMMONS:  Correct.

13           THE COURT:  This is a letter from Rosette

14   November 3, 2015, to the Chippewa Valley Bank.

15           MS. SIMMONS:  For that one, Your Honor, we were

16   not able to identify anything in the record as of this

17   date that shows Mr. Martorello received this one.

18           THE COURT:  All right.

19           HHH this is another Rosette letter to Amlaur

20   Credit Resources dated December 30th, 2015.  Have we got

21   proof that it went to Martorello?

22           MS. SIMMONS:  For this one, plaintiffs stipulate

23   that Mr. Martorello received it.

24           THE COURT:  Stipulation?

25           MS. SIMMONS:  Yes.

1          THE COURT:  All right.  And what in here informs

2    his belief?

3          MS. SIMMONS:  So this letter is an opinion

4    letter to this hedge fund, and it goes through the various

5    documents that they -- that Rosette reviewed in drafting

6    this opinion.

7          THE COURT:  So which informs his belief?  There

8    are a lot of words in here.  And I can't make the -- an

9    awful lot of them that I have read quickly don't do that.

10          MS. SIMMONS:  So if you go to the final -- well,

11    the page of the letter Bates-stamped 11626.

12          THE COURT:  Uh-huh.

13          MS. SIMMONS:  And it's paragraphs 8, 9 and 10.

14          THE COURT:  Roman numeral?

15          MS. SIMMONS:  Roman numerals, yes.

16          THE COURT:  Okay.

17          MS. SIMMONS:  Rather, just the first couple

18    sentences of that particular paragraph, and then the

19    entirety of IX and X.

20          THE COURT:  What?

21          MS. SIMMONS:  I'm saying that it's not all of

22    paragraph VIII.  It's just the first sentences.

23          THE COURT:  "Borrower is an economic development

24    arm, instrumentality, and limited liability company wholly

25    owned and operated by the tribe.  The tribe is a federally

1 recognized Indian tribe and enjoys tribal sovereign

2 immunity."  Is that it?  Is that what you're talking

3 about?

4            MS. SIMMONS:  And then the next sentence as

5 well.

6            THE COURT:  "As an economic development arm of

7 the tribe, borrower enjoys tribal immunity."  That doesn't

8 show that tribal law applies.

9            MS. SIMMONS:  So if you --

10           THE COURT:  That has to do with the federal

11 sovereign immunity law.

12           MS. SIMMONS:  And so those conclusions are in

13 paragraphs IX and X.

14           THE COURT:  "Borrower has been licensed to

15 engage in consumer lending."

16           And they are enforceable under tribal law.

17           So this all goes to the applicability of tribal

18 law, then; is that right?

19           MS. SIMMONS:  Yep.

20           THE COURT:  All right.

21           All right.  All right.  Then we go to JJJ.  And

22 that's to Eventide, which is one of Mr. Martorello's

23 companies.  Any evidence he received it?

24           MS. SIMMONS:  I'm sorry?

25           THE COURT:  Is there any evidence he got this?

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 166 of 375
Case 3:17-cv-00461-REP  Document 1317  Filed 06/15/23  Page 97 of 228 PageID# 57048

311

```
 1              MS. SIMMONS:  It's Bates-stamped.  I don't think
 2  plaintiffs are arguing that he didn't receive this
 3  particular letter.
 4              THE COURT:  Do you stipulate he received it?
 5              MS. SIMMONS:  I don't want to --
 6              MS. KELLY:  It was produced by Mr. Martorello.
 7              THE COURT:  Say what now?  I missed it.
 8              MS. KELLY:  It was produced by Mr. Martorello.
 9  So we assume that he had possession of it at some point.
10              THE COURT:  So you stipulate that he received
11  it?
12              MS. KELLY:  Correct.
13              THE COURT:  And what part of it goes to inform
14  his belief, as set forth in the first page of ECF 1275?
15              MS. SIMMONS:  So, again, Your Honor, this letter
16  also goes through the numerous documents that Rosette
17  reviewed.
18              THE COURT:  I want to know what text in here
19  does it.
20              MS. SIMMONS:  So --
21              THE COURT:  Tell me the text.
22              MS. SIMMONS:  So beginning with -- at the bottom
23  of page 1, the merger agreement.  The fact that they --
24  I'm trying to lay the foundation for why the later
25  portions of the letter would have informed his belief.
```

1              THE COURT:  I don't want to know about why they

2    informed his belief --

3              MS. SIMMONS:  Okay.

4              THE COURT:  -- at this stage.  I want to know

5    what part of it did inform his belief.  Then we can get

6    into why.  So tell me that first thing.  What part of the

7    letter informs his belief?  That's what we're dealing

8    with.

9              I mean, I see a number of places where there's

10   reference to tribal law of all kinds here.  He gives

11   opinions on page -- beginning at the bottom of 7915 and

12   continuing to midway through 7918, and they seem all to me

13   to be pertinent to the question that tribal law applies.

14   Is that what you're offering -- is that -- are they the

15   ones?

16             MS. SIMMONS:  Yes, Your Honor.  All of these

17   opinions would support because it's showing the proper

18   formation of these entities that would permit tribal law

19   to apply.

20             THE COURT:  And then how about, "The foregoing

21   opinions subject to the following exceptions,

22   qualifications and limitations"?  Because that qualifies

23   all of it.

24             And it says in there, at page 7918, that, "Our

25   opinions only apply to the loan documents," and describes

1    what they are.  "Our opinion specifically does not apply

2    to any other agreement referenced therein being executed,

3    delivered or for which performance is required by another

4    party."

5            And then it says, "We express no opinion as to

6    the laws of any jurisdiction other than the included

7    laws."

8            Again, that seems to me to be that tribal law

9    applies.  Is that what -- is that the part of it we're

10   talking about?  There's a whole lot of disclaimers after

11   that that go on for pages.  Is there any disclaimer that

12   backs off of any of the opinions or that affects them?

13           MS. SIMMONS:  Not that I saw, Your Honor.  The

14   opinions themselves support Mr. Martorello's belief.

15           THE COURT:  Okay.  So it's these opinions are

16   that tribal law applies and the loans are lawful under

17   tribal law; is that right?

18           MS. SIMMONS:  Yes, Your Honor.

19           THE COURT:  All right.  That brings us to MMM,

20   the last document from something.  It's to Matt Martorello

21   from Rick Hackett.  What is Hudson Cook, LLP?  It's a law

22   firm somewhere?

23           MS. SIMMONS:  Yes, Your Honor.

24           THE COURT:  And this is History of Federal

25   Regulatory Intervention in Small Dollar Lending.

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 169 of 375
Case 3:17-cv-00461-REP  Document 1317  Filed 06/15/23  Page 100 of 228 PageID# 57051

314

1            Okay.  So what is it that informs his belief as
2   expressed on the first page of 1275?
3            MS. SIMMONS:  So if you look, Your Honor, to the
4   paragraphs beginning underneath Summary Conclusions.
5            THE COURT:  Okay.  Hold on.  Let me get there.
6   And the "Beginning in the late fall," or what?
7            MS. SIMMONS:  Yes, those photographs.
8            THE COURT:  What part of that paragraph?
9            MS. SIMMONS:  Can I briefly provide Your Honor
10  just a background of what this memo is?
11           THE COURT:  Yes, but --
12           MS. SIMMONS:  I understand we have to get the
13  business of the specific part, but I feel like the
14  background would be helpful.
15           THE COURT:  Well, doesn't it say what this is?
16           MS. SIMMONS:  So this is a memo talking about
17  the history of federal regulation in small dollar lending.
18  But in particular, it talks about the federal government's
19  actions during Operation Chokepoint.
20           THE COURT:  Yep.
21           MS. SIMMONS:  And it's discussing that,
22  generally speaking, the -- the -- that Operation
23  Chokepoint was -- sorry.  I'm just looking for the
24  paragraph.
25           THE COURT:  As I read it, he's saying Operation

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 170 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 101 of 228 PageID# 57052

315

1   Chokepoint was premised on the basis that the tribal

2   lending was not lawful and it impacted the industry and

3   they have not recovered from the activities that began in

4   the fall of 2013, and he's writing as of 2017.  That's the

5   way he read it, what I've read so far.  Is there more?

6               MS. SIMMONS:  So --

7               THE COURT:  I don't know how this informs his

8   belief that tribal law applies, given that Operation

9   Chokepoint is essentially premised on the notion that it

10  is not.  Maybe you can help me.

11              I think it sets the background for what

12  Operation Chokepoint was, but I don't think it informs his

13  belief as set forth in the first page of 1275.

14              MS. SIMMONS:  May I confer with my colleagues

15  just a moment, Your Honor?

16              THE COURT:  Yeah.  Sure.  This is a document I

17  have read before.  It takes a while to trigger it in my

18  mind.

19              MS. SIMMONS:  Thank you, Your Honor, for just

20  the moment.

21              So if you turn to page 11676.

22              THE COURT:  Yes.

23              MS. SIMMONS:  And if you look at the third

24  paragraph underneath the chart.

25              THE COURT:  "Thus, by January 2016."

USCA4 Appeal: 23-2097   Doc: 11-6     Filed: 12/06/2023   Pg: 171 of 375
Case 3.17-cv-00461-REP  Document 1317  Filed 06/15/23  Page 102 of 228 PageID# 57053

316

1          MS. SIMMONS:  Yes.

2          THE COURT:  All right.  Let me look at it.

3          "Thus, by January 2016, it was reasonable to

4    conclude, and the market had concluded, that the threat

5    presented by Operation Chokepoint had run its course, or

6    was at least manageable."

7          MS. SIMMONS:  Yes, Your Honor.

8          THE COURT:  What does that inform with respect

9    to the opinion -- his belief that the tribal lending law

10   applied and that the loans were legal?

11         MS. SIMMONS:  That the Operation Chokepoint was

12   targeting various entities to push them out of business

13   and that it had not specifically resulted in Red Rock --

14   well, at the time Operation Chokepoint was happening, it

15   began with Red Rock and then it moved to Big Picture.

16         THE COURT:  So?  What does that show on what he

17   says his belief is?  I mean, it shows that the Chokepoint

18   tried but didn't succeed in shutting them down, but why

19   does that show that tribal law applies or that it's legal?

20   It just means that the government effort didn't succeed,

21   in this man's view.

22         MS. SIMMONS:  That the -- because it supported

23   his understanding that the activities were not unlawful.

24         THE COURT:  How?  I understand you're saying

25   that.  I'm saying how does it do that?  In other words,

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 172 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 103 of 228 PageID# 57054

317

 1   connect the logic of it to me.  I don't see how it does

 2   it.

 3            MS. SIMMONS:  We submit that the -- that the --

 4            THE COURT:  That a government agency tried and

 5   failed doesn't necessarily mean anything to me.  And if

 6   it's marginally probative of that, then you've got to

 7   consider whether -- what that does.  I mean, what does

 8   that do?  That means that you consider letting that

 9   evidence in.  And if that evidence is in, then you

10   consider, under Rule 403, what that does to the case.  And

11   so I'm having trouble.  I see no relevance to it at all.

12            MS. SIMMONS:  So, Your Honor --

13            MR. GIVEN:  Can I just confer quickly?

14            MS. SIMMONS:  So, Your Honor, there will be

15   other evidence that will be submitted that will show part

16   of it is the expert testimony of Todd Zywicki that will

17   show that not only -- that Congress and the CFPB itself --

18   and I believe also the -- I'm sorry -- the DOJ and the

19   FDIC themselves said that Operation Chokepoint was an

20   inappropriate action by the federal government and they

21   shouldn't have been undertaking those actions.

22            THE COURT:  So what?  What does that prove?

23   That somebody said that.  Even if you can get that in,

24   what does it prove?

25            MS. SIMMONS:  That Operation Chokepoint, in and

1  of itself, didn't --

2          THE COURT:  But that's Operation Chokepoint.

3  That's not whether the tribal law applied or the loans

4  were lawful.  That's that somebody made an administrative

5  decision to go the wrong way in enforcing the law.

6          MS. SIMMONS:  Okay.  So, Your Honor, we would

7  respectfully request to be able to use this particular

8  document for rebuttal.

9          THE COURT:  Well, you can hold it for rebuttal

10  and offer if, in fact, it comes in, but it's not relevant

11  to his belief.

12          MS. SIMMONS:  Understood, Your Honor.

13          THE COURT:  Substantively, it's not relevant.

14  And if it is, it raises such additional issues as to

15  protract the trial, confuse the jury, and create the

16  possibility of severe prejudice that would overcome the

17  marginal probative value of the evidence proffered.

18          All right.

19          MS. SIMMONS:  The last part, Your Honor, is the

20  sentence on page 11677.

21          THE COURT:  One what?

22          MS. SIMMONS:  11677.

23          THE COURT:  All right.  Where is that?

24          MS. SIMMONS:  It says, "We understand your

25  ultimate conclusion to be was it reasonable to predict

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 174 of 375
Case 3.17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 105 of 228 PageID# 57056

319

1  this outcome in January 2016?  We believe a knowledgeable

2  observer of the regulatory interaction at that time would

3  say yes."

4           THE COURT:  To predict what action?  I don't

5  understand.  To predict --

6           MS. SIMMONS:  So the prior paragraphs are

7  talking about the CFPB's rulemaking authority.  And my

8  understanding is that there were some concerns that the

9  CFPB was going to enact rules that would effectively

10 prohibit tribal lenders from operating.

11          THE COURT:  Uh-huh.

12          MS. SIMMONS:  And then they ultimately did not

13 do so.

14          THE COURT:  The same ruling:  It doesn't have

15 anything to do the applicability of -- it's relevant -- if

16 it even has marginal relevance to his belief, it is so

17 substantially prejudicial under 403 it stays out for the

18 same reasons I articulated as to the first "Thus, by

19 January 2016," et cetera, provision.

20          Okay.  That takes care of all of those.

21          Now, that leaves us, I believe, with what,

22 having to do?

23          MR. GIVEN:  Motions in limine, the defendant's

24 motions in limine.

25          THE COURT:  Yes, in just a minute.  I need to

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 175 of 375
Case 3.17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 106 of 228 PageID# 57057

320

1   see what we're doing there.

2            MS. KELLY:  Judge, if I could --

3            THE COURT:  Wait a minute.

4            MS. KELLY:  Okay.  Sorry.

5            THE COURT:  Defendant's motions in limine are,

6   (1), Martorello's omnibus nonexpert motion in limine 1185;

7   is that right?

8            MR. GIVEN:  1186 is the memorandum of law that

9   actually is where they are laid out.

10           THE COURT:  Right.  But 1185 is the motion?

11           MR. GIVEN:  Yes.

12           THE COURT:  I have a note on this that says

13  "where is the draft?"

14           Was there a draft of this that got filed or is

15  this Document 1185 and its support 1186, is that all --

16           MR. GIVEN:  1185 was simply the motion.  We

17  believe it did get filed, but, again, that was -- the

18  operative document where we have the discussion is 1186.

19           THE COURT:  I understand that.  So there's no

20  draft?  I've got the final document here?

21           MR. GIVEN:  Yes.  That's my understanding.

22           THE COURT:  All right.  Have we completely

23  finished with plaintiffs' motions for summary judgment?

24           MR. GUZZO:  We have, Your Honor.

25           THE COURT:  All right.

321

```
 1              All right.  Let's now look at the defendant's
 2   omnibus nonexpert motion in limine and its supporting
 3   brief and response, and that would be ECF 1185, 86,
 4   plaintiffs' response 1199, Martorello's reply 1231; is
 5   that right?
 6              MR. GIVEN:  Correct, Your Honor.
 7              May I proceed?
 8              THE COURT:  Please.
 9              MR. GIVEN:  Motion in limine number 1 is that
10   counsel shall not solicit evidence or make argument
11   regarding pejorative phrases such as rent-a-tribe,
12   rent-a-bank or scheme, and we believe that doing so would
13   violate both Rule 401 and 403 of the Federal Rules of
14   Evidence.
15              And as we note in the briefing, the Advisory
16   Committee Notes to Rule 403 make clear that use of
17   inflammatory phrases suggest a decision on an improper
18   basis commonly, though not necessarily, an emotional one.
19   Accordingly, the Court should grant this motion and
20   preclude plaintiffs from soliciting evidence or making
21   arguments of this pejorative nature.  It's not relevant
22   and it's purely inflammatory.
23              THE COURT:  I find that to be a really
24   remarkable argument in the face of the complaint in the
25   case and all the evidence in the case, and the basic
```

1  evidence is that there was such a thing as a rent-a-bank

2  organization.  The rent-a-bank organization got shut down

3  and it led to the rent-a-tribe organization.

4         I don't think you can discuss any of the

5  evidence in this case, any of the memos in this case

6  without having some understanding of that fundamental

7  concept, which permeates the complaint, the answer and

8  virtually all the briefs, and much of the testimony.

9         MR. GIVEN:  What about the word scheme?

10        THE COURT:  That's different.

11        MR. GIVEN:  Okay.

12        THE COURT:  What about -- we'll deal with that

13  and see what they say about scheme.  But as to the

14  rent-a-tribe and rent-a-bank, that's just part and parcel

15  of the evidence in the case, and I can give some kind of

16  limiting instruction that that's a short form description

17  for a particular set of circumstances, and you all can

18  tender that instruction, review it and I'll be glad to do

19  it and tell them they are to draw no adverse inference

20  from the use in the documents or the testimony of the use

21  of the terms themselves.

22        As to scheme, I don't know what the position is

23  of the plaintiffs.  It looks like to me like they don't

24  really want to use the word scheme or not.  They use

25  enterprise.  So anyway, at this point, that's motion in

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 178 of 375
Case 3.17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 109 of 228 PageID# 57060

323

1    limine number 1.

2              What have you got to say, Ms. Kelly, on scheme?

3              MS. KELLY:   Judge --

4              THE COURT:   Is that -- has that got a number to

5    it or is that motion in limine 1?

6              MS. KELLY:   It's part of motion in limine 1.

7              THE COURT:   Yeah, motion in limine 1.

8              MS. KELLY:   When we briefed it, we believed that

9    the evidence supports the use of the term scheme.   We

10   noted that Judge Orrick in *Brice* allowed us to use the

11   word scheme there.

12             The evidence supports it, and we don't think the

13   Court should exclude the use of the word.   However, as --

14   in terms of the rent-a-tribe or rent-a-bank, we're aware

15   that some people -- Native American tribes consider

16   rent-a-tribe to be pejorative in some senses.

17             THE COURT:   Oh, you mean politically correct?

18   That's not what we are talking about.   We're talking about

19   how a -- that's used in all of the authority.

20             MS. KELLY:   That's right.

21             THE COURT:   If that offends somebody, I'm sorry,

22   but that's -- that distorts the basic record in this case,

23   the issues in the case law, and it's -- I'm not going to

24   make a decision of relevance on the basis of the fact that

25   somebody might get their feelings hurt because of the use

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 179 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 110 of 228 PageID# 57061

324

1  of the tribe -- of rent-a-tribe or rent-a-bank.  I mean,

2  it isn't pejorative related to the fact of Native

3  Americans at all.  It is simply a description of a

4  financing vehicle.  That's all it is.

5          MS. KELLY:  I understand.  Well, Judge Orrick

6  allowed the use of the words scheme, loan sharking,

7  racketeering and front to be used when the defendants in

8  that case sought to execute those terminology.

9          And Mr. Bennett provided the definition of

10 scheme, which is a plan or program of action, especially a

11 crafty or secret one, and it seems like scheme is a really

12 spot-on definition of plaintiffs' position of what

13 happened here.  And we think that the case law we cited in

14 our brief supports the ability to use it, since the

15 evidence supports that such a scheme existed.

16          MR. GIVEN:  May I reply, please?

17          THE COURT:  Sure.

18          MR. GIVEN:  This isn't Judge Orrick.  This is

19 your court.

20          THE COURT:  Well, I'm informed by what other

21 judges do.

22          MR. GIVEN:  I understand, but we were not a

23 party in that case.  We weren't involved in that case.  I

24 don't think we're bound by that case.  That may be

25 informative.  Scheme, they use the word secret.  Nothing

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 180 of 375
Case 3.17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 111 of 228 PageID# 57062

325

1   was secret about this.

2         If they're allowed to use the word scheme,

3   that -- that's so unfair and prejudicial it would be

4   inappropriate.  I mean, I don't think rent-a-tribe or

5   rent-a-bank is appropriate.  I'll take the Court's ruling,

6   but scheme is so prejudicial it would be wholly improper.

7   I feel very strongly about that.

8         THE COURT:  How about loan sharking?  You didn't

9   object to that.  That seems to me loan sharking is a whole

10  lot worse --

11        MR. GIVEN:  I object to loan sharking.  I object

12  to anything pejorative like loan sharking, scheme,

13  criminal.  Yeah, I object to all those things.  I do.

14        THE COURT:  Okay.  All right.

15        I think the ruling by Judge Orrick in *Brice* is a

16  sensible one and that as long as it's not overdone, the

17  reference to scheme can be used in opening statement,

18  defined as a plan.

19        MR. GIVEN:  Are we going to be allowed a

20  limiting instruction on that?

21        THE COURT:  You can offer a limiting

22  instruction.  I'll be glad to consider it.  It would be

23  good if both of you could agree to it, but I'll consider

24  it.

25        So motion in limine number 1 is overruled.

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 181 of 375
Case 3:17-cv-00461-REP  Document 1317  Filed 06/15/23  Page 112 of 228 PageID# 57063

326

 1             MR. GIVEN:  Okay.  Motion in limine number 2.

 2             THE COURT:  Wait just a minute.

 3             MR. GIVEN:  Sorry.

 4             THE COURT:  The use of the terms are pertinent

 5    here.  They run throughout the documents.  They run

 6    throughout the case law.  It is just a fact of the life

 7    associated with this case that that's how the industries,

 8    the literature, the experts and the decisional law all

 9    relate to describe what's going on.

10             I think you can get to a point where you overuse

11    any of those terms, and if you overuse them, that's not

12    appropriate because not really what it's all about.  You

13    don't want to get to the point at all where you create

14    prejudice by hammering on a particular term.  So a

15    limiting instruction would be appropriate, and I'll

16    enterprise it at the time.

17             Motion in limine number 2.

18             MR. GIVEN:  Counsel shall not solicit evidence

19    or make arguments that the Courts in *Otoe-Missouria Tribe*

20    *of Indians v. State of New York Department of Financial*

21    *Services* found or decided anything more than denying a

22    preliminary injunction.  And I think that's straight out

23    of the fact.  There was -- it was simply a preliminary

24    injunction.  It is not controlling law.  And we want to

25    avoid any implication or reference to that because that

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 182 of 375
Case 3.17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 113 of 228 PageID# 57064

327

1    would be inappropriate.  It's not relevant.  And it also

2    would be prejudicial, misleading, and confusing to state

3    or imply that that was some sort of ultimate finding on

4    the merits.

5            THE COURT:  All right.  Let me hear from the

6    plaintiffs.

7            MS. KELLY:  Thank you, Judge.  And we agreed in

8    our response not to characterize the *Otoe* decision as a

9    final merits decision because it wasn't.  It was a ruling

10   on a motion for preliminary injunction that determined

11   that the tribes weren't likely to succeed on the merits at

12   that time, and it was affirmed by the Second Circuit.

13           We are fine discussing it that way.  We think

14   it's significant and relevant because it shows

15   Martorello's involvement with the LVD and it explains his

16   conduct and wanting to restructure it.  It's the story and

17   kind of the theme of the case for why things happened --

18           THE COURT:  He doesn't object to you doing that.

19           MS. KELLY:  Well, he did on reply.

20           THE COURT:  Wait a minute.

21           You don't object.

22           MR. GIVEN:  I don't object to them using that as

23   their narrative and we'll respond, but I don't want to

24   imply or infer that that's the law of the case somehow.

25           THE COURT:  And you're not going to do that.

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 183 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 114 of 228 PageID# 57065

328

1          MS. KELLY:  Yeah, that's fine.

2          THE COURT:  All right.  So the motion in limine

3  number 2 is denied as moot based upon the agreement of the

4  plaintiffs not to make the argument that either the

5  District Court or the Second Circuit opinion in

6  *Otoe-Missouria* found or decided anything -- was a final

7  decision.  So it will be denied as moot on that basis.

8          Defendant's motion in limine number --

9          MR. GIVEN:  -- 3.

10          THE COURT:  Let me find out where it is first.

11  I've got to get there.

12          Okay.  Go ahead.  Now I'm there.

13          MR. GIVEN:  Counsel shall not solicit evidence

14  or make argument suggesting that the *Galloway III*

15  settlement, the amount or fact of settlement demonstrates

16  the settling defendants or Martorello's liability.  Based

17  on your ruling this morning, that must be -- that has to

18  be granted because they can't bring in the settlement if

19  we can't.

20          THE COURT:  I think you're probably right, and I

21  hope she agrees with that.

22          Do you agree?

23          MS. KELLY:  Yes, Judge.

24          THE COURT:  Motion in limine number 3 is

25  granted.

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 184 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 115 of 228 PageID# 57066

329

```
 1           MR. GIVEN:  Motion in limine number 4,
 2  Your Honor.
 3           THE COURT:  Yes.  Excuse me.  Let me get there.
 4           All right.  Go ahead.
 5           MR. GIVEN:  Thank you.  Counsel shall not
 6  solicit evidence or make argument about the dismissed
 7  cases, the pending cases or even Eventide's bankruptcy
 8  case.  Again, Your Honor, that raises both issues of
 9  relevance, hearsay and would be prejudicial, misleading,
10  confusing and a waste of time.  I believe there's some
11  sort of stipulation on that, but --
12           THE COURT:  Just a minute.  Excuse me just a
13  minute.  Just so the record is clear, I had some
14  understanding.  I understand what the Eventide bankruptcy
15  case is.  What is -- is the dismissed cases the pending
16  cases, is that short formed in here somewhere so I know
17  what we're talking about?
18           MR. GIVEN:  I think there were -- there were --
19  one second, Your Honor.
20           THE COURT:  For example, let me make the point
21  to you.  For example, they apparently intend to deal with,
22  in the spoliation issue, that there is a *Hengle* case and
23  that the *Hengle* case contract puts -- disputes
24  Martorello's view that the contract provision was a
25  standard provision.  And I don't know if the *Hengle* case
```

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 185 of 375
Case 3.17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 116 of 228 PageID# 57067

330

```
 1    is included in there or have I missed the definition

 2    somewhere?

 3             MR. GIVEN:  I see.  I've got it now.  I

 4    apologize.

 5             THE COURT:  Where is it?

 6             MR. GIVEN:  It's on page 5, because there were

 7    other cases.  There was --

 8             THE COURT:  Wait a minute.  Let me get there.

 9             MR. GIVEN:  I'm sorry.  Page 5 of Document 1186.

10             THE COURT:  Yes, I'm looking there.

11             MR. GIVEN:  Thank you.

12             THE COURT:  All right.

13             MR. GIVEN:  The dismissed cases --

14             THE COURT:  Are what?

15             MR. GIVEN:  -- are *Cumming, et al. v. Big*

16    *Picture Loans, et al*; *Kobin v. Big Picture Loans, LLC, et*

17    *al.*; and *McKoy v. Big Picture Loans, et al.*  Those are

18    defined as the dismissed cases.

19             THE COURT:  Yes.  Okay.  All right.  And then

20    what's the other one?

21             MR. GIVEN:  And then the settling -- well, the

22    settling defendants were also dismissed from other cases,

23    including this case and, again, because that was the

24    settlement with the tribe.

25             THE COURT:  Well, the term is the pending cases,
```

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 186 of 375
Case 3:17-cv-00461-REP  Document 1317  Filed 06/15/23  Page 117 of 228 PageID# 57068

331

1  and that's --

2          MR. GIVEN:  I mean the pending cases.  I

3  apologize.

4          THE COURT:  That's defined on --

5          MR. GIVEN:  I'm sorry.  The pending cases are

6  the other *Galloway* cases, which are -- it includes

7  *Galloway I, Galloway I*I, the *Smith* case, which is pending

8  in the District of Oregon, and the *Duggan v. Martorello*,

9  which is pending in the District of Massachusetts.  Those

10  are the pending cases.

11          THE COURT:  So you don't want any mention of

12  those cases.  Is that what you're saying?

13          MR. GIVEN:  Correct, because we believe it's

14  confusing, misleading, and not relevant to this case.

15  This case has its own facts, its own merits.  It has

16  different parties, not identical claims, et cetera.

17          THE COURT:  All right.  Let me hear from them.

18          MS. KELLY:  Judge, we agree not to solicit

19  argument or evidence about cases that were dismissed

20  against Martorello or other members.

21          But for the pending cases, if Mr. Martorello is

22  allowed to assert that he believed what he was doing was

23  legal and he had a good faith basis, I think they

24  demonstrate, for impeachment purposes, that he should have

25  known that what he was doing was not legal, he was being

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 187 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 118 of 228 PageID# 57069

332

 1    sued by multiple people, and he did not withdraw from the

 2    alleged conspiracy or enterprise upon being put on that

 3    knowledge.  And so we would think it would be relevant for

 4    that purpose.  And so --

 5              THE COURT:  How would that take shape?

 6    Mr. Martorello is on the stand.  What do you ask him?  How

 7    is he coming out?

 8              MS. KELLY:  Do you still think what you did --

 9    you still have a good faith basis today and you --

10              THE COURT:  Wait a minute.  So you ask him, Are

11    you a defendant in *Galloway*?  Are you a defendant in

12    *Galloway I*?  In *Galloway* II.  Are you a defendant in

13    *Smith*?  Are you a defendant in *Duggan*?

14              Yes, I am.

15              So then the next question is, In those cases, do

16    they allege what?  That you're doing the same thing there

17    that you're doing here.

18              After reviewing those cases, getting sued that

19    many times, do you still -- you take the view -- you still

20    have the view that what you were doing was okay?

21              Is that what you're talking about doing?

22              MS. KELLY:  Essentially, yes, Judge.

23              THE COURT:  So then we're going to try what was

24    going on in those cases.  Is that what happens?  I mean,

25    doesn't that lead down a road to perdition?

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 188 of 375
Case 3:17-cv-00461-REP    Document 1317    Filed 06/15/23    Page 119 of 228 PageID# 57070

333

1             MS. KELLY:  It does, Judge.

2             THE COURT:  I think maybe perdition is a good

3    enough reason not to do it.

4             MS. KELLY:  Okay.  Thank you, Judge.

5             MR. GIVEN:  Thank you, Your Honor.

6             THE COURT:  How about the bankruptcy of

7    Eventide?  Do you intend to mention the bankruptcy of

8    Eventide?

9             MS. KELLY:  Since it was the bankruptcy of

10   Eventide, I don't think it makes sense to do that here,

11   Judge.

12            THE COURT:  All right.  So the motion in limine

13   number 4 is granted because the plaintiffs agree not to

14   refer to dismissed cases.  The Court has concluded that

15   Rule 403 calls for a denial, even if there is marginal

16   relevance to questioning about the pending cases, and the

17   defendant -- the plaintiffs have agreed not to pursue the

18   Eventide and ask questions about that, the Eventide

19   bankruptcy.

20            We're on motion in limine number 5.

21            MR. GIVEN:  Thank you, Your Honor.

22            Motion in limine number 5, counsel shall not

23   solicit evidence or make argument about other cases

24   involving Native American tribes.  And it runs along the

25   same line, that each case is different and, you know, we

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 189 of 375
Case 3.17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 120 of 228 PageID# 57071

334

1  are not -- there's no collateral estoppel or res judicata

2  as to Mr. Martorello.  He's not a party to those other

3  cases.  Every case stands on its own.

4           THE COURT:  Wait a minute, now.  Would this

5  motion, would that stop them from inquiring into

6  *Otoe-Missouria*, for example, into testifying that there

7  was that case, there was this result, and as a result

8  thereof, Martorello took certain actions?  Would you

9  propose that that be kept out --

10          MR. GIVEN:  Yes, we would.

11          THE COURT:  Let me finish.  Let me finish.

12          MR. GIVEN:  I'm sorry.

13          THE COURT:  -- that it be kept out pursuant to

14  this motion in limine; is that right?

15          MR. GIVEN:  Yes, Your Honor.  But if the Court

16  is going to allow that, we would at least like it limited

17  to the *Otoe* case and not a whole slew of other cases.

18  *Otoe* is different.  And I agree that maybe a carve-out

19  here because he certainly knew about that and that was

20  part of the strategy.  But that's different than -- their

21  expert is going to opine on all these other cases that we

22  certainly weren't a party to.

