No. 23-2097

---

**In The United States Court Of Appeals
For The Fourth Circuit**

**LULA WILLIAMS,**
*Plaintiff-Appellee*

v.

**MATT MARTORELLO,**
*Defendant-Appellant,*

On Appeal From The United States District Court
For The Eastern District Of Virginia (Robert E. Payne)
(3:17-cv-00461-REP)

---

**BRIEF OF APPELLANT**

---

Steven D. Gordon
Holland & Knight LLP
800 17th Street, N.W., Suite 1100
Washington, D.C. 20006
Telephone: (202) 955-3000
Facsimile: (202) 955-5564
E-mail: steven.gordon@hklaw.com

December 6, 2023                 *Counsel for Appellant*

# TABLE OF CONTENTS

STATEMENT OF JURISDICTION.................................................................1

STATEMENT OF THE ISSUES...................................................................1

STATEMENT OF THE CASE......................................................................1

    A.    THE TRIBAL LENDING BUSINESS STRUCTURE. ..............................3

    B.    THE LOAN PROCESS. ............................................................6

    C.    DENIAL OF MR. MARTORELLO'S RULE 19 MOTION....................7

    D.    CLASS CERTIFICATION. .........................................................9

    E.    THE SUMMARY JUDGMENT PROCESS.......................................9

    F.    THE DISTRICT COURT'S OPINION. ........................................13

SUMMARY OF ARGUMENT ...................................................................14

ARGUMENT .......................................................................................17

    I.    STANDARD OF REVIEW. .......................................................17

    II.    VIRGINIA LAW CANNOT INVALIDATE LOANS MADE ON THE RESERVATION. ....................................................................18

      A.    Loans made on a reservation are governed by tribal, not state, law.......18

      B.    Loans made on a reservation through use of the internet are also governed by tribal, not state, law..........................................22

      C.    Virginia law does not govern the loans at issue here. ..........................25

    III.    THIS CASE MUST BE DISMISSED PURSUANT TO RULE 19. .........................29

      A.    Big Picture, Ascension, and the Tribe are indispensable parties...........29

      B.    This action should not have proceeded in the absence of Big Picture, Ascension, and the Tribe. .......................................................31

      C.    The district court's Rule 19 analysis is flawed....................................33

        1.    The legal precedents on which the district court relied are inapplicable or incorrect..............................................................33

        2.    Rule 19 applies notwithstanding that the absent parties are alleged joint tortfeasors...................................................................36

        3.    The settlement does not make Rule 19 inapplicable. .............................37

    IV.    RICO LIABILITY REQUIRES KNOWLEDGE THAT THE LOANS WERE UNLAWFUL...........................................................................40

A.    The elements of a RICO unlawful debt offense. ....................................41

B.    Scienter is required for a RICO unlawful debt offense. ........................42

C.    The same scienter is required for civil and criminal RICO violations. ...46

D.    A mistake of law negates scienter. ...........................................................47

CONCLUSION ..............................................................................................52

ADDENDUM ............................................................................................ A-1

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Am. Greyhound Racing, Inc. v. Hull*,
  305 F.3d 1015 (9th Cir. 2002) ..................................................30, 37

*Backcountry Against Dumps v. U.S. Bureau of Indian Affairs*,
  2021 WL 3611049 (S.D. Cal. Aug. 6, 2021), *aff'd*, 2022 WL
  15523095 (9th Cir. 2022)..................................................................35

*Beavertail, Inc. v. United States*,
  2017 WL 3749446 (D. Idaho Aug. 29, 2017) ..................................40

*Beck v. Prupis*,
  529 U.S. 494 (2000)..........................................................................46

*Cades v. H&R Block, Inc.*,
  43 F.3d 869 (4th Cir. 1994) ..............................................................24

*California v. Cabazon Band of Mission Indians*,
  480 U.S. 202 (1987)..........................................................20, 21, 28

*Clark v. Harrah's NC Casino Co., LLC*,
  2018 WL 6118624 (W.D.N.C. Apr. 27, 2018)..................................32

*Clinton v. Babbitt*,
  180 F.3d 1081 (9th Cir. 1999) ..........................................................34

*Commonwealth of Pennsylvania v. Think Finance, Inc.*,
  2016 WL 183289 (E.D. Pa. Jan. 14, 2016).....................33, 34, 35, 36

*Dawavendewa v. Salt River Project Agr. Imp. & Power Dist.*,
  276 F.3d 1150 (9th Cir. 2002) ...................................................29, 30

*Dep't of Taxation and Finance of N.Y. v. Milhelm Attea & Bros., Inc.*,
  512 U.S. 61 (1994)........................................................................20, 21

*Dine Citizens Against Ruining Our Env't v. Bureau of Indian Affairs*,
  932 F.3d 843 (9th Cir. 2019) ............................................................31

iii

*Dixon v. Edwards*,
    290 F.3d 699 (4th Cir. 2002) ..............................................................17

*Elonis v. United States*,
    575 U.S. 723 (2015).............................................................................42

*Enterprise Mgmt. Consultants v. U.S. ex rel. Hodel*,
    883 F.2d 890 (10th Cir. 1989) ...........................................................30

*F.T.C. v. Payday Financial, LLC*,
    935 F.Supp.2d 926 (D.S.D. 2013) .....................................................22

*Galloway, et al. v. Williams, et al.*,
    3:19-cv-00470 (E.D. Va.) ....................................................................8

*Ghirardo v. Antonioli*,
    8 Cal.4th 791 (1994) ..........................................................................49

*Gingras v. Rosette*,
    2016 WL 2932163 (D. Vt. May 18, 2016) ...................................33, 36

*Gunvor SA v. Kayablian*,
    948 F.3d 214 (4th Cir. 2020) .........................................16, 17, 29, 35

*U.S. ex rel. Hall v. Tribal Dev. Corp.*,
    100 F.3d 476 (7th Cir. 1996) .............................................................31

*Hartog v. Jots, Inc.*,
    2004 WL 2600280 (N.D. Cal. Nov. 12, 2004) ..................................38

*Hengle v. Treppa*,
    19 F.4th 324 (4th Cir. 2021) ........................................................26, 27

*Home Buyers Warranty Corp. v. Hanna*,
    750 F.3d 427 (4th Cir. 2014) .............................................32, 36, 37

*Jamul Action Comm. v. Simermeyer*,
    974 F.3d 984 (9th Cir. 2020) .............................................................35

*Kescoli v. Babbitt*,
    101 F.3d 1304 (9th Cir. 1996) ...........................................................32

*Leocal v. Ashcroft*,
543 U.S. 1 (2004).................................................................................46

*Liparota v. United States*,
471 U.S. 419 (1985)...........................................................................47

*Marquette Nat. Bank of Minneapolis v. First of Omaha Service Corp.*,
439 U.S. 299 (1978)....................................................................23, 24

*Michigan v. Bay Mills Indian Community*,
572 U.S. 782 (2014)...........................................................................18

*Montana v. United States*,
450 U.S. 544 (1981)...........................................................................18

*Naartex Consulting Corp. v. Watt*,
722 F.2d 779 (D.C. Cir. 1983)..........................................................30

*Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs.*,
769 F.3d 105 (2d Cir. 2014) .......................................................*passim*

*Rehaif v. United States*,
139 S.Ct. 2191 (2019)...............................................................*passim*

*Republic of Philippines v. Pimentel*,
553 U.S. 851 (2008).....................................................................33, 38

*RJR Nabisco, Inc. v. European Community*,
579 U.S. 325 (2016)...........................................................................46

*Ross Dress for Less, Inc. v. Makarios–Oregon, LLC*,
2018 WL 2452957 (D. Or. May 31, 2018).......................................39

*Ruan v. United States*,
142 S.Ct. 2370 (2022)..................................................................45, 50

*Santa Clara Pueblo v. Martinez*,
436 U.S. 49 (1978).............................................................................40

*Seeman v. Philadelphia Warehouse Co.*,
274 U.S. 403 (1927)...........................................................................23

v

*Seminole Tribe v Florida*,
    517 U.S. 44 (1996) ............................................................................. 19

*Sessions v. Dimaya*,
    584 U.S. ----, 138 S.Ct. 1204 (2018) ........................................... 17, 46

*Shermoen v. United States*,
    982 F.2d 1312 (9th Cir. 1992) ......................................................... 40

*Three Affiliated Tribes of Fort Berthold Reservation v. Wold Engr'g*,
    476 U.S. 877 (1986) .......................................................................... 19

*Union Pacific R. Co. v. Runyon*,
    320 F.R.D. 245 (D. Or. 2017) ......................................................... 36

*United States. v. Aucoin*,
    964 F.2d 1492 (5th Cir. 1992) ......................................................... 41

*United States v. Battle*,
    473 F.Supp.2d 1185 (S.D. Fla. 2006) ............................................. 42

*United States v. Biasucci*,
    786 F.2d 504 (2d Cir. 1986) ....................................................... 42, 43

*United States v. Collado-Gomez*,
    834 F.2d 280 (2d Cir. 1987) (per curiam) ....................................... 51

*United States v. Evans*,
    74 F.4th 597 (4th Cir. 2023) ............................................................ 42

*United States v. Gomez*,
    905 F.2d 1513 (11th Cir. 1990) ....................................................... 51

*United States v. Grote*,
    961 F.3d 105 (2d Cir. 2020) ............................................. 17, 43, 44, 48

*United States v. Jones*,
    471 F.3d 535 (4th Cir. 2006) ...................................................... 50, 51

*United States v. Lawson*,
    677 F.3d 629 (4th Cir. 2012) ........................................................... 43

*United States v. Moseley*,
   980 F.3d 9 (2d Cir. 2020) ................................................................44

*United States v. Pepe*,
   747 F.2d 632 (11th Cir. 1984) .........................................................43

*United States v. Scarfo*,
   711 F.Supp. 1315 (E.D. Pa. 1989) ..................................................49

*United States v. X-Citement Video, Inc.*,
   513 U.S. 64 (1994) ...........................................................44, 45, 46

*Vann v. U.S. Dep't of Interior*,
   701 F.3d 927 (D.C. Cir. 2012) ........................................................33

*In re Venture Mortgage Fund, L.P.*,
   282 F.3d 185 (2d Cir. 2002) ............................................................49

*Ward v. Apple Inc.*,
   791 F.3d 1041 (9th Cir. 2015), *abrogated on other grounds by*
   *Sperring v. LLR, Inc.*, 995 F.3d 680 (9th Cir. 2021) .......................36

*Washington v. Confederated Tribes of Colville Indian Reservation*,
   447 U.S. 134 (1980) ........................................................................18

*White Mountain Apache Tribe v. Bracker*,
   448 U.S. 136 (1980) .................................................................*passim*

