No. 23-2097

# In the United States Court of Appeals for the Third Circuit

LULA WILLIAMS, GLORIA TURNAGE, GEORGE HENGLE, DOWIN COFFY,
MARCELLA P. SINGH, Administrator of the Estate of Felix M. Gillison, Jr., on
behalf of themselves and all individuals similarly situated,
*Plaintiffs-Appellees*

v.

MATT MARTORELLO,
*Defendant-Appellant.*

On Appeal from the United States District Court
for the Eastern District of Virginia at Richmond
Case No. 3:17-cv-00461-REP (The Honorable Robert E. Payne)

## SUPPLEMENTAL APPENDIX

KRISTI C. KELLY
KELLY GUZZO PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7572

MATTHEW W.H. WESSLER
THOMAS SCOTT-RAILTON
GUPTA WESSLER LLP
2001 K Street NW, Suite 850 North
Washington, DC 20006
(202) 888-1741
*matt@guptawessler.com*

*(additional counsel listed on following page)*

February 5, 2024

LEONARD A. BENNETT
CRAIG C. MARCHIANDO
CONSUMER LITIGATION ASSOCIATES,
P.C.
763 J. Clyde Morris Boulevard
Suite 1A
Newport News, VA 23601
(757) 930-3660

BETH E. TERRELL
ELIZABETH A. ADAMS
JENNIFER R. MURRAY
TERRELL MARSHALL LAW GROUP
PLLC
936 North 35th Street, Suite 300
Seattle, WA 98103
(206) 816-6603

JAMES W. SPEER
VIRGINIA POVERTY LAW CENTER
919 East Main Street, Suite 610
Richmond, VA 23219
(804) 782-9430

JOHN G. ALBANESE
ELEANOR M. DRAKE
BERGER & MONTAGUE, P.C.
1229 Tyler Street NE, Suite 205
Minneapolis, MN 55413
(612) 594-5997

MICHAEL A. CADDELL
CADDELL & CHAPMAN
628 East 9th Street
Houston, TX 77007
(713) 751-0400

*Counsel for plaintiffs-appellees*

STEVEN D. GORDON,
HOLLAND & KNIGHT, LLP
800 17th Street, NW
Washington, DC 20006-3203
(202) 457-7038
steven.gordon@hklaw.com

*Counsel for defendant-appellant*

# Index

| Dkt. No. | Document | Date | Page |
|---|---|---|---|
| 624 | Plaintiff's response to Matt Martorello's statement of position | September 16, 2019 | SA1 |
| 637 | Order | October 21, 2019 | SA10 |
| 668 | Order | February 18, 2020 | SA13 |
| 896-10 | Memorandum: Exhibit 10 | June 29, 2020 | SA14 |
| 902 | Matt Martorello's statement of position in response to July 23,2020 order (Paragraph 2) | July 30, 2020 | SA15 |
| 944 | Memorandum opinion | November 18, 2020 | SA40 |
| 986 | Memorandum in support of plaintiff's motion to compel production of documents that Martorello claims are covered by the work-product doctrine | January 11, 2021 | SA79 |
| 986-2 | Exhibit 2 | January 11, 2021 | SA123 |
| 986-3 | Exhibit 3 | January 11, 2021 | SA130 |
| 1004 | Plaintiffs' opposition to defendant Matt martorello's motion to dismiss for failure to join necessary and indispensable parties under Federal Rule of Civil Procedure 19 and 12(b)(7) | February 15, 2021 | SA140 |
| 1090 | Memorandum opinion | May 29, 2021 | SA162 |
| 1106 | Memorandum opinion | July 12, 2021 | SA171 |

| 1110 | Memorandum opinion | July 20, 2021 | SA190 |
| 1111 | Order | July 20, 2021 | SA226 |
| 1407 | Final judgment order | September 22, 2023 | SA230 |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

| | |
|---|---|
| LULA WILLIAMS, *et al*., ) | |
| ) | |
| Plaintiffs, ) | |
| v. ) | Civil Action No. 3:17-cv-461 (REP) |
| ) | |
| BIG PICTURE LOANS, LLC, *et al*., ) | |
| ) | |
| Defendants. ) | |

**PLAINTIFFS' RESPONSE TO MATT MARTORELLO'S STATEMENT OF POSITION**

Pursuant to the Court's orders (ECF Nos. 599, 601), Plaintiffs, by counsel, submit this response to Matt Martorello's Statement of Position (ECF No. 613).

Based on the record before it, the Fourth Circuit held that Big Picture Loans, LLC and Ascension Technologies, LLC (the "Corporate Defendants") were sufficiently "arms-of-the-tribe" such that the Corporate Defendants could share in the LVD Tribe's sovereign immunity from suit. However, critically, the Fourth Circuit ***did not*** bless any portion of the lending enterprise as legal. The Fourth Circuit said nothing about whether RICO or state usury laws apply to the loans.  The Fourth Circuit ***did not*** in any fashion exonerate Matt Martorello from liability.  The opinion merely held that the Corporate Defendants could not be sued.  As the Corporate Defendants stated in their reply brief on appeal, "this appeal is not a policy debate about consumer finance, or whether state or tribal law governs Plaintiffs' consumer loan agreements." *Williams v. Big Picture Loans, LLC*, No. 18-1827, ECF No. 90 at 1 (4th Cir. Feb. 15, 2019).

Predictably, Martorello argues that the Fourth Circuit's limited opinion means that Martorello is somehow off the hook for his conduct in the lending enterprise.  Plaintiffs have previously addressed the effect of the Fourth Circuit's ruling as to Martorello.  (ECF No. 597 at 2-

6.)  To briefly summarize, the Fourth Circuit's ruling has no effect on the merits of the claims against Martorello.  As stated by the Supreme Court, "[t]here is a difference between the right to demand compliance with state laws and the means available to enforce them."  *Kiowa Tribe of Okla. v. Mfg. Techs.*, *Inc.*, 523 U.S. 751, 755 (1998).  Although the questions often arise together, "whether an Indian tribe is subject to a statute and whether the tribe may be sued for violating the statute are **two entirely different questions**."  *Fla. Paraplegic, Ass'n, Inc. v. Miccosukee Tribe of Indians of Fla.*, 166 F.3d 1126, 1130 (11th Cir. 1999) (emphasis added).  Tribal sovereign immunity only addresses whether a tribe may be sued for violating the law.  It does not mean that the illegal activities conducted by a tribe are necessarily legal.  In other words, tribal sovereign immunity "does not transfigure debts that are otherwise unlawful under RICO into lawful ones."  *United States v. Neff*, No. 18-2282, 2019 WL 4235218, at *7 (3d Cir. Sept. 6, 2019).  Nor does it render criminal behavior non-criminal.  *Id.* ("A debt can be 'unlawful' for RICO purposes even if tribal sovereign immunity might stymie a state civil enforcement action or consumer suit (or even a state usury prosecution, although tribal sovereign immunity does not impede a state from resort[ing] to its criminal law and prosecuting offenders . . . .") (internal citation and quotation omitted).  Sovereign immunity merely blocks certain lawsuits directly against arms-of-the-tribe.  State lending laws and RICO apply regardless of whether the Corporate Defendants can be sued for violations of those laws.

Nevertheless, Martorello argues that Plaintiffs' claims must be dismissed because the Corporate Defendants are necessary and indispensable parties, and that Plaintiffs' state law and RICO claims necessarily fail because of the Fourth Circuit's decision.  There are no motions pending regarding any of these issues, and to fully address those positions would far exceed the page limits allowed for this response.  Plaintiffs do note that similar Rule 19 efforts involving tribal

lending enterprises have failed. *See Commonwealth of Pennsylvania v. Think Finance, Inc.*, No. 14-cv-7139, 2016 WL 183289 (E.D. Pa. Jan. 14, 2016) (holding that "[b]ecause the lenders are at most joint tortfeasors or co-conspirators, they are not necessary parties under Rule 19") (internal quotations omitted); *Dillon v. BMO Harris Bank, N.A.*, 16 F. Supp. 3d 605, 613 (M.D.N.C. 2014) (holding that tribal lenders were not necessary parties because "[t]he lenders are at most joint tortfeasors or co-conspirators. Neither are necessary parties under Rule 19."). And for the reasons stated above, the Fourth Circuit's ruling does not mean that RICO and state law do not apply to the loans at issue. It simply means that Plaintiffs cannot maintain a lawsuit for money damages against arms-of-the-tribe. Nor does the Fourth Circuit's opinion have any bearing on whether Plaintiffs' usury and unjust enrichment claims can proceed against Martorello.

As for the pending motions, Martorello argues that Plaintiffs' motion for class certification must be denied, Martorello's motion for reconsideration of the Court's crime-fraud ruling must be granted, and that all of the motions springing from the crime-fraud rulings are moot or should be granted in Martorello's favor. Martorello is wrong on all fronts. None of the pending motions are meaningfully affected by the Fourth Circuit's ruling. The Court should grant Plaintiffs' motion for class certification, and rule on the other pending motions so that trial against Martorello may proceed. Plaintiffs will address these motions in turn.

I.    **Plaintiffs' Motion for Class Certification Should Be Granted.**

Martorello argues Plaintiffs' motion for class certification should be denied because the Fourth Circuit's opinion renders the dispute-resolution procedures and class-action waiver in Plaintiffs' contracts enforceable. The Fourth Circuit's ruling did no such thing and the Court expressed no opinion regarding whether any aspect of the underlying contracts were enforceable. Moreover, the Fourth Circuit, other Courts of Appeal, and this Court have repeatedly invalidated

dispute-resolution mechanisms contained in tribal lending contracts even when the tribal defendants are not part of the case. *Hayes v. Delbert Servs. Corp.*, 811 F.3d 666, 676 (4th Cir. 2016); *Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 330, 336 (4th Cir. 2017); *MacDonald v. CashCall, Inc.*, 883 F.3d 220 (3d Cir. 2018); *Parnell v. Western Sky Fin. LLC*, 664 Fed. App'x 841 (11th Cir. 2016); *Parm v. Nat'l Bank of Cal.*, 835 F.3d 1331 (11th Cir. 2016); *Inetianbor v. CashCall, Inc.*, 768 F.3d 1346, 1354 (11th Cir. 2014); *Gingras v. Think Finance Inc.*, 922 F.3d 112, 126-27 (2d Cir. 2019); *see also Gibbs v. Haynes Investments, LLC*, 368 F. Supp. 3d 901 (E.D. Va. 2019); *Solomon v. American Web Loan*, 2019 WL 1324490, __ F. Supp. 3d __ (E.D. Va. Mar. 22, 2019).

Martorello also argues that Plaintiffs "cannot establish ascertainability because they have no current means of obtaining loan data that would allow identification of class members." (ECF No. 613 at 5.) This is false. As the Court is aware, non-tribal entities TranDotCom and DataX are in possession of information related to the loans. (ECF Nos. 415 and 440.) Tribal sovereign immunity does not protect documents that are possessed by non-tribal parties because subpoenas to those entities they are not "suits" against the tribe that implicate sovereign immunity. *Miccosukee Tribe of Indians of Florida v. United States*, 698 F.3d 1326, 1330 (11th Cir. 2012). This Court has already noted in granting Plaintiffs' motion regarding TranDotCom that it "agrees with the Eleventh Circuit's reasoning" in *Miccosukee*. (ECF No. 415 at 8 n.3.) There is no reason to revisit the Court's prior rulings on those issues. And if anything, Plaintiffs' case for class certification is stronger than it was when originally filed because it is now known for certain that the relevant data can be obtained.

## II. **Martorello's Motion for Reconsideration.**

Martorello argues that the Fourth Circuit's ruling affects this Court's determination that

there was prima facie evidence that Martorello engaged in criminal activity.  Martorello claims

that the Fourth Circuit's ruling and its statement regarding the restructure of the lending enterprise

"effectively eviscerates the rational underlying the Court's crime fraud ruling."  (ECF No. 613 at

6.)  Not so.

> As this Court explained, the crime-fraud exception applied because:
>
> The plaintiffs have made a prima facie case that: (1) Martorello and the Corporate
> Defendants intended to lend at usurious rates of interest in violation of Virginia and
> other states' laws and that they intended to engage in conduct (collecting unlawful
> debt) in violation of RICO; and (2) Martorello and the Corporate Defendants
> engaged the lawyers to help in achieving their objectives. Virginia Code § 6.2-1540
> makes clear that it is a crime to participate in the violation of Virginia's usury
> statute, which limits a business to contracting for a loan interest rate of greater than
> 12%. See Va. Code 6.2-1501. The plaintiffs have made a compelling case that
> Martorello participated in such an endeavor on his own and with the Corporate
> Defendants.

*Williams v. Big Picture Loans, LLC*, No. 17-cv-461, 2019 WL 1983048, at *13 (E.D. Va. May 3,

2019).   In other words, this Court did not apply the crime-fraud exception because of the

restructure; it applied the crime-fraud exception because Plaintiffs sufficiently made a prima facie

showing that Martorello committed crimes and engaged lawyers to assist him with those efforts.

In addition to this, the Court found that "the documents about the corporate restructure and the

Tribe's lending operation" go to the "core of the alleged crimes and fraud by outlining how the

restructuring and the lending operation are to be accomplished." *Id*. at *14.  Put differently, the

restructure is not *the* crime—it is the continued and ongoing violation of state usury laws and

RICO.

Additionally, it is important to note that the Fourth Circuit made its decision regarding the

restructure based on a limited record, *i.e.*, the e-mail from Martorello to Rosette in January 2014

regarding the Consumer Financial Protection Bureau and the August 2014 e-mail to Chairman

Williams. *Williams v. Big Picture Loans, LLC*, No. 18-1827, 2019 WL 2864341, at *5 (4th Cir.

July 3, 2019) (citing J.A. 1321–22 (Martorello emailing Tribal Council members and the Tribe's counsel regarding his concerns about the CFPB and New York enforcement actions); J.A. 1329 (e-mails after the enforcement actions between Martorello and the head of the Tribal Council scheduling a time to discuss "a potential bigger deal for [the Tribe] learning the Servicing business")). Based on these two e-mails, the Fourth Circuit found that "the evidence does not support the district court's conclusion that the creation of the Entities was only or primarily intended to benefit Martorello or that the creation of Big Picture and Ascension was solely the product of Martorello's design and urging." *Id.* The record, of course, is now completely different and the additional evidence submitted by Plaintiffs shows: (1) that the creation of the Entities was primarily intended to benefit Martorello; and (2) they were the product of Martorello's design and urging. To ensure the record is complete, Plaintiffs submitted this additional evidence. *See generally* ECF Nos. 572-10 through 572-26.

Since the time of those submissions, Plaintiffs have additional compelling evidence supporting the Court's waiver decision. This evidence is the Declaration of Joette Pete, attached hereto as Exhibit 1. Ms. Pete is the former Vice Chairwoman of the LVD from 2010 until 2016, *i.e.*, from the inception of the business through the restructure. (Ex. 1 at ¶ 1.) Most notably, Pete explained that she "did not participate in the destruction of Martorello's e-mails," and, to her knowledge, "it was not presented to Tribal Council for approval." (*Id.* at ¶ 11.) However, Pete was not surprised "that the e-mails were destroyed because a shredding company was also hired to destroy paper records related to the business." (*Id.* at ¶ 11.) This step "had never been done in the past and was performed specifically to conceal the truth about the business." (*Id.* at ¶ 11 (emphasis added).) In light of this Declaration—as well as the significant new evidence submitted by Plaintiffs—the Court should deny the Motion for Reconsideration and expedite the spoliation-

related discovery ordered by the Court, which has been flouted by Martorello and the Corporate Defendants.

In sum, the primary basis for the application of the crime-fraud exception is Martorello's criminal activities (which occurred both before and after the restructure) —not whether the Tribe was entitled to sovereign immunity.

**III.    The Other Motions Are Unaffected by the Fourth Circuit's Ruling.**

The other motions cited by Martorello as "spring[ing] from or relat[ing] to" the Court's crime-fraud ruling are likewise unaffected by the Fourth Circuit's ruling with the following exception:  Plaintiffs are no longer seeking to take the depositions of Ascension or Big Picture as parties to the case, and Plaintiffs are no longer seeking to depose Joette Pete.  (*See* ECF Nos. 524, 523.)

Plaintiffs have not waived the right to file a motion regarding spoliation, contrary to Martorello's suggestion.  (ECF No. 613 at n.6.)  All of the Defendants repeatedly obstructed the process and the proposed schedule was never entered by the Court.  Lastly, because the Court's crime-fraud ruling is unaffected, Plaintiffs' arguments opposing Martorello's entitlement to a privilege review still stand.

CONCLUSION

Nothing in the Fourth Circuit's ruling meaningfully affects the claims against Martorello. The Court should grant Plaintiffs' motion for class certification and the case should proceed to trial.

Date: September 16, 2019                    _____/s/_____
                                            Leonard A. Bennett, VSB #37523
                                            Elizabeth W. Hanes, VSB #75574
                                            CONSUMER LITIGATION ASSOCIATES, P.C.
                                            763 J. Clyde Morris Blvd., Ste. 1-A
                                            Newport News, VA 23601

7

SA7

Telephone: (757) 930-3660
Facsimile: (757) 930-3662
Email: lenbennett@clalegal.com
elizabeth@clalegal.com

Kristi C. Kelly, Esq., VSB #72791
Andrew J. Guzzo, Esq., VSB #82170
Casey S. Nash, Esq., VSB #84261
KELLY GUZZO, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7572
(703) 591-0167 Facsimile
Email: kkelly@kellyguzzo.com
Email: aguzzo@kellyguzzo.com
Email: casey@kellyguzzo.com


E. Michelle Drake
John G. Albanese
BERGER MONTAGUE PC
43 SE Main Street, Suite 505
Minneapolis, MN 55414
Tel.: 612.594.5999
Fax: 612.584.4470
emdrake@bm.net
jalbanese@bm.net

Beth E. Terrell
Jennifer Rust Murray
Elizabeth A. Adams
TERRELL MARSHALL LAW GROUP PLLC
bterrell@terrellmarshall.com
jmurray@terrellmarshall.com
eadams@terrellmarshall.com
936 North 34th Street, Suite 300
Seattle, WA 98103
Tel.: (206) 816-6603
Fax.: (206) 319-5450

*Attorneys for Plaintiffs and Proposed Classes*

<u>**CERTIFICATE OF SERVICE**</u>

     I hereby certify that on September 16, 2019, I electronically filed the foregoing with the

Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF)

to all counsel of record.

Date: September 16, 2019                      /s/
                                    Leonard A. Bennett, VSB #37523
                                    CONSUMER LITIGATION ASSOCIATES, P.C.
                                    763 J. Clyde Morris Blvd., Ste. 1-A
                                    Newport News, VA 23601
                                    Telephone: (757) 930-3660
                                    Facsimile: (757) 930-3662
                                    Email: lenbennett@clalegal.com

Case 3:17-cv-00461-REP   Document 637   Filed 10/21/19   Page 1 of 3 PageID# 18711

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

LULA WILLIAMS, et al.,

    Plaintiffs,

v.                                        Civil Action No. 3:17cv461

BIG PICTURE LOANS, LLC,
et al.,

    Defendants.

## ORDER

CAME NOW Plaintiffs and Defendants, Big Picture Loans, LLC ("Big Picture") and Ascension Technologies, LLC ("Ascension" and collectively, the "Parties").

WHEREAS, the Parties have represented to the Court that they have reached a settlement in principle as to the claims alleged by Plaintiffs against Big Picture and Ascension; and

WHEREAS, the Parties require additional time to finalize the formal settlement documentation to be submitted to the Court for approval, including the pleadings necessary to seek preliminary approval of the proposed class settlement; and

UPON CONSIDERATION WHEREOF, and for good cause shown, it is hereby ORDERED as follows:

(1)  Because the Parties have advised the Court that they have reached a settlement and require extension of some deadlines to finalize the formal settlement, by October 29, 2019, the Parties

**SA10**

shall finalize the settlement agreement and file it along with a Motion (with supporting papers and brief) seeking Preliminary Approval of the Settlement and therewith shall submit a proposed Order, proposed notices, and proposed dates for all steps necessary for final approval of the settlement; and

(2) Any deadlines associated with the following motions or Orders are STAYED until sixty (60) days from date of this ORDER or further Order of the Court, whichever shall first occur:

> (a) DEFENDANTS BIG PICTURE LOANS, LLC AND ASCENSION TECHNOLOGIES, LLC'S MOTION TO STRIKE PLAINTIFFS' STATEMENT OF POSITION (ECF No. 554);
>
> (b) MOTION FOR ENTRY OF JUDGMENT OF DEFENDANTS BIG PICTURE LOANS, LLC AND ASCENSION TECHNOLOGIES, LLC (ECF No. 604); and

(3) In addition, any Third-Party discovery served by Plaintiffs implicating Big Picture, Ascension, the Lac Vieux Desert Band of Lake Superior Chippewa Indians, and/or their Council members, officers, present and former attorneys, banks, vendors, or employees, is hereby STAYED until sixty (60) days from date of this ORDER or further Order of the Court, whichever shall first occur; and, by October 28, 2019, counsel for the Parties shall serve a copy of this ORDER on all such Third-Parties, and, by November 5, 2019, shall file a Certification that all Third-Parties have been served; and shall advise the Court (in a formal pleading) of the identity of the Third-Parties that have been served and of

2

**SA11**

the style of the case (and/or motion, with ECF Numbers) involving those Third-Parties so that the Clerk can place a copy of this ORDER in the appropriate Miscellaneous Case files; and

(4)   This ORDER shall have no effect on any pending motions or deadlines as between Plaintiffs and Matt Martorello; and

(6)   All counsel in this case, including counsel for the Parties, shall meet in person with United States District Judge David J. Novak on October 28, 2019 at 9:30 a.m. to discuss settlement of the claims against Matt Martorello.

It is so ORDERED.

/s/   _RE_

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: October 21 , 2019

3

**SA12**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division


LULA WILLIAMS, et al.,

    Plaintiffs,

v.                          Civil Action No. 3:17cv461

BIG PICTURE LOANS, LLC,
et al.,

    Defendants.

### ORDER

In accordance with, and as instructed by, the Judgment of the United States Court of Appeals for the Fourth Circuit entered on July 3, 2019 (ECF No. 582), and the mandate entered on July 25, 2019 (ECF No. 600), this action is dismissed with prejudice against the defendants, Big Picture Loans, LLC and Ascension Technologies, LLC for lack of subject matter jurisdiction.

It is so ORDERED.

                               /s/
                          Robert E. Payne
                          Senior United States District Judge


Richmond, Virginia
Date: February 18, 2020

SA13

# EXHIBIT 10
# (FILED UNDER SEAL)

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

| | | |
|---|---|---|
| LULA WILLIAMS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:17-cv-461 (REP) |
| | ) | |
| BIG PICTURE LOANS, LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| RENEE GALLOWAY, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:18-cv-406 (REP) |
| | ) | |
| BIG PICTURE LOANS, LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MATT MARTORELLO'S STATEMENT OF POSITION
IN RESPONSE TO JULY 23, 2020 ORDER (PARAGRAPH 2)**

On July 23, 2020, the Court issued an Order (*Williams*, ECF No. 880; *Galloway*, ECF No. 539) directing the parties to, among other things, file on or before this date "in both listed actions a chart (a) showing how and through which trusts, corporations, people, or other entities money flows through from the time a borrower makes a payment until the money is distributed to Martorello and others; (b) describing all trusts, corporations, people, or other entities involved in these transactions and how each trust, corporation, person, or other entity relate to each other; and (c) explaining what Martorello's interest, involvement, or relationship is as to each trust, corporation, person, or entity." *Id*. ¶ 2. Further, "if the parties are unable to jointly submit the document described in paragraph (2), the Plaintiffs shall submit their document by July 29, 2020 and Martorello shall file his proposed changes by July 30, 2020." Mr. Martorello respectfully

responds to correct Plaintiffs' submission as follows:

Due to various structural changes which occurred as a result of tax planning relating to Martorello's move to the U.S. Virgin Islands[1], followed by a subsequent move to Puerto Rico to participate in its Act 20 and Act 22 economic development programs, it is difficult to distill the history of the organizational structure into one or two charts. As a result, attached as Exhibit "A" is a series of schematic charts illustrating the organizational structure from 2012 to 2018, which notes the restructuring events that occurred surrounding the launch of Bellicose VI and Bellicose Capital, and the subsequent sale of the assets of Bellicose Capital (and its wholly-owned company SourcePoint VI, LLC) to the LVD.[2] In spite of the numerous small structural

---

[1] Martorello moved to the U.S. Virgin Islands in July of 2011 to participate in its U.S. government sanctioned economic development program (see: https://www.usvieda.org/incentives/edc-program). In advance of doing so, he formed Bellicose VI, Inc. as the corporate entity receiving the government decree detailing a broad mandate as to the activities that Bellicose VI Inc. would perform. More specifically, Bellicose VI Inc., or its successor, Bellicose VI, LLC (collectively referred to herein as "Bellicose VI"), owned interests in companies that developed algorithms and code to create a voice transcription service used by emergency services personnel and financial markets; a voice brokering licensed arm; a proprietary trading arm; funded a debt investment in a maritime operation; a slot lease arrangement with a tribal casino; managing and ownership of a casino cruise ship; and providing management and investment services to related entities. See Ex. B, N.D. Tex. May 28, 2020 Hrg. Tr. at 138:15-141:6, where Martorello describes to the Court the breadth of "family office" Bellicose Capital and its various US investments and ventures.

[2] The primary restructurings can be summarized as follows: On July 18, 2012, for estate planning and limited liability purposes, Martorello transferred 100% of the voting rights of Bellicose VI to Breakwater and 70% of the economic rights to 7X Services, LLC, both wholly-owned by the Trust. On December 31, 2012, Bellicose VI Inc. converted to an LLC for tax efficiency purposes. On January 1, 2014, the structure changed to accommodate the Martorellos' relocation from the U.S. Virgin Islands to Puerto Rico, where he received an Act 20 and Act 22 economic development decree from the Puerto Rican government, through Bellicose VI, and kept an office in St. Croix, U.S. Virgin Islands as well (see: https://www.ddec.pr.gov/wp-content/uploads/2019/11/Performance_of_Incentives_Report-Act_20_and_Act_22.pdf). In June of 2015, Bellicose ownership for the trust and Martorello each changed to a hybrid LLC (i.e. taxed as a corporation on Puerto Rico sourced income and disregarded on US sourced income) in the form of Kairos PR, LLC and Gallant PR, LLC. In preparation for the sale of Bellicose Capital, LLC (which housed the employees central to the performance of SourcePoint VI)

*Footnote continues….*

2
**SA16**

changes over time, the common general ownership structure of Bellicose VI, Bellicose Capital, and Eventide Credit Acquisitions remained virtually the same from July 2012 to present.[3]  The details of the ownership structure are discussed in thorough detail below, but first we will address the money flows.

**Discussion of how and through which trusts, corporations, people, or other entities money flows through from the time a borrower makes a payment until the money is distributed to Martorello and others**

When a consumer made a loan payment to Red Rock Tribal Lending ("RRTL"), the interest received was recognized as revenue to RRTL, while the principal either stayed in cash in RRTL for RRTL's growth, or reduced one of the debt facilities of the Tribe (See ECF 565-1, detailing the funding of RRTL's debt capital as ultimately sourced from third parties nearly entirely at all times, with some exception early in the relationship where Bellicose made a minority co-investment).  In other words, the Tribe could decide to pay debt to third parties that it owed in connection with the lending business.  As can be seen below, payments from that

---

Bellicose Capital had to migrate out of the family office all entities, data, information, and IP that were not a part of what the Tribe was purchasing, which included sensitive personal and family information, and that of Martorello's partners (see Ex. C (with personal information redacted).  From time to time, restructurings occurred in to segregate entities with U.S. sourced income in one segment of the organizational structure for simplification, and any entities with Puerto Rico sourced income in another segment.  Finally, upon relocation back to the mainland United States, the structure again changed and simplified.

[3] Notwithstanding two subsequent dilutive events impacting ownership pro rata via issuing equity to key management personnel across the first half of 2014, Bellicose VI and its successors' profits interests were generally owned 70% by Guardian Trust Corporation, as trustee of the Bluetech Irrevocable Trust, the vehicle for Martorello's estate plan (his mother, brother, and sister as initial beneficiaries, replaced by his wife and their future descendants in late 2012 after their marriage in March of 2012), and 30% by Martorello personally, through his wholly owned LLC, initially MBM Services, LLC, which was later succeeded in interest by Liont, LLC and Gallant Capital, LLC.  These distributions would amount to a substantial amount of income to Martorello personally.

revenue to SourcePoint VI, LLC ("SPVI") were wholly untied to the loans themselves.[4]  Rather, whether or not SPVI was paid in any given month was based on the operational success or failure of the services it provided to RRTL, and thereby related to its efforts to build the good customer list and IP of LVD's business over time (See Ex. E, Servicing Agreement at § 6.4).[5] The following are the operational steps, in order, RRTL would take in the disbursement of its revenue:

1.  RRTL would send the Tribe ("LVD") the greater of the $20,000 monthly minimum, or 2% of Gross Revenue less Bad Debt expense, as a distribution.

2.  RRTL would repay SPVI for any reimbursements advanced to it, if applicable.

3.  RRTL would pay its vendor's bills, which included marketing agencies, underwriting expenses, technology, ACH processors, bank fees, call center expense, non-SPVI related consultants, legal, accounting and audit fees, interest expense, payment to its affiliate Duck Creek for employee personnel, and miscellaneous fees.[6]  (See Ex. G, Financial

---

[4] During the Parties' attempts to reach agreement on the form of the requested charts, Martorello repeatedly emphasized that "SourcePoint VI's servicing fee was wholly untied to consumer loans, but rather predicated on the success or failure of RRTL's business."  (See Ex. D at 4; see also Ex. D at 2 ("Disagree that payment is misleading, it demonstrates the payment to SPVI, and thus to its member, were entirely untied to the consumer loans, but instead based on the performance of the tribe's business holistically.")  While Plaintiffs may take umbrage with this undisputed fact, and mischaracterize it as "misleading," they cannot dispute that given SPVI's fee and Eventide's note payment stem from the success or failure of the Tribe's bottom line, and the demonstrative variability in any given month or period of time, SPVI's payments indeed were wholly untied to the consumer loans.

[5] See Ex. F, expert report Greg Cowhey of RSM at 20 (noting the "Value Allocation to the Tribal Entity" on the date of sale as "24,729,000")..  See also Ex. G, demonstrating RRTL's spending $59 million on marketing, by date of sale, to develop its most valuable IP, its customer list.

[6] Plaintiffs mention markup at the call center and improperly characterize Iron Fence Investments Interest Income.  These had no net impact on Tribal Net Profit or Martorello's share versus the trust.  No separate hidden fees were received by Martorello outside of his 30% interest in SPVI (owned indirectly through Bellicose).  As stated above, loans made to RRTL to provide

*Footnote continues….*

---

4

**SA18**

Statements demonstrating RRTL paid $294 million in total expenses, $223 million for costs other than "Servicing Fee – SPVI"). Additionally, RRTL would retain capital for reserves if required.

4. RRTL would pay its creditors to the extent required for either interest or principal, or reserve therefor.

5. RRTL would pay net revenues to SPVI, in the event any such amounts remained.[7]

Once SPVI received payment, if any, from RRTL, SPVI would pay its expenses, including a fee allocated for the engagement of the employees of its parent company, Bellicose Capital, LLC, and any overhead before it would make profit distributions to its parent company, Bellicose Capital, LLC. Additional expenses of Bellicose Capital would then determine whether the services SPVI provided were profitable or not profitable to the members of Bellicose Capital.

From Bellicose Capital, disbursements of remaining cash were not formulaic, but irregular and sporadic. As a holding company and family office designed to invest in US entities (rather than distribute offshore as Plaintiffs allege the design), Bellicose focused attention on growing and diversifying its family office investments and holdings, in entirely US subsidiaries. As such, Bellicose would assess its cash liquidity, its business or investment opportunities, and existing forecasted cash requirements and then (i) choose to retain its earnings for investment

---

capital were almost entirely made from third party capital sources; to the extent a loan was made from a Trust-owned subsidiary to RRTL, the interest payments back to that entity were a debt expense to RRTL that reduced SPVI revenue, resulting in a net effect of zero.

[7] To demonstrate that no given loan could be tied to the Servicing Fees, after the launch of RRTL in January 2012, SPVI received no payment for services in January, February, March, April, May, July or September. Clearly, it received no dollars from those loans and was far from guaranteed to. And notwithstanding the ability for LVD to voluntarily terminate the contract with SPVI with just 120 days' notice to engage increasing competition to SPVI, even before many loans originated could mature, after netting SPVI's expenses and overhead allocations, SPVI lost money through its provision of services to RRTL in the year of 2012.

into new ventures, (ii) grow its businesses and its own US subsidiaries, or (iii) distribute excess funds to its members.  Any such distributions to its members were made pro rata to the members of Bellicose Capital owning economic interests: (i) 70% to the LLC owned by Guardian Trust Corporation, as trustee of the Bluetech Irrevocable Trust (the "Trust")[8] and (ii) 30% to the LLC owned by Martorello[9].  The Trust's LLC owner (also, always a Delaware LLC from January 1, 2014 to date of sale) would either invest in its own subsidiary ventures or private equity vehicles (all US entities and investments again), or make a distribution up to the Trust. Martorello's LLC owner would similarly elect to invest such distributions into his own US entities, or pay them to Martorello, who (contrary to the actions of one seeking an offshore shelter) generally reinvested them in his personally-owned interests in illiquid US start-ups he co-founded (since 2013) and other business ventures.

In 2014, the management team members of Bellicose Capital were issued their equity interests. Thereafter, distributions would additionally be made pro rata to Justin Martorello (9.9%), Brian McFadden (2%), James Dowd (1.5%) and Simon Liang (1.5%) in accordance with their ownership percentages per the operating agreement.  The Trust's LLC owner's interest was thereby diluted to 59.6% and Martorello's LLC owner's interest was thereby diluted to 25.5%.

Since the sale of the Bellicose assets (the "Bellicose Sale") to the Tribe on January 26, 2016, payments from the Tribe have followed the same formula, except that the formula was changed from $20,000 to 2% for the Tribe's distribution, plus an additional 2% to be reinvested

---

[8] The trust held its interest in Bellicose VI and Bellicose Capital from time to time through three **Delaware holding companies**: 7X Services, LLC, Alpha Tau Capital, LLC, or Kairos Holdings, LLC (or its Puerto Rico holding company, Kairos PR, LLC).

[9] Martorello held his interest in Bellicose VI and Bellicose Capital, LLC from time to time through three **Delaware holding companies**: MBM Services, LLC, Liont, LLC or Gallant Capital, LLC (or its Puerto Rico holding company, Gallant PR, LLC).

as equity capital to grow the health and self-sufficiency of LVD's lending business and move it closer to self-sufficiency.  However, the LVD economy entered two periods of economic strife following the sale, and the Tribe called upon Eventide to renegotiate the distribution calculation from 2% so as to help support the Tribal members' struggle.  Eventide and Martorello were eager to oblige, and increased the distribution to 3%, with a 2% retention in November 2016 (See Ex. H), and in May 2018 "in order to assist the financial needs of the Tribe, to alleviate Tribal budgetary stress and to aid the Tribe to avoid cuts to essential government services" Eventide agreed to forego the retention so that LVD could distribute a full 6% of the formula on a monthly basis and that arrangement stands today (Ex. I).

Unlike Bellicose, which was a holding company and family office, Eventide is a special purpose entity holding only the LVD debt obligation.  As such, upon receipt of its note payments beginning in 2016, distributions to Eventide's members occurred regularly, pro rata, through early 2019 under the auspices of ample projected note payments based on the forecast.  Since early 2019, however, upon suspicion that the borrower's material changes in lending operations and product over the years post-sale would result in a material degradation to Eventide's note payments, it ceased all distributions to its members and reserved all of its cash for legal expenses associated with the litigation.[10]  Eventide's earlier distributions to Breakwater have been invested in U.S. private equity funds, with any excess being distributed up to the Trust. Eventide's distributions to Gallant Capital have been distributed to Martorello for further substantial investment in his personal US investments since 2013, including Braviant, a US start-

---

[10] Another example of the consumer loan payment being wholly untied to the payments under the waterfall methodology, which was discussed with plaintiffs the day before this filing but omitted from their brief, the Tribe has made **no payments** on the note by waterfall calculation from November of 2018 through the date of this filing.

up entity with a long-term investment horizon founded by Martorello, or used by Martorello personally.

### Discussion describing all trusts, corporations, people, or other entities involved in these transactions and how each trust, corporation, person, or other entity relate to each other

Martorello, as settlor, and Guardian Trust Corporation, as trustee, established the M. Martorello Irrevocable Trust (the "Trust"), a Cook Islands Trust, on November 1, 2010.[11] On June 10, 2011, by trustee resolution, the Trust name was changed to the Bluetech Irrevocable Trust. Prior to Martorello's marriage in March of 2012, the beneficiaries were his mother and siblings; following his marriage and the birth of his children, the trustee added Martorello's wife and descendants as beneficiaries. Simultaneously with the establishment of the Trust, the trustee created Breakwater Holding, LLC ("Breakwater"), a Cook Islands limited liability company owned by the Trust as its sole member, for the purpose of holding assets of the Trust. Breakwater's initial manager was ATP Directors Ltd., a director company wholly owned by Asiaciti Trust Pacific Limited, the parent company of Guardian Trust Corporation, a duly-licensed Cook Islands trust company. The trust agreement of this Trust does not grant the settlor any power, control, or authority over the Trust's administration or its assets. The settlor's role is limited to creating and funding the Trust. While Plaintiffs make hay of Martorello referring to Bellicose as "my business" (as certainly all members did) in this case, Martorello is also treated as the grantor (or tax "owner") for U.S. federal income tax purposes, meaning that he is

---

[11] There are a variety of reasons to choose a foreign jurisdiction to administer a trust, including, but not limited to: (i) cost efficiency vs US trustees (ii) economic diversification; (iii) access to certain types of offshore private placement life insurance policies (for which Martorello has); (iv) estate planning; (v) asset protection from the creditors of its beneficiaries; (vi) premarital planning; and (vi) tax planning, if available. Dynastic trusts are a common estate planning vehicle that permit a settlor to transfer property to a trustee to be invested, managed, and administered for the benefit of the settlor's family and future generations. There are many motivations and purposes for establishing a trust, but preservation of family wealth and ensuring financial security for the settlor's spouse and descendants is often a primary goal.

obligated to report and pay taxes on the Trust's earnings, and he in fact does so.  Martorello has never been a beneficiary of the Trust, nor has he ever received a distribution from the Trust. Likewise, Martorello has never served as a Protector of the Trust or in any other fiduciary capacity.[12]  Assets held by the Trust or subsidiaries owned by the Trust are <u>legally</u> owned by the trustee for the benefit of the Trust beneficiaries.[13]  Assets owned by Martorello or by subsidiaries owned by Martorello are legally owned by Martorello.  Martorello's status as the grantor and tax "owner" of the Trust does not in any way grant to him legal or beneficial ownership of, or control over, the Trust assets; it merely indicates that he is obligated to pay the income taxes on Trust earnings.[14] In fact, both he and the beneficiaries are powerless to compel the trustee to take *any* action.

As mentioned above and generally at footnote 3, supra, the charts attached as Exhibit "A" depict the Trust and its various subsidiaries owned from time to time, as well as entities owned

---

[12] Plaintiffs pointed out the NDTX opinion had stated that Martorello admitted he was the "protector".  This was clear error of the Court.  Martorello stated rather that the trust document referred to him as "principal" (See Ex. J, N.D. Tex. May 21, 2020 Hrg. Tr. at 77:22-78:2), while he also stated he has never been "protector" and there has not been since 2011 (see Ex. J at 178:3-24).

[13] To the extent that the trustee elects to make distributions to the beneficiaries of the Trust, it does so in its sole discretion, and distributions may not be made to anyone who is not a beneficiary of the Trust. The beneficiaries may not compel distributions from the trustee. The Trust is a spendthrift trust, meaning that the trustee has the power to deny requests for distributions from creditors of the beneficiaries, as well as requests for distributions from the beneficiaries themselves. The trustee can, and often does, exercise its discretion and refuse to make distributions to a beneficiary. A trustee will not distribute funds to satisfy a creditor claim of a beneficiary, particularly when doing so would harm the other current beneficiaries and future remainder beneficiaries. The trust is irrevocable, meaning that no person has the power to revoke the trust. Once the settlor transfers property to the trustee to hold in trust for the beneficiaries, the settlor relinquishes all control over the trust property and retains no beneficial rights so long as the settlor is not a beneficiary of the trust.

[14] This is not optional: Section 679 of the Internal Revenue Code requires that a U.S. person who directly or indirectly transfers property to a foreign trust with at least one U.S. beneficiary shall be treated as the tax owner of the trust.

by Martorello that were involved in these transactions. From the time of the formation of Bellicose VI and Bellicose Capital leading up to the Bellicose Sale, multiple reorganizations occurred to the ownership structure to facilitate the tax planning in the U.S. Virgin Islands, followed by a reorganization for Puerto Rico tax purposes upon the Martorellos' relocation from the USVI to Puerto Rico.

Below are more granular details explaining the Trust and various entities.

- **Bluetech Irrevocable Trust** (the "Trust") was established by Matt Martorello, as grantor, and Guardian Trust Corporation, as trustee, on November 1, 2010. The beneficiaries of the Trust, since late 2012, are Rebecca Martorello and the descendants of Rebecca and Matt Martorello. **Matt Martorello was never a beneficiary of the Trust, never the protector, nor has he ever had any beneficial interest in an entity or affiliated sub-trust owned by the Trust.** The Trust's holdings include various holding companies (each described in more detail below), namely Breakwater Holding, LLC 7X Services, LLC, Alpha Tau Capital, LLC, and Kairos Holdings, LLC, and sub-trusts. All directly-owned holding companies have been dissolved except for Breakwater.

- **Guardian Trust Corporation** is a provider of professional fiduciary services and a wholly-owned subsidiary of **Asiaciti Trust Pacific Limited**, Cook Islands, the Cook Islands branch of Asiaciti Trust, an international trust and corporate services provider that has been operating in multiple jurisdictions globally (except the U.S.) for the past 40 years and oversees several billion dollars in trust and corporate assets (see www.asiacititrust.com). The current managing director of the Cook Islands operation, Ms. Tine Ponia, a New Zealand attorney, is the trust officer in charge of the Trust.

- **Breakwater Holding, LLC** ("Breakwater"), a Cook Islands LLC, was created by the

trustee simultaneously upon the establishment of the Trust, November 1, 2010, to serve as the Trust's holding company for the Trust's private company investments. From 2010 to March 2013, Breakwater's manager was ATP Directors Ltd., a special purpose company owned by the trustee to serve as corporate director and manager. The trustee later appointed Martorello's entities MBM Services, LLC and then Liont, LLC as the successor managers of Breakwater from March 2013-June 2018.  Contrary to one using offshore entities for protection, on December 31, 2013, Martorello transferred the Bellicose equity **_out_** of the Cook Islands LLC and into Delaware LLC, Alpha Tau Capital.  In June 2018, the trustee, as member, then removed Liont as manager and replaced it once again with ATP Directors Ltd. ATP Directors consulted with managers of its underlying private company investment entities, including Matt Martorello, as needed, to satisfy its fiduciary obligation to its member, the Trust.  Breakwater only **briefly** owned an interest in Bellicose VI in July of 2012 (prior to which it was owned by Martorello personally) until it transferred its interest to Delaware LLC Alpha Tau Capital in December 31, 2013. From that point on, it did not hold a direct interest in the Bellicose entities.

- **MBM Services, LLC**, a Delaware LLC, was wholly-owned by Matt Martorello and served as his management company. The trustee named MBM Services, LLC as manager of Breakwater, Bellicose Capital, LLC, Kairos Holdings, LLC, 7X Services, LLC, and Alpha Tau Capital, LLC. This allowed day-to-day oversight of the operating entities held by the Trust by MBM Services, LLC, with the help of its staff and oversight by Matt Martorello, as its manager. MBM Services, LLC was later succeeded by Liont, LLC as manager of the companies it managed. Although MBM Services and Liont, LLC handled

administrative and ministerial tasks for the companies they managed, substantial decisions relating to the Trust-owned private companies continued to require the consent of the trustee of the Trust, as member.

- **Liont, LLC** ("Liont"), a Delaware LLC, is the family office entity wholly-owned by Martorello and has served as manager of multiple entities, some owned by the Trust and some owned by Martorello.  Liont was a successor to Martorello's initial management company, MBM Services. Liont has employed staff to facilitate with its management services. In July 2015, Matt contributed Liont (at that time it had a zero value and no assets) to Kairos to allow Liont to hire Puerto Rican employees and to qualify for Puerto Rico tax benefits as a subsidiary of Kairos PR. Upon the Martorellos' departure from Puerto Rico, Martorello repurchased Liont, LLC from Kairos, rendering Kairos obsolete and it was later dissolved.

- **Bellicose VI, Inc.** was formed in 2011 by Martorello and later restructured as **Bellicose VI, LLC** for tax purposes (collectively referred to as "Bellicose VI").  It was initially a Virgin Islands company wholly owned by Martorello personally, and was later converted to a Delaware LLC.  Contrary to the mischaracterization of the Plaintiffs that Martorello had some nefarious scheme with regard to LVD's lending, Martorello engaged Bellicose VI under his personal ownership in 2011.  It was not until July 18, 2012 when Martorello transferred 70% of his interest in Bellicose VI to Delaware LLC 7X Services, LLC (a wholly owned entity of the Trust).  In early 2013, when Bellicose VI was converted to an LLC, it issued a Class A equity interest to Breakwater (100%, transferred a few months after to Alpha Tau Capital, a Delaware LLC described below), and Class A economic interests to Delaware LLCs 7X Services (70%) and MBM Services (30%). Bellicose VI

was later merged into Bellicose Capital, LLC in 2014 upon the companies' move from the USVI to Puerto Rico (described below).

- o 7X Services LLC held a 70% economic interest in Bellicose VI and Martorello, through MBM Services, held a 30% economic interest. 7X was wholly-owned by the Trust, so the 70% economic interest owned by 7X constituted the Trust's profits interest in Bellicose VI. The 30% economic interest held by MBM Services, LLC constituted the profits interest received by Matt Martorello for his services to Bellicose VI.

- o Bellicose VI was the initial owner, later transferred to Bellicose Capital, of a number of U.S. investments through various entities, including Alpha Tau Capital, LLC, Indian Country Analytics, LLC, Iron Fence Investments, LLC, SPVI, and Green Key Markets, LLC, the marketing arm of GreenKey Technologies, described below (all US entities).

- o On December 31, 2013, the holding structure was reorganized in conjunction with the companies' planned move to Puerto Rico and the Trust replaced 7X with Alpha Tau Capital as its new holding company for the Bellicose VI structure. The economic interest remained the same: Alpha Tau Capital (70%) and MBM Services (30%) (both Delaware LLCs).

- **Bellicose Capital, LLC**, a Delaware LLC,  was created January 2014 as a subsidiary of Alpha Tau Capital (70%) and MBM Services (30%) and began operations in Puerto Rico. Bellicose Capital had three classes of ownership interest, which is incompletely disclosed in Plaintiff's brief: Class A Members (with general rights to the assets of Bellicose Capital other than SPVI and GreenKey Technologies), divided further into voting, equity,

and economic interests; Class B Members (with rights to the investment in SPVI), divided into equity and economic interests; and Class C Members (with rights to the investment in GreenKey Technologies, LLC), divided into equity and economic interests. The business activities of SPVI and GreenKey Technologies are described in more detail below. Having noted the 2011 and 2012 ownership and the short duration in 2013 when Breakwater owned Bellicose VI, the ownership of Bellicose Capital evolved as follows:

> **2014 (All US ownership)**
> Class A Members:
> *Alpha Tau Capital, LLC* ("ATC") - 100% voting; 70% economic; and 100% equity
> *MBM Services, LLC* ("MBMS") - 30% economic
> Class B Members:
> *ATC* - 60% economic, and 90% equity.
> *MBMS* - 30% economic.
> *Justin Martorello* - 10% economic and equity.
> Class C Members:
> *ATC* - 80% economic and equity.
> *Justin Martorello* - 20% economic and equity.
>
> **January 1, 2016 (All US Ownership)**
> Class A Members:
> *Kairos Holdings* ("KH") - 100% voting; 70% economic; and 100% equity
> *Gallant PR* ("GPR;" PR Holding company of Gallant Capital, LLC) - 30% economic
> Class B Members:
> *KH* - 59.6% economic, and 59.6% equity
> GPR - 25.5% economic and 25.5% equity
> *Justin Martorello* - 9.9% economic and equity
> *Brian McFadden* - 2.0% economic and equity
> *Simon Liang* - 1.5% economic and equity
> *James Dowd* - 1.5% economic and equity
> Class C Members:
> *No changes.*

o   The succession of ownership of Martorello's 30% profits interest in Bellicose Capital evolved as follows: MBM Services, LLC, followed by Liont, LLC, followed by Gallant Capital, LLC, then briefly Gallant PR, LLC. Gallant PR,

LLC was created for Puerto Rico tax purposes and briefly owned Gallant Capital. Again, all US entities. Martorello's 30% interest was diluted to 25.5% upon the issuance of equity interests to key personnel in 2014.

- o The management was initially MBM Services, LLC and later Liont, LLC.
- o Bellicose VI transferred its interest in SPVI to Bellicose Capital.
- o In January 2016, SPVI and Bellicose VI were merged into Bellicose Capital, LLC in anticipation of the Bellicose Sale, which occurred on January 26, 2016.

- **SourcePoint VI, LLC** ("SPVI"), initially a Virgin Islands LLC and later a Delaware LLC, was owned by Bellicose VI and later Bellicose Capital and managed by MBM Services and later Liont. Its business purpose was to serve as a fintech platform for lenders. Payments from RRTL were made to SPVI.

- **7X Services, LLC** ("7X"), a Delaware LLC, was wholly-owned by the Trust and was the initial owner of BVI, Inc. Its manager was MBM Services, LLC. 7X held a 70% economic interest in Bellicose VI, which interest was later transferred to Alpha Tau Capital (described below).

- **Alpha Tau Capital, LLC** ("ATC"), a Delaware LLC, was wholly-owned by the Trust and served as the Trust's holding company for investments such as Alpha One Investments and Iron Fence Investments. It also held a 70% economic interest in Bellicose VI for a time. Its manager was MBM Services, LLC.

- **Kairos Holdings, LLC** ("Kairos"), a Delaware LLC, was formed by the trustee in 2014 to serve as another holding company for the Trust's U.S. investments. It was always owned directly by the Trust, with initial management by MBM Services, LLC, followed by Liont, LLC.

- o In 2014, Martorello and his family relocated to Puerto Rico and Kairos, along with its subsidiaries, were transferred to newly-formed Kairos PR, LLC for Puerto Rico tax planning purposes.

- o Kairos was dissolved by its member (the trustee) in 2019, after liquidating its de minimis remaining assets following the Bellicose Sale.

- **Eventide Credit Acquisitions, LLC** ("Eventide"), a Delaware LLC, was formed February 9, 2015 for the purpose of holding the debt obligation from the LVD following the Bellicose Sale. Its initial manager was Liont, LLC and is currently Martorello. As explained above, its ownership was designed to mirror the ownership of the Class B Membership interests in Bellicose Capital. The Trust initially owned 85% of Eventide through its holding company, Kairos Holdings. Leading up to the sale, Kairos transferred a 25.5% interest in Eventide to Martorello's holding company, Gallant Capital, as payment for Martorello's efforts brokering the Bellicose Sale and to mirror the economic arrangement between Gallant Capital and Bellicose Capital, which was also 25.5%. Kairos simultaneously transferred the remaining 59.6% of its interest in Eventide to its sister subsidiary, Breakwater Holding, which was to remain as the Trust's primary holding company following the Bellicose Sale and simplification of the holding structure.

- **Gallant Capital, LLC** ("Gallant Capital"), a Delaware LLC, was formed June 30, 2015, by Martorello as member and Liont, LLC as manager, to hold Martorello's interest in Eventide. In 2018, Martorello transferred 15% of his ownership in Gallant Capital to Gallant Distributions LLC (Delaware) in turn owned by a Family Limited Partnership owned by two US trusts formed for tax planning purposes in 2018.

16
**SA30**

- **GreenKey Technologies, LLC** ("GreenKey"), a Delaware LLC, was created in January 2014, and Martorello is a co-founder. Its initial managing member was Bellicose Capital. Its current managing member is Dorado Analytics, LLC. GreenKey is a fintech start-up developing voice transcription technology for use in the financial sector (referred to as "Alexa for Wall Street"), as well as for 911 call centers and use by police forces.

  o Bellicose Capital purchased a 75% membership interest in GreenKey Technologies in 2014. A Class C Membership interest in Bellicose Capital was formed to segregate GreenKey's profits from those of SPVI and Bellicose Capital. The Class C Members were the Trust (through Alpha Tau Capital) (80%) and Justin Martorello (20%).

  o In January 2015, Justin Martorello and Bellicose Capital formed Dorado Analytics to serve as a holding company for GreenKey Technologies and shortly thereafter Bellicose Capital assigned its interest in Dorado Analytics to Kairos Holdings, which at that time was holding the Trust's U.S. investments that were unrelated to tribal lending services.

- Other Entities Owned by the Trust Structure

  o **Dorado Analytics, LLC**, a Delaware LLC, was created as a holding company for a portion of GreenKey, as described above.

  o **Indian Country Analytics, LLC**, a Delaware LLC, was created early on and was never significantly capitalized or utilized.

  o **Source Point, LLC**, a Delaware LLC, was a slot lessor to a tribal casino in Oklahoma and also owned a maritime asset backed loan in Florida.

  o **Palm Beach Gaming, LLC**, a Delaware LLC, owned a maritime lease and Blue

Horizons Casino Cruises.

- o **Blue Horizons Casino Cruises, LLC** served as the operating entity for the casino cruise operation in Florida.

- o **Iron Fence Investments, LLC**, a Delaware LLC, was used as a fundraising entity and earned a 1% profits interest for deals it helped to broker.

- o **Alpha One Investments, LLC**, a Delaware LLC, served as a proprietary trading firm pertaining to US securities.

- **Matt Martorello** has served as manager of MBM Services and Liont, which were named by the trustee of the Trust to manage a number of the trust-owned entities from time to time, as explained above. Martorello, through his wholly-owned holding companies, has received 25.5% to 30% of the net revenues from Bellicose VI, Bellicose Capital, and Eventide, as explained above. Martorello has founded or co-founded a number of U.S. start-up companies, and has invested millions of his personal capital in these business ventures owned outside of the Trust structure. Entities owned by the Trust have provided debt financing to Martorello and/or entities majority owned by Martorello. Some of the business entities majority owned by Martorello appear on Exhibit "A" and are described below:

- o **Braviant Holdings, LLC** ("Braviant"), a Delaware LLC, is an online consumer lending company founded by Martorello in 2013. Martorello made substantial investments into Braviant over the years. It is currently managed by its CEO, Stephanie Klein.  Braviant owns the following affiliates: Braviant Consumer, Braviant, LLC, SunUp Financial (non-prime consumer lender), Chorus Credit (near prime consumer lender), and Promovere (a Phillipine company that

operates a customer call center).

- o **Jet Business Loans, LLC's** primary activity is small business factoring. Martorello founded Jet in 2015 and continues to be the sole owner, having made substantial investments in this US start-up company since 2015.

- o **MBM Services,** described above.

- o **Liont, LLC,** described above also owns a share in a Dallas restaurant.

- o **Gallant Capital, LLC,** described above.

- o **GFLP Entity 1, LP** owns a small equity interest in a real estate development project in Dallas, Texas.

### Explanation of Martorello's interest, involvement, or relationship as to each trust, corporation, person, or entity

Martorello's role as manager of MBM Services and Liont is described in more detail above. Martorello's participation and consultation with the trustee via his management entities allowed the Trust to benefit from his expertise and to grow the Trust investments on behalf of the Trust beneficiaries, satisfying its fiduciary obligation to its current and remainder beneficiaries. In exchange, Martorello received the benefit of his own profits interest in the Trust majority-owned companies as described above (30% of Bellicose VI, and later 25.5% of Bellicose Capital and Eventide). This was the primary source of compensation to Martorello for his efforts in working with Bellicose and Eventide.  He received a reasonable salary over the years, but after that did not receive any other regular source of income or wages from any other Trust-owned subsidiary, until his recent appointed Management position this year at Eventide.

As explained above, Martorello has never received a distribution or any other financial benefit from the Trust and has never been a beneficiary, trustee, or protector of the Trust.  He has no power to compel the Trustee to make distributions or turn over Trust assets, nor does he have

the power to change the beneficiaries or cause himself to be added as a beneficiary. Martorello also does not hold the power to change the trustee. By design, the Trust's investments are preserved for the benefit of the trust beneficiaries, Martorello's wife, children, and all future descendants, and the disposition of the Trust assets during his lifetime and after his death are governed by the terms of the Bluetech Irrevocable Trust agreement.

The trustee of the Trust has *full discretion* as to whether to make distributions, or not, to its beneficiaries; there is no set amount to be paid to any beneficiary. That said, in the history of the Trust, the trustee has made one single distribution since its establishment in 2010 to one of its beneficiaries, Rebecca Martorello. Rebecca Martorello used the full amount of that distribution to purchase a life insurance policy on Matt Martorello's life.

Rebecca Martorello received a $70,000 salary from Bellicose VI until her employment was terminated in mid-2013. Rebecca was also employed by Liont to assist with paying invoices and received a similar salary from mid-2017 through early 2019. She has not otherwise received any payments or distributions from Trust-owned subsidiaries.

While Martorello objected to Plaintiff's providing actual dollar figures, as the Court stated it did not want or need them, Plaintiffs have used the figures to allege that for some period of time SPVI received about 90% net vs LVD's distributions of 10%, implying the impropriety of the SPVI and RRTL relationship. Setting aside federal policy regarding self-determination in such matters, Martorello respectfully responds as follows:

The economic split of Plaintiffs ignores entirely the nearly $25mm in equity value created by date of sale and continuing to accrue to the Tribe as the Eventide note nears termination. (See Ex. F at 20). Moreover, this servicing arrangement (including the economic split) is entirely market rate in fintech platforms, even outside of Indian country. Indeed, a

comparative non-bank lending model is diagrammatically presented by the state of Texas: https://occc.texas.gov/sites/default/files/uploads/what-is-a-cab-6-26-14.pdf. Here, the Credit Access Businesses ("CAB") even **owns the website**, markets, underwrites, originates and collects, performing all of the lending functions, but the lender provides the dollars to be loaned, and it receives the non-usurious "interest" rate (usury cap is 10% APR) while the CAB gets all of the remainder as its fees equating to a combined triple digit cost to the borrower. This split, on a net basis, is approximately 90% to the CAB and 10% to the lender within the "Components of the Finance Charge" at 90% net vs 10% net: See https://www.checkngo.com/wp-content/uploads/2018/02/TX_PDL_CNG_ONLINE_2018V1.pdf). Dozens of comparative examples publicly exist across Texas, and similar statutory arrangements to the CAB model have existed in FL, OH and MD.[15]

Even more broadly, fintech platforms working with both bank and non-bank lenders, typically provide and **own** the website the consumer visits. They also own the technology and they originate, underwrite, service, collect, market and fund the loans for the lender. See examples: *Sawyer v. Bill Me Later, Inc.*, 23 F. Supp. 3d 1359 (D. Utah 2014): at 1367–68; *Hudson v. ACE Cash Express, Inc*., 2002 WL 1205060 (S.D. Ind.): where the agreement required ACE to purchase a **95% interest** in any loan made (in ACE storefronts) under the agreement, which determined irrelevant to the court, as was the fact that ACE was responsible for collecting payments under the loans. *See id*. at *3; See also *Meade v. Avant of Colorado, LLC*, 2018 WL 1101672 (D.Colo.) consumer applied for and obtained loans from servicer's website; servicer

---

[15] See Ex. K, Scott Merritt deposition transcript excerpts at 49:7-15 (testifying that the financial arrangement was ordinary and "actually pretty decent") and 53:4-20 (testifying that this relationship is typical outside of the tribal lending context, particularly in the Texas Credit Service Organization lending model and regarding economics that the Texas lending model "[has] similar rev shares as the tribal."

buys loans within 2-days, paid all lender legal fees and fees to initiate the program, bore all

expenses incurred, determined which loan applicants received loans and bore all costs of making

such recommendations, was responsible for compliance with federal and state laws, indemnified

the Lender, bore all risk of default, and conducted underwriting, servicing, and collection;

**Servicer retained 99% of profits** on the loans); and *Beechum v. Navient Solutions, Inc.*, 2016

WL 5340454 (C.D. Cal. Sept. 20, 2016): where the non-bank lender originated, underwrote,

marketed, and funded private student loans for which the bank would be identified as the lender.

The non-bank lender would subsequently purchase 100% of the loans from the bank within 90

days of disbursement for principal, plus accrued interest, and less the amount paid for

indemnification of loan loss.

These fintech relationships have been promoted by modern policy and recognized as

legitimate by Treasury and bank regulators, in their efforts to clarify the legal uncertainty

plaguing these relationships. See: https://www.fdic.gov/fditech/guide.pdf;

https://www.fdic.gov/news/news/financial/2005/fil1405a.html#foot1 revised November 2015,

describing what a bank lender/Fintech platform relationship involves in order to "export

favorable interest rates provided under the laws of the state where the bank is located" for a

"typical charge…APR of nearly 400%". Here the banks "enter into arrangements with third

parties" "in which the institution funds payday loans originated through the third party" which

"may be underwritten off-site" by "third party originators" and "may involve the sale to the third

party of the loans or servicing rights to the loans" and "additional services that the bank would

normally provide, including collections, advertising and soliciting applications." See also:

https://home.treasury.gov/sites/default/files/2018-08/A-Financial-System-that-Creates-

Economic-Opportunities---Nonbank-Financials-Fintech-and-Innovation_0.pdf describing the

"uncertainties created by these court cases" as "pressure" resulting in FinTech Platforms altering "their economic relationships with partnering banks to better account for the risks presented by these court cases" and recommending that "Congress codify that the existence of a service or economic relationship between a bank and a third party (including financial technology companies) does not affect the role of the bank as the true lender of loans it makes" and "federal banking regulators should also reaffirm…"

Indeed, just one week ago, the OCC obliged by issuing its proposed rule, stating "the relationships have been subject to increasing uncertainty about the legal framework that applies to loans made as part of these relationships. This uncertainty may discourage banks and third parties from entering into relationships, limit competition, and chill the innovation that results from these partnerships—all of which may restrict access to affordable credit. The proposed rule would resolve this uncertainty by specifying that a bank makes a loan and is the "true lender" if, as of the date of origination, it (1) is named as the lender in the loan agreement or (2) funds the loan."   See   https://www.occ.gov/news-issuances/news-releases/2020/nr-occ-2020-97.html, putting to an end once and for all the "true lender" controversy.  The alleged 90% to 10% split here, is similarly an issue reserved for Congress or the CFPB.

RESPECTFULLY SUBMITTED AND DATED this 30th day of July, 2020.


Dated: July 30, 2020                        Respectfully submitted,

                                            */s/ John M. Erbach*
                                            John M. Erbach (VSB No. 76695)
                                            jerbach@spottsfain.com
                                            M. F. Connell Mullins, Jr. (VSB No. 47213)
                                            cmullins@spottsfain.com
                                            SPOTTS FAIN PC
                                            411 E Franklin Street Suite 600

Richmond, VA 23219
Tel: (804) 697-2044
Fax: (804) 697-2144

Richard Lawrence Scheff (pro hac vice)
Jonathan P. Boughrum (pro hac vice)
Michael C. Witsch (pro hac vice)
ARMSTRONG TEASDALE LLP
2005 Market Street, 29th Floor
One Commerce Square
Philadelphia, PA 19103
Tel: (267) 780-2012
Fax: (215) 405-9070
rlscheff@armstrongteasdale.com
jboughrum@armstrongteasdale.com
mwitsch@armstrongteasdale.com

*Attorneys for Defendant Matt Martorello*

## CERTIFICATE OF SERVICE

I, John M. Erbach, hereby certify that on July 30, 2020, I filed the foregoing using the

Court's CM/ECF electronic filing system, which will serve an electronic copy on all counsel of

record by Notice of Electronic Filing (NEF).

*/s/ John M. Erbach*
John M. Erbach (VSB No. 76695)
jerbach@spottsfain.com
SPOTTS FAIN PC
411 E Franklin Street Suite 600
Richmond, VA 23219
Tel: (804) 697-2044
Fax: (804) 697-2144

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

LULA WILLIAMS,
et al.,

     Plaintiffs,

v.                        Civil Action No. 3:17cv461

BIG PICTURE LOANS, LLC,
et al.,

     Defendants.

---

RENEE GALLOWAY,
et al.,

     Plaintiffs,

v.                        Civil Action No. 3:18cv406

BIG PICTURE LOANS, LLC,
et al.,

     Defendants.

### MEMORANDUM OPINION

In Williams, et al. v. Big Picture Loans, LLC, et al., 3:17cv461 (E.D. Va.) ("Williams"), Renee Galloway, et al. v. Big Picture Loans, LLC, et al., 3:18cv406 (E.D. Va.) ("Galloway I") and Renee Galloway, et al. v. Martorello, et al., 3:19cv314 (E.D. Va.) ("Galloway II"), the Plaintiffs filed three similar, but in some respects substantively quite different, actions arising out of a so-called "Rent A Tribe" scheme allegedly orchestrated by Matt Martorello ("Martorello"), members of his family, companies

**SA40**

that he controls, and investors who allegedly funded the scheme (the "Martorello Defendants").    Big Picture Loans, LLC ("Big Picture") and Ascension Technologies, Inc. ("Ascension") (collectively sometimes referred to as the "Tribal Defendants") are entities formed under the tribal laws of the Lac View Band of Lake Superior Chippewa Indians ("LVD").    Big Picture and Ascension are also defendants in Williams and Galloway I, and both entities are alleged to be implicated in the Rent A Tribe scheme that lies at the core of the Plaintiffs' claims on those cases.

In Williams, Big Picture and Ascension claimed to share LVD's sovereign immunity and, on that basis, those entities sought dismissal of the case against them.    This Court rejected that argument.[1]   On appeal, the United States Circuit Court of Appeals for the Fourth Circuit[2] held that Big Picture and Ascension were entitled to the protection of LVD's sovereign immunity.[3]

---

[1] Williams v. Big Picture Loans, LLC, 329 F.Supp.3d 248 (E.D. Va. 2018).

[2] Williams v. Big Picture Loans, LLC, 929 F.3d 170 (4th Cir. 2019). In so ruling, the Fourth Circuit made clear that its decision does not affect the merits of the Plaintiffs' claims.   Id. at 185.   It appears that the Fourth Circuit relied on this Court's findings of fact, finding no clear error in those findings.   Williams v. Big Picture Loans, LLC, 929 F.3d at 177.

[3] Those entities also claimed sovereign immunity in Galloway I. Big Picture, Ascension and many other defendants since have reached a class action settlement of Williams, Galloway I, and Galloway II that was filed in yet another case, Renee Galloway, et al. v. James Williams, Jr., et al., 3:19cv470 (E.D. Va.) ("Galloway III").   That

Following the decision of the Fourth Circuit in <u>Williams</u>, the Court directed that the parties file Statements of Position explaining, how, if at all, the decision of the Fourth Circuit affected these proceedings and pending motions (ECF Nos. 599 and 601).[4]  In his Statement of Position, Martorello argued that the holding that Big Picture and Ascension are protected from suit by LVD's sovereign immunity has substantive and procedural consequences that necessitate dismissal of the case against them. MARTORELLO'S STATEMENT OF POSITION PURSUANT TO ECH NOS. 599 & 601 (ECF No. 613).  In their response to MARTORELLO'S STATEMENT OF POSITION PURSUANT TO ECH NOS. 599 & 601, the Plaintiffs asserted, <u>inter</u> <u>alia</u>, that Martorello and others made material misrepresentations to this Court and to the Fourth Circuit about the facts pertaining to sovereign immunity and that, as a result, the Fourth Circuit's decision on that issue cannot be relied on by Martorello.  PLAINTIFFS' RESPONSE TO MATT MARTORELLO'S STATEMENT OF POSITION (ECF No. 624).  This Memorandum Opinion addresses the alleged misrepresentations and their effect in these proceedings.[5]

---

settlement has been preliminary approved and a hearing on a motion for final approval is set for December 15, 2020.

[4] Although this ORDER was not entered in <u>Galloway I</u>, the parties have briefed the misrepresentations issues in the same way as in <u>Williams</u>.

[5] There are pending other motions in which the parties take the same positions.

3

**SA42**

### BACKGROUND

The facts of Williams and Galloway I, insofar as they pertain to Martorello, have their genesis in the efforts of so-called payday lenders to evade state usury laws by using, as loan conduits, national banks, which, by virtue of the National Bank Act, 12 U.S.C. § 85, are exempt from the interest rate caps set by state laws.  Under those arrangements, the payday lenders funded, serviced, and collected loans that were nominally made by the national banks which received a small payment in return for fronting the loans.  Those schemes were known commonly as "Rent A Bank" schemes.  The payday lenders had to abandon Rent A Bank schemes when federal regulators intervened and put a stop to them.

When that happened, payday lenders then segued into the so-called "Rent A Tribe" scheme.  This new device to evade state usury laws used Native American tribal entities (rather than banks) as the nominal lender in an effort to cloak the payday lenders in the sovereign immunity of Native American tribes, and, in so doing, to preclude enforcement of the interest rate caps in state usury laws. Nathalie Martin & Joshua Swartz, The Alliance Between Payday Lenders and Tribes:  Are Both Tribal Sovereignty and Consumer Protection at Risk?, 69 Wash. & Lee L. Rev. 751, 785 (2012).

In 2008, Martorello became involved in payday lending using a company called MMP Finance and an internet domain

(www.peppercash.com, ECF No. 784, Ex.3; Ex. 4)  The interest rates on those loans would be usurious under state laws in the United States.  Therefore, the loans were to be governed by the laws of Costa Rica.  Later, in 2011, Martorello became interested in the tribal lending concept.  That, in turn, led him to the LVD and to the formation of Red Rock Tribal Lending ("Red Rock") and Duck Creek Tribal Lending ("Duck Creek").

Many of the alleged misrepresentations made by Martorello and others pertain to the formation and operation of Red Rock and Duck Creek.  Although Red Rock and Duck Creek are not parties to these actions, they later were supplanted by Big Picture and Ascension in the Rent A Tribe scheme at issue in Williams and Galloway I. Thus, why and how they were formed, how they were operated, and what happened to them are material matters in assessing the claims made against Martorello and the Tribal Defendants in these cases.

With this background in mind, it is necessary to identify the alleged misrepresentations and then to determine whether the record shows that the allegations of misrepresentation have been proved.  Thereafter, the Court will undertake to assess the consequences that flow from any proven misrepresentation.

### THE ALLEGED MISREPRESENTATIONS

The charge that material misrepresentations of fact have been made to a Court in pursuit of a favorable ruling is a most serious

matter.   Therefore, the Plaintiffs were ordered to specify the alleged misrepresentations and to submit proof in support of their assertions.  A number of filings were made as a result of those orders.[6]  In addition to the briefing, the parties presented documentary and deposition evidence and in-person testimony at an evidentiary hearing.  Supplemental briefs were filed (MATT MARTORELLO'S SUPPLEMENTAL BRIEF REGARDING ALLEGED MISREPRESENTATIONS, ECF No. 907 in Williams; ECF No. 562 in Galloway I; PLAINTIFFS' SUPPLEMENTAL MEMORANDUM SUMMARIZING ADMITTED EVIDENCE AT JULY 21 and 22, 2020 MISREPRESENTATIONS HEARING, ECF No. 910 in Williams; ECF No. 566 in Galloway I).[7]

---

[6] In Williams, those filing are the redacted and sealed versions of PLAINTIFFS' STATEMENT OF POSITION REGARDING MATERIAL MISREPRESENTATIONS AND OMISSIONS MADE TO THE COURT (ECF Nos. 784 and 788, respectively) and 98 exhibits thereto.  Three of the exhibits were sealed (ECF No. 788-1, 788-2, and 788-3), but have been removed from seal.  In Galloway I, that pleading is ECF Nos. 432 and 436, respectively.  The sealed exhibits are 436-1, 436-2, and 436-3.

[7] In this Memorandum Opinion, the citation to the Plaintiffs' initial statement will be to the unredacted version (ECF No. 788). However, the Plaintiffs filed their supporting exhibits with the redacted version of their Statement which is ECF No. 784.  Because of limitations in the CM/ECF System, it was necessary to file the first batch of exhibits as ECF Nos. 784-1 through 784-50.  The second batch was filed under ECF No. 785 and are ECF Nos. 785-1 through 785-48.  The exhibits are all referred to in ECF No. 788 only by number, without regard to whether the exhibit was filed with ECF No. 784 or 785.  For convenience, the Memorandum Opinion uses ECF No. 788-1, No. 788-2, etc.

The alleged material misrepresentations were claimed to have been made by Martorello and others in support of the Tribal Defendants' Motion to Dismiss which the Fourth Circuit held should have been granted on the assertion of tribal sovereign immunity. According to the Plaintiffs, the misrepresentations "were designed to deliberately and materially mislead the Court" and to create a fictious storyline designed to convince this Court and the Fourth Circuit that:

> (1) the Lac Vieux Desert Band of Lake Superior Chippewa Indians ('LVD') created Red Rock to 'learn the lending industry;' (2) Red Rock was 'managed by appointed LVD members and under the control of the LVD Council;' (3) LVD 'had acquired years of knowledge and business acumen related to the online lending industry,' thereby prompting it to purchase Bellicose 'to begin in-housing services;' and ultimately, '[t]hrough Ascension, LVD would be able to 'in-house' many of the activities previously performed by its third-party vendors, including Bellicose, resulting in significant cost savings and efficiencies.'

PLAINTIFFS' STATEMENT OF POSITION REGARDING MATERIAL MISREPRESENTATIONS AND OMISSIONS MADE TO THE COURT (ECF No. 788, p. 1).[8]

--------

[8] There is no allegation that counsel of record for Martorello or the Tribal Defendants with Troutman Pepper Hamilton Sanders LLP, Christian & Barton, LLP, Spotts Fain PC, or Armstrong Teasdale LLP were knowledgeable of the misrepresentations discussed herein, and the record shows no indication that any lawyer with those firms knew that what was being asserted by Martorello and Hazen were misrepresentations.
(footnote continued on next page)

The plaintiffs identified several misrepresentations, four of which have become the focus of the evidentiary hearing and the briefing.  They are:

1.  Misrepresentations About Martorello's Involvement in the Creation of Red Rock

2.  Misrepresentations About the Control of Red Rock's Lending Operations

3.  Misrepresentations About How and Why Bellicose was Sold to LVD

4.  Misrepresentations About the Creation of Big Picture

Each asserted misrepresentation will be examined in turn.

1.  **Martorello's Involvement In The Creation Of Red Rock**

Martorello filed a declaration in support of the Tribal Defendants' Reply in Support of the Motion to Dismiss (ECF No. 106-1 (Plfs Ex. 103) in <u>Williams</u>).  Therein, Martorello swore that "I was not involved in the creation of Red Rock, but made aware Red Rock had been formed."  <u>Id.</u> ¶ 17.  The Tribal Defendants made the same argument to this Court and to the Fourth Circuit.  (ECF 784, in <u>Williams</u>, Ex. 9, Reply Brief, at 10, note 7.)  "The Tribe

---

The record contains documents from Martorello to lawyers in Rosette LLP (some of whose partners or associates are counsel of record) and from lawyers in that firm to Martorello that are pertinent to some of the alleged misrepresentations.  However, plaintiffs do not allege that lawyers in Rosette LLP who are counsel of record were knowledgeable of the alleged misrepresentations.

**SA47**

approached Martorello in 2011 after independently deciding to
explore tribal lending, not the other way around." Id.

The record shows that, contrary to these representations,
Martorello was heavily involved in the creation of Red Rock. To
begin, Martorello's legal counsel prepared the documents for the
formation of Red Rock, and Martorello reviewed those documents for
substantive comment. (July 21, 2020 Hearing Tr. pp 51-52); see
also Plfs Hearing Ex 3 (Martorello wrote that he would "like to
keep the legal documents all completed and ready for signature
ASAP. Then on that week in Sept. we can execute the agreements
with an October 1 launch date." (Plfs Hearing Ex. 5)
Additionally, before the Red Rock formation documents were
executed, counsel for the Tribe, Karrie Wichtman, sent to
Martorello's attorney, Jennifer Weddle, a copy of the proposed
Tribal resolution to review and asked for any changes that Weddle
wanted to make. Martorello reviewed and commented on these
documents as well.

The record is clear that Martorello actually selected the
name "Red Rock." (ECF No. 788, Ex. 10) ("Matt has indicated that
the intended tribal LLC should be established as 'Red Rock Lending,
LLC,' a tribal entity.") See also ECF No. 788, Ex. 11 in which
"Martorello was told that he could name the tribal entity."
Thereafter, Martorello sent an email stating "I like the name Red

9

**SA48**

Rock Tribal Cash, LLC (or Corp.)" (ECF No. 788, Ex. 12). At the July 21-22 evidentiary hearing, Martorello admitted that he had picked the name "Red Rock." July 21, 2020 Hearing Tr., p. 41.

Martorello's declaration clearly stated that he "was not involved in the creation of Red Rock . . . ." (Martorello Decl. ¶ 17) The word "involved" is defined as "having a part in something; included in something." INVOLVED, Merriam-Webster, https://www.merriam-webster.com/dictionary/involved. The facts that Martorello's counsel prepared the formational documents for Red Rock and that Martorello reviewed them before they were sent to LVD Tribal Council for approval, and the fact that Martorello chose the name "Red Rock" show that his representation that he "was not involved in the creation of Red Rock" is not true.

The record reflects also that Martorello was involved in the formation of Red Rock in an even more fundamental sense, contrary to assertions made in his affidavit on which this Court relied in making its decision. In particular, in Martorello's affidavit there is a subheading entitled "**LVD Approached Martorello in 2011 to assist them create and grow online lending businesses.**" The first paragraph under that heading says: "In mid-2011, I learned that LVD had identified me as a potential consultant." Then, in the next paragraph (15), Martorello swore that, "[b]efore LVD

10

**SA49**

approached me in 2011, I was not familiar with the issues of Indian sovereignty."

The record demonstrates that those representations simply were not true. In fact, the record shows that Martorello sought out a connection with the LVD so that he could get into the Tribal lending business.

Joette Pete, former Vice-Chairman of LVD, testified that the "Tribal Council was approached by Matt Martorello with an opportunity to participate in a lending business." (July 21, 2020 Hearing, Plfs Ex. 129, August 20, 2019 Declaration of Joette Pete and its exhibits). Scott Merritt confirmed Pete's declaration when he testified that Martorello was the one who reached out to him seeking a Tribal connection for his lending business. (July 21, 2020 Hearing Tr., Plfs Ex. 139, Merritt's Dep 32:7-23) The record is clear that, Merritt, who had long been a proponent of the Tribal lending model, was sought out by Martorello and asked to give Martorello an introduction to a Tribe so that Martorello could enter the Tribal lending business. To that end, and at Martorello's request, Merritt introduced Martorello to Rob Rosette, a lawyer who was known as a "matchmaker" who put potential lenders together with Indian tribes. Merritt's testimony on that score illustrates the point.

**SA50**

> Question: Okay.  So what made you – what led you, then,
>           to introduce him [Martorello] to Mr. Rosette?
>
> Answer:   Just his - [Martorello's] interest in working
>           with the Tribe.  I knew Rob - Rob's a very
>           well known attorney in that space.

Id.  At the time of that introduction, Merritt had not been told

by Rosette or Ms. Wichtman (the LVD lawyer) or anyone else that

"LVD was interested in finding a service provider."  Merritt's

testimony further undercuts Martorello's assertion that the Tribe

approached him with respect to an existing Tribal lending business.

> Question: So if Mr. Martorello said that, Scott Merritt
>           approached me indicating that he represented
>           the Tribe, that would be inaccurate; right?
>
> Answer:   Inaccurate.
>
> Question: And it would also be inaccurate if – that,
>           Scott Merritt told Mr. Martorello that the LVD
>           was involved in the -- in an online lending
>           business and was looking for a servicer?
>
> Answer:   Inaccurate as well.
>
> Question: Okay, and it also would be inaccurate that you
>           told him [Martorello] the LVD had a Tribal
>           code and was set to make loans?
>
> Answer:   Inaccurate.

July 21, 2020 Hearing, Plfs Ex. 139, Merritt Dep. at 92:16-93:3.

The testimony of Pete and Merritt, supported by the

documentary record, demonstrate that this Court incorrectly found

that there was a lending operation underway when the Tribe was put

**SA51**

in touch with Martorello and that the Tribe had identified Martorello as a potential consultant.[9]

## 2.    Misrepresentations About the Control of Red Rock's Lending Operations

Previously, the Court held that "the company [Red Rock] was managed by two members of the Tribe and the Tribe was Red Rock's sole member." Williams, 329 F. Supp.3d at 255. Martorello also asserted that Red Rock's co-managers were ultimately responsible for all decisions regarding Red Rock's operations (ECF No. 106-1, ¶ 22). In pressing their motion to dismiss on the basis of sovereign immunity, the Tribal Defendants argued that Red Rock's managers made all final decisions about operations and that Martorello was a consultant. And, the Court accepted those representations in making findings about the control of Red Rock, relying principally on Martorello's affidavit.

Considered as a whole, Martorello's affidavit and the position of the Tribal defendants on the issue of sovereign immunity are premised on representations that the Tribal entities controlled LVD's lending operations. The record disproves those representations.

---

[9] Those findings were based on misrepresentations made in Martorello's declaration, ¶¶ 14, 15 and 17, and were argued by the Tribal Defendants in seeking dismissal of the case against them.

At the outset, it is appropriate to note that, contrary to what was represented to the Court, at the time of the initial formation of Red Rock, Martorello understood that his company, Bellicose, would operate the lending business in which Red Rock was to be engaged completely and that the "Tribe's managers are not involved in the business." July 21, 2020 Hearing, Plfs Ex 4, August 26, 2011 email correspondence between M. Martorello and R. Richardson; see also July 21, 2020 Hearing Transcript, 54:14-19.

The rather meaningless role played by the Tribe's co-managers is manifest in an email exchange between Martorello and the Tribe's lawyers, wherein Martorello refused to respond substantively when the Tribe asked him to identify what the co-managers were being asked to approve. A part of that exchange illustrates how little the Tribe's managers knew when the Tribe's lawyers posited a number of questions that needed to be answered so that the Tribe's managers could understand the lending operation and what the lawyers were asking them to approve. (July 21 Hearing Ex. 56).

Evidence at the July 21 hearing also established the very limited involvement of the Red Rock employees in the lending operation. Specifically, what they did was: to verify the bank data submitted by borrowers, ascertain whether the borrowers were employed, and to determine whether the bank account was really the borrower's bank account. July 21, 2020 Hearing Tr. 59:23-60:1.

14

**SA53**

Neither the establishment of the actual underwriting criteria for making the loans nor the decision actually to make them (or not) was done by the Tribal entity or by its employees.

Joette Pete, Vice-Chairman of the LVD Tribal Council, explained that, while she was on the Tribal Council (from 2010 to 2016), Martorello operated the Tribe's lending business. She said:

> after the inception of the business, it was operated completely by Martorello until Government regulators and litigation against competitors began. As these cases proceeded, efforts were made to create the appearance of the Tribe's involvement but the Tribe had no substantive involvement.

Plfs Ex. 126, at ¶ 4, July 21, 2020 Hearing (emphasis added).

Collection of the consumer loans was a key component of the lending operation. Martorello swore that neither he nor his company ever collected any consumer loan originated by Red Rock. In particular, in paragraph 26 of his declaration, Martorello swore that:

> I have never taken any action to collect, in whole or in part, any consumer loan originated by Red Rock. No company I own or manage has ever taken any action to collect, in whole or in part, any consumer loan originated by Red Rock.

ECF No. 106-1, p. 5, ¶ 26 (emphasis added). That statement is squarely at odds with the Servicing Agreement which, in paragraph 4.9, provides that the servicer shall collect all the gross

revenues.    The   servicer   was   Bellicose,   a   company   owned   and
controlled by Martorello.

At the evidentiary hearing it was established that money paid
by consumers went into the Bellicose bank account over which only
Martorello and his employees had control and access.    That, of
course, is collection under the plain meaning of the word.

At the evidentiary hearing Martorello attempted to justify
the statement in paragraph 26 of his declaration by saying:  "What
I meant was that we did not take or receive any cash from the
consumer."    That  is  a  fascile,  unconvincing  explanation,
considering that there is no evidence that any consumer ever
delivered cash to satisfy a payment obligation.    Nor is there
evidence  that  the  Servicing  Agreement  established  a  cash
collection system.[10]    Moreover, the Court is constrained to
conclude that Martorello's demeanor and conduct when answering
questions on this topic of the evidentiary hearing compels the
conclusion that Martorello was not telling the truth and that, in
fact, contrary to the affidavit, Bellicose collected the consumer
loans originated by Red Rock.

The initial draft of the Servicing Agreement reflected the
following:

---

[10] And, considering that the borrowers lived all over the country,
it is illogical to believe that payments could have been made in
cash.

> It is the Party's intentions [sic] that all business and [sic] affairs in connection with day-to-day operation, management, and maintenance [of Red Rock] including the establishment of operating days and hours, shall be the responsibility of the servicer [Bellicose which is controlled by Martorello].

(ECF No. 788, Ex. 15) (emphasis added).   Although Martorello insisted on taking the word "management" out of the agreement, the concept embodied in that email was, in fact, the way that Red Rock operated.   This was confirmed by the testimony of LVD's Vice-Chairman, Pete Joette, (who was on the Tribal Council from 2010 to 2016).   Pete testified:

> For Martorello to be able to claim that LVD law applied to the consumer loans, the deal required that Red Rock 'originate' the loans. But this responsibility was immaterial because Red Rock would have no reason to reject a loan that satisfied Martorello's lending criteria because Martorello ran the business and bore all the risk.   After the inception of the business, it was operated completely by Martorello until government regulators and litigation against competitors began.   As these cases proceeded, efforts were made to create the appearance of the Tribe's involvement, but the Tribe had no substantive involvement.

July 21, 2020 Hearing, Plfs Ex 129 at ¶ 4 (emphasis added).   Several years afterward, in explaining the role of the managers (Hazen and Williams), Martorello confirmed that to be the case, saying that, "[a]s far as I know, the Managers' [sic] don't really do anything." (ECF No. 788, Ex 14, emphasis added).

17

**SA56**

At this point, it is appropriate to note that Bellicose assigned the Servicing Agreement between it and the Tribe to SourcePoint VI ("SourcePoint"), a wholly owned subsidiary of Bellicose. And, it is important to understand that the key to the operation of the lending business was the intellectual property (sometimes called the "special sauce") which Martorello's company kept for itself. That intellectual property was the basis for underwriting loans, the heart of the lending operation. The record shows that the intellectual property was kept by Martorello's company, Sourcepoint, and was not known by, or available to, the Tribal entities that nominally were making the loans at issue.

Martorello, who had controlling interest in Bellicose, told Wichtman:

> Remember when we started that [] all of these vendors and systems were 'tied internally within SourcePoint's systems' behind the scenes. . . . the vendor contracts and formulas used [were are] very closely guarded internal IP and <u>entirely unobtainable" by Red Rock</u>.

(ECF No. 788, Ex. 8). The "formulas used" referred to the formulas for underwriting recommendations.

As Martorello made clear, this intellectual property was quite valuable to Bellicose/SourcePoint (Martorello companies running the LVD lending operation) and was "guarded" and "unobtainable" to Red Rock. Without access to those formulas that

established the underwriting criteria, there would be no way for Red Rock's managers meaningfully to participate in the lending process. And, even though in 2014, Martorello had explained quite clearly that this intellectual property was closely guarded and unobtainable by the Tribal entities or managers, in his declaration, he said quite the contrary:

> [u]nder the Servicing Agreement, Red Rock paid
> SourcePoint to develop underwriting criteria
> to recommend for implementation by Red Rock.
> SourcePoint did not simply implement these
> underwriting criteria on behalf of Red Rock,
> but instead presented the underwriting
> criteria to Red Rock's co-managers for their
> evaluation and ultimate approval or rejection.

ECF No. 106-1 at ¶ 45.

And, later Martorello represented that:

> [n]either I nor Bellicose have 'controlled'
> any underwriting criteria used by and of LVD's
> lending businesses—at all times the LVD
> business retained full control over the
> underwriting criteria used to make loans.

ECF No. 106-1 at ¶ 101 (emphasis added).

The close guarding and unobtainability of intellectual property developed by SourcePoint, as described by Martorello in the written record, is also entirely at odds with his assertion in his declaration that "LVD received and retained the significant additional economic value of ownership of all intellectual property developed under the agreement by SourcePoint." That

19

**SA58**

simply did not happen.  In other words, Martorello misrepresented the pertinent facts.

The Tribal Defendants and Martorello claimed that "Red Rock consulted with Bellicose about day-to-day operations, but all decisions were either made by Red Rock's managers or expressly delegated and overseen by Red Rock's managers." (ECF No. 40 at 5, Hazen Declaration at ¶ 11; ECF No. 106-1 at ¶ 22) The record shows that is not true.  This is well-illustrated by the testimony of Craig Mansfield, a co-manager for Red Rock.  Mansfield admitted that he did not know "how the decision of whether to fund the loan occurred" or whether that process occurred on the reservation.  He did not know how loans were originated or how verifications of loans were completed.  He did not know how Red Rock obtained the money it needed to fund the loans and did not know how the call centers in the Philippines operated (Mansfield Dep. 114:25-115:3; 115:4-14; 115:15-22; 112:15-18; 128:24-129:12; 119:20-120:1)  That is fully consistent with Martorello's understanding that the Tribal managers do nothing.

The negotiations respecting the sale of Bellicose and its conversion into Big Picture are instructive.  When discussing the sale, in August 2014, Martorello informed LVD that, in any sale, "the seller will have to keep a final say so in business decisions to protect the business from being destroyed by the new owner

before being paid." (July 21, 2020 Hearing, Plfs Ex 57, August 26, 2014 email between M. Martorello, K. Wichtman, D. Gravel, and Giizhigookway) (emphasis added). Then, in September 2014, Martorello informed Wichtman that:

> After further discussions, the Bellicose companies will be sold only 'as is,' with existing capital management in place and the company remaining substantially the same. Of course, a purchase, merger and dissolution are required for a tribal buyer, so the name will/jurisdiction of the LLC will change . . . it also needs to be run in the same format it is today.

(July 21, 2020 Hearing, Plfs Ex 60, September 15, 2014 email between M. Martorello and K. Wichtman) (emphasis added). In August 2014, Martorello informed the Tribe's Council that:

> We respectfully opt to continue to keep any details of [SourcePoint] IP (including DM) explicitly for internal eyes only, both for the protection of our business and maintaining the integrity of an acquisition of the SourcePoint business. Should an acquisition actually transpire, obviously these will be relevant questions for the eyes of Management and those in the acquiring company on a need to know basis as well (I.e [sic] Certain IP, even in small doses should at all times be aggressively protected when the result is such a massive competitive advantage, like the process of even just utilizing DM itself which SourcePoint owns and created.

(July 21, 2020 Hearing, Plf Ex 56, August 26, 2014 email between M. Martorello, K. Wichtman, D. Gravel, and Giizhigookway) (emphasis added). During the discussions and negotiations for the

sale of Bellicose to become Big Picture, the intellectual property was referred to as the "secret sauce." LVD's lawyer made the comment:

> I wasn't recommending that [SourcePoint] disclose its secret sauce but only that [SourcePoint] will be willing to explain to the co-managers what exactly they [the managers] are approving.

Id.

All of this shows quite clearly that the key ingredient of the lending operation, the underwriting criteria or "secret sauce," was SourcePoint's,[11] not that of any Tribal Entity. And, the record shows that Martorello controlled the lending operations of LVD because, _inter alia_, he controlled the secret sauce (the key loan underwriting criteria), the linchpin to the lending operations.

In sum, the record establishes that the Plaintiffs have established, quite clearly, that the representations made to the Court about who controlled the LVD lending operations at Red Rock were not true. And, it is not disputed that Red Rock later was "rebranded" to become Big Picture. And, except for a few cosmetic changes (or "otpics" as Martorello described them), the LVD lending

---

[11] A wholly owned subsidiary of Bellicose, a company controlled by Martorello.

**SA61**

operation by way of Big Picture continued as it had under the Red Rock structure.

### 3.    Misrepresentations About Why Bellicose was Sold to LVD

In his declaration in support of the Tribal Defendants' Motion to Dismiss on the ground of sovereign immunity, Martorello swore that:

> [c]ontrary to the allegations of Plaintiffs, the <u>decision to sell Bellicose to LVD was not</u> <u>motivated by impending threats of litigation</u> <u>or enforcement action by government agencies</u>. Indeed much of the discussions as to the motivation behind the sales transactions described by the Plaintiffs' Complaint are nonsensical and are temporally problematic. Plaintiffs' claim there were certain 'motivating factors' for the sale which, in reality, occurred eighteen months to three years before the sale transaction closed.

ECF No. 106-1, ¶ 69 (emphasis added).  That representation was not true.

The record shows that the negotiations for the sale of Bellicose began in 2012 (Martorello Declaration, ¶ 49). Negotiations continued for four years.  Karrie Wicthman, counsel for LVD, testified that the sale "was a long, long, long negotiated transaction with many moving parts and many changes over a four year period."  (Defs Ex. 327, Wictman Depo. at 31:07-12).  Thus, although the terms of the sale changed over time, evolving from the sale of Bellicose's intellectual property (the so-called "secret sauce," which lay at the heart of the lending business),

**SA62**

to the sale of an ownership interest in Bellicose, and then to the
sale of Bellicose itself, those changes were all part of
Martorello's desire to evade liability by trying to use LVD's
sovereign immunity. And the motivation for the sale, contrary to
Martorello's declaration, were not distantly removed in time from
the consummation of the sale.[12]

What then, according to the record, was the motivation for
the sale of Bellicose to LVD? Some history is required to discern
the truth as to why Bellicose was sold to LVD.

Red Rock began operation in approximately 2011. In December
2012, slightly a year into the lending business, Martorello became
concerned about the liability presented by the Tribal lending
model. (ECF No. 788, Ex. 43, December 10, 2012 email from
Martorello to Arqyros).

These concerns were magnified when, on August 6, 2013, the
New York Department of Financial Services ("NYDFS") issued cease
and desist orders to 35 online lending companies, including Red
Rock, alleging violations of New York's usury laws. Shortly after
the issuance of the cease and desist orders, counsel for several

---

[12] At the July 21-22, 2020 hearing, Martorello sought to
characterize the sale discussions as occurring in three discreet
periods. However, Wichtman's testimony refutes that; Martorello's
own affidavit refutes it; and there is nothing in the record to
support Martorello's view. Nor, in his declaration, did Martorello
make any reference to the three different phases.

**SA63**

tribes, including LVD, had prepared for LVD's consideration the draft of a Complaint to be filed against NYDFS. (ECF No. 788, Ex. 45)

Rosette, counsel for LVD, wrote to Martorello recommending strongly that a lawsuit should be filed against NYDFS asserting that sovereign immunity rendered New York law inapplicable. Rosette urged that Red Rock should be part of that suit. Wichtman, counsel for the Tribe, shared that view in an email to Martorello. However, she made clear to Martorello that nothing would be filed "unless and until fully vetted with the Tribe and you." (ECF No. 788, Ex. 46, emphasis added).

Martorello expressed concern about joining the litigation and about the reaction of the regulators to such a lawsuit. Nonetheless, Martorello ultimately agreed to the filing of the lawsuit. Once he had given assent, it was filed on August 21, 2013.[13]

However, the tactic was unsuccessful and, in fact, it was counterproductive because the district court found that plaintiffs, including Red Rock, were "subject to the States' non-discriminatory anti-usury laws" because the "undisputed facts demonstrate" that the illegal activity was "taking place in New

---

[13] That evidence, of course, is highly probative of the extent of Martorello's control over the Tribe's lending operation.

**SA64**

York off of the Tribe's lands." <u>Otoe-Missouria Tribe v. N.Y. Dept.</u>
<u>of Fin. Servs.</u>, 974 F. Supp.2d 353, 361 (S.D.N.Y. 2013). On the
latter point, the district court noted that the plaintiffs, which
included Red Rock, had "built a wobbly foundation for their
contention" that the activity was occurring "on the Tribes' lands."
<u>Id.</u> at 360.

Under the then-existing structure of the Tribal lending
operation in the Red Rock mold, neither Martorello nor Bellicose
had any colorable claim of sovereign immunity. Thus, within two
days of the district court's decision in <u>Otoe-Missouria Tribe</u>,
Martorello wrote that the decision "presents a significant
liability for [Bellicose] and we do not believe that we should
service any New York loans." (ECF No. 788, Ex 49)

At this point, it is appropriate to note that the Tribal
Defendants argued in the Fourth Circuit that "there was no
evidence" that the restructure was intended to provide Martorello
or his companies with immunity."[14]  That, of course, is what
Martorello asserted in his declaration in support of the Tribal
Defendants' Motion to Dismiss on the ground of sovereign immunity
(¶ 69).

---

[14] United States Court of Appeals for the Fourth Circuit, oral
argument/listen to oral arguments, opening argument of William
Hurd, audio file at 13:35-14:30, http//www.ca4.uscourts.gov/
OArchive/mp3/1827-20190507.mps.

**SA65**

Contrary to the statement in Martorello's declaration to this Court and to the argument made to the Fourth Circuit, two weeks after the district court had decided <u>Otoe-Missouria Tribe</u>, Martorello sent an email to Rosette proposing a restructure of the lending arrangement with LVD for the purpose of protecting Martorello and Bellicose from liability arising out of the Tribal lending arrangement. The subject line of that email was "LVD to take ownership of Bellicose VI." One of the options presented was for "Bellicose to immediately assign LVD 51% of Bellicose via Equity only membership interest tied to the SPVI [Source Point Virgin Islands] subsidiary only." (ECF No. 788, Ex 50).[15] Importantly, Martorello's proposal included the requirement that the restructure would provide all entities with sovereign immunity protection.

Not long thereafter, Martorello once again explained to Wichtman his concerns over the liability created by the various pending investigations and legal actions against Rent A Tribe operations. In particular, Martorello told Wichtman that the result of affirmance of the New York ruling would be "certain death." He further said that "all vendors including [Source

---

[15] Source Point Virgin Islands, sometimes referred to as SPVI, was owned by Bellicose which was controlled by Martorello.

Point],[16] banks, ACH processors, bureaus, etc. would all obviously shut down if it were considered off reservation activity." (ECF No. 788, Ex. 52) Martorello commented, as well, upon his personal liability when he observed that class actions and "personal threats of enforcement action against individuals by regulators has everyone spooked." Id.

In subsequent communications between Martorello and Rosette, Martorello underscored the urgency of reaching an agreement to restructure his lending arrangement with LVD in the effort to secure sovereign immunity for Martorello and his entities that were central to the Red Rock lending activity.

> Clock is ticking before I end up in a Cash
> Call attack though, at which point, I think
> the deal is about dead.

(ECF No. 788, Ex 54) "Cash Call" was a decision arising out of Colorado in which a similarly structured lending operation and its owner had been held to have violated Colorado law. (ECF No. 788, Ex. 54).

In fact, after Martorello learned of the Cash Call ruling in Colorado, he wrote to Rosette stating:

> Let's zero in ASAP on minimizing my risk for
> being individually liable like CO [Colorado]
> just successfully did to Butch Webb . . . I
> don't want my company on anything that goes to
> the CFPB. This may mean DCTF [Duck Creek]

---

[16] A company owned by Martorello that was a key player in the Red Rock lending scheme.

> needs to do a lot more on [its] own including
> its compliance program.

ECF No. 788, Ex. 54 (emphasis added). Confronted with the email
communications described above, Martorello admitted that he "was
alarmed in 2012/13" about several court rulings against lenders
including in Colorado [Cash Call]. (July 21 Hearing Trans. at
122).

The record also reflects that Martorello told others with
whom he interacted during the applicable time that he was concerned
about the threat of litigation and the consequences thereof. For
example, Wichtman testified that Martorello was concerned about
Operation Choke Point, "a campaign initiated by the United States
Department of Justice to force banks to terminate their business
relationships with payday lenders." Advanced Am. Cash Advance
CTRS, Inc. v. FDIC, 251 F. Supp. 3d, 78, 79 (D.D.C. 2017).
According to Wichtman, Martorello's concerns were both operational
for the business ventures as well his personal liability. (Def Ex
327, Wichtman Dep. at 55:22-56:07). Rob Rosette, the lender/tribal
matchmaker and lawyer of LVD in the potential purchase of
Bellicose, observed that Martorello was motivated to sell because
he wanted to avoid a "CashCall type of attack." (July 21 Hearing,
ex. 142). And, in an email exchange with a business associate on
December 31, 2013, Martorello expressed his concern, stating

**SA68**

"Clock is ticking before I end up in a Cash Call type attack."
(July 21 Hearing, Ex. 43).

The record is thus clear beyond serious question that
Martorello was motivated to sell Bellicose to LVD because of the
threats of litigation and enforcement actions against him and his
entities under the then-current lending arrangement between him,
his entities, and LVD. Nonetheless, Martorello, at the evidentiary
hearing, testified that his motivations for the sale included "the
attractive offer that [he] received from the Tribes' Council and
the Tribe, and his wish to raise his child in the mainland United
States." (Hearing Trans. at 225:25-27:4) That testimony is simply
not credible in view of the substantial record written at the time
by Martorello and the evidence presented at the evidentiary
hearing. Nor, judged by his demeanor when testifying on the point
at the evidentiary hearing, can the Court accept Martorello's
testimony as credible.

**4.   Misrepresentation Respecting the Creation of Big Picture**

In support of the sovereign immunity argument and with respect
to the analysis to be made under applicable law,[17] the Court was
told that the Tribe created Big Picture "to be an online lending
business in order to bring revenue to LVD." (ECF No. 788., Ex.

---

[17] Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort,
629 F.3d 1173 (10th Cir. 2010).

40; ECF No. 788, Ex. 48, Hazen Declaration at ¶ 16)  The Court
also was told that "LVD began by creating Big Picture in August
2014."   (DEFENDANT BIG PICTURE LOANS, LLC'S FINANCIAL INTEREST
DISCLOSURE STATEMENT, ECF No. 38 at 5)  Additionally, Hazen, the
Chairman of the Tribe, was deposed and asked whose idea was it to
create Big Picture Loans.  Hazen responded that it was the Tribe's
idea.  (ECF No. 38, Ex. 33, at Hazen Depo. 34:4-8).  Hazen also
was asked who selected the name for Big Picture and she testified
that it was "kind of a group discussion."  (Id. at 38:7-9)  These
representations were made as part of the story presented to this
Court (and to the Fourth Circuit) to create the appearance that
LVD was the driving force behind the creation of Big Picture.
Martorello supported this story line in his declaration supporting
the Tribal Defendants' motion to dismiss on grounds of sovereign
immunity.  There, Martorello swore that:  "Neither I nor any
company I own or manage directed or controlled the creation of Big
Picture."  (ECF No. 106-1, ¶ 67).

    The record shows that the representations as to the overall
concept respecting the creation of Big Picture and the specific
representations made by Hazen and Martorello on the subject were
untrue.  In fact, the record shows that Martorello created the
entity, Big Picture Loans, at least a year before LVD says that it
created or formed the entity.  Specifically, the internet domain

name for Big Picture Loans was registered on September 18, 2013.
(ECF No. 788, Ex 59)    The record shows that Martorello and
Bellicose (one of Martorello's companies) had anticipated using
the Big Picture company with another tribe (not LVD) that was
located at Fort Belknap Indian Reservation (ECF No. 788, Ex 60)
However, the launch of the Fort Belknap enterprise had to be put
on hold.

Nonetheless, Martorello was able to put the entity and domain
in use in the lending operations of LVD.    In particular, in the
aftermath of the Otoe-Missouria decision in the district court in
New York, and, while that case was pending on appeal, Martorello
urged Wichtman, Hazen and Williams to "rebrand" Red Rock.    (ECF
No. 788, Ex 62)    In a memorandum in July 2014, Martorello observed
that Red Rock [which had been a party in the Otoe-Missouria case]
had been blacklisted and rolled through the mud in the press and
asserted that "it's time to get away from the word payday and the
black mark of [Red Rock] before rules come out and things get
hotter."    Id.    Accordingly, Martorello suggested forming "ASAP a
new LLC with a new domain/brand for purposes of transferring all
contracts, assets, bank accounts, liabilities, etc. over to the
new entities when ready."    Id.    Martorello urged that the parties
get moving on this project forthwith and volunteered that his

**SA71**

company, Bellicose, would facilitate the work. Id. The "rebrand" was Big Picture.

The evidence at the July 21-22 hearing also proved that Martorello registered the Big Picture website on September 18, 2013 (July 21-22 Hearing, Plfs Ex 33, September 18, 2013 Big Picture Loans domain registration). Then, on September 30, 2013, a vendor, hired by Martorello, created a full design and operational materials for Big Picture Loans which Martorello intended to use to add an Indian tribe other than LVD as a business partner (July 21, 2020 Hearing, Plfx Ex 35, September 20, 20103 email between M. Icardo, M. Hona A. Mein) ("Bellicose has procured additional tribal business with entities not related to LVD or Midletown-I.E. Fort Belknap (Big Picture Loans) and Chorus Loans.")[18]

The record thus proves the falsity of the assertions made in Martorello's declaration that "neither I nor any company I owned, managed, directed or controlled the creation of Big Picture" and

_____

[18] The record shows that Martorello also wanted LVD to buy Sourcepoint VI. But, if that did not work out, he was prepared to sell Sourcepoint to another tribe. As Martorello wrote:

> So here's what I'm thinking (for now) if we can't reach terms with LVD to buy SPVI, then SPVI will be sold to another tribe (likely Midletown).

(July 21, 2020 Hearing, Plfs Ex 53, August 25, 2014 email between M. Martorello and R. Rosette).

33

**SA72**

"neither I, nor Bellicose, helped form Big Picture." (ECF No. 106-1, Martorello Decl. ¶¶ 67 and 102). And, the record shows convincingly that Big Picture was not created by LVD as the result of the Tribe's years of knowledge and business acumen related to online lending. In fact, Big Picture was created by Martorello for use with a different tribe and, when that fell through, Big Picture, at Martorello's instruction, was used to rebrand Red Rock. In other words, the record shows convincingly that Martorello was the driving force in the creation of Big Picture and Ascension, just as he was in the creation of Red Rock.

In sum, the record convincingly confirms that misrepresentations respecting the genesis of Big Picture were made by Martorello and Hazen. Those misrepresentations were presented to, and relied on, by this Court in making its factual findings which were undisturbed by the Court of Appeals.

## THE EFFECT OF THE MISREPRESENTATIONS

To analyze whether the Tribal Defendants (Big Picture and Ascension) shared LVD's sovereign immunity, this Court and the Fourth Circuit used the test in <u>Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort</u>, 629 F.3d 1173 (10th Cir. 2010). <u>Williams v. Big Picture Loans, LLC</u>, 929 F.3d 170, 177 (4th Cir. 2019). "Those non-exhaustive factors are: (1) the method of the entities' creation; (2) their purpose; (3) their structure,

**SA73**

ownership, and management; (4) the tribe's intent to share its sovereign immunity; (5) the financial relationship between the tribe and the entities; and (6) the policies underlying tribal sovereign immunity and the entities' connection to tribal economic development, and whether those policies are served by granting immunity to the economic entities." Williams v. Big Picture Loans, LLC, 929 F.3d 170, 177 (4th Cir. 2019) (quoting Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort, 629 F.3d 1173, 1187 (10th Cir. 2010)) (internal quotation marks omitted). The Fourth Circuit adopted the first five of these factors. Williams v. Big Picture Loans, LLC, 929 F.3d 170, 177 (4th Cir. 2019). As to the "sixth Breakthrough factor, the Fourth Circuit held that whether the purposes underlying tribal sovereign immunity would be served by granting an entity immunity, overlaps significantly with the first five Breakthrough factors. Thus, the extent to which a grant of arm-of-the-tribe immunity promotes the purposes of tribal sovereign immunity is too important to constitute a single factor and will instead inform the entire analysis." Williams v. Big Picture Loans, LLC, 929 F.3d 170, 177 (4th Cir. 2019).

In one way or another, the misrepresentations now proved by the record are related to the Breakthrough factors and thus to the determination whether the Tribal Defendants shared the sovereign immunity of LVD. The four misrepresentations pressed by the

Plaintiffs, individually and taken as a whole, are relevant to determining:

>    (1)   the method of creation of the entities (Big Picture and Ascension);
>
>    (2)   the purpose for the creation of those entities;
>
>    (3)   the structure, ownership and management of those entities;
>
>    (4)   the intent of LVD in creating the entities;
>
>    (5)   the financial relationship between the Tribe and those entities;
>
>    (6)   the policies underlying tribal sovereign immunity and the connection of those entities to LVD economic development and whether those policies are served by granting LVD's sovereign immunity to those entities.

The record shows that the misrepresentations produced significantly erroneous findings by this Court. Williams v. Big Picture Loans, LLC, 329 F. Supp.3d 248, (E.D. Va. 2018). Reviewing the findings made by this Court in Williams v. Big Picture Loans, LLC, 329 F. Supp.3d 248, 253-265 (E.D. Va. 2018), in perspective of the record made on the topic of the misrepresentations both in the exhibits and in the evidentiary hearing, the Court concludes that had the facts not been misrepresented to it, there are certain findings that simply could not have been made. Thus, the Court could not have found that:

**SA75**

> The company was managed by two members of the
> Tribe.

_Williams_, 329 F. Supp.3d at 255.

Nor could the Court have found that:

- Red Rock subsequently decided to contract
  with an outside entity to better learn the
  lending industry.  The Tribe had identified
  Martorello has a potential consultant in
  mid-2011, but he was not involved in the
  creation of Red Rock.

_Williams_, 329 F. Supp.3d at 255.

- In     addition,    aside    from    these
  distributions,  Red   Rock   received   and
  retained  ownership  of  all  intellectual
  property development under the Servicing
  Agreement by SourcePoint.

_Williams_, 329 F. Supp.3d at 256.

- Final determination as to whether to lend
  to a consumer rest[ed] with [Red Rock].

_Williams_, 329 F. Supp.3d at 257.

- All decisions about operations were made by
  Red Rock's managers . . . or that Red Rock's
  co-managers were ultimately responsible for
  all   decisions   regarding   Red   Rock's
  operations.

_Williams_, 329 F. Supp.3d at 257.

- Martorello,  Bellicose  and  SourcePoint
  never, on Red Rock's behalf, made lending
  decisions;  originated  a  consumer  loan;
  purchased a loan originated by Red Rock; or
  took any action to collect a Red Rock loan.

_Williams_, 329 F. Supp.3d at 257.

37

**SA76**

- After 2011, through its operation of Red
  Rock and relationship with Bellicose and
  Martorello, the Tribe gained knowledge of
  the online lending industry . . . the Tribe
  wanted to apply that knowledge to expand
  its online lending platform and increase
  profitability for the Tribe, employ more
  Tribal members, and acquire its vendors'
  businesses so the Tribe would earn more
  money.

Williams, 329 F. Supp.3d at 258.

- LVD Council organized Big Picture, was
  'meant to serve as an independent Tribal
  lending entity,' that 'would ultimately
  consolidate the business of the Tribe's
  other lending entities, Red Rock and Duck
  Creek Financial, LLC.

Williams, 329 F. Supp.3d at 258.

- [Martorello] never provided any consulting
  services to Big Picture or Ascension;
  suggested marketing strategies,
  underwriting criteria or other policies to
  them; accessed any of their software
  systems, databases, bank accounts, or
  records, or hired or fired their employees.

Williams, 329 F. Supp.3d at 263.

Further, the entire section of the opinion describing Big Picture's lending process, Williams, 329 F. Supp.3d at 264, was materially erroneous because of the misrepresentations.

The established misrepresentations strongly suggest that the Fourth Circuit's decision on the Tribal Defendants' entitlement to share LVD's sovereign immunity is open to question. But, that is not a matter for this Court to decide.

SA77

However, in analyzing all pending and future motions in which Martorello argues that his position is supported by the Fourth Circuit's decision, this Court will now be required to take into account the record about the misrepresentations and the findings about them that are made herein.[19] And, now that the record on the misrepresentations has been made, the Court will turn to the various pending motions and this record is available to help resolve those motions.

It is so ORDERED.

/s/ _____

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: November 18, 2020

---

[19] As the Plaintiffs correctly point out, the Fourth Circuit's decision on sovereign immunity does not confer on Martorello the immunity claimed by the Tribal Defendants. When, and as, it becomes necessary to assess that question, the record on the misrepresentations is now available.

39

**SA78**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Richmond Division**

| | |
|---|---|
| **LULA WILLIAMS, *et al.*,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| **v.** ) | **Civil Action No. 3:17-cv-461 (REP)** |
| ) | |
| **BIG PICTURE LOANS, LLC, *et al.*,** ) | |
| ) | |
| **Defendants.** ) | |

### MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS THAT MARTORELLO CLAIMS ARE COVERED BY THE WORK-PRODUCT DOCTRINE

Pursuant to the Court's order (ECF No. 954), Plaintiffs, by counsel, move the Court to compel Defendant Martorello to produce documents that he claims are covered by the work-product doctrine. The Court should order production of the documents for four reasons.

First, Martorello has not established that any of the communications on his privilege logs were prepared in anticipation of litigation. Indeed, Martorello has specifically and repeatedly disclaimed that any actions taken in furtherance of the usurious lending scheme were done in anticipation of litigation, including the sale of his company Bellicose Capital to the Tribe. Because none of the communications were prepared in anticipation of litigation, the communications cannot be shielded form discovery under the work product privilege.

Second, Martorello has waived any work-product protections for the documents on his privilege logs due the inadequacy of the logs. The logs do not comply with Fed. R. Civ. P. 26(b)(5) and do not provide an adequate description of the documents to assess whether the assertion of work-product is appropriate under the circumstances. There is no excuse for the inadequacy of the logs, and waiver is an appropriate sanction.

Third, because Martorello intends to rely on attorney advice for his good faith defense, Martorello has waived work product protections for both fact and opinion work product.  As shown repeatedly throughout this litigation. Martorello intends to argue that he relied on the expert opinions of his lawyers regarding the legality of his business.  Ex. 1 at Int. Nos. 13 and 15. Martorello cannot use the attorney-client privilege as both a sword and shield to selectively disclosure certain communications but not others.  The same reasoning applies to attorney work product, both fact and opinion work product.

Fourth, Martorello is unable to claim work product protections for fact work product because he has forfeited that right under the crime/fraud exceptions.  Under binding Fourth Circuit law, when a client engaged attorneys in furtherance of a crime, work product protections are lost for fact work product.  With respect to opinion work product, the party seeking the documents needs to show that the attorneys were involved in the furtherance of the illegal activity.  Here, all of the lawyers involved knew the nature of the lending business and scheme, are well versed in tribal lending, and knew that the lending scheme at issue was designed to avoid the application of state usury laws.

Thus, Plaintiff moves to compel (a) all documents withheld on Martorello's privilege logs on work product grounds, and find a waiver for work product regarding: (i) the legality of the tribal business model, (ii) the legality of LVD's lending operations, (iii) the restructure (including the reasons for including and related negotiations surrounding the contractual provision that requires the destruction of Bellicose Capital's documents and records), and (iv) any litigation involving any similar business models, including but not limited to any litigation involving CashCall, John Reddam, Scott Tucker, Charles Hallinan, Think Finance, and Kenneth Rees.

## BACKGROUND[1]

As this Court observed in its November 18, 2020 opinion, the facts of this case "have their genesis in the efforts of so-called payday lenders to evade state usury laws by using as loan conduits, national banks, which by virtue of the National Bank Act, 12 U.S.C. § 85, are exempt from the interest rate caps set by state laws." Mem. Op., ECF No. 944 at 4. Those "Rent-A-Bank" schemes were abandoned "when federal regulators intervened and put a stop to them." *Id.* Subsequently, "payday lenders then segued into the so-called 'Rent A Tribe' scheme," which "used Native American tribal entities (rather than banks) as the nominal lender." *See* Mem. Op., ECF No. 944 at 4 (defining a "Rent A Tribe" scheme).

"In 2008, Martorello became involved in payday lending using a company" that would make loans in violation of United States usury laws that "were to be governed by the laws of Costa Rica." Mem. Op., ECF No. 944 at 4. Subsequently, in 2011 Martorello became interested "in working with Native American tribes" at an online lending conference. Ex. 2, Merritt Dep. 31:3-4; 93:16-20; *see also* Mem. Op., ECF No. 944 at 4. Martorello "sought out a connection with the LVD so that he could get into the Tribal lending business," which led to "the formation of Red Rock Tribal Lending ('Red Rock') and Duck Creek Tribal Lending ('Duck Creek')." *See* Mem. Op., ECF No. 944 at 4, 11. "Martorello understood that his company, Bellicose, would operate the lending business in which Red Rock was to be engaged completely" and that the Tribe's managers would play a "rather meaningless role." *Id.* at 14.

---

[1] While not identical, there is substantial overlap in the analysis of whether attorney-client privilege was waived and whether work-product privilege was waived.  The factual background set forth herein is the same as in Plaintiffs' brief regarding waiver of attorney-client privilege.

A.   **Martorello's Rent a Tribe business is based on a misguided belief that the loans would be exempt from state usury laws so long as the final act of loan origination occurred on the reservation.**

The cornerstone of the Rent A Tribe business model is the misguided opinion that usurious loans are exempt from state usury restrictions so long as a tribal entity serves as a nominal lender by the delegation of loan originations to the tribal entity. Martorello created the Rent A Tribe business challenged here under this erroneous belief. This is demonstrated in Martorello's emails with Robert Rosette and Flint Richardson.

Martorello's interest in Tribal lending, led him to Robert Rosette, who was "a very well-known attorney in that space." Ex. 2, Merritt Dep. at 28:16-21; 32:7-11. In August 2011, Martorello received a draft of the initial agreement providing the structure for the tribal lending enterprise. *See* Ex. 3 at Rosette_Revised_052504, Aug. 25, 2011 E-mail from Martorello. After reviewing the draft of the "servicing" agreement, Martorello asked several questions to Rosette and his business partner, Flint Richardson, about this new business model. *Id.* at 052501. One of those questions was whether "the Tribal Lending entity" would have "a Tribal Management Company, which is going to be the Bellicose customer[?]" *Id*. In response, Richardson said "NO," and clarified that Martorello's "ENTITY WOULD BE THE SERVICER FOR THE LENDING OPERATION. THE LLC MANAGERS ARE MANAGERS OF THE LLC ENTITY ON BEHALF OF THE TRIBE BUT ARENT INVOLVED IN THE BUSINESS." *Id*. at 052500 (caps in original). And, when asked by Martorello to further elaborate on this point, Richardson explained that "REPRESENTATIVES FROM THE TRIBE ARE THE LLC'S 'MANAGERS'. THE SERVICER, BELLICOSE OPERATES THE BUSINESS COMPLETELY." *Id*. at 052498. In their view, this structure was legitimate because the "cornerstone of the sovereign model," Richardson explained, was the delegation of "Loan Originations" to the tribal lending entity. *Id*.

at 052497. Delegating originations to the tribal lender, according to Richardson and Rosette, purportedly exempted the loans from state interest rates. *Id*. at 052497.

Richardson's e-mail is consistent with the LVD's understanding that it would "have no risk" in Martorello's Rent A Tribe business. *See* Ex. 4 at ¶ 1. The sworn declaration of Joette Pete, who served as the Vice Chairwoman of the Lac Vieux Desert Band of Lake Superior Chippewa Indians explained: "When Tribal Council initially agreed to the deal with Martorello," they "understood that **all aspects of the lending business would be handled by Martorello** and that **the Tribe would have no risk**. It was understood that **Martorello's company would handle everything**, including underwriting, marketing, servicing, funding, and collection of the loans." *Id*. at ¶ 3 (emphasis added).

### B.    The business was initially structured in a manner to give Martorello complete control and the vast majority of the profits.

Earlier in the litigation, Martorello portrayed himself to the Court as a mere consultant who was not involved in the formation of Red Rock and had little control over the Rent a Tribe business. *See* Mem. Op., ECF No. 944 at 8-9, 13-14. However, the record now shows that this was untrue. As the Court recently found, Martorello "was heavily involved in the creation of Red Rock," and he "understood that his company, Bellicose, would operate the lending business in which Red Rock was to be engaged completely." *Id.* at 9, 14.

Martorello chose the name "Red Rock," and he and his counsel prepared and reviewed the formational documents before they were sent to Tribal Council for approval. *Id.* at 9-10. On October 25, 2011, Martorello's company, Bellicose VI, LLC, executed the "servicing agreement" with Red Rock Tribal Lending, LLC, giving Martorello almost exclusive control over Red Rock's

operations. *See generally* Ex. 5, Oct. 25, 2011 Servicing Agreement.[2] Martorello not only had the

contractual authority to control the lending business, but as detailed by the former Tribal Vice

Chairwoman: "[a]fter the inception of the business, it was operated completely by Martorello until

government regulators and litigation against competitors began. As these cases proceeded, efforts

were made to create the appearance of the Tribe's involvement, but the Tribe had no substantive

involvement." Ex. 4 at ¶ 4; *see also* Mem. Op., ECF No. 944 at 15. Although the Tribe's co-

managers held titles supposedly giving them a voice in Red Rock's lending operation, the co-

managers actually played a "rather meaningless role" with limited involvement in or knowledge

about the lending enterprise. Mem. Op., ECF No. 944 at 14. "Neither the establishment of the

actual underwriting criteria for making the loans nor the decision actually to make them (or not)

---

[2] For example, the contract provided that Bellicose VI "shall have the authority and responsibility over all communication and interaction whatsoever between [Red Rock] and each service provider, lender and other agents of [Red Rock]." Ex. 5 at § 3.1; *see also id.* at § 4.1.1 (granting Bellicose VI "the necessary power and authority to act in order to fulfill its responsibilities" under the contract). Consistent with Bellicose VI's "authority and responsibility over all communication and interaction whatsoever" between Red Rock and others, the contract further specified that Bellicose VI was responsible for: (1) selecting and negotiating with service providers and lenders; (2) "[d]evelopment and promotion of sound and positive business relationships," including "the enforcement or termination of agreements with such service providers and lenders;" (3) preparation of regulatory, compliance, training, education, and accounting standards, as well as standards for "screening and review of" "website contents, marketing and consumer relations practices;" (4) providing "pre-qualified leads" and the "credit-modeling data and risk assessment strategies;" (5) oversight of Red Rock's call center in the Philippines; and (6) sales to third-party debt collectors. *Id.* § 4.2.1.

     Bellicose VI also had the authority to "collect all gross revenues and other proceeds connected with or arising from the operation" of Red Rock. *Id.* § 4.9. Bellicose VI also had the contractual right to "sweep [Red Rock's] bank account amounts into [SourcePoint's] bank accounts" to receive its share of the proceeds. *Id.* § 3.5. Bellicose VI had "sole signatory and transfer authority over such bank accounts." *Id.* §§ 3.5; 4.4. The Court recently summarized findings on this issue: "money paid by consumers went into the Bellicose bank account over which only Martorello and his employees had control and access. (Dkt. 944 at 16.)

was done by the Tribal entity or by its employees." *Id*. at 15. In fact, the relevant "intellectual property was kept by Martorello's company, SourcePoint, and was not known by, or available to, the Tribal entities that nominally were making the loans at issue." *Id*. at 18. In other words, "the key ingredient of the lending operation, the underwriting criteria or 'secret sauce' was SourcePoint's, not that of any Tribal Entity." *Id.* at 22. In exchange for running virtually all aspects of the business, Bellicose VI received 98% of the net income collected on the loans. Ex. 5 at §§ 2.25; 3.5.1. By contrast, Red Rock received 2% of the net revenue from the loans, less charge offs.[3] *Id.* § 2.25.

### C.    Martorello becomes concerned about the legality of the Tribal lending model.

As early as December 2012—a little over a year into the business—Martorello had concerns about the viability of the tribal lending model. Ex. 6 at Martorello_038990; *see also* Mem. Op., ECF No. 944 at 24. In an e-mail from December 2012 to a business valuation expert, Martorello wrote that he had "some urgent questions" for them "on valuation" of his business. Ex. 6 at Martorello_038990. Among other things, Martorello asked how to value illegal businesses, such as online poker sites, medical marijuana stores, and a drug cartel. *Id*. Martorello further added that "[t]his industry is going to be living in the grey area of its legality for another year or two," and that they had already "received dozens of letters from State AGs saying we need to be licensed and sending Cease and Desist orders." *Id*., 038991. In Martorello's view, there was "no business with such risk to it" as the tribal lending model, and the "[b]ottom line" was that "this business

---

[3] However, Red Rock's compensation was reduced by 50% to pay a brokerage fee to another company owned by Rosette, Tribal Loan Management, LLC. *Id.* § 7.15. Rosette's 50% brokerage fee was paid directly by Bellicose VI. *Id.* ("[Red Rock] has authorized that fifty percent (50%) of the Tribal Net Profits due to the Tribe pursuant to Section 3.5.1 with the minimum set forth therein be paid directly to Tribal Loan Management, LLC by [Bellicose VI] on behalf of [Red Rock][.]").

will simply not exist in 2 to 3 years," at least how it did then. *Id*. In addition to this risk, Martorello further explained that Greenberg Traurig provided him with a 20-page legal opinion, concluding that Martorello could be liable "for aiding and abetting felony crime[s]" in states like Georgia. *Id*. The term of the arrangement between Martorello and Red Rock was supposed to last until December 31, 2018, per an express term of the Servicing Agreement, Ex. 5 at § 3.2, but Martorello knew it would not make it more than "2 to 3 years." Ex. 6 at 038991. As early as April 2013, Martorello began e-mailing Rosette about restricting the arrangement to reduce Martorello's liability, writing: "Let's zero in asap on minimizing my risk for being individually liable like [Colorado] just successfully did to Butch [W]ebb." Ex. 7 at Rosette_Revised_048497.

Over the next six months, regulators continued to threaten to take action to stop Red Rock's illegal business practices. *See, e.g.*, Ex. 8, May 2013 Ltr. from Conn. Dep't of Banking. "These concerns were magnified when, on August 6, 2013, the New York Department of Financial Services ("NYDFS") issued cease and desist orders to 35 online lending companies, including Red Rock, alleging violations of New York's usury laws." Mem. Op., ECF No. 944 at 24; *see also* The Official Website of New York State, Press Room, *Cuomo Administration Demands 35 Companies Cease and Desist Offering Illegal Online Payday Loans That Harm New York Consumers* (Aug. 6, 2013), *available at* https://www.governor.ny.gov/news/cuomo-administration-demands-35-companies-cease-and-desist-offering-illegal-online-payday-loans. Unlike other letters from state regulatory authorities, the NY DFS posed the biggest threat as it also sent letters to 117 banks and the National Automated Clearinghouse Association, requesting that "they work with DFS to cut off access to New York customer accounts for illegal payday lenders." *Id*.

Six days after the issuance of the cease and desist, Rosette had already drafted a complaint against the NY DFS "for LVD's consideration." Ex. 9 at Rosette 041064; *see also* Mem. Op., ECF

No. 944 at 25. In his e-mail to Martorello, Rosette—who was receiving 50% of Tribal profits for brokering the partnership—wrote that he "believe[d] strongly if we do nothing we may forever lose the tribal online lending opportunity." Ex. 9 at Rosette 041064 In a separate e-mail to Martorello, Karrie Wichtman, the Tribe's lawyer, echoed these concerns, writing "what do we achieve by laying low waiting for the next bomb to drop - hoping that it doesn't blow us up?" Ex. 10 at Rosette_Revised_049126.

"Martorello expressed concern about joining the litigation and about the reaction of the regulators to such a lawsuit." Mem. Op., ECF No. 944 at 25; *see* Ex. 10 at Rosette_Revised_ 049125. According to Martorello, the filing would "open the doors" and result in "counter attacks from all sides," and it would be "game over really quick." Ex. 10 at Rosette_Revised_ 049125. Additionally, Martorello added that the "LVD's house" was not "completely in order yet," which was a concern he raised on multiple occasions. *Id*. Because of Martorello's dominance over operations, he further cautioned that "LVD" did not "represent the best facts" at the moment because they were not originating the loans on the reservation. Ex. 11 at Rosette_Revised_046605. Ultimately, Martorello became comfortable enough with the lawsuit, and it was filed on August 21, 2013, including a request for a preliminary injunction to prevent the NY DFS from interfering with the lending operation.

As Martorello had feared, the lawsuit backfired—the district court not only denied Red Rock's motion for a preliminary injunction, but its findings jeopardized the entire business model and opened Martorello to potential prosecution. *See* Ex. 12 at Rosette 006304-5. Most notably, "the district court found that plaintiffs, including Red Rock, were 'subject to the State's non-discriminatory anti-usury laws' because the 'undisputed facts demonstrate' that the illegal activity was 'taking place in New York, off of the Tribe's lands.'" Mem. Op., ECF No. 944 at 25-26

(quoting *Otoe-Missouria Tribe v. N.Y. Dep't of Fin. Servs.*, 974 F. Supp. 2d 353, 361 (S.D.N.Y. Sept. 2013)). The court further noted that Red Rock "built a wobbly foundation for their contention" that the activity was occurring "on the Tribes' lands," and contrary to their argument, consumers did not "in any legally meaningful sense, travel[] to Tribal land." *Otoe-Missouria Tribe v.*, 974 F. Supp. 2d at 360.

Two days after the ruling, Martorello wrote that the decision "presents a significant potential liability for [Bellicose] and we do not believe that we should service any new New York loans." Ex. 12, Rosette 06304-5. Martorello further added that they were willing to see existing loans through completion, "but [they] simply cannot flaunt the clear ruling from Judge Sullivan's order, however legally incorrect it might be." *Id*. Martorello expressed concern that the "finding that tribal enterprises are subject to New York's anti-usury laws will be regarded as sufficiently final… such that it will precipitate their potential investigation and potential prosecution of us personally and our companies if we continue" to conduct business in New York. *Id*.

> **D.    Two weeks after the district court's decision, Martorello contacts Rosette regarding a potential restructure to provide immunity to all entities involved in the illegal enterprise.**

Two weeks after the district court's decision, Martorello approached Rosette about a possible restructure of the business to protect Martorello/Bellicose. *See generally* Ex. 13. Martorello has misrepresented to this Court that he was motivated to sell Bellicose to LVD because of "the attractive offer" he received from the LVD. *See* Mem. Op., ECF No. 944 at 30. However, this Court found that this testimony was "simply not credible" and that "Martorello was motivated to sell Bellicose to LVD because of the threats of litigation and enforcement actions against him and his entities." *Id.*

In an e-mail dated October 14, 2013, with a subject matter entitled "LVD to take ownership

of Bellicose VI," Martorello presented options for a restructure so that Bellicose could attempt to share in the LVD's immunity. *Id*. Martorello proposed that Bellicose would "[a]ssign today LVD 51% of Bellicose via Equity only membership interest tied to the SPVI subsidiary only." *Id*. (underline in original). Additionally, Martorello also proposed assigning 51% of the interests in his other businesses involved in the scheme. *Id*. Anticipating the business would be shut down, Martorello further proposed that BlueTech, his trust, would "own 49% equity, but 100% profits interests until month 49," *i.e.*, ensuring Martorello would retain the profits until the business was gone. *Id*. Martorello's e-mail candidly explained that the transaction must be "structured to provide all entities sovereign immunity." *Id*. Thus, Martorello proposed "the restructure of the lending arrangement with LVD for the purpose of protecting Martorello and Bellicose from liability arising out of the Tribal lending arrangement." Mem. Op., ECF No. 944 at 27.

Martorello also sent a similar e-mail to the members of LVD's Tribal Council, entitled "SPVI Equity Transfer to LVD." Ex. 4 at JPB 00988. Martorello wrote: "Below is the beginning of a concept I have to facilitate a transition to LVD of MY businesses." *Id*. This concept, as described by Martorello, was to "[a]ssign today to LVD – 51% of Bellicose VI, LLC," but "0% profits interest" until four years after the restructure. *Id*. Martorello further added: the "Current Manager (myself) will be locked in as the decision maker for 48 months, at which point they will hire a new Manager to replace me." *Id*. According to the former Vice Chairwoman of LVD, this e-mail was "the first time [they] were ever presented with the opportunity 'to own' the business, but it would still be controlled by Martorello as proposed." Ex. 4 at ¶ 9.

Martorello continued to voice "his concerns" to Wichtman "over the liability created by the various pending investigations and legal actions against Rent A Tribe operations. Mem. Op., ECF No. 944 at 27. For example, Martorello noted that vendors and debt providers of Red Rock

were "asking what would happen to everything if the ruling in NY were upheld[?]" Ex. 14. The repercussions, according to Martorello, would be "certain death" and "all vendors including [SourcePoint], banks, ACH processors, bureaus etc would all obviously shut down if it were considered off reservation activity[.]" *Id*. Martorello added that "class actions" and "personal threats of enforcement actions against individuals by regulators" have "everyone spooked," causing "several of the biggest servicers" to "shut down." *Id*. In closing, Martorello proclaimed "[d]esperately hoping that Rule 19 works and a favorable outcome on the appeal!" *Id*.

On November 8, 2013, Martorello sent a similar e-mail to Wichtman, noting that SourcePoint was "about to be discovered and will need extreme resources to defend itself against all kinds of aiding and abetting and 'true lender' claims" coming in the first quarter of 2014. Ex. 15 at Rosette_Revised_052787. And similar to his earlier emails, Martorello reiterated that there was a "very significant possibility that should we even survive long enough to get there," he would need "to defend [him]self even personally (in more than civil matters), with no ongoing business or revenue at all should the decision be made in the appeal that the activity is in fact OFF reservation (a certain end to the industry)." *Id*. (capitals in original).

### E.   In December 2013, Rosette circulates a memorandum regarding a potential restructure to provide Martorello's entities with sovereign immunity, while Martorello's concerns grow.

On December 30, 2013, Rosette circulated a legal memorandum regarding Martorello's proposed transaction, analyzing "whether formation of a new entity that is co-owned by the Tribe and Source Point and subject to the proposed profit, management and voting controls" suggested by Martorello would be "sufficient to pass muster with the 'arm of the tribe' test to extend the Tribe's sovereign immunity from suit to the new LLC." Ex. 16 at Rosette_Revised_052248. On proposed changes to the structure, Martorello commented that the tribe's percentage of ownership of the company "could easily be increased to whatever the benchmark of confidence is, since

equity and profits interest differ." *Id*. at 052247. He further added that he did not think "100%"

ownership was "out of reach," and "some caveats could simply be made." *Id*. Martorello, however,

took issue with Rosette's proposed revenue changes, writing "10% [to the tribal entity] certainly

isn't going to work from a business standpoint," and he "might as well be a state licensed lender,

as a comp[arison]." *Id*. Martorello also rejected Rosette's proposed management structure, writing

"[a]ll the investors (institutional, personal, and myself) won't allow the deal to occur without being

100% certain adequate [m]anagement resources are in control," *id*. at 052248, *i.e.*, unless non-

tribal members like Martorello continued to have final say over operations. And if challenged,

Martorello explained that "[w]hat I think you'd tell a court" is "that if the deal were not done,"

then the tribe would not know: (1) "if SPVI would be around in 10 days given the industry," (2)

execute "its termination provision in accordance with the" servicing agreement, or (3) "hike rates

as risk has gone through the roof with detractors now seeking out SPVI's of the world for major

attacks." *Id*. at 052247. Martorello stressed the deal's urgency, writing:

> **Clock is ticking before I end up in a Cash Call type attack though, at which
> point, I think the deal is about dead.**

*Id*. at 052248 (emphasis added).

A few days after receiving Rosette's memorandum analyzing the potential transaction,

Martorello sent an e-mail regarding the Consumer Financial Protection Bureau's civil complaint

against CashCall, which was filed on December 16, 2013. *Consumer Fin. Protection Bureau v.

CashCall, Inc.*, No. 1:13-cv-13167 (Mass) (complaint filed on Dec. 16, 2013). Ex 17. In this e-

mail, Martorello characterized the CFPB's position as "without question a major attack on legit

tribal lending operations." *Id*. at LVD-DEF00018128. Martorello's e-mail also expressed concern

with cooperating with the CFPB's investigative demands, explaining that it would "come with an

almost identical suit against the [tribal lending entities] as they just did against Cash Call." *Id*. at

00018129. If an "attack" on the Red Rock operation happened, Martorello warned, "the stakes are very literally everything." *Id*. at 00018128.

Less than a week later, things got worse for the industry and Martorello when the Department of Justice announced a consent decree with a major ACH provider. *See generally* Ex. 18 at Rosette_Revised_052155. Rosette described this consent decree as "the most disastrous result we have seen yet," and he predicted that he "would not be [] surprise[d] if we lost the last remaining banks and ach processors servicing tribal accounts after reading the consent decree." *Id*. Sure enough, the enterprise lost its only ACH processer the following day, which "obviously ha[d] major implications for [M]att since he ha[d] no other processors." Ex. 19. And, when Martorello attempted to hire another processor, one bank explained that they were told "if the bank so much as processes a single transaction [t]he DOJ will be relentless in shutting them down under the full weight of the US government." Ex. 20 at Rosette 036580-2. By this time, Red Rock had also received more than a dozen warnings from state attorney generals' offices. Ex. 6 at 038991.

Thus, "[t]he record also reflects that Martorello told others with whom he interacted during the applicable time that he was concerned about the threat of litigation and the consequences thereof." Mem. Op., ECF No. 944 at 27.

### F.    Martorello pushed for re-branding of Red Rock to Big Picture Loans, a lending platform he had already developed.

Earlier in the litigation, Martorello and the Tribe represented to the Court that the Tribe "was the driving force behind the creation of Big Picture." Mem. Op., ECF No. 944 at 30-31. However, the record now reflects that these representations "were untrue" and that "Martorello created the entity, Big Picture Loans, at least a year before LVD says that it created or formed the entity." *Id.* at 31-32. Indeed, as further discussed below, "the record shows convincingly that Martorello was the driving force in the creation of Big Picture and Ascension, just as he was in the

creation of Red Rock", and "except for a few cosmetic changes (or 'optics' as Martorello described them), the LVD lending operation by way of Big Picture continued as it had under the Red Rock structure." *Id.* at 22-23, 34.

Email communications demonstrate that Martorello was the driving force behind the creation of Big Picture. For example, Martorello e-mailed Hazen and Wichtman in July 2014, urging that Red Rock "needs a rebrand." Ex. 21 at Rosette_Revised_058409. Martorello further explained that "RRTL ha[d] been blacklisted and rolled through the mud in the press" following the *Otoe-Missouria* decision. *Id*. He added that "it's time to get away from the word '[p]ayday' and the black mark of RRTL before rules come out and things get hotter." *Id*. To accomplish the rebrand, Martorello suggested "forming ASAP a new LLC with a new domain/brand, for purposes of transferring all contracts, assets, bank accounts, liabilities etc. over to the new entities when ready." *Id*. Martorello's e-mail concluded that Bellicose would "gladly facilitate the work," but it needed "the entity formed and approv[ed] to begin doing" the rest of the work. *Id*. Shortly thereafter, Martorello had "the work and imaging done for ChorusLoans." *Id*. at 058407. Martorello further claimed that "[d]omain names in this space" were "very very rare and hard to come by" and "trying to get a [trademark] to protect it from competition" was "another issue," and "SPVI did a lot of work" to create "Chorus[.]" *Id*. On August 25, 2014, Martorello e-mailed Wichtman that "Chorus has been sold." Ex. 22 at Rosette 043437. But Martorello had "another really great brand" known as Big Picture Loans. *Id*. In this e-mail, Martorello attached a document, "Big Picture Site Designs," showing a fully developed website and brand for Big Picture. *Id*. at 043437-57. Wichtman, who was drafting the resolution for approval by tribal council, responded, "Which one do you want me to use?" *Id*. at 043435. It was left up to Martorello to decide on "BigPictureLoans.com." *Id*. The following day, Wichtman presented a resolution for the creation

of Big Picture, as well as approving its Articles of Organization and Operating Agreement. Ex. 23, Resolution # T2014-066 ("the Council has been presented with Articles of Organization and an Operating Agreement for the tribally chartered business entity to be known as Big Picture Loans, LLC….").

### G.    Restructuring became urgent after the Second Circuit's decision.

Over the next month, the parties did not make significant progress on the key terms or mechanics of the sale, but on October 1, 2014, it became urgent when the Second Circuit affirmed the district court's decision in *Otoe-Missouria*. In doing so, the Second Circuit made several damaging findings, including that "New York's usury laws apply to all lenders, not just tribal lenders[.]" *Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 769 F.3d 105, 117 (2d Cir. 2014). The Second Circuit also observed that "Native Americans 'going beyond the reservation boundaries' must comply with state laws as long as those laws are 'non-discriminatory [and] … otherwise applicable to all citizens of that [State]." *Id.* (citations omitted). Against this backdrop, the Second Circuit observed that "[m]uch of the commercial activity at issue takes place in New York." *Id.* It reached these conclusions even though LVD/Red Rock never disclosed to the district court or Second Circuit the role of Martorello's companies in the operations.

After the Second Circuit issued its decision, Martorello wrote an e-mail to Wichtman on October 10, 2014, urging her to drop the case. Ex. 24 at Rosette 043659 ("I can't urge any stronger that LVD not proceed even if [O]toe does."). Martorello also indicated that "SPVI won't be willing to testify, or do anything as the result of another filing will certainly end in a slew of attacks on me, SPVI and my team." *Id.* Ultimately, Wichtman agreed, and as she explained in a subsequent e-mail to Martorello, their best option was to "go quietly into the night and restructure based on what we know from the opinion in order to build an even stronger case for future litigation." Ex.

25 at Rosette 001130. Following the Second Circuit's decision, the parties started moving quickly to restructure the business—even though the parties had not reached an agreement in principle to the major terms of the restructure, including the price to be paid. For example, Wichtman obtained an employer tax identification number for Big Picture on December 1, 2014. Ex. 26.

On February 5, 2015, the LVD's Tribal Council adopted a resolution creating Ascension Technologies and designating Brian McFadden as its president. Ex. 27. Similarly, even though they were employed by a different company, Ascension designated McFadden and Liang as the signatories on Ascension's bank account on February 19, 2015. Ex 28 at LVD-DEF00000229. And, immediately following its creation, SourcePoint began assigning its contracts to Ascension—another sign that the restructure was not an arm's length transaction, but a façade designed to protect Martorello and his team. *See, e.g.*, Ex. 29 at Rosette 035776. All of these steps—the creation of Ascension, the designation of McFadden as its president, the assignment of contracts, adding signatories to bank accounts—were taken months before the parties entered into the Agreement and Plan of Merger dated September 14, 2015.

### H.   Martorello forms Eventide Credit Acquisitions to facilitate his ongoing criminal objective.

On February 9, 2015, Martorello created a new company, Eventide Credit Acquisitions, to facilitate the continuation of the illegal lending enterprise. *See generally* Ex. 30. On September 14, 2015, Eventide, Bellicose, and a company formed by LVD to effectuate the merger, Tribal Acquisition Company, LLC, executed the "Agreement and Plan of Merger." *See generally* Ex. 31. Pursuant to § 2.7 of the Agreement and Plan of Merger, the "consideration to be paid to" Eventide was "an amount equal to three hundred million dollars, $300,000,000 (the 'Acquisition Amount')." *Id.* § 2.7.

The $300 million acquisition price was just an elaborate opportunity for Eventide and

Martorello to be the targeted recipient of all of the net profits from the lending operation for the anticipated life cycle of the enterprise. Martorello engineered the superficial changes to the structure of the operation—characterizing his interest as a $300 million debt rather than equity—in a vain attempt to avoid accountability for his oversight of the lending operation and blatant violations of state and federal lending laws. Through the inflated "sales" price with an accompanying sunset provision to "forgive" any remaining "debt," Martorello intended to receive all the net profits from the lending operation while maintaining the "status quo" of his oversight and management of the illegal scheme.

Approximately three weeks after the Agreement and Plan of Merger, Martorello wrote an e-mail providing his thoughts on the "FMV vs FV" of Bellicose, *i.e.*, its fair market value v. future value. Ex. 32 at Liont_09845. As for its low fair market value, Martorello stated "[e]veryone knows the CFPB rule shuts down the business and there is a court decision that shows the CFPB does control Tribes." *Id*. Martorello wrote that they could "provide all the support in the world for this." *Id*. And if "someone asks," Martorello provided 11 points for the low fair market value assigned to the business, including "1) the Tribe is buying it b/c our contract gets terminated and they want this to continue[,] 2) Operation Choke Point is a risk for SPVI owners but not for the Tribe[,] 3) All the lawsuits against Servicers is removed from the equation for the Tribe to lose us… 7) They risk that they lose their debt investors if we go away, this deal keeps debt investors comfortable to remain, whereas they'd leave if a new vendor replaced us… 10) IN THE UNLIKELY EVENT that the CFPB rule doesn't take them down, then they pay as they go via a Seller financed deal rather than taking risk. . . ." *Id*. at 09845-6. In closing, Martorello further added "there is the risk that we get shut off from banking immediately (or the Tribe does) and we suffer catastrophic damages even worse than CFPB rule." *Id*. at 09846.

Martorello sent a similar e-mail to a business valuation firm on December 5, 2015, *i.e.*, about six weeks before the closing. Ex. 33 at Martorello_05530-2. In this e-mail, Martorello explained that "efforts would be attempted by [s]tate governments to shut down tribal lenders (and are being attempted in fact)." *Id*. One of those was an action filed by the Pennsylvania Attorney General, which Martorello characterized as "the most significant issue/risk to SPVI" as "PA could bring the same claims against SPVI for sure." *Id*. Martorello further added that Red Rock had already "received threats from several state AGs demanding they stop lending or they will come after them." *Id*. In addition to attorney general threats, Martorello further explained that the NY DFS has "issues too" with tribal lending "and they could go after SPVI as well." *Id*. Martorello encouraged the firm to include all "of the support [] that says the CFPB rule will shut this business down, and how operation choke point is hurting everyone." *Id*.

In another email dated December 6, 2016, Martorello similarly wrote that "It was estimated that the industry would be wiped out in Feb 2014 by the new CFPB, and/operation chokepoint tactics." Ex. 34 at Martorello_011446. Martorello further explained that "[a]ccurately enough, the clients lost the ability to debit borrower bank accounts in January 2014" and they "made no loans for many months after out of fear banking would be fully cut off for good." *Id*.

There are multiple e-mails reiterating this position that the tribal lending would be shut down and the restructure was simply a disguise to allow Martorello to continue to make millions until his prediction came true. *See also* Ex. 35, at Liont_05387 ("Lawsuits by AGs and regulators against SPVI, myself, or the client (as the reports and cases filed to date against competitors supports) may end the business or seriously shrink the business"); Ex. 36 at Martorello_011671 (e-mail from Martorello explaining that "we thought (and data supported) 'end of days in 2015'" because of Operation Chokepoint). In a review of this record, the Court recently found, "The record

is thus clear beyond serious question that Martorello was motivated to sell Bellicose to LVD because of the threats of litigation and enforcement actions against him and his entities under the then-current lending arrangement between him, his entities, and LVD." Mem. Op., ECF No. 944 at 30.

### I.  During the negotiations, Martorello insists on retaining control over the business after the restructure.

Although Martorello "sold" his companies to LVD, he insisted on control over the business until the expiration or repayment of the $300,000,000.00 promissory note. For example, in an e-mail dated August 26, 2014, Martorello insisted "the seller," "will have to keep a final say so in business decisions to protect the business from being destroyed by the new owner before paid." Ex. 37 at 045272. And, Martorello made clear he did not want any changes, explaining there was "[n]o need to reinvent the wheel or shake things up, just need to keep it alive and then use the earnings from it to take risks with and do other things." *Id*.

Similarly, in an e-mail to Wichtman, Hazen, and Chairman Williams dated September 15, 2014, Martorello insisted that "the Bellicose Companies will be sold only 'as is', with existing Management in place and the company remaining substantially the same." Ex. 38 at Rosette_Revised 040179. Despite servicing through a new entity, Martorello insisted that it needed to "remain an independent cutting edge" company, which "needs to be run in the same format it is today." *Id*. Although technically tribally owned, remaining separately managed by the servicer would aid the "PR effect" on hiring and retaining professionals "who will understand they risk being labeled by peers as working for some 'illegal' lender" if the companies were combined. *Id*.

They maintained the status quo even though one of Rosette's lawyers, Tanya M. Gibbs, identified the structure—requiring Big Picture "to establish certain relationships with a servicer"— as opening them up to rent-a-tribe arguments similar to "the current class action litigation pending

in Vermont, *Gingras & Givens v. Rosette*." Ex. 39 at Rosette_Revised 043997. To avoid this, Ms. Gibbs wondered whether they needed to "to put these things in writing." *Id*. Martorello insisted on formal control in writing, saying it was "take it or leave it[.]" *Id*. at 043996. Martorello further added that "Servicer comfort" was the "only way" that an important investor would "be involved." *Id*. From "their perspective," if LVD "was to cut SPVI out of the picture, then [it] simply cannot perform as a business." *Id*.

The parties' intent to restructure the form of the arrangement but, not its substance, is further demonstrated by an e-mail exchange dated January 14, 2016, *i.e.*, two weeks before closing. As a part of the email exchange, Martorello explained that the enterprise's lenders "care about the person who runs the business at AT." *Id*. So long as the restructure documents were "clear that the position in question and under scrutiny to the lenders is President and CEO (Brian)," it was sufficient according to Martorello. *Id*. Martorello further wrote "[a]s far as I know, the Manager[s]," *i.e*., Hazen and Chairman Williams, "don't really do anything." *Id*. In closing, Martorello explained that he would leave it up to his attorney, John Williams, on what the transaction documents "say if that jives, and what the authority is of BMF [Brian McFadden] vs the Managers, but if Managers are really only involved per the [operating agreement] to get feedback from the CEO/President" then that seemed "OK." *Id*. If the managers did "more than that" or the governing documents "say the position of concern are the Managers," then there was "some cleaning up to do" according to Martorello. *Id*. A day after this exchange, John Williams e-mailed Wichtman a draft of the Delegation of Authority Policy to ensure it was clear who had operational control. Ex. 40. The Delegation of Authority policy ensured that "The Tribal Council does not get to make the decision regarding [McFadden's] employment nor determine his salary other than through the budgeting process [which involves Eventide]" as explained by Wichtman's

email dated January 14, 2016. Ex. 41 at Rosette_Revised_020473. Put differently, Wichtman explained that this structure ensured that "Tribal Council can't get a wild hair up their hiny and pass a resolution or motion to fire [Brian] because they do not have the authority to act in that capacity as Member." *Id*.

J.    **As demanded by Martorello, the restructuring documents are crafted to ensure Martorello's control over operations and retention of profits.**

In an effort to exploit sovereign immunity and conceal Martorello's role, the lending enterprise completed the merger on January 26, 2016. Ex. 42. On paper, the LVD now appeared to own the business, ostensibly shielding Bellicose/Martorello from any pre-merger claims—as desired by Martorello almost immediately after he read the district court's decision in *Otoe-Missouria*. Ex. 13 (proposing "LVD to take ownership of Bellicose VI," and "[a]ll structured to provide all entities sovereign immunity"). And, as designed by Martorello, LVD contractually relinquished any right to control the business through the restructuring documents, namely: (1) the Delegation of Authority Policy, (2) the Intratribal Servicing Agreement, (3) the Loan and Security Agreement, and (4) Eventide's Operating Agreement. Each of these documents worked together to ensure Martorello's control.

*First*, LVD contractually relinquished any right to control Ascension through the Delegation of Authority Policy. *See generally* Ex. 43. Under this policy, Ascension delegated McFadden with the authority to: (1) handle Ascension's "strategic direction, goals and targets," (2) execute documents on behalf of Ascension, (3) open and maintain bank accounts, (4) adopt employee benefit plans and programs, and (5) "authority regarding all matters necessary for the day to day management of Ascension." *Id*. at § 1.4(a)-(e)). By contrast, the only matters designated to the tribal co-managers are: (1) approval of contracts in excess of $100,000 in a calendar year, (2) appointment of the president, and (3) approval of any "new major employee benefit plans." *Id*.

at § 1.2(a)-(c). And, while the authority to appoint the president seems to provide some control, the Loan Agreement takes this control away—to appoint a new president, Hazen and Williams must receive the approval of Eventide, *i.e.*, Martorello. *See* Ex. 44 at Martorello_000080 ("Management. Neither [TED] nor [Big Picture or Ascension] shall terminate or replace any manager, director or officer of [TED] or [Big Picture or Ascension] or modify delegations of authority without the prior written consent of [Eventide], which shall not be unreasonably withheld, conditioned or delayed.").

Second, because of McFadden's *de facto* control of Ascension, the restructuring documents were designed to provide Ascension with control over Big Picture's operations—no different than the relationship between SourcePoint and Red Rock. *See generally*, Ex. 45. Indeed, Ascension and Big Picture entered into a "Intratribal Servicing Agreement," which is virtually identical to the prior servicing agreement between SourcePoint and Red Rock. *Compare id.*, *with* Ex. 5 at § 4.2.1. Like the prior arrangement, this agreement grants Ascension "all the necessary power and authority to act in order to fulfill its responsibilities," which includes the enumerated responsibilities previously designated to SourcePoint. Ex. 5 at §§ 4.1, 4.2; *compare with* Ex. 45, at §§ 4.1, 4.2. And, just like the Delegation of Authority Policy, LVD cannot amend, modify, or terminate the Intratribal Servicing Agreement until satisfaction of the $300 million-dollar promissory note.[4] Ex. 44 at § 5.12. The Delegation of Authority Policy and Intratribal Servicing Agreement work in tandem to ensure that Martorello's designee, McFadden, has control over Ascension, and Ascension has control over the lending business.

---

[4] If TED breaches the Intratribal Servicing Agreement, it would forfeit the reinvestment amounts, as well as its ownership interest in Ascension. (Ex. 46, Secured Promissory Note at § 1.2(b)(2)).

Further, Eventide's operating agreement ensures that Martorello has control over McFadden. *See generally* Ex. 30 at § II(I). In particular, to ensure control over McFadden, Eventide's operating agreement allows Martorello to unilaterally revoke his shares in Eventide with 14-days notice. *Id.* ("The Manager, in his sole and absolute discretion, may require a Member to sell all or a portion of the Interest" within 14 days). In other words, if Martorello disagrees with any action by McFadden, including in his capacity as president of Ascension, Martorello possesses the sole discretion to revoke his primary economic interest in the lending enterprise, *i.e.*, McFadden's profit interest as a shareholder of Eventide. Ex. 30. And those profits have been substantial, including monthly distributions, on average, of $35,000.  *See* Ex. 47 at p. 12.

The evidence shows that Martorello has already considered wielding this power, including in August 2016, when Martorello texted his brother and business partner, expressing concern that "Brian [McFadden] and James [Dowd] are getting too big for their britches." Ex. 48 at Justin_Martorello_00157. Martorello further explained that "they see monthly wires and are starting to think they deserve a lot more of it now than the $1mm a year Brian makes for being a hired CEO." *Id*. Martorello further wrote that McFadden "may have to be disappointed somewhere down the near term road," as "he's not the founder and $1mm a year buys a lot of very capable replacements." *Id*. In short, even after the sale, Martorello believed that he controlled the business, including the ability to remove the president of Ascension, who possesses the authority to run the lending business free from interference by the co-managers or Tribal Council—exactly as Martorello had insisted.

### K.   Martorello negotiates a provision requiring the destruction of his documents, including the damaging emails uncovered from third parties.

Martorello's efforts to avoid liability did not end with the restructure. To ensure the utmost protection, Martorello included a provision in the Merger Agreement that expressly required the

destruction of all of Bellicose's documents related to the lending enterprise, including Martorello's emails. In particular, the Merger Agreement provides that: "All [Bellicose] information now or that may be discovered on equipment of any kind or in any written materials shall be immediately provided to [TAC] and deleted or destroyed by [TAC] so that [TAC] retains no copies of Company information." Ex. 31 at § 2.6(d). Counsel for Big Picture represented that this destruction occurred, including Martorello's emails. Ex. 49. To help eliminate any trace of evidence, Martorello's attorneys at Greenberg Traurig were also instructed to delete their documents and "communications regarding Bellicose with Mr. Martorello and other persons and entities." Ex. 50, Jan. 24, 2019 Declaration of Jennifer Weddle.

Consistent with his conduct throughout the case, Martorello has also lied—under oath—about the genesis of the document destruction provision. According to Martorello in his deposition, the prior merger agreement was "a template document" provided to him by an attorney, John Williams, and the destruction provision was in the original document from the other transaction.[5] Plaintiffs' counsel has obtained the "template" document from the other transaction. The two agreements are substantively identical except for one term—there is no § 2.6(d) in the other agreement. *See* Ex. 52 at pg. 4. After § 2.6(c), the "template" goes immediately to § 2.7. *Id*. The provision requiring the destruction of Martorello's documents, in other words, was intentionally

---

[5] Ex. 51, 149:7-24 ("Q. And first, whose idea was it to put this language in this merger agreement? A. This provision was included in a -- sort of like a template, the original template document that came from a -- my understanding is that it came from another transaction. Q. Okay. Do you know what transaction? A. Yeah, I think it was related to Upper Lake. Q. What is Upper Lake? A. Upper Lake is a tribe in northern California that had made an acquisition in some similar capacity. So this was the -- this was the template document that was provided to me with the exception being the very last sentence, which I was adamant that I obviously needed to be able to retain anything required for tax returns and anything that would amount to that.").

added to Martorello's merger agreement. *See* Ex. 31 at § 2.6(d). And, when John Williams was

asked: "Did Mr. Martorello advise you to put paragraph 2.6D or provisions to that effect into the

merger agreement," he was instructed not to answer on the grounds of privilege. Ex. 53 at 183:18-

184:3. There are also express communications between Martorello and John Williams related to §

2.6(d) of the Merger Agreement, which are being withheld based on Martorello's assertion of

attorney client privilege. *See* Ex. 56.

## ARGUMENT

### I.    Martorello has not established that any work product was prepared in anticipation of litigation.

"Courts disfavor assertions of evidentiary privilege because they shield evidence from the

truth-seeking process." *RLI Ins. Co. v. Conseco, Inc.*, 477 F. Supp. 2d 741, 748 (E.D. Va. 2007).

"[T]he work product doctrine belongs to the attorney and confers a qualified privilege on

documents prepared by an attorney in anticipation of litigation." *Solis v. Food Employers Labor

Relations Ass'n*, 644 F.3d 221, 231 (4th Cir. 2011). "[T]he party claiming the protection bears the

burden of demonstrating the applicability of the work product doctrine." *Id.*

"First, the party asserting work-product protection bears the burden to show that the 'work

product' was prepared in anticipation of litigation." *RLI Ins. Co.*, 477 F. Supp. 2d at 748. "Second,

in order to meet this burden, the proponent of the privilege must 'come forward with a specific

demonstration of facts supporting the requested protection,' preferably though affidavits from

knowledgeable persons." *Id.* (quoting *Suggs v. Whitaker,* 152 F.R.D. 501, 505 (M.D.N.C.1993)).

"Finally, assertions of evidentiary privilege are narrowly and strictly construed, so that the

privilege is strictly confined within the narrowest possible limits consistent with the logic of its

principle." *Id.* (internal citations and quotations omitted).

The work product doctrine only covers documents that are prepared by an attorney in anticipation of litigation. "'Materials prepared in the ordinary course of business or pursuant to regulatory requirements or for other non-litigation purposes' do not constitute 'documents prepared in anticipation of litigation' protected by work product privilege." *Food Employers Labor Relations Ass'n*, 644 F.3d at 232 (quoting *Nat'l Union Fire Ins. Co. v. Murray Sheet Metal Co.,* 967 F.2d 980, 984 (4th Cir.1992) (internal modification omitted)).

"The document must be prepared *because* of the prospect of litigation when the preparer faces an actual claim or a potential claim following an actual event or series of events that reasonably could result in litigation." *Nat'l Union Fire Ins.,* 967 F.2d at 984. "The preparation of work merely because an attorney 'anticipates the contingency' of litigation is not sufficient to qualify the work for the protection afforded by the work-product doctrine. *RLI Ins. Co.*, 477 F. Supp. 2d at 747 (quoting *Nat'l Union Fire Ins.,* 967 F.2d at 984). Further, "the 'because of' standard is designed to protect only work that was conducted because of litigation, not work that would have been done in any event." *Id.*

On his privilege logs (Exs. 54 & 55), Martorello has not asserted that any of the documents were prepared with this litigation in mind, and most of them appear to relate to the sale of Bellicose and the tax consequences of the sale.[6]  As this Court already found on a different occasion, "Martorello has provided no information about what pending or imminent litigation prompted" the creation of each document and "vague, inchoate threat of future litigation based on the complicated

---

6 See, e.g., LVRMM_00005246, LVRMM_00005247, LVRMM_00001753, LVRMM_00001754, LVRMM_00002497, LVRMM_00002498, LVRMM_00003358, LVRMM_00006441, LVRMM_00006640. (Ex. 54)

sale of Bellicose is not enough." *Williams v. Big Picture Loans, LLC*, 303 F. Supp. 3d 434, 449 (E.D. Va. 2018). Nor is the prospect of being audited by the IRS. *Id.* at 449.

Of course, Plaintiffs contend that the entire sale of Bellicose was designed to shield Martorello from liability from impending litigation. But Martorello has not asserted that, and it is his burden to substantiate the work-product privilege. Indeed, Martorello has repeatedly disclaimed that he anticipated litigation at the time of the sale. *See, e.g.,* ECF 389 at 6 ("Martorello's sale of the business to LVD was not a sham and was not spurred by litigation or regulatory efforts directed at tribal lending."); ECF 299 at 5 ("Most importantly, there was no pending or threatened litigation at the time that the documents were destroyed.") Because Martorello has failed to demonstrate that any documents on his privilege logs, or any other documents that pre-date this lawsuit related to the operation of the lending business and its restructure were created *"because of"* the prospect of litigation, Martorello has not met his burden to show that work-product protection is appropriate.

## II.    Martorello's privilege logs are inadequate.

Rule 26(b)(5)(A)(ii)'s requires that a party "describe the nature of the documents" and "do so in a manner" that "will enable the other parties to assess the claim." Fed. R. Civ. P. 26(b)(5)(A)(ii); *see also Rambus v. Infineon Technologies, Inc.*, 220 F.R.D. 264, 272 (E.D. Va. 2004) ("the descriptions in the log must satisfy the claiming party's burden.").

"[A]n adequate 'privilege log' should contain: a brief description or summary of the contents of the document, the date the document was prepared, the person or persons who prepared the document, the person to whom the document was directed, or for whom the document was prepared, the purpose in preparing the document, the privilege or privileges asserted with respect to the document, and how each element of the privilege is met as to that document." *Cappetta v.*

*GC Servs. Ltd. P'ship*, 3:08-cv-288, 2008 WL 5377934, at *4 (E.D. Va. Dec. 24, 2008) (quoting *Burns v. Imagine Films Entm't, Inc.,* 164 F.R.D. 589, 593 (W.D.N.Y. 1996).

Here, Martorello's description of the documents on the privilege logs makes it impossible for Plaintiffs to assess the applicability of privilege. Instead, Martorello's descriptions are nothing more than conclusory assertions such as "PMA attorney communication and work product,"[7] "attorney communication and work product,"[8] and "communication with counsel re transaction."[9] These descriptions fall far short of what is required.

Failure to provide an adequate privilege log may result in a waiver of privilege, *Cappetta*, 2008 WL 5377934, at *4, an outcome that is not rare in this District. *Burke v. Fed. Nat'l Mort. Ass'n*, No. 3:16-cv-00153 (E.D. Va. Oct. 6, 2016) (Novak, J.) (ECF No. 91) (finding privilege waived due to failure to provide privilege log with responses and insufficient descriptions); *ePlus Inc. v. Lawson Software, Inc.*, 280 F.R.D. 247, 251-52 (E.D. Va. 2012) (finding privilege waived where party failed to provide author and recipient information). In determining whether waiver is an appropriate sanction, this Court has examined a number of factors, including: (1) the reasonableness of the effort made by the party; (2) the time taken to rectify any error; (3) the scope of discovery; (4) and the overriding fairness of the assertion. *Cappetta*, 2008 WL 5377934, at *4. In short, waiver is appropriate "[w]here a party has taken no precautions to properly assert the privilege, and has allowed time to pass without clarifying the basis for its assertion of privilege[.]" *Id.*

In this case, waiver is an appropriate sanction because Martorello did not make reasonable

---

7 LVRMM_00011603-00011616 (Ex. 55).
8 LVRMM_00011714-00011716; LVRMM_00006454-00006460 (Ex.55).
9 LVRMM_00012653-00012669 (Ex.55).

efforts to satisfy his obligations under Rule 26(b)(5). He omitted basic information that would have taken a few hours to log, such as adequate descriptions of the documents. He has allowed far too much time to pass without correcting his errors as these privilege logs are over three years old. Waiver is an appropriate sanction here.

### III.    Martorello has waived work product by raising his good faith defense

Martorello has waived work product privilege by raising a good faith defense and intending to rely on advice of attorneys.  Martorello's Answer to the Complaint stated, "Defendant Matt Martorello, at all times relevant acted in good faith and in a lawful manner towards consumers and in conformity with all applicable laws and regulations." Martorello's Answer, ECF No. 35 at 23. Martorello again asserted this defense in his responses to Plaintiffs' interrogatories. Ex. 1 at Int. No. 13. Martorello further indicated that this defense was based "on non-privileged information provided by attorneys Jennifer Weddle, Karrie Wichtman, Blake Sims, John Williams, Jennifer Galloway, Dan Gravel, Saba Bazzazieh and Rob Rosette… about the legality of the tribal business model and LVD's operations." *Id.* at Int. No. 13. These attorneys "who had intimate knowledge of the entire operations of the Tribe's lending business and relationships, routinely issued opinion letters—which Martorello received… expressing the confidence in the Tribe's sovereign status, the legality of the Tribe's lending businesses…." *Id.* at Int. No. 15. According to Martorello, this legal advice provided him "with the assurances that the servicing relationship whereby Bellicose or SourcePoint would assist the Tribe's lending businesses was lawful in all respects." *Id.* at Int. No. 15.

Where a party raises a defense about his good faith belief that he was following the law, he cannot prevent disclosure of any advice related to that belief. *U.S. v. Bilzerian*, 926 F.2d 1285, 1292 (2nd Cir. 1991) (upholding trial court's ruling that if defendant testified about his good faith

belief he was following the law, he could not also invoke the privilege regarding what his attorneys told him because "[defendant's] testimony that he thought his actions were legal would have put his knowledge of the law and the basis for his understanding of what the law required in issue."); *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162 (9th Cir. 1992) (argument that defendants cannot use attorney client privilege as both a "sword" and a "shield" has merit); *see also United States v. Moazzeni*, 906 F. Supp. 2d 505, 518 (E.D. Va. 2012) ("By placing his attorneys' representation at the center of his defense, Moazzeni has waived any privilege to communications within the scope of that issue."); *Rhone–Poulenc Rorer v. Home Indem. Co.,* 32 F.3d 851, 863 (3d Cir. 1994); *see also United States v. Jones*, 696 F.2d 1069, 1072 (4th Cir.1982) ("Selective disclosure for tactical purposes waives the attorney-client privilege.").

Further, when a party asserts a defense based on advice received from attorneys, the party may not reveal "beneficial communication[s]" but withhold other "less helpful, communication(s) on the same matter." *E.I. Dupont de Nemours & Co. v. Kolon Indus., Inc.*, 269 F.R.D. 600, 605 (E.D. Va. 2010). This principle, often referred to as the "at issue" doctrine, is rooted in fairness— when a jury evaluates Defendants' good faith defense, it must be able to assess the full story to evaluate their belief of the legality of his conduct, not just the beneficial or conclusory assertions. Thus, when a party contends it acted in good faith based on its understanding of the law, "then the extent of its investigation and the basis for its subjective evaluation are called into question." *Hege v. Aegon USA, LLC*, 2011 WL 1791883, at *4 (D.S.C. May 10, 2011); (citing *City of Myrtle Beach v. United Nat. Ins. Co.*, 2010 WL 3420044, at *5 (D.S.C. Aug. 27, 2010) ("[I]f a defendant voluntarily injects an issue in the case, whether legal or factual, the insurer voluntary waives, explicitly or impliedly, the attorney-client privilege.").

"[W]here a party intends to use an 'attorney's opinions as a sword or shield to affect the factfinding process[,]' those opinions are not covered by the work product doctrine." *Twigg v. Pilgrim's Pride Corp.*, No. 3:05-CV-40, 2007 WL 676208, at *8 (N.D. W.Va. Mar. 1, 2007) (quoting *Vaughan Furniture Co. v. Featureline Manufacturing Co.,* 156 F.R.D. 123, 128 (M.D.N.C.1994)). An implied waiver of work product occurs is when a party "attempt[s] to make testimonial use of work-product materials." *In re Martin Marietta Corp.*, 856 F.2d 619, 624 (4th Cir. 1988).

The Fourth Circuit has delineated between opinion work product and non-opinion work product, noting "that opinion work product is to be accorded great protection by the courts." *Id.* at 626. However, "when work product concerns activities of counsel that are directly in issue, courts have not hesitated to find subject matter waiver." *E.I. Dupont de Nemours & Co. v. Kolon Indus., Inc.*, 269 F.R.D. 600, 608 (E.D. Va. 2010) (internal quotation and modifications omitted) (collecting authority). This is especially true where a party "intends to use its attorney as an expert witness and to use the attorney's opinions as a sword or shield to affect the factfinding process." *Vaughan Furniture Co. Inc.*, 156 F.R.D. at 128. In other words, "[a] party waives the opinion work product protection of its attorney by naming its attorney as an expert witness." *Id.* at 128.

It is evident that Martorello intends to use the "expert" opinions of lawyers to bolster his good faith defense. In these circumstances where a party intends to use an attorney's opinions in their defense at trial, work product protections for both opinion and non-opinion work product have been waived. *Vaughan Furniture Co. Inc.*, 156 F.R.D. at 128; *Cornett Mgmt. Co., LLC v. Lexington Ins. Co.*, No. CIV.A. 5:04-CV-22, 2007 WL 1140253, at *6 (N.D.W. Va. Apr. 17, 2007) (finding waiver where party "has placed its communications with its attorneys at the center of this litigation"); *Cincinnati Ins. Co. v. Zurich Ins. Co.*, 198 F.R.D. 81, 87 (W.D.N.C. 2000) (finding

opinion work product protection waived when the party intended to offer the attorney's opinion at trial); *Charlotte Motor Speedway, Inc. v. Int'l Ins. Co.*, 125 F.R.D. 127, 130 (M.D.N.C. 1989) ("Many courts faced with the issue of the production of opinion work product have recognized an exception to Rule 26(b)(3) protection for work product which concerns activities of counsel that are directly in issue.")

As to the scope of the waiver, broad "subject matter waiver applies" for fact work product. *In re Martin Marietta Corp.*, 856 F.2d 619, 625 (4th Cir. 1988). As evident in Martorello's privilege logs, the work product assertions here are broad and relate to all aspects of the lending business, including the corporate restructure. The subject matter waiver for fact work product thus should be co-extensive with the subject matter waiver for attorney-client privilege.

For opinion work product, the waiver is more limited: "[W]aiver of the opinion work-product protection is limited to the documents actually disclosed." *E.I. Dupont de Nemours & Co.*, 269 F.R.D. at 606 (modification omitted). Thus, to the extent that Martorello intends to rely on any opinions drafted by lawyers at trial, opinion work product privilege has been waived with respect to those documents. If there is protected opinion work product "commingled with fact work product that must be disclosed under subject matter waiver, the proper method of preventing disclosure of opinion work product is for the Court to review the material and redact the legal theories and mental impressions from the otherwise discoverable materials." *Id.*

**IV.    Martorello waived work product under the crime-fraud exception.**

The record establishes a prima facie showing that the crime/fraud exception for work product protection applies to any documents pertaining to the legality of the business model, the LVD's operations, and the restructure. "The crime/fraud exception to the attorney-client and work product privileges provides that otherwise privileged communications or work product made for,

or in furtherance of, the purpose of committing a crime or fraud will not be privileged or protected." *Rambus, Inc. v. Infineon Technologies AG*, 222 F.R.D. 280, 287 (E.D. Va. 2004) (citing *Chaudhry v. Gallerizzo*, 174 F.3d 394, 403 (4th Cir. 1999)).

The Fourth Circuit uses "similar standards when applying the crime-fraud exception to attorney-client and fact work product privileges." *In re Grand Jury Proceedings #5 Empaneled Jan. 28, 2004*, 401 F.3d 247, 252–53 (4th Cir. 2005). "[F]act work product may be discovered upon prima facie evidence of a crime or fraud as to the client only and thus even when the attorney is unaware of the crime or fraud." *Id.* For opinion work product, "[a] party seeking to compel the production of opinion work product under the crime-fraud exception must demonstrate attorney knowledge of or participation in the client's crime or fraud." *In re Grand Jury Subpoena*, 870 F.3d 312, 316 (4th Cir. 2017).

Here, the lawyers involved in the lending scheme to whom Martorello or his companies went to for advice include John Williams, Jennifer Weddle, and Jennifer Galloway. All of these lawyers knew that about the lending scheme and Martorello's involvement, and the assertions that the Tribe did not have to comply with state usury laws. Thus, to the extent that Martorello is in possession of any opinion work product from these lawyers or any other lawyer who was involved in lending scheme or the restructure, that information should be produced and is not protected opinion work product

Plaintiffs must make a prima facie showing that the crime/fraud exception applies by establishing that "(1) the client was engaged in or planning a criminal or fraudulent scheme when he sought the advice of counsel to further the scheme and (2) the documents containing the privileged materials bear a close relationship to the client's existing or future scheme to commit a crime or fraud." *See* Mem. Op., ECF No. 478 at 34.

**A.    Martorello was engaged in a criminal and fraudulent lending scheme when he sought the advice of counsel as early as 2011.**

The record establishes that Martorello sought the advice of counsel for the purpose of furthering a usurious lending scheme that violates state and federal law. The Tribal lending model, or "Rent A Tribe" lending scheme, was preceded by the "Rent A Bank" scheme, in which payday lenders used national banks as loan conduits to evade state usury laws. *See* Mem. Op., ECF No. 944 at 4; *see also* Nathalie Martin & Joshua Schwartz, *The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?*, 69 Wash. & Lee L. Rev. 751, 785 (2012) (describing the rent-a-tribe model as "the most recent incarnation of payday lending companies regulation-avoidance"). After federal regulators intervened and put a stop the Rent A Bank model, many payday lenders began using Native American tribal entities as the conduit for the loans. *See* Mem. Op., ECF No. 944 at 4; *see also* Martin & Schwartz, supra at 785. Martorello's involvement in internet lending that attempts to avoid state usury caps follows a similar timeline: in 2008 he was involved with a payday lending company that attempted to use Costa Rica law to avoid the application of state usury laws. *See* Mem. Op., ECF No. 944 at 4. Subsequently, in 2011, Martorello became interested in the Tribal lending model. Ex. 2, Merritt Dep. 31:3-4; 93:16-20; *see also* Mem. Op., ECF No. 944 at 4.

Like many other states, Virginia law makes it a crime to violate or to participate in a violation of its usury statute. Va. Code § 6.2-1540.[10] In particular, the Virginia Code provides

---

[10] *See also,* Ga. Code Ann. § 16-17-2(d) (establishing that any person who violates Georgia's payday lending statute "shall be guilty of a misdemeanor of a high and aggravated nature and upon conviction thereof shall be punished by imprisonment for not more than one year or by a fine not to exceed $5,000.00 or both."); N.Y. Penal Law § 190.40 (same); Mass. Gen. Laws Ann. ch. 271, § 49 (same).

"[a]ny person, including *members*, officers, directors, agents, and employees of an entity, who violates or *participates in* the violation of any provision of § 6.2-1501 is guilty of a Class 2 misdemeanor." *Id.* (emphasis added). In turn, Va. Code § 6.2-1501 provides that "[n]o person shall engage in the business of making loans to individual . . . and charge, contract for, or receive, directly or indirectly, on or in connection with any loan interest" an amount greater than 12% without first obtaining a license from the Virginia State Corporation Commission. Va. Code § 6.2-1501(A). In sum, Virginia law "makes clear that it is a crime to participate in the violation of Virginia's usury statute, which limits a business to contracting for a loan interest rate of greater than 12%." *Williams*, 2019 WL 1983048, at *13 (citing Va. Code § 6.2-1501).

Similarly, "[t]he enactment of RICO was a result of twenty years of intense scrutiny of organized crime by Congress, the Department of Justice, and the public." Pamela Bucy Pierson, *Rico, Corruption & White-Collar Crime*, 85 TEMP. L. REV. 523, 535 (2013). The statutory scheme reflects Congress's recognition that groups—rather than individuals—working together present "a greater potential threat to the public than individual delicts." *Id.* Indeed, when enacting the statute, Congress declared that its purpose was to seek the eradication of organized crime in the United States," including loan sharking. Pub. L. 91–452, § 1; *see also United States v. Biasucci*, 786 F.2d 504, 512 (2d Cir. 1986) ("The elimination of loansharking was one of Congress' principal aims in enacting the statute.").

To accomplish Congress's goal to prevent loan sharking, RICO generally prohibits four activities associated with "unlawful debt," which is defined as debt that "is *unenforceable under State* or Federal law in whole or in part as to principal or interest because of laws relating to usury," where "the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6) (emphasis added). Against this backdrop: (1) § 1962(a) prohibits a person who has received income from the

collection of an unlawful debt from investing any of that income in the enterprise; (2) § 1962(b) prohibits a person to acquire or maintain control over an enterprise engaged in the unlawful collection of debt; (3) § 1962(c) prohibits a person from conducting or participating in the affairs of an enterprise engaged in the collection of an unlawful debt; and (4) § 1962(d) prohibits any person from conspiring to commit any of the provisions in §§ 1962(a)-(c). 18 U.S.C. § 1962(a)-(d). In sum, RICO "makes it unlawful for '*any person*'—not just mobsters—" to be part of an organized scheme to collect unlawful debt. *Busby v. Crown Supply, Inc.*, 896 F.2d 833, 839 (4th Cir. 1990) (emphasis in original). And, if a person violates any section of § 1962 of RICO, including its prohibition against schemes to collect unlawful debt, it is a felony, and the person may be "imprisoned not more than 20 years." 18 U.S.C. § 1963(a).

Martorello's conduct was not only a crime, but it was also a fraudulent scheme that used the tribe as a front for his usurious lending. As the former Vice Chairman of the Tribe explained: "When Tribal Council initially agreed to the deal with Martorello," they "understood that all aspects of the lending business would be handled by Martorello and that the Tribe would have no risk. It was understood that Martorello's company would handle everything, including underwriting, marketing, servicing, funding, and collection of the loans." Ex. 4 at ¶¶ 2-3. Pete further explained that "[a]fter the inception of the business, it was operated completely by Martorello until government regulators and litigation against competitors began. As these cases proceeded, efforts were made to create the appearance of the Tribe's involvement, but the Tribe had no substantive involvement." *Id*. at ¶ 4.

In short, the crime/fraud exception exists for situations just like this and recognizes the "commonsense notion" that privileges "'cannot avail to protect the client in concerting with the

attorney a crime or other evil enterprise.'" *Rambus*, 222 F.R.D. at 281 (quoting Evidence § 2298 at 572 (McNaughton rev. 1961)).

### B. The documents bear a close relationship to Martorello's existing and ongoing criminal efforts.

The rent-a-tribe business model was developed, in large part, by attorneys in response to federal crackdowns on the rent-a-bank model. In the CFPB's litigation against CashCall, the legal advice provided by attorneys was revealed as part of CashCall's good faith defense. *CFPB v. CashCall, Inc.*, 2018 WL 485963, at *3 (C.D. Cal. Jan. 19, 2018) (post-trial fact of finding and conclusion of law). This evidence showed that CashCall's attorney, Claudia Callaway, began advising her clients in January 2009 that the rent-a-bank model "was no longer viable because of pressure from regulators and, therefore, she was advising her consumer lending clients to switch to a similar business model, which involved partnering with an Indian tribal entity or member who would act in the same capacity as a state-chartered bank[.]" *Id*. "[B]ecause the loans made pursuant to the Tribal Lending Model were originated by a tribe or tribal member," Callaway advised her clients that " the loans would be made under the laws of the tribe and would not have to comply with licensing and usury laws in states where borrowers resided." *Id*.

Like CashCall, Martorello retained attorneys to assist him with launching and developing the tribal lending model with Red Rock and LVD. Martorello's attorneys, primarily Jennifer Weddle, Jennifer Galloway, and John Williams—presumably provided advice consistent with Callaway's and the overarching purpose of the model, which was to circumvent applicable state and federal laws. Over the past eight years, dozens of courts have rejected this dubious effort to avoid regulation, resulting in multi-million dollar enforcement actions and imprisonment of three

of the pioneers of the scheme, as well as some of their lawyers.[11] For example, the Third Circuit recently affirmed the criminal convictions of Charles Hallinan and Wheeler Neff (his lawyer), whose "RICO convictions" were "based on their efforts to skirt state usury laws by partnering with American Indian tribes to offer usurious payday loans." Neff, 787 F. App'x at 85, *cert. denied*, 140 S. Ct. 2674 (2020). In rejecting the defendant's argument about the legality of the tribal loans, the Third Circuit explained:

> Tribal sovereign immunity thus limits how states can enforce their laws against tribes or arms of tribes, but, contrary to Neff's understanding, it does not transfigure debts that are otherwise unlawful under RICO into lawful ones. A debt can be "unlawful" for RICO purposes even if tribal sovereign immunity might stymie a state civil enforcement action or consumer suit[.]

*Id*. at 92.

In the case against another pioneer, Scott Tucker, the United States District Court for the Southern District of New York applied the crime/fraud exception. *United States v. Tucker*, 2017 WL 2470836, at *1 (S.D.N.Y. June 6, 2017). In that case, the indictment charged Tucker with "conspiracy to collect unlawful debts" and "collection of unlawful debts," through several payday lending businesses that Tucker managed and controlled, but "were nominally owned by American Indian tribes, including the Miami Tribe of Oklahoma." *Id*. Just like this case, the government alleged that "Tucker entered into sham relationships with the Indian tribes in order to invoke tribal

---

[11] *See* The United States Attorney's Office, Southern District of New York, *Scott Tucker Sentenced To More Than 16 Years In Prison For Running $3.5 Billion Unlawful Internet Payday Lending Enterprise* (Jan. 8, 2018), https://www.justice.gov/usao-sdny/pr/scott-tucker-sentenced-more-16-years-prison-running-35-billion-unlawful-internet-payday; The United States Attorney's Office, Eastern District of Pennsylvania, *Two Men Found Guilty of Racketeering Conspiracy in Payday Lending Case*, (Nov. 27, 2017), https://www.justice.gov/usao-edpa/pr/two-men-found-guilty-racketeering-conspiracy-payday-lending-case.

immunity and continue lending practices that would otherwise be unlawful." *Id*. In finding certain documents were not privileged due to the crime/fraud exclusion, the court observed that the "continuation of an unlawfully usurious lending business was the crime or fraud attempted, and the communications and documents concerning *Tucker v. AMG* were in furtherance thereof because they were part of an effort to baselessly invoke the protections of tribal immunity." *Id*.

Given the similarities between their business, Martorello has described Tucker as a "competitor," including in his email comparing his company to a drug cartel. Ex. 6, at MARTORELLO_038990. Because of the fundamental nature of the scheme, the crime/fraud exception warrants disclosure of the legal advice received by Martorello regarding the legality of the business model, its operations, the restructure, and any advice made pursuant to or in furtherance of this scheme. *Rambus*, 222 F.R.D. at 279 ("it is the planning and pursuit of the scheme with the advice of counsel, not the scheme's success or failure, that animates the crime/fraud exception."). Although blanket waivers of privilege are rarely appropriate, it is hard to imagine any legal advice that would not have been made in furtherance of the scheme. Put differently, any legal advice would have been "made for" or "in further" of the overarching purpose of the business model, *i.e.*, avoidance of state and federal law.

Additionally, there is ample evidence in the record establishing that Martorello restructured the Tribal lending business for the criminal purpose of continuing to violate state usury laws and RICO with no liability. Indeed, the record repeatedly reflects that Martorello was concerned about the viability of the tribal business model and his own potential criminal liability. For example, when discussing the valuation of the business, Martorello asked how to value illegal businesses, citing poker sites, medical marijuana stores, and a drug cartel as comparable to the Tribal lending model. Ex. 6 at Martorello_038990-0389911; *see also* Mem. Op., ECF No. 944 at 24. Similarly,

in November 8, 2013, Martorello expressly stated that he was concerned about defending himself "personally in more than civil matters"). Ex. 15 at Rosette_Revised_052787. Because of this, as well as his efforts to misrepresent what actually happened, all advice and communications regarding the restructure should be produced, including fact and opinion work product.

>    **C. The crime/fraud exception applies to any documents destroyed as part of the sale of Bellicose, as well as any communications planning or in further of the destruction.**

In *Rambus*, this Court held that the crime/fraud exception extends to materials or communication created for planning, or in furtherance of, spoliation. *Rambus*, 220 F.R.D. at 283 (citing *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590–91 (4th Cir. 2001). In doing so, the Court explained that it "is self-evident" that protecting "any communication between lawyer and client respecting spoliation is fundamentally inconsistent with the asserted principles behind the recognition of the attorney-client privilege, namely, 'observance of law' or the 'administration of justice.'" *Id*. at 283. This is because "an attorney who counsels a client to spoliate evidence is not advancing the observance of the law, but rather counseling misconduct." *Id*.

As part of the restructuring, Martorello included a provision in the Merger Agreement requiring a tribal entity, Tribal Acquisition Company, requiring the destruction of Bellicose's records, including Martorello's emails. In particular, the Merger Agreement provides that: "All [Bellicose] information now or that may be discovered on equipment of any kind or in any written materials shall be immediately provided to [TAC] and deleted or destroyed by the [TAC] so that [TAC] retains no copies of Company information." Ex. 31 at § 2.6(d). The Big Picture's counsel has confirmed that the deletion occurred, including the deletion of Martorello's emails. Ex. 49. In particular, Big Picture's counsel stated:

> When we searched, the only Martorello emails on the server were the pre-2014 travel confirmation emails. Any other emails surrendered by Martorello to my

clients were deleted shortly after the time of the acquisition according to the requirements in the acquisition documents.

*Id*.

Consistent with his conduct throughout the case, Martorello has also lied—under oath—about the genesis of the document destruction provision. According to Martorello in his deposition, the prior merger agreement was "a template document" provided to him by an attorney, John Williams, and the destruction provision was in the original document from the other transaction.[12] If Martorello were telling the truth—that he simply used a template from another transaction—this would be important evidence that Martorello never intended to destroy documents. But, as with many of his other statements, the documents show otherwise.

Plaintiffs' counsel has obtained the "template" document from the other transaction. The two agreements are substantively identical except for one term—there is no § 2.6(d) in the other agreement. *See* Ex. 52 at pg. 4. After § 2.6(c), the "template" goes immediately to § 2.7. *Id*. The provision requiring the destruction of Martorello's documents, in other words, was intentionally added to Martorello's merger agreement. *See* Ex. 31 at § 2.6(d). And, when John Williams was asked: "Did Mr. Martorello advise you to put paragraph 2.6D or provisions to that effect into the merger agreement," he was instructed not to answer on the grounds of privilege. Ex. 53 at 183:18-184:3. There are also express communications between Martorello and John Williams

---

[12] Ex. 51, 149:7-24 ("Q. And first, whose idea was it to put this language in this merger agreement? A. This provision was included in a -- sort of like a template, the original template document that came from a -- my understanding is that it came from another transaction. Q. Okay. Do you know what transaction? A. Yeah, I think it was related to Upper Lake. Q. What is Upper Lake? A. Upper Lake is a tribe in northern California that had made an acquisition in some similar capacity. So this was the -- this was the template document that was provided to me with the exception being the very last sentence, which I was adamant that I obviously needed to be able to retain anything required for tax returns and anything that would amount to that.").

related to § 2.6(d) of the Merger Agreement, which are being withheld based on Martorello's assertion of attorney client privilege. Ex. 56, Conner Winters, LLP.

In light of the evidence cited above, it inconceivable that this provision was included for a purpose other than to intentionally destroy evidence of Martorello and Bellicose's misconduct. And, the effort to obstruct justice did not stop with the destruction of Martorello's records—his attorneys at Greenberg Traurig were also instructed to delete their documents regarding the arrangement, including "communications regarding Bellicose with Mr. Martorello and other persons and entities." Ex. 50, Jan. 24, 2019 Declaration of Jennifer Weddle.

This widespread, intentional effort to destroy evidence warrants a severe sanction. *Silvestri*, 271 F.3d at 590–91 (noting that district courts may impose a wide range of remedies for spoliation). Before requesting the sanction, however, Plaintiffs believe it is necessary to exhaust all efforts to attempt to restore the information, including retaining an independent expert to examine all possible sources for the information. Plaintiffs further believe it is necessary to obtain any communications regarding the spoliation, as well as deposition testimony of those involved. Accordingly, Plaintiffs request the Court to make a finding that spoliation occurred and order: (1) production of all communications concerning the destruction of any of Martorello or his companies' information; and (2) that privilege is waived as to all such communications, as well as any documents retrieved as part of Plaintiffs' efforts to restore the destroyed information

## CONCLUSION

For the documents listed on Martorello's privilege logs, Martorello has failed to show that work product protection applies because there is no evidence that the documents were created in anticipation of litigation. Further, for the documents listed on his privilege logs, Martorello has waived any protections due to the inadequacy of the logs. To the extent that there are

communications protected by work-product, Martorello has waived such protections as to fact and

opinion work product by raising his good faith defense, and waived any such protection afforded

to fact and opinion work product under the crime-fraud exception.

Respectfully submitted,

Date: January 11, 2021                        _____/s/_____
                                              Leonard A. Bennett, VSB #37523
                                              CONSUMER LITIGATION ASSOCIATES, P.C.
                                              763 J. Clyde Morris Blvd., Ste. 1-A
                                              Newport News, VA 23601
                                              Telephone: (757) 930-3660
                                              Facsimile: (757) 930-3662
                                              Email: lenbennett@clalegal.com
                                              *Attorneys for Plaintiffs and Proposed Classes*

- Exhibit 2 -

Page 1

```
 1                UNITED STATES DISTRICT COURT
 2            IN AND FOR THE DISTRICT OF VIRGINIA
 3                    RICHMOND DIVISION
 4
                                       )
 5     LULA WILLIAMS, GLORIA           )
       TURNAGE, GEORGE HENGLE, DOWIN   )
 6     COFFY, and FELIX GILLISON,      )
       JR., on behalf of themselves    )
 7     and all individuals similarly   )  No. 3:17-cv-00461
       situated,                       )
 8                                     )
                         Plaintiffs,   )
 9                                     )
                      vs.              )
10                                     )
       BIG PICTURE LOANS, LLC; MATT    )
11     MARTORELLO; ASCENSION           )
       TECHNOLOGIES, INC.; DANIEL      )
12     GRAVEL; JAMES WILLIAMS, JR.;    )
       GERTRUDE MCGESHICK; SUSAN       )
13     MCGESHICK; and                  )
       GIIWEGIIZHIGOODWAY MARTIN,      )
14                                     )
                         Defendants.   )
15                                     )
16              VIDEOTAPED DEPOSITION OF
17                WARREN SCOTT MERRITT
18             Taken in behalf of Defendants
19                     *   *   *
20                   March 21, 2019
21            400 Columbia Street, Suite 140
22                  Vancouver, WA 98660
23
          Job No. CS3256218
24        Janette M. Schmitt, CSR, CCR, RPR
25        Court Reporter
```

Page 28

 1        A.    Yes.

 2        Q.    -- but in your capacity for Answers, Etc.?

 3        A.    Yes.

 4        Q.    Okay.  At the time you attended the trade

 5   show, were you doing any consulting work with or for

 6   Mr. Rosette or Ms. Wichtman also?

 7        A.    Not for them, no.

 8        Q.    Okay.  And -- and I'll back up a little bit

 9   too.  So -- and were you doing any consulting work,

10   either directly or indirectly, on behalf of LVD?

11        A.    No.

12        Q.    This was the first time you met

13   Mr. Martorello?

14        A.    Yes.

15        Q.    So tell me about that.

16        A.    If I recall, I was introduced by a mutual

17   colleague, and I -- I don't recall who that is, and

18   started talking.  And my hopes at the time -- my

19   intent was to see if I could do a deal -- software

20   deal with him, because he wasn't entirely happy with

21   his current solution.

22        Q.    So how did you first come to meet him at

23   the trade show?

24        A.    Somebody introduced us.

25        Q.    Do you recall who?

Page 31

1      Q.   You mentioned that you then introduced Matt

2  to Mr. Rosette?

3      A.   Yeah.  Matt indicated that he had an

4  interest in working with Native American tribes.

5      Q.   What specifically do you recall Matt

6  telling you about his interest?

7      A.   Just that he was interested.  I don't know

8  if he -- he gave me a reason.  I mean, there are

9  several reasons why -- the typical, but I don't want

10 to speculate.

11     Q.   I understand you don't want to speculate as

12 to Mr. Martorello's reasons.  But what are some of

13 the typical reasons, in your experience, that

14 individuals are interested in doing business with

15 Native American tribes?

16     A.   To really streamline compliance.  Indian

17 tribes will adopt their own lending regulations, so

18 it's easier to conduct business in multiple states,

19 and so you don't have to worry about 50 different

20 states' rules -- lending rules.

21          So the tribes can lend money to virtually

22 any state as long as they adhere to federal and

23 their tribal laws.

24     Q.   So beyond that Mr. Martorello was

25 interested, in your ter -- in your words, interested

Page 32

 1   in, did you say, doing work with tribes?

 2        A.   Yes.

 3        Q.   Okay.  You don't recall anything

 4   specifically that he told you?

 5        A.   Not really, no.  I mean, I have dozens of

 6   those conversations at every trade show.

 7        Q.   Okay.  So what made you -- what led you,

 8   then, to introduce him to Mr. Rosette?

 9        A.   Just his -- his interest in working with

10   the tribe.  I knew Rob -- Rob's a very well-known

11   attorney in that space.

12        Q.   At the time that you introduced

13   Mr. Martorello to Mr. Rosette, had Mr. Rosette or

14   anyone -- or Ms. Wichtman or anyone else indicated

15   to you that LVD was interested in finding a service

16   provider?

17        A.   No.

18        Q.   Had you had any interactions with anyone

19   specifically at the tribe or its -- any of its

20   corporate entities?

21        A.   LVD?

22        Q.   Uh-huh.

23        A.   No.

24        Q.   When did you introduce Mr. Martorello to

25   Mr. Rosette?

Page 93

1    you told him the LVD had a tribal code and was set

2    to make loans?

3        A.   Inaccurate.

4        Q.   Okay.  And it would be inaccurate in part

5    because Matt approached you and told you he was

6    interested in finding a tribal partner; right?

7            MS. ALAMO:  Objection.  Mischaracterizes

8    his testimony.

9            THE WITNESS:  Repeat the question, please.

10       Q.   (By Mr. Guzzo)  I said it would be

11   inaccurate because Matt actually approached you and

12   said he was interested in finding a tribal partner;

13   is that right?

14       A.   Matt was introduced to me, and he didn't

15   approach me.

16       Q.   Well -- okay.  And after he was introduced

17   to you, he was the one that indicated his

18   willingness or his desire to find a tribal partner;

19   right?

20       A.   That's correct.

21       Q.   Yeah.  And if Matt testified that you

22   introduced him to members of the LVD's tribal

23   council, that would be inaccurate too; right?

24       A.   Correct.

25       Q.   And you didn't introduce him to the

Page 124

```
 1                    C E R T I F I C A T E

 2

 3          I, Janette M. Schmitt, a Certified Court

 4    Reporter for Washington, pursuant to RCW 5.28.010

 5    authorized to administer oaths and affirmations in

 6    and for the State of Washington, do hereby certify

 7    that, WARREN SCOTT MERRITT personally appeared

 8    before me at the time and place set forth in the

 9    caption hereof; that at said time and place I

10    reported in Stenotype all testimony adduced and

11    other oral proceedings had in the foregoing matter;

12    that thereafter my notes were reduced to typewriting

13    under my direction pursuant to Washington

14    Administrative Code 308-14-135, the transcript

15    preparation format guideline; and that the foregoing

16    transcript, pages 1 to 125, both inclusive,

17    constitutes a full, true and accurate record of all

18    such testimony adduced and oral proceedings had, and

19    of the whole thereof.

20            Witness my hand and CCR stamp at Vancouver,

21    Washington, this 26th of March, 2019.

22

23    _____

                     JANETTE M. SCHMITT

24                   Certified Court Reporter

                     Certificate No. 2252

25                   Commission Expires:  7/30/2019
```

Exhibit 3

**Darcie Pace**

| | |
|---|---|
| **From:** | mattm@bellicosevi.com |
| **Sent:** | Friday, August 26, 2011 7:32 AM |
| **To:** | Flint Richardson |
| **Cc:** | Scott Merritt; Robert Rosette |
| **Subject:** | Re: Question on Docs |

I'd agree with that for sure. If she's already been around these documents several times then we will see what she can do. She's on vacation until the 2nd though. I don't think we'll make the 9/15 and 10/1 dates we targeted.  With the back and forth that will e required, I'd be happy to have things wrapped up for 11/1 if we can move efficiently.

Ryan Bloom will be reaching out to Rob to conduct their diligence on the tribe. That should happen today.


On Aug 26, 2011, at 7:24 AM, Flint Richardson <flint@wsedge.biz> wrote:

> Matt – to the extent that you already have counsel on board that is fine.  Claudia (and Christina who works with her) have completed a few large scale deals which is helpful.  Wheeler is ok, personally I think his agreements are the least complex and I don't believe that he may have built in the same level of protection for his clients.
>
>
> Rob – thoughts here?
>
>
>
> **Flint Richardson | CPA | Chandler | AZ| 85225 |**
> office 480.889.4888 | fax 480.889.8997 | flint@wsedge.biz |
>
>
> **<IMAGE003.JPG>**
>
>
> ********************************************************************************
> ********************************************************************************
> ********

This e-mail message may contain legally privileged and/or confidential information. If you are not the intended recipient(s), or the employee or agent responsible for delivery of this message to the intended recipient(s), you are hereby notified that any dissemination, distribution or copying of this e-mail message is strictly prohibited. If you have received this message in error, please immediately notify the sender and delete this e-mail message from your computer.

CONFIDENTIAL

**SA131**

ROSETTE_REVISED_052496

IRS CIRCULAR 230 DISCLOSURE:  To ensure compliance with Treasury Department regulations, we inform you that any U.S. federal tax advice contained in this correspondence (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties that may be imposed under the U.S. Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

**From:** mattm@bellicosevi.com [mailto:mattm@bellicosevi.com]
**Sent:** Friday, August 26, 2011 2:20 AM
**To:** Flint Richardson
**Cc:** Scott Merritt; Rob Rosette
**Subject:** Re: Question on Docs

Does her structure differ somehow? I'm curious how she will be more value added than the other 3 lawyers we've engaged now. Also, how is Wheeler Neff?

On Aug 26, 2011, at 3:23 AM, "Flint Richardson" <flint@wsedge.biz> wrote:

> Matt – sorry for the delay on getting back to you.  I was sick this afternoon so ended up leaving the office at around 4 and slept/threw up until about 8:30.  Please give Rob a call tomorrow at 480-242-9810 as I will be in transit to MI all morning and he is the expert on agreement type questions.  Following are some initial responses on your questions (the ones that I can answer).          Further, upon further reflection we would in fact recommend that you engage Claudia Callaway in order to assist you with the agreements.  She has a superb structure that we have just completed the review on and we believe that utilizing her on this will expedite us getting this deal done.
>
>
> A) If Wells Fargo is subpoenaed, what information is given (names of signors) which exposes whoever is a signor on behalf of Servicer.  Can this be hedged? ==YES, IF YOU WANT THE TRIBE TO BE THE EXCLUSIVE SIGNER ON THE ACCOUNT.==
>
> B) For the USVI, Bellicose can have nothing to do with "Loan Originations", it can only provide the Analytics and such, and I think the Tribe has to be the originator anyway, correct? ==YES, CORRECT – CORNERSTONE OF THE SOVEREIGN MODEL.== In fact, the Loan Management Software would have to be with the Tribe, and not with Bellicose.  This creates a problem where it says "Servicer, shall determine whether such applicants are eligible for Loans from Consumer Lender based on Consumer Lender's credit granting standards duly adopted from time to time by Consumer Lender and applied by Servicer".  Bellicose wants to provide the IP, but Consumer Lender should be the one making the final decision and originating the loans on Tribal Land.  If I'm not mistaking, that applies to support the Tribal Jurisdiction as well?  Similarly, Bellicose can't be as stated in provision 6 specifically.  The USVI will require better separation that the Tribe is the originator and Bellicose is simply a consultant/Manager. ==THE TRIBE ESTABLISHES THE LENDING CRITERIA, AND IS THE LENDER BELLICOSE IS JUST CARRYING OUT THE TRIBE'S DIRECTION.  WE CAN CHANGE THE LANGUAGE HOWEVER YOU WOULD LIKE.==

CONFIDENTIAL                                    **SA132**                      ROSETTE_REVISED_052497

C) If possible, we'd like the Tribe to be on all vendor documents so any subpoena given to any vendor points to the Tribe. This does, however, create an issue of protecting the information. TRIBE SHOULD BE ON ALL VENDOR DOCUMENTS WEB-SITE, ACH AGREEMENTS ETC – WE AGREE. INFORMATION IS IN THE POSSESSION OF THE SERVICER.

Can you elaborate on this: So the Tribal Lending entity has a Tribal Management Company, which is going to be the Bellicose customer – NO, YOUR ENTITY WOULD BE THE SERVICER FOR THE LENDING OPERATION. THE LLC MANAGERS ARE MANAGERS OF THE LLC ENTITY ON BEHALF OF THE TRIBE BUT ARENT INVOLVED IN THE BUSINESS.

Does it mean that Bellicose is the Manager of the Tribal LLC? Similarly, in what capacity is Bellicose's name on the operating account of the Tribe? NO REPRESENTATIVES FROM THE TRIBE ARE THE LLC'S "MANAGERS". THE SERVICER, BELLCIOSE OPERATES THE BUSINESS COMPLETELTY.

**Flint Richardson | CPA** | Chandler | AZ| 85225 |
office 480.889.4888 | fax 480.889.8997 | flint@wsedge.biz |

**<IMAGE003.JPG>**

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

This e-mail message may contain legally privileged and/or confidential information. If you are not the intended recipient(s), or the employee or agent responsible for delivery of this message to the intended recipient(s), you are hereby notified that any dissemination, distribution or copying of this e-mail message is strictly prohibited. If you have received this message in error, please immediately notify the sender and delete this e-mail message from your computer.

IRS CIRCULAR 230 DISCLOSURE: To ensure compliance with Treasury Department regulations, we inform you that any U.S. federal tax advice contained in this correspondence (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties that may be imposed under the U.S. Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

CONFIDENTIAL

ROSETTE_REVISED_052498

**From:** mattm@bellicosevi.com [mailto:mattm@bellicosevi.com]
**Sent:** Thursday, August 25, 2011 11:59 AM
**To:** Flint Richardson; 'Scott Merritt'; Rob Rosette
**Subject:** RE: Question on Docs

This is helpful thanks.  Can you hop on a call real quick with me and walk through this, I'd have to call you though, cell doesn't work down here:

The Servicing Agreement says that it is between Consumer Lender and XYZ Company, another "wholly-owned, unincorporated entity of the _____, created under Tribal law".  I've seen these models before, and I'm not sure which way to go is the best.   My concern/questions surround:

A) If Wells Fargo is subpoenaed, what information is given (names of signors) which exposes whoever is a signor on behalf of Servicer.  Can this be hedged?

B) For the USVI, Bellicose can have nothing to do with "Loan Originations", it can only provide the Analytics and such, and I think the Tribe has to be the originator anyway, correct?  In fact, the Loan Management Software would have to be with the Tribe, and not with Bellicose.  This creates a problem where it says "Servicer, shall determine whether such applicants are eligible for Loans from Consumer Lender based on Consumer Lender's credit granting standards duly adopted from time to time by Consumer Lender and applied by Servicer".  Bellicose wants to provide the IP, but Consumer Lender should be the one making the final decision and originating the loans on Tribal Land.  If I'm not mistaking, that applies to support the Tribal Jurisdiction as well?  Similarly, Bellicose can't be as stated in provision 6 specifically.  The USVI will require better separation that the Tribe is the originator and Bellicose is simply a consultant/Manager.

C) If possible, we'd like the Tribe to be on all vendor documents so any subpoena given to any vendor points to the Tribe.  This does, however, create an issue of protecting the information.

Can you elaborate on this: So the Tribal Lending entity has a Tribal Management Company, which is going to be the Bellicose customer – NO, YOUR ENTITY WOULD BE THE SERVICER FOR THE LENDING OPERATION.  THE LLC MANAGERS ARE MANAGERS OF THE LLC ENTITY ON BEHALF OF THE TRIBE BUT ARENT INVOLVED IN THE BUSINESS.

Does it mean that Bellicose is the Manager of the Tribal LLC?  Similarly, in what capacity is Bellicose's name on the operating account of the Tribe?

**Regards,**

CONFIDENTIAL
**SA134**
ROSETTE_REVISED_052499

**Matt Martorello**

Mobile: 773-209-7720

Email: MattM@BellicoseVI.com

<image005.jpg>

---

**From:** Flint Richardson [mailto:flint@wsedge.biz]
**Sent:** Thursday, August 25, 2011 2:40 PM
**To:** mattm@bellicosevi.com; 'Scott Merritt'; Rob Rosette
**Subject:** RE: Question on Docs

Matt – see attached document with you initial questions from August 23 along with responses which are underlined.  Following are responses to your email below:

So the Tribal Lending entity has a Tribal Management Company, which is going to be the Bellicose customer – NO, YOUR ENTITY WOULD BE THE SERVICER FOR THE LENDING OPERATION.  THE LLC MANAGERS ARE MANAGERS OF THE LLC ENTITY ON BEHALF OF THE TRIBE BUT ARENT INVOLVED IN THE BUSINESS.

Do we want to service the Tribal Management Company or do we want to service the Tribe directly?  YOU WILL BE THE SERVICER FOR THE UNIQUE LLC THAT IS ESTABLISHED – FOR INSTANCE, YOUR SERVICING AGREEMENT WOULD BE FOR RED ROCK LENDING, LLC (WHICH IS THE TRIBALLY ESTABLISHED ENTITY FOR LENDING)

What's the advantage of the Tribal Lender having the Tribal Service Entity?  Trying to get these docs done and still not certain what the structure looks like in this regard.  PLEASE CALL ME IF YOU HAVE QUESTIONS RELATED TO ANY OF OUR RESPONSES.

Thanks Matt.

CONFIDENTIAL

**SA135**

ROSETTE_REVISED_052500

**Flint Richardson** | **CPA** | Chandler | AZ| 85225 |
office 480.889.4888 | fax 480.889.8997 | flint@wsedge.biz |


**<IMAGE006.JPG>**


\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

This e-mail message may contain legally privileged and/or confidential information. If you are not the intended recipient(s), or the employee or agent responsible for delivery of this message to the intended recipient(s), you are hereby notified that any dissemination, distribution or copying of this e-mail message is strictly prohibited. If you have received this message in error, please immediately notify the sender and delete this e-mail message from your computer.


**IRS CIRCULAR 230 DISCLOSURE**:  To ensure compliance with Treasury Department regulations, we inform you that any U.S. federal tax advice contained in this correspondence (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties that may be imposed under the U.S. Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.


**From:** mattm@bellicosevi.com [mailto:mattm@bellicosevi.com]
**Sent:** Thursday, August 25, 2011 11:24 AM
**To:** flint@wsedge.biz; Scott Merritt (smerritt@answersetc.com); Rob Rosette (rosette@rosettelaw.com)
**Subject:** Question on Docs


So the Tribal Lending entity has a Tribal Management Company, which is going to be the Bellicose customer.  Do we want to service the Tribal Management Company or do we want to service the Tribe directly?  What's the advantage of the Tribal Lender having the Tribal Service Entity?  Trying to get these docs done and still not certain what the structure looks like in this regard.


**Regards,**


**Matt Martorello**

Mobile: 773-209-7720

6

Email: MattM@BellicoseVI.com

<image005.jpg>

CONFIDENTIAL

**SA137**

ROSETTE_REVISED_052502

**Darcie Pace**

---

| | |
|---|---|
| **From:** | mattm@bellicosevi.com |
| **Sent:** | Friday, August 26, 2011 5:20 AM |
| **To:** | Flint Richardson |
| **Cc:** | Scott Merritt; Robert Rosette |
| **Subject:** | Re: Question on Docs |

Does her structure differ somehow? I'm curious how she will be more value added than the other 3 lawyers we've engaged now. Also, how is Wheeler Neff?

On Aug 26, 2011, at 3:23 AM, "Flint Richardson" <flint@wsedge.biz> wrote:

> Matt – sorry for the delay on getting back to you.  I was sick this afternoon so ended up leaving the office at around 4 and slept/threw up until about 8:30.  Please give Rob a call tomorrow at 480-242-9810 as I will be in transit to MI all morning and he is the expert on agreement type questions.  Following are some initial responses on your questions (the ones that I can answer).            Further, upon further reflection we would in fact recommend that you engage Claudia Callaway in order to assist you with the agreements.  She has a superb structure that we have just completed the review on and we believe that utilizing her on this will expedite us getting this deal done.
>
>
>
> A) If Wells Fargo is subpoenaed, what information is given (names of signors) which exposes whoever is a signor on behalf of Servicer.  Can this be hedged?  ==YES, IF YOU WANT THE TRIBE TO BE THE EXCLUSIVE SIGNER ON THE ACCOUNT.==
>
> B) For the USVI, Bellicose can have nothing to do with "Loan Originations", it can only provide the Analytics and such, and I think the Tribe has to be the originator anyway, correct?  ==YES, CORRECT – CORNERSTONE OF THE SOVEREIGN MODEL.== In fact, the Loan Management Software would have to be with the Tribe, and not with Bellicose.  This creates a problem where it says "Servicer, shall determine whether such applicants are eligible for Loans from Consumer Lender based on Consumer Lender's credit granting standards duly adopted from time to time by Consumer Lender and applied by Servicer".  Bellicose wants to provide the IP, but Consumer Lender should be the one making the final decision and originating the loans on Tribal Land.  If I'm not mistaking, that applies to support the Tribal Jurisdiction as well?  Similarly, Bellicose can't be as stated in provision 6 specifically.  The USVI will require better separation that the Tribe is the originator and Bellicose is simply a consultant/Manager.  ==THE TRIBE ESTABLISHES THE LENDING CRITERIA, AND IS THE LENDER BELLICOSE IS JUST CARRYING OUT THE TRIBE'S DIRECTION.  WE CAN CHANGE THE LANGUAGE HOWEVER YOU WOULD LIKE.==
>
> C) If possible, we'd like the Tribe to be on all vendor documents so any subpoena given to any vendor points to the Tribe.  This does, however, create an issue of protecting the information.  ==TRIBE SHOULD BE ON ALL VENDOR DOCUMENTS WEB-SITE, ACH AGREEMENTS ETC – WE AGREE.  INFORMATION IS IN THE POSSESSION OF THE SERVICER.==
>
>
> Can you elaborate on this: So the Tribal Lending entity has a Tribal Management Company, which is going to be the Bellicose customer – NO, YOUR ENTITY WOULD BE THE SERVICER FOR THE LENDING

CONFIDENTIAL

**SA138**

ROSETTE_REVISED_052503

OPERATION.  THE LLC MANAGERS ARE MANAGERS OF THE LLC ENTITY ON BEHALF OF THE TRIBE BUT
ARENT INVOLVED IN THE BUSINESS.

Does it mean that Bellicose is the Manager of the Tribal LLC?  Similarly, in what capacity is Bellicose's
name on the operating account of the Tribe?  NO REPRESENTATIVES FROM THE TRIBE ARE THE LLC'S
"MANAGERS".  THE SERVICER, BELLCIOSE OPERATES THE BUSINESS COMPLETELTY.

**Flint Richardson** | **CPA** | Chandler | AZ| 85225 |
office 480.889.4888 | fax 480.889.8997 | flint@wsedge.biz |

**<IMAGE003.JPG>**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*

This e-mail message may contain legally privileged and/or confidential information. If you are not the intended
recipient(s), or the employee or agent responsible for delivery of this message to the intended recipient(s), you are
hereby notified that any dissemination, distribution or copying of this e-mail message is strictly prohibited. If you have
received this message in error, please immediately notify the sender and delete this e-mail message from your
computer.

**IRS CIRCULAR 230 DISCLOSURE**:  To ensure compliance with Treasury Department regulations, we inform you
that any U.S. federal tax advice contained in this correspondence (including any attachments) is not intended or
written to be used, and cannot be used, for the purpose of (i) avoiding penalties that may be imposed under the U.S.
Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter
addressed herein.

**From:** mattm@bellicosevi.com [mailto:mattm@bellicosevi.com]
**Sent:** Thursday, August 25, 2011 11:59 AM
**To:** Flint Richardson; 'Scott Merritt'; Rob Rosette
**Subject:** RE: Question on Docs

This is helpful thanks.  Can you hop on a call real quick with me and walk through this, I'd have to call
you though, cell doesn't work down here:

## IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

|  |  |  |
|---|---|---|
| LULA WILLIAMS, *et al.*, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:17-cv-461 (REP) |
| | ) | |
| BIG PICTURE LOANS, LLC, *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

|  |  |  |
|---|---|---|
| RENEE GALLOWAY, *et al.*, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:18-cv-406 (REP) |
| | ) | |
| BIG PICTURE LOANS, LLC, *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

### PLAINTIFFS' OPPOSITION TO DEFENDANT MATT MARTORELLO'S
### MOTION TO DISMISS FOR FAILURE TO JOIN NECESSARY AND INDISPENSABLE
### PARTIES UNDER FEDERAL RULE OF CIVIL PROCEDURE 19 and 12(b)(7)

Plaintiffs, on behalf of themselves and all others similarly situated, by counsel, respectfully

submit this Memorandum in Opposition to Defendant Matt Martorello's Motion to Dismiss for

Failure to Join Necessary and Indispensable Parties Under Federal Rule of Civil Procedure 19. *See*

*Williams* at ECF No. 987; ECF No. 988.[1]

### INTRODUCTION

This motion is Martorello's latest attempt to exploit tribal sovereignty. Invoking Rule 19

---

[1] Martorello filed virtually identical motions in both the *Williams* and *Galloway* matters. For the purpose of simplicity, Plaintiffs will refer to the ECF Nos. in the *Williams* matter. The corresponding entries in *Galloway* are at ECF Nos. 592 & 593.

1
**SA140**

of the Federal Rules of Civil Procedure, Martorello seeks to further capitalize from his tribal lending model by requesting this Court to dismiss Plaintiffs' claims on the grounds that Big Picture, Ascension, and the Tribe are necessary and indispensable parties. At least two other courts have denied similar motions from rent-a-tribe operators. *Commonwealth of Pennsylvania v. Think Fin., Inc.*, 2016 WL 183289, at *4 (E.D. Pa. Jan. 14, 2016); *Gingras v. Rosette*, 2016 WL 2932163, at *20 (D. Vt. May 18, 2016). Undeterred by these cases, Martorello presents the Court with virtually identical arguments—primarily focusing on Big Picture's purported financial interest in the enforceability of the loans. But where, as here, a plaintiff seeks monetary damages from a co-conspirator: "[i]t has long been the rule that it is not necessary for all joint tortfeasors to be named as defendants in a single lawsuit." *Temple v. Synthes Corp., Ltd.*, 498 U.S. 5, 7 (1990); *see also Southern Co. Energy Mktg., L.P. v. Virginia Elec. & Power Co.*, 190 F.R.D. 182, 186 n.5 (E.D. Va. 1999) (citing *Temple* and explaining that it is "firmly established rule that joint tortfeasors are not necessary parties.").

Even putting this well established rule aside, Martorello has far bigger problems in this case: Rule 19 is a joinder rule that attempts to preserve the rights of <u>absent</u> parties. Here, Big Picture, Ascension, several of their executives, and the Tribal Officials (hereafter "the Settled Parties") were <u>joined</u> as parties to this litigation. And as a result of more than two years of litigation, Plaintiffs reached a class action settlement with the Settled Parties, part of which expressly negotiated that Plaintiffs' claims against Martorello would continue. *See* ECF No. 988-1 at ¶ 2.16. Far from an absent party, the Settled Parties were active litigants that negotiated a settlement with Plaintiffs, including an express term that allowed Plaintiffs to proceed in their claims for monetary damages against Martorello. *Id.* Under these circumstances, Rule 19 is simply inapplicable as there is no absent party or claimed interest as required by the plain language and

purpose of the rule.

## PROCEDURAL HISTORY

The Court is already very familiar with the history of this litigation. As it has previously explained, certain plaintiffs "have filed in *Williams*, *Galloway I*, and *Galloway II*, three similar, but in many respects substantively quite different, actions arising out of a so-called "Rent A Tribe" scheme allegedly orchestrated by Matt Martorello, members of his family, companies that he controls, and investors who allegedly funded the scheme (the "Martorello Defendants"). *Williams v. Big Picture Loans, LLC*, No. CV 18CV406, 2020 WL 1879675, at *1 (E.D. Va. Apr. 15, 2020). In addition to Martorello, his family, and his companies, plaintiffs also filed these actions against "certain entities related to the Lac Vieux Desert Band of Lake Superior Chippewa Indians… and officers, employees and agents of those entities." *Id*.

After more than two years of litigation, Plaintiffs entered into a class action settlement with Big Picture, Ascension, several of their executives, and the Tribal Officials. *Galloway v. Williams*, No. 3:19-CV-470, 2020 WL 7482191, at *2 (E.D. Va. Dec. 18, 2020) (providing background on the events leading to the settlement). Although Martorello participated in the mediation sessions, Plaintiffs could not reach a settlement with him, his family, or his companies and, as a result, the Settlement Agreement specifically carved out the Martorello related defendants. *Id*. at *1; see also ECF No. 988-1 at ¶ 2.16. On December 20, 2020, the Court granted final approval of the class action settlement, which expressly contemplated that this litigation would continue against Martorello. *Galloway*, 2020 WL 7482191, at *1.

## LEGAL STANDARD

Rule 12(b)(7) allows a court to dismiss a claim for failure to join a party under Rule 19. Rule 19 "establishes separate tests for determining whether a party is 'necessary' and whether a

party is 'indispensable,' meaning that courts must engage in a two-step inquiry. *Horner v. Pharmacists Mut. Ins. Co.*, 2010 WL 5677695, at *5 (E.D. Va. Dec. 17, 2010) (Lauck, J.), *adopted by*, 2011 WL 336468 (E.D. Va. Feb. 3, 2011) (Williams, J.). First, the court must determine whether the party is "necessary," and if so, then the Court must determine whether the party is " indispensable." "Importantly, the party asserting the Rule 12(b)(7) defense bears the burden of showing that a person not joined is necessary and indispensable." *Id*. (citing *Am. Gen. Life & Accident Ins. Co. v. Wood,* 429 F.3d 83, 92 (4th Cir.2005)). "Upon review of a Rule 12(b)(7) motion, like any motion under Rules 12(b) or 12(c), 'a court must accept all factual allegations in the complaint as true and draw inferences in favor of the non-moving party.'" *Quinn v. Fishkin*, 117 F. Supp. 3d 134, 139 (D. Conn. 2015) (quoting 5C Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1359 (3d ed.)).

## **ARGUMENT**

### I.    **Rule 19 applies to nonjoined parties—not settling parties such as Big Picture and Ascension.**

Martorello asserts that "Big Picture, Ascension, and the Tribe are necessary parties under Rule 19(a) because of their contractual interests in the loan agreements" and because "Plaintiffs' claims challenge" the Tribe's "sovereign interests in regulating Big Picture's lending business." ECF No. 988 at 1-2. However, Big Picture, Ascension, and the Tribal Council Defendants have all been involved in the litigation and have settled with Plaintiffs. *Galloway v. Williams*, No. 3:19-CV-470, 2020 WL 7482191, at *1 (E.D. Va. Dec. 18, 2020) (granting final approval of the class action settlement between Plaintiffs, Big Picture, Ascension, and the Tribe's officials). Thus, Martorello's motion is fundamentally flawed: Rule 19 simply does not apply to parties who have settled Plaintiffs' claims. *See, e.g.*, *Shropshire v. Canning*, No. 10-CV-01941-LHK, 2012 WL 13658, at *5-6 (N.D. Cal. Jan. 4, 2012) (explaining that Rule 19's concerns were no longer present

because a settling party had already been joined to the action).

To begin, the express terms of Rule 19 address the "Required Joinder of Parties." Fed. R. Civ. P. 19. Thus, Rule 19 involves an analysis of persons who are not parties to the action and involves a determination of whether such a person is a "Required Party." Fed. R. Civ. P. 19(a). In pertinent part, the rule begins with the following condition: "A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if. . ." Fed. R. Civ. P. 19. Against this backdrop, the rule then creates two situations where an absent litigant should be joined: (1) if the court "cannot afford complete relief among the existing parties;" or (2) where a person "claims an interest relating to the subject of the action." Id. at 19 (a)(1)(A)-(B).

The purpose of Rule 19 is to "preserve the rights of parties to make known their interests and legal theories'" and to protect an absent "party's right to be heard and to participate in adjudication of a claimed interest." *Shropshire*, 2012 WL 13658, at *5 (citation and quotations omitted). These concerns are simply not present where, as here, the persons were involved in the litigation and have settled the plaintiffs' claims. In other words, the settlement with persons no longer involved in the action does not: (1) create a threat of repeated lawsuits on the same matter; (2) prejudice the settled party; or (3) create a threat of double or inconsistent liability to the settled party. *See* Fed. R. Civ. P. 19.

Because Rule 19 was enacted to protect absent—not settled—parties, courts have repeatedly rejected similar attempts. *See, e.g.*, *Shropshire*, 2012 WL 13658, at *5-6 (N.D. Cal. Jan. 4, 2012) (Order) (explaining the purpose of Rule 19 and explaining that a party that was given an opportunity but chose not to claim an interest in the litigation did not subject the defendant to a substantial risk of incurring double, multiple, or inconsistent obligations); *Hill v. Mallinckrodt*

*LLC*, No. 1:19CV532, 2020 WL 956589, at *3 (M.D.N.C. Feb. 27, 2020) (explaining, in a similar context, that the absent party's "interest has already been adequately protected through their participation in the South Carolina action and <u>the resulting settlement</u>" between the absent party and the plaintiff) (emphasis added); *CRST Expedited, Inc. v. TransAm Trucking, Inc*., No. C16-52-LTS, 2018 WL 2016273, *9 (N.D. Iowa Mar. 30, 2018) (finding settlement of some claims could affect calculation of damages, but does not factor into an analysis of joinder); *Sec. & Exch. Comm'n v. Nodurft*, No. 8:09-CV-866-T-26TGW, 2009 WL 10671156, at *1 (M.D. Fla. June 17, 2009) (denying a Rule 19 motion, including as to "Defendants who were named in the earlier lawsuit… which was settled"); *Thompson v. United Transp. Union,* No. 99-2288-JWL, 2000 WL 382033, at *2 (D. Kan. Mar. 30, 2000) (denying Rule 19 motion for joinder of settled party, noting that "[p]resumably, [the settling defendant] would not have settled with plaintiff if it had known it could still be brought into the litigation by the nonsettling [defendant]").

The Ninth Circuit addressed a similar issue in *U.S. ex rel. Morongo Band of Mission Indians v. Rose*, 34 F.3d 901 (9th Cir 1994).  In that case, the plaintiff filed claims against defendants Rose and Miller and sought injunctive relief against the defendants.  *Id*. at 903-04. The plaintiff and Miller agreed to a stipulated dismissal of Miller, who was a party to the disputed contracts.  *Id*. at 904.  After the dismissal, "Rose moved to dismiss the complaint for failure to join Miller as an indispensable party." Id. The district court denied Rose's motion, and the Ninth Circuit affirmed:

> The purpose of Fed. R. Civ. P. 19(a)(2)(i) is to protect the legitimate interests of absent parties, as well as to discourage multiplicitous litigation. Ordinarily, any party may move to join any such interested party. In this case, however, the procedural history is such that it is inappropriate for one defendant to attempt to champion an absent party's interests. <u>Miller was originally a defendant in the action, but he and the Band stipulated to his dismissal shortly after this court's resolution of the first appeal. Therefore, Miller's voluntary dismissal indicates that Miller himself did not feel that it was necessarily in his interest to remain a party in</u>

<u>this action. This is the best evidence that Miller's absence would not impair or impede his ability to protect his interests</u>. Moreover, Miller filed declarations in support of his position, and Rose had every incentive to pursue the defense based on the contract[s] to which Miller was a party. "Impairment may be minimized if the absent party is adequately represented in the suit." *Makah*, 910 F.2d at 558. We believe that these facts provide a solid basis for a conclusion that Miller's interests would not be prejudiced by his absence.

*Id.* at 908 (emphasis added).  The Ninth Circuit also noted that, as in this case, "[t]here is no indication that Rose sought to retain Miller as a party at the time of Miller's dismissal, probably because Rose is only interested in securing dismissal of the action against him, not in joining Miller." *Id.* at 908 n.6.  These facts are analogous to the present case:  Miller's participation in the suit and election to join in a stipulated dismissal are similar to the Settled Parties' involvement in this case and negotiation for dismissal.  Also, Martorello has also misused Rule 19 for purposes of seeking dismissal, with no real interest in joinder of the Settled Parties.

Thus, Martorello's argument that the Settled Parties are necessary parties because of their "contractual interests in the loan agreements" cannot satisfy his burden. Because Big Picture and Ascension were involved in the litigation and settled with Plaintiffs, they cannot be considered a person that "has not been joined" under Rule 19. The involvement of Big Picture, Ascension, and the Tribal Council Defendants in the litigation and their settlement with Plaintiffs, obviates any claim that Big Picture, Ascension, or the Tribe is a necessary party to Plaintiffs' claims against Martorello.

## II.    Martorello has not established that Big Picture, Ascension, and the Tribe are necessary parties.

A "party is not necessary simply because joinder would be convenient, or because two claims share common facts . . . ." *S. Co. Energy Mktg., L.P. v. Virginia Elec. & Power Co.*, 190 F.R.D. 182, 185 (E.D. Va. 1999) (Ellis, J.). A party is necessary and must be joined only under three circumstances: (a) the nonparty's presence is needed to afford complete relief to those already

parties; (b) the nonparty claims an interest in the subject of the action and a failure to join the nonparty would impair or impede the nonparty's ability to protect that interest; or (c) the nonparty claims an interest in the subject of the action and failure to join the nonparty would leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations. *Id.*; Fed. R. Civ. P. 19(a)(1)(A)-(B).

Martorello argues that the present case presents two of the circumstances listed above: (a) that the Settled Parties are necessary to afford complete relief and (b) that failure to join the Settled Parties will impair their ability to protect their interests. However, as discussed below, Martorello has failed to meet his burden of establishing the existence of these circumstances.

### A.    The Court can accord complete relief among the existing parties.

Martorello is unable to establish the application of Rule 19(a)(1)(A) because the Court is in a position to accord complete relief among the existing parties—Plaintiffs and Martorello. Plaintiffs are not seeking an injunction restraining the Tribe or any Tribal entity. Instead, Plaintiffs seek exclusively monetary relief from Martorello. *See Williams*, ECF No. 1 ¶ 102; *see generally Galloway I*, ECF. No. 30.

*1. Plaintiffs are not seeking injunctive relief against Big Picture.* Ignoring the evolution of the litigation, Martorello makes a puzzling argument that Big Picture is a necessary party under Rule 19(a)(1)(A). *See* ECF No. 988 at 6. He highlights that the Complaint sought an injunction against "*all*" Defendants, which would include Big Picture as a Defendant in the case. *Id.* He argues that Big Picture is necessary because the Complaint initially sought injunctive relief against Big Picture as a Defendant and "Martorello has no ability to prevent Big Picture from collecting on its loans." ECF No. 988 at 6. Thus, Martorello mischaracterizes the injunctive relief being sought by ignoring the history of the case.

Big Picture is no longer a "Defendant," and Plaintiffs are clearly no longer seeking injunctive relief against Defendants who are no longer parties. Reading the Complaints in light of the procedural history of the case, the only relief Plaintiffs seek is monetary relief against Martorello. Plaintiffs are not required to amend their initial Complaints to reflect that "Defendants" as used throughout the Complaint no longer includes Big Picture.[2] Accordingly, Martorello has failed to establish that Big Picture is a necessary party under Rule 19(a)(1)(A).

*2. Plaintiffs are exclusively seeking monetary relief against Martorello.* A party is necessary and must be joined if "in that person's absence, the court cannot accord complete relief among underlying existing parties." Fed. R. Civ. P. 19(a)(1)(A) (emphasis added). Thus, the complete relief inquiry is limited to persons who are already parties—"not as between a party and the absent person whose joinder is sought." *United States v. Cnty. of Arlington*, 669 F.2d 925, 929 (4th Cir.1982) (quoting 3A Moore's Federal Practice P 19.07-1(1) at 9-128 (2d ed. 1979)). Relief is considered "complete" if it 'will effectively and completely adjudicate the dispute.'" *Pettiford v. City of Greensboro*, 556 F. Supp. 2d 512, 518 (M.D.N.C. 2008) (quoting 7 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 1604 (3d ed. 2001)). In other words, relief is not complete where it is only "partial" or "hollow" relief. Fed. R. Civ. P. 19 cmt.; *see also Gen. Refractories Co. v. First State Ins. Co.*, 500 F.3d 306, 315 (3d Cir. 2007).

Here, the Court may grant complete relief to Plaintiffs in the absence of Big Picture. Plaintiffs seek monetary damages available under RICO and state laws for Martorello's conduct. In rejecting nearly identical arguments in a similar case, the United States District Court for the Eastern District of Pennsylvania explained:

> [H]ere the relief sought by the Plaintiffs does not require the non-party tribes to do or refrain from doing anything. For example, the Plaintiff seeks disgorgement of

---

[2] Although not required, Plaintiffs are willing to file an Amended Complaint to remove all requests for declaratory and injunctive relief as to Big Picture and Ascension.

> the money earned by the Defendants only, not the money the tribes have earned, through the alleged scheme. The Plaintiff is not seeking a declaration that the contracts themselves are illegal, but rather a declaration that the Defendants' conduct violates a number of state and federal laws. The Chippewa Cree were engaged in consumer lending prior to their partnership with Think Finance and, since the tribes are not bound by the outcome of this case, they would be permitted to continue that business. The tribes continuing their business (without the services of the Defendants) would in no way limit the relief the Plaintiffs seek. The tribes are not required under Rule 19(a)(1)(a).

*Think Fin.*, 2016 WL 183289, at *4 (E.D. Pa. Jan. 14, 2016) (internal citations omitted) (citing

*Dillon v. BMO Harris Bank, N.A.*, 16 F. Supp. 3d 605, 615 (M.D.N.C. 2014) ("[J]udgment . . . will

not prohibit the lenders from lending money or from relying on other mechanisms to collect on

their loans.").

Simply put, Plaintiffs seek monetary damages for Martorello's violations of state and

federal law. Such relief would "accord complete relief among existing parties." Fed. R. Civ. P.

19(a). Put differently, the present case involves nothing more than a party seeking monetary

damages from a joint tortfeasor. It is well settled that Rule 19 is inapplicable in such situations.

*Dillon*, 16 F. Supp. 3d at 615 ("However, this is not an action to set aside a contract or for breach

of contract; Mr. Dillon's RICO and UDTPA claims arise under statutory schemes analogous to

tort law. The lenders are at most joint tortfeasors or co-conspirators. Neither are necessary parties

under Rule 19."); *Think Fin.*, 2016 WL 183289, at *7 ("We find the Commonwealth's argument

that the tribes are akin to joint tortfeasors, and therefore not necessary to be joined, persuasive.");

*Energy Mktg.*, 190 F.R.D. at 186 (same).[3]  Additionally, to the extent Plaintiffs may be able to

seek other relief from other nonparties for different claims, it is irrelevant as the inquiry under Rule

---

[3] As explained in the comments to Rule 19, subdivision (a) "is not at variance with the settled authority holding that a tortfeasor with the usual 'joint and several liability is merely a permissive party to an action against another with like liability." Fed. R. Civ. P. 19 at cmt. "Joinder of these tortfeasors continues to be regulated by Rule 20 . . . ." *Id.*

19(a)(1) looks only to the Court's ability to provide "complete relief among *existing* parties." Fed. R. Civ. P. 19(a) (emphasis added). Here, the joinder of the Settled Parties would add nothing to Plaintiffs' claims for Martorello's violations of federal and state law. Accordingly, the Court can accord complete relief among the existing parties.

###    B.    The Tribe does not claim an interest in the litigation.

Martorello asserts that Big Picture, Ascension, and the Tribe are necessary parties under Rule 19(a)(1)(B) based on their interest in the loan agreements and the Tribe's sovereign and economic interests. *See* ECF No. 988 at 6-13. However, Martorello produces no evidence establishing that Big Picture, Ascension, or the Tribe currently claim any interest in the litigation.[4] Martorello bears the burden to show that a third party claims this interest, not that he claims such interest on their behalf. *Scottsdale Ins. Co. v. B&G Fitness Center, Inc.*, No. 4:14-CV-187-F, 2015 WL 4641530, at *3 (E.D.N.C. Aug. 4, 2015). As explained below, the evidence attached to Martorello's brief instead unequivocally establishes that Big Picture, Ascension, and the Tribe do not claim any interest in Plaintiffs' claims against Martorello. *See Hill*, 2020 WL 956589 at *3

---

[4] Martorello attached as evidence the Settlement Agreement and the Declaration of Chairman James Williams, Jr. from July 2018. *See* ECF Nos. 988-1, 988-2. Martorello also cites to Brian McFadden and Simon Liang's motion to dismiss and misleadingly refers to them as "tribal officers." *See* ECF No. 988 at 13 n.3. To be clear, McFadden and Liang are not tribal officials or officers. They may arguably be called tribal employees because of their employment by Ascension. *Williams v. Big Picture Loans, LLC*, No. CV 3:18-MC-12, 2019 WL 542304, at *2 (E.D. Va. Feb. 11, 2019) ("Liang is the controller of Ascension and he was formerly an employee of Bellicose. He is a part owner of Eventide Credit Acquisitions, LLC ("Eventide") which provided the initial loan of $300M that was to fund the lending operations to be conducted by Ascension and Big Picture Loans after Bellicose became what is now Ascension and Big Picture Loans.") However, they are also Martorello's business partners and shareholders in Eventide. *Id.* Regardless, even if they somehow could speak for the Tribe, their argument that Big Picture's absence would prejudice the Tribe is mooted by Big Picture, McFadden, and Liang's participation in and settlement with Plaintiffs. *See Galloway*, 2020 WL 7482191, at *1 (explaining that the proposed settlement resolves "nine cases" against "25 different defendants," including McFadden and Liang).

(explaining that even if the absent party claimed an interest, that "interest ha[d] already been protected" through participation in a related action and "the resulting settlement" thereof).

To understand why, one must simply read the plain language of Rule 19(a)(1)(B), which only applies if the person "claims an interest relating to the subject of the action." Fed. R. Civ. P. 19(a)(1)(B). In other words, it is not enough that a party may be directly or indirectly impacted by litigation, they must "claim an interest." *Wellin v. Wellin*, No. 2:14-CV-4067-DCN, 2015 WL 628071, at *8 (D.S.C. Feb. 12, 2015) (gathering cases and explaining that "[c]ourts have held that application of Rule 19(a)(1)(B) is contingent on the absent party <u>actually claiming</u> an interest in the subject matter of the suit.") (emphasis added). Because Martorello has the burden of proof, his failure to offer any evidence of an actual claim by the Tribe, Big Picture, or Ascension is dispositive. *See, e.g.*, *United States v. Bowen*, 172 F.3d 682, 689 (9th Cir. 1999) (holding that a person who is aware of an action but chooses not to claim an interest is not a necessary party); *Marina One v. Jones*, 29 F. Supp. 3d 669, 678 (E.D. Va. 2014) (concluding that for an absent party to claim an interest there must be "some sort of affirmative indication by the absent party in the court hearing the Rule 19 matter" and that filing a tort action in state court that directly implicates the same agreement was not sufficient); *Think Fin.*, 2016 WL 183289, at *5 ("[T]he issue is whether the tribes claim an interest, not whether they have one."); *Altmann v. Republic of Austria*, 142 F. Supp. 2d 1187, 1212 (C.D. Cal. 2001), *aff'd*, 317 F.3d 954 (9th Cir. 2002) (same).

Worse yet for Martorello, he included the Settlement Agreement as an exhibit to his motion, which proves that Big Picture, Ascension, and the Tribe do not claim an interest in Plaintiffs' claims against Martorello. ECF No. 988-1. In the Agreement, Big Picture, Ascension, and the Tribal Council Defendants settled Plaintiffs' claims. The Settlement Agreement acknowledges the parties' awareness of the Plaintiffs' claims against Martorello and specifically

defines him as a "Non-Settling Defendant." *See* ECF No. 988-1 at ¶ 2.16. Further, the "Released Parties" is defined to include the Tribe, Big Picture, Ascension, and the Tribal Official Defendants and to expressly exclude "Matt Martorello." *Id*. at ¶ 2.22. The Settlement Agreement also expressly specified that the Final Approval Order would "dismiss[] with prejudice Plaintiffs' claims (which shall not include Plaintiffs' Claims against the Non-Settling Defendants)." *Id*. at ¶ 2.14. Further, with respect to the Parties' agreement to seek a stay of all actions related to the litigation, it was expressly specified that "[t]he stay will not apply to the prosecution of claims against the Non-Settling Defendants." *Id*. at ¶ 5.3. Further, Big Picture agreed that, if a class action is certified against Martorello, Big Picture will provide data for the purpose of identifying and distributing funds to class members. *Id*. at ¶ 6.3. Notably, the signatories to the Agreement included, *inter alia*, the Tribal Chairman, James Williams, Jr.; Big Picture; Ascension; and other Tribal Officials. *Id*. at 54.

Further, even assuming absent persons claimed an interest similar to the economic benefits Martorello claims on behalf of the Tribe, such a financial interest would not fall within the scope of interests protected by Rule 19, which "does not protect every interest an absentee may have." *Lennar Mare Island v. Steadfast Ins.*, 139 F. Supp. 3d 1141, 1151 (E.D. Cal. 2015). For example, it is well settled that "a financial stake in the outcome of the litigation is not a legally protected interest giving rise to § 19(a)(2) necessity." *Disabled Rights Action Comm. v. Las Vegas Events*, 375 F.3d 861, 883 (9th Cir. 2004). Indeed, in a similar case involving a rent-a-tribe scheme, Judge Hudson denied a Rule 19 motion where the defendant claimed that the tribal lender, Island Finance, was a necessary party. *Pettus*, 2015 WL 9255331, at *3. In doing so, Judge Hudson explained

"[c]omplicating or tangentially affecting one's business does not rise to the level of impairing one's ability to protect one's interest . . . ." *Id.*[5]

In sum, Martorello not only failed to establish an actual claimed interest by the Tribe, Big Picture, and/or Ascension, the evidence submitted by him shows that the Tribe, Big Picture, and Ascension expressly agreed that this litigation could continue as part of its settlement. Accordingly, Martorello cannot establish that Rule 19(a)(1)(B) applies.

## III.    Martorello has not established that Big Picture, Ascension, and the Tribe are indispensable parties under Rule 19(b).

As discussed in Part II, Martorello is unable to establish the Tribe, Big Picture, or Ascension are necessary parties. The necessary parties issue is not a close one, particularly given that (1) Plaintiffs are only seeking monetary damages against Martorello and (2) existence of the Settlement Agreement. Accordingly, because only necessary persons can be indispensable, the Court need not consider whether Tribe, Big Picture, or Ascension are indispensable absent parties. *See e.g.*, *Schlumberger Indus., Inc. v. Nat'l Sur. Corp.*, 36 F.3d 1274, 1285–86 (4th Cir. 1994) ("Only necessary persons can be indispensable, but not all necessary persons are indispensable."); *Think Fin.*, 2016 WL 183289 at *8, n.7 ("Having not found the tribes necessary under Rule 19(a), we are not required to analyze whether they are indispensable under Rule 19(b)."). Nonetheless, Plaintiffs briefly discuss the indispensable analysis and address Martorello's arguments on this issue.

---

[5] *See also Pa. Transp. Auth. v. Pa. Pub. Util. Comm'n*, 210 F. Supp. 2d 689, 718 (E.D. Pa. 2002) (stating that "the interest held by the allegedly necessary party 'must be legally protected, and must be more than a mere financial interest'"); *Kenko Int'l v. Asolo S.r.l.*, 838 F. Supp. 503, 506 (D. Colo. 1993) (requiring "legally protected interest, and not merely a financial interest or interest of convenience").

### A. The Rule 19(b) factors weigh in favor of the case proceeding against Martorello.

Courts consider four factors in deciding whether "in equity and good conscience, the action should proceed among the existing parties or should be dismissed." Fed. R. Civ. P. 19(b). The four factors are: (1) the extent to which a judgment rendered in absence of the Tribe might prejudice the Tribe or the existing parties; (2) the extent to which any prejudice could be lessened or avoided; (3) whether a judgment rendered in the Tribe's absence would be adequate; and (4) whether Plaintiffs would have an adequate remedy if the action were dismissed for nonjoinder. Fed. R. Civ. P. 19(b). All four factors would weigh in favor of the case proceeding in the absence of the Tribe, Big Picture, and Ascension if they were in fact absent and necessary parties.

**First**, there is no chance of prejudice to the Tribe, Big Picture, and Ascension, especially in light of the Settlement Agreement. The first factor involves "a consideration of what a judgment in the action would mean to the absentee." Fed. R. Civ. P. 19 cmt. The Court should consider whether the Tribe would be "adversely affected in a practical sense" and, if so, whether the prejudice would be "immediate and serious, or remote and minor." *Id.* With respect to the enforceability of the agreement, Plaintiffs do not currently seek to enforce, rely on, or otherwise set aside a valid or voidable agreement. Instead, Plaintiffs seek monetary damages against Martorello for his violations of state and federal law. To the extent the Court determines the enforceability of the lending agreements, the Tribe is not a party to the agreements and never had the power to enforce the agreements. To the extent the Big Picture is a necessary party for this reason, Big Picture has entered into a Settlement Agreement with Plaintiffs, and thus Big Picture has participated in the litigation to protect their own interests. As discussed, Big Picture, Ascension, and the Tribal Official Defendants all participated in the settlement and have thus protected their interests and the interests of the Tribe.

This action does not in any way challenge the sovereignty of the Tribe. This action does not challenge the operations of the Tribe, nor does it challenge Martorello's relationship with the Tribe. In light of the remaining parties in the case and Settlement Agreement, Plaintiffs are only seeking monetary damages from Martorello at this time for his violations of state and federal law. Accordingly, there is no chance of prejudice to the Tribe, Big Picture, and Ascension.

*Second*, the Court may fashion any relief awarded to Plaintiffs in a manner that will eliminate any prejudice to the Tribe, Big Picture, or Ascension. Plaintiffs' lawsuit seeks monetary damages from Defendants, and the Court may award damages for Martorello's statutory violations without prejudicing the Tribes. *See* Fed. R. Civ. P. 19 cmt. (explaining that the awarding of monetary damages where specific relief would damage an absentee would be appropriate). By extension, Plaintiffs challenge only Martorello's violations of Virginia and federal law.

*Third*, the absence of the Tribe, Big Picture, and Ascension would not render any judgment inadequate. This action challenges Martorello's violations of federal and state consumer protection statutes. The Court has the authority to render an adequate judgment to address Plaintiffs' claims for Martorello's violations of these remedial statutes.

*Fourth*, Plaintiffs would be left with no remedy for Martorello's violations of federal and state law if this action were dismissed for nonjoinder of absent parties. Martorello and others created the rent-a-tribe scheme in an effort to avoid liability for their practices that violate state and federal consumer protection laws. Martorello and others crafted the lending agreements in a manner that prospectively waived the application of all federal and state law from the lending agreements and sets forth a sham arbitration system that insulates any decision from judicial review by state or federal courts. Martorello's argument that Plaintiffs "can pursue relief under the Tribal Dispute Resolution Procedure set forth in their loan agreements" is misleading in two

respects. *See* ECF No. 988 at 18. First, Plaintiffs have settled any claims against Big Picture, and thus they would be unable to seek any relief through the Tribal Dispute Resolution Procedure. Second, and more importantly, Plaintiffs would be left without a forum to pursue any relief from Martorello. Accordingly, this fourth factor weighs heavily in favor of the Court continuing the matter in the absence of the Tribe, Big Picture, and Ascension.

Accordingly, for the reasons discussed above, Martorello has not—and cannot—establish that the Tribe, Big Picture, and Ascension are indispensable parties.

**B.      Martorello's cited authority does not support dismissal in this case.**

Martorello makes several arguments in support of his position that Rule 19 necessitates dismissal of Plaintiffs' claims against him. Plaintiffs address these arguments below.

***First***, Martorello argues that because the Tribe, Big Picture, and Ascension benefit from tribal immunity, they must be indispensable, citing several cases noting that sovereign immunity of an absent necessary party is a compelling interest. However, none of the cases involves purely monetary claims against a joint tortfeasor.[6] *See* ECF No. 988 at 14, 18 (citing *Fluent v. Salamanca Indian Lease Auth.*, 928 F.2d 542 (2d Cir. 1991) (concluding a tribe was necessary and indispensable to claims seeking to set aside a lease agreement of tribal land); *Dine Citizens Against Ruining Our Env't v. Bureau of Indian Affairs*, 932 F.3d 843, 847 (9th Cir. 2019) (concluding a tribal corporation was a necessary and indispensable party in lawsuit challenging a variety of government agency decisions reauthorizing mining activity on tribal land by a tribal company), *cert. denied*, 141 S. Ct. 161 (2020); *White v. Univ. of California*, 765 F.3d 1010, 1027 (9th Cir. 2014) (declaratory judgment action by scientists seeking to establish that human remains found at archaeological site at UCSD were not Native American); *Republic of Philippines v. Pimentel*, 553

---

[6] Not to mention, the court also found that the absent party was necessary in each case.

U.S. 851, 854 (2008) (an interpleader action seeking to establish the ownership of property stolen by the President of the Philippines could not proceed without Republic of the Philippines and Philippine Commission on Good Governance); *Clark v. Harrah's NC Casino Co., LLC*, No. 1:17CV240, 2018 WL 6118624, at *3 (W.D.N.C. Apr. 27, 2018) (holding that Plaintiff's employment claim against casino could not proceed in the absence of Plaintiff's employer, which was a tribal entity).

**Second**, Martorello argues that Plaintiffs' claim for a declaratory judgment would prejudice Big Picture and the Tribe. *See* ECF No. 988 at 15-16. Plaintiffs are no longer seeking this relief, and thus this argument is moot.

**Third**, Martorello claims that permitting the actions to proceed in the absence of the Tribe "would also prejudice Martorello." ECF No. 988 at 16. Martorello claims he will not be able to present an adequate defense because "the Court cannot compel Big Picture, Ascension, and the Tribe to provide documents and witnesses." ECF No. 988 at 17. Martorello cites to no authority in support of this argument, which is unsupported by the language of Rule 19(b), which focuses on available relief and prejudice from the relief awarded by the court. *See* Fed. R. Civ. P. 19.

**Fourth**, Martorello cites to cases seeking to void or rescind contracts in support of his argument that the Tribe, Big Picture, and Ascension are indispensable parties. *See* ECF No. 988 at 17 (citing *United States ex rel. Hall v. Tribal Dev. Corp.*, 100 F.3d 476 (7th Cir. 1996) (the plaintiffs sought to void contracts between the defendants and the Tribe); *Hardy v. IGT, Inc.*, No. 2:10-CV-901-WKW, 2011 WL 3583745, at *6 (M.D. Ala. Aug. 15, 2011) (reasoning that the tribe were not merely joint tortfeasors because the plaintiffs' sought "rescission of a contract, where all the parties to the contract must be joined"); *Am. Greyhound Racing, Inc. v. Hull*, 305 F.3d 1015, 1018 (9th Cir. 2002) (concluding tribes were necessary and indispensable in case challenging

Arizona's gaming compacts with the tribes). These cases are not applicable here because Plaintiffs only seek monetary damages from Martorello for his violations of state and federal law.

As explained by the United States District Court for the Middle District of North Carolina, this type of analysis, specifically the reasoning in *Hardy*, was premised on plaintiff's seeking rescission of a contract as the sole remedy:

> *Hardy*, however, was an "action seeking rescission of a contract." The plaintiff sued the manufacturers of electronic bingo machines used in Tribal gaming facilities under an Alabama statute that voids gambling contracts. The plaintiff did not sue the Tribe. The court found that the Tribe was a required party because the action threatened the Tribe's contractual interests with gamblers and the manufacturers— the remedy for the only claim in the case was rescission. The *Hardy* court explicitly distinguished the case from lawsuits involving tort claims. Therefore, *Hardy* supports Mr. Dillon's argument that the lenders here are not required parties to the RICO and UDTPA claims.

*Dillon v. BMO Harris Bank*, 16 F. Supp. 3d 605, 613 (M.D.N.C. 2014). The same reasoning applies here where Plaintiffs do not seek rescission of any agreement. And, to the extent the Court's judgment may affect Martorello's willingness to "provide services" to the Tribe, "it will not prohibit the lenders from lending money or from relying on other mechanisms to collect on their loans." *Dillon*, 16 F. Supp. 3d at 615.

**Fifth**, Martorello makes the stunning claim that "Plaintiffs have an adequate remedy if these actions are dismissed" because "[t]hey can pursue relief under the Tribal Dispute Resolution Procedure set forth in their loan agreements." ECF No. 988 at 18. Martorello fails to clarify what relief and against whom Plaintiffs will be able to obtain. His argument is perhaps so vague because this assertion is unsupportable. For starters, Plaintiffs have settled with Big Picture; accordingly, there is no one to pursue claims against using this mechanism. And, Plaintiffs would have no forum in which to obtain relief against Martorello, who is not subject to the Tribal Dispute Resolution Procedure. *See* Tribal Code § 9.2(a), attached as Ex. 1 (specifying that the Tribal Dispute Resolution Procedure applies to claims arising by "an action or inaction of a Licensee," *e.g.*, Big

Picture); *see also Gibbs v. Haynes Investments, LLC*, 967 F.3d 332, 343–44 (4th Cir. 2020) (interpreting an identical tribal code and explaining that it violated the prospective waiver doctrine because it exempted non-tribal individuals like Martorello).

**IV.    Martorello makes his motion to protect himself rather than the Tribe.**

Martorello requests the Court to dismiss Plaintiffs' claims for monetary damages against him, pointing to the "sovereign interests" of the Tribe even though the Tribe claims no interest in the litigation. "Thus, [Martorello] attempt[s] to manipulate a doctrine designed to preserve tribal self-governance and independence into one that can be used as a legalistic loophole to assist non-Indians in the avoidance of civil liability . . . ." *Multimedia Games, Inc. v. WLGC Acquisition Corp.*, 214 F. Supp. 2d 1131, 1143 (N.D. Okla. 2001). Such an abuse of Rule 19 "cannot stand." *Id.*; *see also Dillon*, 16 F. Supp. 3d at 615 n.48 (citing *Multimedia Games* with approval as an additional reason to distinguish tribal lending cases from *Yashenko*). Allowing Defendants to use Rule 19 to escape liability would create a legal loophole from accountability for illegal activity and accordingly incentivize widespread misconduct and abuse of the sovereign immunity doctrine. *See Bassett v. Mashantucket Pequot Tribe*, 204 F.3d 343, 385 (2d Cir. 2000) (holding, in a case for copyright infringement, that tribe was not indispensable party where "dismissal would completely deprive [the plaintiff] of the opportunity to prevent further infringement"). In equity and good conscience, this Court should not allow Rule 19 to be misused in this fashion.

By extension, "the district court has discretion to consider the timeliness of [the] motion if it appears that the defendant is interposing that motion for its own defensive purposes, rather than to protect the absent party's interests." *Fireman's Fund Ins. Co. v. Nat'l Bank of Cooperatives*, 103 F.3d 888, 896 (9th Cir. 1996); *Shropshire*, 2012 WL 13658, at *6; *see also* Fed. R. Civ. P. 19, cmt. ("However, when the moving party is seeking dismissal in order to protect himself against a later suit by the absent person (subdivision (a)(2)(ii)), and is not seeking vicariously to protect the

absent person against a prejudicial judgment (subdivision (a)(2)(i)), his undue delay in making the motion can properly be counted against him as a reason for denying the motion."). Here, prior to the confirmation of the Settlement Agreement, Martorello had the opportunity yet failed to raise concerns regarding any impact the absence of Big Picture, Ascension, or the Tribe would have on the Court's ability to afford complete relief amongst Martorello and Plaintiffs in their absence. *See Shropshire*, 2012 WL 13658, at *6 ("Here, prior to Plaintiff's dismissal of Trigg with prejudice, Defendant had the opportunity yet failed to raise potential concerns regarding any impact Trigg's dismissal might have on the Court's ability to accord complete relief among the remaining parties."). Further, Martorello was not only on notice of the Settlement, but he participated in multiple mediations sessions and was fully aware of the class settlement agreement. "To the extent [Martorello] was concerned that [the absence of the Tribe, Big Picture, and Ascension] would impair his interests and expose him to multiple or inconsistent obligations, [he] should have raised this issue earlier." *Id.* at *6. Accordingly, Martorello should be equitably estopped from now "using Rule 19 to engage in gamesmanship." *Id.*

## CONCLUSION

For the reasons discussed above, the Court should deny the motion.

Respectfully submitted,
**PLAINTIFFS**

By:  /s/ Kristi C. Kelly
Counsel

Kristi C. Kelly, Esq., VSB #72791
Andrew J. Guzzo, Esq., VSB #82170
Casey S. Nash, Esq., VSB #84261
KELLY GUZZO, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
Telephone: (703) 424-7572
Fax: (703) 591-0167

Email: kkelly@kellyguzzo.com
Email: aguzzo@kellyguzzo.com
Email:  casey@kellyguzzo.com
*Counsel for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division


LULA WILLIAMS, et al.,

    Plaintiffs,

v.                       Civil Action No. 3:17cv461

BIG PICTURE LOANS, LLC,
et al.,

    Defendants.



RENEE GALLOWAY, et al.,

v.                       Civil Action No. 3:18cv406

BIG PICTURE LOANS, LLC,
et al.,

    Defendants.


**MEMORANDUM OPINION**

This matter is before the Court on DEFENDANT MATT MARTORELLO'S MOTION FOR ORDER CERTIFYING NOVEMBER 18, 2020 MEMORANDUM OPINION FOR INTERLOCUTORY APPEAL UNDER 28 U.S.C. § 1292(b) (the "Motion"), ECF No. 946 in Williams, et al v. Big Picture Loans, LLC, et al., 3:17cv461 ("Williams") and ECF No. 582 in Galloway, et al v. Big Picture Loans, LLC, et al., 3:18cv406 ("Galloway I"). Having considered the Motion, the supporting, opposing and reply

memoranda, the Motion (ECF No. 946 in <u>Williams</u> and ECF No. 582 in <u>Galloway</u>) will be denied.

**BACKGROUND**

In <u>Williams</u>, <u>Galloway I</u> and <u>Renee Galloway, et al. v. Martorello, et al.</u>, 3:19cv314 (E.D. Va.) ("<u>Galloway II</u>"), the Plaintiffs filed three similar, but in some respects substantively quite different, actions arising out of a so-called "Rent A Tribe" scheme allegedly orchestrated by Matt Martorello ("Martorello"), members of his family, companies that he controls, and investors who allegedly funded the scheme (the "Martorello Defendants"). Big Picture Loans, LLC ("Big Picture") and Ascension Technologies, Inc. ("Ascension") (collectively sometimes referred to as the "Tribal Defendants") are entities formed under the tribal laws of the Lac View Band of Lake Superior Chippewa Indians ("LVD"). Big Picture and Ascension are also named defendants in <u>Williams</u> and <u>Galloway I</u>, and both entities are alleged to be implicated in the Rent A Tribe scheme that lies at the core of the Plaintiffs' claims in those cases.

In <u>Williams</u>, Big Picture and Ascension claimed to share LVD's sovereign immunity and, on that basis, those entities sought dismissal of the case against them. The Court rejected that

2

**SA163**

argument.[1]  On appeal, the United States Circuit Court of Appeals
for the Fourth Circuit[2] held that Big Picture and Ascension were
entitled to the protection of LVD's sovereign immunity.[3]

Following the decision of the Fourth Circuit in Williams, the
Court directed that the parties file Statements of Position
explaining, how, if at all, the decision of the Fourth Circuit
affected these proceedings and pending motions (ECF Nos. 599 and
601).[4]  In his Statement of Position, Martorello argued that the
holding that Big Picture and Ascension are protected from suit by
LVD's sovereign immunity has substantive and procedural
consequences that necessitate dismissal of the case against them.
MARTORELLO'S STATEMENT OF POSITION PURSUANT TO ECF NOS. 599 & 601

---

[1] Williams v. Big Picture Loans, LLC, 329 F.Supp.3d 248 (E.D. Va. 2018).

[2] Williams v. Big Picture Loans, LLC, 929 F.3d 170 (4th Cir. 2019).
In so ruling, the Fourth Circuit made clear that its decision does
not affect the merits of the Plaintiffs' claims.  Id. at 185.  It
appears that the Fourth Circuit relied on this Court's findings of
fact, finding no clear error in those findings.  Williams v. Big
Picture Loans, LLC, 929 F.3d at 177.

[3] Those entities also claimed sovereign immunity in Galloway I.
Big Picture, Ascension and many other defendants since have reached
a class action settlement of Williams, Galloway I, and Galloway II
that was filed in yet another case, Renee Galloway, et al. v. James
Williams, Jr., et al., 3:19cv470 (E.D. Va.) ("Galloway III").  That
settlement has been preliminary approved and a hearing on a motion
for final approval is set for December 15, 2020.

[4] Although this ORDER was not entered in Galloway I, the parties
have briefed that topic and the misrepresentations issues in that
case in the same way as they briefed them in Williams.

(ECF No. 613).   In their response to MARTORELLO'S STATEMENT OF
POSITION PURSUANT TO ECF NOS. 599 & 601, the Plaintiffs asserted,
inter  alia,  that  Martorello  and  others  made  material
misrepresentations to this Court and to the Fourth Circuit about
the facts pertaining to sovereign immunity and that, as a result,
the Fourth Circuit's decision on that issue cannot be relied on by
Martorello.   PLAINTIFFS' RESPONSE TO MATT MARTORELLO'S STATEMENT
OF POSITION (ECF No. 624).[5]

At the urging of Martorello, the Court held a two-day
evidentiary hearing and accepted post-hearing briefs.   That was
done so that Martorello, in his words, "be provided a full and
fair   opportunity   to   respond   [to   plaintiffs'   alleged
misrepresentations] through an evidentiary hearing and briefing."[6]

After  conducting  the  requested  evidentiary  hearing  and
reviewing the requested briefing, the Court issued a MEMORANDUM
OPINION (Williams, ECF No. 944; Galloway, ECF. No 581).   Therein,
the  Court  found  that  Martorello  had  made  certain  of  the
misrepresentations asserted by the plaintiffs.   The MEMORANDUM
OPINION explained that, as a result of the evidentiary hearing,

_____

[5] There are pending other motions in which the parties take the
same positions.

[6] Williams, NOTICE OF MATT MARTORELLO REGARDING EVIDENTIARY HEARING
(ECF No. 679 at 5); Williams, MATT MARTORELLO'S SUPPLEMENTAL BRIEF
ADDRESSING  THE  EFFECT  OF  THE  FOURTH  CIRCUIT'S  DECISION  ON
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION (ECF No. 664 at 16-17);
Williams, ORDER (ECF No. 697).

4

SA165

"in analyzing all pleadings and future motions in which Martorello argues that his position is supported by the Fourth Circuit's [sovereign immunity] decision, this Court will now be required to take into account the record about the misrepresentations and the findings about them that are made herein." MEMORANDUM OPINION (Williams, ECF No. 944 at 39; Galloway I, ECF. No 581 at 39).

Contrary to Martorello's brief, the MEMORANDUM OPINION did not expressly overrule its previous factual findings in Williams v. Big Picture Loans, LLC, 329 F. Supp.3d 248 (E.D. Va. 2018), which were affirmed, and relied on, by the Fourth Circuit in Williams v. Big Picture Loans, LLC, 929 F.3d 170 (4th Cir. 2019). What the Court did is say that, had it known the truth about representations proved at the evidentiary hearing, it could not have made certain of those factual findings.

## DISCUSSION

Martorello seeks an interlocutory appeal of the MEMORANDUM OPINION.[7] Martorello seeks an interlocutory appeal because:

> In reaching its findings, the Court stated that it considered allegedly conflicting evidence and assessed Martorello's credibility, thereby depriving Martorello his right to have a right to have a jury decide factual questions raised by the Plaintiffs' claims. This error merits appellate review

---

[7] It is appropriate to note that the Order followed the Memorandum Opinion (Williams, ECF No. 945) merely required counsel to set a schedule for the filing of briefs on an Amended Motion for Class Certification.

and issuance of an Order certifying its
determination for immediate appeal under 28
U.S.C. § 1292(b), which will materially
advance the termination of this case. In
addition, the Court expressly overruled its
previous factual findings in Williams v. Big
Picture Loans, LLC, 329 F. Supp.3d 248 (E.D.
Va. 2018), which were affirmed by the Fourth
Circuit in Williams v. Big Picture Loans, LLC,
929 F.3d 170 (4th Cir. 2019). In doing so,
the Court violated the mandate rule requiring
district courts to consider only issues
expressly remanded following appeal. In doing
so, the Court violated the mandate rule
requiring district courts to consider only
issues expressly remanded following appeal.

The fundamental premise for the reasons for seeking appeal

ignore what actually happened. In sum, the plaintiffs asserted

that Martorello had made misrepresentations of fact to the Court

in securing certain legal rulings from the Court. Martorello

vigorously asserted that he had not made misrepresentations and

had demanded an evidentiary hearing, a request the Court granted.

He also demanded full briefing on the misrepresentations issue

after a transcript was prepared. The Court granted that request

as well. As a result of the hearing, the Court determined, in

fact, that Martorello had made certain misrepresentations of fact.

The end result was that, in analyzing pending and future motions

on a limited topic (whether Martorello's position in any particular

motion is supported by the Fourth Circuit's decision), the Court

will be required to take into account the record on the

6

SA167

misrepresentations and findings about them.  To date, nothing of the sort has happened.

Moreover, Martorello's brief illustrates the fundamental misunderstanding of what is required to secure an order permitting an interlocutory appeal.

Under 28 U.S.C. § 1292(b), a district court must certify that any order sought to be appealed:  (1) involves a controlling question of law; (2) as to which there is substantial ground for difference of opinion; and (3) that an immediate appeal from the order may materially advance the ultimate termination of litigation.  Those prerequisites are important because an interlocutory appeal under § 1292(b) is an exception to the general rule that appeals are to be had only after final judgment. Accordingly, the appellate device created by § 1292(b) "should be used sparingly and its requirement must be strictly construed." Difelice v. U.S. Airways, 404 F. Supp. 2d 907, 908-909 (E.D. Va. 2005).  As Difelice explained, the kind of question best suited for interlocutory review "is a narrow question of pure law whose resolution will be completely dispositive of the litigation, even as a legal or practical matter, whichever way it goes." Difelice v. U.S. Airways, Inc., 404 F. Supp. 2d at 908-909.  Martorello's motion fails these tests.

To begin, Martorello's vaguely identified "controlling question of law" is not a controlling question of law.  Indeed,

7

**SA168**

Martorello actually seeks to appeal matters of fact, not a question of law. Nor has Martorello shown any ground for substantial difference of opinion on any question that he asserts should be examined on interlocutory appeal; third, Martorello has not shown how an interlocutory appeal would materially advance the ultimate termination of the litigation and, to the contrary, an appeal of this stage would be slow the litigation further than it already has been slowed.

The closest that Martorello comes to specifying a question of law for review is in his assertion that the mandate rule was violated because the Court overruled previous factual findings on which the Court of Appeals relied. That simply is not true. What the Court did was find that, in the face of the evidence presented at the evidentiary hearing (that was requested by Martorello), it could not have been able to make findings that it had made. Nothing was reversed. Nothing was changed.

In sum, there is no reason to grant an interlocutory appeal in this case.

### CONCLUSION

For the reasons set forth above, DEFENDANT MATT MARTORELLO'S MOTION FOR ORDER CERTIFYING NOVEMBER 18, 2020 MEMORANDUM OPINION FOR INTERLOCUTORY APPEAL UNDER 28 U.S.C. § 1292(b), ECF No. 946 in Williams, et al v. Big Picture Loans, LLC, et al., 3:17cv461

8

**SA169**

and ECF No. 582 in <u>Galloway, et al v. Big Picture Loans, LLC, et al.</u>, 3:18cv406, will be denied.

It is so ORDERED.

/s/ *REP*

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: May ___, 2021

9

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**



LULA WILLIAMS, et al.,

    Plaintiffs,

v.                                    Civil Action No. 3:17-cv-461

BIG PICTURE LOANS, LLC, et al.,

    Defendants.

### MEMORANDUM OPINION

This Memorandum Opinion address an objection tendered by Defendant Matt Martorello in opposition to PLAINTIFFS' RENEWED MOTION FOR CLASS CERTIFICATION OF CLAIMS AGAINST DEFENDANT MATT MARTORELLO ("Motion for Class Certification") (ECF No. 967). The objection, which is laid out in Martorello's OPPOSITION TO PLAINTIFFS' RENEWED MOTION FOR CLASS CERTIFICATION AGAINST MATT MARTORELLO ("Response Memorandum") (ECF No. 1007), argues that the proposed class members waived their right to serve as class representatives.   Plaintiffs responded to that objection in PLAINTIFFS' REPLY IN SUPPORT OF RENEWED MOTION FOR CLASS CERTIFICATION AGAINST DEFENDANT MATT MARTORELLO ("Reply Memorandum") (ECF No. 1055).   And, on June 29, 2021, the Court heard argument on, inter alia, the objection in question.

Having considered all of the submitted information, including the information set forth on the record during the hearing on June 29, 2021, the Court finds that the proposed

class members did not waive their right to participate in a class action against Defendant Matt Martorello ("Martorello"). The remainder of the Court's analysis of Plaintiffs' Motion for Class Certification will be addressed in a separate memorandum opinion.

## I. BACKGROUND

The facts surrounding this lawsuit have been recounted by this Court on numerous occasions. See, e.g., MEM. OP., ECF No. 944. For the purposes of deciding the enforceability of the class action waiver (which is primarily a question of contract interpretation), it suffices here to provide only a brief summary of the broader merits dispute. The relevant text of the loan contract is provided in the Appendix.

This case is one of four similar, but distinct, actions[1] "arising out of a so-called 'Rent a Tribe' scheme allegedly orchestrated by Matt Martorello ('Martorello'), members of his family, companies that he controls, and investors who allegedly funded the scheme (the 'Martorello Defendants')" along with two "entities formed under the tribal laws of the Lac View Band of

---

[1] In addition to this case, i.e., Williams, et al. v. Big Picture Loans, LLC, et al., 3:17-cv-461 (E.D. Va.) ("Williams"), the other related cases are (1) Renee Galloway, et al. v. Big Picture Loans, LLC, et al., 3:18-cv-406 (E.D. Va.) ("Galloway I"), (2) Renee Galloway, et al. v. Martorello, et al., 3:19-cv-314 (E.D. Va.) ("Galloway II"), and (3) Renee Galloway, et al. v. James Williams, Jr., et al., 3:19-cv-470 (E.D. Va.) ("Galloway III").

2

Lake Superior Chippewa Indians ('LVD')," i.e., "Big Picture Loans, LLC ('Big Picture') and Ascension Technologies, Inc. ('Ascension') (collectively sometimes referred to as the 'Tribal Defendants')." Williams v. Big Picture Loans, LLC, 3:17-cv-461, 2020 U.S. Dist. LEXIS 216792, 2020 WL 6784352, at *1-2 (E.D. Va. Nov. 18, 2020) (Payne, J.). The term "Rent-a-Tribe" refers to the practice of so-called payday lenders partnering with Native American tribes "in an effort to cloak the payday lenders in the sovereign immunity of Native American tribes, and, in so doing, to preclude enforcement of the interest rate caps in state usury laws." See MEM. OP. at 4, ECF No. 944. Plaintiffs' basic contention across all four cases is that Martorello (and the now-dismissed Tribal Defendants) were involved in such a scheme.

The lending operations evolved over time, but they began with the use of a so-called tribal lending entity named Red Rock Lending, LLC ("Red Rock") which used Bellicose, LLC, a non-tribal entity owned and operated by Martorello, to handle the lending operations and the servicing of loans. For reasons that need not be discussed here, around 2013, Red Rock, Bellicose, and another corporate entity were restructured into a new lending entity — i.e., Big Picture.

The loan contracts at issue in this Opinion are the loan contracts by which Plaintiffs received high-interest small-dollar loans from either Red Rock or Big Picture. See Ex. 1,

3

ECF No. 1055-1.[2]  A very high percentage of the payments on those loan contracts made their way to Martorello through a rather byzantine corporate structure.

Martorello's objection is based on the "class action waiver" in the "Waiver of Jury Trial" provision of the contract; however, that heading is misleading because the "Waiver of Jury Trial" provision actually contains, for disputes arising from the loan contract: (1) an agreement that the LVD's Tribal Dispute Resolution Procedure will be the "sole and exclusive dispute resolution mechanism"; (2) a waiver of the right to a trial by jury; (3) language consenting to the jurisdiction of the LVD; (4) a waiver of the right to serve as a class action representative or to participate in a class; and (5) a waiver of the right to pursue "litigation or arbitration."  See Ex. 1 at 6, ECF No. 1055-1.  This Opinion will use the term "waiver" or "class action waiver" to refer to all of the waivers contained in the discussion of the several provisions because that is how the parties have presented them.

---

[2]    Martorello refers to an ostensibly identical loan contract in his response brief (ECF No. 734-1), but that version of the contract has one fewer page than Plaintiffs' version.  Compare Ex. 1, ECF No. 734-1 with Ex. 1, ECF No. 1055-1.  In any case, Martorello appears to accept that the sample loan contract in ECF No. 1055-1 is an accurate and representative copy of the loan contracts from both lenders over the relevant class period (i.e., 2013-2019).  See Hearing Tr. 65:21-24, 90:19-91:6, ECF No. 1104; see also Hearing Tr. 40:2-41:14, ECF No. 1104.

4

## II. DISCUSSION

Deciding whether the class action waiver applies to block Plaintiffs' ability to serve as class action representatives involves two distinct questions: does the class action waiver apply to claims against Martorello? And, if it does, is the waiver, nevertheless, unenforceable? For the reasons set forth below, the Court finds that the waiver does not apply to Martorello, and even if it did, the waiver is unenforceable.[3]

### A. Does the waiver of class certification apply to Martorello?

Martorello asserts that the class action waivers apply to him,[4] a non-party to the loan agreement, for two reasons.[5]

---

[3]    "Ordinarily, it is preferable to articulate a single basis for decision and, conversely, to refrain from making alternative holdings." Amato v. City of Richmond, 875 F. Supp. 1124, 1139 (E.D. Va. 1994) (Payne, J.). However, because these issues are highly amenable to appeal — particularly at this stage in the litigation, "this case presents one of those unusual circumstances where it is appropriate to articulate an alternative ground of decision." Id.

[4]    Martorello's Response Memorandum did not explain how this argument related to the Rule 23 factors governing class certification. See Fed. R. Civ. P. Rule 23(a)-(b). At oral argument, Martorello's counsel clarified that the waiver arguments related to the adequacy of the class representatives under Rule 23(a)(3) and the superiority of the class action vehicle under Rule 23(b)(3). Hearing Tr. 62: 2-13, ECF No. 1104.

[5]    Martorello's Response Memorandum also attempted to argue that he could enforce the contract because he was a "servicer," but at oral argument, both parties expressly denied that Martorello was a servicer. Hearing Tr. 55:16-56:7, 94:2-3, ECF No. 1004.

5

First, the class action waivers apply to "disputes and claims related to or arising under this Agreement[,]" and according to Martorello, Plaintiffs' claims constitute disputes arising under the loan agreement.  Ex. 1 at 6, ECF No. 1055-1.  And, second, the class action waivers apply to "related third parties" (a defined term in the contract), and Martorello asserts that he is a related third party by virtue of being an "affiliated entity" and an "alleged agent."  Resp. Mem. at 4, ECF No. 1007.  Neither argument is persuasive.

### 1.  **The waiver cannot apply to strangers to the contract.**

First, it is axiomatic that a contract is only binding on the parties to the contract, absent certain limited exceptions. 13 WILLISTON ON CONTRACTS § 37.1 (4th ed.) ("The mere fact of entering into a contract gives rise to a relationship between or among the contracting parties known as 'privity.' Under the traditional common-law rule, only parties in privity of contract could sue on the contract[.]") (footnote omitted); see also Privity of Contract, BLACK'S LAW DICTIONARY (11th ed. 2019) ("The relationship between the parties to a contract, allowing them to sue each other but preventing a third party from doing so."). Martorello admits, as he must, that he was not a party to the loan contracts.  See Resp. Mem. at 3, ECF No. 1007.  And, he provides no explanation for why the general rule of privity of contract would not apply merely because of the subject matter of

6

Plaintiffs' lawsuit.   Martorello cannot, therefore, claim a right to enforce any part of the loan contract purely because the current suit is a dispute or claim arising from the loan contract.

### 2. Martorello is not a related third party.

Of course, it is possible that third-parties can be made beneficiaries of a contract.   13 WILLISTON ON CONTRACTS § 37.1 (4th ed.).   And, if a third-party is a beneficiary of a contract, the third-party may claim its benefits.   However, to do that, the third party must be designated a beneficiary in the contract. 13 WILLISTON ON CONTRACTS § 37.29 (4th ed.).   Martorello was not so named and thus cannot claim third-party beneficiary status unless he is a "related third party" under the loan agreement.

For the reasons that follow, Martorello is not a "related third party" within the meaning of the loan contract.   The loan contract states:

> For purposes of this Waiver of Jury Trial provision and Tribal Dispute Resolution Procedure provision above, the words 'dispute' and 'disputes' are given the broadest possibly meaning and include, without limitation, . . . (h) all claims asserted by You individually against Us and <u>any of Our employees,</u> **agents,** <u>directors, officers, shareholders, governors, managers, members, parent company or</u> **affiliated entities** <u>(hereinafter collectively referred to as **'related third parties'**)</u>, including claims for money damages and/or equitable or injunctive relief;

7

**SA177**

Ex. 1 at 6, ECF No. 1055-1 (emphasis added).[6]    The phrase "related third parties" subsequently appears six times in the loan contract and is never redefined or used in a manner that would contradict this definition.    In his Response Memorandum, Martorello asserts that he was both an "agent" and an "affiliated entity."  Resp. Mem. at 4, ECF No. 1007.  Martorello argues that he and the companies "he managed were 'affiliated entities' because they provided consulting and servicing assistance to the Tribal Lender prior to the sale of Bellicose." Resp. Mem. at 4, ECF No. 1007 (footnote omitted).    And, according to Martorello, he should be viewed as an "agent" because of Plaintiffs' own arguments.[7]  Resp. Mem. at 4, ECF No.

---

[6] The fact that several provisions of the loan contract specify exactly to which non-parties they apply (e.g., managers, shareholders, etc.) further undermines Martorello's prior argument that the waiver is over a "subject matter category" that could apply to him despite his lack of privity.

[7]    At oral argument, counsel for Martorello stated, arguably for the first time, that Martorello was an agent because he was a consultant.  Hearing Tr. 94:24-25, ECF No. 1104; see also Resp. Mem. at 4, ECF No. 1007 (arguing that Martorello-managed companies were consultants to the Tribe's business and that Martorello and his companies were 'affiliated entities' because they provided consulting services to the Tribal Lender prior to the sale of Bellicose).    This argument was based on a separate clause in the same Waiver of Jury Trial provision which states that the waiver applies to "(a) all claims, disputes or controversies involving the parties to this Agreement and Our employees, servicers, and agents, including but not limited to consultants, banks, payment processors, software providers, data providers and credit bureaus[.]"    Ex. 1 at 6, ECF No. 1055-1 (emphasis added).    Arguments presented for the first time at oral argument will not be considered.  First Tennessee Bank Nat.

8

1007 ("Plaintiffs allege[d] (incorrectly) that Martorello and businesses he managed were agents behind the entire lending business."). Martorello is mistaken on all counts.

At this point it is appropriate to clarify that the loan contract explicitly states that the words "We," "Us," "Our," and "Lender" all refer to one of the two tribal lenders, i.e. Big Picture or Red Rock. Ex. 1 at 3, ECF No. 1055-1. Thus, the phrases "Our . . . agent" and "Our . . . affiliated entities" refer to the lender's (i.e., Big Picture or Red Rock's) agent or affiliated entity, not the agent or affiliated entity of the LVD or any other entity involved in the loan scheme. And, the term "affiliated entity" is not defined in the loan contract. See Ex. 1, ECF No. 1055-1.

### a. Martorello is not an "affiliated entity."

Martorello is not an affiliated entity of either lender (i.e., Red Rock or Big Picture Loans). In his Response Memorandum, Martorello argued, without any citation to the record, that he and his companies were "affiliated entities" to Red Rock and Big Picture Loans because he and his companies

---

Ass'n v. Global Title, LLC, 3:09-cv-550, 2010 WL 5187834, *1 (Nov. 16, 2010) (citing North Carolina Alliance for Transp. Reform, Inc. v. U.S. Dept. Of Transp., 713 F. Supp. 2d 491, 510 (M.D.N.C. 2010)). Even if the Court were prepared to consider such an argument, counsel for Martorello were not able to identify specific portions of the record that would show that Martorello was a consultant (and therefore an agent) of either lender. Hearing Tr. 94:24-95:14, 152:1-8, ECF No. 1104.

9

**SA179**

"provided consulting and servicing assistance to the Tribal Lender prior to the sale of Bellicose." Resp. Mem. at 4, n.3, ECF No. 1007 (footnote omitted).

At oral argument, counsel for Martorello argued, for the first time, that evidence of the alleged affiliate relationship can be found in the servicing agreement between Red Rock (the lender) and Bellicose (a Martorello company). Hearing Tr. 150:9-151:14, ECF No. 1104. Because the argument was presented for the first time at oral argument, it cannot be considered. First Tennessee Bank Nat. Ass'n v. Global Title, LLC, 3:09-cv-550, 2010 WL 5187834, *1 (Nov. 16, 2010) (citing North Carolina Alliance for Transp. Reform, Inc. v. U.S. Dept. Of Transp., 713 F. Supp. 2d 491, 510 (M.D.N.C. 2010)). But, even if it were considered, it would fail.

In the 2011 servicing agreement, the term "affiliate" is defined in reference to the "Enterprise" (i.e., Red Rock) and the "Servicer" (i.e., Bellicose):

> "Affiliate" means as to Servicer or Enterprise, any corporation, partnership, limited liability company, joint venture, trust, department or agency or individual controlled by, under common control with, or which controls, directly or indirectly Servicer or Enterprise. "Control" means (i) ownership, control, or power to vote twenty five percent (25%) or more of the outstanding shares of any class of voting securities, directly or indirectly or acting through one (1) or more persons, (ii) control in any manner over the election of a majority of the directors, trustees, or general partners (or individuals exercising similar functions), or (iii)

10

the power to exercise, directly or indirectly, a
controlling influence over management or policies."

Ex. 5 at 5, ¶ 2.1, ECF No. 968-5 (emphasis added); accord
Affiliate, BLACK'S LAW DICTIONARY (11th ed. 2019).   Both parties
agree that under the aforementioned definition, Martorello would
be an "affiliate."  Hearing Tr. 151:11-20, ECF No. 1104.

However, they differ on how that definition of "affiliate"
compares to the term "affiliated entity" in the loan contract.
Martorello argues that the term "entity" can include a natural
person, Resp. Mem. at 4, n.3, ECF No. 1007, and thus, appears to
be saying that the term "affiliated entity" is equivalent to the
term "affiliate" as used in the 2011 servicing agreement.
Plaintiffs argue that the term "affiliated entity," as opposed
to the term "affiliate," is more naturally read to refer to a
corporate entity that is related to Red Rock or Big Picture
through some kind of control relationship.  See Reply Mem. at
14-18, ECF No. 1055.

Because there is no definition of "affiliated entity" in
the contract, the Court must look to the common and ordinary
meaning the term, which can include referring to dictionary
definitions.  Nationwide Mut. Ins. Co. v. Overlook, LLC, 785 F.
Supp. 2d 502, 518 (E.D. Va. 2011).  The common and ordinary
meaning of "affiliate" is essentially what the 2011 servicing
agreement stated, i.e., "A corporation that is related to

11

**SA181**

another corporation by shareholdings or other means of control; a subsidiary, parent, or sibling corporation," and in certain contexts, the term "affiliate" could include an individual. Affiliate, BLACK'S LAW DICTIONARY (11th ed. 2019). However, the common and ordinary meaning of "entity" is "an organization (such as a business or governmental unit) that has a legal identity apart from its members or owners."[8] Although both "affiliate" and "entity" can sometimes refer to individuals, the common and ordinary meaning of "affiliated entity" refers to a business organization, not an individual. And, at least one court that has had occasion to consider the plain and ordinary meaning of "affiliated entities" has come to the same conclusion.[9] Under this reading, the term "affiliated entities" cannot refer to Martorello.

---

[8] Entity, BLACK'S LAW DICTIONARY (11th ed. 2019); accord Entity, MERRIAM-WEBSTER.COM,                         https://www.merriam-webster.com/dictionary/entity (last visited July 6, 2021); but see Entity, AMERICAN HERITAGE DICTIONARY, https://www.ahdictionary.com/word/search.html?q=entity (last visited July 6, 2021) (using "entity" in a sentence to refer to an individual).

[9] See Bd. of Trustees of Leland Stanford Junior Univ. v. Agilent Techs., Inc., No. 18-CV-01199-VC, 2019 WL 4729602, at *1 (N.D. Cal. Aug. 13, 2019) ("If one company owns another, those companies are affiliated entities in the ordinary sense of the term."); see also Silva v. Butori Corp., No. CV-19-04904-PHX-MTL, 2020 U.S. Dist. LEXIS 81367, *12 (D. Ariz., May 8, 2020) (referring to the Black's Law and Merriam Webster definitions of "affiliate" and "affiliated," respectively, to determine the plain and ordinary meaning of the term "affiliated entity").

12

### b. Martorello is not an "agent" of either lender.

Additionally, Martorello is not an agent of either lender. To begin, notwithstanding Martorello's assertions to the contrary, Resp. Mem. at 4, ECF No. 1007, Plaintiffs never alleged that Martorello was an agent of the LVD (quite the opposite actually). See, e.g., Compl. ¶ 3, ECF No. 1 (describing Martorello as the mastermind behind the LVD's lending operations). And, in any case, the loan contract uses "agent" to refer to an agent of the lender, not the LVD. Martorello has not pointed the Court to any evidence in the record that he was an agent of Red Rock or Big Picture.

Based on the loan contract and the parties' written and oral arguments, the "Waiver of Jury Trial" provision, which includes the class action waiver, does not apply to Martorello.

### B. Is the waiver valid and enforceable?

Even if the "Waiver of Jury Trial" provision somehow could be construed to apply to Martorello, the waiver is, nevertheless, unenforceable. According to Plaintiffs, this is because of the prospective waiver doctrine. Although the prospective waiver doctrine has most commonly been associated with arbitration agreements, the rationale behind the doctrine supports its application in contexts beyond mandatory arbitration agreements.

13

**SA183**

From its origins in Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., the prospective waiver inquiry has focused on whether a party has waived, in advance, its right to pursue federal statutory remedies. 473 U.S. 614, 637 n.19 (1985) ("[I]n the event the choice-of-forum and choice-of-law clauses operated in tandem as a prospective waiver of a party's right to pursue statutory remedies for antitrust violations, we would have little hesitation in condemning the agreement as against public policy."). Though decisional law has been concentrated on mandatory arbitration claims, it is the waiver of important federal rights that is at issue, not merely the suitability of arbitral forums. Am. Exp. Co. v. Italian Colors Rest., 570 U.S. 228, 240 (2013) (Kagan, J. dissenting) ("[C]ourts will not enforce a prospective waiver of the right to gain redress for an antitrust injury, whether in an arbitration agreement or any other contract."). This understanding is reflected in the recent cases of the Fourth Circuit examining the enforceability of various Tribal lending contracts. Hayes v. Delbert Servs. Corp., 811 F.3d 666, 673 (4th Cir. 2016) ("This arbitration agreement fails for the fundamental reason that it purports to renounce wholesale the application of any federal law to the plaintiffs' federal claims."); Dillon v. BMO Harris Bank, N.A., 856 F.3d 330, 335 (4th Cir. 2017) ("These terms throughout the underlying loan agreement further

14

illustrate that the choice of law provision in the arbitration agreement 'disavow[s] the application of all state and federal law' and 'unambiguously forbids an arbitrator from even applying the applicable law.'"); Gibbs v. Haynes Invs., LLC, 967 F.3d 332, 340-41, 343-44 (4th Cir. 2020) (describing a tribal loan contract as problematic because consumers were functionally prohibited from enforcing the federal RICO statute); Gibbs v. Sequoia Capital Operations, LLC, 966 F.3d 286, 294 (4th Cir. 2020) ("In summary, because the effect of the choice-of-law provisions is to stymie the vindication of the federal statutory claims that the borrowers seek to enforce, they amount to a prospective waiver and render the delegation provisions unenforceable."). Therefore, where a provision of a contract mandates an alternative dispute resolution procedure that amounts to a substantive waiver of federally protect rights, the provision is unenforceable. See Hayes v. Delbert Servs. Corp., 811 F.3d 666, 674-75 (4th Cir. 2016).

When viewed in the context of the Tribal Financial Services Regulatory Authority Code (the "Code") and the loan agreement as a whole, the "Waiver of Jury Trial" provision clearly amounts to a substantive waiver of federally protected rights. Although there is no express renunciation of federal law, the net result of the loan contract is that the consumers have no meaningful

15

**SA185**

way to vindicate their federal rights.  This is demonstrated by
the following provisions:

- o The governing law of the contract, by its terms, is "the
  laws of the Lac Vieux Desert Band of Lake Superior
  Chippewa Indians ('Tribal law'),[10] including but not
  limited to the Code as well as applicable federal law."
  Ex. 1 at 5, ECF No. 1055-1.

- o The Code states that the lender must "conduct business in
  a manner consistent with <u>the principles of</u> federal
  consumer protection law, including, without limitation"
  ten enumerated federal consumer financial protection laws
  or regulations.[11]  Ex. 6 ¶ 6.2, ECF No. 1055-6 (emphasis
  added).

- o The Tribal Dispute Resolution Procedure is the sole
  method of resolving any disputes any under the contract.
  Ex. 1 at 5, ECF No. 1055-1 ("All disputes shall be solely
  and exclusively resolved pursuant to the Tribal Dispute
  Resolution Procedure set forth in Section 9 of the Code .
  . . .")  Ex. 1 at 5, ECF No. 1055-1.  This sentiment is
  repeated at least four times in the contract.  <u>See</u> Ex. 1
  at 6 ¶ 2(c), ECF No. 1055-1 ("YOU CONSENT TO THE
  JURISDICTION OF THE TRIBE AND HAVE READ AND AGREE TO BE
  BOUND SOLELY BY THE TRIBAL DISPUTE RESOLUTION PROCEDURE
  FOUND IN THE CODE[.]"); Ex. 1 at 6 ¶ 4, ECF No. 1055-1
  ("All disputes arising out of, relating to, or in
  connection with this Agreement shall be finally settled
  under the Tribal Dispute Resolution Procedure."); Ex. 1
  at 7, ECF No. 1055-1 ("You acknowledge and agree that
  this Agreement is subject solely and exclusively to the
  Tribal law and jurisdiction of the Lac Vieux Desert Band
  of Lake Superior Chippewa Indians."); Ex. 1 at 7, ECF No.
  1055-1 ("[T]he Tribal Dispute Resolution Procedure is the
  sole and exclusive forum for resolving disputes and/or
  claims arising from or relating to this Agreement.").

---

[10] Neither party has submitted any Tribal law (that is, other
than the Code) for this Court's consideration.

[11] Notably, the list of federal consumer financial protections,
while not exhaustive, does not include the federal RICO statute
which Plaintiffs are suing under in this case.

16

o  "The Tribal Dispute Resolution Procedure has been created by the Tribe <u>as a courtesy</u> to consumers and is the sole and exclusive dispute resolution mechanism for disputes and claims related to or arising under this Agreement." Ex. 1 at 6, ECF No. 1055-1 (emphasis added).

o  Under the Tribal Dispute Resolution Procedure, consumers must first lodge an informal complaint with the lender. Ex. 1 at 6, ECF No. 1055-1. The lender will then investigate the complaint and respond.  <u>Id.</u>  If the consumer is unhappy with the lender's response, the consumer can initiate a Formal Dispute Resolution by requesting that the Tribal Financial Services Regulatory Authority ("Authority") review the lender's decision. <u>Id.</u>  The Authority will decide if the consumer can have a hearing or not and will ultimately render its own decision.  <u>Id.</u>  An Authority decision may be appealed to the Tribal Court, <u>id.</u>, but the scope of the Tribal Court's review is roughly that of a federal court reviewing a federal agency's decision.  <u>See</u> Ex. 6 at 29, ECF No. 1055-6. And, the Tribal Court's decision may not be appealed.  Ex. 6 at 30, ECF No. 1055-6.

o  Under the Tribal Dispute Resolution Procedure, "[a] person's complaint to the Lender <u>shall be considered similar in nature to a petition for redress submitted to a sovereign government, without waiver of sovereign immunity and exclusive jurisdiction, and does not create any binding procedural or substantive rights for a petitioner</u>."  Ex. 1 at 6, ECF No. 1055-1 (emphasis added).

o  The Tribe and the Lender (i.e., Big Picture or Red Rock) both "express" their "intention" "to fully preserve, and not waive either in whole or in part, exclusive jurisdiction, sovereign immunity, and any other rights, titles, privileges and immunities to which they are entitled." Ex. 1 at 6, ECF No. 1055-1.

o  The loan contract also waives a consumer's right to a trial by jury, the right to serve as a class representative, and the right to arbitration. Ex. 1 at 6, ECF No. 1055-1.

o  The contract then explicitly adds that "NO LITIGATION OR ARBITRATION IS AVAILABLE[.]"  Ex. 1 at 6, ECF No. 1055-1.

17

**SA187**

In conjunction, these provisions operate to functionally waive a consumer's right to vindicate federally protected statutory rights. Here, as in Hayes v. Delbert Servs. Corp., the animating purpose of these provisions is to allow the making of consumer loans free from the strictures of federal law. 811 F.3d 666, 676 (4th Cir. 2016). And, as in Gibbs v. Haynes Invs., LLC, the practical effect of these provisions is that "tribal law preempts the application of any contrary law – including contrary federal law." 967 F.3d 332, 342 (4th Cir. 2020). In short, the system set up here prevents borrowers from effectively vindicating any federal statutory claim. Indeed, the remedial procedures outlined in the contract are courtesies, not rights. See, e.g., Ex. 1 at 6, ECF No. 1055-1 ("A person's complaint to the Lender shall be considered similar in nature to a petition for redress submitted to a sovereign government, without waiver of sovereign immunity and exclusive jurisdiction, and does not create any binding procedural or substantive rights for a petitioner."). Taken together, these provisions violate the prospective waiver rule.[12]

_____

[12] Neither party requested severance of any part of the loan contract, but in any case, because these issues are pervasive throughout the loan contract, there would be no way to sever the offending provisions. See Dillon v. BMO Harris Bank, N.A., 856 F.3d 330, 335 (4th Cir. 2017).

## CONCLUSION

For the foregoing reasons, the Court finds that the waiver does not apply to Martorello, and even if it did, the waiver is, nevertheless, unenforceable. Martorello's objection to class certification on the waiver theory will be rejected.

It is so ORDERED.

/s/

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: July 12, 2021

19

**SA189**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**



LULA WILLIAMS, et al.,

    Plaintiffs,

v.                                    Civil Action No. 3:17-cv-461

BIG PICTURE LOANS, LLC, et al.,

    Defendants.

## MEMORANDUM OPINION

This Memorandum Opinion addresses PLAINTIFFS' RENEWED MOTION FOR CLASS CERTIFICATION OF CLAIMS AGAINST DEFENDANT MATT MARTORELLO ("Motion for Class Certification") (ECF No. 967) in which Plaintiffs, on behalf of themselves and all other similarly situated individuals, request that this Court certify their claims against Defendant Matt Martorello ("Martorello"). Martorello opposes class certification on four main grounds: (1) Plaintiffs waived the ability to pursue a class action;[1] (2) the class members are not readily ascertainable; (3) common issues do not predominate; and (4) a class action is not a superior method of bringing suit. OPPOSITION TO PLAINTIFFS' RENEWED MOTION FOR CLASS CERTIFICATION AGAINST MATT MARTORELLO

---

[1] A separate Memorandum Opinion supplies the reasons for overruling Martorello's objection to class certification on the ground that the proposed class representatives (as well as all of the proposed class members) waived their right to participate in a class action. See MEM. OP., ECF No. 1106.

("Response Memorandum"), ECF No. 1007. Notwithstanding Martorello's arguments in opposition, for the reasons that follow, Plaintiffs' Motion for Class Certification will be granted.

## I. BACKGROUND

### A. Statement of Facts

The facts surrounding this lawsuit have been recounted by the Court on numerous occasions. See, e.g., MEM. OP., ECF No. 944. The facts of this case are, therefore, presumed known, and it suffices here to provide only a brief summary.

This case is one of four similar, but distinct, actions[2] "arising out of a so-called 'Rent a Tribe' scheme allegedly orchestrated by Matt Martorello ('Martorello'), members of his family, companies that he controls, and investors who allegedly funded the scheme (the 'Martorello Defendants')" along with two "entities formed under the tribal laws of the Lac View Band of Lake Superior Chippewa Indians ('LVD')," i.e., "Big Picture Loans, LLC ('Big Picture')[3] and Ascension Technologies, Inc.

---

[2] In addition to this case, i.e., Williams, et al. v. Big Picture Loans, LLC, et al., 3:17-cv-461 (E.D. Va.) ("Williams"), the other related cases are (1) Renee Galloway, et al. v. Big Picture Loans, LLC, et al., 3:18-cv-406 (E.D. Va.) ("Galloway I"), (2) Renee Galloway, et al. v. Martorello, et al., 3:19-cv-314 (E.D. Va.) ("Galloway II"), and (3) Renee Galloway, et al. v. James Williams, Jr., et al., 3:19-cv-470 (E.D. Va.) ("Galloway III").

[3] The LVD's lending operations evolved over time, but they began with the use of a so-called tribal lending entity named Red Rock

2

('Ascension') (collectively sometimes referred to as the 'Tribal Defendants')." <u>Williams v. Big Picture Loans, LLC</u>, 3:17-cv-461, 2020 U.S. Dist. LEXIS 216792, 2020 WL 6784352, at *1-2 (E.D. Va. Nov. 18, 2020) (Payne, J.).  The term "Rent-a-Tribe" refers to the practice of so-called payday lenders partnering with Native American tribes "in an effort to cloak the payday lenders in the sovereign immunity of Native American tribes, and, in so doing, to preclude enforcement of the interest rate caps in state usury laws." <u>See</u> MEM. OP. at 4, ECF No. 944.

Plaintiffs are all Virginia citizens who took out small-dollar high-interest loans from one of two LVD-affiliated entities (i.e., Red Rock or its successor Big Picture). Plaintiffs' basic argument is that the loans from these entities were made in violation of Virginia's usury laws, and Martorello, who is not a member of any Native American tribe, was both the de facto head and primary beneficiary of the LVD's lending operations.  PLS.' MEM. IN SUPP. OF RENEWED MOT. FOR CLASS CERTIFICATION OF CLAIMS AGAINST DEF. MATT MARTORELLO ("Prelim. Approval Mem.") at 27, ECF No. 968.

---

Lending, LLC ("Red Rock") which used Bellicose, LLC, a non-tribal entity owned and operated by Martorello, to handle the lending operations and the servicing of loans.  For reasons that need not be discussed here, around 2013, Red Rock, Bellicose, and another corporate entity were restructured into a new lending entity — i.e., Big Picture.

3

**B. Plaintiff's Claims**

Plaintiffs are pursuing five claims against Martorello:

- First, Plaintiffs are seeking declaratory judgment that the choice of law and forum-selection provisions in their loan contracts are void and unenforceable under Virginia law and Virginia's "well-established public policy." Compl. ¶ 94, ECF No. 1.

- Second, Plaintiffs allege that Martorello violated 18 U.S.C. § 1962(c) of the RICO statute (which prohibits the collection of unlawful debt). Compl. ¶¶ 103-104, ECF No. 1. Plaintiffs seek actual damages, treble damages, costs, and attorney's fees. Compl. ¶ 109, ECF No. 1.

- Third, Plaintiffs allege that Martorello violated 18 U.S.C. § 1962(d) of the RICO statute (by conspiring to violate 18 U.S.C. § 1962(c)). Compl. ¶ 117, ECF No. 1. Plaintiffs seek actual damages, treble damages, costs, and attorney's fees. Compl. ¶ 118, ECF No. 1.

- Fourth, Plaintiffs allege that Martorello violated Virginia's usury law, namely Va. Code § 6.2-305(A). Compl. ¶¶ 127-28, ECF No. 1. Plaintiffs seek damages "equal to the total amount of interest paid in excess of 12% plus twice the amount of such usurious interest that was paid in the two years preceding [the] filing of this action, attorney's fees, and costs." Compl. ¶ 128, ECF No. 1.

- Finally, Plaintiffs allege that Martorello was unjustly enriched because he received payments from illegal and unenforceable loan contracts. Compl. ¶¶ 137-139, ECF No. 1. Plaintiffs seek all amounts repaid on loans with Big Picture or Red Rock. Compl. ¶ 139, ECF No. 1.

Counts II through V are the subject of this Opinion.

4

## C. Proposed Classes

Proposed Class Counsel,[4] representing Plaintiffs, who are the Proposed Class Representatives,[5] propose the following classes:

> **Big Picture RICO Class:** All Virginia consumers who entered into a loan agreement with Big Picture where a payment was made from June 22, 2013 to December 20, 2019.
>
> > **Big Picture Usury Sub-class:** All Virginia consumers who paid any principal, interest, or fees on their loan with Big Picture from June 22, 2015 to December 20, 2019.
> >
> > **Big Picture Unjust Enrichment Sub-class:** All Virginia consumers who paid any amount on their loan with Big Picture from June 22, 2014 to December 20, 2019.
>
> **Red Rock RICO Class:** All Virginia consumers who entered into a loan agreement with Red Rock where a payment was made from June 22, 2013 to December 20, 2019.
>
> > **Red Rock Usury Sub-class:** All Virginia consumers who paid any principal, interest, or fees on their loan with Red Rock from June 22, 2015 to December 20, 2019.
> >
> > **Red Rock Unjust Enrichment Sub-class:** All Virginia consumers who paid any amount on their

---

[4] That is, Amy Leigh Austin, Craig Carley Machiando, Kristi Cahoon Kelly, Andrew Joseph Guzzo, Beth Ellen Terrell, Casey Shannon Nash, Eleanor Michelle Drake, Elizabeth Anne Adams, James Wilson Speer, Jennifer Rust Murray, John Albanese, Leonard Anthony Bennett, Matthew William Wessley, and Michael Allen Caddell. Prelim. Approval Mem. at 27, ECF No. 968.

[5] That is, Lula Williams, Gloria Turnage, George Hengle, Dowin Coffy, and Felix M. Gillison, Jr. (represented by Marcella P. Singh, the administrator of the Estate of Felix M. Gillison, Jr.). Prelim. Approval Mem. at 27, ECF No. 968.

loan with Red Rock from June 22, 2014 to December 20, 2019.

Prelim. Approval Mem. at 24, ECF No. 968.    At bottom, all proposed class members are (or were) Virginia citizens who took out loans with interest rates above 12% from entities affiliated with the LVD tribe (i.e., Big Picture or Red Rock) and who made payments on those loans.    Prelim. Approval Mot. at 22, ECF No. 968.

## D. Martorello's Involvement Over Time

For nearly every argument Martorello makes in opposition to class certification, Martorello asserts that, because his role in the lending scheme changed between 2013 and 2019, the class members will be situated differently vis-à-vis each other across different time periods, and those differences between class members will result in a need for a series of complicated mini-trials to determine which class members can recover.[6]  Not so.

Shortly after the Fourth Circuit's decision in Williams v. Big Picture Loans, LLC, 929 F.3d 170 (4th Cir. 2019), the Plaintiffs alleged that Martorello and others had made material misrepresentations to this Court and the Fourth Circuit on which this Court and the Fourth Circuit had relied in making their

---

[6] This "non-uniformity" argument is addressed in Martorello's positions on (1) ascertainability, Resp. Mem. at 32-33, ECF No. 1007; (2) commonality, id. at 35-42; (3) predominance (unjust enrichment), id. at 44, 47; (4) predominance (RICO), id. at 46; and (5) superiority, id. at 49.

respective decisions. At Martorello's request, this Court subsequently held a hearing on the alleged misrepresentations; thereafter received briefing; and then issued an opinion finding that several material misrepresentations had been made to the Court. MEM. OP. at 8, ECF No. 944 ("November 18 Opinion"). For a detailed description of all of the facts, see the November 18 Opinion (ECF No. 944).

As explained fully in the November 18 Opinion, there is substantial (and largely unrebutted) evidence that, throughout the relevant class periods, Martorello had de facto control of Red Rock and Big Picture's lending operations. To begin, there is unrebutted evidence that Martorello was both highly instrumental and heavily involved in the LVD's entrance into the business of payday lending. Nov. 18 OP. at 9-12, ECF No. 944. And, contrary to what the LVD and Martorello previously represented, there is proof that Martorello was functionally in charge of the lending business and the Tribal "managers" were "rather meaningless." Nov. 18 OP. at 13-15, 20, ECF No. 944. And, even after the LVD restructured the lending operations to avoid regulatory scrutiny, the evidence strongly shows that Martorello was still running the show. Nov. 18 OP. at 15, ECF No. 944 ("Efforts were made to create the appearance of the Tribe's involvement but the Tribe had no substantive involvement."). "[E]xcept for a few cosmetic changes . . ., the

7

LVD lending operation by way of Big Picture continued as it had under the Red Rock structure." Nov. 18 OP. at 22-23, ECF No. 944.

Notwithstanding that Martorello's Response Memorandum was filed after the November 18 Opinion was issued, the Response Memorandum fails to take any of the Court's findings into account and continues to advance some of the very same misrepresentations addressed in the November 18 Opinion.[7]

On the current record, no credence can be given to Martorello's arguments challenging class certification on the ground that, because of his changing roles, Plaintiffs' claims will not be susceptible to class-wide proof. Certainly, Martorello's conclusory assertions do not overcome the Plaintiffs' evidence that disproves the need for the "mini-trials" that Martorello's arguments attempt to conjure.

## II. DISCUSSION

A class can be certified if plaintiffs show that the four requirements of Fed. R. Civ. P. 23(a) are met <u>and</u> that the class fits the requirements of at least one of the class types outlined in Fed. R. Civ. P. 23(b). <u>Branch v. Gov't Emples. Ins.</u>

---

[7] For example, Martorello asserts that his role in the LVD's "lending business declined considerably over time, <u>and ceased</u> after Martorello's 2016 sale of Bellicose to the Tribe." Resp. Mem. at 38 (emphasis added), ECF No. 1007. The evidence of record shows otherwise. Nov. 18 OP. at 22-23, ECF No. 944. And, Martorello's Response Memorandum offers no viable evidence to disprove that showing.

<u>Co.</u>, 323 F.R.D. 539, 544 (E.D. Va. 2018).  The Court's analysis for each requirement must be "rigorous."  <u>Wal-Mart Stores, Inc. v. Dukes</u>, 564 U.S. 338, 350-51 (2011).  And, plaintiffs bear the burden of demonstrating that all of the Rule 23 requirements have been satisfied.  <u>Branch</u>, 323 F.R.D. at 545.

## A. Rule 23(a) Analysis

Under Rule 23(a), class certification is appropriate if "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a).

### 1. Ascertainability

Although not self-evident on the face of Fed. R. Civ. P. 23, it is inherent in the concept of class certification that there must be a "readily identifiable" set of putative class members.  <u>EQT Prod. Co. v. Adair</u>, 764 F.3d 347, 358 (4th Cir. 2014).  This is sometimes referred to as the "ascertainability" requirement.  <u>Id.</u>  Plaintiffs need not be able to identify each and every class member at the time of class certification, but class members must be identifiable by reference to objective criteria without "extensive and individualized fact-finding or 'mini-trials[.]'"  <u>Id.</u> (citation omitted).

9

**SA198**

Here, Plaintiffs assert that they can readily identify the class through objective, electronic data analysis of data that will be voluntarily provided by Big Picture and Ascension once the class has been certified. Prelim. Approval Mot. at 26, ECF No. 968. Specifically, Plaintiffs explain that:

> Identification of the class members involves a handful of discrete steps: (1) determining whether a consumer had a loan with Big Picture and/or Red Rock, (2) for all such consumers, determining whether they had a Virginia address when they executed the loan, and (3) identifying any payments made by those consumers from June 22, 2013 to December 20, 2019.

Prelim. Approval Mot. at 26, ECF No. 968.

Martorello, nevertheless, attacks the ascertainability of the proposed class on four grounds: (1) the loan information is largely under Tribal control, and neither party will have access to it until after the class is certified; (2) even if the loan information were provided, because Martorello's involvement in the lending scheme changed over time, mini-trials will be needed to understand each proposed class members' claims as to Martorello himself (as opposed to any other defendant); (3) mini-trials would be needed to determine if proposed class members have already released their rights, have already recovered, or have been estopped from recovering as a result of the Galloway III settlement; and (4) mini-trials would be needed to determine if proposed class members' claims are time-barred

10

**SA199**

because of the statute of limitations. Resp. Mem. at 30-34, ECF
No. 1007. These arguments are not persuasive.

First, the requirement that a class be readily identifiable
does not mean that Plaintiffs must present the Court (or
Martorello) with a list of each and every proposed class member
at the time of class certification. EQT, 764 F.3d at 358. And,
while the parties are not presently in possession of the
detailed loan data for each of the proposed class members, that
is not to say that they are totally ignorant of the likely
candidates for class membership. The putative class members in
this case are a subset of the class members defined by the
Galloway III settlement (and the proposed class counsel in this
case were also class counsel in Galloway III). Prelim. Approval
Mem. at 26-27, ECF No. 968. As part of the Galloway III
settlement, the Tribal Defendants turned over "the majority of
the information" Plaintiffs would need to identify the class
members. Prelim. Approval Mem. at 27, ECF No. 968; see also Ex.
51 ¶ 3, ECF No. 968-51 (describing the customer loan data turned
over to the Settlement Administrator in Galloway III).
Furthermore, the Tribal Defendants have already agreed to turn
over the necessary data if the Court certifies the class in this
case. Ex. 52, ECF No. 968-52 (showing counsel for the Tribal
Defendants agreeing, on behalf of Ascension and Big Picture, to

11

**SA200**

turn over the necessary loan data once a class has been certified in this case).

The cases Martorello cites to defend his position are clearly distinguishable. Unlike in <u>Marcus v. BMW of N. Am., LLC</u>, the third parties with possession of the data (i.e., Big Picture and Ascension) have ready access to the necessary data <u>and</u> have voluntarily agreed to turn it over to Plaintiffs if this Court certifies the proposed class. 687 F.3d 583, 594 (3d Cir. 2012). Unlike in <u>Supler v. FKAACS, Inc.</u>, it is, in fact, possible to determine who the class members would be. 2012 WL 5430328, at *4, *9 (E.D.N.C. Nov. 6, 2012). And, unlike in <u>Carrera v. Bayer Corp.</u>, 727 F.3d 300, 308-09 (3d Cir. 2013), Plaintiffs are not basing their ascertainability arguments on hypothetical data that may or may not exist or relying on class members to self-identify themselves through affidavits. Rather, Plaintiffs propose to use objective factors (i.e., whether an individual had a loan with a given company, whether that individual's home address was in Virginia when the loan was executed, and whether any loan payments were made after June 22, 2013) to analyze data that they have confirmed exists (and that they have confirmed they will have access to),[8] and that data is

---

[8] Martorello attempts to argue that "[w]ithout the loan records, the only way to identify the class members is to seek documents and testimony regarding loan and payment details from each putative class member. This is exactly the type of

12

comparable to data that they successfully have used in a related case before this Court.  Prelim. Approval Mem. at 26-27, ECF No. 968; PLS.' REPLY IN SUPP. OF RENEWED MOT. FOR CLASS CERTIFICATION AGAINST DEF. MATT MARTORELLO ("Reply Mem.") at 18-19, ECF No. 1055.  Thus, contrary to what Martorello implies in his briefs, Plaintiffs are not just spitballing here.

Furthermore, the fact that Martorello will not have access to the loan data until after certification is not a violation of his due process rights.  Martorello asserts that "forcing" him "to defend against certification of a class where the loans are unavailable is contrary to ascertainability, fairness, and due process."  Resp. Mem. at 31, ECF No. 1007.  Not so.  "The due process question is not whether the identity of class members can be ascertained with perfect accuracy at the certification stage but whether the defendant will receive a fair opportunity to present its defenses when putative class members actually come forward."  Mullins v. Direct Digital, LLC, 795 F.3d 654, 670 (7th Cir. 2015).  So long as Martorello has an opportunity to challenge each purported class member's claim to recover against him specifically (as opposed to any other defendant),

---

individualized review that renders a class not ascertainable." Resp. Mem. at 32, ECF No. 1007.  The operative phrase, of course, is "without the loan records."  If, for some reason, the loan records are not turned over by Big Picture and Ascension, the Court can reconsider its class certification decision.  See Fed. R. Civ. P. 23(c)(1)(C).

13

**SA202**

his due process rights have not been violated.  See <u>Mullins</u>, 795
F.3d at 671.  To hold that Martorello would suffer a due process
violation if he were not given "[t]he specific loan information
for each proposed class member (including residency, date of
borrowing; payment histories; and balances)[,]" Resp. Mem. at
31, ECF No. 1007, would run contrary to the Fourth Circuit's
clear explanation of the ascertainability requirement.  See <u>EQT</u>
<u>Prod. Co. v. Adair</u>, 764 F.3d 347, 358 (4th Cir. 2014) ("The
plaintiffs need not be able to identify every class member at
the time of certification.").

Martorello's    second    and    third    challenges    to
ascertainability   can   be   more   quickly   dispensed   with.[9]
Martorello's second argument against the ascertainability of the
class is that, because his involvement in the lending scheme
changed over time, mini-trials will be needed to understand
whether  each  putative  class  member  has  a  claim  against
Martorello himself (as opposed to any other defendants).  As
discussed  above  in  Part  I.D,  there  is  no  evidence  that
Martorello's role in the LVD's lending scheme materially changed
over  time,  and  as  discussed  later  in  Part  II.B.1,  Plaintiffs'

---

[9] Martorello also repeats these two arguments again in a section
of his Response Memorandum titled "THE CLASS DEFINITION FAILS
BECAUSE MANY PROPOSED MEMBERS WERE NOT INJURED BY MARTORELLO."
Resp. Mem. at 47, ECF No. 1007.  The arguments in that section
fail for the same reasons.

theory of the case lends itself to class-wide proof on all four
of Plaintiffs' legal theories.

Martorello's third claim (i.e., that mini-trials would be
needed to ascertain whether proposed class members have already
waived their right to recover by joining the Galloway III
settlement) is also clearly incorrect.  No proposed class member
has released their rights to pursue a suit against Martorello;
the Galloway III settlement, by its terms, applied to 25
enumerated defendants (none of which were Martorello).  MEM.
OP., Galloway III, 3:19-cv-470, ECF No. 114 (E.D. Va. Dec. 18,
2020).

Martorello's fourth and final attack on ascertainability
(i.e., that mini-trials will be needed to ascertain whether
proposed class members' claims are barred by the statute of
limitations) will require more analysis.

### *Statute of Limitations*

With respect to Plaintiffs' usury and unjust enrichment
claims, Martorello asserts that the claims of some proposed
class members may be barred by the statute of limitations.
Resp. Mem. at 34, ECF No. 1007.  According to Martorello,
because class members took out loans at different times with
different payment schedules, the Court would essentially need to
have complex mini-trials to determine which class members are
still eligible to recover.  Plaintiffs respond that having

15

**SA204**

separate subclasses - with separate class periods - for both the usury and unjust enrichment claims will avoid any statute of limitations issues.

The class period for the proposed usury subclasses runs from June 22, 2015 to December 22, 2019. Prelim. Approval Mem. at 24, ECF No. 968. The statute of limitations for a claim based on a violation of Virginia state usury law is two-years after the last scheduled loan payment or the date of payment of the loan in full - whichever comes first. Va. Code. Ann. § 6.2-305. Because the case was filed on June 22, 2017 (i.e., two years after June 22, 2015), even the members of the proposed class who were making payments on their loans as far back as June 22, 2013 fall within the statute of limitations period.

Similarly, the class period for the proposed unjust enrichment subclasses runs from June 22, 2014 to December 20, 2019. The statute of limitations for a claim based on a violation of Virginia's unjust enrichment law is three years from accrual. Hengle v. Asner, 433 F. Supp. 3d 825, 893 (E.D. Va. 2020); see also 12A Michie's Jurisprudence § 12 (Limitation of Actions) (2021). As with the usury claim, because this case was filed on June 22, 2017 (i.e., three years after June 22, 2014), even the members of the proposed class who made payments on their loans as far back as June 22, 2014 fall within the statute of limitations period.

16

**SA205**

There are, therefore, no statute of limitations problems for the usury or unjust enrichment subclasses even though Plaintiffs entered into loan contracts at different times.

### 2. Numerosity

There is no bright-line threshold at which point a class is so numerous that joinder of all members is impracticable. Brown v. Transurban USA, Inc., 318 F.R.D. 560, 566 (E.D. Va. 2016). Whether joinder is impracticable is a fact-specific inquiry that depends not only on the number of class members but also on the circumstances of the case. Soutter v. Equifax Info. Servs., LLC, 307 F.R.D. 183, 199 (E.D. Va. 2015). "'Courts consider a number of factors in considering whether joinder is practicable including the size of the class, ease of identifying its numbers and determining their addresses, facility of making service on them if joined and their geographic dispersion.'" Soutter, 307 F.R.D. at 199 (quoting Adams v. Henderson, 197 F.R.D. 162, 170 (D. Md. 2000)).

Here, the numerosity requirement is easily met; the putative class consists of at least 12,530 individuals. Prelim. Approval Mem. at 26, ECF No. 968. Joinder of over 12,000 individuals would undoubtedly be impracticable. See Soutter, 307 F.R.D. at 199 (granting class certification for a class of approximately 1,000 consumers; see also William B. Rubenstein, 1 Newberg on Class Actions § 3:11 (5th ed. 2021) ("No specific

17

**SA206**

number alone is determinative of whether numerosity is present, but joinder is generally deemed practicable in classes with fewer than 20 members and impracticable in classes with more [than] 40 members.").

### 3. Commonality

The commonality requirement necessitates that there be common questions of law or fact among the class members such that common treatment is "necessary and beneficial."[10] Jeffreys v. Communs. Workers of Am., 212 F.R.D. 320, 322 (E.D. Va. 2003); Fed. R. Civ. P. 23(a)(2) (emphasis added). Accordingly, class members need not have suffered a violation of the same law. Branch v. Gov't Emples. Ins. Co., 323 F.R.D. 539, 546 (E.D. Va. 2018). And, "a class action will not be defeated solely because of some factual variances in individual grievances." Jeffreys, 212 F.R.D. at 322. As long as claims "arise from the same isolated set of facts," differences in the extent of each class member's injuries or damages will not prevent a finding that commonality exists." Jeffreys, 212 F.R.D. at 322.

Plaintiffs have met their burden of showing that commonality exists among the proposed classes. The proposed

---

[10] In a class action brought under Rule 23(b)(3) the commonality requirement will be "subsumed under, or superseded by, the more stringent Rule 23(b)(3) requirement that questions common to the class 'predominate over' other questions." Lienhart v. Dryvit Sys., 255 F.3d 138, 146 n.4 (4th Cir. 2001) (quoting Amchem Prods. v. Windsor, 521 U.S. 591, 609 (1997)). Nevertheless, the inquiries are distinct.

18

class members' claims are all based on the same tribal lending scheme, and in particular, on "the same conduct, practice, and procedure on the part of Martorello." Prelim. Approval Mem. at 27, ECF No. 968. The class members, therefore, share a common set of legal and factual questions. According to Plaintiffs, these include:

> (1) whether their interest rates violate Virginia's usury laws; (2) whether the choice-of-law provision in their loan agreements bar[s] enforcement of Virginia's usury laws; (3) whether the relationship between the various participants constitutes an enterprise as defined under RICO; (4) whether Martorello participated or operated in the management of the enterprise; (5) whether Martorello had knowledge of and agreed to the overall objective of the enterprise; and (6) whether the amounts paid by each consumer are recoverable against Martorello.

Prelim. Approval Mem. at 27-28, ECF No. 968. Moreover, several courts have found that commonality existed in comparable cases where class members brought suits challenging various tribal lending schemes. See Inetianbor, et al. v. Cashcall, Inc., et al., 13-6066-CIV-COHN/SELTZER (S.D. Fla., Sept. 19, 2016), Ex. 53, ECF No. 968-53; Macdonald v. CashCall, Inc., 333 F.R.D. 331, 342-43 (D.N.J. 2019). The same is true here.

### 4. Typicality

The typicality requirement necessitates that the claims of the representative plaintiffs be typical of those of the class. The typicality requirement does not require that the class representative's claims be identical to those of the class, but

19

the representative's claims "cannot be so different from the claims of absent class members that their claims will not be advanced by plaintiff's proof of [her] own individual claim.'" Branch v. Gov't Emples. Ins. Co., 323 F.R.D. 539, 547 (E.D. Va. 2018) (quoting Deiter v. Microsoft Corp., 436 F.3d 461, 466-67 (4th Cir. 2006)) (alteration in original). A class representative must generally be part of the class and have "the same interest and suffer the same injury as the class members." Deiter, 436 F.3d at 466. "The essence of the typicality requirement is captured by the notion that 'as goes the claim of the named plaintiff, so go the claims of the class.'" Id. (citation omitted).

The Court finds that the typicality requirement has been met. The Plaintiffs and proposed class representatives are Lula Williams, Gloria Turnage, George Hengle, Dowin Coffy, and Felix M. Gillison, Jr. (represented by Marcella P. Singh, the administrator of the Estate of Felix M. Gillison, Jr.).[11] See Prelim. Approval Mem. at 27, ECF No. 968. Plaintiffs are indeed

---

[11] Martorello objects to having the deceased Felix M. Gillison represent the class by way of his estate's administrator, Marcella P. Singh. Because the Court interprets this as a challenge to the representativeness of Singh, not whether Gillison's claims are typical of those of the class, the Court will confine its analysis of Singh's suitability as a class representative to the representativeness prong.

20

**SA209**

part of the proposed classes,[12] and all five Plaintiffs, as well as the proposed classes, obtained loans, with interest rates above 12%, from either Big Picture or Red Rock (i.e., the two lending entities affiliated with the LVD tribe).[13]   Prelim. Approval Mem. at 27, ECF No. 968.   Therefore, the proposed class representatives suffered the same injury and have the same basic legal claims as those of the proposed class members.   The only difference across class members would be the actual damages they are asserting which will not preclude a finding of typicality. Accordingly, as go the claims of the five Named Plaintiffs, so go the claims of the class.

### 5. Representativeness

The representativeness requirement ensures that the class will be adequately represented by the named plaintiffs and class counsel.   Branch v. Gov't Emples. Ins. Co., 323 F.R.D. 539, 548-49 (E.D. Va. 2018).   The requirement is satisfied "when: (1) the

---

[12] Williams and Turnage would be part of the Big Picture Loans RICO Class and the Usury and Unjust Enrichment Sub-classes. DECL. KRISTI KELLY ¶¶ 16-17, ECF No. 968-54.   Hengle would be part of the Red Rock RICO Class and the Usury and Unjust Enrichment Sub-classes.   DECL. KRISTI KELLY ¶ 18, ECF No. 968-54.   Coffy would actually be a part of all six classes.   DECL. KRISTI KELLY ¶ 19, ECF No. 968-54.   And, Gillison would only be a part of the Red Rock RICO class.   DECL. KRISTI KELLY ¶ 20, ECF No. 968-54.

[13] "Williams' loan was subject to an APR of 649.8%; Turnage's loan had an APR of 693.2%; Hengle's loan had an APR of 607.5%; Coffy's loan had an APR of 607.5%; and Gillison, Jr.'s loan had an APR of 627.2%."   Prelim. Approval Mem. at 22, ECF No. 968.

named plaintiff does not have interests antagonistic to those of the class; and (2) plaintiff's attorneys are qualified, experienced, and generally able to conduct the litigation." Brown v. Transurban USA, Inc., 318 F.R.D. 560, 567 (E.D. Va. 2016) (internal quotation marks omitted).

The Court finds that the representativeness requirement is satisfied for both the proposed Class Representatives and proposed Class Counsel. As noted under the analysis of the commonality and typicality factors, Plaintiffs' interests are in line with those of the broader classes, and Plaintiffs were, in fact, already named as class representatives in a related case. See Galloway III, 3:19-cv-470, ORDER ¶ 5, ECF No. 115. Accordingly, the Court finds that the proposed Class Representatives will adequately represent the interests of the class (including Felix Gillison, Jr. who will be discussed further below).

Proposed Class Counsel have extensive experience with class actions, consumer financial protection law, and tribal lending operations. See DECL. KRISTI C. KELLY ¶¶ 4-6, 8-13, ECF No. 968-54; DECL. LEONARD A. BENNETT ¶¶ 4-7, 9-17, 19-23, ECF No. 968-55; DECL. MICHELLE DRAKE ¶¶ 3-9, 11-12, ECF No. 965-56; DECL. BETH E. TERRELL ¶¶ 2-6, ECF No. 968-57; DECL. MATTHEW W.H. WESSLER ¶¶ 2-10, ECF No. 968-58; DECL. MICHAEL A. CADDELL ¶¶ 3-19, 22-33, ECF No. 968-59. The Court has already found them

22

**SA211**

competent in a related case, <u>Galloway III</u>, 2020 WL 7482191, at
*8 (E.D. Va. Dec. 18, 2020), and the Court reaffirms that
finding here.

### *Adequacy of Administrator*

Martorello challenges the appointment of Marcella Singh,
administrator of Felix Gillison, Jr.'s estate, as a class
representative on the ground that Singh has almost no first-hand
knowledge of the facts of the case. Resp. Mem. at 49, ECF No.
1007. The Court does not find this argument persuasive for
several reasons. First, Martorello consented to the
substitution of Marcella P. Singh for Felix Gillison, Jr.
following Gillison's death in June 2018. ORDER, ECF No. 200;
<u>see also</u> MEM. IN SUPP. OF MOT. TO SUBSTITUTE PARTY, ECF No. 187.
Second, allowing an estate administrator to serve as a class
representative in place of a deceased plaintiff is a generally
accepted practice.[14] See Rubenstein, 1 <u>Newberg on Class Actions</u>
§ 3.71 (5th ed.); <u>but see</u> <u>Chappelle v. E.I. Du Pont de Nemours &</u>
<u>Co.</u>, 75 F.R.D. 74, 79 n.10 (E.D. Va. 1977) (Merhige, J.)

---

[14] Some courts (though, to the Court's knowledge, none in this
circuit) have only allowed an executor to serve as a class
representative where (1) the beneficiaries of the estate consent
to the administrator's participation in the lawsuit and (2) the
executor assumes the costs of litigation personally so that the
estate will not bear the costs. Rubenstein, 1 <u>Newberg on Class
Actions</u> § 3.71 (5th ed.). The Court will decline to apply that
test in this case because it has no bearing on the substance of
the Defendant's argument.

23

(finding administrator of a deceased plaintiff's estate inadequate to serve as a class representative in a Title VII discrimination suit for "obvious reasons"[15]).    Third, on the facts of this case, it is not even clear what Martorello finds lacking in Singh's testimony.[16]    A class representative's knowledge of the case "need not be robust."    Rubenstein, 1 Newberg on Class Actions § 3:67 (5th ed.).   "It is hornbook law . . . that '[i]n a complex lawsuit, such as one in which the defendant's liability can be established only after a great deal of investigation and discovery by counsel against a background of legal knowledge, the representative need not have extensive knowledge of the facts of the case in order to be an adequate representative.'"   Gunnells v. Healthplan Servs., Inc., 348 F.3d 417, 430 (4th Cir. 2003) (citation omitted).   Plaintiffs' claims have never been based on any personal interactions with Martorello or any personalized knowledge of the internal workings of the LVD's lending operations, see Compl., ECF No. 1;

---

[15] With respect to Judge Merhige, the Court does not find the reasons obvious.

[16] If the Court has the deposition transcript of Marcella Singh, the Court is not aware of it.   The Court only knows of what Martorello reports regarding Singh's testimony.   See Resp. Mem. at 49, ECF No. 1007 ("Ms. Singh is also not an adequate class representative because she has virtually no knowledge—firsthand or otherwise—of any facts relating to this case. Ex. QQ, Singh Dep. Tr. at 12:17-25, 20:8-17, 18:19-19:8, 22:18-22. Her lone source of information, records she obtained through Plaintiffs' counsel, id. at 23:1-7, is insufficient.").

24

that information has come from discovery. Named Plaintiffs'
personal narratives have generally been confined to the fact
that they (1) applied for and received a loan from either Red
Rock or Big Picture — with an interest rate well above 12% and
(2) made payments on that loan.[17]  See, e.g., GEORGE HENGLE
DECL., ECF No. 190-20. Moreover, Plaintiffs have represented to
the Court that Singh, along with the other proposed class
representatives, has actively participated in the management of
the case. See DECL. KRISTI KELLY ¶ 14, ECF No. 968-54. Under
the circumstances, the Court finds that Marcella Singh, acting
as the administrator of the estate of Felix Gillison, Jr., is an
adequate class representative.

## B.   Rule 23(b)(3) Analysis

In addition to satisfying the Rule 23(a) factors, a class
must fit into one of the three Rule 23(b) class types. Fed. R.
Civ. P. 23(b). Here, the class is purported to be a Rule
23(b)(3) class. Class certification under Rule 23(b)(3) is
appropriate if (1) questions of law or fact common to class
members predominate over any questions affecting only individual
members, and (2) a class action is superior to other available
methods for fairly and efficiently adjudicating the controversy.
Fed. R. Civ. P. 23(b)(3).

---

[17] As noted in the discussion of ascertainability, that
information can also be verified with the LVD's loan records.

25

The Rule 23(b)(3) analysis will sometimes overlap with the merits of the underlying case, but "[t]hat cannot be helped." Branch v. Gov't Emples. Ins. Co., 323 F.R.D. 539, 545 (E.D. Va. 2018) (quoting Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 351 (2011)). However, "'Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent – but only to the extent – that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.'" Branch, 323 F.R.D. at 545 (quoting Amgen Inc. v. Conn. Ret. Plans & Trust Funds, 568 U.S. 455, 466 (2013)).

### 1. Predominance

Rule 23(b)'s inquiry into whether common questions of law or fact predominate over individual issues is distinct from the Rule 23(a) commonality requirement in that the predominance inquiry is more demanding. Comcast Corp. v. Behrend, 569 U.S. 27, 34 (2013). The more demanding standard is a function of the more "adventuresome" nature of Rule 23(b)(3) relative to Rules (b)(1) and (b)(2): Rule 23(b) "allows class certification in a much wider set of circumstances but with greater procedural protections." Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 362 (2011).

The predominance inquiry is fundamentally qualitative. Gunnells v. Healthplan Servs., 348 F.3d 417, 429 (4th Cir.

26

2003). That is to say, the predominance inquiry "is not simply a matter of counting common versus noncommon questions and checking the final tally." Soutter v. Equifax Info. Servs., LLC, 307 F.R.D. 183, 214 (E.D. Va. 2015). Rather, a court must look at the relationship between the common questions and the individual questions in the context of the case as whole. Krakauer v. Dish Network, LLC, 925 F.3d 643, 658 (4th Cir. 2019). "An individual question is one where a 'member of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will be sufficient for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'" Tyson Foods, Inc. v. Bouaphakeo, 136 S. Ct. 1036 (2016). So long as the overarching issue in a case is common to the class, class certification is still appropriate even if there are some individual issues (e.g., damages) that will need to be resolved. Krakauer, 925 F.3d at 658; Ealy v. Pinkerton Gov't Servs., 514 Fed. Appx. 299, 305 (4th Cir. 2013).

Here, Plaintiffs assert that common issues predominate because Plaintiffs' claims are entirely based on standardized loan contracts and standardized conduct by Martorello.

First, as a general matter, Courts have found that the predominance factor has been met in comparable cases, albeit in unpublished opinions. See, e.g., Inetianbor, et al. v. Cash

27

Call Inc., et al., 13-60066-CIV, at *3, *22 (Dec. 23, 2020), ECF
No. 958-53 (finding predominance met where plaintiff's legal
claims were against an alleged tribal lender and based on
violation of Florida's usury statute and Florida's Deceptive and
Unfair Trade Practices Act); Upshaw v. Ga. Catalog Sales, Inc.,
206 F.R.D. 694, 700-01 (M.D. Ga. 2002) (finding predominance met
in a payday lending case where plaintiffs' claims were based on
statute usury laws and RICO, defendants' conduct was
substantially the same with respect to all members of the class,
and defendants' primary defense applied to the class as a
whole). For example, in Purdie v. Ace Cash Express, Inc., the
court found that the predominance standard was met because of
(1) "the standardized nature of the payday loan transactions",
(2) "the uniform manner in which Defendants made, processed, and
collected on the loans", (3) the fact that "few variations exist
in the claims or the factual bases underlying the legal claims",
and (4) "the legal claims and theories asserted," namely
violations of "the Racketeer Influenced and Corrupt
Organizations Act ("RICO"), 18 U.S.C. § 1962(a), (c)& (d), the
Truth in Lending Act ("TILA"), 15 U.S.C. § 1602 et seq., the
Electronic Funds Transfer Act ("EFTA"), 15 U.S.C. § 1693 et
seq., the Fair Debt Collection Practices Act ("FDCPA"), 15
U.S.C. § 1692, et seq., state statutes regulating small loans,
the Texas Deceptive Trade Practices Act[, and] other state

consumer protection laws." 2003 U.S. Dist. LEXIS 22547, at *5, *13-14 (N.D. Tex. Dec. 11, 2003). As in those cases, here, there is strong and unrebutted evidence that Martorello's conduct was substantially the same with respect to all proposed class members.

Furthermore, as Plaintiffs correctly point out, "[c]ourts, when faced with class certification in RICO claims, often find that 'common issues predominate over individualized ones.'" Solomon v. Am. Web Loan, 2020 U.S. Dist. LEXIS 112782, *9 (E.D. Va. June 26, 2020) (Morgan, J.) (quoting Robinson v. Fountain Title Group Corp., 257 F.R.D. 92, 94 (D. Md. 2009)). This is due to the elements of the federal RICO statute and the proof necessary to make out a RICO claim. Williams v. Mohawk Indus., 568 F.3d 1350, 1357-58 (11th Cir. 2009).

And finally, although, for all of Plaintiffs' claims, damages for each proposed class member would need to be calculated on an individual basis, those damages could likely be calculated straight from the loan records that Plaintiffs anticipate receiving from Big Picture and Ascension (as opposed to damages for claims like emotional distress which might require extensive evidence for all individuals involved). Under these circumstances, Plaintiffs have met their burden to show that the predominance requirement is met, despite Martorello's many many arguments to the contrary.

29

**SA218**

Martorello attacks the predominance requirement on six, overlapping, grounds.  Plaintiffs respond that the Defendant is misstating the law or the facts in all of these arguments, and they are correct.

### a. Tracing Proposed Class Members' Payments

First, with respect to Plaintiffs' usury and unjust enrichment claims, Martorello argues that Plaintiffs cannot show that Martorello uniformly received loan payments from all of the proposed class members for the entire class period.  Resp. Mem. at 36, 44, ECF No. 1007.  According to Martorello, this is because loan payments were directly received by various tribal lending entities and only then passed to Martorello in a formula based on the total profitability of the lender.[18]  Resp. Mem. at 36, ECF No. 1007.  Therefore, says Martorello, "[t]he issue of whether specific interest payments . . . ever reached Martorello over the class period requires individualized analysis and does not predominate through the class period."  Resp. Mem. at 35-36, ECF No. 1007.

To be clear, it is undisputed that, over time, substantial parts of the loan payments passed from Red Rock and Big Picture to Martorello through various entities.  See Hearing Tr. 107:19-25, ECF No. 1104.  Martorello is simply trying to argue that

---

[18] And, to further complicate matters, as the LVD's lending operations evolved so did the path by which money made its way from consumer loan payments to Martorello's financial accounts.

Plaintiffs have no way of knowing which borrower's repayments made their way into Martorello's pocket because Martorello was paid based on the overall profitability of the lending operation. Hearing Tr. 107:19-108:4, ECF No. 1104. Martorello may very well be right that Plaintiffs cannot track the dollars paid by each individual class member straight into Martorello's financial accounts. However, that is not how Plaintiffs propose to prove that Martorello received payments on usurious loans. Rather, Plaintiffs propose to look to the contracts between each lender (i.e., Red Rock and Big Picture) and the Martorello Defendants to show that between 2013 and 2016, Martorello received 98% of Red Red's gross revenue from loans, and between 2016 and 2020, Martorello received 95% of Big Picture's gross revenue from loans. That, says Plaintiffs, is sufficient to show that Martorello was receiving payments on usurious loans, and therefore, being unjustly enriched. See Reply Mem. at 21-24, ECF No. 1055.

The Court agrees with Plaintiffs. Based on the proof that Plaintiffs propose to offer, it is clear that common facts will predominate and those facts are highly susceptible to class-wide proof.

### b. Martorello's Allegedly Changing Role

Next, Martorello makes the same basic argument three times: because of his changing role over time, class members will be

31

situated differently vis-à-vis each other over the class period
with respect to several elements of Plaintiffs' claims. These
elements include (1) whether Martorello participated in the
collection of unlawful debt in the same manner over the relevant
class periods, Resp. Mem. at 41, 46, ECF No. 1007; (2) whether
Martorello participated in the conspiracy to collect unlawful
debt in the same manner over the relevant class periods, Resp.
Mem. at 46, ECF No. 1007; and (3) whether "Martorello committed
or authorized any intentional tort(s) on behalf of the lender,"
Resp. Mem. at 39, ECF No. 1007. As noted in Part I.D, the Court
does not credit Martorello's arguments that Martorello played
only a minor, supporting role in the LVD's lending operations or
that his role changed meaningfully between June 22, 2013 and
December 22, 2019. Martorello was the de facto head of the
LVD's lending operations at all relevant times. At trial,
Plaintiffs would, nevertheless, still need to prove that
Martorello was sufficiently involved in the LVD's lending
operations to be liable under each of Plaintiff's four legal
theories for the duration of the relevant class periods, but
facts surrounding Martorello's involvement will be highly
amenable to class-wide proof.

### c. Proximate Cause and Plaintiffs' RICO Injuries

With respect to Plaintiffs' RICO claims, Martorello argues
that, because he was never really in charge of the LVD's lending

32

operations, he could not have "proximately caused" harm to Plaintiffs. Resp. Mem. at 41, ECF No. 1007. Whether Martorello caused the class members' injury is a merits question to be resolved at a later stage. Martorello has not credibly explained why the facts surrounding "proximate cause" would create individualized issues.

### d. Injury to Plaintiffs/Benefit Conferred

With respect to Plaintiffs' unjust enrichment claims, Martorello also attempts to argue that some Plaintiffs did not confer a benefit on Martorello because they paid back less than they received on their loans.[19] Plaintiffs' respond that, under Virginia law, a contract with an interest rate above the legal limit (here 12%) is void. Hearing Tr. 48:4-10, ECF No. 1104. To make out a claim for unjust enrichment under Virginia law, a plaintiff must show that he or she (1) conferred a benefit on the defendant; (2) the defendant knew of the benefit; and (3) the defendant accepted or retained the benefit "under circumstances that 'render it inequitable for the defendant to retain the benefit without paying for its value.'"

---

[19]   Martorello also repeats a version of this argument in a section of his Response Memorandum titled "THE CLASS DEFINITION FAILS BECAUSE MANY PROPOSED MEMBERS WERE NOT INJURED BY MARTORELLO," but there, the argument appears to apply to more than just unjust enrichment claims. Resp. Mem. at 46, ECF No. 1007. The distinction will not save the argument. If the loan contracts were usurious, they were void, and any payment on them was an injury to Plaintiffs.

33

Microstrategy, Inc. v. Netsolve, Inc., 368 F. Supp. 2d 533, 536 (E.D. Va. 2005) (quoting Nossen v. Hoy, 750 F. Supp. 740, 744-45 (E.D. Va. 1990)). Under Virginia law, "[a]ny contract made in violation of [Virginia's usury laws] is void and no person shall have the right to collect, receive, or retain any principal, interest, fees, or other charges in connection with the contract." Va. Code. Ann. § 6.2-303(F). So, says Plaintiffs, any money paid on a void contract could constitute a benefit for the purposes of an unjust enrichment. Hearing Tr. 48:4-10, ECF No. 1104. The Court agrees. Moreover, Martorello has not explained why the Plaintiffs are not correct.

### 2. Superiority

The superiority element requires that a class action be superior to other available methods for fairly and efficiently adjudicating the controversy. Fed. R. Civ. P. 23(b)(3). Relevant factors include: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3). Although the factors in Rule 23(b)(3)(A)-(D) theoretically apply to predominance and superiority, most courts

34

use the factors exclusively for the superiority analysis. Rubenstein, 2 Newberg on Class Actions § 4.64 (5th ed.).

A class action would clearly be a superior method of fairly and efficiently adjudicating this case. First, the key factual issues for each putative class member would be the same, with only damage amounts changing from person to person. Reply Mem. at 35, ECF No. 1055. Second, there are 12,530 putative class members, and re-litigating the same issues even 100 times would be an unnecessary and untenable burden on the judicial system.[20] Third, it is not likely that class members' individual damages, which are tied to their relatively small-dollar loans, would be enough to justify bringing individual lawsuits. Soutter v. Equifax Info. Servs., LLC, 307 F.R.D. 183, 218 (E.D. Va. 2015) (quoting Calvin v. Home Loan Ctr., Inc., 236 F.R.D. 387, 396 (N.D Ill. May 10, 2006)) ("[T]here is a strong presumption in favor of finding superiority" where "the alternative to a class action is likely to be no action at all for the majority of class members."). Under these circumstances, a class action is both fair and efficient.

Martorello asserts that a class action would not be superior due to manageability issues. Resp. Mem. at 48, ECF No. 1007. Martorello bases this challenge on two arguments. First,

---

[20] This case (not to mention its brethren) has now been litigated for four years and involves over 1,000 electronic filings.

he appears to be arguing that there is a risk that a significant number of proposed class members could bring suits individually. See Resp. Mem. at 48, ECF No. 1007.  But, as noted above, the Court does not find that likely.  Second, Martorello asserts, as he has before, that there will be intraclass differences due to his "ever-shifting, relationships, and responsibilities over time."  As noted in Part I.D, the Court does not find that argument credible.

CONCLUSION

For the foregoing reasons, PLAINTIFF'S RENEWED MOTION FOR CLASS CERTIFICATION OF CLAIMS AGAINST DEFENDANT MATT MARTORELLO (ECF No. 967) ("Preliminary Approval Motion") will be granted.

It is so ORDERED.

/s/            REP
Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: July 19, 2021

36

**SA225**



**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

LULA WILLIAMS, *et al.*,

    Plaintiffs,

v.                                      Civil Action No. 3:17-cv-461

BIG PICTURE LOANS, LLC, *et al.*,

    Defendants.

<b>ORDER</b>

This matter comes before the Court on Plaintiffs'
Renewed Motion to Certify a Class (ECF No. 967). Upon
consideration of the Motion, and Defendant's opposition
thereto, the Court hereby GRANTS the Motion.

1. For the reasons stated in the Court's prior
Memorandum Opinion (ECF No. 1106), the Court finds that
Plaintiffs have not waived their right to bring a class
action.

2. Pursuant to Rule 23 of the Federal Rules of Civil
Procedure, the Court certifies the following Classes
("Classes"):

> (a) **Big Picture RICO Class:** All Virginia consumers
> who entered into a loan agreement with Big
> Picture where a payment was made from June 22,
> 2013 to December 20, 2019.
>
>     (i) **Big Picture Usury Sub-class:** All

Virginia consumers who paid any principal, interest, or fees on their loan with Big Picture from June 22, 2015 to December 20, 2019.

(ii) **Big Picture Unjust Enrichment Sub-class**: All Virginia consumers who paid any amount on their loan with Big Picture from June 22, 2014 to December 20, 2019.

(b) **Red Rock RICO Class**: All Virginia consumers who entered into a loan agreement with Red Rock where a payment was made from June 22, 2013 to December 20, 2019.

(i) **Red Rock Usury Sub-class**: All Virginia consumers who paid any principal, interest, or fees on their loan with Red Rock from June 22, 2015 to December 20, 2019.

(ii) **Red Rock Unjust Enrichment Sub-class**: All Virginia consumers who paid any amount on their loan with Red Rock from June 22, 2014 to December 20, 2019.

3. As detailed in the accompanying Memorandum Opinion, the prerequisites to a class action under Fed. R. Civ. P. 23(a) have been preliminarily satisfied in that:

(a) the Classes are so numerous that joinder would be impractical;

(b) the claims of the Plaintiffs are typical of those of the other members of the Classes;

(c) there are questions of fact and law that are common to all members of the Classes; and

(d) the Plaintiffs will fairly and adequately protect the interests of the Classes and have

**SA227**

retained counsel experienced in consumer class action litigation who have and will continue to adequately represent the Classes.

4. Pursuant to Fed. R. Civ. P. 23(b)(3), the Court further finds that this action is maintainable as a class action because: (1) a class action is a fair and efficient adjudication of this controversy; and (2) questions of fact and law common to the members of the Classes predominate over any questions affecting only individual members.

5. The Court appoints Lula Williams, George Hengle, Gloria Turnage, Dowin Coffy and Marcella Singh, as administrator for Felix Gillison, Jr.'s estate as the Class Representatives. The Court also appoints the law firms of Kelly Guzzo, PLC, Consumer Litigation Associates, P.C., Terrell Marshall Law Group, PLLC, Berger Montague, P.C., and Caddell & Chapman as counsel for the Class ("Class Counsel").

6. Pursuant to the Court's March 12, 2019 Order (ECF No. 416), Class Counsel shall notify TranDotCom Solutions, LLC of this decision to arrange for the transmission of the necessary data to notify the Classes.

7. Class Counsel and Defendant Martorello shall confer to file a Notice Plan no later than two weeks from the date

Case 3:17-cv-00461-REP   Document 1111   Filed 07/20/21   Page 4 of 4 PageID# 47400

of the entry of this Order. If the parties cannot agree on a

Notice Plan, each side shall submit a pleading no longer

than five pages no later than 21 days after the entry of

this Order.

    **IT IS SO ORDERED.**

                           /s/

                  Robert E. Payne
                  Senior United States District Judge

Richmond, Virginia
Date: July  19 , 2021

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

LULA WILLIAMS,
et al.,

     Plaintiffs,

v.                   Civil Action No. 3:17cv461

BIG PICTURE LOANS, LLC,
et al.,

     Defendants.


## FINAL JUDGMENT ORDER


     Having granted the PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT on COUNT THREE of the CLASS ACTION COMPLAINT (ECF No. 1165) as set forth in the ORDER (ECF No. 1328), and the MEMORANDUM OPINION (ECF No. 1398) having granted summary judgment on COUNT TWO of the CLASS ACTION COMPLAINT (ECF No. 1373) and (ECF No. 1350); having ruled on the PLAINTIFFS' OMNIBUS MOTIONS *IN LIMINE* (ECF No. 1173) as reflected in the ORDER (ECF No. 1328), having denied DEFENDANT MATT MARTORELLO'S MOTION FOR SUMMARY JUDGMENT (ECF No. 1254) as set forth in the ORDER (ECF No. 1354) and the MEMORANDUM OPINION (ECF No. 1392) and having entered the ORDER (ECF No. 1374) and the JOINT NOTICE AND STIPULATION REGARDING § 1962(c) DAMAGES (ECF No. 1389), it is hereby ORDERED that judgment is hereby entered in favor of the Plaintiffs, as representatives

SA230

of the Certified Class (see ORDER (ECF No. 1111) and against the defendant Matt Martorello as follows:

(1)  For relief under COUNT TWO of the CLASS ACTION COMPLAINT, Matt Martorello shall pay damages to the Plaintiffs, as representatives of the Certified Class, in the amount of $43,401,817.47 with interest at the federal judgment rate of 5.35% per annum from July 7, 2023 until paid in full (none of which may be setoff based on any prior settlement of any part of the Plaintiffs' Class Claims;1 and

(2)  For relief under COUNT THREE of the CLASS ACTION COMPLAINT, Matt Martorello shall pay damages to the Plaintiffs, as representatives of the Certified Class, in the amount of $43,401,817.47 with interest at the federal judgment rate of 5.35% per annum from July 7, 2023 until paid in full (none of which may be set off based on any prior settlement of any part of the Plaintiffs' Classes' Claims.

It is further ORDERED that, upon motion of the Plaintiffs and agreement of Matt Martorello, COUNTS ONE, FOUR, and FIVE of the

---

1 Pursuant to 18 U.S.C. § 1964, the total cumulative amount of damages paid for relief under COUNT TWO and COUNT THREE of the CLASS ACTION COMPLAINT shall not exceed $43,401,817.47 with interest at the federal judgment rate of 5.35% per annum from July 7, 2023 until paid in full (none of which may be set off based on any prior settlement of any part of the Plaintiffs' Class Claims).

2

**SA231**

Case 3:17-cv-00461-REP  Document 1407  Filed 09/22/23  Page 3 of 3 PageID# 58404

CLASS ACTION COMPLAINT are dismissed without prejudice and with leave to amend; and

It is further ORDERED that, upon agreement of the parties, the time for filing a bill of costs and petition for attorneys' fees shall be extended until ninety (90) days after final resolution of any appeal.

It is so ORDERED.

_____ /s/ _____

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: September 21, 2023

3

**SA232**