23          THE COURT:  Maybe not.

24          MR. GIVEN:  Well --

25          THE COURT:  They may not.

USCA4 Appeal: 23-2097  Doc: 11-6  Filed: 12/06/2023  Pg: 190 of 375
Case 3.17-cv-00461-REP  Document 1317  Filed 06/15/23  Page 121 of 228 PageID# 57072

335

1          MR. GIVEN:  Well, if you exclude it, maybe not.

2          THE COURT:  But -- but that comes up in the

3    adverse inference issue, it seems to me.  Because they

4    identified -- and I have to find my notes.  But they

5    identified the CashCall, the Hallinan, the Tucker, the

6    other cases that he knew about and that they imposed

7    liability and that prompted the insertion of the clause

8    that had his -- his information transferred to the tribe

9    and required the tribe, in the merger or acquisition

10   agreement, to destroy all the evidence, which was done.

11         So would that also not get brought into the --

12   into the case under this motion in limine?

13         MR. GIVEN:  Yes.  We don't think that's proper.

14   We think, again, that --

15         THE COURT:  Well, excuse me.  But haven't I

16   already ruled on that?

17         MR. GIVEN:  We're bound by the ruling.  I'm

18   just --

19         THE COURT:  Well, does the analysis that's in

20   here warrant my -- the analysis you're making here,

21   warrant my revisiting what you think --

22         MR. GIVEN:  I believe it does.

23         THE COURT:  -- what you think was an erroneous

24   ruling?

25         MR. GIVEN:  My apologies.  Yes, Your Honor.  I

336

1   don't think that it was appropriate.

2               THE COURT:  All right.

3               MR. GIVEN:  If --

4               THE COURT:  Now, apart from *Otoe* and apart from

5   those cases that I mentioned in part with the adverse

6   inference issue, are there any other cases that we're

7   talking about that you don't want mentioned?

8               MR. GIVEN:  Well, I'm not sure what else their

9   expert, Ms. Martin, is going to say.  That will come up in

10  the motion to exclude.

11              THE COURT:  Excuse me just a minute.  You should

12  be sure what she's going to say because she filed a

13  report, she can't go beyond the report, and she was

14  deposed.

15              MR. GIVEN:  I apologize.

16              THE COURT:  Did she testify about other -- I

17  didn't really see that.

18              MR. GIVEN:  She did, Your Honor, and I

19  apologize.  I misspoke.  I don't remember what other

20  Native American tribe cases she opined about, or tribes.

21  I don't have that at my immediate recall.

22              I will say this, Your Honor.  If the Court is

23  going to allow counsel to solicit evidence or make

24  argument about other cases involving Native American

25  tribes, we simply then would want the opportunity for

JA2572

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 192 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 123 of 228 PageID# 57074

337

1   Mr. Martorello to be able to testify why those cases were

2   different in his understanding and not applicable.   I

3   think that's only fair.

4            THE COURT:  Well, that's part of the mistake of

5   law defense.

6            MR. GIVEN:  Correct.

7            THE COURT:  Okay.  All right.  I see.

8            MR. GIVEN:  All right.

9            THE COURT:  I need to hear -- are you finished

10  with that one?

11           May I hear from Ms. Kelly or whoever is going to

12  argue?

13           So what are we talking about here is the first

14  question, Ms. Kelly?  He says *Otoe* is a carve-out from the

15  motion, and I think he's correct to say that.

16           He says that the cases that you listed in

17  connection with the adverse inference motion in limine

18  that you had fall within motion in limine number 5 and

19  that I should take another look at that question because

20  of the motion in limine number 5, which, in essence, is

21  that its prejudicial.  Is that right, sir?

22           MR. GIVEN:  Correct.  Thank you, Your Honor.

23           MS. KELLY:  So, first, Judge, the cases that

24  we're talking about, to answer your question, are the

25  CashCall-type -- Cash Call cases, which are the *Butch Webb*

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 193 of 375
Case 3.17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 124 of 228 PageID# 57075

338

 1    or *Western Sky* cases, *Scott Tucker, Hallinan, Think*

 2    *Finance*, and *Hengle*.  And the reason why we think that we

 3    should be able to discuss these cases is because it gives

 4    the context for the conduct in this case.

 5              Why is Mr. Martorello working with the Native

 6    American tribe?  Why is he providing all these services,

 7    you know, to the tribe?  Why is he trying to change the

 8    structure?  Why is he sending so many e-mails very

 9    concerned about regulatory issues or referencing certain

10    individuals?  Why is he trying to sell the business to the

11    tribe?  Why does the restructure occur?

12              And so the whole reason for the entire structure

13    of this enterprise is, first, to avoid detection and to

14    keep avoiding detection and, you know, make the business

15    seem a little bit different from this competitor.  He's

16    comparing himself to these people in these cases all the

17    time.  He is trying to avoid the regulatory --

18              THE COURT:  Is this part of your case in chief

19    or is it in response to his mistake of law/good

20    faith/advice of counsel defense?

21              MS. KELLY:  Well, it's --

22              THE COURT:  You see, here's the problem.  You've

23    got -- you can't approbate and reprobate any more than he

24    can.  You have to be singing from the same hymnal on the

25    issues.

JA2574

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 194 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 125 of 228 PageID# 57076

339

```
 1            And I understand that you're making these
 2  general statements, but they don't tell me why they have
 3  anything to do with the case, and I have to understand
 4  that in order to actually understand the right way to rule
 5  on the motion in limine.  And your brief doesn't address
 6  it any more specifically than does his brief.
 7            So I think what needs to be done is that you
 8  need to file a paper that explains to me why it is, and
 9  taking into account, the reasons why the evidence that you
10  have and the temporal connections to these cases,
11  CashCall, Tucker, Hallinan, Think Finance, and Hengle, to
12  this case.  And it may be that some of them are pertinent.
13            For example, if he's trying to structure
14  something some way because of CashCall and you've got a
15  memo from him that says that, that's one thing.  Isn't the
16  same thing -- is that basis there for Hengle?  I'm not
17  sure -- I don't know.
18            MS. KELLY:  So --
19            THE COURT:  And I can't rule on this motion
20  without having a lot more specificity on each of the
21  cases.  So you need to agree on which cases you're
22  fighting, and then we need to have a supplemental paper on
23  them because I think, Mr. Given, he could have done a
24  better job saying what's the problem here.  You could have
25  done a better job saying it ain't a problem.
```

1           MS. KELLY:  Right.

2           THE COURT:  But for me to do the right job, I

3    need to hear from you both further.  So I would allow

4    further briefing on that.

5           MS. KELLY:  Okay.

6           THE COURT:  And I think in this instance, it

7    probably is best if you go first and identify the cases

8    you're talking about so we know what you're talking about,

9    what from those cases is pertinent here and why.  Then

10   Mr. Given can have a basis upon which to respond.  Then

11   you can have a reply.

12          MS. KELLY:  Yes, Judge.  We can do that.  And we

13   can also try to limit the ways in which we would want to

14   use it.  I know one of the main ways was the reason for

15   the restructure.

16          THE COURT:  Yeah.

17          MS. KELLY:  So if we can limit it to just maybe

18   that reason or another, I think that might make things

19   easier.

20          THE COURT:  There may be legitimate reasons why

21   it can be, and he may agree ultimately that the evidence

22   that you have leads to that result.  But this is an

23   instance when --

24          MS. KELLY:  I understand.

25          THE COURT:  -- a full explanation of what's

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 196 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 127 of 228 PageID# 57078

341

1    going on here will help Mr. Given, you and me.

2                    And so when do you want to file that?

3                    MS. KELLY:  Could we have a week?

4                    THE COURT:  What is a week?  No, that's from

5    Downton Abbey, what is a weekend.

6                    Okay.  This is the 7th.  No.  This is the 8th,

7    right?  So that would make it the 15?

8                    All right.  See that -- if you -- then he gets a

9    little bit of time, that's going to push us right up into

10   the pretrial.

11                   MS. KELLY:  We could do it sooner if we could

12   have until Wednesday next week.

13                   THE COURT:  All right.  That's June the 14th.

14   You cut one day off and you think that's a big deal?

15   That's some kind of bended math.  That's what that is.

16                   MR. BENNETT:  Tuesday the 12th.

17                   THE COURT:  Monday is the 12th.

18                   MR. BENNETT:  I mean Tuesday the 13th, Judge.

19                   THE COURT:  Tuesday the 13th at 5:00.

20                   MS. KELLY:  Okay.

21                   THE COURT:  Response, Mr. Given?

22                   MR. GIVEN:  Wednesday 5:00?

23                   THE COURT:  Wednesday, the 14th?

24                   MR. GIVEN:  Two days later, 5:00.

25                   THE COURT:  Well, that would be June 15th.

342

```
 1              MR. GIVEN:  Oh, I thought somebody said Monday.
 2   My apologies.
 3              THE COURT:  June 15th, 5:00.
 4              MR. GIVEN:  Thank you.
 5              THE COURT:  And then we have a reply.
 6              MS. KELLY:  We'll limit it, yeah.
 7              MR. GIVEN:  Your Honor, I have a potential
 8   solution.  I'll just offer it to the Court, and I think
 9   there's one --
10              THE COURT:  You're settling the case?
11              MR. GIVEN:  Pardon?
12              THE COURT:  You're settling the case?  Is that
13   the solution?
14              MR. GIVEN:  No.  We'd love to.  But I think,
15   Your Honor, one of our concerns is that -- if they would
16   limit it -- if she can identify what e-mails or documents
17   that Mr. Martorello has or has produced that mention those
18   cases, I think that's fair game.  But otherwise you're
19   squeezing the toothpaste out of the tube you'll never get
20   back if you talk about those other cases.
21              So I would request that as part of their
22   briefing, if they can identify the documents or e-mails
23   where those cases are provided to Mr. Martorello, I think
24   that's fair game.
25              THE COURT:  Or where he knows about them.
```

JA2578

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 198 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 129 of 228 PageID# 57080

343

```
 1              MR. GIVEN:  Right.  That means he knows about
 2    them, and that could -- that then lays a foundation, did
 3    this affect your decision.  I think that's fair game.
 4              THE COURT:  Can you do that, Ms. Kelly?  Do you
 5    think?
 6              MS. KELLY:  Yeah.  We're giving them our
 7    exhibits today, and we'll just highlight the ones that --
 8              THE COURT:  And you mention them in the paper
 9    you're going to file.
10              MS. KELLY:  Yep.
11              THE COURT:  All right.  That makes sense.
12              MR. GIVEN:  And then the other thing,
13    Your Honor, is *Hengle*.  Again, maybe it will be if there's
14    something to Mr. Martorello.  My timing might be off, but
15    I thought *Hengle* was filed after this case.
16              THE COURT:  I did, too.
17              MR. GIVEN:  So if that's the case, it would be
18    kind of hard to rely on that back in 2015.
19              THE COURT:  Or at any time going forward.
20              MR. GIVEN:  Correct.  Exactly.
21              THE COURT:  I don't know how *Hengle* comes in
22    either, but I'm sure she thinks that out carefully before
23    she missteps.
24              MR. GIVEN:  Okay.  Thank you, Your Honor.
25              May I proceed to number 6?
```

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 199 of 375

344

```
 1              THE COURT:  All right.  So I'll see your reply

 2   when?

 3              MR. GIVEN:  Two days later.

 4              THE COURT:  Yeah.  You're going to have your

 5   response on the 15th.

 6              When am I going to see the reply brief?

 7              He's filing Thursday, the 15th.  You're filing

 8   the 13th at 5:00.  He's filing the 15th at 5:00.  The 16th

 9   is a logical date, and it gives you a free three-day

10   weekend because Juneteenth is Monday.  So what do you want

11   to do?

12              MR. GUZZO:  I think I'd take until Monday,

13   Your Honor.

14              THE COURT:  You think you'll file on Monday.

15              MR. GUZZO:  Yeah, just because it would be --

16              THE COURT:  5:00 Monday.

17              MR. GUZZO:  That's fine.  Thank you, Your Honor.

18              THE COURT:  The 19th.  Now, when you file things

19   at 5:00 Monday, you have to personally deliver the copies

20   to my house.

21              Please don't do that.

22              MR. GUZZO:  I live pretty far from here,

23   Your Honor.

24              THE COURT:  You have a car, don't you?

25              MR. GUZZO:  No.
```

JA2580

USCA4 Appeal: 23-2097   Doc: 11-6     Filed: 12/06/2023   Pg: 200 of 375
Case 3.17-cv-00461-REP  Document 1317   Filed 06/15/23  Page 131 of 228 PageID# 57082

345

 1              THE COURT:  No.

 2              Okay.  That takes care of how we're going to

 3    deal with number 5.

 4              MR. GIVEN:  Your Honor, counsel has stipulated,

 5    on number 6, that that should be granted, with the Court's

 6    approval.

 7              THE COURT:  Let's see what it says.  I've

 8    forgotten now what it is.

 9              MS. KELLY:  It's mutual, though.

10              MR. GIVEN:  It's mutual, correct.  It's about

11    personal knowledge, that shouldn't be allowed to testify

12    outside the personal knowledge --

13              THE COURT:  Yeah.  Okay.

14              MR. GIVEN:  It just follows the Rules of

15    Evidence.

16              THE COURT:  I just apply that as I normally

17    apply it.  Okay.

18              MR. GIVEN:  Thank you, Your Honor.

19              May I proceed to number 7?

20              THE COURT:  Just a minute.  That one will be --

21    actually, I think the right thing do with number 6 is to

22    deny it as moot by agreement of the parties.

23              MR. GIVEN:  That's fine, Your Honor.  Thank you.

24              THE COURT:  All right.  Just a minute.

25              We're going to number 7 now.

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 201 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 132 of 228 PageID# 57083

346

 1          All right.  Number 7.

 2          MR. GIVEN:  Counsel shall not solicit evidence

 3   or make argument implying that there has been any judicial

 4   finding that the conduct at issue in Operation Chokepoint

 5   has been held illegal or improper.  And that goes to what

 6   Ms. Simmons was talking about earlier.  You know, they can

 7   talk about Operation Chokepoint.  We can respond, but I

 8   don't want them to imply or state to the jury the fact

 9   that Operation Chokepoint existed, was a finding by the

10   federal government, a determination that the underlying

11   conduct of the tribes was illegal or improper.

12          THE COURT:  All right.  Let me hear what they

13   have to say.

14          Operation Chokepoint comes into evidence because

15   of testimony that it created some problems and that there

16   were reactions to it; is that correct?

17          MS. KELLY:  That's correct, Judge.  And in our

18   response, we agreed to say that we're not going to say

19   there was a judicial finding about Operation Chokepoint,

20   and we put in our response that we would fairly

21   characterize it as a campaign initiated by the Department

22   of Justice to force banks to terminate their relationships

23   with payday lenders.

24          THE COURT:  That's how the Department of Justice

25   ultimately said it was characterized, didn't it?

JA2582

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 202 of 375
Case 3.17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 133 of 228 PageID# 57084

347

1    MS. KELLY:  Right.  We said we were open to a

2 stipulation about a fair characterization and that that's

3 what we would state.  We weren't going to say that any

4 court made any judicial opinions about it.  And the *Brice*

5 court took up a similar issue and allowed the limited use

6 and mention of regulatory actions to explain defendant's

7 knowledge of, concerns about, and actions in response to

8 regulatory activity.  And we think our proposal is

9 appropriate here.

10    And also --

11    THE COURT:  Are you in agreement?

12    MR. GIVEN:  I'm in agreement as long as, again,

13 we have the opportunity to respond about how

14 Mr. Martorello responded to Operation Chokepoint or the

15 others who discussed it with him.

16    THE COURT:  However, there was no comment on the

17 merits vel non of the Chokepoint Operation.

18    MR. GIVEN:  Correct.

19    THE COURT:  Okay.  So you all are going to reach

20 a stipulation?

21    MS. KELLY:  Yep.

22    MR. GIVEN:  We will.  We'll submit something to

23 the Court.

24    THE COURT:  All right.  That will resolve it.

25    MR. GIVEN:  I think that will be fine.

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 203 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 134 of 228 PageID# 57085

348

1             THE COURT:  Motion in limine number 8.

2             MR. GIVEN:  Counsel shall not solicit evidence

3     regarding the financial condition of any party.  And,

4     again, Your Honor, we cited the *Kinsey* opinion that

5     parties are not permitted to argue to the fact finder's

6     potential economic sympathies or prejudices.  Because what

7     they want to do is they want to put on their plaintiffs

8     and say, "We were so poor.  We had no choice but to get

9     this loan."

10            That is not relevant to the underlying issue of

11    the legality of the loan or the damages sought.  All that

12    does is create additional sympathy.  That's not relevant,

13    and it would be prejudicial to get into their financial

14    condition.  It's not relevant why they took the loans.

15    They took the loans.  The numbers are going to be what

16    they are based on the data, but that would create

17    additional sympathy and we believe would be improper.  And

18    we cited numerous cases that follow that theory.

19            THE COURT:  All right.

20            MS. KELLY:  And, Judge, as to this one, we agree

21    not to discuss the financial condition of Mr. Martorello

22    or the plaintiffs in general, but we believe that the

23    plaintiffs should be able to get a very limited background

24    of why they took out the loan.

25            THE COURT:  Such as?

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 204 of 375
Case 3.17-cv-00461-REP    Document 1317    Filed 06/15/23    Page 135 of 228 PageID# 57086

349

1          MS. KELLY:  Such as, "I needed money to pay this

2     bill and so I went online and did this."

3          THE COURT:  That's the end of it.

4          MS. KELLY:  Exactly.  And we agreed that -- when

5     we discussed that we're not going to put on testimony that

6     because I had this loan, I had all these other things

7     happen to me, but we should be able to give a small bit of

8     context that would be relevant --

9          THE COURT:  Well, that context would be, "I

10    needed some money to pay bills and so I did this."

11         MS. KELLY:  Exactly.

12         THE COURT:  That's what you're saying?

13         MS. KELLY:  Yes.  Exactly.

14         THE COURT:  You object to that?

15         MR. GIVEN:  Yeah.  I don't think it's relevant.

16    We stipulate they took the loans.  I just think it's going

17    to lead to undue prejudice against our client.

18         THE COURT:  I think a proper limiting

19    instruction can cure that.  They can set the context as

20    long as you confine it to what she said.

21         MR. GIVEN:  Okay.

22         THE COURT:  However, I have this question

23    respecting this motion, and that is, that doesn't the --

24    do the damages include a request for punitive damages?

25         MR. GIVEN:  No.  It's a RICO claim, Your Honor.

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 205 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 136 of 228 PageID# 57087

350

1   And the case law -- and we can brief that.  I think we

2   already did brief that.  You don't get both RICO damages

3   and punitive damages on top of it because RICO --

4            THE COURT:  No.  I'm talking about the state

5   court claim, the --

6            MR. GIVEN:  Well, that would be bifurcated,

7   Your Honor, in the second portion.

8            THE COURT:  Well, that's what I'm trying to get

9   at.  All damage evidence would come in a second trial.

10            MR. GIVEN:  Correct.  That's all I'm saying.

11            THE COURT:  I mean a second stage.

12            MR. GIVEN:  I agree.  If you go to punitive

13   damages that are non-RICO punitive damages in the second

14   stage, that is an appropriate question.  Not the first

15   phase.

16            THE COURT:  RICO damages are what here?  What

17   are your RICO damages?

18            MR. GUZZO:  Your Honor, the RICO damages are we

19   believe -- and we can brief this if you'd like,

20   Your Honor, they are trebled automatically.  It's

21   mandatory.

22            THE COURT:  What are you trebling?

23            MR. GUZZO:  The unlawful payments.  So in this

24   particular case, I don't have the --

25            THE COURT:  Well, the jury doesn't decide that

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 206 of 375

351

1  trebling.

2          MR. GUZZO:  No.  The Court would decide the

3  trebling.

4          THE COURT:  The jury decides what's the quantum,

5  and the trebling occurs as a matter of law.

6          MR. GUZZO:  That's correct.

7          THE COURT:  Yeah.

8          MR. GUZZO:  And so that's why we agreed to this

9  as to Mr. Martorello's financial condition, because we

10 don't think his net worth is relevant because the RICO's

11 treble damages is mandatory by law.

12         THE COURT:  Well, what about the -- I think your

13 complaint says that you have -- you want punitive damages

14 in the state claim, doesn't it?

15         MR. GUZZO:  So the state law claim under section

16 6.2305, the usurious interest is doubled.

17         THE COURT:  Again, that's a mathematical?

18         MR. GUZZO:  It's objective.  It's not subjective

19 based on his net worth or other factors that would

20 typically be considered in a punitive damages calculation.

21 Like the reprehensibility of a defendant's conduct.

22         MR. GIVEN:  I've got -- I think that's correct,

23 Your Honor.

24         MR. GUZZO:  So that's our position.

25         THE COURT:  And the unjust enrichment has

JA2587

1   nothing to do with his economic interest.

2          MR. GUZZO:  There would be -- well, there would

3   be no punitive damages associated with the unjust

4   enrichment condition.

5          MR. GIVEN:  Correct.

6          MR. GUZZO:  Correct.

7          THE COURT:  All right.

8          MR. GIVEN:  Kristi, I think we stipulated on 9?

9          THE COURT:  So number 8, it's denied as moot by

10  your agreement; is that right?

11         MR. GIVEN:  Yes.

12         THE COURT:  On the record.  By agreement on the

13  record and in the papers.  And provided, however, that it

14  is allowed to the extent that the plaintiffs may explain

15  the mere fact that they needed money to pay a bill and

16  they borrowed the money.

17         MR. GIVEN:  Right.  We'll look at that.

18         THE COURT:  All right.

19         MR. GIVEN:  In number 9, Your Honor, I believe I

20  want to make sure that that is stipulated to or agreed to.

21         MS. KELLY:  Judge, we agreed not to represent --

22  not to reference the misrepresentation hearing as long as

23  Mr. Martorello does not imply that there's sovereign

24  immunity.

25                But in reply, Mr. Martorello said that there

353

1  should be instruction that Ascension and Big Picture

2  received immunity.  And so we don't agree to that.  So as

3  long as you withdraw that --

4          MR. GIVEN:  Yeah, I think we can withdraw that.

5  I'll confer, Your Honor, but I'm sure we can withdraw

6  that.

7          THE COURT:  Well, let me help you.  You should

8  withdraw it.

9          MR. GIVEN:  Yes.  Okay.  So then I think that

10  would moot number 9, Your Honor.

11          THE COURT:  So deny that as moot by agreement.

12          MR. GIVEN:  Yes.

13          MS. KELLY:  And the one thing, though, is that

14  when Mr. Martorello's testifying, if he testifies to the

15  same thing as he did in the same ways at the

16  misrepresentation hearing, we may want to use something

17  for impeachment purposes related to that.

18          MR. GIVEN:  We -- sorry.

19          THE COURT:  Go ahead.  Excuse me.

20          MR. GIVEN:  We have advised Mr. Martorello.  We

21  don't intend to have him testify to any matters that the

22  Court found to be misrepresentations in the prior hearing.

23  Again, we weren't --

24          THE COURT:  That cannot be allowed.

25          MR. GIVEN:  Correct.  We agreed.  We weren't

JA2589

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 209 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 140 of 228 PageID# 57091

354

1    counsel at the time, but we've read it.  We understand,

2    and we've advised him.

3              THE COURT:  Okay.

4              MR. GIVEN:  Thank you.

5              And that concludes our motions in limine,

6    Your Honor.

7              THE COURT:  Mr. Bennett.

8              MR. BENNETT:  The only thing I'd say is that --

9    understand I'll be examining Mr. Martorello as adverse or

10   on cross -- that if he has been found to have -- if I have

11   a basis to impeach him, including through prior

12   inconsistent statements, not just simply not testifying

13   exactly the same way in the misrepresentation hearing,

14   then it may be that the -- the fact that he has been found

15   to be dishonest or have made misrepresentations itself

16   could come in in impeachment.

17             I can represent to the Court and counsel, before

18   I go there, I will make sure the Court and counsel know

19   that so that we can -- in context for whatever

20   Mr. Martorello says, and it changes --

21             THE COURT:  Well, I understand.  That is a

22   circumstance, to quote Judge Williams, that must abide the

23   event.  So I'll wait until it happens, and we'll deal with

24   it if and when it comes up.

25             MR. GIVEN:  Thank you.

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 210 of 375
Case 3.17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 141 of 228 PageID# 57092

355

```
1              THE COURT:  And that will be -- motion in limine
2    number 9 is denied as moot by agreement on the record and
3    the Court will reserve judgment of the use of the
4    misrepresentation opinion should circumstances at trial
5    call for it so that everybody has -- we have a predicate
6    and we know what we are talking about.
7              That takes care of the motion in limine?
8              MR. GIVEN:  Yes, Your Honor.
9              THE COURT:  All right.  Well, you have a motion
10   in limine on the plaintiffs' expert Ms. Martin, which
11   we'll take up.
12             MR. GIVEN:  Yeah.  That's -- the experts are
13   being handled by Mr. Taliaferro.
14             THE COURT:  Yeah.  I think what we'll do is
15   we'll take a 20-minute recess and then we'll proceed from
16   there on that motion, and then we've got other motions.
17             (Recess from 3:07 p.m. until 3:30 p.m.)
18             THE COURT:  All right.  Just a minute, please.
19             We've had argument and the presentation of
20   related evidence on the question of what has become --
21   what is variously asserted as the mistake of law, good
22   faith defense, and attorney-client privilege -- attorney
23   reliance on the advice of counsel.
24             The record on the reliance, it all merges into,
25   as everybody agrees, a mistake of law question.  In fact,
```

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 211 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 142 of 228 PageID# 57093

356

```
 1  when Mr. Martorello was asked to articulate what his basis
 2  for belief was, a good faith belief, it's that the loans
 3  were governed by the laws of the Lac Vieux Desert Band of
 4  Lake Superior Chippewa Indians, the tribe, and applicable
 5  federal law and were lawful.
 6           To the extent that that relies on advice of
 7  counsel, the record is fairly clear, from what has been
 8  presented to me in the last two days and in the papers
 9  related to the files on those issues, that there was never
10  any full disclosure about Martorello and what he did and
11  who was doing what to whom and when and how.  He didn't
12  really ever receive any advice from anybody about it one
13  way or the other.  He got general information about it.
14  He got it from lawyers.  And he, in fact, says he's going
15  to really rely on nonprivileged material, which means he's
16  relying on things that don't come from the advice of
17  counsel.  That's in one of the documents that was cited.
18           When all is said and done, the other thing that
19  is clear from the papers that have been submitted to me is
20  that Martorello was told that there was a high risk of
21  liability because of the illegality of the plan that was
22  under consideration, and basically he chose to believe one
23  side of it and roll the dice that he would be -- that he
24  was right.  That's a mistake of law defense, no matter how
25  you cut it.
```

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 212 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 143 of 228 PageID# 57094

357

```
 1              Viewing the record as a whole, what we have is a
 2    mistake of law defense.  There is no mistake of law
 3    defense available in this case.  And an opinion will issue
 4    to that effect, but I think it's necessary that you all
 5    know that and understand that at the earliest possible
 6    time so you can shape the way you want to present your
 7    case.
 8              I need to sort out in my mind the two remaining
 9    points of the plaintiffs' motion for summary judgment on
10    the first two points that were being made -- the way they
11    were structured in the opening brief.  And that would be
12    whether Martorello knew about the scheme and whether he
13    furthered the scheme.
14              There is no -- there is no willfulness
15    requirement in the civil RICO statute, as is evidenced by
16    the decisions that we referred to the other day in the
17    Second Circuit, the Third Circuit, and the Eleventh
18    Circuit, and in the cases that were otherwise cited,
19    including the Mao case in this court.
20              There is, however, a knowledge requirement that
21    must be dealt with, and I think that Mr. Guzzo probably
22    articulated it very well in the transcript, and I've asked
23    for that.  I'll look at it.  But you all need to give me
24    the instructions that deal with the extent to which the
25    knowledge is involved, and that has to do with the
```

1    predicate offense of violating the statute.

2            And an opinion on all of that will obtain

3    forthwith, but you need to know it so that you can prepare

4    for trial.

5            I feel like I've been fully briefed on it, maybe

6    more than is necessary, but I was concerned to make sure

7    it was done right.  So I'd rather have more than less, and

8    I appreciate the assistance you gave me in assessing the

9    questions.

10            I think it's important also, in assessing the

11   expert testimony, as to whether there's a mistake of law

12   defense.  And it has occurred to me that I can go through

13   these motions in limine on the experts or I can let you

14   all go through them and determine that given that that's

15   the ruling, what actually can your experts say; (A), in

16   the plaintiffs' side, because some of what your witness,

17   Professor -- is it Martin?

18            MR. BENNETT:  Martin, Judge.

19            THE COURT:  What?

20            MR. BENNETT:  Professor Martin is our witness.

21            THE COURT:  Yeah, Professor Martin says seems to

22   me to be in anticipation of a mistake of law defense or in

23   rebuttal to it.

24            A lot of what the defendant's experts say is

25   keyed to a mistake of law defense and may, in fact, just

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 214 of 375

359

 1   simply not be applicable for that reason.

 2           And so I have thought that it might be a good

 3   idea to let you go think about these rulings and narrow,

 4   without waiving any position that you've asserted as to

 5   whether the mistake of law, good faith or advice of

 6   counsel is available.  And with that understanding that

 7   you're giving nothing up that you wish to appeal and that

 8   you've made your record on it, but saying to yourself, as

 9   you're looking through it, well, given the rulings that

10   have been made, this is all the expert can say, or the

11   expert can't say anything because that's the entirety of

12   the expert, and what you've done is to eliminate the

13   ability to put on the expert.  And if that's the result,

14   then I think you owe it to yourselves, your client, and to

15   the system to say that.

16           Likewise, I think that to the extent

17   Professor Martin is striking in apprehendo, thinking that

18   there's a way to mute the advice of counsel defense, it

19   might well be that the plaintiffs don't want to put some

20   of that testimony on.

21           And in the past, what I have done in situations

22   like this is to ask the parties to take their expert

23   reports, leave them as they are, but show me by

24   highlighting that which you would put on, what opinions

25   you actually would want to put on, given the rulings.  In

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 215 of 375
Case 3:17-cv-00461-REP    Document 1317    Filed 06/15/23    Page 146 of 228 PageID# 57097

360

 1   the old days, the highlighting was done by magic marker or

 2   a highlighter.  In these days, if you want to do it by the

 3   computer, that's okay, too.

 4          But I think what it will do is hone the

 5   decisions on the motions in limine to shape where these

 6   rulings have taken us, the rulings respecting the

 7   applicable law, the rulings respecting the mistake of

 8   law/good faith/advice of counsel defense.

 9          How long do you think it would take you to do

10   that, thinking through your case?  And I recognize -- it

11   would be a mistake to try to ask you to do it on the fly.

12   It would not be right for any of you to have to make those

13   decisions, and it wouldn't be helpful anyway because we

14   really wouldn't get anywhere.

15          How long do you think it would take you to do

16   it, Mr. -- okay, Mr. Taliaferro.

17          MR. BENNETT:  Mr. Taliaferro, you only have one.

18          MR. TALIAFERRO:  Well, I think it's the other

19   way, right?

20          MR. BENNETT:  Five.  Yes, that's right.

21          MR. TALIAFERRO:  Your Honor, I was --

22          THE COURT:  Mr. Taliaferro has several experts.

23          MR. TALIAFERRO:  Well, I had a panicked two

24   minutes over there thinking about how I was trying to

25   advise my argument in light of your ruling just now.  So I

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 216 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 147 of 228 PageID# 57098

361

1   do appreciate the offer to do that.

2           THE COURT:  Well, I mean, I think it's only fair

3   for you to have to deal with what's on the table at the

4   time, which is why I have announced the result without the

5   reasoning.

6           MR. TALIAFERRO:  And Your Honor is correct that

7   that will significantly streamline defendant's experts, to

8   the extent that some of them may need to be withdrawn.

9           I would --

10          THE COURT:  They may need to be withdrawn or

11  they may -- their opinion may need to be changed.

12          But I will say this:  The way the plaintiffs'

13  expert report reads -- and I haven't gone back and studied

14  the depositions.  I've read the reports.

15          It may be that you need to trim up your case a

16  little bit, too.  I don't know.  But it will help -- I

17  think the first person to act has to be the plaintiff and

18  then you have the right to react.  Because it may be that

19  there are parts of your experts that do remain,

20  notwithstanding --

21          MR. TALIAFERRO:  I recognize that time is short.

22  The first thing that came to mind to me was through the

23  weekend, Your Honor, if that's possible.