*White v. Univ. of Cal.*,
   765 F.3d 1010 (9th Cir. 2014) .........................................................35

*Wilbur v. Locke*,
   423 F.3d 1101 (9th Cir. 2005), *abrogated on other grounds by*
   *Levin v. Commerce Energy, Inc.*, 560 U.S. 413 (2010) ....................35

*Williams v. Big Picture Loans, LLC*,
   929 F.3d 170 (4th Cir. 2019) ....................................................*passim*

*Williams v. Martorello*,
   59 F.4th 68 (4th Cir. 2023) ...............................................................9

*Yashenko v. Harrah's NC Casino Co., LLC*,
   446 F.3d 541 (4th Cir. 2006) ....................................................*passim*

*Ex parte Young*,
209 U.S. 123 (1908)................................................................26, 33

**Statutes**

U.S. CONST. art. I, § 8, cl. 3 ...............................................................18

18 U.S.C. § 1955 ..................................................................................43

18 U.S.C. § 1961(6) ........................................................................41, 42

18 U.S.C. § 1962 .........................................................................*passim*

28 U.S.C. § 1291 ....................................................................................1

28 U.S.C. § 1331 ....................................................................................1

Native American Business Development, Trade Promotion and
Tourism Act, 25 U.S.C. § 4301 .......................................................20

Truth In Lending Act, 15 U.S.C. § 1601 *et seq.* .........................................2

Unlawful Internet Gambling Enforcement Act, 31 U.S.C. § 5361 *et
seq.* ....................................................................................................24

Va. Code § 6.2-305(A)...........................................................................42

Va. Code § 6.2-1816 ..............................................................................22

**Other Authorities**

4Pt1 Bruner & O'Connor, *Construction Law* § 11:88............................49

Consumer Federation of America, Payday Loan Information for
Consumers, https://paydayloaninfo.org/states/virginia/ ...................22

85 Fed. Reg. 44,382 ................................................................................2

Fed.R.App.P. 4(a)(1)(A) .........................................................................1

Fed.R.Civ.P. 12(b)(7)..............................................................................9

Fed.R.Civ.P. 19 .............................................................................*passim*

1 *Federal Rules of Civil Procedure, Rules and Commentary*, Rule 19...................18

Model Penal Code § 2.04 .......................................................................47

National Conference of State Legislatures, "Payday Lending State
    Statutes," https://www.ncsl.org/financial-services/payday-lending-
    state-statutes ...................................................................................21

Jay B. Sykes, *Federal Banking Regulator Finalizes Rule on State
    Usury Laws*, Congressional Research Service (July 9, 2020),
    https://crsreports.congress.gov/product/pdf/LSB/LSB10512 ...........................49

U.S. Dept. of Justice, *Criminal RICO: 18 U.S.C. §§ 1961-1968,
    A Manual for Federal* Prosecutors (6th rev. ed. 2016) ................................42, 51

1 *Wharton's Criminal Law* § 13:3 (16th ed.).........................................................47

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1331.  On September 22, 2023, the district court entered an amended memorandum opinion and order which granted plaintiffs' motion for summary judgment on their claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO").  Defendant filed a timely notice of appeal pursuant to F.R.A.P. 4(a)(1)(A) on October 17, 2023.  This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.     Are internet loans made by an arm of an Indian tribe on its reservation governed by tribal law or by the law of the borrower's state?

2.     Should this case be dismissed pursuant to Fed.R.Civ.P. 19(b) because the tribal lender and its tribe are required parties who have sovereign immunity and cannot be joined?

3.     Does a RICO violation for collection of, or conspiring to collect, unlawful debt require proof that the defendant knew that the debt was unlawful and that the rate charged was at least twice the legally enforceable rate?

## STATEMENT OF THE CASE

In this case, which has spanned more than six years and two interlocutory appeals to this Court, a class of Virginia residents challenges the legality of

1

"payday loans" they obtained via the internet from Big Picture Loans, LLC ("Big Picture"), an arm of the Lac Vieux Desert Band of the Lake Superior Chippewa Indians ("the Tribe").  The loans were made by Big Picture on the Tribe's reservation in Michigan and comply with tribal and federal law.[1]  Nonetheless, the district court ruled that the loans are governed by Virginia law, are therefore usurious, and that appellant Matt Martorello violated RICO by assisting the tribal lending business regardless of whether he knew that the loans were unlawful.  The court also ruled that this action could proceed against Mr. Martorello in the absence of Big Picture and the Tribe, which are immune from the court's jurisdiction.  Each of these rulings was erroneous.

In 2017, plaintiffs filed this action against Big Picture, another Tribal entity, Ascension Technologies, LLC ("Ascension"), Mr. Martorello, and other parties not relevant to this appeal.  Plaintiffs sought declaratory relief that the choice of law and forum-selection provisions in Big Picture's loan agreements were void and unenforceable under Virginia law, and asserted claims for violations of RICO, violations of Virginia usury law, and unjust enrichment.

---

[1] For example, the loans complied with the Truth In Lending Act.  After the period at issue here, the Consumer Financial Protection Bureau issued a regulation that places no limit on the making of payday loans but restricts repeated attempts by lenders to collect from a borrower's bank account – a practice not at issue here.  85 Fed. Reg. 44,382.

## A.    The Tribal Lending Business Structure.

Big Picture and Ascension sought to be dismissed from this action based on tribal sovereign immunity. Following jurisdictional discovery, the district court denied their motion. (JA198) ("*Williams I*"). This Court reversed. *Williams v. Big Picture Loans, LLC*, 929 F.3d 170 (4th Cir. 2019) ("*Williams II*"). In doing so, the Court analyzed the structure and evolution of the Tribal lending business.

The Tribe entered the business of online lending in 2011 when it organized Red Rock Lending ("Red Rock") as a tribally owned LLC. Red Rock provided loans to consumers from its offices on the Tribe's reservation. Red Rock contracted with Bellicose Capital, LLC ("Bellicose"), a non-tribal LLC, to provide it with vendor management services, compliance management assistance, marketing material development, and risk modeling and data analytics development. Mr. Martorello, a non-tribe member, was Bellicose's founder and chief executive officer. *See id.* at 174.

In August 2014, the Tribe organized Big Picture as a new tribal lending entity that would ultimately consolidate the activities of its lending entities, including Red Rock. In February 2015, the Tribe formed (1) Tribal Economic Development Holdings, LLC ("TED"), to operate the Tribe's current and future lending companies, and (2) Ascension as a subsidiary of TED for the purpose of

engaging in marketing, technological, and vendor services to support the Tribe's lending entities. *See id.* at 174-75.

TED oversees both Big Picture and Ascension, and all three entities have their headquarters on the reservation. Big Picture employs 15 tribal members on the reservation, and Ascension employs 31 individuals, most of whom work outside the reservation. An Intratribal Servicing Agreement sets forth the relationship between Big Picture and Ascension, with Ascension handling certain day-to-day aspects associated with Big Picture's loan operations. Members of the Tribe Council co-manage all three companies from the reservation, but Ascension's president is a non-tribal member. *See id.* at 175.

In 2015, Mr. Martorello and the Tribe agreed on a framework for the Tribe to purchase Bellicose: a seller-financed transaction with payments tied to revenues over a seven-year term, at which point any outstanding amount due would be forgiven. The seller-financier would be Eventide Credit Acquisitions, LLC ("Eventide"), a company managed and majority-owned by Mr. Martorello's entities. Pursuant to the agreement, Big Picture distributes its gross revenues to TED, which then uses most of those revenues to pay Eventide, while distributing a portion to the Tribe and reinvesting another portion in growing Big Picture's loan portfolio.

In January 2016, the Tribe completed its purchase of Bellicose and acquired

4

all of Bellicose's data and software. By September 2017, TED had distributed nearly $5 million to the Tribe. *See id.* at 175.

This Court found that "Big Picture is answerable to the Tribe at every level" and that, "while Ascension does manage many of the day-to-day activities associated with Big Picture's lending," "the Intratribal Servicing Agreement … indicates that Big Picture remains in control of its essential functions." *Id.* at 182-83. That agreement "expressly forbids Ascension from engaging in origination activities, executing loan documentation, or approving the issuance of loans to consumers." *Id.* at 183.

The Court rejected plaintiffs' "rent-a-tribe" argument that the tribal entities were formed "for the real purpose of helping Mr. Martorello … to avoid liability, rather than to help the Tribe start a business." *Id.* at 178. Likewise, the Court rejected the contention that the tribal entities "*primarily* benefit individuals and entities outside the Tribe" because "[s]uch a conclusion disregards the substantial revenue that the Tribe has received (and will continue to receive) in the form of payouts and reinvestments." *Id.* at 182 (emphasis in the original).[2]

---

[2] The Court said "the evidence suggests that the Tribe would not have been able to finance a loan operation on its own and thus entered a loan agreement with a non-tribal entity in order to obtain revenue both now and in the future." *Id.* at 180. It noted that "[c]urrently, the Tribe receives 5% of Big Picture's gross revenue distribution, and this percentage will increase to 8% upon payment of half the loan." *Id.* at 180-81. And, "in only a few years, not only will all revenue belong to the Tribe, but it will own outright all of the components of the commercial lending

The Court concluded that Big Picture and Ascension are arms of the Tribe which "serve the purposes of tribal economic development and self-governance." *Id.* at 182. "The evidence here shows that the Entities have increased the Tribe's general fund, expanded the Tribe's commercial dealings, and subsidized a host of services for the Tribe's members. Accordingly, [Big Picture and Ascension] have promoted 'the Tribe's self-determination through revenue generation and the funding of diversified economic development.'" *Id.* at 185.

## B. The Loan Process.

The actual loan process is summarized in *Williams I*. Big Picture has its principal place of business on the Tribe's reservation; all of its employees are located there, as are the servers for Big Picture's websites. All loan applications are approved by Big Picture employees on the reservation, and all consumer loans are originated there. (JA228).

To obtain a loan, consumers must log onto the company's website and complete and submit an application. Big Picture then conducts a review using a software-based underwriting process and either accepts or denies the application. If an application is accepted, the borrower must complete several more steps before the loan is finalized: (1) select the desired loan amount; (2) select the term of the loan and receive an estimated annual percentage rate based on the underwriting

enterprise." *Id.* at 181.

software's determination of an applicant's repayment ability; (3) review Big Picture's standard loan agreement; (4) acknowledge their review of, and agree to, the loan agreement, including the choice-of-law clause; and (5) select the payment method. (JA228-JA229).

Once a borrower signs the loan agreement, it is reviewed by Big Picture employees on the reservation to verify the applicant's information. If there are no issues, the employee manually enters the date of disbursal of funds, which authorizes electronic approval of the agreement. This also causes the loan to be originated and triggers the transmission of instructions to a third-party payment processor, which then disburses the funds to the consumer. (JA230).