24          THE COURT:  Yeah.

25          MR. BENNETT:  Your Honor, I -- responding to

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 217 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 148 of 228 PageID# 57099

362

 1  that question, I've been -- I mean, I'll be working on

 2  them immediately because I'm -- they're fresh in my mind.

 3  If we had through the weekend on our side, that would be

 4  great.  I believe that it should be simultaneous and then

 5  we can meet and confer.  I don't believe they're

 6  staggered.  In fact, I don't think that there's direct

 7  joinder between the defendant's experts and the

 8  plaintiffs'.  A couple of them are valuation experts, or

 9  the like.

10          So I don't think that us acting or delaying it,

11  plaintiff acting, then defendant, then plaintiff respond

12  would be necessary.  I'd appreciate it if we did do it --

13  over the weekend is what you suggest, Mr. Taliaferro?

14          That we both send to one another by noon Monday?

15  Is that doable?

16          MR. TALIAFERRO:  That's doable.

17          MR. BENNETT:  And then we report back to the

18  Court.  And I have utmost confidence in these three

19  attorneys and our ability to work through reasonable

20  stipulations and narrow so that the Court's decisions --

21          THE COURT:  Well, you are right, that there are

22  various and sundry experts that we can take care of

23  without -- without adjustment, I suppose.

24          Let me look at the -- I don't think that we can

25  deal with the defendant's motion for the plaintiffs'

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 218 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 149 of 228 PageID# 57100

363

1    expert, Professor Martin, until you sort through what

2    you're doing.  So that means you've got to go -- you've

3    got to go first.

4              Now, the motions in limine of the plaintiffs as

5    to -- I guess which is the valuation expert?  Cowhey?

6    Norman?

7              MR. TALIAFERRO:  Your Honor, again, and I

8    apologize for just trying to think through this as it

9    comes.

10             THE COURT:  Sure.

11             MR. TALIAFERRO:  I believe that Beales, Brandon,

12   and Zywicki are significantly impacted by your court's

13   ruling on the mistake of law.

14             THE COURT:  I think that's correct.

15             MR. BENNETT:  I agree.  Plaintiff agrees.

16             MR. TALIAFERRO:  I believe that Norman and

17   Cowhey are much less significantly impacted by those

18   rulings.

19             THE COURT:  If at all.

20             MR. TALIAFERRO:  If at all.

21             THE COURT:  I don't see -- you brought that up,

22   and I appreciate it.  You're exactly right, they are not.

23   And we can hear argument on those today if you'd like to.

24   Would you like to go ahead and do that?

25             MR. BENNETT:  Please.

364

```
 1              MR. TALIAFERRO:  I think we should keep this
 2    thing moving, Your Honor.
 3              THE COURT:  All right.  And I do think -- we'll
 4    work out a schedule for Brandon, Zywicki and Beales and
 5    Martin.  And I think probably it's a good idea for you to
 6    approach it the way that you all talked about approaching
 7    it and getting something in on Tuesday.
 8              So let's take the Cowhey report, then.
 9              Just a minute, please.
10              I guess I need to be put in the picture a little
11    bit.  I don't -- I don't understand the opinions.  There
12    are four.  The fair market value of the business is sold
13    to the tribe by Martorello in 2016.  Same for 2018.  And
14    then the fair market value of the promissory note received
15    by -- that's the 300 million one; is that right?
16              MR. BENNETT:  Yes, Judge.
17              THE COURT:  In 2016 and 2018, and the fair
18    market value of the businesses sold in 2023.  Why are
19    those -- why is that pertinent to anything in the case?
20              I think I need to hear from the defendant first,
21    just to put me in the picture.  You all are far ahead of
22    me in the knowledge, and I've read these materials, but
23    I'm still not quite sure I understand it.
24              Can you help me with that, Mr. Taliaferro, as to
25    why the fair market value in 2006 of the businesses sold
```

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 220 of 375
Case 3.17-cv-00461-REP    Document 1317    Filed 06/15/23    Page 151 of 228 PageID# 57102

365

1  in 2016, 2018, and 2023 are something I need to pay

2  attention to -- or should come in?  Excuse me.

3          And that fair market value is of what company?

4          MR. TALIAFERRO:  That is the fair market value

5  of the businesses that were sold to the tribe, Your Honor.

6          THE COURT:  And they are, so the record is

7  clear?  SourcePoint and Bellicose?

8          MS. SIMMONS:  It's just Bellicose.

9          MR. TALIAFERRO:  At this point, it's the sale of

10  the Bellicose, Your Honor.

11          THE COURT:  It's just Bellicose.  Is that right?

12  Everybody agree?

13          All right.  So not businesses, business.

14          MR. TALIAFERRO:  Well --

15          THE COURT:  All right.  So Bellicose.  And

16  Bellicose, just for the record, is what entity?  It does

17  what in this whole plan, operation?

18          MR. TALIAFERRO:  I'm sorry.  I'm going to have

19  to lean on Ms. Simmons for an accurate description.

20          MS. SIMMONS:  So the company that was sold was

21  Bellicose Capital, which was the holding company.  And

22  underneath that was SourcePoint VI.  My understanding is

23  there were various mergers that happened so that the

24  ultimate entity that was sold was Bellicose Capital.  But

25  with that goes SourcePoint VI, which is the entity that

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 221 of 375
Case 3.17-cv-00461-REP    Document 1317    Filed 06/15/23    Page 152 of 228 PageID# 57103

366

 1   we've been discussing was the servicer.

 2              THE COURT:  So what is Bellicose Capital?

 3              MS. SIMMONS:  It was the holding company for

 4   SourcePoint.

 5              THE COURT:  What does it do?

 6              MS. SIMMONS:  That's what it did.  It was just

 7   the holding company.  It was the mechanism for -- it was

 8   the holding company.  That was the actual entity that was

 9   sold.  But along with that was the sale of SourcePoint's

10   IP, all of the -- the entire servicing entity itself.

11              THE COURT:  All right.  So the real issue is the

12   value -- why is the market value of those -- of the

13   Bellicose Capital and SourcePoint in 2016, '18 and '23

14   something that we should consider at all in this case?

15              MR. TALIAFERRO:  Well, I think it --

16              THE COURT:  Reliability.

17              MR. TALIAFERRO:  It continues to go to the

18   management of the enterprise prong.  And this goes to

19   plaintiffs' contention that the sale of the businesses was

20   simply a paper transaction by which Mr. Martorello

21   continued to exercise management and control over the

22   enterprise after the sales.

23              THE COURT:  So it basically goes to show that --

24   these opinions as to the fair market value go to show that

25   the sale was not a paper transaction and that Martorello

1   did not continue in the affairs of the enterprise.  Is

2   that what you're saying?

3            MR. TALIAFERRO:  That is correct.  I believe

4   this is plaintiffs' contention, although I'm happy to be

5   corrected if this is not the change, that the finances did

6   not change.  The money and where it was going didn't

7   change after the sale in January of 2016.

8            Mr. Cowhey's --

9            THE COURT:  What do you mean "the money"?

10           MR. TALIAFERRO:  Well, they believe there was an

11   allocation of proceeds from the -- from the loan business.

12   The number that's been thrown out is the 98/2 split.

13           THE COURT:  Percent.

14           MR. TALIAFERRO:  Percent split and that after

15   the sale, that economic split continued.

16           THE COURT:  Okay.  And the fair market value of

17   the businesses sold in -- what it was in 2016, 2018 and

18   2023 goes to show that the split was different?

19           MR. TALIAFERRO:  It goes to show --

20           THE COURT:  How does it show that percent was

21   different?  I don't understand.

22           MR. TALIAFERRO:  It shows that the tribe

23   received something of value in excess of what it paid

24   through the promissory note.

25           THE COURT:  Wait just a minute, though.  Wait

USCA4 Appeal: 23-2097 Doc: 11-6 Filed: 12/06/2023 Pg: 223 of 375
Case 3.17-cv-00461-REP Document 1317 Filed 06/15/23 Page 154 of 228 PageID# 57105

368

1   just a minute, now.

2           It does not, then, go to prove that the split

3   was different.  The split was the same.  In other words,

4   how can the fair market value of the business in 2016,

5   2018 and 2023 go to show that the 2 percent/98 percent of

6   the revenues was different?

7           MR. TALIAFERRO:  It's --

8           THE COURT:  How does that --

9           MR. TALIAFERRO:  I misspoke, Your Honor.

10          THE COURT:  Okay.

11          MR. TALIAFERRO:  The Cowhey opinion demonstrates

12  that the 98/2 split was not the full picture of economic

13  benefit received by the tribe.

14          THE COURT:  But it does not go to show that the

15  split of revenues was different; is that correct?

16          MR. TALIAFERRO:  Mr. Cowhey does not issue an

17  opinion on that matter.

18          THE COURT:  Okay.

19          So it shows that there was -- it shows that the

20  tribe received things in addition to the 2 percent money

21  and benefits; is that right?

22          MR. TALIAFERRO:  That's precisely correct,

23  Your Honor.

24          THE COURT:  So what are those things?

25          MR. TALIAFERRO:  Based on Mr. Cowhey's opinion,

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 224 of 375
Case 3.17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 155 of 228 PageID# 57106

369

 1   they received an enterprise that had a fair market value.

 2              THE COURT:  And what was it?

 3              MR. TALIAFERRO:  He provides some different

 4   valuation dates.

 5              THE COURT:  What was it in 2016, 2018 and 2023,

 6   because that's the date his opinion relates?

 7              MR. BENNETT:  Respectfully, Judge, his

 8   opinion --

 9              THE COURT:  I mean, that's when -- when the

10   opinions are summarized by both of you and by him, that's

11   what he says he's doing, the fair market value of the

12   businesses as of 2016 -- the time of sale -- I guess that

13   would be 2015 -- yeah, the sale closed in 2016?

14              MR. BENNETT:  Yes, sir.  But he has two reports,

15   the 2023 report, then the 2019.  The 2023 report, which is

16   four years later, his -- his report is I can't tell you

17   anything because I haven't received any documents since

18   2019.

19              THE COURT:  Well, that's an argument to one of

20   the issues.

21              I'm asking simply the question what does he say?

22   So as to 2023, the answer is he doesn't have it.

23   Mr. Bennett says zero.

24              MR. TALIAFERRO:  That's correct.

25              THE COURT:  Is that right?

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 225 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 156 of 228 PageID# 57107

370

1          MR. TALIAFERRO:  That's correct.

2          THE COURT:  Zero info.  He's not saying it's

3   worth zero.  He's just saying he doesn't have info.

4          Okay.  What does he say it was worth in 2016?

5   In other words, what was the benefit or the value of the

6   enterprise?

7          MR. TALIAFERRO:  Okay.

8          THE COURT:  Or the value of the enterprise that

9   he says in 2016 and 2018?

10         MR. TALIAFERRO:  His first opinion is that the

11  combined business had a value of $189,307,000 as of the

12  combination date of January 26, 2016.

13         THE COURT:  And of 2018, what was the value of

14  that business, fair market value?

15         MR. TALIAFERRO:  That's his opinion 3, and it's

16  that as of November 30th, 2018, there was a combined

17  business value of $102,251,000.

18         THE COURT:  102.2.

19         All right.  Now, what's the probative value of

20  the information that -- the value of the enterprise; that

21  is, of the two businesses, was 190 and 102 million on

22  those dates.  What's the probative value of that?

23         MR. TALIAFERRO:  The probative value is that the

24  partnership --

25         THE COURT:  The what?

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 226 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 157 of 228 PageID# 57108

371

1          MR. TALIAFERRO:  The business relationship with

2    Mr. Martorello's enterprises was building something of

3    value for the tribe.  And to the extent that there's an

4    assertion in this case that the tribe didn't benefit or

5    that they were being rented, that they were -- that

6    that -- Mr. Cowhey's report would suggest that that is not

7    the case and what they were doing was building something

8    of value for the future.

9          THE COURT:  And what does -- what element of the

10   liability case does that go to -- and this pertains to the

11   1962(d) claim; is that right?

12         MS. SIMMONS:  (c).

13         MR. TALIAFERRO:  It's the (c) claim, the

14   management or control of the enterprise.

15         THE COURT:  Really, what does it have to do with

16   that?

17         MR. TALIAFERRO:  It shows that the tribe was --

18   it has probative value towards proving that the tribe was

19   gaining something of value through --

20         THE COURT:  And what does that go -- what

21   element does that go to prove in the 1962(c) claim?

22         MR. TALIAFERRO:  We believe it has probative

23   value to whether Mr. Martorello's entities were managing

24   or controlling the enterprise.

25         THE COURT:  How does it do that?  How does the

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 227 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 158 of 228 PageID# 57109

372

1  fair market value of the company show how that

2  Martorello's enterprises were controlling anything?

3          MR. TALIAFERRO:  Or not controlling.

4          THE COURT:  Or not.

5          MR. TALIAFERRO:  And we would submit that the

6  tribe was learning the business, teaching itself the small

7  installment industry, and ultimately gaining an enterprise

8  of value.

9          THE COURT:  I understand that.  But that doesn't

10 explain why the fair market value of the company shows

11 that.  I can understand that the administration of the

12 company was showing that the tribe was learning the

13 business.  Why does the value of the company have anything

14 to do with showing that the tribe was learning the

15 business?

16         MR. TALIAFERRO:  Well, I think it's evidence

17 that the tribe was able to manage the combined business by

18 themselves and was therefore learning the business.

19         THE COURT:  So the fact that there was a value

20 of 190, roughly, in 2016, that declines to 1 million 2 in

21 two years shows that they are running the business

22 effectively.  Is that the pint?  I don't understand how

23 that works.

24         MR. TALIAFERRO:  I don't know if I would show

25 the decline -- I mean, there's other factors.

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 228 of 375
Case 3.17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 159 of 228 PageID# 57110

373

1          THE COURT:  There was.  You say it's the value

2    of the two points -- at the two points in time and the

3    decline is rather significant.  So how does it show that

4    they are learning the business?

5          It shows a lot of things, I suppose, that there

6    is a business.  I just don't understand how this fair

7    market value stuff shows anything that's relevant in the

8    case.  That's where I'm having trouble.

9          Is there anything else that that's probative of,

10   that the fair market value of the business is or have you

11   explained to me what it is and I'll hear their side of it?

12         MR. TALIAFERRO:  I believe that given the

13   remaining issues in the case, I've explained what I think

14   the remaining --

15         THE COURT:  All right.  Then the next opinions

16   that he says are -- the second opinion is the fair market

17   value of the note.  Now, the note was when?  And that's

18   the $300 million note, right?

19         MR. TALIAFERRO:  It has a nominal maximum face

20   value of $300 million.

21         THE COURT:  Yeah.  Okay.  In -- at the time of

22   sale, that would be 2016 and 2018.  So what does that --

23   what is his opinion as to the fair market value of the

24   note in 2016 and 2018, respectively?

25         I have to confess that I had some difficulty

374

1  sorting through exactly what he was saying, and I don't

2  want it to be misunderstood.

3          MR. TALIAFERRO:  So his opinion is that the fair

4  market value of the Eventide note as of January 26, 2016,

5  was 164,578,000.

6          THE COURT:  All right.  And 2018?

7          MR. TALIAFERRO:  His opinion is that the fair

8  market value of the Eventide note as of November 30th,

9  2018, was $50,358,000.

10          THE COURT:  And what does that information go to

11  show?

12          MR. TALIAFERRO:  Just to be clear, what he

13  does -- Mr. Cowhey does with those two valuations is he

14  subtracts the value of the note from the value of the

15  enterprise.  The difference for both of the two dates, the

16  difference is the value that the tribe received in excess

17  of payments to Mr. Martorello.

18          THE COURT:  So that doesn't square.  If the

19  value of the note is 164.5 million in 2016 and the value

20  of the enterprise was 189.4 million in 2016, the

21  difference would be what?

22          MR. TALIAFERRO:  24,729,000.

23          THE COURT:  24 million and what?

24          MR. TALIAFERRO:  729,000.

25          THE COURT:  Okay.  24.7 million.  And the

1  difference between 2018, which is 102.2 million, versus 50

2  is what?

3          MR. TALIAFERRO:  The difference, as reported in

4  Mr. Cowhey's report, is $51,893,000.

5          THE COURT:  All right.  And that is what?  That

6  represents what?

7          MR. TALIAFERRO:  That number reflects the value

8  that the tribe received in excess of what the tribe paid

9  at those points in time.

10         THE COURT:  The excess of what the tribe

11  received versus what the tribe paid.

12         And what does that go to prove?

13         MR. TALIAFERRO:  We believe it speaks to the

14  same issue, that the tribe was building something of value

15  and, indeed, got something of value in excess of what they

16  paid through the Eventide note.

17         THE COURT:  Let's assume that that's true.  What

18  does that show?

19         MR. TALIAFERRO:  We believe it speaks to the

20  management prong of 1926(c) and that the tribe was

21  learning the business and gaining something of value.

22         THE COURT:  All right.  Does that take care of

23  why that's relevant, then, that it relates to the

24  management component in 1926(c)?

25         MR. TALIAFERRO:  Yes, Your Honor.

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 231 of 375
Case 3.17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 162 of 228 PageID# 57113

376

 1          THE COURT:  And because the tribe was learning

 2  business -- the business and gaining some -- what?

 3          MR. TALIAFERRO:  Something of value is I believe

 4  what I said.

 5          THE COURT:  Something of value.  Above what they

 6  were paying on the note?

 7          MR. TALIAFERRO:  That's correct.

 8          THE COURT:  All right.  All right.  I understand

 9  now.  Let me hear from them.

10          MR. TALIAFERRO:  I just --

11          THE COURT:  Oh, excuse me.

12          MR. TALIAFERRO:  I did get one note handed up to

13  me.  This also, I think, shows the separation of the

14  businesses, that Eventide was just a note holder at this

15  point, following the sale.

16          THE COURT:  That Eventide was a note holder.  So

17  what?  Eventide was nothing but a note holder to begin

18  with.  Is that what you're saying?  And they just remained

19  a note holder.

20          MR. TALIAFERRO:  That's correct, Your Honor.  So

21  to the extent that there's, you know, an assertion that

22  during the Big Picture loan, that Mr. Martorello is

23  personally liable, we think that this further shows the

24  separation of the businesses, that they were not

25  equivalent values.  There's two things.  At January of

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 232 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 163 of 228 PageID# 57114

377

1   2016, these ships kind of part and then you have the

2   business with its valuation.  You have the note with its

3   valuation, and they are not moving harmoniously at that

4   point.

5           THE COURT:  Okay.  But if the value of what they

6   got, as of 2016, was 190 million and they paid a note,

7   signed a note for 300 million, it looks to me like they

8   paid more than it was worth.

9           MR. TALIAFERRO:  And I think --

10          THE COURT:  It doesn't show the converse of

11  that, and I'm having trouble grasping that notion.  And it

12  looks to me like that to the extent that the note had any

13  payments made on it between 2016 and 2018, that the value

14  of the note far exceeded the value of the business.  And

15  therefore -- I mean, am I -- is there something wrong with

16  that thinking?

17          MR. TALIAFERRO:  We don't think the note is

18  $300 million, Your Honor.

19          THE COURT:  Well, everybody says it is.  I'll

20  tell you this.  Martorello says it's 300 million.

21          What is the note?  Give me the note.  Can

22  somebody show me the note, and what does it say?

23          MR. TALIAFERRO:  We can get you a copy of the

24  note, Your Honor.

25          THE COURT:  What does it say?

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 233 of 375
Case 3:17-cv-00461-REP    Document 1317    Filed 06/15/23    Page 164 of 228 PageID# 57115

378

1          MR. TALIAFERRO:  Well, it has a maximum value of

2    300, but it's subject to earn-out based on performance of

3    the entity.

4          THE COURT:  Well, that just means how much they

5    collect.

6          MR. TALIAFERRO:  No.  It's paid off of how the

7    business is doing.

8          THE COURT:  Well, that means how much they

9    collect.

10          MR. TALIAFERRO:  Yes, but it's --

11          THE COURT:  But it doesn't provide that it's

12    adjusted downward to $190 million.  And is there any

13    evidence about what they contemplated this maximum would

14    be less than the maximum?  Is there any evidence in the

15    file about that?

16          MR. TALIAFERRO:  There is some evidence about

17    what --

18          THE COURT:  What is it?  What does it say?

19          MR. TALIAFERRO:  I want to say it's $108

20    million.

21          THE COURT:  In other words, the tribe signed on

22    for $300 million worth of debt when they really thought it

23    was going to yield them 108 million?  That's what they

24    were getting?  Is that right?  Yes or no.

25          MR. TALIAFERRO:  No.  No.  I don't --

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 234 of 375
Case 3:17-cv-00461-REP    Document 1317    Filed 06/15/23    Page 165 of 228 PageID# 57116

379

1          THE COURT:  That's what it sounds like.

2          MR. TALIAFERRO:  I believe this issue was in

3   the -- I mean this was discussed at the transcript in the

4   misrepresentation hearing.  I don't have that in front of

5   me.

6          THE COURT:  Well, that might help you, but it

7   doesn't help me.

8          But the point is there's a note and the value of

9   the note is 300 million.  Now, you say it's a maximum.

10  That calls into question what is the state of the evidence

11  that -- as to what the actual value was that they were

12  getting.  And you say that's 108 million.  That's a big

13  difference.  That's roughly, not quite, $200 million.  In

14  other words, the tribe's paying $200 million more for the

15  note than it's actually getting.

16         Now, that may be -- I think I recall a tax

17  benefit discussion at the hearing, and that might be the

18  tax benefit to Martorello because, in fact, instead of a

19  $300 million asset, he's getting a $108 million asset.

20         But that doesn't go -- I don't understand why

21  it's relevant that the tribe got $200 million -- paid

22  $200 million for an asset that was worth 108.

23         That's how -- I'm having trouble how that shows

24  anything that's relevant to the case.  Can you help me

25  with that?

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 235 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 166 of 228 PageID# 57117

380

1          MR. GIVEN:  May I assist, Your Honor?

2          THE COURT:  If you come to the lectern.

3          MR. GIVEN:  Thank you.

4          Your Honor, what it was they had, it was a

5  maximum amount but it was an earn-out note.  And that's

6  all the testimony.

7          And it wasn't just how much they collected from

8  consumers.  "They" meaning the tribe.  It was also based

9  on their expenses and what expenses they had to pay as

10 part of their operations.

11         So, again, there's -- I don't think there's a

12 dispute about how much was collected on the note so it was

13 a maximum.  It's an earn-out.  And that's very --

14         THE COURT:  What does an earn-out mean?

15         MR. GIVEN:  An earn-out note is a very common

16 note.  What it means is that it is a note that is based on

17 the actual net earnings of the company.  So often in

18 earn-out transactions -- they're very common -- is you say

19 I'm going to pay you up to this amount, but it's going to

20 be -- the actual realization will be based on the actual

21 earnings of the operation; i.e., the tribe.

22         THE COURT:  But you're talking in gross

23 generalities.  So whose expenses are you talking about?

24         MR. GIVEN:  The tribe's expenses, Your Honor.

25         THE COURT:  No, it isn't.  You deduct from the

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 236 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 167 of 228 PageID# 57118

381

 1    amount.  Not the tribe's expenses.  It's the servicer's

 2    expenses.

 3              MR. GIVEN:  But the tribe --

 4              THE COURT:  -- according to what Martorello --

 5              MR. GIVEN:  -- purchased the servicing company,

 6    Your Honor.  That's the point.

 7              When Eventide was created, as Mr. Taliaferro

 8    told you, the tribe purchased the servicing company.  They

 9    then owned the entire operation.

10              THE COURT:  That's SourcePoint.

11              MR. GIVEN:  SourcePoint.

12              THE COURT:  Okay.  So it's SourcePoint's, not

13    the tribe.

14              MR. GIVEN:  But they don't own SourcePoint.

15              THE COURT:  Well, don't tell me it's the tribe

16    when, in fact, it's the SourcePoint.

17              MR. GIVEN:  Okay.

18              THE COURT:  Because the tribe has a lot of

19    assets other than the SourcePoint.

20              MR. GIVEN:  Okay.  The SourcePoint and the

21    tribal economic development expenses were deducted from

22    the earnings.  Then that net --

23              THE COURT:  And how is that shown in his report

24    as to what they were?

25              MR. GIVEN:  Well, go ahead.  I was just trying

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 237 of 375
Case 3.17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 168 of 228 PageID# 57119

382

1   to explain the note.  I apologize.  Thank you.

2              MR. TALIAFERRO:  I'm sorry.  Could you repeat

3   the question, Your Honor?

4              THE COURT:  He says that the expenses of the

5   tribe, tribal council, or whoever it was, plus the

6   expenses of SourcePoint were deducted from the amount of

7   the note.  So what were those expenses?

8              MR. TALIAFERRO:  Your Honor, I actually do not

9   have that information in front of me.

10             THE COURT:  I don't think that's in his report.

11  If it's there, I didn't see it.  I mean, maybe it's there,

12  but I missed it.

13             Okay.  So I think -- so what value -- what does

14  this show?  What does this go to show that we're having

15  here?

16             As I understand it, the point is that they --

17  all this evidence goes to show the excess of what they

18  received against what the tribe paid; is that right?

19             MR. TALIAFERRO:  That's correct, Your Honor.

20             THE COURT:  Okay.  And -- but the facts that you

21  tell me are that the tribe paid $300 million, was on the

22  note for $300 million, but actually only got $108 million

23  after expenses and all of that.  So I don't follow how

24  that shows that there's an excess of what was received;

25  i.e., the business, against what the tribe paid; i.e., the

383

1    amount it had to pay under the note.

2              MR. TALIAFERRO:  And we're trying to locate the

3    note, Your Honor.  I don't have any more information to

4    provide you other than --

5              THE COURT:  All right.  That's fine.  Let me

6    hear from them, then, on this point.

7              MR. TALIAFERRO:  Thank you.

8              THE COURT:  Thank you.

9              Now, what is your objection to this testimony?

10             MR. BENNETT:  It's irrelevant.  And under 403,

11   it would be a sideshow that's so prejudicial that the jury

12   would have to go into the third reason, that this witness

13   is entirely incompetent to render the opinion that he

14   rendered.  The reason --

15             THE COURT:  I thought I decided that.  If he's

16   not qualified, he doesn't testify.  Isn't that my --

17             MR. BENNETT:  Judge, yes.  The reason that you

18   are having to go through these odd numbers and the

19   disparity between the reality and the make-believe that is

20   Mr. Cowhey is because he just made them up, literally made

21   them up.  He said, "I made them up."  He said, "I don't

22   have a formula.  I don't have a matrix."

23             If I could first before -- the relevance

24   argument, I think, is obvious.  The value of the company

25   itself would be prejudicial when there's so much more

 1    relevant probative evidence --

 2              THE COURT:  Wait just a minute.  You're

 3    confusing relevance and prejudice.  Relevance -- why is

 4    the value of the company not relevant?

 5              He says that it's relevant to show the -- we're

 6    talking about two things now.  We're talking about the

 7    value of the company.  He says that the value of the

 8    company is to show that the tribe received things in

 9    addition to the 2 percent of the revenue and that -- that

10    they were building something of value for the future and

11    that that's relevant to the 1962(c) claim because it shows

12    that Martorello companies were not -- Martorello's

13    companies were not controlling and that the tribe was

14    learning the business.

15              Isn't that what you said, Mr. Taliaferro?

16              MR. TALIAFERRO:  That's correct, Your Honor.

17              THE COURT:  All right.  Now, respond to that.

18    That's what's on the table.  So tell me.

19              MR. BENNETT:  The Court has already ruled early,

20    the first day, that the societal benefit to the tribe

21    itself isn't relevant to a RICO claim.  There's no element

22    of the RICO claim, for example, that measures whether or

23    not it was good to violate the law because the tribe

24    needed the money and needed the benefit and made off like

25    a bandit over the generous victim, Mr. Martorello.

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 240 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 171 of 228 PageID# 57122

385

1          This Court has already found that what --

2          THE COURT:  So it's not relevant because what

3     he's arguing is that it got -- the tribe got a benefit and

4     that's not relevant to anything in any element of the RICO

5     1962(c) claim, right?

6          MR. BENNETT:  Correct, except Your Honor has

7     used an indefinite pronoun, it.

8          It, the valuation, isn't relevant.

9          In addition, Mr. Cowhey's projected valuation of

10    what the tribe could benefit from the future is even less

11    relevant because there's two different things.  The first,

12    Mr. Cowhey is saying he is guessing what the value of this

13    company will be from what the projected income will be in

14    the future going through to 2023.  That valuation, if we

15    knew the actual valuation, itself is irrelevant.

16         In addition, Mr. Cowhey's guesstimate of what

17    happened in -- as of looking at the income that predates

18    to 2016 --

19         THE COURT:  Wait just a minute.

20         You're saying that the future information, to

21    the extent he's present valuing and looking at a stream of

22    income, that's speculative and it's speculative, as I

23    understand your papers, because his assumption is that the

24    predicate of his opinion is that the loans will pay on the

25    high interest rate that is the face value and not the real

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 241 of 375

1    value; is that correct?

2            MR. BENNETT:  That's correct.  But that's not

3    the better argument.

4            The better argument is he is looking at the

5    income that existed prior to the sale.  He's received that

6    income -- those income numbers from Mr. Martorello.  Then

7    he literally manufactures -- he says that there is no

8    matrix or formula -- a discount rate to try to project the

9    risk of the tribe not actually earning that same income.

10           So you have the Martorello income, and you have

11   the income that the tribe may earn in the future.  He

12   creates a discount rate comparing Big Picture Loan

13   business model to publicly traded companies, Dun &

14   Bradstreet, Experian, TransUnion, Synchrony, which does

15   the credit for a number of store credit cards, and a

16   number of legitimate publicly traded companies.  And their

17   risk was 13 percent, and he added 10 percent to that.

18           And when I asked him, in two different

19   depositions, to explain it, he testified -- and it's

20   attached to our -- attached to our reply brief, which is

21   at 1232-1, he testified he had no formula, he had no

22   matrix.  I showed him the Martorello estimate of

23   valuation.  Mr. Martorello's 2012 e-mail said how would

24   you value?  What's the discount rate you would use?

25           Mr. Martorello said it was in the hundreds, not

1   10 extra percent.

2           And I asked, Have you ever talked and estimated

3   the value with Mr. Martorello or these documents?  Have

4   you ever reviewed any of the actual tax returns where

5   Mr. Martorello reported a value?  Have you ever read any

6   of the valuations from the professional companies that

7   were paid to do a valuation?

8               Answer to all of those is no.

9           So the question of relevance is what is -- of

10  course, the valuation is irrelevant, and you've already --

11          THE COURT:  You are confusing the concept of

12  relevance with the concept of qualification and

13  method and --

14          MR. BENNETT:  The second is whether the

15  estimated value is itself relevant.

16          THE COURT:  The value of the company?

17          MR. BENNETT:  His valuation of the business.

18          THE COURT:  Well, basically, as I understand

19  your point, it's that he used -- to value the business, he

20  used a discount rate, assuming public companies got to

21  13 percent, added arbitrarily 10 percent and came up with

22  that.

23          MR. BENNETT:  Correct.

24          THE COURT:  And that's not a proper method of

25  doing anything.

388

 1              MR. BENNETT:  It's not a proper method.  It's

 2    also -- even if I didn't challenge the qualification --

 3              THE COURT:  But I don't care.  We're talking

 4    about -- you have to be segregated in your talking, and

 5    that is we're talking about the qualifications now.  Is he

 6    not qualified?  Is that your point?

 7              MR. BENNETT:  He is not qualified.

 8              THE COURT:  Because if I find he's not

 9    qualified, that's a ground.  I don't have to go any

10    further.

11              MR. BENNETT:  Understood.

12              THE COURT:  If I find that he's qualified but

13    that the opinion is unreliable and it's unreliable or it

14    doesn't fit, then that's another ground.  If I find that

15    it's not relevant, that's yet another ground.

16              MR. BENNETT:  Agreed.  But the point is that

17    he -- this is the method that he used to guess -- guess

18    what the value would be between 2016 and 2018, for

19    example.

20              And the problem is he never received, from

21    Mr. Martorello, who has possession of the actual income

22    numbers in '16, '17, '18, '19, '20, '21 -- sorry, madam

23    court reporter -- '22 and this year.  Mr. Martorello has

24    the actual, real income numbers.  There's no need to

25    estimate.

JA2624

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 244 of 375
Case 3.17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 175 of 228 PageID# 57126

389

 1              And that's a relevance issue.  It is irrelevant

 2    what Mr. Cowhey would estimate the income value to have

 3    been when we know the reality of the business.