## C.    Denial Of Mr. Martorello's Rule 19 Motion.

This Court directed the district court to dismiss Big Picture and Ascension for lack of jurisdiction, and issued its mandate on July 25, 2019. (JA078, ECF No. 600). Nonetheless, the district court did not proceed to dismiss them. On August 12, 2019, Big Picture and Ascension filed a motion seeking their dismissal. (JA079, ECF No. 604). They asserted that they "continue to incur needless fees and costs as a result of remaining nominal parties in this action," (JA282), and noted in their reply brief that "they have been required to spend millions of dollars to vindicate their sovereignty …." (JA287). Still the district court did not dismiss Big Picture and Ascension from the suit.

7

Big Picture and Ascension entered into settlement discussions to resolve all of the litigation in which they or tribal employees were then involved and reached a settlement agreement in principle three months later in late October.  (JA081, ECF No. 637).  A written agreement was ultimately filed on December 19, 2019, in *Galloway, et al. v. Williams, et al.*, 3:19-cv-00470 (E.D. Va.) ("*Galloway III*"), which was a settlement case filed in the district court to effectuate settlement between the proposed class and Big Picture, Ascension, and the tribal employees. (JA297).  The parties to the settlement agreement consist of (1) a Settlement Class that includes all U.S. consumers who executed loan agreements with Big Picture from June 22, 2013 to December 20, 2019, (2) Big Picture and Ascension, (3) individual Tribal officials who had been named as defendants in this or other cases, and (4) certain other parties.  The Tribe is *not* a party to the *Galloway III* settlement case or to the settlement agreement approved therein.

The day after the settlement agreement was filed in *Galloway III*, the district court held a hearing on it and entered an order preliminarily approving it.  That same day, the court stayed the pending motion in this case for entry of judgment as to Big Picture and Ascension.  (JA082, ECF No. 645).  On February 18, 2020, seven months after this Court's mandate issued, the district court finally entered an order dismissing Big Picture and Ascension from this case in accordance with this Court's order.  (JA085, ECF No. 668).

8

Subsequently, Mr. Martorello filed a motion to dismiss the case pursuant to Rules 19 and 12(b)(7) on the grounds that Big Picture, Ascension, and the Tribe were all required parties who could not be joined because of their sovereign immunity. (JA117, ECF Nos. 987, 988). The district court denied this motion in a brief memorandum order. (JA413).

## D. Class Certification.

In July 2021, the district court granted plaintiffs' motion for class certification. (JA130, ECF Nos. 1110, 1111). Mr. Martorello petitioned for permission to appeal the class certification and certain other rulings made by the district court. This Court permitted the appeal and affirmed the rulings. *Williams v. Martorello*, 59 F.4th 68 (4th Cir. 2023).

## E. The Summary Judgment Process.

Following remand to the district court, the parties conducted discovery and then filed motions for summary judgment. Plaintiffs' motion focused on their RICO claims. They took the position that (1) the loans are governed by Virginia law, are usurious under Virginia's applicable statute, and so are "unlawful debt" under RICO; (2) the participants in the Tribal lending operation – including Mr. Martorello, Eventide, the Tribe, Big Picture, and Ascension – constitute a RICO enterprise; and (3) persons associated with the enterprise collected, and conspired to collect, "unlawful debt" in violation of RICO. Plaintiffs asserted that Mr.

Martorello was liable under RICO regardless of whether he believed that the loans were governed by Tribal law and were thus lawful.

Mr. Martorello contended that the loans are governed by Tribal law. Alternatively, he argued that he believed in good faith that the loans were lawful and he lacked the requisite scienter to violate RICO. Mr. Martorello noted that the tribal loan operation had been structured by and then operated under the advice and guidance of reputable lawyers, experienced in the applicable law, who represented him and his companies, on one hand, and the Tribe and its entities, on the other. Those attorneys – for both clients – consistently said that the loans were governed by Tribal law. The firm of Greenberg Traurig, which advised Mr. Martorello and his companies, co-authored multiple letters to state authorities asserting that the loans were lawful and issued multiple legal opinions to that effect. The firm of Rosette, LLP, which specializes in representing tribes and represented the Tribe here, took the same position and communicated it to banks, creditors, credit bureaus, and ACH processors as well as in their communications with Mr. Martorello. (*See* JA141, ECF No. 1218). In addition, Mr. Martorello contested whether his involvement in conducting the affairs of the alleged RICO enterprise was sufficient to establish liability under 18 U.S.C. § 1962(c).

Plaintiffs sought partial summary judgment that (1) the loans are governed by Virginia law rather than tribal law; (2) Mr. Martorello violated the RICO

conspiracy provision, 18 U.S.C. § 1962(d), because he knew about the alleged RICO scheme, furthered the scheme, and profited from it; and (3) certain elements of the substantive RICO claim under § 1962(c) were established, namely that a RICO enterprise existed, that loans made by the enterprise were "unlawful debt" under RICO, and that persons associated with the enterprise engaged in the collection of those debts. (JA137, ECF No. 1169).

The district court heard argument on plaintiffs' motion on June 7-8, 2023. Mr. Martorello stipulated that, *if Virginia law applies*, the loans constituted unlawful debts within the meaning of RICO. He further stipulated that he knew of the existence of the alleged RICO enterprise (the tribal loan operation) and that persons associated with the enterprise collected the loans. The court ruled that Virginia law governed and the parties agreed that the only remaining issue with respect to the RICO conspiracy claim was whether plaintiffs must prove that Mr. Martorello knew the loans were illegal.

On June 16, 2023, the district court issued an order that Virginia law governs the loans, granted partial summary judgment on elements of plaintiffs' RICO claims, and ruled that Mr. Martorello need not know of the loans' illegality in order to establish a RICO violation. But the court did not grant summary judgment as to all elements of the RICO conspiracy claim. (JA154, ECF No. 1328). Plaintiffs moved to amend this order to also adjudge that Mr. Martorello knew

about and facilitated the RICO enterprise. (JA156, ECF No. 1340). Given the court's rulings that Virginia law governed and that plaintiffs need not prove he knew the loans were illegal, Mr. Martorello conceded that there were no remaining triable issues of fact on the RICO conspiracy claim. (JA2679). The court then granted summary judgment as to all elements of the conspiracy claim. (JA157, ECF No. 1350).

Meanwhile, Mr. Martorello had sought summary judgment that Tribal law applied to the loans; that he was not liable under Virginia's usury laws; and that he was not liable for unjust enrichment (JA145, ECF No. 1255). The district court heard argument on this motion on June 26-27, 2023, and denied it (JA157, ECF No. 1354).

During the June 26, 2023 hearing, the district court orally ruled that liability under § 1962(c) does not require proof that defendant controlled the RICO enterprise. Mr. Martorello then stipulated that there were no remaining triable issues of material fact regarding the substantive RICO claim. (JA2681). The court granted summary judgment to plaintiffs on that claim. (JA2684).

The parties stipulated that the amount of damages for each of the RICO claims was $43,401,817.47. (JA161, ECF No. 1389). Plaintiffs dismissed their remaining claims without prejudice. (JA161, ECF No. 1390, JA163, ECF No. 1405).

On September 22, 2023, the district court entered an amended opinion explaining its reasons for granting partial summary judgment to plaintiffs and its subsequent orders addressing the remaining issues in the case.  (JA2685).  The court also entered a final judgment on the two RICO claims awarding damages in the stipulated amount on each claim.  (JA163, ECF No. 1407).

## F.    The District Court's Opinion.

The opinion expounded the district court's conclusions that the loans are governed by Virginia law and that Mr. Martorello is liable under RICO regardless of whether he knew that the loans were unlawful.  The court asserted that Virginia law governs because online tribal lending constitutes "off-reservation" conduct which can be regulated by the states.  (JA2706).  And it found that the tribal choice of law provision in the loan agreements violated the prospective waiver doctrine and Virginia's strong public interest against usurious loans.

The court devoted most of the opinion to its conclusion that Mr. Martorello need not know that the loans were unlawful in order to be liable under RICO.  It reasoned that the text of the RICO statute does not require such knowledge and that Mr. Martorello was asserting an impermissible mistake of law defense.

The court also included a lengthy assessment of the factual merits of Mr. Martorello's scienter defense.  (JA2717–JA2722).  Although it had excluded 43 of the 50 exhibits Mr. Martorello proffered on this issue, the Court acknowledged that

the seven exhibits it admitted "are probative of Mr. Martorello's assertion that he believed that Tribal law governed the loans at issue." (JA2719). Still, it opined, "the record as a whole reflects that Mr. Martorello knew that he was operating in, at-best, a grey area of the law." (JA2719). The court concluded that "Mr. Martorello knew that the [loans were] of questionable legality" and he "deliberately took the risk that his guess about what law would apply might well be wrong." (JA2721). Further, the court offered the inappropriate and incorrect prognostication that Mr. Martorello would not actually present a scienter defense because "it would be quite surprising if Mr. Martorello were to testify at trial." (JA2722).

## SUMMARY OF ARGUMENT

1.     Virginia law does not invalidate the loans at issue. A tribe is a sovereign which can regulate the activities of nonmembers who contract with the tribe or its entities. The loans at issue here are commerce with an Indian tribe which can only be regulated by Congress, not by the states. A state law cannot be applied to a tribe or to on-reservation activities where it would impermissibly infringe on tribal sovereignty, a determination that is based on the state, federal, and tribal interests at stake. *See White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 145 (1980). The Supreme Court has held that the federal and tribal interests in Indian sovereignty, tribal self-sufficiency, and economic development

14

preclude states from interfering with activities on the reservation that generate value.

Internet lending by tribes has been analyzed under *Bracker* by one federal circuit court of appeals. *See Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs.*, 769 F.3d 105 (2d Cir. 2014). It observed that "[l]oans brokered over the internet seem to exist in two places at once. Lenders extend credit from reservations; borrowers apply for and receive loans without leaving [their] State." *Id.* at 114. Nonetheless, such loans can constitute on-reservation activity if the lender is "firmly rooted" there. *Id.* at 115. In this event, the applicable federal and tribal interests can preclude states from interfering with the tribe's affairs. *See id.* at 112 n. 4.

The record in this case establishes that the loan transactions are indeed "firmly rooted" on the Tribe's reservation and generate substantial value for the Tribe. Accordingly, the federal and tribal interests in Indian sovereignty, tribal self-sufficiency, and economic development preclude application of Virginia law to invalidate these loans. So this case must be dismissed.