 4              There's no evidence that --

 5              THE COURT:  It seems to me that that's a method

 6    question.

 7              MR. BENNETT:  Well, we know the actual answer.

 8              THE COURT:  What evidence is there that the

 9    method he used is appropriately used by others in his

10    field or by him in performing his work of valuing

11    companies?

12              MR. BENNETT:  He testifies, and he does other

13    valuations professionally, that one of the methods -- and

14    this is not to betray my 35-year-old finance degree, but

15    income methods is one of the methods of valuation.  We

16    will concede that.  You can look at the projected income

17    into the future and discount the chance that that income

18    projection is not going to be fulfilled.

19              THE COURT:  But the first thing you do is to

20    look at the income figures, and your point is he didn't.

21              MR. BENNETT:  He did not.

22              THE COURT:  He just took Martorello's word for

23    the income figures.

24              MR. BENNETT:  Well, and he only looked at stale,

25    presale income figures.

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 245 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 176 of 228 PageID# 57127

390

1          THE COURT:  Wait a minute.  Did he look at the

2    figures or did he take Mr. Martorello's forum?

3          MR. BENNETT:  He looked at the figures that were

4    given to him by Armstrong Teasdale.

5          THE COURT:  All right.  So he looked at figures

6    of some kind, but they were out of date or what?

7          MR. BENNETT:  They were presale and --

8          THE COURT:  What he basically says, as I

9    understand it, that if it were determined that state law

10   governed the allowable interest rates, he would have to go

11   back and recast the projections on the different lending

12   models, such that the whole model would have to be recast.

13   That's what he said.

14         MR. BENNETT:  That's what he said.

15         THE COURT:  Okay.  So I decided that the state

16   law applies and that -- why doesn't that dispose of it

17   because his opinion no longer fits this case?

18         Are you aware of the concept of fit?

19         MR. BENNETT:  Agreed, except that -- not to make

20   the defendant's argument.  Their argument is that when

21   Mr. Martorello sold the business, he was giving a gift to

22   the tribe.  He was giving them an asset that had far more

23   value than the 108 million that he reported on the tax

24   returns as the actual claim value.

25         And that -- that -- beyond anything, that's

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 246 of 375
Case 3:17-cv-00461-REP    Document 1317    Filed 06/15/23    Page 177 of 228 PageID# 57128

391

1  irrelevant because it's not an element of any of the

2  claims.  You know it's not an element of any of the claims

3  because this argument that is being made by Mr. Taliaferro

4  is not in opposition to our summary judgment motion.  And

5  the only mention of the collar, or the valuation, is at

6  the very literal last paragraph before the conclusion of

7  the defendant's own summary judgment brief, which is --

8           THE COURT:  I'm not talking about that brief.

9           MR. BENNETT:  Understood.  There's no -- if it's

10  such an important --

11           THE COURT:  I don't have that in front of me.

12           MR. BENNETT:  If it were relevant, someone would

13  be talking about it besides Mr. Taliaferro, Mr. Bennett,

14  and Mr. Cowhey.  There is no element that exists in any

15  cause that we have where this could be relevant.

16           And I do want to also say as to prejudice,

17  because if there somehow were some modicum of relevance

18  that the benefit to the tribe could matter somehow, the

19  fact that you would have to have this projection of future

20  value going back as if Mr. Cowhey were there in 2016, in

21  contradiction to the actual valuations that existed,

22  itself would be confusing and burdensome to the jury to

23  try to figure out income method and then we'd have to have

24  a sideshow about --

25           THE COURT:  Juries hear this information all the

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 247 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 178 of 228 PageID# 57129

392

 1   time.

 2            MR. BENNETT:  We'd have to hear why did you

 3   value it at 10 percent more than TransUnion and Synchrony.

 4            That sideshow, and particularly when there isn't

 5   any explanation for how the witness came up with that,

 6   would --

 7            THE COURT:  The confusion doesn't arise out of

 8   the hearing of the income method.  It's a fairly

 9   straightforward explanation that juries hear all the time.

10            The confusion and prejudice arises in the

11   selection of the discount rate, through the arbitrary way

12   that he did it, as I understand your argument.  Is that

13   correct?

14            MR. BENNETT:  That's correct.

15            THE COURT:  Okay.

16            MR. BENNETT:  We examined him as how he would

17   have calculated that.  Did he know about -- his

18   explanation, frankly --

19            THE COURT:  Was his testimony presented in the

20   *Brice* case?

21            MR. BENNETT:  No.

22            THE COURT:  Has it been presented anywhere else?

23   He gave the information about what his testimony was.

24            MR. BENNETT:  He's not -- he certainly has

25   appeared in other cases as an expert witness.  He has

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 248 of 375
Case 3.17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 179 of 228 PageID# 57130

393

 1  never testified in one of these tribal lending cases.

 2          THE COURT:  All right.  Anything else?

 3          MR. BENNETT:  Judge, the only -- the other thing

 4  I would say about Mr. Cowhey is to the extent that the

 5  question is of control; that is, this just shows that

 6  Mr. Martorello was actually leaving the business because

 7  he gave this giant asset away, the evidence that actually

 8  is relevant to that and that would be impaired and in a

 9  prejudicial way by this sideshow is the actual note itself

10  and the documents that governed the sale in which

11  Mr. Martorello maintained an iron fist, despite having the

12  note, and the conduct that we'll show at trial to show

13  that he more than participated, that even after the sale,

14  he was controlling pay, manager selection.  He was active.

15          And so the idea that this valuation could do

16  anything other than unfairly prejudice or confuse the jury

17  in the face of actual direct evidence of his actions and

18  control and of the documentary evidence of that right to

19  control I think is, as well, dispositive.

20          THE COURT:  Thank you.

21          Mr. Taliaferro, your response on Cowhey.

22          MR. TALIAFERRO:  Just three brief points,

23  Your Honor.  I think much of what Mr. Bennett spoke to

24  goes to the robustness of Mr. Cowhey's opinion, of which,

25  you know, plaintiffs have the right to cross-examine.

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 249 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 180 of 228 PageID# 57131

394

 1          THE COURT:  It goes to the weight of his

 2  opinion.

 3          MR. TALIAFERRO:  It goes to the weight of his

 4  opinion.

 5          Just three quick points of clarification.  The

 6  2016 valuation is based on actual -- actual numbers, what

 7  they were presale.  And then Mr. Cowhey switched to

 8  projected numbers for the subsequent opinions.

 9          THE COURT:  Well, he didn't give one as to 2023.

10          MR. TALIAFERRO:  That's right.

11          We disagree that Mr. Martorello had sufficient

12  information to give to Mr. Cowhey to do a 2023 valuation.

13  The nature of what he received from --

14          THE COURT:  He said that.

15          MR. TALIAFERRO:  Okay.  So I just wanted to --

16          THE COURT:  The witness says I don't have enough

17  information to do it.

18          MR. TALIAFERRO:  I just wanted to be clear.

19  When Mr. Bennett counted out data from 2017, 2018, 2019,

20  2020 -- I forgot how far he went.  At some point, the

21  quality of that data decreased such that Mr. Cowhey could

22  not do the 2023 valuation.  So that's --

23          THE COURT:  All right.

24          MR. TALIAFERRO:  And then the third point is on

25  the discount rate.  Your Honor is quite right that an

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 250 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 181 of 228 PageID# 57132

395

1    income method with a discount rate is the gold standard of

2    valuation.  And plaintiffs may quibble about whether the

3    discount rate was correct, but that's inevitable -- when

4    you have a publicly traded company, you can figure out

5    exactly what the discount rate is because you have books,

6    you have records.

7              When you have a privately held company, there's

8    some measure always -- and this is within the standard of

9    703.  There's always an estimate of the discount rate and

10   then it's adjusted for risk.

11             And so we would take exception to the idea that

12   Mr. Cowhey just pulled it out of thin air.  He took the

13   best comps he had and then he applied an additional

14   discount rate.

15             THE COURT:  Where do you get that?

16             MR. TALIAFERRO:  It's based on his experience.

17   It's relied on by people.

18             THE COURT:  Where did he say -- where did that

19   experience come from?  I didn't understand him to provide

20   that information.  He just said it was based on his

21   judgment, I thought.

22             MR. TALIAFERRO:  Well, his judgment --

23             THE COURT:  Tell me where you're talking about

24   in the report, where he says that.  Is it in the first or

25   second report?

 1            MR. TALIAFERRO:  It's in his original report,

 2  his 2019 report.

 3            THE COURT:  Where is it?

 4            MR. TALIAFERRO:  I'm looking right now,

 5  Your Honor.

 6            It's on page 14 of his report.

 7            THE COURT:  Just a minute.  I'll get there.

 8            Page 11 he talks about valuations -- I mean

 9  about methodologies.

10            Okay.  Now, 14?

11            MR. TALIAFERRO:  14.  He picks the guideline

12  companies?

13            THE COURT:  He picks what?

14            MR. TALIAFERRO:  The guideline companies.  These

15  are companies that he believes are similar.

16            THE COURT:  Uh-huh.  Where are they?  Where are

17  the guideline companies?

18            MR. TALIAFERRO:  The guideline companies are

19  listed on page 14 of the report.

20            THE COURT:  Uh-huh.  All right.  That's where --

21  so how did he -- he took the median, the mean, and the

22  upper quartile and the lower quartile and he chose the

23  median; is that right?

24            MR. TALIAFERRO:  He took the upper quartile and

25  then he applied a business-specific risk premium of

1  10 percent.

2          THE COURT:  He took the upper -- he reduced it

3  to 3 percent?

4          MR. TALIAFERRO:  No.  He went the other way.  He

5  added 10 percent risk premium.  And, of course --

6          THE COURT:  He took the upper quartile of these

7  established companies to measure this fledgling business;

8  is that right?

9          MR. TALIAFERRO:  And because the fledgling

10  business --

11          THE COURT:  Then he added risk.  And where did

12  he get the risk factor?  I didn't see where he got the

13  risk factor.

14          MR. TALIAFERRO:  He reports, in --

15          THE COURT:  Where is it?  Just tell me and

16  I'll --

17          MR. TALIAFERRO:  Okay.  If you look at the

18  paragraph that begins, "Based upon the cost of equity."

19          THE COURT:  Right.  Where is it?

20          MR. TALIAFERRO:  Okay.  If you go down to the

21  next to last line in that paragraph, it says "Ten

22  percentage points."

23          THE COURT:  What's the sentence begin with?

24          MR. TALIAFERRO:  "Having considered the relevant

25  facts and circumstances" --

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 253 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 184 of 228 PageID# 57135

398

1              THE COURT:  -- "we concluded that a SCRP" -- is

2    what?  What is the SCRP?

3              MR. TALIAFERRO:  That's the --

4              THE COURT:  Specific Company Risk Premium.

5              MR. TALIAFERRO:  Yes, sir, Specific Company Risk

6    Premium.

7              THE COURT:  All right.  Thank you.  That takes

8    care of it.

9              MR. TALIAFERRO:  Thank you, Your Honor.

10             THE COURT:  All right.  Well, it is clear from

11   *Daubert* and *Kumho* and the rules themselves that there has

12   to be a relevance to the testimony of the expert and an

13   assessment of the reliability of it, and in addition, it

14   has to fit the case, the particular case.

15             In this instance, to begin, these figures are

16   being offered to show that the tribe received things of

17   benefit, in addition to the 2 percent share, and that they

18   got an enterprise and the value of the enterprise was as

19   shown in this evaluation.  That is, in turn, offered to

20   show that they were building something of value and that

21   that's to show something about whether was a management

22   involvement.  And that's the component of the 1962(c)

23   claim.  The societal benefit to the tribe is not relevant.

24   It doesn't apply here.  Judge Orrick found that in the

25   *Brice* opinion.  The same is true here.

JA2634

1          The problem with the report, though, far exceeds
2    that because I don't know that this is a societal benefit
3    to the tribe.  I don't think that fits the same model.  To
4    the extent it's offered to that end, it's not relevant.
5          But it's offered, I think, to show that this was
6    a transaction -- a business transaction that was a
7    legitimate business transaction, and I think it probably
8    has probative value to do that.  The problem is there's no
9    method to it.  There's no -- this is as close to a guess
10   in an application of a standard methodology that I've ever
11   seen.
12          There's no question that the income approach to
13   valuation is appropriate, but you have to have a sensible
14   way to apply the income valuation.  So you have to use
15   actual figures of what the income has been across time in
16   order to do it.  And he didn't do that.  He began -- he
17   took some basic figures in the early days and then
18   projected them.  That's sheer speculation.  That's all
19   that it appears from his report.
20          And that is -- it is nothing that -- and he
21   admits as much.  But how did he do that?  He relied on
22   very significant publicly held companies to arrive at a
23   discount rate, took -- determined the median, the mean,
24   the upper quartile, and the lower quartile.  From that, he
25   took the highest figure he could get, the 13.8 percent,

 1  which was the highest possible figure in his analogy and

 2  his method, without explaining why you would take the

 3  highest method from a bunch of publicly held companies and

 4  apply it to a company of this nature, which certainly

 5  wasn't that kind of company.

 6          And then he says, "Having considered the

 7  relevant facts and circumstances, we concluded that a

 8  SCRP, Specific Company Risk Premium, of ten percent points

 9  was reasonable and appropriate."  There's no explanation

10  whatsoever about why that is so, where 10 percent came

11  from, why it would be appropriate.  It is sheer

12  speculation.

13          And the fact of the matter is given the

14  difference in disparities involved in the kinds of

15  companies involved in the evaluation and the application

16  of income method, what you have here is a classic example

17  of a report that just doesn't fit the facts of where it

18  is.

19          Fit is explained in both *Daubert* and *Kumho* as a

20  function of reliability and of relevance.  And what

21  happens is as a result of the lack of fit, there's no

22  reliability here.  There's no relevance here.  It presents

23  sheer guesswork.  And that's especially true given the

24  fact that he did review basic figures early on, but

25  acknowledged in his report or deposition that if it was

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 256 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 187 of 228 PageID# 57138

401

 1   determined that state law governed the allowable interest

 2   rates, he would have to go back and recast the projections

 3   on the different lending models such that the whole model

 4   would have to be recast.

 5           Under this circumstances here, this report

 6   cannot be considered reliable and does not fit the

 7   component -- it does not match the fit component of

 8   *Daubert* because the rule of law that applies here is

 9   Virginia, not the tribal law.  And therefore, the whole

10   economic model lacks a valid base whatsoever.  And

11   testimony based on that tribal law concept and what the

12   company made under tribal law, what the income was, what

13   it would be projected as under the discount rate, and what

14   the actual discount rate would be simply are inapplicable

15   in this circumstance.

16           So the motion to exclude the testimony of

17   Cowhey, ECF 1184, I guess it is -- is that right?

18           MR. BENNETT:  Yes.

19           THE COURT:  -- is granted.

20           Now we have the Norman report.

21           What's the Norman report all about here,

22   Mr. Taliaferro?  Can you take me through that?

23           I think I had an easier time dealing with it

24   than I did Cowhey, but I'm not sure.

25           And let's see.  The Norman report is ECF 1182-1,

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 257 of 375
Case 3:17-cv-00461-REP    Document 1317    Filed 06/15/23    Page 188 of 228 PageID# 57139

402

 1  and the objection to it is 11 -- excuse me.  I've got the

 2  wrong book here.  Eleven -- pardon me.  I have so many

 3  notebooks that I think I put the wrong one -- I'm sorry.

 4  I'm having difficulty locating my briefing on those

 5  motions.  I have the expert reports, but I don't have the

 6  briefs.

 7            Norman report.  What did I do with it?  Let's

 8  see.  What's over here?  I don't think -- this is Zywicki

 9  rebuttal.  I don't have that.

10            MR. BENNETT:  We have copies.

11            THE COURT:  I've got it.  I just have so many

12  things here.

13            The brief on this is ECF 1181.  The memo in

14  support is 1182.  The opposition is 1200, and the reply is

15  1223, and the report of Norman is 1128-1.

16            So take me through a little bit of --

17            MR. TALIAFERRO:  This speaks to Mr. --

18  Mr. Norman's report speaks to Mr. Martorello's liability

19  after the sale portion.  So for the post --

20            THE COURT:  After what?

21            MR. TALIAFERRO:  After the sale of the business

22  in January 2016.

23            THE COURT:  His liability for what?

24            MR. TALIAFERRO:  For any of the loans made after

25  that period.

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 258 of 375

403

1          THE COURT:  What does that mean, liability for

2  the loans?

3          MR. TALIAFERRO:  Well, there's a contention that

4  Mr. Martorello's RICO liability extended into the Big

5  Picture period.

6          THE COURT:  So it goes to RICO -- Martorello's

7  RICO liability for loans made after the sale of Bellicose

8  Capital and SourcePoint --

9          MR. TALIAFERRO:  That's correct.

10          THE COURT:  -- in 2016; is that right?

11          MR. TALIAFERRO:  That's correct.

12          THE COURT:  All right.  And how does it show

13  that.

14          MR. TALIAFERRO:  Just so the report is clear,

15  Your Honor, that same rebuttal of liability also applies

16  to the Virginia state claim and the unjust enrichment

17  claim.

18          THE COURT:  The usury claim.

19          MR. TALIAFERRO:  The usury claim and the unjust

20  enrichment claim.

21          THE COURT:  All right.  Let's take the RICO.

22          MR. TALIAFERRO:  Okay.

23          THE COURT:  How does his report address that

24  question is what I want to know.

25          MR. TALIAFERRO:  Plaintiffs' contention in this

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 259 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 190 of 228 PageID# 57141

404

1   case is that the sale -- I don't want to put words in

2   their mouth, but they have essentially characterized it as

3   an artifice, or not a real sale, and that this was done

4   simply to paper over the ownership issue.

5          Mr. Norman's opinion makes three points about

6   the sale to explain that it was a bona fide sale and that

7   it was undertaken for legitimate business purposes.

8          THE COURT:  Okay.

9          MR. TALIAFERRO:  And here are the three opinions

10  that he offers.

11         THE COURT:  Okay.  Excuse me one minute.  Pardon

12  me while I look for something here.

13         He has three opinions.

14         MR. TALIAFERRO:  Yes, sir.

15         THE COURT:  The Bellicose transaction is a

16  deferred consideration sale arrangement that is common in

17  middle-market, private business acquisitions.

18         Second, the specific terms of the Bellicose

19  transaction are common in deferred compensation,

20  seller-financed business transaction.

21         Third, the timing of the Bellicose transaction

22  provided additional tax benefits for Mr. Martorello.

23         Okay.

24         MR. TALIAFERRO:  And as explained in greater

25  detail in Mr. Norman's report, a deferred compensation

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 260 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 191 of 228 PageID# 57142

405

1  sale arrangement is a common and typical way that

2  businesses are sold in this segment of the economy; that

3  is, middle market and not publicly traded.

4           So contrary to the assertions that plaintiffs

5  want to make in this case, the fact that no money actually

6  exchanged hands between the tribe and --

7           THE COURT:  What does this go to?  Excuse me.

8  Which count does this go to?  The RICO count is --

9           MR. TALIAFERRO:  It goes to the RICO count,

10 but it also --

11          THE COURT:  Excuse me.  There are RICO counts.

12 1962(c) or (d)?

13          MR. TALIAFERRO:  We think it goes to both of

14 those.

15          THE COURT:  Okay.  And you've already said it

16 goes to -- it is addressed to the Virginia usury claim and

17 the unjust enrichment claim.  All right.  So how does

18 it -- where does it fit here to say that the deferred

19 consideration sales are not unusual?

20          MR. TALIAFERRO:  So plaintiffs are offering the

21 position that -- I believe this is correct.  Plaintiffs

22 are offering the case theory that the sale does not look

23 like a real sale because no money exchanged hands, that

24 there was certain seller covenants, and the timing all

25 suggest that this was a continuation of business as usual.

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 261 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 192 of 228 PageID# 57143

406

1          Mr. Norman offers his three opinions to support

2   necessary information for the jury to understand that the

3   arrangement of the sale is typical, it's not unusual, and

4   there's no reason to think or suspect, in the first

5   instance, that this was done as a sham transaction or an

6   artificial sale.

7          So it goes to the weight and the probative value

8   of the claims that plaintiffs would like to put on in this

9   case that this was done to perpetuate the enterprise and

10  to continue business as usual.

11         THE COURT:  All right.  Thank you.  I'll hear

12  from them now.

13         That's what they're offering it for.  There are

14  three opinions.  What's wrong with them?

15         MR. BENNETT:  Judge, they're not relevant.  The

16  opinion -- the explanation that counsel is suggesting that

17  somehow this would go to rebut this strawman of it's a

18  nonexistent sale --

19         THE COURT:  He says that you contend it's an

20  artifice, the sale was an artifice and that, in fact, the

21  business continued to march the same as it did before the

22  sale, and he's showing this is a standard business way to

23  effect a sale transaction in the first two opinions, and

24  the last one is just that Martorello gets a tax benefit,

25  got a tax benefit out of it, the way it was structured.

USCA4 Appeal: 23-2097 Doc: 11-6 Filed: 12/06/2023 Pg: 262 of 375

407

1  So we'll deal with that in a minute.  But we're talking

2  about the first two opinions now.

3          MR. BENNETT:  So, Mr. Norman, fine gentleman.

4  He will not testify, no matter what happens here.  At the

5  end of his deposition, the last part of it,

6  Mr. Norman testified that it's a very typical aspect of

7  this type of seller finance, for the seller to maintain

8  control of the business.  The reason is because the seller

9  wants to control.  That's why they use this method of

10 deferred compensation financing.  There's no way they'll

11 use him.

12          But --

13          THE COURT:  What?  I'm being asked to

14 deal with -- wait a minute.

15          MR. BENNETT:  Yes, sir.

16          THE COURT:  You know they're not going to use

17 him?  I don't want to waste my time dealing with it.

18          MR. BENNETT:  The question --

19          MR. TALIAFERRO:  We are going to use him.

20          THE COURT:  Okay.  Are you going to use this

21 witness or not?

22          MR. TALIAFERRO:  I may have missed a lunch

23 conversation, but I think Mr. Bennett may be speaking

24 hyperbolically.

25          THE COURT:  So your plan is to use him.

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 263 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 194 of 228 PageID# 57145

408

1            MR. TALIAFERRO:  It is.

2            THE COURT:  Okay.

3            MR. BENNETT:  The point is that the probative

4    value of these opinions, even assuming for a moment that

5    Mr. Taliaferro's theoretical use itself is relevant; that

6    is, his argument is that the fact that this is a common

7    way to structure a seller-financed business sale, that

8    that itself -- if this witness' opinion is that the

9    seller-financed deferred compensation method of conveying

10   ownership is common, there is no evidence to reach

11   Mr. Taliaferro's goal that the fact that it may be a

12   common method speaks in any way to the viability or the

13   correctness of Mr. Martorello's method of structuring the

14   sale.

15           He may have used this tax tool.  That doesn't

16   mean he didn't maintain control.  It doesn't mean he

17   didn't participate.  It doesn't speak to that.  It isn't

18   probative either way, at least from the evidence that is

19   here.

20           From the opinion itself, there's nothing in the

21   opinion that suggests that Mr. Norman would testify that

22   there was no longer participation from Mr. Martorello in

23   the enterprise or that he lacked control.  It's not in

24   here, and it wouldn't go to 702.  But Mr. Norman testified

25   a key aspect of the deferred compensation, seller-financed

 1  tool that he's opining about is so a seller can maintain

 2  control.  He testified there were seven or eight different

 3  businesses that he had worked on that were in that nature

 4  and they were all seller controlled but one.

 5          And so it doesn't speak -- there's nothing in

 6  his report that speaks to a probative value to the

 7  objective Mr. Taliaferro seeks.

 8          THE COURT:  That's in his deposition, not --

 9          MR. BENNETT:  True enough.  But his report is --

10          THE COURT:  Is that right?

11          MR. BENNETT:  That's correct.  It's in his

12  deposition.  But the report is silent as to that big leap

13  that Mr. Taliaferro would make that the fact that you use

14  a particular tax tool, this particular method of sale,

15  somehow is probative of the lack of control or lack of

16  participation, which are the elements, or the lack of --

17  or the lack of operation as a lender under Virginia's law.

18  There's -- that's a giant leap.  And there's nothing in

19  the report that suggests the application of these

20  conclusions that Mr. Norman attempts with what

21  Mr. Taliaferro claims to use.

22          That's not in -- again, you'll learn soon enough

23  it's not -- Mr. Norman is never mentioned or this argument

24  is never mentioned in their summary judgment.  It's not

25  mentioned in any of the briefing in our summary judgment.

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 265 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 196 of 228 PageID# 57147

410

1    That's when you put your cards on the table.  If this had

2    had any probative value, you would have heard about this

3    argument before now.

4                THE COURT:  Well, I'm hearing about it now at

5    the time I scheduled to hear about it.  So the issue is

6    the basis for your opposition.

7                MR. BENNETT:  Yes, sir.

8                The other thing is that Judge Orrick heard and

9    considered, in *Brice*, a similar argument, which is the

10   argument that other companies have done it this way, that

11   there has been a business -- a business has been

12   structured this way by other companies and therefore, that

13   might have some probative value here.

14               But in this instance, the fact that

15   Mr. Martorello knows of other companies that have used

16   deferred compensation/seller-financed --

17               THE COURT:  What did he find?

18               MR. BENNETT:  He found that it was irrelevant.

19   He found that the witness -- the 702 witness couldn't so

20   testify.  He also found that it would be confusing for the

21   jury under 403.

22               The other thing is this.  Mr. Norman testifies

23   that there might have been tax reasons to do this.

24               THE COURT:  Where does he say that in his

25   report?

JA2646

1            MR. BENNETT:  Yes, sir, in his report.

2            THE COURT:  Where?  You use that little word

3    that's troublesome to judges.  "Might have been."

4            MR. BENNETT:  It says -- IV is the Summary of

5    Opinions.

6            THE COURT:  What page?

7            MR. BENNETT:  Page 11 of his report, which will

8    be --

9            THE COURT:  That's where the opinion is.  Where

10   does he -- where does he talk about it later on so I can

11   understand it more in-depth?

12           MR. BENNETT:  Well, he doesn't.

13           THE COURT:  He doesn't?

14           MR. BENNETT:  He does not suggest that he knows

15   anything about whether Mr. Martorello actually benefited

16   from using this --

17           THE COURT:  That's the third opinion -- is that

18   right? -- what we're talking about now?

19           MR. BENNETT:  We are.

20           THE COURT:  Okay.

21           MR. BENNETT:  Also, there's no evidence -- and

22   Mr. Norman doesn't include any in his report and

23   testified, because he never saw the documents, that

24   Mr. Martorello actually used this particular IRS

25   structure.  So what you have --

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 267 of 375

412

1          THE COURT:  Wait a minute.  I lost you on that.

2     What do you mean?

3          MR. BENNETT:  So all Mr. Norman did was look at

4     sale documents.  The deferred compensation sale method

5     that he's describing is an IRS tool to get a certain tax

6     benefit.  And he cites that at footnote 87 of his report.

7          THE COURT:  Does he say that this sale document

8     fits that IRS regulation?

9          MR. BENNETT:  What he says is that it could

10    have.  This type of structure -- Mr. Martorello could have

11    benefited if he, tax wise, treated it and reported it that

12    way to the IRS.  There's no evidence that Mr. Martorello

13    did.

14          And, in fact, he testified -- and you see that

15    part of the deposition.  He testified, I've never seen

16    Mr. Martorello's taxes.  So when you see his "see report"

17    where he says it provides tax benefits to Martorello, it's

18    coming from a witness who testified they never gave me his

19    report, his taxes.  He's never seen them.  He doesn't even

20    know that Mr. Martorello used this tax structure.  He's

21    saying, You could have.  But that's clearly irrelevant.

22          THE COURT:  All right.  Anything else?

23          MR. BENNETT:  No, sir.

24          THE COURT:  All right.  Okay.  He says it's

25    neither relevant, that other companies have done it this

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 268 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 199 of 228 PageID# 57150

413

1   way, and that 403 takes it out of play even if it's

2   marginally relevant, as to opinion 1 and 2, and that

3   opinion 3, there's no basis for it at all.

4            Is that a fair statement of where you are?

5            MR. BENNETT:  It is, Your Honor.

6            THE COURT:  So what do you say, sir?

7            MR. TALIAFERRO:  So if I could take those in

8   reverse order.

9            THE COURT:  Whatever way you want to take them.

10           MR. TALIAFERRO:  The tax benefit, Your Honor, at

11  page 22 of the report is about the timing of the sale as

12  it relates to Mr. Martorello's move from Puerto Rico to

13  the United States.

14           THE COURT:  Well, I understand.  But he says, in

15  that respect, on the top of 23, "I understand that

16  Mr. Martorello was eligible for this exemption as a

17  resident of Puerto Rico.  As such, by selling Bellicose

18  Capital prior to his contemplated move from Puerto Rico,

19  the gains on the sale of Bellicose Capital were tax

20  exempt.  On the other hand, if the sale took place after

21  Mr. Martorello's contemplated move, the sale would have

22  been subject to the United States federal capital gains

23  tax, likely at a rate of 20 percent."

24           Likely.

25           Let's see.  "Additionally, had Mr. Martorello

 1  retained his interest in Bellicose Capital, his income

 2  from that investment would have been subject to U.S.

 3  income taxes at ordinarily individual rates.  As such,

 4  Mr. Martorello had a tax incentive to sell Bellicose

 5  Capital."

 6            MR. TALIAFERRO:  That's correct.

 7            THE COURT:  So --

 8            MR. TALIAFERRO:  And Mr. -- we don't dispute

 9  that Mr. Norman did not look at Mr. Martorello's tax

10  returns.

11            THE COURT:  How can he make any comment on the

12  tax consequences of it if he didn't look at his tax

13  returns?

14            MR. TALIAFERRO:  He's explaining that that was a

15  benefit that would have been eligible based on the timing

16  of the sale.  If they --

17            THE COURT:  Depending upon what?  I mean, don't

18  you have to look at the tax returns to make an opinion on

19  the availability of a tax -- or not the tax returns, the

20  tax records so that you can make an intelligent opinion on

21  the benefit or not of the tax -- of the sale as it affects

22  taxes?

23            MR. TALIAFERRO:  Well, we submit that the sale

24  of the business and whether the tax benefit would have

25  been available is an objective, appropriate subject for

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 270 of 375
Case 3:17-cv-00461-REP    Document 1317    Filed 06/15/23    Page 201 of 228 PageID# 57152

415

1    expert testimony.

2              Whether it was taken advantage of --

3              THE COURT:  Is there testimony from Martorello

4    that he received advice on taxes before he made the sale?

5    Is there any testimony of that?

6              Not whether or not some expert, after the fact,

7    said it might have been available, but is there any

8    testimony that he took taxes into account in the date of

9    the sale at all?

10             MR. TALIAFERRO:  He did -- well, I hate to bring

11   this up.  He did bring that up and testified to that at

12   the misrepresentation opinion.  I don't believe that --

13   well, I don't believe that that was -- I don't believe

14   that that specific testimony was challenged in the

15   misrepresentation opinion.

16             THE COURT:  I don't know whether it was or

17   wasn't.  You got it?

18             MR. GUZZO:  Your Honor, we disagree with that.

19             THE COURT:  Okay.  I'll give you a chance.

20             MR. GUZZO:  Okay.

21             THE COURT:  In other words, wouldn't Martorello

22   have to testify to that before this opinion would come in?

23             MR. TALIAFERRO:  That may be necessary.  And we

24   can lay that foundation if that's necessary to do, but we

25   think that he can lay that testimony -- lay that

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 271 of 375
Case 3:17-cv-00461-REP    Document 1317    Filed 06/15/23    Page 202 of 228 PageID# 57153

416

 1   foundation.

 2           THE COURT:  Has anybody got his testimony on

 3   that previously?  Did he testify to it in deposition?  Did

 4   he testify to it in interrogatories?  Anything -- anything

 5   in the record where Martorello says he timed the matter

 6   for tax sale.  Apart -- forget what Norman said.  I'm

 7   interested if there's a factual predicate for it.

 8           MR. TALIAFERRO:  In addition to his testimony,

 9   Your Honor, there's also the text messages, which are

10   attached to plaintiffs' motion to exclude.  In that

11   testimony, he's celebrating the tax treatment of the loan.

12           Now, plaintiffs, to be fair, characterized that

13   as he was expressing that he wasn't sure about the tax

14   treatment.  We think that that --

15           THE COURT:  What does it say?

16           MR. TALIAFERRO:  So I actually -- the testimony

17   in the July 2020 hearing is Document 1200-1.  It's

18   Exhibit A to our opposition.

19           THE COURT:  All right.  I've got it.  What does

20   it say?