2.     This case also must be dismissed pursuant to Rule 19 because the Tribe, Big Picture, and Ascension are indispensable parties which cannot be joined due to their sovereign immunity, and in whose absence this case cannot be adjudicated. Big Picture is the lender whose activities are at issue; it is a party to

15

all of the loan agreements and so "is the paradigm of an indispensable party." *Gunvor SA v. Kayablian*, 948 F.3d 214, 221 (4th Cir. 2020). Ascension also is indispensable because an adjudication regarding the validity of the loans might impair its contractual interests. The Tribe is indispensable because any judgment against Mr. Martorello would threaten to impair its sovereign capacity to negotiate contracts and to govern its reservation. *See Yashenko v. Harrah's NC Casino Co., LLC*, 446 F.3d 541, 553 (4th Cir. 2006). A suit must be dismissed when, as here, sovereign entities are required parties but cannot be joined because of their immunity. *See id.*

3.    Mr. Martorello could not have violated RICO unless he knew that the loans at issue constitute "unlawful debt," meaning that: (1) they were unlawful under governing usury law, and (2) the interest rate charged was at least twice the enforceable rate. RICO violations are crimes and courts "presume that Congress did not intend to impose criminal liability on persons who, due to lack of knowledge, did not have a wrongful mental state." *Rehaif v. United States*, 139 S.Ct. 2191, 2198 (2019). A defendant must "possess a culpable mental state regarding 'each of the statutory elements that criminalize otherwise innocent conduct.'" *Id.* at 2195.

Here an essential element of the offense is that the loans were "unlawful debt." RICO does not authorize conviction of a defendant "who neither knew the

rate of interest charged nor that the rate charged was illegal." *United States v. Grote*, 961 F.3d 105, 119 (2d Cir. 2020). Thus, Mr. Martorello is not liable if he believed that the loans were lawful or he lacked knowledge that the interest rate charged was double the enforceable rate.

This scienter requirement applies even though it relates to an issue of law. "[A] mistake of law is a defense if the mistake negates the 'knowledge … required to establish a material element of the offense.'" *Rehaif*, 139 S.Ct. at 2198. Nor is the scienter requirement relaxed in this case because civil liability under RICO, rather than criminal liability, is at stake. The statute must be interpreted consistently whether it is being applied in a criminal or civil context. *See Sessions v. Dimaya*, 584 U.S. ----, 138 S.Ct. 1204, 1217 (2018). Mr. Martorello is entitled to a trial on the RICO charges at which plaintiffs must prove that he had the requisite scienter with respect to the loans. The district court's judgment against him must be reversed.

## ARGUMENT

### I.    Standard Of Review.

This Court reviews an award of summary judgment *de novo*. *Dixon v. Edwards*, 290 F.3d 699, 710 (4th Cir. 2002). It reviews a Rule 19 decision for abuse of discretion, reviewing the underlying findings of fact for clear error. *See Gunvor*, 948 F.3d at 219. However, "the trial court will inevitably make legal

conclusions about the standards governing Rule 19, and such legal conclusions are reviewed *de novo*."  1 *Federal Rules of Civil Procedure, Rules and Commentary*, Rule 19.

## II.    Virginia Law Cannot Invalidate Loans Made On The Reservation.

The threshold issue is whether Virginia law governs these loans.  Because the loans are made on the reservation by an arm of the Tribe, the district court erred in ruling that they are governed by Virginia law.

### A.    Loans made on a reservation are governed by tribal, not state, law.

"Indian tribes are domestic dependent nations that exercise inherent sovereign authority."  *Michigan v. Bay Mills Indian Community*, 572 U.S. 782, 788 (2014) (internal quotation marks and citations omitted).  "A tribe may regulate … the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements."  *Montana v. United States*, 450 U.S. 544, 565 (1981).

 "[T]ribal sovereignty is dependent on, and subordinate to, only the Federal Government, not the States."  *Washington v. Confederated Tribes of Colville Indian Reservation*, 447 U.S. 134, 154 (1980).  The Constitution grants Congress plenary power to "regulate Commerce … with the Indian Tribes."  U.S. CONST. art. I, § 8, cl. 3.  This remedied a flaw in the Articles of Confederation, which had given authority to regulate trade with Indians to both the Continental Congress and

to the states. *See* The Federalist Papers, No. 42. "If anything, the Indian Commerce Clause accomplishes a greater transfer of power from the States to the Federal Government than does the Interstate Commerce Clause." *Seminole Tribe v Florida*, 517 U.S. 44, 62 (1996). "This is clear enough from the fact that the States still exercise some authority over interstate trade but have been divested of virtually all authority over Indian commerce and Indian tribes." *Id.*

Thus, "'absent governing Acts of Congress,' a State may not act in a manner that 'infringe[s] on the right of reservation Indians to make their own laws and be ruled by them.'" *Three Affiliated Tribes of Fort Berthold Reservation v. Wold Engr'g*, 476 U.S. 877, 890 (1986) (citation omitted). "[C]ongressional authority and the 'semi-independent position' of Indian tribes have given rise to two independent but related barriers to the assertion of state regulatory authority over tribal reservations and members. First, the exercise of such authority may be pre-empted by federal law." *Bracker*, 448 U.S. at 142. "Second, it may unlawfully infringe 'on the right of reservation Indians to make their own laws and be ruled by them.'" *Id.*

To determine whether state actions infringe on tribal sovereignty, the Supreme Court requires "a particularized inquiry into the nature of the state, federal, and tribal interests at stake, an inquiry designed to determine whether, in the specific context, the exercise of state authority would violate federal law."

19

*Bracker*, 448 U.S. at 145. "State jurisdiction is pre-empted … if it interferes or is incompatible with federal and tribal interests reflected in federal law, unless the state interests at stake are sufficient to justify the assertion of state authority." *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 216 (1987) (citation omitted). "The inquiry is to proceed in light of traditional notions of Indian sovereignty and the congressional goal of Indian self-government, including its 'overriding goal' of encouraging tribal self-sufficiency and economic development." *Id.*[3]

Because states have a significant interest in collecting taxes from non-Indians, they can require tribal retailers to enforce a state tax "which falls on non-Indian purchasers of goods that are merely retailed on a reservation." *Dep't of Taxation and Finance of N.Y. v. Milhelm Attea & Bros., Inc.*, 512 U.S. 61, 73 (1994). A state's interest in enforcing its taxes "outweighs tribes' modest interest in offering a tax exemption to customers who would ordinarily shop elsewhere." *Id.* But the balance of interests is markedly different for taxes aimed at Indians, such as a state "tax imposed directly on Indian traders, on enrolled tribal members

---

[3] Congress reaffirmed "the twin goals of economic self-sufficiency and political self-determination for Native Americans" in 2000 in the Native American Business Development, Trade Promotion and Tourism Act. 25 U.S.C. § 4301(a). It found that "the United States has an obligation to guard and preserve the sovereignty of Indian tribes in order to foster strong tribal governments, Indian self-determination, and economic self-sufficiency among Indian tribes." *Id*.

or tribal organizations, or on 'value generated on the reservation by activities involving the Tribes.'" *Id.*

And the Supreme Court has rejected state efforts to *regulate* transactions on a reservation. It concluded that a state law limiting gaming on a reservation impermissibly infringed on tribal government because "[s]elf-determination and economic development are not within reach if the Tribes cannot raise revenues and provide employment for their members." *Cabazon*, 480 U.S. at 219. Tribal gaming "generat[es] value on the reservations through activities in which [the tribes] have a substantial interest," *id.* at 220, and does not "merely market[] an exemption from state gambling laws." *Id.* at 219. The state's asserted interest in preventing the infiltration of organized crime did not justify regulation of tribal gaming in light of the compelling federal and tribal interests supporting the tribal enterprises. *Id.* at 221-22.

This analysis is equally applicable to tribal lending. It, too, offers non-tribal members a *bona fide* product which generates value on the reservation, thereby raising revenue for the tribe and providing employment for tribal members. There is no question that payday loans are a *bona fide* product. Currently, 37 states permit such loans.[4] Virginia is one of those states -- it permits licensed lenders to

---

[4] *See* National Conference of State Legislatures, "Payday Lending State Statutes," https://www.ncsl.org/financial-services/payday-lending-state-statutes.

make loans with an annual percentage rate of 688% for a 14-day loan.[5] Accordingly, the tribal and federal interests in promoting tribal sovereignty, self-sufficiency and economic development through the provision of payday lending products preclude states from regulating such loans made to non-Indians on a reservation.

### B.  Loans made on a reservation through use of the internet are also governed by tribal, not state, law.

Tribal law also governs loans made on a reservation when the borrower applies via the internet rather than in person.  The lender's conduct in making these loans is exactly the same and occurs entirely on the reservation.  The only difference is on the borrower side, i.e., the borrower submits the loan application via the internet rather than delivering it in person.  A borrower "through the internet or phone, can conduct business on the reservation and can affect the Tribe and tribal members without physically entering the reservation." *F.T.C. v. Payday Financial, LLC*, 935 F.Supp.2d 926, 939 (D.S.D. 2013).  Loans contracted by phone or internet "have the same effect on the nonmember [borrower], the tribe, the lender, and the reservation" as loans contracted in person.  *Id.* at 940.

A borrower's use of the internet to submit a loan application to a tribal lender on the reservation does not alter the *Bracker* interests at play.  It does not empower the borrower's home state to supplant tribal law and regulate or prohibit

---

[5] *See* Va. Code § 6.2-1816;  https://paydayloaninfo.org/states/virginia/.

the loan transaction, much less to penalize the tribal lender and third parties that facilitate the loan. The relevant state, federal, and tribal interests are the same as if the borrower personally visited the reservation. The tribal and federal interests in promoting tribal sovereignty, self-sufficiency and economic development still outweigh a state's interest in regulating loans that its citizens contract in another jurisdiction.

The Supreme Court has consistently upheld the validity of cross-jurisdiction loans. A lender can "legitimately lend funds outside the state, and stipulate for repayment in [the state] in accordance with its laws, and at the rate of interest there lawful, even though the agreement for the loan were entered into in another state, where a different law and a different rate of interest prevailed." *Seeman v. Philadelphia Warehouse Co.*, 274 U.S. 403, 407 (1927). Conversely, "citizens of one State [a]re free to visit a neighboring State to receive credit at foreign interest rates." *Marquette Nat. Bank of Minneapolis v. First of Omaha Service Corp.*, 439 U.S. 299, 318 (1978).

The Court has acknowledged that this "exportation" of interest rates impairs the effectiveness of state usury laws, and that "[t]his impairment may in fact be accentuated by the ease with which interstate credit is available by mail through the use of modern credit cards." *Marquette*, 439 U.S. at 318-19 (emphasis added). However, "[a]lthough the convenience of modern mail permits [residents of one

state] to receive loans without visiting [another state]," the Court rejected the argument that the usury law of the borrower's state could be applied to these loans. *Id.* at 311. It concluded that "the protection of state usury laws is an issue of legislative policy" that must be addressed to Congress, not the courts. *Id.* at 319; *see also Cades v. H&R Block, Inc.*, 43 F.3d 869, 874 (4th Cir. 1994).