21           MR. TALIAFERRO:  On page 226 --

22           THE COURT:  225.

23           MR. TALIAFERRO:  Yeah.  The next --

24           THE COURT:  "What motivated -- at the point in

25   time you agreed to sell Big Picture and SourcePoint, what

USCA4 Appeal: 23-2097   Doc: 11-6      Filed: 12/06/2023   Pg: 272 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 203 of 228 PageID# 57154

417

1   were the motivations for that sale?"

2           Answer, "It was the attractive offer that I

3   received from the tribe's council and the tribe."

4           It doesn't say anything about taxes.

5           MR. TALIAFERRO:  And then if you look at the

6   next page --

7           THE COURT:  So where does it say about taxes?

8           MR. TALIAFERRO:  If you look at the next page,

9   page 226-16, "I had studied the -- if it would work from a

10  tax perspective."

11          THE COURT:  Hold on.  Wait just a minute.  227?

12          MR. TALIAFERRO:  No.  226, beginning at line 16.

13          THE COURT:  Line 16.  Excuse me.  "I had studied

14  the -- if it would work from a tax perspective for me.  At

15  one point I found out that it wouldn't, and I wasn't going

16  to refuse to sell.  That was October 2014, and then

17  eventually I concluded that the sale would have to close

18  January 1st, 2016, because then that would allow me and my

19  family to move back to the mainland to raise our first

20  kid."

21          "And why was that a factor in your decision to

22  sell at the time you sold?"

23          "Because if we sold in 2015, I would have had to

24  have stayed on the island until 2016.  But in 2016, we

25  could move back, and we were having -- our child was born,

1  you know, August 15th.  So we were around first trimester,

2  January, February 2015.  So by that time, I knew it was

3  less likely my wife would want to be away from family."

4           Is that what you're talking about?

5           MR. TALIAFERRO:  Yes, Your Honor.

6           THE COURT:  What part of that has to do with

7  taxes?

8           MR. TALIAFERRO:  He says it would work for me

9  from a tax perspective.

10           THE COURT:  Well, he said, "I studied that."  He

11  doesn't say whether it would or wouldn't.

12           MR. TALIAFERRO:  That's correct, Your Honor.  He

13  does not say whether it would or wouldn't.

14           THE COURT:  All right.

15           MR. TALIAFERRO:  The second piece of evidence,

16  and I think --

17           THE COURT:  Do we know -- is there anything in

18  the record about how he studied it or anything?

19           MR. TALIAFERRO:  I'm not aware of anything

20  beyond that testimony, Your Honor.

21           THE COURT:  Okay.  All right.

22           All right.  Are you standing for exercise or

23  what?

24           MR. TALIAFERRO:  No.

25           THE COURT:  No.  Mr. Bennett.

1          MR. BENNETT:  If we wanted to complete the

2    record, we have two other parts of the record that

3    expressly discuss that exact issue before you moved on.

4          MR. TALIAFERRO:  Well, I was going to --

5          THE COURT:  Let him finish, and then you'll have

6    a chance.

7          MR. BENNETT:  I mean Mr. Martorello's actual

8    words.

9          THE COURT:  That's fine.  You can raise that

10   when it's your turn.

11         MR. BENNETT:  Yes, sir.

12         THE COURT:  When you get called on in class, you

13   raise your hand.  And when you get called on in court,

14   it's your turn.

15         All right.  Mr. Taliaferro, what else?

16         MR. TALIAFERRO:  Then -- and I think what

17   Mr. Bennett was about to bring to the Court's attention --

18   and he obviously can characterize these text messages how

19   he wants, but if you look at 1182-3, which are the text

20   messages that --

21         THE COURT:  I don't happen to have that right up

22   there with me.  Have you got a copy of it?

23         MR. BENNETT:  We can lend our copy.  Here.

24         THE COURT:  May I have it?  Sorry I don't have

25   everything in this case --

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 275 of 375
Case 3:17-cv-00461-REP    Document 1317    Filed 06/15/23    Page 206 of 228 PageID# 57157

420

1          MR. BENNETT:  It's small for my eyes, Judge,

2   but --

3          THE COURT:  Thank you.  And this is 11 -- what

4   did you say?  1182-3.  So what part of it do you want me

5   to read?

6          MR. TALIAFERRO:  If you'd look at the second

7   page.

8          MR. BENNETT:  I'm sorry.

9          THE COURT:  I only got one page.  Mr. Bennett.

10         MR. BENNETT:  I didn't give him the first.

11         THE COURT:  Don't be so parsimonious.

12         Thank you very much.

13         All right.  Second page of 1182-3.  It's called

14  page 3 of 3 on this ECF system.  So where on there do you

15  want me to look?

16         MR. TALIAFERRO:  If you look down at the fifth

17  text message --

18         THE COURT:  "I suspect the NPV" --

19         MR. TALIAFERRO:  That's the net present value of

20  the note.

21         THE COURT:  -- "was 100 million.  So the first

22  100 million received is taxed in 2016 based on 2016

23  residency."

24         MR. TALIAFERRO:  And that's a reference to

25  Mr. Martorello's residency as of 2016, which was

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 276 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 207 of 228 PageID# 57158

421

1  Puerto Rico.

2        THE COURT:  All right.

3        MR. TALIAFERRO:  Plaintiffs remain free to

4  dispute, as I expect they will, that taxes were the real

5  reason for the sale.

6        Mr. Norman's testimony establishes that, as that

7  tax message shows, that there was a tax benefit to be

8  derived from --

9        THE COURT:  That's not relevant unless it was

10  shown that Mr. Martorello was told there was a tax

11  benefit.  Are you representing to me that he's going to

12  testify about the tax benefit that Norman relates in here

13  on that IRS section?

14        MR. TALIAFERRO:  I believe he will testify.

15        THE COURT:  If he does, I think I have to abide

16  the event and look at the testimony on the tax aspect of

17  it and that's the reason for the sale.

18        I will hold the ruling on that and you have to

19  lay a foundation is the ruling on that motion -- that

20  aspect of the opinion.

21        MR. TALIAFERRO:  Okay.  So then on the first

22  two --

23        THE COURT:  Yeah.  He basically says they are

24  not relevant and they fall on the wrong side of the 403

25  analysis and that Judge Orrick held that in the *Brice*

422

1    case, and I believe he did.  That is to say that other

2    companies have done it this way.  So he's saying so what.

3           MR. TALIAFERRO:  And I'm not familiar with the

4    *Brice* case, but I -- I don't know if that testimony about

5    the way other businesses do it was in relation to a sale

6    of the business specifically.  So I can't speak to

7    whether -- the testimony --

8           THE COURT:  Where is that part of the *Brice*

9    case?  I'm afraid I left my *Brice* back in the office.

10   Where is the transcript on that -- I mean the decision on

11   that?  Let me see it.  I have a recollection that it's

12   similar to the Norman issue, but I can't now say for sure

13   that that's correct.  Have you got a copy?

14          MR. BENNETT:  Yes, sir.

15          Your Honor, the --

16          THE COURT:  What page are you talking about so

17   you can refer him and me to it?

18          MR. BENNETT:  Yes, sir.  Page 14 is the start of

19   the full discussion of the motions to exclude.  Page 15 --

20          THE COURT:  Wait a minute.  Wait a minute.  My

21   pages don't have 14, 15 on them.

22          My pagination goes from page to page.  Oh, I

23   see.  The number you're talking about is in the margin.

24          MR. BENNETT:  Yes, sir.

25          THE COURT:  All right.  So where would that be

1    in -- on -- what heading is that in?

2           MR. BENNETT:  It's under III, Plaintiffs' Motion

3    to Exclude --

4           THE COURT:  Okay.  Hold on.

5           MR. BENNETT:  Here it's talking about the

6    analogy to outsourcing.

7           THE COURT:  Page 18, you say?

8           MR. BENNETT:  Page 14 is the start of it.

9           THE COURT:  Fourteen.  Okay.  Hold on.

10          All right.  That's -- under number III, section

11   1962(a), and then where does it go?

12          MR. BENNETT:  Well, said in the first argument

13   is that first paragraph under III in 14.

14          THE COURT:  Starting with what?

15          MR. BENNETT:  And others and how the outsourcing

16   companies --

17          THE COURT:  What's the start of the paragraph?

18   That is how I can find it.

19          MR. BENNETT:  I'm sorry.  If you go to page 15,

20   the start of the paragraph is the second full paragraph on

21   the left.  It says --

22          THE COURT:  What's the word say?

23          MR. BENNETT:  "Plaintiffs' motions."

24          THE COURT:  On page 15, the top of the page say

25   Homes of Arizona, Inc., if you're using the --

424

 1          MR. BENNETT:  Let my try it differently.  Let me

 2   give you my 15.

 3          THE COURT:  Just tell me where it is and where

 4   it starts.

 5          MR. BENNETT:  Well, I'm wondering if you have a

 6   different printout.

 7          THE COURT:  Well, you gave it to me.

 8          MR. BENNETT:  I did.

 9          THE COURT:  So whatever it is, I don't know.

10          MR. BENNETT:  The bottom right --

11          THE COURT:  You're not -- you're not on --

12   you're on page 26.

13          MR. GUZZO:  It's on page 14.

14          MR. BENNETT:  I'm sorry.  It's Westlaw page 14,

15   the bottom right-hand corner.

16          MR. GUZZO:  Your Honor, it's in the second

17   paragraph.

18          THE COURT:  It's the Westlaw -- it's the Westlaw

19   page.  Give it back to him.  Thank you.

20          It would be nice if you tell me which one of

21   these pages you're talking about.  There's the

22   interlineated numbers that are between pages that are

23   actual reporter page.  Then there's the internal number,

24   and then there's the Westlaw number.

25          MR. BENNETT:  Yes, sir.

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 280 of 375
Case 3:17-cv-00461-REP    Document 1317    Filed 06/15/23    Page 211 of 228 PageID# 57162

425

 1          THE COURT:  So "plaintiffs' motions to exclude
 2  are granted."  Okay.  "Both of these experts opine on
 3  issues that are not directly relevant to the resolution of
 4  the claims against the defendants remaining in these
 5  consolidated cases.  Whether the structure of the
 6  arrangements between the tribes and some of the defendants
 7  are similar to other prior or subsequent arrangement is
 8  not relevant to the potential RICO liability or liability
 9  under California law.  Similarly, how the tribe spent the
10  money" -- no, that's not that.
11          "And the social utility of that income is
12  similarly irrelevant, except to the scope of the financial
13  benefit vis-a-vis non-tribal entities.  However, that
14  issue can be established through documentary and
15  percipient witness testimony."
16          Okay.  So basically, he held there that how
17  other companies did it, arranged their transactions is not
18  relevant to any RICO liability.
19          Did that case involve RICO liability under
20  1962(c) and (d)?
21          MR. BENNETT:  Yes, Your Honor.
22          THE COURT:  All right.  Do you have it?
23          MR. TALIAFERRO:  Yes, Your Honor.
24          THE COURT:  He's ruled that way.  What do you
25  think about that?

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 281 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 212 of 228 PageID# 57163

426

1      MR. TALIAFERRO:  So this case does not appear to

2   have involved a sale of the business and an exit by any of

3   the principals.  I'm pretty sure Mr. Morgan --

4      THE COURT:  Well, that's not the issue.

5      The issue is if they are saying that this is an

6   unusual or sham transaction, evidence that it is a usual

7   mechanism would be available to show that it is not.

8      MR. TALIAFERRO:  That's correct, Your Honor.

9      THE COURT:  Now, that has marginal relevance.

10  So the question then becomes how do you assess the

11  reliance?  He's raised the question, under 403, that

12  that's such a sideshow that it would confuse the jury.

13      Is that where you are?

14      MR. BENNETT:  Yes, Your Honor.

15      THE COURT:  All right.  So answer that one.

16      MR. TALIAFERRO:  Okay.  We don't think it's a

17  sideshow.

18      THE COURT:  Because?

19      MR. TALIAFERRO:  Because if there's no expert

20  testimony to explain the normalcy and the regular nature

21  of seller-side financing and of seller covenants -- now

22  Mr. Bennett characterized those as continued control.

23  Mr. Norman --

24      THE COURT:  Well, they're characterizable in

25  most transactions as continued control.  Isn't that the

JA2662

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 282 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 213 of 228 PageID# 57164

427

1    way they do it?

2              MR. TALIAFERRO:  We think those are fairly

3    characterized as sellers wanting to maintain the quality

4    of the business.

5              THE COURT:  Of course, and they keep some pretty

6    tight control over it so it will be done right.

7              MR. TALIAFERRO:  That's correct.

8              THE COURT:  At one point in time, it gave rise

9    to a claim called lender liability, if you were -- if you

10   were financing a business or if you were a bank.  And

11   there was the whole issue of what was the purpose of all

12   of these various and sundry mechanisms.  So I think I

13   understand your point on it.

14             MR. TALIAFERRO:  And so that -- those

15   restrictions, those covenants need to be placed in the

16   context of their normal business practice and whether --

17             THE COURT:  Not of a normal business practice

18   but of a not unusual business practice.

19             MR. TALIAFERRO:  The not unusual business

20   practice.  That's correct, Your Honor.

21             THE COURT:  Yeah.  I mean, that's what he says.

22   It's not unusual.

23             All right.  Mr. Bennett, anything else?

24             MR. BENNETT:  Just two things.

25             THE COURT:  This case is different than the

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 283 of 375
Case 3.17-cv-00461-REP    Document 1317    Filed 06/15/23    Page 214 of 228 PageID# 57165

428

1   *Brice* case in the respect, as Mr. Taliaferro said, it

2   seems to me.  So why can't they put on -- if you say this

3   is a sham, an artifice, why can't they put on evidence

4   that this is a standard way of doing business and then you

5   can cross-examine on the effect of it and you get -- of

6   course, you get some good out of what he was just talking

7   about, about the controls, and that's the consequence they

8   have to bear if they put him on.  I don't know whether

9   they will or not, as you said.  But if they do, I don't --

10  it doesn't seem to me to be out of line when you're

11  contending that this is an artifice that they say

12  evidence -- they present evidence that it's not.

13          MR. BENNETT:  We're not saying it's an artifice.

14          THE COURT:  You are.  You are saying it's an

15  artifice by which he maintained control, a device.

16          MR. BENNETT:  We are saying -- it was a device

17  by which he was able to sell the company into somebody

18  else's name but get all the benefits of ownership.

19          THE COURT:  Well, you're right.  That's a

20  device.

21          MR. BENNETT:  And there's nothing that this

22  witness says that rebuts that single point.  This would

23  be --

24          THE COURT:  He doesn't have to.  The question is

25  whether or not the testimony they are offering actually is

JA2664

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 284 of 375
Case 3.17-cv-00461-REP  Document 1317  Filed 06/15/23  Page 215 of 228 PageID# 57166

429

1    probative of a way to meet your contention.  Then they may

2    have to offer other evidence from Martorello and other

3    people about why they did it, but that doesn't keep this

4    guy from testifying, I don't think.

5              MR. BENNETT:  Judge, we could stipulate -- this

6    is the equivalent to have a witness that testified you can

7    create a corporation or you can create a limited liability

8    company.  There's no probative value of that.

9              But if this witness wants to testify that this

10   is a -- I'm sorry.

11             In addition to that, even for the first two

12   opinions, A and B, this witness doesn't testify that

13   Mr. Martorello, in fact, did implement that -- did follow

14   that structure.  They implemented the sale.  It's an IRS

15   categorization.  It's like --

16             THE COURT:  You've got an expert to say that,

17   then, don't you?

18             MR. BENNETT:  Well, this witness never

19   testified.  All he did is testify there was this

20   possibility that a person who had this kind of sale could

21   have treated it like a deferred compensation,

22   seller-financed.

23             THE COURT:  No.  What you're saying is different

24   than his opinion.  He says that the transaction is a

25   deferred compensation sale arrangement that is common in

430

 1  middle-market, private business acquisitions.  Why can't

 2  he say that?  And then it's up to you to say, well, here's

 3  the problem you got.

 4           MR. BENNETT:  He can say that.

 5           THE COURT:  All right.  Well, then don't object

 6  to it.

 7           MR. BENNETT:  I don't object to it.

 8           THE COURT:  Then he can say the specific terms

 9  the Bellicose transaction are common in deferred

10  compensation, seller-financed business transactions.

11  That's a different one.

12           First, he's saying the mode of sale is common.

13  The next one is the terms of sale.

14           Now, what does the record show about whether he

15  has ever compared the terms of sale in the Bellicose

16  transaction with any other business transaction?

17           MR. BENNETT:  Judge, there's nothing in his

18  report that says that.  He just simply declares it.

19           THE COURT:  Is that right?  Where does he say

20  it?  Tell me where he says it.  Is this the first one that

21  it appears in?  Second one?

22           I want to know -- he can't testify to the

23  opinion number 2 unless he testifies he's actually made a

24  comparison.  And where is it?

25           MR. TALIAFERRO:  Your Honor, if you look at

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 286 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 217 of 228 PageID# 57168

431

1  page 17.

2          THE COURT:  Seventeen.  Hold on.  Of the

3  original report, that's 1182-1?

4          MR. GIVEN:  Yes, sir.

5          THE COURT:  Seventeen.  Let's see what he says.

6  All right.  "The specific terms are common" -- that's his

7  opinion on that.  He says, "I have seen no evidence that

8  the Bellicose transaction unreasonably favored

9  Mr. Martorello or provided Mr. Martorello with de facto

10  ownership."

11         Well, he can't testify to that.  I mean, he's

12  not going to testify to that kind of stuff.

13         MR. TALIAFERRO:  That's correct, Your Honor.

14         THE COURT:  What is he?  He just wants to come

15  in here and volunteer?

16         Where is it that he says --

17         MR. TALIAFERRO:  The example he provides is in

18  the next part of that paragraph.  "For example, I was

19  involved" --

20         THE COURT:  -- "in a seller-financed transaction

21  that utilized the calculation for determining cash flow

22  for reinvestment of the business with any excess cash flow

23  used for a promissory note payment."

24         Well, that just says he compared it with one.

25  That is not the basis for saying "are common in deferred

 1    compensation, seller-financed business transactions."  You

 2    can't use one as the basis for commonality in a whole

 3    industry.  He can't testify to that.

 4              MR. TALIAFERRO:  I understand, Your Honor.

 5              THE COURT:  That's the basis for it?

 6              MR. TALIAFERRO:  Additional examples were

 7    solicited during his deposition that formed --

 8              THE COURT:  What's the rule on that?

 9              You can't augment a report with a deposition

10    because the rules, as changed in 1993, require that you

11    put everything in the report so that the people will know

12    whether to cross-examine somebody and a cross-examination

13    can be confined to what's in the report.  And to frustrate

14    the practice that grew up with experts trying to bail

15    themselves out of deficient reports by testifying at the

16    deposition to whole new things, thereby necessitating

17    another round of discovery and so forth.

18              In other words, whatever went on in the

19    deposition is antithetical to the requirement of stating

20    the full basis for the report that's in Rule 26.

21              So he can't testify to B.  He can testify to A.

22    And he -- you keep him on a tight leash.  He's not going

23    to be talking about all of these things that he seems like

24    he wants to talk about.  But he can give the opinion in A.

25    He can give the opinion in C only if there is a basis for

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 288 of 375
Case 3:17-cv-00461-REP    Document 1317    Filed 06/15/23    Page 219 of 228 PageID# 57170

433

```
 1  it, and I will determine that.
 2          MR. BENNETT:  Your Honor, you said I could have
 3  my turn on C.
 4          THE COURT:  What?
 5          MR. BENNETT:  On C, may I have my turn?
 6          THE COURT:  You've had your turn.  You started
 7  with your turn.
 8          MR. BENNETT:  Understood.  And my reply, before
 9  you rule on C, I wanted to read you from your
10  misrepresentation opinion, as well as --
11          THE COURT:  All right.  I think that's fair
12  game.  That's fair to do.  It's late in the afternoon, and
13  I may have precipitously sought to terminate the day.  And
14  I apologize for my manifold sins and weaknesses.
15          MR. BENNETT:  From the Court's memorandum
16  opinion in this case, the misrepresentation opinion -- and
17  I am reading -- I'm reading the Westlaw version online,
18  but it's asterisk 11, section asterisk 11.  The Court
19  wrote, "The record is thus clear, beyond serious question,
20  that Martorello was motivated to sell Bellicose to LVD
21  because of the threats of litigation and enforcement
22  action against him and his entities under the then current
23  lending arrangement between him, his entities, and LVD.
24  Nonetheless, Martorello, at the evidentiary hearing,
25  testified that his motivations for the sale included,
```

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 289 of 375
Case 3:17-cv-00461-REP    Document 1317    Filed 06/15/23    Page 220 of 228    PageID# 57171

434

 1   quote, the attractive offer that (he) received from the

 2   tribe's council and the tribe and his wish to raise his

 3   child in mainland United States.  The testimony is simply

 4   not credible in view of the substantial records written at

 5   the time by Martorello and the evidence presented at

 6   evidentiary hearing, nor judged by his demeanor when

 7   testifying on the point at the evidentiary hearing can the

 8   Court accept Martorello's testimony as credible."

 9           THE COURT:  Did the Fourth Circuit review that

10   finding?  Was it brought to the Fourth Circuit for

11   decision?

12           MR. BENNETT:  It was.

13           THE COURT:  What did the Fourth Circuit say

14   about it?

15           MR. BENNETT:  The Fourth Circuit found that this

16   Court's conclusion -- and I apologize.  I'm using the

17   Fourth Circuit's language.  The Fourth Circuit concluded,

18   "This Court was right to find that Mr. Martorello had

19   lied," a word I wouldn't ordinarily use in this

20   courthouse.

21           Mr. Martorello's own words are at

22   Document 1182-2, filed, I believe, the summary judgment

23   briefing.  1182-2, page 2 of 3.  Mr. Martorello's e-mail

24   to Nicole St. Germain, who was with the tribe, copying

25   Mr. Rosette, Ms. Wichtman, and Tanya Gibbs, lawyer for the

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 290 of 375
Case 3:17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 221 of 228 PageID# 57172

435

1  tribe.  He wrote -- and this was a negotiation of the sale
2  that ultimately occurred.  "Hi guys.  Nicole and I spoke
3  at length on Friday about this.  I likely have a massive
4  negative tax consequence associated with this.  I'm trying
5  to figure, but I'm ready to proceed with the potential
6  sales of the companies/discussion.  What are the next
7  steps?"
8          So there is no evidence -- of course,
9  Mr. Norman never saw Mr. Martorello's tax documents.  He
10 never saw correspondence.  He never spoke to
11 Mr. Martorello.  It's completely irrelevant that
12 theoretically, if all the pieces were aligned, there could
13 have been a tax benefit to Mr. Martorello when we know
14 factually that the reason that he sold was because of
15 impending litigation and threats of prosecution.
16         THE COURT:  All right.  Thank you.
17         Anything else you wish to say?  Mr. Taliaferro.
18         MR. TALIAFERRO:  I think this is fairly well
19 plowed in the summary judgment briefing, Your Honor.  But
20 the document that Mr. Bennett just read from on the
21 negative tax liability was from 2014.  At the July 2020
22 hearing, Mr. Martorello testifies, "At one point it wasn't
23 going to work for me from a tax benefit and then I
24 determined that it was."
25         THE COURT:  Right.

436

1          MR. TALIAFERRO:  So that's the evolution of

2     that.

3          THE COURT:  I understand.  Okay.

4          I said in the opinion that was decided, the

5     so-called misrepresentation opinion, that I needed --

6     couldn't make any decision that would alter what it was

7     that it had happened in the case previously or on appeal,

8     but that it needed to be taken into account in all future

9     proceedings in this case.

10          The Fourth Circuit -- I found that

11     Mr. Martorello lied about the testimony on the motivation

12     for the sale.  The Fourth Circuit affirmed it, and that's

13     the law that governs this.  And it would be against the --

14     all principles of judicial administration to allow

15     Mr. Martorello or Mr. Norman to put in evidence that's

16     contrary to the finding that what he said about that topic

17     and the motivation for the sale was a lie, and the Fourth

18     Circuit affirmed it.

19          The opinion on C(3) will not be allowed for that

20     reason.

21          So -- and that's C.  Excuse me.  It's the third

22     opinion listed in ECF 1182-A, B, and C.

23          So the bottom line is that as to the opinions of

24     Norman, he may testify that the Bellicose transaction is a

25     deferred consideration sale arrangement that is common in

USCA4 Appeal: 23-2097 Doc: 11-6 Filed: 12/06/2023 Pg: 292 of 375
Case 3:17-cv-00461-REP Document 1317 Filed 06/15/23 Page 223 of 228 PageID# 57174

437

1  middle-market, private business acquisitions.

2         He may not testify that the specific terms of

3  the Bellicose transaction are common in any deferred

4  compensation, seller-financed business transactions for

5  lack of a basis, and he may not, for the reasons I just

6  stated, testify that the timing of the Bellicose

7  transaction provided additional tax benefit to

8  Mr. Martorello, nor may Mr. Martorello testify to that.

9  That's been settled.  That's the rule here.

10        All right.  So I was premature, wasn't I?

11        Are we finished with the motions now?  Because

12 you've got the ones that you have to do -- you have to

13 work on.  How -- but the two that I can deal with today of

14 the plaintiffs' motion respecting experts have been done.

15        Then there is what you do with Brandon, Beales,

16 Zywicki.  And then there's the rebuttal expert report of

17 Zywicki that just came in, and I need to deal with that.

18 So you all are going to work that out.

19        MR. BENNETT:  Yes, Your Honor.

20        THE COURT:  All right.  When are we going to

21 have -- when am I going to know what these experts are

22 proposed to testify to in view of the rulings that I have

23 made?

24        What I really would like is their report

25 highlighted to reflect the opinions they are going to

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 293 of 375
Case 3:17-cv-00461-REP    Document 1317    Filed 06/15/23    Page 224 of 228 PageID# 57175

438

 1  give, in view of the rulings that I have made.

 2          MR. TALIAFERRO:  I believe we had settled on

 3  noon on Monday, Your Honor.

 4          MR. BENNETT:  I expect we're going to exchange

 5  with one another noon on Monday.

 6          MR. TALIAFERRO:  Okay.

 7          MR. BENNETT:  And then we will need two days

 8  together.

 9          THE COURT:  To file it.

10          MR. BENNETT:  To get together, to determine if

11  there's any stipulations or agreement and to advise the

12  Court what remains in contest or not.

13          THE COURT:  So you will file that on what date?

14          MR. BENNETT:  If we could file it by close of

15  business Wednesday.  Is that viable?

16          MR. TALIAFERRO:  That's viable.

17          THE COURT:  All right.  File that by 5:00 on --

18  that's what day of the week is that?

19          MR. BENNETT:  That would be Wednesday the 14th.

20          THE COURT:  All right.  So have I set a date for

21  the hearing of the motion for summary judgment of the

22  defendant yet?

23          MR. TALIAFERRO:  We believe it's on the 20th,

24  but it's in the afternoon, Your Honor.

25          THE COURT:  Yeah.  And let me look and see.

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 294 of 375
Case 3.17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 225 of 228 PageID# 57176

439

1              MR. TALIAFERRO:  1:30.

2              THE COURT:  Yes, it is.  Is that a problem?  If

3     it goes over, if it needs to go over, I can hear it in the

4     afternoon of the 21st as well.

5              MR. TALIAFERRO:  It's not a problem for us, and

6     I -- we've discussed with plaintiffs' counsel.

7     Your Honor's ruling on the choice of law significantly

8     limits what we're moving for on summary judgment.

9              THE COURT:  Okay.  Will you do me a favor and

10    identify what remains for me to look at?  I've got to go

11    back -- I've looked at that information, but I haven't

12    studied it carefully.  So will you give me a list of the

13    parts of it that I need to focus on?  You can just do it

14    by your headings.  That will be sufficient.

15             MR. TALIAFERRO:  We will file that notice,

16    Your Honor.

17             MR. GUZZO:  I could tell you right now,

18    Your Honor, if you'd like.  I filed the opposition last

19    night after the hearing so I'm pretty familiar with it.

20             MR. GIVEN:  Can we --

21             THE COURT:  I would like to say this.  I think

22    you're probably going to end up agreeing on it, but I do

23    think since it's their motion and their ox is getting

24    gored, it's probably best, in the overall scheme of

25    things, that they be allowed to say how they feel like

USCA4 Appeal: 23-2097   Doc: 11-6   Filed: 12/06/2023   Pg: 295 of 375
Case 3.17-cv-00461-REP   Document 1317   Filed 06/15/23   Page 226 of 228 PageID# 57177

440

 1   it's done.  If you don't agree with it, we can deal with
 2   it later.
 3              All right.  So that will be good.
 4              So does that take care of everything that's
 5   pending in the way of --
 6              MR. GIVEN:  Yes, Your Honor.
 7              THE COURT:  Except the motion for summary
 8   judgment and the things you've got to -- defendant's
 9   motion for summary judgment.  What else is left?
10              MS. KELLY:  Just super briefly.  The parties
11   have been working together because of the Court's ruling
12   on the motions in limines to -- we're going to be filing a
13   joint motion to extend certain deadlines in the pretrial
14   order so that --
15              THE COURT:  Yeah, you need time to digest.
16              MS. KELLY:  Yes.  And so the parties will make
17   sure to have everything in that is filed with the Court in
18   sufficient time before the final pretrial conference.
19              THE COURT:  All right.
20              MS. KELLY:  But we are going to be filing a
21   motion to move the deadlines to work with our schedule.
22              THE COURT:  I think that's fine.  It's something
23   that happens anytime this approach works.
24              So just make sure it's in an order so there's no
25   misunderstanding about it.

441

```
 1              MS. KELLY:  Yes.  And then --
 2              THE COURT:  I know you all will act
 3   professionally and get it done, but just so there isn't
 4   any problems, if you do that.
 5              MS. KELLY:  The one other thing.  In order to
 6   accommodate the schedule, in the Galloway against
 7   Mr. Martorello, there's depositions that are scheduled of
 8   the plaintiffs, and so we were going to also push those
 9   back slightly.  Just so Your Honor is aware.
10              THE COURT:  That's fine.
11              MS. KELLY:  It won't affect any filings or
12   anything with the Court.
13              THE COURT:  That's fine by me.
14              MS. KELLY:  Okay.  Thank you very much, Judge.
15              THE COURT:  All right.  The other thing we're
16   really going to have to sort out is once we get all these
17   rulings in and where you stand on your summary judgment
18   and where you -- what's going on, we need to figure out
19   how the trial is going to get configured and what we're
20   really going to be doing.  And right now, that's -- as I
21   said, we usually take that up on July the 26th at the
22   pretrial.
23              MR. GIVEN:  Mr. Bennett and I spoke at lunch,
24   and we're going to work on that to facilitate and
25   streamline the pretrial conference in advance of the
```

JA2677

USCA4 Appeal: 23-2097    Doc: 11-6    Filed: 12/06/2023    Pg: 297 of 375
Case 3:17-cv-00461-REP    Document 1317    Filed 06/15/23    Page 228 of 228 PageID# 57179

442

1    conference.

2            THE COURT:  I understand.  Yeah.  And then --

3    that will be fine.  So thank you all very much for

4    everything.  And you all have gotten me in trouble at home

5    because of the hour it is.  Probably the Court staff is

6    the same situation so I'm going to flee.

7            We'll have adjournment.

8            (The proceeding concluded at 5:42 p.m.)

9                    REPORTER'S CERTIFICATE

10        I, Tracy J. Stroh, OCR, RPR, Notary Public in and for

11    the Commonwealth of Virginia at large, and whose

12    commission expires September 30, 2023, Notary Registration

13    Number 7108255, do hereby certify that the pages contained

14    herein accurately reflect the stenographic notes taken by

15    me, to the best of my ability, in the above-styled action.

16        Given under my hand this 11th day of June 2023.

17

18    _____
             /s/
         Tracy J. Stroh, RPR

19

20

21

22

23

24

25

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | |
|---|---|
| LULA WILLIAMS, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) Case No. 3:17-cv-00461 (REP) |
| v. | ) |
| | ) |
| BIG PICTURE LOANS, LLC, *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |

### DEFENDANT MATT MARTORELLO'S RESPONSE TO PLAINTIFFS' NOTICE AND REQUEST FOR RECONSIDERATION OF COURT'S RULING ON SATISFACTION OF THE 1962(d) ELEMENTS

Defendant Matt Martorello, by and through his undersigned counsel, responds to Plaintiffs' Notice and Request for Reconsideration of the Court's Ruling on Satisfaction of the of the § 1962(d) claim elements.  Dkt No. 1340.