Today, interstate credit is available via the internet as well as by mail. However, Congress has not chosen to regulate internet lending to protect state usury laws although it has restricted other forms of internet commerce to safeguard state interests. For example, in 2006 Congress prohibited internet gambling that is either initiated or received within a state where such gambling is unlawful under that state's laws. *See* Unlawful Internet Gambling Enforcement Act, 31 U.S.C. § 5361, *et seq.*

Since Congress has not regulated tribal lending conducted via the internet, the states cannot do so unilaterally. Virginia cannot prevent its citizens from using the internet to obtain credit at a foreign interest rate. Neither can it prevent a tribal lender from extending credit on the reservation to a Virginia citizen.[6] Absent federal authorization, a state cannot constitutionally regulate this kind of commerce

---

[6] In *Marquette*, the Supreme Court reasoned that a bank located in Nebraska extended credit there to Minnesota credit card holders by paying the sales drafts of Minnesota merchants and banks. *See* 439 U.S. at 311-12. Likewise, here, the Tribal lender extends credit on the reservation to borrowers from other jurisdictions.

24

between its citizens and an Indian tribe.

### C.    Virginia law does not govern the loans at issue here.

The Second Circuit's decision in *Otoe-Missouria* recognized that states may be precluded from regulating tribal lending that is transacted via the internet.  In that case the Tribe and another tribe sought to enjoin New York's efforts to bar them from extending internet loans to New York residents at interest rates above the state ceiling.  They argued that the state's efforts violated their tribal sovereignty and the Indian Commerce Clause.  The trial court denied the tribes' request for preliminary injunctive relief and the Second Circuit affirmed given the limited factual record that had been presented.  Significantly, however, it acknowledged that the tribes' arguments might prevail with further factual development.

The Second Circuit stated that "[a] court might well find that the tribes' sovereign interest in raising revenue militate in favor of prohibiting a separate sovereign from interfering in their affairs."  769 F.3d at 112 n. 4.  Although the loans were collected in New York, "[a] court might ultimately conclude that … the transaction being regulated by New York could be regarded as on-reservation, based on the extent to which one side of the transaction is firmly rooted on the reservation." *Id.* at 115.

Here, however, the district court ignored the on-reservation elements of the

loan transactions and ruled that online tribal lending constitutes "off-reservation" conduct which states can regulate. (JA2706). It purported to rely on this Court's decision in *Hengle v. Treppa*, 19 F.4th 324, 348-49 (4th Cir. 2021). But *Hengle* addressed a different issue: whether tribal sovereign immunity covers tribal officials sued for alleged violations of state law under the doctrine of *Ex parte Young*, 209 U.S. 123 (1908). The Court ruled that some of the officials' *alleged* conduct occurred off-reservation and therefore was not immune.[7] *See* 19 F.4th at 349 ("In sum, substantive state law applies to off-reservation conduct, and although the Tribe itself cannot be sued for its commercial activities, its members and officers can be.").[8] *Hengle* did not discuss the Indian Commerce Clause or federal preemption. It did not analyze the "balance of state, federal, and tribal interests" at stake or whether the loan transactions were "firmly rooted" on the reservation because those issues were not before it. In short, *Hengle* is inapposite to this case.

The relevant precedent is *Otoe-Missouria*, which recognized that tribal loans

---

[7] *Hengle* involved a motion to dismiss and so the allegations of the complaint were accepted as true.

[8] The opinion also concluded that the governing-law provision of the loan agreements, specifying tribal law, was unenforceable in Virginia courts because it would violate Virginia's compelling public policy against usurious lending. The Court decided this issue by applying Virginia's choice-of-law rules, which the parties had stipulated should direct the inquiry. *See* 19 F.4th at 349-53.

contracted via the internet can qualify as on-reservation activities if the lender's side of the transaction is firmly rooted there. Ultimately, the Second Circuit concluded that the preliminary injunction record contained "insufficient evidence to establish … that the internet loans should be treated as on-reservation activity." 769 F.3d at 115. Specifically, "[t]he lenders' affidavits boldly (but conclusorily) assert that 'loans are approved through processes that occur on … Reservation[s],' but nowhere do they state what specific portion of a lending transaction took place at any facility physically located on a reservation … or where the servers hosting the websites were located." *Id.*[9]

In contrast, the record here is fully developed and establishes that the loans at issue are indeed "firmly rooted" on the Tribe's reservation. All of the loans were made by Big Picture, a wholly owned and operated instrumentality of the Tribe which is organized under tribal law. The district court found that Big Picture operates entirely on the reservation and that the loans are originated there:

> "Big Picture has its principal place of business on the Reservation, and its employees are all located there. The servers for Big Picture's websites are also stored on the Reservation. And, because all loan applications are approved by Big Picture employees on the Reservation, all consumer loans are originated there."

(JA228). Accordingly, the Tribe's "sovereign interest in raising revenue

---

[9] The tribes never presented additional evidence to address these deficiencies because the litigation ended after the Second Circuit denied the interlocutory appeal.

militate[s] in favor of prohibiting a separate sovereign from interfering in [its] affairs." *Otoe-Missouria*, 769 F.3d at 112 n. 4.

Moreover, the tribal lending operation "ha[s] promoted the Tribe's self-determination through revenue generation and the funding of diversified economic development." *Williams II*, 929 F.3d at 185. And, "[t]he Tribe itself has invested over $7 million [in the lending operation]." (JA226). "A tribe's [sovereign] interest peaks when a [state] regulation threatens a venture in which the tribe has invested significant resources" and state regulation would "unsettle and supplant those investments." *Otoe-Missouria*, 769 F.3d at 113.

Weighing the interests at stake here produces the same conclusion that the Supreme Court reached in *Cabazon*, i.e., that state law cannot regulate the tribal business. The Tribe's interests in self-determination and self-sufficiency are at their peak. They are bolstered by the federal interest in promoting tribal self-governance, self-sufficiency and economic development. Virginia's competing interest in regulating non-Virginia loans made to its citizens, but which it cannot stop them from contracting, does not overcome these tribal and federal interests. Virginia's interest "does not justify state regulation of the tribal [lending] enterprises in light of the compelling federal and tribal interests supporting them." *Cabazon*, 480 U.S. at 221-22. "State regulation would impermissibly infringe on tribal government." *Id.* at 222.

Because Virginia law cannot be applied to override tribal law and invalidate these loans, this case must be dismissed.

## III.     This Case Must Be Dismissed Pursuant To Rule 19.

This case must also be dismissed pursuant to Fed.R.Civ.P. 19(b) because the Tribe, Big Picture and Ascension are indispensable parties in whose absence this case cannot be adjudicated.  Plaintiffs claimed, and the district court ruled, that their loan agreements with Big Picture are governed by Virginia usury laws and are usurious, and that Big Picture and Ascension are parts of a RICO enterprise that engaged in the collection of unlawful debt.  Yet the district court lacks jurisdiction over Big Picture and Ascension, not to mention the Tribe, because of tribal sovereign immunity.

### A.     Big Picture, Ascension, and the Tribe are indispensable parties.

Plainly, Big Picture is a required party under Rule 19.  "[A] contracting party is the paradigm of an indispensable party." *Gunvor*, 948 F.3d at 221 (quoting *Nat'l Union Fire Ins. Co. v. Rite Aid of S.C., Inc.*, 210 F.3d 246, 252 (4th Cir. 2000)).  "[A] party to a contract is necessary, and if not susceptible to joinder, indispensable to litigation seeking to decimate that contract." *Dawavendewa v. Salt River Project Agr. Imp. & Power Dist.*, 276 F.3d 1150, 1157 (9th Cir. 2002).

Ascension is also a required party.  "[N]o procedural principle is more deeply imbedded in the common law than that, in an action to set aside a lease or a

contract, all parties who may be affected by the determination of the action are indispensable." *Dawavendewa*, 276 F.3d at 1156. "Numerous cases hold that 'an action seeking rescission of a contract must be dismissed unless all parties to the contract, and others having a substantial interest in it, can be joined.'" *Naartex Consulting Corp. v. Watt*, 722 F.2d 779, 788 (D.C. Cir. 1983).

Likewise, the Tribe is a required party for multiple reasons. First, adjudicating the validity of the loan agreements in the absence of the Tribe impairs its sovereign interests in making and enforcing its laws. "[A]ny judgment … would threaten 'to impair the [Tribe]'s contractual interests, and thus, its fundamental economic relationship with' [a contracting] party, as well as 'its sovereign capacity to negotiate contracts and, in general, to govern' the reservation.'". *Yashenko*, 446 F.3d at 553 (citation omitted). This "suit would … effectively abrogate the Tribe's sovereign immunity by adjudicating its interest in [the loan] contract[s] without consent." *Enterprise Mgmt. Consultants v. U.S. ex rel. Hodel*, 883 F.2d 890, 894 (10th Cir. 1989). Because the relief sought "amounts to a declaratory judgment that the present [lending] conducted by the tribe[] is unlawful," it is a required party. *Am. Greyhound Racing, Inc. v. Hull*, 305 F.3d 1015, 1024 (9th Cir. 2002). The Tribe's "interests may well be affected *as a practical matter* by the judgment that its operations are illegal." *Id.* (emphasis in original).

Second, the Tribe's direct and substantial economic interest in Big Picture's lending business makes it a required party. "[T]he precedent set by rescission of transactions freely entered by the tribe[] would likely be extremely prejudicial to the tribe['s] long term interest in Indian gaming [here lending] and the revenue it provides." *U.S. ex rel. Hall v. Tribal Dev. Corp.*, 100 F.3d 476, 480 (7th Cir. 1996) (citation omitted); *see also Dine Citizens Against Ruining Our Env't v. Bureau of Indian Affairs*, 932 F.3d 843, 857 (9th Cir. 2019) ("[t]he Navajo Nation and [the corporation] would be prejudiced if this lawsuit were to proceed and Plaintiffs were to prevail—at stake is an estimated 40 to 60 million dollars per year in revenue for the Navajo Nation, as well as its ability to use its natural resources how it chooses."). A tribe is an indispensable party where any judgment would prejudice its economic interests in a contract and its interests as a sovereign in negotiating contracts and governing its reservation. *See Yashenko*, 446 F.3d at 553.