In this Circuit, a violation of § 1962(d) "does not require that a defendant have a role in directing an enterprise," *United States v. Mouzone*, 687 F.3d 207, 218 (4th Cir. 2012), and "simply agreeing to advance a RICO undertaking is sufficient" for a § 1962(d) violation.  *Id*.  As a result, Martorello's Opposition to Plaintiffs' Summary Judgment Brief, Dkt No. 1206, did not contest Plaintiffs' assertion that "Martorello had high-level involvement in the facilitation of the" enterprise.  Dkt No. 1241 at p. 28.  Given the Court's rulings that the loans are governed by the "law of the Commonwealth of Virginia," Dkt. No. 1328, and that a good-faith defense is not available as a defense to liability under 18 U.S.C. § 1962(d), *id.*, Defendant concedes there are no remaining triable issues of fact on Plaintiffs' § 1962(d) claim.[1]

---

[1] Defendant disagrees with the choice of law and good-faith defense rulings and reserves all rights to appeal them but acknowledges that the Court has ruled on these two matters.

24234311.1
233953-10004

JA2679

Dated: June 23, 2023

 */s/ John David Taliaferro*
John David Taliaferro (Va. Bar. 71502)
LOEB & LOEB LLP
901 New York Ave., NW
Suite 300-E
Washington, DC 20001
Tel. (202) 618-5015
Facsimile: (202) 318-0691
jtaliaferro@loeb.com

Bernard R. Given (*pro hac vice*)
LOEB & LOEB LLP
10100 Santa Monica Blvd., Suite 2200
Los Angeles, CA 90067
Telephone: (310) 282-2348
Facsimile: (310) 742-0414
bgiven@loeb.com

*Counsel for Defendant Matt Martorello*

## CERTIFICATE OF SERVICE

I certify that on this 23rd day of June, 2023, a true and correct copy of the foregoing was served upon all parties that are registered to receive electronic service through the Court's ECF notice system in the above case.

 */s/ John David Taliaferro*
John David Taliaferro (Va. Bar. 71502)

JA2680

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | |
|---|---|
| LULA WILLIAMS, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) Case No. 3:17-cv-00461 (REP) |
| v. | ) |
| | ) |
| BIG PICTURE LOANS, LLC, *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |

### DEFENDANT MATT MARTORELLO'S STIPULATION REGARDING REMAINING ELEMENTS OF RICO 1962(c) CLAIM

Defendant Matt Martorello, by and through his undersigned counsel, hereby files the following stipulation regarding Plaintiffs' Claim under 18 U.S.C. §1962(c):

Given the Court's June 27, 2023 ruling that control is not a prerequisite for purposes of § 1962(c) liability, (*see, e.g.*, June 27 Transcript at 177:1-5; 180:9-12), **Mr. Martorello stipulates that, for the entire class period, he was associated with an association-in-fact enterprise the activities of which affect, interstate or foreign commerce, and Mr. Martorello participated in the operation of the affairs of the enterprise through the collection of unlawful debt.**

As a result, there are no remaining triable issues of material fact regarding Plaintiffs' § 1962(c) claim, and the Court can enter summary judgment on Plaintiffs' § 1962(c) claim.[1]

Dated: June 30, 2023

 /s/ John David Taliaferro
John David Taliaferro (Va. Bar. 71502)
LOEB & LOEB LLP
901 New York Ave., NW
Suite 300-E
Washington, DC 20001
Tel. (202) 618-5015
Facsimile: (202) 318-0691
jtaliaferro@loeb.com

---

[1] Defendant reserves the right to appeal the Court's legal rulings made with respect to § 1962.

24266752.2
233953-10004

JA2681

Bernard R. Given (*pro hac vice*)
LOEB & LOEB LLP
10100 Santa Monica Blvd., Suite 2200
Los Angeles, CA 90067
Telephone: (310) 282-2348
Facsimile: (310) 742-0414
bgiven@loeb.com

*Counsel for Defendant Matt Martorello*

**AGREED TO:**

Dated:  June 30, 2023              */s/ Kristi Cahoon Kelly*
Kristi Cahoon Kelly (VSB #72791)
Andrew Joseph Guzzo (VSB #82170)
KELLY GUZZO, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
Phone: 703-424-7572
Fax: 703-591-0167
Email: kkelly@kellyguzzo.com
Email: aguzzo@kellyguzzo.com

Leonard Anthony Bennett
Consumer Litigation Associates
763 J Clyde Morris Boulevard, Suite 1A
Newport News, VA 23601
Telephone: 757-930-3660
Facsimile: 757-930-3662
Email: lenbennett@clalegal.com

*Counsel for Plaintiffs*

2

JA2682

## CERTIFICATE OF SERVICE

I certify that on this 30th day of June, 2023, a true and correct copy of the foregoing was served upon all parties that are registered to receive electronic service through the Court's ECF notice system in the above case.


_/s/ John David Taliaferro_____
John David Taliaferro (Va. Bar. 71502)

JA2683

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**


LULA WILLIAMS ET AL.,
    Plaintiffs.


v.                              Case No. 3:17-cv-461


BIG PICTURE LOANS, LLC ET AL.,
    Defendants.


**ORDER**

Having reviewed DEFENDANT MATT MARTORELLO'S STIPULATION
REGARDING REMAINING ELEMENTS OF RICO 1962(c) CLAIM (ECF No.
1359), it is hereby ORDERED that summary judgment is entered in
favor of the Plaintiffs as to Plaintiffs' COUNT TWO. CLASS
ACTION COMPLAINT at 20 (ECF No. 1). Judgment thereon shall be
entered at the conclusion of the trial set to begin on July 17,
2023.

By July 21, 2023, the parties shall advise: (1) the
calculations of damages; and (2) whether the damages as to COUNT
TWO are the same as, or different than, those for COUNT THREE.

It is SO ORDERED.

_____/s/_____
Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: July _____, 2023

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
Richmond Division

LULA WILLI.AMS, et al.,

    Plaintiffs,

v.                      Case No. 3:17cv461

BIG PICTURE LOANS, LLC,
et al.,

    Defendants.

### AMENDED MEMORANDUM OPINION

This matter is before the Court on the PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT ("Plaintiffs' Motion") (ECF No. 1165). By ORDER entered on June 16, 2023 (ECF No. 1328), Plaintiffs' Motion was granted in part. This MEMORANDUM OPINION further explains the reasons for so doing.[1]

### BACKGROUND

**A. Factual Background**

This class action proceeding concerns a "lending scheme allegedly designed to circumvent state usury laws." Williams v. Martorello, 59 F.4th 68, 72 (4th Cir. 2023) [hereinafter Williams

---

[1] It also explains subsequent orders that were based on the resolution of the Plaintiffs' Motion.

II). Plaintiffs, representing a class of borrowers,[2] allege that the defendant, Matt Martorello ("Martorello"), conspired with the Lac Vieux Desert Band of Chippewa Indians ("the Tribe") and various other entities and individuals to issue high-interest loans through the internet to consumers within the Commonwealth of Virginia. Plaintiffs brought a five count CLASS ACTION COMPLAINT ("Compl.") (ECF No. 1) against Martorello. COUNT ONE seeks a

---

[2] The Court certified the following classes:
   (a) **Big Picture RICO Class:** All Virginia consumers who entered into a loan agreement with Big Picture where a payment was made from June 22, 2013 to December 20, 2019.

      (i) **Big Picture Usury Sub-class:** All Virginia consumers who paid any principal, interest, or fees on their loan with Big Picture from June 22, 2015 to December 20, 2019.

      (ii) **Big Picture Unjust Enrichment Sub-class:** All Virginia consumers who paid any amount on their loan with Big Picture from June 22, 2014 to December 20, 2019.

   (b) **Red Rock RICO Class:** All Virginia consumers who entered into a loan agreement with Red Rock where a payment was made from June 22, 2013 to December 20, 2019.

      (i) **Red Rock Usury Sub-class:** All Virginia consumers who paid any principal, interest, or fees on their loan with Red Rock from June 22, 2015 to December 20, 2019.

      (ii) **Red Rock** Unjust Enrichment **Sub-class:** All Virginia consumers who paid any amount on their loan with Red Rock from June 22, 2014 to December 20, 2019.

Class Certification Order (ECF No. 1111) which was affirmed by the United States Court of Appeals for the Fourth Circuit in Williams II.

JA2686

Declaratory Judgment that "the choice of law and forum-selection provisions are void and unenforceable under Va. Code§ 62-1541(A) and as a matter of Virginia's well-established public policy." Compl. at ¶ 94.[3] COUNT TWO seeks relief under the Racketeer Influenced and Corrupt Organizations Act ("RICO") , 18 U.S.C. § 1962(c), COUNT THREE seeks relief under RICO, 18 U.S.C. § 1962(d). COUNT FOUR is based on violations of Virginia Usury Laws. COUNT FIVE presents a claim for unjust enrichment under Virginia law. Compl. at 20-31.

The Plaintiffs Motion seeks summary judgment on COUNT THREE, the RICO conspiracy claim[4] based on 18 U.S.C. § 1962(d) which provides that:

> It shall be unlawful for any person to conspire to violate any of the provisions of subsection ... (c) of this section.

18 U.S.C. § 1962(d).

The Plaintiffs' Motion also seeks summary judgment on certain elements of COUNT TWO based on 18 U.S.C. § 1962(c): participation in the affairs of the RICO enterprise.  Section 1962(c) provides that:

---

[3] COUNT ONE will be dismissed pursuant to PLAINTIFFS' CONSENT MOTION TO DISMISS COUNT ONE OF THE COMPLAINT (ECF No. 1400).

[4] PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT ("Pls. Memo. in Supp.") at 3 n.1 (ECF No. 1169). An unsealed version is filed at ECF No. 1166.

3

> It shall be unlawful for any person employed by or associated with an enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c).

Section 1962(c) is also the RICO section that is charged as that which was violated by the conspiracy that is alleged in COUNT THREE. A brief summary of the factual underpinnings of Plaintiffs' RICO claims is necessary to an understanding of the issues that are the subject of this MEMORANDUM OPINION.

According to Plaintiffs and supported by the record offered in support of Plaintiffs' Motion, and not much materially disputed, Martorello began engaging in the online lending business in 2008. In 2011, Martorello, working with Robert Rosette, a well-known lawyer in the tribal lending business, established a relationship with the Tribe. The alleged purpose of this relationship was to establish a so-called "rent-a-tribe" online lending operation. The online lending operation was conducted by the alleged RICO enterprise, which was comprised of Martorello, several entities created and controlled by Martorello, several of his friends and relatives, the Tribe, and several entities created by the Tribe.

The purpose to be served by the relationship Martorello sought with the Tribe was to imbue a forthcoming online lending operation

4

with the Tribe's sovereign immunity. If that could be accomplished, Martorello envisioned that he {and entities that he would control and use to make high interest, usurious loans that violated the laws of most states and RICO) would be immune from civil and criminal liability for such violations.

There is undisputed evidence that, through the alleged RICO enterprise, the alleged RICO conspiracy made high interest loans.[5] First, under the name of Red Rock Tribal Lending, LLC {"Red Rock"), and then in the name of Big Picture Loans, LLC {"Big Picture Loans"). Both of those entities are considered arms-of-the-tribe. Williams v. Big Picture, 929 F.3d 170 {4th Cir. 2019) [hereinafter Williams I].

However, the loans were funded by Martorello's company, Bellicose VI and then Bellicose Capital, LLC {"Bellicose Capital"). The record shows that Bellicose VI and then SourcePoint VI, LLC {"SourcePoint") {Bellicose VI's subsidiary), which were owned and controlled by Martorello, handled the day-to-day operation of the business of the tribal entities and, for all practical purposes, underwrote, issued, and serviced the loans made online by the alleged RICO enterprise. For most of the time at issue, the Tribe received approximately 2% of the net revenue

---

[5] I.e., loans that were unlawful under Virginia law and 18 U.S.C. § 1961(6).

from loan payments.[6]  Martorello's companies received the rest. And, ultimately, those companies sent the money to Martorello and his family through offshore trusts that Martorello established to receive the proceeds of the unlawful loans.

The undisputed evidence shows that Martorello was the founder and Chief Executive Officer of Bellicose Capital. There is no material dispute that Martorello created Bellicose VI and Bellicose for the purpose of funding, making, and collecting the alleged unlawful loans made by the alleged RICO enterprise.

Nor is it disputed that, in 2014 and 2015, Martorello knew about enforcement actions taken by various state agencies against unrelated, but similar, rent-a-tribe operations engaged in online lending operations such as the one being operated by Martorello's entities and the Tribe. So, in January 2016, Martorello arranged a restructuring of the online lending operation in which Martorello, his entities, and the Tribe were involved. As part of that restructuring, the Tribe acquired Bellicose Capital, and Martorello's entities and the Tribe entered into several related

---

[6] Late in the timeframe, the Tribe's percentage was increased slightly, to 4%, following a restructuring of the enterprise that will be discussed below.

6

contracts that facilitated the continuation of their allegedly illegal online lending activities.[7]

After the restructuring, most of the proceeds from the online lending enterprise continued to flow to Martorello and his family through a series of companies and trusts. Throughout the entire course of the alleged RICO enterprise, its purpose was to make and collect unlawful debts {i.e., loans on which the interest rate exceeded the usury rate permitted under Virginia law and which met the definition of "unlawful debt" in 18 U.S.C. § 1961{6)). There is substantial evidence to support that Martorello was extensively involved in the affairs of the alleged RICO enterprise.

It is important to keep in mind that the Tribe enjoyed sovereign immunity. Therefore, even if it made loans that exceeded permissible usury rates, it could not be sued. The same is true of entities organized by the Tribe to participate in the RICO enterprise's online lending scheme. See Williams I, 929 F.3d at 185. The record contains substantial, undisputed evidence, that Martorello's purpose in making online loans under the so-called "rent-a-tribe model" was to attempt to clothe the alleged RICO enterprise with the sovereign immunity which the Tribe and its entities possessed.

_____

[7] Under the restructured lending arrangements, the Tribe was to receive approximately 4% of the gross revenues.

7

There is evidence to show that Martorello (the alleged mastermind and principal beneficiary of the rent-a-tribe scheme), the entities that make and collect the usurious loans and that distribute the loan payments, and the people who run these various entities comprise the alleged RICO enterprise. The present action focuses on Martorello because he is said to have conceived of, and set up, the unlawful online lending arrangements, and spearheaded efforts to make them appear to be of tribal origin. But allegedly, in fact, it was his business entities and Martorello himself who were conducting the affairs of the alleged RICO criminal enterprise. And, it was Martorello and his family and investors who ultimately received the funds generated by the unlawful usurious loans.

## B. Procedural Background

This case has a long procedural history. It has twice been to the United States Court of Appeals for the Fourth Circuit. On the first occasion, the Fourth Circuit considered the question of tribal sovereign immunity and dismissed the two tribal entity defendants, Big Picture Loans and Ascension Technologies, LLC ("Ascension"). Williams I, 929 F.3d at 185; see also Dismissal Order {ECF No. 668) (dismissing Big Picture Loans and Ascension). On the second, and more recent occasion, the Fourth Circuit affirmed this Court's class certification order. Williams II, 59

8

F.4th at 73. Thereafter, the parties conducted extensive discovery on the merits of the case after which the Plaintiffs and Martorello both filed motions for summary judgment.

### 1.   **Martorello's Motion for Summary Judgment**

Martorello requested summary judgment that:

(1)   Tribal law applied to the loans;

(2)   Martorello could not be held liable under Virginia's usury laws; and

(3)   Martorello could not be held liable for unjust enrichment.[8]

On June 26-27, 2023, the Court heard oral argument on Martorello's Motion for Summary Judgment (June 26, 2023 Minute Entry (ECF No. **1351)).**   That motion was denied in its entirety. June 28, 2023 ORDER (the "June 28 ORDER#) (ECF No. 1354).  On July 11, 2023, a MEMORANDUM OPINION (ECF No. 1392) was issued explaining that decision.

### 2.   The Plaintiffs' Motion for Partial Summary Judgment

To some extent, the issues presented for decision in the Plaintiffs' Motion evolved over time because of the positions

---

[8] **DEFENDANT MATT MARTORELLO MEMORANDUM OF LAW OF IN SUPPORT OF HIS MOTION FOR PARTIAL SUMMARY JUDGMENT ("Martorello Memo. in Supp.n)** at **18, 32, 35 (ECF No. 1255).**

9

asserted in the briefs[9] and even in argument. Accordingly, it is necessary to explain the evolution of the issues from inception to decision.

The brief supporting the Plaintiffs' Motion originally specified that the only entire count presented for summary judgment was COUNT THREE, the RICO conspiracy claim under 18 U.S.C. § 1962(d) (Plaintiffs' Opening Memo, ECF No. 1169, p. 3 n.1). However, later in their brief, the Plaintiffs also presented Argument VI which was entitled: "Summary judgment should be granted that a violation of § 1962(c) [COUNT TWO) occurred.[1][10]   However, an examination of Plaintiffs' opening and reply briefs make it clear that Argument VI was addressed only to certain elements of COUNT TWO (the§ 1962(c) claim); and that the Plaintiffs' Motion only sought summary judgment on those elements, not on COUNT TWO

---

[9] PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT (ECF No. 1169); DEFENDANT MATT MARTORELLO REPLACEMENT MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT (ECF No. 1218); and PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT (ECF No. 1244). At the request of Martorello, (ECF Nos. 1216 and 1217), a replacement memorandum (ECF No. 1218) was filed in an effort to remove from the decisional process the need to decide whether Martorello' s original filing was objectionable for failure to satisfy the requirement of a local rule of civil procedure. The replacement memorandum was filed with the consent of the Plaintiffs, and it is intended to respond to the Plaintiffs' motion for partial summary judgment (the brief for which is ECF No. 1169).

[10] (ECF No. 1169, pp. 36-40).

as a whole.   With that clarification in mind, the Plaintiffs'
Motion sought partial summary judgment:

- On the choice of law issue (ECF No. 1169, pp. 26-31);

- On the tribal immunity defense presented by Martorello
  {ECF No. 1169, pp. 31-32); and

- That Martorello had violated§ 1962{d) (ECF No. 1169,
  pp. 32-36) based on the assertions that: (A)
  Martorello knew about the alleged RICO scheme and (B)
  Martorello furthered the scheme and knowingly took
  millions of dollars therefrom; and

- On certain elements of COUNT TWO, to-wit:

    (i)  an enterprise existed; and

    {ii) the loans made by the enterprise are unlawful
         debts; and

   {iii) persons associated with the enterprise engaged
         in collection of those debts.[11]

In response, Martorello substantively addressed some of those
issues, stipulated as to some of them, and ignored others. It is
thus necessary to sort out where Martorello now stands on those
issues.

---

[11] Again, it is appropriate to keep in mind that at the time the
Plaintiffs' Motion was filed, the Plaintiffs acknowledged the
existence of a disputed issue of fact respecting whether Martorello
participated in the management of the enterprise and therefore did
not seek summary judgment on COUNT TWO, the alleged violation of
18 **U.S.** § 1962(c).

11

First, Martorello's response to the Plaintiffs' Motion took the position that Tribal law (not Virginia law) applied *to* the loans at issue because FEDERAL PREEMPTION PRECLUDES APPLICATION OF VIRGINIA LAW (ECF No. 1218, pp. 21-31). That argument is comprised of several subparts which are as follows:

- [The Tribe's] sovereignty rights require application of tribal law because of provisions in the so-called "Indian Commerce Clause;" and

- Application of Virginia law is at odds with the Native American Business Development Act ("NABDA") (ECF No. 1218, pp. 26-28); and

- The Economics of a Deal do not Change the Preemption Analysis; and

- The National Bank Act Preemption supports application of federal law; and

- The prospective waiver provisions in the choice of forum clause in the loan agreements do not render the tribal choice of law clause unenforceable; and

- <u>Hengle</u> <u>v.</u> <u>Treppa</u> is distinguishable and not controlling.

Second, Martorello opposed the requested partial summary judgment by claiming that he was entitled *to* present a mistake of law to the RICO claims and that therefore those claims were not amenable *to* summary judgment.

12

On June 7 and 8, 2023, the Court heard oral argument on Plaintiffs' Motion and the parties' respective motions in limine.[12] June 7, 2023 Trans. (ECF No. 1316); June 8, 2023 Trans. (ECF No. 1317). In his briefing and at oral argument, Martorello stipulated that:

(1)  if the Court determined that Virginia law applies, the loans constituted unlawful debts within the meaning of RICO (18 U.S.C. § 1961(6));

(2)  Martorello knew that there was an enterprise, as defined by 18 U.S.C. § 1961(4); and

(3)  "persons associated with the enterprise engaged in the collection of unlawful debt."

Hearing Trans. at 171-73. In addition, Martorello clarified that he no longer was claiming tribal immunity. Id. at 165.

Subsequently, the parties agreed that, based on the foregoing stipulations by Martorello and the Court's ruling on the choice of law issue, the only remaining questions as to the claim under 18 U.S.C. § 1962(d) (COUNT THREE) were whether Martorello could present a mistake of law defense (that tribal law applied) and, relatedly, whether the Plaintiffs had to prove that Martorello had to know that the loans were illegal. Id.  In some iterations, the

---

[12] For a complete list of all matters heard during the June 7-8 hearings, see May 24, 2023 ORDER (ECF No. 1267).

latter contention was whether he had to know that the specific interest rate was illegal. At other times, the contention was merely a repetition of the belief that tribal law applied.

On June 16, 2023, the Court granted summary judgment in favor of the Plaintiffs as to:

(1) The choice of law issue (1 I(1));

(2) Tribal immunity issue (1 I(2));

(3) Martorello's mistake of law defense (1 I(3));[13] and

(4) The following elements of the claim under 18 U.S.C. §§ 1962(c) (COUNT TWO):[14]

> "(a) The loans in question are 'unlawful debts' as defined in 18 U.S.C. §§ 1961(6), 1962(c); and
>
> (b) An 'enterprise' existed as defined in 18 U.S.C. §§ 1961(4), 1962(c); and
>
> (c) Persons engaged in the enterprise collected unlawful debts; and

---

[13] **As explained below, MATT MARTORELLO'S ANSWER AND AFFIRMATIVE** DEFENSES TO PLAINTIFFS' COMPLAINT ("Martorello's Answer") (ECF No. 23) refers to the defense as one of "good faith," and the parties' briefs used the terms "good faith," "advice of counsel," and "mistake of law" interchangeably, but, at oral argument, both agreed that the defense actually was "mistake of law."

[14] And, to the extent that§ 1962(c) is alleged as part of the§ 1962(d) RICO conspiracy claim, to that aspect of COUNT THREE.

14

(d) There is no willfulness element for a civil cause of

action under 18 U.S.C. §§ 1962(c)-(d)."[15]

June 16, 2023 ORDER at 2-3 ("June 16 ORDER") (ECF No. 1328). This

MEMORANDUM OPINION will further explain the reasoning on which

those decisions were based.

After the June 16 ORDER was issued, Plaintiffs filed a request

for reconsideration and asked the Court to amend the June 16 ORDER

"to reflect that summary judgment is granted in favor of Plaintiffs

as to 18 U.S.C. § 1962(d)'s elements that Martorello: (1) knew

about; and (2) facilitated the usurious lending enterprise."[16]

Martorello conceded that, after the Court's ruling that the loans

are governed by the law of Virginia and that a mistake of law

defense is not available as a defense to liability, "there are no

remaining triable issues of fact on Plaintiffs' § 1962(d) claim

[COUNT THREE]."[17] In perspective of that concession, the June 16

ORDER was amended to read: "Summary judgment is granted in favor

---

[15] By ORDER (ECF No. 1397), this part of the ORDER (ECF No. 1328) was deleted.

[16] PLAINTIFFS' NOTICE AND REQUEST FOR RECONSIDERATION OF COURT'S RULING ON SATISFACTION OF THE 1962(d) ELEMENTS at 2 (ECF No. 1340).

[17] DEFENDANT MATT MARTORELLO'S RESPONSE TO PLAINTIFFS' NOTICE AND REQUEST FOR RECONSIDERATION OF COURT'S RULING ON SATISFACTION OF THE 1962(d) ELEMENTS (ECF No. 1345).

15

of the Plaintiffs as to all elements of Plaintiffs' 18 U.S.C. § 1962(d) claim [COUNT THREE]." June 26, 2023 ORDER (ECF No. 1350).[18]

Following the Court's June 26, 2023 oral ruling that "control is not a prerequisite for purposes of (18 U.S.C.] § 1962(c) liability," Martorello stipulated:

> that, for the entire class period, he was associated with an association-in-fact enterprise the activities of which affect, interstate or foreign commerce, and Mr. Martorello participated in the operation of the affairs of the enterprise through the collection of "unlawful debt" [19]

He also informed the Court that "there are no remaining triable issues of material fact regarding Plaintiffs' § 1962(c) claim [COUNT TWO]." Id. Thereafter, the Court granted summary judgment on COUNT TWO of the Complaint (the claim under 18 U.S.C. § 1962(c)). July 7, 2023 ORDER (ECF No. 1373).

Then, on July 10, 2023, for purposes of simplifying the forthcoming trial, Plaintiffs moved to dismiss the state law counts without prejudice, COUNTS FOUR and FIVE.[20] The Court granted that

---

[18] The June 26, 2023 ORDER was later amended to correct a scrivener's error. July 5, 2023 ORDER (ECF No. 1362).

[19] DEFENDANT MATT MARTORELLO'S STIPULATION REGARDING REMAINING ELEMENTS OF RICO 1962(c) CLAIM (ECF No. 1359).

[20] PLAINTIFFS' CONSENT MOTION TO DISMISS USURY AND UNJUST ENRICHMENT CLAIMS WITHOUT PREJUDICE PURSUANT TO RULE 41(a)(2) (ECF No. 1387).

16

motion, and dismissed COUNTS FOUR and FIVE without prejudice. July 10, 2023 ORDER **(ECF No.** 1390).

Also, on July 10, 2023, the parties stipulated "that the damages amount for the § 1962(c) claim [COUNT TWO] is $43,401,817.47." JOINT NOTICE AND STIPULATION REGARDING§ 1962(c) DAMAGES (ECF No. 1389). They then stipulated "that the damages for [the] § 1962(c) claim [COUNT TWO] are the same as the damages for the§ 1962(d) claim [COUNT THREE]." (ECF No. 1389).

After conferring with the parties in a conference call, July 10, 2023 Call Trans. (ECF No. 1393), and "understanding that there are no remaining triable issues," the Court canceled the trial that had been set to begin with jury selection on July 12, 2023. (July 11, 2023 ORDER (ECF No. 1391)).

With the foregoing background in mind, we return to explaining the decisions on Plaintiffs' Motion.

## DISCUSSION

### A.    Legal Framework

Rule 56 sets forth the familiar standard for summary judgment, providing that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

17

Fed. R. Civ. P. 56(c). The Supreme Court has construed Rule 56(c) to "mandate the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The Court explained that, "[i]n such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case renders all other facts immaterial." Id. at 323, 106 S. Ct. 2548; see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

In reviewing a motion for summary judgment, a court must view the facts and any inferences drawn from these facts in the light most favorable to the nonmoving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986); Seabulk Offshore, Ltd. v. Am. Home Assurance Co., 377 F.3d 408, 418 (4th Cir. 2004). The nonmoving party must demonstrate that there are specific facts that would create a genuine issue for trial. See Anderson, 477 U.S. at 250, 106 S. Ct. 2505. "Where ... the record taken as a whole could not lead a rational trier of fact to find for the non-moving party,

disposition by summary judgment is appropriate." United States v. Lee, 943 F.2d 366, 368 (4th Cir. 1991).

## B. Analysis

This MEMORANDUM OPINION principally addresses two issues on which the Plaintiffs sought summary judgment: (1) the applicable law (the choice of law issue); and (2) the availability of a mistake of law defense to a claim for civil liability for conspiracy under RICO: 18 U.S.C. § 1962{d). It also resolves aspects of the Plaintiffs' Motion in Plaintiffs' favor because Martorello did not contest them.

1.  Choice of Law: Tribal Law or Virginia Law

The parties dispute what law applies to the loans that were made by the alleged RICO enterprise. Plaintiffs argue that Virginia law governs because: (1) all Plaintiffs in this class resided in Virginia when they took out the loans and the effects of the loan were felt by Plaintiffs in Virginia and (2) the loan agreement's choice of law clause (which specifies tribal law as the governing law) is unenforceable. Pls. Memo. in Supp. at 27, 30.[21] So, the

---

[21] This dispute is also related to Plaintiffs' Motion in Limine 3, **MEMORANDUM IN SUPPORT OF PLAINTIFFS' OMNIBUS MOTIONS IN LIMINE** at 4 (ECF No. 1174) (requesting the Court to "Exclude Argument or Suggestion that Tribal Law Governs the Loans or Virginia law does not apply to the loans, or that the Class Action Waivers are Enforceable") (emphasis removed), and id. at 6 (requesting the Court to "Exclude Any Suggestion that Federal Policy Supports these Commercial Activities") (emphasis removed). Over Martorello's

**19**

Plaintiffs ask for summary judgment that Virginia law applies to the loan agreements.[22]

In response, Martorello argues that various federal preemption principles preclude the application of Virginia law and, instead, that the loans at issue are governed by tribal law because of the Indian Commerce Clause, U.S. Const. Art. 1, § 8, and the federal preemption principles[23] said to derive from the NABDA and the National Bank Act ("NBA"). Martorello also argues that, even if the Indian Commerce Clause, the NABDA, and/or the NBA do not require the application of tribal law, the choice of law clauses in the loan agreement, specifying the application of tribal law, are enforceable under federal law.[24]

(a) The Indian Commerce Clause, the **NABDA**, the NBA

Martorello argues that, instead of engaging in the usual choice of law analysis (which admittedly would not apply tribal

---

opposition, DEFENDANT MATT MARTORELLO' **S** MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' OMNIBUS MOTION IN LIMINE at 2-3 (ECF No. 1205), the Court granted both these Motions in Limine. June 16, **2023 ORDER at 3 (ECF No. 1328).**

[22] Pls. Memo. in Supp. at 26.

[23] Martorello Memo. in Supp. at 18.

[24] **DEFENDANT MATT MARTORELLO REPLACEMENT MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT** ("Martorello Response") at 29 (ECF No. 1218).

20

law), the Court should engage in an Indian Commerce Clause analysis. Martorello Response at 21-22. Under that analysis, says Martorello, tribal law governs the loans, and any attempt to apply Virginia law to the loans violates the Tribe's sovereign authority and preempts federal law. Id. at 26.[25]

The Indian Commerce Clause states: "The Congress shall have Power . . . To regulate Commerce.    with the Indian Tribes." U.S. Const. Art. I, § 8, cl. 3. Under that clause, ucongress has broad power to regulate tribal affairs," and federal law concerning tribal affairs preempts state law. White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 142 (1980). Federal preemption and the "tradition of Indian sovereignty over the reservation and tribal members" together serve to limit the states' ability to interfere in tribal affairs. Id. at 143.

Tribal affairs are implicated when states attempt to regulate \\activity undertaken on the reservation or by tribal members." Id. at 143; see also California v. Cabazon Band of Mission Indians, 480 U.S. 202, 205 (1987) {discussing regulation of \\non-Indians coming onto the reservations"). When tribal affairs are implicated, the Supreme Court has instructed that a multi-faceted

---

[25] Martorello reiterated these same arguments in his Motion for **Summary Judgment. See DEFENDANT MATT MARTORELLO MEMORANDUM OF LAW OF IN SUPPORT OF HIS MOTION FOR PARTIAL SUMMARY JUDGMENT at 18, 28 (ECF No. 1255).**

21

test is to be employed to determine if state laws can apply. Id. at 145; Otoe-Missouria Tribe of Indians v. N.Y. Dep't of Fin. Servs., 769 F.3d 105, 112 (2d Cir. 2014).

However, the Supreme Court has made clear that the Bracker test does not apply where a state imposed a regulation on "a non-Indian" engaging in "a transaction that occurs off the reservation." Wagnon v. Prairie Band Potawatomi Nation, 546 U.S. 95, 99 (2005). And, "[u]nless federal law provides differently, Indians going beyond reservation boundaries are subject to any generally applicable state law." Michigan v. Bay Mills Indian Cmty., 572 U.S. 782, 795 (2014} (citation omitted).