**B.      This action should not have proceeded in the absence of Big Picture, Ascension, and the Tribe.**

To evaluate whether an action can fairly proceed without a required party, courts consider four non-exclusive factors: (1) the extent to which a judgment rendered in the party's absence might prejudice it or the existing parties; (2) the extent to which any prejudice could be lessened or avoided; (3) whether a judgment rendered in the party's absence would be adequate; and (4) whether the

plaintiff would have an adequate remedy if the action were dismissed for nonjoinder. *See* Fed.R.Civ.P. 19(b). "Decisions must be made pragmatically, in the context of the substance of each case, and courts must take into account the possible prejudice to all parties, *including those not before it*." *Home Buyers Warranty Corp. v. Hanna*, 750 F.3d 427, 433 (4th Cir. 2014) (internal quotations and citations omitted) (emphasis added).

However, "[i]f the necessary party is immune from suit, there may be 'very little need for balancing Rule 19(b) factors because immunity itself may be viewed as the compelling factor.'" *Kescoli v. Babbitt*, 101 F.3d 1304, 1311 (9th Cir. 1996) (citation omitted). "Under Rule 19(b), immunity is deemed a 'compelling factor' to demonstrate that the party is indispensable." *Clark v. Harrah's NC Casino Co., LLC*, 2018 WL 6118624, at *6 (W.D.N.C. Apr. 27, 2018), *adopted*, 2018 WL 4664136 (Sept. 28, 2018). The Supreme Court has held that "[a] case may not proceed when a required-entity sovereign is not amenable to suit. . . . [where] the claims of the sovereign are not frivolous, dismissal of the action must be ordered where there is a potential for injury to the interests of the absent sovereign." *Republic of Philippines v. Pimentel*, 553 U.S. 851, 867 (2008). Accordingly, a suit must be dismissed when a tribe or tribal entity is a required party and cannot be joined because of sovereign immunity, as is the case here. *See Yashenko*, 446 F.3d at 553.

### C.     The district court's Rule 19 analysis is flawed.

Nonetheless, the district court ruled that this suit could proceed in the absence of Big Picture, Ascension and the Tribe.  It cited two district court decisions: *Commonwealth of Pennsylvania v. Think Finance, Inc.*, 2016 WL 183289 (E.D. Pa. Jan. 14, 2016) and *Gingras v. Rosette*, 2016 WL 2932163, at *20 (D. Vt. May 18, 2016).  It also relied on the doctrine that joint tortfeasors are not necessary parties, and asserted that that Rule 19 is inapplicable because Big Picture and Ascension were joined as parties and reached a settlement with the plaintiffs. (JA414).  However, the court's analysis is flawed.

#### 1.     *The legal precedents on which the district court relied are inapplicable or incorrect.*

Neither precedent cited by the district court supports its conclusion.  The *Gingras* decision is inapposite because plaintiffs there sought prospective relief under *Ex parte Young* against executives of the tribal lender, together with their claims against non-tribal defendants.  A tribe and its officers are "one and the same in an *Ex parte Young* suit for declaratory and injunctive relief."  *Vann v. U.S. Dep't of Interior*, 701 F.3d 927, 929 (D.C. Cir. 2012).  The *Gingras* court ruled that the presence of the *non-immune tribal officials* satisfied Rule 19 concerns about the absence of the tribal lender and its tribe.  In contrast, this suit does not involve any claims for prospective relief against tribal officials who represent the interests of

the absent Tribe, Big Picture and Ascension.[10]

The *Think Finance* decision is distinguishable on its facts and its reasoning is flawed. The case involved an action by a state Attorney General against private parties who allegedly schemed to avoid state laws by issuing loans in partnership with tribes who acted as the nominal lender. The tribes were not named as defendants and no relief was sought against them or against tribal officials. The district court therefore ruled that the tribes were not necessary parties under Rule 19(a).

Significantly, the plaintiff in *Think Finance* "[did] not seek[] a declaration that the [loan] contracts themselves are illegal, but rather a declaration that the Defendants' conduct [in facilitating those loans] violates a number of state and federal laws." 2016 WL 183289, at *4. Accordingly, the court held that it could grant complete relief to the existing parties in the absence of the tribes, as required by Rule 19(a)(1)(A). Here, in contrast, plaintiffs alleged that Big Picture's loan agreements are void and unenforceable under Virginia law and they sought declaratory relief to that effect. The district court could not afford complete relief on this claim in the absence of Big Picture. *See Yashenko*, 446 F.3d at 552-53; *Clinton v. Babbitt*, 180 F.3d 1081, 1088 (9th Cir. 1999).

---

[10] Some individual tribal officers were originally named as co-defendants but damages rather than prospective relief were sought against them. Further, they were terminated from this action at an early stage (JA033, ECF No. 122), well before the Rule 19 motion was filed.

The *Think Finance* court also concluded that, under Rule 19(a)(1)(B), the tribes were not necessary parties because their contractual and sovereignty interests would be protected by the existing defendants who had the same interest as the tribes had in proving the legality of the loan contracts. *Id.* at *8. This flawed rationale "assumes too much;" it would mean that "one seeking to nullify an agreement could simply sue one of the signatories and then argue that the remaining signatories were not necessary because the existing defendant would 'adequately represent' their interest in defending the contract." *Wilbur v. Locke*, 423 F.3d 1101, 1113-14 (9th Cir. 2005), *abrogated on other grounds by Levin v. Commerce Energy, Inc.*, 560 U.S. 413 (2010). "[T]he general rule is exactly the opposite: all parties to a contract are necessary in litigation seeking to 'decimate' that contract." *Id.* This Court follows that rule. *See Gunvor*, 948 F.3d at 221.

Furthermore, in this case Mr. Martorello cannot adequately represent the interests of Big Picture, Ascension, or the Tribe. "Both tribal officers and federal agencies may, in some circumstances, adequately represent the interests of an absent tribe." *Jamul Action Comm. v. Simermeyer*, 974 F.3d 984, 997 (9th Cir. 2020). But courts have rejected arguments that other parties can adequately represent absent tribes. *See, e.g., White v. Univ. of Cal.*, 765 F.3d 1010, 1027 (9th Cir. 2014) (state university could not do so); *Backcountry Against Dumps v. U.S. Bureau of Indian Affairs*, 2021 WL 3611049, at *8 (S.D. Cal. Aug. 6, 2021), *aff'd*,

2022 WL 15523095 (9th Cir. 2022) (private entity could not do so); *Union Pacific R. Co. v. Runyon*, 320 F.R.D. 245, 252 (D. Or. 2017) (county commissioners and public interest groups could not do so).  Moreover, Mr. Martorello has never represented "that [he has] the intent or ability to represent the [tribal] interests." *See Runyon*, 320 F.R.D. at 252.

For all of these reasons, both *Gingras* and *Think Finance* fail to support the district court's decision.

### 2.    Rule 19 applies notwithstanding that the absent parties are alleged joint tortfeasors.

Nor does the contention that Big Picture and Ascension are joint tortfeasors render Rule 19 inapplicable here.  The rule of joint and several liability often satisfies Rule 19(a)(1)(A) in tort cases by enabling a court to provide complete relief where only money damages are being sought.  However, that is not the end of the Rule 19 analysis.  "Rule 19(a)(1)(B)(i) directs [a court] to consider a non-joined party's ability to protect its own interests."  *Home Buyers*, 750 F.3d at 434.

"[A]n absent party's role as a joint tortfeasor does not preclude it from having an interest in the action that warrants protection."  *Ward v. Apple Inc.*, 791 F.3d 1041, 1049 (9th Cir. 2015), *abrogated on other grounds by Sperring v. LLR, Inc.*, 995 F.3d 680, 682 (9th Cir. 2021).  For example, an "absent party's contract rights may give it a legally protected interest in an action."  *Id.* at 1053 (citations omitted).  Accordingly, this Court has found absent third parties were required

parties under Rule 19 based on their "natural interest in any adjudication of the terms of [the] contract" at issue. *Home Buyers*, 750 F.3d at 434.

Here, Big Picture, Ascension and the Tribe all have legally protected contractual interests in the adjudication of plaintiffs' claims. Further, "any judgment on [plaintiffs'] claim[s] would threaten 'to impair the [Tribe]'s … 'sovereign capacity to negotiate contracts and, in general, to govern' the reservation." *Yashenko*, 446 F.3d at 553. And the Tribe's "interests may well be affected *as a practical matter* by the judgment that its operations are illegal." *Am. Greyhound Racing*, 305 F.3d at 1024 (emphasis in original). "[T]he risk that an action will trigger regulatory scrutiny may give an absent [alleged joint tortfeasor] a legally protected interest under Rule 19(a)." *Ward v. Apple*, 791 F.3d at 1051. These protected interests make Big Picture, Ascension, and the Tribe indispensable parties regardless of whether they are allegedly joint tortfeasors with Mr. Martorello.

### 3.      *The settlement does not make Rule 19 inapplicable.*

Finally, the district court opined that "the Motion [to dismiss] fails because the very entities that the defendant assert [sic] should be joined as indispensable parties were, in fact, joined as parties to this litigation. However, they have reached a settlement with the plaintiffs. Accordingly, Rule 19 simply does not apply by its very terms." (JA414). This reasoning is completely flawed.

37

First, Rule 19 applies regardless of whether the absent parties were once joined in the litigation.  *See Pimentel*, 553 U.S. at 855 (Rule 19 precluded suit after immune parties were dismissed); *Hartog v. Jots, Inc.*, 2004 WL 2600280 (N.D. Cal. Nov. 12, 2004) (Rule 19 motion granted after indispensable defendant was dismissed for lack of jurisdiction).

Second, the settlement does not affect this case because: (1) the Tribe was not a party to this case or the settlement; and (2) Big Picture and Ascension were dismissed *based on their immunity*, pursuant to this Court's mandate, not based on the settlement.  The settlement agreement affected other pending litigation against Big Picture and Ascension, not this case.

Third, the settlement does not eliminate the protected interests of the Tribe, Big Picture, or Ascension in this action.  It is readily apparent that Big Picture and Ascension settled the remaining litigation to avoid the expense and distraction of litigating their immunity in each case.  In doing so, they did not disclaim or resolve all of their interests in this suit (or the other actions) nor did they consent to this action (or any other) proceeding in their absence.