Binding Fourth Circuit precedent makes clear that online tribal lending is considered "off-reservation" conduct. Hengle v. Treppa, 19 F.4th 324, 348-49 (4th Cir. 2021}. Here, as in Hengle, the office of the entities that (at least nominally) issued the loans, Red Rock and Big Picture Loans, were "located on tribal land,"[26] but it is not disputed that the Plaintiffs in this case (the targets of the lending activity} "reside[d] on non-Indian lands when they applied for their loans online...  and the effects of Defendants' allegedly illegal activities were felt by the Plaintiffs in Virginia," not on tribal land. Hengle, 19 F.4th at

---

[26] Loan Agreement at 2 (ECF No. 1-1).

348-49 (citing Gingras v. Think Fin., Inc., 922 F.3d 112, 121 (2d Cir. 2019); Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs., 974 F. Supp. 2d 353, 360-361 (S.D.N.Y. 2013); Colorado v. W. Sky Fin., LLC, 845 F. Supp. 2d 1178, 1181 (D. Colo. 2011); United States v. Hallinan, No. 16-cr-130, 2016 WL 7477767, at *1 n.2 (E.D. Pa. Dec. 29, 2016)); see Pls. Memo. in Supp. at 1 140; Martorello Response at 1140.[27]

The undisputed record in this case establishes that the loan activities in this case are "directly analogous to the lending activity that other courts have found to clearly constitute off-reservation conduct subject to nondiscriminatory state regulation." Hengle, 19 F.4th at 348-49 (citation omitted}. And, there is no assertion that Martorello is a tribal member. Thus, on this record, the Bracker Indian Commerce Clause test is inapplicable.

Martorello also points to the NABDA and the NBA, arguing that these federal laws preempt the application of state law. Martorello

---

[27] When citing to the Plaintiffs' statement of facts, Pls. Memo. in Supp. at 5-26, the Court will refer to the numbered paragraphs therein. Martorello submitted both a "Counterstatement of Undisputed Material Facts," Martorello Response at 2-15, and a "Response to Plaintiffs' Statement of Facts," id. at 15-21, both of which use numbered paragraphs. All citations to numbered paragraphs in Martorello's Response correspond to the section titled "Response to Plaintiffs' Statement of Facts," not to Martorello's "Counterstatement."

**23**

Response at 26-29. But, he has identified neither a statutory provision nor a court decision that would permit a finding that those statutes preempt state usury laws. Id. Martorello also mentions, in passing, that "[t]he economics of a deal do not change the pre-emption analysis." Id. at 28. That conclusory argument cites authorities that, upon examination, have no bearing on the issues in this case. Indeed, that argument, like the NABDA and the NBA arguments, is so lacking in merit as to warrant summary rejection.

Therefore, unless there is an enforceable choice of law clause providing otherwise, Virginia law applies. The analysis turns next to that question.

### (b) The Choice of Law Clauses in the Loan Agreements

The Loan Agreement's tribal choice of law clause states:

> This Agreement will be governed by the laws of the Lac Vieux Desert Band of Lake Superior Chippewa Indians ("Tribal law"), including but not limited to the [Tribal Consumer Financial Regulatory] Code as well as applicable federal law. All disputes shall be solely and exclusively resolved pursuant to the Tribal Dispute Resolution Procedure set forth in Section 9 of the Code and summarized below for Your convenience.

Loan Agreement at 4 {ECF No. 1-1) (emphasis added).

Because "the parties have not provided the Court with any tribal law concerning contract interpretation," the Court "will apply the contract interpretation principles of the forum, Virginia." Hengle, 19 F.4th at 340 n.5; see also Williams II, 59

24

F.4th at 77-78 n.7. Choice of law clauses are often enforceable under Virginia law, Hengle, 19 F.4th at 349; however, those clauses are not given effect when enforcement is "contrary to compelling public policy." Id.

The choice of law clause in these loan agreements is contrary to public policy for two reasons. First, the clause violates federal public policy under the prospective waiver doctrine. Second, the clause violates Virginia's strong public interest against usurious loans.

As explained by the Fourth Circuit, "[t]he prospective waiver doctrine invalidates agreements that prospectively waive a party's right to pursue statutory remedies in certain circumstances" because such a wavier "violates public policy." Williams II, 59 F.4th at 80.  In this case, the Fourth Circuit has found that this choice of law clause runs afoul of the prospective waiver doctrine. In so doing, the Fourth Circuit held that, notwithstanding its references to federal law, the Loan Agreement "in general" is "governed exclusively by Tribal law." Id. at 84 (emphasis added). And, although it is true that the Tribe's Regulatory Code[28] incorporates some federal consumer protection laws, it does not

---

[28] Lac Vieux Desert Band of Lake Superior Chippewa Indians Tribal Consumer Financial Services Regulatory Code ("Tribe's Regulatory **Code") § 6.2 (ECF No.** 1207-6).

include the federal statute (RICO) at issue in this litigation. Thus, under the terms of the Loan Agreement, Plaintiffs would not be able to "effectively vindicate their federal statutory rights" to relief under RICO. Id. at as.

By denying Plaintiffs the ability to pursue those federal statutory remedies, the choice of law clause in these loan agreements violates the prospective waiver doctrine. The clause is therefore unenforceable for that reason alone. Id.

The choice of law clause in the loan agreements also is unenforceable because it is contrary to the Commonwealth of Virginia's public policy. The Tribe's Regulatory Code states:

> Except as otherwise specified in this Code, a consumer financial services transaction may provide for such price, interest, time price differential, rent, fees, filing fees, and other charges as agreed upon by the parties.

Tribe's Regulatory Code § 7.2(b). The Tribe's Regulatory Code provides for no limitation on the interest charged on small loan transactions. Id. at § 11.[29] Virginia, on the other hand, has a "compelling public policy against unregulated usurious lending" and caps general interest rates at 12%. Hengle, 19 F.4th at 350,

---

[29] It appears that only vehicle loans are subject to a usury cap under the Tribe's Regulatory Code. Vehicle loans may not be subject to more than 390% annual interest rates. Tribe's Regulatory Code § 12.2(b).

352 (citing Va. Code Ann.§ 6.2-303(A)).[30]Therefore, as the Fourth Circuit has recognized, "unregulated usurious lending of low-dollar short-term loans at triple-digit interest rates to Virginia borrower-unquestionably 'shocks... one's sense of right' in view of Virginia law." Id. at 352 (quoting Tate v. Hain, 25 S.E.2d 321, 325 (Va. 1943)); see also Radford v. Cmty. Mortg. & Inv. Corp., 312 S.E.2d. 282, 285 (Va. 1984) ("The usury statutes represent a clarification of the public policy of the state that usury is not to be tolerated          " (citation omitted)). Thus, under Virginia's compelling public policy, the choice of law clause is unenforceable.

In sum, neither the Indian Commerce Clause, the NABDA, the NBA, nor the choice of law provision in the loan agreements precludes application of Virginia's usury laws. For those reasons, the Court held that Plaintiffs are entitled to summary judgment on the choice of law issue. And that judgment is that Virginia law applies and governs, inter alia, the lawful interest rate. And, under RICO, any rate that exceeds twice the rate allowed by state law offends the RICO statute and is an unlawful debt.[31]

---

[30]There are circumstances in which Virginia law allows interest rates in excess of 12%, but these loans do not fall within any exception. Martorello does not contend otherwise.

[31]After the Court found that Virginia law applied to the loans, June 16, 2023 ORDER (ECF No. 1328), Martorello conceded that the loans in question were "unlawful debt," as defined by 18 U.S.C. §

## 2. Mistake of Law Defense and Knowledge That Loans Were Unlawful

Martorello argues that he can assert, as a defense to RICO civil liability under§ 1962(c) and§ 1962(d), that he acted as he did on a mistaken belief of law that (1) the loans made by the alleged RICO enterprise were governed by tribal law and that, therefore, (2) those loans were legal under tribal law. Martorello Response at 33-34. Relatedly, Martorello also argues that to be liable under § 1962(d), "Plaintiffs must prove that Martorello knew that the loans were unlawful and, with that knowledge, intentionally conspired with co-conspirators to collect them." Martorello Response at 33 (emphasis added).

Plaintiffs assert that there is no "mistake of law" defense to liability under § 1962(c) or § 1962(d).[32] They also take the view that neither § 1962(c) nor § 1962(d} requires proof that Martorello knew that the loans in question were unlawful. Id.

---

1961(6}, June 7, 2023 Hearing Trans. at 171-72. Virginia caps interest rates at 12%, Va. Code Ann. § 6.2-303. Therefore, all loans in excess of 24% are \\unlawful debts" under RICO. Here, it is undisputed that the "average [Annual Percentage Rate] for the consumer loans was 727.80%" and the lowest was 34.8887%. Pls. Memo. in Supp. at 1146; Martorello Response at 1 146.

[32] PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT at 19-27 (ECF No. 1241).

28

**(a)  Mistake** of Law

The mistake of law defense seems to have its genesis in Martorello's SEVENTH AFFIRMATIVE DEFENSE which is:

> Defendant, Matt Martorello, at all times relevant acted in good faith and in a lawful manner towards consumers in conformity with all applicable laws and regulations.[33]

During the course of the case and in their summary judgment briefs, the parties confused the record respecting the true nature of the defense because they variously referred to it as a "good faith" defense, a "mistake of law" defense, the "scienter question," or "advice of counsel." Indeed, the parties used all of those terms interchangeably to refer to what seemed to be the same issue: whether Martorello's alleged mistaken belief that tribal law governed the legality of the collected debt [the loans] at issue is available as a defense to COUNT TWO and COUNT THREE.

Of course, good faith, advice of counsel, scienter, and mistake of law are somewhat different, albeit sometimes related, concepts.  So, at the June 7 hearing, the Court sought to understand the true nature of the defense that, in the briefs, bore these various sobriquets.[34]

---

[33] **MATT MARTORELLO'S ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFFS'** COMPLAINT {ECF No. 35, p. 23).
[34]  Martorello advised that he was not presenting an advice of counsel defense.

**29**

At the June 7 hearing, counsel for Martorello clarified that, notwithstanding the various references made in the briefs and pleadings, Martorello indeed was relying on a mistake of law defense and whether such a defense was available to Martorello in defense of COUNT TWO and COUNT THREE. June 7, 2023 Hearing Trans. at 8, 45-46, 60-61 (ECF No. 1316). Counsel for the Plaintiffs agreed that was the issue.

But then, counsel for Martorello stated: "when I have conceived of this argument and I've drafted it, I did not refer to it as a mistake of law. So I may not use that terminology, but I'm certainly on the same page with what we're discussing and what we're arguing here." June 7, 2023 Hearing Trans. at 61.

> MS. SIMMONS: Okay. So the threshold question we believe here is - and Your Honor has - has conceived of it as a mistake of law.
>
> The question we think that the Court has to answer is-
>
> THE COURT: Just a minute. Just a minute. I didn't conceive of it. You all conceived of it. He [Plaintiffs' counsel] agreed with that's what it was. The plaintiffs agreed that's what it was. It's in your briefs. It is articulated in three different ways, advice of counsel, good faith, mistake of law, but its predominant thesis is it's a mistake of law.
>
> * * *
>
> MS. SIMMONS: ... The question is does section 1962(d), the conspiracy section of the RICO statute, have a scienter element that would place the burden on Plaintiffs to show that Martorello willfully agreed that he, or some member of the alleged RICO conspiracy, would engage in the collection of unlawful debt. And we submit

30

that it does have that scienter requirement as the first
point.

So in the *United States* --

THE COURT: Mark that right there. I need to have that
typed up.

That isn't how these briefs read.

MS. SIMMONS:  I think that it is how the --

THE COURT: It's a refinement on it that I don't think
is quite in the papers.

MS. SIMMONS:  It's certainly the intention of the portion
of our opposition to their motion for summary judgment
on this point.

{June 7, 2023 Transcript {\\June 7 Tr."), pp. 60-64.

Martorello's counsel then turned to United States v. Mouzone,

687 F.3d 207, 218 (4th Cir. 2012). There, the Court of Appeals,

when deciding that a conviction for violating§ 1962(d) did not

require that the defendant have a role in directing the RICO

enterprise, also made the statement that the§ 1962{d) criminal

liability charge had as an element that \\each defendant knowingly

and willfully agreed that he or some other member of the conspiracy

would commit at least two racketeering acts." Id. at 218; June

7 Tr. at 62.

And counsel for Martorello continued:

MS. SIMMONS: And so the existence of Mr. Martorello's
good faith belief goes to the question of whether or not
he could have engaged in willful conduct.

31

In [another] case,[35] in a footnote, the Court said, nwillfulness generally requires a showing of knowledge of unlawfulness." And it did so in the citation to the Supreme Court's decision in Bryan v. United States at 524 U.S. 184.

So if we are correct, and we think we are, that a section 1962{d) claim requires a showing of willfulness to engage in the collection of unlawful debt, then Mr. Martorello should be entitled to present evidence of his good faith belief.

THE COURT: Good faith belief of what?

MS. SIMMONS: That he was not engaging in the collection of unlawful debt, that he - that he had a good faith belief that tribal law would apply to the loans.

* * *

**THE COURT:** So it's mistake of law.

**MS. SIMMONS:** Yes, Your Honor.

**THE COURT:** He made a mistake of law.

**MS. SIMMONS:** Yes, Your Honor.

**THE COURT: Okay.**

MS. SIMMONS: But the case law saying that mistake of law is not a defense we submit doesn't apply here because there is a willfulness element, which, in and of itself, allows a defendant to present evidence of his good faith belief that it wasn't unlawful. And so that's why this type of evidence is relevant.

{June 7 Tr., pp. 63-65) (emphasis added).

Thus, when all is said, Martorello wanted to defend against RICO liability by asserting the mistaken belief that tribal law,

---

[35] United States v. Grote, 961 F.3d 105 (2d Cir. 2020).

not Virginia law, governed whether the loans were unlawful (i.e., whether the debt being collected was unlawful). So, sobriquets notwithstanding, the issue to be decided is whether there is a mistake of law defense to the RICO civil conspiracy claim under§ 1962(d), and to the claim under§ 1962(c).

As matters now stand, Martorello's mistake of law defense has two purposes. First, he wishes to present the mistake of law argument to defend against a perceived willfulness element that Martorello says is in § 1962(d). Second, he wishes to use the mistake of law argument to defend against what he asserts to be the knowledge of illegality of the debt (the loans) element in§ 1962(c) (which is alleged to be the object of the § 1962(d) conspiracy).

## (b) The Mistake of Law Defense: Factual Basis

Before addressing those two issues, it is necessary to understand the factual basis for the mistake of law defense as Martorello presents it in the case. Because of the broad and vague text of Martorello's SEVENTH AFFIRMATIVE DEFENSE in his Answer and the varying sobriquets attached to it in subsequent discovery responses and briefs, Martorello was ordered to submit a statement detailing his mistake of law defense and produce all documents reflecting the sources of his belief that tribal law applied (ECF No. 1247). In response, Martorello submitted fifty documents that

33

purportedly reflected written advice, or the substance of oral advice, provided to Martorello to support his belief that tribal law applied to the loans at issue and that, therefore, the debt being collected was not unlawful.[36]

For various reasons set forth on the record, the Court sustained the Plaintiffs' objections to the use of most of the proffered documents. In so doing, the Court narrowed those documents to seven exhibits.[37]

Those documents fit into three categories:[38] (1) letters from lawyers who are counsel to online tribal lending expressing the view that tribal laws govern the loans;[39] ( 2} communications showing that, in 2013 and 2014, Martorello was aware of the decision in Otoe that was adverse to rent-a-tribe online lending

---

[36] DEFENDANT MATT MARTORELLO' S STATEMENT OF POSITION REGARDING GOOD FAITH DEFENSE PURSUANT TO ORDER AT DOCKET NO. 1247 at 9-17 (ECF No. 1275} (unsealed version at ECF No. 1261}.

[37] BB (ECF No. 1264-13; _refiled at_ ECF No. 1396 with email attachment per ECF No. 1394), EE (ECF No. 1261-31), KK (ECF No. 1264-18}, MM (ECF No. 1264-20; _refiled at_ ECF No. 1396-1 with email attachment per ECF No. 1394}, CCC (if foundation was provided) (ECF No. 1264-29; _refiled at_ ECF No. 1396-2 with email attachment **per ECF No. 1394}, HHH {ECF No. 1264-32}, and JJJ {ECF No. 1261-**62}. _See_ June 7 Hearing Trans. at 270-272, 284, 286, 297, 298, 3030, 307-08, 310, 313, 318.

[38] Some of the exhibits of which do not reflect that Martorello even received or saw them and for which that foundation must be laid if they are to be admitted.

[39] Exhibits **BB, KK,** and JJJ.

that, in turn, necessitated the decision to suspend the Martorello/Tribe online lending in New York;[40] and (3) a 2015 letter from Rosette, LLP, counsel for many tribes, including the Tribe, outlining a strategy to deal with the Otoe decision.[41]

Assuming that those documents are admissible (i.e., that Martorello was aware of them at the relevant times), they are probative of Martorello's assertion that he believed that Tribal law governed the loans at issue (the debt being collected}. However, those documents are not the only evidence pertaining to the mistake of law defense.

For example, in his briefing, Martorello says that he knew "tribal lending... was under legal and regulatory attack in some quarters throughout the relevant period of time." Martorello Response at 35.[42] And, the record as a whole reflects that Martorello knew that he was operating in, at-best, a grey area of the law. In fact, in 2012, he said that the tribal lending "industry is going to be living in the grey area of its legality for another year or two" and noted that "[w]e have received dozens of letters from State AGs saying we need to be licensed and sending

---

[40] Exhibits EE and MM.

[41] Exhibit KK.

[42] Exhibits EE and MM confirm that to be so.

Cease and Desist order." Martorello to Argyros Email at 13-14 (ECF No. 1266-1); see also Connecticut Cease & Desist Letter (ECF No. 1166-20).

Martorello closely followed successful lawsuits against, and criminal prosecutions of, other players in the rent-a-tribe lending industry. Martorello to Argyros Email at 12; Martorello to Rosette Email at 1 (ECF No. 1166-19); Martorello to Wichtman Email (ECF No. 1166-26). Martorello was so concerned about his own liability that he asked two attorneys to put together an opinion letter detailing his potential for personal criminal liability for the online lending rent-a-tribe involved in this case. In response, the attorneys stressed "[t]here isn't a bright-line answer here from a legal standpoint" and informed him that "[i]t is possible that individual or third-party service-providers could be held liable for criminal violations of Georgia [and other states'] law." Weddle & Compton Email & Memo to Martorello at 2, 14 (ECF No. 1270-2) (emphasis added). Martorello summed up the content of this email and the accompanying memorandum to say "something like ... 'yes it is possible the state will come after you for helping the tribe lend against their [the state's] laws and charge YOU for aiding and abetting as a felony crime in their state (in some instances penalty could be jail time}, but we don't think it•s going to happen.'" Martorello to Argyros Email at 14 (ECF No. 1266-1}.

36

JA2720

Another attorney advised Martorello that "it will be an uphill battle" to persuade a court that the loans were legal in a civil proceeding. Wichtman to Martorello Email at 3 (ECF No. 1166-22}.

In sum, Martorello knew that the online rent-a-tribe operation in which he was engaged was of questionable legality; that courts had held that tribal law did not apply to tribal online lending; that, in a civil proceeding, it would be difficult ("uphill") to persuade a court that the loans were legal; and that, if he persisted in asserting that tribal law governed the loans, he might face state felony prosecution.  And, he knew that the tribal lawyers knew as much even while asserting their belief that tribal law applied.[43] With that knowledge, and aware that online tribal lenders had been found to be wrong by the federal courts in New York, Martorello deliberately took the risk that his guess about what law would apply might well be wrong.

Of course, Martorello's mistake of law defense cannot rest on documentary evidence alone. In particular, because his defense depends on his knowledge and subjective belief, Martorello cannot rely on his mistake of law defense unless he testifies to what his belief was and why he held it.

---

[43] **Exhibits BB, EE, KK, MM, CCC, HHH, and JJJ cited on p.  31, <u>supra.</u>**

Considering that this Court and the Court of Appeals has held that Martorello previously has lied under oath about topics that are pertinent to the mistake of law defense,[44] it would be quite surprising if Martorello were to testify at trial. If he does not, there could be no mistake of law defense. However, counsel has represented that Martorello will testify at trial. So, at this stage, it must be assumed that he will and that he would say that he held the belief that tribal law governed whether the loans were unlawful debt.

That, in sum, is the factual predicate for what Martorello calls the mistake of law defense. Whether that fact basis could constitute a mistake of law defense is not now before the Court. But, assuming that it could, the question is whether that defense is even available to Martorello in defense of the RICO counts.

### (c)   **Willfulness and the Mistake of Law Defense**

To assess Martorello's position on his mistake of law defense, it is necessary to understand the elements of § 1962(c) and (d). Subsection (c) is involved in the analysis of liability under COUNT TWO and under COUNT THREE because COUNT THREE alleges a conspiracy to violate § 1962(c).

The starting point is the statutory text.

---

[44] Williams v. Big Picture Loans, LLC, No. 3:17-cv-461, 2020 WL 6784352 (E.D. Va. Nov. 8, 2020); Williams II, 59 F.4th at 89-90.

Section 1962(c) reads, in full:

It shall be unlawful for <u>any</u> <u>person</u> employed by or associated with <u>any</u> <u>enterprise</u> <u>engaged</u> in, or the activities of which affect, <u>interstate</u> <u>or</u> <u>foreign</u> <u>commerce,</u> <u>to</u> <u>conduct</u> <u>or</u> <u>participate,</u> <u>directly</u> <u>or</u> <u>indirectly, in the conduct of such enterprise's affairs</u> through a pattern of racketeering activity or <u>collection</u> <u>of unlawful debt.</u>

18 U.S.C. § 1962(c) (emphasis added). To establish the collection of unlawful debt, Plaintiffs must show that the defendant "(1) conducted [or participated in conducting] the affairs of an enterprise (2) through the collection of unlawful debt (3) while employed by or associated with (4) the 'enterprise engaged in, or the activities of which affect, interstate or foreign commerce.'"[45] <u>Gibbs v. Stinson,</u> 421 F. Supp. 3d 267, 312 (E.D. Va. 2019), <u>aff'd on different grounds sub nom. Gibbs v. Sequoia Cap. Operations, LLC,</u> 966 F.3d 286 (4th Cir. 2020) (quoting§ 1962(c)); <u>see also Salinas v. United States,</u> 552 U.S. 52, 62 (1997) (holding that "[t]he elements predominant in a subsection (c) violation are: (1) the conduct (2) of an enterprise (3) through a pattern of racketeering activity [like the collection of unlawful debt").

---

[45] It is undisputed that the loans involved interstate or foreign commerce. There is also no dispute that Plaintiffs were injured by the alleged RICO violation. <u>See Nunes v. Fusion GPS,</u> 531 F. Supp. 3d 993, 1012-1013 (E.D. Va. 2021).

Section 1962(c) does not mention willfulness. In that situation, it is often helpful to examine what the instructions would be if the case were to go to trial.

A widely used instruction on civil RICO liability delineates the elements of§ 1962(c) as follows:

> In order to prove that the defendant violated section 1962(c), plaintiff must establish by a preponderance of the evidence each one of the following five elements:
>
> First, that an <u>enterprise existed</u> as alleged in the complaint;
>
> Second, that the enterprise <u>affected</u> <u>interstate</u> or foreign <u>commerce;</u>
>
> Third, that the <u>defendant</u> was <u>associated</u> <u>with,</u> or employed by, <u>the enterprise;</u>
>
> Fourth, that the <u>defendant</u> <u>engaged</u> in a pattern of racketeering activity <u>(or</u> <u>the collection of an unlawful</u> <u>debt};</u> and
>
> Fifth, that the <u>defendant</u> conducted, or <u>participated</u> <u>in, the</u> <u>conduct of</u> <u>the enterprise</u> <u>through</u> that pattern of racketeering activity {or <u>collection of</u> <u>an unlawful</u> <u>debt}.</u>

<u>Modern</u> <u>Federal</u> <u>Jury</u> <u>Instructions</u> (Civil}, § 84-23 {emphasis added).

The instruction, like the statutory text, does not mention that willfulness is an element to be proved in establishing a civil

40

JA2724

claim under Section 1962(c).[46] Accordingly, Martorello's purported purpose to use a mistake of law defense to counter a willfulness element in a Section 1962(c) claim is not supportable.

But, were willfulness an element of a Section 1962(c) claim, the jury would be told that:

> The term "willfully," as used in these instructions to describe the alleged state of mind of defendant . means that he acted knowingly, deliberately and intentionally as contrasted with accidentally, carelessly, or unintentionally.

1A O'Malley, Grenig & Lee, <u>Federal Jury Practice and Instructions,</u> § 17.05 (6th ed. 2008). The "mistake of law" defense, as Martorello would present it, would not be probative to refute that Martorello's participation in directing the affairs of the enterprise was knowing, deliberate, and intentional.

More importantly, mistake of law defenses are heavily disfavored in civil cases and should not be allowed here. The Supreme Court has "long recognized the 'common maxim, familiar to all minds, that ignorance of the law will not excuse any person, either civilly or criminally.'" <u>Jerman</u> <u>v.</u> <u>Carlisle,</u> <u>McNellie,</u> <u>Rini, Kramer</u> <u>&</u> <u>Ulrich LPA,</u> 558 U.S. 573, 581 (2010) (quoting <u>Barlow</u> <u>v. United States,</u> 7 Pet. 404, 411 (1833) (opinion for the Court by

---

[46] Section 1962(c) is both a claim in its own right and is also necessary to the§ 1962(d) claim, which requires proof that the object of the RICO conspiracy was to violate§ 1962(c).

Story, J.)); <u>see also id.</u> at 582 n.5 (referring to the "venerable principle' that ignorance of the law generally is no defense") (quoting Ratzlaf v. United States, 510 U.S. 135, 149 (1994)); <u>United States v.</u> <u>Evans,</u> No. 2204307, slip op. at 13 (4th Cir. July 25, 2023).

As a result, individuals are nonetheless liable for their actions even if they, in good faith, believe that they are acting in accordance with the law. <u>See United States v.</u> <u>Fuller,</u> 162 F.3d 256, 261-62 (4th Cir. 1998). Indeed, as the Supreme Court has made clear, American "law is ...  no stranger to the possibility that an act may be 'intentional' for purposes of civil liability, even if the actor lacked actual knowledge that her conduct violated the law." <u>Jerman,</u> 599 U.S. at 582-83. The "background presumption must be that 'every citizen knows the law.'" <u>Fuller,</u> 162 F.3d at 262 (quoting <u>Bryan v.</u> <u>United States,</u> 524 U.S. 184, 193 (1998)).

There are, of course, some instances when ignorance of the law may be a defense to civil liability under federal law. However, "when Congress has intended to provide a mistake of law defense to civil liability, it has often done so more explicitly than here." <u>Jerman,</u> 559 U.S. at 583 (discussing the Fair Debt Collection Practices Act). Congress did not do so when it enacted RICO. Martorello does not contend otherwise.

**42**

Martorello's mistake of law defense does not fare better under Section 1962(d) which provides that:

> It shall be unlawful for any person <u>to conspire to violate</u> any of the provisions of <u>subsection</u> .l.f.l. of this section.

18 U.S.C. § 1962(d) (emphasis added). The statutory text of § 1962(d) does not mention willfulness. "[T]o prove a RICO conspiracy, the Plaintiffs must establish: (1) that <u>two or more people agreed to commit a substantive RICO offense;</u> and (2) that the defendant **knew** <u>of and agreed to</u> the overall <u>objective</u> of the RICO offense." <u>Blackburn v. A.C. Israel Enters.,</u> No. 3:22cv146, 2023 WL 4710884, at *31 (E.D. Va. July 24, 2023) (quoting <u>Solomon v. Arn. Web Loan,</u> No. 4:17cv145, 2019 WL 1320790, at *11 (E.D. Va. March 22, 2019)) (emphasis added); <u>see also Mao v. Glob. Tr. Mgmt., LLC,</u> No. 4:21CV65, 2022 WL 989012, at *12 (E.D. Va. March 31, 2022). RICO conspiracy does not require "some overt act or specific act" and is therefore "even more comprehensive" than the general conspiracy statute. <u>Salinas,</u> 522 U.S. at 63. "The partners in the criminal plan must agree to pursue the same criminal objective . . . ," "even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense." <u>Id.</u> at 63-64.

RICO does not include a definition of "conspiracy," but we are not without guidance. "When Congress uses a term with a well-established meaning, we presume-absent evidence otherwise-that

Congress intends to adopt that meaning, because Congress is presumed to be aware of judicial interpretations." Jackson v. Home Depot U.S.A., Inc., 880 F.3d 165, 171 (4th Cir. 2018), aff'd, 139 S. Ct. 1743, 204 L. Ed. 2d 34 (2019); see also Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639, 652 (2008) (describing "the presumption that Congress intends to adopt the settled meaning of common-law terms"). By adopting "terms of art in which are accumulated the legal tradition and meaning of centuries of practice," Congress "presumably knows and adopts the cluster of ideas that were attached to each borrowed word." Morrisette v. United States, 342 U.S. 246, 264 (1952). "Conspiracy" is, of course, a legal term of art with "a settled common-law meaning." Bridge, 553 U.S. at 652.

Of course, "[t]he function of a conspiracy claim differs in criminal and civil cases." Beck v. Prupis, 162 F.3d 1090, 1099 n.18 (11th Cir. 1998), aff'd, 529 U.S. 494, 501-03 (2000). So, the question becomes: when determining the meaning of RICO conspiracy as alleged in this civil action, do we look to the civil common law or the criminal common law? The answer depends upon which enforcement provision is the basis for the action. If an action is being brought pursuant to 18 U.S.C. § 1963, setting forth criminal penalties for RICO violations, the criminal common law applies. Salinas, 522 U.S. at 63 ("When Congress uses well-settled

44

terminology of criminal law, its words are presumed to have their ordinary meaning and definition.") . But, if the action is being brought pursuant to 18 U.S.C. § 1964,[47] providing for civil remedies, we look to the civil common law. Beck, 529 U.S. at 501 n.6 {holding that, when interpreting§ 1962(d) in conjunction with § 1962 {c) , "[t] he obvious source in the common law for the combined meaning of these provisions is the law of civil conspiracy") . Because this case is a civil action, we look to the civil common law definition of "conspiracy."

In contrast to criminal law, where "the requirement of some mens rea for a crime is firmly embedded" in the "background rules of the common law," Elonis v. United States, 575 U.S. 723, 744 {2015) (Alito, J., concurring in part) {quoting Staples v. United States, 511 U.S. 600, 605 {1994)), civil liability is "more strict," Morrisette, 342 U.S. at 254. When it comes to civil torts, "the defendant's knowledge, intent, motive, mistake, and good faith are generally irrelevant." Id. at 270. That principle applies where the claim is one for civil conspiracy. According to the Restatement, an individual is liable for civil conspiracy if:

---

[47] Section 1964 sets forth two forms of civil remedies: proceedings instituted by the Attorney General pursuant to § 1964 (b) and proceedings instituted by private individuals pursuant to § 1964(c).

> (a) the defendant <u>made</u> <u>an</u> <u>agreement</u> with another <u>to</u>
> <u>commit</u> <u>a</u> <u>wrong;</u> (b) a tortious or unlawful <u>act</u> <u>was</u>
> <u>committed</u> against the plaintiff in furtherance of the
> agreement; and (c) the plaintiff <u>suffered economic loss</u>
> as a result.

Restatement (Third) of Torts: Liability for Economic Harm § 27

(Am. Law Ins. 2020) (emphasis added).

The Restatement does not require that the defendant to a civil

conspiracy claim know that the purpose to which he agreed was

unlawful. Civil conspiracy only requires an agreement to

accomplish "an unlawful purpose." Here, Martorello agreed to the

collection of debts with interest rates above 24%. Although that

was an unlawful purpose, Martorello's civil conspiracy liability

does not require proof that he knew that the purpose was unlawful.


No doubt, it must be shown that the defendant knowingly agreed

to join the conspiracy alleged under 18 **U.S.C.** § 1962(d). And,

the act of joining the conspiracy would have to be willful on the

part of the defendant. But here too the jury would be told:

> The term "willfully," as used in these instructions to
> describe the alleged state of mind of defendant .
> means that he acted knowingly, deliberately and
> intentionally as contrasted with accidentally,
> carelessly, or unintentionally.

lA O'Malley, Grenig & Lee, <u>Federal Jury Practice and Instructions,</u>

§ 17.05 (6th ed. 2008). And, as is the case under § 1962(c),

Martorello's mistake of law defense would not be probative to

refute that his joining the conspiracy was knowing, deliberate, or intentional.