The settlement agreement did not end Big Picture's challenged lending practices; rather, it permits those practices to continue in return for the Settlement Class receiving a share of the funds generated by the allegedly illegal loans.  *See* Settlement Agreement (JA297-JA375) § 10.1 (establishing a two-year payment

schedule for Big Picture to make deposits to the settlement fund). The agreement: (1) contains no admission of liability and no waiver of tribal sovereign immunity (Settlement Agreement §§ 1.4, 1.6, 3.1-3.3.); (2) does not modify the provisions in Big Picture's loan agreements that plaintiffs challenged; (3) does not modify or curtail Big Picture's operations or Ascension's participation in them; (4) permits the continued collection of Big Picture's loans at rates that far exceed the Virginia usury laws; (5) does not cover any loans originated after December 20, 2019; and (6) does not resolve the claims of most Settlement Class members against Big Picture or Ascension; it simply waives their right to form a class if they file suit. (Settlement Agreement §§ 12.3-12.4.)[11]

Moreover, nowhere in the settlement agreement do Big Picture and Ascension (much less the Tribe) disclaim their interests in this case. Unless absent parties "unambiguously disclaim [their] interest, then Rule 19 would presumptively require their joinder." *Ross Dress for Less, Inc. v. Makarios–Oregon, LLC*, 2018 WL 2452957, at *8 (D. Or. May 31, 2018). Nor did the settlement extinguish all of their interests in this action. To the contrary, Big Picture and Ascension retain the same interests that they had before the settlement agreement was struck: in not having the loan agreements held unlawful, and in not

---

[11] Class members do not release their individual claims unless they receive payment from the settlement fund. Some 75% of the Class are not eligible to receive any payment from the settlement fund. And only about 1% of the Class actually submitted claims against the fund. (JA380–JA 381).

having the tribal lending business adjudicated to be a criminal RICO enterprise. Thus, Big Picture and Ascension remain indispensable parties under Rule 19. *See Beavertail, Inc. v. United States*, 2017 WL 3749446, at \*12 (D. Idaho Aug. 29, 2017) (where state did not abandon its claimed ownership of a lakebed in a settlement agreement, it remained a required party under Rule 19).

In addition, where the absent parties are a sovereign tribe and arms of the tribe, they "have an interest in preserving their own sovereign immunity, with its concomitant 'right not to have [their] legal duties judicially determined without consent.'" *Shermoen v. United States*, 982 F.2d 1312, 1317 (9th Cir. 1992) (quoting *Enterprise Mgmt.*, 883 F.2d at 894). The waiver of tribal sovereign immunity "cannot be implied but must be unequivocally expressed." *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58 (1978). Nowhere have the Tribe, Big Picture, or Ascension unequivocally waived their immunity or their immunity-based right not to have their interests adjudicated in their absence. Accordingly, Rule 19 requires that this case be dismissed.

## IV.    RICO Liability Requires Knowledge That The Loans Were Unlawful.

Even if the loans at issue are governed by Virginia law, Mr. Martorello did not violate RICO by facilitating them unless he (1) knew the loans were unlawful under governing law, and (2) knew that the interest rate being charged was twice the legally enforceable rate. However, the district court ruled that Mr. Martorello's

knowledge is irrelevant because these offenses are essentially strict liability in nature. This was reversible error.

## A. The elements of a RICO unlawful debt offense.

The two RICO offenses at issue here are set forth in 18 U.S.C. §§ 1962(c) and (d), which provide as follows:

> (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through … collection of unlawful debt.

> (d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

"Unlawful debt" is defined as "a debt (A) … which is unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury, and (B) which was incurred in connection with … the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

Liability for a RICO unlawful debt offense under § 1962(c) requires proof that the defendant acted with specific intent and that he knowingly and willfully conducted or participated in the affairs of the enterprise through the collection of an unlawful debt. *See United States. v. Aucoin*, 964 F.2d 1492, 1498 (5th Cir. 1992). Similarly, liability for a RICO conspiracy claim under § 1962(d) requires proof that the defendant knew that the loans were unlawful and, with that

knowledge, intentionally conspired to collect them.  *See United States v. Battle*, 473 F.Supp.2d 1185, 1212 (S.D. Fla. 2006).  Both offenses require proof that the defendant "knew that the debt was unlawful and that the rate charged was at least twice the legally enforceable rate."  U.S. Department of Justice, *Criminal RICO: 18 U.S.C. §§ 1961-1968, A Manual for Federal Prosecutors*, p. 136 (6th rev. ed. 2016).

### B.    Scienter is required for a RICO unlawful debt offense.

The district court ruled, however, that RICO imposes no *mens rea* requirement for an unlawful debt offense beyond that required by the predicate state usury statute.  The Virginia usury statute is a civil prohibition that does not require any *mens rea*.  It imposes liability on the person taking or receiving loan payments "[i]f interest in excess of that permitted by an applicable statute is paid upon any loan."  Va. Code § 6.2-305(A).  Thus, the district court concluded that a violation of the civil Virginia usury statute is *ipso facto* a felony violation of RICO as well.  The law is to the contrary.

"Generally, 'wrongdoing must be conscious to be criminal.' "  *United States v. Evans*, 74 F.4th 597, 604 (4th Cir. 2023) (quoting *Elonis v. United States*, 575 U.S. 723, 734 (2015)).  In ruling otherwise, the district court relied on the decisions in *United States v. Biasucci*, 786 F.2d 504 (2d Cir. 1986) and *United States v. Pepe*, 747 F.2d 632 (11th Cir. 1984), which held that RICO does not contain any

separate *mens rea* or scienter elements beyond those encompassed in its predicate acts.[12]  However, neither of these precedents is persuasive authority here.

*Pepe* is readily distinguishable.  It involved classic loansharking activities including repeated threats of violence and actual violence when loans were not repaid.  The scienter issue in *Pepe* was not whether defendants knew that the loans were illegal but, instead, whether participation in the enterprise's affairs had to be knowing and willful.  The circuit court dismissed defendants' argument that scienter was required to keep RICO from becoming a strict liability measure, noting that "[t]he bases for the verdicts were far from strict liability."  *Id.* at 676.

*Biasucci* has been effectively repudiated by the Second Circuit in two recent RICO cases involving the collection of unlawful debt.  In *United States v. Grote*, the court explained that, because some civil usury statutes lack any scienter requirement, *Biasucci's* construction of RICO could result in a violation that requires no proof of scienter at all.  This would "authorize conviction under RICO of a defendant who neither knew the rate of interest charged nor that the rate charged was illegal."  961 F.3d at 119.  The court found that result difficult to reconcile with the Supreme Court's presumption that scienter is required for criminal statutes, set forth in post-*Biasucci* decisions such as *United States v. X-*

---

[12] The court also relied on *United States v. Lawson*, 677 F.3d 629, 652-53 (4th Cir. 2012), which held that 18 U.S.C. § 1955, proscribing illegal gambling, is a general intent offense.  That decision is inapposite to the proper construction of the RICO unlawful debt offense.

43

*Citement Video, Inc.*, 513 U.S. 64 (1994).

The Second Circuit was concerned that, "[i]f RICO liability … applies where unenforceability under state law depends on only the interest rate (without regard to state of mind) …, this can produce criminal liability for racketeering for unexceptionable conduct."  961 F.3d at 121.  It had "serious doubts that such a rule appropriately 'separate[s] wrongful conduct from otherwise innocent conduct,'" as required by the Supreme Court's precedents.  *Id.*  (citation omitted).  However, the court did not finally resolve this issue in *Grote* because it was applying the plain error standard and there was overwhelming evidence that defendants had acted willfully.  *Id.*

Shortly thereafter, in *United States v. Moseley*, 980 F.3d 9 (2d Cir. 2020), the Second Circuit reiterated *Grote's* concerns about scienter in another RICO case involving the collection of unlawful debt.  *See id.* at 19.  It assumed, without deciding, that the government had to prove the defendant knew that the debt was unlawful.  The court assessed the sufficiency of the evidence against that standard.

The Supreme Court's *mens rea* jurisprudence leaves no doubt that scienter is required for a RICO unlawful debt offense.  For example, in *X-Citement Video*, the Court construed a statute that prohibits the knowing transportation, receipt, or distribution of "any visual depiction involving the use of a minor engaging in sexually explicit conduct."  The Court reasoned that "the presumption in favor of a

scienter requirement should apply to each of the statutory elements that criminalize otherwise innocent conduct." *Id.* at 72. Because "the age of the performers is the crucial element separating legal innocence from wrongful conduct," *id.* at 73, the Court concluded that a defendant must know both the sexually explicit nature of the material and the age of the performers. *Id.* at 78.

The Court has repeatedly reaffirmed this presumption in favor of a scienter requirement. "[W]hen we interpret criminal statutes, we normally 'start from a longstanding presumption, traceable to the common law, that Congress intends to require a defendant to possess a culpable mental state.'" *Ruan v. United States*, 142 S.Ct. 2370, 2377 (2022). Thus, it "read[s] into criminal statutes that are *silent* on the required mental state—meaning statutes that contain no *mens rea* provision whatsoever—that *mens rea* which is necessary to separate wrongful conduct from otherwise innocent conduct." *Id.* (emphasis in the original; internal quotations omitted). The Court explained that "[a] strong scienter requirement helps to diminish the risk of 'overdeterrence,' *i.e.*, punishing acceptable and beneficial conduct that lies close to, but on the permissible side of, the criminal line." *Id.* at 2378.

Courts "presume that Congress did not intend to impose criminal liability on persons who, due to lack of knowledge, did not have a wrongful mental state." *Rehaif*, 139 S.Ct. at 2198. The defendant must "possess a culpable mental state

regarding 'each of the statutory elements that criminalize otherwise innocent conduct.'" *Id.* at 2195 (quoting *X-Citement Video*, 513 U.S. at 72). Because RICO criminalizes collection (or conspiracy to collect) "unlawful debt" that is (1) unenforceable under state or federal usury laws, and (2) where the usurious rate is at least twice the enforceable rate, a defendant must have culpable knowledge regarding both elements.

### C.    The same scienter is required for civil and criminal RICO violations.

The district court asserted that the scienter requirement is lessened for a civil violation of RICO. This is incorrect. A violation of 18 U.S.C. § 1962 is subject to either a criminal penalty or civil liability, and the statute makes no distinction in the elements of RICO offenses regardless of which penalty is being sought. *See RJR Nabisco, Inc. v. European Community*, 579 U.S. 325, 331 (2016). A court "must interpret the statute consistently, whether we encounter its application in a criminal or noncriminal context." *Sessions v. Dimaya*, 138 S.Ct. at 1217 (quoting *Leocal v. Ashcroft*, 543 U.S. 1, 11 n.8 (2004)). Thus, the scienter requirement for civil and criminal RICO violations is identical.

The district court cited *Beck v. Prupis*, 529 U.S. 494 (2000) in support of a distinction between civil and criminal RICO violations, but that decision is inapposite. It addressed standing to bring a civil RICO claim under § 1964(c), which provides a civil cause of action to anyone "injured … by reason of a

46

violation of section 1962." To determine what it means to be "injured … by reason of" a conspiracy, the Supreme Court turned to the common law of civil conspiracy. *See* 529 U.S. at 500. In short, the Court utilized civil law precedents to construe a civil procedural provision of RICO, and not – as the district court did here -- to construe the elements of a RICO offense under § 1962.