But, in any event, that is not Martorello's willfulness issue: his willfulness contention is that, although he was aware that tribal law had been held inapplicable to rent-a-tribe online lending operations such as his, he nonetheless subscribed to the view that tribal law governed and, because of that mistake of law, he did not act willfully. For the reasons explained above in discussing the defense as to§ 1962{c}, the general, well-settled principles of Jerman, Barlow, and Fuller foreclose such a defense to the claim under§ 1962{d}, COUNT THREE.

So, as is true of the Section 1962{c} claim in COUNT TWO, there is no place for a mistake of law defense in responding to a willful component of the claim under Section 1962{d} (COUNT THREE). And, for the reasons previously given,[48] there is no more place for the mistake of law defense in defending the civil conspiracy claim under Section 1962(d) than there is in defending the civil Section 1962(c) claim.

A final word about Martorello's citation to United States v. Mouzone. Martorello relies on the statement in Mouzone that an element of§ 1962(d) criminal liability is "that each defendant

---

[48] See pp. 38-39, supra.

knowingly and willfully agreed that he or some other member of the conspiracy would commit at least two racketeering acts." 687 F.3d at 218.

Assuming that actually is an element necessary in a criminal case, the willful aspect in that element is attached to the agreement to commit the alleged racketeering act, whatever it might be. Nothing in that formulation requires proof that the defendant knew that the racketeering act to be committed was an unlawful one.

And, in any event, the jury would be told that:

The term "willfully," as used in these instructions to describe the alleged state of mind of defendant . means that he acted knowingly, deliberately and intentionally as contrasted with accidentally, carelessly, or unintentionally.

So, the general rules about mistake of law would apply and a mistake of law would not preclude civil liability under§ 1962(d) as alleged in COUNT THREE.

That then brings the analysis to the second aspect of Martorello's theory: using the mistake of law defense to counter what Martorello perceives (erroneously} to be an element of RICO liability: knowledge that the loan itself was illegal.

(d)  Knowledge of Illegality of the Loans

As explained above, Martorello also asserts the mistake of law defense against what he erroneously perceives to be another

48

element of the claims under both Section 1962{c) and Section 1962{d). Specifically, Martorello argues that Plaintiffs must prove that he knew that the loans were unlawful, and that his mistake of law defense is available to counter that element. For the reasons set forth below, this twist on Martorello's mistake of law defense also lacks merit.

To begin, the text of neither§ 1962(c) nor§ 1962(d) say that knowledge that the loans (the asserted unlawful debt) are illegal is an element of the RICO claims asserted in COUNTS TWO and THREE. Nor does the definition of "unlawful debt" in§ 1961(6) say that such knowledge is required. So, the statutory text does not predicate liability on a finding of a defendant's knowledge that the collected debt is an unlawful one. That is not dispositive, but it is helpful in deciding whether Congress intended RICO liability for collecting an unlawful debt to necessitate proof that a defendant knew the debt to be unlawful.

When determining whether knowledge of the illegality of the loans is required, it is helpful to look to the elements of the respective claims. The elements of a§ 1962(c) claim do not require knowledge of the illegality of the loans. Gibbs v. Stinson, 421 F. Supp. 3d at 312 (E.D. Va. 2019); Mao, 2022 WL 989012, at *9; Gibbs v. Elevate Credit, No. 3:20cv632, 2021 WL 4851066, at *15 (E.D. Va. Oct. 17, 2021) (quoting Slay's Restoration, LLC v. Wright Nat'l

49

Flood Ins. Co., 884 F.3d 489, 493 (4th Cir. 2018)); see also Solomon v. Am. Web Loan, No. 4:17cvl45, 2019 WL 1320790, at \*5-6 (E.D. Va. March 22, 2019) {quoting Dillon v. BMO Hams Bank, N.A., 16 F. Supp. 3d 605, 618 (M.D.N.C. 2014)).

Nor do the elements of a§ 1962(d) civil claim bespeak the need for proof of knowledge that the predicate acts (here, collection of unlawful debt) are illegal. To be found liable of RICO conspiracy, a defendant must have "by either words or action, objectively manifested an agreement to participate directly or indirectly in the affairs of the enterprise." United States v. Tillett, 763 F.2d 628, 632 (4th Cir. 1985). Plaintiffs "need not establish that each conspirator had knowledge of all the details of the conspiracy but, rather, only that the defendant participated in the conspiracy with knowledge of the essential nature of the plan." Id. (emphasis added). Unlike the general conspiracy statute, § 1962(d) contains "no requirement of some overt act or specific act." Salinas, 552 U.S. at 63. "The RICO conspiracy provision, then, is even more comprehensive than the general conspiracy offense." Id.

When evaluating a motion to dismiss, the court found in another civil tribal lending case that "Plaintiffs do not have to allege knowledge of illegality." Mao, 2022 WL 989012, at \*9. Instead, the Plaintiffs must show that the enterprise members,

**SO**

including Martorello, were "associated together for a common purpose of engaging in a course of conduct." Id. (quoting United States v. Turkette, 452 U.S. 576, 583 (2009)). The "purpose" requirement "may be [satisfied with a showing that] Defendants associated for the purpose of collecting unlawful debt, whether they knew that debt was unlawful or not." Id. (emphasis added).

Here too, it is helpful to consider the way in which the jury would be instructed. To secure the views of the parties on that subject, the Court called upon them to provide their views of what the instructions would be on the two RICO claims. (ORDER, ECF No. 1247).

Martorello's provided instructions were from United States v. Tucker, No.16-cr-91 (PKC), 2020 WL 6891517 (S.D.N.Y. Nov. 24, 2020}, a 2017 criminal RICO case.[49] Tucker Jury Instructions (ECF No. 1253-1).so On the conspiracy charge, the Court instructed the jury that the Government must prove that "each defendant intentionally joined the conspiracy" and did so "knowingly and willfully...  for the purpose of furthering its unlawful object,

---

[49] United States v. Grote, 961 F.3d 105 (2d Cir. 2020), discussed in further detail below, is related to this case.

so DEFENDANT'S NOTICE OF FILING PURSUANT TO ORDER AT DOCKET NO. 1247 OF JURY INSTRUCTIONS GIVEN IN OTHER UNLAWFUL DEBT RICO CASES (ECF No. 1253).

which is the collection of an unlawful debt." Id. at 3287.[51] The
Tucker Court instructed that "the government must prove... that
the defendant willfully and knowingly engaged in the collection of
unlawful debt." Id. at 3296.

Then, as to whether the defendant acted "willfully" and
"knowingly," the Court instructed that "[t]he defendant need not
have known that he was breaking any particular law, but he must
have been aware of the generally unlawful nature of his act." Id.
at 3288 (emphasis added). The Government also did not need "to
prove that the defendant knew what the usury rates were in the
states that the borrowers lived." Id. at 3293 (emphasis added).
The Court in Tucker summed up its instructions on that point by
stating:

> In this case, ignorance of the specific terms of any law
> is no excuse to the charged conduct. The government can
> meet its burden on the "willfully" and "knowingly"
> element by proving that a defendant acted deliberately,
> with knowledge of the actual interest rate charged on
> the loan. It may also meet its burden by showing a
> defendant acted deliberately, with an awareness of the
> generally unlawful nature of the loan, and also that it
> was the practice of the business engaged in lending money
> to make such loans.

---

[51] The pagination is from the original case transcript.

Id. at 3293-94 (emphasis added).[52] So, even Martorello's view does not necessitate proof that he knew the specific interest rate charged or that the debt being collected was an unlawful one.

Plaintiffs attached four different sets of jury instructions but only two of these had actually been given at trial. PLAINTIFFS' STATEMENT OF POSITION IN RESPONSE TO THE COURT'S ORDER DATED MAY 19, 2023 at 2 (ECF No. 1252). One of the offered instructions comes from Tucker and has been discussed. The other given instructions come from the 2019 Northern District of California civil RICO case Planned Parenthood Federation of America, Inc. v. Center for Medical Progress, Case No. 3:16-cv-236 (N.D. Cal. 2019). Id. The claim in Planned Parenthood involved a theory of "pattern of racketeering activity," rather than collection of unlawful debt. Thus, this does not directly answer the question whether Martorello needed to know that the debts were unlawful. However, in Planned

_____

[52] In Tucker, the Court did allow for an advice of counsel defense. The Court instructed the jury to:

> consider whether, in seeking and obtaining advice from lawyers, [the defendant] *intended for his acts to be lawful.* If he did so, a defendant cannot be convicted of a crime that requires willful and unlawful intent, even if such advice were an inaccurate description of the law.

Id. at 3301 (emphasis added). However, Martorello is not presenting an advice of counsel defense.

Parenthood, the Court did provide guidance on RICO. It instructed that, to show that a defendant had associated with the enterprise, "Plaintiffs must prove that the Defendant was connected to the enterprise in some meaningful way and that the Defendant knew of the existence of the enterprise and of the general nature of its activities." Planned Parenthood Jury Instructions at 60 (ECF No. 1252-1) (emphasis added). As to the conspiracy question, the Court instructed that:

> One becomes a member of a conspiracy by willfully participating in the unlawful plan with the intent to advance or further some object or purpose of the conspiracy, even if the person does not have full knowledge of all the details of the conspiracy.

Id. at 66. Notably, there is no requirement that the defendant know that the alleged acts of racketeering are illegal.

Neither respected instruction book specifies knowledge of illegality as an element of either 1962(c) or (d). That, of course, teaches that a mistake of law as to the legality of the underlying unlawful debt could be no defense to the Subsection (c) aspect of the conspiracy claim.

The Fourth Circuit has not addressed whether, in a civil RICO case, the defendant must have knowledge of illegality, but other federal courts of appeals have. In 1980, the United States Court of Appeals for the Second Circuit squarely held that RICO "does not include a scienter element over and above that required by the

**54**

predicate crimes." United States v. Boylan, 620 F.3d 359, 361-62 (2d Cir. 1980). Six years later, in United States v. Biasucci, 786 F.2d 504 (2d Cir. 1986), cert. denied, 479 U.S. 827 (1986), the Second Circuit rejected an argument that the "government was required to establish that [the defendants] had knowledge of the specific interest rates" on the loans at issue, i.e., knowledge of the illegality of the loans. Id. at 512-13. In so doing, the Second Circuit, citing Boylan, reiterated that "RICO imposes no additional mens rea requirement beyond that found in the predicate crimes." Id. at 512. And so, "we look to the scienter elements found in the statutory definitions of the predicate crimes to determine the degree of knowledge that must be proved to establish a RICO violation." Id.

Finding that the New York usury law (the predicate crime) "does not require specific intent to violate the usury laws," the Second Circuit declined to find that the government had to have proven that the defendant had knowledge of the specific illegal interest rate. Id. Thereupon, the Second Circuit approved the district court's instruction that the RICO scienter requirement could be satisfied "either by proving specific knowledge of the interest rates on the usurious loans, or by showing the defendant's awareness 'of the general unlawful nature of the particular loan in question and also that it was the practice of the lenders to

55

make such loans.'" Id. (emphasis added) (quoting the trial court's jury instructions).

The Second Circuit also found that neither the statutory language nor the policies underlying RICO and the predicate state law "impel us.  . to require knowledge of the specific interest rates charged on usurious loans." Id. Indeed, because "one of Congress' principal aims" in enacting RICO was to eliminate loansharking, and because "Congress expressly commanded that the RICO statute 'be liberally construed to effectuate its remedial purposes,'" it "could not have intended to hobble the government's ability to combat loansharking by requiring it to prove knowledge of the specific interest rates charged." Id. (citation omitted) (quoting U.S. v. Ruggiero, 726 F.2d 913, 919 (2d Cir. 1984)).

Martorello correctly notes that, in United States v. Grote, 961 F.3d 105 (2d Cir. 2020), the Second Circuit, in dicta, queried whether Biasucci was consistent with a "presumption in favor of a scienter requirement" for criminal statutes, as provided in Elonis, 575 U.S. at 727, and United States v. X-Citement Video, Inc., 513 U.S. 64 (1994). Grote, 961 F.3d at 117-19.[53] In United States v. Moseley, 980 F.3d 9, 19 (2d Cir. 2020), the Second

---

[53] **DEFENDANT MATT MARTORELLO REPLACEMENT MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT** ("Martorello Response") at 33 (ECF No. 1218).

Circuit noted <u>Grote,</u> but, like <u>Grote,</u> declined to depart from <u>Biasucci</u> concluding only that the defendant must be aware of the unlawful nature of his actions.

In any event, <u>Elonis</u> does not help Martorello in his assertion that the mistake of law defense, as he would present it, is available in this case. Indeed, <u>Elonis</u> quite plainly says that, even in a criminal case, where guilty mind is an element in every crime:

> This is <u>not to say</u> <u>that a defendant</u> <u>must know that</u> <u>his</u> <u>conduct</u> <u>is illegal</u> before he may be found guilty. The familiar maxim 'ignorance of the law is no excuse' typically holds true. Instead, our cases have explained that a defendant generally must <u>'know</u> <u>the</u> <u>facts</u> <u>that</u> <u>make</u> <u>his</u> <u>conduct</u> <u>fit</u> <u>the definition</u> <u>of</u> <u>the</u> <u>offense,"</u> <u>[citation omitted]</u> <u>even if</u> <u>he does not know</u> <u>that those</u> <u>facts give rise</u> <u>to a crime.</u>

<u>Elonis,</u> 575 U.S. at 735 (emphasis added). The dicta in <u>Grote</u> notwithstanding, <u>Elonis</u> does not support Martorello's view that he can present a mistake of law defense.

The Second Circuit's approach in <u>Biasucci</u> has met with approval from the United States Court of Appeals for the Eleventh Circuit. In <u>United</u> <u>States</u> <u>v.</u> <u>Pepe,</u> the Eleventh Circuit agreed with <u>Biasucci</u> that "[a] plain reading of the statute indicates that RICO <u>does</u> <u>not</u> <u>contain</u> <u>any</u> <u>separate</u> mens rea <u>or</u> <u>scienter</u> <u>elements beyond those encompassed in its predicate acts."</u> 747 F.2d 632, 675-76 (11th Cir. 1984) (emphasis added). The Eleventh Circuit went on to explain that the district court correctly

57

instructed, as to the § 1962(d) conspiracy charge, that \\the defendant with knowledge of the conspiracy, willfully became a member of the conspiracy by agreeing to participate." Id. at 676. That instruction would, of course, be given as to COUNT THREE at the trial of this case, but it certainly does not open the door to a mistake of law defense. And, as to the § 1962(c) charge, the Eleventh Circuit approved the district court's charge that the jury had to find that the \\defendant was engaged in a pattern of racketeering activity ...  by knowingly and willfully committing at least two acts of racketeering activity or knowingly and willfully collecting an unlawful debt." Id. at 676 (internal quotations omitted).  That instruction would be appropriate here as well, but, as the Eleventh Circuit explained, it does not require \\a mens rea or scienter requirement beyond those encompassed in the predicate acts." So, if the Virginia law does not require proof that the defendant knew the loan was illegal (and it does not), then neither does § 1962(c). And, as is true with § 1962(c), the willful aspect of the instruction (knowingly and willfully) modifies the act of collecting, not whether the debt was unlawful. And, the instruction certainly does not suggest that a mistake of law defense is available.

In addition to <u>Mao,</u> two other district courts within the Fourth Circuit, in deciding civil RICO cases, have endorsed the

Second Circuit's <u>Biasucci</u> view. The Western District of North Carolina, citing to a District of Connecticut decision governed by <u>Biasucci,</u> found that "[t]he plaintiff must demonstrate, with respect to a defendant, both that the defendant committed a predicate offense as delineated in Section 1961 [the definitions section] and that the defendant had the <u>requisite scienter for the underlying predicate offense.</u>" <u>Smith</u> v. <u>Chapman,</u> No. 3:14-cv-00238, 2015 WL 5039533, at *7 (W.D.N.C. Aug. 26, 2015) (emphasis added) (quoting <u>Interstate Flagging,</u> Inc. v. <u>Town of Darien,</u> 283 F. Supp. 2d 641, 645 (D. Conn. 2003)). The Middle District of North Carolina reached the same conclusion, finding "[i]t appears there is no mental state requirement <u>'beyond that found in the predicate crimes.'</u>" <u>Dillon v. BMO Harris Bank,</u> **N.A.,** 16 F. Supp. 3d 605, 618 (M.D.N.C. 2014) (emphasis added) (quoting <u>Biasucci,</u> 786 F.2d at **514)**.

Moreover, even in criminal cases, "[t]he presumption in favor of scienter requires a court to read into a statute only that <u>mens rea</u> which is necessary to separate wrongful conduct from 'otherwise innocent conduct.'" <u>Carter v.</u> <u>United States,</u> 530 U.S. 255, 269 (2000) (quoting <u>X-Citement Video,</u> 513 U.S. at 72). When it comes to general intent crimes, the prosecution only needs to prove "knowledge with respect to the <u>actus reus</u> of the crime." Id. In other words, a defendant "generally <u>must 'know the facts that make</u>

his conduct <u>fit the definition of the offense,'</u> even if <u>he does not know that those facts give rise to a crime.</u>" <u>Elonis,</u> 575 U.S. at 735 (emphasis added) (quoting <u>Staples</u> v. <u>U.S.,</u> 511 U.S. 600, 608 n.3 (1994)). This, of course, is a manifestation of the principle that there is no mental state requirement beyond that found in a predicate crime. It also reinforces the principle that a mistake of law defense is no defense at all.

In <u>United States v. Lawson,</u> 677 F.3d 629, 652 (4th Cir. 2012), the Fourth Circuit considered a position like Martorello's under 18 U.S.C. § 1955, which prohibits illegal gambling. Section 1955, which is quite similar to § 1962, provides that "[w]hoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined under this title or imprisoned not more than five years, or both." The statute goes on to define "illegal gambling business" as a "gambling business which is a violation of the law of a State or political subdivision in which it is conducted." 18 U.S.C. § 1955(b)(1)(i).

In reviewing a defendant's conviction under that provision, the Fourth Circuit rejected the defendant's argument that the jury should have been instructed that she "must have known that her conduct constituted gambling under [applicable state] law." <u>Lawson,</u> 677 F.3d at 652. The Court of Appeals reasoned that the

"plain language" of the statute sets forth a general intent crime and thus "does not require the government to establish that the defendant knew that their conduct violated state law." Id. at 652-53.

The same holds true for § 1962. "Conduct" and "participate," the operative verbs in § 1962, impute the same scienter requirement as § 1955's operative verbs, which include "conduct." In addition, both the definition of "gambling business" and "unlawful debts" incorporate state law. 18 U.S.C. § 1961(6). Mirroring the statutory framework of § 1955, when used in a criminal prosecution, § 1962 is a general intent crime. And, when a general intent crime is involved, a "good-faith instruction [which, in Lawson, was based on a mistake of law] . . . is unavailable." Lawson, 677 F.3d at 653.

The teaching of Lawson, applied in the civil context, is that §§ 1962(c) and (d) do not require knowledge of illegality of the collected debt as an element of either COUNT TWO or COUNT THREE. Lawson likewise teaches that Martorello may not raise a mistake of law defense based on the notion that he did not know the loans were illegal, because he chose to take the view tribal law applied, but guessed wrongly.

In this case, of course, RICO is being asserted as the basis for civil liability. Courts follow much of the same process in

determining if a civil statute contains a scienter requirement. First, they look to the language of the statute to ascertain congressional intent. For example, when it has intended to excuse mistakes of law, Congress has required violations to be "willful." Jerman, 559 U.S. at 584-85. Even more explicitly, Congress sometimes includes a mistake of law defense. It did so, for instance, in the Fair Debt Collection Practices Act ("FDCPA"} by requiring that the defendant acted with "actual knowledge or knowledge fairly implied" that his action was prohibited by the statute. Id. at 584 (quoting 15 U.S.C. §§ 45(m}(l}(A), (C}}. The RICO statute, on the other hand, contains no provision requiring that the defendant knew his conduct (collection of an unlawful debt) was unlawful. Nor does it provide a mistake of law defense.

The Supreme Court also has had multiple occasions to consider scienter requirements in the various provisions of the Securities and Exchange Act of 1934, making it an especially useful comparison statute. For example, in assessing§ 10(b), which makes it unlawful to "use or employ" "any manipulative or deceptive device or contrivance" in connection with the purchase or sale of securities, 15 U.S.C. § 78j(b), the Supreme Court determined that Congress had imposed a scienter requirement for liability under this provision by using "[t]he words 'manipulative or deceptive'. in conjunction with 'device or contrivance         '" Ernst & Ernst v.

62

Hochfelder, 425 U.S. 185, 197 (1976). The ordinary meaning of those words, particularly "manipulative," "make unmistakable a congressional intent to proscribe a type of conduct quite different from negligence." Id. at 199. "[M]anipulative," so the Supreme Court explained, "connotes international or willful conduct designed to deceive or defraud." Id.

In contrast, the Supreme Court found that another provision in the Act, prohibiting "any person from obtaining money or property 'by means of any untrue statement of a material fact or any omission to state a material fact,' is devoid of any suggestion whatsoever of scienter requirement." Aaron v. Securities & Exchange Comm., 446 U.S. 680, 696 (1980) (quoting§ 17(a)(2) of the Securities and Exchange Act of 1934). Likewise, the Supreme Court determined that a prohibition on "'engag[ing] in any transaction, practice, or course of business which operates or would operate as a fraud or deceit' . quite plainly focuses upon the effect of particular conduct on members of the investing public, rather than on the culpability of the person responsible." Id. at 696-97 (quoting§ 17(a)(3) of the Securities and Exchange Act of 1934). Therefore, that provision was found not to contain a scienter requirement.

RICO contains no language that overcomes the presumption against mistake of law defenses. Section 1962(c) contains no

scienter requirement, see supra, nor does it contain an explicit mistake of law defense like the FDCPA. The language used by § 1962(c)-"conduct or participate" in conjunction with "collection"-does not connotate the sinister intentions implicit in "manipulative" or "deceptive" as found in§ 10b of the Securities and Exchange Act. Instead, these terms are far more similar to "engage," as found in§ 17(a)(3) of the Act, which does not excuse mistake of law.

In addition to evaluating statutory text, the Supreme Court has also turned to legislative history to understand Congressional intent. Hochfelder, 425 U.S. at 201. Considering the history of§ 10(b) of the Securities and Exchange Act, the Supreme Court determined that the legislative history indicated Congress only wanted to impose liability on those who act other than in good **faith. Id. at 206.**

With RICO, on the other hand, the legislative history supports the opposite conclusion. RICO itself contains a provision instructing that "its terms are to be 'liberally construed to effectuate its remedial purposes.'" Boyle v. United States, 556 U.S. 938, 944 (2009) (quoting § 904(a), 84 Stat. 947, note following 18 U.S.C. § 1961). And supporters of the bill were especially concerned with loansharking. Turkette, 452 U.S. at 591-92 & n. 14 (considering RICO's legislative history). Congress's

**64**

remedial intentions in passing RICO, therefore, would not be advanced by "permit[ting] the defendant to avoid [liability] by simply claiming that he had not brushed up on the law." <u>Hamling v. United States,</u> 418 U.S. 87, 123 (1974).

In sum, the text of §§ 1962(c) and (d) does not require that the defendant knew the loans were illegal, nor does the legislative history indicate that Congress intended such a result or that a "mistake of law" defense should be available. The Court declines to read into RICO what Congress omitted. Unless the predicate offense contains a scienter requirement,[54] all that RICO requires is that the defendant knew that the loans were issued at a rate above that permitted by 18 U.S.C. § 1961(6) or that Martorello had knowledge of the general illegal nature of the enterprise. <u>Brice v. Haynes Invs., Inc,</u> 548 F. Supp. 3d 882, 894 (N.D. Cal. 2021) (holding that defendants must have "knowledge of the purpose" of the scheme or "knowledge of the terms on which the loans would be provided and repayment required"). In other words, Martorello must knowingly engage in the activity itself, but he does not have to know that, by doing so, he would break the law. The next question

---

[54] For example, when pursuing a RICO conspiracy case based on violations of a federal statute prohibiting the <u>knowing</u> hiring of unauthorized aliens, 8 U.S.C. § 1324(a)(3), that knowledge requirement is then imputed to RICO. See <u>Walters v. McMahen,</u> 684 F.3d 435, 440 (4th Cir. 2012).

is whether Virginia's usury statute contains a scienter requirement.

### 3. Virginia's Usury Statute: Va. Code Ann. § 6.2-303(A)

The underlying Virginia statute, Va. Code Ann. § 6.2-303(A), does not contain a mens rea or scienter requirement. Nor has it been interpreted to contain one. The provision states, in full:

> Except as otherwise permitted by law, no contract shall be made for the payment of interest on a loan at a rate that exceeds 12 percent per year.

Va. Code Ann. § 6.2-303(A). The statute goes on to clarify that it "shall apply to any person who seeks to evade its application by any device, subterfuge, or pretense whatsoever" followed by a non-exhaustive list of such subterfuges. Va. Code Ann. § 6.2-303(E). The statute provides for only one defense: if the "interest or other charges in excess of those permitted by law were imposed or collected as a result of a bona fide error in computation or similar mistake." Va. Code Ann. § 6.2-305(C).

There is no Virginia decision that addresses whether the current Virginia statute allows for mistake of law defense. But, in 1826, the Supreme Court of Appeals of Virginia interpreted an earlier version of this provision to explicitly exclude a mistake of law defense, stating:

> Wherever such intention appears in the taking more than legal interest, it is evidence of the corrupt agreement required by the statute; though the party may never have heard of the law, or may think that he is steering quite

66

JA2750

> clear of it. Ignorance or mistake of the law excuses no
> man; but a mistake of fact does excuse.

Childers v. Deane, 4 Rand. 406, 410-11 (Va. 1826) (emphasis
added).[55]

Although Childers is an older precedent interpreting an
earlier version of the statute, it is in accord with more recent
decisions explaining how courts understand the current statute. To
make out a claim under Va. Code Ann. §6.2-303(A), plaintiffs need
only show that defendants "collected or received payments on loans
that violated Virginia's statutory limits." Gibbs v. Stinson, 421
F. Supp. 3d at 309. The elements of the statutory cause of action
include no reference to the defendants' intent or knowledge.

Modern caselaw reinforces the fact that a creditor's belief
that he is acting in accordance with the law is no defense. For
example, the Supreme Court of Virginia invalidated a usurious loan
even though the issuing bank believed, presumably in good faith,
that it fell under one of the statutory provisions exempting it

---

[55] The version of the statute in effect at the time reads: "No
person shall, upon any contract, take, directly or indirectly, for
loan of any money, wares, or merchanize [sic], or other commodity,
above the value of six dollar for the forbearance of one hundred
dollars for a year." "An act to reduce into one act, the several
acts against Usury" (Feb. 24, 1819) § 1, in Revised Code of the
Laws of Virginia: Being a Collection of All Such Acts of the
General Assembly, of a Public and Permanent Nature, as are Now in
Force, ch. 102, pp. 373-74 (1819).

from the usury laws. <u>Radford v. Cmty. Mortg. & Inv. Corp.</u>, 312 S.E.2d 282, 285 (Va. 1984). That, of course, is a mistake of law. In so deciding, the Supreme Court of Virginia reaffirmed that "[t]he [Commonwealth's] usury laws. . . are to be liberally construed with a view to advance the remedy and suppress the mischief" and the courts "should therefore be chary in permitting this policy to be thwarted." Id.[56]

Looking at the statutory language and the public policy underlying the statute, the Virginia usury statute does not impose a scienter requirement, nor can it be read to allow a mistake of law defense.

---

[56] There is one easily distinguishable case finding that the lenders' good-faith belief can excuse a usurious debt. In this case, the debtor and creditor engaged in a complicated loan transaction involving real estate liens, corporate debts, and individuals acting on behalf of themselves and partnerships. <u>Heubusch v. Boone,</u> 192 S.E.2d 783, 787-78 (Va. 1972). On its face, the Supreme Court of Virginia determined that the resulting loan was usurious. <u>Id.</u> at 789. However, the debtors in the case were a lawyer and his law firm and had "induce[d] the lender to enter into a usurious agreement that he would not otherwise have made." <u>Id.</u> at 789-91. As the debtor/lawyers "were the direct causes of the illegality complained of," the debtors were "estopped from profiting by that illegality of their defense" and the loan was deemed valid. Id. at 790. While <u>Heubusch</u> does involve a creditor relying in good faith on the advice of counsel, it is readily distinguishable from Martorello's asserted defense. Martorello relied on his own lawyers' advice, not that of the debtor. Martorello's debtors in no way "induce[d]" him to enter into the loans as in <u>Heubusch.</u> Thus, that decision does not support the availability of a good-faith defense to Virginia Code Ann. § 6.2-303{A} in this case.

JA2752

## C.   Summary Judgment: Certain Elements of COUNT TWO

The Plaintiffs' Motion asked for summary judgment on certain elements of the 18 U.S.C. § 1962(c) claim in COUNT TWO (ECF No. 1169, pp. 36-40). In particular, they asked for summary judgment that: (i) "an enterprise existed;" (ii) that "an association-in-fact enterprise existed;" (iii) the loans at issue "constituted 'unlawful debt'" because the interest rates on those loans exceeded 24% (twice the 12% rate permitted by Virginia law; and (iv) "persons associated with the enterprise engaged in the collection of the debt." (ECF No. 1169, pp. 36-40, § VIA-C). However, recognizing that there was a material fact dispute over one element of COUNT TWO, Plaintiffs did not seek summary judgment as to COUNT TWO as a whole.

As explained above, Martorello did not respond to the arguments on those points.s[57]   At oral argument on June 7, Martorello's counsel agreed. June 7 Tr. p. 173. Hence, summary judgment on those points (the elements) in Plaintiffs' favor is appropriate.

_____

[57] **Compare PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT (ECF No. 1241, pp. 7, 28-30) with DEFENDANT MATT MARTORELLO REPLACEMENT MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT {ECF No. 1218).**

**69**

## CONCLUSION

For the reasons set forth above, the Court granted PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT (ECF No. 1165) in part and denied in part.

Subsequent orders have taken the matter further so that, as of now, summary judgment has been granted as to COUNTS TWO and THREE and COUNTS FOUR and FIVE have been dismissed without prejudice. [58] As a result of this MEMORANDUM OPINION and those ORDERS, a final judgment will be entered separately on COUNTS TWO and THREE.

It **is so ORDERED.**

                              /s/   _____

                         Robert E. Payne
                         Senior United States District Judge


Richmond, Virginia  ./
Date: September *1-.V,* 2023

---

[58] **June 16, 2023 ORDER (ECF No. 1328), as amended by ECF No. 1350;** July 7, 2023 ORDER (ECF No. 1373) (granting summary judgment in favor of the Plaintiffs as to COUNT TWO); July 10, 2023 ORDER (ECF No. 1390) (dismissing without prejudice COUNTS FOUR and FIVE).

**70**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

LULA WILLIAMS, *et al.*,                    )
                                            )
        Plaintiffs,                 )
                                            )
    v.                                )     Civil Action No. 3:17-cv-461 (REP)
                                            )
BIG PICTURE LOANS, LLC, *et al.*,           )
                                            )
        Defendants.                 )
_____        )

## NOTICE OF APPEAL

Defendant Matt Martorello appeals to the United States Court of Appeals for the Fourth Circuit from the final judgment entered on September 22, 2023.

Dated:  October 17, 2023          */s/ John David Taliaferro*_____
                                  John David Taliaferro (Va. Bar. 71502)
                                  LOEB & LOEB LLP
                                  901 New York Ave., NW
                                  Suite 300-E
                                  Washington, DC  20001
                                  Tel. (202) 618-5015
                                  Facsimile: (202) 318-0691
                                  jtaliaferro@loeb.com

                                  Bernard R. Given (*pro hac vice*)
                                  LOEB & LOEB LLP
                                  10100 Santa Monica Blvd., Suite 2200
                                  Los Angeles, CA 90067
                                  Telephone: (310) 282-2348
                                  Facsimile: (310) 742-0414
                                  bgiven@loeb.com

                                  *Counsel for Defendant Matt Martorello*

JA2755

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 17th day of October, 2023, a true and correct copy of the foregoing was served upon all parties that are registered to receive electronic service through the Court's ECF notice system in the above case.

<u>   /s/ John David Taliaferro              </u>
John David Taliaferro (Va. Bar. 71502)

#231410366_v1

JA2756