### D. A mistake of law negates scienter.

The district court also claimed that a "mistake of law" cannot be a defense to liability, making it immaterial whether Mr. Martorello knew the loans were unlawful or not. Again, this is legal error.

"[A] mistake of law is a defense if the mistake negates the 'knowledge … required to establish a material element of the offense.'" *Rehaif*, 139 S.Ct. at 2198 (quoting Model Penal Code § 2.04, at 27). "A person who engages in penally prohibited conduct may be relieved of criminal liability if, because of ignorance or mistake of law, he did not entertain the culpable mental state required for commission of the offense[.]" 1 *Wharton's Criminal Law* § 13:3 (16th ed.).

The Supreme Court has recognized that certain federal offenses require proof that the defendant knew he was violating another law. For example, in *Liparota v. United States*, 471 U.S. 419 (1985), the Court "required the Government to prove that the defendant knew that his use of food stamps was unlawful—even though that was a question of law." *Rehaif*, 139 S.Ct. at 2198.

47

The Court recently construed the offense of firearm possession by an alien "illegally or unlawfully in the United States" in a similar fashion. It ruled that "[a] defendant who does not know that he is an alien 'illegally or unlawfully in the United States' does not have the guilty state of mind that the statute's language and purposes require." *Rehaif*, 139 S.Ct. at 2198. Although the person's immigration status is an issue of law, knowledge of it makes the difference between innocent and criminal conduct. "Without knowledge of that status, the defendant may well lack the intent needed to make his behavior wrongful. His behavior may instead be an innocent mistake to which criminal sanctions normally do not attach." *Id.* at 2197.

Likewise, in order for a loan to constitute "unlawful debt" and trigger RICO penalties, a defendant must know that (1) the debt was unlawful and (2) the rate charged was at least twice the legally enforceable rate. Although the legality of the debt and the legally enforceable rate are issues of law, they make the difference between innocent and criminal conduct. RICO liability cannot depend "on only the interest rate (without regard to state of mind)" because this could "produce criminal liability … for unexceptionable conduct." *Grote*, 961 F.3d at 121.

The drastic penalties for RICO violations are not intended to be imposed on lenders who have unknowingly run afoul of state usury laws, which are

48

"complex,"[13] quite varied,[14] and themselves are further complicated by choice of law issues that are "complex, uncertain and critical."[15]  Applying RICO to lenders who have made innocent mistakes or acted on flawed legal advice violates the presumption that Congress intends to punish only those who have a wrongful mental state, i.e., those who engaged in collecting debt they knew to be "unlawful."

The district court opined that Mr. Martorello knew that the loans were "of questionable legality" and that he assumed the risk that they were unlawful. (JA2721).   This is beside the point given the court's ruling that there is no scienter requirement here.   But, since the concept of a strict liability RICO offense is so incongruous, the court offered this alternative justification that Mr. Martorello

---

[13] For example, California's usury law "is complex and is riddled with so many exceptions that the law's application itself seems to be the exception rather than the rule." *Ghirardo v. Antonioli*, 8 Cal.4th 791, 807 (1994).  New York's usury law is composed of "complex and cross-referencing statutes." *In re Venture Mortgage Fund, L.P.*, 282 F.3d 185, 189 (2d Cir. 2002).  Likewise, "Pennsylvania's usury laws are complex." *United States v. Scarfo*, 711 F.Supp. 1315, 1335 n.15 (E.D. Pa. 1989).

[14] "There is significant variation among state interest-rate limits: some states have adopted strict usury laws, some have enacted more permissive rules, and others have eliminated usury laws altogether." Jay B. Sykes, *Federal Banking Regulator Finalizes Rule on State Usury Laws*, Congressional Research Service at 1 (July 9, 2020), available at https://crsreports.congress.gov/product/pdf/LSB/LSB10512.

[15] 4Pt1 Bruner & O'Connor *Construction Law* § 11:88, Choice of law: So many rules, so little clarity.

"knowingly approached the line."[16]   However, assumption of the risk is not a substitute for actual knowledge that the loans were unlawful.  Indeed, one purpose of a "strong scienter requirement" is precisely to avoid deterring conduct that lies close to, but on the permissible side of, the criminal line.  *See Ruan*, 142 S.Ct. at 2378.  Assumption of the risk is the antithesis of actual knowledge in this respect.

An assumption of the risk standard may suffice with respect to some elements of a criminal offense, but only if those elements do not make the difference between innocent and criminal conduct.  This distinction is illustrated in *United States v. Jones*, 471 F.3d 535 (4th Cir. 2006).  There this Court held that a defendant need not know the alleged victim's age to commit the offense of transporting a minor across state lines for prostitution because "the minority of the victim is hardly a factor that distinguishes the defendant's actions from 'innocent conduct.'"  *Id.* at 541.  It explained that, "[b]ecause an individual is already on notice that he is committing a crime when he transports an individual of any age in interstate commerce for the purpose of prostitution, it is both reasonable and just to

---

[16] The district court also sought to mitigate the harshness of its strict liability ruling by commenting that scienter would not actually have become an issue at trial because Mr. Martorello wouldn't testify.  This prediction is incorrect.  More importantly, the court had no legitimate reason to engage in such speculation in ruling on summary judgment.

conclude that the transporter assumes the risk that the victim is a minor." *Id.* (internal quotations and citations omitted).[17]

Here, in contrast, the divide between innocent and unlawful conduct under RICO is knowledge that the loans constituted "unlawful debt." Mr. Martorello is not liable at all unless he knew – not merely risked – that the loans were unlawful and that the rate charged for those loans was at least twice the legally enforceable rate. This is why the Department of Justice teaches prosecutors that they must prove both of these points in an unlawful debt prosecution. *Criminal RICO: 18 U.S.C. §§ 1961-1968, A Manual for Federal Prosecutors*, p. 136 (6th rev. ed. 2016).

In sum, the district court erred in holding Mr. Martorello liable for the RICO offenses absent proof that he knew that (1) the loans were unlawful, and (2) the interest rate being charged was twice the legally enforceable rate. Resolution of those factual issues requires a trial on the merits at which plaintiffs bear the burden

---

[17] Other circuits likewise have held that defendants who knowingly engage in criminal conduct assume the risk as to additional elements of an offense that enhance punishment. *E.g.*, *United States v. Gomez*, 905 F.2d 1513, 1514-15 (11th Cir. 1990) ("those who, acting with a deliberate anti-social purpose in mind, become involved in illegal drug transactions, assume the risk that their actions will subject them to enhanced criminal liability."); *United States v. Collado-Gomez*, 834 F.2d 280, 281 (2d Cir. 1987) (per curiam) ("Just as those who possess drugs for sale must bear the risk of determining how close to a school they are, such dealers must bear the risk of knowing what drugs they are dealing[.]")

of proof and Mr. Martorello can present all relevant evidence bearing on his knowledge and good faith.

## CONCLUSION

The judgment of the district court must be reversed. Because Virginia law cannot be applied to invalidate these loans and because the Tribe, Big Picture and Ascension are all indispensable parties in whose absence this litigation cannot proceed, this case must be dismissed. Alternatively, the case must be remanded for a trial of the RICO claims at which plaintiffs must prove that Mr. Martorello knew that the loans were unlawful and that the interest charged for those loans was twice the legally enforceable rate.

## REQUEST FOR ORAL ARGUMENT

Mr. Martorello respectfully requests that the Court hear oral argument in this case.

December 6, 2023

Respectfully submitted,

HOLLAND & KNIGHT LLP

 /s/  Steven D. Gordon
Steven D. Gordon
800 17th Street, N.W., Suite 1100
Washington, D.C. 20006
Telephone: (202) 955-3000
Facsimile: (202) 955-5564
E-mail:  steven.gordon@hklaw.com

*Counsel for Appellant*

## CERTIFICATE OF COMPLIANCE

1.    This Brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B), because this Brief contains 12,389 words, excluding the parts of the Brief exempted by Fed. R. App. P. 32(f).

2.    This Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) because this Brief has been prepared in a proportionally spaced typeface using Microsoft Word in Fourteen point, Times New Roman.


  /s/  Steven D. Gordon
Steven D. Gordon

*Counsel for Appellant*

**ADDENDUM**

**Table of Contents**

<u>**Statutes**</u>

18 U.S.C. § 1961(6) ................................................................ A-2

18 U.S.C. § 1962 .................................................................... A-3

<u>**Rules**</u>

FED.R.CIV.P. 19 .................................................................... A-4

**18 U.S. Code § 1961 – Definitions**

\*    \*    \*

(6)  "unlawful debt" means a debt (A) incurred or contracted in gambling activity which was in violation of the law of the United States, a State or political subdivision thereof, or which is unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury, and (B) which was incurred in connection with the business of gambling in violation of the law of the United States, a State or political subdivision thereof, or the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate;

## 18 U.S. Code § 1962 - Prohibited activities

(a)It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce. A purchase of securities on the open market for purposes of investment, and without the intention of controlling or participating in the control of the issuer, or of assisting another to do so, shall not be unlawful under this subsection if the securities of the issuer held by the purchaser, the members of his immediate family, and his or their accomplices in any pattern or racketeering activity or the collection of an unlawful debt after such purchase do not amount in the aggregate to one percent of the outstanding securities of any one class, and do not confer, either in law or in fact, the power to elect one or more directors of the issuer.

(b)It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

(c)It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

(d)It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

**Rule 19 – Required Joinder of Parties**

(a) Persons Required to Be Joined if Feasible.

(1) Required Party. A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if:

(A) in that person's absence, the court cannot accord complete relief among existing parties; or

(B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:

(i) as a practical matter impair or impede the person's ability to protect the interest; or

(ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

(2) Joinder by Court Order. If a person has not been joined as required, the court must order that the person be made a party. A person who refuses to join as a plaintiff may be made either a defendant or, in a proper case, an involuntary plaintiff.

(3) Venue. If a joined party objects to venue and the joinder would make venue improper, the court must dismiss that party.

(b) When Joinder Is Not Feasible. If a person who is required to be joined if feasible cannot be joined, the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed. The factors for the court to consider include:

(1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;

(2) the extent to which any prejudice could be lessened or avoided by:

(A) protective provisions in the judgment;

(B) shaping the relief; or

(C) other measures;

(3) whether a judgment rendered in the person's absence would be adequate; and

(4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

(c) Pleading the Reasons for Nonjoinder. When asserting a claim for relief, a party must state:

(1) the name, if known, of any person who is required to be joined if feasible but is not joined; and

(2) the reasons for not joining that person.

(d) Exception for Class Actions. This rule is subject to Rule 23.